IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA      )  CAUSE NO. 3:04-CR-240-G
                              (
vs.                           )
                              (  JULY 26, 2007
                              )  DALLAS, TEXAS
HOLY LAND FOUNDATION, ET AL   (  1:30 P.M.

_____


VOLUME 3-B

_____


STATEMENT OF FACTS


BEFORE THE HONORABLE A. JOE FISH
UNITED STATES DISTRICT JUDGE
and a jury

_____




A P P E A R A N C E S




        FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                              1100 COMMERCE, 3RD FLOOR
                              DALLAS, TEXAS  75242
                              BY:  MR. JIM JACKS
                                   MR. BARRY JONAS
                                   MS. ELIZABETH SHAPIRO
                                   MR. NATHAN GARRETT

        FOR THE DEFENDANT:    FREEDMAN, BOYD, DANIELS
        (SHUKRI BAKER)        & HOLLANDER
                              20 FIRST PLAZA, SUITE 700
                              ALBUQUERQUE, NEW MEXICO 87102
                              BY:  MS. NANCY HOLLANDER
                                   MS. TERESA DUNCAN

1      FOR THE DEFENDANT:    LAW OFFICE OF JOSHUA L. DRATEL
       (MOHAMED EL-MEZAIN)   14 WALL STREET, 28TH FLOOR
2                            NEW YORK, NEW YORK  10005
                             BY:  MR. JOSHUA DRATEL
3                                 MR. AARON J. MYSLIWIEC

4      FOR THE DEFENDANT:    LAW OFFICE OF MARLO P. CADEDDU
       (MUFID ABDULQADER)    3232 McKINNEY AVENUE, SUITE 700
5                            DALLAS, TEXAS  75204
                             BY:  MS. MARLO P. CADEDDU
6
       FOR THE DEFENDANT:    LAW OFFICE OF LINDA MORENO
7      (GHASSAN ELASHI)      P.O. BOX 10985
                             TAMPA, FLORIDA  33679
8                            BY:  MS. LINDA MORENO

9                            JONES DAY
                             555 CALIFORNIA ST., 26TH FLOOR
10                           SAN FRANCISCO, CA  94104
                             BY:  MR. JOHN D. CLINE
11
       OFFICIAL COURT REPORTER:    SHAWN M. McROBERTS, RMR, CRR
12                                 1100 COMMERCE STREET, RM. 1654
                                   DALLAS, TEXAS  75242
13                                 (214) 753-2349

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Good afternoon, ladies and gentlemen.

2     Let me introduce to you Mr. Shawn McRoberts who is reporting

3     for us this afternoon.  The lady who has been reporting, Ms.

4     Cass Casey, was taken ill at the end of the morning session,

5     so Mr. McRoberts is pinch-hitting for us this afternoon.

6          Go ahead, Mr. Jacks.

7          MR. JACKS:  Thank you, Your Honor.

8     Q.   (BY MR. JACKS)  Agent Burns, I believe before we stopped

9     for the lunch break you were talking about some public record

10    documents that you had obtained during the course of your

11    investigation.  Is that correct?

12    A.   That is correct.

13    Q.   And I believe we were talking about Government's Exhibit

14    No. 11-41.  And let me ask you, do you have a copy of that in

15    front of you, a paper copy?

16    A.   I do.

17    Q.   How many pages is that exhibit?

18    A.   Four pages.

19    Q.   And can you see there on the screen in front of you one

20    of those pages?

21    A.   Yes.

22    Q.   All right.  And I believe this was the page that we had

23    reached when we stopped for our break.  If you could, just

24    tell us what is depicted on that particular page of that

25    exhibit.

A.   The name and respective addresses of the directors or

trustees for the Holy Land Foundation.

Q.   Go ahead.  Just tell us who is shown there as the

director and their city of residence.

A.   Mohammad El-Mezain, 151 Derrom Avenue, Patterson, New

Jersey, Shukri Baker, 1111 Abrams Road, 103, Richardson,

Texas, Ghassan Elashi, 850 North Dorothy Drive, Suite 516,

Richardson, Texas.

Q.   And go to the next paragraph, please.  And that shows

what or lists whom?

A.   The names and addresses of the respective officers.

Q.   And are those, essentially, those names the same as in

paragraph nine?

A.   Yes, they are.

Q.   And it shows to be -- this application to have been filed

on what date or completed on what date?

A.   September 28th, 1992.

Q.   Can you tell me, is there another page to that exhibit?

A.   There is.

Q.   Would you go to that, please?

     Now, this exhibit purports to be from what entity or

organization?

A.   The Secretary of State for California.

Q.   And is it a part, nonetheless, of the records that were

filed with the Texas Secretary of State?

1    A.    Yes.

2    Q.    And if you could, just summarize what is contained

3    within, say, those first two or three paragraphs.

4    A.    It Says that the Occupied Land Fund was incorporated

5    under the laws of the state of California on January 11th,

6    1989.

7          It states that on September 16th, 1991, that a

8    certificate of amendment was filed changing the name of the

9    Occupied Land Fund to the Holy Land Foundation for Relief and

10   Development, and that on March 25th, 1992, the H.L.F. filed a

11   Statement by Domestic Nonprofit Corporation in accordance with

12   several I guess codes or sections of their corporations code,

13   and that the address was 5855 Green Valley Circle, No. 207,

14   Culver City, California.

15   Q.    Is that the last page of that exhibit?

16   A.    It is.

17   Q.    All right.  Let me direct your attention, do you have in

18   front of you an item labeled as Government's Exhibit No. 8-1?

19   A.    I don't know that I have that one with me.

20   Q.    Let me ask you -- I will move on to another subject

21   matter.  Did you seek records pertaining to an organization

22   called the Islamic Association for Palestine, or I.A.P.?

23   A.    Yes, I did.

24   Q.    Do you have Government's Exhibit No. 11-33 in front of

25   you?

1    A.    Yes.

2    Q.    And how long is that exhibit in terms of the number of

3    pages?

4    A.    Four pages.

5    Q.    And would you just tell us where that exhibit was

6    obtained from, whose records are contained within that

7    exhibit?

8    A.    The Secretary of State for California.

9    Q.    And does that have a certification as to whether or not

10   it is an official public record from the state of California?

11   A.    It does.

12          MR. JACKS:  Judge, we move the admission of

13   Government's Exhibit No. 11-33.

14          THE COURT:  Any objection?

15          MS. HOLLANDER:  No objection.

16          THE COURT:  Government's Exhibit No. 11-33 is

17   admitted.

18   Q.    (BY MR. JACKS)  Agent Burns, is this the first page of

19   that exhibit?

20   A.    Yes.

21   Q.    And is it the certification that refers to the exhibits

22   or the papers that follow?

23   A.    Yes.

24          MR. JACKS:  Let's go to the second page, please.  Q.

25          (BY MR. JACKS)  And again, is this part of the

1    certification from the Secretary of State of California?

2    A.    Yes, it is.

3            MR. JACKS:  The third page, please.

4    Q.    (BY MR. JACKS)  And what is depicted on the third page,

5    Agent Burns, if you don't mind?

6    A.    These are the articles of incorporation of the Islamic

7    Association for Palestine.

8    Q.    And does it show when they were filed with the California

9    Secretary of State?

10   A.    November 12th, 1986.

11   Q.    And is that the stamp that appears in the upper right

12   hand corner?

13   A.    Yes.

14   Q.    Would you please tell us what is stated in paragraph II?

15   A.    "This corporation is a religious corporation, and is not

16   organized for the private gain of any person.  It is organized

17   under the Nonprofit Religious Corporation Law primarily for

18   religious purposes."

19   Q.    And with regard to paragraph III, who is shown to be the

20   agent for service of that corporation?

21   A.    Ghassan Elashi.

22   Q.    And that address, can you tell us, is that the same

23   address that appeared in the California Secretary of State's

24   records for the Occupied Land Fund?

25   A.    I believe it is.  Let me double check.  Yes, it is.

1        MR. JACKS:  Let's go to the full page of this

2   particular exhibit.  And would you please enlarge, if you

3   don't mind, Paragraph C.

4   Q.   (BY MR. JACKS)  Agent Burns, would you tell us what is

5   shown in Paragraph C?

6   A.   It states, "No substantial part of the activities of this

7   corporation shall consist of carrying on propaganda, or

8   otherwise attempting to influence legislation, and the

9   corporation shall not participate or intervene in any

10  political campaign (including the publishing or distribution

11  of statements) on behalf of any candidate for public office."

12  Q.   And who is shown to have signed that document as the

13  incorporator?

14  A.   Ghassan Elashi.

15  Q.   And the date of that signature?

16  A.   November 5th, 1986.

17  Q.   Is that the last page of that exhibit?

18  A.   It is.

19  Q.   Do you have Exhibit No. 11-13 in front of you?

20  A.   Yes, I do.

21  Q.   How many pages is that exhibit?

22  A.   Three pages.

23  Q.   And where did that exhibit come from?

24  A.   The Secretary of State for Texas.

25  Q.   And what does it pertain to?  What organization does it

1    pertain to?

2    A.    The Islamic Association for Palestine.

3            MR. JACKS:  Judge, we move the admission of

4    Government's Exhibit No. 11-13.

5            THE COURT:  Any objection?

6            MS. HOLLANDER:  This one is not on the screen, so I

7    am having a little trouble figuring out which one it is.  Do

8    you have this one?

9            MR. JACKS:  Do you want it on the screen to look at

10   it?

11           MS. HOLLANDER:  Yes.

12           MR. JACKS:  Would you go ahead and put it on the

13   screen?

14   Q.    (BY MR. JACKS)  Can you see it, Agent Burns?  Is it in

15   front of you?

16   A.    I can, and the front cover of the exhibit is not the

17   correct exhibit.

18   Q.    Okay.  We will come back to that, then.

19         Let me ask you to look at 11-12.  Do you have that in the

20   binder?

21   A.    I do.

22   Q.    And how many pages is that exhibit?

23   A.    Six pages.

24   Q.    And that exhibit was derived from what agency?

25   A.    It appears to be the Dallas County Clerk's Office.

1   Q.   And is there a certification on the front of that

2   exhibit?

3   A.   It is on the back actually.

4   Q.   All right.  And what does it pertain to?

5   A.   The Islamic Association for Palestine in North America.

6           MR. JACKS:  Would move the admission of Government's

7   Exhibit No. 11-12.

8           THE COURT:  Any objection?

9           MS. HOLLANDER:  I believe that the incorporation

10  document is just one part of the exhibit and there is some

11  additional pages.  Are you moving the whole thing?

12          MR. JACKS:  Yes.

13          MS. HOLLANDER:  No objection, Your Honor.

14          THE COURT:  Government's Exhibit No. 11-12 is

15  admitted.

16  Q.   (BY MR. JACKS)  Agent Burns, is this the first page of

17  the exhibit?

18  A.   It is.

19  Q.   And just describe, if you would, Agent Burns, what this

20  document purports to be.

21  A.   This is filed with the assumed name records certificate

22  of ownership for unincorporated business or profession.

23  Q.   And what business or profession is represented to be

24  filing this document?

25  A.   The Islamic Association for Palestine in North America.

1    Q.    And their address, please?

2    A.    13931 North Central Expressway, 318-411, Dallas, Texas.

3    Q.    Can you see in terms of -- There is some boxes there to

4    be checked regarding the type of business, and what box is

5    checked and what description is in there for the manner in

6    which this business is to be conducted?

7    A.    Yes.  It says "association."

8    Q.    The box there, the outlined box, what is contained within

9    that square?

10   A.    A certificate of ownership.

11   Q.    And is that plural?  Does it show to be plural owners?

12   A.    Yes, it does.

13   Q.    Okay.  And who is shown to be the owners of this

14   association, if you will?

15   A.    Ghassan A. Dahduli at P.O. Box 741805, Dallas, Texas, and

16   Basman Elashi at 13931 North Central Expressway, 318-411,

17   Dallas, Texas.

18   Q.    And would you indicate if there is a date or signatures

19   or names printed for those two individuals there?

20   A.    Yes.  Ghassan Dahduli and Basman Elashi, and the date is

21   March 18th, 1993.

22   Q.    Do you see the stamp that appears on that page also?

23   A.    Yes, in the upper right hand corner.

24   Q.    All right.  What date is represented in that stamp?

25   A.    March 8th, 1993.

1  Q.   And what is shown on this second page, if you will, Agent

2  Burns?

3  A.   The certificate of authenticity.

4  Q.   From the Dallas County clerk?

5  A.   Yes.

6        MR. JACKS:  Okay.  Next page.

7  Q.   (BY MR. JACKS)  And was this page included among the

8  records that were filed with the Dallas County clerk that you

9  got from the Dallas County clerk for this entity?

10  A.   Yes.

11  Q.   And just, if you would, just tell us what it purports to

12  be.

13  A.   The articles of incorporation for the American Middle

14  Eastern League for Palestine.

15  Q.   And when and where does that document show to have been

16  filed, based on the stamp?

17  A.   Based on the stamp it is with the Secretary of State of

18  Texas on March 2nd, 1990.

19  Q.   All right.  And if you would, could you tell us what is

20  stated in Article Four?

21  A.   It states, "The purpose for which the corporation is

22  organized are:

23        To encourage the general public to study the Middle East

24  and its social, religious and political history.

25        To promote cooperation among all groups, business,

1   ethnic, religious and political.

2        To conduct educational services in the fields of

3   religion, education, society and history concerning

4   Palestinian issues both in the United States and abroad."

5             MR. JACKS:  Could you show paragraph six on that

6   document?

7   Q.   (BY MR. JACKS)  And just tell us, if you would, or

8   briefly what is stated in Article Six?

9   A.   It says, "The number of directors constituting the

10  initial board of directors is three (3), and the name and

11  address of the persons who are to serve as directors until the

12  first annual meeting of the shareholders or their successors

13  are elected and qualified is:

14       Ahmed Agha, 2500 Wildwood Ponca City, Oklahoma.

15       Yasser K. Saleh Bushnaq, P.O. Box 741805, Dallas, Texas.

16       Ismail Elbarasse 5942 Jennings Lane, Springfield,

17  Virginia."

18  Q.   Now, where have you -- You testified earlier about an

19  Ismail ElbarasseElbarasse Is that correct?

20  A.   That is correct.

21  Q.   And what was the subject of your testimony about

22  Ismail -- Where did you make reference to him earlier today?

23  A.   You had asked me a question about Mr. Elbarasse, and I

24  can't remember exactly in what context that question was.

25  Q.   Well, was that one of the search warrants that was

1  executed?

2  A.   Yes, it was.

3  Q.   In northern Virginia?

4  A.   Yes.

5  Q.   And what is shown in Article Seven there as the

6  incorporator?

7  A.   It states the incorporator is Yasser K. Saleh Bushnaq at

8  the same address as listed on the previous page.

9  Q.   And when was this document signed, according to the

10  verification there?

11  A.   February 27th, 1990.

12  Q.   Is there another page to that exhibit?

13  A.   Yes, there is.

14  Q.   And just Paragraph 1, if you would just tell us generally

15  what it states.

16  A.   This is an assumed name certificate for an incorporated

17  business or profession, and it says, "The assumed name under

18  which the business or professional service is to be conducted

19  is the Islamic Association for Palestine in North America,

20  (I.A.P.)."

21  Q.   And does it have a date stamp there when this document

22  was filed?

23  A.   March 8th, 1990.

24  Q.   All right.  So that paragraph you just read says the

25  assumed name that it will operate under.  Is that correct?

1    A.    That is correct.

2    Q.    What does the next paragraph say regarding its corporate

3    name?

4    A.    It says that "The name of the incorporated business or

5    profession as stated in its Articles of Incorporation"--I

6    can't read the last word--"is the American Middle Eastern

7    League for Palestine."

8    Q.    And then does it contain an address, the same address

9    that appeared on the earlier page?

10   A.    It says an address of Two Oaks Plaza, 6730 LBJ Freeway,

11   Suite 2150, Dallas, Texas, and has the same P.O. Box listed in

12   the latter part of the document as the earlier P.O. Box

13   741805, Dallas, Texas.

14   Q.    And does that contain another date stamp on it on the

15   left hand side there?

16   A.    Yes, it does.

17   Q.    For what date?

18   A.    March 8th, 1990.

19   Q.    Is there another page to that exhibit?

20   A.    Yes, there is.

21   Q.    Would you please go to that page, please?  And is that

22   the certification regarding those records from the Dallas

23   County clerk?

24   A.    Yes, it is.

25   Q.    Is that the last page of the exhibit?

A.    Yes.

Q.    Do you recall Doctor Levitt's testimony regarding the Hamas charter or covenant?

A.    Yes, I do.

Q.    Do you recall his testimony regarding one of the publishers of the Hamas covenant?

A.    I do.

          MR. JACKS:  Could you show Government's Exhibit No. 3-12?

     May I approach the witness, Your Honor?

          THE COURT:  Yes, sir.

Q.    (BY MR. JACKS)  Agent Burns, I am going to show you the original of Government's Exhibit No. 3-12.  And have you seen that item before?

A.    Yes, I have.

Q.    What is it?

A.    This is a copy of the Hamas charter that was published by the I.A.P.

Q.    That particular copy, where was it recovered?

A.    It was recovered from the home of Ismail Elbarasse.

Q.    During that search warrant you testified about earlier?

A.    Yes.

Q.    Now, you mentioned in your testimony or there was reference to an organization called A.M.E.L.  Did you locate other public records regarding this A-M-E-L?

1   A.   Yes, I did.

2   Q.   Do you have Government's Exhibit No. 11-2 in front of

3   you?

4   A.   Yes, I do.

5   Q.   And how many pages does that exhibit consist of?

6   A.   Two pages.

7   Q.   And where did those documents come from?

8   A.   The Secretary of State of Texas.

9   Q.   Is there a certification that they are records from the

10  Secretary of State?

11  A.   Not with this exhibit.

12  Q.   With regard to that exhibit, what entity does it refer

13  to?

14  A.   The American Middle Eastern League for Palestine.

15           MR. JACKS:  Judge we move the admission of

16  Government's Exhibit No. 11-2.

17           THE COURT:  Any objection?

18           MS. HOLLANDER:  No objection, Your Honor.

19           THE COURT:  Government's Exhibit No. 11-2 is

20  admitted.

21           MR. JACKS:  Would you show the first page, please?

22  Q.   (BY MR. JACKS)  Now, is there a date stamp on this

23  exhibit showing when it was filed and what agency it was filed

24  with?

25  A.   Yes.  It was filed on March 2nd, 1990 with the Secretary

1    of State for Texas.

2    Q.    And this exhibit is what?

3    A.    The Articles of Incorporation for the American Middle

4    Eastern League for Palestine.

5    Q.    And does this look like a copy of the document that was

6    included in the Dallas County clerk's records?

7    A.    Yes, it appears to be.

8    Q.    All right.  Is it the same as part of the records that

9    were -- you talked about in Government's Exhibit No. 11-12

10   just a few moments ago?

11   A.    Yes.

12   Q.    All right.  Do you have Government's Exhibit No. 11-35 in

13   front of you?

14   A.    Yes, I do.

15   Q.    And that particular exhibit consists of how many pages?

16   A.    Four pages.

17   Q.    I am sorry?

18   A.    Four pages.

19   Q.    Where did it come from, those particular documents?

20   A.    The Dallas County Clerk's Office.

21   Q.    And are they certified as official public records from

22   the Dallas County Clerk's Office?

23   A.    Yes.

24   Q.    Pertaining to what entity?

25   A.    The Islamic Association for Palestine in North America,

1    I.A.P.

2              MR. JACKS:  Move the admission of Government's

3    Exhibit No. 35, Your Honor.

4              THE COURT:  Any objection?

5              MS. HOLLANDER:  No objection.

6              THE COURT:  Government's Exhibit No. 11-35 is

7    admitted.

8              MR. JACKS:  Would you show the first page, please?

9    Q.   (BY MR. JACKS)  Now, Agent Burns, is this merely another

10   copy of the document that was contained within the records of

11   the Dallas County clerk?

12   A.   Yes.

13   Q.   And regarding this entity A.M.E.L.

14   A.   That is correct.

15   Q.   And of those pages that you have in front of you, are any

16   of them pages that you haven't identified previously to the

17   jury?

18   A.   No.

19   Q.   All right.  Let me ask you to look at Government's

20   Exhibit No. 11-10, if you have that in front of you.

21   A.   Yes.

22   Q.   No. 11-10 consists of how many pages, if you would?

23   A.   One page.

24   Q.   And from where is it derived?

25   A.   The Dallas County clerk.

1   Q.   Pertaining to?

2   A.   The I.A.P. Information Office.

3            MR. JACKS:  Move the admission of Government's

4   Exhibit No. 11-10, Your Honor.

5            THE COURT:  Any objection?

6            MS. HOLLANDER:  No objection.

7            THE COURT:  Government's Exhibit No. 11-10 is

8   admitted.

9            MR. JACKS:  And could you show that page, please?

10  Q.   (BY MR. JACKS)  And if you would, Agent Burns, just kind

11  of walk us through this document in terms of what it

12  represents or what it states.

13  A.   This is an assumed name certificate.  It says that the

14  name under which the business will be operating is the I.A.P.

15  Information Office, again at P.O. Box 741805 Dallas, Texas,

16  and that the name of the incorporated business is American

17  Middle Eastern League for Palestine.

18  Q.   And the address of Two Oaks Plaza, is that the same

19  address that has appeared in some of these earlier records?

20  A.   Yes.

21  Q.   The date stamp when this was filed was what?

22  A.   March 13th, 1990.

23  Q.   Is there a signature of any individual on that page?

24  A.   It says "signature of officer," and it appears to be the

25  same signature on the other one before, Yasser Bushnaq.

1  Q.    Agent Burns, are you familiar with an association that

2  went by the name of United Association of Studies and

3  Research?

4  A.    Yes, I am.

5  Q.    Did you seek out any records that might pertain to that

6  particular organization?

7  A.    Yes, I did.

8  Q.    Do you have Government's Exhibit No. 11-40 in front of

9  you?

10 A.    Yes.

11 Q.    Would you tell us how many pages that exhibit consists

12 of?

13 A.    Twenty-five.

14 Q.    And where were those pages obtained from?

15 A.    They were obtained from the Secretary of State for

16 Virginia, but they include also records from the Secretary of

17 State for Illinois.

18 Q.    When you say they also contain records from the Secretary

19 of State from Illinois, were those a part of the records that

20 you got from the Secretary of State for Virginia?

21 A.    Yes.

22 Q.    And those -- Is there a certification with those Virginia

23 records?

24 A.    Yes.

25         MR. JACKS:  Your Honor, we move the admission of

1    Government's Exhibit No. 11-40.

2                THE COURT:  Any objection?

3                MS. HOLLANDER:  No objection.

4                THE COURT:  Government's Exhibit No. 11-40 is

5    admitted.

6                MR. JACKS:  And if you could just show the first

7    page, please.

8    Q.   (BY MR. JACKS)  Looking at the first page, Ms. Burns, can

9    you just tell us what that page shows?

10   A.   It shows that the corporation's name is the United

11   Association for Studies and Research, and the registered

12   agent's name and address.

13   Q.   What is the name of the registered agent?

14   A.   Yousef Saleh.

15   Q.   And what city is he supposed to be located in?

16   A.   Springfield, Virginia.

17   Q.   And the county?

18   A.   Fairfax County.

19   Q.   And where does it show that corporation or entity

20   originally came into existence?

21   A.   Illinois.

22   Q.   The pages -- You can just look at them if you don't mind,

23   but what follows that page, if you could describe for us?

24   A.   The pages immediately following the first page are the I

25   guess corporate records for the United Association for Studies

1 and Research in the state of Virginia listing directors and

2 principal officers.

3 Q.   Is that the second page?

4 A.   Yes.

5        MR. JACKS:  Would you go to that, please?

6 Q.   (BY MR. JACKS)  And if you would, just tell us what you

7 were referring to there, the parts you observed?

8 A.   The list of directors and principal officers.

9 Q.   Who are they shown to be?

10 A.   A man named Abdullatif Alkusari listed as the treasure,

11 Yousef Saleh is also listed as treasurer, Abdurahman Alamoudi

12 is represented as secretary, Laura Drake is listed as

13 director, Yousef Mahmoud Saleh is listed as director, and

14 Robert Crane is listed as director.

15        MR. JACKS:  Would you go to the second page, please?

16 Q.   (BY MR. JACKS)  And this particular page can you just

17 summarize what it shows?

18 A.   It shows the change in the principal office address.

19 Q.   And from where to where?

20 A.   From 5424 North Sawyer, Chicago, Illinois, to 5524

21 Hempstead Way, No. 300, Springfield, Virginia.

22 Q.   If you would, just the remaining pages, can you just

23 describe for us, please, what they represent or contain?

24 A.   They contain more information about the principal

25 officers and directors, and then the records from the State of

1    Illinois are also included.

2    Q.   And do the records from the State of Illinois show the

3    incorporators?

4    A.   They do.

5    Q.   What page of the exhibit is that, please?

6    A.   It is page ten.

7    Q.   Ten?

8    A.   Yes.

9         MR. JACKS:  Will you show that, please?

10   Q.   (BY MR. JACKS)  Is your copy legible?

11   A.   Somewhat.

12   Q.   All right.  And who is shown in that section in the

13   middle of the page that lists names and addresses?  Can you

14   tell us who those names are that appear there?

15   A.   Yes.  Under what I think is Article Three it says, "Board

16   of directors shall be five," and then there is a list of five

17   individuals.  Mohammad Elherezi I believe is the first one.

18   Q.   Okay.  And where does it show that he lived at that time?

19   A.   In a city in Illinois.  I am not sure what city that is.

20   Q.   Okay.  The second name?

21   A.   Fadel Lamen, L-A-M-E-N.

22   Q.   Third name?

23   A.   Mohamed Adlouni.

24   Q.   Fourth name?

25   A.   Mousa Abu Marzook.

```
1    Q.   Where does it show -- what city and state does it show

2    that he is a resident in?

3    A.   Ruston, Louisiana.

4    Q.   And who is Mousa Abu Marzook, based on your knowledge?

5    A.   He is a specially designated terrorist, the Hamas deputy

6    political bureau chief.

7    Q.   The fifth name?

8    A.   Rabil Sadun.

9    Q.   Where does he supposedly live?

10   A.   Tulsa, Oklahoma.

11   Q.   Let me ask you, the pages following this exhibit, what do

12   they contain?

13   A.   They contain the names and addresses of the

14   incorporators, I guess along with their signatures, and then

15   the actual articles of incorporation.

16   Q.   What page are the signatures of the incorporators on?

17   A.   Page 11.

18           MR. JACKS:  Go to page 11, please.  And could you

19   highlight the portion where the signatures are?

20   Q.   (BY MR. JACKS)  And is that the part you were referring

21   to?

22   A.   Yes.

23   Q.   You said following that were the actual articles of

24   incorporation?

25   A.   Yes.
```

1   Q.   How many pages comprise the articles of incorporation?

2   A.   Two, pages 12 and 13.

3   Q.   Is there a section in there that indicates the purpose of

4   the organization?

5   A.   There is.

6   Q.   What page is that?

7   A.   Page 12.

8            MR. JACKS:  Go to that part, page 12.

9   Q.   (BY MR. JACKS)  And where were you referring to?

10  A.   This appears to be a list of the items that -- its

11  purpose, a list of them.  There are more than one.

12  Q.   Summarize those for us, please.

13  A.   Section 1 is "Support relief programs.  Corporation

14  shall...support relief programs and funds for victims

15  of...natural disasters" and other things.

16       Section 2 is "Establish development programs.

17  Corporation shall establish agricultural and industrial

18  development programs...in developing countries."

19       Section 3 --

20            MR. DRATEL:  Objection to a document that can be

21  read from or speaks for itself.

22            THE COURT:  It does seem to me we are spending an

23  undue amount of time on this, Mr. Jacks.  Is there some

24  particular purpose for this exercise?

25            MR. JACKS:  Your Honor, at some point in time it

1    would have to be conveyed; either the jury would have to read

2    it on their own.  So that was just my purpose.  But I will try

3    to move along.

4            THE COURT:  Let's try to move faster through this.

5    Q.   (BY MR. JACKS)  Agent Burns, did you seek to obtain

6    information regarding a corporation called InfoCom?

7    A.   Yes, I did.

8    Q.   Do you have Government's Exhibit No. 11-42 in front of

9    you?

10   A.   Yes.

11   Q.   How many pages does that exhibit consist of?

12   A.   One.

13   Q.   And where did it come from, that particular exhibit?

14   A.   The State of California Secretary of State.

15   Q.   What entity does it relate to or refer to?

16   A.   International Computers and Communications, Incorporated.

17   Q.   And who is the -- Is there an individual that is shown on

18   those records?

19   A.   Yes; Ghassan Elashi.

20           MR. JACKS:  Judge, we move the admission of

21   Government's Exhibit No. 11-42.

22           THE COURT:  Any objection?

23           MS. HOLLANDER:  No objection.

24           THE COURT:  Government's Exhibit No. 11-42 is

25   admitted.

1    Q.    (BY MR. JACKS)   Is the certification the only part of

2    that exhibit?

3    A.    No, I am sorry.   It is two pages.

4    Q.    Would you go to the second page, please?   And if you

5    would, just read what is shown there as far as the entity

6    involved and who the persons are that are connected to that

7    organization.

8    A.    International Computers and Communications, Incorporated

9    2265 Westwood Boulevard, Los Angeles, California.   The names

10   of the officers are Ghassan Elashi, Basman Elashi, and Ghassan

11   Elashi again.

12   Q.    And the last one is the directors.   Is that correct?

13   A.    That is correct.   And those are Ghassan Elashi and Basman

14   Elashi.

15   Q.    And is it signed by anyone?

16   A.    Ghassan Elashi.

17   Q.    And is it dated as far as it is filed in the upper right

18   hand corner?

19   A.    October 8, 1987.

20   Q.    Do you have an exhibit, Government's Exhibit No. 11-17?

21   A.    Yes, I do.

22   Q.    And how many pages is that exhibit, if you don't mind?

23   A.    Two.

24   Q.    The records in there, where do they come from?

25   A.    From the Secretary of State for Texas.

```
1    Q.    And relating to what entity?

2    A.    InfoCom.

3            MR. JACKS:  Judge, we move the admission of

4    Government's Exhibit No. 11-17.

5            MR. CLINE:  No objection.

6            THE COURT:  Government's Exhibit No. 11-17 is

7    admitted.

8    Q.    (BY MR. JACKS)  Is the first page a certification?

9    A.    Yes, it is.

10            MR. JACKS:  Would you go to page two, please?

11   Q.    (BY MR. JACKS)  And if you would, just -- When does it

12   show to have been filed with the Secretary of State for Texas?

13   A.    March 16th, 1992.

14   Q.    And the entity is shown in paragraph one.  Is that

15   correct?

16   A.    That is correct.

17   Q.    The address?

18   A.    It is 13931 North Central Expressway, Unit 318-411,

19   Dallas, Texas.

20   Q.    And who is shown to be the incorporator?

21   A.    Bayan Elashi.

22   Q.    Does it purport to show his signature?

23   A.    Yes, it does.

24   Q.    And the date that was executed?

25   A.    March 12th, 1992.
```

```
 1    Q.   Is that the last page of that exhibit?

 2    A.   Yes, it is.

 3    Q.   Do you have 11-18 in front of you?

 4    A.   Yes, I do.

 5    Q.   How many pages is that exhibit?

 6    A.   Two.

 7    Q.   From what agency did it come from?

 8    A.   The Secretary of State for Texas.

 9    Q.   What entity does it relate to?

10    A.   ICC Tec.

11    Q.   And any names of individuals that are on there?

12    A.   Ghassan Elashi.

13         MR. JACKS:  Move the admission of Government's

14    Exhibit No. 11-18, Your Honor.

15         MR. CLINE:  No objection.

16         THE COURT:  Government's Exhibit No. 11-18 is

17    admitted.

18    Q.   (BY MR. JACKS)  Is the first page again a certification?

19    A.   Yes, it is.

20         MR. JACKS:  Would you show the second page, please?

21    Q.   (BY MR. JACKS)  And could you tell us when that document

22    was filed where the Secretary of State for Texas?

23    A.   April 17th, 1992.

24    Q.   You said this was ICC Tec?

25    A.   That is correct.
```

1    Q.   And what address does it show for the business?

2    A.   13931 North Central Expressway, Unit 318-411, Dallas,

3    Texas.

4    Q.   Was that the same address that was for InfoCom?

5    A.   That is correct.

6    Q.   And the incorporator is shown to be Ghassan Elashi?

7    A.   Yes.

8    Q.   And does it purport to show his signature there?

9    A.   Yes, it does.

10   Q.   Do you have 11-34 in front of you?

11   A.   Yes.

12   Q.   What is -- How many pages does 11-34 consist of?

13   A.   Eight.

14   Q.   Where do those pages come from?

15   A.   The Secretary of State for Mississippi.

16   Q.   And what entity is referenced in the exhibit?

17   A.   Al-Aqsa Education Fund.

18   Q.   And any individuals' names that are shown there that we

19   are going to see later?

20   A.   Abdel Haleem Ashqar.

21           MR. JACKS:  Judge, we move the admission of

22   Government's Exhibit No. 11-34.

23           MR. CLINE:  No objection.

24           THE COURT:  Government's Exhibit No. 11-34 is

25   admitted.

1   Q.   (BY MR. JACKS)   Is the first page a certification?

2   A.   Yes, it is.

3   Q.   Okay.

4           MR. JACKS:   Could you show the second page?

5   Q.   (BY MR. JACKS)   Does that give the name of the entity and

6   when this document was filed?

7   A.   Yes, it does.

8   Q.   What is the name and the date?

9   A.   Al-Aqsa Educational Fund, Incorporated, and it was filed

10  on January 26th, 1993.

11  Q.   Go to the next page, please.  And can you just summarize,

12  if you would, what is shown on that particular page of this

13  exhibit?

14  A.   It lists the Al-Aqsa Education Fund, the Articles of

15  Incorporation for that organization, its address in Oxford,

16  Mississippi, and the name of the registered agent is Abdel

17  Haleem Ashqar.

18  Q.   And does it have his name there?

19  A.   Yes.

20  Q.   Now, you said you went to the University of Alabama?

21  A.   Yes.

22  Q.   Can you tell us what is at Oxford, Mississippi?

23  A.   I believe it is the University of Mississippi.

24  Q.   The next page refers to what?

25  A.   I believe the next page is another certification.

1    Q.    Regarding?

2    A.    The Al-Aqsa Education Fund.  Then behind it on page five

3    there is an Articles of Amendment.

4          MR. JACKS:  Would you go to that, please, page five?

5    Q.    (BY MR. JACKS)  And what does it -- Does it indicate what

6    the amendment was?

7    A.    I believe it was an amendment for the Al-Aqsa Education

8    Fund, and it indicates that it was adopted by a board of

9    directors and incorporators without member action, and member

10   action was not required.  I guess the actual amendment was

11   attached.

12   Q.    Okay.  What was that?  Is that the next page?

13   A.    Yes.  It is page six.  The Articles of Incorporation were

14   added to amend the following language.

15   Q.    Is that regarding nonprofit status?

16   A.    It is.

17   Q.    Thank you, Agent Burns.

18         Let me just ask you some other questions regarding other

19   items now.

20         You have talked about the search warrants that were

21   conducted from which you and other agents working with you

22   received evidence.  Is that correct?

23   A.    Yes.

24   Q.    And you have talked about the InfoCom search warrant, the

25   search warrant of the H.L.F. Offices, the residence of Ismail

1    Elbarasse, the residence of Fawaz Mushtaha, and was there also

2    a subsequent acquisition of evidence regarding the residence

3    of Fawaz Mushtaha that provided evidence that you utilized?

4    A.    Yes.  There was a consensual search that was conducted at

5    that location in late 2006.

6    Q.    And the party that gave consent was?

7    A.    The current homeowner, Marcial Predeo.

8    Q.    Let me ask you, in your investigation did you make effort

9    to determine who -- what individuals may have had

10   relationships with some of these different offices or entities

11   that you have been talking about?

12   A.    Yes, I did.

13   Q.    Do you have Government's Exhibit No. 1-279 in front of

14   you?

15   A.    I don't believe I have a copy of that one, but I can view

16   it on the screen:

17            MR. JACKS:  Your Honor, may I display that to her

18   and not the jury?

19            THE COURT:  Okay.

20   Q.    (BY MR. JACKS)  Do you see the exhibit in front of you,

21   Agent Burns?

22   A.    Not yet.

23            THE COURT:  I don't know how to display it to her,

24   Mr. Jacks.

25            MR. JACKS:  All right.  May I have just a moment?

1           THE COURT:  Yes, sir.

2    Q.   (BY MR. JACKS)  Do you have Government's Exhibit

3    No. 11-38 in front of you?

4    A.   Yes, I do.

5    Q.   And is that -- How many pages is that exhibit, please?

6    A.   Seven pages.

7    Q.   And where did it come from?

8    A.   The New Jersey Secretary of State.

9    Q.   And what entity does it pertain to?

10   A.   The H.L.F.

11   Q.   How many pages is that exhibit?

12   A.   Seven.

13           MR. JACKS:  Your Honor, we would move the admission

14   of Government's Exhibit No. 11-38.

15           MR. CLINE:  No objection.

16           THE COURT:  Government's Exhibit No. 11-38 is

17   admitted.

18           MR. JACKS:  And can you show that, please?

19   Q.   (BY MR. JACKS)  If you would, just tell us what is shown

20   on the first page, the type of document and the information

21   there.

22   A.   It is an application for certificate of authority to

23   operate in the state of New Jersey.

24   Q.   For what entity?

25   A.   For the Holy Land Foundation.

1    Q.    And if you would just kind of briefly, the typed in or

2    filled-in information, if you would just kind of go through

3    that for us.

4    A.    It indicates the name of the corporation is the Holy Land

5    Foundation, that it was incorporated under the laws of

6    California in January of 1989, and that the address in New

7    Jersey is 1710 Firman Drive, Suite 100, that is in Richardson,

8    Texas, and that the address in New Jersey would be 100

9    Hamilton Plaza, Suite 1413, patterson, New Jersey, along with

10    the registered agent Mohammad El-Mazain.

11    Q.    And what date does that show to be filed with the New

12    Jersey Secretary of State?

13    A.    June 2nd, 1994.

14        MR. JACKS:  Would you go to the next page, please?

15    Q.    (BY MR. JACKS)  And is this just the records from

16    California that were filed with that application?

17    A.    Yes.

18    Q.    The remaining pages, is that part of the records from

19    California?

20    A.    I believe these are actually from the New Jersey office.

21    Q.    Okay.

22        MR. JACKS:  Would you go to the next page, please?

23    Q.    (BY MR. JACKS)  And just if you would, tell us what is

24    referenced on that page?

25    A.    It reflects Shukri A. Baker as secretary, Ghassan Elashi

as other, and Mohammad El-Mezain as other for officers and

directors.

Q.   And the address shown for the business under those names?

A.   Those names, Shukri A.  Baker, 525 International Parkway,

Richardson, Texas, Ghassan Elashi, 525 International Parkway,

Parkway Richardson, Texas, and Mohammad El-Mezain, 525

International Parkway, Richardson, Texas.

Q.   And what is shown on that page, please?

A.   It is the registered agent as Mohammad El-Mazain, the

address at 525 International Parkway at the Richardson, Texas

address, and the principal business address is at 345 East

Railway, Patterson, New Jersey.

MR. JACKS:  The next page, please.

Q.   (BY MR. JACKS)  Just a recitation as far as the report

date for this document is when?

A.   November 10th, 2005.

Q.   And is that when you received it, or shortly thereafter?

A.   Yes.

MR. JACKS:  The next page, please.

Q.   (BY MR. JACKS)  And that contains information regarding

the registered agent for that company?

A.   Yes.

Q.   Mr. El-Mazain?

A.   Yes.

Q.   Do you have Government's Exhibit No. 1-59 in front of

1    you?

2    A.   Yes, I do.

3    Q.   How many pages is that exhibit, please?

4    A.   It is quite lengthy--121 pages.

5    Q.   And what -- Where did that document -- Where was it

6    found?

7    A.   It was found in the H.L.F. New Jersey office.

8    Q.   And can you describe what it appears to be?  Does it have

9    a title?

10   A.   It is called "weekly report checklist."

11   Q.   Okay.

12   A.   It is a collection of those.

13          MR. JACKS:  Judge, we move the admission of

14   Government's Exhibit No. 1-59.

15          THE COURT:  Any objection?

16          MR. WESTFALL:  No objection.

17          THE COURT:  Government's Exhibit No. 1-59 is

18   admitted.

19          MR. JACKS:  Would you show page 4, please?

20   Q.   (BY MR. JACKS)  Do you have page 4 in front of you, Agent

21   Burns?

22   A.   Yes, I do.

23   Q.   Would you kind of summarize what it refers to?

24   A.   It relates also to page 5.  I guess that is the front

25   page of the weekly report checklist for Abdul Rahman Odeh for

the week of August 23rd to August 29th, 1997 and it lists a

number of questions about his activities.  And under No. 4 it

includes things like marketing tickets for the annual dinner

fund and donations for school bags and tickets.

MR. JACKS:  Could you go to page 5, please?

Q.  (BY MR. JACKS)  Okay.  Is this the page that you just

referred to?

A.   Yes.

Q.   And you said it references Abdul Rahman Odeh.  Is that

correct?

A.   That is correct.

MR. JACKS:  Would you go to page 7, please?

Q.  (BY MR. JACKS)  And what is referenced on this particular

page of this exhibit?

A.   This is Mr. Odeh's report from the week of August 16th to

August 27, 1997.  It includes business he conducted over this

week, including calling Mr. Bassam about tickets and

letterhead, Mr. Haytham [sic] about late tickets and posters,

and New York coin boxes and other items.

Q.   What does it show under week overview item No. 2?

A.   Total revenue generated for the week $12,273.

Q.   You mentioned an entry referring to a Mr. Haytham.  Is

there a Haitham a person with the name Haitham that you became

to be aware of in this case?

A.   Haitham Maghawri was employed by the H.L.F.

```
1    Q.   What capacity?

2    A.   As the executive director.

3    Q.   Where was he located?

4    A.   In Richardson, Texas.

5         MR. JACKS:  Would you go to page 9, please?

6    Q.   (BY MR. JACKS)  And is this another weekly report for Mr.

7    Odeh?

8    A.   Yes, it is.

9    Q.   For what week?

10   A.   August 9th to August 15th, 1997.

11   Q.   What does it show for revenue?

12   A.   It shows $19,036.

13   Q.   And in terms of who he may have dealt with, under that

14   middle part of the page there --

15   A.   Under headquarters business it says, "How many times did

16   you contact the headquarters office during a week?  Five

17   times."  It lists four individuals with whom he spoke with at

18   the headquarters--Mr. Bassam, Mr. Ibrahim, Mr. Haytham, and

19   Mr. Yaeish about tickets, orphan sponsorships, coin boxes, and

20   expenses.

21        MR. JACKS:  Would you go to page 35, please?

22   Q.   (BY MR. JACKS)  And what does this report show?

23   A.   Weekly report for Mr. Odeh from June 14th to June 20th,

24   1997.

25   Q.   The amount of revenue generated?
```

1    A.    $30,508.

2    Q.    And headquarters business shown?

3    A.    It shows he contacted headquarters four times during the

4    week and spoke with Mr. Omar Saleem, Mr. Shukri about Jordan's

5    office, and Mr. Haytham.

6           MR. JACKS:  Go to page 43, please.

7    Q.    (BY MR. JACKS)  And this weekly report shows what?

8    A.    It shows revenue generated for $1,622.  It shows that he

9    called Mr. Shukri about his trip to Jordan, and Mr. Basim

10   about his trip to Jordan and work in the office.

11   Q.    This was for what time period?

12   A.    May 21st through 23rd, 1997.

13          MR. JACKS:  Page 67, please.

14   Q.    (BY MR. JACKS)  Could you tell us what is indicated or

15   shown on this report?

16   A.    This is a handwritten report from Mr. Odeh for the week

17   of January 28th through 31st, 1997.  It shows that the revenue

18   generated for that week was $5,732, and that his headquarters

19   business included speaking with Mr. Shukri to inform him about

20   his return from Jordan, and also shows him discussing other

21   matters with other people from headquarters.

22       There is a note on the bottom that says, "Return from my

23   business trip to Jordan on 1/28/1997."  And it was duty trip

24   to distribute food packages in Jordan.

25          MR. JACKS:  Let's go to page 70, please.

1    Q.   (BY MR. JACKS)   And can you -- If you would, is there a

2    page either before or after this one that goes with this

3    particular page?

4    A.   Yes.  Page 69 is the front page for that particular week

5    report.

6              MR. JACKS:   Would you go to that, please?

7    Q.   (BY MR. JACKS)   And what time period does it cover?

8    A.   January 11th through 15th, 1997.

9    Q.   And as far as the amount of money generated?

10   A.   $15,752.

11   Q.   Headquarters contact?

12   A.   It shows there were three--Mr. Bassam, Shukri, and Mr.

13   Samnah, and on page 70 it shows that he participated in

14   fundraising with Sheik Kafamien for food parcels.

15   Q.   And that is under Paragraph 4?

16   A.   Yes, that is correct.

17             MR. JACKS:   Page 102, if you don't mind.

18   Q.   (BY MR. JACKS)   What time period is covered by this

19   report?

20   A.   November 2nd through 8th November, 1996.

21   Q.   And the amount of revenue generated?

22   A.   $6,338.

23   Q.   And what does it show his activities were?

24   A.   It shows under headquarters business contacts about the

25   orphans of the Aqsa massacre about sponsors, the families of

1    Aqsa, and about something else that I can't read.

2         MR. JACKS:  Would you go to page 118, please?

3    Q.   (BY MR. JACKS)  What time period does that cover?

4    A.   August 10th through 16th, 1996.

5    Q.   And the revenue generated?

6    A.   $431.

7    Q.   The headquarters activity or contact?

8    A.   I can't read No. 1, something about the orphans No. 2,

9    about Mr. Hamza Mansour No. 3.

10   Q.   Do you have Government's Exhibit No. 1-60 in front of

11   you?

12   A.   I think that is in the next section.

13        MR. JACKS:  May I approach, Your Honor?

14        THE COURT:  Yes, sir.

15        THE WITNESS:  I don't know if it is going to be in

16   here or not.

17   Q.   (BY MR. JACKS)  How about 1-98?  Is that in that binder?

18   A.   I don't think so.  I think we are missing a section of

19   binder.

20   Q.   All right.  What is the first exhibit that you have there

21   in the second binder I just gave you?

22   A.   I actually have 1-363.

23   Q.   Let me move to something else, if I could, just for a

24   moment, Agent Burns.  In the course of conducting your

25   investigation, did you ever -- You said that you had met I

1    suppose each of the Defendants at some time prior to this

2    trial.  Is that right?

3    A.    That is correct.

4    Q.    Let me ask you specifically regarding the Defendant Mufid

5    Abdulqader.  Did you ever have a chance to sit down and

6    interview him?

7    A.    Yes, I did.

8    Q.    And about when was that interview?

9    A.    April 5th, 2002, I believe.

10         MS. CADEDDU:  Your Honor, I am going to object to

11   this on the grounds that were set forth orally in the previous

12   hearing that we had.

13         THE COURT:  Can you be more specific about which

14   hearing?

15         MS. CADEDDU:  Yes, Your Honor.  The *Kastigar*

16   hearing.  At the end of that there was some testimony

17   presented.

18         THE COURT:  Very well.  I understand your objection.

19   Overruled.

20   Q.    (BY MR. JACKS)  I am sorry.  Would you tell us the date

21   of that interview again?

22   A.    I believe it was April 5th, 2002.

23   Q.    And was anybody with you when you conducted that

24   interview?

25   A.    Yes.  Special Agent Robert Miranda and Special Agent Jim

1    Lewis.

2    Q.    Where was that interview conducted or held?

3    A.    At the office of Mr. Abdulqader's attorney.

4    Q.    And let me ask you if in the course of that interview did

5    you ask Mr. Abdulqader about his relationship or connection to

6    the Holy Land Foundation?

7    A.    Yes.

8    Q.    Did you ever ask him regarding how long that relationship

9    existed or how long he had known those individuals?

10   A.    He did not state exactly when he began working with them,

11   but stated that he did not know anyone from if H.L.F. except

12   for his cousin before 1995 when he moved to Dallas.

13   Q.    Now, where did he say he lived before he came to Dallas?

14   A.    In Oklahoma.

15   Q.    You said that he told you he moved to Dallas in 1995?

16   A.    Yes.

17   Q.    You made reference to his cousin or he had mentioned his

18   cousin during that interview.   Who was we referring to?

19   A.    An individual Akram Mishal who was an employee with the

20   Holy Land Foundation.

21   Q.    Can you spell his name, please?

22   A.    Akram, A-K-R-A-M, last name Mishal, M-I-S-H-A-L.

23   Q.    And is that the only person that Mr. Abdulqader said he

24   knew at the Holy Land Foundation?

25   A.    He said prior to 1995 that was the only individual he

1    knew at the Holy Land Foundation.

2    Q.    So anybody else, he met them '95 or after?

3    A.    That is what he said.

4    Q.    Did you ever come across any records to contradict that?

5    A.    Yes, I did.

6    Q.    Do you have Government's Exhibit No. 1-21 in front of

7    you?

8    A.    Yes, I do.

9    Q.    How many pages is Government's Exhibit No. 1-21?

10   A.    Two pages.

11   Q.    Where did it come from, that particular exhibit?

12   A.    This was seized from the H.L.F.'s Dallas office.

13          MR. JACKS:  Judge, we move the admission of

14   Government's Exhibit No. 1-21.

15          THE COURT:  Any objection?

16   Government's Exhibit No. 1-21 is admitted.

17          MR. JACKS:  Would you show the first page, please?

18   Q.    (BY MR. JACKS)  Now, if you would, just tell us what is

19   shown on Government's Exhibit No. 1-21, this first page?

20   A.    The first page is a listing of overseas speakers.

21   Q.    Okay.  And do you recognize any of the names shown on

22   this page?

23   A.    Yes, I do.

24   Q.    Which ones do you recognize?

25   A.    Foud Abu Zeid, Hatem Qafisha, Aziz Dweik, Hafeth Natsheh,

1    Majdi Aqel, Hussein Abu Kweik.

2    Q.    All right.  What is after Abu Kweik?

3    A.    Doctor Zeid.

4    Q.    What about the next to the last one?

5    A.    Khaled Abdelqader.

6    Q.    The column in the middle of the page, are those phone

7    numbers?

8    A.    They are.

9    Q.    Do you recognize to what part of the world they go to?

10   A.    Jordan.  Excuse me.  972 is actually Palestinian

11   Territories for Israel.

12   Q.    Let me ask you, in the course -- How long have you worked

13   on this case, you said?

14   A.    Quite a long time.

15   Q.    All right.  In the course of working on this case, have

16   you come to know and recognize like country codes, telephone

17   country codes and area codes and that type of thing?

18   A.    Yes.

19   Q.    Now, Khaled Abdelqader, does he have another name?

20   A.    I believe he was affiliated with Zacabani.

21        MR. DRATEL:  Object as to the basis "I believe."

22        THE COURT:  Sustained.

23        MR. JACKS:  Would you go to the next page, please?

24   Q.    (BY MR. JACKS)  And this page is entitled what?

25   A.    "Local speakers."

```
 1   Q.   And just if you would just make reference to or tell us

 2   is this one of the documents that you located that made

 3   reference to the Defendant Mufid Abdulqader?

 4   A.   Yes, he is.

 5   Q.   Where is he shown in that exhibit?

 6   A.   He is shown about halfway down.

 7   Q.   And does it have a home and work telephone number?

 8   A.   Yes, it does.  Home number is 972-705-9235, and

 9   214-948-4677.

10   Q.   And this document you said was recovered from the H.L.F.

11   offices.  Is that correct?

12   A.   That is correct.

13   Q.    Do you have Government's Exhibit No. 1-72 in front of

14   you?

15   A.   I have 1-22.

16             MR. JACKS:  May I approach the witness?

17             THE COURT:  Yes.

18   Q.   (BY MR. JACKS)  Do you have Government's Exhibit

19   No. 5-28?

20   A.   Yes, I do.

21   Q.   Government's Exhibit No. 5 -- Just generically what is

22   it?

23   A.   It is an American Express bill.

24   Q.   And were those obtained from American Express?

25   A.   Yes, they were.
```

1    Q.    Pertaining to what entity?

2            MS. HOLLANDER:  I am sorry.  I just didn't hear what

3    the exhibit number is.

4            THE COURT:  No. 5-28.

5            MS. HOLLANDER:  Thank you.

6            MR. JACKS:  Sorry.

7    Q.   (BY MR. JACKS)  Were those from American Express?

8    A.    Yes, they were.

9    Q.    Okay.  I am sorry.  Who is the cardholder?

10   A.    Shokri Abu Baker, Occupied Land Fund.

11           MR. JACKS:  Judge, we move the admission of

12   Government's Exhibit No. 5-28.

13           THE COURT:  Any objection?

14           MS. HOLLANDER:  No objection.

15           THE COURT:  Government's Exhibit No. 5-28 is

16   admitted.

17           MR. JACKS:  Could you show the first page, if you

18   would, please?

19   Q.   (BY MR. JACKS)  And if you would, just refer us to how

20   you interpreted this document.  Not interpreted, but the part

21   you looked at and utilized.

22   A.    The statement closing date for this particular American

23   Express bill was November 16th, 1990.  Again, this was for

24   Shokri Abu Baker and the Occupied Land Fund.  On page three of

25   the exhibit there is a -- I guess the way American Express

1    organizes its bills, there is a charge for an airline ticket

2    through ABA Travel, transaction date October 5th, 1990 for M.

3    Abdulqader.

4    Q.    Are you looking at the top part of the statement or the

5    individual smaller parts?

6    A.    The first smaller box on the left.

7    Q.    Is that what is shown on the screen?

8    A.    Yes.

9    Q.    Okay.  Kind of summarize or tell us what it references

10   there.

11   A.    It references an American Airlines ticket purchased for

12   M. Abdulqader from Oklahoma City to Chicago to Boston to

13   Dallas and back to Oklahoma City on October 5th, 1990.

14   Q.    Okay.

15   A.    It also references travel for other individuals to Boston

16   for tickets purchased around that same time period that were

17   also members of a band.

18   Q.    All right.  Well, specifically which charges are you

19   making reference to?

20   A.    If you will look at the box directly below that one there

21   is an M. Taleb.

22   Q.    Do you know a person in this investigation with the first

23   name initial that begins with M. and last name Taleb,

24   T-A-L-E-B?

25   A.    Yes, Monzer Taleb is a member of the band.

1    Q.   Does that time frame correspond to the charge above for

2    Mr. Abdulqader?

3    A.   Yes, it does.  It shows the transaction date.  It does

4    not show the date of actual travel, so these tickets were

5    purchased within three days of each other to the same

6    location.

7    Q.   Okay.  Any other items in this statement or in this

8    exhibit that make reference to the Defendant Abdulqader?

9    A.   Yes.  On page four, the third box down in the left

10   column, shows that on October 25th, 1990 the Occupied Land

11   Fund was charged for one standard letter for ABA travel for

12   Mr. M. Abdulqader.

13   Q.   Any other references to --

14   A.   Yes.

15   Q.   Go ahead.

16   A.   On page five in the right hand column, the first box,

17   there is another standard letter charged to the Occupied Land

18   Fund from October 17th, 1990 to Mr. Mufid Abdulqader, and

19   below that the next three boxes show M. Abdulqader, M. Taleb,

20   and M. El-Mazain had tickets purchased by the Occupied Land

21   Fund for travel to Phoenix.

22   Q.   All right.  Those are the three that have just scrolled

23   across the screen.  Is that correct?

24   A.   That is correct.

25   Q.   Now, when did he tell you that he first began to work

1    with them?

2    A.    After he moved to Dallas in 1995.

3    Q.    Did you -- In your interview with him in April of 2002,

4    did you ask him what he did for the Holy Land Foundation?

5    A.    He said that he was a volunteer and that he raised funds

6    on occasion for the Holy Land Foundation.

7    Q.    I am sorry.  I heard you said he was a volunteer.  And

8    then the next thing that you said?

9    A.    He raised money for them on occasion.

10   Q.    On occasion?  Okay.

11   A.    He couldn't recall how many times he had done it.

12   Q.    Do you have Government's Exhibit No. 1-18 in front of

13   you?

14   A.    Yes, I do.

15   Q.    Where did that exhibit come from?

16   A.    This was seized from the Holy Land Foundation's office in

17   Dallas.

18   Q.    And just tell me if -- that particular exhibit is how

19   many pages?

20   A.    One.

21   Q.    And can you describe it?

22   A.    Yes.  This is an invoice from Al-Nujoom Band to the Holy

23   Land Foundation.

24         MR. JACKS:  Judge, we move the admission of

25   Government's Exhibit No. 1-18.

1          MS. CADEDDU:  No objection.

2          THE COURT:  Government's Exhibit No. 1-18 is

3    admitted.

4          MR. JACKS:  Would you show that, please?

5    Q.   (BY MR. JACKS)  And would you describe what is shown on

6    that particular exhibit?

7    A.    This is an invoice dated September 1st, 1998 for

8    Al-Nujoom, which is the band Mr. Abdulqader, Monzer Taleb,

9    Kifah Mustapha, Mufid Abdulqader, and Sabri Sabri were part

10   of, and it shows their charges.

11         MR. JACKS:  Can you enlarged the part in the box

12   where it says quantity description?  Yes.  Thank you.

13   Q.   (BY MR. JACKS)  And now if you can give us some of the

14   details as far as what it refers to?

15   A.    It says performing in Charlotte September 19th, 1998, and

16   by each individual's name it shows Charlotte -- by Monzur

17   Taleb, Charlotte plus Tampa; for Kifah Mustapha, Charlotte

18   plus Tampa; for Mufid Abdulqader it has Charlotte; and Sabri

19   Sabri, Charlotte; and has a series of numbers and then the

20   word "ticket."

21   Q.   Now, this invoice was found in the records of the Holy

22   Land Foundation?

23   A.    That is correct.

24   Q.   Do you have Government's Exhibit No. 1-43?

25   A.    Yes, I do.

1   Q.   What is that exhibit?  Where did it come from?

2   A.   It came from the H.L.F.'s Dallas office.

3   Q.   How many pages is that particular exhibit?

4   A.   Two.

5         MR. JACKS:  Judge, we move the admission of 1-43.

6         MS. CADEDDU:  No objection.

7         THE COURT:  Government's Exhibit No. 1-43 is

8   admitted.

9         MR. JACKS:  Could you display that, please?

10   Q.   (BY MR. JACKS)  And just if you would, tell us what this

11   exhibit references.

12   A.   This is a travel itinerary from Travel Monitors of

13   America dated December 28th, 1998 to Brother Akram at H.L.F.

14   For Mufid Abdulqader, and shows a flight itinerary on American

15   Airlines from Dallas to Houston and Little Rock and I believe

16   back to Dallas.

17   Q.   And I am sorry.  The date?

18   A.   The date of the itinerary was December 28th, 1998.  The

19   date of travel was January 1st, 1999.

20   Q.   Do you have Government's Exhibit No. -- Is there another

21   page to that?

22   A.   Yes, there is a second page.

23         MR. JACKS:  Okay.  Would you show that, please?

24   Q.   (BY MR. JACKS)  Now, this document, can you tell whether

25   it was mailed or faxed?

1   A.   It appears to be faxed.

2   Q.   And the number -- this travel agency is located where?

3   A.   At 13610 Midway Road, Suite 240, Dallas, Texas.

4   Q.   And does it show who this was addressed to?

5   A.   To Akram at the H.L.F.

6   Q.   And who is it for?

7   A.   Mufid Abdulqader.

8   Q.   Do you have Government's Exhibit No. 1-44 in front of

9   you?

10  A.   Yes, I do.

11  Q.   And was this a document seized in the search warrant of

12  H.L.F.

13  A.   Yes, it was.

14  Q.   How many pages is it?

15  A.   One.

16        MR. JACKS:  Move the admission of Government's

17  Exhibit No. 1-44, Your Honor.

18        MS. CADEDDU:  No objection.

19        THE COURT:  Government's Exhibit No. 1-44 is

20  admitted.

21        MR. JACKS:  If you could display that, please.

22  Q.   (BY MR. JACKS)  And if you would just describe this

23  exhibit for us, Agent Burns.

24  A.   This is also a travel itinerary from DTA Tours & Travel

25  to 525 International Parkway, Richardson, Texas, for Mufid

1    Abdulqader dated December 21st, 1999 for travel from Dallas to

2    El Paso to Oklahoma City back to Dallas.

3    Q.   Do you have -- I may have asked you.  Do you have

4    Government's Exhibit No. 1-19?

5    A.   Yes, I do.

6    Q.   Okay.  And is that an exhibit that was obtained in the

7    search of the Holy Land Foundation offices?

8    A.   Yes.

9    Q.   How many pages is it?

10   A.   One.

11        MR. JACKS:  Move the admission of Government's

12   Exhibit No. 1-19.

13        MS. CADEDDU:  No objection.

14        THE COURT:  Government's Exhibit No. 1-19 is

15   admitted.

16        MR. JACKS:  Would you display that, please?

17   Q.   (BY MR. JACKS)  And would you describe, please, what is

18   shown in Government's Exhibit No. 1-19?

19   A.   This is a Holy Land Foundation or Holy Land Foundation

20   check, or I guess the stub on the check showing payments to

21   Mufid Abdulqader for services provided during Eid Al for

22   $1,000.

23   Q.   Now, what did he tell you regarding whether he was an

24   employee or paid for his work for the Holy Land Foundation?

25   A.   He said he was -- He said that he never received

1    compensation but that he received expenses for travel.

2    Q.   Now, is there anything on here that indicates this is for

3    expenses?

4    A.   No.  It says "services."

5    Q.   And did you say that he also told you he was a volunteer?

6    A.   Yes.

7    Q.   Do you have Government's Exhibit--let me just do

8    this--1-20, 21, 22, and 23 in front of you?

9    A.   Yes.

10   Q.   Are those also records that were taken in the Holy Land

11   search?

12   A.   Yes, they are.

13           MR. JACKS:  Judge, I move the admission of

14   Government's Exhibit No. 1-20, 21, 22, and 23.

15           MS. CADEDDU:  No objection.

16           MR. JACKS:  And No. 21 may have already been

17   admitted.

18           THE COURT:  I think 1-21 is already admitted.

19   Government's Exhibit No. 1-20, 1-22, and 1-23 are admitted.

20   Q.   (BY MR. JACKS)  Let me direct your attention to 1-20,

21   Agent Burns, if you will.

22           MR. JACKS:  Could you display that, please?

23   Q.   (BY MR. JACKS)  Now, what does this show?

24   A.   This shows that Mufid Abdulqader received $273.66 for

25   fundraising expenses from the Holy Land Foundation April 20th,

1    2000.

2    Q.   And I believe the earlier exhibit, 1-19, was April 27th.

3    Is that correct?

4    A.   Yes, that is correct.

5            MR. JACKS:  And if you would, show 1-21 again, the

6    second page, please.

7    Q.   (BY MR. JACKS)  And that is the exhibit you testified

8    about a moment ago regarding the local speakers.  Is that

9    correct?

10   A.   Yes.

11           MR. JACKS:  1-22, please, if you would show that.

12   Q.   (BY MR. JACKS)  Describe what is shown in Government's

13   Exhibit No. 1-22.

14   A.   This is actually a canceled check from the Holy Land

15   Foundation to Mufid Abdulqader dated January 4th, 2000 for

16   $1,000 and it is endorsed by him on the back.

17   Q.   Who signed it as the representative for the check?  Who

18   signed the check for Holy Land?

19   A.   Shukri Abu-Baker.

20   Q.   And that is the endorsement you referred to on the right

21   hand side?

22   A.   Yes, that is correct.

23           MR. JACKS:  Could you show 1-23, please?

24   Q.   (BY MR. JACKS)  And again describe what is shown in this

25   exhibit, please.

1    A.    This appears to be actually the check that corresponds to

2    the check stub we were looking at from the Holy Land

3    Foundation to Mufid Abdulqader April 27th, 2000 for $1,000.

4    And it is endorsed on the back.

5              MR. JACKS:  Show the second page, if you would,

6    please.

7    Q.    (BY MR. JACKS)  And that is the endorsement you made

8    reference to?

9    A.    That is correct.

10             THE COURT:  Mr. Jacks, let's take our mid-afternoon

11   recess at this time.

12        Ladies and gentlemen, we will be in recess until 3:20.

13                       (Brief Recess.)

14             THE COURT:  Go ahead, Mr. Jacks, when you are ready.

15             MR. JACKS:  Thank you, Your Honor.

16   Q.    (BY MR. JACKS)  Agent Burns, you have testified just

17   before the break regarding Government's Exhibit No. 1-19, 20,

18   22, 23, those being checks written to Mufid Abdulqader.  Those

19   exhibits, are those all of the checks that you found in your

20   examination of the Holy Land Foundation records written to

21   Mufid Abdulqader?  Were all of them in those exhibits?

22   A.    No, there were more.

23   Q.    All right.  Is that a representative sample of what was

24   introduced of those checks?

25   A.    Yes.

```
 1   Q.   Do you have Government's Exhibit No. 1-363 in front of
 2   you?
 3   A.   I think it may be in the binder on the table there.
 4   Q.   I am sorry.  This binder?
 5   A.   I believe so.
 6   Q.   That is all right.  We will go to something else.
 7   A.   I found it.  I am sorry.  Too many tabs in this binder.
 8   Q.   I am sorry.  Do you have it?
 9   A.   Yes, I do.
10   Q.   Would you tell us how many pages that exhibit is?
11   A.   Two.
12   Q.   And where -- That particular exhibit, where did it come
13   from?
14   A.   It came from the H.L.F. Dallas office.
15   Q.   And just --
16        MR. JACKS:  Judge, move the admission of
17   Government's Exhibit No. 1-363.
18        MS. HOLLANDER:  I don't seem to have No. 1-363,
19   unless it is one that we just received today, in which case we
20   just got the disks a little while ago.
21        MR. JACKS:  I will move on to something else, Your
22   Honor.  I apologize.
23   Q.   (BY MR. JACKS)  I am sorry, Agent Burns.  How about
24   No. 1-60.
25   A.   I think there is a copy in the original.  I don't have
```

1    one of those in my binder.

2    Q.    I am sorry.

3          MR. JACKS:  May I approach the witness, Your Honor?

4          THE COURT:  Yes, sir.

5    Q.    (BY MR. JACKS)  I am going to hand you four hanging file

6    folders, and is one of those labeled 1-60?

7    A.    Yes, it is.

8    Q.    And is that a document that came from the H.L.F. search?

9    A.    Yes, it is.

10   Q.    Would that be true of 1-98 and 1-57, and 1-58?

11   A.    Yes.

12   Q.    Is that the four hanging file folders that I just gave to

13   you?

14   A.    Yes.

15   Q.    And again, all of those items came from the H.L.F.

16   search?

17   A.    Yes.  That is correct.

18          MR. JACKS:  Judge, move the admission of

19   Government's Exhibit No. 1-57, 58, 60, and 98.

20          MS. HOLLANDER:  Your Honor, I am sorry.  We need

21   just a minute to find those because we didn't know ahead of

22   time which ones we were going to have to look at.  We need

23   just a minute to look at them.

24          THE COURT:  Go ahead.

25          MS. HOLLANDER:  Thank you, Your Honor.

1      We don't have any objection.

2           THE COURT:  Government's Exhibit No. 1-57, 1-58,

3      1-60, 1-98 are admitted.

4      Q.  (BY MR. JACKS)  If I could take them in numerical order.

5      No. 1-57 is what?

6           MR. JACKS:  And if you could show that, please.

7           THE WITNESS:  This is a letter of employment.

8      Q.  (BY MR. JACKS)  From whom to whom?

9      A.  From the Holy Land Foundation to Mohammad El-Mazain.

10     Q.  Dated?

11     A.  October 28, 1999.

12     Q.  And just if you could describe what that exhibit

13     references.

14     A.  This is a letter to Mohammad El-Mazain from Shukri

15     Abu-Baker, employment with the Holy Land Foundation for

16     $90,000 beginning October 15th, 1999.

17     Q.  And what position does it say he is going to be holding?

18     I think it is in that first paragraph.

19     A.  The director of endowment.

20     Q.  Would you look at Government's Exhibit No. 1-58, please?

21     And just if you would, what is this exhibit?

22     A.  This is a letter from Mohammad El-Mazain to the Holy Land

23     Foundation.  It is regarding his resignation as chairman of

24     the board.  He states in the letter that it was his pleasure

25     to serve as the chairman of the board for the Holy Land

1    Foundation for the past 11 years.  And the letter is dated

2    April 4th, 1999.

3    Q.   Now, actually -- so this letter predates the one you just

4    showed as far as No. 57 where he was employed as the director

5    of endowment?

6    A.   Correct.

7    Q.   And would you go to Government's Exhibit No. 1-60?

8         MR. JACKS:  If you could display that, please?

9    Q.   (BY MR. JACKS)  And again, is this another series of

10   these weekly reports for Abdul Rahman Odeh?

11   A.   Yes.

12   Q.   And how many pages is that exhibit?

13   A.   Twenty pages.

14   Q.   And are the pages essentially similar in nature to this

15   first page?

16   A.   Yes, they are.

17   Q.   Okay.  And if you would, go to Government's Exhibit

18   No. 1-98, which was just admitted.  Do you have that?

19   A.   I do.

20        MR. JACKS:  Could you display that, please?

21   Q.   (BY MR. JACKS)  No. 1-98 consists of what, Agent Burns?

22   A.   This is a copy of an American Express bill found at the

23   Holy Land Foundation's office for Shukri Abu-Baker.

24   Q.   He is the cardholder?

25   A.   That is correct.

1    Q.    And what charges are shown on this record?

2    A.    There are a number of charges, but specifically on the

3    bottom right of page 1 there is a receipt for travel for A.

4    Odeh, November of 2000 from Newark to Dallas to Atlanta and

5    back to Newark.

6    Q.    And you may have said it, but the date?

7    A.    The transaction date, the date the ticket was purchased

8    was November 13th, 2000.

9    Q.    All right.

10   A.    The second page of the exhibit --

11   Q.    Yes, go ahead, please.

12   A.    Is another receipt for travel of A. Odeh from Newark to

13   Dallas and this time the transaction date was October 5th,

14   1995.

15   Q.    Any other entries in there that pertain to Mr. Odeh?

16   A.    Yes.  Page 3 --

17            MR. JACKS:  If you would show that.

18            THE WITNESS:  The second box on the right hand side

19   shows travel for A. Odeh from Newark to Houston to Dallas and

20   the transaction date of that purchase was March 12th, 1996.

21   Q.    Any other transactions pertaining to Mr. Odeh?

22   A.    Yes.  On the next page the upper left corner shows travel

23   from A. Odeh from Newark to Dallas transaction date June 4th,

24   1996.

25   Q.    Any other transactions related to Mr. Odeh in that

exhibit?

A.    On page 5 the second box on the left column shows travel of A. Odeh from Newark to Dallas The transaction date was May 18th, 1994.

Q.    How about others?

A.    On the following page, again the second box in the left hand column, shows travel for Mr. Odeh from Newark to Dallas and the transaction date of that one was November 7th, 1994.

Q.    Any others in there relating to Mr. Odeh?

A.    Also on that same page, receipts for travel of Mr. El-Mazain are also included.

On the following page, page 7, there is a receipt for travel for Mr. Odeh from Newark to Dallas again.  Transaction date was December 4th, 1994.

Q.    Any others?

A.    Page 8, travel itinerary from Apollo International for travel of Abdelman Odeh from June 4th, 1996 from Newark again to Dallas.

Behind that are three additional travel itineraries for Mr. Abdelman.

Q.    If you would just tell us the dates?

A.    Okay.  September 30th 1996 from Newark again to Dallas, January 22nd, 1999 to Dallas, March 13th, 1996 to Dallas.

Q.    Thank you.  Let me ask you a question.  I want to direct your attention back to your interview with Mufid Abdulqader in

1    April of 2002.  Did you ever ask him anything about the

2    collection of money or handling of money?

3    A.    Yes, I did.

4    Q.    Specifically what did you ask him about that?  I am

5    talking about with regards or in connection with the Holy Land

6    Foundation.

7    A.    I asked him how much money he raised when he would attend

8    the event for the Holy Land Foundation.  He told me that he

9    did not know how much money he raised because he never handled

10   the money.

11   Q.    Let me direct your attention to Government's Exhibit

12   No. 18-5.  Do you have that exhibit in front of you?

13   A.    I believe they used my copy to make another copy.

14   Q.    Oh, I am sorry.  All right.

15            MR. JACKS:  May I approach, Your Honor?

16            THE COURT:  Yes, sir.

17   Q.    (BY MR. JACKS)  Do you have Government's Exhibit No. 18-5

18   in front of you?

19   A.    Yes, I do.

20   Q.    And is that a transcript of a telephone conversation?

21   A.    Yes, it is.

22   Q.    And was this a conversation that was intercepted pursuant

23   to a court-authorized wire interception order?

24   A.    Yes.

25   Q.    The exhibit that you have in front of you, is that an

1    English language transcript of that conversation?

2    A.    Yes, it is.

3    Q.    Was the conversation, based on your investigation, in

4    Arabic and then translated into English?

5    A.    Yes.

6    Q.    How long is that transcript that you have in front of

7    you?

8    A.    Twelve pages.

9         MR. JACKS:  Your Honor, at this time we would move

10   the admission of Government's Exhibit No. 18-5, which is the

11   conversation.  And we propose to -- Rather than playing the

12   conversation at this time, we propose that Agent Burns and

13   myself read the translation.

14        THE COURT:  Ms. Cadeddu?

15        MS. CADEDDU:  I would like to just renew the

16   pretrial objections made to the evidence obtained from FISA,

17   Your Honor.

18        THE COURT:  I will overrule that objection and admit

19   into evidence Government's Exhibit No. 18-5.

20        Let me just ask for clarification.  No. 18-5 is the

21   English language transcript of that conversation.  Is that

22   right?

23        MR. JACKS:  Yes, Your Honor.  And let me --

24   No. 18-6--is that right--is the conversation itself.  So we

25   would move the admission of No. 18-6, Your Honor, as well as

1    18-5.  No. 18-5 is the transcript.  No. 18-6 is the electronic

2    audio conversation.

3           MS. CADEDDU:  With the same objection, Your Honor.

4           THE COURT:  I will overrule the objection and admit

5    into evidence Government's Exhibit No. 18-6.

6    Q.   (BY MR. JACKS)  Agent Burns, Government's Exhibit No.

7    18-5, does it make reference or indicate the date and time the

8    conversation was recorded?

9    A.   January 2nd, 2000.

10   Q.   And the time?

11   A.   22:54:14.  It is on the 24-hour clock.

12   Q.   It is military time?

13   A.   Military time.

14   Q.   So that would be 10:00, almost 11:00 at night?

15   A.   Right.

16   Q.   All right.  And as far as the participants in the

17   conversation, are they shown?

18   A.   They are.  Initially an unidentified female answered the

19   phone.  The ultimate participants in the call were Mufid

20   Abdulqader, Ibrahim Khalil, K-H-A-L-I-L, and Moataz,

21   M-O-A-T-A-Z.

22   Q.   And last name was unknown for this Moataz?

23   A.   That is correct.

24   Q.   If you would, go to the second page of that transcript.

25   And I am going to ask, would you please read the part, the

1    comments by Mufid Abdulqader, and I will read the parts of the

2    other participants.  Is that clear?

3    A.    Yes.  Are we going to begin after the prompt for the Holy

4    Land Foundation reading?

5    Q.    Yes.  Just if you would, describe for us, if you will,

6    what you are referring to when you say the prompt for the Holy

7    Land Foundation.

8    A.    There was a call that was placed to the Holy Land

9    Foundation.  At the time that the phone was answered there was

10   a prompt that says, "Thank you for calling the Holy Land

11   Foundation.  If you know your party's extension, please enter

12   it."  And numbers are dialed, and there was a prompt, and then

13   an unidentified female answers the call, and Mufid Abdulqader

14   greets that person and asks to speak with Ibraham.  On page 3

15   of that transcript, ultimately Mufid and Ibraham begin talking

16   on page 3.

17   Q.    All right.  And that would be about a third of the way

18   down the page.  Is that correct?

19   A.    That is correct.

20          MR. JACKS:  Can you show page 3 of that transcript?

21   Q.    "Hello!"?

22   A.    "Peace be upon you."

23   Q.    "And peace be upon you."

24   A.    "Who is talking?"

25   Q.    "Ibrahim."

```
1    A.   "How are you?"

2    Q.   "Your dear one.  Where are you, man?"

3    A.   "What do you mean, where am I?"

4    Q.   "No word, no news, and I don't know what went on with you

5    or ..."

6    A.   "By God, you know me, I do not tell.  I stopped telling."

7    Q.   "Why?"

8    A.   "It is better this way."

9    Q.   "Why?"

10   A.   "It is more convenient."

11   Q.   "But let me know what happened to you, I mean."

12   A.   "Nothing new..."

13   Q.   "I did not know how to call you, and I do not know where

14   you are and..."

15   A.   "Fine, haven't you reached me now?"

16   Q.   "What?"

17   A.   "You have reached us, and we have reached you."

18   Q.   "Yes.  What are your news?"

19   A.   "By God, thank God."

20   Q.   "How are you?"

21   A.   "Very well, by God."

22   Q.   "Uh, we heard good news about you."

23   A.   "What?"

24   Q.   "We heard good news about you in Windsor."

25   A.   "Who told you?"
```

1   Q.    "Nothing...a female called me..."

2   A.    "Yes."

3   Q.    "She donated."

4   A.    "She called you?"

5   Q.    "And she donated."

6   A.    "Yes..."

7   Q.    "I think that she is a Pakistani."

8   A.    "Yes."

9   Q.    "Yes."

10  A.    "What did she tell you?"

11  Q.    "She said, 'By God, I just heard a sermon and I was very

12  impressed and I would like to donate.'"

13  A.    "How much did she donate?"

14  Q.    "What do you think?"

15  A.    "At least one thousand."

16  Q.    "Eh...no."

17  A.    "Well, sir.  How much did she donate?"

18  Q.    "Five thousand dollars.

19  A.    "Uh!  This is excellent, by God.  Five thousand and I

20  brought you twenty-five thousand."

21  Q.    "From Windsor?!  Twenty-five thousand from Windsor?!  In

22  God's name, are you serious.  Twenty-five thousand from

23  Windsor?"

24  A.    "Or what?  Do I have...you know me, I mean, am I the

25  joking type?"

1    Q.    "Thank God, thank God, our Sheik, God willing."  Hold on

2    with me, please...Mufid, hold on with me a little bit please."

3    A.    "My child," and the next part was a recording from being

4    on hold.

5    Q.    "Are you serious Mufid?"

6    A.    "Just a moment, just a moment, Ibraham."

7    Q.    "Yes, my dear Haitham."

8    A.    "Just a moment, my brother!"

9    Q.    "Yes, my brother!"

10   A.    I brought you with me..."

11   Q.    "Yes."

12   A.    "...seventeen thousands from Windsor.  These are cash by

13   hand."

14   Q.    "Cash by hand, seventeen thousand."

15   A.    "Someone donated five thousands, which he will mail, by

16   mail or I don't know, he's gonna call or whatever, I mean,

17   he's gonna do something."

18   Q.    "Meaning...OK."

19   A.    "...and I have four persons..."

20   Q.    "Um..."

21   A.    "...each one of them will donate four thousands, I mean a

22   thousand, a thousand..."

23   Q.    "Fine..."

24   A.    "...all of them will mail them..."

25   Q.    "Um."

```
1    A.    "...and there is also a few...you may say four or five of
2    them five hundred dollars."
3    Q.    "Okay?"
4    A.    "Maybe more, I mean more than that, this, you may say is
5    estimation, but what I have, which I brought for you is
6    seventeen thousand."
7    Q.    "And the five thousand makes it twenty-two thousands."
8    A.    "And five thousand...it goes up, I mean, it reaches
9    thirty..."
10   Q.    "Yes."
11   A.    "If you want to take the woman into consideration, I
12   mean, with the impact of the sermon...did she tell you that
13   she was impressed?"
14   Q.    "Yeah?"
15   A.    "Did she tell you that she was impressed?"
16   Q.    "Yes, she told me, 'I just heard your sermon in the
17   mosque, thank God, and...I took your pledge form and I am
18   calling because I want to donate.'  She donated five thousand
19   dollars."
20   A.    "Praised be God.  Excellent, by God.  And by the
21   way...Sarah get lost from here...so thank God there are many
22   people, I mean, and I know a lot of people who said:  'We are
23   not prepared, we do not have checks, we do not have so and so,
24   we will send it by mail!  We distributed...I distributed a
25   large amount."
```

1    Q.    "Thank God, what about Boston?"

2    A.    "What?"

3    Q.    "Boston?"

4    A.    "Boston, between us, I feel that it would have been

5    better for me if I did not go."

6    Q.    "Why?"

7    A.    "Did the guys tell you that they take fifteen percent?"

8    Q.    "Yeah."

9    A.    "Why didn't you tell me?"

10   Q.    "But that is how they always are, er...Boston."

11   A.    "But you must tell me, brother, so that I do not go there

12   create problems with them..."

13   Q.    "No!  Did you have a problem with them?"

14   A.    "No, I did not do anything..."

15   Q.    "But you know that they will take the amount, they will

16   send us the check."

17   A.    "No, I took the check from them.  I did."

18   Q.    "Did you take the check from them?"

19   A.    "Of course."

20   Q.    "You are really something, Mufid.  Good, I will always

21   send you to Boston."

22   A.    "What do you think I am coming to do?"

23   Q.    "Good, give me an amount that will also cheer me up."

24   A.    "I would not leave them.  I collected twelve thousand

25   dollars from them."

```
1    Q.    "Twelve thousand?  Have you already brought twelve

2    thousand dollars?"

3    A.    "No."

4    Q.    "How much did they give you?"

5    A.    "There are approximately four thousand in pledges."

6    Q.    "Yes."

7    A.    "So they kept those pledges...I do not even know their

8    names."

9    Q.    "Good, I will call Osama now."

10   A.    "And they took around eight thousands, so the total in

11   cash they had in hand is eight thousands."

12   Q.    "Eight thousand dollars."

13   A.    "They took 15 percent..."

14   Q.    "Fine..."

15   A.    "...so I brought around seven thousands with me."

16   Q.    "Seven thousand dollars.  Ok, thank God, thank God, you

17   have become on top of the list, you."

18   A.    "Tell me College Station..."

19   Q.    "Yes?"

20   A.    "You did not know what happened in College Station."

21   Q.    "What happened in Co..."

22   A.    "It turned out that the guys had been exhausted."

23   Q.    "I know."

24   A.    "...because you went the last week."

25   Q.    "So..."
```

1    A.    "But how much do you think we brought?"

2    Q.    "Five thousands?"

3    A.    "What?"

4    Q.    "Five?"

5    A.    "No, man!  That is shameful, we do not talk about

6    fives..."

7    Q.    "Ten?"

8    A.    "Eleven thousand five hundred which I brought in cash

9    with me."

10   Q.    "You brought with you eleven thousand five hundred?  I

11   swear to God you are something, Mufid.  You deserve a kiss

12   between your eyes.  You deserve a kiss between your eyes."

13   A.    "Of course this is besides what will come in the mail."

14   Q.    "God willing, may God recompense you well.  May God

15   recompense you well, Sheik.  Does this mean we will see you

16   tomorrow?"

17   A.    "By the way, between you and me, I am exhausted."

18   Q.    "Fine, we will see you tomorrow after the break-of-fast,

19   God willing."

20   A.    "You see, I have arrived from Carrollton."

21   Q.    "I know, by God, I know."

22   A.    "Who told you?"

23   Q.    "You told me, you said, 'I have Carrollton on Sunday.  I

24   want to come for Carrollton.'"

25   A.    "By God, I went there, thank God, also..."

1   Q.   "How much did you collect in Carrollton?"

2   A.   "I do not know, thirty-five to forth thousands for them."

3   Q.   "For the mosque, right."

4   A.   "Yes, for their mosque."

5   Q.   "Well, good, may God recompense you well."

6   A.   "That's good, I mean, it is for their mosque; I mean

7   money for them as they say."

8   Q.   "May God recompense you well, Sheik, may God recompense

9   you well."

10  A.   "May God..."

11  Q.   "We will see you then, God willing."

12  A.   "But by God, Ibrahim, it is a trip...a

13  trip...tsk-tsk-tsk."

14  Q.   "God granted you acceptance, Sheik."

15  A.   "God, glory to Him, protected me; the trip to Boston,

16  man..."

17  Q.   "Um..."

18  A.   "Exhausted me exhausted me beyond exhaustion."

19  Q.   "That is all right, Sheik!"

20  A.   "What one..."

21  Q.   "You are capable of that and more, Mufid."

22  A.   "Er, God willing."

23  Q.   "Capable of that and more, and our God will recompense

24  you well; with those amounts, see how many families will pray

25  for you, God willing."

1   A.   "By God, this is one's hope, Ibrahim."

2   Q.   "May God recompense you well."

3   A.   "By God this is one's hope, what do you think, it is

4   one's faith in God; Glory to Him."

5   Q.   "May God recompense you..."

6   A.   "...now Windsor, we have received in our pocket

7   twenty-two thousands."

8   Q.   "May God recompense you well, our Sheik."

9   A.   "Uh-uh?"

10  Q.   "Uh-uh."

11  A.   "Other than what will be sent, I mean, I phew!  By God

12  these are the blessings of God, glory to him."

13  Q.   "Praised by God, praised be God."

14  A.   "By God, between you and me, the people are...good

15  manners and politeness."

16  Q.   "Fine our Sheik, let me go, I have to go to the airport,

17  but I will see you tomorrow, God willing."

18  A.   "Fine, peace be upon you."

19  Q.   "And peace be you upon you, our Sheik."

20         MS. CADEDDU:  Your Honor, under Rule 106 I would

21  like the Arabic tape to be played as well.

22         THE COURT:  I am not sure I understand the purpose

23  of that.

24         MS. CADEDDU:  Well, the purpose, Your Honor, is that

25  the intonation and the way people talk and the tone of voice

1    is important to understand the context of the conversation.  I

2    think reading it in a monotone does not really give full

3    effect to the tone of voice that was used.

4           MR. DRATEL:  Your Honor, in addition, the italics

5    are not italics in terms of emphasis, and it distorts the

6    meaning.  And we thought that the italics would be removed

7    because they have to do -- some are in Arabic and some are in

8    English, and it distorts the reading so you would

9    automatically think there is emphasis when it is not.  It is

10   an English word used in the middle of an Arabic sentence, and

11   without hearing the conversation it really does create -- it

12   is just hard to read them that way.  It has been hard to read

13   them this way from the beginning.  That is why we thought the

14   italics were going to be removed, so there wouldn't be that

15   reaction that it is for emphasis.

16          THE COURT:  All right.  Under the provisions of the

17   Rule of completeness, I will order that Government's Exhibit

18   No. 18-6 be played at this time.

19          MR. JACKS:  Your Honor, the reason that this

20   particular exhibit was read as it was, it is my understanding

21   there is a problem with the audio of the laptop at this time,

22   and so -- This was the only one that we were going to make

23   reference to this afternoon, and so that was why it was done

24   in this manner.

25          We can certainly the next time we are back in Court, once

1    we have time to make sure that the audio is working, play this

2    exhibit.  But that was the purpose and reason it was done at

3    this time in this manner.

4         THE COURT:  So you are telling me that it is not

5    possible to play 18-6.

6         MR. JACKS:  Yes, sir, at this time.

7         THE COURT:  Very well.  I suppose we will have to

8    delay that, then, until the next session when the equipment is

9    working.

10        MR. JACKS:  May I proceed, Your Honor?

11        THE COURT:  Yes, sir.

12   Q.  (BY MR. JACKS)  Let me go back just for a moment, Agent

13   Burns, to your interview with Mufid Abdulqader.  During that

14   interview did you ask him about his relationship, if any, to

15   Khalid Mishal, the head of Hamas?

16   A.   Yes, I did.

17   Q.   What did he tell you about his relationship to him?

18   A.   He said that it was his half brother.

19        MR. JACKS:  May I approach the witness, Your Honor?

20        THE COURT:  Yes, sir.

21   Q.  (BY MR. JACKS)  Agent Burns, I am going to hand you three

22   file folders labeled Government's Exhibit No. 11-4, 11-7, and

23   11-9, and ask you to look at those.

24        Do you have 11-4 in front of you.

25   A.   Yes, I do.

1   Q.   And if you would, just describe what 11-4 is.

2   A.   This is a designation and blocking order from the Office

3   of Foreign Assets Control.

4   Q.   What branch of the Government does that fall under?

5   A.   The United States Treasury Department.

6   Q.   All right.  And is that a certified copy of that record?

7   A.   Yes, it is.

8            MR. JACKS:  Judge, we move the admission of

9   Government's Exhibit No. 11-4.

10           THE COURT:  Any objection?

11           MR. CLINE:  No objection.

12           THE COURT:  Government's Exhibit No. 11-4 is

13   admitted.

14           MR. JACKS:  Could you display that, please?

15   Q.   (BY MR. JACKS)  Is that visible on your screen as well,

16   Agent Burns?

17   A.   Yes, it is.

18   Q.   And the certification is the first page.  Is that

19   correct?

20   A.   Yes.

21   Q.   And if you would, go to the second page, please.

22       And if you would, just describe that exhibit for us.

23   A.   This is the Department of Treasury's designation and

24   blocking memorandum pursuant to Executive Order 13224, and it

25   lists a number of entities and individuals whom it has

1    designated.

2    Q.   And if you would, can you tell us the entities that are

3    relative to this case?

4    A.   Yes.   No. 1 is the Commiti De Bienfaisance et de Secours

5    aux Palestinians--I am sure I butchered that--referred to as

6    the CDSB.   No. 2 is the Palestinian Association of Austria.

7    No. 3 is the Palestinian Relief and Development Fund, a.k.a.,

8    Interpal.   No. 4 is the Sanabil Association for Relief and

9    Development.   No. 5 is the Association de Secours

10   Palestinians.

11   Q.   Go ahead.

12   A.   I was going to just add that that one is in Switzerland.

13   Q.   Okay.   And the individuals that are referenced in there,

14   how many are there?

15   A.   There are six individuals.

16   Q.   And would you just tell us who they are?

17   A.   Yes No. 1 is Sheik Ahmed Ismail.   No. 2 is Imad Khalil

18   Al-Alami.   No. 3 is Usama Hamdan.   No. 4 is Khalid Mishaal.

19   No. 5 is Musa Abu Marzouk.   And No. 6 is Abdel Aziz Rantisi.

20   Q.   Let me direct your attention to 11-5.

21   A.   That is not one of the ones that I was handed.

22   Q.   I am sorry.

23   A.   I have 11-7.

24   Q.   I am sorry.   No. 11-7.   And what is that exhibit and

25   where is it from?

1    A.    This is designation order from the U.S. Treasury

2    Department, Office of Foreign Assets Control.

3    Q.    And is it a certified copy?

4    A.    Yes, it is.

5            MR. JACKS:  Move the admission of Government's

6    Exhibit No. 11-7.

7            MR. CLINE:  No objection.

8            THE COURT:  Government's Exhibit No. 11-7 is

9    admitted.

10           MR. JACKS:  Could you display that, please?

11   Q.    (BY MR. JACKS)  Just describe or would you describe that

12   exhibit for us, please, Agent Burns?

13   A.    Yes.  This is a document, a blocking memorandum which

14   notes the designation of Mousa Abu Marzook as a specially

15   designated terrorist.

16   Q.    And are there aliases or other names, a.k.a.s listed

17   there?

18   A.    Yes.  Mousa Abu Marzook is listed with several a.k.a.s.

19   The first few involve various spellings of his name, and then

20   he is also noted as Abu Umar, and he is noted to be the

21   political leader in Amman, Jordan and Damascus, Syria for

22   Hamas.

23           MR. JACKS:  Go to the second page, please.

24   Q.    (BY MR. JACKS)  And this again just describes the

25   blocking memorandum?

1    A.    That is correct.

2    Q.    What was the date that this memorandum was issued?

3    A.    August 16th, 1995.

4    Q.    The last paragraph there, what does it refer to, the one

5    that begins in consequence?

6    A.    It states, "...all real and personal property of..."

7    Mousa Marzook "...including but not limited to all accounts in

8    which the above-named subject has any interest, are blocked;

9    and all transactions involving U.S. persons and..." Mr.

10   Marzook "...named above..." "...are prohibited unless licensed

11   by the Office of Foreign Assets Control."

12   Q.    What is the other exhibit I just handed you that you

13   have?

14   A.    11-9.

15   Q.    And would you please just describe it?

16   A.    This is a certified copy of a designation of blocking

17   order from the Office of Foreign Assets Control.

18           MR. JACKS:  Move the admission of Government's

19   Exhibit No. 11-9, Your Honor.

20           MR. CLINE:  No objection.

21           THE COURT:  Government's Exhibit No. 11-9 is

22   admitted.

23           MR. JACKS:  Could you display that, please?

24   Q.    (BY MR. JACKS)  And just, if you would, describe the

25   first page, Agent Burns, for that exhibit.

1    A.    This is the blocking notice for Shaykh Ahmad Yasin,

2    founder and chief ideological figure of Hamas.

3    Q.    And the date that this particular designation went into

4    effect?

5    A.    I believe we have to go to page 4 of the exhibit for

6    that.  And that is January 23rd, 1995.

7    Q.    Now, there are other people, individuals that are listed

8    in this designation.  Is that correct?

9    A.    Yes, individuals and organizations.

10   Q.    Okay.  And if you would, is Shaykh Yasin further

11   described on this page that is shown on the screen?

12   A.    Yes.  Shaykh Yasin is described as the founder and chief

13   ideological figure of Hamas.

14   Q.    That is like the third paragraph down from the top?

15   A.    Yes.  And though it was not mentioned on the first page,

16   this also designated Hamas as a special designated terrorist

17   on page 2.

18   Q.    And just, if you would, just describe where you see that

19   designation, what listing?

20   A.    It is the third name under organizations on page 2, hamas

21   a.k.a., the Islamic Resistance Movement.

22   Q.    Thank you.

23         Do you have Government's Exhibit No. 3-91 in front of you

24   in the binder?

25   A.    Yes, I do.

1   Q.   Could you turn to that, please?  Do you have it?

2   A.   Yes.

3   Q.   And how many pages is Government's Exhibit No. 3-91?

4   A.   Two pages.

5   Q.   And where did it come from, that particular document?

6   A.   This was seized from the home of Ismail Elbarasse.

7        MR. JACKS:  Your Honor, move the admission of

8   Government's Exhibit No. 3-91.

9        THE COURT:  Any objection?

10        MR. DRATEL:  No objection, Your Honor.

11        THE COURT:  Government's Exhibit No. 3-91 is

12   admitted.

13        MR. JACKS:  Could you display it, please?

14   Q.   (BY MR. JACKS)  Now, this document you said came out of

15   the search of Ismail Elbarasse's house in northern Virginia.

16   Is that correct?

17   A.   Yes.

18   Q.   If you would, just describe what this document shows.

19   A.   This is a listing of the I.A.P. executive committee and

20   I.A.P. co-executive committee.

21   Q.   And you have made reference -- Just describe, if you

22   will, the names shown.

23   A.   Individuals that we have already mentioned, the first one

24   is Y. Bushnaq.  That is Yasser Bushnaq in Dallas, Texas.

25   Ghassan Saleh down the first page is Ghassan Saleh that we

1    mentioned earlier, Ismail Elbarasse is the individual from

2    whose home this was seized.

3    Q.    And where is he mentioned on this list?

4    A.    He is on the bottom right corner of the first page.

5    Q.    Is that Ismail Barassi where it says

6    "Washington-National"?

7    A.    Yes.  That is a phonetic spelling of his name.

8    Q.    Go ahead.

9    A.    And then on the second page, on the top half of the page

10   the first individual in the left hand corner Fawaz Mushtaha.

11   Q.    Where was that name mentioned earlier?  What is the

12   relationship?

13   A.    The search warrant that was conducted on his home in

14   2003.

15   Q.    Okay.  And is the source of some of the exhibits in the

16   case?

17   A.    Yes.

18   Q.    Okay.  Go ahead.

19   A.    Basman Elashi and Ghassan Elashi.

20   Q.    And where does it show where Basman Elashi and Ghassan

21   Elashi resided at the time this was generated?

22   A.    In Los Angeles, California.

23   Q.    And if you will, just tell us what it shows there for the

24   location for the Islamic Association of Palestine.

25   A.    It shows the information office for the I.A.P. to be that

1    same, P.O. Box 741805 in Dallas, Texas.

2    Q.    Do you have Government's Exhibit No. 5-18 in front of

3    you?

4    A.    Yes, I do.

5    Q.    And how many pages is that exhibit?

6    A.    Two pages.

7    Q.    And what is the source of that particular exhibit?

8    A.    This is a record obtained from Commerce Bank.

9            MR. JACKS:  Judge, we move the admission of

10   Government's Exhibit No. 5-18.

11           MR. CLINE:  Objection; relevance and 403.

12           THE COURT:  What is the relevance, Mr. Jacks?

13           MR. JACKS:  Your Honor, it is to show the

14   association and the relationship between Mousa Abu Marzook and

15   the Islamic Association of Palestine.

16           MR. CLINE:  It is dated 1985, your Honor, from the

17   exhibit list.

18           MR. JACKS:  That may go to the weight, Your Honor,

19   but it still we believe relevant.

20           THE COURT:  I think I am going to sustain the

21   objection to relevance without some further explanation.  I

22   believe that the date is pretty remote.

23   Q.    (BY MR. JACKS)  Agent Burns, you have discussed briefly

24   the source of the materials that you used or some of the

25   sources of materials that you used to conduct your

1    investigation.

2         In the course of conducting this investigation, did you

3    come across documents or audiotapes or videotapes that made

4    reference to the Muslim Brotherhood.

5    A.    Yes, I did.

6    Q.    And in the course of examining all of these items, did

7    you become familiar with the terms that are used by the Muslim

8    Brotherhood?

9    A.    Yes, I did.

10   Q.    Let me ask you regarding some of those terms.  A term

11   like --

12             MR. DRATEL:  Objection, Your Honor.  What is the

13   basis for this?  Is this testifying as an expert?  In what

14   capacity are these Arabic terms originally, the documents or

15   information that they came from -- there is a whole range of

16   providence objections, and basis for knowledge.

17             THE COURT:  I am not sure I have heard the question

18   yet so I am going to hold the objection in abeyance for a

19   moment until I hear the question.

20   Q.    (BY MR. JACKS)  Let me ask you, Agent Burns, I am going

21   to put this question to you to allow the Judge to rule.  In

22   the course of this investigation, did you become familiar with

23   the term ikwad (phonetic)?

24   A.    Yes, I did.

25             MR. DRATEL:  Your Honor, objection.  I will let Mr.

1    Cline --

2              MR. CLINE:  Your Honor, I object on 401 and 403

3    grounds.  I also object because I believe this is going to be

4    opinion testimony.  We have had no expert notice and haven't

5    had the sort of hearing that we would normally have.

6              THE COURT:  I will sustain the objection to the

7    question as framed, Mr. Jacks.  When you say "become familiar

8    with," I think we need to find out more what that means, how

9    she became familiar with it and what context.  Sustained.

10             MR. JACKS:  Yes, sir.

11   Q.   (BY MR. JACKS)  In reviewing documents that made

12   reference to the Muslim Brotherhood, did you come across terms

13   that you saw quite often or that repeated?

14   A.   Yes, I did.

15   Q.   All right.  And did you either through -- Did you seek to

16   determine what those terms meant?

17   A.   During witness interviews of native Arabic speakers I

18   asked the question, consulted --

19             MR. DRATEL:  Objection.  I believe hearsay is coming

20   in.

21             THE COURT:  It sounds like it, but overruled at this

22   point.

23   Q.   (BY MR. JACKS)  So you said you talked to persons that

24   spoke Arabic?

25   A.   That is correct.

1   Q.   Did you do research and read materials about the Muslim

2   Brotherhood?

3   A.   Yes, I did.

4   Q.   In those materials was there information about the

5   terminology or terms that applied to the Muslim Brotherhood?

6   A.   Yes.

7            MR. DRATEL:  Still hearsay, Your Honor, even if it

8   is written.

9            THE COURT:  Sustained.

10  Q.   (BY MR. JACKS)  Let me ask you, Agent Burns, you said

11  that you had met Mohammad El-Mazain.  Is that correct?

12  A.   That is correct.

13  Q.   And have you interviewed him?

14  A.   Yes, I have.

15  Q.   How many times, if you recall?

16  A.   More than once.

17  Q.   All right.  Were any of those interviews conducted in the

18  presence of his attorney --

19  A.   Yes.

20  Q.   -- at the time?

21  A.   Yes.

22  Q.   In the course of that interview or that interview that I

23  am referring to, did you ask him whether or not he was a

24  member of the Muslim Brotherhood?

25  A.   I did.

1    Q.    And what did he say?

2    A.    He said he was.

3    Q.    I am sorry?

4    A.    He said that he was a member of the Muslim Brotherhood.

5    Q.    In the course of examining materials that you

6    were -- were presented to you in this case, did you come

7    across materials that made reference to the Muslim

8    Brotherhood?

9    A.    Yes, I did.

10   Q.    Do you have Government's Exhibit No. 3-14 in front of

11   you?

12   A.    Yes, I do.

13   Q.    Where did that exhibit come from originally?

14   A.    This document was seized from the home of Ismail

15   Elbarasse.

16   Q.    How long is that exhibit?

17   A.    Five pages.

18   Q.    And if you would, describe -- Is it in an Arabic version

19   and a translated version?

20   A.    Yes.  The first two pages of the exhibit are the Arabic

21   typewritten --

22   Q.    How many pages are in Arabic?

23   A.    Two.

24   Q.    All right.

25   A.    And then the following three pages are the English

1    translation of that document.

2    Q.   And obviously you have reviewed the English translation.

3    Is that correct?

4    A.   That is correct.

5            MR. JACKS:  Judge, we move the admission of 3-14.

6            MR. DRATEL:  Objection, Your Honor; hearsay

7    providence, foundation.  We have no idea who wrote it.  There

8    is no indication anyway of any kind of authentication of the

9    document, and it is total hearsay.

10           MR. JACKS:  Your Honor, we are offering it as a

11   co-conspirator's exception to the hearsay rule.

12           MR. DRATEL:  Your Honor, I think as a threshold

13   matter there has been no showing that it is admissible under

14   that exception.

15           THE COURT:  I agree.  I think we need a further

16   foundation before I could consider admitting it on the basis

17   of that exception.  Sustain the objection as the record

18   currently stands.

19           MR. JACKS:  Your Honor, in order to lay the

20   foundation, we would have to make reference to the contents of

21   the document, and so I don't know how the Court wants to

22   approach this, but the next series of exhibits are going to be

23   of a similar nature, and it is one of those matters that the

24   Court indicated in pretrial conferences that you would have to

25   make a decision at the time regarding the state of the

1    evidence and that type of thing.

2         THE COURT:  Well, perhaps we should go ahead and

3    excuse the jury for the day and let you make your offer of

4    proof in that regard.

5         Ladies and gentlemen, you may remember I announced

6    beginning of the week that we would only be in session Monday

7    through Thursday, and this being Thursday afternoon, we will

8    be in recess until next Monday morning.

9         Because we will be away from each other for several days

10   and nights, I want to go over with you again to refresh your

11   memories and to emphasize the importance of observing the

12   rules that I have given you regarding your conduct as jurors

13   in this case.

14        First, don't discuss this case with anyone or permit

15   anyone else to discuss it with you.  That includes your

16   family, your friends, and the people with whom you work or

17   associate.

18        Second, don't do any research or investigation about this

19   case on your own, including on the internet.  Don't read or

20   watch or listen to any media accounts of the case, if there

21   are media accounts either in the newspaper or on television,

22   radio, or the internet.  And don't have any contact or

23   conversation with anyone that you know to be connected with

24   the trial of this case.

25        I hope all of you have a pleasant weekend, and we will

1    see you Monday morning at 9:00.

2              (Whereupon, the jury left the courtroom.)

3              THE COURT:  I don't believe I have a copy of that

4    document, Mr. Jacks, so if you feel that you need to display

5    its contents to me in order to make your offer of proof under

6    the co-conspirator hearsay exception, perhaps you should

7    display it on the screen.

8              MR. JACKS:  Yes, Your Honor.

9         If I may, before doing that, if the Court has the

10   Government's exhibit list in front of it.

11             THE COURT:  Yes.

12             MR. JACKS:  On the first page it talks about the

13   exhibits that are in what I will refer to as Series 3, and it

14   shows to be 99 in number, and that those exhibits came from

15   the search of Ismail Elbarasse's residence.

16             THE COURT:  Yes, sir.

17             MR. JACKS:  So all of those items listed in that

18   Series 3 fall within that category, or that is where they came

19   from.

20        Rather than just focusing on this particular exhibit, the

21   same -- essentially the same argument is going to apply for a

22   large number of these items that the Government is going to be

23   offering under the co-conspirator exception to the hearsay

24   rule, or, as we stated in our trial brief, the joint venture

25   exception, if you will, under the Rules of Evidence.

1    With regard to all of these items, what I had intended to

2    do and thought about trying to do, but I wasn't sure if the

3    Court would welcome this suggestion, was to provide a binder

4    to the Court with all of these items listed -- Not listed.  I

5    am sorry.  Actually copies of them, so that the Court can

6    review them.  They vary in length.  Some of them, you know,

7    are just a few pages.  Some of them are more.  I can make

8    reference to the excerpts on the longer ones to the part that

9    the Government contends or intends to submit, and my intention

10   was to -- I think I was going to try to do it in some kind of

11   chart form and just show the Court the Government's theory

12   under which it should be admissible under the co-conspirator

13   exception to the hearsay rule, or if it falls under another

14   exception, and also make reference to that.

15       I just -- I thought that might be the most efficient way

16   to do it, rather than going item by item and having the jury

17   sit here.

18       And I am not sure if I could have done it earlier, Your

19   Honor, given the Court's perfectly logical answer that, "Well,

20   I won't know until we get to that point in the trial."  So I

21   apologize that, you know, this hasn't been done, but I do

22   think that it might be the most efficient way for the Court to

23   look at these documents and make a decision on them.

24       A lot of what the Government submits will support the

25   admissibility of what is contained within the documents and

1   also the correlation between these documents.  In other words,

2   one item in one document would support the inference that the

3   other document is also a co-conspirator statement, which is

4   permissible under *Bourjailly* and the under 801(d)(2)(E).  So

5   that was one thing I contemplated doing.

6       I don't know if the Court is interested in that or

7   thinks --

8           THE COURT:  I guess it depends on timing.  We don't

9   have to worry about the jury waiting anymore, since they have

10  been excused for the next few days, but when exactly did you

11  expect to have this chart available for me to look at and the

12  documents to which it refers?

13          MR. JACKS:  I have got the documents copied and in

14  binders and can deliver those tomorrow.  The chart, if you

15  will, I think I can have by the end of the day tomorrow.  And

16  as I said, I just think it is an unusual thing to do, but I

17  think in the long run it will speed things up and somewhat

18  accelerate the issues of our disagreeing over these exhibits

19  and whether they are admissible or not.

20          THE COURT:  I am certainly willing to give it a try.

21  I think it would also be helpful in connection with the

22  preparation of this chart.  And this need not be lengthy, but

23  if you would set out for me what elements you think you have

24  to prove as the proponent of this evidence to meet this

25  co-conspirator exception and how these various excerpts that

1    you are relying on satisfy that burden.

2          MR. JACKS:  We touched upon that some in your trial

3    brief, but certainly I can restate that or take the applicable

4    parts and put it in this document that I am talking about.

5    But anyway --

6          THE COURT:  Well, I will need that, in order to do

7    me any good, by the close of business tomorrow so that I can

8    review it over the weekend and be prepared to make a decision

9    on Monday morning whether you have in my view satisfied your

10   burden or not.

11         MR. JACKS:  And in the event -- I am not sure how

12   long it will take, Your Honor.  But in the event I don't get

13   all the way through it, I will certainly give the Court what I

14   have with regard to the exhibits and then supplement it later.

15         THE COURT:  Just on another subject that may affect

16   our progress on Monday when we next are in session, it is my

17   understanding that there is some malfunction of the equipment

18   to play audio on the Government's laptop, and so it is my

19   understanding that efforts will be underway in the next few

20   days to remedy that problem.

21         MR. JACKS:  Yes, sir.

22         MR. CLINE:  Excuse me, Your Honor.

23         THE COURT:  Yes, sir.

24         MR. CLINE:  On the issue of the co-conspirator

25   statements, if we could get both the binder from Mr. Jacks and

1    the chart as soon as it is available at whatever shape it is

2    available, we can be prepared Monday morning to address the

3    issue.  If Your Honor would like to start early, we are happy

4    to do that.

5              THE COURT:  I don't know that I need to hear from

6    the Defendants.  I think it is the Government's burden, and I

7    understood from Mr. Jacks that he thinks he can satisfy this

8    burden by simply what is in the documents themselves.  I

9    reserve decision on that.  I don't know if that is so or not.

10   But I don't want to spend a lot of time while the jury is

11   waiting on Monday morning at 9:00 hearing from lawyers.  We

12   can spend all day arguing about this.

13             MR. CLINE:  I just am wondering if it would be

14   possible, because there may be some legal issues as well, if

15   it would be possible to get together a little early Monday

16   morning and spend 15 minutes or so discussing that.

17             THE COURT:  I don't object to that, if we can in 15

18   minutes, but you know everybody on that side of the table, if

19   everybody wants to be heard, about two minutes each --

20             MR. CLINE:  How about if we agree that only one of

21   us will speak?

22             THE COURT:  That is a start.

23             MR. CLINE:  We will agree that only one of us will

24   speak.  I will not commit to which one, but only one of us

25   will speak.

1          MR. JACKS:  I will nominate Mr. Jonas for the

2     Government.

3          THE COURT:  All right.

4          MR. CLINE:  So, Your Honor, just to be clear,

5     because I don't want to be coming back in, 8:45 on Monday

6     morning.  Is that all right?

7          THE COURT:  Yes, sir.

8          MR. JACKS:  May I just ask, do you want me to create

9     a separate binder for you or can you simply print out what is

10    shown on the exhibit list?

11         MR. CLINE:  If the binder is just going to contain

12    the 3 series exhibits, we don't need a second binder.

13         MR. JACKS:  All right.

14         MR. DRATEL:  Your Honor?

15         THE COURT:  Yes, sir.

16         MR. DRATEL:  Just two things.  One is so we don't

17    have the situation following with the transcripts, like if the

18    Court could inquire of the Government whether it is going to

19    remove those italics so that it doesn't create an issue.

20         THE COURT:  I did intend to raise that myself, but

21    since you have raised it, what about that, Mr. Jacks?  I have

22    not seen the transcript that was utilized earlier when you and

23    Agent Burns were reading from it, so I did not observe

24    personally that it was in italics, but evidently that is an

25    issue of concern to the Defense.

1          MR. JACKS:  Yes, Your Honor.  In fact I believe it

2     was Ms. Hollander or Ms. Duncan, she had written me a letter

3     or an email, I am not sure which, but asking the Government to

4     remove the italics.  And let me give the Court a copy of this

5     particular transcript.  And the first page there, the key or

6     index, whatever you care to call it, shows that italics are

7     used to indicate that the speakers said something in English,

8     and that is the purpose for the italics.  And I think that the

9     Government's position is that that is reasonable and it is not

10    prejudicial to the Defendants.  I mean, it does what it

11    purports to do.  It just says at this particular point in the

12    conversation they said something in English.  I don't think it

13    unduly emphasizes that word.

14         I know that that is a writing style that some people use,

15    when they want to emphasize something they will convert it

16    from a regular font to an italics, but I don't think that a

17    juror would think that, you know, that this is -- you know,

18    that there is something extra that ought to be taken from this

19    word.

20         I just don't simply think that it is that prejudicial,

21    particularly when they can see, or if we have to just tell

22    them, you know, at one time that that is the reason these

23    things are in italics.  It is not because you need to pay

24    special attention to this word.  It is just because the

25    speakers, you know, instead of speaking Arabic they have now

spoken in English, or whatever the difference may be.  And I

just don't think it is that prejudicial, and it does

help -- It might help the jurors if they are following these

transcripts to -- You know, if they get lost during the

Arabic, and they can say, "Okay.  Here is an English word," so

it might in fact serve a benefit to get them reoriented, and I

don't think that the prejudice is there.

MR. DRATEL:  Your Honor?

THE COURT:  Just a moment, Mr. Dratel.

When the jury filed out, I have thought maybe we would

need testimony from you on this co-conspirator exception to

the hearsay rule, but evidently we don't for the moment.  And

for the record, let me say that Mr. Jacks handed me just now

Government's Exhibit No. 18-5, which is apparently a 12-page

transcript that was the subject of this afternoon of him and

Agent Burns reading.

I had not, to my memory, seen this before, Mr. Dratel, so

I guess my assumption, based upon your comments, that the

italics was for emphasis, but I now understand it is to

distinguish the English part of the conversation from the

Arabic part of the conversation.

MR. DRATEL:  That is the problem, Your Honor.

Because I have read some of these conversations a half dozen

times, and even myself I can't just say when I read it, it

automatically, from training about what italics -- I mean, I

1    have to stop myself and say, "No, this is not for emphasis."

2    And it totally takes out from the comprehension and it creates

3    a totally different context in the way that you read it.  And

4    I think that someone following Mr. Jacks the way it is

5    supposed to, the jury is not going to know Arabic.  They are

6    not going to be following Arabic.  It is all in English.  The

7    fact one is English is not going to make a difference to a

8    juror reading a transcript.  All it does is interfere with

9    your comprehension of it.

10          THE COURT:  You think it should all be in Roman

11   type?

12          MR. DRATEL:  There are other conversations, very

13   long, very involved, with some very long passages from people,

14   and when you see this it just completely disrupts -- it

15   stymies your ability to follow and really grasp the

16   conversation the way it happens as opposed to -- And

17   particularly on the fly where jurors are going to be listening

18   to a conversation and read on the fly, they can't do it like

19   we do it in preparation, which is look at it, look at it,

20   figure out, go back to the beginning, read it in Arabic or

21   English which language is it.

22          THE COURT:  Mr. Jacks makes the point, which I

23   thought was persuasive, that in a conversation such as this

24   one reflected in 18-5, that the portions in English would be

25   sort of guideposts to someone who doesn't speak Arabic, but

1    you could at least recognize the English portions of this

2    conversation and sort of see where you are in the transcript.

3    Are you telling me that the English is unintelligible to an

4    English speaker?

5              MR. DRATEL:  No.  I am saying what is the

6    difference?  If they will be following it in Arabic, hearing

7    it in Arabic, it will be of no comprehension value to him.

8    The comprehension value is the transcript, and this actually

9    interferes with that comprehension value.

10             THE COURT:  Well, I am not persuaded by your

11   argument, so I am not going to require the Government to

12   change the italics.  I think it probably would be useful.  And

13   I don't know that the jury has seen this either.  I think this

14   was not displayed to them this afternoon when this portion of

15   the conversation was read.

16             MR. DRATEL:  I think it was, Your Honor.  It looked

17   like they were reading.

18             MR. JACKS:  It was on the screen.

19             THE COURT:  Did you say it was or was not?

20             MR. DRATEL:  I believe it was.  It looked like they

21   were reading.

22             MR. JACKS:  It was on the screen.

23             THE COURT:  Okay.  I didn't remember that.  So it

24   may be that we need to clarify to them what the meaning of

25   italics is in these transcripts; that it is a reflection of

1    the English portion of the conversation rather than any

2    emphasis on the words.  But other than that, I am going to

3    overrule the objection, if there is one on that ground.

4         And insofar as the Rule 106 objection that was made

5    earlier by Ms. Cadeddu, I have been reflecting on that and I

6    don't know that I see the utility, especially if that is going

7    to be a recurring request every time one of these transcripts

8    comes up.  So I think I would like to have some briefing on

9    that and some case law if you are serious about pursuing that

10   on what other courts have done when faced with this situation.

11             MS. CADEDDU:  Yes, Your Honor.

12             THE COURT:  And so I would like that before we begin

13   on Monday morning, preferably by the close of business

14   tomorrow afternoon, so I can have a decision about it before

15   we begin on Monday.

16             MR. WESTFALL:  Your Honor, one other thing on the

17   transcripts.  Mr. Jacks handed you one where the key in the

18   front it says "italics spoken in English."  The vast majority

19   of them, though, say in their key "italics" and then "spoken

20   in foreign languages."  So the vast majority of those

21   transcripts it doesn't say italics equals English, even though

22   that is a fact.  Virtually every time, any time they are

23   speaking in italics that I have seen it has been in English.

24   But if we never hear the recordings especially, the

25   translations where it just says "italics spoken in foreign

1   languages," I think we would all feel much more comfortable if

2   that were cleared up that when it is italics we actually know

3   the language they are speaking in.

4           MS. HOLLANDER:  Actually, Your Honor, there are some

5   in English.  There aren't very many, but there are some in

6   English and the italics are what is in Arabic because the

7   italics, or whatever, is not the major language of the

8   conversation.

9           THE COURT:  Okay.  Well, perhaps that needs to be

10  clarified in some fashion before any extensive use of these

11  transcripts is made.

12          MR. JACKS:  Yes, sir.  And I don't know if that just

13  means an instruction to the jury to let them know that this is

14  what it is, or if having the witness each time that one of

15  these is played just clarify that, you know, the bulk of the

16  conversation is in this language, but as you can see from the

17  key if they speak in a different language then it will be in

18  italics.

19          THE COURT:  How many of these transcripts do you

20  anticipate we will be using in the course of this trial?

21          MR. JACKS:  Well, I think we were thinking in terms

22  of a couple of hundred, and we have been seriously thinking

23  about reducing that.  So I mean, right now I would say the

24  universe, the outside universe is a couple of hundred, and

25  then with our hope that, you know, we -- And again, I should

1    say with some of those it will be excerpts, not the entire

2    conversation.  So --

3            THE COURT:  With that number it sounds to me like

4    probably, even though this will be a little more time

5    consuming, but it would probably be a good idea that every

6    time you use one of these to cover with whatever witness is

7    being questioned about it what the meaning of italics in that

8    particular transcript is.

9            MR. JACKS:  Yes, sir.  We can do that.

10           THE COURT:  Anything else?

11           MR. DRATEL:  Yes, Your Honor.  Two things.  One is

12   in the Court's rule for the conduct at trial Section 5.5, it

13   says, "In advance of each trial sentence counsel for the party

14   conducting direct examination at that session should show

15   opposing counsel the exhibits he or she intends to introduce

16   at that session."  We did not get that today, and I would hope

17   that this would be something that will be rectified.

18           THE COURT:  It did not seem that things were very

19   well organized today, and I have heard anecdotally that that

20   was because we made faster progress than the Government

21   anticipated, which I guess is a good thing.  But it did seem

22   to throw things out of whack for the balance of today.

23       Yes, I do want to emphasize that requirement to all

24   parties, and would hope that Monday the Government will be in

25   compliance with that, as well as the *Jencks* material

1    requirement, which I think my scheduling order also requires

2    to be given at least by the -- Well, the statute itself

3    requires at least by the time cross examination begins, and I

4    think my scheduling order says by the time the witness is

5    called to the stand.

6         MR. JACKS:  Yes, Your Honor.  And I apologize, but

7    the Court is correct in that the Government anticipated that

8    the witnesses that we had today would basically fill up the

9    day, and so that is not an excuse, but it is an explanation.

10        And I apologize for not having the exhibits to give to

11   them, because, quite frankly, I didn't think we would reach

12   Agent Burns today.

13        With regard to the *Jencks*, I have indicated to the Court

14   this morning or -- yes, this morning, that I hoped I would

15   have it by the end of the day today.  I told Defense

16   counsel--I don't think I have told all of them because they

17   were not all in the courtroom at the time--that I will have it

18   by in the morning, and the reason I don't have it now as

19   opposed to in the morning is that it is classified, and not

20   all of it but part of it is, so I have to get it declassified

21   and I will have it for them in the morning.

22        THE COURT:  Along that line, or at least in my mind

23   it is related, Mr. Dratel, I think my order also says

24   something--it may not be that exact section--to the effect

25   that if counsel is examining a witness about a series of

1    documents, that those documents should all be placed on the

2    witness chair at the beginning of the examination, and that

3    really was not done by the Defense when they were cross

4    examining our first witness Doctor Levitt.

5              MR. DRATEL:  Thank you, Your Honor.

6              THE COURT:  Anything else?  If not, we will be in

7    recess until 8:45 Monday morning.

8                         (End of Day.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts   08/15/2008

10   _____DATE_____
    SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25