18:00   1                   IN THE UNITED STATES DISTRICT COURT

        2                 FOR THE NORTHERN DISTRICT OF TEXAS

        3                           DALLAS DIVISION

        4
           UNITED STATES OF AMERICA        (    NUMBER 3:04-CR-240-G
        5                                  (
                                           (
        6   VERSUS                         (
                                           (
        7                                  (
           HOLY LAND FOUNDATION, ET AL.    (    June 28, 2007
        8

        9   _____
18:00
       10                       PRETRIAL CONFERENCE
                              TRANSCRIPT OF THE TRIAL
       11              BEFORE THE HONORABLE A. JOE FISH
            _____

       12

       13   A P P E A R A N C E S:

       14
            For the Government:     MR. JIM JACKS
       15                           MR. BARRY JONAS
                                    MS. ELIZABETH SHAPIRO
       16                           MR. NATHAN GARRETT
                                    Assistant United States Attorney
       17                           UNITED STATES DEPARTMENT OF JUSTICE
                                    NORTHERN DISTRICT OF TEXAS
       18                           U.S. Courthouse
                                    1100 Commerce Street
       19                           Dallas, Texas 75242
                                          214/659-8600
       20

       21   For the Defendant Shukri Baker:

       22
                                    MS. NANCY HOLLANDER
       23                           MS. TERESA DUNCAN
                                    FREEDMAN BOYD DANIELS
       24                           HOLLANDER
                                    20 First Plaza, Suite 700
       25                           Albuquerque, NM 87102
                                          505/842-9960

18:00 1    For the Defendant El-Mezain:

2

                            MR. JOSHUA DRATEL
3                           MR. AARON J. MYSLIWIEC
                            LAW OFFICE OF JOSHUA L. DRATEL
4                           14 Wall Street, 28th Floor
                            New York, NY 10005
5                                212/732-0707

6

           For the Defendant Mufid Abdulqader:

7

8                           MS. MARLO CADEDDU
18:00                       LAW OFFICE OF MARLO P. CADEDDU
9                           3232 McKinney Avenue, Suite 700
                            Dallas, Texas 75204
10                               214/744-3015

11    For the Defendant Elashi:

12

                            MS. LINDA MORENO
13                          LAW OFFICE OF LINDA MORENO
                            PO BOX 10985
14                          Tampa, Florida 33679
                                 813-247-4500
15
                            MR. JOHN D. CLINE
16                          Jones Day
                            555 California St
17                          26th Floor
                            San Francisco, CA 94104-1500
18                               415/875-5812

19

20

21

22

23

24

25

18:00  1            For the Defendant Odeh:

       2
                                  MR. GREG WESTFALL
       3                          WESTFALL PLATT CUTRER
                                  Mallick Tower
       4                          One Summit Avenue, Suite 910
                                  Fort Worth, Texas 76102
       5                              817/877-1700

       6

       7    Court Reporter:       Cassidi L. Casey, CSR No. 1703
                                  1100 Commerce Street, Rm 15D6L
18:00  8                          Dallas, Texas 75242
                                      214-254-3139
       9

      10

      11

      12

      13

      14

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

$$P \ R \ O \ C \ E \ E \ D \ I \ N \ G \ S:$$

18:00 1

2          THE COURT:  This is a pretrial conference in the

3     case of United States against Holy Land Foundation and

4     Others, which is our Docket Number 3:0 4-240-G.  I have a

5     number of matters on my agenda that I wanted to cover with

6     you, and if you have other matters, we will take those up

7     at the appropriate time.

8          First, I think about two or three months ago I

9     put out an order called Order Regarding Conduct of Trial.

10    And I know there are voluminous pleadings in this case so

11    you might have some difficulty locating it, but that's my

12    effort to reduce to writing the way I do things the

13    courtroom in trial.  I have tried cases with Mr. Jacks but

14    I don't remember that I have worked with any of the rest

18:00 15  of you before.  So I would like you to be familiar with

16    that order by the time we commence trial.

17         I want to be sure now I have all the pretrial

18    materials that the parties intend to give us such as

19    witness lists, exhibit lists, voir dire questions and so

20    forth.  Do we have those from the government?

21         MR. JACKS:  Yes, sir.  We will be amending, but

22    you have the original.

23         MS. HOLLANDER:  Same for us.  We will be

24    amending, but you do have a witness and exhibit list.

25         MR. DRATEL:  Your Honor, the voir dire, we had

18:00 1    asked and been granted permission to await the

2    questionnaire so that we could focus those questionnaires

3    more appropriately.

4          THE COURT:  And I do want to discuss that in

5    more detail in my agenda here, but thanks for that

6    clarification, Mr. Dratel.

7          Since we have exhibit lists from both sides,

8    have each side seen the other side's exhibits?  Have those

9    documents been exchanged?

10          MS. HOLLANDER:  Most of them.  I think we are

11    missing some, and the government may be missing some, but

12    we're continuing to communicate about what we're missing.

13    Some of the government's were misidentified, and I think

14    maybe ours were, too, but at this point we're working

18:00 15    those issues out.

16          MR. JACKS:  Yes, sir.

17          THE COURT:  Do you intend to have a set of

18    exhibits for the Bench?

19          MR. JACKS:  Yes, sir.

20          MS. HOLLANDER:  We're assuming you wanted them

21    later because they are voluminous.

22          THE COURT:  And that raises another question

23    now.  I have a letter dated June 15, 2007 on the

24    letterhead of the Dallas Morning News over the signature

25    of a man named Jason Trahan who says that he's a reporter,

18:00 1   and he anticipates covering this trial and he says -- I'll

2   quote a portion of it. "While I do not wish to interrupt

3   the Court's business in any way, I would like to insure

4   that I am able to gain access to the evidence on the same

5   day it is introduced. This is so I am able to fully

6   understand what's going on and be able to report

7   accurately and with appropriate context. Otherwise, I

8   will not be able to read documents which I will have to be

9   writing about on a daily deadline because they are

10  discussed in Court. In a prior case involving some of the

11  defendants, I have been told that Judge Lindsay had been

12  given copies of admitted exhibits at the end of each trial

13  day. Using a portable document scanner the

14  reporter scanned documents, and the court reporter oversaw

18:00 15  the newspaper representatives' inspection to maintain the

16  document's integrity. I do not expect to be able to

17  rummage through evidence on my own." So I think we should

18  try to make evidence accessible to the press on a daily

19  basis, and if the parties have all of their documents in

20  electronic media, maybe we could make a disk available to

21  the media if that's practicable. I don't know whether it

22  is or alternatively let them scan the paper documents.

23          MR. JACKS: I guess the first thing that comes

24  in my mind is, if the disk would have all the exhibits

25  some of which --

18:00 1          THE COURT:  I don't know if that's practical or

2   not.  I know some editing would be involved.

3          MR. JACKS:  That was our concern in the earlier

4   trial.  We didn't want it to fall upon us to be taking

5   time out of our day to make copies for them.  As far as,

6   you know -- I don't know how much work it would take to

7   burn or select -- Okay, these have been admitted today.

8   Burn these to a CD and give them to him.  I guess we would

9   just have to think about that.

10          THE COURT:  Are we going to have paper documents

11   that we could scan if he wants to do that?

12          MR. JACKS:  Yes.

13          THE COURT:  Well, maybe we should do what he's

14   requested then, just let him access to the paper documents

18:00 15   at the end of each day that have been admitted during that

16   trial day.

17          MR. JONAS:  Your Honor, in the Infocom case

18   before Judge Lindsay the Dallas Morning News acted as a

19   liaison to the rest of the press.  So that may be a good

20   idea.

21          MR. JACKS:  Well, both of them.  To say they

22   were the pool may be a bit of an exaggeration.

23          MS. HOLLANDER:  I think neither side wants them

24   to have something that was denied or may not have been

25   admitted.  And there is another wrinkle, and that is Mr.

18:00 1    McGonigle, who's a Dallas Morning News reporter is on the

2    witness list.

3             MS. SHAPIRO:  He won't be covering the trial.

4             MS. HOLLANDER:  Yes, but is he going to get the

5    exhibits.

6             MR. DRATEL:  Your Honor, there is something in

7    the letter that says I can't do it all myself.  I want to

8    scan it.  He may want to bring it back to the office who

9    are familiar with the case.  It's Mr. McGonigle, and

10   that's a Rule 615 issue.

11            MR. JACKS:  I thought he was saying he would

12   need help from a court clerk or personnel.

13            THE COURT:  I don't think he says anything in

14   there about giving the documents to anybody else.  But I

18:00 15   read it too quickly.

16            MR. DRATEL:  He says I don't expect to be able

17   to rummage through evidence on my own.  I guess Mr. Jacks

18   is right.  It seemed to me he was going to be getting help

19   from the office, but if it's from a witness, we need to

20   oppose that.

21            THE COURT:  Well, I agree with that.  I didn't

22   realize that Mr. McGonigle is still with the Dallas

23   Morning News.  I recognize he was a reporter in the past,

24   but I haven't seen any stories recently.

25            MS. SHAPIRO:  He's still there, but he won't be

18:00 1 covering the case because he's a witness.

2    THE COURT:  But in my event, before we agree to

3 Mr. Trahan's request, I need to ascertain that he would be

4 the only one going through the documents and not sharing

5 them with anyone at the Dallas Morning News.

6    MS. HUDSON:  Is it okay that he acts as the

7 liaison with any other media?  I just got a call during

8 the week about someone interested in the same thing.

9    THE COURT:  Well, we might ascertain whether Mr.

10 Trahan is willing to do that, and we'll tell anybody else

11 who inquires they need to contact Mr. Trahan.

12    Let me go back to the subject of exhibits for

13 the moment.  I know we have this electronic courtroom so

14 this question is a bit obsolete, but do you anticipate

18:00 15 having any large exhibits or photographs like charts or

16 maps or do you intend to use the electronic?

17    MR. JACKS:  We intend to use the electronic.

18    MR. GARRETT:  We will, your Honor.

19    MR. JACKS:  And as far as how big they are --

20    MR. JONAS:  They are a poster size.  The record

21 will reflect.  Right here.

22    THE COURT:  Just be sure the defense has seen

23 those before they are displayed to the jury so if there is

24 any objection I can rule ahead of time.

25    MS. HOLLANDER:  We do have some charts and maps.

18:00 1   Whether we're going to blow them up or not, I don't know.

2   But we'll tell the government also.

3        MR. DRATEL:  Just one thing.  While we're on the

4   subject of electronic system in the courtroom -- and we

5   had a training session yesterday -- and with respect to

6   your Honor's court rules, I want to know how your Honor

7   wants to do it.  The reason I ask is it's an extra step

8   that takes time, and if it's the Rule that's fine.  I just

9   want to know.  And that's the function.  Before the jury

10  gets to see a document that's placed on the document

11  camera or the lap top, is the jury off?  That's controlled

12  from the Bench?  And I don't know if the Court does that

13  or whether the deputy does that, and the question is

14  obviously the Court's rules say only address the Court,

18:00 15  not the deputy.  If we ask the Court and then the Court

16  directs the deputy or can we direct the deputy at the same

17  time?

18        THE COURT:  Well, Ms. Hudson is my courtroom

19  deputy, and in most cases she's not in the courtroom after

20  the jury selection.  Unfortunately, that leaves me to

21  operate the equipment, and I'm technologically challenged,

22  as you will find when we get under way.

23        MR. DRATEL:  That's fine.  If you are going to

24  be doing it, it makes it easier.

25        MS. HOLLANDER:  The other thing we heard, are

18:00  1    the witness and the jury are controlled by the same

2    button?  So we may have to approach the witness with the

3    actual document before we turn on the button?

4           THE COURT:  Well, I'm sure there will be a

5    learning curve for all of us as we get started.

6           MR. JACKS:  May I ask a question?

7           THE COURT:  Yes, sir.

8           MR. JACKS:  Will you have your own lap top?

9           MS. HOLLANDER:  Yes, we have a lap top and a

10   paralegal who will be sitting behind the seats right

11   behind counsel with a lap top, and then looking at the

12   screen, that's one of the screens that's there.  That's

13   the way --

14          MR. JACKS:  I was just wondering.  I have never

18:00 15   had a trial where both sides were using their own lap top.

16   I have had it where there was one lap top and if the

17   defense had electronic exhibits, then they would have been

18   either by CD or something loaded into the one government

19   lap top, and I don't know if -- I don't know --

20          THE COURT:  Did I understand correctly that both

21   sides are going to have paralegals operating this

22   equipment and that they have had the training from the

23   Clerk's Office?

24          MS. HOLLANDER:  Our paralegal has had the

25   training, yes.

18:00 1          THE COURT:  Do we have audio tapes or video

2     tapes?

3          MR. JACKS:  Yes, sir.

4          THE COURT:  And I guess you will be playing

5     those from the lap tops, also.

6          MR. JACKS:  Yes, they have been digitized.

7          THE COURT:  I had the impression from our

8     Kastigar hearing the other day that the government had

9     certain transcripts that it intends to rely on.  I just

10    wanted to cover with everybody what my understanding is of

11    the law in our circuit on admission of transcripts.  There

12    is a Fifth Circuit pattern instruction that's been used

13    numerous times -- approved by the Circuit I think in

14    virtually all instances -- that I should instruct the jury

18:00 15   that where a transcript is involved that it's only

16    secondary evidence, that the primary evidence is the tape

17    recording or video tape and that they are the sole judges

18    of who the speakers are and what the content of the

19    conversation is.  It not infrequently occurs that there is

20    a dispute between the prosecution and the defense on

21    whether a transcript is accurate.  As I understand the law

22    of the Circuit, that's not a grounds for denying admission

23    to a transcript.  Rather, the remedy is if there is a

24    disagreement, for each side to produce their own version

25    of what the transcript should be, and then the jury

18:00 1    decides which is the accurate version.  The circuit

2    suggested long ago in a case called United States against

3    Onori, 535 F 2nd 948 at 958, Footnote 5, a 1976 decision,

4    that this matter is best handled at pretrial -- which is

5    why I raise it now -- and that an effort should be made

6    for the parties to agree on the transcript if possible,

7    and if not, that's why I said alternate versions should be

8    produced for the jury's consideration.  So that's my

9    understanding of the law of the circuit if we have a

10    disagreement between the parties on the accuracy of the

11    transcript.

12            MR. JACKS:  Well, your Honor, that was one of

13    the things that we were going to bring up.  You know,

14    throughout the case, the defense has contended there were

18:00 15    inaccuracies in the government's transcriptions at various

16    points in the investigation and whatever.  And it was our

17    hope that we could address to the extent possible, okay,

18    what are the inaccuracies.  Maybe if we agree to them or

19    they agree to them.  And let's try to get one transcript

20    that both sides agree to.  And so that's what we would

21    like to add.  The other point that I wanted to ask about,

22    I understand the Fifth Circuit law, but when the tape is

23    in a foreign language, the jury -- the tape is the primary

24    evidence, but if it's in a foreign language, then they are

25    really relying on the transcript or the testimony of the

18:00 1    translator that this is a fair and accurate transcription.

2              THE COURT:  Right.

3              MR. JACKS:  I can't recall a case addressing

4    foreign languages.

5              THE COURT:  I have had cases like that.  One of

6    them is United States against Allibhai which is a reported

7    decision in the Fifth Circuit.  I don't think you were the

8    prosecutor, but it was foreign nationals who were Muslim

9    who were alleged to have been sending money overseas to

10   the Àgha Khan, who was the head of their branch of Islam.

11   And their native language was Gujrati.

12             MS. HOLLANDER:  Did the jury listen to the tape

13   in GU?

14             THE COURT:  My memory is yes, but it was a long

18:00 15   time ago.  So I'm not certain of that, but I'm ninety

16   percent certain.

17             MS. HOLLANDER:  Your Honor, to get back to the

18   question, maybe it was Mr. Jacks's question about trying

19   to agree on the transcripts.  We received these two

20   hundred transcripts on May 29th.  We are trying to go

21   through them and see if we have any disagreements that are

22   material, and we hope to have that done, but it is not

23   finished.

24             THE COURT:  Well, I understand it's a large job

25   among many other large jobs.

18:00 1          MS. HOLLANDER:  There is just so much we can get

2      finished in a day, but we're aware of this issue.

3          MR. JONAS:  Your Honor, it's not just

4      transcripts for video and audio tapes; it's a lot of

5      documents where we have translation, and so we include

6      that in the pool.

7          MS. HOLLANDER:  Right.  And there are thousands.

8      That's true.  We're trying to find any that are a serious

9      issue and deal with those.  But it's an enormous task, and

10      I can say that it probably will not be finished by the

11      time we go to trial, and there will be some issues that

12      come up at trial.

13          MR. JONAS:  If I may ask, are the defendants

14      aiding in that?  None of this is classified, and this is

18:00 15      their native language.  How are they aiding in the

16      translations?

17          MS. HOLLANDER:  How we're doing is really work

18      product.

19          MR. JACKS:  Well, your Honor, I would request as

20      they find the parts where they disagree, if we would come

21      to us and see if we can agree rather than lay behind the

22      law and try to make it some kind of a litigation advantage

23      or something.  If we could resolve those.

24          THE COURT:  Well, I would certainly encourage

25      that.  I'm not telling either side how to try its case

18:00 1     because you are all experienced trial lawyers, and I know

2     you have your own way of doing things, but I think that

3     would make things go smoothly if we could iron out as many

4     difficulties like that as possible beforehand.

5             MR. WESTFALL:  First of all, I can now certainly

6     empathize with your issue of being able to hear all the

7     way down at the other end of the table.  I have tried one

8     transcript case, and my memory is that an instruction is

9     given at the time the transcript is introduced in

10     evidence.  Is that correct?

11             THE COURT:  That's the way I typically do it,

12     give a verbal instruction to the jury at that time.  And

13     in my written instructions at the end, I will repeat that.

14     And I ma -- Depending on how many repeats there are, I may

18:00 15     give some version of that as we go along.  If we have two

16     hundred come in evidence, I probably won't be doing it

17     every time, but from time to time I would, yes.

18             MR. JACKS:  The report I got from our paralegal

19     is that the transcripts -- We asked them to copy on the

20     front and back of the page to cut down on the volume of

21     paper.  But I think it's like four binders.  So we will

22     have those for the parties and the jurors and the court.

23             THE COURT:  Okay.  Good.  There was some

24     discussion at previous conferences about efforts to

25     stipulate to business records to avoid the government

18:00 1    having to call a lot of custodial witnesses, and I haven't
2    heard anything further since then.  Has any progress been
3    made on that front?
4              MR. JACKS:  No, your Honor.  That was one of the
5    things we were going to bring up just to see what we could
6    do about -- I sent this proposed stipulation.  It's both
7    foreign bank records, financial institutions.  We have not
8    really heard from opposing counsel and so don't know their
9    position, and that's one of the things that we would like
10   to try to address and get resolved to expedite, shorten,
11   focus the trial.
12             MS. HOLLANDER:  Your Honor, we couldn't respond
13   until we saw the exhibits, and now we're trying to go
14   through and see whether there are some we can stipulate to
18:00 15   or whether we have some stipulations that we want to
16   request of the government.  We have actually discussed
17   that as recently as yesterday, but we haven't --
18             THE COURT:  You mean amongst yourselves or with
19   the government?
20             MS. HOLLANDER:  Amongst ourselves.  We haven't
21   discussed it with the government yet, but we have
22   discussed it among ourselves and are trying to figure out
23   what our position is.  We're not quite there yet.  We'll
24   try to get there as soon as possible.
25             THE COURT:  I was reminded during the Kastigar

18:00  1    hearing the other data we have a superseding indictment in

2    this case.  Have the defendants been rearraigned on the

3    superseding indictment?

4            MR. DRATEL:  I don't think so.

5            MS. HOLLANDER:  I guess not.

6            MR. JACKS:  I can't remember -- I know in the

7    earlier case involving Mr. Elashi when there was a

8    superseding indictment I sent out a waiver of

9    rearraignment, and it was signed by the defendants.  I

10   don't remember if I did that in this case or not.

11           MR. DRATEL:  I don't recall.  The reporter is

12   nodding when I said before, I don't think I have

13   actually -- I don't think I have actually been in open

14   court with your Honor in terms of an arraignment.

18:00 15          THE COURT:  That's probably right.  That's

16   something we need to either get a waiver or take care of

17   at some point before the trial commences.

18           MR. WESTFALL:  If you prepare a waiver, I'll be

19   fine with that.

20           MR. DRATEL:  That's fine.  I had no

21   recollection.

22           MS. HOLLANDER:  I don't think we have.

23           THE COURT:  I wanted to tell you about one thing

24   that I have started recently that I have had good results

25   with, and that is especially in a trial as long as this

18:00   1    one is expected to be, I have begun taking photographs of
        2    the witnesses who testify and writing their name either at
        3    the bottom or the back, and we send those to the juryroom
        4    at the conclusion of the case with the documentary
        5    evidence and my instructions so that the jurors can recall
        6    who testified and what they said.  In talking with jurors
        7    informally after a case is over, generally I have gotten
        8    good reviews on that.  They say it does assist them in
        9    their deliberations.  So I want to use that procedure in
        10   this case.  And my assistant Eleanore has a digital
        11   camera.  So if you would like us to take the pictures,
        12   when your witness is ready testify, be sure to send them
        13   back so that she can take their picture, and they will be
        14   portrayed in the same clothing they are wearing when
18:00   15   testifying.  If you want to do it yourself, that's fine
        16   with me as long as the witness looks the same way in the
        17   photograph when they do when they appear on the stand.
        18          MS. HOLLANDER:  Can we have those photographs so
        19   we can remember after several months?
        20          THE COURT:  I know there is one witness the
        21   government is concerned about, the Israeli agent.  We
        22   shred the paragraphs after the trial is over.  We don't
        23   make them a part of the record.
        24          MS. SHAPIRO:  I think as long as it's not
        25   disseminated.

18:00 1          THE COURT:  One other thing about the jury.

2    Because of the anticipated length of trial, it's my

3    intention to let the jury take notes, and I will give them

4    the cautionary instructions in the Fifth Circuit Pattern

5    Instructions about the notes are only for their own

6    benefit and not to rely unduly on the notes of other

7    jurors who may be better notetakers than they are and so

8    forth.

9          Let's see.  I think we need to talk more about

10    the procedures for voir dire.  I know we have discussed it

11    in the past in general terms.  My memory is a little hazy.

12    I have not gone back and reviewed the transcripts of our

13    earlier sessions.  But I have it in my mind -- and maybe

14    based largely on what Ms. Moreno told us about her

18:00 15    experience and maybe Mr. Dratel as well.  I'm hoping to

16    have a jury in place within the first three or four days.

17    I understood that you are willing to live within some

18    reasonable time limits to be imposed by me, but I wanted

19    to go back and review again what we talked about earlier.

20    My impression is we would have a general session where I

21    would make some remarks and then counsel would have --

22    maybe and I don't remember this exactly -- maybe an

23    opportunity to make some remarks or ask some questions of

24    the panel as a whole, although I don't think with two

25    hundred forty people, more or less, in our panel that we

18:00  1   can do it all at one time unless we do it outside the

2   courtroom because my courtroom won't hold that many

3   people.  So we might have to have two or three different

4   sessions.  But anyway, there would be a general session,

5   and then based upon questionnaire answers you will have

6   received, you wanted to bring them up in smaller groups

7   and question them individually.  So I wanted to refresh my

8   memory about that and talk about it maybe in more detail

9   than we have in the past.  Mr. Westfall.

10           MR. WESTFALL:  What seems like logistically the

11  best option -- We talked about this yesterday -- would be

12  to bring up the small groups of five to fifteen at fifteen

13  minutes per juror, hopefully knocking out thirty a day.  I

14  think that was the number.  And once we have exercised

18:00 15  challenges for cause and built up enough jurors to where

16  we can have an entire panel, at that point bring that

17  panel in and do your general instructions on burden of

18  proof and all of that.  That would get rid of the big

19  logistical difficulty in the front.

20           THE COURT:  Have you discussed that with the

21  government?  That sounds like a good plan to me if they

22  don't have a problem with it.

23           MR. JACKS:  We are opposed to that.  I don't see

24  the need to have the second smaller groups.  To me, it

25  seems like the most efficient way to do it is like we have

18:00   1   always done it in that we have the general voir dire --

  2   and I understand that you may have to have two sessions

  3   because of the number of jurors in the panel, but -- and

  4   then if certain jurors indicate any kind of positive

  5   response that needs follow-up, bring those up and those

  6   alone, as opposed to bringing everyone up in these small

  7   groups. I'm concerned, first of all, this goal of fifteen

  8   minutes is not going to be met. Questions and follow-ups

  9   are going to be -- There is going to be the need for more

  10   follow-up as to certain jurors. So whether we could

  11   maintain that schedule -- And even if the Court decided

  12   that we're going to maintain it, you are sitting there

  13   watching the clock rather than focusing on what the juror

  14   says and exploring that. I think it's more logical and

18:00 15   more efficient to do the standard voir dire, have the

  16   Court give its portion of the voir dire, if the parties

  17   have any kind of individual voir dire they would like to

  18   do, and I think that should be explored through the court,

  19   the questions that the parties propose to ask during their

  20   individual voir dire. And then if there are positive

  21   responses that indicate follow-up is needed, just bring

  22   those people in, Not go through this procedure with a

  23   hundred and something people and then bring them back in

  24   at fifteen at a time and go through -- I just think that

  25   puts an extra step in there that is not really necessary.

18:00   1          THE COURT:  Let be go back and be sure I

2     understand what you are saying, Mr. Jacks.  We have now --

3     just for a round number -- 40 people in our panel.  And I

4     understand we have the second group as we speak in the

5     process of answering these questionnaires.  So we will

6     start with that group of 240 to which you will have

7     questionnaire answers.  My courtroom probably at the

8     maximum would hold about sixty potential jurors.  So under

9     your plan, we would need probably -- If we have a voir

10     dire for all 240, we would need four days to do that or

11     four and a half days, however long it takes.  So your idea

12     would be on Monday July 16, we would bring the first group

13     of sixty in my courtroom, have a general voir dire session

14     and if necessary follow-up with individual voir dire by

18:00  15     counsel, and then we would bring a second group in I guess

16     either the afternoon of the 16th or the next day on the

17     17th and do same thing all over again and whether we do

18     that for the third and fourth groups if we needed to reach

19     them?

20          MR. JACKS:  Actually, your Honor, I was hopeful

21     if we could use Fitzwater's courtroom if it was available.

22     I think it holds a little over a hundred plus -- I was

23     asking -- Maybe Gail O'Neal told me.  But it's -- so that

24     would -- If his courtroom was available, that would cut it

25     down to two.  We could do a hundred or two hundred at a

18:00  1    time, and if we couldn't get enough out of that, I guess

2    we could look at the next thirty or something.  That was

3    my thought in terms of the overall voir dire.  But, yeah,

4    under what you said, if we used your courtroom it would be

5    even further stretched out and extended.  And I just -- As

6    I said, I think bringing them up in groups of ten or

7    fifteen is an unnecessary extra step.

8         THE COURT:  Mr. Westfall, let me go back and

9    kind of review from the beginning what your proposal is.

10   Under your proposal, I guess we would start out with this

11   240, although we may not bring them down to courtroom the

12   same day because we couldn't probably talk to all of them.

13   You mentioned small groups.  Go over with me step by step

14   what the size of those groups would be or would we be

18:00 15   talking to the potential jurors in groups or one at a

16   time?  How would that work exactly?

17        MR. WESTFALL:  We would bring them in the

18   courtroom one at a time.  We would bring them as a group,

19   but bring them in the courtroom one at a time for a

20   maximum of fifteen minutes.

21        THE COURT:  Per side or both sides?

22        MR. WESTFALL:  Seven and a half minutes per side

23   which we're willing to have strict time limits on that.

24   The questioning would commence, and there is some jurors

25   that there may not be any time at all spent with them.

18:00 1    Some jurors, maybe the whole fifteen minutes spent with

2    them.  The advantages of that, as we discussed earlier,

3    this case has certain issues that we have a hundred ten

4    people sitting out there there is a chance that all a

5    hundred ten might have to be flushed if we had a

6    sufficient outbreak and that's what we had discussed

7    earlier.  That would move along pretty well.  It really

8    would.  And we do the math and figure up the number of

9    jurors we need which is fifteen or sixteen.  I can't

10   remember.

11              THE COURT:  I am going to use the maximum number

12   of alternates which is six I think the Rules say.

13              MR. WESTFALL:  And you throw challenges on top

14   of that, that is how big a panel we would have to

18:00 15   assemble, and it's a matter of when that panel gets

16   assembled.  And then it was contemplated before that the

17   struck juror method would be used where the whole panel is

18   assembled, and you would want maybe ten additionals in

19   case somebody said I can't follow the burden of proof, but

20   after we have gone through all the preliminary remarks and

21   individual voir dire, I can't imagine that we would have

22   much of a problem with that and the jury is basically cut

23   using that struck method in the course of thirty minutes

24   to an hour.  Tops.  As opposed to doing the same thing

25   four days in a row with large panels, I really think it's

18:00 1    a more efficient way of getting it done.

2              MS. MORENO:  Your Honor, if I may, the other

3        step that wasn't discussed by Mr. Jacks is there should be

4        an opportunity before July 16 -- because my understanding

5        is we're going to get these questionnaires -- tomorrow,

6        sometime over the weekend, that we might be able to

7        stipulate to some cause challenges and narrow down the

8        list even further which would cut down the time further,

9        and it's been my experience -- counsels' experience this

10       often happens where the answers on the questionnaires are

11       so flagrant that both sides think it's an easy stipulation

12       for cause.  So I think that is also going to ameliorate

13       the time concerns that your Honor has.

14             THE COURT:  I was just trying to figure out in

18:00 15   my own mind to do the arithmetic.  If we could do fifteen

16       minutes per member of the panel, that's a maximum of four

17       people per hour, and hopefully, some we didn't need to

18       spend any time on like Mr. Westfall said.  I don't really

19       know that.  So the conservative approach would be to say

20       we spend fifteen minutes on each one.  And I'm normally in

21       court maybe five and a half to six hours a day.  So that

22       would mean that we could do probably on the outside about

23       twenty-five people a day using that approach.

24             MR. WESTFALL:  We would want to bring more in

25       case somebody has a cause challenge.

18:00 1          THE COURT:  Sure.  So that would take four days

2     to do a hundred people at that rate.

3          MR. JACKS:  Fifteen minutes per juror?

4          MS. HOLLANDER:  We don't need anymore after

5     that.

6          MR. JACKS:  Well, let's say there is a hundred

7     we have to question.  I think my math is right.  That's

8     twenty-five hours, and that's if you are watching the

9     clock.  That fifteen minutes stops.  No going out.  He's

10    in the bathroom.  Let's get them back.  Let's say you are

11    bringing up fifteen, and five of those don't have anything

12    to say.  We could have figured that out when we had them

13    in the group when we asked those questions, and those that

14    had an issue, we bring them back and explore it.  If we do

18:00 15   it in the traditional way, we locate those within the

16    larger group that have some issue, and we focus on those.

17    And I just think -- I think it would be making it more

18    difficult than it needed to be.  It would be committing to

19    a process that's going to -- I don't think there is any

20    way that we would be able to adhere.  We're talking about

21    lawyers, your Honor.  One more question, you know, it

22    turns into ten more questions.  You know, your Honor, this

23    is very important.  This way we will be able to

24    concentrate on the jurors that really do have an issue as

25    opposed to running them all through the gate and saying

18:00  1    you are okay.  Go ahead.  I want to ask them -- You give

       2    them time, they will think of a question they want to ask.

       3           MR. DRATEL:  We do this all the time in the

       4    state court.  You get a certain amount of time, and you

       5    use it, and the court stops you.  I thought this had been

       6    decided last time.  We spent a lot of time figuring out

       7    the mechanics.  The Court had said individual voir dire

       8    and attorney voir dire.  Fifteen minutes per person is a

       9    maximum.  So we're not talking about fifteen minutes maybe

      10    more; we're talking about a maximum.  We're not going to

      11    have fifteen minutes per person, so we're going to get

      12    ahead in that way.  And once we get to -- I think the

      13    magic number, fifty-two or something, once we get there,

      14    we stop.  Because of the way the system has operated, we

18:00 15    have already eliminated those who were a waste of time.

      16    We eliminate more people we would have wasted time on, as

      17    Ms. Moreno suggested.  We're getting down to core jurors

      18    who are the mix.  We're -- I don't think we're going to

      19    get past a hundred.  In this context, I think it would be

      20    very unusual if we got past a hundred.

      21           MR. JONAS:  Your Honor, a question for

      22    clarification.  And I'll address it to Mr. Westfall, if I

      23    can.  Are you contemplating that after a juror is

      24    questioned for fifteen minutes we discuss whether or not

      25    that person is struck for cause?

18:00 1      MR. WESTFALL:  Either side would level a

2      challenge at that point that the Court would rule on.

3           MR. JONAS:  So we need to rule in time for

4      argument.  It's my experience if you think there is a

5      cause and we don't, that goes back and forth, and as Mr.

6      Jacks says, we're lawyers.

7           MS. HOLLANDER:  Your Honor, I realize that it's

8      the Court's prerogative to visit this, but I just read the

9      transcript from the status conference where we discussed

10     this.  Your Honor had said that's the way we were going to

11     do it, and I thought that is the way we're going to do it.

12     We were going to have the individual voir dire.  That's

13     the way I read it.

14          MR. JACKS:  I read it, too, and you clearly said

18:00 15     I haven't made up my mind about that yet.  I'm not

16     comfortable with Mr. Dratel's prediction that this is

17     going to be no problem and we're going to gain time.

18          THE COURT:  Let me say I have not reviewed the

19     transcript, so I don't remember what I said.  I do

20     remember in preparation for this conference today that --

21     I remember some general discussion that we had, but now

22     that we're getting close to actually having to embark on

23     this process, I really didn't remember the details of what

24     we had discussed.

25          To reiterate what I said at an earlier

18:00 1    conference, I recognize that this is an unusual case and

2    it requires some special handling.  Mr. Jacks and I have

3    worked together over the years in a number of cases, and

4    so he talks about the usual way because we have a certain

5    way of doing things in our district, and I think every

6    community has its own legal culture, and Mr. Dratel, I'm

7    sure, is used to doing certain things in New York that

8    would be alien to me and vice versa.  I think the easy

9    decision for me would be to go along with what Mr. Jacks

10   says and say I'm used to doing it this way, that's the way

11   we're going to do it.  I may have said or at least

12   intimated that we would do it as proposed on the defense

13   side today, and I am inclined to do things that way just

14   because I want to be sure that we have as good a jury as

18:00 15   we can come up with as a result of this process, and I

16   want the defense to think that as well as the government.

17   I think it's arguable the defense way is a more time

18   intensive way, although it's hard for me going into the

19   process which way would save more time.  So let me say

20   that I'm willing, Mr. Westfall and Mr. Dratel, to do it

21   your way with this caveat.  Don't make me sorry at the end

22   of the day or at the end of the week that I have agreed

23   with you.  I am relying on your representations on these

24   time limits, and I do want to have a jury in place by the

25   latter part of the week of July 16.  One reason, as I

18:00 1  mentioned to you earlier this week, that I had a

2  conversation with Leigh Lyon earlier this week about

3  logistical details concerning this case, and one of those

4  is I intend to have the jurors once they are selected come

5  to a location remote from the courthouse and be bussed

6  here every day during the trial.  Our court had to sign a

7  contract with the GSA for the van to transport those

8  jurors, and I gave Leigh the date of July 19th to begin

9  that contract.  So that was just an estimate on my part.

10  But I would like to have the jury in place as a target on

11  July 19th.

12        MR. JACKS:  Your Honor, I have never understood

13  that the defendant's plan called for individual voir dire.

14  It was my understanding that their proposal was that the

18:00 15  jurors be in groups of ten to fifteen to be questioned as

16  a small group, not this fourteen wait out in the hall and

17  they come in one at a time.  That was never the proposal,

18  as I understood it.

19        THE COURT:  That's why I asked for clarification

20  because I wasn't sure myself.

21        MS. MORENO:  Your Honor, I have the filing by

22  the defense of the protocol where we intensively discuss

23  individual voir dire, cite the supporting law and give

24  examples.  So that was always front and center.  I

25  discussed it with your Honor at previous status

1    conferences.  So I'm a bit surprised that Mr. Jacks

2    doesn't recall that.

3            MR. JACKS:  I recall them discussing it.  I

4    don't recall them discussing it in a plan.

5            MS. MORENO:  Document 555 filed March 1st, 2007.

6            MR. DRATEL:  And my whole discussion about

7    contamination in all of these pretrial conferences is

8    based on having the jury hermetically sealed from the

9    panel because of an answer we could not anticipate.

10           MR. JACKS:  Your Honor, I appreciate the Court's

11   position and comments, but in terms of how much different

12   this case is, I respectfully disagree in the sense that

13   it's still a criminal case, and we're treating it

14   differently in the sense that we're using a questionnaire.

15   We have sent out these summons in advance.  Except out the

16   hardship questions in advance, that's different.  The

17   Court has made concessions that are different from other

18   cases, and I think what the Court has done so far is more

19   than adequate.  This talk about pervasive pretrial

20   publicity is incredibly overblown.  There haven't been any

21   stories in the paper.  Maybe it says something about me,

22   but what I'm working on, to my circle of friends they say

23   doesn't ring a bell.  So I don't believe the concern about

24   that is as great as it's being portrayed, and I have to

25   say that I really think to set this case up for individual

18:00 1  voir dire is way beyond what is necessary, and I think it

2  is just prolonging the length of this trial, and I just

3  think it's –– And I do disagree with the defense saying

4  this has always been the plan that they proposed.  I

5  understand we can look at transcripts and look at

6  pleadings and see, but I don't think this case is one that

7  justifies individual voir dire.

8      THE COURT:  Well, I understand your position,

9  Mr. Jacks, but I have made my decision, and as I said

10  earlier, I will use the procedures proposed by the defense

11  in this case for individual voir dire, but they have the

12  potential to disappoint me greatly at the beginning of the

13  case if we're not able to stay on schedule.  So I mention

14  that as a caveat.

18:00 15      MR. JACKS:  All right.

16      MS. SHAPIRO:  Your Honor, I wanted to raise one

17  issue.  We have a witness who's expected to be our first

18  witness who's unavailable on the 24th of July.  So I

19  wanted to put that out there.  I'm not sure exactly when

20  the jury will be selected and how long openings will go.

21  That's all up in the air, but that one particular day is a

22  problem for this witness.

23      THE COURT:  All I can say is you'll have to do

24  the best you can.  One of the difficulties in any criminal

25  case –– but particularly one of this size and scope –– is

18:00 1   the logistics of getting this number of busy people in one

2   place at one time, and as I said earlier, I'm not going to

3   try to tell you how to try the case.  But either your

4   order of witnesses may have to give or the witness' plans

5   may have to give because we'll do the best we can in

6   keeping the case on schedule, but I can't schedule things

7   in the trial around the convenience or not of a witness.

8   It's just too much.

9        MR. JONAS:  Just to expand that slightly.  We

10   certainly appreciate your Honor's comments.  It's a

11   religious holiday that day that conflicts with the

12   witness' unavailability.

13        THE COURT:  Well, maybe convenience is the wrong

14   word, but I don't feel like I can schedule all the people

18:00 15   in this trial around the schedule of a particular person.

16        We have some motions in limine I wanted to

17   discuss.  The defendants filed on June 13 a joint request

18   for a James hearing, and it's entitled Motion in Limine to

19   Exclude Alleged Co-conspirator Statements Not Meeting the

20   Requirements of Federal Rule of Evidence 801 (d)(2)(e),

21   and the government responded in writing on March the 16th.

22   I am going to deny the motion for a James hearing.  I

23   agree with the government's position and with the

24   authorities cited therein, principally United States

25   against Fragoso that under the law of our circuit a

18:00 1    pretrial hearing is not required.  It's been my experience

2    that the more expeditious way to handle these things is

3    simply take the matter up at trial, and of course, the law

4    of our circuit and the Supreme Court decision in

5    Bourjailey approved this practice.  I think it would be an

6    undue consumption of resources to have to hear this

7    evidence twice.

8         I'm sorry.  I just realized in preparing for

9    this conference today that there are a couple of other

10   motions in limine that I'm not familiar with.  So I'll

11   have to ask counsel to briefly summarize what they say.

12   First is the Government's Motion in Limine filed March 14

13   asking me to prohibit defense counsel from making

14   arguments designed to elicit jury nullification.  What is

18:00 15   that about, Mr. Jacks, or if you want to yield to one of

16   your cocounsel?

17         MR. JACKS:  Judge, it's basically you cannot

18   tell necessarily at the start of the trial but if that

19   starts to become the point of the defense's position, then

20   we are making the objection in advance to make the Court

21   aware of our position, and I know the defense says they

22   are aware of the law and have no intention to do that.

23         THE COURT:  Well I agree with you that it would

24   be improper to ask the jury to disregard the law, and if

25   that comes up at the time, I will make a ruling, and I'm

18:00 1   not prepared on the defense's response either.  But if

2   they say they don't intend to do that, it would seem to me

3   I can deny the motion at this point without prejudice to

4   its being renewed if that issue arises during the trial.

5           MS. HOLLANDER:  That's fine.

6           THE COURT:  And then there is a Defense Joint

7   Motion in Limine to Exclude Evidence from Trial and

8   Memorandum in Support.  I'm not sure -- Again, I didn't

9   read that in preparation for today.  I guess it escaped my

10  notice.  Ms. Hollander, can you or one of your cocounsel

11  tell me what it's about?

12          MS. HOLLANDER:  I don't have a copy in front of

13  me, your Honor, but it's about a large number of items.

14          MS. DUNCAN:  As Ms. Hollander mentioned, your

18:00 15  Honor, we will be challenging several exhibits under

16  several general categories.  The first is relevance

17  grounds or 403 grounds.  We have challenged some

18  coconspirator statements, 404(b) evidence.  Do you want me

19  to walk through each piece that we're challenging?

20          THE COURT:  In a general way, hit the high

21  spots, if you will, or maybe just describe the general

22  tenure or character of the testimony you are concerned

23  about.

24          MS. DUNCAN:  The main categories we're concerned

25  about involve evidence of acts of terrorism or violence

18:00 1   that are unrelated to the Holy Land.  The government

2   indicated an intent to bring in evidence of suicide

3   bombing.  There is no evidence with respect to Holy Land

4   as to that.  All acts of violence that the government

5   intends to bring in are unrelated to the Holy Land.  There

6   is evidence that --

7        THE COURT:  Let me stop you a minute.  When you

8   say unrelated to the Holy Land Foundation, I'm not sure

9   what that means.  I understood the government's general

10   theory in this case that HAMAS is an organization that is

11   engaged in violence on a fairly routine basis in the

12   Middle East and that the Holy Land Foundation has been

13   funneling money to HAMAS, and so if that theory is

14   correct, I don't know how you could say that the Holy Land

18:00 15   Foundation is unrelated to HAMAS.

16        MS. DUNCAN:  Well, my understanding of the

17   government's position is that the Holy Land Foundation

18   funneled money to zakat organizations that had members of

19   HAMAS on their board of directors.  There is no allegation

20   that the Holy Land Foundation provided resources for

21   terrorist acts.  We're objecting, for example, with

22   respect to the Operation Defensive Shield, a search in

23   Palestine, where a lot of evidence was seized.  It was the

24   government's position it was in response to terrorist

25   acts, and our position is that is completely irrelevant as

18:00 1    to why the government of Israel seized certain documents,

2    and it's very prejudicial to our clients.

3        MR. DRATEL:  Your Honor, also if I may add.  The

4    defense is not giving money -- it's giving money to

5    foreign terrorist organizations in that this is an

6    organization that's been designated.  Not one that has to

7    do with all the extra very prejudicial and 403 implicated

8    evidence that we're talking about here which Holy Land is

9    not accused of financing or being related to in any

10    operational way.

11        THE COURT:  I thought one of government's

12    theories was that money was given to widows and orphans of

13    suicide bombers and this in effect rewarded or encouraged

14    suicide bombing as a technique.

18:00 15        MR. DRATEL:  But that doesn't require a litany

16    of suicide bombings and all the grizzly parts related to

17    that.  What could be done in a 403 way is to really limit

18    it so it relates to the issue at trial and not inject

19    prejudicial parts that are inflaming and don't have

20    anything to do with the elements of the offense or the

21    parts of the government's theory because unless the

22    government is going to say that a specific terrorist act

23    was a result of a specific payment to a person, then all

24    of that stuff is really just window dressing.  Most of it

25    is after the fact.  They are saying it's a reward.  So

18:00 1    what happened at the bombing is really irrelevant to the

2    specific allegation that goes to the offense.  So I think

3    the rest of it would be precluded under 403.

4            MR. JONAS:  Your Honor, may I respond?

5            THE COURT:  Yes, I was going to ask for someone

6    on the government's side to respond because I have not

7    reviewed your response either.

8            MR. JONAS:  Your Honor, 18 United States Code,

9    Section 2339(b), which is one of a series of charges in

10   this case -- and I won't read the whole statute.

11   Subsection A, Subsection 1, which is entitled "Unlawful

12   Conduct:  To violate this paragraph a person must have

13   knowledge that an organization is a designated terrorist

14   organization, that the organization is engaged in

18:00 15   terrorist activity or that the organization has engaged or

16   engages in terrorism."

17           There are certain acts that we intend to have

18   our expert witness discuss that were committed by HAMAS or

19   claimed to be committed by HAMAS where the defendants were

20   on notice of because we have intercepted communications

21   that they are discussing the act or because they received

22   faxes that are newsletters where other acts are discussed.

23   One category is suicide bombings or terrorist acts of

24   HAMAS that we intend to discuss through our expert.

25   Another is the socialization of the HAMAS, through the

18:00 1    zakat committee and how their acts of the zakats support

2    the military wing.  For example, where members of zakat

3    committees provided support to terrorist activity.  Those

4    are two areas where we think we're entitled to present

5    evidence to the jury of terrorist acts.  That evidence is

6    not going to be bringing in victims or witnesses to the

7    terrorist acts but through our expert who will testify

8    about HAMAS's claim of these acts, and he would briefly

9    describe the act.  On such and such a date HAMAS claims to

10    have committed this bombing and move on from there.

11        MR. DRATEl:  Your Honor, it's just like a

12    justification defense in reverse, what we're talking about

13    here.  What Mr. Jonas talks about is the second part of

14    the second knowledge element of 2339(b) which is a

18:00 15    defendant has to be aware that it's a designated

16    organization, that the organization engages in violent

17    activity.  So when I say it's like a justification

18    defense, let's say you represent a defendant in a

19    justification case in which the defendant is aware that

20    the -- Let's say the homicide victim who the defendant has

21    killed and he's claiming justification.  If the homicide

22    victim had committed three murders, but the defendant

23    didn't know, it doesn't come in evidence.  It's only what

24    the defendant knew that's relevant to the justification.

25    And if all it is is the defendant got  -- the victim got

18:00  1    into a fight last week and that he's prone to fighting,

2    that's all that comes in.  So what's in these

3    conversations is really the limit of what the defendant's

4    knowledge is.  By saying because the defendant knows there

5    is a suicide bombing that the defendant knows all the

6    details and background, that's not true.  That's sort of

7    bootstrapping their knowledge element to say because the

8    defendant may know part of it -- and I'm not saying this

9    is a contested issue at trial as to whether the defendants

10    knew it was a designated organization or not.  I'm not

11    sure that's going to be contested at trial.  So in

12    relation to an issue that's not even going to be

13    contested, you have an extraordinary amount of prejudicial

14    evidence that comes in.  And also doesn't go to a

18:00  15    defendant's knowledge because what a defendant knows from

16    a phone conversation that says there was a suicide bombing

17    on X day, he doesn't know about all of that and unless he

18    does, it's not relevant to that issue.  So it comes in to

19    try to prejudice, and as a 403 matter, I think it's clear

20    it's not necessary for the case and could really be -- not

21    only a red herring but something that drives the jury in

22    the way the evidence does not and creates a 403 problem.

23            MR. JONAS:  I respectfully disagree.  Because

24    the context of the conversation requires some testimony to

25    the jury so that the jury can understand the conversation.

18:00 1    It's not always clear where it's one defendant talking to

2    another saying HAMAS just committed a suicide bombing.

3    You have to understand when they are celebrating on the

4    phone an attack, they don't say there has just been an

5    attack If the jury knows on that day there was an attack,

6    it puts that conversation in context.  Moreover, we think

7    the jury is entitled to understand the full flavor of

8    HAMAS and why they are a designated organization and the

9    relationships among the different wings of HAMAS.  There

10   is a case -- And I apologize, your Honor.  I wasn't

11   expecting to make this argument.  I don't know the

12   citation.  I believe it's in the Eastern District of New

13   York.

14          MR. JACKS:  McKeef.

18:00 15          MR. JONAS:  McKeef I know is Boston, but I know

16   there is another case where they were able to bring in for

17   similar reasons -- where they brought in victims of

18   terrorist acts for the same reason we're doing, but we're

19   not going that far.

20          MR. DRATEL:  That's not an issue, why it's a

21   designated terrorist organization.  We're not allowed to

22   challenge and they shouldn't be able to put it in.  That's

23   completely off the charts as far as this prosecution, and

24   they specifically said they were not getting into this,

25   and it's even worse than what they represented.  I don't

18:00 1    have the papers in front of me -- The government wrote --

2    Footnote 4 in our in limine motion, the government wrote

3    previously -- it's a motion -- it's Document Number 468

4    filed November 9th, 2006.  It's actually to protect the

5    identity of important witnesses.  The defendants imply in

6    Footnote 10 that they will address the Israeli-Palestine

7    conflict at some point in the future.  The government will

8    be filing a motion in limine on this issue as the conflict

9    is irrelevant to the defendant's support of a designated

10    terrorist organization and would only serve to support an

11    improper jury nullification defense.  If the defendants

12    are permitted to present evidence on the conflict to the

13    jury, the door will be opened to the jury on the reasons

14    why HAMAS was designated a terrorist organization which

18:00 15    took the life of American citizens."  This is a 180 from

16    that representation.

17         MR. JACKS:  Your Honor, it's not.  If I were in

18    their shoes, I would be doing the same thing to water down

19    this case, but this is a terrorism case.

20         THE COURT:  Well, I have heard enough argument.

21    I'm ready to rule on this.  I was just scanning through

22    the government's response, as Mr. Jonas was arguing, and I

23    see the government has quoted a case called United States

24    against Pace, which is a 1993 Fifth Circuit decision, and

25    I recognize the quotation, although not from Pace, because

18:00 1    I think this language actually comes from an earlier Fifth

2    Circuit decision, and I can't remember the name of the

3    defendant in that case, but it starts with an M-c-K.

4    Anyway, the language is quoted at the bottom of Page 2 and

5    top of Page 3 of the government's response and the thrust

6    of this language is that Rule 403 in the Federal Rules of

7    Evidence should be sparingly applied, and I'll quote the

8    language for everybody's benefit since you don't have that

9    in front of you, no doubt.  This is Pace, 10 F 3d 1106,

10   "Relevant evidence is prejudicial, but it is only unfair

11   prejudice outweighing probative value which permits

12   exclusion of relevant matter under 403.  Unless trials are

13   to be conducted on unreal scenarios, on unreal facts

14   sanitized for the occasion, the application of Rule 403

18:00 15   must be cautious and sparing.  Its major function is

16   limited to excluding matter of scant or cumulative

17   probative force, dragged in by the heals for the sake of

18   its prejudicial effect.  As to such, Rule 403 is meant to

19   relax the iron rule of relevance, to permit the trial

20   judge to preserve the fairness of the proceeding by

21   exclusion despite its relevance.  It's not to 'even out'

22   the evidence or make a crime or contest where there is

23   little or none."

24          So based on that, I am going to deny the motion

25   in limine that has been brought by the defense without

18:00 1    prejudice, of course, to objection at trial to specific

2    evidence as it is offered.  But it's difficult for me to

3    say as an in-limine matter without having heard any

4    context that that particular evidence to be offered by the

5    government would not be admissible under Rule 403.

6              I think that may be all of the in-limine

7    motions.

8              MS. DUNCAN:  Your Honor, there are actually

9    several other categories of evidence we challenged.

10             THE COURT:  I'm sorry.  You had just gotten to

11   the first one.  Okay.

12             MS. DUNCAN:  The second broad category we

13   challenge is evidence having to do with other designated

14   terrorist groups, in particular Al Qaeda, and in our

18:00 15   review of the government's exhibit list, we included

16   pictures of Osama bin Laden.  They have documents

17   comparing Infocom with documents alleged to be related

18   with Al Qaeda.  The only reason for bringing in such

19   evidence is to clearly prejudice the jury against the

20   defendants and to remind them of 9-11 and inflame them as

21   to that horrific event.  It's grossly outweighed by the

22   unfair prejudice of the evidence.

23             THE COURT:  Why don't you go through all four

24   categories.

25             MS. DUNCAN:  There is more than four.  They are

18:00 1    grouped together, but we discussed smaller categories.

2              THE COURT:  Hit the high spots of all of them

3    then.

4              MS. DUNCAN:  We challenged evidence of

5    conventions, seminars and rallies sponsored by

6    organizations other than Holy Land Foundation.  We

7    challenged that on relevance grounds and also --

8              THE COURT:  Let me ask a question.  It's my

9    impression -- And in part this is from the Kastigar

10   hearing that we began a couple of days ago -- that these

11   fundraising events that at least some of the defendants in

12   this case were part of were typically held at mosques.  Is

13   that the type of organization that you are referring to

14   when you challenge evidence of fundraisers at other

18:00 15   organizations?

16             MS. DUNCAN:  No, your Honor, we're not

17   challenging the evidence of Holy Land fundraising

18   activities.  We're challenging the admission of evidence

19   that's unrelated to Holy Land.  Other people speaking at

20   events that have nothing to do with Holy Land as a

21   category.

22             MR. WESTFALL:  Your Honor, just for context,

23   there was fundraising done in mosques, but there was also

24   fundraising done at conventions like would be at a

25   convention center for instance.  If there was a guitar

18:00 1   show down here the Dallas Convention Center and I am a

2   guitar manufacturer and I want to go sell my guitars at

3   that guitar show, basically the theory is that I am then

4   liable for everything else that goes on at that guitar

5   show.  That's the type of organization that we're talking

6   about in this motion in limine.

7           MR. JACKS:  You think that's an accurate

8   metaphor or analogy.

9           MR. WESTFALL:  It's one that personally is

10   accurate to me.

11           MR. JONAS:  Your Honor, if I may respond.

12           THE COURT:  I'd like to hear all the categories

13   first, and then maybe you can give a response to them.

14           MS. DUNCAN:  The next category is evidence that

18:00 15   the Government of Israel designated zakat committees with

16   whom Holy Land worked in 2000.

17           MS. HOLLANDER:  Which was after Holy Land

18   closed.

19           MS. DUNCAN:  And a related category are

20   designations either by the US Government, by the

21   Governments of Germany or Israel of any individuals who

22   were not charged with giving money, any designations of

23   Holy Land Foundation and any other organizations not named

24   in the indictment.  And that would include, for example,

25   some of the family members of the defendants.  We

18:00 1 challenged evidence relating to other organizations that

2 the government alleges are linked to HAMAS, including

3 Interpol. I think you heard about Al Aqsa yesterday

4 during the Kastigar hearing. In particular, we object

5 generally to the introduction of any evidence having to do

6 with those organizations, and to the extent the Court

7 overrules that objection, we would ask for an offer of

8 proof from the government of any relationship between the

9 Holy Land Foundation and those organizations before such

10 evidence was allowed into trial. Evidence of web sites

11 that include hyperlinks to the Holy Land Foundation's web

12 site without some evidence that the Holy Land Foundation

13 expressly agreed to have that link included on the web

14 site. Any evidence of events occurring after September

18:00 15 4th, 2001 which is the date the Holy Land Foundation was

16 closed and all of its assets were seized. We had

17 challenged evidence or mentioned the two trials and

18 convictions of Defendant Elashi. The government has

19 indicated in its response that it does not intend to

20 introduce any evidence of the convictions itself, although

21 they have reserved the right to introduce evidence that

22 was introduced during those trials.

23 We have renewed our objection to any evidence

24 that the defendants are related to leaders of HAMAS on the

25 grounds that such evidence is completely irrelevant to

18:00 1    this prosecution.  I'm sorry.  I have to go through this.

2    It's been a while since I have read this, your Honor.

3          And then generally, we have raised objections

4    regarding authentication of documents that were seized by

5    the government of Israel from various zakat committees

6    that are key chains or posters.  We don't know and I don't

7    know if the government knows where they were found.

8          MR. JACKS:  We know they were found at a

9    particular zakat committee, but I don't know whose office

10   and in what context that evidence was found.

11         MS. DUNCAN:  We have challenged the admission of

12   a document entitled Foundation's Policies and Guidelines

13   which was seized by the government during a raid of the

14   Infocom Company on the grounds -- first of all that it's

18:00 15   irrelevant, and secondly, that we don't know where it came

16   from.  It doesn't have any reference to the Holy Land

17   Foundation, and related to that we're challenging the

18   comparison of that document with the Al Qaeda document by

19   the government's witness.

20         MS. HOLLANDER:  Let me add one thing to that.

21   The Al Qaeda is an alleged Al Qaeda document that was

22   seized in Manchester, England in some case and is alleged

23   to be an Al Qaeda document.

24         MS. DUNCAN:  We also raised a general

25   confrontation challenge because at the time we wrote this

18:00 1    we didn't have access to the government's witness list or

2    exhibit list to bring the issue to the Court's attention.

3    With respect to the alleged coconspirator statements, we

4    challenge the admission of any statements made by an

5    alleged coconspirator before the time of the designation

6    of HAMAS in 1995 on the grounds that there could be no

7    conspiracy to violate the law before that date.

8         We challenge the evidence relating to criminal

9    proceedings against various Palestinians by the Government

10   of Israel, and we do intend to challenge based on our

11   review of the government's evidence.  We now know what

12   type of documents they intend to introduce to prove those

13   criminal histories, and we plan to file that within the

14   week.  We also are challenging the government's reliance

18:00 15   on newspapers articles.  Our initial review of the

16   government's exhibit list shows they intend to introduce

17   articles that were found in the Holy Land files.  I think

18   it was mostly articles found in the Holy Land files, and

19   they are rank hearsay and have no probative value in this

20   case.  I think those are the main categories, your Honor.

21        MR. DRATEL:  I want to say one thing about the

22   web site.  And that is there are -- I don't know what the

23   number is by now.  Could be millions -- web sites that

24   link to the United States Department of Justice.  Does

25   that mean the United States Department of Justice is in

18:00 1    sync with every web site?  Most of them are groups in

2    opposition to the United States Department of Justice.

3    But they put links.  You can get the documents and filings

4    and all sorts of reports that are done.  It would be to

5    say as if the government was there for -- that it could

6    come in to show the government's state of mind that

7    believes what the ACLU -- It would be as if saying the

8    government -- that you could prove the government's intent

9    because on its web site for an organization like the ACLU

10   is a link to the government, and therefore, they have to

11   have the same intent and knowledge and state of mind as

12   the ACLU or any other organization that has the web site.

13   That's really what we're talking about here.  No one can

14   prevent people from putting Holy Land.  Nobody can prevent

18:00 15   a link to the Department of Justice.

16            THE COURT:  I think that's a good jury argument

17   if this evidence comes in, but I don't think it's an

18   argument that this evidence is so prejudicial that the

19   jury shouldn't hear it.

20            MR. DRATEL:  It's a relevance argument.  What's

21   the connection as to why it should come in at all.  The

22   internet is such a democratic institution, such an

23   unmonitored institution that to attribute on the basis of

24   things like links almost takes relevance out of the case

25   in that regard.

18:00 1              THE COURT:  Mr. Jonas.

2              MR. JONAS:  Thank you, your Honor, and I think

3    we may wind up bouncing back and forth, depending on the

4    issue of relevance to us.  I am going to let Ms. Shapiro

5    handle the first issue.

6              MS. SHAPIRO:  I think the objection was that

7    there was some Al Qaeda related posters is my

8    recollection, that there were posters of Osama bin Laden

9    in the evidence.  There were some posters that were seized

10   from the zakat committees that Holy Land supported that

11   included Osama bin Laden among other terrorist leaders.  I

12   think there is one of Nasrallah also that was in there

13   and --

14             MR. GARRETT:  The leader of HAMAS.

18:00 15             MS. SHAPIRO:  Yeah, I'm sorry.  Leader of HAMAS.

16   And these posters show the kinds of things that were in

17   the committees that were supported by the Holy Land

18   Foundation.  They show that rather than benign charities

19   that the defense will try to make them out to be that they

20   have a political nature and that they have these kinds of

21   posters and images in their possession.  Most of the

22   posters are specifically HAMAS-related, and there were a

23   couple that had Osama bin Laden and also some Chechnian

24   leaders and Hezbollah leaders.

25             MS. HOLLANDER:  Your Honor, this raises a huge

1    issue.  These documents that come from the Government of

2    Israel were seized by the Government of Israel during what

3    they call Operation Defensive Shield.  It was a military

4    operation.  They seized vast quantities.  The Government

5    of Israel's operatives seized vast quantities of

6    documents, and then they filtered through them, and then

7    they provided certain ones to the government.  But you

8    know, if you go in my office, you will find books about

9    HAMAS.  If you go in the government's office, you will

10    find books about HAMAS.  We don't know whether there was a

11    file on HAMAS and a file on Fatah, and these are the

12    groups we shouldn't have anything to do with or should

13    have anything to do with.  We don't have any idea or

14    concept of the provenance of those, who put them there,

15    how they got there, what file they were in and who saw

16    them.  And for these kinds of things to come in -- and

17    there are over a hundred exhibits that the government has

18    filtered from this group that include posters, key chains,

19    newspapers articles, various things that these zakat

20    committees had.  And it's important to understand the

21    context.

22            THE COURT:  Well, I agree that context is

23    everything, and I'm not in a position to say that

24    categorically before I have heard the evidence that none

25    of this evidence will be relevant.  I can't do that in

18:00  1    limine.

2    MS. HOLLANDER:  I fear this trial is going to be

3    one continuous Bench conference.

4    THE COURT:  I assure you, Ms. Hollander, that it

5    will not be.  That's going to take too much time with all

6    the lawyers we have to bring up to the Bench.

7    MS. HOLLANDER:  I understand.  And our efforts

8    to lay this out in great detail in this motion and to

9    explain why all of these items should be dealt with ahead

10    of time was to try to avoid that.

11    MR. DRATEL:  Your Honor, this particular part --

12    First of all, getting beyond the authenticity of the

13    document which is zero, you will not have anyone that says

14    they took it from a certain place.

18:00 15    MS. SHAPIRO:  That's not true.

16    MR. DRATEL:  But the problem I want to speak to

17    is the extraordinary 1st Amendment implications of this

18    type of evidence.  To try to get a conviction under a

19    statute that expressly says -- has a provision added by

20    Congress -- that says the statute shall not be interpreted

21    or construed in a manner to abridge 1st Amendment

22    freedoms.  So they are saying now what you have read is

23    fair game -- what somebody else read.

24    THE COURT:  I thought these things were seized

25    in Palestine.  The 1st Amendment doesn't apply outside the

18:00 1    United States, does it?

2              MR. DRATEL:  The statute is not designed to

3    punish people for supporting or sympathizing with a group,

4    and I say support in terms of moral support, ideological

5    support.  There is no crime in that.  So first of all, the

6    403 nature of it is off the charts.  Particularly because

7    there is no relevance, and Al Qaeda is not what Holy Land

8    is accused of supporting.  So it's almost amending the

9    indictment at this point when you say you give to a zakat

10   committee and they support Al Qaeda and therefore you

11   should convict them.  It's quite plain.

12             THE COURT:  I thought they were saying a zakat

13   committee is not just a charity but has a political aspect

14   and that political aspect includes supporting goals of Al

18:00 15  Qaeda?

16             MR. DRATEL:  That's not the crime.  They

17   shouldn't has been allowed to put that in.

18             THE COURT:  Well, except it shows it's not just

19   a charity if it has a political aspect.

20             MR. DRATEL:  Because I have something in my

21   library that's written by an Islamic fundamentalist?  Does

22   that -- What does that mean?

23             THE COURT:  I think that goes back to Pace.  If

24   you limit a zakat committee to just a charity and nothing

25   else.

18:00 1          MR. DRATEL:  We put our law in there, too, which

2     is from the Supreme Court, the Herndon v Lowry case which

3     is you cannot punish people and you cannot use -- It's

4     really a thought crime at that stage which is to say

5     because you have something in your library and you are

6     interested in a particular thing we're going to attribute

7     that intent to you and therefore convict you of a crime

8     that is not even the same crime because there is no crime

9     of simply having a poster or being a sympathizer.  We

10    could all get on the street right now and speak for hours

11    about how wonderful any particular organization in the

12    world is that is a designated terrorist organization.  I'm

13    not saying it won't be prosecuted, but the point is the

14    statute doesn't permit it.

18:00 15          MR. GARRETT:  But it's your state of mind.  What

16    one says is certainly protected by the 1st Amendment, but

17    it's certainly doesn't say it's not evidence.  To go back

18    to these committees, I think that's not a good argument.

19    It's exactly what the issue is, the nature of the

20    committees and in every sense.  The statute says one shall

21    not be prosecuted solely on the basis of the --

22          MR. DRATEL:  That's not what it says.

23          MR. GARRETT:  I go back and harness on to what

24    your Honor said.  If they want to make argument as to

25    weight, that should be placed on that they should be

18:00 1    entitled to do so.

2              MR. JONAS:  This is not a prosecution as to what

3         they said.  As your Honor pointed out, this is a part of

4         the government's evidence to show the zakat committees are

5         controlled by HAMAS.  It's one part and certainly evidence

6         of the zakat committees' relationship with HAMAS by the

7         fact that all of these key chains, posters and other

8         evidence show they are HAMAS.

9              MR. DRATEL:  But not Al Qaeda.  That's clear.

10        It's got nothing to do with Al Qaeda.  I understand what

11        the Court is saying, but I also think that our purpose in

12        putting this in the context of this motion -- It's going

13        to have to be an item-by-item determination.

14             THE COURT:  Well, I think that's right, and what

18:00 15   I'm telling you now is that I don't think I can

16        categorically say that type of evidence would not be

17        admissible at trial without any context to make that

18        determination.

19             MR. DRATEL:  I understand what the Court is

20        saying.  I want the Court to understand that we're now

21        going to have at trial and item-by-item determination

22        where we will be raising these in context.

23             MS. HOLLANDER:  That was the point I was

24        raising, but to be clear about the 1st Amendment, it says

25        "Nothing in this section shall be construed to abridge the

18:00 1    rights guaranteed under the 1st Amendment."  And the other

2    big problem with the evidence which the government has

3    never acknowledged is that we don't know -- we can't

4    even -- Even if you said the zakat committees weren't

5    charities -- and I have never heard that before.  They are

6    charities.  I don't think there is any question about

7    that.  So the issue is whether or not these charities

8    support in the sense of moral support a particular

9    organization, but you don't even know that because these

10    items were all taken completely out of context since we

11    don't have the full range of items and we don't know where

12    they were found.  Or maybe they were found in a file that

13    said don't support any of this.  We don't have any way of

14    knowing that, nor does the government.

18:00 15           MS. SHAPIRO:  If I could respond briefly.  I

16    want to remind Ms. Hollander and everyone the words of

17    "humanitarian project," there is no 1st Amendment right to

18    support a terrorist organization and the items found in

19    the zakats go to show these zakats were part of the HAMAS

20    social network, and it's evidence that they were part of

21    the HAMAS social network, and so the fact that Holy Land

22    wants to use these charities does not implicate a First

23    Amendment issue if, in fact, as we allege, they are

24    connected to HAMAS's social structure.

25           MR. DRATEL:  Humanitarian law doesn't say that.

18:00 1    It says you have no right to provide resources as

2    enumerated.  Bowen says that in the 7th Circuit.  In the

3    designation of Holy Land, the district court said that

4    humanitarian law -- said it more than once in the Ninth

5    Circuit and the district courts have said that advocacy,

6    support, sympathy, everything short of providing material

7    support and resources, and that's you can't give money to

8    the terrorist activity organization.  But support is a

9    much broader term.

10    MR. GARRETT:  That doesn't render irrelevant all

11    the things you were just discussing.  Certainly we have to

12    add to that.  We're going to show the nature of the

13    organizations and the nature of the Holy Land, its beliefs

14    and state of mind.  Certainly by itself is not good

18:00 15    enough.  Not good enough.  I absolutely agree.  But the

16    government intends to show that there was financial

17    support provided that goes in concert with that state of

18    mind and those beliefs.  You cannot look at the money in a

19    vacuum but in the total context of the total organizations

20    and the defendants.

21    THE COURT:  I think I have heard enough argument

22    now.  I think I know what the motion is about, having

23    heard it explained by the defense.  I am going to deny the

24    motion at this point without prejudice to the defense

25    making objections as these items of evidence are offered

18:00  1    by the government during its case.

2                Does that complete the motions in limine?

3                MR. JONAS:  That just addresses the first

4    category they raised.

5                THE COURT:  I thought she had gone through all

6    the others.

7                MR. JONAS:  But the argument we had --

8                MR. GARRETT:  Mr. Jonas needs to leave the room.

9                MR. JONAS:  I thought you were addressing the

10   one issue.  I didn't realize you were addressing the whole

11   motion in its entirety.  I apologize.

12               THE COURT:  I was just asking the question, Mr.

13   Jonas, if there are other motions in limine that I need to

14   deal with or are there others.

18:00 15               MR. JACKS:  Our motion was a consolidated motion

16   in limine, and there were other points in there.

17               MS. SHAPIRO:  One of them is we objected in

18   limine to one of the defense's proposed -- Well, I guess

19   on two levels we objected to the defense experts as

20   cumulative of each other and also to Leah Tesemel.

21   According to the defense, she intends to talk about

22   torture generally by the Government of Israel, and we

23   objected to that in limine and to the relevance of that.

24               THE COURT:  I think I will be denying that

25   motion in limine as well, again because I don't have any

18:00 1    real context in order to make a determination.  If that's

2    a defense witness, I don't think that I will need to

3    decide that before trial.  I will have heard the

4    government's case by the time this witness is ready to

5    testify.  If the government is so inclined, they can renew

6    that motion I suppose when we're ready to hear this

7    witness, and I should be in a much better position to make

8    a decision then than I am now.

9            MS. HOLLANDER:  Your Honor, we do have other

10   outstanding motions.  We have a motion in limine, and if

11   these have been ruled on and we missed them -- I suppose

12   it's possible.

13           THE COURT:  No.  I appreciate you telling me the

14   ones outstanding.

18:00 15           MS. HOLLANDER:  We made a list.  To stick with

16   the motion in limine, Docket Number 584 regarding issues

17   arising under the Religious Freedom Restoration Act and

18   the First Amendment, it was filed March 14, 2007.  Did you

19   want all of them or one at a time?

20           THE COURT:  Why don't you go through all of

21   them, and we can come back and talk about particular ones.

22           MS. HOLLANDER:  There was also on the motions in

23   limine -- There is a motion to include the government's

24   experts or in the alternative for a Daubert hearing, and

25   that's filed 3-14-2007, Docket Number 582.

18:00  1          And then to go back much earlier, there is

2     Docket Number 399 filed October 6th, and that was the

3     Defendant's Joint Sealed Motion and Memorandum to Suppress

4     Evidence Obtained in FISA Surveillance.  But it was filed

5     under seal.  It's a classified motion.  So I can't

6     describe it right now.

7          MR. STEWART:  Can I make a suggestion?  Would

8     you mind going through this list of motions that I show

9     pending and let me know if there are not my on that list?

10          MS. HOLLANDER:  All right.  I think it's just

11     from my list the 399 and 582 -- 399, 582 and 584.  What

12     about -- We responded to the government's notice, 807 and

13     the CIPA motions.  Does that help?

14          THE COURT:  Do we need to take those up now or

18:00 15     are you working on them?

16          MR. STEWART:  I'm working on everything at

17     various stages.

18          THE COURT:  I'm informed and I'll pass along to

19     counsel for the record Mr. Stewart says that now that we

20     have gone through his list that he's working on all of

21     them, and they are at various stages of development, but

22     we should have rulings for you before trial, and I

23     apologize we're not further along, but as my justification

24     I'll go back to what I said in the beginning, that the

25     filings in this case are voluminous as everyone knows.

18:00 1          MS. HOLLANDER:  And unfortunately, we have one

2     that we're filing today, but it's a brief motion I

3     discussed the other day.  It's issues that your Honor has

4     decided.  I think there is new issues, but we will be

5     filing that later today.  It's finished.  We just didn't

6     get a chance to get it on the electronic filing.  It's

7     short.

8          MS. SHAPIRO:  To follow-up on Ms. Hollander's

9     motion, unfortunately there are a couple of things coming

10    from us.  One I think we raised the last time we were

11    together was a motion to reconsider the Court's ruling on

12    the witness from the Israeli Defense Forces who came to

13    authenticate.

14         THE COURT:  I had understood that you were going

18:00 15 to file some additional material asking me to reconsider,

16    and as far as I know, we have not yet received it.  So I

17    thought maybe you had changed your mind.

18         MS. SHAPIRO:  No, the motion has actually been

19    prepared since the time we were here, but we asked the

20    defense minister to provide us with a document, and there

21    was an election in Israel, and the defense minister

22    changed, and now there is a new defense minister, and he

23    has it on his desk, and I was literally this morning on

24    the phone hoping we could get it scanned and sent over,

25    and I'm hoping it would be okay to file the scanned copy

18:00  1    and substitute with the original signature to speed things

2    up.  We're anxious to get it to your Honor.  It's a little

3    out of our control.  But hopefully my in the next few days

4    that would come in.  The other motion will also be very

5    short, and that would be a motion in limine with respect

6    to Steve McGonigle, who's the Dallas Morning News reporter

7    at the hearing we had before Judge Stickney.  On the

8    motion to quash that trial subpoena which was denied,

9    there was an issue with respect to a confidential source

10    that Mr. McGonigle wants to protect.  It's not the

11    government's intention to elicit that confidential source.

12    The government's perspective is it's not relevant to any

13    of his testimony.  But in the opposing papers, the defense

14    indicated that they may want to compel that source.  So we

18:00 15    wanted to at least make your Honor aware up front that

16    confidential source may be an issue that would come up,

17    and we wanted to at least put a motion in limine on

18    record.

19          MR. JONAS:  There is also another motion, your

20    Honor.  Motion under CIPA pertaining to potential 3500

21    material of certain witnesses, that material being

22    irrelevant and also classified.  So we will be providing

23    an unclassified motion with classified attachments for the

24    Court's review.  We think under 3500(c) the material is

25    not relevant and should not be turned over to the defense,

18:00 1    but we're asking the Court to review it.

2              THE COURT:  It's currently pending or on the

3    way?

4              MR. JONAS:  It's on the way.  It should be filed

5    very shortly.

6              MS. HOLLANDER:  That actually raises another

7    issue.  Maybe it's a little out of order.  Maybe not.  And

8    that was a request of the government of which we can

9    anticipate receiving Jencks material, Giglio material, and

10   we would hope to know who their initial witnesses are so

11   since this is such a long trial we would know where to

12   start.  Those were three requests that we had.

13             MR. JACKS:  I think the local rule -- or maybe

14   it's your rule also.  But the standard is like the night

18:00 15   before the witness testifies, but we're aware if the

16   witness has a fair volume of material we will try to turn

17   that over sufficiently -- maybe a week in advance or

18   something like that to give you adequate time to look at

19   it.

20             MS. HOLLANDER:  For Jencks?

21             MR. JACKS:  Yes.

22             MS. HOLLANDER:  And Giglio?

23             MR. JACKS:  Same.

24             MS. HOLLANDER:  If it's all right, I'll ask Mr.

25   Jacks directly.  Are you willing to tell us who your first

18:00  1   witnesses are so we know where to start?  When you know.

2          MR. JACKS:  Well, stipulations factor into that.

3   Because if we don't get stipulations, there is going to be

4   some records custodians.  We anticipate Mr. Levitt being

5   the first witness.

6          MS. HOLLANDER:  The first substantive witness?

7          MR. JACKS:  Right.

8          MS. HOLLANDER:  There is one other issue, your

9   Honor.  There is outstanding discovery requests that we

10   have.  And I think we made a list of them, and maybe after

11   this we can talk to Mr. Jacks.  Some letters recently that

12   haven't been responded to.  And we're all trying to get

13   those sorted out, and there is one other issue, and I

14   don't know that we disagree or not, but I think we do, and

18:00 15   that has to do with the Rule 615.  We have a number of

16   expert witnesses in this case.  We would like to obviously

17   be able -- We aren't asking that they all be in the

18   courtroom for three months or even necessarily during all

19   of the government's experts, but we would want them in the

20   courtroom perhaps for some of the government's experts,

21   but if they are not in the courtroom, we want to be able

22   to share testimony with our experts.  So we would like and

23   we propose to the government that we assume that one side

24   or the other is going to invoke the Rule and that we

25   exclude all experts, theirs and ours and all translators

18:00 1   because translators may -- I'm not talking about

2   interpreters.  Our clients all speak English, but

3   translators may have to be told about specific issues as

4   they come up.  So our proposal was to exclude all

5   translators, ours and theirs, and all experts from the

6   Rule.  And we have kind of gone back and forth, but we

7   haven't had a definitive answer on whether we agree on

8   this.

9         MR. JACKS:  I think my last communication with

10   Marlo, who was the one that raised it with me, is you know

11   I probably would want to address it on a

12   witness-by-witness basis.  But I think we really haven't

13   had a chance to talk about it.  But she clarified to me

14   she wasn't necessarily talking about them being in the

18:00 15   courtroom.  She just wanted to be free to tell them what a

16   witness said.  My initial reaction is that I don't know

17   that I will have a problem with that.

18         MS. HOLLANDER:  We just need to know whether we

19   need to raise it with the Court.

20         MR. JACKS:  Your Honor translators are potential

21   witnesses.

22         MS. HOLLANDER:  Only if there is an issue that

23   we can't agree on a translation.  So we have to be able to

24   tell them what the translations are.

25         MR. JACKS:  I understand.

18:00 1          MS. HOLLANDER:  We may want to have an expert

2     come for a particular witness, but generally we're not

3     going to have our experts come and sit through.  It's not

4     just expert to expert.  I mean their experts are talking

5     about exhibits, and our experts are going to be talking

6     about exhibits.  They just need to not be prohibited by

7     the Rule from sharing testimony with them.

8          THE COURT:  I have not gone back and looked at

9     Rule 615 in the recent past.  So my memory is a little

10    vague.  But my understanding of the Rule is it's really

11    designed to cover fact witnesses, not experts.

12         MS. HOLLANDER:  It is, your Honor.

13         THE COURT:  And I would put translators in that

14    same category I think.  Of course, at the margins you get

18:00 15   into a question of whether a particular witness is only an

16    expert witness or a combination expert and fact witness.

17    But to the extent they are entirely expert witnesses, I

18    personally don't think the Rule applies to them, and I

19    don't know if the circuit agrees with my interpretation or

20    not.  So I don't think there should be a problem in having

21    anyone who's only an expert being in the courtroom at any

22    time or all the time, unless counsel have a different

23    view.  That's my view of the matter.

24         MS. HOLLANDER:  We did prepare a memo on this

25    which I don't have with me, but it's my understanding that

18:00 1    it's really within your discretion basically.

2              THE COURT:  Well --

3              MS. HOLLANDER:  It doesn't usually come up

4    because frankly both sides usually agree.

5              THE COURT:  Well, I encourage you to continue to

6    have discussions with the government about it and see if

7    you can reach an agreement, and if you can't, I will make

8    a ruling if you bring it to my attention, but let's have

9    those discussions first and see if we can reach an

10   agreement.  It seems to me for the most part it should be

11   a nonissue.

12             MS. HOLLANDER:  That's what I thought.

13             MR. JACKS:  Your Honor, in that vein, the

14   government was going to ask permission to have two agents

18:00 15   sit at counsel table, given the volume of evidence and --

16   And both of those agents will be witnesses, Ms. Burns and

17   Mr. Miranda.  There may be a third agent that we would ask

18   to be excused from the Rule.  But if he would testify and

19   what he would testify about is still up in the air.

20             MS. HOLLANDER:  Your Honor, Rule 615 cases deal

21   with that issue also, and it is within your discretion to

22   permit that.  What we would request because I suspect --

23             THE COURT:  It's really a question of whether

24   they are entitled to the one additional.  As a matter of

25   right they can have one, and my discretion extends to any

18:00 1  beyond that.

2           MS. HOLLANDER:  You do have discretion, your

3  Honor, to order them to either have those witnesses

4  testify first so that they don't hear the testimony of our

5  witnesses or not be the room when each other is

6  testifying, if there is more than one, and we would

7  request that at a very minimum -- In other words, if Ms.

8  Burns and Agent Miranda -- that they not be permitted to

9  know each other's testimony.  At the very least if they

10  are not going to be the first and second witness.

11          THE COURT:  Well, I haven't had that specific

12  request come up before.  So I guess before I made a

13  decision I would like to see the case you are relying on.

14          MS. HOLLANDER:  I have them and will provide

18:00 15  them both.

16          THE COURT:  I think one thing that's in the

17  order that came up the other day in a way in the Kastigar

18  hearing, I called on Ms. Cadeddu to cross examine first

19  because her client was higher up in the list of defendants

20  in the indictment than Mr. Westfall's, and my order

21  regarding conduct of trial says cross examination and

22  presentation of any defense cases will go in the order

23  that the defendants are listed in the indictment unless by

24  agreement we come to some other order.  I'm generally

25  receptive to letting defendants switch the order around as

18:00 1    long as that's not abused in some way, and I would hope

2    that with most of the government witnesses that some

3    lawyer on the defense side could sort of take the lead in

4    cross examining that witness and everybody else's

5    questions be nonexistent or minimum after the lead lawyer

6    does the cross examination.  I would certainly be happy to

7    do it that way, and that way we would be varying the order

8    on the defense side somewhat, but I don't know what your

9    respective attitudes are.

10          MR. DRATEL:  That is our intention, your Honor.

11    I mean it's our intention for a variety of reasons, our

12    own trial strategy.

13          THE COURT:  All I can say again is don't make me

14    sorry that I am agreeing to that.  Early on in my time

18:00 15    here back in the mid-eighties we had a large prosecution

16    which still holds the record in length of cases I presided

17    over.  United States against Helms.  Big mail fraud

18    prosecution.  And the defense lawyers did make me regret

19    that about three or four weeks into the trial, and in

20    fact, I changed the procedure midway through the trial

21    because they were abusing it.  But you work with me, and

22    I'll be working with you.

23          MS. HOLLANDER:  Judge, one thing that the

24    defense wanted to bring up was the possibility that at

25    some point after the jury is selected -- and I don't know

18:00 1 if it would be after opening statements or where would be

2 a good time to do this -- would be to have a session with

3 the Court where the jury is not here and not waiting in

4 the juryroom, and then the parties can attempt to go

5 through the evidence that -- its admissibility can be

6 ruled on.  For example, if a witness is not necessary and

7 if that took half a day or just like we had these

8 discussions here with the Court -- I guess the question is

9 if there are stipulations that we have worked out, but I

10 was just thinking if we could -- while not wasting the

11 jury's time have a session where we determine okay what

12 government evidence is going to be admitted and what can

13 be admitted and then get that out of the way so that we're

14 not stopping in the middle of trial.  I don't know -- As I

18:00 15 said, some of it may not have a nature that you could do

16 that.  You are going to need a witness or need to hear

17 testimony.  But if there is evidence that's really a

18 question of law and the Court ruling on it, if the Court

19 would at least keep in mind the possibility of doing

20 something like that to make better use of our time where

21 we're not arguing over exhibits and not wasting the jury's

22 time.

23    THE COURT:  Well, I don't know that I can make

24 that decision now based on what I know about the case.  I

25 think as we get into the trial and we see how things are

1    going, I would be open to something like that if it looks

2    like it would be a productive use of time.

3              MR. JACKS:  And I realize it's up to us to

4    crystallize those things so they are tee'd up for the

5    Court to say yea or nay so that we can do that.

6              THE COURT:  I'm a little reluctant -- And again

7    without beating a dead horse, it may be difficult in a lot

8    of instances for me to make a judgment on some of these

9    witnesses without having a substantial context.

10             MR. WESTFALL:  Your Honor, I think we will stay

11   in a constant dialogue about what things we can agree to

12   and what we can't.  So if we get a pile of things that

13   need the Court's attention, that may be a good

14   alternative.

15             MR. DRATEL:  But otherwise, the context is

16   essential.

17             MS. HOLLANDER:  Can we also ask the government

18   if you can bring all the boxes at the FBI office and have

19   them here because we're going to need some of them.  We

20   need the originals of some.  At least nondemonstratives

21   for the jury.

22             MR. JACKS:  Well, if you could tell me which

23   ones.  I don't want to bring three hundred something boxes

24   down here, and you are going to need one piece of paper

25   out of one box.  I'm certainly willing to -- if you could

18:00  1    give me a list of which original documents you think --

2          MS. HOLLANDER:  I can tell you which boxes.

3    Maybe we can do it that way.

4          MR. JACKS:  Well, yeah.

5          MS. HOLLANDER:  We can try to do it by boxes.

6    But we need a substantial number of originals here.

7          THE COURT:  I promised you at the beginning -- I

8    think I have gone through my agenda -- that I would give

9    each side an opportunity to raise any issues you have.  I

10   see by the clock on the wall it's 11:40.  I will want to

11   recess if we're not done by noon for lunch and take about

12   an hour and a half for lunch, and then when we come back

13   if we're not done with the pretrial conference, we need to

14   finish it and go on to the CIPA matters we discussed the

18:00  15   other day.  I have a pretrial conference in another

16   case -- another criminal case at four o'clock.  So we will

17   need to get everything done, if possible, by then.  But

18   with that information, let me call on counsel for the

19   government for any additional issues.

20         MR. JACKS:  My closing remarks.  I'm tapped out,

21   your Honor.  If I knew anything, I have forgotten it.

22         MS. HOLLANDER:  I'm finished.  We went through

23   my list.

24         MR. WESTFALL:  Just one thing, your Honor.  As

25   to the panels, in order to really hit the ground running

18:00 1    on Monday morning --

2                    THE COURT:  You talking about panels of jurors?

3                    MR. WESTFALL:  Yes.  I think it would be real

4      helpful if we could have a list of who the jurors are

5      going to be that come in the first day.  We spoke with

6      Leigh, and she said that you would have to give your

7      permission.

8                    THE COURT:  I don't see any problem.  I think it

9      would expedite and make the process more efficient for all

10     counsel involved if you need ahead of time, and you will

11     have presumably the answers to these questionnaires well

12     in advance.  So you probably will focus on some more than

13     others.  I think that's a good idea myself.

14                   MR. WESTFALL:  That's all I had.

18:00 15                  THE COURT:  We had a discussion at an earlier

16     conference that once the jury is selected we should

17     somehow mix in the jury box the regular jurors and

18     alternate jurors which I think is an excellent idea, even

19     though I have never done that before.  And I wanted to

20     discuss with counsel again to be sure that everybody is in

21     agreement about that and to find out how to do it.  I

22     guess my initial sense of the best way would be once we

23     know who the jurors are and the alternate jurors are to

24     put the names in a hat and draw them out in a random order

25     so that they are not arranged in any particular way in the

18:00 1    jury box.  And I would probably make some announcement to

2    them when they are sworn in that among you are regular

3    jurors and alternate jurors, and you don't know who you

4    are, and the parties and their counsel know, and you don't

5    know, and the reason I'm telling you this is that nobody

6    knows who will be serving as jurors at the time you begin

7    your deliberations.  So it's important that everybody pay

8    attention throughout the trial or some language to that

9    effect.

10         MS. MORENO:  Yes, your Honor, we would request

11    that sort of instruction from the Court.

12         THE COURT:  Is the process okay on how we

13    arrange them in the jury box?

14         MS. MORENO:  I have done that before, and it

18:00 15   works well, and everybody pays attention.

16         MS. HUDSON:  Judge, how many jurors you want to

17    be brought in on the 16th?

18         THE COURT:  That's another question I guess we

19    should talk about.  At a rate of four an hour

20    approximately, I have just estimated that maybe we could

21    do twenty-four that day, and Mr. Westfall commented -- and

22    I think correctly -- that we should aim a little higher in

23    case we don't need to spend time with certain members.  So

24    what do you think?  Thirty or forty?

25         MR. JACKS:  I thought we were going to do the

18:00 1  whole panel after --

2        THE COURT:  No, we agreed to do that after we

3  did the individual panels and we have enough so that we

4  don't have to bring in 40.

5        MR. JACKS:  Well, if they are not oriented and

6  educated about the case, to be sitting there and

7  questioning them individually I think is kind of putting

8  the cart before the horse a little bit.  They haven't, you

9  know as I said, been oriented and notified about what the

10  case is about, the burden of proof and those kinds of

11  things and to start -- just to jump in cold with

12  individual voir dire I think could be problematic and

13  really deprives them of, you know, maybe some basic

14  fundamental information that would help them to form their

18:00 15  decision or their answers.

16        I wasn't aware that we were going to immediately

17  start in with individual voir dire regarding whatever

18  issues the parties started to bring up.  I think it's

19  important and better to have the standard voir dire, first

20  of all, of as many as we can get in, as I said, and orient

21  and inform them about the process and who's who and what

22  the charges are.

23        THE COURT:  Okay.  I understand your position,

24  but I have already said that I am going to do it in the

25  way that's been proposed by the defense.

18:00  1          MR. DRATEL:  Your Honor, I have just one thing.

2     I don't have to do it right now, but I want to alert the

3     Court or get some permission.  There is some

4     health-related issues with respect to Mr. El Mezain.  Some

5     of them are logistical about the courthouse and the

6     courtroom, and if I may speak to Ms. Hudson if the Court

7     will permit me to do that, and we'll try to work it out.

8          THE COURT:  Anything else on the defense side?

9          MR. WESTFALL:  No, your Honor.

10          THE COURT:  Okay.  We'll be in recess until

11     1:30, and we'll come back to resume with the CIPA matters

12     at that time.

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3          I, Cassidi L. Casey, certify that during the

4     proceedings of the foregoing-styled and -numbered cause, I

5     was the official reporter and took in stenotypy such

6     proceedings and have transcribed the same as shown by the

7     above and foregoing pages 1 through 79 and that said

8     transcript is true and correct.

9

10         I further certify that the transcript fees and format

11    comply with those prescribed by the court and the Judicial

12    Conference of the United States.

13

14

15

16                              Cassidi Casey/s

17                              CASSIDI L. CASEY
                                UNITED STATES DISTRICT REPORTER
18                              NORTHERN DISTRICT OF TEXAS
                                DALLAS DIVISION
19                              CSR NUMBER 1703

20

21

22

23

24

25

< 0 >
**04-CR-240-G** 1:5
**05/842-9960505/842-9960**
1:47

< 1 >
**1** 39:11, 79:7
**10** 43:6, 44:9
**10005** 2:7
**10985** 2:25
**1100** 1:33, 3:14
**1106** 44:9
**11:40.** 74:10
**12/732-0707212/732-0707**
2:8
**13-247-4500813-247-4500**
2:27
**14** 2:6
**14-254-3139214-254-3139**
3:16
**14/659-8600214/659-8600**
1:35
**14/744-3015214/744-3015**
2:18
**15/875-5812415/875-5812**
2:34
**15D6L** 3:14
**16th** 23:16, 34:21, 76:17
**17/877-1700817/877-1700**
3:9
**1703** 3:13, 79:21
**17th** 23:17
**18** 39:8
**180** 43:15
**1976** 13:3
**1993** 43:24
**1995** 50:6
**1:30** 78:11
**1st** 54:17, 54:21, 54:25,
56:16, 57:24, 58:1, 58:17

< 2 >
**2** 44:4
**20** 1:45
**2000.** 47:16

**2339(b** 39:9, 40:14
**240** 23:6, 23:10, 24:11
**24th** 33:18
**26th** 2:32
**28th** 2:6
**2nd** 13:3

< 3 >
**3** 1:5, 44:5
**3232** 2:16
**33679** 2:26
**3500** 64:20
**3500(c** 64:24
**399** 62:2, 62:11
**3:0** 4:4
**3d** 44:9

< 4 >
**4** 43:2
**4-240-G** 4:4
**40** 23:3
**40.** 77:4
**403** 36:17, 38:7, 38:17,
41:19, 41:22, 44:6, 44:14,
44:18, 55:6
**403.** 39:3, 44:12, 45:5
**404(b** 36:18
**468** 43:3

< 5 >
**5** 13:3
**535** 13:3
**555** 2:31, 32:5
**582** 62:11
**582.** 61:25
**584** 61:16
**584.** 62:11

< 6 >
**615** 8:10, 68:9, 69:20
**615.** 66:15

< 7 >
**700** 1:45, 2:16
**75204** 2:17

**75242** 1:34, 3:15
**76102** 3:8
**79** 79:7
**7th** 59:2

< 8 >
**801** 34:20
**807** 62:12
**87102** 1:46

< 9 >
**9-11** 45:20
**910** 3:7
**94104-1500** 2:33
**948** 13:3
**958** 13:3

< A >
**AARON** 2:4
**Abdulqader** 2:11
**able** 6:4, 6:5, 6:6, 6:8, 6:16,
8:16, 16:6, 26:6, 27:20,
27:23, 33:13, 42:16, 42:22,
66:17, 66:21, 67:23
**above** 79:7
**abridge** 54:21, 57:25
**absolutely** 59:15
**abused** 71:1
**abusing** 71:21
**access** 6:4, 7:14, 50:1
**accessible** 6:18
**According** 60:21
**accuracy** 13:10
**accurate** 12:21, 13:1, 14:1,
47:7, 47:10
**accurately** 6:7
**accused** 38:9, 55:8
**acknowledged** 58:3
**ACLU** 51:7, 51:9, 51:12
**Act** 38:22, 39:21, 40:9, 61:17
**acted** 7:18
**activities** 46:18
**activity** 39:15, 40:3, 40:17,
59:8
**acts** 9:6, 36:25, 37:4, 37:21,
37:25, 39:17, 39:22, 39:23,
40:1, 40:5, 40:7, 40:8, 42:18

**actual** 11:3
**Actually** 17:16, 18:13, 23:20, 29:22, 43:4, 44:1, 45:8, 63:18, 65:6
**add** 13:21, 38:3, 49:20, 59:12
**added** 54:19
**additional** 63:15, 69:24, 74:19
**additionals** 25:18
**address** 10:14, 13:17, 17:10, 28:22, 43:6, 67:11
**addresses** 60:3
**addressing** 14:3, 60:9, 60:10
**adequate** 32:19, 65:18
**adhere** 27:20
**admissibility** 72:5
**admissible** 45:5, 57:17
**admission** 12:11, 12:22, 46:18, 49:11, 50:4
**admitted** 6:12, 7:7, 7:15, 7:25, 72:12, 72:13
**advance** 32:15, 32:16, 35:20, 65:17, 75:12
**advantage** 15:22
**advantages** 25:2
**advocacy** 59:5
**after** 10:19, 19:7, 19:19, 19:22, 25:20, 27:4, 28:23, 38:25, 47:17, 48:14, 66:10, 71:5, 71:25, 72:1, 77:1, 77:2
**afternoon** 23:16
**Again** 20:19, 23:17, 36:8, 60:25, 71:13, 73:6, 75:20
**against** 4:3, 13:2, 14:6, 34:25, 43:24, 45:19, 50:9, 71:17
**agenda** 4:5, 5:5, 74:8
**Agent** 19:21, 69:17, 70:8
**agents** 69:14, 69:16
**ago** 4:8, 13:2, 14:15, 46:10
**agree** 8:21, 9:2, 13:6, 13:18, 13:19, 13:20, 14:19, 15:21, 34:23, 35:23, 53:22, 59:15, 67:7, 67:23, 69:4, 73:11
**agreed** 30:22, 48:13, 77:2
**agreeing** 71:14
**agreement** 69:7, 69:10, 70:24, 75:21
**agrees** 68:19

**ahead** 9:24, 28:1, 28:12, 54:9, 75:10
**aiding** 15:14, 15:15
**aim** 76:22
**air** 33:21, 69:19
**AI** 1:11, 45:14, 45:18, 48:3, 49:18, 49:21, 49:23, 52:7, 55:7, 55:10, 55:14, 57:9, 57:10
**Albuquerque** 1:46
**alert** 78:2
**alien** 30:8
**allegation** 37:19, 39:2
**allege** 58:23
**Alleged** 14:9, 34:19, 45:17, 49:21, 49:22, 50:3, 50:5
**alleges** 48:2
**Allibhai** 14:6
**allowed** 42:21, 48:10, 55:17
**almost** 51:24, 55:8
**alone** 22:6
**along** 16:15, 25:7, 30:9, 62:18, 62:23
**already** 28:15, 77:24
**also** 10:2, 12:5, 26:12, 38:3, 41:14, 46:7, 46:23, 49:24, 50:14, 52:12, 52:23, 57:11, 60:20, 61:22, 64:4, 64:19, 64:22, 65:14, 69:21, 73:17
**alternate** 13:7, 75:18, 75:23, 76:3
**alternates** 25:12
**alternative** 61:24, 73:14
**alternatively** 6:22
**although** 20:24, 24:11, 30:18, 43:25, 48:20
**always** 22:1, 31:24, 33:4, 42:1
**am** 6:4, 6:5, 25:11, 30:13, 30:23, 34:22, 44:24, 47:1, 47:3, 52:4, 59:23, 61:8, 71:14, 77:24
**ameliorate** 26:12
**amending** 4:21, 4:24, 55:8
**Amendment** 54:17, 54:21, 54:25, 56:16, 57:24, 58:17, 58:23, 61:18
**Amendment.** 58:1
**AMERICA** 1:5
**American** 43:15

**among** 14:25, 17:22, 42:9, 52:11, 76:2
**Amongst** 17:18, 17:20
**amount** 28:4, 41:13
**analogy** 47:8
**announcement** 76:1
**Another** 5:22, 7:25, 39:25, 42:2, 42:16, 64:19, 65:6, 74:15, 74:16, 76:18
**answer** 32:9, 67:7
**answering** 23:5
**answers** 21:5, 23:7, 26:10, 75:11, 77:15
**anticipate** 9:14, 32:9, 65:9, 66:4
**anticipated** 20:2
**anticipates** 6:1
**anxious** 64:2
**anybody** 8:14, 9:10
**anymore** 27:4
**anyone** 9:5, 54:13, 68:21
**Anything** 8:13, 17:2, 27:11, 38:20, 53:12, 53:13, 74:21, 78:8
**Anyway** 21:4, 44:4
**apologize** 42:10, 60:11, 62:23
**appear** 19:17
**application** 44:14
**applied** 44:7
**applies** 68:18
**apply** 54:25
**appreciate** 32:10, 34:10, 61:13
**approach** 11:2, 26:19, 26:23
**appropriate** 4:7, 6:7
**appropriately** 5:3
**approved** 12:13, 35:5
**approximately** 76:20
**Aqsa** 48:3
**areas** 40:4
**aren't** 66:17
**arguable** 30:17
**arguing** 43:22, 72:21
**argument** 29:4, 42:11, 43:20, 51:16, 51:18, 51:20, 56:18, 56:24, 59:21, 60:7
**arguments** 35:14
**arises** 36:4
**arising** 61:17

**arithmetic** 26:15
**around** 34:7, 34:15, 70:25
**arraignment** 18:14
**arrange** 76:13
**arranged** 75:25
**articles** 50:15, 50:17, 50:18, 53:19
**ascertain** 9:3, 9:9
**ask** 10:7, 10:15, 11:6, 13:21, 15:13, 20:23, 22:19, 28:1, 28:2, 35:11, 35:24, 39:5, 46:8, 48:7, 65:24, 69:14, 69:17, 73:17
**asked** 5:1, 16:19, 27:13, 31:19, 63:19
**asking** 23:23, 35:13, 60:12, 63:15, 65:1, 66:17
**aspect** 55:13, 55:14, 55:19
**assemble** 25:15
**assembled** 25:16, 25:18
**assets** 48:16
**assist** 19:8
**Assistant** 1:29, 19:10
**assume** 66:23
**assuming** 5:20
**assure** 54:4
**attachments** 64:23
**attack** 42:4, 42:5
**attempt** 72:4
**attention** 50:2, 69:8, 73:13, 76:8, 76:15
**attitudes** 71:9
**Attorney** 1:29, 28:8
**attribute** 51:23, 56:6
**audio** 12:1, 15:4
**authenticate** 63:13
**authentication** 49:4
**authenticity** 54:12
**authorities** 34:24
**available** 6:20, 23:21, 23:24
**Avenue** 2:16, 3:7
**avoid** 16:25, 54:10
**await** 5:1
**aware** 15:2, 35:21, 35:22, 40:15, 40:19, 64:15, 65:15, 77:16

< B >
**back** 8:8, 9:12, 14:17, 16:20,
19:3, 19:13, 20:12, 20:19, 22:23, 23:1, 24:8, 27:10, 27:14, 29:5, 52:3, 55:23, 56:17, 56:23, 61:21, 62:1, 62:24, 67:6, 68:8, 71:15, 74:12, 78:11
**background** 41:6
**Baker** 1:38
**bank** 17:7
**BARRY** 1:26
**based** 20:14, 21:5, 32:8, 44:24, 50:10, 72:24
**basic** 77:13
**basically** 25:22, 35:17, 47:3, 69:1
**basis** 6:19, 37:11, 51:23, 56:21, 67:12
**bathroom** 27:10
**beating** 73:7
**become** 35:19
**beforehand** 16:4
**began** 46:10
**begin** 31:8, 76:6
**beginning** 24:9, 33:12, 62:24, 74:7
**begun** 19:1
**behind** 11:10, 11:11, 15:21
**beliefs** 59:13, 59:18
**believe** 32:23, 42:12
**believes** 51:7
**bell** 32:23
**Bench** 5:18, 10:12, 54:3, 54:6
**benefit** 20:6, 44:8
**benign** 52:18
**best** 13:4, 21:11, 33:24, 34:5, 75:22
**better** 20:7, 61:7, 72:20, 77:19
**beyond** 33:1, 54:12, 70:1
**Big** 9:19, 21:18, 25:14, 58:2, 71:17
**bin** 45:16, 52:8, 52:11, 52:23
**binders** 16:21
**bit** 7:22, 9:14, 32:1, 77:8
**blow** 10:1
**board** 37:19
**bombers** 38:13
**bombing** 37:3, 38:14, 39:1, 40:10, 41:5, 41:16, 42:2

**bombings** 38:16, 39:23
**books** 53:8, 53:10
**bootstrapping** 41:7
**Boston** 42:15
**bottom** 19:3, 44:4
**bouncing** 52:3
**Bourjailey** 35:5
**Bowen** 59:2
**BOX** 2:25, 73:25, 75:17, 76:1, 76:13
**boxes** 73:18, 73:23, 74:2, 74:5
**BOYD** 1:43
**branch** 14:10
**brief** 63:2
**briefly** 35:11, 40:8, 58:15
**bring** 8:8, 13:13, 17:5, 21:6, 21:12, 21:16, 22:5, 22:21, 22:23, 23:12, 23:15, 24:11, 24:17, 24:18, 24:19, 26:24, 27:14, 37:2, 37:5, 42:16, 50:2, 54:6, 69:8, 71:24, 73:18, 73:23, 77:4, 77:18
**bringing** 22:6, 24:6, 27:11, 40:6, 45:18
**broad** 45:12
**broader** 59:9
**brought** 42:17, 44:25, 76:17
**built** 21:15
**burden** 21:17, 25:19, 77:10
**Burn** 7:7, 7:8
**Burns** 69:16, 70:8
**business** 6:3, 16:25
**bussed** 31:5
**busy** 34:1
**button** 11:2, 11:3

< C >
**CA** 2:33
**Cadeddu** 2:14, 2:15, 70:18
**California** 2:31
**call** 9:7, 17:1, 53:3, 74:18
**called** 4:9, 13:2, 31:13, 43:23, 70:18
**camera** 10:11, 19:11
**care** 18:16
**cart** 77:8
**cases** 4:13, 10:19, 14:5, 30:3, 32:18, 69:20, 70:22,

71:16
**CASEY** 3:13, 79:3, 79:17
**Casey/s** 79:16
**CASSIDI** 3:13, 79:3, 79:16, 79:17
**categorically** 53:24, 57:16
**categories** 36:16, 36:24, 45:9, 45:24, 46:1, 47:12, 50:20
**category** 39:23, 45:12, 46:21, 47:14, 47:19, 60:4, 68:14
**cause** 21:15, 26:7, 26:12, 26:25, 28:25, 29:5, 79:4
**cautionary** 20:4
**cautious** 44:15
**caveat** 30:21, 33:14
**CD** 7:8, 11:18
**celebrating** 42:3
**Center** 31:24, 46:25, 47:1
**certain** 12:9, 14:15, 14:16, 22:4, 22:10, 25:3, 28:4, 30:4, 30:7, 38:1, 39:17, 53:7, 54:14, 64:21, 76:23
**Certainly** 15:24, 16:5, 34:10, 56:16, 56:17, 57:5, 59:11, 59:14, 71:6, 73:25
**certify** 79:3, 79:10
**chains** 49:6, 53:18, 57:7
**challenge** 26:25, 29:2, 42:22, 45:13, 46:14, 49:25, 50:4, 50:8, 50:10
**challenged** 10:21, 36:17, 45:9, 46:4, 46:7, 48:1, 48:17, 49:11
**challenges** 21:15, 25:13, 26:7
**challenging** 36:15, 36:19, 46:17, 46:18, 49:17, 50:14
**chance** 25:4, 63:6, 67:13
**changed** 63:17, 63:22, 71:20
**character** 36:22
**charged** 47:22
**charges** 39:9, 77:22
**charities** 52:18, 58:5, 58:6, 58:7, 58:22
**charity** 55:13, 55:19, 55:24
**charts** 9:15, 9:25, 42:23, 55:6
**Chechnian** 52:23

**CIPA** 62:13, 64:20, 74:14, 78:11
**circle** 32:22
**Circuit** 12:11, 12:12, 12:13, 12:22, 13:1, 13:9, 13:22, 14:7, 20:4, 34:25, 35:4, 43:24, 44:2, 59:2, 59:5, 68:19
**citation** 42:12
**cite** 31:23
**cited** 34:24
**citizens.** 43:15
**claim** 40:8
**claimed** 39:19
**claiming** 40:21
**claims** 40:9
**clarification** 5:6, 28:22, 31:19
**clarified** 67:13
**classified** 15:14, 62:5, 64:22, 64:23
**clear** 41:19, 42:1, 57:9, 57:24
**clearly** 29:14, 45:19
**Clerk** 8:12, 11:23
**client** 70:19
**clients** 38:2, 67:2
**CLINE** 2:29
**clock** 22:13, 27:9, 74:10
**close** 29:22
**closed** 47:18, 48:16
**closing** 74:20
**clothing** 19:14
**Co-conspirator** 34:19
**coconspirator** 36:18, 50:3, 50:5
**cocounsel** 35:16, 36:10
**Code** 39:8
**cold** 77:11
**combination** 68:16
**comes** 6:23, 35:25, 41:2, 41:14, 41:18, 44:1, 51:17
**comfortable** 29:16
**coming** 63:9
**commence** 4:16, 24:24
**commences** 18:17
**commented** 76:21
**comments** 32:11, 34:10
**Commerce** 1:33, 3:14
**committed** 39:18, 39:19, 40:10, 40:22, 42:2

**committee** 40:1, 49:9, 55:10, 55:13, 55:24
**committees** 40:3, 47:15, 49:5, 52:10, 52:17, 53:20, 56:18, 56:20, 57:4, 57:6, 58:4
**committing** 27:18
**communicate** 5:12
**communication** 67:9
**communications** 39:20
**community** 30:6
**Company** 49:14
**comparing** 45:17
**comparison** 49:18
**compel** 64:14
**complete** 60:2
**completely** 37:25, 42:23, 48:25, 58:10
**comply** 79:11
**concentrate** 27:24
**concept** 53:14
**concern** 7:3, 32:23
**concerned** 19:21, 22:7, 36:22, 36:24
**concerning** 31:3
**concerns** 26:13
**concert** 59:17
**concessions** 32:17
**conclusion** 19:4
**Conduct** 4:9, 39:12, 70:21
**conducted** 44:13
**Conference** 1:16, 4:2, 29:9, 29:20, 30:1, 35:9, 54:3, 74:13, 74:15, 75:16, 79:12
**conferences** 16:24, 32:1, 32:7
**confidential** 64:9, 64:11, 64:16
**conflict** 43:7, 43:8, 43:12
**conflicts** 34:11
**confrontation** 49:25
**Congress** 54:20
**connected** 58:24
**connection** 51:21
**conservative** 26:19
**consideration** 13:8
**consolidated** 60:15
**conspiracy** 50:7
**constant** 73:11
**construed** 54:21, 57:25
**consumption** 35:6

**contact** 9:11
**contamination** 32:7
**contemplated** 25:16
**contemplating** 28:23
**contended** 13:14
**content** 12:18
**contest** 44:22
**contested** 41:9, 41:11, 41:13
**context** 6:7, 28:19, 41:24, 42:6, 45:4, 46:22, 49:10, 53:21, 53:22, 57:12, 57:17, 57:22, 58:10, 59:19, 61:1, 73:9, 73:15
**continue** 69:5
**continuing** 5:12
**continuous** 54:3
**contract** 31:7, 31:9
**control** 64:3
**controlled** 10:11, 11:1, 57:5
**convenience** 34:7, 34:13
**Convention** 46:25, 47:1
**conventions** 46:5, 46:24
**conversation** 12:19, 31:2, 41:16, 41:24, 41:25, 42:6
**conversations** 41:3
**convict** 55:11, 56:7
**conviction** 54:18
**convictions** 48:18, 48:20
**copies** 6:12, 7:5
**copy** 16:19, 36:12, 63:25
**core** 28:17
**correct** 16:10, 37:14, 79:8
**correctly** 11:20, 76:22
**counsel** 11:11, 17:8, 20:21, 23:15, 35:11, 35:13, 62:19, 68:22, 69:15, 74:18, 75:10, 75:20, 76:4
**counsels** 26:9
**couple** 35:9, 46:10, 52:23, 63:9
**course** 25:23, 35:3, 45:1, 68:14
**Courthouse** 1:32, 31:5, 78:5
**courtroom** 4:13, 9:13, 10:4, 10:18, 10:19, 21:2, 23:7, 23:13, 23:21, 23:24, 24:4, 24:11, 24:18, 24:19, 66:18, 66:20, 66:21, 67:15, 68:21, 78:6
**courts** 59:5

**cover** 4:5, 12:10, 68:11
**covering** 6:1, 8:3, 9:1
**creates** 41:22
**crime** 44:22, 55:5, 55:16, 56:4, 56:7, 56:8
**criminal** 32:13, 33:24, 50:8, 50:13, 74:16
**cross** 70:18, 70:21, 71:4, 71:6
**crystallize** 73:4
**CSR** 3:13, 79:21
**culture** 30:6
**cumulative** 44:16, 60:20
**currently** 65:2
**curve** 11:5
**custodial** 17:1
**custodians** 66:4
**cut** 16:20, 23:24, 25:22, 26:8
**CUTRER** 3:5

**< D >**
**d)(2)(e** 34:20
**D.** 2:29
**daily** 6:9, 6:18
**DALLAS** 1:3, 1:34, 2:17, 3:15, 5:24, 7:18, 8:1, 8:22, 9:5, 47:1, 64:6, 79:20
**DANIELS** 1:43
**data** 18:1
**date** 31:8, 40:9, 48:15, 50:7
**dated** 5:23
**Daubert** 61:24
**Day** 2:30, 6:5, 6:13, 7:5, 7:15, 7:16, 12:8, 15:2, 21:13, 23:16, 24:12, 26:21, 26:23, 30:22, 31:6, 33:21, 34:11, 41:17, 42:5, 63:3, 70:17, 72:7, 74:15, 75:5, 76:21
**days** 20:16, 23:10, 23:11, 25:25, 27:1, 46:10, 64:3
**dead** 73:7
**deadline** 6:9
**deal** 15:9, 60:14, 69:20
**dealt** 54:9
**decide** 61:3
**decided** 22:11, 28:6, 63:4
**decides** 13:1
**decision** 13:3, 14:7, 30:9, 33:9, 35:4, 43:24, 44:2, 61:8,

70:13, 72:24, 77:15
**Defendant** 1:38, 2:1, 2:11, 2:20, 3:1, 31:13, 40:15, 40:18, 40:19, 40:20, 40:22, 40:24, 40:25, 41:3, 41:4, 41:5, 41:8, 41:15, 42:1, 43:9, 44:3, 48:18, 62:3
**defendants** 6:11, 15:13, 18:2, 18:9, 34:17, 39:19, 41:9, 43:5, 43:11, 45:20, 46:11, 47:25, 48:24, 59:20, 70:19, 70:23, 70:25
**Defense** 9:22, 11:17, 12:20, 13:14, 30:12, 30:16, 30:17, 31:22, 33:3, 33:10, 35:13, 35:19, 35:21, 36:1, 36:6, 38:4, 40:12, 40:18, 43:11, 44:25, 52:19, 59:23, 59:24, 60:18, 60:19, 60:21, 61:2, 63:12, 63:20, 63:21, 63:22, 64:13, 64:25, 70:22, 71:3, 71:8, 71:18, 71:24, 77:25, 78:8
**Defensive** 37:22, 53:3
**definitive** 67:7
**deliberations** 19:9, 76:7
**democratic** 51:22
**denied** 7:24, 64:8
**deny** 34:22, 36:3, 44:24, 59:23
**denying** 12:22, 60:24
**Department** 1:30, 50:24, 50:25, 51:2, 51:15
**Depending** 16:14, 52:3
**deprives** 77:13
**deputy** 10:13, 10:15, 10:16, 10:19
**describe** 36:21, 40:9, 62:6
**designated** 38:6, 39:13, 40:15, 41:10, 42:8, 42:21, 43:9, 43:14, 45:13, 47:15, 56:12
**designation** 50:5, 59:3
**designations** 47:20, 47:22
**designed** 35:14, 55:2, 68:11
**desk** 63:23
**despite** 44:21
**detail** 5:5, 21:8, 54:8
**details** 29:23, 31:3, 41:6
**determination** 57:13, 57:18,

57:21, 61:1
**determine** 72:11
**development** 62:21
**dialogue** 73:11
**different** 21:3, 32:11, 32:16, 32:17, 42:9, 68:22
**differently** 32:14
**difficult** 27:18, 45:2, 73:7
**difficulties** 16:4, 33:24
**difficulty** 4:11, 21:19
**digital** 19:10
**digitized** 12:6
**dire** 4:19, 4:25, 20:10, 22:1, 22:15, 22:16, 22:17, 22:20, 23:10, 23:13, 23:14, 24:3, 25:21, 28:7, 28:8, 29:12, 31:13, 31:23, 33:1, 33:7, 33:11, 77:12, 77:17, 77:19
**direct** 10:16
**directly** 65:25
**directors** 37:19
**directs** 10:16
**disagree** 15:20, 32:12, 33:3, 41:23, 66:14
**disagreement** 12:24, 13:10
**disagreements** 14:21
**disappoint** 33:12
**discovery** 66:9
**discretion** 69:1, 69:21, 69:25, 70:2
**discuss** 5:4, 28:24, 31:22, 34:17, 39:18, 39:24, 75:20
**discussed** 6:10, 17:16, 17:21, 17:22, 20:10, 21:20, 25:2, 25:6, 26:3, 29:9, 29:24, 31:25, 39:22, 46:1, 63:3, 74:14
**discussing** 32:3, 32:4, 39:21, 59:11
**discussion** 16:24, 29:21, 32:6, 75:15
**discussions** 69:6, 69:9, 72:8
**disk** 6:20, 6:24
**displayed** 9:23
**dispute** 12:20
**disregard** 35:24
**disseminated** 19:25
**DISTRICT** 1:1, 1:2, 1:31, 30:5, 42:12, 59:3, 59:5, 79:18, 79:19

**DIVISION** 1:3, 79:20
**Docket** 4:4, 61:16, 61:25, 62:2
**Document** 6:13, 6:16, 10:10, 11:3, 32:5, 43:3, 49:12, 49:18, 49:21, 49:23, 54:13, 63:20
**documentary** 19:4
**documents** 5:9, 6:8, 6:14, 6:19, 6:22, 7:10, 7:14, 8:14, 9:4, 15:5, 38:1, 45:16, 45:17, 49:4, 50:12, 51:3, 53:1, 53:6, 74:1
**doing** 10:24, 15:17, 16:2, 16:16, 25:24, 30:5, 30:7, 30:10, 42:18, 43:18, 72:19
**done** 14:22, 22:1, 26:1, 32:18, 38:17, 46:23, 46:24, 51:4, 74:11, 74:13, 74:17, 75:19, 76:14
**door** 43:13
**doubt** 44:9
**down** 16:7, 16:20, 23:25, 24:11, 26:7, 26:8, 28:17, 43:18, 47:1, 73:24
**dragged** 44:17
**DRATEL** 2:3, 2:5, 4:25, 5:6, 8:6, 8:16, 10:3, 10:23, 18:4, 18:11, 18:20, 20:15, 28:3, 29:16, 30:6, 30:20, 32:6, 38:3, 38:15, 40:11, 42:20, 50:21, 51:20, 54:11, 54:16, 55:2, 55:16, 55:20, 56:1, 56:22, 57:9, 57:19, 58:25, 71:10, 73:15, 78:1
**draw** 75:24
**dressing** 38:24
**drives** 41:21
**DUNCAN** 1:42, 36:14, 36:24, 37:16, 45:8, 45:12, 45:25, 46:4, 46:16, 47:14, 47:19, 49:11, 49:24
**during** 7:15, 9:7, 17:25, 22:19, 31:6, 36:4, 48:4, 48:22, 49:13, 53:2, 60:1, 66:18, 79:3

**< E >**
**earlier** 7:3, 18:7, 20:13,

20:19, 25:2, 25:7, 29:25, 31:1, 31:2, 33:10, 34:2, 44:1, 62:1, 75:15
**Early** 71:14
**easier** 10:24
**East** 37:12
**Eastern** 42:12
**easy** 26:11, 30:8
**editing** 7:2
**educated** 77:6
**effect** 38:13, 44:18, 76:9
**efficient** 21:25, 22:15, 26:1, 75:9
**effort** 4:12, 13:5
**efforts** 16:24, 54:7
**Either** 11:18, 15:25, 18:16, 19:2, 23:16, 29:1, 34:3, 36:1, 39:7, 47:20, 70:3
**El** 78:4
**El-mezain** 2:1
**Elashi** 2:20, 18:7, 48:18
**Eleanore** 19:10
**election** 63:21
**electronic** 6:20, 9:13, 9:16, 9:17, 10:4, 11:17, 63:6
**element** 40:14, 41:7
**elements** 38:20
**elicit** 35:14, 64:11
**eliminate** 28:16
**eliminated** 28:15
**ELIZABETH** 1:27
**embark** 29:22
**empathize** 16:6
**encourage** 15:24, 69:5
**encouraged** 38:13
**end** 6:12, 7:15, 16:7, 16:13, 30:21, 30:22
**engaged** 37:11, 39:14, 39:15
**engages** 39:16, 40:16
**England** 49:22
**English** 67:2
**enormous** 15:9
**enough** 21:15, 24:1, 43:20, 59:15, 59:21, 77:3
**entire** 21:16
**entirely** 68:17
**entirety** 60:11
**entitled** 34:18, 39:11, 40:4, 42:7, 49:12, 57:1, 69:24
**enumerated** 59:2

**equipment** 10:21, 11:22
**escaped** 36:9
**especially** 18:25
**essential** 73:16
**estimate** 31:9
**estimated** 76:20
**ET** 1:11
**event** 9:2, 45:21
**events** 46:11, 46:20, 48:14
**everybody** 12:10, 44:8, 71:4, 75:20, 76:7, 76:15
**everyone** 22:6, 58:16, 62:25
**everything** 47:4, 53:23, 59:6, 62:16, 74:17
**exactly** 20:22, 24:16, 33:19, 56:19
**exaggeration** 7:22
**examination** 70:21, 71:6
**examine** 70:18
**examining** 71:4
**example** 37:21, 40:2, 47:24, 72:6
**examples** 31:24
**excellent** 75:18
**Except** 32:15, 55:18
**exchanged** 5:9
**Exclude** 34:19, 36:7, 66:25, 67:4
**excluding** 44:16
**exclusion** 44:12, 44:21
**excused** 69:18
**exercised** 21:14
**exhibit** 4:19, 4:24, 5:7, 45:15, 50:2, 50:16
**exhibits** 5:8, 5:18, 6:12, 6:24, 8:5, 9:12, 9:15, 11:17, 17:13, 36:15, 53:17, 68:5, 68:6, 72:21
**expand** 34:9
**expect** 6:16, 8:16
**expected** 19:1, 33:17
**expecting** 42:11
**expedite** 17:10, 75:9
**expeditious** 35:2
**experience** 20:15, 26:9, 29:4, 35:1
**experienced** 16:1
**expert** 39:18, 39:24, 40:7, 66:16, 68:1, 68:4, 68:16, 68:17, 68:21

**experts** 60:19, 61:24, 66:19, 66:20, 66:22, 66:25, 67:5, 68:3, 68:4, 68:5, 68:11
**explain** 54:9
**explained** 59:23
**explore** 27:14
**explored** 22:18
**exploring** 22:14
**expressly** 48:13, 54:19
**extended** 24:5
**extends** 69:25
**extent** 13:17, 48:6, 68:17
**extra** 10:7, 22:25, 24:7, 38:7
**extraordinary** 41:13, 54:17

**< F >**
**fact** 38:25, 57:7, 58:21, 58:23, 68:11, 68:16, 71:20
**factor** 66:2
**facts** 44:13
**fair** 14:1, 54:23, 65:16
**fairly** 37:11
**fairness** 44:20
**fall** 7:4
**familiar** 4:15, 8:9, 35:10
**family** 47:25
**far** 7:5, 9:19, 32:18, 42:19, 42:23, 63:16
**Fatah** 53:11
**faxes** 39:22
**FBI** 73:18
**fear** 54:2
**Federal** 34:20, 44:6
**feel** 34:14
**fees** 79:10
**few** 64:3
**Fifteen** 21:12, 22:7, 22:24, 24:7, 24:20, 25:1, 25:9, 26:15, 26:20, 27:3, 27:9, 27:11, 28:8, 28:9, 28:11, 28:24, 31:15
**Fifth** 12:12, 13:22, 14:7, 20:4, 43:24, 44:1
**fifty-two** 28:13
**fight** 41:1
**fighting** 41:1
**figure** 17:22, 25:8, 26:14
**figured** 27:12
**figuring** 28:6

**file** 50:13, 53:11, 53:15, 58:12, 63:15, 63:25
**filed** 32:5, 34:17, 35:12, 43:4, 61:18, 61:25, 62:2, 62:4, 65:4
**files** 50:17, 50:18
**filing** 31:21, 43:8, 63:2, 63:5, 63:6
**filings** 51:3, 62:25
**filtered** 53:6, 53:18
**financial** 17:7, 59:16
**financing** 38:9
**find** 10:22, 15:8, 15:20, 53:8, 53:10, 75:21
**fine** 10:8, 10:23, 18:19, 18:20, 19:15, 36:5
**finish** 74:14
**finished** 14:23, 15:2, 15:10, 63:5, 74:22
**First** 1:45, 4:8, 6:23, 16:5, 20:16, 22:7, 23:12, 33:17, 35:12, 36:16, 45:11, 47:13, 49:14, 52:5, 54:12, 55:5, 58:22, 60:3, 61:18, 65:25, 66:5, 66:6, 69:9, 70:4, 70:10, 70:18, 75:5, 77:19
**FISA** 62:4
**FISH** 1:18
**Fitzwater** 23:21
**five** 21:12, 26:21, 27:11
**flagrant** 26:11
**flavor** 42:7
**Floor** 2:6, 2:32
**Florida** 2:26
**flushed** 25:5
**focus** 5:2, 17:11, 27:16, 75:12
**focusing** 22:13
**follow** 25:19
**follow-up** 22:5, 22:10, 22:21, 23:14, 63:8
**follow-ups** 22:8
**Footnote** 13:3, 43:2, 43:6
**force** 44:17
**Forces** 63:12
**foregoing** 79:7
**foregoing-styled** 79:4
**foreign** 13:23, 13:24, 14:4, 14:8, 17:7, 38:5
**forgotten** 74:21

**form** 77:14
**format** 79:10
**Fort** 3:8
**forth** 4:20, 20:8, 29:5, 52:3, 67:6
**forty** 20:25, 76:24
**found** 49:7, 49:8, 49:10, 50:17, 50:18, 58:12, 58:18
**Foundation** 1:11, 4:3, 37:8, 37:12, 37:15, 37:17, 37:20, 46:6, 47:23, 48:9, 48:11, 48:12, 48:15, 49:12, 49:17, 52:18
**four** 16:21, 20:16, 23:10, 23:11, 25:25, 26:16, 27:1, 45:23, 71:19, 74:16, 76:19
**four.** 45:25
**fourteen** 31:16
**fourth** 23:18
**Fragoso** 34:25
**Francisco** 2:33
**frankly** 69:4
**fraud** 71:17
**free** 67:15
**FREEDMAN** 1:43
**Freedom** 61:17
**freedoms** 54:22
**friends** 32:22
**front** 16:20, 17:3, 21:19, 31:24, 36:12, 43:1, 44:9, 64:15
**full** 42:7, 58:11
**fully** 6:5
**function** 10:9, 44:15
**fundamental** 77:14
**fundamentalist** 55:21
**fundraisers** 46:14
**fundraising** 46:11, 46:17, 46:23, 46:24
**funneled** 37:18
**funneling** 37:13
**future** 43:7

< G >
**Gail** 23:23
**gain** 6:4, 29:17
**game** 54:23
**GARRETT** 1:28, 9:18, 52:14, 56:15, 56:23, 59:10, 60:8

**gate** 27:25
**gave** 31:8
**general** 20:11, 20:20, 21:4, 21:17, 22:1, 23:13, 29:21, 36:16, 36:20, 36:21, 37:9, 49:24
**generally** 19:7, 48:5, 49:3, 60:22, 68:2, 70:24
**Germany** 47:21
**gets** 10:10, 25:15
**getting** 8:18, 26:1, 28:17, 29:22, 34:1, 42:24, 54:12
**gha** 14:10
**Giglio** 65:9, 65:22
**give** 4:18, 7:8, 16:12, 16:15, 20:3, 22:16, 28:1, 31:23, 34:4, 34:5, 47:13, 55:9, 59:7, 65:18, 74:1, 74:8, 75:6
**given** 6:12, 16:9, 38:12, 69:15
**giving** 8:14, 38:4, 47:22
**goal** 22:7
**goals** 55:14
**gotten** 19:7, 45:10
**Governments** 47:21
**granted** 5:1
**great** 32:24, 54:8
**greatly** 33:12
**GREG** 3:4
**grizzly** 38:16
**grossly** 45:21
**ground** 74:25
**grounds** 12:22, 36:17, 46:7, 48:25, 49:14, 50:6
**group** 23:4, 23:6, 23:12, 23:15, 24:18, 27:13, 27:16, 31:16, 53:18, 55:3
**grouped** 46:1
**groups** 21:6, 21:12, 21:24, 22:7, 23:18, 24:6, 24:13, 24:14, 24:15, 31:15, 45:14, 51:1, 53:12
**GSA** 31:7
**GU** 14:13
**guaranteed** 58:1
**guess** 6:23, 7:8, 8:17, 12:4, 18:5, 23:15, 24:1, 24:10, 36:9, 60:18, 70:12, 72:8, 75:22, 76:18
**Guidelines** 49:12

**guitar** 46:25, 47:2, 47:3, 47:4
**guitars** 47:2
**Gujrati** 14:11

< H >
**half** 23:11, 24:22, 26:21, 72:7, 74:12
**hall** 31:16
**HAMAS** 37:10, 37:13, 37:15, 37:19, 39:18, 39:19, 39:24, 39:25, 40:8, 40:9, 42:2, 42:8, 42:9, 43:14, 48:2, 48:24, 50:6, 52:14, 52:15, 53:9, 53:10, 53:11, 57:5, 57:6, 57:8, 58:19, 58:21, 58:24
**Hamas-related** 52:22
**handle** 35:2, 52:5
**handled** 13:4
**handling** 30:2
**happened** 39:1
**happens** 26:10
**happy** 71:6
**hard** 30:18
**hardship** 32:16
**harness** 56:23
**hat** 75:24
**hazy** 20:11
**head** 14:10
**heals** 44:17
**health-related** 78:4
**hear** 16:6, 35:6, 47:12, 51:19, 61:6, 70:4, 72:16
**heard** 10:25, 17:2, 17:8, 43:20, 45:3, 48:3, 53:24, 58:5, 59:21, 59:23, 61:3
**hearing** 12:8, 18:1, 34:18, 34:22, 35:1, 46:10, 48:4, 61:24, 64:7, 70:18
**hearsay** 50:19
**held** 46:12
**Helms** 71:17
**help** 8:12, 8:18, 62:13, 77:14
**helpful** 75:4
**hermetically** 32:8
**Herndon** 56:2
**herring** 41:21
**Hezbollah** 52:24
**high** 36:20, 46:2
**higher** 70:19, 76:22

**histories** 50:13
**Hit** 36:20, 46:2, 74:25
**hold** 21:2, 23:8
**holds** 23:22, 71:16
**holiday** 34:11
**HOLLANDER** 1:41, 1:44, 5:10, 36:10, 36:14, 54:4, 58:16, 61:15, 62:10, 63:8, 67:22, 69:3, 74:2
**Holy** 1:11, 4:3, 37:1, 37:3, 37:5, 37:8, 37:12, 37:14, 37:17, 37:20, 38:8, 46:6, 46:17, 46:19, 46:20, 47:16, 47:17, 47:23, 48:9, 48:11, 48:12, 48:15, 49:16, 50:17, 50:18, 51:14, 52:10, 52:17, 55:7, 58:21, 59:3, 59:13
**homicide** 40:20, 40:21
**HONORABLE** 1:18
**hope** 13:17, 14:22, 65:10, 71:1
**hopeful** 23:20
**hopefully** 21:13, 26:17, 64:3
**hoping** 20:15, 63:24, 63:25
**horrific** 45:21
**horse** 73:7, 77:8
**hour** 25:24, 26:17, 74:12, 76:19
**hours** 26:21, 27:8, 56:10
**Hudson** 9:6, 10:18, 76:16, 78:6
**huge** 52:25
**Humanitarian** 58:17, 58:25, 59:4
**hundred** 14:20, 16:16, 20:25, 22:23, 23:22, 23:25, 25:3, 25:5, 27:2, 27:6, 53:17, 73:23
**hundred.** 28:19, 28:20
**hyperlinks** 48:11


**< I >**
**idea** 7:20, 23:11, 53:13, 75:13, 75:18
**identity** 43:5
**ideological** 55:4
**images** 52:21
**imagine** 25:21
**immediately** 77:16

**implicate** 58:22
**implicated** 38:7
**implications** 54:17
**imply** 43:5
**important** 27:23, 43:5, 53:20, 76:7, 77:19
**imposed** 20:18
**impression** 12:7, 20:20, 46:9
**improper** 35:24, 43:11
**in-limine** 45:3, 45:6
**in.** 41:2, 41:14, 42:22, 55:17, 64:4
**inaccuracies** 13:15, 13:18
**inclined** 30:13, 61:5
**include** 15:5, 47:24, 48:11, 53:18, 61:23
**included** 45:15, 48:13, 52:11
**includes** 55:14
**including** 48:2
**incredibly** 32:20
**indicate** 22:4, 22:21
**indicated** 37:2, 48:19, 64:14
**indictment** 18:1, 18:3, 18:8, 47:24, 55:9, 70:20, 70:23
**individual** 22:17, 22:20, 23:14, 25:21, 28:7, 29:12, 31:13, 31:23, 32:25, 33:7, 33:11, 77:3, 77:12, 77:17
**individually** 21:7, 77:7
**individuals** 47:21
**inflame** 45:20
**inflaming** 38:19
**Infocom** 7:17, 45:17, 49:14
**inform** 77:21
**informally** 19:7
**information** 74:18, 77:14
**informed** 62:18
**infrequently** 12:19
**initial** 50:15, 65:10, 67:16, 75:22
**inject** 38:18
**inquires** 9:11
**inspection** 6:15
**instance** 46:25
**instances** 12:14, 73:8
**institution** 51:22, 51:23
**institutions** 17:7
**instruct** 12:14
**instruction** 12:12, 16:8, 16:12, 76:11

**Instructions** 16:13, 19:5, 20:4, 20:5, 21:17
**insure** 6:3
**integrity** 6:16
**intend** 4:18, 5:17, 9:16, 9:17, 31:4, 36:2, 39:17, 39:24, 48:19, 50:10, 50:12, 50:16
**intends** 12:9, 37:5, 59:16, 60:21
**intensive** 30:18
**intensively** 31:22
**intent** 37:2, 51:8, 51:11, 56:7
**intention** 20:3, 35:22, 64:11, 71:10, 71:11
**intercepted** 39:20
**interpretation** 68:19
**interpreted** 54:20
**interpreters** 67:2
**interrupt** 6:2
**intimated** 30:12
**introduce** 48:20, 48:21, 50:12, 50:16
**introduced** 6:5, 16:9, 48:22
**introduction** 48:5
**investigation** 13:16
**invoke** 66:24
**involve** 36:25
**involved** 7:2, 12:15, 75:10
**involving** 6:10, 18:7
**iron** 16:3, 44:19
**irrelevant** 37:25, 39:1, 43:9, 48:25, 49:15, 59:10, 64:22
**Islam** 14:10
**Islamic** 55:21
**Israel** 38:1, 47:15, 47:21, 49:5, 50:10, 53:2, 53:5, 60:22, 63:21
**Israeli** 19:21, 63:12
**Israeli-palestine** 43:6
**issue** 8:10, 15:2, 15:9, 16:6, 27:14, 27:16, 27:24, 33:17, 36:4, 38:18, 41:9, 41:12, 41:18, 42:20, 43:8, 50:2, 52:4, 52:5, 53:1, 56:19, 58:7, 58:23, 60:10, 64:9, 64:16, 65:7, 66:8, 66:13, 67:22, 69:21

**issues** 5:15, 15:11, 25:3, 61:16, 63:3, 63:4, 67:3, 74:9, 74:19, 77:18, 78:4
**item-by-item** 57:13, 57:21
**items** 36:13, 54:9, 58:10, 58:11, 58:18, 59:25
**itself** 48:20, 59:14

< J >
**J.** 2:4
**Jacks** 1:25, 4:13, 8:17, 14:18, 23:2, 26:3, 29:6, 30:2, 30:9, 32:1, 33:9, 35:15, 49:8, 65:25, 66:11
**James** 34:18, 34:22
**Jason** 5:25
**Jencks** 65:9, 65:20
**JIM** 1:25
**job** 14:24
**jobs** 14:25
**JOE** 1:18
**JOHN** 2:29
**Joint** 34:17, 36:6, 62:3
**JONAS** 1:26, 7:17, 9:20, 15:3, 15:13, 28:21, 29:3, 34:9, 39:4, 39:8, 40:13, 41:23, 42:15, 43:22, 47:11, 52:1, 52:2, 57:2, 60:3, 60:7, 60:8, 60:9, 60:13, 64:19, 65:4
**Jones** 2:30
**JOSHUA** 2:3, 2:5
**Judge** 6:11, 7:18, 35:17, 44:20, 64:7, 71:23, 76:16
**judges** 12:17
**judgment** 73:8
**Judicial** 79:11
**July** 33:18
**jump** 77:11
**juror** 21:13, 22:13, 25:17, 27:3, 28:23
**jurors** 16:22, 19:5, 19:6, 20:7, 21:15, 22:3, 22:4, 22:10, 23:8, 24:15, 24:24, 25:1, 25:9, 27:24, 28:17, 31:4, 31:8, 31:15, 75:2, 75:4, 75:17, 75:18, 75:23, 76:3, 76:6, 76:16
**juryroom** 19:3, 72:4
**Justice** 1:30, 50:24, 50:25,

51:2, 51:15
**justification** 40:12, 40:17, 40:19, 40:21, 40:24, 62:23
**justifies** 33:7

< K >
**Kastigar** 12:8, 17:25, 46:9, 48:4, 70:17
**keep** 72:19
**keeping** 34:6
**key** 49:6, 53:18, 57:7
**Khan** 14:10
**killed** 40:21
**kind** 15:22, 22:4, 22:17, 24:9, 67:6, 77:7
**kinds** 52:16, 52:20, 53:16, 77:10
**knocking** 21:13
**knowing** 58:14
**knowledge** 39:13, 40:14, 41:4, 41:7, 41:15, 51:11
**knows** 41:4, 41:5, 41:15, 42:5, 49:7, 62:25, 76:6

< L >
**L.** 2:5, 3:13, 79:3, 79:17
**Laden** 45:16, 52:8, 52:11, 52:23
**Land** 1:11, 4:3, 37:1, 37:3, 37:5, 37:8, 37:12, 37:14, 37:17, 37:20, 38:8, 46:6, 46:17, 46:19, 46:20, 47:16, 47:17, 47:23, 48:9, 48:11, 48:12, 48:15, 49:16, 50:17, 50:18, 51:14, 52:10, 52:17, 55:7, 58:21, 59:3, 59:13
**language** 13:23, 13:24, 14:11, 15:15, 44:1, 44:4, 44:6, 44:8, 76:8
**languages** 14:4
**lap** 10:11, 11:8, 11:9, 11:11, 11:15, 11:16, 11:19, 12:5
**large** 9:15, 14:24, 14:25, 25:25, 36:13, 71:15
**largely** 20:14
**larger** 27:16
**last** 28:6, 41:1, 63:10, 67:9
**later** 5:21, 63:5

**latter** 30:25
**LAW** 2:5, 2:15, 2:24, 12:11, 12:21, 13:9, 13:22, 15:22, 31:23, 34:25, 35:3, 35:22, 35:24, 50:7, 56:1, 58:25, 59:4, 72:18
**lawyer** 71:3, 71:5
**lawyers** 16:1, 27:21, 29:6, 54:6, 71:18
**lay** 15:21, 54:8
**lead** 71:3, 71:5
**Leader** 52:14, 52:15
**leaders** 48:24, 52:11, 52:24
**Leah** 60:20
**learning** 11:5
**least** 30:11, 46:11, 64:15, 64:17, 70:9, 72:19, 73:20
**leave** 60:8
**leaves** 10:20
**legal** 30:6
**Leigh** 31:2, 31:8, 75:6
**length** 20:2, 33:2, 71:16
**less** 20:25
**letter** 5:23, 8:7
**letterhead** 5:24
**letters** 66:11
**letting** 70:25
**level** 29:1
**levels** 60:19
**Levitt** 66:4
**liable** 47:4
**liaison** 7:19, 9:7
**library** 55:21, 56:5
**life** 43:15
**Limine** 34:16, 34:18, 35:10, 35:12, 36:7, 43:2, 43:8, 44:25, 47:6, 54:1, 60:2, 60:13, 60:16, 60:18, 60:23, 60:25, 61:10, 61:16, 61:23, 64:5, 64:17
**limit** 38:17, 41:3, 55:24
**limited** 44:16
**limits** 20:18, 24:23, 30:24
**LINDA** 2:23, 2:24
**Lindsay** 6:11, 7:18
**link** 48:13, 50:24, 51:10, 51:15
**linked** 48:2
**links** 51:3, 51:24
**list** 4:24, 8:2, 26:8, 45:15,

50:1, 50:2, 50:16, 61:15,
62:8, 62:9, 62:11, 62:20,
66:10, 70:19, 74:1, 74:23,
75:4
**listed** 70:23
**listen** 14:12
**lists** 4:19, 5:7
**litany** 38:15
**literally** 63:23
**litigation** 15:22
**little** 20:11, 23:22, 44:23,
64:2, 65:7, 68:9, 73:6, 76:22,
77:8
**live** 20:17
**loaded** 11:18
**local** 65:13
**locate** 27:15
**locating** 4:11
**location** 31:5
**logical** 22:14
**logistical** 21:19, 31:3, 78:5
**logistically** 21:10
**logistics** 34:1
**long** 13:2, 14:14, 18:25,
19:16, 19:24, 23:11, 33:20,
65:11, 71:1
**look** 24:2, 33:5, 59:18, 65:18
**looked** 68:8
**looking** 11:11
**looks** 19:16, 73:1
**lot** 15:4, 17:1, 28:6, 37:23,
73:7
**Lowry** 56:2
**lunch** 74:11, 74:12
**Lyon** 31:2

**< M >**
**M-c-k** 44:3
**ma** 16:14
**magic** 28:13
**mail** 71:17
**main** 36:24, 50:20
**maintain** 6:15, 22:11, 22:12
**major** 44:15
**Mallick** 3:6
**man** 5:25
**Manchester** 49:22
**manner** 54:21
**manufacturer** 47:2

**maps** 9:16, 9:25
**March** 34:21
**margins** 68:14
**Marlo** 2:14, 2:15, 67:10
**material** 14:22, 59:6, 63:15,
64:21, 64:24, 65:9, 65:16
**materials** 4:18
**math** 25:8, 27:7
**matter** 13:4, 25:15, 35:3,
41:19, 44:12, 44:16, 45:3,
68:23, 69:24
**matters** 4:5, 4:6, 74:14,
78:11
**maximum** 23:8, 24:20,
25:11, 26:16, 28:9, 28:10
**Mcgonigle** 8:1, 8:9, 8:22,
64:6, 64:10
**Mckeef** 42:14, 42:15
**Mckinney** 2:16
**mean** 17:18, 26:22, 50:25,
55:22, 68:4, 71:11
**means** 37:9
**meant** 44:18
**mechanics** 28:7
**media** 6:20, 6:21, 9:7
**Meeting** 34:19
**member** 26:16
**members** 37:18, 40:2, 47:25,
76:23
**memo** 68:24
**Memorandum** 36:8, 62:3
**memory** 14:14, 16:8, 20:11,
21:8, 68:9
**mention** 33:13
**mentioned** 24:13, 31:1,
36:14, 48:17
**met** 22:8
**metaphor** 47:8
**method** 25:17, 25:23
**Mezain** 78:4
**mid-eighties** 71:15
**Middle** 37:12, 72:14
**midway** 71:20
**military** 40:2, 53:3
**millions** 50:23
**mind** 6:24, 20:13, 26:15,
29:15, 51:6, 51:11, 56:15,
59:14, 59:18, 62:8, 63:17,
72:19
**minimum** 70:7, 71:5

**minister** 63:20, 63:21, 63:22
**minute** 37:7
**minutes** 21:13, 22:8, 24:20,
24:22, 25:1, 25:23, 26:16,
26:20, 27:3, 27:9, 28:8, 28:9,
28:11, 28:24
**Miranda** 69:17, 70:8
**misidentified** 5:13
**missed** 61:11
**missing** 5:11, 5:12
**mix** 28:18, 75:17
**moment** 9:13
**Monday** 23:12, 75:1
**money** 14:9, 37:13, 37:18,
38:4, 38:12, 47:22, 59:7,
59:18
**months** 4:8, 19:19, 66:18
**moral** 55:4, 58:8
**MORENO** 2:23, 2:24, 20:14,
26:2, 28:17, 31:21, 32:5,
76:10, 76:14
**Morning** 5:24, 7:18, 8:1,
8:23, 9:5, 63:23, 64:6, 75:1
**mosques** 46:12, 46:23
**mostly** 50:18
**Motion** 34:18, 34:22, 35:12,
36:3, 36:7, 43:2, 43:3, 43:8,
44:24, 47:6, 54:8, 57:12,
59:22, 59:24, 60:11, 60:15,
60:25, 61:6, 61:10, 61:16,
61:23, 62:3, 62:5, 63:2, 63:9,
63:11, 63:18, 64:4, 64:5,
64:8, 64:17, 64:19, 64:20,
64:23
**motions** 34:16, 35:10, 45:7,
60:2, 60:13, 61:10, 61:22,
62:8, 62:13
**move** 25:7, 40:10
**Mufid** 2:11
**murders** 40:22
**Muslim** 14:8
**myself** 8:7, 31:20, 75:13
**MYSLIWIEC** 2:4

**< N >**
**name** 19:2, 44:2
**named** 5:25, 47:23
**names** 75:24
**NANCY** 1:41

**narrow** 26:7
**Nasrallah** 52:12
**NATHAN** 1:28
**nationals** 14:8
**native** 14:11, 15:15
**nature** 52:20, 55:6, 56:19, 59:12, 59:13, 72:15
**nay** 73:5
**necessarily** 35:18, 66:18, 67:14
**necessary** 22:25, 23:14, 33:1, 41:20, 72:6
**need** 8:12, 8:19, 9:3, 9:11, 18:16, 20:9, 21:24, 22:9, 23:9, 23:10, 25:9, 26:17, 27:4, 29:3, 60:13, 61:2, 62:14, 67:18, 67:19, 68:6, 72:16, 73:13, 73:19, 73:20, 73:24, 74:6, 74:13, 74:17, 75:10, 76:23
**needed** 22:21, 23:18, 27:18
**needs** 22:5, 60:8
**neither** 7:23
**network** 58:20, 58:21
**New** 2:7, 30:7, 42:12, 63:4, 63:22
**News** 5:24, 7:18, 8:1, 8:23, 9:5, 64:6
**newsletters** 39:22
**newspaper** 6:15
**newspapers** 50:15, 53:19
**next** 23:16, 24:2, 47:14, 64:3
**night** 65:14
**ninety** 14:15
**Ninth** 59:4
**NM** 1:46
**Nobody** 51:14, 76:5
**nodding** 18:12
**nondemonstratives** 73:20
**None** 15:14, 53:24
**none.** 44:23
**nonexistent** 71:5
**nonissue** 69:11
**noon** 74:11
**nor** 58:14
**normally** 26:20
**NORTHERN** 1:2, 1:31, 79:19
**notes** 20:3, 20:5, 20:6
**notetakers** 20:7
**Nothing** 46:20, 55:24, 57:10, 57:25
**notice** 36:10, 39:20, 62:12
**notified** 77:9
**nullification** 35:14, 43:11
**NUMBER** 1:5, 4:4, 4:5, 21:14, 22:3, 23:3, 25:8, 25:11, 28:13, 30:3, 34:1, 36:13, 43:3, 50:23, 61:16, 61:25, 62:2, 66:15, 74:6, 79:21
**numerous** 12:13
**NY** 2:7

< O >
**o'clock** 74:16
**O'neal** 23:23
**object** 48:4
**objected** 60:17, 60:19, 60:23
**objecting** 37:21
**objection** 9:24, 35:20, 45:1, 48:7, 48:23, 52:6
**objections** 49:3, 59:25
**obsolete** 9:14
**Obtained** 62:4
**obviously** 10:14, 66:16
**occasion** 44:14
**occurring** 48:14
**occurs** 12:19
**Odeh** 3:1
**offense** 38:20, 39:2
**offer** 48:7
**offered** 45:2, 45:4, 59:25
**Office** 2:5, 2:15, 2:24, 8:8, 8:19, 11:23, 49:9, 53:8, 53:9, 73:18
**official** 79:5
**often** 26:10
**Okay** 7:7, 9:6, 13:17, 16:23, 28:1, 45:11, 63:25, 72:11, 76:12, 77:23, 78:10
**once** 21:14, 28:12, 28:13, 31:4, 59:4, 75:16, 75:22
**one.** 26:20
**ones** 53:7, 61:14, 61:21, 73:23
**Onori** 13:3
**open** 18:13, 73:1
**opened** 43:13
**opening** 72:1
**openings** 33:20
**operate** 10:21
**operated** 28:14
**operating** 11:21
**Operation** 37:22, 53:3, 53:4
**operational** 38:10
**operatives** 53:5
**opportunity** 20:23, 26:4, 74:9
**oppose** 8:20
**opposed** 21:23, 22:6, 25:24, 27:25
**opposing** 17:8, 64:13
**opposition** 51:2
**option** 21:11
**Order** 4:9, 4:16, 34:4, 61:1, 65:7, 70:3, 70:17, 70:20, 70:22, 70:24, 70:25, 71:7, 74:25, 75:24
**organization** 37:10, 38:6, 39:13, 39:14, 39:15, 40:16, 41:10, 42:8, 42:21, 43:10, 43:14, 46:13, 47:5, 51:9, 51:12, 56:11, 56:12, 58:9, 58:18, 59:8
**organizations** 37:18, 38:5, 46:6, 46:15, 47:23, 48:1, 48:6, 48:9, 59:13, 59:19
**orient** 77:20
**oriented** 77:5, 77:9
**original** 4:22, 64:1, 74:1
**originals** 73:20, 74:6
**orphans** 38:12
**Osama** 45:16, 52:8, 52:11, 52:23
**Others** 4:4, 60:6, 60:14, 75:13
**Otherwise** 6:7, 73:15
**ourselves** 17:20, 17:22
**outbreak** 25:6
**outside** 21:1, 26:22, 54:25
**outstanding** 61:10, 61:14, 66:9
**outweighed** 45:21
**outweighing** 44:11
**overall** 24:3
**overblown** 32:20
**overrules** 48:7
**oversaw** 6:14
**overseas** 14:9

**own** 8:17, 11:8, 11:15, 12:24, 16:2, 20:5, 26:15, 30:6, 71:12
**own.** 6:17

**< P >**
**P.** 2:15
**Pace** 43:24, 43:25, 44:9, 55:23
**Page** 16:20, 44:4, 44:5
**pages** 79:7
**Palestine** 37:23, 54:25
**Palestinians** 50:9
**panel** 20:24, 20:25, 21:16, 21:17, 22:3, 23:3, 25:14, 25:15, 25:17, 26:16, 32:9, 77:1
**panels** 25:25, 74:25, 75:2, 77:3
**paper** 6:22, 7:10, 7:14, 16:21, 32:21, 73:24
**papers** 43:1, 64:13
**paragraph** 39:12
**paragraphs** 19:22
**paralegal** 11:10, 11:24, 16:18
**paralegals** 11:21
**part** 19:23, 30:25, 31:9, 40:13, 41:8, 46:9, 46:12, 54:11, 57:3, 57:5, 58:19, 58:20, 69:10
**particular** 33:21, 34:15, 45:4, 45:14, 48:4, 49:9, 54:11, 56:6, 56:11, 58:8, 61:21, 68:2, 68:15, 75:25
**Particularly** 33:25, 55:6
**parties** 34:18, 6:19, 13:6, 13:10, 16:22, 22:16, 22:19, 72:4, 76:4, 77:18
**parts** 15:20, 38:16, 38:19, 38:21
**pass** 62:18
**past** 8:23, 20:11, 21:9, 28:19, 28:20, 68:9
**Pattern** 12:12, 20:4
**pay** 76:7
**payment** 38:23
**pays** 76:15
**pending** 62:9, 65:2
**people** 20:25, 21:3, 22:22,

22:23, 23:3, 25:4, 26:17, 26:23, 27:2, 28:16, 34:1, 34:14, 46:19, 51:14, 55:3, 56:3
**Per** 21:13, 24:21, 24:22, 26:16, 26:17, 27:3, 28:8, 28:11
**percent** 14:16
**perhaps** 66:20
**permission** 5:1, 69:14, 75:7, 78:3
**permit** 44:19, 56:14, 69:22, 78:7
**permits** 44:11
**permitted** 43:12, 70:8
**person** 28:8, 28:11, 28:25, 34:15, 38:23, 39:12
**personally** 47:9, 68:18
**personnel** 8:12
**perspective** 64:12
**pertaining** 64:20
**pervasive** 32:19
**phone** 41:16, 42:4, 63:24
**photograph** 19:17
**photographs** 9:15, 19:1, 19:18
**picture** 19:13
**pictures** 19:11, 45:16
**piece** 36:19, 73:24
**pile** 73:12
**place** 20:16, 30:24, 31:10, 34:2, 54:14
**placed** 10:10, 56:25
**plain** 55:11
**plan** 21:21, 23:9, 31:13, 32:4, 33:4, 50:13
**plans** 34:4
**PLATT** 3:5
**playing** 12:4
**Plaza** 1:45
**pleadings** 4:10, 33:6
**plus** 23:22
**PO** 2:25
**point** 5:14, 13:21, 18:17, 21:16, 29:2, 35:19, 36:3, 43:7, 55:9, 56:13, 57:23, 59:24, 71:25
**pointed** 57:3
**points** 13:16, 60:16
**Policies** 49:12

**political** 52:20, 55:13, 55:14, 55:19
**pool** 7:22, 15:6
**portable** 6:13
**portion** 6:2, 22:16
**portrayed** 19:14, 32:24
**position** 17:9, 17:23, 32:11, 33:8, 34:23, 35:19, 35:21, 37:17, 37:24, 37:25, 53:23, 61:7, 77:23
**positive** 22:4, 22:20
**possession** 52:21
**possibility** 71:24, 72:19
**possible** 13:6, 13:17, 16:4, 17:24, 61:12, 74:17
**poster** 9:20, 56:9
**posters** 49:6, 52:7, 52:8, 52:9, 52:16, 52:21, 52:22, 53:18, 57:7
**potential** 23:8, 24:15, 33:12, 64:20, 67:20
**practicable** 6:21
**practical** 7:1
**practice** 35:5
**precluded** 39:3
**prediction** 29:16
**prejudice** 36:3, 41:19, 44:11, 45:1, 45:19, 45:22, 59:24
**prejudicial** 38:2, 38:7, 38:19, 41:13, 44:10, 44:18, 51:18
**preliminary** 25:20
**preparation** 29:20, 36:9
**prepare** 18:18, 68:24
**prepared** 36:1, 63:19
**preparing** 35:8
**prerogative** 29:8
**prescribed** 79:11
**present** 40:4, 43:12
**presentation** 70:22
**preserve** 44:20
**presided** 71:16
**press** 6:18, 7:19
**presumably** 75:11
**PRETRIAL** 1:16, 4:2, 4:17, 13:4, 32:7, 32:19, 35:1, 74:13, 74:15
**pretty** 25:7
**prevent** 51:14
**previous** 16:24, 31:25
**previously** 43:3

**primary** 12:16, 13:23
**principally** 34:24
**prior** 6:10
**probably** 15:10, 16:16, 18:15, 23:7, 23:9, 24:12, 26:22, 67:11, 75:12, 76:1
**probative** 44:11, 44:17, 50:19
**problem** 21:22, 25:22, 29:17, 33:22, 41:22, 54:16, 58:2, 67:17, 68:20, 75:8
**problematic** 77:12
**procedure** 19:9, 22:22, 71:20
**procedures** 20:10, 33:10
**proceeding** 44:20
**proceedings** 50:9, 79:4, 79:6
**process** 23:5, 27:19, 29:23, 30:15, 30:19, 75:9, 76:12, 77:21
**produce** 12:24
**produced** 13:8
**product** 15:18
**productive** 73:2
**progress** 17:2
**prohibit** 35:13
**prohibited** 68:6
**project** 58:17
**prolonging** 33:2
**promised** 74:7
**prone** 41:1
**proof** 21:18, 25:19, 48:8, 77:10
**proposal** 24:9, 24:10, 31:14, 31:17, 67:4
**propose** 22:19, 66:23
**proposed** 17:6, 30:12, 33:4, 33:10, 60:18, 77:25
**prosecuted** 56:13, 56:21
**prosecution** 12:20, 42:23, 49:1, 57:2, 71:15, 71:18
**prosecutor** 14:8
**protect** 43:4, 64:10
**protected** 56:16
**protocol** 31:22
**prove** 50:12, 51:8
**provenance** 53:14
**provide** 59:1, 63:20, 70:14
**provided** 37:20, 40:3, 53:7, 59:17
**providing** 59:6, 64:22
**provision** 54:19
**publicity** 32:20
**punish** 55:3, 56:3
**purpose** 57:11
**put** 4:9, 33:19, 42:22, 51:3, 53:14, 55:17, 56:1, 64:17, 68:13, 75:24
**puts** 22:25, 42:6
**putting** 51:14, 57:12, 77:7


< Q >
**Qaeda** 45:14, 45:18, 49:18, 49:21, 49:23, 52:7, 55:7, 55:10, 55:15, 57:9, 57:10
**quantities** 53:4, 53:5
**quash** 64:8
**question** 5:22, 9:14, 10:13, 11:6, 14:18, 21:7, 27:7, 27:21, 28:2, 28:21, 46:8, 58:6, 60:12, 68:15, 69:23, 72:8, 72:18, 76:18
**questioned** 28:24, 31:15
**questioning** 24:24, 77:7
**questionnaire** 5:2, 21:5, 23:7, 32:14
**questionnaires** 5:2, 23:5, 26:5, 26:10, 75:11
**Questions** 4:19, 20:23, 22:8, 22:19, 27:13, 27:22, 32:16, 71:5
**quickly** 8:15
**quite** 17:23, 55:11
**quotation** 43:25
**quote** 6:2, 44:7
**quoted** 43:23, 44:4


< R >
**raid** 49:13
**raise** 13:5, 33:16, 67:19, 74:9
**raised** 49:3, 49:24, 60:4, 63:10, 67:10
**raises** 5:22, 52:25, 65:6
**raising** 57:22, 57:24
**rallies** 46:5
**random** 75:24

**range** 58:11
**rank** 50:19
**rate** 27:2, 76:19
**Rather** 12:23, 15:21, 22:13, 52:18
**reach** 23:18, 69:7, 69:9
**reaction** 67:16
**read** 6:8, 8:15, 29:8, 29:13, 29:14, 36:9, 39:10, 49:2, 54:22, 54:23
**ready** 19:12, 43:21, 61:4, 61:6
**real** 61:1, 75:3
**realize** 8:22, 29:7, 60:10, 73:3
**realized** 35:8
**really** 13:25, 15:17, 17:8, 22:25, 25:7, 25:25, 26:18, 27:24, 29:23, 32:25, 38:17, 38:24, 39:1, 41:3, 41:20, 51:13, 56:4, 67:12, 68:10, 69:1, 69:23, 72:17, 74:25, 77:13
**rearraigned** 18:2
**rearraignment** 18:9
**reason** 10:7, 30:25, 42:18, 45:18, 76:5
**reasonable** 20:18
**reasons** 42:17, 43:13, 71:11
**recall** 14:3, 18:11, 19:5, 32:2, 32:3, 32:4
**received** 14:19, 21:6, 39:21, 63:16
**receiving** 65:9
**recent** 68:9
**recently** 8:24, 17:17, 18:24, 66:11
**receptive** 70:25
**recess** 74:11, 78:10
**recognize** 8:23, 30:1, 43:25
**recollection** 18:21, 52:8
**reconsider** 63:11, 63:15
**record** 9:20, 19:23, 62:19, 64:18, 71:16
**recording** 12:17
**records** 16:25, 17:7, 66:4
**red** 41:21
**reduce** 4:12
**reference** 49:16
**referring** 46:13

**reflect** 9:21
**refresh** 21:7
**regard** 51:25
**Regarding** 4:9, 49:4, 61:16, 70:21, 77:17
**regret** 71:18
**regular** 75:17, 76:2
**reiterate** 29:25
**related** 38:9, 38:16, 45:17, 47:19, 48:24, 49:17, 52:7
**relates** 38:18
**relating** 48:1, 50:8
**relation** 41:12
**relationship** 48:8, 57:6
**relationships** 42:9
**relax** 44:19
**relevance** 36:16, 44:19, 44:21, 46:7, 51:20, 51:24, 52:4, 55:7, 60:23
**Relevant** 40:24, 41:18, 44:10, 44:12, 53:25, 64:12, 64:25
**reliance** 50:14
**Religious** 34:11, 61:17
**reluctant** 73:6
**rely** 12:9, 20:6
**relying** 13:25, 30:23, 70:13
**remarks** 20:21, 20:23, 25:20, 74:20
**remedy** 12:23
**remember** 4:14, 18:6, 18:10, 19:19, 20:22, 25:10, 29:19, 29:20, 29:21, 29:23, 44:2
**remind** 45:20, 58:16
**reminded** 17:25
**remote** 31:5
**render** 59:10
**renew** 61:5
**renewed** 36:4, 48:23
**repeat** 16:13
**repeats** 16:14
**report** 6:6, 16:18
**reported** 14:6
**REPORTER** 3:13, 5:25, 6:14, 8:1, 8:23, 18:11, 64:6, 79:5, 79:18
**reports** 51:4
**represent** 40:18
**representation** 43:16
**representations** 30:23

**representatives** 6:15
**represented** 42:25
**request** 9:3, 15:19, 17:16, 34:17, 65:8, 69:22, 70:7, 70:12, 76:10
**requested** 7:14
**requests** 65:12, 66:9
**require** 38:15
**required** 35:1
**Requirements** 34:20
**requires** 30:2, 41:24
**reserved** 48:21
**resolve** 15:23
**resolved** 17:10
**resources** 35:6, 37:20, 59:1, 59:7
**respect** 10:5, 37:3, 37:22, 50:3, 64:5, 64:9, 78:4
**respectfully** 32:12, 41:23
**respective** 71:9
**respond** 17:12, 39:4, 39:6, 47:11, 58:15
**responded** 34:21, 62:12, 66:12
**response** 22:5, 36:1, 37:24, 39:7, 43:22, 44:5, 47:13, 48:19
**responses** 22:21
**rest** 4:14, 7:19, 39:3
**Restoration** 61:17
**result** 30:15, 38:23
**results** 18:24
**resume** 78:11
**reverse** 40:12
**review** 20:19, 24:9, 45:15, 50:11, 50:15, 64:24, 65:1
**reviewed** 20:12, 29:18, 39:7
**reviews** 19:8
**reward** 38:25
**rewarded** 38:13
**rid** 21:18
**rights** 58:1
**ring** 32:23
**Rm** 3:14
**room** 60:8, 70:5
**round** 23:3
**routine** 37:11
**row** 25:25
**Rule** 8:10, 9:24, 10:8, 29:2, 29:3, 34:20, 43:21, 44:6,

44:14, 44:18, 44:19, 45:5, 65:13, 65:14, 66:15, 66:24, 67:6, 68:7, 68:9, 68:10, 68:18, 69:18, 69:20
**ruled** 61:11, 72:6
**Rules** 10:6, 10:14, 25:12, 44:6
**ruling** 35:25, 63:11, 69:8, 72:18
**rulings** 62:22
**rummage** 6:17, 8:17
**running** 27:25, 74:25

< S >
**sake** 44:17
**San** 2:33
**sanitized** 44:14
**save** 30:19
**saw** 17:13, 53:15
**saying** 8:11, 23:2, 27:25, 33:3, 38:25, 41:4, 41:8, 42:2, 51:7, 54:22, 55:12, 56:13, 57:11, 57:20
**says** 5:25, 6:1, 8:7, 8:13, 8:16, 22:14, 29:6, 30:10, 32:21, 35:21, 41:16, 54:13, 54:19, 54:20, 56:16, 56:20, 56:22, 57:24, 59:1, 59:2, 62:19, 70:21
**scan** 6:22, 7:11, 8:8
**scanned** 6:14, 63:24, 63:25
**scanner** 6:13
**scanning** 43:21
**scant** 44:16
**scenarios** 44:13
**schedule** 22:11, 33:13, 34:6, 34:14, 34:15
**scope** 33:25
**screen** 11:12
**screens** 11:12
**seal** 62:5
**Sealed** 32:8, 62:3
**search** 37:22
**seats** 11:10
**second** 21:24, 23:4, 23:15, 40:13, 40:14, 45:12, 70:10
**secondary** 12:16
**secondly** 49:15
**Section** 39:9, 57:25

**seem** 36:2
**seemed** 8:18
**seems** 21:10, 21:25, 69:10
**seen** 5:8, 8:24, 9:22
**seized** 37:23, 38:1, 48:16, 49:4, 49:13, 49:22, 52:9, 53:2, 53:4, 53:5, 54:24
**select** 7:7
**selected** 31:4, 33:20, 71:25, 75:16
**selection** 10:20
**sell** 47:2
**seminars** 46:5
**send** 19:3, 19:12
**sending** 14:9
**sense** 32:12, 32:14, 56:20, 58:8, 75:22
**sent** 17:6, 18:8, 32:15, 63:24
**series** 39:9
**serious** 15:8
**serve** 43:10
**serving** 76:6
**session** 10:5, 20:20, 21:4, 23:13, 72:2, 72:11
**sessions** 20:13, 21:4, 22:2
**set** 5:17, 32:25
**Seven** 24:22
**several** 19:19, 36:15, 36:16, 45:9
**shall** 54:20, 56:20, 57:25
**SHAPIRO** 1:27, 8:3, 8:25, 19:24, 33:16, 52:4, 52:6, 52:15, 54:15, 58:15, 60:17, 63:8, 63:18
**share** 66:22
**sharing** 9:4, 68:7
**Shield** 37:22, 53:3
**shoes** 43:18
**short** 59:6, 63:7, 64:5
**shorten** 17:10
**shortly** 65:5
**shouldn't** 42:22, 51:19, 53:12, 55:17
**show** 47:1, 47:3, 47:5, 51:6, 52:16, 52:18, 57:4, 57:8, 58:19, 59:12, 59:16, 62:8
**shown** 79:6
**shows** 50:16, 55:18
**shred** 19:22
**Shukri** 1:38

**side** 5:8, 7:23, 12:24, 15:25, 24:21, 24:22, 29:1, 30:13, 39:6, 66:23, 71:3, 71:8, 74:9, 78:8
**sides** 5:7, 11:15, 11:21, 13:20, 24:21, 26:11, 69:4
**sign** 31:6
**signature** 5:24, 64:1
**signed** 18:9
**similar** 42:17
**simply** 35:3, 56:9
**sir** 4:21, 5:16, 5:19, 11:7, 12:3
**sit** 68:3, 69:15
**site** 48:12, 48:14, 50:22, 51:1, 51:9, 51:12
**sites** 48:10, 50:23
**sitting** 11:10, 22:12, 25:4, 77:6
**six** 25:12, 26:21
**sixteen.** 25:9
**sixty** 23:8, 23:13
**size** 9:20, 24:14, 33:25
**slightly** 34:9
**small** 21:12, 22:6, 24:13, 31:16
**smaller** 21:6, 21:24, 46:1
**smoothly** 16:3
**social** 58:20, 58:21, 58:24
**socialization** 39:25
**sole** 12:17
**solely** 56:21
**somebody** 25:19, 26:25, 54:23
**somehow** 75:17
**someone** 9:8, 39:5
**sometime** 26:6
**somewhat** 71:8
**soon** 17:24
**sorry** 30:21, 35:8, 45:10, 49:1, 52:15, 71:14
**sort** 41:6, 71:3, 76:11
**sorted** 66:13
**sorts** 51:4
**sounds** 21:21
**source** 64:9, 64:11, 64:14, 64:16
**sparing** 44:15
**sparingly** 44:7
**speakers** 12:18

**speaking** 46:19
**special** 30:2
**specific** 38:22, 38:23, 39:2, 45:1, 67:3, 70:11
**specifically** 42:24, 52:22
**speed** 64:1
**spend** 26:18, 26:20, 76:23
**spent** 24:25, 25:1, 28:6
**spoke** 75:5
**sponsored** 46:5
**spots** 36:21, 46:2
**St** 2:31
**stage** 56:4
**stages** 62:17, 62:21
**stand** 19:17
**standard** 22:15, 65:14, 77:19
**start** 23:6, 24:10, 35:18, 65:12, 66:1, 77:11, 77:17
**started** 11:5, 18:24, 77:18
**starts** 35:19, 44:3
**state** 28:4, 51:6, 51:11, 56:15, 59:14, 59:17
**Statements** 34:19, 36:18, 50:3, 50:4, 72:1
**STATES** 1:1, 1:5, 1:29, 1:30, 4:3, 13:2, 14:6, 34:24, 39:8, 43:23, 50:24, 50:25, 51:2, 55:1, 71:17, 79:12, 79:18
**status** 29:9, 31:25
**statute** 39:10, 54:19, 54:20, 55:2, 56:14, 56:20
**stay** 33:13, 73:10
**stenotypy** 79:5
**step** 10:7, 22:25, 24:7, 24:13, 26:3
**Steve** 64:6
**Stewart** 62:7, 62:16, 62:19
**stick** 61:15
**Stickney** 64:7
**stipulate** 16:25, 17:14, 26:7
**stipulation** 17:6, 26:11
**stipulations** 17:15, 66:2, 66:3, 72:9
**stop** 28:14, 37:7
**stopping** 72:14
**stops** 27:9, 28:5
**stories** 8:24, 32:21
**strategy** 71:12
**Street** 1:33, 2:6, 3:14, 56:10
**stretched** 24:5

strict 24:23
struck 25:17, 25:23, 28:25
structure 58:24
stuff 38:24
subject 9:12, 10:4
subpoena 64:8
Subsection 39:11
substantial 73:9, 74:6
substantive 66:6
substitute 64:1
sufficient 25:6
sufficiently 65:17
suggested 13:2, 28:17
suggestion 62:7
suicide 37:2, 38:13, 38:14, 38:16, 39:23, 41:5, 41:16, 42:2
Suite 1:45, 2:16, 3:7
summarize 35:11
Summit 3:7
summons 32:15
superseding 18:1, 18:3, 18:8
Support 36:8, 40:1, 40:3, 43:9, 43:10, 55:4, 55:5, 55:10, 58:8, 58:13, 58:18, 59:6, 59:7, 59:8, 59:17
supported 52:10, 52:17
supporting 31:23, 55:3, 55:8, 55:14
suppose 61:6, 61:11
Suppress 62:3
Supreme 35:4, 56:2
surprised 32:1
Surveillance 62:4
suspect 69:22
switch 70:25
sworn 76:2
sympathizer 56:9
sympathizing 55:3
sympathy 59:6
sync 51:1
system 10:4, 28:14


< T >
table 16:7, 69:15
talked 20:19, 21:11
talks 30:4, 40:13
Tampa 2:26

tape 12:16, 12:17, 13:22, 13:23, 14:12
tapes 12:1, 12:2, 15:4
tapped 74:20
target 31:10
task 15:9
technique 38:14
technologically 10:21
tee'd 73:4
ten 24:6, 25:3, 25:5, 25:18, 27:22, 31:15
tenure 36:22
TERESA 1:42
term 59:9
terms 18:14, 20:11, 24:3, 32:11, 55:4
terrorism 36:25, 43:19
terrorism. 39:16
terrorist 37:21, 37:24, 38:5, 38:22, 39:13, 39:15, 39:23, 40:3, 40:5, 40:7, 42:18, 42:21, 43:10, 43:14, 45:14, 52:11, 56:12, 58:18, 59:8
Tesemel 60:20
testified 19:6
testifies 65:15
testify 19:2, 19:12, 40:7, 61:5, 69:18, 69:19, 70:4
testifying 19:15, 70:6
testimony 13:25, 36:22, 41:24, 64:13, 66:22, 68:7, 70:4, 70:9, 72:17
TEXAS 1:2, 1:31, 1:34, 2:17, 3:8, 3:15, 79:19
thanks 5:5
theirs 66:25, 67:5
theories 38:12
theory 37:10, 37:13, 38:21, 47:3
therein 34:24
thinking 72:10
third 23:18, 69:17
Thirty 21:13, 24:2, 25:23, 76:24
though 75:19
thousands 15:7
three 4:8, 20:16, 21:3, 40:22, 65:12, 66:18, 71:19, 73:23
throughout 13:14, 76:8
throw 25:13

thrust 44:5
today 7:7, 29:20, 30:13, 35:9, 36:9, 63:2, 63:5
together 30:3, 46:1, 63:11
tomorrow 26:5
took 43:15, 54:14, 72:7, 79:5
top 10:11, 11:8, 11:9, 11:11, 11:15, 11:16, 11:19, 25:13, 44:5
Tops 12:5, 25:24
torture 60:22
total 59:19
Tower 3:6
traditional 27:15
Trahan 5:25, 9:3, 9:10, 9:11
training 10:5, 11:22, 11:25
transcribed 79:6
TRANSCRIPT 1:17, 12:15, 12:21, 12:23, 12:25, 13:6, 13:11, 13:19, 13:25, 16:8, 16:9, 29:9, 29:19, 78:8, 79:10
transcription 14:1
transcriptions 13:15
transcripts 12:9, 12:11, 14:19, 14:20, 15:4, 16:19, 20:12, 33:5
translation 15:5, 67:23
translations 15:16, 67:24
translator 14:1
translators 66:25, 67:1, 67:3, 67:5, 67:20, 68:13
transport 31:7
treating 32:13
trials 44:12, 48:17, 48:22
tried 4:13, 16:7
true 15:8, 41:6, 54:15, 79:8
try 6:18, 13:19, 15:22, 15:25, 17:10, 17:24, 34:3, 41:19, 52:19, 54:10, 54:18, 65:16, 74:5, 78:7
trying 14:18, 14:20, 15:8, 17:13, 17:22, 26:14, 66:12
turn 11:3, 65:16
turned 64:25
turns 27:22
twenty-five 26:23, 27:8
twenty-four 76:21
twice 35:7
two 4:8, 14:19, 16:15, 20:24, 21:3, 22:2, 23:25, 40:4,

48:17, 60:19, 69:14
**two.** 23:25
**type** 46:13, 47:5, 50:12, 54:18, 57:16
**typically** 16:11, 46:12

< U >
**unavailability** 34:12
**unavailable** 33:18
**unclassified** 64:23
**understand** 6:6, 11:20, 12:21, 13:22, 14:24, 22:2, 23:2, 23:4, 33:5, 33:8, 41:25, 42:3, 42:7, 53:20, 54:7, 57:10, 57:19, 57:20, 67:25, 77:23
**understanding** 12:10, 13:9, 26:4, 31:14, 37:16, 68:10, 68:25
**understood** 20:17, 31:12, 31:18, 37:9, 63:14
**undue** 35:6
**unduly** 20:6
**unfair** 44:10, 45:22
**Unfortunately** 10:20, 63:1, 63:9
**UNITED** 1:1, 1:5, 1:29, 1:30, 4:3, 13:2, 14:6, 34:24, 39:8, 43:23, 50:24, 50:25, 51:2, 55:1, 71:17, 79:12, 79:18
**Unlawful** 39:11
**Unless** 21:1, 38:21, 41:17, 44:12, 68:22, 70:23
**unmonitored** 51:23
**unnecessary** 24:7
**unreal** 44:13
**unrelated** 37:1, 37:5, 37:8, 37:15, 46:19
**until** 17:13, 78:10
**unusual** 28:20, 30:1
**Using** 6:13, 11:15, 25:23, 26:23, 32:14
**usual** 30:4

< V >
**vacuum** 59:19
**vague** 68:10
**value** 44:11, 50:19

**van** 31:7
**variety** 71:11
**various** 13:15, 49:5, 50:9, 53:19, 62:17, 62:21
**varying** 71:7
**vast** 53:4, 53:5
**vein** 69:13
**verbal** 16:12
**versa** 30:8
**version** 12:24, 13:1, 16:15
**versions** 13:7
**VERSUS** 1:8
**vice** 30:8
**victim** 40:20, 40:22, 40:25
**victims** 40:6, 42:17
**video** 12:1, 12:17, 15:4
**view** 68:23
**violate** 39:12, 50:7
**violence** 36:25, 37:4, 37:11
**violent** 40:16
**virtually** 12:14
**visit** 29:8
**voir** 4:19, 4:25, 20:10, 22:1, 22:15, 22:16, 22:17, 22:20, 23:9, 23:13, 23:14, 24:3, 25:21, 28:7, 28:8, 29:12, 31:13, 31:23, 33:1, 33:7, 33:11, 77:12, 77:17, 77:19
**volume** 16:20, 65:16, 69:15
**voluminous** 4:10, 5:21, 62:25

< W >
**wait** 31:16
**waiting** 72:3
**waiver** 18:8, 18:16, 18:18
**walk** 36:19
**Wall** 2:6, 74:10
**wanted** 4:5, 5:20, 12:10, 13:21, 18:23, 20:18, 21:6, 21:7, 33:16, 33:19, 34:16, 64:15, 64:17, 67:15, 71:24, 75:19
**wants** 7:11, 7:23, 10:7, 58:22, 64:10
**waste** 28:15
**wasted** 28:16
**wasting** 72:10, 72:21
**watching** 22:13, 27:8

**water** 43:18
**wearing** 19:14
**web** 48:10, 48:11, 48:13, 50:22, 50:23, 51:1, 51:9, 51:12
**week** 9:8, 30:22, 30:25, 31:1, 31:2, 41:1, 50:14, 65:17
**weekend** 26:6
**weeks** 71:19
**weight** 56:25
**WESTFALL** 3:4, 3:5, 16:5, 18:18, 21:9, 21:10, 24:8, 24:17, 24:22, 25:13, 26:18, 26:24, 28:22, 29:1, 30:20, 46:22, 47:9, 70:20, 73:10, 74:24, 75:3, 75:14, 76:21, 78:9
**whatever** 13:16, 77:17
**Whether** 6:21, 9:9, 10:1, 10:13, 12:21, 17:14, 17:15, 22:10, 23:17, 28:24, 41:9, 53:10, 58:7, 67:7, 67:18, 68:15, 69:23
**whole** 20:24, 25:1, 25:17, 32:6, 39:10, 60:10, 77:1
**whom** 47:16
**widows** 38:12
**willing** 9:10, 20:17, 24:23, 30:20, 65:25, 73:25
**wind** 52:3
**window** 38:24
**wing** 40:2
**wings** 42:9
**wish** 6:2
**within** 20:16, 20:17, 27:15, 50:13, 69:1, 69:21
**without** 36:3, 44:25, 45:3, 48:12, 57:17, 59:24, 73:7, 73:9
**witness** 4:19, 4:24, 8:2, 8:19, 9:1, 11:1, 11:2, 19:12, 19:16, 19:20, 33:17, 33:18, 33:22, 34:4, 34:7, 34:12, 39:18, 49:19, 50:1, 61:2, 61:4, 61:7, 63:12, 65:15, 65:16, 66:5, 66:6, 67:16, 68:2, 68:15, 68:16, 70:10, 71:4, 72:6, 72:16
**witness-by-witness** 67:12
**witnesses** 17:1, 19:2, 34:4,

40:6, 43:5, 64:21, 65:10,
66:1, 66:16, 67:21, 68:11,
68:17, 69:16, 70:3, 70:5,
71:2, 73:9
**wonderful** 56:11
**wondering** 11:14
**word** 34:14
**words** 58:16, 70:7
**work** 7:6, 15:17, 24:16,
71:21, 78:7
**worked** 4:14, 30:3, 47:16,
72:9
**working** 5:14, 32:22, 62:15,
62:16, 62:20, 71:22
**works** 76:15
**world** 56:12
**worse** 42:25
**Worth** 3:8
**wrinkle** 7:25
**writing** 4:12, 6:9, 19:2, 34:21
**written** 16:13, 55:21
**wrote** 43:1, 43:2, 49:25


**< Y >**
**yea** 73:5
**years** 30:3
**yesterday** 10:5, 17:17,
21:11, 48:3
**yield** 35:15
**York** 2:7, 30:7, 42:13
**yourself** 19:15
**yourselves** 17:18


**< Z >**
**zakat** 37:18, 40:1, 40:2,
47:15, 49:5, 49:9, 52:10,
53:19, 55:9, 55:12, 55:24,
57:4, 57:6, 58:4
**zakats** 40:1, 58:19
**zero** 54:13