18:00 1         IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
2                  DALLAS DIVISION

3

4   UNITED STATES OF AMERICA     (   NUMBER 3: 04-240-G
                          (
5                          (
   VERSUS                    (
6                          (
                          (
7   HOLY LAND FOUNDATION, ET AL.   (   July 16, 2007

18:00 8   _____

9                     VOLUME 1
               VOIR DIRE EXAMINATION
10         BEFORE THE HONORABLE A. JOE FISH

11  _____

12

   A P P E A R A N C E S:
13

14

   For the Government:   MR. JIM JACKS
15                      MR. BARRY JONAS
                     MS. ELIZABETH SHAPIRO
16                   MR. NATHAN GARRETT
                   Assistant United States Attorney
17                 UNITED STATES DEPARTMENT OF JUSTICE
                 NORTHERN DISTRICT OF TEXAS
18                 U.S. Courthouse
                 1100 Commerce Street
19                 Dallas, Texas 75242
                    214/659-8600
20

21  For the Defendant and Shukri Abu Baker:

22

                 MS. NANCY HOLLANDER
23                 MS. TERESA DUNCAN
                 FREEDMAN BOYD DANIELS
24                 HOLLANDER
                 20 First Plaza, Suite 700
25                 Albuquerque, NM 87102
                    505/842-9960

18:00 1

2      For the Defendant El-Mezain:

3
                              MR. JOSHUA DRATEL
4                             LAW OFFICE OF JOSHUA L. DRATEL
                              14 Wall Street, 28th Floor
5                             New York, NY 10005
                                      212/732-0707
6

7      For the Defendant Mufid Abdulqader:

8
18:00                         MS. MARLO CADEDDU
9                             LAW OFFICE OF MARLO P. CADEDDU
                              3232 McKinney Avenue, Suite 700
10                            Dallas, Texas 75204
                                      214/744-3015
11

       For the Defendant Elashi:
12

13                            MS. LINDA MORENO
                              LAW OFFICE OF LINDA MORENO
14                            PO BOX 10985
                              Tampa, Florida 33679
15                                    813-247-4500

16     For the Defendant Odeh:

17                            MR. GREG WESTFALL
                              WESTFALL PLATT CUTRER
18                            Mallick Tower
                              One Summit Avenue, Suite 910
19                            Fort Worth, Texas 76102
                                      817/877-1700
20

21     Court Reporter:        Cassidi L. Casey, CSR No. 1703
                              1100 Commerce Street, Rm 15D6L
22                            Dallas, Texas 75242
                                      214/354-3139
23

24

25

P R O C E E D I N G S:

THE COURT:  Good morning, Ladies and Gentlemen.
I have a few preliminary matters that I need to cover with
you before we begin questioning the individual members of
the venire.  However, I hope to make this brief so that we
can stay on schedule today.

First, I wanted to inform you that Ms. Hudson
either has or will before the members of the venire come
up administer to them the general oath that I usually have
administered in the courtroom.  So we don't need to worry
about that.

Second, we have not previously discussed or
established what order the questioning will go in; that
is, whether the government or defendant will go first.
But the procedure being utilized here is one that has been
proposed by the defendants, and I don't know if it's fair
to say the government has opposed it, but certainly they
have expressed doubts about it, and so it seemed to me
that we ought to have the defendants' counsel go first in
questioning the members of the venire and the government
second.

And finally, I had a request this morning by Ms.
Moreno that when the potential juror is being questioned
that rather than have them stand at the lectern that we
seat them in the jury box here and have questioning

18:00   1   counsel stand at the lectern, and I wanted to find out if

  2   the government had a position about that.

  3             MR. JACKS: We have no objection, your Honor.

  4             THE COURT: Let's try it. My only concern about

  5   it is the person being questioned will not have a

  6   microphone available. And there may be an issue if they

  7   are soft spoken, but I'm willing to give it to try.

  8             MR. JACKS: I would object to the Court

  9   determining that the defendants have the opportunity to

10   question first. That's contrary to the standard practice,

11   and I'm not sure if that practice goes because the

12   government has the burden of proof, but generally the

13   government has the opportunity to examine the panel after

14   the Court does.

18:00 15             THE COURT: So you want to go first?

16             MR. JACKS: Yes, your Honor.

17             THE COURT: Okay. Well, as I said, I thought we

18   should do it the other way because the defendants were the

19   proponents of this procedure, and at least in the past,

20   Mr. Jacks, you expressed some reservations about it, but

21   if you want to go first, I'm willing to do that, too,

22   since generally the government goes first in criminal

23   cases.

24             MR. WESTFALL: Your Honor, one technical point.

25   We had discussed the issues of challenges for cause, and

18:00 1  we wanted to throw this out because it will come up.  What

2  we feel the best way would be if a challenge is developed

3  as soon as the juror leaves we would state our challenge

4  to the Court.

5          THE COURT:  You said you had discussed that,

6  what is the government's position on that.

7          MS. SHAPIRO:  That's fine.

8          THE COURT:  We'll take a brief recess while the

9  first group of jurors are being brought to the courtroom,

10  and when they are up here, we'll commence.  We're on a

11  tight time schedule, and I intend to enforce this

12  fifteen-minute time limit strictly in questioning the

13  venire.

14          (Recess)

18:00 15          THE COURT:  Good morning, Ladies and

16  Gentlemen.  Mr. Epperson, counsel for the parties have

17  some questions for you in this case.  Mr. Westfall, do you

18  have questions for Mr. Epperson?

19          MR. WESTFALL:  I do, your Honor.  Mr. Epperson,

20  I'm Greg Westfall.  I'm one of defense lawyers in this

21  case.

22          VENIRE PERSON:  Okay.

23          MR. WESTFALL:  How are you this morning?

24          VENIRE PERSON:  Good.

25          MR. WESTFALL:  Good.  Thank you for coming.  In

18:00 1   your questionnaire you said you have observed the

2   Palestinian-Israeli conflict somewhat well.  Is that

3   correct?

4               VENIRE PERSON:  Just what I read in the

5   newspapers and see on television.

6               MR. WESTFALL:  Well, let me tell you this case

7   is the Holy Land Foundation for Relief and Development

8   that is a Muslim charity that in this case is charged or

9   accused of giving material support to a terrorist

10  organization, specifically HAMAS.  From anything you have

11  read or heard in the news, does that ring a bell?

12              VENIRE PERSON:  I remember reading something in

13  the newspapers when the case first came out.  I think it

14  was in Richardson or something like that, and I live in

18:00 15  Garland.  That's all I heard about it right there.  I

16  probably read some of those news accounts.

17               .

18              MR. WESTFALL:  From what you have read and what

19  you have heard, have you formed any opinions about the

20  guilt or innocence of the defendants in the case?

21              VENIRE PERSON:  No, I didn't read that much

22  about it.  Just a couple of paragraphs or headlines,

23  whatever was in the paper.

24              MR. WESTFALL:  We have a Muslim charity charged

25  with, like I said -- accused of giving material support to

18:00 1    a foreign terrorist organization.  So obviously we have

2    Islamic and then terrorism in the same sentence.

3          Is there anything about the nature of those

4    charges that would make it difficult for you to be fair

5    and impartial or be able to render a fair verdict based

6    just on the evidence in court?

7          VENIRE PERSON:  No.

8          MR. WESTFALL:  Do you know any Muslims?

9          VENIRE PERSON:  I probably do in a roundabout

10   way, maybe from college days, but no close associates or

11   anything like that.

12         MR. WESTFALL:  So have you had any bad

13   experiences with Muslims?

14         VENIRE PERSON:  No.

18:00 15   MR. WESTFALL:  Any good experience?

16         VENIRE PERSON:  No.

17         MR. WESTFALL:  Mr. Epperson, thank you so much

18   for speaking with us.  We tender the juror to counsel.

19         THE COURT:  Counsel for the government have

20   questions?

21         MR. JACKS:  Just briefly, your Honor.  Mr.

22   Epperson, my name is Jim Jacks.  I'm an Assistant United

23   States Attorney here in Dallas.  Good morning.

24         VENIRE PERSON:  Good morning.

25         MR. JACKS:  How long have you been retired, sir?

18:00 1          VENIRE PERSON:  Six years.

2          MR. JACKS:  Does your wife work?

3          VENIRE PERSON:  A teacher also.

4          MR. JACKS:  Is she retired or does she still

5     work?

6          VENIRE PERSON:  She still works.

7          MR. JACKS:  You didn't mark it necessarily on

8     your questionnaire, and I assume that may be because you

9     don't remember.  But your prior jury service, as far as

10    when that was approximately?

11         VENIRE PERSON:  I think I have been three or

12    four times there at the criminal courthouse and all within

13    the last ten to twelve years.

14         MR. JACKS:  Would that be in Hunt County,

18:00 15    Rockwall County or Dallas County, Texas?

16         VENIRE PERSON:  Dallas County, Texas.

17         MR. JACKS:  No further questions, your Honor.

18    I'm sorry.  I do have one question.  I'm sorry.

19         Mr. Epperson, I expect the Judge -- I know the

20    Judge will give the jury instructions after all the

21    evidence has been presented.  He would tell you what the

22    law is, and I expect that he would tell you that if an

23    individual provides material support to a designated

24    terrorist group knowing that it's going to a designated

25    terrorist group, even if that support is in the form of

18:00 1    humanitarian aid -- it could be books, food or soccer

2    balls or anything like that.  Even if that support is of

3    that nature, it's still a violation of the law.  Would you

4    have any problem accepting that instruction and following

5    that aspect of the law?

6              VENIRE PERSON:  No.

7              MR. JACKS:  Thank you, sir.

8              THE COURT:  Mr. Epperson, you may rejoin the

9    others in the hall.  Thank you.

10             Good morning, Ms. Gartman.  Counsel for the

11   parties in this case have some questions for you.

12             Mr. Westfall.

13             MR. WESTFALL:  Thank you, your Honor.

14             Hello, Ms. Gartman.  I'm Greg Westfall.  I'm one

18:00 15   of the defense lawyers in this case.

16             This case is the case of Holy Land Foundation

17   for Relief and Development which is a Muslim charity

18   accused of giving support to a foreign terrorist

19   organization and that terrorist organization is HAMAS.

20   Knowing that, does that ring any bells from anything you

21   have seen in the media?

22             VENIRE PERSON:  I vaguely remember that it was

23   recorded on TV.  I don't know when.  I saw one report on

24   it.  That's all.  That's the only thing I remember.

25             MR. WESTFALL:  Based on that, have you reached

18:00  1    any opinions about the case?

2              VENIRE PERSON:  No.  I don't really remember it.

3    I have not been in the City of Dallas very much the last

4    three or four years, and I might have seen one report on

5    it, and I haven't formed any opinion because I really

6    don't know anything.

7              MR. WESTFALL:  You have been doing work out of

8    town a lot?

9              VENIRE PERSON:  No, I took care of my parents in

10   Arkansas.

11             MR. WESTFALL:  Well, this is a criminal case,

12   and in any criminal case the defendants have a number of

13   protections.  One of them is that the jury reaches a fair

14   verdict based upon only the evidence that comes out in

18:00 15   trial?

16             VENIRE PERSON:  Yes.

17             MR. WESTFALL:  And another one is that everyone

18   who's charged in the United States with a crime is

19   presumed innocent unless and until the government proves

20   its case beyond a reasonable doubt, and you are familiar

21   with both of those?

22             VENIRE PERSON:  Yes.

23             MR. WESTFALL:  And in this case we have Muslims

24   who are charged with material support of terrorism.  Think

25   about those charges for a second.  The nature of the case,

18:00 1    particularly in this day and age and the nature of those

2    charges, will it be possible for you fairly to give the

3    defendants the benefit of the presumption of innocence?

4              VENIRE PERSON:  I think so, yes.

5              MR. WESTFALL:  Do you know any Muslims?

6              VENIRE PERSON:  Yes, sir.

7              MR. WESTFALL:  Have you had good experiences,

8    bad experiences?

9              VENIRE PERSON:  Some good and some bad.  I had a

10    brother-in-law that was a Muslim.

11              MR. WESTFALL:  Really.

12              VENIRE PERSON:  It was my sister's husband, and

13    they have since divorced.

14              MR. WESTFALL:  Is that one of the bad

18:00 15    experiences?

16              VENIRE PERSON:  Yes, that was the bad

17    experience.  Until they divorced, it was okay.

18              MR. WESTFALL:  Do you have an opinion of Muslims

19    in general?

20              VENIRE PERSON:  No, not really.  They are like

21    everybody else.  There are fanatics and some that aren't

22    fanatics.  Some good, some bad, just like any other person

23    or group on earth.

24              MR. WESTFALL:  I'll just ask you, could you give

25    a fair and impartial verdict rendered only on the evidence

18:00  1    in court if you are on the jury?

2                    VENIRE PERSON:  Yes.

3                    MR. WESTFALL:  Ms. Gartman, thank you very much.

4                    VENIRE PERSON:  Yes.

5                    THE COURT:  Counsel for the government have

6    questions for Ms. Gartman?

7                    MR. JACKS:  Good morning, Ms. Gartman.

8                    VENIRE PERSON:  Good morning.

9                    MR. JACKS:  My name is Jim Jacks and I'm an

10   Assistant United States Attorney here in Dallas.  Your

11   former brother-in-law, you said he was Muslim.

12                   VENIRE PERSON:  Yes.

13                   MR. JACKS:  What nationality was he?

14                   VENIRE PERSON:  He was from Iran.

18:00 15                   MR. JACKS:  And how long has it been since he

16   was divorced from your sister?

17                   VENIRE PERSON:  Nine years.

18                   MR. JACKS:  Is he still in this country?

19                   VENIRE PERSON:  Yes.

20                   MR. JACKS:  Do you or your sister have contact

21   with him?

22                   ?

23                   VENIRE PERSON:  No.  I haven't talked to him in

24   like eleven years.

25                   MR. JACKS:  I believe in one of your answers you

18:00  1    said you had been out of Dallas for some time.

2          VENIRE PERSON:  Yes.  Up until my mother died in

3    November and I came back to Dallas.  I was part time in

4    Arkansas, and I would bring my mother down here.  So I was

5    here for three months at a time, and I would go back up

6    there for three months at a time.

7          MR. JACKS:  One of the lists that we have -- I

8    think on the questionnaire -- you showed that you were a

9    homemaker, and we have another list that shows you work as

10   an item processor.

11         VENIRE PERSON:  I quit in 2002 I think, and then

12   I haven't worked since then.  I just stayed home.  When I

13   wasn't taking care of my mom and dad I was home.

14         MR. JACKS:  What kind of work does your husband

18:00 15  do?

16         VENIRE PERSON:  He's a project manager for a

17   laboratory.

18         MR. JACKS:  Who did you last work for?

19         VENIRE PERSON:  Ten years, Provident Bank, Bank

20   One, Chase.

21         MR. JACKS:  Is that what used to be called the

22   proof department of bank?

23         VENIRE PERSON:  I worked in proof part of time,

24   and the last several years I worked in item processing

25   which is where after the proof they run through the

18:00  1    sorter, and I did the balancing work on that.  Mostly, I

      2    dealt with incoming checks rather than outgoing checks.

      3            MR. JACKS:  Let me ask you some questions

      4    specifically about this case.  At the end of all the

      5    testimony when both sides have rested their case, the

      6    Judge has written instructions in which he tells the jury

      7    what the law is so that you can use that to render your

      8    verdict.  One of the instructions that will be included in

      9    that explanation of the law is that with regards to the

    10    charge of providing material support to a terrorist

    11    organization.  One of those instructions will be that even

    12    if the support is in the nature of humanitarian aid --

    13    clothing, school backpacks, pencils, soccer balls, food.

    14    Even if the aid is in that form, it's still against the

18:00 15    law.  First of all, would you be able to follow that

    16    instruction?

    17            VENIRE PERSON:  Uh-huh.

    18            MR. JACKS:  You don't have any question or

    19    disagreement with that aspect of the law?

    20            VENIRE PERSON:  No.

    21            MR. JACKS:  Thank you.  That's all.

    22            THE COURT:  Thank you, Ms. Gartman.  You may

    23    rejoin the others in the hall.

    24            THE COURT:  Good morning Ms. Pritchard.

    25    Counsel for the parties in this case have some questions

18:00 1     for you.  Mr. Westfall.

2               MR. WESTFALL:  Thank you, your Honor.

3               Ms. Pritchard, I'm Greg Westfall.  I'm one of

4      the defense lawyers in this case.  How are you doing?

5               VENIRE PERSON:  I'm fine.

6               MR. WESTFALL:  I want to speak with you very

7      briefly.

8               VENIRE PERSON:  What now?

9               MR. WESTFALL:  Can you hear me?

10              VENIRE PERSON:  I didn't hear that.

11              MR. WESTFALL:  I said I want to speak with you

12     briefly.  Do you remember the questionnaire you filled

13     out?

14              VENIRE PERSON:  Yes.

18:00 15              MR. WESTFALL:  In response to the question about

16     the Palestine-Israeli conflict you said something to the

17     effect that both sides are Looney Toons and in serious

18     need of intervention.

19              VENIRE PERSON:  Yes.

20              MR. WESTFALL:  Tell us more about that?

21              VENIRE PERSON:  I'm sixty.  I have seen a lot of

22     conflict around the world that I just think is crazy.

23     It's just crazy.  They have been fighting for five

24     thousand years, you know, technically.  And beyond it.  I

25     have never hated anyone.  I have never had anyone hate me.

18:00   1    I don't understand.

     2            MR. WESTFALL:  Do you have a sense of who's is

     3    right or wrong in that conflict?

     4            VENIRE PERSON:  No, I think both sides are

     5    stupid.

     6            MR. WESTFALL:  So is there anything about

     7    that -- Let me tell you this case is a Holy Land

     8    Foundation case, and the United States government is

     9    charging the Holy Land Foundation and these men of giving

    10    material support to a foreign terrorist organization,

    11    HAMAS.  Does that ring any bells with you from anything

    12    you have heard or read?

    13            VENIRE PERSON:  I think right after the towers

    14    went down I read something about they were looking into

18:00 15    the Holy Land Foundation.  I follow the news, but not that

    16    closely.

    17            MR. WESTFALL:  Do you know any Muslims?

    18            VENIRE PERSON:  Yes.  Actually I work in a

    19    counseling agency, and we have interns that come and go

    20    with the different semesters, and actually we have a

    21    Muslim young woman that's working with us right now, and

    22    in the past we have had Muslims.  We have had Hindus,

    23    Christians, Jews, everything.

    24            MR. WESTFALL:  What agency is that?

    25            VENIRE PERSON:  Irving Advocacy Center.  It's

18:00  1  funded by the city.

       2          MR. WESTFALL:  Does that like work in the

       3  divorce courts?

       4          VENIRE PERSON:  No, actually we are a community

       5  counseling agency.  We were started to deal with families

       6  whose children got in trouble, teenagers, but over the

       7  years we have evolved into individual and marital family

       8  counseling.

       9          MR. WESTFALL:  And have you had good experiences

      10  with the Muslim people that you have worked with?

      11          VENIRE PERSON:  In fact, one of them is so funny

      12  because she was with us through Ramadan, and she would

      13  come in and say I'm starving to death and it's not in

      14  sundown.  So we would ask her to explain.

18:00 15          MR. WESTFALL:  What did you think about it?

      16          VENIRE PERSON:  We had heard it before, but it

      17  was interesting to hear her personal take on it.  When the

      18  month came to a close, why they had to wait for a certain

      19  hour.

      20          MR. WESTFALL:  What ultimately happened to her?

      21          VENIRE PERSON:  She moved on.  She's probably in

      22  private counseling now.  Her husband was a doctor.

      23          MR. WESTFALL:  Now, there are protections that

      24  are for defendants on trial in a criminal case.  Do you

      25  know what they are?

18:00  1         VENIRE PERSON:  No.

       2         MR. WESTFALL:  A couple of them are the 5th

       3    Amendment, the right not to incriminate yourself or

       4    testify; the right to have the government prove its case

       5    beyond a reasonable doubt.  And then a presumption of

       6    innocence.  The point of all of this is the decision has

       7    to be made on just the evidence, and that's why we talk

       8    about the opinions and such that might keep a person from

       9    doing that.

      10         Do you think you could be fair and impartial in

      11    a case involving a Muslim charity charged with material

      12    support to a terrorist organization?

      13         VENIRE PERSON:  Yes.

      14         MR. WESTFALL:  Thank you so much?

18:00 15         VENIRE PERSON:  You are welcome.

      16         THE COURT:  Mr. Jacks, do you have questions for

      17    Ms. Pritchard?

      18         MR. JACKS:  Yes, your Honor.

      19         MR. JACKS:  Good morning, Ms. Pritchard.  My

      20    name is Jim Jacks.  I'm an Assistant United States

      21    Attorney here in the Northern District of Texas at Dallas.

      22         In your questionnaire, you were asked if there

      23    were any potential medical problems that might affect your

      24    ability to serve in this case, and you mentioned diabetes

      25    and in terms of how that might present a problem if you

18:00 1   had a potential drop in blood sugar.  Would that manifest

2   itself in fatigue or drowsiness?

3          VENIRE PERSON:  No.  It usually causes shakes

4   and sweating.

5          MR. JACKS:  And you are able to regulate that;

6   is that correct?

7          VENIRE PERSON:  I have an insulin pump, but

8   sometimes things happen.

9          MR. JACKS:  Are you concerned that could be a

10  problem if you were selected to serve on this jury?

11         VENIRE PERSON:  I don't know.  I have been at

12  this for over forty years, so it's kind of second nature.

13         MR. JACKS:  As far as handling the disease?

14         VENIRE PERSON:  Yes.

18:00 15        MR. JACKS:  I believe you said your husband is a

16  retired school counselor.

17         VENIRE PERSON:  Yes.  He has MS.

18         MR. JACKS:  I'm sorry.

19         VENIRE PERSON:  And it's affecting his mind.

20  He's losing ground.

21         MR. JACKS:  And you are his sole care giver?

22         VENIRE PERSON:  He does all right.  Like today

23  he would be all right until I get home.  He might forget

24  to eat, but that's okay.

25         MR. JACKS:  And obviously you have provided that

18:00  1    information in your questionnaire.  Is that something that
       2    you would be concerned about while you were here in court
       3    and on the jury?  Obviously you are concerned about it.
       4    Is it something that would --
       5                 VENIRE PERSON:  There is no chance that we would
       6    be sequestered, is there?
       7                 MR. JACKS:  Well, the Judge makes that decision.
       8                 THE COURT:  I don't know that I would say no
       9    chance, but the chances are minimal.  I have been here
      10    almost twenty-five years, and I have never sequestered a
      11    jury.
      12                 VENIRE PERSON:  That would be the only thing.  I
      13    would not, you know, want to be gone from him day after
      14    day, night after night.
18:00 15                 MR. JACKS:  Do you have other family in town
      16    that could help you if something came up?
      17                 VENIRE PERSON:  My brother lives in Midlothian,
      18    and that's really about it.  We do have friends, but my
      19    family is kind of scattered.
      20                 MR. JACKS:  Well, I believe you said the agency
      21    that you worked for has an office inside the Irving Police
      22    Department.
      23                 VENIRE PERSON:  Yes, because we were originally
      24    set up as a diversion program for juvenile offenders.  We
      25    were originally funded through the police department.  So

18:00 1   we continue to be funded through the police department.

2   Our building that we have been in five years, we have the

3   lower floor, and upstairs is the officers that deal with

4   the victims of abuse and domestic violence, and CPS has

5   offices up there, and our victims abuse case workers are

6   upstairs.

7           MR. JACKS:  In your questionnaire you advised us

8   that your brother and his wife are police officers with

9   the Dallas Police Department?

10          VENIRE PERSON:  Yes, Richard has within DPD

11  twenty-three years, and his wife retired after

12  twenty-five.  She's still a reserve officer.

13          MR. JACKS:  Your brother's name?

14          VENIRE PERSON:  Richard Kress.

18:00 15         MR. JACKS:  Where he did he work in DPD?

16          VENIRE PERSON:  He's in personnel.  He does

17  background.

18          MR. JACKS:  But he's a police officer, as was

19  his wife?

20          VENIRE PERSON:  Yes.

21          MR. JACKS:  Where did she work?

22          VENIRE PERSON:  First she worked Southwest

23  Division, and that's where they met.  And when she got

24  pregnant, she went to the academy and worked there for a

25  while, and then she went to the crime unit.  They don't

18:00 1    call it CSI, but that's what it's like.

2              MR. JACKS:  Physical evidence section or

3         something?

4              VENIRE PERSON:  Yes, she did fingerprinting and

5         photographing and checking the fingerprints and stuff.

6              MR. JACKS:  Lastly I want to ask you your

7         opinion about the Palestinian-Israeli conflict.  Had you

8         done any -- Research may be too strong a word.  But have

9         you read about it to try to learn the source of conflict

10        or anything like that?

11             VENIRE PERSON:  Well, oh, yes.  I'm kind of an

12        amateur student of history.  So yes, I probably know more

13        than I want to know about it.

14             MR. JACKS:  How long have you been doing that?

18:00 15        VENIRE PERSON:  I think I have been aware that

16        there was a conflict practically since I was aware of

17        anything because I was born in 1946, and the division

18        happened in 1948, and it's been a conflict since then.

19             MR. JACKS:  You mentioned -- The questionnaire

20        asked about wire taps and that type of thing.  Your

21        response was as long as there was a warrant issued before

22        the taps by the judge.  Does that mean if there was a

23        warrant you have no problem accepting that type of

24        evidence?

25             VENIRE PERSON:  Right.

18:00  1                MR. JACKS:  The last question I want to ask you

       2     is, as Mr. Westfall said, this case is about individuals

       3     and an organization who are accused of providing material

       4     support to a foreign terrorist organization, specifically

       5     HAMAS.  After the evidence is in and both sides have

       6     rested their case, the Judge will read the law to the jury

       7     which tells them what the statutes say and what law they

       8     are supposed to apply to the evidence.  Part of that

       9     instruction and that law will be even if the aid provided

      10     to the foreign terrorist organization is in the form of

      11     humanitarian aid such as food, clothing, school equipment,

      12     medical equipment, even if it's in that type of

      13     humanitarian form, it's still against the law to provide

      14     that type of material to a foreign terrorist organization.

18:00 15     Do you have any problem following that part of the law?

      16                VENIRE PERSON:  I don't think so.

      17                MR. JACKS:  Do you have some doubt in your mind

      18     as to whether you could?

      19                VENIRE PERSON:  Maybe a tiny bit, you know.  But

      20     if it's the law, the way it's applied.

      21                THE COURT:  Mr. Jacks, your time has expired.

      22     Thank you, Ms. Pritchard.  You may rejoin the others in

      23     the hall.

      24                MR. JACKS:  Your Honor, we would ask Ms.

      25     Pritchard be excused for cause given her last answer that

18:00    1    she may have a tiny bit of a problem following that

         2    portion of the law, and we would ask that she be excused

         3    for cause.

         4            THE COURT: Mr. Westfall.

         5            MR. WESTFALL: Your Honor, I don't think they

         6    have made a challenge for cause. I don't think they built

         7    cause on this woman. First of all, it was the

         8    prosecutor's rendition of the law; it wasn't the Court's

         9    rendition of the law. And second of all, the last thing

       10    she said was if it's the law. I think she will follow it,

       11    your Honor.

       12            THE COURT: I am going to take the challenge for

       13    cause of Ms. Pritchard under advisement for the moment.

       14    And Mr. Kiblinger, do we have the next person here, Ms.

18:00 15    Constantinescu.

       16            Good morning, Ms. Constantinescu.

       17            VENIRE PERSON: Good morning.

       18            THE COURT: Counsel for the parties in this case

       19    have questions for you. Mr. Westfall.

       20            MR. WESTFALL: Thank you, your Honor. Ms.

       21    Constantinescu, do you go by Dr. Constantinescu?

       22            VENIRE PERSON: Doctor of cardiology, yes.

       23            MR. WESTFALL: Do people address you as doctor?

       24            VENIRE PERSON: Yes, because I am a Ph.D.

       25            MR. WESTFALL: Well, Doctor, good morning.

18:00  1    Thank you for coming in.  You speak very softly, so would

       2    you please kind of speak up when I'm talking to you a

       3    little bit so that we can all hear you.

       4              VENIRE PERSON:  Okay.

       5              MR. WESTFALL:  Thank you.  The questionnaire you

       6    filled out in response to a question that had to do with

       7    Israel and Palestine, I want to talk to you about your

       8    response.  I'm Greg Westfall, and I represent one of the

       9    defendants in this Holy Land Foundation case, and this

      10    case is the Holy Land Foundation -- the United States

      11    government versus the Holy Land Foundation for Relief and

      12    Development.  And what it is a Muslim charity who has been

      13    accused and some of its employees -- who have been accused

      14    of giving material support to a foreign terrorist

18:00 15    organization, specifically HAMAS.  Does that ring a bell

      16    with you?  Have you heard anything about this case?

      17              VENIRE PERSON:  Yes.

      18              MR. WESTFALL:  What have you heard?

      19              VENIRE PERSON:  I heard this morning on the

      20    radio.

      21              MR. WESTFALL:  Which station?

      22              VENIRE PERSON:  I think KRLD.

      23              MR. WESTFALL:  KRLD?

      24              VENIRE PERSON:  Yes.

      25              MR. WESTFALL:  Had you heard about it before

18:00 1    this morning?

2              VENIRE PERSON:  A long time ago.  I don't know

3    exactly.

4              MR. WESTFALL:  But based upon what you have

5    heard, what are your feelings?

6              VENIRE PERSON:  I don't know the truth.  I don't

7    know the situation.

8              MR. WESTFALL:  You don't know the situation?

9              VENIRE PERSON:  No.

10             MR. WESTFALL:  So have you formed any opinions

11   based upon what you have heard?

12             VENIRE PERSON:  No, because I don't know even

13   where they are located and what they did.  I don't know

14   the facts.

18:00 15            MR. WESTFALL:  Do you know any Muslims or have

16   you known any Muslims?

17             VENIRE PERSON:  Yes, we have a Muslim in our

18   group at school.  I am retired now, but I still work part

19   time for UT Southwestern Medical Center, and he's very

20   nice guy.

21             MR. WESTFALL:  Very nice guy?

22             VENIRE PERSON:  Yes.

23             MR. WESTFALL:  Did he go to the mosque and

24   things like that?

25             VENIRE PERSON:  I don't know his personal life.

18:00 1    He's a good worker, also Ph.D.  He's from Iran or Saudi

2    Arabia.  I don't know where.

3                MR. WESTFALL:  But you liked him?

4                VENIRE PERSON:  I like him.

5                MR. WESTFALL:  Did you have any contact with

6    Muslim in Romania?

7                VENIRE PERSON:  No, there were no Muslims.  We

8    came in 1984.

9                MR. WESTFALL:  So you lived there during the

10   previous government?

11               VENIRE PERSON:  Yes.

12               MR. WESTFALL:  Have you been on any juries?

13               VENIRE PERSON:  Yes.

14               MR. WESTFALL:  Criminal juries?

18:00 15               VENIRE PERSON:  At the other court but I was not

16   up to the end.  It was postponed.  One of them was

17   postponed, and I don't remember.  This has been maybe four

18   and six years back, something.

19               MR. WESTFALL:  In every criminal case in the

20   United States there are certain protections that everyone

21   has if they are charged with a crime.  One of those is,

22   you know the, right not to testify against yourself.  You

23   are familiar with that?  The right if you come into court

24   you don't have to testify against yourself.  You don't

25   have to testify at all.  Did you know about that?

18:00 1                  VENIRE PERSON:  No.  As a juror?

2                  MR. WESTFALL:  No, as a defendant.

3                  VENIRE PERSON:  Yes, I know.

4                  MR. WESTFALL:  And you know there is a

5        presumption of innocence.

6                  VENIRE PERSON:  Yes.

7                  MR. WESTFALL:  Everyone is presumed innocent

8        unless and until the government proves its case beyond a

9        reasonable doubt.

10                  VENIRE PERSON:  Yes.

11                  MR. WESTFALL:  How do you feel about those?  Do

12        you think it's fair?

13                  VENIRE PERSON:  It's fair.

14                  MR. WESTFALL:  The effect of that is decisions

18:00 15        by juries have to be based on what's going on in the court

16        and not on what's going on outside the court.

17                  VENIRE PERSON:  Yes.

18                  MR. WESTFALL:  Now, you answered one of your

19        questions that you didn't fill like a noncitizen should be

20        entitled to Constitutional protection.  Do you remember

21        that?

22                  VENIRE PERSON:  No.

23                  MR. WESTFALL:  I didn't know if maybe -- You

24        answered everything else exactly like you have talked

25        about.  That one was checked no.  Do you think it was

18:00   1    hastily done?

       2            VENIRE PERSON: I don't remember the question.

       3            MR. WESTFALL: Do you know that somebody even if

       4    they are not a citizen is entitled to the protection of

       5    United States laws if they are charged with crimes?

       6            VENIRE PERSON: Yes.

       7            MR. WESTFALL: How do you feel about that?

       8            VENIRE PERSON: It's fair. If the crime was

       9    done in the United States, no?

     10            MR. WESTFALL: Right.

     11            VENIRE PERSON: Yes.

     12            MR. WESTFALL: It couldn't be prosecuted in the

     13    United States if it was done somewhere else?

     14            VENIRE PERSON: Yes.

18:00 15            MR. WESTFALL: Yes, that is absolutely correct.

     16    Tell me about your work.

     17            VENIRE PERSON: I work as a researcher,

     18    scientist, in Radiology Department of UT Southwestern

     19    Medical Center.

     20            MR. WESTFALL: Do you work with a lot of people

     21    from other countries there?

     22            VENIRE PERSON: We have students, a lot of

     23    foreigners, many. Most of them are Indians and Chinese.

     24            MR. WESTFALL: And how do you like them?

     25            VENIRE PERSON: If they are good, I like this.

18:00  1    If they are not --

       2            MR. WESTFALL:  Well, if they are incompetent,

       3    they are just incompetent?

       4            ?

       5            VENIRE PERSON:  Yes.

       6            MR. WESTFALL:  Doesn't matter what race or

       7    nationality?

       8            VENIRE PERSON:  No.

       9            MR. WESTFALL:  And I have told you about the

      10    charges, and they actually have that word "terrorism" in

      11    it.  They are Muslims.  Can you render a verdict based on

      12    just the evidence in a case that involves some sort of

      13    allegations like that in a case?

      14            VENIRE PERSON:  Yes.

18:00 15            MR. WESTFALL:  Do you feel strongly about that?

      16            VENIRE PERSON:  Yes.

      17            MR. WESTFALL:  Why do you feel strongly about

      18    that?

      19            VENIRE PERSON:  I cannot judge any person unless

      20    the evidence is very clear.

      21            MR. WESTFALL:  You know the reasonable doubt

      22    standard is the highest standard in the law.  Do you think

      23    that's fair?

      24            VENIRE PERSON:  It's fair.

      25            MR. WESTFALL:  Well, I think I have asked you

18:00  1   all the questions I can ask you.  Thank you, your Honor.

       2              THE COURT:  Mr. Jacks, do you have questions for

       3   Dr. Constantinescu?

       4              MR. JACKS:  Good morning.

       5              VENIRE PERSON:  Good morning, yes.

       6              MR. JACKS:  Is it pronounced Constantinescu?

       7              VENIRE PERSON:  Yes good.  Very close.

       8              MR. JACKS:  My name is Jim Jacks.  I'm Assistant

       9   United States Attorney here in Dallas.  Just so that I may

      10   be clear, did both you and your husband immigrate to the

      11   United States from Romania?

      12              VENIRE PERSON:  Yes.

      13              MR. JACKS:  Same time?

      14              VENIRE PERSON:  Same time.  And the children.

18:00 15   Same year but not the same time.

      16              MR. JACKS:  Have you lived anywhere else in the

      17   United States?

      18              VENIRE PERSON:  Philadelphia for almost one

      19   year.

      20              MR. JACKS:  And the rest of that time has been

      21   in this area?

      22              VENIRE PERSON:  Yes.

      23              MR. JACKS:  You said your husband is a chemical

      24   engineer?

      25              VENIRE PERSON:  Yes.

18:00 1          MR. JACKS:  Is he retired?

2          VENIRE PERSON:  Yes.

3          MR. JACKS:  Who did he work for?

4          VENIRE PERSON:  City of Dallas, drinking water

5     treatment.

6          MR. JACKS:  And when did he retire?

7          VENIRE PERSON:  Last year, 2006.

8          MR. JACKS:  When did you become a citizen?

9          VENIRE PERSON:  We come here in 1985 and two

10     years after we were citizens.

11          MR. JACKS:  So 1987?

12          VENIRE PERSON:  Yes.

13          MR. JACKS:  Your children, have they been

14     naturalized as well?

18:00 15          VENIRE PERSON:  Yes.

16          MR. JACKS:  Have you worked at UT Southwestern

17     the entire time that you have been in Dallas?

18          VENIRE PERSON:  Absolutely.  Since 1985.

19          MR. JACKS:  You said that your work is in the

20     field of radiology.

21          VENIRE PERSON:  Yes, sir.  Mostly tumor

22     detection, cancer tumor detection.

23          MR. JACKS:  You said that you may identify or

24     refer to yourself as retired but you still work.

25          VENIRE PERSON:  Yes, part time.

18:00 1          MR. JACKS:  And how much?

2          VENIRE PERSON:  One day a week.

3          MR. JACKS:  How do you spend the rest of your

4     time?

5          VENIRE PERSON:  I am quite busy.  I have

6     children, grandchildren and great grandchildren.

7          MR. JACKS:  Do you travel very much anymore?

8          VENIRE PERSON:  Not too much but we do.  We go

9     to visit our family because we are only ourselves here,

10    and all the others are away.

11         MR. JACKS:  One of the defendants in this case I

12    believe the evidence will show at one time worked for the

13    City of Dallas.  His name is Mufid Abdulqader.

14         VENIRE PERSON:  I don't know that name.

18:00 15         MR. JACKS:  Is it possible that your husband had

16    any contact with him?

17         VENIRE PERSON:  It depends on where he was

18    located, his office, and what position he had.  My husband

19    was a professional in research.  He is a professional

20    engineer, and he was in research.

21         MR. JACKS:  You said your husband was in the

22    public works department?

23         VENIRE PERSON:  No, the drinking water.

24         MR. JACKS:  Did he work in Dallas City Hall?

25         VENIRE PERSON:  No.

18:00 1         MR. JACKS:  Where was his office?

2         VENIRE PERSON:  Sunnyvale.

3         MR. JACKS:  The Judge will tell the jury --

4 people that are ultimately chosen to be the jury, he would

5 tell them what the law is, and he would do that after all

6 the evidence is in.  After both sides have rested their

7 case, and I expect and anticipate that as part of his

8 instructions on the law regarding providing -- if a person

9 is accused of providing material support to a designated

10 terrorist group, I expect the judge will include in those

11 instructions an instruction that even if the support is in

12 the form of humanitarian aid -- in other words if it's

13 food or school supplies or medical equipment, soccer

14 balls, anything like that -- even if it's in that form,

18:00 15 that is still a violation of the law.  Do you have any

16 disagreement with that provision of the law?

17         VENIRE PERSON:  No.

18         MR. JACKS:  Could you follow that provision of

19 the law?

20         VENIRE PERSON:  Yes.

21         MR. JACKS:  You indicated that you had a

22 stepson.

23         VENIRE PERSON:  That I don't know actually.  I

24 know he did this, but I don't know him.

25         MR. JACKS:  And is what you wrote misdemeanor --

18:00 1    I'm sorry.  I couldn't read your handwriting.

2                  VENIRE PERSON:  I don't know what it was.  It

3    was a felony or misdemeanor.

4                  MR. JACKS:  Do you know what happened to him in

5    that regard?

6                  VENIRE PERSON:  No, because the Court has --

7                  MR. JACKS:  Still pending?

8                  VENIRE PERSON:  I think.

9                  MR. JACKS:  Is that here in Dallas?

10                 VENIRE PERSON:  No, in Nevada.

11                 MR. JACKS:  Is he a college student or --

12                 VENIRE PERSON:  No, no.  He worked in a store.

13                 MR. JACKS:  Is he grown and moved away from

14   home?

18:00 15               VENIRE PERSON:  Oh, yeah.  I don't know too

16   much.

17                 MR. JACKS:  That's all I have.

18                 THE COURT:  Dr. Constantinescu, you may rejoin

19   the others in the hall.  Thank you.

20                 Good morning, Ms. Simental.  Counsel for the

21   parties have some questions for you.  Ms. Moreno.

22                 MS. MORENO:  Thank you.  My name is Linda

23   Moreno, and I represent one of the gentlemen here in this

24   case.

25                 VENIRE PERSON:  Okay.

18:00 1          MS. MORENO:  You filled out your questionnaire

2  some months ago, do you remember that?

3          VENIRE PERSON:  Yes.

4          MS. MORENO:  And I'm wondering if between the

5  time you filled out your questionnaire then and today if

6  you have heard any media coverage about this case.  This

7  is a case that involved the Holy Land Foundation for

8  Relief and Development, and I want to know if you have

9  heard anything or read anything in the news about it.

10          VENIRE PERSON:  No.

11          MS. MORENO:  This is a case that involves an

12  American Muslim charity that the government contends

13  provided material support to a foreign terrorist

14  organization called HAMAS.  Does that ring any bells for

18:00 15  you?

16          VENIRE PERSON:  No, I'm sorry.

17          MS. MORENO:  Now that you know what the charges

18  are -- because you were aware of the charges when you

19  filled out the questionnaire, is that correct?

20          VENIRE PERSON:  Right.

21          MS. MORENO:  Now that you have heard the charges

22  in this case are terrorism related, is there anything I

23  have told you that causes you concern, that you think

24  might affect your ability to be fair in this case?

25          VENIRE PERSON:  (Shakes head)

18:00   1          MS. MORENO:  This is a criminal case, and in a

        2    case like this the government has the burden of proof, and

        3    they have to prove each charge in this case beyond every

        4    reasonable doubt.  Have you heard that concept before?

        5          VENIRE PERSON:  Yes.

        6          MS. MORENO:  Do you have any problems with that

        7    issue?

        8          VENIRE PERSON:  No.

        9          MS. MORENO:  In a terrorism case where the

        10   charges are so serious, do you think the government's

        11   burden of proof should be any less than?  Less than beyond

        12   every reasonable doubt?

        13         VENIRE PERSON:  No.  It should be that way.

        14         MS. MORENO:  So it doesn't matter that it's a

18:00   15   terrorism case or even a shoplifting case?

        16         VENIRE PERSON:  Right.

        17         MS. MORENO:  Do you feel if a case has come this

        18   far -- here we are assembled and talking to jurors -- that

        19   there might be a notion of where there is smoke there is

        20   fire?

        21         VENIRE PERSON:  I guess now I do.

        22         MS. MORENO:  Explain what those thoughts are?

        23         VENIRE PERSON:  I just don't know what it's all

        24   about.  I think it just has to be something serious.

        25         MS. MORENO:  And because you say something

18:00 1    serious, does that cause you any kind of concern in your

2    ability to sit as a juror if you are chosen?

3                VENIRE PERSON:  No.

4                MS. MORENO:  You don't have any issues or

5    problems with that?

6                VENIRE PERSON:  No.

7                MS. MORENO:  Do you know any Muslims?

8                VENIRE PERSON:  No.

9                MS. MORENO:  Never worked with any or known any?

10               VENIRE PERSON:  I work in a dentist's office.

11   So we see a lot of people, but no, individually as a

12   friend, no.

13               MS. MORENO:  And what do you do in the dentist's

14   office.

18:00 15               VENIRE PERSON:  Front office.

16               MS. MORENO:  Receptionist?

17               VENIRE PERSON:  In-take and insurance, right.

18               MS. MORENO:  Now, you are bilingual.  Is that

19   correct?

20               VENIRE PERSON:  Yes.

21               MS. MORENO:  Would you agree with me that he

22   when someone is translating one language to another that

23   the words can be translated correctly but the meaning is

24   not?

25               MR. JACKS:  Judge, I object to this question.

18:00 1    That doesn't go to this juror's qualifications to serve as

2    a juror.

3              THE COURT:  Overruled.  Go ahead, Ms. Moreno.

4              MS. MORENO:  You can answer.  When I said that

5    to you, what were you thinking?

6              VENIRE PERSON:  It's true.  I know in the

7    Spanish language you say something or translate and it's

8    not totally the same as you meant it to be and vice versa.

9              MS. MORENO:  And does that also vary from Cubans

10   Dominicans to Mexicans?  Would you agree?

11             VENIRE PERSON:  I would agree to that, yes.

12             MS. MORENO:  Now, in this case the government

13   alleges that the charity supported HAMAS, this terrorist

14   organization, by distributing humanitarian aid through

18:00 15   certain charities and committees in Palestine, in the West

16   Bank in Gaza.  That's what they allege.

17             My question is, if at the end of the case you

18   believe the government has shown that the Holy Land

19   Foundation distributed humanitarian aid in the form of

20   food, medicine, rebuilding of homes that were

21   demolished -- if that's what you learned in this case and

22   you were not convinced that that in any way supported a

23   foreign terrorist organization, could you vote not guilty?

24             VENIRE PERSON:  Yes.

25             MS. MORENO:  Thank you.

18:00   1                   THE COURT:  Mr. Jacks, do you have questions for

        2    Ms. Simental?

        3                   MR. JACKS:  Yes, your Honor.

        4                   Good morning, Ms. Simental.  Did I pronounce

        5    that right?

        6                   VENIRE PERSON:  Pretty close.

        7                   MR. JACKS:  My name is Jim Jacks and I'm an

        8    Assistant United States Attorney here in Dallas.  I too

        9    have follow-up questions from the questionnaire you filled

       10    out sometime ago.  We have also got another form that was

       11    provided to us by the Clerk.  One of the things that is

       12    not clear is what does your husband do?

       13                   VENIRE PERSON:  He works for Highlight as

       14    quality control.

18:00  15                   MR. JACKS:  What does Highlight do?

       16                   VENIRE PERSON:  Highlight does brake valves,

       17    automotive parts for Chrysler.  I don't know what other

       18    companies.  They do just brake valves.

       19                   MR. JACKS:  Is that a manufacturing facility?

       20                   VENIRE PERSON:  Yes.

       21                   MR. JACKS:  And how long have you worked for

       22    this dental office that you work in?

       23                   VENIRE PERSON:  Fourteen years.

       24                   MR. JACKS:  Is El Paso where you grew up?

       25                   VENIRE PERSON:  Yes.

18:00 1        MR. JACKS:  Have you lived anywhere other than

2     El Paso since you moved to Dallas?

3             VENIRE PERSON:  No.

4             MR. JACKS:  Is your husband from the Dallas area

5     or El Paso?

6             VENIRE PERSON:  No, he's from El Paso.

7             MR. JACKS:  Regarding the conflict that exists

8     between the State of Israeli and the Palestinians, have

9     you followed that at all?

10             VENIRE PERSON:  Normally, I don't watch a lot of

11    TV at all.  I go home, and there is other priorities I

12    need to take care of, and then I sit down.  My husband

13    will probably know, but not me.

14             MR. JACKS:  Do you mind if I ask you how long

18:00 15   your husband has worked for highlight?

16             VENIRE PERSON:  Fourteen years.

17             MR. JACKS:  And again, it wasn't clear to me.

18    Do you have any children or are they all away from home?

19             VENIRE PERSON:  No, I have my two girls at home.

20    They are twenty-five and one just went to Baylor

21    University.  Twenty-five and twenty-one.

22             MR. JACKS:  And is the younger one the one that

23    is at Baylor?

24             VENIRE PERSON:  Yes.

25             MR. JACKS:  Is the older one finished?

18:00 1        VENIRE PERSON:  Not yet.  She's attending UTD

2    Dallas.

3        MR. JACKS:  Kind of touching upon what defense

4    counsel mentioned to you, as she said, this case

5    essentially charges the Holy Land Foundation as well as

6    five of its directors or employees with conspiring to

7    provide material support to a designated foreign terrorist

8    organization, and that organization specifically is HAMAS.

9    Have you heard of that organization before?

10        VENIRE PERSON:  (Shakes head)

11        MR. JACKS:  You have not?

12        VENIRE PERSON:  (Shakes head)

13        MR. JACKS:  After all the evidence has been

14    presented, after both sides have had the chance to present

18:00 15 whatever witnesses or documents they want to present, the

16    Judge will tell the jury what the law is with regard to

17    this case.  He would tell you what the United States law

18    is about providing material support to a terrorist

19    organization.  Part of those instructions or part of that

20    explanation to you will include a statement or an

21    instruction that even humanitarian aid in the form --

22    which could be in the form of food or clothing, medical

23    supplies, school supplies, backpacks, anything like that.

24    Even material support of that nature, if it's provided to

25    or for the benefit of a foreign terrorist organization,

18:00 1    that's against the law. Do you understand that concept

2    and do you have any problem or disagreement with that?

3            VENIRE PERSON: No. I understand.

4            MR. JACKS: Do you believe that you could follow

5    that instruction if the Judge told you that?

6            VENIRE PERSON: Yes, sir.

7            MR. JACKS: Thank you, ma'am.

8            THE COURT: Thank you, Ms. Simental. You may

9    rejoin the others in the hall.

10           Good morning. Counsel for the parties have some

11    questions for you.

12           MR. WESTFALL: Good morning, I'm Greg

13    Westfall, Mr. Baccus.

14           VENIRE PERSON: Nice to meet you.

18:00 15          MR. WESTFALL: Nice to meet you. This is a

16    criminal case, as you know, and it's about a Muslim

17    foundation, Holy Land Foundation for Relief and

18    Development and accusations that the charity gave support

19    to a foreign terrorist organization called HAMAS. Does

20    that ring any bells with you?

21           VENIRE PERSON: I have heard it. I didn't

22    follow it.

23           MR. WESTFALL: Have you heard anything since you

24    filled out the questionnaire?

25           VENIRE PERSON: No.

18:00  1              MR. WESTFALL:  Based upon what you have heard,
       2     do you have any opinions?  What do you think?
       3              VENIRE PERSON:  Not really.  I heard it on the
       4     news a couple of years back that they arrested a couple of
       5     people, and that's about it.
       6              MR. WESTFALL:  Were you living in Oklahoma City?
       7              VENIRE PERSON:  I'm from Oklahoma City.
       8              MR. WESTFALL:  Were you living in Oklahoma City
       9     at the time of the Edward Murrow Building?
      10              VENIRE PERSON:  Yes, I was.  I was in high
      11     school.
      12              MR. WESTFALL:  How did that affect you?  How do
      13     you feel about that?
      14              VENIRE PERSON:  It was upsetting that it
18:00 15     happened in our home city and our home state.  I was
      16     sitting in high school English class actually, and you
      17     could feel the bomb when it went off.  We thought it was
      18     thunder and went outside, and it was a clear sky.
      19              MR. WESTFALL:  Ultimately we found out those
      20     were domestic guys that did that, but in the beginning
      21     there was a lot of speculation as to who it might have
      22     been.
      23              VENIRE PERSON:  Yes.
      24              MR. WESTFALL:  But that's deep experience,
      25     something that sticks with you.  And this case doesn't

18:00 1    involve anything like that, but the word "terrorism" is in

2    the charge.

3              VENIRE PERSON:  Yes.

4              MR. WESTFALL:  How do you feel about that?

5              VENIRE PERSON:  Well, whether it's a white

6    person or Middle Eastern, terrorism is terrorism in my

7    eyes.

8              MR. WESTFALL:  In this case the ultimate

9    decision is going to be whether charitable contributions

10   that were sent over to Palestine -- whether those gave

11   material support to HAMAS.

12             VENIRE PERSON:  Okay.

13             MR. WESTFALL:  How do you feel about being on a

14   jury where we're looking at issues of supporting of a

18:00 15   terrorist organization?  How does that strike you?  How

16   does it move you?

17             VENIRE PERSON:  Well, it's upsetting one way or

18   the other when you look at it because of what happened on

19   9-11 and the worldwide terrorism we have been looking at,

20   whether it's over there or whether it's here.  I think I

21   could make a good decision, looking at all the evidence,

22   of being guilty or not guilty.

23             MR. WESTFALL:  But in a criminal case, the

24   ultimate decision, as you say, of guilty or not guilty has

25   to be made on the evidence that comes off of this witness

18:00 1    stand or is admitted in evidence.

2              VENIRE PERSON:  Yes, sir.

3              MR. WESTFALL:  It can't be made on experiences

4    that we have had.

5              VENIRE PERSON:  Yes.

6              MR. WESTFALL:  And people that we know and have

7    liked or don't like.  And your experience in Oklahoma, is

8    that something you think would interfere with your ability

9    to render a verdict in this case just based upon the

10   evidence?

11             VENIRE PERSON:  No.

12             MR. WESTFALL:  Do you know any Muslims?

13             VENIRE PERSON:  I do know one, a friend of a

14   friend.

18:00 15            MR. WESTFALL:  A friend of a friend?

16             VENIRE PERSON:  Yes.

17             MR. WESTFALL:  Have you had much contact with

18   him?

19             VENIRE PERSON:  No, not lately.

20             MR. WESTFALL:  What do you think of him?

21             VENIRE PERSON:  He's a real good guy.  We have

22   gone out and played golf a couple of times.

23             MR. WESTFALL:  And you knew he was Muslim.  Was

24   he religious?

25             VENIRE PERSON:  We really didn't discuss it.  He

18:00 1    was a friend of a fraternity brother of mine and a friend

2    of my wife's friend, and I'll see him from time to time.

3    I think he's in Kansas City now.

4              MR. WESTFALL:  What fraternity were you in?

5              VENIRE PERSON:  Sigma which is Sigma Phi

6    Epsilon.

7              MR. WESTFALL:  Right.  Where do you work now?

8              VENIRE PERSON:  I'm an insurance agent.

9              MR. WESTFALL:  Independent?

10             VENIRE PERSON:  Well, I work for State Farm, but

11   it's independently owned and operated.

12             MR. WESTFALL:  And where do you live?

13             VENIRE PERSON:  Plano.

14             MR. WESTFALL:  So you live --

18:00 15            VENIRE PERSON:  In Addison and commute to Plano.

16             MR. WESTFALL:  And you have an eighteen-month

17   old son?

18             VENIRE PERSON:  I do.

19             MR. WESTFALL:  Congratulations.  The issue of

20   child care, you know this trial could go on for months.

21   Is there anything about your and your wife's -- Does she

22   work outside the home?

23             VENIRE PERSON:  No, she does not.

24             MR. WESTFALL:  You have no child care issues.

25   You don't have to run back and forth to day care and stuff

18:00 1    like that?

2          VENIRE PERSON:  I do not.

3          MR. WESTFALL:  Thank you.  We'll tender the

4    juror.  Thank you.

5          THE COURT:  Mr. Jacks, do you have questions for

6    Mr. Baccus?

7          MR. JACKS:  Just briefly, your Honor.

8          Good morning, Mr. Baccus.

9          VENIRE PERSON:  Good morning.

10         MR. JACKS:  My name is Jim Jacks, and I'm an

11   Assistant United States Attorney here in Dallas.

12         VENIRE PERSON:  Very nice to meet you, Mr.

13   Jacks.

14         MR. JACKS:  You have been in Dallas for seven

18:00 15   years; is that correct?

16         VENIRE PERSON:  That's correct.

17         MR. JACKS:  Following graduation from college?

18         VENIRE PERSON:  That's correct.

19         MR. JACKS:  Have you worked in the insurance

20   industry that entire time?

21         VENIRE PERSON:  I have.

22         MR. JACKS:  The same agency?

23         VENIRE PERSON:  Yes, I was an employee of State

24   Farm Insurance for about four years and then became an

25   independent agent for them.

18:00   1             MR. JACKS: Has your wife worked outside the

       2    home?

       3             VENIRE PERSON: She has.

       4             MR. JACKS: What type of profession did she

       5    have?

       6             VENIRE PERSON: She was a teacher for a year in

       7    Carrollton-Farmer's Branch school system, and then she

       8    worked for a lady out of her house for about a year, and

       9    basically they would contract work with Neiman Marcus and

     10    a couple of other companies, but basically they would buy

     11    gifts and accessories overseas, like China, and import

     12    them and sell them to Neiman Marcus and companies like

     13    that, and she did that for about six months to a year and

     14    got pregnant, and we had our son and she's been at home

18:00 15    ever since.

     16             MR. JACKS: When she was teaching, what grade or

     17    level did she teach?

     18             VENIRE PERSON: Special education.

     19             MR. JACKS: Several levels or elementary?

     20             VENIRE PERSON: It was for three and four year

     21    olds.

     22             MR. JACKS: One of the -- You have not been on a

     23    jury before; is that correct?

     24             VENIRE PERSON: That's correct. First time I

     25    have ever been called.

18:00  1          MR. JACKS:  One of the things that I want to ask

       2    you was at the end of the evidence after both sides have

       3    presented whatever witnesses or documents they intend to

       4    present, the Judge will read what's known as the Court's

       5    charge to the jury which basically contains the law that

       6    the jury is supposed to apply to the facts.

       7          VENIRE PERSON:  Okay.

       8          MR. JACKS:  And he would explain to you the law

       9    as it relates to all the charges in the indictment.  With

      10    respect to the law in the United States prohibiting

      11    persons from providing material support to a foreign

      12    terrorist organization, I anticipate that he would tell

      13    you that a part of that law is even if the support,

      14    whatever it may be -- if it's money or whatever, even if

18:00 15    the support is in the form of food, clothing, what might

      16    be called humanitarian aid, backpacks, soccer balls,

      17    materials for a hospital -- if it is for the benefit or

      18    use of a foreign terrorist organization it's still against

      19    the law.  Do you have any problem if that instruction is

      20    given to you or do you have any disagreement with that

      21    provision of the law?

      22          VENIRE PERSON:  No, I don't.

      23          MR. JACKS:  Thank you.

      24          THE COURT:  Thank you, Mr. Baccus.  You may

      25    rejoin the others in the hall.

18:00 1         Good morning, Mr. Maddox.  Counsel for the

2     parties have some questions for you?

3             VENIRE PERSON:  Yes.

4             THE COURT:  Mr. Westfall.

5             MR. WESTFALL:  Mr. Maddox, good morning.  I'll

6     Greg Westfall.  I'm one of the attorneys for the defense

7     in this case.  This case is the Holy Land Foundation, the

8     U.S. Government versus the Holy Land Foundation for Relief

9     and Development.  It involves a Muslim charity accused of

10    material support of a foreign terrorist organization,

11    specifically HAMAS.

12            Does that ring any bells?  Have you heard about

13    the case?

14            VENIRE PERSON:  Yes, sir.

18:00 15        MR. WESTFALL:  What have you heard?

16            VENIRE PERSON:  That one of the defendants has

17    been found guilty of supporting Syria and another country

18    and perhaps having supported HAMAS before.

19            MR. WESTFALL:  Right.

20            VENIRE PERSON:  It's an important yet difficult

21    case for the government.

22            MR. WESTFALL:  What's your opinion?

23            VENIRE PERSON:  I don't know that I have much of

24    one at this point.

25            MR. WESTFALL:  Is there anything about what you

18:00 1    said that would -- a criminal trial is supposed to be

2    ideally decided on the evidence from the courtroom.  Is

3    there anything you have seen or heard that would make it

4    difficult for you to do that?

5                VENIRE PERSON:  No, sir.

6                MR. WESTFALL:  Tell me about international

7    politics.  That was your degree?

8                VENIRE PERSON:  Yes.

9                MR. WESTFALL:  Was that MBA?

10               VENIRE PERSON:  No.  My undergraduate degree is

11   in international politics.  I went to Georgetown.  And

12   it's still something I enjoy, still do.

13               MR. WESTFALL:  Georgetown has a lot of political

14   programs?

18:00 15               VENIRE PERSON:  Yes.

16               MR. WESTFALL:  Were you a helicopter pilot in

17   Vietnam?

18               VENIRE PERSON:  I was.

19               MR. WESTFALL:  How many tours did you do?

20               VENIRE PERSON:  Just one right at the end.

21               MR. WESTFALL:  And you have traveled extensively

22   in the Middle East?

23               VENIRE PERSON:  Yes, sir.

24               MR. WESTFALL:  And do you know many Muslim

25   people?

18:00 1                    VENIRE PERSON:  Yes.

2                    MR. WESTFALL:  And how is your relationship with

3      them?

4                    VENIRE PERSON:  Well, I worked in the Middle

5      East about twenty years.

6                    MR. WESTFALL:  Where did you work?

7                    VENIRE PERSON:  United Emirates, Oman, Jordan,

8      Egypt, a little bit across North Africa.

9                    MR. WESTFALL:  What were you doing with them?

10                    VENIRE PERSON:  Working helicopter programs,

11      selling helicopters.

12                    MR. WESTFALL:  So you actually negotiated with a

13      lot of Muslims?

14                    VENIRE PERSON:  Quite a number.

18:00 15                    MR. WESTFALL:  How were your experiences with

16      them?

17                    VENIRE PERSON:  I enjoyed it.  I sort of grew up

18      in the Middle East in terms of that's where my career took

19      off in the early eighties, and I ended up working a lot in

20      Iraq, and we had good relations with them for a while in

21      the eighties and even Iran for a little bit.

22                    MR. WESTFALL:  Do you still keep up with any of

23      the people that you worked with over there?

24                    VENIRE PERSON:  Somewhat.  Our representatives

25      are dealers that helped to put together some of the

18:00  1    programs.  I see them almost on an annual basis.

       2              MR. WESTFALL:  Where do you see them?  Over

       3    there or here?

       4              VENIRE PERSON:  Mostly here.

       5              MR. WESTFALL:  What do you do over here that

       6    brings you in contact with them?

       7              VENIRE PERSON:  Well, I don't deal with them

       8    much.  I have something called key accounts which is for

       9    the most part U.S. Government, U.S. and Canadian

      10    operators, some of the largest ones we have.

      11              MR. WESTFALL:  While you were living there for

      12    so long, did you pick up any of the language?

      13              VENIRE PERSON:  I didn't live there.  I know a

      14    few words, but by no means fluent.

18:00 15              MR. WESTFALL:  You said in your questionnaire

      16    that you followed the Israeli-Palestinian conflict very

      17    closely.

      18              VENIRE PERSON:  Yes, sir.

      19              MR. WESTFALL:  But you didn't put any comment

      20    about that.  Could you give us a little more information?

      21    What do you mean you followed them very closely?

      22              VENIRE PERSON:  Well, I read about it.  Whenever

      23    it's in the paper.  Periodicals.  I read books about it.

      24    I enjoy politics.  I enjoy history.

      25              MR. WESTFALL:  Do you have an opinion as to

18:00  1    which side is right and which side a wrong?

       2            VENIRE PERSON:  I wouldn't go so far as to say

       3    that there is a right and wrong side overall.  There is

       4    certain elements to both sides that have strength as

       5    opposed to countervailing positions.

       6            MR. WESTFALL:  Like what?

       7            VENIRE PERSON:  You are asking for my specific

       8    opinions on various issues.  I think Americans --

       9    America's ties to particularly the religious right in

      10    America and the way that has brought out support for the

      11    Israelis is perhaps not in our best interest.  I think

      12    that we need to take a somewhat broader view as to what

      13    has happened in the Middle East, the difficulties that

      14    have been brought about by our support of the State of

18:00 15    Israeli.

      16            On the other hand, I don't know that most of the

      17    Arab -- or not Arab but Islamic states have really covered

      18    themselves in glory in terms of setting up stable, viable

      19    governments that allowed people to flourish and do well,

      20    and that in itself is a major cause of discontent in the

      21    Islamic world.

      22            MR. WESTFALL:  You have given this a lot of

      23    thought.

      24            VENIRE PERSON:  A little bit.

      25            MR. WESTFALL:  In a criminal trial now, of

18:00  1    course you will be -- you know the protections that apply,

2    not to testify if you don't want to testify, if you are

3    charged.  The government has to prove its case beyond a

4    reasonable doubt and the presumption of innocence.  And

5    the juror -- Those are the rules that we have to live by

6    if we're going to be on the jury.

7              VENIRE PERSON:  Right.

8              MR. WESTFALL:  Anything about any of your

9    experiences that would keep you, do you think, from making

10   the government prove its case beyond a reasonable doubt?

11             VENIRE PERSON:  No, sir.

12             MR. WESTFALL:  Do you think it's a fair burden

13   even in a terrorism case?

14             THE COURT:  Mr. Westfall, your time has expired.

18:00 15             Mr. Jacks, do you have questions for Mr. Maddox?

16             MR. WESTFALL:  Good morning.  My name is Jim

17   Jacks.  I'm an Assistant United States Attorney here in

18   Dallas.  I want to follow-up on some of the information

19   you put in the questionnaire and also some of the

20   questions that defense counsel asked you.

21             Just as an aside you indicate that your wife

22   works in sales.

23             VENIRE PERSON:  Yes, sir.

24             MR. JACKS:  What type of sales work does she do?

25             VENIRE PERSON:  She sells business development

18:00 1    services to automobile dealerships.

2                MR. JACKS:  Does she work for another company or

3        have her own company?

4                VENIRE PERSON:  She works for another company.

5                MR. JACKS:  And you have a daughter that is

6        either graduating from high school or graduated?

7                VENIRE PERSON:  She graduated.  She goes off to

8        school this fall.

9                MR. JACKS:  And you still are with Bell

10       Helicopter?

11               VENIRE PERSON:  Yes.

12               MR. JACKS:  Involved in sales?

13               VENIRE PERSON:  Yes.

14               MR. JACKS:  Is that a fair layman's description

18:00 15   of what your job is?

16               VENIRE PERSON:  Yes, sir.

17               MR. JACKS:  Do you still travel quite a bit?

18               VENIRE PERSON:  Somewhat.  Not as much as I used

19       to but a fair amount.

20               MR. JACKS:  Does that include going through the

21       Middle East?

22               VENIRE PERSON:  No so much the Middle East now.

23       More Europe.  I may have one trip planned to the Middle

24       East this fall.

25               MR. JACKS:  In your job have you ever had to

18:00 1    receive a security clearance?

2              VENIRE PERSON:  Yes, sir.

3              MR. JACKS:  Do you still have a security

4    clearance?

5              VENIRE PERSON:  Yes, sir.

6              MR. JACKS:  You said you attended Georgetown.

7              VENIRE PERSON:  Yes, sir.

8              MR. JACKS:  Was that for your undergraduate

9    degree?

10             VENIRE PERSON:  Yes, sir.

11             MR. JACKS:  Where did you receive your masters?

12             VENIRE PERSON:  At Wake Forest in North

13   Carolina.

14             MR. JACKS:  How long were you in the Army, Mr.

18:00 15  Maddox?

16             VENIRE PERSON:  Four and a half years on active

17   duty, and then when I got out to go to college, I was in

18   army guard for three years.

19             MR. JACKS:  With regard to your views and

20   knowledge of the situation in the Middle East, would you

21   say it's certainly above average as far as most people are

22   concerned?

23             VENIRE PERSON:  Perhaps.

24             MR. JACKS:  One of the things that will happen

25   is after all the evidence has been presented by both

18:00  1    sides -- and I'm sure you having been on a jury know that

       2    at the end of the case the court reads its instructions,

       3    several pages, which is essentially the law as it applies

       4    to the charges and that the jury is supposed to apply to

       5    the facts.  I expect that the Judge will tell you what the

       6    federal statutes are as they relate to providing material

       7    support to a designated foreign terrorist organization.  I

       8    also expect that as a part of those instructions or law he

       9    would tell the jury that even if the material support is

      10    in the form of so called humanitarian aid -- books,

      11    backpacks, food, construction materials, medical supplies,

      12    soccer balls, supplies for a hospital or a mosque, that

      13    even if it is in that form, if it is for the benefit of a

      14    foreign terrorist organization that's prohibited by law.

18:00 15    Would you be able to follow that instruction or do you

      16    have any disagreement with that instruction?

      17             VENIRE PERSON:  No, sir.

      18             MR. JACKS:  So no, you don't have any

      19    disagreement and you could follow that instruction?

      20             VENIRE PERSON:  That's correct.

      21             MR. JACKS:  Defense counsel asked you to kind of

      22    expound on your beliefs about the Palestinian and Israeli

      23    conflict.  You made a comment -- And if I'm misstating it,

      24    tell me -- that there is responsibility on both sides.

      25             VENIRE PERSON:  Yes, sir.

18:00  1              MR. JACKS:  If the government called witnesses
       2    who were from the State of Israel, would you be able to
       3    judge their testimony -- Is there anything about your
       4    views about the situation that would prohibit you from
       5    evaluating their testimony fairly and impartially?
       6              VENIRE PERSON:  No, sir.
       7              MR. JACKS:  Would you evaluate it to determine
       8    if it made common sense or comported with the evidence
       9    that was presented in the case?
      10              VENIRE PERSON:  I could certainly do that.
      11              MR. JACKS:  I may have made that question a
      12    little bit confusing, but I understand your answer.  Just
      13    one moment, if I may.  That's all I have.  Thank you, your
      14    Honor.  Thank you, sir.
18:00 15              THE COURT:  Thank you, Mr. Maddox.  You may
      16    rejoin the others in the hall.
      17              THE COURT:  Good morning, Ms. Smith.  Counsel
      18    for the parties have some questions for you.  Ms. Moreno.
      19              MS. MORENO:  Thank you, your Honor.
      20              Good morning.  My name is Linda Moreno, and I
      21    represent one of the gentlemen.  I'm a defense attorney.
      22    Do you remember filling out that questionnaire a few
      23    months ago?
      24              VENIRE PERSON:  Yes.
      25              MS. MORENO:  This is a criminal case that

18:00 1    involves accusations against an American Muslim charity,

2          the Holy Land Foundation.

3                    VENIRE PERSON:  Yes.

4                    MS. MORENO:  Now, just saying that, have you

5          heard anything about the Holy Land Foundation either on

6          the radio or seen anything in TV or read anything in the

7          newspapers?

8                    VENIRE PERSON:  Yes, ma'am.

9                    MS. MORENO:  Why don't you tell us what you

10         heard, read or saw?

11                   VENIRE PERSON:  What I remember is they was

12         using charitable money for illegal things that they wasn't

13         supposed to.

14                   MS. MORENO:  Is that something you read, Ms.

18:00 15   Smith?

16                   VENIRE PERSON:  I heard it on the TV.

17                   MS. MORENO:  And is that something you heard

18         just in the last few days or months ago?  What is your

19         best recollection about that?

20                   VENIRE PERSON:  I think both if I remember.  You

21         know several months ago and seems like I have heard

22         something recently.

23                   MS. MORENO:  And because of what you heard in

24         the newspapers -- on the TV or what you read in the

25         newspapers, have you already formed an opinion about what

18:00 1 might be going on in this case?

2 VENIRE PERSON: Not for sure, you know, what you

3 are asking me.

4 MS. MORENO: You know, sometimes you read

5 articles about cases or you hear about them on TV, and you

6 come away from it thinking, you know, I think there is a

7 problem there, I think these guys might be guilty or I

8 think the government is all wrong. That's what I'm

9 getting at. Do you have any impressions or have you

10 formed any opinions based on what you have seen or heard

11 thus far?

12 VENIRE PERSON: Not really. I don't know how to

13 answer that.

14 MS. MORENO: Well, there is no right and no

18:00 15 wrong answer. What we're trying to do is to find jurors

16 who have no preconceptions or prejudices or biases. It's

17 difficult to have that. We all have biases and

18 prejudices, and that's okay. So we're trying to get

19 honest answer here. There is nothing wrong with having

20 those ideas or preconceptions. Having said that, and

21 forgive me for exploring and pushing you --

22 VENIRE PERSON: No, that's fine.

23 MS. MORENO: It's very important that we find

24 this out. Have you made up your mind or do you have any

25 opinions about this case so far?

18:00 1          VENIRE PERSON:  I'd say no.  You know one way or

2      the other.

3          MS. MORENO:  You think you need to know more?

4          VENIRE PERSON:  Yes.  I mean, you know -- There

5      is right and wrong, and you know -- but other than that I

6      couldn't say.

7          MS. MORENO:  Now, this is a case that involves

8      charges of terrorism.

9          VENIRE PERSON:  Okay.

10          MS. MORENO:  The government alleges that Holy

11      Land Foundation materially supported a terrorist

12      organization named HAMAS.  Have you ever heard of HAMAS?

13          VENIRE PERSON:  I have heard of it.

14          MS. MORENO:  And the government alleges that

18:00 15      this charity organization supported HAMAS by distributing

16      humanitarian aid through other charities and somehow that

17      benefited HAMAS.  That's what they say.  Now, this

18      humanitarian aid was in the form of books, medicine, food,

19      the rebuilding of homes.  If the government at the end of

20      its case does not prove beyond a reasonable doubt that the

21      Holy Land Foundation and the gentlemen charged supported

22      HAMAS, would you have a problem returning a verdict of not

23      guilty?

24          VENIRE PERSON:  That's hard to say.

25          MS. MORENO:  Tell me why that's hard to say.

18:00 1         VENIRE PERSON:  I guess the way things are now,

2   you know.

3         MS. MORENO:  Yes, ma'am.

4         VENIRE PERSON:  I had a daughter-in-law in the

5   army and a son and just different ways.  I can't say I'm

6   going to find them guilty, but I'm not going to say I

7   could find them not guilty.

8         MS. MORENO:  You mentioned your daughter-in-law

9   in the army.  Was she stationed in Iraq?

10         ?

11         VENIRE PERSON:  Yes.  And I had a son-in-law

12   that was in the army, too.

13         MS. MORENO:  Where was he?

14         VENIRE PERSON:  Like Bosnia and Italy and

18:00 15   different places like that.

16         MS. MORENO:  Given your family's history and

17   their fine service for our country in these places like

18   Iraq, Bosnia I think you said --

19         VENIRE PERSON:  Yes.

20         MS. MORENO:  -- does that give you some

21   hesitation that you couldn't promise these gentlemen to be

22   completely fair in evaluating the evidence?

23         VENIRE PERSON:  To a point, yes.

24         MS. MORENO:  Thank you for your honesty.  Can

25   you tell us a little bit more about that?  When you say to

18:00 1    a point --

2              VENIRE PERSON:  I can't just come and say well

3    what they did was right or what they did was wrong.  But

4    to me, you know, it's human beings.  I can't see things

5    like that.  I have seen too much stuff in my life to

6    know -- the harm that different things can do and people

7    can say I didn't do this or I did this.  It's just talk,

8    and I'm having a hard time up here.

9              MS. MORENO:  We all appreciate how difficult

10   this is.  Let me ask you a couple more questions on this

11   issue.  These gentlemen are presumed innocent.  You have

12   heard the presumption of innocence.  Being American you

13   have grown up with this.

14             VENIRE PERSON:  Yes.

18:00 15            MS. MORENO:  But that means you can't have any

16   emotional reservations.  You have to have no emotional

17   reservations starting this case.  Can you tell us that you

18   can absolutely and honestly afford these gentlemen the

19   presumption of innocence or would that be something you

20   cannot do?

21             VENIRE PERSON:  At this point I could not do

22   that.

23             MS. MORENO:  Thank you so much.  Pass the juror.

24             THE COURT:  Mr. Jacks, do you have questions for

25   Ms. Smith?

18:00 1          MR. JACKS:  Yes, sir.  Ms. Smith, good morning.

2          VENIRE PERSON: Good morning.

3          MR. JACKS:  My name is Jim Jacks, and I'm an

4   Assistant United States Attorney here in Dallas.  Thank

5   you for being here, and I, too, want to ask you some

6   questions regarding the answers that you have given on

7   your questionnaire and to defense counsel.  Let me ask you

8   generally your husband -- you have listed his occupation

9   as instrument technician.

10          VENIRE PERSON:  Yes.

11          MR. JACKS:  Who does he work for?

12          VENIRE PERSON:  He retired from the City of

13   Dallas Water Department.

14          MR. JACKS:  And where did he work?

18:00 15          VENIRE PERSON:  Sunnyvale in water purification.

16          MR. JACKS:  Do you know if he would have known

17   an engineer in that office by the name of Mr.

18   Constantinescu?

19          VENIRE PERSON:  I have no idea.

20          MR. JACKS:  You have never heard that name?

21          VENIRE PERSON:  No.  I'm not saying he didn't.

22   I don't know.

23          MR. JACKS:  How long has he been retired?

24          VENIRE PERSON:  Five years.

25          MR. JACKS:  And have you worked outside the

18:00 1    home?

2                    VENIRE PERSON:  Yes.

3                    MR. JACKS:  What type of work did you do when

4          you worked outside the home?

5                    VENIRE PERSON:  In graphic arts, printing,

6          making yearbooks.

7                    MR. JACKS:  And how long did you do that?

8                    VENIRE PERSON:  Seventeen years.

9                    MR. JACKS:  And where was that?  What company?

10                    VENIRE PERSON:  Publishing in Dallas.

11                    MR. JACKS:  Have you always lived in Kaufman for

12          the most part?

13                    VENIRE PERSON:  Fourteen years and we lived in

14          Mesquite before.

18:00 15                    MR. JACKS:  Let me back up and talk to you a

16          little bit about some of the things that Ms. Moreno was

17          asking you.  You said you heard about this case in

18          either -- on the radio or in the newspapers.  Is that

19          right?

20                    VENIRE PERSON:  Yes.

21                    MR. JACKS:  Anything about that that made you

22          form an opinion about whether these individuals were

23          guilty or not guilty.

24                    ?

25                    VENIRE PERSON:  I couldn't say if I found them

18:00 1    guilty, but when I heard it I thought that's not right.

2    You know --

3                    MR. JACKS:  Is it fair to say that what you are

4    saying is that if these people did this, that's not right?

5                    VENIRE PERSON:  Yes.

6                    MR. JACKS:  Let me make a point to you.  There

7    is nothing in the law that says the people that serve on

8    juries have to have been living in a cave and totally cut

9    off from everything around the world that goes on around

10   them.  Do you understand that?

11                   VENIRE PERSON:  Yes.

12                   MR. JACKS:  The issue I believe, as it will be

13   explained to you or put to you, is regardless of whatever

14   you may have heard or seen can you put that aside and be a

18:00 15   fair and impartial juror in this case.  Listen to the

16   evidence, and if the government proves the charges beyond

17   a reasonable doubt find a person guilty.  If the

18   government does not prove the charges beyond a reasonable

19   doubt, find that person not guilty.  Can you do that?

20                   VENIRE PERSON:  I think so, yes.

21                   MR. JACKS:  Well, somebody may push you and say

22   you think so, but we need to know for sure.  When you say

23   I think so, is there anything that would prevent you from

24   being a fair and impartial juror as you sit here today?

25   You haven't heard any evidence today.

18:00   1          VENIRE PERSON:  No, I make my own decisions.

2          MR. JACKS:  And if the government does not prove

3   its case beyond a reasonable doubt, can you return a

4   verdict of not guilty?

5          VENIRE PERSON:  Yes.

6          MR. JACKS:  Now, earlier you answered a question

7   regarding the presumption of innocence.  Do you believe in

8   the presumption of innocence?

9          VENIRE PERSON:  That.

10         MR. JACKS:  That when a person is charged with a

11   crime all they have to do is show up in court and it's --

12   the burden is on the government to prove that they are

13   guilty.  Do you believe in that and agree with that?

14         MS. MORENO:  Objection, your Honor, misstates

18:00 15   the law as to what presumption of innocence is.

16         THE COURT:  I don't know that I agree it

17   misstates the law.  It's perhaps an incomplete statement

18   of law.  The presumption of innocence, Ms. Smith, is that

19   when a person is charged with a crime he is presumed to be

20   innocent unless and until the jury unanimously is

21   satisfied that he has been proven guilty beyond a

22   reasonable doubt.

23         VENIRE PERSON:  Yes, sir.

24         THE COURT:  So with that explanation, I think

25   the question Mr. Jacks wanted to pose to you is do you

18:00 1   agree with that concept and can you apply it in this case.

2            VENIRE PERSON:  Yes.

3            MR. JACKS:  Even if the case is about charges

4   that people are accused of providing material support to a

5   terrorist group, even in that type of case, would you

6   abide by the presumption of innocence and provide these

7   gentlemen over here that presumption in this case?

8            VENIRE PERSON:  If they prove they are not

9   guilty, yes.

10           MR. JACKS:  You understand they are not required

11   to prove anything?

12           VENIRE PERSON:  I'm saying if it's proven to

13   me -- Yes, they are not guilty until they are proven to be

14   guilty.  That's the question you asked?

18:00 15           MR. JACKS:  Yes, ma'am.

16           VENIRE PERSON:  Yes.

17           MR. JACKS:  So you will look at the evidence and

18   make a decision on your own based upon the evidence; is

19   that what you are saying?

20           VENIRE PERSON:  Yes.

21           MR. JACKS:  Even though you don't like

22   terrorism -- and I don't expect anybody to come in and say

23   I like terrorism.  But even though you do not like the

24   fact that there might have been terrorism committed or

25   support for terrorism, you do not approve of that type of

18:00 1    conduct.  Is that what you are saying?

2              VENIRE PERSON:  See, I'm confused now.

3              MR. JACKS:  I'm sorry.

4              VENIRE PERSON:  They are innocent until they are

5    proven.  I do not say, well, they are a terrorist.  I'm

6    not going to say well they are terrorists.

7              MR. JACKS:  You are not going to prejudge them?

8              VENIRE PERSON:  No.

9              MR. JACKS:  Well, okay.  And even though the

10   charges in this case as opposed to being a robbery charge

11   or an income tax evasion charge, the fact that this charge

12   involves providing material support to terrorism, will you

13   still give that presumption of innocence to the defendants

14   and make the government prove its case beyond a reasonable

18:00 15   doubt?

16             VENIRE PERSON:  Yes, sir.

17             THE COURT:  Mr. Jacks, your time has expired.

18             Thank you, Ms. Smith.  You may rejoin the others

19   in the hall.

20             MS. MORENO:  If I may, your Honor.  At this

21   point, we would enter a cause challenge against Ms. Smith.

22   What she said was -- I think clearly when I was

23   questioning her -- although it was difficult for her to

24   admit to it that she could not afford the presumption of

25   innocence.  And she gave reasons why.  Her family members

18:00 1    apparently were in Bosnia and Iraq, and this would be very

2    difficult for her, and when Mr. Jacks tried to

3    rehabilitate her, the juror clearly showed confusion about

4    what she understood the presumption of innocence to be,

5    and then she added another burden on the defense which was

6    that the defense had to prove themselves not guilty.  I

7    think the defense would ask the Court to err on the side

8    of caution, if at all, and excuse this juror for cause.

9         THE COURT:  Mr. Jacks, do you oppose that

10    challenge?

11         MR. JACKS:  Your Honor, I think she indicated

12    that she would be fair and impartial and that she had not

13    made up her mind.  Part of her I think confusion was by

14    the way the questions were put to her, and we don't

18:00 15    believe that she has shown herself -- that she should be

16    excused for cause.

17         THE COURT:  I will take this one under

18    advisement, as I did the earlier one for Ms. Pritchard.

19         MS. HOLLANDER:  Your Honor, would it be possible

20    for the jurors to sit on the back row?  We can't see them.

21         THE COURT:  We will try that.  That may create a

22    problem for the ones that are soft spoken, but we'll try

23    it.

24         MS. HOLLANDER:  Thank you.

25         THE COURT:  I think we're ready to see Ms. Pena

18:00 1    next.  Good morning, Ms. Pena.  Counsel for the parties

2    have some questions for you.

3                VENIRE PERSON:  Yes, sir.

4                THE COURT:  Mr. Westfall.

5                MR. WESTFALL:  Yes, your Honor, thank you.  Ms.

6    Pena, how are you doing?

7                VENIRE PERSON:  Fine, how are you?

8                MR. WESTFALL:  My name is Greg Westfall, and I'm

9    a criminal defense lawyer, and I'm one of the lawyers on

10    this criminal case which is the United States versus Holy

11    Land Foundation.  This is a case that is -- involves

12    allegations by the government that the Holy Land

13    Foundation which is a Muslim charity was giving material

14    support to a foreign terrorist organization, specifically

18:00 15    HAMAS.  Hearing that, does that ring any bells with you?

16                VENIRE PERSON:  Well, I probably only heard that

17    it was starting today, the jury for that.  That's it.

18                MR. WESTFALL:  Where do you think you heard

19    that?

20                VENIRE PERSON:  I heard it on the radio this

21    morning when I was coming into the train.

22                MR. WESTFALL:  To the train station?

23                ?

24                VENIRE PERSON:  Yes, my husband's radio that was

25    on going to the train station I heard the jury would start

18:00   1    today.  That's all I heard.

        2                MR. WESTFALL:  What station do you listen to?

        3                VENIRE PERSON:  Like a classic rock station.

        4                MR. WESTFALL:  When you heard it did you think,

        5    oh, that's the case I'm going to?

        6                VENIRE PERSON:  They said four- to five-month

        7    duration for the Court to start and begin.  That's why I

        8    put it together.

        9                MR. WESTFALL:  Right.  Well, you know on that

       10    four- or five-month deal, you had expressed in your

       11    questionnaire that you have issues with migraine

       12    headaches.

       13                VENIRE PERSON:  Yes, sir.

       14                MR. WESTFALL:  And I guess also asthma?

18:00  15                VENIRE PERSON:  Yes, sir.

       16                MR. WESTFALL:  And you are taking certain

       17    medication?

       18                VENIRE PERSON:  Yes, sir.

       19                MR. WESTFALL:  And your jury service may be

       20    difficult because of that.  Could you please tell us --

       21                VENIRE PERSON:  You want me to elaborate on

       22    that?

       23                MR. WESTFALL:  Yes, because if your jury service

       24    is difficult, that's something we definitely need to talk

       25    about.

18:00 1      VENIRE PERSON:  I personally don't think it

2      would affect it, but I didn't want it to be out there.  I

3      know I had to disclose everything, but regarding my

4      migraine headache I take Ibuprofen, and I'm fine, and I do

5      have something for the asthma which is a preventative, but

6      I wanted to have it out because I thought everything had

7      to be disclosed.

8            MR. WESTFALL:  And it won't cause you any

9      problems?

10           VENIRE PERSON:  No.

11           MR. WESTFALL:  Well, that's all we need to talk

12     about.  Let's talk about the charges.  Based upon what you

13     have heard in the news, which it doesn't sound like much,

14     but I need to ask you --

18:00 15           VENIRE PERSON:  Yes, sir.

16           MR. WESTFALL:  -- have you formed any opinions

17     as to whether the defendants are guilty or not?

18           VENIRE PERSON:  No, sir, what I heard was very

19     brief and because I was kind of concerned about getting on

20     the bus.  I just wanted to let you know that's what I

21     heard.  And I was more concerned about getting on the bus

22     and getting over here.

23           MR. WESTFALL:  Do you know any Muslims?

24           VENIRE PERSON:  I work at a school district, and

25     I work with a lot of multicultural families as a clerk and

18:00 1    with the RISD program, but I have never asked about their

2    religious background because it's only for the children.

3    I don't make it an issue because I try to be fair with

4    everyone.

5                MR. WESTFALL:  So you have not been aware of any

6    dealings with other teachers or have you ever had any good

7    experiences with people who are Arab or Muslim or bad

8    experiences?

9                VENIRE PERSON:  Not good or bad.  From what I

10   have seen there are times that there are fasting, and when

11   you work in a school you try to work with everyone and

12   kind of be aware -- being indifferent to everyone's

13   religions and trying to treat everybody fair.  So I try

14   not to make it an issue and try to be kind with everyone.

18:00 15               MR. WESTFALL:  And you teach with the RISD.

16               VENIRE PERSON:  I work as an aid, a translator.

17   I work in the office as a clerk, and I work in a lot of

18   different areas of the school.

19               MR. WESTFALL:  In a criminal case, it doesn't

20   look like you have been on a jury before.

21               VENIRE PERSON:  No, sir.

22               MR. WESTFALL:  In a criminal case, there are

23   protections that are given to people charged with crimes.

24   One of those is the right not to testify unless you want

25   to.  Have you heard that?

18:00  1            VENIRE PERSON:  Yes, sir.

       2            MR. WESTFALL:  And another one is that the

       3    government bears the burden of proof, and the government

       4    is the only one that bears the burden of proof, and that

       5    burden of proof is beyond a reasonable doubt.  They have

       6    to prove their allegations beyond a reasonable doubt.  And

       7    another important one is a presumption of innocence.  That

       8    means as a person sits here before the trial begins and

       9    all the way until the verdict is rendered, that person is

      10    presumed to be innocent.  That's a very important

      11    Constitutional protection.  A person is presumed to be

      12    innocent.  As we sit here today, anyone is innocent until

      13    the government proves them guilty beyond a reasonable

      14    doubt.  This is a terrorism case.  It's not a terrorism

18:00 15    case as such, but it's material support of terrorism, and

      16    when I say terrorism, I mean terrorism is in the title

      17    somewhere.  The allegation is that the Holy Land

      18    Foundation and these employees that are sitting here gave

      19    material support to HAMAS.  Can you abide -- Can you

      20    presume them innocent as we sit here right now?

      21            VENIRE PERSON:  Oh, yes, sir.  Yes.

      22            MR. WESTFALL:  And if at the end of the day, at

      23    the end of the trial, some months from now all that's been

      24    shown to you is that they sent humanitarian aid over to

      25    Palestine, but it has not been proven to you beyond a

18:00 1    reasonable doubt that they did so with the intent to help

2    this HAMAS, can you render a verdict of not guilty?

3              VENIRE PERSON:  Oh, yes, clearly.  Yes.

4              MR. WESTFALL:  Thank you so much.

5              THE COURT:  Mr. Jacks, do you have questions for

6    Ms. Pena?

7              MR. JACKS:  Yes, sir.  Good morning, Ms. Pena.

8              VENIRE PERSON:  Good morning.

9              MR. JACKS:  My name is Jim Jacks, and I'm an

10   Assistant United States Attorney here in Dallas.  I'm one

11   of the prosecutors on this case.

12             VENIRE PERSON:  Yes, sir.

13             MR. JACKS:  You work for the Richardson School

14   District?

18:00 15            VENIRE PERSON:  Yes, sir.

16             MR. JACKS:  And do you work at a particular

17   campus?

18             VENIRE PERSON:  Yes, I work at O'Henry

19   Elementary.

20             MR. JACKS:  And your husband, you have shown his

21   occupation as electrical tech.  Is that a technician?

22             VENIRE PERSON:  Yes, sir.  At DRS.

23             MR. JACKS:  What company is that?

24             VENIRE PERSON:  Dallas base, it's where the TI,

25   that Sherman Street is, right there.  They do contracts.

18:00   1   He doesn't do contracts. He does more hands-on with the

2   technology.

3          MR. JACKS: What kind of a product is it that he

4   works with?

5          VENIRE PERSON: Infrared, night vision, goggles.

6          MR. JACKS: Does he have a security clearance?

7          VENIRE PERSON: He may have. I know he had one

8   previously. I don't know if he has had it updated, but he

9   has had one previously.

10          MR. JACKS: Do you know what DRS stands for?

11          VENIRE PERSON: Something to the effect of --

12          MR. JACKS: That's okay. There is lots of

13   acronyms that I hear, but I don't know what they mean.

14   How long has he worked there?

18:00 15          VENIRE PERSON: Two years.

16          MR. JACKS: Before that, where did he work?

17          VENIRE PERSON: Steakley Chevrolet.

18          MR. JACKS: What job did he have there?

19          VENIRE PERSON: Car salesman. He had been laid

20   off from Raytheon.

21          MR. JACKS: How long did he work at Raytheon?

22          VENIRE PERSON: I would say ten years. For sure

23   he had a security clearance there.

24          MR. JACKS: Does he have a college degree?

25          VENIRE PERSON: An associate related to

18:00 1    mechanical.

2             MR. JACKS:  Okay.  You have told us that you

3    heard the news reports on the radio about this case.  Is

4    that the extent of what you have heard about this case?

5             VENIRE PERSON:  I heard it on the radio.

6    Broadcasting on a small portion of it.

7             MR. JACKS:  One of the procedures -- As Mr.

8    Westfall, the gentlemen that spoke to you a second ago

9    told you, this case is a case in which the United States

10   has charged the Holy Land Foundation and certain of its

11   representatives or employees with providing material

12   support to a foreign terrorist organization, specifically

13   HAMAS.  Have you ever heard of HAMAS?

14            VENIRE PERSON:  I probably have heard very

18:00 15   little.  But I don't know anything about it.

16            MR. JACKS:  Okay.  After everyone -- both sides

17   have had an opportunity to present their evidence and to

18   present any witnesses or documents that they care to

19   present, the Judge will read his instructions to the jury,

20   and essentially those instructions will be him telling the

21   jury what the law is that applies to this case, what is

22   the law in the United States regarding providing material

23   support to a terrorist organization.  What is meant by a

24   terrorist organization, he would give you that definition.

25   What is meant by material support, he would define that

18:00  1    term for the jury.  And I expect and anticipate that one

       2    of the instructions that he would tell you if you are

       3    selected to serve on this jury is that even if the

       4    material support -- even if what is given over to this

       5    terrorist organization is in the form of so called

       6    humanitarian aid, even if what the individuals are charged

       7    with giving is food, clothing, medical supplies, school

       8    supplies, backpacks, books, even if it is in that nature,

       9    that it's still against the law to give that type of

      10    material for the benefit of a foreign terrorist

      11    organization.  First of all, do you understand that

      12    concept?  And secondly, do you have any problem with that

      13    provision in the law?

      14              VENIRE PERSON:  I don't have any problem, and I

18:00 15    understand the concept.  The way you described it right

      16    now, humanitarian aid is basically like sending foods or

      17    things that people use daily?

      18              MR. JACKS:  Right.

      19              VENIRE PERSON:  I understand.

      20              MR. JACKS:  And even if it's that, it's still

      21    illegal if it's been given knowingly to a terrorist

      22    organization.

      23              VENIRE PERSON:  I understand.

      24              MR. JACKS:  And you could follow that if the

      25    Judge included that in the instruction?

1          VENIRE PERSON:  I do.  I understand it.

2          MR. JACKS:  How long have you worked for the

3     Richard School District?

4          VENIRE PERSON:  This will be my eleventh year.

5          MR. JACKS:  And it appears you have some

6     background in health care or graphics.

7          VENIRE PERSON:  Yes, I worked in a hospital

8     previously, about twenty years ago as an aid and in a

9     geriatric setting, and then I also worked in a print shop

10    with graphics.  I have a certification for that.

11         MR. JACKS:  Was that here in the Dallas area?

12         VENIRE PERSON:  No.  In South Texas in the

13    Brownsville area.

14         MR. JACKS:  And the hospital was that in South

15    Texas as well?

16         VENIRE PERSON:  Harlingen.

17         MR. JACKS:  Nothing further, your Honor.

18         THE COURT:  Thank you, Ms. Pena.  You may rejoin

19    the others in the hall.  Ms. Bobbitt.

20         MS. MORENO:  Good morning.  My name is Linda

21    Moreno.  I'm one of the defense lawyers in this case.  I

22    am going to ask you some questions about the charges in

23    this case and the questionnaire you filled out all of

24    those months ago?

25         VENIRE PERSON:  Okay.

18:00 1          MS. MORENO:  On that questionnaire, you were

2     asked about media, and you answered that you watched CNN

3     with your husband?

4          VENIRE PERSON:  Yes.

5          MS. MORENO:  This is the case that involves the

6     Holy Land charity.  This is an American Muslim charity.  I

7     want to know if you have heard anything about it in the

8     last few days or read or heard anything about it in the

9     recent past?

10         VENIRE PERSON:  In the last few days before I

11    went to bed they said they would be screening for jurors.

12    Holy Land Foundation?

13         MS. MORENO:  Yes, ma'am.

14         VENIRE PERSON:  Seems like it was a few years

18:00 15   back that it all came back.  I just remember something

16    about an organization in Richardson.  I don't know a lot

17    of detail.  I just know it's connected with something,

18    terrorists or something like that.

19         MS. MORENO:  And what you heard in the last few

20    days about the screening of jurors?

21         VENIRE PERSON:  The only thing I saw was on the

22    screen.  It said Monday would start the jury selection.

23         MS. MORENO:  Did you know you would be one of

24    the lucky jurors?

25         VENIRE PERSON:  I had a feeling possibly.

18:00 1          MS. MORENO:  And after understanding this was a

2    case that had some terrorism-related charges, did you have

3    any hesitation or apprehension?

4          VENIRE PERSON:  Not really.

5          MS. MORENO:  About sitting as a juror?

6          VENIRE PERSON:  No.

7          MS. MORENO:  We'll talk more about that in a

8    moment.  So just to be clear, is there anything about what

9    you have read or heard at this point that causes you any

10   concern about sitting as a juror?

11         VENIRE PERSON:  My only concern would be that I

12   fully understood everything that went on, every angle or

13   detail about the issue.  Yeah, because a lot of times you

14   hear about things like this, but you don't know the

18:00 15  details.  You just know the minor highlights.

16         MS. MORENO:  You mean from the news reports?

17         VENIRE PERSON:  Yes.

18         MS. MORENO:  And those minor highlights that you

19   have heard, is there anything about that that causes you

20   any apprehension or concern right now as you sit there?

21         VENIRE PERSON:  My only concern is that I fully

22   understood what was going on.

23         MS. MORENO:  When you say you fully understood

24   what was going on, what do you mean by that?

25         VENIRE PERSON:  Well, you hear about things

18:00   1     happening in the other parts of the world, and I'm not

      2     sure anybody really understands the whole detail of it,

      3     why, when, where, kind of that, just educational wise.

      4           MS. MORENO:  This is a case where the government

      5     alleges that the Holy Land Foundation which is an American

      6     Muslim charity supported the foreign terrorist

      7     organization HAMAS.  Have you heard about HAMAS?

      8           VENIRE PERSON:  I have heard the word "HAMAS."

      9     I don't know that much about it.

    10           MS. MORENO:  The government alleges that the --

    11     in the distribution of humanitarian aid that this charity

    12     distributed, food, medicine, books, clothing, libraries,

    13     helped assist in the rebuilding of homes that were

    14     destroyed and demolished.  That's the humanitarian aid

18:00 15     that we're talking about.  The government alleges that aid

    16     that the Holy Land Foundation distributed in Palestine and

    17     the West Bank and Gaza and other places that that

    18     benefited this terrorist organization, HAMAS.

    19           VENIRE PERSON:  I understand that.

    20           MS. MORENO:  Knowing those charges, do you have

    21     any opinions about that?  Any concerns or any ideas just

    22     knowing what the allegations are?

    23           VENIRE PERSON:  No, not really.

    24           MS. MORENO:  In a criminal case the defendants

    25     are afforded the presumption of innocence.  You know what

18:00 1    the presumption of innocence is, correct?

2              VENIRE PERSON:  Yes.

3              MS. MORENO:  And the government has the burden

4    of proof, and they must prove beyond every reasonable

5    doubt the charges that are alleged.  Do you have any

6    thoughts about the burden of proof or the presumption of

7    innocence?

8              VENIRE PERSON:  Well, I'm a person that's real

9    detailed.  I would want to know every angle, every "i"

10   dotted, every "t" crossed, everything about it.

11             MS. MORENO:  In fact, on your questionnaire, if

12   I remember, you were asked something about if a person

13   decides not to testify on their own behalf, would you hold

14   that against them?

18:00 15             VENIRE PERSON:  Personally I would like to hear

16   them explain their side of it.

17             MS. MORENO:  Let's say that one of these

18   gentlemen decided not to take the stand -- all or one of

19   them -- is that something you would think to yourself they

20   must be hiding something?

21             VENIRE PERSON:  I wouldn't think they were

22   hiding something, but I really would like to hear everyone

23   so that I could get a better opinion of the situation.

24             MS. MORENO:  And if you didn't hear someone

25   testify on their own behalf, would you hold that against

18:00  1    them?  Would you say they should be telling their side of

       2    the story?  And I want to say to you there are no right or

       3    wrong answers here.  We're just looking.  This is a search

       4    for the truth by both sides, and we're trying to find

       5    those jurors who could be fair and impartial in this kind

       6    of a case.  So knowing that, would you hold that against

       7    someone?

       8            MR. JACKS:  Your Honor, I believe she has

       9    answered that question already.  It was put to her

      10    earlier, and I believe she answered.

      11            THE COURT:  Overruled.  You may answer.

      12            VENIRE PERSON:  Well, I guess a lot of times it

      13    depends on the overall jury -- I mean the overall scenario

      14    whether you want to hear from that person or not.

18:00 15            MS. MORENO:  Do you understand in a criminal

      16    case that the defendants don't have to testify?

      17            VENIRE PERSON:  I know they don't.

      18            MS. MORENO:  But are you the kind of person that

      19    would want them to?

      20            VENIRE PERSON:  I pretty much like to hear all

      21    the opinions.  I like to know every detail.

      22            MS. MORENO:  And if they didn't take the stand,

      23    is that something --

      24            VENIRE PERSON:  It depends on the overall

      25    testimony of everyone else.

18:00  1              MS. MORENO:  But you can't sit here and tell

       2      us --

       3              VENIRE PERSON:  I can't say that I absolutely

       4      have to hear them testify.  I would like to hear them

       5      testify.

       6              MS. MORENO:  In a case that involves charges of

       7      terrorism like this case, do you think that the burden of

       8      proof that the government has should be lessened somehow

       9      because these charges are so serious?  They should have

      10      less of a burden of proof?

      11              VENIRE PERSON:  I don't think so.

      12              THE COURT:  Ms. Moreno, your time has expired.

      13      Mr. Jacks, do you have questions for Ms. Bobbitt?

      14              MR. JACKS:  Good morning, Ms. Bobbitt.  My name

18:00 15      is Jim Jacks.  I'm an Assistant United States Attorney

      16      here in Dallas, and I'm one of the prosecutors in this

      17      case.  I also have some just brief follow-up questions.

      18              As I understand it from your questionnaire, you

      19      are presently retired, and before you retired you worked

      20      for a personnel service.

      21              VENIRE PERSON:  Yes, mortgage personnel.

      22              MR. JACKS:  All right.  And you were a branch

      23      manager; is that correct?

      24              VENIRE PERSON:  Yes.

      25              MR. JACKS:  The only information we have

18:00  1  regarding your husband is that he is a project manager.

       2  Do you mind telling us who he works for generally?

       3          VENIRE PERSON:  He's retired also now.

       4          MR. JACKS:  How long has he been retired?

       5          VENIRE PERSON:  Gosh.  Five years.

       6          MR. JACKS:  And before he retired, who did he

       7  work for?

       8          VENIRE PERSON:  I want to say it was called --

       9  He worked there about a year and a half.  Gosh.  I don't

      10  know.  I can't remember.

      11          MR. JACKS:  What type of a business or industry

      12  was it?

      13          VENIRE PERSON:  Well, see, my husband has always

      14  worked with a union usually, different jobs at different

18:00 15  locations, and this was a job that he got.  He was taking

      16  college courses, and they needed a project manager for

      17  like a year, year and a half.

      18          MR. JACKS:  Is it construction?

      19          VENIRE PERSON:  Yes, construction.

      20          MR. JACKS:  Commercial construction?

      21          VENIRE PERSON:  Yes.

      22          MR. JACKS:  And before the last company that he

      23  worked for before he retired, did he work for other

      24  companies in that field?

      25          VENIRE PERSON:  Well, belonging to the union, he

18:00 1    worked for various companies.  Okay.

2              MR. JACKS:  And what union was he a member of?

3              VENIRE PERSON:  Metal Lathe Workers Union.

4              MR. JACKS:  Okay.  And you have told us that you

5    have minimal knowledge of this case from the newspapers or

6    television.

7              VENIRE PERSON:  TV.

8              MR. JACKS:  And I gather from your answers that

9    you want to hear as much evidence as there is to help you

10   make your decision.  Is that a fair summary?

11             VENIRE PERSON:  Well, before -- Being in

12   personnel, I worked in mortgage and banking, and you

13   usually have to know everything about every little thing,

14   and so probably from my background I would like that.

18:00 15             MR. JACKS:  And I gather you are telling us you

16   haven't made up your mind, and that's what you are here

17   for if you are selected to serve on this jury, is to

18   listen to the evidence and render a fair decision.  Is

19   that a fair statement?

20             VENIRE PERSON:  Well, I haven't heard enough

21   about the situation.

22             MR. JACKS:  I understand.  Now, regarding the

23   right of a defendant not to testify, that's something that

24   is in the Constitution, and I gather or I assume that your

25   answer was that you understand that and you accept that.

18:00 1    Is that a fair statement?

2         VENIRE PERSON:  I accept that, but I usually

3    like to hear their opinion.

4         MR. JACKS:  All right.  If the Judge tells you

5    in the instructions that if any defendant chooses not to

6    testify for whatever reason, that that's something that

7    you as a juror cannot hold against him -- if he tells you

8    that as part of the law, can you follow that instruction?

9         VENIRE PERSON:  I will have to abide by that if

10   the Judge tells me that.

11        MR. JACKS:  I expect that he would tell you

12   that.

13        VENIRE PERSON:  Yes.

14        MR. JACKS:  So can you follow that instruction

18:00 15   and abide by it?

16        VENIRE PERSON:  I can follow the instructions.

17        MR. JACKS:  Let me also touch on another point.

18   As defense counsel told you, the central charges in this

19   case -- I guess if you were to try to describe them in a

20   sentence or two is that the United States government has

21   charged the Holy Land Foundation and certain individuals

22   that worked with that organization with conspiring to and

23   actually providing material support to a foreign terrorist

24   organization, and it's alleged that foreign terrorist

25   organization was HAMAS, and I believe you said you had

18:00 1    heard of HAMAS.  Is that right?

2              VENIRE PERSON:  I have.

3              MR. JACKS:  Have you ever served on a jury

4    before?

5              VENIRE PERSON:  No.

6              MR. JACKS:  After both sides have presented

7    their evidence and before they give their final summations

8    or arguments, the Judge will read to you what's sometimes

9    called the Court's charge or the jury instructions, and

10   it's a multi-page document which you will be given a copy

11   of after he reads it, but it basically contains the law

12   that applies to the case, and the jury is instructed that

13   you take this law and you apply it to the facts, and

14   that's what you use to try to render a verdict, and he

18:00 15   would include definitions in there so that you know what

16   is meant by a foreign terrorist organization and that type

17   of thing.  I expect that one of the instructions or

18   explanations of law that the Judge will give is that even

19   if the aid -- the material support -- that is given by the

20   defendants for the benefit of a foreign terrorist

21   organization -- even if it's in the form of so called

22   humanitarian aid -- food, clothing, medical supplies,

23   school books, backpacks, that type of thing -- even if

24   it's that type of material that it is still against United

25   States law to do that.

18:00 1    Do you understand that idea?  And can you follow

2    that instruction if the Judge tells you that is part of

3    the law?

4    VENIRE PERSON:  Yes.  I understand that.

5    MR. JACKS:  I believe that's all I have, your

6    Honor.

7    THE COURT:  Thank you, Ms. Bobbitt.  You may

8    rejoin the others in the hall.

9    MR. JACKS:  Your Honor, may we approach the

10   bench on a general housekeeping matter?

11   THE COURT:  All right.

12   MR. JACKS:  Judge, we would ask if the Court

13   would when these people are finished instruct them that

14   they are not to listen to any media reports, just to keep

18:00 15   them from doing any of that and maybe not speak to the

16   other jurors as well when they go back to the juryroom.

17   THE COURT:  Good morning.

18   MR. WESTFALL:  Good morning, Mr. Mosty.  I'm

19   Greg Westfall.  I'm one of the defense lawyers in this

20   case.  I see you are from Richardson.

21   VENIRE PERSON:  Yes, sir.

22   MR. WESTFALL:  This case is about Holy Land

23   Foundation for Relief and Development which used to be in

24   Richardson.  Does this ring any bells with you?

25   VENIRE PERSON:  Oh, yeah.

18:00  1          MR. WESTFALL:  And can you tell me what you have

2      heard about the case?

3          VENIRE PERSON:  It's been a few years ago.  So I

4      don't remember much of the stuff about it, but it was the

5      fact that they thought that they were sending money to

6      HAMAS or radicals and rather than going to where they said

7      it was supposed to be going.

8          MR. WESTFALL:  What do you know about HAMAS?

9          VENIRE PERSON:  I don't want to know anything

10     about them.

11         MR. WESTFALL:  Don't want to know anything more

12     than you have to know?

13         VENIRE PERSON:  That's right.  I know they are

14     somebody that I don't want to mess with.

18:00 15         MR. WESTFALL:  Do you know where they are

16     supposed to be?

17         VENIRE PERSON:  Middle East, mainly Jordan, West

18     Bank I think and then some of the other Arab countries

19     there.  I think they are pretty well all throughout the

20     area.

21         MR. WESTFALL:  At various times the media has

22     been pretty heavy on this story.

23         VENIRE PERSON:  Right.

24         MR. WESTFALL:  And recently, of course, because

25     the trial is getting ready to start there is a resurgence.

18:00  1    Kind of give me your opinion of the situation based on

       2    what you have read, you know, on the case, whether they

       3    are good for it, whether they are not good for it.  What's

       4    your overall opinion?

       5              VENIRE PERSON:  I don't know for sure, but that

       6    would be something that I would just have to listen to the

       7    information and find out, you know, whether -- I feel like

       8    I could give a good -- I'm not biased either way.  The

       9    only problem I have is that being if we were convicted --

      10    I did find them guilty, I think somewhere down the line

      11    there would be some retribution to people that put them

      12    away.

      13              MR. WESTFALL:  So you are personally afraid?

      14              VENIRE PERSON:  Yes.  I think something is going

18:00 15    to happen.  Found them not guilty, I doubt that anything

      16    would ever happen.  But if I come to the conclusion that

      17    they are a part of that group, I don't put anything past

      18    that group.

      19              MR. WESTFALL:  Have you discussed this anxiety

      20    you have with your wife?

      21              VENIRE PERSON:  Yes, sir.

      22              MR. WESTFALL:  You said in your questionnaire

      23    that you look at the Palestinian-Israeli conflict closely,

      24    but you didn't put any explanation.  What did you mean by

      25    that?

18:00 1          VENIRE PERSON:  News.  I do quite a bit of

2     watching of, like, the History Channel and stuff like that

3     where there have been documentaries on the different

4     things that happen in the Middle East -- Six Day War,

5     etcetera -- and kind of follow what's going on in Iraq,

6     and in the past the deal here with the West Bank and Gaza,

7     you know, I followed that.  I don't know the names that

8     good.  But I know what's going on.

9          MR. WESTFALL:  And do you have a sense on who's

10    right and who is wrong in the Palestinian-Israeli

11    conflict?

12         VENIRE PERSON:  Two goats butting heads.  You

13    know, it's just something that is probably going to keep

14    on going for years and years and maybe more centuries.

18:00 15   It's too many different ideas of the way they want to do

16    things, and some groups are, you know -- They are too

17    wrapped up in what they are doing, and I'm sure they

18    believe that what they are doing is right.  But it doesn't

19    follow with what I think.

20         MR. WESTFALL:  You know -- You have a good sense

21    for what the issues are, and you have told us how you fear

22    the retribution which you are not alone in that.  I want

23    to know how that might affect you being on the jury.  Is

24    this something that's very real with you?  You have spoken

25    with your wife.  Is this the kind of thing that would

18:00 1    affect your jury service?

2          VENIRE PERSON:  I think I could still do the --

3    weigh the issue and do what I think is right.  But if it

4    came out that they were guilty, I think something is going

5    to happen.

6          MR. WESTFALL:  Well, I'll put the question out

7    there.  The way a trial is supposed to go is the decision

8    on whether somebody is guilty or not guilty is supposed to

9    be based only on what's in court, but it sounds like, you

10   know, you have this other issue going on.  Will that

11   impair you in any way no matter how slight on your ability

12   to render a fair and impartial decision just based on the

13   evidence?

14         VENIRE PERSON:  Maybe just a little bit.  Might

18:00 15   have a ten percent that I'd hate to be in that situation.

16         MR. WESTFALL:  So if the choices are just yes

17   and no, then yes is probably the answer on that?

18         VENIRE PERSON:  Yes, sir.

19         MR. WESTFALL:  Mr. Mosty.  Thank you so much.

20         THE COURT:  Mr. Jacks, do you have questions for

21   Mr. Mosty?

22         MR. JACKS:  Yes, sir.  Good morning, Mr. Mosty.

23         VENIRE PERSON:  Good morning.

24         MR. JACKS:  My name is Jim Jacks.  I'm an

25   Assistant United States Attorney here in Dallas.  I'm one

18:00 1    of the prosecutors on this case.  I would like to ask you

2    a few follow-up questions if I could.  You indicated that

3    you have followed the situation between the Israelis and

4    the Palestinians somewhat closely in your questionnaire.

5    The next question in that questionnaire was have you

6    formed any opinion or belief about the nature of that

7    conflict that would prevent you from serving as a fair and

8    impartial juror in this case and you checked no.

9            VENIRE PERSON:  (Witness nods)

10           MR. JACKS:  That is correct?

11           VENIRE PERSON:  Yes.

12           MR. JACKS:  Do you still believe that to be

13   true?

14           VENIRE PERSON:  Yes.

18:00 15          MR. JACKS:  Have you ever served on a federal

16   jury before?  Answer out so the court reporter can write

17   down your answer.

18           VENIRE PERSON:  Okay.

19           MR. JACKS:  You shook your head no.  Is that

20   correct?

21           VENIRE PERSON:  It was no.

22           MR. JACKS:  Have you served on a state jury

23   before at the county courthouse?

24           VENIRE PERSON:  No.

25           MR. JACKS:  I take it you are not aware in the

18:00 1    federal criminal case the jury does not assess punishment.

2    That's done by the judge later on.

3              VENIRE PERSON:  I did not know that.

4              MR. JACKS:  With regard to your answer that you

5    felt like that if the case was proven and a guilty verdict

6    was returned that there would be some retaliation or

7    reaction down the road  --

8              VENIRE PERSON:  Yes.

9              MR. JACKS:  -- is that something -- When you

10   said that, did you mean against the people on the jury or

11   just generally?

12             VENIRE PERSON:  No.  I think it would be on the

13   jury or their families.

14             MR. JACKS:  Would that affect your ability to

18:00 15   serve on the jury in this case?

16             VENIRE PERSON:  I told him.  That might be ten

17   percent of it.

18             MR. JACKS:  Well, if you thought something might

19   happen to you, depending on what your verdict was,

20   apparently that might cause your verdict to go one way or

21   the other.  Is that what you are saying?

22             VENIRE PERSON:  Yes.

23             MR. JACKS:  Dispute whatever the evidence might

24   be in the case?

25             VENIRE PERSON:  Yes.

18:00  1          MR. JACKS:  So even if the government proved its

       2    case beyond a reasonable doubt, you might return a not

       3    guilty verdict because you would be concerned about your

       4    safety later on?

       5          VENIRE PERSON:  There would be a possibility of

       6    that.

       7          MR. JACKS:  What about the flip side of that?

       8    If the government didn't meet its burden in your mind and

       9    didn't prove the defendant's guilty, are you saying that

      10    you would find them guilty even though you didn't think

      11    they had been proven guilty?

      12          VENIRE PERSON:  No.

      13          MR. JACKS:  So by your answer is it the

      14    government that may suffer if you are selected to serve on

18:00 15    this jury?

      16          VENIRE PERSON:  No.

      17          MR. JACKS:  Let me just cover some of the things

      18    that were in the questionnaire and I think you answered

      19    them.  You will follow the Court's instructions regarding

      20    if a defendant chooses not to testify and the court says

      21    you cannot hold that against them.  Can you follow that

      22    instruction if the judge tells you that's the law?

      23          VENIRE PERSON:  Yes.

      24          MR. JACKS:  If the Judge tells you that the

      25    government's burden is beyond a reasonable doubt will you

18:00 1  hold the government to that burden?

2          VENIRE PERSON:  Yes.

3          MR. JACKS:  Thank you, sir.

4          THE COURT:  Mr. Mosty, you are currently a

5  member of the pool from which this jury will be selected.

6  We have a ways to go before we know who's on the jury and

7  who's not.  So in the meantime I am going to direct that

8  you not watch or read or listen to any media accounts of

9  this case, if there are any, and that you not have any

10  conversation about the case with any of the other members

11  of the jury panel.

12          VENIRE PERSON:  Yes, sir.

13          THE COURT:  Ladies and Gentlemen, because of the

14  hour I would like to take our luncheon recess at this

18:00 15  time.  I want to be in recess for an hour for lunch.

16  We're making I guess reasonable progress, but we still

17  have a long way to go, as I told Mr. Mosty just now, and

18  also I wanted to let counsel and the parties know that two

19  of the persons on our list were no-shows today.  That's

20  Number 3, Mr. Fletcher, and Number 28, Medina.

21          MR. WESTFALL:  Your Honor, may I interpose a

22  challenge for cause on Mr. Mosty?

23          THE COURT:  Yes, sir.

24          MR. WESTFALL:  Fear of retribution would affect

25  his verdict.  I think it's clear.  He stuck to it under

18:00  1    Mr. Jacks's questioning.  I think that he's clearly

       2    challengeable, your Honor.  We submit him.

       3              THE COURT:  What do you say, Mr. Jacks?

       4              MR. JACKS:  Well, it sounds like it would be to

       5    the detriment of the government as opposed to the defense.

       6    So I believe they have shown that he should be challenged

       7    for cause.

       8              THE COURT:  I'm not quite sure I follow the

       9    logic there, but I am going to grant the challenge to

      10    excuse Mr. Mosty for cause.  We'll be in recess for lunch

      11    until 1:00.

      12              (Recess)

      13              THE COURT:  Good afternoon, Mr. Perry.

      14    Counsel for the parties have some questions for you.

18:00 15              MR. WESTFALL:  Thank you, your Honor.

      16              Mr. Perry, how are you doing?

      17              VENIRE PERSON:  Good, thank you.

      18              MR. WESTFALL:  I'm Greg Westfall, one of the

      19    defense lawyers in this case.  We're a long away from each

      20    other and you don't have a microphone.  Would you please

      21    speak up and speak a little louder?

      22              VENIRE PERSON:  I have a low voice.

      23              MR. WESTFALL:  Okay.  You work at Frye's right

      24    now?

      25              VENIRE PERSON:  I did.  I actually quit not too

18:00  1    long ago.

       2              MR. WESTFALL:  So are you --

       3              VENIRE PERSON:  Unemployed.

       4              MR. WESTFALL:  Looking for a job?

       5              VENIRE PERSON:  Yes.

       6              MR. WESTFALL:  This case involves a Muslim

       7    charity called the Holy Land Foundation for Relief and

       8    Development, and the allegations are that the Holy Land

       9    Foundation gave material support to a terrorist

      10    organization, a foreign terrorist organization called

      11    HAMAS.  Does that ring any bells?

      12              VENIRE PERSON:  No.

      13              MR. WESTFALL:  You never heard of the case at

      14    all?

18:00 15              VENIRE PERSON:  No.

      16              MR. WESTFALL:  You have never heard of the case

      17    since you filled out this questionnaire?

      18              VENIRE PERSON:  No.

      19              MR. WESTFALL:  Where do you live in Dallas, not

      20    an address but an area?

      21              VENIRE PERSON:  White Rock Lake.

      22              MR. WESTFALL:  So in the Dallas area?

      23              VENIRE PERSON:  Yes.

      24              MR. WESTFALL:  Do you know any Muslims?

      25              VENIRE PERSON:  No.

18:00  1           MR. WESTFALL:  Have you ever met any?

       2           VENIRE PERSON:  I used to work with one at

       3   Frye's, a year back, year and a half ago.

       4           MR. WESTFALL:  What was your relationship with

       5   that person, good or bad?

       6           VENIRE PERSON:  Good.

       7           MR. WESTFALL:  Tell me about the person.

       8           VENIRE PERSON:  He was a salesman.  He was

       9   motivated.  He was Muslim, but he didn't have the

      10   stereotypical attributes you would say.  Very

      11   Americanized.

      12           MR. WESTFALL:  What are the stereotypical

      13   American attributes?

      14           VENIRE PERSON:  No beard, no turban or anything

18:00 15   like that.  Well spoken.

      16           MR. WESTFALL:  Where was he from?

      17           VENIRE PERSON:  I don't know specifically.

      18           MR. WESTFALL:  What do you know about HAMAS?

      19           VENIRE PERSON:  Not very much.  I don't pay much

      20   attention to the television or media.

      21           MR. WESTFALL:  Do you get your news over the

      22   media?

      23           VENIRE PERSON:  Not too much.

      24           MR. WESTFALL:  Do you know where HAMAS operates?

      25           VENIRE PERSON:  No.

18:00    1            MR. WESTFALL:  This case involves allegations of

         2   terrorism, not terroristic acts per se but giving money or

         3   blankets or whatever.  That's the essential charge here.

         4   How do you feel about being on a jury deciding a case with

         5   those sorts of issues?

         6            VENIRE PERSON:  Although I'm not comfortable

         7   right now because it's the first time I have done

         8   something like this.  I assume I would be fair because I

         9   don't know anything.  I haven't read the media or anything

        10   like that.  I assume I would be impartial.

        11            MR. WESTFALL:  You have never been on a jury I

        12   guess?

        13            VENIRE PERSON:  No.

        14            MR. WESTFALL:  You probably know about some of

18:00   15   the protections that are afforded to a person that's

        16   charged with a crime in the United States.  One of them is

        17   they don't have to testify if they don't want to.  How do

        18   you feel about somebody testifying in their own criminal

        19   trial?

        20            VENIRE PERSON:  It's their choice.

        21            MR. WESTFALL:  You wouldn't hold that against

        22   them?

        23            VENIRE PERSON:  They may feel that their

        24   testifying may hurt their case.  They are welcome not to

        25   do it.  Some people aren't good with words.

18:00 1          MR. WESTFALL:  Another protection is the

2     presumption of innocence.  Somebody is presumed innocent.

3     You have heard that phrase?

4          VENIRE PERSON:  Right.

5          MR. WESTFALL:  Somebody is presumed innocent.

6     If they are charged with an offense they are presumed

7     innocent unless and until the government proves its case

8     beyond any reasonable doubt.  So that means anybody

9     sitting in trial is presumed innocent.  Can you presume

10    all the defendants are innocent?  Is that a yes?

11         VENIRE PERSON:  That's a yes until I hear the

12    evidence in the case.

13         MR. WESTFALL:  You have some family in law

14    enforcement, police officers?

18:00 15         VENIRE PERSON:  Yes.

16         MR. WESTFALL:  Was your grandfather the last one

17    that was a police officer in your family line?

18         VENIRE PERSON:  Yes.

19         MR. WESTFALL:  Police officers you know often

20    testify in trial.  How do you feel about a police officer

21    testifying versus just a regular witness testifying?

22         VENIRE PERSON:  I'm not sure.

23         MR. WESTFALL:  Well, let me be more clear.  What

24    the law presumes is that you will give the same

25    consideration to a non police officer as you would to a

18:00   1     police officer.

      2               VENIRE PERSON:  I see.

      3               MR. WESTFALL:  Do you have any problem with

      4     that?

      5               VENIRE PERSON:  No.

      6               MR. WESTFALL:  I know you are currently

      7     unemployed.  Anything about being in a jury for four

      8     months that would make it difficult for you to serve?

      9               VENIRE PERSON:  It would keep me from finding a

    10     job.

    11               MR. WESTFALL:  Is that a difficulty that would

    12     weigh on your mind while you are trying to do this

    13     service?

    14               VENIRE PERSON:  Yes.

18:00 15               MR. WESTFALL:  The kind of difficulty that could

    16     distract you from this service?

    17               VENIRE PERSON:  It might.

    18               MR. WESTFALL:  If you had to answer yes or no,

    19     would it be yes?

    20               VENIRE PERSON:  Yes.

    21               MR. WESTFALL:  Mr. Perry, thank you very much.

    22               THE COURT:  Mr. Jacks, do you have questions for

    23     Mr. Perry?

    24               MR. JACKS:  Yes, your Honor.  Good afternoon,

    25     Mr. Perry.  My name is Jim Jacks.  I'm an Assistant United

18:00  1     States Attorney here in Dallas.  I'm one of the

      2     prosecutors on this case.  I have some questions that I

      3     want to ask you very briefly, if you don't mind.

      4             VENIRE PERSON:  Go right ahead.

      5             MR. JACKS:  How long has it been since you left

      6     your job at Frye Electronics?

      7             VENIRE PERSON:  About two weeks.  Two or three

      8     weeks I believe.

      9             MR. JACKS:  I'm not sure when -- It looks like

    10     you filled out this questionnaire on June 27th.  So from

    11     the date you filled out the questionnaire about how long?

    12             VENIRE PERSON:  I was still employed with

    13     Frye's.  But I was considering leaving.  I probably left a

    14     few days after.

18:00 15             MR. JACKS:  All right.  What other kind of work

    16     have you done in your life?

    17             VENIRE PERSON:  Frye's was my first job.

    18             MR. JACKS:  At the present time do you live with

    19     your parents?

    20             VENIRE PERSON:  No, I moved out.

    21             MR. JACKS:  Do you have a roommate or live by

    22     yourself.

    23             MR. JACKS:  I have an occupant.  He's not on the

    24     lease.

    25             MR. JACKS:  Where did you go to school?

6

18:00  1          VENIRE PERSON:  I went to Bryan Adams, and I

      2   dropped out, and then I went to home school but based in

      3   Florida.

      4          MR. JACKS:  It was based in Florida?

      5          VENIRE PERSON:  I would send my curriculum

      6   through the mail.

      7          MR. JACKS:  So you were at your home in Dallas

      8   and completed your requirements on line?

      9          VENIRE PERSON:  Correct.

     10          MR. JACKS:  Do you have brothers and sisters?

     11          VENIRE PERSON:  Yes, I do.

     12          MR. JACKS:  Are they in the Dallas area?

     13          VENIRE PERSON:  Yes.

     14          MR. JACKS:  Is there a particular field or area

18:00 15   that you are looking in as far as your employment?  Do you

     16   have a specialty that you focus in?

     17          VENIRE PERSON:  Not necessarily.  I was thinking

     18   of taking classes up at a college.  I haven't decided

     19   which one yet.  I might specialize in psychology.  I don't

     20   know if I want to go in education or not.  Maybe a

     21   teacher.

     22          MR. JACKS:  I believe you indicated on your

     23   questionnaire that you have previously lived in Oklahoma

     24   and Wyoming.  Did you move here to the Dallas area with

     25   your family?

CASSIDI L. CASEY, CSR, 214-354-3139
UNITED STATES DISTRICT COURT

18:00  1          VENIRE PERSON:  Yes.

2          MR. JACKS:  And I suppose if I do the math, that

3     would have been when you were about seven years old?

4          VENIRE PERSON:  Yes, and a little bit younger

5     when I was in Wyoming.

6          MR. JACKS:  You indicated that you are really

7     not a person that watches the news or do you read the

8     newspapers?

9          VENIRE PERSON:  Not really.

10          MR. JACKS:  I understand what you said about you

11     are in the process of looking for work.  You understand

12     that you will be compensated for your service as a juror.

13     Would that make any difference or assist you in your

14     financial situation?

18:00 15          VENIRE PERSON:  It would.

16          MR. JACKS:  I guess the question that may go to

17     the heart of it, if you are selected to serve on this jury

18     would you be able to give your full attention to it while

19     you were in the juryroom and listen to the evidence and

20     make decisions whenever the case is turned over to the

21     jury.  Could you do that?

22          VENIRE PERSON:  With a clear mind, yes.

23          MR. JACKS:  I think you told defense counsel

24     that you were not familiar with the organization known as

25     HAMAS.

18:00  1          VENIRE PERSON:  No.

        2          MR. JACKS:  Have you ever heard of it?

        3          VENIRE PERSON:  No.

        4          MR. JACKS:  I take it then that you have not

        5    really followed the situation in the Middle East in terms

        6    of the Israelis and Palestinians?

        7          VENIRE PERSON:  Whatever I have heard from

        8    people is hearsay.  I don't really watch TV or read the

        9    newspaper.

       10          MR. JACKS:  At the close of the case when both

       11    sides have presented all the evidence they intend to

       12    present, the Judge will give the jury its instructions

       13    which he would read to the jury, and it will be a written

       14    document which after he reads it the jury gets to keep a

18:00 15    copy of it to refer to, but essentially it would be his

       16    telling the jury what the law is as it applies to this

       17    case.  He would give you definitions.  He would tell the

       18    jury what is meant by the term "foreign terrorist

       19    organization" and things such as that.  He would read to

       20    the jury the United States law as far as it pertains to

       21    providing material support to a foreign terrorist

       22    organization.  I expect that among those instructions and

       23    those descriptions of the law will be a description that

       24    says even if the funds that are used or given over to the

       25    foreign terrorist organization are used for humanitarian

18:00  1    purposes -- even if that money is spent buying food or
       2    books or medical supplies, educational supplies -- even if
       3    that is how the money is spent that it's still against the
       4    law to provide that money to a foreign terrorist
       5    organization.  Do you have any feeling about that
       6    particular provision of law?  And if so, do you feel like
       7    you could follow that instruction if the Judge told you
       8    that was the law?
       9            VENIRE PERSON:  Yes.
      10            THE COURT:  Mr. Jacks, your time has expired.
      11            MR. JACKS:  Thank you, your Honor.  Thank you,
      12    sir.
      13            THE COURT:  Mr. Perry, you are a part of a pool
      14    from which this jury will be selected.  We're still in the
18:00 15    process of interviewing prospective jurors, and so until
      16    you hear further from us so that you know whether you are
      17    on the jury or not, you should not discuss this case with
      18    anyone or read or watch or listen to any media accounts of
      19    it.  Thank you.  You may rejoin the others in the hall.
      20            MR. JACKS:  Just for clarification, do the
      21    jurors leave the courthouse after they finished here?
      22            THE COURT:  That's what the jury administrator
      23    has been doing this morning.  I had a conference with the
      24    jury clerk to see if we could get those jurors up here to
      25    give the instruction you requested, and I was told they

18:00 1    had already left the courthouse.

2              MR. WESTFALL:  Your Honor, I believe that

3         hardships are purely within the discretion of the Court.

4         So as opposed to a challenge for cause, the Court is

5         alerted to a possible hardship.  This guy, I can still see

6         him in Month Number 2.

7              THE COURT:  Thank you.  Mr. Kiblinger, I think

8         we're ready to see our next potential juror, Ms.

9         Lopez-Rogina.

10              Good afternoon.  Counsel for the parties have

11         some questions for you.  Ms. Moreno.

12              MS. MORENO:  Thank you, your Honor.  Is it

13         Shawn Lopez-Rogina?

14              VENIRE PERSON:  Yes, it is.

18:00 15              MS. MORENO:  My name is Linda Moreno, and I

16         represent one of the gentlemen in the Holy Land case.  I

17         am going to ask you some questions that came out of that

18         questionnaire that you filled out so many months ago.  Do

19         you remember that questionnaire?

20              VENIRE PERSON:  Yes.

21              MS. MORENO:  One of the things we need to

22         discuss is whether you have heard or read anything that

23         deals with this particular case.  This is a case that

24         involves the Holy Land Foundation.  It is an American

25         Muslim charity.  There might have been some press reports

18:00 1    on the television or newspapers, and so we need to find

2    out if you have heard anything about it in the resent

3    past, now or years ago.

4            VENIRE PERSON:  I heard nothing, except this

5    morning on the way here I heard -- they just made the

6    statement that jury selection was beginning today in

7    Dallas for the Holy -- I'm not sure.  Holy Land and that's

8    all they said.  In my head I thought, oh, maybe that's the

9    jury selection I'm going to.

10           MS. MORENO:  Let's talk about that, who you

11   felt.  Was that an "oh, great" or "oh, no, what have I

12   gotten myself into"?

13           VENIRE PERSON:  No.  I was just thinking maybe

14   that is the situation, my jury selection that I'm a part

18:00 15   of.  It was just a thought that it could be.

16           MS. MORENO:  And you were right.  This is where

17   we are now.  I want to ask you some more questions, Ms.

18   Rogina.  What we're looking for is honesty.  There is no

19   right answer or wrong answer.  We're just exploring

20   whether you would be a good juror to sit on a case like

21   this?

22           VENIRE PERSON:  Yes.

23           MS. MORENO:  I see on your questionnaire that

24   you are an English-as-a-second-language teacher.  How long

25   have you been doing that?

18:00  1                VENIRE PERSON:  Approximately four years.  A

2      teacher for ten years.

3                MS. MORENO:  And you teach kindergarten?

4                VENIRE PERSON:  Pre K, four and five years old.

5                MS. MORENO:  And in your English as a second

6      language, are those adults?

7                VENIRE PERSON:  Oh, no, the children.

8                MS. MORENO:  Now, have you ever experienced in

9      terms of translation -- Let me ask you, do you speak

10     Spanish?

11               VENIRE PERSON:  No, I do not.  English as a

12     second language you teach using strategies, pictures, body

13     language, visuals.  You don't have to rely on the first

14     language because there might be children in the class that

18:00 15  have different languages, but I do work with a class that

16     is also one language.

17               MS. MORENO:  What language is that?

18               VENIRE PERSON:  That would be Spanish.

19               MS. MORENO:  And you don't speak Spanish?

20               VENIRE PERSON:  No.  My husband is fluent.

21               MS. MORENO:  He's Cuban?

22               VENIRE PERSON:  Yes.

23               MS. MORENO:  Have you ever experienced the idea

24     in translation that sometimes the words are right but the

25     meaning is wrong?

18:00 1          VENIRE PERSON:  The words are right but the

2    meaning is wrong?

3          MS. MORENO:  Perhaps a literal translation.

4          VENIRE PERSON:  Oh, yes, most definitely.

5          MS. MORENO:  Tell us about that.

6          VENIRE PERSON:  Using a word for word

7    translation to go home to parents, that in the past they

8    said, oh, yes, this would work, and then a native Spanish

9    speaker would read it and say, oh, my, goodness, this

10    doesn't even make sense.  So yes, we have had that

11    experience.

12          MS. MORENO:  So the meaning was contrary to what

13    you thought you were putting down when you put the

14    word-for-word translation?

18:00 15          VENIRE PERSON:  Yes.

16          MS. MORENO:  All right.  Thank you.  Let me ask

17    you.  You were talking about your class is mainly Spanish.

18          VENIRE PERSON:  Yes.

19          MS. MORENO:  Have you ever had any experience

20    with people of Muslim faith?

21          VENIRE PERSON:  No, I have not.

22          MS. MORENO:  Never worked with or dealt with any

23    Muslims?

24          VENIRE PERSON:  No, I have not.

25          MS. MORENO:  Do you have any opinion about

18:00 1    people of the Muslim faith as you sit here now?  General

2    questions?

3              VENIRE PERSON:  I think we are all human beings,

4    and we're different in our own ways, and I respect all.

5              MS. MORENO:  Thank you.

6              THE COURT:  Mr. Jacks, do you have questions for

7    Ms. Rogina.

8              MR. JACKS:  Yes, your Honor, thank you.  Good

9    afternoon.

10             VENIRE PERSON:  Good afternoon.

11             MR. JACKS:  When people address you, do they

12   call you Ms. Rogina or Ms. Lopez or Ms. Lopez-Rogina?

13             VENIRE PERSON:  All of the above.

14             MR. JACKS:  What would you prefer?

18:00 15            VENIRE PERSON:  Rogina.  That's fine.

16             MR. JACKS:  When did your husband immigrate to

17   the United States?

18             VENIRE PERSON:  When he was five.

19             MR. JACKS:  When did he move to this area?

20             VENIRE PERSON:  I believe he was about third

21   grade or so, approximately.

22             MR. JACKS:  Did you meet here in the Dallas

23   metroplex area?

24             VENIRE PERSON:  Huntsville, Texas.  College.

25             MR. JACKS:  Sam Houston?

18:00  1                    VENIRE PERSON:  Yes.

       2            MR. JACKS:  And I believe on one of the

       3    information sheets you showed that he is an IT manager?

       4                    VENIRE PERSON:  Yes.

       5            MR. JACKS:  And for whom does he work?

       6                    VENIRE PERSON:  He was just laid off.

       7            MR. JACKS:  I'm sorry.

       8                    VENIRE PERSON:  But it was Dust Free in Royce

       9    City.

      10            MR. JACKS:  And what type of business are they

      11    in?

      12                    VENIRE PERSON:  Air filtration.

      13            MR. JACKS:  Have you and your family lived in

      14    Royce City for sixteen years?

18:00 15                    VENIRE PERSON:  Yes.

      16            MR. JACKS:  And prior to that it was Lewisville

      17    and Bedford.  Is that correct?

      18                    VENIRE PERSON:  That's correct.

      19            MR. JACKS:  You indicated that you have

      20    previously been on a jury in a criminal case.  Is that

      21    correct?

      22                    VENIRE PERSON:  Yes.

      23            MR. JACKS:  And that was in Hunt County?

      24                    VENIRE PERSON:  Yes.

      25            MR. JACKS:  And that's the one experience you

18:00   1    have had on the jury?

       2           VENIRE PERSON: Yes, sir.

       3           MR. JACKS: How long did your husband work for

       4    that air filtration company?

       5           VENIRE PERSON: I am estimating about fifteen

       6    years I think.

       7           MR. JACKS: And you said it is located in Royce

       8    City?

       9           VENIRE PERSON: Yes.

     10           MR. JACKS: Is his educational background in

     11    information technology?

     12           VENIRE PERSON: No. He had started out -- He

     13    has done many things -- plumbing, electrical. He's

     14    someone that -- get an idea about something he wants to

18:00  15    do, learn it and do it. He started at that company as

     16    maintenance, and then he decided he enjoyed the computers,

     17    and he took over their computer program as he grew. He

     18    started their program with the network.

     19           MR. JACKS: Okay. And I believe you said that

     20    after your marriage is when your husband became a

     21    naturalized U.S. citizen.

     22           VENIRE PERSON: Yes, I'm not sure how long after

     23    we were married that he went.

     24           MR. JACKS: I think that's all I have. Thank

     25    you.

18:00 1          THE COURT:  Ms. Rogina, you are part of the pool

2     from which this jury will be selected.  We're still

3     talking with members of that group, and it will probably

4     be later this week before we know who the jurors are.  So

5     in the meantime you should not discuss the subject of this

6     case with anyone or watch or read or listen to any media

7     accounts of it.  Thank you.  You may rejoin the others in

8     the hall.

9          Good afternoon, Mr. Lovely, counsel in this case

10    have some questions for you.  Mr. Westfall.

11          MR. WESTFALL:  Mr. Lovely, how are you doing,

12    I'm Greg Westfall.

13          VENIRE PERSON:  How you doing.

14          MR. WESTFALL:  I'm one of the defense lawyers in

18:00 15    this case.  How are you today?

16          VENIRE PERSON:  I'm good.

17          MR. WESTFALL:  This case is the Holy Land

18    Foundation.  It's the United States versus Holy Land

19    Foundation, and it involves a Muslim charity that is

20    accused of giving material support to a foreign terrorist

21    organization, HAMAS.  Are you familiar with the case?

22          VENIRE PERSON:  No.

23          MR. WESTFALL:  Haven't heard anything in the

24    news or anything about it?

25          VENIRE PERSON:  No.

18:00 1          MR. WESTFALL:  Are you surprised to hear that?

2     This is the first time you have ever heard it?

3          VENIRE PERSON:  I'm not surprised after what

4     happened on 9-11 I guess.  I'm not surprised too much.

5          MR. WESTFALL:  Tell me a little bit more about

6     that.  You are not surprised about what happens after

7     9-11?

8          VENIRE PERSON:  Well, things like that is

9     capable of happening in this country.  That's what I mean.

10          MR. WESTFALL:  Right.  How do you feel being on

11     a jury that's going to decide issues in any way related to

12     terrorism?

13          VENIRE PERSON:  I feel I'm a citizen in this

14     country, and it's part of my right.

18:00 15          MR. WESTFALL:  It's part of your right?

16          VENIRE PERSON:  It's my right, you know.

17          MR. WESTFALL:  Do you -- Is there anything about

18     it that would make it difficult for you to make a decision

19     just based on the evidence?

20          VENIRE PERSON:  No.

21          MR. WESTFALL:  You work in the juvenile system?

22          VENIRE PERSON:  Correct.

23          MR. WESTFALL:  Tell me what you do.

24          VENIRE PERSON:  I'm a juvenile residential

25     officer.  I work in the therapeutic part.

18:00 1                    MR. WESTFALL:  And what kind of therapy are we

2        talking about?

3                    VENIRE PERSON:  Teaching life skills to

4        juveniles, males of course.  Just do all type of

5        therapeutic games and things of that nature.

6                    MR. WESTFALL:  Does this age-wise run the gamut?

7                    VENIRE PERSON:  From twelve to seventeen.

8                    MR. WESTFALL:  How long have you been doing

9        that?

10                    VENIRE PERSON:  Last three years.

11                    MR. WESTFALL:  How do you like it?

12                    VENIRE PERSON:  I love it.

13                    MR. WESTFALL:  Do you think you are going to

14        keep on doing it?

18:00 15                    VENIRE PERSON:  Yes.

16                    MR. WESTFALL:  Sounds like you believe in it.

17        Have you had any particular training in law enforcement or

18        anything like that?

19                    VENIRE PERSON:  Well, yes, you could say

20        de-escalation and crisis and things of that nature.

21                    MR. WESTFALL:  Well, it's like social work?

22                    VENIRE PERSON:  Yes, it's like social worker.

23                    MR. WESTFALL:  Have you done something like that

24        all of your life, work with the church and stuff?

25                    VENIRE PERSON:  Pretty much.

18:00 1          MR. WESTFALL:  What church?

2          VENIRE PERSON:  I go to Eternal Rest Baptist

3     Church, but I worked in the drug prevention field for

4     twelve years before I started in the juvenile department.

5     Working for a nonprofit organization.

6          MR. WESTFALL:  Like which ones?

7          VENIRE PERSON:  A place called Nexus Recovery

8     Center.  I worked for a company called Rainbow Days.  I

9     work for an adolescent treatment facility, Home Street

10     Foundation.

11          MR. WESTFALL:  And these were all organizations

12     where people would donate money?

13          VENIRE PERSON:  Sure, yes.

14          MR. WESTFALL:  And you do your work based upon

18:00 15     the money donated?

16          VENIRE PERSON:  Nonprofit.

17          MR. WESTFALL:  And how long have you done that

18     kind of work?

19          VENIRE PERSON:  For the last fourteen, fifteen

20     years.

21          MR. WESTFALL:  In a case where we're talking

22     about material support of terrorism, you said you can be

23     fair and impartial.  You know there is a burden of proof

24     beyond a reasonable doubt?

25          VENIRE PERSON:  Yes.

18:00 1          MR. WESTFALL:  Can you hold the government to

2   that burden?

3          VENIRE PERSON:  Yes.

4          MR. WESTFALL:  Any problem with that at all?

5          VENIRE PERSON:  No.

6          MR. WESTFALL:  You know that everyone in the

7   criminal justice system is presumed innocent until the

8   government proves guilt beyond a reasonable doubt?

9          VENIRE PERSON:  Right.

10         MR. WESTFALL:  Any problem with that in a case

11  like this?

12         VENIRE PERSON:  None whatsoever.

13         MR. WESTFALL:  Mr. Lovely, thank you very much.

14         THE COURT:  Mr. Jacks, do you have questions for

18:00 15  Mr. Lovely?

16         MR. JACKS:  Yes, sir.  Thank you.  Good

17  afternoon, Mr. Lovely.

18         VENIRE PERSON:  Good afternoon.

19         MR. JACKS:  My name is Jim Jacks.  I'm an

20  Assistant United States Attorney here in Dallas.  I'm one

21  of the prosecutors on this case.  I have just a few

22  questions that I would like to ask you as well, if you

23  don't mind.  In your job as the juvenile resident officer,

24  have you ever had to testify in juvenile court or any

25  court proceeding?

18:00  1                VENIRE PERSON:  No.

       2                MR. JACKS:  Is that just because nothing has

       3     happened or it's not part of your job?

       4                VENIRE PERSON:  Because nothing has happened.

       5                MR. JACKS:  Is your job one that you are -- that

       6     you live in a facility with these juveniles?

       7                VENIRE PERSON:  No.

       8                MR. JACKS:  Can you then educate me about what

       9     it means to be a juvenile resident officer?

      10                VENIRE PERSON:  Yes.  The shift -- I work the

      11     first shift which is from seven to three o'clock, and I'm

      12     on duty from seven to three o'clock every day.  Of course,

      13     somebody calls in or comes in late, then I would have to

      14     stay over because we are a twenty-four hour facility.

18:00 15                MR. JACKS:  Is this the juvenile detention

      16     facility on Interstate 30?

      17                VENIRE PERSON:  No.  It's a branch from that.

      18                MR. JACKS:  Okay.

      19                VENIRE PERSON:  The detention center is just

      20     like a holding center.  I work for -- The branch I work

      21     for is called Youth Village, and it's more of a

      22     therapeutic part of the detention center.  What we doing

      23     is we teaching the youth skills, life skills, teaching

      24     them to use thinking arrows so we can get them back in

      25     society.

18:00 1          MR. JACKS:  Are they serving a sentence there or

2     is it -- Is it mandatory that they be there or voluntary?

3          VENIRE PERSON:  Voluntary.  And the way it works

4     is they finish our program successfully, then their record

5     will be sealed.

6          MR. JACKS:  So they have done something to

7     violate the law to end up there?

8          VENIRE PERSON:  Right.  It's a part of their

9     probation.

10          MR. JACKS:  One of the forms that we have, it

11     looks like you indicated that your wife is a manager.

12     What kind of manager is she or who does she work?

13          VENIRE PERSON:  She works for a company called

14     Smith Ink Blot.  It's a small architect firm over in

18:00 15     uptown, and she's an office manager.

16          MR. JACKS:  Do you know about how big, as far as

17     the number of people that work there?

18          VENIRE PERSON:  Six.

19          MR. JACKS:  How long has she worked for them?

20          VENIRE PERSON:  The last four years.

21          MR. JACKS:  Are you originally from Dallas?  Is

22     this where you grew up?

23          VENIRE PERSON:  Yes.

24          MR. JACKS:  And some people on their

25     questionnaire have indicated different things as far as

18:00  1    children.  Some people have said they didn't have children

       2    and what they meant by that was their children were grown

       3    and left the house.  Do you have any children?

       4            VENIRE PERSON:  Yes.

       5            MR. JACKS:  About what age are they?

       6            VENIRE PERSON:  I don't call my stepkids my

       7    stepkids, I call them my kids.  I have four kids.

       8            MR. JACKS:  And what age range do they cover?

       9            VENIRE PERSON:  One is twenty-four.  One is

      10    twenty and one nineteen and one is eighteen.

      11            MR. JACKS:  And how many of them live with you

      12    and your wife?

      13            VENIRE PERSON:  Right now, none.  They all off

      14    to college.

18:00 15            MR. JACKS:  Were they her children by an earlier

      16    marriage?

      17            VENIRE PERSON:  Yes, two of them is hers, and

      18    two of them are mine.

      19            MR. JACKS:  I believe you advised us earlier

      20    that you have not really followed or heard anything about

      21    this case in the news; is that true?

      22            VENIRE PERSON:  Yes.

      23            MR. JACKS:  And Mr. Westfall mentioned that the

      24    charges in this case essentially are that the Holy Land

      25    Foundation and the men that worked in that organization

18:00 1  provided material support to a foreign terrorist

2  organization, specifically HAMAS, H-A-M-A-S.  Have you

3  heard of HAMAS before?

4           VENIRE PERSON:  Yes.

5           MR. JACKS:  The Judge will give instructions to

6  the jury after both sides have finished presenting their

7  evidence, and he would read these instructions to you and

8  then give you a copy of them in writing.  But essentially

9  he would tell the jury what the law is here in the United

10 States as it pertains to these charges so that you can

11 then take the facts and the law and apply them together to

12 reach your verdict.  One of the things I expect he would

13 include in those instructions is that with regard to a

14 charge of providing material support to a foreign

18:00 15 terrorist organization, that he would tell you that the

16 law is even if the funds or the money that is provided to

17 that terrorist organization are used for things such as

18 medicine or books or soccer balls or a backpacks or

19 welfare payments -- even if that is how the money is

20 spent -- that is still a violation of the law.  Do you

21 understand that principle?  And do you have any question

22 about that?  Or is that something if the Judge told you

23 that was the law that you could agree with that and follow

24 that?

25           VENIRE PERSON:  Yes, I could.

18:00  1          MR. JACKS:  You said that you were active in

       2     your church -- Was it Friendship West?

       3          VENIRE PERSON:  Eternal Rest.

       4          MR. JACKS:  You said that was a Baptist

       5     denomination?

       6          VENIRE PERSON:  Yes.

       7          MR. JACKS:  What part of Dallas is it located

       8     in?

       9          VENIRE PERSON:  Northeast Dallas, off Ross and

      10     Washington.

      11          THE COURT:  Mr. Jacks, your time has expired.

      12          MR. JACKS:  Thank you, your Honor.

      13          THE COURT:  Mr. Lovely, as you probably can

      14     tell, we are still in the process of interviewing members

18:00 15     of the panel from which the jury will be selected.  That

      16     process will probably take us until the latter part of

      17     this week.  So until you hear from us again, you should

      18     not discuss this case with anyone or allow anyone to

      19     discuss it with you.  Nor should you read or watch or

      20     listen to any media accounts of the case.  Thank you.  You

      21     may rejoin the others in the hall.

      22          Good afternoon, Ms. Marshall.

      23          VENIRE PERSON:  Afternoon.

      24          THE COURT:  Counsel for parties in this case

      25     have some questions for you.  Mr. Westfall.

18:00   1            MR. WESTFALL:  Thank you, your Honor.  Ms.

      2   Marshall, I'm Greg Westfall.  How are you today?

      3            VENIRE PERSON:  Fine, how are you?

      4            MR. WESTFALL:  Very well.  I was listening to

      5   see if I was going to be able to hear your voice.  I am

      6   one of the defense lawyers in this case, and I am going to

      7   speak with you a little bit, and the government is going

      8   to speak with you a little bit.  This case is the Holy

      9   Land Foundation case, United States versus Holy Land

   10   Foundation, and it involves allegations that the Muslim

   11   charity, the Holy Land Foundation -- it's an

   12   American-Muslim charity -- gave material support to a

   13   foreign terrorist organization, specifically HAMAS.

   14   Having heard that, do you recognize the case?

18:00 15            VENIRE PERSON:  I read in the paper this

   16   morning.

   17            MR. WESTFALL:  You read in the paper this

   18   morning?

   19            VENIRE PERSON:  Yes.

   20            MR. WESTFALL:  Which paper did you read?

   21            VENIRE PERSON:  Dallas Morning News.

   22            MR. WESTFALL:  Did you read the whole article?

   23            VENIRE PERSON:  Yes, I did.

   24            MR. WESTFALL:  And what sort of impressions or

   25   opinions did you form as a result of that?

18:00 1            VENIRE PERSON:  Confused.

2            MR. WESTFALL:  Confused?  Well, that's good.  Do

3       you remember ever hearing about it before this morning?

4            VENIRE PERSON:  I really hadn't, no.

5            MR. WESTFALL:  Having read that, do you think

6       there is anything about that and you reading that that

7       would make it difficult for you to serve as a juror in

8       this case?

9            VENIRE PERSON:  I don't think it would.

10           MR. WESTFALL:  How long have you been with

11      Baylor?

12           VENIRE PERSON:  Fifteen years.

13           MR. WESTFALL:  Do you work in the school part or

14      treatment part?

18:00 15          VENIRE PERSON:  I work in the treatment part.

16      I'm a dental technician.

17           MR. WESTFALL:  You have been on a jury before?

18           VENIRE PERSON:  Yes, I have.

19           MR. WESTFALL:  And have you been on more than

20      one you think?  Criminal jury?

21           VENIRE PERSON:  One was civil, and the other was

22      grand jury.  I was on there for a couple of months, but it

23      was like one day a week, and it was several cases every

24      day.

25           MR. WESTFALL:  Where were you on the grand jury?

18:00  1              VENIRE PERSON:  At the Crowley Building.

2              MR. WESTFALL:  So here in Dallas?

3              VENIRE PERSON:  Yes.

4              MR. WESTFALL:  How did you like that?

5              VENIRE PERSON:  Very interesting.

6              MR. WESTFALL:  So you must be intimately

7    familiar with the Constitutional rights people have when

8    they are charged with crimes?

9              VENIRE PERSON:  A little bit.

10             MR. WESTFALL:  You know you have a burden of

11   proof in criminal courts.  It's not anything like the

12   grand jury.  Grand jury is probable cause.  But once it

13   gets here, we're talking about reasonable doubt, and of

14   course, the presumption of innocence.  Even though you

18:00 15   have been indicted, the government still has to prove its

16   case beyond a reasonable doubt, and anyone charged with a

17   crime is presumed innocent up until the time that the jury

18   decides the government has proven the case beyond a

19   reasonable doubt.  What do you think of those?  Do you

20   like those protections?  Too protective, not protective

21   enough?

22             VENIRE PERSON:  I think they are fair.

23             MR. WESTFALL:  Why do you think we have them?

24             VENIRE PERSON:  Well --

25             MR. JACKS:  Judge, I object to the form of the

18:00  1    question.  I don't believe that's germane to her

       2    qualifications to serve on the jury.

       3            THE COURT:  I didn't understand the question.

       4    What was it, Mr. Westfall?

       5            MR. WESTFALL:  I asked her why does she believe

       6    or why does she think that we have a presumption of

       7    innocence.

       8            THE COURT:  I'll permit it.  Overruled.

       9            MR. WESTFALL:  Well, it's to make it fair, just

      10    make the process fair?

      11            VENIRE PERSON:  Yes.

      12            MR. WESTFALL:  Do you agree with those

      13    protections?  Do you feel like they are good?

      14            VENIRE PERSON:  I think so.

18:00 15            MR. WESTFALL:  Do you know any Muslims in your

      16    work?

      17            VENIRE PERSON:  No, not personally.  You know,

      18    we have them, all nationalities go to school there.  But

      19    you know --

      20            MR. WESTFALL:  Have you had any bad experiences

      21    with Muslims?

      22            VENIRE PERSON:  No.

      23            MR. WESTFALL:  Any good experiences with Muslim?

      24            VENIRE PERSON:  I have never had any problem

      25    with anybody really.

18:00  1          MR. WESTFALL:  This is a case that has terrorism

2     in the name.  In this case, can you presume a Muslim

3     innocent until the government either carries his burden of

4     proof or doesn't?

5          VENIRE PERSON:  I don't feel like anybody is

6     guilty until they are proven guilty, is my belief.

7          MR. WESTFALL:  Just like on the grand jury, the

8     ones that do the accusing have to do the proving?

9          VENIRE PERSON:  Yes, that's my belief.

10         THE COURT:  Mr. Jacks, do you have questions for

11    Ms. Marshall?

12         MR. JACKS:  Yes, your Honor, thank you.  Good

13    afternoon, Ms. Marshall.

14         VENIRE PERSON:  Hi, how are you.

18:00 15         MR. JACKS:  My name is Jim Jacks.  I'm an

16    Assistant United States Attorney here in Dallas, and I'm

17    one of the prosecutors in this case.  I have a few brief

18    questions that I would like to ask you to follow-up on

19    your questionnaire and also questions that Mr. Westfall

20    asked you if you don't mind.

21         VENIRE PERSON:  Okay.

22         MR. JACKS:  As I understand it, you have lived

23    in the Dallas area all of your life.  Is that correct?

24         VENIRE PERSON:  Yes.

25         MR. JACKS:  And how long have you worked in the

18:00 1    field as a dental technician?

2            VENIRE PERSON:  I have been there fifteen years.

3    Before I did that, I worked in the grocery business.

4            MR. JACKS:  Grocery business?

5            VENIRE PERSON:  Yes.

6            MR. JACKS:  For one of the major chains?

7            VENIRE PERSON:  It was Safeway.

8            MR. JACKS:  Did you work in a store or some

9    other capacity?

10            VENIRE PERSON:  Yes.  I worked in a store.

11            MR. JACKS:  Different parts of town or mainly in

12    one store?

13            VENIRE PERSON:  Mainly in East Dallas.

14            MR. JACKS:  Okay.  Your children are all grown?

18:00 15            VENIRE PERSON:  Yes, they are.

16            MR. JACKS:  Do they live in this area still?

17            VENIRE PERSON:  All of them live here in Dallas.

18            MR. JACKS:  On the questionnaire when it asked

19    you about prior jury service, let's see, you said you had

20    been on a jury in a civil case but you weren't sure of the

21    date.

22            VENIRE PERSON:  No, I'm not sure of the date.

23    It was so long ago.

24            MR. JACKS:  Do you remember what the nature of

25    the dispute was?

18:00 1          VENIRE PERSON:  I can't remember.  Really I
2     don't remember.  I know it was civil, but I don't know.

3          MR. JACKS:  Okay.  You checked yes that you had
4     been a juror in a criminal case.  Is that accurate, that
5     you have been on a trial jury in a criminal case?

6          VENIRE PERSON:  I was on a trial jury.  I'm
7     trying to think -- I remember one case was for incest, and
8     I know I was on another one, but I was so young I can't
9     remember what that case was for.  I know I was on two.

10          MR. JACKS:  Do you know if the jury reached a
11    verdict?

12          VENIRE PERSON:  Yes, we did.

13          MR. JACKS:  And you said you did serve on the
14    Dallas County, Texas grand jury?

18:00 15          VENIRE PERSON:  Yes.

16          MR. JACKS:  About how long was that?

17          VENIRE PERSON:  I think that was about ten years
18    ago I believe.

19          MR. JACKS:  And you said the term was for sixty
20    days.  Is that correct?

21          VENIRE PERSON:  We were there -- I think it was
22    a two-month deal, and we went one day a week, and they had
23    several things on docket every Thursday.  I know it was on
24    a Thursday.

25          MR. JACKS:  Okay.  Mr. Westfall briefly touched

18:00  1    on the nature of the charges in this case, and as he

       2    stated to you, the principal or I guess the way the case

       3    has been referred to is the United States versus the Holy

       4    Land Foundation and certain individuals that work with

       5    that organization, and they have been indicted for

       6    providing material support to a foreign terrorist group,

       7    specifically HAMAS.  Have you ever heard of HAMAS?

       8            VENIRE PERSON:  Just what I read.

       9            MR. JACKS:  Through the news?

      10            VENIRE PERSON:  That's it.

      11            MR. JACKS:  Do you regularly read the

      12    newspapers?

      13            VENIRE PERSON:  Yes, I do.

      14            MR. JACKS:  And the Judge will -- as you

18:00 15    probably remember from having been on a jury.  After all

      16    the evidence has been presented, the Judge will read

      17    instructions to the jury telling them what the law is,

      18    giving definitions of words, principles of law that you

      19    are to apply to the facts that have come into evidence so

      20    that you can render your verdict.  Do you remember that

      21    part of the procedure?

      22            VENIRE PERSON:  I do.

      23            MR. JACKS:  And the Judge in this case will do

      24    that same thing to those that are on the jury?

      25            VENIRE PERSON:  Yes.

18:00   1          MR. JACKS:  I principles of law or the

        2   principles of the statutes that pertain to a charge of

        3   providing material support to a foreign terrorist

        4   organization, the Judge will tell the jury that even if

        5   the funds -- the money that is provided to a terrorist

        6   organization -- is spent for things such as books,

        7   backpacks or medicine or support funds for widows and

        8   orphans, even if it is spent for what would otherwise be

        9   good purposes, that is still a violation of the law.

     10   Having said that to you, I assume you probably weren't

     11   aware of that particular feature in the law.  Is that

     12   right?  Could you answer out?

     13           VENIRE PERSON:  Okay.  Now what?

     14           MR. JACKS:  I assume you were not aware of that

18:00 15   before you came in here today.

     16           VENIRE PERSON:  No.

     17           MR. JACKS:  If the Judge told you that was the

     18   law, could you abide by it and apply it?

     19           VENIRE PERSON:  I think I could.

     20           MR. JACKS:  There is one thing on the

     21   questionnaire that I wanted to touch on.  There was a

     22   question that asked you whether you spoke Arabic or

     23   Hebrew, and you answered no.  And the next question was --

     24   and I'm not sure if you intended to answer this or not.

     25   But it was if you speak, read or understand Arabic or

18:00 1    Hebrew, would you have any difficulty relying solely on

2    the translator's translation of the evidence.  And you

3    said yes.  Do you remember that question?

4              VENIRE PERSON:  That means if someone was

5    translating it to me in English?

6              MR. JACKS:  Right.

7              VENIRE PERSON:  I understand English, yes.

8              THE COURT:  Mr. Jacks, your time is expired.

9              MR. JACKS:  Thank you, I think I understand your

10   answer.

11             Ms. Marshall, as you can probably tell, we're in

12   the process of talking with members of the pool from which

13   our jury will be selected.  We probably will be at least a

14   couple of days.  So it will be later this week before we

18:00 15   know who's on the jury or who's not.  And in the mean time

16   don't discuss this case with anyone or allow anyone to

17   discuss it with you or read or watch any media accounts of

18   the case.

19             VENIRE PERSON:  Okay.

20             THE COURT:  We're finished with our questioning

21   of you, and so you may rejoin the others in the hall.

22   Thank you.

23             THE COURT:  Good afternoon, is your name

24   pronounced Arce?

25             VENIRE PERSON:  Arce.

18:00  1           THE COURT:  Counsel for the parties have some

       2    questions for you about this case.  Mr. Westfall.

       3           MR. WESTFALL:  Mr. Arce, I'm Greg Westfall.

       4           VENIRE PERSON:  Hi.

       5           MR. WESTFALL:  I'm one of the defense lawyers in

       6    this case.  I want to talk to you a little bit, and then I

       7    imagine the government will talk to you a little bit.

       8    Okay?

       9           VENIRE PERSON:  Okay.

      10           MR. WESTFALL:  This case is about an allegation

      11    by the government that the Holy Land Foundation for Relief

      12    and Development, which is an American Muslim charity -- or

      13    was -- gave material support to a foreign terrorist

      14    organization, specifically HAMAS.  Does that ring any

18:00 15    bells with you?

      16           VENIRE PERSON:  I have heard of HAMAS on news

      17    before, but don't remember exactly what it was connected

      18    with.

      19           MR. WESTFALL:  This charity was in Richardson,

      20    Texas.  Never.  Heard anything about arrests or anything

      21    like that?

      22           VENIRE PERSON:  No.

      23           MR. WESTFALL:  What do you know about HAMAS?

      24           VENIRE PERSON:  I just heard the name in the

      25    news.  I know it's a terrorist group.  I never paid too

18:00    1    much attention.

         2                MR. WESTFALL:  Do you know where they are

         3    supposed to operate?

         4                VENIRE PERSON:  Overseas somewhere.

         5                MR. WESTFALL:  How long have you been with the

         6    post office?

         7                VENIRE PERSON:  About seven years.

         8                MR. WESTFALL:  Do you like it?

         9                VENIRE PERSON:  Yes.

        10                MR. WESTFALL:  Do you work with any Muslims?

        11                VENIRE PERSON:  No, I don't believe I do.  Not

        12    to my knowledge.

        13                MR. WESTFALL:  Do you know any?

        14                VENIRE PERSON:  Not personally.

18:00  15                MR. WESTFALL:  Anybody of Arabic decent?

        16                VENIRE PERSON:  I think my mechanic is.

        17                MR. WESTFALL:  Do you like your mechanic?

        18                VENIRE PERSON:  Yes, I do.

        19                MR. WESTFALL:  Have you had any good experience

        20    with Muslims or bad experiences, anything that sticks out?

        21                VENIRE PERSON:  Not to speak of, nothing bad or

        22    good.

        23                MR. WESTFALL:  Israel and Palestine, have you

        24    ever done any studying on the Israeli-Palestinian conflict

        25    at all?

18:00 1          VENIRE PERSON:  I haven't done any studying.  I

2     heard it on the news.  I know there is conflicts between

3     the two.

4          MR. WESTFALL:  Do you have an opinion on that?

5          VENIRE PERSON:  I don't know enough to have an

6     opinion on it.

7          MR. WESTFALL:  In a criminal trial, you know

8     everyone has the right not to testify against themselves.

9     Did you know that?

10          VENIRE PERSON:  Yes.

11          MR. WESTFALL:  Have you been on a jury before?

12     I didn't think that you had.

13          VENIRE PERSON:  No.

14          MR. WESTFALL:  In addition, there is the burden

18:00 15     which is always on the government, never shifts.  And it's

16     called beyond a reasonable doubt.  That's the highest

17     burden in the law, and that's reserved only for criminal

18     trials.  Did you know that?

19          VENIRE PERSON:  Yes.

20          MR. WESTFALL:  And then there is the presumption

21     of innocence that I'm sure you know about.

22          VENIRE PERSON:  Yes.

23          MR. WESTFALL:  It is that anybody who's charged

24     with a criminal case anywhere in this nation, they are

25     presumed innocent until the government proves its case

18:00  1    beyond a reasonable doubt.  How do you feel about those

       2    protections?

       3              VENIRE PERSON:  I feel it's very fair.

       4              MR. WESTFALL:  So if somebody doesn't want to

       5    testify -- Can you imagine somebody not testifying in

       6    their own criminal trial?

       7              VENIRE PERSON:  Can I imagine it?  Yes.

       8              MR. WESTFALL:  Any problems at all, you know,

       9    with the length of trial being four months or somewhere

      10    thereabouts?  Nobody can guarantee how long it's going to

      11    go, but it's going a while.  Anything about that make it

      12    hard for you to serve and keep your mind on it?

      13              VENIRE PERSON:  No.

      14              MR. WESTFALL:  That's all, your Honor.  Thank

18:00 15    you.  Thank you.

      16              THE COURT:  Mr. Jacks, do you have questions for

      17    Ms. Arce?

      18              MR. JACKS:  Mr. Arce, my name is Jim Jacks.  I'm

      19    one of the prosecutors on this case.  I have a few

      20    questions.

      21              VENIRE PERSON:  Okay.

      22              MR. JACKS:  Are your children still at home?

      23              VENIRE PERSON:  My daughter moved out, and my

      24    son recently moved out and moved back in, and I have my

      25    thirteen year old at home with me.

18:00  1            MR. JACKS:  Have you lived in the Dallas area

2     basically your entire life?

3            VENIRE PERSON:  Just about.

4            MR. JACKS:  And you said you had worked for the

5     Postal Service about seven years?

6            VENIRE PERSON:  Yes, about seven years.

7            MR. JACKS:  What kind of work did you do before

8     that?

9            VENIRE PERSON:  I was a homemaker.  I stayed at

10    home.

11           MR. JACKS:  Any other jobs that you have had

12    outside the home other than for the Postal Service?

13           VENIRE PERSON:  I worked part time here and

14    there.  Kroger at one point.  I also did the census, and

18:00 15   when I was in high school I worked part time at a grocery

16    store.

17           MR. JACKS:  Okay.  One of the things that you

18    responded to on the questionnaire was that a couple of

19    your children had had a misdemeanor theft charge.

20           VENIRE PERSON:  Yes.

21           MR. JACKS:  How long ago was that?

22           VENIRE PERSON:  My daughter had one just at the

23    beginning of the year, new year, to be precise, and my

24    son, I think it was like two years ago.

25           MR. JACKS:  Were they juveniles or older than

18:00  1    seventeen at the time?

       2             VENIRE PERSON:  Older than seventeen.

       3             MR. JACKS:  Have those been resolved?

       4             VENIRE PERSON:  Yes, they have.

       5             MR. JACKS:  Do you feel like they were treated

       6    fairly when those were resolved?

       7             VENIRE PERSON:  Yes.

       8             MR. JACKS:  Would you describe yourself as

       9    active in your church?

      10             VENIRE PERSON:  No, not really active.  I guess

      11    moderate.

      12             MR. JACKS:  I understand.  You've told us that

      13    you don't know much at all obviously about this case from

      14    the media.  Is that correct?

18:00 15             VENIRE PERSON:  Yes, it is.

      16             MR. JACKS:  And you have not been on a trial

      17    jury before?  You have never served on a trial jury?

      18             VENIRE PERSON:  That's correct.

      19             MR. JACKS:  Have you ever received a jury

      20    summons?

      21             VENIRE PERSON:  Yes.

      22             MR. JACKS:  And have you been through this

      23    process before, not so much as an individual but as a

      24    group?  Did you get summoned to a courtroom and go through

      25    the jury selection process?

18:00 1          VENIRE PERSON:  Yes, I did.

2          MR. JACKS:  Was that at Dallas County, Texas?

3          VENIRE PERSON:  Yes, at Lew Sterrett.

4          MR. JACKS:  Crowley or whatever?

5          VENIRE PERSON:  Yes.

6          MR. JACKS:  At the end of the evidence when both

7     sides have presented all their evidence, the Judge will

8     deliver or read to the jury the Court's charge or its jury

9     instructions which are basically the Judge telling the

10    jury this is the law that should be applied to this case,

11    and you have heard mentioned that one of the charges is

12    providing material support to a foreign terrorist

13    organization.  Well, he would read that law to you and

14    explain to you definitions like what is a foreign

18:00 15   terrorist organization, that type of thing.  In addition,

16    as a part of those instructions, I anticipate the Judge

17    will tell the jury that with regard to the notion of

18    material support, whether it's money, currency or

19    whatever, that even if that material support is in the

20    form of food, clothing, books, medical equipment to be

21    used in a hospital, even if it's in that type of form, if

22    it's being provided for the benefit of a foreign terrorist

23    organization, that that's against the law.

24          Do you have any feelings one way or the other

25    about that feature of the law?  Do you agree with it,

18:00 1   disagree with it?  Could you follow it?

2           VENIRE PERSON:  I could follow it.

3           MR. JACKS:  Thank you, ma'am.  Thank you, your

4   Honor.

5           THE COURT:  Ms. Arce, as you can probably tell,

6   we are in the process of determining now who will be on

7   the jury that would hear this case.  We are expecting that

8   this process will extend over a period of days.  So it

9   will probably be later this week before we know who's on

10  the jury, and in the meantime until you hear from us again

11  you should not discuss this case with anyone or allow

12  anyone to discuss it with you.  Nor should you read or

13  watch or listen to any media accounts of the case.  Thank

14  you.  You may rejoin the others in the hall.

18:00 15          THE COURT:  Good afternoon, Ms. Ho.  Counsel

16  for the parties in this case have some questions for you.

17          Ms. Moreno.

18          MS. MORENO:  Good afternoon.  My name is Linda

19  Moreno, and I represent one of the gentlemen here in this

20  particular case.  I want to ask you some questions about

21  the questionnaire that you filled out all of those months

22  ago.  Do you remember that?

23          VENIRE PERSON:  Not for sure.

24          MS. MORENO:  I am going to need you to speak up

25  just a little bit.

18:00 1         Let me first ask you, this is a case that may

2   take three months, four months, five months.  It's

3   uncertain at this time.  Knowing that, would that pose a

4   hardship for you, an economic hardship for you?  Would

5   that be a big problem for you?

6         VENIRE PERSON:  Well, one thing I would like to

7   let you know, I don't think I'm good on a jury because I'm

8   not speaking English very well.

9         MS. MORENO:  In fact, I saw from your

10   questionnaire that English is your second language.  Is

11   that right?

12         VENIRE PERSON: Yes, that's correct.

13         MS. MORENO:  In this case there is going to be a

14   lot of documents and transcripts and tapes.  Do you think

18:00 15   that you could follow along easily all of that kind of

16   evidence in the English language or would that be too

17   difficult for you?

18         VENIRE PERSON:  Yes, that's very difficult for

19   me.

20         MS. MORENO:  So what I understand you to say,

21   because of the difficulty in comprehending the English

22   language, you would not be able to be a good juror for

23   this case and be able to follow the evidence.  Is that

24   right?

25         VENIRE PERSON:  Yes.

18:00 1                MS. MORENO:  Thank you so much.  Pass the juror.

2                THE COURT:  Mr. Jacks, do you have questions for

3        Ms. Ho?

4                MR. JACKS:  Very briefly, your Honor.  My name

5        is Jim Jacks, and I'm an Assistant United States Attorney

6        here in Dallas and one of the prosecutors on the case.

7        You said you had lived in the Dallas area for thirteen

8        years.

9                VENIRE PERSON:  Yes.

10               MR. JACKS:  Where did you live before that?

11               VENIRE PERSON:  In Grand Prairie.

12               MR. JACKS:  In Grand Prairie?

13               VENIRE PERSON:  Yes.

14               MR. JACKS:  Were you born in the United States

18:00 15       or did you immigrate to the United States?

16               VENIRE PERSON:  I'm not born in the United

17       States.

18               MR. JACKS:  When did you move to the United

19       States?

20               VENIRE PERSON:  I don't remember.  It's been a

21       long time ago.

22               MR. JACKS:  And is it your view that it would be

23       difficult for you to understand the evidence because it's

24       not your first language?

25               VENIRE PERSON:  Yes.

18:00   1             MR. JACKS:  Well, I think your English is

2    excellent, but I understand your concern.  Thank you, your

3    Honor.

4             THE COURT:  Ms. Ho, we are in the process of

5    selecting the jury that would hear this case.  But it

6    probably will be later this week before we know who's on

7    the jury.  So in the meantime you should not discuss this

8    case with anyone or allow anyone to discuss it with you.

9    Nor should you read or watch or listen to any media

10    accounts of the case.  Thank you, you may rejoin the

11    others in the hall.

12             VENIRE PERSON:  All right.  Thank you.

13             MS. MORENO:  Your Honor, at this point we would

14    move the Court to excuse Ms. Ho.  She cannot understand

18:00 15    the English language.  She was very honest with us.  She

16    could not follow the evidence.  She volunteered that

17    information.  I really didn't have to elicit it from her.

18    So I think that rises to a cause challenge.

19             THE COURT:  Any objection, Mr. Jacks?

20             MR. JACKS:  No, your Honor.

21             THE COURT:  I will excuse Ms. Ho for cause.

22             MR. WESTFALL:  Your Honor, I have been asked to

23    inquire -- We have a couple of people here with bathroom

24    issues.  Maybe after this one take a short break to go to

25    the restroom?

18:00   1            THE COURT:  Okay.

       2            MR. WESTFALL:  Thank you, your Honor.  Mr.

       3 Kiblinger, I think we're ready to see Mr. Smith.

       4            THE COURT:  Good afternoon, Mr. Smith.  Counsel

       5 for the parties have some questions they would like to ask

       6 you.

       7            MR. WESTFALL:  Mr. Smith, how you doing?

       8            VENIRE PERSON:  Fine.

       9            MR. WESTFALL:  I'm Greg Westfall.  I'm one of

     10 lawyers representing the defendants in this case.  Do you

     11 know what case we're here on?

     12            VENIRE PERSON:  (Shakes head)

     13            MR. WESTFALL:  United States versus Holy Land

     14 Foundation which is an American Muslim charity that is

18:00 15 accused of giving material support to HAMAS which is a

     16 terrorist organization.  Now, knowing that additional

     17 information, does that ring a bell at all?

     18            VENIRE PERSON:  Not really.

     19            MR. WESTFALL:  You haven't read anything about

     20 it in the paper or anything like that?

     21            VENIRE PERSON:  It sounds kind of familiar

     22 but --

     23            MR. WESTFALL:  I guess you haven't made up your

     24 mind one way or the other?

     25            VENIRE PERSON:  No.

18:00 1          MR. WESTFALL:  Do you know what HAMAS is?  Are
     2     you familiar with HAMAS, the organization?

     3          VENIRE PERSON:  It's a Muslim organization?

     4          MR. WESTFALL:  Right.

     5          VENIRE PERSON:  No, I'm not familiar with it.

     6          MR. WESTFALL:  You are retired now?

     7          VENIRE PERSON:  Yes.

     8          MR. WESTFALL:  What do you do?

     9          VENIRE PERSON:  I worked for the public schools
    10     in Dallas.

    11          MR. WESTFALL:  What do you do now that you are
    12     retired?  Do you still have some jobs that you do?

    13          VENIRE PERSON:  No, I don't right now.  I'm too
    14     old.

18:00 15          MR. WESTFALL:  Just kind of taking it easy.
    16     Have you ever been on a jury before?

    17          VENIRE PERSON:  No, sir.

    18          MR. WESTFALL:  And you are probably familiar
    19     with these, but there are some protections that apply to
    20     anyone who's charged with a crime in the American jury
    21     system in a criminal case.  I bet you already know what
    22     some of those are.  You don't have to testify if you don't
    23     want to if you are a criminal defendant.  Did you know
    24     that?

    25          VENIRE PERSON:  Not really.

18:00 1      MR. WESTFALL:  5th Amendment, pleading the 5th

2   Amendment?

3            VENIRE PERSON:  I remember that.

4            MR. WESTFALL:  That really is a protection in a

5   criminal trial and a very serious one.  If somebody

6   doesn't want to testify in a criminal case, their own,

7   they don't have to, and the jury is not allowed to hold

8   that against them.  Are you okay with that?

9            VENIRE PERSON:  I'm okay.

10           MR. WESTFALL:  Do you think that's fair?

11           VENIRE PERSON:  Yes.

12           MR. WESTFALL:  And another one is called

13  presumption of innocence.  Anyone charged with a crime in

14  the United States is presumed innocent?

18:00 15          VENIRE PERSON:  Until proven.

16           MR. WESTFALL:  As we sit here everybody is

17  presumed innocent.  The presumption of innocence is

18  sufficient alone to acquit a person; that is, unless the

19  government proves its case beyond a reasonable doubt.  And

20  you have heard about beyond a reasonable doubt?

21           VENIRE PERSON:  I understand.

22           MR. WESTFALL:  This is a case that the -- You

23  know terrorism is in the name of the offense.  How do you

24  feel about giving those protections to somebody charged

25  with terrorism in the name of the offense?  Do you think

18:00   1    that they should have those protections like anyone else?

      2                VENIRE PERSON:  Sure.

      3                MR. WESTFALL:  Do you know any Muslims?

      4                VENIRE PERSON:  No.

      5                MR. WESTFALL:  Have you ever known any Muslims?

      6                VENIRE PERSON:  I'm not sure.

      7                MR. WESTFALL:  How about Arabs?

      8                VENIRE PERSON:  No.

      9                MR. WESTFALL:  Do you have any opinions about

   10    Muslims?

   11                VENIRE PERSON:  No, that's their belief.

   12                MR. WESTFALL:  Right.  Do you often go to church

   13    yourself?

   14                VENIRE PERSON:  Yes.

18:00 15                MR. WESTFALL:  Which church do you go to, just

   16    denomination?

   17                VENIRE PERSON:  Baptist.

   18                MR. WESTFALL:  Do you volunteer at all at the

   19    church?  Do any volunteer work?

   20                VENIRE PERSON:  Yes.

   21                MR. WESTFALL:  What do you do?

   22                VENIRE PERSON:  Sunday school superintendent.

   23                MR. WESTFALL:  What does a Sunday school

   24    superintendent do?

   25                VENIRE PERSON:  Teach the lesson and then I help

18:00 1  with other things, too, with the children.

2           MR. WESTFALL:  So do you have, like, some

3  administrative duties in addition to teaching the Sunday

4  school?

5           VENIRE PERSON:  Yes.

6           MR. WESTFALL:  You know that Israel is kind of

7  disputed territory, some of it?

8           VENIRE PERSON:  Right.

9           MR. WESTFALL:  Palestine-Israeli issue, how do

10  you feel about that?

11           VENIRE PERSON:  I don't have a feeling about it.

12  To each his own.  So I don't have an opinion how I feel on

13  it.

14           MR. WESTFALL:  As between the Israelis and the

18:00 15  Palestinians, you don't have a position on who's right or

16  who's wrong in that?

17           VENIRE PERSON:  No, I don't.

18           MR. WESTFALL:  Thank you very much for speaking

19  with me.

20           VENIRE PERSON:  You are welcome.

21           THE COURT:  Mr. Jacks, do you have questions for

22  Mr. Smith?

23           MR. JACKS:  Yes, your Honor.  Good afternoon,

24  Mr. Smith.  My name is Jim Jacks, and I'm an Assistant

25  United States Attorney here in, Dallas and I'm one of

18:00  1    prosecutors on this case.  I have a few questions that I

       2    would like to ask you if you don't mind.  You've been

       3    retired from DISD for how long?

       4               VENIRE PERSON:  Since 2000.

       5               MR. JACKS:  And you worked there for how long?

       6               VENIRE PERSON:  Fifteen years.

       7               MR. JACKS:  Did you work at different campuses

       8    or always at the same campus?

       9               VENIRE PERSON:  Well, to start out I was at

      10    different campuses until I became an assistant, and I was

      11    at one location then.

      12               MR. JACKS:  Where was that?

      13               VENIRE PERSON:  Pershing Middle School.

      14               MR. JACKS:  How long did you work there at

18:00 15    Pershing?

      16               VENIRE PERSON:  Eleven years.

      17               MR. JACKS:  Your wife -- On one of the forms

      18    that we have, you have shown that your wife is a housewife

      19    now?

      20               VENIRE PERSON:  Yes.

      21               MR. JACKS:  Has she ever worked outside the

      22    home?

      23               VENIRE PERSON:  She did at Salvation Army.

      24               MR. JACKS:  And what kind of work did she do

      25    there?  Was it one of their stores?

18:00  1          VENIRE PERSON:  No, where they take in abused

       2     children.  Abused wives.

       3          MR. JACKS:  At a shelter?

       4          VENIRE PERSON:  Yes.

       5          MR. JACKS:  How long did she work there?

       6          VENIRE PERSON:  A couple of years.

       7          MR. JACKS:  Any other work she did outside the

       8     home?

       9          VENIRE PERSON:  I think she worked at Sears

      10     warehouse.

      11          MR. JACKS:  Was that location down here on Lamar

      12     years ago or --

      13          VENIRE PERSON:  No, it was more or less Garland

      14     area.

18:00 15          MR. JACKS:  Prior to working for DISD, what kind

      16     of work did you do?

      17          VENIRE PERSON:  Warehouse work, forklift and

      18     filling orders.

      19          MR. JACKS:  For whom did you work?

      20          VENIRE PERSON:  It's slipping.

      21          MR. JACKS:  That's okay.  Let me ask you this.

      22     What type of product did they sell?

      23          VENIRE PERSON:  Washing powders and soaps and

      24     toothpaste.

      25          MR. JACKS:  You said you have not served on a

18:00  1     jury before.

       2               VENIRE PERSON:  That's correct.

       3               MR. JACKS:  I take it your children are all

       4     grown and left home.

       5               VENIRE PERSON:  All grown.

       6               MR. JACKS:  One of the -- One of the questions

       7     that Mr. Westfall gave you was a very brief description of

       8     what this case is about, what the charges are.  And at the

       9     end of the evidence, when both sides have rested their

      10     case, the Judge will read his instructions to the jury

      11     which it will be a multi-page document, and the jury will

      12     have a copy of it when they are deliberating.  But it

      13     basically contains the law as it applies to this case.  It

      14     will tell you what has to be present in the evidence in

18:00 15     order to find that somebody has provided material support

      16     to a foreign terrorist organization.  He would give you

      17     definitions like a foreign terrorist organization is what,

      18     and they will tell you what that means.  I anticipate that

      19     as a part of those instructions he would tell you what

      20     must happen or must be present for you to find or believe

      21     that someone has violated this law, but I anticipate that

      22     he would also tell you that even if the defendant or some

      23     other -- that person gave support, whether in the form of

      24     money or goods like educational supplies, backpacks,

      25     books, food, money to support people, soccer balls,

18:00 1    anything like that, so called maybe humanitarian aid --

2    Even if the support is of that type, if it's for the

3    benefit of a foreign terrorist organization, it's against

4    the law.  Do you understand that explanation as I gave it

5    to you?

6                VENIRE PERSON:  Yes.

7                MR. JACKS:  Do you agree with that provision of

8    the law?

9                VENIRE PERSON:  I don't think so.

10                MR. JACKS:  You don't think so?

11                VENIRE PERSON:  No, sir.

12                MR. JACKS:  So if the evidence in this case

13    showed that's -- For example, if money were given to this

14    organization, this foreign terrorist organization, but it

18:00 15    was spent for what would otherwise be in and of itself

16    good things, that if that was what the evidence showed you

17    couldn't return a guilty verdict?

18                VENIRE PERSON:  I look at it as a humanitarian

19    situation.  It's giving to help someone.

20                MR. JACKS:  I understand.

21                VENIRE PERSON:  I don't see where that's wrong.

22    Maybe I'm wrong but --

23                MR. JACKS:  Well, there are no wrong answers

24    from where you sit.  That's kind of the purpose of this,

25    is to find out how jurors feel, what their life

18:00 1    experiences have been.  And so it's not a question that

2    your answer is right or wrong.

3              THE COURT:  Mr. Jacks, your time has expired.

4              MR. JACKS:  Thank you.

5              THE COURT:  Mr. Smith, as you can tell, we're in

6    the process of selecting a jurY from among the pool in

7    this case, and so you should not discuss this case with

8    anyone or allow anyone to discuss it with you.  Nor should

9    you read or watch or listen to any other media coverage

10   about the case.  Thank you.  You may rejoin the others in

11   the hall.

12             MR. JACKS:  Your Honor, we would submit Mr.

13   Smith for cause.

14             THE COURT:  Any objection, Mr. Westfall?

18:00 15            MR. WESTFALL:  Yes, your Honor, we object.  I'm

16   not at all convinced that Mr. Smith understood the concept

17   that the prosecutor was trying to get across, and the

18   question itself had about a hundred fifty words including

19   a laundry list of things.  The issue is whether he can

20   consider nonmonetary aid or non -- giving guns as material

21   support of a terrorist organization.  I don't think that

22   question was fairly asked in a way that he could

23   understand it, and I don't think they have made their

24   challenge on the law, your Honor.

25             THE COURT:  This is another one that I will take

18:00 1  under advisement for the time being.

2              Ladies and Gentlemen, we'll take a fifteen

3  minute recess.

4              (Recess)

5              THE COURT:  Be seated, please.  Good afternoon,

6  Mr. Holmes.  Counsel for the parties in this case have

7  some questions for you.  Mr. Westfall.

8              MR. WESTFALL:  Thank you, your Honor.  I'm

9  Greg Westfall.  I'm one of the defense lawyers on this

10 case.

11             VENIRE PERSON:  All right.

12             MR. WESTFALL:  Do you know what case this is?

13             VENIRE PERSON:  No, sir.

14             MR. WESTFALL:  This is the Holy Land Foundation

18:00 15 case, the United States versus Holy Land Foundation and

16 several individuals.  It is a case where what the

17 government alleges is that the Holy Land Foundation, which

18 is an American Muslim charity, gave material support to

19 HAMAS which is a foreign terrorist organization.  After

20 telling you that, does that ring any bells?

21             VENIRE PERSON:  No, sir.

22             MR. WESTFALL:  So you don't know anything about

23 it?

24             VENIRE PERSON:  No, sir.

25             MR. WESTFALL:  What do you do as a receiving

18:00  1   supervisor?

      2           VENIRE PERSON:  We recycle cardboard.

      3           MR. WESTFALL:  We recycle cardboard?

      4           VENIRE PERSON:  Turn it into, like, what we call

      5   medium paper and liner paper, like paper sacks.  Okay.

      6   It's in the form of that.  But it's like sheets into six

      7   feet down.

      8           MR. WESTFALL:  So you convert it into basically

      9   corrugated cardboard?

    10           VENIRE PERSON:  Yes.

    11           MR. WESTFALL:  How long have you been doing at

    12   that?

    13           VENIRE PERSON:  Twenty-five years.

    14           MR. WESTFALL:  You have been there a long time?

18:00 15           VENIRE PERSON:  Yes, sir.

    16           MR. WESTFALL:  What else did you do?  Any

    17   volunteer work?

    18           VENIRE PERSON:  No, except for at the church.

    19           MR. WESTFALL:  Which church is that?

    20           VENIRE PERSON:  Mount Calvary Baptist church in

    21   Terrell.

    22           MR. WESTFALL:  What kind of volunteer work do

    23   you do with them?

    24           VENIRE PERSON:  Whatever the church requires to

    25   service the people.

18:00 1          MR. WESTFALL:  Do you do any ministries with

2      them at all?

3              VENIRE PERSON:  No, sir.

4              MR. WESTFALL:  So just kind of help out at the

5      church?

6              VENIRE PERSON:  Just help out wherever needs to

7      be.

8              MR. WESTFALL:  Do you do any other volunteer

9      work?

10             VENIRE PERSON:  I do a lot of counseling.  I

11     like to talk to kids.  I guess I put that in there.

12             MR. WESTFALL:  How long have you done that?

13             VENIRE PERSON:  A little small town.  Well, like

14     most of the things I do is right there considered in the

18:00 15   church.  Sometime I help schools out.  If they have

16     athletes that need talking to, a lot of times if I know

17     them personally I talk to them in that regard.

18             MR. WESTFALL:  So are you called to do that?

19             VENIRE PERSON:  Oh, no.

20             MR. WESTFALL:  You just see a need and you do

21     it?

22             VENIRE PERSON:  Yes, sir.

23             MR. WESTFALL:  Have you ever known any

24     practicing Muslims?

25             VENIRE PERSON:  No, sir.

18:00   1         MR. WESTFALL: Have you had any experience with

      2   Muslims?

      3         VENIRE PERSON: No.

      4         MR. WESTFALL: How about Arabs in general?

      5         VENIRE PERSON: No, sir.

      6         MR. WESTFALL: This is a case where obviously

      7   Muslim individuals are charged with a crime, providing

      8   material support to a terrorist organization?

      9         VENIRE PERSON: Yes.

    10         MR. WESTFALL: Can you be fair and impartial if

    11   you're sitting on a jury with those types of charges?

    12         VENIRE PERSON: No, sir.

    13         MR. WESTFALL: You just said no?

    14         VENIRE PERSON: Yes, sir.

18:00 15         MR. WESTFALL: Can you be fair and impartial

    16   when we're talking about those types of charges?

    17         VENIRE PERSON: You are saying fair?

    18         MR. WESTFALL: Yes.

    19         VENIRE PERSON: Yes, sir.

    20         MR. WESTFALL: Do you have any hesitation?

    21         VENIRE PERSON: Shouldn't have any hesitation.

    22         MR. WESTFALL: Do you know the rights that a

    23   criminal defendant has in our system?

    24         VENIRE PERSON: Not really.

    25         MR. WESTFALL: This will refresh you. You have

18:00  1    heard of them.  Your right not to testify against

       2    yourself.

       3              VENIRE PERSON:  Against yourself?  Oh, yes,

       4    okay.

       5              MR. WESTFALL:  If you don't want to testify in

       6    your own criminal trial, you don't have to?

       7              VENIRE PERSON:  Yes.

       8              MR. WESTFALL:  And you don't have to do that?

       9              VENIRE PERSON:  Yes.

      10              MR. WESTFALL:  The government has to prove its

      11    case beyond a reasonable doubt.  You are familiar with

      12    that?

      13              VENIRE PERSON:  Yes.

      14              MR. WESTFALL:  And everyone charged with a crime

18:00 15    in this country, even in a case charging terrorism or any

      16    kind of case, you have the right to what's called the

      17    presumption of innocence?

      18              VENIRE PERSON:  Yes.

      19              MR. WESTFALL:  Do you have any trouble with the

      20    presumption of innocence in a case like this?

      21              VENIRE PERSON:  I say no.  I don't know much

      22    about the judical (sic) system.  I don't know that much

      23    about it.  This is the first time I have ever been to a

      24    jury or called.  So the stuff you asked about, I don't

      25    know anything about it.

18:00 1          MR. WESTFALL:  I understand.  And we can't tell

2      you much about it other than the charge.  But the charge

3      is material support of terrorism and the Constitutional

4      protection is the presumption of innocence.

5                VENIRE PERSON:  Yes.

6                MR. WESTFALL:  So with the charge that has

7      anything to do with terrorism, can you give a criminal

8      defendant, somebody charged with that crime the

9      presumption of innocence?

10               VENIRE PERSON:  Be pretty hard I guess.

11               MR. WESTFALL:  Tell me why.

12               VENIRE PERSON:  You said material, normally when

13     you state that, that's right there in itself, you know.

14     Me, my point I would say, boy, that's pretty hard there,

18:00 15   trying to support it or not supporting it.  I just can't

16     see myself, me, supporting it because I know what it is.

17     So terrorism, that's to act on something.

18               MR. WESTFALL:  Well, what the issue will come

19     down to is we're talking about charitable support.

20               VENIRE PERSON:  Okay.

21               MR. WESTFALL:  Charitable support given to

22     people in another country, in Palestine, and the issue is

23     going to be whether that charitable support helped HAMAS

24     or only those people?

25               VENIRE PERSON:  Yes.

18:00  1          MR. WESTFALL:  And that is going to be basically

     2   your ultimate decision.  Now, if the government proves to

     3   you beyond a reasonable doubt that it was given to those

     4   people with the intent to help HAMAS, you have to render

     5   your verdict accordingly which is guilty?

     6          VENIRE PERSON:  Yes.

     7          MR. WESTFALL:  But even though the material was

     8   given to those people over there -- when I say those

     9   people, I'm talking about Palestinians in Palestine.

    10          VENIRE PERSON:  Yes.

    11          MR. WESTFALL:  If the government fails to prove

    12   beyond a reasonable doubt that it was done to help HAMAS,

    13   then your verdict must be not guilty.

    14          VENIRE PERSON:  Yes, sir.

18:00 15          MR. WESTFALL:  Does that make sense to you?

    16          VENIRE PERSON:  Yes.

    17          MR. WESTFALL:  Is that a law you can follow in

    18   this case?

    19          VENIRE PERSON:  Yes.

    20          MR. WESTFALL:  You don't have any problem with

    21   that?

    22          VENIRE PERSON:  No.

    23          THE COURT:  Mr. Westfall, your time is expired.

    24          MR. WESTFALL:  Thank you, your Honor.  Mr.

    25   Jacks, do you have questions for Mr. Holmes?

18:00  1              MR. JACKS:  Yes, your Honor.  Good afternoon Mr.

     2     Holmes.  My name is Jim Jacks.  I'm an Assistant United

     3     States Attorney here in Dallas.  I'm one of the

     4     prosecutors on this case.  I have a few questions for you

     5     just to follow-up on some of the earlier ones that you

     6     were asked.  You indicated that you have not served on a

     7     jury before.

     8              VENIRE PERSON:  That's correct.

     9              MR. JACKS:  Have you ever been summoned for jury

    10     duty before?

    11              VENIRE PERSON:  Yes.

    12              MR. JACKS:  Was that in Kaufman County?

    13              VENIRE PERSON:  Yes.

    14              MR. JACKS:  I don't know -- Some of the

18:00 15     information we have is complete and some is not.  Does

    16     your wife work outside the home?

    17              VENIRE PERSON:  Yes.

    18              MR. JACKS:  What type of work does she do?

    19              VENIRE PERSON:  She's an MHMR assistant.

    20              MR. JACKS:  Where physically does she work?

    21              VENIRE PERSON:  Terrell State Hospital.

    22              MR. JACKS:  You said she's an assistant, MHMR

    23     assistant?

    24              VENIRE PERSON:  Yes, sir.

    25              MR. JACKS:  How long has she worked for that

18:00  1    organization?

       2            VENIRE PERSON:  Twenty years I think.

       3            MR. JACKS:  Your company is physically located

       4    where?

       5            VENIRE PERSON:  Forney.

       6            MR. JACKS:  And it looks like you have lived in

       7    the Dallas area most of your adult life.

       8            VENIRE PERSON:  Yes.

       9            MR. JACKS:  Where did you live before that?

      10            VENIRE PERSON:  Terrell.  That's where I have

      11    been.

      12            MR. JACKS:  And you attended college.  Where did

      13    you attend college?

      14            VENIRE PERSON:  McMurray College, Abilene,

18:00 15    Texas.

      16            MR. JACKS:  And your area of study was physical

      17    education and also real estate.

      18            VENIRE PERSON:  Yes, sir.

      19            MR. JACKS:  You have four kids.  Are all of them

      20    grown and away from home?

      21            VENIRE PERSON:  Yes, sir.

      22            MR. JACKS:  There was a part on the

      23    questionnaire that had several parts to it.  One of them

      24    was do you have -- Let's see.  You or anyone else close to

      25    you that has worked for a city or town attorney, attorney

18:00  1    general, state or federal prosecutor, and I think you

      2    indicated that you have a close friend.

      3               VENIRE PERSON:  Oh, oh, oh, he's an attorney.

      4    Dave Mallard.

      5               MR. JACKS:  Dave Mallard?

      6               VENIRE PERSON:  Yes.

      7               MR. JACKS:  Is he from --

      8               VENIRE PERSON:  He's out of Terrell.

      9               MR. JACKS:  Do you know what type of practice he

     10    has?

     11               VENIRE PERSON:  He handled a divorce.  He's like

     12    a collection lawyer.

     13               MR. JACKS:  Mainly civil-type stuff?

     14               VENIRE PERSON:  That, I don't know.

18:00 15               MR. JACKS:  And then you said your wife has a

     16    close friend who works either in newspapers, radio or

     17    television or some other type of --

     18               VENIRE PERSON:  That was me.

     19               MR. JACKS:  So the friend, your friend that

     20    works in that field, is it newspapers, radio, television?

     21               VENIRE PERSON:  She works for Dallas Morning

     22    News.

     23               MR. JACKS:  Do you know what that person's job

     24    is?  Are they a writer or work on the business side?

     25               VENIRE PERSON:  Just -- I don't know what she

18:00 1   work at.

2          MR. JACKS: You indicated that you are not that

3   familiar with the criminal justice system when Mr.

4   Westfall was asking you about these concepts. Let me just

5   ask you generally, whatever the Judge tells you regarding

6   the law, regarding presumption of innocence, who has the

7   burden of proof, that the government has the burden of

8   proof, a defendant's right not to testify if he doesn't

9   want to. And he can do that and not only can he do it,

10   but the jury cannot hold it against him if he chooses to

11   do that. Those types of things, could you follow those

12   instructions if the Judge gave you those instructions?

13          VENIRE PERSON: Yes, sir.

14          MR. JACKS: In that regard, after both sides

18:00 15   have presented their evidence, all the evidence, witnesses

16   and documents that they want to present and shortly before

17   what's sometimes referred to as final summations or

18   closing arguments, if you will, the Judge will read the

19   law and tell the jury what the law is that should be

20   applied to this case. And specifically with regard to a

21   charge that somebody has provided material support to a

22   foreign terrorist organization, he would tell you what

23   that law says. He would define terms. He would tell you

24   what a foreign terrorist organization is or this is the

25   definition so that you can then say, all right, let's take

18:00  1    the evidence, has that been answered.  I anticipate when

2    he talks to you or tells you in his instructions in terms

3    of what is prohibited in providing support to a terrorist

4    organization that he would tell you that even if money is

5    given over to an organization, a foreign terrorist

6    organization, and that money is spent for so called

7    humanitarian items -- medical supplies, books, other

8    school supplies, athletic equipment, money to help people

9    whose family member may be in prison or something such as

10   that.  Even if the money is spent in that way, I expect

11   the Judge will tell you the law says if it goes for the

12   benefit of a foreign terrorist organization, that's still

13   a violation of the law.  I wanted to ask you with that

14   explanation, is there anything about that aspect of this

18:00 15   law that concerns you or that would cause you to not be

16   able to follow that aspect of the law?

17            VENIRE PERSON:  No, sir.

18            THE COURT:  Mr. Jacks, your time has expired.

19            MR. JACKS:  Thank you.

20            THE COURT:  Mr. Holmes, we're in the process of

21   selecting the jury that would hear this case, and I expect

22   this process will take another day or two at least.  So

23   until you hear from us again, you should not discuss this

24   case with anyone or allow anyone to discuss it with you.

25   Nor should you read or watch or listen to any media

18:00 1   accounts about the case.  Thank you.  You may rejoin the

2   others in the hall.

3              VENIRE PERSON:  All right.

4              THE COURT:  Good afternoon Ms. Roberson, counsel

5   for parties in this case have some questions for you.  Ms.

6   Moreno.

7              MS. MORENO:  Thank you, your Honor.  Good

8   afternoon, Mr. Roberson.  My name is Linda Moreno, and I'm

9   one of the defense attorneys in this case.  I want to ask

10  you some questions about some answers you gave on your

11  questionnaire that you filled out months ago.

12             VENIRE PERSON:  Okay.

13             MS. MORENO:  And I want to ask you some other

14  questions as well.  Let me tell you there are no right or

18:00 15  wrong answers here.  We're just here to find out if you

16  could be a good juror for this particular case, if you can

17  be fair to the parties involved.

18             That said, this is a case involving the Holy

19  Land Foundation charity.  This charity is an American

20  Muslim charity here in Texas.  Have you heard anything

21  about that either on television or on the radio or read

22  anything in the news about that?

23             VENIRE PERSON:  This morning I did, coming here.

24  It was on the radio.

25             MS. MORENO:  Do you remember what you heard?

18:00  1          VENIRE PERSON:  Not too much.  This morning when

       2    I heard it was on a Christian channel station that I

       3    listen to, and they was talking about the trial was going

       4    to be real big and how -- something about it was based on

       5    some Holy something and that's all I really heard.

       6          MS. MORENO:  Now that you have found out that

       7    the case you heard about on your Christian radio station

       8    is this case, did you hear anything about the nature of

       9    the charges?

      10          VENIRE PERSON:  No, I did not.

      11          MS. MORENO:  In this case the government alleges

      12    that this charity and these gentlemen supported a foreign

      13    terrorist organization called HAMAS.  Have you ever heard

      14    of HAMAS?

18:00 15          VENIRE PERSON:  No, ma'am.

      16          MS. MORENO:  The government says that in this

      17    case the humanitarian aid that this charity distributed in

      18    Palestine in the form of medicine for children, books,

      19    toys, backpacks, this kind of humanitarian aid -- the

      20    government alleges benefited this terrorist organization.

      21    Okay?  That's the allegation.  Knowing that, is there

      22    anything about the nature of the charges that I have just

      23    described to you that gives you concern or if you have any

      24    opinions about that?

      25          VENIRE PERSON:  Not really.  I really don't have

18:00  1    an opinion, but one thing come to my mind when you said it

       2    benefited the people over in the Holy Land.

       3              MS. MORENO:  Yes, ma'am.

       4              VENIRE PERSON:  What do you mean by benefit?

       5    You mean they funded that over in the area?  They went and

       6    gave them money to do what they wanted to do with the

       7    money.  Is that correct?

       8              MS. MORENO:  I think that -- If I can answer the

       9    question.  The government alleges that the Holy Land

      10    Foundation charity distributed humanitarian aid in the

      11    form of food, helping build homes, toys, medicine -- and

      12    that aid actually went to the needy, actually went to the

      13    needy.  But the government further alleges that that in

      14    some fashion benefited this terrorist organization.

18:00 15    That's what they say.  So my question is does that give

      16    you any pause or do you have any opinions about that?

      17              VENIRE PERSON:  It makes me think it probably

      18    went over there, the money really did go to the needy over

      19    there.  It throws a question up in my mind.

      20              MS. MORENO:  When you say throws a question up

      21    in your mind, are you suspicious the money didn't go to

      22    the needy?

      23              VENIRE PERSON:  Yes.

      24              MS. MORENO:  And having that idea in your mind,

      25    understanding that what we need in terms of jurors here

18:00 1    are people who have no opinions, have no prejudices, can

2    you promise us that you can be fair and impartial and put

3    aside those opinions or are those opinions, you know,

4    strong?  In other words, it would be difficult for you to

5    put those opinions aside?

6              VENIRE PERSON:  I'm not prejudiced, but it will

7    be difficult for me to put those opinions aside.

8              MS. MORENO:  You sound like a lady who has

9    strong opinions and is steadfast with them.  Because of

10   that, you couldn't really tell the Judge and the parties

11   that you could put that aside and not consider that and be

12   fair and impartial in this case.  Is that right?

13             VENIRE PERSON:  Repeat the question one more

14   time.

18:00 15            MS. MORENO:  I'm sorry.  I don't mean to confuse

16   you.  Again, there aren't any right or wrong answers here.

17   What we're looking for is jurors who don't have any biases

18   or prejudices or opinions about the evidence or the

19   evidence of this case.  And you have expressed in hearing

20   the charges some pretty definite opinions, and my question

21   to you is I'm sensing that you could not put those

22   opinions aside.  Is that right?

23             VENIRE PERSON:  Right.

24             MS. MORENO:  And because you cannot put those

25   opinions aside, you could not fairly evaluate the evidence

18:00 1    in this case?

2              VENIRE PERSON:  Yes.  After hearing that,

3         correct.

4              MS. MORENO:  And because of those opinions, you

5         cannot afford these gentlemen the presumption of innocence

6         that they must have in this case, right?

7              VENIRE PERSON:  Right.  Right now, yes.

8              MS. MORENO:  Thank you very much.

9              THE COURT:  Mr. Jacks, do you have questions for

10        Ms. Roberson?

11             MR. JACKS:  Ms. Roberson, my name is Jim Jacks,

12        and I'm one of the prosecutors on this case that will be

13        representing the government.  I have a few questions that

14        I would like to ask you.  You worked for Blue Cross Blue

18:00 15   Shield.  Is that right?

16             VENIRE PERSON:  That's right.

17             MR. JACKS:  Are they still located on Spring

18        Valley?

19             VENIRE PERSON:  South Central.

20             MR. JACKS:  Is that the location you work at?

21             VENIRE PERSON:  Yes.

22             MR. JACKS:  How long have you worked for them?

23             VENIRE PERSON:  Fifteen years.

24             MR. JACKS:  As a financial coordinator, what do

25        you do?

18:00 1          VENIRE PERSON:  We pursue refunds.  When the

2     doctor says we paid the incorrect provider, we go and sue

3     that provider and get our money back.

4          MR. JACKS:  And one of the sheets I have -- just

5     for your husband -- shows that he's a supervisor.  Who

6     does he work for?

7          VENIRE PERSON:  Aviall.

8          MR. JACKS:  I know I have heard that name, does

9     that have to do with planes, airplanes?

10         VENIRE PERSON:  Airplanes.

11         MR. JACKS:  Is it at Love Field?

12         VENIRE PERSON:  Right by Love Field, yes.  I'm

13    sorry.  DFW.

14         MR. JACKS:  What does he do for them?

18:00 15         VENIRE PERSON:  He's a supervisor.  He's in

16    shipping and receiving.  He supervises a bunch of guys.

17    When the army parts come in, he makes sure all the

18    packages get to the right area.

19         MR. JACKS:  How long has he worked for them?

20         VENIRE PERSON:  Nineteen years.

21         MR. JACKS:  And I think you said that you have

22    lived in the Dallas area for five years or you have lived

23    in Rowlett for five years?

24         VENIRE PERSON:  I have lived in Rowlett for five

25    years.

18:00 1          MR. JACKS:  How long in the Dallas area?

2          VENIRE PERSON:  Ten.

3          MR. JACKS:  Before that?

4          VENIRE PERSON:  I was in California.

5          MR. JACKS:  You were asked about your ability to

6     be a fair and impartial juror, and you were asked about

7     your opinions, and it wasn't clear to me what opinions Ms.

8     Moreno was referring to.  Do you remember what she had

9     asked you or what opinion you held that might affect --

10          VENIRE PERSON:  When she was explaining about

11     the government and how long -- about the money situation,

12     that the gentlemen were being accused about sending the

13     money over to the Holy Land, and they was saying the money

14     was going to benefit -- I believe it was the money for

18:00 15     food and clothing and things like that, and that's when

16     that thought came to my mind was the money really going

17     over there to benefit those types of individuals, was the

18     money really going to be used for that.

19          MR. JACKS:  Let me ask you this and get your

20     reaction or response to this question.  Have you ever

21     served on a criminal jury before?

22          VENIRE PERSON:  No, I have not.

23          MR. JACKS:  In a trial when the evidence is

24     concluded, when both sides have called all the witnesses

25     and introduced all the documents that they want to

18:00 1    introduce, the Judge will read a document and tell the
2    jury this is the law that applies to this case, and the
3    jury gets a copy of that document so that they can look at
4    it while they are deliberating. And essentially, the
5    Judge tells you this is the statute, the United States
6    Statute, that applies to this case that the charges are
7    brought under, these are the definitions of words that are
8    contained in those statutes. He would define what is
9    meant by material support, what is meant by a foreign
10   terrorist organization. He would explain all of that to
11   the jury, and then the jury applies -- They look at the
12   evidence and say, okay, has this fact been proven in the
13   trial, and that's how they arrive at their verdict. So he
14   would tell you what the law is as it pertains to -- when a
18:00 15   person is accused of providing material support to
16   terrorism. One of the things that I am anticipating that
17   will be in those charges, part of the law that he would
18   tell to the jury, is that if money is provided or actual
19   materials like books, food or as I said just money, and
20   that money is turned around and used to buy those things,
21   things that otherwise would be referred to as humanitarian
22   things, if that is done for the benefit of a foreign
23   terrorist organization, that's still a violation of the
24   law.
25        Now, with that explanation and if the Judge

18:00 1    tells you that which I anticipate he would in his jury

2    instructions, is that something -- Do you understand that

3    part of the law and could you follow that part of the law?

4              VENIRE PERSON:  I could follow the law.  If the

5    Judge explain it to us, I could follow it.

6              MR. JACKS:  So even if the evidence showed that

7    every nickel that went over there went for something like

8    books and money for a hospital but it was done in the name

9    of or to benefit a terrorist organization and the Judge

10   said if you find that to be true, then there has been a

11   violation of that law, even if that was what the evidence

12   showed, could you still return a verdict accordingly?

13             VENIRE PERSON:  Yes, I could.

14             MR. JACKS:  Is there any question about that in

18:00 15   your mind?

16             VENIRE PERSON:  No.

17             MR. JACKS:  I think one of the questions that

18   you were asked dealt with a hypothetical or speculation.

19   My question to you is, will you render your verdict based

20   upon the evidence you hear in this courtroom and not

21   anything else outside?

22             VENIRE PERSON:  Yes.

23             MR. JACKS:  Thank you.

24             THE COURT:  Ms. Roberson, I apologize for

25   mispronouncing your name earlier, and as you can probably

18:00  1    tell we are in the process of selecting the jurors who

2    will hear this case.  I anticipate that that process will

3    take another day or two.  So until you hear from us again,

4    you should not discuss this case with anyone or allow

5    anyone to discuss it with you, and you should not read or

6    watch or listen to any media accounts about this case.

7    Thank you, you may rejoin the others in the hall.

8         MS. MORENO:  Your Honor, at this time on behalf

9    of the defense we move to strike Ms. Roberson for cause.

10   It was clear that she said in a number of ways that she

11   could not afford these gentlemen the presumption of

12   innocence, that she could not set aside her opinions.  She

13   talked about how she was already suspicious about the

14   money issues in this case.  When the prosecutor got up to

18:00 15   try to rehabilitate her, he never asked the

16   presumption-of-innocence questions.  So she never came

17   back and assured everyone, which she must do, that she

18   could afford the presumption of innocence in this case.  I

19   would cite Irvin vs. Dowd 366 F 2nd 717 and its progeny,

20   Virgil vs. Dretke, 446 F 3d 598.  It's a bedrock

21   fundamental law that the presumption of innocence is

22   unequivocal.

23        THE COURT:  Thank you.  Mr. Jacks, do you have a

24   response?

25        MR. JACKS:  Your Honor, I disagree that it was

18:00 1    so clear cut that she could not follow the Court's

2    instructions, and I think the Court saw and heard her

3    answer counsel's questions, and I think counsel kind of

4    put words in her mouth, and I'm not sure it's that clear

5    that she could not follow the Court's instructions and

6    observe the notions of presumption of innocence and that

7    type of thing.  I don't believe she has shown that she

8    could not follow the Court's instructions and be a fair

9    and impartial juror.

10          THE COURT:  This is another one of those that I

11    will take under advisement for the time being.

12          Good afternoon, Mr. Milburn.

13          VENIRE PERSON:  Good afternoon.

14          THE COURT:  Counsel for parties have some

18:00 15    questions they would like to ask you.

16          MR. WESTFALL:  Mr. Milburn, how are you doing?

17          VENIRE PERSON:  Nervous.

18          MR. WESTFALL:  Try to relax.  I'm going to talk

19    to you a little bit.  I'm Greg Westfall.  I'm a criminal

20    defense attorney.  This is the government.  I will talk to

21    you a very few minutes, and then the government will, and

22    then you will be out of here.

23          MR. WESTFALL:  You have never testified in court

24    before?

25          VENIRE PERSON:  First time.

18:00  1          MR. WESTFALL:  You are technically not

       2    testifying now.  You are just on the panel.

       3          VENIRE PERSON:  First time.

       4          MR. WESTFALL:  The case is United States versus

       5    the Holy Land Foundation, and it is a case where the

       6    government alleges that the Holy Land Foundation gave

       7    material support to HAMAS which is a foreign terrorist

       8    organization.  Just telling you that, does that ring any

       9    bells?  Have you heard of the case?

      10          VENIRE PERSON:  I never paid attention pretty

      11    much to it.  I heard some things a couple of years ago,

      12    but I didn't pay attention for details.  It wasn't

      13    something that really interested me.

      14          MR. WESTFALL:  So it doesn't ring a bell?

18:00 15          VENIRE PERSON:  Just went in one ear and out the

      16    other.

      17          MR. WESTFALL:  Were you in the army?

      18          VENIRE PERSON:  Yes.  I was in the army.

      19          MR. WESTFALL:  I saw PFC.

      20          VENIRE PERSON:  Yes.

      21          MR. WESTFALL:  How long ago was that?

      22          VENIRE PERSON:  Eighteen years old.  I didn't

      23    join on my own, but for family reasons.  It's something I

      24    would rather be doing something else.  Somebody giving me

      25    orders, that wasn't my thing.

18:00  1                    MR. WESTFALL:  So what did you do in the army?

       2                    VENIRE PERSON:  I was a medical supply

       3        specialist.

       4                    MR. WESTFALL:  Were you overseas?

       5                    VENIRE PERSON:  No, I never did go overseas.  I

       6        was in San Antonio, but it wasn't my cup of tea.

       7                    MR. WESTFALL:  I understand that.  Have you ever

       8        had any dealings at all with people of the Muslim faith?

       9                    VENIRE PERSON:  I have some friends of mine.  I

      10        never had no problem with them.  Not close friends, just

      11        people on the job.  As long as you treat them like human

      12        beings, they treat me like a human being, and other than

      13        that I haven't had a problem.

      14                    MR. WESTFALL:  You haven't had a problem?

18:00 15                    VENIRE PERSON:  Never had no problems because I

      16        treat somebody like the way I want to be treated.

      17                    MR. WESTFALL:  You have never been on a jury

      18        before?

      19                    VENIRE PERSON:  Never have, sir.

      20                    MR. WESTFALL:  What do you know about HAMAS?

      21                    VENIRE PERSON:  It's a foreign group overseas

      22        fighting Israel.  It's more like revolutionary.

      23                    MR. WESTFALL:  How did you come to learn about

      24        HAMAS?

      25                    VENIRE PERSON:  You can't help but see it on TV,

18:00 1    you know, but I believe in a sense there is two sides to

2    every story.  My opinion.  Maybe these people, maybe if

3    they had a place they could call home that would relief

4    some of the pressure.  But due to the fact of injustice,

5    they don't have the same rights as other people.  So these

6    people just trying to obtain some form of peace through

7    blood shed.  That's just my opinion.

8              MR. WESTFALL:  Right.  Sounds like you know

9    something about it.  This is a criminal trial, and in a

10   criminal trial you know, the government has the burden of

11   proof, and that's beyond a reasonable doubt.  The way the

12   material support of terrorism works out is even if

13   somebody is giving benign things like bandages, medical

14   supplies or food, even if they are benign items, if they

18:00 15   are doing that with the intent to give material support to

16   a foreign terrorist organization -- which is HAMAS is

17   on -- and if they prove that, if the government proves

18   that beyond a reasonable doubt, regardless of what they

19   gave, if it's to the benefit of HAMAS, then the verdict is

20   guilty, right?

21             VENIRE PERSON:  Yes.  I don't want to say

22   nothing that will incriminate me.  But I think like -- I

23   don't know.  Depend on which side you are on.  You know as

24   long as it's not weapons of mass destruction or something

25   like that I feel like in a sense -- You know you look at

18:00 1   aiding some group.  They help supporting and aiding, but

2   it makes me feel like it's their family and brothers.  I

3   know it's not helping us, but I look at it in the sense

4   that I try to be realistic.  Maybe they had --

5           MR. WESTFALL:  Let me interrupt you for a

6   second.  We're talking about your duty as a juror.  As a

7   juror if the government proves its case beyond a

8   reasonable doubt, you have to convict.  If the government

9   fails to prove its case beyond a reasonable doubt, then

10  the law says you have to acquit, and that's basically the

11  scope of your duty.  The law says it doesn't have to be

12  guns.  It can be benign.  But if it helps HAMAS and they

13  prove that beyond a reasonable doubt, you would have to

14  vote guilty.

18:00 15          VENIRE PERSON:  I agree with that.  You still

16  breaking the law.  Even if it's ten percent, you are part

17  of the organization even ten percent, you are part of the

18  organization.  I realize that.

19          MR. WESTFALL:  So you wouldn't have no problem

20  following that?

21          VENIRE PERSON:  I don't have a problem because

22  one percent still represents the whole.  I realize that.

23          MR. WESTFALL:  Thank you very much.

24          THE COURT:  Mr. Jacks, do you have questions for

25  Mr. Milburn?

18:00  1          MR. JACKS:  Good afternoon, Mr. Milburn.  My

       2     name is Jim Jacks.  I'm one of the prosecutors in this

       3     case.  I agree with Mr. Westfall.  It sounds like you have

       4     given some thought to the situation in the Middle East.

       5     Is that a fair statement?

       6          VENIRE PERSON:  Yes.

       7          MR. JACKS:  And it sounds like you believe that

       8     there are certain positions that perhaps the United States

       9     Government has taken that you disagree with.  Is that

      10     true?

      11          VENIRE PERSON:  That's true.

      12          MR. JACKS:  For example, the United States

      13     Government has determined that HAMAS is a terrorist

      14     organization, and that determination is made by either the

18:00 15     Secretary of State or someone such as that, Department of

      16     the Treasury.  Do you disagree with that policy or do you

      17     think that decision is contrary to the way you feel about

      18     HAMAS and what it's trying to do and its purposes?

      19          VENIRE PERSON:  I feel like HAMAS is mainly

      20     revolting against what opposition they are facing.  If

      21     they had the same freedom -- You've got to think about it.

      22     During the civil right movement -- I hate to go back

      23     there, but just imagine if blacks and stuff like that and

      24     the Jewish people during that time.  I hate to say that.

      25     If they had guns, it probably be more like a revolution,

18:00 1    also.

2              MR. JACKS:  Is your answer then saying that you

3    do not think the government should have declared HAMAS a

4    terrorist organization, that they are more revolutionary?

5              VENIRE PERSON:  More revolutionary.

6              MR. JACKS:  I suspect the Judge will tell you

7    that decision has been made.  The U.S. Government, whether

8    you or I agree with it or not, that decision to determine

9    that they are a terrorist organization has been made.  If

10   the Judge tells you that's the law, would that affect your

11   ability to be a fair juror in this case?

12             VENIRE PERSON:  I don't have a problem with it.

13   I just feel like that they are probably a revolutionary

14   group, but there are other ways to solve problems other

18:00 15   than blood shed.

16             MR. JACKS:  Let me give you another example, and

17   I think Mr. Westfall touched on this a little bit.  At the

18   end of the evidence the Judge is going to read the jury

19   instructions to the jury and tell you what the law is.

20   And he would tell you this is what the government must

21   show to prove that somebody violated this law, and I

22   expect to be included in those instructions and the Judge

23   to tell you that the law says even if a person gives

24   humanitarian things to this organization, to HAMAS or

25   gives money, currency and then that money is spent on

18:00  1  humanitarian things, that's against the law.  Could you

2  abide by that instruction?  Do you think that should be

3  the law?

4  VENIRE PERSON:  I think in a way -- I understand

5  exactly what you are saying, and I understand the

6  question, but one thing about it, if you think about it,

7  if this money was given to another party other than maybe

8  the Palestinians, would that be wrong for them doing that?

9  If they were giving to some other organization or aid

10  somewhere else.

11  MR. JACKS:  Well, I understand your question.

12  My question is, if the Judge tells you that even

13  humanitarian aid, you know, diapers and baby formula, and

14  if it's given for the benefit of HAMAS, that's a violation

18:00 15  of law, could you abide by that?  Could you find somebody

16  guilty if they had done that?

17  VENIRE PERSON:  If it was just diapers, I

18  couldn't find them guilty.  I'm being honest with myself.

19  It's not something that's going to kill people.  If it's

20  something that's harmful toward humankind, man, they are

21  guilty, talking about destroying life, but if it's just

22  diapers and food, kids hungry, you think about it.  Those

23  people have sanctions.  One thing about it through

24  sanctions they are not able to be given medical supplies

25  and stuff like that due to the war sanctions, and I feel

18:00   1   like it's not the children.  It's the adults, and I feel

2   like the children should have diapers and babies have baby

3   food.  Hey, it's not the children.  It's the adults.  I

4   feel like it's a grown-up problem, and I feel like if

5   those people had a homeland like I stated before, they

6   probably have a whole different outlook.

7              MR. JACKS:  So in that circumstance you wouldn't

8   be able to return a verdict of guilty?

9              VENIRE PERSON:  I couldn't say guilty.  I'm

10   being honest.

11              MR. JACKS:  I understand.  Thank you.

12              THE COURT:  Mr. Milburn, as you can tell, we're

13   in the process of selecting a jury that would hear this

14   case, and I anticipate that process will go on for at

18:00  15   least another day or two, and until you hear from us

16   again, you should not discuss this case with anyone or

17   allow anyone to discuss it with you.  Nor should you read

18   or watch or listen to any media accounts about the case.

19              VENIRE PERSON:  Yes, your Honor.

20              THE COURT:  Thank you, sir.  You may rejoin the

21   others in the hall.

22              MR. JACKS:  Your Honor, we would submit Mr.

23   Milburn for cause in that his answers showed that he could

24   not follow the Court's instructions and would not be able

25   to follow them with regard to the law in this case.

18:00  1              THE COURT:  Mr. Westfall, do you have a position

       2    about that?

       3              MR. WESTFALL:  I cannot, your Honor, in good

       4    faith argue against that.

       5              THE COURT:  I will excuse Mr. Milburn for cause.

       6    Good afternoon Mr. Jackson.

       7              VENIRE PERSON:  How are you doing.

       8              THE COURT:  Fine, thank you.  Counsel for the

       9    parties have some questions they would like to ask you.

      10              MR. WESTFALL:  Mr. Jackson, how are you doing.

      11              VENIRE PERSON:  Yes.

      12              MR. WESTFALL:  I'm Greg Westfall, one of the

      13    defense lawyers in this case.  I'll talk to you a few

      14    minutes, and then the government is talk to you a little

18:00 15    bit.  Okay?  This is a criminal case, and it's the United

      16    States of America versus the Holy Land Foundation.  Does

      17    that ring a bell at all with you?

      18              VENIRE PERSON:  No.

      19              MR. WESTFALL:  The allegation is that this was a

      20    Muslim charity here in Richardson, here in the area, and

      21    the government is accusing them of giving support to a

      22    foreign terrorist organization, HAMAS.  Given that amount

      23    of information, do you recognize that from any media

      24    accounts or anything you have heard?

      25              VENIRE PERSON:  I still don't know who they are.

18:00   1          MR. WESTFALL: Well, now that you know what the

2   charges are, what do you think?

3          VENIRE PERSON: Sounds like it's pretty serious

4   charges if it's true.

5          MR. WESTFALL: Right. What do you know about

6   HAMAS?

7          VENIRE PERSON: Who?

8          MR. WESTFALL: HAMAS.

9          VENIRE PERSON: I don't.

10          MR. WESTFALL: Do you recognize the name at all?

11          VENIRE PERSON: No.

12          MR. WESTFALL: How do you feel about being a

13   juror in a case that has anything whatsoever to do with

14   terrorism?

18:00 15          VENIRE PERSON: I don't feel too comfortable

16   with it.

17          MR. WESTFALL: You don't feel too comfortable.

18   What do you mean by that?

19          VENIRE PERSON: What happens to me if somebody

20   comes up to me and says that's what he did, oh, this is

21   what we do.

22          MR. WESTFALL: So retaliation, does that

23   characterize what you are talking about?

24          VENIRE PERSON: Right.

25          MR. WESTFALL: And you are worried that your

18:00  1    decision in this case could result in retaliation against

       2    the jury which would include you?

       3              VENIRE PERSON:  Right.

       4              MR. WESTFALL:  And you are not the only person

       5    that has said that.  How long have you felt this way?

       6              VENIRE PERSON:  I see what's going on as far as

       7    the world goes, and it's not too bright.

       8              MR. WESTFALL:  Well, you filled out the

       9    questionnaire two weeks ago.  Did it strike you then that

      10    there might be retaliation against the jury?

      11              VENIRE PERSON:  Not really.  I figure if you are

      12    going to do something, might as well do it right.

      13              MR. WESTFALL:  But as we sit here right now, the

      14    issue of retaliation is on your mind?

18:00 15              VENIRE PERSON:  It's on my mind now.

      16              MR. WESTFALL:  This case would be about four

      17    months long or so.  It may be a little less or maybe a

      18    little more, and day after day you would come in here and

      19    sit in the same room with the defendants, the government

      20    and everyone else, and then hopefully you would have to

      21    make your decision.  The fear of retaliation is very real

      22    to you, it sounds like.

      23              VENIRE PERSON:  Right.

      24              MR. WESTFALL:  Would the fear of retaliation be

      25    something that might affect the way you look at the case?

18:00  1          VENIRE PERSON:  Probably would.

       2          MR. WESTFALL:  And the way that you give

       3  consideration to the evidence?

       4          VENIRE PERSON:  I don't think so.

       5          MR. WESTFALL:  Well, when you render a verdict

       6  at the end of the trial, that verdict has to be based on

       7  just the evidence.  That's just out of fairness.  That's

       8  the fair process.  Okay?  Only the evidence in this

       9  courtroom is what can be considered in reaching that

      10  verdict.  Do you understand?

      11          VENIRE PERSON:  Yes.

      12          MR. WESTFALL:  It sounds to me though like the

      13  fear of retaliation is an issue with you.  Would that

      14  affect your jury service?  Would it be something that

18:00 15  would be on your mind?

      16          VENIRE PERSON:  It probably would.

      17          MR. WESTFALL:  And something that may even from

      18  time to time distract you?

      19          VENIRE PERSON:  Right.

      20          MR. WESTFALL:  Sounds like it's something that's

      21  on your mind right now.

      22          VENIRE PERSON:  Like I say, man, I knew it was

      23  serious.  I didn't know it was this serious.  This is not

      24  like who murdered who; this is serious.  I look at it like

      25  that.

18:00 1              MR. WESTFALL:  Thank you very much.

2              VENIRE PERSON:  Thank you.

3              THE COURT:  Mr. Jacks, do you have questions for

4     Mr. Jackson?

5              MR. JACKS:  No, your Honor.

6              THE COURT:  Mr. Jackson, as you can tell, we're

7     in the process of selecting the jury that would hear this

8     case.  I expect this process to go on for another day or

9     two at least.  So until you hear from us again, you should

10    not discuss this case with anyone or allow anyone to

11    discuss it with you.  Nor should you read or watch or

12    listen to any media accounts about the case.  Thank you.

13    You may rejoin the others in the hall.

14             MR. WESTFALL:  Your Honor, we would submit Mr.

18:00 15   Jackson for cause, fear of retaliation interfering with

16    his ability to render a fair and impartial verdict.

17             THE COURT:  Mr. Jacks, do you oppose that?

18             MR. JACKS:  No, your Honor.

19             THE COURT:  I will grant the motion to challenge

20    Mr. Jackson for cause.

21             Good afternoon, Mr. Henson.  Counsel for the

22    parties have some questions for you.  Mr. Westfall.

23             MR. WESTFALL:  Mr. Henson, how are you doing?

24             VENIRE PERSON:  Fine, how are you?

25             MR. WESTFALL:  My name is Greg Westfall.  I'm

18:00 1    one of the defense lawyers in this case.  I am going to

2    speak to you for a few minutes, and then the government is

3    perhaps going to speak to you.

4            VENIRE PERSON:  Okay.

5            MR. WESTFALL:  This case is called the United

6    States versus the Holy Land Foundation for Relief and

7    Development, and it is a case that involves allegations

8    that an American Muslim charity -- that's the Holy Land

9    Foundation -- that an American Muslim charity gave

10    material support to a foreign terrorist organization,

11    specifically HAMAS.  Knowing that, after I told you that,

12    does that ring a bell?  Have you heard about it any time

13    before today?

14            VENIRE PERSON:  No.

18:00 15            MR. WESTFALL:  So completely unfamiliar with the

16    names, didn't hear them on the radio or anything else

17    recently?

18            VENIRE PERSON:  No.

19            MR. WESTFALL:  How do you feel about the issue

20    of being in a jury where it's a criminal case that has

21    anything to do with terrorism?

22            VENIRE PERSON:  Well, you have to do what you

23    have to do as a citizen.  I do what I have to do as a

24    citizen.  It has no bearings on Muslim on whoever it is.

25            MR. WESTFALL:  Thank you.  Do you understand

18:00 1    that I have to ask you these questions?

2             VENIRE PERSON:  Go ahead.

3             MR. WESTFALL:  Do you know any Muslims?

4             VENIRE PERSON:  Yes, I do.

5             MR. WESTFALL:  Are you friendly with them?

6             VENIRE PERSON:  No.  I know a large variety of

7    people in the field I works in.  Everybody has the right

8    to feel how they feel.  So I know quite a few.

9             MR. WESTFALL:  Have you had good experiences or

10   bad experiences?

11            VENIRE PERSON:  I have a work relationship.

12            MR. WESTFALL:  Are you friendly or unfriendly?

13            VENIRE PERSON:  I'm friendly with anybody I

14   meet.  I have no reason not to.  They gave me no reason to

18:00 15  feel differently.  I try not to judge people just because

16   of their nationality.  I'm a bus operator.  So I see quite

17   a few people a year.  I cannot discriminate.  I just look

18   at people as people.

19            MR. WESTFALL:  You are a leader in your union?

20            VENIRE PERSON:  Yes, I am.

21            MR. WESTFALL:  And are you a steward?

22            VENIRE PERSON:  Yes, I am.

23            MR. WESTFALL:  And how long have you been a

24   steward?

25            VENIRE PERSON:  I have been a steward for five

18:00 1    and a half years.

2              MR. WESTFALL:  Are you going to keep on doing it

3    or --

4              VENIRE PERSON:  I ran for another elected

5    office, and I lost by seventeen votes, but right now what

6    I'm doing is I just judge the situation for whatever it

7    is, whatever it is, if it's in favor of the company or not

8    in favor of the company.

9              MR. WESTFALL:  You haven't been on any juries

10   before?

11             VENIRE PERSON:  No, I haven't.

12             MR. WESTFALL:  In a criminal case in the United

13   States, a person who's accused of a crime is presumed

14   innocent.  You know that?

18:00 15             VENIRE PERSON:  That should be in any case that

16   you start in, until proven guilty.

17             MR. WESTFALL:  And then the burden of proof is

18   beyond a reasonable doubt?

19             VENIRE PERSON:  It has to be.

20             MR. WESTFALL:  And you know that's the highest

21   burden of proof?

22             VENIRE PERSON:  It's the same.  It's a higher

23   technique of what I deal with every day as a shop steward.

24   Because I deal with a lot of times the person's

25   livelihood.  Their likelihood depends on the decision that

18:00 1   is made, and the decisions are made by facts.  If the

2   facts are there, you have them.  If the facts are not

3   there, we proceed on to the next step.

4        MR. WESTFALL:  So as a steward, do you actually

5   monitor the disciplinary action against someone in the

6   union?

7        VENIRE PERSON:  Yes, I do.  And if I feel it's

8   too harsh, I must go to management and explain to them why

9   I feel that way, and it's like anything else -- you have

10   laws that govern, by laws and things that are govern as to

11   how much it is.

12        MR. WESTFALL:  It sounds like you like the

13   responsibility.

14        VENIRE PERSON:  Well, sometimes after you are

18:00 15   thrust into a position, you advance yourself, do what you

16   have to do.

17        MR. WESTFALL:  Rise to the level?

18        VENIRE PERSON:  Just like you when you started

19   your job, it might not have been something you really

20   liked, but as you proceeded on, you did what you had to do

21   to make the best assessment you could.

22        MR. WESTFALL:  Very true.  Just out of

23   curiosity, what did you do in the military?

24        VENIRE PERSON:  I was a cook.

25        MR. WESTFALL:  With the army?

18:00 1          VENIRE PERSON:  Yes.

2          MR. WESTFALL:  In Germany?

3          VENIRE PERSON:  Yes.

4          MR. WESTFALL:  How long ago was that?

5          VENIRE PERSON:  Nineteen -- I got out in 1977.

6     Maybe 1975.

7          MR. WESTFALL:  I hate to say a long time ago

8     because I remember those years, too.  Thank you very much.

9          THE COURT:  Mr. Jacks, do you have questions for

10    Mr. Henson?

11         MR. JACKS:  Good afternoon.  My name is Jim

12    Jacks.  I'm one of the prosecutors representing the

13    government in this case.  I have a few questions for you

14    as well that won't take but just a moment or two.  When

18:00 15    you were in the army what division or unit were you in?

16         VENIRE PERSON:  Okay.  When I come out of basic

17    training, I went to 21st Cal which is a support unit for

18    the 1st Calvary Armored Division.  I was transferred to

19    16th Armor which is an army unit under the direction of

20    George Patton, Junior.  We in turn went to Germany in

21    1975.

22         MR. JACKS:  Were you ever stationed at Fort

23    Hood?

24         VENIRE PERSON:  Yes, I was.

25         MR. JACKS:  And how long was your army career?

18:00  1               VENIRE PERSON:  Active duty three years,

2     inactive three years, total six years.

3               MR. JACKS:  Do you still cook?

4               VENIRE PERSON:  I have no choice.

5               MR. JACKS:  Not unless it's for two hundred

6     people or whatever?

7               VENIRE PERSON:  No, no, no.

8               MR. JACKS:  And you have lived in Saint Louis

9     and Shreveport?

10               VENIRE PERSON:  Yes, my mother lives in Saint

11     Louis.

12               MR. JACKS:  I don't think I have who you work

13     for?

14               VENIRE PERSON:  Greyhound Lines.

18:00 15               MR. JACKS:  How long have you worked for them?

16               VENIRE PERSON:  This is my nineteenth year.

17               MR. JACKS:  Has all of that been in Dallas?

18               VENIRE PERSON:  No.

19               MR. JACKS:  Where else?

20               VENIRE PERSON:  I started working for Greyhound

21     out of Saint Louis in 1989.

22               MR. JACKS:  And what union are you a member of?

23               VENIRE PERSON:  Amalgamated Transit, Local 1700.

24               MR. JACKS:  And in your work with the union,

25     have you ever had to have any contact with the Department

18:00 1    of Labor or pension and welfare or pension and benefits or

2    anything like that?

3            VENIRE PERSON:  I had some contact with the

4    Department of Labor which was last year which was

5    pertaining to the election itself and the way that the

6    election was ran, because the election wasn't ran

7    according to the bylaws.  And by me being a person running

8    in the election and we had one party had material that

9    everyone else wasn't supplied with and I questioned the

10   union about it, and I couldn't get a clear understanding.

11   So I went to the Department of Labor.  And they told me

12   what to do, but I chose not to do it because of the

13   financial burden it would place on the union.  The union

14   was already strapped because of misappropriation of the

18:00 15   funds by the secretary.  So I took the fall myself and

16   say, you know, well, I just lost that one.

17           MR. JACKS:  Did the Department of Labor resolve

18   it to your satisfaction or do as much as they could in

19   your opinion?

20           VENIRE PERSON:  Well, they gave me the

21   information that I would need to pursue the situation if I

22   was going to pursue it.  But I in return addressed it

23   would have been costly for the union.  I in turn addressed

24   it to which was the International Amalgamated Union, which

25   I felt like them being the big brothers they should

18:00  1    overlook it because of them receiving some gains from the
       2    union dues that are being paid.  I felt like they should
       3    look in the situation and address it so it wouldn't be a
       4    costly matter.
       5         MR. JACKS:  Let me ask you some questions about
       6    this particular case that you are here for.  Are you
       7    familiar the organization known as HAMAS?  Have you heard
       8    of it?
       9         VENIRE PERSON:  No, I have not.
      10         MR. JACKS:  Do you follow the news in terms of
      11    what's going on in the Middle East?
      12         VENIRE PERSON:  Right now to be honest with you,
      13    I don't have time because of my work schedule.  It's so
      14    unflexible (sic).  Most of the times -- My day starts
18:00 15    about twelve and ends at about three o'clock in the
      16    morning.  I'm a sports fanatic which that's bad.  I need
      17    to see more of the news you understand.  But I don't do
      18    that, and I go from there to the sports channel.
      19         MR. JACKS:  I don't mean to interrupt you, but I
      20    have a limited amount of time.  I cannot remember if you
      21    in your earlier questions or in the earlier
      22    questionnaire -- did you make any statement about whether
      23    it would be a hardship for you to be on the jury for three
      24    or four months?
      25         VENIRE PERSON:  No.

18:00 1          MR. JACKS:  You could serve on this jury if you

2     were selected regardless of what's going on in your job?

3          VENIRE PERSON:  I do what I have to do.  They

4     understand.  There is guidelines in place for jury duty

5     and having to serve on jury duty.

6          MR. JACKS:  The Judge -- After the parties have

7     rested their case, the judge will give you the

8     instructions on the law that applies to the case, and for

9     example, he will tell you what the law is as far as

10    providing material support to a terrorist organization.  I

11    anticipate included in those instructions he would tell

12    you that even if the person giving support -- if they are

13    given money, for example, and that money is later spent

14    for humanitarian items such as food, medical supplies,

18:00 15   school supplies, books, money to support widows and

16    orphans, even if that money is spent in that fashion, if

17    it's spent for the benefit of the terrorist organization,

18    that's a violation of the law.  Now, having told you that,

19    what is your reaction to that portion of the law?

20         VENIRE PERSON:  Exactly what I recently said.

21    The burden of proof.  You have to have the evidence.  It's

22    the same thing I do when I go to represent someone.  If

23    the proof is not there, you don't have it.  If you got the

24    proof there, then you make your call.

25         MR. JACKS:  If the government proves that these

18:00 1    defendants sent money to a foreign terrorist organization

2    and that money was spent for not bullets, not dynamite,

3    not suicide vests but was spent for backpacks, soccer

4    balls, bed pans for a hospital, syringes for a hospital,

5    could you return a verdict of guilty on that?

6              VENIRE PERSON:  Sir, back to what I said, it's

7    the intent.  What was the intent to be done with it.

8              THE COURT:  Mr. Jacks, your time is expired.

9    Mr. Henson, as you can tell, we are in the process of

10   selecting the jury to hear this case.  But I expect that

11   we will be at this process for at least another day or

12   two.  So until you hear from us again, you should not

13   discuss this case with anyone or allow anyone to discuss

14   it with you.  Nor should you read or watch or listen to

18:00 15   any media accounts about the case.  Thank you and you may

16   rejoin the others in the hall.

17             Good afternoon, Ms. Johnson.  Counsel for the

18   parties have some questions to ask you.

19             MR. WESTFALL:  Good afternoon, Ms. Johnson.

20   I'm Greg Westfall and I am a defense lawyer in this case.

21   I'll speak with you a few minutes and then the government

22   will speak to you.  This is a case that the United States

23   brought against Holy Land Foundation.  It's a case that

24   the government alleges that a charity association gave

25   material support to a foreign terrorist organization.

18:00 1   Does that ring a bell?  Have you heard it in the press or

2   anything like that?

3           VENIRE PERSON:  I have.

4           MR. WESTFALL:  You have?

5           VENIRE PERSON:  Yes.

6           MR. WESTFALL:  Tell us what you heard.

7           VENIRE PERSON:  I heard there was a church in

8   Richardson or something like that was giving money to the

9   Holy Land.  I didn't really go into detail about it.  They

10  didn't.  They were just speaking of it, and I was like

11  what is that.

12          MR. WESTFALL:  How long ago is that that you

13  heard this?

14          VENIRE PERSON:  Probably about three, four

18:00 15  months ago.

16          MR. WESTFALL:  Have you heard anything since

17  then?

18          VENIRE PERSON:  I haven't.

19          MR. WESTFALL:  What you have heard so far from

20  whatever source you heard it?  I guess the radio or TV,

21  right?

22          VENIRE PERSON:  Yes.

23          MR. WESTFALL:  Did you form any opinions as to

24  the guilt or innocence of the defendants as a result of

25  that?

18:00  1                VENIRE PERSON:  I haven't, no.

2                MR. WESTFALL:  How do you feel -- the prospect

3       of being on a jury where the issues have anything to do

4       with the terrorism.

5                VENIRE PERSON:  Not good.

6                MR. WESTFALL:  Why?

7                VENIRE PERSON:  Because anything could happen.

8       I have a family, and it's -- the fact of being on the jury

9       has to do with other members of that family makes me

10      nervous.

11               MR. WESTFALL:  Are you nervous because of some

12      sort of retaliation?

13               VENIRE PERSON:  Could be, yes.  Part of it.

14               MR. WESTFALL:  You said part of it.  Is there

18:00 15   any or part?

16               VENIRE PERSON:  Mainly the terrorist.

17               MR. WESTFALL:  Worried about being retaliated

18      against?

19               VENIRE PERSON:  That's a major part of it.

20               MR. WESTFALL:  Well, I want to talk to you a

21      little bit about that, about the fear of retaliation.

22      Okay?

23               VENIRE PERSON:  Okay.

24               MR. WESTFALL:  When we seat a jury, the jury is

25      going to have to decide whether the Government has proved

18:00 1   its case beyond a reasonable doubt, and that decision has

2   to be made only on the evidence in court, and there can't

3   be any external influences or like pre-depositions.  Some

4   people have made up their mind already.  But the issue of

5   retaliation -- And you are not the only person who has

6   talked about that.  So don't worry about that, the fear of

7   retaliation while we're in trial for several months.  It

8   may be four months, maybe less than, maybe more, but

9   that's kind of what everyone is guessing right now.  We're

10  all going to be in the same room together day after day

11  for four months.  While we're doing that, is there going

12  to be this niggling fear in your mind if you decide this

13  case the wrong way your family may be hurt?

14              VENIRE PERSON:  Yes.

18:00 15             MR. WESTFALL:  Is this the kind of fear that

16  would distract you from doing your job as a juror?

17              VENIRE PERSON:  Yes.

18              MR. WESTFALL:  You feel pretty sure about that?

19              VENIRE PERSON:  Yes, sir.

20              MR. WESTFALL:  Thank you, your Honor.

21              THE COURT:  Mr. Jacks, do you have questions for

22  Ms. Johnson?

23              MR. JACKS:  Just briefly, your Honor.

24              Ms. Johnson, my name is Jim Jacks.  I'm an

25  Assistant United States Attorney, and I'm one of

18:00 1    prosecutors in this case.  I just have a couple of

2    questions for you.

3                    VENIRE PERSON:  Okay.

4                    MR. JACKS:  I believe you indicated that you

5    heard something about this case on the radio.  Is that

6    right?

7                    VENIRE PERSON:  No.  I heard it on the news.

8                    MR. JACKS:  Television?

9                    VENIRE PERSON:  Yes.

10                    MR. JACKS:  And at some point in time, did you

11    connect that to the fact that this was the case you were

12    summoned for?

13                    VENIRE PERSON:  I didn't.

14                    MR. JACKS:  You did?

18:00 15                    VENIRE PERSON:  No, I did not.

16                    MR. JACKS:  The charges in the case are that

17    this organization and these men that worked for this

18    organization are accused of providing material support to

19    HAMAS.  Do you understand that?

20                    VENIRE PERSON:  Yes.

21                    MR. JACKS:  Have you ever heard of HAMAS?

22                    VENIRE PERSON:  No.

23                    MR. JACKS:  Do you even know what they are or

24    where they are located?

25                    VENIRE PERSON:  No.

18:00  1          MR. JACKS:  Is it your -- I guess not testimony

2    because you are not really testifying, but is it your

3    position that simply the fact that this case involves the

4    allegations of people sending money or goods to support a

5    terrorist organization is enough to prevent you from being

6    a juror in this case?

7          VENIRE PERSON:  Could you repeat that?  I'm

8    sorry.

9          MR. JACKS:  Sure.  Is what you are saying is

10   just the fact that this is a case in which people are

11   charged with supporting a terrorist organization, just the

12   nature of that concerns you so much that you don't think

13   you could pay attention to the evidence and render a

14   verdict based on the evidence?

18:00  15         VENIRE PERSON:  Yes, I would be nervous because

16   I don't want to -- You know, it's my opinion and with the

17   evidence that we have, the Court (sic) presents to the

18   Court.  But it would still be bothering me, knowing, yes,

19   they were wrong or they were right and somebody is going

20   to be put in jail or wherever they have to go.

21         MR. JACKS:  Thank you, ma'am.

22         THE COURT:  Ms. Johnson, we are in the process

23   of selecting the jury that would hear this case.  I expect

24   that that process will continue for at least another day

25   or two.  Until you hear from us again, you should not

18:00 1    discuss this case with anyone or permit anyone to discuss

2    it with you.  Nor should you read or watch or listen to

3    any media accounts about the case.

4         VENIRE PERSON:  Thank you.

5         THE COURT:  Thank you, you may rejoin the others

6    in the hall.

7         MR. WESTFALL:  Your Honor, we challenge on the

8    grounds that fear of retaliation will impair her jury

9    service and not allow her to render a fair verdict based

10   upon the evidence.

11        THE COURT:  Any objection, Mr. Jacks?

12        MR. JACKS:  No, your Honor.

13        THE COURT:  I will grant the motion to excuse

14   Ms. Johnson for cause.

18:00 15       MR. JACKS:  Your Honor, I would ask and object

16   to Mr. Westfall telling jurors that you are not the only

17   one who has said that.  I think that defeats the whole

18   purpose of talking to these people individually.

19        THE COURT:  I agree.  Mr. Kiblinger, I think

20   we're ready to see next Ms. Mallory, Number 25 on the

21   list.

22        Good afternoon, Ms. Mallory.  Counsel for the

23   parties in this case have some questions they would like

24   to ask you.  Mr. Westfall.

25        MR. WESTFALL:  Ms. Mallory, my name is Greg

18:00   1    Westfall.  I'm one of the defense lawyers in this case.  I

      2    am going to speak with you for a few minutes, and the

      3    government is going to speak with you perhaps for a few

      4    minutes.  Okay?  This case is the United States versus the

      5    Holy Land Foundation for Relief and Development, and it is

      6    about an American Muslim charity that the government

      7    alleges gave material support to HAMAS which is a foreign

      8    terrorist organization.  Having told you that, do you

      9    recognize the name or anything?

    10                VENIRE PERSON:  Yes.

    11                MR. WESTFALL:  Tell me how.

    12                VENIRE PERSON:  I just heard it on the news

    13    some.

    14                MR. WESTFALL:  Have you heard it recently?

18:00 15                VENIRE PERSON:  No.  I don't know when, but I

    16    have heard it before.

    17                MR. WESTFALL:  What was your -- What are your

    18    thoughts about it based upon what you heard?

    19                VENIRE PERSON:  I don't really know.

    20                MR. WESTFALL:  I'm sorry.

    21                VENIRE PERSON:  I don't really keep up with all

    22    of that kind of stuff.

    23                MR. WESTFALL:  Did you arrive at any opinions

    24    based on what you heard?

    25                VENIRE PERSON:  No.

18:00 1        MR. WESTFALL:  How do you feel about being on a

2  jury -- potentially being on a jury where the case is a

3  criminal case, where the case has anything to do with

4  terrorism?

5        VENIRE PERSON:  I would rather not be on a case.

6        MR. WESTFALL:  Any case period?

7        VENIRE PERSON:  No.

8        MR. WESTFALL:  Is there anything about this

9  case -- Let me ask you, are you afraid to be on jury?

10        VENIRE PERSON:  No.

11        MR. WESTFALL:  Do you know any Muslims?

12        VENIRE PERSON:  No.

13        MR. WESTFALL:  You have never known any?

14        VENIRE PERSON:  No.

18:00 15        MR. WESTFALL:  Have you had any dealings with

16  people of Arab decent?

17        VENIRE PERSON:  No.

18        MR. WESTFALL:  Where are you a nurse?

19        VENIRE PERSON:  At Tremont.

20        MR. WESTFALL:  What is that?

21        VENIRE PERSON:  It's a retirement center.

22        MR. WESTFALL:  How long have you been working

23  there?

24        VENIRE PERSON:  About five years.

25        MR. WESTFALL:  Do you like it?

18:00  1                    VENIRE PERSON:  Yes.

       2                    MR. WESTFALL:  So you are kind of in the service

       3     world?

       4                    VENIRE PERSON:  Yes.

       5                    MR. WESTFALL:  Do you do any other volunteer

       6     stuff?

       7                    VENIRE PERSON:  Same thing, like home health.

       8                    MR. WESTFALL:  So you do home health and your

       9     work at the --

      10                    VENIRE PERSON:  At the nursing home.

      11                    MR. WESTFALL:  You work a lot?

      12                    VENIRE PERSON:  Yes.

      13                    MR. WESTFALL:  This trial could possibly go

      14     several months.  Any problem with making ends meet if you

18:00 15     are out of circulation that long?

      16                    VENIRE PERSON:  Probably so because I'm a single

      17     parent.

      18                    MR. WESTFALL:  How old is your child?

      19                    VENIRE PERSON:  Fourteen.

      20                    MR. WESTFALL:  But you still supervise him I

      21     guess?

      22                    VENIRE PERSON:  Yes.

      23                    MR. WESTFALL:  He or she?

      24                    VENIRE PERSON:  Boy.

      25                    MR. WESTFALL:  What is he doing during the

18:00 1    summer like today?

2              VENIRE PERSON:  He mostly stay at home.  Doesn't

3    do anything else.

4              MR. WESTFALL:  If you are in a trial that lasts

5    as long as this one possibly could, three months, four

6    months, five months -- No one knows for sure but the over

7    and under is four months.  Is that going to cause a

8    hardship for you?

9              VENIRE PERSON:  Yes, because my job doesn't pay

10   for it.

11             MR. WESTFALL:  Is that something that would

12   impair your jury service?

13             VENIRE PERSON:  Well, yes, because my job

14   doesn't pay jury duty.

18:00 15             MR. WESTFALL:  You would just run out of money?

16             VENIRE PERSON:  Yes.  I couldn't pay my bills.

17             MR. WESTFALL:  Do you rent a house or an apt?

18             VENIRE PERSON:  I rent a condo, yes.

19             MR. WESTFALL:  And so you have to pay the rent

20   each month?

21             VENIRE PERSON:  Yes.

22             MR. WESTFALL:  Is there anyone else that

23   supports you besides yourself?

24             VENIRE PERSON:  No.

25             MR. WESTFALL:  Your Honor, I don't think I have

18:00 1    anything else.  Thank you.

2            THE COURT:  Mr. Jacks, do you have questions for

3    Ms. Mallory?

4            MR. JACKS:  Just briefly, your Honor.  Good

5    afternoon, Ms. Mallory.

6            VENIRE PERSON:  Hello.

7            MR. JACKS:  My name is Jim Jacks, and I'm an

8    Assistant United States Attorney here in Dallas.  I'm one

9    of the prosecutors who will be representing the government

10   in this case.  I just have a few questions to ask you as

11   well.  You said you work at Tremont.  It's a retirement

12   facility?

13           VENIRE PERSON:  Yes.

14           MR. JACKS:  Is it located on Harvest Hill?

18:00 15   VENIRE PERSON:  Yes.

16           MR. JACKS:  How long have you worked there?

17           VENIRE PERSON:  Five years.

18           MR. JACKS:  Have you done similar type of work?

19           VENIRE PERSON:  Yes.

20           MR. JACKS:  How long have you worked in that

21   health care field?

22           VENIRE PERSON:  About twenty years.

23           MR. JACKS:  Has it always been at retirement

24   facilities or have you worked at hospitals?

25           VENIRE PERSON:  Hospitals and retirement

18:00  1    centers.

 2            MR. JACKS:  You have three sons; is that right?

 3            VENIRE PERSON:  Yes.

 4            MR. JACKS:  Are all of them still at home or one

 5    or two?

 6            VENIRE PERSON:  Just the one.

 7            MR. JACKS:  Okay.  You have never served on a

 8    jury before; is that correct?

 9            VENIRE PERSON:  No, I haven't.

10            MR. JACKS:  And if you were aware –– Are you

11    aware that you will be paid for your jury service, forty

12    something dollars a day?

13            VENIRE PERSON:  Yes.

14            MR. JACKS:  Is that –– Does that help to

18:00 15    alleviate your financial situation?

16            VENIRE PERSON:  No.  It wouldn't help.

17            MR. JACKS:  If you were selected to be on this

18    jury, would you be able to give your attention to the

19    evidence and return a verdict based on the evidence that

20    was presented?

21            VENIRE PERSON:  Yes.

22            MR. JACKS:  Even if –– Well, let me ask you this

23    question.  Will your job still be there?  I'm not sure how

24    long this trial will last.  I think all of us are going to

25    try to make it go as quickly as we can.  But do you know

18:00  1    if your job will still be there when you finish your jury

       2    service?

       3                VENIRE PERSON:  I don't know.

       4                MR. JACKS:  Have you ever asked your employer?

       5                VENIRE PERSON:  Well, no, but she told me they

       6    don't pay for it.  That's all I know.

       7                MR. JACKS:  And before coming down here today --

       8    Well, let me ask you this question.  Have you heard of the

       9    terrorist group HAMAS?

      10                VENIRE PERSON:  Yes.  Just on TV and stuff.

      11                MR. JACKS:  Do you know where they are located?

      12                VENIRE PERSON:  No.

      13                MR. JACKS:  Have you followed any other, like,

      14    terrorism related cases in the news?

18:00 15                VENIRE PERSON:  No.

      16                MR. JACKS:  If the Judge when he gives the jury

      17    the law -- And when I say that, I'm talking about at that

      18    point in the trial at the end of the trial after all of

      19    the parties have presented all the evidence that they want

      20    to present, the judge tells the jury this is the law that

      21    you have to apply to this case, and he would tell you what

      22    the law is on, for example, a charge of providing material

      23    support to a foreign terrorist organization.  And he'll

      24    tell you what is the definition of a foreign terrorist

      25    organization and that type of thing.  Part of the law that

18:00  1    he would give to the jury will be that if the evidence

2    shows that the defendants -- not only if they gave money

3    or simply materials, even if the materials or the money

4    was spent on humanitarian items like diapers, food,

5    clothing, books, medical supplies -- if it was spent with

6    the intent to benefit this terrorist organization, even if

7    that money was later spent for those types of items, that

8    would still be a violation of the law.  Now, having heard

9    that, how do you feel about that aspect of the law?  Do

10    you agree or disagree with that?

11        VENIRE PERSON:  I agree with the law.

12        MR. JACKS:  So if the evidence showed that the

13    only thing that was provided to this organization was not

14    bullets or anything -- guns or anything like that but it

18:00  15    was these types of so called humanitarian things, could

16    you return a verdict of guilty if that's all the evidence

17    showed?

18        VENIRE PERSON:  Yes.

19        MR. JACKS:  Thank you.

20        THE COURT:  Ms. Mallory, we are in the process

21    of selecting the jury that will hear this case.  I

22    anticipate that process of jury selection will continue

23    for at least another day or two.  Until you hear from us

24    again, you should not discuss this case with anyone or

25    allow anyone to discuss it with you, nor should you read

18:00 1    or watch or listen to any media accounts about the case.

2    Thank you.  You may rejoin the others in the hall.

3             Mr. Westfall.

4             MR. WESTFALL:  It sounds like Ms. Mallory is

5    going to suffer more of a hardship than she knows.  She

6    has demonstrated that she won't be able to give full

7    consideration to the trial because of her significant

8    financial issues.

9             THE COURT:  Mr. Jacks, what is the government's

10   position?

11            MR. JACKS:  Well, your Honor, I'm not sure

12   that's clear.  I understand what she's saying.  But when

13   you ask her point blank, could you pay attention and be a

14   fair juror, she says yes.  So I think this is one of those

18:00 15   again where it's not a cause challenge, but one of those

16   that the Court might just hold in abeyance and take under

17   advisement.

18            THE COURT:  Yes, I don't have to make a decision

19   about that now.  So I think I will take that under

20   advisement for the moment.

21            Mr. Kiblinger, I think we're ready to see Mr.

22   Cabrera next.

23            Good afternoon.  The parties to this case have

24   some questions they would like to ask you.

25            VENIRE PERSON:  Yes, sir.

18:00   1           MS. MORENO:  Good afternoon.  My name is Linda

        2    Moreno, and I represent one of the gentlemen here in this

        3    case.  I want to ask you some questions about the

        4    questionnaire that you filled out several months ago.  Do

        5    you remember doing that?

        6           VENIRE PERSON:  Yes, I do.

        7           MS. MORENO:  I'm going to ask you first if you

        8    have heard anything about this case.  This is the case

        9    involving the Holy Land Foundation which is an American

       10    Muslim charity.

       11           VENIRE PERSON:  Yes.

       12           MS. MORENO:  And I want to know if you have

       13    heard anything about this particular case or if the name

       14    rings a bell, if you have read anything in the newspapers

18:00  15    or heard anything on the TV or radio.

       16           VENIRE PERSON:  I know it was in the newspapers

       17    this morning.  I didn't read it.  I did hear about it in

       18    the news.  I think it was yesterday or Sunday night I was

       19    watching the TV, and something came on about it.  That's

       20    as far as I know.

       21           MS. MORENO:  Is that the only time you recall

       22    hearing the name "Holy Land Foundation"?

       23           VENIRE PERSON:  I remember it was a while back.

       24    It was a couple of years ago.  I do remember that only

       25    because of what they said.  Only because of the situation

18:00 1    I guess.

2                    MS. MORENO:  This is a case that involves

3    charges of terrorism.

4                    VENIRE PERSON:  Yes.

5                    MS. MORENO:  And did you hear anything about the

6    nature of the charges on the TV or the radio?

7                    VENIRE PERSON:  All they said was like you said

8    some kind of terrorist deal.  Funding for the terrorists.

9    That's all.

10                    MS. MORENO:  Now, just hearing that, just

11    hearing that description of the charges, is there anything

12    about that description that makes you think I don't think

13    I want to sit on this case or I have very strong opinions

14    about these kinds of charges?

18:00 15                    VENIRE PERSON:  To tell you the truth, not

16    really.  It doesn't bother me.  I'm in the military right

17    now so we deal with that.

18                    MS. MORENO:  Well, when you say --

19                    VENIRE PERSON:  I myself.  I'm in the army

20    reserves, yes, ma'am.

21                    MS. MORENO:  And you say we deal with that, what

22    do you mean by that?

23                    VENIRE PERSON:  Basically the army.  What we're

24    taught and stuff like that, you know.

25                    MS. MORENO:  Were you in Iraq, sir?

18:00  1          VENIRE PERSON:  Yes, ma'am.  I just got back in

       2   November.

       3          MS. MORENO:  Where were you in Iraq?

       4          VENIRE PERSON:  Nasiriah.

       5          MS. MORENO:  How long was your tour of duty?

       6          VENIRE PERSON:  A year overseas.

       7          MS. MORENO:  You are in the army reserves?

       8          VENIRE PERSON:  That's correct.

       9          MS. MORENO:  Did you see combat over there?

      10          VENIRE PERSON:  Actually most of the time we was

      11   just getting mortared, and like, if we go on convoys,

      12   basically nothing happened to us.  So that's pretty good,

      13   and that's about the only thing.

      14          MS. MORENO:  Well, certainly your life was in

18:00 15   danger?

      16          VENIRE PERSON:  Yes, ma'am.

      17          MS. MORENO:  And this case involves gentlemen

      18   who are of the Muslim faith.

      19          VENIRE PERSON:  Yes.

      20          MS. MORENO:  And who are Palestinian.

      21          VENIRE PERSON:  Yes.

      22          MS. MORENO:  And this is a time when there

      23   aren't any right or wrong answers, Mr. Cabrera.  We just

      24   need to know how you feel in your heart, if this is a case

      25   you would be a fair and impartial juror on.

18:00  1          VENIRE PERSON:  Yes, I understand.

       2          MS. MORENO:  Now, I ask you, having really had

       3   this life-and-death experience in Iraq and dealing with

       4   persons over there who are Muslim and now you are in

       5   America in this courtroom having to decide a case that

       6   involves Muslims, Arabic men, what are your thoughts?  Do

       7   you have any opinions?

       8          VENIRE PERSON:  I don't have no opinions.  I

       9   mean as far as a hatred towards them, I don't.  I'm just

      10   glad to be back basically.  Trying to get my life again.

      11   You know, that's it.  What do you want me to say?  Do I

      12   have hatred toward them?  I don't.  It's my job.  Whatever

      13   happens.  Just something happens.

      14          MS. MORENO:  Well, let me ask you this.  Have

18:00 15   you heard of the presumption of innocence?

      16          VENIRE PERSON:  Well --

      17          MS. MORENO:  In criminal cases persons in this

      18   country who are charged with crimes are afforded certain

      19   Constitutional rights and protections.  Okay?

      20          VENIRE PERSON:  Yes.

      21          MS. MORENO:  And one of them is you are presumed

      22   innocent.

      23          VENIRE PERSON:  Until guilty.

      24          MS. MORENO:  Until the government proves its

      25   case beyond every reasonable doubt.  That's presumption of

18:00    1    innocence.

         2                VENIRE PERSON:  Yes.

         3                MS. MORENO:  So given your experience and things

         4    that have happened to you, could you honestly say that you

         5    can afford these gentlemen the presumption of innocence or

         6    do you have hesitation?

         7                VENIRE PERSON:  No, I don't have no hesitation.

         8    Like you said, everybody is innocent until proven guilty.

         9                MS. MORENO:  In this case, as I said -- And I'll

        10    explain the charge for you in a minute.

        11                VENIRE PERSON:  Right.

        12                MS. MORENO:  This is a terrorism-related charge,

        13    material support of a foreign terrorist organization,

        14    HAMAS?

18:00   15                VENIRE PERSON:  Yes.

        16                MS. MORENO:  The government has the burden of

        17    proof.  Do you think in this time in America in terrorism

        18    cases that the burden of proof should be less on the

        19    government because the charges are so serious?

        20                VENIRE PERSON:  What do you mean by less?

        21                MS. MORENO:  Well, the burden of proof

        22    ordinarily is proof beyond a reasonable doubt.  That's the

        23    standard.

        24                VENIRE PERSON:  Yes.

        25                MS. MORENO:  Do you think in a terrorism case

18:00 1    that burden should be less?

2                    VENIRE PERSON:  Not really.

3                    MS. MORENO:  Do you have any problem with that

4    concept?

5                    VENIRE PERSON:  No, I don't.

6                    MS. MORENO:  In this case, the government

7    alleges that the Holy Land Foundation sent humanitarian

8    aid to Palestine -- and this aid was food, medicine,

9    diapers, lollipops, books -- and that the Holy Land

10   Foundation sent it to the needy and the children in the

11   West Bank and Gaza.  The government further alleges that

12   that humanitarian aid that was sent benefited HAMAS.

13   That's their allegation.  That's what they say.

14                   VENIRE PERSON:  Okay.

18:00 15            MS. MORENO:  Now, hearing those charges, does

16   that cause you any concern?  Do you have any opinions just

17   hearing those kinds of charges?

18                   VENIRE PERSON:  My concern is -- I mean are they

19   really sending that?  I have no idea.  With the books or

20   something, some kind of other deals of knowledge of the

21   U.S., you know.  I mean as far as you know some kind of

22   ideas of what the U.S. has.  Did they get the books or did

23   they get something else besides the books?  You know,

24   yeah, you can -- It's like a front basically.  What I'm

25   trying to say, yes, this is just a front so it makes it

18:00  1    seem like they are getting lollipops or whatever.  But if

2    they are going to throw something else in there.  That's

3    how I see it.

4              THE COURT:  Ms. Moreno, your time has expired.

5              VENIRE PERSON:  Excuse me, sir.

6              THE COURT:  I was speaking to Ms. Moreno.

7              Mr. Jacks, do you have questions for Mr.

8    Cabrera?

9              MR. JACKS:  Yes, your Honor.  Good afternoon.

10             VENIRE PERSON:  Good afternoon.

11             MR. JACKS:  My name is Jim Jacks.  I'm an

12   Assistant United States Attorney here in Dallas, and I'm

13   one of the prosecutors representing the government in this

14   case.  I have just a few questions for you.  I think first

18:00 15   of all, all of us, everybody in this room, would like to

16   thank you for your service.  I think both sides of the bar

17   would want to acknowledge that.

18             Is what you are saying basically that if the

19   army wanted you to have an opinion they would have issued

20   you one?

21             VENIRE PERSON:  No.

22             MR. JACKS:  You when you are not working or on

23   active duty, what kind of work do you do?

24             VENIRE PERSON:  I work for the school district.

25   I work in a warehouse.

18:00 1                     MR. JACKS:  And what type of a warehouse is it?

2                     VENIRE PERSON:  Basically we deal with

3          maintenance, HBC, carpentry, plumbing, anything that deals

4          with maintenance.

5                     MR. JACKS:  And is this, for example, where

6          these maintenance people need a part, they come to the

7          warehouse to get the part to do whatever work that needs

8          to be done at some school somewhere?

9                     VENIRE PERSON:  That's correct.

10                     MR. JACKS:  How long have you been there?

11                     VENIRE PERSON:  I have been with the district

12         for seventeen years.

13                     MR. JACKS:  How long have you been an army

14         reservist?

18:00 15                     VENIRE PERSON:  Three years, sir.

16                     MR. JACKS:  And was there a period of time when

17         you were on active duty?

18                     VENIRE PERSON:  No, sir, straight into the

19         reserves.

20                     MR. JACKS:  What was your job in the army?

21                     VENIRE PERSON:  My job basically when you go

22         overseas, everything changes.  My primary was MOS was 92

23         Whiskey which was water purification.  But during that

24         time you could do a little bit of everything.  Guard.

25         Convoys.  Just everything.

18:00  1          MR. JACKS:  All right.  Do you know whether or

       2     not you are expected to return?

       3          VENIRE PERSON:  Yes, I do know.

       4          MR. JACKS:  Do you know when that might be?

       5          VENIRE PERSON:  2008 is all I can say.

       6          MR. JACKS:  You've not served on a criminal jury

       7     before; is that correct?

       8          VENIRE PERSON:  That's correct.

       9          MR. JACKS:  You grew up in Dallas?

      10          VENIRE PERSON:  Yes, sir.

      11          MR. JACKS:  Mr. Cabrera, not having served on a

      12     trial jury before, at the conclusion of all the evidence,

      13     after both sides have presented all of the testimony and

      14     all the documents and before the final arguments or

18:00 15     summations, if you will, the Judge will read his

      16     instructions or his charge to the jury which basically

      17     contains the law that applies to this case, and he would

      18     for example -- The charge of providing material support to

      19     a foreign terrorist organization, he would tell you what

      20     that statute is.  And it will be included word for word in

      21     that charge.  He would define words -- In other words, he

      22     would define what is meant by a foreign terrorist

      23     organization.  As a part of that instruction, I anticipate

      24     that he would include the fact that the criminal law of

      25     the United States is that even if the material support --

18:00 1   whether it's currency or actual goods and services, even

2   if it's for so called humanitarian purposes, if it's books

3   or if it's currency that is then later used to spend money

4   on a hospital or something like that -- if it's provided

5   for the benefit of a foreign terrorist organization, it's

6   still a violation of the law.  Having been told that, is

7   there anything about that provision of the law that you

8   disagree with or would not be able to follow?

9           VENIRE PERSON:  No.

10          MR. JACKS:  Okay.  Thank you, sir.

11          VENIRE PERSON:  I got a question.  I don't know

12   if this is the last question.  I don't know -- Let's say I

13   get made for the jury and I get orders to go and train.

14   Is this going to affect -- I mean is it going to put an

18:00 15   affect on me or anything?

16          MR. JACKS:  Your Honor --

17          THE COURT:  I don't know that I know the answer

18   to that either, Mr. Cabrera.  That's something I guess

19   we'll have to look into.  Do you think it's a possibility

20   that you will receive such orders?

21          VENIRE PERSON:  Yes, I do.  It's annual

22   training, two weeks to a month.  I have no idea.

23          THE COURT:  Well, obviously you can't be in two

24   places at the same time.  So we do need to find out the

25   answer to that.  But thank you for raising the question.

18:00  1          VENIRE PERSON:  Thank you, sir.

       2          THE COURT:  Mr. Cabrera, as you can tell, we're

       3   in the process of selecting the jury that would hear this

       4   case.  I expect that process will continue for at least

       5   another day or two.  So until you hear back from us again,

       6   you should not discuss this case with anyone or allow

       7   anyone to discuss it with you, and you should also not

       8   read or watch or listen to any media accounts about the

       9   case, if there are any.  Thank you, sir, you may leave us

      10   and go to the hall.

      11          MS. MORENO:  The defense has a concern obviously

      12   that Mr. Cabrera's receiving orders may come at any time,

      13   and so I would raise this serious consideration to the

      14   Court.  I think he indicated that he would receive orders,

18:00 15   and this would be either two weeks to a month in training.

      16          Additionally, your Honor, I would also raise a

      17   cause challenge to Mr. Cabrera.  He volunteered his

      18   opinion after I described to him what the allegations were

      19   by the government, that this was really a front, that -- I

      20   think his words were this is some kind of deal, would they

      21   be getting books or something else, are they really

      22   sending that, this is just a front.  So I would move a

      23   cause challenge for Mr. Cabrera and raise the hardship

      24   issue as well.

      25          THE COURT:  Mr. Jacks, do you have a position

18:00  1    about that?

2         MR. JACKS:  Yes, your Honor, I don't believe

3    there is anything that merits this juror being excused for

4    cause.  In terms of whether a problem later arises

5    regarding orders that he might receive, that's total

6    speculation as far as if and when that might happen.

7         Secondly regarding his answer, I do not believe

8    that that statement that he made in any way goes to show

9    that he would be disqualified.  He made very clear that he

10    would listen to the evidence and follow the Court's

11    instructions and the law.  So I don't believe that any

12    answer he has given is one that would merit him being

13    excused for cause.

14         THE COURT:  I will deny the motion to excuse

18:00 15    Mr. Cabrera for cause.  And I will simply take note for

16    the moment of his concern that he might receive orders for

17    annual training with his military unit.  That's something

18    that I think I need to look into, but I don't think I need

19    to take action on it today.

20         Ladies and Gentlemen, I'd like to -- Mr. Cabrera

21    will be the last member of venire that we can question

22    today because of the hour.  But I'd like to go back and

23    just review where I think we are in this process so that

24    we're all on the same page so to speak.

25         I have excused some of the ones that we have

18:00   1   questioned today already for cause; namely, Mr. Mosty,

        2   Number 11; Ms. Ho, Number 17; Mr. Milburn, Number 21; Mr.

        3   Jackson, Number 22; and Ms. Johnson, Number 24.

        4           There are still pending challenges for cause to

        5   Number 3, Ms. Pritchard; Number 8, Ms. Smith; Number 18,

        6   Mr. Smith; Number 20, Ms. Roberson.  And then there are a

        7   few instances where counsel have raised the question of

        8   whether I should exercise my discretion to excuse for

        9   hardship, and that's Number 12, Mr. Perry, who's currently

       10   unemployed; Ms. Mallory, Number 25, who's employed at

       11   Tremont Retirement Center, and I suppose in that same

       12   category would be Mr. Cabrera in the event he receives

       13   these orders for annual training.  Did I misstate any of

       14   those?

18:00  15           MS. MORENO:  We would agree, your Honor.

       16           THE COURT:  Counsel, I wanted to provide to you

       17   some information that I received from the jury

       18   administrator.  Number 28 who was a no-show today, Mr.

       19   Griffin, has been released by the jury administrator.  She

       20   says that they found out that he resides in Collin County,

       21   although his jury information shows Dallas County, Texas,

       22   but the post office shows Collin County, and that's in the

       23   Eastern Direct of Texas rather than the Northern District.

       24   So he would not be eligible to serve.

       25           Mr. Brownell, would have been on the list for

18:00  1  tomorrow, July 17, but Mr. Brownell is in the hospital

2  today and may be released tomorrow, and he requested an

3  excuse and stated he is seventy-one years old and said he

4  was not going to submit any additional information.  So

5  the jury administrator excused him on the basis of the

6  information that he has already provided.  And Juror

7  Number 02-0391, Hobbs, called and stated he needed to go

8  out of town to be with his son who's having eye surgery.

9  He can be back and report on Thursday, the 19th, which may

10  be the day he is to report in anyway.

11  Ladies and Gentlemen, I wanted to commend

12  counsel for the way the questioning went today.  We didn't

13  do as well as I had hoped in my best case scenario, but we

14  also exceeded what I feared in the worst case scenario.  I

18:00 15  think we did make reasonable progress today.  I do hope

16  that tomorrow morning we can all be in place exactly at

17  nine and can begin on time.  We were a bit late getting

18  started this morning, and I admit I was probably as much

19  at fault as anyone else for that, and so we lost half an

20  hour potentially at the beginning of the day today.  But I

21  think if we can get started at nine tomorrow, that we can

22  make good progress again tomorrow.

23  Is there anything else that we need to cover

24  while we're all together this afternoon?

25  MR. WESTFALL:  Your Honor, just a clarification.

18:00 1    You had mentioned last week what would happen if we had

2    jurors left over at the end of the day.  So am I guessing

3    correctly that we're starting with Mr. Lennie Denton in

4    the morning?

5              THE COURT:  I told Ms. Hudson who transmitted

6    this information to the jury administrator that they

7    should begin with the people at the place we left off

8    today as the first group summoned tomorrow and to summon

9    an additional number to equal approximately forty people.

10    So I think that's what we will do.  We'll be in recess

11    until nine o'clock tomorrow morning.

1                C E R T I F I C A T I O N

2

3        I, Cassidi L. Casey, certify that during the

4   proceedings of the foregoing-styled and -numbered cause, I

5   was the official reporter and took in stenotypy such

6   proceedings and have transcribed the same as shown by the

7   above and foregoing pages 1 through 237 and that said

8   transcript is true and correct.

9

10        I further certify that the transcript fees and format

11  comply with those prescribed by the court and the Judicial

12  Conference of the United States.

13

14

15                          s/Cassidi L. Casey
                            _____
16                          CASSIDI L. CASEY
                            UNITED STATES DISTRICT REPORTER
17                          NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
18                          CSR NUMBER 1703

19

20

21

22

23

24

25

**< A >**
**Abdulqader** 2:12, 33:13
**abeyance** 221:16
**abide** 70:6, 77:19, 91:9, 91:15, 138:18, 190:2, 190:15
**Abilene** 169:14
**ability** 18:24, 36:24, 38:2, 46:8, 97:11, 99:14, 179:5, 189:11, 196:16
**able** 7:5, 14:15, 19:5, 59:15, 60:2, 110:18, 130:5, 148:22, 148:23, 172:16, 190:24, 191:8, 191:24, 218:18, 221:6, 231:8
**above** 58:21, 117:13, 238:9
**Absolutely** 29:15, 32:18, 65:18, 88:3
**Abu** 1:40
**abuse** 21:4, 21:5
**Abused** 157:1, 157:2
**academy** 21:24
**accept** 90:25, 91:2
**accepting** 9:4, 22:23
**accessories** 49:11
**according** 203:7
**accordingly** 167:5, 181:12
**accounts** 6:16, 54:8, 101:8, 112:18, 120:7, 129:20, 139:17, 147:13, 150:10, 173:1, 182:6, 191:18, 192:24, 196:12, 206:15, 212:3, 221:1, 232:8
**accurate** 136:4
**accusations** 43:18, 61:1
**accused** 6:9, 6:25, 9:18, 23:3, 25:13, 25:13, 34:9, 51:9, 70:4, 120:20, 151:15, 179:12, 180:15, 199:13, 210:18
**accusing** 134:8, 192:21
**acknowledge** 228:17
**acquit** 153:18, 187:10
**acronyms** 79:13
**across** 53:8, 160:17
**act** 166:17
**action** 200:5, 233:19
**Active** 58:16, 129:1, 145:9, 145:10, 202:1, 228:23, 229:17
**acts** 105:2

**actual** 180:18, 231:1
**Actually** 16:18, 16:20, 17:4, 30:10, 34:23, 44:16, 53:12, 91:23, 102:25, 175:12, 175:12, 200:4, 224:10
**Adams** 109:1
**added** 72:5
**Addison** 47:15
**addition** 142:14, 146:15, 155:3
**additional** 151:16, 235:4, 236:9
**Additionally** 232:16
**address** 24:23, 103:20, 117:11, 204:3
**addressed** 203:22, 203:23
**administer** 3:9
**administered** 3:10
**administrative** 155:3
**administrator** 112:22, 234:18, 234:19, 235:5, 236:6
**admit** 71:24, 235:18
**admitted** 46:1
**adolescent** 123:9
**Adriene** 237:28
**adult** 169:7
**adults** 115:6, 191:1, 191:3
**advance** 200:15
**advised** 21:7, 127:19
**advisement** 24:13, 72:18, 161:1, 183:11, 221:17, 221:20
**Advocacy** 16:25
**affect** 18:23, 36:24, 44:12, 75:2, 96:23, 97:1, 99:14, 101:24, 179:9, 189:10, 194:25, 195:14, 231:14, 231:15
**affecting** 19:19
**afford** 65:18, 71:24, 177:5, 182:11, 182:18, 226:5
**afforded** 85:25, 105:15, 225:18
**afraid** 95:13, 214:9
**Africa** 53:8
**After** 4:13, 8:20, 13:25, 16:13, 20:13, 20:14, 21:11, 23:5, 32:10, 34:5, 34:6, 42:13, 42:14, 50:2, 58:25, 80:16, 84:1, 92:6, 92:11,

108:14, 111:14, 112:21, 119:20, 119:22, 121:3, 121:6, 128:6, 137:15, 150:24, 161:19, 171:14, 177:2, 194:18, 197:11, 200:14, 205:6, 209:10, 219:18, 230:13, 232:18
**Afternoon** 102:13, 107:24, 113:10, 117:9, 117:10, 120:9, 124:17, 124:18, 129:22, 129:23, 134:13, 139:23, 147:15, 147:18, 151:4, 155:23, 161:5, 168:1, 173:4, 173:8, 183:12, 183:13, 188:1, 192:6, 196:21, 201:11, 206:17, 206:19, 212:22, 217:5, 221:23, 222:1, 228:9, 228:10, 235:24
**Again** 41:17, 129:17, 147:10, 172:23, 176:16, 182:3, 191:16, 196:9, 206:12, 211:25, 220:24, 221:15, 225:10, 232:5, 235:22
**Against** 14:14, 23:13, 27:22, 27:24, 43:1, 50:18, 61:1, 71:21, 81:9, 86:14, 86:25, 87:6, 91:7, 92:24, 99:10, 100:21, 105:21, 112:3, 142:8, 146:23, 153:8, 159:3, 165:1, 165:3, 171:10, 188:20, 190:1, 192:4, 194:1, 194:10, 200:5, 206:23, 208:18
**age** 11:1, 127:5, 127:8
**age-wise** 122:6
**agency** 16:19, 16:24, 17:5, 20:20, 48:22
**agent** 47:8, 48:25
**ago** 26:2, 36:2, 40:10, 60:23, 61:18, 61:21, 80:8, 82:8, 82:24, 94:3, 103:1, 104:3, 113:18, 114:3, 135:23, 136:18, 144:21, 144:24, 147:22, 149:21, 157:12, 173:11, 184:11, 184:21, 194:9, 201:4, 201:7, 207:12, 207:15, 222:4, 222:24
**agree** 38:21, 39:10, 39:11, 69:13, 69:16, 70:1, 128:23, 133:12, 146:25, 159:7, 187:15, 188:3, 189:8, 212:19,

220:10, 220:11, 234:15
**ahead** 39:3, 108:4, 198:2
**aid** 9:1, 14:12, 14:14, 23:9, 23:11, 34:12, 39:14, 39:19, 42:21, 50:16, 59:10, 63:16, 63:18, 76:16, 77:24, 81:6, 81:16, 82:8, 85:11, 85:14, 85:15, 92:19, 92:22, 159:1, 160:20, 174:17, 174:19, 175:10, 175:12, 190:9, 190:13, 227:8, 227:8, 227:12
**aiding** 187:1, 187:1
**Air** 118:12, 119:4
**Airplanes** 178:9, 178:10
**AL** 1:13
**Albuquerque** 1:48
**alerted** 113:5
**allegation** 77:17, 140:10, 174:21, 192:19, 227:13
**allegations** 30:13, 73:12, 77:6, 85:22, 103:8, 105:1, 130:10, 197:7, 211:4, 232:18
**allege** 39:16
**alleged** 86:5, 91:24
**alleges** 39:13, 63:10, 63:14, 85:5, 85:10, 85:15, 161:17, 174:11, 174:20, 175:9, 175:13, 184:6, 206:24, 213:7, 227:7, 227:11
**alleviate** 218:15
**allow** 129:18, 139:16, 147:11, 150:8, 160:8, 172:24, 182:4, 191:17, 196:10, 206:13, 212:9, 220:25, 232:6
**allowed** 55:19, 153:7
**almost** 20:10, 31:18, 54:1
**alone** 96:22, 153:18
**along** 148:15
**already** 61:25, 87:9, 113:1, 152:21, 182:13, 203:14, 209:4, 234:1, 235:6
**also** 8:3, 27:1, 39:9, 40:10, 56:19, 59:8, 74:14, 82:9, 88:17, 89:3, 91:17, 101:18, 115:16, 134:19, 144:14, 158:22, 169:17, 189:1, 232:7, 232:16, 235:14
**Although** 71:23, 105:6, 234:21
**Alvin** 237:22

**always** 67:11, 89:13, 142:15, 156:8, 217:23
**am** 24:12, 24:24, 26:18, 33:5, 82:22, 101:7, 102:9, 113:17, 119:5, 130:5, 130:6, 147:24, 180:16, 197:1, 198:20, 198:22, 206:20, 213:2, 236:2
**Amalgamated** 202:23, 203:24
**amateur** 22:12
**Amendment** 18:3, 153:1, 153:2
**America** 1:7, 55:9, 55:10, 192:16, 225:5, 226:17
**American** 36:12, 61:1, 65:12, 83:6, 85:5, 104:13, 113:24, 140:12, 151:14, 152:20, 161:18, 173:19, 197:8, 197:9, 213:6, 222:9
**American-muslim** 130:12
**Americanized** 104:11
**Americans** 55:8
**among** 111:22, 160:6
**amount** 57:19, 192:22, 204:20
**Anca** 237:12
**angle** 84:12, 86:9
**annual** 54:1, 231:21, 233:17, 234:13
**Another** 10:17, 13:9, 38:22, 40:10, 51:17, 57:2, 57:4, 72:5, 77:2, 77:7, 91:17, 106:1, 136:8, 153:12, 160:25, 166:22, 172:22, 182:3, 183:10, 189:16, 190:7, 191:15, 196:8, 199:4, 206:11, 211:24, 220:23, 232:5
**Answer** 23:25, 39:4, 60:12, 62:13, 62:15, 62:19, 87:11, 90:25, 97:17, 98:16, 98:17, 99:4, 100:13, 107:18, 114:19, 114:19, 138:12, 138:24, 139:10, 160:2, 175:8, 183:3, 189:2, 231:17, 231:25, 233:7, 233:12
**answered** 28:18, 28:24, 69:6, 83:2, 87:9, 87:10, 100:18, 138:23, 172:1
**answers** 12:25, 66:6, 87:3, 90:8, 159:23, 173:10, 173:15,

176:16, 191:23, 224:23
**anticipate** 34:7, 50:12, 81:1, 146:16, 158:18, 158:21, 172:1, 181:1, 182:2, 191:14, 205:11, 220:22, 230:23
**anticipating** 180:16
**Antonio** 185:6
**anxiety** 95:19
**Anybody** 70:22, 85:2, 106:8, 133:25, 134:5, 141:15, 142:23, 198:13
**anymore** 33:7
**Anyone** 15:25, 15:25, 77:12, 112:18, 120:6, 129:18, 129:18, 132:16, 139:16, 139:16, 147:11, 147:12, 150:8, 150:8, 152:20, 153:13, 154:1, 160:8, 160:8, 169:24, 172:24, 172:24, 182:4, 182:5, 191:16, 191:17, 196:10, 196:10, 206:13, 206:13, 212:1, 212:1, 216:22, 220:24, 220:25, 232:6, 232:7, 235:19
**anyway** 235:10
**anywhere** 31:16, 41:1, 142:24
**apologize** 181:24
**apparently** 72:1, 99:20
**appears** 82:5
**applied** 23:20, 146:10, 171:20
**applies** 59:3, 80:21, 92:12, 111:16, 158:13, 180:2, 180:6, 180:11, 205:8, 230:17
**apply** 23:8, 50:6, 56:1, 59:4, 70:1, 92:13, 128:11, 137:19, 138:18, 152:19, 219:21
**appreciate** 65:9
**apprehension** 84:3, 84:20
**approach** 93:9
**approve** 70:25
**Approximately** 8:10, 115:1, 117:21, 236:9
**apt** 216:17
**Arab** 55:17, 55:17, 76:7, 94:18, 214:16
**Arabia** 27:2
**Arabic** 138:22, 138:25, 141:15, 225:6
**Arabs** 154:7, 164:4

**Arce** 139:24, 139:25, 140:3, 143:17, 143:18, 147:5, 237:24
**architect** 126:14
**area** 31:21, 41:4, 82:11, 82:13, 94:20, 103:20, 103:22, 109:12, 109:14, 109:24, 117:19, 117:23, 134:23, 135:16, 144:1, 149:7, 157:14, 169:7, 169:16, 175:5, 178:18, 178:22, 179:1, 192:20
**areas** 76:18
**aren't** 11:21, 105:25, 176:16, 224:23
**argue** 192:4
**arguments** 92:8, 171:18, 230:14
**arises** 233:4
**Arkansas** 10:10, 13:4
**Armor** 201:19
**Armored** 201:18
**Army** 58:14, 58:18, 64:5, 64:9, 64:12, 156:23, 178:17, 184:17, 184:18, 185:1, 200:25, 201:15, 201:19, 201:25, 223:19, 223:23, 224:7, 228:19, 229:13, 229:20
**around** 15:22, 68:9, 68:9, 180:20
**arrested** 44:4
**arrests** 140:20
**Arrika** 237:32
**arrive** 180:13, 213:23
**arrows** 125:24
**article** 130:22
**articles** 62:5
**arts** 67:5
**aside** 56:21, 68:14, 176:3, 176:5, 176:7, 176:11, 176:22, 176:25, 182:12
**asked** 18:22, 22:20, 30:25, 56:20, 59:21, 70:14, 76:1, 83:2, 86:12, 133:5, 134:20, 135:18, 138:22, 150:22, 160:22, 165:24, 168:6, 179:5, 179:6, 179:9, 181:18, 182:15, 219:4
**asking** 55:7, 62:3, 67:17, 171:4

**aspect** 9:5, 14:19, 172:14, 172:16, 220:9
**assembled** 37:18
**assess** 99:1
**assessment** 200:21
**assist** 85:13, 110:13
**Assistant** 1:31, 7:22, 12:10, 18:20, 31:8, 40:8, 48:11, 56:17, 66:4, 78:10, 88:15, 97:25, 107:25, 124:20, 134:16, 149:5, 155:24, 156:10, 168:2, 168:19, 168:22, 168:23, 209:25, 217:8, 228:12
**associate** 79:25
**associates** 7:10
**association** 206:24
**assume** 8:8, 90:24, 105:8, 105:10, 138:10, 138:14
**assured** 182:17
**asthma** 74:14, 75:5
**athletes** 163:16
**athletic** 172:8
**attend** 169:13
**attended** 58:6, 169:12
**attending** 42:1
**attention** 104:20, 110:18, 141:1, 184:10, 184:12, 211:13, 218:18, 221:13
**Attorney** 1:31, 7:23, 12:10, 18:21, 31:9, 40:8, 48:11, 56:17, 60:21, 66:4, 78:10, 88:15, 97:25, 108:1, 124:20, 134:16, 149:5, 155:25, 168:3, 169:25, 169:25, 170:3, 183:20, 209:25, 217:8, 228:12
**attorneys** 51:6, 173:9
**attributes** 104:10, 104:13
**automobile** 57:1
**automotive** 40:17
**available** 4:6
**Avenue** 2:17, 2:35
**average** 58:21
**Aviall** 178:7
**aware** 22:15, 22:16, 36:18, 76:5, 76:12, 98:25, 138:11, 138:14, 218:10, 218:11
**away** 33:10, 35:13, 41:18, 62:6, 95:12, 102:19, 169:20

**< B >**
**babies** 191:2
**baby** 190:13, 191:2
**Baccus** 43:13, 48:6, 48:8, 50:24, 237:14
**back** 13:3, 13:5, 27:18, 44:4, 47:25, 67:15, 72:20, 83:15, 83:15, 93:16, 104:3, 125:24, 143:24, 178:3, 182:17, 188:22, 206:6, 222:23, 224:1, 225:10, 232:5, 233:22, 235:9
**background** 21:17, 76:2, 82:6, 90:14, 119:10
**backpacks** 14:13, 42:23, 50:16, 59:11, 81:8, 92:23, 128:18, 138:7, 158:24, 174:19, 206:3
**bad** 7:12, 11:8, 11:9, 11:14, 11:16, 11:22, 76:7, 76:9, 104:5, 133:20, 141:20, 141:21, 198:10, 204:16
**Baker** 1:40
**balancing** 14:1
**balls** 9:2, 14:13, 34:14, 50:16, 59:12, 128:18, 158:25, 206:4
**bandages** 186:13
**Bank** 13:19, 13:19, 13:22, 39:16, 85:17, 94:18, 96:6, 227:11
**banking** 90:12
**Baptist** 123:2, 129:4, 154:17, 162:20
**bar** 228:16
**BARRY** 1:28
**base** 78:24
**Based** 7:5, 9:25, 10:14, 26:4, 26:11, 28:15, 30:11, 44:1, 46:9, 62:10, 70:18, 75:12, 95:1, 97:9, 97:12, 109:2, 109:4, 121:19, 123:14, 174:4, 181:19, 195:6, 211:14, 212:9, 213:18, 213:24, 218:19
**basic** 201:16
**Basically** 49:9, 49:10, 50:5, 81:16, 92:11, 144:2, 146:9, 158:13, 162:8, 167:1, 187:10, 223:23, 224:12, 225:10,

227:24, 228:18, 229:2, 229:21, 230:16
**basis** 54:1, 235:5
**bathroom** 150:23
**Baylor** 41:20, 41:23, 131:11
**beard** 104:14
**bearings** 197:24
**bears** 77:3, 77:4
**became** 48:24, 119:20, 156:10
**become** 32:8
**bed** 83:11, 206:4
**Bedford** 118:17
**bedrock** 182:20
**begin** 3:4, 74:7, 235:17, 236:7
**beginning** 44:20, 114:6, 144:23, 235:20
**begins** 77:8
**behalf** 86:13, 86:25, 182:8
**beings** 65:4, 117:3, 185:12
**belief** 98:6, 134:6, 134:9, 154:11
**beliefs** 59:22
**believe** 12:25, 19:15, 20:20, 33:12, 39:18, 43:4, 68:12, 69:7, 69:13, 72:15, 87:8, 87:10, 91:25, 93:5, 96:18, 98:12, 102:6, 108:8, 109:22, 113:2, 117:20, 118:2, 119:19, 122:16, 127:19, 133:1, 133:5, 136:18, 141:11, 158:20, 179:14, 183:7, 186:1, 188:7, 210:4, 233:2, 233:7, 233:11
**Bell** 6:11, 25:15, 57:9, 151:17, 184:14, 192:17, 197:12, 207:1, 222:14
**bells** 9:20, 16:11, 36:14, 43:20, 51:12, 73:15, 93:24, 103:11, 140:15, 161:20, 184:9
**belonging** 89:25
**bench** 93:10
**benefit** 11:3, 42:25, 50:17, 59:13, 81:10, 92:20, 146:22, 159:3, 172:12, 175:4, 179:14, 179:17, 180:22, 181:9, 186:19, 190:14, 205:17, 220:6, 231:5
**benefited** 63:17, 85:18,

174:20, 175:2, 175:14, 227:12
**benefits** 203:1
**benign** 186:13, 186:14, 187:12
**besides** 216:23, 227:23
**best** 5:2, 55:11, 61:19, 200:21, 235:13
**bet** 152:21
**better** 86:23
**biased** 95:8
**biases** 62:16, 62:17, 176:17
**big** 126:16, 148:5, 174:4, 203:25
**bilingual** 38:18
**Billie** 237:16
**bills** 216:16
**bit** 23:19, 24:1, 25:3, 53:8, 53:21, 55:24, 57:17, 60:12, 64:25, 67:16, 96:1, 97:14, 110:4, 121:5, 130:7, 130:8, 132:9, 140:6, 140:7, 147:25, 183:19, 189:17, 192:15, 208:21, 229:24, 235:17
**blacks** 188:23
**blank** 221:13
**blankets** 105:3
**blood** 19:1, 186:7, 189:15
**Blot** 126:14
**Blue** 177:14, 177:14
**Bobbitt** 82:19, 88:13, 88:14, 93:7, 237:18
**body** 115:12
**bomb** 44:17
**books** 9:1, 54:23, 59:10, 63:18, 81:8, 85:12, 92:23, 112:2, 128:18, 138:6, 146:20, 158:25, 172:7, 174:18, 180:19, 181:8, 205:15, 220:5, 227:9, 227:19, 227:22, 227:23, 231:2, 232:21
**born** 22:17, 149:14, 149:16
**Bosnia** 64:14, 64:18, 72:1
**bother** 223:16
**bothering** 211:18
**BOX** 2:26, 3:25
**Boy** 166:14, 215:24
**BOYD** 1:45
**brake** 40:16, 40:18
**Branch** 49:7, 88:22, 125:17,

125:20
**break** 150:24
**breaking** 187:16
**brief** 3:5, 5:8, 75:19, 88:17, 134:17, 158:7
**briefly** 7:21, 15:7, 15:12, 48:7, 108:3, 136:25, 149:4, 209:23, 217:4
**bright** 194:7
**bring** 13:4
**brings** 54:6
**Broadcasting** 80:6
**broader** 55:12
**brother** 20:17, 21:8, 21:13, 47:1
**brother-in-law** 11:10, 12:11
**brothers** 109:10, 187:2, 203:25
**brought** 5:9, 55:10, 55:14, 180:7, 206:23
**Brownell** 234:25, 235:1
**Brownsville** 82:13
**Bryan** 109:1
**build** 175:11
**Building** 21:2, 44:9, 132:1
**built** 24:6
**bullets** 206:2, 220:14
**bunch** 178:16
**burden** 4:12, 37:2, 37:11, 56:12, 69:12, 72:5, 77:3, 77:4, 77:5, 86:3, 86:6, 88:7, 88:10, 100:8, 100:25, 101:1, 123:23, 124:2, 132:10, 134:3, 142:14, 142:17, 171:7, 171:7, 186:10, 199:17, 199:21, 203:13, 205:21, 226:16, 226:18, 226:21, 227:1
**bus** 75:20, 75:21, 198:16
**business** 56:25, 89:11, 118:10, 135:3, 135:4, 170:24
**busy** 33:5
**butting** 96:12
**buy** 49:10, 180:20
**buying** 112:1
**bylaws** 203:7


**< C >**
**Cabrera** 221:22, 224:23, 228:8, 230:11, 231:18, 232:2,

232:12, 232:17, 232:23, 233:15, 233:20, 234:12, 237:34
**CADEDDU** 2:15, 2:16
**Cal** 201:17
**California** 179:4
**call** 22:1, 117:12, 127:6, 127:7, 162:4, 186:3, 205:24
**called** 13:21, 36:14, 43:19, 49:25, 50:16, 54:8, 59:10, 60:1, 81:5, 89:8, 92:9, 92:21, 103:7, 103:10, 123:7, 123:8, 125:21, 126:13, 142:16, 153:12, 159:1, 163:18, 165:16, 165:24, 172:6, 174:13, 179:24, 197:5, 220:15, 231:2, 235:7
**calls** 125:13
**Calvary** 162:20, 201:18
**campus** 78:17, 156:8
**campuses** 156:7, 156:10
**Canadian** 54:9
**cancer** 32:22
**capable** 121:9
**capacity** 135:9
**Car** 79:19
**cardboard** 162:2, 162:3, 162:9
**cardiology** 24:22
**care** 10:9, 13:13, 19:21, 41:12, 47:20, 47:24, 47:25, 80:18, 82:6, 217:21
**career** 53:18, 201:25
**Carolina** 58:13
**carpentry** 229:3
**carries** 134:3
**Carrollton-farmer** 49:7
**Carter** 237:24
**cases** 4:23, 62:5, 131:23, 219:14, 225:17, 226:18
**CASEY** 2:40, 238:5, 238:19
**CASSIDI** 2:40, 238:5, 238:19
**category** 234:12
**cause** 4:25, 23:25, 24:3, 24:6, 24:7, 24:13, 38:1, 55:20, 71:21, 72:8, 72:16, 75:8, 99:20, 101:22, 102:7, 102:10, 113:4, 132:12, 150:18, 150:21, 160:13, 172:15, 182:9, 191:23, 192:5,

196:15, 196:20, 212:14, 216:7, 221:15, 227:16, 232:17, 232:23, 233:4, 233:13, 233:15, 234:1, 234:4, 238:6
**causes** 19:3, 36:23, 84:9, 84:19
**caution** 72:8
**cave** 68:8
**census** 144:14
**Center** 16:25, 26:19, 29:19, 123:8, 125:19, 125:20, 125:22, 214:21, 234:11
**centers** 218:1
**Central** 91:18, 177:19
**centuries** 96:14
**certain** 17:18, 27:20, 39:15, 55:4, 74:16, 80:10, 91:21, 137:4, 188:8, 225:18
**certainly** 3:17, 58:21, 60:10, 224:14
**certification** 82:10
**certify** 238:5, 238:12
**chains** 135:6
**challenge** 5:2, 5:3, 24:6, 24:12, 71:21, 72:10, 101:22, 102:9, 113:4, 150:18, 160:24, 196:19, 212:7, 221:15, 232:17, 232:23
**challengeable** 102:2
**challenged** 102:6
**challenges** 4:25, 234:4
**chance** 20:5, 20:9, 42:14
**chances** 20:9
**changes** 229:22
**Channel** 96:2, 174:2, 204:18
**characterize** 193:23
**charge** 14:10, 37:3, 45:2, 50:5, 71:10, 71:11, 71:11, 92:9, 105:3, 128:14, 138:2, 144:19, 146:8, 166:2, 166:2, 166:6, 171:21, 219:22, 226:10, 226:12, 230:16, 230:18, 230:21
**charged** 6:8, 6:24, 10:18, 10:24, 18:11, 27:21, 29:5, 56:3, 63:21, 69:10, 69:19, 76:23, 80:10, 81:6, 91:21, 105:16, 106:6, 132:8, 132:16, 142:23, 152:20, 153:13,

153:24, 164:7, 165:14, 166:8, 211:11, 225:18
**charging** 16:9, 165:15
**Charitable** 45:9, 61:12, 166:19, 166:21, 166:23
**charities** 39:15, 63:16
**charity** 6:8, 6:24, 9:17, 18:11, 25:12, 36:12, 39:13, 43:18, 51:9, 61:1, 63:15, 73:13, 83:6, 83:6, 85:6, 85:11, 103:7, 113:25, 120:19, 130:11, 130:12, 140:12, 140:19, 151:14, 161:18, 173:19, 173:19, 173:20, 174:12, 174:17, 175:10, 192:20, 197:8, 197:9, 206:24, 213:6, 222:10
**Chase** 13:20
**checked** 28:25, 98:8, 136:3
**checking** 22:5
**checks** 14:2, 14:2
**chemical** 31:23
**Chevrolet** 79:17
**child** 47:20, 47:24, 215:18
**children** 17:6, 31:14, 32:13, 33:6, 41:18, 76:2, 115:7, 115:14, 127:1, 127:1, 127:2, 127:3, 127:15, 135:14, 143:22, 144:19, 155:1, 157:2, 158:3, 174:18, 191:1, 191:2, 191:3, 227:10
**China** 49:11
**Chinese** 29:23
**choice** 105:20, 202:4
**choices** 97:16
**chooses** 91:5, 100:20, 171:10
**chose** 203:12
**chosen** 34:4, 38:2
**Christian** 174:2, 174:7
**Christians** 16:23
**Chrysler** 40:17
**Church** 122:24, 123:1, 123:3, 129:2, 145:9, 154:12, 154:15, 154:19, 162:18, 162:19, 162:20, 162:24, 163:5, 163:15, 207:7
**circulation** 215:15
**circumstance** 191:7
**cite** 182:19

**citizen** 29:4, 32:8, 119:21, 121:13, 197:23, 197:24
**citizens** 32:10
**City** 10:3, 17:1, 32:4, 33:13, 33:24, 44:6, 44:7, 44:8, 44:15, 47:3, 66:12, 118:9, 118:14, 119:8, 169:25
**civil** 131:21, 135:20, 136:2, 188:22
**civil-type** 170:13
**clarification** 112:20, 235:25
**class** 44:16, 115:14, 115:15, 116:17
**classes** 109:18
**classic** 74:3
**clear** 30:20, 31:10, 40:12, 41:17, 44:18, 84:8, 101:25, 106:23, 110:22, 179:7, 182:10, 183:1, 183:4, 203:10, 221:12, 233:9
**clearance** 58:1, 58:4, 79:6, 79:23
**clearly** 71:22, 72:3, 78:3, 102:1
**Clerk** 40:11, 75:25, 76:17, 112:24
**close** 7:10, 17:18, 31:7, 40:6, 111:10, 169:24, 170:2, 170:16, 185:10
**closely** 16:16, 54:17, 54:21, 95:23, 98:4
**closing** 171:18
**clothing** 14:13, 23:11, 42:22, 50:15, 81:7, 85:12, 92:22, 146:20, 179:15, 220:5
**CNN** 83:2
**collection** 170:12
**College** 7:10, 35:11, 48:17, 58:17, 79:24, 89:16, 109:18, 117:24, 127:14, 169:12, 169:13, 169:14
**Collin** 234:20, 234:22
**combat** 224:9
**comes** 10:14, 45:25, 125:13, 193:20
**comfortable** 105:6, 193:15, 193:17
**coming** 5:25, 25:1, 73:21, 173:23, 219:7
**commence** 5:10

**commend** 235:11
**comment** 54:19, 59:23
**Commerce** 1:35, 2:41
**Commercial** 89:20
**committed** 70:24
**committees** 39:15
**common** 60:8
**community** 17:4
**commute** 47:15
**companies** 40:18, 49:10, 49:12, 89:24, 90:1
**company** 57:2, 57:3, 57:4, 67:9, 78:23, 89:22, 119:4, 119:15, 123:8, 126:13, 169:3, 199:7, 199:8
**compensated** 110:12
**complete** 168:15
**completed** 109:8
**completely** 64:22, 197:15
**comply** 238:13
**comported** 60:8
**comprehending** 148:21
**computer** 119:17
**computers** 119:16
**concept** 37:4, 43:1, 70:1, 81:12, 81:15, 160:16, 227:4
**concepts** 171:4
**concern** 4:4, 36:23, 38:1, 84:10, 84:11, 84:20, 84:21, 150:2, 174:23, 227:16, 227:18, 232:11, 233:16
**concerned** 19:9, 20:2, 20:3, 58:22, 75:19, 75:21, 100:3
**concerns** 85:21, 172:15, 211:12
**concluded** 179:24
**conclusion** 95:16, 230:12
**condo** 216:18
**conduct** 71:1
**Conference** 112:23, 238:14
**conflict** 6:2, 15:16, 15:22, 16:3, 22:7, 22:9, 22:16, 22:18, 41:7, 54:16, 59:23, 95:23, 96:11, 98:7, 141:24
**conflicts** 142:2
**confuse** 176:15
**Confused** 71:2, 131:1, 131:2
**confusing** 60:12
**confusion** 72:3, 72:13
**Congratulations** 47:19

**connect** 210:11
**connected** 83:17, 140:17
**consider** 160:20, 176:11
**consideration** 106:25, 195:3, 221:7, 232:13
**considered** 163:14, 195:9
**considering** 108:13
**conspiring** 42:6, 91:22
**Constantinescu** 24:15, 24:16, 24:21, 24:21, 31:3, 31:6, 35:18, 66:18, 237:12
**Constitution** 90:24
**Constitutional** 28:20, 77:11, 132:7, 166:3, 225:19
**construction** 59:11, 89:18, 89:19, 89:20
**contact** 12:20, 27:5, 33:16, 46:17, 54:6, 202:25, 203:3
**contained** 180:8
**contains** 50:5, 92:11, 158:13, 230:17
**contends** 36:12
**continue** 21:1, 211:24, 220:22, 232:4
**contract** 49:9
**contracts** 78:25, 79:1
**contrary** 4:10, 116:12, 188:17
**contributions** 45:9
**control** 40:14
**conversation** 101:10
**convert** 162:8
**convict** 187:8
**convicted** 95:9
**convinced** 39:22, 160:16
**Convoys** 224:11, 229:25
**cook** 200:24, 202:3
**coordinator** 177:24
**copy** 92:10, 111:15, 128:8, 158:12, 180:3
**Correct** 6:3, 19:6, 29:15, 36:19, 38:19, 48:15, 48:16, 48:18, 49:23, 49:24, 59:20, 86:1, 88:23, 98:10, 98:20, 109:9, 118:17, 118:18, 118:21, 121:22, 134:23, 136:20, 145:14, 145:18, 148:12, 158:2, 168:8, 175:7, 177:3, 218:8, 224:8, 229:9, 230:7, 230:8, 238:10

**correctly** 38:23, 236:3
**corrugated** 162:9
**costly** 203:23, 204:4
**Counsel** 3:19, 4:1, 5:16, 7:18, 7:19, 9:10, 12:5, 14:25, 24:18, 35:20, 42:4, 43:10, 51:1, 56:20, 59:21, 60:17, 66:7, 73:1, 91:18, 101:18, 102:14, 110:23, 113:10, 120:9, 129:24, 140:1, 147:15, 151:4, 161:6, 173:4, 183:3, 183:3, 183:14, 192:8, 196:21, 206:17, 212:22, 234:7, 234:16, 235:12
**counseling** 16:19, 17:5, 17:8, 17:22, 163:10
**counselor** 19:16
**countervailing** 55:5
**countries** 29:21, 94:18
**country** 12:18, 51:17, 64:17, 121:9, 121:14, 165:15, 166:22, 225:18
**County** 8:14, 8:15, 8:15, 8:16, 98:23, 118:23, 136:14, 146:2, 168:12, 234:20, 234:21, 234:22
**couple** 6:22, 18:2, 44:4, 44:4, 46:22, 49:10, 65:10, 131:22, 139:14, 144:18, 150:23, 157:6, 184:11, 210:1, 222:24
**course** 56:1, 94:24, 122:4, 125:12, 132:14
**courses** 89:16
**Courthouse** 1:34, 8:12, 98:23, 112:21, 113:1
**courtroom** 3:10, 5:9, 52:2, 145:24, 181:20, 195:9, 225:5
**courts** 17:3, 132:11
**cover** 3:3, 100:17, 127:8, 235:23
**coverage** 36:6, 160:9
**covered** 55:17
**CPS** 21:4
**crazy** 15:22, 15:23
**create** 72:21
**crime** 10:18, 21:25, 27:21, 29:8, 69:11, 69:19, 105:16, 132:17, 152:20, 153:13, 164:7, 165:14, 166:8, 199:13

**crimes** 29:5, 76:23, 132:8, 225:18
**crisis** 122:20
**Cross** 177:14
**crossed** 86:10
**Crowley** 132:1, 146:4
**CSI** 22:1
**CSR** 2:40
**Cuban** 115:21
**Cubans** 39:9
**cup** 185:6
**curiosity** 200:23
**currency** 146:18, 189:25, 231:1, 231:3
**currently** 101:4, 107:6, 234:9
**curriculum** 109:5
**cut** 68:8, 183:1
**CUTRER** 2:33


**< D >**
**dad** 13:13
**daily** 81:17
**danger** 224:15
**DANIELS** 1:45
**date** 108:11, 135:21, 135:22
**daughter** 57:5, 143:23, 144:22
**daughter-in-law** 64:4, 64:8
**Dave** 170:4, 170:5
**Day** 11:1, 20:13, 20:14, 33:2, 47:25, 77:22, 96:4, 125:12, 131:23, 131:24, 136:22, 172:22, 182:3, 191:15, 194:18, 194:18, 196:8, 199:23, 204:14, 206:11, 209:10, 209:10, 211:24, 218:12, 220:23, 232:5, 235:10, 235:20, 236:2
**Days** 7:10, 61:18, 83:8, 83:10, 83:20, 108:14, 123:8, 136:20, 139:14, 147:8
**de-escalation** 122:20
**deal** 17:5, 21:3, 54:7, 74:10, 96:6, 136:22, 199:23, 199:24, 223:8, 223:17, 223:21, 229:2, 232:20
**dealers** 53:25
**dealerships** 57:1
**dealing** 225:3

**dealings** 76:6, 185:8, 214:15
**deals** 113:23, 227:20, 229:3
**dealt** 14:2, 116:22, 181:18
**death** 17:13
**decent** 141:15, 214:16
**decide** 121:11, 208:25, 209:12, 225:5
**decided** 52:2, 86:18, 109:18, 119:16
**decides** 86:13, 132:18
**deciding** 105:4
**decision** 18:6, 20:7, 45:9, 45:21, 45:24, 70:18, 90:10, 90:18, 97:7, 97:12, 121:18, 167:2, 188:17, 189:7, 189:8, 194:1, 194:21, 199:25, 209:1, 221:18
**decisions** 28:14, 69:1, 110:20, 200:1
**declared** 189:3
**deep** 44:24
**defeats** 212:17
**Defendant** 1:40, 2:3, 2:12, 2:21, 2:30, 3:14, 28:2, 90:23, 91:5, 100:9, 100:20, 152:23, 158:22, 164:23, 166:8, 171:8
**defendants** 3:16, 3:19, 4:9, 4:18, 6:20, 10:12, 11:3, 17:24, 25:9, 33:11, 51:16, 71:13, 75:17, 85:24, 87:16, 92:20, 106:10, 151:10, 194:19, 206:1, 207:24, 220:2
**Defense** 5:20, 9:15, 15:4, 42:3, 51:6, 56:20, 59:21, 60:21, 66:7, 72:5, 72:6, 72:7, 73:9, 82:21, 91:18, 93:19, 102:5, 102:19, 110:23, 120:14, 130:6, 140:5, 161:9, 173:9, 182:9, 183:20, 192:13, 197:1, 206:20, 213:1, 232:11
**define** 80:25, 171:23, 180:8, 230:21, 230:22
**definite** 176:20
**definitely** 74:24, 116:4
**definition** 80:24, 171:25, 219:24
**definitions** 92:15, 111:17, 137:18, 146:14, 158:17, 180:7
**degree** 52:7, 52:10, 58:9,

79:24
**deliberating** 158:12, 180:4
**deliver** 146:8
**demolished** 39:21, 85:14
**demonstrated** 221:6
**denomination** 129:5, 154:16
**dental** 40:22, 131:16, 135:1
**dentist** 38:10, 38:13
**Denton** 236:3
**deny** 233:14
**Department** 1:32, 13:22, 20:22, 20:25, 21:1, 21:9, 29:18, 33:22, 66:13, 123:4, 188:15, 202:25, 203:4, 203:11, 203:17
**Depend** 186:23
**depending** 99:19
**depends** 33:17, 87:13, 87:24, 199:25
**Derenda** 237:33
**describe** 91:19, 145:8
**described** 81:15, 174:23, 232:18
**description** 57:14, 111:23, 158:7, 223:11, 223:12
**descriptions** 111:23
**designated** 8:23, 8:24, 34:9, 42:7, 59:7
**destroyed** 85:14
**destroying** 190:21
**destruction** 186:24
**detail** 83:17, 84:13, 85:2, 87:21, 207:9
**detailed** 86:9
**details** 84:15, 184:12
**detection** 32:22, 32:22
**detention** 125:15, 125:19, 125:22
**determination** 188:14
**determine** 60:7, 189:8
**determined** 188:13
**determining** 4:9, 147:6
**detriment** 102:5
**developed** 5:2
**Development** 6:7, 9:17, 25:12, 36:8, 43:18, 51:9, 56:25, 93:23, 103:8, 140:12, 197:7, 213:5
**DFW** 178:13
**diabetes** 18:24

**diapers** 190:13, 190:17, 190:22, 191:2, 220:4, 227:9
**died** 13:2
**difference** 110:13
**Different** 16:20, 64:5, 64:15, 65:6, 76:18, 89:14, 89:14, 96:3, 96:15, 115:15, 117:4, 126:25, 135:11, 156:7, 156:10, 191:6
**differently** 198:15
**difficult** 7:4, 51:20, 52:4, 62:17, 65:9, 71:23, 72:2, 74:20, 74:24, 107:8, 121:18, 131:7, 148:17, 148:18, 149:23, 176:4, 176:7
**difficulties** 55:13
**difficulty** 107:11, 107:15, 139:1, 148:21
**DIRE** 1:17
**Direct** 101:7, 234:23
**direction** 201:19
**directors** 42:6
**disagree** 147:1, 182:25, 188:9, 188:16, 220:10, 231:8
**disagreement** 14:19, 34:16, 43:2, 50:20, 59:16, 59:19
**disciplinary** 200:5
**disclose** 75:3
**disclosed** 75:7
**discontent** 55:20
**discretion** 113:3, 234:8
**discriminate** 198:17
**discuss** 46:25, 112:17, 113:22, 120:5, 129:18, 129:19, 139:16, 139:17, 147:11, 147:12, 150:7, 150:8, 160:7, 160:8, 172:23, 172:24, 182:4, 182:5, 191:16, 191:17, 196:10, 196:11, 206:13, 206:13, 212:1, 212:1, 220:24, 220:25, 232:6, 232:7
**discussed** 3:12, 4:25, 5:5, 95:19
**DISD** 156:3, 157:15
**disease** 19:13
**Dispute** 99:23, 135:25
**disputed** 155:7
**disqualified** 233:9
**distract** 107:16, 195:18, 209:16

**distributed** 39:19, 85:12, 85:16, 174:17, 175:10
**distributing** 39:14, 63:15
**distribution** 85:11
**DISTRICT** 1:1, 1:2, 1:33, 18:21, 75:24, 78:14, 82:3, 228:24, 229:11, 234:23, 238:20, 238:21
**diversion** 20:24
**DIVISION** 1:3, 21:23, 22:17, 201:15, 201:18, 238:22
**divorce** 17:3, 170:11
**divorced** 11:13, 11:17, 12:16
**docket** 136:23
**Doctor** 17:22, 24:22, 24:23, 24:25, 178:2
**document** 92:10, 111:14, 158:11, 180:1, 180:3
**documentaries** 96:3
**documents** 42:15, 50:3, 80:18, 148:14, 171:16, 179:25, 230:14
**doing** 10:7, 15:4, 18:9, 22:14, 53:9, 73:6, 93:15, 96:17, 96:18, 102:16, 112:23, 114:25, 120:11, 120:13, 122:8, 122:14, 125:22, 151:7, 162:11, 183:16, 184:24, 186:15, 190:8, 192:7, 192:10, 196:23, 199:2, 199:6, 209:11, 209:16, 215:25, 222:5
**dollars** 218:12
**domestic** 21:4, 44:20
**Dominicans** 39:10
**donate** 123:12
**donated** 123:15
**done** 22:8, 29:1, 29:9, 29:13, 99:2, 105:7, 108:16, 119:13, 122:23, 123:17, 126:6, 141:24, 142:1, 163:12, 167:12, 180:22, 181:8, 190:16, 206:7, 217:18, 229:8
**dotted** 86:10
**doubts** 3:18
**Dowd** 182:19
**down** 13:4, 16:14, 41:12, 95:10, 98:17, 99:7, 116:13, 157:11, 162:7, 166:19, 219:7
**DPD** 21:10, 21:15
**DRATEL** 2:5, 2:6

**Dretke** 182:20
**drinking** 32:4, 33:23
**drop** 19:1
**dropped** 109:2
**drowsiness** 19:2
**DRS** 79:10
**DRS.** 78:22
**drug** 123:3
**due** 186:4, 190:25
**dues** 204:2
**DUNCAN** 1:44
**duration** 74:7
**During** 27:9, 188:22, 188:24, 215:25, 229:23, 238:5
**Dust** 118:8
**duties** 155:3
**duty** 58:17, 125:12, 168:10, 187:6, 187:11, 202:1, 205:4, 205:5, 216:14, 224:5, 228:23, 229:17
**dynamite** 206:2

**< E >**
**ear** 184:15
**earlier** 69:6, 72:18, 87:10, 127:15, 127:19, 168:5, 181:25, 204:21, 204:21
**early** 53:19
**earth** 11:23
**easily** 148:15
**East** 52:22, 53:5, 53:18, 55:13, 57:21, 57:22, 57:24, 58:20, 94:17, 96:4, 111:5, 135:13, 188:4, 204:11
**Eastern** 45:6, 234:23
**easy** 152:15
**eat** 19:24
**economic** 148:4
**educate** 125:8
**education** 49:18, 109:20, 169:17
**educational** 85:3, 112:2, 119:10, 158:24
**Edward** 44:9
**effect** 15:17, 28:14, 79:11
**Egypt** 53:8
**Eighteen** 127:10, 184:22
**eighteen-month** 47:16
**eighties** 53:19, 53:21

**either** 3:8, 57:6, 61:5, 67:18, 95:8, 134:3, 170:16, 173:21, 188:14, 231:18, 232:15
**El** 40:24, 41:2, 41:5, 41:6
**El-mezain** 2:3
**elaborate** 74:21
**Elashi** 2:21
**elected** 199:4
**election** 203:5, 203:6, 203:6, 203:8
**electrical** 78:21, 119:13
**Electronics** 108:6
**Elementary** 49:19, 78:19
**elements** 55:4
**Eleven** 12:24, 156:16
**eleventh** 82:4
**elicit** 150:17
**eligible** 234:24
**ELIZABETH** 1:29
**Emirates** 53:7
**emotional** 65:16, 65:16
**employed** 108:12, 234:10
**employee** 48:23
**employees** 25:13, 42:6, 77:18, 80:11
**employer** 219:4
**employment** 109:15
**end** 14:4, 27:16, 39:17, 50:2, 52:20, 59:2, 63:19, 77:22, 77:23, 126:7, 146:6, 158:9, 189:18, 195:6, 219:18, 236:2
**ended** 53:19
**ends** 204:15, 215:14
**enforce** 5:11
**enforcement** 106:14, 122:17
**engineer** 31:24, 33:20, 66:17
**English** 44:16, 115:5, 115:11, 139:5, 139:7, 148:8, 148:10, 148:16, 148:21, 150:1, 150:15
**English-as-a-second-language** 114:24
**enjoy** 52:12, 54:24, 54:24
**enjoyed** 53:17, 119:16
**enough** 90:20, 132:21, 142:5, 211:5
**enter** 71:21
**entire** 32:17, 48:20, 144:2
**entitled** 28:20, 29:4
**Epperson** 5:16, 5:18, 5:19,

7:17, 7:22, 8:19, 9:8, 237:9
**Epsilon** 47:6
**equal** 236:9
**equipment** 23:11, 23:12, 34:13, 146:20, 172:8
**err** 72:7
**essential** 105:3
**essentially** 42:5, 59:3, 80:20, 111:15, 127:24, 128:8, 180:4
**established** 3:13
**estate** 169:17
**estimating** 119:5
**ET** 1:13
**etcetera** 96:5
**Eternal** 123:2, 129:3
**Europe** 57:23
**evaluate** 60:7, 176:25
**evaluating** 60:5, 64:22
**evasion** 71:11
**event** 234:12
**Everybody** 11:21, 76:13, 153:16, 198:7, 226:8, 228:15
**Everyone** 10:17, 27:20, 28:7, 76:4, 76:11, 76:12, 76:14, 80:16, 86:22, 87:25, 124:6, 142:8, 165:14, 182:17, 194:20, 203:9, 209:9
**everything** 16:23, 28:24, 68:9, 75:3, 75:6, 84:12, 86:10, 90:13, 229:22, 229:24, 229:25
**evolved** 17:7
**Exactly** 26:3, 28:24, 140:17, 190:5, 205:20, 235:16
**EXAMINATION** 1:17
**examine** 4:13
**example** 159:13, 188:12, 189:16, 205:9, 205:13, 219:22, 229:5, 230:18
**exceeded** 235:14
**excellent** 150:2
**except** 114:4, 162:18
**Excuse** 72:8, 102:10, 150:14, 150:21, 192:5, 212:13, 228:5, 233:14, 234:8, 235:3
**excused** 23:25, 24:2, 72:16, 233:3, 233:13, 233:25, 235:5
**exercise** 234:8
**exists** 41:7

**expect** 8:19, 8:22, 34:7, 34:10, 59:5, 59:8, 70:22, 81:1, 91:11, 92:17, 111:22, 128:12, 172:10, 172:21, 189:22, 196:8, 206:10, 211:23, 232:4
**expected** 230:2
**expecting** 147:7
**experience** 7:15, 11:17, 44:24, 46:7, 116:11, 116:19, 118:25, 141:19, 164:1, 225:3, 226:3
**experienced** 115:8, 115:23
**experiences** 7:13, 11:7, 11:8, 11:15, 17:9, 46:3, 53:15, 56:9, 76:7, 76:8, 133:20, 133:23, 141:20, 160:1, 198:9, 198:10
**expired** 23:21, 56:14, 71:17, 88:12, 112:10, 129:11, 139:8, 160:3, 167:23, 172:18, 206:8, 228:4
**Explain** 17:14, 37:22, 50:8, 86:16, 146:14, 180:10, 181:5, 200:8, 226:10
**explained** 68:13
**explaining** 179:10
**explanation** 14:9, 42:20, 69:24, 95:24, 159:4, 172:14, 180:25
**explanations** 92:18
**exploring** 62:21, 114:19
**expound** 59:22
**expressed** 3:18, 4:20, 74:10, 176:19
**extend** 147:8
**extensively** 52:21
**extent** 80:4
**external** 209:3
**eye** 235:8
**eyes** 45:7

**< F >**
**facilities** 217:24
**facility** 40:19, 123:9, 125:6, 125:14, 125:16, 217:12
**facing** 188:20
**fact** 17:11, 70:24, 71:11, 86:11, 94:5, 148:9, 180:12, 186:4, 208:8, 210:11, 211:3, 211:10, 230:24
**facts** 26:14, 50:6, 59:5, 92:13, 128:11, 137:19, 200:1, 200:2, 200:2
**fails** 167:11, 187:9
**fairly** 11:2, 60:5, 145:6, 160:22, 176:25
**fairness** 195:7
**faith** 116:20, 117:1, 185:8, 192:4, 224:18
**fall** 57:8, 57:24, 203:15
**familiar** 10:20, 27:23, 110:24, 120:21, 132:7, 151:21, 152:2, 152:5, 152:18, 165:11, 171:3, 204:7
**families** 17:5, 75:25, 99:13
**family** 17:7, 20:15, 20:19, 33:9, 64:16, 71:25, 106:13, 106:17, 109:25, 118:13, 172:9, 184:23, 187:2, 208:8, 208:9, 209:13
**fanatic** 204:16
**fanatics** 11:21, 11:22
**far** 8:9, 19:13, 37:18, 55:2, 58:21, 62:11, 62:25, 109:15, 111:20, 126:16, 126:25, 194:6, 205:9, 207:19, 222:20, 225:9, 227:21, 233:6
**Farm** 47:10, 48:24
**fashion** 175:14, 205:16
**fasting** 76:10
**fatigue** 19:2
**fault** 235:19
**favor** 199:7, 199:8
**Fear** 96:21, 101:24, 194:21, 194:24, 195:13, 196:15, 208:21, 209:6, 209:12, 209:15, 212:8
**feared** 235:14
**feature** 138:11, 146:25
**federal** 59:6, 98:15, 99:1, 170:1
**feeling** 83:25, 112:5, 155:11
**feelings** 26:5, 146:24
**fees** 238:12
**feet** 162:7
**felony** 35:3
**felt** 99:5, 114:11, 194:5, 203:25, 204:2

**few** 3:3, 54:14, 60:22, 61:18, 83:8, 83:10, 83:14, 83:19, 94:3, 98:2, 108:14, 124:21, 134:17, 143:19, 156:1, 168:4, 177:13, 183:21, 192:13, 197:2, 198:8, 198:17, 201:13, 206:21, 213:2, 213:3, 217:10, 228:14, 234:7
**Field** 32:20, 89:24, 109:14, 123:3, 135:1, 170:20, 178:11, 178:12, 198:7, 217:21
**Fifteen** 119:5, 123:19, 131:12, 135:2, 156:6, 161:2, 177:23
**fifteen-minute** 5:12
**fifty** 160:18
**fighting** 15:23, 185:22
**figure** 194:11
**fill** 28:19
**filled** 15:12, 25:6, 36:1, 36:5, 36:19, 40:9, 43:24, 82:23, 103:17, 108:10, 108:11, 113:18, 147:21, 173:11, 194:8, 222:4
**filling** 60:22, 157:18
**filtration** 118:12, 119:4
**final** 92:7, 171:17, 230:14
**finally** 3:22
**financial** 110:14, 177:24, 203:13, 218:15, 221:8
**find** 4:1, 62:15, 62:23, 64:6, 64:7, 68:17, 68:19, 87:4, 95:7, 95:10, 100:10, 114:1, 158:15, 158:20, 159:25, 173:15, 181:10, 190:15, 190:18, 231:24
**finding** 107:9
**Fine** 5:7, 15:5, 62:22, 64:17, 73:7, 75:4, 117:15, 130:3, 151:8, 192:8, 196:24
**fingerprinting** 22:4
**fingerprints** 22:5
**finish** 126:4, 219:1
**finished** 41:25, 93:13, 112:21, 128:6, 139:20
**fire** 37:20
**firm** 126:14
**firs** 3:7, 4:21
**First** 1:47, 3:14, 3:19, 4:10, 4:15, 4:22, 5:9, 6:13, 14:15,

21:22, 24:7, 49:24, 81:11, 105:7, 108:17, 115:13, 121:2, 125:11, 148:1, 149:24, 165:23, 183:25, 184:3, 222:7, 228:14, 236:8
**FISH** 1:18
**Five** 15:23, 21:2, 42:6, 66:24, 89:5, 115:4, 117:18, 148:2, 178:22, 178:23, 178:24, 198:25, 214:24, 216:6, 217:17
**five-month** 74:6, 74:10
**Fletcher** 101:20
**flip** 100:7
**Floor** 2:7, 21:3
**Florida** 2:27, 109:3, 109:4
**flourish** 55:19
**fluent** 54:14, 115:20
**focus** 109:16
**follow** 14:15, 16:15, 24:10, 34:18, 43:4, 43:22, 59:15, 59:19, 81:24, 91:8, 91:14, 91:16, 93:1, 96:5, 96:19, 100:19, 100:21, 102:8, 112:7, 128:23, 147:1, 147:2, 148:15, 148:23, 150:16, 167:17, 171:11, 172:16, 181:3, 181:4, 181:5, 183:1, 183:5, 183:8, 191:24, 191:25, 204:10, 231:8, 233:10
**follow-up** 40:9, 56:18, 88:17, 98:2, 134:18, 168:5
**followed** 41:9, 54:16, 54:21, 96:7, 98:3, 111:5, 127:20, 219:13
**Following** 9:4, 23:15, 24:1, 48:17, 187:20
**food** 9:1, 14:13, 23:11, 34:13, 39:20, 42:22, 50:15, 59:11, 63:18, 81:7, 85:12, 92:22, 112:1, 146:20, 158:25, 175:11, 179:15, 180:19, 186:14, 190:22, 191:3, 205:14, 220:4, 227:8
**foods** 81:16
**foregoing** 238:9
**foregoing-styled** 238:6
**foreigners** 29:23
**Forest** 58:12
**forget** 19:23

**forgive** 62:21
**forklift** 157:17
**form** 8:25, 14:14, 23:10, 23:13, 34:12, 34:14, 39:19, 40:10, 42:21, 42:22, 50:15, 59:10, 59:13, 63:18, 67:22, 81:5, 92:21, 130:25, 132:25, 146:20, 146:21, 158:23, 162:6, 174:18, 175:11, 186:6, 207:23
**format** 238:12
**formed** 6:19, 10:5, 26:10, 61:25, 62:10, 75:16, 98:6
**former** 12:11
**forms** 126:10, 156:17
**formula** 190:13
**Forney** 169:5
**Fort** 2:36, 201:22
**forth** 47:25
**forty** 19:12, 218:11, 236:9
**Found** 44:19, 51:17, 67:25, 95:15, 174:6, 234:20
**Four** 8:12, 10:4, 27:17, 48:24, 49:20, 58:16, 107:7, 115:1, 115:4, 126:20, 127:7, 143:9, 148:2, 169:19, 194:16, 204:24, 207:14, 209:8, 209:11, 216:5, 216:7
**four-** 74:6, 74:10
**fourtee** 123:19
**Fourteen** 40:23, 41:16, 67:13, 215:19
**fraternity** 47:1, 47:4
**Free** 118:8
**FREEDMAN** 1:45
**freedom** 188:21
**friend** 38:12, 46:13, 46:14, 46:15, 46:15, 47:1, 47:1, 47:2, 170:2, 170:16, 170:19, 170:19
**friendly** 198:5, 198:12, 198:13
**friends** 20:18, 185:9, 185:10
**Friendship** 129:2
**Front** 38:15, 227:24, 227:25, 232:19, 232:22
**Frye** 102:23, 104:3, 108:6, 108:13, 108:17
**full** 110:18, 221:6
**fully** 84:12, 84:21, 84:23

**fundamental** 182:21
**funded** 17:1, 20:25, 21:1, 175:5
**Funding** 223:8
**funds** 111:24, 128:16, 138:5, 138:7, 203:15
**funny** 17:11

< G >
**gains** 204:1
**games** 122:5
**gamut** 122:6
**Garland** 6:15, 157:13
**GARRETT** 1:30
**Gartman** 9:10, 9:14, 12:3, 12:6, 12:7, 14:22, 237:10
**gather** 90:8, 90:15, 90:24
**gave** 43:18, 45:10, 71:25, 77:18, 103:9, 130:12, 140:13, 158:7, 158:23, 159:4, 161:18, 171:12, 173:10, 175:6, 184:6, 186:19, 197:9, 198:14, 203:20, 206:24, 213:7, 220:2
**Gaza** 39:16, 85:17, 96:6, 227:11
**General** 3:9, 11:19, 93:10, 117:1, 164:4, 170:1
**generally** 4:12, 4:22, 66:8, 89:2, 99:11, 171:5
**Gentlemen** 3:2, 5:16, 35:23, 60:21, 63:21, 64:21, 65:11, 65:18, 70:7, 80:8, 86:18, 101:13, 113:16, 147:19, 161:2, 174:12, 177:5, 179:12, 182:11, 222:2, 224:17, 226:5, 233:20, 235:11
**George** 201:20
**Georgetown** 52:11, 52:13, 58:6
**Geraldine** 237:11
**geriatric** 82:9
**germane** 133:1
**Germany** 201:2, 201:20
**gets** 111:14, 132:13, 180:3
**getting** 62:9, 75:19, 75:21, 75:22, 94:25, 224:11, 228:1, 232:21, 235:17
**gifts** 49:11
**girls** 41:19

give 4:7, 8:20, 11:2, 11:24, 54:20, 64:20, 71:13, 80:24, 81:9, 92:7, 92:18, 95:1, 95:8, 106:24, 110:18, 111:12, 111:17, 112:25, 128:5, 128:8, 158:16, 166:7, 175:15, 186:15, 189:16, 195:2, 205:7, 218:18, 220:1, 221:6
Given 23:25, 50:20, 55:22, 64:16, 66:6, 76:23, 81:4, 81:21, 92:10, 92:19, 111:24, 159:13, 166:21, 167:3, 167:8, 172:5, 188:4, 190:7, 190:14, 190:24, 192:22, 205:13, 226:3, 233:12
giver 19:21
gives 174:23, 189:23, 189:25, 219:16
giving 6:9, 6:25, 9:18, 16:9, 25:14, 73:13, 81:7, 105:2, 120:20, 137:18, 151:15, 153:24, 159:19, 160:20, 184:24, 186:13, 190:9, 192:21, 205:12, 207:8
glad 225:10
glory 55:18
goats 96:12
goggles 79:5
golf 46:22
goodness 116:9
goods 158:24, 211:4, 231:1
Gosh 89:5, 89:9
gotten 114:12
govern 200:10, 200:10
governments 55:19
grade 49:16, 117:21
graduated 57:6, 57:7
graduating 57:6
graduation 48:17
Grand 131:22, 131:25, 132:12, 132:12, 134:7, 136:14, 149:11, 149:12
grandchildren 33:6, 33:6
grandfather 106:16
grant 102:9, 196:19, 212:13
graphic 67:5
graphics 82:6, 82:10
great 33:6, 114:11
Greg 2:32, 5:20, 9:14, 15:3, 25:8, 43:12, 51:6, 73:8,

93:19, 102:18, 120:12, 130:2, 140:3, 151:9, 161:9, 183:19, 192:12, 196:25, 206:20, 212:25
grew 40:24, 53:17, 119:17, 126:22, 230:9
Greyhound 202:14, 202:20
Griffin 234:19
Grocery 135:3, 135:4, 144:15
ground 19:20
grounds 212:8
group 5:9, 8:24, 8:25, 11:23, 26:18, 34:10, 70:5, 95:17, 95:18, 120:3, 137:6, 140:25, 145:24, 185:21, 187:1, 189:14, 219:9, 236:8
groups 96:16
grown 35:13, 65:13, 127:2, 135:14, 158:4, 158:5, 169:20
grown-up 191:4
guarantee 143:10
Guard 58:18, 229:24
guess 37:21, 64:1, 74:14, 87:12, 91:19, 101:16, 105:12, 110:16, 121:4, 137:2, 145:10, 151:23, 163:11, 166:10, 207:20, 211:1, 215:21, 223:1, 231:18
guessing 209:9, 236:2
guidelines 205:4
guilt 6:20, 124:8, 207:24
guns 160:20, 187:12, 188:25, 220:14
guy 26:20, 26:21, 46:21, 113:5
guys 44:20, 62:7, 178:16

< H >
H-A-M-A-S 128:2
half 58:16, 89:9, 89:17, 104:3, 199:1, 235:19
Hall 9:9, 14:23, 23:23, 33:24, 35:19, 43:9, 50:25, 60:16, 71:19, 82:19, 93:8, 112:19, 120:8, 129:21, 139:21, 147:14, 150:11, 160:11, 173:2, 182:7, 191:21, 196:13, 206:16, 212:6, 221:2, 232:10

HAMAS. 85:8
hand 55:16
handled 170:11
handling 19:13
hands-on 79:1
handwriting 35:1
happen 19:8, 58:24, 95:15, 95:16, 96:4, 97:5, 99:19, 158:20, 208:7, 233:6, 236:1
happened 17:20, 22:18, 35:4, 44:15, 45:18, 55:13, 121:4, 125:3, 125:4, 224:12, 226:4
happening 85:1, 121:9
happens 121:6, 193:19, 225:13, 225:13
hard 63:24, 63:25, 65:8, 143:12, 166:10, 166:14
hardship 113:5, 148:4, 148:4, 204:23, 216:8, 221:5, 232:23, 234:9
hardships 113:3
Harlingen 82:16
harm 65:6
harmful 190:20
harsh 200:8
Harvest 217:14
hastily 29:1
hate 15:25, 97:15, 188:22, 188:24, 201:7
hated 15:25
hatred 225:9, 225:12
Hattie 237:23
HBC 229:3
he'll 219:23
head 36:25, 42:10, 42:12, 98:19, 114:8, 151:12
headache 75:4
headaches 74:12
headlines 6:22
heads 96:12
health 82:6, 215:7, 215:8, 217:21
Hearing 73:15, 131:3, 176:19, 177:2, 222:22, 223:10, 223:11, 227:15, 227:17
hearsay 111:8
heart 110:17, 224:24
heavy 94:22

**Hebrew** 138:23, 139:1
**held** 179:9
**Helicopter** 52:16, 53:10, 57:10
**helicopters** 53:11
**Hello** 9:14, 217:6
**help** 20:16, 78:1, 90:9, 154:25, 159:19, 163:4, 163:6, 163:15, 167:4, 167:12, 172:8, 185:25, 187:1, 218:14, 218:16
**helped** 53:25, 85:13, 166:23
**helping** 175:11, 187:3
**helps** 187:12
**Henson** 196:21, 196:23, 201:10, 206:9, 237:31
**Hermelinda** 237:13
**herself** 72:15
**hesitation** 64:21, 84:3, 164:20, 164:21, 226:6, 226:7
**hiding** 86:20, 86:22
**high** 44:10, 44:16, 57:6, 144:15
**higher** 199:22
**highest** 30:22, 142:16, 199:20
**Highlight** 40:13, 40:15, 40:16, 41:15
**highlights** 84:15, 84:18
**Hill** 217:14
**Hindus** 16:22
**History** 22:12, 54:24, 64:16, 96:2
**Ho** 147:15, 149:3, 150:4, 150:14, 150:21, 234:2, 237:25
**Hobbs** 235:7
**hold** 86:13, 86:25, 87:6, 91:7, 100:21, 101:1, 105:21, 124:1, 153:7, 171:10, 221:16
**holding** 125:20
**HOLLANDER** 1:43, 1:46
**Holmes** 161:6, 167:25, 168:2, 172:20, 237:27
**Home** 13:12, 13:13, 19:23, 35:14, 41:11, 41:18, 41:19, 44:15, 44:15, 47:22, 49:2, 49:14, 67:1, 67:4, 109:2, 109:7, 116:7, 123:9, 143:22, 143:25, 144:10, 144:12,

156:22, 157:8, 158:4, 168:16, 169:20, 186:3, 215:7, 215:8, 215:10, 216:2, 218:4
**homeland** 191:5
**homemaker** 13:9, 144:9
**homes** 39:20, 63:19, 85:13, 175:11
**honest** 62:19, 150:15, 190:18, 191:10, 204:12
**honestly** 65:18, 226:4
**honesty** 64:24, 114:18
**HONORABLE** 1:18
**Hood** 201:23
**hope** 3:5, 235:15
**hoped** 235:13
**hopefully** 194:20
**Hospital** 50:17, 59:12, 82:7, 82:14, 146:21, 168:21, 181:8, 206:4, 206:4, 231:4, 235:1
**Hospitals** 217:24, 217:25
**hour** 17:19, 101:14, 101:15, 125:14, 233:22, 235:20
**house** 49:8, 127:3, 216:17
**housekeeping** 93:10
**housewife** 156:18
**Houston** 117:25
**Hudson** 3:7, 236:5
**human** 65:4, 117:3, 185:11, 185:12
**humanitarian** 9:1, 14:12, 23:11, 23:13, 34:12, 39:14, 39:19, 42:21, 50:16, 59:10, 63:16, 63:18, 77:24, 81:6, 81:16, 85:11, 85:14, 92:22, 111:25, 159:1, 159:18, 172:7, 174:17, 174:19, 175:10, 180:21, 189:24, 190:1, 190:13, 205:14, 220:4, 220:15, 227:7, 227:12, 231:2
**humankind** 190:20
**hundred** 160:18, 202:5
**hungry** 190:22
**Hunt** 8:14, 118:23
**Huntsville** 117:24
**hurt** 105:24, 209:13
**husband** 11:12, 13:14, 17:22, 19:15, 31:10, 31:23, 33:15, 33:18, 33:21, 40:12, 41:4, 41:12, 41:15, 66:8, 73:24, 78:20, 83:3, 89:1,

89:13, 115:20, 117:16, 119:3, 119:20, 178:5
**hypothetical** 181:18

**< I >**
**Ibuprofen** 75:4
**idea** 66:19, 93:1, 115:23, 119:14, 175:24, 227:19, 231:22
**ideally** 52:2
**ideas** 62:20, 85:21, 96:15, 227:22
**identify** 32:23
**illegal** 61:12, 81:21
**imagine** 140:7, 143:5, 143:7, 188:23
**immigrate** 31:10, 117:16, 149:15
**impair** 97:11, 212:8, 216:12
**impartial** 7:5, 11:25, 18:10, 68:15, 68:24, 72:12, 87:5, 97:12, 98:8, 105:10, 123:23, 164:10, 164:15, 176:2, 176:12, 179:6, 183:9, 196:16, 224:25
**impartially** 60:5
**import** 49:11
**important** 51:20, 62:23, 77:7, 77:10
**impressions** 62:9, 130:24
**In-take** 38:17
**in.** 25:1, 34:6, 198:7
**inactive** 202:2
**incest** 136:7
**include** 34:10, 42:20, 57:20, 92:15, 128:13, 194:2, 230:24
**included** 14:8, 81:25, 189:22, 205:11, 230:20
**including** 160:18
**income** 71:11
**incoming** 14:2
**incompetent** 30:2, 30:3
**incomplete** 69:17
**incorrect** 178:2
**incriminate** 18:3, 186:22
**Independent** 47:9, 48:25
**independently** 47:11
**INDEX** 237:3
**Indians** 29:23

**indicate** 56:21
**indicated** 34:21, 72:11, 98:2, 109:22, 110:6, 118:19, 126:11, 126:25, 168:6, 170:2, 171:2, 210:4, 232:14
**indicted** 132:15, 137:5
**indictment** 50:9
**indifferent** 76:12
**individual** 3:4, 8:23, 17:7, 145:23
**individually** 38:11, 212:18
**individuals** 23:2, 67:22, 81:6, 91:21, 137:4, 161:16, 164:7, 179:17
**industry** 48:20, 89:11
**influences** 209:3
**inform** 3:7
**information** 20:1, 54:20, 56:18, 88:25, 95:7, 118:3, 119:11, 150:17, 151:17, 168:15, 192:23, 203:21, 234:17, 234:21, 235:4, 235:6, 236:6
**Infrared** 79:5
**injustice** 186:4
**Ink** 126:14
**innocence** 6:20, 11:3, 18:6, 28:5, 56:4, 65:12, 65:19, 69:7, 69:8, 69:15, 69:18, 70:6, 71:13, 71:25, 72:4, 77:7, 85:25, 86:1, 86:7, 106:2, 132:14, 133:7, 142:21, 153:13, 153:17, 165:17, 165:20, 166:4, 166:9, 171:6, 177:5, 182:12, 182:18, 182:21, 183:6, 207:24, 225:15, 226:1, 226:5
**innocent** 10:19, 28:7, 65:11, 69:20, 71:4, 77:10, 77:12, 77:12, 77:20, 106:2, 106:5, 106:7, 106:9, 106:10, 124:7, 132:17, 134:3, 142:25, 153:14, 153:17, 199:14, 225:22, 226:8
**inquire** 150:23
**inside** 20:21
**instances** 234:7
**instruct** 93:13
**instructed** 92:12
**instruction** 9:4, 14:16, 23:9,

34:11, 42:21, 43:5, 50:19, 59:15, 59:16, 59:19, 81:25, 91:8, 91:14, 93:2, 100:22, 112:7, 112:25, 190:2, 230:23
**instrument** 66:9
**insulin** 19:7
**Insurance** 38:17, 47:8, 48:19, 48:24
**intend** 5:11, 50:3, 111:11
**intended** 138:24
**intent** 78:1, 167:4, 186:15, 206:7, 206:7, 220:6
**interest** 55:11
**interested** 184:13
**interesting** 17:17, 132:5
**interfere** 46:8
**interfering** 196:15
**International** 52:6, 52:11, 203:24
**interns** 16:19
**interpose** 101:21
**interrupt** 187:5, 204:19
**Interstate** 125:16
**intervention** 15:18
**interviewing** 112:15, 129:14
**intimately** 132:6
**introduce** 180:1
**introduced** 179:25
**involve** 45:1
**Involved** 36:7, 57:12, 173:17
**involves** 30:12, 36:11, 51:9, 61:1, 63:7, 71:12, 73:11, 83:5, 88:6, 103:6, 105:1, 113:24, 120:19, 130:10, 197:7, 211:3, 223:2, 224:17, 225:6
**involving** 18:11, 173:18, 222:9
**Ira** 237:26
**Iran** 12:14, 27:1, 53:21
**Iraq** 53:20, 64:9, 64:18, 72:1, 96:5, 223:25, 224:3, 225:3
**Irvin** 182:19
**Irving** 16:25, 20:21
**Islamic** 7:2, 55:17, 55:21
**Israel** 25:7, 60:2, 141:23, 155:6, 185:22
**Israeli** 41:8, 55:15, 59:22
**Israeli-palestinian** 54:16, 141:24

**Israelis** 55:11, 98:3, 111:6, 155:14
**issue** 4:6, 37:7, 47:19, 65:11, 68:12, 76:3, 76:14, 84:13, 97:3, 97:10, 155:9, 160:19, 166:18, 166:22, 194:14, 195:13, 197:19, 209:4, 232:24
**issued** 22:21, 228:19
**issues** 4:25, 38:4, 45:14, 47:24, 55:8, 74:11, 96:21, 105:5, 121:11, 150:24, 182:14, 208:3, 221:8
**Italy** 64:14
**item** 13:10, 13:24
**items** 172:7, 186:14, 205:14, 220:4, 220:7
**itself** 19:2, 55:20, 159:15, 160:18, 166:13, 203:5
**Ivan** 237:34


< J >
**Jackson** 192:6, 192:10, 196:4, 196:6, 196:15, 196:20, 234:3, 237:30
**Jacob** 237:14
**jail** 211:20
**Jerry** 237:31
**Jewish** 188:24
**Jews** 16:23
**Jim** 1:27, 7:22, 12:9, 18:20, 31:8, 40:7, 48:10, 56:16, 66:3, 78:9, 88:15, 97:24, 107:25, 124:19, 134:15, 143:18, 149:5, 155:24, 168:2, 177:11, 188:2, 201:11, 209:24, 217:7, 228:11
**job** 57:15, 57:25, 79:18, 89:15, 103:4, 107:10, 108:6, 108:17, 124:23, 125:3, 125:5, 170:23, 185:11, 200:19, 205:2, 209:16, 216:9, 216:13, 218:23, 219:1, 225:12, 229:20, 229:21
**jobs** 89:14, 144:11, 152:12
**JOE** 1:18
**John** 237:19
**Johnson** 206:17, 206:19, 209:22, 209:24, 211:22,

212:14, 234:3, 237:32
**join** 184:23
**JONAS** 1:28
**Jordan** 53:7, 94:17
**JOSHUA** 2:5, 2:6
**judical** 165:22
**Judicial** 238:13
**July** 235:1
**June** 108:10
**Junior** 201:20
**juries** 27:12, 27:14, 28:15, 68:8, 199:9
**Juror** 3:23, 5:3, 7:18, 28:1, 38:2, 39:1, 39:2, 48:4, 56:5, 65:23, 68:15, 68:24, 72:3, 72:8, 84:5, 84:10, 91:7, 98:8, 110:12, 113:8, 114:20, 131:7, 136:4, 148:22, 149:1, 173:16, 179:6, 183:9, 187:6, 187:7, 189:11, 193:13, 209:16, 211:6, 221:14, 224:25, 233:3, 235:6
**jurors** 5:9, 37:18, 62:15, 72:20, 83:11, 83:20, 83:24, 87:5, 93:16, 112:15, 112:21, 112:24, 120:4, 159:25, 175:25, 176:17, 182:1, 212:16, 236:2
**juryroom** 93:16, 110:19
**JUSTICE** 1:32, 124:7, 171:3
**juvenile** 20:24, 121:21, 121:24, 123:4, 124:23, 124:24, 125:9, 125:15
**juveniles** 122:4, 125:6, 144:25

**< K >**
**Kansas** 47:3
**Kaufman** 67:11, 168:12
**keep** 18:8, 53:22, 56:9, 93:14, 96:13, 107:9, 111:14, 122:14, 143:12, 199:2, 213:21
**key** 54:8
**Kiblinger** 24:14, 113:7, 151:3, 212:19, 221:21
**kids** 127:7, 127:7, 163:11, 169:19, 190:22
**kill** 190:19

**kindergarten** 115:3
**kinds** 223:14, 227:17
**Knowing** 8:24, 9:20, 85:20, 85:22, 87:6, 148:3, 151:16, 174:21, 197:11, 211:18
**knowingly** 81:21
**knowledge** 58:20, 90:5, 141:12, 227:20
**known** 26:16, 38:9, 50:4, 66:16, 110:24, 154:5, 163:23, 204:7, 214:13
**knows** 216:6, 221:5
**Kress** 21:14
**KRLD** 25:22, 25:23
**Kroger** 144:14

**< L >**
**L.** 2:6, 2:40, 238:5, 238:19
**Labor** 203:1, 203:4, 203:11, 203:17
**laboratory** 13:17
**Ladies** 3:2, 5:15, 101:13, 161:2, 233:20, 235:11
**lady** 49:8, 176:8
**laid** 79:19, 118:6
**Lake** 103:21
**Lamar** 157:11
**language** 38:22, 39:7, 54:12, 115:6, 115:12, 115:13, 115:14, 115:16, 115:17, 148:10, 148:16, 148:22, 149:24, 150:15
**languages** 115:15
**large** 198:6
**largest** 54:10
**Last** 8:13, 10:3, 13:18, 13:24, 23:1, 23:25, 24:9, 32:7, 61:18, 83:8, 83:10, 83:19, 89:22, 106:16, 122:10, 123:19, 126:20, 203:4, 218:24, 231:12, 233:21, 236:1
**Lastly** 22:6
**lasts** 216:4
**late** 125:13, 235:17
**lately** 46:19
**later** 99:2, 100:4, 120:4, 139:14, 147:9, 150:6, 205:13, 220:7, 231:3, 233:4

**Lathe** 90:3
**latter** 129:16
**laundry** 160:19
**laws** 29:5, 200:10, 200:10
**lawyer** 73:9, 170:12, 206:20
**lawyers** 5:20, 9:15, 15:4, 73:9, 82:21, 93:19, 102:19, 120:14, 130:6, 140:5, 151:10, 161:9, 192:13, 197:1, 213:1
**layman** 57:14
**leader** 198:19
**learn** 22:9, 119:15, 185:23
**learned** 39:21
**lease** 108:24
**least** 4:19, 139:13, 172:22, 191:15, 196:9, 206:11, 211:24, 220:23, 232:4
**leave** 112:21, 232:9
**leaves** 5:3
**leaving** 108:13
**lectern** 3:24, 4:1
**left** 108:5, 108:13, 113:1, 127:3, 158:4, 236:2, 236:7
**length** 143:9
**Lennie** 236:3
**Leonard** 237:30
**Less** 37:11, 37:11, 88:10, 157:13, 194:17, 209:8, 226:18, 226:20, 227:1
**lessened** 88:8
**lesson** 154:25
**level** 49:17, 200:17
**levels** 49:19
**Lew** 146:3
**Lewisville** 118:16
**libraries** 85:12
**life** 26:25, 65:5, 108:16, 122:3, 122:24, 125:23, 134:23, 144:2, 159:25, 169:7, 190:21, 224:14, 225:10
**life-and-death** 225:3
**likelihood** 199:25
**limit** 5:12
**limited** 204:20
**Linda** 2:24, 2:25, 35:22, 60:20, 82:20, 113:15, 147:18, 173:8, 222:1, 237:10
**line** 95:10, 106:17, 109:8
**liner** 162:5
**Lines** 202:14

**list** 13:9, 101:19, 160:19, 212:21, 234:25
**listed** 66:8
**Listen** 68:15, 74:2, 90:18, 93:14, 95:6, 101:8, 110:19, 112:18, 120:6, 129:20, 147:13, 150:9, 160:9, 172:25, 174:3, 182:6, 191:18, 196:12, 206:14, 212:2, 221:1, 232:8, 233:10
**listening** 130:4
**lists** 13:7
**literal** 116:3
**little** 25:3, 53:8, 53:21, 54:20, 55:24, 60:12, 64:25, 67:16, 80:15, 90:13, 97:14, 102:21, 110:4, 121:5, 130:7, 130:8, 132:9, 140:6, 140:7, 147:25, 163:13, 183:19, 189:17, 192:14, 194:17, 194:18, 208:21, 229:24
**live** 6:14, 47:12, 47:14, 54:13, 56:5, 103:19, 108:18, 108:21, 125:6, 127:11, 135:16, 135:17, 149:10, 169:9
**lived** 27:9, 31:16, 41:1, 67:11, 67:13, 109:23, 118:13, 134:22, 144:1, 149:7, 169:6, 178:22, 178:22, 178:24, 202:8
**livelihood** 199:25
**lives** 20:17, 202:10
**living** 44:6, 44:8, 54:11, 68:8
**Local** 202:23
**located** 26:13, 33:18, 119:7, 129:7, 169:3, 177:17, 210:24, 217:14, 219:11
**location** 156:11, 157:11, 177:20
**locations** 89:15
**logic** 102:9
**lollipops** 227:9, 228:1
**look** 45:18, 70:17, 76:20, 95:23, 159:18, 180:3, 180:11, 186:25, 187:3, 194:25, 195:24, 198:17, 204:3, 231:19, 233:18
**Looking** 16:14, 45:14, 45:19, 45:21, 87:3, 103:4, 109:15,

110:11, 114:18, 176:17
**looks** 108:9, 126:11, 169:6
**Looney** 15:17
**Lopez** 117:12
**Lopez-rogina** 113:9, 113:13, 117:12, 237:21
**losing** 19:20
**lost** 199:5, 203:16, 235:19
**lot** 10:8, 15:21, 29:20, 29:22, 38:11, 41:10, 44:21, 52:13, 53:13, 53:19, 55:22, 75:25, 76:17, 83:16, 84:13, 87:12, 148:14, 163:10, 163:16, 199:24, 215:11
**lots** 79:12
**louder** 102:21
**Louis** 202:8, 202:11, 202:21
**Love** 122:12, 178:11, 178:12
**Lovely** 120:9, 120:11, 124:13, 124:15, 124:17, 129:13, 237:22
**low** 102:22
**lower** 21:3
**lucky** 83:24
**lunch** 101:15, 102:10
**luncheon** 101:14


**< M >**
**ma'am** 43:7, 61:8, 64:3, 70:15, 83:13, 147:3, 174:15, 175:3, 211:21, 223:20, 224:1, 224:16
**Maddox** 51:1, 51:5, 56:15, 58:15, 60:15, 237:15
**mail** 109:6
**Mainly** 94:17, 116:17, 135:11, 135:13, 170:13, 188:19, 208:16
**maintenance** 119:16, 229:3, 229:4, 229:6
**major** 55:20, 135:6, 208:19
**males** 122:4
**Mallard** 170:4, 170:5
**Mallick** 2:34
**Mallory** 212:20, 212:22, 212:25, 217:3, 217:5, 220:20, 221:4, 234:10, 237:33
**man** 190:20, 195:22
**management** 200:8

**manager** 13:16, 88:23, 89:1, 89:16, 118:3, 126:11, 126:12, 126:15
**mandatory** 126:2
**manifest** 19:1
**manufacturing** 40:19
**Marcus** 49:9, 49:12
**marital** 17:7
**mark** 8:7
**MARLO** 2:15, 2:16
**marriage** 119:20, 127:16
**married** 119:23
**Marshall** 129:22, 130:2, 134:11, 134:13, 139:11, 237:23
**Mary** 237:17
**mass** 186:24
**masters** 58:11
**materially** 63:11
**materials** 50:17, 59:11, 180:19, 220:3, 220:3
**math** 110:2
**matter** 30:6, 37:14, 93:10, 97:11, 204:4
**matters** 3:3
**MBA** 52:9
**Mckinney** 2:17
**Mcmurray** 169:14
**mean** 22:22, 54:21, 63:4, 77:16, 79:13, 84:16, 84:24, 87:13, 95:24, 99:10, 121:9, 139:15, 175:4, 175:5, 176:15, 193:18, 204:19, 223:22, 225:9, 226:20, 227:18, 227:21, 231:14
**meaning** 38:23, 115:25, 116:2, 116:12
**means** 54:14, 65:15, 77:8, 106:8, 125:9, 139:4, 158:18
**meant** 39:8, 80:23, 80:25, 92:16, 111:18, 127:2, 180:9, 180:9, 230:22
**meantime** 101:7, 120:5, 147:10, 150:7
**mechanic** 141:16, 141:17
**mechanical** 80:1
**media** 9:21, 36:6, 83:2, 93:14, 94:21, 101:8, 104:20, 104:22, 105:9, 112:18, 120:6, 129:20, 139:17, 145:14,

147:13, 150:9, 160:9, 172:25, 182:6, 191:18, 192:23, 196:12, 206:15, 212:3, 221:1, 232:8

**Medical** 18:23, 23:12, 26:19, 29:19, 34:13, 42:22, 59:11, 81:7, 92:22, 112:2, 146:20, 172:7, 185:2, 186:13, 190:24, 205:14, 220:5

**medication** 74:17

**medicine** 39:20, 63:18, 85:12, 128:18, 138:7, 174:18, 175:11, 227:8

**Medina** 101:20

**medium** 162:5

**meet** 43:14, 43:15, 48:12, 100:8, 117:22, 198:14, 215:14

**member** 90:2, 101:5, 172:9, 202:22, 233:21

**members** 3:4, 3:8, 3:20, 71:25, 101:10, 120:3, 129:14, 139:12, 208:9

**men** 16:9, 127:25, 210:17, 225:6

**mentioned** 18:24, 22:19, 42:4, 64:8, 127:23, 146:11, 236:1

**merit** 233:12

**merits** 233:3

**Mesquite** 67:14

**mess** 94:14

**met** 21:23, 104:1

**Metal** 90:3

**metroplex** 117:23

**Mexicans** 39:10

**MHMR** 168:19, 168:22

**microphone** 4:6, 102:20

**Middle** 45:6, 52:22, 53:4, 53:18, 55:13, 57:21, 57:22, 57:23, 58:20, 94:17, 96:4, 111:5, 156:13, 188:4, 204:11

**Midlothian** 20:17

**migraine** 74:11, 75:4

**Milburn** 183:12, 183:16, 187:25, 188:1, 191:12, 191:23, 192:5, 234:2, 237:29

**military** 200:23, 223:16, 233:17

**mind** 19:19, 23:17, 41:14,

62:24, 72:13, 89:2, 90:16, 100:8, 107:12, 108:3, 110:22, 124:23, 134:20, 143:12, 151:24, 156:2, 175:1, 175:19, 175:21, 175:24, 179:16, 181:15, 194:14, 194:15, 195:15, 195:21, 209:4, 209:12

**mine** 47:1, 127:18, 185:9

**minimal** 20:9, 90:5

**ministries** 163:1

**minor** 84:15, 84:18

**minute** 161:3, 226:10

**minutes** 183:21, 192:14, 197:2, 206:21, 213:2, 213:4

**misappropriation** 203:14

**misdemeanor** 34:25, 35:3, 144:19

**mispronouncing** 181:25

**misstate** 234:13

**misstates** 69:14, 69:17

**misstating** 59:23

**moderate** 145:11

**mom** 13:13

**moment** 24:13, 60:13, 84:8, 201:14, 221:20, 233:16

**Monday** 83:22

**monitor** 200:5

**Month** 17:18, 113:6, 216:20, 231:22, 232:15

**months** 13:5, 13:6, 36:2, 47:20, 49:13, 60:23, 61:18, 61:21, 77:23, 82:24, 107:8, 113:18, 131:22, 143:9, 147:21, 148:2, 148:2, 148:2, 173:11, 194:17, 204:24, 207:15, 209:7, 209:8, 209:11, 215:14, 216:5, 216:6, 216:6, 216:7, 222:4

**Moreno** 2:24, 2:25, 3:23, 35:21, 35:23, 38:16, 38:18, 39:3, 60:18, 60:20, 65:15, 67:16, 82:21, 84:23, 88:12, 113:11, 113:15, 147:17, 147:19, 173:6, 173:8, 175:24, 179:8, 222:2, 224:5, 228:4, 228:6

**mortared** 224:11

**mortgage** 88:21, 90:12

**MOS** 229:22

**mosque** 26:23, 59:12

**Mostly** 14:1, 32:21, 54:4, 216:2

**Mosty** 93:18, 97:19, 97:21, 97:22, 101:4, 101:17, 101:22, 102:10, 234:1, 237:19

**mother** 13:2, 13:4, 202:10

**motion** 196:19, 212:13, 233:14

**motivated** 104:9

**Mount** 162:20

**mouth** 183:4

**move** 45:16, 109:24, 117:19, 149:18, 150:14, 182:9, 232:22

**moved** 17:21, 35:13, 41:2, 108:20, 143:23, 143:24, 143:24

**movement** 188:22

**Mufid** 2:12, 33:13

**multi-page** 92:10, 158:11

**multicultural** 75:25

**murdered** 195:24

**Murrow** 44:9

**Muslims** 7:8, 7:13, 10:23, 11:5, 11:18, 16:17, 16:22, 26:15, 26:16, 27:7, 30:11, 38:7, 46:12, 53:13, 75:23, 103:24, 116:23, 133:15, 133:21, 141:10, 141:20, 154:3, 154:5, 154:10, 163:24, 164:2, 198:3, 214:11, 225:6

**myself** 114:12, 166:16, 190:18, 203:15, 223:19

**Mytien** 237:25

**< N >**

**named** 63:12

**namely** 234:1

**names** 96:7, 197:16

**NANCY** 1:43

**Nasiriah** 224:4

**NATHAN** 1:30

**nation** 142:24

**nationalities** 133:18

**nationality** 12:13, 30:7, 198:16

**native** 116:8

**naturalized** 32:14, 119:21

**nature** 7:3, 9:3, 10:25, 11:1, 14:12, 19:12, 42:24, 81:8, 98:6, 122:5, 122:20, 135:24, 137:1, 174:8, 174:22, 211:12, 223:6
**necessarily** 8:7, 109:17
**need** 3:3, 3:10, 15:18, 41:12, 55:12, 63:3, 68:22, 74:24, 75:11, 75:14, 113:21, 114:1, 147:24, 163:16, 163:20, 175:25, 203:21, 204:16, 224:24, 229:6, 231:24, 233:18, 233:18, 235:23
**needed** 89:16, 235:7
**needs** 163:6, 229:7
**needy** 175:12, 175:13, 175:18, 175:22, 227:10
**negotiated** 53:12
**Neiman** 49:9, 49:12
**Nervous** 183:17, 208:10, 208:11, 211:15
**network** 119:18
**Nevada** 35:10
**New** 2:8, 144:23
**News** 6:11, 6:16, 16:15, 36:9, 44:4, 75:13, 80:3, 84:16, 96:1, 104:21, 110:7, 120:24, 127:21, 130:21, 137:9, 140:16, 140:25, 142:2, 170:22, 173:22, 204:10, 204:17, 210:7, 213:12, 219:14, 222:18
**newspaper** 111:9
**newspapers** 6:5, 6:13, 61:7, 61:24, 61:25, 67:18, 90:5, 110:8, 114:1, 137:12, 170:16, 170:20, 222:14, 222:16
**next** 24:14, 73:1, 98:5, 113:8, 138:23, 200:3, 212:20, 221:22
**Nexus** 123:7
**Nice** 26:20, 26:21, 43:14, 43:15, 48:12
**nickel** 181:7
**niggling** 209:12
**night** 20:14, 20:14, 79:5, 222:18
**Nine** 12:17, 235:17, 235:21, 236:11
**Nineteen** 127:10, 178:20,

201:5
**nineteenth** 202:16
**NM** 1:48
**no-show** 234:18
**no-shows** 101:19
**Nobody** 143:10
**nods** 98:9
**non** 106:25, 160:20
**noncitizen** 28:19
**None** 124:12, 127:13
**nonmonetary** 160:20
**Nonprofit** 123:5, 123:16
**Nor** 129:19, 147:12, 150:9, 160:8, 172:25, 191:17, 196:11, 206:14, 212:2, 220:25
**Normally** 41:10, 166:12
**North** 53:8, 58:12
**Northeast** 129:9
**NORTHERN** 1:2, 1:33, 18:21, 234:23, 238:21
**note** 233:15
**Nothing** 62:19, 68:7, 82:17, 114:4, 125:2, 125:4, 141:21, 186:22, 224:12
**notion** 37:19, 146:17
**notions** 183:6
**November** 13:3, 224:2
**Number** 1:7, 10:12, 53:14, 101:20, 101:20, 113:6, 126:17, 182:10, 212:20, 234:2, 234:2, 234:2, 234:3, 234:3, 234:5, 234:5, 234:5, 234:6, 234:9, 234:10, 234:18, 235:7, 236:9
**nurse** 214:18
**nursing** 215:10
**NY** 2:8

< O >
**o'clock** 125:11, 125:12, 204:15, 236:11
**O'henry** 78:18
**oath** 3:9
**object** 4:8, 38:25, 132:25, 160:15, 212:15
**Objection** 4:3, 69:14, 150:19, 160:14, 212:11
**observe** 183:6

**observed** 6:1
**obtain** 186:6
**Obviously** 7:1, 19:25, 20:3, 145:13, 164:6, 231:23, 232:11
**occupant** 108:23
**occupation** 66:8, 78:21
**Odeh** 2:30
**offenders** 20:24
**offense** 106:6, 153:23, 153:25
**OFFICE** 2:6, 2:16, 2:25, 20:21, 33:18, 34:1, 38:10, 38:14, 38:15, 40:22, 66:17, 76:17, 126:15, 141:6, 199:5, 234:22
**officer** 21:12, 21:18, 106:17, 106:20, 106:25, 107:1, 121:25, 124:23, 125:9
**officers** 21:3, 21:8, 106:14, 106:19
**offices** 21:5
**official** 238:7
**often** 106:19, 154:12
**Oklahoma** 44:6, 44:7, 44:8, 46:7, 109:23
**old** 47:17, 110:3, 115:4, 143:25, 152:14, 184:22, 215:18, 235:3
**Older** 41:25, 144:25, 145:2
**olds** 49:21
**Oman** 53:7
**once** 132:12
**ones** 54:10, 72:22, 123:6, 134:8, 168:5, 233:25
**operate** 141:3
**operated** 47:11
**operates** 104:24
**operator** 198:16
**operators** 54:10
**opinion** 10:5, 11:18, 22:7, 51:22, 54:25, 61:25, 67:22, 86:23, 91:3, 95:1, 95:4, 98:6, 116:25, 142:4, 142:6, 155:12, 175:1, 179:9, 186:2, 186:7, 203:19, 211:16, 228:19, 232:18
**opinions** 6:19, 10:1, 18:8, 26:10, 44:2, 55:8, 62:10, 62:25, 75:16, 85:21, 87:21,

130:25, 154:9, 174:24,
175:16, 176:1, 176:3, 176:3,
176:5, 176:7, 176:9, 176:18,
176:20, 176:22, 176:25,
177:4, 179:7, 179:7, 182:12,
207:23, 213:23, 223:13,
225:7, 225:8, 227:16
**opportunity** 4:9, 4:13, 80:17
**oppose** 72:9, 196:17
**opposed** 3:17, 55:5, 71:10,
102:5, 113:4
**opposition** 188:20
**order** 3:13, 158:15
**orders** 157:18, 184:25,
231:13, 231:20, 232:12,
232:14, 233:5, 233:16,
234:13
**ordinarily** 226:22
**organizations** 123:11
**originally** 20:23, 20:25,
126:21
**orphans** 138:8, 205:16
**others** 9:9, 14:23, 23:22,
33:10, 35:19, 43:9, 50:25,
60:16, 71:18, 82:19, 93:8,
112:19, 120:7, 129:21,
139:21, 147:14, 150:11,
160:10, 173:2, 182:7, 191:21,
196:13, 206:16, 212:5, 221:2
**otherwise** 138:8, 159:15,
180:21
**ought** 3:19
**ourselves** 33:9
**outgoing** 14:2
**outlook** 191:6
**outside** 28:16, 44:18, 47:22,
49:1, 66:25, 67:4, 144:12,
156:21, 157:7, 168:16,
181:21
**overall** 55:3, 87:13, 87:13,
87:24, 95:4
**overlook** 204:1
**Overruled** 39:3, 87:11, 133:8
**Overseas** 49:11, 141:4,
185:4, 185:5, 185:21, 224:6,
229:22
**own** 57:3, 69:1, 70:18, 86:13,
86:25, 105:18, 117:4, 143:6,
153:6, 155:12, 165:6, 184:23
**owned** 47:11

**< P >**
**P.** 2:16
**packages** 178:18
**PAGE** 233:24, 237:6
**pages** 59:3, 238:9
**paid** 140:25, 178:2, 184:10,
204:2, 218:11
**Palestine** 25:7, 39:15, 45:10,
77:25, 85:16, 141:23, 166:22,
167:9, 174:18, 227:8
**Palestine-israeli** 15:16,
155:9
**Palestinian** 59:22, 224:20
**Palestinian-israeli** 6:2, 22:7,
95:23, 96:10
**Palestinians** 41:8, 98:4,
111:6, 155:15, 167:9, 190:8
**panel** 4:13, 101:11, 129:15,
184:2
**pans** 206:4
**paper** 6:23, 54:23, 130:15,
130:17, 130:20, 151:20,
162:5, 162:5, 162:5
**paragraphs** 6:22
**parent** 215:17
**parents** 10:9, 108:19, 116:7
**particular** 78:16, 109:14,
112:6, 113:23, 122:17,
138:11, 147:20, 173:16,
204:6, 222:13
**particularly** 11:1, 55:9
**parties** 5:16, 9:11, 14:25,
24:18, 35:21, 43:10, 51:2,
60:18, 73:1, 101:18, 102:14,
113:10, 129:24, 140:1,
147:16, 151:5, 161:6, 173:5,
173:17, 176:10, 183:14,
192:9, 196:22, 205:6, 206:18,
212:23, 219:19, 221:23
**parts** 40:17, 85:1, 135:11,
169:23, 178:17
**party** 190:7, 203:8
**Paso** 40:24, 41:2, 41:5, 41:6
**Pass** 65:23, 149:1
**past** 4:19, 16:22, 83:9,
95:17, 96:6, 114:3, 116:7
**Patton** 201:20
**pause** 175:16

**pay** 104:19, 184:12, 211:13,
216:9, 216:14, 216:16,
216:19, 219:6, 221:13
**payments** 128:19
**peace** 186:6
**Pena** 72:25, 73:1, 73:6, 78:6,
78:7, 82:18, 237:17
**pencils** 14:13
**pending** 35:7, 234:4
**pension** 203:1, 203:1
**per** 105:2
**percent** 97:15, 99:17,
187:16, 187:17, 187:22
**Perhaps** 51:18, 55:11, 58:23,
69:17, 116:3, 188:8, 197:3,
213:3
**period** 147:8, 214:6, 229:16
**Periodicals** 54:23
**permit** 133:8, 212:1
**Perry** 102:13, 102:16,
107:21, 107:23, 107:25,
112:13, 234:9, 237:20
**Pershing** 156:13, 156:15
**personal** 17:17, 26:25
**Personally** 75:1, 86:15,
95:13, 133:17, 141:14,
163:17
**personnel** 21:16, 88:20,
88:21, 90:12
**persons** 50:11, 101:19,
225:4, 225:17
**pertain** 138:2
**pertaining** 203:5
**pertains** 111:20, 128:10,
180:14
**PFC** 184:19
**Ph** 24:24, 27:1
**Phi** 47:5
**Philadelphia** 31:18
**photographing** 22:5
**phrase** 106:3
**Physical** 22:2, 169:16
**physically** 168:20, 169:3
**pick** 54:12
**pictures** 115:12
**pilot** 52:16
**place** 123:7, 186:3, 203:13,
205:4, 235:16, 236:7
**places** 64:15, 64:17, 85:17,
231:24

**planes** 178:9
**planned** 57:23
**Plano** 47:13, 47:15
**PLATT** 2:33
**played** 46:22
**Plaza** 1:47
**pleading** 153:1
**please** 25:2, 74:20, 102:20, 161:5
**plumbing** 119:13, 229:3
**PO** 2:26
**poin** 64:23, 71:21
**point** 4:24, 18:6, 51:24, 65:1, 65:21, 68:6, 84:9, 91:17, 144:14, 150:13, 166:14, 210:10, 219:18, 221:13
**Police** 20:21, 20:25, 21:1, 21:8, 21:9, 21:18, 106:14, 106:17, 106:19, 106:20, 106:25, 107:1
**policy** 188:16
**political** 52:13
**politics** 52:7, 52:11, 54:24
**pool** 101:5, 112:13, 120:1, 139:12, 160:6
**portion** 24:2, 80:6, 205:19
**pose** 69:25, 148:3
**position** 4:2, 5:6, 33:18, 155:15, 192:1, 200:15, 211:3, 221:10, 232:25
**positions** 55:5, 188:8
**possibility** 100:5, 231:19
**possible** 11:2, 33:15, 72:19, 113:5
**possibly** 83:25, 215:13, 216:5
**post** 141:6, 234:22
**Postal** 144:5, 144:12
**postponed** 27:16, 27:17
**potential** 3:23, 18:23, 19:1, 113:8
**potentially** 214:2, 235:20
**powders** 157:23
**practically** 22:16
**practice** 4:10, 4:11, 170:9
**practicing** 163:24
**Prairie** 149:11, 149:12
**Pre** 115:4
**pre-depositions** 209:3
**precise** 144:23

**preconceptions** 62:16, 62:20
**prefer** 117:14
**pregnant** 21:24, 49:14
**prejudge** 71:7
**prejudiced** 176:6
**prejudices** 62:16, 62:18, 176:1, 176:18
**preliminary** 3:3
**prescribed** 238:13
**present** 18:25, 42:14, 42:15, 50:4, 80:17, 80:18, 80:19, 108:18, 111:12, 158:14, 158:20, 171:16, 219:20
**presented** 8:21, 42:14, 50:3, 58:25, 60:9, 92:6, 111:11, 137:16, 146:7, 171:15, 218:20, 219:19, 230:13
**presenting** 128:6
**presently** 88:19
**presents** 211:17
**press** 113:25, 207:1
**pressure** 186:4
**presume** 77:20, 106:9, 134:2
**presumed** 10:19, 28:7, 65:11, 69:19, 77:10, 77:11, 106:2, 106:5, 106:6, 106:9, 124:7, 132:17, 142:25, 153:14, 153:17, 199:13, 225:21
**presumes** 106:24
**presumption** 11:3, 18:5, 28:5, 56:4, 65:12, 65:19, 69:7, 69:8, 69:15, 69:18, 70:6, 70:7, 71:13, 71:24, 72:4, 77:7, 85:25, 86:1, 86:6, 106:2, 132:14, 133:6, 142:20, 153:13, 153:17, 165:17, 165:20, 166:4, 166:9, 171:6, 177:5, 182:11, 182:18, 182:21, 183:6, 225:15, 225:25, 226:5
**presumption-of-innocence** 182:16
**Pretty** 40:6, 87:20, 94:19, 94:22, 122:25, 166:10, 166:14, 176:20, 184:10, 193:3, 209:18, 224:12
**prevent** 68:23, 98:7, 211:5
**preventative** 75:5

**prevention** 123:3
**previous** 27:10
**previously** 3:12, 79:8, 79:9, 82:8, 109:23, 118:20
**primary** 229:22
**principal** 137:2
**principle** 128:21
**principles** 137:18, 138:1, 138:2
**print** 82:9
**printing** 67:5
**Prior** 8:9, 118:16, 135:19, 157:15
**priorities** 41:11
**prison** 172:9
**Pritchard** 14:24, 15:3, 18:17, 18:19, 23:22, 23:25, 24:13, 72:18, 234:5, 237:11
**private** 17:22
**probable** 132:12
**Probably** 6:16, 7:9, 17:21, 22:12, 41:13, 73:16, 80:14, 90:14, 96:13, 97:17, 105:14, 108:13, 120:3, 129:13, 129:16, 137:15, 138:10, 139:11, 139:13, 147:5, 147:9, 150:6, 152:18, 175:17, 181:25, 188:25, 189:13, 191:6, 195:1, 195:16, 207:14, 215:16, 235:18
**probation** 126:9
**problem** 9:4, 18:25, 19:10, 22:23, 23:15, 24:1, 43:2, 50:19, 62:7, 63:22, 72:22, 81:12, 81:14, 95:9, 107:3, 124:4, 124:10, 133:24, 148:5, 167:20, 185:10, 185:13, 185:14, 187:19, 187:21, 189:12, 191:4, 215:14, 227:3, 233:4
**problems** 18:23, 37:6, 38:5, 75:9, 143:8, 185:15, 189:14
**procedure** 3:15, 4:19, 137:21
**procedures** 80:7
**proceed** 200:3
**proceeded** 200:20
**proceeding** 124:25
**proceedings** 238:6, 238:8
**process** 110:11, 112:15,

129:14, 129:16, 133:10, 139:12, 145:23, 145:25, 147:6, 147:8, 150:4, 160:6, 172:20, 172:22, 182:1, 182:2, 191:13, 191:14, 195:8, 196:7, 196:8, 206:9, 206:11, 211:22, 211:24, 220:20, 220:22, 232:3, 232:4, 233:23
**processing** 13:24
**processor** 13:10
**product** 79:3, 157:22
**profession** 49:4
**professional** 33:19, 33:19
**progeny** 182:19
**program** 20:24, 76:1, 119:17, 119:18, 126:4
**programs** 52:14, 53:10, 54:1
**progress** 101:16, 235:15, 235:22
**prohibit** 60:4
**prohibited** 59:14, 172:3
**prohibiting** 50:10
**project** 13:16, 89:1, 89:16
**promise** 64:21, 176:2
**pronounce** 40:4
**pronounced** 31:6, 139:24
**proof** 4:12, 13:22, 13:23, 13:25, 37:2, 37:11, 77:3, 77:4, 77:5, 86:4, 86:6, 88:8, 88:10, 123:23, 132:11, 134:4, 171:7, 171:8, 186:11, 199:17, 199:21, 205:21, 205:23, 205:24, 226:17, 226:18, 226:21, 226:22
**proponents** 4:19
**proposed** 3:16
**prosecuted** 29:12
**prosecutor** 24:8, 160:17, 170:1, 182:14
**prosecutors** 78:11, 88:16, 98:1, 108:2, 124:21, 134:17, 143:19, 149:6, 156:1, 168:4, 177:12, 188:2, 201:12, 210:1, 217:9, 228:13
**prospect** 208:2
**prospective** 112:15
**protection** 28:20, 29:4, 77:11, 106:1, 153:4, 166:4
**protections** 10:13, 17:23, 27:20, 56:1, 76:23, 105:15,

132:20, 133:13, 143:2, 152:19, 153:24, 154:1, 225:19
**protective** 132:20, 132:20
**prove** 18:4, 37:3, 56:3, 56:10, 63:20, 68:18, 69:2, 69:12, 70:8, 70:11, 71:14, 72:6, 77:6, 86:4, 100:9, 132:15, 165:10, 167:11, 186:17, 187:9, 187:13, 189:21
**proved** 100:1, 208:25
**proven** 69:21, 70:12, 70:13, 71:5, 77:25, 99:5, 100:11, 132:18, 134:6, 153:15, 180:12, 199:16, 226:8
**proves** 10:19, 28:8, 68:16, 77:13, 106:7, 124:8, 142:25, 153:19, 167:2, 186:17, 187:7, 205:25, 225:24
**provide** 23:13, 42:7, 70:6, 112:4, 234:16
**provided** 19:25, 23:9, 36:13, 40:11, 42:24, 128:1, 128:16, 138:5, 146:22, 158:15, 171:21, 180:18, 220:13, 231:4, 235:6
**Provident** 13:19
**provider** 178:2, 178:3
**provides** 8:23
**providing** 14:10, 23:3, 34:8, 34:9, 42:18, 50:11, 59:6, 70:4, 71:12, 80:11, 80:22, 91:23, 111:21, 128:14, 137:6, 138:3, 146:12, 164:7, 172:3, 180:15, 205:10, 210:18, 219:22, 230:18
**proving** 134:8
**provision** 34:16, 34:18, 50:21, 81:13, 112:6, 159:7, 231:7
**psychology** 109:19
**public** 33:22, 152:9
**Publishing** 67:10
**pump** 19:7
**punishment** 99:1
**purely** 113:3
**purification** 66:15, 229:23
**purpose** 159:24, 212:18
**purposes** 112:1, 138:9,

188:18, 231:2
**pursue** 178:1, 203:21, 203:22
**push** 68:21
**pushing** 62:21
**put** 53:25, 54:19, 56:19, 68:13, 68:14, 72:14, 74:8, 87:9, 95:11, 95:17, 95:24, 97:6, 116:13, 163:11, 176:2, 176:5, 176:7, 176:11, 176:21, 176:24, 183:4, 211:20, 231:14
**putting** 116:13

< Q >
**qualifications** 39:1, 133:2
**quality** 40:14
**questioned** 3:23, 4:5, 203:9, 234:1
**questioning** 3:4, 3:13, 3:20, 3:25, 5:12, 71:23, 102:1, 139:20, 235:12
**quickly** 218:25
**quit** 13:11, 102:25
**Quite** 33:5, 53:14, 57:17, 96:1, 102:8, 198:8, 198:16

< R >
**race** 30:6
**radicals** 94:6
**radio** 25:20, 61:6, 67:18, 73:20, 73:24, 80:3, 80:5, 170:16, 170:20, 173:21, 173:24, 174:7, 197:16, 207:20, 210:5, 222:15, 223:6
**Radiology** 29:18, 32:20
**Rainbow** 123:8
**raise** 232:13, 232:16, 232:23
**raised** 234:7
**raising** 231:25
**Ramadan** 17:12
**ran** 199:4, 203:6, 203:6
**range** 127:8
**rather** 3:24, 14:2, 94:6, 184:24, 214:5, 234:23
**Raytheon** 79:20, 79:21
**reach** 128:12
**reached** 9:25, 136:10

reaches 10:13
reaching 195:9
reaction 99:7, 179:20, 205:19
reading 6:12, 131:6
reads 59:2, 92:11, 111:14
ready 72:25, 94:25, 113:8, 151:3, 212:20, 221:21
real 46:21, 86:8, 96:24, 169:17, 174:4, 194:21
realistic 187:4
realize 187:18, 187:22
reason 91:6, 198:14, 198:14
reasons 71:25, 184:23
rebuilding 39:20, 63:19, 85:13
recall 222:21
receive 58:1, 58:11, 231:20, 232:14, 233:5, 233:16
received 145:19, 234:17
receives 234:12
receiving 161:25, 178:16, 204:1, 232:12
recent 83:9
recently 61:22, 94:24, 143:24, 197:17, 205:20, 213:14
Receptionist 38:16
Recess 5:8, 5:14, 101:14, 101:15, 102:10, 102:12, 161:3, 161:4, 236:10
recognize 130:14, 192:23, 193:10, 213:9
recollection 61:19
record 126:4
recorded 9:23
Recovery 123:7
recycle 162:2, 162:3
refer 32:24, 111:15
referred 137:3, 171:17, 180:21
referring 179:8
refresh 164:25
refunds 178:1
regard 35:5, 42:16, 58:19, 99:4, 128:13, 146:17, 163:17, 171:14, 171:20, 191:25
Regarding 34:8, 41:7, 66:6, 69:7, 75:3, 80:22, 89:1, 90:22, 100:19, 171:5, 171:6,

233:5, 233:7
regardless 68:13, 186:18, 205:2
regards 14:9
regular 106:21
regularly 137:11
regulate 19:5
rehabilitate 72:3, 182:15
rejoin 9:8, 14:23, 23:22, 35:18, 43:9, 50:25, 60:16, 71:18, 82:18, 93:8, 112:19, 120:7, 129:21, 139:21, 147:14, 150:10, 160:10, 173:1, 182:7, 191:20, 196:13, 206:16, 212:5, 221:2
relate 59:6
related 36:22, 79:25, 121:11, 219:14
relates 50:9
relations 53:20
relationship 53:2, 104:4, 198:11
relax 183:18
released 234:19, 235:2
Relief 6:7, 9:17, 25:11, 36:8, 43:17, 51:8, 93:23, 103:7, 140:11, 186:3, 197:6, 213:5
religions 76:13
religious 46:24, 55:9, 76:2
rely 115:13
relying 139:1
remember 6:12, 8:9, 9:22, 9:24, 10:2, 15:12, 27:17, 28:20, 29:2, 36:2, 60:22, 61:11, 61:20, 83:15, 86:12, 89:10, 94:4, 113:19, 131:3, 135:24, 136:1, 136:2, 136:7, 136:9, 137:15, 137:20, 139:3, 140:17, 147:22, 149:20, 153:3, 173:25, 179:8, 201:8, 204:20, 222:5, 222:23, 222:24
render 7:5, 14:7, 30:11, 46:9, 78:2, 90:18, 92:14, 97:12, 137:20, 167:4, 181:19, 195:5, 196:16, 211:13, 212:9
rendered 11:25, 77:9
rendition 24:8, 24:9
rent 216:17, 216:18, 216:19
Repeat 176:13, 211:7

report 9:23, 10:4, 235:9, 235:10
REPORTER 2:40, 98:16, 238:7, 238:20
reports 80:3, 84:16, 93:14, 113:25
represent 25:8, 35:23, 60:21, 113:16, 147:19, 205:22, 222:2
representatives 53:24, 80:11
representing 151:10, 177:13, 201:12, 217:9, 228:13
represents 187:22
request 3:22
requested 112:25, 235:2
required 70:10
requirements 109:8
requires 162:24
Research 22:8, 33:19, 33:20
researcher 29:17
resent 114:2
reservations 4:20, 65:16, 65:17
reserve 21:12
reserved 142:17
reserves 223:20, 224:7, 229:19
reservist 229:14
resident 124:23, 125:9
residential 121:24
resides 234:20
resolve 203:17
resolved 145:3, 145:6
respect 50:10, 117:4
responded 144:18
response 15:15, 22:21, 25:6, 25:8, 179:20, 182:24
responsibility 59:24, 200:13
Rest 31:20, 33:3, 123:2, 129:3
rested 14:5, 23:6, 34:6, 158:9, 205:7
restroom 150:25
result 130:25, 194:1, 207:24
resurgence 94:25
retaliated 208:17
retaliation 99:6, 193:22, 194:1, 194:10, 194:14,

194:21, 194:24, 195:13, 196:15, 208:12, 208:21, 209:5, 209:7, 212:8
**retire** 32:6
**retired** 7:25, 8:4, 19:16, 21:11, 26:18, 32:1, 32:24, 66:12, 66:23, 88:19, 88:19, 89:3, 89:4, 89:6, 89:23, 152:6, 152:12, 156:3
**Retirement** 214:21, 217:11, 217:23, 217:25, 234:11
**retribution** 95:11, 96:22, 101:24
**return** 69:3, 100:2, 159:17, 181:12, 191:8, 203:22, 206:5, 218:19, 220:16, 230:2
**returned** 99:6
**returning** 63:22
**review** 233:23
**revolting** 188:20
**revolution** 188:25
**revolutionary** 185:22, 189:4, 189:5, 189:13
**Richard** 21:10, 21:14, 82:3
**Richardson** 6:14, 78:13, 83:16, 93:20, 93:24, 140:19, 192:20, 207:8
**rights** 132:7, 164:22, 186:5, 225:19
**ring** 6:11, 9:20, 16:11, 25:15, 36:14, 43:20, 51:12, 73:15, 93:24, 103:11, 140:14, 151:17, 161:20, 184:8, 184:14, 192:17, 197:12, 207:1
**rings** 222:14
**RISD** 76:1, 76:15
**Rise** 200:17
**rises** 150:18
**Rm** 2:41
**road** 99:7
**robbery** 71:10
**Roberson** 173:4, 173:8, 177:10, 177:11, 181:24, 182:9, 234:6, 237:28
**Rock** 74:3, 103:21
**Rockwall** 8:15
**Rogina** 114:18, 117:7, 117:12, 117:15, 120:1
**Romania** 27:6, 31:11

**room** 194:19, 209:10, 228:15
**roommate** 108:21
**Ross** 129:9
**roundabout** 7:9
**row** 72:20
**Rowlett** 178:23, 178:24
**Royce** 118:8, 118:14, 119:7
**rules** 56:5
**run** 13:25, 47:25, 122:6, 216:15
**running** 203:7

< S >
**sacks** 162:5
**safety** 100:4
**Safeway** 135:7
**Saint** 202:8, 202:10, 202:21
**sales** 56:22, 56:24, 57:12
**salesman** 79:19, 104:8
**Salvation** 156:23
**Sam** 117:25
**San** 185:6
**sanctions** 190:23, 190:24, 190:25
**Sandra** 237:18
**satisfaction** 203:18
**satisfied** 69:21
**Saudi** 27:1
**saw** 9:23, 61:10, 83:21, 148:9, 183:2, 184:19
**saying** 61:4, 66:21, 68:4, 70:12, 70:19, 71:1, 99:21, 100:9, 164:17, 179:13, 189:2, 190:5, 211:9, 221:12, 228:18
**says** 68:7, 100:20, 111:24, 171:23, 172:11, 174:16, 178:2, 187:10, 187:11, 189:23, 193:20, 221:14, 234:20
**scattered** 20:19
**scenario** 87:13, 235:13, 235:14
**schedule** 3:6, 5:11, 204:13
**School** 14:13, 19:16, 23:11, 26:18, 34:13, 42:23, 44:11, 44:16, 49:7, 57:6, 57:8, 75:24, 76:11, 76:18, 78:13, 81:7, 82:3, 92:23, 108:25, 109:2, 131:13, 133:18,

144:15, 154:22, 154:23, 155:4, 156:13, 172:8, 205:15, 228:24, 229:8
**schools** 152:9, 163:15
**scientist** 29:18
**scope** 187:11
**screen** 83:22
**screening** 83:11, 83:20
**se** 105:2
**sealed** 126:5
**search** 87:3
**Sears** 157:9
**seat** 3:25, 208:24
**seated** 161:5
**secon** 3:12
**second** 3:21, 10:25, 19:12, 24:9, 80:8, 115:5, 115:12, 148:10, 187:6
**Secondly** 81:12, 233:7
**Secretary** 188:15, 203:15
**section** 22:2
**security** 58:1, 58:3, 79:6, 79:23
**seem** 228:1
**seemed** 3:18
**Seems** 61:21, 83:14
**seen** 9:21, 10:4, 15:21, 52:3, 61:6, 62:10, 65:5, 68:14, 76:10
**selected** 19:10, 81:3, 90:17, 100:14, 101:5, 110:17, 112:14, 120:2, 129:15, 139:13, 205:2, 218:17
**selecting** 150:5, 160:6, 172:21, 182:1, 191:13, 196:7, 206:10, 211:23, 220:21, 232:3
**selection** 83:22, 114:6, 114:9, 114:14, 145:25, 220:22
**sell** 49:12, 157:22
**selling** 53:11
**sells** 56:25
**semesters** 16:20
**send** 109:5
**sending** 81:16, 94:5, 179:12, 211:4, 227:19, 232:22
**sense** 16:2, 60:8, 96:9, 96:20, 116:10, 167:15, 186:1, 186:25, 187:3

sensing 176:21
sent 45:10, 77:24, 206:1, 227:7, 227:10, 227:12
sentence 7:2, 91:20, 126:1
sequestered 20:6, 20:10
serious 15:17, 37:10, 37:24, 38:1, 88:9, 153:5, 193:3, 195:23, 195:23, 195:24, 226:19, 232:13
serve 18:24, 19:10, 39:1, 68:7, 81:3, 90:17, 99:15, 100:14, 107:8, 110:17, 131:7, 133:2, 136:13, 143:12, 205:1, 205:5, 234:24
served 92:3, 98:15, 98:22, 145:17, 157:25, 168:6, 179:21, 218:7, 230:6, 230:11
Service 8:9, 64:17, 74:19, 74:23, 88:20, 97:1, 107:13, 107:16, 110:12, 135:19, 144:5, 144:12, 162:25, 195:14, 212:9, 215:2, 216:12, 218:11, 219:2, 228:16
services 57:1, 231:1
serving 98:7, 126:1
set 20:24, 182:12
setting 55:18, 82:9
seven 48:14, 110:3, 125:11, 125:12, 141:7, 144:5, 144:6
Seventeen 67:8, 122:7, 145:1, 145:2, 199:5, 229:12
seventy-one 235:3
Several 13:24, 49:19, 59:3, 61:21, 131:23, 136:23, 161:16, 169:23, 209:7, 215:14, 222:4
Shakes 19:3, 36:25, 42:10, 42:12, 151:12
SHAPIRO 1:29, 5:7
Shawn 113:13, 237:21
shed 186:7, 189:15
sheets 118:3, 162:6, 178:4
shelter 157:3
Sherman 78:25
Shield 177:15
shift 125:10, 125:11
shifts 142:15
shipping 178:16
shook 98:19
shop 82:9, 199:23

shoplifting 37:15
short 150:24
shortly 171:16
Shouldn't 164:21
show 33:12, 69:11, 189:21, 233:8
showed 13:8, 72:3, 118:3, 159:13, 159:16, 181:6, 181:12, 191:23, 220:12, 220:17
shown 39:18, 72:15, 77:24, 78:20, 102:6, 156:18, 183:7, 238:8
shows 13:9, 178:5, 220:2, 234:21, 234:22
Shreveport 202:9
Shukri 1:40
sic 165:22, 204:14, 211:17
side 55:1, 55:1, 55:3, 72:7, 86:16, 87:1, 100:7, 170:24, 186:23
sides 14:5, 15:17, 16:4, 23:5, 34:6, 42:14, 50:2, 55:4, 59:1, 59:24, 80:16, 87:4, 92:6, 111:11, 128:6, 146:7, 158:9, 171:14, 179:24, 186:1, 228:16, 230:13
Sigma 47:5, 47:5
significant 221:7
Simental 35:20, 40:2, 40:4, 43:8, 237:13
similar 217:18
simply 211:3, 220:3, 233:15
single 215:16
sister 11:12, 12:16, 12:20
sisters 109:10
sit 38:2, 41:12, 68:24, 72:20, 77:12, 77:20, 84:20, 88:1, 114:20, 117:1, 153:16, 159:24, 194:13, 194:19, 223:13
sits 77:8
sitting 44:16, 77:18, 84:5, 84:10, 106:9, 164:11
situation 26:7, 26:8, 58:20, 60:4, 86:23, 90:21, 95:1, 97:15, 98:3, 110:14, 111:5, 114:14, 159:19, 179:11, 188:4, 199:6, 203:21, 204:3, 218:15, 222:25

Six 8:1, 27:18, 49:13, 96:4, 126:18, 162:6, 202:2
sixteen 118:14
sixty 15:21, 136:19
skills 122:3, 125:23, 125:23
sky 44:18
slight 97:11
slipping 157:20
Slyvester 237:27
small 80:6, 126:14, 163:13
Smith 60:17, 61:15, 65:25, 66:1, 69:18, 71:18, 71:21, 126:14, 151:3, 151:4, 151:7, 155:22, 155:24, 160:5, 160:13, 160:16, 234:5, 234:6, 237:16, 237:26
smoke 37:19
soaps 157:23
soccer 9:1, 14:13, 34:13, 50:16, 59:12, 128:18, 158:25, 206:3
social 122:21, 122:22
society 125:25
soft 4:7, 72:22
softly 25:1
sole 19:21
solely 139:1
solve 189:14
Somebody 29:3, 68:21, 94:14, 97:8, 105:18, 106:2, 106:5, 125:13, 143:4, 143:5, 153:5, 153:24, 158:15, 166:8, 171:21, 184:24, 185:16, 186:13, 189:21, 190:15, 193:19, 211:19
somehow 63:16, 88:8
someone 38:22, 86:24, 87:7, 119:14, 139:4, 158:21, 159:19, 188:15, 200:5, 205:22
Sometime 40:10, 163:15
sometimes 19:8, 62:4, 92:8, 115:24, 171:17, 200:14
Somewhat 6:2, 53:24, 55:12, 57:18, 98:4
somewhere 29:13, 77:17, 95:10, 141:4, 143:9, 190:10, 229:8
son 47:17, 49:14, 64:5, 143:24, 144:24, 235:8

**son-in-law** 64:11
**sons** 218:2
**soon** 5:3
**sorry** 8:18, 8:18, 19:18, 35:1, 36:16, 71:3, 118:7, 176:15, 178:13, 211:8, 213:20
**sort** 30:12, 53:17, 130:24, 208:12
**sorter** 14:1
**sorts** 105:5
**sound** 75:13, 176:8
**Sounds** 97:9, 102:4, 122:16, 151:21, 186:8, 188:3, 188:7, 193:3, 194:22, 195:12, 195:20, 200:12, 221:4
**source** 22:9, 207:20
**South** 82:12, 82:14, 177:19
**Southwest** 21:22
**Southwestern** 26:19, 29:18, 32:16
**Spanish** 39:7, 115:10, 115:18, 115:19, 116:8, 116:17
**speaker** 116:9
**speaking** 7:18, 148:8, 155:18, 207:10, 228:6
**Special** 49:18
**specialist** 185:3
**specialize** 109:19
**specialty** 109:16
**specific** 55:7
**specifically** 6:10, 14:4, 23:4, 25:15, 42:8, 51:11, 73:14, 80:12, 104:17, 128:2, 130:13, 137:7, 140:14, 171:20, 197:11
**speculation** 44:21, 181:18, 233:6
**spend** 33:3, 231:3
**spent** 112:1, 112:3, 128:20, 138:6, 138:8, 159:15, 172:6, 172:10, 189:25, 205:13, 205:16, 205:17, 206:2, 206:3, 220:4, 220:5, 220:7
**spoke** 80:8, 138:22
**spoken** 4:7, 72:22, 96:24, 104:15
**sports** 204:16, 204:18
**Spring** 177:17
**stable** 55:18

**stand** 3:24, 4:1, 46:1, 86:18, 87:22
**standard** 4:10, 30:22, 30:22, 226:23
**stands** 79:10
**start** 73:25, 74:7, 83:22, 94:25, 156:9, 199:16
**started** 17:5, 119:12, 119:15, 119:18, 123:4, 200:18, 202:20, 235:18, 235:21
**starting** 65:17, 73:17, 236:3
**starts** 204:14
**starving** 17:13
**State** 5:3, 41:8, 44:15, 47:10, 48:23, 55:14, 60:2, 98:22, 166:13, 168:21, 170:1, 188:15
**stated** 137:2, 191:5, 235:3, 235:7
**statement** 42:20, 69:17, 90:19, 91:1, 114:6, 188:5, 204:22, 233:8
**station** 25:21, 73:22, 73:25, 74:2, 74:3, 174:2, 174:7
**stationed** 64:9, 201:22
**Statute** 180:5, 180:6, 230:20
**statutes** 23:7, 59:6, 138:2, 180:8
**stay** 3:6, 125:14, 216:2
**stayed** 13:12, 144:9
**steadfast** 176:9
**Steakley** 79:17
**stenotypy** 238:7
**step** 200:3
**stepkids** 127:6, 127:7
**stepson** 34:22
**stereotypical** 104:10, 104:12
**Sterrett** 146:3
**steward** 198:21, 198:24, 198:25, 199:23, 200:4
**sticks** 44:25, 141:20
**store** 35:12, 135:8, 135:10, 135:12, 144:16
**stores** 156:25
**story** 87:2, 94:22, 186:2
**straight** 229:18
**strapped** 203:14
**strategies** 115:12
**Street** 1:35, 2:7, 2:41, 78:25, 123:9

**strength** 55:4
**strictly** 5:12
**strike** 45:15, 182:9, 194:9
**strong** 22:8, 176:4, 176:9, 223:13
**strongly** 30:15, 30:17
**stuck** 101:25
**student** 22:12, 35:11
**students** 29:22
**study** 169:16
**studying** 141:24, 142:1
**stuff** 22:5, 47:25, 65:5, 94:4, 96:2, 122:24, 165:24, 170:13, 188:23, 190:25, 213:22, 215:6, 219:10, 223:24
**stupid** 16:5
**subject** 120:5
**submit** 102:2, 160:12, 191:22, 196:14, 235:4
**successfully** 126:4
**sue** 178:2
**suffer** 100:14, 221:5
**sufficient** 153:18
**sugar** 19:1
**suicide** 206:3
**Suite** 1:47, 2:17, 2:35
**summary** 90:10
**summations** 92:7, 171:17, 230:15
**summer** 216:1
**Summit** 2:35
**summon** 236:8
**summoned** 145:24, 168:9, 210:12, 236:8
**summons** 145:20
**Sunday** 154:22, 154:23, 155:3, 222:18
**sundown** 17:14
**Sunnyvale** 34:2, 66:15
**superintendent** 154:22, 154:24
**supervise** 215:20
**supervises** 178:16
**supervisor** 162:1, 178:5, 178:15
**supplied** 203:9
**supplies** 34:13, 42:23, 42:23, 59:11, 59:12, 81:7, 81:8, 92:22, 112:2, 112:2, 158:24, 172:7, 172:8, 186:14,

190:24, 205:14, 205:15, 220:5
**supply** 185:2
**supported** 39:13, 39:22, 51:18, 63:11, 63:15, 63:21, 85:6, 174:12
**supporting** 45:14, 51:17, 166:15, 166:16, 187:1, 211:11
**supports** 216:23
**suppose** 110:2, 234:11
**supposed** 23:8, 50:6, 52:1, 59:4, 61:13, 94:7, 94:16, 97:7, 97:8, 141:3
**surgery** 235:8
**surprised** 121:1, 121:3, 121:4, 121:6
**suspect** 189:6
**suspicious** 175:21, 182:13
**sweating** 19:4
**Syria** 51:17
**syringes** 206:4
**system** 49:7, 121:21, 124:7, 152:21, 164:23, 165:22, 171:3

**< T >**
**talked** 12:23, 28:24, 182:13, 209:6
**talks** 172:2
**Tampa** 2:27
**tapes** 148:14
**taps** 22:20, 22:22
**taught** 223:24
**tax** 71:11
**tea** 185:6
**Teach** 49:17, 76:15, 115:3, 115:12, 154:25
**teacher** 8:3, 49:6, 109:21, 114:24, 115:2
**teachers** 76:6
**Teaching** 49:16, 122:3, 125:23, 125:23, 155:3
**tech** 78:21
**technical** 4:24
**technically** 15:24, 184:1
**technician** 66:9, 78:21, 131:16, 135:1
**technique** 199:23

**technology** 79:2, 119:11
**teenagers** 17:6
**Television** 6:5, 90:6, 104:20, 114:1, 170:17, 170:20, 173:21, 210:8
**tells** 14:6, 23:7, 91:4, 91:7, 91:10, 93:2, 100:22, 100:24, 171:5, 172:2, 180:5, 181:1, 189:10, 190:12, 219:20
**Ten** 8:13, 13:19, 79:22, 97:15, 99:16, 115:2, 136:17, 179:2, 187:16, 187:17
**tender** 7:18, 48:3
**TERESA** 1:44
**term** 81:1, 111:18, 136:19
**terms** 18:25, 53:18, 55:18, 111:5, 115:9, 171:23, 172:2, 175:25, 204:10, 233:4
**Terrell** 162:21, 168:21, 169:10, 170:8
**territory** 155:7
**terrorism-related** 84:2, 226:12
**terroristic** 105:2
**terrorists** 71:6, 83:18, 223:8
**testified** 183:23
**testify** 18:4, 27:22, 27:24, 27:25, 56:2, 56:2, 76:24, 86:13, 86:25, 87:16, 88:4, 88:5, 90:23, 91:6, 100:20, 105:17, 106:20, 124:24, 142:8, 143:5, 152:22, 153:6, 165:1, 165:5, 171:8
**testifying** 105:18, 105:24, 106:21, 106:21, 143:5, 184:2, 211:2
**testimony** 14:5, 60:3, 60:5, 87:25, 211:1, 230:13
**TEXAS** 1:2, 1:33, 1:36, 2:18, 2:36, 2:42, 8:15, 8:16, 18:21, 82:12, 82:15, 117:24, 136:14, 140:20, 146:2, 169:15, 173:20, 234:21, 234:23, 238:21
**theft** 144:19
**themselves** 55:18, 72:6, 142:8
**therapeutic** 121:25, 122:5, 125:22
**therapy** 122:1

**thereabouts** 143:10
**thinking** 39:5, 62:6, 109:17, 114:13, 125:24
**third** 117:20
**thirteen** 143:25, 149:7
**Thomas** 237:29
**though** 70:21, 70:23, 71:9, 100:10, 132:14, 167:7, 195:12
**thoughts** 37:22, 86:6, 213:18, 225:6
**thousand** 15:24
**thre** 207:14
**Three** 8:11, 10:4, 13:5, 13:6, 49:20, 58:18, 108:7, 122:10, 125:11, 125:12, 148:2, 202:1, 202:2, 204:15, 204:23, 216:5, 218:2, 229:15
**throughout** 94:19
**throw** 5:1, 228:2
**throws** 175:19, 175:20
**thrust** 200:15
**thunder** 44:18
**Thursday** 136:23, 136:24, 235:9
**TI** 78:24
**ties** 55:9
**tight** 5:11
**tiny** 23:19, 24:1
**title** 77:16
**today** 3:6, 19:22, 36:5, 68:24, 68:25, 73:17, 74:1, 77:12, 101:19, 114:6, 120:15, 130:2, 138:15, 197:13, 216:1, 219:7, 233:19, 233:22, 234:1, 234:18, 235:2, 235:12, 235:15, 235:20, 236:8
**together** 53:25, 74:8, 128:11, 209:10, 235:24
**tomorrow** 235:1, 235:2, 235:16, 235:21, 235:22, 236:8, 236:11
**took** 10:9, 53:18, 119:17, 203:15, 238:7
**Toons** 15:17
**toothpaste** 157:24
**total** 202:2, 233:5
**totally** 39:8, 68:8
**touch** 91:17, 138:21
**touched** 136:25, 189:17

**touching** 42:3
**tour** 224:5
**tours** 52:19
**toward** 190:20, 225:12
**towards** 225:9
**Tower** 2:34
**towers** 16:13
**town** 10:8, 20:15, 135:11, 163:13, 169:25, 235:8
**toys** 174:19, 175:11
**train** 73:21, 73:22, 73:25, 231:13
**training** 122:17, 201:17, 231:22, 232:15, 233:17, 234:13
**transcribed** 238:8
**transcript** 238:10, 238:12
**transcripts** 148:14
**transferred** 201:18
**Transit** 202:23
**translate** 39:7
**translated** 38:23
**translating** 38:22, 139:5
**translation** 115:9, 115:24, 116:3, 116:7, 116:14, 139:2
**translator** 76:16, 139:2
**transmitted** 236:5
**travel** 33:7, 57:17
**traveled** 52:21
**Treasury** 188:16
**treat** 76:13, 185:11, 185:12, 185:16
**treated** 145:5, 185:16
**treatment** 32:5, 123:9, 131:14, 131:15
**Tremont** 214:19, 217:11, 234:11
**trial** 10:15, 17:24, 47:20, 52:1, 55:25, 77:8, 77:23, 94:25, 97:7, 105:19, 106:9, 106:20, 136:5, 136:6, 142:7, 143:6, 143:9, 145:16, 145:17, 153:5, 165:6, 174:3, 179:23, 180:13, 186:9, 186:10, 195:6, 209:7, 215:13, 216:4, 218:24, 219:18, 219:18, 221:7, 230:12
**trials** 142:18
**tried** 72:2
**trip** 57:23

**trouble** 17:6, 165:19
**true** 39:6, 98:13, 127:21, 181:10, 188:10, 188:11, 193:4, 200:22, 238:10
**truth** 26:6, 87:4, 223:15
**Try** 4:4, 4:7, 22:9, 72:21, 72:22, 76:3, 76:11, 76:13, 76:14, 91:19, 92:14, 182:15, 183:18, 187:4, 198:15, 218:25
**Trying** 62:15, 62:18, 76:13, 87:4, 107:12, 136:7, 160:17, 166:15, 186:6, 188:18, 225:10, 227:25
**tumor** 32:21, 32:22
**turban** 104:14
**Turn** 162:4, 201:20, 203:23
**turned** 110:20, 180:20
**TV** 9:23, 41:11, 61:6, 61:16, 61:24, 62:5, 90:7, 111:8, 185:25, 207:20, 219:10, 222:15, 222:19, 223:6
**tw** 191:15
**twelve** 8:13, 122:7, 123:4, 204:15
**Twenty** 53:5, 82:8, 127:10, 169:2, 217:22
**Twenty-five** 20:10, 21:12, 41:20, 41:21, 162:13
**twenty-four** 125:14, 127:9
**twenty-one** 41:21
**twenty-three** 21:11
**Two** 32:9, 41:19, 79:15, 91:20, 96:12, 101:18, 108:7, 108:7, 127:17, 127:18, 136:9, 142:3, 144:24, 172:22, 182:3, 186:1, 194:9, 196:9, 201:14, 202:5, 206:12, 211:25, 218:5, 220:23, 231:22, 231:23, 232:5, 232:15
**two-month** 136:22
**type** 22:20, 22:23, 23:12, 23:14, 49:4, 56:24, 67:3, 70:5, 70:25, 81:9, 89:11, 92:16, 92:23, 92:24, 118:10, 122:4, 146:15, 146:21, 157:22, 159:2, 168:18, 170:9, 170:17, 183:7, 217:18, 219:25, 229:1
**types** 164:11, 164:16,

171:11, 179:17, 220:7, 220:15

**< U >**
**ultimate** 45:8, 45:24, 167:2
**Ultimately** 17:20, 34:4, 44:19
**unanimously** 69:20
**uncertain** 148:3
**undergraduate** 52:10, 58:8
**understanding** 84:1, 175:25, 203:10
**understands** 85:2
**understood** 72:4, 84:12, 84:22, 84:23, 160:16
**Unemployed** 103:3, 107:7, 234:10
**unequivocal** 182:22
**unfamiliar** 197:15
**unflexible** 204:14
**unfriendly** 198:12
**Union** 89:14, 89:25, 90:2, 90:3, 198:19, 200:6, 202:22, 202:24, 203:10, 203:13, 203:13, 203:23, 203:24, 204:2
**unit** 21:25, 201:15, 201:17, 201:19, 233:17
**University** 41:21
**unless** 10:19, 28:8, 30:19, 69:20, 76:24, 106:7, 153:18, 202:5
**Until** 10:19, 11:17, 13:2, 19:23, 28:8, 69:20, 70:13, 71:4, 77:9, 77:12, 102:11, 106:7, 106:11, 112:15, 124:7, 129:16, 129:17, 132:17, 134:3, 134:6, 142:25, 147:10, 153:15, 156:10, 172:23, 182:3, 191:15, 196:9, 199:16, 206:12, 211:25, 220:23, 225:23, 225:24, 226:8, 232:5, 236:11
**updated** 79:8
**upsetting** 44:14, 45:17
**upstairs** 21:3, 21:6
**uptown** 126:15
**Using** 61:12, 115:12, 116:6
**UT** 26:19, 29:18, 32:16
**UTD** 42:1

**utilized** 3:15


< V >

**vaguely** 9:22
**Valley** 177:18
**valves** 40:16, 40:18
**variety** 198:6
**various** 55:8, 90:1, 94:21
**vary** 39:9
**verdict** 7:5, 10:14, 11:25, 14:8, 30:11, 46:9, 63:22, 69:4, 77:9, 78:2, 92:14, 99:5, 99:19, 99:20, 100:3, 101:25, 128:12, 136:11, 137:20, 159:17, 167:5, 167:13, 180:13, 181:12, 181:19, 186:19, 191:8, 195:5, 195:6, 195:10, 196:16, 206:5, 211:14, 212:9, 218:19, 220:16
**versa** 39:8
**VERSUS** 1:10, 25:11, 51:8, 73:10, 106:21, 120:18, 130:9, 137:3, 151:13, 161:15, 184:4, 192:16, 197:6, 213:4
**vests** 206:3
**viable** 55:18
**vice** 39:8
**victims** 21:4, 21:5
**Vietnam** 52:17
**view** 55:12, 149:22
**views** 58:19, 60:4
**Village** 125:21
**violate** 126:7
**violated** 158:21, 189:21
**violation** 9:3, 34:15, 128:20, 138:9, 172:13, 180:23, 181:11, 190:14, 205:18, 220:8, 231:6
**violence** 21:4
**Virgil** 182:20
**vision** 79:5
**visit** 33:9
**visuals** 115:13
**voice** 102:22, 130:5
**VOIR** 1:17
**VOLUME** 1:16
**Voluntary** 126:2, 126:3
**volunteer** 154:18, 154:19,

162:17, 162:22, 163:8, 215:5
**volunteered** 150:16, 232:17
**vote** 39:23, 187:14
**votes** 199:5
**vs** 182:19, 182:20


< W >

**wait** 17:18
**Wake** 58:12
**Wall** 2:7
**wanted** 3:7, 4:1, 5:1, 69:25, 75:6, 75:20, 101:18, 138:21, 172:13, 175:6, 228:19, 234:16, 235:11
**wants** 119:14
**War** 96:4, 190:25
**Warehouse** 157:10, 157:17, 228:25, 229:1, 229:7
**warrant** 22:21, 22:23
**Washing** 157:23
**Washington** 129:10
**watch** 41:10, 101:8, 111:8, 112:18, 120:6, 129:19, 139:17, 147:13, 150:9, 160:9, 172:25, 182:6, 191:18, 196:11, 206:14, 212:2, 221:1, 232:8
**watched** 83:2
**watches** 110:7
**watching** 96:2, 222:19
**Water** 32:4, 33:23, 66:13, 66:15, 229:23
**ways** 64:5, 101:6, 117:4, 182:10, 189:14
**weapons** 186:24
**week** 33:2, 120:4, 129:17, 131:23, 136:22, 139:14, 147:9, 150:6, 236:1
**weeks** 108:7, 108:8, 194:9, 231:22, 232:15
**weigh** 97:3, 107:12
**welcome** 18:15, 105:24, 155:20
**welfare** 128:19, 203:1
**West** 39:15, 85:17, 94:17, 96:6, 129:2, 227:11
**Whatever** 6:23, 42:15, 50:3, 50:14, 50:14, 68:13, 91:6, 99:23, 105:3, 111:7, 146:4,

146:19, 162:24, 171:5, 199:6, 199:7, 202:6, 207:20, 225:12, 228:1, 229:7
**whatsoever** 124:12, 193:13
**Whenever** 54:22, 110:20
**wherever** 163:6, 211:20
**whether** 3:14, 23:18, 45:5, 45:9, 45:10, 45:20, 45:20, 67:22, 75:17, 87:14, 95:2, 95:3, 95:7, 97:8, 112:16, 113:22, 114:20, 138:22, 146:18, 158:23, 160:19, 166:23, 189:7, 204:22, 208:25, 230:1, 231:1, 233:4, 234:8
**Whiskey** 229:23
**White** 45:5, 103:21
**whoever** 197:24
**whole** 85:2, 130:22, 187:22, 191:6, 212:17
**whom** 118:5, 157:19
**widows** 138:7, 205:15
**wife** 8:2, 21:8, 21:11, 21:19, 47:2, 47:21, 49:1, 56:21, 95:20, 96:25, 126:11, 127:12, 156:17, 156:18, 168:16, 170:15
**William** 237:9, 237:15, 237:20
**willing** 4:7, 4:21
**wire** 22:20
**wise** 85:3
**within** 8:12, 21:10, 113:3
**Witness** 45:25, 98:9, 106:21
**witnesses** 42:15, 50:3, 60:1, 80:18, 171:15, 179:24
**wives** 157:2
**woman** 16:21, 24:7
**wondering** 36:4
**word** 22:8, 30:10, 45:1, 85:8, 116:6, 116:6, 230:20, 230:20
**word-for-word** 116:14
**words** 34:12, 38:23, 54:14, 105:25, 115:24, 116:1, 137:18, 160:18, 176:4, 180:7, 183:4, 230:21, 230:21, 232:20
**worker** 27:1, 122:22
**Workers** 21:5, 90:3
**Working** 16:21, 53:10,

53:19, 123:5, 157:15, 202:20, 214:22, 228:22
**works** 8:6, 33:22, 40:13, 56:22, 57:4, 79:4, 89:2, 126:3, 126:13, 170:16, 170:20, 170:21, 186:12, 198:7
**world** 15:22, 55:21, 68:9, 85:1, 194:7, 215:3
**worldwide** 45:19
**Worried** 193:25, 208:17
**worry** 3:10, 209:6
**worst** 235:14
**Worth** 2:36
**wrapped** 96:17
**write** 98:16
**writer** 170:24
**writing** 128:8
**written** 14:6, 111:13
**wrote** 34:25
**Wyoming** 109:24, 110:5


**< Y >**
**year** 31:15, 31:19, 32:7, 49:6, 49:8, 49:13, 49:20, 82:4, 89:9, 89:17, 89:17, 104:3, 104:3, 143:25, 144:23, 144:23, 198:17, 202:16, 203:4, 224:6
**yearbooks** 67:6
**yesterday** 222:18
**York** 2:8
**young** 16:21, 136:8
**younger** 41:22, 110:4
**yourself** 18:3, 27:22, 27:24, 32:24, 86:19, 108:22, 145:8, 154:13, 165:2, 165:3, 200:15, 216:23
**Youth** 125:21, 125:23


**< Dates >**
**july 16, 2007** 1:13, 1:13, 1:13