18:00  1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
2                DALLAS DIVISION

3

4   UNITED STATES OF AMERICA     (   NUMBER 3: 04-240-G
                                (
5

   VERSUS                     (
6                              (
                              (
7   HOLY LAND FOUNDATION, ET AL.   (   July 17, 2007

8   _____

18:00  9                     VOLUME 2
                 VOIR DIRE EXAMINATION
10          BEFORE THE HONORABLE A. JOE FISH

11  _____

12

   A P P E A R A N C E S:
13

14  For the Government:    MR. JIM JACKS
                         MR. BARRY JONAS
15                   MS. ELIZABETH SHAPIRO
                         MR. NATHAN GARRETT
16                   Assistant United States Attorney
                       UNITED STATES DEPARTMENT OF JUSTICE
17                 NORTHERN DISTRICT OF TEXAS
                     U.S. Courthouse
18                 1100 Commerce Street
                     Dallas, Texas 75242
19                     214/659-8600

20

   For the Defendant and Shukri Abu Baker:
21

22                 MS. NANCY HOLLANDER
                 MS. TERESA DUNCAN
23                 FREEDMAN BOYD DANIELS
                 HOLLANDER
24                 20 First Plaza, Suite 700
                 Albuquerque, NM 87102
25                  505/842-9960

18:00 1    For the Defendant El-Mezain:

2

                              MR. JOSHUA DRATEL
3                             LAW OFFICE OF JOSHUA L. DRATEL
                              14 Wall Street, 28th Floor
4                             New York, NY 10005
                                   212/732-0707
5

6    For the Defendant Mufid Abdulqader:

7

                              MS. MARLO CADEDDU
8                             LAW OFFICE OF MARLO P. CADEDDU
18:00                         3232 McKinney Avenue, Suite 700
9                             Dallas, Texas 75204
                                   214/744-3015
10

     For the Defendant Elashi:
11

12                            MS. LINDA MORENO
                              LAW OFFICE OF LINDA MORENO
13                            PO BOX 10985
                              Tampa, Florida 33679
14                                 813-247-4500

15   For the Defendant Odeh:

16                            MR. GREG WESTFALL
                              WESTFALL PLATT CUTRER
17                            Mallick Tower
                              One Summit Avenue, Suite 910
18                            Fort Worth, Texas 76102
                                   817/877-1700
19

20   Court Reporter:         Cassidi L. Casey, CSR No. 1703
                              1100 Commerce Street, Rm 15D6L
21                            Dallas, Texas 75242
                                   214/354-3139
22

23

24

25

18:00 1                   P R O C E E D I N G S:

2              THE COURT:  Thank you, Ladies and Gentlemen.

3      Thank you for being on time.  I'm sorry we were not able

4      to start at nine o'clock, but apparently there was a delay

5      in the jury room in getting the list assembled for today's

6      session.

7              I believe we're ready to see Mr. Denton, Number

8      27 on the list from yesterday.  Good morning, Mr. Denton.

9              VENIRE PERSON:  Good morning.

10             THE COURT:  Counsel for the parties have some

11     questions for you in this case.  Mr. Westfall.

12             MR. WESTFALL:  Thank you, Mr. Denton, I'm Greg

13     Westfall.  I'm one of defense lawyers in this case.  I am

14     going to talk to you just a few minutes, and I imagine

18:00 15    somebody from the government will be speaking with you.

16     This case -- You know what this case is?

17             VENIRE PERSON:  Yes.

18             MR. WESTFALL:  The Holy Land Foundation case.

19             VENIRE PERSON:  Yes.

20             MR. WESTFALL:  You are from Richardson.  Have

21     you heard of there case before?

22             VENIRE PERSON:  I have been reading about it in

23     the paper.

24             MR. WESTFALL:  Recently?

25             VENIRE PERSON:  Recently.

18:00 1          MR. WESTFALL:  And before recently, had you ever

2     heard of the case before?

3          VENIRE PERSON:  Yes.

4          MR. WESTFALL:  And based on what you have read

5     or heard before, do you have any opinion about the guilt

6     or innocence of the defendants?

7          VENIRE PERSON:  Yes.

8          MR. WESTFALL:  What is that?

9          VENIRE PERSON:  Guilty.

10         MR. WESTFALL:  Is there any way you can set that

11    opinion aside?

12         VENIRE PERSON:  I don't think so.

13         MR. WESTFALL:  That's all.  Thank you.

14         THE COURT:  Mr. Jacks, do you have questions for

18:00 15   Mr. Denton?

16         MR. GARRETT:  No questions, your Honor.

17         THE COURT:  Thank you, Mr. Denton.  We are in

18    the process of selecting jurors for this case, and I

19    anticipate that process will last another day or two.  So

20    when you leave here today, you should not discuss the case

21    with anyone or read or watch any media accounts about the

22    case with anyone until you hear from us.  Thank you.

23         MR. WESTFALL:  Your Honor, we move to strike Mr.

24    Denton or actually submit him for a challenge, inability

25    to be fair and impartial.  He has pre-judged the case.

18:00   1            THE COURT:  Any objection?

  2            MR. GARRETT:  No objection.

  3            THE COURT:  We're ready to see next Mr. Gregory

  4   Griffin.  I'm sorry.  Gregory Griffin is the one I

  5   referred to yesterday afternoon who was excused because he

  6   was in Collin County.  So the next one would be Samantha

  7   Ritz.

  8            MS. MORENO:  Good morning, Ms. Ritz.  My name

  9   is Linda Moreno, and I'm a defense attorney in this case.

 10            I am going to ask you about some of the answers

 11   you put on your questionnaire.  Do you remember filling

 12   out that questionnaire all of those months ago?

 13            VENIRE PERSON:  Yes, sir.

 14            MS. MORENO:  This is a case that involves the

18:00 15   Holy Land Foundation.  This is an American Muslim charity

 16   that the government alleges materially supported this

 17   foreign terrorist organization, HAMAS.  Okay?  I want to

 18   know, just hearing that, if you have heard anything or

 19   read anything in the media recently or in the past that

 20   brings up this case.

 21            VENIRE PERSON:  I did.  It actually started a

 22   few days ago, but I wasn't for sure that's what I was

 23   doing.  But I have.

 24            MS. MORENO:  Here you are.

 25            VENIRE PERSON:  Yes, ma'am.

18:00 1          MS. MORENO:  Do you recall what you heard?

2          VENIRE PERSON:  Just that they were funding

3 money to certain terrorist acts, and it's been years.

4 They have been under investigation for years, like 1994,

5 1995 maybe.

6          MS. MORENO:  And in hearing that, did that raise

7 any red flags for you, any concerns, any opinions that you

8 may have about this case?

9          VENIRE PERSON:  It did at first because I was

10 wondering why it took so long to come out.  But it is kind

11 of crazy.

12          MS. MORENO:  Let's talk about that.  There are

13 no right or wrong answers to the questions I'm asking you

14 or the government asks.  But we need to try to understand

18:00 15 and find jurors who have no prejudices, no fears about

16 sitting on a case like this because that would be the fair

17 thing for these gentlemen.  Okay?  So you have used the

18 word "scary."  Talk to me about that.  As you sit here

19 knowing this is a case involving terrorism-related

20 charges, do you have any fears, apprehensions?

21          VENIRE PERSON:  I mean I do.  It's in the

22 newspapers every day.  You drive to work every day.  You

23 never know when something is going to land in your front

24 yard.  It's not like a safe world when I was growing up as

25 a child.  You can't even walk to the store anymore without

18:00 1    being mugged or somebody picking you up on the street or

2    somebody is going to shoot you driving down the road

3    because they didn't like the color of your skin.

4                 MS. MORENO:  I understand, and I'm sure many

5    people have those same opinions and ideas.  Given what you

6    are feeling right now, could you honestly put those

7    feelings aside and promise these gentlemen that you can

8    fairly and in a just fashion evaluate the evidence in this

9    case?

10                VENIRE PERSON:  No, ma'am.  Not as a mother.

11   Not as a mother with two children growing up in a world

12   where they have to go through metal detectors to go to

13   school.

14                MS. MORENO:  I understand.  And there is nothing

18:00 15   that anyone in this courtroom can say to you that will

16   force you to put aside those opinions.  Isn't that right?

17                VENIRE PERSON:  Yes, ma'am.

18                THE COURT:  Mr. Nathan, do you have questions?

19                MR. GARRETT:  Just a couple.

20                Good morning.  My name is Nathan Garrett, and

21   I'm an Assistant United States Attorney and one of the

22   prosecutors in this case.  Just a couple of questions to

23   follow-up on.  You stated that you are married.  Is that

24   correct?

25                VENIRE PERSON:  Yes, sir.

18:00 1     MR. GARRETT: What does your husband do?

2     VENIRE PERSON: He took care of his invalid

3 mother until two weeks ago when she passed away.

4     MR. GARRETT: I'm sorry for that. You are an --

5     VENIRE PERSON: Optometric tech?

6     MR. GARRETT: What does an optometric tech do?

7     VENIRE PERSON: We do all the work for the

8 doctor -- testing, dispensing of contact lenses and so

9 forth.

10     MR. GARRETT: How long have you been doing that?

11     VENIRE PERSON: Twelve years.

12     MR. GARRETT: And you have two children, twelve

13 years old and eight years old. Is that correct?

14     VENIRE PERSON: Yes, sir.

18:00 15     MR. GARRETT: And you have lived in this area

16 for thirteen years. Is that right?

17     VENIRE PERSON: Yes, sir.

18     MR. GARRETT: And where did you live before this

19 area?

20     VENIRE PERSON: I lived in Liberty, Texas,

21 between Houston and Beaumont.

22     MR. GARRETT: I'm sorry. Where?

23     VENIRE PERSON: Between Houston and Beaumont.

24     MR. GARRETT: And you haven't had any jury

25 service?

18:00  1          VENIRE PERSON:  No, sir, I have been pooled for

2     jury service the last three years.

3          MR. GARRETT:  Do you mean similar to here?  You

4     come to a big group, but you have never actually been

5     selected to sit and listen to a trial?

6          VENIRE PERSON:  Both cases have been dismissed

7     before we got in the room.

8          MR. GARRETT:  Were those criminal or civil or do

9     you know?

10          VENIRE PERSON:  Petty, really.

11          MR. GARRETT:  But you never served?

12          VENIRE PERSON:  No, sir.

13          MR. GARRETT:  Ms. Moreno asked you some

14     questions about your fears, and it sounds like you have

18:00 15     fears about crime generally.  Is that right?

16          VENIRE PERSON:  Yes.

17          MR. GARRETT:  And you said that came from being

18     the mother of two children.

19          VENIRE PERSON:  That's correct.

20          MR. GARRETT:  And you also told Ms. Moreno that

21     concern, that fear you thought would impact your ability

22     to sit fairly in this case or be able to judge these

23     defendants.

24          VENIRE PERSON:  That's correct.

25          MR. GARRETT:  So are you telling me if the Judge

18:00 1    instructs you to presume they are innocent -- Do you know

2    what presumption of innocence is?

3                    VENIRE PERSON:  Yes.

4                    MR. GARRETT:  What does it mean?

5                    VENIRE PERSON:  In laymen's terms that they have

6    to prove their guilt beyond a reasonable doubt.

7                    MR. GARRETT:  That's our burden to carry.

8    Unless and until we prove these defendants' guilt beyond a

9    reasonable doubt, you cannot find them guilty.  Do you

10   understand that?

11                   VENIRE PERSON:  Yes.

12                   MR. GARRETT:  Do you think that's a fair and

13   just right they have?

14                   VENIRE PERSON:  As long as they are United

18:00 15   States citizens.

16                   MR. GARRETT:  So, do you feel differently if

17   they are not United States citizen?

18                   VENIRE PERSON:  In some cases I do.  They are

19   here.  Unless they have taken the test to become United

20   States citizens, I really don't think they should reap

21   what we have.  I know that sounds really bad, but we have

22   worked all of our lives to get what we have now.

23                   MR. GARRETT:  Does that include in your

24   assessment of that -- And that is fair.  We all appreciate

25   your honesty, and as Ms. Moreno said there is no right and

18:00 1    wrong here.  This is your opportunity to be honest about

2    how you feel.  Does that include people who may be here

3    legally, although not citizens?

4           VENIRE PERSON:  As long as they are here legal.

5           MR. GARRETT:  I know these are terms you may not

6    be familiar with.  Lawful citizens, legal aliens or

7    residents.

8           VENIRE PERSON:  Yes.

9           MR. GARRETT:  Do you think regardless of the

10   circle they are in of those terms that they should enjoy

11   those Constitutional protections?

12          VENIRE PERSON:  Yes.

13          MR. GARRETT:  Does that include the

14   Constitutional protection of presumption of innocence?

18:00 15       VENIRE PERSON:  Yes.

16          MR. GARRETT:  And so would you be able to judge

17   these defendants and give them that presumption of

18   innocence?  That is, the government is required to prove

19   their guilt.  They are not required to prove anything.  We

20   have to prove their guilt beyond a reasonable doubt.  Is

21   that something you can do?

22          VENIRE PERSON:  I can try.

23          MR. GARRETT:  Well, I need to know if that's

24   something you can do.  We want fair jurors, and that's all

25   we're trying to get to.

18:00 1        VENIRE PERSON:  To be honest with you, I don't
     2    know.  Growing up if you went to court, I mean there was a
     3    reason why you got there.  I was raised old school.  So it
     4    was totally different.  My parents believed you went to
     5    court, you were guilty, regardless.  And unfortunately,
     6    those stick with you as an adult.  Do I say they are
     7    guilty?  No.  I don't know the individuals.  I don't know
     8    who they are.  And coming from a big town, you don't know
     9    your neighbors like a small town.

    10        MR. GARRETT:  Thank you.  I appreciate your
    11    honesty.

    12        THE COURT:  Ms. Ritz, we are in the process of
    13    talking with persons in the pool from which the jury in
    14    this case will be selected.  I anticipate that process
18:00 15    will go on for at least another day or two.  So until you
    16    hear from us further, you should not discuss this case
    17    with anyone or allow anyone to discuss it with you.  Nor
    18    should you read or watch or listen to any media accounts
    19    about the case.  Thank you.  You may rejoin the others in
    20    the hall.

    21        MS. MORENO:  Your Honor, on behalf of
    22    defendants, we would move to strike this defendant for
    23    cause.  She was very articulate, your Honor.  She recited
    24    a litany of fears from metal detectors to being shot.  She
    25    used words like "scary" and "frightened," and she was

18:00 1   asked if they could afford these gentlemen the presumption

2   of innocence.  She was very clear and unambiguous that she

3   could not, and when the government asked her again if she

4   could do that she said I don't know, and she went into her

5   background which included the notion that if you come to

6   trial you must be guilty.  So we think those are adequate

7   grounds for cause.

8              THE COURT:  Mr. Garrett.

9              MR. GARRETT:  No objection, your Honor.

10             THE COURT:  I will grant the challenge for cause

11  to Ms. Samantha Ritz.

12             MR. JACKS:  Your Honor, at this time the

13  government would like to voice an objection.  We would

14  object to -- We have let it go on for some time but to the

18:00 15  form of the questions being put forth by defense counsel.

16  The purpose of this exercise is to determine whether there

17  is any reason that these jurors cannot be fair and

18  impartial and determine their qualifications.  And a lot

19  of these questions almost are in the nature of a civics

20  course which I don't believe is the purpose of this

21  exercise, and in addition -- particularly the leading

22  questions.  I think this particular objection was prompted

23  by Ms. Moreno when she basically told the juror so nothing

24  else anybody said to you in the courtroom is going to

25  change your mind on that.  That's not really letting the

18:00 1    juror express their opinion or view.  That's Ms. Moreno

2    stating her opinion and getting the witness or juror to

3    agree with it, and we would ask the Court to restrict the

4    type of questions so that they are legitimate questions

5    and not questions that are essentially putting the answer

6    that the attorney wants to receive in the form of a

7    leading question.  I don't believe that's proper, your

8    Honor.

9             THE COURT:  Well, I agree with you about leading

10   questions generally during this process, Mr. Jacks, but

11   I'm a little unclear about the nature of the questions

12   that you said were little more than civics lessons.  I'm

13   not sure what you have in mind.

14            MR. JACKS:  Well, that was an unclear statement

18:00 15   on my part, your Honor.  Certain questions almost seem

16   like you are asking legal questions of a juror which

17   unless they are lawyers there is no way they are going to

18   know.  I'm not talking about the burden of proof or

19   presumption of innocence.  But there are certain other

20   questions that I think most people would agree that they

21   are not within the realm of a lay juror, and as such I

22   think they are unfocused as a consequence.  The question

23   is so open that the juror really has no information about,

24   well, what are you asking me about.

25            THE COURT:  I'm still having a hard time getting

18:00 1    down the specifics of an example of what you are talking.

2          MR. JACKS:  All right.  Your Honor, I will point

3    it out if it happens again or I see an example that is

4    illustrative of that point.

5          MS. MORENO:  Your Honor, I just wish to say that

6    there is no legal authority that Mr. Jacks can cite that

7    prevents leading questions in voir dire.  In fact, in

8    certain instances that is the only way to elicit honest

9    answers from the jurors and with respect to the civics

10    lesson, your Honor, with every single juror yesterday Mr.

11    Jacks ended his question with a long question on the law,

12    and often the jurors were confused about that.  So I would

13    take exception to his characterization of this process by

14    the defense.

18:00 15          THE COURT:  I agree with you, Ms. Moreno, in

16    that I don't think I can prohibit leading questions, but I

17    think everyone involved, defense side and government's

18    side, that the primary purpose of this process is to allow

19    us to understand the opinions and concerns and questions

20    and fears of these prospective jurors, and everyone would

21    also agree that you don't obtain that generally by asking

22    leading questions as opposed to open-ended questions.  So

23    I would encourage counsel to the extent possible to ask

24    open-ended rather than leading questions.  I don't think

25    that we will benefit from this expenditure of time as much

18:00 1    if we don't do it that way.

2         I think we're ready to see next Mr. Tillman

3    Johnson, Jr.

4         Good morning, Mr. Johnson.  Counsel for the

5    parties in this case have some questions they would like

6    to ask.

7         MR. WESTFALL:  Good morning, I'm Greg Westfall.

8    I'm one of the lawyers in this case.  I am going to speak

9    with you for a few minutes, and then one of the lawyers

10   for the government will get up and speak with you.  Are

11   you doing okay?

12        VENIRE PERSON:  Yes.

13        MR. WESTFALL:  All right.  Do you know what case

14   this is?

18:00 15   VENIRE PERSON:  No, I don't.

16        MR. WESTFALL:  This is the Holy Land Foundation

17   case is what it's come to be called.  It's the United

18   States versus the Holy Land Foundation for Relief and

19   Development.  And it is a case where the government

20   alleges that the Holy Land Foundation and some individuals

21   who work with the Holy Land Foundation gave material

22   support to a foreign terrorist organization, that being

23   HAMAS.  Having told you that, does that ring any bells?

24        VENIRE PERSON:  I think it happened a few years

25   back.  I seen it flash across the news.  That was

18:00  1    basically it.

       2            MR. WESTFALL:  Anything about any of that

       3    coverage caused you to form an opinion as to guilt or

       4    innocence?

       5            VENIRE PERSON:  No.

       6            MR. WESTFALL:  Seems like you have a lot of

       7    family in the police department.

       8            VENIRE PERSON:  Yes.

       9            MR. WESTFALL:  What departments are they in?

      10            VENIRE PERSON:  My brother is a Hutchinson

      11    police officer, and my sister is a corporal for the Dallas

      12    PD, and my other sister works for the direct entry clerk

      13    where she actually places calls for auto thefts or missing

      14    people, to get the call to come out to dispatch the

18:00 15    officer.

      16            MR. WESTFALL:  Is she a dispatcher?

      17            VENIRE PERSON:  She's more --

      18            MR. WESTFALL:  Data entry.

      19            VENIRE PERSON:  With a number where the

      20    detective can come out and see you and you give the

      21    information to the detective.

      22            MR. WESTFALL:  Were you inclined to go in law

      23    enforcement for yourself?

      24            VENIRE PERSON:  When I was working for the city

      25    I thought about it, and I found a job in a department

18:00 1    elsewhere.  So I took the other job.

2           MR. WESTFALL:  Now, in this case name appears

3    the word terrorism, material support of terrorism.  Okay?

4           VENIRE PERSON:  Okay.

5           MR. WESTFALL:  And what that means is the

6    allegation that there was some goods given with the intent

7    to benefit this terrorist organization.  So we're not

8    talking about a direct terrorist incident, but nonetheless

9    it has that word "terrorist" in the name.  How do you feel

10    about being on a jury that is dealing with those kinds of

11    issues in a criminal case?

12           VENIRE PERSON:  I can't really express how I

13    would feel.  I know when this is happening it's someone's

14    loved ones that is possibly in harm's way, and if that

18:00 15    person were to be captured, I would feel good.  That's my

16    basic opinion as far as terrorism, just being straight.

17           MR. WESTFALL:  So you have no personal

18    reservations like fear or otherwise about being on the

19    jury?

20           VENIRE PERSON:  No.

21           MR. WESTFALL:  Do you know any Muslims?

22           VENIRE PERSON:  When I was in the military I was

23    stationed with one.  He was in our unit.

24           MR. WESTFALL:  Where were you stationed?

25           VENIRE PERSON:  Over in Germany for two years.

18:00 1              MR. WESTFALL:  Were you in the army?

2              VENIRE PERSON:  Yes.

3              MR. WESTFALL:  What did you do?

4              VENIRE PERSON:  I was a communication

5       specialist.

6              MR. WESTFALL:  What's your MOS?

7              VENIRE PERSON:  31 Uniform.

8              MR. WESTFALL:  And you actually worked with a

9       practicing Muslim?

10             VENIRE PERSON:  No, I didn't work with a

11      practicing Muslim.  We associated, spoke, we sit and have

12      lunch together, and we discuss what his job was, and I

13      would discuss my job in the military with him as far as

14      training over the radios and what would be a certain part

18:00 15      as far as he would be doing in the field.

16             MR. WESTFALL:  And have you all ever kept in

17      touch since then?

18             VENIRE PERSON:  No.  Just during the course that

19      we were stationed together.

20             MR. WESTFALL:  How long were you together?

21             VENIRE PERSON:  About a year and a half.

22             MR. WESTFALL:  That sounds like it was a good

23      relationship.

24             VENIRE PERSON:  Oh, yeah, just speaking with him

25      I learned about his culture, where he grew up and how it

18:00  1    was for him coming up, and I told him where I lived, about

2    Texas and everything, and I could understand a place I

3    will probably never get a chance to go.

4                MR. WESTFALL:  Where was he from?

5                VENIRE PERSON:  Bangladesh.

6                MR. WESTFALL:  How long have you been a mail

7    handler?

8                VENIRE PERSON:  A little over a year.

9                MR. WESTFALL:  Do you like it?

10                VENIRE PERSON:  Oh, yes, love it.

11                MR. WESTFALL:  Mr. Johnson, thank you so much

12    for speaking with me.

13                THE COURT:  Mr. Garrett, do you have questions

14    of the witness?

18:00 15                MR. GARRETT:  Yes, your Honor.  Mr. Johnson,

16    good morning.  My name is Nathan Garrett, and I'm

17    Assistant United States Attorney and one of the

18    prosecutors on this case.  I just have a few questions for

19    you, a follow-up on Mr. Westfall's questions, and I may

20    repeat a question or two so forgive me for that.  I'm

21    going through a lot of questionnaires.  You are married?

22                VENIRE PERSON:  Yes.

23                MR. GARRETT:  Does your wife work outside the

24    home?

25                VENIRE PERSON:  Yes.

18:00 1          MR. GARRETT:  What does she do?

2          VENIRE PERSON:  She's a receptionist for a

3     commercial metal corporation.

4          MR. GARRETT:  How long has she been working

5     there?

6          VENIRE PERSON:  I believe over ten years.

7          MR. GARRETT:  Good.  You have two children, is

8     that right, a sixteen year old and a six year old?

9          VENIRE PERSON:  Yes.

10          MR. GARRETT:  Big spread.  You mentioned on your

11     questionnaire, which is what I'm using to go by that you

12     have lived here about twelve years.  Is that right?

13          VENIRE PERSON:  Yes.

14          MR. GARRETT:  In this area about twelve years.

18:00 15          VENIRE PERSON:  Yes, in Dallas.

16          MR. GARRETT:  Before that, where did you live?

17          VENIRE PERSON:  I got out of the military and I

18     went back home for probably about four months, and then I

19     moved here.  East Texas, Mount Pleasant.

20          MR. GARRETT:  Where is home?

21          VENIRE PERSON:  Mount Pleasant, East Texas.

22          MR. GARRETT:  You mentioned you were in the

23     military, that you were in communications.  Is that right?

24          VENIRE PERSON:  Yes.

25          MR. GARRETT:  And what years did you serve?

18:00  1             VENIRE PERSON:  From 1989 until 1994 I believe.

       2             MR. GARRETT:  Was that all active duty or was

       3    there reserve time in there as well?

       4             VENIRE PERSON:  That was on active duty.

       5             MR. GARRETT:  Was that in Germany?

       6             VENIRE PERSON:  Yes, I spent two years in

       7    Germany.

       8             MR. GARRETT:  Where?

       9             VENIRE PERSON:  Hannover.

      10             MR. GARRETT:  How did you like Hannover?

      11             VENIRE PERSON:  I loved it.

      12             MR. GARRETT:  It was nice to come home?

      13             VENIRE PERSON:  It was nice to come back to the

      14    States, but while I was there those two years, I enjoyed

18:00 15    it.  I got to travel.

      16             MR. GARRETT:  Europe or other places?

      17             VENIRE PERSON:  Yes, sir.

      18             MR. GARRETT:  Where did you travel?

      19             VENIRE PERSON:  Other than doing field exercise

      20    we took a trip to Barcelona, Spain.

      21             MR. GARRETT:  You mentioned to Mr. Westfall that

      22    you are a mail handler.

      23             VENIRE PERSON:  Yes.

      24             MR. GARRETT:  What did you do between your

      25    military and the time you work for the post office?

18:00  1          VENIRE PERSON:  I worked for a place called

2     Amrep Chemical Plant.  And I worked for TCI Cable, and I

3     worked for Brinks Home Security as an installer, and then

4     I went to the City of Dallas for nine and a half years and

5     I ended up at the post office.

6          MR. GARRETT:  What did you do at the City of

7     Dallas?

8          VENIRE PERSON:  I did the first four and a half

9     years as a boiler inspector, went out and inspected the

10    infrastructure of storm drains, and the last part, five

11    years, with the Dallas Water Utilities as a field service

12    rep.

13         MR. GARRETT:  And during your time working for

14    the City of Dallas, did you know Mufid Abdulqader?

18:00 15         VENIRE PERSON:  Who?

16         MR. GARRETT:  Any of the defendants seated here?

17         VENIRE PERSON:  No, sir.

18         MR. GARRETT:  And I believe I'm correct that you

19    have not had any prior jury service.

20         VENIRE PERSON:  Yes.

21         MR. GARRETT:  When you say jury service, does

22    that mean you have never even been called down to the

23    courthouse like you have today, not even in a big jury

24    pool?

25         VENIRE PERSON:  Well, I have been called down,

18:00 1    yes, but I was released.

2            MR. GARRETT:  Here in the federal court or state

3    court?

4            VENIRE PERSON:  State court, George Allen

5    Building.

6            MR. GARRETT:  How many times did that happen to

7    you?

8            VENIRE PERSON:  I think that was just once.

9            MR. GARRETT:  I am going to ask you about your

10    questionnaire, and I know you haven't seen it in a few

11    weeks, and I know it's not very fair of me.  You marked on

12    the questionnaire that you do not speak Arabic or Hebrew.

13    Is that right?

14            VENIRE PERSON:  That's correct.

18:00 15            MR. GARRETT:  But on the question beneath that

16    it says if you do speak Arabic or Hebrew would you have

17    trouble relying on transcripts of translators.  Did you

18    mean to do that or was that a mistake?

19            VENIRE PERSON:  That was a mistake.

20            MR. GARRETT:  Would you have any problem if a

21    translator's transcript was admitted in evidence?  If you

22    didn't speak the language, would you have any trouble

23    accepting that?

24            VENIRE PERSON:  No.

25            MR. GARRETT:  Mr. Westfall talked to you a

18:00 1    little bit about the case, and the case involved

2    allegations that these defendants were providing material

3    support to a foreign terrorist organization.  That

4    organization is HAMAS.  Have you heard of the HAMAS

5    terrorist organization?

6              VENIRE PERSON:  Just like scanning through the

7    channels, something catch my eye for a minute.  Keep

8    scanning the channels.  Nothing that I can say I would

9    pick up the paper and read and get into a conversation

10   with anyone else about what was going on.

11             MR. GARRETT:  You don't follow what's going on

12   over in the Middle East that closely?

13             VENIRE PERSON:  Well, see what's happening and

14   go on.  I might see what the weather would be like for

18:00 15   that day or traffic is backed up over here or --

16             MR. GARRETT:  Something that affects your life?

17             VENIRE PERSON:  That's basically going on in the

18   United States.

19             MR. GARRETT:  And as Mr. Westfall said, this

20   allegation is material support, and I expect there to be

21   evidence that material support was in the form of money

22   that went overseas to support HAMAS.  And the evidence may

23   show that some of that money that went over was spent on

24   what you might think of as humanitarian supplies --

25   medical supplies, school books, that sort of thing.  And

18:00 1    at the end of the case the judge is going to tell you at

2    the end of case what the law is.

3            THE COURT:  Mr. Garrett, your time has expired.

4            Mr. Johnson, we're still in the process of

5    selecting the jury to hear this case, and I expect that

6    process to continue for at least another day or two.

7    After you leave here today, until you hear from us again,

8    you should not discuss this case with anyone or allow

9    anyone to discuss it with you.  Nor should you read or

10   watch or listen to any media accounts of this case if

11   there are any.  Thank you.  You may rejoin the others in

12   the hall.

13           VENIRE PERSON:  Thank you, your Honor.

14           THE COURT:  Good morning, Ms. Lopez.  Counsel in

18:00 15  this case have some questions they would like to ask you.

16           MS. MORENO:  Good morning, Ms. Lopez.  My name

17   is Linda Moreno, and I'm one of the defense attorneys in

18   this case.  I am going to ask you some questions about

19   your answers from the questionnaire you filled out months

20   ago.  Do you remember that?

21           VENIRE PERSON:  Yes.

22           MS. MORENO:  And I am going to ask you if you

23   have heard about this case before in the media.

24           VENIRE PERSON:  No.

25           MS. MORENO:  Let me tell you what it is.  This

18:00 1  is a case involving an American Muslim charity, the Holy

2  Land Foundation, and I'm wondering if you have heard

3  anything about the Holy Land Foundation going to trial,

4  either in the news, on TV, on the radio or newspapers.

5          VENIRE PERSON:  No, I have not.

6          MS. MORENO:  All right.  There is no right or

7  wrong answers here.  What we're trying to find out is if

8  there is anything that concerns you about sitting on a

9  case like this or if you have any preconceived notions or

10  opinions that would be important for us to know to

11  determine whether you would be a fair juror for this case.

12  Okay?

13          VENIRE PERSON:  The only concern I have is my

14  job right now.

18:00 15          MS. MORENO:  Let's talk about that.  This case

16  may take three to four months, perhaps less, perhaps more.

17  It's not clear now.  I see that you work in patient

18  registration at the hospital.

19          VENIRE PERSON:  Yes.

20          MS. MORENO:  Why don't you tell us what your

21  concerns are about serving this long.

22          VENIRE PERSON:  My supervisor is pregnant, and

23  she's going to be on leave in a couple of weeks, and we're

24  very concerned about if I am chosen what kind of coverage

25  we're going to have in the department.  She's a

18:00 1   supervisor, and I'm a team leader.

2           MS. MORENO: Is there anyone else who could do

3   your job while you are away for three or four months?

4           VENIRE PERSON: I'm pretty sure they can find

5   someone else. They might not want to, but it's a pretty

6   wide department that they could find someone to do that.

7           MS. MORENO: Do you have any concerns about

8   getting paid during your service?

9           VENIRE PERSON: No. I heard we do. I have

10   already talked to my human resources department, and they

11   told me that I will get paid.

12           MS. MORENO: So, is there anything about the

13   supervisor being pregnant and worrying about coverage that

14   would cause you distraction in a three- to four-trial?

18:00 15   Would you be worried about that and not able to pay

16   attention to what was going on in the case?

17           VENIRE PERSON: Not necessarily. If I'm here

18   away from work, no. Maybe after I go back.

19           MS. MORENO: You speak Spanish?

20           VENIRE PERSON: I do. I'm fluent.

21           MS. MORENO: And your husband was born in

22   Mexico?

23           VENIRE PERSON: Yes.

24           MS. MORENO: And you have also lived in Mexico?

25           VENIRE PERSON: Yes.

18:00 1          MS. MORENO:  You are familiar with translations

2    of, say, Spanish into English.  You have heard that

3    probably your whole life.  Is that right?

4          VENIRE PERSON:  Yes.

5          MS. MORENO:  Have you ever experienced words

6    being translated accurately but the meaning is wrong?

7    Have you ever heard that?

8          VENIRE PERSON:  Yes, I can't remember exactly

9    right now, but yes.

10          MS. MORENO:  Where the word for word was

11    translated accurately but the whole sense or meaning of

12    the conversation was wrong, have you had that experience?

13          VENIRE PERSON:  Yes, I have.  One word that

14    totally converts the sentence to another one, yes.

18:00 15          MS. MORENO:  Can you think of any examples?

16          MR. JACKS:  Judge, I object to this.  This has

17    nothing to do with her qualifications.

18          THE COURT:  Overruled.

19          MS. MORENO:  You can answer.

20          VENIRE PERSON:  One time we were registering a

21    patient.  I was helping her apply for a government fund,

22    and the interpreter came along.  Although I speak Spanish,

23    I'm not allowed to interpret.  That's not my job unless a

24    patient is being registered.  So at this time the patient

25    was not being registered.  And I believe the interpreter

18:00 1   asked her a question and she answered and said -- Can I

2   speak Spanish?

3            THE COURT:  Sure.

4            VENIRE PERSON:  She was trying to say she's

5   bothering me in Spanish, and the interpreter said she was

6   molested.  And that's totally different.

7            MS. MORENO:  Let me tell you a little bit about

8   this case.  This is a case involving an American Muslim

9   charity, and this charity the government claims materially

10   supported a foreign terrorist organization called HAMAS.

11   Have you ever heard of HAMAS?

12            VENIRE PERSON:  No.

13            MS. MORENO:  Is there anything about what I just

14   said about terrorism-related charges that causes you

18:00 15   concern?  I don't think I want to be here?  Do any red

16   flags come up for you?

17            VENIRE PERSON:  Well, I know that's a very

18   important word, no.

19            MS. MORENO:  In any criminal case in this

20   country, the government has the burden of proof, and they

21   have to prove the case beyond every reasonable doubt.

22   Have you heard of that concept?

23            VENIRE PERSON:  I think I have before.

24            MS. MORENO:  In other words, if you have a

25   single reasonable doubt, you cannot vote guilty in a case.

18:00 1    Do you understand that?

2                VENIRE PERSON:  Yes.

3                MS. MORENO:  Do you think in a case involving

4    allegations of terrorism that burden of proof should be

5    less?  In other words, do you think, well, terrorism is a

6    serious charge.  Maybe if I just had one small reasonable

7    doubt I could still vote guilty.

8                VENIRE PERSON:  I guess I didn't understand your

9    question a hundred percent.

10               MS. MORENO:  In any case the government has the

11   burden of proof, and this proof means that they must take

12   away every single reasonable doubt that you as a juror

13   would have.  I'm asking you, do you think because this is

14   a case involving terrorism that they should have a

18:00 15   different burden of proof because the charges they say are

16   so serious?

17               VENIRE PERSON:  No.

18               THE COURT:  Ms. Moreno, your time has expired.

19   Mr. Garrett, do you have questions for Ms. Lopez?

20               MR. GARRETT:  Yes, your Honor.

21               MR. GARRETT:  Ms. Lopez, good morning.  My name

22   is Nathan Garrett, and I'm an Assistant United States

23   Attorney, and I'm one of the prosecutors representing the

24   government in this case.  I just have a few follow-up

25   questions for you.  Okay?  I look at your questionnaire,

18:00 1   and I know you filled it out sometime ago.  Is that

2   correct?

3            VENIRE PERSON:  Yes.

4            MR. GARRETT:  You are married?

5            VENIRE PERSON:  Yes.

6            MR. GARRETT:  And where does your husband work?

7            VENIRE PERSON:  Same company I work for, UT

8   Southwestern Medical Center.

9            MR. GARRETT:  And what does he do?

10            VENIRE PERSON:  He's a sheet metal worker.

11            MR. GARRETT:  And how long has he worked there

12   with you?

13            VENIRE PERSON:  Five years.

14            MR. GARRETT:  And you have worked there?

18:00 15            VENIRE PERSON:  Seven years next month.

16            MR. GARRETT:  What did you do before working

17   there?

18            VENIRE PERSON:  I previously worked for a bank,

19   and I have done also some bookkeeping-type services.

20            MR. GARRETT:  And I think you said you worked

21   for a bank in your questionnaire.  What did you do for the

22   bank?

23            VENIRE PERSON:  I was a teller.

24            MR. GARRETT:  And how long did you work for the

25   bank?

18:00 1     VENIRE PERSON:  It was less than a year.  From

2 January 1999 to December 1999.

3     MR. GARRETT:  And you have two small children;

4 is that right?

5     VENIRE PERSON:  Yes.

6     MR. GARRETT:  Six year old and one year old.

7     VENIRE PERSON:  Almost six, yes.  Five.

8     MR. GARRETT:  You both work.  So I'm assuming

9 you have some sort of care for them.

10     VENIRE PERSON:  Yes.

11     MR. GARRETT:  So that wouldn't present any kind

12 of problem for you in this case, correct?

13     VENIRE PERSON:  No, no problem.

14     MR. GARRETT:  You mentioned -- And I couldn't

18:00 15 make it out.  Number 14 question asked about civic or

16 social institutions that you are involved in and something

17 about your soccer team.

18     VENIRE PERSON:  Oh, yes, I'm a team mom.

19     MR. GARRETT:  I guess I can imagine.  Tell me

20 what a team mom is.

21     VENIRE PERSON:  I just help coach.  It's not an

22 assistant coach because I don't help with practice.  I

23 help the coach order uniforms and organize parties and our

24 soccer team.

25     MR. GARRETT:  That's your soccer team?

18:00 1          VENIRE PERSON:  No.  I have been with this coach

2     for a year.

3          MR. GARRETT:  Do you play?

4          VENIRE PERSON:  No, it's for my son.

5          MR. GARRETT:  You also marked that you had a

6     legal assistant certificate; is that right?

7          VENIRE PERSON:  Yes.

8          MR. GARRETT:  Can you tell me a little bit about

9     what that is?

10          VENIRE PERSON:  I went to technical school back

11     in 1988, and it took me six or seven months to finish the

12     course, and I graduated with a legal assistant.

13          VENIRE PERSON:  I have never worked as a legal

14     assistant.

18:00 15          MR. GARRETT:  But you have the certificate?

16          VENIRE PERSON:  Yes.

17          MR. GARRETT:  All right.  Fantastic.  In

18     response to Ms. Moreno's question about the translation

19     issue, you recounted an experience that you have had on

20     translation with Molestation translation.  What was the

21     Spanish word?

22          VENIRE PERSON:  Molesta.

23          MR. GARRETT:  You obviously speak English very

24     well.  If you were translating that would you say molested

25     or what would you say?

18:00 1          VENIRE PERSON:  No.  Bothering.  She didn't want

2     to bother her family members.

3          MR. GARRETT:  So from Spanish to English the

4     word is bother or disturb?

5          VENIRE PERSON:  Yes.

6          MR. GARRETT:  So that's a proper translation.  I

7     don't think you speak Arabic or Hebrew.

8          VENIRE PERSON:  No.

9          MR. GARRETT:  But I expect there will be

10    translations of those documents or audio tapes or

11    something.  There will be translations admitted in

12    evidence of those particular documents or tapes,

13    translations either from Arabic or Hebrew into English.

14    My question for you is, would you have any problem based

18:00 15   on your experience that you just recounted for us relying

16    on those translations of a language you don't speak?

17         VENIRE PERSON:  No.  If they are made by someone

18    that knows the language, no.

19         MR. GARRETT:  And also Ms. Moreno asked you

20    about reasonable doubt.  You understand by reasonable

21    doubt it's any reasonable doubt you have related to this

22    case.  You understand that?

23         VENIRE PERSON:  Yes.

24         MR. GARRETT:  But that's our burden that we have

25    to prove to you beyond a reasonable doubt with regard to

18:00  1    the evidence presented in this case.  Do you understand

2    that burden on us?

3              VENIRE PERSON:  Yes, I do.

4              MR. GARRETT:  I expect in this case there is

5    going to be evidence and allegations by the government

6    that these defendants knowingly supported a foreign

7    terrorist organization.  That organization is HAMAS.  Are

8    you familiar with the HAMAS organization?

9              VENIRE PERSON:  No, I'm not.

10             MR. GARRETT:  At the end of the case the judge

11   is going to give you instructions on the law, what the law

12   is.  You don't have to guess.  The facts as to the law,

13   that's all you.  But at the end he would give you

14   instructions on what the law is, and I expect there to be

18:00 15   allegations that these defendants sent money over to

16   organizations overseas that the government alleges -- and

17   we will ask you to find -- that the government alleges are

18   part of the HAMAS organization.  And I expect the Judge

19   will instruct you that money is one of those material

20   supports to a foreign terrorist organization.  But there

21   may be evidence that some of that money was used to buy

22   what you think of as humanitarian things like library

23   supplies or medical supplies or that sort of thing, and I

24   expect the Judge to tell you that even if you find there

25   were humanitarian items that went to the terrorist

18:00 1    organization, that is illegal.  Do you have a problem with

2    that?

3                    VENIRE PERSON:  No.

4                    MR. GARRETT:  Could you follow the law that even

5    if there were humanitarian items purchased with that money

6    that constitutes a violation?

7                    VENIRE PERSON:  Yes.

8                    MR. GARRETT:  Thank you very much for your time.

9                    THE COURT:  Ms. Lopez, we are talking to members

10   of the pool from which the jury will be selected in this

11   case, and I expect that process to continue for at least

12   another day or two, and when you leave here today, you

13   should not until you hear from us again talk about the

14   case or read about the case.  Thank you.  You may rejoin

18:00 15   the others in the hall.

16                    THE COURT:  Good morning, Mr. Gray.  Counsel

17   for the parties have some questions for you about this

18   case.

19                    MR. WESTFALL:  Thank you, your Honor.  Mr. Gray,

20   I'm Greg Westfall.

21                    VENIRE PERSON:  Good morning.

22                    MR. WESTFALL:  I'm one of the defense lawyers in

23   this case.  I am going to speak with you for just a few

24   minutes, and I expect someone from the government may want

25   to talk to you as well.  This case is the United States

18:00 1  versus the Holy Land Foundation for Relief and

2  Development. And what it is, is the United States is

3  alleging that several people who were working with the

4  Holy Land Foundation gave material support to a foreign

5  terrorist organization, specifically HAMAS. Now, are you

6  familiar with it?

7       VENIRE PERSON: Slightly, yes, sir.

8       MR. WESTFALL: Have you read any media accounts?

9       VENIRE PERSON: A few years ago I did.

10      MR. WESTFALL: Not recently.

11      VENIRE PERSON: No, sir.

12      MR. WESTFALL: Based upon anything you have

13  read, have you formed an opinion as to the guilt or

14  innocence of the defendants?

18:00 15      VENIRE PERSON: No, sir.

16      MR. WESTFALL: Where did you get your bachelor

17  of theology?

18      VENIRE PERSON: At Texas Institute and Seminary

19  in Henderson, Texas.

20      MR. WESTFALL: And what moved you to get a

21  bachelor of theology?

22      VENIRE PERSON: At the time I wanted to go into

23  full time ministry. I felt a lead to preach, and so I

24  went there, and then I pastored a couple of churches.

25      MR. WESTFALL: Rural churches or city churches?

18:00  1          VENIRE PERSON:  One was rural and then I moved

2     to Amarillo and pastored a church there.

3          MR. WESTFALL:  You have traveled to Latin

4     America a lot.  Was that mission trips?

5          VENIRE PERSON:  No, sir, just vacation.

6          MR. WESTFALL:  You just like Latin America?

7          VENIRE PERSON:  I like going to the beach.

8          MR. WESTFALL:  While you were in the seminary,

9     did you take any courses on comparing the three major

10    religions?

11         VENIRE PERSON:  No, sir, that school did not

12    offer comparative religions.

13         MR. WESTFALL:  Have you studied that on your

14    own?

18:00 15         VENIRE PERSON:  Yes, sir.

16         MR. WESTFALL:  Have you studied Islam at all?

17         VENIRE PERSON:  Yes, sir.

18         MR. WESTFALL:  I see you said on your

19    questionnaire you followed the Palestinian-Israeli

20    conflict very well.  Tell me about that.

21         VENIRE PERSON:  Growing up in a Christian home

22    we talked a lot about Palestine and Israel.  I also

23    started reading a lot outside of what I grew up with.  I

24    have bought various books.  I own a couple of the Koran.

25    I have read some of it, not all of it.  I have read a few

18:00 1    points other than the one I grew up with as far as trying

2    to get a wider understanding of what was going on.  I had

3    one side growing up, and I have tried to get a wider view

4    in the last ten years I would say.

5         MR. WESTFALL:  Would you say your view has

6    evolved?

7         VENIRE PERSON:  Somewhat.

8         MR. WESTFALL:  What do you think about the

9    Koran?

10        VENIRE PERSON:  I think it's a good book.  I

11   don't necessarily consider it inspired by God, but I

12   consider it a good book.

13        MR. WESTFALL:  When you think of a Muslim, what

14   do you think about?

18:00 15        VENIRE PERSON:  I think of a person who has a

16   belief in God and a way of following God that is different

17   from mine.

18        MR. WESTFALL:  And you know, we know about

19   terrorist attacks and things like that.  Do you see any

20   difference between someone who's a terrorist and some

21   who's a devoted Muslim?

22        VENIRE PERSON:  Yes, much like a Christian and

23   an extreme Christian who maybe blows up an abortion

24   clinics.  I think people may stray from the teachings of

25   their faith.

18:00  1          MR. WESTFALL:  Now, on the Israeli-Palestinian

    2     conflict, do you have an opinion as to who's right or

    3     wrong?

    4          VENIRE PERSON:  That's a good question.  That's

    5     one of the issues I have been struggling with the last ten

    6     years or so.  I used to be a strong supporter of Israel,

    7     and I have since moderated my view and think both sides

    8     have issues that need to be discussed.  It's a lot more

    9     complex than I thought it was.

   10          MR. WESTFALL:  Are you still studying fairly

   11     closely?

   12          VENIRE PERSON:  Fairly closely, yes.

   13          MR. WESTFALL:  You were in the TSA for a period

   14     of time?

18:00 15          VENIRE PERSON:  Yes.

   16          MR. WESTFALL:  What did you do?

   17          VENIRE PERSON:  I screened passengers and bags.

   18          MR. WESTFALL:  So you did the check in?

   19          VENIRE PERSON:  Yes, the screening.

   20          MR. WESTFALL:  Why did you leave?

   21          VENIRE PERSON:  I was discharged.  I came to

   22     work after a night of drinking and had alcohol on my

   23     breath.  Zero tolerance in the TSA.  So I was discharged.

   24          MR. WESTFALL:  Did you undergo any terrorism

   25     training or anything like that with the TSA?

18:00  1          VENIRE PERSON:  As far as -- Basically how to

2     recognize IED's in X rays and think like that.

3          MR. WESTFALL:  As you go through life in the

4     United States, are you afraid of terrorist attacks?

5          VENIRE PERSON:  Not necessarily, no, sir.  I

6     think there is always a possibility.

7          MR. WESTFALL:  But you don't live in fear day

8     after day after day?

9          VENIRE PERSON:  No, sir.

10          MR. WESTFALL:  Looking inside yourself, only you

11     can know, we're looking at a case that has something to do

12     with terrorism.  Do you think you could fairly and

13     impartially look at the evidence and give the defendants a

14     fair trial?

18:00 15          VENIRE PERSON:  I believe I could.

16          MR. WESTFALL:  One more question.  What does a

17     score reader do?

18          VENIRE PERSON:  I score and read essays on the

19     SAT college entrance exam.  I read essays from students

20     around the world.  I have to ascribe a score to that based

21     upon the mechanics of the paper, not necessarily the

22     content.

23          MR. WESTFALL:  No, that is a position of power.

24          VENIRE PERSON:  Yes, sir.

25          MR. WESTFALL:  I now feel humbled.  How long

18:00 1    have you been doing that?

2              VENIRE PERSON:  Two years.  It's a contract job,

3    and only when there is testing going on do I work.  And I

4    work from my home.

5              MR. WESTFALL:  Mr. Gray, thank you so much for

6    speaking with me.

7              THE COURT:  Mr. Garrett, do you have questions

8    for Mr. Gray?

9              MR. GARRETT:  Just a couple, your Honor.  Thank

10   you.

11             Mr. Gray, good morning.

12             VENIRE PERSON:  Good morning.

13             MR. GARRETT:  My name is Nathan Garrett, and I'm

14   an Assistant United States Attorney.  One of the

18:00 15   prosecutors representing the government in this case.  I

16   have a follow-up question for you, and I apologize if I'm

17   repetitive.  As I'm writing something down I may have

18   missed one of Mr. Westfall's questions.  I apologize for

19   that.  You are married?

20             VENIRE PERSON:  Yes, sir.

21             MR. GARRETT:  And your wife, does she work

22   outside the home?

23             VENIRE PERSON:  Yes.

24             MR. GARRETT:  What does she do?

25             VENIRE PERSON:  She's a registered nurse.

18:00 1                    MR. GARRETT:  And where does she practice?

2                    VENIRE PERSON:  Children's Medical Center.

3                    MR. WESTFALL:  Does she have a special

4         discipline?

5                    VENIRE PERSON:  Psychiatry.

6                    MR. GARRETT:  And you are unemployed right now?

7                    VENIRE PERSON:  Yes, we are not grading right

8         now.

9                    MR. GARRETT:  So that's episodic?

10                    VENIRE PERSON:  Like from June through October I

11        don't work.  I have to find other temporary work, and then

12        in October it starts up again.

13                    MR. GARRETT:  You are back to having children's

14        lives in your hands, right?

18:00 15                    VENIRE PERSON:  Pretty much.

16                    MR. GARRETT:  And during that period of time you

17        said you find other things to do.

18                    VENIRE PERSON:  Yes.

19                    MR. GARRETT:  What other things do you pick up

20        during those times?

21                    VENIRE PERSON:  Warehouse work, whatever general

22        things I can find like through a temporary service.

23                    MR. GARRETT:  What sort of things do those

24        include?

25                    VENIRE PERSON:  Most of it winds up being

18:00 1    warehouse work, packing, loading, preparing things for

2    shipment.  That's pretty much how it's been.

3              MR. GARRETT:  Now, from your questionnaire, you

4    have two children.

5              VENIRE PERSON:  Right.

6              MR. GARRETT:  Twenty-two and nineteen.

7              VENIRE PERSON:  Yes, sir.

8              MR. GARRETT:  Are they in the home or out of the

9    home?

10             VENIRE PERSON:  The nineteen year is in the

11   home, and the twenty-two lives in North Carolina.

12             MR. GARRETT:  Where in North Carolina?

13             VENIRE PERSON:  Asheville.

14             MR. GARRETT:  I looked at your questionnaire,

18:00 15   and you said you were in the U.S. Navy.  Is that right?

16             VENIRE PERSON:  Yes, sir.

17             MR. GARRETT:  How long were you in the Navy?

18             VENIRE PERSON:  About eight weeks.

19             MR. GARRETT:  That's a short tour.  Enjoyed all

20   you could stand?

21             VENIRE PERSON:  Until I had an asthma attack.

22             MR. GARRETT:  So it was a medical discharge.  I

23   guess honorable is how they described it but a medical

24   discharge?

25             VENIRE PERSON:  Yes, sir.

18:00  1          MR. GARRETT:  And that was when?

       2          VENIRE PERSON:  1981.

       3          MR. GARRETT:  No, Mr. Westfall asked you about

       4  your following of the Middle East issue and the

       5  Palestinian issue.  Are you able to take your experience

       6  and knowledge about that issue and set that aside and

       7  judge this case based solely on the evidence that Court

       8  admits in this case?  Are you able to do that?

       9          VENIRE PERSON:  Yes.

      10          MR. GARRETT:  You also mentioned on your

      11  questionnaire that you had prior jury service on a civil

      12  jury.  Is that right?

      13          VENIRE PERSON:  Yes.

      14          MR. GARRETT:  And that was a wrongful

18:00 15  termination or something like that?

      16          VENIRE PERSON:  Yes, sir.

      17          MR. GARRETT:  Were you all able to reach a

      18  verdict in that case?

      19          VENIRE PERSON:  Yes, sir.

      20          MR. GARRETT:  Is that the only jury that you

      21  have served on?

      22          VENIRE PERSON:  Yes, sir.

      23          MR. GARRETT:  Have you been called down to jury,

      24  either at the county level or federal level before, in a

      25  big jury pool like you are now?

18:00 1          VENIRE PERSON:  No, not since I have been in

2     Dallas.

3          MR. GARRETT:  How long have you been in Dallas?

4          VENIRE PERSON:  Five years.

5          MR. GARRETT:  And before Dallas?

6          VENIRE PERSON:  In Midland, Texas.

7          MR. GARRETT:  What brought you to Dallas

8     originally?

9          VENIRE PERSON:  To get married.

10          MR. GARRETT:  Great.  You mentioned that you

11    were with the TSA for a period of time, and you were

12    excused based on some of those issues.

13          VENIRE PERSON:  Yes.

14          MR. GARRETT:  I notice there were other legal

18:00 15   matters regarding those issues.  And we will ask you do

16    you feel like you were treated fairly in those other legal

17    matters that involved that same issue.

18          VENIRE PERSON:  Yes, sir, I do.

19          MR. GARRETT:  Is there anything about -- Both

20    sides in this case, we're all after the same juror, and

21    that is a fair and impartial juror.  Is there anything

22    about that experience that would affect your ability for

23    either side to be able to sit and fairly judge the

24    evidence in this case?

25          VENIRE PERSON:  Not that I can think of.  I kind

18:00 1     of take the blame for that on myself.

2           MR. GARRETT:  And nothing about your prior civil

3     jury service that would affect or impair you in any way to

4     be able to handle this case?

5           VENIRE PERSON:  I don't believe so, no.

6           MR. GARRETT:  One moment, your Honor.

7           THE COURT:  Yes, sir.

8           MR. GARRETT:  Judge, may we approach?

9           THE COURT:  All right.

10           MR. GARRETT:  Judge, I have a concern about the

11     alcohol issue.  He said he was let go because of alcohol,

12     coming to work with it on his breath.  He has a pending

13     DWI right now which sends me the message there may be a

14     recurring alcohol problem.  I don't think any of us want a

18:00 15     juror who may have an alcohol problem, and I don't want to

16     ask him about that in open court.  Perhaps to bring him

17     either to a closed session or side bar or something.  I

18     don't want to embarrass him.  But I do think it's

19     important to all sides to find out whether he's in

20     treatment or something that may impair his ability to sit

21     in the jury four months.  That's my concern.  I don't

22     really have a good solution.

23           THE COURT:  Anybody else have any views?

24           MR. WESTFALL:  I don't share those concerns,

25     your Honor.

18:00 1          THE COURT:  You said you do not?

2          MR. WESTFALL:  I don't.  It sounds to me as

3     though he is either in recovery or trying real hard to be

4     in recovery.  He's very serious about his church, and he

5     actually said that was my fault, my responsibility.  He

6     has taken responsibility for everything.  It sounds to me,

7     your Honor, like he's in recovery.

8          THE COURT:  Well, if you don't share Mr.

9     Garrett's concerns, I'm not going to have a sidebar.

10          MR. GARRETT:  Okay.

11          THE COURT:  Mr. Gray, we're still in the process

12     of choosing jurors from among this pool.  So you should

13     not discuss the case with anyone or read about the case or

14     listen to any radio reports.  Thank you.  You may rejoin

18:00 15     the others in the hall.

16          Ladies and Gentlemen, let's take a

17     fifteen-minute recess at this point.

18          (Recess)

19          MR. GARRETT:  Your Honor, before we bring in the

20     next juror, the government would move for cause against

21     Mr. Gray.  The basis of that request, your Honor, is the

22     alcohol issue, and Mr. Gray on his questionnaire noted

23     that he had a past DWI, that he had a current pending

24     charge of DWI, he was let go from his job at TSA -- which

25     I'm surmising was a good job for him -- because he showed

18:00 1  up at work with alcohol on his breath.  He has all the

2  telltale signs of someone who has an alcohol problem.

3  This is a case that we all know is expected to go some

4  length, and he's unemployed, doesn't have steady

5  employment.  All the warning signs are there, and the

6  government is greatly concerned that Mr. Gray's apparent

7  problem with alcohol may interfere -- based on the

8  questionnaire and his answers may interfere with his

9  ability to sit and concentrate on the matters at trial.

10  So the government moves for cause to dismiss Mr. Gray.

11         THE COURT:  Mr. Westfall, I assume from your

12  remarks at the Bench that you are opposed to that.

13         MR. WESTFALL:  I am, your Honor.  People who are

14  hopeless alcoholics recover every day through religion or

18:00 15  Alcoholics Anonymous.  He appeared to be taking personal

16  responsibility for his situation, and there is not a

17  record to support this man is going to be drinking during

18  jury service, your Honor.

19         THE COURT:  As I did with some of these

20  challenges for cause, I will take this one under

21  advisement for the moment.  I think we're ready to see

22  next Ms. Cynthia Williams.

23         Good morning, Ms. Williams.  Counsel for the

24  parties in this case have some questions they would like

25  to ask you.

18:00 1          MR. WESTFALL:  Ms. Williams, I'm Greg Westfall.

     2     I'm one of the defense lawyers in this case.  I am going

     3     to speak with you a little bit, and I imagine the

     4     government is going to speak with you a little bit.  Okay?

     5          VENIRE PERSON:  Okay.

     6          MR. WESTFALL:  This is the case of United States

     7     versus Holy Land Foundation, have you heard of the name?

     8          VENIRE PERSON:  No.

     9          MR. WESTFALL:  It involves -- It involves

    10     allegations by the government that the Holy Land

    11     Foundation and some of the men involved in the Holy Land

    12     Foundation gave material support to a foreign terrorist

    13     organization, that being HAMAS.  With that additional

    14     information, do you know anything about the case?  Have

18:00 15     you heard anything at all?

    16          VENIRE PERSON:  I may have heard something, but

    17     I don't recall.  It's just right over my head.  I don't

    18     know.

    19          MR. WESTFALL:  So I guess it's safe to assume

    20     that you haven't made up your mind one way or the other on

    21     it?

    22          VENIRE PERSON:  No.

    23          MR. WESTFALL:  Let me ask you real fast about

    24     something you put in your questionnaire.  That's diabetes

    25     and vision problems.  You mentioned that in your

18:00  1    questionnaire.  So I want to talk to you real briefly

2    about it.  Is that something that you feel like could

3    impair your jury service?

4              VENIRE PERSON:  No.

5              MR. WESTFALL:  Over a four-month period of time,

6    you are okay with that?

7              VENIRE PERSON:  Yes.

8              MR. WESTFALL:  All right.  How do you feel about

9    being a juror in a case that has anything to do with

10    terrorism?

11              VENIRE PERSON:  How do I feel?

12              MS. CADEDDU:  Yes, ma'am.

13              VENIRE PERSON:  Well, as an American citizen if

14    I'm called upon to serve, I will serve.

18:00 15              MR. WESTFALL:  Do you know any people who are

16    Muslim?

17              VENIRE PERSON:  No.

18              MR. WESTFALL:  Have you had any bad experiences

19    with people who are Muslim?

20              VENIRE PERSON:  No.

21              MR. WESTFALL:  Any good experiences?

22              VENIRE PERSON:  No.

23              MR. WESTFALL:  You know this is a case where

24    we're talking about Muslim men who are charged with this?

25              VENIRE PERSON:  Okay.

18:00 1              MR. WESTFALL:  How do you feel about that?

2              VENIRE PERSON:  I don't have any preconceived

3    notions one way or the other.

4              MR. WESTFALL:  Your brother was a police

5    officer.

6              VENIRE PERSON:  Yes.

7              MR. WESTFALL:  Is he retired now?

8              VENIRE PERSON:  Yes, he's deceased.

9              MR. WESTFALL:  Was he with the Dallas PD?

10              VENIRE PERSON:  No.  Actually he lived in

11   Pennsylvania.

12              MR. WESTFALL:  How long was he a police officer?

13              VENIRE PERSON:  He retired as a policeman.  He

14   was in the army for eighteen years and then another

18:00 15   eighteen years.  So.

16              MR. WESTFALL:  Lifetime service?

17              VENIRE PERSON:  Yes.

18              MR. WESTFALL:  On the questionnaire, you may not

19   remember doing it, but it says police officers, law

20   enforcement personnel, FBI agents have to be judged the

21   same way in a court of law as any other person whether

22   that be an expert or just a man off the street.  It was

23   just a check mark, but you made a check mark saying you

24   would have trouble following that instruction.

25              VENIRE PERSON:  (No response)

18:00 1          MR. WESTFALL:  Sounds like you didn't mean to.

      2          VENIRE PERSON:  I didn't mean to.

      3          MR. WESTFALL:  So you don't have a problem?

      4          VENIRE PERSON:  None whatsoever.

      5          MR. WESTFALL:  Interestingly, in your

      6    questionnaire you said you followed the

      7    Palestinian-Israeli conflict somewhat closely.

      8          VENIRE PERSON:  Yes.

      9          MR. WESTFALL:  But you didn't put any comments

     10    on that.  So what did you mean by that?

     11          VENIRE PERSON:  I'm interested in what's going

     12    on in my country.  So I like to watch the news and see

     13    what's happening, where we are going with this war.  I

     14    want it to end.  I want our men home.  So therefore that's

18:00 15    why I follow what's happening there.

     16          MR. WESTFALL:  How do you feel about the

     17    Palestinian-Israeli issue?

     18          VENIRE PERSON:  I think we should let them

     19    settle their dispute.  I think the United States -- We

     20    should bring our young men home.

     21          MR. WESTFALL:  Have you known any young men that

     22    have been in this war?

     23          VENIRE PERSON:  No.

     24          MR. WESTFALL:  Have you heard of HAMAS?

     25          VENIRE PERSON:  Yes.

18:00  1            MR. WESTFALL:  Do you know where they operate?

       2            VENIRE PERSON:  Yes.

       3            MR. WESTFALL:  Palestine?

       4            VENIRE PERSON:  Yes.

       5            MR. WESTFALL:  In looking at the situation over

       6    there and the Middle East in general but specifically in

       7    the Israli-Palestine territories, have you come to an

       8    opinion or do you have a sense of who is right and who's

       9    wrong in that?

      10            VENIRE PERSON:  I really don't know.  I don't

      11    know.

      12            That war has been going on since the beginning

      13    of time as far as I'm concerned.  So I don't know.

      14            MR. WESTFALL:  Are you inclined to look into it

18:00 15    more, buy books or maps or something like that to follow

      16    along with?

      17            VENIRE PERSON:  Occasionally.  I do own a PC.

      18    So occasionally I do try to check some information out.

      19            MR. WESTFALL:  Do you go to church?

      20            VENIRE PERSON:  Yes.

      21            MR. WESTFALL:  What is your church's position on

      22    who's right or wrong?

      23            VENIRE PERSON:  My church does not take a

      24    position on who's right or wrong.

      25            MR. WESTFALL:  Do you do any other volunteer

18:00 1   work with your church or otherwise?

2       VENIRE PERSON:  I do volunteer work in a shelter

3   that my church supports.

4       MR. WESTFALL:  Is this a family shelter,

5   homeless shelter?

6       VENIRE PERSON:  Yes.

7       MR. WESTFALL:  How do you feel about charity?

8       VENIRE PERSON:  I feel strongly about it.  I

9   support charity.  Personally, I give to charities.

10   Through my company, I make contributions to charity.  So

11   I'm in support of charities.

12       MR. WESTFALL:  Well, at the end of the day in

13   this case what it may come down to is a charity gave what

14   would otherwise be considered charity.  But the issue is

18:00 15   did they do that with the intent to support HAMAS.  So it

16   would be the intent, yes or no.  Do you see what I mean?

17   Like for instance we send --

18       THE COURT:  Mr. Westfall, your time has expired.

19       MR. WESTFALL:  Thank you, your Honor.

20       THE COURT:  Mr. Garrett, do you have questions

21   for Ms. Williams?

22       MR. GARRETT:  Good morning, Ms. Williams.

23       VENIRE PERSON:  Good morning.

24       MR. GARRETT:  My name is Nathan Garrett and I'm

25   an Assistant United States Attorney in the United States

18:00  1    Attorney's Office, and I'm one of the prosecutors in this

2    case for the government.

3            I just have a few questions to follow-up some of

4    what Mr. Westfall said and some new.  You stated that you

5    are married.  Is that correct?

6            VENIRE PERSON:  I am married, yes.

7            MR. GARRETT:  And does your husband work?

8            VENIRE PERSON:  He's retired a couple of years

9    ago.

10            MR. GARRETT:  Good for him.

11            VENIRE PERSON:  Yes.

12            MR. GARRETT:  Maybe not so good for you, but

13    good for him.  What did he do before he retired, ma'am?

14            VENIRE PERSON:  He was a switch technician for

18:00  15    Verizon.

16            MR. GARRETT:  How long did he work for Verizon?

17            VENIRE PERSON:  Thirty-six years.

18            MR. GARRETT:  Now, you marked that you lived

19    here in the area for forty-seven years.  Is that right?

20            VENIRE PERSON:  Yes.

21            MR. GARRETT:  Has that all been right here in

22    the Dallas region?

23            VENIRE PERSON:  Yes.

24            MR. GARRETT:  And you have looks like by your

25    questionnaire you have three children.

18:00  1            VENIRE PERSON:  Yes, I do.

       2            MR. GARRETT:  Thirty-seven, thirty-four and

       3     twenty-five, correct?

       4            VENIRE PERSON:  Correct.

       5            MR. GARRETT:  Are they out of the nest now?

       6            VENIRE PERSON:  Yes, thank goodness.

       7            MR. GARRETT:  But now you have your husband is

       8     back?

       9            VENIRE PERSON:  Yes.

      10            MR. GARRETT:  You mentioned on your

      11     questionnaire also that you had prior jury service.

      12            VENIRE PERSON:  Yes.

      13            MR. GARRETT:  But you couldn't remember exactly

      14     what it was.

18:00 15            VENIRE PERSON:  I can't remember the years going

      16     back because I have been a juror for many years off and

      17     on.

      18            MR. GARRETT:  So you have actually had the great

      19     pleasure of sitting on cases, several cases?

      20            VENIRE PERSON:  Yes.

      21            MR. GARRETT:  Has that been -- Have those been

      22     federal cases or state cases or some combination?

      23            VENIRE PERSON:  A combination of civil and

      24     criminal.

      25            MR. GARRETT:  Have those all been --

18:00 1                    VENIRE PERSON:  State.

2                    THE DEFENDANT:  Down at the state.  Okay.

3        Approximately how many do you think you have served on?

4                    VENIRE PERSON:  I'm thinking over the years

5        probably four.

6                    MR. GARRETT:  And on the criminal cases, you

7        were being collectively -- your jury able to reach a

8        verdict in those cases?

9                    VENIRE PERSON:  Yes, sir.

10                   MR. GARRETT:  You mentioned also on your

11       questionnaire that your son had been arrested.

12                   VENIRE PERSON:  Yes.

13                   MR. GARRETT:  And I'm sorry to ask about these

14       sorts of things.  They are just things I have to ask

18:00 15 about.  Okay?  What was he arrested for?

16                   VENIRE PERSON:  Unfortunately, he was at a party

17       where they were making a lot of noise, and the neighbors

18       called the police, and when they got there, they found

19       marijuana.  So they took them all down.

20                   MR. GARRETT:  Is that something that's pending

21       right now?

22                   VENIRE PERSON:  No.  They no billed it or

23       dismissed it, threw it out or whatever.

24                   MR. GARRETT:  So that's gone?

25                   VENIRE PERSON:  Yes, this has been three years

18:00 1    ago.

2              MR. GARRETT:  Is there anything about your

3    experience in dealing with that situation that would

4    affect your ability to serve in this case either for or

5    against the government or the defendants in this case?

6              VENIRE PERSON:  Absolutely not.

7              MR. GARRETT:  Do you feel like your son was

8    treated fairly at the end of the day in that proceeding?

9              VENIRE PERSON:  Yes, I do.

10             MR. GARRETT:  Mr. Westfall asked you about your

11   feelings about charity.  I think we all agree that charity

12   is a good thing.

13             VENIRE PERSON:  Yes.

14             MR. GARRETT:  He also told you the allegations

18:00 15   in this case involve material support to a foreign

16   terrorist organization.  The Judge will instruct you at

17   the end of the case what a foreign terrorist organization

18   is.  In this case it's HAMAS.  He would give you

19   instructions on that.  My question focuses on the

20   materials side of that.  I expect there will be evidence

21   of money that the government alleges was sent in support

22   of this foreign terrorist organization, HAMAS, and I

23   expect the Judge will tell that you money is material

24   support within the law.  I also suspect there may be some

25   evidence that that money once it's overseas was allegedly

18:00 1  spent on what we think of as charitable things -- library

2  supplies, medical supplies and that sort of thing.  In

3  that regard, I expect the Court to instruct you even if

4  you find that money was spent on what apparently were

5  charitable things, if it was for or to the benefit of a

6  foreign terrorist organization, that, too, is against the

7  law.  If it fits within material support which is cash but

8  also these charitable items, if you so find, that's all a

9  violation of law.  So I would ask you given your answer

10  about charity, what's your reaction to those instructions

11  that even charity if it's to the benefit of a foreign

12  terrorist organization is against the law.

13          VENIRE PERSON:  If it's not used for charity,

14  it's against the law.

18:00 15          MR. GARRETT:  But what if his instruction is

16  even if you find or believe some of this money was spent

17  for charitable items -- library supplies, medical

18  supplies, even if you so find, I expect the instruction to

19  be that, too, is material support and a violation of law,

20  if you find it was to or for the benefit of a terrorist

21  organization.  Would you have trouble following that

22  instruction if you find it was charitable items?

23          VENIRE PERSON:  I wouldn't have any problem at

24  all.

25          MR. GARRETT:  Thank you.  No more questions,

18:00 1    your Honor.

2                THE COURT:  Ms. Williams, we're in the process

3    of talking with people in the pool from which the jury

4    will be selected that will hear this case.  I expect this

5    process will go on for another day or two at least.  So

6    until you hear from us again, you should not discuss this

7    case with anyone or allow anyone to discuss it with you.

8    Nor should you read or watch or listen to any media

9    accounts about the case.  Thank you.  You may rejoin the

10   others in the hall.

11               Good morning, Ms. Williams.  Counsel for the

12   parties in this case have some questions they would like

13   to ask you.  Mr. Westfall.

14               MR. WESTFALL:  Thank you, your Honor.  Ms.

18:00 15   Williams, I'm Greg Westfall.  I'm one of the defense

16   lawyers in this case, and I'll talk with you for a few

17   minutes, and then the government will talk to you as well.

18               VENIRE PERSON:  Okay.

19               MR. WESTFALL:  This case is the United States

20   versus the Holy Land Foundation, and it involves

21   allegations by the government that the Holy Land

22   Foundation and some of the men who work with the Holy Land

23   Foundation were giving material support to a foreign

24   terrorist organization, and that is specifically HAMAS.

25   After hearing that, does this ring any bells with you?

18:00  1    Have you heard of the case before?

       2                VENIRE PERSON:  I have just heard of the Holy

       3    Land Foundation, but I haven't heard any of the details.

       4                MR. WESTFALL:  What have you heard about the

       5    Holy Land Foundation?

       6                VENIRE PERSON:  They were suspected.  That's all

       7    I know.

       8                MR. WESTFALL:  How long ago did you hear that?

       9                VENIRE PERSON:  It must have been at least three

      10    or four months ago.

      11                MR. WESTFALL:  Based upon anything that you have

      12    heard, have you formed an opinion as to the guilt or

      13    innocence of the defendants?

      14                VENIRE PERSON:  No, I haven't.

18:00 15                MR. WESTFALL:  You say you were born in

      16    Gibraltar.

      17                VENIRE PERSON:  Yes, sir.

      18                MR. WESTFALL:  Was your dad in the military?

      19                VENIRE PERSON:  Construction.  He worked for

      20    Fluer Corporation.

      21                MR. WESTFALL:  I don't know what that is.

      22                VENIRE PERSON:  It was an oil company.  They

      23    built -- I guess helped build the oil wells in Saudi

      24    Arabia back in the 50's.

      25                MR. WESTFALL:  You weren't around in the 50's?

18:00 1          VENIRE PERSON:  No.  I was born in 58, but too

2      young to know anything.

3          MR. WESTFALL:  Did you travel with him in the

4      Middle East or was it just in the 50's?

5          VENIRE PERSON:  Just in the 50's.  When we got

6      older we traveled to like Germany, Puerto Rico, but no

7      Middle East.  Mom and dad did the Middle East before they

8      had me and my brother.

9          MR. WESTFALL:  Have you ever known any people

10      who practice the Islamic faith or Muslims?

11          VENIRE PERSON:  No, sir.

12          MR. WESTFALL:  Did your dad ever speak of

13      Muslims when you were growing up?

14          VENIRE PERSON:  If he did, I don't remember.

18:00 15      But I don't think he did.

16          MR. WESTFALL:  This case, as you know, involves

17      Muslims who are charged with terrorism.

18          VENIRE PERSON:  Yes.

19          MR. WESTFALL:  How do you feel about being on a

20      jury that involves those circumstances?

21          VENIRE PERSON:  I would have to hear the

22      evidence and see what happens from there.  I don't really

23      have an opinion on -- Everybody has their religion and

24      philosophies, and I feel like that's their prerogative.

25          MR. WESTFALL:  Have you ever looked into Islam

18:00 1   at all?

2           VENIRE PERSON:  No, sir.

3           MR. WESTFALL:  Ever had it discussed in your

4   church?

5           VENIRE PERSON:  No, sir.

6           MR. WESTFALL:  Attend church regularly?

7           VENIRE PERSON:  No, sir.

8           MR. WESTFALL:  Have you ever kept up with the

9   whole Israel-Palestinian conflict?

10           VENIRE PERSON:  No, sir.

11           MR. WESTFALL:  You don't have any opinions about

12   who's right or wrong over there?

13           VENIRE PERSON:  Not really.  I just know a lot

14   of innocent people are getting killed, and it doesn't

18:00 15   matter what side is doing it.  It's just a lot of innocent

16   people are hurting because of it.

17           MR. WESTFALL:  What do you think would be the

18   solution?

19           VENIRE PERSON:  I really don't know, to be

20   honest with you.  I wish everybody could get along, live

21   in peace.

22           MR. WESTFALL:  Do you do any volunteer work?

23           VENIRE PERSON:  No.

24           MR. WESTFALL:  Have you ever?

25           VENIRE PERSON:  Not since I moved to Waxahachie.

18:00 1    I might have done some volunteer work when I was in high

2    school just helping get like concession stand and stuff

3    for football.

4            MR. WESTFALL:  You have lived in Waxahachie for

5    quite a while?

6            VENIRE PERSON:  Yes, sir, since 1992.

7            MR. WESTFALL:  Are you in the town or away from

8    it?

9            VENIRE PERSON:  I'm in the town and away from

10    it.  I live right down from 35.

11            MR. WESTFALL:  What do you like about

12    Waxahachie?

13            VENIRE PERSON:  I'm getting to know a lot of

14    people there because of where I work at, and a lot of

18:00 15    people are really nice.  It's still got a small town

16    feeling.  Everybody seems to know everybody, and they seem

17    to help each other out when it needs to be done.

18            MR. WESTFALL:  Would it be any kind of a

19    hardship to drive from here to Waxahachie each day?

20            VENIRE PERSON:  No, sir.

21            MR. WESTFALL:  Do you have any questions of me?

22            VENIRE PERSON:  No, just nervous.

23            MR. WESTFALL:  I understand.  Thank you.

24            THE COURT:  Mr. Garrett, do you have questions

25    for Ms. Williams?

18:00 1          MR. GARRETT:  Thank you, your Honor.  Ms.

2   Williams, good morning.  My name is Nathan Garrett, and

3   I'm an Assistant United States Attorney, and I'm one of

4   the prosecutors in this case, and I have a few questions

5   to follow-up, and so I may be repetitive of Mr. Westfall.

6   So forgive me for that.  You have been in Waxahachie I

7   think for seventeen years.  Is that right?

8          VENIRE PERSON:  I believe so, yes, sir.

9          MR. GARRETT:  And I know you were born in

10   Gibraltar, but before Waxahachie where did you live?

11          VENIRE PERSON:  Down in Lake Jackson which is

12   where Dow Chemical is.

13          MR. GARRETT:  How long did you live in Lake

14   Jackson?

18:00 15          VENIRE PERSON:  I lived in Lake Jackson in

16   Angleton since 1977.  I'm sorry.  1975.  I graduated

17   Angleton in 1977.  I lived there -- Angleton and Lake

18   Jackson were basically about fifteen miles apart from each

19   other.  So since 1975.

20          MR. GARRETT:  What brought you to Waxahachie?

21          VENIRE PERSON:  My husband got a job up here.

22   He got laid off on the job down at Lake Jackson, and he

23   came up here because his parents were up here, and so I

24   came up here with him.

25          MR. GARRETT:  Great.  Does he work in Dallas or

18:00  1    Waxahachie?

2              VENIRE PERSON:  He doesn't work anymore.  He's

3        disabled.

4              MR. GARRETT:  And you said you live right

5        outside of Waxahachie.

6              VENIRE PERSON:  It's considered Waxahachie city

7        limits, but I live about five miles from Interstate 35.

8              MR. GARRETT:  What did your husband do before

9        his retirement?

10             VENIRE PERSON:  He did the cryogenics.  He fixed

11       machines that would turn oxygen and nitrogen into liquid.

12             MR. GARRETT:  Now, you didn't mark one way or

13       the other on children.  Do you have any children?

14             VENIRE PERSON:  No children.

18:00 15             MR. GARRETT:  You also marked that you had a

16       brother who had been involved in some allegations of drug

17       possession.  Is that right?

18             VENIRE PERSON:  Yes, I want to say that was back

19       in 1975, 1976, but he has cleaned himself up, and he lives

20       in California now.  He is definitely turned himself

21       around.

22             MR. GARRETT:  Good.  I know that was a long time

23       ago, but is there anything about that experience for you

24       that would affect your ability to sit impartially in this

25       case?

18:00 1          VENIRE PERSON:  Not really.  My brother made a

2     mistake.  He did his time.

3          MR. GARRETT:  Do you feel like your brother was

4     treated fairly at the end of the day?

5          VENIRE PERSON:  Yes, I do.

6          MR. GARRETT:  As Mr. Westfall said, this case

7     involves allegations that these defendants and their

8     corporation provided material support to a foreign

9     terrorist organization.  That foreign terrorist

10    organization is HAMAS.  I want to ask you just about the

11    material support of that.

12         VENIRE PERSON:  Okay.

13         MR. GARRETT:  At the end of the case when you

14    are given all the evidence and asked to go back and

18:00 15    deliberate about this -- Have you served on a jury before?

16         VENIRE PERSON:  No, sir.  This is my first one,

17    on one explaining the situation to me.  I have never done

18    it before.

19         MR. GARRETT:  You have never sat on a jury

20    before?

21         VENIRE PERSON:  Never.

22         MR. GARRETT:  Well, I'm sorry.  At the end of

23    the case, the Judge will give you what are called

24    instructions, and those instructions will tell you what

25    the law is on this case.  You don't have to wonder what

18:00 1    the law is.  He will have to fill that plate.  But you

2    will take the facts and apply that to the law he has given

3    you.

4              VENIRE PERSON:  Okay.

5              MR. GARRETT:  And on the issue of material

6    support, I expect he would give you instructions on what

7    the law says material support includes.  And part of those

8    instructions will be funds, money.  And I expect that you

9    will hear evidence alleging that these defendants sent

10   money over to this foreign terrorist organization.  Those

11   are allegations, and you have to find those beyond a

12   reasonable doubt, but there may also be evidence that

13   those funds when they went over there may have been spent

14   in part on what you would think of as humanitarian items

18:00 15   like library supplies, school supplies, medical equipment,

16   that sort of stuff.

17             VENIRE PERSON:  Yes, sir.

18             MR. GARRETT:  I expect the Court will instruct

19   you again that money is material support and can't go.

20   But even if you find that money may have been spent on so

21   called humanitarian items, if it was to or for the benefit

22   of the foreign terrorist organization, that's against the

23   law.  What is your reaction to that instruction?

24             VENIRE PERSON:  I would just have to hear the

25   instruction and the evidence and hopefully make the right

18:00  1    decision.

2          MR. GARRETT:  Let me ask it this way.  Could you

3    follow the Court's instruction that even if you found the

4    money was spent on charitable items, if it went to or for

5    the benefit of a foreign terrorist organization that's

6    against the law.  Could you find those charitable items

7    were a violation of the law assuming the government proved

8    it beyond a reasonable doubt?

9          VENIRE PERSON:  Yes, sir.

10          MR. GARRETT:  Thank you for your time.

11          THE COURT:  Ms. Williams, we're in the process

12    of talking to members of the pool from which the jury will

13    be selected in this case.  I expect the process to go on

14    for another day or two.  So until you hear from us again,

18:00 15  you should not discuss the case or allow anyone to discuss

16    it with you.  Nor should you read or watch or listen to

17    any media reports about this case, if there are any.

18    Thank you.  You may rejoin the others in the hall.

19          Good morning, Mr. Olguin.  Counsel for the

20    parties have some questions they would like to ask you

21    about this case.

22          MR. WESTFALL:  Thank you, your Honor.

23          Mr. Olguin, I'm Greg Westfall.  How are you

24    doing?

25          VENIRE PERSON:  Just fine.

18:00 1          MR. WESTFALL:  I'm one of the defense lawyers on

2     this case.  I'll talk to you a few minutes, and then the

3     government may want to get up and have words with you

4     about the case.  Okay?

5          VENIRE PERSON:  Yes, sir.

6          MR. WESTFALL:  This case is United States versus

7     Holy Land Foundation and several of the men who work with

8     the Holy Land Foundation, and the allegation is that they

9     gave material support to a foreign terrorist organization,

10    specifically HAMAS.  So the allegation is they gave

11    support to HAMAS.  Having heard that, does that ring any

12    bells with you?  Have you heard about it on the outside?

13         VENIRE PERSON:  I have heard about it.

14         MR. WESTFALL:  Tell me what you have heard.

18:00 15         VENIRE PERSON:  I heard that they were taken to

16    jail.

17         MR. WESTFALL:  I'm sorry.

18         VENIRE PERSON:  Whenever they got taken to the

19    jail, that's what I heard.  I'm not really into the news.

20         MR. WESTFALL:  Do you remember anything about

21    the allegations?

22         VENIRE PERSON:  All I remember is that was in

23    Richardson because it's around where my mother-in-law

24    lives.  That's the only reason I paid attention to it

25    because it was over there in Richardson.

18:00 1              MR. WESTFALL:  Did you and your mother-in-law

2      speak about it?

3              VENIRE PERSON:  No, no.

4              MR. WESTFALL:  It just struck you because it was

5      in Richardson?

6              VENIRE PERSON:  That's the only reason why, it

7      was in the same town.

8              MR. WESTFALL:  Based upon what you have read or

9      possibly heard, have you formed any opinions as to the

10      guilt or innocence of the defendants?

11              VENIRE PERSON:  No.  I don't know anything.

12              MR. WESTFALL:  You know what?  I have trouble

13      hearing.  I really do.

14              VENIRE PERSON:  No.  I haven't formed any

18:00 15      opinions.  I haven't heard anything yet.

16              MR. WESTFALL:  Excellent.  Thank you.  You have

17      been on a jury before?

18              VENIRE PERSON:  Yes.

19              MR. WESTFALL:  So you know the decision is made

20      purely on the evidence or lack thereof.

21              VENIRE PERSON:  Yes.

22              MR. WESTFALL:  Where were you born in Mexico?

23              VENIRE PERSON:  San Luis Obispo.

24              MR. WESTFALL:  What state is that?

25              VENIRE PERSON:  It's a state.  It's in the

18:00 1    middle of Mexico.

2              MR. WESTFALL:  So landlocked?

3              VENIRE PERSON:  Yes.

4              MR. WESTFALL:  How long have you been in the

5    United States?

6              VENIRE PERSON:  Most of my life.  I have to say

7    a good twenty years.

8              MR. WESTFALL:  You say you are full time

9    replenishment?

10             VENIRE PERSON:  Yes.

11             MR. WESTFALL:  I'm dying to know what that is.

12             VENIRE PERSON:  Just the department I'm in.

13    Mainly dispersing the product, like palletizing it,

14    getting it on the pallets and shipping it out.

18:00 15             MR. WESTFALL:  What kind of product?

16             VENIRE PERSON:  Sour cream.

17             MR. WESTFALL:  So you work with a dairy?

18             VENIRE PERSON:  One of the sour cream companies.

19             MR. WESTFALL:  How long have you been doing

20    that?

21             VENIRE PERSON:  About a year.

22             MR. WESTFALL:  So you basically load the product

23    on a pallet and get them out of there?

24             VENIRE PERSON:  Yes.

25             MR. WESTFALL:  Do you know any Muslims at all?

18:00 1          VENIRE PERSON:  No.

2          MR. WESTFALL:  Have you ever known any?

3          VENIRE PERSON:  No.

4          MR. WESTFALL:  How do you feel about the issue

5    of being on a jury that has anything to do with Muslims

6    and charity?

7          VENIRE PERSON:  It's okay.

8          MR. WESTFALL:  You are all right with that?

9          VENIRE PERSON:  Yes.

10          MR. WESTFALL:  I saw that you have a four week

11    old girl.  Congratulations first of all.

12          VENIRE PERSON:  Thank you.

13          MR. WESTFALL:  This case could go for three

14    months, four months, you know, a few months anyway.

18:00 15          VENIRE PERSON:  Yes.

16          MR. WESTFALL:  And is there anything about the

17    arrangements you have with day care or anything like that?

18          VENIRE PERSON:  Yes, that might be an issue

19    right there.

20          MR. WESTFALL:  Please tell us about it.

21          VENIRE PERSON:  My fiance say works in the

22    mornings, and I work at night, and we switch on and off to

23    watch her.  That would be an issue.  We wouldn't have

24    anybody to watch her.

25          MR. WESTFALL:  Okay.  So you have to be at home

18:00   1    during -- Do you get the daytime duty or the night time

      2    duty?

      3             VENIRE PERSON: Daytime.

      4             MR. WESTFALL: So what's happening right now?

      5             VENIRE PERSON: I left her with my mother-in-law

      6    right now.

      7             MR. WESTFALL: Would your mother-in-law be

      8    available to take care of her four months?

      9             VENIRE PERSON: No. She's only off right now

    10    because her other daughter had a baby yesterday. That's

    11    why she was off. She was off yesterday and today. That's

    12    why she could watch her yesterday and today, because she

    13    was off from work. But aside from today she isn't going

    14    to be able to watch her.

18:00 15             MR. WESTFALL: Do you have any back-up plan

    16    whatsoever?

    17             VENIRE PERSON: None whatsoever.

    18             MR. WESTFALL: So during the daytime you have to

    19    be there and then you work at night?

    20             VENIRE PERSON: Yes.

    21             MR. WESTFALL: Would that distract you if you

    22    were to be on the jury for three or four months?

    23             VENIRE PERSON: Definitely because I would be

    24    thinking about my daughter, you know.

    25             MR. WESTFALL: In order to do a good, proper job

18:00 1   in a jury, you have to give your attention hundred percent

2   to the evidence.

3           VENIRE PERSON:  Yes.

4           MR. WESTFALL:  And the issue only arises really

5   if your family situation would impair your ability to do

6   that.  Do you feel like it would or not?

7           VENIRE PERSON:  Yes.

8           MR. WESTFALL:  Do you feel like it would?

9           VENIRE PERSON:  Yes.

10          MR. WESTFALL:  Thank you very much.

11          THE COURT:  Mr. Garrett, do you have questions

12   for Mr. Olguin?

13          MR. GARRETT:  No, your Honor.

14          THE COURT:  Mr. Olguin, we are in the process of

18:00 15  talking with the people in the jury pool from which the

16   jury that would hear this case will be selected.  I

17   anticipate that process will take another day or two at

18   least.  So until you hear from us further, you should not

19   discuss this case with anyone or allow anyone to discuss

20   it with you.  Nor should you read or watch or listen to

21   any media accounts of this case, if there are any.  Thank

22   you.  You may rejoin the others in the hall.

23          VENIRE PERSON:  Thank you.

24          MR. WESTFALL:  Your Honor, he probably needs to

25   go on list for hardship.

18:00 1          THE COURT:  I agree.  Mr. Garrett, do you have a

2     position about that?

3          MR. GARRETT:  I agree, your Honor.

4          THE COURT:  Mr. Kiblinger, I think we're ready

5     to see next Ms. Drake, Number 36.

6          Good morning, Ms. Drake.  Counsel for the

7     parties have some questions they would like to ask.

8          MS. MORENO:  Good morning, Ms. Drake.  My name

9     is Linda Moreno, and I'm one of the defense attorneys on

10    this case.  I am going to ask you some questions about

11    some of the answers on the questionnaire you filled out

12    and also if you have heard anything about this case.  This

13    is the case that involves the Holy Land Foundation which

14    is an American Muslim charity.  Have you heard about this

18:00 15   particular case?

16         VENIRE PERSON:  Just the name.  I don't know

17    anything other than that.

18         MS. MORENO:  Do you remember when you heard

19    something about it?

20         VENIRE PERSON:  Just reading the paper and

21    glancing after the trial.  Anything before that, I don't

22    remember seeing anything.  But after the trial, we were

23    told not to read about it.  So whenever I saw it, I turned

24    the page.

25         MS. MORENO:  After the trial?

18:00 1                    VENIRE PERSON:  After we were called.

2                    MS. MORENO:  You may have seen something, but

3          you don't remember reading anything about it?

4                    VENIRE PERSON:  No.

5                    MS. MORENO:  This is a case that may take three

6          or four months.  Does that impose a hardship for you?

7                    VENIRE PERSON:  Actually it does.  Right now I'm

8          a temporary employee, and the company is ready to make me

9          permanent, but because of this situation, because they

10         can't be without an employee for four months, should I be

11         selected I won't be paid my salary.

12                   MS. MORENO:  You won't be paid?

13                   VENIRE PERSON:  No.

14                   MS. MORENO:  And could you potentially lose that

18:00 15   position?

16                   VENIRE PERSON:  Yes.

17                   MS. MORENO:  So sitting on this case then would

18         make you lose your job opportunity.  Is that right?

19                   VENIRE PERSON:  Yes.

20                   MS. MORENO:  Why don't you tell us how that

21         would affect your ability to sit and concentrate on all

22         the evidence in this case?

23                   VENIRE PERSON:  Well, I mean, I don't think it

24         would affect my ability to concentrate so much as the

25         financial hardship would be difficult.  It wouldn't change

18:00  1    anything because I understand being on a jury you have to

2    devote your time and energy to the case being presented

3    and you have to be fair.  But it would be --

4                MR. WESTFALL:  But it would be a financial

5    hardship?

6                VENIRE PERSON:  Right.

7                MS. MORENO:  Let me just ask you a few more

8    questions.  What is Tejas Council?

9                VENIRE PERSON:  That's the Girl Scouts.

10               MS. MORENO:  What is that?

11               VENIRE PERSON:  It's an organization.

12               MS. MORENO:  No.  I know what the organization

13   is.  Tejas Council.

14               VENIRE PERSON:  Just the area group, the

18:00 15   district for the Girl Scouts.

16               MS. MORENO:  I see.

17               VENIRE PERSON:  That's something I volunteer on

18   the side.

19               MS. MORENO:  So you volunteer on that?

20               VENIRE PERSON:  Right.

21               MS. MORENO:  Let me ask you, do you know any

22   Muslims?

23               VENIRE PERSON:  One.

24               MS. MORENO:  Is this a friend or someone you

25   work with?

18:00 1          VENIRE PERSON:  It was a former coworker.

2          MS. MORENO:  And in your working relationship

3     with this person, would you characterize it as positive it

4     was negative?

5          VENIRE PERSON:  Positive.

6          MS. MORENO:  As you sit there, do you have any

7     preconceived notions or prejudices against people who are

8     Muslim?

9          VENIRE PERSON:  No, I think God created

10    everybody equal, and everybody has a right to their

11    beliefs, and if they choose to carry out their life that

12    way, that's their choice.  We live in a free country, and

13    everyone has the choice of how they want to live.

14         MS. MORENO:  This is a case that, as I said,

18:00 15   involves the Holy Land Foundation and that the government

16    claims that this charity sent humanitarian aid over to

17    Palestine and the Gaza strip and other areas, and this

18    humanitarian aid was in the form of food, medicine,

19    library books, assisting in the rebuilding of homes which

20    were destroyed, milk, bread.  Humanitarian aid.  And the

21    government says that humanitarian aid that was sent over

22    there somehow benefited the foreign terrorist organization

23    called HAMAS.  That's what they say.  Now, have you ever

24    heard of HAMAS?

25         VENIRE PERSON:  Just brief mention of it in the

18:00 1    news.  Quite honestly, I don't pay attention to world news

2    that much.  I usually just watch the local.  But I have

3    heard the name before.

4            MS. MORENO:  Is there anything about what I have

5    just told you or the nature of those charges that causes

6    you any concern?

7            VENIRE PERSON:  No.  I mean if there was

8    evidence proving that they are guilty, then they are

9    guilty.  If there is no evidence proving it, then they are

10   not.

11           MS. MORENO:  In all criminal cases there is

12   something called the presumption of innocence.  You have

13   heard of that, right?

14           VENIRE PERSON:  Correct.

18:00 15           MS. MORENO:  And that means that you have to --

16   no question about it, as a juror afford these gentlemen

17   the presumption of innocence, and that is only overcome --

18   that goes away -- only after you have been convinced

19   beyond every single reasonable doubt that they are guilty.

20   Do you have any problem with that concept?

21           VENIRE PERSON:  No.  I have served on a jury

22   panel, and I understand the law.  The way it works is the

23   way the country works.

24           MS. MORENO:  That prior jury service, were you

25   the foreperson?

18:00 1          VENIRE PERSON:  Yes.

2          MS. MORENO:  What was the best part of that

3     experience?

4          VENIRE PERSON:  I don't know that you can say

5     deciding someone's future is very wonderful, but it was a

6     learning experience for me in seeing how court cases are

7     handled and the way they actually work, not based on what

8     you see on TV all the time.  I was able to see other

9     people's opinions and viewpoints, and we all reached a

10     decision at the end.

11          MS. MORENO:  Was there anything negative about

12     that experience for you?

13          VENIRE PERSON:  Just seeing a person that really

14     had not come from a good background, and he wound up

18:00 15     committing a crime he shouldn't have, but seeing him being

16     punished basically for the way he was raised was kind of

17     difficult for me.  Fortunately, in that situation we were

18     able to get him into a work program that helped him better

19     his future.  So I guess that was a positive spin on the

20     negative.

21          MS. MORENO:  Forgive me for asking this

22     question.  I see you are a member of the Wildwood Baptist

23     Church.  My question is, is there anything in your

24     religious orientation or beliefs that you would have a

25     problem with respect to people who follow the Islamic

18:00  1    faith?

       2            VENIRE PERSON:  No, it's kind of personal, but I

       3    was raised in a household where we were southern Baptist.

       4    In a former relationship, I was engaged to someone who was

       5    Catholic, and I went through Catholic classes, and I was

       6    supported because as my mom put it there are many

       7    different roads to the same places and whatever road will

       8    take you that's the road you should choose.

       9            THE COURT:  Ms. Moreno, your time is expired.

      10            MS. MORENO:  Thank you, your Honor.

      11            THE COURT:  Mr. Garrett, do you have questions

      12    for Ms. Drake?

      13            MR. GARRETT:  Good morning, Ms. Drake.  My name

      14    is Nathan Garrett, and I'm an Assistant United States

18:00 15    Attorney and one of the prosecutors representing the

      16    government in this case.  Just a few follow-up questions

      17    for you.  Some of them may be repetitive of Ms. Moreno,

      18    and I apologize for that.  You are married, correct?

      19            VENIRE PERSON:  Yes.

      20            MR. GARRETT:  Is your husband employed?

      21            VENIRE PERSON:  Electrician.  He's a foreman for

      22    a private electrical contractor company that does

      23    commercial remodeling and electrical work.

      24            MR. GARRETT:  Is that here in Dallas?

      25            VENIRE PERSON:  He's actually working on the

18:00 1    Bank of America building right now.

2              MR. GARRETT:  Down the street?

3              VENIRE PERSON:  Yes.

4              MR. GARRETT:  And how long have you lived in the

5    Dallas area?

6              VENIRE PERSON:  I have lived in Mesquite for

7    thirty-six years, my entire life.

8              MR. GARRETT:  You have no children at present?

9              VENIRE PERSON:  No.

10             MR. GARRETT:  Ms. Moreno was asking you about

11   your job situation, your temp.  That's something that's

12   important to all of us.

13             VENIRE PERSON:  Of course.

14             MR. GARRETT:  Not doubt for you.

18:00 15            VENIRE PERSON:  Of course.

16             MR. GARRETT:  Can you explain how it works at

17   the temp agency?

18             VENIRE PERSON:  Right now I'm a private banking

19   representative for a bank here in Dallas, and currently

20   I'm working for a financial temp agency who has placed me

21   with this company.  The position is open there, and they

22   are ready for me to go permanent.  I have been trained,

23   and I have been in banking for almost six years now.  But

24   unfortunately, they can't hire an employee that's not

25   going to be there four months and have to pay someone else

18:00 1  to fill in while I'm gone.  So I'm kind of on hold right

2  now until we know the outcome.

3       MR. GARRETT:  And if you are called to serve, no

4  one wants to put you in a bad situation.  That's where we

5  are all headed.

6       VENIRE PERSON:  Right.

7       MR. GARRETT:  Given your husband is employed,

8  most importantly, financially will that present a serious

9  hardship for you?  Can you qualify?

10       VENIRE PERSON:  I can't say it would be

11  extremely difficult.  We're comfortable now.  I'm sure it

12  wouldn't be as comfortable.  I'm sure we could figure

13  something out, but not as easy as it is now.

14       MR. GARRETT:  Now, if something happened with

18:00 15  this other job you are temping for now, would you still go

16  to another job?

17       VENIRE PERSON:  I could go to another bank.

18  They have positions all the time.  The company is looking

19  into possibilities that if I am selected they could hire

20  another temp to fill in until I return.

21       MR. GARRETT:  For a period of time?

22       VENIRE PERSON:  Right.  They have someone from

23  the temp agency that's filling in who does not want to go

24  permanent.  She wants to be a temp.  So they are looking

25  at the possibility of having her there until I come out,

1    and it would not be easy, and if someone else came in and

2    wanted the position, they would possibly offer that to

3    them.

4         MR. GARRETT:  Ms. Moreno talked to you a little

5    bit about the allegations of this case, being that the

6    defendants provided material support to a foreign

7    terrorist organization.  That's HAMAS.  So we will call

8    that part HAMAS.  On the issue of material support, what

9    is that?  Providing material support.  At the end of the

10   case, as you are well aware as a former foreperson on a

11   jury, the Judge will give you instructions on the law, and

12   you take all of this evidence and put it to the law.

13   Okay?

14         VENIRE PERSON:  Yes.

15        MR. GARRETT:  In those instructions I expect

16   that he would tell you how the law defines material

17   support.

18         VENIRE PERSON:  Yes.

19        MR. GARRETT:  I expect this case to involve

20   allegations that these defendants sent money to HAMAS, and

21   I expect the instructions to tell you that funds are a

22   part of material support.  They are prohibited to be given

23   knowingly to this terrorist organization.  There may in

24   addition be evidence that some of this money once it was

25   sent was spent on ostensibly charitable items such as

18:00 1    library equipment, school supplies, the sort of thing you

2    would think of as charitable equipment.  I expect the

3    instructions will also tell you that those types of

4    items -- food, clothing, shelter, clothing -- if they are

5    to or for the benefit of HAMAS in this case, that too is

6    proscribed or prohibited by law.  Do you have any reaction

7    to that?  Not the funds but the charitable side.

8              VENIRE PERSON:  I wouldn't have any problem.

9              MR. GARRETT:  So you could follow the

10   instructions that that too is --

11             VENIRE PERSON:  Yes.

12             MR. GARRETT:  Thank you so much for your time.

13             THE COURT:  Ms. Drake, we are in the process of

14   talking with people on the jury pool from which the jury

18:00 15   that would hear this case will be selected.  I expect that

16   process will go on for at least another day or two.  So

17   until you hear from us again, you should not discuss this

18   case with anyone or allow anyone to discuss it with you.

19   Nor should you read or watch or listen to any media

20   accounts of this case, if there are any.

21             Thank you.  You may rejoin the others in the

22   hall.

23             MS. MORENO:  Your Honor, if I may, we would

24   request Ms. Drake be put on the hardship list.  She

25   indicated that she would be losing a job opportunity.

18:00 1    When I was speaking with her, she indicated this would be

2    a significant financial hardship.

3         THE COURT:  Thank you, ma'am.  Mr. Kiblinger, I

4    think we're ready to see next Ms. Hill, Number 37.

5         Good morning, Ms. Hill.  Counsel for the

6    parties have some questions they would like to ask you

7    about this case.

8         MS. MORENO:  Good morning, Ms. Hill.  My name is

9    Linda Moreno.  I'm one of the defense attorneys in this

10   case.  I am going to ask you some questions about the

11   questionnaire you filled out all of those months ago.

12        VENIRE PERSON:  Okay.

13        MS. MORENO:  And whether you have heard anything

14   about this case.  This is a case that involves the Holy

18:00 15   Land Foundation.  The Holy Land Foundation was an American

16   Muslim charity.  Have you heard anything about it recently

17   in the press?

18        VENIRE PERSON:  Recently no, not recently.  I

19   remember probably about five years ago when they have had

20   it on the news and talked about closing it because of

21   something about funding, and I never heard much more about

22   it.  So that was about all I heard about it.

23        MS. MORENO:  Based on that bit of information

24   you heard and now knowing that you are here being

25   considered as a juror in this case, is there anything

18:00 1     about what you heard –– and we'll go into this a little

2     further –– about what you heard then that can affect your

3     ability to be fair and impartial?

4          VENIRE PERSON:  No, I don't all the facts.  It

5     would have to be based upon the facts and evidence in the

6     case, and from what I heard, it didn't go into a lot of

7     detail.  It just said they closed this Holy Land funding

8     thing, and it was about the money, and that's all I heard

9     about it.

10          MS. MORENO:  So nothing you have heard thus far

11     in the press that affects your ability to be fair?

12          VENIRE PERSON:  No.

13          MS. MORENO:  Boy Scouts of America.  You were a

14     Cub Scout?

18:00 15          VENIRE PERSON:  Cub Scout leader.  Den leader.

16          MS. MORENO:  For your sons?

17          VENIRE PERSON:  Both of my sons.

18          MS. MORENO:  And they are out of the Scouts now?

19          VENIRE PERSON:  Yes.

20          MS. MORENO:  And it says you are HIPA certified.

21          VENIRE PERSON:  Yes.

22          MS. MORENO:  Tell me about that.

23          VENIRE PERSON:  I used to work at Lab

24     Corporation, and we dealt with patient histories and

25     addresses, and we had to take a course and sign an oath

18:00 1   that we would not disclose that information -- information

2   that we saw to anybody else.

3         MS. MORENO:  So it was an issue of

4   confidentiality that you could keep?

5         VENIRE PERSON:  Right.

6         MS. MORENO:  I also see that you have been on a

7   couple of prior juries.

8         VENIRE PERSON:  Yes, three times.

9         MS. MORENO:  Three times you were picked.  Lucky

10   you.  On any one of those three times, were you the

11   foreperson?

12         VENIRE PERSON:  Yes, I was.

13         MS. MORENO:  Which case?

14         VENIRE PERSON:  That was the first case I was

18:00 15   on.  A gentlemen was accused of resisting arrest and

16   battery to a police officer.

17         MS. MORENO:  Did you reach a verdict?

18         VENIRE PERSON:  Yes, we did.

19         MS. MORENO:  And there were two other criminal

20   cases?

21         VENIRE PERSON:  Yes.

22         MS. MORENO:  What was the second one?

23         VENIRE PERSON:  It was a case of a gentlemen

24   being a door guard for a crack house, and the third one I

25   guess would be more of a civil suit.  It had to do with

18:00  1    who was responsible for flooding damage in a downtown

2    highrise.

3            MS. MORENO:  And in those two cases, were you

4    the foreperson?

5            VENIRE PERSON:  No, I wasn't.

6            MS. MORENO:  And did you reach verdicts in those

7    two cases?

8            VENIRE PERSON:  On the second one, yes.  The

9    third one ended in mistrial after the fifth day.

10            MS. MORENO:  What was the best part of that

11    experience for you sitting as a juror?

12            VENIRE PERSON:  Seeing how the judicial system

13    works, learning new experiences.  Seeing people's

14    reaction, seeing how the lawyers acted, you know, how each

18:00 15    side defendant and prosecutor acted, and you know just

16    learning about the judicial system.  I can't talk.

17    Judicial system.

18            MS. MORENO:  Was there anything negative about

19    that experience?

20            VENIRE PERSON:  No, it was all very positive.

21            MS. MORENO:  Ms. Hill, do you know any Muslims?

22            VENIRE PERSON:  No, I don't.

23            MS. MORENO:  Never had any sort of experiences

24    in any fashion with people of the Islamic faith?

25            VENIRE PERSON:  No.

18:00 1         MS. MORENO:  These gentlemen that are charged in

2    this case are Muslim, and what we need to know, if there

3    is anything in your own religious beliefs that we should

4    know about that might impair your ability, might be hard

5    for you to look at this case fairly.

6         VENIRE PERSON:  No.  I believe everyone has

7    their own right to their own religious beliefs.

8         MS. MORENO:  What do you do now?

9         VENIRE PERSON:  I work for a jewelry distributor

10   company, Zale Corporation.

11        MS. MORENO:  This case is going to take three to

12   four months.  Maybe more, maybe less.  Is there anything

13   about the duration of this trial that would cause you

14   hardship?

18:00 15        VENIRE PERSON:  None.  The original

16   questionnaire I received in the mail I showed to my

17   employers, and they have already okayed it if I would have

18   to be off for that length of time.

19        MS. MORENO:  Because of your prior criminal jury

20   service you understand what the burden of proof is and the

21   presumption of innocence?

22        VENIRE PERSON:  Yes.

23        MS. MORENO:  Knowing this is a case where the

24   government claims there are charges related to terrorism

25   involving this charity, just knowing that general

18:00  1    information, do you think the burden of proof should be
       2    less on the government in a terrorism trial?
       3              VENIRE PERSON:  No.  It should be about the same
       4    in any trial.  You have to prove it beyond a reasonable
       5    doubt either guilty or innocent, and everyone is innocent
       6    until proven guilty.  That's my feeling.
       7              MS. MORENO:  Thank you very much.  Pass the
       8    witness.
       9              THE COURT:  Mr. Garrett, do you have questions
      10    for Ms. Hill?
      11              MR. GARRETT:  Yes, your Honor.  Ms. Hill, good
      12    morning.  My name is Nathan Garrett, and I'm an Assistant
      13    United States Attorney, and I am one of the prosecutors
      14    handling this case for the government.  I just have a few
18:00 15    follow-up questions for you.
      16              VENIRE PERSON:  Okay.
      17              MR. GARRETT:  You are living with someone now;
      18    is that correct?
      19              VENIRE PERSON:  Yes.
      20              MR. GARRETT:  Does that person work?
      21              VENIRE PERSON:  Yes, he does.
      22              MR. GARRETT:  Generally what field is he in?
      23              VENIRE PERSON:  Pool cleaning business.
      24              MR. GARRETT:  Does he work generally around the
      25    area?

18:00 1          VENIRE PERSON:  Yes.

2          MR. GARRETT:  And you have two children.  Is

3     that right?

4          VENIRE PERSON:  Yes.

5          MR. GARRETT:  And both of them are -- I believe

6     Ms. Moreno asked you questions about them, but they are

7     outside the home.  Do they live in the area?

8          VENIRE PERSON:  One lives in Alvarado and the

9     other one in Arlington.

10          MR. GARRETT:  Both in Texas.  I thought Alvarado

11    was in Texas.

12          VENIRE PERSON:  Yes.

13          MR. GARRETT:  You have lived in the area I think

14    from your questionnaire for twenty-two years at least?

18:00 15          VENIRE PERSON:  Yes.

16          MR. GARRETT:  Where did you live before that?

17          VENIRE PERSON:  Baltimore, Maryland.

18          MR. GARRETT:  What brought you here?

19          VENIRE PERSON:  My ex-husband and I, he was

20    looking for a change in his work and better work, and we

21    moved in with his sister and brother.

22          MR. GARRETT:  Better weather?

23          VENIRE PERSON:  Yes, hotter.

24          MR. GARRETT:  Now, you have been on two juries.

25          VENIRE PERSON:  Three.

18:00  1          MR. GARRETT:  I'm sorry.  Three.  Two criminal

 2    and one civil.

 3          VENIRE PERSON:  Right.

 4          MR. GARRETT:  And you were the foreperson on one

 5    of those?

 6          VENIRE PERSON:  Right.

 7          MR. GARRETT:  And I believe you mentioned to Ms.

 8    Moreno that nothing about that would affect your ability

 9    to sit on another jury if you are so invited.

10          VENIRE PERSON:  Right.

11          MR. GARRETT:  Obviously I know nothing about

12    that case, and I'm not asking about that case, but is

13    there anything about that case, looking at witnesses or

14    listening to the evidence, that would affect the way you

18:00 15    hear evidence in this case or any particular types of

16    witnesses, law enforcement, civilian witnesses, that would

17    change the effect of the credibility you give that

18    witness?

19          VENIRE PERSON:  No.

20          MR. GARRETT:  Let me ask you finally to flush

21    out a little bit about what Ms. Moreno was talking to you

22    about -- and that is the allegations of this case.

23          VENIRE PERSON:  Right.

24          MR. GARRETT:  And the allegations of this case,

25    as Ms. Moreno told you, are that these defendants -- The

18:00  1    allegations are that these defendants provided material

2    support to a foreign terrorist organization.  That's

3    HAMAS.  Have you heard of HAMAS?  Did she ask you?

4            VENIRE PERSON:  She didn't ask, but I have heard

5    it.

6            MR. GARRETT:  Have you heard of them?

7            VENIRE PERSON:  Here and there on the news, but

8    that's it.

9            MR. GARRETT:  So the allegations are that they

10   provided material support to a foreign terrorist

11   organization.  And as you are well aware, the Judge at the

12   end of trial will submit to you instructions, and those

13   instructions will instruct you on what the law is as it

14   applies to this case.

18:00 15        VENIRE PERSON:  Right.

16           MR. GARRETT:  That's not something you have to

17   decide.  That's something that your Honor will tell you.

18           VENIRE PERSON:  Right.

19           MR. GARRETT:  And you will take all of these

20   facts and apply it to that law to reach your conclusion.

21   I expect his instructions will tell you -- I know they

22   will -- what a foreign terrorist organization is.  They

23   will also tell you what material support is.  In other

24   words, what does that mean, material support.  You will

25   hear evidence in this case alleging that these gentlemen

18:00  1    and their company sent funds -- sent money over to

2    organizations that the government will allege are part of

3    the HAMAS structure.  And his Honor will instruct you that

4    funds, money, are part of those things that are prohibited

5    by law.  You can't knowingly send those to any component

6    of a foreign terrorist organization.  Okay?  That's one

7    thing.  There may also be further instructions that even

8    if you find that there were items given or that money that

9    was sent was spent on certain charitable items such as

10   school supplies, books, those sorts of things that you

11   would think of as charitable items that those, too,

12   constitute material support and cannot be given to any

13   component of a foreign terrorist organization.  Do you

14   have any reaction to that part of the law?

18:00 15          VENIRE PERSON:  No.

16          MR. GARRETT:  Could you follow those

17   instructions?

18          VENIRE PERSON:  Yes.

19          MR. GARRETT:  Great.  Thank you so much for your

20   time.  Oh, you marked on your questionnaire what other

21   languages do you speak and you said ASL.

22          VENIRE PERSON:  American sign language.

23          MR. GARRETT:  See, right past me.  Thank you so

24   much.

25          THE COURT:  Ms. Hill, we are talking with

18:00   1   members from the jury pool from which the jury will be
        2   selected to hear this case.  I expect this to go on a day
        3   or two longer.  So until you hear from us you should not
        4   discuss this case with anyone or allow anyone to discuss
        5   it with you.  Nor should you read or watch or listen to
        6   any media accounts about this case, if there are any.
        7   Thank you.  You may rejoin the others in the hall.
        8           Good morning, Ms. Morton.  Counsel for the
        9   parties have some questions for you.
       10           MR. WESTFALL:  Good morning.  My name is Greg
       11   Westfall, and I am a defense lawyer in this case.  I have
       12   a few questions for you, and then the government will have
       13   some questions I believe.  I'm hard of hearing.  I will
       14   keep this ear towards you, but if you could speak up.
18:00  15   This room is also hard, too.
       16           VENIRE PERSON:  Okay.
       17           MR. WESTFALL:  The actual title of this case is
       18   United States versus Holy Land Foundation for Relief and
       19   Development, and what the allegations are is that the Holy
       20   Land Foundation and some men who were working with the
       21   Foundation -- the government alleges that they gave
       22   material support to HAMAS which is a foreign terrorist
       23   organization.  That's a term that is used to describe
       24   HAMAS and other organizations.  But these men are accused
       25   of giving material support to a foreign terrorist

18:00  1    organization, specifically HAMAS.

       2            Now, I have told you that in two different ways,

       3    and it's confusing, but those words that I have just given

       4    you, do you recognize the case?  Have you heard anything

       5    about it?

       6            VENIRE PERSON:  How long ago was this?  Has it

       7    been a long time ago or --

       8            MR. WESTFALL:  It's been going on a while.  But

       9    like recently have you heard anything in the media?

      10            VENIRE PERSON:  No, not recently.

      11            MR. WESTFALL:  Is there anything specific in

      12    your mind that you have heard in the media?

      13            VENIRE PERSON:  No.  I guess kind of what you

      14    said -- No.

18:00 15            MR. WESTFALL:  Here is my reason for asking you.

      16    If a juror comes in and they have read something in the

      17    media and because of what they read they have their mind

      18    made up -- These people, there is no way I am going to

      19    convict them or no way I am going to do anything but

      20    convict them.  Do you fall into that category?

      21            VENIRE PERSON:  No.

      22            MR. WESTFALL:  I think so.  How long have you

      23    been doing customer service?

      24            VENIRE PERSON:  I have been doing that since I

      25    was nineteen.  So probably eighteen years.

18:00 1      MR. WESTFALL:  At the same place?

2      VENIRE PERSON:  No, different places.

3      MR. WESTFALL:  How many places have you worked?

4      VENIRE PERSON:  Maybe five different places.

5      MR. WESTFALL:  And done customer service in

6  every one of them?

7      VENIRE PERSON:  Yes.

8      MR. WESTFALL:  What sort of business are you

9  currently doing customer service for now?

10      VENIRE PERSON:  Chase Auto Finance.

11      MR. WESTFALL:  So it has to do with loans on

12  cars?

13      VENIRE PERSON:  Right.

14      MR. WESTFALL:  And questions about that loan?

18:00 15      VENIRE PERSON:  Right.

16      MR. WESTFALL:  It sounds like you like doing

17  customer service.

18      VENIRE PERSON:  Yes.

19      MR. WESTFALL:  Why do you like it?

20      VENIRE PERSON:  I guess that's always what I

21  have done.  I like to communicate with different people.

22      MR. WESTFALL:  Do you know any Muslims?  People

23  who practice the Islamic faith.

24      VENIRE PERSON:  No.

25      MR. WESTFALL:  Have you ever known any?

18:00 1              VENIRE PERSON:  No.

2              MR. WESTFALL:  Have you ever dealt with any in

3     your job?

4              VENIRE PERSON:  Well, I do a lot of phone work.

5     I'm sure I may have.  I don't see them face to face.  I'm

6     in a call center.  So I probably have over the phone.

7              MR. WESTFALL:  Do you do cold calling or if

8     somebody has a problem they call you?

9              VENIRE PERSON:  They call us if they have a

10    problem.

11             MR. WESTFALL:  Do you know anything about HAMAS?

12             VENIRE PERSON:  No.

13             MR. WESTFALL:  Have you ever looked into or kept

14    up with the Palestinian-Israeli conflict?

18:00 15             VENIRE PERSON:  No.

16             MR. WESTFALL:  How far away is Red Oak?

17             VENIRE PERSON:  Probably about twenty miles.

18             MR. WESTFALL:  So that's not going to pose any

19    sort of problem?

20             VENIRE PERSON:  No.

21             MR. WESTFALL:  Any other problems that would

22    keep you from being able to do jury service?

23             VENIRE PERSON:  No.

24             MR. WESTFALL:  Thank you so much.

25             THE COURT:  Mr. Garrett, do you have questions

18:00 1    for Ms. Morton?

2            MR. GARRETT:  Yes, your Honor.

3            Ms. Morton, good morning.

4            VENIRE PERSON:  Good morning.

5            MR. GARRETT:  My name is Nathan Garrett, and I'm

6    an Assistant United States Attorney, and I am one of the

7    prosecutors representing the government in this case.  I

8    have a couple of follow-up questions from Mr. Westfall,

9    but I will keep it brief for you.  Okay?

10           VENIRE PERSON:  Yes.

11           MR. GARRETT:  You are married?

12           VENIRE PERSON:  Yes.

13           MR. GARRETT:  Does your spouse work outside the

14   home?

18:00 15          VENIRE PERSON:  Yes, sir.

16           MR. GARRETT:  What sort of work does he do

17   generally?

18           VENIRE PERSON:  He's a manager, but they do

19   spray lawns.

20           MR. GARRETT:  Is that mostly in the metroplex

21   area?

22           VENIRE PERSON:  Yes.

23           MR. GARRETT:  And you live in Red Oak?

24           VENIRE PERSON:  Yes.

25           MR. GARRETT:  And you said you lived there five

18:00 1    years?

2                    VENIRE PERSON:  Well, I grew up there and moved

3        off.

4                    MR. GARRETT:  Where did you move off to?

5                    VENIRE PERSON:  The next town, Ovilla.

6                    MR. GARRETT:  And they pulled you back?

7                    VENIRE PERSON:  Yes.

8                    MR. GARRETT:  And you have two children,

9        seventeen and nineteen?

10                   VENIRE PERSON:  Seventeen and twelve.

11                   MR. GARRETT:  Are they both still in the home

12       with you?

13                   VENIRE PERSON:  Yes.

14                   MR. GARRETT:  You said you were in customer

18:00 15   service.

16                   VENIRE PERSON:  Yes.

17                   MR. GARRETT:  How long were you in customer

18       service?

19                   VENIRE PERSON:  Well, since I was nineteen.

20                   MR. GARRETT:  I just asked you that because I

21       was in customer service for about thirty minutes.  That

22       was it.  All I could stand.  So you have to take the calls

23       when people call and have issues and complain to you?

24                   VENIRE PERSON:  Right.

25                   MR. GARRETT:  Let me ask you, have you had any

18:00 1    prior jury service?

2          VENIRE PERSON:  No.  I have never been.

3          MR. GARRETT:  Have you ever been called like

4    today to the collective pool of prospective jurors?

5          VENIRE PERSON:  I think I was called one time,

6    but I worked at a bank, and they told us to hand it over

7    to our attorneys, and they would take care of that.  So I

8    never really had to go there.

9          MR. GARRETT:  So this is the first time you have

10   physically had to show up?

11         VENIRE PERSON:  Right.

12         MR. GARRETT:  As Mr. Westfall I think told

13   you -- Regarding the specific allegations of this case, it

14   involves allegations that these defendants and the

18:00 15   corporation for which they worked knowingly provided

16   material support to a foreign terrorist organization.

17   That's HAMAS is that foreign terrorist organization.  At

18   the end of this case, the Judge is going to issue you what

19   he calls instructions, and those instructions will tell

20   you a lot of things about how you go about doing your job,

21   but specifically those instructions will tell you what the

22   law is.  So you don't have to come in here knowing

23   anything about the law or being a lawyer.  To the

24   contrary, his Honor will tell you this is the law.  So

25   your job is to take the facts and apply it to the law.  Do

18:00 1    you understand that?

2                    VENIRE PERSON:  Yes.

3                    MR. GARRETT:  And specifically with regard to

4    this case, it will involve two important definitions.  One

5    is what is a terrorist organization, and your Honor will

6    tell you that.  It's HAMAS.  And the second part of that

7    is what is material support.  I expect there will be

8    evidence in this case that the defendants sent money or

9    funds to a foreign terrorist organization.  And the

10   instructions I suspect will tell you that if the

11   defendants did that knowingly, if they knew they were

12   giving the funds to a foreign terrorist organization,

13   that's a violation of law.  But I expect there may be

14   evidence that those funds may have been spent in part on

18:00 15   what you think of as charitable things -- library

16   equipment, medical supplies, those sorts of things.  And

17   the instructions, he will tell you even those types of

18   items -- clothes, food, medicine, what you think of as

19   charitable items -- if those are given to any component of

20   a foreign terrorist organization, those, too, are

21   prohibited by law.  Do you understand that?

22                   VENIRE PERSON:  Yes.

23                   MR. GARRETT:  You can't give money, but you also

24   can't give money that's to be spent on anything,

25   charitable items or anything else.  But you also can't

18:00  1    give charitable items like food, clothing, medical

2    supplies and those sorts of things if you do it knowingly

3    and it's going to a foreign terrorist organization.

4                VENIRE PERSON:  Oh, a foreign terrorist

5    organization?

6                MR. GARRETT:  Do you have any problem regarding

7    the charitable side of that?

8                VENIRE PERSON:  Not really.

9                MR. GARRETT:  Let me ask you this.  Could you

10   follow the Court's instructions that even if you find that

11   items given to this foreign terrorist organization were of

12   a charitable nature that was a violation of law?

13               VENIRE PERSON:  It was charitable, but it was

14   against the law to do that, right?

18:00 15               MR. GARRETT:  If that's the instruction, could

16   you follow it?

17               VENIRE PERSON:  Right.  Okay.  So if for some

18   reason they gave charitable items to another country, and

19   it's against the law, I guess that would be against the

20   law.

21               MR. GARRETT:  That's what I'm asking you.  If he

22   instructed you that even if you find these things are

23   charitable items -- are knowingly given to a terrorist

24   organization.  You can't do that.  So could you find the

25   defendants guilty if you found that they had knowingly

18:00  1   given charitable items to this foreign terrorist

2   organization?

3          VENIRE PERSON:  I guess it depends on the

4   reason.  Probably, yes.  Maybe I'm just not understanding

5   right.

6          MR. GARRETT:  I'm sure it's on me.  But my

7   question is to ask you again to make sure you understand.

8   The Court will issue you instructions, and if the Court

9   issued an instruction that said even items like charitable

10   supplies -- medicine, books, whatever -- these items

11   cannot be given to any component of a foreign terrorist

12   organization, of HAMAS, knowingly.  You cannot give those

13   types of items to HAMAS.  Could you follow that

14   instruction?

18:00 15          VENIRE PERSON:  Yes.

16          MR. GARRETT:  All right.  Was that clearer?

17          VENIRE PERSON:  Yes, that was clearer.  But what

18   is HAMAS?

19          MR. GARRETT:  HAMAS being the foreign terrorist

20   organization.

21          VENIRE PERSON:  Yes.

22          MR. GARRETT:  Do you understand?

23          VENIRE PERSON:  Yes.

24          MR. GARRETT:  I'm sorry for my lack of clarity.

25          VENIRE PERSON:  That's okay.

18:00  1           THE COURT:  Ms. Morton, we are in the process of

       2   selecting jurors from this panel who will be hearing the

       3   case.  I expect this process to go on another day or two.

       4   So until you hear from us further, you should not discuss

       5   this case with anyone or allow anyone to discuss it with

       6   you.  Nor should you watch or read or listen to any media

       7   accounts about this case.  Thank you.  You may rejoin the

       8   others in the hall.

       9           Ladies and Gentlemen, it's near the noon hour so

      10   I would like to take our recess for lunch in just a

      11   moment.  I did want to impart to you some information

      12   about two of the venire people that we saw yesterday.

      13   First, about Ms. Roberson, who was Number 20 on the list,

      14   I have a note from her which reads "My husband will be

18:00 15   having surgery on July 23rd through July 27th.  I need to

      16   be with him on that day.  Thanks, Ms. Adrienne Roberson."

      17           And then this information is concerning Mr.

      18   Baccus, Number 6.  This is an e-mail from a member of the

      19   jury administrator's office.  It says Mr. Baccus called at

      20   1:15 p.m. -- This was yesterday afternoon -- stating he

      21   believes his wife worked with the family that has a child

      22   with Down's Syndrome.  They can't remember the name of the

      23   family but thinks it is one of the parties involved in

      24   this case.  She was an intern approximately three years

      25   ago with Early Childhood Intervention which is an

18:00  1   organization that provides care to families with Down

2   Syndrome children while completing hours for her master's

3   degree.  She made visits to families participating in this

4   program.  He states that neither he or his wife knew them

5   personally, but he wanted to share this information with

6   the court.

7          Ladies and Gentlemen, because we are making

8   pretty good progress but we need to push on, I would like

9   to limit our lunch recess to an hour.

10          MS. SHAPIRO:  Your Honor, there are two matters

11   that we would like to take up with the court.  We can do

12   it at the end of the day.  Shouldn't take too long.

13          THE COURT:  That probably be best so we don't

14   cut too much into the lunch hour.  So we'll be in recess

18:00 15   until 1:00.

16          (Recess)

17          THE COURT:  Good afternoon.  Counsel for the

18   parties have some questions they would like to ask.

19          MR. WESTFALL:  Hello, Ms. Mejia.  My name is

20   Greg Westfall.  I'm one of the defense lawyers in this

21   case.  I am going to speak with you for a few minutes, and

22   then the government may have a lawyer to speak with you

23   for a few minutes also.

24          VENIRE PERSON:  Okay.

25          MR. WESTFALL:  This is the United States of

18:00  1   America versus Holy Land Foundation case, and it involves

2   allegations that the Holy Land Foundation and some men

3   that were involved with the Holy Land Foundation, that

4   were associated with it, gave material support to HAMAS

5   which is a terrorist organization.  Having told you that,

6   have you heard of the case?

7            VENIRE PERSON:  No.  I don't have full

8   information.

9            MR. WESTFALL:  Well, what information do you

10  have?

11           VENIRE PERSON:  I really don't know about it.  I

12  saw little bits and pieces on the TV, but I really didn't

13  focus on what was going on.  I really don't know.

14           MR. WESTFALL:  Okay.  You know, in the

18:00 15  allegations, of course, appears the word "terrorism."  Do

16  you have any problem sitting on a jury where we are

17  talking about Muslim men and anything that has to do with

18  terrorism?

19           VENIRE PERSON:  Yes, I do.  My son went to war

20  two years ago, and I think a lot of it had to do with

21  terrorists.

22           MR. WESTFALL:  I saw that in your questionnaire.

23  He went to Iraq?

24           VENIRE PERSON:  Yes.

25           MR. WESTFALL:  Is he back okay?

18:00 1          VENIRE PERSON:  Yes.

2          MR. WESTFALL:  You also said in your

3     questionnaire basically if they are being taken to court

4     it must be for a good reason.

5          VENIRE PERSON:  Yes.

6          MR. WESTFALL:  So in the criminal justice system

7     we have what's called the presumption of innocence.  No

8     one can come in -- No one can come into court and sit on a

9     jury and make the decision on anything except the evidence

10    that's actually in trial.  That's a rule.  That's a rule

11    that some people can follow and some people can't follow.

12    And when we can't follow that rule, it's because we have

13    personal experiences or something like that that keeps us

14    from what the law calls careful and fair and impartial

18:00 15   consideration of the evidence.  It sounds from what you

16    say about your son you may have trouble giving this fair

17    and impartial consideration.  Is that true?

18         VENIRE PERSON:  That's true.

19         MR. WESTFALL:  Ms. Mejia, thank you so much.

20         THE COURT:  Mr. Garrett, do you have questions

21    for Ms. Mejia?

22         MR. GARRETT:  No, your Honor.

23         THE COURT:  Ms. Mejia, we are in the process of

24    talking to people who are being considered for service on

25    the jury that would hear this case.  I expect this process

18:00 1    of talking to people will last at least another day or

2    two.  So until you hear from us further, you should not

3    discuss this case with anyone or permit anyone to discuss

4    it with you.  Nor should you read or watch or listen to

5    any media accounts about this case if there are any.

6        Thank you.  You may rejoin the others in the

7    hall.

8        MR. WESTFALL:  Your Honor, we'll submit Ms.

9    Mejia for challenge, inability to be fair and impartial.

10       THE COURT:  Mr. Garrett, do you have a position

11   about that?

12       MR. GARRETT:  No objection, your Honor.

13       THE COURT:  I will excuse Ms. Mejia for cause.

14       Good afternoon, Ms. Shrum.

18:00 15      VENIRE PERSON:  Hello.

16       THE COURT:  Counsel for the parties in this case

17   have some questions they would like to ask you.

18       MR. WESTFALL:  Thank you, your Honor.  Ms.

19   Shrum, I'm Greg Westfall.  I'm one of the defense lawyers

20   in the case.  I am going to speak to you for a very few

21   minutes, and then the government will have someone speak

22   to you also.  This case is the United States versus the

23   Holy Land Foundation.  It is a case where it is alleged

24   that the Holy Land Foundation and men who were involved

25   with the Holy Land Foundation gave material support to

18:00 1    HAMAS which is a terrorist organization.  Have you heard

2    of the case after I have given you that information?

3            VENIRE PERSON:  No, I haven't.

4            MR. WESTFALL:  Never read about it or heard

5    about it?

6            VENIRE PERSON:  I did hear on the news yesterday

7    morning that they were selecting a jury.  That's all I

8    have ever heard.

9            MR. WESTFALL:  Did you form any opinions based

10   on that?

11           VENIRE PERSON:  (Shakes head)

12           MR. WESTFALL:  Other than the opinions you need

13   to be here?

14           VENIRE PERSON:  Anybody gets to come here.

18:00 15    MR. WESTFALL:  Do you know any Muslims?

16           VENIRE PERSON:  No, I don't.

17           MR. WESTFALL:  Have you ever known any?

18           VENIRE PERSON:  I don't recall that I have.

19           MR. WESTFALL:  So have you had any good

20   experiences or bad experiences with Muslims over the

21   course of your life?

22           VENIRE PERSON:  No, I have not.  Well, you know

23   what?  I don't know that he was a Muslim.  I had a coach

24   when I was in college that was a foreigner.  I don't

25   believe he was a Muslim.  He did wear a turnick (sic).

1          MR. WESTFALL:  He wore a turban?

2          VENIRE PERSON:  Yes, but I don't know what

3     nationality he was.

4          MR. WESTFALL:  How do you feel --

5          VENIRE PERSON:  Extremely nervous.

6          MR. WESTFALL:  From sitting there, right?

7          VENIRE PERSON:  Yes.

8          MR. WESTFALL:  You know, we're nervous, too.

9     How do you feel, the idea of being on a jury where -- It's

10    going to be a multi-month long trial -- where the issues

11    have to do with terrorist and Muslim men?

12         VENIRE PERSON:  Very nervous.  I feel like you

13    would have to be watching your back all the time.  I'm a

14    pretty trusting person, but it doesn't sound like your

15   regular trial, but I feel like you would really have to

16    keep your eyes open and be sure you are not be followed.

17         MR. WESTFALL:  So are you fearful that you would

18    be retaliated against if you did serve in this trial?

19         VENIRE PERSON:  I don't know that I would say

20    that.  But I feel I would be a lot more cautious than

21    normal.

22         MR. WESTFALL:  Here is what I'm getting at.  If

23    over the course of the next couple of months -- three

24    months, however long this goes -- if fear is distracting

25    you from what's actually going on in the courtroom, then

18:00 1    this may be a trial that you probably ought not to be on.

2    You know what I mean?

3                    VENIRE PERSON:  (Shakes head)

4                    MR. WESTFALL:  There is a million different

5    other kinds of trial, as you know.  You have been on one.

6    The feeling that you have, fear, is that the kind of thing

7    that would distract you from your service while we're

8    going through this trial?

9                    VENIRE PERSON:  Again, like I said, I would feel

10    more cautious, like I would have to watch my back more,

11    and that's not me as an individual, but considering

12    everything involved, I don't know much about terrorism,

13    don't want to know much to be honest with you, and I just

14    feel like you would have to definitely keep your eyes

18:00 15   open.  I think being on a jury would be a good challenge

16    and a learning experience in life.  On the other hand -- I

17    won't say that I'm fearful, but I would be very cautious.

18                    MR. WESTFALL:  Well, before I get off the

19    subject, if you had to pick just yes or no on whether

20    these things you have talked about -- having to watch

21    yourself and your back and all of that, whether that would

22    distract you from your service in any way while we're in

23    trial, would you say yes or no?

24                    VENIRE PERSON:  No, I wouldn't want to serve.

25                    MR. WESTFALL:  You would not?

18:00 1           VENIRE PERSON:  No, I would not.

2           MR. WESTFALL:  So the answer is basically yes?

3           VENIRE PERSON:  I would not want to serve, no.

4    I do not want to sit on the jury.

5           MR. WESTFALL:  Is it because of that feeling at

6    least in part?

7           VENIRE PERSON:  Because of that.  I have

8    personal things going on in my life.  I'm sure no one

9    wants to take three or four months out of their life.  I'm

10   not good at sitting for very long.  I have a back problem.

11   Like I said, to me, it would be interesting.  However, you

12   have to put your life on hold as well.

13          MR. WESTFALL:  Right.  Of course.  And you have

14   to do that any time you are on a jury.  This just happens

18:00 15   to be a long one.

16          VENIRE PERSON:  Of course.

17          MR. WESTFALL:  The issue of whether you could be

18   a fair and impartial juror though is what I'm asking you.

19   When we say fair and impartial, it means looking at the

20   evidence and being able to make a decision only on the

21   evidence.  And do you believe you could be a fair and

22   impartial juror?

23          VENIRE PERSON:  Yes, sir.

24          MR. WESTFALL:  The hardship issue is another

25   issue.  Do you know much about the Palestinian-Israeli

18:00 1 conflict?

2     VENIRE PERSON:  No.  I have listened to the

3 news, but to actually know someone that's been over there

4 and involved in it, no.

5     MR. WESTFALL:  Have a sense of who's right and

6 who's wrong over there?

7     VENIRE PERSON:  No, I do not.

8     MR. WESTFALL:  Not a little?

9     VENIRE PERSON:  I'm hesitant because I believe

10 in our government.  We hear so much about pulling the

11 troops out, and I believe the leader of our country is

12 doing the right thing.

13     MR. WESTFALL:  Do you know anything about HAMAS?

14     VENIRE PERSON:  No.

18:00 15     MR. WESTFALL:  Do you have any idea where HAMAS

16 operates?

17     VENIRE PERSON:  No.

18     MR. WESTFALL:  Have you ever heard of HAMAS?

19     VENIRE PERSON:  I have heard of it, but I don't

20 know about it.

21     MR. WESTFALL:  What do you think it is?

22     VENIRE PERSON:  My guess would be a group of

23 individuals that probably are like terrorists and have

24 their own religion, and to me, a religion is something

25 that's man made, and it's taught from the time you are

18:00 1    brought up, and that's what you are led to believe.  Am I

2    way off?

3            MS. CADEDDU:  I'm just asking you what you know.

4    I'm just asking you what you know.

5            VENIRE PERSON:  What is it?

6            MR. WESTFALL:  For purposes of this trial it's a

7    terrorist organization, but they operate in Palestine.  Do

8    you go to church?  Are you active in a religion?

9            VENIRE PERSON:  Yes.

10            MR. WESTFALL:  When you think of a Muslim, what

11    do you think about?

12            VENIRE PERSON:  Again, to me a religion is man

13    made, and I believe each religion for a reason because man

14    creates the rules.  I think we all have a supreme being

18:00 15    that we are worshiping.  I don't know that the Muslims are

16    worshiping God the way we do.  I don't believe they are.

17    That's what I believe.

18            THE COURT:  Mr. Westfall, your time has expired.

19            MR. WESTFALL:  Thank you, your Honor.

20            Mr. Garrett, do you have questions for Ms.

21    Shrum?

22            MR. GARRETT:  Yes, your Honor.  Good afternoon.

23    My name is Nathan Garrett, and I'm an Assistant United

24    States Attorney, and I'm one of the prosecutors assigned

25    to this case.  I'll be prosecuting on behalf of the

18:00 1   government.  Just a couple of questions to follow-up on

2   Mr. Westfall's questions.  Bear with me.  You said on your

3   questionnaire that you were a buyer.  Can you tell me what

4   that is?

5        VENIRE PERSON:  I work in a chemical company,

6   and we have direct materials which are the raw materials

7   that go into the product and indirect materials which are

8   the products used in the plant, everything except for the

9   chemicals and raw materials.  So I buy your pumps and

10   chairs that you sit in, everything except the raw

11   materials.

12        MR. GARRETT:  Is the company for which you work

13   located in Dallas or --

14        VENIRE PERSON:  Ennis, Texas.

18:00 15        MR. GARRETT:  And I believe you also marked that

16   you were married.  Is that correct?

17        VENIRE PERSON:  Yes.

18        MR. GARRETT:  Does your husband work as well?

19        VENIRE PERSON:  Yes.

20        MR. GARRETT:  What does he do?  Just generally.

21        VENIRE PERSON:  He's supervisor of maintenance

22   for a pipe company that makes concrete pipe.

23        MR. GARRETT:  Is that in Dallas?

24        VENIRE PERSON:  Grand Prairie.

25        MR. GARRETT:  You marked here that you don't

18:00 1    have any children.

2              VENIRE PERSON:  I have two stepchildren, but

3    personally, no.

4              MR. GARRETT:  And how old are they?

5              VENIRE PERSON:  Twenty-five and twenty-seven.

6              MR. GARRETT:  Are they in the home or outside

7    the home?

8              VENIRE PERSON:  Outside the home.

9              MR. GARRETT:  You marked that you have served on

10   a jury before.  Is that correct?

11             VENIRE PERSON:  Yes, Ellis County.

12             MR. GARRETT:  That was my next question.  That

13   was at the county level.

14             VENIRE PERSON:  Yes.

18:00 15             MR. GARRETT:  Have you ever served in a federal

16   jury?

17             VENIRE PERSON:  No.

18             MR. GARRETT:  Ever been called down before like

19   this?

20             VENIRE PERSON:  No.

21             MR. GARRETT:  First opportunity?

22             VENIRE PERSON:  Yes.

23             MR. GARRETT:  You are in Red Oak, right?

24             VENIRE PERSON:  Yes.

25             MR. GARRETT:  And I think your questionnaire

18:00  1    said you have been there eighteen years and before that

2    you were in Toledo?

3                   VENIRE PERSON:  Yes.

4                   MR. GARRETT:  Toledo, Ohio?

5                   VENIRE PERSON:  Yes.

6                   MR. GARRETT:  How long?

7                   VENIRE PERSON:  I grew up there.

8                   MR. GARRETT:  So spent your life in Toledo until

9    you had the good fortune to come here?

10                   VENIRE PERSON:  Right.

11                   MR. GARRETT:  You mentioned to Mr. Westfall

12   about your reluctance to serve or you really didn't want

13   to serve, and there was some discussion going back and

14   forth about your fears or concerns generally about this

18:00 15   type of case.  I certainly understand that you don't want

16   to serve.  You are not asking, raising your hand to do

17   that.  Is that right?

18                   VENIRE PERSON:  Right.

19                   MR. GARRETT:  But if you were asked to serve, if

20   you were called upon by the Court to serve as a juror in

21   this case, is that something you could do and do it fairly

22   and impartially?

23                   VENIRE PERSON:  As far as my opinion, yes.

24                   MR. GARRETT:  And what do you mean when you say

25   as far as my opinion?

18:00 1          VENIRE PERSON:  As far as -- I feel I could do

2    it.  As I mentioned earlier, I do have a problem sitting

3    for a long period of time.  That's the only thing that I

4    think would hold me back.

5          MR. GARRETT:  I understand you are not asking to

6    be here, but if you were here and asked to serve --

7          VENIRE PERSON:  As far as my opinion, I think I

8    could be very fair.

9          MR. GARRETT:  And you could afford each of these

10   defendants the rights that they are entitled to -- The

11   presumption of innocence, the burden the government

12   carries to prove the case beyond a reasonable doubt, those

13   are things that you could honor as a juror?

14          VENIRE PERSON:  Yes.

18:00 15          MR. GARRETT:  As Mr. Westfall mentioned to you,

16   this case involves allegations that the defendants

17   knowingly provided material support to a terrorist

18   organization.  That's HAMAS.  And the Judge will give you

19   instructions at the end of the case on what the law is,

20   and then you take the facts from the testimony and

21   evidence, and you apply the facts to that law that he

22   gives.

23          VENIRE PERSON:  Yes.

24          MR. GARRETT:  And that law I expect he would

25   tell you is that HAMAS is a terrorist organization, and as

18:00 1    a result of that one cannot give material support to

2    HAMAS.  You can't give money, but you also can't give

3    charitable items, library books, school supplies, that

4    sort of stuff.  Do you understand that?

5               VENIRE PERSON:  Yes, I do.

6               MR. GARRETT:  Do you have any issue with that

7    provision of the law?

8               VENIRE PERSON:  No, I don't.

9               MR. GARRETT:  If the Judge instructed you that

10   was prohibited, you could follow that as well?

11              VENIRE PERSON:  Yes, sir.

12              MR. GARRETT:  Thank you, ma'am.  Thank you, your

13   Honor.

14              THE COURT:  Ms. Shrum, you said you had

18:00 15   difficulty sitting for long periods of time.  Can you be

16   more specific?

17              VENIRE PERSON:  Well, I have a desk job, and to

18   tell you the truth, the longest I sit is about an hour,

19   and I'm up stretching and moving around.

20              THE COURT:  Well, in our court sessions here, we

21   typically go maximum hour and a half before we take a

22   break, if we went that long and you were on the jury and

23   started to experience discomfort and seated in the back

24   row, as you are now, would it be problem if you stood up

25   and stretched your back?

18:00 1          VENIRE PERSON:  As long as I can stand and not

2     sit for a long period of time.  I do have a letter from my

3     chiropractor.  I thought that would let you know that I'm

4     not telling you a story.

5          THE COURT:  Thank you, Ms. Shrum.  As you have

6     probably gathered, we are in the process of talking to

7     people in the jury pool from which the jury will be drawn

8     to hear this case.  I expect that will go on for at least

9     another day or two.  So until you hear from us again, you

10     should not discuss this case with anyone or allow anyone

11     to discuss it with you, and if there are any media

12     accounts about the case, you should not read or watch or

13     listen to any of those media accounts.

14          VENIRE PERSON:  Yes, sir.  Would you like this

18:00 15     letter.

16          THE COURT:  Sure if you want to give it to me.

17     This a copy that I can keep?

18          VENIRE PERSON:  That's an original you can keep.

19          THE COURT:  Ladies and Gentlemen, the letter

20     that was just handed to me by Ms. Shrum is on the

21     letterhead of Chiropractor Clinic in Duncanville, Texas,

22     and it's related to Ms. Shrum.  It says "To whom it may

23     concern, I recommend that Ms. Shrum does not participate

24     as a juror due to chronic low back condition that would

25     preclude her from any prolonged sitting.  If you have any

18:00  1    questions regarding Ms. Shrum, please do not hesitate to

2    conduct this office." And the letter is signed by Timothy

3    R. Klezmet, D.C.  Klezmet Chiropractor Clinic.

4         MR. JACKS:  Your Honor, I wanted to interpose an

5    objection.  Mr. Westfall, there were a couple of questions

6    that he asked Ms. Shrum that I believe are improper or

7    they are certainly put to the jury in an improper fashion.

8    And I cannot remember the exact question leading up to it,

9    but essentially it was about if you were on this jury and

10   it involves matters relating to terrorism, and then he

11   would follow that up with a question like if you had to

12   answer yes or no, would your answer be yes or no, and I

13   don't believe that's proper.  I don't believe it's proper

14   to force the juror to give a yes or no answer because they

18:00 15   don't know that they can decline to give a yes or no

16   answer.  They are not sure what they can do or not do, and

17   I think that's unfair and improper to put it in that way

18   so that the juror feels like they have to give a yes or no

19   answer, but I don't believe that they should be required

20   to give a yes or no answer on something like that and

21   forced to make a decision one way or the other when that

22   may not be the way they feel.

23        Secondly, there was also before that he made a

24   statement to Ms. Shrum, and I think it's been stated to

25   other members of the jury pool that you may not be the

18:00 1    right person for this jury.  And it sounded more as though

2    Mr. Westfall was making that statement rather than asking

3    the juror the question.  So I would request the Court

4    instruct the defense not to make those types of

5    statements.  That is something the juror is supposed to

6    provide answers about, and they are not to be told that

7    because, again, they are in a strange environment, and

8    they don't know whether they can disagree or not.  And so

9    to just make a statement to them is I think unfair to the

10    juror and restricts their answers.

11        THE COURT:  Mr. Westfall, do you want to be

12    heard before I make a decision?

13        MS. CADEDDU:  Your Honor, I don't think I'm

14    being unfriendly or overbearing at all with these jurors.

18:00 15    Earlier they had an objection about Linda using leading

16    questions.  I could just as easily have said it sounds

17    like you have a disability.  You have a disability, don't

18    you.  I think in order to make a record and for the Court

19    to rule on a challenge for cause she has to say yes or no,

20    and if she refused to answer I wouldn't have made her.  I

21    couldn't make her.  I don't feel like -- And I'll look for

22    the Court's guidance.  But I don't feel like there is

23    anything improper in the way I'm questioning the jurors,

24    your Honor.

25        THE COURT:  Well, I don't know that I would go

18:00 1    so far as to say it's improper, Mr. Westfall, but it does

2    seem to me that -- I think there is a validity to what Mr.

3    Jacks is saying, that most of these people have not been

4    on jury service before, and even if they have, they have

5    not been through a process of individual questioning like

6    this, and so they are in a strange environment where they

7    don't really know what the rules or procedures are, and it

8    seems to me it is unfair to them to require them to answer

9    in any particular way.  I think that we should give them

10   the latitude to tell us how they feel but in the way that

11   expresses clearly what those feelings are rather than

12   trying to channel it into a particular either/or, yes or

13   no, or whatever else the choice is.  So you said you would

14   ask for my guidance, and that is my guidance.  I don't

18:00 15   think that is particularly useful with what we're about

16   here.  I do agree with you that I don't think you have

17   been overbearing or intimidating to the jurors, but I

18   don't think it elicits the kind of information that is

19   helpful to us.

20            MR. WESTFALL:  Okay.  I think I understand.

21            THE COURT:  Mr. Kiblinger, I think we're ready

22   to see next Mr. Saucier, Number 4.

23            Good afternoon.  Your name is pronounced

24   Saucier?

25            VENIRE PERSON:  Yes.

18:00 1          THE COURT:  Mr. Saucier, counsel for the parties

2     in this case have some questions they would like to ask

3     you.  Mr. Westfall.

4          MR. WESTFALL:  Thank you, your Honor.  Mr.

5     Saucier, how are you doing?

6          VENIRE PERSON:  Just fine.

7          MR. WESTFALL:  My name is Greg Westfall, and I'm

8     a criminal defense lawyer, one of the lawyers on this

9     case, and I want to speak with you for a very few minutes,

10    and then I expect the government will want to speak to

11    you.

12          This case is the United States versus Holy Land

13    Foundation for Relief and Development.  It has to do with

14    an organization and Muslim charity -- Well, what they

18:00 15 allege is providing material support to HAMAS which is a

16    terrorist organization.  Having told that you, do you

17    recognize that at all?

18          VENIRE PERSON:  I remember hearing something

19    about it three years ago or so.

20          MR. WESTFALL:  Have you heard anything recently?

21          VENIRE PERSON:  Not until this week.  I heard

22    something Monday.

23          MR. WESTFALL:  What all have you heard?

24          VENIRE PERSON:  Just the jury selection.  That's

25    all I heard.

18:00 1    MR. WESTFALL:  From anything you heard from

2    three years ago or this week, have you formed an opinion

3    at all about the guilt or innocence of the defendants or

4    the strength of the government's case or anything?

5        VENIRE PERSON:  I really don't know anything

6    about it.  But no, I don't have an opinion about it.

7        MR. WESTFALL:  You put on your questionnaire you

8    are active in the Masons.

9        VENIRE PERSON:  I haven't been active, but I'm

10   part of it, yes.

11       MR. WESTFALL:  How long have you been a Mason?

12       VENIRE PERSON:  Probably 1999.

13       MR. WESTFALL:  How did you come to be a Mason?

14       VENIRE PERSON:  My father is a Mason.

18:00 15    MR. WESTFALL:  What do the Masons do?

16       VENIRE PERSON:  Just a fraternity.  They do a

17   lot of charitable stuff.

18       MR. WESTFALL:  Did you do charitable projects

19   with the Masons?

20       VENIRE PERSON:  Yes.

21       MR. WESTFALL:  Like what?

22       VENIRE PERSON:  You hold a breakfast to raise

23   money for the -- have you seen the Shriners?

24       MR. WESTFALL:  Yes.

25       VENIRE PERSON:  That's part of the Masons.

18:00 1                MR. WESTFALL:  Are they the charitable part

2     or --

3                VENIRE PERSON:  They tend to do more of it.  But

4     I have been active with them.

5                MR. WESTFALL:  And how long have you been a part

6     of the Masons?

7                VENIRE PERSON:  Ten years.

8                MR. WESTFALL:  You said in your questionnaire

9     you followed the Israeli-Palestinian conflict somewhat

10    closely.

11               VENIRE PERSON:  Yes.  Over the years.  I do

12    listen to talk radio.

13               MR. WESTFALL:  Who do you like on talk radio?

14               VENIRE PERSON:  Man, I guess Mike Gallagher I

18:00 15  would like.

16               MR. WESTFALL:  Is that the WBAP or KVIL?

17               VENIRE PERSON:  No, the other one, 660.

18               MR. WESTFALL:  Are we talking about seeing news

19    or have you looked at books about the Israeli-Palestinian

20    conflict, studied the history?

21               VENIRE PERSON:  No, but there is a friend of

22    mine who is pretty heavily read up on the conflict there,

23    but we talk about it a lot.  But whenever I talk to him.

24    I guess it's more that.  So I guess maybe a lot of

25    information from him.

18:00 1          MR. WESTFALL:  Does he have an opinion as to

2      who's right and who's wrong?

3          VENIRE PERSON:  Actually he doesn't.  He's kind

4      of indifferent.  He doesn't really.

5          MR. WESTFALL:  How about you?  Have you ever

6      formed an opinion about who's right or wrong?

7          VENIRE PERSON:  There is certain situations

8      where I see both sides.  So I mean if -- I see both sides

9      of it.  On certain circumstances, I would definitely see

10     why one does one thing and why another does another thing.

11         MR. WESTFALL:  For instance, what's the Israeli

12     side?

13         VENIRE PERSON:  Well, I'm sure they are kind of

14     in fear of being attacked and on the opposite side the PLO

18:00 15   seems to be tired of being crowded in certain areas and

16     not being able to -- the Palestinians.  I see both sides.

17         MR. WESTFALL:  Do you know any Muslims

18     personally?

19         VENIRE PERSON:  Yes.

20         MR. WESTFALL:  How many?  Tell me.

21         VENIRE PERSON:  I'm not sure he's a Muslim.  If

22     he is, I don't think he's practicing.  I knew some in

23     school.  They were twins.  I think they were born here.

24     None I talk to right now.  One of them was a friend in

25     school and he died.

18:00 1    MR. WESTFALL:  Do you have friendly experiences

2    with the ones you know?

3        VENIRE PERSON:  Oh, yes.

4        MR. WESTFALL:  Do you know anything about the

5    religion at all?

6        VENIRE PERSON:  Yes.

7        MR. WESTFALL:  Did they go through things like

8    Ramadan while you knew them?

9        VENIRE PERSON:  Most of them were secular.  But

10    my friend Jamal, he would pray seven times a day.  He's

11    pretty religious.

12        MR. WESTFALL:  Pious, devoted?

13        VENIRE PERSON:  He's a good guy.

14        MR. WESTFALL:  What did you think of that?

18:00 15    VENIRE PERSON:  I have no problem.  I'm

16    religious, too.  So no problem.

17        MR. WESTFALL:  Anything about being on a case

18    like this where it has anything to do with terrorism that

19    you feel like you couldn't be fair and impartial?

20        VENIRE PERSON:  I feel I could be fair and

21    impartial.  There might be concern about things -- if

22    there is a sequestering involved, I may have some personal

23    issues that really severely damage me if I did it, but

24    other than being impartial, no.

25        MR. WESTFALL:  In every trial you have to make

18:00 1  your decision just upon the evidence that you see in court

2  and hear in court and that's it.  Any problem at all in

3  doing that in your case do you think?

4           VENIRE PERSON:  No.

5           MR. WESTFALL:  Thank you so much.

6           THE COURT:  Mr. Garrett, do you have questions

7  for Mr. Saucier?

8           MR. GARRETT:  Yes, your Honor.

9           Good afternoon.

10           VENIRE PERSON:  Good afternoon.

11           MR. GARRETT:  My name is Nathan Garrett, and I'm

12  an Assistant United States Attorney, and I'm one of the

13  prosecutors for the government, prosecuting this case.  I

14  have just a couple of follow-up questions for you just

18:00 15  briefly.  You are married; is that correct?

16           VENIRE PERSON:  Yes.

17           MR. GARRETT:  And does your wife work outside

18  the home?

19           VENIRE PERSON:  She does.

20           MR. GARRETT:  What type of work does she do?

21           VENIRE PERSON:  She's a nurse.  Just recently

22  got her RN.

23           MR. GARRETT:  Congratulations to her and you.

24  Does she work in any particular area, doctor's office or

25  hospital?

18:00 1          VENIRE PERSON:  Transplant unit at the hospital.

2          MR. GARRETT:  Two children?

3          VENIRE PERSON:  And one on the way, due at the

4     end of next month.

5          MR. GARRETT:  Oh.  Your children are five and

6     six that you have right now; is that right?

7          VENIRE PERSON:  Yes.

8          MR. GARRETT:  Boys or girls?

9          VENIRE PERSON:  Girls.

10          MR. GARRETT:  And the one on the way?

11          VENIRE PERSON:  A boy.

12          MR. GARRETT:  You know?

13          VENIRE PERSON:  Yes.

14          MR. GARRETT:  He is expected when?

18:00 15          VENIRE PERSON:  The end of next month.  October

16     2nd.  Maybe a C-section.

17          MR. GARRETT:  How would that affect your ability

18     to serve as a juror in this case?

19          VENIRE PERSON:  Well, if I'm sequestered --

20          MR. GARRETT:  I can't speak for the Court, but

21     we don't expect that but assuming that --

22          VENIRE PERSON:  The only other thing is at the

23     end of this month we'll be moving to a new house, but

24     that's just a logistical thing.

25          MR. GARRETT:  In terms of your ability to serve

18:00 1 during the hours of the jury, that's no problem?

2    VENIRE PERSON:  As long as I'm not sequestered.

3    MR. GARRETT:  I believe on your questionnaire

4 you said you performed environmental consulting.

5    VENIRE PERSON:  Yes.

6    MR. GARRETT:  Can you flush that out a little

7 bit?

8    VENIRE PERSON:  It's mostly dealing with the

9 petroleum storage tank sites.  We'll go in and investigate

10 and do an examination, and if it has possible problems, we

11 will do a subsearch investigation, and then if there is a

12 problem, we will clean it up.

13    MR. GARRETT:  That's a private firm?

14    VENIRE PERSON:  Yes.

18:00 15    MR. GARRETT:  Is that the sort of job that may

16 take you elsewhere when you're working?

17    VENIRE PERSON:  Oh, yeah, I have been all over

18 the United States doing it.

19    MR. GARRETT:  Is it Dallas-based?

20    VENIRE PERSON:  It is now.  It was Fort Worth,

21 but we have a Dallas, Weatherford, Midland office.

22    MR. GARRETT:  And how long have you lived in

23 this area?

24    VENIRE PERSON:  Thirty years.

25    MR. GARRETT:  How old are you?

18:00  1          VENIRE PERSON:  Thirty-four.

       2          MR. GARRETT:  I noticed also on there it asks if

       3     you have had any friends or relatives that have been

       4     involved in any kind of legal dispute, and you mentioned

       5     that you had a brother that had a tangle up or two.

       6          VENIRE PERSON:  Yes, my brother has issues.

       7          MR. GARRETT:  Is that something going on now?

       8          VENIRE PERSON:  No, not that I know of.

       9          MR. GARRETT:  Is there anything about that

      10     experience from your standpoint that would affect your

      11     ability to sit as a juror, to hear one side or the other?

      12          VENIRE PERSON:  No.

      13          MR. GARRETT:  In terms of his involvement with

      14     the law or law enforcement do you think that he was

18:00 15     treated fairly at the end of the day?

      16          MR. GARRETT:  Treated more than fairly.

      17          MR. GARRETT:  Sounds like you might have been

      18     harder.

      19          VENIRE PERSON:  Probably.

      20          MR. GARRETT:  As Mr. Westfall said, this case

      21     involves material support to a terrorist organization.

      22     And that terrorist organization is HAMAS, and the Judge

      23     will give you instructions at the end of the case telling

      24     you exactly what the law is defining a terrorist

      25     organization and defining material support, and I submit

18:00 1    he would tell that you HAMAS is a terrorist organization

2    for the purposes of this trial.  As a result of that

3    designation one cannot knowingly send funds, money, to

4    that organization, to any component of that organization.

5    Nor can one send what you might think of as charitable

6    things -- books, supplies, medicines.  In terms of the

7    charitable side of that, do you understand that?

8                    VENIRE PERSON:  Yes.

9                    MR. GARRETT:  Do you have any reactions or

10    issues one way or the other?

11                    VENIRE PERSON:  Well, it's against the law.

12                    MR. GARRETT:  So that's an instruction you can

13    follow?

14                    VENIRE PERSON:  Yes.

18:00 15                    MR. GARRETT:  Thank you so much for your time.

16                    THE COURT:  Mr. Saucier, we are in the process

17    of interviewing people who are in the pool from which the

18    jury will be selected that would hear this case.  I

19    anticipate that process will continue for at least another

20    day or two.  So until you hear from us again, you should

21    not discuss this case with anyone or allow anyone to

22    discuss it with you.  Nor should you read or watch or

23    listen to any media accounts of this case if there are

24    any.  Thank you.  You may rejoin the others in the hall.

25                    THE COURT:  Good afternoon, Ms. Tillis.  Counsel

18:00  1    for the parties have some questions to ask you.

2              MR. WESTFALL:  Ms. Tillis, my name is Greg

3         Westfall, and I want to speak to you a few minutes, and

4         then the government may want to stand up and speak to you.

5         This case is the Holy Land Foundation case.  You mentioned

6         in your questionnaire you thought you might have heard

7         about it before.

8              VENIRE PERSON:  Exactly.

9              MR. WESTFALL:  And the allegations are that the

10        government alleges that the Holy Land Foundation and some

11        of the men involved in that Foundation gave material

12        support to HAMAS which is a terrorist organization.  Is

13        that the same one you thought you heard about?

14             VENIRE PERSON:  Yes, sir.

18:00 15             MR. WESTFALL:  What have you heard about in I

16        presume the media?

17             VENIRE PERSON:  Just the media.

18             MR. WESTFALL:  What have you heard?

19             VENIRE PERSON:  Just what the media stated.

20        Like I said in my questionnaire, I didn't really know all

21        the details and facts and things.  But I know they got

22        stuff taken away.  I knew the government went in and

23        seized some of their possessions.  That's all I know

24        basically.

25             MR. WESTFALL:  Based upon anything you have read

18:00 1    or heard, have you formed an opinion as to the guilt or

2    innocence of the defendant?

3          VENIRE PERSON: Well, I really don't know the

4    facts. Like I said, I know they seized their property. I

5    don't know the details. I didn't get that.

6          MR. WESTFALL: So let me ask you another couple

7    of things about your questionnaire.

8          VENIRE PERSON: Okay.

9          MR. WESTFALL: One of the questions said "Have

10    you formed any believe about the Palestinian-Israeli

11    conflict." And you wrote due to the fact that killing is

12    a crime you don't support those organizations, and for

13    that reason you couldn't be fair.

14          VENIRE PERSON: Right. Terrorist. Innocent

18:00 15    people. But I don't know the facts. That was my opinion.

16          MR. WESTFALL: You know, this case has terrorism

17    in the charge. It's material support of terrorism.

18          VENIRE PERSON: Okay, well, if that's the case,

19    you read what I wrote then.

20          MR. WESTFALL: So you don't think you could be

21    fair and impartial?

22          VENIRE PERSON: Well, my strong opinion is I

23    don't believe in killing, especially innocent people.

24          MR. WESTFALL: Well, I guess the only question

25    is your opinions that you have, could you set those aside

18:00 1    and fairly consider on the facts of the case?

2           VENIRE PERSON: Right. I don't know the facts

3    about them, the Foundation. I don't know. But that's my

4    opinion about terrorists.

5           MR. WESTFALL: Tell me about that opinion. It's

6    very strong.

7           VENIRE PERSON: Very strong. We have innocent

8    people that die for this. We got people over there in the

9    war every day. That's why I don't like to look at the

10    media and all. That's what it reflects. Just bad, to me.

11    It's bad.

12           MR. WESTFALL: Do you know anyone that's in the

13    military right now over there?

14           VENIRE PERSON: I know several people. I have

18:00 15    some that came back, yes.

16           MR. WESTFALL: Do you know anything about HAMAS?

17           VENIRE PERSON: No.

18           MR. WESTFALL: Do you know where HAMAS operates

19    I guess?

20           VENIRE PERSON: No.

21           MR. WESTFALL: You know HAMAS isn't in Iraq;

22    it's over in Palestine.

23           VENIRE PERSON: I probably wrote that in there

24    in my questionnaire about the media and all of that. I

25    read the newspapers, but when it goes to stuff like that,

18:00 1    I don't like to read because it just --

2                    MR. WESTFALL:  I got you.

3                    VENIRE PERSON:  It's what I wrote.

4                    MR. WESTFALL:  What do you do for a living?

5                    VENIRE PERSON:  I'm a manager of corporate

6    accounting, general ledger.

7                    MR. WESTFALL:  You have a bachelor of science?

8                    VENIRE PERSON:  Yes, BS.

9                    MR. WESTFALL:  Accounting?

10                   VENIRE PERSON:  Accounting.

11                   MR. WESTFALL:  Do you know any Muslims?

12                   VENIRE PERSON:  Yes.

13                   MR. WESTFALL:  Can you tell me about them?

14                   VENIRE PERSON:  Well, they have a store

18:00 15   downstairs in my building where I work.

16                   MR. WESTFALL:  How do you get along with them?

17                   VENIRE PERSON:  Fine.

18                   MR. WESTFALL:  Are they nice people?

19                   VENIRE PERSON:  Yes.

20                   MR. WESTFALL:  Have you had any bad experiences

21   with Muslims at all?

22                   VENIRE PERSON:  Experience like what?  Visiting,

23   chatting, yes, every day.

24                   MR. WESTFALL:  Just talking to them.

25                   VENIRE PERSON:  Go downstairs and get a paper,

18:00  1    hey, good morning.  Every day we talk.  I don't judge

2    people just because of their religion or faith or

3    whatever.  People is people.  Human.

4             MR. WESTFALL:  You go to church yourself?

5             VENIRE PERSON:  Yes.  Yes, sir.

6             MR. WESTFALL:  Well, not everyone does.

7             VENIRE PERSON:  I believe it.  But I do.

8             MR. WESTFALL:  Have you ever done any work in

9    your church like volunteer work or charity work?

10             VENIRE PERSON:  Yes, Bible school, yes.

11             MR. WESTFALL:  How do you feel about it?

12             VENIRE PERSON:  It's good.

13             MR. WESTFALL:  Is it something you practice?

14             VENIRE PERSON:  Yes, different organizations,

18:00 15    yes.

16             MR. WESTFALL:  Like what?

17             VENIRE PERSON:  Like the diabetes.  That's one

18    of them and the veterans.  And then the church, we have

19    different families that in time of need we give money and

20    do what we need to do.

21             MR. WESTFALL:  Very nice.  How do you feel about

22    being on this jury?

23             VENIRE PERSON:  Well, it's like I'm on trial.

24    You asked me a hundred questions.

25             MR. WESTFALL:  Well, I'll stop right now.

18:00 1          VENIRE PERSON:  Thank you.

2          MR. WESTFALL:  Tender the juror.

3          THE COURT:  Mr. Garrett, do you have questions

4     for the juror?

5          MR. GARRETT:  At some risk, your Honor, yes.

6     Good afternoon.  How are you?

7          VENIRE PERSON:  Fine, how are you?

8          MR. GARRETT:  Great.  My name is Nathan Garrett,

9     and I'm an Assistant United States Attorney, and I'm one

10    of the prosecutors in this case.  I have a few quick

11    questions to follow-up from Mr. Westfall.  You have in

12    your questionnaire that you are married.

13         VENIRE PERSON:  Yes.

14         MR. GARRETT:  Does your husband work?

18:00 15         VENIRE PERSON:  Yes.

16         MR. GARRETT:  What kind of work does he do?

17         VENIRE PERSON:  He's a teacher.

18         MR. GARRETT:  What does he teach?

19         VENIRE PERSON:  Special education.

20         MR. GARRETT:  High school or --

21         VENIRE PERSON:  Now high school.  It was

22    elementary school.

23         MR. GARRETT:  You mentioned on your

24    questionnaire -- You said you would want to talk to your

25    husband or your husband would want to talk to you at night

18:00 1     about what went on during the day.  It asked you if you

2     were instructed not to talk to anybody or read anything to

3     anybody about this case could you do that.

4           VENIRE PERSON:  It would be very hard not to

5     communicate with him.

6           MR. GARRETT:  If this Court instructed you not

7     to talk to your husband or anybody else about this case or

8     your service on this case, at least during the pendancy

9     while you are sitting as a juror --

10          VENIRE PERSON:  Yes, if I get instructed.  I

11    love my freedom.

12          MR. GARRETT:  If he told you not to do that,

13    that's something you could follow?

14          VENIRE PERSON:  Yes.

18:00 15         MR. GARRETT:  And one of the questions was about

16    electronic intercepts.  In this case you will hear

17    evidence that there were intercepts of conversations

18    involving the defendants, and you mentioned on there that

19    you had an issue with that, and I think you wrote privacy

20    next to it.  Can you tell me what you mean by that?

21          VENIRE PERSON:  Well, basically -- I guess there

22    is certain levels I guess.  But I don't -- What do you

23    call those devices?

24          MR. GARRETT:  Wire taps.

25          VENIRE PERSON:  I'm just not in favor of them.

18:00 1    Sorry.

2              MR. GARRETT:  You don't need to be sorry for

3    anything here today.  No right or wrong answers.  Would

4    that include where a judge has issued a warrant

5    authorizing a wire tap?

6              VENIRE PERSON:  Well, I guess there would be a

7    reason.  There would have to be a reason.

8              MR. GARRETT:  Here is what I'm asking.  If a

9    judge authorized the wire tapping of someone's phone and

10   then at trial there is evidence of those conversations

11   pursuant to a warrant issued by a Court, could you

12   consider that evidence?

13             VENIRE PERSON:  I guess what I'm saying by

14   privacy, if I haven't done anything being in my -- that's

18:00 15   privacy to me.

16             MR. GARRETT:  I don't want that either.

17             VENIRE PERSON:  Social Security, nothing.

18             MR. GARRETT:  I understand that.  But if there

19   was evidence in this case that was derived from wire taps

20   that were lawfully authorized, could you consider that

21   evidence?

22             VENIRE PERSON:  Lawfully, it is what it is.

23             MR. GARRETT:  And you mentioned charity as a

24   concept is a good thing.

25             VENIRE PERSON:  It is.

18:00 1          MR. GARRETT:  And in this case -- I don't

2     remember how specific Mr. Westfall was with you, but this

3     case involves allegations that these gentlemen seated

4     behind me knowingly supported a terrorist organization.

5     HAMAS is the organization.  Okay?  And at the end of the

6     trial, the Judge will give you instructions on the law.

7     He would tell you what the law is in this case.  You have

8     to figure out how the facts meet with the law, but he

9     would tell you what the law is, and I expect he would

10    instruct you that HAMAS for the purposes of this case is a

11    terrorist organization.  On the question of material

12    support, as a result of the designation, it's unlawful for

13    someone to knowingly give support to that terrorist

14    organization.  Money, which I expect there would be

18:00 15   evidence of that, but also charitable items, if it goes to

16    that terrorist organization, you can't send that either.

17    Library books, medical supply, all of that stuff.  If it

18    goes to or for the benefit of one of the terrorist

19    organizations, in this case HAMAS, you can't do that.  Do

20    you have any problem or reaction to that?

21          VENIRE PERSON:  I guess I do.  Because I stated

22    that since -- We backing someone, terrorists?  I don't

23    know.  Even though you are saying charitable.  Charitable

24    to me is for those in need.  To me that's not a special

25    organization.

18:00 1          MR. GARRETT:  Okay.  Okay.  But if the Judge

2     instructs you that HAMAS is a terrorist organization and

3     as a result of that designation and as a result of that

4     status someone cannot knowingly send them money or

5     clothing or library books or any of those types of things,

6     could you follow that instruction?

7          VENIRE PERSON:  Yes.

8          MR. GARRETT:  And if you have hesitation or

9     concern I want you to be honest.

10          VENIRE PERSON:  Well, that's basically what I'm

11     saying.  I don't support anyone that does that.  Any

12     organization -- like you say a library book or anything.

13          MR. GARRETT:  So you could follow that

14     instruction?

18:00 15          VENIRE PERSON:  Yes.

16          THE COURT:  Ms. Tillis, as you probably

17     understand we're interviewing members of the pool from

18     which the jury will be selected that would hear this case,

19     and it will probably take us at least another day or two

20     to complete this process.  So until you hear from us

21     again, you should not discuss this case with anyone or

22     allow anyone to discuss it with you, nor should you watch

23     or listen to any media accounts about this case if there

24     are any.  Do you understand that?

25          VENIRE PERSON:  Yes, Judge.

18:00 1          THE COURT:  Thank you.  You may be excused from

2      the courtroom.

3          VENIRE PERSON:  Thank you.

4          THE COURT:  Mr. Jacks.

5          MR. JACKS:  I want to interpose objections by

6      Mr. Westfall.  Specifically in questioning Ms. Tillis, he

7      made the statement that HAMAS is not in Iraq.  I assume he

8      was trying to draw a distinction between the conflict in

9      Iraq and the Palestinian-Israeli conflict, but that may or

10     may not be a proper statement, and I don't think it's

11     proper for him to make that factual representation to the

12     juror so that the juror then believes that statement.  So

13     my concern is that with making statements of fact to a

14     juror that may or may not be true.

18:00 15          THE COURT:  Thank you.  Mr. Westfall.

16          MR. WESTFALL:  Your Honor, the last three to

17     five minutes of their questioning of every single witness

18     has to do with an awful lot of facts, your Honor, and

19     we're not objecting to that.  We're not objecting to that

20     at all.  And Mr. Jacks complains about factual

21     representations that I made without acknowledging the many

22     factual representations that they are making, and I think

23     this process has been going well.  Mr. Jacks has now

24     decided to start objecting every time I'm talking to the

25     jury, trying to somehow limit me.  But if we want to limit

18:00 1     this process, I think that goes both ways.  That may not

2     be something he has considered, your Honor.  I'm asking

3     what they know about HAMAS, and I will -- Once again, I'll

4     look for guidance from the Court.  But I don't think that

5     it's productive really in effect to get up and try to

6     limit one side when the other side is injecting an awful

7     lost facts of their own.

8          THE COURT:  Mr. Westfall, I agree with much of

9     what you have said.  I think the process in general,

10    although it's going slower than I would like, it's still

11    going well, and I commend both sides for their use of this

12    time for the most part.  I could quibble around the edges

13    about some of the questions that have been asked, but

14    generally I think it's going well and used productively.

18:00 15   And I also share your concern about objections taking up

16    time and in some respects disrupting the process, although

17    I certainly acknowledge counsel's duty and right to make

18    objections when they feel obliged to do so.  Insofar as

19    this particular objection is concerned, I appreciate your

20    seeking guidance from me, and I'm sorry to say that I

21    don't know that I can give you specific guidance about

22    this.  I recognize and agree with what you said about the

23    government's representations about what the evidence in

24    this case will be, and I feel that I have to defer at this

25    stage of the proceedings largely to counsel's knowledge of

18:00 1    the evidence which is vastly superior to mine I think at
2    this point.

3         I think to the extent that you told Ms. Tillis
4    that HAMAS is not in Iraq, like Mr. Jacks, I don't know if
5    that's true or not.  I'm not knowledgeable about that, and
6    I don't know whether it will be supported by the evidence
7    or not.  Regardless of whether it is or is not supported
8    by the evidence, I certainly believe that your motives
9    were entirely benign in trying to dispel any confusion
10   that might have existed in Ms. Tillis's mind about whether
11   we were talking about Palestine or Iraq in this case.
12   Nonetheless, the only guidance I can give you is to try to
13   be sure that representations that are made in the course
14   of questioning are well founded in the evidence that will
18:00 15   be adduced in this trial.

16        I think we're ready to see next Ms. Scroggins.
17   Counsel for parties have some questions to ask you.

18        MS. MORENO:  My name is Linda Moreno, and I'm
19   a defense attorney in this case.  I am going to ask you
20   about the questionnaire you recently filled out some
21   couple of weeks ago and also what you may have heard in
22   this case.  In looking at your questionnaire, I was struck
23   by you were born in Australia.

24        VENIRE PERSON:  That's correct.

25        MS. MORENO:  And you indicated that you were a

18:00 1    member of the Daughters of the British Empire.  Please

2    instruct me as to what that is.

3         VENIRE PERSON:  It's a nonprofit group.  We

4    raise money to support an elderly people's home primarily,

5    and there are a number of chapters all over the country,

6    and usually each of them has another charity they support

7    as well.

8         MS. MORENO:  And this elderly people's homes?

9         VENIRE PERSON:  In Houston.  Our particular one

10   is in Houston.

11        MS. MORENO:  And do other charities have other

12   specially located charities or homes they support?

13        VENIRE PERSON:  There are five homes throughout

14   the United States, and you divide it into districts.  The

18:00 15   people in that district support that home, and each

16   chapter -- and there a number of chapters across the

17   United States -- usually has at least one other charity

18   that they support.

19        MS. MORENO:  Is there something about the

20   particular home that the Daughters of the British Empire

21   support?  Are these persons who are British or Australian?

22        VENIRE PERSON:  Not anymore.  We're not allowed

23   to anymore.

24        MS. MORENO:  What was the change?

25        VENIRE PERSON:  Well, you got into

18:00  1   discrimination.  They weren't allowed to just have it for

2   people of British origin.

3                MS. MORENO:  But it did start out that way?

4                VENIRE PERSON:  Originally it was, yes.

5                MS. MORENO:  Is this an old organization?

6                VENIRE PERSON:  We're close to a hundred years

7   old.

8                MS. MORENO:  Thank you.  You have some prior

9   jury experience?

10               VENIRE PERSON:  Yes.

11               MS. MORENO:  Where was that?

12               VENIRE PERSON:  Down at Lew Sterrett.

13               MS. MORENO:  Were you the foreperson?

14               VENIRE PERSON:  No.

18:00 15               MS. MORENO:  Were there two cases that you

16   served on?

17               VENIRE PERSON:  That's correct.

18               MS. MORENO:  One was drunk driving, and one was

19   a robbery.  Is that correct?

20               VENIRE PERSON:  That's correct.

21               MS. MORENO:  And was there anything about that

22   experience as a juror that was unpleasant for you?

23               VENIRE PERSON:  Not especially.

24               MS. MORENO:  Was there anything pleasant?

25               VENIRE PERSON:  It's interesting.

1          MS. MORENO:  I'm curious about how persons who

2     have served on juries before -- what they liked about it

3     and what they didn't like it.  What did you like about the

4     past experience?

5          VENIRE PERSON:  I have to say it's just that it

6     was interesting for me.  I was usually sitting behind the

7     table.  I was formerly a claims adjustor, and I

8     represented DART, and when we had a case I had to sit and

9     represent DART.  So I was sitting on the other side of the

10    table, you would say.

11         MS. MORENO:  So you were an advocate?

12         VENIRE PERSON:  What do you mean by that?

13         MS. MORENO:  You were arguing the claims for

14    DART?

15         VENIRE PERSON:  Well, people have accidents and

16    other things that happen on DART vehicles, and I was a

17    claims adjustor, and I had to decide whether they were

18    owed anything or not, basically, and sometimes it went to

19    court, and I handled the case all the way from the

20    original taking it on the phone to going down to the

21    courthouse about it.

22         MS. MORENO:  Did you do that often, appear in

23    court?

24         VENIRE PERSON:  Probably two or three times a

25    year.

1          MS. MORENO:  How long did you work for DART?

2          VENIRE PERSON:  For DART, I worked there I think

3     about eleven years.

4          MS. MORENO:  This is a case of an American

5     corporation called the Holy Land Foundation.  What I would

6     like to know is if you have heard anything about this case

7     in the media.

8          VENIRE PERSON:  I saw something about it on

9     television originally.  I didn't pay much attention to it

10    at the time, and since then -- I think the last couple of

11    days -- they have had something about it, and since I

12    suspected that I was going to be in the case I said I'm

13    not going to listen to it.

14         MS. MORENO:  And this was because of

15    instructions you received at the orientation?

16         VENIRE PERSON:  That's correct.

17         MS. MORENO:  Well, this is a case where the

18    government claims that this charity sent humanitarian aid

19    to Palestinian and other places.  And that humanitarian

20    aid was in the form of money, food, diapers, library

21    books, the rebuilding of homes, assisting needy families

22    and helping children.  The government further claims that

23    this humanitarian aid somehow benefited this terrorist

24    organization called HAMAS.  Have you ever heard of HAMAS?

25         VENIRE PERSON:  Only what I have heard in the

18:00  1    media.

2              MS. MORENO:  Do you know much about it?

3              VENIRE PERSON:  Not really.

4              MS. MORENO:  Knowing just a summary of what the

5    charges are, does that cause you any concern?  Do you have

6    any opinions about that?

7              VENIRE PERSON:  I don't really have enough

8    information to have any opinion.

9              MS. MORENO:  Understanding that -- And you

10   served in two prior criminal cases, so I take it you are

11   familiar with the burden of proof?

12             VENIRE PERSON:  Yes.

13             MS. MORENO:  And the presumption of innocence?

14             VENIRE PERSON:  Right.

18:00 15        MS. MORENO:  Before I ask you about that, do you

16   know any Muslims?

17             VENIRE PERSON:  Not that I know of.

18             MS. MORENO:  Well, have you ever had any

19   experience or dealings with persons of Arabic descent?

20             VENIRE PERSON:  I don't think so.

21             MS. MORENO:  I ask you these questions because I

22   want to explore with you whether there is anything in your

23   personal background in dealing with persons of Islamic

24   background or Arabic descent that would assist you in

25   understanding these gentlemen.

18:00  1              VENIRE PERSON:  I don't really have any opinion

2      about that.  I don't have any negative or positive

3      feelings about it I believe.

4              MS. MORENO:  So there is nothing in your own

5      religious beliefs, I take it, that would color the way you

6      look at the evidence in the case that involves Islam,

7      charities and allegations of terrorism?

8              VENIRE PERSON:  No.

9              MS. MORENO:  Having heard me speak about this,

10     is there anything you want to add?

11             VENIRE PERSON:  I don't believe so.

12             MS. MORENO:  Pass the juror.

13             THE COURT:  Mr. Garrett, do you have questions

14     for the juror?

18:00 15             MR. GARRETT:  Yes, your Honor.

16             Good afternoon, ma'am.  My name is Nathan

17     Garrett, and I'm an Assistant United States Attorney.  I'm

18     one of the prosecutors for the United States in this case.

19     I just have a couple of follow-up questions for you.  You

20     mentioned you were born in Australia.  Is that correct?

21             VENIRE PERSON:  That's correct.

22             MR. GARRETT:  Where in Australia?

23             VENIRE PERSON:  Melbourne.

24             MR. GARRETT:  How long did you live in

25     Melbourne?

18:00  1          VENIRE PERSON:  I think I was about twenty-seven

2      when I came over here.

3              MR. GARRETT:  And you came from Australia to the

4      United States?

5              VENIRE PERSON:  That's correct.

6              MR. GARRETT:  And so you are a naturalized

7      citizen?

8              VENIRE PERSON:  Yes.

9              MR. GARRETT:  And when did you become

10     naturalized?

11             VENIRE PERSON:  In the very early 1970's.  I

12     don't have a date.

13             MR. GARRETT:  And since you have been in the

14     United States, generally where have you lived?

18:00 15         VENIRE PERSON:  In Dallas.

16             MR. GARRETT:  The whole time?

17             VENIRE PERSON:  Yes.

18             MR. GARRETT:  You mentioned that you were

19     retired now.

20             VENIRE PERSON:  That's correct.

21             MR. GARRETT:  How long have you been retired?

22             VENIRE PERSON:  I think it's about two years.

23             MR. GARRETT:  And you were a claims adjustor I

24     know.

25             VENIRE PERSON:  That's correct.

18:00 1          MR. GARRETT:  You said you worked for DART.

2          VENIRE PERSON:  Dallas Area Rapid Transit.

3          MR. GARRETT:  And in response to Ms. Moreno, you

4  said you were there eleven years.

5          VENIRE PERSON:  I believe it was about eleven

6  years.

7          MR. GARRETT:  And prior to that, what did you

8  do?

9          VENIRE PERSON:  Prior to that I was a claims

10  adjustor for Amerisure which is Michigan Mutual.  And

11  before that, I worked for the University of Texas at

12  Dallas in admissions.  Prior to that I was in college.  I

13  went to UTA, Mountain View and UTA, and prior to that I

14  worked for Lintz Jewelers.

18:00 15          MR. GARRETT:  All of that here in Dallas?

16          VENIRE PERSON:  That's here.

17          MR. GARRETT:  You are married; is that correct?

18          VENIRE PERSON:  That's correct.

19          MR. GARRETT:  Is your husband retired?

20          VENIRE PERSON:  Semi-retired.  He works at home

21  though.

22          MR. GARRETT:  What sort of work does he do?

23          VENIRE PERSON:  He's a CPA.

24          MR. GARRETT:  And he works out of the home

25  because he wants to, correct?

18:00  1           VENIRE PERSON:  That's correct.

2           MR. GARRETT:  You don't have children; is that

3      correct?

4           VENIRE PERSON:  That's correct.

5           MR. GARRETT:  I think you stated on your

6      questionnaire or she may have asked you -- and if she did,

7      I apologize -- that you don't follow the

8      Israeli-Palestinian issue closely.

9           VENIRE PERSON:  Just what I see on the

10     television from time to time.

11          MR. GARRETT:  It's not something that you seek

12     out.

13          VENIRE PERSON:  No.

14          MR. GARRETT:  To the extent that you have been

18:00 15     exposed to it, have you formed opinions or taken a

16     position on one side or the other that would affect your

17     ability to sit on a case that might involve some of those

18     issues?

19          VENIRE PERSON:  I don't believe so.

20          MR. GARRETT:  As Ms. Moreno suggested to you,

21     this case involves allegations that these defendants and

22     the corporation for which they worked knowingly provided

23     material support to a terrorist organization.  Those are

24     the allegations, and they are just that, just allegations

25     at this point.  As you know from your prior jury service,

18:00 1   at the end of the case, after you have heard all the

2   evidence and all the documents and things have been

3   submitted in evidence, the Judge will instruct you on what

4   the law is in this case so that you can take all of those

5   facts that you have been subjected to over the course of

6   weeks and apply it to that law.  In this case, I expect

7   that the Court will give you instructions on what a

8   terrorist organization is.  And in this case, I expect

9   that will be HAMAS, that HAMAS is a terrorist

10  organization.  As a result of that designation, I expect

11  the instruction will tell you that one cannot provide

12  material support to HAMAS.  That material support

13  instruction will tell you support includes funds -- money

14  can't go -- but also certain charitable items like books

18:00 15  or medical supplies or clothing.  If it goes to the

16  benefit of HAMAS, you can't do that either.  If that's

17  what the instructions tell you, would you have any problem

18  following that?

19          VENIRE PERSON:  I don't think so.  If that's how

20  I was instructed to consider the case.

21          MR. GARRETT:  When you say I don't think so,

22  what do you mean?

23          VENIRE PERSON:  It's hard to say until I hear

24  what the actual circumstances are.

25          MR. GARRETT:  But if the Judge were to instruct

1  you this is the category of things you can't send and if

2  you found that they knowingly sent those things, could you

3  follow that instruction as a violation of law?

4            VENIRE PERSON:  Yes.

5            MR. GARRETT:  Thank you, ma'am.

6            THE COURT:  Ms. Scroggins, we are in the process

7  of talking to members of the pool from which the jury that

8  will hear this case will be selected.  So it probably will

9  take us another day or two to complete this process.

10  Until you hear from us further, you should not discuss

11  this case with anyone or allow anyone to discuss it with

12  you.  And if there are any media accounts about the case,

13  you should not read or watch or listen to any of those.

14  Thank you, you may be excused from the courtroom.

15            Good afternoon, Mr. Robinson.  Counsel for

16  parties have some questions to ask you.

17            MS. MORENO:  Good afternoon, Mr. Robinson.  My

18  name is Linda Moreno.  I want to ask you some questions

19  about the questionnaire you filled out a couple of weeks

20  ago.

21            VENIRE PERSON:  Okay.

22            MS. MORENO:  And if you have heard anything

23  about the case -- And I am going to describe the case to

24  you in a minute.  This is the case that involves an

25  American Muslim charity called the Holy Land Foundation.

18:00 1          VENIRE PERSON:  Yes.

2          MS. MORENO:  Have you heard anything about the

3     Holy Land Foundation?

4          VENIRE PERSON:  Yes.  I remember reading some

5     articles about that.

6          MS. MORENO:  Was that recently, sir, or in the

7     past?

8          VENIRE PERSON:  Well, actually way back in the

9     past and kind of recent.  I didn't read the full thing,

10    but I remember hearing about it several years ago.

11         MS. MORENO:  Do you remember what you heard

12    about it?

13         VENIRE PERSON:  Something to do with money being

14    sent to -- I think it was being sent to Palestine and that

18:00 15   it was used for some -- I know it was used for something

16    that was illegal or something that they sent over somebody

17    used it for.  I don't know, you know, the full details on

18    it.

19         MS. MORENO:  Okay.  Well, we're going to get

20    into that in a minute.  But is there anything about what

21    you read or heard that already has colored your opinions

22    on this case?  Any issues that come up for you?

23         VENIRE PERSON:  No.  I mean it's something I

24    think about, but I wouldn't have no opinion because I

25    really don't know the full details of what happened.

18:00  1          MS. MORENO:  This is a case where the government

2      claims that the Holy Land Foundation, this charity, sent

3      humanitarian aid over to Palestine.  And this aid was in

4      the form of food that the Holy Land Foundation sent,

5      bread, milk, diapers for children, books, medicine, that

6      the Holy Land Foundation helped rebuild homes that were

7      destroyed in Palestine.  Okay?  And the government further

8      claims that aid, that charitable humanitarian aid, somehow

9      benefited HAMAS.  Have you ever heard of HAMAS?

10          VENIRE PERSON:  Yes.

11          MS. MORENO:  What do you know about HAMAS?

12          VENIRE PERSON:  Supposed to be something similar

13     to a terrorist organization over there.

14          MS. MORENO:  So that's what the government

18:00  15  claims in this case, that this is somehow material support

16     for a terrorist organization.  Knowing that, which is

17     maybe a little more than you knew before, is there

18     anything that causes you concern to sit on a case like

19     this?

20          VENIRE PERSON:  I would be curious to know more

21     about what really happened.  I couldn't say anything about

22     it until I saw a little bit more of the facts on it I

23     guess.

24          MS. MORENO:  Do you know any Muslims?

25          VENIRE PERSON:  Well, I know some -- I guess if

18:00 1    you say Muslims from the U.S., a few, yes.

2              MS. MORENO:  And would you know them in some

3    sort of work context or personally?

4              VENIRE PERSON:  Pretty much work.

5              MS. MORENO:  Tell me about how your experiences

6    and interactions have been with those people.

7              VENIRE PERSON:  Pretty good.  And then you know

8    a few that I know from doing -- like going to their stores

9    and anyone we communicate with each other friendly like.

10   So everything is good.

11             MS. MORENO:  Any bad experiences about that?

12             VENIRE PERSON:  No.

13             MS. MORENO:  Nothing we would have to worry

14   about in your past in terms of dealing with Muslims that

18:00 15   might give you some kind of prejudices here in deciding

16   this case?

17             VENIRE PERSON:  Right.  No.

18             MS. MORENO:  Nothing like that?

19             VENIRE PERSON:  No.

20             MS. MORENO:  You indicated on your questionnaire

21   that you have followed the Palestinian-Israeli conflict

22   somewhat closely.  Do you remember saying that?

23             VENIRE PERSON:  Yes.  What I'm saying is that --

24   I mean, like I say, whenever I read stories in the paper,

25   you generally read so much of.  Sometimes you read the

18:00 1  full story, depending on how long the article is.  So I

2  mean I have heard different things about it.

3          MS. MORENO:  Do you have an opinion about the

4  conflict, perhaps who's right or who's wrong?  Have you

5  made that decision?

6          VENIRE PERSON:  No, I've just been curious -- It

7  seems like something that could be settled but no opinion

8  on why it continues like it is.  Whenever I look at the

9  situation, I look at it, it sure would be easy to settle.

10          MS. MORENO:  You have never served on a jury

11  before?

12          VENIRE PERSON:  Yes, a civil jury.

13          MS. MORENO:  On a civil jury?

14          VENIRE PERSON:  Yes.

18:00 15          MS. MORENO:  But not on a criminal jury?

16          VENIRE PERSON:  Yes.

17          MS. MORENO:  On civil jury, were you the

18  foreperson?

19          VENIRE PERSON:  Yes.

20          MS. MORENO:  In a criminal case, there is

21  something called the burden of proof.  Have you heard of

22  that?

23          VENIRE PERSON:  Yes.

24          MS. MORENO:  And what that means is the

25  government has to prove the charges beyond every single

18:00 1    reasonable doubt.

2                    VENIRE PERSON:  Okay.

3                    MS. MORENO:  And this is a case where they

4    allege charges of terrorism in this case.  So my question

5    to you is, do you think that in this kind of a case with

6    these allegations that the burden of proof on the

7    government should be less?

8                    VENIRE PERSON:  No.  When you said less, less

9    what?

10                   MS. MORENO:  Less than them having to prove

11   beyond every reasonable doubt.  In other words, should it

12   be easier on them because the charges are of this nature?

13                   VENIRE PERSON:  No, I wouldn't think so.

14                   MS. MORENO:  The presumption of innocence, you

18:00 15   have heard of that?

16                   VENIRE PERSON:  Yes.

17                   MS. MORENO:  And what these gentlemen and what

18   his Honor would require is that you afford these gentlemen

19   the presumption of innocence.

20                   VENIRE PERSON:  Right.

21                   MS. MORENO:  Do you know what the presumption of

22   innocence is?

23                   VENIRE PERSON:  That they are innocent until

24   they are proved otherwise.

25                   MS. MORENO:  Until they prove them guilty.

18:00 1          VENIRE PERSON:  Right.

2          MS. MORENO:  Do you have any issues or concerns

3     or problems with that?

4          VENIRE PERSON:  No.

5          MS. MORENO:  Is there anything in your

6     background, Mr. Robinson, that we should know about that

7     might touch on any of these issues of religion, terrorism,

8     that would color the way you could look at the evidence in

9     this case?

10          VENIRE PERSON:  No.  I don't think so, no.

11          THE COURT:  Ms. Moreno, your time is expired.

12          MS. MORENO:  Thank you, your Honor.  Thank you,

13     Mr. Robinson.

14          THE COURT:  Mr. Jacks, do you have questions?

18:00 15          MR. JACKS:  I do.

16          Good afternoon, Mr. Robinson.  My name is Jim

17     Jacks and I'm an Assistant United States Attorney here in

18     Dallas, and I'm one of the prosecutors that is going to be

19     representing the government in this case.  I have a few

20     follow-up questions, if you don't mind.  You indicated

21     that you worked for Wynne Media as a production

22     technician.

23          VENIRE PERSON:  Right.

24          MR. JACKS:  Can you tell me what that means or

25     what you do?

18:00 1          VENIRE PERSON:  Well, we actually do trial

2     exhibits and litigation work for lawyers, and I pretty

3     much do exhibits like the large boards or something for

4     the jury to look at, those types of things, and then we do

5     litigation work where we copy certain work papers and

6     files and things like that.

7          MR. JACKS:  Who's Wynne of Wynne Media?

8          VENIRE PERSON:  The owner.  Leslie Wynne.

9          MR. JACKS:  Is that a man or a woman?

10          VENIRE PERSON:  Man.

11          MR. JACKS:  Is he a lawyer?

12          VENIRE PERSON:  Actually none of us are lawyers.

13     We just do the work for lawyers.

14          MR. JACKS:  How long have you been doing that?

18:00 15          VENIRE PERSON:  Since about 1995.

16          MR. JACKS:  1995.

17          VENIRE PERSON:  Yes.

18          MR. JACKS:  And --

19          VENIRE PERSON:  And actually I have been doing

20     similar work though since about 1988.  But I have been

21     doing this pretty much since 1995.

22          MR. JACKS:  Between 1988 and 1995 who did you

23     work for?

24          VENIRE PERSON:  I worked for a company called

25     Blair Graphics.

18:00 1          MR. JACKS:  Did Blair Graphics work in

2     litigation support or was that just part of what they did?

3          VENIRE PERSON:  Kind of part.  They would do

4     some type work for other companies.  Like the company I

5     work for, we may send work to them.  But they did pretty

6     much more architectural type of things.

7          MR. JACKS:  Is your area of work strictly like

8     poster boards and display or did you get involved with

9     videos and that type of thing?

10          VENIRE PERSON:  No.  Most of mine is posters,

11     like displays.

12          MR. JACKS:  Do you meet with lawyers and

13     paralegals and talk with them about what they want?

14          VENIRE PERSON:  On occasion.  I get into it once

18:00 15     in a while but not too often.  Most of the people in the

16     computer area, they do that.  But every now and then,

17     certain documents, I may speak with a lawyer about it.

18          MR. JACKS:  Do you know what the cases you are

19     working on are about?

20          MR. JACKS:  Sometimes.  But most of the time I'm

21     not really into that part of it.

22          MR. JACKS:  Now, when you get into the trial,

23     when you make the jury, are you going to be second

24     guessing and criticizing our exhibits and videos?  Are we

25     going to have a critic over there in the jury box?

18:00 1          VENIRE PERSON:  Well, I know I would probably

2    pay more attention than just a normal person.

3          MR. JACKS:  The cases you have worked on, are

4    they civil, criminal or both?

5          VENIRE PERSON:  Sometimes both.

6          MR. JACKS:  Do you know any criminal lawyers

7    that you have done work for or you have done work that was

8    their cases?

9          VENIRE PERSON:  Yes.

10          MR. JACKS:  Who are some of those?

11          VENIRE PERSON:  Do you know a lawyer by the name

12    of -- I think they do criminal.  I'm not for sure.

13          MR. JACKS:  I'm sorry.  Let me shorten it.  Any

14    of the lawyers in the room that you know?  I think Ms.

18:00 15    Cadeddu, Marlo Cadeddu is from Dallas.

16          VENIRE PERSON:  I don't know any faces.

17          MR. JACKS:  She just stood up.  Mr. Westfall

18    from Fort Worth, have you done any cases that he might

19    have been involved in?

20          VENIRE PERSON:  I don't see any faces that I'm

21    familiar with.

22          MR. JACKS:  Do you ever go to the trial to watch

23    or see how the things are set up?

24          VENIRE PERSON:  No.  I have gone in order to

25    take the boards or documents to the trial, but I don't

18:00 1    actually ever stay in there.  I don't really see what's

2    going on.

3             MR. JACKS:  Being in the work that you do, do

4    you feel like you've got a better knowledge of the court

5    system than say the average juror?

6             VENIRE PERSON:  I don't think so because, like I

7    said, a lot of things I do I'm not there to see how they

8    present it or anything like that.

9             MR. JACKS:  You said your wife works for the

10   county clerk.

11            VENIRE PERSON:  Yes, she works in the family

12   section of the county.

13            MR. JACKS:  Here in Dallas County?

14            VENIRE PERSON:  Yes.

18:00 15   MR. JACKS:  How long has she been there?

16            VENIRE PERSON:  About three years I believe.

17            MR. JACKS:  What did she do before that?

18            VENIRE PERSON:  Clerk for the City of Dallas.

19            MR. JACKS:  What department?

20            VENIRE PERSON:  In the ticket department.

21   Traffic ticket department.

22            MR. JACKS:  So if you got a traffic ticket --

23   Did she work at the counter or in the back?

24            VENIRE PERSON:  At the counter.

25            MR. JACKS:  Well, I may have seen her.  As has

18:00 1    been mentioned to you, this case involves charges that an

2    organization and the men that work for that organization

3    provided material support for a terrorist organization.

4    And if you are selected for the jury, the Judge will tell

5    you at the end of the case what the law is, what has to be

6    present to prove a charge of providing material support to

7    a terrorist organization.  Now, I expect the evidence will

8    show that money, currency, was sent overseas, and the

9    government is alleging that it went to a terrorist

10    organization or for their benefit or to organizations that

11    were affiliated with them.  Now, if the evidence shows

12    that money was later spent on humanitarian items like

13    medical supplies or educational supplies or anything like

14    that, if that is what the evidence shows, I expect the

18:00 15    Judge will include in his instructions a part of the law

16    that even aid in the form of charitable items is

17    prohibited, and if charitable items are purchased with

18    that money or, in fact, directly given to that

19    organization, that's still a violation of the law.

20         Now, if that instruction is given to you, would

21    you be able to follow that instruction?  And by that I

22    mean if you believe that, yes, they gave money but that

23    money was spent on these kind of charitable things, would

24    you be able to follow that instruction and return a

25    verdict of guilty if you believed that it was done for the

18:00 1 benefit of this terrorist organization?

2 VENIRE PERSON: Well, wait a minute. Let me see

3 if I'm understanding you right.

4 THE COURT: Mr. Jacks, your time has expired.

5 MR. JACKS: Thank you, your Honor.

6 THE COURT: Mr. Robinson, as you can probably

7 tell, we're in the process of interviewing those who are

8 in the pool from which the jury will be selected that

9 would hear this case. I expect this process will take us

10 another day or two to complete. In the meantime, until

11 you hear from us again, you should not discuss this case

12 with anyone or allow anyone to discuss it with you, and if

13 there are any media accounts about the case, you should

14 not read or watch or listen to any of them. Thank you.

18:00 15 You may be excused from the courtroom.

16 VENIRE PERSON: Thanks.

17 THE COURT: Good afternoon, Ms. Wolverton.

18 Counsel for the parties in this case have some questions

19 they would like to ask you.

20 MR. WESTFALL: Ms. Wolverton, I'm Greg Westfall.

21 I'm one of the attorneys in this case. I am going to

22 speak with you a very few minutes and then the government

23 may speak with you. Okay?

24 VENIRE PERSON: Yes.

25 MR. WESTFALL: This is the Holy Land Foundation

18:00 1    case.  It's Holy Land Foundation for Relief and

2    Development, and the allegation is some of the men

3    involved with the organization gave material support to

4    HAMAS which is a terrorist organization.  I'm telling you

5    that because does that ring any bells?  Have you heard of

6    it?

7         VENIRE PERSON:  I have seen stories in passing.

8         MR. WESTFALL:  Can you remember anything you

9    read?

10         VENIRE PERSON:  Not especially, no.  Yes, I have

11    seen in passing.

12         MR. WESTFALL:  Anything you have read or seen,

13    have you formed any opinion about the case?

14         VENIRE PERSON:  Not especially.

18:00 15         MR. WESTFALL:  You work with?

16         VENIRE PERSON:  Bank of America.

17         MR. WESTFALL:  In I think corporate actions?

18         VENIRE PERSON:  Yes.

19         MR. WESTFALL:  What is corporate actions?

20         VENIRE PERSON:  We process -- It's a security

21    operation, and I process voluntary corporate actions.  If

22    a company declares a dividend and you choose stock or

23    cash, I'm the person that would process it for you.

24         MR. WESTFALL:  Okay.  Shareholders decide

25    whether they want the money or like a stock re-investment?

18:00 1    Program.

2              VENIRE PERSON:  Yes.

3              MR. WESTFALL:  And you are the person that does

4    that?

5              VENIRE PERSON:  Yes.

6              MR. WESTFALL:  What you do, does it have

7    anything to do with financial investigations?

8              VENIRE PERSON:  No.

9              MR. WESTFALL:  So what's the procedure?

10             VENIRE PERSON:  We receive notifications from

11   companies that declare dividends or tender offers such as

12   that, and we notify the investment managers, and based on

13   their decision we put depository and when I receive

14   instructions I process them.

18:00 15            MR. WESTFALL:  Have you ever worked in a bank

16   where you did forensic investigations on financial

17   documents or anything like that?

18             VENIRE PERSON:  No.

19             MR. WESTFALL:  Now, this case is material

20   support of terrorism.  So terrorism is kind of in the

21   title of the offense we're talking about.  How do you feel

22   about being on a jury where we're talking about

23   allegations of anything that has to do with terrorism?

24             VENIRE PERSON:  A little uncomfortable.  I'm

25   sure no more than anybody else would be.

18:00 1              MR. WESTFALL:  Anything about that -- Would that

2      impair your service?

3              VENIRE PERSON:  I don't think so.

4              MR. WESTFALL:  Do you know any Muslims?

5              VENIRE PERSON:  No.

6              MR. WESTFALL:  Have you ever?

7              VENIRE PERSON:  No.

8              MR. WESTFALL:  Have you ever had any good

9      experiences or bad experiences?

10              VENIRE PERSON:  No.

11              MR. WESTFALL:  How long have you been doing

12      corporate actions work?

13              VENIRE PERSON:  I have been with Bank of America

14      for seven years, and I have been in corporate actions for

18:00 15      five.

16              MR. WESTFALL:  You are married?

17              VENIRE PERSON:  Yes.

18              MR. WESTFALL:  What does your husband do?

19              VENIRE PERSON:  He's self-employed, landscaping,

20      irrigation, handyman.

21              MR. WESTFALL:  That's a pretty good business

22      these days, isn't it?

23              VENIRE PERSON:  That's a matter of opinion.

24              MR. WESTFALL:  You don't have any kids at the

25      house?

18:00    1              VENIRE PERSON:  No.

         2              MR. WESTFALL:  Is Bank of America okay with you

         3    doing extended jury service?

         4              VENIRE PERSON:  I have not asked that question,

         5    but I'm sure they don't have much of a choice in the

         6    matter.

         7              MR. WESTFALL:  Don't feel like you would lose

         8    your job over this?

         9              VENIRE PERSON:  I didn't think I could lose my

        10    job over this.

        11              MR. WESTFALL:  I truly have no idea.  Tell me

        12    about your brothers.

        13              VENIRE PERSON:  My brothers?

        14              MS. CADEDDU:  You mentioned two brothers in your

18:00   15    questionnaire that ran into some legal problems.

        16              VENIRE PERSON:  Yes, both of them went to prison

        17    for drug issues.

        18              MR. WESTFALL:  Was it the same case they both

        19    went to prison on or?

        20              VENIRE PERSON:  Yes, essentially.  One brother

        21    had been in trouble before and was on probation and went

        22    to jail over that, yes.  And my oldest brother went to

        23    jail several times due to drug issues.

        24              MR. WESTFALL:  How are they doing now?

        25              VENIRE PERSON:  They are both deceased.

18:00 1               MR. WESTFALL:  I'm sorry.  How long ago was

2   that?

3               VENIRE PERSON:  Four years and for the last one

4   six years prior to that, that my oldest brother passed

5   away.

6               MR. WESTFALL:  The banking business, have you

7   been in any banking business before you started doing

8   corporate actions?

9               VENIRE PERSON:  Well, I have been with the bank

10   for five years and corporate actions for five, and prior

11   to that, it was on the data entry system.

12               MR. WESTFALL:  Thank you.

13               THE COURT:  Mr. Jacks, do you have questions for

14   Ms. Wolverton?

18:00 15               MR. JACKS:  Yes, sir.  Good afternoon, my name

16   is Jim Jacks.  I'm an Assistant United States Attorney

17   here in Dallas, and I'll be one of the prosecutors

18   representing the government during this trial.  I have

19   just a few follow-up questions to ask if you don't mind.

20               Have you lived in the Dallas area all of your

21   life?

22               VENIRE PERSON:  Yes, I have.

23               MR. JACKS:  Is the same true of your husband?

24               VENIRE PERSON:  That is true, yes.

25               MR. JACKS:  Regarding your college background,

18:00 1    you stated you had some hours of community college and

2    that was in computer science.

3            VENIRE PERSON:  Yes, sir.

4            MR. JACKS:  Before Bank of America, what type of

5    work did you do?

6            VENIRE PERSON:  I was a homemaker before that

7    for three years, and prior to that, public storage

8    warehouse for seventeen years.

9            MR. JACKS:  Like public warehouse?

10            VENIRE PERSON:  We processed orders and shipping

11    and controlled their inventory.

12            MR. JACKS:  What kind of products?

13            VENIRE PERSON:  A variety of products.

14    Cosmetics all the way down to hazardous materials.

18:00 15            MR. JACKS:  And the name of the company was

16    Public Warehouse or that's a description?

17            VENIRE PERSON:  No.  That's the description of

18    the type of business it was.

19            MR. JACKS:  What was the name of the company?

20            VENIRE PERSON:  It was first called the Senner

21    Companies, and they went out of business, and then they

22    were acquired by Texas Cartage.

23            MR. JACKS:  And prior to doing what he does now,

24    the handyman and landscaping service, did he do any

25    different work before?

18:00 1          VENIRE PERSON:  Yes, he did.  He was a salesman

2     for Ms. Baird's for twenty years.

3          MR. JACKS:  Does that mean he had a route and

4     drove?

5          VENIRE PERSON:  Yes.

6          MR. JACKS:  Your prior jury service, you said it

7     was a criminal case on your questionnaire.

8          VENIRE PERSON:  Well, they wouldn't let us ask

9     questions.  It was very minor.  So I didn't know if it

10    constituted crime or not.

11         MR. JACKS:  Was it in a justice of the peace

12    court or county courthouse or do you remember?

13         VENIRE PERSON:  It was at the county courthouse,

14    and it was about giving false information to a police

18:00 15    officer.

16         MR. JACKS:  Was it a six-person jury or

17    twelve-person jury?

18         VENIRE PERSON:  Six.

19         MR. JACKS:  And the trial lasted a day or two?

20         VENIRE PERSON:  A day.

21         MR. JACKS:  And I can't remember.  Were you the

22    foreperson or not?

23         VENIRE PERSON:  I was not.

24         MR. JACKS:  As has been mentioned to you, I

25    suppose the central charges as they are described in this

18:00 1    case are that this Holy Land Foundation and men that

2    worked for it have been charged with among other things

3    providing material support to a terrorist organization,

4    specifically HAMAS.  I cannot remember what you said, if

5    you have ever heard of the organization HAMAS.  Have you?

6              VENIRE PERSON:  I have heard the name.  But it

7    doesn't especially mean anything to me.

8              MR. JACKS:  When you heard it, was it in the

9    context that it was a terrorist organization?

10             VENIRE PERSON:  I believe so.

11             MR. JACKS:  You have been on a trial jury

12   before.  So you know when all the evidence is finished,

13   the Judge instructs the jury on the law and reads it to

14   them, and in fact, normally gives them those written

18:00 15   instructions so that they know what the laws are for the

16   various charges and what definitions and that type of

17   thing.  Do you recall that from your earlier jury service?

18             VENIRE PERSON:  Yes.

19             MR. JACKS:  If the evidence shows in this case

20   that HAMAS, this terrorist organization, has a military

21   side but then a social side also and if the evidence shows

22   that these items of support, actually money, went to that

23   social side and then further if the instructions that you

24   get from the Court -- if the Court tells the jury that

25   even items of charity such as food or clothing or anything

18:00  1   like that, whether those items directly are given over to

       2   that organization or the money that is given over to that

       3   organization is then spent on things like that, if the

       4   Judge tells the jury that even expenditures like that are

       5   a violation of the law, would you be able to accept that

       6   instruction and to follow it?

       7           VENIRE PERSON:  If that's the law, yes.

       8           MR. JACKS:  The fact that they -- that these

       9   items may have gone for a humanitarian purpose but they

      10   went for the benefit of a terrorist organization, you

      11   could follow that instruction if the Judge told you that

      12   would be a violation?

      13           VENIRE PERSON:  If that was the law, yes, I

      14   could.

18:00 15           MR. JACKS:  Thank you, ma'am.

      16           THE COURT:  Ms. Wolverton, we are in the process

      17   of talking with members of the pool from which this jury

      18   will be selected, and I expect that process will continue

      19   for another day or so.  In the meantime, until you hear

      20   from us again, you should not discuss this case with

      21   anyone or allow anyone to discuss it with you, and if

      22   there are any media accounts of the case, you should not

      23   read or watch or listen to any of those.  Thank you.  You

      24   may rejoin the others in the hall.

      25           MR. WESTFALL:  Your Honor, we're having a

18:00  1    popular demand to run to the bathroom real fast.

       2           THE COURT:  I was trying to get one more in, but

       3    if it's urgent.

       4           MR. WESTFALL:  It was urgent two ago.

       5           THE COURT:  All right.  We'll be in recess for

       6    fifteen minutes.

       7           (Recess)

       8           THE COURT:  Good afternoon, Ms. Ritter.

       9    Counsel for the parties in this case have some questions

      10    they would like to ask you.  Ms. Moreno.

      11           MS. MORENO:  Thank you, your Honor.  Good

      12    afternoon.  My name is Linda Moreno.  I'm one of the

      13    defense lawyers in this case.  I want to ask you some

      14    questions about the answer in your questionnaire and if

18:00 15    you have heard anything about this case.

      16           VENIRE PERSON:  All right.

      17           MS. MORENO:  This is a case that involves an

      18    American Muslim charity called the Holy Land Foundation.

      19    Have you heard anything about the Holy Land Foundation in

      20    the press recently or in the past?

      21           VENIRE PERSON:  Actually last night was the

      22    first time.

      23           MS. MORENO:  Was the first time?

      24           VENIRE PERSON:  Yes.

      25           MS. MORENO:  And what did you hear?

18:00 1          VENIRE PERSON:  That there was going to be this

2     case about the Holy Land and it had to do with aiding

3     money to terrorism.  And it would be a long case.

4          MS. MORENO:  And is that something you saw on

5     TV?

6          VENIRE PERSON:  Yes.  I don't know.  It was

7     after the six o'clock news.

8          MS. MORENO:  And after you heard that it was the

9     Holy Land case that had these terrorism related charges

10     and you knew you were coming today for jury selection,

11     what did you think?

12          VENIRE PERSON:  I thought this is the case I

13     came in June for to answer questions about.

14          MS. MORENO:  What I want to explore with you a

18:00 15     little bit is if there is anything about what you heard

16     last night on the news or from filling out that

17     questionnaire that causes you any concern at this point

18     before you go any further.

19          VENIRE PERSON:  Just the length of time?

20          MS. MORENO:  Let's talk about that.  The case

21     could take three months, four months, more or less.  Does

22     that impose an economic hardship for you?

23          VENIRE PERSON:  Not economic but I'm a school

24     teacher, and I teach middle school math.  So I have a

25     concern for my students.

18:00 1          MS. MORENO:  Tell me more about that concern.

2          VENIRE PERSON:  Since I do teach math, I would

3     think that as parents out here in the crowd, if you knew

4     that your school teacher who teaches math is going to be

5     gone four days a week and there one day a week to teach

6     your child and a substitute would be there the other four

7     days, how would you feel about the education of your

8     child?

9          MS. MORENO:  Well, I want to know how you feel

10    about that.

11         VENIRE PERSON:  I take a personal interest in my

12    students and because of Texas and the TAKS test, and it

13    relates to that -- It's hard for me because I tutor, and I

14    tutor all the time -- during advisory, mornings,

18:00 15   afternoons.  I'm not one of those teachers that sits back

16    and says good luck.

17         MS. MORENO:  I think you are sharing that you

18    are a very committed teacher, and as parents I'm sure we

19    all appreciate that.  The question I need to know the

20    answer to is given all of that is that something you would

21    be so distracted -- as you said you would have to sit if

22    this courtroom every day and look at the evidence -- would

23    you be so distracted that you could not give your full

24    attention?

25         VENIRE PERSON:  It would not distract me being

18:00 1    here for the case because I'm one of those people that

2    whatever I'm doing at the time I'm fully committed.

3           MS. MORENO:  Anything else you want to tell us

4    about that particular issue?

5           VENIRE PERSON:  No, other than the time.

6           MS. MORENO:  Do you know any Muslims?

7           VENIRE PERSON:  No.

8           MS. MORENO:  Have you ever had any interaction

9    with persons of Muslim decent?

10           VENIRE PERSON:  Other than at airports.  I'm

11    sure walking down the street maybe.  I'm sure that's it.

12           MS. MORENO:  I'm asking you these questions

13    also.  Let me tell you there is no right or wrong answer.

14    What we need to know is if you have any preconceived

18:00 15    notions or prejudices that would prevent you from being a

16    fair juror in this case.

17           VENIRE PERSON:  No, because I really don't know

18    the total background of their religion or culture.  I

19    really don't know a lot about it.

20           MS. MORENO:  I was going to ask you a little bit

21    about that.  You are a member of the Casa View Baptist

22    Church.

23           VENIRE PERSON:  Yes, sir.

24           MS. MORENO:  Is there anything about your

25    religion that you believe might interfere -- when you are

18:00  1    looking at a case that involves a religion that you don't
       2    know too much about, Islam?
       3         VENIRE PERSON:  I'm sorry.  Repeat that.
       4         MS. MORENO:  Is there anything about your
       5    religion, belief or convictions that may color the way you
       6    look at a case like this that involves the religion of
       7    Islam?
       8         VENIRE PERSON:  No.  Everybody still has the
       9    freedom of their own religion.  Whatever you are raised,
      10    it depends on what you think, your own opinion, but they
      11    can certainly have their own belief.
      12         MS. MORENO:  In your congregation, do you have
      13    charities that you support?  Does your congregation have
      14    certain charities they support?
18:00 15         VENIRE PERSON:  Not necessarily charities but
      16    missionary work.
      17         MS. MORENO:  And where would that missionary
      18    work be?
      19         VENIRE PERSON:  To Africa, France.  I can't
      20    recall all the countries.
      21         MS. MORENO:  And the missionary work that your
      22    church supports, is this in the form of humanitarian aid,
      23    food?  What is it?
      24         VENIRE PERSON:  To go out and build churches and
      25    spread the gospel.

18:00 1          MS. MORENO:  Is there any other component to

2     that missionary work that involves humanitarian aid?

3               VENIRE PERSON:  Not to my knowledge.

4               MS. MORENO:  In the building of churches, does

5     this happen in foreign countries like Africa and other

6     places that your congregation supports?

7               VENIRE PERSON:  Yes.

8               MS. MORENO:  Are these churches that you build

9     in certain towns and villages throughout the country?

10              VENIRE PERSON:  Yes.

11              MS. MORENO:  Are these supported entirely by

12    your congregation?

13              VENIRE PERSON:  No.  Probably also from the

14    Southern Baptist Convention.

18:00 15         MS. MORENO:  How do you feel about charity?

16              VENIRE PERSON:  Well, it's a good thing.  Some

17    organizations, they couldn't do without a charity.  You

18    know, it's helping someone else who can't help themselves

19    sometimes.

20              MS. MORENO:  This case involves an American

21    Muslim charity called the Holy Land Foundation.

22              THE COURT:  Ms. Moreno, your time has expired.

23              MS. MORENO:  Thank you.  Thank you for answering

24    my questions.

25              THE COURT:  Mr. Jacks, do you have questions for

18:00 1    Ms. Ritter?

2          MR. JACKS:  Yes, your Honor.  Good afternoon,

3    Ms. Ritter.

4          VENIRE PERSON:  Good afternoon.

5          MR. JACKS:  My name is Jim Jacks.  I'm an

6    Assistant United States Attorney here in Dallas, and I'll

7    be one of the prosecutors representing the government

8    during this trial.  I have just a few questions for you as

9    well, if you don't mind.  I take it your children are all

10   grown and out of the house.

11         VENIRE PERSON:  Yes, they are all teachers.

12         MR. JACKS:  And one of the lists you filled out

13   you showed your husband was a vice president for AC Horn.

14         VENIRE PERSON:  Yes.

18:00 15   MR. JACKS:  What type of a company is that?

16         VENIRE PERSON:  Precision sheet metal.

17         MR. JACKS:  How long has he worked for that

18   company?

19         VENIRE PERSON:  Thirty, thirty-one years.

20         MR. JACKS:  Is it a company that's strictly

21   located in Dallas or statewide or nationwide?

22         VENIRE PERSON:  No.  It's family owned, and it's

23   here in Dallas.

24         MR. JACKS:  I wanted to follow-up on your

25   educational background.  You have a college degree?

18:00  1           VENIRE PERSON:  Yes.

       2           MR. JACKS:  And where did you receive your

       3   degree?

       4           VENIRE PERSON:  At East Texas.

       5           MR. JACKS:  And your description of your major

       6   was inter-disciplinary studies with an emphasis in

       7   English.  Am I interpreting that right?

       8           VENIRE PERSON:  Yes, that is my minor.

       9           MR. JACKS:  And after college did you begin

      10   teaching pretty soon thereafter?

      11           VENIRE PERSON:  Yes, sir.

      12           MR. JACKS:  Have you taught anywhere other than

      13   the Garland School District?

      14           VENIRE PERSON:  No.

18:00 15           MR. JACKS:  I believe you indicated that you

      16   have been on a trial jury at least once before.  Do you

      17   feel like this is the only time or were there other times

      18   that you could not recall?

      19           VENIRE PERSON:  No, that's the only time I

      20   served.

      21           MR. JACKS:  Was that in Dallas County?

      22           VENIRE PERSON:  Yes.

      23           MR. JACKS:  I think we all are receptive to what

      24   you were talking about regarding your commitment to your

      25   students and your belief of how important it is that you

18:00 1    be there for them.  And I want to make a point and ask you

2    a question about that point.  I don't know how much you

3    know about how a trial jury is selected, but essentially

4    the parties will -- when the pool of jurors is finally

5    determined, the parties will elect to excuse persons.  So

6    the people that end up on the jury are the people that

7    were not excused.  It's kind of a service by default, if

8    you will.  So there is a possibility that you could end up

9    on the jury because, you know, there were other people on

10    the panel that for one reason or the other might have been

11    struck.  Am I making sense to you?

12         VENIRE PERSON:  Yes.

13         MR. JACKS:  Let's say you are on the jury.  I

14    know that's something you are not hoping or looking

18:00 15    forward to.  But let's say you end up on the jury.  Would

16    that be -- Would you have any kind of feelings of

17    resentment toward either side once you found out, well,

18    I'm here now?

19         VENIRE PERSON:  No.  No.  I would not have

20    resentment.  Not resentment.

21         MR. JACKS:  Disappointment?

22         VENIRE PERSON:  Well, no, it's like I said.  You

23    know, when school starts, students come in, and they think

24    you are the teacher, and she says, no, I'm the substitute,

25    but your teacher will be here on Friday.

1          MR. JACKS:  I understand.  You also have concern

2     for the parents of those students and their concerns?

3          VENIRE PERSON:  Right.

4          MR. JACKS:  I think I speak for everybody that

5     we're all going to try to move expeditiously in this case

6     but at the same time doing it right.  Because if it's

7     worth doing, it's worth doing right.

8          VENIRE PERSON:  That's only fair.

9          MR. JACKS:  As Ms. Moreno pointed out to you --

10    And I don't know how you refer to it, but the principal

11    charge that seems to be referred to most often in this

12    case is providing material support to a terrorist

13    organization, and I expect the evidence to show that money

14    was sent by this organization, the Holy Land Foundation,

15   and the men that worked for it and the government has

16    alleged in the indictment that that money was sent

17    overseas for the benefit of HAMAS, a terrorist

18    organization.  And I can't remember what you said about if

19    you had heard of HAMAS or knew generally what HAMAS is.

20         VENIRE PERSON:  No, I do not.

21         MR. JACKS:  As you may remember from having been

22    on a jury before, at the end of the evidence before the

23    arguments the Judge will read the law that the jury is

24    supposed to apply to the facts from the evidence.  And

25    that instruction will contain a recitation of the law.  In

18:00   1    other words, this is what constitutes a violation of this

  2    statute.  These are the definitions you may need to

  3    understand and he would tell the jury that these are the

  4    things the government must prove to show that someone has

  5    provided material support to a terrorist organization.  I

  6    expect that there will also be an explanation or

  7    instruction that talks about a provision in the law that

  8    says even if the material support that is provided to this

  9    organization is in the form of what might be called

  10    charitable or humanitarian items, be it food or clothing

  11    or medical supplies, even if the material support is of

  12    that nature, but if it goes to a terrorist organization or

  13    for the benefit of a terrorist organization, that that is

  14    still a violation of the law.  Do you understand that

18:00  15    provision as I have attempted to explain it?

  16           VENIRE PERSON:  Yes, it would be some sort of

  17    aid.

  18           MR. JACKS:  Could you apply that provision of

  19    the law if the evidence showed?

  20           THE COURT:  Mr. Jacks, your time has expired.

  21           MR. JACKS:  Thank you.

  22           THE COURT:  Ms. Ritter, we are in the process of

  23    talking with members of the pool from which the jury will

  24    be selected, and I expect that process will go on for

  25    another day or so.  Until you hear from us further, you

18:00   1   should not discuss this case with anyone or allow anyone

        2   to discuss it with you, and also if there are any media

        3   accounts about the case, you should not read or watch or

        4   listen to any of those.  Thank you for your time.  You may

        5   be excused.

        6           Good afternoon, Ms. Moss.  Counsel for parties

        7   have some questions for you in this case.

        8           MR. WESTFALL:  Ms. Moss.

        9           VENIRE PERSON:  Yes.

       10           MR. WESTFALL:  I'm Greg Westfall.

       11           VENIRE PERSON:  Nice to meet you.

       12           MR. WESTFALL:  I'm one of the defense lawyers on

       13   this case, and I am going to speak with you for a few

       14   minutes, and then the government is probably going to want

18:00  15   to get up and speak with you.  Okay?

       16           VENIRE PERSON:  Okay.

       17           MR. WESTFALL:  This case is the United States

       18   versus the Holy Land Foundation.  It is a case where the

       19   government alleges that the Holy Land Foundation and some

       20   of the men involved in it gave material support to a

       21   terrorist organization, specifically HAMAS.  Does this

       22   ring a bell?  Have you heard about it?

       23           VENIRE PERSON:  I have heard a little bit about

       24   it.

       25           MR. WESTFALL:  Where have you heard about it?

18:00  1                    VENIRE PERSON:  In the newspapers only.

        2               MR. WESTFALL:  Which one?

        3               VENIRE PERSON:  Fort Worth Star Telegram.

        4               MR. WESTFALL:  Did you read about it this last

        5     weekend?

        6               VENIRE PERSON:  No, there was a little article

        7     yesterday.

        8               MR. WESTFALL:  Yesterday.  Okay.  And having

        9     read that have you formed any opinions?

       10               VENIRE PERSON:  Oh, no.  I read the paper every

       11     day.  I don't really have an opinion.

       12               MR. WESTFALL:  Do you take the Dallas Morning

       13     News?

       14               VENIRE PERSON:  No.  Just the Fort Worth Star

18:00  15     Telegram.

       16               MR. WESTFALL:  Do you live in the Dallas area?

       17               VENIRE PERSON:  Grand Prairie, Arlington.

       18               MR. WESTFALL:  In your questionnaire you said

       19     you follow the Israeli-Palestinian conflict somewhat

       20     closely.

       21               VENIRE PERSON:  Not really.

       22               MR. WESTFALL:  How long did you work with Grand

       23     Prairie ISD.

       24               VENIRE PERSON:  Twenty years.

       25               MR. WESTFALL:  You were in food service the

18:00 1  entire time?

2          VENIRE PERSON:  Yes.

3          MR. WESTFALL:  And you worked in the cafeteria?

4          VENIRE PERSON:  Yes.

5          MR. WESTFALL:  How long have you been retired?

6          VENIRE PERSON:  I'm at home.  I'm a domestic

7  engineer.

8          MR. WESTFALL:  After four years you are getting

9  good at it?

10          VENIRE PERSON:  Oh, I was good at it before.

11          MR. WESTFALL:  Do you know any Muslims or people

12  who practice the Islamic faith?

13          VENIRE PERSON:  No, I don't.

14          MR. WESTFALL:  Never have?

18:00 15          VENIRE PERSON:  No.

16          MR. WESTFALL:  Have you had any good experiences

17  or bad experiences?

18          VENIRE PERSON:  No, not really.  I don't know of

19  anybody that's in that type of organization.

20          MR. WESTFALL:  That's in that religion?

21          VENIRE PERSON:  Yes.

22          MR. WESTFALL:  Do you practice a religion

23  yourself?

24          VENIRE PERSON:  Yes, Baptist.

25          MR. WESTFALL:  Attend the church regularly?

18:00  1          VENIRE PERSON:  Not regularly, but most of the

2      time.

3              MR. WESTFALL:  Do you do anything else like

4      service work?

5              VENIRE PERSON:  No.  I have an autistic son that

6      requires my time at home.

7              MR. WESTFALL:  How old is your son?

8              VENIRE PERSON:  He's thirty.

9              MR. WESTFALL:  Is it Autism Asberger?

10             VENIRE PERSON:  He's Asberger and autistic.

11             MR. WESTFALL:  How is he getting along?  You are

12     here.

13             VENIRE PERSON:  He's with his dad today.  He's

14     very emotional, and he has to have one of us with him most

18:00 15     of the time.

16             MR. WESTFALL:  Right.  So we're talking about a

17     trial that might last four months.  Is that going to pose

18     a problem?

19             VENIRE PERSON:  No, my husband is at home.  He's

20     also retired.  So our schedules revolves around him.

21             MR. WESTFALL:  Very well.  This is a case where

22     we have Muslim men charged with material support of

23     terrorism.  So terrorism is in the name of the charge.

24     That can evoke some strong emotions given the last several

25     years, and you know what I'm talking about.

1         VENIRE PERSON:  Yes.

2         MR. WESTFALL:  Just think for a moment and then

3 the question really is, in a case involving Muslim men and

4 terrorism is in the title of it, can you be fair and

5 impartial?  Is there anything that might keep you from

6 being fair and impartial?

7         VENIRE PERSON:  Not to my knowledge there is

8 not.  I don't know enough about what is going on.

9         MR. WESTFALL:  This is a criminal case, and the

10 way it's supposed to work is when a jury is listening and

11 makes a decision, that decision can only be based on the

12 evidence and can't be based on anything outside --

13 newspapers articles and all of that.

14         VENIRE PERSON:  Yes.

15         MR. WESTFALL:  And also personal feelings.

16         VENIRE PERSON:  Personal opinions?

17         MR. WESTFALL:  Right.  Sounds like that wouldn't

18 be a problem with you.  You would be able to listen to the

19 evidence?

20         VENIRE PERSON:  Yes.  I'm usually an open-minded

21 person about everything until I hear the whole story.

22         MR. WESTFALL:  What did you like most about

23 working in the cafeteria?

24         VENIRE PERSON:  The children.  It's an

25 interesting place to work.  There is never a dull moment

18:00 1    when you work with kids, no matter what part you work

2    with, and then I have my son at home, and that is a task

3    in itself.

4            MR. WESTFALL:  Did you work in the part where

5    the kids actually come through the line?

6            VENIRE PERSON:  I only worked part time, but

7    yeah, that's what I did.

8            MR. WESTFALL:  So you did it part time?

9            VENIRE PERSON:  Yes.

10            MR. WESTFALL:  For twenty years?

11            VENIRE PERSON:  And I worked there because of my

12    son.

13            MR. WESTFALL:  So your son went there, too?

14            VENIRE PERSON:  He went to the school where I

18:00 15    was at.  He was in that school for three years, and then

16    he went onto high school.

17            MR. WESTFALL:  What is his name?

18            VENIRE PERSON:  David.

19            MR. WESTFALL:  Thank you very much, ma'am.

20            VENIRE PERSON:  Yes.

21            THE COURT:  Mr. Jacks, do you have questions for

22    Ms. Moss?

23            MR. JACKS:  Yes, your Honor.  Thank you.  Good

24    afternoon.

25            VENIRE PERSON:  Hello, how are you?

18:00  1                MR. JACKS:  My name is Jim Jacks.  I'm an

2      Assistant United States Attorney here in Dallas, and I am

3      going to be one of the prosecutors during this trial.  I

4      have a couple of questions I would like to ask you as

5      well.

6                MR. JACKS:  On one of the forms you filled out,

7      you indicated your husband was with the Postal Service for

8      thirty-five years.

9                VENIRE PERSON:  Yes.

10               MR. JACKS:  And what was his position at the

11     end?

12               VENIRE PERSON:  A letter carrier.

13               MR. JACKS:  Was that something he did his entire

14     career there?

18:00 15               VENIRE PERSON:  No, sir.  Also a clerk inside

16     the post office.

17               MR. JACKS:  The school at which you worked,

18     which school district was that?

19               VENIRE PERSON:  Grand Prairie ISD.

20               MR. JACKS:  Did you work at a particular campus?

21               VENIRE PERSON:  Yes, I worked at a middle

22     school.

23               MR. JACKS:  Do you live in Grand Prairie?

24               VENIRE PERSON:  Yes, I do.

25               MR. JACKS:  Have you always lived in the Dallas

18:00 1    Fort Worth area?

2              VENIRE PERSON:  I was raised in Dallas.

3              MR. JACKS:  Would that be true of your husband

4         as well?

5              VENIRE PERSON:  Yes.

6              MR. JACKS:  And am I correct in assuming at the

7         present time living in your home is you and your husband

8         and -- How old is your son?  Thirty?

9              VENIRE PERSON:  He's thirty.

10             MR. JACKS:  Is that the extent of who lives in

11        your home?

12             VENIRE PERSON:  That's all except for our pet.

13             MR. JACKS:  Who?

14             VENIRE PERSON:  We have a cat.  He thinks he's

18:00 15   part of the family.

16             MR. JACKS:  They do count.  Is it correct that

17        you have never served on a trial jury before?

18             VENIRE PERSON:  No.

19             MR. JACKS:  Have you ever received a jury

20        summons where you had to go?

21             VENIRE PERSON:  Yes, I have twice.

22             MR. JACKS:  Was that at Dallas County

23        Courthouse?

24             VENIRE PERSON:  Yes, Dallas County.

25             MR. JACKS:  Other than working in the cafeteria

18:00 1    for the school district, have you held any other jobs

2    before that?

3                VENIRE PERSON:  Yes, I have.

4                MR. JACKS:  What did you do?

5                VENIRE PERSON:  I worked in an office for a

6    tractor supply company.

7                MR. JACKS:  In Grand Prairie?

8                VENIRE PERSON:  No.  Farmer's Branch.

9                MR. JACKS:  How long did you do that?

10             VENIRE PERSON:  I worked there eleven years.

11             MR. JACKS:  What was your job there?

12             VENIRE PERSON:  Office clerk.

13             MR. JACKS:  I realize you don't know much about

14    what this case is about other than what we have told you.

18:00 15            VENIRE PERSON:  What I read in the newspapers,

16    and you can't believe everything you read.  I just read a

17    small little article I saw the other day.

18             MR. JACKS:  I think it's been described that

19    this case is essentially an allegation that this

20    foundation or organization, the Holy Land Foundation and

21    men that worked with it or for it are accused of providing

22    material support to a terrorist organization; namely,

23    HAMAS.  I can't remember.  Have you ever heard of HAMAS?

24            VENIRE PERSON:  Well, I probably have, but I

25    haven't paid a whole lot of attention.

18:00  1          MR. JACKS:  At the end of the evidence when both

       2     sides have finished presenting their witnesses and

       3     documents but before the attorneys stand up in front of

       4     the jury and give their final summation and argument, it's

       5     at that point in time that the Judge will read

       6     instructions to the jury and tell them what the law is

       7     that applies to the case, and the jury will have a written

       8     copy that they get to keep while they are deliberating,

       9     and those instructions basically tell the jury these are

      10     the laws that we're talking about.  These are the statutes

      11     that the government is relying upon.  He'll put

      12     definitions in there and say this is what is meant by this

      13     term.  And I anticipate that one of the statutes or

      14     instructions that he would tell the jury is that -- Well,

18:00 15     first of all, he's going to tell the jury what the

      16     government has to prove to show that someone or some group

      17     has provided material support to a terrorist organization,

      18     and I expect he would also put in there a part of the law

      19     that says even if that support that was provided over to

      20     that terrorist organization was in the form of charitable

      21     goods such as food or clothing or medical supplies -- Even

      22     if that was what we were talking about or that's what you

      23     find from having heard the evidence that was what was

      24     given over to this terrorist organization, that even

      25     giving things such as that is prohibited by law.  Do you

18:00 1    understand my statement as I explained it?

2           VENIRE PERSON:  Yes.

3           MR. JACKS:  My next question is if that is a

4    part of the law and if the Judge tells you that is part of

5    the law and you find from the evidence that's what was

6    given over, charitable items but it was given over to a

7    terrorist organization, would you be able to return a

8    verdict of guilty under that provision of the law?

9           VENIRE PERSON:  Probably after I heard all of it

10    I might be able to.

11           MR. JACKS:  I'm not doing a very good job of

12    making it clear, but if the Judge told you that would be a

13    violation of the law, would you be able to follow that

14    instruction?

18:00 15           VENIRE PERSON:  (No response).

16           MR. JACKS:  I'm sorry.  If he told you that it

17    is a violation of the law, even if the items given were

18    charitable items, would you be able to follow that

19    instruction?

20           VENIRE PERSON:  Yes, probably could.

21           MR. JACKS:  Thank you.

22           THE COURT:  Ms. Moss, we are in the process of

23    talking with the members of the panel from which the jury

24    will be drawn that would hear this case.  I expect this

25    process to go on for another day or so.  So until you hear

18:00 1    from us again, you should not discuss this case with

2    anyone or allow anyone to discuss it with you, and if

3    there are any media accounts about this case, you should

4    not read or watch or listen to any of them.

5            VENIRE PERSON:  Okay.

6            THE COURT:  Thank you for your time.  You may be

7    excused.

8            Good afternoon, Ms. Young.  Counsel for the

9    parties have some questions they would like to ask you.

10           MR. WESTFALL:  Ms. Young, I'm Greg Westfall.

11    I'm one of the defense lawyers in this case, and I am

12    going to speak with you for a few minutes, and then the

13    government is going to speak with you for a few minutes.

14    How are you doing?

18:00 15           VENIRE PERSON:  Fine.

16           MR. WESTFALL:  This is a criminal case.  It's

17    United States of America versus Holy Land Foundation, and

18    it's a case that involves a Muslim charity that the

19    government alleges gave material support to HAMAS which is

20    a terrorist organization.  Does that ring any bells or

21    have you heard about it at all?  Haven't read anything in

22    the paper?

23           VENIRE PERSON:  No.

24           MR. WESTFALL:  You have been twenty years in

25    Burleson?

18:00  1                    VENIRE PERSON:  Yes.

       2                    MR. WESTFALL:  So South Burleson then?

       3                    VENIRE PERSON:  Yes.

       4                    MR. WESTFALL:  I was thinking that's in Tarrant

       5        County.  How long have you been with the beauty school?

       6                    VENIRE PERSON:  About ten years.  The current

       7        school about seven years.  But the school business for

       8        about ten years.  And I am at Aladdin.

       9                    MR. WESTFALL:  Do you know any Muslims?

      10                    VENIRE PERSON:  No.

      11                    MR. WESTFALL:  Have you had any experiences with

      12        a Muslim?

      13                    VENIRE PERSON:  I had one student that was

      14        Muslim, but she transferred to another state.

18:00 15                    MR. WESTFALL:  Where was she from?

      16                    VENIRE PERSON:  I don't know.

      17                    MR. WESTFALL:  You said from Aladdin?

      18                    VENIRE PERSON:  Yes, I had one student that was

      19        Muslim.

      20                    MR. WESTFALL:  Did she wear a veil and stuff?

      21                    VENIRE PERSON:  Yes.

      22                    MR. WESTFALL:  How did you get along?

      23                    VENIRE PERSON:  Fine, we don't discriminate.  As

      24        long as she came to the school and followed the rules,

      25        that was great.

18:00 1                MR. WESTFALL:  Were you friendly?

2                VENIRE PERSON:  I can't be too friendly as the

3      director, but I get along with everyone.

4                MR. WESTFALL:  Did she seem friendly?

5                VENIRE PERSON:  She did.

6                MR. WESTFALL:  This is a case that has an

7      allegation of material support of terrorism.  So in the

8      title somewhere is the word "terrorism."  That can evoke

9      some strong emotions, as you know.

10                VENIRE PERSON:  Right.

11                MR. WESTFALL:  How do you feel about being on a

12     jury that involves allegations of terrorism?

13                VENIRE PERSON:  I would like to think I could be

14     fair.

18:00 15                MR. WESTFALL:  Have you ever been on a jury

16     before?

17                VENIRE PERSON:  No.

18                MR. WESTFALL:  In a criminal case -- and it's

19     this way all over the United States -- there are

20     Constitutional rights that are accorded to people accused

21     of a crime.  It doesn't matter whether it's a misdemeanor

22     or death case.  Everybody gets the same right.  A small

23     part of that is the right not to have to testify if you

24     don't want to in your own criminal trial, and another is

25     you are presumed innocent until the government can prove

18:00 1    you guilty beyond a reasonable doubt.

2              VENIRE PERSON:  Right.

3              MR. WESTFALL:  And so the presumption of

4    innocence alone is sufficient to acquit somebody.

5              VENIRE PERSON:  Right.

6              MR. WESTFALL:  Have you heard those before?

7              VENIRE PERSON:  Yes.

8              MR. WESTFALL:  You don't have any difficulty

9    with that, do you?

10             VENIRE PERSON:  No.

11             MR. WESTFALL:  Where did you go to high school?

12             VENIRE PERSON:  Alvarado.

13             MR. WESTFALL:  So you stayed in the same area?

14             VENIRE PERSON:  I did.

18:00 15           MR. WESTFALL:  All the same friends growing up?

16             VENIRE PERSON:  Not really.  Kind of lost touch

17   with them when I came up this direction.  There is a lot

18   of them still down there.

19             MR. WESTFALL:  What do you do in your off time

20   when your not at Aladdin?

21             VENIRE PERSON:  Go to the casino.  I'm a

22   gambler.

23             MR. WESTFALL:  North or east?

24             VENIRE PERSON:  North.  I go to Oklahoma.

25             MR. WESTFALL:  How often do you do that?

18:00 1          VENIRE PERSON:  As much as I can.  Usually once

2     or twice a month.

3          MR. WESTFALL:  Do you do any sort of charity

4     work or church work or anything?

5          VENIRE PERSON:  No.

6          MR. WESTFALL:  Thank you very much.

7          THE COURT:  Mr. Jacks, do you have questions?

8          MR. JACKS:  Yes, sir.  Good afternoon.  My name

9     is Jim Jacks.  I'm an Assistant United States Attorney

10    here in the Northern District of Texas.  I am going to be

11    one of the prosecutors representing the government in this

12    trial, and I just have a few questions for you.  You have

13    not served on a trial jury before.  Is that correct?

14         VENIRE PERSON:  No.

18:00 15         MR. JACKS:  Have you ever been summoned and gone

16    through jury selection?

17         VENIRE PERSON:  For the county I did.

18         MR. JACKS:  And that's Johnson County?

19         VENIRE PERSON:  Yes.

20         MR. JACKS:  Do you remember if that was criminal

21    or civil?

22         VENIRE PERSON:  I'm not sure.  He took a plea

23    bargain before we did the selection.

24         MR. JACKS:  How long ago was that in the past?

25         VENIRE PERSON:  Probably about three years ago.

18:00 1          MR. JACKS:  On one of the forms that you filled

2   out you listed your husband's occupation as a machinist.

3          VENIRE PERSON:  Yes.

4          MR. JACKS:  Who does he work for?

5          VENIRE PERSON:  JDP Manufacturing.

6          MR. JACKS:  What are the initials again?

7          VENIRE PERSON:  JDP Manufacturing.

8          MR. JACKS:  What kind of products do they

9   manufacture?

10          VENIRE PERSON:  Downstream equipment.  I'm not

11   sure.  They make machines that make the plastic pipe that

12   you need for your plumbing and stuff like that.

13          MR. JACKS:  Where is that plant located?

14          VENIRE PERSON:  Fort Worth.

18:00 15          MR. JACKS:  Do you have any children?

16          VENIRE PERSON:  No.

17          MR. JACKS:  You are the director of this beauty

18   college.  You said you had been in that business for about

19   ten years.

20          VENIRE PERSON:  Yes.

21          MR. JACKS:  Before Aladdin, where did you work?

22          VENIRE PERSON:  Fort Worth Beauty School.

23          MR. JACKS:  For about eight years?

24          VENIRE PERSON:  Yes.

25          MR. JACKS:  You were born and raised in Johnson

18:00   1   County?

        2           VENIRE PERSON:  Actually I was born in Irving.

        3   We moved when I was about fifteen.

        4           MR. JACKS:  How about your husband?  Is he from

        5   this area?

        6           VENIRE PERSON:  Originally Pittsburgh.

        7           MR. JACKS:  Pennsylvania?

        8           VENIRE PERSON:  No, Texas.  And then he moved to

        9   Odessa.

       10           MR. JACKS:  Was he ever in the military?

       11           VENIRE PERSON:  No.

       12           MR. JACKS:  You indicated that you had a

       13   relative -- in response to one of the questions -- who had

       14   been in jail for drugs.  Do you know is he still in jail

18:00  15   or is that something --

       16           VENIRE PERSON:  I really don't know.  I don't

       17   socialize with that end of the family too much anymore.

       18           MR. JACKS:  You mentioned that you had

       19   previously had a student there who was Muslim.

       20           VENIRE PERSON:  Yes.

       21           MR. JACKS:  About how long was that?

       22           VENIRE PERSON:  About a year ago.

       23           MR. JACKS:  So it was while you were the

       24   director at Aladdin?

       25           VENIRE PERSON:  Yes.

18:00 1          MR. JACKS:  In your job as director, how many

2     people work for you?

3               VENIRE PERSON:  Eight.

4               MR. JACKS:  And they are instructors?

5               VENIRE PERSON:  Yes.

6               MR. JACKS:  As director, are you the senior most

7     person at that location?

8               VENIRE PERSON:  Yes.

9               MR. JACKS:  Do you hire and fire people if need

10    be?

11              VENIRE PERSON:  Yes.

12              MR. JACKS:  Are you involved with like

13    purchasing supplies and equipment, that kind of thing?

14              VENIRE PERSON:  Everything from my school I have

18:00 15   to do the ordering for.

16              MR. JACKS:  Are these schools franchises or

17    privately owned?

18              VENIRE PERSON:  We have seventeen locations

19    throughout, seventeen of this particular company.

20              MR. JACKS:  And your boss is located where?

21              VENIRE PERSON:  She's in Texas.  Local.  She's

22    here.

23              MR. JACKS:  When you were with the Fort Worth

24    school, did you have a management position or a teacher?

25              VENIRE PERSON:  Manager.

18:00 1          MR. JACKS:  The whole time you are there you

2     were a manager?

3               VENIRE PERSON:  Yes.

4               MR. JACKS:  Or move from instructor to manager?

5               VENIRE PERSON:  No, I was manager.

6               MR. JACKS:  At the end of the evidence after

7     both sides have presented their evidence in this case, the

8     Judge will give the jury the law that they are supposed to

9     apply to the facts in this case, and he would tell you

10    what is meant by a charge of material support to a

11    terrorist organization, and he'll give you definitions.  I

12    have a couple of questions.  I expect that he would tell

13    you that HAMAS is a designated terrorist organization;

14    that is, the United States Government has designated HAMAS

18:00 15   as a terrorist organization.  I think he would also tell

16    you that it is illegal to give to them in terms of

17    material support, even if it's items for charity.  Can you

18    follow that law if the Judge instructs you in that law?

19              VENIRE PERSON:  Yes.

20              MR. JACKS:  Okay.  Thank you.

21              THE COURT:  Ms. Young, we are in the process of

22    talking with the members of the pool from which the jury

23    will be drawn that would hear this case.  I expect that

24    process to go on for another day or two.  So until you

25    hear from us again, you should not discuss this case with

18:00 1   anyone or allow anyone to discuss it with you.  Also if

2   there are any media accounts about the case, you should

3   not read or watch or listen to any of those.  Thank you

4   for your time.  You may be excused.

5         Good afternoon, Ms. Suarez, counsel for the

6   parties have some questions to ask you.

7         MR. WESTFALL:  Ms. Suarez, I'm Greg Westfall.

8   I'm a defense lawyer in this case.  I'll talk to you a few

9   minutes, and then the government will talk to you.  This

10   is the United States versus the Holy Land Foundation, and

11   the allegations are that the Holy Land Foundation and some

12   of the men involved with the Holy Land Foundation gave

13   material support to HAMAS which is a terrorist

14   organization.  After telling you that, does that ring a

18:00 15   bell?  Have you heard of the case?

16         VENIRE PERSON:  No.

17         MR. WESTFALL:  From no source whatsoever?

18         VENIRE PERSON:  No source whatsoever.

19         MR. WESTFALL:  You are a video producer with

20   DISD?

21         VENIRE PERSON:  Yes.

22         MR. WESTFALL:  What did you do as a video

23   producer for DISD?

24         VENIRE PERSON:  I produce elementary distance

25   learning programming for students and also staff

18:00  1    development programming for the staff.

       2              MR. WESTFALL:  So distance learning I guess is

       3    someone in DISD, and if they can't be at physical school

       4    they can watch the videos?

       5              VENIRE PERSON:  Right.

       6              MR. WESTFALL:  Do you record the teachers doing

       7    their lectures or --

       8              VENIRE PERSON:  Yes, sir, sometimes we go to the

       9    training sites and edit them and get them ready for airing

      10    so more teachers can view it.

      11              MR. WESTFALL:  Do you ever provide informational

      12    stuff?

      13              VENIRE PERSON:  We do public service

      14    announcements that might air at the American Airlines

18:00 15    Jumbotron, that might air about the DISD students and

      16    their successes.

      17              MR. WESTFALL:  And you went to school for it?

      18              VENIRE PERSON:  I did.

      19              MR. WESTFALL:  You have radio and television

      20    associate degree?

      21              VENIRE PERSON:  Yes.

      22              MR. WESTFALL:  Where did you go?

      23              VENIRE PERSON:  I went to several places.  I got

      24    my degree at Art Institute of Dallas.  But I have a lot of

      25    other training.  So.

18:00   1              MR. WESTFALL:  How do you feel about possibly

        2   being a juror in a case where there is allegations that

        3   have anything to do with terrorism?

        4              VENIRE PERSON:  I guess it depends on the

        5   information that I'm given.  I'm not really sure.  I have

        6   to hear more about it.  I don't know too much about it.

        7              MR. WESTFALL:  Well, the trial is going to take

        8   about four months.  And I have about three more minutes.

        9   But based on the fact that -- The allegation is material

       10   support of terrorism, and the allegation isn't blowing up

       11   a building.  It's material support of terrorism.  But

       12   nonetheless we're talking about Muslims with allegations

       13   of something that has to do with terrorism.

       14              VENIRE PERSON:  Right.

18:00  15              MR. WESTFALL:  Given that, can you be fair and

       16   impartial in a case like that?

       17              VENIRE PERSON:  I believe I can.

       18              MR. WESTFALL:  You believe you can?

       19              VENIRE PERSON:  Yes.

       20              MR. WESTFALL:  Are you okay with being a juror

       21   in a case like that?

       22              VENIRE PERSON:  About four months or so?

       23              MR. WESTFALL:  No one is okay with that.  Are

       24   you okay of it in terms of doing it, going through it?

       25              VENIRE PERSON:  I think so.  I think I would be

18:00 1    okay with it.

2              MR. WESTFALL:  Now, is there any kind of a

3    severe hardship that the four months would cause you?

4              VENIRE PERSON:  I don't believe so.  I checked

5    with payroll, and we're covered.  So I think I will be

6    okay.

7              MR. WESTFALL:  Do you know any Muslims?  Did I

8    ask you that?

9              VENIRE PERSON:  No, and no, you didn't.

10             MR. WESTFALL:  Have you ever had any good

11   experience or bad experience with Muslims?

12             VENIRE PERSON:  Not that I recall.

13             MR. WESTFALL:  Let's open it up.  Arabs?

14             VENIRE PERSON:  Well, I deal with a lot of

18:00 15   different students, and they have a lot of different

16   backgrounds.

17             MR. WESTFALL:  Have you kept up with the

18   Palestinian-Israeli conflict?

19             VENIRE PERSON:  No.

20             MR. WESTFALL:  Have you ever heard of HAMAS?

21             VENIRE PERSON:  No.  I'm very busy.  I have

22   three children and run a part-time business, also.

23             MR. WESTFALL:  Do you do any volunteer work

24   through your church?

25             VENIRE PERSON:  I'm a soccer mom.

18:00 1          MR. WESTFALL:  You said that.  And your husband

2     is a soccer coach?

3          VENIRE PERSON:  I did say that.

4          MR. WESTFALL:  Tell me about being a soccer mom.

5          VENIRE PERSON:  Taking the kids to practice and

6     organizing the games.

7          MR. WESTFALL:  Is it three separate soccer

8     teams?

9          VENIRE PERSON:  Yes.

10          MR. WESTFALL:  It's like twelve months a year?

11          VENIRE PERSON:  For the older one, yes, it's

12     select soccer, and the younger one is on a rec soccer, and

13     then he does indoor soccer the rest of the year.

14          MR. WESTFALL:  Thank you.

18:00 15          THE COURT:  Mr. Jacks, do you have questions for

16     Ms. Suarez?

17          MR. JACKS:  Yes, your Honor.  Good afternoon.

18     My name is Jim Jacks.  I'm an Assistant United States

19     Attorney here in Dallas, and I'll be representing the

20     government in this trial along with some colleagues.  I

21     have a few follow-up questions if you don't mind.  Your

22     husband's occupation is soccer coach?

23          VENIRE PERSON:  Yes.

24          MR. JACKS:  Does he coach select teams or club

25     teams?

18:00  1              VENIRE PERSON:  Both.  He does it full time at a

      2    high school in Dallas, and then he also coaches select

      3    soccer all the time.

      4              VENIRE PERSON:  Before that, did he play soccer

      5    for a living?

      6              VENIRE PERSON:  No.

      7              MR. JACKS:  Did you indicate on the

      8    questionnaire he was born in Mexico City?

      9              VENIRE PERSON:  Yes.

     10              MR. JACKS:  When did he move to the United

     11    States?

     12              VENIRE PERSON:  I believe when he was eight.

     13              MR. JACKS:  Did he move to the Dallas area?

     14              VENIRE PERSON:  Dallas.

18:00 15              MR. JACKS:  Has he always lived in the Dallas

     16    area when he has lived in the United States?

     17              VENIRE PERSON:  Yes.

     18              MR. JACKS:  A naturalized citizen?

     19              VENIRE PERSON:  Yes.

     20              MR. JACKS:  When did he acquire his citizenship

     21    approximately?

     22              VENIRE PERSON:  I am thinking about eighteen

     23    years ago.

     24              MR. JACKS:  And you are from the Dallas area?

     25              VENIRE PERSON:  Yes.

18:00  1          MR. JACKS:  Your role or job in producing these

       2    videos, is it just kind of the overseeing it?  You are not

       3    actually the cameraman?

       4          VENIRE PERSON:  I'm the camera person.

       5          MR. JACKS:  When you do these videos, do you use

       6    actors or real people?

       7          VENIRE PERSON:  Real people.

       8          MR. JACKS:  I didn't know if they were the

       9    quality -- your children I believe you said are -- two are

      10    in elementary school, one in middle school or junior high?

      11          VENIRE PERSON:  High school.

      12          MR. JACKS:  Are they in the Dallas School

      13    District?

      14          VENIRE PERSON:  Yes, Dallas.

18:00 15          MR. JACKS:  You have been on a jury before, a

      16    trial jury?

      17          VENIRE PERSON:  Yes, sir.

      18          MR. JACKS:  And that was in Dallas County?

      19          VENIRE PERSON:  Yes.

      20          MR. JACKS:  And you said the date was about

      21    2002?

      22          VENIRE PERSON:  I believe it was 2002.

      23          MR. JACKS:  That was sort of a driving while

      24    intoxicated charge?

      25          VENIRE PERSON:  Yes.

18:00 1          MR. JACKS:  Do you remember how long that trial

2     took?

3          VENIRE PERSON:  Just a day.

4          MR. JACKS:  I believe you answered in response

5     to the questionnaire that you had a relative who was

6     incarcerated, and they were released.  How close were you

7     when that happened?

8          VENIRE PERSON:  I was very close when it

9     happened, but I didn't keep in contact during the twenty

10    years he was in prison.  So I just recently started seeing

11    him again.

12         MR. JACKS:  Okay.  You have gone in detail on

13    the next page I see.  With regard to that event, were you

14    ever a witness or did you have any involvement with the

18:00 15   court system in that regard?

16         VENIRE PERSON:  No, but I did sit in on the

17    trial a couple of days just to hear what happened.

18         MR. JACKS:  So it was resolved through a trial

19    as opposed to a plea of some sort?

20         VENIRE PERSON:  Yes.

21         MR. JACKS:  With regard to having been through

22    that experience, do you feel like he was treated fairly by

23    the criminal justice system?

24         VENIRE PERSON:  I really don't know because I

25    didn't hear everything that happened, all the evidence

18:00  1    that was presented.  So I couldn't judge.  I didn't know

2    what to think, and so I kind of left it alone.  I didn't

3    have all the facts.  So I couldn't make an assumption.

4             MR. JACKS:  And this would have happened when

5    you were a teenager or even younger than that?

6             VENIRE PERSON:  Yes.  A teenager.

7             MR. JACKS:  And I believe you indicated that you

8    have not heard anything really about this particular case.

9    Is that correct?

10             VENIRE PERSON:  Correct.

11             MR. JACKS:  And that in regards to the reference

12    to this terrorist organization, HAMAS, have you ever heard

13    of HAMAS?

14             VENIRE PERSON:  Sorry.

18:00 15             MR. JACKS:  That's fine.  At the end of the

16    evidence in this trial -- And you having been through a

17    trial and may recall this.  But before the counsel begin

18    their closing arguments, the Judge reads the instructions

19    which are the law that is supposed to apply to the case.

20    Do you remember that?

21             VENIRE PERSON:  Yes.

22             MR. JACKS:  It's anticipated in this case that

23    the Judge will instruct the jury as to what the law is or

24    what makes up the charge of providing material support to

25    a terrorist organization.  I expect the judge in his

18:00 1    instructions will tell you that HAMAS has been designated

2    by the U.S. government as a terrorist organization.  I

3    also expect that he would tell you in those instructions

4    that giving anything to HAMAS, be it money, or anything in

5    the nature of the charity is against the law.  Can you

6    follow that law or those instructions if the Judge gives

7    you such instructions?

8                 VENIRE PERSON:  Yes.

9                 MR. JACKS:  Thank you.

10                THE COURT:  Ms. Suarez, we are in the process of

11   talking with the members of the pool from which the jury

12   for this case will be selected, but I expect it will take

13   a couple of days more, and in the mean time you should not

14   discuss this case or allow anyone to discuss it with you,

18:00 15   and if there are any media accounts about this case, you

16   should not read or watch or listen to any of those.  Thank

17   you.  You may be excused.

18                Good afternoon.  Mr. Geruntho.  The parties in

19   this case have some questions they would like to ask you.

20                MR. WESTFALL:  Mr. Geruntho, I'm Greg Westfall.

21   I'm a criminal defense lawyer and one of the lawyers on

22   this case.  I am going to speak with you for a few

23   minutes, and then the government will speak with you for a

24   few minutes in all likelihood.  Okay.

25                VENIRE PERSON:  Sure.

18:00  1                    MR. WESTFALL:  This is the case of United States

       2    versus Holy Land Foundation, and the allegation is that

       3    the Holy Land Foundation and several of the men associated

       4    with the Holy Land Foundation -- the government alleges

       5    that they gave material support to HAMAS which is a

       6    terrorist organization.  Having told you that, does that

       7    ring any bells?

       8                    VENIRE PERSON:  A little bit, yes.

       9                    MR. WESTFALL:  Can you tell me from where?

      10                    VENIRE PERSON:  I think I read about it when it

      11    came out in the paper four or five years ago.

      12                    MR. WESTFALL:  How long have you lived in the

      13    area?

      14                    VENIRE PERSON:  Since 1999.

18:00 15                    MR. WESTFALL:  And I notice that you had lived

      16    up in Newark.

      17                    VENIRE PERSON:  Yes.

      18                    MR. WESTFALL:  How long did you live there?

      19                    VENIRE PERSON:  I was born there and then I grew

      20    up in a more rural place, but I moved back there and lived

      21    there ten years before leaving New Jersey.

      22                    MR. WESTFALL:  Do you miss Newark?

      23                    VENIRE PERSON:  Not exactly.

      24                    MR. WESTFALL:  I have been there a few times.

      25                    VENIRE PERSON:  But I'm actually going back

18:00 1  there on vacation.  So I must miss it a little bit.

2           MR. WESTFALL:  You still have folks that you go

3  up to see?

4           VENIRE PERSON:  That's right.

5           MR. WESTFALL:  Do you know any Muslims here or

6  back in New Jersey?

7           VENIRE PERSON:  No, but as an engineer I have

8  worked with Muslims from different countries.

9           MR. WESTFALL:  Any come to mind?  Some that you

10  work with now?

11           VENIRE PERSON:  Not right now, but I can say

12  that I have never worked with a Muslim engineer that I

13  didn't find to be the most courteous and polite person.

14           MR. WESTFALL:  Did you have a sense of whether

18:00 15  they were devout and practiced their religion or more

16  secular?

17           VENIRE PERSON:  No, I really didn't.

18           MR. WESTFALL:  Around Newark there are some

19  Muslim communities up there?

20           VENIRE PERSON:  Well, you know, I'm only aware

21  of one of those communities.  I really didn't have contact

22  with them.  I know there was one.  I just can't think of

23  the town.

24           MR. WESTFALL:  You mentioned in your

25  questionnaire that you followed the Palestinian-Israeli

18:00  1      conflict somewhat closely.

2                    VENIRE PERSON:  Did I say that?

3                    MS. CADEDDU:  You did.  Do you take it back?

4                    VENIRE PERSON:  No.  I don't remember saying it.

5                    MR. WESTFALL:  You didn't put a comment.  So I

6      was going to ask you what you mean by following it

7      closely.

8                    VENIRE PERSON:  Well, you know, it's all over

9      the news and the world we live in today.  To not follow it

10     closely, you have to live in some kind of a bubble.  It

11     would be more unusual to say I didn't follow it closely,

12     in my opinion.

13                   MR. WESTFALL:  Have you ever read any books or

14     anything besides watching on the TV to try to study up on

18:00 15     it?

16                   VENIRE PERSON:  I really don't watch TV.

17                   MR. WESTFALL:  How do you learn about it?

18                   VENIRE PERSON:  I get most of my news off the

19     internet.

20                   MR. WESTFALL:  Which sites do you like to go to?

21                   VENIRE PERSON:  Fox News I guess.

22                   MR. WESTFALL:  Do you have an opinion as to

23     who's right and who's wrong in the Palestinian-Israeli

24     issue?

25                   VENIRE PERSON:  To be honest, I have a little

18:00 1    bit of bias with regard to that.

2              MR. WESTFALL:  In favor of whom?

3              VENIRE PERSON:  In favor of Israel.

4              MR. WESTFALL:  This bias that you just have

5    spoken of, would this be the kind of thing that might

6    prevent you from being a completely impartial juror in a

7    case where we're talking about Muslim men that has

8    anything to do with terrorism?

9              VENIRE PERSON:  Well, it's certainly true that

10   not all Muslim men are terrorists.  So I think I can make

11   that distinction.

12             MR. WESTFALL:  Okay.  Tell me about the bias.

13             VENIRE PERSON:  I guess, you know, just the

14   subject of terrorism in general.  It's hard not to be

18:00 15   biased against terrorists.

16             MR. WESTFALL:  True.

17             VENIRE PERSON:  And HAMAS is definitely a

18   terrorist organization.  So if I were not biased against a

19   terrorist organization, I would think I would be a little

20   bit strange.  Beyond that normal amount of bias, then I

21   think I'm pretty fair minded.

22             MR. WESTFALL:  Well, you know, there is a lot of

23   different types of criminal trials.  Everything you can

24   imagine.  This one has to do with several Muslim men who

25   are charged with something that has something to do with

18:00  1     terrorism, and we're talking about HAMAS.  In this nation,

2     everyone who's charged with a crime has what's called the

3     presumption of innocence.

4                    VENIRE PERSON:  Right.

5                    MR. WESTFALL:  And that presumption carries all

6     the way unless and until the government proves its case

7     beyond a reasonable doubt.  Only you can answer because

8     only you know you.  But on this case, this case as we have

9     discussed, can you truly give effect to that presumption

10    of innocence?

11                   VENIRE PERSON:  I believe I could, yes.

12                   MR. WESTFALL:  How do you like engineering?

13                   VENIRE PERSON:  Sometimes I like it.  Sometimes

14    I don't.

18:00 15                   MR. WESTFALL:  Do you do mechanical engineering?

16                   VENIRE PERSON:  Yes, sir.

17                   MR. WESTFALL:  Tell me just a little bit about

18    that.

19                   VENIRE PERSON:  I work mostly in high tech

20    electronics industries doing the mechanical design for

21    electronics.

22                   MR. WESTFALL:  Computers or anything?

23                   VENIRE PERSON:  Most of the electronics are a

24    form of a computer, one form or another of a computer.

25    Microprocessors.

18:00 1                  MR. WESTFALL:  Thank you very much.

2                  THE COURT:  Mr. Jacks.

3                  MR. JACKS:  Good afternoon.  My name is Jim

4       Jacks.  I'm an Assistant United States Attorney here in

5       Dallas, and I will be one of the prosecutors representing

6       the government in this trial.  I have a few follow-up

7       questions for you, if you don't mind.  You indicated that

8       your wife is a registered nurse.

9                  VENIRE PERSON:  That's correct.

10                  MR. JACKS:  Does she presently work or practice?

11                  VENIRE PERSON:  Yes.  She works on the weekends.

12                  MR. JACKS:  At a hospital?

13                  VENIRE PERSON:  Yes, sir.

14                  MR. JACKS:  Does she do intensive care or

18:00 15       critical care or just -- I forget what the other

16       terminology is.

17                  VENIRE PERSON:  She's working a variety of

18       positions.  She's working ICU and emergency right now.

19       She's on a surgical floor.  Charge nurse on a surgical

20       floor.

21                  MR. JACKS:  How long has she been a registered

22       nurse?

23                  VENIRE PERSON:  In the United States since 1983.

24                  MR. JACKS:  That's right.  She is from the

25       Philippines; is that correct?

18:00  1          VENIRE PERSON:  Yes.

        2          MR. JACKS:  Did you and she meet in the United

        3     States or somewhere else?

        4          VENIRE PERSON:  Yes.  New Jersey is a very

        5     multi-cultural place.

        6          MR. JACKS:  And she followed you or you were

        7     married in New Jersey and moved to Texas?

        8          VENIRE PERSON:  Right.  And in between I lived

        9     in Maryland for a while.

       10          MR. JACKS:  Who do you presently work for?

       11          VENIRE PERSON:  A small company in Plano called

       12     Watch Dog Services.

       13          MR. JACKS:  And what is their business?

       14          VENIRE PERSON:  They made an in-car DVD system

18:00  15     for police cars.  Actually, I think we have become the

       16     number one supplier of that product actually, as a small

       17     start-up.

       18          MR. JACKS:  So like dashboard mounted cameras or

       19     something, it will record it to a DVD?

       20          VENIRE PERSON:  That's exactly right.  It's not

       21     mounted in the dashboard, but it mounts somewhere in the

       22     vehicle and then records to a DVD.

       23          MR. JACKS:  And how long have you been working

       24     at that company?

       25          VENIRE PERSON:  For a year and four months.

18:00 1     MR. JACKS:  Are you a part owner of the company?

2           VENIRE PERSON:  No.

3           MR. JACKS:  You mind if I ask you where you got

4     your education, your degrees?

5           VENIRE PERSON:  Of course not.  I have an

6     undergraduate degree from Trenton State College in New

7     Jersey.  It's now called the College of New Jersey, and I

8     have a masters degree from John Hopkins in Baltimore.

9           MR. JACKS:  You have served on one trial jury;

10    is that correct?

11          VENIRE PERSON:  Yes, in Newark.

12          MR. JACKS:  And that was a civil case involving

13    a personal injury?

14          VENIRE PERSON:  That's correct.

18:00 15    MR. JACKS:  Any chance that you were the

16    foreperson of that jury?

17          VENIRE PERSON:  No, I was not.

18          MR. JACKS:  And for that type of a case, was it

19    a six-person jury or twelve-person jury?

20          VENIRE PERSON:  I am going to say six person.  I

21    don't honestly remember.

22          MR. JACKS:  But that's the only trial jury

23    service you have had?

24          VENIRE PERSON:  That's correct.

25          MR. JACKS:  I notice that you have received a

18:00 1   security clearance in the past.

2                    VENIRE PERSON:  Yes, but it's no longer active.

3                    MR. JACKS:  About how long ago was it that you

4   received that clearance?

5                    VENIRE PERSON:  I had an active secret clearance

6   from 1982 to about 1985 or 1986, and then there was a one-

7   or two-year period where I was no longer having one, and

8   then I had it reinstated for another year approximately in

9   1989 to 1990.

10                    MR. JACKS:  Regarding your earlier answer about

11   I think -- Sometimes it's hard to hear when you are

12   writing down, but I think the question posed to you was

13   whether or not you have a bias because this is a terrorism

14   trial.  It's my understanding your answer was, well, I am

18:00 15   opposed or I may have a bias against terrorism.

16                    VENIRE PERSON:  That's what I said, yes.

17                    MR. JACKS:  So if this was a murder trial and

18   they asked you if you had a bias against murder, is that

19   of a similar nature to what you are talking about?

20                    VENIRE PERSON:  I think you hit the nail on the

21   head there.

22                    MR. JACKS:  Thank you, sir.  That's all the

23   questions I have.

24                    THE COURT:  Sir, we are in the process of

25   talking to members of the jury pool from which the jury

18:00 1    will be drawn that would hear this case.  But I expect

2    that process will go on for another day or so.  Until you

3    hear from us again, you should not discuss this case with

4    anyone or allow anyone to discuss it with you, and if

5    there are any media accounts about the case, you should

6    not read or watch or listen to any of those.

7           VENIRE PERSON:  I have just a question, your

8    Honor.

9           THE COURT:  Yes, sir.

10           VENIRE PERSON:  It's my understanding that the

11    trial will last for quite a few months.

12           THE COURT:  The lawyers probably know better

13    than I how long it will last, but the best estimate I have

14    heard from anyone is that it is a multi-month trial.

18:00 15           VENIRE PERSON:  Yes, I don't believe I will have

16    that luxury of time to provide.  I'd like to do my duty as

17    a citizen, but working for a small start-up company, it's

18    unrealistic to think that they are not going to replace me

19    if I'm gone that long.

20           THE COURT:  Can you give me a little bit more

21    information about how big the company is and whether there

22    is anyone else that could pitch hit for you if you were

23    away?

24           VENIRE PERSON:  That's the problem.  I'm the

25    only mechanical engineer.  We're about seventy employees.

18:00 1     And I know legally there is one thing of what they should

2     or shouldn't do, and then there is the reality that they

3     need to find somebody to do the job. If I told them it

4     was going to be a three-month trial, I'm pretty sure they

5     would start interviewing people as fast as possible.

6             THE COURT: So you have not discussed with

7     anybody there in management about your summons for jury

8     service and the expected length of this trial?

9             VENIRE PERSON: Right. I guess I told them I

10     had jury duty, but I don't think I realized until recently

11     that it could be potentially that long of a trial.

12     Besides the fact that I have a vacation planned where I

13     have already purchased the airfare and reservations on

14     hotels. So personally it would be a bit of a hardship.

18:00 15             THE COURT: What is the date of your planned

16     vacation?

17             VENIRE PERSON: August 2nd through August 20.

18             THE COURT: Thank you, sir. You may be excused.

19             Ms. Medina, I believe the parties in this case

20     have some questions for you.

21             MR. WESTFALL: Ms. Medina, I'm Greg Westfall. I

22     have some questions for you, and then the government will

23     have some I believe. This case is about United States of

24     America versus Holy Land Foundation. Does that ring a

25     bell for you?

18:00 1        VENIRE PERSON:  No.

2        MR. WESTFALL:  This is a Muslim charity, and the

3   allegation is that they gave material support to a

4   terrorist organization.  Having heard that, have you heard

5   of that anywhere?

6        VENIRE PERSON:  It does ring a slight bell from

7   a long time ago.  Not recently.

8        MR. WESTFALL:  Based upon anything you read

9   before, do you have an opinion as to guilt or innocence?

10       VENIRE PERSON:  Not to the guilt or innocence of

11  the individual, no.

12       MR. WESTFALL:  Do you have any kind of opinion?

13       VENIRE PERSON:  Not to this case, no.  I have

14  some reservations, you know, with everything we have been

18:00 15 through in the past several years, yes.

16       MR. WESTFALL:  Please tell us about them.

17       VENIRE PERSON:  I personally -- With 9-11, yes,

18  I have some biases towards those from other countries.  I

19  have strong beliefs if you are not a citizen and you don't

20  have the proper papers to be here, you need to go home or

21  be deported.

22       MR. WESTFALL:  Tell me about the first thing you

23  said.  I didn't quite hear.

24       VENIRE PERSON:  I tend -- Not knowing all the

25  facts with 9-11, I prefer not to associate myself with

18:00 1   individuals that may be associated with those individuals

2   if that makes sense.

3          MR. WESTFALL:  What do you mean may be

4   associated?

5          VENIRE PERSON:  I have no Muslim friends.  I

6   don't know any Muslims.  It's not a culture I'm around at

7   all, and it's not a culture I particularly understand, and

8   maybe it's ignorance on my part but --

9          MR. WESTFALL:  In a trial where we're talking

10   about Muslim men being charged with something that has the

11   word "terrorism" in it, it sounds like maybe you would

12   have difficulty being fair and impartial in that.

13          VENIRE PERSON:  Yes, I would.

14          MR. WESTFALL:  You couldn't set that aside?

18:00 15          VENIRE PERSON:  I would do that to the best of

16   my ability, to set it aside, but I can't say one hundred

17   percent certain that it wouldn't be somewhere in the back

18   of my head.

19          MR. WESTFALL:  Okay.  Thank you.

20          THE COURT:  Mr. Jacks, do you have questions for

21   Ms. Medina?

22          MR. JACKS:  Just very briefly, your Honor.  Good

23   afternoon, Ms. Medina.  My name is Jim Jacks.  I'm an

24   Assistant United States Attorney here in Dallas, and I'm

25   one of prosecutors in this case, and we will be

18:00 1    representing the government in this trial.  I have a few

2    questions for you as well if you don't mind.

3                    VENIRE PERSON:  All right.

4                    MR. JACKS:  Have you lived in this Dallas-Fort

5    Worth area most of your life?

6                    VENIRE PERSON:  Yes, sir.

7                    MR. JACKS:  Were you born here?

8                    VENIRE PERSON:  No.

9                    MR. JACKS:  Where did you live before Dallas?

10                    VENIRE PERSON:  I was born in San Jose,

11    California, and I lived there ten years.  We moved to

12    Buda, Texas down by Austin.  I lived there six years, and

13    then I moved to Denton.

14                    MR. JACKS:  Where did you attend high school?  I

18:00 15    don't need the name but the community.

16                    VENIRE PERSON:  The first two years was in Buda,

17    Texas.  The final two years was at University of North

18    Texas, Denton.

19                    MR. JACKS:  Where did you get your college

20    degree?

21                    VENIRE PERSON:  University of North Texas.

22                    MR. JACKS:  In your position as risk manager for

23    human resources, what does that in laymen's terms mean?

24                    VENIRE PERSON:  In laymen's terms I deal with

25    lawsuits for the City, meaning very simplistically, I help

18:00  1    the lawyers collect the paperwork, collect the data.

       2    That's my part in it.  If a citizen feels we have harmed

       3    their property, I contact our insurance company, go out

       4    there with them and assess the damage and see what's going

       5    on.  The other part of my job is the HR side of things

       6    which includes employee relations, including recruiting.

       7    The recruiting is for the entire city, including police

       8    officers, firemen, solid waste individuals, everybody.

       9         MR. JACKS:  How long have you been in that

      10    position?

      11         VENIRE PERSON:  April 2nd is when I started, of

      12    this year.  I have been in HR for over ten years.

      13         MR. JACKS:  Before the city, where did you work?

      14         VENIRE PERSON:  Before I the city I worked for

18:00 15    Brinks Home Security for approximately eleven months.

      16         MR. JACKS:  And before that?

      17         VENIRE PERSON:  Before that I was with the City

      18    of Arlington, and I was an HR consultant there.

      19         MR. JACKS:  I want to follow-up on some of the

      20    answers you gave.  As I recall, you said you have some

      21    reservations not to this case but just generally.  Did I

      22    remember that right or hear that right?

      23         VENIRE PERSON:  Yes, you did.

      24         MR. JACKS:  You expressed the view that you

      25    didn't think persons who were in this country that were --

18:00  1     that did not have papers or -- were here legally?

       2             VENIRE PERSON:  Illegally.

       3             MR. JACKS:  Illegally.  How about your attitude

       4     about people who are U.S. citizens or have proper

       5     documentation?

       6             VENIRE PERSON:  That's fine.  They can live and

       7     work and participate in society.

       8             MR. JACKS:  You have no problem with according

       9     them the rights that they are entitled to?

      10             VENIRE PERSON:  No.

      11             MR. JACKS:  You talked about your views about

      12     certain things.  I guess my ultimate question to you is

      13     regardless of your life experiences, or your opinion about

      14     things, would you be able to listen to the evidence and --

18:00 15     have you ever served -- I don't mean to interrupt.  But

      16     have you ever served on a criminal jury before?

      17             VENIRE PERSON:  I have not.

      18             MR. JACKS:  The Judge will instruct the jury on

      19     the law.  Would you be able to follow the law that the

      20     Judge gives you?  He says this is what the law is in the

      21     United States, would you be able to follow those

      22     instructions?

      23             VENIRE PERSON:  I would like to believe I could,

      24     yes.

      25             MR. JACKS:  I think you told us that you don't

18:00 1    have any Muslim friends and you don't to your knowledge

2    associate with any.  Do you mean that that would somehow

3    affect your ability to serve on this jury?

4          VENIRE PERSON:  I would like to believe it

5    wouldn't, but I'm not going to say with one hundred

6    percent surety that it wouldn't, but it could.

7          MR. JACKS:  If the Constitution says all people

8    are innocent until proven guilty, would you afford these

9    defendants that presumption of innocence?

10          VENIRE PERSON:  I would have to if I was called

11    to serve.

12          MR. JACKS:  Do you believe that's what the

13    Constitution expects of its citizens?

14          VENIRE PERSON:  Yes, I do.

18:00 15          MR. JACKS:  With regard to the burden of proof,

16    the government having brought the charges has the burden

17    of proof, and that burden is beyond a reasonable doubt.

18    Would you hold the government to its burden and expect the

19    government to prove its case beyond a reasonable doubt?

20          VENIRE PERSON:  Yes.

21          MR. JACKS:  Regardless of who the persons are or

22    where they are from?

23          VENIRE PERSON:  As hard as that would be

24    sometimes, yes.

25          THE COURT:  Ms. Medina, we are in the process of

18:00  1   talking to the members of the pool from which a jury to

2   hear this case will be drawn.  We expect that to continue

3   for a couple of days.  Until you hear from us, you must

4   not talk to anyone about the case or allow anyone to talk

5   to you or read or watch any media accounts about the case.

6          Thank you.  You may be excused.

7          MR. WESTFALL:  Your Honor, we would submit Juror

8   Medina, who we just heard from, for challenge for cause.

9   She said that she has a definite bias against Muslims.

10  While she would hope to be able to be fair, she can't say

11  that it would be a hundred percent, and I think that the

12  attempts to rehabilitate her from that definite opinion

13  certainly fell short, your Honor.  Finally being forced to

14  say that, yes, I would follow the presumption of innocence

18:00 15  doesn't do it on that.  So we submit her for challenge,

16  your Honor.  I think the grounds are pretty clear that she

17  cannot be fair and impartial when we're talking about

18  Muslims.

19         THE COURT:  Mr. Jacks, I would assume from your

20  questioning of Ms. Medina that you are opposed to that.

21         MR. JACKS:  Yes, sir.

22         THE COURT:  I will take this one under

23  advisement.

24         MR. WESTFALL:  Your Honor, I was asleep on Mr.

25  Geruntho.  He said after looking at Fox News on the web

18:00  1   site -- He said I have a bias for Israel, and I wanted the
       2   record to reflect our challenge on him on that basis.
       3   He's biased towards Israel, and I don't think he can be
       4   fair and impartial.  And I didn't hear him because he
       5   mumbled.  Did he say he had prepaid vacation from August
       6   2nd to August 20th?
       7              THE COURT:  That's what I understood, yes.
       8              MR. WESTFALL:  Well, he has a hardship on the
       9   job.  That's up to the Court.  That's a long prepaid
      10   vacation.
      11              THE COURT:  I will take this challenge for cause
      12   under advisement, too.  I believe we are to see Mr. Marvel
      13   next, Number 15.
      14              Good afternoon, Mr. Marvel.
18:00 15              VENIRE PERSON:  Good afternoon.
      16              THE COURT:  Counsel for the parties have some
      17   questions they would like to ask you about this case.  Go
      18   ahead, Mr. Westfall.
      19              MR. WESTFALL:  Mr. Marvel, I'm Greg Westfall.
      20              VENIRE PERSON:  Good afternoon.
      21              MR. WESTFALL:  I'm a defense lawyer in this
      22   case, and I am going to speak with you for a few minutes,
      23   and then the government will speak with you.  You know
      24   what case this is?
      25              VENIRE PERSON:  Yes.

18:00  1          MR. WESTFALL:  You know quite a bit about the

2  case?

3          VENIRE PERSON:  Yes.  I work for a newspaper.

4  I'm a news junkie.  So I followed it in the news.

5          MR. WESTFALL:  You used to work with the Dallas

6  Morning News?

7          VENIRE PERSON:  Until December.

8          MR. WESTFALL:  And now you are with the Writers'

9  Garrett?

10          VENIRE PERSON:  I teach there, and I also do

11  freelance writing, and I also taught at the University of

12  North Texas.

13          MR. WESTFALL:  When you were at the Dallas

14  Morning News, did you know Steve McGonigle?

18:00 15          VENIRE PERSON:  I knew him.  We weren't friends,

16  but I knew him to speak in the hallway.

17          MR. WESTFALL:  You weren't friends.

18          VENIRE PERSON:  No, he was on the fourth floor.

19  I was in Features, and he was on the fourth floor.

20          MR. WESTFALL:  If you were on this jury, Steve

21  McGonigle, as you probably know, is on the witness list.

22          VENIRE PERSON:  I expected as much.

23          MR. WESTFALL:  If he is here testifying, could

24  you give him the same consideration or would you be biased

25  for him or against him?  Would his testimony be equal to

18:00  1    everyone else's you think?

2         VENIRE PERSON:  Well, all things considered, I

3    have to consider he's a journalist and I'm a journalist.

4    I know what our code of conduct is.  But I assume every

5    witness would be honest unless something convinces me

6    otherwise.

7         MR. WESTFALL:  You wouldn't have any trouble?

8         VENIRE PERSON:  I don't think so.

9         MR. WESTFALL:  You said that you had written

10   about the Muslim community in your questionnaire.

11        VENIRE PERSON:  Yes.

12        MR. WESTFALL:  Can you tell us about that?

13        VENIRE PERSON:  I'm in Features, not hard news,

14   and so the days after 9-11 we thought that in the Feature

18:00 15   Section we ought to get to know who these people are and

16   in fact put human faces on them.  All of us in Features

17   did stories.  I did a profile of a Muslim family in

18   Dallas, and I did a number of visits up to the Mosque in

19   Richardson.  I did three or four stories.  I did a story

20   when members of a Muslim family became citizens.  So it

21   was that kind of stuff, not hard news stuff.

22        MR. WESTFALL:  How do you like Muslims?

23        VENIRE PERSON:  I got along with them fine.

24        MR. WESTFALL:  You went to their mosque and saw

25   their religion?

18:00  1          VENIRE PERSON:  Yes.  I talked to the head of

2     the mosque.  It was interesting.  I discussed theology a

3     little bit with them.  I read the Koran.

4          MR. WESTFALL:  You did.  All of it?

5          VENIRE PERSON:  Yes.

6          MR. WESTFALL:  What do you think of it?

7          VENIRE PERSON:  Well, I found it fascinating,

8     you know, and of course, as a Roman Catholic I think the

9     Bible occupies a special place, but clearly this was an

10    earth shaking religious work, an important work, and I

11    wasn't disturbed by it or offended by it.

12         MR. WESTFALL:  Do you have any of the Muslim

13    people that you have written on or that you became friends

14    with that you still kind of keep touch with?

18:00 15         VENIRE PERSON:  Not really.  You know, you move

16    on to other stories.  So.

17         MR. WESTFALL:  Now, I know you are a journalist,

18    and I know what the journalist answer would be.  But think

19    about it.  You know a lot about the case.  Have you

20    arrived at any opinions as to whether or not they are

21    guilty or not?

22         VENIRE PERSON:  No.  I was going to say I have

23    no idea as to whether the charges are true or not true.

24    As far as I'm concerned, I know what the charges are, but

25    I'm a complete blank slate.  I would actually like to find

18:00 1    out what this may uncover, but I have no opinion

2    whatsoever.

3         MR. WESTFALL:  What do you think about newspaper

4    articles as like evidence?

5         VENIRE PERSON:  I think they have to be taken

6    with a grain of salt.  Most of us labor to make our

7    articles as fair and balanced as possible, but we are

8    human beings, and I think when anybody reads a newspaper

9    article they have to use their own intelligence and

10    judgment when reading it.  This is not the word of God.

11    This is the word of an individual person who finds out

12    what he or she can and maybe misses something.

13         MR. WESTFALL:  So are you comfortable sending

14    somebody to prison over what's said in a newspaper

18:00 15    article?

16         VENIRE PERSON:  I would not do it just on the

17    basis of what's said in newspaper articles by any means.

18    They may be a little piece of the evidence, but there has

19    what to be far more.

20         MR. WESTFALL:  I know there was some

21    conversation about that or debate about that in

22    journalistic circles a few years ago.

23         VENIRE PERSON:  It's kind of a continuing

24    discussion.  Journalists are extremely uncomfortable when

25    their articles are used as evidence, and they are

18:00 1    extremely against testifying in cases or turning over

2    their notes.  They don't like to get caught up in the

3    judicial process.  We regard our role as something

4    different, but invariably as journalists -- I myself have

5    testified in cases where I witnessed something.

6              MR. WESTFALL:  Have you ever gone over to the

7    Middle East?

8              VENIRE PERSON:  No.

9              MR. WESTFALL:  How long has it been since you

10   wrote a story on the Middle East?

11             VENIRE PERSON:  Oh, gosh, maybe four or five

12   years.  I don't know because I have written so many.  But

13   certainly four or five years.

14             MR. WESTFALL:  Thank you.

18:00 15            THE COURT:  Mr. Jacks, do you have questions for

16   Mr. Marvel?

17             MR. JACKS:  Yes, please.  Good afternoon, Mr.

18   Marvel.  My name is Jim Jacks.  I'm an Assistant United

19   States Attorney here in Dallas, and I'll be prosecuting

20   along with other attorneys in this trial.  I'd like to

21   follow-up with what you wrote on your questionnaire.  When

22   you wrote, did you write as William Marvel or Bill Marvel?

23             VENIRE PERSON:  Bill Marvel.

24             MR. JACKS:  How long have you worked here in

25   Dallas?

18:00 1           VENIRE PERSON:  I came here from Washington DC

2  in 1986, and then I worked for Dallas Morning News.

3           MR. JACKS:  Did you work before 1961?

4           VENIRE PERSON:  Yes, Denver, Colorado, and

5  covered the federal courts briefly, and then Washington DC

6  where I worked for the National Observer, and since 1977 I

7  have been here.  So I have been all of my life in the

8  newspaper business.

9           MR. JACKS:  And in Colorado you said your

10  assignments were basically covering the federal courts.

11           VENIRE PERSON:  I rotated through the whole

12  newspaper, and for a number of years, I was the federal

13  beat reporter, and that involved covering the federal

14  courts.  So probably about two and a half years I covered

18:00 15  the federal courts in Denver.

16           MR. JACKS:  Working backwards, when you worked

17  at the Morning News, you stated you were in Features.  Was

18  that true for the entire term of your time at the Morning

19  News?

20           VENIRE PERSON:  Yes, I was brought over from

21  entertainment because I had been an art critic for a

22  while, and I wanted to write more broadly about topics,

23  and so I worked my way to Features.

24           MR. JACKS:  And Features would have been

25  normally what part of the paper?

18:00  1                VENIRE PERSON:  Well, Features now no longer

      2      exists, as it did in the news.  But that would have been

      3      in a separate section.  You know -- You have the front

      4      section and then the Metro Section and then sports and

      5      news and a special section of features which originally

      6      just had -- was for interest and good writing.  Now it's

      7      become more and more a section of useful news for busy

      8      housewives and things like that.  But when I was writing

      9      for it, we did a little bit of everything.

     10                MR. JACKS:  And at the Times Herald what was

     11      your assignment?

     12                VENIRE PERSON:  When I started at the Times

     13      Herald, I was an arts writer.  I had been an art critic.

     14      So I was mostly an arts writer.

18:00 15                MR. JACKS:  You talked about the projects you

     16      worked on that involved the Muslim community.  That was

     17      post 9-11?

     18                VENIRE PERSON:  Yes.

     19                MR. JACKS:  And you said that you had been to

     20      the mosque in Richardson?

     21                VENIRE PERSON:  Yes.

     22                MR. JACKS:  On more than one occasion?

     23                VENIRE PERSON:  Oh, I would say at least maybe

     24      four occasions.  Maybe more.  Some of them were just

     25      visits where I was not necessarily working on a specific

18:00  1      story.  And others were -- You know, I did a profile of

2      the president of the mosque, and I was invited out, and I

3      did a profile on men in the Muslim community and spent

4      some time at the mosque.

5              MR. JACKS:  In your visits to the mosque, did

6      you ever cross paths with any of the defendants in this

7      case?

8              VENIRE PERSON:  You know I saw that

9      questionnaire.  I may well have met one of them or several

10     of them.  It didn't lodge in my mind.

11             MR. JACKS:  These feature stories that were

12     written post 9-11, if the Holy Land Foundation was shut

13     down September 4th of 2001, were your articles after that

14     date?

18:00  15             VENIRE PERSON:  Some of them were.  I don't know

16     the exact dates now, but I'm sure some of them at least

17     were, and I know the one where the mother and father

18     became citizens, that would have been after that date.

19             MR. JACKS:  And when you were preparing or

20     researching this article, did the topic of the Holy Land

21     Foundation come up?

22             VENIRE PERSON:  I don't ever remember discussing

23     it.  It may have popped up at one time or another, but I

24     don't remember specifically discussing it.  No.  If it

25     did, it has passed out of my memory.

18:00 1          MR. JACKS:  So in your meeting with the

2   president of the mosque or the other people that attended

3   this mosque and in doing this research, the circumstances

4   surrounding the Holy Land Foundation did not come up?  Can

5   you say they didn't come up?

6          VENIRE PERSON:  I don't remember any mention or

7   discussion about the current matter that you are dealing

8   with here.  The Holy Land Foundation may have been

9   mentioned or may not have.  But that wasn't the focus of

10   my story, and so you know, I have no memory of discussing

11   the Holy Land Foundation or any involvement with the

12   government or anything else.

13          MR. JACKS:  How about their lawsuit against the

14   Morning News?  Were you aware of that?

18:00 15          VENIRE PERSON:  I was aware of it, but it wasn't

16   something I paid any more attention to than other things

17   in the paper.  We got sued frequently.  You know, I don't

18   pay too much attention to that.

19          MR. JACKS:  Do you feel like -- Let me ask you

20   this question.  Would you rather be on this jury or

21   covering this trial as a reporter?

22          VENIRE PERSON:  Well, as no longer a functioning

23   reporter -- I think this is a fascinating case, and

24   because I have no predisposition I would love to find out

25   what kind of evidence there is, what's going on here.  So

1    I have that natural newsman curiosity.  It would be fun to

2    cover it as a reporter.

3              Having to sit in judgment is an entirely

4    different function.  There I function as an ordinary human

5    being, and I'm not uncomfortable with that role, but I

6    have to say I have great curiosity about what this case is

7    about.

8              MR. JACKS:  Do you feel that you would bring in

9    more knowledge or different knowledge or special knowledge

10   that another juror might not because you have been working

11   in this field and done research regarding -- at least

12   certainly related issues?

13             VENIRE PERSON:  I would say because of my

14   experience doing a few stories on the Muslim community,

15   you know, that I have -- To me, these are human beings.

16   Some of them American citizens.  I don't feel particularly

17   threatened.  They are not an unknown.  I have read the

18   Koran.  It's not a mystery to me.  So if you brought

19   somebody here just cold, who knows what they would think

20   of the whole subject?  But I know a little more about it,

21   and I don't feel particularly threatened or anything of

22   that sort.

23             MR. JACKS:  Do you believe that your life

24   experiences in this area regarding this topic is something

25   that will be beneficial in this case for you as a juror?

18:00   1            VENIRE PERSON: Well, I certainly think it would

2   steer me away from any quick prejudgments as to whether

3   the defendants are guilty or not. I think it actually

4   frees me in a way that the average American who doesn't

5   know anything about the Muslim community would not be

6   free.

7             THE COURT: Mr. Jacks, your time has expired.

8             Mr. Marvel, it sounds like you know a lot more

9   about this case than most of the members of the jury pool

10   we have interviewed to this point, but out of an abundance

11   of caution I am going to give you the same instruction,

12   and that is this talking with the members of the pool from

13   which the jury will be selected is an ongoing one that

14   probably will last for another day or two. So until you

18:00 15   hear from us again, you should not discuss the subject of

16   this trial or allow anyone to discuss it with you. Also

17   if there are any media accounts of the case, it sounds

18   like you are less influenced by them than other people we

19   have talked to, but I must instruct you nonetheless if

20   there are such accounts that you must not read or watch or

21   listen to any of them until you hear from us again. Thank

22   you. You may be excused.

23            Ladies and Gentlemen, I think this probably be

24   an appropriate point for us to interrupt our proceedings

25   to take our overnight recess.

18:00  1          MR. JACKS:  Your Honor, I would like to submit

2    Mr. Marvel for cause.  I believe the fact that he has done

3    work as a reporter in this area and the fact that he knows

4    one of the government's witnesses is grounds that should

5    submit him for cause.

6          THE COURT:  Mr. Westfall.

7          MR. WESTFALL:  And the fact that he proclaimed

8    without hesitation that none of that would ever affect his

9    jury service, your Honor, we think is a sufficient ground

10   to deny that request.

11         THE COURT:  This is another one that I will take

12   under advisement for the moment.

13         Mr. Jonas, you had said just before the noon

14   recess that you had a couple of matters we needed to take

18:00 15  up at the end of the day.

16         MR. JONAS:  It's actually three matters, the

17   first one regarding scheduling for next week, and we have

18   consulted with defense counsel, and I believe I can speak

19   for everybody on both sides.  What we would propose to do

20   especially in light of yesterday's order from the Court on

21   the government's experts is not bring in the jury on

22   Monday and Monday afternoon have a Daubert hearing for the

23   government's first witness which would be Matthew Levitt.

24   Tuesday bring the jury in, read the indictment, have the

25   openings and give the Court's instructions to the jury.

18:00 1    We expect that would take a full day and then Wednesday

2    start with the government's witnesses.

3            THE COURT:  If I'm understanding you correctly

4    you want to not be in session Monday morning, and then we

5    would have a Daubert hearing for this first witness, Mr.

6    Levitt on Monday afternoon, and then Tuesday would be

7    devoted to reading the indictment to the jury after they

8    are sworn in and given preliminary instructions and

9    opening statements from counsel.  Is that right?

10           MR. JONAS:  Yes, your Honor, and given it is

11   likely there are seven opening statements, I would expect

12   that to take up the bulk of the day.

13           THE COURT:  I guess my question about that

14   schedule is why we don't start with the Daubert hearing on

18:00 15   Monday morning?  I'm just concerned if that takes longer

16   than a single afternoon, then we are set back for the

17   whole schedule that you have outlined.

18           MR. JONAS:  Yes, sir.  Only because the witness

19   will fly down -- He's in Washington, and I understand that

20   he would be unavailable on the weekend Sunday night to

21   Dallas.  So we are having him fly in on Monday morning.

22   So he should be here mid-morning on Monday.  So I was

23   thinking after lunch.

24           THE COURT:  Well, what do we do if it takes

25   longer than Monday afternoon?

18:00  1          MR. JONAS:  I don't think it would, but I

       2    suggest starting out finishing the hearing first thing

       3    Wednesday morning, if there is anything left over, and as

       4    soon as we are done with the Daubert hearing go straight

       5    into testimony.

       6          THE COURT:  Well, I in principal don't have any

       7    objection to that, especially if counsel have agreed on

       8    it.  But I will have to say that I would like to

       9    accommodate witness schedules.  We have a lot of people

      10    involved in this case, as you can see, by looking around

      11    the courtroom.  We have a lot of court staff.  The

      12    government is paying for most or all of this.  And it just

      13    seems to me an awful lot to ask for us to shift our

      14    schedules around to accommodate the schedule of the

18:00 15    witness just because he doesn't want to come down on

      16    Sunday.  That's my concern about it, and I am going to be

      17    unhappy if our schedule is thrown out of kilter because

      18    the witness was unwilling to come on the weekend.

      19          MR. JONAS:  I will check with the witness about

      20    the weekend, and I will let the Court know tomorrow.  My

      21    understanding is he's going to be out of town on the

      22    weekend, and that's why he was unable to fly in.

      23          THE COURT:  All right.  That was the first item.

      24    What is the next?

      25          MR. JONAS:  The second involves an issue that

18:00 1   has surfaced a few times over the last year or so, and the

2    Court touched on it last week, and that is with regard to

3    conflict of interest of Shukri Abu Baker and Holy Land

4    Foundation being represented by the same counsel.  The

5    government is concerned about the record.  Coming out of

6    Washington, I have practiced in different jurisdictions.

7    Up there, what normally happens is the defendants are

8    brought before the court, and the court itself questions

9    the defendants regarding their understanding about the

10   conflict and the waiver.  In fact, I have had experience

11   where the court will bring in outside counsel -- usually

12   from the public defender's office -- to talk to the

13   defendants themselves.  In this instance, we have written

14   waivers with the defendants, but we're uncomfortable that

18:00 15  may not be enough to protect the record on conflict, and I

16   understand the Court questioned Ms. Duncan last week about

17   her understanding of the conflict.  But we would be more

18   comfortable if the Court questioned the defendants on this

19   issue.

20        THE COURT:  When you say the defendants, I'm not

21   sure if all the defendants are affected.  I have the

22   impression that at least some of them are represented by

23   only one counsel and that counsel in turn represents only

24   one defendant.  But there may be some other defendants who

25   are represented by counsel who represent more than one

18:00  1   defendant?

       2          MS. JONAS:  Yes, that's correct.  This only

       3   affects the Defendant Shukri Abu Baker and Holy Land

       4   Foundation.

       5          THE COURT:  Like you, I would like to be sure

       6   the record is clear in that regard before we invest the

       7   amount of time that everyone has been talking about in

       8   this case, and so I do think that is something that I

       9   probably should question the defendants about personally,

      10   as I think Rule 44 of the Rules of Criminal Procedure

      11   actually requires.  Like you, I have not researched the

      12   subject area at least recently on the Fifth Circuit

      13   precedent in that regard.  But I think the Rule does

      14   contemplate that the Court will directly talk with the

18:00 15   defendant about the issue of multiple representation.  One

      16   question I have, and I don't know if you are the right

      17   person to ask this question of, but it is my understanding

      18   that the Holy Land Foundation is a defunct corporate

      19   entity, and of course, any corporate entity for purposes

      20   of the Court complying with Rule 44 must be represented by

      21   a natural person, and I'm not sure since this entity I

      22   understand is defunct who will be the natural person

      23   representative of it.

      24          MR. JONAS:  That's a good question, your Honor.

      25   Ms. Hollander informed me that the Defendant Ghassan

18:00 1   Elashi signed the waiver a few months ago on behalf of

2   Holy Land Foundation.  That, of course, raises another

3   question as to whether or not there is a conflict with him

4   doing that.  And I don't know the answer to that.

5         THE COURT:  Counsel for any of the defendants

6   who are involved in this representation have any help for

7   us on this issue?

8         MS. HOLLANDER:  May we have a moment, your

9   Honor?

10         THE COURT:  All right.

11         MR. CLINE:  Your Honor, John Cline on behalf of

12   Mr. Elashi.  We're a bit puzzled here.  We're not sure

13   what Mr. Elashi's status is with respect to the Holy Land.

14   May we have overnight and take it up first thing tomorrow

18:00 15   morning?

16         THE COURT:  Yes, sir.  I don't know about

17   tomorrow morning.  If we have people downstairs waiting to

18   be interviewed, I don't know that I want to take the time

19   to resolve this issue while they are waiting, but if you

20   need overnight to talk about it, I would appreciate

21   whatever assistance you can provide.

22         MR. JONAS:  Your Honor, one other quick matter.

23   I guess procedural.  The government is going to be moving

24   to dismiss five of the counts, and our question for the

25   Court is on the indictment do you wish us to renumber and

18:00 1    move up all the remaining counts or leave those blank?

2          THE COURT: Well, there again, I don't know that

3    I have a particular view on it. Have you consulted

4    defense counsel about that?

5          MR. JONAS: We haven't had a chance to. We

6    certainly will.

7          I think it's our preference to leave the counts

8    blank anD leave all the other counts in their place.

9          THE COURT: Well, I would say from what you have

10    told me that there are probably at least two possibilities

11    of how we could do this. One, we could, as you suggest,

12    renumber the remaining counts after the dismissed counts

13    are disposed of. Or we could simply redact the indictment

14    when the copies of the indictment go with the jury at the

18:00 15    end of the case for their deliberations. And I could give

16    them an instruction that they are not to be concerned

17    about what happened to the counts that are missing. So I

18    would probably be guided in large part by counsel's views

19    on this issue.

20          MR. JONAS: Yes, sir, we will consult with the

21    defendants.

22          MS. HOLLANDER: Your Honor, on behalf of the

23    defendants, we do want them renumbered.

24          THE COURT: Did you say that was a possibility

25    as far as you are concerned, Mr. Jonas?

18:00 1              MR. JONAS:  I assume it's an option, yes.

2              THE COURT:  Well, if you have no objection on

3       behalf of the government and that's the way the defendants

4       want to do it, I would say let's do it that way.

5              MR. JONAS:  That's fine, your Honor.

6              THE COURT:  Can all of that be done before the

7       indictment is presented to the jury next Tuesday?

8              MR. JONAS:  Yes.  That should not be a problem.

9              THE COURT:  I wanted to talk with counsel a bit

10      myself.  Just about the progress that we are making on the

11      individual voir dire.

12              In general, as I did yesterday afternoon, I want

13      to commend counsel for their use of the allotted time.

14      I'm trying to be conservative in the numbers I'm using

18:00 15      here.  I'm setting aside for the moment those persons for

16      whom there is a pending challenge for cause and also those

17      who have indicated themselves that they have a hardship or

18      which counsel have arisen to say that they believe a

19      hardship exists.  And by my count, I think we have twenty

20      people on this first list and another eleven people from

21      the second list.  So that would give us a total of 31.  I

22      can't remember if I ever said in the pretrial conference

23      that we have had how many peremptory challenges I would

24      allot for the alternates to be selected in this case.  By

25      rule, if we have a total of six alternates which I have

18:00 1   already said is what I would want, the government would be

2   entitled to three peremptory challenges and the defendants

3   to three.  But since we have six defendants in this case,

4   I'm willing to increase the number of peremptory

5   challenges to six for the defendants so that they will

6   each have one, although they can collaborate in their use,

7   as I said, with respect to the regular jurors.  And I

8   would then increase the government's number also so that

9   they would have an equal number of six, and by doing that,

10   the number of people we would need at a minimum for a pool

11   before the striking of the jurors peremptory begins would

12   be 31.  Plus 12.  I'm sorry.  I misstated that.  We need

13   49.  Six peremptory challenges for the defendant and six

14   for the government, and we need six persons to be

18:00 15   alternates so that would be a total of 18.  And it looks

16   like the way we are going that we now have about 31.  So

17   we are still 18 short.  So I'm thinking that we probably

18   will need to go at least until sometime during the day

19   Thursday and maybe throughout the day on Thursday to reach

20   this total of 49 and perhaps to have a few extras in the

21   event that something comes up during the general voir

22   dire.  So I wanted to announce my intention to work on

23   Friday if we still don't have a jury at that point,

24   notwithstanding what I said earlier about our trial

25   schedule, and once we start trial, it's my intention to

18:00 1    take Fridays off, but I think it is important that we get

2    a jury this week.

3         Do counsel have any comments about that or any

4    different idea?

5         MS. HOLLANDER:  Your Honor, you had previously

6    informed us that if we didn't have the jury picked, we

7    would use Friday of this week.  So we are all aware that

8    was a possibility.  But I assume that if we do pick the

9    jury by the end of Thursday, we're not going on Friday.

10         THE COURT:  Yes.  I would only do that if we

11    need Friday to finish the completion of jury selection.

12         The other issue that's related to that -- And I

13    think Mr. Stewart, the law clerk, may have already

14    discussed this with counsel, but I wanted to be sure.  My

18:00 15    scheduling order -- going back a ways in the chronology of

16    this case -- requested the voir dire questions be

17    submitted by a certain date.  Counsel requested relief

18    from that deadline, and I granted that because once we had

19    settled on this individual voir dire procedure, counsel

20    said -- and I think with good reason -- that you really

21    weren't sure what questions needed to be asked by the

22    Court during the general voir dire session until after we

23    had the results from this experience.  I'm now thinking

24    ahead to that general voir dire, and really a lot -- In

25    fact, most of what I normally cover in voir dire has been

18:00 1    raised by counsel in this individual questioning.  So I'm

2    not quite sure from my own experience what is left to be

3    covered during the general voir dire, nor do I know

4    whether you have submitted any questions for me to ask

5    during that session.  So if you have not submitted those

6    questions, I am going to need them pretty soon so that I

7    will be in a position to ask whatever questions remain.

8              MR. WESTFALL:  Thank you, your Honor.  We were

9    told to kind of get you something in writing.  What we

10    would envision what you would do -- And we will certainly

11    do that, but I think what everyone was thinking is the

12    Court's general voir dire -- We have spoken about burden

13    of proof and all of that, but certainly we haven't covered

14    it like the Court would.

18:00 15             THE COURT:  Well, I don't know that I in most

16    cases cover it in more detail than you have here.  I'm

17    certainly willing to go over it again because it is a very

18    important concept, but unless you have something more

19    specific, you have generally covered it as well as I would

20    myself.

21             MR. WESTFALL:  I just haven't done it with every

22    single juror.  Thank you, your Honor.

23             THE COURT:  If there is nothing else, Ladies and

24    Gentlemen, we'll be in recess until tomorrow morning.

25

18:00  1              C E R T I F I C A T I O N

2          I, Cassidi L. Casey, certify that during the

3    proceedings of the foregoing-styled and -numbered cause, I

4    was the official reporter and took in stenotypy such

5    proceedings and have transcribed the same as shown by the

6    above and foregoing pages 267 through 532 and that said

7    transcript is true and correct.

8

9          I further certify that the transcript fees and format

10   comply with those prescribed by the court and the Judicial

11   Conference of the United States.

12

13

14                         s/Cassidi L. Casey

                           _____
15                         CASSIDI L. CASEY
                           UNITED STATES DISTRICT REPORTER
16                         NORTHERN DISTRICT OF TEXAS
                           DALLAS DIVISION
17                         CSR NUMBER 1703

18

19

20

21

22

23

24

25

**< A >**
**Abdulqader** 268:10, 289:14
**ability** 275:21, 313:22,
314:20, 316:9, 326:4, 334:24,
343:5, 345:21, 345:24, 356:3,
356:11, 359:4, 362:8, 401:17,
401:25, 403:11, 426:17,
503:16, 507:3
**able** 269:3, 275:22, 277:16,
294:15, 312:5, 312:8, 312:17,
313:23, 314:4, 325:7, 342:14,
349:8, 349:18, 368:22,
383:20, 398:16, 439:21,
439:24, 449:5, 465:18, 471:7,
471:10, 471:13, 471:18,
506:14, 506:19, 506:21,
508:10
**abortion** 306:23
**above** 533:7
**Absolutely** 326:6
**Abu** 267:38, 524:3, 525:3
**abundance** 520:10
**AC** 456:13
**accept** 449:5
**accepting** 290:23
**accidents** 420:15
**accommodate** 523:9, 523:14
**accorded** 474:20
**according** 506:8
**Accounting** 408:6, 408:9,
408:10
**accounts** 270:21, 278:18,
292:10, 304:8, 328:9, 343:21,
354:20, 365:6, 375:7, 379:5,
391:12, 391:13, 404:23,
414:23, 428:12, 440:13,
449:22, 461:3, 472:3, 481:2,
490:15, 500:5, 508:5, 520:17,
520:20
**accurately** 295:6, 295:11
**accused** 357:15, 365:24,
469:21, 474:20
**acknowledge** 416:17
**acknowledging** 415:21
**acquire** 486:20
**acquired** 446:22
**acquit** 475:4
**across** 282:25, 418:16
**acted** 358:14, 358:15

**actions** 441:17, 441:19,
441:21, 443:12, 443:14,
445:8, 445:10
**active** 288:2, 288:4, 385:8,
396:8, 396:9, 397:4, 499:2,
499:5
**actors** 487:6
**acts** 272:3
**actual** 365:17, 427:24
**Actually** 270:24, 271:21,
275:4, 283:13, 285:8, 315:5,
319:10, 324:18, 345:7, 349:7,
350:25, 378:10, 381:25,
384:3, 398:3, 429:8, 435:1,
435:12, 435:19, 438:1,
448:22, 450:21, 466:5, 478:2,
487:3, 491:25, 497:15,
497:16, 512:25, 520:3,
521:16, 525:11
**add** 423:10
**addition** 279:21, 353:24
**additional** 317:13
**addresses** 356:25
**adduced** 417:15
**adequate** 279:6
**adjustor** 420:7, 420:17,
424:23, 425:10
**administrator** 375:19
**admissions** 425:12
**admits** 312:8
**admitted** 290:21, 301:11
**Adrienne** 375:16
**adult** 278:6
**advisement** 316:21, 508:23,
509:12, 521:12
**advisory** 452:14
**advocate** 420:11
**affect** 313:22, 314:3, 326:4,
334:24, 345:21, 345:24,
356:2, 362:8, 362:14, 401:17,
403:10, 426:16, 507:3, 521:8
**affected** 524:21
**affects** 291:16, 356:11,
525:3
**affiliated** 439:11
**afford** 279:1, 348:16, 389:9,
433:18, 507:8
**afraid** 308:4
**Africa** 454:19, 455:5
**After** 292:7, 294:18, 307:22,

308:8, 313:20, 328:25,
344:21, 344:22, 344:25,
345:1, 348:18, 358:9, 380:2,
427:1, 451:7, 451:8, 457:9,
463:8, 471:9, 480:6, 481:14,
508:25, 511:14, 517:13,
517:18, 522:7, 522:23,
527:12, 530:22
**afternoon** 271:5, 375:20,
376:17, 379:14, 385:22,
394:23, 400:9, 400:10,
404:25, 410:6, 423:16,
428:15, 428:17, 434:16,
440:17, 445:15, 450:8,
450:12, 456:2, 456:4, 461:6,
466:24, 472:8, 476:8, 481:5,
485:17, 490:18, 496:3,
503:23, 509:14, 509:15,
509:20, 514:17, 521:22,
522:6, 522:16, 522:25,
528:12
**afternoons** 452:15
**Again** 279:3, 281:3, 292:7,
303:13, 310:12, 328:6,
336:19, 337:14, 354:17,
374:7, 382:9, 385:12, 391:9,
393:7, 404:20, 414:21, 416:3,
440:11, 449:20, 472:1, 477:6,
480:25, 488:11, 500:3,
520:15, 520:21, 527:2,
531:17
**against** 315:20, 326:5,
327:6, 327:12, 327:14,
336:22, 337:6, 347:7, 373:14,
373:19, 381:18, 404:11,
490:5, 494:15, 494:18,
499:15, 499:18, 508:9,
510:25, 514:1, 518:13
**agency** 351:17, 351:20,
352:23
**agents** 319:20
**ago** 271:12, 271:22, 274:3,
292:20, 298:1, 304:9, 323:9,
326:1, 329:8, 329:10, 334:23,
355:11, 355:19, 366:6, 366:7,
375:25, 377:20, 395:19,
396:2, 417:21, 428:20,
429:10, 445:1, 450:4, 476:24,
476:25, 478:22, 486:23,
491:11, 499:3, 502:7, 513:22,

526:1
**agree** 280:3, 280:9, 280:20, 281:15, 281:21, 326:11, 344:1, 344:3, 394:16, 416:8, 416:22
**agreed** 523:7
**ahead** 509:18, 530:24
**aid** 347:16, 347:18, 347:20, 347:21, 421:18, 421:20, 421:23, 430:3, 430:8, 439:16, 454:22, 455:2, 460:17
**aiding** 451:2
**air** 482:14, 482:15
**airfare** 501:13
**airing** 482:9
**Airlines** 482:14
**airports** 453:10
**AL** 267:13
**Aladdin** 473:8, 473:17, 475:20, 477:21, 478:24
**Albuquerque** 267:46
**alcohol** 307:22, 314:11, 314:14, 314:15, 315:22, 316:1, 316:2, 316:7
**Alcoholics** 316:14, 316:15
**aliens** 277:6
**allegation** 284:6, 291:20, 338:8, 338:10, 441:2, 469:19, 474:7, 483:9, 483:10, 491:2, 502:3
**allegations** 291:2, 297:4, 302:5, 302:15, 317:10, 326:14, 328:21, 334:16, 335:7, 336:11, 338:21, 353:5, 353:20, 362:22, 362:24, 363:1, 363:9, 365:19, 371:13, 371:14, 377:2, 377:15, 389:16, 405:9, 413:3, 423:7, 426:21, 426:24, 433:6, 442:23, 474:12, 481:11, 483:2, 483:12
**allege** 364:2, 395:15, 433:4
**alleged** 379:23, 459:16
**allegedly** 326:25
**alleges** 271:16, 282:20, 302:16, 302:17, 326:21, 365:21, 405:10, 461:19, 472:19, 491:4
**alleging** 304:3, 336:9, 363:25, 439:9

**Allen** 290:4
**allot** 528:24
**allotted** 528:13
**allow** 278:17, 281:18, 292:8, 328:7, 337:15, 343:19, 354:18, 365:4, 375:5, 391:10, 404:21, 414:22, 428:11, 440:12, 449:21, 461:1, 472:2, 481:1, 490:14, 500:4, 508:4, 520:16
**allowed** 295:23, 418:22, 419:1
**Almost** 279:19, 280:15, 299:7, 351:23
**alone** 475:4, 489:2
**along** 295:22, 321:16, 331:20, 408:16, 464:11, 473:22, 474:3, 485:20, 511:23, 514:20
**already** 294:10, 359:17, 429:21, 501:13, 529:1, 530:13
**alternates** 528:24, 528:25, 529:15
**Although** 277:3, 295:22, 416:10, 416:16, 529:6
**Alvarado** 361:8, 361:10, 475:12
**always** 308:6, 367:20, 467:25, 486:15
**Amarillo** 305:2
**America** 267:7, 305:4, 305:6, 351:1, 356:13, 377:1, 441:16, 443:13, 444:2, 446:4, 472:17, 501:24
**American** 271:15, 293:1, 296:8, 318:13, 344:14, 355:15, 364:22, 421:4, 428:25, 450:18, 455:20, 482:14, 519:16, 520:4
**Amerisure** 425:10
**among** 315:12, 448:2
**amount** 494:20, 525:7
**Amrep** 289:2
**Angleton** 333:16, 333:17
**announce** 529:22
**announcements** 482:14
**Anonymous** 316:15
**answer** 280:5, 295:19, 327:9, 383:2, 392:12, 392:14,

392:16, 392:19, 392:20, 393:20, 394:8, 450:14, 451:13, 452:20, 453:13, 495:7, 499:10, 499:14, 512:18, 526:4
**answered** 296:1, 488:4
**answering** 455:23
**answers** 271:10, 272:13, 281:9, 292:19, 293:7, 316:8, 344:11, 393:6, 393:10, 412:3, 505:20
**anticipate** 270:19, 278:14, 343:17, 404:19, 470:13
**anticipated** 489:22
**Anybody** 279:24, 314:23, 341:24, 357:2, 380:14, 411:2, 411:3, 411:7, 442:25, 463:19, 501:7, 513:8
**anymore** 272:25, 334:2, 418:22, 418:23, 478:17
**anyone** 270:21, 270:22, 273:15, 278:17, 291:10, 292:8, 292:9, 294:2, 315:13, 328:7, 337:15, 343:19, 354:18, 365:4, 375:5, 379:3, 391:10, 404:21, 407:12, 414:11, 414:21, 414:22, 428:11, 431:9, 440:12, 449:21, 461:1, 472:2, 481:1, 490:14, 500:4, 500:14, 500:22, 508:4, 520:16
**anyway** 341:14
**anywhere** 457:12, 502:5
**apart** 333:18
**apologize** 309:16, 309:18, 350:18, 426:7
**apparent** 316:6
**apparently** 269:4, 327:4
**appear** 420:22
**appeared** 316:15
**appears** 284:2, 377:15
**applies** 363:14, 470:7
**apply** 295:21, 336:2, 363:20, 371:25, 389:21, 427:6, 459:24, 460:18, 480:9, 489:19
**appreciate** 276:24, 278:10, 416:19, 452:19, 526:20
**apprehensions** 272:20
**approach** 314:8

**appropriate** 520:24
**Approximately** 325:3, 375:24, 486:21, 499:8, 505:15
**Arabia** 329:24
**Arabic** 290:12, 290:16, 301:7, 301:13, 422:19, 422:24
**Arabs** 484:13
**architectural** 436:6
**Area** 274:15, 274:19, 287:14, 323:19, 346:14, 351:5, 360:25, 361:7, 361:13, 369:21, 400:24, 402:23, 425:2, 436:7, 436:16, 445:20, 462:16, 468:1, 475:13, 478:5, 486:13, 486:16, 486:24, 491:13, 504:5, 519:24, 521:3, 525:12
**areas** 347:17, 398:15
**arguing** 420:13
**argument** 470:4
**arguments** 459:23, 489:18
**arisen** 528:18
**arises** 343:4
**Arlington** 361:9, 462:17, 505:18
**army** 285:1, 319:14
**Around** 308:20, 329:25, 334:21, 338:23, 360:24, 390:19, 416:12, 464:20, 492:18, 503:6, 523:10, 523:14
**arrangements** 341:17
**arrest** 357:15
**arrested** 325:11, 325:15
**arrived** 512:20
**Art** 482:24, 515:21, 516:13
**article** 432:1, 462:6, 469:17, 513:9, 513:15, 517:20
**articles** 429:5, 465:13, 513:4, 513:7, 513:17, 513:25, 517:13
**articulate** 278:23
**arts** 516:13, 516:14
**Asberger** 464:9, 464:10
**ascribe** 308:20
**Asheville** 311:13
**aside** 270:11, 273:7, 273:16, 312:6, 342:13, 406:25,

503:14, 503:16, 528:15
**asked** 275:13, 279:1, 279:3, 296:1, 299:15, 301:19, 312:3, 326:10, 335:14, 361:6, 370:20, 388:19, 389:6, 392:6, 409:24, 411:1, 416:13, 426:6, 444:4, 499:18, 530:21
**asking** 272:13, 280:16, 280:24, 281:21, 297:13, 349:21, 351:10, 362:12, 366:15, 373:21, 383:18, 385:3, 385:4, 388:16, 389:5, 393:2, 412:8, 416:2, 453:12
**asks** 272:14, 403:2
**ASL** 364:21
**asleep** 508:24
**assembled** 269:5
**assess** 505:4
**assessment** 276:24
**assigned** 385:24
**assignment** 516:11
**assignments** 515:10
**assist** 422:24
**assistance** 526:21
**Assistant** 267:29, 273:21, 286:17, 297:22, 299:22, 300:6, 300:12, 300:14, 309:14, 322:25, 333:3, 350:14, 360:12, 369:6, 385:23, 400:12, 410:9, 423:17, 434:17, 445:16, 456:6, 467:2, 476:9, 485:18, 496:4, 503:24, 514:18
**assisting** 347:19, 421:21
**associate** 482:20, 502:25, 507:2
**associated** 285:11, 377:4, 491:3, 503:1, 503:4
**assume** 316:11, 317:19, 415:7, 508:19, 511:4, 528:1, 530:8
**assuming** 299:8, 337:7, 401:21, 468:6
**assumption** 489:3
**asthma** 311:21
**attack** 311:21
**attacked** 398:14
**attacks** 306:19, 308:4
**attempted** 460:15
**attempts** 508:12

**Attend** 331:6, 463:25, 504:14
**attended** 518:2
**attention** 294:16, 338:24, 343:1, 348:1, 421:9, 437:2, 452:24, 469:25, 518:16, 518:18
**attitude** 506:3
**Attorney** 267:29, 271:9, 273:21, 280:6, 286:17, 297:23, 309:14, 322:25, 323:1, 333:3, 350:15, 360:13, 369:6, 385:24, 400:12, 410:9, 417:19, 423:17, 434:17, 445:16, 456:6, 467:2, 476:9, 485:19, 496:4, 503:24, 514:19
**attorneys** 292:17, 344:9, 355:9, 371:7, 440:21, 470:3, 514:20
**audio** 301:10
**August** 509:6
**Austin** 504:12
**Australia** 417:23, 423:20, 423:22, 424:3
**Australian** 418:21
**authority** 281:6
**authorized** 412:9, 412:20
**authorizing** 412:5
**Autism** 464:9
**autistic** 464:5, 464:10
**Auto** 283:13, 367:10
**available** 342:8
**Avenue** 268:15, 268:33
**average** 438:5, 520:4
**aware** 353:10, 363:11, 492:20, 518:14, 518:15, 530:7
**away** 274:3, 294:3, 294:18, 297:12, 332:7, 332:9, 348:18, 368:16, 405:22, 445:5, 500:23, 520:2
**awful** 415:18, 416:6, 523:13

< B >
**baby** 342:10
**Baccus** 375:18, 375:19
**bachelor** 304:16, 304:21, 408:7
**back** 282:25, 287:18, 288:13,

294:18, 300:10, 310:13,
324:8, 324:16, 329:24,
334:18, 335:14, 370:6,
377:25, 381:13, 382:10,
382:21, 383:10, 388:13,
389:4, 390:23, 390:25,
391:24, 407:15, 429:8,
438:23, 452:15, 491:20,
491:25, 492:6, 493:3, 503:17,
522:16, 530:15
**back-up** 342:15
**backed** 291:15
**background** 279:5, 349:14,
422:23, 422:24, 434:6,
445:25, 453:18, 456:25
**backgrounds** 484:16
**backing** 413:22
**backwards** 515:16
**bad** 276:21, 318:18, 352:4,
380:20, 407:10, 407:11,
408:20, 431:11, 443:9,
463:17, 484:11
**bags** 307:17
**Baird** 447:2
**Baker** 267:38, 524:3, 525:3
**balanced** 513:7
**Baltimore** 361:17, 498:8
**Bangladesh** 286:5
**Bank** 298:18, 298:21,
298:22, 298:25, 351:1,
351:19, 352:17, 371:6,
441:16, 442:15, 443:13,
444:2, 445:9, 446:4
**banking** 351:18, 351:23,
445:6, 445:7
**Baptist** 349:22, 350:3,
453:21, 455:14, 463:24
**bar** 314:17
**Barcelona** 288:20
**bargain** 476:23
**BARRY** 267:26
**Based** 270:4, 301:14,
304:12, 308:20, 312:7,
313:12, 316:7, 329:11, 339:8,
349:7, 355:23, 356:5, 380:9,
405:25, 442:12, 465:11,
465:12, 483:9, 502:8
**basic** 284:16
**Basically** 279:23, 283:1,
291:17, 308:1, 333:18,

340:22, 349:16, 378:3, 383:2,
405:24, 411:21, 414:10,
420:18, 470:9, 515:10
**basis** 315:21, 509:2, 513:17
**bathroom** 450:1
**battery** 357:16
**beach** 305:7
**Bear** 386:2
**beat** 515:13
**Beaumont** 274:21, 274:23
**Beauty** 473:5, 477:17,
477:22
**became** 511:20, 512:13,
517:18
**become** 276:19, 424:9,
497:15, 516:7
**begin** 457:9, 489:17
**beginning** 321:12
**begins** 529:11
**behalf** 278:21, 385:25,
526:1, 526:11, 527:22, 528:3
**behind** 413:4, 420:6
**beings** 513:8, 519:15
**belief** 306:16, 454:5, 454:11,
457:25
**beliefs** 347:11, 349:24,
359:3, 359:7, 423:5, 502:19
**believed** 278:4, 439:25
**believes** 375:21, 415:12
**bell** 461:22, 481:15, 501:25,
502:6
**bells** 282:23, 328:25, 338:12,
441:5, 472:20, 491:7
**Bench** 316:12
**beneath** 290:15
**beneficial** 519:25
**benefit** 281:25, 284:7, 327:5,
327:11, 327:20, 336:21,
337:5, 354:5, 413:18, 427:16,
439:10, 440:1, 449:10,
459:17, 460:13
**benefited** 347:22, 421:23,
430:9
**benign** 417:9
**Besides** 493:14, 501:12
**best** 349:2, 358:10, 376:13,
500:13, 503:15
**Better** 349:18, 361:20,
361:22, 438:4, 500:12
**Beyond** 276:6, 276:8,

277:20, 296:21, 301:25,
336:11, 337:8, 348:19, 360:4,
389:12, 432:25, 433:11,
475:1, 494:20, 495:7, 507:17,
507:19
**bias** 494:1, 494:4, 494:12,
494:20, 499:13, 499:15,
499:18, 508:9, 509:1
**biased** 494:15, 494:18,
509:3, 510:24
**biases** 502:18
**Bible** 409:10, 512:9
**Big** 275:4, 278:8, 287:10,
289:23, 312:25, 500:21
**Bill** 514:22, 514:23
**billed** 325:22
**bit** 291:1, 296:7, 300:8,
317:3, 317:4, 353:5, 355:23,
362:21, 402:7, 430:22,
451:15, 453:20, 461:23,
491:8, 492:1, 494:1, 494:20,
495:17, 500:20, 501:14,
510:1, 512:3, 516:9, 526:12,
528:9
**bits** 377:12
**Blair** 435:25, 436:1
**blame** 314:1
**blank** 512:25, 527:1, 527:8
**blowing** 483:10
**blows** 306:23
**boards** 435:3, 436:8, 437:25
**boiler** 289:9
**book** 306:10, 306:12, 414:12
**bookkeeping-type** 298:19
**books** 291:25, 305:24,
321:15, 347:19, 364:10,
374:10, 390:3, 397:19, 404:6,
413:17, 414:5, 421:21,
427:14, 430:5, 493:13
**born** 294:21, 329:15, 330:1,
333:9, 339:22, 398:23,
417:23, 423:20, 477:25,
478:2, 486:8, 491:19, 504:7,
504:10
**boss** 479:20
**bother** 301:2, 301:4
**Bothering** 296:5, 301:1
**bought** 305:24
**BOX** 268:24, 436:25
**Boy** 356:13, 401:11

**BOYD** 267:43
**Boys** 401:8
**Branch** 469:8
**bread** 347:20, 430:5
**break** 390:22
**breakfast** 396:22
**breath** 307:23, 314:12, 316:1
**brief** 347:25, 369:9
**briefly** 318:1, 400:15, 503:22, 515:5
**bring** 314:16, 315:19, 320:20, 519:8, 521:21, 521:24, 524:11
**brings** 271:20
**Brinks** 289:3, 505:15
**British** 418:1, 418:20, 418:21, 419:2
**broadly** 515:22
**brother** 283:10, 319:4, 330:8, 334:16, 335:1, 335:3, 361:21, 403:5, 403:6, 444:20, 444:22, 445:4
**brothers** 444:12, 444:13, 444:14
**brought** 313:7, 333:20, 361:18, 385:1, 507:16, 515:20, 519:18, 524:8
**BS** 408:8
**bubble** 493:10
**Buda** 504:12, 504:16
**build** 329:23, 454:24, 455:8
**Building** 290:5, 351:1, 408:15, 455:4, 483:11
**built** 329:23
**bulk** 522:12
**burden** 276:7, 280:18, 296:20, 297:4, 297:11, 297:15, 301:24, 302:2, 359:20, 360:1, 389:11, 422:11, 432:21, 433:6, 507:15, 507:16, 507:17, 507:18, 531:12
**Burleson** 472:25, 473:2
**business** 360:23, 367:8, 443:21, 445:6, 445:7, 446:18, 446:21, 473:7, 477:18, 484:22, 497:13, 515:8
**busy** 484:21, 516:7
**buy** 302:21, 321:15, 386:9
**buyer** 386:3

**< C >**
**C-section** 401:16
**Cable** 289:2
**Cadeddu** 268:13, 268:14, 437:15
**cafeteria** 463:3, 465:23, 468:25
**California** 334:20, 504:11
**call** 283:14, 353:7, 368:6, 368:8, 368:9, 370:23, 411:23
**called** 282:17, 289:1, 289:22, 289:25, 296:10, 312:23, 318:14, 325:18, 335:23, 336:21, 345:1, 347:23, 348:12, 352:3, 371:3, 371:5, 375:19, 378:7, 387:18, 388:20, 421:5, 421:24, 428:25, 432:21, 435:24, 446:20, 450:18, 455:21, 460:9, 495:2, 497:11, 498:7, 507:10
**calling** 368:7
**calls** 283:13, 370:22, 371:19, 378:14
**camera** 487:4
**cameraman** 487:3
**cameras** 497:18
**campus** 467:20
**captured** 284:15
**care** 274:2, 299:9, 341:17, 342:8, 371:7, 376:1, 496:14, 496:15
**career** 467:14
**careful** 378:14
**Carolina** 311:11, 311:12
**carrier** 467:12
**carries** 389:12, 495:5
**carry** 276:7, 347:11
**cars** 367:12, 497:15
**Cartage** 446:22
**Casa** 453:21
**cases** 275:6, 276:18, 324:19, 324:22, 325:6, 325:8, 348:11, 349:6, 357:20, 358:3, 358:7, 419:15, 422:10, 436:18, 437:3, 437:8, 437:18, 514:1, 514:5, 531:16
**CASEY** 268:38, 533:3, 533:17
**Casey/s** 533:15
**cash** 327:7, 441:23
**casino** 475:21
**CASSIDI** 268:38, 533:3, 533:15, 533:17
**cat** 468:14
**catch** 291:7
**category** 366:20, 428:1
**Catholic** 350:5, 512:8
**caught** 514:2
**cause** 278:23, 279:7, 279:10, 294:14, 315:20, 316:10, 316:20, 359:13, 379:13, 393:19, 422:5, 484:3, 508:8, 509:11, 521:2, 521:5, 528:16, 533:4
**caused** 283:3
**causes** 296:14, 348:5, 430:18, 451:17
**caution** 520:11
**cautious** 381:20, 382:10, 382:17
**Center** 298:8, 310:2, 368:6
**central** 447:25
**Certain** 272:3, 280:15, 280:19, 281:8, 285:14, 364:9, 398:7, 398:9, 398:15, 411:22, 427:14, 435:5, 436:17, 454:14, 455:9, 503:17, 506:12, 530:17
**certainly** 388:15, 392:7, 416:17, 417:8, 454:11, 494:9, 508:13, 514:13, 519:12, 520:1, 527:6, 531:10, 531:13, 531:17
**certificate** 300:6, 300:15
**certified** 356:20
**certify** 533:3, 533:10
**chairs** 386:10
**challenge** 270:24, 279:10, 379:9, 382:15, 393:19, 508:8, 508:15, 509:2, 509:11, 528:16
**challenges** 316:20, 528:23, 529:2, 529:5, 529:13
**chance** 286:3, 498:15, 527:5
**change** 279:25, 345:25, 361:20, 362:17, 418:24
**channel** 394:12

**channels** 291:7, 291:8
**chapter** 418:16
**chapters** 418:5, 418:16
**characterization** 281:13
**characterize** 347:3
**Charge** 297:6, 315:24, 406:17, 439:6, 459:11, 464:23, 480:10, 487:24, 489:24, 496:19
**charged** 318:24, 330:17, 359:1, 448:2, 464:22, 494:25, 495:2, 503:10
**charges** 272:20, 296:14, 297:15, 348:5, 359:24, 422:5, 432:25, 433:4, 433:12, 439:1, 447:25, 448:16, 451:9, 507:16, 512:23, 512:24
**Charitable** 327:1, 327:5, 327:8, 327:17, 327:22, 337:4, 337:6, 353:25, 354:2, 354:7, 364:9, 364:11, 372:15, 372:19, 372:25, 373:1, 373:7, 373:12, 373:13, 373:18, 373:23, 374:1, 374:9, 390:3, 396:17, 396:18, 397:1, 404:5, 404:7, 413:15, 413:23, 427:14, 430:8, 439:16, 439:17, 439:23, 460:10, 470:20, 471:6, 471:18
**charities** 322:9, 322:11, 418:11, 418:12, 423:7, 454:13, 454:14, 454:15
**charity** 271:15, 293:1, 296:9, 322:7, 322:9, 322:10, 322:13, 322:14, 326:11, 327:10, 327:11, 327:13, 341:6, 344:14, 347:16, 355:16, 359:25, 395:14, 409:9, 412:23, 418:6, 418:17, 421:18, 428:25, 430:2, 448:25, 450:18, 455:15, 455:17, 455:21, 472:18, 476:3, 480:17, 490:5, 502:2
**Chase** 367:10
**chatting** 408:23
**check** 307:18, 319:23, 321:18, 523:19
**checked** 484:4
**Chemical** 289:2, 333:12, 386:5

**chemicals** 386:9
**child** 272:25, 375:21, 452:6, 452:8
**Childhood** 375:25
**Children** 273:11, 274:12, 275:18, 287:7, 299:3, 310:2, 310:13, 311:4, 323:25, 334:13, 334:14, 351:8, 361:2, 370:8, 376:2, 387:1, 401:2, 401:5, 421:22, 426:2, 430:5, 456:9, 465:24, 477:15, 484:22, 487:9
**Chiropractor** 391:3, 391:21, 392:3
**choice** 347:12, 347:13, 394:13, 444:5
**choose** 347:11, 350:8, 441:22
**choosing** 315:12
**chosen** 293:24
**Christian** 305:21, 306:22, 306:23
**chronic** 391:24
**chronology** 530:15
**Church** 305:2, 315:4, 321:19, 321:21, 321:23, 322:1, 322:3, 331:4, 331:6, 349:23, 385:8, 409:4, 409:9, 409:18, 453:22, 454:22, 463:25, 476:4, 484:24
**churches** 304:24, 304:25, 454:24, 455:4, 455:8
**circle** 277:10
**circles** 513:22
**Circuit** 525:12
**circumstances** 330:20, 398:9, 427:24, 518:3
**cite** 281:6
**citizen** 276:17, 318:13, 424:7, 486:18, 500:17, 502:19, 505:2
**citizens** 276:15, 276:20, 277:3, 277:6, 506:4, 507:13, 511:20, 517:18, 519:16
**citizenship** 486:20
**City** 283:24, 289:4, 289:6, 289:14, 304:25, 334:6, 438:18, 486:8, 504:25, 505:7, 505:13, 505:14, 505:17
**civic** 299:15

**civics** 279:19, 280:12, 281:9
**civil** 275:8, 312:11, 314:2, 324:23, 357:25, 362:2, 432:12, 432:13, 432:17, 437:4, 476:21, 498:12
**civilian** 362:16
**claims** 296:9, 347:16, 359:24, 420:7, 420:13, 420:17, 421:18, 421:22, 424:23, 425:9, 430:2, 430:8, 430:15
**clarity** 374:24
**classes** 350:5
**clean** 402:12
**cleaned** 334:19
**cleaning** 360:23
**clear** 279:2, 293:17, 471:12, 508:16, 525:6
**clearance** 499:1, 499:4, 499:5
**clearer** 374:16, 374:17
**clearly** 394:11, 512:9
**Clerk** 283:12, 438:10, 438:18, 467:15, 469:12, 530:13
**Cline** 526:11
**Clinic** 391:21, 392:3
**clinics** 306:24
**close** 419:6, 488:6, 488:8
**closed** 314:17, 356:7
**closely** 291:12, 307:11, 307:12, 320:7, 397:10, 426:8, 431:22, 462:20, 493:1, 493:7, 493:10, 493:11
**closing** 355:20, 489:18
**clothes** 372:18
**clothing** 354:4, 373:1, 414:5, 427:15, 448:25, 460:10, 470:21
**club** 485:24
**coach** 299:21, 299:22, 299:23, 300:1, 380:23, 485:2, 485:22, 485:24
**coaches** 486:2
**code** 511:4
**cold** 368:7, 519:19
**collaborate** 529:6
**colleagues** 485:20
**collect** 505:1
**collective** 371:4

**collectively** 325:7
**College** 308:19, 380:24, 425:12, 445:25, 446:1, 456:25, 457:9, 477:18, 498:6, 498:7, 504:19
**Collin** 271:6
**color** 273:3, 423:5, 434:8, 454:5
**Colorado** 515:4, 515:9
**colored** 429:21
**combination** 324:22, 324:23
**comes** 366:16, 529:21
**comfortable** 352:11, 352:12, 513:13, 524:18
**Coming** 278:8, 286:1, 314:12, 451:10, 524:5
**commend** 416:11, 528:13
**comment** 493:5
**comments** 320:9, 530:3
**Commerce** 267:33, 268:39
**commercial** 287:3, 350:23
**commitment** 457:24
**committed** 452:18, 453:2
**committing** 349:15
**communicate** 367:21, 411:5, 431:9
**communication** 285:4
**communications** 287:23
**communities** 492:19, 492:21
**community** 446:1, 504:15, 511:10, 516:16, 517:3, 519:14, 520:5
**Companies** 340:18, 436:4, 442:11, 446:21
**company** 298:7, 322:10, 329:22, 345:8, 350:22, 351:21, 352:18, 359:10, 364:1, 386:5, 386:12, 386:22, 435:24, 436:4, 441:22, 446:15, 446:19, 456:15, 456:18, 456:20, 469:6, 479:19, 497:11, 497:24, 498:1, 500:17, 500:21, 505:3
**comparative** 305:12
**comparing** 305:9
**complain** 370:23
**complains** 415:20
**complete** 414:20, 428:9, 440:10, 512:25
**completely** 494:6

**completing** 376:2
**completion** 530:11
**complex** 307:9
**comply** 533:11
**complying** 525:20
**component** 364:5, 364:13, 372:19, 374:11, 404:4, 455:1
**computer** 436:16, 446:2, 495:24
**Computers** 495:22
**concentrate** 316:9, 345:21, 345:24
**concept** 296:22, 348:20, 412:24, 531:18
**concern** 275:21, 293:13, 296:15, 314:10, 314:21, 348:6, 391:23, 399:21, 414:9, 415:13, 416:15, 422:5, 430:18, 451:17, 451:25, 452:1, 459:1, 523:16
**concerned** 293:24, 316:6, 321:13, 416:19, 512:24, 522:15, 524:5, 527:16, 527:25
**concerning** 375:17
**concerns** 272:7, 281:19, 293:8, 293:21, 294:7, 314:24, 315:9, 388:14, 434:2, 459:2
**concession** 332:2
**conclusion** 363:20
**concrete** 386:22
**condition** 391:24
**conduct** 392:2, 511:4
**Conference** 528:22, 533:12
**confidentiality** 357:4
**conflict** 305:20, 307:2, 320:7, 331:9, 368:14, 384:1, 397:9, 397:20, 397:22, 415:8, 415:9, 431:21, 432:4, 462:19, 484:18, 493:1, 524:3, 524:10, 524:15, 524:17, 526:3
**conflict.** 406:11
**confused** 281:12
**confusing** 366:3
**confusion** 417:9
**Congratulations** 341:11, 400:23
**congregation** 454:12, 454:13, 455:6, 455:12
**consequence** 280:22

**conservative** 528:14
**consider** 306:11, 306:12, 407:1, 412:12, 412:20, 427:20, 511:3
**consideration** 378:15, 378:17, 510:24
**considered** 322:14, 334:6, 355:25, 378:24, 416:2, 511:2
**considering** 382:11
**constitute** 364:12
**constituted** 447:10
**constitutes** 303:6, 460:1
**Constitution** 507:7, 507:13
**Constitutional** 277:11, 277:14, 474:20
**Construction** 329:19
**consult** 527:20
**consultant** 505:18
**consulted** 521:18, 527:3
**consulting** 402:4
**contact** 274:8, 488:9, 492:21, 505:3
**contain** 459:25
**contemplate** 525:14
**content** 308:22
**context** 431:3, 448:9
**continue** 292:6, 303:11, 404:19, 449:18, 508:2
**continues** 432:8
**continuing** 513:23
**contract** 309:2
**contractor** 350:22
**contrary** 371:24
**contributions** 322:10
**controlled** 446:11
**Convention** 455:14
**conversation** 291:9, 295:12, 513:21
**conversations** 411:17, 412:10
**converts** 295:14
**convict** 366:19, 366:20
**convictions** 454:5
**convinced** 348:18
**convinces** 511:5
**copies** 527:14
**copy** 391:17, 435:5, 470:8
**corporal** 283:11
**corporate** 408:5, 441:17, 441:19, 441:21, 443:12,

443:14, 445:8, 445:10, 525:18, 525:19
**Corporation** 287:3, 329:20, 335:8, 356:24, 359:10, 371:15, 421:5, 426:22
**correctly** 522:3
**Cosmetics** 446:14
**Council** 346:8, 346:13
**count** 468:16, 528:19
**counter** 438:23, 438:24
**countries** 454:20, 455:5, 492:8, 502:18
**country** 296:20, 320:12, 347:12, 348:23, 373:18, 384:11, 418:5, 455:9, 505:25
**counts** 526:24, 527:1, 527:7, 527:8, 527:12, 527:17
**County** 271:6, 312:24, 387:11, 387:13, 438:10, 438:12, 438:13, 447:12, 447:13, 457:21, 468:22, 468:24, 473:5, 476:17, 476:18, 478:1, 487:18
**couple** 273:19, 273:22, 293:23, 304:24, 305:24, 309:9, 323:8, 357:7, 369:8, 381:23, 386:1, 392:5, 400:14, 406:6, 417:21, 421:10, 423:19, 428:19, 467:4, 480:12, 488:17, 490:13, 508:3, 521:14
**course** 279:20, 285:18, 300:12, 351:13, 351:15, 356:25, 377:15, 380:21, 381:23, 383:13, 383:16, 417:13, 427:5, 498:5, 512:8, 525:19, 526:2
**courses** 305:9
**courteous** 492:13
**Courthouse** 267:32, 289:23, 420:21, 447:12, 447:13, 468:23
**courtroom** 273:15, 279:24, 381:25, 415:2, 428:14, 440:15, 452:22, 523:11
**courts** 515:5, 515:10, 515:14, 515:15
**cover** 519:2, 530:25, 531:16
**coverage** 283:3, 293:24, 294:13

**covered** 484:5, 515:5, 515:14, 531:3, 531:13, 531:19
**covering** 515:10, 515:13, 518:21
**coworker** 347:1
**CPA** 425:23
**crack** 357:24
**crazy** 272:11
**cream** 340:16, 340:18
**created** 347:9
**creates** 385:14
**credibility** 362:17
**crime** 275:15, 349:15, 406:12, 447:10, 474:21, 495:2
**Criminal** 275:8, 284:11, 296:19, 324:24, 325:6, 348:11, 357:19, 359:19, 362:1, 378:6, 395:8, 422:10, 432:15, 432:20, 437:4, 437:6, 437:12, 447:7, 465:9, 472:16, 474:18, 474:24, 476:20, 488:23, 490:21, 494:23, 506:16, 525:10
**critic** 436:25, 515:21, 516:13
**critical** 496:15
**criticizing** 436:24
**cross** 517:6
**crowd** 452:3
**crowded** 398:15
**cryogenics** 334:10
**CSR** 268:38, 533:21
**Cub** 356:14, 356:15
**culture** 285:25, 453:18, 503:6, 503:7
**curiosity** 519:1, 519:6
**curious** 420:1, 430:20, 432:6
**currency** 439:8
**current** 315:23, 473:6, 518:7
**currently** 351:19, 367:9
**customer** 366:23, 367:5, 367:9, 367:17, 370:14, 370:17, 370:21
**cut** 376:14
**CUTRER** 268:31
**Cynthia** 316:22


< D >

**dad** 329:18, 330:7, 330:12, 464:13
**dairy** 340:17
**Dallas-based** 402:19
**Dallas-fort** 504:4
**damage** 358:1, 399:23, 505:4
**DANIELS** 267:43
**DART** 420:8, 420:9, 420:14, 420:16, 421:1, 421:2, 425:1
**dashboard** 497:18, 497:21
**Data** 283:18, 445:11, 505:1
**date** 424:12, 487:20, 501:15, 517:14, 517:18, 530:17
**dates** 517:16
**Daubert** 521:22, 522:5, 522:14, 523:4
**daughter** 342:10, 342:24
**Daughters** 418:1, 418:20
**David** 466:18
**days** 271:22, 421:11, 443:22, 452:5, 452:7, 488:17, 490:13, 508:3, 511:14
**Daytime** 342:1, 342:3, 342:18
**DC** 515:1, 515:5
**deadline** 530:18
**deal** 484:14, 504:24
**dealing** 284:10, 326:3, 402:8, 422:23, 431:14, 518:7
**dealings** 422:19
**dealt** 356:24, 368:2
**death** 474:22
**debate** 513:21
**deceased** 319:8, 444:25
**December** 510:7
**decent** 453:9
**decide** 363:17, 420:17, 441:24
**decided** 415:24
**deciding** 349:5, 431:15
**decision** 337:1, 339:19, 349:10, 378:9, 383:20, 392:21, 393:12, 400:1, 432:5, 442:13, 465:11
**declare** 442:11
**declares** 441:22
**decline** 392:15
**default** 458:7
**Defendant** 267:38, 268:1,

268:10, 268:19, 268:28, 278:22, 325:2, 358:15, 406:2, 524:24, 525:1, 525:3, 525:15, 525:25, 529:13
**defender** 524:12
**defense** 269:13, 271:9, 279:15, 281:14, 281:17, 292:17, 303:22, 317:2, 328:15, 338:1, 344:9, 355:9, 365:11, 376:20, 379:19, 393:4, 395:8, 417:19, 450:13, 461:12, 472:11, 481:8, 490:21, 509:21, 521:18, 527:4
**defer** 416:24
**defines** 353:16
**defining** 403:24, 403:25
**definite** 508:9, 508:12
**Definitely** 334:20, 342:23, 382:14, 398:9, 494:17
**definitions** 372:4, 448:16, 460:2, 470:12, 480:11
**defunct** 525:18, 525:22
**degree** 376:3, 456:25, 457:3, 482:20, 482:24, 498:6, 498:8, 504:20
**degrees** 498:4
**delay** 269:4
**deliberate** 335:15
**deliberating** 470:8
**deliberations** 527:15
**demand** 450:1
**Den** 356:15
**Denton** 269:7, 269:8, 269:12, 270:15, 270:17, 270:24, 504:13, 504:18
**Denver** 515:4, 515:15
**deny** 521:10
**DEPARTMENT** 267:30, 283:7, 283:25, 293:25, 294:6, 294:10, 340:12, 438:19, 438:20, 438:21
**departments** 283:9
**depending** 432:1
**depends** 374:3, 454:10, 483:4
**deported** 502:21
**depository** 442:13
**derived** 412:19
**descent** 422:19, 422:24

**describe** 365:23, 428:23
**described** 311:23, 447:25, 469:18
**description** 446:16, 446:17, 457:5
**design** 495:20
**designated** 480:13, 480:14, 490:1
**designation** 404:3, 413:12, 414:3, 427:10
**desk** 390:17
**destroyed** 347:20, 430:7
**detail** 356:7, 488:12, 531:16
**details** 329:3, 405:21, 406:5, 429:17, 429:25
**detective** 283:20, 283:21
**detectors** 273:12, 278:24
**determine** 279:16, 279:18, 293:11
**determined** 458:5
**Development** 282:19, 304:2, 365:19, 395:13, 441:2, 482:1
**devices** 411:23
**devote** 346:2
**devoted** 306:21, 399:12, 522:7
**devout** 492:15
**diabetes** 317:24, 409:17
**diapers** 421:20, 430:5
**die** 407:8
**died** 398:25
**difference** 306:20
**different** 278:4, 296:6, 297:15, 306:16, 350:7, 366:2, 367:2, 367:4, 367:21, 382:4, 409:14, 409:19, 432:2, 446:25, 484:15, 492:8, 494:23, 514:4, 519:4, 519:9, 524:6, 530:4
**differently** 276:16
**difficult** 345:25, 349:17, 352:11
**difficulty** 390:15, 475:8, 503:12
**DIRE** 267:16, 281:7, 528:11, 529:22, 530:16, 530:19, 530:22, 530:24, 530:25, 531:3, 531:12
**direct** 283:12, 284:8, 386:6
**direction** 475:17

**directly** 439:18, 449:1, 525:14
**director** 474:3, 477:17, 478:24, 479:1, 479:6
**disability** 393:17
**disabled** 334:3
**disagree** 393:8
**Disappointment** 458:21
**discharge** 311:22, 311:24
**discharged** 307:21, 307:23
**discipline** 310:4
**disclose** 357:1
**discomfort** 390:23
**discriminate** 473:23
**discrimination** 419:1
**discussed** 307:8, 331:3, 495:9, 501:6, 512:2, 530:14
**discussing** 517:22, 517:24, 518:10
**discussion** 388:13, 513:24, 518:7
**DISD** 481:20, 481:23, 482:3, 482:15
**dismiss** 316:10, 526:24
**dismissed** 275:6, 325:23, 527:12
**dispatch** 283:14
**dispatcher** 283:16
**dispel** 417:9
**dispensing** 274:8
**dispersing** 340:13
**display** 436:8
**displays** 436:11
**disposed** 527:13
**dispute** 320:19, 403:4
**disrupting** 416:16
**distance** 481:24, 482:2
**distinction** 415:8, 494:11
**distract** 342:21, 382:7, 382:22, 452:25
**distracted** 452:21, 452:23
**distracting** 381:24
**distraction** 294:14
**distributor** 359:9
**DISTRICT** 267:1, 267:2, 267:31, 346:15, 418:15, 457:13, 467:18, 469:1, 476:10, 487:13, 533:18, 533:19
**districts** 418:14

**disturb** 301:4
**disturbed** 512:11
**divide** 418:14
**dividend** 441:22
**dividends** 442:11
**DIVISION** 267:3, 533:20
**doctor** 274:8, 400:24
**documentation** 506:5
**documents** 301:10, 301:12, 427:2, 436:17, 437:25, 442:17, 470:3
**Dog** 497:12
**doing** 271:23, 274:10, 282:11, 285:15, 288:19, 309:1, 319:19, 331:15, 337:24, 340:19, 366:23, 366:24, 367:9, 367:16, 371:20, 384:12, 395:5, 400:3, 402:18, 431:8, 435:14, 435:19, 435:21, 443:11, 444:3, 444:24, 445:7, 446:23, 453:2, 459:6, 459:7, 471:11, 472:14, 482:6, 483:24, 495:20, 518:3, 519:14, 526:4, 529:9
**domestic** 463:6
**done** 298:19, 332:1, 332:17, 335:17, 367:5, 367:21, 409:8, 412:14, 437:7, 437:18, 439:25, 519:11, 521:2, 523:4, 528:6, 531:21
**door** 357:24
**doubt** 276:6, 276:9, 277:20, 296:21, 296:25, 297:7, 297:12, 301:20, 301:21, 301:25, 336:12, 337:8, 348:19, 351:14, 360:5, 389:12, 433:1, 433:11, 475:1, 495:7, 507:17, 507:19
**Dow** 333:12
**Down** 273:2, 281:1, 289:22, 289:25, 309:17, 312:23, 322:13, 325:2, 325:19, 332:10, 333:11, 333:22, 351:2, 375:22, 376:1, 387:18, 419:12, 420:20, 446:14, 453:11, 475:18, 499:12, 504:12, 517:13, 522:19, 523:15
**downstairs** 408:15, 408:25,

526:17
**Downstream** 477:10
**downtown** 358:1
**drains** 289:10
**Drake** 344:5, 344:6, 344:8, 350:12, 350:13, 354:13, 354:24
**DRATEL** 268:3, 268:4
**draw** 415:8
**drawn** 391:7, 471:24, 480:23, 500:1, 508:2
**drinking** 307:22, 316:17
**drive** 272:22, 332:19
**driving** 273:2, 419:18, 487:23
**drove** 447:4
**drug** 334:16, 444:17, 444:23
**drugs** 478:14
**drunk** 419:18
**due** 391:24, 401:3, 406:11, 444:23
**dull** 465:25
**Duncan** 267:42, 524:16
**Duncanville** 391:21
**duration** 359:13
**during** 280:10, 285:18, 289:13, 294:8, 310:16, 310:20, 316:17, 342:1, 342:18, 402:1, 411:1, 411:8, 445:18, 452:14, 456:8, 467:3, 488:9, 529:18, 529:21, 530:22, 531:3, 531:5, 533:3
**duty** 288:2, 288:4, 342:1, 342:2, 416:17, 500:16, 501:10
**DVD** 497:14, 497:19, 497:22
**DWI** 314:13, 315:23, 315:24
**dying** 340:11

**< E >**
**e-mail** 375:18
**ear** 365:14
**Earlier** 389:2, 393:15, 448:17, 499:10, 529:24
**Early** 375:25, 424:11
**earth** 512:10
**easier** 433:12
**easily** 393:16
**East** 287:19, 287:21, 291:12,

312:4, 321:6, 330:4, 330:7, 457:4, 475:23, 514:7, 514:10
**easy** 352:13, 353:1, 432:9
**economic** 451:22, 451:23
**edges** 416:12
**edit** 482:9
**education** 410:19, 452:7, 498:4
**educational** 439:13, 456:25
**effect** 362:17, 416:5, 495:9
**eight** 274:13, 311:18, 477:23
**Eight.** 479:3, 486:12
**eighteen** 319:14, 319:15, 366:25, 388:1, 486:22
**either** 293:4, 301:13, 312:24, 313:23, 314:17, 315:3, 326:4, 360:5, 412:16, 413:16, 427:16, 458:17
**either/or** 394:12
**El-mezain** 268:1
**Elashi** 268:19, 526:1, 526:12, 526:13
**elderly** 418:4, 418:8
**elect** 458:5
**electrical** 350:22, 350:23
**Electrician** 350:21
**electronic** 411:16
**electronics** 495:20, 495:21, 495:23
**elementary** 410:22, 481:24, 487:10
**eleven** 421:3, 425:4, 425:5, 469:10, 505:15, 528:20
**elicit** 281:8
**elicits** 394:18
**ELIZABETH** 267:27
**Ellis** 387:11
**elsewhere** 284:1, 402:16
**embarrass** 314:18
**emergency** 496:18
**emotional** 464:14
**emotions** 464:24, 474:9
**emphasis** 457:6
**Empire** 418:1, 418:20
**employed** 350:20, 352:7
**employee** 345:8, 345:10, 351:24, 505:6
**employees** 500:25
**employers** 359:17
**employment** 316:5

**encourage** 281:23
**end** 292:1, 292:2, 302:10,
302:13, 320:14, 322:12,
326:8, 326:17, 335:4, 335:13,
335:22, 349:10, 353:9,
363:12, 371:18, 376:12,
389:19, 401:4, 401:15,
401:23, 403:15, 403:23,
413:5, 427:1, 439:5, 458:6,
458:8, 458:15, 459:22,
467:11, 470:1, 478:17, 480:6,
489:15, 521:15, 527:15,
530:9
**ended** 281:11, 289:5, 358:9
**energy** 346:2
**enforcement** 283:23,
319:20, 362:16, 403:14
**engaged** 350:4
**engineer** 463:7, 492:7,
492:12, 500:25
**engineering** 495:12, 495:15
**English** 295:2, 300:23,
301:3, 301:13, 457:7
**enjoy** 277:10
**Enjoyed** 288:14, 311:19
**Ennis** 386:14
**enough** 422:7, 465:8, 524:15
**entertainment** 515:21
**entire** 351:7, 463:1, 467:13,
505:7, 515:18
**entirely** 417:9, 455:11, 519:3
**entitled** 389:10, 506:9, 529:2
**entity** 525:19, 525:21
**entrance** 308:19
**entry** 283:12, 283:18, 445:11
**environment** 393:7, 394:6
**environmental** 402:4
**envision** 531:10
**episodic** 310:9
**equal** 347:10, 510:25, 529:9
**equipment** 336:15, 354:1,
354:2, 372:16, 477:10,
479:13
**especially** 406:23, 419:23,
441:10, 441:14, 448:7,
521:20, 523:7
**essays** 308:18, 308:19
**essentially** 280:5, 392:9,
444:20, 458:3, 469:19
**estimate** 500:13

**ET** 267:13
**Europe** 288:16
**evaluate** 273:8
**evening** 531:24
**event** 488:13, 529:21
**Everybody** 330:23, 331:20,
332:16, 347:10, 454:8, 459:4,
474:22, 505:8, 521:19
**everyone** 281:17, 281:20,
347:13, 359:6, 360:5, 409:6,
474:3, 495:2, 511:1, 525:7,
531:11
**Everything** 286:2, 315:6,
382:12, 386:8, 386:10,
431:10, 465:21, 469:16,
479:14, 488:25, 494:23,
502:14, 516:9
**evoke** 464:24, 474:8
**evolved** 306:6
**ex-husband** 361:19
**exact** 392:8, 517:16
**Exactly** 295:8, 324:13,
403:24, 405:8, 491:23,
497:20
**exam** 308:19
**EXAMINATION** 267:16,
402:10
**example** 281:1, 281:3
**examples** 295:15
**Excellent** 339:16
**except** 378:9, 386:8, 386:10,
468:12
**exception** 281:13
**excuse** 379:13, 458:5
**excused** 271:5, 313:12,
415:1, 428:14, 440:15, 458:7,
461:5, 472:7, 481:4, 490:17,
501:18, 508:6, 520:22
**exercise** 279:16, 279:21,
288:19
**exhibits** 435:2, 435:3,
436:24
**existed** 417:10
**exists** 516:2, 528:19
**expected** 316:3, 401:14,
501:8, 510:22
**expects** 507:13
**expeditiously** 459:5
**expenditure** 281:25
**expenditures** 449:4

**Experience** 295:12, 300:19,
301:15, 312:5, 313:22, 326:3,
334:23, 349:3, 349:6, 349:12,
358:11, 358:19, 382:16,
390:23, 403:10, 408:22,
419:9, 419:22, 420:4, 422:19,
484:11, 488:22, 519:14,
524:10, 530:23, 531:2
**experienced** 295:5
**experiences** 318:18, 318:21,
358:13, 358:23, 378:13,
380:20, 399:1, 408:20, 431:5,
431:11, 443:9, 463:16,
463:17, 473:11, 506:13,
519:24
**expert** 319:22
**experts** 521:21
**expired** 292:3, 297:18,
322:18, 350:9, 385:18,
434:11, 440:4, 455:22,
460:20, 520:7
**explain** 351:16, 460:15
**explained** 471:1
**explaining** 335:17
**explanation** 460:6
**explore** 422:22, 451:14
**exposed** 426:15
**express** 280:1, 284:12
**expressed** 505:24
**expresses** 394:11
**extended** 444:3
**extent** 281:23, 417:3,
426:14, 468:10
**extras** 529:20
**extreme** 306:23
**Extremely** 352:11, 381:5,
513:24, 514:1
**eye** 291:7
**eyes** 381:16, 382:14


**< F >**
**face** 368:5
**faces** 437:16, 437:20, 511:16
**fact** 281:7, 406:11, 415:13,
439:18, 448:14, 449:8, 483:9,
501:12, 511:16, 521:2, 521:3,
521:7, 524:10, 530:25
**facts** 302:12, 336:2, 356:4,
356:5, 363:20, 371:25,

389:20, 389:21, 405:21, 406:4, 406:15, 407:1, 407:2, 413:8, 415:18, 416:7, 427:5, 430:22, 459:24, 480:9, 489:3, 502:25

**factual** 415:11, 415:20, 415:22

**fair** 270:25, 272:16, 276:12, 276:24, 277:24, 279:17, 290:11, 293:11, 308:14, 313:21, 346:3, 356:3, 356:11, 378:14, 378:16, 379:9, 383:18, 383:19, 383:21, 389:8, 399:19, 399:20, 406:13, 406:21, 453:16, 459:8, 465:4, 465:6, 474:14, 483:15, 494:21, 503:12, 508:10, 508:17, 509:4, 513:7

**Fairly** 273:8, 275:22, 307:10, 307:12, 308:12, 313:16, 313:23, 326:8, 335:4, 359:5, 388:21, 403:15, 403:16, 407:1, 488:22

**faith** 306:25, 330:10, 350:1, 358:24, 367:23, 409:2, 463:12

**fall** 366:20

**false** 447:14

**familiar** 277:6, 295:1, 302:8, 304:6, 422:11, 437:21

**families** 376:1, 376:3, 409:19, 421:21

**family** 283:7, 301:2, 322:4, 343:5, 375:21, 375:23, 438:11, 456:22, 468:15, 478:17, 511:17, 511:20

**Fantastic** 300:17

**far** 284:16, 285:13, 285:15, 306:1, 308:1, 321:13, 356:10, 368:16, 388:23, 388:25, 389:1, 389:7, 394:1, 512:24, 513:19, 527:25

**Farmer** 469:8

**fascinating** 512:7, 518:23

**fashion** 273:8, 358:24, 392:7

**fast** 317:23, 450:1, 501:5

**father** 396:14, 517:17

**fault** 315:5

**favor** 411:25, 494:2, 494:3

**FBI** 319:20

**fear** 275:21, 284:18, 308:7, 381:24, 382:6, 398:14

**fearful** 381:17, 382:17

**fears** 272:15, 272:20, 275:14, 275:15, 278:24, 281:20, 388:14

**Feature** 511:14, 517:11

**Features** 510:19, 511:13, 511:16, 515:17, 515:23, 515:24, 516:1, 516:5

**federal** 290:2, 312:24, 324:22, 387:15, 515:5, 515:10, 515:12, 515:13, 515:15

**feeling** 273:6, 332:16, 360:6, 382:6, 383:5

**feelings** 273:7, 326:11, 394:11, 423:3, 458:16, 465:15

**feels** 392:18, 505:2

**fees** 533:10

**fell** 508:13

**felt** 304:23

**fiance** 341:21

**field** 285:15, 288:19, 289:11, 360:22, 519:11

**fifteen** 333:18, 450:6

**fifteen-minute** 315:17

**fifteen.** 478:3

**Fifth** 358:9, 525:12

**figure** 352:12, 413:8

**files** 435:6

**fill** 336:1, 352:1, 352:20

**filled** 292:19, 298:1, 344:11, 355:11, 417:20, 428:19, 456:12, 467:6, 477:1

**filling** 271:11, 352:23, 451:16

**final** 470:4, 504:17

**Finally** 362:20, 458:4, 508:13

**Finance** 367:10

**financial** 345:25, 346:4, 351:20, 355:2, 442:7, 442:16

**financially** 352:8

**find** 272:15, 276:9, 293:7, 294:4, 294:6, 302:17, 302:24, 310:11, 310:17, 310:22, 314:19, 327:4, 327:8, 327:16, 327:18, 327:20, 327:22, 336:11, 336:20, 337:6, 364:8,

373:10, 373:22, 373:24, 470:23, 471:5, 492:13, 501:3, 512:25, 518:24

**finds** 513:11

**Fine** 337:25, 395:6, 408:17, 410:7, 472:15, 473:23, 489:15, 506:6, 511:23, 528:5

**finish** 300:11, 530:11

**finished** 448:12, 470:2

**finishing** 523:2

**fire** 479:9

**firemen** 505:8

**firm** 402:13

**First** 267:45, 272:9, 289:8, 335:16, 341:11, 357:14, 371:9, 375:13, 387:21, 446:20, 450:22, 450:23, 470:15, 502:22, 504:16, 521:17, 521:23, 522:5, 523:2, 523:23, 526:14, 528:20

**FISH** 267:17

**fits** 327:7

**Five** 289:10, 298:13, 313:4, 334:7, 355:19, 367:4, 369:25, 401:5, 415:17, 418:13, 445:10, 491:11, 514:11, 514:13, 526:24

**Five.** 299:7, 443:15

**fixed** 334:10

**flags** 272:7, 296:16

**flash** 282:25

**flooding** 358:1

**Floor** 268:5, 496:19, 496:20, 510:18, 510:19

**Florida** 268:25

**fluent** 294:20

**Fluer** 329:20

**flush** 362:20, 402:6

**fly** 522:19, 522:21, 523:22

**focus** 377:13, 518:9

**focuses** 326:19

**folks** 492:2

**follow** 291:11, 303:4, 320:15, 321:15, 337:3, 349:25, 354:9, 364:16, 373:10, 373:16, 374:13, 378:11, 378:12, 390:10, 392:11, 404:13, 411:13, 414:6, 414:13, 426:7, 428:3, 439:21, 439:24, 449:6,

449:11, 462:19, 471:13,
471:18, 480:18, 490:6, 493:9,
493:11, 506:19, 506:21,
508:14
**follow-up** 273:23, 286:19,
297:24, 309:16, 323:3, 333:5,
350:16, 360:15, 369:8, 386:1,
400:14, 410:11, 423:19,
434:20, 445:19, 456:24,
485:21, 496:6, 505:19,
514:21
**followed** 305:19, 320:6,
381:16, 397:9, 431:21,
473:24, 492:25, 497:6, 510:4
**following** 306:16, 312:4,
319:24, 327:21, 427:18,
493:6
**food** 347:18, 354:4, 372:18,
373:1, 421:20, 430:4, 448:25,
454:23, 460:10, 462:25,
470:21
**football** 332:3
**force** 273:16, 392:14
**forced** 392:21, 508:13
**foregoing** 533:7
**foregoing-styled** 533:4
**foreigner** 380:24
**foreman** 350:21
**forensic** 442:16
**foreperson** 348:25, 353:10,
357:11, 358:4, 362:4, 419:13,
432:18, 447:22, 498:16
**forget** 496:15
**Forgive** 286:20, 333:6,
349:21
**form** 279:15, 280:6, 283:3,
291:21, 347:18, 380:9,
421:20, 430:4, 439:16,
454:22, 460:9, 470:20,
495:24
**format** 533:10
**formed** 304:13, 329:12,
339:9, 339:14, 396:2, 398:6,
406:1, 406:10, 426:15,
441:13, 462:9
**former** 347:1, 350:4, 353:10
**formerly** 420:7
**forms** 467:6, 477:1
**Fort** 268:34, 402:20, 437:18,
462:3, 462:14, 468:1, 477:14,

477:22, 479:23
**forth** 274:9, 279:15, 388:14
**Fortunately** 349:17
**fortune** 388:9
**forty-seven** 323:19
**forward** 458:15
**found** 283:25, 325:18, 337:3,
373:25, 428:2, 458:17, 512:7
**founded** 417:14
**Four** 287:18, 289:8, 293:16,
294:3, 314:21, 329:10,
341:10, 341:14, 342:8,
342:22, 345:6, 345:10,
351:25, 359:12, 383:9, 445:3,
451:21, 452:5, 452:6, 463:8,
464:17, 483:8, 483:22, 484:3,
491:11, 497:25, 511:19,
514:11, 514:13, 516:24
**four-month** 318:5
**four-trial** 294:14
**four.** 325:5
**fourth** 510:18, 510:19
**Fox** 493:21, 508:25
**France** 454:19
**franchises** 479:16
**fraternity** 396:16
**free** 347:12, 520:6
**FREEDMAN** 267:43
**freedom** 411:11, 454:9
**freelance** 510:11
**frees** 520:4
**frequently** 518:17
**Friday** 458:25, 529:23,
530:7, 530:9, 530:11
**Fridays** 530:1
**friend** 346:24, 397:21,
398:24, 399:10
**friendly** 399:1, 431:9, 474:1,
474:2, 474:4
**friends** 403:3, 475:15, 503:5,
507:1, 510:15, 510:17,
512:13
**frightened** 278:25
**front** 272:23, 470:3, 516:3
**full** 304:23, 340:8, 377:7,
429:9, 429:17, 429:25, 432:1,
452:23, 486:1, 522:1
**fully** 453:2
**fun** 519:1
**function** 519:4

**functioning** 518:22
**fund** 295:21
**funding** 272:2, 355:21, 356:7
**funds** 336:8, 336:13, 353:21,
354:7, 364:1, 364:4, 372:9,
372:12, 372:14, 404:3,
427:13
**future** 349:5, 349:19


**< G >**
**Gallagher** 397:14
**gambler** 475:22
**games** 485:6
**Garland** 457:13
**Garrett** 267:28, 273:20,
274:15, 279:8, 286:13,
286:16, 292:3, 297:19,
297:22, 309:7, 309:13, 315:9,
322:20, 322:24, 332:24,
333:2, 343:11, 344:1, 350:11,
350:14, 360:9, 360:12,
368:25, 369:5, 378:20,
379:10, 385:20, 385:23,
400:6, 400:11, 410:3, 410:8,
423:13, 423:17, 510:9
**gathered** 391:6
**gave** 282:21, 304:4, 317:12,
322:13, 338:9, 338:10,
365:21, 373:18, 377:4,
379:25, 405:11, 439:22,
441:3, 461:20, 472:19,
481:12, 491:5, 502:3, 505:20
**Gaza** 347:17
**general** 310:21, 321:6,
359:25, 408:6, 416:9, 494:14,
528:12, 529:21, 530:22,
530:24, 531:3, 531:12
**Generally** 275:15, 280:10,
281:21, 360:22, 360:24,
369:17, 386:20, 388:14,
416:14, 424:14, 431:25,
459:19, 505:21, 531:19
**Gentlemen** 269:2, 272:17,
273:7, 279:1, 315:16, 348:16,
357:15, 357:23, 359:1,
363:25, 375:9, 376:7, 391:19,
413:3, 422:25, 433:17,
433:18, 520:23, 531:24
**George** 290:4

**Germany** 284:25, 288:5, 288:7, 330:6
**Geruntho** 490:18, 490:20, 508:25
**gets** 380:14, 474:22
**getting** 269:5, 280:2, 280:25, 294:8, 331:14, 332:13, 340:14, 381:22, 463:8, 464:11
**Ghassan** 525:25
**Gibraltar** 329:16, 333:10
**Girl** 341:11, 346:9, 346:15
**Girls** 401:8, 401:9
**Given** 273:5, 284:6, 327:9, 335:14, 336:2, 352:7, 353:22, 364:8, 364:12, 366:3, 372:19, 373:11, 373:23, 374:1, 374:11, 380:2, 439:18, 439:20, 449:1, 449:2, 452:20, 464:24, 470:24, 471:6, 471:17, 483:5, 483:15, 522:8, 522:10
**gives** 389:22, 448:14, 490:6, 506:20
**giving** 328:23, 365:25, 372:12, 378:16, 447:14, 470:25, 490:4
**glancing** 344:21
**God** 306:11, 306:16, 347:9, 385:16, 513:10
**goodness** 324:6
**goods** 284:6, 470:21
**gosh** 514:11
**gospel** 454:25
**grading** 310:7
**graduated** 300:12, 333:16
**grain** 513:6
**Grand** 386:24, 462:17, 462:22, 467:19, 467:23, 469:7
**grant** 279:10
**granted** 530:18
**Graphics** 435:25, 436:1
**Gray** 303:16, 303:19, 309:5, 309:8, 309:11, 315:11, 315:21, 315:22, 316:6, 316:10
**Great** 313:10, 324:18, 333:25, 364:19, 410:8, 473:25, 519:6

**greatly** 316:6
**Greg** 268:30, 269:12, 282:7, 303:20, 317:1, 328:15, 337:23, 365:10, 376:20, 379:19, 395:7, 405:2, 440:20, 461:10, 472:10, 481:7, 490:20, 501:21, 509:19
**Gregory** 271:3, 271:4
**grew** 285:25, 305:23, 306:1, 370:2, 388:7, 491:19
**Griffin** 271:4
**ground** 521:9
**grounds** 279:7, 508:16, 521:4
**group** 275:4, 346:14, 384:22, 418:3, 470:16
**Growing** 272:24, 273:11, 278:2, 305:21, 306:3, 330:13, 475:15
**grown** 456:10
**guard** 357:24
**guess** 297:8, 299:19, 302:12, 311:23, 317:19, 329:23, 349:19, 357:25, 366:13, 367:20, 373:19, 374:3, 384:22, 397:14, 397:24, 406:24, 407:19, 411:21, 411:22, 412:6, 412:13, 413:21, 430:23, 430:25, 482:2, 483:4, 493:21, 494:13, 501:9, 506:12, 522:13, 526:23
**guessing** 436:24
**guidance** 393:22, 394:14, 416:4, 416:20, 416:21, 417:12
**guided** 527:18
**guilt** 270:5, 276:6, 276:8, 277:19, 277:20, 283:3, 304:13, 329:12, 339:10, 396:3, 406:1, 502:9, 502:10
**Guilty** 270:9, 276:9, 278:5, 278:7, 279:6, 296:25, 297:7, 348:8, 348:9, 348:19, 360:5, 360:6, 373:25, 433:25, 439:25, 471:8, 475:1, 507:8, 512:21, 520:3
**guy** 399:13

< H >
**half** 285:21, 289:4, 289:8, 390:21, 515:14
**hall** 278:20, 292:12, 303:15, 315:15, 328:10, 337:18, 343:22, 354:22, 365:7, 375:8, 379:7, 404:24, 449:24
**hallway** 510:16
**hand** 371:6, 382:16, 388:16
**handed** 391:20
**handle** 314:4
**handled** 349:7, 420:19
**handler** 286:7, 288:22
**handling** 360:14
**hands** 310:14
**handyman** 443:20, 446:24
**Hannover** 288:9, 288:10
**happen** 290:6, 420:16, 455:5
**happened** 282:24, 352:14, 429:25, 430:21, 488:7, 488:9, 488:17, 488:25, 489:4, 527:17
**happening** 284:13, 291:13, 320:13, 320:15, 342:4
**happens** 281:3, 330:22, 383:14, 524:7
**hard** 280:25, 315:3, 359:4, 365:13, 365:15, 411:4, 427:23, 452:13, 494:14, 499:11, 507:23, 511:13, 511:21
**harder** 403:18
**hardship** 332:19, 343:25, 345:6, 345:25, 346:5, 352:9, 354:24, 355:2, 359:14, 383:24, 451:22, 484:3, 501:14, 509:8, 528:17, 528:19
**harm** 284:14
**harmed** 505:2
**hazardous** 446:14
**He'll** 470:11, 480:11
**head** 317:17, 380:11, 382:3, 499:21, 503:18, 512:1
**headed** 352:5
**hearing** 271:18, 272:6, 328:25, 339:13, 365:13, 375:2, 395:18, 429:10, 521:22, 522:5, 522:14, 523:2, 523:4

heavily 397:22
Hebrew 290:12, 290:16, 301:7, 301:13
held 469:1
Hello 376:19, 379:15, 466:25
help 299:21, 299:22, 299:23, 332:17, 455:18, 504:25, 526:6
helped 329:23, 349:18, 430:6
helpful 394:19
helping 295:21, 332:2, 421:22, 455:18
Henderson 304:19
Herald 516:10, 516:13
hesitant 384:9
hesitate 392:1
hesitation 414:8, 521:8
High 332:1, 410:20, 410:21, 466:16, 475:11, 486:2, 487:10, 487:11, 495:19, 504:14
highrise 358:2
Hill 355:4, 355:5, 355:8, 358:21, 360:10, 360:11, 364:25
HIPA 356:20
hire 351:24, 352:19, 479:9
histories 356:24
history 397:20
hit 499:20, 500:22
hold 352:1, 383:12, 389:4, 396:22, 507:18
Hollander 267:41, 267:44, 525:25
Home 286:24, 287:18, 287:20, 288:12, 289:3, 305:21, 309:4, 309:22, 311:8, 311:9, 311:11, 320:14, 320:20, 341:25, 361:7, 369:14, 370:11, 387:6, 387:7, 387:8, 400:18, 418:4, 418:15, 418:20, 425:20, 425:24, 463:6, 464:6, 464:19, 466:2, 468:7, 468:11, 502:20, 505:15
homeless 322:5
homemaker 446:6
homes 347:19, 418:8, 418:12, 418:13, 421:21, 430:6

honest 277:1, 278:1, 281:8, 331:20, 382:13, 414:9, 493:25, 511:5
honestly 273:6, 348:1, 498:21
honesty 276:25, 278:11
HONORABLE 267:17, 311:23
hope 508:10
hopefully 336:25
hopeless 316:14
hoping 458:14
Hopkins 498:8
Horn 456:13
hospital 293:18, 400:25, 401:1, 496:12
hotels 501:14
hotter 361:23
hour 375:9, 376:9, 376:14, 390:18, 390:21
hours 376:2, 402:1, 446:1
house 357:24, 401:23, 443:25, 456:10
household 350:3
housewives 516:8
Houston 274:21, 274:23, 418:9, 418:10
HR 505:5, 505:12, 505:18
Human 294:10, 409:3, 504:23, 511:16, 513:8, 519:4, 519:15
Humanitarian 291:24, 302:22, 302:25, 303:5, 336:14, 336:21, 347:16, 347:18, 347:20, 347:21, 421:18, 421:19, 421:23, 430:3, 430:8, 439:12, 449:9, 454:22, 455:2, 460:10
humbled 308:25
hundred 297:9, 343:1, 409:24, 419:6, 503:16, 507:5, 508:11
hurting 331:16
husband 274:1, 294:21, 298:6, 323:7, 324:7, 333:21, 334:8, 350:20, 352:7, 375:14, 386:18, 410:14, 410:25, 411:7, 425:19, 443:18, 445:23, 456:13, 464:19,

467:7, 468:3, 468:7, 477:2, 478:4, 485:1, 485:22
Hutchinson 283:10

< I >
ICU 496:18
idea 381:9, 384:15, 444:11, 512:23, 530:4
ideas 273:5
IED 308:2
ignorance 503:8
illegal 303:1, 429:16, 480:16
Illegally 506:2, 506:3
illustrative 281:4
imagine 269:14, 299:19, 317:3, 494:24
impact 275:21
impair 314:3, 314:20, 318:3, 343:5, 359:4, 443:2
impart 375:11
impartial 270:25, 279:18, 313:21, 356:3, 378:14, 378:17, 379:9, 383:18, 383:19, 383:22, 399:19, 399:21, 399:24, 406:21, 465:5, 465:6, 483:16, 494:6, 503:12, 508:17, 509:4
impartially 308:13, 334:24, 388:22
important 293:10, 296:18, 314:19, 351:12, 372:4, 457:25, 512:10, 530:1, 531:18
importantly 352:8
impose 345:6, 451:22
impression 524:22
improper 392:6, 392:7, 392:17, 393:23, 394:1
in-car 497:14
in. 340:12, 523:22
inability 270:24, 379:9
incarcerated 488:6
incident 284:8
inclined 283:22, 321:14
include 276:23, 277:2, 277:13, 310:24, 412:4, 439:15
included 279:5
includes 336:7, 427:13,

505:6
**including** 505:6, 505:7
**increase** 529:4, 529:8
**indicate** 486:7
**indicated** 354:25, 355:1, 417:25, 431:20, 434:20, 457:15, 467:7, 478:12, 489:7, 496:7, 528:17
**indictment** 459:16, 521:24, 522:7, 526:25, 527:13, 527:14, 528:7
**indifferent** 398:4
**indirect** 386:7
**individual** 382:11, 394:5, 502:11, 513:11, 528:11, 530:19, 531:1
**individuals** 278:7, 282:20, 384:23, 503:1, 505:8
**indoor** 485:13
**industries** 495:20
**influenced** 520:18
**information** 280:23, 283:21, 317:14, 321:18, 355:23, 357:1, 360:1, 375:11, 375:17, 376:5, 377:8, 377:9, 380:2, 394:18, 397:25, 422:8, 447:14, 483:5, 500:21
**informational** 482:11
**informed** 525:25, 530:6
**infrastructure** 289:10
**initials** 477:6
**injecting** 416:6
**injury** 498:13
**innocence** 270:6, 276:2, 277:14, 277:18, 279:2, 280:19, 283:4, 304:14, 329:13, 339:10, 348:12, 348:17, 359:21, 378:7, 389:11, 396:3, 406:2, 422:13, 433:14, 433:19, 433:22, 475:4, 495:3, 495:10, 502:9, 502:10, 507:9, 508:14
**Innocent** 276:1, 331:14, 331:15, 360:5, 406:14, 406:23, 407:7, 433:23, 474:25, 507:8
**inside** 308:10, 467:15
**Insofar** 416:18
**inspected** 289:9
**inspector** 289:9

**inspired** 306:11
**installer** 289:3
**instance** 322:17, 398:11, 524:13
**instances** 281:8
**Institute** 304:18, 482:24
**institutions** 299:16
**instruct** 302:19, 326:16, 327:3, 336:18, 363:13, 364:3, 393:4, 413:10, 418:2, 427:3, 427:25, 489:23, 506:18, 520:19
**instructed** 373:22, 390:9, 411:2, 411:6, 411:10, 427:20
**instruction** 319:24, 327:15, 327:18, 327:22, 336:23, 336:25, 337:3, 373:15, 374:9, 374:14, 404:12, 414:6, 414:14, 427:11, 427:13, 428:3, 439:20, 439:21, 439:24, 449:6, 449:11, 459:25, 460:7, 471:14, 471:19, 520:11, 527:16
**instructor** 480:4
**instructors** 479:4
**instructs** 276:1, 414:2, 448:13, 480:18
**insurance** 505:3
**intelligence** 513:9
**intensive** 496:14
**intent** 284:6, 322:15, 322:16
**intention** 529:22, 529:25
**inter-disciplinary** 457:6
**interaction** 453:8
**interactions** 431:6
**intercepts** 411:16, 411:17
**interest** 452:11, 516:6, 524:3
**interested** 320:11
**interesting** 383:11, 419:25, 420:6, 465:25, 512:2
**Interestingly** 320:5
**interfere** 316:7, 316:8, 453:25
**intern** 375:24
**internet** 493:19
**interpose** 392:4, 415:5
**interpret** 295:23
**interpreter** 295:22, 295:25, 296:5
**interpreting** 457:7

**interrupt** 506:15, 520:24
**Interstate** 334:7
**Intervention** 375:25
**interviewed** 520:10, 526:18
**interviewing** 404:17, 414:17, 440:7, 501:5
**intimidating** 394:17
**intoxicated** 487:24
**invalid** 274:2
**invariably** 514:4
**inventory** 446:11
**invest** 525:6
**investigate** 402:9
**investigation** 272:4, 402:11
**investigations** 442:7, 442:16
**investment** 442:12
**invited** 362:9, 517:2
**involve** 326:15, 353:19, 372:4, 426:17
**involved** 281:17, 291:1, 299:16, 313:17, 317:11, 334:16, 375:23, 377:3, 379:24, 382:12, 384:4, 399:22, 403:4, 405:11, 436:8, 437:19, 441:3, 461:20, 479:12, 481:12, 515:13, 516:16, 523:10, 526:6
**involvement** 403:13, 488:14, 518:11
**involves** 271:14, 317:9, 328:20, 330:16, 330:20, 335:7, 344:13, 347:15, 355:14, 371:14, 377:1, 389:16, 392:10, 403:21, 413:3, 423:6, 426:21, 428:24, 439:1, 450:17, 454:1, 454:6, 455:2, 455:20, 472:18, 474:12, 523:25
**involving** 272:19, 293:1, 296:8, 297:3, 297:14, 359:25, 411:18, 465:3, 498:12
**Iraq** 377:23, 407:21, 415:7, 415:9, 417:4, 417:11
**irrigation** 443:20
**Irving** 478:2
**ISD** 462:23, 467:19
**Islam** 305:16, 330:25, 423:6, 454:2, 454:7
**Islamic** 330:10, 349:25, 358:24, 367:23, 422:23,

463:12
**Israel** 305:22, 307:6, 494:3, 509:1, 509:3
**Israel-palestinian** 331:9
**Israeli** 398:11
**Israeli-palestinian** 307:1, 397:9, 397:19, 426:8, 462:19
**Israli-palestine** 321:7
**issue** 300:19, 312:4, 312:5, 312:6, 313:17, 314:11, 315:22, 320:17, 322:14, 336:5, 341:4, 341:18, 341:23, 343:4, 353:8, 357:3, 371:18, 374:8, 383:17, 383:24, 383:25, 390:6, 411:19, 426:8, 453:4, 493:24, 523:25, 524:19, 525:15, 526:7, 526:19, 527:19, 530:12
**issued** 374:9, 412:4, 412:11
**issues** 284:11, 307:5, 307:8, 313:12, 313:15, 370:23, 381:10, 399:23, 403:6, 404:10, 426:18, 429:22, 434:2, 434:7, 444:17, 444:23, 519:12
**item** 523:23
**items** 302:25, 303:5, 327:8, 327:17, 327:22, 336:14, 336:21, 337:4, 337:6, 353:25, 354:4, 364:8, 364:9, 364:11, 372:18, 372:19, 372:25, 373:1, 373:11, 373:18, 373:23, 374:1, 374:9, 374:10, 374:13, 390:3, 413:15, 427:14, 439:12, 439:16, 439:17, 448:22, 448:25, 449:1, 449:9, 460:10, 471:6, 471:17, 471:18, 480:17
**itself** 466:3, 524:8

**< J >**
**Jacks** 267:25, 270:14, 280:10, 281:6, 281:11, 394:3, 415:4, 415:20, 415:23, 417:4, 434:14, 434:17, 440:4, 445:13, 445:16, 455:25, 456:5, 460:20, 466:21, 467:1, 476:7, 476:9, 485:15, 485:18, 496:2, 496:4, 503:20, 503:23,
508:19, 514:15, 514:18, 520:7
**Jackson** 333:11, 333:14, 333:15, 333:18, 333:22
**jail** 338:16, 338:19, 444:22, 444:23, 478:14
**Jamal** 399:10
**JDP** 477:5, 477:7
**Jersey** 491:21, 492:6, 497:4, 497:7, 498:7
**Jewelers** 425:14
**jewelry** 359:9
**Jim** 267:25, 434:16, 445:16, 456:5, 467:1, 476:9, 485:18, 496:3, 503:23, 514:18
**job** 283:25, 284:1, 285:12, 285:13, 293:14, 294:3, 295:23, 309:2, 315:24, 315:25, 333:21, 333:22, 342:25, 345:18, 351:11, 352:15, 352:16, 354:25, 368:3, 371:20, 371:25, 390:17, 402:15, 444:8, 444:10, 469:11, 471:11, 479:1, 487:1, 501:3, 505:5, 509:9
**jobs** 469:1
**JOE** 267:17
**John** 498:8, 526:11
**Johnson** 282:3, 282:4, 286:11, 286:15, 292:4, 476:18, 477:25
**JONAS** 267:26, 521:13, 521:16, 522:10, 522:18, 523:1, 523:19, 523:25, 525:2, 525:24, 526:22, 527:5, 527:20, 527:25, 528:1, 528:5, 528:8, 531:25
**Jose** 504:10
**JOSHUA** 268:3, 268:4
**journalist** 511:3, 512:17, 512:18
**journalistic** 513:22
**Journalists** 513:24, 514:4
**Jr** 282:3
**judged** 319:20
**judgment** 513:10, 519:3
**Judicial** 358:12, 358:16, 358:17, 514:3, 533:11
**Jumbotron** 482:15

**June** 310:10, 451:13
**junior** 487:10
**junkie** 510:4
**juries** 357:7, 361:24, 420:2
**jurisdictions** 524:6
**jurors** 270:18, 272:15, 277:24, 279:17, 281:9, 281:12, 281:20, 315:12, 371:4, 375:2, 393:14, 393:23, 394:17, 458:4, 529:7, 529:11
**JUSTICE** 267:30, 378:6, 447:11, 488:23

**< K >**
**Keep** 291:7, 357:4, 365:14, 368:22, 369:9, 381:16, 382:14, 391:17, 391:18, 465:5, 470:8, 488:9, 512:14
**keeps** 378:13
**kept** 285:16, 331:8, 368:13, 484:17
**Kiblinger** 344:4, 355:3, 394:21
**kids** 443:24, 466:1, 466:5, 485:5
**killed** 331:14
**killing** 406:11, 406:23
**kilter** 523:17
**Kind** 272:10, 293:24, 299:11, 313:25, 332:18, 340:15, 349:16, 350:2, 352:1, 366:13, 382:6, 394:18, 398:3, 398:13, 403:4, 410:16, 429:9, 431:15, 433:5, 436:3, 439:23, 442:20, 446:12, 458:7, 458:16, 475:16, 477:8, 479:13, 484:2, 487:2, 489:2, 493:10, 494:5, 502:12, 511:21, 512:14, 513:23, 518:25, 531:9
**kinds** 284:10, 382:5
**Klezmet** 392:3
**Knowing** 272:19, 355:24, 359:23, 359:25, 371:22, 422:4, 430:16, 502:24
**knowingly** 302:6, 353:23, 364:5, 371:15, 372:11, 373:2, 373:23, 373:25, 374:12, 389:17, 404:3, 413:4, 413:13, 414:4, 426:22, 428:2

**knowledge** 312:6, 416:25, 438:4, 455:3, 465:7, 507:1, 519:9
**knowledgeable** 417:5
**known** 320:21, 330:9, 341:2, 367:25, 380:17
**knows** 301:18, 519:19, 521:3
**Koran** 305:24, 306:9, 512:3, 519:18
**KVIL** 397:16

**< L >**
**L.** 268:4, 268:38, 533:3, 533:15, 533:17
**Lab** 356:23
**labor** 513:6
**lack** 339:20, 374:24
**Ladies** 269:2, 315:16, 375:9, 376:7, 391:19, 520:23, 531:23
**laid** 333:22
**Lake** 333:11, 333:13, 333:15, 333:17, 333:22
**landlocked** 340:2
**landscaping** 443:19, 446:24
**language** 290:22, 301:16, 301:18, 364:22
**languages** 364:21
**large** 435:3, 527:18
**largely** 416:25
**last** 270:19, 275:2, 289:10, 306:4, 307:5, 379:1, 415:16, 421:10, 445:3, 450:21, 451:16, 462:4, 464:17, 464:24, 500:11, 500:13, 520:14, 524:1, 524:2, 524:16
**lasted** 447:19
**later** 439:12
**Latin** 305:3, 305:6
**latitude** 394:10
**Lawful** 277:6
**Lawfully** 412:20, 412:22
**lawns** 369:19
**laws** 448:15, 470:10
**lawsuit** 518:13
**lawsuits** 504:25
**lawyer** 365:11, 371:23, 376:22, 395:8, 435:11, 436:17, 437:11, 481:8,

490:21, 509:21
**lawyers** 269:13, 280:17, 282:8, 282:9, 303:22, 317:2, 328:16, 338:1, 358:14, 376:20, 379:19, 395:8, 435:2, 435:12, 435:13, 436:12, 437:6, 437:14, 450:13, 461:12, 472:11, 490:21, 500:12, 505:1
**lay** 280:21
**laymen** 276:5, 504:23, 504:24
**lead** 304:23
**leader** 294:1, 356:15, 384:11
**leading** 279:21, 280:7, 280:9, 281:7, 281:16, 281:22, 281:24, 392:8, 393:15
**learn** 493:17
**learned** 285:25
**learning** 349:6, 358:13, 358:16, 382:16, 481:25, 482:2
**least** 278:15, 292:6, 303:11, 328:5, 329:9, 343:18, 354:16, 361:14, 379:1, 383:6, 391:8, 404:19, 411:8, 414:19, 418:17, 457:16, 516:23, 517:16, 519:11, 524:22, 525:12, 527:10, 529:18
**leave** 270:20, 292:7, 293:23, 303:12, 307:20, 527:1, 527:7, 527:8
**leaving** 491:21
**lectures** 482:7
**led** 385:1
**ledger** 408:6
**left** 342:5, 489:2, 523:3, 531:2
**legal** 277:4, 277:6, 280:16, 281:6, 300:6, 300:12, 300:13, 313:14, 313:16, 403:4, 444:15
**legally** 277:3, 501:1, 506:1
**legitimate** 280:4
**length** 316:4, 359:18, 451:19, 501:8
**lenses** 274:8
**Leslie** 435:8
**Less** 293:16, 297:5, 299:1, 359:12, 360:2, 433:7, 433:8,

433:10, 451:21, 520:18
**lesson** 281:10
**lessons** 280:12
**letter** 391:2, 391:15, 391:19, 392:2, 467:12
**letterhead** 391:21
**letting** 279:25
**level** 312:24, 387:13
**levels** 411:22
**Levitt** 521:23, 522:6
**Lew** 419:12
**Liberty** 274:20
**Library** 302:22, 327:1, 327:17, 336:15, 347:19, 354:1, 372:15, 390:3, 413:17, 414:5, 414:12, 421:20
**life** 291:16, 295:3, 308:3, 340:6, 347:11, 351:7, 380:21, 382:16, 383:8, 383:9, 383:12, 388:8, 445:21, 504:5, 506:13, 515:7, 519:23
**Lifetime** 319:16
**light** 521:20
**likelihood** 490:24
**likely** 522:11
**limit** 376:9, 415:25, 416:6
**limits** 334:7
**Linda** 268:22, 268:23, 271:9, 292:17, 344:9, 355:9, 393:15, 417:18, 428:18, 450:12
**line** 466:5
**Lintz** 425:14
**liquid** 334:11
**list** 269:5, 269:8, 343:25, 354:24, 375:13, 510:21, 528:20, 528:21
**listed** 477:2
**listen** 275:5, 278:18, 292:10, 315:14, 328:8, 337:16, 343:20, 354:19, 365:5, 375:6, 379:4, 391:13, 397:12, 404:23, 414:23, 421:13, 428:13, 440:14, 449:23, 461:4, 465:18, 472:4, 481:3, 490:16, 500:6, 506:14, 520:21
**listened** 384:2
**listening** 362:14, 465:10
**lists** 456:12
**litany** 278:24

**litigation** 435:2, 435:5, 436:2
**little** 280:11, 280:12, 286:8, 291:1, 296:7, 300:8, 317:3, 317:4, 353:4, 356:1, 362:21, 377:12, 384:8, 402:6, 430:17, 430:22, 442:24, 451:15, 453:20, 461:23, 462:6, 469:17, 491:8, 492:1, 493:25, 494:19, 495:17, 500:20, 512:3, 513:18, 516:9, 519:20
**live** 274:18, 287:16, 308:7, 331:20, 332:10, 333:10, 333:13, 334:4, 334:7, 347:12, 347:13, 361:7, 361:16, 369:23, 423:24, 462:16, 467:23, 491:18, 493:9, 493:10, 504:9, 506:6
**lived** 274:15, 274:20, 286:1, 287:12, 294:24, 319:10, 323:18, 332:4, 333:15, 333:17, 351:4, 351:6, 361:13, 369:25, 402:22, 424:14, 445:20, 467:25, 486:15, 486:16, 491:12, 491:15, 491:20, 497:8, 504:4, 504:11, 504:12
**lives** 276:22, 310:14, 311:11, 334:19, 338:24, 361:8, 468:10
**living** 360:17, 408:4, 468:7, 486:5
**load** 340:22
**loading** 311:1
**loan** 367:14
**loans** 367:11
**Local** 348:2, 479:21
**located** 386:13, 418:12, 456:21, 477:13, 479:20
**location** 479:7
**locations** 479:18
**lodge** 517:10
**logistical** 401:24
**longer** 365:3, 499:2, 499:7, 516:1, 518:22, 522:15, 522:25
**longest** 390:18
**look** 297:25, 308:13, 321:14, 359:5, 393:21, 407:9, 416:4, 423:6, 432:8, 432:9, 434:8, 435:4, 452:22, 454:6

**looked** 311:14, 330:25, 368:13, 397:19
**Looking** 308:10, 308:11, 321:5, 352:18, 352:24, 361:20, 362:13, 383:19, 417:22, 454:1, 458:14, 508:25, 523:10
**looks** 323:24, 529:15
**Lopez** 292:14, 292:16, 297:19, 297:21, 303:9
**lose** 345:14, 345:18, 444:7, 444:9
**losing** 354:25
**lost** 416:7, 475:16
**lot** 279:18, 283:6, 286:21, 305:4, 305:22, 305:23, 307:8, 325:17, 331:13, 331:15, 332:13, 332:14, 356:6, 368:4, 371:20, 377:20, 381:20, 396:17, 397:23, 397:24, 415:18, 438:7, 453:19, 469:25, 475:17, 482:24, 484:14, 484:15, 494:22, 512:19, 520:8, 523:9, 523:11, 523:13, 530:24
**love** 286:10, 411:11, 518:24
**loved** 284:14, 288:11
**low** 391:24
**luck** 452:16
**Lucky** 357:9
**Luis** 339:23
**lunch** 285:12, 375:10, 376:9, 376:14, 522:23
**luxury** 500:16

**< M >**
**ma'am** 271:25, 273:10, 273:17, 318:12, 323:13, 355:3, 390:12, 423:16, 428:5, 449:15, 466:19
**machines** 334:11, 477:11
**machinist** 477:2
**mail** 286:6, 288:22, 359:16
**Mainly** 340:13
**maintenance** 386:21
**major** 305:9, 457:5
**Mallick** 268:32
**Man** 316:17, 319:22, 384:25, 385:12, 385:13, 397:14,

435:9, 435:10
**management** 479:24, 501:7
**Manager** 369:18, 408:5, 479:25, 480:2, 480:4, 480:5, 504:22
**managers** 442:12
**manufacture** 477:9
**Manufacturing** 477:5, 477:7
**maps** 321:15
**marijuana** 325:19
**mark** 319:23, 334:12
**marked** 290:11, 300:5, 323:18, 334:15, 364:20, 386:15, 386:25, 387:9
**Marlo** 268:13, 268:14, 437:15
**married** 273:23, 286:21, 298:4, 309:19, 313:9, 323:5, 323:6, 350:18, 369:11, 386:16, 400:15, 410:12, 425:17, 443:16, 497:7
**Marvel** 509:12, 509:14, 509:19, 514:16, 514:18, 514:22, 514:23, 520:8, 521:2
**Maryland** 361:17, 497:9
**Mason** 396:11, 396:13, 396:14
**Masons** 396:8, 396:15, 396:19, 396:25, 397:6
**master** 376:2
**masters** 498:8
**materially** 271:16, 296:9
**materials** 326:20, 386:6, 386:7, 386:9, 386:11, 446:14
**math** 451:24, 452:2, 452:4
**matter** 331:15, 443:23, 444:6, 466:1, 474:21, 518:7, 526:22
**matters** 313:15, 313:17, 316:9, 376:10, 392:10, 521:14, 521:16
**Matthew** 521:23
**maximum** 390:21
**Mcgonigle** 510:14, 510:21
**Mckinney** 268:15
**mean** 272:21, 275:3, 276:4, 278:2, 289:22, 290:18, 320:1, 320:2, 320:10, 322:16, 345:23, 348:7, 363:24, 382:2, 388:24, 398:8, 411:20,

420:12, 427:22, 429:23, 431:24, 432:2, 439:22, 447:3, 448:7, 490:13, 493:6, 503:3, 504:23, 506:15, 507:2
**meaning** 295:6, 295:11, 504:25
**means** 284:5, 297:11, 348:15, 383:19, 432:24, 434:24, 513:17
**meant** 470:12, 480:10
**meantime** 440:10, 449:19
**mechanical** 495:15, 495:20, 500:25
**mechanics** 308:21
**Media** 270:21, 271:19, 278:18, 292:10, 292:23, 304:8, 328:8, 337:17, 343:21, 354:19, 365:6, 366:9, 366:12, 366:17, 375:6, 379:5, 391:11, 391:13, 404:23, 405:16, 405:17, 405:19, 407:10, 407:24, 414:23, 421:7, 422:1, 428:12, 434:21, 435:7, 440:13, 449:22, 461:2, 472:3, 481:2, 490:15, 500:5, 508:5, 520:17
**Medical** 291:25, 298:8, 302:23, 310:2, 311:22, 311:23, 327:2, 327:17, 336:15, 372:16, 373:1, 413:17, 427:15, 439:13, 460:11, 470:21
**medicine** 347:18, 372:18, 374:10, 430:5
**medicines** 404:6
**Medina** 501:19, 501:21, 503:21, 503:23, 507:25, 508:8, 508:20
**meet** 413:8, 436:12, 461:11, 497:2
**meeting** 518:1
**Mejia** 376:19, 378:19, 378:21, 378:23, 379:9, 379:13
**Melbourne** 423:23, 423:25
**member** 349:22, 375:18, 418:1, 453:21
**members** 301:2, 303:9, 337:12, 365:1, 392:25, 414:17, 428:7, 449:17,

460:23, 471:23, 480:22, 490:11, 499:25, 508:1, 511:20, 520:9, 520:12
**memory** 517:25, 518:10
**men** 317:11, 318:24, 320:14, 320:20, 320:21, 328:22, 338:7, 365:20, 365:24, 377:2, 377:17, 379:24, 381:11, 405:11, 439:2, 441:2, 448:1, 459:15, 461:20, 464:22, 465:3, 469:21, 481:12, 491:3, 494:7, 494:10, 494:24, 503:10, 517:3
**mention** 347:25, 518:6
**mentioned** 287:10, 287:22, 288:21, 299:14, 312:10, 313:10, 317:25, 324:10, 325:10, 362:7, 388:11, 389:2, 389:15, 403:4, 405:5, 410:23, 411:18, 412:23, 423:20, 424:18, 439:1, 444:14, 447:24, 478:18, 492:24, 518:9
**Mesquite** 351:6
**message** 314:13
**met** 517:9
**metal** 273:12, 278:24, 287:3, 298:10, 456:16
**Metro** 516:4
**metroplex** 369:20
**Mexico** 294:22, 294:24, 339:22, 340:1, 486:8
**Michigan** 425:10
**Microprocessors** 495:25
**mid-morning** 522:22
**Middle** 291:12, 312:4, 321:6, 330:4, 330:7, 340:1, 451:24, 467:21, 487:10, 514:7, 514:10
**Midland** 313:6, 402:21
**Mike** 397:14
**miles** 333:18, 334:7, 368:17
**military** 284:22, 285:13, 287:17, 287:23, 288:25, 329:18, 407:13, 448:20, 478:10
**milk** 347:20, 430:5
**million** 382:4
**mind** 279:25, 280:13, 317:20, 366:12, 366:17,

417:10, 434:20, 445:19, 456:9, 485:21, 492:9, 496:7, 498:3, 504:2, 517:10
**minded** 494:21
**mine** 306:17, 397:22, 417:1, 436:10
**minimum** 529:10
**ministry** 304:23
**minor** 447:9, 457:8
**minute** 291:7, 428:24, 429:20, 440:2
**minutes** 269:14, 282:9, 303:24, 328:17, 338:2, 370:21, 376:21, 376:23, 379:21, 395:9, 405:3, 415:17, 440:22, 450:6, 461:14, 472:12, 472:13, 481:9, 483:8, 490:23, 490:24, 509:22
**misdemeanor** 474:21
**missed** 309:18
**misses** 513:12
**missing** 283:13, 527:17
**mission** 305:4
**missionary** 454:16, 454:17, 454:21, 455:2
**misstated** 529:12
**mistake** 290:18, 290:19, 335:2
**mistrial** 358:9
**moderated** 307:7
**Molesta** 300:22
**Molestation** 300:20
**molested** 296:6, 300:24
**Mom** 299:18, 299:20, 330:7, 350:6, 484:25, 485:4
**moment** 314:6, 316:21, 375:11, 465:2, 465:25, 521:12, 526:8, 528:15
**Monday** 395:22, 521:22, 522:4, 522:6, 522:15, 522:21, 522:22, 522:25
**month** 298:15, 401:4, 401:15, 401:23, 476:2
**months** 271:12, 287:18, 292:19, 293:16, 294:3, 300:11, 314:21, 329:10, 341:14, 342:8, 342:22, 345:6, 345:10, 351:25, 355:11, 359:12, 381:23, 381:24, 383:9, 451:21, 464:17, 483:8,

483:22, 484:3, 485:10,
497:25, 500:11, 505:15,
526:1
**Moreno** 268:22, 268:23,
271:8, 271:9, 275:13, 275:20,
276:25, 279:23, 280:1,
281:15, 292:17, 295:10,
297:18, 300:18, 301:19,
344:9, 350:9, 350:17, 351:10,
353:4, 355:9, 357:19, 361:6,
362:8, 362:21, 362:25,
417:18, 425:3, 426:20,
428:18, 434:11, 450:10,
450:12, 455:22, 459:9
**mornings** 341:22, 452:14
**Morton** 365:8, 369:1, 369:3,
375:1
**MOS** 285:6
**Mosque** 511:18, 511:24,
512:2, 516:20, 517:2, 517:4,
517:5, 518:2, 518:3
**Moss** 461:6, 461:8, 466:22,
471:22
**mostly** 369:20, 402:8,
495:19, 516:14
**mother** 273:10, 273:11,
274:3, 275:18, 517:17
**mother-in-law** 338:23,
339:1, 342:5, 342:7
**motives** 417:8
**Mount** 287:19, 287:21
**Mountain** 425:13
**mounted** 497:18, 497:21
**mounts** 497:21
**move** 270:23, 278:22,
315:20, 370:4, 459:5, 480:4,
486:10, 486:13, 512:15,
527:1
**moved** 287:19, 304:20,
305:1, 331:25, 361:21, 370:2,
478:3, 478:8, 491:20, 497:7,
504:11, 504:13
**moves** 316:10
**moving** 390:19, 401:23,
526:23
**MS. CADEDDU** 318:12,
385:3, 393:13, 444:14, 493:3
**MS. HOLLANDER** 526:8,
527:22, 530:5
**Mufid** 268:10, 289:14

**mugged** 273:1
**multi-cultural** 497:5
**multi-month** 381:10, 500:14
**multiple** 525:15
**mumbled** 509:5
**murder** 499:17, 499:18
**Muslims** 284:21, 330:10,
330:13, 330:17, 340:25,
341:5, 346:22, 358:21,
367:22, 380:15, 380:20,
385:15, 398:17, 408:11,
408:21, 422:16, 430:24,
431:1, 431:14, 443:4, 453:6,
463:11, 473:9, 483:12, 484:7,
484:11, 492:5, 492:8, 503:6,
508:9, 508:18, 511:22
**Mutual** 425:10
**myself** 314:1, 502:25, 514:4,
528:10, 531:20
**mystery** 519:18

**< N >**
**nail** 499:20
**namely** 469:22
**NANCY** 267:41
**Nathan** 267:28, 273:18,
273:20, 286:16, 297:22,
309:13, 322:24, 333:2,
350:14, 360:12, 369:5,
385:23, 400:11, 410:8,
423:16
**nation** 495:1
**National** 515:6
**nationality** 381:3
**nationwide** 456:21
**natural** 519:1, 525:21,
525:22
**naturalized** 424:6, 424:10,
486:18
**nature** 279:19, 280:11,
348:5, 373:12, 433:12,
460:12, 490:5, 499:19
**Navy** 311:15, 311:17
**near** 375:9
**necessarily** 294:17, 306:11,
308:5, 308:21, 454:15,
516:25
**need** 272:14, 277:23, 307:8,
359:2, 375:15, 376:8, 380:12,

409:19, 409:20, 412:2,
413:24, 452:19, 453:14,
460:2, 477:12, 479:9, 501:3,
502:20, 504:15, 526:20,
529:10, 529:12, 529:14,
529:18, 530:11, 531:6
**needed** 521:14, 530:21
**needs** 332:17, 343:24
**needy** 421:21
**negative** 347:4, 349:11,
349:20, 358:18, 423:2
**neighbors** 278:9, 325:17
**neither** 376:4
**nervous** 332:22, 381:5,
381:8, 381:12
**nest** 324:5
**New** 268:6, 323:4, 358:13,
401:23, 491:21, 492:6, 497:4,
497:7, 498:6, 498:7
**Newark** 491:16, 491:22,
492:18, 498:11
**News** 282:25, 293:4, 320:12,
338:19, 348:1, 355:20, 363:7,
380:6, 384:3, 397:18, 451:7,
451:16, 462:13, 493:9,
493:18, 493:21, 508:25,
510:4, 510:6, 510:14, 511:13,
511:21, 515:2, 515:17,
515:19, 516:2, 516:5, 516:7,
518:14
**newsman** 519:1
**newspaper** 510:3, 513:3,
513:8, 513:14, 513:17, 515:8,
515:12
**newspapers** 272:22, 293:4,
407:25, 462:1, 465:13,
469:15
**next** 271:3, 271:6, 282:2,
298:15, 315:20, 316:22,
344:5, 355:4, 370:5, 381:23,
387:12, 394:22, 401:4,
401:15, 411:20, 417:16,
471:3, 488:13, 509:13,
521:17, 523:24, 528:7
**Nice** 288:12, 288:13, 332:15,
408:18, 409:21, 461:11
**night** 307:22, 341:22, 342:1,
342:19, 410:25, 450:21,
451:16, 522:20
**nine** 269:4, 289:4, 532:3

**nineteen** 311:10, 370:9
**nineteen.** 311:6, 366:25, 370:19
**nitrogen** 334:11
**NM** 267:46
**noise** 325:17
**None** 320:4, 342:17, 359:15, 398:24, 435:12, 521:8
**Nonetheless** 284:8, 417:12, 483:12, 520:19
**nonprofit** 418:3
**noon** 375:9, 521:13
**Nor** 278:17, 292:9, 328:8, 337:16, 343:20, 354:19, 365:5, 375:6, 379:4, 404:5, 404:22, 414:22, 531:3
**normal** 381:21, 437:2, 494:20
**normally** 448:14, 515:25, 524:7, 530:25
**North** 311:11, 311:12, 475:23, 475:24, 504:17, 504:21, 510:12
**NORTHERN** 267:2, 267:31, 476:10, 533:19
**note** 375:14
**noted** 315:22
**notes** 514:2
**Nothing** 273:14, 279:23, 291:8, 295:17, 314:2, 356:10, 362:8, 362:11, 412:17, 423:4, 431:13, 431:18
**notice** 313:14, 491:15, 498:25
**noticed** 403:2
**notifications** 442:10
**notify** 442:12
**notion** 279:5
**notions** 293:9, 319:3, 347:7, 453:15
**notwithstanding** 529:24
**NUMBER** 267:7, 269:7, 283:19, 299:15, 344:5, 355:4, 375:13, 375:18, 394:22, 418:5, 418:16, 497:16, 509:13, 511:18, 515:12, 529:4, 529:8, 529:9, 529:10, 533:21
**numbers** 528:14
**nurse** 309:25, 400:21, 496:8,

496:19, 496:22
**NY** 268:6

**< O >**
**o'clock** 269:4, 451:7, 532:3
**Oak** 368:16, 369:23, 387:23
**oath** 356:25
**Obispo** 339:23
**object** 279:14, 295:16
**objecting** 415:19, 415:24
**objection** 271:1, 271:2, 279:9, 279:13, 279:22, 379:12, 392:5, 393:15, 416:19, 523:7, 528:2
**objections** 415:5, 416:15, 416:18
**obliged** 416:18
**Observer** 515:6
**obtain** 281:21
**Obviously** 300:23, 362:11
**occasion** 436:14, 516:22
**Occasionally** 321:17, 321:18
**occasions** 516:24
**occupation** 477:2, 485:22
**occupies** 512:9
**October** 310:10, 310:12
**Odeh** 268:28
**Odessa** 478:9
**offended** 512:11
**offense** 442:21
**offer** 305:12, 353:2
**offers** 442:11
**Office** 268:4, 268:14, 268:23, 288:25, 289:5, 323:1, 375:19, 400:24, 402:21, 467:16, 469:5, 469:12, 524:12
**office.** 392:2
**officer** 283:11, 283:15, 319:5, 319:12, 357:16, 447:15
**officers** 319:19, 505:8
**official** 533:5
**often** 281:12, 420:22, 436:15, 459:11, 475:25
**Ohio** 388:4
**oil** 329:22, 329:23
**okayed** 359:17
**Oklahoma** 475:24
**old** 274:13, 278:3, 287:8,

299:6, 341:11, 387:4, 402:25, 419:5, 419:7, 464:7, 468:8
**older** 330:6, 485:11
**oldest** 444:22, 445:4
**Olguin** 337:19, 337:23, 343:12, 343:14
**Once** 290:8, 326:25, 353:24, 416:3, 436:14, 457:16, 458:17, 476:1, 529:25, 530:18
**one-** 499:6
**One.** 284:23, 346:23, 382:5, 383:15, 492:22
**ones** 284:14, 399:2
**ongoing** 520:13
**open** 280:23, 314:16, 351:21, 381:16, 382:15, 484:13
**open-ended** 281:22, 281:24
**open-minded** 465:20
**opening** 522:9, 522:11
**openings** 521:25
**operate** 321:1, 385:7
**operates** 384:16, 407:18
**operation** 441:21
**opinion** 270:5, 270:11, 280:1, 280:2, 283:3, 284:16, 304:13, 307:2, 321:8, 329:12, 330:23, 388:23, 388:25, 389:7, 396:2, 396:6, 398:1, 398:6, 406:1, 406:15, 406:22, 407:4, 407:5, 422:8, 423:1, 429:24, 432:3, 432:7, 441:13, 443:23, 454:10, 462:11, 493:12, 493:22, 502:9, 502:12, 506:13, 508:12, 513:1
**opinions** 272:7, 273:5, 273:16, 281:19, 293:10, 331:11, 339:9, 339:15, 349:9, 380:9, 380:12, 406:25, 422:6, 426:15, 429:21, 462:9, 465:16, 512:20
**opportunity** 277:1, 345:18, 354:25, 387:21
**opposed** 281:22, 316:12, 488:19, 499:15, 508:20
**opposite** 398:14
**option** 528:1
**Optometric** 274:5, 274:6

**order** 299:23, 342:25, 393:18, 437:24, 521:20, 530:15
**ordering** 479:15
**orders** 446:10
**ordinary** 519:4
**organizations** 302:16, 364:2, 365:24, 406:12, 409:14, 413:19, 439:10, 455:17
**organize** 299:23
**organizing** 485:6
**orientation** 349:24, 421:15
**origin** 419:2
**original** 359:15, 391:18, 420:20
**Originally** 313:8, 419:4, 421:9, 478:6, 516:5
**ostensibly** 353:25
**others** 278:19, 292:11, 303:15, 315:15, 328:10, 337:18, 343:22, 354:21, 365:7, 375:8, 379:6, 404:24, 449:24, 517:1
**otherwise** 284:18, 322:1, 322:14, 433:24, 511:6
**ought** 382:1, 511:15
**outcome** 352:2
**outlined** 522:17
**Outside** 286:23, 305:23, 309:22, 334:5, 338:12, 361:7, 369:13, 387:6, 387:8, 400:17, 465:12, 524:11
**overbearing** 393:14, 394:17
**overcome** 348:17
**overnight** 520:25, 526:14, 526:20
**Overruled** 295:18
**overseas** 291:22, 302:16, 326:25, 439:8, 459:17
**overseeing** 487:2
**Ovilla** 370:5
**owed** 420:18
**own** 305:14, 305:24, 321:17, 359:3, 359:7, 384:24, 416:7, 423:4, 454:9, 454:10, 454:11, 474:24, 513:9, 531:2
**owned** 456:22, 479:17
**owner** 435:8, 498:1
**oxygen** 334:11

**< P >**
**P.** 268:14
**p.m.** 375:20
**packing** 311:1
**page** 344:24, 488:13
**pages** 533:7
**paid** 294:8, 294:11, 338:24, 345:11, 345:12, 469:25, 518:16
**Palestine** 305:22, 321:3, 347:17, 385:7, 407:22, 417:11, 429:14, 430:3, 430:7
**Palestinian** 312:5, 421:19
**Palestinian-israeli** 305:19, 320:7, 320:17, 368:14, 383:25, 406:10, 415:9, 431:21, 484:18, 492:25, 493:23
**Palestinians** 398:16
**pallet** 340:23
**palletizing** 340:13
**pallets** 340:14
**panel** 348:22, 375:2, 458:10, 471:23
**paper** 269:23, 291:9, 308:21, 344:20, 408:25, 431:24, 462:10, 472:22, 491:11, 515:25, 518:17
**papers** 435:5, 502:20, 506:1
**paperwork** 505:1
**paralegals** 436:13
**parents** 278:4, 333:23, 452:3, 452:18, 459:2
**part** 280:15, 285:14, 289:10, 302:18, 336:7, 336:14, 349:2, 353:8, 353:22, 358:10, 364:2, 364:4, 364:14, 372:6, 372:14, 383:6, 396:10, 396:25, 397:1, 397:5, 416:12, 436:2, 436:3, 436:21, 439:15, 466:1, 466:4, 466:6, 466:8, 468:15, 470:18, 471:4, 474:23, 498:1, 503:8, 505:2, 505:5, 515:25, 527:18
**part-time** 484:22
**participate** 391:23, 506:7
**participating** 376:3
**particular** 279:22, 301:12, 344:15, 362:15, 394:9, 394:12, 400:24, 416:19,

418:9, 418:20, 453:4, 467:20, 479:19, 489:8, 527:3
**particularly** 279:21, 394:15, 503:7, 519:16, 519:21
**parties** 269:10, 282:5, 299:23, 303:17, 316:24, 328:12, 337:20, 344:7, 355:6, 365:9, 375:23, 376:18, 379:16, 395:1, 405:1, 417:17, 428:16, 440:18, 450:9, 458:4, 458:5, 461:6, 472:9, 481:6, 490:18, 501:19, 509:16
**party** 325:16
**Pass** 360:7, 423:12
**passed** 274:3, 445:4, 517:25
**passengers** 307:17
**passing** 441:7, 441:11
**past** 271:19, 315:23, 364:23, 420:4, 429:7, 429:9, 431:14, 450:20, 476:24, 499:1, 502:15
**pastored** 304:24, 305:2
**paths** 517:6
**patient** 293:17, 295:21, 295:24, 356:24
**pay** 294:15, 348:1, 351:25, 421:9, 437:2, 518:18
**paying** 523:12
**payroll** 484:5
**PC** 321:17
**PD** 283:12, 319:9
**peace** 331:21, 447:11
**pendancy** 411:8
**pending** 314:12, 315:23, 325:20, 528:16
**Pennsylvania** 319:11, 478:7
**percent** 297:9, 343:1, 503:17, 507:6, 508:11
**peremptory** 528:23, 529:2, 529:4, 529:11, 529:13
**performed** 402:4
**Perhaps** 293:16, 314:16, 432:4, 529:20
**period** 307:13, 310:16, 313:11, 318:5, 352:21, 389:3, 391:2, 499:7
**periods** 390:15
**permanent** 345:9, 351:22, 352:24
**permit** 379:3

**Personal** 284:17, 316:15, 350:2, 378:13, 383:8, 399:22, 422:23, 452:11, 465:15, 465:16, 498:13
**Personally** 322:9, 376:5, 387:3, 398:18, 431:3, 501:14, 502:17, 525:9
**personnel** 319:20
**persons** 278:13, 418:21, 420:1, 422:19, 422:23, 453:9, 458:5, 505:25, 507:21, 528:15, 529:14
**pet** 468:12
**petroleum** 402:9
**Petty** 275:10
**Philippines** 496:25
**philosophies** 330:24
**phone** 368:4, 368:6, 412:9, 420:20
**physical** 482:3
**physically** 371:10
**pick** 291:9, 310:19, 382:19, 530:8
**picked** 357:9, 530:6
**picking** 273:1
**piece** 513:18
**pieces** 377:12
**Pious** 399:12
**pipe** 386:22, 477:11
**pitch** 500:22
**Pittsburgh** 478:6
**place** 286:2, 289:1, 367:1, 465:25, 491:20, 497:5, 512:9, 527:8
**placed** 351:20
**places** 283:13, 288:16, 350:7, 367:2, 367:3, 367:4, 421:19, 455:6, 482:23
**plan** 342:15
**planned** 501:12, 501:15
**Plano** 497:11
**Plant** 289:2, 386:8, 477:13
**plastic** 477:11
**plate** 336:1
**PLATT** 268:31
**play** 300:3, 486:4
**Plaza** 267:45
**plea** 476:22, 488:19
**Pleasant** 287:19, 287:21, 419:24

**Please** 341:20, 392:1, 418:1, 502:16, 514:17
**pleasure** 324:19
**PLO** 398:14
**plumbing** 477:12
**Plus** 529:12
**PO** 268:24
**point** 281:2, 451:17, 458:1, 470:5, 520:10, 520:24, 529:23
**point.** 281:4, 315:17, 417:2, 426:25, 458:2
**pointed** 459:9
**points** 306:1
**police** 283:7, 283:11, 319:4, 319:12, 319:19, 325:18, 357:16, 447:14, 497:15, 505:7
**policeman** 319:13
**polite** 492:13
**Pool** 278:13, 289:24, 303:10, 312:25, 315:12, 328:3, 337:12, 343:15, 354:14, 360:23, 365:1, 371:4, 391:7, 392:25, 404:17, 414:17, 428:7, 440:8, 449:17, 458:4, 460:23, 480:22, 490:11, 499:25, 508:1, 520:9, 520:12, 529:10
**pooled** 275:1
**popped** 517:23
**popular** 450:1
**pose** 368:18, 464:17
**posed** 499:12
**position** 308:23, 321:21, 321:24, 344:2, 345:15, 351:21, 353:2, 379:10, 426:16, 467:10, 479:24, 504:22, 505:10, 531:7
**positions** 352:18, 496:18
**Positive** 347:3, 347:5, 349:19, 358:20, 423:2
**possession** 334:17
**possessions** 405:23
**possibilities** 352:19, 527:10
**possibility** 308:6, 352:25, 458:8, 527:24, 530:8
**possible** 281:23, 402:10, 501:5, 513:7
**possibly** 284:14, 339:9,

353:2, 483:1
**post** 288:25, 289:5, 467:16, 516:17, 517:12
**Postal** 467:7
**poster** 436:8
**posters** 436:10
**potentially** 345:14, 501:11
**power** 308:23
**practice** 299:22, 310:1, 330:10, 367:23, 409:13, 463:12, 463:22, 485:5, 496:10
**practiced** 492:15, 524:6
**practicing** 285:9, 285:11, 398:22
**Prairie** 386:24, 462:17, 462:23, 467:19, 467:23, 469:7
**pray** 399:10
**pre-judged** 270:25
**preach** 304:23
**precedent** 525:13
**Precision** 456:16
**preclude** 391:25
**preconceived** 293:9, 319:2, 347:7, 453:14
**predisposition** 518:24
**prefer** 502:25
**preference** 527:7
**pregnant** 293:22, 294:13
**prejudgments** 520:2
**prejudices** 272:15, 347:7, 431:15, 453:15
**preliminary** 522:8
**prepaid** 509:5, 509:9
**preparing** 311:1, 517:19
**prerogative** 330:24
**prescribed** 533:11
**present** 299:11, 351:8, 352:8, 438:8, 439:6, 468:7
**presented** 302:1, 346:2, 480:7, 489:1, 528:7
**presenting** 470:2
**presently** 496:10, 497:10
**president** 456:13, 517:2, 518:2
**press** 355:17, 356:11, 450:20
**presume** 276:1, 405:16
**presumed** 474:25

presumption 276:2, 277:14, 277:17, 279:1, 280:19, 348:12, 348:17, 359:21, 378:7, 389:11, 422:13, 433:14, 433:19, 433:21, 475:3, 495:3, 495:5, 495:9, 507:9, 508:14
pretrial 528:22
**Pretty** 294:4, 294:5, 310:15, 311:2, 376:8, 381:14, 397:22, 399:11, 431:4, 431:7, 435:2, 435:21, 436:5, 443:21, 457:10, 494:21, 501:4, 508:16, 531:6
prevent 453:15, 494:6
prevents 281:7
previously 298:18, 478:19, 530:5
primarily 418:4
primary 281:18
principal 459:10, 523:6
**Prior** 289:19, 312:11, 314:2, 324:11, 348:24, 357:7, 359:19, 371:1, 419:8, 422:10, 425:7, 425:9, 425:12, 425:13, 426:25, 445:4, 445:10, 446:7, 446:23, 447:6
prison 444:16, 444:19, 488:10, 513:14
privacy 411:19, 412:14, 412:15
private 350:22, 351:18, 402:13
privately 479:17
**Probably** 286:3, 287:18, 295:3, 325:5, 343:24, 355:19, 366:25, 368:6, 368:17, 374:4, 376:13, 382:1, 384:23, 391:6, 396:12, 403:19, 407:23, 414:16, 414:19, 420:24, 428:8, 437:1, 440:6, 455:13, 461:14, 469:24, 471:9, 471:20, 476:25, 500:12, 510:21, 515:14, 520:14, 520:23, 525:9, 527:10, 527:18, 529:17
probation 444:21
problem 290:20, 299:12, 299:13, 301:14, 303:1, 314:14, 314:15, 316:2, 316:7,

320:3, 327:23, 348:20, 349:25, 354:8, 368:8, 368:10, 368:19, 373:6, 377:16, 383:10, 389:2, 390:24, 399:15, 399:16, 400:2, 402:1, 402:12, 413:20, 427:17, 464:18, 465:18, 500:24, 506:8, 528:8
problems 317:25, 368:21, 402:10, 434:3, 444:15
procedural 526:23
**Procedure** 442:9, 525:10, 530:19
procedures 394:7
proceeding 326:8
proceedings 416:25, 520:24, 533:4, 533:6
processed 446:10
proclaimed 521:7
produce 481:24
producer 481:19, 481:23
producing 487:1
product 340:13, 340:15, 340:22, 386:7, 497:16
production 434:21
productive 416:5
productively 416:14
products 386:8, 446:12, 446:13, 477:8
profile 511:17, 517:1, 517:3
**Program** 349:18, 376:4, 442:1
programming 481:25, 482:1
progress 376:8, 528:10
prohibit 281:16
prohibited 353:22, 354:6, 364:4, 372:21, 390:10, 439:17, 470:25
projects 396:18, 516:15
prolonged 391:25
promise 273:7
prompted 279:22
pronounced 394:23
proof 280:18, 296:20, 297:4, 297:11, 297:15, 359:20, 360:1, 422:11, 432:21, 433:6, 507:15, 507:17, 531:13
proper 280:7, 301:6, 342:25, 392:13, 415:10, 415:11, 502:20, 506:4

property 406:4, 505:3
propose 521:19
proscribed 354:6
prosecuting 385:25, 400:13, 514:19
prosecutor 358:15
prosecutors 273:22, 286:18, 297:23, 309:15, 323:1, 333:4, 350:15, 360:13, 369:7, 385:24, 400:13, 410:10, 423:18, 434:18, 445:17, 456:7, 467:3, 476:11, 496:5, 503:25
prospective 281:20, 371:4
protect 524:15
protection 277:14
protections 277:11
**prove** 276:6, 276:8, 277:18, 277:19, 277:20, 296:21, 301:25, 360:4, 389:12, 432:25, 433:10, 433:25, 439:6, 460:4, 470:16, 474:25, 507:19
proved 337:7, 433:24
proven 360:6, 507:8
proves 495:6
provide 393:6, 427:11, 482:11, 500:16, 526:21
provided 335:8, 353:6, 363:1, 363:10, 371:15, 389:17, 426:22, 439:3, 460:5, 460:8, 470:17, 470:19
provides 376:1
**Providing** 291:2, 353:9, 395:15, 439:6, 448:3, 459:12, 469:21, 489:24
proving 348:8, 348:9
provision 390:7, 460:7, 460:15, 460:18, 471:8
Psychiatry 310:5
**Public** 446:7, 446:9, 446:16, 482:13, 524:12
Puerto 330:6
pulled 370:6
pulling 384:10
pumps 386:9
punished 349:16
purchased 303:5, 439:17, 501:13
purchasing 479:13

**purely** 339:20
**purpose** 279:16, 279:20, 281:18, 449:9
**purposes** 385:6, 404:2, 413:10, 525:19
**pursuant** 412:11
**push** 376:8
**put** 271:11, 273:6, 273:16, 279:15, 317:24, 320:9, 350:6, 352:4, 353:12, 354:24, 383:12, 392:7, 392:17, 396:7, 442:13, 470:11, 470:18, 493:5, 511:16
**putting** 280:5
**puzzled** 526:12

**< Q >**
**qualifications** 279:18, 295:17
**qualify** 352:9
**quality** 487:9
**questioned** 524:16, 524:18
**questioning** 393:23, 394:5, 415:6, 415:17, 417:14, 508:20, 531:1
**questionnaires** 286:21
**quibble** 416:12
**quick** 410:10, 520:2, 526:22
**Quite** 332:5, 348:1, 500:11, 502:23, 510:1, 531:2

**< R >**
**R.** 392:3
**radio** 293:4, 315:14, 397:12, 397:13, 482:19
**radios** 285:14
**raise** 272:6, 396:22, 418:4
**raised** 278:3, 349:16, 350:3, 454:9, 468:2, 477:25, 531:1
**raises** 526:2
**raising** 388:16
**Ramadan** 399:8
**ran** 444:15
**Rapid** 425:2
**rather** 281:24, 393:2, 394:11, 518:20
**raw** 386:6, 386:9, 386:10
**rays** 308:2

**re-investment** 441:25
**reach** 312:17, 325:7, 357:17, 358:6, 363:20, 529:19
**reached** 349:9
**reaction** 327:10, 336:23, 354:6, 358:14, 364:14, 413:20
**reactions** 404:9
**reader** 308:17
**reading** 269:22, 305:23, 344:20, 345:3, 429:4, 513:10, 522:7
**reads** 375:14, 448:13, 489:18, 513:8
**ready** 269:7, 271:3, 282:2, 316:21, 344:4, 345:8, 351:22, 355:4, 394:21, 417:16, 482:9
**Real** 315:3, 317:23, 318:1, 450:1, 487:6, 487:7
**reality** 501:2
**realize** 469:13
**realized** 501:10
**realm** 280:21
**reap** 276:20
**reason** 278:3, 279:17, 338:24, 339:6, 366:15, 373:18, 374:4, 378:4, 385:13, 406:13, 412:7, 458:10, 530:20
**reasonable** 276:6, 276:9, 277:20, 296:21, 296:25, 297:6, 297:12, 301:20, 301:21, 301:25, 336:12, 337:8, 348:19, 360:4, 389:12, 433:1, 433:11, 475:1, 495:7, 507:17, 507:19
**rebuild** 430:6
**rebuilding** 347:19, 421:21
**rec** 485:12
**recall** 272:1, 317:17, 380:18, 448:17, 454:20, 457:18, 484:12, 489:17, 505:20
**receive** 280:6, 442:10, 442:13, 457:2
**received** 359:16, 421:15, 468:19, 498:25, 499:4
**recent** 429:9
**Recently** 269:24, 269:25, 270:1, 271:19, 304:10, 355:16, 355:18, 366:9,

366:10, 395:20, 400:21, 417:20, 429:6, 450:20, 488:10, 501:10, 502:7, 525:12
**receptionist** 287:2
**receptive** 457:23
**Recess** 315:17, 315:18, 375:10, 376:9, 376:14, 376:16, 450:5, 450:7, 520:25, 521:14, 532:2
**recitation** 459:25
**recited** 278:23
**recognize** 308:2, 366:4, 395:17, 416:22
**recommend** 391:23
**record** 316:17, 393:18, 482:6, 497:19, 509:2, 524:5, 524:15, 525:6
**records** 497:22
**recounted** 300:19, 301:15
**recover** 316:14
**recovery** 315:3, 315:4, 315:7
**recruiting** 505:6, 505:7
**recurring** 314:14
**Red** 272:7, 296:15, 368:16, 369:23, 387:23
**redact** 527:13
**refer** 459:10
**reference** 489:11
**referred** 271:5, 459:11
**reflect** 509:2
**reflects** 407:10
**refused** 393:20
**regard** 301:25, 327:3, 372:3, 488:13, 488:15, 488:21, 494:1, 507:15, 514:3, 524:2, 525:6, 525:13
**Regarding** 313:15, 371:13, 373:6, 392:1, 445:25, 457:24, 499:10, 519:11, 519:24, 521:17, 524:9
**Regardless** 277:9, 278:5, 417:7, 506:13, 507:21
**regards** 489:11
**region** 323:22
**registered** 295:24, 295:25, 309:25, 496:8, 496:21
**registering** 295:20
**registration** 293:18
**regular** 381:15, 529:7

**regularly** 331:6, 463:25, 464:1
**rehabilitate** 508:12
**reinstated** 499:8
**rejoin** 278:19, 292:11, 303:14, 315:14, 328:9, 337:18, 343:22, 354:21, 365:7, 375:7, 379:6, 404:24, 449:24
**related** 301:21, 359:24, 391:22, 451:9, 519:12, 530:12
**relates** 452:13
**relating** 392:10
**relations** 505:6
**relationship** 285:23, 347:2, 350:4
**relative** 478:13, 488:5
**relatives** 403:3
**released** 290:1, 488:6
**Relief** 282:18, 304:1, 365:18, 395:13, 441:1, 530:17
**religion** 316:14, 330:23, 384:24, 385:8, 385:12, 385:13, 399:5, 409:2, 434:7, 453:18, 453:25, 454:1, 454:5, 454:6, 454:9, 463:20, 463:22, 492:15, 511:25
**religions** 305:10, 305:12
**religious** 349:24, 359:3, 359:7, 399:11, 399:16, 423:5, 512:10
**reluctance** 388:12
**relying** 290:17, 301:15, 470:11
**remain** 531:7
**remaining** 527:1, 527:12
**remarks** 316:12
**remember** 271:11, 292:20, 295:8, 319:19, 324:13, 324:15, 330:14, 338:20, 338:22, 344:18, 344:22, 345:3, 355:19, 375:22, 392:8, 395:18, 413:2, 429:4, 429:10, 429:11, 431:22, 441:8, 447:12, 447:21, 448:4, 459:18, 459:21, 469:23, 476:20, 488:1, 489:20, 493:4, 498:21, 505:22, 517:22, 517:24, 518:6, 528:22

**remodeling** 350:23
**renumber** 526:25, 527:12
**renumbered** 527:23
**rep.** 289:12
**Repeat** 286:20, 454:3
**repetitive** 309:17, 333:5, 350:17
**replace** 500:18
**replenishment** 340:9
**REPORTER** 268:38, 515:13, 518:21, 518:23, 519:2, 521:3, 533:5, 533:18
**reports** 315:14, 337:17
**represent** 420:9, 524:25
**representation** 415:11, 525:15, 526:6
**representations** 415:21, 415:22, 416:23, 417:13
**representative** 351:19, 525:23
**represented** 420:8, 524:4, 524:22, 524:25, 525:20
**representing** 297:23, 309:15, 350:15, 369:7, 434:19, 445:18, 456:7, 476:11, 485:19, 496:5, 504:1
**represents** 524:23
**request** 315:21, 354:24, 393:3, 521:10
**requested** 530:16, 530:17
**require** 394:8, 433:18
**required** 277:18, 277:19, 392:19
**requires** 464:6, 525:11
**research** 518:3, 519:11
**researched** 525:11
**researching** 517:20
**resentment** 458:17, 458:20
**reservations** 284:18, 501:13, 502:14, 505:21
**reserve** 288:3
**residents** 277:7
**resisting** 357:15
**resolve** 526:19
**resolved** 488:18
**resources** 294:10, 504:23
**respect** 281:9, 349:25, 526:13, 529:7
**respects** 416:16
**response** 300:18, 319:25,

425:3, 471:15, 478:13, 488:4
**responsibility** 315:5, 315:6, 316:16
**responsible** 358:1
**rest** 485:13
**restrict** 280:3
**restricts** 393:10
**result** 390:1, 404:2, 413:12, 414:3, 427:10
**results** 530:23
**retaliated** 381:18
**retired** 319:7, 319:13, 323:8, 323:13, 424:19, 424:21, 425:19, 463:5, 464:20
**retirement** 334:9
**return** 352:20, 439:24, 471:7
**revolves** 464:20
**Richardson** 269:20, 338:23, 338:25, 339:5, 511:19, 516:20
**Rico** 330:6
**rights** 389:10, 474:20, 506:9
**ring** 282:23, 328:25, 338:11, 441:5, 461:22, 472:20, 481:14, 491:7, 501:24, 502:6
**risk** 410:5, 504:22
**Ritter** 450:8, 456:1, 456:3, 460:22
**Ritz** 271:7, 271:8, 278:12, 279:11
**Rm** 268:39
**RN** 400:22
**road** 273:2, 350:7, 350:8
**roads** 350:7
**robbery** 419:19
**Roberson** 375:13
**Roberson.** 375:16
**Robinson** 428:15, 428:17, 434:6, 434:13, 434:16, 440:6
**role** 487:1, 514:3, 519:5
**Roman** 512:8
**room** 269:5, 275:7, 365:15, 437:14
**rotated** 515:11
**route** 447:3
**row** 390:24
**Rule** 378:10, 378:12, 393:19, 525:10, 525:13, 525:20, 528:25
**Rules** 385:14, 394:7, 473:24,

525:10
**run** 450:1, 484:22
**Rural** 304:25, 305:1, 491:20

**< S >**
**safe** 272:24, 317:19
**salary** 345:11
**salesman** 447:1
**salt** 513:6
**Samantha** 271:6, 279:11
**San** 339:23, 504:10
**SAT** 308:19, 335:19
**Saucier** 394:22, 394:24, 395:1, 395:5, 400:7, 404:16
**Saudi** 329:23
**saw** 341:10, 344:23, 357:2, 375:12, 377:12, 377:22, 421:8, 430:22, 451:4, 469:17, 511:24, 517:8
**saying** 319:23, 394:3, 412:13, 413:23, 414:11, 431:22, 431:23, 493:4
**says** 290:16, 319:19, 336:7, 347:21, 356:20, 375:19, 391:22, 452:16, 458:24, 460:8, 470:19, 506:20, 507:7
**scanning** 291:6, 291:8
**scary** 278:25
**scary.** 272:18
**schedule** 522:14, 522:17, 523:14, 523:17, 529:25
**schedules** 464:20, 523:9, 523:14
**scheduling** 521:17, 530:15
**schools** 479:16
**science** 408:7, 446:2
**score** 308:17, 308:18, 308:20
**Scout** 356:14, 356:15
**Scouts** 346:9, 346:15, 356:13, 356:18
**screened** 307:17
**screening** 307:19
**Scroggins** 417:16, 428:6
**seated** 289:16, 390:23, 413:3
**second** 357:22, 358:8, 372:6, 436:23, 523:25, 528:21

**Secondly** 392:23
**secret** 499:5
**Section** 438:12, 511:15, 516:3, 516:4, 516:5, 516:7
**secular** 399:9, 492:16
**Security** 289:3, 412:17, 441:20, 499:1, 505:15
**Seeing** 344:22, 349:6, 349:13, 349:15, 358:12, 358:13, 358:14, 397:18, 488:10
**seek** 426:11
**seeking** 416:20
**seem** 280:15, 332:16, 394:2, 474:4
**Seems** 283:6, 332:16, 394:8, 398:15, 432:7, 459:11, 523:13
**seen** 282:25, 290:10, 345:2, 396:23, 438:25, 441:7, 441:11, 441:12
**seized** 405:23, 406:4
**select** 485:12, 485:24, 486:2
**selected** 275:5, 278:14, 303:10, 328:4, 337:13, 343:16, 345:11, 352:19, 354:15, 365:2, 404:18, 414:18, 428:8, 439:4, 440:8, 449:18, 458:3, 460:24, 490:12, 520:13, 528:24
**selecting** 270:18, 292:5, 375:2, 380:7
**selection** 395:24, 451:10, 476:16, 476:23, 530:11
**self-employed** 443:19
**Semi-retired** 425:20
**Seminary** 304:18, 305:8
**send** 322:17, 364:5, 404:3, 404:5, 413:16, 414:4, 428:1, 436:5
**sending** 513:13
**sends** 314:13
**senior** 479:6
**Senner** 446:20
**sense** 295:11, 321:8, 384:5, 458:11, 492:14, 503:2
**sent** 302:15, 326:21, 336:9, 347:16, 347:21, 353:20, 353:25, 364:1, 364:9, 372:8, 421:18, 428:2, 429:14,

429:16, 430:2, 430:4, 439:8, 459:14, 459:16
**sentence** 295:14
**separate** 485:7, 516:3, 531:24
**sequestered** 401:19, 402:2
**sequestering** 399:22
**serious** 297:6, 297:16, 315:4, 352:8
**serve** 287:25, 318:14, 326:4, 352:3, 381:18, 382:24, 383:3, 388:12, 388:13, 388:16, 388:19, 388:20, 389:6, 401:18, 401:25, 507:3, 507:11
**served** 275:11, 312:21, 325:3, 335:15, 348:21, 387:9, 387:15, 419:16, 420:2, 422:10, 432:10, 457:20, 468:17, 476:13, 498:9, 506:15, 506:16
**Services** 298:19, 497:12
**serving** 293:21
**session** 269:6, 314:17, 522:4, 530:22, 531:5
**sessions** 390:20
**set** 270:10, 312:6, 406:25, 437:23, 503:14, 503:16, 522:16
**setting** 528:15
**settle** 320:19, 432:9
**settled** 432:7, 530:19
**Seven** 298:15, 300:11, 399:10, 443:14, 473:7, 522:11
**Seventeen** 333:7, 370:9, 370:10, 446:8, 479:18, 479:19
**seventy** 500:25
**several** 304:3, 324:19, 338:7, 407:14, 429:10, 444:23, 464:24, 482:23, 491:3, 494:24, 502:15, 517:9
**severe** 484:3
**severely** 399:23
**Shakes** 380:11, 382:3
**shaking** 512:10
**SHAPIRO** 267:27, 376:10
**share** 314:24, 315:8, 376:5, 416:15

**Shareholders** 441:24
**sharing** 452:17
**sheet** 298:10, 456:16
**shelter** 322:2, 322:4, 322:5, 354:4
**shift** 523:13
**shipment** 311:2
**shipping** 340:14, 446:10
**shoot** 273:2
**short** 311:19, 508:13, 529:17
**shorten** 437:13
**shot** 278:24
**Shouldn't** 349:15, 376:12, 501:2
**show** 291:23, 371:10, 439:8, 459:13, 460:4, 470:16
**showed** 315:25, 359:16, 456:13, 460:19
**shown** 533:6
**shows** 439:11, 439:14, 448:19, 448:21
**Shriners** 396:23
**Shrum** 379:14, 379:19, 385:21, 390:14, 391:5, 391:20, 391:22, 391:23, 392:1, 392:6, 392:24
**Shukri** 267:38, 524:3, 525:3
**shut** 517:12
**sic** 380:25
**side** 281:17, 281:18, 306:3, 313:23, 314:17, 326:20, 331:15, 346:18, 354:7, 358:15, 373:7, 398:12, 398:14, 403:11, 404:7, 416:6, 420:9, 426:16, 448:21, 448:23, 458:17, 505:5
**sidebar** 315:9
**sides** 307:7, 313:20, 314:19, 398:8, 398:16, 416:11, 470:2, 480:7, 521:19
**sign** 356:25, 364:22
**signed** 392:2, 526:1
**significant** 355:2
**signs** 316:2, 316:5
**similar** 275:3, 430:12, 435:20, 499:19
**simplistically** 504:25
**simply** 527:13
**single** 281:10, 296:25, 297:12, 348:19, 415:17,

432:25, 522:16, 531:22
**sister** 283:11, 283:12, 361:21
**sit** 272:18, 275:5, 275:22, 285:11, 313:23, 314:20, 316:9, 334:24, 345:21, 347:6, 362:9, 378:8, 383:4, 386:10, 390:18, 391:2, 403:11, 420:8, 426:17, 430:18, 452:21, 488:16, 519:3
**site** 509:1
**sites** 402:9, 482:9, 493:20
**sits** 452:15
**sitting** 272:16, 293:8, 324:19, 345:17, 358:11, 377:16, 381:6, 383:10, 389:2, 390:15, 391:25, 411:9, 420:6, 420:9
**situation** 316:16, 321:5, 326:3, 335:17, 343:5, 345:9, 349:17, 351:11, 352:4, 432:9
**situations** 398:7
**Six** 287:8, 299:6, 299:7, 300:11, 351:23, 401:6, 445:4, 451:7, 498:20, 504:12, 528:25, 529:3, 529:5, 529:9, 529:13, 529:14
**six-person** 447:16, 498:19
**Six.** 447:18
**sixteen** 287:8
**skin** 273:3
**slate** 512:25
**slight** 502:6
**Slightly** 304:7
**slower** 416:10
**small** 278:9, 297:6, 299:3, 332:15, 469:17, 474:22, 497:11, 497:16, 500:17
**soccer** 299:17, 299:24, 299:25, 484:25, 485:2, 485:4, 485:7, 485:12, 485:13, 485:22, 486:3, 486:4
**Social** 299:16, 412:17, 448:21, 448:23
**socialize** 478:17
**society** 506:7
**solely** 312:7
**solid** 505:8
**solution** 314:22, 331:18
**somebody** 269:15, 273:1,

273:2, 368:8, 429:16, 475:4, 501:3, 513:14, 519:19
**somehow** 347:22, 415:25, 421:23, 430:8, 430:15, 507:2
**someone** 284:13, 294:5, 294:6, 301:17, 303:24, 306:20, 316:2, 346:24, 349:5, 350:4, 351:25, 352:22, 353:1, 360:17, 379:21, 384:3, 412:9, 413:13, 413:22, 414:4, 455:18, 460:4, 470:16, 482:3
**sometime** 298:1, 529:18
**Sometimes** 420:18, 431:25, 436:20, 437:5, 455:19, 482:8, 495:13, 499:11, 507:24
**Somewhat** 306:7, 320:7, 397:9, 431:22, 462:19, 493:1
**somewhere** 474:8, 497:3, 497:21, 503:17
**son** 300:4, 325:11, 326:7, 377:19, 378:16, 464:5, 464:7, 466:2, 466:12, 466:13, 468:8
**sons** 356:16, 356:17
**soon** 457:10, 523:4, 531:6
**Sorry** 269:3, 271:4, 274:4, 274:22, 325:13, 333:16, 335:22, 338:17, 362:1, 374:24, 412:1, 412:2, 416:20, 437:13, 445:1, 454:3, 471:16, 489:14, 529:12
**sort** 291:25, 299:9, 302:23, 310:23, 327:2, 336:16, 354:1, 358:23, 367:8, 368:19, 369:16, 390:4, 402:15, 425:22, 431:3, 460:16, 476:3, 487:23, 488:19, 519:22
**sorts** 325:14, 364:10, 372:16, 373:2
**sound** 381:14
**sounded** 393:1
**Sounds** 275:14, 276:21, 285:22, 315:2, 315:6, 320:1, 367:16, 378:15, 393:16, 403:17, 465:17, 503:11, 520:8, 520:17
**Sour** 340:16, 340:18
**source** 481:17, 481:18
**South** 473:2
**Southern** 350:3, 455:14
**Southwestern** 298:8

**Spain** 288:20
**Spanish** 294:19, 295:2, 295:22, 296:2, 296:5, 300:21, 301:3
**speaking** 269:15, 285:24, 286:12, 309:6, 355:1
**Special** 310:3, 410:19, 413:24, 512:9, 516:5, 519:9
**specialist** 285:5
**specially** 418:12
**specific** 366:11, 371:13, 390:16, 413:2, 416:21, 516:25, 531:19
**Specifically** 304:5, 321:6, 328:24, 338:10, 366:1, 371:21, 372:3, 415:6, 448:4, 461:21, 517:24
**specifics** 281:1
**spent** 288:6, 291:23, 327:1, 327:4, 327:16, 336:13, 336:20, 337:4, 353:25, 364:9, 372:14, 372:24, 388:8, 439:12, 439:23, 449:3, 517:3
**spin** 349:19
**spoke** 285:11
**spoken** 494:5, 531:12
**sports** 516:4
**spouse** 369:13
**spray** 369:19
**spread** 287:10, 454:25
**staff** 481:25, 482:1, 523:11
**stage** 416:25
**stand** 311:20, 332:2, 370:22, 391:1, 405:4, 470:3
**standpoint** 403:10
**Star** 462:3, 462:14
**start** 269:4, 415:24, 419:3, 501:5, 522:2, 522:14, 529:25
**start-up** 497:17, 500:17
**started** 271:21, 305:23, 390:23, 445:7, 488:10, 505:11, 516:12
**starting** 523:2
**starts** 310:12, 458:23
**State** 290:2, 290:4, 324:22, 325:1, 325:2, 339:24, 339:25, 473:14, 498:6
**stated** 273:23, 323:4, 392:24, 405:19, 413:21, 426:5, 446:1, 515:17

**statement** 280:14, 392:24, 393:2, 393:9, 415:7, 415:10, 415:12, 471:1
**statements** 393:5, 415:13, 522:9, 522:11
**statewide** 456:21
**stating** 280:2, 375:20
**stationed** 284:23, 284:24, 285:19
**status** 414:4, 526:13
**statute** 460:2
**statutes** 470:10, 470:13
**stay** 438:1
**stayed** 475:13
**steady** 316:4
**steer** 520:2
**stenotypy** 533:5
**stepchildren** 387:2
**Sterrett** 419:12
**Steve** 510:14, 510:20
**Stewart** 530:13
**stick** 278:6
**stock** 441:22, 441:25
**stood** 390:24, 437:17
**stop** 409:25
**storage** 402:9, 446:7
**store** 272:25, 408:14
**stores** 431:8
**stories** 431:24, 441:7, 511:17, 511:19, 512:16, 517:11, 519:14
**storm** 289:10
**story** 391:4, 432:1, 465:21, 511:19, 514:10, 517:1, 518:10
**straight** 284:16, 523:4
**strange** 393:7, 394:6, 494:20
**stray** 306:24
**Street** 267:33, 268:5, 268:39, 273:1, 319:22, 351:2, 453:11
**strength** 396:4
**stretched** 390:25
**stretching** 390:19
**strictly** 436:7, 456:20
**strike** 270:23, 278:22
**striking** 529:11
**strip** 347:17
**strong** 307:6, 406:22, 407:6, 407:7, 464:24, 474:9, 502:19
**strongly** 322:8

**struck** 339:4, 417:22, 458:11
**structure** 364:3
**struggling** 307:5
**student** 473:13, 473:18, 478:19
**students** 308:19, 451:25, 452:12, 457:25, 458:23, 459:2, 481:25, 482:15, 484:15
**studied** 305:13, 305:16, 397:20
**studies** 457:6
**study** 493:14
**studying** 307:10
**stuff** 332:2, 336:16, 390:4, 396:17, 405:22, 407:25, 413:17, 473:20, 477:12, 482:12, 511:21
**Suarez** 481:5, 481:7, 485:16, 490:10
**subject** 382:19, 494:14, 519:20, 520:15, 525:12
**subjected** 427:5
**submit** 270:24, 363:12, 379:8, 403:25, 508:7, 508:15, 521:1, 521:5
**submitted** 427:3, 530:17, 531:4, 531:5
**subsearch** 402:11
**substitute** 452:6, 458:24
**successes** 482:16
**sued** 518:17
**sufficient** 475:4, 521:9
**suggest** 523:2, 527:11
**suggested** 426:20
**suit** 357:25
**Suite** 267:45, 268:15, 268:33
**summary** 422:4
**summation** 470:4
**Summit** 268:33
**summoned** 476:15
**summons** 468:20, 501:7
**Sunday** 522:20, 523:16
**superior** 417:1
**supervisor** 293:22, 294:1, 294:13, 386:21
**supplier** 497:16
**supplies** 291:24, 291:25, 302:23, 327:2, 327:17, 327:18, 336:15, 354:1,

364:10, 372:16, 373:2, 374:10, 390:3, 404:6, 427:15, 439:13, 460:11, 470:21, 479:13
**supply** 413:17, 469:6
**supported** 271:16, 296:10, 302:6, 350:6, 413:4, 417:6, 417:7, 455:11
**supporter** 307:6
**supports** 302:20, 322:3, 454:22, 455:6
**suppose** 447:25
**Supposed** 393:5, 430:12, 459:24, 465:10, 480:8, 489:19
**supreme** 385:14
**surety** 507:6
**surfaced** 524:1
**surgery** 375:15
**surgical** 496:19
**surmising** 315:25
**surrounding** 518:4
**suspect** 326:24, 372:10
**suspected** 329:6, 421:12
**switch** 323:14, 341:22
**sworn** 522:8
**Syndrome** 375:22, 376:2
**system** 358:12, 358:16, 358:17, 378:6, 438:5, 445:11, 488:15, 488:23, 497:14

**< T >**
**table** 420:7, 420:10
**TAKS** 452:12
**talked** 290:25, 294:10, 305:22, 353:4, 355:20, 382:20, 506:11, 512:1, 516:15, 520:19
**talks** 460:7
**Tampa** 268:25
**tangle** 403:5
**tank** 402:9
**tap** 412:5
**tapes** 301:10, 301:12
**tapping** 412:9
**taps** 411:24, 412:19
**Tarrant** 473:4
**task** 466:2
**taught** 384:25, 457:12,

510:11
**TCI** 289:2
**teach** 410:18, 451:24, 452:2, 452:5, 510:10
**teacher** 410:17, 451:24, 452:4, 452:18, 458:24, 458:25, 479:24
**teachers** 452:15, 456:11, 482:6, 482:10
**teaches** 452:4
**teaching** 457:10
**teachings** 306:24
**team** 294:1, 299:17, 299:18, 299:20, 299:24, 299:25
**teams** 485:8, 485:24, 485:25
**tech** 274:5, 274:6, 495:19
**technical** 300:10
**technician** 323:14, 434:22
**teenager** 489:5, 489:6
**Tejas** 346:8, 346:13
**Telegram** 462:3, 462:15
**television** 421:9, 426:10, 482:19
**teller** 298:23
**tells** 448:24, 449:4, 471:4
**telltale** 316:2
**temp** 351:17, 351:20, 352:20, 352:23
**temp.** 351:11, 352:24
**temping** 352:15
**temporary** 310:11, 310:22, 345:8
**Ten** 287:6, 306:4, 307:5, 397:7, 473:6, 473:8, 477:19, 491:21, 504:11, 505:12
**tend** 397:3, 502:24
**Tender** 410:2, 442:11
**TERESA** 267:42
**term** 365:23, 470:13, 515:18
**termination** 312:15
**terminology** 496:16
**terms** 276:5, 277:5, 277:10, 401:25, 403:13, 404:6, 431:14, 480:16, 483:24, 504:23, 504:24
**territories** 321:7
**terrorism** 284:3, 284:16, 297:4, 297:5, 297:14, 307:24, 308:12, 318:10, 330:17, 359:24, 360:2, 377:18,

382:12, 392:10, 399:18, 406:16, 406:17, 423:7, 433:4, 434:7, 442:20, 442:23, 451:3, 451:9, 464:23, 465:4, 474:7, 474:12, 483:3, 483:10, 483:11, 483:13, 494:8, 494:14, 495:1, 499:13, 499:15, 503:11
**terrorism-related** 272:19, 296:14
**terrorism.** 377:15, 474:8
**terrorists** 377:21, 384:23, 407:4, 413:22, 494:10, 494:15
**test** 276:19, 452:12
**testified** 514:5
**testify** 474:23
**testifying** 510:23, 514:1
**testimony** 389:20, 510:25, 523:5
**testing** 274:8, 309:3
**TEXAS** 267:2, 267:31, 267:34, 268:16, 268:34, 268:40, 274:20, 286:2, 287:19, 287:21, 304:18, 304:19, 313:6, 361:10, 361:11, 386:14, 391:21, 425:11, 446:22, 452:12, 457:4, 476:10, 478:8, 479:21, 497:7, 504:12, 504:17, 504:18, 504:21, 510:12, 533:19
**Thanks** 375:16, 440:16
**thefts** 283:13
**themselves** 455:18, 524:13, 528:17
**theology** 304:17, 304:21, 512:2
**thereafter** 457:10
**thereof** 339:20
**thinking** 325:4, 342:24, 473:4, 486:22, 522:23, 529:17, 530:23, 531:11
**thinks** 375:23, 468:14
**third** 357:24, 358:9
**thirteen** 274:16
**Thirty** 370:21, 402:24, 456:19, 468:8
**thirty-five** 467:8
**thirty-four** 324:2

**Thirty-four.** 403:1
**thirty-one** 456:19
**Thirty-seven** 324:2
**Thirty-six** 323:17, 351:7
**thirty.** 464:8, 468:9
**though** 315:3, 383:18, 393:1, 413:23, 425:21, 435:20
**threatened** 519:17, 519:21
**Three** 275:2, 293:16, 294:3, 305:9, 323:25, 325:25, 329:9, 341:13, 342:22, 345:5, 357:8, 357:9, 357:10, 359:11, 375:24, 381:23, 383:9, 395:19, 396:2, 415:16, 420:24, 438:16, 446:7, 451:21, 466:15, 476:25, 483:8, 484:22, 485:7, 511:19, 521:16, 529:2
**three-** 294:14
**three-month** 501:4
**Three.** 361:25, 362:1, 529:3
**threw** 325:23
**throughout** 418:13, 455:9, 479:19, 529:19
**thrown** 523:17
**Thursday** 529:19, 530:9
**ticket** 438:20, 438:21, 438:22
**Tillis** 404:25, 405:2, 414:16, 415:6, 417:3, 417:10
**Tillman** 282:2
**Timothy** 392:2
**tired** 398:15
**title** 365:17, 442:21, 465:4, 474:8
**today** 269:5, 270:20, 289:23, 292:7, 303:12, 342:11, 342:12, 342:13, 371:4, 412:3, 451:10, 464:13, 493:9
**together** 285:12, 285:19, 285:20
**Toledo** 388:2, 388:4, 388:8
**tolerance** 307:23
**tomorrow** 523:20, 526:14, 526:17, 532:3
**took** 272:10, 274:2, 284:1, 288:20, 300:11, 325:19, 476:22, 488:2, 533:5
**topic** 517:20, 519:24
**topics** 515:22

**total** 453:18, 528:21, 528:25, 529:15, 529:20
**totally** 278:4, 295:14, 296:6
**touch** 285:17, 434:7, 475:16, 512:14
**touched** 524:2
**tour** 311:19
**toward** 458:17
**towards** 365:14, 502:18, 509:3
**Tower** 268:32
**town** 278:8, 278:9, 332:7, 332:9, 332:15, 339:7, 370:5, 492:23, 523:21
**towns** 455:9
**tractor** 469:6
**Traffic** 291:15, 438:21, 438:22
**trained** 351:22
**training** 285:14, 307:25, 482:9, 482:25
**transcribed** 533:6
**transcript** 290:21, 533:8, 533:10
**transcripts** 290:17
**transferred** 473:14
**Transit** 425:2
**translated** 295:6, 295:11
**translating** 300:24
**translation** 300:18, 300:20, 301:6
**translations** 295:1, 301:10, 301:11, 301:13, 301:16
**translator** 290:21
**translators** 290:17
**Transplant** 401:1
**travel** 288:15, 288:18, 330:3
**traveled** 305:3, 330:6
**Treated** 313:16, 326:8, 335:4, 403:15, 403:16, 488:22
**treatment** 314:20
**Trenton** 498:6
**trials** 494:23
**tried** 306:3
**trip** 288:20
**trips** 305:4
**troops** 384:11
**trouble** 290:17, 290:22, 319:24, 327:21, 339:12,

378:16, 444:21, 511:7
**True** 378:17, 378:18, 415:14, 417:5, 445:23, 445:24, 468:3, 494:9, 494:16, 512:23, 515:18, 533:8
**truly** 444:11, 495:9
**trusting** 381:14
**truth** 390:18
**try** 272:14, 277:22, 321:18, 416:5, 417:12, 459:5, 493:14
**trying** 277:25, 293:7, 296:4, 306:1, 315:3, 394:12, 415:8, 415:25, 417:9, 450:2, 528:14
**TSA** 307:13, 307:23, 307:25, 313:11, 315:24
**Tuesday** 521:24, 522:6, 528:7
**turban** 381:1
**turn** 334:11, 524:23
**turned** 334:20, 344:23
**turnick** 380:25
**turning** 514:1
**tutor** 452:13, 452:14
**TV** 293:4, 349:8, 377:12, 451:5, 493:14, 493:16
**Twelve** 274:11, 274:12, 287:12, 287:14, 485:10
**twelve-person** 447:17, 498:19
**twelve.** 370:10
**Twenty** 340:7, 368:17, 447:2, 462:24, 466:10, 472:24, 488:9, 528:19
**Twenty-five** 324:3, 387:5
**twenty-seven** 424:1
**twenty-seven.** 387:5
**Twenty-two** 311:6, 311:11, 361:14
**twice** 468:21, 476:2
**twins** 398:23
**two-year** 499:7
**two.** 270:19, 278:15, 292:6, 337:14, 354:16, 375:3, 379:2, 391:9, 403:5, 404:20, 480:24, 520:14
**type** 280:4, 388:15, 400:20, 436:4, 436:6, 436:9, 446:4, 446:18, 448:16, 456:15, 463:19, 498:18
**types** 354:3, 362:15, 372:17,

374:13, 393:4, 414:5, 435:4, 494:23
**typically** 390:21

**< U >**
**ultimate** 506:12
**unable** 523:22
**unambiguous** 279:2
**unavailable** 522:20
**unclear** 280:11, 280:14
**uncomfortable** 442:24, 513:24, 519:5, 524:14
**uncover** 513:1
**undergo** 307:24
**undergraduate** 498:6
**understand** 272:14, 273:4, 273:14, 276:10, 281:19, 286:2, 297:1, 297:8, 301:20, 301:22, 302:1, 332:23, 346:1, 348:22, 359:20, 372:1, 372:21, 374:7, 374:22, 388:15, 389:5, 390:4, 394:20, 404:7, 412:18, 414:17, 414:24, 459:1, 460:3, 460:14, 471:1, 503:7, 522:19, 524:16, 525:22
**Understanding** 306:2, 374:4, 422:9, 422:25, 440:3, 499:14, 500:10, 522:3, 523:21, 524:9, 524:17, 525:17
**understood** 509:7
**unemployed** 310:6, 316:4
**unfair** 392:17, 393:9, 394:8
**unfocused** 280:22
**Unfortunately** 278:5, 325:16, 351:24
**unfriendly** 393:14
**unhappy** 523:17
**Uniform** 285:7
**uniforms** 299:23
**unit** 284:23, 401:1
**University** 425:11, 504:17, 504:21, 510:11
**unknown** 519:17
**unlawful** 413:12
**Unless** 276:8, 276:19, 280:17, 295:23, 495:6, 511:5, 531:18
**unpleasant** 419:22

**unrealistic** 500:18
**unusual** 493:11
**unwilling** 523:18
**urgent** 450:3, 450:4
**useful** 394:15, 516:7
**using** 287:11, 393:15, 528:14
**UT** 298:7
**UTA** 425:13
**Utilities** 289:11

**< V >**
**vacation** 305:5, 492:1, 501:12, 501:16, 509:5, 509:10
**validity** 394:2
**variety** 446:13, 496:17
**various** 305:24, 448:16
**vastly** 417:1
**vehicle** 497:22
**vehicles** 420:16
**veil** 473:20
**verdict** 312:18, 325:8, 357:17, 439:25, 471:8
**verdicts** 358:6
**Verizon** 323:15, 323:16
**VERSUS** 267:10, 282:18, 304:1, 317:7, 328:20, 338:6, 365:18, 377:1, 379:22, 395:12, 461:18, 472:17, 481:10, 491:2, 501:24
**veterans** 409:18
**vice** 456:13
**video** 481:19, 481:22
**videos** 436:9, 436:24, 482:4, 487:2, 487:5
**View** 280:1, 306:3, 306:5, 307:7, 425:13, 453:21, 482:10, 505:24, 527:3
**viewpoints** 349:9
**views** 314:23, 506:11, 527:18
**villages** 455:9
**violation** 303:6, 327:9, 327:19, 337:7, 372:13, 373:12, 428:3, 439:19, 449:5, 449:12, 460:1, 460:14, 471:13, 471:17
**vision** 317:25

**Visiting** 408:22
**visits** 376:3, 511:18, 516:25, 517:5
**voice** 279:13
**VOIR** 267:16, 281:7, 528:11, 529:21, 530:16, 530:19, 530:22, 530:24, 530:25, 531:3, 531:12
**VOLUME** 267:15
**voluntary** 441:21
**volunteer** 321:25, 322:2, 331:22, 332:1, 346:17, 346:19, 409:9, 484:23
**vote** 296:25, 297:7

**< W >**
**wait** 440:2
**waiting** 526:17, 526:19
**waiver** 524:10, 526:1
**waivers** 524:14
**walk** 272:25
**walking** 453:11
**Wall** 268:5
**wanted** 304:22, 353:2, 376:5, 392:4, 456:24, 509:1, 515:22, 528:9, 529:22, 530:14
**wants** 280:6, 352:4, 352:24, 383:9, 425:25
**war** 320:13, 320:22, 321:12, 377:19, 407:9
**Warehouse** 310:21, 311:1, 446:8, 446:9, 446:16
**warning** 316:5
**warrant** 412:4, 412:11
**Washington** 515:1, 515:5, 522:19, 524:6
**waste** 505:8
**Watch** 270:21, 278:18, 292:10, 320:12, 328:8, 337:16, 341:23, 341:24, 342:12, 342:14, 343:20, 348:2, 354:19, 365:5, 375:6, 379:4, 382:10, 382:20, 391:12, 404:22, 414:22, 428:13, 437:22, 440:14, 449:23, 461:3, 472:4, 481:3, 482:4, 490:16, 493:16, 497:12, 500:6, 508:5, 520:20

**watching** 381:13, 493:14
**Water** 289:11
**Waxahachie** 331:25, 332:4, 332:12, 332:19, 333:6, 333:10, 333:20, 334:1, 334:5, 334:6
**ways** 366:2, 416:1, 530:15
**WBAP** 397:16
**wear** 380:25, 473:20
**weather** 291:14, 361:22
**Weatherford** 402:21
**web** 508:25
**Wednesday** 522:1, 523:3
**week** 341:10, 395:21, 396:2, 452:5, 521:17, 524:2, 524:16, 530:2, 530:7
**weekend** 462:5, 522:20, 523:18, 523:20, 523:22
**weekends** 496:11
**weeks** 274:3, 290:11, 293:23, 311:18, 417:21, 427:6, 428:19
**wells** 329:23
**Whatever** 310:21, 325:23, 350:7, 374:10, 394:13, 409:3, 453:2, 454:9, 526:21, 531:7
**whatsoever** 320:4, 342:16, 342:17, 481:17, 481:18, 513:2
**Whenever** 338:18, 344:23, 397:23, 431:24, 432:8
**whether** 279:16, 293:11, 314:19, 319:21, 355:13, 382:19, 382:21, 383:17, 393:8, 417:6, 417:7, 417:10, 420:17, 422:22, 441:25, 449:1, 474:21, 492:14, 499:13, 500:21, 512:20, 512:23, 520:2, 526:3, 531:4
**whole** 295:3, 295:11, 331:9, 424:16, 465:21, 469:25, 480:1, 515:11, 519:20, 522:17
**whom** 391:22, 494:2, 528:16
**wide** 294:6
**wider** 306:2, 306:3
**wife** 286:23, 309:21, 375:21, 376:4, 400:17, 438:9, 496:8
**Wildwood** 349:22
**William** 514:22

**Williams** 316:22, 316:23, 317:1, 322:21, 322:22, 328:2, 328:11, 328:15, 332:25, 333:2, 337:11
**willing** 529:4, 531:17
**winds** 310:25
**Wire** 411:24, 412:5, 412:9, 412:19
**wish** 281:5, 331:20, 526:25
**within** 280:21, 326:24, 327:7
**without** 272:25, 345:10, 415:21, 455:17, 521:8
**witness** 280:2, 286:14, 360:8, 362:18, 415:17, 488:14, 510:21, 511:5, 521:23, 522:5, 522:18, 523:9, 523:15, 523:18, 523:19
**witnessed** 514:5
**witnesses** 362:13, 362:16, 470:2, 521:4, 522:2
**Wolverton** 440:17, 440:20, 445:14, 449:16
**woman** 435:9
**wonder** 335:25
**wonderful** 349:5
**wondering** 272:10, 293:2
**word** 272:18, 284:3, 284:9, 295:10, 295:13, 296:18, 300:21, 301:4, 377:15, 474:8, 503:11, 513:10, 513:11
**words** 278:25, 295:5, 296:24, 297:5, 338:3, 363:24, 366:3, 433:11, 460:1
**wore** 381:1
**worker** 298:10
**Working** 283:24, 287:4, 289:13, 298:16, 304:3, 347:2, 350:25, 351:20, 365:20, 402:16, 436:19, 465:23, 468:25, 496:17, 496:18, 497:23, 500:17, 515:16, 516:25, 519:10
**works** 283:12, 341:21, 348:22, 348:23, 351:16, 358:13, 425:20, 425:24, 438:9, 438:11, 496:11
**world** 272:24, 273:11, 308:20, 348:1, 493:9
**worried** 294:15
**worry** 431:13

**worrying** 294:13
**worshiping** 385:15, 385:16
**Worth** 268:34, 402:20, 437:18, 459:7, 462:3, 462:14, 468:1, 477:14, 477:22, 479:23, 504:5
**wound** 349:14
**write** 514:22, 515:22
**writer** 516:13, 516:14
**Writers** 510:8
**writing** 309:17, 499:12, 510:11, 516:6, 516:8, 531:9
**written** 448:14, 470:7, 511:9, 512:13, 514:12, 517:12, 524:13
**wrongful** 312:14
**wrote** 406:11, 406:19, 407:23, 408:3, 411:19, 514:10, 514:21, 514:22
**Wynne** 434:21, 435:7, 435:8

**< Y >**
**yard** 272:24
**year** 285:21, 286:8, 287:8, 299:1, 299:6, 300:2, 311:10, 340:21, 420:25, 478:22, 485:10, 485:13, 497:25, 499:8, 505:12, 524:1
**Yesterday** 269:8, 271:5, 281:10, 342:10, 342:11, 342:12, 375:12, 375:20, 380:6, 462:7, 462:8, 521:20, 528:12
**York** 268:6
**Young** 320:20, 320:21, 330:2, 472:8, 472:10, 480:21
**younger** 485:12, 489:5
**yourself** 283:23, 308:10, 382:21, 409:4, 463:23

**< Z >**
**Zale** 359:10
**Zero** 307:23