18:00  1                IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
       2                        DALLAS DIVISION

       3

       4   UNITED STATES OF AMERICA        (    NUMBER 3: 04-240-G
                                           (
       5                                   (
           VERSUS                          (
       6                                   (
                                           (
       7   HOLY LAND FOUNDATION, ET AL.    (    July 18, 2007

18:00  8   _____

       9                            VOLUME 3
                            VOIR DIRE EXAMINATION
      10              BEFORE THE HONORABLE A. JOE FISH

      11   _____

      12
           A P P E A R A N C E S:
      13

      14

           For the Government:    MR. JIM JACKS
      15                          MR. BARRY JONAS
                                  MS. ELIZABETH SHAPIRO
      16                          MR. NATHAN GARRETT
                                  Assistant United States Attorney
      17                          UNITED STATES DEPARTMENT OF JUSTICE
                                  NORTHERN DISTRICT OF TEXAS
      18                          U.S. Courthouse
                                  1100 Commerce Street
      19                          Dallas, Texas 75242
                                        214/659-8600
      20

      21   For the Defendant and Shukri Abu Baker:

      22
                                  MS. NANCY HOLLANDER
      23                          MS. TERESA DUNCAN
                                  FREEDMAN BOYD DANIELS
      24                          HOLLANDER
                                  20 First Plaza, Suite 700
      25                          Albuquerque, NM 87102
                                        505/842-9960

18:00  1

2    For the Defendant El-Mezain:

3

                          MR. JOSHUA DRATEL
4                             LAW OFFICE OF JOSHUA L. DRATEL
                           14 Wall Street, 28th Floor
5                           New York, NY 10005
                                212/732-0707

6

7    For the Defendant Mufid Abdulqader:

8
18:00                            MS. MARLO CADEDDU
9                             LAW OFFICE OF MARLO P. CADEDDU
                           3232 McKinney Avenue, Suite 700
10                           Dallas, Texas 75204
                                214/744-3015

11

    For the Defendant Elashi:
12

13                           MS. LINDA MORENO
                           LAW OFFICE OF LINDA MORENO
14                           PO BOX 10985
                           Tampa, Florida 33679
15                               813-247-4500

16    For the Defendant Odeh:

17                           MR. GREG WESTFALL
                           WESTFALL PLATT CUTRER
18                           Mallick Tower
                           One Summit Avenue, Suite 910
19                           Fort Worth, Texas 76102
                              817/877-1700

20

21    Court Reporter:       Cassidi L. Casey, CSR No. 1703
                           1100 Commerce Street, Rm 15D6L
22                         Dallas, Texas 75242
                              214/354-3139

23

24

25

18:00 1        P R O C E E D I N G S :

2            THE COURT:  Good morning, Ladies and Gentlemen.

3    Thank you for being on time.  Before we get started, I

4    wanted to pass along to you a couple of tidbits of

5    information that were given to me after recess.

6            First, I was asked to caution counsel who are

7    questioning the venire to please stay near the microphone.

8    As I think I have told all of you before, we have a remote

9    courtroom here which is really set up for the media, and I

10   think some of them have been utilizing it, and there was a

11   point during the questioning yesterday that counsel got

12   too far away from the microphone, and they could not hear

13   the questioning.  That's Point 1.

14           And I don't know the answer to that because I

18:00 15  know you are under time limits, but the jury administrator

16   reported that several people who were questioned yesterday

17   complained when they got downstairs, particularly Ms.

18   Medina, that they couldn't get a word in edge-wise, that

19   apparently some of them had pre-planned vacations, and

20   they wanted to tell us about that, but they didn't have an

21   opportunity.  So if you feel you can spare the time from

22   your questioning to ask about things of that nature, it

23   might be a good thing to do.

24           Mr. Kiblinger, I think we're ready to see our

25   first member of the venire, Mr. Torrez.

18:00 1          Good morning, Mr. Torrez.  Counsel for the

2     parties have some questions this would like to ask you

3     about this case.

4          MS. MORENO:  Thank you, your Honor.  Mr. Torrez,

5     my name is Linda Moreno.  I'm one of the defense attorneys

6     in this case.  I want to ask you some questions about the

7     questionnaire you filled out a couple of weeks ago.  I

8     want to ask you about anything you think you might have

9     heard about this case.  I want to talk to you a few

10    minutes.

11         First of all, I see in your questionnaire that

12    you are unemployed.  So my first question to you is this

13    case is going to take three to four months.  Maybe longer,

14    maybe less.  Is that going to impose any kind of economic

18:00 15   hardship for you?

16         VENIRE PERSON:  No.  Right now I am unemployed,

17    and I take care of my daughter and my father.  My father

18    has cancer.  I just help him.

19         MS. MORENO:  I'm so sorry to hear that.  I

20    understand your situation.

21         So I guess my question is unnecessary.  Have you

22    any pre-planned vacations?

23         VENIRE PERSON:  No.

24         MS. MORENO:  Are you fluent in Spanish?

25         VENIRE PERSON:  Yes, ma'am.

18:00 1          MS. MORENO:  Have you had an experience where

2     someone was translating a sentence or a paragraph to you

3     from Spanish to English and the words were accurate, but

4     the meaning was off?

5          VENIRE PERSON:  Yes, I have.

6          MS. MORENO:  Can you think of any examples of

7     that?

8          VENIRE PERSON:  Not a certain example but I can

9     tell you where I did experience that is where I would take

10    a trip to Ruidoso and my friend, we went to his family,

11    and it was mainly a lot of Spaniards.

12         MS. MORENO:  From Spain?

13         VENIRE PERSON:  Blonde and blue eyed.  Their

14    Spanish is just so proper it's completely different from

18:00 15   what I'm used to as far as the Spanish over here which is

16    pretty much broken.  And he would be telling me something.

17    And what I'm thinking, I'm hearing he's telling me

18    something different.  There is Spanish words that have

19    multiple meanings, a lot of words do, and their words,

20    yeah, it has one true meaning that we're used to.  And it

21    did throw me off a little bit.

22         MS. MORENO:  So you have had that experience?

23         VENIRE PERSON:  Yes.

24         MS. MORENO:  Thank you.

25         You have a cousin who's a prosecutor?

18:00 1               VENIRE PERSON:  Yes.

2               MS. MORENO:  Where is that?

3               VENIRE PERSON:  Somewhere near El Paso.  He was

4  in Laredo.

5               MS. MORENO:  Are you close?

6               VENIRE PERSON:  I mean we grew up together.  But

7  you know, we're not like close close, no.

8               MS. MORENO:  Well, the reason I asked such a

9  private question -- if you are close to your cousin -- is

10  what we're talking about here is to try to find jurors who

11  can be fair, open, who don't come to this process with any

12  baggage, with any prejudices or preconceived notions.  And

13  so my question is, is your relationship with your cousin

14  who's in law enforcement going to color the way you look

18:00 15  at this case?

16               VENIRE PERSON:  No, it would not.  Once he

17  passed the bar exam and everything, became a DA, he has

18  been so busy with his job we have become more distant than

19  ever.  We rarely talk, maybe once a month.

20               MS. MORENO:  Do you know any Muslims?

21               ?

22               VENIRE PERSON:  A couple.  Not too well.

23               MS. MORENO:  I'll ask you this question also

24  because these gentlemen are Muslim, and this case involves

25  the Holy Land Foundation charity which is an American

18:00  1    Muslim charity.  So I need to know if you have had any

2    unpleasant experiences in your life with Muslims.

3                VENIRE PERSON:  No.

4                MS. MORENO:  How about with persons of Arab

5    descent?

6                ?

7                VENIRE PERSON:  No.

8                MS. MORENO:  Let me ask you a media question.

9    This is the case of the Holy Land Foundation which as I

10   said is an American Muslim charity, and I want to know if

11   you have heard anything about it in the media, read

12   anything about it?

13               VENIRE PERSON:  I haven't even watched TV the

14   past two or three weeks.  I didn't even know what it was

18:00 15   about or anything.  Like I said, I'm always volunteering

16   for grand jury and as far as for me to give back and do my

17   part.

18               MS. MORENO:  I appreciate that.  I believe you

19   were in the grand jury in 2005?

20               VENIRE PERSON:  Yes.

21               MS. MORENO:  Where did you sit?

22               VENIRE PERSON:  600 Commerce.  I sat at the

23   back.

24               MS. MORENO:  But you were in a grand jury?

25               VENIRE PERSON:  Right.

18:00  1          MS. MORENO:  Anything about that experience that

       2    was negative?

       3          VENIRE PERSON:  No.  Some of the cases we

       4    decided to bill or true bill or no bill they are heart

       5    breaking.  It takes a majority of us.

       6          MS. MORENO:  Yeah, to do your duty as a citizen.

       7          VENIRE PERSON:  Yes.

       8          MS. MORENO:  Thank you so much, Mr. Torrez.

       9          THE COURT:  Counsel for the government?

      10          MS. SHAPIRO:  Good morning, I'm Liz Shapiro.

      11    I'm counsel for the government, and I have a few follow-up

      12    questions for you.  You said on your questionnaire you are

      13    married.

      14          VENIRE PERSON:  Legally married but separation.

18:00 15          MS. SHAPIRO:  So when you talked about the

      16    separation on your questionnaire, that's what you were

      17    referring to?

      18          VENIRE PERSON:  Yes, right.

      19          MS. SHAPIRO:  And you said on your

      20    questionnaire there were problems during that process.

      21          VENIRE PERSON:  Yes.

      22          MS. SHAPIRO:  Has that been resolved?

      23          VENIRE PERSON:  Completely for my little girl's

      24    sake.

      25          MS. SHAPIRO:  You have a three year old

18:00 1    daughter?

2                    VENIRE PERSON:  Yes, sir.

3                    MS. SHAPIRO:  Does she live with you or her

4    mother?

5                    VENIRE PERSON:  Joint custody.  She resides with

6    me mainly.  It's on the paperwork.  Her main residence is

7    with me.

8                    MS. SHAPIRO:  And if you were to serve on this

9    case for a period of four months, would there be a problem

10   of child care?

11                   VENIRE PERSON:  No, ma'am.

12                   MS. SHAPIRO:  You have that all taken care of?

13                   VENIRE PERSON:  Yes.

14                   MS. SHAPIRO:  And you said you worked for the

18:00 15   Postal Service?

16                   VENIRE PERSON:  Yes, ma'am.  I did.  During the

17   separation that's when -- I couldn't take any more stress

18   from my job as well.  So I had to walk away from it at

19   that point in time.

20                   MS. SHAPIRO:  What was it that you were doing

21   when you were working for the Postal Service?

22                   VENIRE PERSON:  Window clerk.

23                   MS. SHAPIRO:  So you were dealing with

24   customers?

25                   VENIRE PERSON:  Correct.

18:00  1              MS. SHAPIRO:  How long did you do that?

       2              VENIRE PERSON:  March in 1998.  I believe I

       3       worked to October.

       4              MS. SHAPIRO:  And before you worked for the

       5       Postal Service, where did you work before that?

       6              VENIRE PERSON:  Odd jobs, warehouse jobs and

       7       just about anything and everything.

       8              MS. SHAPIRO:  You were talking to Ms. Moreno

       9       about your grand jury service, was there anything at all

      10       about your service on the grand jury that would affect

      11       your ability to hear all the evidence and judge this case

      12       fairly?

      13              VENIRE PERSON:  No, ma'am.  It would actually

      14       benefit me.  As I said, you get to view everything from a

18:00 15       different aspect than you would normally in court.

      16       Teaching you to look at everything from every aspect, not

      17       just the first.  So go by the facts of the case.

      18              MS. SHAPIRO:  Okay.  Ms. Moreno also talked to

      19       you about the situation in a foreign language where there

      20       might be a word that is translated or can have different

      21       meanings, and you were giving us an example of one of

      22       those.  In this case, there would be translations that

      23       will be introduced of documents that are in the Arabic

      24       language or Hebrew language.  If those translations are

      25       admitted in this case, would you be able to accept that

18:00 1    translation?

2          VENIRE PERSON:  I would have to get every

3    aspect -- as far as what meanings of words would mean.

4    What transmissions it came in and what text it's being

5    used.  I have to know every meaning.  I would like to know

6    the meaning of the word, what it would mean in slang,

7    proper.  That way I can make a judgment, not go by what I

8    was hearing.

9          MS. SHAPIRO:  If you are given a document and

10    that's the translation the Judge admits in the case and

11    that's the only translation you may see, would you be able

12    to accept that as the translation of the document?

13          VENIRE PERSON:  Honestly I wouldn't because if I

14    know there is -- me being bilingual and everything, I know

18:00 15    Spanish has multiple meanings to words.  I'm not going to

16    feel comfortable unless I have knowledge of what that word

17    means.  I'm not going by just the first thing I see or

18    hear.  I'm not going to be comfortable with that.

19          MS. SHAPIRO:  If the Judge were to instruct you

20    that this translation was the evidence in the case and

21    that you are only to consider that translation, is that an

22    instruction you could follow?

23          VENIRE PERSON:  Of course, I mean, if that's

24    what he wants to give me, yeah, I wouldn't have a problem

25    following that aspect if I can't get the other details on

18:00 1    it.

2              MS. SHAPIRO: Ms. Moreno didn't actually I

3    believe describe the charges in this case for you. So I

4    wanted you to understand what is actually being alleged

5    here, and it's a case about the government alleges the

6    defendants here provided material support to a designated

7    terrorist organization and that organization is called

8    HAMAS. Have you heard of that?

9              VENIRE PERSON: No, I have not honestly.

10             MS. SHAPIRO: At the end of case, the Judge

11   will give instructions about the law the jury has to

12   follow in deciding the case and as part of that

13   instruction, he may tell you that providing money to a

14   terrorist organization is against the law, even if some of

18:00 15   that money is used to purchase things that you might

16   consider as charity or humanitarian aid like food or books

17   or pack backs for children, something of that nature. Are

18   you okay with that?

19             VENIRE PERSON: Fine. I mean that's why we're

20   here, to make sure that everybody did follow the law.

21   That's why we're here to make the judgment that no law was

22   broken. So yeah, I have no problem with that.

23             MS. SHAPIRO: So if the Judge gave you that

24   instruction, you would be able to follow that?

25             VENIRE PERSON: Yes, ma'am.

18:00 1        MS. SHAPIRO:  Thank you very much.

2        THE COURT:  Mr. Torrez, we are in the process of

3  talking to the members of the pool from which the jury

4  will be drawn that would hear this case.  I expect this

5  process will go on for another day or so.  So until you

6  hear from us again, you should not discuss this case with

7  anyone or allow anyone to discuss it with you, and if

8  there are any media accounts of the case, you should not

9  read or watch or listen to any of those.

10        Good morning, Ms. Bailey.

11        VENIRE PERSON:  Good morning.

12        THE COURT:  Counsel in this case have questions

13  for you.

14        MR. WESTFALL:  Good morning, Ms. Bailey.  I'm

18:00 15  Greg Westfall.  I'm one of the defense lawyers in this

16  case.  I am going to speak with you for a few minutes, and

17  then the government will probably have a few questions for

18  you.

19        VENIRE PERSON:  All right.

20        MR. WESTFALL:  This is the Holy Land Foundation

21  case.  It is the United States versus Holy Land

22  Foundation.  It involves allegations that Holy Land

23  Foundation and several of the men involved with the

24  Foundation gave material support to a terrorist

25  organization, HAMAS.  Having told you that, does that ring

18:00 1  any bells?  Have you heard of the case?

2          VENIRE PERSON:  Not really.  Just on TV a little

3  bit I saw a little something.

4          MR. WESTFALL:  Anything you have heard

5  influenced your opinion at all?  Do you have any opinions

6  based upon that?

7          VENIRE PERSON:  No.

8          MR. WESTFALL:  This trial may go as long as four

9  months, maybe a little bit longer than four months.  Do

10  you have any pre-planned travel or anything like that?

11          VENIRE PERSON:  Yes, I'm supposed to go on a

12  cruise November 11th.

13          MR. WESTFALL:  Anything else between now and

14  November 11th?

18:00 15          VENIRE PERSON:  No.  My husband had a stroke

16  last Friday.

17          MR. WESTFALL:  Last Friday?

18          VENIRE PERSON:  Yes.

19          MR. WESTFALL:  Tell me about that.

20          VENIRE PERSON:  He hasn't gone back to work yet.

21  He's doing okay, but I have to be there to monitor his

22  medication.

23          MR. WESTFALL:  The Court is intending to meet

24  Monday through Thursday, basically business hours, and

25  then Friday is off.  Is that going to pose a problem with

18:00 1    you in helping your husband?  Do you have a back-up plan?

2    Do you have anyone else that can help you during those

3    hours?

4              VENIRE PERSON:  Also I'm a diabetic.  Sometimes

5    I fall asleep a little after I eat something, but not all

6    the time.

7              MR. WESTFALL:  All told, do you have the ability

8    to serve on a jury?

9              VENIRE PERSON:  Yes, I do.

10             MR. WESTFALL:  Do you know any Muslims?

11             VENIRE PERSON:  Not really.

12             MR. WESTFALL:  Have you ever had any bad

13   experiences with Muslims?

14             VENIRE PERSON:  I know the Farakhan was a

18:00 15  Muslim.  That's all I know.

16             MR. WESTFALL:  Have you ever followed what Mr.

17   Farakhan has done?

18             VENIRE PERSON:  Not really.

19             MR. WESTFALL:  You are an OR nurse?

20             VENIRE PERSON:  Yes.

21             MR. WESTFALL:  How long have you been doing

22   that?

23             VENIRE PERSON:  Thirty-six years.

24             MR. WESTFALL:  Where do you work?

25             VENIRE PERSON:  Federal hospital, VA Hospital.

18:00  1           MR. WESTFALL:  Do you know a doctor over there

2   by the name of Cadeddu?

3           VENIRE PERSON:  No.

4           MR. WESTFALL:  What does free speech mean to

5   you?  Have you ever thought about your freedom of speech?

6           VENIRE PERSON:  That you can speech freely

7   whatever you feel within your heart.

8           MR. WESTFALL:  Can you think of a country or a

9   place that doesn't have freedom of speech?

10          VENIRE PERSON:  No.

11          MR. WESTFALL:  There is speech out there I

12   imagine that you don't like, isn't there?  Can you tell me

13   some?

14          VENIRE PERSON:  If there is some countries

18:00 15   that --

16          MR. WESTFALL:  Speech in our country -- like

17   whether it's music lyrics or flag burning or something --

18   there is speech out there that insults everyone?

19          VENIRE PERSON:  It doesn't offend me.

20          MR. WESTFALL:  Doesn't offend you?

21          VENIRE PERSON:  No.

22          MR. WESTFALL:  How do you feel about other

23   people being able to say what they want to say?

24          VENIRE PERSON:  I'm okay with that.

25          MR. WESTFALL:  Is that a right that you value?

18:00 1          VENIRE PERSON:  That's a right I value.  I

2    wouldn't say I agree with it.  But I think everybody is

3    free to have their own speech.

4          MR. WESTFALL:  If you were going to set out to

5    suppress somebody's speech, make it where they couldn't

6    say what they wanted to anymore, what would you do?

7          MR. JACKS:  Your Honor, I object to that just on

8    the grounds of relevance.

9          THE COURT:  Sustained.

10          MR. WESTFALL:  Mr. Farakhan.  Mr. Farakhan says

11    things that certain people become highly offended at.

12    That's an example of somebody being able to exercise their

13    freedom of speech in this country, isn't it?

14          VENIRE PERSON:  Right.

18:00 15          MR. WESTFALL:  Do you think Mr. Farakhan should

16    have to stop saying that?

17          VENIRE PERSON:  Yes, I do.

18          MR. WESTFALL:  Do you think he should have to

19    stop saying what he's saying?

20          VENIRE PERSON:  Some of the things he says, I

21    believe so.  He should.

22          MR. WESTFALL:  Do you think that he should be

23    made to stop saying?

24          VENIRE PERSON:  Not necessarily.  I just don't

25    have to abide by it.

18:00   1             MR. WESTFALL: How do you feel about being on a

2   case as a juror where -- We're talking about Muslim men,

3   and the allegation has something to do with terrorism.

4   Terrorism is in the title of the charge. What are your

5   thoughts on that?

6              VENIRE PERSON: I don't have to follow it. I

7   can listen to it.

8              MR. WESTFALL: You are okay with it?

9              VENIRE PERSON: I'm okay with it.

10              MR. WESTFALL: What's your favorite thing about

11   nursing?

12              VENIRE PERSON: Caring for the people. You

13   know, making sure they are comfortable and I'm there for

14   them. Letting them know that.

18:00 15              MR. WESTFALL: And you treat mainly veterans?

16              VENIRE PERSON: Yes, always.

17              MR. WESTFALL: Do you like that particular

18   aspect of your work?

19              VENIRE PERSON: Oh, I love it.

20              MR. WESTFALL: Are you treating Gulf War

21   veterans? Do you have veterans that went to Iraq?

22              VENIRE PERSON: Yes, Vietnam, you know, all the

23   wars.

24              MR. WESTFALL: Have you ever heard of HAMAS?

25              VENIRE PERSON: No.

18:00  1          THE COURT:  Mr. Westfall, your time has expired.

2      Counsel for the government have questions for Ms. Bailey?

3          MR. JACKS:  Yes, your Honor.  Good morning, Ms.

4      Bailey.  My name is Jim Jacks.  I'm an Assistant United

5      States Attorney.  I'll be one of the prosecutors in this

6      case that will be representing the government during this

7      trial.  I have a few questions myself to ask you if you

8      don't mind.

9          VENIRE PERSON:  Okay.

10          MR. JACKS:  We have your questionnaire, and then

11      we have another list that contains information that you

12      provided to the jury clerk.  You indicated that you are

13      married.  What does your husband do?

14          VENIRE PERSON:  He's a chemical tech at Texas

18:00 15      Instruments.

16          MR. JACKS:  What does that mean?  What does he

17      actually do?

18          VENIRE PERSON:  The chemical tanks that they

19      bring in, he was to monitor the gauge and different kinds

20      of chemicals that they use for TI for whatever project

21      they are doing.

22          MR. JACKS:  How long has he worked there?

23          VENIRE PERSON:  Forty years.

24          MR. JACKS:  You may have answered this, but how

25      long have you worked at the VA Hospital?

18:00  1          VENIRE PERSON:  Thirty-six years.

       2          MR. JACKS:  How long have you been an operating

       3   room nurse?

       4          VENIRE PERSON:  Twenty-eight years.

       5          MR. JACKS:  And you have two sons, and I take it

       6   they are grown and both out of the house.  Do they live in

       7   the Dallas area?

       8          VENIRE PERSON:  Yes, they both live in Dallas.

       9          MR. JACKS:  It seems like you have traveled

      10   quite a bit overseas and out of the country.  Were those

      11   trips for pleasure or some other?

      12          VENIRE PERSON:  It was for pleasure.

      13          MR. JACKS:  And were there multiple trips?  You

      14   have marked that you have been to Germany and France and

18:00 15   Puerto Rico and Mexico.  For example the places in Europe,

      16   was that one trip or different trips?

      17          VENIRE PERSON:  That was one trip.

      18          MR. JACKS:  And Puerto Rico was a separate trip

      19   and Mexico?

      20          VENIRE PERSON:  Yes, on a cruise.

      21          MR. JACKS:  You have served on trial juries

      22   before.  One of them you described as a real estate

      23   matter.  Do you know whether that was a civil or criminal

      24   case?

      25          VENIRE PERSON:  It was a civil.

18:00  1          MR. JACKS:  So two private parties were suing

       2     each other or one of them was?

       3          VENIRE PERSON:  Yes, one of them was.

       4          MR. JACKS:  And I guess the jury rendered a

       5     verdict in that case.  And then an earlier case you

       6     describe it as Molestation, like child abuse?

       7          VENIRE PERSON:  Yes.

       8          MR. JACKS:  Down at the state?

       9          VENIRE PERSON:  Crowley.

      10          MR. JACKS:  How long did that trial last?

      11          VENIRE PERSON:  Five days.

      12          MR. JACKS:  How long were the jury

      13     deliberations?

      14          VENIRE PERSON:  Probably a day.

18:00 15          MR. JACKS:  Were you the foreman of the jury?

      16          VENIRE PERSON:  Oh, no.

      17          MR. JACKS:  And you indicated that a nephew of

      18     yours by marriage -- Does that mean your husband's side of

      19     the family?

      20          VENIRE PERSON:  Yes.

      21          MR. JACKS:  -- was convicted of murder.  How

      22     long ago was that?

      23          VENIRE PERSON:  This past May.

      24          MR. JACKS:  And I take it he was sentenced to

      25     the penitentiary?

18:00 1          VENIRE PERSON:  Yes.

2          MR. JACKS:  Did you attend the trial?

3          VENIRE PERSON:  As a witness.

4          MR. JACKS:  Regarding that experience, how do

5 you think your nephew was treated by the criminal justice

6 system?

7          VENIRE PERSON:  I think he was treated fairly

8 well.

9          MR. JACKS:  Who was the victim in that case,

10 somebody known to him?

11          VENIRE PERSON:  Yes, his first cousin.

12          MR. JACKS:  Having been on a criminal jury

13 before, I'm sure you recall that after all the parties

14 have finished presenting evidence and either before or

18:00 15 after, depending on which court it is in, the Judge gives

16 instructions to the jury and tells them what the law is.

17 That would happen as well in this case.

18          The Judge will tell you in his instructions to

19 you that -- You have not heard of HAMAS?

20          VENIRE PERSON:  No.

21          MR. JACKS:  I anticipate the Judge will tell you

22 that HAMAS is a designated foreign terrorist organization;

23 that is, the United States has designated them a terrorist

24 organization.  And I expect the Judge to tell you that a

25 person in the United States cannot give anything to

18:00 1　benefit a foreign terrorist organization, even if it's

2　something that would otherwise be considered a charitable

3　or humanitarian item like food or clothing or books or

4　medical supplies.  Even that type of aid or support is

5　against the law.  Would you have any problem with that

6　aspect of the law and following that instruction from the

7　Judge?

8　　　　　VENIRE PERSON:  No, I wouldn't have a problem.

9　　　　　MR. JACKS:  Thank you.

10　　　　　THE COURT:  Ms. Bailey, we're in the process of

11　talking to the members of the panel from which the jury

12　will be selected that would hear this case.  I expect that

13　process will go on for another day or two.  So until you

14　hear from us further, you should not discuss the case with

18:00 15　anyone or allow anyone to discuss it with you, and if

16　there are any media accounts about this case, you should

17　not read or watch or listen to any of those media

18　accounts.

19　　　　　Thank you, ma'am, you may excused.

20　　　　　Good morning, Mr. Boozer.  Counsel for the

21　parties in this case have some questions they would like

22　to ask you.  Mr. Westfall.

23　　　　　MR. WESTFALL:  Good morning, Mr. Boozer.  I'm

24　Greg Westfall.  I'm one of the defense lawyers in this

25　case.  I am going to speak with you a few minutes.  Okay?

18:00 1          VENIRE PERSON:  Okay.

2          MR. WESTFALL:  This case is the United States

3     versus the Holy Land Foundation.  Have you heard of it?

4          VENIRE PERSON:  I might have hit it in the

5     headlines of the paper.

6          MR. WESTFALL:  It involves allegations that the

7     Holy Land Foundation which was an American Muslim charity,

8     and some of the men who work with that charity gave

9     material support to HAMAS which is a foreign terrorist

10    organization.  Having told you that, ring anymore bells or

11    different bells than it did before?

12         VENIRE PERSON:  The extent of my knowledge would

13    be that I glance at the newspapers most days, and I do

14    recall some arrests, and I don't know that I got the

18:00 15   details, and I don't know the time frame.  A couple of

16    years ago, there was some arrests made in Richardson, the

17    area or something like that, and beyond that I would know

18    zip.

19         MR. WESTFALL:  That's the same one.  Based upon

20    anything you have read or heard, have you reached any

21    opinions about the guilt or innocence of anyone?

22         VENIRE PERSON:  No.

23         MR. WESTFALL:  Let's focus for a second on

24    hardship.  And by hardship I mean something that would

25    make it difficult, if not impossible, something like you

18:00 1     are going to lose your job. I know you put in a hardship.

2          VENIRE PERSON: It's not a hardship letter.

3     It's just my schedule is such. I'm a pilot, and as such I

4     needed to know what days I would be needed to be here so I

5     could schedule it. After that there was no problem.

6          MR. WESTFALL: So if this thing goes four

7     months, you are not going to have a problem with that?

8          VENIRE PERSON: No.

9          MR. WESTFALL: No problem with prepaid vacations

10     or anything like that?

11          VENIRE PERSON: No.

12          MR. WESTFALL: How long have you been a pilot?

13          VENIRE PERSON: Fifteen years.

14          MR. WESTFALL: Did you learn in the military

18:00 15     or --

16          VENIRE PERSON: Civilian.

17          MR. WESTFALL: In American Airlines, I would

18     imagine they have probably had some training since 9-11

19     that has to do with terrorism?

20          VENIRE PERSON: I'm with American Eagle which is

21     the stepson of American. But it's minor in nature. They

22     go over certain cases and tell us okay, for example, any

23     time there is any situation at all, you lock the door.

24     That's basically -- And then they go over certain

25     situations that have occurred in the past. As an example,

18:00 1    used to be before 9-11 you did whatever somebody that was

2    getting on board -- you tried to comply.  Now, you just

3    close the door and land.  So that's the extent of it.

4            MR. WESTFALL:  Do they teach you anything like

5    profiling or what someone looks like that you are supposed

6    to be suspicious of?

7            VENIRE PERSON:  I wouldn't call it profiling.  I

8    would say that more attune to listening to uneasiness of

9    anyone -- the flight attendants, the other crew members,

10   something you heard in the airport, something through

11   security or saw in the newspapers, etcetera.

12           MR. WESTFALL:  Have you had any incidents where

13   you had to lock the door and immediately land the plane?

14           VENIRE PERSON:  No.

18:00 15          MR. WESTFALL:  Anyone you know had that?

16           VENIRE PERSON:  No one I know.  I have heard of

17   instances where this has happened, but no one I do know.

18           MR. WESTFALL:  I saw you went to Iran back in

19   the seventies.

20           THE DEFENDANT:  Yes, sir.

21           MR. WESTFALL:  I guess the Shah was still in

22   power then?

23           VENIRE PERSON:  He was out of the country sick

24   at the time, but yes.

25           MR. WESTFALL:  Nowadays do you know any Muslims?

18:00 1           VENIRE PERSON:  The only guy I know is I traded

2   at a gas station with a guy.  I'm not sure he is Muslim or

3   not.

4           MR. WESTFALL:  But he's Arab?

5           VENIRE PERSON:  I think he told me he's from

6   Iran.  So I know he's from Iran because we talked about

7   that.

8           MR. WESTFALL:  Sounds like that may be a fairly

9   pleasant experience.

10           VENIRE PERSON:  Yes, he's a nice guy.

11           MR. WESTFALL:  Have you ever had any bad

12   experiences with Muslims or Arabs?

13           VENIRE PERSON:  No, sir, not that I know of.

14           MR. WESTFALL:  Any particularly good things?

18:00 15           VENIRE PERSON:  Good mechanic.  I mean he

16   repairs my truck.  But that's the extent of it.

17           MR. WESTFALL:  I probably don't need to ask you

18   this, but how do you feel about the prospect of being on a

19   jury where we're talking about Muslim men and the charge

20   has terrorism in the title?

21           VENIRE PERSON:  That's a pretty simple question.

22   I think I am fair enough that I let the facts on whatever

23   the case is stand up.  I don't have that many

24   preconceptions on things.  I listen to what the people

25   say, and from that I will go ahead and make a decision.

18:00 1          MR. WESTFALL:  Been on a jury before?

2          VENIRE PERSON:  Yes, sir.

3          MR. WESTFALL:  So you know that a decision by

4     the jury has to be based on only the evidence in the

5     court?

6          VENIRE PERSON:  Yes.

7          MR. WESTFALL:  What drew you to piloting?  What

8     drew you to be a pilot?

9          VENIRE PERSON:  I was still in insurance and

10     hated it, and a friend of mine gave me lessons and said,

11     hey, this is a career you might like, and I looked at it

12     and said, okay, I am going to do it.  And on my form it

13     says that I have worked two jobs for almost twenty years

14     this month, and I went to work for a trucking company and

18:00 15     did my schooling and pilot training during the day, and

16     then I started working as a pilot.

17          MR. WESTFALL:  So now all you do is piloting.

18     You don't have to have a second job?

19          VENIRE PERSON:  No, I'm retiring from the other

20     job this month.

21          MR. WESTFALL:  One other thing I wanted to talk

22     to you about, but I got so interested in the story.

23          Oh, have you had to have a security clearance or

24     anything like that?  Have you done any sort of

25     investigation work with the federal government?

18:00 1          VENIRE PERSON:  The only security clearance we

2     have is at the airport.  We send in fingerprints, and they

3     do a background check on us.  I guess that's a security

4     clearance.  That's all I would know of.

5          MR. WESTFALL:  So you haven't been in the

6     military?

7          VENIRE PERSON:  No, sir.

8          MR. WESTFALL:  Thank you very much, sir.

9          THE COURT:  Counsel for the government have

10     questions for Mr. Boozer?

11          MS. SHAPIRO:  Good morning, my name is Liz

12     Shapiro, and I'm one of the prosecutors assigned to this

13     case for the government.

14          VENIRE PERSON:  Good morning, Elizabeth.

18:00 15          MS. SHAPIRO:  You indicated on your

16     questionnaire that you are married.  Is that right?

17          VENIRE PERSON:  Yes, ma'am.

18          MS. SHAPIRO:  And does your wife work outside

19     the home?

20          VENIRE PERSON:  Yes, ma'am.  She's director of a

21     day care.

22          MS. SHAPIRO:  Is that in the Dallas area?

23          VENIRE PERSON:  Irving, Dallas County.

24          MS. SHAPIRO:  Young children, preschool?

25          VENIRE PERSON:  I think it goes up through first

18:00 1   or second grade.

2                MS. SHAPIRO:  And she works full time there?

3                VENIRE PERSON:  Yes, ma'am.

4                MS. SHAPIRO:  And you indicated that your best

5   friend is a lawyer.  Is that right?

6                VENIRE PERSON:  Yes.

7                MS. SHAPIRO:  And does he or she work at a

8   firm?

9                VENIRE PERSON:  Works over in Arlington, used to

10  work for Hill Gilstrap.  I think he works now for -- I

11  have the name in my wallet.  I can get it if you want the

12  name.

13               MS. SHAPIRO:  Is it a big law firm?

14               VENIRE PERSON:  No, ma'am, I don't think so.

18:00 15  It's small.

16               MS. SHAPIRO:  Does he practice criminal law?

17               VENIRE PERSON:  I think he's more on business

18  law.

19               MS. SHAPIRO:  Has he talked to you about the

20  kind of work he does?

21               VENIRE PERSON:  We don't talk shop.  We talk

22  baseball and rangers.

23               MS. SHAPIRO:  I noticed you were a wrestler?

24               VENIRE PERSON:  Yes, ma'am.

25               MS. SHAPIRO:  What weight class?

18:00 1          VENIRE PERSON:  167, 177 and 187.

2               MS. SHAPIRO:  You managed to maintain that?

3               VENIRE PERSON:  Yes, added a couple.

4               MS. SHAPIRO:  As Mr. Westfall told you the

5      charges in this case involve material support to a

6      designated terrorist organization.  At the end of the

7      case, as I'm sure you know from your jury experience --

8      You said you served on several juries.  Is that right?

9               VENIRE PERSON:  Yes.

10              MS. SHAPIRO:  If you will recall, the judge

11     gave you instructions at the end of the case.

12              VENIRE PERSON:  Yes, ma'am.

13              MS. SHAPIRO:  In those instructions the Judge

14     may tell you that material support to a designated

18:00 15     terrorist organization may include not only money but

16     things that you might consider to be humanitarian type of

17     assistance like food or clothing or books or backpacks for

18     children, things of that nature.  If the Judge instructed

19     you that that, too, was against the law, would you be able

20     to follow that instruction?

21              VENIRE PERSON:  I think so, yes, ma'am.

22              MS. SHAPIRO:  Does that bother you at all or

23     give you hesitation?

24              VENIRE PERSON:  Well, I think before I agree or

25     disagree, when the Judge gives me an order like that I'm

18:00 1    pretty well determined to have to follow such.

2          However, as far as, yes, I think I could.  It

3    would be possible to distinguish that some things might be

4    humanitarian and some things might be other things.

5          MS. SHAPIRO:  But if the Court were to give you

6    instruction that under the law knowingly giving assistance

7    of an humanitarian nature even, assistance that benefited

8    a terrorist organization, that was against the law, would

9    you be able to follow that instruction?

10         VENIRE PERSON:  Yes, ma'am.

11         MS. SHAPIRO:  Thank you.

12         THE COURT:  Mr. Boozer, we are in the process of

13   talking with the people in the pool from which the people

14   will be drawn that would hear this case.  I expect that

18:00 15   process to go on for the rest of today and possibly into

16   tomorrow.  So until you hear from us again, you should not

17   discuss the case with anyone or allow anyone to discuss it

18   with you, and if there are any media accounts about this

19   case, you should not read or watch or listen to any of

20   those.  Thank you, sir.  You may be excused.

21         Good morning, Ms. Jensen.  Counsel for the

22   parties have some questions to ask you about this case.

23         MR. WESTFALL:  Ms. Jensen, I'm Greg Westfall.

24   I'm one of the defense lawyers in this case.  I want to

25   speak to you for a moment about this case.

18:00 1          VENIRE PERSON:  Okay.

2          MR. WESTFALL:  This case is United States versus

3    Holy Land Foundation.  It involves allegations by the

4    government that the Holy Land Foundation and some of the

5    men involved in the Foundation gave material support to

6    HAMAS which is a terrorist organization.  Having told you

7    that, does that ring any bells?

8          VENIRE PERSON:  Yes, I think I heard something

9    about Holy Land Foundation being in the news years ago,

10   but not really any details.

11          MR. WESTFALL:  Nothing recently?

12          VENIRE PERSON:  Monday I heard something about

13   it, but I went the other way.  When I heard it, it rang a

14   bell.

18:00 15          MR. WESTFALL:  How do you feel about being in a

16   jury with Muslim men and terrorism is in the title?

17          VENIRE PERSON:  I'm not sure I have any feelings

18   about it one way or the other, anymore than I would any

19   other jury.  It's a little bit inconvenient, but I will

20   deal with it.

21          MR. WESTFALL:  Inconvenient?

22          VENIRE PERSON:  It's a lot farther to drive than

23   work.

24          MR. WESTFALL:  On the issue of inconvenience,

25   this could go four months.

18:00 1          VENIRE PERSON:  I get paid at my job.  That

2      would be all right.

3          MR. WESTFALL:  Okay.  Very well.  You work with

4      the Postal Service?

5          VENIRE PERSON:  Yes.

6          MR. WESTFALL:  What is the union?

7          VENIRE PERSON:  American Postal Workers Union.

8          MR. WESTFALL:  And that's like the main union?

9          VENIRE PERSON:  No, they have seven.

10          MR. WESTFALL:  Seven unions?

11          VENIRE PERSON:  Yes.

12          MR. WESTFALL:  Are you a steward or have you

13      ever been a steward?

14          VENIRE PERSON:  No.

18:00 15          MR. WESTFALL:  I saw in your questionnaire you

16      went and interviewed with the FBI in relation to something

17      you used to do or did at some point which is the Titan

18      missile project.

19          VENIRE PERSON:  Yes, data entry.

20          MR. WESTFALL:  What were the Titan missiles?

21      That a cold war thing?

22          VENIRE PERSON:  I think so.  I don't remember.

23          MR. WESTFALL:  So where did you go to do the

24      data entry?

25          VENIRE PERSON:  I worked in Dallas for TI.

18:00 1          MR. WESTFALL:  Oh.  How long did you do that?

2          VENIRE PERSON:  On the actual Titan missile

3  project?

4          MR. WESTFALL:  No, in that sort of area with the

5  security clearance and all.

6          VENIRE PERSON:  It was just the one project, and

7  it was three months.

8          MR. WESTFALL:  Have you always done that kind of

9  work?

10         VENIRE PERSON:  No, I don't like data entry.  I

11  would rather be up doing something physical.

12         MR. WESTFALL:  So you left data entry and became

13  a mail carrier?

14         VENIRE PERSON:  No, I'm a mail processor.

18:00 15        MR. WESTFALL:  I guess there is a big mail

16  processing plant here in Dallas?

17         VENIRE PERSON:  Yes, there is two.

18         MR. WESTFALL:  And you work at one of the

19  plants?

20         VENIRE PERSON:  Right.  I work at the Bulk Mail

21  Center.

22         MR. WESTFALL:  Do you do any charity work?

23         VENIRE PERSON:  Yes.

24         MR. WESTFALL:  What do you do?

25         VENIRE PERSON:  My husband and I work with a

18:00  1    group in Dallas called Youth World, and my husband is a

2    guitar player, and I help him with the fundraisers and

3    organizing events and that sort of thing.

4              MR. WESTFALL:  What does Youth World do?

5              VENIRE PERSON:  They cater to underprivileged

6    youth of all classes, Oak Cliff mostly.

7              MR. WESTFALL:  What does Youth World do for the

8    underprivileged youth?

9              VENIRE PERSON:  Music lessons, a place to go

10    after school rather than getting in gangs.  They are

11    multi-denomination Christian group so they also preach.

12    Give them a place to share faith.

13              MR. WESTFALL:  Do they provide scholarships?

14              VENIRE PERSON:  Not that I am aware of.

18:00 15              MR. WESTFALL:  Do they give them food?

16              VENIRE PERSON:  Yes, after school.

17              MR. WESTFALL:  At Christmas do they give them

18    presents?

19              VENIRE PERSON:  Not that I am aware of, but they

20    put them in touch with organizations that do that.

21              MR. WESTFALL:  How long have you done that?

22              VENIRE PERSON:  About two years.  My husband has

23    been involved five years.

24              MR. WESTFALL:  Have you had you any intention of

25    quitting?

18:00 1          VENIRE PERSON:  I don't do it much, but no, the

2      children need us.

3          MR. WESTFALL:  You said give them an opportunity

4      other than gangs by giving them food and a place.

5          VENIRE PERSON:  Yes.

6          MR. WESTFALL:  And giving them love and

7      attention?

8          VENIRE PERSON:  Yes.  If they don't receive

9      those things, they are likely to get in those gangs and

10     get in trouble.

11         MR. WESTFALL:  And do violent things?

12         VENIRE PERSON:  Let's hope not, but yeah,

13     possibly.

14         MR. WESTFALL:  Ms. Jensen, thank you.

18:00 15         THE COURT:  Counsel for the government have

16     questions for Ms. Jensen?

17         MR. JACKS:  Yes, sir.  My name is Jim Jacks.

18     I'm an Assistant United States Attorney here in the

19     Northern District of Texas.  I'm one of the prosecutors in

20     this case and will be representing the government during

21     this trial.  I have a few questions for you if you don't

22     mind.  How long have you worked for the Postal Service?

23         VENIRE PERSON:  Since 1993.

24         MR. JACKS:  Immediately prior to that was that

25     when you worked for Texas Instruments?

18:00  1              VENIRE PERSON:  To several years prior to that.

       2              MR. JACKS:  Before you joined the Postal Service

       3       what was your profession?

       4              VENIRE PERSON:  I had two young children.  I was

       5       a homemaker.

       6              MR. JACKS:  And I guess maybe before your

       7       children were born -- I'm trying to get an employment

       8       history a little bit.  How long did you work for Texas

       9       Instruments?

      10              VENIRE PERSON:  Just the three-month project

      11       when they needed extra help.  They laid me off.

      12              MR. JACKS:  Before your children were born, what

      13       kind of work did you do?

      14              MR. JACKS:  I worked in a warehouse pulling

18:00 15       orders for -- actually it ended up being Wal-Mart, but it

      16       started out being Western Merchandisers.

      17              MR. JACKS:  Have you lived your entire life here

      18       in the Dallas Fort Worth area?

      19              VENIRE PERSON:  I was born in New York State.

      20       Lived there until I was seven.  My stepfather got laid off

      21       and found work here, because the economy was bad, and we

      22       moved here.

      23              MR. JACKS:  What year was that?

      24              VENIRE PERSON:  1975 or 1976 I think.

      25              MR. JACKS:  So you have lived here all of your

18:00 1　adult life?

2　　　　　VENIRE PERSON:  No.  I went back to New York for

3　three years and came back to Texas.

4　　　　　MR. JACKS:  Where did you live?

5　　　　　VENIRE PERSON:  Upstate New York.  Do you know

6　where Binghamton is?

7　　　　　MR. JACKS:  Yes.

8　　　　　VENIRE PERSON:  That's where.

9　　　　　MR. JACKS:  You listed your husband's job as an

10　environmental aid.

11　　　　　VENIRE PERSON:  Yes, it's not what it sounds

12　like.

13　　　　　MR. JACKS:  Tell us what it is.

14　　　　　VENIRE PERSON:  He works as a liaison between

18:00 15　BEA systems and EPA to make sure that hazardous materials

16　are properly deposed of.

17　　　　　MR. JACKS:  BEA Systems?

18　　　　　VENIRE PERSON:  Right.

19　　　　　MR. JACKS:  Who do they do?

20　　　　　VENIRE PERSON:  They used to be Boeing.  They

21　build cockpits of airplanes.

22　　　　　MR. JACKS:  Are they located in --

23　　　　　VENIRE PERSON:  No.  Irving.

24　　　　　MR. JACKS:  Two children and they attend school

25　in Grand Prairie?

18:00   1              VENIRE PERSON:  Yes.

        2              MR. JACKS:  And one is home schooled?

        3              VENIRE PERSON:  Yes.

        4              MR. JACKS:  Who home schools him?

        5              VENIRE PERSON:  My husband.

        6              MR. JACKS:  When does he do that?

        7              VENIRE PERSON:  In the evening after work.

        8              MR. JACKS:  Has he been home schooled for his

        9    entire age?

        10             VENIRE PERSON:  Yes.  He didn't do well.  He

        11   didn't get along with the other kids.

        12             MR. JACKS:  The organization you referred to,

        13   Youth World, you said that's a multi-denominational

        14   Christian organization?

18:00  15             VENIRE PERSON:  That's correct.

        16             MR. JACKS:  How did you or your husband become

        17   connected to that organization?

        18             VENIRE PERSON:  Through BEA Systems.

        19             MR. JACKS:  It's something the company

        20   encouraged or supported?

        21             VENIRE PERSON:  Yes, they do an annual campaign

        22   or charity drive, and they were looking for organizations

        23   to donate money to and Youth World applied, and my husband

        24   was on the committee that evaluated them, and he mentioned

        25   he played guitar, and they said they were looking for

18:00  1    someone to give guitar lessons to the children after

2    school, and my husband worked out a date and time, and he

3    started doing that about five years ago.

4         MR. JACKS:  Would you give us an idea of how

5    many hours a week or a month he spends on that?

6         VENIRE PERSON:  He does about eight hours, and I

7    generally get in an hour, hour and a half a month.  I do

8    very little.

9         MR. JACKS:  As has been mentioned to you, the

10    principal charges in this case -- It's alleged that the

11    Holy Land Foundation is an organization and several

12    individuals that worked with it provided material support

13    to a terrorist organization; namely, HAMAS.  Have you

14    heard of HAMAS or aware of what it is?

18:00 15         VENIRE PERSON:  I have heard of it.  I wouldn't

16    say I'm aware of what it is other than it's supposed to be

17    a terrorist organization.

18         MR. JACKS:  At the end of the evidence the Judge

19    will read his instructions to the jury which is

20    essentially what the law is.  It says what must be proven

21    and definitions and that type of thing so the jury will

22    know the law and then can apply the law to render its

23    verdict.  Do you understand that concept?

24         VENIRE PERSON:  Yes.

25         MR. JACKS:  I anticipate that the judge will in

18:00  1    his instructions tell the jury that HAMAS is a designated

2    terrorist organization.  And I also anticipate that he

3    would as part of his instructions tell the jury that any

4    contribution or any material support provided to or for

5    the benefit of HAMAS is illegal, even if it's of a charity

6    nature.  Even if it's food or clothing or medical supplies

7    or backpacks.  How do you feel about that aspect of the

8    law?

9              VENIRE PERSON:  I'm sure it's there for a

10   reason.  It's not necessarily morally correct.

11             MR. JACKS:  Would you be able to follow the

12   instruction?

13             VENIRE PERSON:  Yes.

14             MR. JACKS:  So even though you thought it was

18:00 15   morally incorrect, if you found that was the -- that money

16   was provided and that's the way it was spent, you would be

17   able to return a verdict of guilty beyond a reasonable

18   doubt, if you found that was done?

19             VENIRE PERSON:  Yes.

20             MR. JACKS:  Thank you.

21             THE COURT:  Ms. Jensen, we're in the process of

22   talking with the members of the pool from which the jury

23   will be selected that would hear this case.  I expect that

24   process will go on today and probably into tomorrow.  So

25   until you hear from us further, you should not discuss

18:00 1  this case with anyone or allow anyone to discuss it with

2  you, and if there are any media accounts about the case,

3  you should not read or watch or listen to any of those.

4  Thank you, ma'am, you may be excused.

5  Good morning, Mr. Neal. Counsel for the parties

6  have some questions to ask you. Mr. Neal, I'm Greg

7  Westfall. I'm one of the defense lawyers on this case. I

8  want to talk to you a few minutes. Okay?

9  VENIRE PERSON: Okay.

10  MR. WESTFALL: This is the case of the Holy Land

11  Foundation. The United States Government is alleging that

12  the Holy Land Foundation and several of its men associated

13  with the Holy Land Foundation gave material support to

14  HAMAS which is a terrorist organization. Having heard

18:00 15  that, do you recognize the story? Have you heard about

16  it?

17  VENIRE PERSON: I think I heard about it a while

18  back, but I don't know much about it other than the name,

19  and I think it was in Richardson.

20  MR. WESTFALL: You haven't read or heard or seen

21  anything?

22  VENIRE PERSON: It may have been a long time

23  ago. But I don't remember anything.

24  MR. WESTFALL: It's a case -- It's an American

25  Muslim charity and obviously Muslim men and the issue is

18:00 1    whether they -- I mean the government alleges they gave

2    material support to HAMAS.  The case has something to do

3    with terrorism.  Terrorism is in the name of the charge.

4    How do you feel about being in a jury on that type of

5    case?

6            VENIRE PERSON:  I really don't know what to feel

7    about it.  If I had to be picked, I had to be picked.  I

8    don't know that I feel anything one way or the other.

9            MR. WESTFALL:  Your dad I guess was in the Air

10   Force?

11           VENIRE PERSON:  Yes, he was.

12           MR. WESTFALL:  Retired?

13           VENIRE PERSON:  He's retired from the Air Force

14   but not from working.  He works for Customs.

18:00 15           MR. WESTFALL:  He works for ICE now?

16           VENIRE PERSON:  U.S. Customs and Border Officer.

17           MR. WESTFALL:  Where?

18           VENIRE PERSON:  In New Mexico.

19           MR. WESTFALL:  So he mans like a border

20   crossing?

21           VENIRE PERSON:  He actually manages the border

22   crossing.  He's the senior officer there.

23           MR. WESTFALL:  What brought you over here?

24           VENIRE PERSON:  I haven't lived with my parents

25   in years.  I haven't lived with them since 1996.  I mean

18:00 1    they live their life, and I have mine.  I probably see

2    them every couple of years.

3              MR. WESTFALL:  And you have a bachelor of fine

4    arts?

5              VENIRE PERSON:  Yes.

6              MR. WESTFALL:  Where did you get that?

7              VENIRE PERSON:  Art Institute.

8              MR. WESTFALL:  In Dallas?

9              VENIRE PERSON:  Yes and University of Pittsburgh

10   for a while.

11             MR. WESTFALL:  And you do graphic arts now?

12             VENIRE PERSON:  I'm an art director for Zig

13   Zeigler.

14             MR. WESTFALL:  Oh really, how many art directors

18:00 15   does Zig Zeigler have?

16             VENIRE PERSON:  Just one, me.

17             MR. WESTFALL:  So what do you do for Zig

18   Zeigler?

19             VENIRE PERSON:  Pretty much design his manuals

20   and pamphlets and logos.

21             MR. WESTFALL:  How well he is?

22             VENIRE PERSON:  Pretty good for someone who's

23   eighty.  He still comes in the office every Monday

24   morning.

25             MR. WESTFALL:  Anything about your job -- If

18:00 1  this trial goes like four months, is that going to be an

2  issue at your job?

3         VENIRE PERSON:  I thought about it, and I think

4  I can probably do the work in the evening.  I could

5  probably go ahead and work from home.  It would be

6  inconvenient, but I don't think it would be work

7  threatening I guess I should say.

8         MR. WESTFALL:  You said in your questionnaire

9  that you have followed the Palestinian-Israeli conflict

10  pretty closely.

11         VENIRE PERSON:  I listen to KVRA and the BBC.

12  It's always on there.

13         MR. WESTFALL:  So aside from listening to the

14  public radio, have you read any books?

18:00 15         VENIRE PERSON:  No, I just follow the news.

16  It's too pointed.  News is one thing, but a book is a

17  little more pointed.  If that's the case, I would have to

18  probably read every other book.

19         MR. WESTFALL:  Excellent.  Do you know any

20  people who practice the Muslim faith?

21         VENIRE PERSON:  No, I do not.

22         MR. WESTFALL:  Have you ever?

23         VENIRE PERSON:  I'm sure I have known some

24  friends, but we never talked about it.  It's been a while.

25  It was a long time ago, but as far as right now, no, I

18:00 1     don't know anybody that said they openly practiced it.

2           MR. WESTFALL:  Have you had any bad experiences

3     or good experiences with Arabs or Muslims?

4           VENIRE PERSON:  I worked for an Iranian guy

5     about four years, and he was nice.  I mean I didn't have

6     any problems with him.  He told me a little about his

7     faith.

8           MR. WESTFALL:  What did you think?

9           VENIRE PERSON:  It's interesting.  Actually I

10    don't practice faith, but I found it interesting

11    historically speaking because it all came from the same

12    base.  So it's interesting.

13         MR. WESTFALL:  In your questionnaire we're

14    talking about citizens versus noncitizens and whether

18:00 15   Constitutional rights should be afforded to them.

16         VENIRE PERSON:  That's a tricky question.  I was

17    actually weighing it when I answered that question.  I

18    started thinking about American citizenship and human

19    rights.  Should they get the same rights?  I don't know.

20    My dad defended this country, still defending it for the

21    last forty years.  So it's pretty hard for me to say that

22    someone who's not a citizen should get the same rights as

23    a U.S. citizen, but at the same time there is human rights

24    that cross over.  So it's a tricky question to answer.

25         MR. WESTFALL:  How about some people will draw a

18:00 1  distinction between citizens and noncitizens and other

2  people will draw a distinction between legal residents and

3  illegal residents?

4       VENIRE PERSON:  I know what you are saying.  If

5  the case is they are a legal resident, it gets tricky.  If

6  they were a legal resident, I would have to give them the

7  same rights as an American citizen because they are

8  supposed to be here.  No, if they are illegal, I wouldn't.

9  That's for sure.

10       MR. WESTFALL:  How do you feel about freedom of

11  speech?

12       VENIRE PERSON:  I feel strongly about it.

13  Again, when my father defended the country, you are

14  afforded freedom of speech.  So I feel very strongly about

18:00 15  that.  I feel strongly about any rights given to citizens.

16       MR. WESTFALL:  Any places that don't have

17  freedom of speech?

18       VENIRE PERSON:  A lot of places.  Almost all the

19  European countries and everyplace else.  They have a Roman

20  law or marshal law where you are pretty much guilty first.

21  They don't have freedom of speech over there, that's for

22  sure.

23       THE COURT:  Mr. Westfall, your time has expired.

24       MR. WESTFALL:  Thank you, your Honor.

25       THE COURT:  Counsel for the government have

18:00 1    questions?

2              MR. JACKS:  Yes, your Honor.  Good morning, Mr.

3    Neal.  My name is Jim Jacks.  I'm an Assistant United

4    States Attorney for the Northern District of Texas.  I'm

5    one of the prosecutors that will be representing the

6    government in this trial.  I just have a few questions for

7    you as well.  Your time that you lived overseas, was that

8    with your family when your dad was serving overseas?

9              VENIRE PERSON:  Yes.

10             MR. JACKS:  She has to write down everything.

11   And I know we are far apart and this room is not conducive

12   to hearing each other, but if I could get you to speak up.

13             VENIRE PERSON:  Sure.

14             MR. JACKS:  How long have you worked for -- Is

18:00 15   it Zeigler?

16             VENIRE PERSON:  Zig Zeigler.

17             MR. JACKS:  Yes.  How long have you worked

18   there?

19             VENIRE PERSON:  Four and a half years.

20             MR. JACKS:  Before that, what kind of work did

21   you do?

22             VENIRE PERSON:  A bar manager of a night club.

23             MR. JACKS:  In Dallas?

24             VENIRE PERSON:  Yes.

25             MR. JACKS:  Which one?

18:00  1          VENIRE PERSON:  It no longer exists.  It was

2      Area 51, but it was the Iranian gentlemen I worked for.

3      Him and his sons owned it.

4          MR. JACKS:  How long did you work there?

5          VENIRE PERSON:  About four years.

6          MR. JACKS:  Was it by Love Field?

7          VENIRE PERSON:  Downtown where the Old Stork

8      Club used to be.

9          MR. JACKS:  And what did you do before that?

10          VENIRE PERSON:  I worked as a freelance graphics

11      designer off and on and worked at bar places.  But

12      basically a freelance designer.

13          MR. JACKS:  And in layman's terms what did you

14      do as a graphic designer?

18:00 15          VENIRE PERSON:  Just design logos, posters and

16      stuff like that.

17          MR. JACKS:  Did you work for a company?

18          VENIRE PERSON:  I freelanced so I worked for a

19      whole bunch of companies.  I don't remember half of them.

20          MR. JACKS:  And Zig Zeigler, what is his

21      company?

22          VENIRE PERSON:  It's a performance company.  We

23      do business training, corporate training, sales, you know,

24      stuff like that.

25          MR. JACKS:  And how big is the company in terms

18:00 1   of employees?

2          VENIRE PERSON:  I would say less than thirty.

3   It fluctuates.  We go anywhere from thirty to fifty.

4   Hasn't been over thirty since the time I worked there.

5          MR. JACKS:  Their offices are?

6          VENIRE PERSON:  Addison.

7          MR. JACKS:  With regard to this gentlemen you

8   worked for when you were asked if you knew any Muslims,

9   you said an Iranian.  He was in fact a Muslim?

10          VENIRE PERSON:  Most definitely.  He wore

11   necklaces that had different items of faith on it.

12          MR. JACKS:  How observant was he?  Did he pray

13   five times a day?

14          VENIRE PERSON:  You know, I don't know the

18:00 15   extent of his faith.  I know when Iran was mentioned, he

16   was open to talk about it.  I don't know that he was

17   observant because he owned a night club that had drinking

18   in it.  I know his wife wasn't, and I don't think his sons

19   weren't either.

20          MR. JACKS:  It's hard to hear.  Did you say you

21   talked to him about your faith?

22          VENIRE PERSON:  No.  I didn't talk to him about

23   my faith.  Occasionally, yes.

24          MR. JACKS:  But you talked to him about his

25   background?

18:00 1          VENIRE PERSON:  Yes.

2          MR. JACKS:  How long has your father been with

3     the Customs Service and Border Protection?

4          VENIRE PERSON:  About eight years now.  He has

5     always done something with the country, firefighting.  He

6     believes in it strongly.

7          MR. JACKS:  Has he always been stationed in New

8     Mexico?

9          VENIRE PERSON:  No, before Customs he's been

10    stationed in Europe fifteen years.

11         MR. JACKS:  Mr. Neal, you have had very little

12    explanation given to you about the trial.  Generally it's

13    been stated that the central charge, if you will, is

14    providing material supported to a designated terrorist

18:00 15    organization.  Have you ever served on a trial jury

16    before?

17         VENIRE PERSON:  No, this is my first time even

18    being called.

19         MR. JACKS:  Have you ever received a jury

20    summons before?

21         VENIRE PERSON:  No.

22         MR. JACKS:  After both sides have presented

23    their testimony in evidence and depending on if you are in

24    state court or federal court, before the attorneys give

25    their final summations, the Judge will tell the jury what

18:00 1   the law is, and he would read from a document, and the

2   jury will get copies of that document.  It tells you what

3   the government must prove, what the law is, definitions of

4   words that are words of art, that type of thing.  I expect

5   in this case as part of the Judge's instructions, he would

6   tell the jury that HAMAS has been designated as a

7   terrorist organization by the U.S. government.  I also

8   expect in those instructions he would tell the jury that

9   anything that is given to a terrorist organization --

10   money, clothing, charitable items -- is still a violation

11   of the law.  If that money was spent for food or clothing

12   or medicine that was provided to the benefit of this

13   terrorist organization, that's still a violation of the

14   law.  If that instruction was given to you, could you

18:00 15   follow that instruction?

16           VENIRE PERSON:  Yes.

17           MR. JACKS:  Thank you, sir.

18           THE COURT:  Mr. Neal, we are in the process of

19   talking with the members of the pool from which the jury

20   will be selected that would hear this case.  I expect that

21   process will go on for the rest of today and probably into

22   tomorrow so until you hear from us again you should not

23   discuss this case with anyone or allow anyone to discuss

24   it with you, and if there are any media accounts about the

25   case, you should not read or watch or listen to any of

18:00 1    those.

2          Thank you.  You may be excused.

3          Good morning, Ms. Taylor.  Counsel for the

4    parties have some questions they would like to ask you.

5          MS. MORENO:  Good morning, Ms. Taylor.  You are

6    going to have to speak up a little bit so that I can hear

7    you.  My name is Linda Moreno.  I'm one of the defense

8    attorneys in this case.  I am going to ask you some

9    questions about the questionnaire you filled out a few

10   weeks ago and if you have heard anything about this case

11   which we will discuss in a minute.

12       This is the case of the Holy Land Foundation which is

13   an American Muslim charity.  I'm wondering if you have

14   heard anything about the Holy Land Foundation in the press

18:00 15 or TV or on the radio?

16         VENIRE PERSON:  I haven't heard anything.  I

17   have heard other people talking.  I have a four year old

18   daughter.  So I don't get to watch the news.  I have just

19   heard other people talking.

20         MS. MORENO:  You have a four year old daughter,

21   and you are a busy mom?

22         VENIRE PERSON:  Single and her dad is not

23   around.  So it's just me all the time.

24         MS. MORENO:  Let's talk about that.  This case

25   may last three to four months, maybe longer.  So what we

18:00 1   need to know is if that kind of jury service would be an

2   economic hardship for you or in your family.

3           VENIRE PERSON:  As far as my daughter goes, I

4   have to pick her up from day care by six.  Like I said,

5   I'm a single mom, and I don't have anybody to help me.  I

6   live in Waxahachie, and she goes to school in Red Oak.

7           MS. MORENO:  How far is Red Oak from her?

8           VENIRE PERSON:  It's twenty-five miles, but with

9   the traffic and commute it turns into an hour drive.

10          MS. MORENO:  So you would have to leave this

11   courthouse by five o'clock?

12          VENIRE PERSON:  Yes, if not earlier.  That's

13   what time her day care closes.  So I have to pick her up

14   by six.

18:00 15          MS. MORENO:  What about in the morning?

16          VENIRE PERSON:  Her day care opens at 6:30.

17   It's not an issue getting her there.  It's picking her up.

18          MS. MORENO:  And what do you do?

19          VENIRE PERSON:  I'm an investment banker, and I

20   sell investments for the bank as well.

21          MS. MORENO:  And in terms of your job, would

22   three to four months pose a difficulty?

23          VENIRE PERSON:  I looked it up after I got the

24   form, and human resources says they will pay you, but they

25   could fire you for anything.  I don't know.

18:00 1          MS. MORENO:  Have you talked to anybody about

2     your summons?

3          VENIRE PERSON:  My managers and stuff.  I told

4     them about the paper I got and said it's going to last

5     four months, and they are like I hope you get out of it.

6          MS. MORENO:  They said that they would like you

7     out of it?

8          VENIRE PERSON:  Well, yes, but --

9          MS. MORENO:  If there is any further information

10     that you get from your job before this process is over in

11     the next day or two, could you alert us?  Let the Court

12     know or the jury clerk know?

13          VENIRE PERSON:  Yes.

14          MS. MORENO:  You said when I asked you if you

18:00 15     had heard anything about the case -- You said you heard

16     others talking about it.

17          VENIRE PERSON:  Yes.

18          MS. MORENO:  Tell me about that.

19          VENIRE PERSON:  They are saying it's on the news

20     and talking about it, not in detail what it's over, just

21     talking about, you know, the Holy Land trial and big case.

22     I don't know in detail about anything.  I just get to

23     watch the Disney Channel.  That's it.

24          MS. MORENO:  Lots of Disney Channel?

25          VENIRE PERSON:  Yes.

18:00 1          MS. MORENO:  There aren't too many trials on the

2      Disney Channel?

3          VENIRE PERSON:  No.

4          MS. MORENO:  All right.  Let's talk about this

5      case.  This case is one where the government claims that

6      this foundation provided material support to a terrorist

7      organization.  Knowing that, just that little bit of

8      information, does that cause you any concern about sitting

9      on a case like this?  Does that bring anything up for you?

10     Let me tell you there aren't any right or wrong answers

11     here.  So it's our opportunity to hear what you really

12     feel about this.

13         VENIRE PERSON:  It's a little scary considering

14     what the subject is over and stuff like that.  As far as

18:00 15     that whole thing -- I don't know.  It's a little

16     intimidating.

17         MS. MORENO:  I have heard you say intimidating

18     and fear?

19         VENIRE PERSON:  Well, after 9-11, terrorists is

20     like whoa.

21         MS. MORENO:  Given the thoughts you have and the

22     concerns that you have, do you think that you could really

23     put those aside and presume these gentlemen innocent which

24     is what is required of a juror to sit in this case or

25     would that be very difficult for you?

18:00  1           VENIRE PERSON:  I don't know.  It's kind of

       2      hard.  I think it's just a touchy subject for everybody

       3      that is American that experienced 9-11 and went through

       4      the whole thing.  As a person, yeah, I would try to, but I

       5      guess it's just that word, you know, and everything that's

       6      been going on ever since then.

       7           MS. MORENO:  I appreciate what you are saying in

       8      terms of you would try to.  What the law requires in this

       9      case is that you must assure us -- And it's okay if you

      10      can't assure us.  But you must assure us that would not

      11      color your opinion and those prejudices would not affect

      12      the way you would evaluate this case.  You would have to

      13      assure us of that.  Could you?

      14           VENIRE PERSON:  I would try my hardest.  When

18:00 15      you say prejudice, I mean it's not against a certain race

      16      or a religious thing.  It's just that word.

      17           MS. MORENO:  I'm talking now more about the

      18      prejudices, not so much about your fears.  Well, let me

      19      ask it this way.  Would you knowing -- And you are the

      20      only person who can answer this question sitting there.

      21      With your state of mind right now as we're discussing

      22      this, would you want to be judged with someone with your

      23      state of mind in a case like this?

      24           VENIRE PERSON:  Yes.  I feel like I'm a very

      25      open person and not judgmental.  I think I would be fair,

18:00  1    but you know, it's kind of like going to work and having a

     2    bad day.  You have to put that aside and focus on your

     3    job.

     4              THE COURT:  Ms. Moreno, your time has expired.

     5              MS. MORENO:  Thank you so much.

     6              THE COURT:  Counsel for the government have

     7    questions for Ms. Taylor?

     8              MR. JACKS:  Good morning, Ms. Taylor.

     9              VENIRE PERSON:  Hello.

    10              MR. JACKS:  My name is Jim Jacks.  I'm an

    11    Assistant United States Attorney here in the Northern

    12    District of Texas.  I'm one of the prosecutors in this

    13    case that will be representing the government during this

    14    trial, and I just have a few questions for you as well if

18:00 15    you don't mind.

    16              How long have you worked for the bank?

    17              VENIRE PERSON:  I have worked for that bank

    18    since April of last year, but I have been in banking for

    19    about two and a half years now.

    20              MR. JACKS:  So April of 2006?

    21              VENIRE PERSON:  Yes.

    22              MR. JACKS:  I believe it's Bank of America?

    23              VENIRE PERSON:  Citizens National Bank.  It's a

    24    smaller bank in Ellis County.

    25              MR. JACKS:  Is it in Waxahachie?

18:00 1          VENIRE PERSON:  The one I worked at is out of
2    Red Oak, but they are officed out of Waxahachie.
3          MR. JACKS:  Before that bank, what bank did you
4    work at?
5          VENIRE PERSON:  I didn't.  I was a stay-at-home
6    mom and went to school.
7          MR. JACKS:  I'm confused.
8          VENIRE PERSON:  I worked Guarantee Bank
9    currently.  Before that I worked First Citizens National
10   Bank of Texas.  It's headquartered in Waxahachie with an
11   office in Red Oak, and I worked there a year, and prior to
12   that I stayed home a few months, and prior to that I was
13   going to nursing school.
14          MR. JACKS:  Where did you attend nursing school?
18:00 15         VENIRE PERSON:  Navarro in Waxahachie.
16          MR. JACKS:  The Guaranty Bank you worked at, is
17   that in Dallas?
18          VENIRE PERSON:  Well, I was, but now I'm in
19   Arlington.
20          MR. JACKS:  You said your day care where your
21   daughter stays closes at six so you need to make sure that
22   you are there by six o'clock?
23          VENIRE PERSON:  Yes.
24          MR. JACKS:  So if the Court were to adjourn at
25   4:45 each day, you would expect that would give you time

18:00 1    to get there if you were chosen for this jury?

2         VENIRE PERSON:  Yes.

3         MR. JACKS:  You said, I believe, that you are a

4    fair person, not judgmental and one that will listen to

5    both sides and then make a decision.  Did I hear you

6    correctly?

7         VENIRE PERSON:  Yes.

8         MR. JACKS:  As far as the notion of fear, it was

9    your answer is the word "terrorism" has a different ring

10   to it than say a fraud case or a drug case or something

11   like that?  --

12        VENIRE PERSON:  Yes, I think it does.

13        MR. JACKS:  But the fact that this case is still

14   a criminal trial in a courtroom with a judge and twelve --

18:00 15   at least twelve jurors --

16        VENIRE PERSON:  Yes.

17        MR. JACKS:  -- would that reassure you that at

18   the end of the day this is still just a criminal case?

19        VENIRE PERSON:  It's a criminal case regardless

20   of what it is.  It's just the subject matter.

21        MR. JACKS:  Are you aware if there have been

22   other terrorism trials in the United States?

23        VENIRE PERSON:  No.

24        MR. JACKS:  Okay.  If you were chosen and became

25   a member of this jury, will you be able to follow the

18:00  1    Court's instructions on what the law is and issues like

2    the burden of proof that the government has and the

3    presumption of innocence that the defendants enjoy?  Can

4    you follow those instructions from the Judge?

5        VENIRE PERSON:  Yes.

6        MR. JACKS:  Have you lived in this area all of

7    your life, in the Dallas Fort Worth area?

8        VENIRE PERSON:  I grew up in Dallas.  I was born

9    in Saint Paul Hospital.  I just moved to Waxahachie about

10   five years ago.

11       MR. JACKS:  And you have never been on a trial

12   jury before; is that correct?

13       VENIRE PERSON:  No, never.

14       MR. JACKS:  Have you ever received a jury

18:00 15  summons before?

16       VENIRE PERSON:  No.

17       MR. JACKS:  At the end of all the evidence after

18   both sides have presented all the testimony and witnesses

19   and documents that they want to present, the Judge will

20   read and give his instructions to the jury which contains

21   the law the jury is supposed to use in the case, and it

22   will tell the jury this is what must be proven before you

23   can find this person guilty of this charge, and he would

24   have definitions in there, and so if there is a word used

25   in one of these laws, if necessary, he would define it in

18:00   1    that same instruction. I expect as part of his

  2    instructions, he would tell the jury that HAMAS is a

  3    terrorist organization. I don't remember if you were

  4    asked. Have you ever heard of HAMAS?

  5           VENIRE PERSON: No. And when I filled out the

  6    questionnaire, that's the first time I have seen any of

  7    the names.

  8           MR. JACKS: I expect the Judge will tell you

  9    that HAMAS has been designated a terrorist organization by

  10    the United States Government. I also suspect in his

  11    instructions he would tell you that any type of material

  12    support -- money or goods or services -- that are given to

  13    a terrorist organization or to an entity affiliated with a

  14    terrorist organization is against the law, including if

18:00  15    that money is later spent on what might be considered

  16    charitable items -- food or clothing or educational

  17    materials, books, backpacks. If that is in the

  18    instructions, if the Judge says even money or materials of

  19    that nature is a violation of the law if it's given

  20    knowingly to a terrorist organization, would you be able

  21    to follow that instruction?

  22           VENIRE PERSON: Well, I think it is. If you are

  23    supporting them in any way, giving them a piece of bread

  24    or supplying a bomb.

  25           MR. JACKS: Thank you, ma'am.

18:00  1          THE COURT:  Ms. Taylor, we are in the process of

2      interviewing the panel from which a jury will be selected

3      to hear this case.  I expect that to go on through

4      tomorrow.  So until you hear from us you should not

5      discuss the case with anyone or allow anyone to discuss it

6      with you, and if there are any media accounts, you should

7      not read or watch or listen to any of those.

8          VENIRE PERSON:  May I approach?

9          THE COURT:  Yes, sir.

10          VENIRE PERSON:  I don't know if it matters or

11     not, but I have a vacation in October.  The ladies down

12     there told me to let you know of that.

13          THE COURT:  Would you mind telling that to

14     everybody?

18:00 15          VENIRE PERSON:  Sure.

16          THE COURT:  It was just disclosed to me by Ms.

17     Taylor that she has vacation plans in the month of

18     October.  Can you tell us about that?  Have you paid for

19     those already?

20          VENIRE PERSON:  My mom is taking my family on a

21     cruise starting October 7, and it's lasting for a week.

22     The lady downstairs told me to tell you about it.  So I'm

23     telling you.

24          THE COURT:  Thank you, Ms. Taylor.

25          MS. MORENO:  First of all, I apologize for not

18:00 1    going into the vacation, and I will keep that in mind the
2    next time.  We would move for both a hardship and a cause
3    challenge on this young lady.  She's got a vacation from
4    October 7 for a week.  Clearly, it doesn't seem from all
5    the estimates that this case will be over by then.
6    Secondly, the picking up of her daughter, if I recall
7    correctly, I think the Court indicated you expected the
8    jurors to be bussed from a particular location.  So it's
9    not that she's going to be able to leave here at 4:45 and
10    directly pick up her child which she has to get to at six
11    o'clock.  The reason I asked about the distance is I'm not
12    from here.  It's a good hour, and I think that would pose
13    a problem.

14    Additionally, on the cause issues, the young
18:00 15    lady when I asked her about the presumption and a case
16    like this, she indicated that she thought the terrorist
17    charges were scary and intimidating.  She indicated she
18    would try to put them aside.  I kept asking for
19    assurances, but she could not provide them.  I can provide
20    the case law over the evening about the issues and there
21    can be no equivocation that she can afford these gentlemen
22    the presumption of innocence.

23    THE COURT:  Mr. Jacks, do you have an objection
24    to the challenge for cause of Ms. Taylor?

25    MR. JACKS:  Yes, sir, I don't believe any answer

18:00 1    she gave anywhere near approaches the grounds that she

2    should be excused for cause.  I think her answer was that

3    she would follow the Court's instructions and observe the

4    requirements of the burden of proof and presumption of

5    innocence.  And I do not believe that any of her answers

6    in any way indicate at the end of the day she couldn't be

7    a fair and impartial juror.

8           THE COURT:  Thank you.  I am going to take the

9    challenge for cause to Ms. Taylor under advisement.  There

10    is one other member of the venire that we have talked to

11    that I wanted to give all of you an update about.  I'm

12    sorry.  I have been intending to do this for the last

13    twenty-four hours, but it has slipped my mind every time.

14    But I wanted to cover it now while it is on my mind.  This

18:00 15    is on first day I believe, and I believe the last person

16    we saw on the first day.  Mr. Ivan Cabrera.  He's a

17    military reservist, and he expressed some concern that he

18    might be receiving training orders, and after that I

19    talked to Mr. Morales, and it turns out that Mr. Morales

20    and Mr. Cabrera had trained together.  So I asked Mr.

21    Morales if he had any way to determine if orders would be

22    received by Mr. Cabrera and he told me he would check into

23    it because he knew an officer that had access to the

24    computer.  And he told me yesterday that he had been in

25    touch with that officer, and he understood that Mr.

18:00 1    Cabrera's orders would be forthcoming, and I don't

2    remember the exact dates.  Do you?

3              MR. MORALES:  8th through the 20th in

4    preparation for going to Iraq.

5              THE COURT:  Thank you, sir.  We'll be in recess

6    for fifteen minutes.

7              (Recess)

8              THE COURT:  Good morning, Mr. Rosalez.  Counsel

9    for the parties in this case have some questions they

10   would like to ask you.

11             MR. WESTFALL:  Good morning.  My name is Greg

12   Westfall, and I'm one of the defense lawyers in this case.

13   I know you had to wait around this morning, and we

14   appreciate your patience, especially that you had to wait

18:00 15   for us to take a break.  I want to talk to you a few

16   minutes, and then the prosecutor may get up and talk to

17   you.  First off, I want to talk to you about your family

18   situation.  You said you are single but you have a ten

19   year old child.

20             VENIRE PERSON:  Yes, sir.

21             MR. WESTFALL:  Are you caring for your child?

22             VENIRE PERSON:  We have joint custody.

23             MR. WESTFALL:  So if you are on this jury for a

24   period of months, is that going to interfere with your

25   ability to care for your child.

18:00  1                    VENIRE PERSON:  No, sir.

       2                    MR. WESTFALL:  Do you have anything else like

       3      prepaid vacations?

       4                    VENIRE PERSON:  Yes, I do.  September 21st I'm

       5      going on a cruise.

       6                    MR. WESTFALL:  For how long?

       7                    VENIRE PERSON:  Five days.

       8                    MR. WESTFALL:  How long have you had the

       9      tickets?

      10                    VENIRE PERSON:  I bought them early march.

      11                    MR. WESTFALL:  Is it all prepaid?

      12                    VENIRE PERSON:  Yes.

      13                    MR. WESTFALL:  If you didn't go on the cruise,

      14      would you be able to get your money back?

18:00 15                    VENIRE PERSON:  No, sir, I believe the deadline

      16      was yesterday.

      17                    MR. WESTFALL:  This a family type of vacation?

      18                    VENIRE PERSON:  It's twenty friends of mine.

      19      We're all going.  Someone is getting married.

      20                    MR. WESTFALL:  It's a wedding?

      21                    VENIRE PERSON:  Yes, sir.

      22                    MR. WESTFALL:  Very well.  Thank you for telling

      23      us about that.

      24                    VENIRE PERSON:  You are welcome.

      25                    MR. WESTFALL:  The case is United States versus

18:00   1    Holy Land Foundation.  And it involves allegations of

      2    material support to a terrorist group, that being HAMAS.

      3    Having told you that, do you recognize the case style?  Do

      4    you recognize the facts at all?

      5              VENIRE PERSON:  I really haven't followed it.

      6              MR. WESTFALL:  Have you heard of it?

      7              VENIRE PERSON:  Yes, I heard of it just from TV.

      8              MR. WESTFALL:  Based on anything you have heard,

      9    have you formed any opinions?

    10              VENIRE PERSON:  No.

    11              MR. WESTFALL:  What does a coding tech do?

    12              VENIRE PERSON:  We code lenses for binoculars.

    13    Everything is pretty much laser guided in the military.

    14    So we code the lenses on the binoculars so the soldiers

18:00 15    won't get blind.

    16              MR. WESTFALL:  Do you just do it for military

    17    operations?

    18              VENIRE PERSON:  Yes, sir.  Just military.

    19              MR. WESTFALL:  Have you been in the military?

    20              VENIRE PERSON:  No, sir.

    21              MR. WESTFALL:  How did you get this job?

    22              VENIRE PERSON:  I coated lenses, like glasses

    23    eight years.  So a friend of mine gave me a referral for

    24    Northrup.

    25              MR. WESTFALL:  Is that who you work with,

18:00 1    Northrup?

2                    VENIRE PERSON:  Yes, sir.

3                    MR. WESTFALL:  Did you get a security clearance?

4                    VENIRE PERSON:  Yes.

5                    MR. WESTFALL:  So you have been investigated by

6    the FBI?

7                    VENIRE PERSON:  I don't know the extent of their

8    investigation, but they did a background check on me and

9    everything.

10                   MR. WESTFALL:  Did you do any other kinds of

11   military equipment like scopes or anything like that?

12                   VENIRE PERSON:  We do like tanks, windows for

13   tanks.

14                   MR. WESTFALL:  You personally do.

18:00 15                  VENIRE PERSON:  Every now and then.  It depends

16   on what the job calls for.

17                   MR. WESTFALL:  This coating prevents lasers from

18   being able to go into the binoculars?

19                   VENIRE PERSON:  Yes, sir.  And vice versa for

20   the tank windows.

21                   MR. WESTFALL:  Have you had any terrorism

22   training or anything like that as a result of your job?

23                   VENIRE PERSON:  No.

24                   MR. WESTFALL:  How do you feel about being on a

25   case where we're talking about Muslim men who are accused

18:00 1  of something where terrorism is actually in the name of

2  the offense?

3          VENIRE PERSON:  I have no problem.

4          MR. WESTFALL:  Do you know any Muslims?

5          VENIRE PERSON:  No, sir.

6          MR. WESTFALL:  Do you have any people of Arabic

7  descent that work at Northrup?

8          VENIRE PERSON:  No, sir.

9          MR. WESTFALL:  Have you ever any good

10 experiences or bad experiences with Muslims?

11          VENIRE PERSON:  No experiences at all.

12          MR. WESTFALL:  What else do you do besides your

13 work and your child?

14          VENIRE PERSON:  That's about it.  My son is

18:00 15 pretty much everything to me.

16          MR. WESTFALL:  Does he do things like play

17 soccer?

18          VENIRE PERSON:  Soccer and basic ball.

19          MR. WESTFALL:  You go to those games?

20          VENIRE PERSON:  Yes.  I try to be assistant

21 coach on some of the teams.

22          MR. WESTFALL:  Do you do any kind of a

23 charitable work?

24          VENIRE PERSON:  No, sir.

25          MR. WESTFALL:  Are you involved in your church?

18:00  1              VENIRE PERSON:  No.  The only church I'm

2      involved in is when I visit my family, Pentecostal.  So I

3      go over there.

4              MR. WESTFALL:  You do with your family to do

5      that?

6              VENIRE PERSON:  Yes, Easter and stuff like that.

7              MR. WESTFALL:  Your brother was a detention

8      officer for the State of Oklahoma?

9              VENIRE PERSON:  Yes.

10              MR. WESTFALL:  Does he still do that?

11              VENIRE PERSON:  No.

12              MR. WESTFALL:  What does he do now?

13              VENIRE PERSON:  I believe he works at Wal-Mart.

14              MR. WESTFALL:  This is a criminal case, and all

18:00 15      the rights apply when you are char ged with a crime in the

16      United States.  You have the right not to testify against

17      yourself or testify at all if you don't want to.  You know

18      that?

19              VENIRE PERSON:  Yes.

20              MR. WESTFALL:  You have the right to the

21      presumption of innocence.  Have you ever heard of that

22      term, presumption of innocence?

23              VENIRE PERSON:  No, sir.

24              MR. WESTFALL:  You have a right to have the

25      state prove or the government prove its case beyond a

18:00 1  reasonable doubt.  Have you ever heard of the

2  beyond-a-reasonable-doubt standard?

3          VENIRE PERSON:  Yes, sir.

4          MR. WESTFALL:  Well, the presumption of

5  innocence means as a person sits here and is charged with

6  an offense, they are presumed innocent until and unless

7  the government proves its case beyond a reasonable doubt.

8  Having told you a little more about that, have you heard

9  of that?

10          VENIRE PERSON:  No.

11          MR. WESTFALL:  Not from watching Cops or

12  anything like that?

13          VENIRE PERSON:  No.

14          MR. WESTFALL:  That is a very valuable and

18:00 15  serious protection to anyone who's charged with an

16  offense.  Anyone who's accused -- a citizen or a

17  noncitizen -- who's accused in the United States.  Do you

18  think that's fair?

19          VENIRE PERSON:  Yes.

20          MR. WESTFALL:  Do you think it's fair to have

21  that in a case that involves terrorism?

22          VENIRE PERSON:  Yes.

23          MR. WESTFALL:  Thank you very much.

24          THE COURT:  Counsel for the government have

25  questions for Mr. Rosalez?

18:00  1          MR. JACKS:  Thank you, your Honor.  Mr. Rosalez,

2   my name is Jim Jacks, and I'm an Assistant United States

3   Attorney for the Northern District of Texas.  I will be

4   one of the prosecutors in this case, and I will be

5   representing the government.  I have just a few questions

6   for you if you don't mind.  How long have you worked for

7   Northrup Grummen?

8          VENIRE PERSON:  Two and a half years.

9          MR. JACKS:  And before that, where did you work?

10         VENIRE PERSON:  SOR America.

11         MR. JACKS:  And that's some kind of an optical

12  company or lens manufacturing?

13         VENIRE PERSON:  Yes, sir.

14         MR. JACKS:  Where are they located?

18:00 15         VENIRE PERSON:  They are located in Farmer's

16  Branch.

17         MR. JACKS:  And Northrup Grummen is located

18  where?

19         VENIRE PERSON:  In Garland.

20         MR. JACKS:  Is it near Raytheon?

21         VENIRE PERSON:  Yes, it's right down the street.

22         MR. JACKS:  You live in Rowlett?

23         VENIRE PERSON:  Yes.

24         MR. JACKS:  Did you grow up in Oklahoma?

25         VENIRE PERSON:  No, I grew up in Dallas.

18:00 1          MR. JACKS:  But some of your family is in

2      Oklahoma?

3          VENIRE PERSON:  Yes, they relocated when my mom

4      married.

5          MR. JACKS:  Have you lived in the Dallas area

6      your whole life?

7          VENIRE PERSON:  Yes, sir.

8          MR. JACKS:  Do you remember receiving a part of

9      the questionnaire early before you came down to the

10      courthouse and filling out this multi-page questionnaire?

11          VENIRE PERSON:  Yes, sir.

12          MR. JACKS:  And that part of it pertained to

13      hardships or conflicts.  I cannot remember.  I'm sure I

14      saw it.  Did you mention the upcoming cruise in that form?

18:00 15          VENIRE PERSON:  No, I didn't.  I think that

16      would be a hardship.

17          MR. JACKS:  And the purpose of this cruise is a

18      wedding?

19          VENIRE PERSON:  Yes.  It's a friend of mine.

20          MR. JACKS:  Are you in the wedding?

21          VENIRE PERSON:  No.

22          MR. JACKS:  Where does it depart?

23          VENIRE PERSON:  Galveston and then Yucatan and

24      Mexico.

25          MR. JACKS:  And you said it's for a week?

18:00 1          VENIRE PERSON:  Five days.

2          MR. JACKS:  Your brother you said works for the

3     State of Oklahoma as a detention officer?

4          VENIRE PERSON:  He did.

5          MR. JACKS:  How long has it been since he did

6     that work?

7          VENIRE PERSON:  Two to three years.

8          MR. JACKS:  What does he do now?

9          VENIRE PERSON:  Works in Wal-Mart in Ada.

10          MR. JACKS:  This a prison that he worked at or a

11     county jail?

12          VENIRE PERSON:  It was a prison.

13          MR. JACKS:  You indicated in response to a

14     question that you had some friends that had been arrested

18:00 15     for different things.  One individual -- Actually two

16     individuals you said had been charged with intent to

17     distribute drugs.

18          VENIRE PERSON:  Yes, sir.

19          MR. JACKS:  Are those charges resolved or are

20     they still pending?

21          VENIRE PERSON:  They are resolved.

22          MR. JACKS:  Were they convicted?

23          VENIRE PERSON:  Yes, they are on probation.

24          MR. JACKS:  Was that in Dallas County or some

25     other county?

18:00 1                VENIRE PERSON:  Dallas.

2                MR. JACKS:  What drugs were involved?

3      Marijuana?  Cocaine?

4                VENIRE PERSON:  I believe cocaine.

5                MR. JACKS:  How close are you to those friends?

6                VENIRE PERSON:  I see them once, probably twice

7      a month.

8                MR. JACKS:  Did you ever attend court on their

9      behalf or anything like that?

10                VENIRE PERSON:  No, sir.

11                MR. JACKS:  Based on what you have learned about

12      that, do you feel like they were treated fairly by the

13      criminal justice system?

14                VENIRE PERSON:  Yes.

18:00 15                MR. JACKS:  Is there any question in your mind

16      about that?

17                VENIRE PERSON:  No.

18                MR. JACKS:  Thank you.

19                THE COURT:  Mr. Rosalez, we are in the process

20      of hearing from the panel from which the jury will be

21      selected to hear this case.  I expect that will last

22      through tomorrow.  Until you hear from us, you should not

23      discuss the case with anyone or allow anyone to discuss it

24      with you, and if there are any media accounts, you should

25      not read or watch or listen to any of those.  Thank you,

18:00 1    you may be excused.

2              VENIRE PERSON:  Thank you.

3              THE COURT:  Good morning, Mr. Griftner.  Counsel

4    for the parties have some questions to ask you.

5              VENIRE PERSON:  Is there a couple of things I

6    can say?

7              THE COURT:  Yes, sir.

8              VENIRE PERSON:  I didn't realize the longevity

9    of this, and I'm a new business office, and due to this

10   I'm missing computer training program for the sales

11   program, and as well as I have a trip this weekend to go

12   to California to promote my business.

13             THE COURT:  How long is that trip supposed to

14   last?

18:00 15            VENIRE PERSON:  That will be just through the

16   weekend.

17             THE COURT:  Thank you.  Mr. Westfall.

18             MR. WESTFALL:  I'm Greg Westfall.  Thank you for

19   waiting for us.  I'm one of the criminal defense lawyers

20   on this case.  I am going to speak with you a little bit,

21   and then the government will speak with you.  This is the

22   Holy Land Foundation, the United States versus the Holy

23   Land Foundation, and it involves allegations of material

24   support of a terrorist organization, specifically HAMAS.

25   Have you heard anything about the case?

18:00 1          VENIRE PERSON:  I remember like a year and a
     2    half ago when it was in the news.  I don't follow the news
     3    on a regular basis, but the bigger things I usually hear
     4    about from workers or family.
     5          MR. WESTFALL:  Have you formed any opinions on
     6    anything you have read or heard about the guilt or
     7    innocence of the defendants?
     8          VENIRE PERSON:  I don't know.  That's a hard
     9    question to answer.  It's hard to say yes or no honestly.
     10          MR. WESTFALL:  I'll tell you why I asked.  The
     11   jury that is impaneled ultimately for the trial -- You
     12   know how long it could last now, four months?
     13          VENIRE PERSON:  Yes, sir.
     14          MR. WESTFALL:  The jury has to make a decision
18:00 15   one hundred percent on the evidence and testimony that is
     16   given in trial inside this courtroom from that witness
     17   stand.  And no preformed opinions or personal feelings can
     18   interfere with that.  That is kind of a requirement for
     19   sitting on the jury, and that requirement changes case to
     20   case because, you know, if you are on a car theft case,
     21   the feelings may be different than if you are on a high
     22   profile case and has different issues.  Do you know what I
     23   mean?
     24          VENIRE PERSON:  Yes, before I got into it -- I'm
     25   dyslexic, and I scanned through it, and I didn't realize

1    the complexity of the case.  Like you said, a stolen car

2    or something like that would be a much easier way.  But

3    yeah, I probably have feelings towards a certain way.

4              MR. WESTFALL:  The legal basic question is can

5    you set those feelings aside and judge this case only on

6    the evidence.  And there is no right or wrong answer to

7    that question.

8              VENIRE PERSON:  Honestly not really.  That would

9    be hard.

10             MR. WESTFALL:  You don't think you can?

11             VENIRE PERSON:  No.

12             MR. WESTFALL:  I saw the Griftner's Motorcycles,

13   and I thought that might be your business.

14             VENIRE PERSON:  Yes.  I have been working on it

15   for a month now.  I just turned twenty-five and got my

16   inheritance, and I just put the open sign up last

17   Wednesday.

18             MR. WESTFALL:  You have a fairly substantial

19   financial investment?

20             VENIRE PERSON:  Yes, my life is riding on it.

21   If it doesn't go, my life is in the gutter.

22             MR. WESTFALL:  Thank you.

23             THE COURT:  Counsel for the government have

24   questions?

25             MR. GARRETT:  No, your Honor.

18:00  1          THE COURT:  Mr. Griftner, we're in the process

2     of talking to the panel that will hear this case, and I

3     think that will go through tomorrow.  So until you hear

4     from us, you should not discuss the case with anyone or

5     allow anyone to discuss it with you, and if there are any

6     media accounts of this case, you should not read or watch

7     or listen to any of those.

8          MR. WESTFALL:  Your Honor, we challenge the

9     juror.  We don't think he can be fair and impartial.

10         THE COURT:  Does the government have a position

11    about that?

12         MR. GARRETT:  No objection.

13         THE COURT:  I will excuse the juror for cause.

14    I think we're ready to see next Ms. Gonzales.

18:00 15         Good morning, Ladies and Gentlemen.  Counsel for

16    the parties have some questions to ask you.

17         MS. MORENO:  Good morning, Ms. Gonzales.  My

18    name is Linda Moreno, and I'm one of defense counsel in

19    this case.  I want to ask you some questions about the

20    answers you filled out on the questionnaire a couple of

21    weeks ago.  Do you remember that?

22         VENIRE PERSON:  Yes.

23         MS. MORENO:  And also if you have heard anything

24    about this case.  So I am going to ask you a few questions

25    for a few minutes.

18:00 1        This is the case that involves the Holy Land

2    Foundation charity.  Holy Land Foundation, have you heard

3    about it or read about it in the media lately?

4        VENIRE PERSON:  I have heard about it in the

5    news, but I really haven't been paying attention to it.

6        MS. MORENO:  Was that recently or?

7        VENIRE PERSON:  It was -- I think it was Friday

8    morning as I was going to work.

9        MS. MORENO:  Did you hear anything of any of the

10   details about the case?

11       VENIRE PERSON:  I really didn't pay any

12   attention.

13       MS. MORENO:  I see that you are a driver for

14   O'O'Riley Auto Parts?

18:00 15       VENIRE PERSON:  Yes, I'm a driver.

16       MS. MORENO:  This case may take three to four

17   months.  Perhaps longer.  We're not sure.  Knowing that,

18   would that cause you any difficulty or economic hardship

19   at your job?

20       VENIRE PERSON:  Well, I'm the only one.  I'm not

21   married.  I'm single.  So I am responsible for my bills.

22       MS. MORENO:  Do you know if your company would

23   pay you?

24       VENIRE PERSON:  I think they do.  I'm not too

25   sure.

18:00  1           MS. MORENO:  You are not sure?

2           VENIRE PERSON:  No.

3           MS. MORENO:  If you find out they don't pay you,

4  would you please alert the Court?

5           VENIRE PERSON:  Yes.

6           MS. MORENO:  You are a Spanish speaker?

7           VENIRE PERSON:  Yes.

8           MS. MORENO:  Is Spanish your first language?

9           VENIRE PERSON:  Well, my mom doesn't speak

10  English.  And at work, too, they are mostly Spanish

11  people.

12           MS. MORENO:  In this case, there is going to be

13  translation evidence -- documents, transcripts -- from

14  Arabic to English.  Have you ever had a situation in your

18:00 15  life where someone was translating something from Spanish

16  to English?

17           VENIRE PERSON:  No.

18           MS. MORENO:  Let me give you the example.  Are

19  you nervous?

20           VENIRE PERSON:  Yes.

21           MS. MORENO:  I am, too.  Let's relax.  Have you

22  ever had a situation where someone was translating from

23  Spanish to English and the words were correct, but the

24  meaning was wrong?

25           VENIRE PERSON:  No.

18:00 1                    MS. MORENO:  Have you ever had that experience?

2                    VENIRE PERSON:  No.

3                    MS. MORENO:  This is a case that involves

4        allegations of terrorism.  The government says the Holy

5        Land Foundation which is an American Muslim charity

6        through humanitarian aid supported terrorist organization

7        named HAMAS.  Have you ever heard of HAMAS?

8                    VENIRE PERSON:  No.

9                    MS. MORENO:  Knowing this case involves charges

10       of terrorism which are pretty serious charges -- Do you

11       agree?

12                    VENIRE PERSON:  Yes.

13                    MS. MORENO:  Does that cause you any concern in

14       sitting on a jury like this?  Does it worry you?

18:00 15                    VENIRE PERSON:  I guess.

16                    MS. MORENO:  And I'm sorry to explore this with

17       you, but there is an important reason for me to do that,

18       and I want to tell you what you say is not right or wrong.

19       We're not looking for right or wrong answers.  We're not

20       looking for a certain answer.  We're trying to determine

21       if this is a good case for you to sit on in terms of your

22       ability to be fair and impartial.  Can you tell us, assure

23       us, that you would not be concerned or afraid to sit on a

24       jury like this?  Or would you have some fear?

25                    VENIRE PERSON:  I think I would have some fear.

18:00 1    Concern.

2           MS. MORENO: Tell us about that.

3           VENIRE PERSON: Well, I am very -- I get very

4    nervous. I am very forgetful. I can't remember. I can't

5    communicate that well with people. And if I was asked

6    questions, I would probably not be able to answer them.

7           MS. MORENO: In this case which may take, as I

8    said, four months there is going to be a lot of

9    evidence -- transcripts, documents, videos and tapes. Do

10    you think it would be difficult for you to remember and

11    follow along on this evidence?

12           VENIRE PERSON: Yes.

13           MS. MORENO: Would that be so difficult for you

14    that you couldn't really keep track of the information and

18:00 15    fulfill your duty as a juror?

16           VENIRE PERSON: Yes.

17           MS. MORENO: You couldn't do that, could you?

18           VENIRE PERSON: No.

19           MS. MORENO: Thank you so much. We really

20    appreciate it. Pass the juror.

21           THE COURT: Counsel for the government have

22    questions for Ms. Gonzales?

23           MR. JACKS: Yes, your Honor. Good morning, Ms.

24    Gonzales.

25           VENIRE PERSON: Good morning.

18:00  1              MR. JACKS:  My name is Jim Jacks.  I'm the

       2   Assistant United States Attorney here in Dallas.  I'll be

       3   one of the prosecutors in this case which means I will be

       4   representing the government during this trial, and I have

       5   a few questions to ask you as well for a very brief

       6   moment.

       7              How long have you worked for O'Riley Auto Parts?

       8              VENIRE PERSON:  Ten years.

       9              MR. JACKS:  Have you ever held another position

      10   over the driver?

      11              VENIRE PERSON:  No.

      12              MR. JACKS:  Do you make deliveries to car

      13   dealerships and garages and that type of thing?

      14              VENIRE PERSON:  Yes.

18:00 15              MR. JACKS:  Is your work schedule Monday through

      16   Friday or do you work on the weekends or does it vary?

      17              VENIRE PERSON:  Monday through Friday.

      18   Sometimes Saturdays.  But mostly from Monday to Friday.

      19              MR. JACKS:  And some of the people who have

      20   filled out the questionnaire have filled it out

      21   differently, but do you have any children?

      22              VENIRE PERSON:  I have three boys, but they are

      23   all grown.

      24              MR. JACKS:  Do they still live in the Dallas

      25   area?

18:00 1                    VENIRE PERSON:  Yes.

2                    MR. JACKS:  Have you lived in the Dallas area

3        your entire life?

4                    VENIRE PERSON:  Since 1974.

5                    MR. JACKS:  Before that where were you living?

6                    VENIRE PERSON:  In California.

7                    MR. JACKS:  Were you born and raised in

8        California?

9                    VENIRE PERSON:  I was born in Mexico, and at the

10       age of seven I came to the United States.

11                   MR. JACKS:  What caused you to move from

12       California to Texas?

13                   VENIRE PERSON:  Work.

14                   MR. JACKS:  You were told just a little bit

18:00 15       about this trial.  The principal charge essentially has

16       been referred to as providing material support to a

17       terrorist organization; namely HAMAS.  And you said you

18       had never heard of a group called HAMAS.

19                   VENIRE PERSON:  No.

20                   MR. JACKS:  And I think you have indicated that

21       you are nervous about being here.  Is that correct?

22                   VENIRE PERSON:  Correct.

23                   MR. JACKS:  In terms of the word "fear," were

24       you afraid before you came here or nervous?  Which is the

25       more accurate if you can?

18:00 1          VENIRE PERSON:  I guess I was afraid when I got

2      the letter to appear.

3          MR. JACKS:  What was it that made you afraid?

4      What were your concerns?

5          VENIRE PERSON:  The questions that I was going

6      to be asked.  If I was going to be able to understand them

7      and answer them.

8          MR. JACKS:  All right.  So it was more

9      nervousness or concern or anxiety on your part about being

10     able to respond to questions like this in front of a group

11     of people.  Is that a fair statement?

12         VENIRE PERSON:  Yes.

13         MR. JACKS:  Is that different than being afraid

14     for your safety?  Are you afraid for your safety or just

18:00 15  anxious about being questioned in public about things?

16         VENIRE PERSON:  I think it's mostly anxious and

17     anxiety.

18         MR. JACKS:  Have you ever served on a jury

19     before?

20         VENIRE PERSON:  No.

21         MR. JACKS:  Have you ever received a jury

22     summons before?

23         VENIRE PERSON:  Yes.

24         MR. JACKS:  About how many times approximately

25     if it's a lot?

18:00   1              VENIRE PERSON: Just one. This is two.

  2              MR. JACKS: This is the second time?

  3              VENIRE PERSON: This is the second time.

  4              MR. JACKS: The earlier time, was that the

  5  Dallas County Courthouse? Is that where you went?

  6              VENIRE PERSON: Yes.

  7              MR. JACKS: You have obviously no experience

  8  being a juror during a trial. You did say that you get

  9  nervous. Did I hear you correctly?

 10              VENIRE PERSON: Yes.

 11              MR. JACKS: And you cannot communicate --

 12              VENIRE PERSON: Well, I have a hard time

 13  communicating.

 14              MR. JACKS: If you should end up on this jury,

18:00 15  do you think that you could pay attention to the evidence

 16  and give both sides -- Let me ask that one step at a time.

 17  Do you feel like you could pay attention to the evidence?

 18  And when I say evidence, I'm talking about witnesses that

 19  get on the witness stand and then maybe documents, videos,

 20  photographs. Do you feel like you could pay attention to

 21  those things as they are being discussed during the trial?

 22              VENIRE PERSON: I can, but I might forget.

 23              MR. JACKS: Would it help you if you were

 24  allowed to take notes?

 25              VENIRE PERSON: Probably, yes.

18:00  1         MR. JACKS:  If the Judge was to allow the

2    jury -- That is permissible under the law to allow the

3    jury to make notes of what happens so that they can

4    refresh their memory.  Anything else that would -- you

5    think we should know about your feelings if you were

6    selected as a juror?  Anything else that you think we

7    should know about?

8         VENIRE PERSON:  That I'm taking medication for

9    depression?

10         MR. JACKS:  Okay.  Is that something you take

11    daily?

12         VENIRE PERSON:  No.  Just when I am --

13         MR. JACKS:  When you feel like you need it?

14         VENIRE PERSON:  When I feel like I'm getting

18:00 15    depressed.

16         MR. JACKS:  Does that medication seem to do its

17    job?

18         VENIRE PERSON:  A little bit.

19         MR. JACKS:  Ms. Gonzales, near the end of the

20    trial, after both of the parties have presented all the

21    witnesses they want to present and all the documents, the

22    Judge then will tell the jury -- He'll be on the Bench,

23    and he would read to you his instructions which basically

24    tell the jury this is the law that you apply to this case,

25    and you will have a copy yourself.  Each juror will have a

18:00  1    written copy of those instructions.

       2            THE COURT:  Mr. Jacks, your time has expired.

       3            MR. JACKS:  Thank you.  Thank you, Ms. Gonzales.

       4            THE COURT:  Ms. Gonzales, we are in the process

       5    of talking with each member of the panel from which the

       6    jury will be drawn that would hear this case.  I expect

       7    that process will continue today and into tomorrow.  So

       8    until you hear from us again, you should not discuss this

       9    case with anyone or allow anyone to discuss it with you,

      10    and if there are any media accounts about this case on the

      11    television or in the newspapers or on the radio, you

      12    should not read or watch or listen to any of those media

      13    accounts.  Thank you, you may be excused.

      14            MS. MORENO:  Thank you, your Honor.  We would
18:00 15    move for a cause challenge on this particular juror.  She

      16    was very clear that she was very nervous and scared.  She

      17    Stated quite clearly that she would have difficulty

      18    keeping track of the evidence.  Keeping in mind this is

      19    going to be a three- to four-month trial, that would

      20    probably not be fair to both sides, your Honor.  She's on

      21    medication for depression.  The stress of this trial would

      22    certainly impact that.  But most importantly, she was even

      23    during Mr. Jacks's questioning -- It's quite clear that

      24    she has a tremendous amount of anxiety in serving on this

      25    case, and I think that would not be fair to either side.

18:00 1    So we move for a cause challenge.

2              THE COURT:  Mr. Jacks, do you have a position

3    about that challenge for cause?

4              MR. JACKS:  No.

5              THE COURT:  I will excuse Ms. Gonzales for

6    cause.

7              Good morning, Ms. Voss.  Counsel for the parties

8    have some questions they would like to ask you.

9              Mr. Westfall.

10             MR. WESTFALL:  Thank you, your Honor.

11             Ms. Voss, how are you doing?

12             VENIRE PERSON:  All right.

13             MR. WESTFALL:  My name is Greg Westfall.  I'm

14   one of the criminal defense lawyers on this case.  I want

18:00 15   to speak with you a very few minutes.  Thank you so much

16   for waiting.

17             VENIRE PERSON:  You are welcome.

18             MR. WESTFALL:  This case, as you may know by

19   now, is United States versus the Holy Land Foundation.

20   The allegation by the government is that the Holy Land

21   Foundation -- which was an American Muslim charity?

22             VENIRE PERSON:  Okay.

23             MR. WESTFALL:  The Holy Land Foundation and

24   several of the men in that foundation gave material

25   support to a terrorist organization, specifically HAMAS.

18:00 1    Material support to HAMAS. You probably never heard of

2    material support, but from the words "Holy Land

3    Foundation, criminal case, Muslim charity, HAMAS,

4    Palestine," does this ring any bells? Have you heard

5    about this before?

6         VENIRE PERSON: No.

7         MR. WESTFALL: Okay. Would you do me a favor?

8    Just be sure to keep your voice up. The walls kind of

9    echo. Thank you so much. Do you work? What kind of

10   warehouse is it? What do you do?

11        VENIRE PERSON: We deal in cereal and snack

12   bars.

13        MR. WESTFALL: You make cereal and snack bars?

14        VENIRE PERSON: No. We box it up, and they ship

18:00 15   it off.

16        MR. WESTFALL: Is it the food?

17        VENIRE PERSON: Cereal.

18        MR. WESTFALL: How long have you been doing

19   that?

20        VENIRE PERSON: About a year.

21        MR. WESTFALL: What did you do before that?

22        VENIRE PERSON: Not too much.

23        MR. WESTFALL: Just hung around?

24        VENIRE PERSON: Yes.

25        MR. WESTFALL: How do you like your job?

18:00 1             VENIRE PERSON:  It's okay.

2             MR. WESTFALL:  What do you do besides your job?

3             VENIRE PERSON:  Play basketball and listen to

4  music.

5             MR. WESTFALL:  Do you have a pick-up game like

6  at the Y or just in the neighborhood?

7             VENIRE PERSON:  The neighborhood.

8             MR. WESTFALL:  Is there a group of you that

9  regularly plays?

10            VENIRE PERSON:  Yes.

11            MR. WESTFALL:  Do you have teams or a league?

12            VENIRE PERSON:  Not a league but certain teams.

13            MR. WESTFALL:  Is it organized like you have

14  jersies?

18:00 15          VENIRE PERSON:  No.

16            MR. WESTFALL:  Just in there in the

17  neighborhood?

18            VENIRE PERSON:  Yes.

19            MR. WESTFALL:  You have been playing basketball

20  a long time?

21            VENIRE PERSON:  Yes.

22            MR. WESTFALL:  Did you play in high school?

23            VENIRE PERSON:  Yes.

24            MR. WESTFALL:  Which position do you play?

25            VENIRE PERSON:  Wing, point guard.

18:00 1          MR. WESTFALL:  Have you ever been -- You've

2      never been on a jury before, have you?

3                VENIRE PERSON:  No, sir.

4                MR. WESTFALL:  How do you feel about being on a

5      jury?

6                VENIRE PERSON:  Kind of nervous.

7                MR. WESTFALL:  Now you are having to be asked

8      questions by a lawyer which is nerve-racking?

9                VENIRE PERSON:  Yes.

10               MR. WESTFALL:  And this is a case that could go

11     on four months.  Maybe longer than four months.  Maybe

12     shorter than four months.  But four months is kind of the

13     over/under.  I want to ask you, does that cause you any

14     hardship?  Are you going to lose your job or do you have

18:00 15     any family duties, anything like that that would be

16     impaired?  We will be in court I think as a general

17     principal during business hours from Monday through

18     Thursday.

19               VENIRE PERSON:  Okay.

20               MR. WESTFALL:  So knocking off about 4:45, five

21     o'clock and not being in court on Friday.  Given that, do

22     you have any family issues, job issues, that would be very

23     impaired as a result of that?

24               VENIRE PERSON:  Well, I take care of my aunt

25     that's kind of legally blind.  It's like after work.  I

18:00 1    pick her up around 3:20 every day.  Other than that,

2    nothing else.

3            MR. WESTFALL:  So you pick up your aunt at 3:20

4    every day?

5            VENIRE PERSON:  3:20 every day.

6            MR. WESTFALL:  Is there anybody else that could

7    pick up your aunt while you are doing this?

8            VENIRE PERSON:  I don't think so.  I have been

9    doing that for the last four years.

10            MR. WESTFALL:  Is there any other arrangements

11    that can be made for your aunt?

12            VENIRE PERSON:  It's possible.  It's possible.

13    I have to talk to her about it.

14            MR. WESTFALL:  If no arrangements can be made,

18:00 15    is that something that would distract you at 3:20 every

16    day?

17            VENIRE PERSON:  It's possible.

18            MR. WESTFALL:  Do you know any Muslims at all?

19            VENIRE PERSON:  No.

20            MR. WESTFALL:  Have you ever had any good

21    experiences or bad experiences with Muslims?

22            VENIRE PERSON:  No.

23            MR. WESTFALL:  How do you feel about being a

24    juror in a case where Muslim men has anything to do with

25    terrorism?

18:00  1           VENIRE PERSON:  I can't say.

2           MR. WESTFALL:  What kind of music do you listen

3  to?

4           VENIRE PERSON:  R and B.

5           MR. WESTFALL:  What are some of your favorite

6  groups?

7           VENIRE PERSON:  R. Kelly.  I can go on and on.

8           MR. WESTFALL:  Do you feel strongly about

9  freedom of speech?

10           VENIRE PERSON:  Yes.

11           MR. WESTFALL:  What does it mean to you?

12           VENIRE PERSON:  Speak what's on your mind.

13           MR. WESTFALL:  You speak your mind?

14           VENIRE PERSON:  Yes.

18:00 15           MR. WESTFALL:  Do you like being free to speak

16  your mind?

17           VENIRE PERSON:  Yes.

18           MR. WESTFALL:  Do you think other people should

19  be free to speak their mind?

20           VENIRE PERSON:  Yes, sir.

21           MR. WESTFALL:  Even if you don't like what they

22  are saying?

23           VENIRE PERSON:  Even if I don't like what they

24  are saying.

25           MR. WESTFALL:  Thank you so much.

18:00 1        THE COURT: Counsel for the government have

2    questions for Ms. Voss?

3        MR. JONAS: Good morning. My name is Barry

4    Jonas. I'm with the Department of Justice, and I'm one of

5    the prosecutors on this case. I just have a few follow-up

6    questions to ask you. I understand in your answers to Mr.

7    Westfall you said you have not heard anything at all about

8    this case.

9        VENIRE PERSON: Correct.

10        MR. JONAS: Have you ever heard of the

11    organization known as HAMAS?

12        VENIRE PERSON: No.

13        MR. JONAS: Know nothing about them?

14        VENIRE PERSON: No.

18:00 15        MR. JONAS: You remember the questionnaire you

16    filled out a few weeks ago?

17        VENIRE PERSON: Yes.

18        MR. JONAS: One of the questions asked about

19    employment, and you checked you were unemployed and laid

20    off. I guess I'm a little confused. Are you currently

21    working at the warehouse?

22        VENIRE PERSON: I am.

23        MR. JONAS: So this is just a mistake?

24        VENIRE PERSON: Yes.

25        MR. JONAS: You also mentioned that you had a

18:00 1     brother who had a drug charge.

2                     VENIRE PERSON:  Yes.

3                     MR. JONAS:  Can you tell me about that?

4                     VENIRE PERSON:  I really don't know too much.  I

5     just know that's the reason he's in jail now, because of

6     drugs.

7                     MR. JONAS:  Do you know how long he's been in

8     jail?

9                     VENIRE PERSON:  About three years.

10                    MR. JONAS:  Is he a close brother?

11                    VENIRE PERSON:  Yes.

12                    MR. JONAS:  Do you think he was treated fairly

13     in the criminal justice system?

14                    VENIRE PERSON:  Yes.

18:00 15                   MR. JONAS:  So there is nothing about his

16     experience that would cause you to think negatively of the

17     prosecution?

18                    VENIRE PERSON:  No.

19                    MR. JONAS:  You also indicated you have a friend

20     who is a security officer?

21                    VENIRE PERSON:  Yes.

22                    MR. JONAS:  Do you know where he works or she

23     works?

24                    VENIRE PERSON:  Not anymore.  It was Statewide

25     Patrol.

18:00  1          MR. JONAS:  That's a private company?

       2          VENIRE PERSON:  Yes.

       3          MR. JONAS:  But he doesn't work there anymore?

       4          VENIRE PERSON:  No.

       5          MR. JONAS:  You mentioned you pick up your aunt

       6  every day at 3:20.  You said she is legally blind.  Where

       7  do you pick her up from?

       8          VENIRE PERSON:  Dallas Lighthouse for the Blind.

       9          MR. JONAS:  Where do you take her?

      10          VENIRE PERSON:  To her house.

      11          MR. JONAS:  Do you stay with her after you pick

      12  her up?

      13          VENIRE PERSON:  Sometimes.

      14          MR. JONAS:  Does she live alone?

18:00 15          VENIRE PERSON:  Yes.

      16          MR. JONAS:  When do you take her?

      17          VENIRE PERSON:  6:20.

      18          MR. JONAS:  Do you drop her off on your way to

      19  work?

      20          VENIRE PERSON:  I work nights.

      21          MR. JONAS:  So you pick her up on your way back

      22  from work?

      23          VENIRE PERSON:  Yes.

      24          MR. JONAS:  When do you sleep?

      25          VENIRE PERSON:  Sometimes I don't sleep.

18:00  1          MR. JONAS:  Okay.  I have had days like that.

2    No further questions, thank you.

3          THE COURT:  Ms. Voss, we are in the process of

4    talking with the members of the panel from whom the jury

5    to hear this case will be drawn.  So until you hear from

6    us do not discuss the case with anyone or allow anyone to

7    discuss it with you, and if there are any media accounts

8    on the television or in the newspapers or on the radio,

9    you should not watch or listen or read any of those

10   accounts.  Thank you.  You may be excused.

11         MR. JONAS:  Your Honor, we would request the

12   court consider her situation for a hardship.

13         THE COURT:  All right, sir.  I will add her to

14   the list.

18:00 15         THE COURT:  Good morning.  Counsel for the

16   parties have some questions to ask you.

17         MR. WESTFALL:  Good morning, I'm Greg Westfall.

18   I'm one of defense lawyers in this case.  This is the case

19   of United States of America versus Holy Land Foundation

20   which involves a foundation and some Muslim men that are

21   alleged to have given aid to a terrorist organization

22   named HAMAS.  Have you heard about that?

23         VENIRE PERSON:  I heard the name HAMAS.

24         MR. WESTFALL:  So you have heard of the Holy

25   Land Foundation?

18:00 1          VENIRE PERSON:  Yes, sir.

2          MR. WESTFALL:  Anything that you have heard,

3     have you formed an opinion one way or the other about

4     whether the defendants are innocent or guilty?

5          VENIRE PERSON:  No, sir, I just briefly read

6     about it.

7          MR. WESTFALL:  This trial could go on four

8     months.  Will you be okay with your employment if you end

9     up doing jury service for that long?

10          VENIRE PERSON:  I'd probably get fired, lose my

11    job.

12          MR. WESTFALL:  What do you think are the chances

13    of that?

14          VENIRE PERSON:  They will let me go.

18:00 15          MR. WESTFALL:  We're looking at four days a

16    week, Monday through Thursday, during business hours.

17    Under that set of circumstances, do you think you would be

18    terminated from your employment?

19          VENIRE PERSON:  Yes.

20          MR. WESTFALL:  Would that create a financial

21    hardship on you?

22          VENIRE PERSON:  Yes, sir.

23          MR. WESTFALL:  Do you support anyone else

24    besides yourself?

25          VENIRE PERSON:  My wife and grandson.

18:00  1            MR. WESTFALL:  Does your wife work also?

2            VENIRE PERSON:  Yes, sir.

3            MR. WESTFALL:  Does your grandson live with you?

4            VENIRE PERSON:  Yes, sir, he does.

5            MR. WESTFALL:  So you basically support the

6       family on wages you earn?

7            VENIRE PERSON:  Yes, sir.

8            MR. WESTFALL:  You said in your questionnaire

9       that you followed the Palestine-Israeli conflict somewhat

10      closely?

11           VENIRE PERSON:  For personal reasons I

12      understand what's going on.

13           MR. WESTFALL:  Tell me what you understand.

14           VENIRE PERSON:  Well, from what I understand the

18:00 15     Palestinians are fighting for the land taken away by

16      Israel, and from what I understand, HAMAS is the group

17      that came out of Palestine, and they are fighting a war.

18           MR. WESTFALL:  Do you do any charity work

19      outside the home at all?  It sounds like you have a lot on

20      your hands, but do you do any volunteer work or charity

21      work?

22           VENIRE PERSON:  No, sir.

23           MR. WESTFALL:  Have you ever?

24           VENIRE PERSON:  What do you mean by charity

25      work?

18:00 1          MR. WESTFALL:  Volunteering with the church or?

2          VENIRE PERSON:  No.

3          MR. WESTFALL:  Do you have any friends or

4  associates or acquaintances that are Muslim?

5          VENIRE PERSON:  I have a supervisor that's

6  Muslim.

7          MR. WESTFALL:  How do you and he get along?

8          VENIRE PERSON:  Great.  We're good friends.  He

9  happens to be like a supervisor.  And like I said, I try

10  to understand the conflicts in the Middle East, all the

11  parties involved.  I'm not an expert, so I have an idea of

12  what's going.  Instead of expressing a foolish opinion, I

13  understand what's going on.  He's Palestinian.  I was

14  curious to what was going on.  I never asked somebody that

18:00 15  has lived in that area.  I want to hear their point of

16  view, and he explained that HAMAS is sort of a -- compared

17  them somewhat to Black Panthers.  They had some bad people

18  in the group, yes, but the main idea was to fight for

19  justice for them and the same thing here.  HAMAS was

20  simply another part of Palestine.

21          MR. WESTFALL:  After speaking with him, did your

22  mind change?  Did you have some ideas before, and you got

23  new ideas?

24          VENIRE PERSON:  Well, it gave me a better

25  understanding of what's going on over there.  They have a

18:00 1  news clipping on the television one day on the news

2  channel.  They were giving a brief history as to how this

3  thing came about, and from what I understand Israel took a

4  lot of their land, and Palestinian people are fighting for

5  it.  So I support their cause, believe me.

6      MR. WESTFALL:  Thank you very much.  I'm sure my

7  time is up.  Thank you.

8      THE COURT:  Counsel for the government have any

9  questions of Mr. Abelar?

10     MR. JACKS:  Good morning.  My name is Jim Jacks,

11 and I'm part of the prosecution in this case, and we'll be

12 representing the government.  I just have a few questions

13 for you.

14     VENIRE PERSON:  Yes, sir.

18:00 15    MR. JACKS:  You work for Central Parking

16 Systems.  Do you work at a particular lot all the time?

17     VENIRE PERSON:  Yes, sir.

18     MR. JACKS:  Where is that lot located?

19     VENIRE PERSON:  I work at the Urban Towers, 222

20 O'Connell Boulevard.  It's at 114.

21     MR. JACKS:  What are your hours daily?

22     VENIRE PERSON:  Six to 2:30.

23     MR. JACKS:  And you said your supervisor is a

24 Muslim?

25     VENIRE PERSON:  Yes, sir.

18:00 1              MR. JACKS:  What nationality is he?

2              VENIRE PERSON:  Palestine.

3              MR. JACKS:  Does he know any of the individuals

4       on trial?

5              VENIRE PERSON:  No, he doesn't.

6              MR. JACKS:  Have you asked him?

7              VENIRE PERSON:  No, I haven't asked him, but

8       when I asked the question about -- explain more about

9       Palestine and HAMAS, I didn't know what HAMAS was until it

10      came in the news more often.  But again, I wanted to have

11      a better understanding so who better to ask than someone

12      from that region.  And what got my attention is one of my

13      supervisors, he's got a very good business head on him.

14             MR. JACKS:  Let me ask you.  Is he somebody you

18:00 15    see every day?  Stop by every day?

16             VENIRE PERSON:  He's like the second in charge.

17             MR. JACKS:  Does he work at that location all

18      the time?

19             VENIRE PERSON:  That location and a couple of

20      others.

21             MR. JACKS:  So you see him every day?

22             VENIRE PERSON:  Every day.

23             MR. JACKS:  When you filled out the

24      questionnaire I guess on June 7th and saw references to

25      questions about the Holy Land Foundation and the names of

18:00  1   these individuals and then questions asking about the

2   Israeli and Palestinian conflict, did you talk to him

3   about it after you filled out the questionnaire?

4          VENIRE PERSON:  Well, I asked about it trying to

5   understand the conflict itself.  But not about this trial

6   or this case.

7          MR. JACKS:  Okay.  But have you talked to him

8   about this case and the Holy Land Foundation, the fact

9   that you may be on the jury?

10          VENIRE PERSON:  No, sir.

11          MR. JACKS:  Did you see newspapers articles on

12   it in the last few days?

13          VENIRE PERSON:  No, sir.

14          MR. JACKS:  Do you read the newspapers?

18:00 15          VENIRE PERSON:  Yes.

16          MR. JACKS:  Do you take the Dallas Morning News?

17          VENIRE PERSON:  Yes.

18          MR. JACKS:  Do you watch the news at night?

19          VENIRE PERSON:  Yes.

20          MR. JACKS:  Have you seen news stories about the

21   trial?

22          VENIRE PERSON:  No.

23          MR. JACKS:  You have gotten your information

24   from him because you are interested in the circumstances;

25   is that right?

18:00 1          VENIRE PERSON:  In the region, in the conflict

2    itself, but not any particular -- other than just to be

3    informed so I understand the conflict.

4          MR. JACKS:  Have you accepted what he has told

5    you as true?

6          VENIRE PERSON:  Well, not just because he talked

7    to me, but because of the news clippings that I have read

8    and seen on the television, the History Channel provided.

9          MR. JACKS:  So you have gotten your information

10   from other sources, too?

11         VENIRE PERSON:  Yes.

12         MR. JACKS:  TV shows, History Channel, that type

13   of thing?

14         VENIRE PERSON:  Yes.

18:00 15       MR. JACKS:  Are you of the belief that HAMAS is

16   like a freedom fighters' organization?

17         VENIRE PERSON:  Somewhat.

18         MR. JACKS:  So if the United States Government

19   has declared them to be a terrorist organization, do you

20   disagree with that description of them?

21         VENIRE PERSON:  I have mixed feelings because in

22   every group that you find, freedom fighters, no matter

23   what nationality or country you are going to have bad

24   people.  But from what I understand they are fighting for

25   Palestinian land.

18:00 1          MR. JACKS:  Right.  But if the government has

2     said that organization is a terrorist organization, does

3     not differentiate among individuals, just says that

4     organization is a terrorist organization, do you disagree

5     with the government having done that?

6          VENIRE PERSON:  I have mixed feelings.

7          MR. JACKS:  All right.  If the Judge told you at

8     the end of the case that this group has been designated by

9     the government as a terrorist organization, would you be

10     able to accept that or would that influence your verdict?

11     Your mixed feelings.

12          VENIRE PERSON:  To be honest, I want to

13     support -- I believe in the HAMAS, their war, if you will.

14     Unfortunately, they are going about it the wrong way, but

18:00 15     they took their land.  They took their land.

16          MR. JACKS:  Would those feelings affect you?

17     Would you be thinking about that when you are serving on

18     the jury?

19          VENIRE PERSON:  I look at the facts.

20          MR. JACKS:  I understand, but you bring your

21     feelings in because you are human.

22          VENIRE PERSON:  Yes.

23          MR. JACKS:  Would those feelings affect your

24     verdict?

25          VENIRE PERSON:  To some extent, yes.

18:00  1          MR. JACKS:  And going back to your job, if you

       2   were going to lose your job from being on this trial, is

       3   that going to affect -- When you are sitting here for

       4   months not having any income from your job, is that going

       5   to concern you while you are sitting here?

       6          VENIRE PERSON:  Of course.

       7          MR. JACKS:  And would it pre-occupy your mind

       8   and make it difficult for you to serve as a juror?

       9          VENIRE PERSON:  I don't know.  I won't be

      10   thinking about that really.  My concern would be the case.

      11          MR. JACKS:  Do you want to be on this jury?

      12          VENIRE PERSON:  I don't know if you would want

      13   me here because I believe in what the Palestinians are

      14   doing.  I don't like how they go about doing it.  The

18:00 15   terrorists.

      16          MR. JACKS:  Do you think the government might

      17   not want you on this jury?

      18          VENIRE PERSON:  Yes.

      19          MR. JACKS:  Because of your views and that would

      20   be a part of your decision making process?

      21          VENIRE PERSON:  Yes.

      22          MR. JACKS:  So you kind of come into this based

      23   on -- I don't know if research is too high toned a word.

      24   But based on your experiences, you have some ideas about

      25   who's right and who's wrong in the Palestinian-Israeli

18:00  1    conflict?

    2        VENIRE PERSON:  Again, I would have to say if I

    3    was picked, no matter how I feel about the conflict over

    4    there, I still have to look at the facts.

    5        MR. JACKS:  I understand.  But are you saying

    6    you are not going to be setting aside what you have

    7    learned on your own regarding how you feel about the

    8    situation over there, your opinion about who's right and

    9    who's wrong?

   10        VENIRE PERSON:  What I think about who's right

   11    or wrong is not my concern.  It concerns the facts of the

   12    trial.

   13        MR. JACKS:  I understand.

   14        THE COURT:  Mr. Jacks, your time has expired.

18:00 15        Mr. Abelar, we are in the process of talking to

   16    all the members of the panel from which the jury will be

   17    drawn that would hear this case.  I expect that process

   18    will go on today and into tomorrow.  So until you hear

   19    from us, you should not discuss this case with anyone or

   20    allow anyone to discuss it with you, and if there are any

   21    media accounts about the case in the newspapers or on

   22    television or in the newspapers or on the radio, you

   23    should not read or watch or listen to any of those news

   24    accounts.

   25        VENIRE PERSON:  I understand.

18:00 1            THE COURT:  Thank you.  You may be excused.

2            MR. JACKS:  Your Honor, at this time the

3    government moves to excuse Mr. Abelar for cause based upon

4    the reason that he has formulated an opinion that would

5    affect his deliberations and that he's basically

6    formulated the belief that HAMAS is a resistance or

7    freedom-fighting group, and in addition also, concerns

8    regarding the loss of his job would be other grounds that

9    would affect or could affect his ability to serve on the

10   jury.

11           THE COURT:  Mr. Westfall, do you have a position

12   about that?

13           MR. WESTFALL:  Your Honor, as to the challenge

14   for cause, Mr. Jacks posed the question to him "Would this

18:00 15   affect your verdict," and his answer was "I can look at

16   the facts.  I would look at the facts in the trial."  He

17   said that a couple of different times which is what is

18   required of him.  I can see how the opinions that he has

19   are not the same opinions that Mr. Jacks would want a

20   juror to have.  But people he disagrees with, that is not

21   a requirement for being struck off the jury.  The issue is

22   can he set those aside, and he said a couple of times on

23   his own volition, I will pay attention to the facts.  I

24   will pay attention to the facts.  This wasn't an issue

25   where he was, you know, just made to go along with

18:00 1    statements that, yeah, I can apply the burden of proof.

2    He actually said I can look at the facts.

3            The hardship, your Honor, that's the Court's

4    discretion after the Court's investigation of the

5    hardship.  He seemed kind of equivocal about the hardship.

6            THE COURT:  Thank you, sir.  I am going to take

7    the challenge for cause to Mr. Abelar under advisement for

8    the time being.

9            Ladies and Gentlemen, we're at the noon hour so

10    I would like to take our midday recess, but I did want to

11    supplement the discussion we had yesterday afternoon about

12    the schedule for the remainder of the week.  There are a

13    number of pending challenges for cause or requests for

14    hardship excuses that are pending, and I have not decided

18:00 15    those, but I think probably some of them will be granted

16    at least, and so for the purpose of determining how many

17    people we still need to see in order to have a sufficient

18    number to wind up with a jury of 12 and six alternates, we

19    still have some ways to go.  I don't know that I have ever

20    covered this with counsel before -- and I don't know that

21    you would have any way to know this -- but our jury clerk,

22    jury administrator, has an automated telephone system, and

23    normally that's the way these jurors or potential jurors

24    are communicated with.  They are told to call this phone

25    number after three o'clock on a given day for

18:00 1     instructions.  And I think that I will not be able to know

2     for sure that we have a sufficient number of people from

3     which to strike our lists by three o'clock today.  I'm not

4     optimistic that we will reach that threshhold by then.  So

5     I think probably we are going to be in session on Friday,

6     and I know that must be a disappointment to all concerned.

7     But I think the first time that we will be able to

8     communicate with these persons that we have interviewed to

9     tell them to come back for a general voir dire session

10     will be after three on Thursday.  So I wanted to alert

11     everyone of that fact in view of our discussion yesterday

12     afternoon.  We'll be in recess for lunch until one

13     o'clock.

14           (Recess)

18:00 15           THE COURT:  Good afternoon, Mr. Jones.  Counsel

16     for the parties have some questions that they would like

17     to ask you.  Mr. Westfall.

18           MR. WESTFALL:  Thank you, your Honor.

19           Mr. Jones, I'm Greg Westfall.  I'm one of the

20     criminal lawyers on this case.  Let me speak with you for

21     a few minutes.  Do me a favor and raise your voice so I

22     can hear you over here.

23           VENIRE PERSON:  Okay.

24           MR. WESTFALL:  Thank you so much.  This is the

25     Holy Land Foundation case, as it has come to be known.

1   United States versus Holy Land Foundation for Relief and

2   Development.  Have you heard of it?

3          VENIRE PERSON:  I think I recall.

4          MR. WESTFALL:  Let me tell you more.  It

5   involves allegations that the Holy Land Foundation and

6   certain men who were associated with the Foundation gave

7   material support to HAMAS which is a terrorist

8   organization.

9          VENIRE PERSON:  I recall now.

10          MR. WESTFALL:  What have you heard about it?

11          VENIRE PERSON:  Recently, not much.  This was, I

12   would say, over a year ago.  I have been out of the

13   country.

14          MR. WESTFALL:  Right.  Anything that you have

15   heard give you an opinion one way or the other?

16          VENIRE PERSON:  No, sir.

17          MR. WESTFALL:  I know you have been gone for a

18   year.  Master sargeant?

19          VENIRE PERSON:  Yes, sir.

20          MR. WESTFALL:  What is your specialty?  Do you

21   still have the same MSO that you did when you first

22   started?

23          VENIRE PERSON:  No.  It fluctuates.

24          MR. WESTFALL:  What is your specialty?

25          VENIRE PERSON:  My current is petroleum.

18:00  1          MR. WESTFALL:  Are you all right talking about

       2    this?

       3          VENIRE PERSON:  Yes.

       4          MR. WESTFALL:  What did you do when you were in

       5    Iraq?

       6          VENIRE PERSON:  My primary mission was

       7    operations NCOIC for our company operations which pretty

       8    much consisted of running the support missions and

       9    overseeing convoy operations.

      10          MR. WESTFALL:  So you were the NCOIC at the

      11    company level?

      12          VENIRE PERSON:  Yes.

      13          MR. WESTFALL:  So kind of quasi first sargeant?

      14          VENIRE PERSON:  (Witness nods)

18:00 15          MR. WESTFALL:  Did you go actually out and do

      16    any of the patrolling or any of the action?

      17          VENIRE PERSON:  Yes, sir.

      18          MR. WESTFALL:  Please tell us about that.

      19          VENIRE PERSON:  Well, initially our primary

      20    mission was to supply fuel for base operations and the

      21    local community.  We supplied the water source for that

      22    area.  It escalated from that to where we were tasked to

      23    run convoy missions to the southern and southeast portion

      24    of Iraq.

      25          MR. WESTFALL:  Did you have to use interpreters

18:00 1     to do what you did --

2            VENIRE PERSON:  No, sir.

3            MR. WESTFALL:  -- to run a supply route.  How

4     long have you been back, since November?

5            VENIRE PERSON:  Since November.

6            MR. WESTFALL:  You say you are still trying to

7     readjust?

8            VENIRE PERSON:  Yes.

9            MR. WESTFALL:  Could you please tell us a little

10    bit about that?

11           VENIRE PERSON:  I guess skittish and leery about

12    my surroundings.  On edge to the extent that I don't

13    socialize a lot, with a lot of people.  Problem sleeping,

14    resting.  A little irritability.

18:00 15         MR. WESTFALL:  The supply missions that you did,

16    were they both night missions and day missions?

17           VENIRE PERSON:  Yes, sir.

18           MR. WESTFALL:  Did you encounter any IED's while

19    you were doing it?

20           VENIRE PERSON:  No IED's but did encounter

21    hostile fire.

22           MR. WESTFALL:  This trial you may know from the

23    questionnaire -- I don't know if you know or not, but it's

24    going to last a long time, like four months, five months.

25    It will be four times a week for the entire business day,

18:00  1    Monday through Thursday.

2            Do you think that right now you are in a good

3    position to turn your attention to a four-month long

4    trial?

5            VENIRE PERSON:  I believe so.

6            MR. WESTFALL:  You believe so?

7            VENIRE PERSON:  Yes, sir.

8            MR. WESTFALL:  Then -- You said you were trying

9    to readjust and feeling skittish.  I didn't know if you

10   want to dive into this like four months.

11           VENIRE PERSON:  I don't think there is going to

12   be any banging --

13           MR. WESTFALL:  If someone startles you in the

14   elevator it's generally pretty safe.  Did you know any

18:00 15   Muslims over there?

16           VENIRE PERSON:  Yes, I did.

17           MR. WESTFALL:  Did you get to know any of the

18   locals?

19           VENIRE PERSON:  Yes, we had a lot of interaction

20   with the local populace to where pretty much where we had

21   a lot of the supply routes we had across the Shiekh's

22   territory.

23           MR. WESTFALL:  What did you think of them?

24           VENIRE PERSON:  I was pretty leery.  It was hard

25   to know who to trust and who not to trust.  And after time

18:00 1   went on, it seemed like pretty much everybody was under

2   the table.  It was who had the money, what type of favor

3   could be done.  So you really couldn't establish a

4   hardcore trust.

5           MR. WESTFALL:  So they have gone to just about a

6   black market economy over there?

7           VENIRE PERSON:  Pretty much.

8           MR. WESTFALL:  Well, this case involves

9   obviously Muslim men who are charged with something that,

10  you know, where terrorism is in the title.  How do you

11  feel about being a juror on a case where you are actually

12  trying to decide something the government is alleging and

13  it has something to do with terrorism?

14          VENIRE PERSON:  I don't equivocate every Muslim

18:00 15 the same.  Like I say, there were some good Muslims.

16  There were some that I had to rely on as far as the

17  information in some of the areas who proved to be pretty

18  much trustworthy.  I don't form any bias.

19          MR. WESTFALL:  You have been an NCO a long time.

20  Have you been in the army reserve a long time?

21          VENIRE PERSON:  Seven years.

22          MR. WESTFALL:  Have you done any of the charity

23  work?  Sometimes they have charity drives in the army.

24  Have you done some of that?  United Way or any charity

25  work with your church?

18:00 1          VENIRE PERSON:  Well, the unit prior to -- The

2     unit I was currently with in Tyler, Texas, we used to have

3     a lot of civil type of affairs.  We would participate in

4     parades, social events, Boy Scouts, Cub Scouts, things of

5     that nature.

6          THE COURT:  Mr. Westfall, your time has expired.

7          MR. JACKS:  Good afternoon, Mr. Jones.  My name

8     is Jim Jacks.  I'm an Assistant United States Attorney

9     here in Dallas.  I'll be part of the prosecuting team

10     representing the government during this trial, and I have

11     a few questions for you as well.

12          I think I speak for everybody in the room when I

13     say thank you for your service and what you have done.  We

14     are all appreciative of people like you and what they have

18:00 15     done.

16          VENIRE PERSON:  Thank you, sir.

17          MR. JACKS:  With regard to your emotional state,

18     having come back from a combat area, is it such to a

19     degree that you have had counseling or been to the VA or

20     had anything like that that you have utilized?

21          VENIRE PERSON:  I'm currently going to

22     counseling, yes, sir.

23          MR. JACKS:  Is that helpful?

24          VENIRE PERSON:  Not really.

25          MR. JACKS:  You may have to just work it out on

18:00  1    your own?

2           VENIRE PERSON:  It takes some time.  It was a

3    big adjustment to life.

4           MR. JACKS:  I believe you said you grew up in

5    Dallas.  You are a native Dallasite?

6           VENIRE PERSON:  Yes, sir.

7           MR. JACKS:  Where did you go to high school,

8    college?

9           MR. JACKS:  Yes.

10          VENIRE PERSON:  Lincoln High School.

11          MR. JACKS:  How about college?  Did you attend

12   some college?

13          VENIRE PERSON:  I spent a year and a half at

14   North Texas State.

18:00 15          MR. JACKS:  How long have you been with the Post

16   Office?

17          VENIRE PERSON:  A little over twenty years.

18          MR. JACKS:  Has it always been in the capacity

19   as a letter carrier?

20          VENIRE PERSON:  Yes, sir.

21          MR. JACKS:  I think you put down a city carrier.

22   Does that mean you have a route in the city?

23          VENIRE PERSON:  Yes, sir.

24          MR. JACKS:  How long have you had your current

25   route?  Obviously just since you came back from overseas

18:00 1    did you get the same route back?

2              VENIRE PERSON:  Yes, sir.

3              MR. JACKS:  How long have you been in the army?

4              VENIRE PERSON:  Thirty-one years.

5              MR. JACKS:  So you enlisted in the late

6    seventies?

7              VENIRE PERSON:  March of 1976.

8              MR. JACKS:  Did you retire from active duty

9    after twenty years?

10             VENIRE PERSON:  After thirty-one.

11             MR. JACKS:  So you are done.  Your obligation is

12   complete?

13             VENIRE PERSON:  I hope so.

14             MR. JACKS:  Well, thirty-one years is probably

18:00 15   enough for one person to give.

16             You indicated as far as your outside activities

17   that you are a member of your men's council at your

18   church?

19             VENIRE PERSON:  Yes, sir.

20             MR. JACKS:  What church would that be?

21             VENIRE PERSON:  Mount Haven Missionary and

22   Baptist Church.

23             MR. JACKS:  What part of town is that?

24             VENIRE PERSON:  Garland.

25             MR. JACKS:  And the men's council, what do they

18:00  1  do as far as what service or function do they provide for

       2  the church?

       3           VENIRE PERSON:  Well, we pretty much coordinate

       4  a lot of the social events that pretty much surround

       5  functions for the men's choir.  Different activities,

       6  community services.  The list goes on.

       7           MR. JACKS:  Are you a pretty regular attendee at

       8  the church?

       9           VENIRE PERSON:  Yes, sir.

      10           MR. JACKS:  How big is the church?

      11           VENIRE PERSON:  About twenty-two hundred.

      12           MR. JACKS:  I see you have spent tours of duty

      13  in South America.

      14           VENIRE PERSON:  Yes, sir.

18:00 15           MR. JACKS:  What parts of South America were you

      16  in?

      17           VENIRE PERSON:  Guyana.  I can't remember.

      18           MR. JACKS:  That's all right.  You have been on

      19  a jury before?

      20           VENIRE PERSON:  Yes.

      21           MR. JACKS:  Is it just the one that you recall?

      22           VENIRE PERSON:  Yes.

      23           MR. JACKS:  Was that a civil matter about child

      24  support?

      25           VENIRE PERSON:  Spouses.

18:00   1            MR. JACKS:  So one spouse was seeking either

2       more child support or alimony or something like that from

3       the other?

4                    VENIRE PERSON:  Yes, sir.

5                    MR. JACKS:  You have a son and a daughter?

6                    VENIRE PERSON:  Yes, sir.

7                    MR. JACKS:  Are both of them away from the home?

8       Have they grown up and left the home?

9                    VENIRE PERSON:  Yes, sir.

10                   MR. JACKS:  Did they live with you or your wife

11      last?

12                   VENIRE PERSON:  My wife.  Ex-wife.

13                   MR. JACKS:  Your son you said had some contact

14      with the local police.  Can you tell us briefly what the

18:00  15      nature of that was?

16                   VENIRE PERSON:  I want to say that it was maybe

17      some issues with drug involvement or usage.

18                   MR. JACKS:  Was anybody arrested?

19                   VENIRE PERSON:  I know he was put on probation.

20                   MR. JACKS:  Do you feel like the criminal

21      justice system treated him fairly in that situation?

22                   VENIRE PERSON:  As far as I know, yes, sir.

23                   MR. JACKS:  Is there some question in your mind

24      maybe about certain aspects of it?

25                   VENIRE PERSON:  Well, there was a situation

18:00 1    where he was arrested, and they said that they had him on

2    video tape and went through a lot of formalities and spent

3    some money and turned out to be that it wasn't him.  So

4    there was some issues there but --

5        MR. JACKS:  You spent the money for his lawyer

6    and that type of thing?

7        VENIRE PERSON:  Yes, I assisted.

8        MR. JACKS:  Mr. Westfall told you the charges in

9    this case are providing material support to a terrorist

10   organization --

11       THE COURT:  Mr. Jacks, your time has expired.

12       MR. JACKS:  Thank you, your Honor.

13       THE COURT:  Mr. Jones, we are in the process of

14   talking to the members of the panel from whom the jury

18:00 15   will be drawn, and I expect that process to continue until

16   at least tomorrow.  In the meantime, you should not

17   discuss this case with anyone or allow anyone to discuss

18   it with you, and if there are any media accounts about

19   this case on television or in the newspapers or radio you

20   should not read or watch or listen to any of those media

21   accounts.  Thank you, sir.  You may be excused.

22       THE COURT:  Good afternoon, Ms. Overy.  Counsel

23   for the parties have some questions for you.

24       MS. MORENO:  Good afternoon.  My name is Linda

25   Moreno.  I'm one of the defense attorneys in this case.  I

18:00 1    am going to ask you about the questionnaire you filled out

2    a few months ago and if you have heard anything about the

3    case.  This is a case that involves the Holy Land

4    Foundation.  And it is an American Muslim charity.  I'm

5    wondering if you heard anything about it in television or

6    radio.

7              VENIRE PERSON:  Just seeing the head lines in

8    the paper the past couple of days and immediately turned

9    them over because I knew I wasn't supposed to read them.

10             MS. MORENO:  Before that, have you heard about

11   the Foundation in the recent past, not just the recent few

12   days?

13             VENIRE PERSON:  I'm sure I heard about it four

14   or five years ago when everything occurred, but life has

18:00 15   happened since then so, no, I don't really remember too

16   much about it.

17             MS. MORENO:  Let me ask you something from your

18   questionnaire.  You indicated you have a diabetic

19   condition.

20             VENIRE PERSON:  Yes.

21             MS. MORENO:  I need to inquire, forgive me, if

22   that is something that might interfere with your jury

23   service.

24             VENIRE PERSON:  Probably not.  The only thing,

25   as I mentioned, I'm a Type II, and I control it with

18:00  1    diabetic medication -- and I'm not insulin dependent --

2    and by eating regularly.  So I need something to eat about

3    every two hours.  I have no idea what sort of breaks are

4    included.  So I put that down.

5            MS. MORENO:  I see that you are unemployed at

6    the present time.

7            VENIRE PERSON:  Currently.  Well, actually I

8    have three jobs, but they are all in process to the full

9    time position I was going to be looking for shortly.

10            MS. MORENO:  Well, tell me about those three

11    jobs.

12            VENIRE PERSON:  The first one is a cashier at an

13    Ace Hardware shop in Coppell.  I was employed there full

14    time until May.  I gave them my notice because I was going

18:00 15    to be looking for full time employment elsewhere.  I still

16    work Sundays for them to keep my discount.

17            Another job that I'm working is a part time for

18    a company called Care Now which has a series of primary

19    care type outlets throughout the Dallas-Fort Worth area.

20            I'm an undercover shopper.  They police

21    themselves.  I do that on my own time, and I get paid when

22    I turn in the reviews on ones I'm assigned.  I turned in

23    three this month, and then occasionally I clean house for

24    a neighbor.

25            MS. MORENO:  This trial may last four months.

18:00  1  Would this affect your financial status?

2  VENIRE PERSON:  Of course.  It's going to affect

3  anybody's if it lasts four months.  Yes, absolutely.

4  MS. MORENO:  Well, what we need to know is if

5  that affect is so severe that it would impact you in a

6  very serious financial way.  That's why I'm asking you

7  that.  Because we would like to know that and the Court

8  would like to know that in considering whether you should

9  or should not serve on this jury.  So why don't you tell

10  us about that.

11  VENIRE PERSON:  It will impact me, not

12  necessarily in a serious, serious way.  My husband is

13  employed and has been employed for the last two and a half

14  years with the same company.  We don't anticipate anything

18:00 15  happening with that position.  So we're financially okay.

16  Do you need to make some money?  Yes, that's why I was

17  going to a position that was going to pay a little more

18  than the cashier position I had at this point.  How long

19  it will be until I find something, I don't know.

20  MS. MORENO:  Do you have any vacations

21  scheduled?

22  VENIRE PERSON:  No, we took our vacation in June

23  right after I gave my notice in anticipation of full time

24  employment.

25  MS. MORENO:  This is a case that involves

18:00 1  charges of terrorism.  The government alleges in this case

2  that the Holy Land Foundation charity sent humanitarian

3  aid to the Occupied Territories, the West Bank and Gaza

4  and that this humanitarian aid was in the form of food,

5  money, books, library books and the rebuilding of homes,

6  that kind of aid.  The government alleges that aid somehow

7  benefited the terrorist organization HAMAS.  That's what

8  they say.  First of all, do you know anything about HAMAS?

9           VENIRE PERSON:  Not necessarily.  I hear the

10  word on the news.

11           MS. MORENO:  Knowing that snippet of

12  information, that these are charges that are

13  terrorism-related, do you have any opinions about that?

14  What do you think about that?

18:00 15           VENIRE PERSON:  I think it would cause any

16  thinking person concern in the day and age that we live

17  in.  Is it going to make me crawl in a hole and die?  No.

18           MS. MORENO:  What I need to know from you is

19  whether that would impact you to fairly evaluate the

20  evidence in this case.  In other words, your mission is to

21  be the judge of the facts, the facts presented in this

22  room and nowhere else, and knowing this is a case that

23  involves charges of terrorism and what you just said,

24  those concerns, would that affect your ability to be fair

25  and impartial?

18:00 1          VENIRE PERSON:  I don't see why.

     2          MS. MORENO:  Let's talk about speech.  There is

     3    going to be a lot of speech introduced in this case I

     4    expect in the form of conversations, transcripts,

     5    etcetera.  What are your thoughts on freedom of speech?

     6          VENIRE PERSON:  It's one of our American rights.

     7          MS. MORENO:  What about speech that is

     8    provocative and inflammatory?

     9          VENIRE PERSON:  I would have to hear specifics

    10    before I made a judgment.

    11          MS. MORENO:  What would you want to hear, when

    12    you say you want to hear specifics?

    13          VENIRE PERSON:  I'm not sure what you are

    14    talking about, when you are talking about inflammatory.  I

18:00 15    consider some of what they say on television nowadays

    16    inflammatory.  Would I want to listen to it?  No.  Turn it

    17    off.  That's also an American right, turn the knob.  I

    18    have to know more.  I have to know locale, who was talking

    19    and to what.  I would have to know more.

    20          MS. MORENO:  Let's say you heard speech in this

    21    case that was critical of American foreign policy and

    22    critical of the Government of Israel.  You heard that.

    23    You saw it in documents, heard it in conversations, read

    24    it in leaflets.  What do you think about that?

    25          VENIRE PERSON:  Generally with the information

18:00 1    you just provided, I would say that's probably someone's

2    right.

3                THE COURT:  Ms. Moreno, your time is up.

4                MS. MORENO:  Thank you.

5                THE COURT:  Counsel for the government have

6    questions for Ms. Overy?

7                MR. JONAS:  Good afternoon, Ms. Overy.  My name

8    is Barry Jonas.  I'm one of the prosecutors in this case.

9    I have just a few questions for you.  With regard to your

10   employment, you stated that you are preparing for a full

11   time job?

12               VENIRE PERSON:  I was preparing to look for a

13   full time job.  I had gotten my notice in to my current

14   employer Ace, and I think about three days later I

18:00 15   received the jury summons in the mail which had an

16   explanation sheet that said if selected this could last up

17   to four months.

18               MR. JONAS:  Hopefully less?

19               VENIRE PERSON:  Needless to say some freedom of

20   expression language passed in our house.

21               MR. JONAS:  Prior to the notice coming and those

22   words coming out of your mouth, what type of job were you

23   looking for?

24               VENIRE PERSON:  I was considering the

25   possibility of going back into teaching.  I was

18:00 1    considering substituting.  With the state of our schools

2    right now the chances of my working full time in a very

3    short period of time were probably good because they need

4    people desperately.  So I was thinking about substituting

5    around in the area where we had moved the last couple of

6    years to see if I found a school I liked and go back into

7    teaching full time.

8              MR. JONAS:  When were you a teacher?

9              VENIRE PERSON:  I was a teacher a couple of

10   years ago with the Dallas Independent School District.

11             MR. JONAS:  Where did you teach?

12             VENIRE PERSON:  A couple of different places, if

13   I can remember their names now.  I went through the

14   Dallas -- I can't think of the name of it.  Where you come

18:00 15   from a different occupation and you go through their --

16   accredited process, and they put me basically where they

17   needed me.  I taught at two different schools in DISD that

18   year, and life happened and things changed for a while.

19             MR. JONAS:  I would like to change the subject

20   briefly, and I apologize.  I know this is somewhat of a

21   personal questionnaire.  But on your questionnaire you

22   indicated that your father had issues with the IRS?

23             VENIRE PERSON:  Yes.

24             MR. JONAS:  And it appears there were

25   criminal -- or were they civil?

18:00  1          VENIRE PERSON:  They were civil I guess.  It's

2     been a while now, and I don't remember.  Did my father

3     ever serve jail time?  No.

4          MR. JONAS:  In this case there may be someone

5     from the IRS that would testify for the government.

6     Besides these feelings that everyone has for the IRS, do

7     you have any additional feelings for the IRS that could

8     negatively impact your listening to the testimony?

9          VENIRE PERSON:  Other than the general, everyone

10    is -- In fact, they have been running an ad for the last

11    two weeks, and I was going to call them because they are

12    looking for people to work in the Dallas area.  I thought

13    that might be interesting.

14         MR. JONAS:  To work for the IRS?

18:00 15         VENIRE PERSON:  Yes.

16         MR. JONAS:  So you don't have negative feelings,

17    anymore than any of the rest of us?

18         VENIRE PERSON:  No.

19         MR. JONAS:  On the questionnaire about the

20    testimony of law enforcement officers, you checked, yes,

21    that you have difficulty accepting a statement regarding

22    giving equal weight to the testimony of a law enforcement

23    officer versus non law enforcement.  Was that a mistake or

24    do you consider police officers to be more credible or

25    less credible?

18:00 1        VENIRE PERSON:  In general more credible.

2        MR. JONAS:  If the Judge instructs you in this

3    case that you should consider that testimony as you would

4    any other testimony, would you be able to accept that

5    instruction?

6        VENIRE PERSON:  I believe I would because it

7    would be in a different context than just being on the

8    street.

9        MR. JONAS:  Ms. Moreno briefly mentioned the

10    allegations in this case.  And at the end of the case when

11    both sides present their evidence, the Judge is going to

12    instruct you, and we expect he's going to tell you that

13    the U.S. Government has designated HAMAS to be a terrorist

14    organization and that under the law, providing any support

18:00 15    to HAMAS, money or otherwise, is illegal.  Would you be

16    able to accept that instruction even if you found the

17    items to be what most people would consider charity?

18        VENIRE PERSON:  If that was the definition

19    applied in this case, yes.

20        MR. JONAS:  Thank you very much.

21        THE COURT:  Ms. Overy, we are in the process of

22    talking to the members of the panel from which this jury

23    will be drawn.  So until you hear from us further, you

24    should not discuss this case with anyone or allow anyone

25    to discuss it with you and if there are any media accounts

18:00 1    about the case in the newspapers or on television or

2    radio, you should not pay any attention to any of those

3    media accounts.  Thank you.  You may be excused.

4            THE COURT:  Good afternoon, Mr. Proctor.

5    Counsel for the parties have some questions they would

6    like to ask you.

7            MS. MORENO:  Good afternoon, Mr. Proctor.  My

8    name is Linda Moreno.  I'm one of the attorneys in this

9    case.  I am going to ask you some questions about the

10    questionnaire you filled out a few weeks ago and if you

11    have heard anything about this particular case.

12            This is a case that involves an American Muslim

13    charity called the Holy Land Foundation.  Have you heard

14    anything about it in the press?  Any media accounts?

18:00 15            VENIRE PERSON:  I remember seeing when they

16    raided the offices.  I remember the images of bringing

17    things out of the office.  That's all I remember.

18            MS. MORENO:  Where do you live?

19            VENIRE PERSON:  In Dallas.

20            MS. MORENO:  And was that a few years ago you

21    remember seeing that?

22            VENIRE PERSON:  Yes.

23            MS. MORENO:  Have you seen anything recently?

24            VENIRE PERSON:  No.

25            MS. MORENO:  Anything about that memory -- This

18:00 1   is our opportunity to talk to you and see if you are right

2   for this jury.  There are no right or wrong answers.

3   Doesn't matter what they are.  Just looking for your

4   honest, heartfelt opinions.

5         That said, is there anything you heard then

6   about the charity that causes you any concern or raises

7   any red flags for you?

8         VENIRE PERSON:  No.

9         MS. MORENO:  This case involves an American

10  Muslim charity that the government claims through the

11  distribution of humanitarian aid supported a terrorist

12  organization named HAMAS.  Have you ever heard of HAMAS?

13        VENIRE PERSON:  In the news, yes.

14        MS. MORENO:  Is there anything about what I have

18:00 15  just told you, the nature of the charges, material support

16  of a terrorist organization -- They sound pretty serious,

17  right?

18        VENIRE PERSON:  Yes.

19        MS. MORENO:  Is there anything about that that

20  causes you any concern or brings up any opinions that you

21  may have?

22        VENIRE PERSON:  Not really.

23        MS. MORENO:  Do you know any Muslims?

24        VENIRE PERSON:  No.

25        MS. MORENO:  Have you ever had any dealings,

18:00 1   business dealings, personal dealings with persons of

2   Arabic descent?

3           VENIRE PERSON:  I drive a bus in Dallas, and I

4   go through an area that has a lot of Muslims probably.

5   Near Richland College.

6           MS. MORENO:  And you can tell they are Muslims

7   by what?  How they dress?

8           VENIRE PERSON:  Yes, mainly by the way they

9   dress.

10          MS. MORENO:  Do you have any opinions about

11  that?  It's okay to have opinions.

12          VENIRE PERSON:  I just think it's odd, the way

13  the women have to wear things covering their head.

14          MS. MORENO:  In this case, all of the gentlemen

18:00 15  charged are Muslim, and they are all of Arabic descent and

16  so I would like to know, sir, if there is anything about

17  that -- sitting in judgment of persons who are Muslim and

18  of Arabic descent -- that you think, you know what, I

19  can't be fair.  I really can't have an open mind about

20  this kind of case.

21          VENIRE PERSON:  It doesn't really matter to me,

22  the religion or where they are from.

23          MS. MORENO:  Do you know anything about the

24  religion?

25          VENIRE PERSON:  No.

18:00 1          MS. MORENO:  As a bus driver, have you received

2     any first responder training?  Any emergency training?

3                VENIRE PERSON:  No, not really.

4                MS. MORENO:  None at all?

5                VENIRE PERSON:  No.

6                MS. MORENO:  You are in the union?

7                VENIRE PERSON:  Yes.

8                MS. MORENO:  Do you hold a position in the

9     union?

10               VENIRE PERSON:  No.

11               MS. MORENO:  What's the union?

12               VENIRE PERSON:  Amalgamated Transit Union.

13               MS. MORENO:  How long have you been a member?

14               VENIRE PERSON:  Seven to ten years.

18:00 15         MS. MORENO:  And you don't hold any position in

16    the union; is that right?

17               VENIRE PERSON:  No, I don't.

18               MS. MORENO:  Is there anything about the length

19    of this trial?  It's a four-month trial.

20               VENIRE PERSON:  I would love to miss work, but I

21    have plane tickets paid for for Nicaragua in August.

22               MS. MORENO:  August when?

23               VENIRE PERSON:  10th.

24               MS. MORENO:  When did you get the tickets?

25               VENIRE PERSON:  About a month or so ago.

18:00 1          MS. MORENO:  Is that a family excursion?

2          VENIRE PERSON:  Yes.

3          MS. MORENO:  With your wife or other members of

4     family?

5          VENIRE PERSON:  Yes.

6          THE COURT:  Counsel for the government have

7     questions of Mr. Proctor?

8          MR. JONAS:  Very briefly, your Honor.

9          Good afternoon, Mr. Proctor.  My name is Barry

10    Jonas.  I'm one of the prosecutors in this case.  I have a

11    couple of questions.  You have a seventeen year old

12    daughter.  Tough age I imagine?

13         VENIRE PERSON:  Yes, sir.

14         MR. JONAS:  If you were to be chosen for the

18:00 15    jury, are there any issues of child care?

16         VENIRE PERSON:  No.

17         MR. JONAS:  I notice in the questionnaire you

18    filled out you have a degree in construction management?

19         VENIRE PERSON:  Yes.

20         MR. JONAS:  Have you ever worked in construction

21    before?

22         VENIRE PERSON:  Briefly until everything went

23    down in the construction industry for a while, and then I

24    applied for a DART bus driver.

25         MR. JONAS:  It's cyclic, good and bad?

18:00  1              VENIRE PERSON:  Yes.

       2              MR. JONAS:  I notice you put down you have been

       3      in Dallas for twenty-five years?

       4              VENIRE PERSON:  Yes.

       5              MR. JONAS:  Where did you grow up?

       6              VENIRE PERSON:  Louisiana and came to Dallas in

       7      the seventies.

       8              MR. JONAS:  What brought you to Dallas?

       9              VENIRE PERSON:  My mother moved here, and I kind

      10      of followed.

      11              MR. JONAS:  Nothing further, your Honor.  Thank

      12      you.

      13              THE COURT:  Mr. Proctor, I would like to ask a

      14      question about the plans that you have made, these prepaid

18:00 15      plane tickets for August 10th to August 20th.  Is there a

      16      possibility of changing the date of that trip if you were

      17      selected to serve on this jury?

      18              VENIRE PERSON:  Not from me.  No.

      19              THE COURT:  And if you were selected to serve on

      20      the jury and had to miss the trip, does that mean you just

      21      lose the money you have already paid for those tickets?

      22              VENIRE PERSON:  Yes.

      23              THE COURT:  You can probably tell we're in the

      24      process of talking with the members of the panel from

      25      which the jury will be drawn that will hear this case, and

18:00 1    I expect that process will go on through today and into

2    tomorrow.  Until you hear from us again, you should not

3    discuss this case with anyone or allow anyone to discuss

4    it with you, and if there are any media accounts about the

5    case in the newspaper or on the television or radio, you

6    should not read or watch or listen to any of those media

7    accounts.  Thank you.  You may be excused.

8              MS. MORENO:  Your Honor, I would ask the Court

9    to consider Mr. Proctor's vacation and take that under

10   advisement in your hardship considerations.

11             THE COURT:  Yes, ma'am, I will do that.  Thank

12   you.

13             Good afternoon, Ms. Graham.  Counsel for the

14   parties have some questions they would like to ask you.

18:00 15   MR. WESTFALL:  Ms. Graham, good afternoon.

16             VENIRE PERSON:  Good afternoon.

17             MR. WESTFALL:  My name is Greg Westfall.  Thank

18   you for doing this and coming and waiting.

19             VENIRE PERSON:  Thank you.

20             MR. WESTFALL:  I'm one of the defense lawyers on

21   the case.  I would like to speak with you for a few

22   minutes.  The case, I'll just let you know, is United

23   States versus the Holy Land Foundation, and it involves an

24   American Muslim charity.  The government alleges that the

25   charity and some of the men involved with the charity gave

18:00 1    material support to HAMAS which is a terrorist

2    organization.  After telling you that, do you recognize

3    the facts at all from the case in the media?

4             VENIRE PERSON:  No, sir.

5             MR. WESTFALL:  Don't know anything about it?

6             VENIRE PERSON:  No, nothing about the news.

7    Anything about the news.

8             MR. WESTFALL:  You don't watch the news?

9             VENIRE PERSON:  I look at the History Channel,

10   National Geographic.

11            MR. WESTFALL:  You work at the cafeteria for

12   DISD.  How long have you been doing that?

13            VENIRE PERSON:  Two years and before that I

14   worked at a family-owned restaurant in Oak Cliff.

18:00 15          MR. WESTFALL:  How do you like the work at the

16   cafeteria?

17            VENIRE PERSON:  It's fine being around the

18   children.

19            MR. WESTFALL:  Do you work in the line and give

20   the food?

21            VENIRE PERSON:  Yes, I do.

22            MR. WESTFALL:  Are you in an elementary or --

23            VENIRE PERSON:  Elementary.

24            MR. WESTFALL:  You got the babies.  While they

25   are still cute?

18:00  1                    VENIRE PERSON:  Right.

       2            MR. WESTFALL:  You used to live in Flint?

       3                    VENIRE PERSON:  Yes.

       4            MR. WESTFALL:  When did you come down here from

       5    Flint?

       6                    VENIRE PERSON:  1998.

       7            MR. WESTFALL:  Why did you leave Flint?

       8                    VENIRE PERSON:  It was a voluntary layoff from

       9    Citizen's Bank.  So I took a voluntary layoff.

      10            MR. WESTFALL:  What brought you down here?

      11                    VENIRE PERSON:  I'm from Louisiana.

      12            MR. WESTFALL:  And so you wanted to go back to

      13    the south where it wasn't cold anymore?

      14                    VENIRE PERSON:  I love cold weather.

18:00 15            MR. WESTFALL:  You do?  You are in the wrong

      16    place.  This case involves allegations of material support

      17    of terrorism.  So terrorism is in the name of the offense.

      18    How do you feel about sitting on a jury that could involve

      19    issues like that?

      20                    VENIRE PERSON:  I wouldn't mind it at all.

      21            MR. WESTFALL:  Are you active in your church?

      22                    VENIRE PERSON:  No, I'm not.

      23            MR. WESTFALL:  Do you do any sort of community

      24    work?

      25                    VENIRE PERSON:  No, I do not.

18:00 1        MR. WESTFALL:  Have you ever done like voluntary

2    work?

3        VENIRE PERSON:  When I was in Michigan but not

4    here.

5        MR. WESTFALL:  Do you know any Muslims?

6        VENIRE PERSON:  (No response)

7        MR. WESTFALL:  Or people who are Arab?

8        VENIRE PERSON:  I know friends from Ethiopia and

9    Nigeria.

10        MR. WESTFALL:  And you have good experiences

11    with them?

12        VENIRE PERSON:  Sure do.

13        MR. WESTFALL:  Do you know anybody who's of

14    Arabic descent?

18:00 15        VENIRE PERSON:  No, I don't.

16        MR. WESTFALL:  Do you have any dealings with

17    people of Arabic descent in your day-to-day activities?

18        VENIRE PERSON:  No.

19        MR. WESTFALL:  Had any good experiences?

20        VENIRE PERSON:  No.

21        MR. WESTFALL:  Bad experiences?

22        VENIRE PERSON:  I don't know any Arabs.

23        MR. WESTFALL:  That's the conclusion I was

24    arriving at.  Thank you so much for speaking to us.

25        THE COURT:  Counsel for the government have

18:00  1    questions for Ms. Graham?

2              MR. JACKS:  Good afternoon, Ms. Graham?

3              VENIRE PERSON:  Good afternoon.

4              MR. JACKS:  My name is Jim Jacks.  I'm an

5    Assistant United States Attorney here in Dallas, and I

6    will be one of the prosecutors representing the government

7    during this trial.  I just have a few questions if I could

8    ask you.

9              So you moved to Dallas in the late eighties?

10             VENIRE PERSON:  Yes, September 1988.

11             MR. JACKS:  At that time did you go to work for

12   the restaurant you were telling us about?

13             VENIRE PERSON:  Yes.

14             MR. JACKS:  What was the name?

18:00 15             VENIRE PERSON:  Michelle Fried Chicken.

16             MR. JACKS:  Where was it located?

17             VENIRE PERSON:  On Overton Road.

18             MR. JACKS:  And you worked there?

19             VENIRE PERSON:  Until 2005 whether it closed.

20             MR. JACKS:  Did you work as a waitress or some

21   other capacity?

22             VENIRE PERSON:  Waitress and cook.

23             MR. JACKS:  Are you off for the summer?

24             VENIRE PERSON:  Yes, I am.

25             MR. JACKS:  And are you doing anything else at

18:00 1    this time?

2            VENIRE PERSON:  I'm taking care of my sister.

3    She's handicapped and bedridden.

4            MR. JACKS:  Does she live with you in your home?

5            VENIRE PERSON:  Yes.

6            MR. JACKS:  Who else lives with you?

7            VENIRE PERSON:  My twin sister and my niece.

8            MR. JACKS:  Is your twin sister the one who's

9    handicapped?

10            VENIRE PERSON:  No.

11            MR. JACKS:  You have another sister?

12            VENIRE PERSON:  Yes.

13            MR. JACKS:  Does your sister that requires

14    care -- does she require care around the clock?

18:00 15            VENIRE PERSON:  Yes, she does.

16            MR. JACKS:  And your other family --

17            VENIRE PERSON:  My twin sister takes care of her

18    but when she gets a little tired, I step in.

19            MR. JACKS:  Do you have any children of your

20    own?

21            VENIRE PERSON:  No, I don't.

22            MR. JACKS:  And I take it from your

23    questionnaire that you have not served on a trial jury

24    before.

25            VENIRE PERSON:  No, sir.

18:00 1         MR. JACKS:  Have you ever received a jury

2   summons?

3         VENIRE PERSON:  Only from the City of Dallas.

4         MR. JACKS:  Was that for like municipal court?

5         VENIRE PERSON:  George Allen.

6         MR. JACKS:  I believe you said your brother

7   worked for the Dallas Morning News.

8         VENIRE PERSON:  He used to.

9         MR. JACKS:  Is he retired?

10        VENIRE PERSON:  Yes, he is.

11        MR. JACKS:  And what did he do when he work for

12  them?

13        VENIRE PERSON:  Worked on computers.

14        MR. JACKS:  What does he do now?

18:00 15        VENIRE PERSON:  Nothing.

16        MR. JACKS:  Is he still here in the Dallas area?

17        VENIRE PERSON:  Yes, sir.

18        MR. JACKS:  When did your brother come to Texas?

19        VENIRE PERSON:  1976.

20        MR. JACKS:  Before you came?

21        VENIRE PERSON:  Oh, no, I came in 1972 and moved

22  to Flint.

23        MR. JACKS:  To talk to you a little bit about

24  the charges in this case, have you heard of the terrorist

25  group HAMAS?

18:00 1         VENIRE PERSON:  No.

2         MR. JACKS:  The principal charge is essentially

3   that the Holy Land Foundation and certain men working for

4   it provided material support to this terrorist

5   organization, HAMAS.  And at the end of the trial when

6   both sides have finished presenting their evidence, the

7   Judge will tell both sides what the law is and what the

8   government must prove to prove its case and definitions of

9   words that you might need to know so that you can do your

10   job.  And I expect in those instructions he would tell

11   you, the jury, this group HAMAS has been designated by the

12   United States Government as a terrorist organization.  I

13   also expect that he would include in his instructions a

14   statement telling the jurors that it is against the United

18:00 15   States law to give anything to or for the benefit of a

16   terrorist organization.  That means even things considered

17   charitable items like food, clothing, medical supplies,

18   books, that type of thing, even that type of stuff.  It

19   would be against the law to provide that type of material

20   to a terrorist organization.  Do you understand that

21   aspect of the law and could you follow that aspect of the

22   law if the Judge told you that was the law?

23         VENIRE PERSON:  I sure could.

24         MR. JACKS:  Okay.  Thank you.

25         VENIRE PERSON:  Thank you.

18:00  1        THE COURT:  Ms. Graham, we are in the process of

    2   talking with the members of the panel from which the jury

    3   will be selected that would hear this case.  I expect that

    4   process will continue until at least late tomorrow.  So

    5   until you hear from us again, you should not discuss this

    6   case with anyone or allow anyone to discuss it with you,

    7   and if there are any media accounts about the case on the

    8   television or in the newspapers or on the radio, you

    9   should not pay any attention to those accounts.

   10        VENIRE PERSON:  Yes, sir.

   11        THE COURT:  Thank you.

   12        Good afternoon, sir, is your name pronounced

   13   Morones?

   14        VENIRE PERSON:  Yes, sir.

18:00 15        THE COURT:  Counsel for the parties have some

   16   questions they would like to ask you.

   17        MR. WESTFALL:  Mr. Morones, I'm Greg Westfall.

   18   I'm one of the defense counsel in this case.  I would like

   19   to speak to you for a few minutes.  This case is the

   20   United States versus Holy Land Foundation for Relief and

   21   Development, and it involves allegations that the Holy

   22   Land Foundation and some of the men who were involved in

   23   the Holy Land Foundation gave material support to HAMAS

   24   which is a terrorist organization.  It's a Muslim charity

   25   originally in Richardson, Texas.  Having heard that, does

18:00 1   that ring any bell?

2           VENIRE PERSON:  Yes, I have heard of it.

3           MR. WESTFALL:  What have you heard?

4           VENIRE PERSON:  Just what you told me.

5           MR. WESTFALL:  Based on what you have heard,

6   have you formed any opinions about whether anyone is

7   guilty?

8           VENIRE PERSON:  No, sir.

9           MR. WESTFALL:  On your questionnaire you

10  answered Number 3 yes, which is do you have a problem with

11  hearing or vision?

12          VENIRE PERSON:  Well, I have to wear these

13  glasses to see you and other glasses to read.

14          MR. WESTFALL:  So you don't have any problems

18:00 15  that aren't correctable with glasses?

16          VENIRE PERSON:  No.

17          MR. WESTFALL:  Tell me.  You work full time for

18  the night crew.  What do you do?

19          VENIRE PERSON:  I work a night crew at Sam's on

20  Park Lane.

21          MR. WESTFALL:  How often do you have to do the

22  night crew?

23          VENIRE PERSON:  Five days a week.

24          MR. WESTFALL:  Monday through Friday?

25          VENIRE PERSON:  Tuesday through Saturday.

18:00 1          MR. WESTFALL:  Did you do the night crew last

2    night?

3          VENIRE PERSON:  No, I had to take off the night

4    before, I couldn't be here this morning.

5          MR. WESTFALL:  You look amazingly spry I was

6    going to say.  This trial is likely to go four months.  Is

7    your job in jeopardy if that happens or are you going to

8    have to be working all night and coming in here?

9          VENIRE PERSON:  I run a three-man crew

10   sometimes, and when I'm out, there is only two men to pick

11   up for me, and I have to talk to them to find out if they

12   can replace me for that amount of time.

13         MR. WESTFALL:  Would you please look into that

14   and let the jury clerk know as quickly as you can?

18:00 15         VENIRE PERSON:  Yes.

16         MR. WESTFALL:  You know this case has something

17   to do with terrorism.  Terrorism is in the name of the

18   offense.  How do you feel about the possibility of being a

19   juror on this case?

20         VENIRE PERSON:  I have mixed feelings about

21   that.  My niece was in New York City at the time of 9-11,

22   and she saw a lot of it, and a year later she killed

23   herself.  Nobody knew why because she was getting ready to

24   get married.  We figured it was because of that.  She saw

25   a lot.

1          MR. WESTFALL:  I'm sorry.  Were you pretty close

2     to your niece?

3          VENIRE PERSON:  I was one of the favorite

4     uncles.  I was the youngest of three uncles, and we were

5     more close to the young kids.  So I was real close to her,

6     yes.  Her name was Octavia Padilla.

7          MR. WESTFALL:  Well, let me just say this about

8     a trial.  Have you been on a jury before?

9          VENIRE PERSON:  No, I never have.

10          MR. WESTFALL:  Every trial is different.  The

11     requirements and the appropriate things to think about to

12     be a juror on any type of trial kind of goes along with

13     the type of trial.  This trial certainly involves material

14     support of terrorism.  And in order to be an effective

15     juror, you would have to be able to make a consideration

16     of the guilt or innocence of the people based upon only

17     the evidence here in trial.

18          Your niece, only you can say.  Is that the kind

19     of thing that would be on your mind?  Would your niece be

20     on your mind when you're in here during this trial?

21          VENIRE PERSON:  She has been on my mind since

22     she did it.  I believe it had a lot to do with her doing

23     it to herself.  She was a curator for a museum in New

24     York.  Like I said, she was about to get married, and

25     there was no reason for her to do that.

18:00  1            MR. WESTFALL:  I am very, very sorry.  Do you
       2    think this might not be the best trial for you to sit on
       3    the jury?
       4            VENIRE PERSON:  I wouldn't think so.  To be
       5    honest with you, it would be hard for me to do that.
       6            MR. WESTFALL:  Sir, thank you so much and I'm
       7    sorry for your loss.
       8            VENIRE PERSON:  Yes, sir.
       9            THE COURT:  Counsel for the government have
      10    questions for Mr. Morones?
      11            MR. JACKS:  Yes, sir.  My name is Jim Jacks.
      12    I'm an Assistant United States Attorney for the United
      13    States Attorney's Office, and I'll be representing the
      14    government during this trial.  I too extend my sympathy
18:00 15    for the loss of your niece.  How long had she been in New
      16    York?
      17            VENIRE PERSON:  About two years.
      18            MR. JACKS:  Was she from this area?
      19            VENIRE PERSON:  Yes, she had graduated from SMU.
      20    She had gone to North Carolina first to her sister's house
      21    and then to New York City.
      22            MR. JACKS:  And what museum she was working at?
      23            VENIRE PERSON:  Fine Arts Museum.  I don't know.
      24            MR. JACKS:  And it's my understanding that you
      25    and your family don't know why, but you surmise it might

18:00  1     have been partly because of the incident on 9-11?

      2           VENIRE PERSON:  Yes.

      3           MR. JACKS:  Where was she when that happened?

      4           VENIRE PERSON:  I don't know.  She said she saw

      5     part of it when she came down to talk to us, but she

      6     wouldn't talk that much about it.  So I don't know how

      7     close she was to it.

      8           MR. JACKS:  Your job responsibilities, what are

      9     your hours where you work?

    10           VENIRE PERSON:  I work from nine o'clock to five

    11     or 5:30.

    12           MR. JACKS:  Is that something you choose to do

    13     or is that the only hours that work can be done?

    14           VENIRE PERSON:  That's the only hours that work

18:00 15     can be done.

    16           MR. JACKS:  When you are not going to respond to

    17     a jury summons during the day, is that when you sleep and

    18     get your rest?

    19           VENIRE PERSON:  Yes.  I sleep from nine o'clock

    20     to two or three o'clock in the afternoon.  Get up for an

    21     hour, eat lunch and lay back down and get back up at 6:30

    22     or 7:00.

    23           MR. JACKS:  Is it your opinion if you were to

    24     end up on this jury, having gone through what you have

    25     gone through that you will not be able to be a fair and

18:00  1    impartial juror for these gentlemen?

2              VENIRE PERSON:  It would be hard for me to say.

3    I would like to be, but I don't know if I could.

4              MR. JACKS:  Well, is there a chance that you

5    would hold them responsible for what happened on 9-11?

6              VENIRE PERSON:  Not directly, no.

7              MR. JACKS:  Indirectly?

8              VENIRE PERSON:  Depending on if it comes out the

9    money is going to terrorists, your Honor.

10              MR. JACKS:  Well, but if the money is going to

11    terrorists and you believe that beyond a reasonable doubt,

12    then that would make them guilty, and if you believe they

13    are guilty, that doesn't necessarily make you an unfair

14    juror, does it?

18:00 15              VENIRE PERSON:  My opinion?

16              MR. JACKS:  Yes.

17              VENIRE PERSON:  Yeah.  I don't think it would.

18              MR. JACKS:  Well, as Mr. Westfall said, only you

19    know.  If you should end up on this jury -- and that's

20    something yet to be decided -- could you be a person that

21    would listen to the evidence, listen to the Judge's

22    instructions and follow the law, give these gentlemen the

23    presumption of innocence that the Constitution says they

24    are entitled to, require the government to prove its case

25    beyond a reasonable doubt?  You are the only one that can

18:00 1    tell us that, and I guess the ultimate $64,000 question is

2    can you do that?

3         VENIRE PERSON:  I think I possibly could.

4         MR. JACKS:  Do you feel like this would not be

5    the jury that you should be on?

6         VENIRE PERSON:  In my heart I don't think so.

7         MR. JACKS:  Does that mean, no, I don't think I

8    should be on this jury?

9         VENIRE PERSON:  I don't think I should be on

10   this jury.

11        MR. JACKS:  Thank you.

12        THE COURT:  Thank you, Mr. Morones.  We're in

13   the process of talking with the members of the panel from

14   whom this jury will be drawn, and that process will

18:00 15  probably go on for the rest of today and into tomorrow.

16   Until you hear from us, you should not discuss this case

17   with anyone or allow anyone to discuss it with you, and if

18   there are any media accounts on the television or in the

19   newspapers or on the radio, you should not pay any

20   attention to those accounts.  Thank you, sir.  You may be

21   excused.

22        MR. WESTFALL:  Your Honor, we'll submit Mr.

23   Morones for inability to be fair and impartial.

24        THE COURT:  Any objection to that, Mr. Jacks?

25        MR. JACKS:  No, sir.

18:00  1              THE COURT:  I will excuse Mr. Morones for cause.

       2    Good afternoon, Ms. Munoz, counsel for the parties have

       3    some questions they would like to ask you.

       4              MS. MORENO:  Hello, Ms. Munoz.  I'm one of the

       5    defense attorneys in this case, and I am going to ask you

       6    some questions about the questionnaire you filled out.

       7              VENIRE PERSON:  Okay.

       8              MS. MORENO:  Remember doing that a couple of

       9    weeks ago?

      10              VENIRE PERSON:  Yes.

      11              MS. MORENO:  First of all, this is a case that

      12    involves the Holy Land Foundation which is an American

      13    Muslim charity in Dallas, and I'm wondering if you heard

      14    anything about the Holy Land Foundation in the press

18:00 15    recently.

      16              VENIRE PERSON:  No.

      17              MS. MORENO:  Do you recall hearing anything

      18    about it some years ago?

      19              VENIRE PERSON:  No.

      20              MS. MORENO:  Have you been in Dallas your whole

      21    life?

      22              VENIRE PERSON:  Yes.

      23              MS. MORENO:  I see that you are unemployed.

      24              VENIRE PERSON:  Yes.

      25              MS. MORENO:  Are you looking for work?

18:00 1          VENIRE PERSON:  Yes.

2          MS. MORENO:  I ask you that not to pry, but this

3     case is going to take about four months.

4          VENIRE PERSON:  Okay.

5          MS. MORENO:  And I'm wondering what kind of an

6     effect is that going to have on your life and your home?

7          VENIRE PERSON:  Well, I just recently started

8     looking for a job, so.  It's not really going to effect

9     anything.  I still live with my parents.

10          MS. MORENO:  They are helping you?

11          VENIRE PERSON:  Yes.

12          MS. MORENO:  Where did you go to school?

13          VENIRE PERSON:  High school?

14          MS. MORENO:  Yes.

18:00 15          VENIRE PERSON:  Riley Christian Academy.

16          MS. MORENO:  Where is that?

17          VENIRE PERSON:  In Dallas.

18          MS. MORENO:  Did you go to college at all?

19          VENIRE PERSON:  I went to Cedar Valley and

20     Trinity Valley.

21          MS. MORENO:  What did you study?

22          VENIRE PERSON:  Just my basics.

23          MS. MORENO:  Did you get a degree from there?

24          VENIRE PERSON:  No.

25          MS. MORENO:  This is a case that involves

18:00 1    allegations of terrorism.  The government claims that this

2    organization, Holy Land Foundation, sent aid to a

3    terrorist organization.  Books, clothes, medicine, things

4    you would think of as charity.  But the government says

5    these items somehow benefited a terrorist organization

6    named HAMAS.  That's what they say.  Have you ever heard

7    of HAMAS?

8            VENIRE PERSON:  Just on television but I didn't

9    pay any attention.

10            MS. MORENO:  If you were picked as a juror on

11    this case, you would have to pay a lot of attention to

12    things like that, HAMAS and terrorism.  What are your

13    thoughts about that?

14            VENIRE PERSON:  About terrorism?

18:00 15            MS. MORENO:  About sitting on a case with

16    charges of terrorism.

17            VENIRE PERSON:  Well, I believe that it's not

18    right, but I don't really have thoughts.

19            MS. MORENO:  In a criminal trial, anyone who's

20    accused of a crime has the presumption of innocence.  Have

21    you heard of that before?

22            VENIRE PERSON:  No.

23            MS. MORENO:  What it means is under the

24    Constitution anybody accused of a crime is presumed

25    innocent.  They start way up here; they are presumed

18:00 1    innocent.  And that presumption of innocence goes away

2    after the government proves its case beyond a reasonable

3    doubt.  Have you heard of that term beyond every

4    reasonable doubt?

5           VENIRE PERSON:  Yes.

6           MS. MORENO:  And what I'm asking you is in a

7    case that involves charges of terrorism which are pretty

8    serious charges, do you have any concerns about that or

9    problems with the presumption of innocence?  What do you

10    think about that?

11           VENIRE PERSON:  I don't know.  Everybody --

12           MS. MORENO:  Let me tell you there aren't any

13    wrong answers.  We're just looking for your opinions and

14    how you feel inside?

18:00 15           VENIRE PERSON:  Okay.

16           MS. MORENO:  No one is judging here but we need

17    to know, and only you can tell us if you have some

18    opinions that would make it difficult for you to sit on a

19    case like this.

20           VENIRE PERSON:  No.  I mean due to the fact that

21    I don't know that much about it I can't have a negative or

22    positive thought to it.  So.

23           MS. MORENO:  Do you know any Muslims?

24           VENIRE PERSON:  No.

25           MS. MORENO:  Have you ever dealt with any people

18:00 1    of Arabic descent?

2              VENIRE PERSON:  Yes.

3              MS. MORENO:  Tell us about that?

4              VENIRE PERSON:  Cosmetology school, a lot of

5    them came in, and we talked to them.

6              MS. MORENO:  Were they Muslim women?

7              VENIRE PERSON:  Yes.

8              MS. MORENO:  How did you know they were Muslim?

9              VENIRE PERSON:  We had to go to a certain room

10   and cover everything up, and no one could see us work on

11   their hair, only us, and then cut their hair.

12             MS. MORENO:  What did you think of that?

13             VENIRE PERSON:  We got used to it.  Every week

14   you had your clients, and you got used to it.

18:00 15            MS. MORENO:  Did you ever ask them why they

16   cover?

17             VENIRE PERSON:  Yes, but after you hear

18   everybody's story, you forget it.  They said in their

19   custom, it's not allowed for anybody to see their hair.

20             MS. MORENO:  What did you think about that?

21   Here were these ladies who covered their hair, covered

22   their heads.  What were your thoughts about that, you as a

23   young lady?

24             VENIRE PERSON:  Well, everybody has their own

25   beliefs.  So it's not like I went into detail, you know,

18:00 1   why do you do it. Don't you ever want a change? That's

2   them. That's who they are. That's what I thought about

3   that.

4          MS. MORENO: Did you ever ask them if they

5   wanted to change?

6          VENIRE PERSON: No.

7          MS. MORENO: And so you would go into a room and

8   cover the room and then you could wash their hair and cut

9   their hair?

10          VENIRE PERSON: Yes, it could only be you.

11   Nobody else watching or anything like that. If you need

12   an instructor or something like that, you had to ask them

13   first if the instructor could come in, but other than that

14   it was just you and them.

18:00 15          MS. MORENO: Did you ever talk about that

16   experience with your friends who didn't cover?

17          VENIRE PERSON: No.

18          MS. MORENO: So in sum, what did you think of

19   that? Do you still have Muslim clients?

20          VENIRE PERSON: No, not no more. It was just in

21   cosmetology school.

22          MS. MORENO: Just in school?

23          VENIRE PERSON: Yes.

24          MS. MORENO: Was that a good or bad experience?

25          VENIRE PERSON: Well, I thought it was good.

18:00 1    It's not like you are going up to someone and say why do

2    you cover yourself up, but they opened up and said, oh,

3    this why.  I didn't really ever question it really.

4          MS. MORENO:  So now when you see women who

5    cover, what do you think about that?

6          VENIRE PERSON:  They have their own beliefs.

7    You do what you got to do.  Nobody should really question

8    you why or anything like that.

9          THE COURT:  Ms. Moreno, your time has expired.

10          MS. MORENO:  Thank you, your Honor.  Thank you

11    so much.

12          THE COURT:  Counsel for the government have

13    questions for Ms. Munoz?

14          MR. JONAS:  Yes, your Honor.  Good afternoon.

18:00 15    My name is Barry Jonas.  I'm one of the prosecutors in

16    this case.  You said you live with your parents.  Do both

17    of them work?

18          VENIRE PERSON:  Yes, my mom works in a factory,

19    and my dad is a truck driver.

20          MR. JONAS:  Who does your dad work for?

21          VENIRE PERSON:  He has his own business.

22          MR. JONAS:  Drives an eighteen-wheeler?

23          VENIRE PERSON:  Yes.

24          MR. JONAS:  Long distance?

25          VENIRE PERSON:  No, he's local.

18:00   1              MR. JONAS:  And your mom works for --

        2              VENIRE PERSON:  A company.  It's a factory.

        3              MR. JONAS:  What do they make?

        4              VENIRE PERSON:  Things for your shower.

        5              MR. JONAS:  And you said you were going to start

        6      looking for a job.  What type of job?

        7              VENIRE PERSON:  Cosmetology.

        8              MR. JONAS:  Did you graduate?

        9              VENIRE PERSON:  Yes.

       10              MR. JONAS:  When was that?

       11              VENIRE PERSON:  Last year.

       12              MR. JONAS:  And since you have been graduated,

       13      what have you been doing?

       14              VENIRE PERSON:  Just basically babysitting.

18:00  15              MR. JONAS:  Any brothers or sisters?

       16              VENIRE PERSON:  Stepbrothers and sisters.

       17              MR. JONAS:  Do they live at home with you?

       18              VENIRE PERSON:  No.

       19              MR. JONAS:  You put down on your questionnaire

       20      that you filled out that you speak Spanish.

       21              VENIRE PERSON:  Yes.

       22              MR. JONAS:  Fluent?

       23              VENIRE PERSON:  Yes.

       24              MR. JONAS:  What is spoken at home?

       25              VENIRE PERSON:  Both.

18:00 1          MR. JONAS:  Very briefly, this is case is about

2     an organization called the Holy Land Foundation that Ms.

3     Moreno told you about that is accused of providing money

4     or support to a terrorist organization known as HAMAS.  I

5     think she asked you if you have heard of HAMAS.

6          VENIRE PERSON:  No.

7          MR. JONAS:  After you hear the evidence, the

8     Court will instruct the jury as to the law.  We expect he

9     would say that HAMAS is an organization designated by the

10    United States Government as a terrorist organization and

11    any support to HAMAS, money or otherwise, is illegal, even

12    if that money is used for what most people consider to be

13    charitable stuff.  Would you be able to accept that

14    charge?

18:00 15         VENIRE PERSON:  Well --

16         MR. JONAS:  Would you be able to listen to the

17    Judge and accept his instructions to you that if you found

18    the defendant gave money to HAMAS, even though it was used

19    for what you normally think of as good things, you could

20    still find them guilty?

21         VENIRE PERSON:  No.

22         MR. JONAS:  You cannot find them guilty for

23    giving good things to a terrorist organization?

24         VENIRE PERSON:  Yes, I could.

25         MR. JONAS:  Thank you.

18:00 1          THE COURT:  Ms. Munoz, we're in the process of

2    talking to the members of the panel from whom the jury

3    that would hear this case will be drawn.  Until you hear

4    from us you should not discuss the case with anyone or

5    allow anyone to discuss it with you, and if there are

6    media accounts on the television, in the newspapers or on

7    the radio, you should not listen to any such accounts.

8    Thank you, you may be excused.

9          Good afternoon, Mr. Taylor.  Counsel for the

10    parties have some questions they would like to ask you.

11    Mr. Westfall.

12          MR. WESTFALL:  Thank you, your Honor.  Mr.

13    Taylor, I'm Greg Westfall.  I'm one of the defense lawyers

14    in this case.  I want to talk to you for a few minutes.

18:00 15    This case is United States Government versus the Holy Land

16    Foundation.  It involves a Muslim charity, an American

17    Muslim charity who the United States Government is

18    alleging gave material support to HAMAS which is a

19    terrorist organization.  What do you think?

20          VENIRE PERSON:  That's tough there.

21          MR. WESTFALL:  What's tough about it?

22          VENIRE PERSON:  Finding that they got something

23    like that that's going on around here.  I don't hear too

24    much about it, but the limited I do hear, I know it's

25    pretty serious.

18:00   1              MR. WESTFALL:  This came out of Richardson.  So

        2    it's kind of in the area.  But you had this look of

        3    surprise on your face.  Is that the first time you have

        4    heard of it or first recognition?

        5              VENIRE PERSON:  First time I have been in

        6    something like this.  This is the first time I have been

        7    selected.  So it's all a surprise to me.

        8              MR. WESTFALL:  That's all I want to talk to you

        9    about is your experiences.  It's part of the process of

       10    putting the jury together.  Have you heard of the case?

       11    Have you heard of the situation at all through the

       12    newspapers or any media or talking or anything?

       13              VENIRE PERSON:  No, I haven't heard anything

       14    about it.

18:00  15              MR. WESTFALL:  We're talking about Muslim men

       16    that are on trial for an offense that has in the name of

       17    that offense terrorism, the material support of terrorism.

       18    How do you feel about that?  The possibility of being a

       19    juror on something like that.  What do you think?

       20              VENIRE PERSON:  Really, I don't have a whole lot

       21    to say about it, but like I say, I'm new to this.  I

       22    haven't sit and listened to what's going on and how

       23    different things occurred.  So I really don't have a whole

       24    lot of experience about how things are going on.

       25              MR. WESTFALL:  Have you ever heard of HAMAS?

18:00  1          VENIRE PERSON:  I have heard it.

       2          MR. WESTFALL:  Tell me what you have heard.

       3          VENIRE PERSON:  Really nothing at all.  I just

       4     heard of it.

       5          MR. WESTFALL:  Have you followed the

       6     Palestinians-Israeli conflict at all?

       7          VENIRE PERSON:  No, whatever it is, I hope it's

       8     all right and everybody get together and talk and hope

       9     everybody get to what you might want to call it an

      10     agreement on something.  Somebody here fighting on this

      11     side and somebody disagreeing on the other side and maybe

      12     everybody can get together and agree on the same thing.

      13          MR. WESTFALL:  You work with the independent

      14     school district.  How long have you worked them?

18:00 15          VENIRE PERSON:  I have been there seven years.

      16          MR. WESTFALL:  What do you do in your off time?

      17          VENIRE PERSON:  Really relax.  What we do is we

      18     strip floors and furniture and stuff like that and my

      19     working at a school that has three floors, we have a whole

      20     lot to do.

      21          MR. WESTFALL:  You work at a high school?

      22          VENIRE PERSON:  E.P. Comstock on Jim Miller, and

      23     it's a middle school.

      24          MR. WESTFALL:  You do that work mainly at night?

      25          VENIRE PERSON:  Yes, I work at night from 2:30

18:00 1    to 11:00.  But now when the kids are out of school we work

2    through the summertime 7:30 to 4:30 or we may have

3    overtime where we work from six until we fall out.

4            MR. WESTFALL:  Are you involved in the community

5    or in church?

6            VENIRE PERSON:  (Shakes head)

7            MR. WESTFALL:  So you kind of work and go home?

8            VENIRE PERSON:  Yes, I go to work and go back to

9    the house.

10            MR. WESTFALL:  You watch TV?

11            VENIRE PERSON:  Every once in a while because

12    when I come in at night the TV is watching me.

13            MR. WESTFALL:  You got those big brother TV's.

14    Sports?

18:00 15            VENIRE PERSON:  Only sports is drag racing.

16            MR. WESTFALL:  Do you go?

17            VENIRE PERSON:  Sometimes but the time I have, I

18    try to sit around the house and enjoy my family.  I'm an

19    only child, and I try to spend a lot of time with my

20    mother.

21            MR. WESTFALL:  Do you think you could be fair in

22    a criminal case where people are accused of supporting a

23    terrorist organization?

24            VENIRE PERSON:  Sure.  But I would like to know

25    more what's going on behind the scenes.

18:00 1          MR. WESTFALL:  And in four months I bet you can

2     learn a lot about what's going on behind the scenes.

3          Your job going to be okay?

4          VENIRE PERSON:  I don't know.  I have to talk to

5     them about it.  School is out, and we're getting ready to

6     start cleaning our building.  We haven't started because

7     they are remodeling and putting sprinklers in and doing

8     the roof and stuff like that so most of my time won't be

9     there.

10          MR. WESTFALL:  Well, if you are in a position

11     where you are going to lose your job and it's to the

12     extent that you can't pay attention in here, that's

13     something the Court needs to know about pretty quickly.

14     Okay?

18:00 15          VENIRE PERSON:  Okay.

16          MR. WESTFALL:  This trial can go four months,

17     possibly shorter, possibly longer.  But Monday through

18     Thursday business hours.  So we'll be knocking off about

19     five, about quitting time, and if that gets in the way of

20     your job where you are going to lose your job or affect

21     you financially, please let the jury clerk know.

22          VENIRE PERSON:  Believe me, I will.

23          MR. WESTFALL:  Do you have any other issues I

24     haven't asked you about?

25          VENIRE PERSON:  No.  Just want to get interested

18:00 1    and find out what's going on and how things go.

2         MR. WESTFALL:  Thank you for your patience.  I

3    know you have been waiting around all day.

4         VENIRE PERSON:  I have been here since eight

5    this morning.

6         THE COURT:  Counsel for the government have

7    questions of Mr. Taylor?

8         MR. JACKS:  Yes, sir.

9         Mr. Taylor, my name is Jim Jacks.  I'm an

10   Assistant United States Attorney here in Dallas.  I'm one

11   of the prosecutors on this case.  I'll be representing the

12   government during this trial, and I just have a few

13   follow-up questions for you, if you don't mind.  How long

14   have you worked for DISD?

18:00 15        VENIRE PERSON:  Seven years.

16        MR. JACKS:  What kind of work did you do before

17   that?

18        VENIRE PERSON:  I was a truck driver before I

19   went to DISD.

20        MR. JACKS:  Who did you work for?

21        VENIRE PERSON:  Premium Laundry.

22        MR. JACKS:  Was that locally here in the Dallas

23   area that you drove?

24        VENIRE PERSON:  No.  I was here and driving from

25   Sherman to Durant, Oklahoma.

18:00 1          MR. JACKS:  And what would you be hauling?

2          VENIRE PERSON:  Linen.

3          MR. JACKS:  How long did you work at that job?

4          VENIRE PERSON:  Eight years.

5          MR. JACKS:  What led you to change from being a

6     truck driver to going to the school?

7          VENIRE PERSON:  I was there eight years, and I

8     didn't get a vacation, and I kept going, and then I had an

9     accident, and I told them I was through.

10         MR. JACKS:  Was there a time-off period or did

11    you pretty quickly get a job with the school district?

12         VENIRE PERSON:  I was off maybe a month, maybe

13    two.

14         MR. JACKS:  Were there any legal proceedings

18:00 15   that resulted from that accident?

16         VENIRE PERSON:  No, I haven't heard anything

17    else about it.

18         MR. JACKS:  All right.  Have you always worked

19    as a custodian for the Dallas Independent School District?

20         VENIRE PERSON:  Yes.

21         MR. JACKS:  You have two children.  Daughter and

22    a son?

23         VENIRE PERSON:  Yes.

24         MR. JACKS:  Do they live with you or with your

25    ex-wife?

18:00 1          VENIRE PERSON:  They stay with their mother.  I

2     have never been married.

3          MR. JACKS:  Are they still in that home with her

4     or moved out of the house?

5          VENIRE PERSON:  From what I know, they are still

6     at home with her.  They stay in Texas City.

7          MR. JACKS:  Okay.  Is Dallas your home?  Is that

8     where you were born and raised?

9          VENIRE PERSON:  Yes.

10          MR. JACKS:  I've got the questionnaire that you

11     filled out two or three weeks ago.  I just want to ask you

12     a couple of follow-up questions.  One of the questions

13     was -- says some of the defendants are citizens of the

14     United States and some are not.  The question was would

18:00 15     you afford each of the defendants the same consideration

16     in evaluating the evidence, and you answered no.  Can you

17     explain your concern about that?

18          VENIRE PERSON:  I don't know because I probably

19     just really didn't understand it fully.

20          MR. JACKS:  So what is your opinion about

21     affording the same rights for citizens and noncitizens?

22     Should that be the case or different for noncitizens?

23          VENIRE PERSON:  Probably should be different.

24          MR. JACKS:  In what way?

25          VENIRE PERSON:  I really couldn't say.

18:00 1          MR. JACKS:  There was another question I wanted

2     to ask you about.  It says the Court will instruct you

3     that the testimony of a law enforcement officer is

4     entitled to no greater weight or lesser weight than that

5     of any other witness, and the question was do you have any

6     difficulty accepting that statement, and your answer was

7     no.  So you believe that a law enforcement officer's

8     testimony is entitled to the same weight as any other

9     person?

10          VENIRE PERSON:  They should if he's involved.

11          MR. JACKS:  And have you had any family member

12     or close personal friend or yourself had any contact with

13     law enforcement?

14          VENIRE PERSON:  I have two cousins behind bars.

18:00 15          MR. JACKS:  What are they in jail for?

16          VENIRE PERSON:  Both of them for murder, I

17     think.

18          MR. JACKS:  And are they in prison right now?

19          VENIRE PERSON:  Yes.

20          MR. JACKS:  When were they sent to prison?

21          VENIRE PERSON:  That's a good question.  I don't

22     remember that one.  It's been a while.  I would say

23     probably back in the nineties.  Late nineties.

24          MR. JACKS:  Were you friends with them?

25          VENIRE PERSON:  They were my cousins.

18:00 1          MR. JACKS:  Yes, were you friends with them

2    during the time before they went to prison?

3          VENIRE PERSON:  I wouldn't say we were close,

4    but we communicated.

5          MR. JACKS:  Did they have a trial before they

6    were convicted?

7          VENIRE PERSON:  I think they did, but I didn't

8    attend.

9          MR. JACKS:  From what you have heard and the

10   information you have received about it, do you believe

11   they were treated fairly by the criminal justice system?

12         VENIRE PERSON:  I put it like this.  If you do

13   wrong, you suffer the consequences.

14         MR. JACKS:  Just to talk to you about the

18:00 15  charges in this case, the charges have been basically

16   summarized as this Holy Land Foundation and the men

17   working for it supplied material support, which can be a

18   lot of things, but the indictment in this case says they

19   supplied money to this terrorist organization HAMAS.  At

20   the end of the case, the Judge will tell the jury what law

21   should be applied, and I expect he would tell the jury

22   that HAMAS has been designated as a terrorist organization

23   by the U.S. Government.  I also expect that he would tell

24   the jury that it's illegal to give anything to HAMAS, even

25   if it's in the nature of charitable items like food and

18:00 1    clothing and medical supplies.  Could you follow that law

2    or could you accept that instruction and that law and

3    return a verdict of guilty even if you believe that what

4    they sent or purchased with that money was humanitarian or

5    charitable items?

6          VENIRE PERSON:  Yes, I can do that.

7          MR. JACKS:  So even the fact that whatever that

8    money was used for may have been for something that would

9    otherwise be good, if the judge told you that would still

10    be against the law, you could return a verdict of guilty

11    if that was what the evidence showed had been done?

12          VENIRE PERSON:  If that's what the evidence

13    show, yes.

14          MR. JACKS:  Thank you.

18:00 15          THE COURT:  Mr. Taylor, we are in the process of

16    talking with the members of the panel from which the jury

17    will be drawn that would hear this case.  I expect that

18    process will go on through today and into tomorrow.  Until

19    you hear from us further, you should not discuss this case

20    with anyone or allow anyone to discuss it with you.  And

21    if there are any media accounts about the case in the

22    newspapers or on television or the radio, you should not

23    read or watch or listen to any such media accounts.

24          VENIRE PERSON:  Okay.  I don't watch much news

25    any way, but the little bitty I do watch.

18:00 1          THE COURT:  Thank you, sir.  You may be excused.

2          Good afternoon, Ms. Fletcher.  Counsel for the

3    parties have some questions they would like to ask you.

4          MS. MORENO:  Thank you, your Honor.  I see from

5    your questionnaire you are an attorney.

6          VENIRE PERSON:  I went to law school.

7          MS. MORENO:  Did you take the bar after that?

8          VENIRE PERSON:  I have taken it once, and I

9    passed.

10         MS. MORENO:  And you have an MBA?

11         VENIRE PERSON:  Yes.

12         MS. MORENO:  And what do you do now?

13         VENIRE PERSON:  I work for Fannie Mae, mortgage

14   banker.

18:00 15         MS. MORENO:  Do you have any intentions of

16   taking the bar again?

17         VENIRE PERSON:  Yes.

18         MS. MORENO:  Want to practice law?

19         VENIRE PERSON:  Eventually.

20         MS. MORENO:  I would like to ask you some

21   questions about your answers to the questionnaire.  One of

22   the questions in the questionnaire was the right to

23   silence, and that is if someone did not take the stand to

24   testify would you hold it against them, and I think you

25   said did you not know.  What did you mean by that?

18:00 1          VENIRE PERSON:  I meant that I know it's not the

2      right thing to do, but depending on what's going on, I

3      wouldn't necessarily not do that.

4          MS. MORENO:  I'm not clear.  What do you mean?

5          VENIRE PERSON:  I understand the person has the

6      right not to take the stand but being human --

7          MS. MORENO:  Would you hold it against them?

8          VENIRE PERSON:  I don't know if I would.

9          MS. MORENO:  Why is that?

10         VENIRE PERSON:  I think the human element.

11     Depending on what's going on.  You get emotionally

12     involved in things, and sometimes you might do that.  I

13     can't say I definitely would not.

14         MS. MORENO:  Is that because you might want to

18:00 15  hear their side of the story?

16         VENIRE PERSON:  Possibly.

17         MS. MORENO:  This is a case involving the Holy

18     Land charity.  Have you heard about this case in the news

19     recently?

20         VENIRE PERSON:  Not very much, no.  I haven't

21     time to watch the news much lately.

22         MS. MORENO:  Have you been busy?

23         VENIRE PERSON:  Very.

24         MS. MORENO:  Doing what?

25         VENIRE PERSON:  Family, work, church.

18:00 1          MS. MORENO:  Anything you heard about the Holy

2     Land Foundation?  Do you remember any of the details?

3               VENIRE PERSON:  Not really.

4               MS. MORENO:  Are you aware this is a case that

5     involves charges of terrorism?

6               VENIRE PERSON:  That's what I do know.

7               MS. MORENO:  And how do you know that?

8               VENIRE PERSON:  From what I have heard.

9               MS. MORENO:  And what is that?

10              VENIRE PERSON:  People talking to me.

11              MS. MORENO:  So you have heard a little bit

12    about the case?

13              VENIRE PERSON:  Yes.

14              MS. MORENO:  From family members or friends?

18:00 15         VENIRE PERSON:  Both.

16              MS. MORENO:  What have you heard in those

17    conversations?

18              VENIRE PERSON:  Just allegations of terrorist

19    activities.  I don't know any details as far as names or

20    anything like that.  I haven't been involved in very

21    detailed conversations other than hearsay, tidbits.

22              MS. MORENO:  What do you think about those kinds

23    of charges?

24              VENIRE PERSON:  They are very serious.

25              MS. MORENO:  And how do you feel about being

1    perhaps selected as a juror in a case like this?

2         VENIRE PERSON:  It's a very important trial, and

3    I would take that very seriously.

4         MS. MORENO:  Do you have any concerns or

5    apprehensions about serving as a juror in a case like

6    this?

7         VENIRE PERSON:  Yes.

8         MS. MORENO:  That's what we're here to find out

9    from everyone that we're talking to today.  So there is no

10   right or wrong answers.  We want your honest heartfelt

11   opinions because these gentlemen deserve a fair trial by a

12   jury that can fairly judge the evidence.  So why don't you

13   tell me about those concerns.

14        VENIRE PERSON:  I think part of it is just given

15   everything that has occurred since 9-11.  I have my own

16   personal opinions about this country, where you live.  So

17   I take it seriously when there are allegations such as

18   terrorism, and I think you feel -- I think it goes back to

19   the original question you asked me, you know, somebody not

20   wanting to take the stand.  I think in this type of

21   situation, you want to hear all the facts.  I would want

22   to hear all the facts and know what's going on, and given

23   the seriousness of the charges, I just think personally it

24   would possibly bother me if that were to happen.  But I

25   think it's really the emotional casualties of the country

18:00 1    in which you live.  You get involved.

2              MS. MORENO:  In a case like this with these

3    kinds of charges, it would be very important to have

4    jurors who were not affected, were not affected by

5    personal concerns or apprehensions about looking at a case

6    that had charges of terrorism.  My question to you is --

7    Let's go back to the right to silence issue.  If these

8    gentlemen did not take the stand, would you hold that

9    against them?

10              VENIRE PERSON:  Probably.

11              MS. MORENO:  I really thank you for your candor

12    because it's so important here.  And if they did not take

13    the stand, you would probably sit there and think what?

14    What would you wonder?

18:00 15              VENIRE PERSON:  Are they guilty?

16              MS. MORENO:  And if they didn't take the stand,

17    would you think to yourself that they are probably more

18    guilty than not because they are not talking?

19              VENIRE PERSON:  Probably.

20              MS. MORENO:  And so you could not honestly

21    afford these gentlemen that Constitutional protection

22    under the Fifth Amendment; is that correct?

23              VENIRE PERSON:  I don't think I could.

24              MS. MORENO:  And nobody is really going to

25    change your mind about that.  Isn't that right?

18:00 1                    VENIRE PERSON:  At this point.

2                    MS. MORENO:  You are a lady of strong opinions I

3          think.

4                    VENIRE PERSON:  I don't think so at this point.

5                    MS. MORENO:  Fair enough.  Pass the juror.

6          Thank you.

7                    THE COURT:  Counsel for the government have

8          questions for Ms. Fletcher?

9                    MS. SHAPIRO:  Yes, sir.  Good afternoon.  My

10         name is Elizabeth Shapiro.  I'm one of the prosecutors

11         representing the government in this case.  We just have a

12         few additional questions to ask you today.  You indicated

13         in your questionnaire that you are married.

14                    VENIRE PERSON:  Yes.

18:00 15                   MS. SHAPIRO:  What does your husband do for a

16         living?

17                    VENIRE PERSON:  He's in gas.  He works as a

18         manager.

19                    MS. SHAPIRO:  With a company?

20                    VENIRE PERSON:  A gas company.

21                    MS. SHAPIRO:  Has he worked there a long time?

22                    VENIRE PERSON:  About six or seven years, yes.

23                    MS. SHAPIRO:  And before that, did he have a

24         different kind of job?

25                    VENIRE PERSON:  Similar.

18:00 1                    MS. SHAPIRO:  And you have two children at home

2          it sounds like?

3                    VENIRE PERSON:  Yes.

4                    MS. SHAPIRO:  It looks like both you and your

5          husband work outside the home.  Do you have child care?

6                    VENIRE PERSON:  Yes.

7                    MS. MORENO:  If you were to serve on a jury for

8          a length of time that we're talking about, would that be

9          an issue for you?

10                    VENIRE PERSON:  Yes, I do have child care, but

11         there is a portion of that responsibility that falls on

12         me.  So it would be somewhat difficult.

13                    MS. SHAPIRO:  Do you think if you were selected

14         for this jury that you might be able to find substitute

18:00 15   arrangements?

16                    VENIRE PERSON:  Given the estimation of the

17         length of the trial it could be difficult.

18                    MS. SHAPIRO:  It looks like you spent some time

19         abroad.

20                    VENIRE PERSON:  Traveling.

21                    MS. SHAPIRO:  You went to Spain and France.

22         Were those holidays, vacation?

23                    VENIRE PERSON:  Vacation.

24                    MS. SHAPIRO:  Did you enjoy that?

25                    VENIRE PERSON:  Yes.

18:00 1          MS. SHAPIRO:  Europe.  Ms. Moreno asked you

2    about the right to silence, and you had a conversation

3    with her about that.  If the Judge were to instruct you

4    that under the Constitution these gentlemen have a right

5    not to testify in this case and that you could not under

6    the law hold that against them, if he were to instruct you

7    in that way, would you be able to follow that instruction?

8          VENIRE PERSON:  I don't know.  I'm just being

9    honest.  I think there is a human element.  Given what you

10   have heard and seen during a trial, I think there are

11   times when it's difficult.

12          MS. SHAPIRO:  So do you think that despite what

13   the Court may tell you is the law and the defendant's

14   rights are under the Constitution -- do you think you

18:00 15   would not be able to follow that instruction?  And

16   understand there are no right or wrong answers.  Whatever

17   you honestly feel.

18          VENIRE PERSON:  I honestly believe I wouldn't,

19   and I believe there are times when it happens in other

20   places.

21          MS. SHAPIRO:  Thank you.

22          THE COURT:  Ms. Fletcher, we're in the process

23   of talking with the members of the panel from which the

24   jury will be selected that would hear this case.  That

25   process will probably go on through today and into

18:00 1    tomorrow.  So until you hear from us again, you should not

2    discuss this case with anyone or allow anyone to discuss

3    it with you, and if there are any media accounts about the

4    case in the newspapers or on television or on the radio,

5    you should not read or watch or listen to any of those

6    news accounts.  Thank you, ma'am, you may excused.

7         MS. MORENO:  Your Honor, on behalf of the

8    defense we move for a cause strike against Ms. Fletcher.

9    She could not afford these gentlemen their Fifth Amendment

10   Constitutional protection and even questioning she could

11   not be rehabilitated.  She was clear and unequivocal, and

12   as an attorney, someone who went to law school, she knows

13   exactly what those protections are.

14        THE COURT:  Counsel for the government have a

18:00 15   position about this?

16        MS. SHAPIRO:  No objection, your Honor.

17        THE COURT:  I will excuse Ms. Fletcher for

18   cause.

19        Mr. Kiblinger, I think we're ready to see next

20   Mr. Odell.

21        THE COURT:  Good afternoon.  Counsel for the

22   parties have some questions for you in this case.

23        MR. WESTFALL:  I'm Greg Westfall, and I'm one of

24   defense attorneys in this case, and thank you for your

25   patience in waiting around all day.  This case, as you

18:00 1    probably know, is the United States versus Holy Land

2    Foundation, and the Holy Land Foundation is accused of

3    giving material support to HAMAS.  It sounds like you may

4    have been to the Holy Land Foundation's offices.

5        VENIRE PERSON:  I can't remember if I made a

6    visit there or not, but I was involved in discussions

7    because we were working with the accountant and all the

8    activity.

9        MR. WESTFALL:  Do you remember who your point of

10   contact was there?

11       VENIRE PERSON:  No, I do not.

12       MR. WESTFALL:  But you had a person within the

13   Foundation you were speaking for?

14       VENIRE PERSON:  No, I was speaking with UPS.

18:00 15      MR. WESTFALL:  I had it in my mind that you were

16   driving a truck.  Were you actually at like the home base?

17       VENIRE PERSON:  Well, I work in a solutions

18   group with technology, and I support the sales force and

19   customers.  So solutions is kind of consulting.

20       MR. WESTFALL:  Well then all right.  You know I

21   go through two days seeing you in a brown outfit and going

22   into a store.

23       VENIRE PERSON:  That's what most people think of

24   UPS, seeing the drivers.

25       MR. WESTFALL:  Did you actually ever speak with

18:00 1    anyone from the Holy Land Foundation?

2           VENIRE PERSON:  I don't believe so.

3           MR. WESTFALL:  Just UPS people?

4           VENIRE PERSON:  Yes.

5           MR. WESTFALL:  I know you heard a lot about it

6    and you were sensitive to the Holy Land Foundation name.

7    So I know you may have seen things in the newspapers that

8    other people may have missed.  How much have you heard or

9    read or been exposed?

10           VENIRE PERSON:  Not a lot.  It would peak your

11    interest a little bit if you saw a blurb on the

12    newspapers.  Hey, I remember that happening or I know that

13    account.

14           MR. WESTFALL:  Well, based on anything you have

18:00 15    heard or read or thought about since then, have you formed

16    any opinions as to the guilt or innocence of the Holy Land

17    Foundation or the gentlemen who were in it?

18           VENIRE PERSON:  No, it's just interesting,

19    something that I knew kind of a little something of.

20           MR. WESTFALL:  How do you feel about being a

21    juror on a case that has anything to do with terrorism,

22    material support of terrorism?

23           VENIRE PERSON:  Not quite sure how to answer

24    that.  I can't say I'm real excited about it.  I'm glad

25    for the trial system.

18:00  1          MR. WESTFALL:  Is there another case that you

2     would be, like, real excited about?

3          VENIRE PERSON:  Well, I just don't think I would

4     get real excited about anything that was indicated to be a

5     four-month-long ordeal.  You know the nature of the trial

6     you think of safety or security or things going on.

7          MR. WESTFALL:  Are you worried about your safety

8     or security as a result of being on the jury?

9          VENIRE PERSON:  I would think my family more so

10    than myself.

11         MR. WESTFALL:  Tell me about that.  It sounds

12    like you have given it some thought.  Are you worried

13    about your family's safety if you are on the jury?

14         VENIRE PERSON:  Not really but it has crossed my

18:00 15    mind.  What if.

16         MR. WESTFALL:  Well, if you are worried at all

17    about your family's safety, it's a pretty significant

18    thing.

19         VENIRE PERSON:  Obviously my safety is well, but

20    to me that's not as big a concern as, like I say, my

21    family.

22         MR. WESTFALL:  Well, the issue of your safety

23    and your family's safety, this trial could go four months.

24    Do you see worrying about that like the whole time we're

25    in trial?

18:00 1          VENIRE PERSON:  I think it would always be in

2     the back of your mind, sure.

3          MR. WESTFALL:  While we're in trial, what the

4     jury is supposed to be considering is the evidence.  This

5     is the way the American criminal justice system works.

6     Jurors ideally don't know anything about the case so that

7     they can make a decision based only on the evidence in

8     here.  And a car theft case is -- You wouldn't be looking

9     two ways to get home if you are in a car theft case or a

10    drug case or something like that.  But this case involves

11    terrorism.  The issue is whether you could give fair and

12    impartial consideration to the evidence, and what that

13    means is whether you could make your decision based only

14    on the evidence or if issues of personal safety and such

18:00 15    would be on your mind to the point where it would either

16    distract you or inform your decision in any way.

17          VENIRE PERSON:  Right.  I don't think it would

18    cause problems looking at the evidence in the case.  It's

19    just a concern.

20          MR. WESTFALL:  Well, then I am going to move

21    past that.  Do you know any Muslims?

22          VENIRE PERSON:  Not really.  Not like friends or

23    people that I really would hang out with.  Obviously in

24    just the line of work I do I make lots of visits and see a

25    lot of different customers.

18:00 1         MR. WESTFALL:  Do you have opinions about Arabs

2  or Muslims?

3         VENIRE PERSON:  Well, I don't have opinions.  I

4  try to be pretty open, but the thought is since 9-11 you

5  think about it a little more than in the past.

6         MR. WESTFALL:  Do you find yourself suspicious

7  of Arabs?  If there was two guys on the street speaking

8  Arabic, what would your reaction about?

9         VENIRE PERSON:  Not a lot of reaction but I

10  might wonder a little bit about, hey, are those guys

11  involved in something?

12         MR. WESTFALL:  Have you looked into the

13  Palestinian-Israeli conflict at all?

14         VENIRE PERSON:  It's not something I followed.

18:00 15  It's not something I perk up and pay extreme attention to.

16         MR. WESTFALL:  Have you ever formed any

17  conclusions as to who's right and who's wrong?

18         VENIRE PERSON:  No.

19         MR. WESTFALL:  I'm about to have to sit down.  I

20  want you to think about this.  We have talked about

21  Muslims, and we have discussed some things.  We're talking

22  about the presumption of innocence, whether the men can be

23  presumed innocent beyond a reasonable doubt until proven

24  guilty by the government.  Can you give these Muslim men a

25  full presumption of innocence?

18:00  1                VENIRE PERSON:  I don't believe so.

2                MR. WESTFALL:  Thank you.

3                THE COURT:  Counsel for the government have

4       questions for Mr. Odell?

5                MR. JONAS:  Yes.  Good afternoon, Mr. Odell.  My

6       name is Barry Jonas.  I'm a prosecutor for the government,

7       and I have a few questions for you.  How long have you

8       worked for UPS?

9                VENIRE PERSON:  Twenty-two years.

10                MR. JONAS:  Do you enjoy it?

11                VENIRE PERSON:  Yes.

12                MR. JONAS:  If you were selected to serve on the

13       trial, it could last four months or longer.  Would you

14       have a problem at work?  I understand everybody would have

18:00 15       a problem.  But would you be fired?

16                VENIRE PERSON:  No, I wouldn't get fired, but

17       there might be a different position when I returned.  But

18       I'm in something I enjoy doing, and I worked a long time

19       to get to this position.

20                MR. JONAS:  Would those concerns weigh on your

21       mind during the trial?

22                VENIRE PERSON:  I wouldn't think so.

23                MR. JONAS:  So it wouldn't affect your ability

24       to be fair or impartial?

25                VENIRE PERSON:  No, sir.

18:00 1          MR. JONAS:  You stated you did not deal with the

2    Holy Land Foundation directly but you know other people at

3    UPS who did?

4          VENIRE PERSON:  Right.  People who did and even

5    had discussions about potentially going to make a visit

6    but had not done so.

7          MR. JONAS:  And in your discussions with your

8    fellow employees, what did they say about the Holy Land

9    Foundation?

10          VENIRE PERSON:  Well, like I say, it was a long

11    time ago.  Nothing in particular.  It was more business

12    matters.  They were looking to do some things with

13    international shipping and that sort of thing.

14          MR. JONAS:  Do you recall filling out the

18:00 15    questionnaire a few weeks ago?

16          VENIRE PERSON:  Yes.

17          MR. JONAS:  And I have to ask you a sensitive

18    question, and I apologize for that, but it's something we

19    need to know.  You put down that you had a medical

20    condition that could make it difficult for you to serve as

21    a juror.  I understand it may be embarrassing, and if you

22    prefer a sidebar.  But can you tell us something about the

23    condition and how it can be regulated?

24          VENIRE PERSON:  My only concern was really

25    sitting for hours or long periods of time without just a

18:00 1    break for a restroom and that sort of thing.

2              THE COURT:  Mr. Odell, typically we go about an

3    hour and a half at a time before a break.  Would that be

4    suitable?

5              VENIRE PERSON:  Most times yes, but morning is

6    when it's more troublesome or a problem.

7              MR. JONAS:  Thank you very much, Mr. Odell.

8              THE COURT:  Mr. Odell, we are in the process of

9    interviewing the members of the panel from which the jury

10   will be drawn that would hear this case.  I expect this

11   process to continue through today and into tomorrow.  So

12   until you hear from us again, you should not discuss this

13   case with anyone or allow anyone to discuss it with you,

14   and if there are any media accounts about this case in the

18:00 15   newspapers or on television or the radio, you should not

16   read or watch or listen to any of those news accounts.

17   Thank you, sir.  You may be excused.

18              We'll take a fifteen-minute recess at this time.

19              (Recess)

20              THE COURT:  Good afternoon.  Counsel for the

21   parties have some questions for you.

22              MS. MORENO:  Good afternoon, Mr. Carrillo.  My

23   name is Linda Moreno, and I have just a few questions for

24   you.  Remember filling out the questionnaire?  I have some

25   questions about your answers.  One of the things you

18:00  1    indicated was perhaps a hearing problem, and I see that

2    you are leaning forward.  Tell us about that problem.

3                 VENIRE PERSON:  The hearing problem?  A little

4    bit.  I work around loud machines and stuff, and so I tend

5    to say what, repeat that again.

6                 MS. MORENO:  Do you have any hearing devices

7    that you use?

8                 VENIRE PERSON:  No.

9                 MS. MORENO:  Would you say it's difficult for

10   you to hear?

11                VENIRE PERSON:  No.  Just a certain pitch.

12                MS. MORENO:  We're going to be in trial for

13   three to four months, and as you can see, this is a big

14   courtroom, and it doesn't have the best acoustics.  So we

18:00 15   need to know if your hearing is going to be a problem.

16                VENIRE PERSON:  I don't see a problem.

17                MS. MORENO:  I mentioned it was going to be a

18   long trial, and I'm wondering if that causes you any

19   difficulty at your job, poses any kind of hardship for

20   you.

21                VENIRE PERSON:  I'm getting paid at work.

22                MS. MORENO:  Tell me about your job.

23                VENIRE PERSON:  I'm a printer.  Been there

24   twenty-three years.  I'm happy with my job.  I like it.

25                MS. MORENO:  Good.  What kind of things do you

18:00 1   do?

2          VENIRE PERSON:  We print checks, brochures,

3   forms, basically everything.

4          MS. MORENO:  There was also a question about any

5   medical conditions, and apparently you crossed it out.  Do

6   you have any other medical concerns that we should know

7   about?

8          VENIRE PERSON:  No, just had a physical not to

9   long ago, and I was fine.

10         MS. MORENO:  Congratulations.

11         VENIRE PERSON:  Thank you.

12         MS. MORENO:  I want to tell you a little bit

13   about the charges in this case so that we can explore if

14   you have any issues.  I want you to know there is no right

18:00 15   answer or wrong answer.

16         VENIRE PERSON:  Okay.

17         MS. MORENO:  Just looking for your honest

18   opinions.  This is a case that involves the Holy Land

19   Foundation which is an American Muslim charity.  Have you

20   heard about that?

21         VENIRE PERSON:  When I filled out the question,

22   I did.  I did remember, and then on the drive home I

23   started remembering something about it on the news.  I

24   caught it on the news, but it's within a while.

25         MS. MORENO:  A couple of years back?

18:00 1          VENIRE PERSON:  Like I say, when I first filled

2    out the questionnaire, I didn't remember, but thinking

3    about it on the way home I remember hearing about it.  I

4    think it was in Plano or Richardson.

5          MS. MORENO:  Yes, that's right.  These are

6    serious allegations.  They are just allegations, but they

7    are serious, and the government claims that the Holy Land

8    charity sent humanitarian aid and that the humanitarian

9    aid was in the form of food and medicine, books, diapers

10    for babies, money for needy families to help the poorest

11    of the poor in West Bank and Gaza and the Occupied

12    Territories.  Okay?

13          VENIRE PERSON:  Okay.

14          MS. MORENO:  They say this humanitarian aid

18:00 15    somehow benefited this terrorist organization called

16    HAMAS.  Have you heard of that?

17          VENIRE PERSON:  Yes.

18          MS. MORENO:  How have you heard of that?

19          VENIRE PERSON:  That it was an organization and

20    they are in the Middle East or something like that.

21          MS. MORENO:  Have you followed the conflict over

22    there at all?

23          VENIRE PERSON:  Yes, but not really.  I don't

24    pay too much attention to it.

25          MS. MORENO:  Have you watched news reports about

18:00  1    what's going on in the Occupied Territories?

       2                VENIRE PERSON:  I try not to.  It's depressing,

       3         the bad news that comes on the news and stuff like that.

       4                MS. MORENO:  In this case because of the serious

       5         allegations, we need to know if you've got any -- I'll

       6         call it baggage.  You know what, this is a case that

       7         involves terrorism charges, and I don't want anything to

       8         do with that.  I'm not the kind of juror that could be

       9         fair in this case.  And what we all want to know -- and

      10         that's why we're questioning all of these people today --

      11         is if you fit in that category, if you have some issues

      12         that would prevent you from being fair and impartial.

      13                VENIRE PERSON:  To be impartial?  If I am picked

      14         for this and I got to hear the evidence and you know -- I

18:00 15         got to hear what's going on and stuff before I make a

      16         decision on that.

      17                MS. MORENO:  Is there anything about the nature

      18         of the charges -- terrorism, material support of a

      19         terrorist organization -- that brings things up for you,

      20         causes you any apprehension?

      21                VENIRE PERSON:  Repeat that again.

      22                MS. MORENO:  Did you not hear me?

      23                VENIRE PERSON:  No.

      24                MS. MORENO:  Is there anything about the nature

      25         of the charges, material support of terrorism, that brings

18:00 1   up any issues for you?  That's what we're trying to

2   explore here.  What do you think of those kinds of

3   charges?

4             VENIRE PERSON:  Well, I'm against terrorism, you

5   know.  And if the evidence points to anything to do with

6   the terrorism, then you know, you know, it's going to be

7   hard for me not to find them guilty or you know --

8             MS. MORENO:  What if the government does not

9   prove its case in this kind of a serious trial?

10            VENIRE PERSON:  Okay.

11            MS. MORENO:  If they don't prove their case.

12   Let's say they showed that the humanitarian aid only went

13   to the needy.  Okay?

14            VENIRE PERSON:  Okay.

18:00 15            MS. MORENO:  And did not benefit any terrorist

16   organization?

17            VENIRE PERSON:  All right.

18            MS. MORENO:  And the Judge instructs you if

19   that's what you found that you would have to accept that,

20   that does not prove their charge.  Okay?

21            VENIRE PERSON:  Okay.

22            MS. MORENO:  Do you have any problems?

23            VENIRE PERSON:  Well, if the government proves

24   that they were -- like the HAMAS -- I heard it's a

25   terrorist organization, they got ties to it.  And I

1   believe if you aid a terrorist group in any form -- If you

2   are associated with them, you know, that's the same as

3   giving them the money to do something, something bad.

4           THE COURT:  Ms. Moreno, your time has expired.

5           MS. MORENO:  Thank you.  Thank you, sir.

6           THE COURT:  Counsel for the government have

7   questions for Mr. Carrillo.

8           MR. GARRETT:  No, your Honor.

9           THE COURT:  Mr. Carrillo, we're in the process

10  of talking with the members of the panel from whom the

11  jury will be selected to hear this case.  That process

12  will probably go on into today and through tomorrow.  So

13  until you hear from us again, you should not discuss this

14  case with anyone or allow anyone to discuss it with you,

15 and if there are any media accounts about the case in the

16  newspapers or on television or the radio, you should not

17  read or watch or listen to any of those media accounts.

18          VENIRE PERSON:  Yes, sir.

19          MR. JACKS:  Your Honor, I would like to request

20  if Ms. Moreno when she discusses the allegations in the

21  charges -- if she could simply refer to what's in the

22  indictment.  The indictment only alleges that they sent

23  money.  There is nothing in the indictment about they sent

24  humanitarian aid or the poorest of the poor or any of

25  those descriptive terms that she's using.  So if she is

18:00 1     going to talk about the allegations, I would ask that she

2     talk about the allegations as they are stated in the

3     indictment.

4          THE COURT:  Well, I can only reiterate what I

5     said earlier in some of our discussions, Mr. Jacks.

6     Counsel I think are much more familiar with the evidence

7     in this case than I am at this point.  And so whether the

8     evidence will be as Ms. Moreno stated it, I don't know.  I

9     know that in your questioning of these venire members and

10    that of other counsel for the government, you have

11    referred to what you expect I will instruct the jury, and

12    I guess I deduced from that there would be evidence to

13    support such an instruction.  So it seems to me that Ms.

14    Moreno was trying to get at the same thing albeit in a

18:00 15   slightly different way.  So I just admonish counsel for

16    all sides again to keep these questions based upon what

17    you believe the evidence in this case will be.  More than

18    that I cannot say.

19          Good afternoon, Ms. Buonasera.  Counsel for the

20    parties have some questions they would like to ask you.

21          MS. MORENO:  Good afternoon.  Is Buonasera

22    Italian?

23          VENIRE PERSON:  Italian.

24          MS. MORENO:  My name is Linda Moreno.  I'm one

25    of the attorneys on this case.  I want to ask you a couple

18:00 1    of questions about the answers on your questionnaire.

2    This is a case that involves the Holy Land Foundation

3    which is an American Muslim charity.  I see that you have

4    lived in Richardson your whole life.

5            VENIRE PERSON:  No.  For the past eight years.

6    I grew up in Plano.

7            MS. MORENO:  Okay.  Have you heard about the

8    Holy Land Foundation in the press recently or in the last

9    few years?

10           VENIRE PERSON:  Just recently.  Because of all

11   the paperwork we filled out.

12           MS. MORENO:  The questionnaire?

13           VENIRE PERSON:  The questionnaire, yes.

14           MS. MORENO:  Before you filled out the

18:00 15   questionnaire, do you recall ever hearing about this

16   charity?

17           VENIRE PERSON:  No.

18           MS. MORENO:  And after you filled out the

19   questionnaire before you came to court today, did you hear

20   or read anything about it in the press?

21           VENIRE PERSON:  I heard about it, but I didn't

22   read anything really.

23           MS. MORENO:  What did you hear?

24           VENIRE PERSON:  That this trial was based on

25   that foundation and that it was going to be a trial that

18:00 1    was going to determine where exactly their money was

2    going, I guess.

3            MS. MORENO:  This is a case that involves

4    allegations of terrorism.  The government alleges that

5    this charity sent humanitarian aid to the West Bank

6    territories -- Gaza, West Bank and other places around the

7    world and that aid was in the form of medicine, food,

8    books, the rebuilding of homes which were destroyed, that

9    sort of humanitarian aid.  The government further alleges

10    that aid somehow benefited this terrorist organization

11    called HAMAS.  Okay?  Have you heard of HAMAS?

12            VENIRE PERSON:  No.

13            MS. MORENO:  Now that I have just given you a

14    little brief summary of the charges and the charges are

18:00 15    material support of a terrorist organization, is there

16    anything about that that causes you any concern?  What are

17    your thoughts about that?

18            VENIRE PERSON:  I don't know.  Like what?

19            MS. MORENO:  Do you have any opinions already

20    thinking, oh, this is a case that involves charges of

21    terrorism, I don't think I want to be here?

22            VENIRE PERSON:  Well, yes, I guess so.

23            MS. MORENO:  First, let me tell you there is no

24    right answer or wrong answer.  We're here and everybody

25    wants to pick a jury that can fairly evaluate the

18:00  1    evidence.

       2            VENIRE PERSON:  Right.

       3            MS. MORENO:  A juror who doesn't have a lot of

       4    baggage and fear and preconceptions.

       5            VENIRE PERSON:  Yes.

       6            MS. MORENO:  What we need to hear are your

       7    heartfelt opinions?

       8            VENIRE PERSON:  Okay.

       9            MS. MORENO:  So talk to me about your heartfelt

      10    opinions.

      11            VENIRE PERSON:  I don't know much about the

      12    case, and I don't know that much about the allegations.

      13    So I don't feel like I have that much of an opinion.

      14    Obviously, I have a strong opinion about terrorism, but

18:00 15    that doesn't necessarily mean that it relates here, I

      16    guess.  I don't know.

      17            MS. MORENO:  So as you sit there, you don't

      18    think "I'm afraid, I don't want to be on this jury or I

      19    have some kind of a concern or apprehension?"  Do you have

      20    any thoughts like that?

      21            VENIRE PERSON:  Well, should I be afraid to be

      22    on the jury?

      23            MS. MORENO:  I'm asking you if you have any

      24    thoughts like that.

      25            VENIRE PERSON:  Well, yes, I guess I do.

18:00 1          MS. MORENO:  Why don't you share that with us.

2          VENIRE PERSON:  Well, if it's a big high profile

3     case, I don't want to be part of it.

4          MS. MORENO:  You don't?

5          VENIRE PERSON:  If it's going to be dangerous,

6     no.

7          MS. MORENO:  Do you think it's going to be

8     dangerous?

9          VENIRE PERSON:  I don't know.

10          MS. MORENO:  I'm inquiring and I apologize for

11     pushing you on that.  We need to know your opinions.  Only

12     you know if you have any apprehensions about being

13     involved in a case like this.

14          VENIRE PERSON:  Slightly apprehensive.  I think

18:00 15     my husband is much more apprehensive.

16          MS. MORENO:  So have you discussed your jury

17     summon?

18          VENIRE PERSON:  Yes.  He knew I was coming

19     today, and he read the paper and said this is probably the

20     case and said you don't want any part of that.

21          MS. MORENO:  Does that influence you in being

22     able to sit on a case like this, your husband saying you

23     don't want any part of that?

24          VENIRE PERSON:  No, not really.

25          MS. MORENO:  See at the end of the day, these

18:00   1    gentlemen have every right to expect from any juror who

  2    sits here that a juror can fairly look at the evidence and

  3    have no apprehensions, no fear whatsoever.  So my question

  4    is can you afford them that right?  And if you can't, we

  5    want to know that and that's fine.

  6            VENIRE PERSON:  I think I can.

  7            MS. MORENO:  Do you have any doubt about that?

  8            VENIRE PERSON:  I don't think so.

  9            MS. MORENO:  The presumption of innocence, have

10    you heard of presumption of innocence?

11            VENIRE PERSON:  Yes.

12            MS. MORENO:  These gentlemen are afforded the

13    presumption of innocence.  And as a juror you have to be

14    able to commit a hundred percent that you can absolutely

18:00 15    unfailingly give them that presumption of innocence.  Can

16    you do that?

17            VENIRE PERSON:  I think I can do that, yes.

18            MS. MORENO:  Do you have any hesitations about

19    that?

20            VENIRE PERSON:  If I could be fair?

21            MS. MORENO:  If you could give them the

22    presumption of innocence.

23            VENIRE PERSON:  Well, I mean, everyone is

24    innocent until proven guilty.  I believe that I guess.

25            MS. MORENO:  And do you believe you can give

18:00  1    that in this case?

       2              VENIRE PERSON:  Yes.

       3              MS. MORENO:  And you have no hesitation about

       4    that.

       5              VENIRE PERSON:  No, I don't think I do.

       6              MS. MORENO:  And you took a while to answer and

       7    that's because?

       8              VENIRE PERSON:  Well, you are making me think

       9    that --

      10              MS. MORENO:  I'm sorry.  I don't mean to.  I'm

      11    just asking what your opinions are, what your state of

      12    mind is.

      13              VENIRE PERSON:  I think I could be fair if I

      14    served on a jury and weigh the evidence.

18:00 15              MS. MORENO:  And could you be fair in this kind

      16    of a trial?

      17              VENIRE PERSON:  I think I could be fair.

      18              THE COURT:  Ms. Moreno, your time is expired.

      19              MS. MORENO:  Thank you.  Thank you, Ms.

      20    Buonasera.

      21              THE COURT:  Counsel for the government have

      22    questions for Ms. Buonasera?

      23              MR. GARRETT:  Briefly, your Honor.

      24              Good afternoon, Ms. Buonasera.

      25              VENIRE PERSON:  Buonasera.

18:00  1          MR. GARRETT:  Good afternoon.  My name is Nathan

       2   Garrett, and I'm one of the Assistant United States

       3   Attorneys, and I'm one of the prosecutors on this case

       4   representing the government, and I have a few questions

       5   for you.  First of all, I don't want anything I say or Ms.

       6   Moreno said to put any thoughts in your head.  We want to

       7   know honestly what you believe.

       8          VENIRE PERSON:  Okay.

       9          MR. GARRETT:  You mentioned under your

      10   questioning of Ms. Moreno that you are married.  Is that

      11   correct?

      12          VENIRE PERSON:  Correct.

      13          MR. GARRETT:  What type of work does your

      14   husband do?

18:00 15          VENIRE PERSON:  We own a landscaping business.

      16          MR. GARRETT:  So you own that together?

      17          VENIRE PERSON:  No, he and my father but I'm not

      18   in that business.

      19          MR. GARRETT:  And you have three children,

      20   thirteen, ten and seven?

      21          VENIRE PERSON:  Yes.

      22          MR. GARRETT:  And what do you do in your free

      23   time?

      24          VENIRE PERSON:  I work.

      25          MR. GARRETT:  And have three kids at home?

18:00  1          VENIRE PERSON:  I don't have any free time.

       2          MR. GARRETT:  I only have two.  I don't think

       3     you marked that you have served any jury service before.

       4          VENIRE PERSON:  I have not.

       5          MR. GARRETT:  Have you ever been called down

       6     here before like you are today in terms of a jury pool?

       7          VENIRE PERSON:  No.

       8          MR. GARRETT:  First time?

       9          VENIRE PERSON:  I think I was on a pool a long

      10     time ago, but they never got down that list far enough.

      11          MR. GARRETT:  I understand.  And you are a high

      12     school counselor?

      13          VENIRE PERSON:  Yes.

      14          MR. GARRETT:  Where?

18:00 15          VENIRE PERSON:  Plano East.

      16          MR. GARRETT:  How long have you had that job?

      17          VENIRE PERSON:  I went back to work full time

      18     for a year.  I went back last year, and before that I

      19     worked at Richardson High School, and prior to that I was

      20     in private practice as a licensed professional counselor.

      21          MR. GARRETT:  So you have been a counselor for

      22     how long?

      23          VENIRE PERSON:  Fourteen years.

      24          MR. GARRETT:  Always education related?

      25          VENIRE PERSON:  No, I was in private practice

18:00 1    doing individual and family therapy.  But it was part time

2    when I was raising my children.

3              MR. GARRETT:  In the schools at the beginning?

4              VENIRE PERSON:  Yes, I was just seeing a few

5    clients to keep my license up for a few years, and I went

6    back to the school, and last year I decided I would start

7    back full time.

8              MR. GARRETT:  Do you prefer the schools or the

9    private?

10             VENIRE PERSON:  I prefer the school.

11             MR. GARRETT:  Why?

12             VENIRE PERSON:  The productivity.  I was working

13   a lot with the adolescents.  Private practice is a lot of

14   therapy appointment after appointment after appointment,

18:00 15   and in the schools there is more variety.  I help the kids

16   with colleges, crisis counseling, I work with schedules.

17   Just a lot more variety.

18             MR. GARRETT:  You work with a number of other

19   counselors I guess in a school that big?

20             VENIRE PERSON:  Yes, sir.

21             MR. GARRETT:  Ms. Moreno mentioned to you the

22   charges, the allegations in this case, what they are.  And

23   to touch base on that, the allegations are that the

24   government is alleging that these gentlemen, these

25   defendants and the companies for which they work, provided

18:00 1   material support to a terrorist organization. And that

2   terrorist organization is HAMAS. And at the end of the

3   case if you are called to serve, if you are that fortunate

4   to serve, the Judge will give you what are called

5   instructions, and those instructions will be on what the

6   law is in this case.

7         VENIRE PERSON: Right.

8         MR. GARRETT: So then you will take the facts

9   you find yourself collectively and apply them to that law.

10   And I instruct you that the Judge will instruct you that

11   HAMAS is a terrorist organization, and as a result of that

12   designation, I expect the instructions will tell you that

13   one cannot send any material support to that organization.

14   And you will hear allegations of money. You can't send

18:00 15   money, regardless of what that money is used for. So even

16   if that money were spent on things you might consider

17   charitable items -- medical supplies or books for schools

18   or anything like that -- would that be an instruction you

19   would have difficulty following?

20         VENIRE PERSON: Not if that was the instruction.

21         MR. GARRETT: Thank you for your time.

22         THE COURT: Ms. Buonasera, we are in the process

23   of talking with the members of the pool from which the

24   jury will be selected that would hear this case. That

25   process will probably continue from today into tomorrow.

18:00 1    So until you hear from us further, you should not discuss

2    this case with anyone or allow anyone to discuss it with

3    you, and if there are any media accounts about the case in

4    the newspapers or on television or the radio, you should

5    not read or watch or listen to any such media accounts.

6    Thank you.  You may be excused.

7         Mr. Kurian, counsel for the parties in this case

8    have some questions they would like to ask you.  Mr.

9    Westfall.

10        MR. WESTFALL:  Thank you, your Honor.  Mr.

11   Kurian, I'm Greg Westfall.  I'm one of the defense lawyers

12   in this case.  I want to talk to you for a few minutes.

13   Okay?  Thank you for waiting all day to speak with us and

14   please just relax.  I know this is probably not your

18:00 15   favorite thing to do on a sunny afternoon.

16        You actually know about this case?

17        VENIRE PERSON:  I learned about the case through

18   the media.

19        MR. WESTFALL:  Please tell me what you have

20   seen.

21        VENIRE PERSON:  This is about Holy Land

22   Foundation?

23        MR. WESTFALL:  Right.

24        VENIRE PERSON:  And money laundering and

25   exporting illegally and it's a charity organization.

18:00  1    That's what I know about it.

2              MR. WESTFALL:  Right.  Well, based upon what you

3    know, did you learn about it again recently?

4              VENIRE PERSON:  Whatever I heard in the news

5    media, that's all I know.

6              MR. WESTFALL:  Well, based upon that, have you

7    arrived at a conclusion as to whether they are guilty or

8    not?

9              VENIRE PERSON:  Based upon the news media,

10   guilty.

11             MR. WESTFALL:  You think they are guilty?

12             VENIRE PERSON:  Yes, based on the news media.

13   But I don't know the whole story.

14             MR. WESTFALL:  Well, we're having a little

18:00 15   difficulty here.  Is that your opinion or is that what you

16   perceive is the news media's opinion?

17             VENIRE PERSON:  News media.

18             MR. WESTFALL:  What is your opinion?

19             VENIRE PERSON:  I don't have any opinion, sir.

20             MR. WESTFALL:  Karikal, India, is that a city,

21   small town?

22             VENIRE PERSON:  It's a state, south part of

23   India, yes.

24             MR. WESTFALL:  Any particular city that you are

25   from?

18:00  1          VENIRE PERSON:  Yes, I'm from a city called

       2    Sonepur.

       3          MR. WESTFALL:  And Malayalam?

       4          VENIRE PERSON:  Malayalam, yes.

       5          MR. WESTFALL:  That is your native language?

       6          VENIRE PERSON:  That's correct.

       7          MR. WESTFALL:  I have not heard of that.  Is

       8    that what they speak in Malaysia?

       9          VENIRE PERSON:  No, no, that's the language in

      10    the state of Karikal.  Each state has its own language.

      11          MR. WESTFALL:  How many states are there?

      12          VENIRE PERSON:  I don't know.  I left India

      13    years ago.

      14          MR. WESTFALL:  When did you leave?

18:00 15          VENIRE PERSON:  I left in 1985.

      16          MR. WESTFALL:  What do you do at Parkland

      17    Hospital?

      18          VENIRE PERSON:  I am a manager in engineering.

      19          MR. WESTFALL:  And you are a mechanical engineer

      20    I guess?

      21          VENIRE PERSON:  Electrical.

      22          MR. WESTFALL:  Electrical engineer?

      23          VENIRE PERSON:  Yes.

      24          MR. WESTFALL:  Do you still have family back in

      25    India?

18:00  1              VENIRE PERSON:  Not close family.  Close family

       2     are here.  My parents, my siblings are here.

       3              MR. WESTFALL:  In your work or whatever, do you

       4     have any contacts with Muslims?

       5              VENIRE PERSON:  Not very close contacts, no.

       6              MR. WESTFALL:  Do you know any?

       7              VENIRE PERSON:  In our department there is

       8     people -- there are people from Arabic countries, yes.

       9              MR. WESTFALL:  Tell me about them.  Do you have

      10     good experiences or bad experiences?

      11              VENIRE PERSON:  Not particularly any experience

      12     other than just coworker.

      13              MR. WESTFALL:  Just professional experiences?

      14              VENIRE PERSON:  Yes, sir.

18:00 15              MR. WESTFALL:  And you put in there that you go

      16     to church?

      17              VENIRE PERSON:  Yes, I do.

      18              MR. WESTFALL:  Are you pretty active in your

      19     church?

      20              VENIRE PERSON:  I was very active until I have

      21     my own business.  I don't have much time.

      22              MR. WESTFALL:  Your own business?

      23              VENIRE PERSON:  Yes, sir.

      24              MR. WESTFALL:  So you have your own business

      25     besides Parkland?

18:00 1          VENIRE PERSON:  My wife have her own business.

2      She runs the business, and I help her.

3          MR. WESTFALL:  What business is that?

4          VENIRE PERSON:  Restoration business.  She runs

5      the business, and I help her.

6          MR. WESTFALL:  What is it?

7          VENIRE PERSON:  Fire and water.

8          MR. WESTFALL:  I bet that keeps you busy.

9          VENIRE PERSON:  Yes, all evening, and with the

10     two kids, pretty busy.

11         MR. WESTFALL:  Are there any charities here like

12     American charities that send money specifically over to

13     the people in India?

14         VENIRE PERSON:  I'm not aware of this.  I'm sure

18:00 15  there are, but permanently I don't have any persons.

16         MR. WESTFALL:  Have you done any kind of charity

17     work or volunteer work?

18         VENIRE PERSON:  No.  I donated money to

19     charities here, March of Dimes and charities like that.

20         MR. WESTFALL:  You do that on a regular basis?

21         VENIRE PERSON:  Every year, yes.

22         MR. WESTFALL:  They come around at the employer

23     and say it's time to donate?

24         MR. GARRETT:  That's correct.

25         MR. WESTFALL:  Do you do any through your church

18:00 1    at all?

2                    VENIRE PERSON:  Not much.

3                    MR. WESTFALL:  You mentioned one other thing.

4    You don't like to watch the killing of another human

5    being?

6                    VENIRE PERSON:  I'm not violent, and I don't

7    like to watch violent graphics.

8                    MR. WESTFALL:  I agree with that.  We have here

9    Muslim men and a case that has terrorism in the title.

10    Can you be a fair and impartial juror in a case like that?

11                    VENIRE PERSON:  Sure.  I don't have anything

12    against Muslims.

13                    MR. WESTFALL:  No hesitation?

14                    VENIRE PERSON:  No.

18:00 15                    MR. WESTFALL:  Do you have anything going on in

16    the next four months?

17                    VENIRE PERSON:  I have manage a project at

18    Parkland, a 1.5 million dollar project.  I just finished

19    with the design.  We are in the process of bidding it.

20                    MR. WESTFALL:  Is the project going to crater if

21    you are not there four months?

22                    VENIRE PERSON:  I don't know who will handle it

23    if I'm not there.  I'm not sure.

24                    MR. WESTFALL:  Well, if it is a situation that

25    could distract you from jury service, four days a week --

18:00   1    From nine o'clock basically to five o'clock Monday through

        2    Thursday, those are the hours.  It could go four months.

        3    If something in your life like this project is in grave

        4    peril of cratoring because of your jury service to where

        5    it would distract you in your jury service, the Court and

        6    we need to know about that.  Are you in that situation?

        7         VENIRE PERSON:  The project I just explained

        8    about, that may have some impact.  I don't know how much

        9    that will be.

       10         MR. WESTFALL:  Well, if you get a handle on

       11    that, speak with the jury administrator or get some

       12    message to the Court so that everyone knows in time.

       13    Because this trial is coming, all right?

       14         VENIRE PERSON:  Yes, sir.

18:00  15         MR. WESTFALL:  Thank you so much.

       16         THE COURT:  Counsel for the government have

       17    questions for Mr. Kurian?

       18         MR. JACKS:  Yes, your Honor.  Good afternoon,

       19    Mr. Kurian.  My name is Jim Jacks.  I'm an Assistant

       20    United States Attorney for the Northern District of Texas.

       21    I'm one of the prosecutors on this case.  I will be

       22    representing the government during this trial, and I have

       23    a few follow-up questions, if I may.  You left India in

       24    1984?

       25         VENIRE PERSON:  End of 1984.  So I think I

18:00 1    reached here January 2nd or something like that.  I don't

2    remember the exact date.

3              MR. JACKS:  Your wife is from Burma?

4              VENIRE PERSON:  Originally, yes.

5              MR. JACKS:  Did you and she meet in the United

6    States?

7              VENIRE PERSON:  No, we met in Singapore.  She

8    lived in Singapore for a long time.

9              MR. JACKS:  Did you meet her before you came to

10   the United States?

11             VENIRE PERSON:  No.

12             MR. JACKS:  What took you to Singapore?

13             VENIRE PERSON:  Family friends.

14             MR. JACKS:  You have two young children, and

18:00 15   your wife operates this new business?

16             VENIRE PERSON:  She handles it all during the

17   day, and I work in the evenings.  It's a twenty-four hour

18   service.

19             MR. JACKS:  It's a twenty-four hour service?

20             VENIRE PERSON:  Yes.

21             MR. JACKS:  Do you have employees that work for

22   you?

23             VENIRE PERSON:  Yes, sir.

24             MR. JACKS:  And from your description it sounds

25   like your company -- if a building or residence is damaged

18:00  1    by fire or water, you go in and clean it up and try to

2    restore it?

3            VENIRE PERSON:  That's correct.

4            MR. JACKS:  How long has that been in existence?

5            VENIRE PERSON:  Two years just about.  I don't

6    have an exact date.

7            MR. JACKS:  About how many employees do you have

8    at any given time?

9            VENIRE PERSON:  About four or five.

10           MR. JACKS:  And you said there is a project or

11   contract that you are in the process of bidding for?

12           VENIRE PERSON:  At Parkland Hospital, yes.

13           MR. JACKS:  Did you say the value of that

14   contract?

18:00 15           VENIRE PERSON:  Approximately 1.5 million

16   dollars.

17           MR. JACKS:  To do what?

18           VENIRE PERSON:  To install generators and gears.

19           MR. JACKS:  This has nothing to do with this

20   company of you and your wife's?

21           VENIRE PERSON:  No, it's my day job.

22           MR. JACKS:  When did you acquire your

23   citizenship?

24           VENIRE PERSON:  I believe in 1992.

25           MR. JACKS:  Would that be true for your wife?

18:00  1     Was it the same time when she got her citizenship?

       2             VENIRE PERSON:  No, I have been here way before

       3     she came.

       4             MR. JACKS:  Is the Dallas area the only place

       5     that you have lived in the United States?

       6             VENIRE PERSON:  Yes, sir.  I came to New York

       7     originally.  That's where I came to and then moved here.

       8             MR. JACKS:  How long did you stay in New York?

       9             VENIRE PERSON:  A few days.  Probably a week or

      10     so.

      11             MR. JACKS:  Okay.  Where did you get your

      12     education?  In the United States or India?

      13             VENIRE PERSON:  Majority of the education in

      14     India and I got an associate degree in electronics.

18:00 15             MR. JACKS:  Where did you get your associate

      16     degree?

      17             VENIRE PERSON:  It's a private school in Dallas.

      18             MR. JACKS:  You show that you are a member of

      19     the Pentecostal church?

      20             VENIRE PERSON:  That's correct.

      21             MR. JACKS:  Was that the faith you followed in

      22     India or did you adopt that faith after you moved to the

      23     United States?

      24             VENIRE PERSON:  We are always a christian

      25     family, but different denomination.  We got baptized when

18:00 1    we got here.

2              MR. JACKS:  Is there anything in the Pentecostal

3    faith that prohibits its members from judging other people

4    or am I confusing that with some other faith?

5              VENIRE PERSON:  I don't know.  I can ask my

6    pastor.  I'm not sure.

7              MR. JACKS:  How would you describe your activity

8    in the church?  Did you and your family go weekly?

9              VENIRE PERSON:  Like I say, our business is

10   twenty-four hours.  Sunday morning I get a job and I don't

11   go to church.  So it's not as usual as it used to be.

12             MR. JACKS:  Where is your church located?  In

13   Garland?

14             VENIRE PERSON:  In Garland.

18:00 15           MR. JACKS:  How big is it?

16             VENIRE PERSON:  Very small.  Our community.

17             MR. JACKS:  So two hundred twenty?

18             VENIRE PERSON:  No, probably about twenty

19   members, twenty families I would say.

20             MR. JACKS:  Twenty families?

21             VENIRE PERSON:  Yes, sir.

22             MR. JACKS:  You said you heard of this case

23   through the media.  Have you heard of HAMAS?

24             VENIRE PERSON:  What I heard through the media.

25             MR. JACKS:  Do you pay attention to what's going

18:00 1    on overseas and around the world?

2         VENIRE PERSON:  No.  I don't have time actually.

3         MR. JACKS:  The Judge will give the jury the law

4    that applies.  He would tell you at the end of the case

5    what the charges are and what the government must prove to

6    prove that a person is guilty.  He will give you

7    definitions of words.  So if there is a word you might not

8    understand, he would put a definition in there.  I

9    suspect, first of all, that he would tell the jury that

10   HAMAS has been designated a terrorist organization by the

11   U. S. Government, and secondly, I suspect he would tell

12   the jury that any type of contribution or material support

13   to HAMAS is against the law, even if money is given and

14   that money is used for humanitarian things like food or

18:00 15   clothing or medical supplies.  If the money is used in

16   that manner but if it's for the benefit or use of HAMAS,

17   it's against the law.  If that is the instruction, would

18   you follow that instruction and find a verdict of guilty

19   if you believe that the government has proved those acts

20   beyond a reasonable doubt?

21        VENIRE PERSON:  Sure.

22        THE COURT:  Mr. Kurian, we're in the process of

23   talking to the members of the panel from which a jury will

24   be selected to hear this case.  I suspect it will continue

25   through tomorrow.  So until you hear further from us, you

18:00  1   should not discuss the case with anyone or allow anyone to

2   discuss it with you, and if there are any media accounts

3   on the television or news or radio, you should not read or

4   watch or listen to any accounts.  Thank you, sir, you may

5   be excused.

6          Mr. Mooney, counsel for the parties have some

7   questions they would like to ask you.

8          MR. WESTFALL:  Good afternoon.  I'm Greg

9   Westfall.  I'm one of the defense lawyers in the case.  I

10   want to speak to you a very few minutes, and then the

11   government will want to speak with you.  Okay?

12          VENIRE PERSON:  Okay.

13          MR. WESTFALL:  This is the United States versus

14   Holy Land Foundation case.  It involves a Muslim charity,

18:00 15   an American Muslim charity and allegations by the

16   government that the charity and some of the men who work

17   with the charity gave material support to HAMAS which is a

18   terrorist organization.  The charity was based in

19   Richardson.  After telling you that, does that ring any

20   bells?  Are you familiar with the case?

21          VENIRE PERSON:  I have heard a little bit about

22   it.  That's about it.

23          MR. WESTFALL:  From what you have heard or

24   thought about or may or may not have discussed with

25   anybody, have you arrived at any opinion as to whether the

18:00 1    defendants are guilty or not guilty?

2            VENIRE PERSON:  I don't know enough of the facts

3    to form an opinion like that.

4            MR. WESTFALL:  How do you feel about being a

5    juror in a case where terrorism is at least in the title

6    of the offense?

7            VENIRE PERSON:  I don't know.  I never

8    experienced it before.

9            MR. WESTFALL:  Ever been on any juries at all?

10            VENIRE PERSON:  Yes.

11            MR. WESTFALL:  You have been on a couple of

12    juries, haven't you?

13            VENIRE PERSON:  Yes.

14            MR. WESTFALL:  So you have experienced being on

18:00 15    the jury?

16            VENIRE PERSON:  That's correct.

17            MR. WESTFALL:  This one may run four months, may

18    run more than four months, but four months is probably

19    everyone's best estimate of what we're looking at.  How do

20    you feel about that?

21            VENIRE PERSON:  It seems a little long, but I

22    understand major cases do run this long.

23            MR. WESTFALL:  We aren't California.  In

24    California, they can make a DWI last four months.  This is

25    going to be a pretty long very complicated case.  It

18:00 1    sounds like -- You mentioned that you have auditing

2    experience and you would use that in looking at the facts.

3              VENIRE PERSON:  Yes.

4              MR. WESTFALL:  Tell me about that experience.

5              VENIRE PERSON:  I work reviewing bank

6    procedures, cash funds, everything involved in the

7    industry.

8              MR. WESTFALL:  So are you called in whenever

9    there has been thought that maybe somebody has done wrong?

10   Do you come in and do a forensic audit or just like an

11   annual audit type of deal?

12             VENIRE PERSON:  I actually did both.  I'm called

13   in when there might be some possible cases of malfeasance

14   or problems.  Most of the work though was ordinary

18:00 15   operational type of how to improve things, etcetera.

16             MR. WESTFALL:  On the forensic audits, I guess

17   you look for a paper trail, and the paper trail pretty

18   much tells the stories?

19             VENIRE PERSON:  Yes.

20             MR. WESTFALL:  How many forensic audits have you

21   done, do you think?

22             VENIRE PERSON:  Probably only three or four.

23             MR. WESTFALL:  Are they recently in your career

24   or way back?

25             VENIRE PERSON:  This would have been twenty

18:00 1    years ago.

2          MR. WESTFALL:  I guess you would be looking for

3    money that was stolen or misappropriated somehow?

4          VENIRE PERSON:  Right.

5          MR. WESTFALL:  And you would be able to figure

6    that out from looking at the paperwork?

7          VENIRE PERSON:  Sometimes.  Sometimes there is

8    gaps in there that can go elsewhere.  The bulk of it is in

9    the paperwork at least.

10         MR. WESTFALL:  So as a forensic auditor, if the

11   paperwork looks like it's in good condition, what did you

12   do?  If the paperwork looks like it's in good condition --

13   I's dotted and T's crossed?

14         VENIRE PERSON:  If it looks in good condition,

18:00 15   yes.  I don't always trust somebody else's paperwork.

16         MR. WESTFALL:  Way back in the seventies you had

17   to have a clearance for something?

18         VENIRE PERSON:  That was in my military career.

19         MR. WESTFALL:  Tell me about your military

20   career.

21         VENIRE PERSON:  I was in the army three years,

22   and I needed a secret security clearance because of the

23   nature of the work I was doing.

24         MR. WESTFALL:  Without giving away any secrets,

25   what did you do?

18:00  1           VENIRE PERSON:  Tactical nuclear weapons.

2           MR. WESTFALL:  Okay.  You did three years,

3      enlisted?

4           VENIRE PERSON:  Yes.

5           MR. WESTFALL:  And then you got out?

6           VENIRE PERSON:  Yes.

7           MR. WESTFALL:  Did you ever do anything with

8      your clearance after that?

9           VENIRE PERSON:  No.

10           MR. WESTFALL:  You said you followed the

11      Israeli-Palestinian conflict closely, but you didn't put

12      anything else out.  What do you think about that?

13           VENIRE PERSON:  I look at it as a key to what's

14      happening in the Middle East.

18:00  15           MR. WESTFALL:  Tell me about that.

16           VENIRE PERSON:  This has been going on for

17      thousands of years, and I would like to see if there are

18      any trends, both positive and negative, of what's going on

19      right now.

20           MR. WESTFALL:  Any sense of who's right and

21      who's wrong in the Palestinians issue?

22           VENIRE PERSON:  Not really.  I think both sides

23      are somewhat hard headed.

24           MR. WESTFALL:  How would you change it?

25           VENIRE PERSON:  I don't see much change.  I

18:00 1    think they are both hard headed about that, and there

2    could be some movement if they are willing to give in

3    some.

4             MR. WESTFALL:  How do you think the war on

5    terror is going?

6             VENIRE PERSON:  Locally, nationally or across

7    the world?

8             MR. WESTFALL:  Internationally?

9             VENIRE PERSON:  Doesn't seem to be going all of

10   that well right now.  There are a lot of hot spots all

11   over the world and a lot of people being hurt.

12            MR. WESTFALL:  What could we be doing

13   differently?

14            VENIRE PERSON:  As individuals?

18:00 15           MR. WESTFALL:  As a country.

16            VENIRE PERSON:  As a country, I don't know.

17            I really don't.  It seems like we have tried a

18   number of things.  It just doesn't seem to help.  I think

19   there is too much of a cultural difference.

20            MR. WESTFALL:  Do you know any Muslims?

21            VENIRE PERSON:  Yes.

22            MR. WESTFALL:  Do you have any good experiences

23   with Muslims?

24            VENIRE PERSON:  Yes.

25            MR. WESTFALL:  Thank you very much.

18:00  1              THE COURT:  Counsel for the government.

       2              MR. GARRETT:  Yes, your Honor.  Mr. Mooney, good

       3     afternoon.  My name is Nathan Garrett, and I'm an

       4     Assistant United States Attorney and one of the

       5     prosecutors who will be handling this case for the

       6     government.  I just have a couple of things -- maybe more

       7     than a couple but a few things to follow-up with you.

       8     Okay?

       9              VENIRE PERSON:  Yes.

      10              MR. GARRETT:  First of all, I agree with you

      11     four months sounds a little long.  We're on the same page.

      12     You state on your questionnaire you are married.

      13              VENIRE PERSON:  Yes.

      14              MR. GARRETT:  Does your wife work outside the

18:00 15     home?

      16              VENIRE PERSON:  Yes.

      17              MR. GARRETT:  What type of work does she do?

      18              VENIRE PERSON:  She's a school principal.

      19              MR. GARRETT:  So she keeps you in line as well?

      20              VENIRE PERSON:  Yes.

      21              MR. GARRETT:  Elementary, high school?

      22              VENIRE PERSON:  Elementary.

      23              MR. GARRETT:  Is that in the Dallas-Fort Worth

      24     area?

      25              VENIRE PERSON:  Yes.

18:00   1            MR. GARRETT:  And you have one daughter?

      2            VENIRE PERSON:  Yes.

      3            MR. GARRETT:  Thirty-one years old?

      4            VENIRE PERSON:  Yes.

      5            MR. GARRETT:  Does she still live around the

      6  area?

      7            VENIRE PERSON:  Yes.

      8            MR. GARRETT:  And in your questionnaire, you

      9  have lived in the area for twenty years; is that right?

    10            VENIRE PERSON:  Yes.

    11            MR. GARRETT:  And where were you living before

    12  you moved to this area?

    13            VENIRE PERSON:  Western Pennsylvania.

    14            MR. GARRETT:  You mind me asking what brought

18:00 15  you to Texas?

    16            VENIRE PERSON:  Too much snow and cold.

    17            MR. GARRETT:  Those are all good reasons.  I'm

    18  from Kansas City.  Those are good reasons.  You also

    19  mentioned to Mr. Westfall that you were in the military.

    20            VENIRE PERSON:  Yes.

    21            MR. GARRETT:  You also were in Hawaii?

    22            VENIRE PERSON:  Yes.

    23            MR. GARRETT:  How does a guy get that draw?

    24            VENIRE PERSON:  I'm not sure.

    25            MR. GARRETT:  But it was a good one?

18:00 1          VENIRE PERSON:  I was actually going through

2    officer training, and when I got out of there I was going

3    everywhere, and at the time ninety percent were going

4    straight to Vietnam.

5          MR. GARRETT:  And you got Hawaii?

6          VENIRE PERSON:  Hawaii and nuclear weapons.

7          MR. GARRETT:  Always a trade off?

8          VENIRE PERSON:  Yes, there is something about a

9    four star general looking over you when you are running

10   through your work.

11         MR. GARRETT:  And now, of course, you have a

12   principal at home so more of the same.  You were in the

13   military I think you said three years?

14         VENIRE PERSON:  Yes.

18:00 15         MR. GARRETT:  Did you serve on any reserve

16   status or anything like that when you got out?

17         VENIRE PERSON:  It was inactive reserve.

18         MR. GARRETT:  And looks like -- I'm looking at

19   your questionnaire.  You have served on three juries?

20         VENIRE PERSON:  Yes.

21         MR. GARRETT:  Those were all criminal I think?

22         VENIRE PERSON:  Yes.

23         MR. GARRETT:  And for one of them you have about

24   1983 on the time frame.  Were the other ones before or

25   after that?

18:00 1           VENIRE PERSON:  Before.

2           MR. GARRETT:  So since 1983 you haven't served

3 on a jury?

4           VENIRE PERSON:  I have been called, but not

5 actually served.

6           MR. GARRETT:  Federal court or state?

7           VENIRE PERSON:  State.

8           MR. GARRETT:  Down at the Crowley Building.

9 Okay.

10           As Mr. Westfall touched on, the allegations of

11 this case include that the defendants knowingly provided

12 material support to a terrorist organization.  As you may

13 recall from your prior jury service -- I know it's been a

14 while -- at the end of the case the judge will give you

18:00 15 instructions on the law, and you and your group

16 collectively take the facts and apply them to that law.  I

17 expect the instructions to be that HAMAS, the group at

18 issue here, is a terrorist organization, been designated

19 by the government as a terrorist organization.  And as a

20 result of that designation, one cannot send material

21 support to HAMAS.  Cannot send money and other things to

22 HAMAS.  And I expect the instruction to include even if

23 that money is spent on so called humanitarian things --

24 medical supplies, books, those sorts of things -- if it

25 goes to the benefit of HAMAS, that's illegal.

18:00  1          VENIRE PERSON:  Yes.

       2          MR. GARRETT:  Is that an instruction you would

       3   have any problem following?

       4          VENIRE PERSON:  No.

       5          MR. GARRETT:  Thank you for your time.

       6          THE COURT:  Mr. Mooney, we're in the process of

       7   talking to the members of the panel from which the jury

       8   will be selected that would hear this case.  I expect that

       9   process to continue through today and into tomorrow.  So

      10   until you hear from us further, you should not discuss

      11   this case with anyone or allow anyone to discuss it with

      12   you, and if there are any media accounts about the case in

      13   the newspapers or on television or on the radio, you

      14   should not read or watch or listen to any such media

18:00 15   accounts.

      16          VENIRE PERSON:  I understand.

      17          THE COURT:  You may be excused.  Thank you.

      18          Good afternoon, Mr. Huffman.  Counsel for the

      19   parties have some questions they would like to ask you.

      20          MR. WESTFALL:  Good afternoon.  I'm Greg

      21   Westfall.  I will like to talk to you for a bit.  Do you

      22   know what case this is?

      23          VENIRE PERSON:  Not specifically but in general.

      24          MR. WESTFALL:  It's United States versus Holy

      25   Land Foundation, and it has to do with an American Muslim

18:00 1    charity that is accused by the government of giving

2    material support to HAMAS which is a terrorist

3    organization.  Is that the same one you have heard about?

4              VENIRE PERSON:  Basically, yes.

5              MR. WESTFALL:  What have you heard?

6              VENIRE PERSON:  That it was essentially a money

7    laundering scheme and a money funneling scheme.  That's

8    essentially what I heard.

9              MR. WESTFALL:  How far back are we talking you

10   heard this in the media?  Was it a long time ago or

11   recently?

12             VENIRE PERSON:  Mentioned yesterday morning the

13   jury selection process.  And before that, I remember it

14   being mentioned on the news about the sting being done,

18:00 15   but I couldn't give you the date on that.

16             MR. WESTFALL:  Based upon what you have read and

17   what you have heard, have you formed any opinions about

18   the guilt or innocence of the defendants?

19             VENIRE PERSON:  No.

20             MR. WESTFALL:  You said on your questionnaire

21   you followed the John Walker case.

22             VENIRE PERSON:  I didn't follow it.  I heard he

23   had been convicted.  But I didn't follow it on a daily

24   basis.

25             MR. WESTFALL:  Well, the question was a little

18:00  1    ambivalent.  What did you think of the conviction or the

2    outcome of the case?

3             VENIRE PERSON:  Well, anybody found guilty of

4    something like that I thought should be punished to the

5    extent of the law.

6             MR. WESTFALL:  I guess he ultimately pled

7    guilty?

8             VENIRE PERSON:  Yes.

9             MR. WESTFALL:  And then Tim McVeigh.  You listed

10   Tim McVeigh.

11            VENIRE PERSON:  Yes.

12            MR. WESTFALL:  Do you design weather radar

13   systems?

14            VENIRE PERSON:  Yes.

18:00 15            MR. WESTFALL:  Can you tell us about that?

16            VENIRE PERSON:  Channel 5, they use our radar

17   processing system.  They call it Storm Track 5.  We have

18   systems in Oklahoma City, Tulsa and just sold one in

19   Sherman.

20            MR. WESTFALL:  So you work for the company that

21   makes them?

22            VENIRE PERSON:  I write the software, and we

23   install the computers and software in our sites.

24            MR. WESTFALL:  Did you go to school here in

25   Texas?

18:00 1          VENIRE PERSON:  Yes, sir.

2          MR. WESTFALL:  A and M?

3          VENIRE PERSON:  Yes, sir.

4          MR. WESTFALL:  You said you followed the

5     Palestinians-Israeli conflict closely?

6          VENIRE PERSON:  Kind of hard to avoid it.

7          MR. WESTFALL:  Tell us how you followed it.

8          VENIRE PERSON:  Well, there is a war going on

9     right now.  Trying to keep a sense of what is happening in

10    the world.

11         MR. WESTFALL:  Any sense of who's right or

12    wrong?

13         VENIRE PERSON:  Well, I believe murder to

14    further a political cause is reprehensible.

18:00 15         MR. WESTFALL:  And which side does that?

16         VENIRE PERSON:  At this point in time I would

17    say the actions of HAMAS and groups like them fall into

18    that category.

19         MR. WESTFALL:  We have Muslim gentlemen in this

20    case charged with something to do with terrorism, material

21    support of HAMAS.  There is a lot of different kinds of

22    trials, criminal trials.  Have you ever been on a trial

23    before?

24         VENIRE PERSON:  No.

25         MR. WESTFALL:  The thing that a juror has to do

18:00 1   and the jury has to do is make a decision based upon the

2   evidence in court.  That's the only fair way, the only way

3   that the process self executes and keeps hopefully coming

4   up with the right result, and it's different in every

5   trial and every jury.  We have a case here of five Muslim

6   men charged with something that has to do with terrorism.

7   How do you feel about being on that jury?

8           VENIRE PERSON:  About being on the jury?  Well,

9   if I am asked, I will serve.

10          MR. WESTFALL:  How do you feel about being on a

11  jury for four months?

12          VENIRE PERSON:  Honestly it doesn't excite me.

13  I have a very large project.  I work in our family

14  business, and our work force is cut by about a fifth.

18:00 15         MR. WESTFALL:  Do you believe that you could

16  give them the presumption of innocence?  That's the way

17  our system works.  Do you believe you can apply the

18  presumption of innocence?

19          VENIRE PERSON:  Yes.

20          MR. WESTFALL:  No hesitation?

21          VENIRE PERSON:  I would like to think that of

22  myself.  Honestly, yes.

23          MR. WESTFALL:  Very good.  Now, on the issue of

24  your family business, is this going to hurt your business?

25          VENIRE PERSON:  It certainly won't help, but

18:00 1    we'll get by.

2              MR. WESTFALL:  Well, if the business is going to

3    be impaired to the point that it will distract you from

4    your service, this is the kind of thing the Court needs to

5    know about and the jury administrator needs to know about,

6    and they need to know about it quickly.

7              VENIRE PERSON:  Well, if I understand correctly,

8    service would be at least four days a week.

9              MR. WESTFALL:  Four days a week.

10             VENIRE PERSON:  So essentially eight hours a

11   day, four days a week, Monday through Thursday.

12             MR. WESTFALL:  Right.

13             VENIRE PERSON:  That would definitely cause

14   problems with work.  It's not a money issue.  It's a

18:00 15   manpower issue.

16             MR. WESTFALL:  If it's an issue at the end of

17   the day that could really hurt your business -- Basically

18   would you sit here and be distracted because you are

19   worried about your business?  That is the kind of thing

20   that can be taken into consideration as long as you give

21   us word quickly.  Do you have any questions?  I know you

22   sat around all day.  Anything else we need to know about

23   or the Court needs to know about?

24             VENIRE PERSON:  No.

25             THE COURT:  Counsel for the government have

18:00 1    questions for Mr. Huffman?

2           MR. JONAS:  No, your Honor.

3           THE COURT:  Mr. Huffman, we're in the process of

4    talking to the members of the panel from which the jury in

5    this case will be selected.  That process will continue

6    until sometime tomorrow.  Until you hear from us, you

7    should not discuss the case anyone or allow anyone to

8    discuss it with you, and if there are any media accounts

9    about this case in the media on television, newspapers or

10    radio, you should not read, watch or listen to any such

11    media accounts.  Thank you, sir.  You may be excused.

12           THE COURT:  Good afternoon, Ms. Hodge.  Counsel

13    have some questions for you.

14           MS. MORENO:  Good afternoon, Ms. Hodge.  Thank

18:00 15    you for waiting all day.  I have some questions I would

16    like to ask you in this case.  I'm Linda Moreno.  This

17    case involves the Holy Land Foundation.  Have you seen

18    anything in the press, heard anything on the TV or on the

19    radio about an organization that has been accused of

20    material support of terrorism?

21           VENIRE PERSON:  I may have, but I didn't pay

22    much attention to it.

23           MS. MORENO:  You don't recall anything?

24           VENIRE PERSON:  No.

25           MS. MORENO:  You are a quality assurance

18:00  1    inspector?

       2                  VENIRE PERSON:  Yes.

       3              MS. MORENO:  Where do you work?

       4                  VENIRE PERSON:  Summercut.

       5              MS. MORENO:  What kind of work is that?

       6                  VENIRE PERSON:  Production.  We make paper cups,

       7    spoons, forks.

       8              MS. MORENO:  And you are the lady that goes by

       9    to make sure they are as they should be?

       10             MR. JACKS:  I go by and take the cups and test

       11   them for leaks.

       12             MS. MORENO:  And how long have you done that?

       13                 VENIRE PERSON:  Ten years.

       14             MS. MORENO:  This is a case that may last four

18:00 15   months.  No court on Friday, four days a week.  But four

       16   months.  Could be more, could be less.  Is that anything

       17   that's going to cause you a hardship, any problems at

       18   work?

       19                 VENIRE PERSON:  At work?  I don't think so.

       20   They would have someone to cover what I do.

       21             MS. MORENO:  So you are not concerned about this

       22   long jury service affecting your job in any way?

       23                 VENIRE PERSON:  No.

       24             MS. MORENO:  If you find that out within the

       25   next day, please let us know.

18:00 1          VENIRE PERSON:  Okay.

2          MS. MORENO:  Where did you go to school?

3          VENIRE PERSON:  South Oak Cliff High School.

4          MS. MORENO:  Do you know any Muslims?

5          VENIRE PERSON:  No.

6          MS. MORENO:  No experience or dealings with

7     people who are Muslims?  How about people of Arabic

8     descent?

9          VENIRE PERSON:  Not that I know of.

10          MS. MORENO:  The gentlemen charged here are all

11     Muslim and Palestinians.  I ask you these questions to

12     determine whether you have had any bad experience with

13     Muslims or if there is any kind of prejudices or ideas

14     that you have that you wouldn't be a fair juror in this

18:00 15     case.

16          VENIRE PERSON:  I haven't had any.

17          MS. MORENO:  I'm sorry?

18          VENIRE PERSON:  I haven't had any experience

19     with Muslims.

20          MS. MORENO:  When you use the term Muslim, what

21     do you think?

22          VENIRE PERSON:  I think of what the guy's name.

23     I think of Mohamed Ali.  Any famous person like that.

24          MS. MORENO:  This is a case that the government

25     alleges that the Holy Land Foundation sent humanitarian

18:00 1     aid and the humanitarian aid was in the form of food,

2     medicine, books, the rebuilding of homes that were

3     destroyed, libraries. Okay? Mobile bread bakeries. Now,

4     this humanitarian aid the government says benefited the

5     terrorist organization called HAMAS. Have you heard of

6     HAMAS?

7             VENIRE PERSON: No.

8             MS. MORENO: The government says this

9     organization somehow benefited the terrorist organization

10    HAMAS. Let me ask you, have you heard of the presumption

11    of innocence? And in this country anybody accused of a

12    crime is presumed innocent. Do you understand that?

13            VENIRE PERSON: Yes.

14            MS. MORENO: Knowing what the charges are, just

18:00 15   what the allegations are, do you have any problems in

16    affording these gentlemen the presumption of innocence in

17    a case like this?

18            VENIRE PERSON: No.

19            MS. MORENO: Does it cause you any kind of

20    concern?

21            VENIRE PERSON: No.

22            MS. MORENO: You need a break?

23            VENIRE PERSON: Well, I have asthma.

24            MS. MORENO: Well, I'm sorry. Is that something

25    that might affect you in your jury service?

18:00 1              VENIRE PERSON:  No.

2              MS. MORENO:  So we don't need to go there.  Then

3     I won't.  The burden of proof, have you heard about the

4     burden of proof beyond a reasonable doubt?

5              VENIRE PERSON:  Yes.

6              MS. MORENO:  There is anything about making the

7     government prove their case beyond a reasonable doubt in a

8     case involving terrorism charges that makes you wonder,

9     that makes you think maybe they don't have to prove it

10    beyond a reasonable doubt?

11             VENIRE PERSON:  I would think that we have to

12    prove it.

13             MS. MORENO:  You don't have any hesitation about

14    that?

18:00 15             VENIRE PERSON:  No.

16             MS. MORENO:  Thank you so much.

17             THE COURT:  Counsel for the government have

18    questions of Ms. Hodge?

19              MS. SHAPIRO:  Yes, your Honor.  Good afternoon.

20    My name is Elizabeth Shapiro, and I'm representing the

21    government in this case.  I have just a couple more

22    questions to ask you.  I take it from your questionnaire

23    that you were born and raised here in Dallas.

24             VENIRE PERSON:  Yes.

25              MS. SHAPIRO:  And it looks like you have a son.

18:00  1  Is that correct?

2             VENIRE PERSON:  Yes.

3             MS. SHAPIRO:  Do you have any other children?

4             VENIRE PERSON:  No.

5             MS. SHAPIRO:  The one son?

6             VENIRE PERSON:  Yes.

7             MS. SHAPIRO:  How old is he?

8             VENIRE PERSON:  Thirty-one.

9             MS. SHAPIRO:  I notice on your questionnaire --

10  And I apologize for raising it -- that it looks like he

11  was convicted of a drug charge.  Is that right?

12            VENIRE PERSON:  Yes, he was.

13            MS. SHAPIRO:  Back in 1993?

14            VENIRE PERSON:  Yes.

18:00 15           MS. SHAPIRO:  Did he end up doing jail time for

16  that?

17            VENIRE PERSON:  Yes, he did.

18            MS. SHAPIRO:  Is he out of jail now?

19            VENIRE PERSON:  Yes.

20            MS. SHAPIRO:  And during that process, did you

21  feel like he was treated fairly by the criminal justice

22  system?

23            VENIRE PERSON:  Yes, I did.

24            MS. SHAPIRO:  Nothing about that experience

25  that would color how you would look at the government in

18:00   1   this case?

2       VENIRE PERSON:  No.

3           MS. SHAPIRO:  Ms. Moreno explained a little bit

4   about the charges in this case, and I wanted to explain

5   them a little more.  The allegations are in this case that

6   the defendants and an organization they worked for sent

7   money overseas to benefit a terrorist organization.  Do

8   you understand?

9       VENIRE PERSON:  Run that by me one more time.

10          MS. SHAPIRO:  Sure.  The allegation or one of

11  the principal allegations are that the defendants in this

12  case and the organization they work for, the Holy Land

13  Foundation, sent money from here, from Dallas, to the

14  Middle East, to the West Bank in Gaza, Palestine, and that

18:00  15  they did that with the intent to benefit a terrorist

16  organization.  Okay?

17          VENIRE PERSON:  All right.

18          MS. SHAPIRO:  So my next question is at the end

19  of the case, when the judge -- after you hear all the

20  evidence from both sides -- instructs you on the law --

21  And the judge will do that at the end of the case.  He

22  would give you instructions so that you know what to do

23  with all the facts you heard.  You decide the facts, and

24  then you apply the law the Judge will give you at the end

25  of the case.  With me so far?

18:00  1              VENIRE PERSON:  Yes.

       2          MS. SHAPIRO:  And the Judge will instruct that

       3   HAMAS is a terrorist organization.  The United States has

       4   so designated it.  He would also instruct you on what

       5   material support means, and he would likely tell you that

       6   sending money to a terrorist organization with the intent

       7   to benefit that organization is material support.  Okay?

       8   He may also tell you that even if some of that money that

       9   was sent over there went for humanitarian purposes -- in

      10   other words, to buy food or clothing or books, but that

      11   humanitarian assistance went to the benefit of a terrorist

      12   organization -- that that, too, is material support, and

      13   that is against the law.  Do you understand?

      14              VENIRE PERSON:  Yes.

18:00 15          MS. SHAPIRO:  If the Judge gave you those

      16   instructions at the end of the case, would you be able to

      17   follow them?  Do you have any problem with that concept?

      18              VENIRE PERSON:  I think I could follow that.

      19          MS. SHAPIRO:  Great.  Thank you.

      20          THE COURT:  Ms. Hodge, we are in the process of

      21   talking with the members of the panel from which the jury

      22   will be selected that would hear this case.  I expect that

      23   process to continue until tomorrow.  So until you hear

      24   from us further, you should not discuss this case with

      25   anyone or allow anyone to discuss it with you, and also if

18:00  1  there are any media accounts about the case in the

2  newspapers or on television or radio, you should not read

3  or watch or listen to any of those media accounts.  Thank

4  you, ma'am.  You may be excused.

5           VENIRE PERSON:  Thank you.

6           THE COURT:  Good afternoon, Ms. Brown.  Counsel

7  for the parties have some questions to ask you.

8           MS. MORENO:  Good afternoon, Ms. Brown.  My name

9  is Linda Moreno.  First of all, thank you for waiting all

10  day long.  I have only a few questions for you based on

11  the answers you gave in your questionnaire that you filled

12  out a couple of weeks ago.  We asked in the questionnaire

13  if you had any opinions regarding the conflict between

14  Israel and Palestine, and I believe you indicated that you

18:00 15  might be partial to Israel because of its supported by the

16  United States and its significance in the Bible?

17           VENIRE PERSON:  Right.

18           MS. MORENO:  Can you explain that?  What is

19  steering you to this support?

20           VENIRE PERSON:  Well, the Bible is the story --

21  especially the old Testament -- of Israel's place in the

22  world, and that's primarily where the Bible mentions

23  Israel, is in the old Testament.

24           MS. MORENO:  You also indicated that you might

25  be partial to Israel because of its support by the United

18:00  1    States.  You seemed to have two reasons.

       2              VENIRE PERSON:  Israeli's support by the United

       3    States?

       4              MS. MORENO:  Yes.

       5              VENIRE PERSON:  United States has long supported

       6    Israel.  I have always felt that was good.

       7              MS. MORENO:  This is a case that involves the

       8    Holy Land Foundation, a charity.  It's an American Muslim

       9    charity.  Have you heard anything about it in the media?

      10              VENIRE PERSON:  I think when it broke several

      11    years ago.  That was in the newspaper, yes.  So I read

      12    that.

      13              MS. MORENO:  Do you recall any of the details?

      14              VENIRE PERSON:  I pretty much skimmed it.  I

18:00 15    think there was some concern about it supporting terrorist

      16    activities.

      17              MS. MORENO:  Yes, ma'am.  So my question to you

      18    is -- And we're going to be talking about your feelings,

      19    your honest feelings.

      20              VENIRE PERSON:  Right.

      21              MS. MORENO:  So I'm asking you -- And we're all

      22    asking you to be open about them.  There aren't any right

      23    or wrong answers, and no one is judging you here.

      24              VENIRE PERSON:  Right.

      25              MS. MORENO:  What these gentlemen are entitled

18:00 1    to and what the Court wants is to sit jurors in this case

2    who can be absolutely fair and impartial.  Okay?

3                    VENIRE PERSON:  (Witness nods)

4            MS. MORENO:  So my question to you is with

5    respect to your opinions on Israel, you talked about being

6    partial?

7                    VENIRE PERSON:  Yes.

8            MS. MORENO:  In this case, the government

9    alleges that this charity sent humanitarian aid over to

10   the West Bank and Gaza to the occupied Palestinian

11   territories.

12                   VENIRE PERSON:  Yes.

13           MS. MORENO:  And they claim this humanitarian

14   aid benefited the terrorist organization HAMAS.  Now, do

18:00 15   you have any thoughts on that?  Any opinions on that?

16                   VENIRE PERSON:  Well, I think the United States

17   Government has to be pretty sure of itself to make such a

18   claim.  I'll say that.

19           MS. MORENO:  Can I take that to mean if this

20   case has gotten this far where we're sitting here now

21   picking a jury, do you think these guys are probably

22   guilty?  There is probably something to the government's

23   case here?

24                   VENIRE PERSON:  I think the wonderful thing

25   about America is everyone is presumed innocent until they

18:00 1 are proven guilty.

2      MS. MORENO:  Okay.  Let's talk about how you

3 think of that presumption of innocence as you sit here

4 today.  If this case involves issues about Israel and

5 Palestine -- And I expect they will.  Based upon your

6 answers in the questionnaire you already indicated you

7 already have a partiality towards Israel, and I'm asking

8 you is that a partiality that would carry you through this

9 trial?

10      VENIRE PERSON:  I don't know that I could rid

11 myself completely of that partiality, no.

12      MS. MORENO:  I appreciate that.  Now let's

13 suppose in this case you were told you had to rid yourself

14 of that partiality.  You had to forget the things you read

18:00 15 in the Bible and things you feel as an American.  Could

16 you do that honestly?

17      VENIRE PERSON:  It would be very hard.

18      MS. MORENO:  You just mentioned the presumption

19 of innocence.  And the law says these gentlemen expect and

20 are entitled to every single juror presuming them innocent

21 one hundred percent without hesitation, without

22 partiality.

23      VENIRE PERSON:  Right.

24      MS. MORENO:  Can you promise this Court and

25 these gentlemen that you could do that, given your ideas,

18:00 1    religious beliefs and political opinion?

2              VENIRE PERSON:  I can't promise, no.

3              MS. MORENO:  So you couldn't afford these

4    gentlemen the presumption of innocence.

5              VENIRE PERSON:  I would like to; I can't

6    promise.

7              THE COURT:  Counsel for the government have

8    questions of Ms. Brown?

9              VENIRE PERSON:  Hello.

10             MR. JACKS:  My name is Jim Jacks.  I'm an

11   Assistant United States Attorney for the Northern District

12   of Texas.  I'm one of the prosecutors in this case, and I

13   will be representing the government.  I just have a few

14   questions for you as well.  You mentioned that I guess in

18:00 15   your views -- when pushed that you are somewhat partial to

16   Israel in the Israeli-Palestinian conflict.  Correct?

17             VENIRE PERSON:  Yes.

18             MR. JACKS:  Do you understand this trial is not

19   about who's right and who is wrong and that's not an issue

20   in this trial?

21             VENIRE PERSON:  Yes.

22             MR. JACKS:  As far as what you know about this

23   case, is it strictly from what you may have heard either

24   in a news story or a newspaper article?

25             VENIRE PERSON:  Newspapers.

18:00  1              MR. JACKS:  So anything that you say about the

       2    case is strictly what somebody else put into a newspaper

       3    article?

       4              VENIRE PERSON:  That's correct.

       5              MR. JACKS:  You haven't heard any evidence.  Is

       6    that true?

       7              VENIRE PERSON:  I have never seen anything or

       8    heard anything about it, except through the newspapers.

       9              MR. JACKS:  All right.  And those were

      10    allegations in the paper, correct?

      11              VENIRE PERSON:  Somebody wrote what they thought

      12    was true.

      13              MR. JACKS:  I believe you said that you believe

      14    in the presumption of innocence.  Is that correct?

18:00 15              VENIRE PERSON:  Yes.

      16              MR. JACKS:  That every person is presumed

      17    innocent unless and until they are proved guilty?

      18              VENIRE PERSON:  I believe our legal system is

      19    based on that.

      20              MR. JACKS:  And even though this case may be

      21    about material support for terrorism, would you apply that

      22    presumption of innocence even in this type of a case, even

      23    in this serious type of case?

      24              VENIRE PERSON:  Well, I said I would like to.  I

      25    can't promise I could.

18:00 1          MR. JACKS:  Well, before you came in here and

2     were questioned by defense counsel, did you feel like you

3     were a fair and impartial juror?

4          VENIRE PERSON:  Not particularly, no.

5          MR. JACKS:  And in what sense did you feel like

6     you would not be a fair and impartial juror?  What was it

7     that you thought would prevent you from being a fair and

8     impartial juror?

9          VENIRE PERSON:  I think the papers.  I think

10     what I have read in the paper has influenced me, for one

11     thing.

12          MR. JACKS:  Have you ever read anything in the

13     paper that you later found out not to be true or you knew

14     even when you read it that's not what happened?  Have you

18:00 15     ever experienced that?

16          VENIRE PERSON:  I'm sure I have.  Yes.

17          MR. JACKS:  Would you be able to do that in this

18     case?  To disregard whatever some newspapers wrote and

19     decide the case based on your front row seat to hear what

20     the evidence is and what the facts are?

21          VENIRE PERSON:  I would try to.  I would try to.

22          MR. JACKS:  Do you feel like you wouldn't be

23     able to do that?  You wouldn't have the discipline to do

24     that or if you could maybe share with us if there is any

25     doubt or hesitancy on your part?

18:00  1          VENIRE PERSON:  I would try to be objective.

2      That's all I can say.

3          MR. JACKS:  Do you understand that you are not

4      required to forget whatever you have learned?  That's not

5      a requirement to be a juror.

6          VENIRE PERSON:  Right.

7          MR. JACKS:  The $64,000 question I suppose is if

8      you were chosen to be on this jury, could you listen to

9      the evidence and weigh the evidence, be fair and impartial

10      to both sides and follow the Court's instructions in terms

11      of what the law is and be a fair and impartial juror.

12      Could you do that?

13          VENIRE PERSON:  I would like to do that.  I

14      would try to do that.  As I said before, I can't promise

18:00 15      that that is the way it would be.

16          MR. JACKS:  Thank you, ma'am.

17          THE COURT:  Ms. Brown, we're in the process of

18      talking with the members of panel from which the jury will

19      be selected that would hear this case.  That process will

20      probably continue through a good part of tomorrow.  So

21      until you hear from us again, you should not discuss this

22      case with anyone or allow anyone to discuss it with you,

23      and if there are any media accounts about this trial in

24      the newspapers or on television or on the radio, you

25      should not read or watch or listen to any such media

18:00 1    accounts.  Thank you, ma'am.  You may be excused.

2              MS. MORENO:  Your Honor, we move for cause

3    against Ms. Brown.  She cannot afford the presumption of

4    innocence against these gentlemen.  She indicated she can

5    not be a fair and impartial juror.

6              THE COURT:  Mr. Jackson, do you have a position

7    about that?

8              MR. JACKS:  No objection.

9              THE COURT:  I will excuse Ms. Brown for cause.

10   Ladies and Gentlemen, due to the hour I think this will be

11   our last person to see today.  As in the two preceding

12   days, I think we have made good progress today, but I'm

13   still not satisfied that we have enough people, given the

14   pendancy of these challenges for cause that I have taken

18:00 15   under advisement as well as the persons who have expressed

16   some hardship about serving in this case.  So I think we

17   need to continue to process for some period of time

18   tomorrow.  Perhaps all day depending on the progress we

19   make.  But certainly probably until noon.

20             We had an issue left over from yesterday

21   concerning joint representation of the defendants in this

22   case, and Ms. Hollander and Mr. Cline asked overnight to

23   discuss that, and I don't know how much time it will take

24   to fully deal with that issue, but I would like to at

25   least have a progress report if counsel have made any

18:00 1    progress after overnight in how to handle this issue.

2              MR. CLINE:  Your Honor, John Cline for Mr.

3    Elashi.  Is it all right if I speak from here?

4              THE COURT:  Yes.

5              MR. CLINE:  Your Honor, the question is whether

6    Mr. Elashi is in a position to speak on behalf of the Holy

7    Land Foundation on this issue of a potential conflict.

8    Unfortunately, we don't know either of the current status

9    of the Holy Land Foundation, whether it exists even as an

10   entity or Mr. Elashi's status, if it does exist.  And so

11   although he has no personal objection to the joint

12   representation, I'm afraid he cannot speak for the Holy

13   Land Foundation at this point.

14             THE COURT:  Anyone else on the defense side who

18:00 15   wants to be heard on this issue?  Ms. Hollander.

16             MS. HOLLANDER:  Your Honor, I would just add

17   that I would agree since it's my firm at issue here.  I

18   agree that's the position he takes, that there is no

19   dispute on behalf of the Holy Land Foundation.

20             THE COURT:  I'm not sure I have really thought

21   through the implications of that.  We do have or at least

22   I thought we had the Holy Land Foundation as a represented

23   defendant in this case; that is, represented by counsel.

24   But I'm inferring from what has been said that there is no

25   natural person as the representative of the Holy Land

18:00 1    Foundation who would be the client for the attorney who's

2    representing the Holy Land Foundation.  Am I understanding

3    that correctly?

4          MS. HOLLANDER:  That is correct at this time,

5    your Honor.

6          THE COURT:  Let me think about that issue a

7    little more and see what I think about advising the

8    defendants of joint representation.

9          Another I guess housekeeping issue that I needed

10    to discuss with you is, as I mentioned earlier today, we

11    need to put a notice on the automated telephone system

12    that the clerk's office uses for jury communications by

13    three o'clock tomorrow afternoon as to what we're going to

14    do on Friday.  And I don't yet have a good idea of how

18:00 15    much time we will need for a general voir dire session,

16    and so I don't know at what hour to schedule it to

17    commence on Friday.  And also the actual method of

18    exercising peremptory challenges, as I have discussed

19    previously with counsel at our various status conferences,

20    is not really familiar to me.  I have never been through

21    that before, and so I don't know how much time to

22    anticipate that process will take.  So I would like some

23    guidance from counsel as to what our schedule for Friday

24    should be.

25          MR. WESTFALL:  And I wanted to update you on an

18:00 1    assignment.  I have now spoken with the government over

2    lunch, and we both agree in principal to this, and I will

3    submit it to the Court in writing tomorrow.  I can do it

4    on a letter if that's okay.  If that's not, I will file it

5    ECF.

6          THE COURT:  Either way is fine with me.  If a

7    letter is easier for you given the fact that this is an

8    overnight assignment, do what's easiest for you, but I

9    probably will want to file whatever you submit among the

10    records in the case.  So it really doesn't matter to me

11    what form it takes.

12          MR. WESTFALL:  Neither side can imagine there is

13    going to be questions submitted to the Court to ask the

14    panel.  I think this has pretty much taken care of that

18:00 15    for sure.  So we're envisioning the Court's general voir

16    dire that would be given in a criminal case without any

17    additional questions by attorneys or any additional

18    submitted questions by an attorney.  Also an introduction

19    of the parties and reading the witness list.  I'm sure

20    your general voir dire includes the role of the judge,

21    judge of the law and the role of jury and matters like

22    that that we haven't been explaining to them and then

23    finally a stern admonishment about the media.  The trial

24    starts on Monday or I guess the Dallas Morning News thinks

25    it's going to start on Monday, and we look forward to

18:00 1    really ratcheting it up.  I envision having that to you in
2    the morning.
3              THE COURT:  Well, if that is the case, I would
4    think -- Although we're dealing with a pretty large group
5    for my courtroom, between fifty and sixty people, those
6    kinds of things to be covered in my standard voir dire
7    probably would not take more than thirty minutes to an
8    hour, I would think.
9              MR. WESTFALL:  And I would think the actual
10   exercise of the peremptory challenges would be an hour or
11   less.
12             THE COURT:  Refresh my memory and you may not be
13   the one to answer this so you can defer to your cocounsel
14   if you need to.  But does the panel need to be here while
18:00 15   that process is done?
16             MR. WESTFALL:  The panel does not technically
17   need to be here at all, your Honor.  We just need to know
18   where everyone is sitting on the panel, and then if the
19   panel is not here, it would be quicker because we can
20   stand up there at the desk.
21             THE COURT:  That's what I was wondering.  It
22   seemed to me it might expedite things if they were not.  I
23   didn't know whether they needed to be.
24             MR. WESTFALL:  That would make it quicker, but
25   we need to know where everyone is sitting for sure.

18:00 1        THE COURT:  It sounds like it might be a good

2    idea to start at nine o'clock Friday morning and do the

3    general voir dire session however long that takes --

4    thirty minutes or an hour -- and send the people we have

5    voir-dired in that session down to the jury assembly room

6    on the first floor and do the peremptory challenges so

7    that if we need to communicate with them -- yes, you are

8    on the jury or no, you are not -- we can notify them when

9    to be back.

10        MR. WESTFALL:  I think that's a very good idea.

11    And they don't have to spend much time there.

12        THE COURT:  Well, I have been thinking as I go

13    along.  If anybody wants to correct me about any false

14    assumptions, now is the time to do so.

18:00 15        MR. JACKS:  Judge, I think there is some

16    sentiment on this side of the room that it would be

17    helpful to have the jury panel in the courtroom and the

18    parties making the strikes at the Bench because you talk

19    to so many people and they run together.  You try to make

20    notes, but there is some benefit with being able to

21    refresh your memory and being able to look out there and

22    say, oh, yeah, that's this person.

23        THE COURT:  Well, I don't have any objection to

24    that.  And I didn't understand Mr. Westfall to be opposed

25    to that.

18:00 1          MS. HOLLANDER:  Well, the problem is the clients

2      have to have input, and that's a lot to be at the Bench.

3      I have used the struck method for years, and that's not

4      usually done.  As the panel goes along, they get to make

5      choices.

6                THE COURT:  It sounds like they have better

7      notes than the government does.

8                MS. HOLLANDER:  I would agree with Mr. Jacks

9      would like to have a little picture.

10               MR. WESTFALL:  Well, we will have an hour while

11     you instruct them.

12               THE COURT:  Well, I guess we can leave that for

13     the moment.  I don't think I have to make a decision about

14     that right now, and I may want to reflect on it some more

18:00 15     before making a decision.

16               Is there anything else that counsel want to

17     raise while we're together?

18               MS. MORENO:  Yes, your Honor, if I may.  Juror

19     Number 67, who was the juror on the first day, July 16th,

20     who was Number 6 on the list, Mr. Jacob Baccus, the Court

21     recalls yesterday that he had indicated some information.

22     I just wish to bring this to the Court's attention.

23     Indeed, we believe Mr. Baccus's wife actually made home

24     visits to the Elashi family and provided a lot of care for

25     the Elashi's youngest son who does have Down's Syndrome.

18:00 1    I wanted to confirm that.  And that lasted quite a period

2    of time.

3            THE COURT:  Thank you, ma'am.  Go ahead.

4            MR. JONAS:  Yes, your Honor, just a follow-up on

5    the issue of scheduling for next week.  I have conferred

6    with the government's witness.  He can be here.  He would

7    be flying in Sunday night.  So if the Court wishes to

8    start the Daubert hearing Monday morning, we can do that.

9            THE COURT:  That would give me greater comfort I

10   think just in case this hearing takes longer than you now

11   expect.  That would give us some additional cushion that

12   day.

13           MR. JONAS:  Another matter we're going to have a

14   conference on, if the Court recalls the government sent a

18:00 15  letter to the Court regarding the defense request for over

16   a thousand declassification and we requested a CIPA

17   conference, and Mr. Dratel sent a letter stating the

18   defendant cannot reevaluate or reevaluate their list.  We

19   will be sending a letter tonight or first thing in the

20   morning basically stating our desire for a Section 2

21   pretrial conference.  So maybe we can do that Monday after

22   as well.

23           THE COURT:  Perhaps, depending on how much time

24   we have.  Thank you.  Ladies and Gentlemen, we'll be in

25   recess until nine o'clock tomorrow morning.

1                    C E R T I F I C A T I O N

2

3        I, Cassidi L. Casey, certify that during the

4    proceedings of the foregoing-styled and -numbered cause, I

5    was the official reporter and took in stenotypy such

6    proceedings and have transcribed the same as shown by the

7    above and foregoing Pages 567 through 829 and that said

8    transcript is true and correct.

9

10       I further certify that the transcript fees and format

11   comply with those prescribed by the court and the Judicial

12   Conference of the United States.

13

14

15                         s/Cassidi L. Casey
                           _____
16                         CASSIDI L. CASEY
                           UNITED STATES DISTRICT REPORTER
17                         NORTHERN DISTRICT OF TEXAS
                           DALLAS DIVISION
18

19

20

21

22

23

24

25

< A >

**Abdulqader** 2:22
**Abelar** 106:9, 112:15, 113:3, 114:7
**abide** 18:25
**ability** 11:11, 16:7, 68:25, 85:22, 113:9, 130:24, 192:23
**able** 11:25, 12:11, 13:24, 17:23, 18:12, 32:19, 33:9, 43:11, 43:17, 62:25, 64:20, 66:9, 69:14, 71:18, 86:6, 89:6, 89:10, 110:10, 115:1, 115:7, 135:4, 135:16, 153:15, 155:25, 166:13, 166:16, 184:14, 185:7, 185:15, 205:22, 206:14, 227:5, 247:16, 254:17, 254:23, 261:20, 261:21
**above** 265:7
**abroad** 184:19
**absolutely** 129:3, 206:14, 250:2
**Abu** 2:1
**abuse** 22:6
**Academy** 159:15
**accept** 11:25, 12:12, 110:10, 135:4, 135:16, 166:13, 166:17, 177:2, 199:19
**accepted** 109:4
**accepting** 134:21, 175:6
**access** 67:23
**accident** 173:9, 173:15
**account** 188:13
**accountant** 187:7
**accredited** 133:16
**accurate** 6:3, 88:25
**accused** 71:25, 74:16, 74:17, 160:20, 160:24, 166:3, 170:22, 187:2, 235:1, 240:19, 243:11
**Ace** 128:13, 132:14
**acoustics** 195:14
**acquaintances** 105:4
**acquire** 220:22
**across** 119:21, 229:6
**action** 117:16
**actions** 237:17
**active** 123:8, 144:21, 215:18, 215:20
**activities** 123:16, 124:5,

145:17, 180:19, 249:16
**activity** 187:8, 222:7
**acts** 223:19
**actual** 36:2, 258:17, 260:9
**Actually** 11:13, 13:2, 13:4, 20:17, 39:15, 45:21, 48:9, 48:17, 72:1, 77:15, 114:2, 117:15, 120:11, 128:7, 187:16, 187:25, 212:16, 223:2, 226:12, 232:1, 233:5, 262:23
**ad** 134:10
**Ada** 77:9
**add** 102:13, 257:16
**added** 32:3
**Addison** 52:6
**addition** 113:7
**additional** 134:7, 183:12, 259:17, 259:17, 263:11
**Additionally** 66:14
**adjourn** 61:24
**adjustment** 122:3
**administrator** 4:15, 114:22, 218:11, 239:5
**admits** 12:10
**admitted** 11:25
**admonish** 201:15
**admonishment** 259:23
**adolescents** 210:13
**adopt** 221:22
**adult** 40:1
**advisement** 67:9, 114:7, 142:10, 256:15
**advising** 258:7
**affairs** 121:3
**affect** 11:10, 59:11, 110:16, 110:23, 111:13, 113:5, 113:9, 113:9, 113:15, 129:1, 129:2, 129:5, 130:24, 171:20, 192:23, 243:25
**affected** 182:4, 182:4
**affecting** 241:22
**affiliated** 64:13
**afford** 66:21, 174:15, 182:21, 186:9, 206:4, 252:3, 256:3
**afforded** 48:15, 49:14, 206:12
**affording** 174:21, 243:16
**afraid** 85:23, 88:24, 89:1, 89:3, 89:13, 89:14, 204:18,

204:21, 257:12
**Again** 14:6, 33:16, 49:13, 54:22, 92:8, 107:10, 112:2, 142:2, 150:5, 178:16, 186:1, 194:12, 195:5, 198:21, 200:13, 201:16, 213:3, 255:21
**against** 13:14, 24:5, 32:19, 33:8, 59:15, 64:14, 73:16, 149:14, 149:19, 177:10, 178:24, 179:7, 182:9, 185:6, 186:8, 199:4, 217:12, 223:13, 223:17, 247:13, 256:3, 256:4
**age** 41:9, 88:10, 130:16, 140:12
**ago** 5:7, 22:22, 25:16, 34:9, 42:3, 44:23, 47:25, 55:10, 63:10, 80:2, 82:21, 99:16, 116:12, 127:2, 127:14, 133:10, 136:10, 136:20, 139:25, 158:9, 158:18, 174:11, 193:11, 193:15, 196:9, 209:10, 214:13, 227:1, 235:10, 248:12, 249:11
**agree** 18:2, 32:24, 85:11, 169:12, 217:8, 230:10, 257:17, 257:18, 259:2, 262:8
**agreement** 169:10
**ahead** 28:25, 47:5, 263:3
**aid** 13:16, 24:4, 40:10, 85:6, 102:21, 130:3, 130:4, 130:6, 130:6, 137:11, 160:2, 197:8, 197:9, 197:14, 199:12, 200:1, 200:24, 203:5, 203:7, 203:9, 203:10, 243:1, 243:1, 243:4, 250:9, 250:14
**Air** 45:9, 45:13
**Airlines** 26:17
**airplanes** 40:21
**airport** 27:10, 30:2
**AL** 1:13
**albeit** 201:14
**Albuquerque** 2:9
**alert** 57:11, 84:4, 115:10
**Ali** 242:23
**alimony** 125:2
**allegation** 19:3, 93:20, 246:10
**allegations** 14:22, 25:6, 34:3, 70:1, 79:23, 85:4,

116:5, 135:10, 144:16, 150:21, 160:1, 180:18, 181:17, 197:6, 197:6, 198:5, 200:20, 201:1, 201:2, 203:4, 204:12, 210:22, 210:23, 211:14, 224:15, 233:10, 243:15, 246:5, 246:11, 253:10

**alleged** 13:4, 42:10, 102:21

**alleges** 13:5, 45:1, 130:1, 130:6, 142:24, 200:22, 203:4, 203:9, 242:25, 250:9

**alleging** 44:11, 120:12, 167:18, 210:24

**Allen** 148:5

**allow** 14:7, 24:15, 33:17, 44:1, 54:23, 65:5, 78:23, 82:5, 91:1, 91:2, 92:9, 102:6, 112:20, 126:17, 135:24, 142:3, 150:6, 157:17, 167:5, 177:20, 186:2, 194:13, 200:14, 212:2, 224:1, 234:11, 240:7, 247:25, 255:22

**allowed** 90:24, 162:19

**Almost** 29:13, 49:18

**alone** 101:14

**along** 4:4, 41:11, 86:11, 105:7, 113:25, 153:12, 261:13, 262:4

**already** 65:19, 141:21, 203:19, 251:6, 251:7

**Also** 7:23, 11:18, 16:4, 37:11, 43:2, 54:7, 64:10, 82:23, 99:25, 100:19, 104:1, 113:7, 131:17, 149:13, 176:23, 196:4, 231:18, 231:21, 247:4, 247:8, 247:25, 248:24, 258:17, 259:18

**alternates** 114:18

**Although** 257:11, 260:4

**Always** 8:15, 19:16, 36:8, 47:12, 53:5, 53:7, 122:18, 173:18, 190:1, 209:24, 221:24, 227:15, 232:7, 249:6

**Am** 5:16, 14:16, 24:25, 28:22, 29:12, 37:14, 37:19, 55:8, 67:8, 79:20, 82:24, 83:21, 84:21, 86:3, 86:4, 91:12, 99:22, 114:6, 127:1, 136:9, 146:24, 154:1, 158:5,

190:20, 198:13, 201:7, 214:18, 222:4, 238:9, 258:2

**Amalgamated** 139:12

**amazingly** 152:5

**ambivalent** 236:1

**Amendment** 182:22, 186:9

**America** 1:7, 60:22, 75:10, 102:19, 124:13, 124:15, 250:25

**American** 7:25, 8:10, 25:7, 26:17, 26:20, 26:21, 35:7, 44:24, 48:18, 49:7, 55:13, 59:3, 85:5, 93:21, 127:4, 131:6, 131:17, 131:21, 136:12, 137:9, 142:24, 158:12, 167:16, 190:5, 196:19, 202:3, 216:12, 224:15, 234:25, 249:8, 251:15

**among** 110:3, 259:9

**amount** 92:24, 152:12

**annual** 41:21, 226:11

**Another** 14:5, 20:11, 24:13, 87:9, 105:20, 128:17, 147:11, 175:1, 189:1, 217:4, 258:9, 263:13

**answer** 4:14, 48:24, 59:20, 62:9, 66:25, 67:2, 80:9, 81:6, 85:20, 86:6, 89:7, 113:15, 175:6, 188:23, 196:15, 196:15, 203:24, 203:24, 207:6, 260:13

**answered** 20:24, 48:17, 151:10, 174:16

**answers** 58:10, 67:5, 82:20, 85:19, 99:6, 137:2, 161:13, 178:21, 181:10, 185:16, 194:25, 202:1, 248:11, 249:23, 251:6

**anticipate** 23:21, 42:25, 43:2, 129:14, 258:22

**anticipation** 129:23

**anxiety** 89:9, 89:17, 92:24

**anxious** 89:15, 89:16

**anybody** 48:1, 56:5, 57:1, 97:6, 125:18, 129:3, 145:13, 160:24, 162:19, 224:25, 236:3, 243:11, 261:13

**anymore** 18:6, 25:10, 34:18, 100:24, 101:3, 134:17,

144:13

**anywhere** 52:3, 67:1

**apart** 50:11

**apologize** 65:25, 133:20, 193:18, 205:10, 245:10

**apparently** 4:19, 196:5

**appear** 89:2

**appears** 133:24

**applied** 41:23, 135:19, 140:24, 176:21

**applies** 223:4

**apply** 42:22, 73:15, 91:24, 114:1, 211:9, 233:16, 238:17, 246:24, 253:21

**appointment** 210:14, 210:14, 210:14

**appreciate** 8:18, 59:7, 68:14, 86:20, 251:12

**appreciative** 121:14

**apprehension** 198:20, 204:19

**apprehensions** 181:5, 182:5, 205:12, 206:3

**apprehensive** 205:14, 205:15

**approach** 65:8

**approaches** 67:1

**appropriate** 153:11

**Approximately** 89:24, 220:15

**April** 60:18, 60:20

**Arab** 8:4, 28:4, 145:7

**Arabic** 11:23, 72:6, 84:14, 138:2, 138:15, 138:18, 145:14, 145:17, 162:1, 191:8, 215:8, 242:7

**Arabs** 28:12, 48:3, 145:22, 191:1, 191:7

**Area** 21:7, 25:17, 30:22, 36:4, 39:18, 51:2, 63:6, 63:7, 76:5, 87:25, 88:2, 105:15, 117:22, 121:18, 128:19, 133:5, 134:12, 138:4, 148:16, 154:18, 168:2, 172:23, 221:4, 230:24, 231:6, 231:9, 231:12

**areas** 120:17

**aren't** 58:1, 58:10, 151:15, 161:12, 225:23, 249:22

**Arlington** 31:9, 61:19

**army** 120:20, 120:23, 123:3,

227:21
**around** 55:23, 68:13, 94:23, 97:1, 133:5, 143:17, 147:14, 167:23, 170:18, 172:3, 186:25, 195:4, 203:6, 216:22, 223:1, 231:5, 239:22
**arrangements** 97:10, 97:14, 184:15
**arrested** 77:14, 125:18, 126:1
**arrests** 25:14, 25:16
**arrived** 213:7, 224:25
**arriving** 145:24
**Art** 46:7, 46:12, 46:14, 54:4
**article** 252:24, 253:3
**articles** 108:11
**Arts** 46:4, 46:11, 154:23
**aside** 47:13, 58:23, 60:2, 66:18, 81:5, 112:6, 113:22
**asked** 4:6, 7:8, 52:8, 57:14, 64:4, 66:11, 66:15, 67:20, 80:10, 86:5, 89:6, 96:7, 99:18, 105:14, 107:6, 107:7, 107:8, 108:4, 166:5, 171:24, 181:19, 185:1, 238:9, 248:12, 256:22
**asking** 66:18, 108:1, 129:6, 161:6, 204:23, 207:11, 231:14, 249:21, 249:22, 251:7
**asleep** 16:5
**aspect** 11:15, 11:16, 12:3, 12:25, 19:18, 24:6, 43:7, 149:21, 149:21
**aspects** 125:24
**assembly** 261:5
**assigned** 30:12, 128:22
**assignment** 259:1, 259:8
**assistance** 32:17, 33:6, 33:7, 247:11
**Assistant** 1:30, 20:4, 38:18, 50:3, 60:11, 72:20, 75:2, 87:2, 121:8, 146:5, 154:12, 172:10, 208:2, 218:19, 230:4, 252:11
**assisted** 126:7
**associate** 221:14, 221:15
**associated** 44:12, 116:6, 200:2
**associates** 105:4

**assumptions** 261:14
**assurance** 240:25
**assurances** 66:19
**assure** 59:9, 59:10, 59:10, 59:13, 85:22
**asthma** 243:23
**attend** 23:2, 40:24, 61:14, 78:8, 122:11, 176:8
**attendants** 27:9
**attendee** 124:7
**attention** 38:7, 83:5, 83:12, 90:15, 90:17, 90:20, 107:12, 113:23, 113:24, 119:3, 136:2, 150:9, 157:20, 160:9, 160:11, 171:12, 191:15, 197:24, 222:25, 240:22, 262:22
**Attorney** 1:30, 20:5, 38:18, 50:4, 60:11, 75:3, 87:2, 121:8, 146:5, 154:12, 154:13, 172:10, 178:5, 186:12, 218:20, 230:4, 252:11, 258:1, 259:18
**Attorneys** 5:5, 53:24, 55:8, 126:25, 136:8, 158:5, 186:24, 201:25, 208:3, 259:17
**attune** 27:8
**audit** 226:10, 226:11
**auditing** 226:1
**auditor** 227:10
**audits** 226:16, 226:20
**August** 139:21, 139:22, 141:15, 141:15
**aunt** 96:24, 97:3, 97:7, 97:11, 101:5
**Auto** 83:14, 87:7
**automated** 114:22, 258:11
**Avenue** 2:27, 2:45
**avoid** 237:6
**aware** 37:14, 37:19, 42:14, 42:16, 62:21, 180:4, 216:14
**away** 4:12, 10:18, 104:15, 125:7, 161:1, 227:24

**< B >**
**B.** 98:4
**babies** 143:24, 197:10
**babysitting** 165:14
**Baccus** 262:20, 262:23
**bachelor** 46:3

**Back** 8:16, 8:23, 15:20, 27:18, 40:2, 40:3, 44:18, 69:14, 101:21, 111:1, 115:9, 118:4, 121:18, 122:25, 123:1, 132:25, 133:6, 144:12, 155:21, 155:21, 170:8, 175:23, 181:18, 182:7, 190:2, 196:25, 209:17, 209:18, 210:6, 210:7, 214:24, 226:24, 227:16, 235:9, 245:13, 261:9
**back-up** 16:1
**background** 30:3, 52:25, 71:8
**backpacks** 32:17, 43:7, 64:17
**backs** 13:17
**Bad** 16:12, 28:11, 39:21, 48:2, 60:2, 72:10, 97:21, 105:17, 109:23, 140:25, 145:21, 163:24, 198:3, 200:3, 215:10, 242:12
**baggage** 7:12, 198:6, 204:4
**Bailey** 14:10, 14:14, 20:2, 20:4, 24:10
**Baker** 2:1
**bakeries** 243:3
**ball** 72:18
**banging** 119:12
**Bank** 56:20, 60:16, 60:17, 60:22, 60:23, 60:24, 61:3, 61:3, 61:8, 61:10, 61:16, 130:3, 144:9, 197:11, 203:5, 203:6, 226:5, 246:14, 250:10
**banker** 56:19, 178:14
**banking** 60:18
**Baptist** 123:22
**baptized** 221:25
**bar** 7:17, 50:22, 51:11, 178:7, 178:16
**Barry** 1:27, 99:3, 132:8, 140:9, 164:15, 192:6
**bars** 94:12, 94:13, 175:14
**base** 48:12, 117:20, 187:16, 210:23
**baseball** 31:22
**Based** 15:6, 25:19, 29:4, 70:8, 78:11, 111:22, 111:24, 113:3, 151:5, 153:16, 188:14, 190:7, 190:13, 201:16, 202:24, 213:2, 213:6, 213:9,

213:12, 224:18, 235:16, 238:1, 248:10, 251:5, 253:19, 254:19

**basic** 72:18, 81:4

**Basically** 15:24, 26:24, 51:12, 91:23, 104:5, 113:5, 133:16, 165:14, 176:15, 196:3, 218:1, 235:4, 239:17, 263:20

**basics** 159:22

**basis** 80:3, 216:20, 235:24

**basketball** 95:3, 95:19

**BBC** 47:11

**BEA** 40:15, 40:17, 41:18

**became** 7:17, 36:12, 62:24

**become** 7:18, 18:11, 41:16

**bedridden** 147:3

**beginning** 210:3

**behalf** 78:9, 186:7, 257:6, 257:19

**behind** 170:25, 171:2, 175:14

**belief** 109:15, 113:6

**beliefs** 162:25, 164:6, 252:1

**believes** 53:6

**bell** 34:14, 151:1

**bells** 15:1, 25:10, 25:11, 34:7, 94:4, 224:20

**Bench** 91:22, 261:18, 262:2

**benefit** 11:14, 24:1, 43:5, 54:12, 149:15, 199:15, 223:16, 233:25, 246:7, 246:15, 247:7, 247:11, 261:20

**benefited** 33:7, 130:7, 160:5, 197:15, 203:10, 243:4, 243:9, 250:14

**Besides** 72:12, 95:2, 103:24, 134:6, 215:25

**best** 31:4, 154:2, 195:14, 225:19

**bet** 171:1, 216:8

**better** 105:24, 107:11, 107:11, 262:6

**beyond** 25:17, 43:17, 73:25, 74:7, 156:11, 156:25, 161:2, 161:3, 191:23, 223:20, 244:4, 244:7, 244:10

**beyond-a-reasonable-doubt** 74:2

**bias** 120:18

**Bible** 248:16, 248:20, 248:22, 251:15

**bidding** 217:19, 220:11

**big** 31:13, 36:15, 51:25, 57:21, 122:3, 124:10, 170:13, 189:20, 195:13, 205:2, 210:19, 222:15

**bigger** 80:3

**bilingual** 12:14

**bill** 9:4, 9:4, 9:4

**bills** 83:21

**Binghamton** 40:6

**binoculars** 70:12, 70:14, 71:18

**bit** 6:21, 15:3, 15:9, 21:10, 34:19, 39:8, 55:6, 58:7, 79:20, 88:14, 91:18, 118:10, 148:23, 180:11, 188:11, 191:10, 195:4, 196:12, 224:21, 234:21, 246:3

**bitty** 177:25

**Black** 105:17, 120:6

**Blind** 70:15, 96:25, 101:6, 101:8

**Blonde** 6:13

**blue** 6:13

**blurb** 188:11

**board** 27:2

**Boeing** 40:20

**bomb** 64:24

**book** 47:16, 47:18

**Books** 13:16, 24:3, 32:17, 47:14, 64:17, 130:5, 130:5, 149:18, 160:3, 197:9, 203:8, 211:17, 233:24, 243:2, 247:10

**Boozer** 24:20, 24:23, 30:10, 33:12

**Border** 45:16, 45:19, 45:21, 53:3

**born** 39:7, 39:12, 39:19, 63:8, 88:7, 88:9, 174:8, 244:23

**bother** 32:22, 181:24

**bought** 69:10

**Boulevard** 106:20

**BOX** 2:36, 94:14

**Boy** 121:4

**BOYD** 2:6

**boys** 87:22

**Branch** 75:16

**bread** 64:23, 243:3

**break** 68:15, 194:1, 194:3, 243:22

**breaking** 9:5

**breaks** 128:3

**brief** 87:5, 106:2, 203:14

**Briefly** 103:5, 125:14, 133:20, 135:9, 140:8, 140:22, 166:1, 207:23

**bring** 20:19, 58:9, 110:20, 262:22

**bringing** 136:16

**brings** 137:20, 198:19, 198:25

**brochures** 196:2

**broke** 249:10

**broken** 6:16, 13:22

**brother** 73:7, 77:2, 100:1, 100:10, 148:6, 148:18, 170:13

**brothers** 165:15

**brought** 45:23, 141:8, 144:10, 231:14

**Brown** 187:21, 248:6, 248:8, 252:8, 255:17, 256:3, 256:9

**build** 40:21

**Building** 171:6, 219:25, 233:8

**Bulk** 36:20, 227:8

**bunch** 51:19

**Buonasera** 201:19, 201:21, 207:20, 207:22, 207:24, 207:25, 211:22

**burden** 63:2, 67:4, 114:1, 244:3, 244:4

**Burma** 219:3

**burning** 17:17

**bus** 138:3, 139:1, 140:24

**business** 15:24, 31:17, 51:23, 79:9, 79:12, 81:13, 96:17, 103:16, 107:13, 118:25, 138:1, 164:21, 171:18, 193:11, 208:15, 208:18, 215:21, 215:22, 215:24, 216:1, 216:2, 216:3, 216:4, 216:5, 219:15, 222:9, 238:14, 238:24, 238:24, 239:2, 239:17, 239:19

**bussed** 66:8
**busy** 7:18, 55:21, 179:22, 216:8, 216:10
**buy** 247:10

< C >
**Cabrera** 67:16, 67:20, 67:22, 68:1
**Cadeddu** 2:25, 2:26, 17:2
**cafeteria** 143:11, 143:16
**California** 79:12, 88:6, 88:8, 88:12, 225:23, 225:24
**call** 27:7, 114:24, 134:11, 169:9, 198:6, 236:17
**called** 13:7, 37:1, 53:18, 88:18, 128:18, 136:13, 166:2, 197:15, 203:11, 209:5, 211:3, 211:4, 214:1, 226:8, 226:12, 233:4, 233:23, 243:5
**calls** 71:16
**campaign** 41:21
**cancer** 5:18
**candor** 182:11
**capacity** 122:18, 146:21
**car** 80:20, 81:1, 87:12, 190:8, 190:9
**Care** 5:17, 10:10, 10:12, 30:21, 56:4, 56:13, 56:16, 61:20, 68:25, 96:24, 128:18, 128:19, 140:15, 147:2, 147:14, 147:14, 147:17, 184:5, 184:10, 259:14, 262:24
**career** 29:11, 226:23, 227:18, 227:20
**Caring** 19:12, 68:21
**Carolina** 154:20
**carrier** 36:13, 122:19, 122:21
**Carrillo** 194:22, 200:7, 200:9
**carry** 251:8
**cases** 9:3, 26:22, 225:22, 226:13
**CASEY** 3:1, 265:3, 265:17
**cash** 226:6
**cashier** 128:12, 129:18
**CASSIDI** 3:1, 265:3, 265:17
**casualties** 181:25
**category** 198:11, 237:18
**cater** 37:5

**caught** 196:24
**cause** 58:8, 66:2, 66:14, 66:24, 67:2, 67:9, 82:13, 83:18, 85:13, 92:15, 93:1, 93:3, 93:6, 96:13, 100:16, 106:5, 113:3, 113:14, 114:7, 114:13, 130:15, 158:1, 186:8, 186:18, 190:18, 237:14, 239:13, 241:17, 243:19, 256:2, 256:9, 256:14, 265:4
**caused** 88:11
**causes** 137:6, 137:20, 195:18, 198:20, 203:16
**caution** 4:6
**Cedar** 159:19
**Center** 36:21
**Central** 53:13, 106:15
**Cereal** 94:11, 94:13, 94:17
**certain** 6:8, 18:11, 26:22, 26:24, 59:15, 81:3, 85:20, 95:12, 116:6, 125:24, 149:3, 162:9, 195:11
**certainly** 92:22, 153:13, 238:25, 256:19
**certify** 265:3, 265:10
**challenge** 66:3, 66:24, 67:9, 82:8, 92:15, 93:1, 93:3, 113:13, 114:7
**challenges** 114:13, 256:14, 258:18, 260:10, 261:6
**chance** 156:4
**chances** 103:12, 133:2
**change** 105:22, 133:19, 163:1, 163:5, 173:5, 182:25, 228:24, 228:25
**changed** 133:18
**changes** 80:19
**changing** 141:16
**Channel** 57:23, 57:24, 58:2, 106:2, 109:8, 109:12, 143:9, 236:16
**char** 73:15
**charge** 19:4, 28:19, 45:3, 53:13, 63:23, 88:15, 100:1, 107:16, 149:2, 166:14, 199:20, 245:11
**charged** 74:5, 74:15, 77:16, 120:9, 138:15, 237:20, 238:6, 242:10
**charges** 13:3, 32:5, 42:10,

66:17, 77:19, 85:9, 85:10, 126:8, 130:1, 130:12, 130:23, 137:15, 148:24, 160:16, 161:7, 161:8, 176:15, 176:15, 180:5, 180:23, 181:23, 182:3, 182:6, 196:13, 198:7, 198:18, 198:25, 199:3, 200:21, 203:14, 203:14, 203:20, 210:22, 223:5, 243:14, 244:8, 246:4
**charitable** 24:2, 54:10, 64:16, 72:23, 149:17, 166:13, 176:25, 177:5, 211:17
**charities** 216:11, 216:12, 216:19, 216:19
**check** 30:3, 67:22, 71:8
**checked** 99:19, 134:20
**checks** 196:2
**chemical** 20:14, 20:18
**chemicals** 20:20
**Chicken** 146:15
**child** 10:10, 22:6, 66:10, 68:19, 68:21, 68:25, 72:13, 124:23, 125:2, 140:15, 170:19, 184:5, 184:10
**children** 13:17, 30:24, 32:18, 38:2, 39:4, 39:7, 39:12, 40:24, 42:1, 87:21, 143:18, 147:19, 173:21, 184:1, 208:19, 210:2, 219:14, 245:3
**choices** 262:5
**choir** 124:5
**choose** 155:12
**chosen** 62:1, 62:24, 140:14, 255:8
**Christian** 37:11, 41:14, 159:15, 221:24
**Christmas** 37:17
**Church** 72:25, 73:1, 105:1, 120:25, 123:18, 123:20, 123:22, 124:2, 124:8, 124:10, 144:21, 170:5, 179:25, 215:16, 215:19, 216:25, 221:19, 222:8, 222:11, 222:12
**CIPA** 263:16
**circumstances** 103:17, 108:24
**Citizen** 9:6, 48:22, 48:23, 49:7, 74:16, 144:9

**Citizens** 48:14, 49:1, 49:15, 60:23, 61:9, 174:13, 174:21
**citizenship** 48:18, 220:23, 221:1
**City** 122:21, 122:22, 148:3, 152:21, 154:21, 174:6, 213:20, 213:24, 214:1, 231:18, 236:18
**civil** 21:23, 21:25, 121:3, 124:23, 133:25, 134:1
**Civilian** 26:16
**claim** 250:13, 250:18
**claims** 58:5, 137:10, 160:1, 197:7
**class** 31:25
**classes** 37:6
**clean** 128:23, 220:1
**cleaning** 171:6
**clear** 92:16, 92:23, 179:4, 186:11
**clearance** 29:23, 30:1, 30:4, 36:5, 71:3, 227:17, 227:22, 228:8
**Clearly** 66:4, 92:17
**clerk** 10:22, 20:12, 57:12, 114:21, 152:14, 171:21, 258:12
**client** 258:1
**clients** 162:14, 163:19, 210:5, 262:1
**Cliff** 37:6, 143:14, 242:3
**CLINE** 256:22, 257:2, 257:2, 257:5
**clipping** 106:1
**clippings** 109:7
**clock** 147:14
**Close** 7:5, 7:7, 7:7, 7:9, 27:3, 78:5, 100:10, 153:1, 153:5, 153:5, 155:7, 175:12, 176:3, 215:1, 215:1, 215:5
**closed** 146:19
**closely** 47:10, 104:10, 228:11, 237:5
**closes** 56:13, 61:21
**clothes** 160:3
**clothing** 24:3, 32:17, 43:6, 54:10, 54:11, 64:16, 149:17, 177:1, 223:15, 247:10
**Club** 50:22, 51:8, 52:17
**coach** 72:21

**coated** 70:22
**coating** 71:17
**Cocaine** 78:3, 78:4
**cockpits** 40:21
**cocounsel** 260:13
**code** 70:12, 70:14
**coding** 70:11
**cold** 35:21, 144:13, 144:14, 231:16
**collectively** 211:9, 233:16
**College** 122:8, 122:11, 122:12, 138:5, 159:18
**colleges** 210:16
**color** 7:14, 59:11, 245:25
**combat** 121:18
**comes** 46:23, 156:8, 198:3
**comfort** 263:9
**comfortable** 12:16, 12:18, 19:13
**coming** 132:21, 132:22, 142:18, 152:8, 205:18, 218:13, 238:3
**commence** 258:17
**Commerce** 1:34, 3:2, 8:22
**commit** 206:14
**committee** 41:24
**communicate** 86:5, 90:11, 115:8, 261:7
**communicated** 114:24, 176:4
**communicating** 90:13
**communications** 258:12
**community** 117:21, 124:6, 144:23, 170:4, 222:16
**commute** 56:9
**companies** 51:19, 210:25
**company** 29:14, 41:19, 51:17, 51:21, 51:22, 51:25, 75:12, 83:22, 101:1, 117:7, 117:11, 128:18, 129:14, 165:2, 183:19, 183:20, 219:25, 220:20, 236:20
**compared** 105:16
**complained** 4:17
**complete** 123:12
**Completely** 6:14, 9:23, 251:11
**complexity** 81:1
**complicated** 225:25
**comply** 27:2, 265:11

**computer** 67:24, 79:10
**computers** 148:13, 236:23
**Comstock** 169:22
**concept** 42:23, 247:17
**Concern** 58:8, 67:17, 85:13, 86:1, 89:9, 111:5, 111:10, 112:11, 130:16, 137:6, 137:20, 174:17, 189:20, 190:19, 193:24, 203:16, 204:19, 243:20, 249:15
**concerned** 85:23, 115:6, 241:21
**concerning** 256:21
**concerns** 58:22, 89:4, 112:11, 113:7, 130:24, 161:8, 181:4, 181:13, 182:5, 192:20, 196:6
**conclusion** 145:23, 213:7
**conclusions** 191:17
**condition** 127:19, 193:20, 193:23, 227:11, 227:12, 227:14
**conditions** 196:5
**conducive** 50:11
**Conference** 263:14, 263:17, 263:21, 263:25, 265:12
**conferences** 258:19
**conferred** 263:5
**confirm** 263:1
**conflict** 47:9, 104:9, 108:2, 108:5, 109:1, 109:3, 112:1, 112:3, 169:6, 191:13, 197:21, 228:11, 237:5, 248:13, 252:16, 257:7
**conflicts** 76:13, 105:10
**confused** 61:7, 99:20
**confusing** 222:4
**Congratulations** 196:10
**connected** 41:17
**consequences** 176:13
**consider** 12:21, 13:16, 32:16, 102:12, 131:15, 134:24, 135:3, 135:17, 142:9, 166:12, 211:16
**consideration** 153:15, 174:15, 190:12, 239:20
**considerations** 142:10
**considered** 24:2, 64:15, 149:16
**considering** 58:13, 129:8,

132:24, 133:1, 190:4
**consisted** 117:8
**Constitution** 156:23, 160:24, 185:4, 185:14
**Constitutional** 48:15, 182:21, 186:10
**construction** 140:18, 140:20, 140:23
**consulting** 187:19
**contact** 125:13, 175:12, 187:10
**contacts** 215:4, 215:5
**contains** 20:11, 63:20
**context** 135:7
**continue** 92:7, 126:15, 150:4, 194:11, 211:25, 223:24, 234:9, 240:5, 247:23, 255:20, 256:17
**contract** 220:11, 220:14
**contribution** 43:4, 223:12
**control** 127:25
**conversation** 185:2
**conversations** 131:4, 131:23, 180:17, 180:21
**convicted** 22:21, 77:22, 176:6, 235:23, 245:11
**conviction** 236:1
**convoy** 117:9, 117:23
**cook** 146:22
**coordinate** 124:3
**copies** 54:2
**Coppell** 128:13
**Cops** 74:11
**copy** 91:25, 92:1
**corporate** 51:23
**Correct** 10:25, 41:15, 43:10, 63:12, 84:23, 88:21, 88:22, 99:9, 182:22, 208:11, 208:12, 214:6, 216:24, 220:3, 221:20, 225:16, 245:1, 252:16, 253:4, 253:10, 253:14, 258:4, 261:13, 265:8
**correctable** 151:15
**correctly** 62:6, 66:7, 90:9, 239:7, 258:3
**Cosmetology** 162:4, 163:21, 165:7
**council** 123:17, 123:25
**counseling** 121:19, 121:22, 210:16

**counselor** 209:12, 209:20, 209:21
**counselors** 210:19
**countries** 17:14, 49:19, 215:8
**country** 17:8, 17:16, 18:13, 21:10, 27:23, 48:20, 49:13, 53:5, 109:23, 116:13, 181:16, 181:25, 229:15, 229:16, 243:11
**County** 30:23, 60:24, 77:11, 77:24, 77:25, 90:5
**couple** 4:4, 5:7, 7:22, 25:15, 32:3, 46:2, 79:5, 82:20, 107:19, 113:17, 113:22, 127:8, 133:5, 133:9, 133:12, 140:11, 158:8, 174:12, 196:25, 201:25, 225:11, 230:6, 230:7, 244:21, 248:12
**course** 12:23, 111:6, 129:2, 232:11
**Courthouse** 1:33, 56:11, 76:10, 90:5
**courtroom** 4:9, 62:14, 80:16, 195:14, 260:5, 261:17
**cousin** 6:25, 7:9, 7:13, 23:11
**cousins** 175:14, 175:25
**cover** 67:14, 162:10, 162:16, 163:8, 163:16, 164:2, 164:5, 241:20
**covered** 114:20, 162:21, 162:21, 260:6
**covering** 138:13
**coworker** 215:12
**crater** 217:20
**cratoring** 218:4
**crawl** 130:17
**create** 103:20
**credible** 134:24, 134:25, 135:1
**crew** 27:9, 151:18, 151:19, 151:22, 152:1, 152:9
**crime** 73:15, 160:20, 160:24, 243:12
**criminal** 21:23, 23:5, 23:12, 31:16, 62:14, 62:18, 62:19, 73:14, 78:13, 79:19, 93:14, 94:3, 100:13, 115:20, 125:20, 133:25, 160:19, 170:22, 176:11, 190:5, 232:21,

237:22, 245:21, 259:16
**crisis** 210:16
**critical** 131:21, 131:22
**cross** 48:24
**crossed** 189:14, 196:5, 227:13
**crossing** 45:20, 45:22
**Crowley** 22:9, 233:8
**cruise** 15:12, 21:20, 65:21, 69:5, 69:13, 76:14, 76:17
**CSR** 3:1
**Cub** 121:4
**cultural** 229:19
**cups** 241:6, 241:10
**curator** 153:23
**curious** 105:14
**current** 116:25, 122:24, 132:13, 257:8
**Currently** 61:9, 99:20, 121:2, 121:21, 128:7
**cushion** 263:11
**custodian** 173:19
**custody** 10:5, 68:22
**custom** 162:19
**customers** 10:24, 187:19, 190:25
**Customs** 45:14, 45:16, 53:3, 53:9
**cut** 162:11, 163:8, 238:14
**cute** 143:25
**CUTRER** 2:43
**cyclic** 140:25

**< D >**
**DA** 7:17
**dad** 45:9, 48:20, 50:8, 55:22, 164:19, 164:20
**daily** 91:11, 106:21, 235:23
**Dallas-fort** 128:19, 230:23
**Dallasite** 122:5
**damaged** 219:25
**dangerous** 205:5, 205:8
**DANIELS** 2:6
**DART** 140:24
**data** 35:19, 35:24, 36:10, 36:12
**date** 42:2, 141:16, 219:2, 220:6, 235:15
**dates** 68:2

**Daubert** 263:8
**Daughter** 5:17, 10:1, 55:18, 55:20, 56:3, 61:21, 66:6, 125:5, 140:12, 173:21, 231:1
**day-to-day** 145:17
**days** 22:11, 25:13, 26:4, 69:7, 77:1, 102:1, 103:15, 108:12, 127:8, 127:12, 132:14, 151:23, 187:21, 217:25, 221:9, 239:8, 239:9, 239:11, 241:15, 256:12
**deadline** 69:15
**deal** 34:20, 94:11, 193:1, 226:11, 256:24
**dealerships** 87:13
**dealing** 10:23, 260:4
**dealings** 137:25, 138:1, 138:1, 145:16, 242:6
**dealt** 161:25
**decide** 120:12, 246:23, 254:19
**decided** 9:4, 114:14, 156:20, 210:6
**deciding** 13:12
**decision** 28:25, 29:3, 62:5, 80:14, 111:20, 190:7, 190:13, 190:16, 198:16, 238:1, 262:13, 262:15
**declared** 109:19
**declassification** 263:16
**deduced** 201:12
**DEFENDANT** 2:1, 2:13, 2:22, 2:31, 2:40, 27:20, 166:18, 185:13, 257:23, 263:18
**defendants** 13:6, 63:3, 80:7, 103:4, 174:13, 174:15, 210:25, 225:1, 233:11, 235:18, 246:6, 246:11, 256:21, 258:8
**defended** 48:20, 49:13
**defending** 48:20
**defense** 5:5, 14:15, 24:24, 33:24, 44:7, 55:7, 68:12, 79:19, 82:18, 93:14, 102:18, 126:25, 142:20, 150:18, 158:5, 167:13, 186:8, 186:24, 212:11, 224:9, 254:2, 257:14, 263:15
**defer** 260:13
**define** 63:25

**definitely** 52:10, 179:13, 239:13
**definition** 135:18, 223:8
**definitions** 42:21, 54:3, 63:24, 149:8, 223:7
**degree** 121:19, 140:18, 159:23, 221:14, 221:16
**deliberations** 22:13, 113:5
**deliveries** 87:12
**denomination** 221:25
**depart** 76:22
**Department** 1:31, 99:4, 215:7
**dependent** 128:1
**Depending** 23:15, 53:23, 156:8, 179:2, 179:11, 256:18, 263:23
**depends** 71:15
**deposed** 40:16
**depressed** 91:15
**depressing** 198:2
**depression** 91:9, 92:21
**descent** 8:5, 72:7, 138:2, 138:15, 138:18, 145:14, 145:17, 162:1, 242:8
**describe** 13:3, 22:6, 222:7
**described** 21:22
**description** 109:20, 219:24
**descriptive** 200:25
**deserve** 181:11
**design** 46:19, 51:15, 217:19, 236:12
**designated** 13:6, 23:22, 23:23, 32:6, 32:14, 43:1, 53:14, 54:6, 64:9, 110:8, 135:13, 149:11, 166:9, 176:22, 223:10, 233:18, 247:4
**designation** 211:12, 233:20
**designer** 51:11, 51:12, 51:14
**desire** 263:20
**desk** 260:20
**desperately** 133:4
**despite** 185:12
**destroyed** 203:8, 243:3
**detail** 57:20, 57:22, 162:25
**detailed** 180:21
**details** 12:25, 25:15, 34:10, 83:10, 180:2, 180:19, 249:13
**detention** 73:7, 77:3

**determine** 67:21, 85:20, 203:1, 242:12
**determined** 33:1
**determining** 114:16
**Development** 116:2, 150:21
**devices** 195:6
**diabetic** 16:4, 127:18, 128:1
**diapers** 197:9
**die** 130:17
**difference** 229:19
**Different** 6:14, 6:18, 11:15, 11:20, 20:19, 21:16, 25:11, 52:11, 62:9, 77:15, 80:21, 80:22, 89:13, 113:17, 124:5, 133:12, 133:15, 133:17, 135:7, 153:10, 168:23, 174:22, 174:23, 183:24, 190:25, 192:17, 201:15, 221:25, 237:21, 238:4
**differentiate** 110:3
**differently** 87:21, 229:13
**difficult** 25:25, 58:25, 86:10, 86:13, 111:8, 161:18, 184:12, 184:17, 185:11, 193:20, 195:9
**difficulty** 56:22, 83:18, 92:17, 134:21, 175:6, 195:19, 211:19, 213:15
**Dimes** 216:19
**DIRE** 1:18, 115:9, 258:15, 259:16, 259:20, 260:6, 261:3
**directly** 66:10, 156:6, 193:2
**director** 30:20, 46:12
**directors** 46:14
**disagree** 32:25, 109:20, 110:4
**disagreeing** 169:11
**disagrees** 113:20
**disappointment** 115:6
**discipline** 254:23
**disclosed** 65:16
**discount** 128:16
**discretion** 114:4
**discussed** 90:21, 191:21, 205:16, 224:24, 258:18
**discusses** 200:20
**discussing** 59:21
**discussion** 114:11, 115:11
**discussions** 187:6, 193:5, 193:7, 201:5

**DISD** 133:17, 143:12, 172:14, 172:19
**Disney** 57:23, 57:24, 58:2
**dispute** 257:19
**disregard** 254:18
**distance** 66:11, 164:24
**distant** 7:18
**distinction** 49:1, 49:2
**distinguish** 33:3
**distract** 97:15, 190:16, 217:25, 218:5, 239:3
**distracted** 239:18
**distribute** 77:17
**distribution** 137:11
**DISTRICT** 1:1, 1:2, 1:32, 38:19, 50:4, 60:12, 75:3, 133:10, 169:14, 173:11, 173:19, 218:20, 252:11, 265:18, 265:19
**dive** 119:10
**DIVISION** 1:3, 265:20
**doctor** 17:1
**document** 12:9, 12:12, 54:1, 54:2
**documents** 11:23, 63:19, 84:13, 86:9, 90:19, 91:21, 131:23
**Doing** 10:20, 15:21, 16:21, 20:21, 36:11, 42:3, 93:11, 94:18, 97:7, 97:9, 103:9, 111:14, 111:14, 118:19, 142:18, 143:12, 146:25, 153:22, 158:8, 165:13, 171:7, 179:24, 192:18, 210:1, 227:23, 229:12, 245:15
**dollar** 217:18
**dollars** 220:16
**donate** 41:23, 216:23
**donated** 216:18
**done** 16:17, 29:24, 36:8, 37:21, 43:18, 53:5, 110:5, 120:3, 120:22, 120:24, 121:13, 121:15, 123:11, 145:1, 155:13, 155:15, 177:11, 193:6, 216:16, 226:9, 226:21, 235:14, 241:12, 260:15, 262:4
**door** 26:23, 27:3, 27:13
**dotted** 227:13
**doubt** 43:18, 74:1, 74:7,
156:11, 156:25, 161:3, 161:4, 191:23, 206:7, 223:20, 244:4, 244:7, 244:10, 254:25
**Down** 22:8, 50:10, 65:11, 75:21, 76:9, 122:21, 128:4, 140:23, 141:2, 144:4, 144:10, 155:5, 155:21, 165:19, 191:19, 193:19, 209:5, 209:10, 233:8, 261:5, 262:25
**downstairs** 4:17, 65:22
**Downtown** 51:7
**drag** 170:15
**Dratel** 2:15, 2:16, 263:17
**draw** 48:25, 49:2, 231:23
**drawn** 14:4, 33:14, 92:6, 102:5, 112:17, 126:15, 135:23, 141:25, 157:14, 167:3, 177:17, 194:10
**dress** 138:7, 138:9
**drew** 29:7, 29:8
**drinking** 52:17
**drive** 34:22, 41:22, 56:9, 138:3, 196:22
**driver** 83:13, 83:15, 87:10, 139:1, 140:24, 164:19, 172:18, 173:6
**drivers** 187:24
**Drives** 120:23, 164:22
**driving** 172:24, 187:16
**drop** 101:18
**drove** 172:23
**drug** 62:10, 100:1, 125:17, 190:10, 245:11
**drugs** 77:17, 78:2, 100:6
**due** 79:9, 161:20, 256:10
**DUNCAN** 2:5
**Durant** 172:25
**During** 4:11, 9:20, 10:16, 16:2, 20:6, 29:15, 38:20, 60:13, 87:4, 90:8, 90:21, 92:23, 96:17, 103:16, 121:10, 146:7, 153:20, 154:14, 155:17, 172:12, 176:2, 185:10, 192:21, 218:22, 219:16, 245:20, 265:3
**duties** 96:15
**duty** 9:6, 86:15, 123:8, 124:12
**DWI** 225:24
**dyslexic** 80:25

**< E >**
**Eagle** 26:20
**earlier** 22:5, 56:12, 90:4, 201:5, 258:10
**early** 69:10, 76:9
**earn** 104:6
**easier** 81:2, 259:7
**easiest** 259:8
**East** 105:10, 197:20, 209:15, 228:14, 246:14
**Easter** 73:6
**eat** 16:5, 128:2, 155:21
**eating** 128:2
**ECF** 259:5
**echo** 94:9
**economic** 5:14, 56:2, 83:18
**economy** 39:21, 120:6
**edge** 118:12
**edge-wise** 4:18
**education** 209:24, 221:12, 221:13
**educational** 64:16
**effect** 159:6, 159:8
**effective** 153:14
**Eight** 42:6, 53:4, 70:23, 172:4, 173:4, 173:7, 202:5, 239:10
**eighteen-wheeler** 164:22
**eighties** 146:9
**eighty** 46:23
**Either** 23:14, 52:19, 92:25, 125:1, 190:15, 252:23, 257:8, 259:6
**El** 7:3
**El-mezain** 2:13
**Elashi** 2:31, 257:3, 257:6, 257:10, 262:24, 262:25
**Electrical** 214:21, 214:22
**electronics** 221:14
**element** 179:10, 185:9
**Elementary** 143:22, 143:23, 230:21, 230:22
**elevator** 119:14
**Elizabeth** 1:28, 30:14, 183:10, 244:20
**Ellis** 60:24
**elsewhere** 128:15, 227:8
**embarrassing** 193:21

**emergency** 139:2
**emotional** 121:17, 181:25
**emotionally** 179:11
**employed** 128:13, 129:13, 129:13
**employees** 52:1, 193:8, 219:21, 220:7
**employer** 132:14, 216:22
**employment** 39:7, 99:19, 103:8, 103:18, 128:15, 129:24, 132:10
**encounter** 118:18, 118:20
**encouraged** 41:20
**End** 13:10, 32:6, 32:11, 42:18, 62:18, 63:17, 67:6, 90:14, 91:19, 103:8, 110:8, 135:10, 149:5, 155:24, 156:19, 176:20, 205:25, 211:2, 218:25, 223:4, 233:14, 239:16, 245:15, 246:18, 246:21, 246:24, 247:16
**ended** 39:15
**enforcement** 7:14, 134:20, 134:22, 134:23, 175:3, 175:7, 175:13
**engineer** 214:19, 214:22
**engineering** 214:18
**English** 6:3, 84:10, 84:14, 84:16, 84:23
**enjoy** 63:3, 170:18, 184:24, 192:10, 192:18
**enlisted** 123:5, 228:3
**enough** 28:22, 123:15, 183:5, 209:10, 225:2, 256:13
**entire** 39:17, 41:9, 88:3, 118:25
**entitled** 156:24, 175:4, 175:8, 249:25, 251:20
**entity** 64:13, 257:10
**entry** 35:19, 35:24, 36:10, 36:12
**environmental** 40:10
**envision** 260:1, 264:1
**envisioning** 259:15
**EPA** 40:15
**equal** 134:22
**equipment** 71:11
**equivocal** 114:5
**equivocate** 120:14
**equivocation** 66:21

**escalated** 117:22
**especially** 68:14, 248:21
**essentially** 42:20, 88:15, 149:2, 235:6, 235:8, 239:10
**establish** 120:3
**estate** 21:22
**estimate** 225:19
**estimates** 66:5
**estimation** 184:16
**ET** 1:13
**etcetera** 27:11, 131:5, 226:15
**Ethiopia** 145:8
**Europe** 21:15, 53:10, 185:1
**European** 49:19
**evaluate** 59:12, 130:19, 203:25
**evaluated** 41:24
**evaluating** 174:16
**evening** 41:7, 47:4, 66:20, 216:9
**evenings** 219:17
**events** 37:3, 121:4, 124:4
**Eventually** 178:19
**Everybody** 13:20, 18:2, 59:2, 65:14, 120:1, 121:12, 161:11, 162:18, 162:24, 169:8, 169:9, 169:12, 192:14, 203:24
**everyone** 17:18, 115:11, 134:6, 134:9, 181:9, 206:23, 218:12, 225:19, 250:25, 260:18, 260:25
**everyplace** 49:19
**Everything** 7:17, 11:7, 11:14, 11:16, 12:14, 50:10, 59:5, 70:13, 71:9, 72:15, 127:14, 140:22, 162:10, 181:15, 196:3, 226:6
**everywhere** 232:3
**Ex-wife** 125:12, 173:25
**exact** 68:2, 219:2, 220:6
**exactly** 186:13, 203:1
**exam** 7:17
**EXAMINATION** 1:18
**example** 6:8, 11:21, 18:12, 21:15, 26:22, 26:25, 84:18
**examples** 6:6
**Excellent** 47:19
**except** 253:8
**excite** 238:12

**excited** 188:24, 189:2, 189:4
**excursion** 140:1
**excuse** 82:13, 93:5, 113:3, 158:1, 186:17, 256:9
**excused** 24:19, 33:20, 44:4, 55:2, 67:2, 79:1, 92:13, 102:10, 113:1, 126:21, 136:3, 142:7, 157:21, 167:8, 178:1, 186:6, 194:17, 212:6, 224:5, 234:17, 240:11, 248:4, 256:1
**excuses** 114:14
**executes** 238:3
**exercise** 18:12, 260:10
**exercising** 258:18
**exist** 257:10
**existence** 220:4
**exists** 51:1, 257:9
**expect** 14:4, 23:24, 24:12, 33:14, 43:23, 54:4, 54:8, 54:20, 61:25, 64:1, 64:8, 65:3, 78:21, 92:6, 112:17, 126:15, 131:4, 135:12, 142:1, 149:10, 149:13, 150:3, 166:8, 176:21, 176:23, 177:17, 194:10, 201:11, 206:1, 211:12, 233:17, 233:22, 234:8, 247:22, 251:5, 251:19, 263:11
**expected** 66:7
**expedite** 260:22
**experience** 6:1, 6:9, 6:22, 9:1, 23:4, 28:9, 32:7, 85:1, 90:7, 100:16, 163:16, 163:24, 168:24, 215:11, 226:2, 226:4, 242:6, 242:12, 242:18, 245:24
**experienced** 59:3, 225:8, 225:14, 254:15
**experiences** 8:2, 16:13, 28:12, 48:2, 48:3, 72:10, 72:10, 72:11, 97:21, 97:21, 111:24, 145:10, 145:19, 145:21, 168:9, 215:10, 215:10, 215:13, 229:22
**expert** 105:11
**expired** 20:1, 49:23, 60:4, 92:2, 112:14, 121:6, 126:11, 164:9, 200:4, 207:18
**explain** 107:8, 174:17, 246:4, 248:18

**explained** 105:16, 218:7, 246:3
**explaining** 259:22
**explanation** 53:12, 132:16
**explore** 85:16, 196:13, 199:2
**exporting** 212:25
**exposed** 188:9
**expressed** 67:17, 256:15
**expressing** 105:12
**expression** 132:20
**extend** 154:14
**extent** 25:12, 27:3, 28:16, 52:15, 71:7, 110:25, 118:12, 171:12, 236:5
**extra** 39:11
**extreme** 191:15
**eyed** 6:13

**< F >**
**face** 168:3
**fact** 52:9, 62:13, 108:8, 115:11, 134:10, 161:20, 177:7, 259:7
**factory** 164:18, 165:2
**facts** 11:17, 28:22, 70:4, 110:19, 112:4, 112:11, 113:16, 113:16, 113:23, 113:24, 114:2, 130:21, 130:21, 143:3, 181:21, 181:22, 211:8, 225:2, 226:2, 233:16, 246:23, 246:23, 254:20
**Fair** 7:11, 28:22, 59:25, 62:4, 67:7, 74:18, 74:20, 82:9, 85:22, 89:11, 92:20, 92:25, 130:24, 138:19, 155:25, 157:23, 170:21, 181:11, 183:5, 190:11, 192:24, 198:9, 198:12, 206:20, 207:13, 207:15, 207:17, 217:10, 238:2, 242:14, 250:2, 254:3, 254:6, 254:7, 255:9, 255:11, 256:5
**fairly** 11:12, 23:7, 28:8, 78:12, 81:18, 100:12, 125:21, 130:19, 176:11, 181:12, 203:25, 206:2, 245:21
**faith** 37:12, 47:20, 48:7, 48:10, 52:11, 52:15, 52:21,

52:23, 221:21, 221:22, 222:3, 222:4
**fall** 16:5, 170:3, 237:17
**falls** 184:11
**false** 261:13
**familiar** 201:6, 224:20, 258:20
**families** 197:10, 222:19, 222:20
**Family** 6:10, 22:19, 50:8, 56:2, 65:20, 68:17, 69:17, 73:2, 73:4, 76:1, 80:4, 96:15, 96:22, 104:6, 140:1, 140:4, 147:16, 154:25, 170:18, 175:11, 179:25, 180:14, 189:9, 189:13, 189:17, 189:21, 189:23, 210:1, 214:24, 215:1, 215:1, 219:13, 221:25, 222:8, 238:13, 238:24, 262:24
**family-owned** 143:14
**famous** 242:23
**Fannie** 178:13
**far** 4:12, 6:15, 8:16, 12:3, 33:2, 47:25, 50:11, 56:3, 56:7, 58:14, 62:8, 120:16, 123:16, 124:1, 125:22, 180:19, 209:10, 235:9, 246:25, 250:20, 252:22
**Farakhan** 16:14, 16:17, 18:10, 18:10, 18:15
**Farmer** 75:15
**farther** 34:22
**father** 5:17, 5:17, 49:13, 53:2, 133:22, 134:2, 208:17
**favor** 94:7, 115:21, 120:2
**favorite** 19:10, 98:5, 153:3, 212:15
**FBI** 35:16, 71:6
**fear** 58:18, 62:8, 85:24, 85:25, 88:23, 204:4, 206:3
**fears** 59:18
**Federal** 16:25, 29:25, 53:24, 233:6
**feeling** 119:9
**feelings** 34:17, 80:17, 80:21, 81:3, 81:5, 91:5, 109:21, 110:6, 110:11, 110:16, 110:21, 110:23, 134:6, 134:7, 134:16, 152:20, 249:18,

249:19
**fees** 265:10
**fellow** 193:8
**felt** 249:6
**Field** 51:6
**Fifteen** 26:13, 53:10, 68:6
**fifteen-minute** 194:18
**Fifth** 182:22, 186:9, 238:14
**fifty** 52:3, 260:5
**fight** 105:18
**fighters** 109:16, 109:22
**fighting** 104:15, 104:17, 106:4, 109:24, 169:10
**figure** 227:5
**figured** 152:24
**file** 259:4, 259:9
**filled** 5:7, 55:9, 64:5, 82:20, 87:20, 87:20, 99:16, 107:23, 108:3, 127:1, 136:10, 140:18, 158:6, 165:20, 174:11, 196:21, 197:1, 202:11, 202:14, 202:18, 248:11
**filling** 76:10, 193:14, 194:24
**final** 53:25
**finally** 259:23
**financial** 81:19, 103:20, 129:1, 129:6
**financially** 129:15, 171:21
**find** 7:10, 63:23, 84:3, 109:22, 129:19, 152:11, 166:20, 166:22, 172:1, 181:8, 184:14, 191:6, 199:7, 211:9, 223:18, 241:24
**Finding** 167:22
**Fine** 13:19, 46:3, 143:17, 154:23, 196:9, 206:5, 259:6
**fingerprints** 30:2
**finished** 23:14, 149:6, 217:18
**Fire** 56:25, 118:21, 216:7, 220:1
**fired** 103:10, 192:15, 192:16
**firefighting** 53:5
**firm** 31:8, 31:13, 257:17
**firs** 4:6, 203:23
**First** 2:8, 4:25, 5:11, 5:12, 11:17, 12:17, 23:11, 30:25, 49:20, 53:17, 61:9, 64:6, 65:25, 67:15, 67:16, 68:17, 84:8, 115:7, 116:21, 117:13,

128:12, 130:8, 139:2, 154:20,
158:11, 163:13, 168:3, 168:4,
168:5, 168:6, 197:1, 208:5,
209:8, 223:9, 230:10, 248:9,
261:6, 262:19, 263:19
**fit** 198:11
**fiv** 171:19
**Five** 22:11, 37:23, 42:3,
52:13, 56:11, 63:10, 69:7,
77:1, 96:20, 118:24, 127:14,
151:23, 155:10, 218:1, 220:9,
238:5
**flag** 17:17
**flags** 137:7
**Fletcher** 178:2, 183:8,
185:22, 186:8, 186:17
**flight** 27:9
**Flint** 144:2, 144:5, 144:7,
148:22
**Floor** 2:17, 261:6
**floors** 169:18, 169:19
**Florida** 2:37
**fluctuates** 52:3, 116:23
**Fluent** 5:24, 165:22
**flying** 263:7
**focus** 25:23, 60:2
**follow** 12:22, 13:12, 13:20,
13:24, 19:6, 32:20, 33:1,
33:9, 43:11, 47:15, 54:15,
62:25, 63:4, 64:21, 67:3,
80:2, 86:11, 149:21, 156:22,
177:1, 185:7, 185:15, 223:18,
235:22, 235:23, 247:17,
247:18, 255:10
**follow-up** 9:11, 99:5, 172:13,
174:12, 218:23, 230:7, 263:4
**followed** 16:16, 47:9, 70:5,
104:9, 141:10, 169:5, 191:14,
197:21, 221:21, 228:10,
235:21, 237:4, 237:7
**following** 12:25, 24:6,
211:19, 234:3
**food** 13:16, 24:3, 32:17,
37:15, 38:4, 43:6, 54:11,
64:16, 94:16, 130:4, 143:20,
149:17, 176:25, 197:9, 203:7,
223:14, 243:1, 247:10
**foolish** 105:12
**Force** 45:10, 45:13, 187:18,
238:14

**foregoing** 265:7
**foregoing-styled** 265:4
**foreign** 11:19, 23:22, 24:1,
25:9, 131:21
**foreman** 22:15
**forensic** 226:10, 226:16,
226:20, 227:10
**forget** 90:22, 162:18, 251:14,
255:4
**forgetful** 86:4
**forgive** 127:21
**forks** 241:7
**form** 29:12, 56:24, 76:14,
120:18, 130:4, 131:4, 197:9,
200:1, 203:7, 225:3, 243:1,
259:11
**formalities** 126:2
**format** 265:10
**formed** 70:9, 80:5, 103:3,
151:6, 188:15, 191:16,
235:17
**forms** 196:3
**formulated** 113:4, 113:6
**Fort** 2:46, 39:18, 63:7
**forthcoming** 68:1
**fortunate** 211:3
**Forty** 20:23, 48:21
**forward** 195:2, 259:25
**found** 39:21, 43:15, 43:18,
48:10, 133:6, 135:16, 166:17,
199:19, 236:3, 254:13
**four-month** 92:19, 119:3,
139:19
**four-month-long** 189:5
**Fourteen** 209:23
**frame** 25:15, 232:24
**France** 21:14, 184:21
**fraud** 62:10
**free** 17:4, 18:3, 98:15, 98:19,
208:22, 209:1
**FREEDMAN** 2:6
**freedom** 17:5, 17:9, 18:13,
49:10, 49:14, 49:17, 49:21,
98:9, 109:16, 109:22, 131:5,
132:19
**freedom-fighting** 113:7
**freelance** 51:10, 51:12
**freelanced** 51:18
**freely** 17:6
**Friday** 15:16, 15:17, 15:25,

83:7, 87:16, 87:17, 87:18,
96:21, 115:5, 151:24, 241:15,
258:14, 258:17, 258:23,
261:2
**Fried** 146:15
**friend** 6:10, 29:10, 31:5,
70:23, 76:19, 100:19, 175:12
**friends** 47:24, 69:18, 77:14,
78:5, 105:3, 105:8, 145:8,
163:16, 175:24, 176:1,
180:14, 190:22, 219:13
**front** 89:10, 254:19
**fuel** 117:20
**fulfill** 86:15
**full** 31:2, 128:8, 128:13,
128:15, 129:23, 132:10,
132:13, 133:2, 133:7, 151:17,
191:25, 209:17, 210:7
**fully** 174:19, 256:24
**function** 124:1
**functions** 124:5
**fundraisers** 37:2
**funds** 226:6
**funneling** 235:7
**furniture** 169:18

**< G >**
**Galveston** 76:23
**game** 95:5
**games** 72:19
**gangs** 37:10, 38:4, 38:9
**gaps** 227:8
**garages** 87:13
**Garland** 75:19, 123:24,
222:13, 222:14
**Garrett** 1:29, 208:2, 230:3
**gas** 28:2, 183:17, 183:20
**gauge** 20:19
**gave** 13:23, 14:24, 25:8,
29:10, 32:11, 34:5, 44:13,
45:1, 67:1, 70:23, 93:24,
105:24, 116:6, 128:14,
129:23, 142:25, 150:23,
166:18, 167:18, 224:17,
247:15, 248:11
**Gaza** 130:3, 197:11, 203:6,
246:14, 250:10
**gears** 220:18
**ged** 73:15

**general** 96:16, 115:9, 134:9, 135:1, 232:9, 234:23, 258:15, 259:15, 259:20, 261:3
**Generally** 42:7, 53:12, 119:14, 131:25
**generators** 220:18
**Gentlemen** 4:2, 7:24, 51:2, 52:7, 58:23, 66:21, 82:15, 114:9, 138:14, 156:1, 156:22, 181:11, 182:8, 182:21, 185:4, 186:9, 188:17, 206:1, 206:12, 210:24, 237:19, 242:10, 243:16, 249:25, 251:19, 251:25, 252:4, 256:4, 256:10, 264:4
**Geographic** 143:10
**George** 148:5
**Germany** 21:14
**gets** 49:5, 147:18, 171:19
**getting** 27:2, 37:10, 56:17, 69:19, 91:14, 152:23, 171:5, 195:21
**Gilstrap** 31:10
**girl** 9:23
**Given** 4:5, 12:9, 49:15, 53:12, 54:9, 54:14, 58:21, 64:12, 64:19, 80:16, 96:21, 102:21, 114:25, 181:14, 181:22, 184:16, 185:9, 189:12, 203:13, 220:8, 223:13, 251:25, 256:13, 259:7, 259:16
**gives** 23:15, 32:25
**giving** 11:21, 33:6, 38:4, 38:6, 64:23, 106:2, 134:22, 166:23, 187:3, 200:3, 227:24, 235:1
**glad** 188:24
**glance** 25:13
**glasses** 70:22, 151:13, 151:13, 151:15
**Gonzales** 82:14, 82:17, 86:22, 86:24, 91:19, 92:3, 92:4, 93:5
**goods** 64:12
**gotten** 108:23, 109:9, 132:13, 250:20
**grade** 31:1
**graduate** 165:8
**graduated** 154:19, 165:12

**Graham** 142:13, 142:15, 146:1, 146:2, 150:1
**Grand** 8:16, 8:19, 8:24, 11:9, 11:10, 40:25
**grandson** 103:25, 104:3
**granted** 114:15
**graphic** 46:11, 51:14
**graphics** 51:10, 217:7
**grave** 218:3
**Great** 105:8, 247:19
**greater** 175:4, 263:9
**Greg** 2:42, 14:15, 24:24, 33:23, 44:6, 68:11, 79:18, 93:13, 102:17, 115:19, 142:17, 150:17, 167:13, 186:23, 212:11, 224:8, 234:20
**grew** 7:6, 63:8, 75:25, 122:4, 202:6
**Griftner** 79:3, 81:12, 82:1
**grounds** 18:8, 67:1, 113:8
**group** 37:1, 37:11, 70:2, 88:18, 89:10, 95:8, 104:16, 105:18, 109:22, 110:8, 113:7, 148:25, 149:11, 187:18, 200:1, 233:15, 233:17, 260:4
**groups** 98:6, 237:17
**grow** 75:24, 141:5
**grown** 21:6, 87:23, 125:8
**Grummen** 75:7, 75:17
**Guarantee** 61:8
**Guaranty** 61:16
**guard** 95:25
**guess** 5:21, 22:4, 27:21, 30:3, 36:15, 39:6, 45:9, 47:7, 59:5, 85:15, 89:1, 99:20, 107:24, 118:11, 134:1, 157:1, 201:12, 203:2, 203:22, 204:16, 204:25, 206:24, 210:19, 214:20, 226:16, 227:2, 236:6, 252:14, 258:9, 259:24, 262:12
**guidance** 258:23
**guided** 70:13
**guilt** 25:21, 80:6, 153:16, 188:16, 235:18
**guilty** 43:17, 49:20, 63:23, 103:4, 151:7, 156:12, 156:13, 166:20, 166:22, 177:3, 177:10, 182:15, 182:18,

191:24, 199:7, 206:24, 213:7, 213:10, 213:11, 223:6, 223:18, 225:1, 225:1, 236:3, 236:7, 250:22, 251:1, 253:17
**guitar** 37:2, 41:25, 42:1
**Gulf** 19:20
**gutter** 81:21
**guy** 28:1, 28:2, 28:10, 48:4, 231:23, 242:22
**Guyana** 124:17
**guys** 191:7, 191:10, 250:21


**< H >**
**hair** 162:11, 162:11, 162:19, 162:21, 163:8, 163:9
**half** 42:7, 50:19, 51:19, 60:19, 75:8, 80:2, 122:13, 129:13, 194:3
**handicapped** 147:3, 147:9
**handle** 217:22, 218:10, 257:1
**handles** 219:16
**handling** 230:5
**hands** 104:20
**hang** 190:23
**happen** 23:17, 181:24
**happened** 27:17, 127:15, 133:18, 155:3, 156:5, 254:14
**happening** 129:15, 188:12, 228:14, 237:9
**happens** 91:3, 105:9, 152:7, 185:19
**happy** 195:24
**hard** 48:21, 52:20, 59:2, 80:8, 80:9, 81:9, 90:12, 119:24, 154:5, 156:2, 199:7, 228:23, 229:1, 237:6, 251:17
**hardcore** 120:4
**hardest** 59:14
**hardship** 5:15, 25:24, 25:24, 26:1, 26:2, 56:2, 66:2, 76:16, 83:18, 96:14, 102:12, 103:21, 114:3, 114:5, 114:5, 114:14, 142:10, 195:19, 241:17, 256:16
**hardships** 76:13
**Hardware** 128:13
**hated** 29:10
**hauling** 173:1

**Haven** 123:21
**Hawaii** 231:21, 232:5, 232:6
**hazardous** 40:15
**He'll** 91:22
**head** 107:13, 127:7, 138:13, 170:6, 208:6
**headed** 228:23, 229:1
**headlines** 25:5
**headquartered** 61:10
**heads** 162:22
**hearing** 6:17, 12:8, 50:12, 78:20, 151:11, 158:17, 195:1, 195:3, 195:6, 195:15, 197:3, 202:15, 263:8, 263:10
**hearsay** 180:21
**heart** 9:4, 17:7, 157:6
**heartfelt** 137:4, 181:10, 204:7, 204:9
**Hebrew** 11:24
**held** 87:9
**Hello** 60:9, 158:4, 252:9
**help** 5:18, 16:2, 37:2, 39:11, 56:5, 90:23, 197:10, 210:15, 216:2, 216:5, 229:18, 238:25
**helpful** 121:23, 261:17
**helping** 16:1, 159:10
**herself** 152:23, 153:23
**hesitancy** 254:25
**hesitation** 32:23, 207:3, 217:13, 238:20, 244:13, 251:21
**hesitations** 206:18
**High** 80:21, 95:22, 111:23, 122:7, 122:10, 159:13, 169:21, 205:2, 209:11, 209:19, 230:21, 242:3
**highly** 18:11
**Hill** 31:10
**historically** 48:11
**History** 39:8, 106:2, 109:8, 109:12, 143:9
**hit** 25:4
**Hodge** 240:12, 240:14, 244:18, 247:20
**hold** 139:8, 139:15, 156:5, 178:24, 179:7, 182:8, 185:6
**hole** 130:17
**holidays** 184:22
**Hollander** 2:4, 2:7, 256:22, 257:15

**home** 30:19, 41:2, 41:4, 41:8, 47:5, 61:12, 104:19, 125:7, 125:8, 147:4, 159:6, 165:17, 165:24, 170:7, 174:3, 174:6, 174:7, 184:1, 184:5, 187:16, 190:9, 196:22, 197:3, 208:25, 230:15, 232:12, 262:23
**homemaker** 39:5
**homes** 130:5, 203:8, 243:2
**honest** 110:12, 137:4, 154:5, 181:10, 185:9, 196:17, 249:19
**Honestly** 12:13, 13:9, 80:9, 81:8, 182:20, 185:17, 185:18, 208:7, 238:12, 238:22, 251:16
**hope** 38:12, 57:5, 123:13, 169:7, 169:8
**Hopefully** 132:18, 238:3
**Hospital** 16:25, 16:25, 20:25, 63:9, 214:17, 220:12
**hostile** 118:21
**hot** 229:10
**hour** 42:7, 42:7, 56:9, 66:12, 114:9, 155:21, 194:3, 219:17, 219:19, 256:10, 258:16, 260:8, 260:10, 261:4, 262:10, 264:2
**hours** 15:24, 16:3, 42:5, 42:6, 67:13, 96:17, 103:16, 106:21, 128:3, 155:9, 155:13, 155:14, 171:18, 193:25, 218:2, 222:10, 239:10
**house** 21:6, 101:10, 128:23, 132:20, 154:20, 170:9, 170:18, 174:4
**housekeeping** 258:9
**Huffman** 234:18, 240:1, 240:3
**human** 48:18, 48:23, 56:24, 110:21, 179:6, 179:10, 185:9, 217:4
**humanitarian** 13:16, 24:3, 32:16, 33:4, 33:7, 85:6, 130:2, 130:4, 137:11, 177:4, 197:8, 197:8, 197:14, 199:12, 200:24, 203:5, 203:9, 223:14, 233:23, 242:25, 243:1, 243:4, 247:9, 247:11, 250:9, 250:13

**hundred** 80:15, 124:11, 206:14, 222:17, 251:21
**hung** 94:23
**hurt** 229:11, 238:24, 239:17
**husband** 15:15, 16:1, 20:13, 22:18, 36:25, 37:1, 37:22, 40:9, 41:5, 41:16, 41:23, 42:2, 129:12, 183:15, 184:5, 205:15, 205:22, 208:14

**< I >**
**ICE** 45:15
**idea** 42:4, 105:11, 105:18, 128:3, 258:14, 261:2, 261:10
**ideally** 190:6
**ideas** 105:22, 105:23, 111:24, 242:13, 251:25
**IED** 118:18, 118:20
**II** 127:25
**illegal** 43:5, 49:3, 49:8, 135:15, 166:11, 176:24, 233:25
**illegally** 212:25
**images** 136:16
**imagine** 17:12, 26:18, 140:12, 259:12
**Immediately** 27:13, 38:24, 127:8
**impact** 92:22, 129:5, 129:11, 130:19, 134:8, 218:8
**impaired** 96:16, 96:23, 239:3
**impaneled** 80:11
**impartial** 67:7, 82:9, 85:22, 130:25, 156:1, 157:23, 190:12, 192:24, 198:12, 198:13, 217:10, 250:2, 254:3, 254:6, 254:8, 255:9, 255:11, 256:5
**implications** 257:21
**important** 85:17, 181:2, 182:3, 182:12
**importantly** 92:22
**impose** 5:14
**impossible** 25:25
**improve** 226:15
**in.** 130:17, 147:18
**inability** 157:23
**inactive** 232:17
**incident** 155:1

**incidents** 27:12
**include** 32:15, 149:13, 233:11, 233:22
**included** 128:4
**includes** 259:20
**including** 64:14
**income** 111:4
**inconvenience** 34:24
**Inconvenient** 34:19, 34:21, 47:6
**incorrect** 43:15
**Independent** 133:10, 169:13, 173:19
**India** 213:20, 213:23, 214:12, 214:25, 216:13, 218:23, 221:12, 221:14, 221:22
**indicate** 67:6
**indicated** 20:12, 22:17, 30:15, 31:4, 66:7, 66:16, 66:17, 77:13, 88:20, 100:19, 123:16, 127:18, 133:22, 183:12, 189:4, 195:1, 248:14, 248:24, 251:6, 256:4, 262:21
**indictment** 176:18, 200:22, 200:22, 200:23, 201:3
**Indirectly** 156:7
**individual** 77:15, 210:1
**individuals** 42:12, 77:16, 107:3, 108:1, 110:3, 229:14
**industry** 140:23, 226:7
**inferring** 257:24
**inflammatory** 131:8, 131:14, 131:16
**influence** 110:10, 205:21
**influenced** 15:5, 254:10
**inform** 190:16
**information** 4:5, 20:11, 57:9, 58:8, 86:14, 108:23, 109:9, 120:17, 130:12, 131:25, 176:10, 262:21
**informed** 109:3
**inheritance** 81:16
**initially** 117:19
**innocence** 25:21, 63:3, 66:22, 67:5, 73:21, 73:22, 74:5, 80:7, 153:16, 156:23, 160:20, 161:1, 161:9, 188:16, 191:22, 191:25, 206:9, 206:10, 206:13, 206:15,

206:22, 235:18, 238:16, 238:18, 243:11, 243:16, 251:3, 251:19, 252:4, 253:14, 253:22, 256:4
**innocent** 58:23, 74:6, 103:4, 160:25, 161:1, 191:23, 206:24, 243:12, 250:25, 251:20, 253:17
**input** 262:2
**inquire** 127:21
**inquiring** 205:10
**inside** 80:16, 161:14
**inspector** 241:1
**install** 220:18, 236:23
**instances** 27:17
**Instead** 105:12
**Institute** 46:7
**instruct** 12:19, 135:12, 166:8, 175:2, 185:3, 185:6, 201:11, 211:10, 211:10, 247:2, 247:4, 262:11
**instructed** 32:18
**instruction** 12:22, 13:13, 13:24, 24:6, 32:20, 33:6, 33:9, 43:12, 54:14, 54:15, 64:1, 64:21, 135:5, 135:16, 177:2, 185:7, 185:15, 201:13, 211:18, 211:20, 223:17, 223:18, 233:22, 234:2
**instructions** 13:11, 23:16, 23:18, 32:11, 32:13, 42:19, 43:1, 43:3, 54:5, 54:8, 63:1, 63:4, 63:20, 64:2, 64:11, 64:18, 67:3, 91:23, 92:1, 115:1, 149:10, 149:13, 156:22, 166:17, 211:5, 211:5, 211:12, 233:15, 233:17, 246:22, 247:16, 255:10
**instructor** 163:12, 163:13
**instructs** 135:2, 199:18, 246:20
**Instruments** 20:15, 38:25, 39:9
**insulin** 128:1
**insults** 17:18
**insurance** 29:9
**intending** 15:23, 67:12
**intent** 77:16, 246:15, 247:6
**intention** 37:24
**intentions** 178:15

**interaction** 119:19
**interest** 188:11
**interested** 29:22, 108:24, 171:25
**interesting** 48:9, 48:10, 48:12, 134:13, 188:18
**interfere** 68:24, 80:18, 127:22
**international** 193:13
**Internationally** 229:8
**interpreters** 117:25
**interviewed** 35:16, 115:8
**interviewing** 65:2, 194:9
**intimidating** 58:16, 58:17, 66:17
**introduced** 11:23, 131:3
**introduction** 259:18
**investigated** 71:5
**investigation** 29:25, 71:8, 114:4
**investment** 56:19, 81:19
**investments** 56:20
**involve** 32:5, 144:18
**involved** 14:23, 34:5, 37:23, 72:25, 73:2, 78:2, 105:11, 142:25, 150:22, 170:4, 175:10, 179:12, 180:20, 182:1, 187:6, 191:11, 205:13, 226:6
**involvement** 125:17
**involves** 7:24, 14:22, 25:6, 34:3, 70:1, 74:21, 79:23, 83:1, 85:3, 85:9, 102:20, 116:5, 120:8, 127:3, 129:25, 130:23, 136:12, 137:9, 142:23, 144:16, 150:21, 153:13, 158:12, 159:25, 161:7, 167:16, 180:5, 190:10, 196:18, 198:7, 202:2, 203:3, 203:20, 224:14, 240:17, 249:7, 251:4
**involving** 179:17, 244:8
**Iran** 27:18, 28:6, 28:6, 52:15
**Iranian** 48:4, 51:2, 52:9
**Iraq** 19:21, 68:4, 117:5, 117:24
**irritability** 118:14
**IRS** 133:22, 134:5, 134:6, 134:7, 134:14
**Irving** 30:23, 40:23

**Israel** 104:16, 106:3, 131:22, 248:14, 248:15, 248:21, 248:23, 248:25, 249:6, 250:5, 251:4, 251:7, 252:16
**Israeli** 108:2, 249:2
**Israeli-palestinian** 228:11, 252:16
**issue** 34:24, 44:25, 47:2, 56:17, 113:21, 113:24, 182:7, 184:9, 189:22, 190:11, 228:21, 233:18, 238:23, 239:14, 239:15, 239:16, 252:19, 256:20, 256:24, 257:1, 257:7, 257:15, 257:17, 258:6, 258:9, 263:5
**issues** 63:1, 66:14, 66:20, 80:22, 96:22, 96:22, 125:17, 126:4, 133:22, 140:15, 144:19, 171:23, 190:14, 196:14, 198:11, 199:1, 251:4
**Italian** 201:22, 201:23
**item** 24:3
**items** 52:11, 54:10, 64:16, 135:17, 149:17, 160:5, 176:25, 177:5, 211:17
**itself** 108:5, 109:2, 250:17
**Ivan** 67:16

**< J >**
**Jacks** 1:26, 20:4, 38:17, 50:3, 60:10, 66:23, 75:2, 76:1, 87:1, 92:2, 92:23, 93:2, 106:10, 112:14, 113:14, 113:19, 121:8, 124:12, 126:11, 146:4, 154:11, 157:24, 172:9, 201:5, 218:19, 222:20, 252:10, 252:22, 262:8
**Jackson** 256:6
**Jacob** 262:20
**jail** 77:11, 100:5, 100:8, 134:3, 175:15, 245:15, 245:18
**January** 219:1
**Jensen** 33:21, 33:23, 38:14, 38:16, 43:21
**jeopardy** 152:7
**jersies** 95:14
**Jim** 1:26, 20:4, 38:17, 50:3,

60:10, 75:2, 87:1, 106:10, 121:8, 146:4, 154:11, 169:22, 172:9, 218:19, 252:10
**jobs** 11:6, 11:6, 29:13, 128:8, 128:11
**John** 235:21, 257:2
**joined** 39:2
**Joint** 10:5, 68:22, 256:21, 257:11, 258:8
**Jonas** 1:27, 99:3, 99:4, 101:1, 101:18, 132:8, 133:8, 140:10, 164:15, 192:6
**Jones** 115:15, 115:19, 121:7, 126:13
**JOSHUA** 2:15, 2:16
**judged** 59:22
**judging** 161:16, 222:3, 249:23
**judgment** 12:7, 13:21, 131:10, 138:17
**judgmental** 59:25, 62:4
**Judicial** 265:11
**July** 262:19
**June** 107:24, 129:22
**juries** 21:21, 32:8, 225:9, 225:12, 232:19
**Jurors** 7:10, 62:15, 66:8, 114:23, 114:23, 149:14, 182:4, 190:6, 250:1
**Justice** 1:31, 23:5, 78:13, 99:4, 100:13, 105:19, 125:21, 176:11, 190:5, 245:21

**< K >**
**Kansas** 231:18
**Karikal** 213:20, 214:10
**keep** 66:1, 86:14, 94:8, 128:16, 201:16, 210:5, 237:9
**Keeping** 92:18, 92:18
**keeps** 216:8, 230:19, 238:3
**Kelly** 98:7
**kept** 66:18, 173:8
**key** 228:13
**Kiblinger** 4:24, 186:19
**kids** 41:11, 153:5, 170:1, 208:25, 210:15, 216:10
**killed** 152:22
**killing** 217:4
**kinds** 20:19, 71:10, 180:22,

182:3, 199:2, 237:21, 260:6
**knob** 131:17
**knocking** 96:20, 171:18
**Knowing** 58:7, 59:19, 83:17, 85:9, 130:11, 130:22, 243:14
**knowingly** 33:6, 64:20, 233:11
**knowledge** 12:16, 25:12
**known** 23:10, 47:23, 99:11, 115:25, 166:4
**knows** 186:12, 218:12
**Kurian** 212:7, 212:11, 218:17, 218:19, 223:22
**KVRA** 47:11

**< L >**
**L.** 2:16, 3:1, 265:3, 265:17
**Ladies** 4:2, 65:11, 82:15, 114:9, 162:21, 256:10, 264:4
**lady** 65:22, 66:3, 66:15, 162:23, 183:2, 241:8
**laid** 39:11, 39:20, 99:19
**landscaping** 208:15
**Lane** 151:20
**language** 11:19, 11:24, 11:24, 84:8, 132:20, 214:5, 214:9, 214:10
**Laredo** 7:4
**large** 238:13, 260:4
**laser** 70:13
**lasers** 71:17
**Last** 15:16, 15:17, 22:10, 48:21, 55:25, 57:4, 60:18, 67:12, 67:15, 78:21, 79:14, 80:12, 81:16, 97:9, 108:12, 118:24, 125:11, 128:25, 129:13, 132:16, 133:5, 134:10, 152:1, 165:11, 192:13, 202:8, 209:18, 210:6, 225:24, 241:14, 256:11
**lasted** 263:1
**lasting** 65:21
**lasts** 129:3
**Late** 123:5, 146:9, 150:4, 175:23
**lately** 83:3, 179:21
**later** 64:15, 132:14, 152:22, 254:13
**laundering** 212:24, 235:7

**Laundry** 172:21
**laws** 63:25
**lawyer** 31:5, 96:8, 126:5
**lawyers** 14:15, 24:24, 33:24, 44:7, 68:12, 79:19, 93:14, 102:18, 115:20, 142:20, 167:13, 212:11, 224:9
**lay** 155:21
**layman** 51:13
**layoff** 144:8, 144:9
**leaflets** 131:24
**league** 95:11, 95:12
**leaks** 241:11
**leaning** 195:2
**learn** 26:14, 171:2, 213:3
**learned** 78:11, 112:7, 212:17, 255:4
**least** 62:15, 114:16, 126:16, 150:4, 225:5, 227:9, 239:8, 256:25, 257:21
**leave** 56:10, 66:9, 144:7, 214:14, 262:12
**led** 173:5
**leery** 118:11, 119:24
**left** 36:12, 125:8, 214:12, 214:15, 218:23, 256:20
**legal** 49:2, 49:5, 49:6, 81:4, 173:14, 253:18
**Legally** 9:14, 96:25, 101:6
**length** 139:18, 184:8, 184:17
**lens** 75:12
**lenses** 70:12, 70:14, 70:22
**less** 5:14, 52:2, 132:18, 134:25, 241:16, 260:11
**lesser** 175:4
**lessons** 29:10, 37:9, 42:1
**letter** 26:2, 89:2, 122:19, 259:4, 259:7, 263:15, 263:17, 263:19
**Letting** 19:14
**level** 117:11
**liaison** 40:14
**libraries** 243:3
**library** 130:5
**license** 210:5
**licensed** 209:20
**life** 8:2, 39:17, 40:1, 46:1, 63:7, 76:6, 81:20, 81:21, 84:15, 88:3, 122:3, 127:14, 133:18, 158:21, 159:6, 202:4,

218:3
**Lighthouse** 101:8
**likely** 38:9, 152:6, 247:5
**limited** 167:24
**limits** 4:15
**Lincoln** 122:10
**Linda** 2:34, 2:35, 5:5, 55:7, 82:18, 126:24, 136:8, 194:23, 201:24, 240:16, 248:9
**line** 143:19, 190:24, 230:19
**Linen** 173:2
**lines** 127:7
**list** 20:11, 102:14, 124:6, 209:10, 259:19, 262:20, 263:18
**listed** 40:9, 236:9
**listen** 14:9, 19:7, 24:17, 28:24, 33:19, 44:3, 47:11, 54:25, 62:4, 65:7, 78:25, 82:7, 92:12, 95:3, 98:2, 102:9, 112:23, 126:20, 131:16, 142:6, 156:21, 156:21, 166:16, 167:7, 177:23, 186:5, 194:16, 200:17, 212:5, 224:4, 234:14, 240:10, 248:3, 255:8, 255:25
**listened** 168:22
**listening** 27:8, 47:13, 134:8
**lists** 115:3
**live** 10:3, 21:6, 21:8, 40:4, 46:1, 56:6, 75:22, 87:24, 101:14, 104:3, 125:10, 130:16, 136:18, 144:2, 147:4, 159:9, 164:16, 165:17, 173:24, 181:16, 182:1, 231:5
**Lived** 39:17, 39:20, 39:25, 45:24, 45:25, 50:7, 63:6, 76:5, 88:2, 105:15, 202:4, 219:8, 221:5, 231:9
**lives** 147:6
**living** 88:5, 183:16, 231:11
**Liz** 9:10, 30:11
**local** 117:21, 119:20, 125:14, 164:25
**locale** 131:18
**Locally** 172:22, 229:6
**locals** 119:18
**located** 40:22, 75:14, 75:15, 75:17, 106:18, 146:16, 222:12

**location** 66:8, 107:17, 107:19
**lock** 26:23, 27:13
**logos** 46:20, 51:15
**longer** 5:13, 15:9, 51:1, 55:25, 83:17, 96:11, 171:17, 192:13, 263:10
**longevity** 79:8
**look** 7:14, 11:16, 110:19, 112:4, 113:15, 113:16, 114:2, 132:12, 143:9, 152:5, 152:13, 168:2, 206:2, 226:17, 228:13, 245:25, 259:25, 261:21
**looked** 29:11, 56:23, 191:12
**looking** 41:22, 41:25, 85:19, 85:20, 103:15, 128:9, 128:15, 132:23, 134:12, 137:3, 158:25, 159:8, 161:13, 165:6, 182:5, 190:8, 190:18, 193:12, 196:17, 225:19, 226:2, 227:2, 227:6, 232:9, 232:18
**looks** 27:5, 184:4, 184:18, 227:11, 227:12, 227:14, 232:18, 244:25, 245:10
**lose** 26:1, 96:14, 103:10, 111:2, 141:21, 171:11, 171:20
**loss** 113:8, 154:7, 154:15
**Lots** 57:24, 190:24
**loud** 195:4
**Louisiana** 141:6, 144:11
**Love** 19:19, 38:6, 51:6, 139:20, 144:14
**lunch** 115:12, 155:21, 259:2
**lyrics** 17:17

**< M >**
**ma'am** 5:25, 10:11, 10:16, 11:13, 13:25, 24:19, 30:17, 30:20, 31:3, 31:14, 31:24, 32:12, 32:21, 33:10, 44:4, 64:25, 142:11, 186:6, 248:4, 249:17, 255:16, 256:1, 263:3
**machines** 195:4
**Mae** 178:13
**Mail** 36:13, 36:14, 36:15, 36:20, 132:15
**main** 10:6, 35:8, 105:18
**mainly** 6:11, 10:6, 19:15,

138:8, 169:24
**maintain** 32:2
**major** 225:22
**Majority** 9:5, 221:13
**Malayalam** 214:3, 214:4
**Malaysia** 214:8
**malfeasance** 226:13
**Mallick** 2:44
**manage** 217:17
**managed** 32:2
**management** 140:18
**manager** 50:22, 183:18, 214:18
**managers** 57:3
**manages** 45:21
**manner** 223:16
**manpower** 239:15
**mans** 45:19
**manuals** 46:19
**manufacturing** 75:12
**March** 11:2, 69:10, 123:7, 216:19
**Marijuana** 78:3
**marked** 21:14, 209:3
**market** 120:6
**MARLO** 2:25, 2:26
**marriage** 22:18
**married** 9:13, 9:14, 20:13, 30:16, 69:19, 76:4, 83:21, 152:24, 153:24, 174:2, 183:13, 208:10, 230:12
**marshal** 49:20
**Master** 116:18
**materials** 40:15, 64:17, 64:18
**matter** 21:23, 62:20, 109:22, 112:3, 124:23, 137:3, 138:21, 259:10, 263:13
**matters** 65:10, 193:12, 259:21
**MBA** 178:10
**Mckinney** 2:27
**Mcveigh** 236:9, 236:10
**mean** 7:6, 12:3, 12:6, 12:23, 13:19, 17:4, 20:16, 22:18, 25:24, 28:15, 45:1, 45:25, 48:5, 59:15, 80:23, 98:11, 104:24, 122:22, 141:20, 157:7, 161:20, 178:25, 179:4, 204:15, 206:23, 207:10,

250:19
**meaning** 6:4, 6:20, 12:5, 12:6, 84:24
**meanings** 6:19, 11:21, 12:3, 12:15
**means** 12:17, 74:5, 87:3, 149:16, 160:23, 190:13, 247:5
**meant** 179:1
**meantime** 126:16
**mechanic** 28:15
**mechanical** 214:19
**medical** 24:4, 43:6, 149:17, 177:1, 193:19, 196:5, 196:6, 211:17, 223:15, 233:24
**medication** 15:22, 91:8, 91:16, 92:21, 128:1
**medicine** 54:12, 160:3, 197:9, 203:7, 243:2
**Medina** 4:18
**meet** 15:23, 219:5, 219:9
**member** 4:25, 62:25, 67:10, 92:5, 123:17, 139:13, 175:11, 221:18
**members** 14:3, 24:11, 27:9, 43:22, 54:19, 102:4, 112:16, 126:14, 135:22, 140:3, 141:24, 150:2, 157:13, 167:2, 177:16, 180:14, 185:23, 194:9, 200:10, 201:9, 211:23, 222:3, 222:19, 223:23, 234:7, 240:4, 247:21, 255:18
**memory** 91:4, 136:25, 260:12, 261:21
**men** 14:23, 19:2, 25:8, 28:19, 34:5, 34:16, 44:12, 44:25, 71:25, 93:24, 97:24, 102:20, 116:6, 120:9, 123:17, 123:25, 124:5, 142:25, 149:3, 150:22, 152:10, 168:15, 176:16, 191:22, 191:24, 217:9, 224:16, 238:6
**mention** 76:14
**Mentioned** 41:24, 42:9, 52:15, 99:25, 101:5, 127:25, 135:9, 195:17, 208:9, 210:21, 217:3, 226:1, 231:19, 235:12, 235:14, 251:18, 252:14, 258:10
**mentions** 248:22

**Merchandisers** 39:16
**message** 218:12
**met** 219:7
**method** 258:17, 262:3
**Mexico** 21:15, 21:19, 45:18, 53:8, 76:24, 88:9
**Michelle** 146:15
**Michigan** 145:3
**microphone** 4:7, 4:12
**midday** 114:10
**Middle** 105:10, 169:23, 197:20, 228:14, 246:14
**miles** 56:8
**military** 26:14, 30:6, 67:17, 70:13, 70:16, 70:18, 70:19, 71:11, 227:18, 227:19, 231:19, 232:13
**Miller** 169:22
**million** 217:18, 220:15
**mind** 20:8, 38:22, 59:21, 59:23, 60:15, 65:13, 66:1, 67:13, 67:14, 75:6, 78:15, 92:18, 98:12, 98:13, 98:16, 98:19, 105:22, 111:7, 125:23, 138:19, 144:20, 153:19, 153:20, 153:21, 172:13, 182:25, 187:15, 189:15, 190:2, 190:15, 192:21, 207:12, 231:14
**mine** 29:10, 46:1, 69:18, 70:23, 76:19
**minor** 26:21
**minute** 55:11
**minutes** 5:10, 14:16, 24:25, 44:8, 68:6, 68:16, 82:25, 93:15, 115:21, 142:22, 150:19, 167:14, 212:12, 224:10, 260:7, 261:4
**misappropriated** 227:3
**missed** 188:8
**missile** 35:18, 36:2
**missiles** 35:20
**missing** 79:10
**mission** 117:6, 117:20, 130:20
**Missionary** 123:21
**missions** 117:8, 117:23, 118:15, 118:16, 118:16
**mistake** 99:23, 134:23
**mixed** 109:21, 110:6,

110:11, 152:20
**Mobile** 243:3
**Mohamed** 242:23
**Molestation** 22:6
**mom** 55:21, 56:5, 61:6, 65:20, 76:3, 84:9, 164:18, 165:1
**moment** 33:25, 87:6, 262:13
**Monday** 15:24, 34:12, 46:23, 87:15, 87:17, 87:18, 96:17, 103:16, 119:1, 151:24, 171:17, 218:1, 239:11, 259:24, 259:25, 263:8, 263:21
**monitor** 15:21, 20:19
**month** 7:19, 29:14, 29:20, 42:5, 42:7, 65:17, 78:7, 81:15, 128:23, 139:25, 173:12
**Mooney** 224:6, 230:2, 234:6
**MORALES** 67:19, 67:19, 67:21, 68:3
**morally** 43:10, 43:15
**Moreno** 2:34, 2:35, 5:5, 11:8, 11:18, 13:2, 55:7, 57:9, 60:4, 82:18, 126:25, 131:2, 132:3, 135:9, 136:8, 161:12, 164:9, 166:3, 179:7, 180:11, 180:14, 184:7, 185:1, 194:23, 200:4, 200:20, 201:8, 201:14, 201:24, 201:24, 207:18, 208:6, 208:10, 210:21, 240:16, 246:3, 248:9
**Morones** 150:13, 150:17, 154:10, 157:12, 157:23, 158:1
**mortgage** 178:13
**mostly** 37:6, 84:10, 87:18, 89:16
**mother** 10:4, 141:9, 170:20, 174:1
**Motorcycles** 81:12
**Mount** 123:21
**mouth** 132:22
**move** 66:2, 88:11, 92:15, 93:1, 186:8, 190:20, 256:2
**moved** 39:22, 63:9, 133:5, 141:9, 146:9, 148:21, 174:4, 221:7, 221:22, 231:12
**movement** 229:2

**moves** 113:3
**MSO** 116:21
**Mufid** 2:22
**multi-denomination** 37:11
**multi-denominational** 41:13
**multi-page** 76:10
**multiple** 6:19, 12:15, 21:13
**municipal** 148:4
**Munoz** 158:2, 158:4, 164:13, 167:1
**murder** 22:21, 175:16, 237:13
**Museum** 153:23, 154:22, 154:23
**Music** 17:17, 37:9, 95:4, 98:2
**Muslims** 7:20, 8:2, 16:10, 16:13, 27:25, 28:12, 48:3, 52:8, 72:4, 72:10, 97:18, 97:21, 119:15, 120:15, 137:23, 138:4, 138:6, 145:5, 161:23, 190:21, 191:2, 191:21, 215:4, 217:12, 229:20, 229:23, 242:4, 242:7, 242:13, 242:19
**myself** 20:7, 189:10, 238:22, 251:11

**< N >**
**named** 85:7, 102:22, 137:12, 160:6
**namely** 42:13, 88:17
**names** 64:7, 107:25, 133:13, 180:19
**NANCY** 2:4
**Nathan** 1:29, 208:1, 230:3
**National** 60:23, 61:9, 143:10
**nationality** 107:1, 109:23
**nationally** 229:6
**native** 122:5, 214:5
**natural** 257:25
**nature** 4:22, 13:17, 26:21, 32:18, 33:7, 43:6, 64:19, 121:5, 125:15, 137:15, 176:25, 189:5, 198:17, 198:24, 227:23
**Navarro** 61:15
**NCO** 120:19
**NCOIC** 117:7, 117:10
**Neal** 44:5, 44:6, 50:3, 53:11,

54:18
**Near** 4:7, 7:3, 67:1, 75:20, 91:19, 138:5
**necessarily** 18:24, 43:10, 129:12, 130:9, 156:13, 179:3, 204:15
**necessary** 63:25
**necklaces** 52:11
**need** 8:1, 28:17, 38:2, 56:1, 61:21, 91:13, 114:17, 127:21, 128:2, 129:4, 129:16, 130:18, 133:3, 149:9, 161:16, 163:11, 193:19, 195:15, 198:5, 204:6, 205:11, 218:6, 239:6, 239:22, 243:22, 244:2, 256:17, 258:11, 258:15, 260:14, 260:14, 260:17, 260:17, 260:25, 261:7
**needed** 26:4, 26:4, 39:11, 133:17, 227:22, 258:9, 260:23
**Needless** 132:19
**needs** 171:13, 239:4, 239:5, 239:23
**needy** 197:10, 199:13
**negative** 9:2, 134:16, 161:21, 228:18
**negatively** 100:16, 134:8
**neighbor** 128:24
**neighborhood** 95:6, 95:7, 95:17
**Neither** 259:12
**nephew** 22:17, 23:5
**nerveracking** 96:8
**nervous** 84:19, 86:4, 88:21, 88:24, 90:9, 92:16, 96:6
**nervousness** 89:9
**New** 2:18, 39:19, 40:2, 40:5, 45:18, 53:7, 79:9, 105:23, 152:21, 153:23, 154:15, 154:21, 168:21, 219:15, 221:6, 221:8
**newspaper** 142:5, 249:11, 252:24, 253:2
**Newspapers** 25:13, 27:11, 92:11, 102:8, 108:11, 108:14, 112:21, 112:22, 126:19, 136:1, 150:8, 157:19, 167:6, 168:12, 177:22, 186:4, 188:7, 188:12, 194:15, 200:16,

212:4, 234:13, 240:9, 248:2, 252:25, 253:8, 254:18, 255:24
**next** 57:11, 66:2, 82:14, 186:19, 217:16, 241:25, 246:18, 263:5
**Nicaragua** 139:21
**nice** 28:10, 48:5
**niece** 147:7, 152:21, 153:2, 153:18, 153:19, 154:15
**Nigeria** 145:9
**night** 50:22, 52:17, 108:18, 118:16, 151:18, 151:19, 151:22, 152:1, 152:2, 152:3, 152:8, 169:24, 169:25, 170:12, 263:7
**nights** 101:20
**nine** 155:10, 155:19, 218:1, 261:2, 264:5
**nineties** 175:23, 175:23
**ninety** 232:3
**NM** 2:9
**Nobody** 152:23, 163:11, 164:7, 182:24
**nods** 117:14, 250:3
**non** 134:23
**noncitizen** 74:17
**noncitizens** 48:14, 49:1, 174:21, 174:22
**None** 139:4
**noon** 114:9, 256:19
**normally** 11:15, 114:23, 166:19
**North** 122:14, 154:20
**NORTHERN** 1:2, 1:32, 38:19, 50:4, 60:11, 75:3, 218:20, 252:11, 265:19
**Northrup** 70:24, 71:1, 72:7, 75:7, 75:17
**notes** 90:24, 91:3, 261:20, 262:7
**Nothing** 34:11, 97:2, 99:13, 100:15, 141:11, 143:6, 148:15, 169:3, 193:11, 200:23, 220:19, 245:24
**notice** 128:14, 129:23, 132:13, 132:21, 140:17, 141:2, 245:9, 258:11
**noticed** 31:23
**notify** 261:8

**notion** 62:8
**notions** 7:12
**November** 15:12, 15:14, 118:4, 118:5
**Nowadays** 27:25, 131:15
**nowhere** 130:22
**nuclear** 228:1, 232:6
**Number** 1:7, 114:13, 114:18, 114:25, 115:2, 151:10, 210:18, 229:18, 262:19, 262:20
**nurse** 16:19, 21:3
**nursing** 19:11, 61:13, 61:14
**NY** 2:18

< O >
**o'clock** 56:11, 61:22, 66:11, 96:21, 114:25, 115:3, 115:13, 155:10, 155:19, 155:20, 218:1, 218:1, 258:13, 261:2, 264:5
**O'connell** 106:20
**O'o'riley** 83:14
**O'riley** 87:7
**Oak** 37:6, 56:6, 56:7, 61:2, 61:11, 143:14, 242:3
**object** 18:7
**objection** 66:23, 82:12, 157:24, 186:16, 256:8, 257:11, 261:23
**objective** 255:1
**obligation** 123:11
**observant** 52:12, 52:17
**observe** 67:3
**Obviously** 44:25, 90:7, 120:9, 122:25, 189:19, 190:23, 204:14
**Occasionally** 52:23, 128:23
**occupation** 133:15
**Occupied** 130:3, 197:11, 198:1, 250:10
**occurred** 26:25, 127:14, 168:23, 181:15
**Octavia** 153:6
**October** 11:3, 65:11, 65:18, 65:21, 66:4
**Odd** 11:6, 138:12
**Odeh** 2:40
**Odell** 186:20, 192:4, 192:5,

194:2, 194:7, 194:8
**offend** 17:19, 17:20
**offended** 18:11
**offense** 72:2, 74:6, 74:16, 144:17, 152:18, 168:16, 168:17, 225:6
**Office** 2:16, 2:26, 2:35, 46:23, 61:11, 79:9, 122:16, 136:17, 154:13, 258:12
**officed** 61:2
**Officer** 45:16, 45:22, 67:23, 67:25, 73:8, 77:3, 100:20, 134:23, 175:3, 175:7, 232:2
**officers** 134:20, 134:24
**offices** 52:5, 136:16, 187:4
**official** 265:5
**often** 107:10, 151:21
**Oklahoma** 73:8, 75:24, 76:2, 77:3, 172:25, 236:18
**Old** 9:25, 51:7, 55:17, 55:20, 68:19, 140:11, 231:3, 245:7, 248:21, 248:23
**Once** 7:16, 7:19, 78:6, 170:11, 178:8
**ones** 128:22, 232:24
**open** 7:11, 52:16, 59:25, 81:16, 138:19, 191:4, 249:22
**opened** 164:2
**openly** 48:1
**opens** 56:16
**operates** 219:15
**operating** 21:2
**operational** 226:15
**operations** 70:17, 117:7, 117:7, 117:9, 117:20
**opinion** 15:5, 59:11, 103:3, 105:12, 112:8, 113:4, 116:15, 155:23, 156:15, 174:20, 204:13, 204:14, 213:15, 213:16, 213:18, 213:19, 224:25, 225:3, 252:1
**opinions** 15:5, 25:21, 70:9, 80:5, 80:17, 113:18, 113:19, 130:13, 137:4, 137:20, 138:10, 138:11, 151:6, 161:13, 161:18, 181:11, 181:16, 183:2, 188:16, 191:1, 191:3, 196:18, 203:19, 204:7, 204:10, 205:11, 207:11, 235:17, 248:13, 250:5,

250:15
**opportunity** 4:21, 38:3, 58:11, 137:1
**opposed** 261:24
**optical** 75:11
**optimistic** 115:4
**ordeal** 189:5
**order** 32:25, 114:17, 153:14
**orders** 39:15, 67:18, 67:21, 68:1
**ordinary** 226:14
**organizations** 37:20, 41:22
**organized** 95:13
**organizing** 37:3
**original** 181:19
**Originally** 150:25, 219:4, 221:7
**others** 57:16, 107:20
**otherwise** 24:2, 135:15, 166:11, 177:9
**outcome** 236:2
**outfit** 187:21
**outlets** 128:19
**outside** 30:18, 104:19, 123:16, 184:5, 230:14
**over/under** 96:13
**overnight** 256:22, 257:1, 259:8
**overseas** 21:10, 50:7, 50:8, 122:25, 223:1, 246:7
**overseeing** 117:9
**overtime** 170:3
**Overton** 146:17
**Overy** 126:22, 132:6, 132:7, 135:21
**own** 18:3, 112:7, 113:23, 122:1, 128:21, 147:20, 162:24, 164:6, 164:21, 181:15, 208:15, 208:16, 214:10, 215:21, 215:22, 215:24, 216:1
**owned** 51:3, 52:17

**< P >**
**P.** 2:26
**pack** 13:17
**Padilla** 153:6
**page** 230:11
**Pages** 265:7

**paid** 35:1, 65:18, 128:21, 139:21, 141:21, 195:21
**Palestine** 94:4, 104:17, 105:20, 107:2, 107:9, 246:14, 248:14, 251:5
**Palestine-israeli** 104:9
**Palestinian** 105:13, 106:4, 108:2, 109:25, 250:10
**Palestinian-israeli** 47:9, 111:25, 191:13
**Palestinians** 104:15, 111:13, 228:21, 242:11
**Palestinians-israeli** 169:6, 237:5
**pamphlets** 46:20
**panel** 24:11, 65:2, 78:20, 82:2, 92:5, 102:4, 112:16, 126:14, 135:22, 141:24, 150:2, 157:13, 167:2, 177:16, 185:23, 194:9, 200:10, 223:23, 234:7, 240:4, 247:21, 255:18, 259:14, 260:14, 260:16, 260:18, 260:19, 261:17, 262:4
**Panthers** 105:17
**paper** 25:5, 57:4, 127:8, 205:19, 226:17, 226:17, 241:6, 253:10, 254:10, 254:13
**papers** 254:9
**paperwork** 10:6, 202:11, 227:6, 227:9, 227:11, 227:12, 227:15
**parades** 121:4
**paragraph** 6:2
**parents** 45:24, 159:9, 164:16, 215:2
**Park** 151:20
**Parking** 106:15
**Parkland** 214:16, 215:25, 217:18, 220:12
**part** 8:17, 13:12, 43:3, 54:5, 64:1, 76:8, 76:12, 89:9, 105:20, 106:11, 111:20, 121:9, 123:23, 128:17, 155:5, 168:9, 181:14, 205:3, 205:20, 205:23, 210:1, 213:22, 254:25, 255:20
**partial** 248:15, 248:25, 250:6, 252:15

**partiality** 251:7, 251:8, 251:11, 251:14, 251:22
**participate** 121:3
**particular** 19:17, 66:8, 92:15, 106:16, 109:2, 136:11, 193:11, 213:24
**particularly** 4:17, 28:14, 215:11, 254:4
**parties** 5:2, 22:1, 23:13, 24:21, 33:22, 44:5, 55:4, 68:9, 79:4, 82:16, 91:20, 93:7, 102:16, 105:11, 115:16, 126:23, 136:5, 142:14, 150:15, 158:2, 167:10, 178:3, 186:22, 194:21, 201:20, 212:7, 224:6, 234:19, 248:7, 259:19, 261:18
**partly** 155:1
**Parts** 83:14, 87:7, 124:15
**Paso** 7:3
**Pass** 4:4, 86:20, 183:5
**passed** 7:17, 132:20, 178:9
**past** 8:14, 22:23, 26:25, 127:8, 127:11, 190:21, 191:5, 202:5
**pastor** 222:6
**patience** 68:14, 172:2, 186:25
**Patrol** 100:25
**patrolling** 117:16
**Paul** 63:9
**pay** 56:24, 83:11, 83:23, 84:3, 90:15, 90:17, 90:20, 113:23, 113:24, 129:17, 136:2, 150:9, 157:19, 160:9, 160:11, 171:12, 191:15, 197:24, 222:25, 240:21
**paying** 83:5
**peak** 188:10
**pendancy** 256:14
**pending** 77:20, 114:13, 114:14
**penitentiary** 22:25
**Pennsylvania** 231:13
**Pentecostal** 73:2, 221:19, 222:2
**perceive** 213:16
**percent** 80:15, 206:14, 232:3, 251:21
**peremptory** 258:18, 260:10,

261:6
**performance** 51:22
**Perhaps** 83:17, 181:1, 195:1, 256:18, 263:23
**peril** 218:4
**period** 10:9, 68:24, 133:3, 173:10, 256:17, 263:1
**periods** 193:25
**perk** 191:15
**permanently** 216:15
**permissible** 91:2
**personal** 80:17, 104:11, 133:21, 138:1, 175:12, 181:16, 182:5, 190:14, 257:11
**personally** 71:14, 181:23
**persons** 8:4, 115:8, 138:1, 138:17, 216:15, 256:15
**pertained** 76:12
**petroleum** 116:25
**phone** 114:24
**photographs** 90:20
**physical** 36:11, 196:8
**pick** 56:4, 56:13, 66:10, 97:1, 97:3, 97:7, 101:5, 101:7, 101:11, 101:21, 152:10, 203:25
**pick-up** 95:5
**picked** 45:7, 45:7, 112:3, 160:10, 198:13
**picking** 56:17, 66:6, 250:21
**picture** 262:9
**piece** 64:23
**pilot** 26:3, 26:12, 29:8, 29:15, 29:16
**piloting** 29:7, 29:17
**pitch** 195:11
**Pittsburgh** 46:9
**place** 17:9, 37:9, 37:12, 38:4, 144:16, 221:4, 248:21
**places** 21:15, 49:16, 49:18, 51:11, 133:12, 185:20, 203:6
**plan** 16:1
**plane** 27:13, 139:21, 141:15
**Plano** 197:4, 202:6, 209:15
**plans** 65:17, 141:14
**plant** 36:16
**plants** 36:19
**PLATT** 2:43
**Play** 72:16, 95:3, 95:22,

95:24
**played** 41:25
**player** 37:2
**playing** 95:19
**plays** 95:9
**Plaza** 2:8
**pleasant** 28:9
**Please** 4:7, 84:4, 117:18, 118:9, 152:13, 171:21, 212:14, 212:19, 241:25
**pleasure** 21:11, 21:12
**pled** 236:6
**PO** 2:36
**Point** 4:11, 4:13, 10:19, 35:17, 95:25, 105:15, 129:18, 183:1, 183:4, 187:9, 190:15, 201:7, 237:16, 239:3, 257:13
**pointed** 47:16, 47:17
**points** 199:5
**police** 125:14, 128:20, 134:24
**policy** 131:21
**political** 237:14, 252:1
**pool** 14:3, 33:13, 43:22, 54:19, 209:6, 209:9, 211:23
**poor** 197:11, 200:24
**poorest** 197:10, 200:24
**populace** 119:20
**portion** 117:23, 184:11
**pose** 15:25, 56:22, 66:12
**posed** 113:14
**poses** 195:19
**position** 82:10, 87:9, 93:2, 95:24, 113:11, 119:3, 128:9, 129:15, 129:17, 129:18, 139:8, 139:15, 171:10, 186:15, 192:17, 192:19, 256:6, 257:6, 257:18
**positive** 161:22, 228:18
**possibility** 132:25, 141:16, 152:18, 168:18
**possible** 33:3, 97:12, 97:12, 97:17, 226:13
**Possibly** 33:15, 38:13, 157:3, 171:17, 171:17, 179:16, 181:24
**Post** 122:15
**Postal** 10:15, 10:21, 11:5, 35:4, 35:7, 38:22, 39:2
**posters** 51:15

**potential** 114:23, 257:7
**potentially** 193:5
**power** 27:22
**practice** 31:16, 47:20, 48:10, 178:18, 209:20, 209:25, 210:13
**practiced** 48:1
**Prairie** 40:25
**pray** 52:12
**pre-occupy** 111:7
**pre-planned** 4:19, 5:22, 15:10
**preach** 37:11
**preceding** 256:11
**preconceived** 7:12
**preconceptions** 28:24, 204:4
**prefer** 193:22, 210:8, 210:10
**preformed** 80:17
**prejudice** 59:15
**prejudices** 7:12, 59:11, 59:18, 242:13
**Premium** 172:21
**prepaid** 26:9, 69:3, 69:11, 141:14
**preparation** 68:4
**preparing** 132:10, 132:12
**preschool** 30:24
**prescribed** 265:11
**present** 63:19, 91:21, 128:6, 135:11
**presented** 53:22, 63:18, 91:20, 130:21
**presenting** 23:14, 149:6
**presents** 37:18
**press** 55:14, 136:14, 158:14, 202:8, 202:20, 240:18
**presume** 58:23
**presumed** 74:6, 160:24, 160:25, 191:23, 243:12, 250:25, 253:16
**presuming** 251:20
**presumption** 63:3, 66:15, 66:22, 67:4, 73:21, 73:22, 74:4, 156:23, 160:20, 161:1, 161:9, 191:22, 191:25, 206:9, 206:10, 206:13, 206:15, 206:22, 238:16, 238:18, 243:10, 243:16, 251:3, 251:18, 252:4, 253:14,

253:22, 256:3
**pretrial** 263:21
**Pretty** 6:16, 28:21, 33:1,
46:19, 46:22, 47:10, 48:21,
49:20, 70:13, 72:15, 85:10,
117:7, 119:14, 119:20,
119:24, 120:1, 120:7, 120:17,
124:3, 124:4, 124:7, 137:16,
153:1, 161:7, 167:25, 171:13,
173:11, 189:17, 191:4,
215:18, 216:10, 225:25,
226:17, 249:14, 250:17,
259:14, 260:4
**prevent** 198:12, 254:7
**prevents** 71:17
**previously** 258:19
**primarily** 248:22
**primary** 117:6, 117:19,
128:18
**principal** 42:10, 88:15,
96:17, 149:2, 230:18, 232:12,
246:11, 259:2
**print** 196:2
**printer** 195:23
**Prior** 38:24, 39:1, 61:11,
61:12, 121:1, 132:21, 209:19,
233:13
**prison** 77:10, 77:12, 175:18,
175:20, 176:2
**Private** 7:9, 22:1, 101:1,
209:20, 209:25, 210:9,
210:13, 221:17
**probation** 77:23, 125:19
**Problem** 10:9, 12:24, 13:22,
15:25, 24:5, 24:8, 26:5, 26:7,
26:9, 66:13, 72:3, 118:13,
151:10, 192:14, 192:15,
194:6, 195:1, 195:2, 195:3,
195:15, 195:16, 234:3,
247:17, 262:1
**problems** 9:20, 48:6, 151:14,
161:9, 190:18, 199:22,
226:14, 239:14, 241:17,
243:15
**procedures** 226:6
**proceedings** 173:14, 265:4,
265:6
**processing** 36:16, 236:17
**processor** 36:14
**Proctor** 136:4, 136:7, 140:7,

140:9, 141:13, 142:9
**Production** 241:6
**productivity** 210:12
**profession** 39:3
**professional** 209:20, 215:13
**profile** 80:22, 205:2
**profiling** 27:5, 27:7
**program** 79:10, 79:11
**progress** 256:12, 256:18,
256:25, 257:1
**prohibits** 222:3
**project** 20:20, 35:18, 36:3,
36:6, 39:10, 217:17, 217:18,
217:20, 218:3, 218:7, 220:10,
238:13
**promise** 251:24, 252:2,
252:6, 253:25, 255:14
**promote** 79:12
**pronounced** 150:12
**proof** 63:2, 67:4, 114:1,
244:3, 244:4
**proper** 6:14, 12:7
**properly** 40:16
**prosecuting** 121:9
**prosecution** 100:17, 106:11
**prosecutor** 6:25, 68:16,
192:6
**prosecutors** 20:5, 30:12,
38:19, 50:5, 60:12, 75:4,
87:3, 99:5, 132:8, 140:10,
146:6, 164:15, 172:11,
183:10, 208:3, 218:21, 230:5,
252:12
**prospect** 28:18
**Protection** 53:3, 74:15,
182:21, 186:10
**protections** 186:13
**prove** 54:3, 73:25, 73:25,
149:8, 149:8, 156:24, 199:9,
199:11, 199:20, 223:5, 223:6,
244:7, 244:9, 244:12
**proved** 120:17, 223:19,
253:17
**proven** 42:20, 63:22, 191:23,
206:24, 251:1
**proves** 74:7, 161:2, 199:23
**provide** 37:13, 66:19, 66:19,
124:1, 149:19
**provided** 13:6, 20:12, 42:12,
43:4, 43:16, 54:12, 58:6,

109:8, 132:1, 149:4, 210:25,
233:11, 262:24
**providing** 13:13, 53:14,
88:16, 126:9, 135:14, 166:3
**provocative** 131:8
**pry** 159:2
**public** 47:14, 89:15
**Puerto** 21:15, 21:18
**pulling** 39:14
**punished** 236:4
**purchase** 13:15
**purchased** 177:4
**purpose** 76:17, 114:16
**purposes** 247:9
**pushed** 252:15
**pushing** 205:11
**put** 26:1, 37:20, 58:23, 60:2,
66:18, 81:16, 122:21, 125:19,
128:4, 133:16, 141:2, 165:19,
176:12, 193:19, 208:6,
215:15, 223:8, 228:11, 253:2,
258:11
**putting** 168:10, 171:7


< Q >
**quality** 240:25
**quasi** 117:13
**question** 5:12, 5:21, 7:9,
7:13, 7:23, 8:8, 28:21, 48:16,
48:17, 48:24, 59:20, 77:14,
78:15, 80:9, 81:4, 81:7,
107:8, 113:14, 125:23,
141:14, 157:1, 164:3, 164:7,
174:14, 175:1, 175:5, 175:21,
181:19, 182:6, 193:18, 196:4,
196:21, 206:3, 235:25,
246:18, 249:17, 250:4, 255:7,
257:5
**questioned** 4:16, 89:15,
254:2
**questioning** 4:7, 4:11, 4:13,
4:22, 92:23, 186:10, 198:10,
201:9, 208:10
**quicker** 260:19, 260:24
**quickly** 152:14, 171:13,
173:11, 239:6, 239:21
**quite** 21:10, 92:17, 92:23,
188:23, 263:1
**quitting** 37:25, 171:19

< R >

**R.** 98:7
**race** 59:15
**racing** 170:15
**radar** 236:12, 236:16
**radio** 47:14, 55:15, 92:11, 102:8, 112:22, 126:19, 127:6, 136:2, 142:5, 150:8, 157:19, 167:7, 177:22, 186:4, 194:15, 200:16, 212:4, 224:3, 234:13, 240:10, 240:19, 248:2, 255:24
**raided** 136:16
**raise** 115:21, 262:17
**raised** 88:7, 174:8, 244:23
**raises** 137:6
**raising** 210:2, 245:10
**rang** 34:13
**rangers** 31:22
**rarely** 7:19
**ratcheting** 260:1
**rather** 36:11, 37:10
**Raytheon** 75:20
**reach** 115:4
**reached** 25:20, 219:1
**reaction** 191:8, 191:9
**reading** 259:19
**readjust** 118:7, 119:9
**ready** 4:24, 82:14, 152:23, 171:5, 186:19
**real** 21:22, 153:5, 188:24, 189:2, 189:4
**realize** 79:8, 80:25
**reason** 7:8, 43:10, 66:11, 85:17, 100:5, 113:4, 153:25
**reasonable** 43:17, 74:1, 74:7, 156:11, 156:25, 161:2, 161:4, 191:23, 223:20, 244:4, 244:7, 244:10
**reasons** 104:11, 231:17, 231:18, 249:1
**reassure** 62:17
**rebuilding** 130:5, 203:8, 243:2
**recall** 23:13, 25:14, 32:10, 66:6, 116:3, 116:9, 124:21, 158:17, 193:14, 202:15, 233:13, 240:23, 249:13

**recalls** 262:21, 263:14
**receive** 38:8
**received** 53:19, 63:14, 67:22, 89:21, 132:15, 139:1, 148:1, 176:10
**receiving** 67:18, 76:8
**recent** 127:11, 127:11
**Recently** 34:11, 83:6, 116:11, 136:23, 158:15, 159:7, 179:19, 202:8, 202:10, 213:3, 226:23, 235:11
**Recess** 4:5, 68:5, 68:7, 114:10, 115:12, 115:14, 194:18, 194:19, 264:5
**recognition** 168:4
**recognize** 44:15, 70:3, 70:4, 143:2
**records** 259:10
**Red** 56:6, 56:7, 61:2, 61:11, 137:7
**reevaluate** 263:18, 263:18
**refer** 200:21
**references** 107:24
**referral** 70:23
**referred** 41:12, 88:16, 201:11
**referring** 9:17
**reflect** 262:14
**Refresh** 91:4, 260:12, 261:21
**regard** 52:7, 121:17, 132:9
**Regarding** 23:4, 112:7, 113:8, 134:21, 248:13, 263:15
**regardless** 62:19, 211:15
**region** 107:12, 109:1
**regular** 80:3, 124:7, 216:20
**regularly** 95:9, 128:2
**regulated** 193:23
**rehabilitated** 186:11
**reiterate** 201:4
**related** 209:24
**relates** 204:15
**relation** 35:16
**relationship** 7:13
**relax** 84:21, 169:17, 212:14
**relevance** 18:8
**Relief** 116:1, 150:20
**religion** 138:22, 138:24
**religious** 59:16, 252:1

**relocated** 76:3
**rely** 120:16
**remainder** 114:12
**Remember** 35:22, 44:23, 51:19, 64:3, 68:2, 76:8, 76:13, 80:1, 82:21, 86:4, 86:10, 99:15, 124:17, 127:15, 133:13, 134:2, 136:15, 136:16, 136:17, 136:21, 158:8, 175:22, 180:2, 187:5, 187:9, 188:12, 194:24, 196:22, 197:2, 197:3, 219:2, 235:13
**remembering** 196:23
**remodeling** 171:7
**remote** 4:8
**render** 42:22
**rendered** 22:4
**repairs** 28:16
**Repeat** 195:5, 198:21
**replace** 152:12
**report** 256:25
**reported** 4:16
**REPORTER** 3:1, 265:5, 265:18
**reports** 197:25
**reprehensible** 237:14
**representation** 256:21, 257:12, 258:8
**representative** 257:25
**represented** 257:22, 257:23
**representing** 20:6, 38:20, 50:5, 60:13, 75:5, 87:4, 106:12, 121:10, 146:6, 154:13, 172:11, 183:11, 208:4, 218:22, 244:20, 252:13, 258:2
**request** 102:11, 200:19, 263:15
**requested** 263:16
**requests** 114:13
**require** 147:14, 156:24
**required** 58:24, 113:18, 255:4
**requirement** 80:18, 80:19, 113:21, 255:5
**requirements** 67:4, 153:11
**requires** 59:8, 147:13
**research** 111:23
**reserve** 120:20, 232:15,

232:17
**reservist** 67:17
**residence** 10:6, 219:25
**resident** 49:5, 49:6
**residents** 49:2, 49:3
**resides** 10:5
**resistance** 113:6
**resolved** 9:22, 77:19, 77:21
**resources** 56:24
**respect** 250:5
**respond** 89:10, 155:16
**responder** 139:2
**response** 77:13, 145:6
**responsibilities** 155:8
**responsibility** 184:11
**responsible** 83:21, 156:5
**rest** 33:15, 54:21, 134:17, 155:18, 157:15
**restaurant** 143:14, 146:12
**resting** 118:14
**Restoration** 216:4
**restore** 220:2
**restroom** 194:1
**result** 71:22, 96:23, 189:8, 211:11, 233:20, 238:4
**resulted** 173:15
**retire** 123:8
**Retired** 45:12, 45:13, 148:9
**retiring** 29:19
**return** 43:17, 177:3, 177:10
**returned** 192:17
**reviewing** 226:5
**reviews** 128:22
**Richardson** 25:16, 44:19, 150:25, 168:1, 197:4, 202:4, 209:19, 224:19
**Richland** 138:5
**Rico** 21:15, 21:18
**rid** 251:10, 251:13
**riding** 81:20
**rights** 48:15, 48:19, 48:19, 48:22, 48:23, 49:7, 49:15, 73:15, 131:6, 174:21, 185:14
**Riley** 159:15
**ring** 14:25, 25:10, 34:7, 62:9, 94:4, 151:1, 224:19
**Rm** 3:2
**Road** 146:17
**role** 259:20, 259:21
**Roman** 49:19

**roof** 171:8
**room** 21:3, 50:11, 121:12, 130:22, 162:9, 163:7, 163:8, 261:5, 261:16
**Rosalez** 68:8, 74:25, 75:1, 78:19
**route** 118:3, 122:22, 122:25, 123:1
**routes** 119:21
**row** 254:19
**Rowlett** 75:22
**Ruidoso** 6:10
**Run** 117:23, 118:3, 152:9, 225:17, 225:18, 225:22, 246:9, 261:19
**running** 117:8, 134:10, 232:9
**runs** 216:2, 216:4

< S >
**S.** 223:11
**safe** 119:14
**safety** 89:14, 89:14, 189:6, 189:7, 189:13, 189:17, 189:19, 189:22, 189:23, 190:14
**Saint** 63:9
**sake** 9:24
**sales** 51:23, 79:10, 187:18
**Sam** 151:19
**sargeant** 116:18, 117:13
**sat** 8:22, 239:22
**satisfied** 256:13
**Saturday** 151:25
**Saturdays** 87:18
**saw** 15:3, 27:11, 27:18, 35:15, 67:16, 76:14, 81:12, 107:24, 131:23, 152:22, 152:24, 155:4, 188:11
**saying** 18:16, 18:19, 18:19, 18:23, 49:4, 57:19, 59:7, 98:22, 98:24, 112:5, 205:22
**says** 18:10, 18:20, 29:13, 42:20, 56:24, 64:18, 85:4, 110:3, 156:23, 160:4, 174:13, 175:2, 176:18, 243:4, 243:8, 251:19
**scanned** 80:25
**scared** 92:16

**scary** 58:13, 66:17
**scenes** 170:25, 171:2
**schedule** 26:3, 26:5, 87:15, 114:12, 258:16, 258:23
**scheduled** 129:21
**schedules** 210:16
**scheduling** 263:5
**scheme** 235:7, 235:7
**scholarships** 37:13
**School** 37:10, 37:16, 40:24, 42:2, 56:6, 61:6, 61:13, 61:14, 95:22, 122:7, 122:10, 133:6, 133:10, 159:12, 159:13, 162:4, 163:21, 163:22, 169:14, 169:19, 169:21, 169:23, 170:1, 171:5, 173:6, 173:11, 173:19, 178:6, 186:12, 209:12, 209:19, 210:6, 210:10, 210:19, 221:17, 230:18, 230:21, 236:24, 242:2, 242:3
**schooled** 41:2, 41:8
**schooling** 29:15
**schools** 41:4, 133:1, 133:17, 210:3, 210:8, 210:15, 211:17
**scopes** 71:11
**Scouts** 121:4, 121:4
**seat** 254:19
**second** 25:23, 29:18, 31:1, 90:2, 90:3, 107:16
**Secondly** 66:6, 223:11
**secret** 227:22
**secrets** 227:24
**Section** 263:20
**security** 27:11, 29:23, 30:1, 30:3, 36:5, 71:3, 100:20, 189:6, 189:8, 227:22
**seeing** 127:7, 136:15, 136:21, 187:21, 187:24, 210:4
**seeking** 125:1
**seem** 66:4, 91:16, 229:9, 229:18
**seemed** 114:5, 120:1, 249:1, 260:22
**seems** 21:9, 201:13, 225:21, 229:17
**seen** 44:20, 64:6, 108:20, 109:8, 136:23, 185:10, 188:7, 212:20, 240:17, 253:7

**selected** 24:12, 43:23, 54:20, 65:2, 78:21, 91:6, 132:16, 141:17, 141:19, 150:3, 168:7, 181:1, 184:13, 185:24, 192:12, 200:11, 211:24, 223:24, 234:8, 240:5, 247:22, 255:19
**selection** 235:13
**self** 238:3
**sell** 56:20
**send** 30:2, 211:13, 211:14, 216:12, 233:20, 233:21, 261:4
**sending** 247:6, 263:19
**senior** 45:22
**sense** 228:20, 237:9, 237:11, 254:5, 263:24
**sensitive** 188:6, 193:17
**sent** 130:2, 160:2, 175:20, 177:4, 197:8, 200:22, 200:23, 203:5, 242:25, 246:6, 246:13, 247:9, 250:9, 263:14, 263:17
**sentence** 6:2
**sentenced** 22:24
**sentiment** 261:16
**separate** 21:18
**separation** 9:14, 9:16, 10:17
**September** 69:4
**series** 128:18
**serious** 74:15, 85:10, 129:6, 129:12, 129:12, 137:16, 161:8, 167:25, 180:24, 197:6, 197:7, 198:4, 199:9, 253:23
**seriously** 181:3, 181:17
**seriousness** 181:23
**serve** 10:8, 16:8, 111:8, 113:9, 129:9, 134:3, 141:17, 141:19, 184:7, 192:12, 193:20, 211:3, 211:4, 232:15, 238:9
**served** 21:21, 32:8, 53:15, 89:18, 147:23, 207:14, 209:3, 232:19, 233:2, 233:5
**Service** 10:15, 10:21, 11:5, 11:9, 11:10, 35:4, 38:22, 39:2, 53:3, 56:1, 103:9, 121:13, 124:1, 127:23, 209:3, 217:25, 218:4, 218:5, 219:18, 219:19, 233:13, 239:4, 239:8, 241:22, 243:25

**services** 64:12, 124:6
**serving** 50:8, 92:24, 110:17, 181:5, 256:16
**session** 115:5, 115:9, 258:15, 261:3, 261:5
**set** 4:9, 18:4, 81:5, 103:17, 113:22
**setting** 112:6
**Seven** 35:9, 35:10, 39:20, 88:10, 120:21, 139:14, 169:15, 172:15, 183:22, 208:20
**seventeen** 140:11
**seventies** 27:19, 123:6, 141:7, 227:16
**several** 4:16, 14:23, 32:8, 39:1, 42:11, 44:12, 93:24, 249:10
**severe** 129:5
**Shah** 27:21
**Shakes** 170:6
**Shapiro** 1:28, 9:10, 30:12, 30:24, 32:2, 183:10, 244:20
**share** 37:12, 205:1, 254:24
**sheet** 132:16
**Sherman** 172:25, 236:19
**Shiekh** 119:21
**ship** 94:14
**shipping** 193:13
**shop** 31:21, 128:13
**shopper** 128:20
**short** 133:3
**shorter** 96:12, 171:17
**shortly** 128:9
**show** 177:13, 221:18
**showed** 177:11, 199:12
**shower** 165:4
**shown** 265:6
**shows** 109:12
**Shukri** 2:1
**siblings** 215:2
**sick** 27:23
**side** 22:18, 92:25, 169:11, 169:11, 179:15, 237:15, 257:14, 259:12, 261:16
**sidebar** 193:22
**sides** 53:22, 62:5, 63:18, 90:16, 92:20, 135:11, 149:6, 149:7, 201:16, 228:22, 246:20, 255:10

**sign** 81:16
**significance** 248:16
**significant** 189:17
**silence** 178:23, 182:7, 185:2
**Similar** 183:25
**simple** 28:21
**simply** 105:20, 200:21
**Singapore** 219:7, 219:8, 219:12
**Single** 55:22, 56:5, 68:18, 83:21, 251:20
**sister** 147:2, 147:7, 147:8, 147:11, 147:13, 147:17, 154:20
**sisters** 165:15, 165:16
**sit** 8:21, 58:24, 85:21, 85:23, 154:2, 161:18, 168:22, 170:18, 182:13, 191:19, 204:17, 205:22, 239:18, 250:1, 251:3
**sites** 236:23
**sits** 74:5, 206:2
**sitting** 58:8, 59:20, 80:19, 85:14, 111:3, 111:5, 138:17, 144:18, 160:15, 193:25, 250:20, 260:18, 260:25
**situation** 5:20, 11:19, 26:23, 68:18, 84:14, 84:22, 102:12, 112:8, 125:21, 125:25, 168:11, 181:21, 217:24, 218:6
**situations** 26:25
**Six** 56:4, 56:14, 61:21, 61:22, 66:10, 106:22, 114:18, 170:3, 183:22
**sixty** 260:5
**skimmed** 249:14
**skittish** 118:11, 119:9
**slang** 12:6
**sleep** 101:24, 101:25, 155:17, 155:19
**sleeping** 118:13
**Slightly** 201:15, 205:14
**slipped** 67:13
**small** 31:15, 213:21, 222:16
**smaller** 60:24
**SMU** 154:19
**snack** 94:11, 94:13
**snippet** 130:11
**snow** 231:16

**Soccer** 72:17, 72:18
**social** 121:4, 124:4
**socialize** 118:13
**software** 236:22, 236:23
**sold** 236:18
**soldiers** 70:14
**solutions** 187:17, 187:19
**Somebody** 18:5, 18:12, 23:10, 27:1, 105:14, 107:14, 169:10, 169:11, 181:19, 226:9, 227:15, 253:2, 253:11
**somehow** 130:6, 160:5, 197:15, 203:10, 227:3, 243:9
**Someone** 6:2, 27:5, 42:1, 46:22, 48:22, 59:22, 69:19, 84:15, 84:22, 107:11, 119:13, 132:1, 134:4, 164:1, 178:23, 186:12, 241:20
**sometime** 240:6
**Sometimes** 16:4, 87:18, 101:13, 101:25, 120:23, 152:10, 170:17, 179:12, 227:7, 227:7
**Somewhat** 104:9, 105:17, 109:17, 133:20, 184:12, 228:23, 252:15
**Somewhere** 7:3
**son** 72:14, 125:5, 125:13, 173:22, 244:25, 245:5, 262:25
**Sonepur** 214:2
**sons** 21:5, 51:3, 52:18
**SOR** 75:10
**sorry** 5:19, 67:12, 85:16, 153:1, 154:1, 154:7, 207:10, 242:17, 243:24
**sort** 29:24, 36:4, 37:3, 105:16, 128:3, 144:23, 193:13, 194:1, 203:9
**sorts** 233:24
**sound** 137:16
**Sounds** 28:8, 40:11, 104:19, 184:2, 187:3, 189:11, 219:24, 226:1, 230:11, 261:1, 262:6
**source** 117:21
**sources** 109:10
**South** 124:13, 124:15, 144:13, 213:22, 242:3
**southeast** 117:23
**southern** 117:23

**Spain** 6:12, 184:21
**Spaniards** 6:11
**Spanish** 5:24, 6:3, 6:14, 6:15, 6:18, 12:15, 84:6, 84:8, 84:10, 84:15, 84:23, 165:20
**spare** 4:21
**speaker** 84:6
**speaking** 48:11, 105:21, 145:24, 187:13, 187:14, 191:7
**specialty** 116:20, 116:24
**specifically** 79:24, 93:25, 216:12, 234:23
**specifics** 131:9, 131:12
**Speech** 17:4, 17:5, 17:6, 17:9, 17:11, 17:16, 17:18, 18:3, 18:5, 18:13, 49:11, 49:14, 49:17, 49:21, 98:9, 131:2, 131:3, 131:5, 131:7, 131:20
**spend** 170:19, 261:11
**spends** 42:5
**spent** 43:16, 54:11, 64:15, 122:13, 124:12, 126:2, 126:5, 184:18, 211:16, 233:23
**spoken** 165:24, 259:1
**spoons** 241:7
**Sports** 170:14, 170:15
**spots** 229:10
**spouse** 125:1
**Spouses** 124:25
**sprinklers** 171:7
**spry** 152:5
**stand** 28:23, 80:17, 90:19, 178:23, 179:6, 181:20, 182:8, 182:13, 182:16, 260:20
**standard** 74:2, 260:6
**star** 232:9
**start** 160:25, 165:5, 171:6, 210:6, 259:25, 261:2, 263:8
**started** 4:3, 29:16, 39:16, 42:3, 48:18, 116:22, 159:7, 171:6, 196:23
**starting** 65:21
**startles** 119:13
**starts** 259:24
**State** 22:8, 39:19, 53:24, 59:21, 59:23, 73:8, 73:25, 77:3, 121:17, 122:14, 133:1, 207:11, 213:22, 214:10,

214:10, 230:12, 233:6, 233:7
**Stated** 53:13, 92:17, 132:10, 193:1, 201:2, 201:8
**statement** 89:11, 134:21, 149:14, 175:6
**statements** 114:1
**Statewide** 100:24
**stating** 263:17, 263:20
**station** 28:2
**stationed** 53:7, 53:10
**status** 129:1, 232:16, 257:8, 257:10, 258:19
**stay** 4:7, 101:11, 174:1, 174:6, 221:8
**stay-at-home** 61:5
**stayed** 61:12
**stays** 61:21
**steering** 248:19
**stenotypy** 265:5
**step** 90:16, 147:18
**Stepbrothers** 165:16
**stepfather** 39:20
**stepson** 26:21
**stern** 259:23
**steward** 35:12, 35:13
**sting** 235:14
**stolen** 81:1, 227:3
**Stop** 18:16, 18:19, 18:23, 107:15
**store** 187:22
**stories** 108:20, 226:18
**Stork** 51:7
**Storm** 236:17
**story** 29:22, 44:15, 162:18, 179:15, 213:13, 248:20, 252:24
**straight** 232:4
**Street** 1:34, 2:17, 3:2, 75:21, 135:8, 191:7
**stress** 10:17, 92:21
**strictly** 252:23, 253:2
**strike** 115:3, 186:8
**strikes** 261:18
**strip** 169:18
**stroke** 15:15
**strong** 183:2, 204:14
**strongly** 49:12, 49:14, 49:15, 53:6, 98:8
**struck** 113:21, 262:3
**study** 159:21

**stuff** 51:16, 51:24, 57:3, 58:14, 73:6, 149:18, 166:13, 169:18, 171:8, 195:4, 198:3, 198:15
**style** 70:3
**subject** 58:14, 59:2, 62:20, 133:19
**submit** 157:22, 259:3, 259:9
**submitted** 259:13, 259:18
**substantial** 81:18
**substitute** 184:14
**substituting** 133:1, 133:4
**suffer** 176:13
**sufficient** 114:17, 115:2
**suing** 22:1
**suitable** 194:4
**Suite** 2:8, 2:27, 2:45
**sum** 163:18
**summarized** 176:16
**summary** 203:14
**summations** 53:25
**summer** 146:23
**Summercut** 241:4
**summertime** 170:2
**Summit** 2:45
**summon** 205:17
**summons** 53:20, 57:2, 63:15, 89:22, 132:15, 148:2, 155:17
**Sunday** 222:10, 263:7
**Sundays** 128:16
**sunny** 212:15
**supervisor** 105:5, 105:9, 106:23
**supervisors** 107:13
**supplement** 114:11
**supplied** 117:21, 176:17, 176:19
**supplies** 24:4, 43:6, 149:17, 177:1, 211:17, 223:15, 233:24
**supply** 117:20, 118:3, 118:15, 119:21
**supplying** 64:24
**supported** 41:20, 53:14, 85:6, 137:11, 248:15, 249:5
**supporting** 64:23, 170:22, 249:15
**suppose** 251:13, 255:7
**supposed** 15:11, 27:5,

42:16, 49:8, 63:21, 79:13, 127:9, 190:4
**suppress** 18:5
**surmise** 154:25
**surprise** 168:3, 168:7
**surround** 124:4
**surroundings** 118:12
**suspect** 64:10, 223:9, 223:11, 223:24
**suspicious** 27:6, 191:6
**Sustained** 18:9
**sympathy** 154:14
**Syndrome** 262:25
**system** 23:6, 78:13, 100:13, 114:22, 125:21, 176:11, 188:25, 190:5, 236:17, 238:17, 245:22, 253:18, 258:11
**Systems** 40:15, 40:17, 41:18, 106:16, 236:13, 236:18

< T >
**table** 120:2
**Tactical** 228:1
**talked** 9:15, 11:18, 28:6, 31:19, 47:24, 52:21, 52:24, 57:1, 67:10, 67:19, 108:7, 109:6, 162:5, 191:20, 250:5
**Tampa** 2:37
**tank** 71:20
**tanks** 20:18, 71:12, 71:13
**tape** 126:2
**tapes** 86:9
**tasked** 117:22
**taught** 133:17
**Taylor** 55:3, 55:5, 60:7, 60:8, 65:1, 65:17, 65:24, 66:24, 67:9, 167:9, 167:13, 172:7, 172:9, 177:15
**teach** 27:4, 133:11
**teacher** 133:8, 133:9
**Teaching** 11:16, 132:25, 133:7
**team** 121:9
**teams** 72:21, 95:11, 95:12
**tech** 20:14, 70:11
**technically** 260:16
**technology** 187:18

**telephone** 114:22, 258:11
**television** 92:11, 102:8, 106:1, 109:8, 112:22, 126:19, 127:5, 131:15, 136:1, 142:5, 150:8, 157:18, 160:8, 167:6, 177:22, 186:4, 194:15, 200:16, 212:4, 224:3, 234:13, 240:9, 248:2, 255:24
**tells** 23:16, 54:2, 226:18
**Ten** 68:18, 87:8, 139:14, 208:20, 241:13
**tend** 195:4
**TERESA** 2:5
**term** 73:22, 161:3, 242:20
**terminated** 103:18
**terms** 51:13, 51:25, 56:21, 59:8, 85:21, 88:23, 200:25, 209:6, 255:10
**Territories** 130:3, 197:12, 198:1, 203:6, 250:11
**territory** 119:22
**terror** 229:5
**terrorism-related** 130:13
**terrorists** 58:19, 111:15, 156:9, 156:11
**test** 241:10
**Testament** 248:21, 248:23
**testify** 73:16, 73:17, 134:5, 178:24, 185:5
**testimony** 53:23, 63:18, 80:15, 134:8, 134:20, 134:22, 135:3, 135:4, 175:3, 175:8
**TEXAS** 1:2, 1:32, 1:35, 2:28, 2:46, 3:3, 20:14, 38:19, 38:25, 39:8, 40:3, 50:4, 60:12, 61:10, 75:3, 88:12, 121:2, 122:14, 148:18, 150:25, 174:6, 218:20, 231:15, 236:25, 252:12, 265:19
**text** 12:4
**theft** 80:20, 190:8, 190:9
**themselves** 128:21
**therapy** 210:1, 210:14
**thinking** 6:17, 48:18, 110:17, 111:10, 130:16, 133:4, 197:2, 203:20, 261:12
**thinks** 259:24
**thirtee** 208:20
**thirty** 52:2, 52:3, 52:4, 260:7,

261:4

**Thirty-one** 123:4, 123:10, 123:14, 231:3, 245:8

**Thirty-six** 16:23, 21:1

**though** 43:14, 166:18, 226:14, 253:20

**thoughts** 19:5, 58:21, 131:5, 160:13, 160:18, 162:22, 203:17, 204:20, 204:24, 208:6, 250:15

**thousand** 263:16

**thousands** 228:17

**threatening** 47:7

**three** 5:13, 8:14, 9:25, 36:7, 40:3, 55:25, 56:22, 77:7, 83:16, 87:22, 100:9, 114:25, 115:3, 115:10, 128:8, 128:10, 128:23, 132:14, 153:4, 155:20, 169:19, 174:11, 195:13, 208:19, 208:25, 226:22, 227:21, 228:2, 232:13, 232:19, 258:13

**three-** 92:19

**three-man** 152:9

**three-month** 39:10

**threshhold** 115:4

**throughout** 128:19

**throw** 6:21

**Thursday** 15:24, 96:18, 103:16, 115:10, 119:1, 171:18, 218:2, 239:11

**Tl** 20:20, 35:25

**tickets** 69:9, 139:21, 139:24, 141:15, 141:21

**tidbits** 4:4, 180:21

**ties** 199:25

**Tim** 236:9, 236:10

**time-off** 173:10

**tired** 147:18

**Titan** 35:17, 35:20, 36:2

**title** 19:4, 28:20, 34:16, 120:10, 217:9, 225:5

**today** 33:15, 43:24, 54:21, 92:7, 112:18, 115:3, 142:1, 157:15, 177:18, 181:9, 183:12, 185:25, 194:11, 198:10, 200:12, 202:19, 205:19, 209:6, 211:25, 234:9, 251:4, 256:11, 256:12, 258:10

**together** 7:6, 67:20, 168:10, 169:8, 169:12, 208:16, 261:19, 262:17

**tomorrow** 33:16, 43:24, 54:22, 65:4, 78:22, 82:3, 92:7, 112:18, 126:16, 142:2, 150:4, 157:15, 177:18, 186:1, 194:11, 200:12, 211:25, 223:25, 234:9, 240:6, 247:23, 255:20, 256:18, 258:13, 259:3, 264:5

**toned** 111:23

**tonight** 263:19

**took** 106:3, 110:15, 110:15, 129:22, 144:9, 207:6, 219:12, 265:5

**Torrez** 4:25, 5:1, 5:4, 9:8, 14:2

**touch** 37:20, 67:25, 210:23

**touched** 233:10

**touchy** 59:2

**Tough** 140:12, 167:20, 167:21

**tours** 124:12

**towards** 81:3, 251:7

**Tower** 2:44

**Towers** 106:19

**town** 123:23, 213:21

**Track** 86:14, 92:18, 236:17

**trade** 232:7

**traded** 28:1

**traffic** 56:9

**trail** 226:17, 226:17

**trained** 67:20

**training** 26:18, 29:15, 51:23, 51:23, 67:18, 71:22, 79:10, 139:2, 139:2, 232:2

**transcribed** 265:6

**transcript** 265:8, 265:10

**transcripts** 84:13, 86:9, 131:4

**Transit** 139:12

**translated** 11:20

**translating** 6:2, 84:15, 84:22

**translation** 12:1, 12:10, 12:11, 12:12, 12:20, 12:21, 84:13

**translations** 11:22, 11:24

**transmissions** 12:4

**travel** 15:10

**traveled** 21:9

**Traveling** 184:20

**treat** 19:15

**treated** 23:5, 23:7, 78:12, 100:12, 125:21, 176:11, 245:21

**treating** 19:20

**tremendous** 92:24

**trends** 228:18

**trial.** 113:16

**trials** 58:1, 62:22, 237:22, 237:22

**tricky** 48:16, 48:24, 49:5

**tried** 27:2, 229:17

**Trinity** 159:20

**trip** 6:10, 21:16, 21:17, 21:18, 79:11, 79:13, 141:16, 141:20

**trips** 21:11, 21:13, 21:16

**trouble** 38:10

**troublesome** 194:6

**truck** 28:16, 164:19, 172:18, 173:6, 187:16

**trucking** 29:14

**true** 6:20, 9:4, 109:5, 220:25, 253:6, 253:12, 254:13, 265:8

**trust** 119:25, 119:25, 120:4, 227:15

**trustworthy** 120:18

**try** 7:10, 59:4, 59:8, 59:14, 66:18, 72:20, 105:9, 170:18, 170:19, 191:4, 198:2, 220:1, 254:21, 254:21, 255:1, 255:14, 261:19

**Trying** 39:7, 85:20, 108:4, 118:6, 119:8, 120:12, 199:1, 201:14, 237:9

**Tuesday** 151:25

**Tulsa** 236:18

**Turn** 119:3, 128:22, 131:16, 131:17

**turned** 81:15, 126:3, 127:8, 128:22

**turns** 56:9, 67:19

**TV** 8:13, 15:2, 55:15, 70:7, 109:12, 170:10, 170:12, 170:13, 240:18

**tw** 57:11

**twelve** 62:14, 62:15

**Twenty** 29:13, 69:18,

122:17, 123:9, 222:17,
222:18, 222:19, 222:20,
226:25, 231:9
**Twenty-eight** 21:4
**twenty-five** 56:8, 81:15,
141:3
**twenty-four** 67:13, 219:17,
219:19, 222:10
**twenty-three** 195:24
**Twenty-two** 124:11, 192:9
**twice** 78:6
**twin** 147:7, 147:8, 147:17
**Two** 8:14, 21:5, 22:1, 24:13,
29:13, 36:17, 37:22, 39:4,
40:24, 60:19, 75:8, 77:7,
77:15, 90:1, 128:3, 129:13,
133:17, 134:11, 143:13,
152:10, 154:17, 155:20,
173:13, 173:21, 174:11,
175:14, 184:1, 187:21, 190:9,
191:7, 209:2, 216:10, 219:14,
220:5, 222:17, 249:1, 256:11
**Tyler** 121:2
**Type** 24:4, 32:16, 42:21,
45:4, 54:4, 64:11, 69:17,
87:13, 109:12, 120:2, 121:3,
126:6, 127:25, 128:19,
132:22, 149:18, 149:18,
149:19, 153:12, 153:13,
165:6, 181:20, 208:13,
223:12, 226:11, 226:15,
230:17, 253:22, 253:23
**typically** 194:2

**< U >**
**U.** 223:11
**ultimate** 157:1
**ultimately** 80:11, 236:6
**uncles** 153:4, 153:4
**undercover** 128:20
**underprivileged** 37:5, 37:8
**understand** 5:20, 13:4,
42:23, 89:6, 99:6, 104:12,
104:13, 104:14, 104:16,
105:10, 105:13, 106:3, 108:5,
109:3, 109:24, 110:20, 112:5,
112:13, 112:25, 149:20,
174:19, 179:5, 185:16,
192:14, 193:21, 209:11,

223:8, 225:22, 234:16, 239:7,
243:12, 246:8, 247:13,
252:18, 255:3, 261:24
**understanding** 105:25,
107:11, 154:24, 258:2
**understood** 67:25
**uneasiness** 27:8
**unemployed** 5:12, 5:16,
99:19, 128:5, 158:23
**unequivocal** 186:11
**unfailingly** 206:15
**unfair** 156:13
**Unfortunately** 110:14, 257:8
**Union** 35:6, 35:7, 35:8,
139:6, 139:9, 139:11, 139:12,
139:16
**unions** 35:10
**unit** 121:1, 121:2
**University** 46:9
**unless** 12:16, 74:6, 253:17
**unnecessary** 5:21
**unpleasant** 8:2
**upcoming** 76:14
**update** 67:11, 258:25
**UPS** 187:14, 187:24, 188:3,
192:8, 193:3
**Upstate** 40:5
**Urban** 106:19
**usage** 125:17
**uses** 258:12
**usual** 222:11
**utilized** 121:20
**utilizing** 4:10

**< V >**
**VA** 16:25, 20:25, 121:19
**Vacation** 65:11, 65:17, 66:1,
66:3, 69:17, 129:22, 142:9,
173:8, 184:22, 184:23
**vacations** 4:19, 5:22, 26:9,
69:3, 129:20
**Valley** 159:19, 159:20
**valuable** 74:14
**value** 17:25, 18:1, 220:13
**variety** 210:15, 210:17
**various** 258:19
**vary** 87:16
**verdict** 22:5, 42:23, 43:17,

110:10, 110:24, 113:15,
177:3, 177:10, 223:18
**versa** 71:19
**VERSUS** 1:10, 14:21, 25:3,
34:2, 48:14, 69:25, 79:22,
93:19, 102:19, 116:1, 134:23,
142:23, 150:20, 167:15,
187:1, 224:13, 234:24
**veterans** 19:15, 19:21, 19:21
**vice** 71:19
**victim** 23:9
**video** 126:2
**videos** 86:9, 90:19
**Vietnam** 19:22, 232:4
**view** 11:14, 105:16, 115:11
**views** 111:19, 252:15
**violation** 54:10, 54:13, 64:19
**violent** 38:11, 217:6, 217:7
**vision** 151:11
**visit** 73:2, 187:6, 193:5
**visits** 190:24, 262:24
**voice** 94:8, 115:21
**VOIR** 1:18, 115:9, 258:15,
259:15, 259:20, 260:6, 261:3
**voir-dired** 261:5
**volition** 113:23
**VOLUME** 1:17
**voluntary** 144:8, 144:9,
145:1
**volunteer** 104:20, 216:17
**Volunteering** 8:15, 105:1
**Voss** 93:7, 93:11, 99:2,
102:3

**< W >**
**wages** 104:6
**wait** 68:13, 68:14
**waiting** 79:19, 93:16,
142:18, 172:3, 186:25,
212:13, 240:15, 248:9
**Waitress** 146:20, 146:22
**Wal-mart** 39:15, 73:13, 77:9
**walk** 10:18
**Walker** 235:21
**Wall** 2:17
**wallet** 31:11
**walls** 94:8
**wanted** 4:4, 4:20, 13:4, 18:6,
29:21, 67:11, 67:14, 107:10,

115:10, 144:12, 163:5, 175:1, 246:4, 258:25, 263:1
**wanting** 181:20
**wants** 12:24, 203:25, 250:1, 257:15, 261:13
**War** 19:20, 35:21, 104:17, 110:13, 229:4, 237:8
**warehouse** 11:6, 39:14, 94:10, 99:21
**wars** 19:23
**wash** 163:8
**watch** 14:9, 24:17, 33:19, 44:3, 54:25, 55:18, 57:23, 65:7, 78:25, 82:6, 92:12, 102:9, 108:18, 112:23, 126:20, 142:6, 143:8, 170:10, 177:23, 177:24, 177:25, 179:21, 186:5, 194:16, 200:17, 212:5, 217:4, 217:7, 224:4, 234:14, 240:10, 248:3, 255:25
**watched** 8:13, 197:25
**watching** 74:11, 163:11, 170:12
**water** 117:21, 216:7, 220:1
**Waxahachie** 56:6, 60:25, 61:2, 61:10, 61:15, 63:9
**ways** 114:19, 190:9
**weapons** 228:1, 232:6
**wear** 138:13, 151:12
**weather** 144:14, 236:12
**wedding** 69:20, 76:18, 76:20
**Wednesday** 81:17
**week** 42:5, 65:21, 66:4, 76:25, 103:16, 114:12, 118:25, 151:23, 162:13, 217:25, 221:9, 239:8, 239:9, 239:11, 241:15, 263:5
**weekend** 79:11, 79:16
**weekends** 87:16
**weekly** 222:8
**weeks** 5:7, 8:14, 55:10, 82:21, 99:16, 134:11, 136:10, 158:9, 174:11, 193:15, 248:12
**weigh** 192:20, 207:14, 255:9
**weighing** 48:17
**weight** 31:25, 134:22, 175:4, 175:4, 175:8
**welcome** 69:24, 93:17

**West** 130:3, 197:11, 203:5, 203:6, 246:14, 250:10
**Western** 39:16, 231:13
**Whatever** 17:7, 20:20, 27:1, 28:22, 169:7, 177:7, 185:16, 213:4, 215:3, 254:18, 255:4, 259:9
**whatsoever** 206:3
**whenever** 226:8
**whether** 17:17, 21:23, 45:1, 48:14, 103:4, 129:8, 130:19, 146:19, 151:6, 190:11, 190:13, 191:22, 201:7, 213:7, 224:25, 242:12, 257:5, 257:9, 260:23
**whoa** 58:20
**whole** 51:19, 58:15, 59:4, 76:6, 158:20, 168:20, 168:23, 169:19, 189:24, 202:4, 213:13
**whom** 102:4, 126:14, 157:14, 167:2, 200:10
**wife** 30:18, 52:18, 103:25, 104:1, 125:10, 125:12, 140:3, 216:1, 219:3, 219:15, 220:20, 220:25, 230:14, 262:23
**willing** 229:2
**wind** 114:18
**Window** 10:22
**windows** 71:12, 71:20
**Wing** 95:25
**wish** 262:22
**wishes** 263:7
**within** 17:7, 187:12, 196:24, 241:24
**Without** 193:25, 227:24, 251:21, 251:21, 259:16
**Witness** 23:3, 80:16, 90:19, 117:14, 175:5, 250:3, 259:19, 263:6
**witnesses** 63:18, 90:18, 91:21
**women** 138:13, 162:6, 164:4
**wonder** 182:14, 191:10, 244:8
**wonderful** 250:24
**wondering** 55:13, 127:5, 158:13, 159:5, 195:18, 260:21
**word** 4:18, 11:20, 12:6,

12:16, 59:5, 59:16, 62:9, 63:24, 88:23, 111:23, 130:10, 223:7, 239:21
**words** 6:3, 6:18, 6:19, 6:19, 12:3, 12:15, 54:4, 54:4, 84:23, 94:2, 130:20, 132:22, 149:9, 223:7, 247:10
**wore** 52:10
**Workers** 35:7, 80:4
**working** 10:21, 29:16, 45:14, 81:14, 99:21, 128:17, 133:2, 149:3, 152:8, 154:22, 169:19, 176:17, 187:7, 210:12
**Works** 31:2, 31:9, 31:10, 40:14, 45:14, 45:15, 73:13, 77:2, 77:9, 100:22, 100:23, 164:18, 165:1, 183:17, 190:5, 238:17
**World** 37:1, 37:4, 37:7, 41:13, 41:23, 203:7, 223:1, 229:7, 229:11, 237:10, 248:22
**worried** 189:7, 189:12, 189:16, 239:19
**worry** 85:14
**worrying** 189:24
**Worth** 2:46, 39:18, 63:7, 128:19, 230:23
**wrestler** 31:23
**write** 50:10, 236:22
**writing** 259:3
**written** 92:1
**wrote** 253:11, 254:18

**< Y >**
**year** 9:25, 39:23, 55:17, 55:20, 60:18, 61:11, 68:19, 80:1, 94:20, 116:12, 116:18, 122:13, 133:18, 140:11, 152:22, 165:11, 209:18, 209:18, 210:6, 216:21
**yesterday** 4:11, 4:16, 67:24, 69:16, 114:11, 115:11, 235:12, 256:20, 262:21
**York** 2:18, 39:19, 40:2, 40:5, 152:21, 153:24, 154:16, 154:21, 221:6, 221:8
**Young** 30:24, 39:4, 66:3, 66:14, 153:5, 162:23, 219:14

**youngest** 153:4, 262:25
**yourself** 73:17, 91:25,
103:24, 164:2, 175:12,
182:17, 191:6, 211:9, 251:13
**Youth** 37:1, 37:4, 37:6, 37:7,
37:8, 41:13, 41:23
**Yucatan** 76:23


**< Z >**
**Zeigler** 46:13, 46:15, 46:18,
50:15, 50:16, 51:20
**Zig** 46:12, 46:15, 46:17,
50:16, 51:20
**zip** 25:18


**< Dates >**
**july 18, 2007** 1:13, 1:13, 1:13
**september 1988** 146:10,
146:10