18:00

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

UNITED STATES OF AMERICA          (     NUMBER 3: 04-240-G
                                  (
                                  (
VERSUS                            (
                                  (
HOLY LAND FOUNDATION, ET AL.      (     July 19, 2007

18:00

_____

VOLUME 4
VOIR DIRE EXAMINATION
BEFORE THE HONORABLE A. JOE FISH
_____


A P P E A R A N C E S:


For the Government:     MR. JIM JACKS
                        MR. BARRY JONAS
                        MS. ELIZABETH SHAPIRO
                        MR. NATHAN GARRETT
                        Assistant United States Attorney
                        UNITED STATES DEPARTMENT OF JUSTICE
                        NORTHERN DISTRICT OF TEXAS
                        U.S. Courthouse
                        1100 Commerce Street
                        Dallas, Texas 75242
                             214/659-8600


For the Defendant Shukri Baker:


                        MS. NANCY HOLLANDER
                        MS. TERESA DUNCAN
                        FREEDMAN BOYD DANIELS
                        HOLLANDER
                        20 First Plaza, Suite 700
                        Albuquerque, NM 87102
                             505/842-9960

18:00  1    For the Defendant El-Mezain:

       2
                                MR. JOSHUA DRATEL
       3                        MR. AARON J. MYSLIWIEC
                                LAW OFFICE OF JOSHUA L. DRATEL
       4                        14 Wall Street, 28th Floor
                                New York, NY 10005
       5                             212/732-0707

       6
            For the Defendant Mufid Abdulqader:
       7

       8                        MS. MARLO CADEDDU
18:00                           LAW OFFICE OF MARLO P. CADEDDU
       9                        3232 McKinney Avenue, Suite 700
                                Dallas, Texas 75204
      10                             214/744-3015

      11    For the Defendant Elashi:

      12
                                MS. LINDA MORENO
      13                        LAW OFFICE OF LINDA MORENO
                                PO BOX 10985
      14                        Tampa, Florida 33679
                                     813-247-4500
      15
                                MR. JOHN D. CLINE
      16                        Jones Day
                                555 California St
      17                        26th Floor
                                San Francisco, CA 94104-1500
      18                             415/875-5812

      19    For the Defendant Odeh:

      20                        MR. GREG WESTFALL
                                WESTFALL PLATT CUTRER
      21                        Mallick Tower
                                One Summit Avenue, Suite 910
      22                        Fort Worth, Texas 76102
                                     817/877-1700
      23

      24    Court Reporter:     Cassidi L. Casey, CSR No. 1703
                                1100 Commerce Street, Rm 15D6L
      25                        Dallas, Texas 75242
                                     214-254-3139

$$P \ R \ O \ C \ E \ E \ D \ I \ N \ G \ S:$$

18:00    THE COURT: Good morning, Ladies and Gentlemen.

MR. WESTFALL: Your Honor, may I approach?

THE COURT: Yes, sir.

Thank you for being on time.

MR. WESTFALL: Your Honor, I haven't had a chance to speak to the government, but I was thinking last night, the Court has given us six strikes per side for alternates.

THE COURT: Yes, sir.

MR. WESTFALL: That would basically be the equivalent of having received twenty-four strikes for the venire panel. We haven't gotten so fond of those six strikes that we wouldn't be willing to go to the statutory three. And with -- We could automatically have six more on this panel if we went to the three strikes per side. That may be an idea. I think everyone, your Honor, would love to figure out a way to make this thing end at lunch time.

THE COURT: Well, why don't you take a minute to confer with counsel for the government to see if that's agreeable to them, and if so, maybe we can shorten these proceedings.

MR. JACKS: Your Honor, this is the first we have heard of it and to sit here and try to think about

18:00  1    the impact of that, we will need more time.

2              THE COURT:  I understand that.  So maybe you can

3         reflect on it and let me know either after the mid-morning

4         recess or after the lunch recess.

5              MR. JACKS:  Thank you, your Honor.  I have one

6         question I wanted to raise.  Regarding the challenges for

7         cause and the hardship situations, I wasn't sure what the

8         Court intended to do -- if the Court was simply going to

9         make a ruling on those and come back and tell us or if the

10        Court was going to perhaps take a moment and summarize so

11        that we all are on the same page as to who's still out

12        there with a cause challenge pending.  And even beyond

13        that, if the Court would even consider giving each side

14        thirty seconds or so just to crystallize their causes and

18:00 15       their response to that cause.

16             THE COURT:  Well, the time table I thought we

17        were on before Mr. Westfall rose to speak a moment ago

18        would be for us to have a general voir dire session,

19        probably at nine o'clock tomorrow morning, but early in

20        the day tomorrow.  And in order to accomplish that, I will

21        need to make a ruling on these pending challenges for

22        cause and hardship excuses by early afternoon today so

23        that we would be able to place a recorded message on this

24        automated telephone system at the jury administrator's

25        office by three o'clock which people needed to report

18:00 1    tomorrow.  So it's my intent to compile that list as we

2    were going along so that I could announce that some time

3    maybe by -- at the conclusion of the noon recess or if I

4    get it together sooner maybe even before that.  So that

5    was my plan.  But in light of what Mr. Westfall has

6    suggested, I'm not sure where we are on the time table if

7    we do try to accelerate things in the manner he suggested.

8         MR. JACKS:  Thank you, your Honor.  Does the

9    Court have in mind the number that it would like to have?

10         THE COURT:  Well, under the numbers that we were

11    operating on before, you know, with six strikes per side

12    for alternates and wanting to have six alternates at the

13    end, that's a total of eighteen, six plus six plus six,

14    and then to get our jury of twelve, I have allocated

18:00 15    twelve strikes collectively to the defense and seven for

16    the government, and then the twelve jurors that we want to

17    wind up with is -- Twelve plus twelve plus seven is

18    thirty-one.  So that's a total of forty-nine all together,

19    regular and alternates.  And my goal today was to question

20    enough people so that after I make a ruling on these

21    challenges for cause and hardship excuses, we would have

22    probably I would say somewhere like half a dozen to a

23    dozen in excess of this forty-nine minimum in case

24    something comes up at the general voir dire that none of

25    us has heard about before, and we wind up having to excuse

18:00 1    a few additional people.  That was my thought.  I don't

2    have a definite number in mind but just some cushion

3    beyond the forty-nine numbers.

4          I believe when we left off for the day yesterday

5    our next person was Patricia Sanders.

6          Good morning, Ms. Sanders.  Counsel for the

7    parties have some questions they would like to ask you?

8          VENIRE PERSON:  Okay.

9          THE COURT:  Mr. Westfall.

10         MR. WESTFALL:  Thank you, your Honor.  My name

11   is Greg Westfall.  How are you this morning?

12         VENIRE PERSON:  I'm good.  How are you?

13         MR. WESTFALL:  I'm one of the defense lawyers in

14   this case, and I am going to speak with you a few minutes.

18:00 15   This case is United States versus the Holy Land Foundation

16   and involves allegations by the government that the Holy

17   Land Foundation and some of the men involved with the Holy

18   Land Foundation gave material support to HAMAS which is a

19   foreign terrorist organization.  The Holy Land Foundation

20   was an American Muslim charity based in Richardson.  Have

21   you heard of the case before?

22         VENIRE PERSON:  No.

23         MR. WESTFALL:  Haven't heard anything in the

24   media?

25         VENIRE PERSON:  No.

18:00  1          MR. WESTFALL:  Do you know any Muslims?

      2           VENIRE PERSON:  No, sir, I don't.

      3           MR. WESTFALL:  Have you ever?

      4           VENIRE PERSON:  No, sir.

      5           MR. WESTFALL:  Have you had any good experiences

      6  with either Muslims or people of Arabic descent?

      7           VENIRE PERSON:  Stopping by the gas station to

      8  get gas.  Other than that, you know, I'm pretty --

      9           MR. WESTFALL:  Has it been pleasant?

    10           VENIRE PERSON:  Yes, very pleasant.

    11           MR. WESTFALL:  Any bad experiences that you can

    12  think of?

    13           VENIRE PERSON:  No, none at all.

    14           MR. WESTFALL:  So on a case where we're talking

18:00 15  about Muslims, Muslim men that are charged with something

    16  that has terrorism in the title -- material support to

    17  terrorism in the title, how do you feel about being on a

    18  jury -- I know you did jury service before but not on a

    19  case like this.  How do you feel about being on a jury

    20  like this?

    21           VENIRE PERSON:  It doesn't bother me.  They need

    22  to be judged on the facts.  I don't look at it any

    23  different.  I just look at the facts presented and make my

    24  judgment from that.

    25           MR. WESTFALL:  How do you feel about free

18:00 1    speech, First Amendment?

2              VENIRE PERSON:  I guess everybody needs to be

3    able to express themselves.  I don't try to hold anybody

4    back from saying what they want to say.  We live in

5    America.  Everybody can say what they want to say.  I

6    don't judge them for it.  That's their opinion.  I have my

7    opinion.  No judgment, just that's your opinion.  We can

8    agree to disagree, and we go on from there.

9              MR. WESTFALL:  You said in your questionnaire

10   that you were currently unemployed.

11             VENIRE PERSON:  I'm looking for a job, yes.

12             MR. WESTFALL:  Are you?

13             VENIRE PERSON:  Yes.

14             MR. WESTFALL:  Any leads on any?

18:00 15             VENIRE PERSON:  I'm working with a temp agency

16   right now, and they are trying to hunt me up a position.

17   Nothing yet.

18             MR. WESTFALL:  What kind of a position?

19             VENIRE PERSON:  Clerical, secretarial.

20             MR. WESTFALL:  What do you like about that?

21             VENIRE PERSON:  People around the office, lots

22   of customer contact.  Helping people.  I like to do that

23   kind of stuff.

24             MR. WESTFALL:  Are you involved with a church?

25             VENIRE PERSON:  Yes.

18:00 1             MR. WESTFALL:  Which one?

2             VENIRE PERSON:  New Mount Zion Baptist in

3     Dallas.

4             MR. WESTFALL:  Do you do any like volunteer work

5     with the church?

6             VENIRE PERSON:  It depends, you know.  Just

7     helping out, doing Thanksgiving holidays, things like

8     that.  Sometimes I have had a chance to do the Meals on

9     Wheels, things like that around the community.

10             MR. WESTFALL:  Do you enjoy doing that?

11             VENIRE PERSON:  I enjoy doing that, yes.

12             MR. WESTFALL:  Do you work with any charities at

13     all?

14             VENIRE PERSON:  I do.  Mothers -- I guess it's

18:00 15     MADD is what I'm trying to do.

16             MR. WESTFALL:  Mothers Against Drunk Drivers?

17             VENIRE PERSON:  Yes.

18             MR. WESTFALL:  What did you do for them?

19             VENIRE PERSON:  Donations around the

20     neighborhood or something like that.  I will help them

21     that way.  Organizing things at school for the kids.

22     Nothing real big.

23             MR. WESTFALL:  What caused you to gravitate

24     towards Mothers Against Drunk Drivers?

25             VENIRE PERSON:  Having teenagers in the house on

18:00  1    a Friday night and that fear of having them go out and be

       2    in an accident.

       3            MR. WESTFALL:  So you haven't suffered a

       4    personal loss?

       5            VENIRE PERSON:  Myself, I have not.  But seeing

       6    others that have, I feel like that's something -- We

       7    really need to drive that home to our kids that they need

       8    to be responsible behind the wheel.

       9            MR. WESTFALL:  This trial may last four months.

      10            VENIRE PERSON:  Okay.

      11            MR. WESTFALL:  Are you okay?

      12            VENIRE PERSON:  I have no problems with that.

      13            MR. WESTFALL:  No hardships, problems with that?

      14            VENIRE PERSON:  I'm in the middle right now of

18:00 15    getting my daughter ready for a marriage next month, but

      16    other than that I have no concerns about the time limit.

      17            MR. WESTFALL:  Okay.

      18            Do you have any questions or anything else you

      19    would like to say that I haven't asked you?

      20            VENIRE PERSON:  No, I don't think so.

      21            MR. WESTFALL:  Thank you so much.

      22            VENIRE PERSON:  Thank you.

      23            THE COURT:  Counsel for the government have

      24    questions for Ms. Sanders?

      25            MR. JACKS:  Thank you, your Honor.  Good

18:00 1    morning, Ms. Sanders.

2              VENIRE PERSON:  Good morning.

3              MR. JACKS:  I appreciate your being here

4    yesterday and again today.  We appreciate your patience

5    with us.

6              VENIRE PERSON:  No problem.

7              MR. JACKS:  My name is Jim Jacks.  I'm an

8    Assistant United States Attorney in the Northern District

9    of Texas.  I will be one of the prosecutors representing

10   the government during this trial.  I just have a few

11   questions to follow-up on as well.

12             What are some of the places that you have worked

13   with companies or offices that you have worked in the last

14   few years?

18:00 15           VENIRE PERSON:  No, I was employed with what was

16   formerly Bank One which is now Chase from 1989 up until

17   about 2001.

18             MR. JACKS:  Did you work in a bank location or

19   like a corporate office?

20             VENIRE PERSON:  Kind of both.  I have worked

21   here in the downtown area, and then I have worked out

22   in -- I have worked at the Oak Lawn office.  I have worked

23   at the office -- Industrial, down there by Saint Paul.

24             MR. JACKS:  How many years did you work for Bank

25   One, slash Chase slash J.P. Morgan?

18:00  1                    VENIRE PERSON:  Thirteen years.

       2            MR. JACKS:  And before that?

       3                    VENIRE PERSON:  Before that, I worked for GE

       4     Capital doing customer service for them.  I worked for

       5     them a couple of years.  I'm not sure who else.

       6            MR. JACKS:  That's fine.  Your husband on one of

       7     the lists we have you indicated he was a phone technician?

       8                    VENIRE PERSON:  Yes, he works for AT&T.

       9            MR. JACKS:  How long has he worked for them?

      10                    VENIRE PERSON:  He just celebrated his 35th

      11     anniversary.

      12            MR. JACKS:  What is meant by phone technician?

      13                    VENIRE PERSON:  He works primarily with

      14     commercial customers when their phones go down.  Now, he

18:00 15     can sit at a desk and communicate back and forth with them

      16     and fix whatever problems that they are having.  So he's

      17     mostly in the office all the time.

      18            MR. JACKS:  And you and your husband, did you

      19     all grow up in the Dallas area?

      20                    VENIRE PERSON:  I did.  My husband is from a

      21     small town in East Texas, Sulfur Springs.  But I grew up

      22     in the Dallas area.

      23            MR. JACKS:  I notice you have college credits.

      24     Where did you attend college?

      25                    VENIRE PERSON:  I started here at El Centro, and

18:00  1    I transferred out to Richland, and that was my early

       2    years.  We had just gotten married, and I had a child on

       3    the way and didn't finish college.  Had to go to work.

       4           MR. JACKS:  Yes, ma'am.  You have two children,

       5    a daughter twenty-one and a son thirty-one?

       6           VENIRE PERSON:  Yes.

       7           MR. JACKS:  And I think you told us that your

       8    son is currently serving time for a drug conviction.

       9           MR. JACKS:  Yes, sir.  He had a small amount --

      10    I guess under two ounces or ounce or something of a

      11    controlled substance, and they didn't say what the

      12    substance was.  So he had some probation time that he had

      13    to finish serving.  So he's been serving his probation

      14    time for about a year.

18:00 15           MR. JACKS:  So he's not incarcerated?

      16           VENIRE PERSON:  Well, he is incarcerated now.

      17    So he should have been getting out before the year is out,

      18    is what I understand.

      19           MR. JACKS:  Did he plead guilty or have a trial?

      20           VENIRE PERSON:  I guess he pled guilty.  He

      21    didn't have a trial or anything.

      22           MR. JACKS:  Did you and your husband have to

      23    hire an attorney?

      24           VENIRE PERSON:  Yes, we did.

      25           MR. JACKS:  Did you have to go to court?

18:00 1          VENIRE PERSON:  Yes, we did.

2          MR. JACKS:  Regarding that experience, do you

3     feel like he was treated fairly or appropriately by the

4     criminal justice system?

5          VENIRE PERSON:  Yes, I do.

6          MR. JACKS:  He's thirty-one.  Does he have his

7     own family or is he single?

8          VENIRE PERSON:  He's single.

9          MR. JACKS:  Is your daughter at home or in

10    school?

11         VENIRE PERSON:  Yes.  She went to school for

12    Mercedes Benz United Technical Institute to learn how to

13    work mechanics, and she had a position out in California

14    for a short time working for the Mercedes Benz, but now

18:00 15   she's back in the Dallas area, and she's waiting for

16    something to come open with them, and she will go back to

17    work with them.

18         MR. JACKS:  You said you were a member of New

19    Mount Zion church?

20         VENIRE PERSON:  Yes, sir.

21         MR. JACKS:  How big is that church in terms of

22    families or members?

23         VENIRE PERSON:  I would say we have about

24    twenty-five hundred, three thousand members.

25         MR. JACKS:  Are you a regular attendee?  Do you

18:00 1    go every Sunday?

2             VENIRE PERSON: Yes, I do.

3             MR. JACKS: Do you have any special -- Are you

4    in the choir or do you hold an office?

5             VENIRE PERSON: I don't hold an office at this

6    time. I was a regular choir member a few years. However,

7    I had a couple of illnesses that came up that kept me from

8    that, but being in the choir was my thing.

9             MR. JACKS: You have been on a trial jury before

10    in a criminal case, correct?

11            VENIRE PERSON: Yes, I have.

12            MR. JACKS: If you recall in that case, at the

13    end of the evidence after both sides have put in their

14    evidence and either before or after, depending on the

18:00 15    court it was in, the judge will read instructions to the

16    jury and tell them what the law is. Do you recall that?

17            VENIRE PERSON: Yes.

18            MR. JACKS: That will happen in this case as

19    well. And as has been stated to you, the central or lead

20    charge in this case that is referred to is providing --

21    this corporation or this association and people that work

22    for it are accused of providing material support to a

23    foreign terrorist organization; namely, HAMAS. Have you

24    ever heard of HAMAS?

25            VENIRE PERSON: I have heard of HAMAS on the

18:00 1    news.

2           MR. JACKS:  At the end when the Judge gives you

3    his instructions, I expect those instructions will contain

4    among other things a statement that the organization HAMAS

5    has been designated by the United States Government as a

6    foreign terrorist organization.  I also expect the judge

7    to include in his instructions a statement to the effect

8    of the law provides that you can't give anything that

9    would be to or for the benefit of a foreign terrorist

10    organization, even things that would otherwise be

11    considered charitable items, like food clothing, medical

12    supplies.  If it's intended to benefit that foreign

13    terrorist organization, even so called good things like

14    that, it's against the law to do that.  Would you be able

18:00 15    to follow the instruction and follow the law if that was

16    the law given to you?

17           VENIRE PERSON:  Definitely.

18           MR. JACKS:  Thank you, Ms. Sanders.

19           THE COURT:  Ms. Sanders, we're in the process of

20    talking with the members of the panel from which the

21    members of the jury will be selected to hear this case,

22    and I expect that process to go on for a while longer

23    today.  Until you hear from us again, you should not

24    discuss this case with anyone or allow anyone to discuss

25    it with you, and if there are any media accounts about the

18:00   1    case on the television or in the newspapers or radio, you

       2    should not read or watch or listen to any of those media

       3    accounts.

       4           Thank you, ma'am.  You may be excused.

       5           Good morning, Mr. McGahan.  Counsel for the

       6    parties have some questions they would like to ask you.

       7           MR. WESTFALL:  Good morning.  I'm Greg Westfall.

       8    I'm one of defense lawyers on this case.  Thank you for

       9    coming here.  You probably came here yesterday, too.

     10    Thank you so much for your time and your patience.  This

     11    case is the United States versus the Holy Land Foundation.

     12    Have you ever heard of that case?

     13           VENIRE PERSON:  Just a few times.

     14           MR. WESTFALL:  What have you heard?

18:00  15           VENIRE PERSON:  I can remember after 9-11, you

     16    know, just a little bit of the news.  The only thing I

     17    remember it saying is that they were accused of sending

     18    money over.  That's about really all I knew about it.

     19           MR. WESTFALL:  What the accusation or charge is

     20    is material support of a foreign terrorist organization,

     21    specifically HAMAS.  And it was an American Muslim charity

     22    based in Richardson and the allegation is material support

     23    to HAMAS.  What do you know about HAMAS?

     24           VENIRE PERSON:  Just hearing the name just every

     25    now and then in the news.

18:00 1          MR. WESTFALL:  Is there anything about what you

2     have heard in the news -- Have you made up your mind as to

3     opinions as to the guilt or innocence of the defendants?

4          VENIRE PERSON:  I really couldn't.

5          MR. WESTFALL:  Haven't heard quite enough?

6          VENIRE PERSON:  No.

7          MR. WESTFALL:  This case could run four months.

8     So needless to say, there is a whole lot more out there

9     that wasn't in the newspapers.

10          VENIRE PERSON:  All right.

11          MR. WESTFALL:  Where are you a delivery driver?

12    Is that what you still do?

13          VENIRE PERSON:  I drive for United Parcel

14    Service.

18:00 15          MR. WESTFALL:  Oh, UPS?

16          VENIRE PERSON:  Yes.

17          MR. WESTFALL:  Did you ever deliver to the Holy

18    Land Foundation?  Was that in your route?

19          VENIRE PERSON:  No, I never delivered in

20    Richardson.  The closest I would have gotten is the west

21    edge of Garland.

22          MR. WESTFALL:  How long have you been with UPS?

23          VENIRE PERSON:  Twenty-three years.

24          MR. WESTFALL:  So early eighties?

25          VENIRE PERSON:  1983 was the first Christmas I

18:00 1   worked.

2                MR. WESTFALL:  I guess you like it.

3                VENIRE PERSON:  Got to eat.

4                MR. WESTFALL:  There can be a distinction

5        between liking a job and got to eat.

6                VENIRE PERSON:  Well, I do enjoy it.

7                Play poker.  I like visiting my kids, my girls.

8        I have three daughters.  My granddaughter, I love seeing

9        her.  Just mostly family stuff and things like that.

10               MR. WESTFALL:  You like to hunt and fish or do

11       anything like that regularly?

12               VENIRE PERSON:  I ride a Harley.

13               MR. WESTFALL:  What kind?

14               VENIRE PERSON:  Soft Tail Night Train.

18:00 15          MR. WESTFALL:  Excellent.  Do you do that on the

16       weekends or any chance --

17               VENIRE PERSON:  Any chance, yes.

18               MR. WESTFALL:  This case involves Muslim men who

19       were charged with giving material support, accused of

20       giving material support to a terrorist organization.  Now,

21       you mentioned 9-11.  And that had a deep impact on all of

22       us in the United States, and I remember where I was when

23       the Towers went down.

24               VENIRE PERSON:  I do, too.

25               MR. WESTFALL:  But here we are.  This is a

18:00  1   criminal case, and everyone is supposed to have the

2   presumption of innocence and the burden of proof being

3   beyond a reasonable doubt. The government has to prove

4   those allegations or else the presumption of innocence

5   alone is sufficient to acquit. Those are the same kind of

6   protections that we would have in a car theft case, a drug

7   possession case and in this case material support of

8   terrorism. How do you feel about that?

9          VENIRE PERSON: I feel like we have it pretty

10   good, probably better than anything else, and I feel okay

11   with it.

12          MR. WESTFALL: You think that's fair?

13          VENIRE PERSON: Yes.

14          MR. WESTFALL: Why do you suppose we have those

18:00 15   protections?

16          VENIRE PERSON: Absolutely for fairness, I

17   imagine. To make sure that it's fair for everybody.

18          MR. WESTFALL: It's a very emotional subject for

19   virtually anyone in the United States, me included.

20   Everyone was touched by that.

21          VENIRE PERSON: Right.

22          MR. WESTFALL: Have you kept up at all with the

23   Palestinian-Israeli conflict?

24          VENIRE PERSON: I'm not a big paper reader or

25   anything like that, and I don't have the internet. So if

18:00  1     I don't hear it on talk radio, I don't know anything about

      2     it.

      3           MR. WESTFALL:  What kind of radio do you listen

      4     to?

      5           VENIRE PERSON:  KABP and KRLD.

      6           MR. WESTFALL:  There is a wide range on both of

      7     those stations.  Which do you like?

      8           VENIRE PERSON:  I listen to the news in the

      9     morning.  I don't hardly ever listen to the talk shows.

     10     In the afternoon, I listen to country music when I'm going

     11     home.  The talk shows, I have listened to them, and the

     12     left talks about the right, and the right talks about the

     13     left, and that's all I get out of it.

     14           MR. WESTFALL:  You don't like to get into all of

18:00 15     that?

     16           VENIRE PERSON:  Right.

     17           MR. WESTFALL:  And if it comes between spending

     18     your time with your daughter or learning about the

     19     Palestinian-Israeli conflict, you would probably make the

     20     choice I did.

     21           VENIRE PERSON:  I would be at my daughter's

     22     house with my grandkid.

     23           MR. WESTFALL:  You checked that noncitizens

     24     should not be afforded the same rights as citizens.

     25           VENIRE PERSON:  I checked that?

18:00  1             MR. WESTFALL:  So I'm gathering you didn't check

2      it on purpose.

3             VENIRE PERSON:  I don't remember checking that.

4             MR. WESTFALL:  Do you have any -- We're talking

5      legal resident aliens.

6             VENIRE PERSON:  I must have thought it said

7      illegal.  No, I don't.

8             MR. WESTFALL:  Very well.  You have been here

9      two days now.  Is there anything I haven't asked you?

10     Anything coming up in your life that we don't know about?

11     This is a four month long trial.

12             VENIRE PERSON:  No.  You know -- I don't

13     remember if I called and changed this or not, but it asked

14     something on there about have you been arrested for

18:00 15     something you could get a year in jail for.  I might have

16     checked yes, but it's no.  I have a pending DWI.

17             MR. WESTFALL:  Unless it's a felony DWI 3rd, you

18     can't get more than a year in jail.

19             VENIRE PERSON:  And I didn't know what the

20     correct answer would be.  So I put the worst to make sure

21     I wasn't going the wrong way.

22             MR. WESTFALL:  Very well.  Thank you for

23     speaking with me, and that's not going to be a problem.

24             VENIRE PERSON:  All right.

25             THE COURT:  Counsel for the government have

18:00 1    questions for Mr. McGahan?

2            MR. GARRETT:  Yes, your Honor.

3            Good morning, Mr. McGahan.  My name is Nathan

4    Garrett, and I'm an Assistant United States Attorney with

5    the United States Attorney's Office.  I will be one of the

6    prosecutors over here representing the United States, and

7    I thank you for your patience.  We're not very quick about

8    this.  I notice -- I think Mr. Westfall asked you, you

9    have three daughters.  Is that right?

10            VENIRE PERSON:  Yes.

11            MR. GARRETT:  And you still came out of that

12    with a Harley Davidson?

13            VENIRE PERSON:  Well, I just got it.

14            MR. GARRETT:  So you were patient about it?

18:00 15            VENIRE PERSON:  Right.  I waited.

16            MR. GARRETT:  You said a Night Train, right?

17            VENIRE PERSON:  Yes.

18            MR. GARRETT:  You like the new bikes or old

19    bikes best?

20            VENIRE PERSON:  I like the new balanced one.

21            MR. GARRETT:  The Fly Wheels?

22            VENIRE PERSON:  Yes, sir.

23            MR. GARRETT:  You were with UPS twenty-three

24    years?

25            VENIRE PERSON:  Yes.

18:00  1          MR. GARRETT:  I can't do the math that quickly.

2     What did you do before UPS?

3          VENIRE PERSON:  Only had six years from high

4     school.  Actually went to Texas Instruments for three

5     months.  I couldn't afford to work there, and then I went

6     to a place called Gardner Denver which was based here in

7     Dallas, and they made oil well and water well rigs, and I

8     was there five years, and you know what happened to the

9     oil business, and that was the end of that, and there was

10     a couple of years I worked little jobs, and when I had a

11     chance to get on with UPS, I did that.

12          MR. GARRETT:  Have you always been here?

13          VENIRE PERSON:  I have always been a delivery

14     driver starting from Mesquite, Texas going east.

18:00 15          MR. GARRETT:  And looks like on your

16     questionnaire, you have lived in this area your whole

17     life.

18          VENIRE PERSON:  Born on Ross Avenue in Dallas.

19          MR. GARRETT:  So all in Dallas?

20          VENIRE PERSON:  Dallas and east because I lived

21     in Kaufman County.

22          MR. GARRETT:  Okay.  Moved to the country?

23          VENIRE PERSON:  Yes.

24          MR. GARRETT:  Now, on your prior jury service --

25     Have you had any prior jury service?

18:00 1            VENIRE PERSON:  I just served on a jury in

2    Kaufman County.

3            MR. GARRETT:  Was that a civil case?

4            VENIRE PERSON:  Civil case.

5            MR. GARRETT:  Kaufman County?

6            VENIRE PERSON:  Yes.

7            MR. GARRETT:  Have you ever been called down

8    other than that time where you served in a jury pool like

9    you are right now?

10            VENIRE PERSON:  Kaufman either three or four

11    times in the last six years.

12            MR. GARRETT:  Anything in Dallas?

13            VENIRE PERSON:  Never in Dallas.

14            MR. GARRETT:  Is this your first experience

18:00 15    coming down to federal court?

16            VENIRE PERSON:  Oh, yes.

17            MR. GARRETT:  You mentioned a couple of things,

18    on prior involvement with the law.  You mentioned with Mr.

19    Westfall that you had a pending DUI right now?

20            VENIRE PERSON:  Yes.

21            MR. GARRETT:  Is that in Kaufman or --

22            VENIRE PERSON:  Yes.

23            MR. GARRETT:  Is that pending in the courts

24    right now?

25            VENIRE PERSON:  It's due to come up for a jury

18:00 1  trial August the 6th, is the last date I have heard that

2  was set.

3          MR. GARRETT:  Is there anything about that --

4  And I'm sorry to pry about that.  Awful nosey.  But is

5  there anything about that that would give you some

6  problems sitting fairly and impartially in this case and

7  being fair to the government and defendants?

8          VENIRE PERSON:  No.  Every situation you run

9  across, there is going to be differences.

10          MR. GARRETT:  Also, I saw where you mentioned

11  that your girlfriend had an incident sometime ago, an

12  arson-related situation?

13          VENIRE PERSON:  Yes.

14          MR. GARRETT:  Was that something that ended up

18:00 15  going to trial or how was it disposed of?

16          VENIRE PERSON:  She pled to get probation.

17          THE DEFENDANT:  Was that here in Dallas or --

18          VENIRE PERSON:  Kaufman.

19          MR. GARRETT:  How long ago was that?

20          VENIRE PERSON:  Two and a half, three years ago.

21          MR. GARRETT:  Is there anything about that that

22  would give you a problem in this case?

23          VENIRE PERSON:  No, that was something she

24  handled on her own.  I wasn't involved in any of it.

25          MR. GARRETT:  But from what you observed, do you

18:00 1    believe she was treated fairly?

2              VENIRE PERSON:  Yes.

3              MR. GARRETT:  Now, when you were serving on this

4    jury --

5              VENIRE PERSON:  Well, let me clarify.  I was the

6    second alternate.  I sat and listened, and then I had to

7    go home.

8              MR. GARRETT:  Not all bad?

9              VENIRE PERSON:  No.

10             MR. GARRETT:  At the end of this case, if you

11   are selected to serve on jury, the Judge will issue you

12   instructions, and the instructions will tell you what the

13   law is, and you will take the facts and apply them to the

14   law.  As we mentioned to you, the central allegation in

18:00 15   this case is these defendants knowingly provided material

16   support to a terrorist organization, HAMAS.  I can't

17   remember if he asked you or not.  Have you ever heard of

18   HAMAS?

19             VENIRE PERSON:  Just in the news.

20             MR. GARRETT:  And I expect those instructions

21   will tell you that HAMAS is a foreign terrorist

22   organization.  And I think the Judge will also tell you

23   that as a result of that designation one cannot knowingly

24   send any support to that organization -- money, but also

25   things that you might think of as humanitarian items,

18:00 1 clothing, blankets, medical supplies, any of those sorts

2 of things -- if it's to or for the benefit of a terrorist

3 organization. Do you understand that?

4 VENIRE PERSON: Yes.

5 MR. GARRETT: Is that an instruction you would

6 have a problem following?

7 VENIRE PERSON: No.

8 MR. GARRETT: Thank you for your time and

9 patience.

10 THE COURT: Mr. McGahan, we are in the process

11 of talking with the members of the pool from which the

12 jury will be selected that would hear this case. I expect

13 that process will continue for a while longer today. So

14 until you hear from us, you should not discuss the case

18:00 15 with anyone or allow anyone to discuss it with you.

16 And if there are any media accounts about the

17 case on the television or in the newspapers or on the

18 radio, you should not read or watch or listen to any of

19 those media accounts. Thank you, sir. You may be

20 excused.

21 Good morning, Ms. Hilton. Counsel for the

22 parties have some questions they would like to ask you.

23 Ms. Moreno.

24 MS. MORENO: Good morning, my name is Linda

25 Moreno. I'm one of the defense attorneys in this case. I

18:00  1    am going to ask you some questions just for a few minutes

2    about some of the answers that you filled out on your

3    questionnaire and also if you have heard anything about

4    this case.  This case involves an American Muslim charity

5    called the Holy Land Foundation.  Have you heard of the

6    Holy Land Foundation?

7              VENIRE PERSON:  Heard of it.

8              MS. MORENO:  In the press?

9              VENIRE PERSON:  Yes.

10             MS. MORENO:  And where did you hear it?

11             VENIRE PERSON:  In the press, the media.

12             MS. MORENO:  Do you recall what you heard about

13    it?

14             VENIRE PERSON:  Not really.

18:00 15             MS. MORENO:  Was that recently?  Some years back

16    or when?

17             VENIRE PERSON:  I saw an article in the

18    newspapers on Tuesday.

19             MS. MORENO:  Did you read the article?

20             VENIRE PERSON:  Yes.

21             MS. MORENO:  I'm sure you read in the article

22    that this case involves allegations of material support of

23    terrorism.

24             VENIRE PERSON:  Yes.

25             MS. MORENO:  So let me ask you right off the

18:00 1  bat.  Knowing this case is going to be a trial regarding

2  allegations of support of terrorism, how do you feel about

3  sitting on a case like that?

4          VENIRE PERSON:  I don't really believe I would

5  be comfortable with it.

6          MS. MORENO:  Now, we're here to explore those

7  feelings that all of these jurors may or may not have

8  because everybody in this courtroom -- his Honor and the

9  defense, the government -- wants jurors who could be fair.

10  So I'm asking you, do you have any opinions that you

11  believe would prevent you from being fair and impartial?

12          VENIRE PERSON:  I really -- I'm not sure.

13          MS. MORENO:  Okay.

14          VENIRE PERSON:  I'm afraid after 9-1 -- As leery

18:00 15  as a lot of Americans are.

16          MS. MORENO:  Yes, ma'am.  I can appreciate that,

17  and that leeriness that you have is something we need to

18  know a little bit about to determine if you could be fair

19  in this case.  What we need are jurors who can be fair and

20  jurors who are not concerned.  So forgive me for pushing

21  and exploring.  I know it's a bit of an invasion of

22  privacy, but as I said, there are no right or wrong

23  answers here, and we need to hear from you what your

24  feelings are in this regard.

25          VENIRE PERSON:  I don't feel it's an invasion.

18:00 1    I feel like my father and others who have died for my

2    right to be able to sit here deserve the pushing you have

3    to do to be sure that you come up with a jury that will be

4    fair.

5            MS. MORENO:  Do you think, Ms. Hilton, that you

6    could sit on a jury in this case and be fair?

7            VENIRE PERSON:  I am not at all sure that I

8    could be completely fair in a terrorism case, no.

9            MS. MORENO:  Do you understand that even though

10    it's a terrorism case it's still a criminal case under the

11    laws of America and the jurors have to be fair when they

12    come in?

13            VENIRE PERSON:  They are innocent until proven

14    guilty.  I'm afraid my own feelings of terrorism would

18:00 15   color my hearing.  I don't know how to say it better.

16            MS. MORENO:  If I can help you just a little

17    bit.  I think what I hear you saying is that given your

18    feelings, that you couldn't put those feelings aside and

19    give these gentlemen one hundred percent the presumption

20    of innocence to which they are required?

21            VENIRE PERSON:  I don't know that I could.

22            MS. MORENO:  And it seems to me that is a hard

23    felt opinion.  Am I right about that?

24            VENIRE PERSON:  As I said, I have family that

25    have died or been hurt -- as I'm sure most of you have --

18:00 1    for the rights I am entitled to today for their suffering.

2    So yes, I feel strongly about their right to a fair trial,

3    but I think I feel so strongly about terrorism that I'm

4    not sure I could do it, and I don't think I would want

5    somebody like me judging me, not in this instance.

6          MS. MORENO:  It's been a privilege to talk to

7    you.  Thank you so much.  Pass the witness.

8          THE COURT:  Counsel for the government have

9    questions for Ms. Hilton.

10          MS. SHAPIRO:  No, your Honor.

11          THE COURT:  Ms. Hilton, we are in the process of

12    talking to the members of the pool from which the jury

13    will be selected that would hear this case.  That process

14    will go on for a while longer today, and so until you hear

18:00 15    from us again, you should not discuss the subject of this

16    trial with anyone or allow anyone to discuss it with you.

17    And if there are any media accounts about the case in the

18    newspapers or on the television or radio, you should not

19    read or watch or listen to those accounts.

20          VENIRE PERSON:  I do have a question if I may.

21    My personal situation has changed since I came down on the

22    27th with the first call.  My husband will be eighty in

23    September.  He does have some dementia.  He saw the doctor

24    the morning I came down, and I normally go with him to

25    doctor's appointments.  I went and spoke to Dr. Pat, and a

18:00  1    couple of days after that he says my husband should not be

2    allowed to remain unattended for very long at a time, he

3    should not be on his own too much, and I really feel like

4    my situation has changed such that I am a care giver to a

5    dependent senior.

6              THE COURT:  Thank you, Ms. Hilton.  I think all

7    of us appreciate your taking the time to be down here

8    today given the other demands from your husband's

9    situation.

10             MS. MORENO:  Your Honor, on behalf of the

11   defense we would move for a cause challenge against Ms.

12   Hilton.  She could not be fair and impartial.

13             THE COURT:  Any objection, Ms. Shapiro?

14             MS. SHAPIRO:  No objection.

18:00 15            THE COURT:  I will excuse Ms. Hilton for cause.

16             Good morning, Mr. Matthews.  Counsel for the

17   parties have some questions for you.

18             MR. WESTFALL:  Mr. Matthews, good morning.  I'm

19   Greg Westfall.  How you doing?

20             VENIRE PERSON:  All right.

21             MR. WESTFALL:  I'm one of the defense lawyers in

22   this case.  Thank you for coming up here.  I know you

23   probably had to sit here all day yesterday.  Thank you for

24   that, and this is your last day of sitting and waiting.

25             This case is the Holy Land Foundation case,

18:00 1    United States versus Holy Land Foundation.  Does that ring

2    a bell?

3            VENIRE PERSON:  Yes.

4            MR. WESTFALL:  Tell me what you have heard.

5            VENIRE PERSON:  I don't know much.  Looking

6    through the news I have heard of it.  Don't know any

7    details or anything.

8            MR. WESTFALL:  Well, it is a case that involves

9    an American Muslim charity.  Used to be in Richardson,

10    Texas.  And the government is alleging the charity and

11    some of the men involved with the charity gave material

12    support to HAMAS.  You have heard of HAMAS?

13            VENIRE PERSON:  Yes.

14            MR. WESTFALL:  The actual title is material

18:00 15    support to a foreign terrorist organization.  Having heard

16    that and what you have heard on the news, have you formed

17    an opinion to the guilt or innocence of the defendants or

18    anyone else?

19            VENIRE PERSON:  Honestly I won't even buy gas if

20    they are behind the counter.  I go to the next gas station

21    or whatever.

22            MR. WESTFALL:  In a criminal jury and in a civil

23    jury, too, which is what we're talking about here, a

24    person who's on the jury has to be able to clear their

25    mind of all experiences and be able to judge just based

18:00  1    upon the evidence and the facts in court.  I mean every

2    jury is as different as every case is.  It sounds like in

3    this case because of the terrorism issue and because of

4    the Muslim issue you would have trouble doing that.

5              VENIRE PERSON:  Yes.

6              MR. WESTFALL:  So you are telling us you could

7    not set that aside and fairly judge the case on the facts?

8              VENIRE PERSON:  No.

9              THE COURT:  Counsel for the government have

10   questions for Mr. Matthews?

11             MS. SHAPIRO:  No, your Honor.

12             THE COURT:  Mr. Matthews, we are in the process

13   of talking with the members of the pool from which the

14   jury in this case will be selected.  I expect that process

18:00 15   will continue later on today.  In the meantime, until you

16   hear from us further, you should not discuss the subject

17   of this case with anyone or allow anyone to discuss it

18   with you.

19             VENIRE PERSON:  Yes, sir.

20             THE COURT:  And if there are any media accounts

21   about this case on the television or in the newspapers or

22   on the radio, you should not read or watch or listen to

23   any of those media accounts.

24             VENIRE PERSON:  Okay.

25             THE COURT:  Thank you, you may be excused.

18:00  1          MR. WESTFALL:  Your Honor, the defense will

      2    submit Mr. Matthews for his inability to be fair and

      3    impartial because of the Muslim issue, that he cannot set

      4    it aside.

      5          THE COURT:  Any objections?

      6          MS. SHAPIRO:  No, your Honor.

      7          THE COURT:  I will excuse Mr. Matthews for

      8    cause.

      9          Good morning, Mr. Erbert.  Counsel for the

     10    parties have some questions for you.

     11          MR. WESTFALL:  Mr. Erbert, I'm Greg Westfall.

     12    I'm one of the defense lawyers in this case.  Thank you

     13    for the time you spent waiting to talk to us.  You

     14    answered Question Number 40 on the questionnaire that said

18:00 15    you had travel plans on July 26 and 29 that you will not

     16    cancel.

     17          VENIRE PERSON:  I would rather not.  I'll lose

     18    the money.  It's paid for.

     19          MR. WESTFALL:  Tell us a little bit about it.

     20    How long have you had the tickets?  Where are you going?

     21          VENIRE PERSON:  Going to Vegas to see friends we

     22    haven't seen in twenty years, and we made the plans in

     23    February and we fly out Sunday.

     24          MR. WESTFALL:  You should have received a

     25    questionnaire about hardship.

18:00 1             VENIRE PERSON:  I did put it on there.

2             MR. WESTFALL:  So you submitted early and

3  submitted often?

4             VENIRE PERSON:  Yes, sir.  And that's really my

5  only issue is that Thursday.  I don't know if court is in

6  session on that Friday.

7             MR. WESTFALL:  So that's like a Thursday,

8  Friday, Saturday, Sunday?

9             VENIRE PERSON:  Yes.

10            MR. WESTFALL:  We will let the Court decide

11  that.  This case is about the United States versus the

12  Holy Land Foundation for Relief and Development.  Does

13  that ring any bells?

14            VENIRE PERSON:  Just on the questionnaire.  I

18:00 15  think they mentioned that in there, but that was it.

16            MR. WESTFALL:  It was an American Muslim charity

17  that is charged with giving material support to HAMAS

18  which is a foreign terrorist organization.  Having heard

19  that, does that ring any bells?  Have you heard about it

20  in the media?

21            VENIRE PERSON:  I think Tuesday while getting

22  ready for work they said the trial was about to begin, but

23  that was all that was said.

24            MR. WESTFALL:  Well, from any source, whether it

25  be TV or conversations with anyone, have you formed any

18:00 1    opinions as to the guilt or innocence of anyone?

2              VENIRE PERSON:  No.

3              MR. WESTFALL:  Did you say you follow the

4    Palestinian-Israeli conflict?

5              VENIRE PERSON:  Not really follow it.  I have

6    heard about it on the news.

7              MR. WESTFALL:  Do you have any sense about who's

8    right or wrong?

9              VENIRE PERSON:  Honestly, if it doesn't affect

10   me immediately, I can't pay too much attention.

11             MR. WESTFALL:  You were in the Navy?

12             VENIRE PERSON:  Yes.

13             MR. WESTFALL:  Were you a SEAL?

14             VENIRE PERSON:  No.

18:00 15   MR. WESTFALL:  I saw all the places you have

16   been.  Sierra Leone?

17             VENIRE PERSON:  Yes, it was mostly volunteering

18   reserve to go all of these places.

19             MR. WESTFALL:  What did you do?

20             VENIRE PERSON:  Supply.  And Sierra Leone was

21   helping to get the refugees to Monrovia.

22             MR. WESTFALL:  And Bahrain?

23             VENIRE PERSON:  Supply.

24             MR. WESTFALL:  Were you working with refugees

25   there?

18:00 1          VENIRE PERSON:  No.  1992 -- I forget when it

2     was.  Just helping get the compound ready.

3          MR. WESTFALL:  What kind of compound?

4          VENIRE PERSON:  Just supply.

5          MR. WESTFALL:  How many missions have you done

6     where you actually helped refugees?

7          VENIRE PERSON:  One.  It was an eye opener, the

8     conditions over there.

9          MR. WESTFALL:  Tell me more.

10          VENIRE PERSON:  Third world country, the

11     poverty.  The first couple of weeks was really stressful

12     but really enjoyed it.

13          MR. WESTFALL:  Did you feel like you were

14     helping the people?

18:00 15          VENIRE PERSON:  Yes.

16          MR. WESTFALL:  Were you able to communicate?

17     Did you use translators?

18          VENIRE PERSON:  No, we had a local who assisted

19     us with everything, and he would take us sightseeing and

20     explain the sites and explain the culture.  But after a

21     couple of weeks, the heat and bugs.  I really enjoyed it.

22          MR. WESTFALL:  Did you see any other relief

23     agencies working in there?

24          VENIRE PERSON:  If I did, it would have been

25     just in passing, a UN truck or something passing by, but

18:00 1    never dealt with them directly.

2              MR. WESTFALL:  You never felt any call to go

3    work with relief?

4              VENIRE PERSON:  After that I wouldn't have

5    minded going back, but then the wife has concerns, not

6    wanting to do all of that anymore.

7              MR. WESTFALL:  She didn't like sleeping under

8    mosquito nets?

9              VENIRE PERSON:  No, me being gone.

10              MR. WESTFALL:  So there was no issue with her

11    going with you?

12              VENIRE PERSON:  That might be an issue.

13              MR. WESTFALL:  Where are you an IT manager?

14              VENIRE PERSON:  I work for a computer contractor

18:00 15    out of Lockheed Martin in Fort Worth.

16              MR. WESTFALL:  You work in Fort Worth.  Quite a

17    drive?

18              VENIRE PERSON:  Yes.

19              MR. WESTFALL:  On the side where you need a

20    security clearance?

21              VENIRE PERSON:  Yes.

22              MR. WESTFALL:  And do you have an active

23    security clearance right now?

24              VENIRE PERSON:  Yes, I do.

25              MR. WESTFALL:  This is a case obviously

18:00 1    involving Muslim men who were accused of giving material

2    support to a terrorist organization.  You have heard of

3    HAMAS?

4           VENIRE PERSON:  Yes.

5           MR. WESTFALL:  How do you feel about being on a

6    jury like that.  Do you have any issues?  If you were in

7    their place, would you want you on the jury?

8           VENIRE PERSON:  I think probably some former

9    military might have an opinion towards certain issues, but

10    honestly, like I said, I haven't followed it so I don't

11    know all the details.

12           MR. WESTFALL:  Well, might form an opinion on

13    certain issues.  Well, in a criminal case you have to make

14    a decision just based on the evidence in court, one

18:00 15    hundred percent.  And everyone has opinions.  The test is

16    can you set those opinions aside and judge the evidence

17    only.  That's the only way anyone gets a fair trial.

18    That's the way we keep people from going to prison.  So

19    you are the only one that can answer it.  I'm not sure of

20    the issue you were talking about, but if there is an

21    issue, can you set that aside and judge this case fairly

22    on the facts?

23           VENIRE PERSON:  I believe so.

24           MR. WESTFALL:  What is the issue?  You said

25    military issues.

18:00  1                    VENIRE PERSON:  Just -- I guess military minded

2    you are so against terrorism and all of that and to get

3    out of that frame of mind and listen to the evidence

4    instead of being told these are bad people.

5                    MR. WESTFALL:  Are you still in the military?

6                    VENIRE PERSON:  No.

7                    MR. WESTFALL:  Why did you join the military?

8                    VENIRE PERSON:  I was seventeen and a half,

9    needed direction.  And then after about ten years, I felt

10    I had that direction and also got married.

11                    MR. WESTFALL:  It seems like regardless how old

12    we are when we join we get this sense that we're doing a

13    very good thing if we're in the military.  Did you have

14    that sense?

18:00  15                    VENIRE PERSON:  Yes, not at first.  Being in

16    supplies, how am I helping out, and that's when I

17    volunteered to go to other places.  I'm sorry.

18                    I did state something wrong.  The refugees, the

19    Haitian refugees.

20                    THE COURT:  Mr. Westfall, your time has expired.

21                    MR. WESTFALL:  Thank you.

22                    THE COURT:  Mr. Jonas, do you have questions for

23    Mr. Erbert?

24                    MR. JONAS:  Yes.  My name is Barry Jonas, and I

25    have a few questions to follow-up.  I want to thank for

18:00 1   your patience yesterday.  Very frustrating waiting outside

2   the door and not knowing what was going on.  You lived in

3   Canada.  How did that come about?

4            VENIRE PERSON:  My parents sitting around the

5   table and there was a discussion and talking about

6   Montana, and somebody said why don't we move to Canada.  I

7   think there was some alcohol involved.

8            MR. JONAS:  How was that?

9            VENIRE PERSON:  Big climate change and I really

10   enjoyed it, but since I have been back since 1989 I'm

11   enjoying it.

12            MR. JONAS:  Enjoying the weather?

13            VENIRE PERSON:  Not the heat, no.  I enjoy the

14   winters.

18:00 15            MR. JONAS:  If there was no court on Friday,

16   would you be able to change your flight to later in the

17   day on Thursday?

18            VENIRE PERSON:  Probably could, yes.  Again,

19   it's next Thursday.  So I don't know if it would be

20   possible, but I'm sure we could.

21            MR. JONAS:  You mentioned that you have heard of

22   HAMAS.  What do you know about them?

23            VENIRE PERSON:  Supposedly they are a terrorist

24   organization.  I don't know if they took over the

25   government or something.  I don't know the whole story.

18:00 1    That's all I really know.

2          MR. JONAS:  Well, this case involves -- The

3    allegations are the Holy Land Foundation and some of the

4    men who ran it supplied money and other items to HAMAS.

5    And we expect at the end of the evidence the Judge is

6    going to charge the jury that HAMAS is a terrorist

7    organization designated by the U.S. government.  And

8    giving anything to HAMAS is illegal, regardless of what it

9    is.  So if HAMAS uses that money for schools and other

10   good things, if you found the defendants gave money for

11   HAMAS, even if that money was for a good thing, would you

12   be able to follow that instruction and find them guilty?

13         VENIRE PERSON:  If knowingly done, yes.

14         MR. JONAS:  Thank you, your Honor.

18:00 15   THE COURT:  Mr. Erbert, we're in the process of

16   talking with the members of the pool from which the jury

17   will be selected that would hear this case.  I expect that

18   process will continue for a while longer today.  Until you

19   hear from us further, you should not discuss this case

20   with anyone or allow anyone to discuss it with you, and if

21   there are any media accounts about this case on the

22   television or in the newspapers or on radio, you should

23   not read or watch or listen to any of those media

24   accounts.  Thank you, sir.  You may be excused.

25         Good morning, Ms. Moreno.  Counsel for the

18:00 1    parties have some questions for you.

2             MR. WESTFALL:  Mr. Moreno, how you doing.  My

3    name is Greg Westfall.  I'm one of the defense lawyers in

4    this case, and I want to talk to you a few minutes.

5             VENIRE PERSON:  Okay.

6             MR. WESTFALL:  Thanks a lot for coming down and

7    all the time you spent here waiting.

8             VENIRE PERSON:  No problem.

9             MR. WESTFALL:  This case is the Holy Land

10   Foundation case, United States versus Holy Land

11   Foundation.  It involves an American Muslim charity that

12   is accused of material support of a terrorist

13   organization, specifically HAMAS.  Does that ring any

14   bells with you?

18:00 15           VENIRE PERSON:  No.

16            MR. WESTFALL:  Have you read anything about it

17   in the paper or anything?

18            VENIRE PERSON:  No.

19            MR. WESTFALL:  You just graduated with a degree

20   in photography?

21            VENIRE PERSON:  Yes.

22            MR. WESTFALL:  You are still looking for a job?

23            VENIRE PERSON:  Yes.

24            MR. WESTFALL:  What are you looking for?

25            VENIRE PERSON:  A job with a photographer.  More

18:00  1    commercial work, not really dealing with weddings.

2                MR. WESTFALL:  So product shots?

3                VENIRE PERSON:  Yes.

4                MR. WESTFALL:  Why a degree in photography?

5                VENIRE PERSON:  In my high school you have to

6     have an elective, and mine was photography.  So I stuck to

7     it throughout.

8                MR. WESTFALL:  Do you carry equipment with you

9     all the time in case you see a good shot?

10               VENIRE PERSON:  I have a little point and shoot

11    camera with me.

12               MR. WESTFALL:  What kind of camera, Canon or

13    Nikon?

14               VENIRE PERSON:  Nikon.  My friends say I should

18:00 15   switch.

16               MR. WESTFALL:  That's like Chevrolet and Ford,

17    perennial argument.  You also majored in business?

18               VENIRE PERSON:  Yes.

19               MR. WESTFALL:  The bachelor of science would

20    have been the photography aspect?

21               VENIRE PERSON:  Yes.

22               MR. WESTFALL:  And what did you do in business,

23    a lot of econ or something?

24               VENIRE PERSON:  It was a double major, both in

25    photography and business administration.  The main goal

18:00  1    that I wanted to have was to open my own studio.  So I

       2    figured I needed some business background.

       3                MR. WESTFALL:  Do you know any Muslim people?

       4                VENIRE PERSON:  No.

       5                MR. WESTFALL:  Have you ever?

       6                VENIRE PERSON:  No.

       7                MR. WESTFALL:  Let's open it up a little bit

       8    like Arabs.  Have you had any experience with them?

       9                VENIRE PERSON:  No.

      10                MR. WESTFALL:  This is a case where Muslim men

      11    are accused of supporting HAMAS.  Have you heard of HAMAS?

      12                VENIRE PERSON:  No.

      13                MR. WESTFALL:  Do you follow the

      14    Palestinian-Israeli conflict at all?

18:00 15                VENIRE PERSON:  No.

      16                MR. WESTFALL:  How do you feel about being on a

      17    jury that has Muslim men and something about terrorism?

      18                VENIRE PERSON:  I don't really have any feelings

      19    either way.

      20                MR. WESTFALL:  How do you feel about freedom of

      21    speech?

      22                VENIRE PERSON:  I'm for it.  It's important that

      23    we have it so that we can express --

      24                MR. WESTFALL:  Have you ever followed any of

      25    Robert Maplethorp's work?

18:00 1              VENIRE PERSON:  No.

2              MR. WESTFALL:  Are you aware of him?

3              VENIRE PERSON:  I am.

4              MR. WESTFALL:  Do you think if someone wants to

5      go buy a Robert Maplethorp book they should be able to?

6              VENIRE PERSON:  Yes.

7              MR. WESTFALL:  In this case, there will be

8      evidence of statements highly critical of Israel and

9      highly critical of the United States.  Is that something

10     you could hear and judge the case on the facts?

11             VENIRE PERSON:  Yes.

12             MR. WESTFALL:  That falls under freedom of

13     speech?

14             VENIRE PERSON:  Yes.

18:00 15             MR. WESTFALL:  You are hesitating.  Are you just

16     digesting it?

17             VENIRE PERSON:  I'm just thinking about the

18     question.

19             MR. WESTFALL:  Are you involved in a church?

20             VENIRE PERSON:  No.

21             MR. WESTFALL:  Did you grow up in a church?

22             VENIRE PERSON:  No.

23             MR. WESTFALL:  Where did you grow up?

24             VENIRE PERSON:  I grew up in Pleasant Grove.  I

25     lived there all of my life.  My parents, they were

18:00  1    Catholic, but we didn't really follow it, at least in my

       2    house.

       3              MR. WESTFALL:  So you haven't studied Islam or

       4    anything like that?

       5              VENIRE PERSON:  I don't know.  Nothing really

       6    comes to mind.  Israel.

       7              MR. WESTFALL:  Israel?

       8              VENIRE PERSON:  Yes.

       9              MR. WESTFALL:  Islam is a religion you know.

      10              VENIRE PERSON:  (Witness nods)

      11              MR. WESTFALL:  Do you have any questions or

      12    anything you are wanting to tell the Court?

      13              VENIRE PERSON:  No.

      14              MR. WESTFALL:  You are okay with four months of

18:00 15    service?

      16              VENIRE PERSON:  Yes.

      17              MR. WESTFALL:  Thank you.

      18              THE COURT:  Counsel for the government have

      19    questions of Ms. Moreno?

      20              MR. JACKS:  Yes, your Honor.  Thank you.

      21              Good morning, Ms. Moreno.  My name is Jim Jacks.

      22    I'm an Assistant United States Attorney for the Northern

      23    District of Texas, and I will be one of the prosecutors

      24    representing the government during this trial.  I also

      25    want to express my appreciation for your patience in

18:00   1    waiting for us.  I have a few questions, if I may.  You

2    told us you were born and raised in Dallas.  This is where

3    you grew up?

4              VENIRE PERSON:  Yes.

5              MR. JACKS:  Where did you go to high school?

6              VENIRE PERSON:  Skyline High School.

7              MR. JACKS:  And your college degree, where did

8    you receive your college degree from?

9              VENIRE PERSON:  I went to Eastfield Community

10   College three years, and then I moved to Texas A & M in

11   Commerce and finished there.

12             MR. JACKS:  Was that for a year or --

13             VENIRE PERSON:  Two and a half years.

14             MR. JACKS:  Did you work while going through

18:00 15   school?

16             VENIRE PERSON:  No, not at all.

17             MR. JACKS:  Right now, do you live at home or

18   have your own place?

19             VENIRE PERSON:  I live at home.

20             MR. JACKS:  What does your father do?

21             VENIRE PERSON:  He works with computers, ACS.

22             MR. JACKS:  What does he do for them?

23             VENIRE PERSON:  They do like programs.  I'm not

24   even sure.  Businesses -- What's that food chain?  Burger

25   King, Zales -- they hire them to run their computers for

18:00 1   programs and make sure everything runs properly.

2       MR. JACKS:  How about your mother?  Does she

3   work outside the home?

4       VENIRE PERSON:  Yes, 7-11.

5       MR. JACKS:  How long has she done that?

6       VENIRE PERSON:  Five years.  Maybe six or seven.

7       MR. JACKS:  What part of town is her store in?

8       VENIRE PERSON:  She works at the corporation.

9   It used to be at -- They moved it recently to first

10  something.

11      MR. JACKS:  Was that at City Place?

12      VENIRE PERSON:  Yes, but then they moved.

13      MR. JACKS:  What does she do in the corporate

14  office?

18:00 15     VENIRE PERSON:  She orders equipment.  She works

16  for like a division.  So a group of states.  So whenever

17  they need to order equipment for the 7-11 stores, that's

18  what she does.

19      MR. JACKS:  Like a purchasing department?

20      VENIRE PERSON:  Yes.

21      MR. JACKS:  Before she worked for Southland

22  Corporation or whatever it's called, where did she work?

23      VENIRE PERSON:  At the Buckner Animal Clinic.

24  It's right there by the house.  She worked there while I

25  was in middle school.  Close by.

18:00 1          MR. JACKS:  How many brothers and sisters do you

2   have?

3          VENIRE PERSON:  I only have one brother, older.

4          MR. JACKS:  Is he still in Dallas?

5          VENIRE PERSON:  Yes.

6          MR. JACKS:  What does he do for a living?

7          VENIRE PERSON:  He works for Chase.  Does

8   something with making credit cards.

9          MR. JACKS:  I take it this is your first time

10   ever to be summoned for jury duty?

11         VENIRE PERSON:  Not my first time but the first

12   time here.

13         MR. JACKS:  Was the previous summons at the

14   Frank Crowley Courthouse?

18:00 15         VENIRE PERSON:  Yes.

16         MR. JACKS:  From your questionnaire, it looks

17   like you actually didn't end up on the jury.

18         VENIRE PERSON:  No.

19         MR. JACKS:  Was that a criminal case that you

20   were summoned for?

21         VENIRE PERSON:  I think it was a civil case.

22         MR. JACKS:  Somebody suing somebody else?

23         VENIRE PERSON:  Yes.

24         MR. JACKS:  Do you follow the news very much?

25         VENIRE PERSON:  No.

18:00 1          MR. JACKS:  Do you read the newspapers on a

2     regular basis?

3               VENIRE PERSON:  No.

4               MR. JACKS:  Do you get the news off the internet

5     ever?

6               VENIRE PERSON:  Sometimes.

7               MR. JACKS:  Your job search, how long has that

8     been going on?

9               VENIRE PERSON:  Probably three months.

10              MR. JACKS:  In your photography, is a lot of

11    that changing now with digital photography?

12              VENIRE PERSON:  Well, what they taught us in

13    school, it was pretty much digital.  But I know the

14    program that I just got finished with, the whole school is

18:00 15    changing to digital.

16              MR. JACKS:  You work with Photo Shop?

17              VENIRE PERSON:  Yes.

18              MR. JACKS:  As was explained to you, the lead

19    charge or principal charge is that the Holy Land

20    Foundation and these men that work for that foundation are

21    accused of providing material support to a foreign

22    terrorist organization, specifically HAMAS.  At the end of

23    the case when the parties have presented all the evidence

24    and witnesses that they want to present, at that time the

25    Judge will instruct the jury on what the law is that

18:00  1    applies to the case, and he will read the instructions,

       2    and you will have a copy when you deliberate.  I expect in

       3    his instructions the Judge will tell you what the

       4    government has to prove to prove a person guilty of this

       5    charge, and I expect included in those instructions will

       6    be a statement or instruction that HAMAS has been

       7    designated by the U.S. government as a foreign terrorist

       8    organization.  I also expect he would have an instruction

       9    in there that will say under the law in the United States

      10    you cannot give anything to or for the benefit of a

      11    foreign terrorist organization, and that includes even so

      12    called charitable things -- books or medical supplies,

      13    food, clothing, that type of thing.  To give that is also

      14    a violation of the law.  Do you have any disagreement with

18:00 15    that part of the law?  And if you do -- Let me ask you, do

      16    you have any disagreement with that part of the law?

      17               VENIRE PERSON:  No, I guess, no.

      18               MR. JACKS:  I mean, I understand this is the

      19    first time this question has ever been asked you, but is

      20    there any question or hesitancy on your part?

      21               VENIRE PERSON:  No, I guess if it's the law

      22    then --

      23               MR. JACKS:  Would you be able to follow that

      24    instruction if the Judge gave you that instruction?

      25               VENIRE PERSON:  Yes.

18:00  1          MR. JACKS:  Thank you, Ms. Moreno.

       2          THE COURT:  Ms. Moreno, we are in the process of

       3     talking to the members of the pool from which the jury

       4     that would hear this case will be selected.  I suspect we

       5     will be doing that until later today, and until you hear

       6     from us, you should not discuss the case with anyone or

       7     allow anyone to discuss it with you.  And if there are any

       8     media accounts of the case in the newspapers or on the

       9     television or radio, you should not read or watch or

      10     listen to any such accounts.  You may be excused.  Thank

      11     you.

      12          VENIRE PERSON:  Thank you.

      13          (Recess)

      14          THE COURT:  Good morning, Ms. Hernandez.

18:00 15     Counsel for the parties have some questions they would

      16     like to ask you.

      17          MS. MORENO:  Good morning, Ms. Hernandez.  My

      18     name is Linda Moreno.  I'm one of the defense attorneys in

      19     this case, and I want to ask you some questions about the

      20     answers you wrote in your questionnaire a few weeks ago.

      21     Okay?  But one of the things I see right away is that you

      22     are in the National Guard.

      23          VENIRE PERSON:  I used to be.

      24          MS. MORENO:  No longer.  Let me ask you this

      25     before we get into other issues.  This is a trial that

18:00 1    will last approximately four months.  Knowing that, is

2    that going to cause you any kind of economic hardship,

3    impact your life in any negative way?

4              VENIRE PERSON:  No.

5              MS. MORENO:  What do you do now?

6              VENIRE PERSON:  I'm an appraiser through the

7    Dallas County Central Appraisal District.

8              MS. MORENO:  What do you appraise?

9              VENIRE PERSON:  It's going to be residential --

10   condos, houses.

11             MS. MORENO:  And how long have you been doing

12   that?

13             VENIRE PERSON:  About three months.

14             MS. MORENO:  What did you do before that?

18:00 15             VENIRE PERSON:  Dallas County Tax Office at

16   Customer Service.

17             MS. MORENO:  How long did you do that?

18             VENIRE PERSON:  About nine months.

19             MS. MORENO:  And before that?

20             VENIRE PERSON:  I worked at Dillards.

21             MS. MORENO:  This is a case involving the Holy

22   Land Foundation.  And the Holy Land Foundation was an

23   American Muslim charity.  Have you heard anything about

24   the Holy Land Foundation in the press or on TV?

25             VENIRE PERSON:  No.

18:00 1          MS. MORENO:  Haven't read anything about it?

2          VENIRE PERSON:  No.

3          MS. MORENO:  The case of the Holy Land

4 Foundation involves, the government claims, charges of

5 material support of terrorism.  The government alleges

6 that the charity sent humanitarian aid and that this

7 humanitarian aid was in the form of food, medicine, books,

8 diapers for children and that this humanitarian aid was

9 sent around the world but primarily to the Occupied

10 Territories in the West Bank and Gaza.  Okay?

11          VENIRE PERSON:  Yes.

12          MS. MORENO:  But the government further says

13 this aid somehow benefited a foreign terrorist

14 organization called HAMAS.  Have you ever heard of HAMAS?

18:00 15          VENIRE PERSON:  Not really.  Unless someone told

16 me something about what's going on in the news right now.

17          MS. MORENO:  Sometimes this is referred to as

18 the Palestinian-Israeli conflict.  Have you followed that

19 conflict at all?

20          VENIRE PERSON:  No.

21          MS. MORENO:  Did you have any opinions about

22 what's going on in the Middle East, primarily in the

23 Occupied Territories?

24          VENIRE PERSON:  No, I don't really get in

25 politics.

18:00  1          MS. MORENO:  You have to speak up a little bit

2     so that I can hear you.

3          VENIRE PERSON:  I don't really look at politics,

4     the Palestinians or Holy Land.  I don't know.

5          MS. MORENO:  Don't have any opinions on that?

6          VENIRE PERSON:  No.

7          MS. MORENO:  You were in the National Guard?

8          VENIRE PERSON:  Yes.

9          MS. MORENO:  How long?

10          VENIRE PERSON:  About three years as a reserve,

11     but I didn't finish my training.

12          MS. MORENO:  So you never were deployed?

13          VENIRE PERSON:  Right.  I never even went to

14     that two weeks in the summer.  Just weekends.

18:00 15          MS. MORENO:  In your questionnaire, there was a

16     question asked about giving the same considerations and

17     Constitutional protection to citizens and noncitizens.

18     That was a question.  And you were asked whether you could

19     do that, and you indicated I believe that you could not do

20     that.  Can you tell me a little bit about why you said

21     that?

22          VENIRE PERSON:  Just the whole issue.  You know

23     even me a minority.  Having different rights when you are

24     a citizen and not a citizen.  But I don't really have that

25     much information.  I'm not well informed or have that much

18:00 1    knowledge on that.  So kind of ignorant on that.

2          MS. MORENO:  When you said a citizen and

3    noncitizen?

4          VENIRE PERSON:  I'm a citizen but like Mexican

5    and all, you know.

6          MS. MORENO:  What do you think about those

7    issues, about being a citizen and noncitizen and being

8    afforded the same rights?  Do you think that's fair?

9          VENIRE PERSON:  No, it was not fair.  But I was

10   fortunate enough -- my parents came over here and first

11   generation, I was fortunate enough to be born here.

12         MS. MORENO:  But you don't think it's fair that

13   a person who's not a citizen has the same rights as you

14   do.  Do I hear you right?

18:00 15       VENIRE PERSON:  Correct.

16         MS. MORENO:  But I'm not sure why you feel that

17   way.

18         VENIRE PERSON:  I don't know.

19         MS. MORENO:  First of all, let me tell you there

20   is no right or wrong answer here.  We get to be a little

21   nosey here to find out what you feel.  If you learned one

22   of these gentlemen was not a citizen, would that be in

23   your mind?  And you would think You know what?  He's not a

24   citizen, and he shouldn't get all of these Constitutional

25   rights that everybody enjoys who's a citizen.  Would you

18:00 1    think that?

2        VENIRE PERSON:  I guess in a way it would be in

3    the back of my mind.

4        MS. MORENO:  And because it's in the back of

5    your mind, is that something that would really prevent you

6    when you are thinking about the evidence in the case from

7    affording that person all of these Constitutional rights

8    that we as citizens enjoy?

9        VENIRE PERSON:  Maybe.  That would still be

10   there.

11       MS. MORENO:  In this case, I expect there will

12   be speech that's critical of the United States.  I expect

13   there to be evidence of conversations and magazines with

14   speech that might be critical of the U.S.  How do you feel

18:00 15 about freedom of speech?

16       VENIRE PERSON:  I feel it's a good thing that we

17   have.

18       MS. MORENO:  How about speech that's critical of

19   our own government?

20       VENIRE PERSON:  It's a person's opinion.

21       THE COURT:  Ms. Moreno.

22       VENIRE PERSON:  When someone is speaking about

23   government, saying their own opinion, that's their

24   opinion.

25       MS. MORENO:  Thank you so much.  Thank you, your

18:00  1    Honor.

2              THE COURT:  Counsel for the government have

3    questions for Ms. Hernandez?

4              MR. JACKS:  Yes, your Honor.

5              Good morning, Ms. Hernandez.  My name is Jim

6    Jacks.  I'm an Assistant United States Attorney here in

7    Dallas, and I'm one of the prosecutors in this case, and I

8    will be representing the government during this trial, and

9    I have just a few questions for you as well, if you don't

10   mind.

11             I, too, want to thank you for your patience in

12   waiting outside while we're working in here.  Is Dallas

13   your home?  Were you born and raised here?

14             VENIRE PERSON:  Yes.

18:00 15             MR. JACKS:  You said that you enlisted in the

16   National Guard.  How old were you when you enlisted?

17             VENIRE PERSON:  I think I was about twenty when

18   I signed the papers.  '02.

19             MR. JACKS:  And you said you did not finish your

20   tour or commission?

21             VENIRE PERSON:  I didn't do my split option.  I

22   didn't want to miss school so I did a summer.  And I went

23   a full year in college, and that summer I was supposed to

24   go back.  I didn't pass my weight and body fat standards.

25   But I would still go to drill every weekend.

18:00 1     MR. JACKS:  And so when that happened, how is

2     that recorded in your papers as far as your discharge?

3             VENIRE PERSON:  I'm not sure.  It just says

4     discharged, and I asked my superiors, and they said it's

5     just a regular charge, not dishonorable.

6             MR. JACKS:  It's not that?

7             VENIRE PERSON:  No.  It's honorable.

8             MR. JACKS:  What was your job in the National

9     Guard?

10             VENIRE PERSON:  I was supposed to be a mechanic.

11     They told me that I could change it later, but I never

12     even went through any of it.

13             MR. JACKS:  So when you wouldn't go to drill or

14     whatever, what would you do?

18:00 15             VENIRE PERSON:  Go to school.

16             MR. JACKS:  Classroom?

17             VENIRE PERSON:  College, yes.

18             MR. JACKS:  But when you would be on duty with

19     the National Guard --

20             VENIRE PERSON:  What would we do?

21             MR. JACKS:  Yes.

22             VENIRE PERSON:  Not really much.

23             MR. JACKS:  Setting aside the physical training,

24     the PT, did you work at some job when you were on duty

25     with the Guard or was it classroom?

18:00 1         VENIRE PERSON: Always waiting around to see

2    what we would do. I will try to help out putting some of

3    the wheels on or, okay, this is how you do stuff and check

4    vehicles. Check the tires a little bit. Just little

5    stuff.

6         MR. JACKS: So you would go to like a motor pool

7    or something?

8         VENIRE PERSON: Sometimes, depending.

9         MR. JACKS: Can you repair or work on cars now?

10         VENIRE PERSON: No.

11         MR. JACKS: Where did you get your college

12    degree?

13         VENIRE PERSON: At UNT.

14         MR. JACKS: Did you commute or live up there?

18:00 15         VENIRE PERSON: I lived up there.

16         MR. JACKS: Is it in real estate?

17         VENIRE PERSON: Yes.

18         MR. JACKS: What's the title? Is it a business

19    degree?

20         VENIRE PERSON: Yes, BA, business

21    administration.

22         MR. JACKS: Do you live on your own or with your

23    family?

24         VENIRE PERSON: I live with my family.

25         MR. JACKS: What does your dad do?

18:00   1              VENIRE PERSON:  He runs a hotel.

       2              MR. JACKS:  What's his job?

       3              VENIRE PERSON:  He works in the laundry in one

       4   and the other as a chef.

       5              MR. JACKS:  So he works at more than one hotel?

       6              VENIRE PERSON:  Yes.

       7              MR. JACKS:  How about your mom?  Does she work

       8   outside the home?

       9              VENIRE PERSON:  Yes, DISD at the cafeteria.

     10              MR. JACKS:  Is she a server or doing something

     11   different?

     12              VENIRE PERSON:  Mostly server.

     13              MR. JACKS:  Does she cook?

     14              VENIRE PERSON:  Just heat them up, yes.

18:00 15              MR. JACKS:  How long has she work at DISD?

     16              VENIRE PERSON:  Maybe ten years.

     17              MR. JACKS:  And how long has your dad worked at

     18   his job?

     19              VENIRE PERSON:  Since I was born.

     20              MR. JACKS:  At the same hotels?

     21              VENIRE PERSON:  No, one changed.

     22              MR. JACKS:  Is he a cook?  Does he cook at home

     23   for you all?

     24              VENIRE PERSON:  No, not really.

     25              MR. JACKS:  Where did you attend high school,

18:00 1        here in Dallas?

2                      VENIRE PERSON:  Townview Magnet, yes.

3                      MR. JACKS:  You said you are an appraiser.  Are

4        you in the field yet?

5                      VENIRE PERSON:  Not yet.  We're at the offices.

6        Just when we have hearings.

7                      MR. JACKS:  Do you sit in on those hearings?

8                      VENIRE PERSON:  I did on Tuesday.  I was

9        supposed to be there this week.

10                     MR. JACKS:  Are you one of the people that sits

11       at the computers and pulls up the comparables and delivers

12       it to the homeowner?

13                     VENIRE PERSON:  It doesn't have to be bad.

14                     MR. JACKS:  You are beginning to be an

18:00 15       appraiser?

16                     VENIRE PERSON:  Correct.

17                     MR. JACKS:  Would that involve being out and

18       taking photographs and running comparables on the

19       computer?

20                     VENIRE PERSON:  Correct.

21                     MR. JACKS:  This something you think you will

22       stay with?

23                     VENIRE PERSON:  Yes.

24                     MR. JACKS:  Do you have any interest in being in

25       real estate sales or development or like that?

18:00  1          VENIRE PERSON:  I am a realtor, also.  I have

2      that on the side.  Since I started this job, I haven't

3      really done that too much.  I'm trying to get used to the

4      time.  It's like all day long.

5          MR. JACKS:  Now, you have told us that your

6      parents were immigrants.  They immigrated from Mexico, and

7      you were born here.

8          VENIRE PERSON:  Yes.

9          MR. JACKS:  Regarding the question you were

10     asked about, is it your feeling that noncitizens should

11     not necessarily be afforded the same rights as a citizen?

12     Is that your answer, what you were saying?

13         VENIRE PERSON:  Correct.  I know my mom, later

14     on she became a citizen.  My dad is still not a citizen.

18:00 15         MR. JACKS:  Would it change your answer if the

16     noncitizen was a legal resident alien?  If that person

17     while not a citizen, I guess similar to your dad, that

18     person had a green card and was legally within the

19     country, would that change your answer as far as their

20     rights in our criminal justice system?

21         VENIRE PERSON:  Just a little bit more rights I

22     guess if they are actually a legal resident.

23         MR. JACKS:  Okay.  I understand your feelings.

24     But if the law was that even a person who's just passing

25     through the country and if they are alleged to have

18:00  1    committed a crime that they would get treated the same as

       2    a citizen -- They have the presumption of innocence, and

       3    if you have been accused of committing a crime in the

       4    United States, the protections of the U.S. Constitution

       5    apply to you in a court of law.  Could you abide by that

       6    if the Court were to tell you that is the law?

       7         VENIRE PERSON:  I would try to, but I guess it

       8    would still be in the back of my mind.

       9         THE COURT:  Mr. Jackson, your time has expired.

      10         MR. JACKS:  Thank you, ma'am.

      11         THE COURT:  Ms. Hernandez, we are in the process

      12    of talking with the members of the pool from which the

      13    jury will be selected that will hear this case.  I expect

      14    that process will continue until later today.  So until

18:00 15    you hear from us again, you should not discuss this case

      16    with anyone or allow anyone to discuss it with you, and if

      17    there are any media accounts about the case in the

      18    newspapers or on television or the radio, you should not

      19    read or watch or listen to any such media accounts.  Thank

      20    you, ma'am.  You may be excused.

      21         MS. MORENO:  Your Honor, at this time on behalf

      22    of the defense we move for a cause challenge on this young

      23    lady.  She could not afford -- and it was pretty clear --

      24    the Constitutional rights to a noncitizen.

      25         THE COURT:  Any objection?

18:00 1                    MR. JACKS:  No, your Honor.

2                    THE COURT:  I will excuse Ms. Hernandez for

3          cause.

4                    Good morning, Ms. Russell.  Counsel for the

5          parties have some questions for you.

6                    MS. MORENO:  First of all, good morning and

7          thank you for your patience in being here.  My name is

8          Linda Moreno, and I'm one of the dense attorneys, and I

9          want to ask you a few questions.  The first is I see you

10         have had a number of back surgeries.  This case is going

11         four months, and so what we need to know if your medical

12         condition would make it difficult for you or cause you any

13         stress?

14                   VENIRE PERSON:  I wasn't aware of this until the

18:00 15   first day when I came to do that questionnaire, and

16         sitting through that, I became very uncomfortable, and

17         then of course, yesterday being here all day I had to lay

18         down in the lounge to try to relief the back.  I am

19         concerned that I might not be as alert if I'm in a lot of

20         pain.

21                   MS. MORENO:  So you experience pain because of

22         this medical condition?

23                   VENIRE PERSON:  Yes.

24                   MS. MORENO:  Are you on any medication?

25                   VENIRE PERSON:  No, I don't take medication.  I

18:00 1    live with it.  I do take aspirin.  Yesterday I took

2    aspirin, but that's about it.

3          MS. MORENO:  Well, this case is going four

4    months, Monday through Thursday.  And while there will be

5    periodic breaks, generally speaking, you will be sitting

6    for long periods of time.  So I guess my question and

7    what's fair to ask on behalf of everyone is if that

8    medical condition and pain that would be attendant to it

9    would distract you from your jury service?

10         VENIRE PERSON:  I really believe it would.  I'm

11    concerned about that on both sides.  I'm worried that I

12    wouldn't be able to give attention to what I need to.  So

13    I am concerned about that.

14         MS. MORENO:  Pass the juror.  Thank you.

18:00 15         THE COURT:  Counsel for the government have

16    questions of Ms. Russell?

17         MR. JACKS:  Just briefly, your Honor.

18         Good morning, Ms. Russell.

19         VENIRE PERSON:  Good morning.

20         MR. JACKS:  My name is Jim Jacks.  I'm an

21    Assistant United States Attorney here in the Northern

22    District of Texas, and I will be representing the

23    government, and I have a few follow-up questions.  I

24    apologize if I repeat some.  It's kind of difficult to

25    hear in the courtroom.  So your condition is your back?

18:00 1          VENIRE PERSON:  Yes, it is.  I have three

2    vertebrae in my lower back that has been fused.  It's the

3    ones in my lower back that creates the pain.

4          MR. JACKS:  Is that from an accident?

5          VENIRE PERSON:  I have degenerative cartilage.

6    My cartilage disintegrates, and they have to go in and

7    replace it.  I have had a knee replacement, too.

8          MR. JACKS:  Well, in this case we generally

9    start at nine and go to 10:30 and take a break and then go

10   to noon and take an hour and a half lunch break and then

11   3:15 or so and take a break and then go to 4:45.  Could

12   you go that?

13         VENIRE PERSON:  I could probably do that.  I

14   took aspirin in the morning, and I took it at lunch.  As

18:00 15   long as I can move around at breaks, not having to sit

16   through four hours.

17         MR. JACKS:  How about if the Judge were to allow

18   you to have a seat on the back row and while the trial was

19   going on you were free to stand up and move around and

20   stretch?

21         VENIRE PERSON:  That would not be a problem at

22   all.

23         MR. JACKS:  Your occupation is a crossing guard?

24         VENIRE PERSON:  Yes, sir.

25         MR. JACKS:  Is that a part time job?

18:00 1          VENIRE PERSON:  Yes, it is.

2          MR. JACKS:  And are you employed by the Sachse

3     Police?

4          VENIRE PERSON:  Yes, I am.

5          MR. JACKS:  Do you work at school zones?

6          VENIRE PERSON:  All school zones.

7          MR. JACKS:  How long have you done that?

8          VENIRE PERSON:  I just started in January.

9          MR. JACKS:  What did you do before that?

10          VENIRE PERSON:  I lived in California and when

11     we moved here I retired.  I used to be a travel agent.  I

12     retired because of my back.  It was too much and through

13     boredom I became a crossing guard, and I love every moment

14     of it.

18:00 15          MR. JACKS:  What part of California were you

16     living in?

17          VENIRE PERSON:  I was born and raised in Los

18     Angeles, and we were living in San Diego when we moved

19     here.

20          MR. JACKS:  What does your husband do?

21          VENIRE PERSON:  Accountant.  Business manager

22     for a HCA.

23          MR. JACKS:  What is that?

24          VENIRE PERSON:  Hospitals.

25          MR. JACKS:  What hospitals do they own?

18:00  1    VENIRE PERSON:  Several.  My husband has fifteen

2    hospitals going all the way from El Paso up into Kansas.

3    He's the centralized business officer in charge of -- What

4    they did is took their billings from the hospitals and put

5    them in the one place in Dallas, and he does all the

6    billing and so forth, collecting insurance.

7    MR. JACKS:  Excuse my ignorance.  Are the

8    hospitals all called HCA?

9    VENIRE PERSON:  No.  Medical City Dallas,

10    Plano -- different hospitals but they belong to HCA.

11    MR. JACKS:  Did you move to Texas with his job?

12    VENIRE PERSON:  Yes, I did.

13    MR. JACKS:  Was he working for that company out

14    there?

18:00 15    VENIRE PERSON:  No.  No, he actually came out

16    here to work for Baylor and worked for them on their

17    centralized business office a few years and went to HCA.

18    MR. JACKS:  Do you live in Sachse?

19    VENIRE PERSON:  Actually, no.  I live in North

20    Garland.

21    MR. JACKS:  Again, have you been on a criminal

22    jury before?

23    VENIRE PERSON:  Never.

24    MR. JACKS:  Have you received a jury summons

25    before?

18:00  1          VENIRE PERSON:  Yes, but when I called, they

       2   said they didn't need me.

       3          MR. JACKS:  Was that in Texas or California?

       4          VENIRE PERSON:  That was here.

       5          MR. JACKS:  And your children, do you have any

       6   children still at home?

       7          VENIRE PERSON:  I have one boy that just came

       8   home for a short period.

       9          MR. JACKS:  From college or?

      10          VENIRE PERSON:  No.  He does have a problem with

      11   drinking, and we have been trying to help him, and he just

      12   had a bout with this problem, and so he has come to

      13   regroup so that he can go back out again.

      14          MR. JACKS:  Where was he living?

18:00 15          VENIRE PERSON:  In Plano.

      16          MR. JACKS:  With regard to the charges in this

      17   case, as has been said, the allegations in this case are

      18   that the Holy Land Foundation and men working for that

      19   entity provided material support to a foreign terrorist

      20   organization; namely, HAMAS.  Have you heard of HAMAS?

      21          VENIRE PERSON:  Yes, I have, but just recently.

      22          MR. JACKS:  As a result of this case coming up

      23   in the news?

      24          VENIRE PERSON:  Yes, it was just on the news

      25   this week.

18:00  1          MR. JACKS:  At the end of the evidence when both

2     sides have presented their evidence, the Judge will read

3     his instructions to the jury, and it will say this is what

4     the jury has to find in order to find a defendant guilty.

5     And I anticipate in those instructions he would tell you

6     that HAMAS has been designated a foreign terrorist

7     organization, and also in those instructions I expect

8     there would be language to the effect that under United

9     States law giving anything in the nature of material

10    support to a foreign terrorist organization is illegal,

11    even if that thing given might be considered otherwise

12    like food or clothing or medical supplies, even those

13    types of items if given to a foreign terrorist

14    organization, that's still a violation of the law.  Having

18:00 15    heard that explanation, do you have any disagreement with

16    that aspect of the law?

17          VENIRE PERSON:  No, not at all.

18          MR. JACKS:  Could you follow the Court's

19    instructions then if he were to instruct you that was the

20    law?

21          VENIRE PERSON:  Yes.

22          THE COURT:  Ms. Russell, we are in the process

23    of talking with the members of the pool from which the

24    jury will be selected that would hear this case.  That

25    process will probably go on for a while longer today.  So

18:00 1    until you hear from us further, you should not discuss

2    this case with anyone or allow anyone to discuss it with

3    you.  And if there are any media accounts about this case

4    in the newspaper or on television or on the radio, you

5    should not read or watch or listen to any of those media

6    accounts.

7            MS. MORENO:  Excuse me, your Honor, before the

8    jury is excused.  May we approach very briefly?

9            THE COURT:  All right.

10           MS. MORENO:  Your Honor, we would ask the Court

11    to inquire if this particular juror knows Agent Robert

12    Miranda.  It's our understanding she does know Agent

13    Miranda who's one of the case agents in this case and what

14    is her relationship with Agent Miranda before she leaves.

18:00 15          THE COURT:  I'm puzzled why you didn't ask that

16    yourself.

17           MS. MORENO:  I apologize.  I thought her

18    description of her ailment and medical problems were

19    sufficient enough that perhaps the government with not try

20    to rehabilitate her.  So I take responsibility for that,

21    and I apologize.  I do think it's important, and the Court

22    should know if she has a relationship with the case agent

23    on this case.  I think it's fair that we all know that.

24          THE COURT:  Ms. Russell, do you know a person by

25    the name of Robert Miranda?

18:00  1          VENIRE PERSON:  I don't think so.

       2          THE COURT:  Thank you, ma'am.

       3          MS. MORENO:  Your Honor, for the record I wanted

       4  to indicate in her questionnaire she had written she does

       5  know FBI Agent Robert Miranda, who's the possible agent to

       6  her citizen's police academy, and further, your Honor, at

       7  this time we would move or ask the Court to consider a

       8  hardship for this particular juror.  She did indicate that

       9  her back situation would make it very difficult for her to

      10  concentrate.  So we would submit that for your

      11  consideration.

      12          THE COURT:  Yes, ma'am.  Thank you.

      13          Mr. Kiblinger, I think we're ready to see next

      14  Ms. Prince.

18:00 15          Good afternoon, Ms. Prince.  I think counsel for

      16  the parties have some questions for you.  Go ahead, Mr.

      17  Westfall.

      18          MR. WESTFALL:  Ms. Prince, I'm Greg Westfall.

      19  How are you this morning?

      20          VENIRE PERSON:  Okay.

      21          MR. WESTFALL:  Thank you so much for coming.

      22  I'm sure you had to come yesterday.

      23          VENIRE PERSON:  That's okay.

      24          MR. WESTFALL:  Thank you so much for the time

      25  you put in this.

18:00  1          VENIRE PERSON:  Okay.

       2          MR. WESTFALL:  I'm one of the defense lawyers in

       3    this case, and I want to talk to you a very few minutes,

       4    and then the government wants to talk to you.  This is the

       5    case of United States versus Holy Land Foundation for

       6    Relief and Development.  Have you heard of the case?

       7          VENIRE PERSON:  Not until very recently.

       8          MR. WESTFALL:  What have you heard recently?

       9          VENIRE PERSON:  Oh, is that that group up in

      10    Richardson?  I don't know.  I don't know about it.  I

      11    don't watch the news or read the paper very much at all.

      12          MR. WESTFALL:  It is the group in Richardson.

      13    It is the American Muslim charity in Richardson, Texas,

      14    that the government now alleges the charity and some of

18:00 15    the men with the charity gave material support to HAMAS.

      16    Hearing all of that, let me ask you, have you made any

      17    decisions or do you have any opinions of the guilt or

      18    innocence of any of the defendants?

      19          VENIRE PERSON:  Not possible.  No, absolutely

      20    not.  There is no way I could.  I don't know anything

      21    about it.

      22          MR. WESTFALL:  Good, that's the A answer.

      23          VENIRE PERSON:  Okay.

      24          MR. WESTFALL:  How do you feel about being on a

      25    jury trial, on a jury in a trial that involves Muslim men

18:00 1     and terrorism is like in the title of the charge?

2                     VENIRE PERSON:  Curious.

3                     MR. WESTFALL:  Curious?

4                     VENIRE PERSON:  Curious.

5                     MR. WESTFALL:  What are you curious about?

6                     VENIRE PERSON:  Federal juries sound different

7     than municipal juries or something like that.

8                     MR. WESTFALL:  Sound what?

9                     VENIRE PERSON:  Different.

10                    MR. WESTFALL:  Than municipal juries?

11                    VENIRE PERSON:  Yes.

12                    MR. WESTFALL:  It is different in a number of

13    ways.

14                    VENIRE PERSON:  Yes.

18:00 15              MR. WESTFALL:  Have you ever known any Muslims?

16                    VENIRE PERSON:  Acquaintances.

17                    MR. WESTFALL:  Tell me about them if you don't

18    mind.

19                    VENIRE PERSON:  One I think is or was a friend

20    of my grandson.  Other than that, possibly somebody in

21    business or something like that.  But not really.

22                    MR. WESTFALL:  Have you ever had any bad

23    experiences with an Arab?

24                    VENIRE PERSON:  No.

25                    MR. WESTFALL:  Any particularly good

18:00 1 experiences?

2    VENIRE PERSON:  No, neither way.

3    MR. WESTFALL:  How many grandchildren do you

4 have?

5    VENIRE PERSON:  You really don't want to know.

6 I have about thirty-five or so step-grandchildren.

7    MR. WESTFALL:  Whoa, thirty-five?

8    VENIRE PERSON:  Yes.

9    MR. WESTFALL:  You could start a country.

10    VENIRE PERSON:  My husband created a dynasty,

11 and then he died and left me with it.

12    MR. WESTFALL:  How are you managing?

13    VENIRE PERSON:  They mostly are in Austin, and

14 I'm up here.  That's a real good way to handle it.

18:00 15    MR. WESTFALL:  Distance does indeed make the

16 heart grow fonder?

17    VENIRE PERSON:  Yes.

18    MR. WESTFALL:  Did you used to be in the army?

19    VENIRE PERSON:  Yes.

20    MR. WESTFALL:  When?

21    VENIRE PERSON:  1965.

22    MR. WESTFALL:  What did you do in the army?

23    VENIRE PERSON:  I was training for the medical

24 corps.

25    MR. WESTFALL:  Did you get out of the army?

18:00  1          VENIRE PERSON:  Yes.  I did not serve a full

    2    period of time.

    3          MR. WESTFALL:  What caused you to join the army

    4    back in 1965?

    5          VENIRE PERSON:  That's a long time ago.  We were

    6    kind of -- my brother was a big military fan, and I had no

    7    definite direction at that time, and it sounded like a

    8    good way to go because I knew I could get an education.

    9          MR. WESTFALL:  Now, you mentioned municipal

   10    court, and this is federal court, and there is differences

   11    in ranges of punishment and stuff like that.  But in a

   12    criminal court anywhere in the United States every person

   13    who's charged has a presumption of innocence.  You have

   14    heard that term?

18:00 15          VENIRE PERSON:  Yes.

   16          MR. WESTFALL:  Do you know what that means?

   17          VENIRE PERSON:  Yes.

   18          MR. WESTFALL:  What does it mean?

   19          VENIRE PERSON:  That you are not guilty of

   20    anything, of what you are charged with.

   21          MR. WESTFALL:  Unless and until the government

   22    proves its case beyond a reasonable doubt.

   23          VENIRE PERSON:  At the beginning you are not

   24    guilty until something happens.

   25          MR. WESTFALL:  Why do you think we have that?

18:00  1    There is really not any other nation in the world that has

2    that.  We do.

3              VENIRE PERSON:  How about we're smart?

4              MR. WESTFALL:  We're smarter?

5              VENIRE PERSON:  Okay.  Scratch that.  That's

6    just the way this country was based.

7              MR. WESTFALL:  It's fairness I think.  We want

8    to be fair and not put innocent people in prison.  That's

9    one of the protections.  It doesn't work all the time, but

10   if we all try -- I think that's the goal.  When our

11   forefathers came from England, there was a lot of people

12   being put in prison for their lack of religion or not

13   worshipping the Pope or whatever.  I think that's the

14   lesson they learned.  At least that's my experience.

18:00 15             Now, how do you feel -- You said curious.  We

16   talked about Constitutional protection.  Do you think in a

17   case talking about Muslim men and terrorism that we ought

18   to have the same kind of protection?

19             VENIRE PERSON:  Absolutely.  You can't be guilty

20   of something until somebody proves it.  That's the way I

21   see it.  Not every christian is the most straightforward

22   or loyal -- or whatever you want to call it -- person.

23   Nor is every Muslim or Buddhist or anyone else.  People

24   are people.

25             MR. WESTFALL:  Everyone is different?

18:00 1          VENIRE PERSON:  Yes.

2          MR. WESTFALL:  You sound like someone who likes

3     freedom of speech.

4          VENIRE PERSON:  Okay.

5          MR. WESTFALL:  Have you ever been accused of

6     speaking your mind?

7          VENIRE PERSON:  Once in a while.

8          MR. WESTFALL:  In this case, there may be

9     evidence of our clients making very critical statements

10     about Israel and sometimes critical statements about the

11     United States.  How do you feel about that?

12          VENIRE PERSON:  I think I have probably made

13     critical statements about everything and everybody because

14     I'm just human.

18:00 15          THE COURT:  Mr. Westfall, your time has expired.

16          MR. WESTFALL:  Thank you, your Honor.  Thank

17     you.

18          THE COURT:  Counsel for the government have

19     questions for Ms. Prince?

20          MR. GARRETT:  Yes, your Honor.  Good morning,

21     Ms. Prince.

22          VENIRE PERSON:  Good morning.

23          MR. GARRETT:  My name is Nathan Garrett, and I'm

24     an Assistant United States Attorney, and I'll be one of

25     the prosecutors that handles this case for the government.

18:00   1   I just have a few follow-up questions for you.  Okay?

        2              VENIRE PERSON:  All right.

        3              MR. GARRETT:  As it came out in Mr. Westfall's

        4   question, you are a lady who has a lot of grandchildren?

        5              VENIRE PERSON:  Yes.

        6              MR. GARRETT:  A lot of children grown it looks

        7   like.  Are they all boys?

        8              VENIRE PERSON:  No.

        9              MR. GARRETT:  You have Linda?

       10              VENIRE PERSON:  Linda and the eighth child which

       11   is kind of tacked on is a girl, Michelle.

       12              MR. GARRETT:  So eight of your own?

       13              VENIRE PERSON:  No.  No, these are all

       14   stepchildren.  I have no children.

18:00  15              MR. GARRETT:  So eight stepchildren and

       16   thirty-five --

       17              VENIRE PERSON:  Yes.

       18              MR. GARRETT:  Last count?

       19              VENIRE PERSON:  Yes, we try not to keep that

       20   caught up.

       21              MR. GARRETT:  You mentioned that most of them

       22   were in Austin.

       23              VENIRE PERSON:  Yes.

       24              MR. GARRETT:  Are some of your family living

       25   here?

18:00  1          VENIRE PERSON:  In the area, my daughter Linda

2      is the only one who lives in the area.

3              MR. GARRETT:  And your questionnaire said you

4      lived in the area for thirty-eight years?

5              VENIRE PERSON:  Approximately, yes.

6              MR. GARRETT:  And where did you live before you

7      came to the Dallas area?

8              VENIRE PERSON:  A short while in Kileen, Texas.

9      I was stationed at Fort Hood and then actually I was born

10     and raised in Chicago.

11             MR. GARRETT:  Now, I apologize for repeating

12     what Mr. Westfall asked you about, but you were in the

13     military how long?

14             VENIRE PERSON:  Just over six months.

18:00 15        MR. GARRETT:  Okay.  You mentioned Fort Hood.

16             VENIRE PERSON:  No, I was at Fort Sam.

17             MR. GARRETT:  Always domestic, never overseas?

18             VENIRE PERSON:  Never overseas.

19             MR. GARRETT:  You mentioned on your

20     questionnaire various work, and I don't know with all of

21     your grandchildren how you have time to do anything.  But

22     you mentioned some accounting?

23             VENIRE PERSON:  Yes, I worked for Southland

24     Corporation in their accounting office.

25             MR. GARRETT:  Is that around here?

18:00  1          VENIRE PERSON:  It was the owners of 7-11

2      originally.

3          MR. GARRETT:  How long did you work for them?

4          VENIRE PERSON:  Twenty-three years.

5          MR. GARRETT:  And you stopped working for them

6      when?

7          VENIRE PERSON:  Fifteen years ago.  Yes, I was

8      caught in a RIFT, reduction in force, but I had enough

9      company time, and so therefore, I ended up retiring.

10         MR. GARRETT:  You mentioned in your

11     questionnaire that you had served on two juries.  Is that

12     right?  One petite and one civil?

13         VENIRE PERSON:  One petite and one civil, yes.

14         MR. GARRETT:  That's fine.  That's the total of

18:00 15     your prior jury service?

16         VENIRE PERSON:  That's correct.

17         MR. GARRETT:  Have you been called down in a

18     group like this before aside from those two?

19         VENIRE PERSON:  Oh, yes.

20         MR. GARRETT:  Were those civil or criminal or do

21     you know?

22         VENIRE PERSON:  I remember one was criminal.

23     I'm not sure about the others.

24         MR. GARRETT:  Has that always been at the state

25     or local level or have you been called down to federal

18:00 1    court?

2                VENIRE PERSON:  No, never.  This is the first

3    one.

4                MR. GARRETT:  First pleasure?

5                VENIRE PERSON:  So that's why the curiosity.

6                MR. GARRETT:  I noticed in your questionnaire

7    regarding your stepchildren and grandchildren, there have

8    been some brushes with the law.

9                VENIRE PERSON:  Oh, that's one way of saying it.

10               MR. GARRETT:  Well, the numbers are against you,

11   I think.  But you mentioned in several places that there

12   had been some of those issues, and I apologize for asking

13   you.  It's a bit rude of me, but I have to do that.  Okay.

14               VENIRE PERSON:  Okay.

18:00 15             MR. GARRETT:  You mentioned I think that you

16   have your son was convicted of theft of a military ID

17   card.

18               VENIRE PERSON:  Yes.

19               MR. GARRETT:  Can you give me a little bit of

20   the --

21               VENIRE PERSON:  Yes, he was National Guard.  He

22   was in the military, and then he became National Guard,

23   and he got involved with a woman, and he stole some blank

24   ID cards for her, and she was selling them I guess to an

25   informant or to someone undercover, and consequently, it

18:00  1    led back to him, and he was in the federal prison in Fort

       2    Worth.  It's up in this area.  He was up there for a

       3    while.

       4                MR. GARRETT:  And you say that you were involved

       5    in a case of police impersonation in Chicago?

       6                VENIRE PERSON:  Yes, a long, long time ago.

       7    Single.  Had my own apt.  I and a friend were out walking

       8    to another friend's place.  A car pulled up.  These guys

       9    came out, and they said they were police officers.  They

      10    had me in the car.  They kept my friend.  They took off

      11    with her.  They let me loose.  We had the police at my

      12    apt.

      13                MR. GARRETT:  So you were a victim or a witness

      14    in that case?

18:00 15                VENIRE PERSON:  Yes.

      16                MR. GARRETT:  I won't ask you to explain them,

      17    but there are a couple of others involving your spouse I

      18    believe and a cattle rustling?

      19                VENIRE PERSON:  That's the term they gave it.

      20    He was out hunting, and it ended up being cattle rustling.

      21    He received probation.

      22                MR. GARRETT:  Let me ask you this.  Based upon

      23    the totality of your experience with your husband and your

      24    children and grandchildren, is there anything about your

      25    experiences in those circumstances that would make it

18:00  1    difficult for you to sit impartially in judging the United

2    States in this case or the defendants?

3            VENIRE PERSON:  No, I don't think so.

4            MR. GARRETT:  Do you feel at the end of the day

5    these family members were involved in the criminal justice

6    system were treated fairly by the criminal justice system?

7            VENIRE PERSON:  Except Michael's but that's

8    because of his former wife.

9            MR. GARRETT:  Would you hold that against me?

10           VENIRE PERSON:  No, forget it.

11           THE COURT:  Mr. Garrett, your time has expired.

12           Ms. Prince, we are in the process of talking to

13   the members of the pool from which the jury that would

14   hear this case will be selected.  I expect that to

18:00 15   continue for some time today.  And until you hear from us,

16   you should not allow anyone to discuss it with you or

17   discuss it with anyone.  And if there are any media

18   accounts in the newspapers or television or on radio, you

19   should not listen or read or watch any of those.

20           VENIRE PERSON:  That will be easy.

21           THE COURT:  Thank you, ma'am.  You may be

22   excused.

23           Good morning, Ms. Cadwallader.  Counsel for the

24   parties have some questions they would like to ask you.

25   Go ahead, Mr. Westfall.

18:00 1          MR. WESTFALL:  Ms. Cadwallader?

2          VENIRE PERSON:  Yes.

3          MR. WESTFALL:  I'm Greg Westfall, one of the

4  defense lawyers in this case.  I want to speak with you

5  for a few minutes, and then the government may speak with

6  you.  You doing okay?

7          VENIRE PERSON:  Nervous.

8          MR. WESTFALL:  Try not to be.  I know it's hard.

9  And also you have been waiting for two days.  Thank you so

10  much for your time and how long it has taken.

11         This case is the Holy Land Foundation case.

12  Does that ring a bell with you?

13         VENIRE PERSON:  Yes, sir.

14         MR. WESTFALL:  Can you tell me what you know

18:00 15  about it?

16         VENIRE PERSON:  What I have been hearing in the

17  news.

18         MR. WESTFALL:  How long have you been hearing

19  stuff in the news?

20         VENIRE PERSON:  Off and on for a couple of

21  months.

22         MR. WESTFALL:  Mainly?

23         VENIRE PERSON:  But I forget about it.

24         MR. WESTFALL:  Like in the newspapers?

25         VENIRE PERSON:  Newspapers, TV.

18:00 1        MR. WESTFALL:  Do you surf the net, too?

2        VENIRE PERSON:  No, no, I don't do computers.

3        MR. WESTFALL:  Not much surfing going on?

4        VENIRE PERSON:  No, I don't do computers.

5        MR. WESTFALL:  Tell me specifically what you

6    have heard.

7        VENIRE PERSON:  Well, that they allegedly have

8    been funneling money into terrorism groups.

9        MR. WESTFALL:  What group?

10        VENIRE PERSON:  Al Qaeda.

11        MR. WESTFALL:  This is a case that involves

12    Muslim men, and the allegation is a terrorist

13    organization.  Not Al Qaeda, it's HAMAS.  Given what you

14    have heard and put into it, have you formed an opinion as

18:00 15    to whether any defendant is guilty or innocent?

16        VENIRE PERSON:  No, not really.

17        MR. WESTFALL:  Have you in any way?

18        VENIRE PERSON:  No.

19        MR. WESTFALL:  How do you feel about being on a

20    jury where we're talking about Muslim men being accused of

21    material support of terrorism?

22        VENIRE PERSON:  I don't think I like it.

23        MR. WESTFALL:  Well, share with us a little bit

24    if you don't mind.

25        VENIRE PERSON:  I think of all the bad things

18:00 1  that are happening, and that's scary.  But if I had to, I

2  would do it.

3          MR. WESTFALL:  So is there a fear of

4  retribution?

5          VENIRE PERSON:  There is always that

6  possibility.  But I feel pretty secure living in the

7  United States.  So hopefully I'll be taken care of.

8          MR. WESTFALL:  Do you know any Muslims?

9          VENIRE PERSON:  No.

10          MR. WESTFALL:  Have you ever known any Muslims?

11          VENIRE PERSON:  No.

12          MR. WESTFALL:  Have you ever known any Arabs or

13  people of Arabic descent?

14          VENIRE PERSON:  No.

18:00 15          MR. WESTFALL:  Had good or bad experiences?

16          VENIRE PERSON:  We do own a complex out near

17  UTA, and we have students that live in our apartments, but

18  most of them are from India.

19          MR. WESTFALL:  So you own an apt you say is --

20  Is it UTA, Arlington?

21          VENIRE PERSON:  Yes.

22          MR. WESTFALL:  Do you actually collect the rent?

23          VENIRE PERSON:  No, when they first move in, we

24  interview them and take an application.

25          MR. WESTFALL:  Have they been polite?

18:00  1          VENIRE PERSON:  Polite and quiet.  Seem focused
       2   on what they want to do as far as their education.
       3          MR. WESTFALL:  How many rental properties do you
       4   have?
       5          VENIRE PERSON:  A few.
       6          MR. WESTFALL:  It took you a while to collect
       7   those?
       8          VENIRE PERSON:  Over a few years, yes.
       9          MR. WESTFALL:  And what do you enjoy doing other
      10   than that?
      11          VENIRE PERSON:  Well, we visit grandkids a lot.
      12   I have one musically inclined.  So we go to Austin quite a
      13   bit to watch him.  We try to travel.
      14          MR. WESTFALL:  Where do you like to travel when
18:00 15   you travel?
      16          VENIRE PERSON:  We haven't done a lot, but we
      17   went to Washington and toured the monuments.
      18          MR. WESTFALL:  Oh, Washington, DC?
      19          VENIRE PERSON:  Yes.
      20          MR. WESTFALL:  What does he do?
      21          VENIRE PERSON:  He's retired.
      22          MR. WESTFALL:  What had he been doing before he
      23   retired?
      24          VENIRE PERSON:  He was a senior accountant for
      25   TXU.

18:00  1              MR. WESTFALL:  And did you work outside the

2      house?

3              VENIRE PERSON:  No, I did not.

4              MR. WESTFALL:  Raised kids?

5              VENIRE PERSON:  Yes.

6              MR. WESTFALL:  How many grandkids do you have?

7              VENIRE PERSON:  Four.

8              MR. WESTFALL:  What are their age ranges?

9              VENIRE PERSON:  10, 11 and 14.

10              MR. WESTFALL:  That's a good range.  Are you

11      active in a church?

12              VENIRE PERSON:  No.

13              MR. WESTFALL:  Have you ever done any, like,

14      community work or volunteer work?

18:00 15              VENIRE PERSON:  No, not really.  Sorry to say,

16      no.

17              MR. WESTFALL:  Are you still feeling nervous?

18              VENIRE PERSON:  Not as much.

19              MR. WESTFALL:  How do you feel about being on

20      this jury?  Let me tell you, in this country everyone has

21      the right to be presumed innocent until proven guilty.

22              VENIRE PERSON:  That's what makes this country

23      so great.

24              MR. WESTFALL:  That's right.  But do you

25      remember where you were on the morning of September 11?

18:00 1          VENIRE PERSON:  Yes.

2          MR. WESTFALL:  I think everybody does.  How do

3     you feel about those protections being applied to a

4     terrorism case?

5          VENIRE PERSON:  Well, I think they should stand

6     a chance.  They need to be proven whether they are

7     innocent or guilty.  So yeah until that happens.

8          MR. WESTFALL:  Some people would say that they

9     shouldn't have any protection in a terrorism case.  Others

10     would say those protections are most important in a

11     terrorism case because this is where we get to demonstrate

12     as a nation just how good our criminal justice system is

13     and how far our people are.  If you had to choose between

14     one of those two, what would you choose?  I have a feeling

18:00 15     I know.

16          VENIRE PERSON:  You mean whether they were

17     guilty or not?

18          MR. WESTFALL:  No.  Whether the protections are

19     so important in this case because it is a terrorism case.

20          VENIRE PERSON:  Yes.

21          MR. WESTFALL:  Don't you think they are really

22     necessary in a case like this?

23          VENIRE PERSON:  Oh, yes.

24          MR. WESTFALL:  And it seems to me you haven't

25     much of a problem applying all of those protections.

18:00 1          VENIRE PERSON:  (No response)

2          MR. WESTFALL:  Would you have a problem applying

3     those?

4          VENIRE PERSON:  No.

5          MR. WESTFALL:  Feel like you would be a fair and

6     impartial juror?

7          VENIRE PERSON:  Well, I would hope so.

8          MR. WESTFALL:  Well, take a second and check in,

9     and do you feel like you could be?  I hope so, too.  But

10     only you know.

11          VENIRE PERSON:  Right.  It's hard to say.  I

12     could be a little biased I guess.  Might be a little hard.

13          MR. WESTFALL:  Biased against Muslims or

14     terrorists?

18:00 15          VENIRE PERSON:  Just the terrorist part.

16          THE COURT:  Mr. Westfall, your time has expired.

17     Counsel for the government have questions for Ms.

18     Cadwallader.

19          MR. JONAS:  Yes, sir.  Good morning, Ms.

20     Cadwallader.  I'm still making sure it's morning.  My name

21     is Barry Jonas.  I'm one of the prosecutors in this case,

22     and I have a few questions for you.  When did you visit

23     Washington?

24          VENIRE PERSON:  This past summer.

25          MR. JONAS:  Did you like it?

18:00 1          VENIRE PERSON:  Loved it.

2          MR. JONAS:  I live in Washington.  I didn't grow

3 up there, but I've lived there about fifteen years, and I

4 still get inspired when you see the Washington monument.

5          VENIRE PERSON:  Oh, yes.

6          MR. JONAS:  Anything else?

7          VENIRE PERSON:  The Lincoln Memorial.  Turn

8 around and see the White House.

9          MR. JONAS:  Right.  And you made a comment about

10 this country being so great, and one of the things that

11 makes it great are the protections afforded to someone

12 who's charged with a crime, the presumption of innocence.

13 And even though this case does involve terrorism,

14 terrorism is in the title as Mr. Westfall said, but it's

18:00 15 important for you to give that presumption of innocence to

16 these individuals.  Despite the fact this is a terrorism

17 case, it is still a criminal case.  Do you think you can

18 truly and fairly give that presumption to these

19 defendants?

20          VENIRE PERSON:  Well, I would hope so.

21          MR. JONAS:  There is no right or wrong answer.

22 This is what you should believe in your heart.  Both sides

23 are looking for someone that can be fair to both sides.  I

24 want to ask you a couple of other questions.  You have

25 served than a jury before?

18:00 1          VENIRE PERSON:  Yes.

2          MR. JONAS:  And how did that turn out?

3          VENIRE PERSON:  Well, we reached verdicts.

4     Different trials that I have been on.  I have been picked

5     before.

6          MR. JONAS:  Were those good experiences?

7          VENIRE PERSON:  Interesting experiences, yes.

8          MR. JONAS:  You put down on your

9     questionnaire -- You filled this out a few weeks ago --

10    whether you or your spouse were born outside the United

11    States, you put Philippines.

12         VENIRE PERSON:  Well, he's an American citizen,

13    but he was born in the Philippines.  His parents were

14    American, but they spent four years in a Japanese prison

18:00 15   camp.

16         MR. JONAS:  You also put you don't speak or

17    understand Hebrew or Arabic, and the government

18    anticipates there will be conversations in Arabic or

19    Hebrew with translations given to the jury.  You checked

20    off if you speak or read Arabic or Hebrew language would

21    you have any difficult relying solely on translator's

22    translation, and you checked yes, implying you would have

23    difficulty.  Is that correct?

24         VENIRE PERSON:  I believe so.

25         MR. JONAS:  Why would you have difficulty

18:00   1   relying on the translator?

        2          VENIRE PERSON:  Well, I guess if they were good,

        3   I would not have a problem.

        4          MR. JONAS:  So if you would evaluate the

        5   translator you would be able to rely upon the translation?

        6          VENIRE PERSON:  Yes.

        7          MR. JONAS:  And if you found they were a good

        8   translator, would you be able to rely on the translation?

        9          VENIRE PERSON:  Yes.

       10          MR. JONAS:  Have you ever heard about HAMAS?

       11          VENIRE PERSON:  Yes.

       12          MR. JONAS:  What do you know about HAMAS?

       13          VENIRE PERSON:  Just what I hear in the paper.

       14          MR. JONAS:  What have you heard?

18:00  15          VENIRE PERSON:  I hear so much sometimes.  When

       16   you start getting older, it's hard to retain all of this

       17   information.

       18          MR. JONAS:  I understand.  As I learn something

       19   new, I have to get rid of something old to take its place.

       20   What is your reaction when you hear HAMAS, good or bad?

       21          VENIRE PERSON:  Bad.

       22          MR. JONAS:  Well, in this case the defendants

       23   are accused of giving aid to HAMAS.  After the Judge

       24   charges the jury with the law, you will hear that HAMAS is

       25   a terrorist organization designated by the United States,

18:00  1   and it makes it illegal for anyone to give support, money

2   or other items to HAMAS. Now, if the evidence -- If you

3   find as a juror that some of the support went for good

4   things, things you normally think of as charity, that it

5   still benefited HAMAS and was done for the benefit of

6   HAMAS, could you find the defendants guilty?

7            VENIRE PERSON:  Yes.

8            MR. JONAS:  Thank you very much.

9            THE COURT:  Ms. Cadwallader, we are in the

10  process of talking with the pool from which the jury will

11  be selected to hear this case.  I expect that process to

12  continue until later today.  So until you hear from us

13  further you should not discuss this case with anyone or

14  allow anyone to discuss it with you, and if there are any

18:00 15  media accounts about the case in the newspapers or on the

16  television or radio, you should not watch or listen to or

17  read any of those media accounts.  Thank you, ma'am.  You

18  may be excused.

19           MR. WESTFALL:  Your Honor, we would like to

20  submit Ms. Cadwallader for cause.  When I was speaking

21  with her, she finally said that she would be biased in a

22  terrorism case, and Mr. Jonas got up and spoke with her

23  and really laid out the presumption of innocence and then

24  finally asked her if she could apply that presumption in

25  this case, and she looked up and she kind of scanned the

18:00 1    defense table and said well I would hope so which is what

2    she said before.  She went ahead and admitted she had a

3    bias.  I think it's easy to infer and clearly a solid

4    inference that her bias would substantially impair her

5    jury service in this case, your Honor.  And we submit her

6    for a challenge on that basis.

7              THE COURT:  Mr. Jonas, what is your position?

8              MR. JONAS:  Our position is cause has not been

9    established here.  She said she would have no problem in

10   applying the protection and she can be fair and apply the

11   presumption of innocence here, and I think everyone has a

12   bias against terrorism.  That doesn't necessarily mean

13   that she would not be fair in this case and give these

14   defendants a good trial.

18:00 15             THE COURT:  Thank you, I will take this one

16   under advisement.  Mr. Kiblinger, I think we're ready to

17   see next Ms. Hervey.

18             Good morning, Ms. Hervey.  Counsel for the

19   parties have some questions they would like to ask you.

20             MR. WESTFALL:  Good morning.  I'm Greg Westfall.

21   How are you today?

22             VENIRE PERSON:  Fine, thank you.

23             MR. WESTFALL:  First of all, I would like to

24   thank you for coming in yesterday and today and doing all

25   the waiting you had to do.  I'm a criminal defense lawyer,

18:00 1    and I'm on the defense team in this case which is the

2    United States versus the Holy Land Foundation.  Are you

3    familiar with the case?

4              VENIRE PERSON:  Not really other than what I

5    heard I think when it first happened.

6              MR. WESTFALL:  Could you tell us what you heard

7    when it first happened?

8              VENIRE PERSON:  Just that they went and raided

9    them and took some stuff.  That's it.  That's basically

10   all I remember.

11             MR. WESTFALL:  Based on what you have heard,

12   have you formed any opinions as to the guilt or innocence

13   of the defendants?

14             VENIRE PERSON:  No, sir.

18:00 15             MR. WESTFALL:  The case is actually material

16   support of a terrorist organization.  That's the

17   allegation.  That's actually the title of the charge.

18   It's an American Muslim charity accused of giving material

19   support to HAMAS which is the foreign terrorist

20   organization.  How do you feel about being on a jury with

21   that kind of case, that kind of issues?

22             VENIRE PERSON:  How do I feel?  Are you asking

23   if I would be partial?

24             MR. WESTFALL:  It's a very vague question.

25   What's the first thing that crosses your mind?

18:00 1          VENIRE PERSON:  A great deal of responsibility

2     to decide guilt or innocence.  I really have no opinion

3     about it.

4          MR. WESTFALL:  And since you brought it up, do

5     you have any issues of being fair and impartial?

6          VENIRE PERSON:  I could be fair.

7          MR. WESTFALL:  Could you be impartial?

8          VENIRE PERSON:  I could be impartial.

9          MR. WESTFALL:  Do you know any Muslims?

10          VENIRE PERSON:  No, sir.

11          MR. WESTFALL:  Have you ever?

12          VENIRE PERSON:  No, sir.

13          MR. WESTFALL:  Have you ever had any good

14     experiences or bad experiences with Arabic people?

18:00 15          VENIRE PERSON:  Dealing with any job, the people

16     I see, I don't really know them.  I have never had any

17     really bad experiences with them.

18          MR. WESTFALL:  How long have you been working

19     with the credit union?

20          VENIRE PERSON:  Almost seven years.

21          MR. WESTFALL:  Do you like it?

22          VENIRE PERSON:  Yes, sir.

23          MR. WESTFALL:  What do you like about it?

24          VENIRE PERSON:  I like meeting people.  It's a

25     great way to meet people, and I feel like I perform great

18:00 1    customer service.

2              MR. WESTFALL:  Pretty big credit union?

3              VENIRE PERSON:  No, sir, we're small.

4              MR. WESTFALL:  So you get to see the regulars?

5              VENIRE PERSON:  Yes.

6              MR. WESTFALL:  You work at a drive-in or window?

7              VENIRE PERSON:  I work at a window.

8              MR. WESTFALL:  What do you like to?

9              VENIRE PERSON:  I like to bowl and play

10   basketball, anything to do with sports with my

11   granddaughter.

12             MR. WESTFALL:  How old is your grand daughter?

13             VENIRE PERSON:  One.

14             MR. WESTFALL:  Does she live with you?

18:00 15            VENIRE PERSON:  Yes.

16             MR. WESTFALL:  How is the child care working?

17             VENIRE PERSON:  I don't provide child care for

18   her.  We have someone that does that.

19             MR. WESTFALL:  The reason why I asked, this case

20   could go on for like four months.  So if you had a one

21   year old at the house we needed to know about that.  If

22   there weren't arrangements that could be made, that could

23   be a hardship issue.  But we're all square there?

24             VENIRE PERSON:  Yes, sir.

25             MR. WESTFALL:  And you are okay with your job

18:00 1  for being gone four months?

2  VENIRE PERSON:  I think my employer might have a

3  hardship about it with me going so long since I recently

4  got a promotion of branch manager.  She may have a problem

5  since we are a small credit union and might have a problem

6  finding someone to fill in for me for a long period of

7  time.

8  MR. WESTFALL:  That could be an issue.  Please

9  find out, okay, just how big an issue that is.

10  VENIRE PERSON:  With my employer?

11  MR. WESTFALL:  Yes.

12  VENIRE PERSON:  She wrote a letter.  I think

13  it's addressed to the Judge.

14  MR. WESTFALL:  Well, he probably has that.

18:00 15  VENIRE PERSON:  No, he doesn't.  I have it.  He

16  hasn't seen the letter.

17  MR. WESTFALL:  How long were you on the jury

18  with the sexual assault?

19  VENIRE PERSON:  It lasted probably four or five

20  days.  It was no longer than a week.

21  MR. WESTFALL:  How did you like it?

22  VENIRE PERSON:  It was uncomfortable listening

23  to --

24  MR. WESTFALL:  Why?

25  VENIRE PERSON:  Because, as I said, it was a

18:00 1  sexual assault case and me being a female it was

2  uncomfortable listening to some of the things she said

3  happened to her.  So it was a little uncomfortable.

4           MR. WESTFALL:  Was it her word against his?

5           VENIRE PERSON:  It was basically her word

6  against his, and when the police showed up he jumped up

7  and ran.  They really didn't see anything.  But it was

8  basically her word against his word.

9           MR. WESTFALL:  You remember all the instructions

10  about the burden of proof and the presumption of

11  innocence?

12           VENIRE PERSON:  Yes, sir.

13           MR. WESTFALL:  How do you feel about those

14  protections?

18:00 15           VENIRE PERSON:  That everyone is innocent until

16  proven guilty.  I believe that is true.  You have to prove

17  them guilty in order to find them guilty.  It has to be

18  proved.

19           MR. WESTFALL:  Did you get a sense that among

20  the jurors in that case the presumption of innocence was

21  applied?

22           VENIRE PERSON:  Towards the young man?

23           MR. WESTFALL:  Yes.

24           VENIRE PERSON:  Yes.  We all considered him

25  innocent until we heard everything that went on, and we

18:00 1    all went from there.

2              MR. WESTFALL:  How do you feel about those

3    protections in this case, in a terrorism-related case?

4              VENIRE PERSON:  That they are innocent.  I

5    believe, as I said, everyone is innocent until we actually

6    prove them guilty.

7              MR. WESTFALL:  Do you do anything with the

8    church?  Are you active in your church?

9              VENIRE PERSON:  No, sir.

10             MR. WESTFALL:  Have you ever done girls club or

11   boys club or Big Sisters?

12             VENIRE PERSON:  Participated in the boys and

13   girls club, but that's been a few years ago.

14             MR. WESTFALL:  How do you feel about charity?

18:00 15   Do you ever donate to charity?

16             VENIRE PERSON:  Yes, sir, I give to United Way

17   and stuff like that.  I donate to charity.

18             MR. WESTFALL:  Why do you do that?

19             VENIRE PERSON:  I feel like if you are able to

20   give you should give.  Some people aren't as fortunate as

21   you are.

22             MR. WESTFALL:  If you are sitting over there, do

23   you want to see you on this jury?

24             VENIRE PERSON:  If I'm sitting over there?  As I

25   said, I could be fair and impartial.  It's up to you if I

18:00 1    sit over here.

2                    MR. WESTFALL:  Thank you.

3                    THE COURT:  Counsel for the government have

4    questions of Ms. Hervey.

5                    MS. SHAPIRO:  Good morning, my name is Elizabeth

6    Shapiro, and I'm one of the prosecutors representing the

7    government in this case.  I have a few additional

8    questions to ask you.  It looks like you were born in

9    Georgia.  Is that right?

10                   VENIRE PERSON:  No.

11                   MS. SHAPIRO:  Born here in Dallas?

12                   VENIRE PERSON:  Yes, ma'am.

13                   MS. SHAPIRO:  Where did I see Georgia?

14                   VENIRE PERSON:  I lived in Georgia for a while.

18:00 15                  MS. SHAPIRO:  When was that?

16                   VENIRE PERSON:  Probably almost twenty years

17   ago.

18                   MS. SHAPIRO:  With your family?

19                   VENIRE PERSON:  My ex-husband, yes.

20                   MS. SHAPIRO:  What brought you to Texas?

21                   VENIRE PERSON:  I have always lived in Texas.

22   He was in the military.

23                   MS. SHAPIRO:  I see and then you came back?

24                   VENIRE PERSON:  Yes.

25                   MS. SHAPIRO:  Where did you study business?

18:00 1              VENIRE PERSON:  North Texas University.

2              MS. SHAPIRO:  What was your favorite subject

3       there?

4              VENIRE PERSON:  Economics.

5              MS. SHAPIRO:  Take a lot of economics classes?

6              VENIRE PERSON:  No, ma'am, just that one.

7              MS. SHAPIRO:  How many brothers and sisters do

8       you have?

9              VENIRE PERSON:  One sister, four brothers.

10             MS. SHAPIRO:  A lot of children.  It looks like

11      you have had uncles that had some encounters with the

12      criminal justice system?

13             VENIRE PERSON:  Yes, ma'am.

14             MS. SHAPIRO:  Are those brothers of your mother

18:00 15     or father?

16             VENIRE PERSON:  They are my mother's brothers.

17             MS. SHAPIRO:  Two?

18             VENIRE PERSON:  Yes.

19             MS. SHAPIRO:  And it says they served some

20      prison time.  Are they out of prison now?

21             VENIRE PERSON:  Yes.

22             MS. SHAPIRO:  And how old were you when they

23      were in prison?

24             VENIRE PERSON:  I have one uncle.  He just

25      recently got out.  The other uncle, probably he's been

18:00 1   deceased almost five years.  So it's probably been about

2   seven years ago.

3            MS. SHAPIRO:  Were you close to them?

4            VENIRE PERSON:  We weren't real close.  I did

5   see them, but that's about it.

6            MS. SHAPIRO:  Was your family involved in their

7   defense and helping them during that process?

8            VENIRE PERSON:  No.

9            MS. SHAPIRO:  Do you have a sense that at the

10  end of the day they were treated fairly by the criminal

11  justice system?

12           VENIRE PERSON:  That they were treated fairly?

13           MS. SHAPIRO:  Yes.

14           VENIRE PERSON:  I believe what they say they

18:00 15  did, they did receive the right punishment.

16           MS. SHAPIRO:  Do you have any lingering bad

17  feelings from that that might cause you to be biased

18  against the government in any way?

19           VENIRE PERSON:  No, ma'am.

20           MS. SHAPIRO:  You did serve on a jury, and with

21  respect to those cases on which you sat, at the end of the

22  case the judge gave you instructions on the law to apply

23  to the case.  Do you remember that?

24           VENIRE PERSON:  Yes.

25           MS. SHAPIRO:  The Court in this case will also

1    give you instructions at the end of the case after all the

2    evidence has been heard, and the Judge is likely to

3    instruct you that HAMAS is a foreign terrorist

4    organization and has been designated as such by the United

5    States, and he would also instruct you on what constitutes

6    material support to HAMAS, and this case is about material

7    support to a foreign terrorist organization.  And in those

8    instructions, he may tell you that sending money to HAMAS,

9    a foreign terrorist organization, is illegal.  And they

10    also tell you that even if that money was partially spent

11    on humanitarian items, things like food or clothes or

12    medicine or things of that nature, that too is illegal if

13    it is knowingly sent to the benefit of this terrorist

14    organization.  Do you understand that idea?

15              VENIRE PERSON:  Yes, ma'am.

16              MS. SHAPIRO:  Do you have any problem accepting

17    that statement of the law?

18              VENIRE PERSON:  No, ma'am.

19              MS. SHAPIRO:  If the Judge gave you such an

20    instruction, would you be able to follow it?

21              VENIRE PERSON:  Yes, sir.

22              MS. SHAPIRO:  Thank you very much.

23              THE COURT:  Ms. Hervey, we're in the process of

24    talking to the members of the panel from which the jury

25    will be selected that would hear this case.  I expect that

18:00 1    process will continue until later today.  So until you

2    hear from us again, you should not discuss this case with

3    anyone or allow anyone to discuss it with you, and if

4    there are any media accounts about this case in the

5    newspapers or on television or on radio, you should not

6    read or watch or listen to any of those media accounts.

7    And one final thing.  I believe you said you had a letter

8    for me which I've not seen.  If you want to deliver that

9    to me, I'll look at it now.

10          If you will remain seated I will read this.  No

11    one else involved in the trial has seen this either.  It's

12    on the letterhead of Metro Medical Credit Union, dated

13    June 17, 2007, re:  Jury duty, June Hervey, Branch

14    Manager, Metro Medical Credit Union.

18:00 15          "Dear Judge, Our employee, June Hervey, has been

16    summoned to report to the jury room on Wednesday July 18,

17    2007 to be considered as a prospective juror.  We are a

18    small credit union with two branches and eighteen

19    employees, one of which is myself, of which several are

20    new employees.  I'm concerned if Ms. Hervey is picked for

21    a jury for a trial lasting more than a couple of days, it

22    would place an undue hardship on our business.  Ms. Hervey

23    was our backup when we lost our branch manager due to

24    termination.  She's now our branch manager.  We don't have

25    a backup.  None of our employees is able to handle the job

18:00  1    for more than a few days, and we have no one at the home

       2    office to replace the branch manager.  I am aware it is

       3    our civic duty to serve as jurors, and several of our

       4    employees have served in the past.  I feel it's important

       5    to society that civic duty not cause small businesses

       6    undue risk.  I have spoken with Ms. Hervey, and if you

       7    have any questions, please feel free to call me.  Yours

       8    truly, Delores Jarbo, President, Metro Medical Credit

       9    Union."

      10          Thank you, Ms. Hervey, we will certainly take

      11    into account this letter when we are making a decision

      12    about whether you should serve.

      13          Thank you, ma'am, you may be excused.

      14          Ladies and Gentlemen, it's now noon by the clock

18:00 15    on the wall.  So I would like to take our midday luncheon

      16    recess from now until one o'clock.  I have been working on

      17    the tabulation of the lists of the persons we have talked

      18    to on the panel, and I have made a tabulation which for

      19    the sake of saving time I had Ms. Piwoni type up, and I

      20    have had copies made, and so I am going to ask that Mr.

      21    Kiblinger distribute those to you now.  I would like you

      22    to review these during the noon hour, if you can, and if

      23    you disagree with the way that I have tabulated this, I

      24    would like to know when we resume.  I did my best on this.

      25    There is a certain arbitrariness, I guess.  The persons on

18:00 1   the list entitled Jurors Available to Serve, what I meant

2   by that heading is these are people which according to my

3   notes neither side has moved to challenge for cause, and I

4   did not understand them to express any kind of a hardship

5   in serving.  As I was about to say, there is a certain

6   arbitrariness.  For example, Number 22 on that list is

7   Diane Shrum, and she did say she was not looking forward

8   to putting her life on hold for three to four months to

9   serve on the jury.  I suppose she could have gone on the

10   hardship list, but I didn't interpret that as anything

11   more than what anyone else would feel at the prospect of

12   serving on a jury for four months.  That's why I put her

13   on the available list instead of hardship list.  One

14   reason I put Ms. Medina on the hardship excuses pending

18:00 15   list -- She's Number 5 on that list -- I think I mentioned

16   to you earlier that the jury administrator had reported to

17   me that Ms. Medina said when she got back down to the

18   central jury room that she had not been able to tell us

19   about pre-existing travel plans.  I have an e-mail from

20   the jury administrator today which said that Ms. Medina

21   said she has travel plans from July 20 to July 22, August

22   3rd to August 6th and August 30th to September 3rd, but

23   that she did not have an opportunity in the courtroom to

24   let the judge slash parties know.

25         One other thing that I needed to just let you

18:00 1     know about because I'm learning something about our jury

2     administration system, too.  I am usually not involved to

3     this extent in jury selection, and probably you are not

4     either.  It was reported to me that one of the things that

5     the counsel for the government was considering and whether

6     to give me back some of the strikes I had previously

7     allocated is they would like the jurors in the same order

8     that we have talked to them.

9             I have learned that apparently each day there is

10    an automated system in the jury administrator's office

11    that when they check these jurors the system automatically

12    randomizes the list, and there is no way to override that

13    system.  So I then inquired if there is some importance in

14    having the people in the same order in which we talked to

18:00 15   them, if that could be done manually, and the jury

16    administrator responded that they could do the list

17    manually, but it's important apparently to her for Susan

18    Hudson, my coordinator here, to get together with her to

19    be sure we have the list in the right order that the

20    parties wanted it.  Also, I don't have any information if

21    we did that manually how long it would take tomorrow

22    morning.  Typically, these people don't get here until

23    8:30 and 9:00, and my question is if we had to do it

24    manually there may be a delay while we prepare that list.

25    That's the information I have on some of the issues that

18:00 1    have come up on how far along we are.

2              One other thing that occurs to me.  These lists
3    I have handed out only go through Ms. Prince because there
4    was some time involved in typing them up.  So Ms.
5    Cadwallader and Ms. Hervey are not on the lists.  We will
6    be in recess for lunch until one o'clock.

7              (Recess)

8              THE COURT:  Good afternoon, Ladies and
9    Gentlemen.  I realize I passed these lists out in haste
10   this afternoon before lunch, and it was reported to me
11   that some defense counsel were unclear about what I wanted
12   you to do.  I apologize for that.

13             This is my own list that I prepared.  And as you
14   can see from my computations we are slightly above the
18:00 15   minimum threshhold that we would need if there is no
16   recomputation of the peremptory challenges for alternate
17   jurors that was raised briefly in discussion this morning.

18             I guess the reason I wanted to share these with
19   you is that I wanted to see if you had any disagreement in
20   your own notes with the categories that we have put these
21   persons in.  I don't want an argument, but if you think I
22   have made a clerical error in putting them in the wrong
23   column, that's what I want to know.

24             And then counsel for the government asked this
25   morning for some time to reflect on whether the government

18:00 1    could give me back some strikes for alternate jurors.

2    However, if there is no consensus about that, I think we

3    need to push on and hear from a few venire this afternoon

4    so that we can make this deadline to put the names on the

5    automated phone system.

6        MR. JACKS:  Judge, I realize I may be hitting

7    the tennis ball back over the net.  As I understand it,

8    the only thing we're dealing with is three strikes or six

9    strikes for the alternates.

10       THE COURT:  That's my understanding.

11       MR. JACKS:  And I think both sides would like to

12   know what that universe is.  And I think obviously the

13   Court's determination of cause will determine where that

14   universe is on the lists.  So I would think if the Court

18:00 15   were to tell us of its rulings with regard to these for

16   cause -- and we could pretty quickly see that means the

17   alternates are going to be in this range -- we could give

18   an answer to the Court in terms of we have enough, three

19   strikes would be satisfactory to both sides or six

20   strikes.  But that's kind of the initial response that we

21   would have.

22       THE COURT:  Well, my intent currently is to

23   sustain all of the challenges for cause that are on this

24   list that I gave you.  That's through 10 starting with

25   Geraldine Pritchard and ending with John Abelar.  And also

18:00 1     to grant the hardship excuses shown in that list ending

2     with Erbert.  And so that would leave us this fifty people

3     who are on the list shown as jurors available to serve.

4           MR. JACKS:  Judge, were there some additions to

5     this list?

6           THE COURT:  There are two other people, as I

7     mentioned, that are not on any of these lists because of

8     just timing.  Ms. Piwoni was typing this up this morning

9     as we spoke with the jurors, Ms. Cadwallader and Ms.

10     Hervey, and I would put Ms. Cadwallader in the

11     challenge-for-cause category because of the defendant's

12     challenge to her, and my intent would be to excuse her for

13     cause, and then Ms. Hervey I would put in the hardship

14     category in view of the letter that her employer wrote

18:00 15     which I read into the record shortly before we recessed.

16     So we're still at the same number of people available to

17     serve; namely, fifty.

18           MR. JACKS:  And so we would be able to calculate

19     which of these jurors would be within the alternate pool,

20     and just for clarification, I assume if a juror is

21     excused, the alternate would replace them in numerical

22     order.

23           THE COURT:  That would be my assumption.  I have

24     never done it in this struck method.  Still, we know who

25     the alternates are on the list, and so as I previously

18:00 1    indicated, I don't want to tell the jurors themselves who

2    are regular jurors and who are alternates.  All of us

3    would know that, and it is my assumption that the

4    alternates would replace the jurors as necessary in the

5    order in which they are alternate.  In other words,

6    Alternate Number 1 and 2 and so forth.

7         MR. JACKS:  Your Honor, if we could have a few

8    moments to determine where the alternate pool may be, I

9    think we can give you our answer pretty quickly as to

10   whether three strikes is fine or six.

11        THE COURT:  Let me ask one other question.  Does

12   your answer presuppose that we will do this manual list

13   tomorrow rather than this automatically randomization?  I

14   think that would entail some delay we won't otherwise

18:00 15   experience and may require us to start at ten rather than

16   nine.

17        MR. JACKS:  Yes, sir.  I think we are all hoping

18   that they will stay in the order.  At least the numerical

19   one for Monday would be followed by Tuesday and Wednesday

20   and so forth.  I think we're counting on that so that we

21   can keep straight who's going to be where on the list.

22        THE COURT:  Why don't we take a few minutes

23   while you talk about that.  I don't want to take too long

24   because if we don't reach some agreement, we have to keep

25   pushing ahead, and we have this three o'clock deadline.

18:00  1          (Recess)

2          THE COURT:  Mr. Jacks, have you had an

3     opportunity to consider the things that were discussed and

4     reach some understanding about them?

5          MR. JACKS:  Yes, your Honor.  And I'm not that

6     confident in my calculations.  You go to law school and

7     somehow the hardest thing is to count.

8          THE COURT:  I understand.

9          MR. JACKS:  But our position is that we would

10    certainly be willing to agree to each side having four

11    strikes among the alternate pool, and if that were the

12    case, assuming no double strikes --

13         THE COURT:  I don't think we can have double

14    strikes under this struck jury method.

18:00 15         MR. WESTFALL:  Just to make sure.

16         MR. JACKS:  To really make sure.  That would

17    leave a cushion of five jurors in the event something

18    happens in the general voir dire.  That's an adequate

19    cushion for the Court, and I think we have probably

20    questioned enough jurors to move into the general voir

21    dire tomorrow.

22         THE COURT:  Okay.  Well, that sounds good to me.

23    Anyone on the defense side disagree with what Mr. Jacks

24    said?

25         MR. WESTFALL:  No, your Honor, we don't

18:00 1    disagree.  I wanted to ask one thing.  Ms. Shrum yesterday

2    brought that note from her chiropractor.

3        THE COURT:  Oh, yes, I know the one you are

4    talking about.  Yes, you are right.  I guess I had

5    somewhat forgotten about that.  The note from the

6    chiropractor recommends that she not participate as a

7    juror due to a chronic low back condition that would

8    include prolonged sitting.  I guess the reason I did not

9    put her in the hardship category is I believe I asked her

10   a follow-up question after we saw this letter, whether she

11   thought she could sit for as long as an hour and a half at

12   a time, and she said yes.

13       MR. WESTFALL:  I think she did, too.  I just

14   wondered whether the Court thought it was a hardship.

18:00 15   With that clarification, I don't think we have a problem

16   with the -- what the court just said with the four

17   strikes.  Ms. Moreno asked me to make sure the Court knew

18   about Mr. Baccus.  I don't know if the Court wants to do

19   anything about him.

20       THE COURT:  Yes, I'm cognizant of what she said

21   at the end of the day yesterday to the effect that she had

22   been able to verify Mr. Elashi was the family with whom

23   Mr. Baccus's wife had served as an intern, but he did not

24   know them personally, and so I thought that was something

25   that the parties might want to take note of exercising

1    their peremptory challenges, but I didn't think it really

2    affected his status as a person who was qualified to

3    serve, from what I know.

4           Let me just ask one other point of

5    clarification, Mr. Westfall, while you are standing.  I

6    don't know what benefit keeping this list in the same

7    order will have on our proceedings tomorrow.  But

8    expecting it may cause some delay beyond what we would

9    others experience because we are doing these lists

10    manually as the people come and are checked in as opposed

11    to the automatic system that randomizes it, and I want to

12    make sure that defense counsel understands that.  I don't

13    know if defense counsel are planning to go back to their

14    residences out of town this weekend.  And it may be at ten

15    o'clock as opposed to a nine o'clock.

16           MR. WESTFALL:  Ten o'clock is fine.  That's just

17    fine.  And it's not going to cause any hardship to us if

18    the jurors are seated in the order that they were called

19    this week.  That's fine with us.  We have no objection to

20    that.

21           THE COURT:  Well, I guess we can go ahead and

22    give this list I entitled Jurors Available to Serve to the

23    jury clerk, and they can begin putting those names on the

24    system before three o'clock.

25           I have your letter you handed up, Mr. Westfall,

18:00 1    this morning.  Unfortunately, I didn't have much time to

2    do anything with it, but I appreciate your putting down in

3    writing what you would like to accomplish.  It doesn't

4    show a copy of this to the government.  So let me just

5    read it into the record so it's clear what is being

6    proposed here.

7              MR. JACKS:  Your Honor, he did serve us with a

8    copy.

9              THE COURT:  Okay.  Do you have any different

10   view about what this general voir dire session should

11   consist of, Mr. Jacks?

12             MR. JACKS:  No, your Honor.

13             THE COURT:  I will file this with the record

14   then, and I will attempt to cover the points that have

18:00 15   been discussed in Mr. Westfall's letter, and I'm still of

16   the opinion that can probably be done in the space of

17   maybe thirty minutes to an hour, and then I would

18   anticipate that we could move very quickly into the

19   process of parties exercising their peremptory challenges.

20   There may be some brief delay just because of my

21   unfamiliarity and the Government's unfamiliarity with this

22   system, but I'm sure that counsel who have been through

23   this before can guide us.  I do think after reflecting on

24   it overnight that it would be better if we excuse the

25   panel from the courtroom before this process begins

18:00 1    because it seems to me that it would be unwieldy to try to

2    have bench conferences with as many parties as we have

3    here.

4          However, I do intend to keep the panel in the

5    jury assembly room because once we know who the twelve and

6    the six alternates are, I think we need to bring them back

7    to the courtroom and have some further proceedings with

8    them.  I think I have told the parties earlier that for

9    this case we've established a remote location for them to

10    come to in the morning, and then they will be driven here

11    by the Marshal in a van so that they will be all together

12    and won't have to run the gauntlet of the media and press

13    and so forth, and then they will be transported back in

14    the same manner in the afternoon.  I think we need to

18:00 15    discuss that with them and let them know where they need

16    to be and when, and I guess we have tentatively

17    established Tuesday as the start date of when they need to

18    report, if I understood that correctly.  So anyway, we

19    need to be sure they know about that.  And also, I may

20    need to reiterate at that point just the importance of

21    their not paying attention to any media accounts of this

22    case while we're apart from them.

23          It was just pointed out to me -- I guess I'm

24    still unused to the publicity that a case like this

25    generates.  Ms. Casey just pointed out to me we won't be

18:00  1    able to have such an orientation in an open session

2    because that would broadcast where the remote site is and

3    defeat the purpose.  Maybe the marshal could do it

4    himself.  But I probably do need to direct them so the

5    marshal can talk to them about that.

6            MR. DRATEL:  The government filed a Section 4

7    notice last night, and I know the court has issued an

8    order.  It's been briefed before, but to put on the record

9    the defenses' objection to the ex parte aspect of it and

10   deviation from the due process that we have objected to

11   earlier.

12           THE COURT:  Yes, sir.  Thank you.

13

14

15

16

17

18

19

20

21

22

23

24

25

1        C E R T I F I C A T I O N

2

3        I, Cassidi L. Casey, certify that during the

4    proceedings of the foregoing-styled and -numbered cause, I

5    was the official reporter and took in stenotypy such

6    proceedings and have transcribed the same as shown by the

7    above and foregoing Pages 862 through 986 and that said

8    transcript is true and correct.

9

10        I further certify that the transcript fees and format

11   comply with those prescribed by the court and the Judicial

12   Conference of the United States.

13

14

15                        s/Cassidi L. Casey
                        _____
16                        CASSIDI L. CASEY
                        UNITED STATES DISTRICT REPORTER
17                        NORTHERN DISTRICT OF TEXAS
                        DALLAS DIVISION
18

19

20

21

22

23

24

25

< Dates >
**August 6th** 974:22
**July 18, 2007** 972:16
**July 19, 2007** 862:11
**July 20** 974:21
**July 22, august 3rd** 974:21
**July 26** 897:15
**June 17, 2007** 972:13
**September 11** 954:25
**September 3rd** 974:22
**'02.** 922:18
**-numbered** 986:4

< 0 >
**04-240-G** 862:5
**05/842-9960505/842-9960**
862:47

< 1 >
**1** 979:6
**10** 954:9, 977:24
**10005** 863:7
**10985** 863:25
**10:30** 931:9
**11** 954:9
**1100** 862:33, 863:47
**12/732-0707212/732-0707**
863:8
**13-247-4500813-247-4500**
863:27
**14** 863:6
**14-254-3139214-254-3139**
863:49
**14.** 954:9
**14/659-8600214/659-8600**
862:35
**14/744-3015214/744-3015**
863:18
**15/875-5812415/875-5812**
863:34
**15D6L** 863:47
**17/877-1700817/877-1700**
863:43
**1703** 863:46
**1965** 941:4
**1965.** 940:21
**1983** 879:25
**1989** 872:16, 904:10

**1992** 900:1

< 2 >
**2** 979:6
**20** 862:45
**2001.** 872:17
**22** 974:6
**26th** 863:32
**27th** 893:22
**28th** 863:6
**29** 897:15

< 3 >
**3** 862:5
**30th** 974:22
**3232** 863:16
**33679** 863:26
**35th** 873:10
**3:15** 931:11
**3rd** 883:17

< 4 >
**4** 862:16, 985:6
**40** 897:14
**4:45.** 931:11

< 5 >
**5** 974:15
**555** 863:31

< 6 >
**6th** 887:1

< 7 >
**7-11** 912:17, 946:1
**7-11.** 912:4
**700** 862:45, 863:16
**75204** 863:17
**75242** 862:34, 863:48
**76102** 863:42

< 8 >
**862** 986:7

**87102** 862:46
**8:30** 975:23

< 9 >
**9-1** 891:14
**9-11** 878:15
**9-11.** 880:21
**910** 863:41
**94104-1500** 863:33
**986** 986:7
**9:00** 975:23

< A >
**AARON** 863:4
**Abdulqader** 863:11
**Abelar** 977:25
**abide** 928:5
**able** 865:23, 869:3, 877:14,
892:2, 895:24, 895:25,
900:16, 904:16, 905:12,
909:5, 915:23, 930:12, 959:5,
959:8, 967:19, 971:20,
972:25, 974:18, 978:18,
981:22, 985:1
**above** 976:14, 986:7
**Absolutely** 881:16, 938:19,
942:19
**academy** 937:6
**accelerate** 866:7
**accepting** 971:16
**accident** 871:2, 931:4
**accomplish** 865:20, 983:3
**according** 974:2
**account** 973:11
**Accountant** 932:21, 953:24
**accounting** 945:22, 945:24
**accounts** 877:25, 878:3,
889:16, 889:19, 893:17,
893:19, 896:20, 896:23,
905:21, 905:24, 916:8,
916:10, 928:17, 928:19,
936:3, 936:6, 949:18, 960:15,
960:17, 972:4, 972:6, 984:21
**accusation** 878:19
**accused** 876:22, 878:17,
880:19, 902:1, 906:12,
908:11, 914:21, 928:3, 943:5,
951:20, 959:23, 962:18

**Acquaintances** 939:16
**acquit** 881:5
**across** 887:9
**ACS** 911:21
**active** 901:22, 954:11, 967:8
**actual** 895:14
**Actually** 885:4, 900:6, 913:17, 927:22, 933:15, 933:19, 945:9, 952:22, 962:15, 962:17, 967:5
**additional** 867:1, 968:7
**additions** 978:4
**addressed** 965:13
**adequate** 980:18
**administration** 907:25, 924:21, 975:2
**administrator** 865:24, 974:16, 974:20, 975:10, 975:16
**admitted** 961:2
**advisement** 961:16
**affect** 899:9
**affected** 982:2
**afford** 885:5, 928:23
**afforded** 882:24, 920:8, 927:11, 957:11
**affording** 921:7
**afraid** 891:14, 892:14
**After** 865:3, 865:4, 866:20, 876:13, 876:14, 878:15, 891:14, 894:1, 900:20, 901:4, 903:9, 959:23, 971:1, 981:10, 983:23
**afternoon** 865:22, 882:10, 937:15, 976:8, 976:10, 977:3, 984:14
**Again** 872:4, 877:23, 893:15, 904:18, 928:15, 933:21, 934:13, 972:2
**Against** 870:16, 870:24, 877:14, 894:11, 903:2, 947:10, 949:9, 956:13, 961:12, 966:4, 966:6, 966:8, 970:18
**age** 954:8
**agencies** 900:23
**agency** 869:15
**Agent** 932:11, 936:11, 936:12, 936:14, 936:22, 937:5

**agents** 936:13
**ago** 865:17, 887:11, 887:19, 887:20, 916:20, 941:5, 946:7, 948:6, 958:9, 967:13, 968:17, 970:2
**agree** 869:8, 980:10
**agreeable** 864:22
**agreement** 979:24
**ahead** 937:16, 949:25, 961:2, 979:25, 982:21
**aid** 918:6, 918:7, 918:8, 918:13, 959:23
**ailment** 936:18
**Al** 862:11, 951:10, 951:13
**Albuquerque** 862:46
**alcohol** 904:7
**alert** 929:19
**alien** 927:16
**aliens** 883:5
**allegation** 878:22, 888:14, 951:12, 962:17
**allegations** 867:16, 881:4, 890:22, 891:2, 905:3, 934:17
**alleged** 927:25
**allegedly** 951:7
**alleges** 915:8, 938:14
**alleging** 895:10
**allocated** 866:14, 975:7
**allow** 877:24, 889:15, 893:16, 896:17, 905:20, 916:7, 928:16, 931:17, 936:2, 949:16, 960:14, 972:3
**allowed** 894:2
**Almost** 963:20, 968:16, 970:1
**alone** 881:5
**along** 866:2, 976:1
**Also** 877:6, 887:10, 888:22, 888:24, 890:3, 903:10, 907:17, 910:24, 915:8, 915:13, 927:1, 935:7, 950:9, 958:16, 970:25, 971:5, 971:10, 975:20, 977:25, 984:19
**Alternate** 888:6, 976:16, 977:1, 978:19, 978:21, 979:5, 979:6, 979:8, 980:11
**alternates** 864:9, 866:12, 866:19, 977:9, 977:17, 978:25, 979:2, 979:4, 984:6

**Always** 885:12, 885:13, 924:1, 945:17, 946:24, 952:5, 968:21
**Am** 867:14, 890:1, 892:7, 892:23, 893:1, 894:4, 903:16, 909:3, 927:1, 929:18, 930:13, 932:4, 973:2, 973:20, 975:2
**Amendment** 869:1
**America** 862:5, 869:5, 892:11
**American** 867:20, 878:21, 890:4, 895:9, 898:16, 906:11, 917:23, 938:13, 958:12, 958:14, 962:18
**Americans** 891:15
**among** 877:4, 966:19, 980:11
**amount** 874:9
**Angeles** 932:18
**Animal** 912:23
**anniversary** 873:11
**announce** 866:2
**another** 948:8
**answer** 883:20, 902:19, 920:20, 927:12, 927:15, 927:19, 938:22, 957:21, 977:18, 979:9, 979:12
**answered** 897:14
**answers** 890:2, 891:23, 916:20
**anticipate** 935:5, 983:18
**anticipates** 958:18
**anybody** 869:3
**anymore** 901:6
**Anyone** 877:24, 881:19, 889:15, 893:16, 895:18, 896:17, 898:25, 899:1, 902:17, 905:20, 916:6, 916:7, 928:16, 936:2, 942:23, 949:16, 949:17, 960:1, 960:13, 960:14, 972:3, 974:11, 980:23
**Anything** 867:23, 871:18, 874:21, 877:8, 879:1, 880:11, 881:10, 881:25, 882:1, 883:9, 883:10, 886:12, 887:3, 887:5, 887:21, 890:3, 895:7, 905:8, 906:16, 906:17, 910:4, 910:12, 915:10, 917:23, 918:1, 935:9, 938:20, 941:20,

945:21, 948:24, 957:6, 964:10, 966:7, 967:7, 974:10, 981:19, 983:2
**anyway** 984:18
**anywhere** 941:12
**apart** 984:22
**apartments** 952:17
**apologize** 930:24, 936:17, 936:21, 945:11, 947:12, 976:12
**apparently** 975:9, 975:17
**application** 952:24
**applied** 955:3, 966:21
**applies** 915:1
**apply** 888:13, 928:5, 960:24, 961:10, 970:22
**applying** 955:25, 956:2, 961:10
**appointments** 893:25
**Appraisal** 917:7
**appraise** 917:8
**appraiser** 917:6, 926:3, 926:15
**appreciate** 872:3, 872:4, 891:16, 894:7, 983:2
**appreciation** 910:25
**approach** 864:3, 936:8
**appropriately** 875:3
**Approximately** 917:1, 945:5
**apt** 952:19
**apt.** 948:7, 948:12
**Arab** 939:23
**Arabic** 868:6, 952:13, 958:17, 958:18, 958:20, 963:14
**Arabs** 908:8, 952:12
**arbitrariness** 973:25, 974:6
**area** 872:21, 873:19, 873:22, 875:15, 885:16, 945:1, 945:2, 945:4, 945:7, 948:2
**aren't** 967:20
**argument** 907:17, 976:21
**Arlington** 952:20
**army** 940:18, 940:22, 940:25, 941:3
**around** 869:21, 870:9, 870:19, 904:4, 918:9, 924:1, 931:15, 931:19, 945:25, 957:8
**arrangements** 964:22

**arrested** 883:14
**arson-related** 887:12
**article** 890:17, 890:19, 890:21
**aside** 892:18, 896:7, 897:4, 902:16, 902:21, 923:23, 946:18
**ask** 867:7, 878:6, 889:22, 890:1, 890:25, 915:15, 916:16, 916:19, 916:24, 929:9, 930:7, 936:10, 936:15, 937:7, 938:16, 948:16, 948:22, 949:24, 957:24, 961:19, 968:8, 973:20, 979:11, 981:11, 982:4
**asked** 871:19, 883:9, 883:13, 884:8, 888:17, 915:19, 919:16, 919:18, 923:4, 927:10, 945:12, 960:24, 964:19, 976:24, 981:9, 981:17
**asking** 891:10, 947:12, 962:22
**aspect** 907:20, 935:16, 985:9
**aspirin** 930:1, 930:2, 931:14
**assault** 965:18, 966:1
**assembly** 984:5
**Assistant** 862:29, 872:8, 884:4, 910:22, 922:6, 930:21, 943:24
**assisted** 900:18
**association** 876:21
**assume** 978:20
**assuming** 980:12
**assumption** 978:23, 979:3
**AT&T** 873:8
**attempt** 983:14
**attend** 873:24, 925:25
**attendant** 930:8
**attendee** 875:25
**attention** 899:10, 930:12, 984:21
**Attorney** 862:29, 872:8, 874:23, 884:4, 884:5, 910:22, 922:6, 930:21, 943:24
**attorneys** 889:25, 916:18, 929:8
**August** 887:1, 974:22
**Austin** 940:13, 944:22,

953:12
**automated** 865:24, 975:10, 977:5
**automatic** 982:11
**automatically** 864:15, 975:11, 979:13
**Available** 974:1, 974:13, 978:3, 978:16, 982:22
**Avenue** 863:16, 863:41, 885:18
**aware** 909:2, 929:14, 973:2
**away** 916:21
**Awful** 887:4

**< B >**
**BA** 924:20
**Baccus** 981:18, 981:23
**bachelor** 907:19
**back** 865:9, 869:4, 873:15, 875:15, 875:16, 890:15, 901:5, 904:10, 921:3, 921:4, 922:24, 928:8, 929:10, 929:18, 930:25, 931:2, 931:3, 931:18, 932:12, 934:13, 937:9, 941:4, 948:1, 968:23, 974:17, 975:6, 977:1, 977:7, 981:7, 982:13, 984:6, 984:13
**background** 908:2
**backup** 972:23, 972:25
**Bad** 868:11, 888:8, 903:4, 926:13, 939:22, 951:25, 952:15, 959:20, 959:21, 963:14, 963:17, 970:16
**Bahrain** 899:22
**Baker** 862:38
**balanced** 884:20
**ball** 977:7
**Bank** 872:16, 872:18, 872:24, 918:10
**Baptist** 870:2
**Barry** 862:26, 903:24, 956:21
**Based** 867:20, 878:22, 885:6, 895:25, 902:14, 942:6, 948:22, 962:11
**basically** 864:11, 962:9, 966:5, 966:8
**basis** 914:2, 961:6
**basketball** 964:10
**bat** 891:1

**Baylor** 933:16
**became** 927:14, 929:16, 932:13, 947:22
**begin** 898:22, 982:23
**beginning** 926:14, 941:23
**begins** 983:25
**behalf** 894:10, 928:21, 930:7
**behind** 871:8, 895:20
**believe** 867:4, 888:1, 891:4, 891:11, 902:23, 919:19, 930:10, 948:18, 957:22, 958:24, 966:16, 967:5, 970:14, 972:7, 981:9
**bell** 895:2, 950:12
**bells** 898:13, 898:19, 906:14
**belong** 933:10
**bench** 984:2
**benefit** 877:9, 877:12, 889:2, 915:10, 960:5, 971:13, 982:6
**benefited** 918:13, 960:5
**Benz** 875:12, 875:14
**best** 884:19, 973:24
**better** 881:10, 892:15, 983:24
**beyond** 865:12, 867:3, 881:3, 941:22, 982:8
**bias** 961:3, 961:4, 961:12
**Biased** 956:12, 956:13, 960:21, 970:17
**Big** 870:22, 875:21, 881:24, 904:9, 941:6, 964:2, 965:9, 967:11
**bikes** 884:18, 884:19
**billing** 933:6
**billings** 933:4
**bit** 878:16, 891:18, 891:21, 892:17, 897:19, 908:7, 919:1, 919:20, 924:4, 927:21, 947:13, 947:19, 951:23, 953:13
**blank** 947:23
**blankets** 889:1
**body** 922:24
**book** 909:5
**books** 915:12, 918:7
**boredom** 932:13
**Born** 885:18, 911:2, 920:11, 922:13, 925:19, 927:7, 932:17, 945:9, 958:10, 958:13, 968:8, 968:11

**bother** 868:21
**bout** 934:12
**bowl** 964:9
**BOX** 863:25
**boy** 934:7
**BOYD** 862:43
**boys** 944:7, 967:11, 967:12
**Branch** 965:4, 972:13, 972:23, 972:24, 973:2
**branches** 972:18
**break** 931:9, 931:10, 931:11
**breaks** 930:5, 931:15
**brief** 983:20
**briefed** 985:8
**briefly** 930:17, 936:8, 976:17
**bring** 984:6
**broadcast** 985:2
**brother** 913:3, 941:6
**brothers** 913:1, 969:7, 969:9, 969:14, 969:16
**brought** 963:4, 968:20, 981:2
**brushes** 947:8
**Buckner** 912:23
**Buddhist** 942:23
**bugs** 900:21
**burden** 881:2, 966:10
**Burger** 911:24
**Business** 885:9, 907:17, 907:22, 907:25, 908:2, 924:18, 924:20, 932:21, 933:3, 933:17, 939:21, 968:25, 972:22
**Businesses** 911:24, 973:5
**buy** 895:19, 909:5


**< C >**
**CA** 863:33
**CADEDDU** 863:14, 863:15
**Cadwallader** 949:23, 950:1, 956:18, 956:20, 960:9, 960:20, 976:5, 978:9, 978:10
**cafeteria** 925:9
**calculate** 978:18
**calculations** 980:6
**California** 863:31, 875:13, 932:10, 932:15, 934:3
**call** 893:22, 901:2, 942:22, 973:7

**called** 877:13, 883:13, 885:6, 886:7, 890:5, 912:22, 915:12, 918:14, 933:8, 934:1, 946:17, 946:25, 982:18
**camera** 907:11, 907:12
**camp** 958:15
**Canada** 904:3, 904:6
**cancel** 897:16
**Canon** 907:12
**Capital** 873:4
**car** 881:6, 948:8, 948:10
**card** 927:18, 947:17
**cards** 913:8, 947:24
**care** 894:4, 952:7, 964:16, 964:17
**carry** 907:8
**cars** 924:9
**cartilage** 931:5, 931:6
**cases** 970:21
**CASEY** 863:46, 984:25, 986:3, 986:15, 986:17
**CASSIDI** 863:46, 986:3, 986:17
**categories** 976:20
**category** 978:11, 978:14, 981:9
**Catholic** 910:1
**cattle** 948:18, 948:20
**caught** 944:20, 946:8
**cause** 865:7, 865:12, 865:15, 865:22, 866:21, 894:11, 894:15, 897:8, 917:2, 928:22, 929:3, 929:12, 960:20, 961:8, 970:17, 973:5, 974:3, 977:13, 977:16, 977:23, 978:13, 982:8, 982:17, 986:4
**caused** 870:23, 941:3
**causes** 865:14
**celebrated** 873:10
**Central** 876:19, 888:14, 917:7, 974:18
**centralized** 933:3, 933:17
**Centro** 873:25
**certain** 902:9, 902:13, 973:25, 974:5
**certainly** 973:10, 980:10
**certify** 986:3, 986:10
**chain** 911:24
**challenge** 865:12, 894:11, 928:22, 961:6, 974:3, 978:12

**challenge-for-cause** 978:11
**challenges** 865:6, 865:21, 866:21, 976:16, 977:23, 982:1, 983:19
**chance** 864:7, 870:8, 880:16, 880:17, 885:11, 955:6
**change** 904:9, 904:16, 923:11, 927:15, 927:19
**changed** 883:13, 893:21, 894:4, 925:21
**changing** 914:11, 914:15
**charge** 876:20, 878:19, 905:6, 914:19, 915:5, 923:5, 933:3, 939:1, 962:17
**charged** 868:15, 880:19, 898:17, 941:13, 941:20, 957:12
**charges** 918:4, 934:16, 959:24
**charitable** 877:11, 915:12
**charities** 870:12
**charity** 867:20, 878:21, 890:4, 895:9, 895:10, 895:11, 898:16, 906:11, 917:23, 918:6, 938:13, 938:14, 938:15, 960:4, 962:18, 967:14, 967:15, 967:17
**Chase** 872:16, 872:25, 913:7
**Check** 883:1, 924:3, 924:4, 956:8, 975:11
**checked** 882:23, 882:25, 883:16, 958:19, 958:22, 982:10
**checking** 883:3
**chef** 925:4
**Chevrolet** 907:16
**Chicago** 945:10, 948:5
**child** 874:2, 944:10, 964:16, 964:17
**children** 874:4, 918:8, 934:5, 934:6, 944:6, 944:14, 948:24, 969:10
**chiropractor** 981:2, 981:6
**choice** 882:20
**choir** 876:4, 876:6, 876:8
**choose** 955:13, 955:14
**christian** 942:21
**Christmas** 879:25
**chronic** 981:7

**church** 869:24, 870:5, 875:19, 875:21, 909:19, 909:21, 954:11, 967:8
**circumstances** 948:25
**citizen** 919:24, 920:2, 920:4, 920:7, 920:13, 920:22, 920:24, 920:25, 927:11, 927:14, 927:17, 928:2, 937:6, 958:12
**citizens** 882:24, 919:17, 921:8
**City** 912:11, 933:9
**civic** 973:3, 973:5
**Civil** 886:3, 886:4, 895:22, 913:21, 946:12, 946:13, 946:20
**claims** 918:4
**clarification** 978:20, 981:15, 982:5
**clarify** 888:5
**classes** 969:5
**Classroom** 923:16, 923:25
**clear** 895:24, 928:23, 983:5
**clearance** 901:20, 901:23
**clearly** 961:3
**Clerical** 869:19, 976:22
**clerk** 982:23
**clients** 943:9
**climate** 904:9
**CLINE** 863:29
**Clinic** 912:23
**clock** 973:14
**Close** 912:25, 970:3, 970:4
**closest** 879:20
**clothes** 971:11
**clothing** 877:11, 889:1, 915:13, 935:12
**club** 967:10, 967:11, 967:13
**cognizant** 981:20
**collect** 952:22, 953:6
**collecting** 933:6
**collectively** 866:15
**College** 873:23, 873:24, 874:3, 911:7, 911:8, 911:10, 922:23, 923:17, 924:11, 934:9
**color** 892:15
**column** 976:23
**comes** 866:24, 882:17, 910:6

**comfortable** 891:5
**coming** 878:9, 883:10, 886:15, 894:22, 906:6, 934:22, 937:21, 961:24
**comment** 957:9
**Commerce** 862:33, 863:47, 911:11
**commercial** 873:14, 907:1
**commission** 922:20
**committed** 928:1
**committing** 928:3
**communicate** 873:15, 900:16
**Community** 870:9, 911:9, 954:14
**commute** 924:14
**companies** 872:13
**company** 933:13, 946:9
**comparables** 926:11, 926:18
**compile** 866:1
**completely** 892:8
**complex** 916:2
**comply** 986:11
**compound** 900:2, 900:3
**computations** 976:14
**computer** 901:14, 926:19
**computers** 911:21, 911:25, 926:11, 951:2, 951:4
**concentrate** 937:10
**concerned** 891:20, 929:19, 930:11, 930:13, 972:20
**concerns** 871:16, 901:5
**conclusion** 866:3
**condition** 929:12, 929:22, 930:8, 930:25, 981:7
**conditions** 900:8
**condos** 917:10
**confer** 864:21
**Conference** 986:12
**conferences** 984:2
**confident** 980:6
**conflict** 881:23, 882:19, 899:4, 908:14, 918:18, 918:19
**consensus** 977:2
**consequently** 947:25
**consider** 865:13, 937:7, 980:3
**consideration** 937:11
**considerations** 919:16

**considered** 877:11, 935:11, 966:24, 972:17
**considering** 975:5
**consist** 983:11
**constitutes** 971:5
**Constitution** 928:4
**Constitutional** 919:17, 920:24, 921:7, 928:24, 942:16
**contact** 869:22
**contain** 877:3
**continue** 889:13, 896:15, 905:18, 928:14, 949:15, 960:12, 972:1
**contractor** 901:14
**controlled** 874:11
**conversations** 898:25, 921:13, 958:18
**convicted** 947:16
**conviction** 874:8
**cook** 925:13, 925:22
**coordinator** 975:18
**copies** 973:20
**copy** 915:2, 983:4, 983:8
**corporate** 872:19, 912:13
**Corporation** 876:21, 912:8, 912:22, 945:24
**corps** 940:24
**Correct** 876:10, 883:20, 920:15, 926:16, 926:20, 927:13, 946:16, 958:23, 986:8
**correctly** 984:18
**Counsel** 864:21, 867:6, 871:23, 878:5, 883:25, 889:21, 893:8, 894:16, 896:9, 897:9, 905:25, 910:18, 916:15, 922:2, 929:4, 930:15, 937:15, 943:18, 949:23, 956:17, 961:18, 968:3, 975:5, 976:11, 976:24, 982:12, 982:13, 983:22
**count** 944:18, 980:7
**counter** 895:20
**counting** 979:20
**country** 882:10, 885:22, 900:10, 927:19, 927:25, 940:9, 942:6, 954:20, 954:22, 957:10
**County** 885:21, 886:2, 886:5,

917:7, 917:15
**couple** 873:5, 876:7, 885:10, 886:17, 894:1, 900:11, 900:21, 948:17, 950:20, 957:24, 972:21
**course** 929:17
**Courthouse** 862:32, 913:14
**courtroom** 891:8, 930:25, 974:23, 983:25, 984:7
**courts** 886:23
**cover** 983:14
**created** 940:10
**creates** 931:3
**Credit** 913:8, 963:19, 964:2, 965:5, 972:12, 972:14, 972:18, 973:8
**credits** 873:23
**crime** 928:1, 928:3, 957:12
**criminal** 875:4, 876:10, 881:1, 892:10, 895:22, 902:13, 913:19, 927:20, 933:21, 941:12, 946:20, 946:22, 949:5, 949:6, 955:12, 957:17, 961:25, 969:12, 970:10
**critical** 909:8, 909:9, 921:12, 921:14, 921:18, 943:9, 943:10, 943:13
**crosses** 962:25
**crossing** 931:23, 932:13
**Crowley** 913:14
**crystallize** 865:14
**CSR** 863:46
**culture** 900:20
**curiosity** 947:5
**Curious** 939:2, 939:3, 939:4, 939:5, 942:15
**currently** 869:10, 874:8, 977:22
**cushion** 867:2, 980:17, 980:19
**Customer** 869:22, 873:4, 917:16, 964:1
**customers** 873:14
**CUTRER** 863:39

**< D >**
**D.** 863:29
**dad** 924:25, 925:17, 927:14,

927:17
**DALLAS** 862:3, 862:34, 863:17, 863:48, 870:3, 873:19, 873:22, 875:15, 885:7, 885:18, 885:19, 885:20, 886:12, 886:13, 887:17, 911:2, 913:4, 917:7, 917:15, 922:7, 922:12, 926:1, 933:5, 933:9, 945:7, 968:11, 986:20
**DANIELS** 862:43
**date** 887:1, 984:17
**dated** 972:12
**daughter** 871:15, 874:5, 875:9, 882:18, 882:21, 945:1, 964:12
**daughters** 880:8, 884:9
**Davidson** 884:12
**Day** 863:30, 865:20, 867:4, 894:23, 894:24, 904:17, 927:4, 929:15, 929:17, 949:4, 970:10, 975:9, 981:21
**days** 883:9, 894:1, 950:9, 965:20, 972:21, 973:1
**DC** 953:18
**deadline** 977:4, 979:25
**deal** 963:1
**Dealing** 907:1, 963:15, 977:8
**dealt** 901:1
**Dear** 972:15
**deceased** 970:1
**decide** 898:10, 963:2
**decision** 902:14, 973:11
**decisions** 938:17
**deep** 880:21
**defeat** 985:3
**DEFENDANT** 862:38, 863:1, 863:11, 863:20, 863:36, 887:17, 935:4, 951:15, 978:11
**defendants** 879:3, 887:7, 888:15, 895:17, 905:10, 938:18, 949:2, 957:19, 959:22, 960:6, 961:14, 962:13
**defense** 866:15, 867:13, 878:8, 889:25, 891:9, 894:11, 894:21, 897:1, 897:12, 906:3, 916:18, 928:22, 938:2, 950:4, 961:1, 961:25, 962:1, 970:7,

976:11, 980:23, 982:12, 982:13
**defenses** 985:9
**definite** 867:2, 941:7
**Definitely** 877:17
**degenerative** 931:5
**degree** 906:19, 907:4, 911:7, 911:8, 924:12, 924:19
**delay** 975:24, 979:14, 982:8, 983:20
**deliberate** 915:2
**deliver** 879:17, 972:8
**delivered** 879:19
**delivers** 926:11
**delivery** 879:11, 885:13
**Delores** 973:8
**demands** 894:8
**dementia** 893:23
**demonstrate** 955:11
**dense** 929:8
**Denver** 885:6
**DEPARTMENT** 862:30, 912:19
**dependent** 894:5
**depending** 876:14, 924:8
**depends** 870:6
**deployed** 919:12
**descent** 868:6, 952:13
**description** 936:18
**deserve** 892:2
**designated** 877:5, 905:7, 915:7, 935:6, 959:25, 971:4
**designation** 888:23
**desk** 873:15
**Despite** 957:16
**details** 895:7, 902:11
**determination** 977:13
**determine** 891:18, 977:13, 979:8
**Development** 898:12, 926:25, 938:6
**deviation** 985:10
**Diane** 974:7
**diapers** 918:8
**died** 892:1, 892:25, 940:11
**Diego** 932:18
**differences** 887:9, 941:10
**Different** 868:23, 896:2, 919:23, 925:11, 933:10, 939:6, 939:9, 939:12, 942:25,

958:4, 983:9
**difficult** 929:12, 930:24, 937:9, 949:1, 958:21
**difficulty** 958:23, 958:25
**digesting** 909:16
**digital** 914:11, 914:13, 914:15
**Dillards** 917:20
**DIRE** 862:17, 865:18, 866:24, 980:18, 980:21, 983:10
**direct** 985:4
**direction** 903:9, 903:10, 941:7
**directly** 901:1
**disagree** 869:8, 973:23, 980:23, 981:1
**disagreement** 915:14, 915:16, 935:15, 976:19
**discharge** 923:2
**discharged** 923:4
**discuss** 877:24, 889:14, 889:15, 893:15, 893:16, 896:16, 896:17, 905:19, 905:20, 916:6, 916:7, 928:15, 928:16, 936:1, 936:2, 949:16, 949:17, 960:13, 960:14, 972:2, 972:3, 984:15
**discussed** 980:3, 983:15
**discussion** 904:5, 976:17
**DISD** 925:9, 925:15
**dishonorable** 923:5
**disintegrates** 931:6
**disposed** 887:15
**Distance** 940:15
**distinction** 880:4
**distract** 930:9
**distribute** 973:21
**DISTRICT** 862:1, 862:2, 862:31, 872:8, 910:23, 917:7, 930:22, 986:18, 986:19
**DIVISION** 862:3, 912:16, 986:20
**doctor** 893:23, 893:25
**doing** 870:7, 870:10, 870:11, 873:4, 894:19, 896:4, 903:12, 906:2, 916:5, 917:11, 925:10, 950:6, 953:9, 953:22, 961:24, 982:9
**domestic** 945:17

**donate** 967:15, 967:17
**Donations** 870:19
**done** 900:5, 905:13, 912:5, 927:3, 932:7, 953:16, 954:13, 960:5, 967:10, 975:15, 978:24, 983:16
**door** 904:2
**double** 907:24, 980:12, 980:13
**doubt** 881:3, 941:22
**down** 872:23, 873:14, 880:23, 886:7, 886:15, 893:21, 893:24, 894:7, 906:6, 929:18, 946:17, 946:25, 958:8, 974:17, 983:2
**downtown** 872:21
**dozen** 866:22, 866:23
**DRATEL** 863:3, 863:5, 985:6
**drill** 922:25, 923:13
**drinking** 934:11
**drive** 871:7, 879:13, 901:17
**drive-in** 964:6
**driven** 984:10
**driver** 879:11, 885:14
**Drivers** 870:16, 870:24
**drug** 874:8, 881:6
**Drunk** 870:16, 870:24
**due** 886:25, 972:23, 981:7, 985:10
**DUI** 886:19
**DUNCAN** 862:42
**during** 872:10, 910:24, 922:8, 970:7, 973:22, 986:3
**duty** 913:10, 923:18, 923:24, 972:13, 973:3, 973:5
**DWI** 883:16, 883:17
**dynasty** 940:10

< E >
**e-mail** 974:19
**earlier** 974:16, 984:8, 985:11
**early** 865:19, 865:22, 874:1, 879:24, 898:2
**East** 873:21, 885:14, 885:20, 918:22
**Eastfield** 911:9
**easy** 949:20, 961:3
**eat** 880:3, 880:5
**econ** 907:23

economic 917:2
Economics 969:4, 969:5
edge 879:21
education 941:8, 953:2
effect 877:7, 935:8, 981:21
eight 944:12, 944:15
eighteen 866:13, 972:18
eighth 944:10
eighties 879:24
eighty 893:22
either 865:3, 868:6, 876:14, 886:10, 908:19, 972:11, 975:4
El 873:25, 933:2
El-mezain 863:1
Elashi 863:20, 981:22
elective 907:6
Elizabeth 862:27, 968:5
emotional 881:18
employed 872:15, 932:2
employee 972:15
employees 972:19, 972:20, 972:25, 973:4
employer 965:2, 965:10, 978:14
encounters 969:11
end 864:18, 866:13, 876:13, 877:2, 885:9, 888:10, 905:5, 913:17, 914:22, 935:1, 949:4, 970:10, 970:21, 971:1, 981:21
ended 887:14, 946:9, 948:20
ending 977:25, 978:1
England 942:11
enjoy 870:10, 870:11, 880:6, 904:13, 921:8, 953:9
enjoyed 900:12, 900:21, 904:10
Enjoying 904:11, 904:12
enjoys 920:25
enlisted 922:15, 922:16
enough 866:20, 879:5, 920:10, 920:11, 936:19, 946:8, 977:18, 980:20
entail 979:14
entitled 893:1, 974:1, 982:22
entity 934:19
equipment 907:8, 912:15, 912:17
equivalent 864:12

Erbert 897:9, 897:11, 903:23, 905:15, 978:2
error 976:22
established 961:9, 984:9, 984:17
estate 924:16, 926:25
ET 862:11
evaluate 959:4
event 980:17
Everybody 869:2, 869:5, 881:17, 891:8, 920:25, 943:13, 955:2
Everyone 864:17, 881:1, 881:20, 902:15, 930:7, 942:25, 954:20, 961:11, 966:15, 967:5
everything 900:19, 912:1, 943:13, 966:25
evidence 876:13, 876:14, 896:1, 902:14, 902:16, 903:3, 905:5, 909:8, 914:23, 921:6, 921:13, 935:1, 935:2, 943:9, 960:2, 971:2
ex 985:9
ex-husband 968:19
EXAMINATION 862:17
example 974:6
Excellent 880:15
Except 949:7
excess 866:23
Excuse 866:25, 894:15, 897:7, 929:2, 933:7, 936:7, 978:12, 983:24
excused 878:4, 889:20, 896:25, 905:24, 916:10, 928:20, 936:8, 949:22, 960:18, 973:13, 978:21
excuses 865:22, 866:21, 974:14, 978:1
exercising 981:25, 983:19
expect 877:3, 877:6, 877:22, 888:20, 889:12, 896:14, 905:5, 905:17, 915:2, 915:5, 915:8, 921:11, 921:12, 928:13, 935:7, 949:14, 960:11, 971:25
expecting 982:8
experience 875:2, 886:14, 908:8, 929:21, 942:14, 948:23, 979:15, 982:9

experiences 868:5, 868:11, 895:25, 939:23, 940:1, 948:25, 952:15, 958:6, 958:7, 963:14, 963:17
expired 903:20, 928:9, 943:15, 949:11, 956:16
explain 900:20, 948:16
explained 914:18
explanation 935:15
explore 891:6
exploring 891:21
express 869:3, 908:23, 910:25, 974:4
extent 975:3
eye 900:7


< F >
fact 957:16
facts 868:22, 868:23, 888:13, 896:1, 896:7, 902:22, 909:10
fair 881:12, 881:17, 887:7, 891:9, 891:11, 891:18, 891:19, 892:4, 892:6, 892:8, 892:11, 893:2, 894:12, 897:2, 902:17, 920:8, 920:9, 920:12, 930:7, 936:23, 942:8, 956:5, 957:23, 961:10, 961:13, 963:5, 963:6, 967:25
fairly 875:3, 887:6, 888:1, 896:7, 902:21, 949:6, 957:18, 970:10, 970:12
fairness 881:16, 942:7
falls 909:12
familiar 962:3
families 875:22
family 875:7, 880:9, 892:24, 924:23, 924:24, 944:24, 949:5, 968:18, 970:6, 981:22
fan 941:6
far 923:2, 927:19, 953:2, 955:13, 976:1
fat 922:24
father 892:1, 911:20, 969:15
favorite 969:2
FBI 937:5
fear 871:1, 952:3
February 897:23
Federal 886:15, 939:6,

941:10, 946:25, 948:1
**feeling** 927:10, 954:17, 955:14
**feelings** 891:7, 891:24, 892:14, 892:18, 908:18, 927:23, 970:17
**fees** 986:10
**felony** 883:17
**felt** 892:23, 901:2, 903:9
**female** 966:1
**few** 867:1, 867:14, 872:10, 872:14, 876:6, 878:13, 890:1, 903:25, 906:4, 911:1, 916:20, 922:9, 929:9, 930:23, 933:17, 938:3, 944:1, 950:5, 953:5, 953:8, 956:22, 958:9, 967:13, 968:7, 973:1, 977:3, 979:7, 979:22
**field** 926:4
**Fifteen** 933:1, 946:7, 957:3
**fifty** 978:2
**fifty.** 978:17
**figure** 864:18
**figured** 908:2
**file** 983:13
**filed** 985:6
**fill** 965:6
**filled** 890:2, 958:9
**final** 972:7
**finally** 960:21, 960:24
**find** 905:12, 920:21, 935:4, 960:3, 960:6, 965:9, 966:17
**finding** 965:6
**Fine** 873:6, 946:14, 961:22, 979:10, 982:16, 982:17, 982:19
**finish** 874:3, 874:13, 919:11, 922:19
**finished** 911:11, 914:14
**First** 862:45, 864:24, 869:1, 879:25, 886:14, 893:22, 900:11, 903:15, 912:9, 913:9, 913:11, 915:19, 920:10, 920:19, 929:6, 929:9, 929:15, 947:2, 947:4, 952:23, 961:23, 962:5, 962:7, 962:25
**FISH** 862:18, 880:10
**Five** 885:8, 912:6, 965:19, 970:1, 980:17
**fix** 873:16

**flight** 904:16
**Floor** 863:6, 863:32
**Florida** 863:26
**Fly** 884:21, 897:23
**focused** 953:1
**follow** 877:15, 899:3, 899:5, 905:12, 908:13, 910:1, 913:24, 915:23, 935:18, 971:20
**follow-up** 872:11, 903:25, 930:23, 944:1, 981:10
**followed** 902:10, 908:24, 918:18, 979:19
**following** 889:6
**fond** 864:13
**fonder** 940:16
**food** 877:11, 911:24, 915:13, 918:7, 935:12, 971:11
**force** 946:8
**Ford** 907:16
**forefathers** 942:11
**foregoing** 986:7
**foregoing-styled** 986:4
**foreign** 867:19, 876:23, 877:6, 877:9, 877:12, 878:20, 888:21, 895:15, 898:18, 914:21, 915:7, 915:11, 918:13, 934:19, 935:6, 935:10, 935:13, 962:19, 971:3, 971:7, 971:9
**forget** 900:1, 949:10, 950:23
**forgive** 891:20
**forgotten** 981:5
**form** 902:12, 918:7
**format** 986:10
**formed** 895:16, 898:25, 951:14, 962:12
**former** 902:8, 949:8
**formerly** 872:16
**Fort** 863:42, 901:15, 901:16, 945:9, 945:15, 945:16, 948:1
**forth** 873:15, 933:6, 979:6, 979:20, 984:13
**fortunate** 920:10, 920:11, 967:20
**forty-nine** 866:18, 866:23, 867:3
**forward** 974:7
**found** 905:10, 959:7
**Foundation** 862:11, 867:15,

867:17, 867:18, 867:19, 878:11, 879:18, 890:5, 890:6, 894:25, 895:1, 898:12, 905:3, 906:10, 906:11, 914:20, 917:22, 917:24, 918:4, 934:18, 938:5, 950:11, 962:2
**four** 871:9, 879:7, 883:11, 886:10, 910:14, 917:1, 929:11, 930:3, 931:16, 958:14, 964:20, 965:1, 965:19, 969:9, 974:8, 974:12, 980:10, 981:16
**Four.** 954:7
**frame** 903:3
**Francisco** 863:33
**Frank** 913:14
**free** 868:25, 931:19, 973:7
**FREEDMAN** 862:43
**freedom** 908:20, 909:12, 921:15, 943:3
**Friday** 871:1, 898:6, 898:8, 904:15
**friend** 939:19, 948:7, 948:8, 948:10
**friends** 897:21, 907:14
**frustrating** 904:1
**full** 922:23, 941:1
**funneling** 951:8
**fused** 931:2

**< G >**
**Gardner** 885:6
**Garland** 879:21, 933:20
**Garrett** 862:28, 884:4, 943:23, 949:11
**gas** 868:7, 868:8, 895:19, 895:20
**gathering** 883:1
**gauntlet** 984:12
**gave** 867:18, 895:11, 905:10, 915:24, 938:15, 948:19, 970:22, 971:19, 977:24
**Gaza** 918:10
**GE** 873:3
**general** 865:18, 866:24, 980:18, 980:20, 983:10
**generally** 930:5, 931:8
**generates** 984:25
**generation** 920:11

**Gentlemen** 864:2, 892:19, 920:22, 973:14, 976:9
**Georgia** 968:9, 968:13, 968:14
**Geraldine** 977:25
**gets** 902:17
**getting** 871:15, 874:17, 898:21, 959:16
**girl** 944:11
**girlfriend** 887:11
**girls** 880:7, 967:10, 967:13
**give** 877:8, 887:5, 887:22, 892:19, 915:10, 915:13, 930:12, 947:19, 957:15, 957:18, 960:1, 961:13, 967:16, 967:20, 971:1, 975:6, 977:1, 977:17, 979:9, 982:22
**Given** 864:8, 877:16, 892:17, 894:8, 935:11, 935:13, 951:13, 958:19
**giver** 894:4
**gives** 877:2
**giving** 865:13, 880:19, 880:20, 898:17, 902:1, 905:8, 919:16, 935:9, 959:23, 962:18
**goal** 866:19, 907:25, 942:10
**gotten** 864:13, 874:2, 879:20
**graduated** 906:19
**grand** 964:12
**grandchildren** 940:3, 944:4, 945:21, 947:7, 948:24
**granddaughter** 880:8, 964:11
**grandkid** 882:22
**grandkids** 953:11, 954:6
**grandson** 939:20
**grant** 978:1
**gravitate** 870:23
**great** 954:23, 957:10, 957:11, 963:1, 963:25
**green** 927:18
**Greg** 863:38, 867:11, 878:7, 894:19, 897:11, 906:3, 937:18, 950:3, 961:20
**grew** 873:21, 909:24, 911:3
**group** 912:16, 938:9, 938:12, 946:18, 951:9
**groups** 951:8
**Grove** 909:24

**grow** 873:19, 909:21, 909:23, 940:16, 957:2
**grown** 944:6
**Guard** 916:22, 919:7, 922:16, 923:9, 923:19, 923:25, 931:23, 932:13, 947:21, 947:22
**guess** 869:2, 870:14, 874:10, 874:20, 880:2, 903:1, 915:17, 915:21, 921:2, 927:17, 927:22, 928:7, 930:6, 947:24, 956:12, 959:2, 973:25, 976:18, 981:4, 981:8, 982:21, 984:16, 984:23
**guide** 983:23
**guilt** 879:3, 895:17, 899:1, 938:17, 962:12, 963:2
**guilty** 874:19, 874:20, 892:14, 905:12, 915:4, 935:4, 941:19, 941:24, 942:19, 951:15, 954:21, 955:7, 955:17, 960:6, 966:16, 966:17, 967:6
**guys** 948:8

**< H >**
**Haitian** 903:19
**half** 866:22, 887:20, 903:8, 911:13, 931:10, 981:11
**HAMAS** 867:18, 876:23, 876:24, 876:25, 877:4, 878:21, 878:23, 888:16, 888:18, 888:21, 895:12, 898:17, 902:3, 904:22, 905:4, 905:6, 905:8, 905:9, 905:11, 906:13, 908:11, 914:22, 915:6, 918:14, 934:20, 935:6, 938:15, 951:13, 959:10, 959:12, 959:20, 959:23, 959:24, 960:2, 960:5, 960:6, 962:19, 971:3, 971:6, 971:8
**handed** 976:3, 982:25
**handle** 940:14, 972:25
**handled** 887:24
**handles** 943:25
**happen** 876:18
**happened** 885:8, 923:1, 962:5, 962:7, 966:3
**happening** 952:1

**happens** 941:24, 955:7, 980:18
**hard** 892:22, 950:8, 956:11, 956:12, 959:16
**hardest** 980:7
**hardly** 882:9
**hardship** 865:7, 865:22, 866:21, 897:25, 917:2, 937:8, 964:23, 965:3, 972:22, 974:4, 974:10, 974:13, 974:14, 978:1, 978:13, 981:9, 981:14, 982:17
**hardships** 871:13
**Harley** 880:12, 884:12
**haste** 976:9
**HCA** 932:22, 933:8, 933:10, 933:17
**heading** 974:2
**hear** 877:21, 877:23, 882:1, 889:12, 889:14, 890:10, 891:23, 892:17, 893:13, 893:14, 896:16, 905:17, 905:19, 909:10, 916:4, 916:5, 919:2, 920:14, 928:13, 928:15, 930:25, 935:24, 936:1, 949:14, 949:15, 959:13, 959:15, 959:20, 959:24, 960:11, 960:12, 971:25, 972:2, 977:3
**Hearing** 878:24, 892:15, 938:16, 950:16, 950:18
**hearings** 926:6, 926:7
**heart** 940:16, 957:22
**heat** 900:21, 904:13, 925:14
**Hebrew** 958:17, 958:19, 958:20
**help** 870:20, 892:16, 924:2, 934:11
**helped** 900:6
**Helping** 869:22, 870:7, 899:21, 900:2, 900:14, 903:16, 970:7
**Hernandez** 916:14, 916:17, 922:3, 922:5, 928:11, 929:2
**Hervey** 961:17, 961:18, 968:4, 971:23, 972:13, 972:15, 972:20, 972:22, 973:6, 973:10, 976:5, 978:10, 978:13
**hesitancy** 915:20

hesitating 909:15
High 885:3, 907:5, 911:5, 911:6, 925:25
highly 909:8, 909:9
Hilton 889:21, 892:5, 893:9, 893:11, 894:6, 894:12, 894:15
hire 874:23, 911:25
hitting 977:6
hold 869:3, 876:4, 876:5, 949:9, 974:8
holidays 870:7
HOLLANDER 862:41, 862:44
Holy 862:11, 867:15, 867:16, 867:17, 867:19, 878:11, 879:17, 890:5, 890:6, 894:25, 895:1, 898:12, 905:3, 906:9, 906:10, 914:19, 917:21, 917:22, 917:24, 918:3, 919:4, 934:18, 938:5, 950:11, 962:2
home 871:7, 875:9, 882:11, 888:7, 911:17, 911:19, 912:3, 922:13, 925:8, 925:22, 934:6, 934:8, 973:1
homeowner 926:12
Honestly 895:19, 899:9, 902:10
Honor 864:3, 864:6, 864:17, 864:24, 865:5, 866:8, 867:10, 871:25, 884:2, 891:8, 893:10, 894:10, 896:11, 897:1, 897:6, 905:14, 910:20, 922:1, 922:4, 928:21, 929:1, 930:17, 936:7, 936:10, 937:3, 937:6, 943:16, 943:20, 960:19, 961:5, 979:7, 980:5, 980:25, 983:7, 983:12
HONORABLE 862:18, 923:7
Hood 945:9, 945:15
hope 956:7, 956:9, 957:20, 961:1
hopefully 952:7
hoping 979:17
Hospitals 932:24, 932:25, 933:2, 933:4, 933:8, 933:10
hotel 925:1, 925:5
hotels 925:20
hour 931:10, 973:22, 981:11, 983:17
hours 931:16

House 870:25, 882:22, 910:2, 912:24, 954:2, 957:8, 964:21
houses 917:10
Hudson 975:18
human 943:14
humanitarian 888:25, 918:6, 918:7, 918:8, 971:11
hundred 875:24, 892:19, 902:15
hunt 869:16, 880:10
hunting 948:20
hurt 892:25
husband 873:6, 873:18, 873:20, 874:22, 893:22, 894:1, 894:8, 932:20, 933:1, 940:10, 948:23


< I >
ID 947:16, 947:24
idea 864:17, 971:14
ignorance 933:7
ignorant 920:1
illegal 883:7, 905:8, 935:10, 960:1, 971:9, 971:12
illnesses 876:7
imagine 881:17
immediately 899:10
immigrants 927:6
immigrated 927:6
impact 865:1, 880:21, 917:3
impair 961:4
impartial 891:11, 894:12, 897:3, 956:6, 963:5, 963:7, 963:8, 967:25
impartially 887:6, 949:1
impersonation 948:5
implying 958:22
importance 975:13, 984:20
important 908:22, 936:21, 955:10, 955:19, 957:15, 973:4, 975:17
in. 976:21
inability 897:2
incarcerated 874:15, 874:16
incident 887:11
inclined 953:12
include 877:7, 981:8
included 881:19, 915:5

includes 915:11
India 952:18
indicate 937:4, 937:8
indicated 873:7, 919:19, 979:1
individuals 957:16
Industrial 872:23
infer 961:3
inference 961:4
informant 947:25
information 919:25, 959:17, 975:20, 975:25
informed 919:25
initial 977:20
innocence 879:3, 881:2, 881:4, 892:20, 895:17, 899:1, 928:2, 938:18, 941:13, 957:12, 957:15, 960:23, 961:11, 962:12, 963:2, 966:11, 966:20
innocent 892:13, 942:8, 951:15, 954:21, 955:7, 966:15, 966:25, 967:4, 967:5
inquire 936:11
inquired 975:13
inspired 957:4
instance 893:5
instead 903:4, 974:13
Institute 875:12
instruct 914:25, 935:19, 971:3, 971:5
instruction 877:15, 889:5, 905:12, 915:6, 915:8, 915:24, 971:20
instructions 876:15, 877:3, 877:7, 888:12, 888:20, 915:1, 915:3, 915:5, 935:3, 935:5, 935:7, 935:19, 966:9, 970:22, 971:1, 971:8
Instruments 885:4
insurance 933:6
intend 984:4
intended 865:8, 877:12
intent 866:1, 977:22, 978:12
interest 926:24
Interesting 958:7
intern 981:23
internet 881:25, 914:4
interpret 974:10
interview 952:24

**invasion** 891:21, 891:25
**involve** 926:17, 957:13
**involved** 867:17, 869:24, 887:24, 895:11, 904:7, 909:19, 947:23, 948:4, 949:5, 970:6, 972:11, 975:2, 976:4
**involvement** 886:18
**involves** 867:16, 880:18, 890:4, 890:22, 895:8, 905:2, 906:11, 918:4, 938:25, 951:11
**involving** 902:1, 917:21, 948:17
**Islam** 910:3, 910:9
**Israel** 909:8, 910:6, 910:7, 943:10
**issue** 888:11, 896:3, 896:4, 897:3, 898:5, 901:10, 901:12, 902:20, 902:21, 902:24, 919:22, 964:23, 965:8, 965:9
**issued** 985:7
**issues** 902:6, 902:9, 902:13, 902:25, 916:25, 920:7, 947:12, 962:21, 963:5, 975:25
**items** 877:11, 888:25, 905:4, 935:13, 960:2, 971:11

**< J >**
**J.** 863:4
**Jacks** 862:25, 872:3, 872:7, 873:6, 910:21, 912:13, 922:6, 923:6, 930:20, 980:2, 980:23, 983:11
**Jackson** 928:9
**jail** 883:15, 883:18
**January** 932:8
**Japanese** 958:14
**Jarbo** 973:8
**Jim** 862:25, 872:7, 910:21, 922:5, 930:20
**job** 869:11, 880:5, 906:22, 906:25, 914:7, 923:8, 923:24, 925:2, 925:18, 927:2, 931:25, 933:11, 963:15, 964:25, 972:25
**jobs** 885:10
**JOE** 862:18
**John** 863:29, 977:25

**join** 903:7, 903:12, 941:3
**Jonas** 862:26, 903:22, 903:24, 904:8, 904:12, 904:15, 904:21, 905:2, 905:14, 956:19, 956:21, 957:9, 960:22, 961:7
**Jones** 863:30
**JOSHUA** 863:3, 863:5
**Judge** 869:6, 876:15, 877:2, 877:6, 888:11, 888:22, 895:25, 896:7, 902:16, 902:21, 905:5, 909:10, 914:25, 915:3, 915:24, 931:17, 935:2, 959:23, 965:13, 970:22, 971:2, 971:19, 972:15, 974:24, 977:6, 978:4
**judged** 868:22
**judging** 893:5, 949:1
**judgment** 868:24, 869:7
**Judicial** 986:11
**jumped** 966:6
**June** 972:13, 972:15
**juries** 939:6, 939:7, 939:10, 946:11
**juror** 930:14, 936:11, 937:8, 956:6, 960:3, 972:17, 978:20, 981:7
**Jurors** 866:16, 891:7, 891:9, 891:19, 891:20, 892:11, 966:20, 973:3, 974:1, 975:7, 975:11, 976:17, 977:1, 978:3, 978:9, 978:19, 979:1, 979:2, 979:4, 980:17, 980:20, 982:18, 982:22
**JUSTICE** 862:30, 875:4, 927:20, 949:5, 949:6, 955:12, 969:12, 970:11

**< K >**
**KABP** 882:5
**Kansas** 933:2
**Kaufman** 885:21, 886:2, 886:5, 886:10, 886:21, 887:18
**keep** 902:18, 944:19, 979:21, 979:24, 984:4
**keeping** 982:6
**kept** 876:7, 881:22, 948:10

**Kiblinger** 937:13, 961:16, 973:21
**kids** 870:21, 871:7, 880:7, 954:4
**Kileen** 945:8
**Kind** 869:18, 869:23, 872:20, 880:13, 881:5, 882:3, 900:3, 907:12, 917:2, 920:1, 930:24, 941:6, 942:18, 944:11, 960:25, 962:21, 974:4, 977:20
**King** 911:25
**knee** 931:7
**Knowing** 891:1, 904:2, 917:1
**knowingly** 888:15, 888:23, 905:13, 971:13
**knowledge** 920:1
**known** 939:15, 952:10, 952:12
**knows** 936:11
**KRLD** 882:5

**< L >**
**L.** 863:5, 863:46, 986:3, 986:15, 986:17
**lack** 942:12
**Ladies** 864:2, 973:14, 976:8
**lady** 928:23, 944:4
**laid** 960:23
**Land** 862:11, 867:15, 867:17, 867:18, 867:19, 878:11, 879:18, 890:5, 890:6, 894:25, 895:1, 898:12, 905:3, 906:9, 906:10, 914:19, 917:22, 917:24, 918:3, 919:4, 934:18, 938:5, 950:11, 962:2
**language** 935:8, 958:20
**Last** 864:7, 871:9, 872:13, 886:11, 887:1, 894:24, 917:1, 944:18, 985:7
**lasted** 965:19
**lasting** 972:21
**later** 896:15, 904:16, 916:5, 923:11, 927:13, 928:14, 960:12, 972:1
**laundry** 925:3
**LAW** 863:5, 863:15, 863:24, 876:16, 877:8, 877:14, 877:15, 877:16, 886:18,

888:13, 888:14, 914:25, 915:9, 915:14, 915:15, 915:16, 915:21, 927:24, 928:5, 928:6, 935:9, 935:14, 935:16, 935:20, 947:8, 959:24, 970:22, 971:17, 980:6
**Lawn** 872:22
**laws** 892:11
**lawyer** 961:25
**lawyers** 867:13, 878:8, 894:21, 897:12, 906:3, 938:2, 950:4
**lay** 929:17
**lead** 876:19, 914:18
**leads** 869:14
**learn** 875:12, 959:18
**learned** 920:21, 942:14, 975:9
**learning** 882:18, 975:1
**least** 910:1, 942:14, 979:18
**leave** 978:2, 980:17
**leaves** 936:14
**led** 948:1
**leeriness** 891:17
**leery** 891:14
**left** 867:4, 882:12, 882:13, 940:11
**legal** 883:5, 927:16, 927:22
**legally** 927:18
**Leone** 899:16, 899:20
**lesson** 942:14
**letter** 965:12, 965:16, 972:7, 973:11, 978:14, 981:10, 982:25, 983:15
**letterhead** 972:12
**level** 946:25
**life** 883:10, 885:17, 909:25, 917:3, 974:8
**light** 866:5
**likely** 971:2
**likes** 943:2
**liking** 880:5
**limit** 871:16
**Lincoln** 957:7
**Linda** 863:23, 863:24, 889:24, 916:18, 929:8, 944:9, 944:10, 945:1
**lingering** 970:16
**list** 866:1, 974:1, 974:6,

974:10, 974:13, 974:15, 975:12, 975:16, 975:19, 975:24, 976:13, 977:24, 978:1, 978:3, 978:5, 978:25, 979:12, 979:21, 982:6, 982:22
**listen** 878:2, 882:3, 882:8, 882:9, 882:10, 889:18, 893:19, 896:22, 903:3, 905:23, 916:10, 928:19, 936:5, 949:19, 960:16, 972:6
**listened** 882:11, 888:6
**listening** 965:22, 966:2
**lists** 873:7, 973:17, 976:2, 976:5, 976:9, 977:14, 978:7, 982:9
**little** 878:16, 885:10, 891:18, 892:16, 897:19, 907:10, 908:7, 919:1, 919:20, 920:20, 924:4, 927:21, 947:19, 951:23, 956:12, 966:3
**live** 869:4, 911:17, 911:19, 924:14, 924:22, 924:24, 930:1, 933:18, 933:19, 945:6, 952:17, 957:2, 964:14
**lived** 885:16, 885:20, 904:2, 909:25, 924:15, 932:10, 945:4, 957:3, 968:14, 968:21
**lives** 945:2
**living** 913:6, 932:16, 932:18, 934:14, 944:24, 952:6
**local** 900:18, 946:25
**location** 872:18, 984:9
**Lockheed** 901:15
**long** 873:9, 879:22, 883:11, 887:19, 894:2, 897:20, 912:5, 914:7, 917:11, 917:17, 919:9, 925:15, 925:17, 927:4, 930:6, 931:15, 932:7, 941:5, 945:13, 946:3, 948:6, 950:10, 950:18, 963:18, 965:3, 965:6, 965:17, 975:21, 979:23, 981:11
**longer** 877:22, 889:13, 893:14, 905:18, 916:24, 935:25, 965:20
**look** 868:22, 868:23, 919:3, 972:9
**looked** 960:25
**Looking** 869:11, 895:5, 906:22, 906:24, 957:23,

974:7
**looks** 885:15, 913:16, 944:6, 968:8, 969:10
**loose** 948:11
**Los** 932:17
**lose** 897:17
**loss** 871:4
**lost** 972:23
**lot** 879:8, 891:15, 906:6, 907:23, 914:10, 929:19, 942:11, 944:4, 944:6, 953:11, 953:16, 969:5, 969:10
**lots** 869:21
**lounge** 929:18
**love** 864:18, 880:8, 932:13
**Loved** 957:1
**low** 981:7
**lower** 931:2, 931:3
**loyal** 942:22
**lunch** 864:18, 865:4, 931:10, 931:14, 976:6, 976:10
**luncheon** 973:15


**< M >**
**ma'am** 874:4, 878:4, 891:16, 928:10, 928:20, 937:2, 937:12, 949:21, 960:17, 968:12, 969:6, 969:13, 970:19, 971:15, 971:18, 973:13
**MADD** 870:15
**magazines** 921:13
**Magnet** 926:2
**main** 907:25
**Mainly** 950:22
**major** 907:24
**majored** 907:17
**Mallick** 863:40
**man** 966:22
**Manager** 901:13, 932:21, 965:4, 972:14, 972:23, 972:24, 973:2
**managing** 940:12
**manner** 866:7, 984:14
**manual** 979:12
**manually** 975:15, 975:17, 975:21, 975:24, 982:10
**Maplethorp** 908:25, 909:5
**MARLO** 863:14, 863:15

**marriage** 871:15
**married** 874:2, 903:10
**Marshal** 984:11, 985:3, 985:5
**Martin** 901:15
**material** 867:18, 868:16, 876:22, 878:20, 878:22, 880:19, 880:20, 881:7, 888:15, 890:22, 895:11, 895:14, 898:17, 902:1, 906:12, 914:21, 918:5, 934:19, 935:9, 938:15, 951:21, 962:15, 962:18, 971:6
**math** 885:1
**Matthews** 894:16, 894:18, 896:10, 896:12, 897:2, 897:7
**Mcgahan** 878:5, 884:1, 884:3, 889:10
**Mckinney** 863:16
**Meals** 870:8
**mean** 896:1, 915:18, 941:18, 955:16, 961:12
**means** 941:16, 977:16
**meant** 873:12, 974:1
**meantime** 896:15
**mechanic** 923:10
**mechanics** 875:13
**media** 867:24, 877:25, 878:2, 889:16, 889:19, 890:11, 893:17, 896:20, 896:23, 898:20, 905:21, 905:23, 916:8, 928:17, 928:19, 936:3, 936:5, 949:17, 960:15, 960:17, 972:4, 972:6, 984:12, 984:21
**Medical** 877:11, 889:1, 915:12, 929:11, 929:22, 930:8, 933:9, 935:12, 936:18, 940:23, 972:12, 972:14, 973:8
**medication** 929:24, 929:25
**medicine** 918:7, 971:12
**Medina** 974:14, 974:17, 974:20
**meet** 963:25
**meeting** 963:24
**member** 875:18, 876:6
**members** 875:22, 875:24, 877:20, 877:21, 889:11,

893:12, 896:13, 905:16, 916:3, 928:12, 935:23, 949:5, 949:13, 971:24
**Memorial** 957:7
**men** 867:17, 868:15, 880:18, 895:11, 902:1, 905:4, 908:10, 908:17, 914:20, 934:18, 938:15, 938:25, 942:17, 951:12, 951:20
**mentioned** 880:21, 886:17, 886:18, 887:10, 888:14, 898:15, 904:21, 941:9, 944:21, 945:15, 945:19, 945:22, 946:10, 947:11, 947:15, 974:15, 978:7
**Mercedes** 875:12, 875:14
**Mesquite** 885:14
**message** 865:23
**method** 978:24, 980:14
**Metro** 972:12, 972:14, 973:8
**Mexican** 920:4
**Mexico** 927:6
**Michael** 949:7
**Michelle** 944:11
**mid-morning** 865:3
**midday** 973:15
**Middle** 871:14, 912:25, 918:22
**military** 902:9, 902:25, 903:1, 903:5, 903:7, 903:13, 941:6, 945:13, 947:16, 947:22, 968:22
**mind** 866:9, 867:2, 879:2, 895:25, 903:3, 910:6, 920:23, 921:3, 921:5, 922:10, 928:8, 939:18, 943:6, 951:24, 962:25
**minded** 901:5, 903:1
**mine** 907:6
**minimum** 866:23, 976:15
**minority** 919:23
**minute** 864:20
**minutes** 867:14, 890:1, 906:4, 938:3, 950:5, 979:22, 983:17
**Miranda** 936:12, 936:13, 936:14, 936:25, 937:5
**missions** 900:5
**mom** 925:7, 927:13
**moment** 865:10, 865:17,

932:13
**moments** 979:8
**Monday** 930:4, 979:19
**money** 878:18, 888:24, 897:18, 905:4, 905:9, 905:10, 905:11, 951:8, 960:1, 971:8, 971:10
**Monrovia** 899:21
**Montana** 904:6
**month** 871:15, 883:11
**months** 871:9, 879:7, 885:5, 910:14, 914:9, 917:1, 917:13, 917:18, 929:11, 930:4, 945:14, 950:21, 964:20, 965:1, 974:8, 974:12
**monument** 957:4
**monuments** 953:17
**Moreno** 863:23, 863:24, 889:23, 889:25, 905:25, 906:2, 910:19, 910:21, 916:1, 916:2, 916:18, 921:21, 929:8, 981:17
**Morgan** 872:25
**mosquito** 901:8
**Mostly** 873:17, 880:9, 899:17, 925:12, 940:13
**mother** 912:2, 969:14, 969:16
**Mothers** 870:14, 870:16, 870:24
**motor** 924:6
**Mount** 870:2, 875:19
**move** 894:11, 904:6, 928:22, 931:15, 931:19, 933:11, 937:7, 952:23, 980:20, 983:18
**Moved** 885:22, 911:10, 912:9, 912:12, 932:11, 932:18, 974:3
**MR. JONAS** 956:25, 957:2, 957:6, 957:21, 958:2, 958:6, 958:8, 958:16, 958:25, 959:4, 959:7, 959:10, 959:12, 959:14, 959:18, 959:22, 960:8, 961:8
**MS. SHAPIRO** 968:5, 968:11, 968:13, 968:18, 968:20, 968:23, 968:25, 969:2, 969:5, 969:7, 969:10, 969:14, 969:17, 969:19,

969:22, 970:3, 970:6, 970:9, 970:13, 970:16, 970:20, 970:25, 971:16, 971:19, 971:22
**Mufid** 863:11
**municipal** 939:7, 939:10, 941:9
**music** 882:10
**musically** 953:12
**Muslim** 867:20, 868:15, 878:21, 880:18, 890:4, 895:9, 896:4, 897:3, 898:16, 902:1, 906:11, 908:3, 908:10, 908:17, 917:23, 938:13, 938:25, 942:17, 942:23, 951:12, 951:20, 962:18
**Muslims** 868:1, 868:6, 868:15, 939:15, 952:8, 952:10, 956:13, 963:9
**Myself** 871:5, 972:19
**MYSLIWIEC** 863:4

**< N >**
**name** 867:10, 872:7, 878:24, 884:3, 889:24, 903:24, 906:3, 910:21, 916:18, 922:5, 929:7, 930:20, 936:25, 943:23, 956:20, 968:5
**namely** 876:23, 934:20, 978:17
**names** 977:4, 982:23
**NANCY** 862:41
**Nathan** 862:28, 884:3, 943:23
**nation** 942:1, 955:12
**National** 916:22, 919:7, 922:16, 923:8, 923:19, 947:21, 947:22
**nature** 935:9, 971:12
**Navy** 899:11
**near** 952:16
**necessarily** 927:11, 961:12
**necessary** 955:22, 979:4
**need** 865:1, 865:21, 868:21, 871:7, 891:17, 891:19, 891:23, 901:19, 912:17, 929:11, 930:12, 934:2, 955:6, 976:15, 977:3, 984:6, 984:14, 984:15, 984:17, 984:19,

984:20, 985:4
**needed** 865:25, 903:9, 908:2, 964:21, 974:25
**needless** 879:8
**needs** 869:2
**negative** 917:3
**neighborhood** 870:20
**neither** 940:2, 974:3
**Nervous** 950:7, 954:17
**net** 951:1, 977:7
**nets** 901:8
**New** 863:7, 870:2, 875:18, 884:18, 884:20, 959:19, 972:20
**news** 877:1, 878:16, 878:25, 879:2, 882:8, 888:19, 895:6, 895:16, 899:6, 913:24, 914:4, 918:16, 934:23, 934:24, 938:11, 950:17, 950:19
**newspaper** 936:4
**Newspapers** 878:1, 879:9, 889:17, 890:18, 893:18, 896:21, 905:22, 914:1, 916:8, 928:18, 949:18, 950:24, 950:25, 960:15, 972:5
**next** 867:5, 871:15, 895:20, 904:19, 937:13, 961:17
**Night** 864:8, 871:1, 880:14, 884:16, 985:7
**Nikon** 907:13, 907:14
**nine** 865:19, 917:18, 931:9, 982:15
**nine.** 979:16
**NM** 862:46
**nods** 910:10
**noncitizen** 920:3, 920:7, 927:16, 928:24
**noncitizens** 882:23, 919:17, 927:10
**None** 866:24, 868:13, 972:25
**noon** 866:3, 931:10, 973:14, 973:22
**Nor** 942:23
**normally** 893:24, 960:4
**North** 933:19, 969:1
**NORTHERN** 862:2, 862:31, 872:8, 910:22, 930:21, 986:19
**nosey** 887:4, 920:21
**note** 981:2, 981:5, 981:25

**notes** 974:3, 976:20
**Nothing** 869:17, 870:22, 910:5
**notice** 873:23, 884:8, 985:7
**noticed** 947:6
**Number** 862:5, 866:9, 867:2, 897:14, 929:10, 939:12, 974:6, 974:15, 978:16, 979:6
**numbers** 866:10, 867:3, 947:10
**numerical** 978:21, 979:18
**NY** 863:7

**< O >**
**o'clock** 865:19, 865:25, 973:16, 976:6, 979:25, 982:15, 982:16, 982:24
**Oak** 872:22
**objected** 985:10
**objection** 894:13, 894:14, 928:25, 982:19, 985:9
**objections** 897:5
**observed** 887:25
**obviously** 901:25, 977:12
**occupation** 931:23
**Occupied** 918:9, 918:23
**occurs** 976:2
**Odeh** 863:36
**Office** 863:5, 863:15, 863:24, 865:25, 869:21, 872:19, 872:22, 872:23, 873:17, 876:4, 876:5, 884:5, 912:14, 917:15, 933:17, 945:24, 973:2, 975:10
**officer** 933:3
**officers** 948:9
**offices** 872:13, 926:5
**official** 986:5
**often** 898:3
**oil** 885:7, 885:9
**Okay** 867:8, 871:10, 871:11, 871:17, 881:10, 885:22, 891:13, 896:24, 906:5, 910:14, 916:21, 918:10, 924:3, 927:23, 937:20, 937:23, 938:1, 938:23, 942:5, 943:4, 944:1, 945:15, 947:13, 947:14, 950:6, 964:25, 965:9, 980:22, 983:9

old 884:18, 903:11, 922:16, 959:19, 964:12, 964:21, 969:22
older 913:3, 959:16
Once 943:7, 984:5
One. 884:20, 900:7, 964:13, 969:6
ones 931:3
open 875:16, 908:1, 908:7, 985:1
opener 900:7
operating 866:11
opinion 869:6, 869:7, 892:23, 895:17, 902:9, 902:12, 921:20, 921:23, 921:24, 951:14, 963:2, 983:16
opinions 879:3, 891:10, 899:1, 902:15, 902:16, 918:21, 919:5, 938:17, 962:12
opportunity 974:23, 980:3
opposed 982:10, 982:15
option 922:21
order 865:20, 912:17, 935:4, 966:17, 975:7, 975:14, 975:19, 978:22, 979:5, 979:18, 982:7, 982:18, 985:8
orders 912:15
organization 867:19, 876:23, 877:4, 877:6, 877:10, 877:13, 878:20, 880:20, 888:16, 888:22, 888:24, 889:3, 895:15, 898:18, 902:2, 904:24, 905:7, 906:13, 914:22, 915:8, 915:11, 918:14, 934:20, 935:7, 935:10, 935:14, 951:13, 959:25, 962:16, 962:20, 971:4, 971:7, 971:9, 971:14
Organizing 870:21
orientation 985:1
originally 946:2
Others 871:6, 892:1, 946:23, 948:17, 955:9, 982:9
otherwise 877:10, 935:11, 979:14
ought 942:17
ounce 874:10
ounces 874:10

outside 904:1, 912:3, 922:12, 925:8, 954:1, 958:10
overnight 983:24
override 975:12
overseas 945:17, 945:18
own 875:7, 887:24, 892:14, 894:3, 908:1, 911:18, 921:19, 921:23, 924:22, 932:25, 944:12, 948:7, 952:16, 952:19, 976:13, 976:20
owners 946:1


< P >
P. 863:15
page 865:11
Pages 986:7
paid 897:18
pain 929:20, 929:21, 930:8, 931:3
Palestinian-israeli 881:23, 882:19, 899:4, 908:14, 918:18
Palestinians 919:4
panel 864:13, 864:16, 877:20, 971:24, 973:18, 983:25, 984:4
paper 881:24, 906:17, 938:11, 959:13
papers 922:18, 923:2
Parcel 879:13
parents 904:4, 909:25, 920:10, 927:6, 958:13
part 912:7, 915:15, 915:16, 915:20, 931:25, 932:15, 956:15
parte 985:9
partial 962:23
partially 971:10
participate 981:6
Participated 967:12
particular 936:11, 937:8
particularly 939:25
parties 867:7, 878:6, 889:22, 894:17, 897:10, 906:1, 914:23, 916:15, 929:5, 937:16, 949:24, 961:19, 974:24, 975:20, 981:25, 983:19, 984:2, 984:8
Paso 933:2

Pass 893:7, 922:24, 930:14
passed 976:9
passing 900:25, 927:24
past 956:24, 973:4
Pat 893:25
patience 872:4, 878:10, 884:7, 889:9, 904:1, 910:25, 922:11, 929:7
patient 884:14
Patricia 867:5
Paul 872:23
pay 899:10
paying 984:21
pending 865:12, 865:21, 883:16, 886:19, 886:23, 974:14
People 865:25, 866:20, 867:1, 868:6, 869:21, 869:22, 876:21, 900:14, 902:18, 903:4, 908:3, 926:10, 942:8, 942:11, 942:23, 942:24, 952:13, 955:8, 955:13, 963:14, 963:15, 963:24, 963:25, 967:20, 974:2, 975:14, 975:22, 978:2, 978:6, 978:16, 982:10
per 864:8, 864:16, 866:11
percent 892:19, 902:15
peremptory 976:16, 982:1, 983:19
perennial 907:17
perform 963:25
perhaps 865:10, 936:19
period 934:8, 941:2, 965:6
periodic 930:5
periods 930:6
personal 871:4, 893:21
personally 981:24
persons 973:17, 973:25, 976:21
petite 946:12, 946:13
Philippines 958:11, 958:13
phone 873:7, 873:12, 977:5
phones 873:14
Photo 914:16
photographer 906:25
photographs 926:18
photography 906:20, 907:4, 907:6, 907:20, 907:25, 914:10, 914:11

**physical** 923:23
**picked** 958:4, 972:20
**Piwoni** 973:19, 978:8
**Place** 865:23, 885:6, 902:7, 911:18, 912:11, 933:5, 948:8, 959:19, 972:22
**places** 872:12, 899:15, 899:18, 903:17, 947:11
**plan** 866:5
**planning** 982:13
**Plano** 933:10, 934:15
**plans** 897:15, 897:22, 974:19, 974:21
**PLATT** 863:39
**Play** 880:7, 964:9
**Plaza** 862:45
**plead** 874:19
**Pleasant** 868:9, 868:10, 909:24
**Please** 965:8, 973:7
**pleasure** 947:4
**pled** 874:20, 887:16
**plus** 866:13, 866:17
**PO** 863:25
**point** 907:10, 982:4, 984:20
**pointed** 984:23, 984:25
**points** 983:14
**poker** 880:7
**Police** 932:3, 937:6, 948:5, 948:9, 948:11, 966:6
**Polite** 952:25, 953:1
**politics** 918:25, 919:3
**pool** 886:8, 889:11, 893:12, 896:13, 905:16, 916:3, 924:6, 928:12, 935:23, 949:13, 960:10, 978:19, 979:8, 980:11
**Pope** 942:13
**position** 869:16, 869:18, 875:13, 961:7, 961:8, 980:9
**possession** 881:7
**possibility** 952:6
**possible** 904:20, 937:5, 938:19
**possibly** 939:20
**poverty** 900:11
**pre-existing** 974:19
**prepare** 975:24
**prepared** 976:13
**prescribed** 986:11

**present** 914:24
**presented** 868:23, 914:23, 935:2
**President** 973:8
**press** 890:8, 890:11, 917:24, 984:12
**presumed** 954:21
**presumption** 881:2, 881:4, 892:19, 928:2, 941:13, 957:12, 957:15, 957:18, 960:23, 960:24, 961:11, 966:10, 966:20
**presuppose** 979:12
**Pretty** 868:8, 881:9, 914:13, 928:23, 952:6, 964:2, 977:16, 979:9
**prevent** 891:11, 921:5
**previous** 913:13
**previously** 975:6, 978:25
**primarily** 873:13, 918:9, 918:22
**Prince** 937:14, 937:15, 937:18, 943:19, 943:21, 949:12, 976:3
**principal** 914:19
**prior** 885:24, 885:25, 886:18, 946:15
**prison** 902:18, 942:8, 942:12, 948:1, 958:14, 969:20, 969:23
**Pritchard** 977:25
**privacy** 891:22
**privilege** 893:6
**Probably** 865:19, 866:22, 878:9, 881:10, 882:19, 894:23, 902:8, 904:18, 914:9, 931:13, 935:25, 943:12, 965:14, 965:19, 968:16, 969:25, 970:1, 975:3, 980:19, 983:16, 985:4
**probation** 874:12, 874:13, 887:16, 948:21
**problem** 872:6, 883:23, 887:22, 889:6, 906:8, 931:21, 934:10, 934:12, 955:25, 956:2, 959:3, 961:9, 965:4, 965:5, 971:16, 981:15
**problems** 871:12, 871:13, 873:16, 887:6, 936:18
**proceedings** 864:23, 982:7,

984:7, 986:4, 986:6
**process** 877:19, 877:22, 889:10, 889:13, 893:11, 893:13, 896:12, 896:14, 905:15, 905:18, 916:2, 928:11, 928:14, 935:22, 935:25, 949:12, 960:10, 960:11, 970:7, 971:23, 972:1, 983:19, 983:25, 985:10
**product** 907:2
**program** 914:14
**programs** 911:23, 912:1
**prolonged** 981:8
**promotion** 965:4
**proof** 881:2, 966:10
**properly** 912:1
**properties** 953:3
**proposed** 983:6
**prosecutors** 872:9, 884:6, 910:23, 922:7, 943:25, 956:21, 968:6
**prospect** 974:11
**prospective** 972:17
**protection** 919:17, 942:16, 942:18, 955:9, 961:10
**protections** 881:6, 881:15, 928:4, 942:9, 955:3, 955:10, 955:18, 955:25, 957:11, 966:14, 967:3
**prove** 881:3, 915:4, 966:16, 967:6
**proved** 966:18
**proven** 892:13, 954:21, 955:6, 966:16
**proves** 941:22, 942:20
**provide** 964:17
**provided** 888:15, 934:19
**provides** 877:8
**providing** 876:20, 876:22, 914:21
**pry** 887:4
**PT** 923:24
**publicity** 984:24
**pulled** 948:8
**pulls** 926:11
**punishment** 941:11, 970:15
**purchasing** 912:19
**purpose** 883:2, 985:3
**push** 977:3
**pushing** 891:20, 892:2,

979:25
**put** 876:13, 883:20, 892:18, 898:1, 933:4, 937:25, 942:8, 942:12, 951:14, 958:8, 958:11, 958:16, 974:12, 974:14, 976:20, 977:4, 978:10, 978:13, 981:9, 985:8
**putting** 924:2, 974:8, 976:22, 982:23, 983:2
**puzzled** 936:15

**< Q >**
**Qaeda** 951:10, 951:13
**qualified** 982:2
**Question** 865:6, 866:19, 893:20, 897:14, 909:18, 915:19, 915:20, 919:16, 919:18, 927:9, 930:6, 944:4, 962:24, 975:23, 979:11, 981:10
**questioned** 980:20
**questionnaire** 869:9, 885:16, 890:3, 897:14, 897:25, 898:14, 913:16, 916:20, 919:15, 929:15, 937:4, 945:3, 945:20, 946:11, 947:6, 958:9
**questions** 867:7, 871:18, 871:24, 872:11, 878:6, 884:1, 889:22, 890:1, 893:9, 894:17, 896:10, 897:10, 903:22, 903:25, 906:1, 910:11, 910:19, 911:1, 916:15, 916:19, 922:3, 922:9, 929:5, 929:9, 930:16, 930:23, 937:16, 943:19, 944:1, 949:24, 956:17, 956:22, 957:24, 961:19, 968:4, 968:8, 973:7
**quick** 884:7
**quickly** 885:1, 977:16, 979:9, 983:18
**quiet** 953:1
**Quite** 879:5, 901:16, 953:12

**< R >**
**radio** 878:1, 882:1, 882:3, 889:18, 893:18, 896:22,

905:22, 916:9, 928:18, 936:4, 949:18, 960:16, 972:5
**raided** 962:8
**raise** 865:6
**Raised** 911:2, 922:13, 932:17, 945:10, 954:4, 976:17
**ran** 905:4, 966:7
**randomization** 979:13
**randomizes** 975:12, 982:11
**range** 882:6, 954:10, 977:17
**ranges** 941:11, 954:8
**rather** 897:17, 979:13, 979:15
**re** 972:13
**reach** 979:24, 980:4
**reached** 958:3
**reaction** 959:20
**read** 876:15, 878:2, 889:18, 890:19, 890:21, 893:19, 896:22, 905:23, 906:16, 914:1, 915:1, 916:9, 918:1, 928:19, 935:2, 936:5, 938:11, 949:19, 958:20, 960:17, 972:6, 972:10, 978:15, 983:5
**reader** 881:24
**ready** 871:15, 898:22, 900:2, 937:13, 961:16
**real** 870:22, 924:16, 926:25, 940:14, 970:4
**realize** 976:9, 977:6
**realtor** 927:1
**reason** 964:19, 974:14, 976:18, 981:8
**reasonable** 881:3, 941:22
**recall** 876:12, 876:16, 890:12
**receive** 911:8, 970:15
**received** 864:12, 897:24, 933:24, 948:21
**recently** 890:15, 912:9, 934:21, 938:7, 938:8, 965:3, 969:25
**Recess** 865:4, 866:3, 916:13, 973:16, 976:6, 976:7, 980:1
**recessed** 978:15
**recommends** 981:6
**recomputation** 976:16
**record** 937:3, 978:15, 983:5,

983:13, 985:8
**recorded** 865:23, 923:2
**reduction** 946:8
**referred** 876:20, 918:17
**reflect** 865:3, 976:25
**reflecting** 983:23
**refugees** 899:21, 899:24, 900:6, 903:18, 903:19
**regard** 891:24, 934:16, 977:15
**Regarding** 865:6, 875:2, 891:1, 927:9, 947:7
**regardless** 903:11, 905:8
**regroup** 934:13
**regular** 866:19, 875:25, 876:6, 914:2, 923:5, 979:2
**regularly** 880:11
**regulars** 964:4
**rehabilitate** 936:20
**reiterate** 984:20
**relationship** 936:14, 936:22
**Relief** 898:12, 900:22, 901:3, 929:18, 938:6
**religion** 910:9, 942:12
**rely** 959:5, 959:8
**relying** 958:21, 959:1
**remain** 894:2, 972:10
**remember** 878:15, 878:17, 880:22, 883:3, 883:13, 888:17, 946:22, 954:25, 962:10, 966:9, 970:23
**remote** 984:9, 985:2
**rent** 952:22
**rental** 953:3
**repair** 924:9
**repeat** 930:24
**repeating** 945:11
**replace** 931:7, 973:2, 978:21, 979:4
**replacement** 931:7
**report** 865:25, 972:16, 984:18
**reported** 974:16, 975:4, 976:10
**REPORTER** 863:46, 986:5, 986:18
**representing** 872:9, 884:6, 910:24, 922:8, 930:22, 968:6
**require** 979:15
**required** 892:20

reserve 899:18, 919:10
residences 982:14
resident 883:5, 927:16, 927:22
residential 917:9
respect 970:21
responded 975:16
response 865:15, 956:1, 977:20
responsibility 936:20, 963:1
responsible 871:8
result 888:23, 934:22
resume 973:24
retain 959:16
retired 932:11, 932:12, 953:21, 953:23
retiring 946:9
retribution 952:4
review 973:22
Richardson 867:20, 878:22, 879:20, 895:9, 938:10, 938:12, 938:13
Richland 874:1
rid 959:19
ride 880:12
RIFT 946:8
rights 882:24, 893:1, 919:23, 920:8, 920:13, 920:25, 921:7, 927:11, 927:20, 927:21, 928:24
rigs 885:7
ring 895:1, 898:13, 898:19, 906:13, 950:12
risk 973:6
Rm 863:47
Robert 908:25, 909:5, 936:11, 936:25, 937:5
room 972:16, 974:18, 984:5
rose 865:17
Ross 885:18
route 879:18
row 931:18
rude 947:13
ruling 865:9, 865:21, 866:20
rulings 977:15
run 879:7, 887:8, 911:25, 984:12
running 926:18
runs 912:1, 925:1
Russell 929:4, 930:16,

930:18, 935:22, 936:24
rustling 948:18, 948:20


< S >
s/cassidi 986:15
Sachse 932:2, 933:18
Saint 872:23
sake 973:19
sales 926:25
Sam 945:16
San 863:33, 932:18
Sanders 867:5, 867:6, 871:24, 872:1, 877:18, 877:19
sat 888:6, 970:21
satisfactory 977:19
Saturday 898:8
saving 973:19
saw 887:10, 890:17, 893:23, 899:15, 981:10
saying 869:4, 878:17, 892:17, 921:23, 927:12, 947:9
says 894:1, 918:12, 923:3, 969:19
scanned 960:25
scary 952:1
School 870:21, 875:10, 875:11, 885:4, 907:5, 911:5, 911:6, 911:15, 912:25, 914:13, 914:14, 922:22, 923:15, 925:25, 932:5, 932:6, 980:6
schools 905:9
science 907:19
Scratch 942:5
SEAL 899:13
search 914:7
seat 931:18
seated 972:10, 982:18
second 888:6, 956:8
seconds 865:14
secretarial 869:19
Section 985:6
secure 952:6
security 901:20, 901:23
seeing 871:5, 880:8
Seem 953:1
seems 892:22, 903:11,

955:24, 984:1
seen 897:22, 965:16, 972:8, 972:11
selected 877:21, 888:11, 889:12, 893:13, 896:14, 905:17, 916:4, 928:13, 935:24, 949:14, 960:11, 971:25
selection 975:3
selling 947:24
send 888:24
sending 878:17, 971:8
senior 894:5, 953:24
sense 899:7, 903:12, 903:14, 966:19, 970:9
sent 918:6, 918:9, 971:13
September 893:23
Serve 888:11, 941:1, 970:20, 973:3, 973:12, 974:1, 974:9, 978:3, 978:17, 982:3, 982:22, 983:7
served 886:1, 886:8, 946:11, 957:25, 969:19, 973:4, 981:23
server 925:10, 925:12
Service 868:18, 873:4, 879:14, 885:24, 885:25, 910:15, 917:16, 930:9, 946:15, 961:5, 964:1
serving 874:8, 874:13, 888:3, 974:5, 974:12
session 865:18, 898:6, 983:10, 985:1
set 887:2, 896:7, 897:3, 902:16, 902:21
Setting 923:23
seven 866:15, 866:17, 963:20, 970:2
seven. 912:6
seventeen 903:8
Several 933:1, 947:11, 972:19, 973:3
sexual 965:18, 966:1
SHAPIRO 862:27, 893:10, 894:13, 894:14, 896:11, 897:6, 968:6, 968:15
share 951:23, 976:18
shoot 907:10
Shop 914:16
short 875:14, 934:8, 945:8

**shorten** 864:22
**shortly** 978:15
**shot** 907:9
**shots** 907:2
**shouldn't** 920:24, 955:9
**show** 983:4
**showed** 966:6
**shown** 978:1, 978:3, 986:6
**shows** 882:9, 882:11
**Shrum** 974:7, 981:1
**Shukri** 862:38
**side** 864:8, 864:16, 865:13,
866:11, 901:19, 927:2, 974:3,
980:10, 980:23
**sides** 876:13, 930:11, 935:2,
957:22, 957:23, 977:11,
977:19
**Sierra** 899:16, 899:20
**sightseeing** 900:19
**signed** 922:18
**similar** 927:17
**simply** 865:8
**Single** 875:7, 875:8, 948:7
**sir** 864:4, 864:10, 868:2,
868:4, 874:9, 875:20, 884:22,
889:19, 896:19, 898:4,
905:24, 931:24, 950:13,
956:19, 962:14, 963:10,
963:12, 963:22, 964:3,
964:24, 966:12, 967:9,
967:16, 971:21, 979:17,
985:12
**sister** 969:9
**Sisters** 913:1, 967:11, 969:7
**sit** 864:25, 873:15, 892:2,
892:6, 894:23, 926:7, 931:15,
949:1, 968:1, 981:11
**site** 985:2
**sites** 900:20
**sits** 926:10
**sitting** 887:6, 891:3, 894:24,
904:4, 929:16, 930:5, 967:22,
967:24, 981:8
**situation** 887:8, 887:12,
893:21, 894:4, 894:9, 937:9
**situations** 865:7
**six** 864:8, 864:13, 864:15,
866:11, 866:12, 866:13,
885:3, 886:11, 912:6, 945:14,
977:8, 977:19, 984:6

**six.** 979:10
**Skyline** 911:6
**slash** 872:25, 974:24
**sleeping** 901:7
**slightly** 976:14
**small** 873:21, 874:9, 964:3,
965:5, 972:18, 973:5
**smart** 942:3
**smarter** 942:4
**society** 973:5
**Soft** 880:14
**solely** 958:21
**solid** 961:3
**Somebody** 893:5, 904:6,
913:22, 939:20, 942:20
**somehow** 918:13, 980:7
**someone** 909:4, 918:15,
921:22, 943:2, 947:25,
957:11, 957:23, 964:18,
965:6
**sometime** 887:11
**Sometimes** 870:8, 914:6,
918:17, 924:8, 943:10,
959:15
**somewhat** 981:5
**somewhere** 866:22
**son** 874:5, 874:8, 947:16
**sooner** 866:4
**Sorry** 887:4, 903:17, 954:15
**sorts** 889:1
**Sound** 939:6, 939:8, 943:2
**sounded** 941:7
**sounds** 896:2, 980:22
**source** 898:24
**Southland** 912:21, 945:23
**space** 983:16
**speaking** 883:23, 921:22,
930:5, 943:6, 960:20
**special** 876:3
**specifically** 878:21, 906:13,
914:22, 951:5
**speech** 869:1, 908:21,
909:13, 921:12, 921:14,
921:15, 921:18, 943:3
**spending** 882:17
**spent** 897:13, 906:7, 958:14,
971:10
**split** 922:21
**spoke** 893:25, 960:22, 978:9
**spoken** 973:6

**sports** 964:10
**spouse** 948:17, 958:10
**Springs** 873:21
**square** 964:23
**St** 863:31
**stand** 931:19, 955:5
**standards** 922:24
**standing** 982:5
**start** 931:9, 940:9, 959:16,
979:15, 984:17
**started** 873:25, 927:2, 932:8
**starting** 885:14, 977:24
**state** 903:18, 946:24
**stated** 876:19
**statement** 877:4, 877:7,
915:6, 971:17
**statements** 909:8, 943:9,
943:10, 943:13
**STATES** 862:1, 862:5,
862:29, 862:30, 867:15,
872:8, 877:5, 878:11, 880:22,
881:19, 884:4, 884:5, 884:6,
895:1, 898:11, 906:10, 909:9,
910:22, 912:16, 915:9,
921:12, 922:6, 928:4, 930:21,
935:9, 938:5, 941:12, 943:11,
943:24, 949:2, 952:7, 958:11,
959:25, 962:2, 971:5, 986:12,
986:18
**station** 868:7, 895:20
**stationed** 945:9
**stations** 882:7
**status** 982:2
**statutory** 864:14
**stay** 926:22, 979:18
**stenotypy** 986:5
**step-grandchildren** 940:6
**stepchildren** 944:14,
944:15, 947:7
**stole** 947:23
**stopped** 946:5
**Stopping** 868:7
**store** 912:7
**stores** 912:17
**story** 904:25
**straight** 979:21
**straightforward** 942:21
**Street** 862:33, 863:6, 863:47
**stress** 929:13
**stressful** 900:11

**stretch** 931:20
**strikes** 864:8, 864:12, 864:14, 864:16, 866:11, 866:15, 975:6, 977:1, 977:8, 977:9, 977:19, 977:20, 979:10, 980:11, 980:12, 980:14, 981:17
**strongly** 893:2, 893:3
**struck** 978:24, 980:14
**stuck** 907:6
**students** 952:17
**studied** 910:3
**studio** 908:1
**study** 968:25
**stuff** 869:23, 880:9, 924:3, 924:5, 941:11, 950:19, 962:9, 967:17
**subject** 881:18, 893:15, 896:16, 969:2
**submit** 897:2, 937:10, 960:20, 961:5
**submitted** 898:2, 898:3
**substance** 874:11, 874:12
**substantially** 961:4
**suffered** 871:3
**suffering** 893:1
**sufficient** 881:5, 936:19
**suggested** 866:6, 866:7
**suing** 913:22
**Suite** 862:45, 863:16, 863:41
**Sulfur** 873:21
**summarize** 865:10
**summer** 919:14, 922:22, 922:23, 956:24
**Summit** 863:41
**summoned** 913:10, 913:20, 972:16
**summons** 913:13, 933:24
**Sunday** 876:1, 897:23, 898:8
**superiors** 923:4
**supplied** 905:4
**supplies** 877:12, 889:1, 903:16, 915:12, 935:12
**Supply** 899:20, 899:23, 900:4
**support** 867:18, 868:16, 876:22, 878:20, 878:22, 880:19, 880:20, 881:7, 888:16, 888:24, 890:22, 891:2, 895:12, 895:15,

898:17, 902:2, 906:12, 914:21, 918:5, 934:19, 935:10, 938:15, 951:21, 960:1, 960:3, 962:16, 962:19, 971:6, 971:7
**supporting** 908:11
**suppose** 881:14, 974:9
**supposed** 881:1, 922:23, 923:10, 926:9
**Supposedly** 904:23
**surf** 951:1
**surfing** 951:3
**surgeries** 929:10
**Susan** 975:17
**suspect** 916:4
**sustain** 977:23
**switch** 907:15
**system** 865:24, 875:4, 927:20, 949:6, 955:12, 969:12, 970:11, 975:2, 975:10, 975:11, 975:13, 977:5, 982:11, 982:24, 983:22

**< T >**
**table** 865:16, 866:6, 904:5, 961:1
**tabulated** 973:23
**tabulation** 973:17, 973:18
**tacked** 944:11
**Tail** 880:14
**talked** 942:16, 973:17, 975:8, 975:14
**talks** 882:12
**Tampa** 863:26
**taught** 914:12
**Tax** 917:15
**team** 962:1
**Technical** 875:12
**technician** 873:7, 873:12
**teenagers** 870:25
**telephone** 865:24
**television** 878:1, 889:17, 893:18, 896:21, 905:22, 916:9, 928:18, 936:4, 949:18, 960:16, 972:5
**temp** 869:15
**Ten** 903:9, 925:16, 979:15, 982:14, 982:16

**tennis** 977:7
**tentatively** 984:16
**TERESA** 862:42
**term** 941:14, 948:19
**termination** 972:24
**terms** 875:21, 977:18
**Territories** 918:10, 918:23
**terrorism** 868:16, 868:17, 881:8, 890:23, 891:2, 892:8, 892:10, 892:14, 893:3, 896:3, 903:2, 908:17, 918:5, 939:1, 942:17, 951:8, 951:21, 955:4, 955:9, 955:11, 955:19, 957:13, 957:14, 957:16, 960:22, 961:12
**terrorism-related** 967:3
**terrorist** 867:19, 876:23, 877:6, 877:9, 877:13, 878:20, 880:20, 888:16, 888:21, 889:2, 895:15, 898:18, 902:2, 904:23, 905:6, 906:12, 914:22, 915:7, 915:11, 918:13, 934:19, 935:6, 935:10, 935:13, 951:12, 956:15, 959:25, 962:16, 962:19, 971:3, 971:7, 971:9, 971:13
**terrorists** 956:14
**test** 902:15
**TEXAS** 862:2, 862:31, 862:34, 863:17, 863:42, 863:48, 872:9, 873:21, 885:4, 885:14, 895:10, 910:23, 911:10, 930:22, 933:11, 934:3, 938:13, 945:8, 968:20, 968:21, 969:1, 986:19
**Thanks** 906:6
**Thanksgiving** 870:7
**theft** 881:6, 947:16
**themselves** 869:3, 979:1
**thinking** 864:7, 909:17, 921:6
**Third** 900:10
**Thirteen** 873:1
**thirty** 865:14, 983:17
**thirty-eight** 945:4
**thirty-five** 940:6, 940:7, 944:16
**thirty-one** 874:5
**thirty-one.** 866:18, 875:6

**though** 892:9, 957:13
**thousand** 875:24
**three** 864:16, 865:25, 875:24, 880:8, 884:9, 885:4, 886:10, 887:20, 911:10, 914:9, 917:13, 919:10, 931:1, 974:8, 977:8, 977:18, 979:10, 979:25, 982:24
**three.** 864:15
**threshhold** 976:15
**throughout** 907:7
**Thursday** 898:5, 898:7, 904:17, 904:19, 930:4
**tickets** 897:20
**timing** 978:8
**tires** 924:4
**title** 868:16, 868:17, 895:14, 924:18, 939:1, 957:14, 962:17
**today** 865:22, 866:19, 872:4, 877:23, 889:13, 893:1, 893:14, 894:8, 896:15, 905:18, 916:5, 928:14, 935:25, 949:15, 960:12, 961:21, 961:24, 972:1, 974:20
**together** 866:4, 866:18, 975:18, 984:11
**tomorrow** 865:19, 865:20, 866:1, 975:21, 979:13, 980:21, 982:7
**took** 904:24, 930:1, 931:14, 933:4, 948:10, 953:6, 962:9, 986:5
**total** 866:13, 866:18, 946:14
**totality** 948:23
**touched** 881:20
**tour** 922:20
**toured** 953:17
**Towards** 870:24, 902:9, 966:22
**Tower** 863:40
**Towers** 880:23
**town** 873:21, 912:7, 982:14
**Townview** 926:2
**Train** 880:14, 884:16
**training** 919:11, 923:23, 940:23
**transcribed** 986:6
**transcript** 986:8, 986:10

**transferred** 874:1
**translation** 958:22, 959:5, 959:8
**translations** 958:19
**translator** 958:21, 959:1, 959:5, 959:8
**translators** 900:17
**transported** 984:13
**travel** 897:15, 932:11, 953:13, 953:14, 953:15, 974:19, 974:21
**treated** 875:3, 888:1, 928:1, 949:6, 970:10, 970:12
**trial** 871:9, 872:10, 874:19, 874:21, 876:9, 883:11, 887:1, 887:15, 891:1, 893:2, 893:16, 898:22, 902:17, 910:24, 916:25, 922:8, 931:18, 938:25, 961:14, 972:11, 972:21
**trials** 958:4
**trouble** 896:4
**truck** 900:25
**true** 966:16, 986:8
**truly** 957:18, 973:8
**Try** 864:25, 866:7, 869:3, 924:2, 928:7, 929:18, 936:19, 942:10, 944:19, 950:8, 953:13, 984:1
**trying** 869:16, 870:15, 927:3, 934:11
**Tuesday** 890:18, 898:21, 926:8, 979:19, 984:17
**Turn** 957:7, 958:2
**TV** 898:25, 917:24, 950:25
**Twelve** 866:14, 866:15, 866:16, 866:17, 984:5
**twenty** 897:22, 922:17, 968:16
**twenty-five** 875:24
**twenty-four** 864:12
**twenty-one** 874:5
**Twenty-three** 879:23, 884:23, 946:4
**Two** 874:4, 874:10, 883:9, 887:20, 911:13, 919:14, 946:11, 946:18, 950:9, 955:14, 969:17, 972:18, 978:6
**TXU** 953:25

**type** 915:13, 973:19
**types** 935:13
**Typically** 975:22
**typing** 976:4, 978:8

**< U >**
**UN** 900:25
**unattended** 894:2
**uncle** 969:24, 969:25
**unclear** 976:11
**uncles** 969:11
**uncomfortable** 929:16, 965:22, 966:2, 966:3
**undercover** 947:25
**understand** 865:2, 874:18, 889:3, 892:9, 915:18, 927:23, 958:17, 959:18, 971:14, 974:4, 977:7, 980:8
**understanding** 936:12, 977:10, 980:4
**understands** 982:12
**understood** 984:18
**undue** 972:22, 973:6
**unemployed** 869:10
**unfamiliarity** 983:21
**Unfortunately** 983:1
**Union** 963:19, 964:2, 965:5, 972:12, 972:14, 972:18
**Union.** 973:9
**UNITED** 862:1, 862:5, 862:29, 862:30, 867:15, 872:8, 875:12, 877:5, 878:11, 879:13, 880:22, 881:19, 884:4, 884:5, 884:6, 895:1, 898:11, 906:10, 909:9, 910:22, 915:9, 921:12, 922:6, 928:4, 930:21, 935:8, 938:5, 941:12, 943:11, 943:24, 949:1, 952:7, 958:10, 959:25, 962:2, 967:16, 971:4, 986:12, 986:18
**universe** 977:12, 977:14
**University** 969:1
**Unless** 883:17, 918:15, 941:21
**UNT** 924:13
**Until** 872:16, 877:23, 889:14, 892:13, 893:14, 896:15, 905:18, 916:5, 928:14,

929:14, 936:1, 938:7, 941:21, 941:24, 942:20, 949:15, 954:21, 955:7, 960:12, 966:15, 966:25, 967:5, 972:1, 973:16, 975:22, 976:6
**unused** 984:24
**unwieldy** 984:1
**UPS** 879:15, 879:22, 884:23, 885:2, 885:11
**uses** 905:9
**UTA** 952:17, 952:20

< V >
**vague** 962:24
**van** 984:11
**various** 945:20
**Vegas** 897:21
**vehicles** 924:4
**verdicts** 958:3
**verify** 981:22
**VERSUS** 862:8, 867:15, 878:11, 895:1, 898:11, 906:10, 938:5, 962:2
**vertebrae** 931:2
**victim** 948:13
**view** 978:14, 983:10
**violation** 915:14, 935:14
**virtually** 881:19
**visit** 953:11, 956:22
**visiting** 880:7
**VOIR** 862:17, 865:18, 866:24, 980:18, 980:20, 983:10
**VOLUME** 862:16
**volunteer** 870:4, 954:14
**volunteered** 903:17
**volunteering** 899:17

< W >
**waited** 884:15
**waiting** 875:15, 894:24, 897:13, 904:1, 906:7, 911:1, 922:12, 924:1, 950:9, 961:25
**walking** 948:7
**Wall** 863:6, 973:15
**wanted** 865:6, 908:1, 937:3, 975:20, 976:11, 976:18, 976:19, 981:1

**wanting** 866:12, 901:6, 910:12
**wants** 891:9, 909:4, 938:4, 981:18
**Washington** 953:17, 953:18, 956:23, 957:2, 957:4
**watch** 878:2, 889:18, 893:19, 896:22, 905:23, 916:9, 928:19, 936:5, 938:11, 949:19, 953:13, 960:16, 972:6
**water** 885:7
**ways** 939:13
**weather** 904:12
**weddings** 907:1
**Wednesday** 972:16, 979:19
**week** 926:9, 934:25, 965:20, 982:19
**weekend** 922:25, 982:14
**weekends** 880:16, 919:14
**weeks** 900:11, 900:21, 916:20, 919:14, 958:9
**weight** 922:24
**West** 879:20, 918:10
**Westfall** 863:38, 863:39, 865:17, 866:5, 867:9, 867:11, 878:7, 884:8, 886:19, 894:19, 897:11, 901:16, 903:20, 906:3, 937:17, 937:18, 943:15, 944:3, 945:12, 949:25, 950:3, 951:17, 956:16, 957:14, 961:20, 982:5, 982:25, 983:15
**whatever** 873:16, 895:21, 912:22, 923:14, 942:13, 942:22
**wheel** 871:8
**Wheels** 870:9, 884:21, 924:3
**whenever** 912:16
**Whether** 898:24, 919:18, 951:15, 955:6, 955:16, 955:18, 958:10, 973:12, 975:5, 976:25, 979:10, 981:10, 981:14
**White** 957:8
**Whoa** 940:7
**whole** 879:8, 885:16, 904:25, 914:14, 919:22
**whom** 981:22
**wide** 882:6

**wife** 901:5, 949:8, 981:23
**willing** 864:14, 980:10
**wind** 866:17, 866:25
**window** 964:6, 964:7
**winters** 904:14
**within** 927:18, 978:19
**Witness** 893:7, 910:10, 948:13
**witnesses** 914:24
**woman** 947:23
**wondered** 981:14
**word** 966:4, 966:5, 966:8
**words** 979:5
**work** 870:4, 870:12, 872:18, 872:24, 874:3, 875:13, 875:17, 876:21, 885:5, 898:22, 901:3, 901:14, 901:16, 907:1, 908:25, 911:14, 912:3, 912:22, 914:16, 914:20, 923:24, 924:9, 925:7, 925:15, 932:5, 933:16, 942:9, 945:20, 946:3, 954:1, 954:14, 964:6, 964:7
**worked** 872:12, 872:13, 872:20, 872:21, 872:22, 873:3, 873:4, 873:9, 880:1, 885:10, 912:21, 912:24, 917:20, 925:17, 933:16, 945:23
**working** 869:15, 875:14, 899:24, 900:23, 922:12, 933:13, 934:18, 946:5, 963:18, 964:16, 973:16
**works** 873:8, 873:13, 911:21, 912:8, 912:15, 913:7, 925:3, 925:5
**world** 900:10, 918:9, 942:1
**worried** 930:11
**worshipping** 942:13
**worst** 883:20
**Worth** 863:42, 901:15, 901:16, 948:2
**writing** 983:3
**written** 937:4
**wrote** 916:20, 965:12, 978:14

< Y >
**year** 874:14, 874:17, 883:15,

883:18, 911:12, 922:23, 964:21

**years** 872:14, 872:24, 873:1, 873:5, 874:2, 876:6, 879:23, 884:24, 885:3, 885:8, 885:10, 886:11, 887:20, 890:15, 897:22, 903:9, 911:10, 911:13, 912:6, 919:10, 925:16, 933:17, 945:4, 946:4, 946:7, 953:8, 957:3, 958:14, 963:20, 967:13, 968:16, 970:1, 970:2

**Yesterday** 867:4, 872:4, 878:9, 894:23, 904:1, 929:17, 930:1, 937:22, 961:24, 981:1, 981:21

**York** 863:7

**young** 928:22, 966:22

**yourself** 936:16


**< Z >**

**Zales** 911:25

**Zion** 870:2, 875:19

**zones** 932:5, 932:6