09:59:32   1
           2
           3
           4
           5
           6
           7
09:59:32   8
           9
          10
          11
          12
          13
          14
          15
          16
          17
          18
          19
          20
          21
          22
          23
          24
          25

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA        (   3:04-CR-00240-P
                Government,     (
                                (
VERSUS                          (   DALLAS, TEXAS
                                (
                                (   August 27, 2008
HOLY LAND FOUNDATION FOR        (
RELIEF AND DEVELOPMENT at al.   (
                Defendant.      (   10:00 a.m.


TRANSCRIPT OF TELEPHONE STATUS CONFERENCE
BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE


A P P E A R A N C E S:

FOR THE GOVERNMENT:        JAMES T. JACKS
                           BARRY JONAS
                           ELIZAETH J. SHAPIRO
                           UNITED STATES DEPARTMENT OF JUSTICE
                           NORTHERN DISTRICT OF TEXAS
                           U.S. Courthouse, Third Floor
                           Dallas, Texas 75242
                                214.659.8600

FOR THE DEFENDANT:         JOHN D. CLINE
                           JONES DAY
                           555 California Street
                           26th Floor
                           San Francisco, California 94104-1500
                                415.875.5812

                           NANCY HOLLANDER
                           FREEDMAN BOYD HOLLANDER
                                GOLDBERG & IVES PA
                           20 First Plaza
                           Suite 700
                           Albuquerque, New Mexico 87102
                                505.842.9960

09:59:32   1

MARLO P. CADEDDU
LAW OFFICE OF MARLO P. CADEDDU
3232 McKinney Avenue
Suite 700
Dallas, Texas 75204
214.220.9000

COURT REPORTER:        P. SUE ENGLEDOW RPR/CSR NO. 1170
1100 Commerce Street, Room 1572
Dallas, Texas 75242
214.753.2325
p.sue@att.net

09:59:32   8

proceedings reported by mechanical stenography, transcript
produced by computer.

09:59:32   1

                     P R O C E E D I N G S
  2
                   August 27, 2008
                    10:00 a.m.
  3
          TELEPHONE STATUS CONFERENCE

  4

  5          THE COURT: Hello.

  6          MR. CLINE: Hello, your Honor.

  7          THE COURT: Who's on the phone? I want to know who

  8 all counsel is on the call.

  9          MR. CLINE: This is John Cline.

 10          THE COURT: Then Mr. Jacks, you're also here?

 11          MR. JACKS: Yes, your Honor. Barry Jonas, myself,

 12 and Ms. Shapiro should be on.

10:06:10 13          THE COURT: Well, this is on the defendants' fourth

 14 CIPA Section V notice.

 15     Mr. Cline, you brought it up last week at the pretrial

 16 conference, and we had looked at it, but realized we hadn't

 17 done the orders on it when we did the order on the discovery

 18 motion.

 19     But, Ms. Shapiro, you're taking the position that all of

 20 these requests are overly broad?

 21          MR. CLINE: Your Honor, may I interrupt for a

 22 second?

 23          THE COURT: Yes.

 24          MR. CLINE: I got an e-mail this morning saying

 25 there wasn't a court reporter.

10:06:46  1           THE COURT:  There is a court reporter now.

2           MR. CLINE:  Then we're all set.

3           THE COURT:  We're good to go.  She's already

4  typing.

5           MR. CLINE:  Okay.  Good.

6           THE COURT:  We're on the record.

7     All right.  Ms. Shapiro.

8           MS. SHAPIRO:  Yes.

9           MR. JACKS:  Mr. Jonas is going to do most of the

10  talking for the government now, and Ms. Shapiro may jump in

11  if necessary.

12           MR. JONAS:  I think your Honor's order on the

13  discovery sort of mooted out some of the government's

14  concerns on a practical level.  I believe I understand where

10:07:16 15  Mr. Cline is coming from saying that there is still an issue

16  that is outstanding, but I think for all practical matters

17  the issue has been filed.  In a sense the way the CIPA notice

18  is framed they're going to defense claims that they're going

19  to reach the names of witnesses during the course of the

20  trial, but they don't have those names.

21           THE COURT:  Right.  I think the name issue, that's

22  resolved through a prior order.

23     Mr. Cline, do you disagree with that?

24           MR. CLINE:  I do, your Honor.

25           THE COURT:  Go ahead then.

10:07:44  1      MR. CLINE:  Because what we would want to do -- we
2      haven't had discovery.  What we would want to do is with
3      Mr. Abbey on the stand, Mr. Abbey, what's your name, if
4      things were to go the way we would want them to go, he would
5      answer that question and tell us his name and then we
6      would --
7      THE COURT:  But I have already said you're entitled
8      to that information in a prior order.  Why doesn't that
9      dispose of that?
10      MR. CLINE:  Because there is a difference that I
11      was getting at when we spoke at the status conference.
12      THE COURT:  On the different standards?
13      MR. CLINE:  There are two different standards that
14      I think are appropriate under the Roviaro standards for
10:08:26 15      discovery classified information.
16      We respectfully disagree with the way that you applied
17      the standard.  I think the standard that is correct for
18      discovery, when you're talking about the admissibility of
19      evidence at trial, that's what we're now discussing for this
20      purpose of the CIPA motion.  The materiality requirement is
21      in play.  That's what the Libby case says that we cited at
22      the status conference.  What Libby says -- this is our
23      position, that when you're seeking discovery of classified
24      information under Rule 16 or the business materiality
25      requirement that's sort of qualified privilege for the

10:09:12   1    government, but when you're talking about the admissibility

2    of evidence at trial, that doesn't apply. All you are really

3    talking about is the Rules of Evidence, Rule 401, 403 and so

4    on.

5        To finish the point, when the materiality standard drops

6    out, and all you're talking about is relevance, I think

7    everybody agrees that name and age are -- for that matter are

8    relevant.

9        THE COURT: We found relevance in that discovery

10    order. We just found you weren't entitled to names.

11        MR. CLINE: Our position is, your Honor, that under

12    the Rules of Evidence under cases like Libby, once relevance

13    is established it is fair game at trial. There is no

14    privilege.

10:10:02  15        THE COURT: I'll just cut this short.

16       I disagree with that. You're not going to get the name

17    at trial. We can apply the other standards, get an order

18    out, but I'm not going to give you the names. So we can

19    short circuit that discussion. That's been resolved in my

20    mind, and we're not going to change our ruling.

21       I don't know why I would say you can't have it in

22    discovery, but, yes, you can have it at trial and use it. It

23    just wouldn't have made any sense to have issued that first

24    order. So I'm not going to give you that information.

25       You have asked for other information. Let's move on to

10:10:36 1  that.

2          MR. CLINE:  All right.  The other information we

3  ask for is somewhat speculative.  My co-counsel may have

4  particular things that they have in mind, but we don't know

5  much about this man.

6          THE COURT:  Right.

7          MR. CLINE:  He's testifying as an expert.  If he

8  were an ordinary expert, we would of course have his name,

9  and we would be able to investigate him.  Lacking that what

10  we would propose to do at trial is ask him the kinds of

11  questions that we would want to be able to ask him -- or

12  explore at pretrial.  That is, details about his training,

13  details about his education, details about the prior work

14  that he's done.

10:11:18 15         THE COURT:  Did any of that come out in the first

16  trial?

17         MR. CLINE:  Some, but not much.  We were all

18  treading very lightly because we were very concerned about

19  creating a problem.  He testified a little bit about his

20  background.  He has a law degree from Tel Aviv University.

21  He works for the Israeli Security Agency.  He worked on a

22  particular case that he talked about.  He talked a little bit

23  about his -- how he came to have knowledge about the issues

24  that he was testifying about.  But there was not a lot of

25  detailed cross about, you know, his training, his education,

10:12:02 1  his background, his affiliations.

2      I mean, hypothetically, for example, if he were part of

3  a settler group in Israel that would be very powerful

4  evidence of bias.  We would want to bring that out.  We

5  didn't get into that kind of thing in the first trial, I

6  think because everybody was walking on egg shells.

7          MR. JONAS:  Your Honor, this is Barry Jonas.

8      If I recall correctly, there was one point during Avi's

9  testimony when we were on a break that Mr. Cline raised an

10  issue similar to this, but very specific -- it was -- it was

11  in regard to his rank in the military.  Most Israeli citizens

12  are required to serve in the military.

13      Mr. Cline can correct me if I'm wrong on what happened,

14  but Mr. Cline requested a hearing on the matter with Judge

10:12:54 15  Fish, and we ended up resolving the issue by providing

16  Mr. Cline with the information he needed.

17      I believe in -- with regard to part two of their notice,

18  the government responded saying it was broad.  We still take

19  the position that it's broad.

20      Frankly, your Honor, if we can get specifics from

21  Mr. Cline outside the course of this conference as to what

22  they plan on asking, we can go back to the Israelis, provide

23  them with the questions, say, okay, tell us what is off

24  limits, what's out of bounds, what's in bound, and maybe we

25  can narrow the focus on what your Honor would have to rule

10:13:30 1    on.

2                    THE COURT:  Okay.  Would that apply then to at

3        least number 2 and 3?

4                    MR. JONAS:  It would certainly apply to number 2.

5            As far as number 3, I do believe that some of this did

6        come out in trial.  Certainly rank came out.

7        Responsibilities came out.  I don't believe compensation is

8        relevant.  I don't see how much he gets paid by the Israeli

9        government, that their salary is an issue here.

10                   MS. SHAPIRO:  This witness was not paid for his

11       testimony.

12                   MR. JONAS:  I'm sorry, your Honor, I assumed

13       compensation was salary.  I didn't assume -- maybe

14       Ms. Shapiro is right, compensation is payment for testimony.

10:14:16 15                  MR. CLINE:  This is John Cline.  I think any

16       payment that he is receiving while he's in court for his

17       services, whether that's salary or some other compensation,

18       would be fair game.

19           He did testify, as I recall, last time that he was being

20       paid a salary by the Israeli government.

21                   THE COURT:  But you didn't get into the amount?

22                   MS. SHAPIRO:  His testimony was that he was simply

23       receiving his normal salary.  His salary was not being

24       suspended while he was testifying, but he received nothing

25       additional.

10:14:52  1     THE COURT: All right. Well, setting aside the

2 compensation issue then, Mr. Jonas, it sounds like 3 has

3 already been provided -- was provided at the first trial.

4 The rank and responsibilities.

5     MR. JONAS: Yes, sir, that's my understanding.

6     THE COURT: Mr. Cline.

7     MR. CLINE: Well, rank, I think, it was provided.

8 The fact that he was receiving a salary was provided. I

9 don't know -- I'm trying to recall whether any details about

10 his position at the ISA -- I don't believe it did.

11     MS. SHAPIRO: It was at the Daubert hearing he

12 testified about that.

13     MR. CLINE: In any event, if the government is

14 telling us that those areas -- the areas in topic 3 are not

10:15:42 15 classified or problematic, then that's an issue that we don't

16 need to trouble ourselves with. It's all mixed up with

17 classified through this process.

18     MR. JONAS: This is Barry Jonas.

19   To a certain extent, and I'm speaking without knowing

20 the details, but, for example, if you question Avi or Major

21 Lior about the Israeli defense forces, about matters they

22 worked on that is completely irrelevant to their testimony, I

23 think those are irrelevant and out of bounds.

24   So I think as long as the questioning is somewhat

25 relevant either to probe their knowledge of the subject

10:16:24   1   matter of the testimony, it's my understanding -- and,

2   Ms. Shapiro, correct me if I'm wrong, but if the rank issue

3   and the responsibility issues came out at trial, that should

4   be okay.

5         MS. SHAPIRO: It did. Mr. Jonas is correct. As

6   long as it's specific as to his testimony, if he testified

7   about it you can, if it's just generally his responsibilities

8   with respect to anything, that's likely going to cause

9   problems.

10         MR. TULLY: This is Daniel Tully. He is testifying

11   as an expert, which does expand his personal knowledge as far

12   as his expertise.

13         MR. CLINE: John Cline.

14     One thing I would add is that there may be areas of

10:17:10 15   responsibility that are unrelated to the subject matter of

16   his testimony, but which are relevant to show a basis, for

17   example, purely hypothetically, if Avi as a member of the ISA

18   has participated in Operation Defensive Shield, or if he has

19   participated -- if he has participated in some particularly

20   controversial action in Gaza, let's say, even though that's

21   not related to the subject matter of his testimony directly,

22   I think we would all argue that that should be put before the

23   jury as evidence of bias.

24     So it doesn't -- I don't believe it could be defined

25   quite so easily as the government suggests.

10:17:56 1    MR. JONAS:  Your Honor, in that case -- Barry

2    Jonas -- I think we can deal with number 3 the same as number

3    2.  If Mr. Cline or other defense counsel could provide us

4    with specific subject matter of questioning of Avi or Major

5    Lior on, we can go back to the Israeli government and we can

6    discuss it with them in order to narrow down the issues that

7    your Honor has to decide.

8         THE COURT:  Mr. Cline, what about that?

9         MR. CLINE:  Well, I guess I have two reactions to

10    that.

11         The first is that the cross-examination becomes a matter

12    of prescriptive questions and answers, I think some of the

13    value -- a lot of the value of it is lost.  So I object to

14    that.  I don't think that's the way the cross-examination

10:18:40 15    ought to go.  It ought to be free-wheeling exchange with the

16    witness so the jury can really access his credibility.

17         Having said that, CIPA, in my view, by its nature hinges

18    on the right to cross-examine.  If the Court were to require

19    us to do that, we will do it.  Under CIPA we will provide

20    Mr. Jonas with more detail.

21         MS. HOLLANDER:  This is Nancy Hollander.

22         Judge, I would just like to say -- I don't disagree with

23    anything Mr. Cline has said, but I would like to state for

24    the record an objection that the government of Israel is

25    basically deciding what our cross can and can't be on a kind

10:19:24 1  of question-by-question basis, which I think is

2  inappropriate.          THE COURT:  I don't know that we're

3  looking at a question-by-question basis.  From what Mr. Jonas

4  is saying it's probably looking for more specific areas of

5  where you wanting to question, not necessarily specific

6  questions.

7      I understand it gets pretty murky where you actually

8  could be given what you're going to ask, but I don't think

9  he's asking for a question-by-question preview of where

10  you're going.

11      I understand the concern, Mr. Cline, that ordinarily you

12  don't have to do this when you're going to cross-examine the

13  witness.  But we do have CIPA, so we have to deal with that.

14  I can't just let you start questioning.

10:20:06 15          MR. CLINE:  I understand, your Honor.  That's why I

16  worded it the way I did.  I object to it.  I think it

17  infringes our cross-examination, but it is what the statute

18  seems to call for.

19          THE COURT:  Right.  Any other thoughts on that

20  issue from any defense counsel?

21          MS. CADEDDU:  Your Honor, this is Marla Cadeddu.

22      I just -- I agree with both Mr. Cline and Ms. Hollander

23  and I think all counsel will join in their objections for

24  record purposes.

25          THE COURT:  Certainly.  Then you may each have

10:20:38 1    that.  I think that's a good approach on it.  I don't know

2    that there is any good way around it.  If someone can make

3    another suggestion other than we'll just let you ask your

4    questions, and the government can object, which I don't want

5    to do that.  If you have another suggestion, I would be glad

6    to hear it now or sometime later, but for now I think that is

7    the way we need to approach it with respect to number 2 and

8    3.

9         I'll take under advisement that issue about the

10   compensation, but with respect to the rank and

11   responsibilities, rank apparently is not an area, but the

12   area of responsibility seems to be some area -- one area

13   where there is a disagreement in terms of how far can you go

14   in asking questions there.

10:21:30 15   Then with respect to number 2, the same.  If you will

16   get with -- counsel can get with each other and maybe narrow

17   down some of what it is you're asking for and then we can at

18   least get the Israeli government's position on it.

19        I don't know that the Israeli government is going to be

20   deciding the issue, but at some point is wanting to press it

21   once we have a specific area where I can rule on it -- be in

22   a better position to rule on it, I'll make a ruling on it,

23   and then we can go from there.  But I think that's a good way

24   to start.

25        Any other thoughts on that with respect to number 2 and

10:22:14  1    3 on the defense motion?

2                    MR. CLINE:   Not from Cline, your Honor.

3                    MR. JONAS:   None from the government, your Honor.

4                    THE COURT:   Then number 4, the basis for the

5        witnesses' opinions.

6            Now, was Major Lior an expert witness?

7                    MR. JONAS:   Major Lior is not.

8                    THE COURT:   This is purely about Avi.

9            Let me hear from you, Mr. Jonas, I have got the defense

10       motion in front of me.  I know -- I think I know what they

11       are asking for.

12                   MR. JONAS:   Your Honor, prior to the last trial the

13       government provided defense counsel with -- I believe it was

14       a notebook or -- you know, I think it's best that Ms. Shapiro

10:22:50  15   respond to this part only because Avi was Ms. Shapiro's

16       witness, and with regard to the information provided to

17       defense counsel prior to the trial she's going to be more

18       clear on that than I am.

19                   THE COURT:   Okay.  Ms. Shapiro.

20                   MS. SHAPIRO:   Right.  We provided a large amount of

21       material to the defense prior to his testimony.  There was a

22       sort of book-like binder of probably a couple hundred pages

23       that the witness had compiled for himself.  That was turned

24       over.

25           He also detailed in his Daubert hearing and in his

10:23:30 1    testimony the basis for his opinion, all the various sources

2    of information that he relied on.

3         In addition, the government turned over some 19 or more

4    binders of information that the government of Israel had

5    given to the United States government, and we turned over all

6    of that to the defense as well.  In fact, very early on in

7    the discovery process.

8              MR. CLINE:  Your Honor, may I ask a question just

9    for clarification?

10             THE COURT:  Yes.

11             MR. CLINE:  Ms. Shapiro, are you -- by the 19

12   binders, are you referring to title materials now, what we

13   call the government of Israel governments?

14             MS. SHAPIRO:  No.  What we call the government of

10:24:14 15   Israel documents.

16             MS. HOLLANDER:  Was that the labeled binders?

17             MS. SHAPIRO:  I'm not sure of what the labeling

18   was.  They were produced to you as they were given to us in

19   binders that were labeled, I think, 1 through 19.  I think

20   there was an A, B, C at the end of -- towards the ends where

21   19 was.

22        Those were different from Colonel Siegel's materials

23   that were turned over as reports of supporting material.

24             MS. HOLLANDER:  We had 21 binders.

25             MS. SHAPIRO:  That must be including them then.

10:24:48   1    THE COURT:  Okay.  Then where are we?  Where does

2    that leave us with respect to number 4?

3        MR. CLINE:  Your Honor, as I understand it, I think

4    what Ms. Shapiro is saying is that everything that Avi is

5    relying on is unclassified, and has been produced so, it's

6    fair game.

7        I think that the reason for including this fourth

8    category, I believe, is that we don't know quite where the

9    lines are.  We don't -- in other words, we have this material

10   that the government has produced, but we may want to ask

11   questions that are not encompassed in that material about did

12   he consider this, did he consider that, what are the limits

13   of the material, what is the context of the material, were

14   there other materials that came with these materials.

10:25:46  15       In other words, has he selected these from a larger

16   pool, what's in that larger pool.  We just don't know whether

17   if we ask those questions we're going to get into classified

18   areas or not.

19       It's a -- particularly dealing with an expert where

20   you're trying to test not only training and expertise, but

21   also the basis for the opinion.  That's the real problem.

22       THE COURT:  Ms. Shapiro.

23       MS. SHAPIRO:  Yeah.  I'm not -- it's sort of a

24   vague answer.  I'm not sure how to counter it other than to

25   say that the witness was very specific in his testimony that

10:26:24 1    he was not relying on any classified materials.  So the

2    basis -- the entire basis for his opinion is unclassified.

3                THE COURT:  Well, then it sounds like, Mr. Cline,

4    that you could ask those questions, and others like it that

5    you were just asking about.  This may be another area that

6    you can speak with the government lawyers on about, and

7    whatever areas you think you want to go into that you may

8    have a concern about opening up or getting into classified

9    material.  That would be the only one that I would think you

10   need to apprise them of, or apprise the Court about, because

11   they're stating as far as they're not -- he's not relying on

12   anything classified.  So it sounds to me like open questions

13   as far as that area would be permissible.

14                MR. CLINE:  Well, your Honor, we will think about

10:27:20 15   what the Court is suggesting, and Ms. Shapiro as well.  We

16   will see if we can make more concrete areas of concern.  If

17   we can't, we can include that with items 2 and 3.  If we can,

18   then it sounds like we do have a pretty open field on it

19   then.

20                THE COURT:  Anything else on that, Ms. Shapiro?

21                MS. SHAPIRO:  I don't think so.

22                THE COURT:  All right.  Any other matters that we

23   need to address?

24                MR. JONAS:  Your Honor, this is Barry Jonas.

25       Again, just from a logistical standpoint with regard to

10:27:52  1   those two witnesses, your Honor, I'm not up to speed on the

2   way things were handled.

3             THE COURT: Just vaguely. I have heard it from

4   Judge Fish, but that's been a while back.

5             MR. JONAS: Okay. The courtroom was closed. Only

6   family members were allowed in. The witnesses entered in

7   from the prisoner entrance into the courtroom. They did this

8   prior to the jury coming into the room so the jury didn't see

9   where they came from. There was -- the whole trial

10   Judge Fish had a camera set up that -- there was a video feed

11   that went to the overflow courtroom, and I'm not sure if your

12   Honor plans on doing that.

13             THE COURT: We are thinking about doing that.

14             MR. JONAS: Okay. That happens -- that's great.

10:28:34 15   The camera was turned away from the witness so that the

16   overflow courtroom could not see Avi's or Lior's face. I

17   believe -- and I'm sure counsel will jump on me if I'm

18   wrong -- Judge Fish made a statement to the jury panel

19   letting them know the witnesses are not testifying under

20   their real name. And both had counsel -- had their own

21   counsel from Israel. If there was a question that could

22   possibly elicit a classified response, counsel was allowed to

23   approach the witness, confer privately, and then the response

24   would come either in the form of an answer, or I cannot

25   answer that. I think that only happened one or two times.

10:29:20  1    But we would certainly ask that the same procedures be put in

2    place.

3            THE COURT:  All right.  Those I remember -- other

4    than having counsel, I don't know that I was aware of that.

5    I don't remember, but the rest of it, I remember Judge Fish

6    telling me that.

7          Mr. Cline, any thoughts on that?

8            MS. CADEDDU:  This is Marlo Cadeddu.

9         There were a couple of occasions where the -- I mean, we

10    would object to treatment of this witness any differently

11    than anyone else, for the record, but as far as practically

12    speaking, there were times when these people came and went

13    through the prisoner entrance, and the jury was able to see

14    them do that.  It wasn't quite as -- I don't think it was

10:30:00 15    done as carefully as it should have been.

16         So I would make the request that if the Court is going

17    to follow that procedure that the Court make absolutely

18    certain that the jury is out before the witness is moved in

19    and out.

20            THE COURT:  Okay.  Why is that?  What do you think

21    that that causes?

22            MS. CADEDDU:  Well, just I have a concern that the

23    jury view the witness as being treated specially, and that

24    there is some sort of safety concern or something with him

25    being in the courtroom.  And I think that raises issues that

10:30:34 1    are inappropriate by the jury.

2            MS. HOLLANDER:  This is Nancy Hollander.

3        I think the witnesses not only have their lawyers, they

4    have some kind of bodyguards.  So that when they moved there

5    was like a bunch of people.  It just sets up a concern that

6    the jury will think that there is fear.  That's what we were

7    concerned about.

8            THE COURT:  Well, we'll certainly try to work with

9    you on that on the breaks just if we can -- our practice, of

10   course, is to allows the witnesses -- jury to leave first on

11   the break.  But if the witness finishes and it's not a break,

12   just call that to my attention and we'll work with you.

13           MR. CLINE:  John Cline.

14       One other thing.  As I recall, I may be recalling this

10:31:20 15   wrong, but as I recall, before the last trial the defense and

16   the government had worked out a statement to be read to the

17   jury to explain the circumstances of Avi's testimony and

18   Major Lior's testimony.

19           THE COURT:  All right.

20           MR. CLINE:  I believe that Judge Fish deviated from

21   that slightly.  I don't recall the details of the deviation,

22   but I do recall that was of concern to the defense.

23       All I would ask is that we have an opportunity to

24   propose a slightly revised statement to be read, and we will

25   try to get the government's agreement, but we -- I think we

10:32:00  1   did have a concern about the statement Judge Fish read.

2        THE COURT:  Why don't counsel get together on that,

3   and see if you can come up with something that you could

4   agree to.

5        Any other issues?

6        MS. SHAPIRO:  This is Elizabeth Shapiro.

7   One more detail with respect to the testimony.

8        That is Major Lior does not speak English, and he had to

9   have interpreters next to him that he alternated.  I guess

10  there is a protocol.  Every so many minutes they rotate.

11       And Avi speaks English, although not the best English in

12  the world.  He had an interpreter as sort of a backup who was

13  next to him in case he couldn't understand a word that was

14  asked in the question, or if he couldn't come up with a word

10:32:52 15  in English for the response.

16       We went that way because the -- having an interpreter

17  slows things up substantially.  So by having him testify in

18  English, it cut out that translation part of it.  We would

19  just ask that that protocol be followed.

20       THE COURT:  All right.  Mr. Cline or any other

21  counsel on that?

22       MR. CLINE:  I don't think we have any objection to

23  that, your Honor.

24       THE COURT:  Okay.  We have done that before.  I

25  think ordinarily when we have witnesses that testify solely

10:33:22  1   through a translator, generally there are two, especially if

2   it's a long testimony, so that they can take a break.  And

3   then I have had standby translators as well.  So we can

4   certainly work with that.

5        All right.  Any other matters we need to address?

6            MR. CLINE:  None from the defense.

7            MR. JONAS:  None from the government.

8            THE COURT:  Okay.  Well, thank you.  Just let us

9   know whether we need to have another phone conference.

10   Hopefully we will see everybody here on the 4th so that we

11   can take up the issues then, specific rulings on specific

12   issues that are remaining.

13            MR. CLINE:  Very well, your Honor.

14            MS. SHAPIRO:  Thank you, your Honor.

10:34:10  15                       ---o0o---

16                 *C E R T I F I C A T E:*

17

18        I, P. Sue Engledow RPR/CSR, certify that the foregoing
is a transcript from the record of the proceedings in the
foregoing entitled matter.

19        I further certify that the transcript fees format comply
with those prescribed by the Court and the Judicial

20   Conference of the United States.
This the 18th day of June, 2009.

21

22                    */S/P sue Engledow*

23                    _____

24                    P. SUE ENGLEDOW RPR/CSR No. 1170
Official Court Reporter

25                    The Northern District of Texas
Dallas Division

10: 34: 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25