IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA ) CAUSE NO. 3:04-CR-240-P
                          (
vs.                       )
                          ( SEPTEMBER 18, 2008
                          ) DALLAS, TEXAS
HOLY LAND FOUNDATION, ET AL ( 9:00 A.M.

_____

VOLUME 5 of 37

_____

STATEMENT OF FACTS

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

_____

A P P E A R A N C E S

FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                      1100 COMMERCE, 3RD FLOOR
                      DALLAS, TEXAS  75242
                      BY:  MR. JIM JACKS
                           MR. BARRY JONAS
                           MS. ELIZABETH SHAPIRO

FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
(SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
                      20 FIRST PLAZA, SUITE 700
                      ALBUQUERQUE, NEW MEXICO 87102
                      BY:  MS. NANCY HOLLANDER
                           MS. TERESA DUNCAN

```
 1            FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
             (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
 2                                NEW YORK, NEW YORK  10005
                                  BY:  MR. JOSHUA DRATEL
 3                                     MR. AARON J. MYSLIWIEC

 4            FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
             (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
 5                                DALLAS, TEXAS  75204
                                  BY:  MS. MARLO P. CADEDDU
 6
              FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
 7           (GHASSAN ELASHI)     P.O. BOX 10985
                                  TAMPA, FLORIDA  33679
 8                                BY:  MS. LINDA MORENO

 9                                JONES DAY
                                  555 CALIFORNIA ST., 26TH FLOOR
10                                SAN FRANCISCO, CA  94104
                                  BY:  MR. JOHN D. CLINE
11
              FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12           (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                  FORT WORTH, TEXAS  76102
13                                BY:  MR. GREG WESTFALL

14            COURT'S LAW CLERK:   MS. JENNIFER HELMS
                                  1100 COMMERCE, RM. 1654
15                                DALLAS, TEXAS  75242.

16            COURT COORDINATOR:   MS. BRENDA WEBB
                                  1100 COMMERCE, RM. 1654
17                                DALLAS, TEXAS  75242

18    OFFICIAL COURT REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                  1100 COMMERCE STREET, RM. 1654
19                                DALLAS, TEXAS  75242
                                  (214) 753-2349
20

21

22

23

24

25
```

## INDEX

**MOTIONS HEARING**

**MOTIONS HEARING**                                                      **Page**
                                                                           4

1          THE COURT:  Good morning.

2      Well, I think we are down to the jury method selection I

3  think is where we are.

4      Mr. Jacks, you are still objecting to the method proposed

5  by the Defense?

6          MR. JACKS:  Yes, Your Honor.  And I can explain

7  further if you would like me to about why I believe --

8          THE COURT:  Maybe at another point.  I am going to

9  do the traditional method of striking, so we will let you take

10  your break.

11      How much time are going to need to make your strikes.

12          MR. WESTFALL:  Not very much, Your Honor.  We gave

13  it some thought last night.

14          THE COURT:  Then go ahead and recess and make your

15  selections, turn in the list to Brenda, and we will come

16  in -- Each of you will have --

17          MR. JACKS:  Just use this list.

18          MR. WESTFALL:  We need to get a new one, and I guess

19  what we have to do is see if there were double strikes and

20  that will determine our alternate pool.

21          THE COURT:  We will compile the list and the

22  alternate pool, and then we will let you see it and make sure

23  we are all in agreement that that is the jury we need to seat.

24          MR. WESTFALL:  And then exercise our strikes on the

25  alternate pool?

1          THE COURT:  That is a good point.  On your first 15

2    strikes and your 9 strikes go on the first 36.  That is our

3    pool for the primary jury.  And then you have 37 through 44,

4    and that is your four strikes, two strikes each on that.  So

5    those four will be the alternate.

6          MR. WESTFALL:  Okay.  So if we have double strikes

7    and then there are jurors left --

8          THE COURT:  They are just out.  That is the way I do

9    it.  So that is the pool for the jury, and so the alternate

10   pool will be the last eight.  Otherwise we wouldn't need the

11   last eight.  That is the way I do that.

12       Some thoughts?  I see some puzzled looks.

13         MS. HOLLANDER:  Yes.  I understand that.  But do we

14   do the first one --

15         THE COURT:  Just do it all at once, once you turn in

16   your 15 strikes and your two strikes.

17         MR. WESTFALL:  We look at them as though they are

18   two separate pools.

19         THE COURT:  But do your strikes all at once.  So

20   once we get the jury list we will have it all, the 12 and the

21   4.  Everybody on the same page?

22         MR. WESTFALL:  Yes, Your Honor.

23         MR. JACKS:  Just to confirm, the highest number --

24         THE COURT:  I didn't count the 36, where No. 36 is.

25   What did you show?

1          MS. HOLLANDER:  No. 76.

2          MR. JACKS:  That is the highest one in the regular

3  pool, and the alternate runs from 78 to 98.

4          MS. MORENO:  No. 76 is where it ends.

5          MS. HOLLANDER:  And the alternate pool ends at 98,

6  Rainwater?

7          THE COURT:  That is what we are showing.

8          MR. WESTFALL:  Did we want to confirm the numbers or

9  anything?

10          THE COURT:  Do you want to do that?  Let me do this.

11  Why don't you get together and see if you agree.  If you agree

12  -- Well, Brenda has the list as well.

13          MR. WESTFALL:  Let's look at Brenda's list.

14          THE COURT:  We will take a look -- You can look at

15  that together before you adjourn, then, to make your strikes.

16          MS. HOLLANDER:  Your Honor, could we have the

17  courtroom to do it so we can meet with our clients?

18          THE COURT:  That is fine.

19      And Mr. Jacks, you can come into the jury room, if that

20  is where you want to go, or whenever you need to go.

21          MS. MORENO:  Is there a time limit?

22          THE COURT:  No.  We don't want to take all morning,

23  but just let us know when you are finished.

24      We are in recess.

25                      (Brief Recess.)

1              .

2              THE COURT:  All right.  It looks like we have a

3      jury.  And the lawyers have looked, and everybody is in

4      agreement that this is the panel.  Correct, Mr. Jacks?

5              MR. JACKS:  Yes.

6              THE COURT:  Any objections from the Defense?

7              MS. HOLLANDER:  No.

8              THE COURT:  We will start with the jury at 9:00

9      Monday morning.

10         We will be back at 2:00 this afternoon to look at the

11     motions in limine.  Hopefully by 2:00 I will get a chance to

12     work my way through all of your motions.

13             Anything else, then, before we recess, Mr. Jacks?

14             MR. JACKS:  No, sir.

15             MR. CLINE:  One question from the audience here.  Do

16     you expect to entertain any argument at all this afternoon, or

17     will you simply --

18             THE COURT:  I may hear on some of those that I need

19     to hear on, so be prepared -- I am not going to hear argument

20     as a matter of course on every motion.  Some I am prepared to

21     rule on.

22         We will see you at 2:00 this afternoon.

23                         (Lunch recess.)

24             THE COURT:  All right.  On the record now.

25         We have had a discussion with counsel and the Court off

1    the record.  After we selected the jury this morning, two

2    members of the panel, one on the 12 and then one of our

3    alternates, had sent in some information regarding being

4    excused--one on a hardship employment, and another one sent in

5    a note from her doctor indicating she was totally

6    incapacitated and should be excused from jury service.

7        So my proposal was to excuse both of these jurors, and

8    then substitute some of the other panel members that were not

9    stricken by either side.

10       And so counsel have now had a little bit of time to think

11   about this and consider what we discussed, and I will hear

12   from Mr. Jacks.

13            MR. JACKS:  Your Honor, that is fine.  We have no

14   problem.

15            THE COURT:  To Ms. Strong and Ms. Kirk?

16            MR. JACKS:  Correct.

17            MR. WESTFALL:  We have no objections either.

18            THE COURT:  So Ms. Strong is the first juror of the

19   two that were not stricken, No. 72, so she will take Ms.

20   Hoff's place and be one of the 12.  And then Ms. Kirk will be

21   an alternate.

22       And there was a question as to which alternate is she.

23            MR. WESTFALL:  Whether she is No. 1 --

24            THE COURT:  My thinking was she has to be No. 1,

25   because we normally take them in order, or at the worst she

1   would have to replace the alternate juror she is replacing, so

2   she would become the third alternate.

3        My thinking would be logically, since everyone is taken

4   in order, she would be No. 1.

5        Mr. Jacks, any thoughts on that?

6             MR. JACKS:  That is fine, Your Honor.

7             THE COURT:  Mr. Westfall.

8             MR. WESTFALL:  No.

9             THE COURT:  That will be the way we do it, then.

10  Ms. Strong will become our juror of the 12, and Ms. Kirk will

11  become alternate No. 1, and then Mr. Mijares and Mr. Cook will

12  move down to 14 and 15.  Okay?

13       Any other issues on that that we need to address.

14            MR. WESTFALL:  Not on that, but let's keep our

15  fingers crossed.

16            THE COURT:  That is our new jury for now.  We hope

17  it will be that way a week or two from now.

18       Let's take up the motions in limine, then.

19       Mr. Jacks, let's take up your motions first, the

20  Government's motions.  Are you going to be addressing the

21  Government's motions?

22            MR. JACKS:  Yes, unless I call in a relief person.

23            THE COURT:  Unless you punt?  Okay.

24       As I understood, there were three parts to yours.  Really

25  the first one under jury nullification you are actually

1    objecting to any evidence of Israeli government -- arguing

2    jury nullification, but tied in that is evidence of Israeli

3    Government misconduct that the Defendants may be offering.

4         MR. JACKS:  Yes, Your Honor, I think that is one way

5    to describe it.  The Government, as it stated to the Court and

6    to prospective jury members, doesn't believe this trial should

7    be about the Palestinian-Israeli conflict and who is right or

8    who is wrong in that particular conflict.  And I know from the

9    previous trial from the first opening statement there was

10   discussion about the number of Israeli settlements, and there

11   was a map that was shown to the jury that showed where Israeli

12   settlements were in the West Bank and Gaza, and just from that

13   point on it seemed like so much of the Defense evidence had to

14   do with allegations or evidence that was characterized or can

15   obviously be characterized as things that the Government of

16   Israel has done to the Palestinian people.

17        And we believe that that is being offered essentially to

18   attempt to make this jury believe that, well, you know, the

19   Israeli Government has done things wrong and in essence

20   whatever these Defendants are accused of doing, or whatever

21   Hamas is accused of doing, you know, the jury should basically

22   just ignore whatever evidence, other evidence there is, and

23   just, you know, kind of say, "Well, I don't care what the

24   evidence is.  Both sides are wrong and we are just not going

25   to get involved, or we are not going to really look at the

1    evidence to see if the charges are proven, and that we are

2    just going to throw up our hands and nullify that."

3        Now, the Defendants in their response have said, "Well,

4    this goes to show why the Defendants did what they did, and

5    the degree of their commitment or passion regarding what they

6    were doing," and I think the proper response to that is that

7    unless and until some Defendant gets up on the witness stand

8    and says, "This was our motivation; this, you know, is why we

9    did this, and this evidence shows it is relevant because it

10   shows or explains why we did something else," or explains this

11   piece of evidence that the Government has put in that until

12   that time is reached, that this evidence is really not

13   relevant or admissible.  And in terms of, whether, you can

14   infer that this evidence is relevant because of something that

15   the Government has put into evidence, whether it is a

16   videotape of the Defendants in their praising Hamas or, you

17   know, chanting, you know, support or making statements, angry

18   statements about Israel, I still don't believe that that is

19   sufficient to make all this other information that they seek

20   to introduce relevant.

21       If the crux of their argument or Defense is that "We were

22   just providing charity and, you know, we were not intending to

23   support Hamas, we had nothing to do with Hamas," well, if that

24   is the case and if they are talking about, you know, "We were

25   trying to help Palestinians in," it is the Government's

1    position that whatever caused them to be in that condition is

2    really not relevant, whether it is a natural disaster or

3    whatever else caused, you know, the situation with the

4    Palestinians, this other activity about where Israeli

5    settlements are, you know, that is really a disconnect between

6    how that relates to whatever their motives were.

7         And if their motives are purely altruistic and purely to

8    help these people, then what is the relevance of whatever

9    caused that situation?  And so it really seems to contradict

10   their statement that they were an apolitical organization, and

11   that, you know, "We had no interest in supporting Hamas, we

12   are not connected to Hamas, and all we are here to do is help

13   the needy Palestinian people."

14        And again, it depends on whatever it is that the Defense

15   is trying to put in evidence.  But situations about what

16   graffiti may be written on a wall somewhere, however many road

17   blocks may exist, there was evidence that there are separate

18   roads for Israelis and Palestinians, and that, you know, it is

19   essentially, we submit, and not very difficult to see that it

20   is basically to present as much evidence as possible to put

21   Israel in a bad light and to attempt to influence the jury to

22   believe that this is about the Palestinian-Israeli conflict.

23   And the more that the Defense can get this jury to consider

24   whatever the government of Israel has done and attempt to make

25   the conclusion that this is a situation where both sides have

1  doing things to each other and, you know, the jury would just

2  throw up their hands and say, "Well, this is a situation that

3  we are just not going to really look at the law, we are just

4  going to abdicate or just say, 'Well, both sides have done it

5  so we are going to find them not guilty,'" and it really does

6  try to focus the jury's attention away from the charges in

7  this case and the evidence as it pertains exactly to those

8  charges, Your Honor.

9         THE COURT:  Okay.  Thank you.

10     Mr. Cline?

11         MR. CLINE:  Your Honor, the bottom line is, as I

12  think Your Honor will see as the evidence develops here, there

13  is no way to air brush out of this case the nature of what was

14  going on over there, both on the Palestinian side and the

15  Israeli side.

16     I think the way to deal with this, I respectfully

17  suggest, is the way Judge Fish did, which is no categorical

18  rulings in the beginning, but rule on particular pieces of

19  evidence as we go along.

20     I think Your Honor will see, and I expect the first

21  witness will be Matthew Levitt.  Mr. Levitt will get on the

22  stand and he will present from the Government's perspective a

23  picture of the political situation in Israel, the situation

24  between the Israelis and the Palestinians, and it is a picture

25  that the Government is going to want to foster throughout the

1    trial of essentially the Palestinians as terrorists and the

2    Israelis as the people attempting to present law and order.

3         That is one side of the story.  There is another side of

4    the story as well.  And it becomes particularly relevant in

5    several ways.  One is, of course, the Defendants were, our

6    position is and I think the evidence will show, they were

7    trying to meet real needs of the Palestinian people; that this

8    was a legitimate charity and it was trying to meet legitimate

9    needs.  And I think what the evidence will show is those needs

10   were almost entirely created by what Israel is doing.

11             THE COURT:  But why is that relevant?  If you just

12   show the needs and they are trying to do something to help

13   alleviate those needs, why is the cause of those needs

14   relevant?

15             MR. CLINE:  There the is no way to keep it out, Your

16   Honor.

17             THE COURT:  Why?

18             MR. CLINE:  For example, there is a demolished homes

19   project.  Those homes were demolished by the Israelis.  You

20   can't -- We just can't pretend, we can't have this case

21   pretending that that wasn't what happened.  We have a lot of

22   care for people who are orphans.  They are orphans in some

23   instances because their breadwinners are detained or killed by

24   the Israelis.  You have a whole range of needs that are

25   created by the restrictions the Israelis are placing.

1    Now, you can debate whether the restrictions are proper

2    or not, and Doctor Levitt will talk about some of that, but I

3    just don't think you can have a coherent trial where you take

4    out of it that part of the context of what is happening.

5    A second way it comes in, Your Honor, they are going to

6    play tapes, whether or not the Defendants testify in this

7    case, there will be lots of their voice in this case.  It is

8    going to come in on tape.  And what the jury is going to hear

9    in a lot of instances is that they are angry.  And, of course,

10    the Government's view is they are angry because they are

11    essentially terrorists or supporting terrorists.

12    Our position is they are not angry because of that.  They

13    are angry because of real injustices that are going on over

14    there.  And it doesn't mean you have to show every detail of

15    every injustice, but without some context the jury is going to

16    get a completely misleading picture of why, when my client Mr.

17    Elashi is on a tape talking to Mr. Abu Baker in one of the

18    tapes, he is very angry.  He is shouting about the injustice

19    of what is going on over there.  You just can't air brush that

20    out of this case.  It is just part of the fiber of the case.

21    You can certainly limit it around the edge, just like we

22    are going to ask you to limit some of the, we think, unfairly

23    prejudicial evidence that they have around the edges.  But the

24    basic story of this conflict is going to be front and center

25    in this case.

1       The third way it comes in is the bias of the witnesses.

2   Again, the Government will present these two anonymous Israeli

3   witnesses.  One is Avi and one is Major Lior; Avi as an expert

4   on Hamas.  And of course the Government, and I am not this

5   isn't criticism, they are going to want to present these

6   people as objective, as truthful, and we are going to want to

7   attack their credibility.  You can't understand -- the jury

8   won't understand, particularly jurors, as we know, don't know

9   a lot about what is going on over there, you can't understand

10  the potential bias of an Avi or a Major Lior without some

11  understanding of what is going on over there--that there is an

12  armed conflict, and in that armed conflict bad things are

13  happening on both sides.

14      Certainly the Palestinians have done some bad things to

15  the Israelis, and the Israelis have done some very bad things

16  to the Palestinians, and these guys, these witnesses don't get

17  on the stand as neutral, objective, detached observers who are

18  here just to tell it like it is.  They are participants in

19  what is really a war.  And to understand their credibility,

20  particularly where we don't know much about them and can't use

21  some of the other avenues of attacking their credibility, you

22  just have to understand where they are coming from.

23      So for all those reasons -- Again, the Government will

24  object to particular pieces of evidence, just like it did in

25  the last trial.  Some I expect you will let in some you will

1   keep out, just like Judge Fish did.  But if you make a

2   categorical ruling at this point, it is going to be unworkable

3   because you, we collectively, the jury is not going to be able

4   to understand the context here in all those respects without

5   some evidence of the reality what is really happening over

6   there.

7           THE COURT:  Okay.  Thank you.

8      Mr. Jacks, any further --

9           MR. JACKS:  Yes, Your Honor.  With regard to his

10  statement that the first witness is going to talk about --

11  that Doctor Levitt it is going to talk about this situation,

12  he is going to talk about Hamas, not about Palestinians in

13  general.  And admittedly there will be some discussion to

14  identify, you know, where the countries are and the boundaries

15  and that type of thing and what the dispute is, but it will be

16  very general.

17      And in terms of him getting up and simply giving the

18  Israeli side of the entire conflict, that is a

19  mischaracterization of what his testimony is about.  The guts

20  of his testimony is going to be the background and history of

21  Hamas and how they operate, how they were founded, what their

22  goals are, and how they attempt to carry out those goals, and

23  not the Palestinian people in general.  He is going to be

24  talking about Hamas as an organization.

25      With regard to the tapes of the Defendants and this

information is necessary to explain their anger, well, that is
part of the choice that a Defendant has about deciding whether
to testify or not testify.  They are not foreclosed from
getting on the stand and explaining these things.  But the
fact that they don't want to testify or don't -- prefer not to
testify, doesn't mean that because of that other evidence that
would otherwise be irrelevant or inadmissible all of a sudden
the Court has to kind of move the boundaries and let that be
admissible.

And again, in terms of this evidence is important to show
the bias of witnesses, well, it is not something that was used
to cross examine them in the first trial, and I don't think
there is going to be any shortage on the part of the Defense
to put this army major and this ISA lawyer, as the cases say,
there is not going to be any shortage of the Defendants'
ability to show who they are and to put them in their place so
that the jury knows exactly who they are, where they work,
where they come from, and the organizations that they are
affiliated with.  I don't think that is going to be a problem.
And they are going to make sure that the jury knows through
cross examination exactly what biases these witnesses
potentially have.

And so I think to -- And I don't really take exception to
Mr. Cline's statement, "Well, it is something that you have
got to look at kind of as they come up in the case," but I

1    certainly would like at a minimum some advanced notice that

2    the parties can at least know in advance outside of the

3    presence of the jury "We are about to put this into evidence.

4    Let's let the Court decide this particular issue."  I don't

5    have any problem with that.  And if we can talk about whatever

6    it is that is the specific topic that they think is relevant,

7    whether it is Israeli settlements, road blocks, separate roads

8    for Israelis --

9              THE COURT:  Well, he gave specifics.  I don't know

10   whether you are wanting to get into road blocks or settlements

11   or separate roads, but he gave specific examples of the

12   demolished homes and you can't separate out how those got

13   demolished.

14             MR. JACKS:  And that may be one we agree to that

15   that is something that does explain the context of that.  But

16   again, I think, you know, you kind of got to take them in

17   increments or in, you know, separate --

18             THE COURT:  He gave another example of the orphans

19   and some people are orphans because they have been killed by

20   Israelis or detained.

21             MR. CLINE:  This is just the point.  There are going

22   to be -- I think Mr. Jacks agrees that aspects of the Israeli

23   conduct that even he is not going to object to.  There are

24   going to be other aspects he is going to object to.  There is

25   no other way to deal with this than in context as the trial

1    goes along.

2    And all I can tell you, Your Honor, I think, as Judge

3    Fish I think concluded last time, as you hear the evidence you

4    will have a sense of where the boundaries are and you will

5    teach us where the boundaries are. But I think, you know, for

6    a variety of reasons a lot of this stuff is relevant.

7    Let me just take an example. Doctor Levitt is going to

8    testify how Hamas started. And that is important. We aren't

9    going to object to that testimony. But it started out of the

10   first Intifada. Well, what was the first Intifada? The first

11   Intifada was an uprising by the Palestinian people against the

12   Israeli occupation where think threw rocks and a lot of things

13   wept on, and out of that grew Hamas, among other things. How

14   do you air brush all that out of that story of how Hamas

15   started?

16   The story is clearly relevant to this case--how did Hamas

17   begin. But you can't tell a story and sort of air brush out

18   of the picture what was going on at the time.

19   All I can tell you, Your Honor, I can go on and on about

20   all the different ways this is going to be relevant. Please

21   reserve judgment on this and take the evidence one piece at a

22   time, and I think it will make a lot more sense.

23   MR. JACKS: And Your Honor, I don't disagree that

24   much with Mr. Cline, but my concern is that there would be

25   some kind of warning that, you know, we are going to try to

1  put into evidence this thing about settlements.  You know, as

2  I said, in the first trial the very first opening argument

3  Ms. Hollander has a map and she is standing there and it has

4  got all these triangles or dots on it or something that show

5  Israeli settlements.  Clearly at that stage there wasn't

6  anything to show the relevance of that.

7      And I understand that, you know, you want to talk about

8  your case in your opening statement, but I would just ask that

9  we have some kind of ordered presentation and that when these

10 topics are about to be approached that we can consider them

11 outside the presence of the jury.  In the first trial

12 basically that broke down, and it was just -- that is why all

13 this stuff came in about all these things, and the Government

14 essentially just gave up, you know.  I don't think ever it was

15 ever really clarified about the relevance of settlements, the

16 relevance of, you know, why there are separate roads.

17         THE COURT:  What might be helpful, you know, is you

18 didn't put that in your motion in terms of -- maybe you did.

19 I have read so much and I don't remember specifically what you

20 had in there.  But the specific -- If you have some specific

21 items that you are objecting to, you stated you are not

22 objecting to some, if you have some specific items that you

23 are objecting to, that might make it easier to put that in

24 paper so they can look at it and I can look at it, and then I

25 can give you a ruling rather than -- Because it looks like, as

1  you have stated, a categorical ruling now isn't going to work.

2  You acknowledged some of it is going to come in.  It looks

3  like you are objecting to some particular items, perhaps.  I

4  don't know that I know those.  I don't know whether you have

5  identified those specifically in your motion, and so I can't

6  give you a ruling on that without knowing that.  They need to

7  know it so they can respond to those specifically, and I can

8  give you a ruling.

9           MR. JACKS:  We can do that, Your Honor.

10          THE COURT:  Okay.  When could you get that in?

11  Obviously I can try to look at some of this tomorrow if we can

12  get it in.

13          MR. JACKS:  By tomorrow.  It is probably just going

14  to be a listing, maybe some --

15          THE COURT:  Well, they are going to want to respond.

16          MR. JACKS:  I understand.

17          THE COURT:  And I would probably need to listen to a

18  response.  Okay.

19       Any thoughts on that, Mr. Cline?

20          MR. CLINE:  No, Your Honor.  I think, you know, to

21  take the settlement example, it is one of the things that is

22  tied intimately to the whole question of need.  Again, they

23  objected to it at the last trial.  Judge Fish allowed it in I

24  just think it is part of the story that you are not going to

25  be able to separate it out.

1      But in any event, if they have a list of things, we can

2  argue them specifically to Your Honor and explain to you why

3  they are important to the case.

4          THE COURT:  I think that may be more beneficial,

5  because it doesn't look I will be able to make a categorical

6  ruling.

7      Your next motion, Mr. Jacks?

8          MR. JACKS:  Judge, it has to do with cumulative

9  experts, and before the first trial I think the response from

10 the Defense was, "We are not going to call all of them."

11         THE COURT:  I think that is what they are saying

12 again.

13         MR. JACKS:  We understand that.  I think there is a

14 couple of them that specifically we have issue with.  There is

15 a woman named Leah Tsemel.  She is an attorney in Israel, and

16 she is put down on their list as a fact witness and also an

17 expert.  And as near as we can tell, one of the principle

18 focuses of her testimony is that Israeli authorities torture

19 Palestinian prisoners.  And we object to that unless and until

20 it is shown that that is somehow relevant, and that is, you

21 know -- I don't believe --

22         MR. CLINE:  I don't mean to cut you off.  Just to

23 speed this up a little bit, we don't know whether we are going

24 to call her.  We didn't call her last time.  We may not this

25 time.  May I just suggest that we provide plenty of notice and

1    we can take this up then.

2           THE COURT:  I think that is a good way to do it.  I

3    understand from your response you hadn't called her.

4           MR. CLINE:  And the same goes for these other

5    cumulative witnesses.  We are not going to call duplicate

6    witnesses to testify to the same thing.  And if we did, you

7    would stop us.

8           THE COURT:  Sure.

9           MR. CLINE:  And he would object.  So may I suggest

10   that we --

11          THE COURT:  I think that is a good way to handle

12   those.

13       Any other motions from your side that we need to

14   consider?

15          MS. SHAPIRO:  Just one moment, Your Honor.

16          THE COURT:  Sure.

17          MR. JACKS:  Judge, this is not really a motion in

18   limine, but in our trial brief we briefed the issue of Rule

19   106, the rule of completeness.  I don't know if you have had a

20   chance to read that trial brief we filed a week or so ago.

21          THE COURT:  I have not seen that one.

22          MR. JACKS:  Then we will -- I guess we could either

23   wait --

24          THE COURT:  We will take that up one day next week,

25   it looks like.

1          MR. CLINE:  And we may want to file a response, not

2     to the whole thing but just to that part of it.

3          May I ask Mr. Jacks, is there any other part of that that

4     you are specifically going to direct the Judge's attention to

5     before trial?

6          MR. JACKS:  That I am going to direct the Judge's

7     attention to?

8          MR. CLINE:  Before trial, any other part of the

9     trial brief so we can brief it?

10         MS. SHAPIRO:  There are portions in the trial brief

11    that also talk about admissibility of certain items that are

12    specific sections in the trial brief.  Essentially the trial

13    brief, Your Honor, adopts the two prior trial briefs that the

14    Government filed, but it also added sections for specific

15    issues that were issues in the last trial that we wanted to

16    bring the Court's attention to as an evidentiary matter ahead

17    of time.  So those may be the sections that you may want to

18    look at and that I think we should address prior to when these

19    things come up.

20         MR. CLINE:  May I suggest by the end of the weekend

21    or first thing Monday morning we will file a brief directed

22    just to the evidentiary portions of the Government's trial

23    brief?

24         THE COURT:  All right.

25         MR. JACKS:  And if it may be that if they are still

1    unresolved, that sometime during the trial at the end of the

2    day before it comes up, I mean before that issue is ripe, we

3    can discuss it at that time.

4            THE COURT:  Okay.  All right.  And remind me before

5    we leave today after we finish the motions to discuss Monday,

6    how we want to proceed, the time those issues that we can take

7    up.

8        All right.  Any other motions from the Government?

9            MR. JACKS:  I don't believe so, Your Honor.

10           THE COURT:  All right.  Let's go back to the

11   Defense, then.

12       And Mr. Cline, are you going to address your motions?

13           MR. CLINE:  Well, most of them, at least.  One of

14   the motions, it is actually a Government motion that we

15   oppose, but I guess it is in the nature of a motion in limine,

16   has to do with the documents that were seized by the

17   Government of Israel from the zakat committees.

18           THE COURT:  Yes.

19           MR. CLINE:  Again, I don't want to just repeat my

20   brief, Your Honor, but in essence we have a couple of

21   different objections.  One has to do with the foundation for

22   the admissibility of the documents.  They came in last time,

23   and I assume they will next time, through Major Lior.  Major

24   Lior was the commander of the Israeli force, I guess you could

25   say, that beginning in April 2002 and continuing through

1    sometime in 2004 went into these zakat committees in the West

2    Bank and took out documents.

3        Major Lior, as it turned out in his testimony at the last

4    trial, didn't participate in any of these actual seizures.  He

5    was the commander, and I think what would happen is his troops

6    would go in take the documents and come back and report to him

7    what they had done.  So when he testified he wasn't testifying

8    based on personal knowledge to a considerable extent.  He

9    certainly had personal knowledge that he possessed the

10   documents and that they were delivered to him by his troops,

11   those kinds of things.  What he didn't have personal knowledge

12   of is that -- is where the documents were seized from.  For

13   that he was depending on what his troops had told him.  That

14   is hearsay.  He lacks personal knowledge and he is in effect

15   repeating what his soldiers had told him.

16       We objected at the last trial.  We didn't really

17   understand the nature of this evidence until we were in the

18   middle of trial, so we just objected in the course of the

19   testimony, and Judge Fish overruled the objection and it was

20   never explored in any detail.  But we have raised that as an

21   issue.

22       Apart from that problem, the hearsay, lack of personal

23   knowledge nature of the foundation testimony for those

24   documents, we have objected under Rules 401 and 403.  And

25   there are really I guess two main prongs to the objection.

1    One is these documents were seized after Holy Land

2    closed.  Holy Land was closed down in December of 2001.  The

3    first of these documents was seized in April of 2002, so five

4    months or so later.  And they continued to be seized over time

5    until sometime I think in 2004, so several years after Holy

6    Land had closed.

7    Now, the only possible relevance of these documents is to

8    attempt to show that these zakat committees were in fact

9    affiliated with Hamas, but their affiliation with Hamas, if

10   they have any affiliation with Hamas, is only relevant during

11   the time that Holy Land was providing with money.  If they are

12   affiliated with Holy Land today, who cares.  It is not part of

13   this case.  So the timing of the documents is one of the

14   issues.

15   Another one of the relevance issues has to do with the

16   lack of any information about where they were found.  We have

17   the hearsay information that they were found in particular

18   zakat committees, but nobody knows -- at least Major Lior

19   didn't know where within the zakat committees they were found.

20        THE COURT:  Specific locations?

21        MR. CLINE:  Specific locations.  They could have

22   been in the trash basket.  They could have been in a janitor's

23   locker.  They could have been in the director's desk.  They

24   could have been on the walls.  They could have been in a file

25   cabinet.  You just don't know.  So it is very hard to assess

1    what significance they have intending to show some affiliation

2    with Hamas.

3         We also don't know, relatedly, what other documents were

4    there, because what happened with these documents, the Israeli

5    Defense Force went into the zakat committees, apparently

6    seized them all, and put them in a warehouse which is located

7    somewhere in the West Bank.  We have never had access to those

8    documents.  That was a subject to the letter rogatory motion.

9         Now, some of the Government witnesses, Mr. Levitt, for

10   example, I believe have had access to the whole cache of

11   documents.  I assume that Avi, the Government expert, has had

12   access to the whole set of documents.  Major Lior may have had

13   access to them.  But we haven't.  And so what we are unable to

14   do is put them in context.

15        The Government, of course, has picked out the ones that

16   are most probative of their case, as I would expect them to

17   do.  We haven't had the chance to do the same thing.  So it

18   is, again, for that reason, very hard to assess what probative

19   value they have.

20        Let me give you a concrete example.  Some of the

21   documents are pictures of Sheikh Yassin who was the founder of

22   Hamas.  Let's assume, based on the hearsay from Major Lior,

23   that they were found in the zakat committee somewhere.  Well,

24   where were they found?  That is one question.  But what else

25   was found with them?  If you have a picture of Sheikh Yassin

in a file cabinet somewhere and you have got Yasser Arafat,

the head of Fatah, the rival faction, up on the wall in a

frame, it is very hard to conclude that Hamas is running that

organization.  Hamas didn't like Arafat.  Arafat was their

rival.  And if Arafat is the guy on the wall and Yassin is

stored away in a file cabinet somewhere, that is pretty

probative.  But we are not in a position to address any of

that because we have never had access to the whole pool of

documents.

So those, I believe, go strongly to the relevance of this

information.

On the unfair prejudice side, getting in now to 403, we

have pictures -- and I am going somewhat from recollection.

For one thing there are some pictures, for example, of Osama

bin Laden; a couple of pictures I believe of Osama bin Laden.

We all -- We picked the jury in the last few days on the

assumption that this case had nothing to do with Al Qaeda

Osama bin Laden, 9/11, and now we are talking about through

those documents starting to inject them into this case, which

I think would be a terrible problem that would affect the

fairness of it.

But there are also pictures of suicide bombers, you know,

stylized portraits of suicide bombers, that kind of thing,

which are highly prejudicial, and I think under the

circumstances where we don't know where these documents came

1    from, what prominence they have --

2            THE COURT:  Are they supposedly members of Hamas?

3            MR. CLINE:  Yes.  Some; not all actually.  Some are;

4    some aren't.  But there are a number of pictures that the

5    Government will put into evidence.  You will see them.  They

6    are kind of stylized portraits of suicide bombers before they

7    go off on their missions.

8        So that is, again, we think, unfairly prejudicial

9    evidence, particularly given the very slim, if any, probative

10   value that they have.  So those are our basic arguments on

11   those documents.

12           THE COURT:  Okay.

13       Ms. Shapiro?

14           MS. SHAPIRO:  Yes.  I will address Mr. Cline's

15   points in turn.

16       We did have a couple of rounds, at least two and perhaps

17   even three, of briefing on this very issue, and I think they

18   have been cited in the papers with the ECF numbers, and it

19   basically summarizes all of these arguments, both the

20   arguments Mr. Cline has made and our rebuttal to them.

21       As for Major Lior's testimony, the bar for authenticity,

22   which he was purely an authenticity witness, is very low.  He

23   needs to show that they are more likely than not to be what

24   they purport to be, these documents.  He didn't testify based

25   on hearsay.  He testified based on a chain of custody that he

presented.  He talked about how the orders that he gave the

soldiers, how they seized the documents, what they did with

them, where they went each step of the way, and that those

documents ended up after that chain of custody in his custody,

and they were indexed.  And so Judge Fish had no trouble

whatsoever finding those to be authentic, and that was the

sole purpose of his testimony.

He didn't address the documents other than these were the

documents that were seized, this is the chain of custody, and

these are where the documents came from.

With respect to where they were and the fact he doesn't

know whether they were on the wall or in a desk, that goes to

the weight, not to the authenticity.  That is material for

cross examination, and in fact that was the crux of their

cross examination.  I remember Mr. Dratel cross examining

about, you know, "Weren't they found -- They could have been

found in a wastebasket.  They could have been found in a

closet."  So that is exactly the kind of cross examination

that they are entitled to probe.  That goes to the weight of

the evidence but it doesn't go to the authenticity.  And that

is what Major Lior establishes.

With respect to the dates and the fact that they were

seized after 2001, that is extremely relevant because the

committees continued to be controlled by the same people who

the Government alleges are Hamas people, and it goes to show

1    that if this committee in 2002 when controlled by the these

2    Hamas individuals are Hamas, then in 2001 they are very likely

3    to be Hamas.  And we are entitled to make that argument, and

4    it is probative if in 2002 they are Hamas, it is probative of

5    whether in 2001 when they are controlled by the same personnel

6    they are also Hamas.

7         And again, the fact that they don't know or there isn't

8    specific soldiers testifying about where materials came from

9    in committees, that is cross examination.

10        And 403, it is not -- this evidence is not at all

11   prejudicial.  These are -- the pictures that were presented

12   were, for the most part, the vast majority, in fact I think

13   all, were Hamas martyrs who they were either framed -- for

14   example, we had framed pictures of who they call the engineer,

15   who was a famous bomb maker Yehia Ayyash.  There is a framed

16   poster -- in fact there is a string across the back, so

17   unlikely it was in a drawer.  But nevertheless, there were

18   pictures that we presented that are actually still in the

19   frames.

20        And there were all kinds of other posters of various

21   martyrs who conducted suicide bombings on behalf of Hamas.

22   The posters have the Hamas symbol.  There is no mystery about

23   who they are.

24        And there were also some computer files, and those had a

25   variety of posters and pictures.  And some of them did have

Osama bin Laden.  I don't believe we introduced any that were solely Osama bin Laden.  There were some that had terrorist leaders around the world.  So there was the leader of Chechnya, and there was Osama bin Laden, and there was Nasrallah from Hezbollah, and there was Sheikh Yassin from Hamas.  So we have sort of all stars of terrorists, and these were in the committee.

So it is not overly prejudicial because it is our burden to establish the tie between these committees and Hamas, and given that those committees are on the other side of the world, that is a difficult task, so anything that is probative and relevant -- it is surely more relevant and not prejudicial.  And the Judge let it in without any trouble.

And Mr. Jonas just reminds me, obviously their argument and the crux of their case is that these committees have no association with Hamas; they are just innocent, benevolent charities that dispense aid to the Palestinians without regard to politics.  So to find these sorts of materials in these committees obviously is very probative that in fact they are not neutral, in fact they are not benevolent, that these are committees that are associated with a political point of view, and that point of view, the Government will say, is Hamas based on the leadership of the committees and a variety of other factors that our experts will discuss.

THE COURT:  Did you have something else?

1          MS. SHAPIRO:  Not at this time.  Thanks.

2          THE COURT:  Mr. Cline?

3          MR. CLINE:  Just a couple of quick points.

4      On this chain of custody issue, there is no chain of

5  custody exception to the hearsay rule.  And the point is, what

6  is important about these documents is where they were found,

7  and Major Lior only knows where they were found because of

8  what someone else told him.  He has no personal knowledge of

9  that.  He knows it because his soldiers told him that, and

10  that is hearsay.  It is a statement, an out-of-court statement

11  offered to prove the truth of the matter asserted not within

12  any exception, and he lacks personal knowledge of it.  So

13  there just is no chain of custody exception to the hearsay

14  rule, and that is basically the argument I understand the

15  Government to be making.

16      On the 401 and 403 issue, I don't think there is any

17  justification for letting in the Osama bin Laden stuff.  If he

18  was in a poster with a bunch of other people, they have got

19  plenty of other posters.  We think they should be all excluded

20  for the reasons we have outlined, but there is certainly no

21  reason to let in some in with Osama bin Laden.

22      And Ms. Shapiro said where they were found and these

23  other issues go to their weight, and I guess in a sense that

24  is true, but under 403 what you are doing, of course, is

25  weighing the weight, that is the probative value, versus the

1    unfair prejudicial impact.  And the weight is pretty slight

2    here for the reasons that I outlined before, and the

3    prejudicial impact is quite high.  So again under 403 we would

4    ask the Court to keep them out.

5              THE COURT:  Thank you.  And that is the subject of

6    some motions.  We have a draft order that hasn't been put out

7    yet, but we will get that out in the next -- probably by

8    tomorrow or so.

9         All right.  Next motion?

10             MR. CLINE:  The next motion, Your Honor, is the

11   motion on the designation of Holy Land.  This happened in the

12   last trial in the following way.

13        First of all, a little background.  The events in this

14   case, at least the charged transactions in this case begin I

15   think sometime in 1995, and the last one is in mid to late

16   2001.  So those are the financial transactions that we are

17   talking about, the transfers of money to the zakat committees

18   and the other entities in the West Bank.

19        In December 2001, I think December the 4th, the

20   Government designated Holy Land a specially designated

21   terrorist under the IEEPA, the International Economic Powers

22   Act.  There is another Emergency Economic Powers Act.

23             THE COURT:  Yeah.

24             MR. CLINE:  And closed it down.  It all happened in

25   one day.  It was designated I think December 3rd, maybe late

1    at night, and early the next day they came in, seized all the

2    assets, and closed it down.  There were, of course, no further

3    transactions after that.

4         The designation and blocking memorandum is dated December

5    3rd or 4th, 2001, and that is the document that the Government

6    wants to put into evidence.  It came in in the last trial.  It

7    was the very last thing the Government did in its case, the

8    very last exhibit it offered.  Just before it rested it puts

9    in this document.  We objected on hearsay grounds.  We did not

10   know it was coming in at that point.  We again had a brief

11   argument in Court, no briefing, Judge Fish overruled the

12   objections and the document came in.

13        We have now briefed it, and I think it is clear that

14   there is no hearsay exception that permits this document to

15   come in.  It is offered to prove the truth of the matters

16   asserted in it.  There is no non-hearsay purpose, as there

17   might be, for example -- just hypothetically if this blocking

18   notice had been issued, say, in 1999, you could argue that it

19   has a non-hearsay purpose unrelated to its truth to put the

20   Defendants on notice that what they are doing is wrong.  Then

21   it might come in for a non-hearsay purpose.  But this document

22   was issued, the blocking notice was issued after all the

23   transactions at issue in this case.  So its only possible

24   relevance can be for the truth of the matters asserted in the

25   document.  Again so it is hearsay.

What is the exception to the hearsay rule that might
apply?  Well, the only one under Fifth Circuit law, business
records exception does not apply to government public records.
That is *U.S. versus Keane* I think is the name of the case.
And so we are talking about the public records exception
803(8).  803(8)(C) is the one most nearly applicable.  That
has to do with fact finding by a government agency.  But that
doesn't come in against criminal defendants.  There is a
specific exclusion in 803(8)(C) that those items -- fact
finding memoranda by government agencies cannot come in
against criminal defendants, so that can can't work here.

The to Government has fallen back on 803(8)(B), but the
cases it cites are cases where the court permitted the
admission into evidence of truly routine, almost mechanical
observations, like license plate numbers at Customs
checkpoints.  I mean, things where there is no discretion
involved, there is no fact-finding involved, you just got
somebody, law enforcement or otherwise, sitting there writing
down the numbers all day, and there is really no reason to
doubt the trustworthiness of the document.

This blocking memorandum is anything but that.  It was a
highly politicized event.  There were 3,000 some odd pages of
administrative record.  There were all kinds of reasons to
challenge the accuracy of the Government's determinations.
That is why we are here, in fact.  It is a classic 803(8)(C)

type document rather than a routine observation that might

fall under 803(8)(B). And 803(8)C simply doesn't permit

admission of government findings against criminal defendants.

So there is a big hearsay problem and we think it ought to be

kept out on that ground.

There is also a Rule 403 problem. And interestingly I

think it came up in voir dire yesterday, or maybe the day

before. The problem with a document like this is that it

suggests to the jury that someone else with great expertise

has already made the determination that the jury is being

asked to make--namely, that the Holy Land Foundation, and by

extension its officers and agents who are on trial here, were

engaged in financing a terrorist entity; they have been

blocked for just that reason under the very executive orders

that the jury is going to be considering. And that has an

enormously prejudicial impact.

One of the jurors yesterday was talking about that Dallas

Morning News article that he read, and one of the things he

read that stuck in his mind was that the President had already

determined that the Holy Land Foundation was doing bad things

and needed to be shut down. And he said, you know, and I am

paraphrasing now, but in essence, "Who am I to second-guess

the President." He is referring to this particular exhibit,

this very document that we are now trying to keep out of

evidence. That is what he is talking about. And it will have

that impact on the jury if it is allowed in evidence.  It in
fact says that an expert agency, the Department of Treasury,
has already made the determination, one of the key
determinations that the jury is being asked to make.  That is
terribly prejudicial, and it really has very little probative
value given the process by which this determination was
reached.

So both hearsay and 401, 403 grounds we ask the Court to
keep it out.  And I should add, the confrontation clause as
well.  That is certainly part of our argument, although that
tends to get subsumed in the hearsay discussion.

THE COURT:  Okay.  Thank you.

MR. JONAS:  Your Honor, I guess I will take this
one.

I am going to be very brief, and I just want to give Your
Honor a little bit of history on that.

There is a reason why that was the last document that we
offered into evidence at the end of our presentation.  It
wasn't because we were trying to set a trap or anything like
that.  We struggled with whether or not we should admit that
document.  And we acknowledge that there could be a 403 issue.

Through cross examination of some of our witnesses, the
Defense admitted exhibits, several exhibits which acknowledge
that Holy Land was shut down.  And there was one in
particular, and I apologize, Your Honor, I don't recall the

1    Defense exhibit number, but it discussed the Holy Land being

2    closed.  And I can't remember if it said by the government or

3    just said closed.  And we felt at that point that the door was

4    sufficiently opened that an explanation needed to be presented

5    to the jury as to why Holy Land Foundation was closed and to

6    what happened, and that is why we presented that document.

7        And in this upcoming trial, I think our intention at

8    least initially is not to offer it into evidence.

9            THE COURT:  It is still not to offer it.

10           MR. JONAS:  Yes.  But we a want to reserve to see

11   how things progress.

12           THE COURT:  I think if that is going to be your

13   procedure, then we will just wait until the time you are ready

14   to offer it.  And just be sure you give them notice, and then

15   we will take that up outside the presence of the jury.  I will

16   have my context by then, so we will do it that way.

17           MR. CLINE:  And, Your Honor, I am fine with that.

18   But I do want to make a couple of points.

19           THE COURT:  Let's wait until they are going to offer

20   it.  If they don't offer it, then none of this will matter.

21   So we will hear it then if it becomes necessary.

22       Next one?

23           MR. CLINE:  I don't know that there are any others.

24   The Government has filed -- We filed a motion to exclude a

25   couple of bits of Government expert evidence, but it is also

1    part of a *Daubert* hearing, and I wonder if it wouldn't make

2    more sense when we have the witnesses and we can talk about

3    the *Daubert*.  And there is a 403 component to the motions, but

4    I think it makes more sense to take it up.

5         Your Honor, we do have something else that Ms. Hollander

6    can argue.

7              THE COURT:  Okay.  Mr. Jonas, were you going to say

8    something?

9              MR. JONAS:  Your Honor, I was just going to inquire

10   about the *Daubert* hearings.  Some of our witnesses, in

11   particular Bruce Hoffman, one of our experts, we have small

12   windows that we can call these people.

13             THE COURT:  I think we had discussed taking up those

14   motions at the time the experts are here so they wouldn't have

15   to come in.  And I was going to try to rule on them, to the

16   extent that I could, from the briefing.  Is there briefing

17   completed on that one?

18             MR. JONAS:  I believe so.

19             THE COURT:  We will take a look at those in the next

20   day or so.  If we can rule on them from the briefing, I will

21   let you know that Monday.

22             MR. JONAS:  That would be great, Your Honor.

23             THE COURT:  And those that we need a hearing, we

24   will take those up as the experts are here.

25             MR. JONAS:  And if I can sort of segue to another

issue just to inform Your Honor.  As I said, some of our

witnesses, two or three of them we have narrow windows that we

can call these people because they are very busy, they do a

lot of traveling, they teach at colleges and that sort of

thing.  In the last trial we faced a similar issue, and the

Defense was gracious enough to allow us to interrupt the

testimony of a witness on the stand, put on the witness who

had the conflict, and when they are off to resume with the

witness that was previously on.

    I am not saying we are necessarily going to have to do

that in this case.  We are trying to set forth our order of

proof so we can work with the witnesses, but sometimes things

move faster than expected or slower than expected.

          THE COURT:  Hopefully faster.

          MR. JONAS:  Yes.  We all want that.  But there may

be situations where we may have to request a favor to allow us

to interrupt the testimony of a witness to get on another

witness through a scheduling conflict.

          THE COURT:  I am sure -- You worked that out last

time.  I am sure we can do that again this time.

          MR. CLINE:  We will.  And we may have some similar

issues, and we will work them out as well.

          THE COURT:  Ms. Hollander?

          MS. HOLLANDER:  Your Honor, we have -- and I don't

know how you want to proceed, because it is a very -- they are

1    very long motions, and maybe you have already dealt with them,

2    but --

3           THE COURT:  I have read them.  Do you want to give

4    me the title of which one --

5           MS. HOLLANDER:  Well, we -- If you look at the

6    Defendants' joint motion in limine to exclude evidence from

7    trial that we just filed August 29th of this year, it listed

8    all of the previous ones, so we didn't have to brief them all

9    again.

10          THE COURT:  And I can tell you I am denying the

11   request for a *James* hearing.  We are not going to have a

12   separate hearing in advance of the trial to determine

13   co-conspirators.  So that is denied.

14      And then your joint motion regarding the Religious

15   Freedom of Restoration Act, First Amendment, I have read those

16   your motion.  The response is in Judge Fish's prior order, and

17   I am adopting his order.  I think that is correct.  I am

18   denying that one.  That will be the same ruling.

19          MS. HOLLANDER:  Those are the kind of two smaller

20   ones.

21          THE COURT:  Your fifth one was a joint motion to

22   strike alleged co-conspirator statements and associated

23   testimony.  How is that one different than your first one on

24   *James*?  And I read it, but there is so many that you filed, I

25   have forgotten now what the distinction was.

1          MS. HOLLANDER:  That is a good question.  I think it

2    was -- I think you are right.  I think that one was specific

3    to what we refer to as the Elbarasse documents which are

4    large -- Am I wrong?

5          MR. CLINE:  I think that is right.  And that is one

6    of the issues the Government brought up in their trial brief.

7          THE COURT:  That you are going to respond to?

8          MS. HOLLANDER:  That is right.

9          THE COURT:  We will take that one up in connection

10   with that, then.

11         MS. HOLLANDER:  To get rid of the kind of smaller

12   ones, No. 4, the Defendants' joint motion --

13         THE COURT:  Indictments and convictions?

14         MS. HOLLANDER:  Yes.  And I should have said this

15   and I apologize.  It was denied as moot by Judge Fish because

16   the Government wrote a letter, which I tried to find today but

17   couldn't, but I found the transcript reference where he said

18   the Government responded to this motion by letter stating they

19   do not currently intend to introduce any such evidence, and

20   therefore he denied it as moot, and if the Government's

21   position changes it would change.  So I don't think we need to

22   raise that at this point.

23         MR. JONAS:  No, but if I can address that briefly.

24   What the Government had intended on doing was introducing

25   convictions of individuals for being members of Hamas and

1    these are convictions in Israel.  The Defendants filed their

2    motion and we decided that they have a valid point and we will

3    not introduce those convictions as evidence.

4        However, some of our experts relied upon their

5    convictions as their body of material that they reviewed in

6    forming opinions.  One of the experts, and I believe it was

7    primarily Avi, referenced one of these convictions.  Mr.

8    Dratel would object and point to the Government's letter, and

9    Judge Fish each time denied his objection.

10       It is our position that his objection is incorrect.  We

11   agreed not to introduce the convictions themselves.  We never

12   agreed that the expert would not be able to rely upon the

13   convictions in forming an opinion.

14           THE COURT:  And so you are intending on eliciting

15   that same testimony from the expert this time around?

16           MR. JONAS:  Yes, sir.

17           THE COURT:  And you are intending to object?

18           MS. HOLLANDER:  Yes, sir.

19           THE COURT:  Okay.

20           MS. SHAPIRO:  Your Honor, Judge Fish actually ruled

21   on that, and I think it is ECF 717 on July 16th, 2007,

22   memorandum opinion and order.

23           THE COURT:  I don't think I have seen that one.  All

24   right.

25           MS. HOLLANDER:  We may wish to review that and

1    revise that, Your Honor.

2         THE COURT:  We can come back to that.  All right.

3      That gets us to your big one.

4         MS. HOLLANDER:  The big one, that really just leaves

5    the big one, and the big one is the that was filed on 3/14/07,

6    and that one was never ruled on in the previous case.  Judge

7    Fish, when we kind of got to this point, he said he would rule

8    on it as things came up.  So we don't really have, except for

9    maybe individual rulings as they came along.  And some of

10   these it would be very helpful to us --

11        THE COURT:  Do you want to point out which ones you

12   would like to get rulings in advance?

13        MS. HOLLANDER:  The references to other

14   organizations, No. 2, evidence regarding Hezbollah, Al Qaeda,

15   Palestinian Islamic Jihad, other organizations, that one is

16   really important.

17        THE COURT:  Let me hear from the Government.  I have

18   read your brief and I think I read your response, but do you

19   want to give a response on that?  Why is that relevant?  Why

20   would you get into that?

21        MS. SHAPIRO:  Well, there is two different contexts.

22   One is that to the extent that the Defense is trying to

23   portray both the Holy Land Foundation and the organizations to

24   which they gave money to overseas as neutral apolitical

25   organizations, they go to show that in fact they are -- that

1    they have either these political jihadist type information

2    about terrorist organizations, and we also have --

3              THE COURT:  Who has that?

4              MS. SHAPIRO:  In the zakat committees.

5         Also there is material, and I don't know if that is what

6    they are getting at now, there is material from the Holy Land

7    computers that has all kinds of material from Hamas, of bin

8    Laden, of all kinds of generically jihadist material that Holy

9    Land itself possessed, and so those are probative.  That is

10   one time when other organizations come up.

11        The other time is that we have an expert witness who will

12   be testifying about why -- about how terrorist organizations

13   use a social network to essentially buy public support and buy

14   popular support, and how that enables them to exist as a

15   terrorist organization; how sort of social sides of terrorist

16   organizations aid the terror side.  And he is going to give

17   examples not just of Hamas, but to help the jury understand

18   that this is an modus operandi of several different terrorist

19   organizations.  And the relevance is --

20             THE COURT:  This is Doctor Levitt?

21             MS. SHAPIRO:  This is Doctor Hoffman.

22             THE COURT:  So through your expert, through some of

23   the items that were seized from the zakat committees, and then

24   through what was seized from the Holy Land Foundation?

25             MS. SHAPIRO:  Those are the only times that I think

1    other organizations -- and I don't know if Doctor Levitt may

2    refer to briefly other terrorist organizations, but he is

3    essentially talking about Hamas.  But those are the times that

4    other organizations may come up.

5        There is, for example, a videotape that Mr. Jacks is

6    reminding me of where there is children from a kindergarten

7    ceremony who are dressed up in military fatigues and acting

8    out characters, and one child of five or six years old is

9    dressed up like Nasrallah, who is the head of Hezbollah.  In

10   that instance there is Hezbollah --

11            THE COURT:  Where is this videotape seized?

12            MS. SHAPIRO:  It was a videotape on which the

13   experts relied to show that -- it was a graduation ceremony

14   from the Islamic Society in Gaza, which is one of these

15   committees to which Holy Land contributed money.  And in the

16   same video there is a child dressed up as Sheikh Yassin from

17   Hamas.  So there is, for example, Hezbollah is shown because

18   there is a child dressed up as Hassan Nasrallah, but there is

19   also a child dressed up as Sheikh Yassin.

20            THE COURT:  So this is a video seized from one of

21   the zakat committees is what you are saying?

22            MS. SHAPIRO:  This is actually a video that showed

23   on Al-Manar, which is the Hezbollah television station in

24   Lebanon.  And it was shown as a demonstrative as the kind of

25   material that the experts were relying on in analyzing the

1    nature of these committees.

2            THE COURT:  And you are saying that part of video

3    Hezbollah is mentioned and then Hamas.

4            MS. SHAPIRO:  Children dressed up -- One child

5    dressed up as the head of Hezbollah, and one child dressed as

6    the head of Hamas.  So that might be another instance.

7        There may be -- For example, there is an overseas

8    speakers list that the Holy Land Foundation used where they

9    brought speakers in from overseas to raise money.  And some of

10   those overseas speakers are part of a Jordanian movement that

11   is Hamas-like but not exactly Hamas.  And so those people are

12   identified as Islamic Action Front.

13       Again, it shows -- it is probative to show that Holy

14   Land, an organization that holds itself out to be a neutral

15   charity, is bringing over terrorists, not just Hamas, plenty

16   of Hamas, but also from Jordanian Action Front.

17       The evidence -- anything that mentions another

18   organization is meant as contextual.  It is not out there on

19   its own as going into another organization.  We are not having

20   any sort of separate evidence that is focused on some other

21   terrorist organization.  It is all in the context of Hamas and

22   these Defendants.

23           THE COURT:  Okay.

24           MR. CLINE:  Your Honor, I just wanted to address the

25   Hoffman part of this.  This was one of the motions that I had,

1    and we can maybe decide this definitively later in connection

2    with this testimony, but I did want to make this point.

3        The Government has two experts, Doctor Levitt, and I

4    think to some extent Avi, who will talk about Hamas and how

5    Hamas has two parts--the military and the social wing.  And we

6    certainly have our problems with Doctor Levitt's testimony and

7    Avi's testimony, but we don't dispute that that is relevant to

8    talk about Hamas and its social wing.  And I don't think there

9    is going to be any dispute that Hamas in fact has these two

10   aspects or maybe more than two aspects.  The dispute is going

11   to be whether the zakat committees were part of any social

12   wing Hamas has.  But how Hamas is structured I don't think is

13   going to be a big point of dispute in this case.  So they have

14   two experts to cover that point that is essentially

15   undisputed.

16       They want to bring in Doctor Hoffman to sort of guild the

17   lily here by saying not only does Hamas have a social wing, a

18   fact that is essentially undisputed, but all these other

19   terrorist organizations also have social wings.  And I just

20   don't see the relevance of that, other than to drag into this

21   case Hezbollah and the Tamil Tigers and Al Qaeda and all these

22   other really bad terrorist groups just so the jury hears them

23   and starts to associate first Hamas, and through Hamas the

24   Defendants, with those other terrorist organizations.  It just

25   seems completely unnecessary to me and horribly prejudicial.

1    The only point that that witness Doctor Hoffman is going

2    to support is a point that two witnesses will already

3    establish for the Government and that we are not going to

4    dispute fundamentally.  We are certainly going to dispute the

5    point about the zakat committees, but that is not what Hoffman

6    is going to testify about.  His point is Hamas has a social

7    wing, and so do lots of other terrorist organizations.  We are

8    not disputing that Hamas is a terrorist organization and that

9    it has a social wing.  So his testimony is just, it is pure

10   prejudice.

11        THE COURT:  As far as it goes beyond Hamas?

12        MR. CLINE:  Yes.  If he wants to come in and testify

13   about Hamas, then we get into an issue of cumulative.  We have

14   three experts.  We don't dispute that that is going to be part

15   of the case.  But to bring in these other terrorist

16   organizations is just pure prejudice.

17        MR. JONAS:  Your Honor, if I can sort of layer the

18   Government's witnesses, Doctor Levitt is going to come in and

19   talk about, as Mr. Jacks said, what we call Hamas 101.  He is

20   basically going to educate the jury on Hamas structure,

21   history leaders, that sort of thing.  Doctor Levitt will talk

22   about the social wing in general, give a couple of examples so

23   the jury early on knows that there is a social wing and what

24   it does.  So to put on a layer, Doctor Levitt is sort of

25   10,000 foot approach.

1    Avi gets into the weeds of the social wing on the ground,

2    gets into a lot of specific details and how certain specific

3    committees of the social wing are controlled by a part of

4    Hamas. He is right there.

5    Doctor Hoffman is 30,000 feet. And the reason we think

6    Doctor Hoffman's testimony is very relevant sort of goes back

7    to what Mr. Jacks argued earlier. There is going to be a lot

8    of evidence of charity in this case. The Defense is going to

9    bombard, and understandably so, the jury, and I am not saying

10   we agree with it, but they are coming at the jury with

11   pictures of children, pictures of giving aid with food to

12   needy families, pictures of demolished homes, and they are

13   going to -- in an attempt to water down the nature of Hamas

14   and its violent activity and terrorist activities.

15   There is an undercurrent of, as Mr. Jacks said, "Hamas

16   isn't so bad. Both sides are bad. There is this charity

17   wing, and the charity wing is good, and in a sense, yeah, we

18   understand the law from the Judge, but we are going to ignore

19   it and find these Defendants not guilty because they are doing

20   good." And there was one potential juror who commented on

21   that. And if the Judge recalls, you rehabilitated him on it,

22   but he had some hesitation.

23   And that is a concern of ours that the jury is going to

24   have the same hesitation when they see all the evidence

25   presented by the Defense.

1    What Doctor Hoffman does is he explains to the jury,

2    "Look, Hamas has a social wing.  Yes.  They are not the only

3    ones.  Other terrorist organizations do, and there are other

4    terrorist organizations that don't."  And he is going to

5    explain the difference how these terrorist organizations

6    operate, in general.  And he is going to explain how ones that

7    do not have the social wings are not very successful and do

8    not last very long because they, unlike the ones with social

9    wings, do not win the hearts and minds of the population.  He

10   is going to explain winning the hearts and minds of the

11   population by the terrorist group is very important for it to

12   succeed in its goals of toppling a government, if that someone

13   of its goals.

14       And, of course, he will pepper his testimony with

15   examples.  And these examples are going to include some groups

16   that are Islamist groups, like Hamas, and some groups that are

17   not Islamist groups, like the IRA.  And I think it is very

18   important for the jury to understand that Hamas isn't all

19   about charity or is not half about charity; that that charity

20   is a means to an end, and that end is a destruction of the

21   state of Israel.

22       MR. CLINE:  And Doctor Levitt will cover everything

23   he just said about Hamas, and you will see how well he covers

24   it.

25       MR. JONAS:  Your Honor, I don't think I can add more

1    than that to say that Doctor Hoffman will show that this is

2    not just a Hamas MO; that this is a plan, for lack of a better

3    room, a guide followed by other terrorist organizations

4    successfully.

5         MS. HOLLANDER:  Your Honor, let me start by saying

6    we just spent two days telling these jurors -- the Government

7    spent two days telling juror, after juror, after juror, after

8    juror, this case is not going to be about Al Qaeda it is not

9    going to be about Iraq or about any other organizations; it is

10   going to be about Palestine Israel and Hamas.  The only

11   purpose of doing this is to prejudice this jury.  It has no

12   probative value whatsoever.  If Hamas -- they can talk about

13   Hamas all they want.  But they can't -- I mean, there is no

14   reason to do it except to pull the jurors back in and have

15   them thinking about Al Qaeda and 9/11 and all of these other

16   organizations.  Their discussion with Doctor Hoffman listed

17   the Tamil Tigers and the IRA.

18       But the other thing I wanted to say is that we are not

19   introducing evidence to water down Hamas.  We are introducing

20   evidence to show the need in Palestine.  And the need existed

21   before Hamas and it existed after Hamas.  The need existed and

22   continues to exist.  And that gets back to the zakat

23   committees and back to the other problem here with this

24   evidence they want to introduce that they found at the zakat

25   committees, and why we had asked for letters rogatory to try

1    to see the same documents that have seen, because there are

2    tens of thousands of documents.

3         They went in -- It is actually part of the story of what

4    was going on there, why Israel had what was called Operation

5    Defensive Shield, why they went into the West Bank and took

6    all of these documents, had to do with some suicide bombings,

7    and those had to do with something else that Israel had done.

8    And that is what happens over there.  One thing happens and

9    another thing happens, and then, I mean, there is tragedy and

10   there is people killed on both sides.

11        But they went into these zakat committees and took

12   everything from them.  And Doctor Levitt has seen this

13   information, and Avi has seen it, and Lior has seen it, and we

14   have had no opportunity to see it.  So we don't even know what

15   else they have.  We don't know what other videotapes were in

16   the zakat committees.

17        And this particular one, this graduation, was taken off

18   the TV in 2007, six years after Holy Land closed, and that is

19   one of the things that they want to introduce.

20        And they want to introduce documents that were found at

21   the Holy Land office, but only the ones that they want to

22   introduce; not anything that shows -- And last time they

23   resisted every time that we actually tried to show what Holy

24   Land did--the need, the demolished homes, the work that Holy

25   Land does--because the Government's position is that they want

1    to keep this jury focused on Hamas and the violence of Hamas

2    at the same time that the Government doesn't -- claims that

3    they don't want to talk about the Palestinian-Israeli

4    conflict.

5         And this evidence of acts of terrorism by Hamas, which is

6    how they are going to start if they do it like they did last

7    time, and evidence of these other organizations have nothing

8    to do with Israel and Palestine, have no probative value, so

9    that the prejudicial --

10        THE COURT:  She stated, Ms. Shapiro -- Mr. Dratel,

11   you had something you wanted to say?

12        MR. DRATEL:  What is the relevance of how other

13   terrorist organizations do things?  It is really about how

14   Hamas does it and whether these zakat committees are part of

15   that.  I don't know if the Court has read the transcript.

16   There was not any word from the Defense that Hamas does not

17   have a social wing.  There was never an argument of that.

18   There was never an argument that Hamas is not a terrorist

19   organization.

20        The argument is what is the character of the zakat

21   committees in the context of the Defendants' knowledge --

22   Actually there are two elements--Defendants' knowledge but

23   also the actual committees themselves and where they are on

24   the ground in West Bank and Gaza.  So the notion of how some

25   other terrorist organization conducts business is not relevant

1    to our discussion here, because we are not saying there is no

2    social networking in terrorism.  We are never said that.  So

3    it is really not relevant.

4        I don't see why you would need a 30,000 foot picture when

5    you have a picture on the ground, which is what they are

6    saying.  It is redundant and it is all about the prejudice of

7    this sort of global nature of terrorism, which we spent three

8    days trying to refine so it is focused on what the allegations

9    are.  It almost gets to the point of an amendment and a

10   variance in the sense that we are really talking about now

11   other groups, other issues as opposed to what is charged in

12   the indictment and what other issues in the case that the jury

13   is going to have to decide.

14            THE COURT:  Thank you.

15            MS. MORENO:  One final thing, Your Honor.  Being so

16   intimately involved in the voir dire for the last three days,

17   I want to remind the Court that there were many panelists who

18   said, "As long as this case has nothing to do with 9/11 I can

19   be fair."  As soon as the specter of Al Qaeda and Osama bin

20   Laden is raised, that, I feel, constitutes a fraud upon what

21   those jurors were led to believe about what was really going

22   on in this case.

23            THE COURT:  As I understood what you were saying,

24   Ms. Shapiro, another area way that this other organization

25   comes in is because you seized some items from the Holy Land

1    Foundation that refers to them, or what do you have?

2    Documents?

3          MS. SHAPIRO:  Pictures, lots; yes.

4          THE COURT:  And why would that not be relevant?

5          MR. CLINE:  Actually, Your Honor, that was something

6    I meant to bring up at the end of the day.  We just got these

7    pictures a few days ago maybe a week ago.

8          MS. SHAPIRO:  Well, they were off the computers

9    which Ms. Hollander has had since 2002 or before.

10         MR. CLINE:  I don't know when we got the computers.

11    There is a lot of stuff on the computers.  These were

12    presented to us as exhibits the Government wanted to admit

13    within the last week.  We are still trying to figure out

14    exactly what they are, and we are going to be filing a motion

15    on this.

16         THE COURT:  Let's assume that is what the Government

17    says they are, for argument's sake.

18         MR. CLINE:  Here is the thing.  First of all, if

19    they were pictures of Osama bin Laden --

20         THE COURT:  Let's leave a side bin Laden.  I think

21    he does have different problems maybe than some of these

22    others.

23         MR. CLINE:  Let's just take the easiest example.  If

24    Ghassan Elashi had on his computer a big picture of Sheikh

25    Yassin and another great big picture of some other Hamas

1    leader I would be hard-pressed to say that that is not

2    relevant.  But I don't think that is what we have here.

3         What we seem to have, and this is what we need to explore

4    and we haven't had a chance to explore it yet, we have

5    pictures related to Hamas that were taken off what appear to

6    be the, and I am learning this lingo as we go along and so

7    this is provisional what I am about to tell you, but it

8    appears to be cache files, which means these are things that

9    somebody who might have been surfing the internet and looking

10   at a whole bunch of stuff but not downloading anything, if you

11   are surfing the internet and you click on a picture and you

12   look at that for a second and then you think "I am not

13   interested on that," and go to the next thing, that picture is

14   stored on your computer in what is called a cache file, I

15   believe that is what it is called.  And it stays there for a

16   while.  It looks to us like that is what this is.

17        In other words, this isn't somebody at the Holy Land

18   Foundation downloading this stuff and saving it and thinking

19   this is important.  If anybody at the Holy Land Foundation,

20   you know, on a coffee break was surfing the web and happened

21   to open up a picture of somebody in Hamas, that ends up going

22   into this cache file.

23        Now, we think that is what is going on, but we haven't

24   had a chance to explore it yet because we didn't know the

25   Government wanted to use this.  That is one issue.  These may

1    be just somebody surfing the web and not downloading anything,

2    nothing like that.

3         Beyond that, it is very hard to tell where these things

4    came from.  We know that some of them came out of the Chicago

5    office of the Holy Land Foundation.  None of the Defendants in

6    this case were located at the Chicago office, none of the

7    individual Defendants.  Some came from New Jersey and some

8    came from Dallas.

9         And then there is a question of whose computer they came

10   off of.  Because again, if it turns out that what we have from

11   Dallas, let's say, is somebody in the mail room who surfed the

12   web and happened to click on a few pictures of Hamas people

13   and those got stored in this temporary cache file, but didn't

14   download them or anything else, none of the Defendants did

15   this.  It is very hard to see how that is relevant, or of much

16   relevance, and it is certainly going to be prejudicial.

17        On the other hand, if it turns out that I am wrong about

18   the whole cache file business and the Defendants were

19   downloading pictures of Hamas people and storing them on their

20   computers, well, that may have some relevance.  I don't think

21   that is what happened.

22             THE COURT:  I think Hamas issue, I will let it go to

23   the weight.  I think the Government, obviously, might have a

24   different view on that than yours, and you can argue that and

25   the jury can make its own decisions, as long as it is Hamas.

1    I am really asking about the other organizations, the other

2    names, the other terrorist organizations.  And from what you

3    stated, you have some information --

4          MS. SHAPIRO:  The only photos, the pictures that we

5    I believe turned over, the vast majority are Hamas.  There

6    might have been a couple of Nasrallah that is Hezbollah.

7    There were a bunch of bin Laden, and there were some that were

8    pictures of bus bombings, Hamas bus bombings in Israel, in

9    other words, the scene of the destruction.  There were some

10   that were burning American flags, Palestinians burning

11   American flags.  I think that covers it.  There weren't other

12   terrorist organizations other than that.

13         THE COURT:  So a few maybe of Hezbollah and then

14   some of bin Laden?

15         MS. SHAPIRO:  Yes.  And just to be clear, there are

16   some that came from Chicago, but Holy Land Foundation is a

17   Defendant in this case, and that was a Holy Land office in

18   Chicago.  So it is clearly relevant.

19        Some of them came from New Jersey where I believe Mr.

20   Odeh was the sole representative.  And a lot of them came from

21   Richardson.  So it is clearly relevant as to whether they were

22   cache files or downloaded files goes to weight.

23         MS. HOLLANDER:  Your Honor, let me just add, there

24   were more than 20 computers in Dallas, and probably 40

25   different employees over the years that came and went and used

1    those computers, many of whom were low level employees.

2              THE COURT:  Well, I think anything that has to do

3    with Hamas, it is going to come in.  That is the issue here is

4    whether they were related to Hamas.  So anything that goes to

5    weight -- And I know you have your theory.  Of course, they

6    have their theory.  That is what the jury is going to be

7    resolving.  So I don't have any real question.  I think with

8    Hamas it is fairly clear cut.  I am trying to focus in on some

9    of the others.  I am just troubled, frankly, whether I am

10   going to let you get into anything on bin Laden.

11             MR. JACKS:  Your Honor, let me make this statement.

12   As you just said, they have their position and sometimes they

13   get a little carried away, they being the Defense.

14             THE COURT:  I think I have seen that maybe across --

15             MR. JACKS:  I agree.  I will confess to that that.

16   We all get wrapped up in our representation.  But I don't

17   expect there will be any connection to this case to 9/11.

18             THE COURT:  Once you start trying to connect it to

19   bin Laden, that is going to be 9/11.  There is no way around

20   it.

21             MR. JACKS:  I understand it.  But if it is something

22   that these Defendants chose to do, or if they have it in their

23   possession, that is indicative of their state of mind, it is

24   indicative --

25             THE COURT:  Well, it may be indicative of some state

1   of mind.  I don't know that it is indicative to the charges

2   here.  That is what we have to keep focusing on here.  The

3   charges here are are they related to Hamas, and so that is

4   what we have to focus on.  They may not have been related to

5   Hamas, but they may have liked bin Laden.  That is just not

6   the same thing.  And one doesn't lead, to me, to conclude that

7   because they may have been fans of bin Laden, or what have

8   you, somebody there, that that means they were connected to

9   Hamas.

10      And the problem is that is when you really start getting

11  into the 403 issue.  Maybe it does.  Maybe there is some

12  argument that you can make, "Well, they are obviously

13  connected to terrorist groups," but because of the 9/11

14  situation, and what we heard from virtually -- so many of the

15  panel members, then you start getting into a real possibility

16  of prejudice, of unfair prejudice.  Obviously all this is

17  prejudicial, but the unfair prejudice, because people will

18  start linking it in to 9/11.  And then they start getting mad

19  or upset and they are going to get convicted because of some

20  perceived link with bin Laden and 9/11.  That should not

21  -- This case should not turn into that.

22      We told them all it wasn't connected, and it isn't.  The

23  charges don't connect it.  And so any evidence that I think

24  leads us there is highly suspect in my mind, and you are going

25  to have a hard time with that.  But I will certainly take a

1    look at what you have.

2         But obviously before you get into anything like, I would

3    want to give them notice and let me know with bin Laden.  I am

4    still -- So we are there with that one.  We are still dealing

5    with these others that don't have that kind of baggage with

6    them or that kind of association with them.

7              MS. SHAPIRO:  The only other things in there other

8    than bin Laden, as I said, were some pictures of Nasrallah

9    from Hezbollah.  And I am not wedded to those.  If that helps

10   to give up Nasrallah, I can do that.

11             THE COURT:  I am still trying to work my way through

12   that and see whether that is relevant.  And again, I

13   understand the relevance that you are trying to link, that

14   these people are tied into terrorist organizations.  Bin Laden

15   is just so loaded that I think that is a fairly easy 403 call

16   that we don't want to go there.

17             MR. JACKS:  And there is just -- As another example,

18   there is a newspaper photograph that has been cut out that was

19   seized in the New Jersey office of the Holy Land Foundation,

20   and it is a picture of three men.  It is Khalid Mishal the

21   head of Hamas, Yousef Qaradawi a Sheikh, and Hassan Nasrallah

22   the head of Hezbollah, and they are together in that

23   photograph.  And that was cut out of some newspaper and kept

24   in the Holy Land Foundation office in New Jersey.  And the

25   fact that somebody would cut it out and keep it we believe is

1    relevant and probative.

2          THE COURT:  Well, and it may be.  But that is where

3    I am still struggling with trying to work my way through other

4    terrorist organizations.  My ruling with respect to bin Laden

5    would still be the same.  I just still think you are injecting

6    issues that we don't need to inject here.  They are not

7    necessary because of the unfair prejudice that is attached to

8    that.  So I think anything with respect to bin Laden, just be

9    sure you approach the bench before you get into anything that

10   has to do with bin Laden or Al Qaeda, anything like that.

11        The other one, you have got a few there from Holy Land

12   and then you say you had some items that were seized from the

13   zakat committees.

14        MS. SHAPIRO:  The items from the zakat committee, my

15   memory is that they are all Hamas.

16        THE COURT:  So not any from the other organizations?

17        MR. CLINE:  There were a few bin Laden ones.

18        THE COURT:  I have ruled on bin Laden.

19        MS. SHAPIRO:  Those were the ones that were, as I

20   said the all star terrorist posters, and none of them were bin

21   Laden alone.

22        THE COURT:  And the ruling with bin Laden will be

23   the same regardless of where that comes from.  And so would

24   you want to get into pictures that don't have bin Laden but

25   other terrorist organizations or other leaders of terrorist

1    organizations?

2         MS. SHAPIRO:  My memory is that the ones that we

3    introduced were of Hamas.  Again, there might have been a

4    couple of Hezbollah leaders who were together with Hamas

5    leaders.

6         MR. CLINE:  May I suggest -- We understand your

7    ruling on Hamas.  We understand your ruling on bin Laden.  May

8    I suggest that on the others we take them up as they come up?

9    There aren't a lot.

10         THE COURT:  That is a good idea.  That way we don't

11    have to --

12         MS. HOLLANDER:  And I just want to kind of second

13    that, because we are still getting the Government's exhibits.

14    We got some more today, and so some others may come up that we

15    don't even know about and we just have to raise them when they

16    come up.

17       On this list, I mean, if there is anything else you want

18    us to discuss I am happy to do it.  We briefed it in about as

19    much detail as we could think of at the time.

20         THE COURT:  So let's just do it this way.  Of

21    course, bin Laden approach the bench.  And then you will

22    approach the bench if it is any other terrorist organization

23    other than Hamas.  There is not that many of them, and we will

24    just take those up as you think you need to get into it.

25         So I guess I will grant the motion in limine.  That is

1    the upshot of this.  I will grant the motion in limine with

2    respect to terrorist organizations other than -- Of course

3    that didn't address Doctor Hoffman.

4              MR. CLINE:  And Your Honor, on that one, too.

5              THE COURT:  I understand that was your first

6    argument.  You led up with that.

7              MR. CLINE:  But I am big on context here.  He is

8    going to come after Levitt.  Right?

9              MR. JONAS:  Much further after Levitt.

10             MR. CLINE:  I think, Your Honor, it would make more

11   sense to take up -- You understand our position on the 403

12   issue.  I think it would make a lot more sense to take it up

13   after you have heard Levitt.

14             THE COURT:  So that doesn't look like we will be

15   getting, and you know the trial better than I know it, but we

16   won't be getting into any other terrorist organizations, then,

17   before then?  Is that safe to say?

18             MR. JONAS:  Doctor Levitt very briefly talks about

19   some other Palestinian rejectionist groups in connection to

20   Hamas; not a lot of detail about it.  It is all contextual to

21   Hamas.  For example, PLO is certainly I think relevance there.

22             MR. CLINE:  I don't think that is a problem.

23             THE COURT:  You don't have a problem with the

24   other Palestinian organizations?

25             MR. CLINE:  The way Doctor Levitt talks about it, I

1    think that is fine.

2         THE COURT:  Anything beyond that, be sure you

3    approach the bench if you think you need to get into it.

4         MS. SHAPIRO:  Only in that the executive order that

5    designates Hamas also designates another number of other

6    terrorist organizations, and that was in evidence last time,

7    and I don't expect there would be an objection to that.

8         THE COURT:  It doesn't do anything to link these

9    Defendants with them, so I think that would be all right.

10       All right.

11        MS. HOLLANDER:  They also have another expert, Your

12   Honor, Doctor Fighel, who also I think talks about zakat

13   committees.

14        MS. SHAPIRO:  Colonel Fighel, I think we advised the

15   Defense it would either be him or Avi.  So right now our

16   intention is not to use Colonel Fighel.

17        MS. HOLLANDER:  Okay.  Thank you.

18        THE COURT:  And you stated there were some others

19   you would like to have rulings on.  Would you like to identify

20   those any further?

21        MS. HOLLANDER:  I don't know that we need any of

22   these right now.

23        THE COURT:  Did we address the indictments and

24   convictions?  You are not going to go into that.

25        MR. JONAS:  That is correct, Your Honor.  The only

1    issue in our opinion is the experts can rely upon it.

2            THE COURT:  That is right.  That has been covered.

3            MS. HOLLANDER:  Your Honor, one of the issues that

4    we raised was I believe the Government probably intends to

5    introduce evidence that in 2002 Israel designated certain

6    organizations as unlawful organizations, and we also think

7    that that is wholly irrelevant.  It is also hearsay, raises

8    confrontation issues for the same kinds of reasons that

9    Mr. Cline raised.

10       It also was another government under entirely different

11   procedures, whatever they are.  Israel actually has separate

12   procedures for how they designate terrorist organizations and

13   how they designate unlawful organizations.  And it was after

14   Holy Land closed.  And part of our motion in limine was to

15   exclude any reference of those, which it may be something that

16   comes up during opening statement.  I can't really remember.

17           THE COURT:  Do you want to address that, the Israeli

18   designation?

19           MS. SHAPIRO:  They are relevant and probative for

20   the same reason that evidence past 2001 is relevant.

21           THE COURT:  I agree that post 2001 evidence could be

22   relevant.  If it gets too far removed, we may have an issue,

23   but I am not in agreement with your arguments that anything

24   post December 4th, 2001 is not relevant.  It can be relevant.

25   But specifically what is the -- I don't -- Are you just

1    objecting to that because it is post December 2001, or are you

2    just generally saying it is not relevant?

3            MS. HOLLANDER:  Well, it is not relevant.  It is

4    also hearsay.  I think it raises confrontation issues.

5            THE COURT:  But your basis for not relevant, is it

6    solely because it was after 2001, or is there some other basis

7    for that?

8            MS. HOLLANDER:  The relevance issue is that it was

9    after 2001 and it is not something that our government did.

10   It has no probative value.

11           MS. SHAPIRO:  The designations are certified as

12   appropriate under --

13           THE COURT:  Let's assume you get over that hurdle,

14   why is that relevant?

15           MS. SHAPIRO:  It is relevant because it is the same

16   zakat committees that are in issue in the indictment.

17           THE COURT:  So it is designating those committees?

18           MS. SHAPIRO:  Those specific committees, at least

19   the Israeli government recognizes that Hamas when they are

20   designated is unlawful.  Now, they can certainly argue as a

21   matter of weight that the jury shouldn't put much weight

22   because it is another government with other procedures, but

23   again, it is weight, not admissibility.

24           MS. HOLLANDER:  It is still hearsay, Your Honor.

25           THE COURT:  I will deal with it.

1      MS. HOLLANDER:  And I think it raises serious

2  confrontation issues.

3      THE COURT:  I understand that argument.  I will give

4  you a ruling on that by Monday morning, if not tomorrow.

5      MS. HOLLANDER:  I don't think there is anything else

6  that we can't raise when it comes up, unless Your Honor in

7  reviewing this wants --

8      THE COURT:  No, I have reviewed it, but I think if

9  you are comfortable with that, I can -- And any events

10  occurring after December 2001, that is too broad.  There are

11  certainly some things after 2001 that could shed some light,

12  and it could be circumstantial.  They can always argue it.  It

13  didn't start in 2002.  This is obviously something that had

14  been going on.  Those are things that go more to weight.

15      You can get far enough removed that maybe it starts

16  losing it probative value, but I just think you need to bring

17  that up on an item by item basis.

18      MR. CLINE:  Your Honor, may I take up a couple of

19  other open issues just in the nature of updating you?

20      THE COURT:  Yes.

21      MR. CLINE:  There is this issue of the photos.  We

22  may file a motion on those.  The ones recovered from the

23  computer, we are still trying to figure out what the story is

24  with those.

25      You may recall we had a discussion of the CIPA -- our

fourth CIPA Section 5 notice having to do with Avi and Major

Lior.  And if you recall, we were going to provide some

questions to the Government and they were going to look into

them.

We did provide the questions to the Government.  I

understand they have been checking those out with the

Government of Israel, and we may -- I understand that I will

soon get a response to which ones are in and out, and there

may be issues that we need to take up.

MS. SHAPIRO:  We have looked into those, and I do

owe Mr. Cline a letter on those.  The vast majority of those

are not going to elicit classified information and they won't

be a problem.  There were one or two things that I will spell

out in the letter and we can discuss them at that point.

MR. CLINE:  And we can see where we stand.

THE COURT:  Sure.

MR. CLINE:  The other thing is we filed a pleading a

couple of days ago, I think, dealing with this discovery order

that Your Honor issued in August.

THE COURT:  Yes.  And I think you were getting a

response in today.  Have you gotten a response?

MR. JACKS:  No.  It should be in by today.

MR. CLINE:  I just wanted to make sure that didn't

get under the radar screen.

THE COURT:  We were looking at it but I think

1  Jennifer talked to somebody and they said we would get a

2  response today.

3  MS. SHAPIRO:  There is just one other issue.  We had

4  filed a motion that essentially asks the Court to adopt Judge

5  Fish's evidentiary ruling with respect to the Defensive Shield

6  documents.  Those are the documents we were discussing

7  earlier.  If it is possible to rule on that prior to trial --

8  THE COURT:  We have a draft order on that as well.

9  We will look into that.  We will get an order out hopefully

10  tomorrow so you all will have it by Monday morning.

11  Any other issues?

12  MR. CLINE:  That is it for the Defense.

13  THE COURT:  Mr. Jacks?

14  MR. JONAS:  I was just going to say scheduling for

15  Monday.

16  THE COURT:  Yes.  Monday morning we will start at

17  9:00 with the jury.  Of course I will impanel them and then

18  give them their oath and give them their instructions, and

19  then we will read the indictment and get the pleas.  And then

20  we will go to opening statements.

21  And who is making the opening statements?

22  MS. SHAPIRO:  I will, Your Honor.

23  THE COURT:  How much time are you --

24  MS. SHAPIRO:  I am hoping no more than an hour.

25  THE COURT:  Okay.  And then do we know the order

1    over here?

2         MS. CADEDDU:  Your Honor, may I just interject.  I

3    don't believe we have an amended copy of the indictment that

4    has redacted the dismissed counts, so we request we be

5    provided with that.

6         MR. JONAS:  Your Honor, we have one and have it

7    ready to email.

8         THE COURT:  You might want to submit one to us also

9    so I can have it.

10        MS. HOLLANDER:  Your Honor, we haven't actually

11   talked about order.  I think there is probably no question

12   that I will go first.

13        THE COURT:  How about time, at least the time.  You

14   all can work out the order and let me know Monday morning, but

15   how much time?  Can we do 15 minutes per party?  That will be

16   about an hour and 15 minutes.

17        MS. HOLLANDER:  I can't do it for 15 minutes.

18        THE COURT:  I am just testing you just in case you

19   would agree to 15 minutes.

20        MS. HOLLANDER:  I have done some really short

21   openings.  I once did one in eight minutes.  Probably 30 to 45

22   minutes.  Can I have 45 minutes, and I probably won't --

23        THE COURT:  Let me see where everybody else is.

24        MR. DRATEL:  My opening at the last trial was eight

25   pages of transcript.  I don't think I will go a page or two

1   beyond that.

2           THE COURT:  How long was that, do you think,

3   time-wise?

4           MR. DRATEL:  I think about 12 minutes.

5           THE COURT:  You did do 15 minutes.  It wasn't that

6   unreasonable.  So you are at 15 minutes again.

7           MR. DRATEL:  Fifteen will do it.

8           THE COURT:  I will hear from everybody that is going

9   to do it.

10          MR. WESTFALL:  Your Honor, may I have like 25

11  minutes?

12          THE COURT:  All right.  And then Ms. Moreno?

13          MS. MORENO:  About 25 to 30 minutes.

14          THE COURT:  Ms. Cadeddu, that leaves you.

15          MS. CADEDDU:  Oh, goodness, Your Honor.  How about

16  -- I don't think I used all my time last time either.  I think

17  I went about 15 or 20, but can I ask for 25 and go shorter.

18          THE COURT:  Okay.  Let me take a look at this, and

19  if there are some changes we will email you tomorrow and let

20  me know.  And let me know at some point what the order is so I

21  can just call it out as you are up.

22          MR. CLINE:  May we just email you in the next couple

23  of days with that?

24          THE COURT:  Sure.  I guess tomorrow since Monday we

25  are -- I don't need to know until Monday morning as far as

1  order, frankly, but I will email you tomorrow on the time that

2  we settle on.

3       Anything else we need to address?

4            MR. JONAS:  No, sir.

5            THE COURT:  From the Defense side?

6            MR. WESTFALL:  No, Your Honor.

7            THE COURT:  See you Monday morning, then.

8            MR. CLINE:  I am sorry.  On the time, Your Honor, I

9  don't know how you contemplate doing it, but if we could have

10 a total allotment for the Defense so that we can divide it up.

11           THE COURT:  For the opening?

12           MR. CLINE:  Yes.

13           THE COURT:  And I can do that.  Let me go through

14 with what you have said and come up with a total, and then I

15 don't think it is going to be significantly different.

16           MR. CLINE:  That is correct.  I just -- Because if

17 we have to trim a little bit, we may try to figure out --

18           THE COURT:  And I don't have a problem with that.

19 In fact I will do that.

20      Be here at 8:30 Monday morning in case anything we need

21 to take up, we will take that up so we can start promptly with

22 the jury at 9:00.

23      Yes, sir?

24           MR. DRATEL:  Mr. El-Mezain has a cushion due to

25 arthritis.  If he could just bring it into the courtroom

1   starting Monday.

2           THE COURT:  Not a problem.

3           MS. HOLLANDER:  And we will be in the other

4   courtroom.  Is that right?

5           THE COURT:  Yes, we will be down on 15 where we did

6   the jury impanelment on September the 4th.

7                   (End of Day.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts              06/03/2009

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25