IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CAUSE NO. 3:04-CR-240-P |
| | ( | |
| vs. | ) | |
| | ( | SEPTEMBER 24, 2008 |
| | ) | DALLAS, TEXAS |
| HOLY LAND FOUNDATION, ET AL | ( | 9:00 A.M. |

_____

VOLUME 8 OF 37

_____

STATEMENT OF FACTS

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

_____

A P P E A R A N C E S

FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                      1100 COMMERCE, 3RD FLOOR
                      DALLAS, TEXAS  75242
                      BY:  MR. JIM JACKS
                           MR. BARRY JONAS
                           MS. ELIZABETH SHAPIRO

FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
(SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
                      20 FIRST PLAZA, SUITE 700
                      ALBUQUERQUE, NEW MEXICO 87102
                      BY:  MS. NANCY HOLLANDER
                           MS. TERESA DUNCAN

```
1          FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
           (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
2                               NEW YORK, NEW YORK  10005
                                BY:  MR. JOSHUA DRATEL
3                                    MR. AARON J. MYSLIWIEC

4          FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
           (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
5                               DALLAS, TEXAS  75204
                                BY:  MS. MARLO P. CADEDDU
6
           FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
7          (GHASSAN ELASHI)     P.O. BOX 10985
                                TAMPA, FLORIDA  33679
8                               BY:  MS. LINDA MORENO

9                               JONES DAY
                                555 CALIFORNIA ST., 26TH FLOOR
10                              SAN FRANCISCO, CA  94104
                                BY:  MR. JOHN D. CLINE
11
           FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12         (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                FORT WORTH, TEXAS  76102
13                              BY:  MR. GREG WESTFALL

14         COURT'S LAW CLERK:   MS. JENNIFER HELMS
                                1100 COMMERCE, RM. 1654
15                              DALLAS, TEXAS  75242.

16         COURT COORDINATOR:   MS. BRENDA WEBB
                                1100 COMMERCE, RM. 1654
17                              DALLAS, TEXAS  75242

18    OFFICIAL COURT REPORTER:  SHAWN M. McROBERTS, RMR, CRR
                                1100 COMMERCE STREET, RM. 1654
19                              DALLAS, TEXAS  75242
                                (214) 753-2349
20

21

22

23

24

25
```

# <u>INDEX</u>

**EXAMINATION**

| Witness Name | Page |
|---|---|
| MATTHEW LEVITT | |
| Cross By MS. CADEDDU | 27 |
| Cross By MR. DRATEL | 30 |
| Redirect By MR. JONAS | 61 |
| Recross By MR. CLINE | 79 |
| Recross By MS. HOLLANDER | 83 |
| MARCIAL PEREDO | |
| Direct By MS. SHAPIRO | 88 |
| PAUL MATULIC | |
| Direct By MR. JONAS | 97 |
| Cross By MR. MYSLIWIEC | 107 |
| ATEF SHAFIK | |
| Direct By MR. JACKS | 112 |

## Government's Exhibits

| Government's Exhibits | Page |
|---|---|
| Mushtaha House No. 1 | 91 |
| Mushtaha House No. 1 | 96 |
| Hamas Letter No. 1 | 100 |
| Hamas Letter No. 2 | 103 |

## Defendants' Exhibits

| Defendants' Exhibits | Page |
|---|---|
| No. 1054 | 82 |

1    THE COURT:  Good morning.

2    MS. CADEDDU:  I believe we have a couple of pending

3    issues.  We had the motion to compel and we had the hearsay

4    issue as well, so I wanted to ask you about those.

5    THE COURT:  I think it is hearsay.  In looking at

6    the issue and discussing it and thinking about it, I know, Mr.

7    Cline, you were saying the evidence is what the witness is

8    going to say, but you are offering an out-of-court statement,

9    and your argument for why it is not hearsay is that it is not

10   hearsay because it is offered for the truth, which I think

11   that is the only way you can go.  There is no exception that

12   applies that I can see.

13   And you are offering the statement by this person,

14   Ms. Roy, that Doctor Levitt's methodology is not valid, and

15   you are offering it for the truth of that assertion.  I think

16   it is hearsay and I think you are offering it for that

17   purpose.  I think you are entitled to get into that, but in

18   the proper form, not through hearsay, and I think this is

19   hearsay.

20   MS. CADEDDU:  Your Honor, I just want to make it

21   clear for the record that I am impeaching Doctor Levitt with

22   his statement that he made that his research methodology is

23   the gold standard and that it has been described by others as

24   the gold standard.

25   THE COURT:  I understand the impeachment, and you

1   are entitled to impeach, but I don't think you can do that

2   through hearsay.  That is not an exception to the hearsay

3   rule.  That is hearsay, so you can't get into that specific

4   statement.

5       Remind me, Ms. Hollander, of this issue on the Islamic

6   University of Gaza, this document that you sought to

7   introduce, your Defense Exhibit No. 1094, and then you wanted

8   only a portion of it?

9           MS. HOLLANDER:  I am happy to just have the portion

10  that I read in, Your Honor, and the part at the top that just

11  says where it came from, that it was the United States cable.

12          THE COURT:  And what is the issue you are wanting to

13  get it in for?

14          MS. HOLLANDER:  Doctor Levitt testified on direct

15  that the University of Gaza was founded by Hamas leaders, and

16  this is a cable from the United States saying -- basically

17  impeaching that.  It is also an admission from the United

18  States, and it is not hearsay under 803(8)(C), because they

19  are factual findings.  There is no issue as to its

20  authenticity.  The Government stipulated to that.

21      So the only issue would be whether it is hearsay, and it

22  is not hearsay for the two reasons that I mentioned.  First of

23  all, it is an admission of the party opponent.  When the

24  government makes statements in a case in which it is the party

25  opponent, they are admissions.  And it is clearly the United

1    States government, or alternatively 803(8)(C).

2         But since it does have other things in it, and I

3    understand that, I am quite content to take it back and redact

4    it just to the statement that I admitted plus where it came

5    from.

6              THE COURT:  That paragraph No. 2?  You don't that

7    have before you?

8              MS. HOLLANDER:  But I know where it is.  It is

9    paragraph No. 2.

10             THE COURT:  Founded in 1978, that statement?

11             MS. HOLLANDER:  Right.  Just exactly what I read.

12   And then just at the top of the page where it says where it

13   came from.

14             THE COURT:  Right.

15        And Mr. Jonas?

16             MR. JONAS:  Your Honor, we don't know the origin of

17   the report.  In other words, we don't know if that in fact is

18   an investigation -- I am paraphrasing the rule.  I don't have

19   it right now.  An investigation conducted pursuant to the

20   authority where the individual was that created it.  This

21   could be just an opinion of the person who wrote the cable.

22   We don't know that.  So we still think it is hearsay.  And let

23   them call someone from the USAID to testify about it.

24             THE COURT:  Well, I think it is sufficient on its

25   face to indicate it is some kind of government report, and

1  they were charged apparently or tasked with this

2  responsibility.  I think it is admissible.  So I will overrule

3  the objection, and you can have that paragraph 2, and then the

4  top of that document as you have stated.

5         MS. CADEDDU:  Your Honor, the index?

6         THE COURT:  Yes, the index.  Mr. Jacks, was there

7  something you wanted to --

8         MR. JACKS:  Your Honor, just yesterday during cross

9  examination by several of the Defense counsel, it seemed that

10  before there would be a question there would be like this

11  preamble or these statements that counsel would make before

12  they would get to the question, not so much really directing

13  the witness to anything they were about to ask him, but kind

14  of a rambling statement.

15     We would just ask the Court if we could just tighten it

16  up a little bit and not have, you know, the lawyers making

17  these statements about their feelings or just make a

18  statement, and instead just get to the question and tighten up

19  the cross examination.  It is hard to describe, but I think

20  you can recognize it when you see it.

21         THE COURT:  And probably the best I can do is if you

22  think some improper statement is being made, you probably just

23  need to object at that time.  Obviously counsel know the

24  rules, but if you think there is something improper that is

25  being stated, you just need to make an objection at that time

1    and I will give you a ruling.

2        Ms. Duncan?

3            MS. DUNCAN:  Your Honor, I just wanted to alert you,

4    we have some issues we would like to address to the Court in

5    regard to a later Government witness, I think the witness that

6    will be testifying after Doctor Levitt.  We can address it

7    then, but I just --

8            THE COURT:  Do you expect he is going to come on

9    this morning, or do you know?

10           MS. SHAPIRO:  Are we talking about Mr. Simon?

11           MS. DUNCAN:  No, Mr. Shafik.

12           MS. SHAPIRO:  He will be coming on this morning, not

13   immediately following Doctor Levitt.  It will be Mr. Peredo

14   will testify next and then Mr. Shafik.

15           THE COURT:  What is the issue with that --

16           MS. SHAPIRO:  I am sorry.  Two witnesses.

17           THE COURT:  You still think we will get to him today

18   before we break at 1:00.  Okay.

19           MS. DUNCAN:  The issue is yesterday afternoon --

20   Mr. Shafik is the Government's translator, and he testified at

21   the last trial about the process by which he translated the

22   Government's various exhibits.  And about a week ago the

23   Government filed a supplemental expert notice designating

24   Mr. Shafik as an expert witness.  They said out of an

25   abundance of caution, but it didn't result in surprise to the

1    Defense because he was going to be testifying to the same

2    things he testified at the first trial, which is basically the

3    correctness of his translation.

4         Yesterday Mr. Jacks informed us that his testimony is

5    going to go well beyond that, and that he is going to testify

6    that in his opinion the frequency with which the Defendants

7    and other speakers on tapes and telephone calls and documents,

8    the frequency with which they praise God is evidence that they

9    are, quote unquote, Islamists, so basically to politicize

10   their religious speech.

11        So he wanted to raise that issue before he testifies

12   because we think it is improper in and of itself, and secondly

13   that Mr. Shafik as a translator is not qualified to

14   distinguish between a person who praises God as part of the

15   Islamic faith and someone who is an Islamist.

16             THE COURT:  Some response?

17             MR. JACKS:  Your Honor, Mr. Shafik will testify that

18   in his background -- He was born in Egypt.  He is a native

19   Arabic speaker.  He has studied languages.  He has a degree in

20   British literature.  And he has been around all cultures in

21   Egypt, all different Arabic dialects.

22        In the conversations, the Defendants and others do make

23   frequent statements "Praise God," you know, "Muhammad, blessed

24   be his name," and other statements such as that, which are

25   distinctive.  And in fact, in a couple -- I believe in a

1    couple of the intercepted conversations, one of the speakers,

2    I believe it is in the Philadelphia meeting, even makes the

3    statement that, "How can we conceal who we are?  Anyone that

4    listens to us speak will know who we are and what we are

5    about."  And I am paraphrasing.

6        But Mr. Shafik will testify that persons that speak in

7    that fashion, just as this person that was intercepted

8    recognizes, are persons that are Islamists, that believe in

9    all of the principles and are strict observers of the Muslim

10   faith, and that people that speak in that fashion are -- that

11   is just without question.  Anyone that comes in contact with

12   them knows, if they speak in that fashion, that that is the

13   type of person that they are.

14       And, you know, as I said, it is raised by the evidence

15   because the Defendants -- Excuse me.  I believe it is actually

16   an unindicted co-conspirator, but themselves make that comment

17   that "the way we speak gives away who we are."  And I just was

18   going to ask him to explain that context.

19            THE COURT:  Ms. Duncan?

20            MS. DUNCAN:  Your Honor, I mean, this is really an

21   attack on the Muslim faith.  One of the fundamental principles

22   of Islam is that you praise God as often as you can.  Muslims

23   are required to pray five times a day to God.

24       The passage that Mr. Jacks is referring to, I will read

25   it to the Court, he says, "I mean, no matter what names you

will use, they will be revealed, because, my brother, you cannot hide a Muslim.  A Muslim wants to pray."  He is talking about being a Muslim.  They are Muslims.  He is not talking about being an Islamist.

This is an effort to politicize these men's religious beliefs.  I mean, the words that Mr. Jacks wants to turn into a political speech are, "God willing, by Ahmadi God, may God greet you, may God reward you."  I mean, this is pure religion.  It has nothing to do with politics.

And I would note to the Court, to the best of my knowledge Mr. Shafik is not a practicing Muslim.  He is a Christian.  And so I just don't see how he is qualified to testify that someone that says "praise God" several times throughout the day is in fact not just an observant Muslim but is an Islamist.

And, you know, in terms of the surprise, if he is allowed to testify to this, then we are going to need to bring in, you know, an expert, an emam to explain to the jury that this is an obligation on all Muslims; that prayer is not political speech, it is devotion to God.  And it is really just improper in this case.

THE COURT:  Mr. Jacks, what is the basis of his qualifications for reaching this opinion?

MR. JACKS:  Your Honor, as I said, he has lived in the Middle East until -- He has lived in Egypt until he was 27

1    or 28 years old.  He has been around all cultures, all

2    nationalities, he has gone to school with them, and he has,

3    you know, extensive experience and has crossed paths with

4    people and knows --

5            THE COURT:  All right.  I think I am getting the

6    drift.  You have to lay the predicate, obviously, when he is

7    testifying.  And before you get into the questions, be sure to

8    approach the bench and I will give you a ruling on that.  But

9    I think I am going to need to hear the predicate.

10           MR. MYSLIWIEC:  Your Honor, we just had that pending

11   motion to compel production of the index.

12           THE COURT:  Yes.  Ms. Cadeddu raised that a minute

13   ago.  We will get to that.

14       Any other issues that we need to address before we bring

15   the jury in?

16       Ms. Cadeddu.

17           MS. CADEDDU:  Yes.  I am going to let -- I don't

18   know what you would like us to do, Your Honor.  We are going

19   to need the index to cross examine Doctor Levitt.

20           THE COURT:  And then your objection to the index is,

21   to providing it, making it available is --

22           MR. JONAS:  It is not something he has testified

23   about.  It is not something he has relied upon in his

24   testimony.  It is an index of documents.  It is the documents,

25   the items themselves, that is what he relied upon as the body

1    of his work.  They are not entitled to it.  Judge Fish

2    addressed this issue in terms of what they are entitled to in

3    regard to the Government's notice of the expert witness.  And

4    that is pretty much it, Your Honor.

5              THE COURT:  Okay.

6              MR. MYSLIWIEC:  Your Honor, I am sure you have

7    looked back at Judge Fish's order and I went and looked at it

8    after Mr. Jonas discussed it the other day.  It is clearly

9    about disclosure at the pretrial stage, and whether or not to

10   disclose everything at that point rather than just a written

11   summary.

12        Here we are now at the trial stage.  Rule 705 comes into

13   play, and having access to the underlying data comes into

14   play.  And Mr. Levitt has testified about seeing these

15   documents, about the fact that they are the basis of his

16   opinion.  And this index is something he reviewed in relation

17   to those documents.

18        Whether he said the word index specifically or not in his

19   testimony here before this jury isn't the point.  It is

20   clearly a document that goes to these issues.

21             THE COURT:  Okay.  Does somebody -- I think I am

22   going to need someone, Defense counsel ask Doctor Levitt some

23   questions about that index and whether he relied on just those

24   types of issues to develop.  I hear your argument, but I

25   haven't heard any testimony to that effect.

1           MR. DRATEL:  Your Honor, he did testify that the --

2           THE COURT:  In the book.

3           MR. DRATEL:  No.  He testified here that the

4    materials that were seized by the Israelis he relied on in

5    reaching his conclusions.  That is what the index is.  So just

6    to say, "I saw these documents and I have a list of them," is

7    not to say that it is not part of his testimony.  I think is

8    parsing it beyond, which the Government is trying to do, is

9    parsing it beyond reality.  The fact is he relied on the

10   materials that are in that index.  That is what he is relying

11   on --

12          THE COURT:  That is what that is not clear to me, in

13   fact.  I don't think anybody made that link.  He relied on

14   some documents that were seized.  I don't know that that is

15   what is on the index, or if the index is more inclusive than

16   that.  I don't know any of that.

17          MR. MYSLIWIEC:  Your Honor, there is one other

18   thing.  He testified specifically in his *Daubert* hearing that

19   he relied on this index as source material.  And so whether he

20   has now put this issue before the jury I think is a separate

21   point.  He has --

22          THE COURT:  I am not talking about before the jury.

23   I need some more information before I can make a ruling on

24   that issue.

25          MR. MYSLIWIEC:  I did cite to exactly where he

1    testified about this index in the transcript.

2         THE COURT:  I still think you may be being

3    overinclusive.

4         MS. CADEDDU:  I want to make the point, Your Honor

5    -- I have a different point to make about the index.  I talked

6    with Doctor Levitt about selection bias, and the index is

7    going to be -- It is going to be, I suspect, I haven't seen

8    it, but I suspect it is going to be more inclusive than the

9    documents he chose to include.  That actually goes directly to

10   his bias.  That tells me what selection bias there is.  So I

11   believe it is relevant for that purpose.

12        THE COURT:  All right.

13      Doctor Levitt, do you have this index available?

14        THE WITNESS:  I have the index, and I can explain it

15   and maybe clarify a lot of what is going on.

16        THE COURT:  If you would.

17        THE WITNESS:  Sure.  I don't know that I have seen a

18   single document cited in that index.  It is a very partial

19   index in Hebrew.

20        THE COURT:  And who prepared that index?

21        THE WITNESS:  I don't know.

22        THE COURT:  You received it.

23        THE WITNESS:  I received it from the Israeli

24   government.  I assume it was prepared by the people who

25   actually seized the documents, which would be the Israeli

1   military, the IDF.  I did not receive it from the IDF.  It is

2   also marked confidential and was given to me in that context.

3        But I got this separate from those documents that I was

4   able to review, seized documents.  This is a completely

5   separate issue.  In that regard, all I have is this list that

6   there were documents seized.  I don't know that I have

7   actually ever seen any one of those documents, and, therefore,

8   I have not relied on the index in any testimony I have given

9   in this trial.

10           THE COURT:  And so you were given the index, and

11  then you were given access to some documents, or all

12  documents.  What were you giving access to?

13           THE WITNESS:  I was given access to some documents.

14  There is a huge warehouse of documents, so seeing all is just

15  not possible.

16           THE COURT:  Right.

17           THE WITNESS:  It was also relatively early on after

18  they had been seized, so there hadn't been an opportunity to

19  go through very many of them.

20       And in a completely separate meeting, I think it was

21  actually a completely separate trip--research for this book

22  was over several years.  It might have been separated by even

23  a year or two.  I think it was--I received this index, which

24  was just a summary of material that had been seized from some

25  of these various offices, specifically zakat committees, but I

1    was not given any of the underlying documents.

2              THE COURT:  That that index refers to?

3              THE WITNESS:  Correct.

4              THE COURT:  Just the index as a summary.

5              THE WITNESS:  Correct.  And the citation to the

6    index in the book doesn't pretend to have seen any of the

7    underlying documents.  It cites to what types of materials

8    were claimed to have been seized.

9              THE COURT:  Okay.

10             THE WITNESS:  Not based on the summaries.

11             THE COURT:  So you are saying you have not seen any

12   of those documents that are referred to in that index.

13             THE WITNESS:  Not no my knowledge.  It is possible

14   some of the documents that I have seen are on that index.

15   There are no specific numbers.  There is no identifier for the

16   document.  It is a very brief descriptor.  It looks like a

17   very initial index probably -- and sometimes it is very

18   colloquial.  It is typed up, but it is if at some point it is

19   someone's notes as they were going through the material in the

20   first iteration.  So I don't know that it would even be

21   possible to determine.

22             THE COURT:  How long is this index?

23             THE WITNESS:  Like 20, 30 pages, I think.

24             THE COURT:  And is the Government -- Are you

25   treating this as classified information?

1          MR. JONAS:  No, we are not treating it as

2    classified.

3          THE COURT:  You are just saying the Defense is not

4    entitled to it.

5          MR. JONAS:  Right.

6          THE COURT:  And part of the concern I have, and of

7    course this was raised again at the last minute, but Judge

8    Fish's order dealt with it under Rule 16(a)(1)(G), which is

9    what is required to be in the summary that you provide to

10   Defense counsel, and he stated the summary was sufficient.

11   There is a request for it under 16(a)(1)(E), the material

12   documents.

13         MR. MYSLIWIEC:  Also under 705.

14         THE COURT:  I am not sure 705 does anything other

15   than refer you back to the rules of discovery, and then

16   whether you are entitled to that or not, I don't think 705

17   gives you any additional grounds for entitlement to that.

18       And so we have got -- We have this issue of whether they

19   are entitled to it pursuant to Rule 16, not (G), not pursuant

20   to this summary of a report that the Government has to provide

21   that Judge Fish found was sufficient.  They have moved away

22   from that now and they are saying they are entitled to it, for

23   one, 705 for cross examination purposes, and also under 16(E),

24   that it is material to the Defense and that they are entitled

25   to that.  And you know, that has not been addressed.

1    It wasn't addressed in Judge Fish's order.  I don't know

2  whether that was raised before Judge Fish.  In fact, your

3  briefing that was filed that resulted in that order didn't

4  mention -- it mentioned Rule 16 globally, but it didn't

5  mention rule 16(a)(1)(E).

6         MR. JONAS:  May I address that, Your Honor?

7         THE COURT:  Yes.

8         MR. JONAS:  They haven't seen this list.  They want

9  to use this list to cross examine Doctor Levitt on his bias.

10  They don't know what is in it.  How can that be material to

11  the Defense?  How can they establish it is material to the

12  Defense, which I believe they have to do, if they don't know

13  what is on it.  It is a fishing expedition and that is all it

14  is.

15         THE COURT:  Well, they asked him some questions at

16  the *Daubert* hearing.  Obviously they are entitled to explore

17  it to try to make a determination -- somehow they have to be

18  able to try to make this determination as to whether it is

19  material.

20         MR. JONAS:  Let them ask him questions about that

21  here.

22         THE COURT:  And that is where I was heading in terms

23  of the questions you had asked.  I don't think you are there,

24  other than, "We would sure like to see it."  And based on what

25  Doctor Levitt stated, I don't think you are there.

1          MR. JONAS:  Your Honor, may I make one other point

2     on that?

3          THE COURT:  Yes.

4          MR. JONAS:  The Defense has inferred, if not

5     actually said, that Doctor Levitt or the Israeli government

6     are acting on behalf of the United States government, that

7     this was a joint investigation, and that, therefore, this

8     document has been in the possession of the U.S. government the

9     whole time it is in the possession of Doctor Levitt.

10         That is not the case.  We have cooperated with -- the

11    Israeli government has cooperated with us in response to

12    Mutual Legal Assistance Treaty requests.  This is not a joint

13    investigation.  Doctor Levitt obviously was not acting on

14    behalf of the United States when he received this document up.

15         Until Monday we have never seen it, never possessed it,

16    and we just received it in response to the Defense request

17    that Doctor Levitt bring it with him.

18         MS. CADEDDU:  I would like to ask, because Mr. Jonas

19    made a point that he wasn't operating on behalf of the U.S.

20    government when he received it.  If he could tell us when he

21    received it, that would be helpful.

22         THE COURT:  You are entitled to ask questions.  If

23    you want to ask him questions, go ahead.  I invited counsel to

24    ask questions about this issue.

25         MS. CADEDDU:  So you would like to ask him now, Your

1    Honor?

2         THE COURT:  Yes.

3         MS. CADEDDU:  Doctor Levitt, when did you receive

4    the index?

5         THE WITNESS:  I don't know the date, but I can give

6    you a time period because the research for the book was

7    concluded -- I think the last major research trip was November

8    2004, so that would have been the latest time I would have

9    gotten it.  I was in no way employed by the U.S. government at

10   that time.

11        MS. CADEDDU:  And you have characterized it, you

12   said it is handwritten or typed?

13        THE WITNESS:  It is typed.

14        MS. CADEDDU:  It is typed.  But you believe it to be

15   an early index of the documents as they were initially gone

16   through by the IDF?

17        THE WITNESS:  That is right.  I mean, it is clearly

18   very, very partial.  And some of the language is -- it is

19   almost in shorthand, almost colloquial in terms of, you know,

20   "found poster," a quick description of the poster, where it

21   was found, this type of thing.  It doesn't sound like, you

22   know, a normal government document would sound.  It sounds

23   like this is one of their early efforts right after they took

24   material to begin to catalog it.

25        It also doesn't have, as I mentioned, any identifier.

1    Usually a document, like in court here, will say, you know,

2    Exhibit 1-A or something so you can then refer back to it, and

3    it doesn't have anything like that either.

4            MS. CADEDDU:  Does it identify the documents seized

5    by zakat committee, or how is it organized?

6            THE WITNESS:  I believe it is by zakat committee.

7    There might be other institutions also, but there are at least

8    some zakat committees there.

9            MS. CADEDDU:  And I am sorry.  What was the second?

10   You said there might be something else also.

11           THE WITNESS:  There might be some other institutions

12   from which they took documents.  They didn't only raid zakat

13   committees.  They also raided Palestinian Authority

14   Intelligence offices, et cetera.  I don't know if those are in

15   there, too.  It might only be zakat committees, and not all

16   zakat committees either.

17           MS. CADEDDU:  And is this like what we would think

18   of as a chain of custody kind of report where it says where in

19   the particular zakat committee a particular document was

20   seized, like such and such an office or such and such a

21   computer?

22           THE WITNESS:  I don't recall them saying anything

23   that specific.  There will be a title of the name of the zakat

24   committee, and then it will say something like, you know, "Box

25   A," and a list of types of things, "Box B," a list of types of

things.

MS. CADEDDU:  And those are the boxes that the --

THE WITNESS:  I don't know.  This is what it says.

MS. CADEDDU:  Would you like to refer to the list while you are testifying?

THE COURT:  I don't want to take the time to do that.  Are you about finished with your questioning?

MS. CADEDDU:  Well, I would like to talk to Mr. Mysliwiec because he was the one who drafted the motion.

THE COURT:  Go ahead and do that, but I am going to go ahead bring the jury in.  Are you prepared to continue your examination?

MS. CADEDDU:  I am.

MR. DRATEL:  Your Honor, may we approach just for one moment to save time?

(The following was had at the bench.)

MR. DRATEL:  I wanted to take this up outside the hearing of the witness.  My intention, part of my cross examination would be to talk about him receiving in confidence, not about discovery, not about obligations or turnovers, but just that he received this document in confidence from the Israelis, and some of the things he said about it is a partial list, the length of it.  Nothing about discovery.  I wanted you to know that --

THE COURT:  Why would that be relevant as far as --

1        MR. DRATEL:  Bias and knowledge and reliance, you

2   know, in terms of the basis for what he has had access to and

3   things like that as an expert.

4        MR. JONAS:  I guess whose bias?

5        MR. DRATEL:  His bias.

6        THE COURT:  One at a time.  We all know that.

7      Because the Israeli government gave him access to it?

8        MR. DRATEL:  Yes.

9        THE COURT:  Okay.  Well, let me give that some

10   thought.  Are you coming up next?

11        MR. DRATEL:  Yes.

12        THE COURT:  How much longer do you have?

13        MS. CADEDDU:  I am almost done, Your Honor.

14        MR. JONAS:  If I can raise one point?

15        THE COURT:  Yes.

16        MS. JONAS:  A question that Ms. Cadeddu asked the

17   witness just now is about "Does this list show where the

18   material was found?"  That is a big cross examination of one

19   of the witnesses the Government is going to call later, Major

20   Lior.

21        MR. DRATEL:  I don't intend to ask --

22        MR. JONAS:  If I can just finish.  That is one of

23   the big cross examinations of Major Lior.  To me this is a

24   transparent move to get this list so they can use it against

25   Major Lior and not to question Doctor Levitt.

1          THE COURT:  That doesn't matter.  The issue is are

2    they entitled to it.  Whatever use they think they need to

3    make of it, we have to deal with that later.  I don't think

4    that is a basis for not letting them have it if they are

5    otherwise entitled to.  I just don't think you have shown that

6    you are entitled to it.

7          MR. JONAS:  I mean, it is just that they couched

8    this whole argument in an attempt to show Doctor Levitt's

9    bias, and that is why I raise that issue.

10          THE COURT:  That is how they are trying to get the

11    question before him, so that is still a separate issue.

12          MR. DRATEL:  And I think that just -- Like I said, I

13    am not going to go into a question of discovery or

14    entitlement, but just that an expert who gets something in

15    confidence from a party, you know, that is involved --

16          THE COURT:  Do we know that others were not given

17    access?

18          MR. DRATEL:  Yes, we will find out from subsequent

19    witnesses.  I can ask him.  He knows that they don't broadcast

20    it to the world.  That is why he was given it in confidence.

21          MS. HOLLANDER:  He testified that the only reason

22    the Center of Special Studies got it, that the way he knows

23    that they are not really an NGO is that they must be

24    affiliated with the Government, because otherwise they

25    wouldn't have the documents.  He said that.

1      MR. DRATEL:  Other witnesses testified to that

2  previously.

3      MR. CLINE:  Just one other point.  If Your Honor is

4  inclined to deny the discovery request, and I understand that

5  you are, because it is a relatively non-voluminous document,

6  can we get a copy made part of the record under seal?

7      MS. HOLLANDER:  As a court exhibit.

8      THE COURT:  Probably.  I think that may be a good

9  idea for appellate review.  That may be the way to do it.  Why

10 don't you submit it to me in camera.  I thought about doing

11 that anyway, just to take a look at it.

12     MR. JONAS:  It is in Hebrew, Your Honor.

13     THE COURT:  No translation with it?

14     MR. JONAS:  No.

15     THE COURT:  Then I don't need a copy.  I can't do

16 anything with it.

17     MR. DRATEL:  But it should be part of the record.

18     MR. JONAS:  That is fine.

19     THE COURT:  We will make it part of the record.

20    Let me give that some thought, the area of cross

21 examination that you were referring to.  Just let me know when

22 you are ready, and then I will give you a ruling.

23          (The following was had in open court.)

24     THE COURT:  If you will bring the jury in.

25          (Whereupon, the jury entered the courtroom.)

1          THE COURT:  Ladies and gentlemen of the jury, good

2    morning.  We are ready to proceed.

3        Ms. Cadeddu?

4          MS. CADEDDU:  Thank you, Your Honor.

5    Q.   (BY MS. CADEDDU)  Doctor Levitt, I wanted to go back to

6    something you talked about on direct examination yesterday,

7    briefly.  I think it was yesterday, maybe the day before.

8        You talked about a number of books that you use in part

9    of your -- as part of your research.  And I think that you

10   said what you do is you review them and test your conclusions

11   against those books.  Is that right?

12   A.   In part.  The books are one part of the information you

13   check your work against.  The question I was responding to is

14   a question are there other books on Hamas that you have read

15   in the course of your research.

16   Q.   Okay.  And those would be books that you would rely on to

17   vet your work?

18   A.   In part.  Some books are better than others especially,

19   and on this subject some books are better than others.

20   Q.   Absolutely.  One of the books I think you mentioned is a

21   book buy a gentlemen Azzam Tamimi.  Is that right.

22   A.   That is right.

23   Q.   In fact, I think I saw that Ms. Shapiro has it on her

24   desk.

25          MS. CADEDDU:  May I borrow that for a second?

1    Q.   (BY MS. CADEDDU)   This book, <u>A History From Within</u>, is

2    that a pretty recent --

3    A.    Within the past year or two, yes.

4    Q.    Okay.  And Mr. Tamimi talks -- You have read this book

5    you said.  Right?

6    A.    I have.

7    Q.    And in his introduction he talks about how there are some

8    books written about Hamas that have a pro-Israeli bias and

9    that rely largely on Israeli security documents.  Do you

10   remember that?

11   A.    In his opinion, yes.

12   Q.    And one of the books that he talks about that does that

13   is yours.  Right?

14   A.    That is right.

15   Q.    Now, I also wanted to ask you about the Operation

16   Defensive Shield documents that we talked about.  And to

17   orient us for a second, those are the documents seized by the

18   IDF, the Israeli Defense Force, the army.  Right?

19   A.    Yes.

20   Q.    In the incursion we talked about that began in 2002?

21   A.    Correct.

22   Q.    And those Operation Defensive Shield documents were

23   seized by the army and then placed in a warehouse.  Right?

24   A.    At least some of them, yes.

25   Q.    And that warehouse is located in Israel somewhere.  Where

1   is it?

2   A.    It is.

3   Q.    Where?  Which city?

4   A.    It is near Tel Aviv.  I don't know what it is called.

5   Q.    And you have actually visited that warehouse.  Right?

6   A.    I was there once, yes.

7   Q.    And it is, I guess, full of documents?

8   A.    Yes.  I don't know if it still is, but when I was there

9   it was.

10  Q.    It was when you were there?

11  A.    Yes.

12  Q.    Let's see here.  And when did you go to that warehouse?

13  A.    I don't recall the date, but it would have been between

14  -- Obviously after the raids, which started in March or April

15  2002.  Probably 2003 or 2004.

16  Q.    Okay.  And at that time --

17  A.    That was the period I was doing the research, so it was

18  somewhere in there.  I don't remember the date.

19  Q.    I didn't mean to interrupt you.  Are you done?

20  A.    I am sorry.  Yes.

21  Q.    And you had access to at least some of the documents that

22  were in that large warehouse.  Right?

23  A.    Correct.

24  Q.    Obviously not all of them, because it was full of

25  documents.

```
 1    A.    Correct.

 2    Q.    You had access to them, but you didn't look at all of

 3    them is what I am saying.

 4    A.    Correct.

 5              MS. CADEDDU:  Pass the witness.

 6              THE COURT:  Thank you.

 7         Mr. Dratel?

 8              MR. DRATEL:  Thank you, Your Honor.

 9                      CROSS EXAMINATION

10    By Mr. Dratel:

11    Q.    Good morning.

12    A.    Good morning.

13    Q.    Now, when were you at the Department of Treasury?

14    A.    2005; November 2005 through January 2007.

15    Q.    Okay.  And your book was published in 2006?

16    A.    It came out, yes, 2006.  I forget the month.

17    Q.    And you were working on it during that period?

18    A.    No.  I don't know what period you are talking about, but

19    I was not working on it while I was at Treasury, other than I

20    got permission to update the introduction conclusion per the

21    elections that had just happened just to note that they

22    happened.

23    Q.    So the answer is yes.

24    A.    Only on that --

25    Q.    That is part of the book.  Correct?
```

1    A.    Yes.  But I don't want you to think that I was working on

2    the whole book.

3    Q.    I didn't say the whole book.  I said the book.  Correct?

4    That was the question--were you working on the book.

5    A.    That part, yes.

6    Q.    Now, what is your customary hourly rate?

7    A.    I am sorry?

8    Q.    What is your customary hourly rate?

9    A.    $200 an hour.  I presume you mean for trials like these.

10   Q.    You said your hourly rate was higher, you testified on

11   direct.

12   A.    No.  What I testified is the going rate is much higher,

13   and that my colleagues who do this think I am a fool for

14   charging so little.

15   Q.    How much do they charge?

16   A.    As much as $500 an hour.

17   Q.    Now, you testified about Mousa Abu Marzook.

18   A.    I did.

19   Q.    As a Hamas official.

20   A.    Correct.

21   Q.    And in fact, he has a brother who is, or was, a general

22   in the Palestinian Authority.  Correct?

23   A.    That is right.  I don't know if he still is, but at least

24   was.

25   Q.    Yes.  And the Palestinian Authority is the -- it still is

1    to a certain extent the government in the West Bank and Gaza.

2    Correct?  To a certain extent?

3    A.    It gets complicated, doesn't it?

4    Q.    Yes.

5    A.    Not in Gaza.  Hamas is in control of Gaza now, but the

6    Palestinian Authority is now again in control of the West

7    Bank.

8    Q.    And was in control of both for a long period of time from

9    the Oslo Accords until 2005.

10   A.    That is right.

11   Q.    And essentially the opposing organization of Hamas, the

12   Palestinian Authority, for a long period of time.

13   A.    Yes.

14   Q.    And would you agree it is very common in Palestinian

15   circles within one family for there to be members of multiple

16   factions?

17   A.    Yes.

18   Q.    In fact, there are many other examples that you could

19   give.

20   A.    Yes.

21   Q.    You also testified about Hassan al-Banna.

22   A.    Yes.

23   Q.    Just to reorient the jury, he was the founder of the

24   Muslim Brotherhood.

25   A.    Correct.

```
1    Q.    In 1928.

2    A.    Correct.

3    Q.    And said on the first slide of your PowerPoint on the

4    Hamas charter, the --

5    A.    Yes.

6    Q.    The charter refers to him as a martyr?

7    A.    Correct.

8    Q.    And he wasn't a suicide bomber.  Correct?

9    A.    No, he was not.

10   Q.    He was, in fact, assassinated in 1949.

11   A.    I don't remember the year, but he was killed, yes.

12   Q.    Was it in the 1940s?

13   A.    Around then, yes.

14   Q.    And, in fact, he was killed in Egypt on the street.

15   A.    That is right.

16   Q.    And certainly not Hamas -- he was certainly not a Hamas

17   person.

18   A.    No.

19   Q.    And Izz el-Din al-Qassam, who you mentioned the military

20   brigade of Hamas is named after.  Correct?

21   A.    That is right.

22   Q.    And you testified about him as well on direct.  And he is

23   not a current figure either.  Right?

24   A.    No.  He was killed.

25   Q.    In 1936.
```

1    A.    That is right, in one of these clashes with the British.

2    Q.    By the British.  He was killed by the British.

3    A.    That is right.

4    Q.    At that time in 1930s, in '36 to the founding of the

5    state of Israel, in fact, there were also Jewish groups acting

6    in opposition, and sometimes violent opposition, to the

7    British.

8    A.    That is right.

9    Q.    You testified on direct about the Islamic Action Front.

10   A.    Correct.

11   Q.    And again just to reorient the jury, that is an

12   organization in Jordan.  Correct?

13   A.    Correct.

14   Q.    It is a political party in Jordan.

15   A.    It is the Muslim Brotherhood political party in Jordan.

16   Q.    And, in fact, they hold seats in the parliament and run a

17   slate of delegates or parliament candidates --

18   A.    They do.

19   Q.    -- in the elections, and some of them have won.

20   A.    I am sorry.  I feel like I am interrupting.  I don't know

21   when to answer you.

22   Q.    Some of them have won and then sit in parliament.

23   A.    Correct.

24   Q.    And Jordan is a country that is at peace with Israel?

25   A.    Since 1995.

```
1   Q.   And which has diplomatic relations with Israel?

2   A.   Yes.

3   Q.   And the Muslim Brotherhood operates openly in Jordan as

4   the Islamic Action Front.  Correct?

5   A.   Correct.

6   Q.   Yet Hamas was expelled from Jordan.

7   A.   Correct.

8   Q.   And remains in that capacity; not permitted in Jordan.

9   A.   Correct.

10  Q.   Take Syria, by contrast.  Khalid Mishal, who you

11  described as the head of the political wing of Hamas, he

12  resides in Syria.  Correct?

13  A.   He does.

14  Q.   And Hamas has an office in Syria, essentially?

15  A.   It does.

16  Q.   Yet the Muslim Brotherhood is outlawed in Syria.

17  Correct?

18  A.   I believe they are banned.  I don't know if it is by law

19  or --

20  Q.   In fact, it is a capital offense, is it not?

21  A.   I don't know.

22  Q.   In fact, in 1980, the Syrians razed, when I say razed,

23  R-A-Z-E-D, wiped out virtually an entire city to try to wipe

24  out the Muslim Brotherhood.

25  A.   They wiped out --
```

1    THE COURT:  Mr. Dratel, I don't understand why this

2  kind of detail is going to be helpful here about Hamas.  And I

3  understand we had to get into some mention of that, but we are

4  going into a lot of detail about issues that I don't see

5  ultimately is going to help the jury --

6    MR. DRATEL:  I will move on, Your Honor.  He is

7  talking about Muslim Brotherhood in his --

8    THE COURT:  Yes, but we are getting way beyond just

9  mentioning them and describing them.

10    MR. DRATEL:  Okay.

11  Q.   (BY MR. DRATEL)  You talked about Muslim Brotherhood

12  philosophy.  Correct?

13  A.   Correct.

14  Q.   And you talked about jihad and the two types of jihad.

15  A.   Correct.

16  Q.   And in fact, the Muslim Brotherhood philosophy of jihad

17  is one that is more oriented towards personal betterment.

18  Correct?

19  A.   It has two halves to it, and the first half is to

20  personal betterment and returning to traditional adherence to

21  the faith, and then the second phase, by their ideology, would

22  be the more violent jihad against the perceived enemies of

23  Islam.

24  Q.   And one of the objections of some terrorist groups is

25  that that will never happen, that first part, so that it will

1   never get to the violent jihad because the Uma, the Muslim

2   world, will never return in a timely fashion; that it was too

3   slow.  Correct.

4   A.   Again, I don't think it is the never.  I think it is the

5   timely fashion.  And not only that, but that by participating

6   in the more militant jihad, that can bring people, by this

7   ideology, closer to their personal improvement as well by

8   flipping the order.

9   Q.   But the principle Muslim Brotherhood jihad, the first

10  jihad is personal betterment?

11  A.   I describe it as returning to the faith, and I don't know

12  that they describe that as a jihad.

13  Q.   Haven't you testified to that in the past?

14  A.   I don't know that I have.

15  Q.   Okay.  Did you testify last year, 2007, as follows, "In

16  other words, the Muslim Brotherhood felt that it was incumbent

17  upon Muslims to return to core elements of the faith for the

18  Muslim nation, for the Uma, to return to the proper practice

19  of Islam and they called that a jihad, in this context an

20  effort at personal betterment"?

21  A.   I don't know, but that sounds like something I would say.

22  It is right.

23          MR. DRATEL:  May I approach, Your Honor?

24          THE COURT:  Well, I don't think he is denying he

25  said that.

1          MR. DRATEL:  He said "I don't know."  I want to make

2   sure that is clear.

3          THE WITNESS:  I think I agreed with it.

4          THE COURT:  He said it sounded like something he

5   would say, counsel.

6          MR. DRATEL:  Can I just clear it up, Your Honor?

7          THE COURT:  All right.  Go ahead.

8          THE WITNESS:  We want to see what this is, first,

9   don't we?  If this is what I said -- This is what I said.

10  Q.   (BY MR. DRATEL)  Okay.  So you agree that was your

11  testimony?

12  A.   Yes.

13  Q.   Thank you.  Now, with to Islamic organizations, religious

14  organizations, in the occupied territories after 1967, you

15  testified on direct about Israeli promotion of such

16  institutions after 1967.  Right?

17  A.   Correct.

18  Q.   And, in fact, the number of mosques in the occupied

19  territories, West Bank and Gaza, doubled between 1967 and

20  1986.

21  A.   I don't have the numbers in front of me, but that sounds

22  right.

23         MR. DRATEL:  May I approach, Your Honor?

24         THE COURT:  Yes.

25  Q.   (BY MR. DRATEL)  Here is a copy of your book.

1   A.   It is a pretty good source.

2   Q.   I just want to make sure that is not just something that

3   sounds right.  This is something you wrote in your book.

4   Correct?  Page 24?

5   A.   Let's see.  Where are we looking here?

6   Q.   If you look at the end of that first long paragraph,

7   there is a sentence that reads, "For example, Israeli

8   authorities permitted the number of mosques in the Gaza Strip

9   to double from 1967 to 1986."

10  A.   That is right.

11  Q.   Okay.  So you wrote that?

12  A.   I did.

13  Q.   And the civil administration -- Withdrawn.  Israel ruled

14  the occupied territories during that period until the Oslo

15  Accords were implemented in '94-'95 by a civil administration

16  and a military administration that ruled the occupied

17  territories.

18  A.   Correct.

19  Q.   And that civil administration, that Israeli civil

20  administration sanctioned these religious organizations and

21  their development.  Sanction meaning they permitted them.

22  Right?

23  A.   Correct.

24  Q.   And one such institution was the Islamic Center that was

25  founded by Sheikh Yassin.

1    A.    That is right.

2    Q.    And the Israeli Government sanctioned Dawa activity, what

3    you called Dawa activities.   Correct?

4    A.    That is correct.

5    Q.    By the way, you said a couple of times that you didn't

6    speak Arabic, but I assume you don't read Arabic either.

7    A.    Correct.

8    Q.    And just going back to the brotherhood for a second,

9    Yasser Arafat was actually originally with the Muslim

10   Brotherhood.   Correct?

11   A.    He was.   He left, but he started off in the Muslim

12   Brotherhood.

13   Q.    And also the Muslim Brotherhood, you talked a little bit

14   about how it operates, but in fact there is a substantial

15   amount of autonomy for individual branches around the world in

16   terms of each country.

17   A.    Yes.

18   Q.    You testified on direct about the relationship between

19   the Palestinian Authority and Hamas.   And again, the

20   Palestinian Authority is the governing body of West Bank and

21   Gaza as a whole.   Correct?

22   A.    In general terms.   Again, shifted back and forth, so --

23   Q.    I am not talking about which party controls, but the

24   actual governing body is the Palestinian Authority.

25   A.    Correct.

```
1    Q.    And for the first ten years of the Palestinian Authority

2    it was run by Fatah, F-A-T-A-H?

3    A.    Dominated by Fatah.  There were others in there, too, but

4    it was heavily dominated by Fatah.

5    Q.    Right.  And Yasser Arafat, who was the president of the

6    Palestinian Authority until he died, was the first president,

7    and president until he died, was the head of Fatah.

8    A.    That is right.

9    Q.    And Fatah, as you mentioned, is what we call secular,

10   non-religious government.  Its party.

11   A.    The party, right.

12   Q.    And as you said, between 1997 and 2001, I think you

13   described it as a state of extreme confrontation with Hamas.

14   A.    Yes.

15   Q.    And --

16   A.    2000 not 2001.

17   Q.    And you have described the Fatah run Palestinian

18   Authority during that period of time as infamously corrupt.

19   Correct?

20   A.    Yes.

21   Q.    And that corruption included the inability to deliver

22   appropriate services to the population.

23   A.    Yes.

24   Q.    Social services.

25   A.    Yes.
```

```
1   Q.   And that contributed to the dire need that you

2   acknowledge exists in the West Bank and Gaza.

3   A.   It is part of the problem.

4   Q.   Right.  So that even though there was a government other

5   than Israel nominally in control of those areas, it still

6   failed to deliver the necessary social services.

7   A.   That is right.  And that is why the United Nations had to

8   play such a prominent role.

9   Q.   The United Nations has been doing that since 1948.

10  A.   In different ways.  The U.N. support in the wake of the

11  Oslo Accords was even more significant.

12  Q.   But still not enough to meet the total need.

13  A.   I don't think so.

14  Q.   And I think you have written in your book, and would you

15  agree, that Hamas versus let's say Fatah it was really a

16  struggle for the control of the Palestinian Authority for the

17  government of the Palestinian territories?

18  A.   I wouldn't put it only that way because that is

19  misleading, but part of their struggle was a political

20  competition within the Palestinian political spectrum even as

21  it was, you know, this violent activity as well.

22  Q.   Right.  But the Hamas goal is to supplant Fatah as the

23  control of the Palestinian --

24  A.   That is one of its goals on its road to its larger goal

25  of --
```

1    Q.   I just asked if that was its goal with respect to the

2    Palestinian Authority.

3    A.   That is one of its goals.

4    Q.   You wrote another book previous to your book on Hamas.

5    Correct?

6    A.   More of a monograph, but yes.

7    Q.   And in that book you discuss some of the other funding

8    that was provided, particularly during the first Intifada.

9    Correct?

10   A.   Correct.

11   Q.   And just to orient the jury again the time frame that we

12   are talking about, 1988 to --

13   A.   I do not know what you are referring to.  You have the

14   book in front of you, I don't, so you will have to lead me on

15   what you are asking me.

16   Q.   Sure, I will be happy to.  Well, the Likud uprising is

17   actually the second Intifada.

18   A.   Yes.  Well, really Al-Aqsa Intifada.

19   Q.   The Saudi government provides has provided extensive

20   support financially to Palestinians in the context of that

21   second Intifada.  Correct?

22   A.   For a period of time it did, primarily through Hamas.

23   Q.   But you wrote, didn't you, that the Saudi Committee for

24   the Support of the Al-Qud's uprising -- And again, the

25   Al-Qud's uprising being the second Intifada.  Right?

1    A.    Correct.  That was the name of the committee.

2    Q.    According to the website, the committee provided $5,333

3    to the family of every Palestinian killed in the Intifada.

4    A.    Correct, through many of these charity committees.

5    Q.    Right.  Total disbursements of $133 million as of May

6    2002.

7    A.    Again, I am assuming.  I don't have the number.

8    Q.    Do you want to see it?  I would be happy to show it to

9    you.

10   A.    That would be great.

11   Q.    Page 82 where the post-it is.

12   A.    Thank you very much.  Those are the right numbers.

13   Q.    And if you keep it there -- And in fact, it also -- you

14   also describe you say that Sheikh Yassin, the founder of

15   Hamas, went on a fundraising tour in the Gulf states raised

16   $300 million to $400 million?

17   A.    $300 million to $400 million.

18   Q.    Thank you.  Now, also yesterday you testified that you

19   had not -- have not visited any of the zakat committees.

20   Correct?

21   A.    I might have visited one a long time ago, but I have not

22   done a study or toured them, no.

23   Q.    Right.  But didn't you testify last year, last July, July

24   2007, when asked about visiting zakat committees, you said,

25   "It raises an interesting point.  I think I will next time I

1   go visit," meaning visit one.  Do you remember giving that

2   testimony?

3   A.    No, but I could have.

4   Q.    Let me show you.

5   A.    I am not contesting it.

6   Q.    It is not a question of contesting.  Let's get the facts.

7   Please read the highlighted portion.  Tell me whether you

8   testified to it.

9   A.    That is.

10  Q.    Okay.  Thank you.  And you have been to Israel and the

11  West Bank since.  Correct?

12  A.    I have been to the West Bank once since then.

13  Q.    Right.

14  A.    For a day.

15  Q.    Didn't go to the zakat committees.

16  A.    Didn't have the opportunity.  I actually requested a

17  meeting, but didn't have the opportunity.

18  Q.    You testified on direct about Edward Said?

19  A.    That is right.

20  Q.    A Columbia professor.  Correct?

21  A.    Correct.

22  Q.    Columbia University.

23  A.    That is right.

24  Q.    But he was also an advisor to Yasser Arafat before the

25  Oslo agreement.  Right?

1   A.   At one point he was an adviser to Yasser Arafat, and then

2   he was a critic of Yasser Arafat.

3   Q.   I am asking before Oslo was he an advisor to Yasser

4   Arafat?

5   A.   I don't know the dates.

6   Q.   Was it a fact that he left his advisorship over protest

7   of Oslo?

8   A.   I believe so.

9   Q.   And he was not a supporter of violence.  Right?

10  A.   I couldn't hear you.

11  Q.   He is not a supporter of violence, Edward Said.

12  A.   No.

13  Q.   And you are aware that his conduct in throwing the

14  stone -- Withdrawn.  There was some testimony yesterday about

15  him throwing a stone, and you were aware of that.  You are

16  aware also that there was a controversy at Columbia over that,

17  and the University ended up defending him on the grounds of

18  free expression.  Right.

19  A.   Actually I am not aware of that.

20  Q.   You were testifying this morning about -- in response to

21  Ms. Cadeddu, and also you testified on direct about certain

22  books that you have read, and one is called Islamic

23  Fundamentalism in the West Bank and Gaza by Ziad Abu-Amr.

24  Correct?

25  A.   Correct.

1    Q.    And you describe that, not here but elsewhere, you have

2    described that as perhaps the best book.

3    A.    One of them, yes.

4    Q.    And you rely on it, obviously, in forming your research

5    and forming your opinions, to a certain extent?

6    A.    One of many sources.

7    Q.    Yes.  Let's talk about the first Intifada.  And would you

8    agree -- And let me just reorient again.  The first Intifada

9    is 1987-'88.  Correct?  It begins?

10   A.    It begins in '87, '88.

11   Q.    November '87, would you say?

12   A.    Around then.

13   Q.    And how long did it last?

14   A.    Until really the onset of the Oslo Accords around '93.

15   Q.    So it is really five, six years almost?

16   A.    Correct.

17   Q.    "The root causes of the uprising were embedded in 20

18   years of Israeli occupation" --

19        MR. JONAS:  I would object.  He is reading from the

20   book.  The book is not evidence if he wants to ask Doctor

21   Levitt as to his opinion.

22        THE COURT:  Sustained.

23        MR. DRATEL:  Your Honor --

24        THE COURT:  Before you read it, though, counsel, if

25   you want to establish something you can do that, but you are

1    reading it before that is done.

2         MR. DRATEL:  I will be happy to do this at the

3    bench -- He said -- I don't want to argue in front of the

4    jury, so I will say he did say he relies on this book among

5    others.

6         THE COURT:  Do you want to show it to him?  Before

7    you start making those kinds of statements, lay a predicate.

8    Q.   (BY MR. DRATEL)  This is the book by Ziad Abu-Amr?

9    A.   That is the book.

10        THE COURT:  Show him the paragraph.  Show him what

11   you are specifically referring to.

12        THE WITNESS:  Am I to read it or read it to myself.

13        THE COURT:  Just to yourself.

14        MR. DRATEL:  Your Honor, while he is doing that, I

15   am relying on 803, I think it is --

16        THE COURT:  In you can show that he relied on a

17   specific, but not just showing that he read that book and

18   generically relied.  If you can show a specific reliance on a

19   specific opinion, I think you are entitled to cross examine.

20   That is my ruling, counsel.

21   Q.   (BY MR. DRATEL)  In your research, and obviously -- At

22   the time of the first Intifada you were how old?

23   A.   I was in college.

24   Q.   All right.  So did you rely on these types of historical

25   commentaries and historical works in forming your opinions?

```
1    A.    About what?

2    Q.    About the Intifada, about everything that you do in your

3    work.

4    A.    I rely on historical accounts of those events.  I wasn't

5    there.

6    Q.    Okay.  And this is an historical account of the Intifada.

7    Correct?

8    A.    It is an academic's account.  He is also a player.  He is

9    not just an academic.  He is a Palestinian politician.  But

10   that would be an account that would be worth reading.  It

11   would be one side of the story, but it would be worth reading

12   that side of the story.

13   Q.    So do you agree that the root causes of the uprising were

14   embedded in 20 years of Israeli occupation and Israeli

15   policies aimed at undermining the material and national

16   existence of the Palestinians in their own land?

17   A.    I think that was a part of it.

18   Q.    And that the Palestinians believe that under the guise of

19   maintaining security, Israel had pursued a host of policies

20   detrimental to Palestinian society?

21   A.    That Palestinians believe that?  Yes.

22   Q.    That Israel had confiscated Arab land?

23   A.    Again, this is under the -- continues under the

24   Palestinians believed, yes.

25   Q.    Israeli had not confiscated Arab land?
```

1    A.    I am talking about how he is writing here.

2    Q.    But do you agree with that, that Israel confiscated Arab

3    land?

4    A.    There is disputed land.  There is some land Israeli

5    actually confiscated, other land that --

6    Q.    So that is yes.  That is yes.  You said there is some

7    confiscated.  That is yes.

8    A.    Some.

9    Q.    Okay.  And that Israel had launched an aggressive

10   settlement policy that left the West Bank and Gaza fragmented

11   both geographically and demographically.

12   A.    I am sorry.  What is the question?

13   Q.    Do you agree with that?

14   A.    I agree that this is his perspective.

15   Q.    So you don't agree --

16   A.    I don't agree that it is a legitimate perspective.

17   Q.    You don't think it is a legitimate perspective.

18   A.    This is a conflict.  There are two sides to this

19   conflict.  So if I were studying these events that I didn't

20   participate to, I would read his Palestinian version and take

21   that very much into account, I would read Israeli versions,

22   too.  But I wasn't there.  This is one reliable Palestinian

23   version.

24   Q.    And would you say that Israeli policies in its occupation

25   of the West Bank and Gaza resulted in loss of life,

1  imprisonment, detention, house or town arrests, demolition of

2  dwellings, deportation --

3         MR. JONAS:  We object on relevance.  We are now

4  getting into politics that Your Honor said we don't need to

5  get into.

6         THE COURT:  Well, I still have a problem just

7  reading out of a book that is not in evidence, counsel.

8         MR. DRATEL:  I am asking if he agrees with a

9  person --

10        THE COURT:  You are still reading from a book that

11 is not in evidence, which is hearsay, and then you are

12 asking -- It is hearsay, counsel.  That is my ruling.  I know

13 you disagree, but that is my ruling.

14        MR. DRATEL:  Thank you, Your Honor.

15 Q.   (BY MR. DRATEL)  Now, the second Intifada begins really

16 September 28th, 2000.  Right?

17 A.   Yes.

18 Q.   And it really began as a result of a visit -- Withdrawn.

19 Ariel Sharon was a candidate at the time for the Israeli prime

20 ministership.  Right?

21 A.   That is right.

22 Q.   And he arranged for a visit to the Temple mount in

23 Jerusalem.  Is that correct?

24 A.   That is right.

25 Q.   For September 28, 2000.

1    A.    That is right.

2    Q.    And that site is an extraordinarily holy site for

3    Muslims.  Right?

4    A.    Muslims and Jews.

5    Q.    Actually my question was about Muslims.

6    A.    And I am correcting you.

7    Q.    No, the question was is it --

8              THE COURT:  Counsel, that is arguing.  He has

9    answered it.  He said it was Muslims and Jews.  That is his

10   answer.  Quit arguing.

11   Q.    (BY MR. DRATEL)  And he was accompanied by about a

12   thousand police officers?

13   A.    I don't know how many, but I imagine it was a lot because

14   of the sensitivity of the site.

15   Q.    For Muslims.

16   A.    And Jews.

17   Q.    But Sharon's visiting would not be sensitive if it were a

18   holy site for Jews.  Right?  If it was just a holy site for

19   Jews, it wouldn't be a sensitive issue, would it?

20             MR. JONAS:  Your Honor, objection; relevance.

21             MR. DRATEL:  It is his answer, Your Honor.

22             THE COURT:  He didn't say it was just a holy site

23   for Jews.

24             MR. DRATEL:  No, but I am saying he said it was a

25   sensitive -- He said that police were there because it was

1   sensitive.  I want to get why it was sensitive.

2   Q.   (BY MR. DRATEL)  It was sensitive because it is such a

3   holy site for Muslims.

4   A.   Because the part of the site he was going to is where the

5   Muslim mosques are, and is especially sensitive for Muslims.

6   Q.   And the second Intifada started after that.  Correct?

7   A.   I don't want to leave the impression that that is what

8   caused this Intifada.  It was but one event.  But it did then

9   follow on the heels of that and other events.

10  Q.   And within three months, by the end of that year, 2000,

11  there were 325 Palestinians dead.  Right?

12  A.   There were dead.  I don't know the number.

13  Q.   And 36 Israelis?

14  A.   Again, there were dead on both sides, more Palestinians.

15  I don't know the numbers.

16  Q.   And more Palestinians injured.

17  A.   Probably.

18  Q.   In the order of 10 to 20, 30 times --

19       THE COURT:  We are getting into a lot of the

20  politics we discussed yesterday.  Yes, sir, it is.

21       MR. DRATEL:  Thank you, Your Honor.

22  Q.   (BY MR. DRATEL)  You talked about the deportation of

23  about 400 people from Israel in November of 1992.  Correct?

24  And you mentioned that international aid organizations came to

25  assist those deportees in Lebanon.

1    A.    That is right.

2    Q.    Including the Red Cross.

3    A.    That is right.

4    Q.    And another book that you talked about as one of the

5    valuable books I think yesterday, and you have testified it is

6    a valuable book is the book by the two Israeli scholars, you

7    mentioned Shaul Mishal and Auraham Sela.  Correct?

8    A.    Correct.

9    Q.    And you rely on that book as well?

10   A.    In part.

11   Q.    And would you agree with them that the deportees included

12   every segment of Palestinian society?

13   A.    I don't know they included every segment of Palestinian

14   society.  It certainly was dominated by Hamas and Islamic

15   jihad.

16   Q.    According to Israel.  I mean, these are two scholars you

17   rely on.  They don't agree with that.  Correct?

18   A.    Scholars frequently don't agree, and I don't have it in

19   front of me and --

20   Q.    I will show it to you.  Thank you very much.  Why don't

21   you read that sentence to yourself.

22   A.    He doesn't disagree with me.

23   Q.    I am sorry?

24   A.    He doesn't disagree with me.

25   Q.    He doesn't?

1  A.    No.

2  Q.    Don't they say --

3          THE COURT:  Counsel, how is this not hearsay?  You

4  are reading from a book that is --

5          MR. DRATEL:  He just said --

6          THE COURT:  I know, but you started it off by asking

7  him about it, and you are offering that for the truth.  It is

8  a book that is not in evidence.

9          MR. DRATEL:  He is claiming it is not in the book,

10 Your Honor.

11 Q.    (BY MR. DRATEL)  But don't they say --

12         THE COURT:  No.  You are turning right around and

13 doing what I am questioning you about.

14 Q.    (BY MR. DRATEL)  So you are saying --

15         THE COURT:  No, sir.  I am trying to get an answer

16 as to why that is not hearsay.

17         MR. DRATEL:  I am going to ask a different question,

18 Your Honor.

19         THE COURT:  All right.

20 Q.    (BY MR. DRATEL)  So you would disagree that they came

21 from every segment of Palestinian society?

22 A.    No.

23 Q.    Oh, you don't disagree with that?

24 A.    No.

25 Q.    Okay.  And did they say that -- Withdrawn.

```
 1              MR. DRATEL:  Your Honor, I am --

 2              THE COURT:  That issue?  Go ahead.

 3              MR. DRATEL:  Thank you, Your Honor.

 4   Q.  (BY MR. DRATEL)  Now, when you -- On one of your trips to

 5   Israel you received from the Israelis an index to some of the

 6   -- Withdrawn.  You received an index to documents seized as

 7   part of the Operation Defensive Shield raids.  Right?

 8   A.   Correct.

 9   Q.   And is that a very partial index, would you say?

10   A.   It seems to be.  It must be because it is not long enough

11   to be all inclusive.

12   Q.   It is 20 to 30 pages, just that index you have.

13   A.   Yeah.

14   Q.   And it is in Hebrew.  Right?

15   A.   Correct.

16   Q.   And you can read it and understand it.

17   A.   Most of it.  I am not perfectly fluent, but I get

18   through.

19   Q.   You didn't have a translated.

20   A.   I never used it in any detailed sense.  I never had the

21   need.

22   Q.   It is cited in your book.  Right?

23   A.   In a very particular and cursory context, yes.

24   Q.   And that is not a list that is available on the web or

25   that the Israeli government has made public.  Correct?
```

A.    I don't know.  Not to my knowledge.

THE COURT:  You are going exactly where you said you were not going to go.

MR. DRATEL:  No.

THE COURT:  Yes, sir.

MR. DRATEL:  Your Honor, may I --

THE COURT:  Approach the bench.

(The following was had outside the hearing of the jury.)

THE COURT:  Now, I understand you are going to try to question him.  You asked him too many questions about that index because it is not in evidence.  You got the answer that he got information that they didn't make available to other scholars, but I don't want anything hinting that you don't have it.

MR. DRATEL:  I apologize.

THE COURT:  That is where you are heading with that.

MR. DRATEL:  Where I am heading -- My next question was "They gave it to you confidentially."  That was my next question.  I wasn't going anywhere else.

THE COURT:  Okay.  That is fine.  I don't want to get into anything that somehow you all have been deprived of something.  Discovery is not an issue.

MR. DRATEL:  Absolutely not.

MR. CLINE:  Your Honor, as long as I am up here, I

1    am not asking you to revisit any of your rulings, but I think

2    you got the idea that Mr. Dratel was doing something really

3    wrong by asking him about those books.  And I am not asking

4    you to revisit it, but I do want to call your attention to

5    this.

6             THE COURT:  That is if he recognizes this as a

7    learned treatise.

8             MR. DRATEL:  Or periodical or other thing.

9             MR. CLINE:  I think he did recognize it as a learned

10   treatise, both of those books.  The reason --

11            THE COURT:  If admitted.

12            MR. CLINE:  The reason I bring this up --

13            THE COURT:  But you are reading from it before you

14   are admitting anything.  You are going into any questioning.

15            MR. DRATEL:  I am saying if he relied on it that you

16   can read it.

17            THE COURT:  If it is admitted.

18            MR. DRATEL:  It is not if admitted.

19            MS. HOLLANDER:  I think the way you are supposed to

20   do it, you ask them if you relied on this --

21            THE COURT:  Without reading it first.  You don't

22   read it first.

23            MR. DRATEL:  I did get him to say he relied on it.

24            THE COURT:  He said he read it.  He did not say he

25   relied on it.

1            MR. DRATEL:  He said he relies on all the sources.

2            MS. HOLLANDER:  If he says he relied on it, then you

3    can read it.

4            MR. CLINE:  And it is not relying on it.  It is

5    whether it is established as a reliable authority by the

6    testimony of the admission of the witness.

7            MR. DRATEL:  That is what he said, I think.

8            MR. CLINE:  The only reason I bring that up, you

9    have ruled, and I am not going to go back into it, I just

10   wanted to explain that --

11           MR. DRATEL:  It was a good faith --

12           THE COURT:  Mr. Jonas?

13           MR. JONAS:  I don't have anything to say.

14           MR. WESTFALL:  Your Honor, the subject may come up

15   again.  On the learned treatises would you like for us to,

16   once we feel like we have made the predicate, to ask the

17   Court, "May we now use this as a learned treatise?"

18           THE COURT:  Yes, that you propose -- Before you get

19   into the statements initially, yes, that you propose to do it.

20   I think you can lay a predicate and then ask if you can do

21   that.

22           MS. HOLLANDER:  And then if you agree, we can read

23   it into evidence?

24           THE COURT:  But I don't want you starting by reading

25   it.

 1           MR. JONAS:  Can I ask a clarifying question?  You

 2   pointed out that if he relied upon it, and Doctor Levitt

 3   relies --

 4           THE COURT:  I understand.  And they are saying you

 5   don't need to rely.  You need to take a look at that, and I

 6   will look at it as well.

 7           MR. JONAS:  My question is, and I am not necessarily

 8   asking for an answer right now, but I want to pose the

 9   question, is the reliance specifically to a specific point in

10   the testimony, or is it a general body of reliance?

11           THE COURT:  That appears to be a general --

12           MR. CLINE:  I think that is correct.  Maybe we can

13   all look at this.

14           THE COURT:  Take a look at that.  This is going to

15   be something that is going to be coming up.

16           (The following was had in the presence and hearing

17           of the jury.)

18           THE COURT:  Counsel?

19           MR. DRATEL:  Thank you, Your Honor.

20   Q.   (BY MR. DRATEL)  So if we get back to the index, that was

21   given to you in confidence.  Correct?  Confidentially?

22   A.   Correct.

23   Q.   By the Israelis.

24   A.   Yes.

25   Q.   Okay.  And you actually lived in Israel for two years.

1   Correct?

2   A.   As a child when my father was working there for an

3   American company.

4   Q.   What years were those?

5   A.   '79 through early -- Some point in '79 through some point

6   in '81.

7   Q.   And did you -- Withdrawn.  And there was a military

8   conflict going on at that time.  Correct?  With Lebanon?

9   A.   Not that I was aware of, but yes.

10  Q.   Okay.

11       MR. DRATEL:  I have nothing further, Your Honor.

12  Thank you.

13       THE COURT:  Mr. Jonas?

14                 REDIRECT EXAMINATION

15  By Mr. Jonas:

16  Q.   Good morning, Doctor Levitt.

17  A.   Good morning.

18  Q.   I am going to try to ask you my questions in the order of

19  the Defense attorneys who questioned you.  That is the way my

20  notes are, so starting with Mr. Cline and his questioning.

21       Do you recall Mr. Cline showed you Defense Exhibit, I

22  believe it is 963, a specially designated nationals list?  Do

23  you recall that?

24  A.   Yes.

25  Q.   You testified that Treasury designates individuals as

1    terrorists.  Do they designate other individuals on other

2    categories as well?

3    A.    Yes.

4    Q.    Could you give an example?

5    A.    Drug traffickers, for example.  There are lists for rogue

6    regimes.  There are a variety of different types of

7    Presidential executive orders authorizing the Treasury to

8    designate--that is, freeze funds and block transactions--for a

9    whole range of illicit activity.

10   Q.    And would all those different type of designations, would

11   they have been included on Defense Exhibit 963, this specially

12   designated nationals list?

13   A.    Not to my knowledge, no.

14   Q.    Was that list strictly terrorists, then?

15   A.    I don't remember the list, but I think it was just one of

16   the executive orders.

17              MR. JONAS:  Do you have No. 963?

18              MR. CLINE:  I do.  We can stipulate that it does

19   include those other categories, if you like.

20              MR. JONAS:  That is fine.

21        Your Honor, for the record the parties have stipulated

22   that that list includes these other categories of designations

23   by Treasury, not just terrorists.

24   Q.    (BY MR. JONAS)  With that stipulation, Doctor Levitt, the

25   list was thick.

1      MR. JONAS:  For the record, I am holding my hand

2  about an inch apart.

3  Q.   (BY MR. JONAS)  Is that correct?

4  A.   That is right.

5  Q.   So it is more than just terrorism designations.

6      Mr. Cline pointed out some designations of organizations

7  known as Interpal, CBSP, and al-Asqa.  Are you familiar with

8  those organizations?

9  A.   I am.

10 Q.   Are those organizations zakat committees?

11 A.   No.

12 Q.   What are they?

13 A.   They are foreign charities.  Interpal is based in Great

14 Britain, CBSP is based in France, Al-Aqsa has offices

15 throughout Europe and some in the Middle East.

16 Q.   Do you know why they were designated by the U.S.

17 government?

18 A.   They were designated for raising and transferring funds

19 for Hamas.

20 Q.   Would you compare them to Holy Land Foundation in the

21 sense of their function in that they are a charity?

22 A.   Yes.

23 Q.   Now, Mr. Cline showed you that list, again, the specially

24 designated nationals list, and asked you if certain zakat

25 committees were mentioned in the list.

1    A.    That is right.

2    Q.    Do you recall the questions?  Does the fact that these

3    Hamas -- Does the fact that certain zakat committees are not

4    mentioned in the specially designated nationals list, that

5    they are not designated by the Treasury Department, does that

6    not make them part of Hamas?

7    A.    No.

8    Q.    Does the fact that certain committees are not on the

9    list, does that mean that people, Americans, are allowed to

10   give money to those zakat committees?

11              MS. HOLLANDER:  Objection; leading, Your Honor.

12              THE COURT:  Overruled.  You may ask that.  He is an

13   expert witness.  Go ahead.

14              THE WITNESS:  I am sorry.  Can you repeat the

15   question?

16   Q.    (BY MR. JONAS)  Sure.  Does the fact that certain zakat

17   committees are not designated by the U.S. government, does

18   that mean that Americans can give money to that zakat

19   committee if it is a Hamas zakat committee?

20              MR. DRATEL:  That is a legal question, really.

21              THE COURT:  Overrule the objection.  Go ahead.

22              THE WITNESS:  No.  Treasury expressly does not have

23   a white list.

24   Q.    (BY MR. JONAS)  Can you explain what that means?

25   A.    Sometimes the designation lists are described black lists

1    because it lists entities that you are not allowed to do

2    business with.  Treasury does not have a white list of the

3    good, if you will, entities you are.  Just by virtue of not

4    being on the black list doesn't mean that you are legitimate.

5    Q.    Does Treasury designate every component of the terrorist

6    organization?

7    A.    No.

8    Q.    Why not?

9    A.    It is impossible.  There are too many entities out there.

10   There is not enough time in the day or employees.  And by

11   virtue of having designated terrorists groups as foreign

12   terrorist organizations at large, if any entity is deemed to

13   be part of, in this case Hamas, it is illegal to do business

14   with them.

15              MR. JONAS:  Your Honor, if I can pull a chart up?

16              THE COURT:  Yes.

17              MR. JONAS:  The one from yesterday.

18   Q.    (BY MR. JONAS)  Doctor Levitt, I am pulling up

19   Demonstrative No. 17, which is the Hamas leaders in the 1990s

20   chart.  Of these individuals on the chart, is there any

21   dispute that these individuals are or have been members and

22   leaders of Hamas?

23   A.    I don't know of any dispute on any of these individuals.

24   Q.    Has Hamas ever come out and denied that these individuals

25   are their members or their leaders?

1    A.    Only Jamil Hamami.

2    Q.    And when was that?

3    A.    '96.

4    Q.    Prior to that was he with Hamas?

5    A.    Clearly.  He was a Hamas spokesman.

6    Q.    How many of these individuals have been designated as

7    terrorists by the United States government?

8    A.    You are testing my memory.  Khalid Mishal, Sheikh Yassin,

9    Mousa Abu Marzook, Imad al-Alami, and I believe Abdul Aziz

10   al-Rantisi, though I can't recall exactly.

11   Q.    These other individuals not designated by the United

12   States, the fact they are not designated, does that mean that

13   U.S. citizens, American people, can give money to them on

14   behalf of Hamas?

15   A.    Since they are publicly identified Hamas members, no.

16   Q.    What if they weren't publicly identified but individuals

17   knew that they were part of Hamas?

18   A.    If the individuals know that they are part of Hamas, then

19   they are knowingly giving to Hamas and that is illegal.

20   Q.    Is it the public identification of an individual or zakat

21   committee as Hamas, is that what makes it improper to give to

22   them?

23   A.    Not that alone, no.

24   Q.    What else?

25   A.    It is whether or not they are members or parts of Hamas

1   and whether the people who were giving the funds at the time

2   knew that at the time.

3   Q.   So the fact -- Just so we are clear --

4           MR. DRATEL:  Your Honor, this is really a matter for

5   the Court.

6           MR. JONAS:  I will move on.

7           THE COURT:  All right.

8   Q.   (BY MR. JONAS)  Mr. Cline asked you about whether any

9   board members of zakat committees have been designated.  Do

10  you recall that question?

11  A.   Correct.

12  Q.   You testified yesterday that Sheikh Yassin created

13  certain Hamas run social institutions.  Do you recall those?

14  A.   Correct.

15  Q.   What were the names of those institutions again?

16  A.   Islamic Center and the Islamic Society, founded in part

17  by Sheikh Yassin and Abdul Aziz al-Rantisi, and others.  I say

18  those two because they are both up on your chart.

19  Q.   Is there any dispute that those were started by Sheikh

20  Yassin?

21  A.   No.

22  Q.   Any dispute that those are Hamas institutions?

23  A.   No.

24  Q.   Do you recall questioning about a book by the name of

25  Azzam Tamimi?

A.    Yes.  Azzam Tamimi is a Palestinian living in Great
Britain closely identified with Hamas.

Q.    Did Azzam Tamimi acknowledge that these institutions are
Hamas institutions?

A.    He acknowledged zakat committees, at least some, are
Hamas institutions.

            MR. DRATEL:  Objection; hearsay.

            THE COURT:  Sustained.

Q.    (BY MR. JONAS)  Sheikh Yassin, you testified, though, is
designated.

A.    Correct.

Q.    So as being a founder of Islamic Society, in response to
Mr. Cline's question -- Withdrawn.  Mr. Cline asked you about
the zakat committees themselves.  Okay?  What about other
charitable institutions of Hamas?  Have board members of those
other charitable institutions been designated?

A.    I don't know if Sheikh Yassin or Abdul Aziz al-Rantisi
are actually board members.  They are certainly founders of
the Islamic Center and Islamic Society.  And as I understood
the question from Mr. Cline, it was about the board members of
specific zakat committees, which is why I answered as I did.

Q.    I want to move on to some questioning by Ms. Hollander.
She questioned you about the needs of the Palestinian people.
Prior to 1967 when the Israelis occupied Gaza and the West
Bank was there a need of the Palestinian people?

1    A.    Yes.

2    Q.    Did the Israeli occupation cause a need for the

3    Palestinian people?

4    A.    There was already a pre-existing need, but the conflict

5    in 1967 arguably exacerbated that need.  The need continued.

6    I don't know if it made it worse.  It certainly didn't fix the

7    need.

8    Q.    And now that Hamas controls the Gaza Strip, is the need

9    still there?

10   A.    Even more so.

11   Q.    Has Hamas taken advantage of this need for its own

12   purposes?

13   A.    Yes.

14   Q.    How so?

15   A.    I think I mentioned yesterday, for example, when Israel

16   at U.S. and other international -- after that pressure agreed

17   to open up the main crossing point for food, medicine, and --

18          MS. HOLLANDER:  Objection, Your Honor.  This was not

19   asked on cross.  This is just repeating his direct

20   examination.  I didn't ask him these questions about whether

21   Hamas had taken advantage of this, on cross.

22          THE COURT:  Does this go to some issue raised on

23   cross?

24          MR. JONAS:  It goes to the issue of the need of the

25   Palestinian people that Ms. Hollander went into, and the

1  implication that the Israelis caused this need, which Doctor

2  Levitt just testified about.  But I think, Your Honor --

3          THE COURT:  That is all right.  Ask your question.

4  Overruled.

5  Q.  (BY MR. JONAS)  The question was whether Hamas took

6  advantage of this desperate need.

7  A.   So I cited the example of Hamas shelling the crossing

8  that had been opened to get food, medicine, humanitarian aid

9  into the Palestinian people.  This is Gaza under Hamas' rule.

10  If Hamas was only about --

11          MR. DRATEL:  Can I get a time frame on this, Your

12  Honor?

13          THE COURT:  Time frame.

14          THE WITNESS:  Since Hamas took over the Gaza Strip

15  in June of 2007.

16  Q.  (BY MR. JONAS)  Doctor Levitt, if I may, what about in

17  the 1990s prior to Hamas taking over the Gaza Strip?  Did

18  Hamas take advantage of the need of the Palestinian people?

19  A.   Yes.

20  Q.   How so?

21  A.   To build grassroots support and use this as a platform to

22  radicalize and recruit.  Hamas is happy to provide aid, though

23  its attacks in very large part are the reason for the

24  continued conflict and the continued need for that aid.

25  Q.   Ms. Hollander talked to you about your speaking

1   engagements.

2   A.   I speak a lot; too much the past couple of days.

3   Q.   Did you ever speak at Arabic organizations or Middle

4   Eastern organizations?

5   A.   Yes.

6   Q.   Such as?

7   A.   Next month I am speaking at the Emirate Center for

8   Strategic Studies and Research, the preeminent think tank in

9   the UAE, the United Arab Emirates in Abu Dhabi, for example.

10   Q.   You said that when you spoke at AIPAC, the

11   American-Israeli Political Action Committee, that they weren't

12   happy with you.  Why not?

13   A.   Well, sometimes.  I speak truth to power.  It is the same

14   message I have given here.  I am a strong advocate for a

15   two-state solution.  Many Palestinians like that, many

16   Israelis don't.  Many Israelis do like it and many

17   Palestinians don't like it.  And when I have spoken on

18   Israeli-Palestinian issues to AIPAC, there are some people

19   that like what I say and some don't.  More often than not I am

20   not speaking on Israeli-Palestinian issues there at all.

21      The past two times, I forget who was asking me about it,

22   raised it, maybe Ms. Hollander, I was speaking on Iran.

23   Q.   Did you ever encourage people there to go out and kill

24   Palestinians?

25   A.   Never.

```
 1   Q.    Ms. Hollander asked you about the Likud party.

 2   A.    Yes.

 3   Q.    Which is one of the Israeli political parties.  Correct?

 4   A.    Correct.

 5   Q.    You were questioned about the Likud party's policy

 6   towards the Oslo Accords?

 7   A.    Yes.

 8   Q.    Did the Likud party commit any suicide bombings to show

 9   their opposition to the Oslo Accords?

10   A.    No.

11   Q.    Has the Likud party been designated by the U.S.

12   government?

13   A.    No.

14   Q.    She asked you about bypass roads in the West Bank.

15   A.    Yes.

16   Q.    Why are there bypass roads?

17   A.    There are bypass roads Jewish civilians, some settlers,

18   some Israelis traveling through the West Bank who don't

19   actually live there, would be fired upon in attacks, by Hamas

20   or others, and bypass roads were built so that commuters would

21   not have to go through Arab towns or villages, and in those

22   places where the bypass roads have the types of walls that

23   Defense counsel described, they are specifically built because

24   there have been shooting attacks there and people have been

25   shot driving down the road.
```

Q.    Ms. Hollander asked you about Jamil Hamami coming to the

United States to speak -- to be invited to speak and she

showed you some letters.  Do you recall that?

A.    I do.

Q.    What year, if you recall, was he invited to speak in the

United States?

A.    It was in the mid to late 1990s.

Q.    Was that after he was disassociated with Hamas?

A.    Yes.

Q.    If you recall, Ms. Cadeddu asked you about your statement

that you called your methodology the gold standard.

A.    Correct.

Q.    Is that something you yourself called it?

A.    No.

          MR. DRATEL:  Objection; hearsay, Your Honor.

          THE COURT:  What he called his methodology?

          MR. DRATEL:  No.  He said he didn't call it that,

and I think he is going to then give some hearsay --

          THE COURT:  The question is "Is that something you

called it?"  That is a proper question.  Overruled.

Q.    (BY MR. JONAS)  Without getting into what was said, who

called you --

          MR. DRATEL:  Objection, Your Honor.  It is a back

door who called you --

          THE COURT:  I haven't heard the question.  Before

1  you answer it, let me rule on it.

2  Q.  (BY MR. JONAS)  Who calls you the gold standard?

3      MR. DRATEL:  Who called you is just a back door way

4  of putting in hearsay.

5      THE COURT:  Someone called him that.  I will sustain

6  the objection.

7  Q.  (BY MR. JONAS)  Ms. Cadeddu went through your book and

8  all the end notes, footnotes, index notes, whatever you want

9  to call them.

10 A.  I am impressed she went through them all.  There are lot.

11 Q.  Well, she stuck with one particular chapter or two

12 chapters.  And she identified Israeli sources that you

13 reviewed.

14 A.  Yes.

15 Q.  AS part of the book.  Are Israeli sources inherently bad?

16 A.  No.  In fact, if you are studying Hamas, Israel and

17 Israeli sources are going to have a lot of information on this

18 group.  This group is targeting Israel, so Israeli police and

19 Israeli officials are going to be the most active in

20 investigating this group.  If you were investigating the FARC

21 in Colombia you would go to the Columbians for information.

22    That doesn't mean that everything that you get from

23 Israel is as reliable.  It doesn't mean that you should use

24 only Israeli information.  One of the things I am careful to

25 do, whether it is Israeli or Palestinian information, is vet

1    it with American scholars and American officials.

2    Q.    Did you use any Palestinian information in your book?

3    A.    Certainly.

4    Q.    She questioned you about, I believe it is CSS.  I can't

5    recall what that stands for.

6    A.    Center for Special Studies, though they have renamed

7    themselves.

8    Q.    That is where she asked you about the bulletins and the

9    attached documents?

10   A.    Yes, sir.

11   Q.    Did you rely upon the bulletins or the analysis by the

12   CSS in reviewing the attached primary documents, or did you

13   just review the documents themselves?

14   A.    I did both.  In other words, there are some citations in

15   the book where I quote from a CSS analysis, and I am very

16   careful to have said "according to an Israeli analysis" so the

17   reader, the audience knows exactly who that is coming from and

18   can judge it as such.

19        I also, and much more frequently, rely on the Palestinian

20   documents, sometimes seized from Palestinian intelligence

21   offices, sometimes seized from zakat committees or other Hamas

22   offices, and rely on the documents themselves.  Those

23   documents have been authenticated by the U.S. government.

24   Q.    Do you recall she asked you a series of questions, and

25   she used as an example the American revolution, letters from

1    Thomas Jefferson, et cetera.  Do you recall those series of

2    questions?

3    A.    Yes.

4    Q.    I want to make sure we are clear on something.  Would

5    you, in your opinion, compare Hamas to the American

6    revolution?

7    A.    No.

8    Q.    Why not?

9    A.    The American revolution was an entirely different

10   circumstance.  In the American revolution, George Washington

11   and his compatriots weren't targeting civilians and --

12         MS. CADEDDU:  Your Honor, I am going to object here.

13   This is not relevant.  And I didn't compare Hamas to the

14   American revolution.  I used it as an example for primary and

15   secondary research.

16         THE COURT:  Sustained.

17   Q.    (BY MR. JONAS)  Ms. Cadeddu asked you about criticism of

18   your book.

19   A.    Yes.

20   Q.    Has there also been praise for your book?

21   A.    There has been both.

22   Q.    Is that normal?

23   A.    Yes, especially on a sensitive subject that is the topic

24   about ongoing conflict.  But on the balance, there has been

25   much more praise, in particular on the methodology and the

1    documentation.

2    Q.    Mr. Dratel asked you about the Israel government

3    sanctioning some of the Dawa activities.  I don't recall

4    specifically if he mentioned Islamic Center or Gaza or not.

5         When did the Israeli government sanction the Dawa

6    activities of Hamas?

7    A.    This was in the years following the 1967 War; 1960s and

8    early 1970s prior to Hamas' engagement in the kind of violence

9    that we have discussed earlier.

10   Q.    Did there come a point when the Israeli government

11   stopped sanctioning the Hamas institution of the Palestinian

12   Muslim Brotherhood institutions?

13   A.    Yes.  And in fact banned them, many of them.

14   Q.    Mr. Dratel asked you about Saudi Arabia support for

15   Hamas.  Do you recall those questions?

16   A.    That is right.

17   Q.    Are you familiar with something called the Islamic

18   Development Bank?

19   A.    I am.

20   Q.    And was that bank had any relationship

21   between -- Withdrawn.  What is that?

22   A.    It is an international bank headquartered I believe in

23   Saudi Arabia.

24   Q.    Did that bank have anything to do with the Saudi Arabia

25   support of Hamas?

1    A.    I believe that some of the transfers were made to the

2    bank.

3    Q.    Some of the money transfers?

4    A.    Correct.

5    Q.    Mr. Dratel asked you about the deportees to Lebanon in

6    1992.  Do you recall that?

7    A.    Yes.

8    Q.    He asked you about the deportees covering every segment

9    of Palestinian society.

10   A.    That is right.

11   Q.    Is that an accurate statement?

12   A.    Yes and no.

13   Q.    Can you explain?

14   A.    The vast majority of these individuals by all accounts,

15   Israeli, American, and Palestinian, is that the vast majority

16   of these people were Hamas and some Islamic jihad; that that

17   there were elements from other persons belonging to other

18   elements of Palestinian society who were involved in violence

19   is likely the case.  But if there were one or two or five out

20   of the 415 or so, that hardly makes it an equal split.

21   Q.    Has Hamas denied that the deportees were Hamas members?

22   A.    Not at all.  Hamas has referred to that deportation as a

23   severe blow to the organization and was quite open about its

24   need to take care of its Hamas members who were deported and

25   their families who remained.

1   Q.   Mr. Dratel asked you about an index you received from the

2   government of Israel regarding documents they seized during

3   the operation known as Defensive Shield.  Do you recall that

4   question?

5   A.   Yes.

6   Q.   He asked you about receiving that index in confidence.

7   Is it uncommon for scholars to receive material in confidence

8   on some occasions?

9   A.   No.  But because I received it in confidence, it is used

10  once in passing in a very general way in the book because I

11  wouldn't want to rely on a document that my readership

12  wouldn't have access to, which is why many of the Palestinian

13  documents I refer to are the ones that are available on the

14  CSS website.

15       I don't think I actually refer to any seized

16  document--other than this index, which is itself just a

17  compilation--I don't think I cite to any specific seized

18  document in the book that I saw but that is not on the website

19  for my readership to see.

20            MR. JONAS:  Your Honor, I have no further questions.

21            THE COURT:  Mr. Cline?

22            MR. CLINE:  Could I do a very brief recross?

23            THE COURT:  Yes.

24                      RECROSS EXAMINATION

25  By Mr. Cline:

1    Q.    Hello again.

2    A.    Good morning.

3    Q.    You testified I think just now on redirect, if I

4    understood you right, that the designation of Hamas as a

5    terrorist organization covered the zakat committees that

6    functioned on behalf of Hamas.  Is that a fair

7    characterization?

8    A.    It would cover any entity that was part of Hamas.

9    Q.    Including zakat committees.

10   A.    Yes.

11   Q.    All right.  I want to ask you about that, and I want to

12   do it in the context of the al-Salah Society which we talked a

13   little bit about yesterday.

14   A.    Okay.

15   Q.    First of all, just to make it clear here, the al-Salah

16   Society is not one of the organizations named in the

17   indictment.  Correct?

18   A.    That is right.

19   Q.    All right.  And something I forgot to mention yesterday,

20   the director of al-Salah, Ahmed al-Kurd, was designated at the

21   same time as al-Salah.  Correct?

22   A.    That is right.

23   Q.    Now, is it fair to say that in your view, and for that

24   matter in the U.S. government's view, the al-Salah Society has

25   for many years been part of the Hamas social wing in the Gaza

1    Strip?

2    A.    Correct; and had been closed by Palestinian and Israeli

3    authorities both over the course of the years.

4    Q.    And for going back, what would you say, 10, 15, 20 years,

5    in your view and in the U.S. government's view, it had been

6    functioning as part of this social side of Hamas, or Dawa as

7    you describe it.  Correct?

8    A.    Correct.

9    Q.    And it was doing this on behalf of Hamas.  Correct?

10   A.    Correct.

11   Q.    Now, al-Salah was designated as a specially designated

12   global terrorist, or SDGT, in August of 2007, just last year.

13   Right?

14   A.    That is right.

15   Q.    And you actually wrote a short article about that

16   designation for the Washington Institute for Near East Policy.

17   Correct?

18   A.    That is right.

19   Q.    And in that article you said, "The new U.S. designation

20   of al-Salah criminalizes American donations to al-Salah."

21   Right?

22   A.    I am not sure what you are asking me.  I don't have it in

23   front of me.

24   Q.    Let me give you a copy.  Maybe we can just put this into

25   evidence.

1          MR. CLINE:  May I approach, Your Honor.

2          THE COURT:  Yes.

3     Q.   (BY MR. CLINE)  Let me hand you what we have marked as

4     Defendant's Exhibit No. 1054.  Do you recognize that, Doctor

5     Levitt, as the article, printout of the brief article you

6     wrote for the Washington Institute for Near East Policy?

7     A.   Yes.

8     Q.   And if you look at the first paragraph, the last

9     sentence, it says -- May we --

10         MR. CLINE:  I will offer this into evidence, Your

11    Honor?

12         MR. JONAS:  We are going to object.  This is a

13    hearsay document.  The fact that this witness wrote it doesn't

14    mean it comes into evidence.

15         THE COURT:  It is a document he wrote?  Is that

16    correct?  Overrule that objection.  Admitted.

17    Q.   (BY MR. CLINE)  Are there is considerable discussion in

18    this article about Hamas and about al-Salah.  Correct?

19    A.   Yes.

20    Q.   All right.  I want to focus you on the last sentence of

21    the first paragraph.  And that sentence says, "The new U.S.

22    designation criminalizes American donations to al-Salah and

23    officially informs banks and donors of the organization's ties

24    to and activities on behalf of Hamas."  Correct?

25    A.   That is right.

1  Q.  All right.

2          MR. CLINE:  Thank you, Your Honor.

3          MS. HOLLANDER:  May I do brief recross?

4          THE COURT:  Yes.

5                  RECROSS EXAMINATION

6  By Ms. Hollander:

7  Q.  You mentioned that Likud party has never been designated

8  and they didn't have suicide bombers.  Correct?

9  A.  That is right.

10 Q.  You are aware of the fact that in the lead-up to Oslo

11 other members of the -- other Israelis accused the Likud party

12 of fomenting settler violence, aren't you?

13 A.  Actually I am not.

14 Q.  You haven't really studied the Israeli part of the Oslo

15 Accord, have you?

16 A.  Actually I have studied it very carefully, but you asked

17 about any particular piece of it.  It may or may not be at my

18 immediate recollection.

19 Q.  And you didn't -- Therefore, you don't recollect anything

20 about the connascent debates about the position that Netanyahu

21 took and his involvement in any of the protests.

22 A.  No, not that specifically.

23 Q.  Now, you claim to be an expert on Hamas.  Correct?

24 A.  Yes.

25 Q.  And you wrote this book about Hamas that you completed --

1    You said you completed all of the background work in the end

2    of 2004.  Correct?

3    A.    The primary research --

4    Q.    Primary research.  And then you worked on writing the

5    book.  Correct?

6    A.    Correct.

7    Q.    And included in your research was your determination of

8    who you believed were the leaders of Hamas.  Correct?

9    A.    I don't know if I described it as my determination,

10   because they are all sourced to other experts, government, et

11   cetera.  But it is not just my opinion.

12   Q.    I understand.  This isn't a trick.  I am just saying that

13   you researched the people who you believed to be the founders

14   of Hamas.  Correct?

15   A.    I am not sure how -- The question is confusing me.  But

16   yes, I have researched some of the leaders of Hamas and

17   addressed some of them here.

18   Q.    Right.  And that was an important part of your expertise

19   is determining who is and who is not Hamas, from your

20   perspective, and from the perspective of who you relied on.

21   Correct?

22   A.    I suppose, yeah.

23   Q.    Well, you just testified this whole chart of people you

24   said were Hamas -- related to Hamas.  Correct?

25   A.    Yes.

1  Q.   Okay.  And included in that list was Jamil Hamami.

2  Correct?

3  A.   That is right.

4  Q.   But even though -- And you mention Jamil Hamami in your

5  book as one of the founders of Hamas.  Correct?

6  A.   In passing, yes; not a focus of the book.

7  Q.   But you mention him three or four times in the book as

8  somebody who was a founder of Hamas.  Correct?

9  A.   I mention him.  I don't remember if I mentioned him as a

10  founder, but I mention him several times in the book.  There

11  is a whole chapter on political leaders.  He is not focused on

12  that chapter.  But he is in there.

13  Q.   But you do consider him part of the founding of Hamas and

14  a senior member of its West Bank leadership.  Correct?

15  A.   Yes.

16  Q.   Okay.  But in fact, it wasn't until 2007 when you were

17  cross examined that you first learned that he had come to the

18  United States in 1996 as a guest of the United States.

19  Correct?

20  A.   That is right.

21           MS. HOLLANDER:  Nothing further, Your Honor.

22           THE COURT:  Okay.  Mr. Westfall, any recross?

23           MR. WESTFALL:  Your Honor, I have no further

24  questions for Doctor Levitt.

25           THE COURT:  Ms. Cadeddu?

1          MS. CADEDDU:  Nor do I, Your Honor.

2          THE COURT:  Mr. Dratel?

3          MR. DRATEL:  Nor do I, Your Honor.

4          THE COURT:  Are you finished?

5          MR. JONAS:  Yes.

6          THE COURT:  Doctor Levitt, you may step down.  You

7     are free to go.  Thank you.

8        Call your next witness.

9          MR. CLINE:  Your Honor, may I retrieve an exhibit?

10         THE COURT:  Sure.  Come on up.

11        While we are getting -- Let me have a conference up here

12    for a minute.

13              (The following was had outside the hearing of the

14              jury.)

15         THE COURT:  I was a little concerned with that last

16    question, "It wasn't until 2007 when you were cross examined."

17    I think you can ask him that he found out in 2007, without

18    getting into cross examination.  That it is just getting too

19    close to a retrial that may stir something in some juror's

20    mind.  We can get there without getting into that.  If you

21    were trying to say a time frame when he found out, you can

22    just ask about that without mentioning anything that might

23    suggest --

24         MS. HOLLANDER:  I was careful to not say cross

25    examined.

1           THE COURT:  It concerned me.

2           MS. CADEDDU:  Can we say he has testified several

3   times before?

4           THE COURT:  Yes.  But when you were talking about

5   "When you were cross examined," it implied like what you were

6   doing here, and that could just be too close.

7           MR. DRATEL:  I think the purpose was he didn't do it

8   on his own.

9           MS. HOLLANDER:  I was trying to stay away from it,

10  but I will be even more careful.

11          MS. CADEDDU:  When you intend to break.

12          THE COURT:  Probably about 11:30 or so.  Actually we

13  can take -- We are only going to work until about 1:00.  Are

14  you ready for a break?

15          MR. WESTFALL:  Your Honor, just out of guidance once

16  again, because this is going to come up, when we want to

17  impeach somebody on a prior statement would the Court prefer

18  that we say "On a previous occasion you testified"?

19          THE COURT:  Yes.  Without giving any kind of a hint

20  that it was --

21          MR. DRATEL:  I just sometimes say "Have you

22  testified previously" --

23          MS. HOLLANDER:  I didn't mean to be giving any --

24          THE COURT:  And I know you weren't trying, but it

25  just concerned me that we were getting a little close.

1          (The following was had in the presence and hearing

2          of the jury.)

3          THE COURT:  I think we are ready for a break, from

4     what they are saying.  Why don't we take the first break.

5     Let's be back at 11:35, and then we will work until 1:00.

6          (Whereupon, the jury left the courtroom.)

7          THE COURT:  We will be in recess.

8                    (Brief Recess.)

9          (Whereupon, the oath was administered by the Court.)

10          THE COURT:  Please be seated.

11                    MARCIAL PEREDO,

12     Testified on direct examination by Ms. Shapiro as follows:

13     Q.    Could you please state your name?

14     A.    Marcial Peredo.

15     Q.    And where do you live, Mr. Peredo?

16     A.    3048 Shadeland Drive in Falls Church, Virginia.

17     Q.    And where is Falls Church, Virginia?

18     A.    Close to Washington, D.C.

19     Q.    Okay.  Do you own your house in Falls Church, Virginia?

20     A.    Yes, I do.

21     Q.    And how long have you owned your house?

22     A.    About three and a half years.

23     Q.    Do you know who the prior owner of your house is?

24     A.    Yes, I do.

25     Q.    And who is that?

1   A.   Fawaz Mushtaha.

2   Q.   Do you receive mail for Fawaz Mushtaha?

3   A.   Yes, I do; initially a lot, but not a lot now.  It

4   trimmed down.

5   Q.   Okay.  And after you moved into your house, a few years

6   ago did there come a time when you improved your backyard?

7   A.   Yes.

8   Q.   And what did you do?

9   A.   I started leveling the backyard.  When they built the

10  garage in the backyard they created a pile of dirt basically.

11  What I ended up doing, I hired a contractor to flatten -- to

12  spread the dirt.

13  Q.   Okay.  You say you were leveling your backyard?

14  A.   Correct.

15  Q.   In the process of leveling your backyard, did you find

16  anything in your backyard?

17  A.   Yes, I did.

18  Q.   What did you find?

19  A.   Some data tapes that looked like videotapes.

20  Q.   How did it happen that you found these tapes?

21  A.   As they were finishing up the work with the bobcat, I

22  asked them to just dig a little bit more dirt out of a corner,

23  and when they did they called me and said, "You have some

24  black tapes in the ground."

25  Q.   Okay.  And what did you do when they told you that or

1   when you learned that there were these black tapes that were

2   in the ground?

3   A.    Basically I went and looked at them, and they were just

4   tapes.  I wasn't 100 percent sure what they were so I didn't

5   want the bobcat to keep spreading it all over the place.  So I

6   dug up the tapes manually, as much as I could, and put them

7   into a trash bag.

8   Q.    Do you know about how deep it was that these tapes were

9   in the ground?

10  A.    It was between from where the original dirt was, so it

11  was between a foot to two feet deep.

12  Q.    Were they uncovered by machinery, or how was it that they

13  were --

14  A.    Correct.  Yes, they were uncovered by machinery, the

15  bobcat.

16  Q.    The bobcat.  Okay.  And can you describe for us a little

17  bit about what these tapes looked like?

18  A.    They were about three and a half to four inches in

19  diameter.  Some of them had more tape than others.  They had

20  kind of whitish reel and they were just tape, like videotape.

21  Q.    Okay.

22  A.    Without the casing.

23  Q.    I am going to show you what has been marked as Mushtaha

24  House No. 2.

25          MS. SHAPIRO:  May I approach, Your Honor?

```
 1              THE COURT:  Yes.

 2   Q.   (BY MS. SHAPIRO)  If you can just tell me if you

 3   recognize this.

 4   A.   Yes, I do.

 5   Q.   Can you tell me generally what this object is?

 6   A.   Those are the --

 7   Q.   Generically.

 8   A.   I am sorry.  Data tape.

 9   Q.   Data tape.

10              MS. SHAPIRO:  Your Honor, I move the admission of

11   Mushtaha House No. 2.

12              MS. CADEDDU:  No objection.

13              THE COURT:  Admitted.

14   Q.   (BY MS. SHAPIRO)  Is this, Mr. Peredo, an example of one

15   of the tapes that you found--I will see if I can take it out

16   of the bag--buried in your backyard?

17   A.   That is correct.

18              MS. SHAPIRO:  May I show the jury, Your Honor?

19              THE COURT:  Yes.

20   Q.   (BY MS. SHAPIRO)  About how many tapes do you think there

21   were that you put into that garbage bag?

22   A.   There were several dozen.  I can't recall exactly.  I

23   wasn't counting, but there were several dozen, probably three

24   dozen or maybe a little bit more.

25   Q.   Okay.  And once you put them into this garbage bag, what
```

1  did you do with them?

2  A.    I put them in the garbage bin that the county gives us

3  for trash pick-up.

4  Q.    So you were going to throw them away?

5  A.    Correct.

6  Q.    Did something happen that caused you to retrieve them

7  from the garbage?

8  A.    Yes.  I was speaking to my neighbors, and from them I

9  learned that the house was previously under surveillance, and

10  in fact it was raided at one point before, obviously before I

11  purchased it.

12  Q.    Okay.  And after you learned that information, what did

13  you do?

14  A.    Well, I decided to call a friend of mine who is in the

15  Homeland Security area to ask him what I should do.

16  Q.    And what did you do after that?

17  A.    Well, he told me that, you know, he would be glad to take

18  a couple of the tapes to the proper authorities and see if

19  there was anything to be concerned about.

20  Q.    So did you then retrieve the bag of tapes from the

21  garbage?

22  A.    Yes, I took the bag out of the garbage.  They were all in

23  one bag.  And then I took two tapes and gave it to the friend

24  of mine so he can take it to his colleagues.

25  Q.    And did you hear anything back about these tapes after

1  you gave them to him?

2  A.   About two or three weeks later I did hear from the FBI

3  that they wanted to get the rest of the tapes.

4  Q.   And did the FBI come to your house?

5  A.   Yes, they came to my house and picked up the rest of the

6  bags.

7  Q.   Did they --

8  A.   I mean the rest of the tapes.

9  Q.   And did they do anything else at your house?

10  A.   They looked at the general area where it was, but that

11  was it for that first visit.

12  Q.   And did the FBI subsequently come back to your house?

13  A.   Yes, they did.  They wanted to come back and see if there

14  were anymore -- I had told them that I didn't take all the

15  tapes out, I took just enough to, you know, kind of finish my

16  landscaping.  So they did come back a few weeks later to do

17  some more digging.

18  Q.   And so did they execute a search of your house?

19  A.   Yes, they did.

20  Q.   Was that with your consent?

21  A.   Oh, yeah.  Everything -- I signed so many papers I can't

22  remember.  Yes.

23  Q.   And did the FBI -- Were you with the FBI when they were

24  doing this search?

25  A.   Yes, I was home at the time.

```
 1    Q.   And did you observe that they found anything in your

 2    backyard?

 3    A.   Correct.  They did find -- In the general area where we

 4    initially found the tapes, they found a few more tapes, not

 5    the same quantity that I originally gathered, but they did

 6    find more tapes.

 7    Q.   And did they take those tapes?

 8    A.   Yes, they did.

 9    Q.   And did they find anything else at your house?

10    A.   Yes.  In conversation I learned that they had.

11              MS. CADEDDU:  Your Honor, I object to hearsay.

12              THE COURT:  Yes.

13              MS. SHAPIRO:  I can ask it another way, Your Honor.

14    Q.   (BY MS. SHAPIRO)  Did you observe the FBI while they were

15    doing additional searching around your house?

16    A.   Correct.  Yes, I did.

17    Q.   And did you personally observe them discover any

18    additional materials?

19    A.   Yes.  They found additional -- not tapes, but the burnt

20    casings in the grill and -- There is a built-in brick grill in

21    the back that I have yet to use, but anyway, they did find

22    some suspicious items, circular items on top, so they asked me

23    if they could dig some more.

24    Q.   Was there anything else besides the burnt casings in the

25    grill?
```

1    A.    Yeah.  Once they started picking out, they found burnt

2    tape casings, also a burnt cell phone, there was a packet of

3    what looked like maps and money half burnt in there.

4    Q.    And did they take all that material, the cell phone and

5    the money and the maps?

6    A.    They took even the ashes.  They took everything.

7    Q.    Okay.

8              THE COURT:  Ms. Shapiro, have you established a time

9    frame for when this was going on?

10             MS. SHAPIRO:  Yes, but I will ask it again.

11   Q.    (BY MS. SHAPIRO)  When exactly was it that you found

12   these tapes?

13   A.    It was the summer of 2006.

14   Q.    Thank you.

15         If I can just show you, Mr. Peredo what has been marked

16   as Mushtaha House No. 1.

17             MS. SHAPIRO:  May I approach, Your Honor?

18             THE COURT:  Yes.

19   Q.    (BY MS. SHAPIRO)  Can you just tell me what this is

20   generically?

21   A.    This is the back of my garage.

22   Q.    Photographs?

23   A.    Photographs.  Correct.

24   Q.    Thank you.

25         Mr. Peredo, did you take these photographs yourself?

A.   Yes, I did.

         MS. SHAPIRO:  I move to admission Mushtaha House
No. 1.

         MS. CADEDDU:  No objection.

         THE COURT:  Okay.  Admitted.

         MS. SHAPIRO:  Could you pull that up on the screen,
please?

Q.   (BY MS. SHAPIRO)  Could you just point out for the jury
the general area where you found these tapes?

A.   It is pretty dark, but on the bottom picture where you
see a white pipe coming out, about a foot to the left and
probably about a foot or so back.

Q.   Okay.  And they were about a foot or two beneath the
ground?

A.   Correct.  I mean, they were almost -- The tapes were
almost at the level of the pipe, and the pipe is about a foot
or more -- Originally it was a foot or more beneath the
ground.

Q.   Okay.  Thank you.

         MS. SHAPIRO:  Pass the witness, Your Honor.

         THE COURT:  Anybody?

         MS. MORENO:  No questions of Mr. Peredo, Your Honor.

         MR. WESTFALL:  We have no questions, Your Honor.

         MS. HOLLANDER:  No questions.

         MR. DRATEL:  None, Your Honor.

1          MS. CADEDDU:  No questions, Your Honor.

2          THE COURT:  Thank you.  You may step down, Mr.

3    Peredo.  Thank you.  You are free to go.

4        Next witness?

5          MR. JONAS:  Your Honor, the government calls Paul

6    Matulic.

7          (Whereupon, the oath was administered by the Court.)

8                    PAUL MATULIC,

9    Testified on direct examination by Mr. Jonas as follows:

10   Q.    Could you state and spell your name, please?

11   A.    Paul Matulic, M-A-T-U-L-I-C.

12   Q.    Mr. Matulic, what do you do for a living?

13   A.    I am a professional staff member on the Senate

14   Intelligence Committee.

15   Q.    What does that mean?

16   A.    The Senate Intelligence Committee has dedicated staff to

17   do the duties of the Committee.  I am one of that staff.  I am

18   also a designee of one of the members on that committee.

19   Q.    This is the United States Senate?

20   A.    Correct.

21   Q.    In Washington?

22   A.    Correct.

23   Q.    Is there a particular senator that you are designee of?

24   A.    I am the designee of Senator Hatch.

25   Q.    Orrin Hatch?

A.    Correct.

Q.    What state does Senator Hatch represent?

A.    The State of Utah.

Q.    How long have you been in that position?

A.    I have been Senator Hatch's designee since 2005.

Q.    Prior to that what did you do?

A.    I was Senator Hatch's foreign policy advisor on his
personal staff from '94 until 2005.

Q.    As his foreign policy advisor, what were your
responsibilities generally?

A.    The primary responsibility is always to advise the
Senator on legislation before the Senate regarding national
security and international affairs, but I also kept him
advised about developments in the world about which he was
interested.

Q.    Was Senator Hatch involved in any Senate committees in
the mid '90s?

A.    The Senator was the chairman of the Senate Judiciary
Committee through most of the '90s.

Q.    What does the Judiciary Committee do?

A.    It has a large portfolio that includes oversight of the
courts, criminal law, constitutional law, antitrust law,
intellectual property law, and immigration law, and I am
probably missing one or two.

Q.    Does it oversee any departments of the Executive Branch?

1    A.    The Department of Justice.

2    Q.    Just so we are clear on the timing and your position,

3    were you the foreign policy advisor of Senator Hatch back in

4    August of 1995?

5    A.    I was.

6    Q.    Do you recall receiving a fax from a certain

7    organization?

8    A.    I do.

9            MR. JONAS:  Your Honor, if I may approach?

10           THE COURT:  Yes.

11   Q.    (BY MR. JONAS)  Sir, you have before you what has been

12   marked as Hamas Letter No. 1.  Do you see that document?

13   A.    I do.

14   Q.    Do you recognize it?

15   A.    I do.

16   Q.    How do you recognize it?

17   A.    I received this document.

18   Q.    Without describing the contents, what is it?

19   A.    It is a fax to Senator Hatch, Chairman of the Judiciary

20   Committee, from Hamas.

21   Q.    And you say you recognize it.  How do you recognize it?

22   A.    It was -- When it was received in Senator Hatch's office

23   it was given to me.

24           MR. JONAS:  Your Honor, at this time I would offer

25   into evidence Hamas Letter No. 1.

1        MR. CLINE:  No objection.

2        THE COURT:  Admitted.

3        MR. JONAS:  If we can put that on the screen,

4   please.

5   Q.   (BY MR. JONAS)  Mr. Matulic, you see the top portion of

6   the letter.  You said this letter came from Hamas.  Does that

7   tell you -- Is your answer based upon the letterhead?

8   A.   Yeah.  I deduced that it came from Hamas because it had

9   Hamas letterhead.

10  Q.   Okay.  Can you read the letter, please?

11  A.   "Mr. Orrin Hatch, Chairman of the Senate Judiciary

12  Committee.

13       "Sir:

14       "We have been advised to approach you on the highly

15  urgent matter of the detention by the U.S. authorities of

16  Dr. Musa Abu Marzuq, Head of the Hamas Political Bureau.  He

17  was arrested on 25 July upon his arrival in New York's JFK

18  Airport on a private perfectly legal visit in the company of

19  his family.

20       "The detention of Dr. Abu Marzuq has been a source of

21  concern for us and for many Arabs and Muslims around the

22  world.  The adoption of what can only be described as delaying

23  tactics by the U.S. authorities in dealing with the matter is

24  a clear indication that the entire measure has been motivated

25  by political rather than legal considerations.  This has been

1    viewed as a deliberate attempt by the U.S. administration to

2    buy time in order to afford certain foreign circles, primarily

3    the Israelis, the opportunity to forge falls charge against

4    Dr. Abu Marzuq prior to applying for his extradition.

5         "The continued detention or the handing over of Dr. Abu

6    Marzuq to the Israelis will provoke a wave out outrage against

7    the United States in various parts of the Arab and Muslim

8    world.  Serious repercussions could ensue as a result.

9         "We hope that you will kindly consider intervening with

10   the U.S. authorities and urge popular and official circles in

11   the United States to support the campaign for the immediate

12   release of Dr. Abu Marzuq, who is a diabetic and in need of

13   special medical attention.  We wish that through your good

14   offices Dr. Abu Marzuq will be released and allowed to leave

15   peacefully to a country of his own choice.

16        "Ibrahim Ghousheh, Hamas spokesman."

17   Q.    Do you see some handwritten notations on the bottom?

18   A.    I do.

19   Q.    Do you recognize those?

20   A.    It is my handwriting.

21   Q.    And what did you write?

22   A.    I wrote "Amman, Jordan."

23   Q.    Why did you write "Amman, Jordan"?

24   A.    Because when I received the letter I didn't recognize the

25   three digit prefix and the phone numbers at the bottom, and I

1  called the Capitol operator and asked her to tell me what they

2  are associated with.

3  Q.   Would that be the 962?

4  A.   That is correct.

5  Q.   And you learned that they were from Amman?

6  A.   Yes.

7  Q.   At the time you received the letter, did you know who

8  Dr. Mousa Abu Marzook was?

9  A.   I did.

10  Q.   And what was your understanding of who he was?

11  A.   That he was the head of the political wing of Hamas.

12  Q.   So what it says in the letter confirmed what your

13  understanding was?

14  A.   Correct.

15  Q.   And do you know what was going on with him at that time?

16  A.   I did.

17  Q.   What was happening to him at the time of this letter?

18  A.   He was in detention at JFK.

19  Q.   When you received this letter, what did you do with it?

20  A.   I read it.

21  Q.   What did you do after you read it?

22  A.   After I read it I made the decision to supply copies to

23  the Capitol Police, to the FBI, to the Department of Justice,

24  and to the Department of State.

25  Q.   Why?

1  A.   Because of a sentence in -- the last sentence in the

2  third paragraph.

3  Q.   What is it about the last sentence in the third paragraph

4  that caused you to send the letter to the FBI?

5  A.   In the context of the entire letter, particularly the

6  third paragraph, the last sentence said, "Serious

7  repercussions could ensue as a result," and I wanted to be

8  cautious and I saw that as a potential threat.

9  Q.   A threat to whom?

10  A.   I was primarily concerned about Senator Hatch and the

11  people in his office.

12  Q.   Did you receive another letter after this one?

13  A.   I did.

14  Q.   Before you do you have what has been marked as Hamas

15  Letter No. 2?

16  A.   This is it.

17  Q.   This is the second letter you received?

18       MR. JONAS:  Your Honor, at this time I offer into

19  evidence Hamas Letter No. 2.

20       MR. CLINE:  No objection.

21       THE COURT:  Admitted.

22       MR. JONAS:  And for the record, when I say 2 I mean

23  the number 2.

24  Q.   (BY MR. JONAS)  What is the date of this letter?

25  A.   25 October, 1995.

Q.    Okay.

        MR. JONAS:    If we can put that on the screen,

please.

Q.    (BY MR. JONAS)    Again does it have the Hamas letterhead?

A.    It does.

Q.    Is it sent from the same person who sent the last letter?

A.    It is.    It was.

Q.    Could you please read this letter?

A.    "Mr. Orrin Hatch, Chairman of the Senate Judiciary

Committee."

        "Dear Mr. Hatch:

        "As you must already know Dr. Musa Abu Marzuq, Head of

Hamas Political Bureau, was arrested on the 25th of July upon

his arrival at New York's JFK Airport on a private perfectly

legal visit in the company of his family.    His visit was aimed

at attending to some private business matters having been a

legal resident of the United States of America long before

1991.    Although initially held allegedly for Immigration

reasons, the entire case has been transformed into a purely

political one as soon as Israel formally applied for his

extradition.    The sharp and rapid turn of this case has taken

proves beyond doubt that the U.S. administration has since the

beginning contemplated handing him over to the Israelis, in

spite of the fact that throughout his 14-year stay in the

United States he had been a law abiding person never charged

1    with any violation.

2         "We urge you to intervene personally and exert all the

3    pressure you can in order to dissuade the U.S. administration

4    from proceeding with this case and to demand it to reject the

5    Israeli application for his extradition.  Dr. Abu Marzuq has

6    never been involved in any hostility against the United States

7    of America, and the movement in which he presides over the

8    political bureau has never carried out any attacks on the

9    American interests or people.  Hamas's struggle has always

10   been strictly confined to resisting the Zionist occupation of

11   Palestine.

12        "The efforts you make with the U.S. administration will

13   undoubtedly contribute to preventing the infliction of more

14   injustices upon the Palestinian people, who have regrettable

15   experiences adopted by successive U.S. administrations against

16   the legitimate struggle of the Palestinians for liberation

17   from Israeli occupation.  The continued detention or the

18   handing over of Dr. Abu Marzuq to the Israelis will provoke a

19   wave of outrage against the United States in various parts of

20   the Arab and Muslim countries and elsewhere in the world by a

21   freedom loving peoples.

22        "We wish that through your good offices Dr. Abu Marzuq

23   will be released and allowed to leave peacefully to a country

24   of his own choice.

25        "Yours sincerely, Ibrahim Ghousheh, Hamas spokesman."

Q.   Did Senator Hatch intervene on behalf of Doctor Marzook?

A.   He did not.

Q.   What did you do with this letter after you received it?

A.   I put this in my file.

Q.   Did you send it to the FBI or the Department of Justice afterwards?

A.   I did not.

Q.   How come?

A.   Because it did not have the same letter that had caused concern -- the same sentence that had caused concern to me as the previous letter had.

Q.   You testified that it was your understanding at the time of the receipt of the letters that Doctor Marzook was detained at JFK.

A.   Correct.

Q.   Just so we are clear, that is John F. Kennedy Airport in New York?

A.   That is correct.

Q.   Was he during the whole time period of these letters from -- I believe the first one is August, the date of the first letter?

A.   Correct.

Q.   To October, was he always detained at JFK, to your understanding?

A.   That is my understanding.

```
1    Q.   Do you know what ultimately happened to him?

2    A.   He left and was returned to Jordan.

3              MR. JONAS:  Your Honor, no further questions.

4              THE COURT:  Any counsel have any questions?

5              MR. MYSLIWIEC:  Yes, Your Honor.

6                       CROSS EXAMINATION

7    By Mr. Mysliwiec:

8    Q.   Good afternoon.

9    A.   Good afternoon.

10   Q.   My name is Aaron Mysliwiec and I represent Mohammad

11   El-Mezain.

12        Sir, at the time you received these letters you worked

13   for Senator Hatch?

14   A.   That is correct.

15   Q.   And he was one of two senators from Utah?

16   A.   Correct.

17   Q.   And you started working for him in '94?

18   A.   Correct.

19   Q.   And you were working as his primary foreign policy

20   advisor for approximately a decade?  Not before you received

21   the letters, but in sum total.

22   A.   Correct.

23   Q.   From '94 to roughly 2005?

24   A.   Correct.

25   Q.   Let's talk about the two Hamas letters.  The first letter
```

1   was dated August 1st of 1995.  Right?

2   A.    Correct.

3   Q.    And it was addressed to Senator Hatch?

4   A.    That is right.

5   Q.    There is an official letterhead on it, as you pointed

6   out.  Right?

7   A.    That is right.

8   Q.    Official Hamas letterhead.  Right?

9   A.    Correct.

10  Q.    And the letter provides a phone number for Hamas.

11  A.    Correct.

12  Q.    And also provides a fax number for Hamas?

13  A.    That is right.

14  Q.    And it is signed by a person who identifies himself as a

15  Hamas spokesman.  Correct?

16  A.    That is correct.

17  Q.    So using the information on this letter, it looks like if

18  a person wanted to contact Hamas they could call that phone

19  number.  Right?

20  A.    That would be a proper assumption, I think.

21  Q.    Right.  And if they wanted to send a letter to Hamas,

22  they could write the letter and send it to the fax number.

23  Right?

24  A.    Correct.

25  Q.    Both letters focus on a person named Doctor Marzuq.

1  Right?

2  A.    Yes.

3  Q.    And he is identified as the head of the Hamas Political

4  Bureau?

5  A.    Correct.

6  Q.    He came to the U.S. on this occasion on July 25th of

7  1995.

8  A.    That is the fact that is stated.  I don't have

9  independent memory of whether that fact is correct, but I

10  don't doubt it.

11  Q.    And that was about a week before the first letter.

12  A.    That is right.

13  Q.    And when he came to the U.S. he came on an airplane.

14  Right?

15  A.    Correct.

16  Q.    A commercial flight.

17  A.    I presume.

18  Q.    Okay.  To JFK Airport, which as you stated is in New York

19  City.  Correct?

20  A.    Correct.

21  Q.    He wasn't traveling alone.

22  A.    The letters state he was with his family.

23  Q.    So he came here with his family.

24       He didn't use a fake name.  Right?

25  A.    I am assuming that this is his name.  I don't have

1    independent knowledge of whether it is his real name or not.

2    Q.    I mean, when he traveled to the U.S.--

3            MR. JONAS:  Your Honor, I am going to object because

4    I think we are going outside the purview of the knowledge of

5    the witness.

6            MR. MYSLIWIEC:  Well, I am asking the witness those

7    questions.

8            THE COURT:  He can ask the questions.  If he doesn't

9    know, he can say so.

10   Q.    (BY MR. MYSLIWIEC)  When he came to the U.S. on a flight,

11   he came as Dr. Mousa Abu Marzook.  Right?

12   A.    That is as it is reported.

13   Q.    He didn't come using some other name.  Right?

14   A.    Not to my recollection.

15   Q.    And when he came to the U.S. in July of 1995, he had

16   already lived in the U.S. for more than a decade.  Right?

17   A.    This I know from refreshing my memory.

18   Q.    Okay.  So you know it from refreshing your memory.

19   A.    Uh-huh.

20   Q.    And you know he lived in the U.S. for more than a decade

21   before this date?

22   A.    I couldn't tell you whether it was more than a decade or

23   not, but I know he had been a long-time resident.

24   Q.    And when he lived in the U.S. as a long-time resident, he

25   lived under the name Dr. Mousa Abu Marzook.  Right?

1  A.   I don't know that.

2  Q.   Now, when he was arrested in 1995, he was detained until

3  about 1997.  Right?

4  A.   I know that he was detained for a long period.  If you

5  say 1997, I don't recall the dates.

6  Q.   The exact dates.  But when you say a long period, when

7  you say you know it was a long period, you mean you know it

8  was at least several months.  Correct?

9  A.   Correct.

10  Q.   And after at least several months the United States

11  finally reached a point where they stopped holding Doctor

12  Marzook.  Correct?

13  A.   Correct.

14  Q.   And when they stopped holding him, he was put on a plane.

15  Right?

16  A.   Correct.

17  Q.   And that plane wasn't to Israel.  Correct?

18  A.   Correct.

19  Q.   It was to Jordan.

20  A.   Correct.

21          MR. MYSLIWIEC:  I have no further questions, Your

22  Honor.

23          THE COURT:  Any other counsel?

24          MR. CLINE:  No, Your Honor.

25          MR. WESTFALL:  No, Your Honor.

1       MS. CADEDDU:  No, Your Honor.

2       MS. HOLLANDER:  No, Your Honor.

3       THE COURT:  Mr. Jonas, any redirect?

4       MR. JONAS:  One second, Your Honor?

5       THE COURT:  Sure.

6       MR. JONAS:  No, Your Honor.

7       THE COURT:  Mr. Matulic, you are free to go.  Thank

8  you.

9       Next witness?

10      MR. JACKS:  Atef Shafik.

11      (Whereupon, the oath was administered by the Court.)

12                      ATEF SHAFIK,

13  Testified on direct examination by Mr. Jacks as follows:

14  Q.   Would you tell us your name, please?

15  A.   Atef Shafik.

16  Q.   And how are you employed, Mr. Shafik?

17  A.   By the FBI.

18  Q.   And how long have you been employed by the FBI?

19  A.   Over ten years.

20  Q.   And where are you assigned or stationed within the FBI?

21  A.   The Dallas office.

22  Q.   And have you been assigned to the Dallas field office

23  your entire career with the FBI?

24  A.   Correct.

25  Q.   What is your position within the FBI?

1  A.  I am a language analyst.

2  Q.  And what is a language analyst?

3  A.  Language analysts are translators who basically translate

4  materials from Arabic into English and vice versa.

5  Q.  And let me just ask you in terms of your personal

6  background, where were you born?

7  A.  I was born in Cairo, Egypt.

8  Q.  And is that where you grew up?

9  A.  Correct; until I was 27 years old.

10  Q.  And when you left Egypt, where did you go?

11  A.  I came to Dallas, Texas.

12  Q.  Okay.  Is Arabic your native language?

13  A.  Correct.

14  Q.  Is Arabic the language that is spoken in Egypt?

15  A.  Correct.

16  Q.  Let me ask you about your educational background.  When

17  you were growing up, did you attend private or public schools?

18  A.  Public schools.

19  Q.  And in terms of your secondary education, did you go to

20  college?

21  A.  Yes, I went to a four-year college.  I graduated with a

22  bachelor in English literature in 1986.

23  Q.  And what college did you attend?

24  A.  It is called the Faculty of Languages, and this is part

25  of the Ain Shams University.

1    Q.    Can you spell that, please?

2    A.    Certainly.  Ain, A-I-N, Shams is spelled S-H-A-M-S.

3    Q.    And you said your degree was in what subject?

4    A.    In English literature.

5    Q.    And does that include like Shakespeare and the classics,

6    that type of English literature?

7    A.    Correct.

8    Q.    All right.  You said that you came to the United States

9    at what age?

10   A.    Twenty-seven years old.

11   Q.    And are you a United States citizen?

12   A.    Yes, I am.

13   Q.    When did you -- What year did you come to the United

14   States?

15   A.    I came in March 1991.

16   Q.    When did you become a United States citizen?

17   A.    October 1996.

18   Q.    In the interim, in that time period what kind of work did

19   you do?

20   A.    Until I became a U.S. citizen?

21   Q.    Yes.

22   A.    I was working for the Hyatt Regency Hotel at the

23   Dallas/Fort Worth Airport as a food and beverage assistant

24   manager.

25   Q.    Did there come a time when you began your employment with

1  the Federal Bureau of Investigation?

2  A.    Correct.  As soon as I obtained my U.S. citizenship in

3  October of 1996, I applied for the language analyst position.

4  Q.    Was that something that even before you became a citizen

5  that you were interested in doing?

6  A.    Absolutely.  This is where my education is and that is

7  where my heart is--language, literature, translation.  I was

8  unable to apply before I obtained my citizenship, and as soon

9  as I became a citizen I applied.

10  Q.    Did you have to undergo a background check or background

11  investigation?

12  A.    Yes, a very extensive one.

13  Q.    Do you have a security clearance now?

14  A.    Yes, I do.

15  Q.    What level is it?

16  A.    It is called SCI clearance.

17  Q.    What does SCI stand for?

18  A.    Secret compartmented information.

19  Q.    Is that above top secret?

20  A.    Yes, it is.

21  Q.    Can you please describe the process which one must go

22  through in order to become an FBI language analyst?

23  A.    After submitting the application, there is a very

24  extensive language test.  It is actually a battery of multiple

25  level of tests.  An applicant for the position is tested on

1    his oral, written, and dialect proficiency in the Arabic test.

2    Q.    You said oral, written, and dialect?

3    A.    Yes.

4    Q.    Okay.  In terms of who it is that submits these tests or

5    tenders these tests to you, who are the people that are

6    testing applicants?

7    A.    They are senior linguists, linguists with the FBI.

8    Q.    Okay.  You made reference in your answer to dialects.

9    Can you tell us or explain what you mean by different

10   dialects?

11   A.    The Arabic language has multiple dialects, and to be

12   hired as a language analyst, Arabic language analyst, you have

13   to show proficiency in multiple dialects.  For instance, my

14   dialect is Egyptian language of dialect.  I have to know

15   multiple dialects in order to be hired with the FBI.

16   Q.    Can you name some of the dialects that exist in the

17   Arabic language?

18   A.    Certainly.  There is the Moroccan dialect, the Egyptian

19   dialect which is my native one, the Levantine dialects, the

20   Gulf dialects of Arabic, to name a few.

21   Q.    When you make reference or when it is referred to as the

22   Gulf dialects, what is it referring to?  Is it a geographical

23   area?

24   A.    Yes.  It merely covers the countries of Saudi Arabia,

25   Bahrain, Emirates, Qatar, and there is another dialect called

1   the Yemeni dialect.

2   Q.    Okay.  And those countries, are they located on the Saudi

3   Arabian peninsula?

4   A.    Correct.

5   Q.    Now you mentioned Levantine dialect, and what is the

6   basis of that name?

7   A.    It is actually a historical name, but that covers the

8   countries of Jordan, Palestine, Israel, and Syria and Lebanon.

9   Q.    Okay.  That geographical area with Lebanon, Syria,

10  Jordan, and Israel and Palestine, what is it called?

11  A.    The al-Sham country in Arabic, spelled A-L  S-H-A-M, and

12  that.

13  Q.    Is that one word or two?

14  A.    It is two words hyphenated.

15  Q.    What other name does it refer to?

16  A.    It is known as the Levantine dialect.

17  Q.    Okay.  In terms of the different dialects is there -- Can

18  you give us an example, say, in English that would explain the

19  concept of different dialects within the same language?

20  A.    The difference between the dialects of Arabic is really

21  no difference than between the dialects in the English

22  language, for instance, like there is American English, there

23  is British English, and there is Australian English.  The

24  difference will be in relation to mainly two areas would be

25  pronunciation and word choice.

```
 1    Q.    Okay.  So within the Arabic language are there unique

 2    expressions or sayings that might be indicative of a

 3    particular dialect or part of the world?

 4    A.    That is correct.  Each dialect has a lot of its own slang

 5    expressions or idioms.

 6    Q.    Okay.  So in English if an Australian says "Good day,

 7    mate," that is indicative of that dialect of English.  Is that

 8    a fair example?

 9    A.    Yes, it is.

10    Q.    What about, for example, between the United Kingdom and

11    America as far as terminology, what they might call objects?

12    Can you give an example of that?

13    A.    Certainly, like what we would the subway in the United

14    States is called the tube in Britain, for instance.

15    Q.    Tube?

16    A.    Yes.

17    Q.    And those kinds of differences would also exist within

18    the Arabic language in the different dialects?

19    A.    Yes, that is correct.

20    Q.    Okay.  When you were growing up in Cairo, you said you

21    went to public schools?

22    A.    Yes.

23    Q.    First of all, do you have any idea how big Cairo is as

24    far as population?

25    A.    The current population is around 20 million people.
```

1  Q.   The city is around 20 million?

2  A.   Correct.

3  Q.   Were you exposed in growing up within Cairo to all these

4  different dialects?

5  A.   Pretty much.  Cairo has very strong well-known

6  universities, and it was very common for Arab students from

7  all over the Middle East to come to seeking education, so

8  where I lived, where I went to school, where I played, there

9  was Arab students from Lebanon, from Morocco, from Algeria,

10  from pretty much everywhere in the outer worlds.

11  Q.   When applying to be a language analyst, is there -- You

12  said there is several tests that you are required to take.  Is

13  that correct?

14  A.   Yes.

15  Q.   And I take it you are scored on those tests.  Is that

16  correct?

17  A.   Yes.  I scored a perfect score in Arabic, which is five

18  out of five, and because of that I was certified later as a

19  tester applying the Arabic oral test to new applicants.

20  Q.   All right.  So now your role is reversed in that you are

21  one of those people that examines people that are trying to

22  become analysts with the FBI?

23  A.   Correct.

24  Q.   Are you now considered a senior language analyst within

25  the FBI?

1  A.    Yes, I am.

2  Q.    Other than actually translating, you have mentioned that

3  one of the things you do is to test other applicants.  What

4  other responsibilities do you have or what other work do you

5  do as a language analyst?

6  A.    I also train new linguists.  There is a long list of

7  rules and regulations regarding translation and FBI policies

8  and regulations.  Due to my seniority as a linguist, I am a

9  trainer.  And also due to my seniority, I am often picked for

10  international assignments to interpret.

11  Q.    Have you been selected or received any advanced training

12  as a language analyst?

13  A.    Yes.  I have been to a number of advanced training, most

14  recently for two weeks consecutive interpreting training in

15  Monterey, California in this past August.

16  Q.    And do you know what facility is located in Monterey,

17  California that you attended this training?

18  A.    It is called the Monterey Institute of International

19  Studies.

20  Q.    Okay.  Other than being familiar with the different

21  dialects within the Arabic language, what else do you do to

22  improve or maintain your ability to serve as a language

23  analyst?

24  A.    The most important item that keeps my language sharp is

25  the extensive reading I do, and that covers books in both

1　　Arabic and English languages, new literature, the fact that I

2　　spend the first part of my day reading extensively about the

3　　daily events, political, religious, and other events in the

4　　Middle East.  Due to my security clearance also I have access

5　　to advanced reports that are made available to only a handful

6　　of linguists like myself, and just being familiar with the

7　　region the developments, the fact that I read extensively.

8　　Q.   So in terms of -- Is what you are saying is that you keep

9　　up with current events?

10　　A.   Correct.

11　　Q.   And the sources that you turn to to keep up your

12　　knowledge of current events consists of what?

13　　A.   There are three main sources.  The first one is Arabic

14　　and English literature.  When I select Arabic literature to

15　　lead, I deliberately select literature written by writers from

16　　all over the Middle East, not just one country.  That gives me

17　　the familiarity with the new expressions that are coined, how

18　　words are used.  For instance, the introduction -- the

19　　internet created a host of new terminology in Arabic language,

20　　and I deliberately read Arabic books on the internet, for

21　　instance, to be able to be familiar with the new terminology

22　　on that field.

23　　　　The second source would be media outlets, and I spend a

24　　great deal of my day reading different publications in Arabic

25　　and in English that focus or discuss events in the Middle

1    East, the politics, the religions, the conflicts, the customs,

2    the traditions of that part.

3        And the third aspect, as I mentioned, is the intelligence

4    community, classified reports that come across my desk.

5    Q.    Could you give an example of why you have to keep up with

6    current events as it relates to doing your job every day; why

7    that would matter if you are, you know, looking at a document

8    or listening to a telephone conversation?

9    A.    Because really the events that take place over here are

10   directly related to events in the Middle East.  For instance,

11   if there is an event that happens in Gaza, I have to be

12   familiar with that event.  I have to know what happened

13   exactly.  So this way if that event is referenced in a call, I

14   know exactly what the event is.

15       In order to be successful, it is not enough for me to be

16   just familiar with the language.  I have to know the events of

17   the Middle East to be able to produce correct translations.

18   Q.    In your career within the FBI, you said that as a part of

19   your work now that you work on other investigations.  Can you

20   give an example of other investigations that you have worked

21   on separate and apart from here in the Dallas office?

22   A.    Certainly.  I took part in the investigation of the

23   bombing of the USS Cole in Yemen, and also I took part in the

24   debriefing detainees in Guantanamo Bay, and I took part in the

25   investigation with InfoCom.

1    Q.   Okay.  And in terms and in your debriefing of people at

2    Guantanamo, was that simply as a translator?

3    A.   No, not just an interpreter.  Other than providing the

4    meaning of the words that were said, I was also a cultural

5    advisor advising the agents on the meaning of things, what do

6    things mean beyond words, the culture, the tradition, the

7    religion.  All these are important aspects of the

8    investigation that I was advising on.

9    Q.   And when you were doing this were you doing it in -- Were

10   you working with other FBI agents when these interviews were

11   being done and you were translating?

12   A.   Correct.

13   Q.   Okay.

14        MR. JACKS:  Your Honor, at this time I would tender

15   Mr. Shafik to the Court as an expert in the translation of the

16   Arabic language.

17        THE COURT:  Is this the witness you were planning on

18   going -- The issue we discussed this morning?

19        MR. JACKS:  Yes, sir.

20        THE COURT:  So you are tendering him as an

21   expert --

22        MR. JACKS:  Yes, sir, and the portion that was at

23   issue will be later in the examination.

24        THE COURT:  Okay.

25        MR. CLINE:  I think there is no objection to him as

1    a translator.  We would appreciate the opportunity to address

2    that other issue when it comes up.

3            THE COURT:  He is accepted as an expert in the area

4    of language translation, Arabic to English and vice versa.

5    Q.   (BY MR. JACKS)  Mr. Shafik, you said that you have been

6    with the FBI since what year?  I am sorry to make you repeat

7    it.

8    A.   Since January of 1998.

9    Q.   And you have been in Dallas, except for when you would be

10   called away for other assignments, but the Dallas office of

11   the FBI has been your primary station or assignment.  Is that

12   correct?

13   A.   Yes.

14   Q.   With regard to -- Have you worked on the investigation of

15   the Holy Land Foundation?

16   A.   Yes, I have.

17   Q.   And when did you begin to work on the investigation of

18   the Holy Land Foundation?

19   A.   Almost immediately after my initial training in 1998.

20   Q.   Were there other language analysts that preceded you that

21   were working on this investigation?

22   A.   Yes, there was.

23   Q.   Can you just tell us, in the course of working on that

24   investigation what type of materials or documents have you

25   examined and translated?

```
 1    A.    Material included phone conversations, documents,

 2    videotapes, cassette tapes computer evidence, faxes.

 3    Q.    Faxes?

 4    A.    Yes.

 5    Q.    All right.  And I take it these documents, the originals

 6    of these documents were in Arabic.  Is that correct?

 7    A.    Correct.

 8    Q.    The documents that you reviewed, were they typewritten or

 9    handwritten or both?

10    A.    They were both.

11    Q.    And just for the education of us, in the Arabic language

12    is the writing from, like in English, from left to right, or

13    is it from right to left?

14    A.    It is from right to left.

15    Q.    So the beginning of a sentence or a page begins at the

16    upper right hand corner.  Is that correct?

17    A.    Yes.

18    Q.    And then you go across the page to the left?

19    A.    Correct.

20    Q.    All right.  You said -- Let me ask you, have you reviewed

21    magazines?

22    A.    Correct, magazines, books brochures, pamphlets.

23    Q.    Okay.  And you said you have reviewed documents from a

24    computer.  Is that what you said?

25    A.    Yes.
```

Q.   Okay.  So you are meaning documents that would be in

electronic form from a computer?

A.   Correct.

Q.   All right.  You said you have reviewed videotapes.  Have

you also reviewed audiotapes?

A.   Yes, I did.

Q.   And you mentioned that you had reviewed conversations,

and these conversations, were some of these conversations, or

many of these conversations, conversations that were

intercepted pursuant to a court order?

A.   Yes, that is correct.

Q.   What type of court order were you talking about?

A.   It is called the FISA, which is short for the Foreign

Intelligence Surveillance Act.  It is the act of law that

grants FBI authority to intercept electronic communications.

Q.   So were many of the conversations that you translated

audio recordings of these intercepted conversations?

A.   Correct.

Q.   And could you just briefly tell us, what is the procedure

that you would follow when you would be tasked or expected to

listen to conversations and translate them?

A.   Initially I was requested to provide a summary of a lot

of the conversation.  And to produce a summary, I would listen

first to the entire phone call with a note pad and pen in my

hand, I would be taking notes on things like the parties of

1    the conversation, the subject of the conversations, dates,

2    times, places, and after I am done listening I begin my

3    summary.  I listen to a portion of it and then I summarize it

4    and then I continue until the call is finished.

5    Q.   All right.  And I don't know that I made it clear from my

6    question, but my question was centered around FISA intercepted

7    calls.  Is that what your answer was dealing with?

8    A.   Yes.

9    Q.   Okay.  What kind of equipment -- I know you said you use

10   a pad and a pen, but what other equipment do you have?

11   A.   I have access to computer and software which really

12   collects these phone calls, and they are kept in a certain

13   database.  When I arrive to work, after I log into the system

14   I can retrieve all the calls that came during my absence.  I

15   can select them to play, pause, fast forward, rewind, slow

16   down the conversation.  I have access to a number of tools

17   that can assist me in producing the translations.

18   Q.   All right.  So you are not, at least from your tenure

19   with the FBI, you are not sitting down with a cassette

20   recorder and putting in a cassette tape and listening to it.

21   Is that correct?

22   A.   Yes.

23   Q.   All right.  Yes, that is correct that you are not doing

24   that?

25   A.   It is correct that I was not using a cassette tape to

1    produce summaries of the phone conversations.

2    Q.    Would you work at a computer with a keyboard?

3    A.    Yes.

4    Q.    You said that you would listen to the conversation and

5    then create a summary?

6    A.    Initially it was a summary, yes.

7    Q.    Would you do that with every conversation?

8    A.    Not every conversation; only the conversations that are

9    labeled pertinent.

10    Q.    All right.  And is that something that is first done by

11    you or a language analyst?

12    A.    Yes.

13    Q.    As far as determining -- And give us an example of a

14    conversation that would with not listened to or not deemed

15    pertinent?

16    A.    For instance, a conversation between children that center

17    around homework, a wife talking to a female friend about the

18    latest sale at the mall, that would be non-pertinent.

19    Q.    Okay.  And then you said you would do first a summary,

20    and generally how long would a summary be in terms of pages

21    or --

22    A.    Depending on the length of the call, it could be anywhere

23    from a paragraph to five, six, ten pages.

24    Q.    Okay.  Let me ask you, before you even begin to listen to

25    these calls, do you have any conversation with the agents or

1    people that are working on the case or the other language

2    analysts?

3    A.    That is correct.  I start listening to the calls, there

4    are monthly or even weekly meetings with the case agents.

5    During these meetings language analysts, like myself, are

6    briefed on the allegations against the Defendants, the items

7    of interest that would further the investigation, and these

8    are what we call the pertinent information that are targets

9    for summary or verbatim.

10   Q.    Is that so you have some idea of what you should be

11   listening for or what would be relevant?

12   A.    Correct.

13   Q.    You said that you had been working on the Holy Land case

14   since 1998.  Let me ask you, in the course of listening to

15   audiotapes of telephone calls, have you become able to

16   recognize and identify the voices of the individuals that you

17   have heard on those telephone calls or audiotapes?

18   A.    Yes.

19   Q.    And how is it that you are able to identify the people on

20   these conversations?

21   A.    Well, initially people might identify themselves when

22   making a phone call, or the other person they are talking to

23   might call them by name, or might call them by their alias,

24   and then also after initial introductions are made, the voice

25   becomes familiar when you listen to it every day for the

1    number of years I have.

2    Q.   All right.  Do the uniqueness or distinctiveness of the

3    voices become familiar to you?

4    A.   Very much so.

5    Q.   Are you able to identify the voices of the Defendants in

6    this case now?

7    A.   Absolutely.

8    Q.   Are you able to identify the voice of, for example,

9    Shukri Abu Baker?

10   A.   Absolutely.

11   Q.   Mohammad El-Mezain?

12   A.   Yes.

13   Q.   Ghassan Elashi?

14   A.   Yes.

15   Q.   Mufid Abdulqader?

16   A.   Yes.

17   Q.   Abdul Odeh?

18   A.   Yes.

19   Q.   Over time have you also seen them either in photographs

20   or in person such that you can identify them in person as

21   well?

22   A.   Correct.  I have seen photographs.  I have seen most of

23   them on TV, and I have met a few of them in person.

24   Q.   Okay.  Could you identify the Defendant Shukri Abu Baker

25   and just tell the Court what he is wearing?

1  A.    He is seated over there.  I believe he is wearing a dark

2  suit and gray shirt and tie.  Yes, that is Mr. Shukri.

3  Q.    And Mr. Odeh, can you identify him?

4  A.    Yes.  He is on the angle of the table with the glasses

5  reading something.

6  Q.    Mr. El-Mezain?

7  A.    Next to him in the light white beard.

8  Q.    And the Defendant Ghassan Elashi?

9  A.    He is down there in the light suit and the light tie.

10  Q.    And the Defendant Mufid Abdulqader?

11  A.    The dark suit and the red tie.

12        MR. JACKS:  Your Honor, may the record reflect he

13  has identified the Defendants in this case?

14        THE COURT:  It may do so.

15  Q.    (BY MR. JACKS)  In terms of identifying the voices of the

16  people you listened to for so long, were you able to, not only

17  of these individuals here, but were you able to identify the

18  voices of other persons that you listen to that were

19  encountered in this investigation?

20  A.    That is correct.  I was able and I am able today to

21  identify voices of many individuals that were in contact with

22  the officers of the Holy Land Foundation.

23  Q.    Okay.  Specifically an individual by the name of Abdel

24  Haleem Ashqar, have you listened to his voice and can you

25  identify him?

1    A.    Yes.

2    Q.    A person by the name of Muin Shabib, M-U-I-N

3    S-H-A-B-I-B?

4    A.    Yes, I can identify his voice.

5    Q.    And would that be true of many other persons that you

6    listened to over this extended period of time?

7    A.    That is correct.

8    Q.    You told us about making summaries of the calls.  And at

9    some point in time if a call is deemed necessary or important,

10   is something beyond a summary prepared or created by you?

11   A.    Yes.  Some of these calls were selected for verbatim

12   translations by the case agents.

13   Q.    And when you say verbatim, what are you talking about?

14   A.    Verbatim translation is translation of the entire call,

15   100 percent of the meanings that were exchanged in the call.

16   Q.    All right.  So in a verbatim, does it have a line for one

17   speaker and shows who the speaker is and then the next speaker

18   and so on and so forth?  Is that correct?

19   A.    Yes, that is correct.

20   Q.    Is there a difference between a literal translation and a

21   verbatim translation?

22   A.    There is a huge difference between both.  Literal

23   translation is called word for word translation, and it seldom

24   produces a correct.  Meaning in linguistic circles it is

25   referred to as machine translations, and oftentimes it can

1    produce a completely different meaning than the original.

2         Verbatim translation, on the other hand, are 100 percent

3    of the meaning, correct and accurate meaning of the

4    information.

5    Q.    Okay.  Is there any way -- How many of these FISA

6    intercepted calls would you estimate that you have listened to

7    during the course of this investigation?

8    A.    At least thousands, if not more.

9    Q.    Thousands?

10   A.    Yes.

11   Q.    Setting aside the intercepted calls but just talking

12   about other audiotapes, whether they were seized in a search

13   warrant or something else, have you also listened to those?

14   A.    Yes, I have.

15   Q.    And with regard to -- You said you have also listened and

16   looked at videotapes and translated those.  Is that correct?

17   A.    Yes.

18   Q.    In terms of just audiotapes, could you give an estimate

19   or a guess as to how many of those you may have listened to?

20   A.    In the hundreds.

21   Q.    And videotapes?

22   A.    Again in the hundreds.

23   Q.    To put it in terms of pages, how many pages of documents

24   would you estimate that you have translated during the course

25   of this investigation?

1    A.    I would say at least in the hundreds of thousands of

2    pages.

3    Q.    Hundreds of thousands?

4    A.    Yes.

5    Q.    Were you the only translator or analyst working on the

6    translation of these conversations and documents in this case?

7    A.    I was the main linguist working on it, but there was some

8    other linguists who were also assisting me in the

9    translations.

10   Q.    Okay.  Would their work, for example, be reviewed by you

11   or checked by you?

12   A.    Yes.

13   Q.    Okay.  Did it -- Did the translations by these other

14   persons ultimately come to your attention for checking or

15   quality control?

16   A.    That is correct.  I had the final say.  When the

17   translations were completed by my colleagues, they were

18   submitted to me, I reviewed them, I made some changes

19   according to what I felt would be a correct translation, and I

20   approved it as my own.

21   Q.    Okay.  Now, let me ask you, you testified that of the

22   many things that you looked at, you looked at and translated

23   magazines and books.  Now, did you ever translate an entire

24   book in this investigation?

25   A.    Not an entire book.  We initially summarized a lot of

1    books, and some segments of books or maybe chapters were

2    selected for verbatim translations.

3    Q.    And why was that done as opposed to translating the

4    entire book word for word or verbatim, if you will?

5    A.    Just due to the sheer size and the time constraints.

6    Q.    Okay.  Were there selections or excerpts from books,

7    pages, if you will, that were translated verbatim?

8    A.    Yes, correct.

9    Q.    Are did you make any mistakes when you were doing these

10   translations?

11   A.    I typed hundreds of thousands of pages, and I am a human

12   being.  I am sure I made some mistakes here and there.

13   Q.    All right.  In terms of what would cause you to make a

14   mistake, what are the problems that are presented when

15   you -- What are the biggest obstacles as far as accuracy and

16   -- Let me take it step by step.  If you are listening to a

17   conversation, what are the biggest obstacles to getting an

18   accurate translation for a transcript?

19   A.    For audio recordings, definitely the quality of the

20   audio.  Several audios were given to me many years after they

21   were recorded.  Audio quality tends to deteriorate over time.

22   And also the fact that there could be several speakers

23   speaking at the same time over each other, interrupting each

24   other, and it makes it harder to dissect and put full

25   sentences when four or five people speak at the same time.

```
1    Q.   Do you wear headphones when you are doing this?

2    A.   Yes, I do.

3    Q.   Are you in a quiet room when you are trying to do this?

4    A.   Yes, I am.

5    Q.   And you said that this is when you go through the process

6    of stopping, pausing, backing up, whatever?

7    A.   Correct.  I try to do my best as far as understanding

8    every word that is said.  However, sometimes that becomes

9    almost impossible.

10   Q.   How about a handwritten document?  What obstacles are

11   there for a translator with regard to a handwritten document?

12   A.   Really bad handwriting is the biggest obstacle to a

13   correct translation.  I have translated a number of documents

14   that was horrible handwriting.  Also many times I am given a

15   copy of a copy of an original, and that a lot of times it

16   often makes it harder for me to read a word or part of a

17   sentence or so.

18   Q.   You mean a photocopy?

19   A.   Yes, correct.

20   Q.   Okay.  When you reach a point where you are just, you

21   know, you cannot determine, you know, what is being said or

22   necessarily -- Let me go back first to what is being said.  Is

23   there a symbol or a notation that you put down?

24   A.   Yes.  I would insert the letters UI for unintelligible

25   between square brackets.
```

Q.   Unintelligible, is that what you said?

A.   Yes.

Q.   And then what about where if it is -- the identity of the

speaker is unknown or can't be determined, what kind of

notation do you put down?

A.   If it is unknown male, I would put UM for unknown male;

and unknown female, I would insert UF for unknown female.

Q.   And I think you said that part of your work in terms of

reading up on what is going on is something you have to do to

be good at your job.  Do you recall when you were talking

about that?

A.   Yes, I do.

Q.   Okay.  So if you are listening to a conversation and the

speaker makes a comment about something, is it necessary for

you to know what is going on to put that comment in context?

A.   Absolutely.  If there were -- during this investigation

there was many references to events that took place in the

Middle East, particularly in Gaza and the West Bank, and that

is an area that has events everyday almost.

     Again, in order for me to understand the references to

these events, I begin my day by reading what happens over the

past eight hours in this area.  And that is a process that I

continue many times during the day, not just in the morning.

This way when a reference is made to an event in Gaza, for

instance, I am completely aware of that event.

1    Q.   What is your duty or your purpose or function as it

2    relates to helping the agents?  What is your expectation or

3    responsibility?

4    A.   My responsibility is initially to translate the material

5    into English, and to also give the meaning behind the words.

6    Oftentimes words do not convey the correct meaning, or maybe

7    conveys a portion of the meaning.  My biggest duty other than

8    translation is to advise of the meaning, the meaning that

9    stems from the culture, from the traditions, from the politics

10   of the Middle East, which is heavily involved in this case.

11   Q.   When you do a translation, is it necessary for you to

12   keep in mind or be aware of what was said in earlier calls

13   either between different people or the same people?

14   A.   Correct.  I have to be aware of what was said before and

15   after in relation to the subjects of the conversation.

16   Q.   What do you do if you have a question about you are not

17   sure about either a translation or an expression that you

18   hear?  What do you do in that instance?

19   A.   I have many colleagues that can consult both in the

20   Dallas Division and also nationwide.  The way the linguists

21   are categorized within the FBI is by native country, so if I

22   am working on a Yemeni document, for instance, I may come

23   across a Yemeni expression that I am not familiar with, I have

24   a list I look up for a colleague in a different part of the

25   country I can call him or her and ask her about that meaning

1    of that expression.

2    Q.    Are Arabic language analysts within the FBI linked

3    together like in an email group or anything where they can

4    easily communicate with each other?

5    A.    Yes.  We are linked by many ways.  Email is one of them,

6    phone conference is another one.

7    Q.    You were just talking about expressions or slang terms or

8    something like that.  As in English, are there slang terms or

9    expressions or idioms in the Arabic language?

10   A.    Yes, there is hundreds of them.

11   Q.    And when I talk about an expression say "kick the

12   bucket," literally that might mean to kick the bucket, but it

13   could also mean to die.  Is that what you are talking about?

14   A.    Yes.

15   Q.    During the course of this case, did you hear one of the

16   Defendants use the expression "give them" or "get it to the

17   chickpea peddler or the lupine salesman"?

18   A.    Yes.  I believe that came in a conversation between Mr.

19   Shukri Abu Baker and Mr. Mohammad El-Mezain.

20   Q.    Okay.  And what is a chickpea peddler or lupine salesman?

21   A.    It is really a street peddler who sells snacks, chickpeas

22   or lupine seeds, on a push cart.  And when you go to purchase

23   some of those seeds they wrap them in paper cones.

24        The expression came -- the original of that came when

25   people just tossed or get rid of the paper.  Instead of

1    tossing them in the trash, they would give them to the

2    chickpea peddler to wrap the seeds in.

3    Q.    This peddler -- These are either dried or cooked or

4    heated chickpeas?

5    A.    They are not cooked.  They are fresh.

6    Q.    Like sunflower seeds in our culture?

7    A.    They are very similar to that, yes.

8    Q.    How are they served to a customer?

9    A.    In a paper cone.

10   Q.    Okay.  Like a professionally manufactured paper cone, or

11   just rolled up paper?

12   A.    Rolled up paper.  It could be newspapers.  It could be

13   old notebook papers.

14   Q.    Okay.  So the expression "Give it to the chickpea peddler

15   or the lupine salesman," what does a person mean when they say

16   that?

17   A.    It means get rid of it.

18   Q.    Okay.  Do people recycle or give their excess trash or

19   paper to these peddlers in the Middle East?

20   A.    Yes.  That is correct.  You give them to the chickpea

21   peddler if he happens to pass around.

22   Q.    Okay.  Let me ask you specifically about Arabic names.

23   If you can kind of tell us a little bit about how Arabic names

24   are determined.  Is there a tradition in terms of how a

25   person's Arabic name in terms of what it means or how many

1    words will be in the name?

2    A.    Other than the given name given by the child's parents,

3    of course, many men, Middle Eastern men, have what we call an

4    Abu name.

5    Q.    How do you spell that?

6    A.    It is A-B-U.

7    Q.    What is an Abu name?

8    A.    Abu means literally father of, and that oftentimes

9    happens when the male has a child and so he becomes known as

10   Abu.

11   Q.    Now, is it a son that you attach your Abu name to?

12   A.    Correct.

13   Q.    Not to a daughter, obviously.

14   A.    Most likely it is a son.

15   Q.    Okay.  And is it supposed to be any particular son that

16   would cause that father to have a certain Abu name?

17   A.    Usually it is the firstborn son.

18   Q.    Okay.  Now, can persons have an Abu name even though they

19   may not have a son, or their son may not have the first name

20   that they have an Abu name with?

21   A.    That is correct.  A person could have the -- Could be

22   named like a historical figure in Islam's history, for

23   instance, and that historical figure was known by a certain

24   Abu name, so by extension the person who lives today would

25   carry the same Abu name even if he doesn't have a son by this

1    name.

2    Q.    All right.  With regard to the Defendants, let me ask

3    you, does Mohammad El-Mezain have an Abu name?

4    A.    Yes, Abu Ibrahim.

5    Q.    Is that two words?

6    A.    Yes.

7    Q.    And Shukri Abu Baker, does he have an Abu name that you

8    have heard?

9    A.    Yes, Abu Mohammed.

10    Q.    And let me ask you about other persons that -- Are you

11    familiar with an individual by the name of Omar Ahmed that you

12    encountered in this case?

13    A.    Yes.  And he also goes by Abu Mohammed.

14    Q.    And how about the individual I asked you about earlier

15    Abdel Haleem Ashqar?  Does he have an Abu name?

16    A.    His Abu name is Abul Hassan.

17    Q.    You are saying Abu or Abul, A-B-U-L?

18    A.    A-B-U-L Hassan, which the E-L at the end the definite

19    article in Mr. Ashqar's name.

20    Q.    So some are A-B-U and some are A-B-U-L followed by

21    another name?

22    A.    Correct.

23    Q.    This name Muin Shabib I asked you about, does he have an

24    Abu name?

25    A.    Yes, Abu Mohammed.

1    Q.   And do you know who Mousa Abu Marzook is?

2    A.   Yes, I do.

3    Q.   Okay.  What is his Abu name?

4    A.   Abu Omar.

5    Q.   O-M-A-R?

6    A.   Spelled either O-M-A-R or U-M-A-R.

7    Q.   And does he also go by another name that you heard from

8  these conversations?

9    A.   Yes.  He is often referred to as by the Arabic name A-L

10  dash U-M-D-A, which is Arabic for the mayor.

11    Q.   The mayor?

12    A.   Yes.

13    Q.   Like the mayor of a city?

14    A.   Yes.

15    Q.   Okay.  Yasser Arafat, the former head of the PLO, did he

16  have an Abu name?

17    A.   Yes, Abu Ammar.

18    Q.   And how do you spell the last word?

19    A.   A-M-M-A-R.

20    Q.   Was it one of your jobs in this investigation to explain

21  or educate the agents about what certain Arabic words might

22  mean?

23    A.   Correct.  That is in the heart of what I do for the FBI.

24    Q.   Let me ask you about the word Umm, U-M-M, what does that

25  mean in Arabic?

```
 1    A.    It means mother of.

 2    Q.    Can you use it or give an example?

 3    A.    A lady, just like a man can be called Abu Mohammed, for

 4    instance, his wife would be Umm Mohammed, which mean

 5    Mohammed's mother.

 6    Q.    Ikhwan, I-K-H-W-A-N, what does that word represent?

 7    A.    Ikhwan is the word that is used by the Muslim Brotherhood

 8    to denote its members.

 9    Q.    And the word USRA, U-S-R-A?

10    A.    USRA again is the smallest cell of the Muslim

11    Brotherhood.  Literally it means family.

12    Q.    Literally it translates to family?

13    A.    Yes.  However in this investigation we write it as

14    U-S-R-A, USRA.

15    Q.    The word Shura, S-H-U-R-A?

16    A.    Shura is the governing or advising board.

17    Q.    The word mojama?

18    A.    Mojama is Arabic for complex or center.

19    Q.    Okay.  Sakhra?

20    A.    Sakhra is Arabic for the rock.

21    Q.    All right.  In Arabic are certain words spelled

22    differently?  And by that I mean words such as Ahmed versus

23    Ahmad, Mohammed with an M-O versus an M-U?  Are the same words

24    sometimes spelled differently?

25    A.    Correct.  Many Arabic names can be spelled many different
```

1    ways.

2    Q.    Are certain letters used interchangeably?

3    A.    Correct.  Like Marzook can be spelled with a K or a Q at

4    the end.  Gammel could be spelled with a G or a J, and the

5    same as el, the different article, could be spelled as an E-L

6    or A-L.

7    Q.    In looking -- In doing your translations and transcripts,

8    Mr. Shafik, did you have occasions where you inserted brackets

9    within the transcripts to inform the reader what was being

10   spoken about?

11   A.    Correct.  There is many occasions where I had to insert a

12   comment between square brackets, which is permissible by the

13   linguist rules of the FBI, to explain or clarify a meaning.

14   Q.    Can you give an example of when that would be necessary?

15   A.    If a word is used in short in Arabic and the translation

16   of this word would not convey the entire meaning, I am

17   oftentimes forced to insert a full name of an organization

18   between brackets so the reader of my translation will

19   understand which organization is referred to.

20   Q.    All right.  Specifically let me ask you, did you -- Were

21   there references during this investigation to an organization

22   called the Islamic association of Palestine, or IAP?

23   A.    Correct.  There were many references to IAP.

24   Q.    Were there references to an organization called the

25   United Association for Studies and Research, UASR?

```
1    A.    Correct.

2    Q.    Were there references to an organization called Muslim

3    Arab Youth Association or MAYA?

4    A.    Yes.

5    Q.    Okay.  All three of those organizations have the word

6    association in their title.  Correct?

7    A.    Correct.

8    Q.    But in Arabic are they the same words used in each name?

9    A.    No.  Each one of those organizations have a unique name

10   in Arabic.  When I hear the short word in Arabic for this

11   organization, I have to insert a comment or clarify by giving

12   the full name of the organization, because all three of them

13   are called association in English.

14   Q.    All right.  So if a person is making reference to the

15   Islamic Association of Palestine and they call it the

16   Association, or whatever, you would put -- If it is the word

17   for the IAP that is used for the IAP association, you would

18   put IAP in brackets.  Is that a fair statement?

19   A.    Correct.

20   Q.    For example, like the Palestine Liberation Organization,

21   if they make reference to the Organization, what word

22   translates to the use of the word Palestine Liberation

23   Organization?

24   A.    The Arabic word for it is al-Monazama, and it is spelled

25   A-L dash M-O-N-A-Z-A-M-A.
```

1    Q.    So that would be the indications or instances -- Let me

2    rephrase that.  Whenever you would put brackets within a

3    transcript, was it your purpose to explain the meaning of the

4    transcript according to what the speakers were saying and

5    based on your listening to them?

6    A.    Correct.  If there is a reference to IAP in Arabic, it

7    will, for instance, be referred to as al-Ithad, which is

8    spelled A-L  I-T-H-A-D.  To produce the translation and for

9    the reader of my translation to understand which organization

10   has just been referred to, I would insert between square

11   brackets the full name of this organization.

12   Q.    Let me just direct your attention to the Government

13   exhibit list and ask you, Mr. Shafik, have you reviewed the

14   items contained with the Government's exhibit list?

15   A.    Yes, I have.

16   Q.    And does that include transcripts of conversations from

17   FISA court authorized intercepted calls?

18   A.    Yes.

19   Q.    And does that include transcripts of FISA court

20   authorized intercepted faxes?

21   A.    Correct.

22   Q.    And transcripts of conversations and languages or images

23   from videotapes?

24   A.    Yes.

25   Q.    When you would look at a videotape, would you also -- if

1    you saw writing on a wall or a caption, would you translate

2    that as well?

3    A.    Yes, I would.

4    Q.    Have you reviewed the audiotapes on the Government's list

5    and the translations and transcriptions from that?

6    A.    Yes, I have.

7    Q.    And the documents on the Government's exhibit list, have

8    you reviewed all of them?

9    A.    Yes, I have.

10   Q.    Is it your testimony that all of the translations that

11   you have done represent a true and accurate translation of

12   either the document, the audiotape, the videotape, a book,

13   pamphlet, and their contents, to the best of your ability?

14   A.    Yes, that is my testimony.

15          MR. JACKS:  Your Honor, at this time I would be

16   moving into that area that we need to discuss outside the

17   presence of the jury.

18          THE COURT:  Okay.

19      Members of the jury, we will go ahead and let you go for

20   the day.  Be back at 9:00 tomorrow morning.  Please recall the

21   instructions we have been over about not discussing this case

22   with anyone.  See you back in the morning.

23          (Whereupon, the jury left the courtroom.)

24          THE COURT:  Be seated.

25      Mr. Jacks, did you want to go ahead?

1    MR. JACKS:  At the Court's pleasure.

2    THE COURT:  Let's take care of that.

3    Q.   (BY MR. JACKS)  Mr. Shafik, in listening to all the

4    conversations and reviewing the documents, were there several

5    instances where the speaker would use phrases such as "God

6    willing," "by God," "by Almighty God," "in the name of God,"

7    "the Beneficent," "the Merciful," "may God greet you," "peace

8    be upon you," "may God reward you," "Mohammed, peace be on His

9    name," phrases such as that, was that something that occurred

10   often in the speaking by the people you were listening to?

11   A.   Yes, very often.

12   Q.   Do you recall with regard to what has been referred to as

13   the Philadelphia meeting or conference, did you translate the

14   transcripts of those intercepted conversations?

15   A.   Yes, I have.

16   Q.   Do you recall on one of the sessions in that meeting

17   where one of the speakers, and it may have been Omar Ahmed, I

18   can't recall, but made the reference or made a comment, and I

19   will paraphrase, that "we will not be able to hide who we are

20   because as soon as we talk it will be apparent who we are"?

21   Do you recall that statement or conversation?

22   A.   Yes, I do.

23   Q.   With regard to the speakers and this use of all this

24   other language about God willing, by Almighty God, in your

25   experience what is that indicative of when an Arabic speaker

1   uses those types of terms within their conversation?

2   A.   It is indicative of a person who is known as an Islamist.

3   Q.   Islamist?

4   A.   Yes.

5   Q.   I-S-L-A-M-I-S-T?

6   A.   Correct.

7   Q.   All right.  And is that different than just saying they

8   are a Muslim?

9   A.   Correct.  That is different.

10  Q.   Are there Muslims who are not Islamists?

11  A.   Yes.

12  Q.   All right.  And an Islamist, in your understanding and

13  background and training, what is that person?

14  A.   An Islamist, according to my experience, is a person who

15  is a devout Muslim, a person who observes all the tenants of

16  Islam.  And also an Islamist is a person who believes that

17  sharia is a law of rule, and that will be the only valid rule

18  that he would like to be subjected to.  An Islamist is also a

19  person who completely rejects peace with Israel and sees that

20  armed resistance or jihad is the only form of acceptable

21  encounter with Israel.

22  Q.   And have you been around persons that have led you to

23  this conclusion?

24  A.   I grew up in Cairo where the Muslim Brotherhood took its

25  start.  As a matter of fact, the part of Cairo I grew up in

1  was where the headquarters of the Muslim Brotherhood was.

2  Their slogans, their speeches, their statements were all over

3  Cairo.  I went to college and there was several Islamist

4  students there that were known to be members of the Muslim

5  Brotherhood, and would cast themselves as such, and they would

6  be segregated, refusing to mingle with anybody else who was

7  non-Islamist.

8  Q.    And in that regard, you are -- This is based on your

9  entire experience in growing up in Cairo and being around

10  people who speak the Arabic language?

11  A.    My personal experience is partly for that, partly

12  responsible for this belief, but also there are many books I

13  have read about Muslim Brotherhood, about Hamas, about Islamic

14  jihad, about the history, about the politics, about the

15  religions of the Middle East.

16  Q.    With regard to non-Islamists, would they speak this way

17  to this extent?

18  A.    No, that would not be their normal conversation.

19  Q.    And, for example, let me just -- To try to illustrate it,

20  with regard to say, for example, persons within the PLO or

21  Fatah, would you expect them to speak in this fashion?

22  A.    Not at all.  Fatah or the PLO are known to be secular

23  organizations and they would not use this kind of conversation

24  or dialogue.

25  Q.    Just for example, Hosni Mubarak, the president of Egypt,

1   is he a Muslim?

2   A.   He is.

3   Q.   All right.  And does he speak like this, or would you

4   expect him to speak like this in conversation?

5   A.   No, I would not expect him to speak like that because he

6   is not an Islamist.

7           MR. DRATEL:  I object to that.  He is talking about

8   someone he has never spoken with this person.  I don't know

9   that he has ever had a conversation with this person.

10          THE COURT:  He is trying to lay a predicate.  I will

11  overrule the objection at this point.  He is trying to lay a

12  predicate.

13          MR. JACKS:  Just a moment, Your Honor.

14          THE COURT:  Sure.

15          MR. JACKS:  That is all I have, Your Honor.  I

16  haven't passed him.

17          THE COURT:  I understand.  This is all laying a

18  predicate.

19      Anybody want to take this -- Ms. Duncan?

20          MS. DUNCAN:  I think his testimony already has

21  exposed the kind of bigotry that we were afraid of, that the

22  fact that someone prays repeatedly throughout the day and

23  praises God in their speech is a terrorist is what this man

24  just said.

25      I can cross examine him if you would like, or Mr.

1    Westfall can, but, I mean, to this point he has exposed

2    exactly what we are afraid of, that just the mere fact that

3    someone says peace be upon you and may God bless you turns

4    this person into a terrorist.  I mean, it is really offensive

5    and contrary to our freedom of religion and to the First

6    Amendment in this country.  It is irrelevant.

7              THE COURT:  Any argument, or did you want to

8    question or --

9              MR. WESTFALL:  If it would be helpful to the Court.

10             THE COURT:  It might.

11             MR. WESTFALL:  Okay.

12   Q.   (BY MR. WESTFALL)  Mr. Shafik?

13   A.   Correct.

14   Q.   Are you a Muslim?

15   A.   No.

16   Q.   Have you ever been a Muslim?

17   A.   Never.

18   Q.   You didn't study religion in school.  Right?

19   A.   I did as part of my education in public schools I did.

20   Q.   Well, are you a Christian, then?

21   A.   Yes, I am.

22   Q.   A practicing Christian?

23   A.   Yes.

24   Q.   Go to church on a regular basis?

25   A.   Pretty much.

1    Q.    And you graduated with a degree in linguistics, language?

2    A.    The official name is English literature.  That included

3    poetry, drama, translation, history of English language.

4    Q.    Okay.  And are you -- Did you ever go to a seminary or

5    anything like that?

6    A.    No, I did not.

7    Q.    So the basis for your opinion is that you knew some

8    Brotherhood folks in Egypt and you are a translator and you

9    have read books.

10   A.    No.  The basis of that is my own experience living in

11   Cairo and seeing the Muslim Brotherhood, how they talk, how

12   they phrase themselves, how they speak, how they make speeches

13   all over, how they introduce themselves in elections for 27

14   years.

15   Q.    Have you ever been recognized as an expert on this in any

16   other court?

17   A.    No, I have not.

18              MR. WESTFALL:  That is all I have, Your Honor.

19              THE COURT:  Mr. Dratel?

20              MR. DRATEL:  I just have one question.

21   Q.    (BY MR. DRATEL)  Good afternoon, Mr. Shafik.

22   A.    Good afternoon.

23   Q.    And you are Egyptian.  Now, isn't it a fact that Egyptian

24   technically is ruled by sharia law?

25   A.    Not technically, no.  There are many laws in Egypt that

1  have sharia elements in them, but they are not sharia 100

2  percent.

3  Q.   Is it the policy of Egyptian government that sharia law

4  applies in Egypt?

5  A.   In certain aspects of Egyptian law only.

6  Q.   But sharia law applies in Egypt.

7  A.   As far as things like marriage, divorce, inheritance,

8  yes, but not otherwise.

9  Q.   But that is sharia law applying in Egypt.

10  A.   Largely.

11       MR. DRATEL:  Thank you.

12       THE COURT:  Ms. Duncan?

13  Q.   (BY MS. DUNCAN)  Now, you are aware that Yasser Arafat

14  identified himself as a secularist, are you not?

15  A.   Yes, I am aware of that.

16  Q.   Are you also aware that he prayed five times a day?

17  A.   Not according to the insider information I read he did

18  not.

19  Q.   So you have never spoken to him about his religious

20  practices so you don't know?

21  A.   I do know, and as a matter of fact this was an item of

22  reference during the conference during the Philadelphia

23  conference --

24  Q.   Let me break it up.  When did you speak to Yasser Arafat?

25  A.   I have never spoken to Yasser Arafat.

1 Q.   That was my question.

2      You are aware that religious Muslims have a duty to pray

3 five times a day.

4 A.   Yes, I am aware of that.

5 Q.   And that they also have a duty to praise God as often as

6 possible.

7 A.   Correct.

8 Q.   Now, I think you are testifying that people who say "God

9 willing, "by God Almighty," in the name of God," the

10 beneficent," "the Merciful," too often are Islamists?

11 A.   That is correct.

12 Q.   Bent on the destruction of Israel.  That is your

13 testimony?

14 A.   I said Islamists are people who harbor the view that

15 there can never be peace with Israel and can never recognize

16 the right of Israeli to exist.  That is --

17 Q.   You identified them by people that say "God willing" or

18 "by God" too often.

19 A.   No.  I said that this is an indication of they are

20 Islamists.  This is just one of many traits.

21 Q.   Well, but you are going to say that people who say --

22 begin their speech with words such as "by God" or "God

23 willing," those are Islamists?

24 A.   That is a good indication that they are Islamists.

25 Q.   Okay.  So my question is how often is too often?  Can we

1   say "God willing" five times a day and that is within the

2   Muslim faith?

3   A.   Yes, you can say that a many times as you like.

4   Q.   And so at what point is it, in your opinion, that you

5   cross the line from being a devout Muslim fulfilling your

6   religious obligation to praise God as often as possible and to

7   someone bent on the destruction of Israel?

8   A.   When every single speech you give with begins and ends

9   with religious references by extensive quotation of the can

10  Quran regarding the destruction of Jews --

11  Q.   Stop.  Stop.  That is not what I asked you.

12          THE COURT:  I want to hear what he has to say.  You

13  cut him off twice, and both times that was improper.  I want

14  to hear what he has to say.  Go ahead.

15          THE WITNESS:  Thank you.  During the speech a person

16  that makes extensive references to religious texts, quotes

17  extensively from Quran, from Hadith, which is the sayings of

18  profit Mohammed, and selects the text that talks about the

19  destruction of the Jews and the internal rights of

20  Palestinian, their land, things like "Palestine is an Islamic

21  endowment, that Palestine is Islamic from the river to the

22  sea," many of these references indicate that this person is an

23  Islamist bent on the destruction of Israel.

24  Q.   (BY MS. DUNCAN)  But that is not what we are talking

25  about.  We are not talking about speech that expresses a

1    desire for the destruction of Israel.  We are talking about

2    speech that expresses an adoration for God and praise of God.

3    A.    Adoration of God is one element of a person's mindset,

4    and that mindset, according to that, could be very well

5    Islamist.

6    Q.   I am confused here.  Okay.  So you testified that if

7    someone quotes portions of the Quran that express an intent to

8    destroy Israel that makes them into an Islamist?

9    A.    I am sorry.  I did not hear the last part.

10   Q.    You testified that if someone is quoting portions of the

11   Quran in support of an argument that Israel should be

12   destroyed, that person is an Islamist.

13   A.    Correct.

14   Q.   I am pushing that to the side because that is not what we

15   are talking about here.  What we are talking about here are

16   things like "God bless you, may peace be upon you."  Are you

17   testifying that those sorts of expressions of religious belief

18   are evidence that someone is an Islamist?

19   A.    I am testifying that the speech, the Arabic speech of a

20   person can identify him as a Muslim or as an Islamist.  If a

21   person is an Islamist, there are certain words that he or she

22   chooses to express his views.  He would not come to a person

23   and say "Good morning."  Instead he would choose a Muslim

24   greeting.  He would not just simply say "good-bye."  He would

25   choose a Muslim greeting.  When he speaks he would constantly

1  make religious references constantly quotes from the Quran,

2  constantly quotes from the Hadith.  I am saying that there a

3  speech in Arabic that can clearly distinguish between a normal

4  Muslim and an Islamist.

5  Q.   So if someone starts off, for example, a letter that says

6  "In the name of God, the Beneficent and Merciful," that is

7  passage from the Quran.  Correct?

8  A.   Yes.

9  Q.   So that is something that a devout Muslim would say, and

10  in fact does say five times a day.

11  A.   That is correct.

12  Q.   Thank you.

13  A.   You are welcome.

14       THE COURT:  Any other questions?

15  Mr. Jacks, anything else?

16       MR. JACKS:  No, sir.

17       THE COURT:  So Mr. Shafik, just so I can be clear,

18  in this case --

19  Mr. Jacks, are you going to ask him some opinions as to

20  whether certain conversations, certain individuals that he has

21  listened to and translated, that they are Islamists?

22       MR. JACKS:  Yes, Your Honor.  And again, all of this

23  is as a result of the fact that these individuals and the men

24  that they were meeting with themselves made the statement that

25  "Our speech will give us away."  So it is not Mr. Shafik

1  saying that, but they themselves take the position that what

2  they say tells something about who they are, not that they are

3  Muslim.

4         THE COURT:  But you are going to ask him his

5  opinions based on some of these conversations he has

6  intercepted and heard.

7         MR. JACKS:  Yes, Your Honor.  And I may ask him or

8  not ask him to go to some of the degree that -- as far as what

9  this represents, but certainly to the extent that a person

10  that speaks in this manner is indicative of a person who is an

11  Islamist.

12         THE COURT:  And when you say who speaks in which

13  manner, in this manner?

14         MR. JACKS:  I am not sure what you call it, Your

15  Honor, but the comments that are reflected throughout the

16  statements.

17         THE COURT:  The conversations?

18         MR. JACKS:  Yes, sir, Your Honor.  And it will be

19  apparent when a person reads them.

20         THE COURT:  And that is what I was going to ask.  In

21  those that you are asking him about, is it more than

22  references to praise to God?  Your initial question indicated

23  that it was just based on those phrases, and what I heard you

24  saying here it is actually more than that.

25         THE WITNESS:  Yes, a lot more than that.

THE COURT:  So are you going to render any opinions as to someone is an Islamist based solely on their reference to praising God, or are you talking about the other things you were talking about at the end here where -- quotes from the Quran, the destruction of Israel, some other language like that.  Is that what you are relying on?

THE WITNESS:  I am relying on ten years of translation where there is consistently an Islamist point of view being expressed.  For instance, during the hundreds of videotapes I translated, there was always reference to the destruction of the Jews, annihilation of the Jews, Quran quotations, every single speaker pretty much repeated the same thing, the same rhetoric.

THE COURT:  So it is that rhetoric you are relying on, along with other factors?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Mr. Jacks, it seems it is a little broader.  I just misunderstood what you were indicating at the beginning.  I think if it is based on what he is talking about now, I think he can give an opinion on that based on that kind of rhetoric and language.

MS. CADEDDU:  But Your Honor, I would just like to make it clear for the record, that the documents, the stuff he is relying on is going to be in the record.  I mean, this is usurping the function of the jury.  He is opining based on the

1   exhibits that are going to come in.

2          THE COURT:  But I think someone with knowledge and

3   skill, they are entitled to do that, and it may be helpful to

4   the jury.  The jury wouldn't have expertise on their own

5   necessarily.

6          MR. CLINE:  Your Honor, I am also a little puzzled

7   about what he is going to be able to opine to.  Are you going

8   to stop him from saying it is indicative of an Islamist, or

9   are you going to let him go on --

10         THE COURT:  I don't know.  I don't know what he is

11  going to ask.  And if you have some concerns we can discuss it

12  or you can object.  I am not sure where --

13         MR. JACKS:  Judge, I will resolve that overnight and

14  communicate to them and let them know.

15         THE COURT:  And then if there is some objections,

16  some areas, we can discuss that before we get there.

17         MR. CLINE:  All right.  Because I think there is a

18  significant difference between saying someone is an Islamist

19  and going on to say an Islamist is bent on the destruction of

20  Israel.  That seems pretty far beyond his expertise.

21         THE COURT:  Well, I am assuming that is where you

22  were wanting to go where someone is an Islamist.  And that is

23  part of what he is relying on is this rhetoric, according to

24  what Mr. Shafik just stated, the rhetoric referencing the

25  destruction of Israel.

1    MR. CLINE:  Yeah, but I guess the problem I have,

2  Your Honor, he is an expert translator.  He has certainly

3  heard people use this language before.  He certainly has never

4  been presented to us, nor qualified, I believe, as an expert

5  in what an Islamist thinks.  I think he is pushing it to say

6  he is qualified to say how Islamists talk, but I can see the

7  argument there that he has heard a lot of people that have

8  later been identified as Islamists talk.  But then to let this

9  man say "These people talk like Islamists, therefore, in my

10  opinion, they are Islamists."  And then go on to say,

11  "Islamists are people who think in a certain way," and

12  describe --

13    THE COURT:  What he stated here earlier, that is

14  what you would object to?

15    MR. CLINE:  Absolutely, yes.

16    Now, let me add one thing.  There are going to be

17  statements in the record by the Defendants.  I think those

18  speaks for themselves.  In other words, the Government will

19  have those the record.  They can argue about those however

20  they want to argue.  What they don't need, and what I think

21  would be improper, Your Honor, is to have this language

22  expert, a linguist for the FBI, to get on the stand and say,

23  "People who talk like this are Islamists.  And by the way,

24  Islamists are people who are bent on the destruction of

25  Israel."  That really seems to me to be going too far.

1          MR. DRATEL:  And Your Honor, I second that.  He is

2     not qualified in Islamist, Islam, any of that.  It is not what

3     his qualifications are for expertise, and there is no

4     comparative analysis either in his analysis.  He has this

5     case.  That is it.  He has been listening it for ten years.

6     There is no analysis how other Muslims speak all over the

7     world.  So in a micro and a macro, but the macro is obviously

8     more important to what Mr. Cline is saying.

9          MS. HOLLANDER:  Can I ask him one question?

10          THE COURT:  Sure?

11     Q.   (BY MS. HOLLANDER)  Have you ever been to Gaza?

12     A.   No.

13     Q.   You ever been to the West Bank?

14     A.   Yes.

15     Q.   How many times?

16     A.   One time.

17     Q.   And when was that?

18     A.   In 1994.

19     Q.   For how long?

20     A.   A week.

21     Q.   And that is the total experience in the occupied

22     territories?

23     A.   That is my total experience in person in the occupied

24     territory, yes.

25          MS. HOLLANDER:  Thank you.

1          THE COURT:  Okay.  Mr. Jacks, any response to what

2     was being stated over here by Mr. Cline and Mr. Dratel in

3     terms of how far you can go with your questioning?

4          MR. JACKS:  Your Honor, I have no response.  As I

5     said, I will communicate to them and to the Court the

6     questions that I propose to ask and the answers that I seek to

7     elicit, but I don't have anything to add.

8          THE COURT:  Why don't you let us know say by 8:30 in

9     the morning.

10          MR. JACKS:  I will do it before then, Your Honor.

11          THE COURT:  And then we can plan on being here no

12     later than 8:45 in the morning, counsel, and then we will

13     resolve that issue.

14          MR. CLINE:  Your Honor, could we approach for one

15     second on a personal scheduling matter?

16          (Discussion at the bench, out of the hearing of the

17          reporter.)

18          THE COURT:  We are in recess.

19                    (End of Day.)

20

21

22

23

24

25

1     I HEREBY CERTIFY THAT THE FOREGOING IS A

2   CORRECT TRANSCRIPT FROM THE RECORD OF

3   PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4   I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5   FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6   COURT AND THE JUDICIAL CONFERENCE OF THE

7   UNITED STATES.

8

9   S/Shawn McRoberts   06/04/2009

10  _____DATE_____

   SHAWN McROBERTS, RMR, CRR

11  FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25