IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA      )  CAUSE NO. 3:04-CR-240-P
                              (
vs.                           )
                              (  SEPTEMBER 25, 2008
                              )  DALLAS, TEXAS
HOLY LAND FOUNDATION, ET AL   (  9:00 A.M.

_____

VOLUME 9 of 37

_____

STATEMENT OF FACTS

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

_____

A P P E A R A N C E S

        FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                              1100 COMMERCE, 3RD FLOOR
                              DALLAS, TEXAS  75242
                              BY:  MR. JIM JACKS
                                   MR. BARRY JONAS
                                   MS. ELIZABETH SHAPIRO

        FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
        (SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
                              20 FIRST PLAZA, SUITE 700
                              ALBUQUERQUE, NEW MEXICO 87102
                              BY:  MS. NANCY HOLLANDER
                                   MS. TERESA DUNCAN

```
 1              FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
                (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
 2                                   NEW YORK, NEW YORK  10005
                                     BY:  MR. JOSHUA DRATEL
 3                                        MR. AARON J. MYSLIWIEC

 4              FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
                (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
 5                                   DALLAS, TEXAS  75204
                                     BY:  MS. MARLO P. CADEDDU
 6
                FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
 7              (GHASSAN ELASHI)     P.O. BOX 10985
                                     TAMPA, FLORIDA  33679
 8                                   BY:  MS. LINDA MORENO

 9                                   JONES DAY
                                     555 CALIFORNIA ST., 26TH FLOOR
10                                   SAN FRANCISCO, CA  94104
                                     BY:  MR. JOHN D. CLINE
11
                FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12              (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                     FORT WORTH, TEXAS  76102
13                                   BY:  MR. GREG WESTFALL

14              COURT'S LAW CLERK:   MS. JENNIFER HELMS
                                     1100 COMMERCE, RM. 1654
15                                   DALLAS, TEXAS  75242

16              COURT COORDINATOR:   MS. BRENDA WEBB
                                     1100 COMMERCE, RM. 1654
17                                   DALLAS, TEXAS  75242

18      OFFICIAL COURT REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                                     1100 COMMERCE STREET, RM. 1654
19                                   DALLAS, TEXAS  75242
                                     (214) 753-2349
20

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| ATEF SHAFIK | |
| Direct By MR. JACKS | 8 |
| Cross By MR. WESTFALL | 8 |
| Cross By MS. CADEDDU | 17 |
| Recross By MR. WESTFALL | 29 |

## Government Exhibits

| **Government Exhibits** | **Page** |
|---|---|
| Secretary of State CA-1 Admitted into evidence | 44 |
| Secretary of State TX-4 Admitted into evidence | 47 |
| Picture 2-6 Admitted into evidence | 51 |
| Secretary of State CA-2 Admitted into evidence | 53 |
| HLF Search -1 Admitted into evidence | 56 |
| HLF Search-2 Admitted into evidence | 57 |
| HLF Search-3 Admitted into evidence | 59 |
| Secretary of State CA-3 Admitted into evidence | 61 |
| Mushtaha Search-6 Admitted into evidence | 68 |
| NAIT Records Admitted into evidence | 75 |
| Secretary of State TX-2 Admitted into evidence | 78 |
| IE/Marzook Bank Account-1, 2, 3 Admitted into evidence | 80 |
| Elbarasse Search No. 1 Admitted into evidence | 87 |
| Elbarasse Search No. 2 Admitted into evidence | 93 |
| Elbarasse Search No. 4 Admitted into evidence | 98 |
| Elbarasse Search No. 3 Admitted into evidence | 103 |
| Elbarasse Search No. 5 Admitted into evidence | 109 |
| Elbarasse Search No. 31 Admitted into evidence | 122 |
| Elbarasse Search No. 7 Admitted into evidence | 126 |
| Secretary of State VA-1 Admitted into evidence | 138 |
| Demonstrative No. 15 Admitted into evidence | 140 |
| Elbarasse Search No. 8 Admitted into evidence | 147 |
| Elbarasse Search No. 9 Admitted into evidence | 150 |
| Elbarasse Search No. 10 Admitted into evidence | 154 |
| Ashqar Search No. 1 Admitted into evidence | 164 |
| Marzook Phonebook Admitted into evidence | 167 |
| Elbarasse Search No. 11 Admitted into evidence | 170 |
| Elbarasse Search No. 12 Admitted into evidence | 172 |
| Elbarasse Search No. 13 Admitted into evidence | 175 |
| HLF Search No. 71 Admitted into evidence | 180 |
| InfoCom Search No. 56 Admitted into evidence | 185 |
| Elbarasse Search No. 14 Admitted into evidence | 190 |
| HLF Search No. 5 Admitted into evidence | 193 |
| Elbarasse Search No. 15 Admitted into evidence | 196 |
| El-Mezain Wiretap No. 9, 9-A Admitted into evidence | 205 |
| Elbarasse Search No. 16 Admitted into evidence | 218 |
| InfoCom Search No. 1 Admitted into evidence | 222 |

Baker Wiretap No. 1, 1-A Admitted into evidence                224
Baker Deposition Admitted into evidence                        234
HLF Search No. 6 Admitted into evidence                        240
InfoCom Search No. 51 Admitted into evidence                   242
Ashqar Search No. 2 Admitted into evidence                     245
Elbarasse Search No. 35 Admitted into evidence                 255

## Defendants' Exhibits

**Defendants' Exhibits**                                       **Page**
No. 1094 Admitted into evidence                                137

1          THE COURT:  We are just now getting the jury -- The

2     jury wasn't here, but I understand there is an issue we need

3     to take up.

4          For the record, I guess, Mr. Jacks, you have withdrawn

5     your request to have Mr. Shafik declared as an expert at this

6     point, and you are not offering -- an expert in the area of

7     the meaning --

8          MR. JACKS:  I have withdrawn my plans to go into

9     that area at this time.  I want to wait until the other

10    evidence comes in.

11         THE COURT:  All right.

12         MR. JACKS:  And make a decision then.

13         THE COURT:  Yes, sir.

14         MR. CLINE:  Just a housekeeping matter.  We had

15    renewed a whole series of motions that Judge Fish had

16    previously decided.  We did it in a form of a list, basically.

17    The Government did a list.  I think the Government may have

18    done the same thing with a list of their motions, and we did a

19    list of their oppositions.

20         Although we are urging the motions seriously, I think the

21    anticipation is that Your Honor will likely adopt Judge fish's

22    ruling on those thing.

23         I just wanted to, as a housekeeping matter, remind the

24    Court of that, because we will end up with orders of those in

25    the event --

1          THE COURT:  We will.

2      Ms. Hollander?

3          MS. HOLLANDER:  Yes, Your Honor, one other issue.

4  This goes to our motion for letters rogatory which we filed in

5  April and the Court hasn't ruled on.

6      On the basis of Doctor Levitt's testimony that he got

7  information from the Israeli government, the index, and that

8  he actually went to the warehouse where the government stores

9  the documents that are going -- the Government is going to

10  introduce in this case, that he has seen them, and they are

11  not available except if you have some relationship with the

12  Israeli government, we are renewing our motion for letters

13  rogatory, because it is the only way we have an opportunity to

14  see those documents.

15          THE COURT:  I will take a look at that motion, then.

16          MS. HOLLANDER:  Thank you, Your Honor.  That is all

17  we have.

18          THE COURT:  All right.  I think they are waiting for

19  the jurors to come up.

20          MR. JACKS:  Your Honor, would you like me to have

21  Mr. Shafik resume the witness stand?

22          THE COURT:  Yes, why don't you have him come up.

23          (Whereupon, the jury entered the courtroom.)

24          THE COURT:  Ladies and gentlemen of the jury, good

25  morning.  We are ready to proceed.

1    Mr. Jacks?

2         MR. JACKS:  Thank you, Your Honor.

3    Q.  (BY MR. JACKS)  Mr. Shafik, I just have a couple of

4    questions for you.  In the course of your investigation, did

5    you come across the name Jarada?

6    A.  Yes, I have.

7    Q.  What is -- Can you spell that, please?

8    A.  Spelled J-A-R-D-A.  I am sorry.  J-A-R-A-D-A.

9    Q.  And is that a person's name, or can it be a person's

10   name?

11   A.  It can be an Arab male name.

12   Q.  An Arab male name?

13   A.  Yes.

14   Q.  How does it translate literally?

15   A.  Literally it means locust.

16   Q.  Locust?

17   A.  Yes.

18   Q.  L-O-C-U-S-T?

19   A.  L-O-C-U-S-T, yes.

20   Q.  Thank you.

21        MR. JACKS:  I pass the witness, Your Honor.

22        THE COURT:  Mr. Westfall?

23                    CROSS EXAMINATION

24   By Mr. Westfall:

25   Q.  Hello, Mr. Shafik.

1    A.    Hello.

2    Q.    You mentioned yesterday that you spend several hours a

3    day following different media to stay current on events in the

4    Middle East.

5    A.    That is correct.

6    Q.    And you do this through newspapers?

7    A.    Newspapers is just one item.  There is many other sources

8    of information I rely on to keep myself updated.

9    Q.    You also do it through the internet?

10   A.    Correct.

11   Q.    Looking at news websites?

12   A.    Correct.

13   Q.    And newspapers, for instance, come in several different

14   languages, but two of those languages certainly are English

15   and Arabic?

16   A.    Correct.

17   Q.    And it is important, isn't it, to read the Arabic

18   newspapers, isn't it?

19   A.    I believe so, yes.

20   Q.    You wouldn't want to base what you do on just the English

21   language newspapers.  Right?

22   A.    That is correct.

23   Q.    They would never give you a full picture of what is going

24   on in a place where they speak Arabic.

25   A.    I believe there is not a single newspaper that can give

1   you the full picture.  That is why I make it a point of

2   reading several of them.

3   Q.   And it is very important to do that.

4   A.   Yes.

5   Q.   Because a single newspaper, even whether it is Arabic or

6   English, can have a point of view.  Right?

7   A.   Correct.

8   Q.   They can have the bias of their editorial board?

9   A.   That is correct.

10  Q.   So it is important to read like, for instance, something

11  we are familiar with, both Fox News and CNN?

12  A.   That is correct.

13  Q.   Because both of those outlets have a really different

14  viewpoint.

15  A.   Yes.

16  Q.   And it is no different with Arabic.

17  A.   That is correct.  Each Arabic newspaper has its own point

18  of view and angle or take on the news.

19  Q.   And the same applies to websites?

20  A.   Yes.

21  Q.   So that is why you have to look at a number of different

22  websites so that you can see all of those points of view?

23  A.   Yes.

24  Q.   And you left Egypt when you were 27?

25  A.   Correct.

1   Q.   But you still keep track of the politics back in Egypt,

2   don't you?

3   A.   I do.

4   Q.   You mentioned yesterday that it is a very political

5   region.

6   A.   That is correct.

7   Q.   So people who are here that have ties to Palestine, it is

8   not unusual at all for them to follow the politics of

9   Palestine?

10  A.   No, I would say it is not unusual.

11  Q.   And, in fact, it is very common.  True?

12  A.   Yes, I believe so.

13  Q.   And it is also, like everyone else, it is common for

14  people from Palestine to look at different news outlets to get

15  all the viewpoints as well.  Right?

16  A.   It is a choice.  People can make that choice or choose to

17  rely on one source of media.  I cannot make that decision for

18  them.

19  Q.   What you do, though, is look at a number of different

20  outlets?

21  A.   I do, because I make a point of deriving information from

22  multiple sources, not relying on a single, but I don't know

23  what other people do.

24  Q.   And that is the way to get the most information.  Right?

25  A.   To me it is.

```
1    Q.    And the best information?

2    A.    To me it is.

3    Q.    Because you get all different viewpoints?

4    A.    I like to get many viewpoints, yes.

5    Q.    And in the news that covers Palestine, a lot of it is

6    very biased, wouldn't you agree?

7    A.    Some of it are very biased.

8    Q.    I mean, for one side or the other.

9    A.    I would say that is true.

10   Q.    And then a lot of the English language stuff that covers

11   Palestine and Israel just doesn't get it because they are

12   really not on the ground.  Wouldn't you agree?

13   A.    It is too broad of a statement, sir.  I am not sure -- I

14   would say some websites are very biased, English and Arabic;

15   some are not; some are somewhere in the middle.

16   Q.    Okay.  None of the FBI agents you worked with on this

17   case speak Arabic.  Right?

18   A.    There were some FBI agents that worked on this case that

19   speak Arabic.

20   Q.    Okay.  Then let me -- That one was probably too broad,

21   too, because there is a lot of FBI agents.  Lara Burns does

22   not speak Arabic.  Right?

23   A.    No, she does snot.

24   Q.    Rob Miranda does not speak Arabic.  Right?

25   A.    Right.
```

1    Q.   Barry Jonas does not speak Arabic.

2    A.   No.

3    Q.   Elizabeth Shapiro does not speak Arabic.

4    A.   No.

5    Q.   And Jim Jacks does not speak Arabic.

6    A.   Correct.

7    Q.   And what I have just named is the Prosecution team and

8    the two primary case agents on this case.  Right?

9    A.   That is correct.

10   Q.   And so they depended upon you to basically tell them what

11   everything means?

12   A.   No, that is not correct.  My translation is a source of

13   information, however FBI agents, especially in the

14   counterterrorism field, rely on multiple sources of

15   information.

16   Q.   I know.  But I am talking about like the FISA calls and

17   when they would hand you a document and ask you to translate

18   it, it was up to you to tell them what it means.  Right?

19   A.   I am one of the lead linguists on the case, but I am one

20   of several linguists that work on the case.

21   Q.   In fact, I think you said yesterday you are the lead

22   linguist.

23   A.   That is correct.

24   Q.   And that when somebody who is your subordinate would give

25   you something, sometimes you would correct that to actually

1    change the meaning or affect the meaning somehow if you felt

2    like it didn't capture the true essence of the meaning?

3    A.    I had the final say regarding word choice.  For instance,

4    if I felt a word conveyed a better meaning, the correct and

5    accurate meaning, I would make a change.

6    Q.    And so when -- It was your duty to listen to the phone

7    calls that had been wiretapped.  Right?

8    A.    Correct.

9    Q.    And then it was also your duty to decide which ones were

10   pertinent.  Right?

11   A.    Based on feedback and instructions from the case agents,

12   yes.

13   Q.    Right.  But certainly when you are sitting there with

14   your headphones and you have been given your criteria, if you

15   pick up on something that sounds pertinent, then that is a

16   pertinent call?

17   A.    Yes.

18   Q.    And you are the one that makes the judgment call on that?

19   A.    Initially, yes.

20   Q.    And if you deem a call to be not pertinent, and pertinent

21   means it basically relates to what we want to, you know, know

22   about the issues of the case.  Right?

23   A.    Yes.

24   Q.    It could be relevant, but pertinent is kind of a term of

25   art in the FBI.  Right?

1    A.    Correct.

2    Q.    So if you make the decision that a call is not pertinent,

3    then you don't summarize it.  Correct?

4    A.    That is correct.  Sometimes there is a request to

5    initially provide coverage or summary of a broad range of the

6    calls, so even sometimes a call that is labeled as not

7    pertinent would receive a small summary.

8    Q.    Pertinent, once again, is a term of art, but let's break

9    it down.  Let's say instead, instead of pertinent, because

10   that, you know, has a very specific meaning, let's say --

11   Would it be fair to say that if you listen to a call and you

12   decide that nothing that is said in that call is meaningful to

13   you, given what the agents have told you and what you know.

14   Okay?  That is a call that would not be summarized.

15   A.    In some cases, or in most cases.  However, like I said,

16   sometimes we receive instructions to provide summary for a

17   block of calls covering certain dates, and many times end up

18   summarizing every single call whether I felt this was

19   pertinent or not.

20   Q.    Okay.  So aside from that exception that you have now

21   told me twice, the answer to my question is yes.

22           THE COURT:  Counsel, the answer is what he gave you,

23   that most of the time they don't do it, but occasionally they

24   do.  You have asked him twice and now you are asking him a

25   third time.

1          MR. WESTFALL:  I am trying to be clear, and I am

2     sorry, Your Honor.

3          THE COURT:  That is the answer.  He has given it

4     twice.

5     Q.    (BY MR. WESTFALL)  Okay.  So if you have decided a call

6     is not relevant, not pertinent, and you didn't summarize it --

7     Which you summarize it in English.  Right?

8     A.    Yes.

9     Q.    So the agents can read it?

10    A.    Correct.

11    Q.    And when you have decided that a call is not pertinent or

12    not part of this block of calls, which is the exception to the

13    rule, then that one just kind of stays on the hard drive.

14    Right?

15    A.    Correct.  It is remained saved, but yes.

16    Q.    Okay.  And then the agents are not necessarily ever going

17    to even know about those.  Right?

18    A.    Actually they would because they can access the system by

19    the phone numbers that dialed to or from a certain target

20    number, as we call it, and they can very well come up and say,

21    "Even though this call was not summarized six months ago, I

22    would like it to be summarized because the phone number that

23    it came from is important to this investigation."

24    Q.    Right.  But what I asked was they are not necessarily

25    ever going to know what that call was about unless they say,

1    "Hey, we now want to see something about this phone

2    number."  But if you don't summarize it into English, they are

3    not necessarily ever going to know what that call says.

4    Correct?

5    A.    Yes.

6            MR. WESTFALL:  Pass the witness.

7            MR. DRATEL:  No questions, Your Honor.

8            MR. CLINE:  No questions.

9            THE COURT:  Anyone have any questions?  Ms. Cadeddu?

10           MS. HOLLANDER:  I have no questions.

11           MS. CADEDDU:  Yes, Your Honor, I do.

12                        CROSS EXAMINATION

13   By Ms. Cadeddu:

14   Q.    Good morning, Mr. Shafik.

15   A.    Good morning.

16   Q.    You testified yesterday that--and I think you just

17   reaffirmed--that you are basically the head translator for

18   this case.  Is that right?

19   A.    Yes.

20   Q.    And so you either translate everything yourself or you

21   oversee the translation by the team who works for you.  Is

22   that right?

23   A.    That is right.

24   Q.    But I think you said that most of the work you did

25   yourself.

```
 1    A.    Correct.

 2    Q.    So would the videos, for example, did you translate all

 3    of those, or was that part of the team effort?

 4    A.    I did most of them, not all of them.

 5    Q.    And the same thing with the FISA calls.  You didn't do

 6    them all?

 7    A.    Yes.

 8    Q.    But I think you did say yesterday you translated the

 9    whole Philadelphia conference.

10    A.    That is correct.

11    Q.    Now, you also testified yesterday that you can recognize

12    the voices of all of these Defendants.  Is that right?

13    A.    Yes.

14    Q.    And I guess you can also -- you said you can also

15    identify the voices of other people who call those phone lines

16    on a regular basis.  Is that right?

17    A.    Yes.

18    Q.    Because what you are doing is listening to all the calls

19    for a particular phone line, telephone line.

20    A.    Correct.

21    Q.    Like a certain number, for example.

22    A.    Yes.

23    Q.    So when we talk about a telephone, a line, because we all

24    know what we are talking about, but when we say line, a line

25    is a telephone number.
```

1    A.    That is correct.

2    Q.    And I think you said, and as I recall this is exactly

3    what you said, the distinctiveness of each voice becomes

4    familiar to you after your years of listening to them.

5    A.    Yes.

6    Q.    And sometimes the way it works is you recognize the

7    voices.  Right?

8    A.    Yes.

9    Q.    But other times the callers identify themselves so that I

10   might call you up and say, "Hi this is Marlo."  Right?

11   A.    Yes.

12   Q.    Or I might call somebody and say, "May I speak to Joe?"

13   And so that would help you identify who the speakers were if

14   you didn't otherwise recognize the voice.  Right?

15   A.    That is correct.

16   Q.    And so, as Mr. Westfall talked about the process, the

17   phone calls that you believe are important, you initially in

18   most cases provide a summary.

19   A.    Correct.

20   Q.    And that summary is basically a sheet of paper, I think

21   you said maybe up to five or six pages sometimes?

22   A.    It could be anywhere from paragraph to 5, 10, 20 pages.

23   Q.    Those summaries are required to be in a certain form.  Is

24   that right?

25   A.    That is correct.

1   Q.   So on the form at the top it is going to say who the

2   speakers are.

3   A.   Yes.

4   Q.   And it will give like a name and then sometimes a little

5   -- like an abbreviation for the name.

6   A.   Abbreviation such as?

7   Q.   I am sorry?

8   A.   Abbreviation such as?

9   Q.   Well, in other words, it might -- there might be--I am

10  trying to think of a name you used yesterday--Muin Shabib, and

11  you might indicate in the transcript an MU or something like

12  that.

13  A.   Yes.

14  Q.   So it would say the name, and then it would say, you

15  know, equals and the abbreviation for that name.  Is that

16  right?

17  A.   That is right.

18  Q.   So in the summary -- In the call it is going to

19  use -- Let me back up.  In either the summary or a verbatim

20  translation, instead of writing out the whole name every time,

21  you are going to use the person's abbreviation?

22  A.   In the summary you usually use the person's first full

23  name.  Verbatim, just for -- I use symbols or short

24  abbreviation of the name.

25  Q.   Sure.  But in every single case when you summarize or do

1    a verbatim translation, at the top you list the names of all

2    the speakers in the call.  Right?

3    A.    If I recognize them, yes, I do.

4    Q.    If you recognize them you do?

5    A.    Yes.

6    Q.    Okay.  Now, you -- And also on that translation or either

7    the summary or the -- Well, on summaries and the verbatim

8    translations, the sheets that you put together, you write on

9    there the line number, for example.

10   A.    Correct.

11   Q.    So that the people who are reading it know what telephone

12   number it came from?

13   A.    Yes.

14   Q.    Okay.  And then you also put your name so that whoever is

15   reading it knows who translated it?

16   A.    Yes.

17   Q.    And you put a time and a date.

18   A.    Yes.

19   Q.    Now, you I believe listened to my calls -- not my calls,

20   I hope, my client's calls, for about three years.

21   A.    Your client is Mr. Mufid?

22   Q.    Mr. Mufid, yes.  For about three years.  Right?  Because

23   you started, I think you said, in 1998, and then the capture

24   was ended in 2001.  Is that correct?

25   A.    I believe that to be correct, yes.

```
1    Q.   But there were actually the -- I believe the FBI was

2    capturing Mr. Abdulqader's calls before you came to the FBI.

3    Right?

4    A.   I don't have this information.  I don't know.

5    Q.   Fair enough.  Now you are aware that two of his telephone

6    numbers were being captured.  Is that right?

7    A.   Yes.

8    Q.   When I say captured, what I mean is recorded.

9    A.   Correct.

10   Q.   And one of those numbers was his home number?

11   A.   Yes.

12   Q.   And one was his office number.

13   A.   Yes.

14   Q.   With the City of Dallas.

15   A.   Yes.

16   Q.   And so you would listen to all his phone calls at the

17   City of Dallas between him and perhaps people in his office or

18   whomever.

19   A.   Correct.

20   Q.   And so during that period of time you obviously got to

21   know his voice.  Right?

22   A.   I was familiar with his voice from before from the

23   frequent contacts he had with the Holy Land Foundation.

24   Q.   I guess I think I am overcomplicating here.  You

25   recognize Mufid Abdulqader's voice when you hear it on a tape?
```

```
 1    A.    Yes, I do.

 2    Q.    And there is one other brief point that I want to talk to

 3    you a little bit about, and it is how -- It is sort of how you

 4    describe what language is being used.  Sometimes calls are

 5    part in English and part in Arabic.  Is that right?

 6    A.    Correct.

 7    Q.    So, for example, Mufid Abdulqader's wife doesn't speak

 8    any Arabic.  Right?

 9    A.    Yes.

10    Q.    She says, "Hello," and someone asks for Mufid, and she

11    says, "Hold on.  Let me get him for you."

12    A.    Yes.

13    Q.    And when you do a verbatim translation, a word-for-word

14    translation of that call, you would indicate the English part

15    by writing it out in italics?

16    A.    Right.  That is actually an FBI headquarters mandate that

17    English would be distinguished from Arabic.

18    Q.    You are writing the whole thing in English.

19    A.    Verbatim, the whole thing.

20    Q.    So unless you identify the English part in some way,

21    people wouldn't know if it was said in English or Arabic.

22    A.    Yes, that is right.

23    Q.    Now, as you said, you recognize Mr. Abdulqader's voice.

24    Right?

25    A.    Yes.
```

1    Q.   From having listened to it for at least three years.

2    Right?

3    A.   Yes.

4    Q.   And you said that you translated the Philadelphia meeting

5    that the jury has heard about.

6    A.   Yes.

7    Q.   That happened in 1993?

8    A.   Correct.

9    Q.   And you did not identify Mr. Abdulqader's voice on a

10   single one of the tapes of the Philadelphia meeting.  Is that

11   right?

12   A.   That is correct.  There are several individuals whose

13   voice resembled very much his, and I was -- Let's say I was 80

14   percent sure that was him.  However, since I could not be 100

15   percent sure, I did not put his name.

16   Q.   Okay.  So you have, I think, there are what?  Maybe 16 or

17   18 tapes.  Right?  Let me take a step back here.  Mr.

18   Abdulqader is not what anyone would call shy.  Right?

19   A.   I don't think he can be.

20         MR. JACKS:  Your Honor --

21         MS. CADEDDU:  Well, he has been listening to his

22   phone calls, Your Honor, for three years.

23   Q.   (BY MS. CADEDDU)  Right?

24   A.   Right.

25   Q.   And you get kind of a feeling for people's personalities.

1  Right?

2  A.    I do.

3  Q.    And how they deal with other people.

4  A.    I do.

5  Q.    Right?  And would you say that Mr. Abdulqader is shy

6  about expressing his feelings or thoughts?

7  A.    No, I would say he is not.

8  Q.    And he also speaks pretty loudly.  Right?

9  A.    Average voice.

10  Q.    Okay.  And would you think it likely he would sit in a

11  meeting for three days and not say anything?

12  A.    No.  I think it is very likely he did speak, and there

13  are certain, many parts in the Philadelphia meeting that I

14  thought was Mr. Abdulqader.  Again, since I was not sure due

15  to audio quality, I marked those as unknown male.

16          MS. CADEDDU:  May I approach the witness, Your

17  Honor?

18          THE COURT:  Yes.

19          MS. CADEDDU:  And Your Honor, I want to go through

20  the identifications.  I am not going to talk about the

21  substance of the calls because they are not in evidence.

22  Q.    (BY MS. CADEDDU)  I have one copy of this.  I would like

23  to page through it here I have Government's Exhibit No. 16-37?

24  Do you see that?

25  A.    Yes, I do.

1    Q.    List of perhaps 16 participants?

2    A.    Yes.

3    Q.    Shukri Abu Baker, Ghassan Elashi, Abdel Jabar Hamdam,

4    Osama Mohammed.  Do you see all those names?

5    A.    Yes.

6    Q.    And Mufid Abdulqader's name is not on there.  Right?

7    A.    No, it is not.

8    Q.    We have another one here.  This is Omar.  Do you see Mr.

9    Abdulqader's name on that?

10    A.    No, I don't.

11    Q.    Okay.  And here on Government's Exhibit No. 16-49, you

12    have listed a number of speakers.  Is Mr. Abdulqader's name on

13    that?

14    A.    No, it is not.

15    Q.    And here Government's Exhibit No. 16-61.  Do you see

16    that?

17    A.    Yes.

18    Q.    And do you see about 12 names identified there?

19    A.    I do.

20    Q.    His name is not one of them.  Right?

21    A.    Right.

22    Q.    Government's Exhibit No. 16-67; 10 or 12 names.

23    A.    His name is not there.

24    Q.    No. 16-73.

25    A.    I see it.

1  Q.   About 18 names, you would say?  His name is not one of

2  them?

3  A.   Correct.

4  Q.   No. 16-77.  Again, about 18 names, maybe 15.  Do you see

5  his name on there?

6  A.   No.

7  Q.   How about this one?  About 20 names on this one, No.

8  16-83.  Do you see his name on there?

9  A.   No.

10 Q.   I think we have one more here.  No.  16-91.  That one has

11 about 20 names.  Is his name identified there?

12 A.   No.

13           MS. CADEDDU:  Pass the witness.

14           THE COURT:  Mr. Jacks?  I think that was all the

15 defense counsel.  Any redirect?

16                    REDIRECT EXAMINATION

17 By Mr. Jacks:

18 Q.   Mr. Shafik, you made reference to the term, or I don't

19 know if it is an acronym, QC.  And what does QC stand for?

20 A.   Yes, it stands for quality control.

21 Q.   And one -- I think you testified that one of your

22 responsibilities as the lead language analyst in this case was

23 to be the quality control person for other language analysts

24 that translated items.  Is that correct?

25 A.   That is correct; in particular in regards to this case.

1  Q.   With regard to your own work, and is it -- Is your own

2  work periodically QCed by people above you, either elsewhere

3  in the Bureau or at headquarters or at the lab?

4  A.   Yes.  My work is QCed, pulled for periodical quality

5  control by other senior linguists in the FBI.

6  Q.   Now, I take it you are not saying that all of this work

7  that you did was looked at by someone, but was it randomly

8  done?

9  A.   Yes.  Samples were taken from my work and QCed by other

10  linguists.

11  Q.   I think I stepped on your answer.  What was taken?

12  A.   Random samples from my work were taken and sent to other

13  senior linguists inside the FBI and it was reviewed for

14  quality control purposes.

15  Q.   You were asked about the transcripts and what information

16  would be contained on the transcript, and obviously you said

17  that the identity of the speakers, to the extent it could be

18  determined, would be listed on the transcript.  Is that

19  correct?

20  A.   Yes, correct.

21  Q.   And with regard to the number that was either called or

22  if it was an incoming call the identity of where the

23  incoming -- the caller I.D. information, for example, that we

24  are so familiar with now, was that captured by this equipment?

25  A.   Yes, it was.

1   Q.   Was it always captured by this equipment?

2   A.   Not always.

3   Q.   And with regard to, for example, overseas calls that

4   might be coming in, would they be captured on the caller I.D.?

5   A.   In regards to the overseas calls at my computer

6   terminals, many times I will have no number or a zero.

7   However, my understanding is that case agents can retrieve

8   this number from a different system.

9   Q.   Do you know if that has been -- If that is a new

10  technology, or if that was a technology that was present when

11  you first started in this case?

12  A.   It was present when I started in this case.

13  Q.   Now, whenever there was a call that did not -- At the

14  time that it was either recorded or listened to by you, and

15  there wasn't any caller I.D. number there, would that then be

16  blank or not a part of the transcript?

17  A.   It would be blank.

18          MR. JACKS:  I believe that is all I have.  Thank

19  you, sir.

20          THE COURT:  Thank you.

21      Mr. Westfall?

22                    RECROSS EXAMINATION

23  By Mr. Westfall:

24  Q.   On the issue of the time and date and the phone number,

25  it appears that all of these, if not -- If not all of them,

1   then certainly the majority have a time and date stamp on the

2   verbatim translation.

3   A.   Most of them do.

4   Q.   And it would be the date and then the time, and then the

5   time is stated in military time.  Right?

6   A.   Correct.

7   Q.   And that is, military time starts at zero at midnight and

8   then 1:00 is like 1300 and such.  Okay.  The time that is

9   stamped on there, that is the time the call was received?

10  A.   That is the time the system displays the call was

11  received, yes.

12  Q.   Okay.  And it is central time or eastern time or what?

13  A.   In my end user -- my computer will be central time.  If

14  it arrives to a different office, it will follow the timing of

15  that time zone.

16  Q.   Okay.  So wherever the call is received is the time zone

17  that is going to be in?

18  A.   Yes.

19  Q.   Okay.

20          MR. WESTFALL:  Thank you, Your Honor.

21          THE COURT:  Ms. Cadeddu, any further questions?

22          MS. CADEDDU:  No, Your Honor.

23          THE COURT:  Anybody else?

24      All right.  Mr. Shafik, you may step down.  Thank you.

25      Next witness?

1    MR. JONAS:  Your Honor, the Government calls Lara

2  Burns.

3    MR. JACKS:  May we approach the bench, Your Honor?

4    THE COURT:  Sure.

5    (The following was had outside the hearing of the

6    Jury.)

7    MR. JACKS:  Judge, I don't know that anybody has

8  invoked the rule yet and the reason I bring it up now one of

9  the individuals on our witness list the Defendant Shukri

10  Baker's brother is in the courtroom so at a minimum we ask he

11  be excluded.

12    MS. HOLLANDER:  We didn't invoke the rule and

13  neither did you.

14    THE COURT:  Do you want to invoke it now.

15    MR. JACKS:  Yes.

16    MS. CADEDDU:  That is going to make it really

17  apparent who is going to leave.

18    THE COURT:  I don't think -- People are coming in

19  and out all the time.  Somebody go back there and tell him he

20  needs to leave.

21    MS. HOLLANDER:  The rule has not been invoked to

22  this time.

23    THE COURT:  I understand but it is being invoked

24  now.

25    MS. HOLLANDER:  Are experts excluded from the rule.

1            THE COURT:  I kind of leave that up to the parties.

2     Sometimes experts want to be in and listen because it is

3     helpful so it would defend if you want to agree to not exclude

4     that is fine.  If you don't want to we can do it on an expert

5     by experts.

6            MR. DRATEL:  I think experts are a different matter.

7            THE COURT:  You can think about that.

8            MS. HOLLANDER:  We would like to exclude.

9            THE COURT:  Do you want to agree to that to exclude

10    experts.

11           MR. JACKS:  That is fine.

12           MS. DUNCAN:  With Mr. Abu Baker can we have a

13    two-minute delay to it doesn't look to the jury like he is

14    being asked to leave?

15           THE COURT:  That is fine.

16           (The following was had in the presence and hearing

17           of the jury.)

18           THE COURT:  Agent Burns, if you will raise your hand

19    and be sworn in.

20           (Whereupon, the oath was administered by the Court.)

21                        LARA BURNS,

22    Testified on direct examination by Mr. Jonas as follows:

23    Q.   Would you please state and spell your name?

24    A.   Yes.  Lara Burns, L-A-R-A  B-U-R-N-S.

25    Q.   Ms. Burns, what do you do for a living?

1    A.    I am a special agent with the Federal Bureau of

2    Investigation.

3    Q.    Would that be the FBI?

4    A.    That would be the FBI.

5    Q.    What is a special agent?

6    A.    An agent that is appointed by the FBI to investigate

7    crimes and other matters.

8    Q.    Do you have a college degree?

9    A.    I do.

10   Q.    What is your degree in?

11   A.    Political science.

12   Q.    Do you have a post graduate degree?

13   A.    I do.

14   Q.    What is that in?

15   A.    I have a law degree.

16   Q.    Do you practice law?

17   A.    I did, but I don't anymore.

18   Q.    When did you join the FBI?

19   A.    In 1999.

20   Q.    Where were you assigned when you joined?

21   A.    After initially training at the FBI academy in Quantico,

22   Virginia, I was assigned to the Dallas Division of the FBI.

23   Q.    Have you been with the Dallas Division ever since?

24   A.    Yes, I have.

25   Q.    What exactly do you do for the FBI?

1    A.    I am currently assigned to the North Texas Joint

2    Terrorism Task Force.

3    Q.    And what is the North Texas Joint Terrorism Task Force?

4    A.    It is a task force whose job is to investigate matters

5    relating to counterterrorism.

6    Q.    And the fact that it is a task force, what does that

7    mean?

8    A.    That means that we, being the FBI, work with other

9    federal, state, and local law enforcement agencies in a joint

10   effort to combat terrorism.

11   Q.    What type of training has the FBI given you?

12   A.    In addition to my initial training at the academy in

13   Quantico, we have periodic training in all issues, everything

14   from money laundering to terrorism.

15   Q.    Have you been certified to teach by the FBI?

16   A.    I have.

17   Q.    In what field?

18   A.    In the counterterrorism field I have been certified to

19   instruct other federal, state, and local law enforcement

20   officers on terrorism issues.

21   Q.    Now, you testified that as a special agent you are

22   involved in criminal investigations?

23   A.    Yes.

24   Q.    Does the FBI conduct other type of investigations as

25   well?

```
 1    A.    They do.

 2    Q.    What type?

 3    A.    Intelligence investigations are one.

 4    Q.    And what are intelligence investigations?

 5    A.    An intelligence investigation is an investigation whose

 6    ultimate purpose is to gather information on matters relating

 7    to national security.

 8    Q.    And what is the difference between an intelligence

 9    investigation and a criminal investigation?

10    A.    The end goal basically is the difference.  A criminal

11    investigation, the purpose for that is to determine if a crime

12    has been committed, and if so, to prosecute individuals or

13    entities for committing those crimes; whereas in an

14    intelligence investigation, the primary goal is to gather

15    intelligence and information on individuals and entities who

16    are deemed to pose a threat to the national security of the

17    United States.

18    Q.    What type of tools are used in intelligence

19    investigations?

20    A.    There are a number of tools.  You can request records

21    from credit card companies, telephone companies, we can

22    conduct wiretaps, we can conduct searches, we interview

23    witnesses, conduct surveillance, things like that.

24    Q.    The wiretaps you mentioned, would those be known as FISA

25    wiretaps?
```

```
1    A.    They are.

2    Q.    And just so we are clear, when I say FISA, I mean Foreign

3    Intelligence Surveillance Act?

4    A.    That is correct.

5    Q.    Are those wiretaps authorized by a federal judge?

6    A.    They are.

7    Q.    Is that judge also known as a FISA judge?

8    A.    Yes.

9    Q.    So he is a judge like Judge Solis?

10   A.    Yes, he is a federal judge.

11   Q.    Can you compare the tools you just discussed in an

12   intelligence investigation with the type of tools that are

13   used in a criminal investigation?

14   A.    The tools themselves are very similar.  It is a

15   difference in where we get the authority to use those tools.

16   In a criminal investigation we have -- we would seek grand

17   jury subpoenas for financial records and telephone records and

18   things like that.  But again, many of the tools are the same.

19   We have wiretaps in criminal investigations, search warrants,

20   interviewing witnesses, things like that.

21   Q.    Was the Holy Land Foundation the subject of an

22   intelligence investigation?

23   A.    They were.

24   Q.    For how long?

25   A.    The intelligence investigation of the Holy Land
```

1    Foundation began in 1994.

2    Q.    When did it end?

3    A.    I think it was around 2001.

4    Q.    Were some of the individual Defendants also the subjects

5    of intelligence investigations?

6    A.    They were.

7    Q.    What investigative techniques were used in those

8    intelligence investigations?

9    A.    There were wiretaps, national security letters were

10   issued, which basically is a subpoena for financial records

11   and also for telephone records, witnesses were interviewed,

12   surveillance was conducted, things like that.

13   Q.    Were you assigned to the intelligence investigation?

14   A.    No, I was not.

15   Q.    Did there come a time when the intelligence investigation

16   became a criminal investigation?

17   A.    The FBI instituted a criminal investigation of the Holy

18   Land Foundation in 2001, in December of 2001.

19   Q.    Were you assigned to the criminal investigation?

20   A.    I was.

21   Q.    Okay.  Are you familiar with the indictment in this case?

22   A.    I am.

23   Q.    The indictment charges the Defendants with crimes that

24   occurred in the '90s through 2001.  Just so we are clear, is

25   that the time of the intelligence investigation of the Holy

1  Land Foundation?

2  A.    That is correct.

3  Q.    If the FBI at the time of the intelligence investigation

4  is aware that crimes may be being committed, why don't they

5  try to stop those individuals at that time?

6  A.    There is an issue -- when there is an intelligence

7  investigation that is ongoing, on certain events or on certain

8  occasions the FBI and the Department of Justice may determine

9  that the purpose for the intelligence investigation trumps a

10 criminal investigation or an immediate criminal investigation

11 of individuals.  In this instance, I believe that is what

12 occurred.

13         MR. DRATEL:  Objection, Your Honor.  She wasn't part

14 of the intelligence investigation.

15         THE COURT:  Overruled.  She may answer.  Go ahead.

16         THE WITNESS:  In this instance the FBI and the

17 Department of Justice were conducting an intelligence

18 investigation of the Holy Land Foundation, and determined that

19 the value --

20         MR. DRATEL:  Object on the basis of knowledge, too.

21         THE COURT:  Overrule the objection.  Go ahead.

22         THE WITNESS:  And they determined that the value of

23 the intelligence gathering mission was more important than the

24 immediate prosecution of individuals for crimes.

25 Q.    (BY MR. JONAS)  What happened in 2001 that caused this to

1    go from an intelligence investigation to a criminal

2    investigation?

3              MR. DRATEL:  Objection, Your Honor.  Again, Your

4    Honor, hearsay.  She was assigned to the criminal

5    investigation --

6              THE COURT:  Overruled.

7              THE WITNESS:  The HLF shut down in December of 2001,

8    and at that time the FBI decided to begin its criminal

9    investigation of those individuals.

10   Q.   (BY MR. JONAS)  In the criminal investigation, what type

11   of investigative tools did you use?

12   A.   We conducted search warrants, we requested that the

13   federal grand jury issue subpoenas for financial records and

14   telephone records, we interviewed witnesses, things like that.

15   Q.   Did you request records from foreign countries?

16   A.   We did.

17   Q.   Okay.  Were you able to access the material gathered

18   during the course of the intelligence investigation?

19   A.   Yes.

20   Q.   And specifically I mean the wiretaps?

21   A.   Yes.

22   Q.   Can you go through with us quickly, not in a lot of

23   detail, the search warrants that were executed as part of the

24   criminal investigation in this matter?

25   A.   As part of the criminal investigation there were several

1    search warrants that were executed.  The HLF offices in

2    Dallas, New Jersey, Illinois, and San Diego, we executed

3    search warrants on the property from those offices.

4         In addition to that, there was a related computer company

5    across the street from the Holy Land Foundation called

6    InfoCom, and we conducted a search warrant of that location.

7         Further, in 2004 the home of a man named Ismail Elbarasse

8    was searched and materials were seized.

9    Q.   Can I stop you for a moment.  Can you try to spell Ismail

10   Elbarasse for the record?

11   A.   Ismail is I-S-M-A-I-L.  The last name is Elbarasse,

12   E-L-B-A-R-A-S-S-E.

13   Q.   And one other question before you continue.  You said --

14   you used the term HLF.  Just so we are clear, what does HLF

15   stand for?

16   A.   The Holy Land Foundation.  It is easier to say the HLF

17   than to say the Holy Land Foundation every time.

18   Q.   Okay.  Continue on with your description of the search

19   warrants.

20   A.   Okay.  After the Elbarasse search warrant, there was a

21   search warrant that was executed on the home of a man named

22   Fawaz Mushataha.  F-A-W-A-Z  M-U-S-H-T-A-H-A, I believe.

23   Q.   And let me interrupt you on that one.  Was that a search

24   done on the home while Fawaz Mushataha with a resident there?

25   A.   There was initially a search warrant on his home

1    conducted by Immigration while he was still in the country.

2    After he departed the country, another homeowner moved in and

3    there was a consensual search of his yard for buried

4    videotapes.

5    Q.    And do you recall the name of that homeowner?

6    A.    Mr. Gus Peredo.

7    Q.    Is that the individual who testified here yesterday?

8    A.    Yes.

9    Q.    Okay.  What other search warrants, if any, were conducted

10   during the course of the criminal investigation?

11   A.    That is all for the criminal investigation.

12   Q.    Approximately how much material was gathered as a result

13   of the search warrants?

14   A.    As a result of the criminal search warrants, we had

15   approximately 500 boxes of documents, including several

16   thousand audio and videotapes, and a number of computers.

17   Q.    It is a lot of material.

18   A.    Yes.

19   Q.    Did the FBI institute some sort of procedure to organize

20   it?

21   A.    Yes.  Once we realized the volume of material that we

22   were dealing with, we recognized that we were going to need a

23   way to track all of these documents, so we decided to stamp

24   each individual document with a unique number so that that

25   document could be tracked.  We call them bates numbers or

1    bates labels.

2    Q.   Can you give us an example of a number like that?

3    A.   Yes.  What we did, we tried to make the bates labels

4    meaningful in that -- to show the source of the document, to

5    help us figure out if we picked up a document where it came

6    from.  So the bates label will have -- the first four letters

7    of the bates label indicate where the document came from.  For

8    example, if the document came from the HLF's Dallas office the

9    first four letters of the bates number would be HLDL as a code

10   to tell me it came from the HLF Dallas office.

11   Q.   What language were the majority of these documents in?

12   A.   A majority of them were in Arabic, although there were a

13   number of English documents as well.

14   Q.   Did you have the Arabic documents translated?

15   A.   Some of them.

16   Q.   And was that done with the assistance of Mr. Shafik, who

17   just testified?

18   A.   Yes, and a number of other translators.

19   Q.   Did you review most of the documents gathered by the FBI

20   during the course of the investigation?

21   A.   Yes.

22   Q.   Would that also include the wiretaps that were gathered

23   during the intelligence investigation?

24   A.   Yes.

25   Q.   As well as material gathered from other sources?

A.    Yes.

Q.    Okay.  All right.  Agent Burns, I want to talk to you about the Holy Land Foundation.  What did the Holy Land Foundation hold itself out to be?

A.    It held itself out to be the largest Muslim charity in the United States.

Q.    When was it created?

A.    It first began its operations as early as January of 1988.

Q.    Did it become incorporated at some point?

A.    It did.

Q.    Where was it created?

A.    It originally began its operations in Indiana in Plainfield, Indiana.

Q.    I want to show you -- You have a binder of exhibits before you.  Correct?

A.    I do.

        MR. JONAS:  And Your Honor, just for the record, Agent Burns will be working with her set of copies.  I will have the originals over here behind me.

        THE COURT:  All right.

Q.    (BY MR. JONAS)  If you can turn to what has been marked as Secretary of State CA-1.  And Agent Burns, what is that document?

A.    These are the articles of incorporation for the Occupied

1    Land Fund.

2    Q.   With regard to the identifier Secretary of State CA, what

3    does that mean?

4    A.   That means it came from the Secretary of State in

5    California.

6    Q.   Okay.  So CA is California?

7    A.   CA is California.

8    Q.   Are these certified by the Secretary of State of

9    California?

10   A.   Yes, they are.

11            MR. JONAS:  At this time I would offer into evidence

12   Government's Exhibit Secretary of State CA-1.

13            MS. HOLLANDER:  No objection.

14            THE COURT:  Admitted.

15            MR. JONAS:  If we can put it on the screen, please.

16   If we can turn to the second page.

17   Q.   (BY MR. JONAS)  Agent Burns, do you recognize the name of

18   one of the individuals on this second page?

19   A.   Yes.  The Defendant Ghassan Elashi is noted as the agent

20   for service of process.

21   Q.   Okay.  Now, Agent Burns, this says that the name of the

22   corporation is the Occupied Land Fund.  What is the Occupied

23   Land Fund?

24   A.   That was the name that the Holy Land Foundation was using

25   at this time in 1989.

1          MR. JONAS:  If we can turn to page 3, please, the

2    next page.

3    Q.   (BY MR. JONAS)  Does that, what you just stated, is that

4    indicated anywhere on this page?

5    A.   It is.  After the initial incorporation in 1989, the

6    Occupied Land Fund officially changed its name in 1991 to the

7    Holy Land Foundation, and that is indicated here.

8    Q.   Okay.  Do you see the names of any other Defendants on

9    this page besides Ghassan Elashi that you mentioned a moment

10   ago?

11   A.   Yes.  In addition to Ghassan Elashi, the Defendant

12   Mohammad El-Mezain is also referenced on this document.

13   Q.   How does this document reference their title with the

14   organization?

15   A.   It indicates Mohammad El-Mezain was the chairman and

16   Ghassan Elashi was the secretary/CFO.

17   Q.   Do you have any idea what CFO stands for?

18   A.   Chief financial officer.

19   Q.   Did there come a time -- I am sorry.  Agent Burns, you

20   testified that the HLF started in Indiana and this document is

21   from the state of California.  Can you explain the

22   discrepancy?

23   A.   Yes.  As I stated, the Holy Land Foundation began its

24   operations initially in January of 1988.

25   Q.   Let me interrupt you.  For purposes of our questioning

1    here, on the understanding that the Occupied Land Fund changed

2    its name to Holy Land Foundation, would it be easier if we

3    referred to it as the Holy Land Foundation for the whole time

4    period?

5    A.    It would, although I may accidentally call it the

6    Occupied Land Fund or the OLF.  But they are the same

7    organization, the OLF and HLF, so we will call it HLF.

8    Q.    Continue on.

9    A.    Okay.  It initially began its operations in January of

10   1988 in Plainfield, Indiana.  Shortly thereafter it moved to a

11   suburb of Los Angeles, California, which is where it was

12   ultimately incorporated in 1989.

13   Q.    Did there come a time when the Holy Land Foundation moved

14   from California to Texas?

15   A.    Yes.

16   Q.    Let me show you -- You should have in front of you what

17   has been marked as Secretary of State TX-4.  Do you have that

18   before you?

19   A.    Yes, I do.

20   Q.    What is that document?

21   A.    This is a document that was filed with the Texas

22   Secretary of State for the Holy Land Foundation.

23          MR. JONAS:  Your Honor, at this time --

24   Q.    (BY MR. JONAS)  Is it certified?

25   A.    It is.

1          MR. JONAS:  At this time I would offer into evidence

2     Government's Exhibit Secretary of State TX-4.

3          MS. HOLLANDER:  No objection.

4          THE COURT:  Admitted.

5     Q.   (BY MR. JONAS)  And Agent Burns, what does TX stand for?

6     A.   Secretary of State for Texas.

7          MR. JONAS:  If we can put that on the screen,

8     please.

9     Q.   (BY MR. JONAS)  Agent Burns, I would like to turn your

10    attention to page three of that document.  Does this indicate

11    who the officers of the HLF were or are?

12    A.   Yes.  It indicates that Mohammad El-Mezain was the

13    president, Shukri Abu Baker was the secretary, and Ghassan

14    Elashi was the treasurer.

15    Q.   And are those three individuals Defendants in this case?

16    A.   They are.

17    Q.   Okay.  By the way, Agent Burns, is there a reference in

18    this document to the Occupied Land Fund?

19    A.   Yes.  If you will turn to the next page I believe it is.

20    Q.   Page four.

21    A.   As a part of this record with the Texas Secretary of

22    State, there is a document from the California Secretary of

23    State indicating that the Holy Land Foundation was originally

24    known as the Occupied Land Fund.

25    Q.   Okay.  Does the HLF -- I believe you indicated this

1  already, but I want to make sure we are clear.  Does the HLF

2  operate today?

3  A.    No.

4  Q.    When did it shut down?

5  A.    December of 2001.

6  Q.    Did it conduct any business in the United States after

7  December of 2001?

8  A.    No.

9  Q.    After the HLF moved from California to Dallas, did it

10  have any other physical offices around the United States?

11  A.    Yes.

12  Q.    Where were those located?

13  A.    The HLF had offices in New Jersey, in Illinois, in

14  California.

15  Q.    You indicated that is where some search warrants were

16  executed?

17  A.    That is correct.

18  Q.    Where in California did it have an office?

19  A.    San Diego.

20  Q.    How do those offices compare to the office in Dallas?

21  A.    They were satellite offices for the most part, regional

22  offices for the headquarters in Dallas.

23  Q.    Was the HLF located in the city limits of Dallas or in

24  the outer suburbs?

25  A.    No.  It was actually physically located in Richardson,

1    Texas.

2    Q.    Talking about -- Withdrawn.  Besides having physical

3    offices in those three locations plus the headquarters in

4    Richardson, did it have representatives around the United

5    States?

6    A.    Yes.

7    Q.    Could you just name some of the places?

8    A.    Detroit, Florida, there were some in Los Angeles,

9    California.  They had a number of representatives throughout

10   the country.

11   Q.    You testified, based upon the Secretary of State

12   incorporation papers, that three of the Defendants here,

13   Mohammad El-Mezain Ghassan Elashi, and Shukri Baker, were the

14   officers at least indicated on the Secretary of State records.

15   A.    That is correct.

16   Q.    Are you familiar if there was anyone else who was

17   involved in the start-up of the HLF back in the early days?

18   A.    In addition to the three individual Defendants?

19   Q.    Correct.

20   A.    Those were the three founders.

21   Q.    Okay.  You are familiar with the Defendants?

22   A.    Yes.

23   Q.    Are you familiar with what is known as an Abu name?

24   A.    I am.

25   Q.    And what is an Abu name?

1    A.    It is basically a nickname.  Abu means father of, and

2    generally the men take the nickname of their, like, first born

3    child.  So if their first born child was Mohammed, their name

4    would be Abu Mohammed, which means father of Mohammed.

5    Q.    Do any of the Defendants in this case use a nickname --

6    who was referred to commonly as this Abu name?

7    A.    Yes.  The Defendant Mohamad El-Mezain commonly used his

8    nickname Abu Ibrahim, which means father of Ibrahim.

9    Q.    Have you seen or -- Have you met the Defendants?

10   A.    Yes.

11   Q.    Are you able to recognize them?

12   A.    I am.

13   Q.    Okay.  Could you point them out in court today, please?

14   A.    Sure.  Shukri Abu Baker is the gentleman wearing the blue

15   blazer with the yellow shirt.  To his right is the Defendant

16   Abdulrahman Odeh be the dark suit and blue shirt with glasses.

17   Next to Mr. Westfall is Defendant Mohammad El-Mezain in the

18   gray suit and glasses.  And then Mr. Mufid Abdulqader is at

19   the end with the gray suit and the beard.

20   Q.    Do you have before you Government's exhibit marked

21   Picture 2, Picture 3, Picture 4, Picture 5, and Picture 6?

22   A.    I do not have the pictures.

23          MR. JONAS:  Your Honor, if I may approach the

24   witness?

25          THE COURT:  Yes.

1  Q.   (BY MR. JONAS)  Now do you have before you what is marked

2  as Government's Exhibit Picture 2, 3, 4, 5, 6?

3  A.   Yes.

4  Q.   Who are they pictures of?

5  A.   These are pictures of the Defendants that I just named.

6  Q.   Okay.  Can you go through each picture and just say who

7  they are with the exhibit number?

8  A.   Picture 2 is the Defendant Shukri Abu Baker.  Picture 3

9  is the Defendant Ghassan Elashi.  Picture 4 is the Defendant

10 Mohammad El-Mezain.  Picture 5 is the Defendant Mufid

11 Abdulqader.  And Picture 6 is the Defendant Abdulrahman Odeh.

12          MR. JONAS:  At this time we offer into evidence

13 Picture 2, Picture 3, Picture 4, Picture 5, and Picture 6.

14          THE COURT:  Counsel?

15          MR. WESTFALL:  No objection.

16          THE COURT:  Those are admitted.

17          MR. JONAS:  For the record, the pictures that Agent

18 Burns identified don't have the names of the Defendants on

19 them, but we would like to substitute pictures with the names

20 on them.

21          THE COURT:  All right.  Any objection to that?

22          MR. WESTFALL:  No objection.

23          THE COURT:  You may do so.

24          MS. CADEDDU:  No, Your Honor.

25          MR. DRATEL:  No, Your Honor.

1    Q.   (BY MR. JONAS)  Agent Burns, starting with the Defendant

2    Shukri Abu Baker, at the time the HLF was first created you

3    mentioned it was in Indiana.  Who was located there?

4    A.   Shukri Abu Baker was.

5    Q.   And when he first was part of the HLF, did he have a day

6    job?

7    A.   He originally did.

8    Q.   What was that?

9    A.   He worked with I believe it was ISNA and MAYA.

10   Q.   Are we going to talk more about those organizations

11   later?

12   A.   Yes.

13   Q.   As the HLF was formed and grew, did he have a day job?

14   A.   Shortly after the creation of the HLF, Shukri Abu Baker

15   began working with them full time.

16   Q.   How about the Defendant Ghassan Elashi?

17   A.   In addition to his duties with the Holy Land Foundation,

18   Ghassan Elashi founded and helped run a computer company

19   called InfoCom.

20   Q.   You testified earlier that there was a search warrant

21   done on a computer company InfoCom.  Is this the same company?

22   A.   It is.

23   Q.   You should have before you what is marked Secretary of

24   State CA-2.

25   A.   I do.

Q.   What is that document?

A.   This is a document that was filed with the Secretary of

State in California relating to InfoCom under its previous

name.

Q.   Is that certified?

A.   Yes.

        MR. JONAS:  Your Honor, at this time I would offer

into evidence Secretary of State CA-2.

        MS. MORENO:  No objection.

        THE COURT:  That is admitted.

        MR. JONAS:  If we can put page two of that on the

screen, please.

Q.   (BY MR. JONAS)  Do you see the name Ghassan Elashi?

A.   I do.

Q.   Does it indicate a role or title that he had with this

company?

A.   Yes.  It indicates that he was the chief executive

officer as well as one of the directors.

Q.   This indicates that this company -- It is listed as

International Computers and Communications.  Did it change its

name to InfoCom at any point?

A.   It did.

Q.   It indicates it was located in Los Angeles, California.

Was it located there at the same time the Holy Land Foundation

was located in Los Angeles?

```
1    A.    Yes.

2    Q.    Did there come a time when InfoCom changed locations?

3    A.    Yes.

4    Q.    When was that approximately?

5    A.    It was approximately 1992, around the same time that the

6    Holy Land Foundation moved to Richardson, Texas.

7    Q.    Where did InfoCom move to?

8    A.    Richardson, Texas.

9    Q.    Where did it move to in relation to the Holy Land

10   Foundation?

11   A.    They ended up across the street from each other.

12   Q.    What relationship, if any, did the Defendant -- I am

13   sorry.  Withdrawn.  Where was the Defendant Ghassan Elashi

14   located during this time period?

15   A.    He was in a suburb of Los Angeles, and then moved to

16   Texas when the companies moved to Texas.

17   Q.    Okay.  And what about the Defendant Mohammad El-Mezain

18   Did he have a day job while being an officer with the Holy

19   Land Foundation?

20   A.    He did.

21   Q.    What was that?

22   A.    He was an emam at a mosque in New Jersey, and also had

23   some affiliation with the Islamic Education Foundation there

24   as well.

25   Q.    Okay.  Where was he located?  You said in New Jersey, but
```

1   was he always in New Jersey during the time period that the

2   Holy Land Foundation was in existence?

3   A.    When it was originally formed in 1988, Mr. El-Mezain was

4   still in Ft. Collins, Colorado.   Shortly thereafter he moved

5   to a suburb of Newark, New Jersey.

6   Q.    And was he always in New Jersey?

7   A.    No.   In 1999, approximately, he moved to San Diego and

8   opened the HLF office in San Diego.

9   Q.    Was he always an officer with the HLF during this whole

10  time period?

11  A.    He was the chairman of the board from the beginning until

12  1999, at which time he stepped down as chairman of the board

13  and became a director or an officer.

14  Q.    I should have asked you this earlier.   Ghassan Elashi,

15  did he always hold the same officership or directorship title

16  with the HLF?

17  A.    No.   He was the treasurer for many years and a board

18  member, but he also took over as chairman of the board later

19  on.

20  Q.    And the same question for Shukri Abu Baker.

21  A.    He was secretary originally, but ultimately became what

22  was considered president/CEO.

23  Q.    Okay.   There are two other Defendants in this case?

24  A.    That is correct.

25  Q.    Starting with the Defendant Abdulrahman Odeh, what was

1  his relationship to the HLF?

2  A.   Mr. Odeh ran the HLF's New Jersey office.

3  Q.   Do you have before you what has been marked HLF Search-1?

4  A.   I do.

5  Q.   What is that document, without getting into the details?

6  A.   It is a service agreement for the Holy Land Foundation.

7  Q.   Could you repeat that?

8  A.   Yes.  It is a service agreement between the Defendant

9  Abdulrahman Odeh and the Holy Land Foundation.

10 Q.   The title, the exhibit number is HLF Search.  What does

11 that mean?

12 A.   That means that this document was seized during the HLF

13 search warrants.

14      MR. JONAS:  Your Honor, at this time I would offer

15 into evidence HLF Search-1.

16      MR. WESTFALL:  No objection, Your Honor.

17      THE COURT:  Admitted.

18      MR. JONAS:  Can you put that on the screen, please?

19 I believe it is a one page document.  Zoom in on the very

20 bottom right hand corner for a moment.

21 Q.   (BY MR. JONAS)  Agent Burns, do you see that number right

22 there?

23 A.   I do.  It is a little difficult to read on that screen,

24 but what it says is HLDL187 0000847.

25 Q.   What does that mean?

A.    This is the bates number.  So just as an example, this
indicates that -- The first four letters indicate that this
document was seized from the HLF's Dallas office.  The next
three numbers indicate what box it was actually seized in.
When the FBI seizes documents, they put them in boxes to
indicate locations, so this tells you that this came from box
187 of the HLF Dallas search warrant.  And then the next
numbers indicate in what sequence it was found in the box.

Q.    And the bottom half of that page, does it indicate a date
that Defendant Abdulrahman Odeh started with the HLF?

A.    Yes, February 1st, 1994.

Q.    This is basically an employment agreement?

A.    Yes.

Q.    Did you also find a list of employees with his name on it
from the HLF?

A.    I did.

Q.    Do you have before you HLF Search-2?

A.    I do.

Q.    Okay.

        MR. JONAS:  Your Honor, at this time I would offer
into evidence HLF Search-2.

        MR. WESTFALL:  No objection, Your Honor.

        THE COURT:  Admitted.

        MR. JONAS:  Put that on the screen, please.

Q.    (BY MR. JONAS)  That is very small print, isn't it?

1    A.    Yes, it is.

2              MR. JONAS:   Okay.   If we can zoom in on the very

3    first few names, the first three names.   It is still pretty

4    small.

5    Q.    (BY MR. JONAS)   Without trying to enlarge it, do you see

6    the Defendant Odeh's name on there?

7    A.    I don't know if I can mark the screen or not.

8    Q.    You cannot.

9    A.    It is the third name on the list, Abdulrahman Odeh.

10   Q.    We don't have the John Madden screens here.

11         Does it indicate when he at least started receiving a

12   salary?

13   A.    Yes.   If you go over to the opposite side of the chart,

14   it indicates date of hire, and by his name it says January

15   1st, 1994.

16   Q.    Does this document also indicate some of the

17   representatives around the country that you discussed earlier

18   that were not located in physical offices?

19   A.    Yes, it does.

20   Q.    Okay.   What did -- Did you come across documents that

21   indicate what Odeh did for the HLF?

22   A.    Yes.

23   Q.    Do you have before you what has been marked as HLF

24   Search-3?

25   A.    I do.

1    Q.    What is that document?

2    A.    This is a document that was prepared by the Defendant Mr.

3    Odeh regarding his activities on behalf of the HLF as the New

4    Jersey office representative.

5    Q.    Where was this document found?

6    A.    It was found in the HLF's New Jersey office in Mr. Odeh's

7    office.

8            MR. JONAS:  Your Honor, at this time I offer into

9    evidence Government's Exhibit HLF Search-3.

10           MR. WESTFALL:  No objection, Your Honor.

11           THE COURT:  Admitted.

12   Q.    (BY MR. JONAS)  This is a fairly thick document?

13   A.    It is.

14   Q.    I am not going to pull up any of the pages on the screen.

15   Can you just briefly -- Withdrawn.  Have you reviewed the

16   document?

17   A.    I have.

18   Q.    Okay.  Can you basically just summarize the type of work

19   that Odeh did, according to the document?

20   A.    Yes.  He managed the HLF's New Jersey office, and in

21   doing so he hosted speakers that came to town on behalf of the

22   HLF to raise money.  He solicited donations from the

23   community.  He handled the money.  He coordinated fundraising

24   events, things like that.

25   Q.    Besides being affiliated with each other at the HLF, were

1    any of the Defendants affiliated with each other in any other

2    organization?

3    A.    They were.

4    Q.    What organization would that be?

5    A.    The Islamic Association for Palestine, which we call the

6    IAP.

7    Q.    Okay.  I am going to show you what is already in evidence

8    as Hamas Charter 2.  Do you have that in front of you?

9    A.    I do not have the Hamas charter.

10           MR. JONAS:  Your Honor, may I approach?

11           THE COURT:  Yes.

12           MR. JONAS:  Can we get the last page of that on the

13    screen, please?

14    Q.    (BY MR. JONAS)  Agent Burns, is the exhibit I just gave

15    you paginated?  Are there page numbers written on the bottom?

16    A.    Page 39.  Excuse me.  That may be a 34 or 35.  The

17    numbers are hard to read.  It is 35, I believe.

18           MR. JONAS:  Okay.  Zoom on the bottom half.  That is

19    it, 35.

20    Q.    (BY MR. JONAS)  It says IAP information office.  Is that

21    the same Islamic Association Of Palestine that you were just

22    referring to that some of the Defendants were involved in?

23    A.    Yes.

24    Q.    Which Defendants are involved with the IAP?

25    A.    Shukri Abu Baker, Mohammad El-Mezain and Ghassan Elashi.

```
1    Q.    Okay.  Have you reviewed items that indicate that?

2    A.    Yes.

3    Q.    Let's start with what has been marked as Secretary of

4    State CA-3.  Do you have that before you?

5    A.    I do.

6    Q.    And what is that document?

7    A.    These are the articles of incorporation for the Islamic

8    Association for Palestine in California.

9    Q.    Are they certified?

10   A.    Yes.

11         MR. JONAS:  Your Honor, at this time I would offer

12   into evidence Secretary of State CA-3.

13         THE COURT:  Counsel any objections?  Admitted.

14         MS. HOLLANDER:  No objection.

15         THE COURT:  I am taking silence as no objections.

16         MS. HOLLANDER:  I thought someone else was doing it.

17   Q.    (BY MR. JONAS)  What is this document, Agent Burns?

18   A.    The articles of incorporation for the Islamic Association

19   for Palestine, the IAP.

20   Q.    Is there anything in these articles of incorporation that

21   reference any of the Defendants in this case?

22   A.    It shows that the Defendant Ghassan Elashi is the agent

23   for service of process.

24   Q.    What page is that on?

25   A.    That is on page 3.
```

1          MR. JONAS:  If you can pull that up real quick,

2    please.

3    Q.   (BY MR. JONAS)  Do you see his name on the screen?

4    A.   Yes.

5    Q.   Okay.  You mentioned that Shukri Abu Baker also has a

6    relationship with the IAP?

7    A.   That is correct.

8    Q.   And what item have you reviewed that indicates that?

9    A.   I have reviewed a deposition that he participated in.

10   Q.   Okay.

11         MR. JONAS:  Before we move on, Your Honor, I believe

12   there may be an issue to take up at sidebar regarding the

13   deposition, if Ms. Hollander wants to do that now.

14             (The following was had outside the hearing of the

15             jury.)

16         MS. HOLLANDER:  Your Honor, this is -- I am not

17   raising this just as to form.  This is what I consider a very

18   serious issue.

19       This deposition that they want to introduce, Shukri Abu

20   Baker was noticed as a 30(b)(6) witness when Holy Land was

21   sued by the Boims.  He appeared at this deposition as its

22   30(b)(6) representative.  Since the corporation doesn't have a

23   Fifth Amendment right, he didn't.  And the case I am relying

24   on is *Brazwell versus United States*, which is at 487 U.S. 99,

25   1988 case.  So the Government can't make evidentiary use of it

1    in this proceeding because he appeared as a corporate

2    representative, and now they are trying to use it against him

3    and he didn't have any Fifth Amendment privilege.

4         The Supreme Court said, the way I understand *Brazwell*, is

5    that he gets his Fifth Amendment privilege back if the

6    Government wishes to use it against him in a personal

7    capacity, because otherwise it is just not fair.

8         I mean, there are portions of this deposition -- it is a

9    very long deposition, and they only want to introduce parts of

10   it.  But, for example, they want to introduce parts of

11   exhibits that are introduced through this deposition and then

12   he describes the exhibits.  So they basically get to introduce

13   documents, for example, IAP documents.

14        Now, I mean, he was involved with IAP.  That is not the

15   issue.  I am not trying to keep that out.  But I am trying to

16   keep this deposition out because it is simply not fair to him.

17   He has a Fifth Amendment privilege that he couldn't assert in

18   that capacity.

19             MR. JONAS:  With regard to documents, we are not

20   there, and I am not sure I am going to be doing it the way it

21   was done in the last trial with regard to specific documents.

22        With regard to the deposition, Ms. Hollander raised the

23   same argument in the last trial.  I have Judge Fish's ruling

24   on that.  It is tabbed.  Judge Fish found that *Brazwell* is not

25   applicable here; that he had the ability to claim the Fifth

1    Amendment even though he was appearing as a designated

2    representative of the HLF, and he chose not to.

3         So I just ask Your Honor to adopt Judge Fish's ruling on

4    this issue.

5              MS. HOLLANDER:  I think Judge Fish was wrong, Your

6    Honor.

7              THE COURT:  If I had had a little more notice of

8    this -- I have read the *Brazwell* case in connection with

9    another case, but that has been a while back, and I can't

10   recall off the top of my head.

11             MS. HOLLANDER:  This is not a criticism of Mr.

12   Jonas, but I didn't know he was going to bring this up today.

13   We received the Government's list of what he was going to

14   bring up today.  I thought it was going to come up later just

15   based on last time.

16             THE COURT:  I am going to have to read the case

17   before I can make a ruling.  I don't think I can make a ruling

18   on the fly on this right away.  I just need to read it.

19        Can you go to another area and come back?  I think you

20   are going to have to, because I am not going to let you get

21   into it until I have read the case.

22             MR. JONAS:  Okay.  Can I ask -- Okay.  Can we do it

23   this way, Your Honor?  The whole purpose right now of the

24   deposition for the moment is just to get in that the Defendant

25   Shukri Baker was connected to the IAP.  Ms. Hollander says she

1    is not contesting to that.  Agent Burns has already said it.

2    So as long as she said it and it is out there, I can move on

3    and get back to the deposition later on to confirm --

4              THE COURT:  So what you are wanting through the

5    deposition is to confirm that he is associated with the IAP?

6              MR. JONAS:  For this moment.  Later on there is

7    going to be other parts --

8              THE COURT:  You stated you weren't trying to keep

9    that out.

10             MS. HOLLANDER:  As far as she has gone so far, I

11   don't have a problem with that.  But there is a lot of other

12   things in there --

13             THE COURT:  I think we can do what you are wanting

14   to do right now.  It sounds like you don't have an objection

15   as long as you are limiting it to connecting him to the IAP.

16             MS. HOLLANDER:  And she has already said that.

17             MR. JONAS:  Right.

18             THE COURT:  And you said you are not getting into

19   the exhibits yet.

20             MR. JONAS:  Not as relates to the deposition.  So I

21   believe there is a little time to address the issue.  I am

22   moving at a fairly good pace, Your Honor, and I think that is

23   a good thing.

24             THE COURT:  That is a good thing.

25             MR. JONAS:  So I don't know -- I cannot say when I

1    am going to refer back to the deposition.  It may very well

2    not be today.  And I will double-check during lunch.

3            THE COURT:  Let me know about that, and we can take

4    a look at this over the break and then at lunch.  But I think

5    for now with where he is going, it sounds like he is okay.

6            MS. HOLLANDER:  He is going to move on to something

7    else.

8            THE COURT:  No.  He is going to cover the IAP.

9            MR. JONAS:  I will be saying something to the effect

10   of, "Agent Burns, just so we are clear, Shukri Baker is

11   connected with the IAP.  Correct?"  And I won't mention the

12   deposition anymore until later on.  I just don't want there

13   anything at this point any objections to no foundation raised,

14   because that is my foundation.

15           MS. HOLLANDER:  I won't object to that as long as we

16   are not waiving -- as long it is clear that I am not waiving

17   this issue, so we can move ahead.

18           THE COURT:  I understand.

19           MS. HOLLANDER:  But I am not waiving this issue.

20           THE COURT:  But as I understood what you are saying,

21   you were not objecting to the portions of it where he simply

22   is connected to the IAP.

23           MS. HOLLANDER:  I am not objecting to his asking her

24   that question and getting that answer.  But I think if I don't

25   object to the portions of it, then I am waiving -- I just

1   don't want to waive my objections to the Fifth Amendment.

2           MR. JONAS:  I won't move the deposition in now, as

3   long as we are clear there is not going to be any objection

4   there is no basis in knowledge, and then we can address the

5   issue later.

6           (The following was had in the presence and hearing

7           of the jury.)

8   Q.  (BY MR. JONAS)  Agent Burns, just so we are clear, so far

9   you have covered Ghassan Elashi is connected to the IAP, and

10  you testified that Shukri Baker had a connection to the IAP.

11  Is that correct?

12  A.    That is correct.

13  Q.    Did any of the other Defendants have a connection to the

14  IAP?

15  A.    Yes.

16  Q.    Who?

17  A.    The Defendant Mohammad El-Mezain.

18  Q.    And have you reviewed anything that tells you that?

19  A.    Yes.

20  Q.    And what did you review?

21  A.    A videotape.

22  Q.    Okay.  I know you don't have a videotape before you, but

23  are you familiar with what has been marked as Mushtaha Search

24  No. 6?

25  A.    Yes.

1    Q.   And the label Mushtaha Search, what does that mean?

2    A.   This refers to one of the videotapes that was unearthed

3    in the yard of the former home of Fawaz Mushtaha.

4    Q.   Before we go to the videotape, what did the FBI do with

5    those videotapes?

6    A.   They were in pretty bad shape.  The casings had been

7    removed and they were buried under like three feet of earth,

8    so they were covered with mud and broken.  So all the reels

9    were taken to the FBI's lab in Quantico, Virginia where they

10   were cleaned and reconstructed.

11   Q.   Okay.  Have you viewed Mushtaha Search No. 6?

12   A.   Yes.

13   Q.   I assume you did because you say that connected Mohammad

14   El-Mezain to the IAP.

15   A.   That is correct.

16        MR. JONAS:  Your Honor, at this time I offer into

17   evidence Government's Exhibit Mushtaha Search No. 6.

18        THE COURT:  Any objection?

19        MR. DRATEL:  Yes, Your Honor; just based on the

20   prior motion that we made.

21        THE COURT:  Okay.  That is overruled, and Mushtaha

22   Search No. 6 is admitted.

23        MR. JONAS:  Your Honor, I would like to be able to

24   play that tape.  There are several segments of it, so we will

25   play those segments.

```
 1   Q.   (BY MR. JONAS)  Before we do that, Agent, there are

 2   segments of this tape we are going to play.  Is that correct?

 3   A.   That is correct.

 4   Q.   Are we going to play the whole tape?

 5   A.   No, we are not.

 6   Q.   Through the course of the investigation how many

 7   videotapes with collected by the FBI through the search

 8   warrants?

 9   A.   Thousands.

10   Q.   Are we showing thousands in this case?

11   A.   No, thank goodness.

12   Q.   The ones we do show, do you anticipate showing the whole

13   tape?

14   A.   No.  The tapes were quite lengthy, so what we did was

15   isolate part of the tapes that were relevant in an effort to

16   cut down the time that we all spent here.  So just portions of

17   each tape are being played.

18   Q.   Okay.

19        MR. JONAS:  Let's play the tape Mushtaha Search-6,

20   please.

21        (Whereupon, Mushtaha Search-6 was played in open

22        court, while questions were propounded.)

23        MR. DRATEL:  Your Honor, can we get a time frame?

24   Q.   (BY MR. JONAS)  Do you know the time frame that this

25   occurred, this videotape?
```

```
1    A.    This was December 1988.

2    Q.    And just so we are clear, when was the search warrant

3    that uncovered the tape?

4    A.    That was in 2004, 2005, maybe even 2006.

5          MR. JONAS:  Before we move on, Your Honor, we need

6    to fix the audio.  Your Honor, I think we will just have

7    to -- They only happen when I am up here, Your Honor, these

8    issues.

9         One moment, Your Honor.

10         THE COURT:  Sure.

11         MR. JONAS:  Your Honor, I have been told it was

12   working this morning.  Can we get an early break to try to fix

13   it?

14         THE COURT:  Sure.  Be back at 20 till 11:00.

15         (Whereupon, the jury left the courtroom.)

16         THE COURT:  We will be in recess.

17              (Brief Recess.)

18         THE COURT:  Mr. Jonas?

19         MR. JONAS:  Thank you, sir.

20         MR. JONAS:  It turns out there is a master volume

21   control somewhere, and it was turned all the way down.  It was

22   as simple as that.

23   Q.    (BY MR. JONAS)  Agent Burns, before we go to the

24   videotape, first one note.  I understand you and I are

25   speaking a little bit too fast.  We need to slow down in our
```

1    speech.

2    A.    Okay.

3    Q.    I want to just go back to something I asked you about

4    earlier and that was the subject of intelligence

5    investigations.  During the course of an intelligence

6    investigation, does the FBI let people know that an

7    intelligence investigation is going on?

8    A.    Absolutely not.  That would defeat the purpose.

9    Q.    Why?

10   A.    Because if someone knows they are being investigated for

11   issues relating to counterterrorism and national security,

12   they are obviously going to attempt to conceal those

13   activities, so it makes it more difficult to gather the

14   intelligence.

15   Q.    When you say conceal their activities, do you mean

16   conceal them in other ways than they may be doing already?

17   A.    That is correct.

18          MR. DRATEL:  Objection, Your Honor.

19          THE COURT:  Overruled.

20   Q.    (BY MR. JONAS)  During the course of criminal

21   investigations, do people sometimes know they are being

22   investigated criminally?

23   A.    Sometimes they do and sometimes they don't.  It depends

24   on the specific circumstance of the investigation.

25   Q.    Let's go to the videotape.  Before we play it, I think

1    there was a question, and I am not sure if you answered it.

2    What was the approximate date of the tape?

3    A.    December 1988.

4    Q.    With regard to Hamas, what had happened around that time?

5    A.    That was the one-year anniversary of the creation of

6    Hamas, basically.

7    Q.    And with regard to the creation of the HLF, how does that

8    correlate in time?

9    A.    It was almost a year after the HLF began its operations.

10   Q.    Okay.

11              MR. JONAS:  If we can play the tape, please.

12              (Whereupon, Mushtaha Search-6 was played, while

13              questions were propounded.)

14   Q.    (BY MR. JONAS)  Agent Burns, did you see where it said

15   the beginning of the second year of the Intifada?

16   A.    Yes.

17   Q.    What does that mean?

18   A.    In December of 1987 there was an uprising in the

19   Palestinian territories called the Intifada.  The Intifada --

20              MR. DRATEL:  I object, Your Honor, to her going into

21   this based on the basis of knowledge.  She is not an expert.

22   This is really not her -- This is not her area of what she --

23              THE COURT:  I don't think she is being offered as an

24   expert in this area.  She may testify to her knowledge.  Go

25   ahead.

            THE WITNESS:  In December of '87 when the Intifada

broke out, that is what sparked the creation of the Hamas

terrorist organization.  It reached its one-year anniversary

in December of '88, which was the beginning of the second year

of the Intifada, so they are celebrating the second year of

this uprising in the Palestinian territories.

Q.   (BY MR. JONAS)  Is that how you dated the tape?

A.   That is correct.

Q.   And you see on the screen right now it says "and Hamas

takeoff."

A.   That is correct.

Q.   Agent Burns, the quote that this individual just gave, do

you recognize that quote?

A.   Yes.

Q.   From where?

A.   Well, I recognize it from several places, but primarily

from the Hamas charter.

Q.   Okay.  Agent Burns, you see it says Sheikh Mohammad

El-Mezain Who is that?

A.   That is Defendant Mohammad El-Mezain.

Q.   The prior screen where the words said from the Islamic

Association Of Palestine.

A.   That is correct.

Q.   Is that one of the ways you connected the Defendant

El-Mezain to the Islamic Association Of Palestine?

1   A.   That is correct.

2   Q.   Agent Burns, besides the three individual Defendants

3   connection to IAP, did you see anything connecting the Holy

4   Land Foundation with the IAP?

5   A.   Yes.

6   Q.   Do you have before you what has been marked at NAIT

7   Records or NAIT, N-A-I-T?

8   A.   Yes, I do.

9   Q.   What are those documents?

10  A.   These are bank records.

11  Q.   Did you subpoena these documents in the course of the

12  criminal investigation?

13  A.   I did.  I submitted the subpoena to NAIT and also to ISNA

14  for the original bank records of the Holy Land Foundation.

15  Q.   Do you know what NAIT stands for?

16  A.   Yes.  NAIT stands for the North America Islamic Trust,

17  N-A-I-T.

18  Q.   And what does ISNA stand for?

19  A.   ISNA is the Islamic Society of North America, I-S-N-A.

20  Q.   I believe you mentioned them earlier, but we will see

21  their names again later?

22  A.   We will.

23  Q.   Can you remind us, in what context did you mention these

24  organizations earlier?

25  A.   These are organizations the Defendants were affiliated

1   with.

2   Q.   Specifically the Defendant Shukri Baker?

3   A.   That is correct.

4        MR. JONAS:  At this time I offer into evidence

5   Government's Exhibit NAIT --

6   Q.   (BY MR. JONAS)  I am not sure.  Are they called NAIT

7   Records or just NAIT?

8   A.   NAIT Records.

9        MR. JONAS:  Your Honor, NAIT Records.

10       MS. HOLLANDER:  No objection.

11       THE COURT:  Admitted.

12  Q.   (BY MR. JONAS)  Agent Burns, if you can turn to page 43

13  of that exhibit.  What does this document say?

14  A.   This is a translation of an Arabic letter that was found

15  in those records, and it is a letter from Ghassan Elashi the

16  Defendant to Brother Shukri.  It states, "Please send the

17  amount of $1500 to cover the expense of the salaries that are

18  paid to the brothers who enter the names into the computer,

19  and also follow up on the correspondence with the donors.

20  Please send the amount to this address:  IAP/OLF P.O. Box

21  1448, culver City, California."

22  Q.   Who is it signed by?

23  A.   It is signed by Ghassan Elashi.  And then below that it

24  says, "IAP.  Please send $1500 to the above address, Shukri

25  Abu Baker."

1  Q.   And again, who is Ghassan Elashi in this case?

2  A.   The Defendant Ghassan Elashi.

3  Q.   And Shukri Baker?

4  A.   Is also a Defendant.  And at the bottom it notes the

5  address for the Occupied Land Fund.

6  Q.   Which is where?

7  A.   In Plainfield, Indiana.

8  Q.   Which was the original address you talked about?

9  A.   That is correct.

10  Q.   Okay.  Besides the Defendants Ghassan Elashi, Shukri Abu

11  Baker, Mohammad El-Mezain and the HLF having a connection to

12  the IAP, was there another individual who was involved in this

13  criminal investigation that had a connection to the IAP?

14  A.   Yes.

15  Q.   You mentioned earlier that there was a search warrant on

16  the home of a man named Ismail Elbarasse.

17  A.   That is correct.

18  Q.   Is that the individual you are referring to?

19  A.   It is.

20  Q.   Let me show what is marked -- Do you have before you what

21  is marked as Secretary of State TX-3?

22  A.   Yes, I do.

23  Q.   What is that document?

24  A.   These are the articles of incorporation for an

25  organization called the American Middle Eastern League.

1          MR. JONAS:  Your Honor, at this time --

2     Q.   (BY MR. JONAS)  Are they certified?

3     A.   Yes.

4          MR. JONAS:  Your Honor, at this time I offer into

5     evidence Government's Exhibit Secretary of State TX-3.

6          MS. HOLLANDER:  No objection.

7          THE COURT:  Admitted.

8     Q.   (BY MR. JONAS)  Agent Burns, what page do we have Ismail

9     Elbarasse's name on this document?

10    A.   On page 1.

11    Q.   Okay.  How did you connect AMEL -- A-M-E-L, is that an

12    acronym for this organization?

13    A.   It is.

14    Q.   To the IAP?

15    A.   The American Middle Eastern League for Palestine, AMEL,

16    is one of the names used by the Islamic Association for

17    Palestine.

18         MR. JONAS:  If we can just scroll down and highlight

19    the very bottom portion of this document.

20    Q.   (BY MR. JONAS)  And do you see where it says Ismail

21    Elbarasse in Springfield, Virginia?

22    A.   Yes, I do.

23    Q.   Is that the individual Elbarasse we have been discussing?

24    A.   Yes.

25    Q.   Is Springfield, Virginia where the search warrant took

1   place?

2   A.   I am not sure of the exact address, but it was northern

3   Virginia.

4   Q.   Is Springfield, Virginia in northern Virginia?

5   A.   It is.

6   Q.   Okay.  Do you have before you what is marked as Secretary

7   of State TX-2?

8   A.   I do.

9   Q.   What is that document?

10   A.   This is an assumed name certificate for the Islamic

11   Association Of Palestine.

12   Q.   Is it certified?

13   A.   It is.

14        MR. JONAS:  Your Honor, at this time I would offer

15   into evidence Government's Exhibit Secretary of State TX-2.

16        MS. HOLLANDER:  No objection.

17        THE COURT:  Admitted.

18   Q.   (BY MR. JONAS)  Agent Burns, can you -- between Secretary

19   of State TX-3, the AMEL document we just looked at, and this

20   current document Secretary of State TX-2, how do you marry

21   them up?

22   A.   This exhibit states specifically in its content that the

23   Islamic Association for Palestine is one of the names used by

24   American Middle Eastern League, so it directly states that

25   there on the document.

1   Q.   So you have Elbarasse on the AMEL incorporation papers,

2   and then the AMEL corporation papers connect the IAP through

3   this document?

4   A.   That is correct.

5   Q.   The Secretary of State TX-2?

6   A.   They are the same organization.

7   Q.   Okay.  In staying with Elbarasse, did you come across any

8   documentation or evidence that links Elbarasse to any of the

9   leaders of Hamas?

10  A.   Yes.

11  Q.   Who is that?

12  A.   In particular, Hamas leader Mousa Abu Marzook.

13          MR. JONAS:  Your Honor, if I can put the easel up.

14          THE COURT:  Yes.

15  Q.   (BY MR. JONAS)  And I am putting, Agent Burns, on the

16  easel the enlargement of Government exhibit Demonstrative

17  No. 17.  Can you see that?

18  A.   I can.

19  Q.   Do you see Mousa Abu Marzook on the exhibit?

20  A.   I do.  He is on the top level, the far right.

21  Q.   Would that be where I am pointing to right now?

22  A.   That is correct.

23  Q.   And just so we are clear, is there any evidence that you

24  have seen that tells you that Marzook was associated with

25  Hamas?

1    A.   Yes.

2    Q.   I don't know if you have in front of you Hamas letter

3    No. 1.  It is already in evidence.

4    A.   Yes.

5    Q.   So on this letter we see it states Dr. Mousa Abu Marzook,

6    head of Hamas Political Bureau.  How do you connect Marzook

7    with Elbarasse?

8    A.   There are several ways I can connect them.  One of the

9    ways is through bank accounts that they shared.

10   Q.   Do can you have before you what has been marked as

11   Government's Exhibit IE/Marzook Bank Account-1?

12   A.   I do.

13   Q.   And in that title what does the IE stand for?

14   A.   Ismail Elbarasse.

15   Q.   Do you have IE/Marzook Bank Account-2?

16   A.   I do.

17   Q.   And IE/Marzook Bank Account-3?

18   A.   Yes.

19        MR. JONAS:  Your Honor, at this time I offer into

20   evidence IE/Marzook Bank Account-1, Bank Account-2, and Bank

21   Account-3.

22        MS. MORENO:  Hearsay objection, Your Honor, as to

23   all three.

24        THE COURT:  And that is overruled, and those

25   exhibits are admitted.

1  Q.  (BY MR. JONAS)  Agent Burns, if you can look at

2  IE/Marzook Bank Account-1, page 3, please.  What is that item?

3  A.  This is a signature card for a bank account at Central

4  Fidelity that was held by Ismail Elbarasse and Mousa Abu

5  Marzook showing both of their signatures.

6  Q.  And do you know where Marzook was living during this time

7  period?

8  A.  During this time period, we are talking about 1990, he

9  was still in Ruston, Louisiana.

10  Q.  Did there come a point where he moved up to Virginia?

11  A.  Yes.

12  Q.  Do you see the signatures for the signature card?

13  A.  I do.

14  Q.  And is that Elbarasse on the left and Marzook's on the

15  right?

16  A.  That is correct.

17  Q.  Marzook's is a little distinctive, isn't it?

18  A.  It is.

19  Q.  Coming from these three bank accounts that we are

20  discussing, the Elbarasse/Marzook joint bank accounts, did any

21  money go from these accounts to the Holy Land Foundation?

22  A.  Yes.

23  Q.  If we can look at IE/Marzook Bank Account-3, page 59,

24  what do we see in this document Agent Burns?

25  A.  This is a check made payable to the Holy Land Foundation

1  in the amount of $100,000 from the joint bank account of

2  Ismail Elbarasse and Mousa Abu Marzook, signed by Mousa Abu

3  Marzook, and dated August 1st, 1992.

4  Q.    Okay.  Now, you talked about there being a search warrant

5  at Elbarasse's home.  Who executed that search warrant?

6  A.    The FBI.

7  Q.    Were you a part of the search warrant team?

8  A.    No, I was not.

9  Q.    Did you take possession of the materials?

10 A.    At some point, yes, I did.

11 Q.    Approximately how much volume-wise was taken?

12 A.    Approximately 50 boxes of documents, including a number

13 of audio and videotapes, and a few computers as well.

14 Q.    Were these documents in a foreign language?

15 A.    A majority of them were in Arabic, although there were

16 some in English.

17 Q.    And as you testified earlier, were they translated?

18 A.    Yes, they were.

19 Q.    Did you review them?

20 A.    I did.

21 Q.    Out of the approximately 50 boxes worth of material, have

22 you identified ones that are particularly relevant to this

23 case?

24 A.    Yes.

25 Q.    And the ones you have identified, do they discuss the

1   Defendants?

2   A.    They do.

3   Q.    As well as the Holy Land Foundation?

4   A.    That is correct.

5   Q.    As well as the IAP?

6   A.    Yes.

7   Q.    Okay.  Are you familiar with the Hamas charter?  You have

8   it in front of you?

9   A.    Yes.

10   Q.    And the Hamas charter identifies Hamas as being part of

11   or branch of the Muslim Brotherhood?

12   A.    That is correct.

13   Q.    Your understanding?

14      In reviewing the Elbarasse documents, did you come across

15   any documents that discusses the Muslim Brotherhood having a

16   presence in the United States?

17   A.    Yes.

18   Q.    Okay.  Do you have what has been marked as Elbarasse

19   Search No. 1 before you?

20   A.    I do.

21   Q.    Okay.  Is that one of the documents that discusses the

22   Muslim Brotherhood?

23   A.    It is.

24        MR. JONAS:  Your Honor, at this time I would offer

25   into evidence Elbarasse Search No. 1.

1      MS. MORENO:  Your Honor, may we approach briefly on

2    this?

3           THE COURT:  Yes.

4           (The following was had outside the hearing of the

5           jury.)

6           MS. MORENO:  Your Honor, I believe that counsel is

7    going to get into search documents 1 through 31, as it appears

8    on the list that we received from the Government today.  I

9    would like a standing objection as to all the Elbarasse

10   documents on the basis of hearsay.

11       With relationship to specific documents, however, I may

12   not have an additional objection, but at times I may have an

13   authentication or providence objection.  But I would ask the

14   Court, instead of us popping up and down, if we may have a

15   standing hearsay objection as to all the Elbarasse documents,

16   not just today but for the ensuing days.

17          MR. DRATEL:  And also if we may have a standing

18   objection to the time frames, because this is all pre-'95, for

19   my client pre-'97, as well.

20       I was going to make an objection at the lunch break just

21   to put something on the record, but I can do it right now.

22          THE COURT:  We will do it at the lunch break where

23   the jury won't be waiting.

24          MS. HOLLANDER:  Your Honor, can we assume if one

25   person objects that we don't all have to stand up?

1          THE COURT:  I don't have a problem with that.

2          MS. DUNCAN:  One other issue, I am the member of the

3    Defense team that reviewed all the Elbarasse documents,

4    according to your order to travel to Texas.  Because of the

5    funding issue we weren't able to get them to the translators

6    until fairly recently, and those are still coming in.  So for

7    some of the Government exhibits we may have some 106 issues,

8    but I haven't been able to identify them because I haven't had

9    them translated.  So I ask the Court's attention that as they

10   come in we can raise those 106 objections later, and not

11   necessarily during the direct of Agent Burns.

12         MR. JONAS:  On the 106 issue, the records are coming

13   in in their entirety.  If it is a question of just having her

14   head read an additional portion, we may have an objection to

15   that, to not interrupt the flow of the.  That may or may not

16   be relevant to something she read.

17         MS. DUNCAN:  That is not entirely true.  There are

18   some documents where you all have picked out a couple of pages

19   of a larger document that I am working on getting translated,

20   and so for those it would be rule 106 outside the scope of

21   what you are introducing.

22         MR. JONAS:  If that is the case, and frankly I can't

23   think off the top of my head if it is if that is with regard

24   to these documents.  If that is the case, certainly if there

25   is a portion that you think is relevant, we would address it

1    at that time.

2          MR. WESTFALL:  And other documents also come under

3    106.  If a separate document ought in fairness to be

4    considered for contextual purposes, that comes under 106, too,

5    and that is kind of the stuff we are trying to get translated

6    on a rolling basis.  So if we could get into those on cross

7    examination as though we were doing it under 106 --

8          THE COURT:  I think probably that is the better way

9    to do it.

10          MR. JONAS:  Assuming, of course, they make the

11    predicate.

12          THE COURT:  Sure.

13          MR. WESTFALL:  But under 106 the predicate is is it

14    a document that ought in fairness to be considered.

15          THE COURT:  That is what he is talking about.  If

16    you can lay the predicate, sure.

17          MR. WESTFALL:  The predicate under 106.  When he

18    says predicate, I think are we going to have to get some sort

19    of custodian of records or something.

20          MR. JONAS:  No.  I knew what you said.

21          MS. MORENO:  If we can have a standing objection as

22    to all the Elbarasse documents, so as not to disrupt the

23    testimony.  But we will have specific additional objections,

24    Your Honor, from time to time on some of the authentication

25    and providence issues.

1          THE COURT:  Are you going to make those as he offers

2     them?

3          MS. MORENO:  Yes.

4          THE COURT:  That is fine.  You can have your

5     standing objection to the hearsay.

6          MR. WESTFALL:  Is it overruled?

7          THE COURT:  It is overruled, yes.

8          MR. DRATEL:  And timing?

9          THE COURT:  Yes.

10          (The following was had in the presence and hearing

11          of the jury.)

12          MR. JONAS:  I believe, Your Honor, for the record I

13     was offering into evidence Elbarasse Search No. 1.

14          THE COURT:  Any additional objections, other than

15     the ones we discussed?

16          MS. MORENO:  No, Your Honor.

17          THE COURT:  That is admitted, subject to a ruling on

18     the subsequent objections.

19          MR. JONAS:  Thank you, sir.

20     Q.   (BY MR. JONAS)  Agent Burns, what is the title of this

21     document?

22     A.   "The Shura Council report on the future of the group,

23     work paper No. 1."

24     Q.   What is the date?

25     A.   It was written on October 25th, 1991 and approved on

1    November 9th, 1991.

2    Q.    Are you familiar with the term -- By the way, what page

3    are you looking at?

4    A.    Page 3.  The first two pages are in Arabic.

5            MR. MYSLIWIEC:  Your Honor, we would like to make

6    one more objection.  There is an unknown author of this

7    document, so we object on that ground as well.

8            THE COURT:  That is overruled.  Go ahead.

9            MR. JONAS:  If we can pull up that page.

10   Q.    (BY MR. JONAS)  Are you familiar with the term Shura

11   Council?

12   A.    Yes.

13   Q.    What is that?

14   A.    It is the ruling body of the Muslim Brotherhood, in the

15   United States in this instance.  It basically serves kind of

16   the same role as a board of directors would for a company.

17   Q.    How do you know this is a Muslim Brotherhood document?

18   A.    Based on the content and the organizations referenced

19   herein, as well as reference to themselves as the group.

20   Q.    Why do you equate the term "The Group" to the Muslim

21   Brotherhood?

22   A.    Because in a number of these documents they actually

23   state that when they use the term "The Group" they mean the

24   Muslim Brotherhood in the United States of America.

25           MR. JONAS:  If we can turn to page 4, paragraph 1.

1  Q.   (BY MR. JONAS)  Agent Burns, if you can read paragraph 1.

2  A.   Again this is a translation.  It states on 1.1, "A

3  historical outlook.  The most important developments in the

4  organizations of the group since its inception in the

5  sixties."  It lists the first of those developments as "In

6  1962 the Muslim Students Union was founded by a group of the

7  first Ikhwan in North America, and the meetings of the Ikhwan

8  became conferences in student union camps."

9  Q.   Does it then go on to state the history of the Muslim

10  Brotherhood?

11  A.   Of its organizations in the United States, yes.

12  Q.   If you can look at paragraph 4 of that.

13  A.   Yes.

14  Q.   And what does that refer to?

15  A.   It states, "In 1972, the Muslim Kuwaiti Youths

16  Association was founded, which later developed in 1976 into

17  the Muslim Arab Youth Association, and its work centered

18  around the Muslim students coming to America from all the Arab

19  countries.  It developed significantly during the eighties,

20  and the Ikhwan play a fundamental role in leading and

21  directing it at the leadership and grass roots levels."

22  Q.   You familiar with the term Ikhwan?

23  A.   Yes.

24  Q.   What is that?

25  A.   Ikhwan refers to the Brotherhood.  Ikhwanul Muslimin is

1   the Arabic term for Muslim Brotherhood.

2   Q.   There is an organization referenced here Muslim Arab

3   Youths Association.  Are you familiar with that association?

4   A.   Yes.  That is the organization that we have spoken about

5   called MAYA.  M-A-Y-A is the abbreviation for it.

6   Q.   And could you read paragraph 5, please?

7   A.   Yes.  It says, "In 1980, the Muslim Students Union was

8   developed into the Islamic Society in North America, ISNA, to

9   include all the Muslim congregation from immigrants and

10  citizens, and to be a nucleus for the Islamic movement in

11  North America.  See the ISNA concept in 1979.  The ISNA has

12  developed significantly in the eighties, but the Ikhwan's

13  leadership and direction of it started to gradually decrease

14  due to their scarce presence in it."

15  Q.   Okay.  ISNA, that is a term you have already testified

16  about.  Could you remind us in what context?

17  A.   Yes.  That is the organization the Islamic Society of

18  North America that the Defendant Shukri Abu Baker was

19  affiliated with.

20  Q.   Did it also have something to do with those NAIT bank

21  records you looked at?

22  A.   Yes.  The Holy Land Foundation originally operated under

23  the ISNA umbrella, and through that umbrella held its first

24  bank account at NAIT.

25          MR. JONAS:  If we can turn to the next page, please.

1    Q.    (BY MR. JONAS)  Can you read what is marked as paragraph

2    8 on the top?

3    A.    Yes.  It says, "In 1981, the Ikhwan founded the Islamic

4    Association for Palestine to serve the cause of Palestine on

5    the political and media fronts.  The Association has absorbed

6    most of the Ikhwan's Palestinian energy at the leadership and

7    grass roots levels, in addition to some of the brothers from

8    other countries.  Attention was given to the Arab new

9    arrivals, immigrants, and brothers, and citizens in general,

10   while focusing on the Palestinians in particular.  The

11   Association's work has developed a great deal since its

12   inception, particularly with the formation of the Palestine

13   Committee, the beginning of the Intifada at the end of 1987,

14   and the proclamation of the Hamas movement.  The Association

15   has organizations affiliated with it such as the United

16   Association for Studies and Research, the Occupied Land Fund,

17   and the media office, dedicated main personnel, several

18   periodicals, research studies, and field branches in all the

19   regions."

20   Q.    Agent Burns, I want to ask you a couple of questions

21   about this paragraph.  It refers to the Association.  Is that

22   the Islamic Association Of Palestine?

23   A.    Yes, it is.

24   Q.    Okay.  It uses the term Palestine Committee It says the

25   formation of the Palestine Committee Is that a term that you

1  have seen throughout some of these Elbarasse documents?

2  A.    Yes.

3  Q.    Are we going to be discussing them in a little bit?

4  A.    At length.

5  Q.    Okay.  It says the Association has organizations

6  affiliated with it and names the Occupied Land Fund.  Is that

7  the Holy Land Foundation?

8  A.    It is.

9  Q.    Okay.  Agent Burns, have you seen any documents contained

10  from the Elbarasse or obtained from the Elbarasse search

11  warrant that discuss the Muslim Brotherhood being somewhat of

12  a secretive organization?

13  A.    Yes.

14  Q.    And do you have before you what has been marked as

15  Elbarasse Search No. 2?

16  A.    I do.

17  Q.    Is that one of these documents I just referred to?

18  A.    This is actually a transcript, yes.

19        MR. JONAS:  Your Honor, at this time I offer into

20  evidence Elbarasse Search No. 2.

21        THE COURT:  Any objections, besides the ones we

22  discussed?

23        MR. MYSLIWIEC:  Your Honor, there are some

24  unidentified people on this transcript, so we object on that

25  ground because we don't know who they are.

THE COURT:  And those are overruled, and that

exhibit, Elbarasse Search No. 2, is admitted.

MR. JONAS:  Thank you, sir.

Q.  (BY MR. JONAS)  You said this is a transcript.  What do

you mean by that?

A.  This is a transcript -- The original exhibit was an

audiotape in Arabic, and what is here before us that we will

be looking at is the English transcription of the audiotape.

Q.  Okay.

MR. JONAS:  And, Your Honor, for the record, we will

be admitting the tape and the transcript.

THE COURT:  Okay.

Q.  (BY MR. JONAS)  Is the transcript a transcript of the

entire tape?

A.  I don't believe so.  I believe that it is a partial

translation, but I am not sure about that.

Q.  Okay.  In reviewing the transcript, what is happening in

this transcript?

MR. DRATEL:  Your Honor, can we get a time frame,

please?

Q.  (BY MR. JONAS)  What is the date of the transcript?

A.  Based on the content, we are able to put it in 1982 or

1983.  This is a lecture entitled "Ikhwan in America, the

Muslim Brotherhood in America," by an individual named Zeid

al-Noman, who during this time period was a leader in the U.S.

Muslim Brotherhood.

MR. DRATEL:  Object, Your Honor, on the basis of knowledge.  She is testifying about things that are not in evidence or directly based on her knowledge.

THE COURT:  Overruled.

MR. JONAS:  Can we turn to page 13 of this document, please?

Q.   (BY MR. JONAS)  Agent Burns, is there a particular section on this page that is of relevance?

A.   Yes.  When examining the U.S. Muslim Brotherhood's attitude toward secrecy, we looked at this portion of the lecture by Zeid al-Noman and he was asked a question by one of the attendees at the lecture stated "By securing the group" --

Q.   Before you do that, if you can identify exactly on the page where you are starting.

A.   It is on page 13, the third paragraph, I guess unknown male -- UM indicates unknown male is asking the question.  An unknown male asked, "By securing the group, do you mean military securing?  And if that is it, would you explain to us a little bit the means to achieve it?"

Zeid al-Noman the leader -- or the Muslim Brotherhood leader says, "No.  Military work is listed under, quote, special work.  Special work means military work.  Securing the group is the group's security; the group's security against outside dangers.  For instance, to monitor the suspicious

movements on the -- which exhibit on the American front, such

as Zionism, Masonry, et cetera.  Monitoring the suspicious

movements or the sides, the government bodies, such as the

CIA, FBI, et cetera, so that we find out if they are

monitoring us, are we not being monitored, how can we get rid

of them, that is what is meant by securing the group."

Unknown male asks the question, "There is a question

which we will ask.  I mean, we will ask them individually as

none of them relate to the other.  The resources and freedoms

which are available in North America are bigger than what is

available in the Islamic world.  Despite that, organizational

work methods have not changed."

Zeid al-Noman responds by saying, "By God, I believe that

the methods are different.  If the asking brother is from

Iraq, he would know that it is impossible to have such a

gathering in Iraq, and this is one of the methods.  If the

asking brother is from Jordan, for instance, he would know

that it is not possible to have military training in Jordan.

For instance, while here in America there is weapons training

in many of the Ikhwans' camps.  If the brother is from Libya,

he would know that the Islamic movement has not been able to

form, due to the pressure which is on the -- on the people.

But it succeeded in growing in America.  Our methods, Ikwhans,

then, are different than even though we might use the same

concepts.  I mean, we resort to secrecy, but the secrecy at

1   our end might take a position that is different from what is

2   in the Orient, for instance.  Secrecy over there might be

3   absolute.  It might be absolute even among the ranks of the

4   group.  For instance, until now most of the movements do not

5   know who is the general Maul of the movement when he is among

6   their ranks, and neither do they know who are members of the

7   executive office or who is the Masul of the organization

8   office, who is the Masul of the financial office and so

9   forth."

10  Q.   Let me interrupt you for a moment.  Do you know what

11  Masul is?

12  A.   Yes, that is the leader.

13  Q.   Agent Burns, and just so we are clear on the date of this

14  document, this predates the formation of Hamas.  Correct?

15  A.   That is correct.

16  Q.   Do they discuss having front organizations in this

17  document?

18  A.   Yes.

19       MR. JONAS:  If we can turn to page 123, please, the

20  prior page.

21  Q.   (BY MR. JONAS)  Where is that?

22  A.   Where it says ZE, again that is the speaker Zeid

23  el-Noman.  And he says, "By God, fronts are one method, one

24  method for grouping, and are one method to communicate the

25  Ikhwans' thought.  They are one method to communicate the

1    Ikhwans' point of view.  A front is not formed until after a

2    study and after an exhaustive study.  I mean, the last front

3    formed by the group is the Islamic Association for Palestine.

4    So, Ikhwans, this did not come out over night, or it was not

5    like the Ikhwans who are in charge went to sleep, dreamed

6    about it, and met the next day and decided to do it.  Not at

7    all, by God.  This went through lengthy meetings and took long

8    discussions.  Many specialized auxiliary committees were

9    formed which were examining this work.  They were examining

10   this work from different angles; from the angle of the benefit

11   of such work, from the angle of, for instance, the human

12   resources we have, from an angle of how this front would

13   benefit us in communicating the brothers' point of view.

14   Then, generally speaking, we don't work out of a vacuum, if

15   that is what is meant.

16        "As for distributing the brothers' efforts, yes, in some

17   of the regions where few Ikhwans exist, there will really be a

18   heavy pressure on them because, in addition to that, they have

19   to be members of the MSA, the Muslim Arab Youth Association,

20   and if they're Palestinians, for instance, they will have to

21   be members of the Islamic Association for Palestine."

22   Q.    The Islamic Association Of Palestine, is that the same

23   organization we have been discussing?

24   A.    Yes.

25   Q.    That the Defendants are associated with?

```
 1    A.    That is correct.

 2    Q.    Okay.  And again, so we are clear on the timing, this

 3    predated not just Hamas but also the creation of the Holy Land

 4    Foundation?

 5    A.    That is correct.

 6    Q.    So the IAP existed prior to the Holy Land Foundation?

 7    A.    That is correct.

 8    Q.    Have you seen any documents seized from the home of

 9    Ismail Elbarasse that discuss other organizations that fall

10    within the Muslim Brotherhood in the United States as well as

11    some of the leaders of the Muslim Brotherhood in the United

12    States?

13    A.    Yes.

14    Q.    Okay.  Do you have before you Elbarasse Search No. 4?

15    A.    I do.

16    Q.    And is that one such document?

17    A.    Yes.

18          MR. JONAS:  Your Honor, I offer into evidence

19    Elbarasse Search No. 4.

20          THE COURT:  Any objections, besides the ones we have

21    discussed?

22          MR. DRATEL:  No, Your Honor.

23          THE COURT:  That is admitted.

24          MR. JONAS:  Thank you, sir.

25       If we can turn to page 7 of that document, and the
```

1    bottom.

2    Q.   (BY MR. JONAS)  And Agent Burns, this document in the

3    very bottom says "IL signature."  And what does that mean?

4    A.   That means illegible signature.

5    Q.   And it says M.A.  What is that?

6    A.   That is the initials of the individual who wrote this

7    document.

8    Q.   Based upon your investigation and the documents you

9    reviewed and that we will discuss, are you able to determine

10   who M.A. is?

11   A.   Mohammed Akram.

12   Q.   Okay.

13        MR. JONAS:  If we can turn to the next page, please.

14   I am sorry.  Before we do that, I am sorry.  Go back.  I

15   apologize.  On the bottom again.

16   Q.   (BY MR. JONAS)  Just so we can put in context what the

17   next page is, what does it state?

18   A.   This is a translation of the original Arabic document,

19   and on this portion of the document it states "A report of the

20   current leadership potentials.  See table."

21   Q.   Before we do that, were you able to date this document?

22   A.   Yes.  If you go back to page 5, which is the first page

23   of the translation --

24   Q.   Top right hand corner?

25   A.   Yes.  The date is December 18, 1988, and it gives the

1    title there.

2    Q.    Which is?

3    A.    "Preliminary vision for preparing future leadership."

4    Q.    Okay.  Now if we can go back to page 8, which -- is it

5    that chart that is on page 8?

6    A.    Yes.  It is the translation of the Arabic chart.

7    Q.    All right.  How do you know, by the way, that this chart

8    refers to the leaders of the Muslim Brotherhood in the United

9    States?

10   A.    Because the document itself is about the leadership of

11   the U.S. Muslim Brotherhood, and the reference to this table

12   is a report of the current leadership.

13            MR. JONAS:  If we can enlarge I guess the top part,

14   the top quarter.  That is good.

15   Q.    (BY MR. JONAS)  Okay.  We see No. 1 on the column in the

16   far left entitled "the apparatuses."  Do you know what that

17   means?

18   A.    Those are the apparatuses of the U.S. Muslim Brotherhood

19   at this time.

20   Q.    It says No. 1 the Shura Council, S-H-U-R-A.  What is

21   that?

22   A.    That is the ruling body again.  We talked about the Shura

23   Council.  It is kind of like a board of directors is the best

24   thing I can compare it to.

25   Q.    Going across on that row it says certain names.  Do you

1    recognize any of those names?

2    A.    I recognize a number of them, but pertinent to what we

3    have been discussing, No. 5 is Mousa, which is Hamas leader

4    Mousa Abu Marzook, and No. 15 is Akram, which is Mohammed

5    Akram Adluni, the author of this document.

6    Q.    No. 15 on the very far end.

7              MR. JONAS:  Okay.  If we can go back to the whole

8    chart.  And if we can enlarge the middle section.  We have to

9    do this piecemeal.  If we can do the left half to make it

10   bigger.

11   Q.    (BY MR. JONAS)  And I know we are not looking on the

12   screen at least at the whole document, but I want to ask you

13   some questions about that, and if we need to move the view of

14   the screen, just let us know.

15        Under the column on the left, which was entitled "the

16   apparatuses," we see a number of organizations.  First of all,

17   are any of these organizations on the left some of the ones

18   you have already testified about?

19   A.    Yes.

20   Q.    Which ones?

21   A.    No. 18, ISNA, is the Islamic Society of North America

22   that we talked about in relation to the bank records for the

23   HLF.  MAYA is another one of the organizations that we have

24   spoken about that was referenced in the U.S. Muslim

25   Brotherhood historical document that we looked at.  NAIT is

1    the North America Islamic Trust, which is the -- we discussed

2    in reference to the HLF's original bank account.

3    Q.    Okay.  Now, looking at the names of the individual, and I

4    am not going to point out a particular committee, but do you

5    recognize any of the Defendants on any of these committees or

6    apparatuses?

7    A.    Yes.  Under No. 10, which is the court committee of the

8    U.S. Muslim Brotherhood, Mohammad El-Mezain the Defendant is

9    listed as one of the leaders.  In addition that, under No. 19

10   MAYA, Shukri Abu Baker is listed.  And I believe Mohammad

11   El-Mezain is also referenced, I am looking for it, under

12   No. 17 for I guess the committee of the regions.

13   Q.    Would that been to the far right off the screen?

14   A.    Yes.  If you move to the right his name is there.

15   Q.    How about No. 21?

16   A.    Yes.  That is another one of the organizations listed,

17   and Mohammad El-Mezain is noted there.

18   Q.    You see No. 11 where it says special committee?

19   A.    I do.

20   Q.    Okay.  Is that a term that we have already seen, a term

21   special in a prior document you discussed?

22   A.    Well, in that lecture that we just reviewed by the U.S.

23   Muslim Brotherhood leader Zeid al-Noman, he talked about

24   special work being the Muslim Brotherhood's military aspect,

25   their military work.

1   Q.   Okay.  I don't know if you mentioned this, No. 12 did you

2   mention the Defendant El-Mezain?

3   A.   I believe I did.  Or maybe I didn't.  I may have skipped

4   that one.

5   Q.   All right.  Do you see No. 16?

6   A.   I do.

7   Q.   Palestine C.  Do you know what the C stands for?

8   A.   Palestine Committee.

9   Q.   And that was something referenced in an earlier document?

10   A.   Yes.

11   Q.   And I asked you if we were going to see again?

12   A.   That is correct.

13   Q.   Okay.  Have you seen any documents that discuss the plans

14   of the Muslim Brotherhood for the United States?

15   A.   Yes.

16   Q.   Do you have before you what has been marked as Elbarasse

17   Search No. 3?

18   A.   I do.

19   Q.   Okay.  And is that one of the documents that I just asked

20   you about about the Muslim Brotherhood in United States?

21   A.   Yes.

22        MR. JONAS:  Your Honor, at this time I offer into

23   evidence Elbarasse Search No. 3.

24        MS. MORENO:  No further objections.

25        THE COURT:  That is admitted.

1    Q.   (BY MR. JONAS)  Agent Burns, what is the first page of

2    the English version?

3    A.   The first page of the English translation is page -- I

4    believe it is 16.  My numbers are hard to read on here.  That

5    is it.

6    Q.   What is the date of this document?

7    A.   May 22nd, 1991.

8    Q.   By the way, there is a question I meant to ask you on the

9    last chart.  And we don't need to pull it back up, if you know

10   it from memory.  The chart with the apparatuses on the

11   Palestine Committee, do you recall seeing any names of the

12   Hamas leaders?

13   A.   Hamas leader Mousa Abu Marzook was listed with that

14   Palestine Committee, and also the author of the document

15   Mohammed Akram was listed.

16   Q.   Turning back to Elbarasse Search No. 3, what is the date

17   of that document?

18   A.   May 22, 1991.

19   Q.   How do you associate this with the Muslim Brotherhood?

20   A.   Based on the content of the document and also in the

21   title, it says it is "an explanatory memorandum on the general

22   strategic goal for the Group in North America."

23        MR. JONAS:  Can we turn to page 21 of this document?

24   Q.   (BY MR. JONAS)  By the way do you know the author?

25   A.   Yes.  If you look at page 17 of the document, there is a

1   letter from the individual that wrote the document, and that

2   is the same Mohammed Akram, who is Mohammed Akram Adluni who

3   we have been discussing.

4   Q.    Turning to page 21, paragraph 4, can you read that?

5   A.    Yes.  This paragraph is entitled, "Understanding the role

6   of the Muslim brother in North America."  It says, "The

7   process of settlement is a civilization jihadist process with

8   all the word means.  The Ikhwan must understand that their

9   work in America is a kind of grand jihad in eliminating and

10  destroying the Western civilization from within and sabotaging

11  its miserable house by their hands and the hands of the

12  believers so that it is eliminated and God's religion is made

13  victorious over all other religions.  Without this level of

14  understanding, we are not up to this challenge and have not

15  prepared ourselves for jihad yet.  It is a Muslim's destiny to

16  perform jihad and work wherever he is and wherever he lands

17  until the final hour comes, and there is no escape from that

18  destiny except for those who choose to slack.  But, would the

19  slackers and the mujahideen be equal?"

20  Q.    Agent Burns, I want you to turn to page 26.  Is there

21  anything on that page that is of interest?

22  A.    Yes.  On the second paragraph under No. 8, Mohamed Akram

23  says, "And in order for the process of settlement"--which is

24  what he was talking about on the previous page--"to be

25  completed, we must plan and work from now to equip and prepare

1    ourselves, our brothers, our apparatuses, our sections, and

2    our committees in order to turn into comprehensive

3    organizations in a gradual and balanced way that is suitable

4    with the need and the reality.  What encourages us to do that,

5    in addition to the aforementioned, is that we possess seeds

6    for each organization from the organization we call for.  See

7    attachment No. 1."

8             MR. JONAS:  Let's turn to page 32.

9    Q.   (BY MR. JONAS)  Is that attachment No. 1?

10   A.   It is.

11   Q.   Okay.  And what is the title of that document or that

12   page?

13   A.   The title of the page that he references attachment No. 1

14   is "a list of our organizations and the organizations of our

15   friends.  Imagine if they all march according to one plan."

16   Q.   The original of this document, this document is in

17   Arabic.  Correct?

18   A.   That is correct.

19   Q.   You are reading the translation?

20   A.   That is correct.

21   Q.   The original Arabic, this particular page is it in Arabic

22   or English?

23   A.   This particular page attachment No. 1 was primarily in

24   English.

25             MR. JONAS:  And if we can pull up page 15 real

1    quick.

2    Q.    (BY MR. JONAS)   Is that the original page?

3    A.    It is.  You can see the title is in Arabic, but the

4    actual organizations that are listed as their seed

5    organization, those are in English.

6    Q.    Let's keep this page on.  Do you recognize any of the

7    organizations that we have been discussing?

8    A.    Yes.

9    Q.    And starting with the top, what do you recognize?

10   A.    No. 1 is ISNA, the Islamic Society of North America,

11   Muslim Students Organization which was referenced in that U.S.

12   Muslim Brotherhood historical document.  No. 8 is NAIT, the

13   North America Islamic Trust where the HLF had its first bank

14   account.  No. 20 is MAYA.  That is the Muslim Arab Youth

15   Association, which was the organization that we saw on that

16   chart that Shukri Abu Baker the Defendant was a part of, that

17   was also referenced in the historical document.  And in

18   addition, the IAP that we have been discussing is No. 22, the

19   UASR is No. 23, which is United Association for Studies and

20   Research.  And No. 24 is the Occupied Land Fund, which is the

21   HLF.

22   Q.    Okay.  Agent Burns, you mentioned the term Palestine

23   Committee.  We talked about it a couple of times.  Have you

24   seen any documents that discuss the Palestine Committee in

25   some detail?

```
 1    A.   Yes, I have.

 2    Q.   Do you have before you Elbarasse Search No. 4?  Is that

 3    before you?  You may not have it.  Do you have before you

 4    Elbarasse Search No. 5?

 5    A.   I have No. 4.  I think we have already discussed that.  I

 6    have No. 5 as well.

 7              MR. JONAS:  One moment, Your Honor.

 8              THE COURT:  Yes.

 9              MR. JONAS:  Let's turn to No. 4 real quick.  On the

10    last page of No. 4, just to reorient ourselves --

11              THE WITNESS:  The last page of the translation is

12    page 8.

13    Q.   (BY MR. JONAS)  On the apparatuses in the middle, No. 16

14    we see -- Is that the Palestine Committee?

15    A.   That is correct.

16    Q.   And that is the one where you said is headed up by Mousa

17    Abu Marzook?

18    A.   That is correct.

19    Q.   And have you seen other Elbarasse documents that discuss

20    the Palestine Committee in greater detail than what we have

21    seen before?

22    A.   Yes.

23    Q.   Do you have before you what is marked as Elbarasse Search

24    No. 5?

25    A.   I do.
```

1    Q.   Is that one of the documents that discusses the Palestine

2    Committee?

3    A.   Yes.

4         MR. JONAS:  Your Honor, at this time I offer

5    Elbarasse Search No. 5.

6         MR. MYSLIWIEC:  Your Honor, we object.  There is not

7    a known author on this document.

8         THE COURT:  I don't believe that affects

9    admissibility.  That is overruled and that exhibit is

10   admitted.

11        MR. JONAS:  If we can put the first page of the

12   translation on the screen, which is page 8.

13   Q.   (BY MR. JONAS)  What is the title of this document?

14   A.   "Islamic Action For Palestine, an internal memo, October

15   1992."

16   Q.   Okay.  At this point in time Hamas was already created.

17   Correct?

18   A.   That is correct.

19   Q.   And was the Holy Land Foundation operating at this point

20   in time?

21   A.   It was.

22   Q.   All right.

23        MR. JONAS:  If we can turn to page 9, which is the

24   next page.

25   Q.   (BY MR. JONAS)  What does it say at the top?

1    A.    "Introduction."

2    Q.    And by the way, so we are clear, there is a number above

3    the introduction, a fairly lengthy number that says SE-SW and

4    has a list of numbers.  What is that?

5    A.    That is the bates number on the original Arabic document.

6    That is how we link the translation to the original Arabic

7    document.  The original document is stamped with a bates

8    number, and its translation has the same bates number printed

9    on it.  That way you can marry them up.

10   Q.    And in the exhibit is the original Arabic there?

11   A.    Yes, it is.

12   Q.    Okay.  What does it say under the bates stamp number?

13   A.    It says -- Well, it talks about the introduction.  I

14   don't know if you want me to read it.

15   Q.    I just want to know the title of the section we are about

16   to go to.

17   A.    "Introduction."

18   Q.    If you go to paragraph 2 under the introduction which

19   starts "Palestine is a land."

20   A.    Okay.  It says, "Palestine is a land which God the

21   Almighty has honored with the blood of the companions which

22   watered its soil, chartering a path on which all great heroes

23   such as al-Qassam, al-Husseini, al-Zeer, Jamjoum, al-Sa'adi

24   and other Muslim grand men marched.  Palestine is the land

25   which moved from one honor to another by the arrival of

1   representatives of the 20th century innovator martyr Imam

2   Hassan al-Banna."

3   Q.   Let me pause you for a moment.  Have we seen that name

4   before in this trial?

5   A.   Yes.

6   Q.   Who is he?

7   A.   He is the founder of the Muslim Brotherhood.

8   Q.   Okay.  Go ahead.

9   A.   "And they transferred to it the Muslim Brotherhood

10  movement in branches for the Ikhwan were formed in the cities

11  of Palestine in the early '40s.  Palestine is the one for

12  which the Muslim Brotherhood prepared armies - made up from

13  the children of Islam in the Arab and Islamic nations to

14  liberate its land from the abomination and the defilement of

15  the children of the Jews, and they watered its pure soil with

16  their honorable blood which sprouted into a jihad that is

17  continuing until the day of resurrection, and provided a zeal

18  without relenting making the slogan of its children 'it is a

19  jihad for victory or martyrdom.'"

20  Q.   Agent Burns, if you can turn to the next page, it says

21  No. 2, "The foundation of Islamic action for Palestine."  And

22  just so we are clear, when it says "The foundation or Islamic

23  action of Palestine," that is not Islamic Association Of

24  Palestine.

25  A.   No.  This is the international Muslim Brotherhood's

1    Islamic Action For Palestine.

2    Q.   Do you see it says "A- the Palestine section"?

3    A.   Yes.

4    Q.   Can you read that?

5    A.   Yes.  I think we need to scroll down on the screen.  It

6    says, "At the end of the '70s, the Shamm Countries Movement

7    opened a new section which was called the Palestine Section."

8    Q.   Let me interrupt you.  Do you know what the Shamm

9    Countries are?

10   A.   Yes.

11   Q.   What are they?

12   A.   It is basically what they consider to be all of

13   Palestine.  It is an area that includes parts of Syria,

14   Lebanon, Israel.

15   Q.   Who is "they"?

16   A.   The Muslim Brotherhood.

17   Q.   Okay.  Continue on.

18   A.   I forget where it left off, so I will start with "...The

19   Palestine Section, to oversee the affairs of the Ikhwan inside

20   the occupied territories.  It was considered the liaison

21   between the followers of the Movement inside and outside.  In

22   the beginning of the '80s, the Islamic Action For Palestine

23   experienced distinguished leaps.  At the inside level groups

24   and apparatuses were formed to confront the Zionist enemy and

25   they carried different names then, such as the Palestinian

1  Mujahideen, and other names.  At the outside level a number of

2  associations, Islamic youths, and students unions were formed

3  to ally the masses in order to render the Palestinian cause

4  victorious.  Therefore, the Islamic Association for

5  Palestine's students in Kuwait, the Islamic Association for

6  Palestine's youth in Britain, the Islamic Association for

7  Palestine in North America, and Muslim Palestinian Youth

8  Association in Germany and others were founded."

9  Q.    The Islamic Association for Palestine in North America,

10 is that the IAP that you have been referring to?

11 A.    It is.  It is the same organization.

12 Q.    Go back to the last page for a moment.  I apologize.

13 Something you read, I want to ask you a question.  On that

14 bottom paragraph it uses the term -- Withdrawn.  First let me

15 ask you this.  It says the inside level and it talks about the

16 outside level.  Do you understand what the inside and the

17 outside means?

18 A.    When discussing --

19        MR. DRATEL:  Object, Your Honor.  This is all

20 hearsay.  Her knowledge is all hearsay.

21        THE COURT:  Overruled.  She may answer.  Go ahead.

22        THE WITNESS:  In this context when they are

23 discussing the inside versus the outside, the inside is used

24 to mean inside the Palestinian territories, meaning Gaza, the

25 West Bank, and sometimes parts of Israel, and the outside is

1    everywhere else.

2    Q.    (BY MR. JONAS)  Okay.  See where it says, quote, the

3    Palestinian mujahideen?

4    A.    Yes.

5    Q.    Is that a term you have seen before?

6    A.    Yes, it is.

7    Q.    Do you know what it means?

8    A.    That was the original name of the Hamas military

9    operations.

10   Q.    The military wing of Hamas?

11   A.    That is correct.

12   Q.    Before it became the Izz el-Din al-Quassam?

13   A.    Izz el-Din al-Quassam brigades.  That is correct.

14   Q.    Are we going to see that term later on?

15   A.    We are.

16   Q.    Okay.  Can you go to page 11, the next page, where you

17   finished off, if you can turn now to D, as in David.  What

18   does that say?  What is the title of that and what does the

19   paragraph say?

20   A.    It says, "The Palestine committees in the countries."

21   Q.    Okay.  Could you read that paragraph?

22   A.    Yes.  It says, "With the growth of the blessed Intifada

23   and the spread of the spirit of jihad amidst the children of

24   Palestine and the nation, it became incumbent upon the

25   remainder of the Ikhwan branches to play a role in attributing

1    this Intifada and this Islamic action to Palestine.

2    Therefore, a resolution was issued by the guidance office and

3    the Shura Council of the international Movement to form

4    Palestine committees in all the Arab, the Islamic, and the

5    Western nations whose job is to make the Palestinian cause

6    victorious and to support it with what it needs of media,

7    money, men, and all of that. (Refer to the resolution in the

8    supplement.)"

9    Q.    Can you read the next paragraph?

10   A.    Yes.  The next paragraph is entitled "The Islamic

11   Resistance Movement."  It states, "With the increase" --

12   Q.    Let me interrupt you.  I apologize.  What is the Islamic

13   Resistance Movement?

14   A.    Hamas.

15   Q.    Okay.  Continue on.

16   A.    "With the increase of the Intifada and the advance of the

17   Islamic action inside and outside Palestine, the Islamic

18   Resistance Movement, Hamas, provided through its activities in

19   resisting the Zionist occupation a lot of sacrifices from

20   martyrs, detainees, wounded, injured, fugitives, and

21   deportees, and it was able to prove that it is an original and

22   an effective movement in leading the Palestinian people.  This

23   Movement, which was bred in the bosom of the mother Movement

24   the Muslim Brotherhood, restored hope and life to the Muslim

25   nation and the notion that the flair of jihad has not died out

1    and that the banner of Islamic jihad is still raised."

2    Q.    Okay.  I want to turn your attention to page 13.  Do you

3    have that in front of you?

4    A.    I do.

5    Q.    Do you see where it says "Four"  Some of the resolutions

6    reached by the Guidance Office regarding the Palestinian

7    cause"?  Do you know what the guidance office is?

8    A.    Yes.  It is the international Muslim Brotherhood's

9    guidance office.  It is their office that issues the edicts

10   and the general rules that Muslim Brotherhood members

11   worldwide are supposed to --

12            MR. DRATEL:  We object again on the basis of

13   knowledge.  She is talking about items going on in other

14   countries.

15            THE COURT:  And that is overruled.  Go ahead.

16   Q.    (BY MR. JONAS)  Continue, please.

17   A.    They issue general orders and resolutions that Muslim

18   Brotherhood members worldwide are supposed to adhere to, and

19   this is relating to resolutions reached by that office of the

20   international Muslim Brotherhood.

21   Q.    Okay.  I am not going to have you read every resolution,

22   but just a few of them.  Can you read No. 1?

23   A.    Yes.  It says, "Supporting the continuation of Intifada."

24   Q.    No. 2?

25   A.    "The Ikhwan in the countries are to hold fundraising

1   campaigns to support the Intifada."

2   Q.   Have you seen videos of fundraising campaigns that

3   support the Intifada?

4   A.   Yes, I have.

5   Q.   Are we going to see some in this trial?

6   A.   We will see several.

7   Q.   No. 6?

8   A.   "Stressing to the countries the need to form special

9   committees for Palestine in each country."

10  Q.   No. 7?

11  A.   "Notifying the countries to provide the following,

12  according to the vision of the general apparatus for Palestine

13  according to their ability and in coordination with the

14  apparatus while documenting it with the countries:  Media

15  support, political support, and financial support."

16  Q.   No. 10, please.

17  A.   "The completion of formation of Palestine committees in

18  all the countries and giving attention to holding conferences

19  relating to Palestine while publicizing and focusing on the

20  savagery of the Jews."

21  Q.   No. 13.

22  A.   "Developing the work of Palestine committees in all the

23  countries and forming committees for Palestine in the

24  countries where they are not formed yet."

25  Q.   Turning to the next page, page 14, if you can continue

1  with the last three resolutions.

2  A.    No. 15 is "Holding conferences to make al-Aqsa and

3  Palestine victorious and to find surrendering solutions."

4       No. 16 is, "Reviving the Palestinian cause with the

5  public opinion by issuing edicts and giving speeches and

6  lectures."

7       And No. 17, "Asking the countries to increase the

8  financial and the moral support for Hamas."

9  Q.    Okay.  For Hamas?

10  A.    Yes.

11  Q.    Can you read -- We are not going to go through everything

12  in this document.  I don't want to dry you out with -- your

13  mouth dry out, but can you read paragraph No. 5 where you just

14  read?

15  A.    Yes.  It says, "The Islamic action for Palestinian cause

16  in America."  It says, "Like other Western, Arab, and Islamic

17  arenas, the American arena has seen a move for action for the

18  Palestinian cause by the grace of God and due to the presence

19  of the Islamic movement and its pioneer the Muslim Brotherhood

20  Movement.  The first organizational frame for Islamic Action

21  For Palestine came in the beginning of the '80s when the

22  leadership of the Movement decided to establish the Islamic

23  Association for Palestine in North America."

24  Q.    And again, is that the IAP that you testified about?

25  A.    That is correct.  "The Association was, and still is, the

1    general field through which the Movement expresses its view

2    and positions regarding the Palestinian cause.  When work

3    developed, the Intifada started and the Islamic Resistance

4    Movement, Hamas, was formed, and the general apparatus for

5    Palestine developed.  And in light of the resolutions of the

6    guidance office and the Shura Council of the international

7    Movement to form Palestine committees in all the countries,

8    the general director of the apparatus came and met with the

9    leadership of the Movement in America in 1988.  After

10   discussions and agreement, a Palestine Committee was formed

11   under the supervision of the executive office.  The Committee

12   was then tasked with supervising all the organizations which

13   serve the plan of the Movement domestically and

14   internationally, in addition to the Palestinian cause.  Among

15   these organizations were the Islamic Association, the Occupied

16   Land Fund, and the United Association.  Like other directors

17   of the Movement's committees and sections, the director of

18   Palestine Committee is to submit periodical reports and

19   adheres to the directions and the guidance of the leadership

20   of the group."

21   Q.   Let me interrupt you.  There are three groups or three

22   organizations that are named and they are in quotes.  The

23   Islamic Association, which one is that?

24   A.   That is the Islamic Association for Palestine, the IAP.

25   Q.   Okay.  Let me skip one.  The United Association?

1    A.    That is the United Association for Studies and Research,

2    which is the UASR, the same organization we saw on the

3    previous document.

4    Q.    And the Occupied Land Fund?

5    A.    That is the HLF.

6    Q.    Turning to the last page of this document, page 15, there

7    is a section that says, "As for why now?"  Do you see that?

8    A.    I do.

9    Q.    Can you read that?

10   A.    Yes.  The guidance office is explaining why they wrote

11   this memo.  It is order [sic] to confirm to all, Palestinians

12   and other nationalities, which we never believed in or

13   recognized them as they are just mere geographical divisions

14   and nothing more, that unity and cohesion of one

15   Islamic/Ikhwani wall in the face of conspiracy to sell

16   Palestine and to hand over Jerusalem to God's enemy and our

17   enemy, all of which in exchange for a submissive, fragile,

18   administrative self-rule is needed today more than any past

19   day.  The Palestinian cause, or say Islam's cause in

20   Palestine, needs today an effective and a distinguished role

21   for the grand Islamic Movement as one fortified wall behind

22   its leadership represented by the Shura Council and a strong

23   support for their tool and striking wing, the Islamic

24   Resistance Movement, Hamas.

25         "To conclude this memo, we stress to our brothers the

1    need to stand behind this blessed Islamic action so that God

2    the almighty make it, or make available to us through it, a

3    field for jihad in which we teach the enemies of God the

4    lessons of prophets and mujahideen in triumphing over them or

5    martyring for the sake of God."

6    Q.    On the prior page, page 14, you talked about -- you read

7    about the Palestine Committee and organizations that it

8    oversaw, including the IAP, the Holy Land Foundation, the

9    UASR.  In reviewing these Elbarasse documents -- Well,

10   withdrawn.  In reviewing the Elbarasse documents, was there a

11   Palestine Committee formed in the United States?

12   A.    Yes.

13   Q.    And did that Palestine Committee, per this document,

14   oversee those three organizations I just named?

15   A.    It did.

16   Q.    Did do you see anything indicating that this Palestine

17   Committee had bylaws?

18   A.    Yes.

19   Q.    Do you have before you what has been marked Elbarasse

20   Search No. 31?

21   A.    Yes, I do.

22   Q.    And what is that document?

23   A.    It is an Arabic document that are the bylaws of the

24   Palestine Committee.

25   Q.    Okay.

1          MR. JONAS:  Your Honor, at this time I offer into

2     evidence Elbarasse Search No. 31.

3          MR. MYSLIWIEC:  No objection.

4          THE COURT:  Admitted.

5          MR. JONAS:  If we can put page 6 on the screen,

6     please.

7     Q.    (BY MR. JONAS)  What is the title of this document?

8     A.    This is "An introduction to the bylaws of the Palestine

9     Committee in North America and Canada."  And again, this is

10    the translation of it.

11    Q.    Fairly self-explanatory?

12    A.    Yes.

13    Q.    Going to the bottom, who is the author?

14    A.    The Palestine Committee produced this document.

15          MS. HOLLANDER:  State the date, please.

16          MR. JONAS:  That is my next question.

17    Q.    (BY MR. JONAS)  What is the date?

18    A.    August 14th, 1988.

19    Q.    Okay.  If you can read on this page, the introduction,

20    please?

21    A.    Yes.  It says, "Due to the developments of the cause of

22    the Palestinian Muslim people, the important developments

23    produced by the blessed Intifada in the occupied territories,

24    and the impact it had on the Muslim Brotherhood Movement, and

25    particularly the directions of his eminence the General Guide,

1    and the latest visit to America by the Palestine Section,

2    formed by the executive office of the Brotherhood in the

3    Levant countries" --

4    Q.   Let me pause you.  Do you know what Levant countries are?

5    A.   It is basically the same as the Shamm region we were

6    talking about.  It is the area that is considered to be all of

7    Palestine, which includes Jordan, or parts of Jordan, Syria,

8    Lebanon, that area.

9    Q.   Israel, West Bank, Gaza?

10   A.   Yes.

11   Q.   Go ahead, please.

12   A.   "...which discussed the cause and its development with

13   their brothers in the leadership of the group here in America.

14   The Palestine Committee was formed to serve the Palestinian

15   cause on the U.S. front.

16       "Since the Committee's scope of work is limited to the

17   Palestinian cause which occupies a large space on the Islamic

18   brotherhood and international front, the brothers in the

19   Committee thought there should be bylaws which spell out the

20   Committee's authority and its relationship with the leadership

21   of the group in America.  If these bylaws are an initiative by

22   the Committee, the matter in the end depends on the direction

23   and the approval of the leadership of the group for any forms

24   of work."

25   Q.   And what is the group in America?

1    A.    That is the U.S. Muslim Brotherhood.

2    Q.    So what is -- Based upon this document, what is the

3    relationship between the Palestine Committee in the United

4    States and the Muslim Brotherhood in the United States?

5    A.    The Palestine Committee reports to the U.S. Muslim

6    Brotherhood.

7    Q.    Can you turn to the next page, which is page 7?  Do you

8    see where it says Article One?

9    A.    Yes.

10   Q.    Can you read that, please?

11   A.    "The Palestine Committee is specialized committee

12   emanating from the Palestine Section which was formed by the

13   executive office of the Muslim Brotherhood in the Levant

14   countries.  Its scope of work is limited to North America and

15   its contacts include other countries.  The Committee works

16   only within its extent and with what does not conflict with

17   the policies and the structures of the group in America."

18   Q.    Can you read Two?

19   A.    "The nature of the Committee's work.  The nature of the

20   Committee's work is the Palestinian cause on the American

21   front, in cooperation and coordination with the brothers

22   inside and outside within its vested authorities."

23   Q.    Again, the term inside and outside, what does that mean?

24   A.    Inside the Palestinian territories and outside.

25   Q.    Okay.  Turning the page to page 8, can you read Article

1    Four?

2    A.    Yes.  It says, "The Committee's formation.  After

3    consulting the leadership of the group in America, the

4    Palestine section appoints the Committee's chairman, who in

5    turn consults with people of opinion and specialization to

6    form his committee.  The Palestine Section and the leadership

7    of the group in America have the right to object to any of any

8    [sic] members of this committee.  In this case the chairman

9    must appoint an alternate to the brother objected to."

10   Q.    And just if you can read Five and Six?

11   A.    "The Committee's membership."  It says, "The Committee

12   accepts a deputy for its president after its formation."

13        And Article Six says, "The Committee consists of 6-7

14   members around whom the executive duties are divided, and each

15   of them chairs a committee which assists him in the duties

16   assigned to him."

17   Q.    And the last page, page 9, please.  There is something

18   called Article Eight, "Policies governing work."  Can you read

19   the last two lines of that where the asterisks are?

20   A.    It says, "The Committee will submit a periodical report

21   to the leadership of the group."  And it notes postscript,

22   "Wherever the word group is mentioned it means group in

23   America."

24   Q.    Have you seen documents taken from the home of Elbarasse

25   where the committee the Palestine Committee submitted reports

1  to the leadership of the group or where it was identified that

2  reports had been submitted?

3  A.   Yes.

4  Q.   Are we going to talk about those in a few minutes?

5  A.   Yes.

6  Q.   Okay.  Staying the with the bylaws for a moment, were

7  these bylaws ever amended?

8  A.   They were.

9  Q.   Do you have before you Elbarasse Search No. 7?

10 A.   I do.

11 Q.   What are those?

12 A.   These are the amended bylaws for the Palestine Committee

13 in Arabic.

14 Q.   Okay.

15       MR. JONAS:  Your Honor, at this time I offer into

16 evidence Elbarasse Search No. 7.

17       MR. MYSLIWIEC:  Your Honor, I don't believe the

18 author is named in this document.

19       THE COURT:  Okay.  And that is overruled.  That

20 document is admitted.  .

21 Q.   (BY MR. JONAS)  Agent Burns, if you can turn to page 7.

22 Again, it is in Arabic?

23 A.   It is.

24 Q.   If you can turn to page 7, what is the title of the

25 document?

1  A.   "A suggestion to amend the bylaws of the Central

2  Committee.

3  Q.   And the date?

4  A.   April 2nd, 1991 on the top, and then on the bottom it is

5  signed April 3rd, 1991.

6  Q.   Okay.  If we can turn to the next page, please, page 8,

7  what is Article One?

8  A.   Article One states, "The Palestine Committee will be

9  called the Central Committee in order to differentiate it from

10  other committees.  It will be referred to in these bylaws as

11  the Committee."

12  Q.   Okay.  Article Two?

13  A.   "The Central Committee is a committee which is

14  specialized in working for the Muslim cause in Palestine, and

15  it originates from the Palestine body formed by the executive

16  office of the Muslim Brotherhood in the Levant countries, and

17  with the direction from the Office of Guidance.  Its scope of

18  work is limited to North America and its contacts include

19  other countries.  The Committee works only in its field of

20  specialty and with what does not conflict with the policies

21  and the systems of the group in America."

22  Q.   No. 3, please, Article Three?

23  A.   "The nature of the Committee's work has general

24  dimensions to serve the Muslim Palestinian cause on the

25  American front in cooperation and coordination with the Ikhwan

1    inside America and outside of it, according to the authorities

2    given to it."

3    Q.    Okay.  Article Four states the Committee's duties, and

4    then it has a 1 underneath that.  It says, "Issues relating to

5    the Islamic Association Of Palestine."  What does it state

6    about the Islamic Association Of Palestine or the IAP?

7    A.    It states that the IAP -- It says, (It is the official

8    organization representing the popular side of work for the

9    cause.  Stressing the Islamic aspect of the cause, the

10   necessity of adopting it and defending it is done through it.)

11   The duty of the Central Committee in regards to the

12   association is as follows.

13        "1- Drawing the general strategy for the association.

14        "2- Approving the plan, work programs, and policies.

15        "3- Approving the budget and the employees.

16        "4- Appointment of the Shura Council and the Executive

17   Committee."

18   Q.    Okay.  Turning to the next page, page 9, does it say

19   anything about the Holy Land Foundation?

20   A.    It does.

21   Q.    What does it say?

22   A.    It says, "Issues relating to the Occupied Land Fund.  It

23   is the official organization which represents the financial

24   and the charitable aspect to support the homeland people in

25   the occupied territories.  Collection of donations, securing

1    their delivery, and adopting charitable projects there is done

2    through it.  The duty of the Central Committee in regards to

3    the Fund is as follows:

4         "1- Drawing the general strategy for the fund.

5         "2- Approval of the plan work programs and policies.

6         "3- Approval of the budget and the employees.

7         "4- Appointing the fund's board of directors."

8    Q.   Okay.  Do you recall earlier there was a document that we

9    looked at that talked about providing media and money, and

10   there was a third thing that I can't remember.

11   A.   Men.

12   Q.   Media, money, and men.  And what did that document say

13   the media, money, and men was to be provided to?

14   A.   Hamas.

15   Q.   And in reviewing this document and the other Elbarasse

16   documents that you saw, did these organizations, the IAP, Holy

17   Land Foundation, Occupied Land Fund, and the next one which is

18   UASR, did they fulfill the functions in providing the media,

19   money, and men?

20   A.   Yes.

21   Q.   How so?

22   A.   For example, the Islamic Association for Palestine, they

23   were basically the media outlet.  They issued periodicals that

24   discussed Hamas operations, things like that --

25   Q.   Let me interrupt you.  You looked before at Hamas

1    charter.

2    A.    That is correct.

3    Q.    And that was issued by the IAP?

4    A.    That is correct.

5    Q.    And for the record I am referring to the exhibit that is

6    Hamas Charter-2.  Did you find -- Well, withdrawn.  Continue

7    on.

8    A.    And then with the Occupied Land Fund, they were -- Their

9    role, as it states here, was to provide financial support, and

10   that is what they did.

11   Q.    Okay.  Moving on in this exhibit to page 10, please, do

12   you see something marked Article Five?

13   A.    Yes.

14   Q.    What does that state?

15   A.    It says, "Issues relating to political work and foreign

16   relations.  It is a committee which operates through the

17   Association for now.  It is hoped that it will become an

18   official organization for political work and its headquarters

19   will be in Washington, God's willing.  It represents the

20   political aspect to support to cause politically on the

21   American front."

22   Q.    Okay.  And I am sorry.  Six?

23   A.    "Issues relating to money and investments.  It is an

24   internal committee which controls and monitors expenses and

25   budgets, the implementation and the monitoring of investment

1   projects to ensure the availability of financial support for

2   the work of the Central Committee.

3   Q.   Okay.  If we can skip to page 11.  There is Article

4   Seven, "Policies governing work."  Just read No. 3 underneath

5   that.

6   A.   It says, "The Committee will present its plans, work

7   programs, policies, and systems to the leadership of the body

8   and the leadership of the group for approval."

9   Q.   Do you recall I asked you earlier about the Palestine

10  Committee reporting up to the Muslim Brotherhood of the United

11  States?

12  A.   Yes.

13  Q.   Does that statement that you just read feed into that?

14  A.   It does.

15  Q.   Okay.  If we can turn to the last page, page 12, it says

16  "Remarks."  Do you see that?

17  A.   I do.

18  Q.   Any particular remarks you want to point out?

19  A.   It says, "The instructions of the international Shura

20  Council and Office of Guidance in regards to the Palestinian

21  issue through the secretariat general dated August 1st, 1990

22  state the following:

23      "1- The completion of the creation of Palestine

24  Committees in all countries.

25      "2- Giving attention to holding conferences relating to

1    the cause of Palestine, publishing and focusing on the

2    brutality of the Jews.

3         "3- Collecting of donations for the Islamic Resistance

4    Movement from the Ikhwan and others".

5    Q.   Let me stop you.  Again what is the Islamic Resistance

6    Movement?

7    A.   Hamas.

8    Q.   Okay.  And what is No. 5?

9    A.   "Bringing to the media light the case of Sheikh Ahmed

10   Yassin and his ailing condition."

11   Q.   Let me show you Demonstrative No. 17.  Do you see Sheikh

12   Ahmed Yassin on this chart?

13   A.   I do.  He is the center at the top.

14   Q.   Is he the leader of Hamas?

15   A.   He was.

16   Q.   Was, past tense.  So where it says "Remarks, No. 3,

17   "Collecting donations for the Islamic Resistance Movement from

18   the Ikhwan for Hamas," did you testify that Holy Land

19   Foundation's role was the money?

20   A.   Yes.  That is what it says.

21   Q.   Okay.  Did you create a PowerPoint presentation that

22   would summarize some of the items that you have read in terms

23   of the organizational structure of the Palestine Committee in

24   the United States?

25   A.   Yes.

1          MR. JONAS:  Your Honor, I would like to show what

2     has been marked, not admitted yet, as Demonstrative No. 15

3     which is this PowerPoint presentation.

4          THE COURT:  No. 15?  All right.  Any objections?

5          MR. WESTFALL:  Your Honor, may we just have from

6     time to time the instruction to the jury pertaining to

7     demonstratives?

8          THE COURT:  Remind me later and we will have a

9     discussion on that in general.  This is Demonstrative No. 15?

10         MR. JONAS:  Your Honor, so that the Defense has an

11    opportunity to pull it up, at mutual request if we can break

12    for lunch now?

13         THE COURT:  Let's do that.  Let's take a lunch

14    break.  Be back at 1:45.

15              (Whereupon, the jury left the courtroom.)

16         THE COURT:  You are offering Demonstrative Exhibit

17    No. 15 at this point.  Is that correct?

18         MR. JONAS:  Yes, sir.

19         THE COURT:  And objections?

20         MS. DUNCAN:  Your Honor, I am sorry.

21         THE COURT:  You want to take a look at it.  Okay.

22    We will address that before the jury comes back, then, after

23    lunch.

24         We had a couple of matters we needed to take up.  Mr.

25    Dratel?

1           MR. DRATEL:  Your Honor, I didn't want to do this in

2   front of the jury.  That is why I said my prior motion.  But I

3   want to clarify that and apply it to all of the documents that

4   have come in through Agent Burns in terms of the Elbarasse

5   documents and the videotape, which is the collateral estoppel

6   motion that we made pretrial, not only in terms of collateral

7   estoppel, double jeopardy, but not only in the context of

8   dismissal, which I reassert as well, and I know the Court

9   denied that, but I think as the evidence comes in I will ask

10  the Court at various times and supplement that in writing in

11  terms of organizing it for the Court to make it as the

12  evidence comes in.  But not only in the context of the

13  dismissal itself, but also as an in limine issue, because if

14  you look at Count 11, which Mr. El-Mezain was acquitted on, if

15  you look at Count 11, and if you look at the nature of these

16  documents, these documents all came in, and I assume the Court

17  is letting them in under the Joint Venture Doctrine, and the

18  jury found in the first trial that Mr. El-Mezain was not a

19  part of any joint venture as of 1995.  All these documents and

20  videos predate 1995.

21          So our position is the jury already found against the

22  Government with respect to this and the collateral estoppel in

23  limine applies, and as well as the double jeopardy parts.

24          I would ask for three -- There are three sort of tiered

25  versions of relief that we would ask for.  The first,

1    obviously, is dismissal based on collateral estoppel.

2        The second is a severance, because Mr. El-Mezain should

3    not be prejudiced by the volume and type of evidence that is

4    coming in in this context.

5        And the third would be a limiting instruction to the jury

6    that this evidence not be considered at all against Mr.

7    El-Mezain.

8        THE COURT:  And I have denied the first two, the

9    severance and the dismissal.  The ruling is the same.  I don't

10   know yet whether -- A limiting instruction, obviously I will

11   carry that along as the evidence is presented.  And then

12   remind me and I will give you a ruling on that.  I am denying

13   that at this point, but without prejudice to renewal.

14       MR. DRATEL:  And, Your Honor, if I could also have

15   as well as standing objection so that with each thing that

16   comes in I don't have to get up in front of the jury and talk

17   about collateral estoppel and things like that.

18       THE COURT:  You may have the collateral estoppel

19   standing objection, yes.

20       MR. JONAS:  Your Honor, with regard to the Baker

21   deposition that was discussed at the sidebar, do you think

22   Your Honor will be able to address it after lunch?

23       THE COURT:  I think so.  I am not prepared to make a

24   ruling yet, but we should be able to do that after lunch.

25       MS. HOLLANDER:  Your Honor, on the deposition,

1    depending on your ruling, there are going to be other

2    objections to it and I just wanted --

3              THE COURT:  What are the objections?

4              MS. HOLLANDER:  Well, if Your Honor decides to admit

5    any portions of it, there are portions of it that we think are

6    specifically -- that the Government has highlighted.  They

7    don't plan to admit the whole thing.  They have highlighted it

8    shouldn't be admitted, and there are other portions that

9    should be.  I am going to try to -- I mean, I have marked them

10   on mine.  I am going to try to take care of that during lunch,

11   but obviously we believe that none of it should come.

12             THE COURT:  I understand that.

13             MS. HOLLANDER:  And can I do one more --

14             THE COURT:  Yes.

15             MS. HOLLANDER:  -- totally unrelated to that.  I

16   really thought I should do this in front of the jury, but I

17   don't know that it really matters.  I just need to move the

18   admission of Defendant's No. 1094.

19             THE COURT:  That is that redacted document?

20             MS. HOLLANDER:  Yes.  And Mr. Jonas has looked at

21   it.  If I was going to do it in front of the jury, I should

22   have done it before Agent Burns started.

23             THE COURT:  That is No. 1094?

24             MS. HOLLANDER:  Yes.

25             THE COURT:  And I believe I had overruled the

1    objection.  Anything else you want to address to that?

2         MR. JONAS:  No, Your Honor.

3         THE COURT:  So Defense Exhibit No. 1094 is admitted.

4         MS. HOLLANDER:  Thank you.

5         THE COURT:  Mr. Westfall?

6         MR. WESTFALL:  You asked me to remind you later

7    about the demonstrative thing, so I didn't know --

8         THE COURT:  Not this soon.  I mean later.

9         MR. WESTFALL:  Oh, okay.

10        THE COURT:  I have already given them one

11   instruction.  I mean later.

12        MR. WESTFALL:  I didn't know what you meant.

13        THE COURT:  We will see you back at 1:45.

14                   (Lunch Recess.)

15        THE COURT:  Mr. Jonas?

16        MR. JONAS:  Thank you, sir.

17   Q.   (BY MR. JONAS)  Agent Burns, at the lunch break we were

18   talking about a PowerPoint demonstrative exhibit you put

19   together to sort of lay out those Elbarasse documents we went

20   over.

21        Before we get there, there is one thing I forgot to ask

22   you.  You testified about an organization as part of this

23   Palestine Committee called United Association of Studies and

24   Research.  Is that correct?

25   A.   That is correct.

```
1    Q.   Okay.  Do you have before you what has been marked as

2    Secretary of State VA-1?

3    A.   I don't have it in front of me, but I know what it is.

4              MR. JONAS:  Your Honor, may I approach?

5              THE COURT:  Yes.

6    Q.   (BY MR. JONAS)  Do you recognize that document?

7    A.   Yes.  These are incorporation records for the United

8    Association for Studies and Research that came from the

9    Secretary of State in Virginia.

10             MR. JONAS:  Your Honor, at this time I would offer

11   into evidence Government's Exhibit Secretary of State VA-1.

12             MS. HOLLANDER:  No objection.

13             THE COURT:  Admitted.

14   Q.   (BY MR. JONAS)  And Agent Burns, the VA in the exhibit

15   number, that stands for Virginia?

16   A.   That is correct.

17   Q.   Is there anyone we have already discussed in your

18   testimony that is an incorporator for the UASR?

19   A.   Yes.

20   Q.   Who?

21   A.   Mousa Abu Marzook and Mohammad Akram.

22   Q.   What page are you looking at?

23   A.   Page 10.

24   Q.   Okay.

25             MR. JONAS:  If we can enlarge the middle portion,
```

1    please.

2    Q.    (BY MR. JONAS)  It is a little difficult to read, but

3    where do you see the name Mousa Abu Marzook?

4    A.    Okay.  About midway through the page you will see two

5    names there -- Well, there are actually five names.  The third

6    name is Mohammad Adluni, which is Mohammed Akram Adluni.  And

7    then the next name is Mousa Abu Marzook.

8    Q.    With regard to Mohammed Adluni, what is significance to

9    him?

10   A.    Mohammed Akram Adluni is the person who authored several

11   of those documents that we have been discussing.  He was also

12   listed on that chart as part of the Muslim Brotherhood Shura

13   Council.

14   Q.    And then Marzook, again, who is he?

15   A.    The Hamas Political Bureau leader at the time, and now

16   currently the Deputy Political Bureau Chief.

17   Q.    Do you see where it says an address for Marzook?

18   A.    I do.

19   Q.    What is that city he is living in?

20   A.    Ruston, Louisiana.

21   Q.    Is that where you testified to that he was living in the

22   early '90s?

23   A.    Yes.

24   Q.    What is the date of this document?

25   A.    This is actually the original records from when the

1    United Association for Studies and Research was incorporated

2    in Chicago.  It was originally incorporated in Chicago and

3    moved to Virginia.  So this document is dated from 1989.  That

4    is why it is so hard to read I think, because it is so old.

5    Q.    United Associations for Studies and Research is a

6    mouthful.  Will it be okay to call it UASR?

7    A.    Yes.

8    Q.    Okay.  Getting back to the demonstrative, when you

9    created this demonstrative exhibit what did you base it upon?

10   A.    The documents that we have been speaking about over the

11   last few hours.

12   Q.    The Elbarasse search warrant documents?

13   A.    That is correct, and a couple of the corporate records.

14   Q.    Okay.

15          MR. JONAS:  Your Honor, I would like to admit as

16   demonstrative exhibit this Demonstrative No. 15 which is a

17   PowerPoint exhibit.

18          THE COURT:  Counsel?

19          MS. CADEDDU:  Your Honor, we would like to request a

20   limiting instruction, and I provided a sample of that

21   instruction.

22          THE COURT:  I will get to that later.  Any

23   objection?

24          MS. CADEDDU:  Not as a demonstrative.

25          THE COURT:  That is admitted.

1   Q.   (BY MR. JONAS)   What is this, Agent Burns?   What do we

2   see?

3   A.   This is the first slide of the PowerPoint that I put

4   together to show specifically what the exhibits that we have

5   just discussed say, because the documents were fairly large

6   and the wording was a bit confusing.   So at the bottom I have

7   noted specifically what exhibits are referenced.

8        The first slide is just a slide about the international

9   Muslim Brotherhood's Office of the General Guide.

10  Q.   Where did you get the term Office of the General Guide

11  from?

12  A.   It was in Elbarasse Search either No. 5 or 7 we went over

13  just before lunch.

14  Q.   If you can speak a little slower, please.

15  A.   Okay.

16  Q.   Okay.   Next slide, please.

17  A.   Okay.   The next slide merely shows the link between the

18  international Muslim Brotherhood and the U.S. Muslim

19  Brotherhood.

20  Q.   Again, is this from the exhibits?

21  A.   It is.   It is from the -- I believe it was Elbarasse

22  Search No. 5, that 1992 memo that explained how the

23  Palestinian Committee was ultimately created.

24  Q.   Next slide, please.

25  A.   Again, this shows based on that document how the

1    international Muslim Brotherhood, in conjunction with the U.S.

2    Muslim Brotherhood, created the Palestinian Committee.  We saw

3    in that 1992 memo where the Office of the General Guide had

4    ordered the U.S. Muslim Brotherhood to create a Palestinian

5    Committee.

6    Q.   Next slide, please.

7    A.   In that same document the Office of the General Guide

8    noted that the international Muslim Brotherhood would have

9    what was called a Palestine Section, which would be the

10   international representative of all the Palestinian Committees

11   around the world.

12   Q.   Next slide, please.

13   A.   That document, and also the bylaws that we went over,

14   indicated that the Palestinian Committee would have a chairman

15   appointed to run things, and that chairman was appointed by

16   the international Muslim Brotherhood's Palestine Section in

17   conjunction with the U.S. Muslim Brotherhood leadership.  That

18   is how the chairman or the leader of the Palestinian Committee

19   was chosen.

20   Q.   Is that what the red lines represent?

21   A.   That is what the red lines represent.

22   Q.   And in the -- According to the documents in evidence, who

23   is the chairman of the Palestine Committee?

24   A.   Mousa Abu Marzook.

25   Q.   Next slide, please.

1    A.   This merely shows, as stated in both the bylaws and the

2    amended bylaws, that once the chairman was selected he would

3    determine who the actual leaders of the Palestinian Committee

4    would be along with him.

5    Q.   Next slide, please.  What have you added here now?

6    A.   I added the term Central Committee because the amended

7    bylaws that we looked at before lunch noted that the

8    Palestinian Committee would be referred to as the Central

9    Committee in their internal documents.  So just to clear up

10   any confusion there might be between the Central Committee and

11   the Palestinian Committee, they are the same thing.

12   Q.   And did you see in the documents the term Central

13   Committee used?

14   A.   Yes.  In the amended bylaws we went over before lunch,

15   Articles One and Two both addressed that the Palestinian

16   Committee would be referred to as the Central Committee.

17   Q.   Next slide.  What do we see here?

18   A.   As we saw in the internal memo from '92, and also the

19   amended bylaws, the Islamic Association For Palestinian was

20   one of the organizations that was to be overseen by the

21   Palestinian Committee.

22   Q.   Next slide.

23   A.   Again as we saw in the internal memorandum from 1992 and

24   the amended bylaws, the Holy Land Foundation was to be one of

25   the organizations that was overseen by the Palestinian

1    Committee.

2    Q.    Next, please.

3    A.    And this is the third organization, the UASR, which was,

4    according to those documents, to be overseen by the

5    Palestinian Committee.

6    Q.    UASR, is that the organization we referred to a minute

7    ago in the Secretary of State VA-1?

8    A.    That is correct.

9    Q.    So you testified that Marzook was one of the original

10   incorporators for the UASR?

11   A.    He was one of the original officers, yes.

12   Q.    And also the chairman of the Palestine Committee?

13   A.    That is correct.

14   Q.    So he wore two hats?

15   A.    Or more than two.

16   Q.    Well, as one of the leaders of Hamas as well.  Three

17   hats?

18   A.    That is correct.

19   Q.    Have you seen in the documents individuals who were part

20   of the Palestine Committee wearing multiple hats?

21   A.    Yes.

22   Q.    And you understand what I mean when I say multiple hats?

23   A.    Yes, I do.

24   Q.    Okay.  Next slide, please.

25   A.    As stated in the internal memorandum in 1992, as well as

the bylaws and the amended bylaws, the organizations that were
a part of the Palestinian Committee were supposed to report to
the leadership of the Palestinian Committee as well as to the
leadership of the U.S. Muslim Brotherhood.  The Palestinian
Committee was to report to the international Muslim
Brotherhood's Palestine Section.  So basically what those
documents said were these organizations were responsible for
reporting to the U.S. Muslim Brotherhood and the international
Muslim Brotherhood.

Q.   Basically reported up the chain?

A.   That is correct.

Q.   I want to ask you, where you have IAP, HLF, and UASR, you
don't just have the words.  You have I guess logos.  Where did
you get those from?

A.   Various pieces of letterhead, different items that we had
in evidence.

Q.   So is that their logos?

A.   Those are.

Q.   When I say "their," I mean those organizations?

A.   That is correct.

Q.   Okay.  Next slide, please.

A.   As we saw in the 1992 internal memorandum from the
international Muslim Brotherhood, in that document they
ordered the Palestinian Committee to raise money for Hamas.
We saw that on I believe it was the last page of that

1   document.

2   Q.   When you say "they," who do you mean?

3   A.   The international Muslim Brotherhood's Office of the

4   General Guide.

5   Q.   Next slide.

6   A.   In that document it was also more specific and stated

7   that the Palestinian Committee was not only to raise money for

8   Hamas, but to support Hamas with media, money, and men.

9   Q.   And in those documents did it refer to Hamas not just by

10  the word Hamas but by another name?

11  A.   Yes; the Islamic Resistance Movement.

12  Q.   Thank you.

13      Agent Burns, these documents that we looked at, and

14  specifically I am referring to Elbarasse Search No. 7, which

15  is already in evidence, was there any discussion about

16  Palestine Committees being in other countries besides the

17  United States?

18  A.   Yes.

19      MR. JONAS:  If we can pull up Elbarasse Search No. 7

20  real quick, please, page 12.

21  Q.   (BY MR. JONAS)  And we see remarks No. 1.  By the way, is

22  Elbarasse Search No. 7 -- What document is that, if you

23  recall?

24  A.   That was I believe -- I don't see the first page, but I

25  believe it was the October 1992 memo from the international

1   Muslim Brotherhood.  If I can see the first page I can tell

2   you for sure.

3   Q.   This is one of the documents you reviewed?

4   A.   It is.

5   Q.   What does the first remark say?

6   A.   I says, "The completion of the creation of Palestine

7   Committees in all countries."

8   Q.   Have you reviewed any Elbarasse search documents that

9   indicate whether any of the Defendants actually went to

10  another country to help create a Palestine Committee?

11  A.   Yes.

12  Q.   Do you have before you Elbarasse Search No. 8?

13  A.   Yes, I do.

14  Q.   Okay.  And does that document indicate what I just asked

15  you about one of the Defendants traveling overseas?

16  A.   That is correct.

17        MR. JONAS:  Your Honor, at this time I would offer

18  into evidence Elbarasse Search No. 8.

19        MR. MYSLIWIEC:  Your Honor, this is I believe a

20  handwritten document where there is no author.

21        THE COURT:  Okay.  That objection is overruled and

22  the document is admitted.

23  Q.   (BY MR. JONAS)  Agent Burns, for the purpose of

24  conducting your criminal investigation and reviewing these

25  items and extracting information from them, did it matter to

1    you whether or not an author -- whether you can identify the

2    author of a document?

3    A.    No, it did not.  If we were able to determine, you know,

4    the content of the document, especially if we could determine

5    that if the document was authored by a particular organization

6    or a committee, things like that, that was significant for us.

7    Q.    And from reviewing these documents, if you didn't see the

8    author, like you said MA was the author on some of them you

9    identified, were you able to identify the group that authored

10   the document?

11   A.    Most often, yes.

12   Q.    As you have been discussing, when you identified whether

13   it was Muslim Brotherhood or Palestine Committee document?

14   A.    That is correct.

15          MR. JONAS:  Okay.  Elbarasse Search No. 8, if we can

16   turn to page 6?

17   Q.    (BY MR. JONAS)  And by the way, we just saw the first

18   page which was the handwriting.  What language was that in?

19   A.    That was Arabic.

20   Q.    Page 6, if you look at what has been marked as No. 8 on

21   the bottom half of the page, can you read what that says?

22   A.    Yes.  This is from the Occupied Land Fund report, and

23   No. 8 says, "The Central Committee for charity work.  Brother

24   Ghassan is currently on a visit to Britain representing the

25   Fund in order to study the possibility of forming a Central

```
1    Committee for charity work affiliated with the apparatus in

2    all the countries with the goal of coordination, exchange of

3    experiences, and finding the best ways to increase donations

4    and to quickly respond to the request of the people inside."

5    Q.   Do you know who brother Ghassan is?

6    A.   I do.

7    Q.   Who is that?

8    A.   The Defendant Ghassan Elashi.

9    Q.   How do you know that?

10   A.   Because at the time of this document, which is dated to

11   1991, based on the content, Ghassan Elashi was the only

12   Ghassan who was an officer in the Holy Land Foundation.

13   Q.   Okay.  Where do you see it says Holy Land Foundation in

14   this paragraph?

15   A.   The title of the document says it is an Occupied Land

16   Fund report, and with reference in that paragraph to the Fund

17   is a reference to the Occupied Land Fund, which is the Holy

18   Land Foundation.

19   Q.   Okay.  It talks about the possibility of forming a

20   Central Committee.  Again, what is a Central Committee as

21   defined by these documents?

22   A.   According to the amended bylaws, the Palestine Committee

23   was also referred to as the Central Committee.

24   Q.   And it uses the term apparatuses.  Where have we seen

25   that?
```

1   A.   We have seen that on, for example, the one Muslim

2   Brotherhood chart that we saw which listed all of the U.S.

3   Muslim Brotherhood committees, it called them apparatuses.

4   Q.   And that chart included the Palestine Committee?

5   A.   That is correct.

6   Q.   Okay.  In your PowerPoint you identified basically

7   reporting up from organizations to Palestine Committee to

8   Muslim Brotherhood, et cetera.  Did you see any documents that

9   indicate that the Muslim Brotherhood in the United States was

10   overseeing the Palestine Committee?

11   A.   Yes.

12   Q.   Do you have before you Elbarasse Search No. 9?

13   A.   I do.

14   Q.   And is that a document that involves reporting up or

15   overseen by the Muslim Brotherhood?

16   A.   Yes.  It indicates the oversight by the Muslim

17   Brotherhood.

18         MR. JONAS:  Your Honor, at this time I offer into

19   evidence Elbarasse Search No. 9.

20         MR. MYSLIWIEC:  No further objection.

21         THE COURT:  Admitted.

22   Q.   (BY MR. JONAS)  Okay.  This is in Arabic.  What is the

23   first page that is translated?

24   A.   Page 20 is the first page of the translation.

25   Q.   Okay.  What is the title of the document?

1    A.    "The implementation manual for the Group's plan for the

2    year 1991 to 1992."

3    Q.    So I take it this was created in 1991 or 1992, around

4    that time?

5    A.    Or possibly in late 1990.

6    Q.    If you can turn to page 26, please.  Do you see the way

7    there is a chart on this page?

8    A.    Yes.

9    Q.    Is the document kind of filled with charts like this?

10   A.    It is.  It is filled with charts discussing the various

11   committees within the U.S. Muslim Brotherhood.

12   Q.    And are you getting that because it says "department" and

13   "committee" over the left hand column?

14   A.    That is correct.

15   Q.    Do you see where it says "Palestine Committee"?

16   A.    I do.

17   Q.    And what is on the right the title on the right column

18   next to where it says "department/committee"?

19   A.    It says "Goals to be accomplished during the year 1991

20   through 1992."

21   Q.    What are some of those goals?

22   A.    "Improving and accomplishing financial, administrative,

23   and job stability of the organizations.  Reaching a donation

24   ceiling of $1.5 million.  Preparing and training 20 Ikhwan for

25   working in the American arena upon their return.  Establishing

1  three branch offices for the Association," being the IAP.

2  Q.   Okay.  If you can turn to page 35, please.  This is

3  another one of those charts that you identified?

4  A.   It is.

5  Q.   Okay.  And what is the title on this chart?

6  A.   "Work to be implemented during the year 1991 to 1992."

7  Q.   Is this particular one referring to the work of the

8  Palestine Committee?

9  A.   It does.

10  Q.   Is there anything in there indicating the Holy Land

11  Foundation?

12  A.   Yes.  The references to the Fund are actually references

13  to the Occupied Land Fund, also known as the Holy Land

14  Foundation.

15  Q.   We also see these other two organizations you referenced

16  earlier, IAP and UASR.  Is that correct?

17  A.   That is correct.

18  Q.   Are -- What language is this document in?

19  A.   Arabic.

20  Q.   This is a translation?

21  A.   That is correct.

22  Q.   Is it lined up properly where you have a number on the

23  left column under where it says "13th Palestine Committee" 170

24  through 179, and then where it says "implementation" and you

25  have the organizations listed, are those matched up correctly?

```
1   A.    Not perfectly.  They had problems with the template.  I

2   guess --

3   Q.    Who is they?

4   A.    The linguists who translated the document --

5   Q.    Okay.

6   A.    -- had problems with the template, so that they didn't

7   get them aligned just like they were in the Arabic version.

8   For example, the Fund should be across from No. 178 and the

9   IAP should be across from No. 177.

10  Q.    So they are reversed?

11  A.    Actually I think the IAP above it should be moved down.

12  Q.    So what is the function of the Fund under the Palestine

13  Committee in this time period?

14  A.    Well, it was supposed to under No. 172, "Reach a donation

15  ceiling of $1.5 million."  And at the bottom it was supposed

16  to form a medical committee putting together a plan and a

17  budget.

18  Q.    Again the fund is who?

19  A.    The Holy Land Foundation.

20  Q.    Okay.  We have been talking about Muslim Brotherhood in

21  the United States and the Palestine Committee under that and

22  the organizations that are overseen by the Palestine

23  Committee.  Did you come across any documentation that

24  actually indicates who made up the Palestine Committee

25  individually?
```

1    A.    Yes.

2    Q.    Do you have before you what is marked as Elbarasse Search

3    No. 10?

4    A.    I do.

5    Q.    And does that document identify the individuals of the

6    Palestine Committee?

7    A.    It does.

8          MR. JONAS:  Your Honor, at this time I would offer

9    into evidence Elbarasse Search No. 10.

10         MR. MYSLIWIEC:  Your Honor, this is a typed

11   document.  I believe the author is indicated, but there are

12   some handwritten notes on the document.  It is not clear who

13   those are from, so we object on that additional ground.

14         THE COURT:  And that is overruled.  That document

15   No. 10 is admitted.

16         MR. JONAS:  Thank you, sir.

17      If we can pull the very first page on the screen, please.

18   Q.    (BY MR. JONAS)  This first page is in English.  Is this a

19   translation?

20   A.    No.  This document was actually in English when it was

21   seized.

22   Q.    Do you see the way it is a flowchart, I guess is a way to

23   describe it?

24   A.    A chart, yes.

25   Q.    Okay.  Can you describe the chart?

A.   Yes.

Q.   Actually I am sorry.  I apologize.  In the bottom left hand side, is it dated?

A.   It is.

Q.   And what is the date?

A.   April 6th, 1991.

Q.   And April 6, 1991, just so we are clear, the Holy Land Foundation is in existence.  Correct?

A.   That is correct.

Q.   What name was it operating under at that time?

A.   Occupied Land Fund.

Q.   OLF?

A.   That is correct.

Q.   At that time Hamas had been created approximately three and a half years earlier?

A.   It was December of '87, so yes.

Q.   So the title of the chart is "The Central Committee Org. Chart," and the Central Committee you testified is the Palestine Committee?

A.   Based on the amended bylaws, that is the Central Committee.  It shows the Central Committee with the president at the head, and then the Central Committee leadership above the various organizations and committees within it, the first being the IAP.  And it shows the various departments within the IAP, the second being the UASR, along with the departments

```
1   that fall under the UASR.  The third is the OLF, which is the

2   Holy Land Foundation, and the departments that fall under

3   that, and then training and finance.

4   Q.   Okay.  With regard to the OLF, do you see that there are

5   positions on -- there is officers, directors, listed to just

6   president, executive director, treasurer, et cetera?

7   A.   Yes.

8   Q.   Can you just remind us who some of those people were that

9   filled those positions at that time?

10  A.   In 1991 the treasurer would be Ghassan Elashi.  The

11  president, according to one of the incorporation records that

12  we looked at, was Mohammad El-Mezain.  And the executive

13  director would have been Shukri Abu Baker, because he was the

14  other officer who was working there at the time.

15  Q.   And those three are Defendants in this courtroom?

16  A.   That is correct.

17  Q.   Okay.  If we can turn to page 3 of this document.  This

18  document now is in Arabic.  Correct?

19  A.   That is correct.  This chart was attached to a couple of

20  more -- to this page, which --

21  Q.   When you say "this," can you be a little more explicit?

22  A.   The first page of the document was in English.  That

23  Central Committee organizational chart in English was attached

24  to the page on the screen that you see, which is in Arabic.

25  Q.   Okay.
```

A.   So we prepared a translation of that page.

      MR. JONAS:  And if we can turn to page 4, please.

Q.   (BY MR. JONAS)  Is page 4 the translation or the chart we just looked at?

A.   Yes.

Q.   Okay.  What is the title of this chart?

A.   It says, "Chart outline for Palestinian action aspects."

Q.   On the Arabic version there is some handwriting.  Is the handwriting translated on the English version?

A.   It is.

Q.   Okay.  Can you -- Starting with -- Well, withdrawn.  It seems that if this is divided into three sections.  In a way, there is a left side, there is a right side, and there is a middle?

A.   That is correct.

Q.   Okay.  Let's start with the middle.

A.   Okay.

Q.   And walk us through that.

A.   Okay.  It has under No. 1 "The administrative aspect, Mousa."

Q.   Let me stop you.  Who is Mousa?

A.   Mousa Abu Marzook.

Q.   One of the leaders of Hamas?

A.   That is correct.  He is listed as the chairman. Committee secretary is listed as Akram, and that is Mohammed

1   Akram.

2   Q.   The MA who authored some of the documents?

3   A.   Yes.  Including the English chart, according to this

4   first page of this exhibit page 1.

5   Q.   Okay.

6   A.   Also listed underneath the section "financial aspect"

7   there is reference to Ismail, who is Ismail Elbarasse.

8   Q.   The individual whose home this was seized from?

9   A.   That is correct.

10  Q.   Okay.

11  A.   The third is "the media and political aspect of the

12  Palestinian Committee," which UASR is noted and Ahmad is noted

13  underneath it as the name.

14  Q.   And let me interrupt you.  It says next to the media

15  office in this section Ghassan.  Do you know if that is the

16  Defendant Ghassan Elashi?

17  A.   It is not.

18  Q.   This is a different Ghassan?

19  A.   This is a different Ghassan.

20  Q.   How do you know it is a different Ghassan?

21  A.   Because Ghassan Dahduli, who is another Ghassan, was

22  affiliated with this aspect of the committee.  And I believe

23  on the next page of the translation his name is actually

24  listed there Ghassan Dahduli.

25  Q.   Okay.  So we will get to that in a moment?

```
1    A.    Right.

2    Q.    What is No. 4?

3    A.    "The charitable and humanitarian aspect."  And noted as

4    the point person under that is the Defendant Mohammad

5    El-Mezain.

6          Next to it are the organizations that made up the

7    charitable and humanitarian aspect.  The Occupied Land Fund

8    and the Defendant Shukri Abu Baker's name is noted there

9    beside it.

10   Q.    All right.  No. 5?

11   A.    "The popular and public aspect."  And No. 1 under that is

12   the Islamic Association for Palestine.

13   Q.    Do you recognize the name Omar next to the IAP?

14   A.    I do.

15   Q.    Who is that?

16   A.    That is Omar Ahmad, also known as Omar Yehia.

17   Q.    Is his name elsewhere in this list?

18   A.    It is.

19   Q.    Have you seen his name -- Will we be discussing him later

20   on?

21   A.    Yes.

22   Q.    Okay.  I want to jump to No. 7 for a moment.  Do you see

23   where it says "artistic aspect"?

24   A.    I do.

25   Q.    Fawaz, do you know who Fawaz is?
```

1    A.    I do.

2    Q.    Who is that?

3    A.    Fawaz is Fawaz Mushtaha is the individual whose yard was

4    -- where they found the buried videotapes basically.

5    Q.    Next to that where it says "artistic foundation" it says

6    "Munzer."  Do you know who that is?

7    A.    Munzer is Munzer Taleb, who is a band member, along with

8    Fawaz Mushtaha, in the band performed in a lot of festivals

9    thrown by the IAP and the HLF.

10   Q.    Are any of the Defendants in this case involved in that

11   band as well?

12   A.    Yes.

13   Q.    Who?

14   A.    The Defendant Mufid Abdulqader.

15   Q.    Have you seen the Defendant Mufid Abdulqader performing

16   on videotape in the band with these other two individuals you

17   just named?

18   A.    Yes, I have.

19   Q.    Let's move to the left side of the chart where it says

20   "committee chairman."  Okay.  And it says "Central Com."  Do

21   you recognize any names of the individuals under the Central

22   Committee?

23   A.    Yes.  Several of these individuals that we have already

24   discussed, No. 1 being Mousa Abu Marzook the Hamas leader; no.

25   2 being Mohammed Akram, author of a number of these documents;

```
1    no. 4 is Elbarasse, which would be Ismail Elbarasse; No. 5 is

2    the Defendant Mohammad El-Mezain; and No. 6 is an individual

3    Abdel Haleem Ashqar; No. 9 is the Defendant Shukri Abu Baker.

4    Q.   And on the right side of this column or this little area

5    it says "executive."

6    A.   Yes.

7    Q.   Do you recognize any of the individuals under

8    "executive"?

9    A.   A number of them.  Some we have already discussed include

10   No. 2, omar Yehia, who is noted over here with the Islamic

11   Association for Palestine; and No. 5, fawaz Mushtaha, the band

12   member who had the videotapes in his yard; and No. 6 is Ismail

13   Elbarasse.

14   Q.   In between the word "Central Com" and "executive" it says

15   "Shura Council"?

16   A.   Yes.

17   Q.   And the Shura Council is the Shura Council you described

18   earlier as sort of being the board of directors?

19   A.   That is correct.

20   Q.   Can we turn now to the far right hand column?  What do we

21   have here?

22   A.   A list of names of members of the Palestinian Committee.

23   Q.   Again we see No. 1, Mousa.  Would that be Mousa Abu

24   Marzook?

25   A.   That is correct.
```

1   Q.   Do you recognize any of the Defendants' names here?

2   A.   The Defendant Mohammad El-Mezain is No. 4; Shukri Abu

3   Baker is No. 11.

4   Q.   And some of the other names you discussed are also listed

5   on this column?

6   A.   That is correct.

7   Q.   We don't need to run through all of them.  You mentioned

8   an individual on this document named Ashqar.

9   A.   That is correct.

10  Q.   Besides seeing the names of the Palestine Committee

11  members in this document, Elbarasse Search No. 10, have you

12  seen their names on any other documents that didn't come from

13  Elbarasse's home?

14  A.   Yes.

15  Q.   With regard to this individual named Ashqar who is on

16  this list, was there a search warrant done of his home?

17  A.   There was a search.  There was not a search warrant in

18  the term you and I would use.  There was a covert search of

19  his home.

20  Q.   Can you explain that briefly?

21  A.   Yes.  In December of 1993 Abdel Haleem Ashqar was the

22  subject of an intelligence investigation by the FBI, and in

23  December of 1993 the FBI received authority from the Attorney

24  General of the United States, who at that time was Janet Reno,

25  to conduct what we call a covert search of Mr. Ashqar's home.

1    What the FBI did was they entered the home and they

2  photographed a number of documents that they deemed pertinent

3  to their counterterrorism investigation.  So that is what

4  happened.

5  Q.   And you are saying it was authorized by the Attorney

6  General.  Was that the state of the law at the time?

7  A.   Yes.

8  Q.   That the Attorney General had the authority to authorize

9  those type of search warrants?

10  A.   That is correct.

11  Q.   Of the items that were photographed from the Ashqar

12  search, was there any items that had the names of the

13  Palestinian Committee members on it?

14  A.   Yes.

15  Q.   Do you have before you what has been marked as Ashqar

16  Search No. 1?

17  A.   I do.

18  Q.   Okay.  Does that have a listing of the Palestinian

19  Committee members?

20  A.   It does.

21       MR. JONAS:  Your Honor, at this time I would offer

22  into evidence Ashqar Search No. 1.

23       MS. HOLLANDER:  Your Honor, we object to the Ashqar

24  documents on the same grounds as previously stated.

25       THE COURT:  Okay.  Those have been overruled, and

1    Ashqar Search No. 1 is admitted.

2              MS. HOLLANDER:  May we have a continuing objection?

3              THE COURT:  Yes, ma'am.

4              MR. JONAS:  Can we first show page 2 of this

5    document?

6    Q.   (BY MR. JONAS)  Agent Burns, I realize the far right

7    column is in Arabic.  Is that correct?

8    A.   That is correct.

9    Q.   What else do we see in this document?

10   A.   We see locations and telephone numbers in English.

11   Q.   Was this document translated?

12   A.   We did translate the document.

13   Q.   Turn to page 4, please.  Is this the translation of page

14   2?

15   A.   It is.

16   Q.   On this document do you see any of the names we have been

17   discussing as members of the Palestine Committee?

18   A.   Yes.

19   Q.   Who do we see?

20   A.   There are a number of them that we have seen in the

21   previous document, but most importantly No. 1, Hamas leader

22   Mousa Abu Marzook; No. 2, Mohammed Akram, the author of a

23   number of these documents; No. 3, Ahmed Yousef with the UASR;

24   No. 5, the Defendant Mohammad El-Mezain; No. 6, Ismail

25   Elbarasse, a person from whose home many of the documents were

taken that we have discussed; No. 8 is Ghassan Elashi, the

Defendant; No. 13 is Fawaz Mushtaha, the band member who had

the buried videotapes; No. 18 is the Defendant Shukri Abu

Baker; No. 25 is Omar Yehia, the individual with the IAP that

we saw on the previous document.  And there are a number of

others on there that are on the previous list that we looked

at.

Q.   So the list from Elbarasse Search No. 10 and Ashqar

Search No. 1, they match up?

A.   There are a few differences, but for the most part they

have many of the same names on them.

Q.   And where it says "city/country" next to the names, is it

your understanding that that information is correct?  In other

words, that the Mousa Abu Marzook lived in Ruston?

A.    It was correct at -- You know, at a time long ago.

Q.   Correct.  Right.  And in fact, the Secretary of State VA

document VA-1, which was the certificate of incorporation for

UASR, did that identify Mousa Abu Marzook as living in Ruston?

A.    That is correct.

Q.   And Ruston is in what state?

A.    In Louisiana.

Q.   And Ismail Elbarasse is where?  No. 6.

A.    Washington, D.C.

Q.   In fact, is the area code next to that for his phone

number, is that Washington, D.C.'s area code?

1   A.   That is northern Virginia, a suburb of Washington, D.C.

2   Q.   And that is where his house was searched?

3   A.   Yes.

4   Q.   And then you have Ghassan Elashi at L.A.  I guess that

5   would be Los Angeles?

6   A.   That is correct.

7   Q.   Was that where he was living in the early '90s before he

8   moved to Dallas?

9   A.   That is correct.

10  Q.   We don't need to go through all of those.

11       Besides seeing the names of some of the Palestine

12  Committee members both in Elbarasse Search No. 10 and Ashqar

13  Search No. 1, have you seen them in another document?

14  A.   Yes.

15  Q.   Do you have before you what has been identified as

16  Marzook Phonebook?

17  A.   I do.

18  Q.   And what is the Marzook phonebook?

19  A.   This is a phonebook that was seized from Marzook when he

20  was arrested at JFK Airport in 1995.

21  Q.   And again, you are stating Marzook, and I am just going

22  to pull up Demonstrative No. 17.  You are referring to this

23  individual over here Mousa Abu Marzook, the political leader

24  of Hamas?

25  A.   That is correct.

```
1    Q.   So in his phonebook did you see any of the same names?

2    A.   Yes.

3              MR. JONAS:  Your Honor, at this time I offer into

4    evidence the Government's Exhibit Marzook Phonebook.

5              MS. HOLLANDER:  Objection; hearsay, Your Honor.

6              THE COURT:  Overruled, and that is admitted.

7    Q.   (BY MR. JONAS)  What language was the phonebook in--the

8    phone numbers, the names?

9    A.   Primarily in Arabic.

10   Q.   Did you have it translated?

11   A.   Yes.

12   Q.   We see on the screen the first page of the phonebook.  Is

13   that correct?

14   A.   That is correct.

15             MR. JONAS:  If we can turn to page 37, please.

16   Q.   (BY MR. JONAS)  What name and phone number do you see

17   here?

18   A.   Ismail Elbarasse.

19             MR. JONAS:  If we can turn to page 48.

20   Q.   (BY MR. JONAS)  What names do we see here that you

21   recognize?

22   A.   The Defendant Ghassan Elashi.

23   Q.   Agent Burns, the phone numbers for Defendant Ghassan

24   Elashi, what is the area code?

25   A.   214, that would be for the Dallas area.
```

```
 1   Q.   So would these numbers have to have been written after

 2   Ghassan Elashi moved to Dallas?

 3   A.   Yes.

 4        MR. JONAS:   If we can turn to page 58, please.

 5   Q.   (BY MR. JONAS)   And do you recognize any names there?

 6   A.   Mohamed Akram.

 7   Q.   Again, that individual is whom?

 8   A.   He is one of the individuals referenced in the

 9   Palestinian Committee on both the chart and the list from

10   Ashqar's home, and the person who drafted a number of those

11   documents.

12   Q.   Page 59, please.

13   A.   The Defendant Mohammad El-Mezain is referenced on this

14   one as Mohamed Abou Ibrahim.

15   Q.   Okay.  You stated earlier you knew Defendant El-Mezain's

16   Abu name?

17   A.   That is correct.

18   Q.   What is that?

19   A.   Abu Ibrahim.

20   Q.   Do you see the phone number?

21   A.   I do.

22   Q.   What is the area code?

23   A.   It is 201.  That is for the area of New Jersey where he

24   lived.

25        MR. JONAS:   And finally if we can turn to page 63.
```

1    Q.    (BY MR. JONAS)  Do you recognize any names there?

2    A.    The Defendant Shukri Abu Baker.

3    Q.    Do you recognize the area code for that one?

4    A.    I do.  I believe that -- I think that was from the Los

5    Angeles area, but I am not positive.  It was an old area code.

6    Q.    Okay.  On the PowerPoint you walked us through,

7    Demonstrative No. 15 did you create some additional slides

8    including the names of some individuals?

9    A.    Yes.

10        MR. JONAS:  If we can go back to Demonstrative No.

11   15, on page 14 of that one.

12   Q.    (BY MR. JONAS)  Agent Burns, what did you add on the

13   bottom of that?

14   A.    I added from the documents that we had previously

15   discussed, the amended bylaws, that the chairman and the

16   leaders of the Palestine Committee were drawing strategies,

17   approving plans, policies and budgets for these organizations.

18   And underneath I listed the individuals that were a part of

19   these organizations according to the exhibits that we have

20   just discussed.

21   Q.    Okay.  And the exhibit numbers are listed on the bottom

22   right hand corner of that?

23   A.    Exactly.  At the bottom all the exhibit numbers that were

24   used to compile this chart are listed.

25   Q.    Okay.  Agent Burns, of the Elbarasse documents, let's go

1  back to those for a moment, did you see any Elbarasse search

2  warrant documents that, for lack of a better term, showed the

3  Palestine Committee in action?

4  A.   Yes.

5  Q.   Do you have before you Elbarasse Search No. 11?

6  A.   I do.

7  Q.   Okay.  And is that one of the documents that shows them

8  in action?

9  A.   Yes.

10  Q.   Of course, when I mean in action, I mean actually

11  functioning and doing things?

12  A.   That is correct.

13        MR. JONAS:  Your Honor, at this time I offer into

14  evidence Government's Exhibit Elbarasse Search No. 11.

15        MR. MYSLIWIEC:  Your Honor, I believe this is

16  another handwritten document where the author is not named.

17        THE COURT:  That is overruled, and Elbarasse Search

18  No. 11 is admitted.

19        MR. JONAS:  Thank you, sir.

20  Q.   (BY MR. JONAS)  I will give you a moment to pour some

21  water.

22       Agent Burns, the fact that this is in handwriting, for

23  purposes of your investigation did that matter?

24  A.   No.

25  Q.   And what language is this document in?

1    A.    Handwritten in Arabic.

2              MR. JONAS:  If we can turn to page 4, please.

3    Q.    (BY MR. JONAS)  What is the date of this item?

4    A.    February 18th, 1989.

5    Q.    Would this have been fairly early in the life of the

6    Palestine Committee?

7    A.    Yes.

8    Q.    What does it call itself, or how does it identify itself

9    as the purpose?

10   A.    The document says it is the meeting agenda of the

11   financial committee.

12   Q.    And it has items listed as an agenda?

13   A.    You see the title, the heading says, "Items on the

14   agenda," and then there are a list of 12 items on the agenda.

15   Q.    Turning to No. 2 for a moment on page 4, do you see any

16   of the Defendants listed?

17   A.    I do.

18   Q.    Who?

19   A.    Under No. 2, Ghassan is the Defendant Ghassan Elashi was

20   responsible for discussing the Fund's correspondence and

21   letters and its legal status.

22   Q.    Any other Defendant?

23   A.    Yes.  No. 3, the Defendant Shukri Abu Baker was

24   responsible for coordinating with ISNA in the accounting.  And

25   it also says, "The sales department, the representatives, or

1    Ghassan."

2    Q.    And No. 5?

3    A.    That is the Defendant Mohammad El-Mezain, whose nickname

4    was Abu Ibrahim.  He was responsible for the representatives

5    and donation campaigns the Fund's letters preparation, and

6    determining disbursement policies from the Fund, and also

7    coordinating with Aboul Hasan in all financial matters.

8    Q.    Do we see his name somewhere else in this document?

9    A.    Yes.  Under the fourth item on the agenda he is noted

10   next to a report about the Fund's accounts and ISNA.

11   Q.    Is there any other documents that you have seen that also

12   show the Palestine Committee and what they were doing?

13   A.    Yes.

14   Q.    Do you have before you Government's Exhibit Elbarasse

15   Search No. 12?

16   A.    I do.

17   Q.    Okay.

18         MR. JONAS:  Your Honor, at this time I offer into

19   evidence Elbarasse Search No. 12.

20         MR. MYSLIWIEC:  Your Honor, this one I believe has

21   an unknown author or an author not named in the document, and

22   we object on those grounds.

23         THE COURT:  That doesn't affect admissibility.

24   Objection is overruled.  That document is admitted.

25         MR. JONAS:  If we can put that on the screen.

```
1    Q.   (BY MR. JONAS)  Agent Burns, this is a handwritten

2    document?

3    A.   It is.

4    Q.   And I am going to hold up the original so you can see it.

5    This looks like it is torn out from a notebook.  Is that

6    correct?

7    A.   That is correct.

8    Q.   Did you tear it out from the notebook?

9    A.   No.

10   Q.   Is this the way it was found?

11   A.   Yes.

12        MR. JONAS:  If we can turn to page 3.

13   Q.   (BY MR. JONAS)  What does this document state?

14   A.   Actually this document was translated -- The pages were

15   reversed, so the first page of this document is actually

16   page 4.

17        MR. JONAS:  Okay.  Let's turn to page 4.

18   Q.   (BY MR. JONAS)  The original in Arabic, it is one page

19   that has writing on both sides.  Correct?

20   A.   That is correct.

21   Q.   Agent Burns, before I ask you anything in particular

22   about this, does this document match up with Elbarasse Search

23   No. 11 which had items on an agenda?

24   A.   Yes.  This document relates to the document that we just

25   discussed.  You can tell by the date, the location, and also
```

1   what is noted herein as having been discussed, it matches up

2   with the items on the agenda from the previous document.

3   Q.   Okay.  Do you see the Defendant Mohammad El-Mezain

4   anywhere on Elbarasse Search No. 12?

5   A.   Yes.  It says a report about the Funds's accounting and

6   ISNA, which was on the previous document as an item for the

7   Defendant Mohammad El-Mezain to discuss.  It is also noted

8   here with his name Abu Ibrahim.

9   Q.   Under No. 4, what you just read discusses their

10  relationship with NAIT, "they" I assume being the Holy Land

11  Foundation.  And it has deposits and disbursements.  Do you

12  see that?

13  A.   I do.

14  Q.   Okay.  Is that statement consistent with the way you

15  received the Holy Land Foundation's bank records from NAIT?

16  A.   Under the deposits, yes, that is consistent with the

17  types of documents that we received from NAIT.

18  Q.   Okay.  I am going to get back to these later.  Did you

19  see any other Elbarasse search documents that also had the

20  Palestine Committee in action, to use that term?

21  A.   Yes.

22  Q.   Do you have before you what has been marked as Elbarasse

23  Search No. 13?

24  A.   I do.

25  Q.   And is that one of those documents?

A.   It is.

MR. JONAS:  Your Honor, at this time I would offer into evidence Elbarasse Search No. 13.

MR. MYSLIWIEC:  Your Honor, this document also I believe does not identify an author.

THE COURT:  Okay.  That objection is overruled, and that document is admitted.

MR. JONAS:  If we can put the first page of this document on the screen, please.

Q.   (BY MR. JONAS)  And, clearly, this document is in Arabic, Agent Burns?

A.   That is correct.

MR. JONAS:  If we can put the second page, please.

Q.   (BY MR. JONAS)  It looks like a table of contents.

A.   It is.

MR. JONAS:  If we go to the first page of the English, which is page 5.

Q.   (BY MR. JONAS)  What is the title of this document?

A.   "The annual report for the year 1989 through 1990 presented to the organizational conference."

Q.   Okay.  Is this a Palestine Committee document or a Muslim Brotherhood document?

A.   This is actually part of a manual that contained a number of reports that are referenced in the table of contents that you will see on the next page in the English translation.

1      MR. JONAS:  If we can turn to that, please, page 6.

2      THE WITNESS:  It was a large document, again with

3   all of these reports.  In order to make it more efficient for

4   today's purposes, we just took out and included the report of

5   the Palestine Committee so that this is a document or a manual

6   that was created for the U.S. Muslim Brotherhood, and the

7   document that we are going to be discussing specifically was

8   created by the Palestinian Committee.

9   Q.   (BY MR. JONAS)  Okay.  And is the Palestinian Committee

10   report attached to this document?

11   A.   It is.

12   Q.   Contained within this exhibit?

13   A.   Yes.

14      MR. JONAS:  If we can turn to page 7, please.

15   Q.   (BY MR. JONAS)  Does the title of this page, "Palestine

16   Committee," and the page number which is above it correspond

17   to the table of contents that we saw a moment ago?

18   A.   It does.

19   Q.   Okay.  Does this talk about the Holy Land Foundation?

20   A.   It does.

21   Q.   What does it say?

22   A.   It says -- Under "general idea about the committee," it

23   says, "The Central Committee for Palestinian activism in

24   America is in charge of planning, directing, and following up

25   on all work related to and connected to the Group.  It

1   includes several committees and organizations, some of which

2   are:  The Islamic Association for Palestine, the Occupied Land

3   Fund, the United Association for Studies and Research, the

4   Office of Foreign Affairs, the Investment Committee, the

5   Rehabilitation Committee, the Medical Committee, and the Legal

6   Committee."

7   Q.   And again, just so we are clear, Islamic Association of

8   Palestine, IAP.

9   A.   That is correct.

10  Q.   Occupied Land Fund, HLF.

11  A.   That is correct.

12  Q.   UASR, United Association.

13  A.   That is correct.

14  Q.   The same three groups you identified as part of the

15  Palestine Committee?

16  A.   That is correct.

17  Q.   Under "achievements" does this talk about how much was

18  raised by the Holy Land Foundation?

19  A.   It does.

20  Q.   What does it say?

21  A.   It says, "The sum of $728,059.04 has been raised through

22  the Occupied Land Fund to support the steadfastness of the

23  people in the inside.  Most of the money has been

24  transferred."

25  Q.   Does this document talk about Hamas?

```
1    A.    It does.

2          MR. JONAS:   If we can turn to the next page, page 8,

3    please.

4    Q.    (BY MR. JONAS)   Under "recommendations and suggestions."

5    A.    It states, "The Committee asks the Group" --

6    Q.    Let's go slower.   The Committee is who?

7    A.    The Committee is the Palestine Committee whose report

8    this is.

9    Q.    And what is the group?

10   A.    The Group is the U.S. Muslim Brotherhood who is the

11   entity that has compiled all of these reports.

12   Q.    Okay.   Continue.

13   A.    "...for more moral support for this work and the

14   Committee overseeing it, as it represents its strong arm and

15   the one which is specialized in defending the Islamic cause in

16   Palestine and support for the emerging movement the Hamas

17   movement."

18   Q.    Turn back to page 7.   Do you see where under

19   "achievements" it says No. 8 Al Sachra Band?

20   A.    Yes, I do.

21   Q.    Read that, please?

22   A.    "The Al Sachra Band participated in over 25 festivals

23   during activities of the Association and the Fund."

24   Q.    You testified earlier that three individuals, Fawaz

25   Mushtaha, Munzer Taleb, and the Defendant Mufid Abdulqader,
```

1    were in a band.  Was that the Al Sacre Band?

2    A.    Yes.

3    Q.    You testified you reviewed videos of the band performing?

4    A.    Yes, I did.

5    Q.    Where do those videos come from?

6    A.    Those videos came from several locations.  Some were

7    seized from the HLF offices, some were seized from InfoCom,

8    some were seized from the home of Ismail Elbarasse, and some

9    were from the yard of Fawaz Mushtaha.

10   Q.    Buried in the yard?

11   A.    Buried in the yard.

12   Q.    You are not going to have this in front of you, but are

13   you familiar with Holy Land Foundation Search No. 71?

14   A.    Yes.

15   Q.    Okay.  What is that?

16   A.    That is a videotape.

17   Q.    What is the date of the videotape?

18   A.    It was sometime between October and December of 1991,

19   based on the content of the videotape.

20   Q.    And that was seized from where?

21   A.    That was seized from the HLF offices.

22           MR. JONAS:  Your Honor, at this time I would offer

23   into evidence Holy Land Search No. 71.

24           MS. CADEDDU:  No objection.

25           THE COURT:  Admitted.

1          MR. JONAS:  If we can play that videotape, please.

2          MS. CADEDDU:  No objection, subject to the previous

3    objections made.

4          THE COURT:  The running objections?

5          MS. CADEDDU:  Yes.

6          THE COURT:  Okay.

7          (Whereupon, HLF Search No. 71 was played in open

8          court, while questions were propounded.)

9    Q.   (BY MR. JONAS)  Do you recognize anybody on the screen?

10   A.   I do, although it is a little bit fuzzy.  It is a little

11   easier to see in motion.  But I believe the tall one is the

12   Defendant Mufid Abdulqader.

13   Q.   Which one from the left would he be?

14   A.   As you are looking at the screen, the second from the

15   left.

16   Q.   Agent Burns, this jumped a little bit.  Is this the whole

17   tape we are seeing?

18   A.   No.

19   Q.   We are seeing segments?

20   A.   Segments of the tape.

21   Q.   Within the segments did they move around from different

22   scenes the way you originally watched them?

23   A.   The way the tape was, during the music the different

24   scenes are portrayed.  We didn't do anything with this.  This

25   is all part of one clip.  So as this music was playing, the

1    tape as it was found included these pictures with Hamas and

2    the different things you are going to see here.

3    Q.   A montage?

4    A.   Yes.

5    Q.   Do you recognize these individuals?

6    A.   Yes.  The individual on the right is the Defendant Mufid

7    Abdulqader.

8    Q.   Okay.  Agent Burns, maybe not in this particular

9    videotape, but in other videotapes that you have seen, have

10   you seen scenes like this where there is an audience sitting

11   in an auditorium?

12   A.   Yes.

13   Q.   And in those videotapes, were you able to determine where

14   that was happening?  In other words, I mean, in the United

15   States or outside the United States?

16   A.   Inside the United States.

17   Q.   Okay.  I should have followed up on this when you said

18   you were able to determine where it was in the United States.

19   What do you base that on?

20   A.   The evidence that we have seen, including the documents

21   and the videotapes, often there will be a banner in the

22   videotape which will actually say where it is; for example,

23   the Islamic Association for Palestine Chicago, or things like

24   that.

25   Q.   So the content of the tape will tell you the location?

A.    Sometimes.  Sometimes.  And again, that is based on, you

know, where the people are sitting in the auditorium, as

opposed to scenes like this from the street.

Q.    That is what I meant, the auditorium audiences.

      Do you see where it says Azzam?

A.    I do.

Q.    Do you know who Azzam is?

A.    Abdel Azzam.

Q.    Do you know who Abdel Azzam is?

A.    I do.

Q.    Who is that?

A.    He was a famous Palestinian mujahideen or fighter that

was revered by Hamas, and he was also on the document Ashqar

No. 1 as a member of the Palestine Section.

Q.    Is that the end of one segment of this videotape?

A.    It is.

Q.    Agent Burns, just remind us, where was this tape found?

A.    This was found in the HLF offices.

Q.    In Dallas?

A.    I can't say for sure about that.  I would have to see the

actual tape.

Q.    But it was one of the HLF offices?

A.    It was one of the HLF offices.

Q.    Do you know if any tapes were found in the other

locations?

```
1    A.    In the other HLF offices?

2    Q.    Right.  The New Jersey, the Illinois, the San Diego --

3    A.    Yes, there were tapes that were found in Chicago, New

4    Jersey, and Dallas.  I am not sure about San Diego.

5    Q.    You saw the name Yassin?

6    A.    Yes, in the first translation.

7    Q.    Correct.  Who is Yassin?

8    A.    Yassin is Ahmed Yassin, the founder and spiritual leader

9    of Hamas, former spiritual leader.

10   Q.    Would that be the gentleman on the top of the chart?

11   A.    That is correct.

12   Q.    A screen ago did you recognize that individual who was

13   singing?

14   A.    Yes.  That band member was Fawaz Mushtaha.

15   Q.    The guy who likes to bury things in the backyard?

16   A.    Yes.

17   Q.    Who is on the screen now?

18   A.    This is Ahmed Yassin, the Hamas spiritual leader.

19   Q.    Okay.  Do you recognize that individual?

20   A.    That is Fawaz Mushtaha.

21   Q.    This is Fawaz Mushtaha here singing?

22   A.    Yes.

23   Q.    And we saw the Defendant Mufid Abdulqader singing?

24   A.    Yes.

25   Q.    Is that the Al Sacre Band?
```

```
1    A.    They are part of the Al Sacre Band, yes.

2    Q.    Is this what we have seen so far, portions of

3    performances by the Al Sacre Band?

4    A.    Yes.

5    Q.    Islamic Association for Palestine, IAP?

6    A.    That is correct.

7    Q.    Okay.  I don't mean to keep doing that.  It says "New

8    Jersey welcomes you."  Is that one of the indicators that is

9    on that banner that tells you where this particular scene was

10   taking place?

11   A.    Yes.

12   Q.    And the gentleman in the middle?

13   A.    That is the Defendant Mufid Abdulqader.

14   Q.    Agent Burns, if we were to play the whole tape, about

15   how long would it have taken?

16   A.    Most of the tapes were about two hours in length.

17   Q.    And other than creating segments to show in trial here,

18   did the FBI do anything to these tapes, doctor them in any

19   way, alter them in any way?

20   A.    No.

21   Q.    What about the Fawaz Mushtaha tapes that were found in

22   the backyard?

23   A.    No.  What we did to the tapes were put the English

24   translation on them so we could all read what was being said,

25   and just choose the portions.   But other than that, the tapes
```

1    are as they were.

2    Q.   You testified that that particular tape was found at the

3    Holy Land Foundation?

4    A.   That is correct.

5    Q.   And you said that some tapes were found at InfoCom.

6    Correct?

7    A.   That is correct.

8         MR. JONAS:  Your Honor, I would like to offer into

9    evidence at this time InfoCom Search No. 56, which is another

10   videotape.

11        MS. CADEDDU:  Same objections as previously made,

12   Your Honor.

13        THE COURT:  All right.  That is overruled, and the

14   exhibit is admitted.

15        MR. JONAS:  If we can play that tape, please.

16        (Whereupon, InfoCom Search No. 56 was played in open

17        court, while questions were propounded.)

18   Q.   (BY MR. JONAS)  Do you see, it says -- there is a circle

19   and it says Islamic Association Of Palestine on the bottom

20   half of that circle?

21   A.   Yes.

22   Q.   Have you seen that symbol before?

23   A.   Yes.  We have seen it in a couple of the videotapes we

24   have played already, and it is the IAP's symbol that they use,

25   or one of them.  And you will see it frequently on banners and

1    things like that at these festivals.

2    Q.    "Al Sacre Band presents"?

3    A.    Yes.

4    Q.    That is the band you have been referring to?

5    A.    That is the band that the Defendant Mufid Abdulqader,

6    Fawaz Mushtaha, and Munzer Taleb were all members of.

7    Q.    Are you able to date this tape?

8    A.    Yes.  This would be at the beginning of the third year of

9    the Intifada, which if you count the beginning of the second

10   or the beginning of the first year -- '91.

11   Q.    '91?

12   A.    Okay.

13   Q.    Do you see it says Intifada in English?

14   A.    Yes.

15   Q.    Okay.  Do you recognize this individual on the screen?

16   A.    I do.

17          MR. JONAS:  Your Honor, if I may put the easel back

18   up?

19          THE COURT:  Yes.

20   Q.    (BY MR. JONAS)  Before I put that up, Agent Burns, you

21   dated this tape approximately 1990?

22   A.    Well, it is actually -- It moved on to say the beginning

23   of the fourth year of the Intifada, which would put it in

24   December of '91.

25   Q.    When was it seized from InfoCom?

1   A.   Well, in September of 2001.

2   Q.   2001?

3   A.   That is correct.

4   Q.   Remind us who is related to InfoCom in the case; which

5   Defendant.

6   A.   The Defendant Ghassan Elashi.

7   Q.   The earlier tape you dated in the early '90s, when was

8   that seized from the Holy Land Foundation?

9   A.   That would have been in 2001 as well.

10  Q.   Thank you.

11       I am going to put the Demonstrative No. 17, the Hamas

12  leaders in the '90s.  The individual on the screen, is he

13  anywhere on this chart of the Hamas leaders.

14  A.   He is.

15  Q.   Let me hold it for a moment and turn it towards you.

16  A.   The individual closest to you, Mahmoud Zahar.

17  Q.   So the individual I am now pointing to?

18  A.   Yes.  That is correct.

19  Q.   Where it says Hamas leader in Gaza?

20  A.   Yes.

21  Q.   Let me put this down.  Do you recognize this individual

22  on the screen?

23  A.   I do.

24  Q.   It is a profile shot.

25  A.   Yes, I do.

1   Q.   Who is that?

2   A.   Jamil Hamami.

3   Q.   And I will hold this this time.  I was too quick to put

4   it down.  Is Jamil Hamami on this chart?

5   A.   He is on the bottom second from you, Jamil Hamami, Hamas

6   leader in the West Bank.

7   Q.   The individual I am pointing to now?

8   A.   That is correct.

9   Q.   Is this the Al Sacre Band before us?

10  A.   Yes.

11  Q.   Do you recognize the Defendant Mufid Abdulqader?

12  A.   I do.

13  Q.   Where is he on the screen?

14  A.   In the previous clip there was a close-up of his face,

15  but I believe now he is the second full person that you can

16  see from the left on the screen.

17  Q.   Do you recognize the individual that just came on the

18  screen?

19  A.   Munzer Taleb.

20  Q.   Is he the same individual in Elbarasse Search No. 10 that

21  was in this chart and the listing of all the Palestine

22  Committee members?

23  A.   Yes.

24  Q.   We saw him name under the artistic --

25  A.   Yes.

```
1    Q.    He is in the band?

2    A.    Yes.

3    Q.    Who just came onto the screen?

4    A.    The Defendant Mufid Abdulqader.

5    Q.    So besides being in a band and a musician, he is also an

6    actor?

7    A.    Performing skits at the festival.

8    Q.    Performing skits.  I guess actor is not the right term.

9          Agent Burns, do you recognize this individual on the

10   screen?

11   A.    I do.

12   Q.    And if I could pull up the Demonstrative No. 17 again, is

13   he anywhere in this chart?

14   A.    Yes.  He is on the second row closest to me on the left,

15   Mohammed Siam.

16   Q.    Where it says Hamas roving ambassador?

17   A.    That is correct.

18   Q.    Okay.

19   A.    Mr. Jonas, I think my math was bad on the date.  Can I

20   correct that?

21   Q.    Sure.

22   A.    I was counting in my head and it has been a long day.  I

23   believe it was December '90 instead of '91, which is what I

24   said.

25   Q.    Does your recounting of the math change the date it was
```

1    seized from InfoCom?

2    A.    No.

3    Q.    It was still in 2001?

4    A.    It was still in 2001.

5    Q.    Agent Burns, going back to the Elbarasse search

6    documents, did you see any other documents that again talked

7    about the achievements or actions of the Committee?

8    A.    I did.

9    Q.    Do you have Elbarasse Search No. 14 before you?

10   A.    I do.

11          MR. JONAS:  Your Honor, at this time I offer into

12   evidence Elbarasse Search No. 14.

13          MR. MYSLIWIEC:  Your Honor, this is a document that

14   does not identify the author, so we don't know created it.

15          THE COURT:  All right.  That is overruled, and

16   Elbarasse Search No. 14 is admitted.

17   Q.    (BY MR. JONAS)  What language is this document in?

18   A.    This document is in Arabic.

19   Q.    And it was translated, I assume?

20   A.    Yes.

21          MR. JONAS:  If we can turn to page 5.

22   Q.    (BY MR. JONAS)  Is this the first page of the

23   translation?

24   A.    It is.

25   Q.    Are you able to date this document?

1   A.    Yes.  It is from sometime in 1991.

2   Q.    What is the title?

3   A.    "Palestine Committee."

4   Q.    Does it discuss the Holy Land Foundation?

5   A.    It does.  It discusses the administrative issues of the

6   Central Committee, which is the Palestine Committee.  Among

7   that it discusses achievements and different things for the

8   various organizations within the Palestine Committee.

9   Q.    Okay.  Can you read No. 6 under "achievements"?

10  A.    It says, "Making three field visits to the offices of the

11  Association, the IAP, the Fund, and the UASR."

12  Q.    And can you read No. 8?

13  A.    "Forming a medical committee to support the people inside

14  under the supervision of the director of the Occupied Land

15  Fund.  Ongoing."

16        MR. JONAS:  If we can turn to page 7, please.

17  Q.    (BY MR. JONAS)  And what does the top half of page 7

18  relate to?

19  A.    The Occupied Land Fund, which is the Holy Land

20  Foundation.

21  Q.    It says "achievements."  Correct?

22  A.    That is correct.

23  Q.    Do you see No. 2 where it says, "Completion of the

24  selection of the board of directors and the board of

25  trustees"?

1    A.    Yes.

2    Q.    You testified already that three of the Defendants,

3    Mohammad El-Mezain Ghassan Elashi, and Shukri Baker were

4    officers of the HLF?

5    A.    That is correct.

6    Q.    Were they also on the board of directors?

7    A.    They were.

8    Q.    Okay.  Do board of directors -- Well, generally, as far

9    as you know, do board of directors have meetings?

10        MR. DRATEL:  Objection, Your Honor, to the form of

11   the question.

12        MR. JONAS:  I will withdraw the question.

13   Q.    (BY MR. JONAS)  Did the board of directors of the Holy

14   Land Foundation have meetings?

15   A.    Yes, they did.

16   Q.    And were these meetings recorded?  And I don't mean

17   necessarily with a recording device.  I mean notes taken.

18   A.    Yes.  Meeting minutes were generally taken.

19   Q.    And what is your understanding as to what meeting minutes

20   are?

21   A.    They are notes of what transpired during the meeting of

22   the board members.

23   Q.    Did you find any board meeting minutes from the HLF in

24   the HLF search warrant material?

25   A.    Yes.  We found some in English, board meeting minutes

1   from the HLF search warrant material.

2   Q.   Do you have what has been marked as HLF Search No. 5

3   before you?

4   A.   Yes, I do.

5   Q.   And what is that?

6   A.   Some of the board meeting minutes from the HLF that were

7   found during the search warrants.

8   Q.   Okay.  And to be clear, that is the HLF search warrant?

9   A.   That is correct.

10          MR. JONAS:  Your Honor, at this time I would offer

11  into evidence HLF Search No. 5.

12          MS. HOLLANDER:  No objection.

13          THE COURT:  Admitted.  .

14  Q.   (BY MR. JONAS)  What is the date of these particular

15  board meeting minutes?

16  A.   February 16th through 18th, 1991.

17  Q.   Do you know how many meeting minutes for different

18  meetings are contained within this particular exhibit,

19  approximately?

20  A.   I don't know about this exhibit.  I know there were a

21  number of them that were seized, but I would -- I think my

22  copy is a little bit broader than what is in here.

23  Q.   Did you extract several meeting minutes to exhibit in

24  this case?

25  A.   Yes.

1   Q.   Okay.  So we are not exhibiting all of them?

2   A.   No.

3   Q.   This particular meeting that we are exhibiting, that is

4   on the screen at least, what is the date of it?

5   A.   February 16th through 18th, 1991.

6   Q.   Where does it take place?

7   A.   In Los Angeles, California.

8   Q.   Is that where the Occupied Land Fund, the HLF, was

9   located at that time?

10  A.   Yes.

11  Q.   Who was present at this meeting?

12  A.   This document indicates that Mohammad El-Mezain, Ghassan

13  Elashi, and Shukri Abu Baker were present at this meeting.

14  Q.   Does it indicate if anyone else was present at the

15  meeting?

16  A.   It does not.

17          MR. JONAS:  If we could pan back for a moment to the

18  whole page, at least the top part of the page?

19  Q.   (BY MR. JONAS)  Do you see the letterhead?

20  A.   I do.

21  Q.   Whose letterhead is that?

22  A.   This is the Occupied Land Fund's letterhead.  This is as

23  the document was found, written in English.

24  Q.   In fact, it is entitled "board meeting minutes."

25  A.   That is correct.

1   Q.   Have you reviewed these board meeting minutes?

2   A.   Yes.

3   Q.   Could you generally tell us what it says, without going

4   into detail?

5   A.   It notes that, for example, "The executive director shall

6   finalize all employment needs of the OLF by the end of 1991."

7   I don't know if you want me to read several of those.

8   Q.   Read two or three.

9   A.   Okay.  It says, "The executive director is authorized to

10  employ more staff, up to $25,000 total annual salaries.  The

11  OLF is shall embark on telecommunication fundraising.  The OLF

12  shall embark on market segmentation, direct mail

13  fundraising" --

14  Q.   That is fine.  Throughout the other search warrants that

15  were conducted in this criminal investigation, did you find

16  other board meeting minutes for this same exact meeting?

17  A.   Yes.  We located minutes from the same meeting in a

18  different search warrant.

19  Q.   What search warrant?

20  A.   The Elbarasse search warrant.

21  Q.   Do you have before you Elbarasse Search No. 15?

22  A.   Yes.

23  Q.   And what is Elbarasse Search No. 15?

24  A.   It is an Arabic document entitled "resolutions relating

25  to the Occupied Land Fund."

1    MR. JONAS:  Your Honor, at this time I would offer

2  into evidence Elbarasse Search No. 15.

3    MR. MYSLIWIEC:  No additional objections to this

4  document.

5    THE COURT:  That is admitted.

6  Q.  (BY MR. JONAS)  Just so we are clear, the board meeting

7  minutes seized at the Holy Land Foundation, those are in

8  English you said?

9  A.  That is correct.

10    MR. JONAS:  If we can pull up Elbarasse Search

11  No. 15, please.

12  Q.  (BY MR. JONAS)  What language is this document in?

13  A.  In Arabic.

14  Q.  Can you see the document?  I am holding it up?

15  A.  I can.

16  Q.  Do you see if it is an original?

17  A.  It is.

18  Q.  Do you see red writing on it?

19  A.  That is correct.  The signature is in red ink.

20    MR. JONAS:  If we can turn to page 2.

21  Q.  (BY MR. JONAS)  Is this the translation of that page I

22  just held up?

23  A.  It is.

24    MR. JONAS:  Your Honor, I am going to try to see if

25  I can get the documents side by side, HLF Search No. 5 and

1    Elbarasse Search No. 15.  If we can enlarge the top half of

2    both of these documents.

3    Q.   (BY MR. JONAS)  Agent Burns, how do you know from looking

4    at Elbarasse Search No. 15 that this relates to the same board

5    meeting as HLF Search No. 5?

6    A.   Okay.  If you will look at the Elbarasse Search No. 15,

7    under "God's peace, mercy, and blessings be upon you," it

8    says, "The following issues have been agreed on during your

9    presence and the brothers, members of the board of directors

10   in the city of Los Angeles on February 17th, 1991."

11       So it is clearly referencing a board of directors meeting

12   in Los Angeles February 17th, 1991.  In looking at the HLF

13   Search No. 5 exhibit, the dates that was a board meeting

14   minute or board meeting from February 16th to 18th in Los

15   Angeles for the HLF.

16   Q.   So the dates match up the location matches up?

17   A.   That is correct.

18       MS. HOLLANDER:  Your Honor, I object to the

19   continuing leading comments from the Prosecutor.

20       THE COURT:  You might want to rephrase your

21   question.  The documents are in evidence, so you are reading

22   from the documents.  Go ahead.

23       MR. JONAS:  If we can get just the Elbarasse Search

24   No. 15 on the screen now, so it is a little more legible?

25   Q.   (BY MR. JONAS)  Agent Burns, can you -- This is entitled

```
 1    "Resolutions relating to the Occupied Land Fund"?

 2    A.    That is correct.

 3    Q.    Could you read No. 2, the second resolution?

 4    A.    It says, "The relationship with the financial controller

 5    of the Central Committee will be established through field

 6    visits and not written reports."

 7    Q.    Okay.  The Central Committee again is what?

 8    A.    The Palestine Committee.

 9    Q.    In looking at the meeting minutes of this meeting that

10    are in English taken from the HLF, did you see any references

11    to the Central Committee?

12    A.    There was no reference to the Central Committee.

13    Q.    Could you read No. 3?

14    A.    It says, "The relationship between the Fund and the

15    bodies similar to it outside of America will be settled at a

16    later time."

17    Q.    Did you see anything in the English version discussing

18    the Fund?  And again, the Fund is the Holy Land Foundation?

19    A.    Holy Land Foundation, yes.

20    Q.    "And bodies outside of America that are similar to it"?

21    A.    No.

22    Q.    Skip to No. 5 please.

23    A.    It says, "The Fund will commit to paying $25,000 annually

24    to the Central Committee."

25    Q.    Did you see anything in the English version of these
```

1    minutes found at the Holy Land Foundation discussing a payment

2    of $25,000 annually to the Central Committee or the Palestine

3    Committee?

4    A.    No.

5    Q.    No. 6, please.

6    A.    "Brother Shukri Abu Baker's salary will be $36,000

7    annually, including everything beginning January 1st, 1991."

8    Q.    Again, anything discussing Shukri Baker's salary in the

9    English version?

10   A.    No.

11   Q.    And who is Shukri Baker?

12   A.    He is one of the Defendants.

13   Q.    No. 7.

14   A.    It says, "Brother Ghassan Elashi will commit to working

15   four hours daily at the Fund as public relations supervisor in

16   compensation for $1,500 monthly."

17   Q.    Anything regarding payments to Ghassan Elashi in the

18   English version?

19   A.    No.

20   Q.    No. 8.

21   A.    "The Fund will commit to paying $1,000 monthly to brother

22   Mohammad El-Mezain for his services to the Fund and to

23   supplement the salary he receives from the mosque."

24   Q.    Anything about that in the English version?

25   A.    No.

1    Q.    And finally No. 10.

2    A.    "Brother Ghassan Elashi will pay $17,000 to the financial

3    controller of the Central Committee."

4    Q.    Anything about Ghassan Elashi paying $17,000 to the

5    Central Committee in the English version?

6    A.    No.

7              MR. JONAS:  Your Honor, one moment, please.

8              THE COURT:  Sure.

9    Q.    (BY MR. JONAS)  Agent Burns, do you see No. 11 on

10   Elbarasse Search No. 15?  Could you read that one?

11   A.    It says, "Brother Izzat Mansour is requested to visit the

12   office of the Fund to take the necessary measures in regards

13   to maintaining security."

14   Q.    Do you recall in the document Elbarasse Search No. 10

15   which listed out the members of the Palestine Committee, did

16   we see the name Izzat Mansour on that document?  And if you

17   need to go back to it, feel free.

18   A.    Yes, we did.

19   Q.    What was that?

20   A.    I said yes, we did.  In Elbarasse Search No. 10 he was

21   No. 23 on the right side of the list.

22   Q.    He was a member of the Palestine Committee?

23   A.    Yes.  He was also identified in Ashqar Search No. 1 on

24   that list of Palestine Committee members.

25   Q.    If we could turn to the next page of this document, page

3.  It is signed, "Your brother, head of the Central

Committee," and it is CCed or carbon copied to members of the

Central Committee.  Did the English version of the board

meeting minutes for this meeting indicate that there was

anyone from the Central Committee or the Palestine Committee

in attendance?

A.   No, it did not, other than the Defendants who were part

of the Palestine Committee.

Q.   Correct.  But no one else?

A.   No one else.  Not the head of the Central Committee.

            THE COURT:  Let's go ahead and take the afternoon

recess.  Let's be back at a quarter till by that clock on the

wall.

            (Whereupon, the jury left the courtroom.)

            THE COURT:  We will be in recess.

                    (Brief Recess.)

            THE COURT:  Mr. Jonas?

            MR. JONAS:  Thank you, sir.

Q.   (BY MR. JONAS)  Agent Burns, we were talking about

Elbarasse Search No. 15, I believe, and that was the Arabic

version of the board meeting minutes for the HLF in 1991?

A.   Yes.

Q.   Okay.  Did you find those same Arabic board meeting

minutes in any of the HLF search warrant documentation?

A.   The Arabic version?

```
1    Q.    Yes.

2    A.    No, I did not.

3    Q.    You just found the English version?

4    A.    That is correct.

5    Q.    Did you find any English version that mirrored the Arabic

6    version?  Do you understand my question?

7    A.    If you will repeat it again.

8    Q.    You didn't find the Arabic version?

9    A.    Not at the HLF.

10   Q.    Did you find at the HLF the English version of the same

11   exact content of the Arabic version of that meeting?

12   A.    No.

13   Q.    Did you look?

14   A.    Yes.

15   Q.    Did you come across anything in the material that you

16   reviewed for this case that may indicate the Defendants

17   throwing things out, throwing documents out on purpose?

18              MR. DRATEL:  Object to leading, Your Honor.

19              THE COURT:  Overruled.

20              THE WITNESS:  Yes, I did.

21   Q.    (BY MR. JONAS)  What was that?

22   A.    A phone conversation.

23   Q.    Between whom?

24   A.    Between the Defendants Shukri Abu Baker and Mohammad

25   El-Mezain.
```

1    Q.   Is that one of the FISA wiretaps?

2    A.   It is one of the wiretaps, yes.

3    Q.   Do you have before you what has been marked as El-Mezain

4    Wiretap No. 9?

5    A.   I do.

6    Q.   And by the way, these FISA wiretaps -- I forgot to ask

7    you before.  In this case there were several different FISA

8    wiretaps that took place during the intelligence

9    investigation?

10   A.   That is correct.

11   Q.   Did they go on for a long time?

12   A.   Some of them went on for longer than others.

13   Q.   You testified that the FBI has to go to a FISA judge,

14   which is a judge like Judge Solis, in order to get approval

15   for that.  Correct?

16   A.   That is correct.

17   Q.   Is approval given once and the FBI can continue listening

18   forever?

19   A.   No.  It has to be renewed on a very frequent basis.

20   Q.   And a report made back to the judge of what is captured,

21   what is intercepted?

22   A.   That is correct.

23   Q.   With regard to the El-Mezain Wiretap No. 9 before you,

24   who are the participants on the call?

25   A.   Defendants Shukri Abu Baker and Mohammad El-Mezain.

1    MR. JONAS:  Your Honor, at this time I would offer

2  into evidence El-Mezain Wiretap No. 9?

3    MR. DRATEL:  Your Honor, we have our motion

4  objection, but also on this one there is also a Rule 106

5  piece, there is one paragraph at the end of the first section.

6  The Government has introduced some of the conversation but not

7  all.  There is one where it is actually in the middle of the

8  sentence.  So we would ask that that be read.  I don't think

9  it is part of the Government's exhibit, so it won't be played,

10  but we would like to have it read.  That we can do

11  contemporaneously.

12    THE COURT:  Do you want to do that

13  contemporaneously?

14    MR. JONAS:  Your Honor, this is the first I am

15  hearing of this.  The transcript we have that we wish to admit

16  into evidence is a redacted version of the entire transcript,

17  as well as the audio portion is a redacted version.  I do not

18  know which section Mr. Dratel is referring to.  I am not

19  prepared to find it at this moment.

20    MR. DRATEL:  Well, I have it here in the transcript

21  form.

22    THE COURT:  Take a look at that.

23    MR. JONAS:  Your Honor, we have no objection to

24  reading the additional paragraph.

25    THE COURT:  All right.

1          MR. DRATEL:  Thank you Your Honor.

2          MR. JONAS:  Your Honor, for the record, El-Mezain

3     Wiretap No. 9 is the redacted transcripts, and move I

4     El-Mezain Wiretap No. 9-A, the actual call.  And again that

5     disk is redacted to match the transcript we are admitting.

6          THE COURT:  So your are offering No. 9 and 9-A,

7     then?

8          MR. JONAS:  Yes, sir.

9          THE COURT:  Any objection to No. 9-A?

10          MR. DRATEL:  No.  Obviously the same --

11          THE COURT:  Right.  Overruled; admitted.

12          MR. JONAS:  Your Honor, just for the Court's

13     information, whenever we introduce a call, it is going to be a

14     number, then with an A, one being the transcript and the A

15     being the audio.

16          THE COURT:  Okay.

17     Q.   (BY MR. JONAS)  Agent Burns, do you have the transcript

18     before you?

19     A.   I do.

20     Q.   I think we are going to play this one.

21     A.   Okay.

22          MR. JONAS:  This moves fairly fast.  It matches the

23     conversation that is going on so, Your Honor, I am going to

24     ask to pause it every once in a while so everyone can catch

25     up.  In fact, if we can go back to the beginning.

```
 1              (Whereupon, El-Mezain Wiretap No. 9-A was played in

 2              open court, while questions were propounded.)

 3   Q.   (BY MR. JONAS)  Agent Burns, who is MO?

 4   A.   MO is the Defendant Mohammad El-Mezain.

 5   Q.   And who is SH?

 6   A.   That is the Defendant Shukri Abu Baker.

 7   Q.   When did this call take place?

 8   A.   This call took place on May 18th, 2000.

 9   Q.   And Mohammad El-Mezain is referencing a lawsuit in

10   Illinois.

11   A.   Yes.

12   Q.   Are you familiar with which lawsuit he is referencing?

13   A.   Yes.

14   Q.   And which lawsuit is that?

15   A.   That would be the Boim lawsuit.

16   Q.   B-O-I-M?

17   A.   That is correct.

18   Q.   Who was sued as a result of the Boim lawsuit?

19   A.   The HLF was one of the Defendants in the civil lawsuit

20   filed by the Boim family.

21              MR. JONAS:  Your Honor, can I have one moment,

22   please?

23              THE COURT:  Yes.

24   Q.   (BY MR. JONAS)  Agent Burns, did you review paperwork

25   pertaining to that lawsuit?
```

1  A.   I did.

2  Q.   A complaint?  Okay.

3       MR. JONAS:  Your Honor, I want to switch for a

4  moment to a demonstrative that we showed Doctor Levitt,

5  Demonstrative No. 14, which is a timeline?

6  Q.   (BY MR. JONAS)  Agent Burns, do you see on your screen

7  there is an indication of a U.S. Citizen David Boim being

8  killed --

9  A.   Yes.

10 Q.   -- in a shooting by Hamas.  Was this --

11      MS. HOLLANDER:  Your Honor, I object to counsel's

12 statement that it is by Hamas.

13      MR. JONAS:  Your Honor, there is testimony by Doctor

14 Levitt.

15      MS. HOLLANDER:  I don't believe -- May we approach?

16      THE COURT:  Yes.

17      (The following was had outside the hearing of the

18      jury.)

19      MS. HOLLANDER:  Your Honor, I could have missed it,

20 but I was listening very carefully and I do not believe Doctor

21 Levitt ever said it was Hamas.  And the current state of that

22 civil litigation as we speak now is that the Seventh Circuit

23 has taken the case en banc, but the Seventh Circuit case that

24 was withdrawn said that the Boims never proved that this was

25 Hamas.

1       Now, they can state that the man was killed, but they

2   can't say, and counsel should not be saying that it was by

3   Hamas.

4           MR. DRATEL:  Your Honor, also I will object to just

5   really repeating his testimony, when it is not relevant at all

6   to the point they are trying to make.  The fact that -- The

7   Boim killing is not relevant to what they are trying to say,

8   which is that -- This conversation is really not about the

9   point of the lawsuit.  That is not why they are putting it in.

10  They are putting it in to try to show -- They are trying to

11  get an inference that there is a consciousness of getting rid

12  of records.  It has got nothing to do with this 1996 killing

13  in terms of -- The point they want to make is in the tape.  It

14  is not in the testimony that is happening right now about Boim

15  in 1996.  It has got nothing to do with that.  You won't hear

16  that in the tape.

17          MS. HOLLANDER:  It is also a 403 issue, because what

18  they are trying to do is link Holy Land to the violence of the

19  death of Boim, and we are not charged with that here.  That is

20  a civil lawsuit.  It has not been determined that Holy Land

21  had anything to do with the Boim death, or that Hamas did at

22  this point from that civil litigation.  And Doctor Levitt

23  didn't say it.  He simply said that Boim was killed, because

24  if he had said it I would have objected.

25          MR. JONAS:  Doctor Levitt, I asked specifically if

1    all the attacks on the PowerPoint were done by Hamas, and he

2    said yes.  I didn't ask him specifically about each one, so my

3    understanding is that covered Boim.

4        I am trying to get context.  This lawsuit is going to

5    come up several times.  In the deposition that we talked

6    about, as well as other documents filed in the lawsuit, there

7    were admissions.  And we are trying to give context that HLF

8    is being sued because of the connection to Hamas.

9        In this particular instance, two of the Defendants

10   discussed destroying documents as a result of that lawsuit.  I

11   think it certainly goes to the state of mind.  The subject

12   matter of the lawsuit is relevant to this case.  I am not

13   looking to bring in the lawsuit itself.  No one is going to

14   accuse the HLF of killing David Boim, or anybody else.  But

15   because of the subject matter of the lawsuit, I think that

16   particular reaction is very important.

17            MR. DRATEL:  Your Honor, the point I am trying to

18   make is that it still gets back to the point of the facts of

19   -- the underlying facts of the lawsuit.  That is not what this

20   conversation is about.  It is not what their point is about.

21   Their point is about board minutes and the potential

22   destruction of records.  It has nothing to do with anything

23   that has to do with the killing of David Boim in any way, and

24   that is 403 and relevance in general.

25            MS. MORENO:  I would also, on behalf of Mr. Elashi,

1    who is not in the depositions or in the lawsuit, individually

2    doesn't appear, there would be 403, hearsay, perhaps even a

3    *Brutin*, confrontation objections.

4           MS. CADEDDU:  And I would second that on behalf of

5    Mr. Abdulqader.

6           MS. HOLLANDER:  I mean, if we are about to go to the

7    Boim answer, which is listed for today, I mean, it is on your

8    list for today, we will object to that because --

9           THE COURT:  The Boim answer?

10          MS. HOLLANDER:  The Holy Land answer.  I am sorry.

11   In the lawsuit.  And the reason is, I mean, obviously Holy

12   Land's answer is Holy Land's answer, but it includes all the

13   allegations in the complaint, and that is total hearsay, and

14   it is a confrontation violation because that is a document

15   made for litigation.  And, I mean, I think -- I am just

16   anticipating for Your Honor that that is coming and that is

17   part of this.

18          MR. JONAS:  On the answer part, there is particular

19   admissions made by the Holy Land Foundation, which is a

20   Defendant in this case, that go directly to statements made by

21   some of the Defendants.  I am happy to redact the answer to

22   that specific statement in there that we need.  You need to

23   have the portion of the complaint that is referred back to to

24   put the whole thing in context, but I am happy to redact

25   anything else that is not something that we don't need.

THE COURT:  Are you going to offer that later this afternoon?

MR. JONAS:  Defending on the timing, I may get it to it later this afternoon.  If I do, I can just have Agent Burns read that one section that we need, and then I can redact and substitute it out.

MS. HOLLANDER:  I need to see what part of the complaint, and I might change my mind.

THE COURT:  Why don't you work on that.  But getting back to this, so what are you getting ready to play?

MR. JONAS:  The call is between El-Mezain and Baker when they talk about destroying documents as a result of the lawsuit being filed.  So I was doing in -- The PowerPoint was just going to show that this killing had spurred the lawsuit.

MR. DRATEL:  But Your Honor, the documents that they are going to allege were destroyed have nothing to do with the facts of the lawsuit.  It is administrative documents of Holy Land.  That is why they say there were two different sets of board minutes--one that they destroyed and one that they kept.  That is the inference they want to make between the two sets of board minutes they already put in.  They are claiming that the ones found at Elbarasse's house were Holy Land board minutes.

THE COURT:  You are objecting to the tape on that basis?

1    MR. DRATEL:  No.  We are objecting to them getting

2  into the underlying Boim facts.  It is not necessary to the

3  point they are making.  It is really pure 403.  It is not

4  probative.  The documents that they are trying to use, these

5  two board minutes, have nothing to do with Boim.  No documents

6  about the Boim killing that they allege were destroyed.

7    THE COURT:  So in this lawsuit the Boim family sued

8  HLF accusing them of being connected --

9    MR. DRATEL:  Financing.

10    THE COURT:  Financing it?

11    MS. HOLLANDER:  Along with others.

12    THE COURT:  And your position is in response to that

13  lawsuit, then, HLF destroyed some documents?

14    MR. JONAS:  Yes.

15    THE COURT:  I think that is proper enough.  So you

16  want to --

17    MR. DRATEL:  We have a --

18    MS. HOLLANDER:  That is all there.  They just don't

19  need to go back and try to link up the Boim kid who was

20  killed.  I think, in fact, Mr. and Ms. Boim are in this

21  courtroom.

22    MR. DRATEL:  I think we are treading the same

23  evidence.

24    MS. HOLLANDER:  I believe they have been here.

25    MR. DRATEL:  My point --

1          MR. JONAS:  I want to show that the lawsuit was

2   filed, and this was the attack that spurred the lawsuit.  That

3   is not in question.

4          MR. DRATEL:  And they have done that already.  We

5   don't need anymore questions about that.

6          MR. JONAS:  That was the whole thing --

7          MR. DRATEL:  I mean, you know, they don't need

8   demonstratives for this witness.  That is my point.  We don't

9   need to rehash violence that has never been connected to Holy

10  Land directly in any way.

11         MS. MORENO:  And hasn't been proven.

12         MR. DRATEL:  It has been dismissed by the Seventh

13  Circuit.  The Holy Land has been dismissed.

14         MR. JONAS:  It is en banc; not the killing issue.

15  It is the legal issue of liability.

16         MR. DRATEL:  But still --

17         MS. HOLLANDER:  The issue --

18         THE COURT:  One at a time.

19         MS. HOLLANDER:  The issue of whether the Boims ever

20  even proved the predicate that it was Hamas, the Seventh

21  Circuit -- I mean, at this point it is up for grabs because we

22  were waiting for a new decision, but that was the last

23  decision.  They didn't even prove that much.

24         MS. SHAPIRO:  Hamas took credit for it.

25         MS. HOLLANDER:  It doesn't matter.

1          MR. DRATEL:  Doctor Levitt testified that groups

2     take credit regardless of whether they did it or not.  On the

3     timeline he expressly acknowledged that Palestinian Islamic

4     Jihad took credit.

5          MS. HOLLANDER:  In fact, it was a newspaper article.

6          MS. SHAPIRO:  Doctor Levitt identified through

7     evidence it was a Hamas attack.

8          MS. HOLLANDER:  For me it is just a straight 403

9     issue.

10         THE COURT:  I don't need anymore argument.  I was

11    trying to decide on the ruling.  Normally you are not entitled

12    to get into other lawsuits to establish anything here.  I

13    mean, other allegations, normally I would not let you get into

14    that.  The only thing that makes it a link is that you are

15    saying that that is what then caused them to destroy records.

16         MR. JONAS:  We simply want to discuss the lawsuit in

17    this regard.

18         THE COURT:  So does it matter what the lawsuit was

19    about, other than the fact that they just had a lawsuit and

20    they decided to destroy records?  I know you want it in, but I

21    think -- Except for this link I don't think that is proper to

22    do that, to take a civil lawsuit--because anybody can make an

23    allegation--and somehow bring that in as evidence of proof

24    somehow.

25         MR. JONAS:  I think it is not even the truth of the

1    allegation.  It is the fact of the allegation that spurred --

2            MS. CADEDDU:  Can I make one statement?  I just want

3    to make the point that the demonstrative of David Boim's

4    death, it has been sitting on the screen in front of the jury

5    for 20 minutes while we are up here discussing this, which I

6    think is improper and is a 403 problem.

7            MR. JONAS:  I am not doing all the talking making

8    this a 20-minute sidebar.  Fine, Judge.  We will take it down

9    and I will move on.

10           THE COURT:  Let's do that for now.

11           MR. JONAS:  If you want to continue to talk, that is

12   fine with me.

13           THE COURT:  Well, to the extent it is a lawsuit and

14   they destroyed records, that is fine if you want to get into

15   that.  I just don't want to get into --

16           MR. JONAS:  I will pull that down.

17           (The following was had in the presence and hearing

18           of the jury.)

19   Q.  (BY MR. JONAS)  Let's go back El-Mezain 9.  Let's get

20   back to that.  If we can continue with the call.

21           (Whereupon, El-Mezain Wiretap No. 9 continued to be

22           played, while questions were propounded.)

23   Q.  (BY MR. JONAS)  Before we play the next clip, per Mr.

24   Dratel's request, I need to read the next two statements.

25   Mohammad El-Mezain says, "Huh?"

1    Shukri Abu Baker says, "So that we can coordinate our

2    issues together and so that he could advise us.  So of course

3    is that we file for dismissal.  I mean, that we must request

4    to throw the lawsuit or dismiss it because it is not valid, or

5    because it is not based on foundations, I mean.  Of course,

6    there are no accusations.  They are not saying -- I mean, in

7    what they call the petition there is no -- any accusations or

8    direct connection between the Foundation and what you call

9    it."

10                    MR. DRATEL:  Thank you.

11                    MR. JONAS:  If we can play the next clip, please.

12                    (Whereupon, El-Mezain Wiretap No. 9 continued to be

13                    played, while questions were propounded.)

14   Q.   (BY MR. JONAS)  Agent Burns, the word discovery is

15   referenced here.  Do you know what discovery is in a lawsuit?

16   A.   Yes.  In a civil lawsuit parties are entitled to what

17   they call discovery, which means that Plaintiffs and

18   Defendants can ask the other side for certain information that

19   they have in their possession that is relevant to the case,

20   basically.

21   Q.   Do you see where Shukri Baker references minutes of the

22   last meeting they held?

23   A.   I do.

24   Q.   And is that meeting of minutes is what we referred to in

25   Elbarasse's Search No. 15, HLF Search No. 5, those board

1    meeting minutes from February 1991?  I am not saying he is

2    referring to those minutes, but I am saying minutes of the

3    meetings.

4    A.    Those are the same type of meeting minutes, yes, sir.

5    Q.    Thank you.  Exactly.

6          Agent Burns, do you see, "If you have someone around you

7    selling lupine seeds it is better to give them to him"?  Are

8    you aware if that is an Arabic phrase?

9                MR. DRATEL:  I object to that.  She is certainly not

10   an Arabic expert.  The testimony is the testimony.  She is not

11   in a position to give that.

12               THE COURT:  Overrule that.  She may answer.

13               THE WITNESS:  What was the question?

14   Q.   (BY MR. JONAS)  Are you aware if that is an Arabic phrase

15   or term?

16   A.    Yes.

17   Q.    What is your understanding of its meaning?

18               MR. DRATEL:  I object; hearsay.  Her understanding

19   of that has to be hearsay.

20               THE COURT:  Overruled.  Go ahead.

21               THE WITNESS:  It means if you give someone or give

22   something to someone selling lupine seeds, it is the same as

23   throwing it away or destroying it, getting rid of it.

24   (BY MR. JONAS)  Agent Burns, I want to turn your attention

25   back to the Elbarasse documents.  We discussed certain

1  documents where there is reporting to the Palestine Committee

2  and reporting from the Palestine Committee up the chain to the

3  Muslim Brotherhood.  Have you seen any other documents that

4  have some reporting or show achievements, things like that?

5  A.   Yes, I have.

6  Q.   Do you have before you what has been marked as Elbarasse

7  Search No. 16?

8  A.   I do.

9  Q.   And is that one of those type of documents I referred to?

10 A.   This is a document showing the activities of the

11 Palestine Committee; basically a meeting where they are

12 discussing their items on their agenda and their achievements

13 and things like that.

14          MR. JONAS:  Your Honor, I offer into evidence

15 Elbarasse Search No. 16.

16          MR. MYSLIWIEC:  No additional objection.

17          THE COURT:  Elbarasse Search No. 16 is admitted.

18 Q.   (BY MR. JONAS)  Agent Burns, again, is this an Arabic

19 document?

20 A.   Yes.

21          MR. JONAS:  If we can turn to page 2 of that

22 document.

23 Q.   (BY MR. JONAS)  What is the date?

24 A.   The date is May 30th, 1990.

25 Q.   What is the title?

```
1    A.    "The meeting agenda for the M.Sh. of the Association."

2    Q.    Going to the bottom portion, can you read No. 7?

3    A.    No. 7 says, "Upcoming conferences and festivals:  A

4    report from brother Shukri."

5    Q.    That would be who?

6    A.    The Defendant Shukri Abu Baker.

7    Q.    Okay.  I skipped one.  If you go to No. 5.  I am sorry.

8    Does it reference the Holy Land Foundation?

9    A.    Yes.  And again, the title of the document was "meeting

10   agenda," and under No. 5, "Presenting and discussing reports

11   of the subcommittees.  1- The Association"--which is the

12   IAP--"brother Yaser Saleh will present the report.

13         "2- The Occupied Land Fund.  Brother Abou Ibrahim"--which

14   is the Defendant Mohammad El-Mezainwill present the report.

15         "3- Palestine branch information.  Brother Ahmad Yousef

16   will present the report."  And then as we read No. 7 for

17   upcoming conferences and festivals, "a report from brother

18   Shukri," which is the Defendant Shukri Abu Baker.

19   Q.    Do you see No. 9?

20   A.    I do.

21   Q.    It says Illa Falestine magazine?

22   A.    Yes.

23   Q.    Are you familiar with what Illa Falestine magazine is?

24   A.    Yes.

25   Q.    What is it?
```

1   A.    It was a periodical that was published by the IAP in the

2   late '80s early '90s.

3   Q.    Are we going to talk more about that later?

4   A.    Yes.

5         MR. JONAS:  If we can go to Elbarasse Search No. 8.

6   I believe that is in evidence, Your Honor.

7         THE COURT:  Yes, it is.

8         MR. JONAS:  Can we turn to page 5 of this document?

9   Q.    (BY MR. JONAS)  We have covered this document already?

10  A.    Just one paragraph of it.

11  Q.    I want to go back and hit another issue on it.  Reading

12  No. 5 on the bottom portion of this document where it says

13  "financial and accounting issues."

14  A.    Okay.  Again, this is the first page of the translation

15  of the Occupied Land Fund report.  And you wanted me to read

16  No. 5?

17  Q.    Start with No. 4.

18  A.    Okay.  Under No. 4, Occupied Land Fund report, it says,

19  "Media work:  The Fund still works hard on propaganda, flyers,

20  and extensive propaganda campaign for its projects and also

21  publishing ads in many newspapers and magazines."

22  Q.    No. 5?

23  A.    "Financial and accounting issues:  They are progressing

24  on a regular basis mostly.  The Fund's financial report has

25  been published at the beginning of this year for the public.

1  Another report is being worked on by the attorney in

2  coordination with the certified accountant, and it will be

3  published in the form of a report which is a part of a

4  brochure to be produced about the Fund, its works, projects,

5  sources of its donations, and a call for more interaction with

6  it."

7          MR. JONAS:  Can we turn to the next page?

8  Q.  (BY MR. JONAS)  Do you see where it says 6, "The inside

9  issues"?

10  A.    I do.

11  Q.    You testified that the term inside is used how?

12  A.    It means inside the Palestinian territories and Israel.

13  Q.    Okay.  Can you read paragraph A under No. 6?

14  A.    Yes.  It says "Opening an office in Jerusalem:  Work is

15  being completed to open an official office for the Fund in

16  Jerusalem.  The U.S. embassy in Jerusalem has been contacted

17  for that purpose and they showed interest and provided

18  assistance in that regard.  After a study from the inside and

19  contacts with the outside, and upon a request from the inside

20  to change the name, and outside consultations, it was agreed

21  to change the name of the Fund from OLF to the Holley [sic]

22  Land Foundation for Relief and Development, HLFRD.

23  Q.    That is far enough.  Did the Defendant Shukri Baker ever

24  deny that the HLF had an office in Jerusalem?

25  A.    Yes, he did.

1    Q.    Do you have before you InfoCom Search No. 1?

2    A.    I do.

3    Q.    What is that document?

4    A.    This is a letter to the Associated Press from Shukri Abu

5    Baker.

6    Q.    Where was it found?

7    A.    At InfoCom.

8    Q.    Does it relate to Holy Land having a Jerusalem office?

9    A.    Yes, it does.

10          MR. JONAS:  Your Honor, at this time I would offer

11   into evidence InfoCom Search No. 1.

12          MS. HOLLANDER:  No objection.

13          THE COURT:  Admitted.

14          MR. JONAS:  If we can put that on the screen,

15   please.

16   Q.    (BY MR. JONAS)  It is on Holy Land Foundation letterhead.

17   Correct?

18   A.    Correct.  This is the original which is in English.

19   Q.    What is the date of the letter?

20   A.    The date of the letter at the top you will see is June

21   6th, 1997.

22   Q.    Okay.

23          MR. JONAS:  Can we get the second paragraph

24   enlarged, please?

25   Q.    (BY MR. JONAS)  Do you see where it says "Another

1    erroneous statement"?

2    A.    Yes.

3    Q.    Can you read that?

4    A.    It says, "Another erroneous statement is that HLF has an

5    office in Jerusalem which is shut down.  HLF has never had an

6    office in Jerusalem.  For your information, there is a

7    Palestinian organization with a similar name in Jerusalem

8    legally operating under Israeli law, and it is not shut down

9    at the moment."

10   Q.    Okay.  Did Shukri Baker ever discuss with anybody that he

11   would tell people that the HLF did not have an office in

12   Jerusalem if asked?

13   A.    Yes, he did.

14   Q.    And how was that discussion -- Withdrawn.  Was that

15   discussion on the phone?

16   A.    Yes, it was captured on a wiretap.

17   Q.    Okay.  Do you have before you Baker Wiretap No. 1?

18   A.    I do.

19   Q.    Is that a transcript of the call that we are referring

20   to?

21   A.    It is.

22          MR. JONAS:  Your Honor, at this time I offer into

23   evidence Baker Wiretap No. 1 and 1-A.

24          MS. HOLLANDER:  Subject to our previous objections,

25   Your Honor.

1          THE COURT:  And those are overruled, and Baker
2    Wiretaps No. 1 and 1-A are admitted.
3    Q.    (BY MR. JONAS)  Agent Burns, this is the portion of the
4    call that is not very long so we will just read it?  Do you
5    want to just do that?
6    A.    Okay.
7    Q.    Do you want to roll play?
8    A.    Certainly.
9    Q.    Who is on this call, by the way?
10   A.    The Defendant Shukri Abu Baker, Haitham Maghawri, and an
11   unidentified male.
12   Q.    Who is Haitham Maghawri?
13   A.    He was one of the officers of the Holy Land Foundation.
14   Q.    When did this call take place?
15   A.    This call took place on December 8th, 1997.
16   Q.    Was that around the time that letter we just referred to,
17   InfoCom Search No. 1?
18   A.    Yes.  That letter was from June 6th of 1997.
19   Q.    Okay.  Is this transcript the complete call?
20   A.    It is not.  It is just a relevant portion of the call.
21   Q.    Okay.  Why don't you read Shukri and I will read the
22   other part.
23   A.    Okay.  Are we going to have it on the screen, the
24   transcript?
25   Q.    Sure.  That is actually a good idea.

A.    "May God greet you.  We wanted to find out how is the

situation.  Here is the situation.  I didn't understand

exactly what happened."

Q.    Unidentified male, "You didn't hear about it, you mean?"

A.    "No.  Where do we hear from?"

Q.    HA, would that be Haitham Maghawri?

A.    It would be.

Q.    Haitham, "No, by God."

A.    "Where do we hear the news from?"

Q.    Unidentified male, "Yes.  Anyway, until now there is

nothing official from the attorney."

A.    "Ah."

Q.    Unidentified male, "Because they came to the office and

they didn't even bring a written order of what they want to

do."

A.    "Ah."

Q.    Unidentified male, "They confiscated everything and they

placed a handwritten paper on the door that it is closed."

A.    "Ah."

Q.    Unidentified male, "And they left.  They told us, I mean,

they told the girl who was working there that 'We advise I you

not to work at the office.'"

A.    "We don't advise you?"

Q.    Unidentified male, "Yes."

A.    "Ah."

Q.   Unidentified male, "She asked them, 'where is the search
order and stuff.'  They told her that, 'We don't give people
in the bank any search order.'"

A.   "Ouf."

Q.   Unidentified male, "Anyway, we spoke with the attorney
and the attorney is supposed to check with them."

A.   "This area is under the authority or under those people?"

Q.   Unidentified male, "It is under -- No, this area is under
them."

A.   "Ah."

Q.   Unidentified male, "It is not under the authority, I
mean."

A.   "Hmm."

Q.   Unidentified male, "So, we're supposed to find out the
details today."

A.   "Were they polite or were they nasty with her?"

Q.   Unidentified male, "By God, I didn't ask this question."

A.   "Ah."

Q.   Unidentified male, "But I believe they were normal."

A.   "Hmm."

Q.   Haitham Maghawri, "Is there anybody else other than us?"

     Unidentified male, "They took all the files.  They took
the fax.

     Haitham Maghawri, "Okay.  Was there a reason for that?
Was there a media campaign a few days before or anything

1    before that?"

2        Unidentified male, "Nothing."

3        Haitham, "Okay.  Are there any other organizations like

4    that as well or --"

5        Unidentified male, "By God, I got the news at night.  I

6    mean, when they broadcasted the news at night they didn't

7    mention these things, I mean."

8    A.    "Ah."

9    Q.    Unidentified male, "I mean, officially they didn't say

10   that they did that?

11   A.    "Hmm."

12   Q.    Unidentified male, "So maybe today they will announce the

13   news and we will see what exactly happened.  It is possible

14   they just want the papers and not the --"

15   A.    "Hmm."

16   Q.    Unidentified male, "Maybe they just want to see the

17   papers."

18   A.    "They took everything at the office, huh."

19   Q.    Unidentified male, "They took the papers."

20   A.    "Okay.  This is the second time they take them.  Right?"

21   Q.    Unidentified male, "Yes.  The first time they -- Right.

22   This is similar to the previous time."

23        Now, what does that black line indicate, Agent Burns?

24   A.    It indicates additional conversation that wasn't

25   pertinent to what they were discussing right here, so we just

1    removed it for time and efficient purposes and began the call

2    again at the next relevant portion.

3    Q.    Okay.  Go ahead.

4    A.    "So from the media point of view, you know that, I stress

5    that, I mean, this is what we are going to say if they ask

6    us."

7    Q.    Unidentified male, "Hmm."

8    A.    "About the nature of our office and your office."

9    Q.    Unidentified male, "Yes."

10    A.    "This is what we are going to say.  You are a registered

11    -- under the Israeli law a registered Palestinian

12    organization.  You have a board of directors and complete

13    independence."

14    Q.    "Yes."

15    A.    "And we have a relationship of cooperation with you."

16    Q.    Unidentified male, "Yes."

17    A.    "Because the media here is -- The U.S. media is very keen

18    to show that we have offices which are shut down.  We tell

19    them, 'No, we don't have offices which are shut down.  We

20    don't have offices to begin with.  There are some Palestinian

21    parties which we cooperate with and they are registered under

22    the Israeli law.'"

23    Q.    "Yes."

24    A.    "So this organization, they got our permission to use the

25    same name, but they have an independent and separate decision.

1    I wanted to tell you that in case someone from the media asked

2    you."

3    Q.   That is the end of the portion of the call?

4    A.   It is.

5                MR. JONAS:  Your Honor, we need a sidebar.  I

6    apologize.

7                THE COURT:  All right.

8                (The following was had outside the hearing of the

9                jury.)

10               MR. JONAS:  We have established that Shukri Baker is

11   denying that they had a Jerusalem office.  In the Boim lawsuit

12   deposition he admits it.  He also admits it in a few other

13   places.  It is under oath.  So I would like to get to the Boim

14   deposition now.

15               THE COURT:  Okay.  Where were we on that?

16               MS. HOLLANDER:  We were waiting for you.

17               THE COURT:  Waiting for me.  Okay.

18               MS. HOLLANDER:  This is what I raised that this

19   is --

20               THE COURT:  Right.  You have given me what Judge

21   Fish's ruling on the *Brazwell* case is.  And I have read the

22   *Brazwell* case again and read Judge Fish's ruling, and I am

23   adopting Judge Fish's ruling.  I think he ruled correctly.

24               MS. HOLLANDER:  I do have some specific issues about

25   that deposition.  I mean, most of it I don't have -- I mean,

1    obviously based on your ruling, most of it I don't object to.

2         There are a few areas where they have started with an

3    answer or part of an answer, and we would request the

4    question.  And there are a couple of things -- There is about

5    -- It has nothing to do with this issue at all, the issue of

6    the Holy Land offices, but there is about five or six pages

7    where the lawyer in the Boim case asked Shukri to translate

8    IAP documents for him, and so he reads all these IAP

9    documents, these exhibits.  And we object to that part because

10   he is really -- He is basically doing a favor for the lawyer,

11   and so we object to that part.  And there are a few other --

12              THE COURT:  Are you wanting to get into that?

13              MR. JONAS:  If I could inquire of Ms. Hollander, are

14   you referring to the Illa Falestine magazine?

15              MS. HOLLANDER:  Yes.

16              MR. JONAS:  Your Honor, last trial through the

17   deposition we got in certain exhibits -- If you recall, Agent

18   Burns talked about the Illa Falestine magazine published by

19   the IAP, which was in the Elbarasse documents.  We are going

20   to admit a few of those, but we are not going to admit them

21   through the deposition.  We are going to admit them on their

22   on standing alone.  And we are not doing them now, obviously,

23   so I don't know if you want me to continue arguing about them,

24   or if we should wait until the proper time.

25              THE COURT:  We can deal with that later.  But this

1    issue that she is raising about these translations --

2            MR. JONAS:  That is the magazines that are referred

3    to.

4            THE COURT:  Do you need to do it now?

5            MR. JONAS:  No, not now.  And I don't plan on using

6    the deposition as the means to get that document into

7    evidence.

8            MS. HOLLANDER:  But that is part of what they

9    included in the deposition.

10           MR. JONAS:  In this deposition?

11           MS. HOLLANDER:  Yes.

12           MR. JONAS:  I will take a look at it, but --

13           MS. HOLLANDER:  Based on your ruling -- Maybe this

14   would help.  Based on your ruling, if he can show me the part

15   that he wants to use for now, we might be able to agree on

16   that part, and then he and I can see whether we can work out

17   the rest of it.

18           MR. JONAS:  That is fine.  I am willing to sit down

19   with Ms. Hollander and figure out if there are issues we can

20   resolve, so we will not waste Your Honor's time.

21           THE COURT:  Okay.

22           MS. MORENO:  So just to be clear, Your Honor, is it

23   coming in now, or parts of it, because I am going to be

24   lodging my objections.

25           THE COURT:  Go ahead.

1    MR. DRATEL:  And we will all join, other than Mr.

2    Baker, obviously.

3    MR. JONAS:  Let me move it in now.  Let me get to

4    the part that is relevant to her testimony right now, and then

5    let me confer with Defense counsel on what the ultimate

6    product will be that will be admitted into evidence and will

7    go to the jury.

8    THE COURT:  Okay.

9    MS. HOLLANDER:  I am happy to do that.  If I can see

10   the part he is going to do now, I am happy to do that.

11   THE COURT:  Can you get that while we discuss this

12   other -- She has another objection.

13   MS. MORENO:  Your Honor, as to Mr. Elashi, and I

14   believe Mr. Dratel would join, and Ms. Cadeddu, it would be a

15   hearsay objection, a confrontation objection --

16   MR. JONAS:  I don't mean to cut you off, but just in

17   the interest of time, what happened in the last trial, Your

18   Honor, there were certain statements in the deposition and

19   there is also a deposition of defendant El-Mezain that we may

20   use later.  In the last trial certain statements we said were

21   false and that they were made in furtherance of the conspiracy

22   that concealed the conspiracy and should be attributed to all

23   of the Defendants; that certain statements be admitted for the

24   truth, like we are about to do now.

25   Judge Fish gave an instruction to the jury that those

1   that were admitted for the truth should be held only against

2   that Defendant as an admission.  I have no problem with that.

3   I have no problem if you want to instruct the jury right now

4   after we get into it that this statement should be held only

5   against the Defendant Shukri Baker, unless you guys object to

6   that.

7           MS. MORENO:  No, we don't object to that.  We would

8   ask the Court to do that.

9           THE COURT:  All right.

10          MR. JONAS:  If I can confer with Ms. Hollander over

11  there, because I have the notes with the pages.

12          THE COURT:  Do we need to come back up here?

13          MR. JONAS:  I don't think so.

14          MS. HOLLANDER:  Not unless we can't agree on this

15  part.

16          (The following was had in the presence and hearing

17          of the jury.)

18          MR. JONAS:  We are ready.

19          THE COURT:  Okay.

20  Q.  (BY MR. JONAS)  Agent Burns, do you have what has been

21  marked as Baker Deposition before you, Government's exhibit?

22  A.   I do.

23          MR. JONAS:  Your Honor, subject to the conversations

24  at sidebar, I would offer into evidence Baker deposition?

25          MS. MORENO:  Your Honor, just subject to the

1    confrontation and hearsay objections.

2           MR. DRATEL:  We join in that, Your Honor, for Mr.

3    El-Mezain.

4           MS. CADEDDU:  And for Mr. Abdulqader.

5           MS. HOLLANDER:  My previous objections, Your Honor.

6           THE COURT:  And that Baker deposition is admitted.

7    And then I will give the limiting instruction when you finish,

8    if you will remind me.

9           MR. JONAS:  Yes, sir.

10   Q.   (BY MR. JONAS)  Agent Burns, you said you are a lawyer.

11   What is a deposition?

12   A.   A deposition is a sworn statement by, in this case,

13   Shukri Abu Baker as a part of the discovery that we talked

14   about in the civil lawsuit of the Boim case.

15   Q.   If you can turn to what is marked in the deposition

16   transcript as page 43.

17   A.   Okay.

18   Q.   Do you have that before you?

19   A.   I just wanted to make sure I am in the right -- Page 43

20   of the deposition pages or 43 of the exhibit?

21   Q.   Page 43 of the deposition pages.

22   A.   I have it.

23   Q.   Okay.  And we have been discussing Shukri Baker's

24   statements that he is going to deny that the HLF has an office

25   in Jerusalem.  Correct?

1    A.    That is correct.

2    Q.    In this deposition, particularly on page 43, does he

3    admit under oath that in fact the HLF did have an office in

4    Jerusalem?

5    A.    He did admit it here.

6    Q.    Starting with page -- Sorry.  Line 8 of that deposition

7    transcript through line 16, could you read that, please?

8    A.    Yes.  The person asking the question, the lawyer, says,

9    "Okay.  Now, we talked about offices in the United States.  It

10   is my understanding that the HLF has at various times had

11   offices outside of the United States as well."

12        Shukri Abu Baker's answer is, "Yes."

13        "Question:  What offices has it had outside of the U.S.?"

14        Shukri Abu Baker's answer:  "We had an office in Gaza and

15   we had an office in Hebron, Hebron West Bank, and we had an

16   office in Jerusalem."

17   Q.    Okay.

18        MR. JONAS:  And Your Honor, if you want to give that

19   instruction?

20        THE COURT:  Members of the jury, when we have a

21   statement like this made by one individual Defendant, in this

22   case Shukri Abu Baker, of course that statement is only to be

23   considered as to him when you are considering the charges

24   against these Defendants.  That would not apply to any of the

25   other Defendants, but only as to Mr. Baker.

         MR. JONAS:  Your Honor, I am sorry.  Could we have a
sidebar?

         THE COURT:  Sure.

         (The following was had outside the hearing of the
         jury.)

         MR. JONAS:  I am sorry.  I should have been more
specific.  With regard to what I said before, what meant
specifically the depositions; in other words, statements made
by the Defendant in the deposition.  What I am afraid, with
your instruction that you gave they may take every statement,
including phone calls, and we don't want that.

         THE COURT:  Gotcha.

         MS. MORENO:  We are very happy with the instruction.

         THE COURT:  I am sure.  It was a little broad.  Just
limit it to this deposition.

         MR. JONAS:  And please, if you can clarify, then,
that other statements made by the Defendants can be attributed
to other Defendants if it is made in the course of the
conspiracy.

         MS. HOLLANDER:  No, no, no.

         MR. JONAS:  Your Honor --

         MS. HOLLANDER:  You can't say that.

         THE COURT:  Why not?  That is what I am going to
tell them in the instructions.

         MR. JONAS:  I think you need to clarify the

1    instruction.

2           THE COURT:  Right.  Because of the mistake that I

3    made, I will have to tell them something to balance it out.  I

4    can tell them that there are circumstances --

5           MS. HOLLANDER:  It is in the course of the

6    conspiracy is the part of that I am concerned about, because

7    that is something that Your Honor will rule on later.

8           THE COURT:  We will, but they will, too, because we

9    instruct them that if they find that the statements are in

10   furtherance and in the course of --

11          MS. CADEDDU:  But it presupposes a conspiracy when

12   you give the instruction that way?

13          THE COURT:  But I can tell them if, under certain

14   circumstances, if statements that are made -- that statements

15   were made to be found in the course of and in furtherance of a

16   conspiracy, then they can be attributed to everybody.

17          MS. HOLLANDER:  I guess my concern is that -- I

18   mean, obviously you are going to decide whether there is a

19   conspiracy even, and that hasn't been even -- These jurors

20   don't know anything about conspiracy at this time.

21          THE COURT:  Yes, they do, because the indictment has

22   been read.  They have been told this is a conspiracy case.

23          MS. HOLLANDER:  I suppose.

24          MS. CADEDDU:  The indictment is not evidence.

25          THE COURT:  I know it is not evidence, but they know

1    that there is a conspiracy charge, and it is part of the law.

2          MS. CADEDDU:  Our concern is, Your Honor, that at

3    this point in this way it is going to overemphasize and make

4    it seem like a conspiracy has been established, and that is

5    the concern.

6          MS. DUNCAN:  Can I make a suggestion?  Are you going

7    to introduce any other statements of Defendants today?

8          THE COURT:  Through deposition.

9          MR. JONAS:  No.

10          MS. DUNCAN:  Wiretaps or anything?

11          MR. JONAS:  Considering we only have a few more

12    minutes, probably not.  I will have to go back and look at any

13    notes to see what is next, but I don't think so.

14          MS. DUNCAN:  My suggestion would be, Your Honor, is

15    just to say that your instruction about the statements

16    pertains only to the deposition, and you will later be giving

17    them an instruction as to other statements, and then we have

18    time to maybe draft something for you to consider with respect

19    to the co-conspirator on Monday.

20          THE COURT:  I think that sounds pretty good.  It

21    takes care of your immediate problem, without getting into

22    everything else.

23          MR. DRATEL:  You can say you will cover it in your

24    full instructions, if not before.

25          THE COURT:  Let's do it that way for now.  I will

1    tell them that the statement I made was inaccurate in the

2    sense that it was too broad, and as far as this statement made

3    by Mr. Baker in this deposition, that that is only to be

4    considered against him; that other statements made by other

5    Defendants under other circumstances will be subject to

6    further instructions.

7              MS. HOLLANDER:  That is a good idea.

8              (The following was had in the presence and hearing

9              of the jury.)

10             THE COURT:  Members of the jury, that last statement

11   that I made about the statement by Mr. Baker, I think I stated

12   it a little too broadly.  This deposition statement that you

13   just heard Agent Burns read, that statement is to be

14   considered only as to Mr. Baker.  You may have heard other

15   statements by other Defendants previously, and you will hear

16   them, of course, throughout the trial.  I will give you

17   further instructions as to those statements.

18        For now, the instruction is this particular statement by

19   Mr. Baker in this deposition, that is to be considered only as

20   to him.  Other statements, we will give you further

21   instructions later on about those.

22             MR. JONAS:  Thank you, sir.

23   Q.   (BY MR. JONAS)  Agent Burns, continuing on this issue of

24   the statements by Shukri Baker that there was no office in

25   Jerusalem, and then the admission that there was, did you find

1    any documents in the HLF search warrant that acknowledges or

2    indicates there was in fact an HLF office in Jerusalem?

3    A.    Yes.

4    Q.    Do you have before you HLF Search No. 6?

5    A.    I do.

6    Q.    Is that one of the documents that indicates that the HLF

7    had an office in Jerusalem?

8    A.    It is.

9              MR. JONAS:  Your Honor, at this time I would offer

10   into evidence HLF Search No. 6.

11             THE COURT:  Counsel?

12             MS. HOLLANDER:  No objection, Your Honor.

13             THE COURT:  Admitted.

14             MR. JONAS:  If you can put that on the screen,

15   please.

16   Q.    (BY MR. JONAS)  What does this document state?  You don't

17   have to read it.

18   A.    It is an agreement that the Holy Land Foundation's office

19   in Jerusalem will be run by Mohamed Anati.

20   Q.    Does it acknowledge that the Holy Land Foundation in fact

21   had an office in Jerusalem?

22   A.    Yes, it does.

23   Q.    Okay.  I am going to turn your attention back to

24   Elbarasse Search No. 8.

25   A.    Okay.

1          MR. JONAS:  If we can get that on the screen,

2     please.

3     Q.   (BY MR. JONAS)  You have in front of you the translated

4     part.  Right?  I will give you a moment to pull out the

5     document.

6     A.   Okay.  I have it.

7     Q.   In that document is there a reference to a brother

8     Shukri?  And I think you will see it, if you have the English

9     version, the translated part, under No. 6 or paragraph 6.

10    A.   Yes, under paragraph 6, section C.

11    Q.   Okay.  What page is that?

12    A.   It is on page 6, which is the second page of the

13    translation.

14          MR. JONAS:  Pull that up, please.

15    Q.   (BY MR. JONAS)  Do you see C -- A few moments ago we were

16    talking about A with regard to opening the office.

17    A.   That is correct.

18    Q.   Now we are on C.  Do you see brother Shukri?  Who is

19    brother Shukri?

20    A.   That is the Defendant Shukri Abu Baker.

21    Q.   Did you come across any other Shukris in this case?

22    A.   Not as it relates to this context.

23    Q.   To the HLF, I mean.

24    A.   Right.

25    Q.   If we can read 6-C of this document.

1  A.   Okay.  Again, this is from the Occupied Land Fund report.

2  It says, "Brother Shukri is currently making a visit to the

3  inside in order to settle the issues with the organizations

4  and the institutions, to open new channels of communications,

5  and to make the brothers over there aware of projects which

6  are accepted by the Fund, and to provide them with training on

7  that, in addition to bringing back projects and establishing

8  communication networks and strengthening the representatives

9  in the areas."

10 Q.   Okay.  Did you come across any reports by Shukri Baker of

11 this trip?

12 A.   Yes.

13 Q.   Where did that come from?

14 A.   That came from InfoCom.

15 Q.   Do you have before you InfoCom Search No. 51?

16 A.   I do.

17 Q.   Is that the report regarding the trip referenced in

18 Elbarasse Search No. 8?

19 A.   It is.

20      MR. JONAS:  Your Honor, at this time I offer into

21 evidence InfoCom Search No. 51?

22      MS. HOLLANDER:  No objection.

23      THE COURT:  Admitted.

24 Q.   (BY MR. JONAS)  This document is in what language?

25 A.   This is in Arabic as well.

```
1    Q.   Turn to page 9.  What is the date of this report?

2    A.   It is dated July 16th through August 3rd, 1991.

3    Q.   You have reviewed the report?

4    A.   I did.

5    Q.   Does the report reference any meeting between the

6    Defendant Shukri Baker and any Hamas leader?

7    A.   It does.

8    Q.   And where is that?

9    A.   I believe there are several references in here to various

10   Hamas leaders, but one in particular was page 11, which is

11   part of the translation, under Gaza, the section Gaza.

12   Q.   Hold on.  Okay.  Please continue?

13   A.   Shukri Abu Baker reports that he visited Gaza

14   "...accompanied by Dr. Suliman, where we met with Mr. Abu

15   Khalid, Abu Nasir, as well as another group officials and

16   those concerned with charitable work.  We discussed with Mr.

17   Abu Khalid the issue of building a research organization and

18   means of supporting the university.  We suggested to him to

19   establish a central zakat committee for the Gaza sector."

20   Q.   Who is Abu Khalid?

21   A.   That is Mahmoud Zahar, the Hamas leader in Gaza on your

22   poster there.

23   Q.   I am going to pull it up real quick again.  Where is he

24   on this poster, Demonstrative No. 17?

25   A.   He is the person closest to you, Mahmoud Zahar, the same
```

1   individual that we saw in the IAP video that we reviewed

2   earlier.

3   Q.   Okay.  How do you know that Abu Khalid is Mahmoud Zahar?

4   A.   Because that is his nickname, Abu Khalid, and he resides

5   in Gaza.  And in addition, there is another document that we

6   will see reporting on Mahmoud Zahar's affiliation with the

7   Studies and Research facility that is mentioned in this

8   paragraph.

9   Q.   Okay.  Going back to Elbarasse Search No. 8, the document

10  prior to this.

11  A.   Okay.

12  Q.   Turn to page 6.

13  A.   Uh-huh.

14  Q.   Do you see there is a section marked 7 under

15  "investments"?

16  A.   Yes.

17  Q.   I am sorry.  Page 7.  I am sorry.  My mistake.

18  A.   Okay.

19  Q.   It is entitled "obstacles in the way of work."  Correct?

20  A.   Correct.

21  Q.   Letter e of this states what?

22  A.   It states, "The fact that the board of directors has not

23  been completed by five members yet despite adding Sheik Sharif

24  El Battikhi to the board."

25  Q.   Which board of directors is this talking about?

1    A.    That is talking about the HLF board of directors.  This

2    is the HLF's report.

3    Q.    Okay.  Do you know who Sharif El Battikhi is?

4    A.    Yes.  During the early '90s he was appointed to the HLF's

5    board of directors.

6    Q.    Have you come across -- Through the course of material

7    you gathered in this case, have you come across any evidence

8    of any other Palestine Committee member visiting the West Bank

9    or Gaza?

10   A.    Yes.

11   Q.    Do you have before you what has been marked as Ashqar

12   Search No. 2?

13   A.    I do.

14   Q.    What is that -- Does that come from that intelligence

15   search warrant or search you talked about earlier?

16   A.    It did.  It came from the covert search conducted in

17   December of 1993 where they took the photographs of the

18   documents at the home of Abdel Haleem Ashqar.

19          MR. JONAS:  Your Honor, at this time I offer into

20   evidence Ashqar Search No. 2.

21          MS. HOLLANDER:  Subject to previous objections, Your

22   Honor.

23          THE COURT:  That is admitted.

24   Q.    Agent Burns, the original of this document is in --

25   A.    In Arabic.

1    Q.    There is a translation?

2    A.    Yes.

3    Q.    What is the date of this document?

4    A.    The date of this document is June 10th, 1991.

5    Q.    What is the title?

6    A.    "A report about a visit to occupied Palestine from May

7    17th until June 4th, 1991."

8          MR. JONAS:  Would you put that on the screen, page

9    7?  My apologies.

10   Q.    (BY MR. JONAS)  Agent Burns, this is the first page of

11   the English translation?

12   A.    It is.

13   Q.    Can you read what it says starting with, "The report"?

14   A.    Yes.  It says, "The report includes several main points

15   regarding Hamas movement situation in the inside and the

16   situation of the Dawa'a work in the 48 territories, as well as

17   some remarks and recommendations I want to convey to you and

18   which I see suitable to organize the activity work in the

19   future."

20   Q.    Continue.

21   A.    "The main points in the report are:

22         "A- The situation of the Hamas movement.

23         "B- The situation of the Dawa'a work in the' 48

24   territories.

25         "C- The general situation in the Bank and the Sector.

1          "D- The future of work, remarks, and recommendations.

2          "E- Elections and the suggested solutions.

3          "F- Remarks."

4               MR. JONAS:  Okay.  Turn to page 8, the top part,

5     please.

6     Q.   (BY MR. JONAS)  I am not going to ask you to read

7     everything except for the title of this page.

8     A.   "The Islamic Resistance Movement, Hamas."

9     Q.   Does this document refer to -- It says -- The title is "A

10    report about a visit to occupied Palestine."  Does this

11    document refer to a visit with Mahmoud Zahar, the individual

12    you identified earlier that Shukri Baker met with in the

13    earlier exhibit?

14    A.   It does not refer to a visit.  What it does is on page 11

15    it reports under K that "The brothers asked Doctor Al-Zahar to

16    open a center for studies and research, and he approved that."

17    Q.   And is Mahmoud Zahar a doctor?

18    A.   Yes.

19    Q.   Did you come across in the Elbarasse search warrant

20    material any bulletins for the Palestine Committee?

21    A.   Yes.

22    Q.   I don't know if you have this before you, Elbarasse

23    Search No. 35?

24    A.   I do not have that in front of me.

25               MR. JONAS:  One moment, if Your Honor please.

THE COURT: Yes.

MR. JONAS: Your Honor I know it is here because I looked at it during the break.

MR. MYSLIWIEC: May we approach?

THE COURT: Yes.

(The following was had outside the hearing of the jury.)

MR. MYSLIWIEC: This one is a little different than the other types of exhibits we have had so far. This one was not admitted at the first trial. Is that correct?

MR. JONAS: Correct.

MR. MYSLIWIEC: Okay. So there is no pre-existing ruling on this document. It appears to be like a press release, press bulletin, almost like a newspaper type of thing. It contains multiple levels of hearsay. For example, if you look at page 11 of the document, in the bottom left it reports on a meeting with somebody, about what was the subject of that meeting, some things that were discussed. That is total complete hearsay, and it is a different kind of hearsay than the other types of things you have ruled on so far, which is why I raise it now. And also the fact that it is a new document, I didn't want to say that in front of the jury.

MR. JONAS: Your Honor, this is like all the other ones. These are co-conspirator statements made in furtherance. All you need to do is look at the beginning of

1    it.  It talks about the Palestine Committee, and that this is

2    a bulletin for -- and I can't read it upside down -- A special

3    non-periodical bulletin.  The bulletin is specifically for the

4    brothers of Masul, the Palestine Committee in every country.

5    So this is a document that is created by the Muslim

6    Brotherhood for members of the Palestinian Committee

7    worldwide.  It was found in Elbarasse's house, along with the

8    other documents that we are talking about.

9        The very last page -- It talks about Hamas throughout,

10   and the last page it has the Hamas symbol or emblem on it.  So

11   we submit that it is part of the conspiracy.

12          MR. MYSLIWIEC:  But that doesn't I think go to the

13   multiple levels of hearsay issue.  It goes maybe to some

14   things that are clear statements from the narrator, the author

15   essentially, but this is covering other things that aren't

16   even that.

17          THE COURT:  Well, without knowing specifically what

18   you are objecting to -- You are offering the entire document?

19          MR. JONAS:  Yes, sir.

20          THE COURT:  What specifically do you want --

21          MR. MYSLIWIEC:  This hasn't been, and I am not

22   saying they are playing fast and loose here.  It just hasn't

23   been on the list that I looked at from last night.  I think

24   this is one you supplemented today.

25          MR. JONAS:  I didn't send a list last night.

1          MR. MYSLIWIEC:  This morning.

2          MR. JONAS:  When I realized I was going faster, I

3    gave a list during lunch.

4          MR. MYSLIWIEC:  Right.  And I actually looked at

5    last year's trial, and I knew which ones they were probably

6    going to do today, and this was not an admitted exhibit so I

7    haven't had a chance to go through all 12 pages and say, "Here

8    is every example of multiple levels of hearsay."

9          THE COURT:  What are you planning on getting into

10   today?

11         MR. JONAS:  Just a couple of portions of it--to

12   identify what it is, identify that it discusses Hamas and that

13   it has the Hamas emblem on the back.  We are just about at the

14   end of the day, and I understand Defense wants to break.

15         THE COURT:  If you can get into the portions that

16   you want to get into that have to do with Hamas, I probably am

17   going to let it in.  And if you want to look at the

18   other -- If you want to work on the others and see if there is

19   anything you can redact.  If not, I will have to rule on it.

20         MR. MYSLIWIEC:  We are going to maintain our

21   objection, but I understand your ruling.

22         MS. HOLLANDER:  Do we have a continuing objection to

23   the Ashqar documents?  I think that I asked for that.

24         THE COURT:  I sure don't remember.

25         MS. HOLLANDER:  Can we have a continuing objection

1    to the Ashqar documents?

2             THE COURT:  On what basis?  Your continuing

3    objection is what?

4             MS. HOLLANDER:  A hearsay objection.  And then we

5    will just have to get up if there is something specific.

6             THE COURT:  Okay.

7             MR. WESTFALL:  There are serious authentication

8    issues on all the documents, Your Honor.  That is what we have

9    been trying to assert.  It is the unsigned, unknown.  Just

10   because they were in Elbarasse's possession, that is the only

11   thing she could ever testify to.

12            THE COURT:  Well, but because they were seized, I

13   don't think that affects admissibility.  I think all that just

14   goes to the weight.  You can argue that to the jury.  They

15   were seized.  And if in fact there was a conspiracy or a joint

16   venture, and it becomes part of that, I think all that goes to

17   weight.  That is why I have overruled those objections.  I

18   don't think that keeps them out.

19            MR. WESTFALL:  There is a time when the weight is so

20   light where we are having 403 trouble.

21            THE COURT:  Well, if you want to point that out, I

22   will be glad to look at that.  You haven't pointed that out

23   yet.  Just a general -- So far the ones they have shown, I can

24   certainly see a link.  At least you are trying to make a link.

25            MR. WESTFALL:  We will interpose a 403 objection on

1    the last document.

2            THE COURT:  You tell me 403, and I have an 11-page

3    document.  That doesn't tell me a whole lot.

4            MR. WESTFALL:  Perhaps what we should do is just has

5    through it.

6            MS. MORENO:  We haven't had a much notice of this

7    document.

8            THE COURT:  Well, of this document, but I am talking

9    in general.  We are going to need to address that, too,

10   because for some reason we didn't get an order out requiring

11   objections in advance.  We are not going to be doing this for

12   the rest of the trial, these bench conferences, and keeping

13   that jury waiting.  So I am going to issue an order requiring

14   objections in writing.

15       I don't know why we didn't do it.  Jennifer checked that

16   and we didn't do it--that is part of our normal practice--so

17   we can rule on some of these besides at a bench conference

18   with the jury sitting here waiting.  We may need to work on

19   some days that we are not normally going to work.  This to

20   take care of that so we don't keep the jury waiting.  This

21   trial isn't going to be continuing like this.

22           MR. DRATEL:  Just to be clear, we received I guess

23   this morning a list.  It was supplemented sometime during the

24   day.  I just saw it five minutes ago.

25           THE COURT:  And you are going to have some time to

1    address those.

2         MR. JONAS:  Can I address this?  The tone of Mr.

3    Dratel's comments is a little disparaging to me.

4         MR. DRATEL:  You gave the list this morning.  I

5    wanted him to know.

6         MR. JONAS:  Judge Fish had an order that required us

7    to list out our exhibits for the day, or for the morning,

8    whatever, to the Defense.  I gave the Defense which exhibits I

9    was going to show Doctor Levitt.  I never received anything in

10   reciprocation on the exhibits they were going to show him on

11   cross.  We assumed that we weren't following the order then.

12        We got an email last night from Ms. Duncan asking if we

13   would pick that up again, and we said fine.  I gave them the

14   list of exhibits this morning.  The email came in last night.

15   I gave them a list this morning of the exhibits I thought I

16   would get today.  I went a little faster than I expected.  I

17   supplemented that this afternoon.  I don't want you to think

18   we are doing anything in bad faith, Your Honor.  I started --

19        THE COURT:  I don't have a problem with that.  If it

20   was listed on your main list of exhibits, they already have

21   notice, but he is raising an issue --

22        MR. DRATEL:  In terms of why this was raised now is

23   because we --

24        THE COURT:  We have been having these bench

25   conferences now pretty much all day.  It is not all because

1   they were just now given to you this morning.  These were all

2   listed on the exhibit list, and I should have required

3   objections filed by both sides.  But we will get that out and

4   take care of that here in the next few days.

5           MR. JONAS:  When I am done with this, I am at the

6   end of -- I am at a real good breaking point.

7           THE COURT:  We will break when you finish this.

8           MR. DRATEL:  I think also, since this is the first

9   day we have had a witness with actual facts and things like

10  that, some of the issues, as you see from -- that we can just

11  stand and make an objection, that you understand what we are

12  saying.  We don't have to come all the time and say "106."

13  Now that we resolved some of those things, it will go

14  smoother.

15          THE COURT:  I hope so.  That is what I was trying to

16  do.  We don't want to go like this.

17          MS. HOLLANDER:  We don't like these either.

18          (The following was had in the presence and hearing

19          of the jury.)

20  Q.  (BY MR. JONAS)  Agent Burns, you have before you

21  Elbarasse Search No. 35, I believe it is?

22  A.   Yes.

23  Q.   And this document discusses the Palestine Committee and

24  Hamas?

25  A.   Yes.

1          MR. JONAS:  Your Honor, at this time I would offer

2     into evidence, subject to the discussion at the sidebar,

3     Elbarasse Search No. 35.

4          THE COURT:  Okay.  Subject to those discussions we

5     had that is admitted.

6     Q.   (BY MR. JONAS)  Is this document in English or Arabic?

7     A.   Arabic.

8     Q.   You have my copy so you have to tell me which page the

9     English begins on.

10    A.   The English begins on 7.

11    Q.   What is this document called?  How does it identify

12    itself?

13    A.   "A special non-periodical bulletin, issue (1)."

14    Q.   And if you can just read the first paragraph as to what

15    this is about.

16    A.   It is addressed to "Honorable brothers," and it says "The

17    pioneering role played by the Hamas movement among the

18    Palestinian people sectors inside and outside and on all the

19    horizons is known to you.  This is a blessing and a favor from

20    God.  The Movement has become the first organization in the

21    field as your brothers bear the burdens of the Intifada and

22    are in the front row of the distinguished operations against

23    the enemy and its collaborators.  The Movement has now a

24    weight that is taken into consideration abroad, and it is the

25    one leading the powers that are opposed to the peaceful

1   settlement, and it amasses all the capabilities for that

2   purpose."

3            MR. JONAS:  If we can scroll down where it says 1 on

4   the bottom half.

5   A.    Okay.

6   Q.    (BY MR. JONAS)  Just read the 1.

7   A.    It says, "The bulletin is specifically for the brothers,

8   the Masuls of Palestine Committee in every country only, and

9   it is a trust in their necks."

10  Q.    Can you turn to the last page and just tell me what the

11  page number is?

12  A.    Of the English translation?

13  Q.    Yes.

14  A.    That is page 17.

15           MR. JONAS:  If you will put up page 17 on the

16  screen, please.

17  Q.    (BY MR. JONAS)  What is the bottom half of that document?

18  A.    It says, "A slogan to be adopted in the sixth anniversary

19  for the start of the blessed Intifada."

20  Q.    Under that where it says logo?

21  A.    It says, "Palestine, the Islamic Resistance Movement,

22  Hamas."  And the Arabic version actually has the symbol.

23  Q.    What page is that?

24  A.    Page 6.

25           MR. JONAS:  If you can put page 6, please.

1    Q.   (BY MR. JONAS)   And is that symbol on the bottom half the

2    Hamas symbol?

3    A.   Yes.

4    Q.   By the way, what is the date of this bulletin?

5    A.   This bulletin is dated October 1st, 1992.

6    Q.   Okay.

7         MR. JONAS:   Your Honor, I am at a good breaking

8    point if you a want to break for the day.

9         THE COURT:   Let's go ahead recess for the day, and

10   for the week.   You will be off tomorrow.

11   Please recall the instructions we have discussed about

12   not reading or hearing anything about the case.   Do not

13   discuss it with anybody.   Those discussions also include with

14   other members of the jury.   Just don't start discussing this

15   case until you have heard all of the evidence and until you

16   get the instructions on the law from me.

17   Have a good weekend.   See you back Monday morning at

18   9:00.

19        (Whereupon, the jury left the courtroom.)

20        THE COURT:   Be seated.

21   We were discussing at one of the bench conferences the

22   issue of wanting to reduce the bench conferences that we are

23   having.   And so whether we need to issue an order -- Somehow

24   we overlooked issuing an order requiring objections in advance

25   to the exhibits listed by all of the parties.   We haven't done

1    that.  So I am thinking of doing that.  And then Mr. Dratel,

2    you were mentioning quite a bit has been resolved.  Were you

3    subjecting we don't need to do that, or what am I hearing?

4         MR. DRATEL:  Well, I think that some of these are in

5    the sense of how to set up a procedure, so some of these --

6    But if there are ones that are specific that we haven't

7    addressed with the Court, I think it may be a good idea to put

8    it in writing and give the Court advanced notice as well.  But

9    a lot of these we can stand up and say, "Based on hearsay or

10   something" --

11        THE COURT:  Those are not the ones that concern me,

12   although I would like to have some listing anyway because I

13   can rule on them in categories and then you don't have to

14   stand up.  You will have your objection.  But certainly what I

15   want to do is reduce the bench conferences and the length that

16   we keep this jury sitting waiting on us.

17        MR. DRATEL:  What we will try to do, and I am not

18   casting any aspersions here, what we will try to is try to go

19   back over Agent Burns' testimony last time.  I assume it is

20   going to be roughly the same.  I see no -- in terms of trying

21   to anticipate, because -- In other words, we can't give you

22   600 exhibits over the weekend in writing.  I don't think we

23   are going to be able to do that.  We will try to do it in a

24   sequence that is orderly and if there is just a couple of them

25   then --

1          THE COURT:  We can deal with a couple of them.  But

2     let's work on that, and then try to get them all done.  How

3     much time do you need to do all the exhibits?  You did it the

4     last time.  This has been done once before.

5          MS. HOLLANDER:  Well, the exhibits are different.  I

6     mean, they aren't all the same exhibits.

7          THE COURT:  I understand that, but I am assuming

8     that the bulk, the vast majority are going to be the same.  Am

9     I incorrect on that?

10          MR. JONAS:  Yes, sir.

11          THE COURT:  Is that right?

12          MR. JONAS:  Yes, the vast majority are the same,

13     certainly by category, like Elbarasse Search or HLF Search

14     where in each one there are several removed and several added

15     in.

16          MS. CADEDDU:  Your Honor, I just want to make clear,

17     we didn't actually file objections in writing to every

18     exhibit.  So what it is going to require is for us to go

19     through the transcript page by page and find the exhibits.

20          THE COURT:  The transcript of the last trial?

21          MS. CADEDDU:  The last trial or just look at the

22     exhibits.  In other words, it is not like we can go to a

23     previous document.

24          THE COURT:  I don't think you need to go to the

25     transcript, because you don't usually get to do that.  There

1    is usually not a trial.  You get the exhibits and make your

2    objections.

3         MS. CADEDDU:  My point is we didn't actually write

4    out a set of objections the last time, so we are going to --

5         THE COURT:  You didn't do that last time?

6         MS. CADEDDU:  No.

7         THE COURT:  Excuse me.  I understand.  I assume you

8    all had done that.

9         MS. MORENO:  No.

10        THE COURT:  But we need to do that so we can speed

11   up the trial.  And we may have to have some hearings, as I had

12   indicated earlier, on the days that we had not scheduled trial

13   to get those objections ruled on, and that will streamline the

14   case, then, and get it moving.

15        All right.  See you Monday.

16        MR. JONAS:  One procedural question to ask.  At some

17   point during Agent Burns testimony, I am going to move into

18   admission a whole series of documents that she is not going to

19   testify about, but it is being done for witnesses that will

20   come later who will testify about them.  It is a housekeeping

21   matter.

22        THE COURT:  Are you going to offer them through her

23   just to get them in?

24        MR. JONAS:  I will offer them through her.  And I

25   can do it one of two ways, whichever way Your Honor wishes.  I

1    can do it outside the presence of the jury, one morning, or at

2    the end of the day, I can do it that way.  Or I can do it in

3    front of the jury and I will do it at some point where I am at

4    a good breaking point and just sort of to change speed or

5    whatever.  Whatever Your Honor wishes--in front of or not in

6    front of the jury.

7            THE COURT:  I don't know that I have a preference.

8    Anybody have any thoughts on that?  Counsel?

9            MR. JACKS:  We were discussing it, Judge.  I don't

10   think that the jury has to be present for exhibits to be

11   admitted.

12           THE COURT:  They don't.

13           MR. JONAS:  So I guess it would be a time-saving

14   measure if I did it outside the presence of the jury at the

15   end of a day, Monday or Tuesday next week, and this way it

16   will save that much time on her testimony.

17           THE COURT:  If you give them a list in advance so

18   they know, and we can take up those objections when we do

19   that, whether it is Monday or Tuesday afternoon.

20           MS. SHAPIRO:  Your Honor, I am likely not going to

21   be here Monday and Tuesday because of some family matters I

22   need to attend to.  I ask the Court's indulgence to excuse me

23   from those.

24           THE COURT:  Certainly.  Is Wednesday our day off

25   next week?  At least from trial.  We may be working on some

1    other things.  But we will see you on Wednesday or Thursday

2    then.

3            All right.  Have a good weekend.  See you Monday.

4                            (End of day.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts          12/03/2008

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25