IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA        )  CAUSE NO. 3:04-CR-240-P
                                (
vs.                             )
                                (  SEPTEMBER 29, 2008
                                )  DALLAS, TEXAS
HOLY LAND FOUNDATION, ET AL     (  9:00 A.M.

_____

VOLUME 10 OF 37

_____

STATEMENT OF FACTS

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

_____

A P P E A R A N C E S

          FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                                1100 COMMERCE, 3RD FLOOR
                                DALLAS, TEXAS  75242
                                BY:  MR. JIM JACKS
                                     MR. BARRY JONAS
                                     MS. ELIZABETH SHAPIRO

          FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
          (SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
                                20 FIRST PLAZA, SUITE 700
                                ALBUQUERQUE, NEW MEXICO 87102
                                BY:  MS. NANCY HOLLANDER
                                     MS. TERESA DUNCAN

```
 1              FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
                (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
 2                                   NEW YORK, NEW YORK  10005
                                     BY:  MR. JOSHUA DRATEL
 3                                        MR. AARON J. MYSLIWIEC

 4              FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
                (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
 5                                   DALLAS, TEXAS  75204
                                     BY:  MS. MARLO P. CADEDDU
 6
                FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
 7              (GHASSAN ELASHI)     P.O. BOX 10985
                                     TAMPA, FLORIDA  33679
 8                                   BY:  MS. LINDA MORENO

 9                                   JONES DAY
                                     555 CALIFORNIA ST., 26TH FLOOR
10                                   SAN FRANCISCO, CA  94104
                                     BY:  MR. JOHN D. CLINE
11
                FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12              (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                     FORT WORTH, TEXAS  76102
13                                   BY:  MR. GREG WESTFALL

14              COURT'S LAW CLERK:   MS. JENNIFER HELMS
                                     1100 COMMERCE, RM. 1654
15                                   DALLAS, TEXAS  75242

16              COURT COORDINATOR:   MS. BRENDA WEBB
                                     1100 COMMERCE, RM. 1654
17                                   DALLAS, TEXAS  75242

18      OFFICIAL COURT REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                                     1100 COMMERCE STREET, RM. 1654
19                                   DALLAS, TEXAS  75242
                                     (214) 753-2349
20

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|

LARA BURNS
   Direct By MR. JONAS .......................................... 39

## Government's Exhibits

| **Government's Exhibits** | **Page** |
|---|---|
| Hamas Charter No. 3 Admitted into evidence. | 43 |
| El-Mezain Deposition Admitted into evidence. | 46 |
| HLF Wiretap 2, 2-A Admitted into evidence. | 53 |
| OLF 1988 Disbursements Admitted into evidence. | 56 |
| 1989 OLF Disbursements Admitted into evidence. | 63 |
| HLF Search No. 7 Admitted into evidence. | 65 |
| HLF Search No. 8 Admitted into evidence. | 66 |
| Baker Declaration Admitted into evidence. | 67 |
| HLF Search No. 108 Admitted into evidence. | 69 |
| InfoCom Search No. 28 Admitted into evidence. | 73 |
| Payments To IC/Gaza Admitted into evidence. | 74 |
| HLF Bank Account No. 1, 3 Admitted into evidence. | 76 |
| HLF Search No. 42 Admitted into evidence. | 76 |
| InfoCom Search No. 20 Admitted into evidence. | 76 |
| HLF Foreign Bank Account No. 1 Admitted into evidence. | 76 |
| Chart Bank Accounts Admitted into evidence. | 77 |
| Payments to K&A Trading Admitted into evidence. | 84 |
| K&A Trading Account Admitted into evidence. | 87 |
| K.Agha/K&A/Marzook Admitted into evidence. | 91 |
| Elbarassee Search No. 36, 39 Admitted into evidence. | 92 |
| Marzook Bank Account No. 4 Admitted into evidence. | 92 |
| Chart Marzook/UASR Admitted into evidence. | 95 |
| Marzook Bank Account No. 1, 3 Admitted into evidence. | 96 |
| Elbarasse Search No. 38 Admitted into evidence. | 96 |
| Marzook/IAP Admitted into evidence. | 97 |
| Marzook Bank Account No. 2 Admitted into evidence. | 98 |
| Marzook/Defendants Admitted into evidence. | 101 |
| Elbarasse Search No. 40 Admitted into evidence. | 105 |
| Marzook Tax No. 1 Admitted into evidence. | 107 |
| InfoCom Search No. 83 Admitted into evidence. | 112 |
| Baker Wiretap No. 2, 2-A Admitted into evidence. | 113 |
| El-Mezain Wiretap 11, 11-A Admitted into evidence. | 118 |
| Marzook/Defendants Phone Calls Admitted into evidence. | 125 |
| HLF Search No. 9, 10 Admitted into evidence. | 126 |
| Bell Atlantic 1, 2 Admitted into evidence. | 126 |
| South Central Bell Admitted into evidence. | 126 |
| New Jersey Bell Admitted into evidence. | 126 |
| Payments to Islam RA Admitted into evidence. | 136 |
| HLF Search No. 44 Admitted into evidence. | 137 |
| Elbarasse Search No. 17 Admitted into evidence. | 139 |

InfoCom Search No. 3 Admitted into evidence.                      140
InfoCom Search No. 4 Admitted into evidence.                      140
Demonstrative No. 8 Admitted into evidence.                       142
InfoCom Search No. 22 Admitted into evidence.                     143
Elbarasse Search No. 18 Admitted into evidence.                   150
Ashqar Wiretap No. 1, 1-A Admitted into Evidence                  163
Ashqar Wiretap No. 2, 2A Admitted into evidence.                  168
Ashqar Search No. 4 Admitted into Evidence                        171
Philly Meeting Summary Admitted into Evidence                     173
Philly Meeting No. 1-18 Admitted into Evidence                    177
Baker Wiretap No. 4, 4A Admitted into evidence.                   196
Elbarasse Search No. 19 Admitted into evidence.                   224
InfoCom Search No. 5 Admitted into Evidence.                      233
El-Mezain Wiretap No. 2 Admitted into Evidence.                   234

THE COURT:  I have not had a chance to look at all these written objections, but I have looked through a good portion of them and I understand Mr. Elashi is the Defendant who is in custody.  Is your client here?

MR. CLINE:  Yes, Your Honor.

THE COURT:  And the rest of the Defendants, we don't need them here for this hearing?

MR. WESTFALL:  That is true, Your Honor.

MR. DRATEL:  Based on timing of morning prayer and the traffic, I didn't think they would be able to make it until 8:45.

THE COURT:  That is fine.

All right.  The objections to the search exhibits, Abdulqader wiretaps, the Ashqar wiretaps, the Baker wiretaps -- Let me start with the wiretaps.  Those objections that were based on the hearsay and the timing, those are overruled, the same rulings that we have had previously.

And then the items that were recovered in the searches, the Ashqar search and Elbarasse search, those are also overruled.

MR. CLINE:  Your Honor, may I ask one question on that?

THE COURT:  Yes.

MR. CLINE:  At the last trial Judge Fish conditionally admitted the co-conspirator statements subject

1    to a motion to strike at the end of the Government's case.

2              THE COURT:  And you can have that.

3              MR. CLINE:  So at the end of the Government's case

4    we can renew --

5              THE COURT:  Correct.  I understand the argument with

6    whether a conspiracy is established or not.  We are early on

7    in the case, so certainly you can have that conditional

8    admitting.  So that would apply to all -- the wiretap?

9              MR. CLINE:  And I am sorry to keep interrupting.

10   One other thing.  May we have -- Just to make sure our record

11   is clear, may we have a conditioning objection to the various

12   exhibits based in what is stated in our pleadings so we don't

13   have to keep hopping up and objecting to things.

14             THE COURT:  Yes, sir.  And you may have that

15   continuing objection.

16             MR. JACKS:  Judge, since it is going to be a

17   continuing objection, we would ask that the Defense not stand

18   up and make an objection if the document or exhibit doesn't

19   have an author or indicated.  We think that is unnecessary,

20   and in a way it is intended to communicate something to the

21   jury that is not necessary and appropriate at that time.

22             THE COURT:  Counsel, any response to that?

23             MR. CLINE:  I think we have a continuing objection,

24   so I don't think --

25             THE COURT:  And I have ruled on those objections.

1    All right.

2         I am on page 11 and 12 of the Defendants' written

3    objections, the El-Mezain deposition.  And on page 12 at the

4    very end of Roman numeral paragraph 4, pages 2 to 6 of the

5    proposed El-Mezain deposition, Mr. Jonas, do you see that?

6              MR. JONAS:  Yes, Your Honor.  And if I may address

7    the deposition issue.  Ms. Hollander and I met yesterday to go

8    over the deposition of her client Shukri Baker as well as the

9    declaration.  I believe we came to an agreement as to how the

10   final form should be, and those changes were made this

11   morning.

12             THE COURT:  Are you in agreement with that?

13             MS. HOLLANDER:  I am.  And I brought a copy just to

14   make sure -- We were doing it pretty fast, but I think we have

15   it, Your Honor.

16             MR. JONAS:  On the El-Mezain deposition, we received

17   an email from his counsel late last night that they have some

18   objections.  We just had a very, very brief discussion on it

19   just before Your Honor got on the bench.  There is one or two

20   pages of that I plan to getting into this morning with Agent

21   Burns.  I don't believe I am get into anything else.

22        We will meet to discuss the rest of their issues and try

23   to work something else at the end of the case.  So I guess my

24   point is if Your Honor can reserve ruling on that.

25             THE COURT:  Certainly.

1          MR. DRATEL:  That is appropriate, Your Honor.

2          MR. CLINE:  And, Your Honor, on the subject of the

3    depositions and declarations generally, on behalf of Mr.

4    Elashi, and I suspect the other Defendants not involved will

5    agree with this, we would ask the Court at the time the

6    excerpt is read into evidence to give a limiting instruction

7    that it applies only to the Defendant who is the declarant in

8    the particular piece of evidence.

9          MR. JONAS:  Your Honor, our position is that is fine

10   if we are offering the statement for the truth.  But if it is

11   a statement that is a false statement that we say is done to

12   further conceal the conspiracy, we don't think such an

13   instruction is appropriate.

14       And I think we need to be clear, because given the

15   instruction last week that the instruction is because this

16   particular statement in this particular deposition was made

17   after the conspiracy pretty much ended, after Holy Land was

18   shut down--I don't want to say after the conspiracy ended.

19   That is the wrong term.  But, this is after HLF was shut

20   down--is very limited.  I am concerned that what I said last

21   week at the bench that if a Defendant makes a statement in the

22   '90s, let's say, when the HLF was up and running, those

23   statements certainly are statements made in furtherance, and

24   we don't want the jury to confuse what they can limit to one

25   Defendant versus what they can hold against everybody.  So I

1    think we need to carefully craft an instruction for Your Honor

2    to give at those appropriate times.

3         MR. CLINE:  And I am not sure what is coming in today.

4    If we have time to do that, I am happy to meet --

5              THE COURT:  And I think we will have some time.  We

6    will finish up here in just a few minutes, and then you can

7    work on that or even during the day.  And I won't give it

8    until we come up with something.

9         The wiretap and the search exhibits, then, those

10   objections have been overruled.

11        And then we are withholding on the depositions to give

12   counsel a chance to work it out.

13        What other exhibits, then, do I need to rule on?

14             MS. HOLLANDER:  Roman numeral five, the Al Zatounia

15   and Illa Falistine exhibits.  And I believe there are some

16   more after that, Your Honor.  Those are the next ones.

17             THE COURT:  Those are the ones we will start with.

18   And I don't have those.  Do you have a copy of those that I

19   can see?

20             MR. JONAS:  Your Honor, we are going to have paper

21   copies of those brought up.  It may just take a few minutes.

22             THE COURT:  Okay.  And you are seeking to introduce

23   the entire documents found these newsletters?

24             MR. JONAS:  Honestly, we are still undecided about

25   that.  I think the way it stands right now, one is in its

entirety, and the others are just redacted versions.  And I
think the one in its entirety, we just have a translation for
a few pages of it that we believe are relevant.

THE COURT:  Which one is that one?

MR. JONAS:  I believe that is Illa Falistine No. 1.
And then the rest are just a few pages in Arabic that match up
with the few pages in English that we have.  And I can address
the background of this if Your Honor wishes.

THE COURT:  Go ahead.

MR. JONAS:  In some of the Elbarasse documents that
have already been admitted, they discuss the role and the
purpose of the IAP, the Islamic Association of Palestine.  And
one of the functions of that organization was to publish a
magazine.  I can't remember if it is monthly.  It is
periodically.  I can't say monthly or bi-monthly, and
specifically identifies these particular magazines these Illa
Falistine and Al Zatounia.

Contained within some of them are certainly ads from the
HLF.  And in one of them in particular there is a, for lack of
a better word, a poem from the Defendant Shukri Baker that is
an ode to Hamas.  There is also an article in one of them that
we seek to admit that talks all about Hamas, it is pro-Hamas,
encourages people to donate to Hamas, and says to give your
donations to the Occupied Land Fund, the predecessor to the
HLF.

1    Clearly these magazines, if you look at the comment, are

2   pro-supportive magazines of Hamas; consistent with everything

3   we have seen so far, and everything we will see, about the HLF

4   and the IAP, the Defendants, and the co-conspirators.

5    We received these magazines from a third party.  They

6   weren't obtained in a search warrant.  They were not obtained

7   by grand jury subpoena.  They were given to us by third

8   parties.

9    It is our position that they are self-authenticating

10   under 902, I can't remember if it is (6) or (8) as

11   periodicals, and that they are co-conspirator statements or

12   joint venture statements made in furtherance of the

13   conspiracy, so we think that they come in that way.

14        THE COURT:  Okay.

15    Ms. Hollander?

16        MS. HOLLANDER:  Yes, Your Honor.  The third party

17   they received these from we believe were the plaintiffs in the

18   Boim litigation that you have heard about before.  They are

19   not -- They are parts of these magazines.  There is one that

20   is a complete magazine.  The rest of those are just portions

21   of them.  The translations in many cases don't even include

22   the whole thing.

23    In other words, they will translate it, and it will say

24   "caption for photo," and the photo isn't even there of a

25   demolished home or whatever.

1    I mean, they are hearsay within hearsay within hearsay.

2    There is no way to know what they are, who said them.  They

3    weren't written -- We don't know who wrote them.  Even the

4    story that is allegedly written by Shukri, we don't know

5    whether he wrote it.  We don't know who wrote the headline of

6    it, because editors write things and change things.  We have

7    no idea of these except to know they came from the Boim

8    litigation.  They came in in bits and pieces, and they are

9    just rank hearsay.

10          THE COURT:  What about the hearsay objection, then?

11   You have covered authentication, but what about hearsay?

12          MR. JONAS:  Because these magazines that are being

13   published by the IAP, which, as we have already established,

14   the Defendant Shukri Baker was involved with the IAP, but also

15   he acknowledged in his deposition that he was on their

16   advisory board at this time.  It is co-conspirator statements.

17   The IAP is publishing and creating this magazine.

18       With regard to the poem written by Shukri Baker, his name

19   son it, and I think that goes to weight as to whether or

20   not --

21          THE COURT:  I agree with that.  She has a hearsay

22   objection just generally to these periodicals.  And most of

23   what she stated I think goes to weight, but what about the

24   hearsay?

25          MR. JONAS:  I guess, Your Honor, it depends upon the

1    particular item that she is referring to.

2              THE COURT:  Let's say she is applying hearsay to the

3    entire periodical.

4              MR. JONAS:  Again, we think it is a co-conspirator

5    statement that is published and created by the IAP.  The

6    article I referenced a moment ago, not the one that is

7    authored by Shukri Baker, but the one that encourages people

8    to donate to the HLF --

9         The article I mentioned a moment ago -- Well, two things.

10   One, again, it is like the Elbarasse documents.  It doesn't

11   always matter who authored it.  The content clearly indicates

12   that it is someone who is part and parcel to this Palestine

13   Committee and is a co-conspirator, first of all.

14        Second of all, we are not offering it for the truth.  The

15   content is all about Hamas and support of Hamas.  We are

16   offering it to show this is what is going on during this time

17   frame involving these Defendants, this Palestine Committee,

18   these co-conspirators, of encouraging people to donate to the

19   HLF to support Hamas.

20             MS. HOLLANDER:  Well, Your Honor, two things.  If

21   they are not offering it for the truth, it is not relevant at

22   all.

23        And secondly, if they are not offering it for the truth,

24   the jury is never going to get that distinction, anyway.

25        And third, if these things come in, they involve all

1    kinds of political issues.  For example, one of them is about

2    the deportees in 1992, and it talks about some of the

3    detainees who came back and were detained.  Well, I believe

4    that they were immediately released.  This is a whole

5    political issue that we are going to have to get into.

6        One of them talks about how the United States, even

7    though it supported the resolution 799 in the U.N. condemning

8    Israel, that there is a whole article about how later the

9    U.S., somebody from the U.S. talked to Prime Minister Rabin

10   and said, "Don't worry.  We will make sure a vote doesn't come

11   up."  So we will have to bring that issue in.

12       It raises enormous numbers of political issues we can't

13   just let sit there, and that are totally irrelevant.

14           MR. JONAS:  Your Honor, I don't any of that is in

15   the translation.

16           MS. HOLLANDER:  Yes, it is.  It is.  I mean, I read

17   it last night.  That whole thing about the deportees, there is

18   a whole -- all kinds of political issues raised in these.

19   Even the one that has the statement that is attributed to

20   Shukri has another article about Hamas in it, and we don't

21   know who it is.

22       These were not -- There is one that they claim is an

23   advertisement by Holy Land in this magazine, but the others

24   are somebody in this magazine saying donate to Holy Land, and

25   we have no idea who did that.

1      THE COURT:  I still think that goes to weight.  What

2 about these articles that have to do with the politics?

3      MR. JONAS:  Your Honor, I honestly don't recall that

4 being in there.  I will accept Ms. Hollander's word at this

5 moment.  But may I make a suggestion?  There are very few

6 pages that are translated right now that we plan on offering

7 into evidence in English.  If we could just show them to you

8 and Your Honor can make the decision if they are issues that

9 you are concerned about --

10      THE COURT:  And we can deal with that later, as long

11 as they don't get to the jury.  You are not planning on

12 showing any of that to the jury today?

13      MR. JONAS:  Not today.  I doubt we will get to it

14 today.

15      THE COURT:  Even when you get to them, are you

16 planning on getting into those political stories that she is

17 talking about?

18      MR. JONAS:  No, sir, that is not the plan.

19      THE COURT:  So before you get into anything like

20 that, approach the bench.  And I think for what you are

21 offering it, I think that is permissible and I will overrule

22 the objections, those objections to those articles that you

23 are talking about.

24      MS. HOLLANDER:  Your Honor, can we have a limiting

25 instruction that they are not being offered for the truth?

1          THE COURT:  No.  I think if you are offering them as

2     part of co-conspirator statements, then they do come in and

3     they can be considered for the truth.  And I think, frankly,

4     you are offering them for the truth.  You say you are not, but

5     then you are saying you want to show that in fact they are

6     supporting Hamas, encouraging.  That sounds like you are

7     offering it for the truth.  I think they come in with that

8     exception, through that exception.

9          MR. DRATEL:  Your Honor, just with respect

10    authentication, I just want to just lodge an objection based

11    on the fact of I think in this day and age, in the context of

12    self-publishing, that a third party giving something to the

13    Government is not authentication of a published document, that

14    it is what it purports to be.

15         THE COURT:  I don't think it is the fact who gave it

16    to the Government.  It is the document itself that

17    authenticates itself by simply looking at it.  And if you tell

18    it is what it purports to be --

19         MR. DRATEL:  But no one can, because no one can tell

20    us what an authentic version of these magazines look like.  We

21    have no testimony -- I realize the hurdle is not that great,

22    but I think at some point --

23         THE COURT:  I don't think they are required to do

24    that, otherwise there wouldn't be self-authenticating.  I

25    think that is the purpose of having the self-authentication

1  rule is the document authenticates itself.  Unless there is

2  something about it that is intrinsically unreliable.  And if

3  it looks like it is a periodical, I am not going to find that

4  the self-authentication is not permissible.

5          MR. DRATEL:  I just object on those grounds.

6          THE COURT:  All right.  You have your objection.

7          MS. HOLLANDER:  So you are going to take a look at

8  them, though, before --

9          THE COURT:  I will take a look for those specific

10  articles that you are objecting to.  But in terms of the

11  periodicals themselves, I think they are admissible for the

12  purposes that Mr. Jonas has identified in terms of showing the

13  link between -- Anything that has to do with the Holy Land

14  Foundation, Occupied Land Fund, obviously that is admissible,

15  and then having to do with Hamas, that is admissible for those

16  purposes.

17      If there are other articles or other reasons you want to

18  get into those, you would need to approach the bench before

19  you get into those in front of the jury, Mr. Jonas.

20      Ms. Moreno?

21          MS. MORENO:  Good morning, Your Honor.

22      I was trying to keep up over there.  I may not have.  On

23  the HLF/InfoCom search documents category, has the Court ruled

24  on those?

25          THE COURT:  I don't know that I specifically did.  I

1    think I stated the search and the wiretaps.  Do you have

2    objections to those, other than the general hearsay and the

3    timing?

4         MS. MORENO:  I do have a very strong hearsay

5    objection.  And if the Court would look on page 14, footnote

6    10, the Court will see the kinds of articles that the

7    Government readily admits it wants to -- it offered for the

8    truth of its contents.  And if they are not going to do that

9    today, I can go more specifically at a later time into the

10   specific objections with respect to these newspaper articles.

11   But these are clearly hearsay.

12        THE COURT:  What about these newspaper articles?

13        MR. JONAS:  I don't think we readily admitted that

14   we are offering them for the truth.  In the fact, quite to the

15   contrary.  These were articles that were found in either HLF

16   or InfoCom, and in many instances -- Not all, but in some

17   instances they relate to conversations that the Defendants

18   had.  They are offered to show the Defendants' state of mind.

19        In other words, there is a call between two of the

20   Defendants discussing one of the articles, and then we found

21   the article at HLF or InfoCom.  I think it is perfectly proper

22   for us to introduce that article so the jury can see that this

23   is what they are talking about.

24        THE COURT:  She listed four articles there.

25        MR. JONAS:  Off the top of my head, I honestly don't

1  know which article goes to which issue I just addressed, and I

2  apologize for that.  I think generally they are for the state

3  of mind of the Defendants.

4     Some of them are for the conversations.  Some of them

5  just were found, for example, in Ghassan Elashi's office.  It

6  goes to show his knowledge, what he has been made aware of

7  that is going on with Hamas and some of the Hamas leaders.  So

8  it is a state of mind issue.  It is not a truth issue.

9        THE COURT:  And I have not looked at those

10  particular documents.

11        MS. MORENO:  Your Honor, if he is offering it for a

12  state of mind, that is an exception to hearsay.  I mean, it is

13  a hearsay document.  And I believe if the Court looks at those

14  articles particularly, and allows me to argue further --

15  Unless they are getting into it this morning.  Are you?

16        MR. JONAS:  There may be one article we are getting

17  into this morning.

18        THE COURT:  Which one is that one?

19        MS. CADEDDU:  Your Honor, may I raise another issue

20  that is related, and that is that my client was not an

21  employee or board member of Holy Land, and so what I am

22  concerned about is these things that are found on Holy Land

23  premises that are being offered to show the Defendants' state

24  of mind, without some evidence that he had any connection to

25  that document, or exhibit, I believe I am entitled to a

1    limiting instruction.

2            THE COURT:  Let me finish ruling on this.  That is a

3    valid point, but we need to come back to that.

4        Mr. Jonas?

5            MR. JONAS:  I am checking my order of exhibits for

6    this morning, and I haven't seen any that will be addressed

7    this morning.

8            THE COURT:  This morning?

9            MR. JONAS:  This morning.  So if I am incorrect, I

10   will ask for a sidebar.

11           THE COURT:  Approach the bench.  And then if you get

12   into any this afternoon, be sure to let us know sometime

13   before we break for lunch so I can look at them over the lunch

14   hour, and I will take a look at them.

15           MR. WESTFALL:  Your Honor --

16           THE COURT:  Are you back on these newspaper

17   articles, or something else?

18           MR. WESTFALL:  Just one very short thing on the

19   newspaper article.

20       Particularly on the Judith Miller article, that was an

21   exhibit that Judge Fish actually kept out.  Please read it.

22   She has been very discredited as an author apparently some

23   time ago.  And the article has some very serious 403

24   implications on top of the hearsay, and the fact that they are

25   offering it for the truth, Your Honor.

1          MS. MORENO:  That is specifically the article I

2    wanted to address with Your Honor.  I think you need to read

3    the article.

4          THE COURT:  And I plan on it.  I just haven't done

5    it yet.  But you are saying you are not offering it for the

6    truth, these particular articles.

7          MR. JONAS:  In fact, that particular article, if it

8    is the one I am thinking of, the Defendants in this

9    Philadelphia meeting that we are going to get to at some point

10   today, the participants in this Philadelphia meeting, because

11   I can't recall exactly who said it, but I think maybe the

12   Defendant Shukri Baker made this comment at least once, talk

13   about them being exposed, and exposed publicly.  They use the

14   word marked or stamped.  This Judith Miller article is what we

15   are going to offer to show this is what they are referring to

16   is them being marked or stamped as Hamas.

17        So it is not being offered for the truth.  It is being

18   offered to show this is what they mean when they say they are

19   being marked or stamped.  And it was found in the HLF.

20         THE COURT:  All right.  I will take a look at that

21   article.  We will come back to that.

22        Anything else on the newspaper articles?

23         MS. CADEDDU:  Just re-raising my objections about

24   the state of mind issues.

25         THE COURT:  On the newspaper?

1          MS. CADEDDU:  In other words, that is being offered

2     to show the Defendants state of mind.

3          THE COURT:  I was going to get to yours in a minute.

4     I am trying to finish up the newspaper --

5          MS. CADEDDU:  I don't want to waive anything, Judge.

6          THE COURT:  Just hold on.

7          Anything else on the newspaper articles, as far as their

8     admissibility?

9          Marlo, your turn.  I think I have your objection.

10         Mr. Jonas, do you want to respond?

11         MR. JONAS:  I am not quite sure --

12         THE COURT:  She says he was never an officer or

13     board director member of HLF, and you have these documents

14     that you are going to show state of mind of these HLF member

15     Defendants, whether they are officers or board of directors,

16     they are connected more directly to HLF.  And she is concerned

17     if he is not an officer or director or board member -- Did I

18     get it right?

19         MS. CADEDDU:  Yes.  Or an employee, and he had no

20     office, and he wasn't there.  And something that is found on

21     the HLF premises, unless they have some evidence to show that

22     he was aware of it, I don't know that that can go to his state

23     of mind, so I ask for a limiting instruction.

24         MR. JONAS:  I am not quite sure -- I don't believe

25     that the co-conspirator joint venture requirement goes to

whether you are an officer or director.  It is whether you are

a member of the joint venture.  So the issue is whether or not

the jury finds him to be a member of the joint venture.

We are going to establish, using as an example this New

York Times article, that the Defendant Mufid Abdulqader was at

the Philadelphia meeting.  And that is where they discuss

being stamped or marked.  I believe it goes to weight.

If Ms. Cadeddu wants to argue that he was not that

associated with the HLF and he wasn't aware of these issues,

let her argue.

THE COURT:  She is really not arguing that it is not

admissible.  She is trying to get a limiting instruction as

to --

MS. CADEDDU:  Let me be specific, Judge.  There are

some that the Government is offering as co-conspirator

statements, and I don't think I am entitled to a limiting

instruction as to that.  But when the Government is offering

something not as a co-conspirator statement, like these

newspaper articles that are being offered for state of mind, I

think they need some connection to my client in order to be

able to show that --

THE COURT:  That is the point --

MR. DRATEL:  Or any specific Defendant, Your Honor,

who is not in Dallas, because my client is in New Jersey and

then in San Diego.  So if it is found in somebody's desk in

1    Dallas, I don't see how that applies to his state of mind,

2    unless they are connected in some way.

3            MS. CADEDDU:  We are distinguishing that from the

4    co-conspirator statements, Your Honor.

5            MR. DRATEL:  That are not offering the newspaper

6    article as a co-conspirator statement, a New York Times

7    article.

8            THE COURT:  He says they are not offering it for the

9    truth, but to show state of mind.

10           MR. JONAS:  Your Honor, I don't have so much of an

11   issue if there is an instruction that this could be viewed by

12   the jury for the Defendants' state of mind for those

13   Defendants that may be aware of them.

14       In other words, this particular newspaper article from

15   the New York Times that I say relates to the conversation at

16   the Philadelphia meeting, well, the Defendant Mufid Abdulqader

17   was in the Philadelphia meeting, so I don't think we can cut

18   him out from that.

19       Newspaper articles that are found in the desk or the

20   office of Ghassan Elashi that we are offering to show his

21   state of mind, I agree.  Give a limiting instruction.  That

22   should be held against Defendant Ghassan Elashi alone.

23       But I just want to make sure that we are not making a

24   general instruction that applies to all exhibits when there

25   shouldn't be.

1          MS. MORENO:  And Your Honor, the article in question

2     is February of 1993.  February of '93 is in the footnote that

3     I oriented the Court to.

4          THE COURT:  I see that.

5          MS. MORENO:  The Philadelphia meeting is eight

6     months later in October of 1993.  It is a stretch to say that

7     eight months later these gentlemen are talking about, without

8     naming the article, without naming Judith Miller, that when

9     they are talking -- whatever conversation they are having,

10    they are referring to this article.  So I think that the time

11    is also something that the Court should focus on.

12         THE COURT:  All right.

13         MS. CADEDDU:  Well, and I also -- Mr. Jonas keeps

14    saying that Mr. Abdulqader was at the Philadelphia meeting.

15    We are going to contest that rather vigorously.  He was not at

16    that meeting.  The translator who testified that he was there

17    said he was 80 percent sure, but he wasn't positive so he

18    didn't put his name on it.  I mean, this is a huge issue.

19    This is the first time I have ever heard that testimony.  That

20    did not happen at the first trial.

21         So, you know, Mr. Jonas can claim that he was at the

22    Philadelphia meeting.  I know he wasn't.  And that is going to

23    be a huge bone of contention.  I wanted to make sure the Court

24    didn't take that as a given.

25         MR. DRATEL:  And it has been conceded by the

1  Government that Mr. El-Mezain was not present at the

2  Philadelphia meeting.

3          MR. JONAS:  I am not sure there is anything I have

4  to add on that.  We are just going round and round.

5          THE COURT:  And we are not to the newspaper articles

6  yet.  It appears that you are willing to limit -- agree to

7  some limiting instruction as to at least Mr. El-Mezain who

8  wasn't there, or the newspaper articles that were found.  Mr.

9  Jacks is shaking his head no.  It doesn't sound like you are

10 in agreement to that.

11         MR. JACKS:  Judge, I think the newspaper article is

12 relevant to show knowledge.  The fact that they had it, you

13 can infer that they saw it when it came out and they kept it

14 for a reason.

15         THE COURT:  But you are saying they and --

16         MR. JACKS:  I understand.

17         THE COURT:  The specific objection is like if one

18 was found in the desk of one of the Defendants.

19         MR. JACKS:  And I think it is reasonable to infer if

20 one member of the conspiracy saw it and read it, that it was

21 conveyed to the others.

22         THE COURT:  So you are not willing to concede a

23 limiting instruction, then.

24         MR. JACKS:  No.  Because they do in fact have

25 conversations later where they talk about these articles.  And

1    that proves the point that the fact that these articles are

2    found in the possession of one of the co-conspirators, and the

3    evidence shows that they talk about these articles among

4    themselves, that the knowledge that it conveys to one

5    co-conspirator, it is permissible to infer that other

6    co-conspirators were made aware of those articles.  Plus the

7    fact that it is in the New York Times.  That is a pretty

8    widely circulated newspaper.

9         So the fact that these articles are imputed to show

10   knowledge, I don't think you can cut it off and say that these

11   other co-conspirators, therefore, didn't have any knowledge.

12   I think that is a matter for the jury to discuss and to weigh

13   and to decide.

14        MS. CADEDDU:  Well, and Your Honor, again, when you

15   are offering it as a co-conspirator statement it is one thing.

16   When you are offering it to show state of mind, you need to

17   show that there is a connection to show state of mind.

18        And I also want to express a concern about this

19   monolithic "they."  The Government is not going to offer any

20   conversations by my client where he talks about any of these

21   articles.  There are two conversations they are offering.

22   Both have to do with fundraising, volunteer fundraising trips

23   that he took.

24        So, you know, I don't want to get swallowed up into this

25   monolithic "they," because there isn't any evidence of that.

1    It is not appropriate.

2              MS. HOLLANDER:  Your Honor, can I just make sure

3    that we raised a 403 argument, because what I believe the

4    reason the Government wants to introduce particularly the

5    Judith Miller article is that it has a lot of information

6    about someone who was arrested in Israel that they are going

7    to try to link -- And the jury cannot decipher what is true

8    and what isn't.  And the unfair prejudicial effect of these

9    newspaper articles, particularly that one, seriously outweighs

10   any probative value it has, and I think you will see that when

11   you read it.

12             THE COURT:  All right.

13       Mr. Cline?

14             MR. CLINE:  Your Honor, one other limiting

15   instruction issue with the newspaper articles.  Of course, we

16   object to their coming in at all on hearsay and 403 grounds,

17   and so on.

18       If they do come in to show notice or knowledge or

19   something like that, we would ask that the jury be instructed

20   that they are not being admitted for the truth, but solely for

21   whatever purpose Your Honor decides to admit them.

22             MR. DRATEL:  And Your Honor, I think Mr. Jacks'

23   construction of the law of inference is actually in reverse of

24   what it ought to be.  You don't get an omnibus inference that

25   the Defense essentially has to disprove; that the Government

has to connect evidence in order to make evidence reasonable.

THE COURT:  Okay.  And I may need you to be more specific at some point, Mr. Jacks, when you get to it.  You say there are phone conversations, so that is some evidence that would with a link.  But I think you need some specific as to who are the parties to those phone conversations.  And I think that is the point Ms. Cadeddu makes is that her client is not going to be involved in any of those conversations, so you are trying to impute knowledge to him.

MR. JACKS:  Your Honor, I will find out and make that known to the Court which exhibits include those conversations.

THE COURT:  And who the parties are that are discussing those articles?

Is the jury here?

Was there anything else on the HLF and InfoCom search documents that we needed to address, besides those newspaper articles?  Ms. Moreno or anyone else?

MS. MORENO:  Not at this point, Your Honor.

THE COURT:  Those, then, the remainder of those are admitted pursuant to the earlier rulings.

Anything else we need to address?

We will be in recess until we get the jury --

MR. DRATEL:  The first part of the El-Mezain documents really has to do with collateral estoppel.  But the

second part, there is one specific conversation. I don't know
if the Court wants to hear argument on that. I don't know the
time of when you think you are going to get to that, this
morning, or --

MR. JONAS: I don't know what conversation you are
referring to.

MR. DRATEL: No. 27 or 12, however you denominate
it.

MR. JONAS: That won't be this morning.

THE COURT: What was the issue with that one?

MR. DRATEL: This was a conversation that -- Well,
we have a number of objections--403, collateral estoppel. I
think the collateral estoppel aspect of this is --

THE COURT: And do you know right off which
particular exhibit that is?

MR. DRATEL: Yes. It is El-Mezain Wiretap No. 27,
but also may be called No. 12.

MR. JONAS: It is not 27.

MR. DRATEL: No. 27 is the entire conversation.

MR. JONAS: No. 27 is a misprint. It is No. 12.

MR. DRATEL: So it is 12. El-Mezain Wiretap No. 12.

THE COURT: And I have No. 27 also listed. So that
should be No. 12?

MR. JONAS: No. 12, Your Honor.

THE COURT: All right. And then your particular

1    objection on that.

2           MR. DRATEL:  Mr. El-Mezain has been acquitted of all

3    money laundering charges, and that is the inference the

4    Government wishes to draw from that conversation, which is

5    totally separate.  It also raises the prospect of prejudicial

6    variance, and even ultimately perhaps an amendment in the

7    indictment because the specific allegations of money

8    laundering in this indictment, which Mr. El-Mezain has been

9    acquitted of, Mr. Odeh is part of that conversation as well.

10   So I am sort of making that argument at the same time, which

11   is that the money laundering is alleged to have been the

12   payments by HLF to the institutions overseas.  This gets into

13   a totally separate issue which essentially could create

14   another theory for the Government to argue money laundering,

15   which wouldn't be proper, which is the notion of deposit

16   structuring, which has nothing to do with the concealment that

17   the Government is alleging or the transfers that the

18   Government is alleging, which has to do with where it is

19   going, not where it is coming from.

20        So it is completely outside the box of what these charges

21   are, and creates a real danger of the jury being misled and

22   confused.

23           THE COURT:  Mr. Jonas?

24           MR. JONAS:  Mr. Dratel's theory of our offer of

25   proof is wrong.  This is a conversation between the Defendants

1    Mohammad El-Mezain and Abdulrahman Odeh that occurred about a

2    month or so after Hamas was designated initially as a

3    terrorist organization.  They talk about structuring the

4    deposits of HLF's cash into the HLF bank account.  They

5    mention about how the accounts are being watched.

6        It is our position that they intend on structuring, or

7    El-Mezain instructing Odeh to structure in order to conceal

8    from the government the fact that they are receiving all this

9    money.  It is not a matter of the money laundering charges and

10   where it is going to.  It is a matter of how they are

11   depositing their cash into their accounts right after Hamas is

12   designated, and their belief that their accounts are being

13   watched.

14        MR. DRATEL:  But, Your Honor, that is -- It is not

15   what the conversation says in toto.  But also it is exactly

16   what I am saying.  They are alleging a separate money

17   laundering mechanism, which is not charged, which is not what

18   this case is about.  This case is about where the money went

19   to.  The notion of some concealment of where the money is

20   coming from, in other words, that contributions and their

21   amounts, has nothing to do with this case or the charges.

22        The other thing is that the reference in the calls is

23   that this is the way that this has always been done; that it

24   has been a practice to break these up.  And the Supreme Court

25   case cited in our papers says you not only have to have an

1    intent to circumvent the reporting requirement, but have to

2    know it is illegal.  There is nothing in the conversation that

3    would suggest that.  So in that context it is not even really

4    a bad act.  It doesn't even constitute it, but it is being

5    used for that inference, I think, in a way that would run

6    afoul of 403, as well at the collateral estoppel.

7         They are talking about charges that Mr. El-Mezain has

8    been acquitted on, not only with respect to collateral

9    estoppel but also with respect to double jeopardy, because in

10   effect they are trying to get him convicted on the basis of

11   charges that he was already acquitted on.

12             THE COURT:  I understand the argument.

13        Anything else you want to add?

14             MR. JONAS:  Briefly, this is for concealment

15   purposes.  It goes to in total their actions in order to keep

16   away from the government, which is consistent with other

17   things they have done with the government--their behavior,

18   their connection to Hamas, all of that.

19             THE COURT:  I think it could go to show knowledge.

20   But I haven't read the conversation.  I will go back and take

21   a look at that.

22             MR. JONAS:  Your Honor, just one quick point.  We

23   have not received from Defense the exhibits they intend on

24   showing to Agent Burns.  I am not sure when we are going to

25   get that.  I am assuming it is closer to the time she is off

1    the stand.  We may need another session like this.

2         THE COURT:  I suspect we will need more than one.

3    We may do another one this afternoon, and then another one in

4    the morning if we need to, or at some point before we get to

5    the documents.

6         When do you expect -- Of course, I guess she will be on

7    direct for a number of days.

8         MR. JONAS:  It is possible she could be off direct

9    by tomorrow the end of the day.

10        THE COURT:  All right.  Well, then, at some point if

11   you will make sure you give your list of exhibits, then, to

12   the Government so we can take those up, whether it be this

13   afternoon or tomorrow morning.

14        Anything else?  The jury is here.

15        MS. HOLLANDER:  Your Honor, I don't believe we can

16   give ours to the Government until we are finished with direct.

17   We are not going to be able to give them our cross

18   examination.  We will give them to them as soon as she is off

19   direct.

20        THE COURT:  And why do you think you can't do that?

21        MS. HOLLANDER:  For a number of reasons.  One is we

22   are not sure what they are until she finishes her direct.

23        Another is if we give them our exhibits -- You know, the

24   witness isn't supposed to know what you are doing on cross,

25   nor is the Government really, but certainly the witness is

1   not.  And if we give them to them now, they just basically get

2   an advantage of incorporating whatever it is that -- kind of

3   getting a telescope of the cross.

4       We can do it, and we thought we were doing it the same

5   way we did it during the first trial, which is that as soon as

6   they finish their direct --

7           THE COURT:  Except we have already had a trial here,

8   so I didn't see there was a big surprise.

9           MS. HOLLANDER:  Well, I think there may be some

10  different exhibits.  They may be exhibits being used

11  differently.  They are using exhibits differently.

12          THE COURT:  But they are giving you notice.

13          MS. HOLLANDER:  And they are using new exhibits.

14          THE COURT:  Yes, but they are giving you notice.

15          MS. HOLLANDER:  They are giving us notice, and we

16  will give them notice as soon as she finishes direct, on the

17  condition that they not show them to the witness, of course.

18          THE COURT:  That is fine.  But if they are not going

19  to show them to the witness, then I don't see any reason why

20  you can't give them to them sooner than that so that they can

21  prepare their objections and we can have these hearings.

22          MS. HOLLANDER:  If we know what they are.

23          THE COURT:  And I can't accept that, counsel.  I

24  can't accept that you haven't prepared your case sufficiently

25  to where you have some idea what your cross is going to be.  I

1    know you don't start planning your cross after she testifies.

2              MS. HOLLANDER:  We have some idea.

3              THE COURT:  Of course.

4              MS. HOLLANDER:  And I think that they know about.

5              THE COURT:  They don't know that if you haven't told

6    them, anymore than you knew exactly what they were going to

7    put on unless they tell you.  You have some idea from the last

8    trial, but they don't know.

9              MS. HOLLANDER:  Your Honor, obviously we will do

10   what you require us to do.

11             THE COURT:  That is what I am requiring you to do.

12             MS. HOLLANDER:  But I think that it is really,

13   frankly, from our perspective -- And I will let -- Ms. Moreno

14   wishes to address that.

15             THE COURT:  We will address that later.  The jury is

16   already here.  We will get started.

17        Mr. Dratel, is there something else?

18             MR. DRATEL:  There is something I would like to

19   approach on for reasons that Your Honor will understand when I

20   approach.  It will take one minute.

21             THE COURT:  Approach the bench.

22             (The following was had at the bench.)

23             MR. DRATEL:  I didn't want a conference already this

24   morning.

25             THE COURT:  I didn't either.

          MR. DRATEL:  Now I see the courtroom filling up, so

I just wanted to raise this here for obvious reasons.

     The Court indicated, and I don't know whether the Court

-- Thursday afternoon when we broke, the Court -- And I don't

know whether you were talking about this case or other matters

on the Court's docket when you said something about getting

stuff done Wednesday, which is the day that we are off.

          THE COURT:  That wasn't this conference that we held

this morning, but these kinds of conferences.

          MR. DRATEL:  Right.  But regardless of how much

progress is made in the next two days with respect these types

of issues, I would object to proceeding Wednesday under any

circumstances in the case because I am -- It is a religious

holiday for myself, for my client, and I don't think he should

be disadvantaged by our exercise of religious freedom, and I

just sort of register a formal objection to proceeding

tomorrow.

          THE COURT:  You said one minute.

          MR. DRATEL:  Okay.

          THE COURT:  You are overruled.

          (The following was had in open court.)

          THE COURT:  Bring in the jury.

          (Whereupon, the jury entered the courtroom.)

          THE COURT:  Ladies and gentlemen of the jury, good

morning.  We are ready to proceed.

1       Mr. Jonas?

2         MR. JONAS:  Thank you, sir.

3  Q.  (BY MR. JONAS)  Good morning, Agent Burns.

4  A.  Good morning.

5  Q.  Before we move to the next subject matter, I just wanted

6  to briefly go over some of the questions and answers that we

7  had on Thursday just to clarify some things.  Okay?

8  A.  Okay.

9  Q.  We discussed a document Elbarasse Search No. 8.  Do you

10  recall that document?

11  A.  I do.  If you will give me one second.  I have it.

12  Q.  Okay.

13        MR. JONAS:  If we can pull Elbarasse Search No. 8 on

14  the screen.

15  Q.  (BY MR. JONAS)  You had me at a disadvantage because I

16  don't have the exhibits with me.  There are a lot of exhibits

17  we are going to go through today, so I didn't bother bringing

18  binders up like you have there.

19     In particular, this document discusses a trip taken by

20  the Defendant Shukri Baker to the West Bank and Gaza.  Can you

21  tell us which page number that discussion is on.

22  A.  That is on page 6, paragraph C.

23  Q.  This discusses him going to the inside.  And what is the

24  inside again?

25  A.  Inside the Palestinian territories in Israel.

1    Q.   We also discussed a report of the trip which was marked

2    as InfoCom Search No. 51.  Do you recall that document?

3    A.   I do.

4    Q.   And we don't need to pull that one up.  Who authored

5    InfoCom Search No. 51?

6    A.   If you give me one second.

7    Q.   Sure.

8    A.   This was a report from Shukri Abu Baker.

9    Q.   And does that reference the trip that was discussed in

10   Elbarasse Search No. 8?

11   A.   It does.

12   Q.   And there is also another report of a trip that was

13   marked or in evidence as Ashqar Search No. 2.  Do you recall

14   that document?

15   A.   I do.

16   Q.   Do you know who authored that document?

17   A.   I do not know who authored that document.

18   Q.   Does that document relate in any way to the report

19   authored by the Defendant Shukri Baker in InfoCom Search

20   No. 51?

21   A.   Yes, it does.

22   Q.   How does it relate, based upon the exhibits you reviewed?

23   A.   This document, the one we are referring to now, which is

24   Ashqar Search No. 2, is a report of a trip in 1991 to the

25   Palestinian territories by someone -- based on the content, by

1  someone within the Palestinian Committee.  They were reporting

2  on Hamas activities in the territories.

3       In that document, if you will turn to page 11 --

4  Q.   Which exhibit is this?  InfoCom Search No. 51?

5  A.   Ashqar Search No. 2.

6            MR. JONAS:  Ashqar Search No. 2, page 11.

7            THE WITNESS:  Under Section K, the individual who

8  wrote this is reporting on activities in the Gaza area, which

9  is in the Palestinian territories.

10 Q.   (BY MR. JONAS)  And that is reflected in this document,

11 the Gaza Sector?

12 A.   Yes.  At the top you will see where it says the south

13 region and refers to the Gaza Sector.  And throughout this it

14 refers to the Movement, which is Hamas.

15      And under Section K, at the bottom if you will look, it

16 says, "The brothers asked Dr. Al-Zahar to open a center for

17 studies and research, and he approved that."  Doctor Al-Zahar,

18 as we identified last week, is Hamas leader Mahmoud Al-Zahar.

19           MR. JONAS:  Your Honor, for the record I am going to

20 hold up Demonstrative No. 17.

21 Q.   (BY MR. JONAS)  And he is here on this chart here?

22 A.   The closest to you.

23 Q.   Where I am pointing?

24 A.   Yes.  So this document is reporting that the brothers met

25 with that individual to discuss opening a center for studies

1   and research.  This document is based on a trip in 1991.

2       If you will turn back to Shukri Abu Baker's report from

3   1991 and turn to -- that exhibit number is InfoCom Search

4   No. 51.  If you will turn to page 11 under "Gaza," Shukri Abu

5   Baker reported that he met with Mr. Abu Khalid, Abu Nasser,

6   and some other officials.  They discussed with Mr. Abu Khalid

7   the subject of building a research organization.  Abu Khalid

8   is the nickname for Hamas leader Mahmoud Zahar.

9       So the way I connected these two reports is that the

10  individual who wrote Ashqar No. 2, the Hamas report, the

11  Palestinian Committee member was actually reporting on Shukri

12  Abu Baker's meeting with Hamas leader Mahmoud Zahar.

13  Q.   Okay.  Agent Burns, if you recall, when you testified on

14  Thursday I showed you Hamas Charter No. 2, which is in

15  evidence, and that is the Arabic version of the Hamas charter.

16  Do you recall that?

17  A.   I do.

18  Q.   Okay.  Who published that document?

19  A.   The IAP.

20  Q.   Did you find -- Where was that document found, if you

21  recall?

22  A.   That one was found at the home of Ismail Elbarasse.

23  Q.   Do you have before you Hamas Charter No. 1, which is not

24  in evidence?

25  A.   I do not have the Hamas charters here.

1          MR. JONAS:  Your Honor, one moment, please?

2          THE COURT:  Yes.

3    Q.   (BY MR. JONAS)  I am referring to Hamas Charter No. 3.

4          MR. JONAS:  And if I may approach, Your Honor?

5          THE COURT:  Yes.

6    Q.   (BY MR. JONAS)  Where was that document found?

7    A.   This document was found at the home of Ismail Elbarasse.

8    Q.   And without going into the contents, what is it?

9    A.   It is the English version of the Hamas charter.

10         MR. JONAS:  Your Honor, at this time I would offer

11   into evidence Hamas Charter No. 3.

12         THE COURT:  Any objections beyond what we have had?

13         That is admitted.

14   Q.   (BY MR. JONAS)  Agent Burns, you testified based upon the

15   Elbarasse search documents about a relationship between the

16   Holy Land Foundation the Islamic Association of Palestine.

17   Just to go back to that, what was the relationship between

18   those two organizations, from the Elbarasse search documents?

19   A.   Based on all the exhibits that we reviewed last week,

20   they were members of the Palestine Committee whose job it was

21   to support Hamas, according to the 1992 memorandum from the

22   international Muslim Brotherhood.

23         MR. JONAS:  And if we can quickly pull up Elbarasse

24   Search No. 10 on the screen.

25   Q.   (BY MR. JONAS)  Do you see the HLF and IAP on this chart?

A.    I do.

Q.    And does that support your statement about what you made

about the relationship between the HLF and the IAP?

A.    It does.  As we discussed on Thursday, the Central

Committee was the Palestine Committee.

Q.    Have you reviewed the Baker deposition that we discussed

the other day?

A.    Yes, I have.

Q.    And in the Baker deposition does the Defendant Shukri

Baker discuss the relationship between the HLF and the IAP?

A.    He is asked about it.

            MR. JONAS:  If we can put page 5 of that deposition

on the screen.  If we can enlarge it.

Q.    (BY MR. JONAS)  Do you see where it says --

            MR. JONAS:  One moment, Your Honor.

Q.    (BY MR. JONAS)  Agent Burns, do you have deposition page

64 and 65 in front of you?

A.    I do.

Q.    Okay.

            MR. JONAS:  We are trying to get it on the screen,

Your Honor.  I think because it is a Monday morning the

computer is a little groggy.

      And if you can enlarge the right hand column.

Q.    (BY MR. JONAS)  Can you read the question and the answer

regarding the relationship between the HLF and the IAP?

1  A.   I can.  The question that the lawyer asked is, "Now, you

2  understand" --

3  Q.   Agent Burns, let me provide you my copy.

4  A.   I will read it off the screen.  "Are you aware of any

5  relationship or affiliation of any sort between that entity

6  IAP and HLF?"

7       Shukri Abu Baker's answer is, "No affiliation.  But what

8  do you mean by relationship?  Can you itemize that?"

9       And the question, "Well, did you undertake any programs

10  together, work together in -- in any fashion?"

11       Answer:  "We had a business relationship with the IAP."

12       Question:  "Okay.  Can you describe for me in general

13  terms the nature of that business relationship?"

14       Answer:  "We advertised with their paper, and we used

15  their graphic design services.  There were invoices for that,

16  and we had a contract to help us through their grass roots

17  volunteers, help the Foundation through its grass root and

18  volunteers to help dispense Holy Land Foundation literature

19  and fund raising material."

20       Question:  "I've seen some indication that -- somewhere

21  that indicated that you were a member of an IAP advisory

22  board."

23       Answer:  "Yes."

24       Question:  "What was -- What was the advisory board?"

25       Answer:  "You know, we would meet once a year, just

1   discuss overall issues, strategies."

2   Q.   That is fine.  Agent Burns, has Shukri Baker discussed

3   the HLF and IAP being part of the Palestine Committee in his

4   deposition?

5   A.   No, he does snot.

6   Q.   Was the Defendant Mohammad El-Mezain also deposed in the

7   same lawsuit?

8   A.   He was.

9   Q.   And do you have his deposition before you?

10  A.   I do.

11  Q.   Okay.

12          MR. JONAS:  Your Honor, at this time, subject to the

13  discussion prior, I would offer into evidence the Defendant

14  Mohammad El-Mezain's deposition.

15          MR. DRATEL:  Your Honor, based on what Mr. Jonas is

16  doing now, and subject to the other previous objections --

17          THE COURT:  Give me that exhibit number again.

18          MR. JONAS:  The exhibit is Exhibit El-Mezain

19  deposition is the title of the exhibit.

20          THE COURT:  That is admitted.

21  Q.   (BY MR. JONAS)  Agent Burns, could you turn to page 25?

22  It is deposition page 25.

23  A.   Okay.

24          MR. JONAS:  I believe for purposes of putting it on

25  the screen, it is page 5.  If you could enlarge the top left

1    hand corner.

2    Q.   (BY MR. JONAS)  Starting with the question on line 2.

3              THE COURT:  Counsel, what are the dates of these

4    depositions?  Has that been established?

5    Q.   (BY MR. JONAS)  For the record, the date of this

6    deposition is what, Agent Burns?

7    A.   The date of this deposition is September 10th, 2003.

8    Q.   And the date of the Baker deposition?

9    A.   January 30th, 2003.

10   Q.   Okay.  If you can read this page, please.

11   A.   It says -- Mohammad El-Mezain's answer is, "You're

12   right."  Question:  "The MAYA conferences that you're

13   referring to, do you recall where those were held?"

14        Answer:  "I Don't recall exactly what one of them."

15        Question:  "Do you recall where whether any of them were

16   in Kansas City?"

17        Answer:  "I don't recall."

18        Question:  "The MAYA conferences where you met Mr. Ahmad

19   was either one of you a speaker at the conference?"

20        Answer:  "No."

21        Question:  "No?  Have you had any personal dealings with

22   Mr. Ahmad outside of the MAYA conferences --"

23        Answer:  "No."

24        Question "-- you testified about."

25   Q.   Let me interrupt you for a moment.  Based upon Elbarasse

1    Search No. 10, is that the document that listed out the

2    members of the Palestine Committee?

3    A.    Yes.

4    Q.    Who is Mr. Ahmad?

5    A.    Ahmed Yousef.

6    Q.    Continue please.  And is Ahmad Yousef one of the

7    individuals listed in the Palestine Committee document?

8    A.    He is.  You will see him referenced both as Ahmed Yousef

9    and Yousef Saleh.

10   Q.    Is the Defendant Mohammad El-Mezain also listed as a

11   members of the Palestine Committee on that document?

12   A.    Yes, he is.

13   Q.    Please continue reading.

14   A.    Question:  "Do you know a man by the name of Ismail

15   Elbarasse?"

16         Answer:  "Yes."

17         Question:  "How is it you know Mr. Elbarasse?"

18         Answer:  "One of the MAYA conferences also."

19         Question:  "Do you recall where that MAYA conference was

20   held?"

21         Answer:  "I don't know.  MAYA conferences, years, too

22   long."

23         Question:  "Do you recall roughly what the time frame was

24   you met Mr. Elbarasse at a MAYA conference?"

25         Answer:  "Is in the eighties."

1    Question:  "How about Mr. Omar Ahmad?  Can you tell me

2  the time frame?"

3    Answer:  "It is in the eighties."

4    Question:  "So you met both of these gentlemen at MAYA

5  conferences in the eighties?"

6    Answer:  "Yeah."

7    And excuse me.  I was referring to another part of the

8  deposition.  When he said Mr. Ahmad, he was referring to Mr.

9  Omar Amhad not Ahmed Yousef.

10  Q.    Who is Omar Ahmad?

11  A.    He was a member of the IAP, also a member of the

12  Palestine Committee.

13  Q.    Is he on the same list of the Defendant El-Mezain in

14  Elbarasse Search No. 10?

15  A.    Yes, he.

16  Q.    Agent Burns, was the Defendant Mohammad El-Mezain

17  questioned about the relationship between the HLF and the IAP

18  in his deposition?

19  A.    Yes, he was.

20  Q.    If you can turn to deposition page 87.

21    MR. JONAS:  Which I believe is page 8 for the

22  purposes of pulling it up on the screen.  No, I was wrong.

23  Take that down.

24  Q.    (BY MR. JONAS)  Agent Burns, just read on deposition page

25  87 line 15 where the Defendant El-Mezain discusses a

1    relationship between the HLF and IAP.

2    A.    Give me one second to see where it begins.

3    Q.    Line 15 on page 87.

4    A.    Okay.  The question is, "Do you know of any relationship

5    or dealings that any of you principals of the Holy Land

6    Foundation had with the Islamic Association for Palestine in

7    January of 1989 that would have caused IAP to know about the

8    Occupied Land Fund and what it was doing?"

9         Answer:  "No.  Actually we -- You asked me before about

10   the people of IAP, and I said to you we know these people but

11   we don't have any relation with them, and they know that we

12   have established Occupied Land Fund in that time.  Not only

13   the IAP actually, it became like, let me see, a custom with

14   the Muslim organizations to recommend a good organization for

15   the good cause."

16   Q.    Again, Elbarasse Search No. 10, what does that document

17   indicate the relationship between the IAP and HLF is?

18   A.    That they were both organizations within the Palestine

19   Committee working together.

20         MS. MORENO:  Excuse me, Your Honor.  I apologize for

21   interrupting.  With respect to both the Baker deposition and

22   the El-Mezain deposition, we would ask on behalf of Mr. Elashi

23   for a limiting instruction to the jury.

24         THE COURT:  And we will come back to that later.

25         Go ahead.

1    Q.   (BY MR. JONAS)  Agent Burns, were there any -- Withdrawn.

2    In the Elbarasse search documents, do you recall there being

3    discussions about there being Palestine committees in other

4    countries?

5    A.   I do.

6    Q.   Was there one document that discussed any of the

7    Defendants traveling to another country in order to help

8    establish the Palestine Committee?

9    A.   Yes.  That Occupied Land Fund report we discussed

10   earlier.

11   Q.   And what did that say, if you recall?  If not, we can

12   pull the exhibit up on the screen.  And we discussed that on

13   Thursday.  Correct?

14   A.   We did.  And I have the exhibit here and I can tell you

15   what it says.  It was Elbarasse Search No. 8.  And under that

16   page 6 -- Do you --

17          MR. JONAS:  If we can put it on the screen.

18   Q.   (BY MR. JONAS)  Which exhibit is this?

19   A.   Elbarasse Search No. 8, page 6.  No. 8 at the bottom

20   under the Central Committee for charity work, it says,

21   "Brother Ghassan," which is the Defendant Ghassan Elashi, "is

22   currently on a visit to Britain representing the Fund in order

23   to study the possibility of forming a Central Committee for

24   charity work affiliated with the Apparatus in all the

25   countries with the goal of coordination, exchange of

1    experience, and finding the best ways to increase donations,

2    and to quickly respond to the request of the people inside."

3         MS. HOLLANDER:  Excuse me.  Your Honor, I am just

4    going to object to just repeating testimony here that the jury

5    already heard on Friday, and object to repeating the

6    testimony, exactly the same testimony.

7         THE COURT:  Overrule the objection.  He is

8    connecting it to a new exhibit.  Go ahead.

9    Q.   (BY MR. JONAS)  Agent Burns, were there any phone

10   conversations involving the Defendants where they discussed

11   the Palestine Committee in another country?

12   A.   Yes.

13   Q.   Do you have before you HLF Wiretap No. 2?  I know you

14   have several binders you need to look through.

15   A.   If you will bear with me.  I have it.

16   Q.   Okay.  Who are the participants on that call?

17   A.   The Defendant Shukri Abu Baker, Akram Mishal.

18   Q.   Who is Akram Mishal?

19   A.   He was an HLF officer.  And Ramsey Abu Baker.

20   Q.   What is the date of the call?

21   A.   June 25th, 2001.

22        MR. JONAS:  Your Honor, at this time I would offer

23   into evidence HLF Wiretap No. 2.

24        THE COURT:  And those have been admitted.  Those

25   ones we admitted this morning.  Are you also offering 2-A?

1          MR. JONAS:  Yes.  Thank you, Your Honor.

2     Q.   (BY MR. JONAS)  Agent Burns, I don't want to play the

3     whole call now.  I think there are going to be portions that

4     we will address later on.  But if you can turn to page 4 of

5     that transcript of HLF Wiretap No. 2.

6          Agent Burns, do you see the line where it starts "AK"?

7     A.   I do.

8     Q.   Who is that?

9     A.   That is Akram Mishal, the HLF officer.

10    Q.   And where it says "SH" underneath that, who is that?

11    A.   That is Shukri Abu Baker.

12    Q.   Okay.

13    A.   The Defendant.

14    Q.   I just want you to read this page and then some of the

15    next page, if you would, please?

16    A.   Okay.  Akram Mishal says, "Hello."

17         Shukri says, "Peace be upon you."

18         "Upon you be peace."

19         "How are you?"

20         "Praise be to God.  What's new?"

21         "Good."

22         "This guy, a person named Mahmoud Ghazal called me from

23    Jeddah.  Who is he?"

24         Akram Mishal says, "I believe he's from the Palestine

25    Committee."

1          "Hmm."

2          "When did he call you?  Today?"

3          "He left me a message today."

4          "Where?  At home or --"

5          "No, on the -- At the foundation."

6     Q.    And the top of the next page.

7     A.    "Strange.  Its possible that he left it and someone

8     transferred it to you."

9          "Hmm."

10          "Yes, yes.  Maybe I called him or I sent him a fax."

11          "Yes.  They are from the Palestine Committee in the world

12     assembly."

13          "Yes, yes."

14          "Uh-huh."

15          "Okay.  Call him and see what he wants.  I wanted to --"

16     Q.    That is good enough.  That is fine.

17          Agent Burns, I want to move away to another subject, and

18     I want to talk to you about the HLF money in the early years

19     of the Holy Land Foundation's life.  Okay?

20          Do you recall some of the Elbarasse documents talked

21     about how much Holy Land Foundation raised in those early

22     years and sent over to the West Bank and Gaza?

23     A.    Yes.

24     Q.    Did you review any records that talk about how much money

25     was sent over to those areas?

```
 1    A.    I did.

 2    Q.    And I don't want to be that specific.  I am just talking

 3    about any money that they sent out from their bank accounts at

 4    all.

 5    A.    Yes.  I reviewed their bank account records from the bank

 6    account they held at NAIT.

 7    Q.    Did you review other records as well?

 8    A.    I did.  I reviewed search warrant material, things like

 9    that.

10    Q.    Generally, without getting into the description of

11    specific items, can you just summarize what you reviewed, what

12    it revealed?

13    A.    Are you talking about a specific year or --

14    Q.    1988.

15    A.    1988.  The financial documents from the bank accounts and

16    the search warrant material, actually from the bank account I

17    think pretty much solely, indicated that a majority of the

18    HLF's money during that year was distributed to Mousa Abu

19    Marzook, his associates, and other individuals and entities

20    that were part of the Palestine Committee.

21    Q.    Did you create a chart that summarizes these

22    transactions?

23    A.    I did.

24    Q.    Do you have before you what has been marked as OLF 1988

25    Disbursements?
```

```
1   A.   I do.

2   Q.   Is this chart based upon documents currently in evidence?

3   A.   Yes.

4   Q.   Would this chart aid the jury in understanding your

5   testimony?

6   A.   Yes, it will.

7               MR. JONAS:  Your Honor, at this time I would offer

8   into evidence OLF 1988 Disbursements.

9               MS. HOLLANDER:  We have no objection, assuming it is

10  accurate, Your Honor.

11              THE COURT:  That is admitted.

12              MS. HOLLANDER:  Actually I do have one objection

13  which is remoteness, 1988.

14              THE COURT:  That is overruled.

15              MS. CADEDDU:  Is this a demonstrative?

16              THE COURT:  No, ma'am.  They are offering it --

17              MR. JONAS:  As a 1006 summary chart.

18              THE COURT:  OLF 1988 is admitted.

19              MR. JONAS:  Can we put the first page on the screen,

20  please?

21  Q.   (BY MR. JONAS)  Agent Burns, before we get into the

22  substance of the transactions, I would like you just to

23  explain to us how this chart is constructed.

24  A.   Okay.  The chart is constructed hopefully to make it easy

25  to understand this mountain of bank records that we have.
```

1    The first column includes the date of the transaction.

2  The next column indicates the source, where the payment in

3  that transaction came from.  In this chart in particular, all

4  of the payments came from the Holy Land Foundation when it was

5  known as the Occupied Land Fund.

6  Q.   Let me interrupt you as you go along.  It says underneath

7  the Occupied Land Fund "North America Islamic Trust."  What is

8  that?

9  A.   That is NAIT, the Muslim Brotherhood organization that we

10  spoke about last week, and that is the entity through which

11  the HLF held its initial bank account.

12  Q.   Okay.  Continue.

13  A.   Under the next section which is entitled "Authorization,"

14  on this chart it merely indicates whether or not the

15  transaction was done with a wire transfer or a check or

16  whether there was an expense voucher, and if on a particular

17  transaction an individual was linked to the transaction.  For

18  example, if the Defendant Shukri Abu Baker requested the

19  transfer, his name will appear in this column as well.

20    The next column is the amount of the transaction.  The

21  following column is the destination.  That is to whom the

22  payment was made.  And finally, the last column is the column

23  for exhibit number, which tells you the exhibit number and

24  specific page that you can go to and look at to see the actual

25  item that represents what is noted on this chart.

1  Q.    And in that particular column there is an I next to some

2  of the page numbers and an S.  What does that mean?

3  A.    I represents the item, whether it be a check or expense

4  voucher or something like that.  S would indicate the actual

5  statement.

6      And on this I would need to note that NAIT was not a

7  traditional bank like we are used to seeing, so the records

8  from NAIT appear different.  There are a lot of handwritten

9  records and the bank statements look different than what you

10 would expect to see from a Bank of America, for example.

11 Q.    When you look under authorization, just looking at the

12 first one as an example where there is a check and the number,

13 what does that number represent?  Do you see 702648?

14 A.    That would be like the transaction number.

15 Q.    Okay.  Or the check number?

16 A.    The check number.

17 Q.    Underneath that it says EXP voucher.  What does that

18 mean?

19 A.    Expense voucher.

20 Q.    Where do you get that from?

21 A.    From the records themselves.

22 Q.    Well, let's look at some of these transactions.  We are

23 on the first one.  We see its destination to MAYA.  Have we

24 seen MAYA somewhere else in some of the documents already

25 admitted?

A.   We have.  It was referenced on some of the documents that

we looked at on Thursday indicating that it was part of the

Muslim Brotherhood's organizations.  If you will recall, the

document that was in Arabic that had the last page attached to

it with the list in English of the "organizations of our

organizations the organizations of our friends," it was listed

there.  It was also listed on that chart that we saw of the

Muslim Brotherhood's apparatuses, and Shukri Abu Baker's name

was affiliated with it.

Q.   Okay.  Getting back to the first document you referenced

that had the list of the Muslim Brotherhood organizations, to

be clear, is that Muslim Brotherhood organizations in the

United States?

A.   That is correct.

Q.   And on that same list was the HLF mentioned?

A.   Yes, it was.

Q.   Okay.  The next transaction you see is a $10,000 check to

Yousef Salah.  Do you know who Yousef Saleh is?

A.   Yes.  He is one of the members of the Palestine Committee

who was a part of the United Association for Studies and

Research, the UASR.

        MR. JONAS:  If we can pull up what is in evidence

Secretary of State VA-1, please, page 2 of that document.

Enlarge the bottom half, please.

Q.   (BY MR. JONAS)  What is this document again, Secretary of

1    State VA-1?

2    A.    These are the articles of incorporation for the United

3    Association for Studies and Research.

4    Q.    And what is that organization again?

5    A.    That was the -- We call it the UASR.  It was listed on

6    several of those documents you saw on Thursday, and is part of

7    the Palestine Committee.

8    Q.    So what does this identify Yousef Salah's role with the

9    UASR?

10   A.    On this part it lists him as a director.

11          MR. JONAS:  If we can turn to page 3, please.

12   Q.    (BY MR. JONAS)  And we see that again his name as a

13   director?

14   A.    That is correct.

15   Q.    Does this document also have Mousa Abu Marzook as an

16   individual associated with the UASR?

17   A.    From the earlier papers, yes, it does.

18   Q.    We covered that last week.  Correct?

19   A.    We did.

20          MR. JONAS:  If we can go back to the OLF 1988

21   disbursements, please, page 1.

22   Q.    (BY MR. JONAS)  Agent Burns, how many pages is this

23   chart?

24   A.    Four pages.

25   Q.    Do you know every recipient on there?  Are you able to

1    identify every recipient?

2    A.    No.  There are some on here that I wasn't able to

3    identify, but I know a lot of them.

4    Q.    We see Fawaz Mushtaha, who is receiving a $20,000 wire on

5    April 15th, 1988.  Do you see that document?

6    A.    I do.

7              MR. JONAS:  Why don't we pull up NAIT Exhibit page

8    5, which references the supporting document for that

9    transaction.

10   Q.    (BY MR. JONAS)  Do you see that document before you,

11   Agent Burns?

12   A.    I do.

13   Q.    What is that?

14   A.    This is a request for a wire transfer to Fawaz Mushtaha

15   for $20,000.  And it is noted at the bottom, if you will look,

16   it says "customer account, Occupied Land Fund."

17   Q.    Who was Fawaz Mushtaha?

18   A.    He was the Palestine Committee member whose yard the

19   videotapes were found in.

20   Q.    Is he also in the band?

21   A.    He is.

22   Q.    Okay.

23   A.    Or was.

24   Q.    Going down on this -- Staying with the same page, do you

25   recognize any other members of the Palestine committee on the

1    document you already discussed?

2    A.    On the disbursement schedule on page 1?

3    Q.    Yes.

4    A.    Yes.  I think it is not on the screen yet.

5              MR. JONAS:  Pull up 1988 OLF Disbursements.

6              THE WITNESS:  The person listed after Fawaz Mushtaha

7    is Hamas leader Mousa Abu Marzook.

8              MR. JONAS:  If we can turn to the second page of

9    this document.

10   Q.    (BY MR. JONAS)  And do you see there is a transaction to

11   an individual named Nadia Elashi?

12   A.    Yes.

13   Q.    And if we can -- Who is Nadia Elashi, if you know?

14   A.    She is the wife of Hamas leader Mousa Abu Marzook and the

15   cousin of the Defendant Ghassan Elashi.

16   Q.    Okay.

17             MR. JONAS:  If we can turn to the third page,

18   please.

19   Q.    (BY MR. JONAS)  Do you see there is $50,035 wire to a

20   company called K&A Overseas Trading?

21   A.    Yes.  There are a number of those transactions on this

22   page to K&A.

23   Q.    Did you create a sort of sub chart to K&A Trading?

24   A.    I did.

25   Q.    We will get to that in just a moment.

1          Did you also create a summary chart for the 1989 OLF or

2    HLF Disbursements.

3    A.    I did.

4    Q.    And do you have that before you?

5    A.    I do.

6    Q.    What is that sub chart -- What is that chart based upon?

7    A.    It is a summary of the HLF disbursements in the year

8    1989, its second year of operation.

9    Q.    And do these come from the NAIT records as well, like the

10   prior chart?

11   A.    Yes.

12          MR. JONAS:  Your Honor, at this time I would offer

13   into evidence Government's exhibit OLF 1989 Disbursements.

14          THE COURT:  Same objections?

15          MS. HOLLANDER:  Same objections, Your Honor.

16          THE COURT:  Those are overruled, and that is

17   admitted.

18          MR. JONAS:  If we can pull that on the screen,

19   please, page 1.

20   Q.    (BY MR. JONAS)  Agent Burns, do you see that before you?

21   A.    I do.

22   Q.    All right.  Do you see the second transaction on that

23   screen, January 23rd, 1989?

24   A.    I do.

25   Q.    You testified Nadia Elashi is Mousa Abu Marzook's wife?

1    A.    That is correct.

2         MR. JONAS:  If we can pull up the NAIT records, page

3    37.

4    Q.    (BY MR. JONAS)  What is that item on the screen?

5    A.    That is a check from NAIT out of the Occupied Land Fund's

6    account to Nadia Elashi for $10,000 on January 23rd, 1989.

7    Q.    During the course of your investigation, did you come

8    across anything indicating whether Nadia Elashi was a charity

9    or needy person?

10   A.    No, I did not.

11   Q.    Going back to the 1989 disbursements, please, do you see

12   there are payments made to the Islamic Center of Gaza?

13   A.    Yes.

14   Q.    Did you create a sub chart of those payments as well?

15   A.    I did.

16   Q.    How much money was paid out?  If you go to the third

17   page.

18   A.    In 1989, approximately $956,705.

19   Q.    Did you come across anything in the documents that

20   indicated how much HLF claimed to have made or taken in

21   donations in 1988 and '89?

22   A.    I found some documents in English that indicated what

23   they said they made in those two years.

24   Q.    Do you have HLF Search No. 7 before you?

25   A.    I do.

1    Q.   Okay.  Does that document indicate how much was received

2    by the HLF in these early years?

3    A.   Yes.

4         MR. JONAS:  Your Honor, at this time I would offer

5    into evidence HLF Search No. 7.

6         THE COURT:  That is admitted from this morning.

7         MR. JONAS:  If we can put that on the screen,

8    please.

9    Q.   (BY MR. JONAS)  Does this indicate how much money the HLF

10   made in 1988?

11        MR. JONAS:  If we can enlarge the middle half,

12   please?

13   Q.   (BY MR. JONAS)  I am sorry.  Before we do that, what is

14   the document entitled?

15   A.   This document, which came from the HLF -- one of the

16   computers in the HLF offices, was originally in English and is

17   titled "The Holy Land Foundation:  A story of growth and

18   prosperity."

19        MR. JONAS:  If we can enlarge the middle half where

20   it says "Income."

21   Q.   (BY MR. JONAS)  How much income did they receive in 1988?

22   A.   The stated income here is $300.

23   Q.   And how about 1989?

24   A.   $400.

25   Q.   Did you come across any other documentation that

1  indicates how much money they may have received in 1989?

2  A.   I did.

3  Q.   Do you have before you HLF Search No. 8?

4  A.   I do.

5  Q.   Okay.  Does that document indicate income from the HLF?

6  A.   It does.

7        MR. JONAS:  Your Honor, at this time I would offer

8  into evidence HLF Search No. 8.

9        THE COURT:  And that is admitted.

10        MR. JONAS:  If we can put the first page on the

11  screen, please.

12  Q.   (BY MR. JONAS)  For the year 1989 how much -- Well,

13  withdrawn.  What does this document purport to be?

14  A.   It is an IRS Form 8734 that was found at the HLF's Dallas

15  office, and it says "support schedule for advance ruling

16  period."  It basically contains records regarding income for

17  the Holy Land Foundation between 1989 and 1993.

18  Q.   Agent Burns, does it have a date on the top right hand

19  side?

20  A.   It does.  April 1st, 1994.

21  Q.   Do you know -- You are not an IRS agent.  Right?

22  A.   No, I am not.

23  Q.   Do you know what the purpose of this form is?

24  A.   No, I don't.

25  Q.   Outside of seeing this document itself, have you studied

1  these forms?

2  A.    I have not.

3  Q.    Line 1 says "Gifts, grants, and contributions received."

4  How much do they indicate in this document that they received

5  in 1989?

6  A.    $210,275.

7  Q.    Do you have -- Did Shukri Baker ever publicly say how

8  much they received in 1989?

9  A.    Yes, he did.

10  Q.    Okay.  Do you have before you what is marked as Baker

11  Declaration?

12  A.    I do.

13  Q.    And without getting into details, what is Baker

14  Declaration?

15  A.    This is a written sworn statement by Shukri Abu Baker to

16  a federal court.

17  Q.    Part of a lawsuit?

18  A.    It is.

19       MR. JONAS:  Your Honor, at this time I would offer

20  into evidence Baker Declaration.

21       MS. HOLLANDER:  Nothing beyond, Your Honor.

22       THE COURT:  All right.  That is admitted.

23       MR. JONAS:  If we can put page 2 on the screen,

24  please.

25  Q.    (BY MR. JONAS)  Agent Burns, in this item how much is

1   Shukri Baker saying HLF took in for 1989 or 1990, at least?

2   A.   And just for reference, the document is dated April 4th,

3   2002, and on page 2, no. 13, it says, "Because...has taken our

4   records, I am providing many of the financial and other

5   details from memory.  During our first year of fundraising

6   ending in 1990, we raised approximately $700,000.  Because the

7   Intifada was going on in Palestine, we focused our charity on

8   orphans, food, and aid to hospitals."

9   Q.   So he is saying 1990 was their first year of fundraising?

10  A.   That is what he says in this sworn statement.

11  Q.   In the 1989 OLF Disbursements, how much did the OLF

12  disburse again?

13  A.   To be accurate, let me check.  In 1989, $956,705.

14  Q.   Did you come across any item in your review of the search

15  warrant material, or all the material, indicating where they

16  would have gotten $956,000 from?

17  A.   Not other than -- No.

18  Q.   We talked a moment ago about these charts I asked you,

19  charts that came from the 1988 and 1989 disbursements.

20  A.   Yes.

21  Q.   Do you recall that?

22  A.   I do.

23  Q.   Okay.  We saw on one of the charts were payments to --

24  Correct me if I am wrong.  On one of the charts do we see

25  payments to an organization known as the Islamic Center of

1  Gaza?

2  A.     Yes.  That was the 1989 disbursement chart.

3  Q.     And do you know what the Islamic Center of Gaza is?

4  A.     Yes, I do.

5  Q.     Have you seen anything in any of the search warrant

6  material of the HLF that indicates what that entity or

7  organization is?

8  A.     Yes.

9  Q.     Do you have before you HLF Search No. 108?

10  A.     I do.

11  Q.     What is that item?

12  A.     This is a Middle East Affairs Journal from the summer of

13  1996 published by the UASR found at the Holy Land Foundation.

14  Q.     And does this Middle East Affairs Journal indicate

15  anywhere anything about the Islamic Center for Gaza?

16  A.     It does.

17         MR. JONAS:  Your Honor, at this time I would offer

18  into evidence HLF Search No. 108.

19         THE COURT:  And that is admitted.

20  Q.     (BY MR. JONAS)  Agent Burns, if you can turn to page 105

21  of this document.

22  A.     I have it.

23  Q.     Do you see -- On the top of 105, what does it say about

24  the Islamic Center of Gaza?

25  A.     It says --

1   Q.   If you can read --

2   A.   I am sorry.  I have too many binders.  It says, "In order

3   to manage the Palestinian Brotherhood's daily activities,

4   however, Yassin established al-Mujamma' al-Islami (The Islamic

5   Center) in Gaza.  He served as its secretary general until

6   1984.  The Center eventually coordinated the activities of all

7   organizations administered by the local Brotherhood."

8   Q.   Is the word in brotherhood in caps?

9   A.   It is.

10  Q.   Indicating it is an entity?

11  A.   Yes.

12  Q.   And let me just show you again Demonstrative No. 17.  It

13  says Yassin.  Who is Yassin?

14  A.   The founder and former spiritual leader of Hamas; the one

15  in the middle on the top.

16  Q.   Sheikh Ahmed Yassin?

17  A.   That is correct.

18  Q.   By the way, does this article identify any other member

19  of Hamas we just saw on the chart, Demonstrative No. 17?  And

20  to make it easier for you, I will direct your attention to

21  page 106, the bottom half.

22  A.   It does.

23  Q.   And that particular paragraph --

24       MR. JONAS:  Can we get the elmo?

25  Q.   (BY MR. JONAS)  Do you see what the title of that

1   particular section of this article is?

2   A.    I do.

3   Q.    What is that?

4   A.    "Hamas."

5        MR. DRATEL:  I just object on hearsay grounds, Your

6   Honor, this journal.

7        THE COURT:  That has been admitted.  That has been

8   overruled and that is admitted.  That is HLF Search No. 108?

9        MR. JONAS:  Yes.

10        THE COURT:  That has been admitted.

11        MS. CADEDDU:  This would be one of the documents I

12   would request a limiting instruction on.

13        MR. DRATEL:  Yes.

14        THE COURT:  All right.  Go ahead.

15   Q.   (BY MR. JONAS)  Agent Burns, who does can it identify as

16   other members of Hamas, or the brotherhood as it says?

17   A.    It identifies -- Under the section, the second paragraph,

18   you will see where it begins, it says, "The Brotherhood began

19   developing a strategy for dealing with the situation.  These

20   were Sheikh Ahmed Yassin" -- The person on the top the middle.

21        MR. JONAS:  For the record, Your Honor, I am holding

22   up Demonstrative No. 17 again.

23        THE WITNESS:  Dr. Abdel Aziz Rantisi.

24   Q.   (BY MR. JONAS)  Is that the individual I am pointing to

25   on Demonstrative No. 17?

1   A.   It is.

2        Ibrahim al-Yazuri.

3   Q.   I don't see him on the chart.

4   A.   He is not on the chart.

5        Salih Shihada.

6   Q.   Also not on the chart.

7   A.   No.  Isa al-Nashar, Muhammad Shama'a, and Abd al-Fattah

8   Dukhan.

9   Q.   Getting back to the Islamic Center of Gaza, Agent Burns,

10  did you find anything else that identifies what this

11  organization is within the search marked material you

12  reviewed?

13  A.   Yes.

14  Q.   Do you have before you what has been marked as InfoCom

15  Search No. 28?

16  A.   I do.

17  Q.   What is that item?

18  A.   This was a manual from InfoCom which discusses the

19  Islamic Center of Gaza, along with a number of other zakat

20  committees.

21  Q.   Is there a page number that discusses the Islamic Center

22  of Gaza?

23  A.   Yes.

24           MS. HOLLANDER:  What was the number of this exhibit?

25           MR. JONAS:  InfoCom Search No. 28.

1        Your Honor, at this time I would offer into evidence

2   InfoCom Search No. 28.

3            THE COURT:  And that is admitted.

4   Q.   (BY MR. JONAS)  Agent Burns, if you turn to page 98 of

5   that exhibit.

6   A.   I have it.

7   Q.   What does it say about the Islamic Center of Gaza?

8   A.   It says, "The Islamic complex"--which is the same thing

9   as the Islamic Center; the Arabic name is al-Mujamma'

10  al-Islami and can be translated both ways--"was founded in

11  1973 by a group of Muslims led by Mujahid Sheikh Ahmed

12  Yassin."

13  Q.   That is the same individual we pointed out on the chart

14  as being the leader of Hamas?

15  A.   That is correct.  And some of the names below were some

16  of the names that were identified in the Middle Eastern

17  Affairs Journal that we just looked at.

18  Q.   Okay.  Agent Burns, did you create some sort of a

19  mini-chart or summary chart for payments to the Islamic Center

20  of Gaza from the HLF?

21  A.   Yes.

22  Q.   Do you have before you a chart that is marked as Payments

23  To IC/Gaza?

24  A.   I do.

25  Q.   Is that based upon records already admitted into

1   evidence, as well as other bank records?

2   A.    Yes.  It is based on, as you said, records that have

3   already been admitted and a few additional bank records.

4   Q.    Okay.

5          MR. JONAS:  Your Honor, at this time I would offer

6   into evidence the chart marked as Payments To IC/Gaza.

7          MR. DRATEL:  One moment, Your Honor.

8          THE COURT:  All right.

9          MR. DRATEL:  Just as to time frame, Your Honor.

10         THE COURT:  Do you want to establish a time frame?

11         MR. DRATEL:  The information -- In other words --

12  Q.    (BY MR. JONAS)  Agent Burns, when is the first

13  transaction between the Holy Land Foundation and the Islamic

14  Center of Gaza?

15  A.    1989.

16  Q.    When is the last transaction?

17  A.    The last transaction on the chart is July 20th, 1994.

18  Q.    Okay.

19         THE COURT:  And that is document --

20         MR. JONAS:  Payments to IC, which stands for Islamic

21  center /Gaza.

22         THE COURT:  That is admitted.

23  Q.    (BY MR. JONAS)  And Agent Burns, you said this is based

24  upon just not the NAIT records.  Is that correct?  But other

25  records as well?

```
 1   A.    That is correct.

 2            MR. JONAS:  Your Honor, for the record I am going to

 3   offer into evidence the other supporting documentation to this

 4   chart, and I will go through them.

 5   Q.   (BY MR. JONAS)  Agent Burns, what is HLF Bank Account No.

 6   3?

 7   A.    That is one of the HLF's bank accounts.

 8   Q.    Okay.

 9            MR. JONAS:  Your Honor, at this time I would offer

10   into evidence HLF Bank Account No. 3.

11            MR. DRATEL:  Same objection, Your Honor.

12            THE COURT:  Do you have several of those you are

13   going to do?

14            MR. JONAS:  Yes.

15            THE COURT:  Just Ask them all and then offer them

16   all at once.

17   Q.   (BY MR. JONAS)  HLF Search No. 42, what is that?

18   A.    It is A document seized in the HLF search warrant that

19   relates to this chart.

20   Q.    Are those documents pertaining specifically to the

21   payments to the Islamic Center of Gaza?

22   A.    Yes.

23   Q.    InfoCom Search No. 20, what is that?

24   A.    That is a document that was seized from the InfoCom

25   search warrant that relate to transactions in this chart.
```

1    Q.    Okay.  Payments between the Holy Land Foundation and the

2    Islamic Center of Gaza?

3    A.    It says the Islamic Society here, but.

4    Q.    HLF Foreign Account No. 1, what is that?

5    A.    That was one of the HLF's foreign bank records, bank

6    account that it held in a foreign country.

7    Q.    Okay.

8              THE COURT:  What was the number?

9              MR. JONAS:  HLF Foreign Account No. 1.

10   Q.    (BY MR. JONAS)  And HLF Search No. 108?

11             THE COURT:  You did that one already.

12             MR. JONAS:  You are right.  I am sorry, Your Honor.

13   Q.    (BY MR. JONAS)  And finally InfoCom Search No. 28?

14             THE COURT:  You have done that one as well.

15             MR. JONAS:  Thank you, sir.

16        So I offer into evidence HLF Bank Account No. 3, HLF

17   Search No. 42, InfoCom Search No. 20, HLF Bank Account No. 1,

18   and HLF Foreign Bank Account No. 1.

19             MR. DRATEL:  Same objection, Your Honor.

20             THE COURT:  Okay.  And those are overruled, and

21   those documents are admitted.

22   Q.    (BY MR. JONAS)  Agent Burns, before we get into the

23   substance of this chart, Islamic Center of Gaza, did you

24   assist in creating a chart that just lists out all the bank

25   accounts that are going to be referred to in this case?

1    A.    Yes.

2    Q.    Would that chart aid the jury in understanding your

3    testimony?

4    A.    It would.

5    Q.    Okay.

6          MR. JONAS:  Your Honor, at this time --

7    Q.    (BY MR. JONAS)  I don't know if you have it before you.

8          MR. JONAS:  May I have one moment, Your Honor?

9          THE COURT:  Go ahead.

10   Q.    (BY MR. JONAS)  Agent Burns, let me show you what has

11   been marked as I believe it is Bank Accounts.  Is this the

12   chart you are referring to?

13   A.    Yes.

14         MR. JONAS:  Your Honor, I offer into evidence as a

15   1006 summary the chart marked Bank Accounts, and we have a

16   smaller version as well.

17         THE COURT:  Counsel?

18         MR. WESTFALL:  We are fine with it, Your Honor.

19         MS. HOLLANDER:  No objection.

20         THE COURT:  That summary chart styled Bank Accounts

21   is admitted.

22   Q.    (BY MR. JONAS)  Agent Burns, I think we will keep this up

23   there since we are going to be referring to other exhibits as

24   well.

25         MS. HOLLANDER:  I can't see the witness, Your Honor,

1   is the problem.

2           THE COURT:  And feel free to move, Ms. Hollander,

3   and all counsel, if you need to move.

4           MR. JONAS:  Okay.  If we could pull up the chart

5   Payments To IC/Gaza, if we have that.

6   Q.  (BY MR. JONAS)  Agent Burns, let's look at the first

7   transaction, April 26, 1989.

8           MR. JONAS:  And if we could pull up NAIT record page

9   176.

10  Q.  (BY MR. JONAS)  Okay.  Who authorized this transaction to

11  the Islamic Center of Gaza?

12  A.   If you will look at the bottom, it says "withdrawal

13  requested by brother Shukri Abu Baker."  That would be the

14  Defendant.

15          MR. JONAS:  Okay.  If we can look at NAIT record

16  page 74, which is another one of these transactions.

17  Q.  (BY MR. JONAS)  Who authorized this transaction to the

18  Islamic Center of Gaza?

19  A.   The bottom section under withdrawal requested by brother

20  Mohd. Mezain and brother Shukri.

21  Q.  Who is Mohd. Mezain?

22  A.   It is like a shortened form for Mohammed, which would be

23  the Defendant Mohammad El-Mezain.  And Shukri would be the

24  Defendant Shukri Abu Baker.

25  Q.  How much is this transaction for?

1    A.    I believe it said $50,000.

2    Q.    Your chart reflects a transaction of $50,035.  Do you

3    know what the $35 would have been for?

4    A.    Likely for wire transfer fees.

5          MR. JONAS:  If we can look at NAIT page 103, please.

6    Q.    (BY MR. JONAS)  This is transaction dated September 21st,

7    1989 for $100,000, not including the $35 fee.  Who authorized

8    this transaction?

9    A.    If you will look at the bottom, it says "withdrawal

10   requested by brother Abu Ibrahim," which that is the nickname

11   for the Defendant Mohammad El-Mezain.

12         MR. JONAS:  If we can look HLF Bank Account No. 3,

13   please, page 7.

14         MS. HOLLANDER:  Excuse me, counsel.  Have these

15   documents been introduced?

16         MR. JONAS:  Yes, they have.  I just introduced some

17   of these just now.

18   Q.    (BY MR. JONAS)  Can you make out -- Is this also to the

19   Islamic Center?

20   A.    It is.  That is the name that I referred to earlier

21   al-Mujama'a al-Islami.  That is the written Arabic that

22   translates into the Islamic Center or the Islamic Complex of

23   Gaza.

24   Q.    And we saw that in the book HLF Search No. 108?

25   A.    That is correct.

1    Q.    Do you see who authorized or who signed this check?

2    A.    This one is signed by Ghassan Elashi.  It is a little bit

3    dark on my screen, but you can see it at the bottom there.

4    Q.    You recognize his signature?

5    A.    I do.

6    Q.    What is the date of this check?

7    A.    June 20th, 1990.

8    Q.    And how much money?

9    A.    $25,000.

10           MR. JONAS:  If we can go back to the chart Payments

11   To IC/Gaza, please, page 2.

12   Q.    (BY MR. JONAS)  Agent Burns, do you see the transaction

13   on June 28th, 1994?

14   A.    I do.

15   Q.    Okay.  This says "wire, Haitham Maghawri."  Who is that?

16   A.    He was also an HLF officer.

17   Q.    You see this transaction has $45,000/$8,000.  Can you

18   explain that, please?

19   A.    In the later years some of the larger wires were sent

20   from the HLF offices here to bank accounts over there --

21   Q.    Let me stop you for a moment.  I am sorry.  You mentioned

22   earlier that some of the records you reviewed for this chart

23   was HLF Foreign Account No. 1.

24   A.    That is correct.

25   Q.    Okay.  Looking at the chart Bank Accounts, I don't know

1   if you can -- Can you see this chart?  Can you see where my

2   finger is?  It says HLF Foreign Account No. 1?

3   A.    I do.

4   Q.    What bank was this account at?

5   A.    The Bank of Palestine.

6   Q.    Do you know where that account was located?

7   A.    In the Palestinian territories.

8   Q.    West Bank or Gaza?

9   A.    I believe it was in Gaza, but I am not positive.

10  Q.    Okay.  Please go ahead and finish your explanation of

11  this transaction?

12  A.    So a large wire would go from the HLF account here to the

13  HLF's foreign accounts, and from there money would be

14  disbursed to different parties.

15  Q.    Okay.  How were you able to determine that $8,000 of this

16  $45,000 went to the Islamic Center of Gaza?

17  A.    By looking at the underlying records, both search warrant

18  and bank records, to see who the ultimate recipient was.

19  Q.    And you see under this column for the exhibit it says

20  InfoCom Search No. 20.  So if someone went to those words

21  contained within InfoCom Search No. 20, would they be able to

22  ascertain out of that $45,000 total wire $8,000 was meant for

23  the Islamic Center of Gaza?

24  A.    That is correct.

25  Q.    Are we going to see transactions like this throughout the

1   charts that you will testify about?

2   A.    Yes.  In the mid to late '90s you will see a lot of

3   those.

4   Q.    The transaction underneath that dated July 15th, 1994, is

5   a similar set-up, the $21,000 and it says/ILS $39,000?

6   A.    Yes.

7   Q.    What is the ILS?

8   A.    It stands for Israel shekels as opposed to U.S. dollars.

9   Q.    If we don't see ILS, then what denomination are all these

10  other denominations in?

11  A.    U.S. dollars.

12  Q.    Do you see the column right next where it says

13  "Destination payment to Ibrahim Al Yazouri, Director of

14  Islamic Council"?  Why is that there and in bold?

15  A.    That is the ultimate recipient of the money, and he was

16  the individual that we saw referenced along with Sheikh Ahmed

17  Yassin in HLF Search No. 108.

18  Q.    How do you know he is the ultimate recipient?

19  A.    Based on the records that are referenced in that exhibit

20  column.

21  Q.    Would that be InfoCom Search No. 20, or one of the other

22  items?

23  A.    That is correct.

24  Q.    If you turn to the last page, page 3, do you see there

25  are two lines that say "Hamas designation SDT, 1/23/95, and

1    then Hamas designation FTO, 10/8/1997"?

2    A.    I do.

3    Q.    What does that mean?

4    A.    On the financial schedules, and we have a number of them

5    that we will be discussing, they are done chronologically.

6    And on all the charts we tried to note the dates of the

7    designations of Hamas so that you could see which transactions

8    occurred prior to and subsequent to those designations.

9    Q.    In this instance, then, did the Holy Land Foundation send

10   any money to the Islamic Center of Gaza after Hamas was

11   designated?

12   A.    I don't know the answer to that.  I know that I could not

13   link any money to the Islamic Center of Gaza.

14   Q.    Based upon what you reviewed and what is in this chart?

15   A.    Right.  That is correct.

16   Q.    There were no transactions post designation?

17   A.    That is correct.

18   Q.    Okay.  The total amount sent is how much to the Islamic

19   Center of Gaza?

20   A.    $733,245, plus $56,100 Israeli shekels.

21   Q.    You didn't convert that to dollars to include in the

22   $733,000 number?

23   A.    It has not been converted because it was impossible to

24   get a completely accurate conversion rate for the specific

25   date of the transactions, so we just left it in Israeli

1    shekels.

2    Q.   Agent Burns, if you recall, on I believe it is the 1988

3    or 1989 OLF Disbursement charts there were payments to an

4    individual or organization known as K&A Trading.  Do you

5    recall that?

6    A.   I do.

7    Q.   Did you create a chart just reflecting on those

8    particular payments?

9    A.   Yes.

10   Q.   Do you have that chart before you?

11   A.   That is one that I do not have.

12           MR. JONAS:  Your Honor, if I may approach?

13           THE COURT:  Yes.

14           THE WITNESS:  Thank you.

15   Q.   (BY MR. JONAS)  Do you have that chart now?

16   A.   I do.

17   Q.   Okay.  Is that chart based upon items already in

18   evidence?

19   A.   It is.

20   Q.   Would that chart aid the jury in understanding your

21   testimony?

22   A.   It will.

23           MR. JONAS:  Your Honor, at this time I would offer

24   into evidence the exhibit marked as Payments to K&A Trading.

25           THE COURT:  And those are admitted.  The reason I

```
 1   say it is -- On your chart, you show two, K&A/Marzook and K&A
 2   Trading.
 3           MR. JONAS:  Correct.  The K&A/Marzook we are going
 4   to get to in a moment.  It is a separate chart.
 5           THE COURT:  So this is the other one?
 6           MR. JONAS:  Correct.
 7           THE COURT:  Okay.  Trading, that is admitted.
 8           MR. JONAS:  If we can put that on the screen,
 9   please.
10   Q.  (BY MR. JONAS)  Agent Burns, when is the first wire
11   transfer to K&A Overseas Trading?
12   A.   September 1st, 1988.
13   Q.   When is the last wire transfer?
14   A.   October 27th, 1988.
15   Q.   Basically a little under a two-month period?
16   A.   That is correct.
17   Q.   And in this two-month period, how much money did the HLF
18   send to K&A Trading?
19   A.   $250,175.
20   Q.   Is it safe to assume that the $175 were wire transfer
21   fees?
22   A.   Yes.
23   Q.   $35 per wire?
24   A.   That is correct.
25   Q.   Do you see where it says --
```

1          MR. JONAS:  Let's just pull up NAIT page 150 that

2     reflects a transaction of September 15th, 1988.

3     Q.   (BY MR. JONAS)  Who authorized this transaction,

4     according to this document on the screen?

5     A.   The Defendant Shukri Abu Baker.

6          MR. JONAS:  If we can scroll up a little bit,

7     please?

8     Q.   (BY MR. JONAS)  Where was the HLF sending the money to

9     for these transactions to K&A Trading?

10    A.   The Banque De Paris in Switzerland.

11    Q.   I assume that is a bank.

12    A.   I am assuming.  I don't speak French.

13    Q.   Neither do I.  Did you, during the course of the

14    investigation make a request, or did someone from the

15    Department of Justice make a request to Switzerland to obtain

16    those bank records?

17    A.   Yes.

18    Q.   Do you have before you what is marked as K&A Trading

19    Account?

20    A.   I do.

21    Q.   And are those -- Is that the account where this money

22    from the HLF was sent to?

23    A.   It is.

24          MR. JONAS:  Your Honor, at this time I would offer

25    into evidence K&A Trading Account.

1          THE COURT:  Admitted.

2     Q.   (BY MR. JONAS)  Agent Burns, the fact it is called K&A

3     Trading Account, does that mean it is not a trading account;

4     it is a bank account?  Just so we are clear for the record?

5     A.   Are you talking about our exhibit name?

6     Q.   Yes.

7     A.   Yes, that is correct.

8     Q.   There is only so much space you can fit --

9     A.   On the little exhibit stickers.  That is right.

10    Q.   Okay.  Agent Burns, how do you know that this is the same

11    account that the money was sent to, that the HLF money was

12    sent to?

13    A.   Because the account number in these records is the same

14    as the account number referenced in the NAIT records from the

15    HLF.

16    Q.   Okay.  So if we can center on the middle, on the middle

17    of this page, do you see where it says 110441?

18    A.   I do.

19    Q.   I am not going to make us jump back and forth between the

20    documents, but is that number referenced on the wire transfer

21    authorization we saw a moment ago from the NAIT records?

22    A.   Yes.

23    Q.   Okay.  And that is how you match up the wire transfers to

24    this particular account?

25    A.   That is correct.

1    Q.    Okay.  Is there anywhere in this document that indicates

2    who owns or operates K&A Overseas Trading?

3    A.    Yes.

4    Q.    Okay.

5          MR. JONAS:  If we look to page 6 of this document,

6    please.

7    Q.    (BY MR. JONAS)  Do you have any idea what language that

8    is in?

9    A.    It is not English.

10   Q.    Okay.  On the right hand side in the middle we see a

11   name.

12   A.    If we go to the next page, it is actually in English.

13   Q.    Okay.  Is that a translation, the next page?

14   A.    Yes, it is.

15         MR. JONAS:  Go to page 7, please.

16   Q.    (BY MR. JONAS)  Okay.  What name do you see over there

17   for this account holder?

18   A.    Mr. Khairy H. Al-Agha, Jeddah, Saudi Arabia.

19   Q.    Would it make sense that the K of K&A Trading, Khairy, A

20   for Al-Agha, K-A?

21   A.    I presume.

22   Q.    Did you come across anything in the evidence you

23   reviewed, including the documents we discussed, that identify

24   who Khairy Al-Agha is?

25   A.    Yes.

1          MR. JONAS:  If you will turn to Ashqar Search No. 1

2    is.  It is a document already in evidence.

3    Q.   (BY MR. JONAS)  Do you have that before you?

4    A.   I do.

5    Q.   Thursday when we talked about Ashqar Search No. 1, what

6    did we focus on, what particular page?

7    A.   We focused on page 4.

8    Q.   Which was?

9    A.   The important phone and fax numbers for the Palestine

10   Section in America.

11   Q.   And we looked at some of those names that matched up with

12   the Palestine Committee names in the Elbarasse documents?

13   A.   That is correct.  We compared this to those lists.

14          MR. JONAS:  Let's go to page 5?

15   Q.   (BY MR. JONAS)  And what is the title of page 5?

16   A.   Again, this is a translation.  It says, "Important phone

17   and fax numbers.  Palestine Section outside America."

18   Q.   Do you see Khairy Al-Agha's name there?

19   A.   He is the first person listed.

20   Q.   Do you see where it says Saudi Arabia?  Did we see Saudi

21   Arabia anywhere on the bank records of his that we looked at?

22   A.   In the bank records on page 7 it was noted that he was in

23   Jeddah, Saudi Arabia.

24   Q.   Did you see his name anywhere else in any of the

25   documents we discussed?

1    A.    Yes.

2    Q.    Do you have Marzook's Phonebook before you?

3    A.    I do.

4          MR. JONAS:  If we can pull up Marzook Phonebook,

5    page 54, please.

6    Q.    (BY MR. JONAS)  Do you see -- Where do you see Khairy

7    Al-Agha's name on the page?

8    A.    The third name on the list says Dr. Khairy.

9    Q.    How do you know that is Khairy Al-Agha?

10   A.    Because if you look at the telephone numbers referenced

11   to the side of his name, first 966 is the country code for

12   Saudi Arabia.

13   Q.    Okay.

14   A.    But both of those numbers are the same phone numbers

15   referenced in Ashqar Search No. 1.

16   Q.    Okay.  While we are talking about Khairy Al-Agha and

17   Marzook, did you come across anything indicating that those

18   two individuals had a relationship?

19   A.    Yes.

20   Q.    And what did you look at?

21   A.    There were bank records taken from Ismail Elbarasse's

22   home indicating a financial relationship between Marzook and

23   Khairy Al-Agha.

24   Q.    Did you create a chart reflecting that financial

25   relationship?

1   A.   Yes.

2   Q.   Is the chart in the same format as these other charts we

3   talked about?

4   A.   It is.

5   Q.   Do you have before you an exhibit marked

6   K.Agha/K&A/Marzook?

7   A.   Yes.

8   Q.   Is that the schedule you created to reflect transactions

9   between Marzook and Khairy Al-Agha?

10  A.   Yes.

11       MR. JONAS:  Your Honor, at this time I would offer

12  into evidence the schedule marked K.Agha/K&A/Marzook.

13       THE COURT:  That is admitted.

14  Q.   (BY MR. JONAS)  Agent Burns, before I get into this one,

15  can you remind us again the time period that the HLF was

16  sending money to Khairy Al-Agha?

17  A.   It was from mid to late 1988.  I believe the last

18  transaction was in late October.  October 27th, 1988 was the

19  last transaction.

20  Q.   When is the first transaction of this chart for payments

21  to Khairy Al-Agha and Marzook?

22  A.   From Khairy Al-Agha to Marzook the first transaction is

23  the second on the chart, which is February 8, 1989, about

24  three and a half months after the HLF sent its last

25  transaction to K&A Trading.

1   Q.   Was there a transaction prior to that between these two

2   individuals?

3   A.   Yes.  Mousa Abu Marzook actually sent $15,000 to Khairy

4   Al-Agha in 1988, and the remainder of the transactions on this

5   chart were going the other direction--K&A was sending the

6   money back to Marzook.

7   Q.   Okay.  You mentioned that some of these documents you

8   looked at to support this chart came from the Elbarasse search

9   warrant?

10  A.   Yes.

11  Q.   Did you look at bank accounts as well?

12  A.   I did.

13  Q.   It says Elbarasse Search No. 36.  Is that some of the

14  documents you are referring to?

15  A.   Yes.

16  Q.   And Elbarasse Search No. 39?

17  A.   That is correct.

18  Q.   Then it says Marzook Bank Account No. 4.  What is that?

19  A.   That is one of the bank accounts held by Mousa Abu

20  Marzook.

21          MR. JONAS:  Your Honor, at this time I would offer

22  into evidence Elbarasse Search No. 36, Elbarasse Search No.

23  39, and Marzook Bank Account No. 4.

24          THE COURT:  Those are admitted.

25  Q.   (BY MR. JONAS)  Agent Burns, how much money was moved

1    from Khairy Al-Agha to Mousa Abu Marzook?

2    A.    I think it was approximately $1.3 million.  There is not

3    a total on here, but if you add them up, it is well over a

4    million.

5    Q.    Just so we are clear are, on the chart the first

6    transaction is shaded.  Why is it shaded?

7    A.    On the very first transaction?

8    Q.    Yes.

9    A.    To indicate the money was going in the other direction.

10   Q.    You mean the other direction from Marzook to Khairy

11   Al-Agha?

12   A.    That is correct.

13   Q.    Then you have money not shaded, and that reflects?

14   A.    Money going from K&A Overseas Trading to Marzook.

15   Q.    Agent Burns, in reviewing all the search warrant material

16   and everything you have seen in the course of this case, did

17   you come across any explanation as to why Holy Land Foundation

18   was sending $250,000 to Khairy Al-Agha?

19   A.    I have seen information indicating that they said they

20   only sent to charitable organizations, and I researched this

21   and Khairy Al-Agha -- K&A Trading is not a charitable

22   organization.  So no, I did not find an explanation as to why

23   they were sending so much money to K&A Overseas Trading.

24   Q.    Okay.  Staying with Marzook, let's talk about him for a

25   minute, did you see anything indicating that Marzook himself

1  sent money to the three organizations that comprise the

2  Palestine Committee, the UASR, IAP, and HLF?

3  A.   Yes, I did.

4  Q.   Did you create a chart that would summarize those

5  transactions?

6  A.   I did.

7  Q.   Do you have those charts before you?

8  A.   I believe I need you to hand me those.

9       MR. JONAS:   Your Honor, may I have a moment, please?

10      THE COURT:   Yes.

11  Q.   (BY MR. JONAS)  Do you have a chart reflecting payments

12  Marzook and UASR?

13  A.   I do.

14  Q.   And what are those payments based upon and that chart

15  based upon?

16  A.   Marzook bank records, Elbarasse search warrant material.

17  Q.   Okay.  And what is the time frame of the transactions

18  between Marzook and UASR?

19  A.   March 2nd, 1992 through November 30th, 1992.

20      MR. JONAS:   Your Honor, at this time I would offer

21  into evidence Government's exhibit I believe it is labeled

22  Marzook/UASR on the exhibit sticker.

23  Q.   (BY MR. JONAS)  Is that correct, Agent Burns?

24  A.   Yes.

25      MR. DRATEL:   As to time frame, Your Honor.

1          MR. JONAS:  I believe she covered the time frame.

2          MR. DRATEL:  No, no.  I am saying it goes to the

3    time frame, that is the objection.

4          MR. JONAS:  I thought that was a question, asking

5    the time frame.

6          THE COURT:  That is overruled, and that exhibit is

7    -- That chart is admitted.

8          MR. JONAS:  If we can put page of that chart on the

9    screen.

10   Q.   (BY MR. JONAS)  Agent Burns, this is based upon, again,

11   Elbarasse search records?

12   A.   In part, yes.

13   Q.   As well as bank records?

14   A.   That is correct.

15         MR. JONAS:  Your Honor, I apologize.  I am not

16   keeping track of documents as I am admitting them, so I may

17   offer documents that are already in evidence just to play it

18   safe.

19         THE COURT:  Sure.

20         MR. JONAS:  At this time I would offer into evidence

21   Marzook Bank Account No. 3, Elbarasse Search No. 38, Marzook

22   Bank Account No. 1.

23         THE COURT:  So Marzook Bank Accounts No. 1 and 3 --

24         MR. JONAS:  Correct, yes, sir.

25         THE COURT:  And then Elbarasse Search No. 38.

1      MR. JONAS:  Correct, yes, sir.

2      THE COURT:  And those are admitted.

3      MR. JONAS:  Thank you.

4    Q.   (BY MR. JONAS)  Agent Burns, how many pages is this

5    document?

6    A.   Two.

7    Q.   Two?  What is the total amount of money Marzook sent to

8    the UASR?

9    A.   $286,272.49.

10     MR. JONAS:  Can we pull up page 54 -- I am sorry.

11   Page 52 of the Marzook Bank Account No. 3, and see one of the

12   items that support this chart.

13   Q.   (BY MR. JONAS)  Is that -- That is from the -- That is a

14   statement.  Right?

15   A.   That is correct.

16   Q.   And that is the statement, if you can look at the chart

17   does it reflect any of the payments between Marzook and UASR?

18   A.   Yes, it does.  The June 30th payment, if you will look at

19   the second line from the bottom, it says June 30th with a

20   check number and then the amount $34,169.42.

21   Q.   Okay.  Did Marzook make payments to the IAP?

22   A.   He did.

23   Q.   I am sorry.  Before you leave the UASR, what was the

24   total time period he was making payments to the UASR?

25   A.   March through November of 1992.

Q.    1992?

A.    That is correct.

Q.    What items did you review to support that he made payments to the IAP?

A.    Elbarasse search warrant materials as well as Marzook bank records.

Q.    Did you create a summary schedule of these payments, these transactions between Marzook and the IAP?

A.    Yes.

Q.    Do you have that before you?

A.    I do.

Q.    Okay.  And is that labeled Marzook/IAP, the exhibit sticker?

A.    Yes, it is.

MR. JONAS:  Your Honor, at this time I would offer into evidence Government's Exhibit Marzook/IAP.

THE COURT:  Okay.  That is admitted.  .

Q.    (BY MR. JONAS)  And for the record, what is the title of the schedule on the top?  Is it a little more expansive than on the exhibit sticker itself?

A.    It is.

Q.    What does it say at the top?

A.    "Payments from Marzook to the Islamic Association for Palestine."

MR. JONAS:  If we can put the first page of that

1    exhibit on the screen, please.

2    Q.   (BY MR. JONAS)  And by the way, Agent Burns, with the

3    last exhibit UASR and this current exhibit, were there any

4    payments going from the UASR or IAP to Marzook, or was it

5    purely a one way street from him to them?

6    A.   I don't think that there were payments, but I can't say

7    for sure that there weren't, based on these records.

8    Q.   Based upon the records.  That is what I am asking.

9    A.   That is correct.

10   Q.   Because in the Khairy Al-Agha transaction you said there

11   was one transaction that went in the opposite direction.

12   A.   That is correct.

13   Q.   From what you have seen, it is from Marzook to all these

14   entities?

15   A.   Yes.

16   Q.   Agent Burns --

17        MR. JONAS:  Your Honor, at this time I would offer

18   into evidence Marzook Bank Account No. 2.

19        THE COURT:  That is admitted.

20   Q.   (BY MR. JONAS)  Agent Burns, could you -- You see where

21   it says authorization?

22   A.   I do.

23   Q.   There is a few times where it says Elbarasse's name.  Why

24   is that?

25   A.   Because he was the individual identified as having

1    authorized the specific payment out of the Marzook bank

2    account.

3    Q.    And what is the time period of these transactions;

4    starting when and ending when?

5    A.    The transactions begin February 11th, 1985 and they end

6    August 1st, 1992.

7    Q.    Okay.  In the Elbarasse records that we looked at the

8    other day, does it indicate how long in existence the IAP --

9    how long IAP existed for?

10   A.    Yes.  I believe it was the first document we actually

11   looked at from Ismail Elbarasse's home indicated that the IAP

12   was originally created by the Muslim Brotherhood in the early

13   '80s.

14   Q.    So it predates the Palestine Committee?

15   A.    Yes.

16   Q.    And the HLF and UASR, do they predate the Palestine

17   Committee, from the records we have seen and discussed?

18   A.    They were all -- Well, the HLF was created about the same

19   time.  1988 was when the Palestine Committee was formed, and

20   the same thing with the HLF.  And the UASR, I am not sure of

21   the actual date, but it was around the same time.

22   Q.    Okay.  So the fact that Marzook is making payments to the

23   IAP as early as 1985, I believe you said was the first

24   transaction, is that consistent with the material we have

25   discussed?

```
 1    A.    Yes.

 2    Q.    And the fact he is making payments to UASR in 1992, is

 3    that also consistent --

 4    A.    Yes.

 5    Q.    In terms of the creation of the organizations.

 6          How much money did Marzook pay in total to the IAP?  If

 7    you look at the bottom of page 5.

 8    A.    $757,864.

 9    Q.    Do you see in the last transaction, last two

10    transactions, it says Richardson, Texas?

11    A.    Yes.

12    Q.    Did the IAP have a presence in Richardson?

13    A.    Yes.

14    Q.    And are you basing that on the bank records that are in

15    evidence?

16    A.    And also I saw the office there.

17    Q.    For purposes of this chart?

18    A.    Yes.

19    Q.    Okay.  Did Marzook make payments to any of the

20    Defendants, including the HLF or these Defendants

21    individually?

22    A.    He did.

23    Q.    Did you create a summary chart reflecting those payments

24    as well?

25    A.    Yes.
```

1   Q.   And what is the name of the summary chart for the

2   purposes of the sticker, the exhibit sticker?

3   A.   The exhibit sticker says Marzook/Defendants.

4   Q.   Okay.  The title is different.  The title says "Payments

5   Between Marzook and the Defendants"?

6   A.   That is correct.

7   Q.   And what did you base this schedule on?

8   A.   The NAIT bank records some of the Marzook bank accounts,

9   Elbarasse search warrant material.

10   Q.   Okay.

11         MR. JONAS:  Your Honor, at this time I would offer

12   into evidence Government's exhibit Marzook/Defendants.

13         MR. DRATEL:  The only objection is as to time frame,

14   Your Honor.

15         THE COURT:  Okay.  That is overruled, and that chart

16   is admitted.

17         MR. JONAS:  If we can put the first page on the

18   screen, please.

19      Your Honor, at this time I offer -- I don't believe I

20   have offered Elbarasse Search No. 37 into evidence yet.  If I

21   have, I apologize.  If I have not, I am offering it now.

22         THE COURT:  No. 37 is admitted.  That was one of the

23   ones we discussed from this morning.  That is admitted.

24   Q.   (BY MR. JONAS)  Agent Burns, when is the first payment

25   from the Holy Land Foundation to Mousa Abu Marzook?

1    A.    The HLF paid Marzook $10,000 on April 26th, 1988.

2    Q.    Do you see on the far right on the exhibits there is

3    several page numbers for the NAIT records?

4    A.    Yes.

5    Q.    One of them has the I and one of them has the S.  Can you

6    explain why there is multiple page numbers for this exhibit

7    for this transaction?

8    A.    Because there were several items that went into creating

9    this transaction from the bank records, if you want to take a

10   look at them.

11   Q.    I didn't mean to interrupt.

12         But they all support that there is one transaction?

13   A.    That is correct.

14   Q.    Okay.  The first part it says destination to Marzook and

15   then Nadia Elashi.  Again, who is she?

16   A.    The wife of Mousa Abu Marzook.

17   Q.    She is getting two $10,000 payments; one on June 24th,

18   1988, and then there is one on January 23rd, 1989.  The

19   spelling of the name is different.  Why is that--Elashi?

20   A.    As often with some of these Arabic names, as they are

21   translated into English they are phonetically translated, so

22   they can be spelled in many different ways.  A-L-A-S-H-I is

23   pronounced the same way as E-L-A-S-H-I.

24   Q.    Is it spelled differently on this particular chart

25   because that is how it is spelled in the records?

1    A.    That is correct.

2    Q.    If you look at the second transaction to Nadia Elashi,

3    again January 23rd, 1989, it says BR Shukri.  What does that

4    mean?

5    A.    Brother Shukri, referring to the Defendant Shukri Abu

6    Baker.

7    Q.    How do you know?  Were there any other Shukris that you

8    came across in connection to the HLF?

9    A.    At this time Shukri Abu Baker was the only Shukri that

10   was affiliated with the HLF.

11   Q.    If you go down further on the right hand side where it

12   says destination, you have source now April 1985 Mousa Abu

13   Marzook, and then destination Shukri Baker.  Can you explain

14   why we have had a shift in this chart from destination and

15   payment?

16   A.    Okay.  The chart was created for all payments between

17   Marzook and the Defendants, so it is organized by who the

18   source and destination were.  So the original transactions

19   show Occupied Land Fund transactions with Mousa Abu Marzook.

20   The next section are transactions between Mousa Abu Marzook

21   and the individual Defendant Shukri Abu Baker chronologically.

22   So the first transaction with Shukri Abu Baker was April 17th,

23   1985.

24   Q.    Going back to the top transaction, April 25th, 1988, how

25   soon after was this transaction occurred after HLF was

1    created?

2    A.    Very shortly.  We first saw the HLF in operation in very

3    early '88.

4    Q.    And in going through all the search warrant material, did

5    you come across any explanation as to why Holy Land Foundation

6    is sending a total of $30,000 to Mousa Abu Marzook?

7    A.    No.

8              MR. JONAS:  Can we turn to the next page?

9    Q.    (BY MR. JONAS)  Was Marzook sending money to other

10   Defendants besides the Holy Land Foundation and Shukri Baker,

11   as we saw on the first page?

12   A.    Yes.

13   Q.    Who else was he sending money to?

14   A.    To the Defendant Ghassan Elashi.

15   Q.    What is the time period for those payments?

16   A.    Both of those were in 1988.

17   Q.    And any other Defendant?

18   A.    The Defendant Mohammad El-Mezain.

19             MR. JONAS:  Turn to the next page, please.

20             MR. DRATEL:  What was the time frame on that?

21   Q.    (BY MR. JONAS)  What was the payment to Mohammad

22   El-Mezain, the first and the last?

23   A.    From July of 1988 through December 26, 1990.

24             MR. JONAS:  Your Honor, the payments to El-Mezain

25   are also reflected in Elbarasse Search No. 40.  I don't

1   believe I have offered that one yet, so I do at this time.

2           THE COURT:  That is admitted.

3       Let's go ahead and take the morning break at this time.

4   Let's be in recess until 11:00.

5               (Whereupon, the jury left the courtroom.)

6           THE COURT:  Be in recess until 11:00.

7                   (Brief Recess.)

8           THE COURT:  Mr. Jonas?

9   Q.  (BY MR. JONAS)  Agent Burns, before the break we were

10  talking about payments from Marzook and the Defendants, as

11  well as the organizations that comprise the Palestine

12  Committee.  On those three charts, are total amounts listed?

13  A.  On some of them they are; not on the chart between

14  Marzook and the Defendants.

15  Q.  Is that multiple individuals that are receiving money?

16  A.  That is correct.

17  Q.  Did you have an opportunity to total up the amount that

18  Marzook paid to the Palestine Committee through the

19  organizations or the Defendants themselves?

20  A.  We did a rough estimate.

21  Q.  Roughly how much did he pay?

22  A.  Over $1.2 million.

23  Q.  You testified that the money to UASR, a lot of it was in

24  1992.  Is that correct?

25  A.  That is correct.

```
1    Q.   And how about between him and the HLF?

2    A.   Between Marzook and the HLF?

3    Q.   I shouldn't say him.  Between Marzook and the HLF, what

4    time period was he sending money to the HLF?

5    A.   1992.

6    Q.   Did you review anything that indicates how much money

7    Marzook himself received in 1992 in order to make these

8    payments?

9    A.   Yes.

10   Q.   All right.  Before we do that, can you just tell us again

11   how much did he pay to the UASR in 1992?

12   A.   To the UASR the total in 1992 was $286,272.49.

13   Q.   And how much did he pay to the Holy Land Foundation in

14   1992?

15   A.   1992, $210,000.

16   Q.   So we are talking approximately half a million dollars

17   that Marzook paid out to the UASR and HLF alone in 1992.  Is

18   that correct?

19   A.   That is correct.

20   Q.   Okay.  Did you review any documents that indicates how

21   much money he himself made in 1992 which would go to support

22   these payments?

23   A.   Yes.

24   Q.   Do you have before you what is marked as Marzook Tax

25   Return No. 1 or Marzook Tax No. 1?
```

1    A.    I do.

2    Q.    What is that item?

3    A.    These are the tax returns for Mousa Abu Marzook that were

4    signed on --

5    Q.    What year is the return for?

6    A.    It says 1992 at the top.

7    Q.    Okay.  You said tax returns.  Is there just one return?

8    A.    One return with supporting documentation.

9    Q.    Is that tax return certified?

10   A.    Yes.

11          MR. JONAS:  Your Honor, at this time I would offer

12   into evidence Marzook Tax No. 1.

13          THE COURT:  Admitted.

14          MR. JONAS:  If we can put the first page on the

15   screen, please.  Or the second page.  Sorry.  If we can scroll

16   down now to the middle.

17   Q.    (BY MR. JONAS)  I am sorry.  Just to confirm at the top

18   it says Mousa Abu Marzook and Nadia Elashi?

19   A.    It does.

20   Q.    You said Nadia Elashi is his wife.  Is that correct?

21   A.    That is correct.

22   Q.    Does this say how much in wages Marzook earned in 1992?

23   A.    It says under taxable interest income $6,809, and then

24   under --

25   Q.    I am sorry, Agent Burns.  I don't mean to interrupt you,

1    but how much did he make in salary?  How much does this

2    document indicate he made in salary in 1992?

3    A.    His adjusted gross income was $51,585.

4    Q.    I don't think you understand my question.  Line 7 says

5    wages.  Correct?

6    A.    Right.

7    Q.    Wages is salary?

8    A.    I am sorry.  Yes.

9    Q.    How much did he earn in salary in 1992?

10   A.    Zero.

11   Q.    Okay.  How much income did he earn from other sources in

12   1992?

13   A.    The interest income was $6,809.

14   Q.    And then how much other income did he earn?

15   A.    Business income was noted as $48,557.

16   Q.    Without analyzing this whole return, is there anywhere on

17   the return that indicates what the business income was?

18   A.    Yes.

19   Q.    And what was it?

20   A.    Mecca Investments, an investment he had in a real estate

21   company.

22   Q.    Is there anywhere in the return to indicate Marzook was

23   wealthy?

24   A.    No.

25   Q.    In the course of your investigation did you come across

1  any evidence that Marzook was wealthy?

2  A.   I came across bank records to indicate he dealt with a

3  lot of money, but I did not see a legitimate source for that

4  money.

5  Q.   Okay.  Do you know what Marzook was doing in 1992 in the

6  United States?

7  A.   I believe he was still a student in Louisiana at that

8  time.

9  Q.   So did you come across, in examining this tax return, any

10  justification or source for $500,000 that Marzook paid out to

11  these two entities, UASR and HLF, just those two alone?

12  A.   No.

13  Q.   Did Marzook take a tax deduction for his payments he made

14  to the HLF?

15  A.   He took a tax donation for a payment that he made to the

16  HLF, but not for the entire thing.

17  Q.   You said he made a total of $210,000 in payments to the

18  HLF in 1992.  How many payments did that comprise?

19  A.   Three.

20  Q.   What was the breakdown?

21  A.   $10,000, and then $100,000, and then about ten days later

22  another $100,000.

23  Q.   If we could turn to page 11 of his tax return, do you see

24  where it says Schedule A?

25  A.   I do.

1  Q.   Contributions by cash, check.  I am assuming that is what

2  it means?

3  A.   Yes.

4  Q.   How much does it say that he contributed to the Holy Land

5  Foundation in 1992?

6  A.   $25,000.

7  Q.   Did the Holy Land Foundation give him a receipt for this

8  money?

9  A.   They did.

10        MR. JONAS:  If you can turn to page 11, please.

11        THE WITNESS:  I believe it is page 13.

12  Q.   (BY MR. JONAS)  I am sorry.  We were on page 11.  And do

13  you see a receipt there from the Holy Land Foundation?

14  A.   Yes.

15  Q.   How much is it for?

16  A.   $25,000.

17  Q.   Based upon your review of the bank records and the

18  Elbarasse material in creating that schedule of payments by

19  Marzook to the Defendants, did you actually see checks or wire

20  transfers totaling the $210,000 he made in 1992?

21  A.   Yes.

22  Q.   Is this $25,000 receipt accurate?

23  A.   No.

24  Q.   Based upon what you looked at?

25  A.   That is correct.

```
1   Q.   Okay.  Did any of the Defendants talk publicly about

2   their relationship with Marzook?

3   A.   They did.

4   Q.   Was any of this public discussion in a phone call

5   intercepted by the FBI?

6   A.   Yes.

7   Q.   Do you have before you what has been marked as Baker

8   Wiretap No. 2?

9   A.   Bear with me while I find my other binder.

10  Q.   Sure.

11  A.   I have it.

12  Q.   I am sorry.  Before we do that, I skipped one question.

13  Did you come across any evidence indicating that Marzook acted

14  as an intermediary in getting money to the HLF?

15  A.   Yes.

16  Q.   Do you have before you what has been marked as InfoCom

17  Search No. 83?

18  A.   I do.

19  Q.   Okay.  Without getting into the details, what is this

20  document?

21  A.   It is a piece of correspondence that relates to a

22  transaction involving Mousa Abu Marzook and the HLF.

23  Q.   Who signed this letter?

24  A.   The Defendant Shukri Abu Baker.

25  Q.   Is it on any letterhead?
```

1    A.    The Occupied Land Fund.

2            MR. JONAS:  Your Honor, at this time I would offer

3    into evidence InfoCom Search No. 83.

4            THE COURT:  Admitted.

5    Q.    (BY MR. JONAS)  What language is this letter in?

6    A.    It was in Arabic.

7            MR. JONAS:  If we can put page 2 on the screen,

8    please.

9    Q.    (BY MR. JONAS)  What is the date of the letter?

10   A.    February 17th, 1991.

11   Q.    Okay.  Just read where it starts, "His eminence," and the

12   next line?

13   A.    It is addressed to "His imminence, the honorable Sheik

14   Omar Ahmad Badahdah.  May good keep him.  In reply to your

15   notification which we received on February 3rd, I would like

16   to inform you that we have received from your end the sum of

17   $66,000 through brother Mousa Abu Marzook.  We thank you, and

18   may God bless you.  Hoping for your continued support to the

19   Fund, and apologizing for the delay in sending this note."

20   Q.    That is fine.  Okay.  Getting back to where I was a

21   moment ago, do you have Baker Wiretap No. 2 before you?

22   A.    I do.

23   Q.    Okay.  And is that a phone call involving any of the

24   Defendants?

25   A.    Yes.

1    Q.    Who?

2    A.    The Defendant Shukri Abu Baker.

3    Q.    What is the date of the call?

4    A.    April 1st, 1996.

5    Q.    1996?

6    A.    That is correct.

7    Q.    And is there a discussion between Shukri Baker and

8    another party regarding his or HLF's relationship with

9    Marzook?

10   A.    Yes.  This is a call in English between Shukri Abu Baker

11   and a reporter, an American reporter named Gayle.

12            MR. JONAS:  Your Honor, at this time I would offer

13   into evidence Baker Wiretap No. 2 and No. 2-A, the

14   accompanying audio.

15            THE COURT:  Ms. Hollander?

16            MS. HOLLANDER:  I am not sure.  Is 2-A is first

17   clip?  Do they go in order?

18            MR. JONAS:  Your Honor, excuse me.

19            THE COURT:  Sure.

20       Any objections, Ms. Hollander?

21            MS. HOLLANDER:  I am not sure which clip this is,

22   because I have them all as one, and I may have some 106, but I

23   will know as soon as I see it.

24            THE COURT:  All right.  Baker Wiretap No. 2 and 2-A

25   are admitted.

1    Q.    (BY MR. JONAS)  Agent Burns, for purposes of this trial

2    is the whole call being admitted, the entire call?

3    A.    No, it is not.

4    Q.    And what did you do with the call?

5    A.    A lot of these calls were fairly lengthy, so what we did

6    was redact and include only the portions that were relevant to

7    what we were wanting to show here today.

8    Q.    That is similar to what you did with the videotapes?

9    A.    That is correct.

10   Q.    Did the FBI change the content of the call in any way?

11   A.    No.

12   Q.    For purposes of this call, then, I think -- Is this call

13   broken down into segments?

14   A.    It is.

15   Q.    I think for right now we only want to play the fourth

16   segment.

17          (Whereupon, Baker Wiretap 2, clip 4 was played in open

18          court, while questions were propounded.)

19   Q.    (BY MR. JONAS)  I am sorry.  This is a woman named Gayle,

20   you said, is a reporter.

21   A.    That is correct.

22   Q.    She referred to Mr. Marzook's attorney.  At the time of

23   this phone call, do you know what was going on with Marzook?

24   A.    Yes.  Marzook had been arrested at JFK Airport in 1995

25   and was currently, at the time of this call, detained and

1    fighting his extradition proceedings.

2    Q.    Okay.  Marzook's phonebook is in evidence.  Correct?

3    A.    That is correct.

4    Q.    Did you go through it?

5    A.    Yes.

6    Q.    Is the Defendant Shukri Baker's name in Marzook's

7    phonebook?

8    A.    It is.

9    Q.    Any other Defendants' names in the phonebook?

10   A.    Yes.

11   Q.    Okay.  Whose?

12   A.    We went through it the other day and identified the

13   number for Mohammad El-Mezain as well as Ghassan Elashi.

14   Q.    Okay.  Shukri Baker is telling this reporter that maybe

15   his phone number is in Marzook's phonebook in relation to the

16   $210,000 three donations that Marzook gave to the HLF.

17   Correct?

18   A.    Actually he said --

19        MS. HOLLANDER:  Your Honor, I object to the leading

20   and repeating testimony.

21        THE COURT:  Okay.  Do you want to rephrase?

22        MR. JONAS:  Sure.

23   Q.    (BY MR. JONAS)  What was Shukri Baker referring to when

24   he talked to Gayle, the reporter, regarding his name in

25   Marzook's phonebook?

A.    He was -- Well, she had asked him why his number would be

in Marzook's phonebook, and he said that he guessed that he

probably picked it up around the time of the convention.

        MR. DRATEL:  Objection, Your Honor.  She is just

repeating the transcript.

        MR. JONAS:  It is a foundational matter.

        THE COURT:  Yes.  Go ahead.

Q.    (BY MR. JONAS)  We looked at the chart before, the

payments between Marzook and the Defendants.  Focus on the

bottom half, please.  Do you see there is a payment from

Marzook to the Defendant Shukri Baker?

A.    I do.

Q.    In 1985?

A.    I do.

Q.    And there is another one in 1985?

A.    Yes.

Q.    Okay.  How much earlier before Marzook gave $210,000 to

the HLF were these payments to the Defendant Shukri Baker?

A.    Almost seven years.

Q.    And there are some more payments on the next page?

A.    Yes.

Q.    So seven years prior to Marzook making this donation, he

is giving money to Baker.  Is that correct?

A.    That is correct.

Q.    Okay.  Did Shukri Baker talk to any other Defendant

1    regarding the phone conversation we just played, the one with

2    Gayle, the reporter?

3    A.    Yes.

4    Q.    Who?

5    A.    The Defendant Mohammad El-Mezain.

6    Q.    Okay.  Do you have -- Was that phone conversation

7    intercepted by the FBI?

8    A.    It was.

9    Q.    Do you have before you what is marked as El-Mezain

10   Wiretap No. 11?

11   A.    Yes.

12   Q.    And who is the participants on that call?

13   A.    This is a call between the Defendants Mohammad El-Mezain,

14   Shukri Abu Baker, and Haitham Maghawri.

15   Q.    What is the date of the call?

16   A.    April 3rd, 1996.

17          MR. JONAS:  Your Honor, at this time I would offer

18   into evidence El-Mezain Wiretap No. 11.

19          MR. DRATEL:  Your Honor, beyond the previous

20   objections, but also we have a 106 --

21          MR. JONAS:  For this one?

22          MR. DRATEL:  Yes.

23          MS. HOLLANDER:  We do, too.  I don't know if it is

24   the same 106.

25          THE COURT:  Are you offering 11-A as well?

1        MR. JONAS:  Yes, sir.

2        THE COURT:  No. 11 and 11-A.  Those are admitted,

3   and we will deal with the 106.

4        MS. HOLLANDER:  I am sorry to interrupt.  I was just

5   going to see if we had the same 106.

6        THE COURT:  All right.  Go ahead.  Have you looked

7   at their 106?

8        MR. JONAS:  I have not, sir.

9        Your Honor, this is the first I am looking at this.  I

10  just need a moment to see if we can agree.

11        THE COURT:  Sure.  Go ahead.

12        MR. JONAS:  Your Honor, we are going to object to

13  their 106 requests.

14        THE COURT:  Okay.  Let me take a look at that.

15        (The following was had outside the presence and

16         hearing of the jury.)

17        MS. HOLLANDER:  This is where theirs ends, and it

18  ends by saying "We don't give to individuals," and then they

19  explain who they do give to.  He is talking about who they

20  give to and who they support.  And then if you leave it there,

21  it is just not complete, and in fairness the jury ought to

22  hear the rest of it.

23        THE COURT:  Okay.  Go ahead.

24        MR. JONAS:  I am not sure that is where we end.  I

25  don't see that on mine.

         MS. HOLLANDER:  That is where that part of it ends.
It may not where the whole thing ends.  I am sorry.

         MR. JONAS:  There is two segments to this call.
That relates to the second segment, which I am not playing
with this witness.  I am only playing the first segment, which
is the conversation about Marzook in the phonebook.

         MS. HOLLANDER:  Okay.

         MR. DRATEL:  Okay.  So we will reserve --

         MS. HOLLANDER:  I am sorry.  I thought this is what
he was --

         MR. DRATEL:  We have something that continues as
well.

         THE COURT:  So it goes beyond?

         MR. DRATEL:  Yes, but it is the next segment.

         MR. JONAS:  I am not sure what that is going to be.
We can address it at that time.

         (The following was had in the presence and hearing
         of the jury.)

         THE COURT:  Yes.  Go ahead.

         MR. JONAS:  It is admitted, I assume, Your Honor?

         THE COURT:  Those are admitted.

         MR. JONAS:  If we can play the first segment of
El-Mezain Wiretap No. 11-A.

         (Whereupon, El-Mezain Wiretap 11 was played, while
         questions were propounded.)

```
1    Q.   (BY MR. JONAS)  Agent Burns, who is SH?

2    A.   That is the Defendant Shukri Abu Baker.

3    Q.   Who is MO?

4    A.   That is the Defendant Mohammad El-Mezain.

5    Q.   Okay.  Agent Burns, who is Abu Omar?

6    A.   That is the nickname for Mousa Abu Marzook.

7    Q.   His Abu name?

8    A.   Yes.

9    Q.   His oldest son is named Omar?

10   A.   Correct.

11   Q.   Agent Burns, you see it says SB 210?

12   A.   I see that.

13   Q.   What is that?  Do you know?

14   A.   I think that is just an error on the screen.  On the

15   actual transcript that is Shukri Abu Baker SH saying 210.

16   Q.   So that is just out of place?

17   A.   That is correct.

18   Q.   Okay.  Do you see where the Defendant Mohammad El-Mezain

19   says "In one lump sum"?

20   A.   Yes.

21   Q.   Was the payment the $210,000 by Marzook to the HLF in one

22   lump sum?

23   A.   No.

24   Q.   How many sums was it in?

25   A.   Three sums, three transactions.
```

1    Q.   Do you see where it said -- the Defendant Shukri Baker

2    said, "We have no relationship issue," and politics right

3    above it.  Was there a relationship between the Defendants,

4    HLF, and Marzook at this time period and going back to 1988?

5    A.   Yes.  The documents that we have reviewed indicate --

6         MR. DRATEL:  Your Honor, I am going to object to the

7    time period going back, because this call is in 1996.

8         THE COURT:  Overruled.  Go ahead.

9         THE WITNESS:  The documents that we reviewed,

10   primarily on Thursday, but a few today, were dated in the late

11   '80s up until that chart that we saw in 1991 where Mousa Abu

12   Marzook was the head of the Palestine Committee of which the

13   Holy Land Foundation and the Defendants Shukri Abu Baker and

14   Mohammad El-Mezain were a part at that very time.

15   Q.   (BY MR. JONAS)  Agent Burns, did you review any evidence

16   indicating that in fact there was telephonic contact between

17   Marzook and the Defendants?

18   A.   Yes.

19   Q.   Are these phone calls that the FBI intercepted?

20   A.   No.  Primarily this information came from old telephone

21   bills that were seized during search warrants and also what we

22   call toll records, which are records from the phone company

23   that were obtained by the FBI back during the time that -- or

24   in, you know, the early to mid '90s.

25   Q.   What time period do you have these phone records for?

1    A.    Approximately 1989 to early 1993, I think.

2    Q.    Is there a reason why you don't have records for a later

3    time period?

4    A.    Well, we didn't have all the phone records, and I don't

5    have all the phone numbers that the Defendants possibly could

6    have used.  So I am sure my records are incomplete, but I

7    based my research on what I had available to me.

8    Q.    Did you create a chart which summarizes the phone calls

9    between the Defendants and Marzook?

10   A.    Yes.

11            MR. JONAS:  Your Honor, may I approach the witness?

12            THE COURT:  Yes.

13   Q.    (BY MR. JONAS)  Is this the chart that you are referring

14   to?

15   A.    Yes.

16   Q.    Is this chart based upon the records you just testified

17   about?

18   A.    That is correct.

19            MR. JONAS:  Your Honor, at this time I would offer

20   into evidence what is marked as Marzook/Defendant Phone Calls.

21            MS. HOLLANDER:  May we approach about this exhibit,

22   Your Honor?

23            THE COURT:  All right.

24            (The following was had outside the hearing of the

25            jury.)

1        MS. DUNCAN:  Your Honor, this exhibit was originally

2   designated as a demonstrative exhibit by the Government, and

3   then we learned yesterday that they are intending to, and I

4   may be wrong about exactly when, but they are intending to

5   introduce it as a summary.

6        These are not voluminous records.  This is not the kind

7   of records that would come in substantive evidence under the

8   summary rule.  They are a demonstrative.  So we object to it

9   coming in as substantive evidence and as anything other than a

10  demonstrative to illustrate the Agent's testimony.

11       MS. HOLLANDER:  All they have are phone records.  In

12  other words, they have records of phone calls placed from a

13  phone number to phone number, and I think this is misleading.

14       MS. CADEDDU:  I also believe it is misleading, and I

15  have some concerns about others of the Government's summary

16  and demonstrative exhibits because they talk about the

17  Defendants, or Defendants, and my client is not listed on any

18  of those.

19       MR. WESTFALL:  May I add one thing?

20       THE COURT:  One more.

21       MR. WESTFALL:  I haven't heard a single thing that

22  happened here, but for my purposes, they keep saying Marzook

23  and the Defendants.  My Defendant isn't in any of this, so I

24  want to just ask for a limiting instruction, but I know you

25  said we are going to take that -- I do not waive my ability to

1  get a limiting instruction before this jury, so how do you

2  want to handle that?

3          THE COURT:  We just have to address that.  I have

4  not seen that exhibit.  Do you have the Defendants, the names

5  on there?

6          MR. JONAS:  Yes, sir.  The names are right there.

7          THE COURT:  Okay.  All right.  Okay.

8      I think that does qualify as a summary.  There are enough

9  calls that it can come in as a substantive chart 106.  And

10  then I think it is self-explanatory.  I understand the

11  concerns you and Mr. Westfall have, but on its face it names

12  the Defendants, and of course you are asking the witness that.

13          MR. JONAS:  I will ask a clarifying question to make

14  sure that we are not talking about the Defendants Abdulqader

15  and Odeh.

16          MS. CADEDDU:  I would like to object generally to

17  the Government's statements "Have you seen evidence of such

18  and such between this person and the Defendants."  I mean,

19  that implies that it is between other of the Defendants and it

20  isn't.

21          THE COURT:  I don't know that the jury is catching

22  all of that.  The evidence that comes in will show who the

23  calls are between, so I think the jury can understand what is

24  going on.

25          MS. CADEDDU:  I would just like -- If the Government

1   is going to talk about the Defendants, I would like them to

2   perhaps say "some of the Defendants" instead of "the

3   Defendants."

4           THE COURT:  It is some of the Defendants.  That

5   would probably be good.

6           MR. JONAS:  Yes, sir.

7           THE COURT:  Okay.

8           (The following was had in the presence and hearing

9           of the jury.)

10          THE COURT:  All right.  This is a chart, then,

11  Marzook/Some of the Defendants Phone Calls?

12          MR. JONAS:  Yes, sir.

13          THE COURT:  That is admitted.

14          MR. JONAS:  For the record, I would like to also

15  admit the documents that Agent Burns referred to to support

16  this chart, HLF Search Warrant No. 9 and HLF Search Warrant

17  No. 10.

18  Q.   (BY MR. JONAS)  And Agent Burns, are those phone records

19  HLF Search Warrant No. 9 and 10?

20  A.   I am looking to make sure that is all of them, because I

21  don't have a copy of the summary chart.  There were --

22  Q.   I know there are additional phone records, but HLF Search

23  No. 9 and 10.

24  A.   That is correct.

25          MR. JONAS:  Also Your Honor, I would like to

1    introduce Bell Atlantic No. 1 and Bell Atlantic No. 2.

2    Q.   (BY MR. JONAS)  Agent Burns, are those also phone

3    records?

4    A.   Yes.

5            MR. JONAS:  Also, Your Honor, South Central Bell.

6    Q.   (BY MR. JONAS)  Agent Burns, are those phone records as

7    well?

8    A.   That is correct.

9            MR. JONAS:  And lastly, Your Honor, is New Jersey

10   Bell.

11   Q.   (BY MR. JONAS)  Agent Burns, are those phone records?

12   A.   Yes.

13           THE COURT:  Any objections to HLF Search No. 9 and

14   10, and then the Bell, South Central Bell and New Jersey phone

15   records?

16           MR. DRATEL:  Just time frame.

17           MR. WESTFALL:  Your Honor, may I address Mr. Jonas?

18           THE COURT:  Sure.

19           MR. WESTFALL:  Thank you, Your Honor.

20           THE COURT:  And any other objections?  Those

21   exhibits are admitted.

22   Q.   (BY MR. JONAS)  Agent Burns, just to be clear, there are

23   three Defendants listed here?

24   A.   That is correct.

25   Q.   On the right.  Defendant Shukri Baker, Defendant Mohammad

1    El-Mezain, and Defendant Ghassan Elashi.  Correct?

2    A.    That is correct.

3    Q.    And when we have been discussing the relationship between

4    Marzook and some of the Defendants, does that include all five

5    Defendants in this case, or all six if you include the HLF?

6    A.    I am sorry.  Can you repeat that?

7    Q.    Are there any Defendants that did not have this

8    relationship with Marzook that we have been discussing, both

9    monetarily in terms of financial transactions, and phone

10   calls?

11   A.    Yes.

12   Q.    Who?

13   A.    The Defendants Mufid Abdulqader and Abdulrahman Odeh are

14   not included on either the financial chart or the phone chart

15   that we are discussing here.

16   Q.    So the Defendants that had a relationship with Marzook

17   are Defendants Shukri Baker, Mohammad El-Mezain, Ghassan

18   Elashi, as well as the Holy Land Foundation?

19   A.    The Defendants that had a relationship that I could

20   establish.

21   Q.    Can you walk us through this chart, Agent Burns?

22   A.    Yes.  Basically this chart just indicates phone calls

23   between Marzook and the Defendants that are listed there.  The

24   numbers, the telephone numbers for Marzook that were analyzed

25   are listed below Marzook's name.  There were five of them; two

1    in Ruston, Louisiana.  The 318 area code indicates the

2    Louisiana numbers.  And 703 are the phone numbers that he had

3    once he moved to northern Virginia.

4         And then the time periods and the number of calls are

5    listed with an arrow indicating in which direction the phone

6    calls were going.  For example, if Marzook -- On the top line

7    Marzook called the Defendant Shukri Abu Baker between January

8    3rd, 1989 and January 22nd, 1990 25 times.

9         And then on the other side it shows for the Defendant

10   Shukri Abu Baker, the phone numbers that were analyzed to put

11   together this chart.  So those were the phone numbers

12   belonging to Shukri Abu Baker that Marzook had telephonic

13   contact with.

14   Q.   And how soon -- How much time period -- Withdrawn.  I

15   wasn't phrasing that correctly.  The donation or the money

16   that Marzook gave to the HLF was in 1992, you stated.  How

17   soon before that was the first phone call between Marzook and

18   Shukri Abu Baker?

19   A.   Several years.  1989, January of 1989, so.

20   Q.   And to be clear, did the FBI, as far as you know,

21   intercept any of these phone calls?

22   A.   No, they did not.  There were no -- During the times of

23   the calls referenced on this chart, there were no wiretaps of

24   any of these individuals.

25   Q.   Did the FBI intercept any phone calls at a later time

1   between Marzook and any of the Defendants listed here?

2   A.   There may have been one that I am thinking of, but not

3   anymore than that.

4   Q.   Okay.  And from your review of the evidence and from your

5   review of these records, does this mean that there were no

6   phone calls between Marzook and the Defendants after the last

7   date on this chart?

8   A.   No.  As I said, I based this chart on the information

9   that I had available to me.  I could only base my research on

10  what I had available.

11  Q.   Did you try to get phone records going back to 1993

12  forward?

13  A.   By the time the criminal investigation was instituted in

14  2001, a lot of older records, they were no longer maintained

15  by the telephone companies.  But in addition that, I also

16  didn't have a complete listing of everyone's phone numbers,

17  their cell phone numbers.  Mousa Abu Marzook moved overseas in

18  the mid '90s, or was overseas quite a bit.  I don't have his

19  numbers for over there.

20  Q.   In the Defendant Shukri Baker's deposition that we have

21  been referring to, did he discuss his relationship with

22  Marzook?

23  A.   He did.

24  Q.   If you can turn to Baker Deposition, page 74, if you have

25  it in front of you.  I can hand you a copy, if you need.

1    A.    I have it.  I just have to find it.

2            MR. JONAS:  If you can put it on the screen.  I

3    believe it is page 6 of the actual document.

4            THE WITNESS:  Okay.

5    Q.    (BY MR. JONAS)  One moment to get it up on the screen.

6    A.    Excuse me, Mr. Jonas.  To point out, I think that there

7    is an error on that chart.  That is what I wanted to check.

8    The 317 area code is actually for Indiana, not California.

9    That should be Indiana, not California.

10   Q.    Okay.  Thank you.

11           MR. JONAS:  Okay.  If we can enlarge the top right

12   hand page.  That is 74 and 75.

13   Q.    (BY MR. JONAS)  Agent Burns, could you read what Shukri

14   Baker said regarding his relationship with Marzook in this

15   sworn deposition?

16   A.    Yes.  The question was, "How about Mr. Abu Marzook?  Do

17   you know who he is?"

18           And Shukri Abu Baker's answer is, "Yes."

19           Question:  "Okay.  Now, it's my understanding at some

20   point he made a contribution to the Holy Land Foundation.  Is

21   that correct?"

22           Answer:  "Yes."

23           Question:  "Okay.  And I want to ask you about that in a

24   minute.  Let's put that aside for the moment.  Other than that

25   contribution, are you aware of any relationship or involvement

1   that Mr. Abu Marzook had with the Holy Land Foundation?"

2   Answer:  "No."

3   Q.   Did the Defendant Mohammad El-Mezain also talk about his

4   relationship with Mousa Abu Marzook in his deposition?

5   A.   He did.

6   Q.   Do you have the El-Mezain Deposition before you?

7   A.   I do.

8   Q.   Do you have starting on page 57, line 15?  And if you

9   don't have that, I can hand you my copy.

10  A.   I do.

11  Q.   Can you read from page 57, line 15, to page 59, line 10,

12  please.

13  A.   Okay.

14  Question:  "Now, have you actually met Abu Marzook?"

15  Mohammad El-Mezain's answer is, "Yes."

16  Question:  "On how many occasions?  Many occasions?  One

17  or two?"

18  Answer:  "He was living in Fort Collins, Colorado."

19  Question:  "When you were there?"

20  Answer:  "Yeah."

21  Question:  "Did you socialize with Abu Marzook when you

22  were in Fort Collins?"

23  Answer:  "Sometimes we sit in the mosque together, with

24  the people of the mosque, basically."

25  Question:  "Other than your dealings with Mr. Abu Marzook

1   in the mosque in Fort Collins, did you have any other personal

2   dealings with him?"

3       Answer:  "No.  You cannot say personal dealings.

4   Sometimes -- Sometimes he call, congratulate our festival or

5   something like that.  We go eat after or something like that."

6       Question:  "Sometimes he called.  When you say, 'our

7   festival,' are you talking about an HLF festival?"

8       Answer:  "No.  We as mosque" --

9   Q.   Agent Burns, let me interrupt you.  I believe in

10  discussion with Defense counsel, that is not supposed to be

11  mosque.  That is supposed to be Muslims.  But please continue.

12  A.   "We as Muslims have two festivals like the Christmas."

13      Question:  "Right.  Like Ramadan?"

14      Answer:  "After Ramadan."

15      Question:  "Okay."

16      Answer:  "This is before he left the country."

17      Question:  "Okay."

18      Answer:  "After that, nothing more."

19      Question:  "When you say, 'He called us,' I guess I was

20  confused.  Who is 'us?'"

21      Answer:  "He called me."

22      Question:  "He called you?"

23      Answer:  "Maybe once a year or something like that, or

24  sometimes two, three years.  It depends upon his call

25  sometimes.  But we don't have any relation, direct relation".

1 Q. Agent Burns, let me interrupt you for a moment. How many

2 calls did Marzook make to El-Mezain in the less than four-year

3 period that is reflected on your chart?

4 A. Fifty-two times.

5 Q. And if he was calling him two or three times a year, per

6 this deposition, during this time period alone, how many calls

7 would there have been?

8 A. He actually says one a year or once every two or three

9 years, so there would have only been a handful.

10 Q. Okay. Please continue.

11 A. Question: "Okay. And these phone calls were around the

12 time of the festivals, the holiday?"

13 Answer: "Yes."

14 Question: "Other than what you've described in terms of

15 these phone calls Mr. Abu Marzook would make around the time

16 of the festivals, your having sat with him in the mosque in

17 Fort Collins, and the distant family relationship, do you have

18 any other relationship with Mr. Abu Marzook over the course of

19 the years?"

20 Answer: "No. Sometimes I saw him in the conferences."

21 Q. That is good enough. Thank you, Agent Burns.

22 Did you look to see if there was a correlation on the

23 dates of the phone calls with any events going on at the Holy

24 Land Foundation?

25 A. I did find a correlation with some of the calls.

1    Q.   And before I ask you that, I want to make sure that when

2    you have a time range here for calls, and just using as an

3    example the first one January 3rd, '89 to January 22nd, 1990

4    with the phone calls to the Defendant Shukri Abu Baker, do you

5    have the actual dates of those calls per the phone records?

6    A.   Yes.  You can actually go to the phone records and look

7    for the telephone numbers referenced and see the actual call,

8    the date, the length of time, et cetera.

9    Q.   Okay.  And in doing that, did you find a correlation

10   between certain calls and certain events with the Holy Land

11   Foundation?

12   A.   Yes.

13   Q.   What was your correlation?

14   A.   On a couple of occasions I found that phone calls between

15   the parties happened at the time of HLF board meetings.

16   Q.   Okay.  Did you find that on more than one time?

17   A.   I did.

18   Q.   Okay.  Agent Burns, I want to turn back to where we were

19   earlier this morning, the Occupied Land Fund Disbursements

20   1989 chart.  Do you recall that?

21   A.   I do.

22          MR. JONAS:  If we can just pull that up real quick.

23   I am being instructed I need to put it on the elmo, and I

24   won't do that because I am moving on to another question.

25   Q.   (BY MR. JONAS)  In that 1989 disbursement chart do you

1  recall seeing payments made to an organization known as the

2  Islamic Relief Association?

3  A.    Yes.

4  Q.    Is that the right title Islamic Relief Association?

5  A.    On the chart it says Islamic Relief.  It is actually the

6  Islamic Relief Committee or Association.  The word translates

7  to both.

8  Q.    Okay.  Did you create a sub-chart reflecting payments

9  between the HLF and the Islamic Relief Association?

10 A.    Yes.

11 Q.    Okay.  Do you have that chart before you?

12 A.    I don't think I have the chart.

13 Q.    Okay.

14        MR. JONAS:  Just give me one moment, sir.  May I

15 approach?

16        THE COURT:  Yes.

17 Q.    (BY MR. JONAS)  Now do you have the chart?

18 A.    I do.

19 Q.    Okay.  And what is that chart based on?

20 A.    This chart is based on search warrant material and also

21 HLF bank records and some Islamic Relief Committee account

22 records.

23 Q.    Okay.

24        MR. JONAS:  Your Honor, at this time I would offer

25 into evidence Government's Exhibit --

1   Q.   (BY MR. JONAS)   What is it called on the sticker, Agent

2   Burns?

3   A.   It is called Payments to Islam RA.

4           MR. JONAS:   I would offer into evidence Government's

5   exhibit Payments to Islam RA.

6           THE COURT:   Counsel?   That is admitted.

7           MR. JONAS:   If we can put the first page on the

8   screen, please.

9   Q.   (BY MR. JONAS)   What is the title of the chart?   I

10  realize it is more expansive than on the sticker.

11  A.   "Payments to Islamic Relief Agency (Committee)."

12  Q.   And what is the date of the first payment?

13  A.   April 12th, 1991.

14  Q.   What does it go through?   What is the last date of the

15  payment on page 7?

16  A.   February 15th, 1996.

17  Q.   Now, you see where it says the Hamas designation-SDT

18  1/23/95?

19  A.   Yes.

20  Q.   Can you explain again what that means, because we have

21  some payments after that date?

22  A.   The schedule lists the payments from the HLF to the

23  Islamic Relief Committee chronologically, and the line there

24  indicates the date of the designation so that you can

25  determine which transactions occurred before and after the

1  designations.

2  Q.   And are any of these transactions authorized by any of

3  the Defendants in this case?

4  A.   Yes.

5  Q.   Who?

6  A.   The Defendant Ghassan Elashi, the Defendant Shukri Abu

7  Baker.

8       MR. JONAS:  Your Honor, at this time as supporting

9  documents I would offer into evidence Government's Exhibit HLF

10  Search No. 44.

11       THE COURT:  Admitted.

12  Q.   (BY MR. JONAS)  Agent Burns, let's just look at the last

13  transaction, the $40,000 transaction, February 1996.

14  A.   Uh-huh.

15       MR. JONAS:  If we can put HLF Bank Account No. 1,

16  page 732 on the screen.

17  Q.   (BY MR. JONAS)  Is HLF Bank Account No. 1 a large

18  exhibit?

19  A.   Yes, it is.

20  Q.   And what is this document?

21  A.   This is the signature card for that bank account.

22  Q.   This is page 1 actually.  Right?

23  A.   That is correct.

24  Q.   And whose name do you see on this card?

25  A.   The Defendants Ghassan Elashi and Shukri Abu Baker.

1          MR. JONAS:  Can we get page 732, please, on the

2     screen?

3     Q.   (BY MR. JONAS)  Does this reflect -- this item reflect

4     the payment to Islamic Relief?

5     A.   This is part of the statement.  I believe you have to

6     scroll to some of the later pages to actually see the exact

7     transaction.

8          MR. JONAS:  Let's go to next page, please.

9     Q.   (BY MR. JONAS)  Do you see it here?

10    A.   Yes.  The wire transfer was dated February 15th, 1996 in

11    the amount of $40,000.  So if you look on the statement

12    February 15th, you can scroll across and see wire transfer

13    $40,000.

14    Q.   How do you know that went to the Islamic Relief

15    Association?

16    A.   I believe if we scroll forward we will see the exact

17    item.  If not, then it is based on the search warrant records

18    that are also referenced in the exhibit column.

19    Q.   So the item that is telling you where this money went is

20    contained either in the bank records or the search warrant

21    records.

22    A.   They are referenced here, yes.

23    Q.   And the schedule tells people where to go to find those

24    items?

25    A.   That is correct.

1    Q.    We are not going to go through every single page.  Okay?

2    A.    Okay.

3    Q.    Did you find the letter in Elbarasse's material regarding

4    a request for $100,000?

5    A.    Yes, I did.

6    Q.    Do you have Elbarasse Search No. 17 before you?

7    A.    I do.

8    Q.    What is the date of that letter, if it is dated?

9    A.    It is dated July 20th.  Based on the content, we were

10    able to put it in 1992.

11    Q.    Okay.  Do you have the author of the letter, who signed

12    it?

13    A.    It was signed in code.

14    Q.    Is it addressed to anybody?

15    A.    It is not.

16          MR. JONAS:  Your Honor, at this time I would offer

17    into evidence Government's Exhibit Elbarasse Search No. 17.

18          MS. MORENO:  Subject to our previous objections,

19    Your Honor.

20          THE COURT:  All right.  That is admitted.

21    Q.    (BY MR. JONAS)  Agent Burns, do you have in front of you

22    InfoCom Search No. 3 as well?

23    A.    I do.

24    Q.    What is that item?

25    A.    This is a project summary report for an HLF project with

 1   the Islamic Relief Committee.

 2   Q.   Agent Burns, am I going somewhere with these random

 3   questions?

 4   A.   Yes, you are, I think.

 5            MR. JONAS:  Your Honor, at this time I would offer

 6   into evidence Government's exhibit InfoCom Search No. 3.

 7            THE COURT:  That is admitted.

 8   Q.   (BY MR. JONAS)  And finally, Agent Burns, do you have

 9   Government's exhibit InfoCom Search No. 4 before you?

10   A.   I do.

11   Q.   Okay.  What is that item?

12   A.   It is also an HLF project summary report found at

13   InfoCom.

14            MR. JONAS:  Your Honor, I would offer into evidence

15   Government's Exhibit InfoCom Search No. 3.

16            THE COURT:  And you are also offering No. 4?

17            MR. JONAS:  I meant No. 4, yes, sir.

18            THE COURT:  I thought you identified 3 and 4.

19            MR. JONAS:  I believe I did No. 3, and I think that

20   was admitted.

21            THE COURT:  You are right.  It is admitted.  No. 4

22   is admitted.

23   Q.   (BY MR. JONAS)  Agent Burns, with regard to Elbarasse

24   Search No. 17, with regard to some of these phone calls from

25   Marzook, with regard to some of the bank records that we have

1   looked at, and for the moment I will talk about InfoCom Search

2   No. 3, is there a correlation?

3   A.   I found that certain circumstances and events happened

4   during a relevant time period that all seemed to fit together.

5   Q.   Okay.  And did you create a chart that would demonstrate

6   these events, a timeline, coming together?

7   A.   I did I created a timeline.

8   Q.   Do you have before you what has been marked as

9   Demonstrative No. 8?

10  A.   I do not have the demonstrative.

11          MR. JONAS:  May I have a moment, please?

12          THE COURT:  Yes.

13          MR. JONAS:  Your Honor, we don't have a copy up

14  here.  I think we left ours downstairs.

15  Q.   (BY MR. JONAS)  Agent Burns, do you know what I am

16  referring to when I refer to Demonstrative No. 8?

17  A.   I do.

18  Q.   Did you create Demonstrative No. 8?

19  A.   Yes.

20  Q.   And is it based upon the documents that are currently in

21  evidence?

22  A.   That is correct.

23          MR. JONAS:  Your Honor, at this time I would offer

24  into evidence Demonstrative No. 8.

25          MS. MORENO:  Excuse me, Your Honor.  I don't have it

1  so I can't -- I have seen it, but it is not in this particular

2  group that I have, and I would object; hearsay, it is

3  misleading, 403, it is inaccurate.

4          THE COURT:  And it is based on documents that are

5  already in evidence, you say?

6          MR. JONAS:  Yes, sir.

7          THE COURT:  It is admitted.  Those objections are

8  overruled.

9          MS. CADEDDU:  Can I clarify?  It is admitted as a

10  demonstrative?

11          THE COURT:  It is admitted as a demonstrative.

12  Q.   (BY MR. JONAS)  Agent Burns, do you see on the screen

13  Demonstrative No. 8?

14  A.   Yes.

15  Q.   Can you walk us through what is going on here?

16  A.   I can.  The first --

17  Q.   Before you do that --

18          MR. JONAS:  Your Honor, there is one more exhibit I

19  believe that is on this document that I didn't offer into

20  evidence, InfoCom Search No. 22.

21  Q.   (BY MR. JONAS)  What is InfoCom Search No. 22, Agent

22  Burns?

23  A.   It was a document seized from InfoCom that relates to the

24  set of events that we are discussing.

25          MR. JONAS:  I will offer into evidence InfoCom

1    Search No. 22.

2              THE COURT:  Counsel?  That is admitted.

3              MR. JONAS:  Agent Burns, if you can walk us through

4    these series of events and the time frame they occur.

5    A.    Okay.  The first item listed on the timeline relates to

6    exhibit Elbarasse Search No. 17, which is a letter that was

7    found in the search warrant of Mr. Elbarasse's home, among a

8    lot of other materials belonging to Mousa Abu Marzook.

9    Q.    Hold on a moment.

10              MR. JONAS:  Let's put that on the screen Elbarasse

11   Search No. 17, please.  We can look at that letter.

12   Q.    (BY MR. JONAS)  What language was that letter found in,

13   by the way?

14   A.    It was in Arabic.

15   Q.    Did the FBI have it translated?

16   A.    Yes.

17              MR. JONAS:  If you can put the next page, please.

18   Q.    (BY MR. JONAS)  Agent Burns, could you read that letter,

19   please?  It is fairly short.

20   A.    Yes.  It says, "In the name of God the beneficent, the

21   merciful.  New daring operations for Ezz Eddin al-Qassam

22   Brigades."

23   Q.    Let me pause you for a moment.  What is that Izz el-Din

24   al-Qassam Brigades?

25   A.    That is the Hamas military wing.

1     Q.    Have you seen that in some of the documents we have

2   discussed?

3     A.    Yes.

4     Q.    The Hamas charter?

5     A.    Yes.

6     Q.    Please go on.

7     A.    Actually I don't believe it was in the Hamas charter,

8   but, I mean, it has been in several of the documents that we

9   have referenced.

10     Q.    Okay.

11     A.    "In response to the martyrdom of the military leader of

12   Ezz Eddin al-Qassam Brigades, the military wing of the Islamic

13   Resistance Movement, Hamas, the Brigades carried out a violent

14   attack on a Zionist military patrol unit in the Jibalia region

15   on Saturday July 18th. The attack led to the injury of a

16   number of the patrol unit members, and the heroes of the

17   Brigades returned safely to their bases.

18     "It is a jihad for the sake of God. A victory or a

19   martyrdom.

20     "We have bargains of very modern and different pieces of

21   steel in front of us, and they are being offered to us for

22   purchase now. Otherwise, they will be offered to Fatah.

23   Therefore we hope" --

24     Q.    Agent Burns, I am sorry. Have we seen Fatah in this

25   case?

1    A.    Yes.

2    Q.    What is Fatah?

3    A.    It is basically the secular party in the Palestinian

4    territories, the party of Yasser Arafat.

5    Q.    Please continue.

6    A.    "Therefore we hope that you send $100,000 very quickly to

7    conclude the bargains before they are sold, as the positive is

8    in dire need for them to replace the old pieces, all of which

9    are not worth one new piece.

10    "Send us the approved budget for the company for month 7.

11    "Salah the treasurer still refuses to give us the sum of

12    money.  Contact him as our financial situation is difficult.

13    "Yesterday an agreement to solve Fatah's problem has been

14    reached, and if the assaults continue we will respond to Fatah

15    in the appropriate manner.

16    "May God bless you.  July 20th."

17    Signed Seven Up.

18    Q.    Were you ever able to determine who Seven Up is?

19    A.    I don't know.

20    MR. JONAS:  If we can go back to Demonstrative No. 8

21    now, please.

22    Q.    (BY MR. JONAS)  Please continue explaining this timeline.

23    A.    On July 30th, telephone records referenced here indicate

24    that Hamas leader Mousa Abu Marzook placed a phone call to the

25    Defendant Mohammad El-Mezain.

1  Q.   Let me ask you -- There are two pictures under that

2  reference.  Who are they?

3  A.   The one on top is Hamas leader Mousa Abu Marzook and the

4  one below is the Defendant Mohammad El-Mezain.

5  Q.   Please continue.

6  A.   Two days later Mousa Abu Marzook issued a $100,000 check

7  to the HLF.

8  Q.   Is that reflected on the summary schedule we looked at

9  before of money moving from Marzook to the HLF?

10  A.   It is.  And the check is located in the bank account

11  referenced, the exhibit referenced here.

12  Q.   Is that part of the $210,000 that has been discussed?

13  A.   Yes.

14  Q.   Please continue.

15  A.   Five days later the Holy Land Foundation approved a

16  project called Project 236 for $100,000 for prisoners'

17  families through the Islamic Relief Committee.  And the wire

18  in that case was requested by the Defendant Ghassan Elashi.

19  Q.   Is that a picture of the Defendant there?

20  A.   It is.

21  Q.   Continue.

22  A.   Then four days later the HLF actually wired $100,000 to

23  the Islamic Relief Committee for that project.

24  Q.   Did you look at InfoCom Search No. 3, the project binder,

25  which supported the $100,000 payment?

```
1    A.    Yes.

2    Q.    And were you able to -- Based upon the documents

3    contained within that project binder, were you able to account

4    for the $100,000 being used for anything?

5    A.    The project was very confusing.  The initial

6    documentation from the time --

7              MR. DRATEL:  I object that the project was

8    confusing, Your Honor.

9              THE COURT:  Overruled.  Go ahead.

10             THE WITNESS:  The time of the initial project in

11   1992, the paperwork indicates that there was $100,000 to go to

12   100 needy families.  Attached to that were applications for

13   approximately 100 families with a suggested amount to be

14   issued to those families.  Two years later --

15   Q.    (BY MR. JONAS)  I am sorry.  Before you go forward,

16   roughly how much was the suggested amounts?

17   A.    The suggested amounts varied, but on average about $200

18   per family.

19   Q.    Did you figure out how much, based on those suggested

20   amounts, should have gone to those 100 families?

21   A.    Much less than $100,000.  If you multiply on average $200

22   for 100 families you have $20,000.

23        But again, about two years later -- And if we could go to

24   that exhibit, I can show you what I am talking about.

25   Q.    Sure.  Which page number?
```

1    A.    Okay.  If you go to page -- It is a very large exhibit

2    because of the 100 families whose applications are attached.

3    Q.    Are those 100 family applications, would that be

4    supporting documentation for the wire transfer?

5    A.    Correct.  As I said, the initial paperwork said this

6    $100,000 was to go to 100 needy family, and then approximately

7    100 needy family applications were attached.

8          If you go to 336 of the exhibit, which is --

9    Q.    InfoCom Search No. 3?

10   A.    Yes.  This is the Arabic version of the document, and I

11   believe the translation is hopefully just after this.  Yes.

12   Later, two years after the initial project, a final report was

13   filed along with this indicating that $100,000 was issued to

14   500 families.

15   Q.    Did you find supporting documentation for 500 families?

16   A.    No.  As I said, the paperwork included the initial 100

17   family applications.

18   Q.    Did you look to see if the paperwork for the 400

19   additional families were anywhere in the search warrant

20   material?

21   A.    I looked for Project 236, and I could not find any

22   additional families that went along with this project.

23   Q.    Okay.  Agent Burns, after this first initial $100,000

24   transaction occurred, did you see something similar happen

25   shortly thereafter?

A.    Yes, very shortly thereafter.

Q.    Did you create a timeline as part of Demonstrative No. 8?

A.    I did.

        MR. JONAS:  Your Honor, if we can put on the second page of Demonstrative No. 8.

Q.    (BY MR. JONAS)  What is happening now?  This is how soon after the last event?

A.    Very soon after the actual -- the last wire went over to the Islamic Relief Committee, but a week after or two weeks after everything started in the last chart.

Q.    Go ahead.

A.    Okay.  On August 10th, 1992, Hamas leader Mousa Abu Marzook placed another call to the Defendant Mohammad El-Mezain.  On that same day he issued another check for $100,000 to the HLF.  Two days later we located or there was a fax dated August 12th, 1992 found in the Elbarasse materials.

Q.    Let me stop you for a moment.  Is Elbarasse Search No. 18 that fax?

A.    It is.

Q.    And does it relate to these transactions that you are testifying about?

A.    It does.

        MR. JONAS:  Your Honor, I am not sure if I offered Elbarasse Search No. 18 into evidence.  I am doing so at this time, if I have not already.

1          THE COURT:  I don't show it in.  Any objection to

2    that?  It is admitted.

3          MR. JONAS:  And why don't we pull up Elbarasse

4    Search No. 18 and look at it.

5    Q.    (BY MR. JONAS)  Okay.  It is in Arabic.  Is that correct,

6    Agent Burns?

7    A.    That is correct.

8    Q.    Did the FBI translate it?

9    A.    Yes.

10   Q.    What page is the English on?

11   A.    Well, at first if you look on the original in the Arabic

12   it says from Islamic Relief Committee or Islamic REL Committee

13   with the date August 12, 1992.

14   Q.    Is that the same committee that we looked at the last

15   financial summary chart of where payments began in the early

16   '90s, I believe, and ended up after Hamas is designated?

17   A.    We looked at the chart from the HLF the to Islamic Relief

18   Committee.  Correct.

19   Q.    By the way, how much did HLF pay the Islamic Relief

20   Committee in total?

21   A.    Over $1.4 million.

22   Q.    Okay.  What is the first page of the English on this

23   document?

24   A.    It is page 10.

25   Q.    And what is it about this document that drew your

1  attention?

2  A.    It was addressed to the brothers, and it was found at

3  Ismail Elbarasse's home, along with all these other documents

4  that we have been talking about.  And it is a request -- it is

5  a letter, it is probably about eight pages long, the

6  translation is, anyway, addressed to the brothers, and it

7  reports on a visit of the individual who wrote the letter, to

8  Palestine in 1992 around the same time of the events that we

9  are discussing in these charts.

10     If go to page 13 of the exhibit, and in the middle there

11 where it says "Our beloved...our brothers" the author is

12 saying -- Do you want me to read it?

13 Q.    Yes, please.

14 A.    "It is an appeal for help from your brothers to you, and

15 from hearts full of wounds, hearts that are not shaken by

16 tornados, and that are not moved by the wind to their brothers

17 in the leadership of Hamas:  Do not forsake your

18 brothers...you fill the earth, and the Muslim Ikhwan are in

19 every part of it.

20     "And they tell you, 'Give us weapons and take men whom

21 the world will recognize,' God willing, even if the criminals

22 hate it and even if the Christians and those who stir up

23 sedition hate it.

24     "And if the hateful hate it.

25     "Weapons...to protect your brothers who are threatened by

1    the eagles of treason, weapons to carry out Jihad operations

2    and ask Khan Younis about the day of July 22nd."

3    Q.    Is there anything else in that letter of note?

4    A.    Yes.  On the following page, page 14, the author under

5    the third paragraph says, "Therefore, I appeal to you to take

6    a quick action and find out the needs of the Inside so that

7    the families of our brothers do not suffer more frustrations

8    than what is already there.  To my humble knowledge, the

9    transfer channels are now open and without problems.

10   Examining the delivery channels, placing each channel in its

11   main purpose without using its funds for other channel means:

12        No. 1 "The detainees and the needs of their families.

13   Their funds are to be in a specific channel and distributed

14   throughout The Strip.

15        "The martyrs.

16        "Those afflicted among our brothers by the demolition of

17   their homes and severance of income.

18        "The activities...and these are numerous and varying.

19        "The economic projects.

20        The Islamic University.

21        "The Islamic Complex.

22        "The Islamic Society."

23   Q.    The Islamic Complex, is that an organization that we have

24   already talked about the HLF sending money to?

25   A.    It is.

1    Q.   Okay.  Agent Burns, you say this came from the Islamic --

2    By the fax title, it came from the Islamic Relief

3    Organization?

4    A.   Yes.  According to the fax title, that is where it came

5    from.

6              MR. JONAS:  And if we can go back to the timeline.

7    Q.   (BY MR. JONAS)  Please continue explaining.

8    A.   Six days after the date of that fax, the HLF approved

9    another $100,000 wire transfer for the Islamic Relief

10   Committee.  And the individuals that were indicated in that

11   committee, and we can go to it in a minute, most of them were

12   families of prisoners.

13   Q.   Well, were you able to account for the $100,000 in this

14   project, this $100,000 wire?

15   A.   No.  This project was the same as the last.  The initial

16   paperwork -- If we want to go to it, it is InfoCom Search No.

17   4, page 1.  You will see there in the middle it indicates that

18   the $100,000 went to 100 families in Gaza and the West Bank.

19   And all of the supporting documentation, the applications for

20   the families that needed support is attached, again,

21   approximately 100 families.  And as I stated in that chart, a

22   majority of the families were family members of people who

23   were detained, and that documentation is contained herein.

24        In this project as well as the other one, there was a

25   report on page 3 is the Arabic version, that in November of

1    1994 was filled out.  And I am not sure what page the

2    translation is on.  If it is not immediately after that we

3    will have to scroll through for the translation.  But

4    basically it says the same thing as the previous one did--that

5    there were 500 families sponsored.

6    Q.   Did you find supporting documentation for 500 families in

7    this project?

8    A.   No, I did not.

9    Q.   So again, if you are looking at 100 families at

10   approximately $200 a family, $20,000 is accounted for?

11   A.   That is true.

12   Q.   And this wire was for $100,000?

13   A.   That is correct.

14        MR. JONAS:  If we can go back to the chart, please,

15   the timeline.

16   Q.   (BY MR. JONAS)  What happened after the $100,000 was

17   approved by Ghassan Elashi to send to the Islamic Relief

18   Association?

19   A.   The next day the money was actually sent, the $100,000

20   was sent from the HLF to the Islamic Relief Committee.

21   Q.   Thank you.

22        MR. JONAS:  Your Honor, I know it is a few minutes

23   early, but I am at a real good breaking point.

24        THE COURT:  Let's take a break.  Be back at 1:45.

25        (Whereupon, the jury left the courtroom.)

1      THE COURT:  Agent, you may step down.

2          Ma'am, on the front row with that magazine, let me see

3   those documents you are holding up.  I could read them from

4   here.  Come up here a minute.

5          Everybody else can have a seat.

6          Mr. Jonas, do you want to take the documents there?

7          Hand those to Mr. Jonas so I can see what it is you are

8   holding up.  I could read something.

9          MR. JONAS:  Evolution.  The back part is disputed

10  territories.

11         THE COURT:  Flip to the front.  The magazine is

12  open.  I saw something.  And then the other side.  That is

13  what I saw.  That is what I read.

14         That is inappropriate for you to have that in here,

15  ma'am.  And I heard that you were displaying it out in the

16  hall earlier.  That is totally inappropriate.  We have jurors

17  that are coming in and out.  I don't know whether you are

18  trying to influence jurors or not.

19         UNIDENTIFIED OBSERVER:  I am just trying to be

20  informed about this.

21         THE COURT:  You can be here, certainly, and be

22  informed, but it is not proper to try and influence.  It is

23  improper to be showing it in here and be carrying it out there

24  where others can see that.

25         THE OBSERVER:  I appreciate that.

1        THE COURT:  Make sure you don't do that.  That is

2   totally inappropriate.

3        THE OBSERVER:  Thank you very much.

4        THE COURT:  All right.  We are in recess.

5                   (Lunch Recess.)

6        MS. CADEDDU:  Your Honor, may we approach?

7        THE COURT:  Sure.  Come on up.

8        (The following was had outside the presence and

9        hearing of the jury.)

10        THE COURT:  Here we are again.

11        MS. CADEDDU:  Here we are again.  I am sorry.

12   Your Honor, I was unaware until today of the lady you

13   called out and what she was doing.  But I wanted to put on the

14   record exactly what the article said and where she was sitting

15   and what she was doing.

16        But before I do that, it has come to our attention that

17   people in the gallery have us that she was holding up another

18   article that said "Hamas rock star" during the Government's

19   playing my client's performances with the band during the

20   video being played for those.

21        She also today was --

22        THE COURT:  Last week?

23        MS. CADEDDU:  That was Thursday, yes, sir.

24        And today during breaks she was showing that article to

25   various people in the hallway.  And then during the lunch

break, I actually saw this myself, she was pulled aside by the

CSO who asked I think for identification, and then when that

interchange was done, she and her friend went and stood next

to two of the jurors who were waiting for an elevator and

proceeded to have a conversation and paged through the

documents.  This was after you instructed her.

THE COURT:  Just now at the lunch break?

MS. CADEDDU:  Yes.  And to put on the record, the

article that she was holding up for the Court said "Hate

speech is not free speech."  And she was sitting directly

behind -- and I am not suggesting the Government had anything

to do with it, but that is where she was sitting.

THE COURT:  In the middle of the courtroom.

MS. CADEDDU:  Yes.  So what we would like to do is

to make inquiry of her the next time she is here about whether

she has had any interchanges with jurors and whether she has

shown them any documents or had any discussions with them.  I

mean, this is obviously of a very great concern.

THE COURT:  All right.

MR. CLINE:  Your Honor, if I may add, in addition to

making the inquiry, admonish her again not to have inside or

outside the courtroom, any contact with the jurors.  She seems

like a person on a mission.

THE COURT:  Do you know her?

MR. JONAS:  No, sir.  We have no idea who she is.

1          MS. HOLLANDER:  If I may add a little bit, she is

2     also drawing pictures, and I don't think we can stop her from

3     this.

4          THE COURT:  We might, depending on what she is

5     drawing.

6          MS. HOLLANDER:  She is drawing counsel.  She was

7     drawing one of the Defendants' and daughter.

8          MS. MORENO:  Only if it is flattering to me.

9     Otherwise --

10          MS. HOLLANDER:  But I just want to make that part of

11     the record, that that is what she is doing, and she was

12     writing in Hebrew.

13          THE COURT:  Okay.  Just remind me next time she is

14     in, and we will find a good time to break and I will talk to

15     her about that, and I will talk to the CSOs and see what they

16     saw as far as with having any contact.

17          MR. JACKS:  I might have missed, how do we know what

18     the articles were about or anything?

19          THE COURT:  I don't know what they were about, but

20     what I saw it said "Hate speech is not free speech."  Of

21     course, that is related to what is going on here, and we don't

22     need that.

23          MR. JACKS:  I understand.

24          THE COURT:  She got up, as soon as they said, "All

25     rise for the jury," she stood up and I saw that right away.

1    So I know the jury could see if they were looking.  The jury

2    is coming this way, so hopefully nobody saw it.  But by the

3    time she came up to Barry, she had already flipped the page

4    and that is not what was showing, so it she indicated to me

5    she knew, she was hiding it.  And I had already heard that

6    there was somebody showing something, but wasn't real

7    specific.  But when I saw that -- I knew it was her, but then

8    when I saw that, that just caught my attention right away.

9         MS. CADEDDU:  Just for the record, Your Honor, the

10   reason we know what the article said that she was showing to

11   people is because she actually showed it to Ms. Hollander's

12   paralegal.  The article said, "Hamas' rock star," and was

13   showing her "Is this Mufid?  Is this his picture?  This is

14   Mufid Abdulqader And so she approached her without knowing who

15   she was or who she was associated with.

16        THE COURT:  In the courtroom or in the hall?

17        MS. CADEDDU:  I believe in the hallway on a break.

18   And of course our jurors are milling around with everyone

19   else.

20        MR. CLINE:  Your Honor, two other quick things

21   before we break here.  I talked with Mr. Jonas, and with the

22   Court's permission these 106 issues that keep coming up, if

23   you don't mind, we would prefer to raise those on cross.

24        THE COURT:  Yeah.  I don't mind.  That is generally

25   the cleaner way to do it, rather than having to have this.

1          MR. CLINE:  The Government will reserve its

2    objections under 106 to particular things we want to put in,

3    but it won't argue we are too late because we are doing it on

4    cross.

5          THE COURT:  At that point I don't think it is even a

6    106.  If it is relevant you are entitled to cross on something

7    that you think is relevant and get it in.  106 is a

8    contemporaneous issue, and then you have to read it and take a

9    look at everything.  That is not a decision that I can always

10   make just real quick.  It takes some time.

11         MR. CLINE:  So we will do that on cross.

12         THE COURT:  I think you will get a lot more latitude

13   on cross.

14         MS. HOLLANDER:  But it can still be a 106 on cross?

15         THE COURT:  If you want to call it that.  I just

16   generally call it cross.

17         MR. WESTFALL:  Just related writings and the rest of

18   the documents will come into evidence.

19         THE COURT:  106, I see this as a narrow rule.  It is

20   something that should be considered contemporaneous, and that

21   is a narrow rule.  I generally like to do it, prefer that you

22   do it on cross, and you can get into whatever you want to on

23   cross, if it is relevant.

24         MR. CLINE:  The other thing is--again, I took this

25   up with Mr. Jonas--we had the discussion this morning about

1    giving the Government on cross exhibits, which we will do.

2    Mr. Jonas has agreed on behalf of the Government, and I agree

3    on behalf of all the Defense, that we will not show that list

4    to the witness who is on cross so that if there is an element

5    of surprise to be had, we will preserve it, but the Government

6    can prepare.

7              THE COURT:  I think that is the way to handle it.

8              MS. MORENO:  And also that may not be exhaustive,

9    depending upon what testimony the witness --

10              THE COURT:  I understand.

11              MR. CLINE:  We will make a good faith effort to do

12    that.

13              THE COURT:  You should know most of it, but if

14    something comes up we can all live with that.

15              (The following was had in the presence and hearing

16              of the jury.)

17              THE COURT:  Mr. Jonas?

18              MR. JONAS:  Thank you, sir.

19    Q.    (BY MR. JONAS)  Agent Burns, I want to get back and talk

20    about the Palestine Committee.

21    A.    Okay.

22    Q.    Did the Palestine Committee have any meetings that were

23    recorded by the FBI?

24    A.    Yes.

25    Q.    And is there one in particular that stands out in your

1  mind?

2  A.    There is.

3  Q.    When did that meeting occur?

4  A.    October 2nd and 3rd of 1993.

5  Q.    I am sorry.  Could you repeat that?

6  A.    October 2nd and 3rd of 1993.

7  Q.    Where did it take place?

8  A.    At a Courtyard by Marriott in Philadelphia, Pennsylvania.

9  Q.    With regard to the Israeli-Palestinian issues, what was

10  going on at that time?

11  A.    The Oslo Peace Accords had just been signed.

12  Q.    Did the FBI record this entire meeting?

13  A.    They did.

14  Q.    And was the recording transcribed into a transcript?

15  A.    Yes.  A majority of the conversation was in Arabic, and

16  there were English transcriptions of the conversations, and I

17  have reviewed those.

18  Q.    Okay.  Generally speaking, what was the purpose of the

19  meeting?

20  A.    The purpose of the meeting was for the Palestinian

21  Committee members to discuss how they were going to continue

22  to operate in the United States in light of the signing of the

23  peace accords between the Palestinians and the Israelis.

24  Q.    Okay.  For purposes of your testimony, would it be fair

25  to call this the Philadelphia meeting or the Philly meeting?

1    A.    Yes.

2    Q.    Were there planning conversations on the

3    call -- Withdrawn.  Did any of the Defendants or any of the

4    participants have any phone calls where they discussed the

5    planing of the Philadelphia meeting?

6    A.    Yes.

7    Q.    And were those phone calls intercepted by the FBI?

8    A.    Some of them were, yes.

9    Q.    Do you have what has been marked Ashqar Wiretap No. 1?

10   A.    I do.

11   Q.    And can you remind us who Ashqar is?

12   A.    Ashqar is one of the members of the Palestinian Committee

13   that we saw on the list.  Also his home is the one that was

14   searched in that covert search in December of '93.

15   Q.    With regard to Ashqar Wiretap No. 1, who are the

16   participants in this call?

17   A.    Abdel Haleem Ashqar, the Defendant Shukri Abu Baker, and

18   Omar Yehia, also known as Omar Ahmad.

19   Q.    What is the date of the call?

20   A.    September 13th, 1993.

21          MR. JONAS:  Your Honor, at this time I would offer

22   into evidence Ashqar Wiretap No. 1 and 1-A.

23          THE COURT:  That is admitted.  .

24   Q.    (BY MR. JONAS)  And again, Agent Burns, is this the whole

25   call that we have, or are we offering into evidence a redacted

1    version?

2    A.   We are offering portions of the call.

3    Q.   All right.

4         MR. JONAS:  If we can play the portions that we

5    have, please.

6         (Whereupon, Ashqar Wiretap No. 1 was played while

7         questions were propounded.)

8    Q.   (BY MR. JONAS)  Agent Burns, this is moving pretty fast.

9    Do you know why it is going fast, the words on the screen?

10   A.   It is my understanding that the language specialist and

11   the technical people tried to marry up the actual Arabic that

12   is spoken with the English on the screen, and they are

13   speaking very fast on the phone, so the print is going to run

14   very fast on the screen.

15        MR. JONAS:  With Your Honor's permission, I may stop

16   it every few moments just to let everyone catch up.

17        THE COURT:  Sure.

18   Q.   (BY MR. JONAS)  Agent Burns, who is OM?

19   A.   That is Omar Ahmad.

20   Q.   And who is SH?

21   A.   The Defendant Shukri Abu Baker.

22   Q.   It said a moment ago Association and Fund.  Where have we

23   seen those names?

24   A.   The Association is the IAP, and the Fund is the Occupied

25   Land Fund or the Holy Land Foundation.

```
 1              THE COURT:  I don't know that the jury remembers

 2    always what these acronyms are.

 3              THE WITNESS:  The Islamic Association for Palestine,

 4    the IAP.

 5    Q.   (BY MR. JONAS)  And where have we seen the IAP and the

 6    HLF together?

 7    A.   Organizations that were part of the Palestine Committee.

 8    Q.   Do you see where Omar mentions Abu Ibrahim?

 9    A.   Yes.

10    Q.   Who is that?

11    A.   That is the Defendant Mohammad El-Mezain.

12    Q.   Do you know who Aboul Hasan is?

13    A.   Aboul Hasan is the nickname for Abdel Haleem Ashqar, who

14    is also a participant in this call.

15    Q.   Would that be AB, the next person speaking?

16    A.   That is correct.

17    Q.   Who is Abu Mohamed?

18    A.   Shukri Abu Baker uses the name Abu Mohamed, but I believe

19    Omar Ahmad also uses that nickname.

20    Q.   Agent Burns, they mentioned an individual who is out in

21    the media all the time.  Did they say that person's name?

22    A.   They did.

23    Q.   Who is that person?

24    A.   Mohamed Helmy.

25    Q.   Do you know who he is?
```

1    A.    There is a Mohamed Helmy Jerad in the Chicago area that I

2    believe he is referring to.

3    Q.    Is he part of the Palestine Committee?

4    A.    He was at one point.

5    Q.    Agent Burns, what does the UI mean in brackets?

6    A.    Unintelligible.  That means the translator couldn't

7    understand exactly what was being said there.

8    Q.    Where Shukri Baker says, "Because of the Friday sermon

9    that one gets the Foundation in grave trouble," what is the

10   Foundation?

11   A.    The Holy Land Foundation.

12   Q.    Agent Burns, again Abu Ibrahim is who?

13   A.    Defendant Mohammad El-Mezain.

14   Q.    Agent Burns, there is a discussion of papers and writing.

15   From your review of the Philadelphia transcript, were papers

16   presented to the participants?

17   A.    Yes, they were.

18   Q.    And what does that mean?

19   A.    Well, the Philadelphia meeting was separated into

20   sessions based on topics, and individuals wrote papers

21   regarding certain topics, like media and charity work, and

22   presented those papers to the meeting attendees and they

23   discussed the papers.

24   Q.    Okay.  Agent Burns, do you see where it says SC in

25   parentheticals?

1    A.    I do.

2    Q.    Do you know what that means?

3    A.    Simultaneous conversation.

4    Q.    Two people speaking at once?

5    A.    Yes.

6    Q.    Do you see where it says "Haitham from the Fund"?

7    A.    I do.

8    Q.    Who is Haitham?

9    A.    Haitham Maghawri from the HLF.

10   Q.    What was his role at the HLF his title?

11   A.    He originally had a different office, but he ultimately

12   became the executive director later on.

13   Q.    Agent Burns, do you see where it says, "But at people who

14   have experience about the inside ought to write their visions

15   about the inside, have we seen the term inside in this case

16   already?

17   A.    Yes.

18   Q.    What does that mean?

19   A.    Again, that means inside the Palestinian territories.

20   Q.    That would be the West Bank and Gaza?

21   A.    That is correct.

22   Q.    Agent Burns, was there another call where there was a

23   discussion about the meeting prior to the meeting taking

24   place?

25   A.    There was.

Q.    Do you have before you Ashqar Wiretap No. 2?

A.    I do.

Q.    Who are the participants in this call?

A.    Abdel Haleem Ashqar and Omar Yehia, also known as Omar

Ahmad.

Q.    What is the date of this call?

A.    This one is dated September 27th, 1993.

          MR. JONAS:  Your Honor, at this time I would offer

into evidence Ashqar Wiretap No. 2.

          THE COURT:  That is admitted.

          MR. JONAS:  I don't think we are going to play this

one.  I think we are just going to read the first page.

Q.    (BY MR. JONAS)  Agent Burns, do you have that in front of

you?

A.    I do.

          THE COURT:  Do you also want to offer 2-A?

          MR. JONAS:  Yes, Your Honor.  Thank you for

reminding me.  No. 2-A.

          THE COURT:  Those are admitted.

          MR. JONAS:  Thank you, sir.

          MR. JONAS:  Page 2.

Q.    (BY MR. JONAS)  Agent Burns, if you can just read this

first page, and I will let you know when to stop.

          MR. DRATEL:  Can we get a date of the conversation?

Q.    (BY MR. JONAS)  Agent Burns do you know the date of the

1  call?

2  A.    Yes.  It is September 27, 1993.

3  Q.    Do you see where the date is on the transcript?

4  A.    That is correct.

5  Q.    Okay.  If you can read the first page or the second page

6  of the transcript, the first page where there is actually

7  conversation, and I will let you know when to stop.

8  A.    Okay.  The first speaker AB is Ashqar, and he says, "By

9  God, no.  I mean, nothing.  May God protect you.  Everything

10  is fine.  Nothing new.  May God bless you."  Abou Mohamed Isam

11  is coming."

12      "Who?"

13      "Isam."

14      "Okay, good God willing."

15      "I am just waiting for what's his name, Riyad, to send me

16  a reply about the other three, who are Yousif, Salah, and Al

17  Hanooti."

18      "Oh, has not Salah answered you yet?"

19      "By God, my brother, I -- I couldn't get ahold of him.

20  So, God willing, I will catch him tomorrow, I mean.  I didn't

21  find him yesterday.  And I contracted him a while ago, but

22  nobody answers, I mean, so -- "

23      "Good."

24      "Good.  But I don't know -- "

25      "Now, it will become how many, six people, I mean, will

1    come."

2         "Hmm.  What's his name, Al Hanooti, Salah as well, Riyad,

3    Abou Ibrahim, and Isam.  That makes it six, I mean".

4         "Jawad."

5         "No.  I meant from New Jersey.  Six, I mean."

6         "Abou Ibrahim, Riyad, and Isam.  Those three are for

7    sure."

8    Q.   Agent Burns, you can stop there.  And Abuo Ibrahim is?

9    A.   The defendant Mohammad El-Mezain.

10   Q.   And where was he living at the time this call took place?

11   A.   In New Jersey.

12   Q.   Looking at the rest of this transcript, generally what do

13   they talk about?

14   A.   Who will be attending the Philadelphia meeting.

15   Q.   Is this really following on the heels of the last call

16   that we played?

17   A.   It does.

18   Q.   Agent Burns, in the course of the material that you

19   reviewed, did you come across any written itinerary for the

20   Philadelphia meeting?

21   A.   I did.

22   Q.   Do you have before you Ashqar Search No. 4?

23   A.   I do.

24   Q.   Where did that document come from?

25   A.   That came from the covert search of the home of Abdel

1  Haleem Ashqar.

2  Q.   And Ashqar was a participant in that first call we just

3  played planning the meeting?

4  A.   In both of the calls that we just discussed.

5        MR. JONAS:  Your Honor, at this time I would offer

6  into evidence Ashqar Search No. 4.

7        THE COURT:  That is admitted.

8        MR. JONAS:  If we can put that on the screen,

9  please, starting with the first page.  The next page.

10  Q.   (BY MR. JONAS)  Agent Burns, the first page it

11  said -- Withdrawn.  What language is this document in?

12  A.   Arabic.

13        MR. JONAS:  And if we can go to page 4, please.

14  Q.   (BY MR. JONAS)  What is the title of this document?

15  A.   "Future of Islamic Action for Palestine in North America

16  seminar, 2-3 October, 1993."

17  Q.   The title "Islamic Action for Palestine," have we seen

18  that title used in any of the documents you testified about

19  already?

20  A.   Yes.  I believe it has been in several, most prominently

21  in the October 1992 internal memorandum from the international

22  Muslim Brotherhood.

23  Q.   That was one of the Elbarasse documents you testified

24  about?

25  A.   That is correct.

1    Q.   On this particular document, just summarize it for us so

2    we don't need to read the whole thing.

3    A.   Basically it lists under No. 1 the goals of the seminar,

4    the Philadelphia meeting.  No. 2, describes how the sessions

5    will be moderated and lists the names of like, for example,

6    session moderator under the first session, if you will scroll

7    down, is the Defendant Shukri Abu Baker.  So it identifies the

8    topic of the first session, the people who will participate,

9    the individual who is moderating.

10        And the same thing for the second session, which is

11   charity work, and identifies who will present the papers, and

12   who will be moderating the session.

13        And on the next page it identifies the topic of the third

14   session, and who would be presenting papers, and the moderator

15   of the session.

16   Q.   Thank you.

17        Agent Burns, did you create a summary chart identifying

18   who attended the session and the documents that you reviewed

19   that helped you identify those people?

20   A.   Yes.

21   Q.   What did you base your summary chart on?

22   A.   We based the summary chart on a variety of different

23   exhibits--the planning phone calls that we just listened to,

24   the actual meeting transcripts themselves, and in the

25   transcripts we were able to identify some of the speakers at

1    the conference.

2         There were also records from the search warrant

3    indicating -- like American Express bills indicating plane

4    tickets that were purchased for individuals.  In addition,

5    there were records obtained from the Marriott Hotel at the

6    time the meeting took place.

7    Q.    What Marriott?

8    A.    I believe it was Courtyard by Marriott in Philadelphia.

9              MR. JONAS:  Your Honor, may I approach?

10             THE COURT:  Yes.

11   Q.    (BY MR. JONAS)  Agent Burns, I am holding up for you what

12   has been marked as Philly Meeting Summary.  Is this the chart

13   that you prepared based upon the records you talked about of

14   who attended the Philadelphia meeting?

15   A.    Yes, we prepared that.

16   Q.    Would this aid the jury in your testimony this afternoon?

17   A.    Yes.

18             MR. JONAS:  Your Honor, at this time I would offer

19   into evidence Philly Meeting Summary.

20             THE COURT:  That is admitted.

21             MR. DRATEL:  I am going to object, Your Honor,

22   because it is misleading with respect to Mr. El-Mezain.  It

23   says the meeting.  He wasn't at the meeting.  The Government

24   acknowledges that.

25             MR. JONAS:  Agent Burns is going to explain exactly

1    that.

2              THE COURT:  That entry?  Okay.

3              MS. CADEDDU:  I would object for the same reason,

4    Your Honor.

5              THE COURT:  Those objections are overruled.  That

6    Philadelphia Meeting chart is admitted.

7    Q.   (BY MR. JONAS)  Agent Burns, let me first start by asking

8    you, the enlargement of this exhibit has tape over a couple of

9    spots.  Why is that?

10   A.   They were corrections made at the last minute.

11   Q.   Okay.  The one on the screen, is that the corrected

12   version, the one that is the actual exhibit?

13   A.   Yes.

14   Q.   Okay.  Can you first walk us through this by explaining

15   across the top what the row is?

16   A.   Well, the first column would be the attendees, the name

17   of the individual that we will be discussing.

18        The next column are the organizations that the individual

19   belonged to according to the evidence that we have discussed.

20        The next column is a column which references AMEX No. 1,

21   which is an exhibit that we will be discussing here.  If that

22   individual appeared in those records as having attended the

23   Philadelphia meeting, there will be a checkmark by that

24   individual's name under that column.

25        The next column is Marriott Hotel records, which were the

1    records that were obtained from the Marriott Hotel at the time

2    of the conference.  If the individual Defendant's name appears

3    in those records, a checkmark will appear across from his name

4    under that column.

5        The next column is listed "speaker at conference," and we

6    have 18 transcripts of conversations that took place during

7    the conference that were recorded.  If the individual either

8    self-identified or his voice was identified by the language

9    specialist as speaking at the conference, there will be a

10   checkmark under his name on the chart.

11       Next, there were some surveillance photos that were taken

12   by FBI agents back in 1993 of the meeting, and if individuals

13   could be positively identified in any of the surveillance

14   photos, there is a check under that column by their name.

15       And then finally, the last column is for planning phone

16   calls, and if the individuals were mentioned as being invited

17   to attend the conference in those calls, there will be a

18   checkmark by that individual's name under that column.

19             MR. JONAS:  Your Honor, at this time I would like to

20   offer into evidence the supporting documentation for this

21   chart, to the extent some of it is not already admitted.  We

22   have AMEX No. 1.

23   Q.   (BY MR. JONAS)  And Agent Burns, whose records are AMEX

24   No. 1?

25   A.   AMEX No. 1 are records obtained from the -- I am looking

1  to make sure I am right, because we had American Express

2  records from two different places.  From American Express.

3  Q.   Whose American Express records are they?

4  A.   The Holy Land Foundation.

5  Q.   Okay.

6       MR. JONAS:  Your Honor, we also offer to admit

7  Marriott.

8  Q.   (BY MR. JONAS)  What is Marriott?  What exhibit is that?

9  A.   Marriott is the name of the exhibit for the Marriott

10 Hotel records.

11      MR. JONAS:  We offer to admit Philly Meeting No. 1

12 through 18.

13 Q.   (BY MR. JONAS)  And what is that?

14 A.   Those are the English transcriptions of the conversations

15 at the meeting.

16      MR. JONAS:  Your Honor, I will have to explain in a

17 moment what we did with those.

18 Q.   (BY MR. JONAS)  And finally Philly Pictures 1 through 6?

19 A.   Those were some of the surveillance photos that agents

20 took back then.

21 Q.   Okay.

22      MR. JONAS:  Your Honor, with Philly Meeting No. 1

23 through 18, which are the transcripts of this meeting that

24 took place, we are offering it a little bit differently than

25 the intercepted calls.  We are offering the whole conference

into evidence.  And I will have Agent Burns explain in a

moment why it is divided into 18.  So the audio disk, which

would be Philly Meeting No. 1-A is a disk of that whole tape

for that section.

       But in addition, we are offering an excerpted transcript.

So we have the full transcript and then an excerpted

transcript, and that is Philly Meeting E.  So if we have for

example, No. 1 would be the full transcript, 1-A is the audio,

and 1-E is the excerpt of that particular session of Philly.

              THE COURT:  You are offering No. 1, 1-A and 1-E.

              MR. JONAS:  Yes, sir, through No. 18, 18-A, and

18-E.

              MS. HOLLANDER:  I just have a question.  We don't

have any objection to these, but is that the entire Philly

meeting?

              MR. JONAS:  No.  1 through 18 is the entire Philly

meeting.

              MS. HOLLANDER:  Okay.  We don't object, as long as

it is the entire meeting.

              MR. JONAS:  That is my understanding.

              THE COURT:  And the AMEX records is AMEX No. 1?

              MR. JONAS:  Yes, sir.

              MS. HOLLANDER:  We don't object to the others.

              THE COURT:  All right.  Those are admitted, then.

Q.    (BY MR. JONAS)  Agent Burns, first of all, why is there

1  18 tapes or transcripts of the Philadelphia meeting?

2  A.    As I understand it, back in 1993 the equipment that the

3  FBI used to record these conversations, it was some type of

4  tape.  I don't know if it was a cassette tape, or I believe it

5  may have actually been one of those old reel to reels.  But

6  they were limited in length, so that once one was filled up

7  they would have to remove it and replace it with a new tape.

8  So we have a transcript for each tape that was made.  So there

9  were approximately 18 tape recordings of that meeting.

10 Q.    And did the FBI record this meeting pursuant to a court

11 order?

12 A.    They did.

13 Q.    Was this part of the intelligence investigations of

14 certain individuals?

15 A.    It was the intelligence investigation of Ashqar.

16 Q.    Agent Burns, there is a blank line about six names, seven

17 names up from the bottom between the name Abu Ahmad and

18 Mohammad El-Mezain.  Can you explain why that is?

19 A.    Yes.  Originally when preparing this chart there were

20 individuals who were invited to attend the conference based on

21 the planning calls, but that we affirmed did not attend for

22 one reason or another.  Those individuals were to be listed

23 below that line as having been invited but not having

24 attended.

25        However, there is I believe an error in that the second

individual listed, Mohamed Al Hanooti, should appear above the

blank line, as there is other evidence that he did in fact

attend.

Q.   Is that other evidence contained within the evidence

admitted?

A.   Yes, it is.

Q.   Agent Burns, I just want to pull up some of these

documents?

MR. JONAS:  If we can pull up AMEX 1, page 6,

please.

Your Honor, I assume, just for the record, they are all

admitted, the documents I offered into evidence?

THE COURT:  Yes.

MR. JONAS:  Thank you, sir.

Q.   (BY MR. JONAS)  Agent Burns, do you see any individuals

who went to the Philadelphia conference on this page with

particular charges?

A.   Yes.  I am going to look at my hard copy because it is a

little bit difficult to read on my screen.

Q.   We will zoom in as soon as you tell me which one to zoom

in on.

A.   Okay.  Third from the top on the left side there, item

No. 27 I believe it is called.

Q.   Who is being paid for here?

A.   Okay.  On this -- Again, this is an American Express

1    bill.  It lists the transaction date, which would be the date

2    of purchase.  It does not list the date of travel.  So this

3    shows that on September 3rd, 1993, a ticket was purchased for

4    Haitham Maghawri from Dallas to Philadelphia.  We do not know

5    the exact travel date for that ticket.

6              MR. JONAS:  Page 11, please.

7    Q.   (BY MR. JONAS)  Who is traveling now to Philadelphia?

8    A.   At the bottom, the two entries there show that on

9    September 10th, 1993, airline tickets were purchased for

10   Shukri Abu Baker the Defendant, and also the Defendant Ghassan

11   Elashi, from Dallas to Philadelphia.

12             MR. JONAS:  Page 12, please.

13             THE WITNESS:  I guess the entire middle section you

14   can highlight.

15        This shows that on September 16th up in the upper left

16   corner, September 16, 1993, that the Holy Land Foundation

17   purchased an airline ticket for G. Saleh, who is Ghassan

18   Saleh, from Dallas to Philadelphia.

19        Moving across the page, on September 17th, 1993, the Holy

20   Land Foundation purchased an airline ticket for O. Amhad to

21   Philadelphia, which would be Omar Ahmad.

22   Q.   If I can interrupt you for a moment.  Where have we seen

23   Omar Ahmad's name on the Elbarasse documents?

24   A.   Well, he was listed with the IAP, but also with the

25   Palestine Committee, on the Elbarasse list of Palestinian

1   Committee members and the Ashqar list of Palestinian Committee

2   members.

3   Q.   And was he involved in that planning phone call that we

4   played for this meeting?

5   A.   Yes, he was.

6   Q.   You testified that these are the HLF AMEX records?

7   A.   Yes.

8   Q.   Was Omar Ahmad an employee of the HLF?

9   A.   No, he was not.

10  Q.   Was he a board member?

11  A.   No.

12  Q.   Was he an officer?

13  A.   No.

14  Q.   Based upon the material that you reviewed, did he have

15  any role with the HLF?

16  A.   Only in respect to his role in the Palestinian Committee.

17  Q.   Okay.  Thank you.

18          MR. JONAS:  If we can turn to page 14, please.

19  Q.   (BY MR. JONAS)  Whose tickets are the HLF paying for

20  here?

21  A.   This is Sharif Battikhi, the second from the top on the

22  left column.

23  Q.   We saw his name in a document the other day, didn't we?

24  A.   We did.

25  Q.   Who is he?

A.    In 1991, he was appointed as a member of the HLF's board

of directors.

Q.    Okay.

          MR. JONAS:  If we can turn to page 12, back to page

12.

Q.    (BY MR. JONAS)  Do you see any hotel bills here?

A.    Yes.  In the bottom on the it shows that the HLF paid the

Courtyard by Marriott in Philadelphia $116.41.  And you can

see the arrival and departure dates, so presumably this would

be one room, october 1st through October 3rd.

          MR. JONAS:  Page 13, please.

Q.    (BY MR. JONAS)  Are they paying for more hotel rooms?

A.    Yes.  This entire page is filled with charges to the Holy

Land Foundation's American Express bill for rooms at the

Courtyard by Marriott in Philadelphia for that time period.

          MR. JONAS:  If we can go back to page 1 on this

exhibit.  Enlarge the top half, please.

Q.    (BY MR. JONAS)  Do we see -- I just want to confirm it

says whose credit card this is?

A.    The Holy Land Foundation, specifically Shukri Abu Baker's

card.

Q.    And do you see any other individual's names who have

access to this card?

A.    It says card member names down below, Shukri Abu Baker,

the Defendant Mohammad El-Mezain, and Haitham Maghawri.

1    Q.    Okay.  Agent Burns, let's look at the Philly Pictures.

2    If we can put up on the screen Philly Picture 1.  You

3    testified these are surveillance photos?

4    A.    They are.

5    Q.    Do you recognize this individual?

6    A.    This person was identified as Ismail Elbarasse.

7    Q.    And who is he again?

8    A.    One of the IAP members; again, one of the Palestinian

9    Committee members, whose home was search where we obtained

10   most of these documents in Arabic that we have been

11   discussing.

12   Q.    Okay.

13        MR. JONAS:  Philly Picture No. 2, please.

14   Q.    (BY MR. JONAS)  Do you recognize this individual?

15   A.    Yes.  This is a side view of the Defendant Ghassan Elashi

16   in front of the hotel.

17        MR. JONAS:  Philly Picture No. 3, please.

18        THE WITNESS:  This is a picture of the Defendant

19   Shukri Abu Baker and Ghassan Elashi.

20        MR. JONAS:  Philly Picture No. 4, please.

21        THE WITNESS:  Again, the Defendants Shukri Abu Baker

22   and Ghassan Elashi.

23        MR. JONAS:  No. 5, please.

24   Q.    (BY MR. JONAS)  Do you recognize these individuals?

25   A.    The individual carrying the box is Haitham Maghawri and

1   the other individual has been identified as Mohamed Al

2   Hanooti.

3   Q.   Is Mohamed Al Hanooti a member of the Palestine

4   Committee?

5   A.   Yes.

6   Q.   Pursuant to the Elbarasse documents you have looked at?

7   A.   That is correct.

8          MR. JONAS:  And finally No. 6.

9          THE WITNESS:  The individual in the very back in the

10  glasses with the tie has been identified as Abdel Haleem

11  Ashqar.

12  Q.   And are there some other individuals who just happened to

13  get in the picture?

14  A.   I don't know who they are.

15  Q.   Okay.  I want to quickly go to the Marriott records.

16         MR. JONAS:  If we can pull up Marriott page 1,

17  please.  Whose bill is this?

18  A.   It has Shukri Baker's name at the top.

19         MR. JONAS:  Next page.

20  Q.   (BY MR. JONAS)  Whose bill is this one?

21  A.   Ghassan Saleh.

22  Q.   Who is that?

23  A.   This individual is Muin Shabib.

24  Q.   Did you hear him on the tape speaking in Philadelphia?

25  A.   They spoke about him in the call, in the planning call,

1    and that he would be an attendee.

2    Q.    And was he actually there?

3    A.    Yes, he was.

4    Q.    What does this one indicate?

5    A.    This, and a few of the following pages, are of the little

6    signature cards that you sign at the hotel when you check in.

7    This one is in the name, and you can see the original name it

8    was in was Hasan Sabri, and then /Maghawri was written in, and

9    it was signed at the bottom by Haitham Maghawri, the HLF

10   officer.

11   Q.    Okay.

12          MR. JONAS:  Next.

13   Q.    (BY MR. JONAS)  What is happening here?

14   A.    Again, this one says has the name Hasan Sabri with a line

15   through it and then has Ghassan Saleh and Riad Ahmed written

16   beside it.  And I can't tell by whom it is signed.

17   Q.    Okay.

18          MR. JONAS:  Next.

19   Q.    (BY MR. JONAS)  Which one is this?

20   A.    This one is for room 227 under the name of M. Abdulqader

21   of Richardson, Texas.

22   Q.    Who is that?

23   A.    That would be the Defendant Mufid Abdulqader.

24   Q.    It says void across it.  Does that mean he wasn't there?

25   A.    He had to have been there because he signed the card, and

1    that is his actual signature at the bottom.  I don't know if

2    the room was canceled -- I don't know why the word void was on

3    there, but he had to have at least been present at the hotel

4    to sign the signature card.

5    Q.   What does it say in the top right hand side of this

6    document?

7    A.   It says "Believe to move to 307 or 301."

8         MR. JONAS:  Let me jump to page 13 the Marriott

9    records.

10   Q.   (BY MR. JONAS)  What is this one?

11   A.   This one is the signature hard for room 401 originally in

12   Hasan Sabri's name, then Mohammad El-Mezain's name is noted,

13   and Haitham Maghawri signed for the room.

14   Q.   Okay.  Thank you.  Did Mohammad El-Mezain attend?

15   A.   No, he did not.

16   Q.   Was that discussed in the Philadelphia meeting?

17   A.   Yes.

18   Q.   What was the reason for him not attending?

19   A.   He was ill and not able to attend.

20   Q.   Outside of the meeting did any of the Defendants publicly

21   discuss what the purpose of the meeting was?

22   A.   Yes.

23   Q.   Who?

24   A.   Shukri Abu Baker.

25   Q.   If you have before you Baker Declaration, which is

1    already in evidence.

2    A.    I do.  Bear with me one second while I find it.

3    Q.    Sure.

4    A.    I have it.

5           MR. JONAS:  If we can turn to the third page,

6    please, and put that on the screen.

7    Q.    (BY MR. JONAS)  The bottom half where it says F, can you

8    read that, please, Agent Burns?

9    A.    Yes.  He says in his sworn statement, "The 1993

10   Philadelphia meeting was a meeting of Islamic intellectuals,

11   academicians, community leaders, and representatives of

12   American Islamic organizations, such as ours.  It was not a

13   meeting of any organization.  No decisions were made by any

14   organization about anything.  Everyone there spoke their

15   minds."

16   Q.    At the Philly meeting was there an announcement made as

17   to the actual purpose of the meeting?

18   A.    Yes.

19          MR. JONAS:  Your Honor, if we can play Philly

20   Meeting 1 the first tape, segment B, please.

21          (Whereupon, Philly Meeting No. 1, Segment B was

22          played, while questions were propounded.)

23   Q.    (BY MR. JONAS)  Did you see where it says, "Abou Ibrahim

24   should have been with us but he is at the hospital for those

25   that don't know"?

```
 1    A.    Yes.

 2    Q.    Is that your explanation for why Mohammad El-Mezain

 3    wasn't there, to your understanding?

 4    A.    Yes.

 5    Q.    In Shukri Baker's declaration did he say this is a

 6    meeting of the Palestine Committee?

 7    A.    No, he doesn't.

 8    Q.    Do you see where it says "union"?

 9    A.    I do.

10    Q.    Is that correct?

11    A.    It is correct, but it is not the --

12          MS. HOLLANDER:  Excuse me.  Who is speaking?  The

13    tape doesn't say who is speaking.

14          THE WITNESS:  Omar Ahmad is the individual who is

15    speaking in clip 1.  Clip 2 I have to see the beginning of it.

16    Q.    (BY MR. JONAS)  We are still on clip 1.

17    A.    We are still on clip 1?  Then it was Omar Ahmad.

18    Q.    It says "union."  Is that supposed to be Union?

19    A.    Union was originally how the word for association was

20    translated.  That should be association, meaning the Islamic

21    Association for Palestine.

22    Q.    I was corrected.  This is the B clip, not the A clip.

23    Does it say who the speaker is on the transcript?  If it would

24    help, I can give you mine.

25    A.    I have it.  Omar Ahmad.
```

1  Q.   Okay.  When Omar Ahmad announced that this was a meeting

2  of the Palestine Committee, was Shukri Baker in the room?

3  A.   Yes.

4  Q.   How do you know that?

5  A.   Because he spoke like within a minute before Omar Ahmad

6  announced this.

7          MR. JONAS:  If we can turn to page 3 of the excerpt.

8  If we can get that on the screen, please, Philly meeting 1-E,

9  page 3.

10  Q.   (BY MR. JONAS)  Do you see that, Agent Burns?

11  A.   I do.

12  Q.   Okay.  Do we see Shukri Baker speaking?

13  A.   Yes, we do.

14  Q.   Does this area, this excerpt identify what his role is to

15  be in this conference?

16  A.   It does.  It indicates that -- would you like me to read

17  it?

18  Q.   Sure.  Go ahead.

19  A.   Omar Ahmad says, "The third session, who has papers?

20  Gawad.  The third session, who has papers for it?  From the

21  beginning, the first session we have Sheik Sharif and brother

22  Abdel Salam, brother Gawad, and Aboul Hasan, Abdel Halim.

23  Anyone else?  Did you write them down?  The second session,

24  guys, stay with me so that we could finish.  The second

25  session we have Osama, Mo'een, and Shukri Abu Baker.  And it

1  will be about charity work.  Anyone else?  The third session

2  will be about political media and popular activism and PR.  We

3  have Ghassan, Saleh, Gawad, and Abdel Rahman, Nihad and Akram.

4  Anyone else?  Who is going to be the moderator of the 1st

5  session?"

6        And he goes on, and down farther where Ghassan is

7  speaking he says, "Regarding the 1st session, Shukri should be

8  the moderator."

9  Q.    By the way, Agent Burns, does each transcript, for either

10 the full transcript or the excerpted transcript, identify the

11 speakers for that particular transcript?

12 A.    Yes.  On the very first page of each transcript.

13 Q.    So where we have initials on the attributions as to who

14 is speaking, all one has to do is go to the first page of the

15 transcript and they can see who that person is.  Is that

16 correct?

17 A.    That is correct.  And with each transcript, different

18 speakers will probably be identified.  So on one transcript

19 you may have five or six people, and on another transcript you

20 may have ten people.

21 Q.    And did Shukri Baker in fact moderate any sessions?

22 A.    He did.

23 Q.    Okay.  Agent Burns, did Shukri Baker the Defendant talk

24 about presenting a cover for this Philadelphia meeting in case

25 anyone asks?

1  A.    He did.

2        MR. JONAS:  If we can turn to Philly Meeting No. 3.

3  Q.    (BY MR. JONAS)  Before I ask you about that one, did they

4  jump around in subject matter during their sessions?

5  A.    Yes.  As you can see, the conference was organized into

6  sessions according to topic, but they did venture off of topic

7  on several occasions, and then they would try to get back on

8  topic.  But they do venture around.

9  Q.    Okay.  So we may venture around ourselves, then?

10 A.    Yes, we will be doing that.

11 Q.    Okay.

12       MR. JONAS:  If we can turn to Philly Meeting No. 3,

13 page 3.  This is the excerpted one, Philly Meeting No. 3-E.

14       THE WITNESS:  I have it.

15 Q.    (BY MR. JONAS)  Do can you have it before you?

16 A.    I do.

17 Q.    This is a short one so we will just read it.  Do you see

18 the second from the top segment?  Can you read what Shukri

19 Baker says about the meeting?

20 A.    "My brothers, this talk is to be continued, God's

21 willing.  There are remarks now.  Please don't mention the

22 name Samah in an explicit manner.  We agree on saying it as

23 sister Samah.  We will talk about her honor, and the session

24 is -- the session here is a joint workshop between the Holy

25 Land Foundation and the IAP.  This is the official form.  I

1  mean, please in case some inquired."

2  Q.   Agent Burns, going back to your Philly Meeting Summary

3  Chart, under organizations you list several organizations--PC,

4  HLF, IAP, depending upon the individual.  Can you explain

5  that, please?

6  A.   Yes.   Individuals who are affiliated with various

7  organizations, according to the evidence that has already been

8  presented, their affiliations are noted in that column.  For

9  example, with the Defendant Shukri Abu Baker we have seen

10  documents that we have are introduced here showing that he was

11  a member of the Palestinian Committee and the HLF, and we have

12  seen his deposition testimony where he admitted being a member

13  of the IAP's advisory board.  Therefore, all three

14  organizations are noted beside his name.

15  Q.   Okay.  And that continues throughout this chart?

16  A.   That is correct.

17  Q.   Okay.  So Shukri Baker, what you just read, says, "In

18  case someone inquired, the session here is a joint session

19  between the Holy Land Foundation and the IAP."  Is everyone

20  who attended, pursuant to your summary, a member of the HLF or

21  part of the HLF or the IAP?

22  A.   No.

23  Q.   Okay.  He uses -- He uses a term sister Samah.  Does he

24  talk about that in his declaration what sister Samah meant in

25  this Philly conference?

1    A.    In his sworn statement he does, yes.

2         MR. JONAS:  If we can pull up Baker Declaration,

3    page 4, please.

4    Q.    (BY MR. JONAS)  What does Shukri Baker say about the term

5    Samah?

6    A.    He says, "The use of the word Samah was a whimsical and

7    ironic" --

8         MS. HOLLANDER:  Would you have her read it from the

9    beginning?

10   Q.    (BY MR. JONAS)  There is a word at the top right.

11   A.    I am sorry.  "Some people at the meeting spoke of Hamas

12   openly, and there was no reason for them not to, since Hamas'

13   role in Palestine was a natural subject of discussion, and

14   Hamas was not a banned organization at that time.  The use of

15   the word Samah was a whimsical and ironic play on words.

16   Samah means forgiveness in Arabic, and in my opinion those who

17   used the term were making ironic fun of Hamas, not adopting a

18   secret term to disguise their references to the organization."

19   Q.    So, Agent Burns, in what we just read a moment ago when

20   he says sister Samah, according to this declaration he is

21   meaning sister forgiveness?

22   A.    If you believe what he says in his declaration.

23   Q.    Do you know what Samah is backwards?

24   A.    Yes.

25         MR. JONAS:  Your Honor, can I just use the elmo,

1    please?

2    Q.   (BY MR. JONAS)  Do you see what I wrote?

3    A.   I do.

4    Q.   What did I write?  What word that is?

5    A.   Reading left to right it is Samah.

6    Q.   Okay.  What is Samah backwards?

7    A.   Hamas, which interestingly in reading Arabic you read

8    from the right to the left.

9         MR. JONAS:  Go back to the screen, please.

10   Q.   (BY MR. JONAS)  What meaning did the word Samah have in

11   the conference?

12   A.   It was a code word for Hamas.

13   Q.   And is that identified in the conference?

14   A.   Yes, it is.

15        MR. JONAS:  Can you turn to Philly meeting 4-E?  We

16   are going to play segment A, please.

17             (Whereupon, Philly Meeting No. 4, Segment A was

18             played, while questions were propounded.)

19   Q.   (BY MR. JONAS)  Agent Burns, have we seen any documents

20   during the course of your testimony to indicate who was going

21   to commit jihad to liberate Palestine?

22   A.   Yes.

23   Q.   What document?

24   A.   Hamas, according to the Hamas charter.

25   Q.   The first thing, or one of the first things we saw on

1   that one, GA, which is who?

2   A.    Gawad.

3   Q.    Gawad says, "Hamas...the Samah Movement.  I mean Samah."

4   Did Shukri Baker express any concern over using the word Hamas

5   during the course of this conference?

6   A.    Yes, he did.

7           MR. JONAS:  If we go back to Philly Meeting No. 3,

8   page 3.  This is a short one.  The third segment.

9   Q.    (BY MR. JONAS)  Can you read that segment Agent Burns?

10   A.    Yes.  Let me find out who AU is.  Aboul Osama is

11   speaking.  He says, "As far as the police is concerned, there

12   is a good reaction to it.  Expectations are that -- It depends

13   on the media if we managed to reach the people."

14           An unknown male says, "What about people's opinions?"

15           "That depends."

16           Unknown male asks, "Is this against Hamas?"

17           Shukri Abu Baker says, "Didn't we say not to mention that

18   term?"

19           Unknown male then says, "Is it against the Movement?"

20   Q.    Agent Burns, have we seen the term Movement used in this

21   case?

22   A.    Yes, we have.

23   Q.    What does that mean?

24   A.    It is short for the Islamic Resistance Movement, which is

25   Hamas.

```
 1    Q.    Is the Philadelphia meeting the only time you have seen

 2    the word Samah used?

 3    A.    No.

 4    Q.    When else have you seen it?

 5    A.    Phone calls.

 6    Q.    Do you have before you Baker Wiretap No. 4?

 7    A.    I do.

 8    Q.    And who are the participants on that call?

 9    A.    Shukri Abu Baker the Defendant, and Abdel Haleem Ashqar.

10    Q.    What is the date of the call?

11    A.    January 11th, 1996.

12              MR. JONAS:  Your Honor, at this time I would offer

13    into evidence Baker Wiretap No. 4 and 4-A.

14              THE COURT:  Admitted.

15              MR. JONAS:  If we can play that, please.

16              (Whereupon, Baker Wiretap No. 4, 4-A was played,

17              while questions were propounded.)

18    Q.    (BY MR. JONAS)  Agent Burns, do you see where Shukri

19    Baker says, "visited their aunt's house"?

20    A.    I do.

21    Q.    Have you seen that term used before?

22    A.    I have.

23    Q.    Where?

24    A.    I have seen it in some of the evidence here; none that we

25    have discussed yet.
```

1    Q.   Without giving your understanding of it, is it a word

2    that -- In the context that you have seen it, not just in this

3    call, but other contexts, is that a code word?

4    A.   It is a code word.

5    Q.   Okay.  Agent Burns, do you see where it says, "he claims

6    a relation to her, this Hajja Samah"?

7    A.   I do.

8    Q.   Using the definition as applied in Baker's declaration,

9    the sworn statement, would that mean Hajja forgiveness?

10   A.   If you look at his statement, but it makes no sense in

11   this context.

12   Q.   Have you seen the term Hajja before?

13   A.   Yes.

14   Q.   Do you know what that means?

15   A.   It can be translated as sister.  It is more of a

16   respected female, but it can be translated as sister.

17           MS. CADEDDU:  I object to her opining about what

18   things mean in Arabic.  She is not an expert or translator.

19   She doesn't speak Arabic.

20           THE COURT:  Overrule that objection.  She may

21   testify to her understanding.  Go ahead.

22   Q.   (BY MR. JONAS)  And is sister Samah the term that we have

23   seen used in the Philadelphia meeting?

24   A.   It is.

25   Q.   Agent Burns, do you see the term "old man"?

1    A.    I do.

2    Q.    Have you seen that term used before?

3    A.    I have seen that term used in the context of this issue

4    and this evidence to mean Yasser Arafat.

5    Q.    Agent Burns, have you seen the use of the term Samah in

6    other calls?

7    A.    Yes.

8    Q.    We will save them for later.

9    A.    Okay.

10   Q.    All right.  You testified that at the time of the

11   Philadelphia meeting the Oslo Accords had just come out.

12   Correct?

13   A.    That is correct.

14   Q.    Per the Hamas charter, what was Hamas' position on the

15   Oslo Accords?

16   A.    Well, according to the Hamas charter they were opposed to

17   any type of peaceful compromise with the Israelis.  The

18   charter predated the Oslo Accords, the signing of the Oslo

19   Accords.

20   Q.    Did the participants in the Philadelphia meeting discuss

21   moving in the same direction as Hamas on this issue?

22   A.    They did.

23         MR. JONAS:  If we can play Philly Meeting No. 2-E,

24   Segment A, please.

25         (Whereupon, Philly Meeting No. 2-E, Segment A was

1          played, while questions were propounded.)

2     Q.   (BY MR. JONAS)  Agent Burns, what is the Fund?

3     A.   That is the Holy Land Foundation.

4     Q.   Agent Burns, do you see where it says, "The programs or

5     the organizations overall should be in complete harmony with

6     the general directions of the Movement"?  What is the

7     Movement?

8     A.   The Islamic Resistance Movement, Hamas.

9     Q.   Who is Abou Ibrahim?

10    A.   The Defendant Mohammad El-Mezain.

11    Q.   Agent Burns, the individual I believe was Gawad who was

12    speaking, talked about moving in directions.  They talked

13    about the Movement being Hamas.  Did Defendant Shukri Baker

14    also talk about moving in particular directions?

15    A.   He did.

16         MR. JONAS:  Okay.  If you will turn to Philly

17    Meeting No. 6-E.  If we can play Segment A, please.

18         (Whereupon, Philly Meeting No. 6-E, Segment A was

19         played, while questions were propounded.)

20    Q.   (BY MR. JONAS)  Who is speaking here?

21    A.   This is the Defendant Shukri Abu Baker.

22    Q.   Okay.  Agent Burns, do you see where Shukri Baker says,

23    "We used to have an approach which probably had a glaring

24    color, I mean, the jihadist [address], and this and that,

25    focus on activism even through our lectures, conferences and

1  seminars"?

2      You said you viewed videotapes, which we have seen some,

3  and I assume we will see more.

4  A.   Yes.

5  Q.   In those videotapes, did many of them predate the

6  Philadelphia conference?

7  A.   They do.

8  Q.   The ones that predate Philadelphia, are they of the same

9  nature of the ones we saw already talking about Hamas, Hamas

10  symbols on the screen, et cetera?

11  A.   The ones that predate the Philadelphia meeting, yes.

12  Q.   The ones that postdate Philadelphia, does the nature of

13  them change?

14  A.   Yes.  They are very toned down.

15  Q.   Did you hear the Defendant Shukri Baker use the term

16  "derailment"?

17  A.   Yes.

18  Q.   Used it a few times.  Is that correct?

19  A.   That is correct.

20  Q.   Did any of the other participants discuss derailment?

21  A.   Yes.

22      MR. JONAS:  If we can turn to Philly Meeting No.

23  10-E, Segment D.

24      One moment, Your Honor.

25      THE COURT:  Yes.

1      MR. JONAS:  Your Honor, we are about to play about

2   four segments in a row, if you are ready to take a break.

3      THE COURT:  This is a good time to break?  Let's

4   take a 20-minute break.  Let's be back at 20 till.

5          (Whereupon, the jury left the courtroom.)

6      THE COURT:  All right.  We will be in recess, 20

7   till.

8              (Brief Recess.)

9      THE COURT:  All right.

10   Mr. Jonas?

11   Q.  (BY MR. JONAS)  Agent Burns, before the break we had

12   played a statement where the Defendant Shukri Baker used the

13   term derailment a few times.  And I believe I asked you, was

14   the term derailment used which other participants in this

15   Philadelphia meeting?

16   A.   Yes, it was.

17   Q.   What was the context?

18   A.   They were discussing how to derail the Oslo Peace

19   Accords.

20      MR. JONAS:  If we can play Philly Meeting No. 10,

21   Segment D.

22          (Whereupon, Philly Meeting No. 10, Segment D, E, F,

23          and K was played, while questions were propounded.)

24   Q.  (BY MR. JONAS)  Agent Burns, in the top right hand side

25   it says D-E-R-A on the screen.  What word is that in your

1    transcript?

2    A.    That would be the word derail.

3    Q.    Cut off here?

4    A.    Apparently it is off center a little bit.

5    Q.    Okay.  Who is AS that is doing the speaking?

6    A.    I will confirm from the front page.  That is Abdel Haleem

7    Ashqar.

8    Q.    Ashqar.  Okay.

9          Agent Burns, did the Defendant Shukri Abu Baker talk

10   about his position on peace agreements in his declaration?

11   A.    Yes.

12   Q.    If we can look at Baker declaration, page 2 paragraph 7.

13          MR. JONAS:  Put that on the screen, please.

14   Q.    (BY MR. JONAS)  What does Shukri Baker say regarding his

15   support for peace?

16   A.    He says "Neither I, nor to my knowledge any of the other

17   founders of this charity, have had any connection whatever to

18   Hamas, or to any terrorist groups or to terrorism.  I do not

19   believe that suicide bombing is countenanced by the Islamic

20   religion.  I have always opposed radicalism.  I have always

21   been for dialogue and for peace, and I am firm in these

22   convictions.  I am confident that the other founders of the

23   Holy Land Foundation feel the same way.  Our objective was and

24   has always been simply to alleviate suffering in Palestine and

25   elsewhere."

1   Q.   Does he talk about derailing the peace accords in his

2   declaration?

3   A.   No, he does not.

4              MS. HOLLANDER:  Your Honor, I would like to voice an

5   objection.  The Oslo Accords were not peace accords, and the

6   Government keeps using the term peace accord.  The Oslo Accord

7   was the Oslo Accord.  It was not a peace agreement.

8              THE COURT:  You may cross examine Agent Burns on

9   that when your turn comes, counsel.

10     Go ahead.

11  Q.   (BY MR. JONAS)  During back to the Philadelphia meeting,

12  did the Defendant Shukri Abu Baker discuss the support that

13  the organizations must give to Hamas?

14  A.   Yes.

15             MR. JONAS:  If we can go to Philly Meeting No. 12,

16  Segment A, please, from the excerpt.

17             (Whereupon, Philly Meeting No. 12, Segment A was

18             played, while questions were propounded.)

19  Q.   (BY MR. JONAS)  Again, Agent Burns, what is the Movement?

20  A.   That is the Islamic Resistance Movement, Hamas.

21  Q.   Agent Burns, how does Shukri Baker refer to what is going

22  on with the Oslo Accords in this attribution right here?

23  A.   In this attribution he refers to the Oslo Accords as the

24  peace project.

25  Q.   Agent Burns, based upon your review of the Elbarasse

1    records, which are in evidence here, was there one of the

2    organizations of the Palestine Committee that functioned as a

3    think tank?

4    A.   The United Association for Studies and Research was what

5    its title said, a research center, which would be a think

6    tank.

7              MR. JONAS:  If we can play Segment B of Philly

8    Meeting No. 12-E.

9              (Whereupon, Philly Meeting No. 12-E, Segment B was

10             played while questions were propounded.)

11   Q.   (BY MR. JONAS)  Agent Burns, who is speaking here?

12   A.   This is Shukri Abu Baker.

13   Q.   Okay.  Agent Burns, did the participants in the

14   Philadelphia meeting ever discuss what they can and cannot

15   officially say in regard to their positions?

16   A.   Yes.

17             MR. JONAS:  If we can turn to Philly Meeting No. 5

18   and play Segment F.

19             (Whereupon, Philly Meeting No. 5, Segment F was

20             played, while questions were propounded.)

21   Q.   (BY MR. JONAS)  Agent Burns, who is speaking?

22   A.   This is Gawad.

23   Q.   On here it says GA, on the transcript, GA.  Is Gawad on

24   the Philadelphia meeting list of people who were there?

25   A.   Yes.  It is spelled with a J.  Here they use the G and

1   the J interchangeably on his name.  So Gawad is the same as

2   Jawad.

3   Q.    Did any of the participants in the Philadelphia meeting

4   discuss how they would go about supporting the resistance?

5   A.    They did.

6           MR. JONAS:  If we can play Segment G of Philly

7   Meeting No. 5.

8           (Whereupon, Philly Meeting No. 5, Segment G was

9           played, while questions were propounded.)

10  Q.    (BY MR. JONAS)  Agent Burns, where the Defendant Shukri

11  Abu Baker says, "You Virginia guys got us in trouble," were

12  there people from Virginia who attended this meeting?

13  A.    Yes.

14  Q.    Who?

15  A.    One of them was Muin Shabib was in Virginia at that time.

16  Q.    How about Elbarasse?

17  A.    He was as well.

18  Q.    Did any of the participants, in particular the Defendant

19  Shukri Abu Baker, express any concern about Hamas being

20  labeled as a terrorist organization?

21  A.    They did.

22          MR. JONAS:  If we can play Philly No. 5, Segment H.

23          (Whereupon, Philly Meeting No. 5, Segment H was

24          played, while questions were propounded.)

25  Q.    (BY MR. JONAS)  Agent Burns, did you see where it says Al

1  Zatounia?

2  A.  I do.

3  Q.  Have we seen Al Zatounia referenced in the Elbarasse

4  records?

5  A.  I believe it was referenced in one of the documents as

6  one of the periodicals.

7  Q.  Periodicals published by whom?

8  A.  The IAP.

9       MR. JONAS:  Play the next segment, Philly No. 5,

10  Segment I.

11       (Whereupon, Philly Meeting No. 5, Segment I was

12       played, while questions were propounded.)

13  Q.  (BY MR. JONAS)  Agent Burns, you see where Shukri Baker

14  -- Is he the one speaking?

15  A.  He is.

16  Q.  He talks about "Our brothers in the occupied territories

17  will pretend to go along with the self-rule, and none of their

18  societies will be shut down."  During the course of your

19  testimony have we talked about any societies that belong to

20  Hamas?

21  A.  The Islamic Center of Gaza would be one.

22  Q.  That was the one that was founded by Sheikh Yassin?

23  A.  That is correct.  That the HLF gave money to in the early

24  years.

25  Q.  Agent Burns, do you see where Shukri Baker uses the word

1  Samah again?

2  A.    I do.

3  Q.    And under his definition would that say, then, "America

4  will classify forgiveness as a terrorist organization," if you

5  used the definition he provided in his declaration?

6  A.    If you use the definition he provided in his sworn

7  declaration, in this context it makes no sense.

8  Q.    Agent Burns, are you familiar with the al-Aqsa

9  educational that is in quotes there?

10  A.    I am.

11  Q.    Is that an entity we are going to talk about in a little

12  while?

13  A.    That is an entity that we actually spoke about on

14  Thursday, Abdel Haleem Ashqar's educational fund.

15  Q.    Ashqar is again who?

16  A.    A member of the Palestine Committee.

17  Q.    He was a participant in the Philadelphia meeting?

18  A.    That is correct.

19        MR. JONAS:  If we can play from Philly Meeting No.

20  5, Section J.

21        (Whereupon, Philly Meeting No. 5, Section J was

22        played, while questions were propounded.)

23  Q.    (BY MR. JONAS)  Agent Burns, at the time of the

24  Philadelphia meeting in 1993, had Hamas been officially

25  designated as a terrorist organization by the United States?

1   A.   No.  Actually the mechanism for designating an

2   organization as a terrorist did not exist at the time of this

3   conference.

4   Q.   Are you aware if the United States in any way recognized

5   Hamas as a terrorist organization at around this time?

6   A.   After the Oslo Accords, the U.S. State Department came

7   out and named them as a terrorist organization, but it did not

8   have the same effect as what an official designation would

9   later on.

10  Q.   What was that document that it came out in?

11  A.   Generally they print these things in what is called --

12  They have a pamphlet called The Patterns of Global Terrorism.

13           MR. JONAS:  Finally, if we can turn to Philly

14  Meeting No. 6 and play segment D.

15           (Whereupon, Philly Meeting NO. 6, Segment D was

16           played, while questions were propounded.)

17  Q.   (BY MR. JONAS)  Agent Burns, who is speaking now?

18  A.   This is the Defendant Shukri Abu Baker.

19  Q.   Okay.  Agent Burns, did the participants discuss what

20  they can and cannot say to America?

21  A.   They did.

22           MR. JONAS:  If we can play Philly Meeting No. 6,

23  segment E.

24           (Whereupon, Philly Meeting No. 6, Segment E was

25           played, while questions were propounded.)

1    Q.   (BY MR. JONAS)  Agent Burns, who is speaking now?

2    A.   This speaker is an unidentified male.

3    Q.   Agent Burns, are you familiar with what is termed the

4    1948 territories?

5    A.   Yes.

6    Q.   What does that mean?  What is your understanding of what

7    that means?

8    A.   That means Israel as it exists.  Israel was established

9    in 1948, so if you are requesting the 1948 territories you

10   want the land that is now considered Israel.

11   Q.   Agent Burns, what document have we seen that discusses

12   demanding the 1948 territories?

13   A.   The Hamas charter.

14   Q.   Are there other times when they discuss what they can and

15   cannot say to the Americans?

16   A.   Yes.

17        MR. JONAS:  If we can play Philly Meeting No. 7,

18   Segment A.

19        (Whereupon, Philly Meeting No. 7, Segment A was

20        played, while questions were propounded.)

21   Q.   (BY MR. JONAS)  Who is speaking here?

22   A.   This is an unknown male.

23   Q.   And this unknown male refers to Shukri.  Was there any

24   other Shukri at the Philadelphia meeting besides the Defendant

25   Shukri Baker?

1   A.   No.

2   Q.   Agent Burns, you see where it says, "You can try to

3   convince people from behind saying tone it down a little"?

4   A.   I do.

5   Q.   Is that consistent with what you testified earlier about

6   the videotapes of the conferences, toning it down post

7   Philadelphia meeting?

8   A.   Yes.

9   Q.   Agent Burns, do you see -- Who is OM that is speaking?

10   A.   That is Omar Ahmad.

11   Q.   Do you see where he references Sheik Omar Abdel Rahman?

12   A.   I do.

13   Q.   Do you know who that individual is?

14   A.   Yes.

15   Q.   Who is that?

16   A.   He is one of the individuals who is currently

17   incarcerated for his role in the plotting of the first World

18   Trade Center bombing.

19   Q.   Which occurred in the early '90s?

20   A.   In 1993.

21   Q.   He is not a member of the Palestine Committee, is he?

22   A.   No, he is not.

23   Q.   Was he part of this meeting at all?

24   A.   No, he was not.

25   Q.   Other than a reference to him here, does he have any

1    involvement to the Defendants, based upon the evidence that

2    you have seen?

3    A.    Not based on the evidence that we have discussed, no.

4    Q.    (BY MR. JONAS)  Did the Defendant Shukri Abu Baker

5    discuss deception?

6    A.    He did.

7    Q.    If we can, staying with Philly Meeting No. 7, do you have

8    page 6 before you?

9    A.    I do.

10   Q.    We will put it on the screen and read this one.  It is

11   fairly short.  I believe it is page 5, the second segment

12   there.  Who is speaking?

13   A.    That is the Defendant Shukri Abu Baker.

14   Q.    Okay.  Can you read this segment?

15   A.    He says, "I swear by your God that war is deception.  War

16   is deception.  We are fighting our enemy with a kind heart and

17   we never thought of deceiving it.  War is deception.  Deceive,

18   camouflage, pretend that you're leaving while you're walking

19   that way.  Or do we have to be -- Deceive your enemy."

20        Omar Ahmad says, "This is like one who plays basketball.

21   He makes a player believe that he is doing this while he does

22   something else.  I agree with you.  Like they say, politics is

23   a completion of war."

24        Shukri Abu Baker says, "Yes, politics, like war, is a

25   deception."

1   Q.   Agent Burns, in 1993 when the Philadelphia meeting took

2   place, what was the Holy Land Foundation supposed to be?

3   A.   A Muslim charity.

4   Q.   Did this discussion of war being deception come up again?

5   A.   It did.

6        MR. JONAS:  If we can turn to Philly Meeting No.

7   12-E.  If we can play Segment E of Philly meeting 12.

8        (Whereupon, Philly Meeting No. 12-E, Segment E was

9        played, while questions were propounded.)

10  Q.   (BY MR. JONAS)  Agent Burns, who is speaking here?

11  A.   I believe it was -- I need to look at the beginning of

12  it, or if you can tell me what page it is on in the

13  transcript.

14  Q.   On the excerpt it is page 6.

15  A.   Unknown male.

16  Q.   Okay.  You see he says, "The first goal is to continue to

17  support the Palestinian cause and defending the Movement's

18  positions," what is the Movement?

19  A.   The Islamic Resistance Movement, Hamas.

20  Q.   Agent Burns, do you see where it says, "Working to make

21  the Islamic Association for Palestine the main source of

22  information which represents the movement's positions," who

23  published the Hamas charter in the United States?

24  A.   The IAP.

25  Q.   Is that the Islamic Association for Palestine?

1    A.    Yes, it is.

2    Q.    Agent Burns, who is SH that says "It should lie"?

3    A.    That is the Defendant Shukri Abu Baker.

4    Q.    Agent Burns, did you see where it said, "Learn from your

5    masters in the Fund"?  What is the Fund?

6    A.    The Holy Land Foundation.

7    Q.    Agent Burns, do you have the last page of Philly segment

8    12-E before you?  There is just one line there that is the

9    last segment?

10   A.    I do.

11        MR. JONAS:  If we can put that last page, page 8

12   open the screen, please.

13   Q.    (BY MR. JONAS)  Agent Burns, just one line.  What does

14   Shukri Baker say, the last line in the excerpted transcript?

15   A.    He says, "Your mother Samah is the mother of democracy."

16   Q.    Did Shukri Baker the Defendant say anything about what he

17   can and cannot say to America about his relationship to Hamas?

18   A.    He did.

19        MR. JONAS:  If we turn to Philly Meeting No. 8, in

20   the excerpts if you can turn to page 3.  Can we get page 3 on

21   the screen, please?

22   Q.    (BY MR. JONAS)  Agent Burns, starting with the top where

23   it says UM, "I can repeat the text," can you read the rest of

24   this segment please?

25   A.    "I can repeat the text if that is going to solve the

problem.  We can say attacking the -- the credibility of the

representation of the Organization, the Organization's right

to sign an accord on behalf of the Palestinian people."

Q.    Let me pause you for a moment.  Which organization signed

the Oslo Accords on behalf of the Palestinian people?

A.    The Palestine Liberation Organization.

Q.    Okay.  Continue.

A.    Gawad says, "No, he didn't sign as the Organization.  He

signed as Abu Ammar.  He didn't sign as the Organization."

Unknown male says, "No, he signed the Palestinian people.

What's his name?  Abu Abbas signed as the Palestinian

delegation."

Gawad said, "But not even one major democratic

Palestinian organization until now has --"

Unknown male says, "This is the point.  This is the

point."

Shukri Abu Baker said, "This is what they understand --

Abu, Abu.  This is what they understand.  Currently Abu Ammar

is the chairman of the PLO.  Our brothers, we cannot use the

same poetic Arabic style when addressing the American

mentality.  Our brother, the American will not understand it.

Please allow me.  They will tell you, 'If he doesn't represent

you, why the hell don't you get rid of him?'  He will tell

you, 'If he doesn't represent you, who represents the

Palestinian people?'"

1    Unknown male says, "We should drop the Arafat issue now.

2    We're talking about the Organization."

3    Shukri Abu Baker says, "These are very critical

4    questions.  We're replying to the question.  It is very

5    critical."

6    Unknown male, "If he is democratic."

7    Shukri Abu Baker says, "I cannot say to him that I'm

8    Hamas."

9    MR. JONAS:  If we play the next segment of Philly

10   Meeting No. 8, which is Segment B.

11   (Whereupon, Philly Meeting No. 8, Segment B was

12   played, while questions were propounded.)

13   Q.   (BY MR. JONAS)  Agent Burns, do you see where it says, "I

14   mean, in the same style as Samah's"?

15   A.   Yes.

16   Q.   Would that mean "in the same style of forgiveness"?

17   A.   No, it doesn't.

18   Q.   Who is speaking right now?

19   A.   Shukri Abu Baker is.

20   Q.   And Omar Yehia is who?

21   A.   That is the same as Omar Ahmad the IAP member/Palestinian

22   Committee member who has been speaking quite frequently

23   throughout this.

24   Q.   Shukri Baker says, "You can go meet a Congressman in your

25   name, in Omar Yehia's name, in the name of the Association's

1    present, and tell him [UI] doesn't represent us.  Mr. Ahmad

2    Yassin represents us."  Who is Ahmed Yassin?

3    A.    The Hamas founder, the former spiritual leader that is on

4    your board there in the middle on the top.

5    Q.    The top, Sheikh Ahmed Yassin?

6    A.    That is correct.

7            MR. JONAS:  If we can stay with Philly Meeting No.

8    8, page 5 of the Philly meeting 8-E, the excerpted portion,

9    the top half, please.

10   Q.    (BY MR. JONAS)  Agent Burns, if you can read what Shukri

11   Baker says at this point in the meeting?

12   A.    He says, "The point you presented which is -- which is

13   withdrawing, attacking his credibility as a representative and

14   a leader of the Palestinian people.  But I tell you that we

15   don't want the American front to become a front for direct

16   conflict.  These things will put us in direct conflict, not

17   only with the Palestinians, even with the official government

18   circles.  What is our benefit?  What is our interest?  As

19   Palestinian action organizations in America, what is our

20   benefit in creating more enemies than necessary?  What is the

21   interest that -- Are you going to win the Palestinian cause if

22   this guy who works at McDonald's, the worker who works there

23   for $4 an hour understands whether Abu Ammar represents us or

24   not, or the Congressman?  If you explain the situation to him

25   that he is -- and doesn't represent the Palestinian people, is

he going to tell you, 'Yes, by God, you convinced me.'
Despite that everything goes as planned.  The point is that we
are not going to expose ourselves to another wave and be
anti-establishment -- anti-establishment.  Okay?  Because for
the American organizations, if you're against peace you're a
terrorist.  When you start attacking Abu Ammar, his
leadership, the people who signed and attended and arranged
their affairs with -- such as a Saudi person who attacks the
Saud family and say that he is not a ruler, my brother, let
him --"

     Unknown male says, "Okay.  Amazing.  But brother, please
finish."

Q.   That is fine.  Were there any other discussions regarding
their presentation or their face to America?

A.   Yes.

Q.   Were there several more discussions regarding that topic?

A.   Yes.

Q.   In fact, was that the subject matter of this whole
conference, this whole meeting?

A.   Yes.

          MR. JONAS:  Let's look at one more.  Philly Meeting
No. 10 in the excerpt page 2.  Can you get that on the screen,
please, the bottom half?

Q.   (BY MR. JONAS)  Agent Burns, are you up to reading one
more?

1    A.    Okay.  Gawad says, "America and the American, in order to

2    convince the people, because everybody is convinced; the

3    Americans are convinced and the Jews.  People must -- On the

4    ground they're happy with the flag now, but the flag will last

5    one week, two weeks, or a month.  And what is after that?  We

6    need bread.  This will be -- The propaganda will be spread

7    will affect Hamas.  In the meanwhile, are you going to collect

8    a million?  Not a million for instance.  The media and

9    political support for the Cause in general terms, and to the

10   rights of the Palestinian people specifically will be

11   negatively affected in my opinion.  Why?  First, the

12   organizations which work on these issues are American and they

13   deal from the -- from America's mentality.  A prominent

14   example for that is the occupation.  The U.S. government used

15   to call it occupation, and used to reject its measures and

16   reject this and that, and used to call to the implementation

17   of the Geneva agreement.  This was the official America, State

18   department and otherwise.  It tried to, because all became a

19   United Nations, so you no longer have the right to resist the

20   occupation.  All of that will be classified according to the

21   American concept.  There is no occupation now.  There is an

22   understanding and there are no weapons to be carried because

23   there is no occupation to be fought.  There is no more

24   suffering because of the occupation.  Suffering now is on the

25   hands of the local government.  This will be classified as

1    terrorism according to America.  How are you going to do it?

2    How are you going to perform jihad?"

3    Q.    Okay.  Agent Burns, have we already heard in some of the

4    calls or some of the segments that we have played or read a

5    discussion for a new organization?

6    A.    Yes.

7    Q.    Has that discussion -- did that happen several times

8    where they discussed creating a new organization?

9    A.    It did.

10   Q.    Okay.

11          MR. JONAS:  If we can turn to Philly Meeting No. 5,

12   and the excerpt if we can get page 1 on the screen, please.

13   Q.    (BY MR. JONAS)  Agent Burns, I will give your voice a

14   break and I will just read this one.

15          Unknown male 2 says, "In my opinion, we must form a new

16   organization for activism which will be neutral because we are

17   placed in a corner.  We are placed in a corner.  It is known

18   who we are.  We are marked.  And I believe that there should

19   be a new neutral organization which works on both sides so

20   that -- because this state is coming no matter what, and this

21   is a new existing order."

22          Agent Burns, were there any other discussions about them

23   being marked?

24   A.    Yes.

25          MR. JONAS:  If we can turn to Philly Meeting No. 13

1    in the excerpt, and if we can play segments F and G, please.

2              (Whereupon, Philly Meeting No. 13-E, Segment F and G

3              were played, while questions were propounded.)

4    Q.   (BY MR. JONAS)  Do you see where it says ISNA and ICNA?

5    Have we seen those names before?

6    A.   Yes.

7    Q.   Where?

8    A.   ISNA was on several of the documents we have already

9    discussed as one of the Muslim Brotherhood organizations.

10             MR. JONAS:  I believe we need to approach for the

11   next question I will ask Agent Burns.

12             THE COURT:  Sure.  Come up.

13             (The following was had outside the hearing of the

14             jury.)

15             MR. JONAS:  Your Honor, we have played two segments

16   so far where participants discussed being marked, and in fact

17   the last one someone said the Holy Land Foundation has been

18   marked.  I think in the context it is clear that they are

19   concerned about being marked as Hamas, and they discuss

20   creating a new neutral organization.

21        At this point I was going to ask Agent Burns if she came

22   across any document within the search warrant material that

23   would show how they were marked, and that is the New York

24   Times article that was found at the Holy Land Foundation,

25   which I have right here.

1        MS. MORENO:  If I can get my notes, Your Honor?

2        THE COURT:  Go ahead.

3        MR. JONAS:  Your Honor, we may have a resolution.

4        THE COURT:  Okay.

5        MR. JONAS:  Mr. Cline can approach.  In the last

6   trial I believe that we had a stipulation that I don't

7   remember the exact terminology.

8        MR. CLINE:  Mr. Jacks just reminded me of this.  We

9   had a stipulation, and I am paraphrasing, but the basic idea

10  was that Holy Land at that point had been publicly associated

11  with Hamas in some fashion.  I forget exactly how we worded

12  it; publicly accused or named or something like that.  And

13  that was how we dealt with this issue in the last trial.  I

14  had forgotten about that.

15       THE COURT:  By a stipulation?

16       MR. CLINE:  By a stipulation.

17       THE COURT:  That had been --

18       MR. CLINE:  That it had been publicly identified,

19  accused, there was some term like that.  We can --

20       THE COURT:  Come up with something or find it?

21       MR. JONAS:  That is fine with me.  It is just that I

22  am at the point now where I think it would be relevant.  So I

23  don't know if you want to give us five minutes to work out the

24  language.

25       THE COURT:  Sure.  We can do that.

1      MS. MORENO:  Because I have all my wonderful

2  objections lined up, Judge, that are devastating.

3      MR. CLINE:  Let me consult with my colleagues on the

4  Defense side.

5      THE COURT:  Sure.  Do you want the jury out for a

6  few minutes?

7      MR. CLINE:  That might be good.

8      (The following was had in the presence and hearing

9      of the jury.)

10     THE COURT:  Members of the jury, if you want to step

11 back into the jury room for just a few minutes.  The lawyers

12 are trying to work out something, and see if we can work

13 something out.

14     (Whereupon, the jury left the courtroom.)

15     THE COURT:  Go ahead and be seated.

16     Do you remember the last time, the stipulation -- there

17 was about three or four of these newspaper articles.  Did it

18 cover all of them, or just this particular one.

19     MR. JONAS:  I believe just this particular one, Your

20 Honor.

21     MS. HOLLANDER:  It just covered this one.  I think

22 we have all the stipulations, but they are -- I don't have

23 them up here.

24     MR. JONAS:  Your Honor, Mr. Cline is going to write

25 out the language.

1          THE COURT:  All right.

2          THE COURT:  Go ahead and bring the jury in.

3          (Whereupon, the jury entered the courtroom.)

4          THE COURT:  Mr. Jonas?

5          MR. JONAS:  Thank you, sir.

6   Q.   (BY MR. JONAS)  Agent Burns, the last segment we played

7   from Philly Meeting No. 13-E, the unidentified male that was

8   speaking said that the Holy Land Foundation was stamped, or

9   ready as whatever.  And the prior segment I read from Philly

10  Meeting No. 5, the unidentified male talked about that "We are

11  placed in a corner.  It is known who we are.  We are marked."

12  Okay?

13         MR. JONAS:  Per stipulation, Your Honor, I would

14  like to read to the jury, upon agreement of the parties, the

15  following:

16      "As of the date of the Philadelphia meeting, the HLF has

17  been publicly named in a newspaper article as being associated

18  with Hamas."

19         THE COURT:  Okay.  And that stipulation the parties

20  have agreed to, so you can accept that as an established fact

21  without hearing any additional evidence.

22      I guess for the record we should get -- Mr. Cline, that

23  is language you have agreed to.  Correct?

24         MR. CLINE:  Yes, Your Honor.

25         THE COURT:  On behalf of all counsel and all the

1   parties?

2           MR. CLINE:  Yes, Your Honor.

3           MR. JONAS:  Thank you, sir.

4   Q.   (BY MR. JONAS)  Agent Burns, that Philly Meeting No. 5

5   segment I read, as well as some other segments we read and

6   played, discussed a new organization being created.  A neutral

7   organization is a term that was used.  Do you have before You

8   Elbarasse Search 19?

9   A.   I do.

10  Q.   Okay.  And what is the date of that document?

11  A.   July 30th, 1994.

12  Q.   And was this document created -- Is that after the Philly

13  Meeting in 1994?

14  A.   It is.

15          MR. JONAS:  Your Honor, at this time I would offer

16  into evidence Elbarasse Search No. 19.

17          THE COURT:  That is admitted.

18          MR. JONAS:  If we could put page 1 of that on the

19  screen, first.

20  Q.   (BY MR. JONAS)  Agent Burns, what language is this

21  document in?

22  A.   It is primarily in Arabic, but there are a few words

23  there that were in English in the original document.

24  Q.   Starting with the English words on this first page that

25  you see, what are those organizations?  What is that?

1    A.    The UASR that we have discussed at length, the HLF, the

2    IAP, and a new organization CAIR.

3    Q.    Was this page translated?

4    A.    It was.

5    Q.    The whole document was translated?

6    A.    It was.

7          MR. JONAS:  If we can go to page 6.

8    Q.    (BY MR. JONAS)  What is the title of this document?

9    A.    "Meeting agenda for the Palestine Committee, July 30th,

10   1994."

11   Q.    And if you go to No. 3, can you read what it says?

12   A.    It says, "Reviewing reports of the working organizations,

13   and it includes:

14        "Reviewing work report of the previous stage.

15        "Financial situation.

16        "Future suggestions to develop work of the following

17   organizations:  IAP, HLF, UASR, Coordination, CAIR."

18   Q.    Do you know what CAIR stands for?

19   A.    Yes.

20   Q.    What does it stand for?

21   A.    Council on American-Islamic Relations.

22   Q.    Prior to the Philadelphia meeting did you see the

23   organization CAIR mentioned in any of the Elbarasse documents?

24   A.    It did not exist prior to the Philadelphia meeting.

25   Q.    So it came into being after Philadelphia?

1    A.    That is correct.

2    Q.    Okay.  Were there any additional discussions by the

3    participants about how they would portray themselves to

4    America?

5    A.    Yes.

6          MR. JONAS:  If we turn to Philly Meeting No. 16 and

7    the excerpts, if we can play Segment F and G together, please.

8          (Whereupon, Philly Meeting NO. 16-E, Segment F and G

9          were played, while questions were propounded.)

10   Q.    (BY MR. JONAS)  Who is speaking here?

11   A.    This is the Defendant Shukri Abu Baker.

12   Q.    Agent Burns, did you see in that segment where the

13   Defendant Shukri Baker talked about making presentations on

14   human suffering and the rights, the issues he understands, he

15   says?

16   A.    Yes.

17   Q.    Were there additional discussions making presentations to

18   America on human rights?

19   A.    Yes.

20         MR. JONAS:  If we can go to Philly Meeting No. 10,

21   Segment G.  That is on page 5 of the excerpted portion.  If we

22   can put that on the screen, please, the bottom segment.

23   Q.    (BY MR. JONAS)  What does this unidentified male say,

24   please?

25   A.    He says, "The first is to make the agreement fail, and

1    this is a public policy and all of us are opposing it.  It is

2    the just the media which exaggerated the issue.  Second,

3    finding the alternatives.  The first step should be taken

4    advantage of by the brothers in -- how to make the agreement

5    fail.  The national rights, human rights, stuff which will be

6    exploited in order to make you look legitimate while you call

7    on the annulment of the agreement.  I mean, there should be

8    legitimacy to everything we do so that they won't -- they

9    should always be in -- this is one aspect.  The other aspect

10   is working to find the alternatives.  Create programs in order

11   to target the agreement."

12   Q.   Agent Burns, were there other discussions about

13   exploiting human rights?

14   A.   Yes.

15        MR. JONAS:  If we can go to Philly Meeting No. 12

16   and play Segment D.

17        (Whereupon, Philly Meeting NO. 12, Segment D was

18   played, while questions were propounded.)

19   Q.   (BY MR. JONAS) Agent Burns, did you see where the

20   Defendant Shukri Baker talked about neglecting camps in the

21   past?

22   A.   I did.

23   Q.   Did he talk -- Were there any other times where he talked

24   about the camps and taking advantage of them?

25   A.   Yes.

1          MR. JONAS:  If we can turn to Philly Meeting No.

2    14-E for the excerpt, play Segment B, please.

3          (Whereupon, Philly Meeting No. 14-E, Segment B was

4          played, while questions were propounded.)

5    Q.   (BY MR. JONAS)  Agent Burns, some of the words are cut

6    off on the right.  Do you see that on your screen?

7    A.   I do.

8    Q.   Do you have this particular portion in your transcript in

9    front of you?

10   A.   I do.  It may take me just a minute to find it.  Okay.  I

11   have it.

12   Q.   Go ahead.

13   A.   Beginning with "Stressing the suffering," "Stressing the

14   suffering in the Palestinians' camps in Palestine and outside

15   it.  The camps program which is excluded in the agreement

16   process...the suffering still exists, and we could benefit

17   from the suffering in the camps from the angle of approaching

18   the Palestinian cause from this angle at least.  Inside

19   Palestine and in all the camps all over the world.  The third

20   item is focusing on the humanitarian needs which are not much

21   affected by the political changes to start with.  An example

22   is the orphan sponsorship program.  It has no relationship

23   with the changes.  Okay?  The needy or the handicapped child

24   fund, the student fund, anti-poverty projects, these are

25   projects which will remain even if there is a Palestinian

state in place.  How much more for people without a

leadership?  The...always negates the religious sentiment at

the donors.  There is a religious sentiment at the donor.  I

tell him, 'Come on.  You will give you zakat out anyway.  Give

me your zakat and I will send it to Palestine.'  He will give

it anyway.  It won't make a difference to him.  Sacrifices,

establishing endowment projects and drinking fountains and

carrying out the legitimate will project.  It is a long term

plan.  That's fine.  Now, if three or four people wrote their

wills, we could get half a million dollars.  It is a long

term, but it is a legitimate will which he will carry out

whether with you or with somebody else, focusing on the

importance of supporting the Islamic organizations in the

upcoming stage.  I will speak about a specific population

which is the Islamic population.  See, if we don't support the

Islamic organizations, other organizations will come to

destroy and crush them.  The Islamic University, the

University, this is a very private address.  I cannot place an

ad in the newspaper saying, 'Save the Islamic institutions.'

Starting a dialogue with the American public to contribute to

the new phase of rebuilding in Gaza and Jericho.  This is an

important issue.  What happened happened.  Why should I rely

on self-rule?  No.  Come here.  I go to the American public

and tell him, 'That is excellent.  Good.  We are going to

build Gaza and we are going to build Jericho.  I want you to

help me.'  That is because I will be in a position of

competition with the other Palestinian organizations which

work with...and which work with the American public.  They

will now have impetus, strong media, and they will have strong

credibility and legitimacy.  We will find ourselves competing

with the Americans.  Why should I portray myself as...saying

that I am an Islamist, only an Islamist, and don't

want...don't want the Americans.  No, I will open a new

dialogue with the Americans and benefit from...and let them go

to Jericho and Gaza.  Yes, it is not wrong.  Seven, start a

dialogue with the U.S. and international charitable

organizations, U.N organizations, and embarking on new joint

projects in Palestine.  Please note that if there is one

advantage of this Palestinian-Israeli agreement to me, it is

that your address to the American public about the Palestinian

cause will be easier.  The psychological barrier between the

Americans and the Palestinian people has begun to erode or

disappear.  I can benefit from this point by...but I cannot

approach them through my strict Islamic address.  I can't tell

him 'I demand 48 borders.'  No way.  No way on earth.  Okay?"

Q.    Agent Burns, to pause for a moment, what items have we

seen that addresses the demanding of 48 borders?

A.    Again, that was the Hamas charter.

Q.    Okay.  Please continue.

A.    "No.  I approach it through humanitarian suffering,

1      refugees' rights, and issues which the Americans will agree

2      with you on.  An example of that is the U.N. organizations and

3      the institutions which give grants, and we could do various

4      projects.  Finally, the broad lines which you could call them

5      strategies, one, the...address should steer totally clear from

6      any tension towards the issue of the self-rule.  I believe

7      that I as a charity organization should not give an opinion or

8      a political judgment at all.  I have no relationship with

9      that.  I am not a political institution.  I want to...there is

10      a new reality I'm dealing with now.  It is not my job to

11      attack the self-rule.  This is my view.  Amicable relationship

12      must be maintained with all parties inside Palestine.  This

13      goes without saying, my brothers.  We must not put any

14      factional or partisan influence on the Foundation of America

15      as it is the charitable arm of this or that.  No.  I say that

16      this is wrong and we must act out of a charitable stand.  We

17      must act as an American organization which is registered in

18      America and which cares for the interests of the Palestinian

19      people.  It doesn't cater to the interests of a specific

20      party.  Our relationship with everyone must be good,

21      regardless."

22           Ghassan Elashi says, "Including the Islamists, of

23      course."

24           And Shukri Abu Baker says, "The Islamists, of course.

25      No, there is no problem, my brother.  This is...we gave the

1    Islamists $100,000 and we gave others $5,000."

2    Q.   I believe on the screen it is slightly different, if you

3    could read it.

4    A.   I am sorry.  "In the past we gave the Islamists $100,000

5    and we gave others $5,000."

6    Q.   Agent Burns, is there any other discussion about that

7    last statement, "In the past we gave the Islamists $100,000

8    and we gave the others $5,000"?  Did anyone else reference

9    back to that?

10   A.   Yes.

11         MR. JONAS:  If we can go to Philly Meeting No. 13,

12   segment H, and play that, please.

13   Q.   (BY MR. JONAS)  Before we do that, Agent Burns, who are

14   the Islamists, or what are the Islamists as referenced in this

15   case?

16   A.   In this context, the Defendants.  That would be people

17   with the Muslim Brotherhood, supporting Hamas, like that.

18         MS. HOLLANDER:  Your Honor, I am going to object to

19   her defining the term Islamist.  I don't believe she has any

20   expertise to do that.

21         THE COURT:  Overruled.

22   Q.   (BY MR. JONAS)  Who are the others?  They say "The

23   Islamists $100,000 and we gave the others $5,000."

24   A.   Anyone else who is not an Islamist.

25         MR. JONAS:  If we can play Segment H of Philly

1    Meeting No. 13.

2                (Whereupon, Philly Meeting No. 13, Segment H was

3                played, while questions were propounded.)

4    Q.   (BY MR. JONAS)  Agent Burns, did the Holy Land Foundation

5    give $100,000 to Islamists?

6    A.   They gave much more to Islamists.

7    Q.   As an example, did they give $5,000 or some other nominal

8    amount to others?

9    A.   They did.

10   Q.   Is there a particular of that?

11   A.   One good example that I looked at was a donation to the

12   victims of the Oklahoma City bombing.

13   Q.   Do you have before you what has been marked as InfoCom

14   Search No. 5?

15   A.   I do.

16   Q.   What is that item?

17   A.   It is a thank-you letter from the Oklahoma City Community

18   Foundation to the Holy Land Foundation.

19              MR. JONAS:  Your Honor, at this time I would offer

20   into evidence InfoCom Search No. 5.

21              MS. HOLLANDER:  No objection.

22              THE COURT:  Admitted.

23              MR. JONAS:  If we can put that on the screen,

24   please.

25   Q.   (BY MR. JONAS)  What does this document state?

1    A.    It says -- Do you want me to read it?

2    Q.    Sure.

3    A.    "On behalf of the citizens of Oklahoma City, Mayor Ronald

4    J. Norick joins me in thanking you for sharing your generosity

5    with the Community Foundation and helping the charitable needs

6    of Oklahoma City.  The Oklahoma City Community Foundation

7    thanks you for your gift of $5,000.  It will be a credit in

8    your name for the benefit of the Mayor's Disaster Relief

9    Fund."

10    Q.    Agent Burns, were there any phone calls between any of

11    the Defendants regarding the Oklahoma City bombing?

12    A.    Yes.

13    Q.    Who?

14    A.    The Defendants Mohammad El-Mezain and Abdulrahman Odeh.

15    Q.    Do you have before you what has been marked as El-Mezain

16    Wiretap No. 2?

17    A.    I do.

18    Q.    Is that a phone call?

19    A.    It is.

20    Q.    What is the date of it?

21    A.    April 19th, 1995.

22          MR. JONAS:  Your Honor, at this time I would offer

23    into evidence El-Mezain Wiretap No. 2.

24          THE COURT:  Admitted.

25          MR. JONAS:  If we can play that call, please.

```
 1              (Whereupon, El-Mezain Wiretap No. 2 was played,

 2              while questions were propounded.)

 3   Q.    (BY MR. JONAS)  Who is the MO?

 4   A.    That is the Defendant Mohammad El-Mezain.

 5   Q.    And who is the AB?

 6   A.    That is the Defendant Abdulrahman Odeh.

 7   Q.    Agent Burns, I want to move away from the Philadelphia

 8   meeting.

 9              MR. JONAS:  Your Honor, I can keep going, or we can

10   break.  It is up to you?

11              THE COURT:  Are you at a good breaking point?

12              MR. JONAS:  Yes.

13              THE COURT:  Let's go ahead and break for the day,

14   then.

15       Be back at 9:00 in the morning.  Please recall the

16   instructions about not discussing the case with anyone or not

17   reading anything about it.

18              (Whereupon, the jury left the courtroom.)

19              THE COURT:  Agent Burns, you can step down.

20       Do we need to come in early in the morning and finish up

21   the rest of these exhibits you intend to offer through Agent

22   Burns, or where are we with that?

23              MR. JONAS:  Your Honor, I believe the only other

24   issues are the magazines --

25              THE COURT:  The magazines, and maybe the rest of the
```

1    newspaper articles.

2        Anything else that anybody thinks we need to address as

3    far as the exhibits that were given to you that he plans on

4    offering through Agent Burns?

5                MR. CLINE:  I don't think so, other than the ones

6    that Mr. Jonas has mentioned that we have our continuing

7    objections.

8                THE COURT:  I understand those.  Why don't we be

9    here at 8:30 in the morning, and we will address those issues.

10   If you can think of something else, we will address them then.

11   Don't work too hard on it.

12               MR. JONAS:  Your Honor, I am going to go through the

13   schedules and summaries that we admitted today, and I am going

14   to make sure that I offered for admission all the supporting

15   documentation.  And if I missed any of that, I would like to

16   clean that up in the morning.

17               THE COURT:  Sure.  We will do that.

18                         (End of day.)

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts          06/04/2009

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25