1        IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
2                 DALLAS DIVISION

3   UNITED STATES OF AMERICA      )  CAUSE NO. 3:04-CR-240-P
                                  (
4   vs.                           )
                                  (  SEPTEMBER 30, 2008
5                                 )  DALLAS, TEXAS
    HOLY LAND FOUNDATION, ET AL   (  9:00 A.M.
6
    _____
7

8                      VOLUME 11 OF 37

9   _____

10                   STATEMENT OF FACTS

11
             BEFORE THE HONORABLE JORGE A. SOLIS
12              UNITED STATES DISTRICT JUDGE
                        and a jury
13  _____

14

15               A P P E A R A N C E S

16

17

18        FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                                1100 COMMERCE, 3RD FLOOR
19                              DALLAS, TEXAS  75242
                                BY:  MR. JIM JACKS
20                                   MR. BARRY JONAS
                                     MS. ELIZABETH SHAPIRO
21
          FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
22        (SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
                                20 FIRST PLAZA, SUITE 700
23                              ALBUQUERQUE, NEW MEXICO 87102
                                BY:  MS. NANCY HOLLANDER
24                                   MS. TERESA DUNCAN

25

```
 1              FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
                (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
 2                                   NEW YORK, NEW YORK  10005
                                     BY:  MR. JOSHUA DRATEL
 3                                        MR. AARON J. MYSLIWIEC

 4              FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
                (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
 5                                   DALLAS, TEXAS  75204
                                     BY:  MS. MARLO P. CADEDDU
 6
                FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
 7              (GHASSAN ELASHI)     P.O. BOX 10985
                                     TAMPA, FLORIDA  33679
 8                                   BY:  MS. LINDA MORENO

 9                                   JONES DAY
                                     555 CALIFORNIA ST., 26TH FLOOR
10                                   SAN FRANCISCO, CA  94104
                                     BY:  MR. JOHN D. CLINE
11
                FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12              (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                     FORT WORTH, TEXAS  76102
13                                   BY:  MR. GREG WESTFALL

14              COURT'S LAW CLERK:   MS. JENNIFER HELMS
                                     1100 COMMERCE, RM. 1654
15                                   DALLAS, TEXAS  75242

16              COURT COORDINATOR:   MS. BRENDA WEBB
                                     1100 COMMERCE, RM. 1654
17                                   DALLAS, TEXAS  75242

18      OFFICIAL COURT REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                                     1100 COMMERCE STREET, RM. 1654
19                                   DALLAS, TEXAS  75242
                                     (214) 753-2349
20

21

22

23

24

25
```

## <u>INDEX</u>

**Government's Exhibits**

| Government's Exhibits | Page |
|---|---|
| Secretary of State MS 1 Admitted into Evidence | 17 |
| Ashqar Wiretap No. 6, 6-A Admitted into Evidence | 18 |
| Shabib Wiretap No. 1, 1-A Admitted into Evidence | 23 |
| Shabib Wiretap No. 2, 2-A Admitted into Evidence | 27 |
| Ashqar Wiretap No. 3, 3-A Admitted into Evidence | 32 |
| Ashqar Wiretap No. 4, 4-A Admitted into Evidence | 35 |
| Baker Wiretap 5, 5-A Admitted into Evidence | 43 |
| Mushtaha Search No. 1 Admitted into Evidence | 51 |
| Illa Falistine No. 1 Admitted into Evidence | 63 |
| Illa Falistine No. 3-5 Admitted into Evidence | 66 |

1          THE COURT:  Good morning.

2      Agent Burns, good morning.  I understand you are not

3  feeling well.

4          THE WITNESS:  I am feeling better than my baby.

5          THE COURT:  I am sorry to hear that.  I got Mr.

6  Jacks' email.  I don't know whether you shared that with any

7  of counsel.

8          MR. JONAS:  We have, and everyone agrees if we could

9  go through lunch today that would help out Agent Burns'

10  health.

11          THE COURT:  And recess at lunch?

12          MR. JONAS:  Yes.

13          THE COURT:  Do you think you are going to get into

14  those newspaper articles and periodicals this morning?

15          MR. JONAS:  Mr. Jacks and I went through the

16  contested exhibits, and what we decided to do is with the

17  newspaper articles -- And I apologize, Your Honor.  I left my

18  list of the exact exhibit numbers downstairs.

19          THE COURT:  I have that.

20          MR. JONAS:  With the newspaper articles, we are not

21  going to use any of them except for that one.

22          THE COURT:  Which is that one?

23          MR. JONAS:  I want to say it is InfoCom No. 73.  For

24  some reason that is sticking in my head.  I can describe the

25  article.  What it is is a <u>Dallas Morning News</u> editorial about

1    Mousa Abu Marzook.

2           THE COURT:  And I believe you are right.  I think

3    that is No. 73.

4           MR. JONAS:  And the reason why we want to use it, we

5    have a phone call with the Defendant Ghassan Elashi and Shukri

6    Abu Baker where Ghassan Elashi reads that article to Shukri

7    Abu Baker and discusses it.  We want to be able to show that

8    here is the article, it was found at InfoCom, and this is what

9    they are talking about.

10          THE COURT:  That is the one you want to use?

11          MR. JONAS:  That is the one of the newspaper

12    articles.

13       The periodical you have, the Al Zatounia and the Illa

14    Falistines, we are not going to use the Al Zatounias.  The

15    Illa Falistines are five issues.

16       The first issue, initially we had the full issue in

17    Arabic with a few pages translated.  What we decided to do is

18    exhibit those few Arabic pages that match the English.

19       With the other four issues, that is what -- It is a few

20    Arabic pages matching the English, and we believe we are

21    entitled and should be able to use those Illa Falistines.  And

22    those I believe I should be able to get to Agent Burns today,

23    although given the court schedule I can't say for sure.

24          THE COURT:  And then you are limiting on the

25    periodicals the Illa Falistine to -- You want the translations

1    and then the corresponding pages in Arabic?

2          MR. JONAS:  Correct, sir.

3          THE COURT:  And then the objection is hearsay, the

4    objection from the Defense.  And these were not found in

5    searches of the Defendants' premises?

6          MR. JONAS:  That is correct.  They were provided by

7    a third party.

8          THE COURT:  What is your -- We discussed this a

9    little bit yesterday, but refresh my memory.

10         MR. JONAS:  Sure.  There are several purposes for

11    these magazines.  One magazine contains what we call a poem by

12    the Defendant Shukri Abu Baker.  I understand Ms. Hollander is

13    contesting the authorship, but I think that goes to the

14    weight.  His name is on it.

15      Another magazine has an article talking about Hamas, and

16    in the body of the article the author encourages the readers

17    to donate to the Occupied Land Fund.  And although the author

18    I believe is unknown, it is still contained in this IAP

19    magazine, which is referenced in the Elbarasse documents and

20    part of the Palestine Committee's modus operandi.

21         THE COURT:  So you want to get into all five of the

22    Illa Falistine periodicals?

23         MR. JONAS:  Yes, sir.

24         THE COURT:  Ms. Hollander?

25         MS. HOLLANDER:  Yes, sir.  Let me, in addition to

1    the arguments I made before --

2            THE COURT:  And I have some of them in writing, and

3    you filed those yesterday.

4            MS. HOLLANDER:  Right.  I won't repeat those.  But

5    Your Honor, I think you have now seen them.

6            THE COURT:  I have.

7            MS. HOLLANDER:  The Government never had the

8    originals of these magazines.  They only had copies of them,

9    although they provided us with what they say is the complete

10   magazine.  I mean, I have no reason to contest that that may

11   or may not be true.

12       But they also contain all kinds of additional hearsay;

13   for example, circled things on the Arabic.  If you look at it,

14   things that are written on them, that came from -- These came,

15   as I said, from the Boim litigation.  We know that is where

16   they came from.  They are referenced in the deposition.  In

17   fact, in the deposition parts of it that were not put into

18   this case, because the Government decided not to use them.

19   That is where they asked Shukri to translate these.  So that

20   is where they came from.

21       They contain -- I mean, everything about them is unknown,

22   even the photographs which, for example, depict things in

23   Palestine.  You can't really see them even in the original.

24   They are hearsay upon hearsay upon hearsay, because we don't

25   know who wrote the marks on them, we don't know who wrote the

1    articles.  They didn't come from any kind of search.  They are

2    clearly more prejudicial than probative.  And the fact that

3    some unknown person says donate to Holy Land, the Occupied

4    Land Fund, can't be attributed to our client.  Anyone can say

5    "We are Hamas, and donate to the Red Cross," and you wouldn't

6    blame the Red Cross for that.  So these should all be excluded

7    as hearsay.

8         The newspaper article, if you want me to address that?

9              THE COURT:  The one that -- He has dropped two of

10   them.

11             MS. HOLLANDER:  It is an editorial, I believe.

12             THE COURT:  And I have read it.

13             MS. HOLLANDER:  You did read it?

14             THE COURT:  Yes.

15             MS. HOLLANDER:  It is an editorial.  It has

16   information in it way beyond anything that this jury should

17   see on the basis of 403.  It talks about, for example, that

18   the FBI says they are cells of Hamas operating in north Texas.

19   What could be more prejudicial and have no probative value

20   than that in the editorial, some editorial person stating his

21   opinion.  It simply should not come in.

22             THE COURT:  Okay.

23             MR. JONAS:  Your Honor, the Defendant Ghassan Elashi

24   reads that line on the phone to the Defendant Shukri Baker and

25   comments on it.  It is going to get before this jury.  It

comes out of his mouth, so I don't think there is really any

prejudice to show the article to the jury and say this is what

they are talking about that was found at InfoCom.  It is not

like we are offering it independent of anything to prove the

truth of what is in the article with regard to that issue.

To get back to the Illa Falistine for a moment, as far as

the marks go that is on the Arabic version.  The circles and

if there is any writing on it, we didn't translate that

writing.  If there is any concern about any extraneous

remarks, we can white those out and make a fresh copy.

As far as the authorship of the article at issue, it is

not just someone random that has something to do with the HLF.

This is someone who is writing an article in the IAP magazine,

which the Defendant acknowledged he was a member of their

advisory board.  And as we have seen for the past several days

of Agent Burns' testimony, there is an intimate relationship

between the IAP and the HLF as part of this Palestine

Committee.  So this is just not some person who has nothing to

do with these Defendants writing an article.  I think clearly

it is a co-conspirator statement in furtherance.

THE COURT:  Ms. Moreno?

MS. MORENO:  Just briefly, on the editorial, not

addressing the periodicals.  I would suggest if the Court is

inclined to let this in, I would ask for a redaction, then.

If the Government wants to focus on a particular sentence they

1    claim my client read, and I don't have the FISA before me so I

2    don't know which sentence it is, then I would suggest that all

3    the rest of it is not necessary before the jury because it is

4    infused with opinion and lots of extraneous evidence that this

5    jury should not hear.  It talks about the Oklahoma City

6    bombing.  It is very, very prejudicial.

7        We could redact it except for that particular line.  Or

8    Your Honor, I would suggest a stipulation in the same way that

9    we stipulated yesterday that there was a piece in the Dallas

10   Morning News that was referred to by Mr. Elashi and Mr. Baker

11   with this particular sentence, and get rid of all this

12   extraneous, prejudicial, opinionated evidence that the jury

13   should not hear.

14           MS. CADEDDU:  May I just make one point, Your Honor?

15           THE COURT:  Yes.

16           MS. CADEDDU:  As far as the Illa Falistine, I mean,

17   I think under Rule 1003, if there is some question raised

18   about the admissibility of a duplicate, then it shouldn't be

19   admitted.  So I think the authenticity is in question because

20   of the source of it.  We don't know where it came from, who

21   provided it, or what they did to it before they provided it.

22       No. 2, as far as the newspaper article, I understand Mr.

23   Jonas to be -- I guess he is introducing that as tending to

24   show state of mind again.  And as far -- Insofar as any

25   evidence admitted that tends to show state of mind, I would

1  again request a limiting instruction that it applies only to

2  those to whom it could change their state of mind.

3          THE COURT:  Thank you.

4          MR. JONAS:  Do I need to respond?

5          THE COURT:  Yes.  Respond.  What about that -- Ms.

6  Moreno addressed the newspaper article.  Are you seeking

7  admission of all of it?

8          MR. JONAS:  Yes, sir.  Mr. Elashi read more than one

9  line.  I don't think it makes any sense, frankly, to cut it

10  up.  It takes completely out of context, and I think it is

11  proper to go in by itself in total.

12          THE COURT:  Are you going to play that conversation

13  first before you --

14          MR. JONAS:  Yes, sir.

15          THE COURT:  Let me listen to the conversation.  I

16  have not heard the conversation.  And I understand that is

17  really your link to seeking admissibility.  There may be some

18  other bases, but primarily that is the link is the

19  conversation.  So let me listen to that, and then you can

20  offer it.  And if we need to approach the bench we can have a

21  bench conference, but I should be able to make a ruling at the

22  time.

23      With respect to the periodicals, I do have some concerns.

24  Are these markings that you put on them?  That is the way you

25  received them?

1              MR. JONAS:  That is the way I received them.

2              THE COURT:  Then I think probably they should be

3    redacted.  There is no reason for extraneous markings other

4    than what is on the periodicals.  I think they are

5    self-authenticated under Rule 902, as we discussed yesterday.

6    And of course, there has been a lot of testimony about the

7    link, purported link between the IAP and the Holy Land

8    Foundation, and then the references in here.

9         I think it is relevant and it is admissible to show state

10   of mind, knowledge, intent.  And so I will overrule the

11   objections with respect to the Illa Falistine periodicals No.

12   1 through 5, with the exception of any extraneous markings.

13   Make sure they are redacted.

14             MR. JONAS:  Yes, sir.  And just so we are clear, I

15   may get to those before we have a chance to redact them.  We

16   will certainly redact them as soon as we have the opportunity.

17             THE COURT:  Before they get back to the jury.

18        And I will withhold ruling on the newspaper until I hear

19   the conversation.

20        What about Ms. Cadeddu's request for a limiting

21   instruction?

22             MR. JONAS:  Sir, I am not sure if that is

23   appropriate.  Again, this ties directly into the call, the

24   call of two co-conspirators, it is all in furtherance of the

25   conspiracy.

1          THE COURT:  When is the telephone conversation?

2          MR. JONAS:  When did it take place?

3          THE COURT:  Yes.

4          MR. JONAS:  It was in the late '90s.  It had to be

5    in '95, '96 because Marzook --

6          THE COURT:  Because he was in custody?

7          MR. JONAS:  Yes.

8          THE COURT:  So you are opposed to that any limiting

9    instruction?

10         MR. JONAS:  Yes, sir.

11         THE COURT:  Okay.  I will deny that at this time.  I

12   am still grappling with the issue of which conversations need

13   to be limited and which do not.  We will need to address that

14   I think more fully.

15         MS. CADEDDU:  Yes, sir.  And I want to make it

16   clear, it is not just conversations.  The Government is

17   offering a lot of documents for state of mind, so it would

18   include those as well.

19         THE COURT:  All right.  We will deal with all of

20   those later, then.

21      Anything else before we bring in the jury?

22         MR. JONAS:  No, sir.  Just one questioning of

23   scheduling, since you have allowed us, and we do appreciate

24   the break at lunch today.  We received last night the list of

25   exhibits that the Defense plans on showing Agent Burns.  If

1    the Court wishes, we could take up our objections to those

2    this afternoon.

3              THE COURT:  That would be good.  I have not had a

4    chance to look at those.  We will come back -- We will discuss

5    that at the break.  Do I have a list of those?  Have you

6    provided us a list of that?

7              MR. MYSLIWIEC:  I didn't copy you on that.

8              THE COURT:  If you will get me a copy of that, and

9    then we will take a long lunch break and come back take up

10   those objections sometime this afternoon.

11             MR. JONAS:  Thank you, sir.

12             THE COURT:  Anything from the Defense before we

13   bring the jury in?

14        Go ahead and bring the jury in.

15             MR. JONAS:  One other thing.  There are two exhibits

16   that support some of the schedules I offered in evidence that

17   I forgot to offer in.

18             THE COURT:  Two exhibits -- I didn't catch the

19   second part.

20             MR. JONAS:  Of all the summary schedules I offered

21   yesterday, I missed two supporting exhibits, so I will start

22   off with those.

23             THE COURT:  Sure.

24             MR. JONAS:  And I am going to have to do it after

25   the break because, again, I left my list of exhibits

1    downstairs.  I apologize.

2            (Whereupon, the jury entered the courtroom.)

3            THE COURT:  Ladies and gentlemen of the jury, good

4    morning.  We are ready to proceed.

5        Mr. Jonas?

6            MR. JONAS:  Thank you, sir.

7    Q.  (BY MR. JONAS)  Agent Burns, I know when we broke

8    yesterday I said we were moving on from the Philadelphia

9    conference, but there are two questions I forgot to ask, and I

10   apologize.

11       The first is you testified yesterday in response to the

12   quote from the Defendant Shukri Abu Baker "In the past we gave

13   the Islamists $100,000 and we gave $5,000 to the others" as an

14   example of the Holy Land Foundation giving $5,000 to Oklahoma

15   City bombing victims.  Did they give more than just $5,000?

16   A.   Yes, they did.  I think they had a blood drive and there

17   were certain expenses associated with them traveling up to

18   Oklahoma City to, you know, administer relief.  But in general

19   it was, you know, the $5,000 donation plus those expenses.

20   Q.   Okay.  You testified during the Philadelphia meeting that

21   several of the participants discussed their approach to

22   America and what they can say to the Americans.  Do you recall

23   that?

24   A.   I do.

25   Q.   Were there several times they discussed it that we didn't

1  play yesterday or read yesterday?

2  A.    Yes.

3  Q.    Okay.

4         MR. JONAS:  Let's play one more, Philly Meeting No.

5  15-E, Segment A, please.

6  Q.    (BY MR. JONAS)  Can you remind us who is speaking?

7  A.    This is Omar Ahmad.

8  Q.    Agent Burns, do you see where it says "if the Fund"?  Who

9  is the fund that?

10  A.    Is the HLF.

11  Q.    Now we will move away from the Philadelphia meeting.

12        After the Philadelphia meeting, did there come a time

13  when an issue arose involving the Holy Land Foundation that

14  required the intervention of the Palestine Committee?

15  A.    Yes.

16  Q.    What was this issue?

17  A.    There was a conflict that arose shortly after the

18  Philadelphia meeting between Abdel Haleem Ashqar and his

19  association, the Al-Aqsa Educational Fund and the officers of

20  the HLF.

21  Q.    You basing that upon what?

22  A.    That is based upon the exhibits that we are about to show

23  to the jury.

24  Q.    Okay.  You testified that Ashqar had an organization

25  called the Al-Aqsa Educational Fund?

1    A.    That is correct.

2    Q.    Do you have before you what has been marked as Secretary

3    of State MS-1?

4    A.    I do.

5    Q.    Okay.  What is that document?

6    A.    These are the articles of incorporation for the Al-Aqsa

7    Educational Fund from the State of Mississippi.

8    Q.    Is that certified?

9    A.    It is.

10         MR. JONAS:  Your Honor, at this time I offer into

11   evidence Government's Exhibit Secretary of State MS-1.

12         MS. HOLLANDER:  No objection, Your Honor.

13         THE COURT:  Admitted.

14   Q.    (BY MR. JONAS)  Agent Burns, the MS in the exhibit number

15   stands for what?

16   A.    The State of Mississippi.

17   Q.    Agent Burns, do you see the page that is on the screen?

18   A.    I do.

19   Q.    Is that the page that identifies Ashqar as being

20   associated with this Al-Aqsa Educational Fund?

21   A.    Yes.  If you will look toward the bottom, his name is

22   listed twice there at the bottom.  It is hard to read on the

23   screen with the small print.

24   Q.    And on the top what does it say?  Does it identify the

25   fund?

1   A.    Yes.  At the top it states that these are the articles of

2   incorporation for the Al-Aqsa Educational Fund.

3   Q.    Based upon these articles of incorporation, what was the

4   Al-Aqsa Educational Fund supposed to be?

5   A.    It was a charitable organization.

6   Q.    Now, you discussed that there was an issue between the

7   Al-Aqsa Educational Fund and the Holy Land Foundation.  Was

8   there any calls that were intercepted by the FBI where these

9   issues were discussed by the Defendants or any other

10  participants in the Palestine Committee?

11  A.    There were several.

12  Q.    Do you have what has been marked as Ashqar Wiretap No. 6

13  before you?

14  A.    I do.

15  Q.    Is that one of the calls you are referring to?

16  A.    It is.

17  Q.    What is the date of the call?

18  A.    February 23rd, 1994.

19  Q.    And who are the participants?

20  A.    Abdel Haleem Ashqar and Muin Shabib.

21          MR. JONAS:  Your Honor, at this time I would offer

22  into evidence Government's Exhibit Ashqar No. 6 and 6-A.

23          MS. HOLLANDER:  Nothing additional, Your Honor.

24          THE COURT:  Admitted.

25          MR. JONAS:  If we can play that call, please.

```
 1              (Whereupon, Ashqar Wiretap No. 6 was played, while

 2              questions were propounded.)

 3    Q.   (BY MR. JONAS)  Okay.  Agent Burns, who is AB?

 4    A.   That is Abdel Haleem Ashqar.

 5    Q.   Who is MU?

 6    A.   That is Muin Shabib.

 7    Q.   Was Muin Shabib also at the Philadelphia meeting?

 8    A.   Yes.

 9    Q.   As well as Ashqar?

10    A.   Yes.

11    Q.   You see he refers to Sheikh Jamil?

12    A.   Yes.

13    Q.   Do they identify who that is in the course of the

14    conversation?

15    A.   Yes.

16    Q.   Who is that?

17    A.   That is Sheikh Jamil Hamami, the Hamas leader from the

18    West Bank.

19    Q.   And if I can hold up Demonstrative No. 17, is he

20    somewhere on this chart?

21    A.   On the bottom row, second from you.

22    Q.   Do you see where I am pointing?

23    A.   Yes, that is him.

24    Q.   Agent Burns, do you see where it says, "My man, the

25    Sheikh's trip must be transferred into the Fund"?
```

1    A.    Yes.

2    Q.    The Fund you testified was used to respect the Holy Land

3    Foundation.

4    A.    That is correct.

5    Q.    But we see you just talked about the Al-Aqsa Educational

6    Fund.  In the context of this call, as well as calls we are

7    about to play, are you able to determine which fund they are

8    talking about here?

9    A.    Yes.

10   Q.    Which one?

11   A.    The Holy Land Foundation.  In this instance they are

12   speaking about, and we will see as the call plays on, as well

13   as the next call, that Sheikh Jamil Hamami was initially

14   brought to the United States to do fundraising for the Al-Aqsa

15   Educational Fund, and that is the problem.  The Holy Land

16   Foundation wanted him to raise money for them, not the Al-Aqsa

17   Educational Fund.

18   Q.    And that is all in this call and the next one?

19   A.    That is exactly what is going to be discussed.

20   Q.    Okay.  Agent Burns, do you see the name Ismail Elbarasse

21   that Mr. Muin Shabib is referring to?

22   A.    I do.

23   Q.    Is that the same Ismail Elbarasse who you have testified

24   about the Elbarasse documents came from a search warrant of

25   his home?

1  A.    That is correct.  A member of the Palestinian Committee.

2  Q.    Did you see a few moments ago that Muin Shabib was

3  referring to a Shukri?

4  A.    Yes.

5  Q.    Are there any other Shukris involved in the Holy Land

6  Foundation other than the Shukri Abu Baker?

7  A.    No.  That would be the Defendant Shukri Abu Baker.

8  Q.    Agent Burns, they refer a few times to Aboul Hasan, have

9  we seen his name before?

10  A.    Yes.  That is the nickname for Abdel Haleem Ashqar.

11  Q.    Agent Burns, do you see where it says Abou Hamzah?

12  A.    Yes.

13  Q.    Do you know who that is?

14  A.    That is the nickname for Jamil Hamami, the Hamas leader.

15  Q.    Agent Burns, do you see a discussion about voting?

16  A.    Yes.

17  Q.    Will it become clear in the next call what they are

18  referring to, or the call after that, as to voting?

19  A.    Yes.

20  Q.    Agent Burns, could you remind us, what was the date of

21  this call?

22  A.    February 23rd, 1994.

23  Q.    Are you aware there has been discussion about Jamil

24  Hamami leaving Hamas at some point?

25  A.    Yes.

1    Q.   You are aware of that?  Was this call before or after he

2    left Hamas?

3    A.   Before he left Hamas.

4    Q.   Again, Aboul Hasan is?

5    A.   Abdel Haleem Ashqar.

6    Q.   And we saw another Abou name a moment ago, a couple of

7    lines earlier.  I should have asked that?

8    A.   Abou Hamzah is Sheikh Jamil Hamami.

9    Q.   Agent Burns, do you see where it says, "This is a

10   committee's decision"?

11   A.   Yes.

12   Q.   Based upon the calls we are going to be playing on this

13   issue this morning, is it clear which committee is being

14   referred to?

15   A.   It does.

16   Q.   And which committee is that?

17   A.   The Palestine Committee.

18   Q.   Agent Burns, they refer to the Defendant Shukri Abu

19   Baker.  Is there another call where the Defendant Mohammad

20   El-Mezain is briefed on the issue, for lack are of a better

21   term?

22   A.   Yes.

23   Q.   Do you have before you what has been marked as Shabib

24   Wiretap No. 1?

25   A.   I do.

1    Q.    What is the date of that call?

2    A.    The front of the transcript, it just says 1993.

3    Q.    So we don't know for sure of the date?

4    A.    We don't.

5    Q.    Are you able to approximate the date based upon what is

6    going on in the call we just placed and the call we are going

7    to play after this one?

8    A.    You can tell from the content of the call that it is

9    happening around the same time.

10   Q.    Which is when again?

11   A.    That was February 23rd, 1994.

12   Q.    Okay.  So the 1993 on the front of the transcript is

13   inaccurate?

14   A.    It could have been late '93, but most likely it was early

15   1994.

16   Q.    Who were the participants in this call?

17   A.    Mohammad El-Mezain and Muin Shabib.

18         MR. JONAS:  Your Honor, at this time I would offer

19   into evidence Shabib Wiretap No. 1 and 1-A.

20         THE COURT:  Admitted.

21         MS. HOLLANDER:  No additional objections.

22     Would you show the first page with the date on it?

23         MR. JONAS:  Sure.  If we can put that on the screen,

24   the first page.  If you can enlarge the top half, please.

25         Okay.  If you will play that call.

1          (Whereupon, Shabib Wiretap No. 1 was played, while

2          questions were propounded.)

3   Q.   (BY MR. JONAS)  Agent Burns, who is MU who is the first

4   person speaking?

5   A.   That is Muin Shabib.

6   Q.   And who is MO?

7   A.   The Defendant Mohammad El-Mezain.

8   Q.   And is this the whole call, or is this just a portion of

9   the call?

10  A.   A portion.

11  Q.   Agent Burns, who is Abu Ibrahim?

12  A.   That is the Defendant Mohammad El-Mezain.

13  Q.   Agent Burns, do you see where it says, "Leave it to the

14  Foundation"?

15  A.   Yes.

16  Q.   In the context of this call, are you able to determine if

17  they are talking about the Holy Land Foundation or the Al-Aqsa

18  Educational Foundation?

19  A.   They are talking about the Holy Land Foundation.

20  Q.   Okay.  Do you see where it says, "And he's allowed to

21  bring a spokesman once a year to advertise for his

22  organization and that's it"?

23  A.   Yes.

24  Q.   Does that relate to what is going on, this issue you

25  described earlier, this conflict between the Al-Aqsa

1    Educational Fund and the Holy Land Foundation?

2    A.    It does.

3    Q.    Will that become clear in the next call?

4    A.    Yes.

5    Q.    Okay.  Agent Burns, after this, was there a phone call

6    where several members of the Palestine Committee got together

7    to resolve this issue?

8    A.    Yes.

9    Q.    And was that phone call recorded by the FBI?

10   A.    It was.

11   Q.    Do you have before you what has been marked as Shabib

12   Wiretap No. 2?

13   A.    I do.

14   Q.    What is the date of that call?

15   A.    February 23rd, 1994.

16   Q.    Who are the participants?

17   A.    Muin Shabib, Ismail Elbarasse, Omar Yehia also known as

18   Omar Ahmad, Osama Ahmad, Shukri Abu Baker, and at one point

19   Hamas leadership Jamil Hamami beeps in but he is not actually

20   a participant in the conference call they are having.

21   Q.    Are these individuals, are they all named in Elbarasse

22   Search No. 10 as members of the Palestine Committee?

23   A.    I believe they are.  I would have to check on Osama Ahmad

24   but if you will give me a second I can check on that.

25            MR. JONAS:  If we can put Elbarasse Search No. 10 on

1    the screen, please, page 3, I believe.

2         The next page.

3    Q.   (BY MR. JONAS)  Agent Burns, do you have that before you?

4    A.   I do.

5    Q.   Can you tell us which side of the page you see these

6    names?

7    A.   Elbarasse is on the right, No. 3.

8    Q.   Are these names in this document multiple times, or this

9    page?

10   A.   Yes.

11   Q.   So we will just use the list on the right.

12   A.   Okay.

13   Q.   Just for now.

14   A.   Again, we identified Ismail Elbarasse.  Omar Ahmad is

15   No. 13, omar Yehia.  Shukri Abu Baker is No. 11.  Jamil Hamami

16   is not on the list because he is from overseas.  Muin Shabib

17   is not on the list.  We heard him discussed in the calls

18   yesterday, but he is not on that list.  And I don't see Osama

19   Ahmad, but let me check one thing.  Yes, I don't see Osama's

20   name either.

21   Q.   You said Muin Shabib is not on this list, but was he at

22   the Philadelphia meeting?

23   A.   He was, as was Osama.

24        MR. JONAS:  Did I offer this into evidence, Your

25   Honor, Shabib Wiretap No. 2?

```
1              THE COURT:  You have not.

2              MR. JONAS:  I offer No. 2 and 2-A.

3              THE COURT:  That is admitted.

4              MR. JONAS:  If we can play that call.

5    Q.   (BY MR. JONAS)  To orientate who the speakers are, who is

6    OM?

7    A.   That is Omar Ahmad.

8    Q.   Is this call segmented out, Agent Burns?

9    A.   It is.

10   Q.   Agent Burns, did the Holy Land Foundation, was it part of

11   the practice in raising funds to bring in speakers from

12   overseas, outside the United States, to come to the United

13   States and raise funds on their behalf?

14   A.   Yes.  That was a practice they had.

15   Q.   Is that something that is going to be discussed in this

16   case later on?

17   A.   It is.

18   Q.   Okay.  And we saw the name Haitham on that last call, and

19   it referred to Haitham following Sheikh Jamil a day or week

20   after.  Who is Haitham?

21   A.   Haitham is Haitham Maghawri, the individual who attended

22   the Philadelphia meeting.  We saw a picture of him yesterday.

23   Q.   And OM on this attribution, again, is that Omar Ahmad?

24   A.   It is.

25   Q.   Okay.  Would you remind us who Abdel Hassan is?
```

1   A.   Abdel Haleem Ashqar.

2   Q.   The head of the Al-Aqsa Educational Fund?

3   A.   That is correct.

4   Q.   Who is IS that is speaking?

5   A.   That is Ismail Elbarasse.

6   Q.   Okay.  Who is OS?

7   A.   That is Osama.

8   Q.   Osama?

9   A.   Ahmad.

10  Q.   Who is MU that is speaking now?

11  A.   That is Muin Shabib.

12  Q.   This Shukri and Abu Ibrahim, who are they?

13  A.   The Defendant Shukri Abu Baker and Mohammed El-Mezain.

14  Q.   Do you see where it says Aboul Hasan said, or there is a

15  quote -- And Aboul Hasan is Ashqar.  Is that correct?

16  A.   That is correct.

17  Q.   "Even if you decide to dissolve the Fund, I would still

18  ignore it."  Which fund is Ashqar talking about?

19  A.   The Al-Aqsa Educational Fund.

20  Q.   That is part of the fund he was with?

21  A.   That is correct.

22  Q.   Per the Secretary of State of Mississippi record we

23  looked at?

24  A.   That is correct.

25  Q.   Do you see where it says Abdel Haleem?  Do you know who

1    that is?

2    A.    That is Abdel Haleem Ashqar.

3    Q.    So they are using Aboul Hasan and Abdel Haleem.  They are

4    using two different names to call the same person?

5    A.    Yes.  They are speaking about the same person here using

6    his nickname and his first and middle name.

7    Q.    Do you see the term fund?

8    A.    Yes.

9    Q.    Which fund are they talking about?

10   A.    In this instance they are saying, "We will leave that

11   opportunity to the Fund," being the Holy Land Foundation.

12   Q.    Okay.

13         MR. JONAS:  One moment, Your Honor.

14         THE COURT:  Yes.

15   Q.    (BY MR. JONAS)  Who is SH?

16   A.    That is Shukri Abu Baker the Defendant.

17   Q.    Who is IS?

18   A.    That is Ismail Elbarasse.

19   Q.    Who is Abou Mohamed that is referred to by Muin Shabib?

20   A.    He is greeting Shukri Abu Baker who joined the call.

21   That is his nickname.

22   Q.    That is whose nickname?

23   A.    Shukri Baker's.

24   Q.    Agent Burns, do you see where Omar Ahmad is referring to

25   a meeting that says "We all met in November"?

A.    Yes.

Q.    And was this meeting referred to several times throughout the conversation?

A.    Yes.

Q.    Did the FBI record that meeting in November?

A.    No.

Q.    Do you see, Agent Burns, where it is referring to the Society of Sciences?

A.    Yes.

Q.    Are you aware what that is?

A.    Yes.

Q.    What is that?

A.    Jamil Hamami was part of the Islamic Science and Culture Committee in Jerusalem.  That is what he is referring to, whether he is going to raise money for the Al-Aqsa Educational Fund.

Q.    Is the Islamic Society of Science something we are going to discuss later on in this case?

A.    Yes, it is.

Q.    Was there a connection between that organization and the Holy Land Foundation?

A.    Yes, there is.

Q.    We will get to it later?

A.    Yes.

Q.    Okay.  Agent Burns, do you see where it says "...handed

1    over to the committee, our committee"?

2    A.    Yes.

3    Q.    What committee are all these individuals part of?

4    A.    The Palestine Committee.

5    Q.    In the course of reviewing all the material reviewed by

6    the FBI, have you seen these individuals associated in any

7    other way, other than the Palestine Committee, as per the

8    Elbarasse documents we looked at?

9    A.    Through the Palestinian Committee and its organizations.

10   Q.    That is the only way that they were connected?

11   A.    Yes.

12   Q.    Agent Burns, who is brother Abou Mohamed?

13   A.    He is talking about Muin Shabib there.

14   Q.    Again, Agent Burns, brother Aboul Hasan?

15   A.    That is Abdel Haleem Ashqar.

16   Q.    And Agent Burns, just so we are clear, on the first page

17   of the transcript it has the names of the participants.  Is

18   that correct?

19   A.    Correct.

20   Q.    And it has their Abu names as well?

21   A.    I believe it does on this one.  Yes, it does.

22   Q.    Agent Burns, did the decision of the Palestine Committee

23   that the money raised by Sheikh Jamil Hamami should go to the

24   Holy Land Foundation, did this particular meeting end the

25   dispute?

1    A.   It did not end the dispute.

2    Q.   The dispute continued?

3    A.   It did.

4    Q.   Are was there another call discussing the dispute?

5    A.   Yes.

6    Q.   Do you have before you what is marked as Ashqar Wiretap

7    No. 3?

8    A.   I do.

9    Q.   What is the date of this call?

10   A.   March 1st, 1994.

11   Q.   And who are the participants?

12   A.   Abdel Haleem Ashqar and an individual identified as Abou

13   Ahmad.

14   Q.   Do you know who Abou Ahmad is?

15   A.   I do not know.

16   Q.   Do they discuss this issue?

17   A.   They do.

18         MR. JONAS:  Your Honor, At this time I offer into

19   evidence Government's Exhibit Ashqar Wiretap No. 3 and 3-A.

20         MS. HOLLANDER:  Nothing additional.

21         THE COURT:  Those are admitted.

22         MR. JONAS:  If we can play that call, please.

23         (Whereupon, Ashqar Wiretap No. 3 was played, while

24         questions were propounded.)

25   Q.   (BY MR. JONAS)  Agent Burns, who is AB that is speaking?

```
1    A.    That is Abou Ahmad.

2    Q.    And who is AS?

3    A.    Abdel Haleem Ashqar.

4    Q.    The person with the Al-Aqsa Educational Fund?

5    A.    That is correct.

6    Q.    Who is Abu Omar?

7    A.    That is Hamas leader Mousa Abu Marzook.

8    Q.    Do you see the Issam Al-Sarraj?

9    A.    I do.

10   Q.    Do you know who that is?

11   A.    That is one of the individuals who was invited to attend

12   the Philadelphia meeting.

13   Q.    Do you know if he attended?

14   A.    I was not able to confirm that one way or the other.

15   Q.    Is he part of the Palestine Committee, per the Elbarasse

16   documents we looked at?

17   A.    Can I check Elbarasse No. 10 to be sure?

18   Q.    Go ahead.

19   A.    He is.  He is No. 21 on the list.

20   Q.    Agent Burns, did the letter from Hamas leader Marzook to

21   Ashqar, did that end this dispute between the Al-Aqsa

22   Educational Fund and the Holy Land Foundation?

23   A.    No, it didn't.

24   Q.    What happened next?

25   A.    Two Hamas leaders attended or went to Abdel Haleem
```

1  Ashqar's home and informed him of what he needed to do.

2  Q.   Was this -- This was in person?

3  A.   It was.

4  Q.   Was this meeting in person recorded by the FBI?

5  A.   Yes, it was.

6  Q.   All right.  Do you have before you what has been marked

7  as Ashqar Wiretap No. 4?

8  A.   I do.

9  Q.   And I guess just to be clear, all the other wiretaps we

10  discussed were phone conversations that were intercepted.

11  Correct?

12  A.   Except for the Philadelphia meeting.

13  Q.   This one is an actual in-person meeting?

14  A.   At Ashqar's home.  Correct.

15  Q.   And also so we are clear, you have identified Ashqar

16  documents that we have called Ashqar Search.  Are those

17  documents that came from the same home where this meeting was

18  recorded?

19  A.   Yes.

20  Q.   It is the same Ashqar?

21  A.   It is.

22  Q.   Okay.  What is the date of this meeting that is in Ashqar

23  Wiretap No. 4?

24  A.   March 14th, 1994.

25        MR. JONAS:  Your Honor, at this time I would offer

1   into evidence Ashqar Wiretap No. 4 and 4-A.

2           MS. HOLLANDER:  Nothing additional, Your Honor.

3           THE COURT:  And those exhibits are admitted.

4           MR. JONAS:  Agent Burns, per the recording, who are

5   the Hamas leaders that went down to see Ashqar on this issue.

6   A.    Mohamed Siam and Jamil Hamami.

7   Q.    And for the record I am going to hold up Demonstrative

8   No. 17, hamas leaders in the '90s.  Agent Burns, are they on

9   this chart?

10  A.    They are.

11  Q.    Can you point where they are at?

12  A.    Mohammed Siam is on the second row, the fartherest from

13  you.

14  Q.    On the end?

15  A.    That is correct.  And Jamil Hamami is on the bottom row,

16  second from you.  That is correct.

17  Q.    And that is the same Jamil Hamami whose fundraising

18  activity in the United States is THE subject of this

19  controversy?

20  A.    That is correct.

21  Q.    Okay.

22          MR. JONAS:  Can we play Ashqar Wiretap No. 4,

23  please?

24          (Whereupon, Ashqar Wiretap No. 4 was played, while

25          questions were propounded.)

1    Q.    (BY MR. JONAS)  Agent Burns, who is the AB?

2    A.    That is Abdel Haleem Ashqar.

3    Q.    Are we playing the whole meeting?

4    A.    No, just portions of it.  It was quite lengthy.

5    Q.    Okay.  Agent Burns, who is Abu Ibrahim that is referred

6    to?

7    A.    The Defendant Mohammad El-Mezain.

8    Q.    Okay.  Agent Burns, who is MO?

9    A.    This is Hamas leader Mohamed Siam.

10   Q.    And who is JA that is coming up?

11   A.    That is Hamas leader Jamil Hamami.

12   Q.    Who is AB again?

13   A.    That is Abdel Haleem Ashqar.

14   Q.    Do you see where it says Ashqar is quoting, and Omar, it

15   says, "as long as I am president of the Association."

16   A.    Yes.

17   Q.    What is the Association?

18   A.    The Islamic Association for Palestine, the IAP.

19   Q.    And who is the Omar that is president of the IAP?

20   A.    Omar Ahmad.

21   Q.    At that time he was president?

22   A.    At that time.

23   Q.    That was the same Omar Ahmad that we have been

24   discussing?

25   A.    That is correct.

1    Q.    Okay.  Do you see where it says Om Omar?

2    A.    I do.

3    Q.    Do you know who that is?

4    A.    That would be the wife of Mousa Abu Marzook.  Om means

5    mother of.  So Marzook's nickname is Abu Omar, father of Omar.

6    Om Omar would be mother of Omar.

7    Q.    And her other name is Nadia Elashi?

8    A.    Her name is Nadia Elashi.

9    Q.    Have we seen her name Nadia Elashi in this case before?

10   A.    We have.  The HLF wrote checks to her from those early

11   bank records.

12   Q.    Agent Burns, do you know who Abou Hemmam is?

13   A.    In this context I cannot say with 100 percent certainty.

14   Q.    Who is Abu Omar?

15   A.    That is Mousa Abu Marzook.

16   Q.    Do you see where it said brother "a Abou Mohamed, meeting

17   Omar"?

18   A.    Yes.

19   Q.    Who is that?

20   A.    That is Omar Ahmad.

21   Q.    Agent Burns, in this meeting with Hamas leaders Sheikh

22   Jamil Hamami and Mohamed Siam with Ashqar, did that

23   effectively end this dispute?

24   A.    Shortly thereafter the dispute resolved.

25   Q.    Was it resolved the way the Palestine Committee directed

1    it to be resolved?

2    A.    Yes.

3    Q.    Okay.  Agent Burns, did the Palestine Committee continue

4    to have involvement with the actions and the activities of the

5    Holy Land Foundation?

6    A.    It did.

7    Q.    Do you have before you what has been marked as Baker

8    Wiretap No. 33?

9    A.    I do.

10   Q.    And is that a call?

11   A.    It is.

12   Q.    Who are the participants?

13   A.    Omar Yehia also known as Omar Ahmad of the IAP, and

14   Haitham Maghawri.

15   Q.    Haitham Maghawri is who again?

16   A.    One of the HLF officers who attended the Philadelphia

17   meeting.

18   Q.    What is the date of this call?

19   A.    November 29, 1999.

20           MR. JONAS:  Can we put the second page on the

21   screen, please?

22   Q.    (BY MR. JONAS)  Agent Burns, are you up to doing a little

23   back and forth reading with me?

24   A.    I can handle that.

25   Q.    Okay.  Which role do you want to be?

A.   I will be Omar.

Q.   Okay.

          MR. JONAS:  If we can enlarge the top half.

          THE WITNESS:  "May God bless you.  Also Shukri had

promised me to support the Lebanese project with 50,000."

Q.   (BY MR. JONAS)  Haitham:  "By God, you're

problem-makers."

          MS. MORENO:  I am so sorry to interrupt.  I

apologize.  Is this in evidence?

          MR. JONAS:  I am sorry, Your Honor.  I forgot to do

that.  I will offer Baker Wiretap No. 33 and 33-A into

evidence.

     Thank you, Ms. Moreno.

          MS. HOLLANDER:  No further objections.

          THE COURT:  That is admitted.

          MR. JONAS:  If we can bring it back up on the

screen.

Q.   (BY MR. JONAS)  Okay.

A.   Do you want me to start over?

Q.   Sure.

A.   Okay.  "May God bless you.  Also Shukri had promised me

to support the Lebanese project with 50,000."

Q.   "By God, you're problem-makers."

A.   "Did he tell you?"

Q.   Haitham:  "He told me."

A.    "Okay.  Go ahead and send it.

Q.    Haitham:  "But, by God, this is not a good business."

A.    "Why?"

Q.    Haitham:  "I don't know.  I don't know."

A.    "Why?"

Q.    Haitham:  "I mean, out of nothing someone comes and takes 50, and we don't give anything to those who have been lined up for a year and haven't gotten a cent.  I mean, by God, it is not fair.  I mean, by God, it is not fair.  Believe me, there are projects, by Almighty God, we don't know."

      Agent Burns, before you read the next line, there are several words that are in Italics.  Do you know why that is?

A.    Because they are spoken in English as opposed to Arabic, which a majority of the conversation was actually spoken in Arabic.

Q.    Okay.  Continue on.

A.    "Omar Ahmad says, "These people, before you start crying, they took it.  These people have money allotted to them, man."

Q.    Haitham:  "Where is this money which is allotted to them?  Tell me."

A.    "Come on."

Q.    Haitham:  "Where?  Where Abou Mohamed.  By God, I mean, where is this money which is allotted to them?  By God, there is not.  I mean, believe me, I am ready now."

A.    "You know how I told you about that.  I will not be able

1    to tell you right now."

2    Q.    Haitham:  "My brother, believe me, there is not.  I'm

3    telling you, believe me, there is not."

4    A.    "You're just making a big deal, man.  Forget it."

5    Q.    Haitham:  "What big deal?"

6    A.    "That one."

7    Q.    Haitham:  "Okay."

8    A.    Omar Ahmad says, "These people got their money.  They

9    took money and that's why they're not asking.  These people,

10   because they say that it is for us, that is, fine, fine."

11   Q.    Haitham:  "God's willing, it will be good."

12   A.    "Don't get upset over it.  Don't...don't think of it that

13   way.  Think of it in a different way.  I even don't know these

14   people.  I don't even know them."

15   Q.    Haitham:  "I don't know.  I don't know, by God."

16   A.    "It will be good."

17   Q.    Haitham:  "God's willing, it will be good.  Okay, Haij."

18   A.    "May God bless you."

19   Q.    Haitham:  "May God bless you, Abou Mohamed.  Peace be

20   with you."

21   A.    "Peace and God's mercy."

22   Q.    Agent Burns, tell us again, what is the date of this

23   call?

24   A.    This was November 29th, 1999.

25   Q.    Was this after Hamas was designated as a terrorist

1    organization?

2    A.    Yes; several years.

3    Q.    And Omar Ahmad, when he is saying that "Shukri promised

4    me to support the Lebanese project with 50,000," at this point

5    in 1999 what was his role with the Holy Land Foundation?

6    A.    Other than being a part of the Palestinian Committee, he

7    had no role with the Holy Land Foundation.

8    Q.    He wasn't an employee?

9    A.    No, he was not.

10   Q.    Was he an officer?

11   A.    No, he was not.

12   Q.    A director?

13   A.    No, he was not.

14   Q.    Any other calls where Omar Ahmad is directing Holy Land

15   Foundation business?

16   A.    Yes.

17   Q.    Do you have before you what has been marked as Baker

18   Wiretap No. 5?

19   A.    I do.

20   Q.    And what is the date of that call?

21   A.    May 25th, 1999.

22   Q.    Who are the participants?

23   A.    Omar Yehia also known as Omar Ahmad, and the Defendant

24   Shukri Abu Baker.

25              MR. JONAS:  At this time, Your Honor, I would offer

1    into evidence Baker Wiretap No. 5 and 5-A.

2              THE COURT:  Those are admitted.

3              MR. JONAS:  If we can play that call.

4              (Whereupon, Baker Wiretap No. 5 was played, while

5              questions were propounded.)

6    Q.   (BY MR. JONAS)  Who is SH?

7    A.    That is the Defendant Shukri Abu Baker.

8    Q.   And who is OM?

9    A.    That is Omar Ahmad.

10   Q.   Okay.  Do you see where Shukri Baker says, "The man made

11   17 to 20 trips maximum"?

12   A.    Yes.

13   Q.   During the course of the call, will it become clear who

14   he is referring to as "the man"?

15   A.    It will.

16   Q.   And who is that?

17   A.    That is the Defendant Mohammad El-Mezain.

18   Q.   Okay.  And it says he made 17 to 20 trips.  Besides being

19   an officer and a director of the Holy Land Foundation, what

20   did the evidence show Mohammad El-Mezain do for them?

21   A.    He was also a fundraiser who traveled around the country

22   to various events and raised money for the HLF.

23   Q.   Agent Burns, the Defendant Shukri Baker refers to

24   Ghassan.  What Ghassans were there associated with the Holy

25   Land Foundation?

1  A.   He is referring to the Defendant Ghassan Elashi.

2  Q.   Okay.  Agent Burns, who is Akram?

3  A.   That is one of the HLF officers at the time Akram Mishal.

4  Q.   Do you know -- It says Abdel Jabbar.  Do you know who

5  that is?

6  A.   Yes.  There was a fundraiser for the HLF from southern

7  California named Abdel Jabar Hamdan.

8  Q.   And is that on any of the lists that we saw early on in

9  your testimony of people who are affiliated with the a HLF?

10 A.   He was one of the attendees at the Philadelphia meeting.

11           THE COURT:  Let's take the morning break here.

12 Let's break until 11:00.

13           (Whereupon, the jury left the courtroom.)

14           THE COURT:  We are in recess until 11:00.

15                     (Brief Recess.)

16           THE COURT:  Are we still on for the schedule that we

17 discussed this morning?

18           MR. JONAS:  Yes, sir.

19           (Whereupon, the jury entered the courtroom.)

20           THE COURT:  And members of the jury, before we

21 start, I forgot to tell you something about our scheduling.  I

22 intended to tell you earlier this morning.

23      We are taking off tomorrow.  I think you remember when we

24 were having the jury selection we told you we would be working

25 four days a week.  Normally we will be off on Fridays except

1  for a few weeks.  This is one of those weeks that we will be

2  off tomorrow and work Thursday and Friday, then.

3      And also Agent Burns isn't feeling well, so we are going

4  to work until probably about 12:30 and then you will be off

5  for the day, and tomorrow, and we will be back on Thursday

6  morning.  Plan on being here Thursday and Friday of this week,

7  because we told you we would be off some Fridays but this

8  Friday we will be here.

9      MR. JONAS:  We were playing Baker Wiretap No. 4, and

10  if we could continue where we left off.

11      (Whereupon, Baker Wiretap No. 4 continued to be

12      played, while questions were propounded.)

13  Q.  (BY MR. JONAS)  Agent Burns, do you see where it says,

14  "It is because of those monitoring your phone"?

15  A.  I do.

16  Q.  Were there other conversations involving the Defendants

17  where they referenced the phones being tapped?

18  A.  Yes.

19  Q.  Agent Burns, Omar Ahmad is saying to the Defendant Shukri

20  Abu Baker, "Let's give him 25 now."  Who is he referring to as

21  "him"?

22  A.  The Defendant Mohammad El-Mezain.

23  Q.  That is in the call they talked about earlier about Abu

24  Ibrahim?

25  A.  That is correct.

1  Q.   When he is saying, "Let's," again, is Omar Ahmad part of

2  the Holy Land Foundation?

3  A.   No.

4  Q.   Okay.  Agent Burns, again, do you see where Omar Ahmad

5  says, "We give him 20 now, for the past 20"?

6  A.   I do.

7  Q.   You said Omar Ahmad is not a member, employee, director,

8  or officer of the Holy Land Foundation?

9  A.   That is correct.

10  Q.   But what is his involvement where he is now directing

11  Shukri Baker or discussing how much to give the Defendant

12  Mohammad El-Mezain?

13  A.   He was a leader within the Palestinian Committee.

14  Q.   Agent Burns, before we play the next segment, can you

15  remind us again the date of this call?

16  A.   This was May 25th, 1999.

17  Q.   Okay.  Was this after Hamas was designated a terrorist

18  organization by the United States?

19  A.   It was.

20  Q.   And what was going on with the Defendant Mohammad

21  El-Mezain in regard to his relationship with the HLF at this

22  time?

23  A.   In 1999 he stepped down as the chairman of the board of

24  the HLF, and was moving to San Diego to take a position as the

25  HLF's projects and grants director, and was in need of money.

1    Q.    Agent Burns, do you know who Wafa is?

2    A.    Yes.

3    Q.    Who is he?

4    A.    Wafa Yaish was the accountant for the Holy Land

5    Foundation at the time of this call.

6    Q.    Agent Burns, they were laughing about dumping something

7    on Ghassan.  Who is Ghassan and what was being dumped on him?

8    A.    The Defendant Ghassan Elashi was going to be appointed

9    the chairman of the board for the Holy Land Foundation.

10   Q.    I forgot to ask you something a moment ago.  If you

11   recall, you testified about the dispute between the Holy Land

12   Foundation and the Al-Aqsa Educational Fund.  Do you recall

13   that?

14   A.    I do.

15   Q.    You testified about how Mohamed Siam and Jamil Hamami

16   went down to see Ashqar, and they discussed Ashqar and the

17   situation.  Correct?

18   A.    Correct.

19   Q.    Could you just briefly remind us what the discussion was

20   about at that meeting?

21   A.    At that meeting Jamil Hamami and Mohamed Siam informed

22   Abdel Haleem Ashqar that he was to abide by the Palestinian

23   Committee decision as a result of that teleconference.  And he

24   also read the letter from Mousa Abu Marzook requesting that he

25   halt his activities until he arrived in the United States.

1   Q.   Just so we remember the participants, you said a letter

2   from Marzook, who is on this top in the green area on the far

3   right?

4   A.   That is correct.

5   Q.   And then Jamil Hamami on the bottom row, third from the

6   left; Mohamed Siam in the middle row, far left?

7   A.   That is correct.

8   Q.   Do you have before you Shukri Baker's deposition, Baker

9   Deposition?

10  A.   I do.

11  Q.   If you can turn to page 74 of that deposition.  It is the

12  deposition page number.

13        MR. JONAS:  And if we can pull up I believe it is

14  page 6 for our purposes, on the screen.

15  Q.   (BY MR. JONAS)  Agent Burns, could you read what is on

16  the screen?

17  A.   Yes.  The question says, "How about Mr. Abu Marzook?  Do

18  you know who he is?"

19        Answer:  "Yes."

20        Question:  "Okay.  Now, it's my understanding at some

21  point he made a contribution to the Holy Land Foundation.  Is

22  that correct?"

23        Answer:  "Yes."

24        Question:  "Okay.  And I want to ask you about that in a

25  minute.  Let's put that aside for the moment.  Other than that

1    contribution, are you aware of any relationship or involvement

2    that Mr. Abu Marzook had with the Holy Land Foundation?"

3         Answer:  "No."

4    Q.   Agent Burns, did Shukri Baker say anywhere in his

5    deposition that Mousa Abu Marzook intervened in a dispute

6    between the HLF and the Al-Aqsa Educational Fund?

7    A.   No, he did not.

8    Q.   Agent Burns, I want to move to a new topic.

9    A.   Okay.

10   Q.   You testified that the Holy Land Foundation held itself

11   out to be a charity.

12   A.   Yes.

13   Q.   And is one of the functions of a charity to raise money?

14   A.   It is.

15   Q.   In fact, have we seen a discussion or evidence of HLF

16   raising money?

17   A.   Yes.

18   Q.   Generally, based upon your review of the evidence, the

19   search warrant material, and the wiretaps, and everything you

20   have gathered, can you generally tell us how the HLF went

21   about raising money?

22   A.   They raised money several different ways.  They would

23   bring in speakers from overseas to raise money at mosques and

24   festivals and things likes that.  They would also hold

25   teleconferences where speakers would call in and talk about a

1    topic of relevance and people would contribute or pay to

2    participate in the conversation or in the teleconference.

3    They would put ads in their periodicals in the Illa Falistines

4    and Al Zatounia papers, the Palestinian Committee papers, and

5    later on they started more the mass mailing campaigns and

6    things like that as well.

7    Q.    And at the conferences, were some of those conferences

8    videotaped?

9    A.    Yes, they were.

10   Q.    We have seen a few of those videotapes already?

11   A.    We have seen a few.

12   Q.    Are you familiar with Mushtaha Search No. 1?

13   A.    I believe that is a videotape.

14   Q.    Where was that videotape seized from?

15   A.    That was one of the buried videotapes that was in the

16   yard of Fawaz Mushtaha.

17   Q.    Are the Defendants on this particular videotape?

18   A.    Yes.

19   Q.    Do you recall the year of this tape?  Were you able to

20   date the year?

21   A.    We were able to date it to approximately 1990.

22   Q.    Okay.

23        MR. JONAS:  Your Honor, at this time I would offer

24   into evidence Mushtaha Search No. 1.

25        MS. CADEDDU:  No objections beyond those previously

1    stated, and relevance as to date.

2              THE COURT:  All right.  And those are overruled, and

3    that is admitted.

4    Q.   (BY MR. JONAS)  Agent Burns are we going to play the

5    whole tape?

6    A.   No.  It was about two hours in length, I believe, this

7    one.

8              MR. JONAS:  If we can start the tape, please.

9              (Whereupon, Mushtaha Search No. 1 was played, while

10             questions were propounded.)

11   Q.   (BY MR. JONAS) Obviously the quality of this tape is not

12   that great of quality.  Do you have any idea why that is?

13   A.   This was one of the tapes that had to be cleaned and put

14   back together because it was buried in the mud in the yard of

15   Fawaz Mushtaha.

16   Q.   Agent Burns, do you recognize any of those individuals

17   sitting there?

18   A.   Yes.  Not in the first row that you are looking at, but

19   in the next row if you look closely there is a gentleman in

20   what appears to be a blue blazer and a striped tie.  He has a

21   beard with dark hair.  That is Hamas leader Mahmoud Zahar.

22   Q.   Okay.  I am holding up Demonstrative No. 17 again.  Where

23   on this chart is Mahmoud Zahar?

24   A.   Closest to you on the second row.

25   Q.   The row I am pointing to?

1   A.   Correct.  Seated next to him, and you will see this

2   better once it starts moving, is the Defendant Mohammad

3   El-Mezain.

4   Q.   As we are facing the screen, on which side of Mahmud

5   Zahar is the Defendant El-Mezain?

6   A.   As we are facing the screen he is to the left.  And then

7   to the left of Mohammad El-Mezain as you will see as the

8   videotape moves on just a little bit, is Hamas leader Jamil

9   Hamami that we have just been talking about.

10  Q.   In regard to the Al-Aqsa Educational Fund issue?

11  A.   The dispute.  That is correct.

12  Q.   Okay.  Do you see Jamil Hamami on that screen?

13  A.   Yes.  That is the gentleman in the beard next to the

14  Defendant Mohammad El-Mezain.

15  Q.   We have three individuals on the screen now.  Just so we

16  are clear, go from left to right as we face the screen.

17  A.   As we face the screen, from left to right is Jamil Hamami

18  Hamas leader from the West Bank, Defendant Mohammad El-Mezain

19  Mahmud Zahar, Hamas leader from Gaza.

20  Q.   Agent Burns, I know this is the beginning of the video so

21  it may not be clearest, but are we going to be able to

22  identify who these band members are?

23  A.   Yes, we are.

24  Q.   Is there anyone there -- Are any of the Defendants in

25  this band?

1  A.   Yes.  The defendant Mufid Abdulqader, and also Fawaz

2  Mushtaha I believe we will see in a little bit, the person

3  whose yard this videotape was found in.

4  Q.   Who is that individual?

5  A.   That is Fawaz Mushtaha.

6  Q.   Okay.  Who is that individual?

7  A.   That is the Defendant Mufid Abdulqader.

8  Q.   Who is the individual that just walked on the screen?

9  A.   That is the Defendant Shukri Abu Baker, and you will see

10 him down there in that portion of the screen periodically

11 throughout this tape.

12 Q.   Agent Burns, he says, "headquarters are located in your

13 city."  Are you able to tell us what city that this conference

14 took place in based upon the date of the conference and by

15 that statement by the Defendant Mohammad El-Mezain?

16 A.   Based on the date and his statement, that would be in the

17 area of Los Angeles, California.

18 Q.   That was prior to the Holy Land Foundation moving to

19 Richardson, Texas?

20 A.   That is correct.

21 Q.   Agent Burns, are you able to identify the individual on

22 the right of the screen?

23 A.   Yes.  The person on the right is the Defendant Mufid

24 Abdulqader.

25 Q.   Agent Burns, the individual on the left, what is he

1  portraying?

2  A.   He is portraying to be a Jewish soldier.

3  Q.   Do you see the name Ahmed Yassin?

4  A.   I do.

5  Q.   Who is that?

6  A.   The Hamas founder and former spiritual leader, the top

7  person on the Hamas leaders' chart there.

8  Q.   Do you see the name Abdullah Azzam?

9  A.   I do.

10  Q.   A name we will be discussing in a few minutes?

11  A.   Yes.

12  Q.   Do you see who Shukri Abu Baker is thanking?

13  A.   Shukri Abu Baker is thanking the guests that attended,

14  and he names them--Mahmoud Al-Zahar and Jamil Hamami, the two

15  people sitting beside El-Mezain in the audience.

16  Q.   Agent Burns, do you have before you Baker Declaration,

17  which was his sworn declaration in evidence filed in a civil

18  lawsuit?

19  A.   I do.

20  Q.   If you can turn to page 2.

21        MR. JONAS:  If we can put that on the screen,

22  please.

23  Q.   (BY MR. JONAS)  Could you read the top line, please?

24  A.   It says, "Neither I, nor to my knowledge, any of the

25  other founders of this charity have had any connection

1    whatever to Hamas, or to any terrorist groups, or to

2    terrorism."

3    Q.    Agent Burns, I want to go back to some of the Elbarasse

4    records.  Do you have before you Elbarasse Search No. 13?

5              MR. JONAS:  If we can put Elbarasse Search No. 13,

6    page 7, on the screen.  Enlarge the middle portion, please.

7    Q.    (BY MR. JONAS)  What is this document again?

8    A.    This is a Palestine Committee report.

9    Q.    Do you see No. 5?

10   A.    I do.

11   Q.    What does that say?

12   A.    It says, "Six issues of Ila Falistine have been issued."

13             MR. JONAS:  If we can go to Elbarasse Search No. 14,

14   specifically page 6.  Enlarge the bottom.

15   Q.    (BY MR. JONAS)  Do you see anything on this page --

16             MR. JONAS:  I am sorry.  The top half?

17             THE WITNESS:  No. 6, I believe.

18   Q.    (BY MR. JONAS)  Yes.  What does that say?

19   A.    It says, "Under the Islamic Association For Palestine

20   achievements," "Issuing nine issues from Al-Zatounia magazine,

21   four issues from the Palestine monitor newspaper in English,

22   and one issue from Ila Falistine, and reprinting and

23   distributing six statements for Hamas."

24   Q.    Have you seen any of these issues of Illa Falistine?

25   A.    I have.

1   Q.   Okay.  Did you obtain them in the search warrant or by

2   grand jury subpoena or anywhere like that?

3   A.   No.

4          MS. HOLLANDER:  Can we approach, Your Honor?

5          THE COURT:  Yes.

6          (The following was had outside the hearing of the

7          jury.)

8          MS. HOLLANDER:  Your Honor, in looking through these

9   Illa Falistines, we would ask that they not be -- that you not

10  admit Illa Falistine No. 2.  They have four others.  And this

11  one has a long article about Azzam that includes discussions

12  about Afghanistan, Malaysia.  It makes it sound as though

13  Hamas is international.  That is not what is intended here,

14  but that is what it is going to sound like.  That page and the

15  page before.  But they can make the point with the others.

16         MR. JONAS:  Your Honor, Abdullah Azzam is an

17  individual who the Holy Land Foundation used to raise funds,

18  and what I mean by that is not in person.  They used his image

19  and videotapes of him.  And we are going to get to that soon.

20  And then on the screen will flash "Send your donations to the

21  Occupied Land Fund."

22         And he is a radical figure and he doesn't talk about

23  sending money for children or anything flowery.  It is

24  weapons.  He is a radical figure.  There is no question about

25  it.  And in that article, the very end says, "Send your money

1    to the OLF."  So there is no way of sugarcoating this.

2              MS. HOLLANDER:  Well, there is another mention of

3    him here.  And, you know, we didn't really get into this last

4    time, but he came to the United States on a visa.  He was

5    fighting -- He was asking for money for the mujahideen

6    fighting the Russians, and that doesn't come out in this

7    video.  I mean, there is a lot of problems we can't address

8    because -- In fact, he was killed probably by Osama bin Laden

9    later in Afghanistan.  We can't get into that, obviously.  He

10   came here -- This is 1988, because he was killed in 1989.

11             THE COURT:  The objection is to the mentioning of

12   Afghan, as I understand it, because I am letting it in; it is

13   in--and the Philippines and Afghanistan.

14             MS. HOLLANDER:  If we can just take this article

15   out, there is another place where it is mentioned.

16             THE COURT:  Do you want to take the entire article

17   out?

18             MS. HOLLANDER:  That article.  They can mention him

19   here because, I mean, it is not as bad, because at least there

20   he is talking about fighting the communists.  He is not

21   talking about everything else.

22        The problem is, Your Honor, we can't address this; we

23   really can't, without getting into how he was killed.

24             THE COURT:  Why would you get into why he was

25   killed?

1          MS. HOLLANDER:  Well, I don't want to, but if they

2   just take out that article and leave the other one, this also

3   says -- This one, too, says give to -- It is the article that

4   concerns me, because it goes into detail.

5          THE COURT:  Are you planning on getting into this

6   right now?

7          MR. JONAS:  Given that we are breaking soon, I

8   probably won't get to it, but it is probably going to be early

9   on Thursday I guess at this point.  And I am going to lay a

10  foundation as to how the HLF used the image of Abdullah Azzam

11  to raise funds.

12         And if you want us to black out the word Afghanistan,

13  that is fine, but I think this article should come in.

14         MS. HOLLANDER:  Your Honor, the problem is he was

15  here in 1988, we are talking about.  He came I believe on a

16  visa from the United States who asked him to help, because at

17  that time the United States was supporting this fight against

18  the Russians in Afghanistan, and he was very -- He was raising

19  money for this fight against the Russians that in fact the

20  United States was supporting financially.  And he talks about

21  the mujahideen.  He is very fiery, but he is talking about --

22  You know, it is a whole different timing era, and we can't

23  respond to it, because to respond to it we would have to

24  explain who killed him.

25         MS. MORENO:  If I may just add one thing, Your

1  Honor.  My recollection is that Azzam was used in IAP videos,

2  not Holy Land videos.

3          MR. JONAS:  At the end of the videotape of a speech,

4  in fact in several tapes like this, it is not just one, of

5  Abdullah Azzam, it flashes on the screen "send your tax

6  deductible donations to the OLF."  They are the ones, the

7  Defendants, who did that.  And they kept that tape until 2001.

8      And, Your Honor, the tape I just played I left one

9  segment out which I plan on playing soon where the Defendant

10  El-Mezain talks about Azzam and praises Azzam and says he was

11  with Azzam and he worked with Azzam.  They are the ones who

12  took advantage of Azzam and who he was to raise funds, and we

13  should not be precluded from getting into who he is.  And we

14  are not getting into the bin Laden issue.

15          MS. HOLLANDER:  I know.  But we can't respond is the

16  problem without getting into the bin Laden issue.  That is the

17  problem, because he was here to raise money for the mujahideen

18  fighting Afghanistan.  That is what it was all about for him.

19  And he doesn't say -- Azzam I don't think says "Give money to

20  the Holy Land Foundation."  They have taken this --

21          THE COURT:  It says it in here.

22          MS. HOLLANDER:  I know.  But he doesn't say it.  He

23  is dead when this comes out.  What they have done is they have

24  these videos, and at the end they just flash "Give money to

25  Holy Land," but there is really no link between him and Holy

1    Land.  The link is --

2              THE COURT:  He is there at that conference.

3              MS. HOLLANDER:  Azzam?  No, no.  He was dead.

4              MR. JONAS:  El-Mezain mentions him.

5              MS. HOLLANDER:  He mentions him, though, because he

6    was a Palestinian hero who was fighting the Russians.  That is

7    what he was.  And then he got into a hassle with bin Laden who

8    killed him.

9              MR. JONAS:  Your Honor, I find this argument by Ms.

10   Hollander very ironic.  There is a video of Abdullah Azzam

11   standing up there and saying "Give to the Occupied Land Fund."

12   She would likely come back and say, "Well, he is saying it.

13   We are not saying it."  In this instance it is the Defendants

14   who are taking his image and his speeches and slapping their

15   ads on it.

16             MS. HOLLANDER:  It is IAP who is doing that.

17             MR. JACKS:  IAP is a co-conspirator.

18             THE COURT:  I understand that is your position.  The

19   position is they are linked, and they have certainly

20   introduced evidence --

21             MS. HOLLANDER:  I understand.  But it is not Holy

22   Land.  But it is just -- The 403 issue with Azzam is so great

23   that all we are asking them to do is remove that.  I mean,

24   they have got plenty of other things they can talk about, they

25   have got plenty of other people they can talk about without,

1    including Azzam and without including that video of Azzam.

2    They have got plenty of other things.  Because that video, and

3    I mean, maybe you should look at it.  He is raising money, I

4    believe, for Afghanistan.

5                THE COURT:  What exhibit number is that?

6                MR. JONAS:  There are several videos like that, but

7    one is Mushtaha No. 2; one is Mushtaha No. 9.

8         Your Honor, we strongly, strongly object to not being

9    able to play that.

10                THE COURT:  Well, I haven't seen it yet.  I will

11    take a look at it.

12                MR. JONAS:  Let me just make one other point.  These

13    Defendants are holding themselves out to be a charity, a

14    peaceful charity, and yet they are taking this fiery rhetoric

15    by this person and slapping their -- I understand Ms.

16    Hollander saying it is IAP, but IAP is a co-conspirator.

17    Assuming the IAP is doing it.  We don't know if the IAP is

18    doing this.  Some of these tapes I think were found at the

19    HLF, and some at Mushtaha.  I am not sure about that 100

20    percent.

21                MS. HOLLANDER:  But Your Honor, he is missing the

22    point.  Azzam was talking about something else.  I mean, we

23    can't get into Afghanistan and fighting the Russians and the

24    U.S. support of that.  I mean, if you want to get into that,

25    that is going to get us down a road that we don't want to go

1    to.

2         MR. JONAS:  On the tape he doesn't identify who he

3    is talking about.  He doesn't say Afghanistan or Mujahideen.

4    And in that clip with the Defendant El-Mezain he refers back

5    to the same speech.  El-Mezain refers back to something that

6    Azzam says which is on the videotape of Azzam.

7         THE COURT:  What are you going to do now between now

8    and the lunch break?

9         MR. JONAS:  This is not the Illa Falistine I am

10   getting into right now with this witness.

11        THE COURT:  Are you getting into this right now.

12        MR. JONAS:  I am not getting into this one now, but

13   it is coming soon.

14        THE COURT:  Well, before we break for lunch?

15        MR. JONAS:  Probably not.

16        THE COURT:  We can take a look at that this

17   afternoon, the videotape you are talking about.  And I read

18   this earlier, but there are five of these and three newspaper

19   articles.  I need to go back and read them again.

20        Just take a look at that tape.  I know we can't do it

21   before lunch, but we will take a look at it this afternoon.

22             (The following was had in the presence and hearing

23             of the jury.)

24   Q.   (BY MR. JONAS)  Agent Burns, I was asking about the Illa

25   Falistine magazines and if you looked at any.

1   A.   Yes, I have.

2   Q.   Do you have before you what has been marked as Illa

3   Falistine No. 1?

4   A.   I do.

5   Q.   Okay.  And are you able to -- What language is it in?

6   A.   Arabic.

7   Q.   Do you have it translated, or some pages of it

8   translated?

9   A.   Parts of it.

10  Q.   And you testified that the IAP published the Illa

11  Falistine magazines?

12  A.   That is correct.  According to the documents that we have

13  looked at.

14       MR. JONAS:  Your Honor, at this time I would offer

15  into evidence Illa Falistine No. 1.

16       THE COURT:  Any objections, besides those that have

17  been submitted in writing?

18       MS. HOLLANDER:  Not any additional.

19       THE COURT:  Those have been overruled and this

20  exhibit is admitted.

21       MR. JONAS:  If we can turn to page 5.

22  Q.   (BY MR. JONAS)  Agent Burns, what is the title of this

23  article or writing?

24  A.   It says, "Hamas Hayzum has come."

25  Q.   Have you read it?

```
 1   A.    I have.

 2   Q.    Okay.

 3              MR. JONAS:  And can we just go to page 7, the end of

 4   it?

 5              MS. HOLLANDER:  Can you give us a date on this

 6   magazine?

 7   Q.    (BY MR. JONAS)  Are you able to date the issue?

 8   A.    It is from 1990.

 9   Q.    1990?  Okay.

10        Agent Burns, on page 7, this is the end of the writing,

11   the article.  How would you describe this?  What would you

12   call this?

13   A.    It is like a poem.

14   Q.    A poem.  Okay.  And the title was again?

15   A.    "Hamas Hayzum has come."

16   Q.    Would you read the last three lines and the author?

17   A.    Yes.  "The youth who spoke for the dead and acted on

18   behalf of the living.

19        "The Hamas Hayzum has arrived, and we will not accept

20   other than Hamas."

21   Q.    Who wrote this according to this document?

22   A.    Shukri Abu Baker.

23   Q.    Who is that?

24   A.    The Defendant Shukri Abu Baker, who also sat on the IAP's

25   advisory board.
```

1    Q.   Can you turn back to Baker Declaration, please?

2    A.   Yes.

3    Q.   Page 2 on the top.  What does that top line say?

4    A.   Shukri Abu Baker says here, "I reject and abhor Hamas,

5    its goals, and its methods.  I reject terrorism by anyone."

6    Q.   That is fine.  And the last line of that poem was?

7    A.   "We will accept none other than Hamas."  I will get it

8    out and read it exactly.  "We will not accept other than

9    Hamas."

10   Q.   In this Illa Falistine, if you can turn to page 8, what

11   is that?

12   A.   This is an advertisement, or the translation of it, for

13   the Occupied Land Fund, which is the Holy Land Foundation.

14   Q.   Okay.  Did you see other Illa Falistine magazines that

15   had ads on it for the Occupied Land Fund or the HLF?

16   A.   I did.

17   Q.   Do you have before you Illa Falistine No. 3, 4, and 5?

18   A.   I do.

19   Q.   What language are these documents in?

20   A.   They are in Arabic.

21   Q.   Did you have some of them translated, some pages of them?

22   A.   Some parts of them, yes.

23   Q.   What are the dates of these issues, if you can tell us by

24   issue?

25   A.   Illa Falistine No. 3 is from October of 1988; Illa

1    Falistine No. 4, December of 1988; Illa Falistine No. 5,

2    February 1989.

3    Q.    Okay.

4            MR. JONAS:  Your Honor, at this time I would offer

5    into evidence Illa Falistine No. 3, Illa Falistine No. 4, and

6    Illa Falistine No. 5.

7            THE COURT:  Any objections, beyond those previously

8    made?

9            MS. HOLLANDER:  No, sir.

10           THE COURT:  And those documents are admitted.

11           MR. JONAS:  If we can put on the screen Illa

12   Falistine No. 3, page 3.

13   Q.    (BY MR. JONAS)  Agent Burns, is this the cover page?

14   A.    It is.

15   Q.    And what does it say in terms of what is contained within

16   the content of the magazine?

17   A.    It indicates that the charter of the Islamic Resistance

18   Movement Hamas was contained therein.

19   Q.    Turn to page 4.  What do you see in the middle?

20   A.    An ad for the Occupied Land Fund, which is the Holy Land

21   Foundation.

22   Q.    Juxtaposed to the ad what is right above it?

23   A.    It is an article about Hamas.

24   Q.    Is that the whole article, or is that just part of the

25   article?

1    A.    I believe it is continued from a previous page.

2          MR. JONAS:  And if we can turn to Illa Falistine No.

3    4, page 3, please.

4    Q.    (BY MR. JONAS)  And what does this cover page say is

5    contained within this magazine?

6    A.    This translation says that the magazine contains

7    information on the Palestinian state and also field visits to

8    the families of the martyrs.

9          MR. JONAS:  Can we jump to page 1?

10   Q.    (BY MR. JONAS)  This is the cover of the magazine

11   untranslated.  Correct?

12   A.    That is correct.

13   Q.    And you see there is a picture there?

14   A.    I do.

15   Q.    All right.

16         MR. JONAS:  If we can jump back to page 3, please.

17   Q.    (BY MR. JONAS)  What does it say in English that is under

18   the caption of that picture?

19   A.    Under the caption of the picture, it says, "The

20   Palestinian flag dipped in blood in one hand, the Quran in the

21   other, a scene from the martyrs' funeral in Nablus."

22         MR. JONAS:  Can we turn to page 4, please?

23   Q.    (BY MR. JONAS)  And what is on the bottom half of this

24   page?

25   A.    The bottom half is a solicitation for donations from the

1    Occupied Land Fund, Holy Land Foundation.

2    Q.    You see it says P.O. Box 38, Plainfield, Indiana?

3    A.    I do.

4    Q.    What is that?

5    A.    That was the original address that the HLF used.

6    Q.    What is above the solicitation for donations to the

7    Occupied Land Fund?

8    A.    A communication from the Islamic Resistance Movement

9    Hamas.

10         MR. JONAS:  If we can focus on the middle right hand

11   side, please.

12   Q.    Is that where you are getting the information?

13   A.    Yes.  You can see at the bottom where it is signed

14   Islamic Resistance Movement Hamas.

15         MR. JONAS:  If we can turn to Illa Falistine five,

16   please, page 1.  And if we can go to page 5, please.

17   Q.    (BY MR. JONAS)  What do we see in the bottom half?

18   A.    An advertisement for the Occupied Land Fund, the HLF.

19   Q.    What is above that?

20   A.    A statement from the Islamic Resistance Movement Hamas.

21         MR. JONAS:  If we can enlarge the bottom right hand

22   side.

23         Your Honor, I am at a point --

24         THE COURT:  All right.  Let's go ahead and break

25   here for the day.  Be back Thursday morning at 9:00.

1      Please recall the instructions that we have been over

2  about not discussing this case with anyone, or not letting

3  anyone discuss it with you.  See you back Thursday morning.

4              (Whereupon, the jury left the courtroom.)

5              THE COURT:  Anything we need to address before we

6  recess?

7      We will be back at 3:00.  Did you want your client here

8  at 3:00?

9              MR. CLINE:  If we may have one moment?

10              MR. JONAS:  Your Honor, are we going to address the

11  issue we discussed at sidebar, because I am at that point.

12              THE COURT:  Yes.  Just be sure to bring that up.

13  And have you had a chance to look at their list, their

14  exhibits?

15              MR. JONAS:  Not really.  We will do that during the

16  break.

17              MR. CLINE:  Yes, Your Honor.  Mr. Elashi would like

18  to be here.

19              THE COURT:  So be back at 3:00, then.  And have Mr.

20  Elashi here.  And I will be prepared to rule on the objections

21  to the Defense exhibits and this issue we just discussed at

22  the sidebar.

23              MS. CADEDDU:  Your Honor, the Defendants don't have

24  to be here, though?

25              THE COURT:  No, they are not required to be here for

1    this.

2                          (Lunch Recess.)

3            THE COURT:  Mr. Cline?

4            MR. CLINE:  I am only here because I happened to be

5    standing near here when you walked in.

6        I have talked briefly with the Government and want to

7    make the following suggestion to the Court, which they at

8    least I think do not oppose.  I think their position is it is

9    in your discretion, which it is.

10       We would much prefer to take up the issue of the

11   Government's objections to our proposed exhibits a little

12   later in the process.  We have given the Government a list,

13   which is essentially the list of the exhibits that we put in

14   last year with Agent Burns.  I can tell Your Honor, though,

15   that that list is going to change, both as she finishes her

16   direct and as we perfect, and perfect is too optimistic a word

17   but refine shall we say our cross of Agent Burns, which we

18   will be doing tomorrow and Thursday as well.

19       What I would like to suggest, therefore, is that the

20   Court delay this discussion of our exhibits until either the

21   end of the day Thursday, I think the plan from the

22   Government's perspective is to have Agent Burns finish her

23   direct Thursday sometime or the first thing Friday morning,

24   whatever the Court prefers.  In the meantime we will continue

25   to refine the list.  There are some exhibits Mr. Jonas told me

1  are already in there are others we are not going to use and I

2  am sure there will be additional ones that they are probably

3  going to want to object to.

4          THE COURT:  Okay.  So Mr. Jonas.

5          MR. JONAS:  That is fine with us, Your Honor.  The

6  whole purpose of this exercise we are not constantly objecting

7  when Agent Burns is on cross so if we do in before cross at

8  any point that is fine.  We do have a series of objections to

9  their proposed exhibits, so we just want to be heard at some

10 point.

11         THE COURT:  Okay.  Well, we can wait on that,

12 then -- How long do you anticipate your direct on Agent Burns

13 lasting?

14         MR. JONAS:  I am going to go through the rest of the

15 day Thursday.  I think if the Court probably noticed the

16 videos slowed things down and while I have a series of videos

17 to play none will be as long as the ones I played before.  It

18 still takes time.  I am hoping by the end of the day Thursday

19 I am done with her, at the latest maybe early Friday.

20         THE COURT:  So we can take this up at the end of

21 Thursday or early Friday morning.

22         MR. CLINE:  That will be fine.

23         THE COURT:  Why don't we -- Yes?

24         MS. CADEDDU:  Do you want to do this now we have an

25 issue we need to take up with the Court at the bench.

1          THE COURT:  Now is as good a time as any.  We are at

2     a breaking point.

3          (The following was had outside the hearing of the

4          Jury.)

5          MS. CADEDDU:  Judge, we are doing this at the bench

6     because the media is here and we don't want to make this blow

7     up any worse than it already is.

8          There is a lady who has been in attendance who has been

9     apparently, we learned today, hanging out with the other two,

10    the one you chastised yesterday.

11         Today as we were leaving, we were waiting -- We always

12    wait for the jury to go on the elevators because the CSOs

13    gather them up.  This lady went in the bathroom, she hung out,

14    she walked back and forth and waited until the jury --

15         MS. HOLLANDER:  She walked back and forth in front

16    of them.

17         MS. CADEDDU:  And then attempted to get on the

18    elevator with them.  And at that point we talked to the CSO,

19    Mr. Hillburn, Ms. Hollander did, and he went and put the

20    jurors on an elevator by themselves and didn't let her on.

21         Subsequently our clients have told us that they know who

22    she is.  She is this sort of crazy jihadist under-the-bed

23    blogger lady.  This is a photograph of her.  You have seen

24    her.  She was in the front row, I think.  And I have got all

25    sorts of her very, very vociferous blogs about the last trial

1    and this trial.

2        What we are concerned about, like this one here is

3    another one of her entries, cutting off the head of the snake.

4    You probably don't need it.  And what we are concerned about

5    is that there seems to be a concerted effort by these ladies

6    to actually have contact with our jurors and try to somehow

7    influence them.  And, you know, I don't know exactly what

8    remedy we need, but --

9            MS. HOLLANDER:  Well, it has been suggested, and I

10   don't know whether you could do this, or would want to,

11   whether you can tell them they have to go to the overflow

12   room, or whether -- I don't have any idea how far your

13   authority goes to tell them how far away they have to stay

14   away from the jurors.  But she was like as close to the jurors

15   as I am to Mr. Jacks.

16           THE COURT:  I think we will be all right.  Tom was

17   telling me about that just now as we were coming in.  They now

18   know her and they have gotten some identification, so they

19   will be watching for that to make sure she doesn't get with

20   the jury.

21           MS. HOLLANDER:  I am wondering what happens when

22   they go downstairs.  I mean, I sent Martha down with her

23   today.  I think she tries to go down and get with them as they

24   are leaving.

25           MS. CADEDDU:  What concerned us was that there was a

1   clear effort today to wait for the jury and to get on the

2   elevator with the jury after you had chastised her friend.

3           THE COURT:  Do we know that they are together?

4           MS. CADEDDU:  Yes.  Well, Mr. Hillburn said they are

5   together.

6           MS. HOLLANDER:  He said they were all sitting

7   together.

8           THE COURT:  I couldn't tell that they were sitting

9   together.  I just couldn't tell.  I saw different people.  I

10  couldn't tell that they were like sitting together, so I don't

11  know.

12          MS. MORENO:  The problem, Your Honor, is that, of

13  course, in the bathrooms, the CSOs can't go in there.  At

14  lunchtime when we are in the cafeteria sometimes, what we try

15  to do is leave the courtroom as soon as possible to beat the

16  jurors, but sometimes we see them down there and she is down

17  there.  So I don't think that the guards, the CSOs can keep an

18  adequate eye on her.  I am very concerned.  I have been down

19  this path before in other cases, and I am very concerned about

20  this.

21      If the Court is not inclined to ask her to be in the

22  overflow room, in an abundance of caution I would ask the

23  Court to admonish her.

24          MS. HOLLANDER:  Not to have magazines and stuff

25  sitting out by them?

THE COURT:  Has she had magazines?

MS. HOLLANDER:  We don't know.

THE COURT:  And I don't either.

MS. HOLLANDER:  We don't know what happens in the lunchroom.

THE COURT:  I think if she is doing something really untoward I think we would hear from the jurors.  They know to report any of that.  And I will remind them of that Thursday.

MS. MORENO:  I would ask the Court to do that.

MS. HOLLANDER:  That is a good idea.

THE COURT:  If they think or see or hear any improper -- anybody attempt to contact them, to be sure and let us know.

And they will watch in terms of getting on the elevator and maybe on the first floor, because they are taking them down to that central jury room.  So they can watch that.  They can't watch everything.  But I think that should be enough --

MS. HOLLANDER:  So they take them all the way down?

THE COURT:  I think we can start doing that.

MS. HOLLANDER:  That will help.

THE COURT:  I don't know whether they did that today or not, but we can tell them to watch her, if nothing else.

MR. JACKS:  Just so the record is clear, Judge, the Defendants' supporters everyday at lunchtime are across the street from the courthouse, and I am talking about family

1   members of the Defendants, holding up signs, and that is

2   clearly intended to reach the jury.

3             THE COURT:  Right.

4             MR. JACKS:  And yesterday they were handing out

5   something to eat, and just people were flocking like birds.

6   So I understand it is a difficult thing for a court to

7   control, but --

8             THE COURT:  We can control it in here.

9             MR. JACKS:  But that is the pot calling the kettle

10  black.

11           THE COURT:  We can't let that go on in here.

12  Obviously if she wants to put her sign up across the street,

13  she can go and put her sign up.

14           MS. MORENO:  That is right, but not in the courtroom

15  and the courthouse.

16           THE COURT:  But we can control it in here.  I just

17  don't want to jump the gun.  I don't know what she is doing.

18  I don't know that she has done anything improper.

19           MS. CADEDDU:  And we don't either.

20           THE COURT:  That is why I don't want to jump the gun

21  and start kicking her out.  Obviously we can if I got to the

22  point that I thought she was doing something.  I am not there,

23  so I just don't want to do that.

24           MS. HOLLANDER:  I wanted to make sure you know what

25  we know so far.

1          THE COURT:  I am glad you did.

2          MS. HOLLANDER:  But if she wants to go outside and

3   put her sign up, she can do that.

4          THE COURT:  She can put her sign up next to the

5   other folks if they want to do that.  Of course, we will

6   instruct the jury.  I don't think they will be influenced by

7   that.  I am concerned about the more direct contact with the

8   jury.  We can't let that happen in here.

9          MR. JACKS:  If you want to talk to her and tell her

10  to just stay away from them.

11         THE COURT:  I think I will just let -- We will talk

12  to the CSOs out there at the mag and here and ask them to keep

13  an eye on her, and if it looks like she is trying something,

14  we can talk to her.  And I can to tell the jury.  Remind me,

15  because I intended to tell them today and I forgot that if

16  somebody does try to contact them in any way about the case to

17  be sure and let us know.

18         MR. JACKS:  I will be happy to tell her.  I don't

19  know who she is, but she is not doing us any favors.

20         MS. CADEDDU:  We are not suggesting the Government

21  is --

22         THE COURT:  Folks just have their own agenda for

23  whatever reason.

24     Yes?

25         MR. JONAS:  Are we going to argue the Abdullah Azzam

1    issue?

2              THE COURT:  Yes.  That is where we are going.

3              (The following was had in open court.)

4              THE COURT:  Mr. Jonas?

5              MR. JONAS:  Your Honor, I guess what I propose there

6    are five videos that are have the subject matter we discussed.

7    We are ready to play them if Your Honor wants to see them.

8              THE COURT:  Yes.  And in goes to which particular

9    issue?

10             MR. JONAS:  This is the Abdullah Azzam issue who is

11   also in the Illa Falistine magazine.

12             THE COURT:  Let me listen to those.  And then also

13   before we leave I would like to hear the one that has to do

14   with the Dallas Morning News editorial.

15             MR. JONAS:  It may take just a moment to figure out.

16             THE COURT:  Sure.  And we can try to resolve that

17   one as well.

18             MR. JONAS:  I think the first video we are playing

19   actually came from the search warrant of Ismail Elbarasse's

20   home.  This is Elbarasse Search No. 32.

21             (Whereupon, Elbarasse Search No. 32 was played.)

22             MR. JONAS:  Your Honor, the next one is Mushtaha

23   Search No. 9.

24             (Whereupon, Mushtaha Search No. 9 was played.)

25             MR. JONAS:  Your Honor, the next tape we are playing

1    is Mushtaha Search No. 7.  And Your Honor, just so we are

2    clear, on that last tape there is another segment that we plan

3    on playing that doesn't have Abdullah Azzam on it.

4              THE COURT:  Okay.

5              (Whereupon, Mushtaha Search No. 7 was played.)

6              MR. JONAS:  And Your Honor, also for the record on

7    that one there are additional portions of that tape which we

8    want to play, and those additional portions show the Defendant

9    Mohammad El-Mezain raising money, show the band singing songs

10   with the Defendant Mufid Abdulqader on it.  And as Your Honor,

11   Abdullah Azzam is talking about Palestine and Palestinian

12   jihad right when the OLF ads appear.

13        The next one is Mushtaha Search No. 2.

14             (Whereupon, Mushtaha Search No. 2 was played.)

15             MR. JONAS:  Your Honor, he is praising Sheikh

16   Yassin, who we know is the spiritual leader of Hamas.  All we

17   heard is Palestinian jihad out of his mouth.  And although we

18   didn't see an OLF ad in that one, I would like to show Your

19   Honor one more clip where one of the Defendants referenced

20   back to the things he said in that clip that we just played.

21        This is Mushtaha Search No. 1.  This is the video I

22   played this afternoon, except I left one segment out.  We will

23   play that segment now.

24             THE COURT:  All right.

25             (Whereupon, Mushtaha Search No. 1 was played.)

1          MR. JONAS:  Your Honor, as you can see clearly, the

2     Defendant Mohammad El-Mezain refers back to statements made by

3     Abdullah Azzam about giving up refreshments, giving up fruit,

4     giving up meat in order to generate money, put money away for

5     Palestinian jihad.  And I think the Illa Falistine article

6     just follows on the heels of all of this.

7          THE COURT:  And you are wanting to introduce, then,

8     that article as part of Illa Falistine No. 2.

9          MR. JONAS:  Yes, sir.

10          THE COURT:  And you are objecting to that one

11     article, or are you objecting to other --

12          MS. HOLLANDER:  I am objecting to that article.  I

13     am objecting also to these videos, Your Honor.

14      The whole issue with Azzam is a complicated one.  He died

15     in 1989, so all of this, none of which is dated, has to be

16     before that.  And I think El-Mezain says "two years ago."  So

17     we are talking about 1987, 1988.

18      The Intifada had just started.  It is very hard for

19     jurors to compartmentalize what is going on.  He is also

20     talking on one of these about Pakistan and the guns he is

21     talking about buying in Pakistan.

22      If Azzam comes into this case, it opens a vast political

23     arena that I don't think we want to get into.  And I think

24     that the unfair prejudice of these, they have got plenty of

25     other videos--of these far outweighs the scant probative

1    value.

2         These were -- not a one of these comes from Holy Land.

3    Four of them come from Mushtaha and one from Elbarasse.  They

4    obviously -- someone unknown has put parts of them together.

5    There is no authentication that Holy Land or the Occupied Land

6    Fund had anything to do with putting those things on those

7    tapes.  I am not counting the last one where El-Mezain talks,

8    but the others.

9         So if they limited it to El-Mezain talking and to the

10   last page of that where it references the death of Azzam and

11   has it right -- and also has an ad for Holy Land, I don't have

12   mine with me, but I think it has it right after it, then we

13   wouldn't object to that, if the Court would then -- If they

14   would delete that article and the four tapes that we don't

15   know where they came from.  They are obviously from somewhere

16   else.  They stop and start.  Sometimes he is talking about

17   Pakistan and Afghanistan.  Sometimes he is talking about

18   Palestine.  And it just gets into a lot of other issues that I

19   don't think you want to get into here.

20        And I don't think that they need it.  I mean at some

21   point it just becomes more unfair than it is probative.

22             THE COURT:  Okay.  Thank you.

23        Mr. Jonas?

24             MR. JONAS:  First of all, Your Honor, I don't recall

25   seeing the words Pakistan or Afghanistan appear on the screen

1    at all.

2              THE COURT:  Pakistan did.  I don't know about

3    Afghanistan.

4              MR. JONAS:  "We can buy the bullets from" --

5              THE COURT:  That they could buy some weapons.  But

6    Afghanistan appears in the articles.

7              MR. JONAS:  He is not advocating for after Pakistan.

8    He is clearly advocating for Palestine.  When he is talking

9    about Sheikh Yassin he is advocating for Hamas.

10        This does not open a door to any other political issues.

11   These tapes speak for themselves.  We are not going to get

12   into who this man was, beyond the fact that he was an

13   inspiration for Hamas and Hamas suicide bombers and all of

14   that.  The fact that it is -- It came from Mushtaha's

15   backyard.  We already established he is a co-conspirator.  He

16   is intimately tied with these Defendants.  The same with

17   Elbarasse.  So it is all part of this conspiracy that we --

18             THE COURT:  What is your intent as far as any

19   explanation as to who this man is?  You stated beyond

20   encouraging Hamas.

21             MR. JONAS:  First of all, Doctor Levitt has already

22   established that he was -- And I forgot the exact words, but

23   Doctor Levitt talked about him briefly and sort of laid that

24   foundation that he was a Palestinian who -- a scholar and

25   Mujahideen.  I think Doctor Levitt really was very general, so

1    we didn't get into this area about Afghanistan.

2              THE COURT:  Did you get -- Did he testify to any

3    link with Hamas?

4              MR. JONAS:  I think he did.  I think he testified

5    that he was one of the Hamas original founders, if I recall

6    correctly.  I am pretty sure he did connect them to Hamas.

7              MS. HOLLANDER:  I don't think so because I don't

8    think that is true.

9              MR. JONAS:  Well, I think there is some disagreement

10   to that then, Your Honor.  We can go back and check.

11             THE COURT:  We can go back and check.

12             MR. JONAS:  But even so, the co-conspirators in this

13   case, whether it is the Defendants themselves or whether it is

14   the people they are working closely with, have created this

15   videotape that they are using to generate support, and the ad,

16   "Send your donations to OLF," right on top of this man talking

17   about Palestinian jihad and "give your money up for jihad,"

18   which is all what Doctor Levitt talked about in the economic

19   jihad that came from the Hamas charter, I think it is

20   incredibly relevant --

21             THE COURT:  But going back to what I had asked, what

22   are you intending to get from Agent Burns, or anyone else, in

23   terms of explaining or saying more about Azzam?  Anything else

24   beyond what is on the videos?

25             MR. JONAS:  Not really, no.  Not much beyond that.

1    It is his relationship to Hamas, if she knows it.  And there

2    is a chance Doctor Levitt may come back a second time, and if

3    he does we may show this to him and ask him about Abdullah

4    Azzam's relationship with Hamas, with no intention of going

5    beyond that.  So there is no intention of opening any vast

6    political doors.

7              THE COURT:  Okay.  So you don't need any references

8    to Afghanistan that are in the periodical?

9              MR. JONAS:  Your Honor, if that is the issue and

10   Your Honor wants us to black out the words --

11             THE COURT:  Well, that is part of the issue, because

12   what the Defense is claiming is that if you put that in, than

13   that opens up this area and they will need to go into it and

14   explain what is going on.  We don't need to turn this into a

15   case about Afghanistan.

16             MR. JONAS:  If Your Honor wishes, we can black out

17   Afghanistan, Philippines, and I think that is all I see is the

18   only two countries mentioned in this article.

19             THE COURT:  And Afghanistan is mentioned in various

20   places.  You can look through that.  Even the last page, I

21   think that --

22             MR. JONAS:  I see Afghanistan in a few places.  We

23   can block out the word Afghanistan if Your Honor wishes.

24             MS. HOLLANDER:  It is on the first page, too.

25             THE COURT:  The last page you were not objecting to

1    it also mentions to eliminate communism.

2            MS. HOLLANDER:  I wasn't objecting not to the last

3    page of the article, but -- and that mentions Afghanistan,

4    too.

5            THE COURT:  So just go through and --

6            MS. HOLLANDER:  Your Honor, could we ask, if I am

7    anticipating your ruling --

8            THE COURT:  Go ahead.

9            MS. HOLLANDER:  I am correct I believe.

10           THE COURT:  Actually I am still just trying to take

11   the information in.  I am leaning that way.  I think it is

12   relevant.  I don't want to get to where we open up other

13   areas.  I think that they have brought in some evidence that

14   links these groups and these documents and this evidence found

15   at these places and tied it to Holy Land.  Of course the tapes

16   themselves are connected to Holy Land.

17       I understand your concerns that you don't know who did

18   it, but I think that goes to weight and not admissibility.  I

19   think that is ultimately up for the jury.

20           MS. HOLLANDER:  Could we ask, then, that they not

21   use Mushtaha No. 2 on the one that references Pakistan?

22   Because I think if you listen to that one, what he is saying

23   is "In Pakistan we buy."  Now, if you didn't know that he is

24   actually in Pakistan and raising money for guns, which is why

25   the United States brought him here--to raise money for guns

1    for the Mujahideen--then you would think he is saying to the

2    Palestinians "Go get your guns in Pakistan."  But that is not

3    what he is saying.  I mean, I know that is not what he is

4    saying because I know exactly what he was doing in the United

5    States in 1988.  And that one would really lead the jury to

6    think exactly what Mr. Jonas said.  He is saying, "We buy guns

7    in Pakistan.  You can buy them in Pakistan."

8              MR. JONAS:  Your Honor, I think -- You know, if you

9    look at the whole tape and what he is talking about, it is all

10   about Hamas and Palestine, the Palestinian jihadists.  And If

11   he is saying, "We buy guns in Pakistan,"  I don't agree with

12   Ms. Hollander that that means that he is talking about another

13   issue.  I think in the context of this speech he is talking

14   about Hamas.  And let them -- I think they can argue that that

15   is not what it means, but I think the tape speaks for itself.

16             MS. HOLLANDER:  If we argue that is what it means,

17   then we have to get into what was going on in Pakistan, which

18   involves the United States surreptitiously feeding guns to

19   fight the communists in Pakistan because that is what was

20   happening in 1988.  And it was the United States that I

21   believe got him to come here.

22        A lot of this is actually in a movie called Charlie

23   Wilson's War that has exposed what the United States' role

24   was.

25             But, I mean, to avoid getting into that, they have got

1    three others.  Why do they need to have four videos, five

2    videos of him saying almost the same thing?  Because he says

3    almost the same thing on all of them.  There is only one where

4    he mentions Pakistan.

5              MR. JONAS:  Your Honor, and that is the one that the

6    Defendant Mohammad El-Mezain refers back to.

7              THE COURT:  Okay.

8              MR. JONAS:  And that is why we want that one in.

9              THE COURT:  Right.  She is asking can you leave out

10   the references -- just that reference to Pakistan.  And I

11   haven't -- Without going back and seeing it, you don't think

12   you can do that, or you think that changes --

13             MR. JONAS:  I think it changes the meaning.  I

14   really don't think we should be required to do that, sir.  I

15   really don't.

16             THE COURT:  And why do you think it changes the

17   meaning?

18             MR. JONAS:  Well, look.  He is obviously giving a

19   military talk, talking about buying weapons and economic

20   jihad.  And these Defendants are trying to portray themselves

21   as just a charity or helping just children and doing all of

22   these good things.  And clearly the fact that there is an ad

23   on top of this man's speech where he is saying "Give your

24   money up so we can buy weapons" goes contrary to what their

25   Defense is.  I think we are entitled --

1          THE COURT:  They are talking about just leaving out

2     the reference to Pakistan; not weapons, just Pakistan.

3          MR. JONAS:  Is it just this word?

4          THE COURT:  Or that sentence, whatever you need to

5     leave out Pakistan.

6          MS. CADEDDU:  No, Your Honor.  We would oppose that

7     as well, because what that does it precludes us -- it changes

8     the meaning.  It lets the Government put in the inference that

9     these are weapons for Hamas, when in reality what they are

10    talking about is the Mujahideen in Pakistan.

11         THE COURT:  I disagree.  I think the Government is

12    correct that when you see the tape and listen to it, that the

13    clear inference appears to be that he is talking about

14    supporting the Palestinian cause.  He is talking about getting

15    weapons from Pakistan, but I think there is a clear link to

16    what he is talking about, which is not Afghanistan.  He

17    doesn't mention Afghanistan or fighting communists anywhere in

18    there.  So I think the clear link is the way the Government

19    argues it.  I think that is there.

20        The problem is their position is that there is another

21    link and they are entitled to get into that, that there is

22    another meaning to that and they are entitled to get into

23    that, which of course is going to open that.

24         MS. CADEDDU:  Yes, sir.  And we would strongly

25    oppose -- if we are going to leave it in but take out

1    Pakistan, we would oppose that because that precludes us from

2    making our arguments in our defense.

3              MS. HOLLANDER:  That makes it even worse.

4              THE COURT:  It makes it worse?  So you are taking

5    the position that that only means weapons for Afghanistan.

6              MS. CADEDDU:  I don't know that we are taking that

7    position, Your Honor, but I think --

8              THE COURT:  Why is it relevant?

9              MS. CADEDDU:  It is open to that interpretation

10   certainly.  And the Government wants to put in their

11   interpretation that it is Hamas.  We don't think it is that.

12   And so you know, by precluding us from explaining what it was

13   exactly that Azzam was getting weapons for, that eviscerates

14   our defense while permitting the Government to get in an

15   inference that is not warranted.

16             THE COURT:  Well, I am not sure it is not warranted.

17   From looking at the tape, I think that inference is warranted,

18   in fact.  And that appears that is what he is doing, unless

19   there is something else that I am not seeing.  Of course, you

20   have it.

21             MS. CADEDDU:  And we can hire another expert to talk

22   about Azzam and what he did and how --

23             THE COURT:  But I don't know that that is relevant

24   is the problem.  The fact that he is involved in a conflict in

25   Afghanistan and he is also involved in a Israeli-Palestinian

1    conflict, they don't need to come together.  The issue that

2    this case is about is the Israeli-Palestinian issue and Hamas'

3    role in it.  That is the only thing that is relevant here.

4    That he may have been involved or was involved in the Afghan

5    conflict really doesn't matter to the issue that is here

6    before this jury.

7              MS. CADEDDU:  Well, HE is making reference to

8    Pakistan and saying "That is where you can get weapons."

9              THE COURT:  But he is making that reference in the

10   context of the Palestinian conflict.

11             MS. CADEDDU:  But the Palestinians haven't gotten

12   the weapons from Pakistan.  He has.

13             MR. JACKS:  How does she know that?

14             MS. CADEDDU:  I mean, that is history.

15             THE COURT:  And we don't know that the Palestinians

16   didn't get their weapons from here.  I mean, the fact that the

17   Afghans may have, that is certainly an inference --

18             MS. CADEDDU:  The Government has no evidence of

19   that.

20             THE COURT:  No.  But except the tape itself is

21   evidence.  That is an inference that you can make from the

22   tape just listening to it.  That is the first time I have seen

23   it, and that is the inference that I draw from that.  When you

24   listen to all the tapes, I think that is the clear inference.

25   He is there in reference to the Palestinian-Israeli conflict,

and that is what he is talking about, and weapons.

I understand why the Government would want it. I was just trying to see if there was a way we could get you there without opening it up. And I don't think where you are wanting to go is really relevant. That is just not relevant.

Yes?

MR. JACKS: If I could back up just a little bit and just focus on this article that is in this magazine, I think that is where we started on this discussion.

THE COURT: Well, but it is all involved. They are objecting to all of it--the tapes as well as the articles.

MR. JACKS: I understand. And we brought up the tapes to tie in the article about why the article was relevant. But the article says -- It talks about jihad in Palestine and jihad in Afghanistan, and then it goes on to elaborate on page 11 and talks about -- I am sorry. Probably the last page, 12.

THE COURT: Where there are two paragraphs?

MR. JACKS: I am trying to find the paragraph, Your Honor, where he talks about that what they are doing in Afghanistan is a threat to Moscow. And I don't think the fact that he was fighting against the Soviets in Afghanistan is prejudicial to these Defendants. The evidence is going to show that he died in 1988 or 1989, so it is not going to translate that --

1          THE COURT:  That is at the -- The very last sentence

2    of that last page.

3          MR. JACKS:  Correct.  So I am not sure if they are

4    saying that, "Well, the fact that he fought the Soviets in

5    Afghanistan is prejudicial to our clients," but --

6          THE COURT:  No.  They are wanting to get into that,

7    that that is where those weapons were going for that conflict.

8          MS. HOLLANDER:  That is part of it.  No, I mean, we

9    don't want to get into it.  We want to keep it all out.

10          THE COURT:  But if it comes in, you want to get into

11    that.

12          MS. HOLLANDER:  Right.  And we don't want, and to

13    some extent I think this is a bit of a trap for us, because

14    what we don't want to get into is how he died.  Now, this is

15    an article about --

16          MR. JACKS:  We have no intention --

17          THE COURT:  Why do we need to get into how he died?

18          MS. HOLLANDER:  I know they are not getting into it,

19    but they have also left an inference with this jury that we

20    have to clear up all the time about people who are martyred or

21    are suicide bombers.  This guy didn't die having anything to

22    do with Palestine.

23          MR. JACKS:  And we are not getting into that.

24          THE COURT:  You probably could do a stipulation on

25    that if that is an issue of concern.

1          MR. JACKS:  We weren't even going into the fact --

2          THE COURT:  But she is saying the inference, because

3    he is referred to as a martyr.  And so she is saying the

4    inference could be that he died as a martyr in the

5    Palestinian-Israeli conflict and on behalf of Hamas, or

6    something.  Did I understand that correctly?

7       And so just leaving it there as a martyr, that it could

8    be interpreted that he was involved or died, martyred in that

9    conflict.  We can deal with that.

10      Okay.  Go ahead.  Mr. Jacks, anything else?

11         MR. JACKS:  Well, I mean --

12         THE COURT:  So are you saying -- The fact that that

13   is not prejudicial--and I agree that is not necessarily

14   prejudicial--you want to leave it in?  Is that what you are

15   arguing for?

16         MR. JACKS:  I don't have any problem taking it out,

17   Your Honor.  I don't think we should have to, because this is

18   their -- and I say their.  The Defendants, their

19   co-conspirators, this is their magazine.  They chose what

20   articles to put in there, or they certainly condoned it or

21   approved it.  So they don't want the jury to know that these

22   are the kind of articles that they put in their magazine, this

23   article praising this man.  Well, that is too bad.  You know,

24   they should have been more careful about who they wrote about.

25      But if the solution is to take out the references to

1    Afghanistan and black out the word, we will do that.  But I

2    just -- I think regardless of if these videotapes -- To me

3    these videotapes just make it abundantly clear of the

4    connection and the presence that Abdullah Azzam has with this

5    organization, and how they regard him as such a revered

6    figure.

7         But setting aside these videotapes, this article is

8    something they chose to put in their magazine.  And this

9    argument that, "Well, if you do that, that is going to open

10   this door," not unless they want to open that door.  And we

11   have no intention of doing that.  But it is really -- It seems

12   like they are setting up the threat that, "Well, this is going

13   to open up all this information about Afghanistan."  Not from

14   us it isn't.

15        So in summary, we will take out the references to

16   Afghanistan.  I think the part in the tape about Pakistan and

17   Afghanistan, it came in in the first trial.  It is a part of

18   his speech and the context of it, and to simply cut out words

19   because of the theory that the jury is going to somehow take

20   that word and it is going to lead them to some thought which

21   is going to lead to some other thought --

22             THE COURT:  I think their argument there is that

23   they want to explain their theory of what that is about, and

24   that is providing weapons for the Afghanistan conflict.

25             MR. JACKS:  There has to be some evidence of that.

1    THE COURT:  That is where they are wanting to go is

2    present evidence.  That is not where I am wanting to go.  I

3    don't want to get into the Afghanistan conflict.

4    MS. HOLLANDER:  Let me make one last try here, Your

5    Honor.

6    THE COURT:  All right.

7    MS. HOLLANDER:  The problem with the whole issue of

8    Azzam and him coming into this case at all is trying to put

9    all of us back into 1988.  He was not a Hamas person.  He was

10   revered by the people in the Intifada because of the work he

11   was doing in Pakistan fighting the communists in Afghanistan.

12   The whole Muslim world was supporting this effort and the

13   United States was supporting this effort to fight the Soviets

14   and get them out of Afghanistan in 1988.

15   And so he is a revered figure, and he is a very fiery

16   figure, and he is a fighter.  I mean, there is no doubt about

17   that in history.  That is who he was.  That is how he lived.

18   That is how he died.  And that is who he is.

19   Now, we can't -- It is very hard to explain that to this

20   jury and explain why it is that in 1988 or 1989 right after he

21   has died that El-Mezain is saying, "Listen to Azzam.  Listen

22   to your brothers who are fighting the Soviets in

23   Afghanistan."  And it just brings all of that in a way that we

24   can't explain.

25   THE COURT:  I don't know -- Go ahead.  I will let

1  you finish.

2          MS. HOLLANDER:  My answer to it, and my request to

3  the Court, they have got lots of evidence of fiery speeches,

4  is to leave Azzam out of this case so that -- for the purposes

5  of not adding clearly unfair prejudice that cannot be

6  explained to this jury.  That is really what I am trying to

7  say.

8          THE COURT:  Well, because I think where I disagree,

9  though, with your statement is you think the explanation lies

10  in explaining his role in the Afghan conflict.

11          MS. HOLLANDER:  I think we can't.  That is the

12  problem.

13          THE COURT:  I don't think you need to is the

14  problem, because these tapes, I agree that they speak for

15  themselves.  And they are not talking about the Afghan

16  conflict.  Clearly he appears to support the resistance, the

17  Hamas movement or the fight against Israel and the

18  Palestinian-Israeli conflict.  He appears to support that.

19  There is no question that is what this is about.  And that

20  fundraising, they are using it, as the Government points out,

21  OLF and contribute, it is that connection.  So he is not

22  talking about Afghanistan.  That is maybe why he was revered

23  and why they would have brought him in to influence people to

24  give, but clearly he is supporting the cause in Palestine.

25          MS. HOLLANDER:  Right.  But his talk about weapons,

1    I mean, we have it up here, the words, it says, "We buy the

2    rocket that destroys a tank.  We buy it in Pakistan."  And the

3    jury is not going to get that reference that he is talking

4    then about his personal position, his situation.

5          THE COURT:  But then he leads that into donating.

6          MS. CADEDDU:  May I read it, Your Honor?  It says --

7    He says, "This is your preparation and this is your best

8    provision.  O children of Palestine, the opportunity to be

9    trained on all types of weapons is open and golden."  The

10   opportunity to be trained.  "So do not let it pass.  By God, O

11   brothers, we buy the RPG rocket that destroys a tank from the

12   tribes region in Pakistan for $5 for 100 rupees.  It is

13   costing the weapon factories $500."  And then he goes on to

14   talk about the prices.  And what he is saying is, "Don't you

15   lose the opportunity.  We are buying this stuff in Pakistan."

16   And I think that that inference comes from the text of what he

17   is saying, and I think we are entitled to explore that.

18         THE COURT:  But why is that relevant?  The issue

19   here before the jury is the Hamas role in the

20   Israeli-Palestinian conflict.  And this tape, as I heard it,

21   he may have made that statement, but it is ultimately

22   encouraging the individuals to give money so that they can buy

23   weapons for the Israeli-Palestinian conflict; not for

24   Afghanistan.  He is not raising money for Afghanistan.

25   Nothing in the tape even suggests that that is why he is

1    there, or that they are using that talk to raise money for

2    Afghanistan.  It is to raise money for what the for the

3    Israeli-Palestinian conflict, so don't lose the opportunity to

4    buy these weapons.  That is still the way I see it.  I don't

5    think that changes -- that somehow this transforms it into

6    this is for Afghanistan.

7             MS. CADEDDU:  No.  The problem here, though, is that

8    this leaves the jury -- This is why the Government is

9    struggling so hard to get it in.  What they are going to leave

10   out there is this guy is buying weapons for Hamas at all these

11   different prices.  He is not.  He is buying weapons for the

12   Mujahideen.  So that inference I think is very confusing to

13   the jury.  And if you asked my normal person when they read

14   this, they are going to think that he is saying "We buy it"

15   means "We buy it for Hamas."  He is not he is saying, "You go

16   buy it.  We buy it for the Mujahideen for this price."

17        And so it leaves the jury with this idea that Hamas is

18   out there buying RPG rockets and this in 1989, when what he is

19   talking about is the Mujahideen in Afghanistan.

20             THE COURT:  Mr. Jonas, any other final thoughts?

21             MR. JONAS:  Your Honor, that is their opinion.  I

22   think the tape speaks for itself.

23             THE COURT:  That is the problem.  That is their

24   opinion.  And that is what they are saying--you have yours and

25   they have theirs, and they want to express theirs to the jury.

1        MR. JONAS:  And we are just looking to play this

2   tape, and Your Honor heard it, and it is clearly about Hamas.

3        THE COURT:  And I agree.  That is certainly what it

4   sounds like to me.

5        MR. JONAS:  And then these Defendants and the

6   co-conspirators took this speech, slapped their ad on it, and

7   used it to get people to send them money.  It is as simple as

8   that.  We should not have to redact any of it.  They shouldn't

9   have done that if they were concerned about what this man was

10  saying and what he was talking about.

11       THE COURT:  Well, I am not having a problem with

12  letting that in as far as that.  I am trying to keep where we

13  are not opening up other areas or not opening it up too much.

14  If it comes in -- And as I stated, I am inclined to let it in.

15  I haven't made the final ruling yet.  I still want to think

16  about it some more after having heard the arguments.  But if I

17  let it in, are you going to want the redactions of

18  Afghanistan.

19       MS. CADEDDU:  No, Your Honor.

20       THE COURT:  The references to Afghanistan and the

21  communist agents of Moscow and --

22       MS. CADEDDU:  Are we talking about the Illa

23  Falistine now, Your Honor?  I have lost track.

24       THE COURT:  Yes.

25       MS. HOLLANDER:  I think we want that article, that

1    they don't need at all, out, that article out.

2            THE COURT:  I understand that.  But I am saying if I

3    let it in.

4            MS. HOLLANDER:  I would have to look at it and see.

5            THE COURT:  Because at one time you were making

6    references, and you underlined, the copy you gave me, the

7    references to Afghanistan because you were saying didn't want

8    that in.

9            MS. HOLLANDER:  I was saying that that is why that

10   article concerned me.  I was saying I really don't want that

11   article in.  At the end, that last part just above the ad, not

12   the article but the next page, it does make a reference to it,

13   but it doesn't make as much of a reference as the article.

14   And I was suggesting as an alternative or as a compromise that

15   they leave the article out.  Because what they said --

16           THE COURT:  You are still not answering the

17   question.  If I let the article in, are you going to want to

18   eliminate or redact those references to Afghanistan or leave

19   them in?  Or do you want to think about it?

20           MS. HOLLANDER:  I don't think I want to redact them

21   if it comes in.

22           THE COURT:  Okay.  So if it comes in, leave it as

23   is.  And then you are going to want to get into explaining --

24           MS. HOLLANDER:  We may on cross.  We may.  We will

25   have to think about it.

1          THE COURT:  Sure.

2          MR. JONAS:  Your Honor, just for your information,

3    if this is a path that we are going to go down about

4    explaining Afghanistan, my understanding of Abdullah Azzam is

5    that he was -- I don't know what word to use.  A cohort, an

6    ally of Osama bin Laden, and that is the path we are going to

7    end up going down.

8          MS. HOLLANDER:  And that is the trap, and that in

9    fact is the trap the Government is trying to put us into, Your

10   Honor.

11         MR. JONAS:  We are not trying to put them in any

12   trap, Your Honor.  These videos speak for themselves.  They

13   are trying to create the illusion of the trap in order to keep

14   them out.

15      Ms. Hollander keeps referencing the Government has plenty

16   of evidence and other videotapes.  If she is willing to

17   concede that the Government has enough evidence to prove her

18   client guilty beyond a reasonable doubt, we will take that

19   concession.

20         THE COURT:  I am sure she would, but I am sure she

21   is not.

22         MR. JONAS:  I am sure she is not also, so that is

23   why we want to put on our case.

24         THE COURT:  Okay.

25         MS. HOLLANDER:  I don't have anything else.

1          THE COURT:  I think we have exhausted the issue.

2      Are there any other issues that we need to address?

3      And I will get back with you, if not later this

4  afternoon, then certainly by in the morning.

5          MR. CLINE:  I just had a couple of procedural things

6  I wanted to briefly touch on.

7      One is we may have already said this, but if we haven't I

8  want to make it clear, that an objection for one Defendant

9  will be treated as an objection for all Defendants?

10          THE COURT:  Yes.  I think we stated that.

11          MR. CLINE:  The second thing, there have been a

12  number of requests throughout the trial so far, and I am sure

13  there will be a flurry of additional ones, for limiting

14  instructions of one kind or another.

15      It occurred to me that it might not be a bad idea for us

16  to plan on at the end of the Government's case filing a sort

17  of omnibus pleading that lays out the limiting instructions

18  that we are requesting for the various items of Government

19  evidence.  Would that be --

20          THE COURT:  That would be helpful, sure.

21          MR. CLINE:  And that way, if it is all right with

22  the Court, that way we will not have to keep requesting

23  particular limiting instructions every time a piece of

24  evidence comes in.

25          THE COURT:  And I haven't ruled on any but one where

there was agreement.  Other than that I think I have withheld

ruling because I don't feel like I am in a position to make

those kinds of decisions as to whether or not those statements

should be limited to a Defendant or a broader import as the

Government is arguing.

MR. CLINE:  And that is part of the reason that it

struck me this might be the best way to go.  We can just give

you a list of the ones we are requesting.

THE COURT:  That would be helpful.  All right.

I will get back with you either later this afternoon or

in the morning on that issue.

And then before you start your cross, if I let the tapes

in and the article in, before you get into anything beyond the

Israeli-Palestinian conflict, be sure your approach the bench.

MS. HOLLANDER:  Of course, Your Honor.

THE COURT:  One last issue.  Did we deal with the

editorial?

MR. JONAS:  I am sorry, Your Honor.

THE COURT:  You had a supporting tape?

MR. JONAS:  I forgot about that.

MR. JACKS:  Your Honor, what was the date of the

editorial?

THE COURT:  It had to be in '95 or '96.  It was

after he was arrested in New York, which I think you stated

was maybe March of '95.

1            MR. CLINE:  August of '95.

2            MR. JONAS:  The exhibit list we have doesn't

3    describe the content of the call, so we are trying to decide

4    by the date.

5            THE COURT:  The paper I have doesn't state a date.

6            MR. JONAS:  Can I just make a suggestion?

7            THE COURT:  Yes.

8            MR. JONAS:  I don't believe I am getting into this

9    with Agent Burns.  Can we identify the call and maybe take

10   this up next time we have another meeting about this?

11           THE COURT:  Sure.  Okay.  So you are not planning on

12   offering this, then, through Agent Burns at this time?

13           MR. JONAS:  No.

14           THE COURT:  All right.

15           MR. JONAS:  We plan on offering it later on.

16           THE COURT:  All right.

17           MR. JACKS:  Your Honor, when we determine which

18   conversation and which exhibit it is, we will just email you

19   and you can look at the transcript of the call on our exhibit

20   list.

21           THE COURT:  Okay.  That would be good.  And then let

22   them know and we can then take up the objections after I have

23   had a chance to look at it.

24       I have read the editorial, but you have a conversation

25   that you say references it, and that is what I wanted to hear

1    before I made a ruling on it.

2         And I think -- Is your position that it all stays out, or

3    were you just wanting some of it out?

4              MS. HOLLANDER:  I think it is Mr. Elashi's

5    conversation, is it not?

6              MR. CLINE:  It involves him, but we are not sure who

7    the other parties are.

8              MR. JONAS:  It is the Defendant Shukri Baker.

9              MS. HOLLANDER:  We need to take a look at it.

10             THE COURT:  Once you get that from the Government,

11   take a look and we will consider it then.

12        Anything else while we are here this afternoon.

13             MR. CLINE:  Not from the Defendants.

14             (Discussion between the Court and the court

15             reporter.)

16             THE COURT:  This is what Doctor Levitt says in his

17   testimony.  I think the question was, "And finally Abdullah

18   Azzam?"

19        And his answer, "Abdullah Azzam is a Palestinian and a

20   kind of spiritual figurehead that Hamas looks up to.  He has

21   been -- he fought against the Soviets in the war in

22   Afghanistan and is seen by Hamas as a figure to look up to.

23        Question:  "Is he still alive today?"

24        Answer:  "He is not."

25        And then question, "What year did he die?"

1    And the answer, "It was mid 1980s, maybe 1985."

2    And then they went on to something else, and so that is

3  what has come out.

4              MR. JACKS:  I think he corrected himself.

5              MS. HOLLANDER:  He did.

6              THE COURT:  And historically it was 1989?

7              MS. HOLLANDER:  It was '88 I think when he died, and

8  I know that Levitt did correct himself later and say it may

9  have been a few years later.

10             THE COURT:  Okay.  All right.

11             MR. JACKS:  Judge, that conversation is Baker

12 Wiretap No. 37, the conversation about the editorial.

13             THE COURT:  Okay.  Baker Wiretap No. 37.  Okay.  I

14 will take a look at that.

15    Any other issues we need to address while we are here?

16             MS. HOLLANDER:  I just need to talk to you about a

17 funding issue very briefly.

18             THE COURT:  Anything else we need to get on the

19 record?

20             MS. HOLLANDER:  No.

21             THE COURT:  We are adjourned, then, until 9:00

22 Thursday morning.

23                      (End of day.)

24

25

1       I HEREBY CERTIFY THAT THE FOREGOING IS A

2       CORRECT TRANSCRIPT FROM THE RECORD OF

3       PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4       I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5       FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6       COURT AND THE JUDICIAL CONFERENCE OF THE

7       UNITED STATES.

8

9       S/Shawn McRoberts            06/04/2009

10      _____DATE_____

        SHAWN McROBERTS, RMR, CRR

11      FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25