IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA  ) CAUSE NO. 3:04-CR-240-P
                          (
vs.                       )
                          ( OCTOBER 2, 2008
                          ) DALLAS, TEXAS
HOLY LAND FOUNDATION, ET AL ( 9:00 A.M.

_____

VOLUME 12 OF 37

_____

STATEMENT OF FACTS


BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

_____




A P P E A R A N C E S



        FOR THE GOVERNMENT:  UNITED STATES ATTORNEY'S OFFICE
                            1100 COMMERCE, 3RD FLOOR
                            DALLAS, TEXAS  75242
                            BY:  MR. JIM JACKS
                                 MR. BARRY JONAS
                                 MS. ELIZABETH SHAPIRO

        FOR THE DEFENDANT:  FREEDMAN, BOYD, HOLLANDER,
        (SHUKRI ABU BAKER)  GOLDBERG & IVES, P.A.
                            20 FIRST PLAZA, SUITE 700
                            ALBUQUERQUE, NEW MEXICO 87102
                            BY:  MS. NANCY HOLLANDER
                                 MS. TERESA DUNCAN

```
 1          FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
            (MOHAMMAD EL-MEZAIN)  14 WALL STREET, 28TH FLOOR
 2                               NEW YORK, NEW YORK  10005
                                 BY:  MR. JOSHUA DRATEL
 3                                    MR. AARON J. MYSLIWIEC

 4          FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
            (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
 5                               DALLAS, TEXAS  75204
                                 BY:  MS. MARLO P. CADEDDU
 6
            FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
 7          (GHASSAN ELASHI)     P.O. BOX 10985
                                 TAMPA, FLORIDA  33679
 8                               BY:  MS. LINDA MORENO

 9                               JONES DAY
                                 555 CALIFORNIA ST., 26TH FLOOR
10                               SAN FRANCISCO, CA  94104
                                 BY:  MR. JOHN D. CLINE
11
            FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12          (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                 FORT WORTH, TEXAS  76102
13                               BY:  MR. GREG WESTFALL

14          COURT'S LAW CLERK:   MS. JENNIFER HELMS
                                 1100 COMMERCE, RM. 1654
15                               DALLAS, TEXAS  75242

16          COURT COORDINATOR:   MS. BRENDA WEBB
                                 1100 COMMERCE, RM. 1654
17                               DALLAS, TEXAS  75242

18   OFFICIAL COURT REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                 1100 COMMERCE STREET, RM. 1654
19                               DALLAS, TEXAS  75242
                                 (214) 753-2349
20

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| LARA BURNS | |
|    Direct By MR. JONAS................................................. | 6 |

## Government's Exhibits

| Government's Exhibits | Page |
|---|---|
| Mushtaha Search No. 9 Admitted into Evidence | 22 |
| Mushtaha Search No. 2, 7 Admitted into Evidence | 24 |
| Elbarasse Search No. 32 Admitted into Evidence | 24 |
| HLF Search No. 127 Admitted into Evidence | 27 |
| HLF Search No. 14 Admitted into Evidence | 29 |
| HLF Search No. 114 Admitted into Evidence | 37 |
| HLF Search No. 16 Admitted into Evidence | 40 |
| HLF Search No. 112 Admitted into Evidence | 41 |
| Abdulqader Wiretap 1, 1-A Admitted into Evidence | 43 |
| Baker Wiretap No. 6, 6-A Admitted into Evidence | 47 |
| Abdulqader Wiretap No. 2, 2-A Admitted into Evidence | 48 |
| AMEX No. 2 Admitted into Evidence | 49 |
| HLF Search No. 15 Admitted into Evidence | 52 |
| HLF Search No. 17-20 Admitted into Evidence | 53 |
| Baker Wiretap No. 7, 7-A Admitted into Evidence | 56 |
| HLF Search No. 21-23, 142-147 Admitted into Evidence | 60 |
| Demonstrative No. 19 Admitted into Evidence | 61 |
| HLF Search No. 124 Admitted into Evidence | 67 |
| Mushtaha Search No. 15 Admitted into Evidence | 70 |
| HLF Search No. 109 Admitted into Evidence | 74 |
| InfoCom Search NO. 7-9 Admitted into Evidence | 77 |
| InfoCom Search No. 10 Admitted into Evidence | 80 |
| HLF Search No. 25 Admitted into Evidence | 84 |
| HLF Search No. 93 Admitted into Evidence | 86 |
| HLF Search No. 94 Admitted into Evidence | 87 |
| HLF Search No. 148 Admitted into Evidence | 88 |
| InfoCom Search No. 72 Admitted into Evidence | 91 |
| El Mezain Wiretap No. 1 Admitted into Evidence | 93 |
| HLF Search No. 87 Admitted into Evidence | 107 |
| El Mezain Wiretap 4, 4-A Admitted into Evidence | 113 |
| El Mezain Wiretap No. 12, 12-A Admitted into Evidence | 131 |
| HLF Bank Account No. 6 Admitted into Evidence | 132 |
| Bank Secrecy Form Admitted into Evidence | 134 |
| HLF Search No. 28 Admitted into Evidence | 139 |
| El Mezain Wiretap No. 7 Admitted into Evidence | 141 |
| HLF Search No. 29 Admitted into Evidence | 143 |
| HLF Search No. 30 Admitted into Evidence | 147 |
| HLF Search No. 31 Admitted into Evidence | 149 |
| HLF Search No. 32 Admitted into Evidence | 151 |
| El Mezain Wiretap No. 7-A Admitted into Evidence | 151 |

Baker Wiretap No. 37, 37-A Admitted into Evidence                152
InfoCom Search No. 73 Admitted into Evidence                    155
Baker Wiretap No. 10, 10-A Admitted into Evidence              156
HLF Bank Account No. 1 Admitted into Evidence                  156
HLF Search No. 11, 12 Admitted into Evidence                   157
Islamic Relief Account No. 1 Admitted into Evidence            157
HLF Search No. 111 Admitted into Evidence                      158
HLF Search No. 125 Admitted into Evidence                      158
Mushtaha Search No. 8 Admitted into Evidence                   158
HLF Search No. 49 Admitted into Evidence                       158
HLF Foreign Account No. 2 Admitted into Evidence               159
HLF Foreign Account No. 6 Admitted into Evidence               159
HLF Search No. 62 Admitted into Evidence                       159
HLF Search No. 76 Admitted into Evidence                       159
HLF Search No. 84 Admitted into Evidence                       160
HLF Search No. 83 Admitted into Evidence                       160
HLF Search No. 82 Admitted into Evidence                       160
HLF Search No. 81 Admitted into Evidence                       160
HLF Search No. 77 Admitted into Evidence                       161
HLF Search No. 75 Admitted into Evidence                       161
HLF Search No. 70 Admitted into Evidence                       161
HLF Search No. 113 Admitted into Evidence                      162
HLF Search No. 105 Admitted into Evidence                      162
HLF Search No. 36 Admitted into Evidence                       162
InfoCom Search No. 31 Admitted into Evidence                   163
InfoCom Search No. 47 Admitted into Evidence                   163
InfoCom Search No. 58-64 Admitted into Evidence                163
InfoCom Search No. 65 Admitted into Evidence                   164
InfoCom Search No. 79 Admitted into Evidence                   164
Elbarasse Search No. 22 Admitted into Evidence                 164
Baker Wiretap No. 13 Admitted into Evidence                    165
Baker Wiretap No. 34, 34-A Admitted into Evidence              165
Baker Wiretap No. 38, 38-A Admitted into Evidence              165
El Mezin Wiretap No. 13, 13-A Admitted into Evidence           165
Payments to IC/Hebron Admitted into Evidence                   167
Chart Payments to IC/Hebron Admitted into Evidence             168
InfoCom Search No. 77 Admitted into Evidence                   172
HLF Search No. 48 Admitted into Evidence                       172
HLF Foreign Account No. 2 Admitted into Evidence               173
InfoCom Search No. 19 Admitted into Evidence                   173
HLF Search No. 41 Admitted into Evidence                       173
InfoCom Search No. 21 Admitted into Evidence                   173
Islamic Association of Gaza Acct. Admitted into Evidence       174
HLF Search No. 43 Admitted into Evidence                       174
InfoCom Search No. 57 Admitted into Evidence                   174
HLF Search No. 33 Admitted into Evidence                       174
InfoCom Search No. 13 Admitted into Evidence                   174
InfoCom Search No. 74 Admitted into Evidence                   175
HLF Search No. 45 Admitted into Evidence                       175
HLF Search NO. 35 Admitted into Evidence                       176

InfoCom Search No. 14 Admitted into Evidence                    176
Jenin Zakat Account No. 1, 3 Admitted into Evidence            177
HLF Search No. 37 Admitted into Evidence                       177
InfoCom Search No. 15 Admitted into Evidence                   177
Nablus Zakat Account No. 1, 2 Admitted into Evidence           177
Tulkarem Zakat Account No. 1 Admitted into Evidence            177
InfoCom Search No. 18 Admitted into Evidence                   178
Qalqilia Zakat Account No. 3 Admitted into Evidence            178
HLF Search No. 40 Admitted into Evidence                       178
HLF Search No. 39 Admitted into Evidence                       178
HLF Search No. 38 Admitted into Evidence                       179
InfoCom Search No. 16 Admitted into Evidence                   179
InfoCom Search No. 17 Admitted into Evidence                   179
Tulkarem Zakat Account No. 3 Admitted into Evidence            179
Payments to Nabulus Zakat Comm. Admitted into Evidence         193
Payments to Tulkarem Zakat Com. Admitted into Evidence         199
Payments to Jenin Zakat Comm. Admitted into Evidence           202
Payments to Ramallah Zakat Com. Admitted into Evidence         205
Payments to Qalqilia Zakat Comm. Admitted into Evidence        206
Payments to Islamic Culture and Sc Admitted into Evidence      206
Payments to Islamic Society of Gaz Admitted into Evidence      208
Payments to Bethlehem Orphan So Admitted into Evidence         209

1          THE COURT:  Good morning.

2      Mr. Jonas?

3          MR. JONAS:  Yes, sir.  Your Honor, I am about to

4  start with Agent Burns the issues involving Abdullah Azzam so

5  I need a ruling whether we can get into.

6          THE COURT:  I am overruling the objections and you

7  can get into that.

8      Anything else before we get started?

9          MS. HOLLANDER:  Ms. Duncan is not here today.

10          THE COURT:  Sure.  That is fine.

11      Go ahead and bring in the jury.

12          (Whereupon, the jury entered the courtroom.)

13          THE COURT:  Ladies and gentlemen of the jury, good

14  morning.  We are ready to proceed.

15      Mr. Jonas?

16          MR. JONAS:  Thank you, sir.

17  Q.   (BY MR. JONAS)  Good morning, Agent Burns.

18  A.   Good morning.

19  Q.   How do you feel this morning?

20  A.   Better, thanks.

21  Q.   If you recall, when we broke on Tuesday we were looking

22  at these IAP magazines called Illa Falistine Do you remember

23  that?

24  A.   I do.

25          MR. JONAS:  And just to re refresh our recollection,

1    if we can pull up the last one that we looked at, Illa

2    Falistine 5, page 5.

3    Q.    (BY MR. JONAS)  Do you see that, Agent Burns?

4    A.    I do.

5    Q.    What does this page depict?

6    A.    This is an Illa Falistine, which is a publication by the

7    Islamic Association for Palestine, the IAP and in it this page

8    includes a statement by the Islamic Resistance Movement,

9    Hamas.

10          MS. HOLLANDER:  Can we have a date, please.

11   Q.    (BY MR. JONAS)  Do you know the date of this issue?

12   A.    The date of the statement here is January 20th, 1989.  I

13   believe the actual magazine article was dated February 1989.

14   Q.    And below that is?

15   A.    Just below the statement by the Islamic Resistance

16   Movement, Hamas is an ad for the Occupied Land Fund that

17   merely says "Send your tax deductible donations."

18   Q.    Okay.  Agent Burns, were there any Illa Falistine

19   magazines that had articles in it referencing the Occupied

20   Land Fund or the Holy Land Foundation?

21   A.    In addition to the ones we have already discussed?

22   Q.    Correct.

23   A.    Yes, there were others.

24   Q.    Okay.  Do you have before you what has been marked as

25   Illa Falistine No. 2?

```
 1   A.    I do.

 2   Q.    Is that one of these magazines that we have been

 3   referring to, the IAP publications?

 4   A.    It is.

 5              MR. JONAS:  Your Honor, at this time I offer into

 6   evidence Government's Exhibit Illa Falistine No. 2?

 7              THE COURT:  That is admitted.

 8              MR. JONAS:  Thank you, sir.

 9   Q.    (BY MR. JONAS)  Agent Burns, if we can first put on page

10   1 so we can see the cover, is that the cover of the magazine?

11   A.    It is.

12   Q.    Do you know the date of this particular issue?

13              MR. JONAS:  And if we can turn to page 7?

14              THE WITNESS:  Yes.  According to page seven this was

15   the November-December 1989 issue.

16   Q.    (BY MR. JONAS)  And to be clear, what language is the

17   original magazine in?

18   A.    It is in Arabic, as were the other Illa Falistines, and

19   we had portions of them translated.

20   Q.    Do you see under in the title page it says picture of

21   Abdullah Azzam?

22   A.    Yes.  That is the individual that is depicted on the

23   front cover of the magazine, if you want to go back to page 1.

24   Q.    Have we seen him referenced in any of the videos we have

25   seen so far, in the songs?
```

A.    Yes, we have.

Q.    If you recall, I asked you about the name during one of the songs being played by the Al Sachra Band?

A.    Yes.  In the video we watched late Tuesday, I guess it was, where they were singing about Sheik Ahmad Yassin, they were singing about Abdullah Azzam.

Q.    Okay.  In asking about this issue, I asked you if there were any articles that referenced the Holy Land Foundation or the Occupied Land Fund.  Is there such an article in this issue?

A.    There is.

       MR. JONAS:  If we can turn to page 8, please.

       THE WITNESS:  Mr. Jonas, on my copy mine ends at 7, so if you can show me the original.

Q.    (BY MR. JONAS)  Sure.

A.    Thank you.

Q.    Agent Burns, can you do a little reading today, or would rather me do it?

A.    I can do it.  Again, this is the translation of page 2 of the original in the magazine.  And it says on top the Islamic Association for Palestine, which is the IAP and then it says, "A statement issued by the media office of the Islamic Association for Palestine in North America, the third year of the Intifada."

Q.    Let me stop you and ask you a few questions on that.

1  Could you remind us again what the Islamic Association for

2  Palestine is?

3  A.   That organization was the media organization which was a

4  part of the Palestine Committee along with the Holy Land

5  Foundation.

6  Q.   And what document has that organization published in

7  English and Arabic in the United States that we have referred

8  to?

9  A.   I am sorry.  Can you repeat that?

10  Q.   What document has that organization published both in

11  English and Arabic?

12  A.   The Hamas charter.

13  Q.   Were any of the Defendants at this time associated with

14  the IAP?

15  A.   Yes.

16  Q.   Who?

17  A.   Well, this was in 1989, as we said, and according to the

18  Defendant Shukri Abu Baker's deposition he was on the advisory

19  board during this time period.  In addition, we saw Mohammad

20  El-Mezain identified in a 1988 video as being a part of the

21  IAP.

22  Q.   Did we also see any IAP documentation indicating another

23  Defendant was associated with it?

24  A.   We did.

25  Q.   What was that?

1    A.    The articles of incorporation for the IAP from 1986

2    showed Ghassan Elashi as an officer and incorporator.

3    Q.    Okay.  Where it says "the third year of the Intifada," is

4    that consistent with the date of this issue?

5    A.    It is.

6    Q.    And if you could continue reading, please.

7    A.    Okay.  It says, "The Intifada of our people knocks on the

8    door of its third year with more determination, persistence,

9    and heroism.

10         "The Intifada of our people in blessed Palestine came

11   with the dawn of the 8th of December, 1987 as an explosion of

12   a volcano of anger which filled the Palestinian heart for

13   several decades; an anger resulting from the conspiracy of

14   colonialism, the establishment of the Zionist state on the

15   pure land of Palestine" --

16   Q.    I am sorry.  Let me pause for a moment and ask you a

17   question.  What is the Zionist state?

18   A.    That would be -- That is the terminology that they use to

19   describe the state of Israel.

20   Q.    Continue.

21   A.    "...the practices of the occupation gangs against our

22   people and the shameful Arab neglect which reached its peak

23   and turned into a conspiracy of treason against the

24   Palestinian cause.

25         "Yes, the Intifada of our people in blessed Palestine

1    came as an eruption of overwhelming Palestinian anger which,

2    God willing, will remove the abomination of the Jews, the sons

3    of Israel from above the pure land of the Night Journey, the

4    land of Palestine.

5         "This is the Intifada of our people.  It is the mosques'

6    revolution knocking the door of its third year while it grew

7    stronger.  Its fire burned brighter.  Its banners rose higher.

8    The resources of our struggling people have exploded and our

9    masses in Palestine have gathered around the leadership of the

10   Islamic Resistance Movement, Hamas, giving it their

11   confidence, moves along with it and by it in the most

12   wonderful jihad march which brings anxiety and worry to the

13   enemy and shakes the ground from under its feet.

14        "As it knocks on the door of the third year of its

15   blessed Intifada under the leadership of the Islamic

16   Resistance Movement, Hamas, our people in Palestine assure the

17   Palestinian masses abroad in the foreign countries and all

18   Arabs and Muslims that it rushes towards its jihad revolution

19   on a firm ground of a sound comprehension of the nature of the

20   fight with Zionism and its allies which can [sic] explained

21   through these facts:

22        "One:  The cause of Palestine is one eternal field battle

23   between the right that the Muslims represent and the wrong

24   that the Jews and their allies represent.

25        "Two:  The only way to liberate Palestine--all of

1    Palestine--is the path of jihad, and any other path other than

2    the path of jihad will only serve to affirm the detested

3    Zionist occupation.

4         "Three:  The land of Palestine is an Islamic endowment,

5    and no government or organization, body, or a human being,

6    whoever he is, may give up one speck of its soil or recognize

7    for the Zionist enemy the legality of seizing one speck of

8    it."

9    Q.    Agent Burns, let me interrupt you.  In the Hamas charter

10   does it talk about how much land Hamas wants to take over with

11   regard to the West Bank, Gaza, and Israel?

12   A.    Yes.

13   Q.    What does it say?

14   A.    All of it.

15   Q.    Continue, please.

16   A.    "Four:  The cause of Palestine is a trust in the neck of

17   every Arab and Muslim, and jihad for the sake of God in order

18   to liberate it is a duty for every male and female Muslim.

19   The struggling Palestinian people is the head of the spear in

20   the march of jihad to liberate Palestine--all of Palestine,

21   from the sea to the river.

22        "Five:  The Islamic Resistance Movement, Hamas, the

23   conscience of our struggling people.  It is the ember of hope

24   which lit up from under the ashes of neglect and conspiracy

25   practiced by the negligent and the conspirators against the

1    Palestinian cause.

2         "O, our Palestinian people everywhere, O, our Arab people

3    everywhere, O, the people of our Muslim nation everywhere.

4         "Everyday, your people in Palestine offer their blood,

5    their children, thousands of prisoners, thousands of houses

6    that the enemy's bulldozers demolish, and thousands of olive

7    trees that the Jews uproot.  They offer all that as fuel for

8    their Intifada so as to continue and escalate.  They have

9    pledged to God to continue with this giving until God allows

10   his victory over the Jews and their allies, and over the

11   negligent and the conspirators from our own kind, the Arabs.

12        "You people in Palestine look up to you with eyes of hope

13   and expectation, and demand their right from you and their

14   right is great as they are the ones who restored for their

15   Arab and Islamic nation its dignity which was smeared with mud

16   by the negligence and the conspiracies of conspirators who

17   appointed themselves guardians over the Palestinian cause and

18   the Palestinian people through many decades.  They are the

19   ones who raised your head after the Zionist occupation lowered

20   it down for many decades.  It is the right of those people in

21   Palestine that we be faithful to the blood of their martyrs

22   and be faithful to their blessed Intifada.

23        "The Islamic Association for Palestine in North America

24   calls upon all of you to do the following in support of the

25   Intifada of the people of the homeland, and to make the

1    blessed cause of Palestine victorious:

2         "First:  We call upon all of you to perform jihad with

3    your money for the sake of God by donating the maximum amount

4    you can to support the Intifada of your people in Palestine.

5    You may send your donations in the name of Occupied Land Fund,

6    P.O. Box 928, L.A., California, 90232-9028.

7         "Two:  We are planning a fast on Thursdays December 7th,

8    1989 and December 4th, 1989, and to make a lot of

9    supplications on that day for our people in Palestine so that

10   God can strengthen their hearts, shake the ground from under

11   the feet of their enemy, have mercy on their martyrs, head

12   their wounded and free their prisoners, and stand up to the

13   craftiness of their enemies, the manifest among them and the

14   hidden ones.

15        "Three:  We call upon our teachers and sheikhs, the imams

16   of the mosque, to dedicate the sermon of the Friday

17   corresponding to the December 8 or December 15, 1989 to speak

18   about the Intifada of our people, what suffering and

19   persecution they suffer on the hands of soldiers of the

20   Zionist occupation, and to urge Muslims to perform their duty

21   by donating their money to support their people in Palestine.

22        "Finally, a greeting of appreciation and glorification to

23   our struggling people in the land of Palestine.  God is great

24   and victory to Islam.

25        "Islamic Association for Palestine in North America."

1    Q.   Thank you, Agent Burns.

2         If you recall, on the front page of this issue there is a

3    picture of Abdullah Azzam.

4    A.   That is correct.

5    Q.   Was there also an article about him in this issue?

6    A.   Yes.

7    Q.   And does that article also reference the Occupied Land

8    Fund or Holy Land Foundation?

9    A.   It does.

10   Q.   Okay.

11            MR. JONAS:  Your Honor, may I have a very, very

12   quick sidebar?

13            THE COURT:  Sure.

14            (The following was had outside the hearing of the

15            jury.)

16            MR. JONAS:  I just want to be clear before we get

17   into this article, we did not redact anything because that was

18   our understanding at the end of the day on Tuesday that the

19   Defense did not want the words Afghanistan redacted, so this

20   issue is not redacted, and I want to make sure there is no

21   misunderstanding to that.

22            MR. DRATEL:  Just so long as we are not going to get

23   into anything beyond the affiliations or anything like that.

24            MR. JONAS:  We are not.

25            (The following was had in the presence and hearing

1          of the jury.)

2     Q.    (BY MR. JONAS)   Agent Burns, if we can look at that

3     article, please.

4               MR. JONAS:   If we can put page 9 on the screen.

5     Q.    (BY MR. JONAS)   Is that correct, page 9?

6     A.    That is where we were.

7     Q.    Page 10, then.

8     A.    Page 11.

9     Q.    You have my copy so I can't say the page.

10    A.    Page 11 is where the article begins.

11    Q.    If we can start with the top, again can you do some

12    reading?

13    A.    I can.

14    Q.    All right.

15    A.    It starts with the Islamic Association for Palestine.  Do

16    you want me to read the verse?

17    Q.    No, you don't need to do that.

18    A.    "The Sheik of Mujahideen Dr. Abdullah Azzam is with God,

19    His guard and contentment.

20         "The Islamic Association for Palestine in North America

21    brings the Muslim nation the good news of the martyrdom of the

22    sheik of Mujahideen brother Dr. Abdullah Azzam and his

23    children Mohamed and Ibrahim.

24         "As we celebrate the passing of our beloved sheik to the

25    guardianship of Good and His contentment, we remember his

1    extreme love for Palestine whose land knew him as a Mujahed

2    leader who carried his soul on his palm for jihad for the sake

3    of God in order to cleanse it from the abomination of God's

4    enemies the children for Zion and their manifest and hidden

5    allies, as much as the struggling land of Afghanistan knew him

6    a Mujahed leader in order to cleanse it from the abomination

7    of God's enemies the communists and their allies.

8         "If the enemies of Islam were tricked by their demons

9    into believing that the assassination of our beloved sheik

10   Abdullah Azzam will stop the high tide of the Islamic

11   renaissance or put a stop to the march of Islamic jihad, we

12   are certain that these enemies will be disappointed and that

13   their arrow will miss its target when they find out that the

14   blood of our beloved martyr and sheik, the blood of our

15   righteous martyrs on the land of Palestine, the land of

16   Afghanistan, and every land on which the banners of jihad

17   flew, will not go in vain but that this pure blood will water

18   the blessed tree of jihad so that it bears thousands upon

19   thousands of heroes and martyrs who will follow the footsteps

20   of our beloved sheik so that the march of Islamic jihad

21   continues, sweeping in its way the enemies of God and the

22   enemies of Islam from all the Islamic land.

23        "Here is the march of Islamic jihad on the pure land of

24   Palestine, loved by our beloved sheik Abdullah Azzam advances

25   and its fire rises, its banner sores, and volcanoes of Islamic

1    anger explode through them through the leadership of the

2    Islamic Resistance Movement, Hamas, which grew out of the same

3    blessed tree which produced our martyr sheik Dr. Abdullah

4    Azzam the blessed tree of the struggling Islamic Movement.

5         "Here we see the march of the Islamic jihad in

6    Afghanistan, God willing, about to tear down the fortresses of

7    the assaulting tyrants, the communists, the agents of Moscow

8    who set heavily on the struggling Afghani land.

9         "The Islamic Association for Palestine in America appeals

10   to the masses of our Muslim nation in the corners of the earth

11   to be faithful to the blood of our hero martyr and his two

12   hero martyr sons, and to the blood of thousands of righteous

13   martyrs in the land of Palestine, Afghanistan, Philippines,

14   and every Muslim land, and to translate this faithfulness into

15   non-tiring work to support the march of Islamic jihad in

16   Palestine and Afghanistan and everywhere, either by actual

17   participation in jihad, if that is possible, or by financial

18   support so that the Islamic jihad march may continue until it

19   bears its fruits as a confirmed victory for Islamic and

20   Muslims.

21        "On this occasion we remind our brothers and sisters, the

22   Muslims of North America, that they can express their

23   faithfulness to the blood of our hero martyr who loved

24   Palestine, the blood of his two hero sons, the blood of our

25   righteous martyrs in blessed Palestine through the support to

1    the Occupied Land Fund so that you can support your people in

2    Palestine.  Its address is Occupied Land Fund, P.O. Box 928,

3    Los Angeles, California."

4    Q.    And this was the address of the Holy Land Foundation at

5    that time?

6    A.    It is.

7    Q.    Agent Burns, besides the video that we referenced a few

8    moments ago where there is a song that Abdullah Azzam's name

9    comes up in, have we seen Abdullah Azzam's name in any of the

10   exhibits you have already testified about?

11   A.    Yes.

12   Q.    Do you have Ashqar Search No. 1?

13   A.    I do.

14         MR. JONAS:  If we can put Ashqar Search No. 1, page

15   5 on the screen.

16   Q.    (BY MR. JONAS)  And while we are doing that and you are

17   looking up, can you remind us what Ashqar Search No. 1 is?

18   A.    Yes.  This was a list of Palestinian Committee members

19   taken from Abdel Haleem Ashqar's home, or a picture was taken

20   of it, in December of 1993.

21         There were two pages to the original document.  The first

22   page were the Palestinian Committee members in North America.

23   The second page the title is "important phone and fax numbers

24   for the Palestine section outside of America."

25   Q.    And why did we look at this particular page earlier?

A.   We looked at this particular page earlier because the

individual, No. 1, Khari al-Agha, was the individual to whom

the HLF sent over $250,000 in 1988 or 1989.  We used it to

show that he was the first on this list.

MR. JONAS:  And if we can enlarge the bottom half of

the page, please.

Q.   (BY MR. JONAS)  Do you see Abdullah Azzam's name on the

list?

A.   I do, under No. 33.

Q.   Besides the Illa Falistine articles and the Ashqar phone

list, have we seen Abdullah Azzam, or have you seen in the

material you have reviewed Abdullah Azzam anywhere else?

A.   Yes.

Q.   Where would that be?

A.   Among other things, in some videotapes.

Q.   Were some of those videotapes ones that were buried in

the backyard of Fawaz Mushtaha?

A.   They were.

Q.   And remind us again, when were they recovered from his

backyard?

A.   In 2005 or 2006.  It was recently.

MR. JONAS:  Your Honor, at this time I would offer

into evidence Government's Exhibit Mushtaha Search No. 9.

THE COURT:  And that is admitted.  Nothing beyond

what you stated previously?

1          MS. HOLLANDER:  Yes.

2          THE COURT:  That is admitted.

3    Q.   (BY MR. JONAS)  On these videotapes that you have seen

4    Abdullah Azzam appear on, are there other individuals on these

5    tapes as well, other scenes?

6    A.   Yes.

7    Q.   Do some of the scenes involve any of the Defendants?

8    A.   They do.

9    Q.   So when we play this tape, are we going to see some of

10   those clips as well?

11   A.   Yes.

12         MR. JONAS:  If we can play Mushtaha Search No. 9.

13         (Whereupon, Mushtaha Search No. 9 was played, while

14         questions were propounded.)

15   Q.   (BY MR. JONAS)  Who do we see on the screen here?

16   A.   The Defendant Mufid Abdulqader is the individual who

17   appears on the screen.

18   Q.   There is a double image of him here.  Did the FBI create

19   that double image?

20   A.   No.  That was apparently the fancy work of whoever

21   produced the tape.

22   Q.   Have you seen that on a number of tapes, this fancy

23   editing?

24   A.   Yes, they do.  They have edited the tapes with different

25   scenes like we have looked at before.

```
 1    Q.    Also the split screen and --

 2    A.    Yes.

 3    Q.    Okay.  Please continue.

 4          MS. CADEDDU:  Can we get a time frame for this

 5    video?

 6    Q.    (BY MR. JONAS)  Agent Burns, do you know what year this

 7    video was created?

 8    A.    It would have been 1988.

 9    Q.    Agent Burns, what is that?

10    A.    That is an ad for you to send your tax deductible

11    donations to the Occupied Land Fund at the same address that

12    we saw in the Illa Falistine articles.

13    Q.    Again, what is the subsequent name to the Occupied Land

14    Fund?

15    A.    HLF.

16    Q.    Agent Burns, besides this tape, were there other tapes

17    with Abdullah Azzam on it?

18    A.    Yes.  We see him speaking on some other tapes as well.

19          MR. JONAS:  Your, Honor at this time I would offer

20    into evidence Mushtaha Search No. 2.

21          THE COURT:  I show that the tapes we went over

22    Tuesday afternoon is Mushtaha Search No. 9, 7, 2, and 1, and

23    then Elbarasse Search No. 32.  Are those the ones you are

24    getting ready to play?

25          MR. JONAS:  I am not going to play all of them now
```

1    with Agent Burns.

2              THE COURT:  Which ones are you getting ready to

3    play?

4              MR. JONAS:  I just did No. 9, and I am getting ready

5    to do No. 2.

6         Your Honor, since we are discussing it, I would offer

7    into evidence those other tapes.  Mushtaha Search No. 1 is

8    already in evidence.  I played part of that.  So at this time

9    I offer in Mushtaha Search No. 2, Mushtaha Search No. 7,

10   Elbarasse Search No. 32.

11             THE COURT:  And those are tapes we discussed Tuesday

12   afternoon.  Correct?

13             MR. JONAS:  Yes, sir.

14             THE COURT:  Any objection beyond what we discussed

15   that afternoon?

16             MS. HOLLANDER:  No, sir.

17             THE COURT:  Those have been overruled, and those

18   exhibits are admitted.

19             MR. JONAS:  If we can Play Mushtaha Search No. 2.

20             (Whereupon, Mushtaha Search No. 2 was played, while

21             questions were propounded.)

22   Q.  (BY MR. JONAS)  Agent Burns, who is Ahmed Yassin?

23   A.   He was the Hamas founder and former spiritual leader

24   there at the top of your chart.

25   Q.   Okay.  For the record, I held up Demonstrative No. 17.

1          MS. HOLLANDER:  What are the dates of this tape?

2    Q.   (BY MR. JONAS)  Agent Burns, do you know the date of this

3    tape?

4    A.   Late 1987 or early '88.

5    Q.   Agent Burns, do you know what an RPG rocket is?

6    A.   Yes.  That is short for rocket propelled grenade.

7    Q.   Agent Burns, did you see where Abdullah Azzam near the

8    end of the clip talked about taking a week off from

9    refreshments, a week off from fruit, a week off from meat?

10   A.   I did.

11   Q.   Have you seen any videotapes where the Defendants refer

12   back to Abdullah Azzam making that speech?

13   A.   Yes, I have.

14   Q.   Is that part of one of the tapes we have already viewed?

15   A.   Yes.  A part of the tape that we reviewed on Tuesday

16   morning where the children were on the stage dancing to the

17   Hamas songs with Shukri Abu Baker down below.

18   Q.   The band on the stage?

19   A.   Right; leading the children singing.

20   Q.   Mahmoud Zahar in the audience?

21   A.   That is correct.

22   Q.   Is this a clip we didn't play yet on Tuesday?

23   A.   We did not play this clip on Tuesday.

24          MR. JONAS:  Can we play Mushtaha Search No. 1, clip

25   B, please?

1          (Whereupon, Mushtaha Search No. 1, Clip B, was

2          played while questions were propounded.)

3    Q.   (BY MR. JONAS)  Agent Burns, who is doing the speaking

4    here?

5    A.   That is the Defendant Mohammad El-Mezain at the podium

6    there.

7    Q.   Okay.

8          MR. DRATEL:  Can we get a time frame, please?

9    Q.   Agent Burns, approximately what year is this conference?

10   A.   Approximately 1990.

11   Q.   Again, when was this tape found?

12   A.   This was a Mushtaha tape as well, so it was 2005 or 2006.

13   Q.   A couple of moments ago the Defendant Mohammad El-Mezain

14   mentioned a coin box.  Did you see that?

15   A.   I did.

16   Q.   Did Abdullah Azzam also mention a coin box in his speech?

17   A.   He said that every family should set up a Palestinian

18   jihad box in their family to put money into.

19   Q.   Agent Burns, the Defendant Mohammad El-Mezain just

20   referred to being on the board with Abdullah Azzam of the

21   Muslim Arab Youth Association.  Does that have an acronym that

22   we have seen?

23   A.   It does.  That is MAYA, M-A-Y-A, that we saw on the

24   Muslim Brotherhood documents during the first days of my

25   testimony.  And also we saw it on the chart with the Defendant

1    Shukri Abu Baker listed out beside MAYA as a member of MAYA.

2    Q.   Do you recognize who is walking across the screen?

3    A.   Can we rewind it just a bit?

4    Q.   That is okay.  Agent Burns, do you recognize who is now

5    on the screen?

6    A.   Yes.  The individual walking on the screen in the bottom

7    with the tie with his hand to his ear is the Defendant Ghassan

8    Elashi.

9    Q.   Agent Burns, when we started talking about Abdullah

10   Azzam, I asked you if we saw a video with the band singing his

11   praises.  Was that more than just that one video where the

12   band sang his praises?

13   A.   Yes, there were.

14   Q.   Should we watch another one?

15   A.   Sure.

16        MR. JONAS:  Your Honor, at this time I would offer

17   into evidence HLF Search No. 127.

18        THE COURT:  Counsel, anything beyond what we

19   previously discussed?

20        MS. HOLLANDER:  No.

21        THE COURT:  Those are admitted.

22        MS. CADEDDU:  Can we get a time frame, please?

23   Q.   (BY MR. JONAS)  Agent Burns, do you know what year this

24   video was created, about?

25   A.   I believe we will see something on the tape indicating

1    1992.

2              (Whereupon, HLF Search No. 127 was played, while

3    questions were propounded.)

4    Q.   (BY MR. JONAS)  Agent Burns, who do we see on the stage,

5    if you recognize anybody?

6    A.   In the middle is the Defendant Mufid Abdulqader.

7    Q.   And remind us again, where was this tape taken from?

8    A.   This was taken from the HLF offices.

9    Q.   When?

10   A.   In 2001, December 2001.

11   Q.   Thank you.

12        Is that where we see Abdullah Azzam being praised?

13   A.   Yes.

14   Q.   And Ahmed Yassin is who again?

15   A.   The Hamas founder, former spiritual leader.

16   Q.   Agent Burns, do you see there is sort of a double image

17   on the screen now?

18   A.   I do.

19   Q.   Did the FBI do that?

20   A.   No.

21   Q.   Is that the way it was found?

22   A.   Yes.

23   Q.   Agent Burns, moving away from Abdullah Azzam, you

24   testified just not that long ago that Shukri Baker had a

25   relationship with the IAP, Ghassan Elashi, Mohammad El-Mezain

1    all had relationships to the IAP.  Other than that, have the

2    two, and other than everything we have seen so far, have you

3    seen anything else where the two had been linked up in one

4    item?

5    A.    Yes.

6    Q.    Do you have before you what has been marked as HLF Search

7    No. 14?

8    A.    I do.

9    Q.    What is that item?

10   A.    This is a book taken from the office of the Defendant

11   Abdulrahman Odeh.

12   Q.    Where would that office have been?

13   A.    In New Jersey.

14   Q.    Remind us, whose office is it.  I don't mean the

15   Defendant but --

16   A.    The HLF New Jersey office.

17          MR. JONAS:  Your Honor, at this time I would offer

18   into evidence HLF Search No. 14.

19          MR. WESTFALL:  No objection, Your Honor.

20          THE COURT:  Admitted.

21          MR. JONAS:  If we can get the first page of the book

22   on the screen so we can see the cover.

23   Q.    (BY MR. JONAS)  Agent Burns, I am holding it up.  Do you

24   see this?

25   A.    I do.

1    Q.   Is this the original of HLF No. 14?

2    A.   It is.

3    Q.   What language is it in?

4    A.   It is in Arabic.

5    Q.   If we can turn to page 22.

6    A.   Okay.

7    Q.   Is that the first page of the translation?

8    A.   It is.  This is the translation of the cover.

9    Q.   Okay.  And what is the title of the book?

10   A.   "The Jihadist School, Izz Eddin Al Qassam."

11   Q.   What is Izz Eddin Al Qassam?

12   A.   Well, in this context he is a Palestinian martyr who died

13   I think at the hands of the British in the mid 1900s.  But it

14   is also -- He was the martyr for whom Hamas named its military

15   wing, which are the Izz el-Din al Qassam Brigades.

16   Q.   Has the whole pamphlet been translated by the FBI, or

17   just a portion?

18   A.   We are exhibiting a portion of the translation.

19   Q.   Okay.  And the portion that is translated, what is that

20   referencing?  There are several pages so I am not going to

21   have you read it, but just tell us what that is about.

22   A.   It is about Izz el-Din al-Qassam, and his experience in

23   jihad and martyrdom.

24        MR. DRATEL:  Can we get a time frame for the book?

25   Q.   (BY MR. JONAS)  Agent Burns, were you able to date when

1    this book was --

2    A.    It was from either late 1987 or early 1988, because in

3    the back, which we are about to get to, the Palestinian Relief

4    Fund was the name used by the HLF, and they stopped using that

5    name around March or so of '88.

6    Q.    What year was this book found?

7    A.    This book was found in the Defendant Abdulrahman Odeh's

8    office in December of 2001.

9    Q.    Okay.  If we can turn to page 31, what is it about this

10   book, and in particular this page, that links up the IAP and

11   the HLF?

12   A.    In the back of the book that was published by the Islamic

13   Association for Palestine, there is a page, and we can look at

14   the original Arabic as well if you want, but it says

15   "addresses that are important to you."  And again, this book

16   was published by the IAP.  And under addresses that are

17   important to you, it lists several addresses for the IAP.  And

18   it says under No. 6, "Financial support for the Association,

19   the Islamic Association for Palestine," and it lists a P.O.

20   Box in Culver City, California, "Or the Palestine Relief Fund,

21   P.O. Box 38 Plainfield, Indiana."

22          MR. JONAS:  Just so we are clear on what that P.O.

23   Box in Plainfield, Indiana is, if we can go to Baker

24   Deposition page 6 for the screen purposes and page 111 of the

25   deposition page.

1    Q.    (BY MR. JONAS)    Agent Burns, in the sworn statement of

2    the Defendant Shukri Abu Baker, what does he say about

3    Plainfield, Indiana, and this particular address found in this

4    jihadist school book?

5    A.    He is questioned about it.    And although the print is

6    terribly hard to read on this screen, I will try.

7        It says, question:    "Are you able to tell that Occupied

8    Land Fund, is that an HLF address at some point, Plainfield,

9    Indiana?    I think you had testified earlier you lived there

10   for some time."

11       Answer:    "P.O. Box 38.    What is the date of this?    1988?"

12       Question:    "Other than the date you read to us earlier, I

13   don't know.    There's no date in English."

14       Answer:    "Yeah, that would have been the Occupied Land

15   Fund address in Plainfield, Indiana."

16   Q.    Okay.    Thank you.

17       Agent Burns, I want to talk for a moment about the

18   Defendant Mufid Abdulqader with you.    Did you interview him?

19   A.    I did.

20   Q.    And where was that interview?

21   A.    In the office of his attorney.

22   Q.    Was his attorney present at the time?

23   A.    He was.

24   Q.    When was the interview?

25   A.    The interview was in I believe 2002, 2003.

1    Q.    During the course of the interview did he state when he

2    started working for the HLF as a volunteer, or in any manner?

3    A.    He did.

4    Q.    What did he state about that?

5    A.    When questioned about his affiliation with the Holy Land

6    Foundation, he told us that he had not worked with them until

7    after he moved to Dallas, which was in approximately 1995.

8    When questioned further, he stated that in fact he didn't even

9    know anyone from the Holy Land Foundation prior to that time,

10   with the exception of his cousin Akram Mishal.

11   Q.    Do you recall Mushtaha Search No. 1?  That was a tape we

12   played on Tuesday, several segments of, we just played another

13   segment today with the Defendant Mohammad El-Mezain on the

14   stage talking about Abdullah Azzam.

15   A.    That is correct.

16   Q.    The portions we played on Tuesday, and I am not going to

17   may any of them again, but was there any portion where any of

18   the Defendants identify Defendant Mufid Abdulqader on the

19   stage?

20   A.    Yes.

21   Q.    And just remind us what that was.

22   A.    Okay.  That was a tape that we were able to date to 1990.

23   And you will remember from Tuesday it was the tape where the

24   Hamas songs were being sung and the children were on stage and

25   Shukri Abu Baker was below the stage.  He took the stage and

1    introduced the band members by name and asked for the audience

2    to applaud them, and one of those was the Defendant Mufid

3    Abdulqader.

4    Q.    What year was that again?

5    A.    That was in 1990, five years before the Defendant told us

6    that he had any affiliation with any of the individuals from

7    the Holy Land Foundation.

8    Q.    Besides playing in the band, do you recall we saw a tape

9    during some point in your testimony where the Defendant Mufid

10   Abdulqader was on the stage and was in a skit where he I

11   believe shot someone pretending to be a Jewish individual?

12   A.    Yes.  He was holding a gun and pretended to shoot the

13   Jewish individual.

14   Q.    Did you see other skits like that in other videos?

15   A.    I did.

16        MR. JONAS:  If we can play Elbarasse Search No. 32,

17   clip H.

18        (Whereupon, Elbarasse Search No. 32, Clip H, was

19   played, while questions were propounded.)

20        MS. MORENO:  Is that in evidence?

21        MR. JONAS:  Yes, it is.  I moved it in earlier when

22   we were talking about the Abdullah Azzam videos.

23   Q.    (BY MR. JONAS)  In fact, on this video, Agent Burns, is

24   there one of the clips with Abdullah Azzam on it?

25   A.    Yes.

1    Q.    Who is it that just came on the screen?

2    A.    This is the Defendant Mufid Abdulqader.

3    Q.    Are you able to date the video?

4    A.    What was the video exhibit number?

5    Q.    This is Elbarasse Search No. 32?  Do you have a cheat

6    sheet you are looking at?

7    A.    I do, because the dates are usually ascertained from

8    content so we had to study the content.  Based upon the

9    content of this one, I think we were dating it to 1988.

10   Q.    And when was it found and where was it found?

11   A.    This was found at Ismail Elbarasse's home, and that

12   search was in late 2004.

13   Q.    Agent Burns, this individual who is identifying himself

14   as I guess a Jew and a Zionist?

15   A.    Yes.

16   Q.    Anywhere from what he says, from what you reviewed of

17   this tape, does he identify himself as an Israel soldier?

18   A.    No, he does not.  He is dressed in a suit.  He is not

19   dressed in military fatigues.

20          MR. JONAS:  Play clip F from Elbarasse Search No.

21   32.

22          (Whereupon, Elbarasse Search No. 32, Clip F, was

23          played, while questions were propounded.)

24   Q.    (BY MR. JONAS)  Agent Burns, do you recognize that

25   individual?

```
1    A.    I do.

2    Q.    Who is that?

3    A.    The Hamas founder Sheikh Ahmed Yassin.

4    Q.    The individual --

5    A.    On the top of the chart, yes.

6    Q.    Agent Burns, do you see where he just said that a

7    peaceful solution is not acceptable?

8    A.    I do.

9    Q.    Where else have we seen that?

10   A.    In the Hamas charter.

11   Q.    Agent Burns, was there anything about this tape that was

12   used to encourage people to donate money to the HLF?

13   A.    Yes.

14         MR. JONAS:  Can we play Segment I?

15   Q.    (BY MR. JONAS)  And before we do that, Agent Burns, this

16   tape was found, you said, at the home of Ismail Elbarasse in

17   2005?

18   A.    2004, I believe.

19   Q.    Was this tape altered in any way by the FBI?

20   A.    No.  We just selected portions to play, but its content

21   was as it was when we seized it.

22         MR. JONAS:  If we can play segment I, please.

23         (Whereupon, Elbarasse Search No. 32, Clip I, was

24         played, while questions were propounded.)

25   Q.    (BY MR. JONAS)  Agent Burns, who was that on the screen
```

1    in the last segment?

2    A.    Abdullah Azzam.

3    Q.    Agent Burns, these videos were in the late 1980s, some of

4    the ones in the early 1990s that we looked at so far?

5    A.    That is correct.

6    Q.    Did you see any videos later?

7    A.    I did.

8    Q.    And so we are clear, the videos we looked at so far all

9    predated the Philadelphia meeting.  Correct?

10   A.    That is correct.

11   Q.    All right.  I believe you testified the videos after the

12   Philadelphia meeting the rhetoric was toned down?

13   A.    Yes, it was.

14   Q.    Is HLF Search No. 114 a videotape?

15   A.    Yes, it is.

16   Q.    Where was that taken from?

17   A.    That was taken from the HLF offices.

18   Q.    Do you know which office, which location, if you know?

19   A.    I would have to look at the tape sleeve.

20          MR. JONAS:  Your Honor, at this time I would offer

21   into evidence HLF Search No. 114.

22          THE COURT:  That is admitted.

23          MR. JONAS:  If we can play segment A of that,

24   please.

25   Q.    (BY MR. JONAS)  Before we play that, are you able to date

1    this tape?

2    A.    Yes.  This was dated to approximately 1996.

3    Q.    So this was after Hamas was designated as a terrorist

4    organization?

5    A.    That is correct.

6              MR. JONAS:  Please play this.

7              (Whereupon, HLF Search No. 114, Clip A, was played,

8              while questions were propounded.)

9    Q.    (BY MR. JONAS)  Agent Burns, who do you see on the screen

10   there?

11   A.    That is the Defendant Abdulrahman Odeh.

12   Q.    Thank you.

13         Agent Burns, do you recognize these two individuals?

14   A.    Yes.

15   Q.    Who are they?

16   A.    The individual singing there on the left of the screen is

17   Mohammed Mustafa, the HLF's agent in Detroit at the time.

18   Q.    Have you personally met him?

19   A.    I did.

20   Q.    Is that how you recognize him on this picture?

21   A.    It is.

22   Q.    Who is the individual on his right as you face the

23   screen?

24   A.    That is the Defendant Mufid Abdulqader.

25   Q.    Do you see where it says, "A span of a hand in it"?  Have

1  we seen that phrase or that reference before?

2  A.   Yes.   In a number of the videotapes that we have watched

3  where Abdullah Azzam spoke, he said that if a span of a hand

4  of Muslim land is occupied, then jihad is a mandate.

5  Q.   Ahmed Yassin, Agent Burns, who was that again?

6  A.   Again, that was the Hamas founder that we identified on

7  the top of that demonstrative on a number of occasions.

8  Q.   Agent Burns, besides seeing the Defendant Mufid

9  Abdulqader in the band singing songs and in those skits that

10  we saw, did he do anything else for the HLF?

11  A.   He did.

12  Q.   What else did he do?

13  A.   In the mid to late 1990s, after he moved to Dallas, he

14  also, in addition to singing with the band at these

15  fundraisers, he also took on the role as a speaker for the HLF

16  where he would actually go and make speeches in order to raise

17  money for the Holy Land Foundation.

18  Q.   Have you seen any documents in the search warrant

19  material that you reviewed that show that?

20  A.   Yes.

21  Q.   Do you have before you what has been marked as HLF Search

22  No. 16?

23  A.   I do.

24  Q.   What is that document, without telling us the contents?

25  A.   It is a list of speakers for the HLF.

1    Q.    Where was that found?

2    A.    It was found in the HLF Dallas office.

3         MR. JONAS:  Your Honor, at this time I would offer

4    into evidence HLF Search No. 16.

5         THE COURT:  Admitted.

6         MR. JONAS:  If we could put page 2 on the screen,

7    please.

8    Q.    (BY MR. JONAS)  Agent Burns, do you see the Defendant

9    Mufid Abdulqader's name anywhere?

10   A.    I do.  He is about halfway down the list.  You see Mufid

11   Abdulqader with a 972 telephone number as well as a 214

12   telephone number.

13   Q.    Do you see any other Defendants on this list?

14   A.    Yes.  The Defendant Shukri Abu Baker is the last

15   individual on the list.

16   Q.    Okay.  Agent Burns, have you seen any videotapes of the

17   Defendant Mufid Abdulqader speaking?

18   A.    I have.

19   Q.    Is HLF Search No. 112 one of those videotapes?

20   A.    It is.

21   Q.    Where was that taken from?

22   A.    The HLF offices.

23   Q.    When?

24   A.    In 2001.

25        MR. JONAS:  Your Honor, at this time I would offer

1    into evidence HLF Search No. 112.

2             THE COURT:  Any objection?

3             MS. CADEDDU:  No, Your Honor, not beyond what was

4    already stated.

5             THE COURT:  All right.  That is admitted.

6             MR. JONAS:  If we can play those clips.

7             (Whereupon, HLF Search No. 112 was played, while

8    questions were propounded.)

9    Q.   (BY MR. JONAS)  Do you see the Defendant Mufid Abdulqader

10   on the stage anywhere?

11   A.   I do.  He is on the stage in the back wearing the wrap on

12   his head.  And I guess he is third from the left as you are

13   looking at the screen.

14   Q.   Okay.  Who is Doctor al-Rantisi?

15   A.   He is one of the Hamas leaders on the chart here.

16   Q.   I am holding up Demonstrative No. 17.  Do you see where

17   he is?

18   A.   The second from you there.

19   Q.   The one I am pointing to here?

20   A.   That is correct.

21   Q.   The middle row, the second from the right?

22   A.   That is correct.

23   Q.   Okay.  Agent Burns, I am not going to pick up the chart

24   again, but Dr. Mousa Abu Marzook is on the chart.  Correct?

25   A.   Mousa Abu Marzook is the Hamas leader that we have been

1  talking about at length who was the head of the Palestine

2  Committee, and also gave money to the HLF, and was arrested in

3  1995 at JFK Airport.  And he is sending him greetings in

4  prison.

5  Q.  So are you able to date this tape from that?

6  A.  It would have been after July of 1995 when Mousa Abu

7  Marzook was arrested.

8  Q.  Was that after Hamas was designated as a terrorist

9  organization by the United States?

10  A.  Yes.

11  Q.  Thank you.

12     Agent Burns, when you interviewed the Defendant Mufid

13  Abdulqader, did you discuss with him his fundraising and the

14  money he raised for the HLF?

15  A.  Yes.

16  Q.  Did he say anything about handling of the money; in other

17  words, what happened to the money once it was raised?

18  A.  He did.

19  Q.  What did he say?

20  A.  Well, we asked him how much he raised on occasion, and

21  how the money was delivered, and he said that he didn't know

22  really how much he received because he did not personally

23  handle the money, especially the cash, and so he was not able

24  to tell us how much money he raised on a particular occasion.

25  Q.  Did you review any intercepted phone calls where the

1  Defendant Mufid Abdulqader was a participant where he actually

2  discussed how much he raised?

3  A.    Yes.

4  Q.    Are those phone calls consistent with the statement he

5  made with you?

6  A.    They were not.

7  Q.    Do you have before you what has been marked as Abdulqader

8  Wiretap No. 1?

9  A.    I do.

10 Q.    Is that one of the phone calls where the Defendant

11 discusses raises funds for the HLF?

12 A.    It is.

13 Q.    Who were the participants on that call?

14 A.    The Defendant Mufid Abdulqader, along with HLF employees

15 Ibrahim Khalil and Moataz Hindawi.

16 Q.    What is the date of the call?

17 A.    The date of the call is January 2nd, 2000.

18       MR. JONAS:  Your Honor, at this time I would offer

19 into evidence Abdulqader Wiretap No. 1 and the accompanying

20 audiotape 1-A.

21       THE COURT:  Any objections beyond what have been

22 stated?

23       MS. CADEDDU:  No, Your Honor.

24       THE COURT:  That is admitted.  .

25       MR. JONAS:  Play that, please.

1          (Whereupon, Abdulqader Wiretap No. 1 was played

2          while questions were propounded.)

3     Q.   (BY MR. JONAS)  Agent Burns, who is the MU on the screen?

4     A.   MU is the Defendant Mufid Abdulqader and IB is HLF

5     officer Ibrahim Khalil.

6     Q.   Agent Burns, were there more calls where the Defendant

7     Mufid Abdulqader talked about how much money he raised?

8     A.   Yes, there were.

9     Q.   Do you have before you Baker Wiretap No. 6?

10    A.   I do.

11    Q.   And who is on that call?

12    A.   That is the Defendant Mufid Abdulqader and Haitham

13    Maghawri.

14    Q.   Who is Haitham Maghawri?

15    A.   One of the HLF officers.

16    Q.   What is the date of the call?

17    A.   January 16, 1989.

18         THE COURT:  Let's take the morning before you play

19    that.  Let's take the morning break.  Be back at 11:00.

20         (Whereupon, the jury left the courtroom.)

21         THE COURT:  We will be in recess until 11:00.

22              (Brief recess.)

23         THE COURT:  Was there something we needed to take up

24    before we bring the jury in?

25         MS. HOLLANDER:  Can we approach?

THE COURT: All right.

(The following was had outside the hearing of the jury.)

MS. HOLLANDER: We don't really need to approach for one of them, but for one of them we do.

You asked us to remind you to admonish the jury.

THE COURT: Yes. I will do that at the lunch hour.

MS. HOLLANDER: Because she is back.

THE COURT: I saw her.

MS. HOLLANDER: We didn't need to approach for this other one, but Agent Burns has something she called her cheat sheet that she is relying on, and pursuant to 612 we are entitled to see that.

MR. JONAS: They have a copy. We gave it to them last week I think.

MS. HOLLANDER: I would like to see the one she has.

MR. JONAS: If you want to see the one she has now, that is fine.

THE COURT: You can see it before cross. You are entitled to see that. He says you have a copy.

MS. HOLLANDER: Can I see if she has any other marks?

MS. CADEDDU: Can I ask, if we have another copy, what it is called? The names are confusing.

MS. HOLLANDER: I need to know what it is. I just

```
 1   didn't want to interrupt.
 2              THE COURT:  That is fine.
 3              MR. HOLLANDER:  Okay.  Actually Barry gave this to
 4   me.
 5              THE COURT:  Is that the one you handed out?
 6              MR. JONAS:  Yes.
 7              MS. HOLLANDER:  He just gave me one.
 8              MS. MORENO:  I didn't see that.
 9              MS. CADEDDU:  I didn't see it either.
10              MR. JONAS:  I gave it to you two weeks ago.
11              MS. HOLLANDER:  But I didn't know what it was.  Now
12   I know what it is.  We have it.
13              THE COURT:  Okay.
14              MS. HOLLANDER:  Thank you.
15              (The following was had in the presence and hearing
16              of the jury.)
17              THE COURT:  Bring in the jury.
18              (whereupon, the jury entered the courtroom.)
19              THE COURT:  Mr. Jonas?
20              MR. JONAS:  Thank you, sir.
21              MR. JONAS:  Before the break, Agent Burns was
22   describing Baker Wiretap No. 6.  At this time I offer into
23   evidence No. 6 and 6-A.
24              THE COURT:  Any objections, beyond what has been
25   tendered?
```

1          MS. HOLLANDER:  No, Your Honor.

2          THE COURT:  Those are admitted.

3   Q.   (BY MR. JONAS)  Agent Burns, just to remind us, who are

4   the participants of the call and the date of the call.

5   A.    The Defendant Mufid Abdulqader and HLF officer Haitham

6   Maghawri.  The date of the call was January 16th, 1999.

7   Q.    Okay.

8          MR. JONAS:  Play that call, please.

9          (Whereupon, Baker Wiretap No. 6 was played, while

10         questions were propounded.)

11  Q.   (BY MR. JONAS)  Can you tell us who HA is and MU is on

12  the screen?

13  A.    HA is Haitham Maghawri and MU is the Defendant Mufid

14  Abdulqader.

15  Q.    Okay.  Agent Burns, this call and the prior call, did

16  they take place before or after Hamas was designated as a

17  terrorist organization?

18  A.    Several years after.

19  Q.    Okay.  Do you have Abdulqader Wiretap No. 2 before you?

20  A.    I do.

21  Q.    What is the date of that call?

22  A.    This is January 3rd, 2000.

23  Q.    Again, is that before or after Hamas was designated?

24  A.    That is almost five years after Hamas was designated.

25  Q.    Who are the participants on this call?

1    A.    The Defendant Mufid Abdulqader and an individual named

2    Sabri.

3              MR. JONAS:  Your Honor, at this time I would offer

4    Abdulqader Wiretap No. 2 and 2-A.

5              THE COURT:  That is admitted.

6              MR. JONAS:  If we can play that call, please.

7              (Whereupon, Abdulqader Wiretap No. 2 was played,

8    while questions were propounded.)

9    Q.    (BY MR. JONAS)  Agent Burns, could you just identify the

10   speakers by their initials?

11   A.    Sabri is SA and the Defendant Mufid Abdulqader is MU.

12   Q.    Okay.  Agent Burns, did the Defendant Mufid Abdulqader,

13   individually for his fundraising and the band that he was

14   playing in, incur travel expenses, things like that?

15   A.    He did.

16   Q.    Did you see who paid for those expenses?

17   A.    He said the HLF did.

18   Q.    He said that?

19   A.    Yes.

20   Q.    Did you see -- Was that during the interview of him?

21   A.    It was.

22   Q.    Did you see any documents taken from the HLF that support

23   that?

24   A.    Yes.

25   Q.    Do you have before you what has been marked as AMEX

1    Records or AMEX No. 2?

2    A.    I do.

3    Q.    And what is AMEX No. 2?

4    A.    Those are American Express records.

5    Q.    Does the fact that there is a 2 versus the AMEX Records

6    No. 1 we already admitted mean they are a separate set of

7    cards, or separate card?

8    A.    They are definitely a separate set of records.

9    Q.    Okay.  Whose records are they, by the way?  Whose AMEX

10   records?

11   A.    For the Holy Land Foundation.

12            MR. JONAS:  Your Honor, at this time I would offer

13   into evidence AMEX No. 2.

14            MS. HOLLANDER:  No objection.

15            THE COURT:  Admitted.

16            MR. JONAS:  If we can put page 1 on the screen,

17   please.

18   Q.    (BY MR. JONAS)  Do you see it says Occupied Land Fund?

19   A.    I do.

20   Q.    What is the time period?

21   A.    The beginning records are from November 16th, 1990, and

22   it looks like this set of records goes through 1994, but I

23   don't believe these are complete records.  These are just

24   selected records from this time period.

25   Q.    And just so we are clear, you testified that AMEX No. 1

1    is also a credit card for the Holy Land Foundation?

2    A.    That is correct.

3    Q.    Is this separate set of AMEX records a different card

4    number or account number?

5    A.    Yes.

6    Q.    Is that correct, a different account number?

7    A.    That is correct.

8    Q.    That is why there is an AMEX No. 1 and an AMEX No. 2?

9    A.    That is correct.

10   Q.    If you can turn to page 3, please.  Do you see on this

11   page anywhere where the Holy Land Foundation is paying for the

12   expenses of the Defendant Mufid Abdulqader?

13   A.    Yes.  If you will go to the middle there where the arrow

14   is and enlarge that one, you can see that for this account on

15   October 5th, 1990, an airline ticket was purchased on American

16   Airlines for M. Abdulqader from Oklahoma City to Chicago, to

17   Boston, to Dallas, and back to Oklahoma City.

18   Q.    Was he living in Oklahoma City at this time?

19   A.    Yes, the Defendant Mufid Abdulqader was living in

20   Oklahoma City during October of 1990.

21   Q.    Remind us again, what did he say about when he started

22   working for the HLF?

23   A.    He said he was not affiliated with them until after he

24   moved to Dallas in 1995.

25   Q.    Do you see the HLF on this page paying for other band

1   members' expenses?

2   A.    I do.

3   Q.    Whose?

4   A.    Just below that record for Mufid Abdulqader we have the

5   band or the HLF purchasing a ticket on Delta Airlines for band

6   member Munzer Taleb from Dallas to Boston.

7   Q.    And throughout these AMEX records, do you see other

8   expenses that are being paid for on behalf of the Defendant

9   Mufid Abdulqader on behalf of the HLF?

10  A.    Yes.

11          MR. JONAS:    Let's go to page 5 and look at one more.

12  Q.    (BY MR. JONAS)  Do you see where these expenses are being

13  paid here?

14  A.    Yes.  On the right hand column third from the top, again

15  you can see where the HLF purchased an airline ticket on

16  American Airlines for Mufid Abdulqader on October 20th, 1990

17  from Oklahoma City to Dallas, Phoenix, back through Dallas, to

18  Oklahoma City.

19  Q.    So if you look through the AMEX records, would you see

20  other samples of these type of payments?

21  A.    Yes, you would.  I don't know if in this one there are

22  additional records for Mufid, but there are more records that

23  show that.

24  Q.    Do you have before you what is marked as HLF Search No.

25  15?

1  A.   I do.

2  Q.   What is that item?

3  A.   This is an invoice from Al-Nujoom Band to the Holy Land

4  Foundation.

5  Q.   What is the date?

6  A.   September 1st, 1998.

7  Q.   Okay.

8        MR. JONAS:  Your Honor, at this time I would offer

9  into evidence HLF Search No. 15.

10        THE COURT:  Admitted.

11        MR. JONAS:  If we can put that on the screen,

12  please.

13  Q.   (BY MR. JONAS)  Do you recognize -- I know it is a little

14  tough to read on the screen.  Do you recognize who the band

15  members are?

16  A.   I do.

17  Q.   Who are they?

18  A.   Here you have Munzer Taleb, Kifah Mustapha, who was also

19  the HLF's Chicago representative, the Defendant Mufid

20  Abdulqader, and a man named Sabri Sabri.

21  Q.   Okay.  And is this bill addressed to the Holy Land

22  Foundation?

23  A.   It is.  If you go up to the top, it says "bill to Holy

24  Land Foundation."

25  Q.   Was this bill before or after Hamas was designated as a

1    terrorist organization?

2    A.    After.

3    Q.    Was the Defendant Mufid Abdulqader a salaried employee of

4    the HLF?

5    A.    No, he was not.

6    Q.    Did he receive any compensation at all for his

7    fundraising?

8    A.    He said that -- In his interview he said that he only

9    received reimbursement for expenses, but some of the material

10   from the search warrant indicates that he received additional

11   payments.

12   Q.    Okay.  Do you have before you what has been marked as HLF

13   Search No. 17?  I am going to ask you for a series of

14   exhibits, HLF No. 17, 18, 19, and 20.

15   A.    I do.

16   Q.    Do those all relate to each other?

17   A.    They do.

18   Q.    Do they relate to any compensation provided to Mufid

19   Abdulqader by the HLF?

20   A.    Yes, they do.

21          MR. JONAS:  Your Honor, at this time I would offer

22   into evidence HLF Search No. 17, 18, 19, and 20.

23          THE COURT:  Admitted.

24          MR. JONAS:  If we can put HLF Search No. 17 on the

25   screen, please.

1    Q.   (BY MR. JONAS)  Agent Burns, what is this item?

2    A.   This is a check to the Defendant Mufid Abdulqader from

3    the Holy Land Foundation dated January 4th, 2000 in the amount

4    of $1,000.  And if you look on the back of the check, it

5    actually has Mufid Abdulqader's signature, which, if you will

6    recall, we identified on the hotel room voucher from the

7    Philadelphia meeting.

8    Q.   The Marriott record?

9    A.   The Marriott records.  That is correct.

10   Q.   Who signed this check?

11   A.   If we go to the first page, the Defendant Shukri Abu

12   Baker.

13   Q.   And does HLF Search No. 18 relate back to this page?  To

14   this check?

15   A.   It does.

16        MR. JONAS:  If we can put HLF Search No. 18 on the

17   screen, please.

18   Q.   (BY MR. JONAS)  What is it about this document that

19   relates to that check?

20   A.   This is a list of Eid bonuses.  Basically the Holy Land

21   Foundation paid bonuses to its employees and volunteers for

22   their work during a fundraising effort.  And if you will look

23   at No. 10 on the list, it indicates that Mufid Abdulqader

24   received $1,000.  And again, if you scroll back up to the top

25   you will see the title of this is Eid bonus.

1    Q.    And are there other Defendants who are also on this list?

2    A.    There are.

3    Q.    Who?

4    A.    No. 2 is the Defendant Mohammad El-Mezain and No. 5 is

5    the Defendant Abdulrahman Odeh.

6    Q.    Is HLF Search No. 19 and 20 also an Eid bonus with

7    accompanying documentation?

8    A.    Well, HLF Search No. 18 I believe is multiple pages, and

9    it actually has the checks supporting those Eid bonuses.  And

10   HLF Search No. 19 is another check for something different.

11          MR. JONAS:  Let's put HLF search 19 on the screen,

12   please.

13   Q.    (BY MR. JONAS)  And what is that?

14   A.    HLF Search No. 19 is a check to Mufid Abdulqader from the

15   Holy Land Foundation, April 27th, 2000, in the amount of

16   $1,000.

17   Q.    Does HLF Search No. 20 relate to this check?

18   A.    It does.

19   Q.    Okay.

20          MR. JONAS:  If we can put HLF Search No. 20 on the

21   screen, please.

22   Q.    (BY MR. JONAS)  And what does this document indicate the

23   check is for?

24   A.    It indicates that the $1,000 check to Mufid Abdulqader

25   was for services during the Eid.

1    Q.   Just so we are clear, he was not a salaried employee?

2    A.   He was not.

3    Q.   But he was receiving some bonuses for his work?

4    A.   That is correct.  For his services, as opposed to his

5    expenses.

6    Q.   Were there any phone calls from Mufid Abdulqader and an

7    HLF employee where they discussed him receiving more than just

8    these bonuses?

9    A.   Yes.

10   Q.   Do you have before you what is marked as Baker Wiretap

11   No. 7?

12   A.   I do.

13   Q.   What is the date of that call?

14   A.   July 9th, 1998.

15   Q.   Who are the participants?

16   A.   The Defendant Mufid Abdulqader, his cousin Akram Mishal

17   who was also an HLF officer, and HLF employee Ayman Ismail.

18           MR. JONAS:  Your Honor, at this time I would offer

19   into evidence Baker Wiretap No. 7 and 7-A.

20           MS. HOLLANDER:  Nothing further, Your Honor.

21           THE COURT:  Admitted.

22           MR. JONAS:  If we can play that call, please.

23           (Whereupon, Baker Wiretap No. 7 was played, while

24   questions were propounded.)

25   Q.   (BY MR. JONAS)  Who is AK?

1    A.    This is Akram Mishal.

2    Q.    Agent Burns, did you come across any other phone call or

3    document in all the material you reviewed that indicates

4    whether or not the Defendant Mufid Abdulqader actually started

5    receiving a percentage of the money he raised?

6    A.    Yes.

7    Q.    You did?

8    A.    Well, other than in addition to the ones we have looked

9    at?

10   Q.    Right.

11   A.    I don't recall anything in addition to the ones we have

12   looked at.

13   Q.    Okay.  So you don't know whether or not they actually

14   followed through?

15   A.    I do not know that they followed through on that phone

16   call.

17   Q.    Okay.  Agent Burns, were there other documentation taken

18   from the Holy Land Foundation that shows the Defendants Mufid

19   Abdulqader's fundraising and travel on behalf of the HLF?

20   A.    Yes.

21   Q.    Okay.  I want to run through the series of exhibits with

22   you, but before I do that let me ask you this one other

23   question.

24        Did you assist in creating a demonstrative chart that

25   shows an example of some of the activity that he performed on

1    behalf of the HLF?

2    A.    Yes, I did.

3    Q.    And is that chart based upon some of the documents that I

4    just asked you about that were taken from the HLF search

5    warrant?

6    A.    That, and some of the videotapes we have seen.

7            MR. JONAS:  Your Honor, I would like to offer into

8    evidence the supporting documentation for this demonstrative

9    chart.  And I will Agent Burns just quickly the item is as we

10   go through them.

11           THE COURT:  All right.

12   Q.    (BY MR. JONAS)  Agent Burns, HLF Search No. 21, what is

13   that?

14   A.    It is a travel itinerary for the Defendant Mufid

15   Abdulqader.

16           MR. JONAS:  Your Honor, I will run through these and

17   then I will offer them into evidence.

18           THE COURT:  All right.

19   Q.    (BY MR. JONAS)  HLF Search No. 22?

20   A.    It is also a travel itinerary for the Defendant Mufid

21   Abdulqader.

22   Q.    Okay.  HLF Search No. 23?

23   A.    This is a document taken from the HLF computers

24   indicating a number of individuals who raised money for the

25   HLF--dates and amounts.

1  Q.    Okay.  HLF Search No. 142?

2  A.    I am looking for that one in my binder, and you will have

3  to bear with me.  I don't see No. 142.

4          MR. JONAS:  Your Honor, may I approach?

5          THE COURT:  Yes.

6  Q.    (BY MR. JONAS)  Let me hand you the original stack.

7  A.    Okay.

8  Q.    HLF Search No. 142?

9  A.    This is a page from a calendar relating to Mufid

10  Abdulqader's fundraising activities.

11  Q.    HLF Search No. 143?

12  A.    This is a page from a daily planner again relating to the

13  fundraising activity of Mufid Abdulqader.

14  Q.    HLF Search No. 144?

15  A.    This appears to be the same document that we saw in HLF

16  Search No. 18.  It is just one page as opposed to the multiple

17  pages in HLF Search No. 18.

18  Q.    HLF Search No. 145?

19  A.    This is a check relating to the fundraising activity of

20  Mufid Abdulqader.

21  Q.    Who is it made out to?

22  A.    Mufid Abdulqader.

23  Q.    Is it one of the checks we looked at already?

24  A.    Well, it is actually the record stub from -- It is not

25  the actual check.  And it is for a different amount.  It is a

1    different item.

2    Q.    A different check?

3    A.    Yes.

4    Q.    HLF Search No. 146?

5    A.    This would be a calendar entry relating to the

6    fundraising activities of the band.

7    Q.    The band that the Defendant Mufid Abdulqader is part of?

8    A.    That is correct.

9    Q.    HLF Search No. 147?

10   A.    This is a document taken from the HLF Chicago office

11   relating to an IAP convention where the Defendant Mufid

12   Abdulqader took part.

13   Q.    Agent Burns, are the dates for these items, do they range

14   over several years, or are they all the same time period?

15   A.    They range over several years.

16         MR. JONAS:  Your Honor, at this time I would offer

17   into evidence HLF Search No. 21, 22, 23, 142, 143, 144, 145,

18   146, and 147.

19         THE COURT:  Any objections?

20         MS. CADEDDU:  No, Your Honor.

21         THE COURT:  All right.  Those are admitted.

22   Q.    (BY MR. JONAS)  Agent Burns, you said that you created or

23   assisted in creating a demonstrative chart that sort of

24   summarized some of the activity that the Defendant Mufid

25   Abdulqader conducted on behalf of the HLF?

1    A.   That is correct.

2    Q.   Agent Burns, I am holding up an enlargement.  Is this the

3    chart you assisted in creating?

4    A.   It is.

5    Q.   Would this chart assist the jury in understanding your

6    testimony?

7    A.   It will.

8         MR. JONAS:  Your Honor, I would offer as a

9    demonstrative exhibit what has been marked as Demonstrative

10   No. 19.

11        MS. CADEDDU:  Your Honor, I would like to look at

12   it, because I think I may have a different version.

13        THE COURT:  Sure.  Come take a look.

14        MR. JONAS:  Your Honor, I will put it in the easel

15   in one moment.

16        THE COURT:  Any objection?

17        MS. CADEDDU:  Well, I am trying to get a corrected

18   copy, Your Honor.  As a demonstrative I don't have an

19   objection.

20        THE COURT:  Okay.  Admitted.

21   Q.   Agent Burns, does this demonstrative chart reflect all

22   the activity of the Defendant Mufid Abdulqader on behalf of

23   the Holy Land Foundation?

24   A.   No, it does not.

25   Q.   Can you just run through it real quick with us, if you

1    can?

2    A.    What we did in creating this was try to give an example

3    of his activities throughout the time period of the activities

4    discussed in the indictment, beginning in 1988 with videos

5    where we see him performing, and then going through 2001 which

6    was the date that the HLF stopped operating.

7          So in this for 1988 you will have the exhibit number

8    listed first where one can go and look at that exhibit to

9    determine that it is in fact what it says it is supposed to

10   be.  For example, in 1988 Mushtaha Search No. 7 is a video

11   which features Mufid Abdulqader singing in the band at one of

12   these festivals that we have talked about.

13   Q.    So if someone were to look at the exhibits, they would

14   see either a video of some of which I assume we saw already?

15   A.    That is correct.

16   Q.    And then the documents you talked about, the calendar

17   entry, for example, HLF Search No. 142 in 1999, the Baker

18   Wiretap No. 6, the one we played, and all this relates back to

19   one shape or another the Defendant Mufid Abdulqader, the band

20   singing for the HLF, him fundraising for the HLF, HLF paying

21   for his expenses.  Is that correct?

22   A.    That is correct.

23   Q.    Just so we are clear, this isn't everything.

24   A.    No, this is just a sample.

25   Q.    Okay.  Let me put this down now.

1    Agent Burns, you said that there was an HLF Search No. 23

2    that was a multiple page document.

3    A.    Yes.

4    Q.    And could we turn back to that real quick?  And what is

5    that document?

6    A.    I have too many binders.

7    Q.    That is okay.

8    A.    This is I guess you would call it a spreadsheet that was

9    taken from the HLF computers that indicates -- I don't know if

10   we want to put it on the screen so I can describe it better.

11   It is hard to describe without looking at it.

12             MR. JONAS:  If we can put page 145 on the screen.

13             THE WITNESS:  Well, on the first page it actually --

14   On the title the first line says "solicitor," which indicates

15   the fundraiser, the individual who was soliciting funds.  Do

16   you see that on the top?  And then there is a date, and then

17   there is a city, and then there is a sum, and it says amount

18   received.  So this is the document as it was on the computer.

19   On the left hand side you will see the names of the

20   different solicitors, the individuals who were raising the

21   money, the dates, sometimes there is a location noted, and

22   then there is an amount received noted.

23   Q.    (BY MR. JONAS)  Is this in chronological order, this

24   document?

25   A.    Yes.

1    Q.    What is the date range?

2    A.    This document ranges from it looks like December of '89

3    through August 29th of 2000.

4    Q.    Do you see the same person multiple times?

5    A.    Yes.  You will see many of the same individuals listed

6    many times.

7    Q.    Is the Defendant Mufid Abdulqader listed in here?

8    A.    He is.

9    Q.    Okay.

10          MR. JONAS:  Can we turn to page 145, please?

11   Q.    (BY MR. JONAS)  Do you see the Defendant on this page?

12   A.    Yes.  If you will look about two thirds of the way down

13   the page you will see the Defendant Mufid Abdulqader's name

14   listed under solicitor with the date of January 6th, 1999, and

15   an amount $1,650.  If you look about seven lines above that

16   you will see his name for January 4th, 1999 and the amount of

17   $3,650.

18   Q.    So is his name in this document more than just those two

19   times that you identified?

20   A.    Yes, many times.  You can go through and look.

21   Q.    Well, we are not going to do that.

22   A.    Okay.

23   Q.    But I do want to talk about another fundraiser for the

24   HLF.  Were any of the other Defendants fundraisers besides the

25   Defendant Mufid Abdulqader?

A.    Yes.  Many of the Defendants were credited with

fundraising activity in one form or another.

MR. JONAS:  If we can stay with HLF Search No. 23

and go back to page 1, please.

Q.    (BY MR. JONAS)  Do you see any other Defendants on this

page?

A.    Yes.  On the second line is the Defendant Shukri Abu

Baker.

Q.    Any others?

A.    The third line is the Defendant Mohammad El-Mezain noted

there.  It says Mezain plus Jabar.

Q.    In fact, you see El-Mezain's name several pages on this

page.  Is that correct?

A.    That is correct.  And then throughout the document the

New Jersey regional office is noted or credited with having

raised money.

MR. JONAS:  Turn to page 17.

Q.    (BY MR. JONAS)  Do you see the New Jersey regional office

anywhere on this page?

A.    Yes.  Close to the top there is an example.  It says New

Jersey regional office, 17th October, 1995, and I believe that

is $380 across from that entry.  And then there is another

entry about eight or nine names down for the 20th of October,

1995, $350.

Q.    Who was the New Jersey office?

1    A.    Abdulrahman Odeh was the manager of that office, and as

2    far as I know there were no other employees there.

3    Q.    Now, I want to talk about the Defendant Mohammad

4    El-Mezain for a moment.  We have seen him in a few videotapes

5    fundraising.  Is that correct?

6    A.    That is correct.

7    Q.    And do you recall the phone call that we played, Baker

8    Wiretap No. 5, between the Defendant Shukri Abu Baker and Omar

9    Ahmad from the Palestine Committee discussing how much money

10   to pay to the Defendant Mohammad El-Mezain for his

11   fundraising?

12   A.    I do.

13   Q.    Okay.  Besides what we have seen and heard, have you seen

14   other videotapes of the Defendant Mohammad El-Mezain doing

15   fundraising?

16   A.    Yes, I have.

17   Q.    Okay.  Do you have HLF Search No. 124 before you?

18   A.    It is a videotape so I do not have it before me, but I

19   know what you are talking about.

20   Q.    And what is the year of that tape, if you can date it?

21   A.    That one can was dated to October 29th, 1995.

22   Q.    Okay.  Where was this tape taken from?

23   A.    The HLF offices.

24   Q.    And when was it taken?

25   A.    In December of 2001.

1          MR. JONAS:  Your Honor, at this time I would offer

2     into evidence HLF Search No. 124.

3          MR. DRATEL:  Your Honor, the prior objections.

4          THE COURT:  Those have been overruled, and HLF No.

5     124 is admitted.

6     Q.   (BY MR. JONAS)  Before we play this tape, you said the

7     date is what again?

8     A.   HLF Search No. 124 is October 29, 1995.

9     Q.   And was this before or after Hamas was designated as a

10    terrorist organization?

11    A.   Hamas was initially designated in January of '95, so this

12    was approximately ten and a half months or ten months after

13    the designation.

14    Q.   Okay.

15         MR. JONAS:  Can we play HLF Search No. 124, please?

16         (Whereupon, HLF Search No. 124 was played, while

17    questions were propounded.)

18    Q.   (BY MR. JONAS)  Mousa Abu Marzook who was that again?

19    A.   Well, Mousa Abu Marzook is the Hamas leader who was

20    detained at the time of this tape.  He said Mahmoud, but

21    Mahmoud Abu Marzook was not detained at the time of this tape.

22    Q.   So it has to be Mousa he is referring to, or would you

23    assume?

24    A.   In the context of this and the other videotapes it would

25    be Mousa Abu Marzook who was detained.

1   Q.   Okay.  Here he says Mousa Abu Marzook?

2   A.   He gets it right in this one.

3   Q.   Is this the same Mousa Abu Marzook that is the head of

4   the Palestine Committee and on Demonstrative No. 17 that is

5   one of the leaders of Hamas that we have talked about many

6   times?

7   A.   Yes.

8   Q.   This individual just said, "...for the legality in the

9   making of the donations," and I may not be getting every word

10  exactly right.  At this time in October 1995 was Marzook

11  himself designated as a terrorist?

12  A.   Yes.  At the time of this videotape Mousa Abu Marzook had

13  been personally designated as a terrorist because of his role

14  with the Hamas terrorist organization.

15  Q.   Okay.  He said, "There is no reason to hesitate to make a

16  donation."  Were people allowed to make donations for

17  Marzook's defense?

18  A.   They were.

19  Q.   Why was that?

20  A.   There was a committee who went to the United States

21  Treasury department and obtained a license to raise funds for

22  his legal defense.

23  Q.   And the license gives them permission to do so?

24  A.   That is correct.

25  Q.   Who do we see on the screen now?

1   A.   The speaker is the Defendant Mohammad El-Mezain.

2   Q.   Okay.  Agent Burns, what is the Bank and what is the

3   Strip that he just referred to?

4   A.   The Bank is the West Bank and Gaza -- the Strip is the

5   Gaza Strip.

6   Q.   Okay.  Agent Burns, did you see where the Defendant

7   Mohammad El-Mezain asked for $500 to liberate a prisoner?

8   A.   I did.

9   Q.   And was there anything in the Hamas charter about

10  supporting prisoners or special segments of this society?

11          MR. DRATEL:  Objection, Your Honor; relevance.

12          THE COURT:  Overruled.  Go ahead.

13          THE WITNESS:  Yes.

14  Q.   (BY MR. JONAS)  And what does the Hamas charter say about

15  doing those sort of things, if you recall?

16  A.   It said that they wanted to support that portion of their

17  population.

18  Q.   That is what the Hamas charter said?

19  A.   If we can pull it up, we can look at the exact language

20  if you would like to.

21  Q.   No, that is okay.  We can move on.

22       I want to show you an earlier tape of Mohammad El-Mezain

23  Is there a video Mushtaha Search No. 15?

24  A.   There was.

25  Q.   What is the year of that video?

1  A.    That one was dated between 1988 and 1992.  It was before

2  the Oslo Accords were signed during the Intifada.

3         MR. JONAS:  Your Honor, at this time I would offer

4  into evidence Mushtaha Search No. 15.

5         MR. DRATEL:  Objection again, Your Honor, as

6  previously stated.

7         THE COURT:  That is overruled, and Mushtaha Search

8  No. 15 is admitted.

9         MR. JONAS:  If we can play those two clips, please.

10        (Whereupon, Mushtaha Search No. 15 was played, while

11        questions were propounded.)

12  Q.    (BY MR. JONAS)  Do you see where he said the term

13  Mujahideen in Palestine?

14  A.    Yes.

15  Q.    Is that term, Palestinian Mujahideen, one we will discuss

16  in a few moments?

17  A.    Yes.

18  Q.    Who are the two individuals that are on the screen?

19  A.    The individual that is speaking right there in the center

20  of the screen is Fawaz Mushtaha, the person whose yard the

21  tapes were found in and also a member of the Palestine

22  Committee.  And to his left is the Defendant Mufid Abdulqader.

23  Q.    Okay.  Agent Burns, are there other methods of

24  fundraising that we are going to cover later in this trial?

25  A.    Yes.  The HLF used several different methods.

1    Q.   Okay.  In reviewing the body of material that you saw,

2    the search warrant material, et cetera, did you come across

3    anything that indicates a reaction by the audience of some of

4    these conferences to the HLF?

5    A.   It did.

6    Q.   And what sort of item did you review that showed their

7    reaction to the rhetoric espoused by the band and by the

8    speakers?

9    A.   There were pieces of correspondence addressed to the Holy

10    Land Foundation indicating what those donors or potential

11    donors thought of the Holy Land Foundation.  In addition,

12    there were checks that were made out to the Holy Land

13    Foundation with comments on them indicating where they wanted

14    their money to go.

15    Q.   Okay.  Let's start with the checks.

16    A.   Okay.

17    Q.   If you have the NAIT records before you.

18    A.   I do.

19    Q.   It is already in evidence.

20           MR. JONAS:  And if we can put page 110 of the NAIT

21    records on the screen, please.

22    Q.   (BY MR. JONAS)  Do you see check No. 188 on this page

23    anywhere, the bottom right hand corner?

24    A.   Yes, I do.

25    Q.   This check is made out to MAYA.  How do you know -- Was

1    this check for the HLF?

2    A.    Yes, it was.    The records that make up this exhibit, this

3    NAIT exhibit, were records produced to me by NAIT in response

4    to my request for all records relating to the Holy Land

5    Foundation.    These were checks that were deposited into the

6    account of the Holy Land Foundation, which was at that time

7    known as the Occupied Land Fund, the account at NAIT.

8    Q.    Now, the check is made out to MAYA, M-A-Y-A.    Have we

9    seen that name before, just this morning?

10   A.    Yes, we have.

11   Q.    Where?

12   A.    Well, it is one of the Muslim Brotherhood organizations

13   on several of those lists that we saw.    It also sponsors some

14   of the conferences that the HLF raised money.

15   Q.    Was this the organization that the Defendant Mohammad

16   El-Mezain referred to in one of those tapes when he was

17   talking about him and Abdullah Azzam?

18   A.    Yes, it was.

19   Q.    What does it say in the memo section?

20   A.    It says "for Palestinian Mujahideen only."

21   Q.    Were there other checks that said Palestinian Mujahideen

22   on them?

23   A.    Yes, there were a number of them.

24            MR. JONAS:    If we could look at check No. 250.    Is

25   that on this page as well in the center?

1   Q.   (BY MR. JONAS)   Okay.   This is also made out to MAYA.

2   Was this part of the response by NAIT for the HLF records?

3   A.   Yes.

4   Q.   Okay.   In the memo section, I know it is difficult to

5   read, but can you see the language?

6   A.   It is in Arabic.

7            MR. JONAS:   If we can turn to page 115.

8   Q.   (BY MR. JONAS)   Is the Arabic translated?

9   A.   It is.

10  Q.   This is check 250.   What does the memo section, or what

11  does it say in the memo section of 250?

12  A.   It says, "Donation to the martyrs a and Mujahideen of

13  Palestine."

14           MR. JONAS:   If we can turn to page 111, please.

15  Q.   (BY MR. JONAS)   Do we see check 1119?   This check is made

16  out to the Islamic Association for Palestine.   How do you know

17  this check is for the HLF?

18  A.   It was deposited into the HLF account that the HLF held

19  at NAIT through ISNA so they deposited it into that HLF

20  account.

21  Q.   This document in the memo section, what language is that

22  the writing in the memo section?

23  A.   The memo section is Arabic.

24           MR. JONAS:   If we can turn to page 126.   Do we see

25  the translation for that check?   I may have the wrong check

1    number.

2    Q.    (BY MR. JONAS)  We see another check 156 where it says

3    Mujahideen --

4    A.    That is correct.

5    Q.    -- of Palestine.  Okay.  Did you come across any material

6    that identifies what the Palestinian Mujahideen is?

7    A.    I did.

8    Q.    Do you have before you HLF Search No. 109?

9    A.    I do.

10   Q.    What is that document?

11   A.    This is a book that was published by the United

12   Association for Studies and Research found in the Defendant

13   Abdulrahman Odeh's office that relates to the Palestinian

14   Mujahideen.

15   Q.    Who published the book?

16   A.    The United Association for Studies and Research, the

17   UASR.

18   Q.    UASR is who again?

19   A.    One of the three organizations that made up the

20   Palestinian Committee, the one that Mousa Abu Marzook actually

21   was one of the original officers of.

22   Q.    What language is the book in?

23   A.    The book is in Arabic.

24          MR. JONAS:  Your Honor, at this time I would offer

25   into evidence HLF Search No. 109.

1          MR. WESTFALL:  No objection, Your Honor.

2          THE COURT:  Admitted.

3    Q.   (BY MR. JONAS)  Agent Burns, what is the title of this

4    book?

5    A.   The title of the book can be found on page 138 of the

6    exhibit, or at least that is my page number.  It says, "A

7    study about the Islamic resistance movement, Hamas."

8    Q.   Is there anything in the translation or anything in the

9    book that has been translated by the FBI that identified what

10   the Palestinian Mujahideen is?

11   A.   Yes.

12   Q.   What page is that on?

13   A.   Page 140.

14          MR. JONAS:  Page 140, please.

15   Q.   (BY MR. JONAS)  What does it say?

16   A.   Well, the beginning, and again we just exhibited a

17   portion of this book because it was quite lengthy, it

18   discusses in the first paragraph an interview with Hamas

19   founder Sheikh Ahmed Yassin, and it identifies him as the head

20   of the Hamas movement in the occupied territories, which are

21   the Palestinian territories.

22        It is a question and answer session.  And you will see

23   where he goes on to ask him when the Hamas movement was

24   established, and Sheikh Ahmed Yassin says, "In the beginning

25   of the Intifada in December of 1987."

1    The next question is, "Does this apply to Hamas in both

2 the West Bank and the Gaza Sector?"

3    Sheikh Ahmed Yassin's answer is, "Yes."

4    Question:  "Can you tell us how Hamas was formed?"

5    Answer, Sheikh Ahmed Yassin says, "we contacted several

6 people in every region and we spoke with them and they agreed.

7 We then started to work."

8    Question:  "How can wings the movement had [sic]?"

9    Sheikh Ahmed Yassin says, "Hamas is a political movement.

10 As for the military and security wings, they were formed prior

11 to the Intifada, but Hamas is a new thing."

12    Question:  "What was the name of the military wing?"

13    Sheikh Ahmed Yassin, "Says the Palestinian Mujahideen."

14 Q.    So the Palestinian Mujahideen, which we have seen on

15 these memo sections or checks for the HLF was the name of the

16 military wing of Hamas?

17 A.    That is correct.  The original name that they said even

18 predated the official creation of Hamas.

19 Q.    Okay.  You mentioned earlier that there were letters sent

20 by some donors to the HLF.  Do these letters also talk about

21 the Mujahideen?

22 A.    They do.

23 Q.    Do you have before you what has been marked as InfoCom

24 Search No. 7, infoCom Search No. 8, and InfoCom Search No. 9?

25 A.    I have InfoCom Search No. 7.  If you will let me look at

1    the originals of No. 8 and 9.

2    Q.    Sure.

3              MR. JONAS:  Your Honor, if I may approach?

4              THE COURT:  Yes.

5    Q.    (BY MR. JONAS)  Do you have No. 8 and 9?

6    A.    I do.

7    Q.    What are those three items?

8    A.    These are pieces of correspondence relating to the Holy

9    Land Foundation that were taken from InfoCom in September of

10   2001.

11             MR. JONAS:  Your Honor, at this time I would offer

12   into evidence InfoCom Search No. 7, infoCom Search No. 8, and

13   InfoCom Search No. 9.

14             MS. MORENO:  Subject to our previous objections,

15   Your Honor.

16             MS. HOLLANDER:  These are hearsay, Your Honor.

17             THE COURT:  Those have been overruled.  Those

18   exhibits are admitted.

19   Q.    (BY MR. JONAS)  Agent Burns, I am going to hold up HLF

20   Search No. 7 for a moment.  Do you see this is the original

21   letter.  Is that correct?

22   A.    That is correct.  With the envelope attached.

23   Q.    InfoCom Search No. 7.  My mistake.  And the letter is in

24   what language?

25   A.    The letter is in Arabic.

1          MR. JONAS:  If we can turn to page 5 of the exhibit

2     which should be the English translation.

3               THE WITNESS:  That is correct.

4     Q.   (BY MR. JONAS)  Okay.  And who is this letter addressed

5     to?

6     A.   To the Defendant Shukri Abu Baker.  The Fund's executive

7     director.

8     Q.   What is the first paragraph, what does it say?

9     A.   It just says, "May God bless you and all the honorable

10    brothers who perform the best of charitable deeds which is

11    supporting the Mujahideen in the occupied land."

12    Q.   Okay.  Are you able to date this letter?  If it would

13    help, I can show you the envelope.

14    A.   I have the envelope.  It was postmarked May 30th, 1990.

15    Q.   Okay.  And this was found when?

16    A.   It was found or it was seized from InfoCom in September

17    of 2001.

18    Q.   And InfoCom Search No. 8, what is that?

19    A.   This is a copy of a handwritten letter in Arabic to the

20    Holy Land Foundation.  It says, "To whom it may concern."

21              MR. JONAS:  If we can put that on the screen,

22    please.

23    Q.   (BY MR. JONAS)  What is the page for the --

24    A.   Page 2.

25    Q.   Do you know the date of this letter?

1    A.    This letter was undated.

2    Q.    And does it indicate anywhere in this letter about the

3    Palestinian Mujahideen?

4    A.    Yes.  In the second paragraph this individual notes, "I

5    am enclosing with this letter of mine a small money transfer

6    for my Mujahideen brothers in Palestine, and I ask God to

7    bless it for them and to help them, keep them steadfast, and

8    to support them with victory."

9    Q.    Okay.  Were there any -- I am sorry.  InfoCom Search No.

10   9, what is that?

11   A.    This is a handwritten letter on Occupied Land Fund

12   letterhead.

13   Q.    Okay.  What language is that in?

14   A.    It is in Arabic.

15   Q.    Is it written by someone that you recognize as being an

16   employee of the Occupied Land Fund or the HLF?

17   A.    Actually if you look at the context of the letter in

18   English, the translation, it indicates that it is sent from a

19   representative of the Fund in Canada, and this individual

20   identifies himself as Ibrahim Al Kurdi.  I do not know that

21   individual.

22   Q.    What page is the English?

23   A.    Page 2.

24   Q.    What does this individual say about Mujahideen?

25   A.    In the second paragraph he actually talks about jihad as

1    opposed to Mujahideen.  "Attached is a check in the amount of

2    $9,873 to the Occupied Land Fund as a contribution to support

3    to jihad in Palestine."

4    Q.    Did you come across any letters that actually talked

5    about Hamas, letters sent to the Holy Land Foundation that

6    talked about Hamas?

7    A.    Yes.

8    Q.    Do you have before you what has been marked as HLF No.

9    25?

10   A.    I do.

11   Q.    I am sorry.  I skipped ahead.  InfoCom Search No. 10.

12   A.    I need the original of that one.

13   Q.    Okay.

14   A.    Thank you.

15   Q.    What is that document?

16   A.    This is a letter to the Holy Land Foundation and a

17   response from the Holy Land Foundation.

18   Q.    Where was this letter found?

19   A.    At the Holy Land Foundation -- Excuse me.  InfoCom.

20         MR. JONAS:  Your Honor, at this time I would offer

21   into evidence InfoCom Search No. 10.

22         MS. HOLLANDER:  Nothing further, Your Honor.

23         THE COURT:  Okay.  That exhibit is admitted.

24         MR. JONAS:  If we can put the first page on the

25   screen, please.

1   Q.   (BY MR. JONAS)   This letter is also on letterhead of the

2   Occupied Land Fund.   Was this written by someone who works for

3   the Occupied Land Fund?

4   A.   Yes.   This is a response to the original letter which is

5   attached, and it is -- This particular letter was sent from

6   the Holy Land Foundation by Shukri Abu Baker.

7   Q.   Okay.

8           MS. HOLLANDER:   Can we have a date, please?

9           THE WITNESS:   The response that we are discussing

10  right here was sent or dated May 15th, 1991.

11          MR. JONAS:   Can we go to the original letter that this is

12  responding to?

13  Q.   (BY MR. JONAS)   What page is that?

14  A.   Page 2 is the original letter.

15  Q.   What language is this in?

16  A.   It is also in Arabic.

17  Q.   Have both these letters been translated?

18  A.   They have.

19  Q.   Which page is the translation for this current exhibit,

20  this current page, page 2?

21  A.   For the original letter on page 2, the translation begins

22  on page 8.

23          MR. JONAS:   Let's go to page 8.

24  Q.   (BY MR. JONAS)   And what is this person writing to the

25  HLF about?

1   A.   This lady writes and addresses her letter to the director

2   of the Occupied Land Fund there on top.  After greetings she

3   says, "You used to send me publications about Hamas'

4   communiques and about the activities of the Islamic Office,

5   then you stopped.  I presented to some of our brothers in God,

6   my colleagues at work, the idea of supporting the Uprising.

7   By God's grace it was accepted by them.

8       "We will send you an undetermined amount quarterly as

9   much as they are able to give, and that is in support of the

10  blessed Islamic Uprising in Palestine.

11      "I would like to inquire about Hamas' books by Ahmed

12  Yousef and also his book about Ahmad Yasin.  I would like to

13  obtain them.  Please advise me of the cost with my thanks."

14  Q.   Okay.  What was the response by Shukri Baker?

15  A.   On page 7, Shukri Abu Baker acknowledges the receipt of

16  her letter.  And the year is noted.  It should be translated.

17  But obviously that was August 10th of it should be 1990, I am

18  assuming, "...which transmits your noble feelings and generous

19  support in benefit of our steadfast people in occupied

20  Palestine."  So in the first paragraph he is acknowledging

21  receipt of the original letter.

22      He says, "As for the books you are inquiring about, we

23  contacted the Islamic Association for Palestine which is the

24  distributing party of statements, publications, and books

25  relating to the Palestinian cause.  They promised us well.  I

1    hope that some of their publications have reached you along

2    with this letter mine [sic] or sooner.

3         "It's important to me, while you and your friends are

4    about to start supporting our relatives in the occupied

5    territory, to assure you that the Occupied Land Fund is your

6    trustworthy organization to which the hearts of thousands of

7    people of charity everywhere look up to, hoping and taking

8    advantage of the historic opportunity to support the

9    resistance of a nation and the jihad of a people.  May God

10   protect you and guide your steps on the path of charity."

11        Signed "Your brother, Shukri Abu Baker."

12   Q.   Does this letter say anything about distancing himself or

13   the Occupied Land Fund from Hamas?

14   A.   No, it does not.

15   Q.   What was the Occupied Land Fund/Holy Land Foundation

16   supposed to be at this time?

17   A.   It was supposed to be a Muslim charity.

18   Q.   Did you come across any letters of similar nature found

19   at the HLF?

20   A.   I did.

21   Q.   Do you have HLF Search No. 25 before you?

22   A.   I do.

23   Q.   And where was this letter found?

24   A.   This was found in the office of the Defendant Abdulrahman

25   Odeh.

1    Q.    Where was that office again?

2    A.    In New Jersey.

3    Q.    That is an HLF office?

4    A.    That is correct.

5    Q.    What is the date of the letter?

6    A.    It is dated November 28, 1996.

7    Q.    Is that after Hamas is designated as a terrorist

8    organization?

9    A.    Yes.

10         MR. JONAS:  Your Honor, at this time I would offer

11   into evidence HLF Search No. 25.

12         MR. WESTFALL:  No objection, Your Honor.

13         THE COURT:  Admitted.

14         MR. JONAS:  If we can put the letter on the screen,

15   the first page.

16   Q.    (BY MR. JONAS)  And what is that?  That is the envelope,

17   Agent Burns?

18   A.    That is the envelope that the letter was sent in.

19   Q.    So the envelope was found with the letter at HLF?

20   A.    Yes, at the HLF New Jersey office.

21   Q.    This letter is in English?

22   A.    That is correct.  This is the original.

23   Q.    It is not a translation by the FBI?

24   A.    That is correct.

25   Q.    Can you read this letter, please?

A.    It says, "Salam Alikum.

"Enclosed is modest contribution for our people suffering from Jewish/Christian Western crimes.  In s'allah both will be defeated, slaughtered, and kicked out of Islamic lands.  This is for relief supplies and weapons to crush the hated enemy. Thank you.  Sultan Mahmoud.

"P.S.  Today the Western criminals celebrate Thanksgiving.  Who once helped their ancestors survive harsh winter then stole their land and killed most all natives? Whoever was left was as effective slaves in reservations.  The Islamic Ummah must not let this happen to us.  We must destroy Israel and unite and get nuclear weapons to kill the West if they attack our member nations of the Ummah.  Unity means must restore Kalafa."

Q.    Did this individual who wrote this letter send a donation to the HLF?

A.    I am sorry?

Q.    Did this individual who wrote the letter send a donation to the HLF?

A.    Yes, he did.

Q.    Please let me finish the question.  Along with the letter?

A.    Yes, he did.

Q.    Okay.  Do you have before you HLF Search No. 93?

A.    I do.

Q.   What is that document?

A.   This is a ledger basically for the Holy Land Foundation.

          MR. JONAS:  Your Honor, at this time I would offer
into evidence HLF Search No. 93.

          MR. WESTFALL:  No objection, Your Honor.

          THE COURT:  Admitted.

          MR. JONAS:  Put that on the screen, please.

Q.   (BY MR. JONAS)  And what does this ledger page reflect
with regard to that letter we just read from Sultan Mahmoud?

A.   It shows on December 4th, 1996 that the payee Sultan
Mahmoud, this is the second entry on the page, and it shows
that he gave a $25 donation.

Q.   Was there any indication that the HLF rejected his
donation because of his letter?

A.   No.  This seems to indicate that they accepted it.

Q.   Okay.  The fact that the HLF -- that the letter was found
in the HLF offices six years after it was written -- It I was
written in '95 or '96?

A.   '96.

Q.   For five years after it was written, does that indicate
they kept the letter or threw it out?

A.   They kept it for five years.

Q.   In response to the letter and the donation, what did the
HLF do?

A.   I located additional solicitations by the HLF of this

1    donor for additional contributions.

2    Q.    Do you have before you what has been marked HLF Search

3    No. 94?

4    A.    I do.

5    Q.    And what is that item?

6    A.    These were the solicitations from the HLF addressed to

7    Sultan Mahmoud, the author of that letter.

8           MR. JONAS:  Your Honor, at this time I would offer

9    into evidence HLF Search No. 94.

10          MR. WESTFALL:  No objection, Your Honor.

11          THE COURT:  Admitted.

12          MR. JONAS:  If we can put page 5 on the screen,

13   please.

14   Q.    (BY MR. JONAS)  Agent Burns, look at the top.  Who is it

15   addressed to?

16   A.    The letter is addressed to Sultan Mahmoud.

17   Q.    Where is it addressed to?

18   A.    It is addressed to P.O. Box 2115, Paterson, New Jersey.

19   Q.    Do you know what P.O. Box 2115, Paterson, New Jersey is?

20   A.    That is one of the mailing addresses for the HLF's New

21   Jersey office.

22   Q.    And where was this letter sent from, which HLF office?

23   A.    The Holy Land Foundation in Richardson, Texas.

24   Q.    So does that mean, then, that the New Jersey office must

25   have transmitted the donation down to Richardson?

1    A.    The original donation, is that what you are discussing?

2    Q.    Yes.   The $25 donation.

3    A.    Yes.

4    Q.    Does this appear to be a form letter?

5    A.    It does.

6    Q.    Did you come across any evidence that Sultan Mahmoud then

7   continued to contribute money to the HLF?

8    A.    Yes.

9    Q.    Do you have before you what has been marked HLF Search

10   No. 148?

11    A.    I need the original of that one.

12    Q.    Sure.   What is HLF Search No. 148?

13    A.    It is a list of donors from March 10, 1998.

14        MR. JONAS:   Your Honor, at this time I would offer

15   into evidence HLF Search No. 148.

16        MR. WESTFALL:   Your Honor, may I inquire how many

17   pages is that?

18        THE WITNESS:   It is one page.

19        MR. WESTFALL:   No objection, Your Honor.

20        THE COURT:   Admitted.

21        MR. JONAS:   If we can put that page on the screen,

22   please.

23    Q.    (BY MR. JONAS)   Do you see anywhere on this page where

24   the individual who wrote that letter that was found in the New

25   Jersey office continued to make contributions to the HLF in

1    response to the donations solicitation?

2    A.    The second entry on this chart shows Sultan Mahmoud and

3    it indicates, if you scroll over to the right, the $25

4    donation in 1996 that we discussed in that original letter,

5    and then it indicates $95 for the year 1997.

6    Q.    Agent Burns, did you come across anything in the body of

7    materials that you reviewed that indicates that the HLF

8    rejected this donation from the individual who wrote that

9    letter?

10   A.    No.

11            MR. JONAS:  Your Honor, at this time I am at a good

12   breaking point if you want to break for lunch.

13            THE COURT:  Let's take the lunch break.  Be back at

14   a quarter till.

15        And let me just say one thing to the members of the jury,

16   to remind you, of course, not to discuss the case with anyone.

17   And be sure when you are here that you wear these tags that

18   you are given so when you are in the hall people know that you

19   are a juror and they should stay away from you.  You should

20   stay away from you.  Of course, you should stay away from

21   anyone that is connected in this case.  And no one should be

22   talking to you about this case.  If anyone should try to talk

23   to you about this case in any way, you should report that to

24   me immediately.

25            (Whereupon, the jury left the courtroom.)

1       THE COURT:  All right.  We will be in recess until

2   1:45.

3                       (Lunch recess.)

4       THE COURT:  Mr. Jonas?

5       MR. JONAS:  Yes, sir.  Thank you.

6   Q.   (BY MR. JONAS)  Agent Burns, in addition to the

7   videotapes we have seen of the Defendant Mohammad El-Mezain

8   raising funds, and that one we saw the other day where someone

9   was spray painting Hamas on the wall, did you see any Hamas

10  communiques being sent to the Defendant Mohammad El-Mezain?

11  A.   I did.

12  Q.   And where did those communiques come from?  In other

13  words, who was the sender?

14  A.   Generally the IAP.

15  Q.   Did you see any documents that indicate that the IAP

16  would be the one sending out these communiques?

17  A.   Yes.  As we have seen Shukri Abu Baker's letter before we

18  broke for lunch when the lady from Saudi Arabia was requesting

19  Hamas books and statements, Shukri Abu Baker responded and in

20  his reply said the IAP was the one responsible for sending

21  those things.

22  Q.   Okay.  Do you also have before you InfoCom Search No. 72?

23  A.   I do.

24  Q.   And what is that document?

25  A.   This is a grant request from the Islamic Association for

1    Palestine to the HLF.

2    Q.   Where was this found?

3    A.   At InfoCom.

4    Q.   Does this item reference communiques being sent out by

5    IAP?

6    A.   It does.

7            MR. JONAS:  Your Honor, at this time I would offer

8    into evidence InfoCom Search No. 72.

9            THE COURT:  Objection?  That is admitted.

10           MR. JONAS:  If we can get page 3 on the screen,

11   please.

12   Q.   (BY MR. JONAS)  Do you see the middle of the page, Agent

13   Burns, where it says "daily fax report"?

14   A.   I do.

15   Q.   If you can just read that one paragraph?

16   A.   It says, "IAP is keeping the readership well-informed of

17   the situation in the occupied territories and daily basis

18   through a fax network that covers 80 recipients at a monthly

19   cost of $500.  Due to many requests from individuals to be

20   added to the list, we wish to accommodate about 50 more

21   institutions and individuals, who like others will pay certain

22   monthly fees."

23   Q.   Was the FBI intercepting or getting copies of faxes sent

24   to the Defendant Mohammad El-Mezain?

25   A.   At some point in 1994 they did begin to monitor some of

1    Mohammad El-Mezain's phone lines, including a fax line.

2    Q.    Was this part of the intelligence investigation into him?

3    A.    It was.

4    Q.    And was the monitoring of the phone and fax lines

5    pursuant to a court order?

6    A.    It was.

7    Q.    Was this the FISA that we talked about earlier?

8    A.    That is correct.  It was a FISA court order.

9    Q.    Okay.  Did you compile some of the El-Mezain faxes that

10   the FBI received into one exhibit?

11   A.    Yes.

12   Q.    Do you have before you what is marked as El-Mezain

13   Wiretap No. 1?

14   A.    I do.

15   Q.    What is that?

16   A.    This is a collection of faxes that the Defendant Mohammad

17   El-Mezain received that were captured by the FBI's monitoring

18   of his fax line.

19   Q.    Were these all the faxes that he received that the FBI

20   monitored?

21   A.    Oh, no.

22   Q.    Do these faxes have something in common?

23   A.    Yes.

24   Q.    What is that?

25   A.    They generally relate to Hamas, the HLF matters that we

1    have been discussing in this case.

2              MR. JONAS:  Your Honor, at this time I would offer

3    into evidence El-Mezain Wiretap No. 1?

4              MR. DRATEL:  Your Honor, just --

5              THE COURT:  Subject to the previous objections?  All

6    right.  Those have been overruled.  El-Mezain Wiretap No. 1 is

7    admitted.

8    Q.   (BY MR. JONAS)  Agent Burns, do you see what I am holding

9    up?  It is a binder.

10   A.   I do.

11   Q.   Do you recognize this as El-Mezain Wiretap No. 1?

12   A.   I do.

13   Q.   We put a sleeve in there that says El-Mezain faxes.  Is

14   that correct?

15   A.   That is correct.

16   Q.   Can you just briefly describe how the binder is divided.

17   And I can hand it to you, if you prefer.

18   A.   My copy is not divided, so if you want to that would be

19   great.

20             MR. JONAS:  If I may approach, Your Honor?

21             THE COURT:  Yes.

22             THE WITNESS:  Okay.  Basically the faxes that we

23   have in this exhibit are organized by date, and they are

24   separated with little tabs that indicate the date.

25   Q.   (BY MR. JONAS)  Okay.  If I may retrieve that.

A.    Okay.

Q.    Can you approximate the number of faxes you put in here?

A.    I can't recall the exact number.  There are about 182 pages, but those include the faxes themselves and the translations of the faxes, as a majority of them, if not all, were in Arabic.

Q.    Do you recall the time frame that the faxes are contained in this exhibit?

A.    1994 and 1995, I believe; maybe some from '96.

Q.    We aren't going to go through every one, but I want to go through a few with you.

        MR. JONAS:  If we can put page 27 on the screen, please.  And if we -- Let's go back to page 25 for a moment just so we can see.

Q.    (BY MR. JONAS)  Agent Burns, is this what the faxes looked like?

A.    Yes.

Q.    Do they all look like this?

A.    Most of them.

Q.    Most of them.  And do you know --

        MR. JONAS:  If we can go to page 27 now.

Q.    (BY MR. JONAS)  What is the date of this particular one?

A.    Well, there are several dates on there.  The report is from Monday October 10th, 1994.

Q.    What is the information contained above where it says

1    "the report"?

2    A.    It has a sent by Xerox with a telecopier date and time

3    stamp, a telephone number for the IAP information office, and

4    there is another date and time stamp.  It is my understanding

5    that the fax machine that was originally collecting these

6    faxes had incorrect dates so that the date printed out by the

7    actual fax machine was sometimes incorrect.  So when possible

8    we rely on the printed date on the document itself, October

9    10th, 1994.

10   Q.    The fax machine you are referring to, would that be the

11   FBI fax machine or the El-Mezain fax machine?

12   A.    It was my understanding that it was the Defendant

13   El-Mezain's fax machine that sometimes printed the wrong date.

14   Q.    Did the FBI put this information on the top, this fax

15   information?

16   A.    That information is on the original.

17   Q.    Are you up for doing some reading?

18   A.    I am.

19   Q.    Okay.  Can you read us at least the first page and a half

20   and the title of this report?

21   A.    Okay.  And again, this is an IAP information office

22   report dated October 10th, 1994, and it is entitled "A special

23   report about the jihadist heroic operation in the midst of the

24   city of West Jerusalem.

25        "Sources of the occupation police said that the armed

attack which took place shortly before midnight last night in

the west side of Jerusalem resulted in the death of 2 and

injury of 16 others, according to initial statistics, and

mentioned that four of the injured are still in critical

condition.  According to occupation authority sources, the

attack took place when two armed individuals in black

uniforms, one wearing a redhead band, opened automatic gunfire

and threw hand grenades towards restaurant patrons and coffee

shop customers and Zionist by-passers in the neighborhood of

Nalat Shaffa'a adjacent to Jaffa Street which is the

commercial street in the midst of the west part of Jerusalem.

The attack took place around 11:30 p.m. last night.  There

were conflicting news reports about the number of the injured

and the dead resulting from the attack which was carried by

two suicide at attackers from Al-Qassam Brigades, Hamas'

military wing, according to the enemy's radio which said that

an unknown person called them and announced Al-Qassam Brigades

responsibility for the attack.  The unknown caller emphasized

this attack was carried out on the fifth anniversary of

al-Aqsa mosque massacre, which took the lives of tens of

Palestinians.  Ha'aretz newspaper said today that 20 Israelis

were injured during the attack while two people were killed,

one of whom is an Israeli recruit called Lisyan Levy from the

Beit Zayet settlement located in the area of Bab El-Wad, which

is the western entrance of Jerusalem.  Israel sources

1    indicated that the two armed fighters were martyred during a

2    forty-minute fight with members of special units of the

3    Zionist's entities border guard and police.  At 11:30 p.m. the

4    two armed fighters had arrived to car by a street near Jaffa

5    Street and the Government press office.  They were armed with

6    automatic Kalashenkoff machine guns, about eight hand

7    grenades, and many ammunition magazines.  They got down and

8    walked towards a paved road in Nahlat Shaba'a, Yomal Moshe

9    Slomon Street where there are many restaurants and coffee

10   shops that were crowded with customers at the time.

11   Eyewitnesses said that the two armed men approached the place

12   of the attack from the Ma'man Allah cemetery, and they

13   immediately started to fire at hundreds of by-passers and

14   restaurant and coffee shop customers.  They were emptying the

15   ammunition magazines and replenishing them one after another

16   until police and border guards arrived on site, at which time

17   a very intense firefight broke out between the two sides which

18   resulted in the martyrdom of the two attackers.  Sources of

19   the enemy's police said that the identities of the two armed

20   fighters were known to them and that they were not wanted by

21   the security force, noting that they came from the Gaza

22   Strip."

23   Q.   Agent Burns, let me interrupt you.  In the context of

24   this article that you are reading, this report that you are

25   reading when it says the enemy's police, who would be the

1    enemy?

2    A.    According to the IAP, the enemy would be the state of

3    Israel.

4    Q.    Okay.  Continue.

5    A.    "Sources of the enemy's police said" -- Excuse me.

6    "Evacuation of the wounded and searching the site continued

7    until 3:30 a.m. today where the accident site was closed.  A

8    helicopter and a large number of police force and border

9    guards joined the search operations looking for other armed

10   men believed to have participated in the attack.  Eyewitnesses

11   Yehdiot Ahronot"--excuse my pronunciation--"newspaper

12   described what happened last night as, 'real hell,' where

13   Jerusalem's commercial district was turned to a fighting zone.

14   It added that a state of fear and terror prevailed the

15   situation and that the restaurant and coffee shop patrons in

16   the area acted in a completely hysterical manner as they were

17   running in horror and stampeding each other inside the

18   restaurant and coffee shops' halls and kitchens where they

19   took refuge while facing the two attackers' hail of bullets.

20   In his report during the morning news from an accident report,

21   an enemy TV reporter said that the psychological and mental

22   damage caused by the attack greatly exceeds the bodily harm

23   resulting from it.  Al-Qassam Brigades said in their statement

24   that two martyrdom-seekers had stormed all the Zionist

25   security barricades and reached Jaffa Street in the heart of

the occupied city of Jerusalem and opened fire on a huge

number of soldiers and Zionist settlers.  One of our heroes

then threw several hand grenades which resulted in killing and

injuring tens in enemy lines.  This heroic battle which lasted

forty minutes coincides with the commemoration of al-Aqsa

massacre which was carried out by Zionist soldiers following a

careful planning by Rabin's terrorist government.  What we

want to stress in this statement is the following:

"First:  The armed resistance on Palestinian soil will

continue on the soil of Palestine until the despised

occupation is completely driven away from every grain of sand

in the land of Palestine.  Our daring armed operations will

not stop as long as there is one Zionist soldier remaining on

our occupied land.

"Second:  Heavenly religions, international protocols,

and sound and national logic grants every Palestinian the

right to resist Israeli occupation of our Palestinian land

until we free every yard of our homeland.  All calls for

weakness and defeat which are repeated here and there will be

trodden under our feet and we will offer blood and sweat as a

price for Palestine and dowry for its pure soil.

"Third:  Rabin's terrorist government which plans day and

night to annihilate our people and to annihilate the Muslim

nation, this government will be the first to pay the price and

the first to be burnt with al-Qassam's fire and Hamas' holy

1    flames.

2        "The statement added that, with all pride and

3    appreciation, we bring to you the glad tidings about the two

4    martyrs of Ezz Eddin al-Qassam Brigades, hero Hassan Abbas

5    from Hashem's Gaza, and martyr Issam Mahni Ismail al-Johari

6    from Egypt, the Quiver.  We pledge our righteous martyrs that

7    we will remain truthful to their righteous blood and that we

8    will draw a quiet smile on the map of Palestine with the

9    openings of our rifles.  That is not too hard for Almighty God

10   to do.  Palestinian sources said martyr Issam Mahni Ismail

11   al-Johari, who was martyred during the attack on Jerusalem

12   last night is an Egyptian citizen born in 1975 and he came to

13   the Gaza Sector under the pretext of tourism on 14 June, 1994.

14   Sources said that during his presence in the Gaza Sector

15   al-Johari made attempts to contact the Hamas movement where he

16   told officials in it that he came to martyr on the land of

17   steadfastness, and that he studied the site where the

18   operation was carried out and planned for it in coordination

19   with Hassan Mahmoud Issa Abbas who participated in the attack

20   with al-Johari and martyred during it.  Palestinian sources

21   said that al-Johari entered Gaza legally using his Egyptian

22   passport No. 360595 issued by Shoubra al-Khima passport

23   office.  Sources said that al-Johari was a soldier in the

24   Egyptian army before his service was terminated due to his

25   activity in the Islamic group which is opposed to the Egyptian

1    government.  Al-Johari is considered the first Egyptian martyr

2    to take part in the Islamic resistance operations inside the

3    occupied territories since the start of the Palestinian

4    Intifada in the year 1987.  Israeli security sources say that

5    al-Johari is a member of Ein Jalout which came over from Egypt

6    and that he was working as a guard in the offices of the

7    Palestinian Authority in the Gaza Sector.  Security circles do

8    not overrule the possibility that al-Johari procured the

9    weapon used in yesterday's attack from the Palestinian police,

10   according to the information of the occupation's radio.  On

11   the other hand, Israeli sources said that the second martyr

12   Hassan Abbas is from al-Daraj district in Gaza City, and he

13   was arrested before by the Israeli security police for

14   allegedly providing aid to al-Qassam Brigades where he worked

15   as a driver for martyr Imad Akel, the Brigades' leader in the

16   sector who was martyred last November by the bullets of the

17   occupation soldiers."

18   Q.   Agent Burns, just remind us, how did this report entitled

19   describe this attack?

20   A.   "Heroic."

21   Q.   If you can turn to the next communique that is dated

22   October 12th, 1994, specifically page 32.  I don't think you

23   need to read the whole thing, but I want you to read the first

24   paragraph; the title, the date, and the first paragraph?

25   A.   Okay.  Again this is a translation.  The title is "a

special report about the kidnapping of a Zionist soldier by

the Hamas movement."  And just to note, if you look at the

original of this document, and we don't have to turn there,

but I just wanted to point out that when you say Hamas in

parentheses here it is in parentheses in the original.

MR. JONAS:  Page 30.

THE WITNESS:  I just wanted to note that that was

not something that was added by the FBI.  If you look up here

where it says -- You can see the title in Arabic there and at

the end there is the parentheses and a word in Arabic.  That

is what I am talking about.

MR. JONAS:  Okay.  Back to page 32.

Q.   (BY MR. JONAS)  Just read the first paragraph, please?

A.   "The Islamic Resistance Movement, Hamas, called upon the

enemy's government in the Zionist entity to release

Palestinian and Arab prisoners detained by the occupation

forces in exchange for the release of an Israeli soldier it

said it is detaining.  A statement issued by the martyr Izz

al-Din al-Qassam Brigades, Hamas military arm, said that the

soldier Nehson Mordecai Faxman, who carries I.D. number"--and

I won't read that--"is detained by the Movement after being

kidnapped by its fighters.  It promised to release him if the

occupation authorities agree on a number of its demands.  In

its handwritten statement, the Movement demanded an immediate

and quick release of the head of the Islamic Resistance

1    Movement, Hamas, Sheik Ahmad Yasin, founder of the former

2    military apparatus of the Hamas movement, Sheik Salah Shehata,

3    Sheik Abdul Karim Ebeid, and Sheik Mustafa Dirani, both of

4    whom are leaders of a Lebanese-based Hezballah organization.

5    The Movement also demanded the release of al-Qassam Brigades

6    detainees.  Among the conditions listed in the Movement's

7    release is the demand that the occupation authorities release

8    180 Palestinian detainees distributed as follows."

9    Q.    That is fine.  Does the rest of this communique discuss

10   the kidnapping of the soldiers?

11   A.    It does.

12   Q.    Okay.

13          MR. JONAS:  If we can put up demonstrative 14, the

14   first page.

15   Q.    (BY MR. JONAS)  Agent Burns, do you see this event

16   timeline that Doctor Levitt discussed?

17   A.    I do.

18   Q.    Do you see the highlighted one, highlighted incident?

19   A.    Yes.

20   Q.    Is that kidnapping on October 9th, 1994, the IDF, the

21   Israeli Defense Forces soldier, the same kidnapping that is

22   discussed in this communique received by the Defendant

23   Mohammad El-Mezain?

24   A.    It is.  There is a difference in the spelling of the

25   names, because his name was translated from Hebrew into

1    English, so there is a variation.  But based on the context,

2    you can determine that it is the same individual.

3    Q.   Agent Burns, I want to turn to page 37.  What is the date

4    of this one?

5    A.   October 15th, 1994.

6    Q.   What is the title?

7    A.   "Heroes of al-Qassam were victorious from the security,

8    military, and behavioral aspects."

9    Q.   If you can read just that first paragraph.

10   A.   "Just as the beginning of operation of our heroes in

11   which they detained the Zionist soldier Faxman was heroic and

12   superb, so was the final outcome with similar heroism and

13   superbness, and contrary to what Zionist war general Rabin had

14   wished and planned for.  It ended in a way contrary to all

15   similar operations which encouraged the general to repeat the

16   method.  This method, which he will change forcibly under the

17   heavy blows of al-Qassam, Salah Jadallah, Taysir Al-Natashah

18   Abdel, Abdul-Karim Badr, our al-Qassam heroes, wrote the end

19   with their blood and smeared it with general Rabin's forehead

20   and all of those who surrender."

21   Q.   Does the rest of this communique go on and talk about

22   these actions as well?

23   A.   It does.

24   Q.   Okay.  Does this communique identify several individuals

25   as Hamas members?  Do you see that?

A.    I do.

Q.    It says Sheikh Ahmed Yassin, and we have seen his name

multiple times throughout the course of your testimony.  Is

that correct?

A.    That is correct.

Q.    And Sheikh Raed Salah, do you recognize that name as

well?

A.    I do.

Q.    Do you know if he is connected with any particular

organization?

A.    He is connected with a relief organization, the Islamic

Relief Committee.  In addition, we saw in the videotapes that

we played just before lunch, Mohammad El-Mezain was talking

about a prisoners project that was presented by Raed Salah.

That was this man.

Q.    Which committee is he affiliated with?

A.    The Islamic Relief Committee.

Q.    Is that a committee that you already discussed with your

financial schedules as the HLF giving money to?

A.    Yes.

Q.    If you go down on this sheet near the bottom half, do you

see where it says, "The Hamas movement accused the Arafat

authority," and you see it says Dr. Mahmoud Al-Zahar?

A.    Yes.

Q.    Okay.  Let me show you Demonstrative No. 17.  Do we see

1    Mahmoud Zahar in this chart anywhere?

2    A.    We do.  He is the one closest to you there on the second

3    row.

4    Q.    Where I am pointing?

5    A.    That is correct.

6    Q.    Does this communique identify him as affiliated with any

7    particular organization?

8    A.    It identifies him as being involved with Hamas.

9    Q.    Have we seen him somewhere else in this case already?

10   A.    We have seen him in several different places, most

11   notably in the video from 1990 in Los Angeles where Mohammad

12   El-Mezain was seated next to him in the audience, and at the

13   end of the tape Shukri Abu Baker thanked the Mujahideen who

14   had traveled to be with them, or the guests, and Doctor Zahar

15   was one of them.

16   Q.    Okay.  Are you aware if Doctor Zahar raised any funds for

17   the HLF?

18   A.    He was listed as a fundraiser, yes.

19   Q.    Do you have before you what has been marked as HLF Search

20   No. 87?

21   A.    I don't have the original of that one.

22            MR. JONAS:  May I approach, Your Honor?

23            THE COURT:  Yes.

24   Q.    (BY MR. JONAS)  Now do you have HLF Search No. 87?

25   A.    I do.

```
1    Q.   What is that document?

2    A.   This is a list of overseas speakers for the HLF.

3    Q.   Where was that taken from?

4    A.   It was taken from an HLF computer.

5              THE COURT:  Your Honor, at this time I would offer

6    into evidence HLF Search No. 87.

7              MS. HOLLANDER:  Your Honor, this is not one that was

8    on the list, so we haven't really discussed it.  Assuming it

9    is accurate, we have no objection.

10             MR. JONAS:  I mentioned to Ms. Hollander this

11   morning that I would be showing Agent Burns this document.

12             THE COURT:  All right.  Admitted.

13   Q.   (BY MR. JONAS)  Agent Burns, is there an enlargement of

14   this document that was created?

15   A.   There was.

16   Q.   Is this that enlargement that I am holding up?

17   A.   It is.

18             MR. JONAS:  Your Honor, for the record I will put

19   this on the easel.

20   Q.   (BY MR. JONAS)  Agent Burns, per the Holy Land Foundation

21   computer where this was printed off of, that the FBI found it

22   on, what date was this document created?

23   A.   July of 1999.

24   Q.   And what date does this communique that was sent to the

25   Defendant Mohammad El-Mezain identifying Mahmoud Zahar as a
```

1    member of Hamas?

2    A.    This was 1994.

3    Q.    Five years before this overseas speakers list was

4    created?

5    A.    That is correct.

6    Q.    On this overseas speakers list, do you see Mahmoud

7    Zahar's name anywhere?

8    A.    I do.

9    Q.    What number would that be.  You have the original there.

10   A.    I don't think the original -- The original is not

11   numbered.  That is what I was looking for.

12   Q.    So the numbers were added by the FBI?

13   A.    Yes, that is correct.  No. 41.

14   Q.    No. 41.

15         Agent Burns, I want you to turn on El-Mezain Wiretap

16   No. 1 to page 57, please.

17   A.    I have it.

18   Q.    What is the date of this report, this communique?

19   A.    November 10th, 1994.

20   Q.    And if you can turn to the second paragraph on this same

21   page.  The other paragraphs are noted with a dot next to them

22   on the left.  The second middle paragraph, if you can just

23   read that paragraph?

24   A.    It says, "Israeli sources reported new and sensitive

25   information about the bus bombing operation which took place

1    in the Dizengoff Square in the midst of the commercial area in

2    the city of Tel Aviv last month whose responsibility was

3    claimed by the Hamas movement.  Member of Israeli Parliament,

4    Dayla Yitzhak from the Likud Bloc said that the initial

5    information indicated that parts of the explosive material

6    which disappeared in the mysterious circumstances from an

7    ammunition warehouse of the occupation army in a training camp

8    in the al-Nabi Mousa area near Jericho were used in the

9    bombing operation that took place in bus number 5 in the heart

10   of Tel Aviv.  Yitzhak questioned the reasons behind ignoring

11   the results of the investigation conducted by the Israeli

12   military police into the case of the disappearance of

13   ammunition and explosives from the military camp at the

14   al-Nabi Mousa which occurred last July and August.  Deputy

15   Minister of Defense of the Zionist entity said it has not

16   confirmed that the explosives and the materials that

17   disappeared from the camp have reached the hands of Al-Qassam

18   cells, but he added saying, 'It is difficult to know that.'"

19   Q.    Okay.  Thank you, Agent Burns.

20         I want to move on to another one.  Page 60.

21   A.    Okay.

22   Q.    What is the date of this one?

23   A.    November 13th, 1994.

24   Q.    If we can read the top paragraph of this one, please.

25   A.    "An authorized Palestinian source said that a delegation

1    from the Hamas movement started an official visit to the

2    Syrian capital of Damascus yesterday where it will meet with

3    ranking Syrian officials and a number of leaders from the

4    Palestinian opposition.  The source reported that the

5    delegation includes the head of the Movement's political

6    office, Mousa Abu-Marzouk, and the official spokesman,

7    engineer Ibrahim Ghosheh.  The delegation is scheduled to meet

8    with Syrian Vice President Abd al-Halim Khaddam, and Assistant

9    Secretary General of the Ba'ath Arab Communist Party Abdullah

10   al-Ahmar.  In addition, Abu-Marzouk And Ghosheh will attend

11   the meetings of the leaders of the coalition of the ten

12   opposition factions."

13   Q.    This document identifies the head of the Movement.  What

14   is the Movement?

15   A.    The Islamic Resistance Movement, Hamas.

16   Q.    Okay.  Identifies Mousa Abu Marzook.

17   A.    That is correct.

18   Q.    Is that the same Mousa Abu Marzook that you testified

19   about extensively the past several days?

20   A.    That is the same individual.

21   Q.    And it identifies the official spokesman, engineer

22   Ibrahim Ghousheh.  Have we seen his name in this case?

23   A.    Yes, we have.

24   Q.    And is he on Demonstrative No. 17, this picture?

25   A.    He is in the very center on the second row.

1    Q.   Do you recall --

2         MR. JONAS:  If we can put Hamas letter 1 on the

3    screen real quick.

4    Q.   (BY MR. JONAS)  Do you recognize this letter, Agent

5    Burns?

6    A.   I do.

7    Q.   This is in evidence already, but just remind us what this

8    is.

9    A.   This is a letter from Hamas to the Senate Judiciary

10   Committee regarding the detention by the U.S. government of

11   Mousa Abu Marzook, and it is signed Ibrahim Ghousheh, the

12   Hamas spokesman.

13   Q.   That is consistent with the communique that we just

14   looked at?

15   A.   That is correct.

16        MR. JONAS:  If we can go back to El-Mezain Wiretap

17   No. 1 and I want to jump to page 123.

18        THE WITNESS:  Okay.

19   Q.   (BY MR. JONAS)  What is the date of this report?

20   A.   January 22nd, 1995.

21   Q.   What is it entitled?

22   A.   "A special report about the heroic operation on the

23   intersection of Beit Lod.

24   Q.   Just read for us the first paragraph, please.

25   A.   "Zionist sources mentioned that a big explosion occurred

around 9:30 this morning at the Beit Lod intersection inside

the green line near Tulkarm.  The explosion resulted in no

less than 18 dead and 62 wounded.  Identical Zionist sources

said that the explosion which occurred this morning was the

result of the exploding a booby-trapped white car model Fiat

which was near the bus station and that the explosion was

followed by another one near the station restaurant which

doubled the injuries.  According to the count, the majority of

those killed are male and female recruits who were on their

way to their barracks and posts in the West Bank and the

Zionist entity."

MR. JONAS:  If we can pull up Demonstrative No. 14,

the second page.

Q.   (BY MR. JONAS)  Agent Burns, do you see on this event

timeline of Hamas attacks the bombing you just described in

the communique referenced anywhere?

A.   I do.

Q.   Where is that?

A.   It is referenced in the one that is highlighted, January

22nd, 1995.

Q.   It discusses the Beit Lod double bombing?

A.   It does, although the communique we were just addressing

notes that Hamas also claimed responsibility for the attack.

Q.   Is this the one where there was a joint responsibility

claimed?

1    A.    That is correct.

2    Q.    Did the FBI intercept any phone calls involving any of

3    the Defendants where they discussed this bombing?

4    A.    Yes.

5    Q.    Who was on that call?  Who were the participants?

6    A.    Mohammad El-Mezain and Abdulrahman Odeh.

7    Q.    Do you have before you El-Mezain Wiretap No. 27?

8    A.    I do.

9    Q.    I am sorry.  Not 27; No. 4.  I got the number wrong.

10   A.    I do.

11   Q.    Okay.  Is that the phone call you referenced?

12   A.    Yes.

13   Q.    What is the date of the call?

14   A.    The same date as that fax as the suicide bombing, January

15   22nd, 1995.

16          MR. JONAS:  Your Honor, at this time I would offer

17   into evidence El-Mezain Wiretap No. 4.

18          MR. DRATEL:  Your Honor, same objection as

19   previously made.

20          THE COURT:  Have been overruled and -- Are you also

21   offering 4-A?

22          MR. JONAS:  Yes, No. 4 and 4-A.

23          THE COURT:  Admitted.

24          MR. JONAS:  If we can play that call, please.

25          (Whereupon, El-Mezain Wiretap No. 4 was played,

1    while questions were propounded.)

2    Q.    (BY MR. JONAS)  Can you first identify who AB and UM are?

3    A.    AB is the Defendant Abdulrahman Odeh.  Unknown male is

4    someone who answered the phone, who apparently is a child of

5    the Defendant Mohammad El-Mezain.

6    Q.    Agent Burns, what was happening right around that time

7    with Hamas with regard to the U.S. government?

8    A.    Shortly after this suicide bombing, the United States

9    designated Hamas as a terrorist organization.

10   Q.    Right after the designation, was there another call

11   between the Defendant Odeh and El-Mezain where they discussed

12   concealment of some of the HLF money?

13   A.    Yes.

14   Q.    Do you have before you what has been marked as El-Mezain

15   Wiretap No. 27?

16   A.    I do.

17   Q.    And who is on that call?

18   A.    Mohammad El-Mezain and Abdulrahman Odeh.

19   Q.    What is the date of the call?

20   A.    February 27th, 1995.

21   Q.    How soon after -- I got the exhibit number wrong.

22   No. 12.  Sorry.  My mistake.  El-Mezain Wiretap No. 12, which

23   may be the same call you are referring to.

24   A.    Okay.  It is labeled here No.  27.  So if No. 27 is now

25   No. 12, then I have it.

Q.   Yes, No. 12.  I am sorry.  My last question to you I

believe, you said who the participants were.  The date of the

call was?

A.   The date of the call was February 27th, 1995.

          MR. JONAS:  Your Honor, at this time I would offer

into evidence El-Mezain Wiretap No. 12 wand 12-A.

          MR. DRATEL:  Your Honor, we have to approach on this

one.

          THE COURT:  All right.

          (The following was had outside the hearing of the

          jury.)

          MR. DRATEL:  This is the call having to do with --

          THE COURT:  With the money laundering?

          MR. DRATEL:  Yes.  And the Court had not ruled on

that as of -- You were going to look at it.

          THE COURT:  Remind me of the issue.

          MR. DRATEL:  The issue, it is really threefold.  One

is Mr. El-Mezain was acquitted on the money laundering counts,

so in that context this is really double jeopardy as well as

collateral estoppel.  But, I mean, there is no argument that

he can be part of a money laundering conspiracy at any time

because he was acquitted of all those charges.

     Second is, it really is a prejudicial variance as well

because it gives the Government an opportunity to argue

something about money laundering that is not part of the money

1    laundering charges in the indictment.  The specific money

2    laundering is the payments from Holy Land to the zakat

3    committees, not the structuring, not deposits, not where the

4    contributions are coming from.  It is where the contributions

5    are going to.  So I think that would be a prejudicial

6    variance.

7        Also it is 403 around all of that as well.  And it really

8    doesn't even make structuring because structuring has to be

9    illegal.  I mean, you have to know it is illegal.  It is a

10   willful -- *Ratzlaf* is the Supreme Court case from '95 that

11   establishes that you have to have an illegal purpose to

12   structure, and here this conversation doesn't give any of

13   that, so it really is a 403, the unfair prejudicial value

14   substantially outweighs any probative value.

15       MR. WESTFALL:  I join in that objection; not only

16   the same double jeopardy issues, but on the issue, the fact

17   that it is, you know, it is not an indictment count.  It is

18   not stated in the indictment anywhere.  And it is a serious

19   403 issue, particularly if they intend to refer to it as

20   structuring and have her opine about structuring and all of

21   that, which I think would very much compound the harm under

22   403, rather than just lay the fact out.

23       Saying that this was structuring, drug dealers do this,

24   or whatever she may be ready to talk about, I think would,

25   just like I said, exponentially compound the harm.  I don't

1    know what they intend to do.

2              MS. HOLLANDER:  I will wait.

3              THE COURT:  I think it involves these two.  Of

4    course, it can apply.

5              MS. CADEDDU:  Once again, this is something that I

6    would request a limiting instruction on.

7              MS. HOLLANDER:  Yes, I would, too, and a

8    contemporaneous limiting instruction, if this is going to come

9    in.  It has nothing to do with my client.

10             MR. JONAS:  This has nothing to do with the money

11   laundering charges as charged.  Okay?  What this really is is

12   about a month after Hamas is designated, the Defendants Odeh

13   and El-Mezain talk about cash that Odeh has, HLF cash he has

14   raised that he has, and El-Mezain tells him to structure it --

15   He doesn't use that term, but he talks about there is a form

16   that will be filled out, and they talk about their bank

17   accounts being watched.

18        So our position is this is part of the whole concealment

19   of the conspiracy.  This is all part of that.  Hamas has just

20   been designated.  They know they are being watched.  He tells

21   them not to put all the money in at once because a form is

22   going to be filled out.  So it goes to --

23             THE COURT:  To knowledge and intent.

24             MR. JONAS:  Knowledge, state of mind, intent, all of

25   that.

1      MR. DRATEL:  Mr. El-Mezain was acquitted of that

2  conspiracy.  This is collateral estoppel.  They can't start

3  proving a conspiracy that he was acquitted on.

4      THE COURT:  But as I understand, it is not just the

5  money laundering conspiracy, but --

6      MR. DRATEL:  But he was acquitted of that

7  conspiracy, the '95 conspiracy, too.

8      THE COURT:  But Mr. Odeh --

9      MR. DRATEL:  Then I would ask for a limiting

10  instruction that it not be considered against Mr. El-Mezain.

11      MR. JONAS:  I think it also goes to intent.

12      THE COURT:  That is what I was getting at.  He is

13  arguing that it goes to the bigger conspiracy; not just the

14  money laundering, but the bigger conspiracy of Hamas.

15      MR. DRATEL:  I understand.  But the whole joint

16  venture issue as to why something before it is illegal for Mr.

17  El-Mezain doesn't apply here because they are already alleging

18  there is a conspiracy.  It is not an illegal joint venture.

19  This is between '95 and '97.

20      THE COURT:  We will deal with the limiting

21  instructions later.  I think it comes in.  Certainly it comes

22  in as to Mr. Odeh.  He is offering it for a broader purpose,

23  for the broader conspiracy, and I think it goes to that as

24  well because it is right after the designation to show

25  knowledge.  That is their spin on it.  Of course, you can

argue whatever you want to, but I think that is ultimately up

to the jury.

MR. DRATEL:  Well, I can't argue --

THE COURT:  Well, everybody.

MR. DRATEL:  Also, Your Honor, I just have some

concern about leaving limiting instructions to the point where

they don't have an impact because they are too late in the

case and the evidence has come in and the jury has been

assimilating it in a way without proper direction from the

Court.

THE COURT:  I am just not ready to give those

limiting instructions because I have to make the

determinations of the conspiracy and furtherance of and the

course and scope.  I understand this is a joint venture, but

it is the same rules.  So I am just not ready to give those

limiting instructions.

MR. DRATEL:  But you understand what I am saying is

the joint venture won't apply to this period of time where

they say there is already a conspiracy because Mr. El-Mezain,

he is just not part of it.

THE COURT:  Yes, I understand your argument.

MR. WESTFALL:  How far do you intend to go with it?

MR. JONAS:  I will tell you exactly.  We are going

to play the call, I was going to ask her if she knows what

structuring is -- Let me rephrase that.  I am going to ask

1    Your Honor if you can maybe even instruct the jury not what

2    structuring is, but if in fact more than $10,000 is deposited

3    into an account at one time, that a form is required to be

4    filed with the U.S. government.  I think either she or Your

5    Honor can tell it to the jury.  And then I was going to show

6    her the fact that we have a certified document that shows that

7    no form was filed with regard to this transaction.

8            THE COURT:  So you are not getting into the fact

9    that it is criminal; just that a form is required and that no

10   form was filed.

11           MR. JONAS:  Correct.  If Your Honor even just wants

12   to just let the jury know --

13           MR. WESTFALL:  We can stipulate that cash deposits

14   over $10,000 require a form to be filled out.

15           THE COURT:  Or you can get her to testify and then

16   you can stipulate to it.

17           MR. WESTFALL:  We will stipulate to that.

18           MR. DRATEL:  That there is a requirement.

19           MR. JONAS:  Do you want me to ask her, or just --

20           MR. WESTFALL:  Let's just stipulate.

21           MS. CADEDDU:  Just one other objection for the

22   record.  I think that this is 404(b).  We weren't given notice

23   of it in advance of trial.  So for that reason also.  I mean,

24   it is not -- I am speaking for them, I guess.  It is 404(b)

25   material that they were not given notice of in advance of

1  trial.  It is an extraneous --

2          THE COURT:  Did this come in the last time?

3          MR. JONAS:  No.  We didn't even -- It wasn't part of

4  our plan last time.  It is our position that it is

5  inextricably intertwined with what was going on in this case.

6          MS. HOLLANDER:  I have one other thing when we are

7  finished, while we are here.

8          THE COURT:  Go ahead.

9          MR. WESTFALL:  Your Honor, can we request the jury

10  out so we can hash out kind of the rest of it.  They have been

11  sitting over there for a while.

12          THE COURT:  I don't think we need to send them out

13  for this.  The stipulation is just simply that a deposit or

14  cash --

15          MR. DRATEL:  Cash deposits of more than $10,000 in

16  one day require a form to be filled out.

17          MR. JONAS:  That gets filed with the Government.

18          MR. DRATEL:  Yes.

19          MR. JONAS:  And when the appropriate time comes up

20  after the call --

21          THE COURT:  Why don't you write that out and hand it

22  to them when you get a chance, and you can just read it.

23          MR. WESTFALL:  And then you are going to do the

24  redacted one, the redacted conversations.

25          MR. JONAS:  The one I am about to play?

1          MR. WESTFALL:  Yes.  That is the redacted one.

2          MR. JONAS:  I know there are concerns you have.

3          MR. WESTFALL:  I received two different versions of

4     it.  One is the long one; one is the short one.

5          MR. JONAS:  It is redacted.  I will show you my

6     transcript.  I know what you are thinking of.

7       Just to inform Your Honor, Mr. Odeh made some statements

8     that can be viewed by some people on the jury as racial,

9     racist.

10          MR. WESTFALL:  Racist or realistic depending on

11    where you live.  He was worried about getting mugged because

12    he had the cash by a black guy.

13          MR. JONAS:  So we are mindful of that, and it is not

14    in the transcript.

15       And Mr. Westfall, I will show you the transcript before

16    you play it.

17          MR. WESTFALL:  That is fine.  Well, I want to double

18    check.

19          MS. CADEDDU:  I want to cite a Fifth Circuit case,

20    *United States versus Sumlin*, a 404(b) reversal in the Fifth

21    Circuit from 2007.

22          MS. HOLLANDER:  We join that.

23          MS. MORENO:  Join that objection.  Ask for a

24    limiting instruction, Your Honor.  And again, I don't know if

25    it has been said because I couldn't hear it, but, Your Honor,

1    I think really the limiting instruction whenever it comes, if

2    it comes after the evidence is in, loses its effectiveness.

3          THE COURT:  I am not sure -- The jury has heard a

4    lot of information over the last couple of weeks.  They are

5    going to hear a lot more.  I am not what any effect any of

6    this, if we gave them a limiting instruction, that they would

7    remember later on what it applies to.  I am not worried about

8    that.  And we will give a proper limiting instruction when the

9    time comes.

10          MS. HOLLANDER:  Your Honor, if I can, I would like a

11   continuing objection, because I don't want to have to keep

12   getting up, but Mr. Jonas continually prefaces his questions

13   with long-leading questions, then goes back and replays things

14   the jury has already seen to tie things up.  Now, I mean it is

15   really not proper to introduce something and introduce it

16   again and introduce it again and introduce it again.  He just

17   did it with this Hamas letter.  Everyone of those is prefaced

18   with leading questions.

19          THE COURT:  You might want to watch the leading.  I

20   would allow some of that linking it, because this is a lot of

21   evidence.  And I know the jury is confused, so they are

22   entitled to try to put it together for that jury.  So I am

23   going to give him some latitude.

24          MS. HOLLANDER:  And I get that latitude, too.

25          THE COURT:  Yes.  But watch the leading.  That

1   doesn't entitle you to lead.  But I do think it is proper.  I

2   think it helps the jury to keep things straight, and so I will

3   let that happen.

4           MS. MORENO:  I just wanted to add my voice to that

5   particular issue as well, Your Honor.  I have not been

6   objecting to the leading questions, but I do think that it has

7   gone way over connecting the jury and assisting the jury.  I

8   understand that, and I haven't gotten up on my feet, but this

9   is direct.  It is not cross examination.  And I would ask the

10  Court to --

11          MR. JONAS:  I will try, Your Honor.

12      There is one thing, a housekeeping matter.  This is

13  something I mentioned the other day.  I have got a series of

14  exhibits that I need to admit through Agent Burns for the

15  testimony of later witnesses, and I am getting to the point

16  where I can probably do that, Your Honor.

17          THE COURT:  It is time to do that?

18          MR. JONAS:  Not quite yet, but soon, because I am

19  getting near the end of her testimony.  I may finish with her

20  today.

21          MS. HOLLANDER:  The zakat committee thing?

22          MR. JONAS:  I am talking about another set of

23  exhibits which is on the list that we gave you.  The zakat

24  committee schedules that she is going to testify about are

25  just to show the transactions.  But there is a series of

1  exhibits she is not going to say a word about other than to

2  get them into evidence.

3           THE COURT:  What are they about?

4           MR. JONAS:  Just different things.  There are some

5  phone calls, some of the same phone calls --

6           THE COURT:  That other witnesses will discuss?

7           MR. JONAS:  Yes.  That need to come in through her.

8           MS. CADEDDU:  Why can't we do them when she comes

9  next time?

10           MR. JONAS:  Because some of those witnesses may

11  testify before she comes back next time.

12           MS. CADEDDU:  Are they on the list?

13           MR. JONAS:  Yes, they are.

14           MS. HOLLANDER:  They are on the list, but I am

15  assuming that -- I have talked to Mr. Jonas about this and he

16  agrees to me.  Since we are not really getting into these now,

17  we are not going to cross her on them now.

18           THE COURT:  I understand.

19           MR. JONAS:  But you are confusing something, Ms.

20  Hollander.  There are financial schedules that I am going to

21  end her testimony with which show where the HLF sent the money

22  to the zakat committees, which is the crime here.  And she is

23  going to -- I am going to put those on the screen, and I am

24  going to have her walk through and explain to the jury some of

25  those schedules and the transactions so that the jury

1   understands.  That is one thing.

2          MS. HOLLANDER:  That is what we are not going to

3   cross about.

4          MR. JONAS:  Right.

5          THE COURT:  That is what you are not going to cross

6   about is this second -- If he goes into the zakat committee --

7   You don't want him to cross on that either?

8          MR. JONAS:  Let me just clarify.  Agent Burns is

9   going to come back a second time to testify.  The second

10  testimony she will get into the substance of the zakat

11  committees and how they are related to Hamas.  This sort of

12  sets that up.  So all she is going to say is -- My questions

13  are going to be, "Where did the HLF send its money to?"  And

14  then we will go through, I don't know how many schedules, six

15  or seven, and I will put them on the screen and she will walk

16  the jury through it.

17         THE COURT:  And you won't cross on that either?

18         MR. JONAS:  That is up to them.

19         MS. HOLLANDER:  We prefer not to cross on that.

20         THE COURT:  I think that is a better way to do that.

21         MR. WESTFALL:  Are we going to do all the financial

22  transactions that underlie the indictment with her right now,

23  and we aren't going to be allowed to cross?

24         THE COURT:  Eventually you will.

25         MS. HOLLANDER:  I was going to wait.

1          THE COURT:  He is just getting them in now.

2          MR. JONAS:  I am going to get them in now, and she

3    will get in the second testimony the zakat committee evidence.

4          MS. MORENO:  I am sorry.  I was under a different

5    impression.  I am so sorry, Mr. Jonas.  I was under a

6    different impression.  I thought the whole substance of the

7    zakat evidence you were going to get in the second go round,

8    and I thought you and I discussed that.  Now I am learning you

9    are going to get into the financial transactions that underlie

10   the indictment.

11         MR. JONAS:  Then you misunderstood.

12         MS. MORENO:  If that is true, I would just ask leave

13   of Court that if I decide not to cross her on those

14   transactions, then I can the second time she appears.

15         THE COURT:  That is when she is really going to get

16   into the substance of it.

17         MR. JONAS:  Right now it is just to let the jury

18   know there are these transactions out there going to these

19   zakat committees, and here are some of the documents that

20   support it.

21         THE COURT:  And why do you think you need to put

22   that on before she comes back the second time?

23         MR. JONAS:  In is separate from what I talked about

24   a moment ago.  This is a bridge for us.  The jury has heard a

25   lot of evidence of what is going on here in the United States,

1    and we want to show the jury, look, now they sent this money

2    to the zakat committees, so the jury knows there is something

3    going on overseas, and then she is going to stop.

4            THE COURT:  And then you will establish that you

5    will bring her back later on?

6            MR. JONAS:  Yes.  And she is going to pick up, as

7    well as other witnesses later on, now the money goes to the

8    zakat committees.  What happens?  Who are these zakat

9    committees?  How are they linked to Hamas?

10       And Your Honor, I did not -- You know, I apologize if you

11   misunderstood.

12           THE COURT:  We have had this conversation before,

13   because I remember it.

14           MR. JONAS:  Separate and apart from that there are a

15   series of exhibits that she will not say a word about, other

16   than, "Agent Burns, what is" --

17       THE COURT:  Identify them and offer them.

18           MR. JONAS:  "What is El-Mezain No. 50?"

19       "El-Mezain No. 50 is a phone call."

20       And I offer it into evidence.  I will not pay the phone

21   call.

22       "What is InfoCom No. 50?"

23       "InfoCom No 50 is a document."

24       "I offer it into evidence."

25       She won't say a word about it, but just to get it into

1    evidence so witnesses later on can talk about it.

2            THE COURT:  Okay.

3            MS. HOLLANDER:  When we cross her this time, I may

4    want to on my cross make clear in my cross to her in front of

5    the jury that we are going to be talking about these zakat

6    committees later on that she did all this stuff.

7            MR. JONAS:  That is fine with me.

8            MR. WESTFALL:  Including the financial transactions?

9            MR. JONAS:  She is going -- When she comes back the

10   second time --

11           MS. MORENO:  It is up to the Court to allow it.

12   That is why I ask leave of the Court if you will let me do

13   that.

14           THE COURT:  That is why he is wanting to do it.  You

15   will be entitled to cross at some point.

16           MS. HOLLANDER:  I will cross her later, but I want

17   to bring it up now so the jury doesn't wonder why we are not

18   crossing her on it.

19           THE COURT:  You can do that.

20           MS. CADEDDU:  I do want to register an objection.  I

21   don't know exactly what she is going to testify to the second

22   time around, but I don't think that Agent Burns is qualified

23   to testify that these zakat committees are Hamas, and I would

24   strenuously object to that.  She is not qualified as an

25   expert.  She is the case agent.

                    THE COURT:  Remind me of that before we get to that

point, like at some point --

                    MS. HOLLANDER:  I think he may have mentioned that

today.

                    MR. JONAS:  That she is an expert?

                    MS. HOLLANDER:  No; that these are Hamas.

                    THE COURT:  That these zakat committees are Hamas,

are you planning on getting into that today?

                    MR. JONAS:  No.

                    THE COURT:  Okay.  So just remind me before we get

to that point, and we will take that up outside the presence

of the jury.

                    MS. MORENO:  Finally, Your Honor, I was also under

the impression, because I have asked Mr. Jonas this several

times because I will be the first to cross examine Agent

Burns, when he was going to finish, and I was told it would be

the end of the today.  So I have always anticipated beginning

tomorrow.  Now I hear that perhaps it might be earlier, and I

would ask if we can begin cross examination tomorrow.

                    THE COURT:  Just remind me.  I don't want to break

too early.  But if we are close, then we can go ahead and

break.

                    MR. JONAS:  Are you faulting me for going a little

faster than anticipated?

                    MS. MORENO:  Go as fast as you want, counsel.

1          THE COURT:  Okay.  That is it.  Okay.

2          (The following was had in the presence and hearing

3          of the jury.)

4          MR. JONAS:  I believe I was offering Government's

5   exhibit El-Mezain Wiretap No. 12 and 12-A.

6          THE COURT:  Yes.  And Mr. Dratel, those objections

7   have been noted.  They are overruled.  And No. 12 and 12-A are

8   admitted.

9          MR. JONAS:  Can you play that call?

10          (Whereupon, El-Mezain Wiretap No. 12 was played,

11   while questions were propounded.)

12   Q.   (BY MR. JONAS)  Agent Burns, who is AB and who is MO?

13   A.   AB is the Defendant Abdulrahman Odeh and MO is the

14   Defendant Mohammad El-Mezain.

15   Q.   And it has been a few minutes since I asked you this.

16   What is the date of the call again?

17   A.   It was February 27th, 1995.

18   Q.   And how soon prior to this call was Hamas first

19   designated as a terrorist organization?

20   A.   Hamas was designated on January 24th, 1995, so

21   approximately a month.

22          MR. JONAS:  Your Honor, at this time I would like to

23   read a stipulation of the parties into the record.

24          THE COURT:  All right.

25          MR. JONAS:  By agreement of the parties, "Bank

1   deposits of more than $10,000 in cash in a single day require

2   that a form be filled out, and that form is filed with the

3   U.S. government."

4           THE COURT:  And counsel, you agree with that

5   stipulation?

6           MR. DRATEL:  Yes, Your Honor.

7           THE COURT:  And as I have explained to you before,

8   once the parties have made a stipulation, then you can accept

9   that as a fact without hearing any additional evidence on that

10  point.

11  Q.   (BY MR. JONAS)  Agent Burns, did you look at the HLF bank

12  account for New Jersey to see if in fact cash was deposited on

13  two separate days in the amounts discussed during that phone

14  call?

15  A.   I did.

16  Q.   Do you have HLF Bank Account No. 6?

17  A.   I do.

18  Q.   What is that bank account?

19  A.   This is one of the HLF bank accounts ending in 1581.

20  Q.   Where is that bank account -- What bank is that from?

21  A.   It is from Hudson United Bank, and that is in Paterson,

22  New Jersey.

23          MR. JONAS:  Your Honor, at this time I would offer

24  into evidence HLF Bank Account No. 6.

25          THE COURT:  That is admitted.

```
 1              MR. JONAS:  If we can put just the first page on.
 2    Q.   (BY MR. JONAS)  What is this document?
 3    A.   This is the signature card for the bank account.
 4    Q.   Whose signatures are on the signature card?
 5    A.   For president it appears to be Mohammad El-Mezain, vice
 6    president Shukri Abu Baker, and treasurer Ghassan Elashi,
 7    although I cannot read that first signature for Mohammad
 8    El-Mezain.
 9              MR. JONAS:  If we can turn to page 4 of this
10    exhibit, please.
11    Q.   (BY MR. JONAS)  What does this page represent?
12    A.   This is a deposit slip.
13    Q.   For how much?
14    A.   $8,950.
15    Q.   Was this cash or check?
16    A.   Cash.
17    Q.   What is the date?
18    A.   The same day as the phone call, February 27th, 1995.
19              MR. JONAS:  And page 5, please.
20    Q.   (BY MR. JONAS)  What does this document, this page
21    represent?
22    A.   This is another deposit slip.
23    Q.   For how much?
24    A.   For $8,000.
25    Q.   What is the date of this deposit?
```

A.    February 28th, 1995, the next day.

Q.    Okay.  Do you know if a form was ever filled out with the government and filed with the government reflecting these two cash deposits?

A.    There was no currency transaction report that was filled out relating to this transaction.

Q.    Do you have before you what has been marked as Bank Secrecy Form?

A.    I don't believe I have that one.

MR. JONAS:  Your Honor, may I approach?

THE COURT:  Yes.

Q.    (BY MR. JONAS)  What is that document?

A.    This is a certification of search for Bank Secrecy Act forms.

Q.    It is a certified document?

A.    It is.

Q.    Does it relate to any of the Defendants in this case?

A.    It does; the Defendant Abdulrahman Odeh.

MR. JONAS:  Your Honor, at this time I would offer into evidence Government's Exhibit Bank Secrecy Form.

THE COURT:  Any objections to that?  That is admitted.

MR. JONAS:  If we can put the second page on the screen, please.

Q.    (BY MR. JONAS)  And what does this document reflect?

1    A.    It reflects -- This is from the Internal Revenue Service,

2    the IRS, and it says that the subject is "Certification of

3    search for Bank Secrecy Act forms."  It says, "As the

4    custodian of records, I have conducted a diligent search of

5    the Internal Revenue Service records maintained at the Detroit

6    Computing Center for Abdulrahman Odeh.  The above search

7    indicated no record for the following Bank Secrecy Act forms

8    were filed for the above information for the period of January

9    1st, 1995 through December 31st, 2001."  And included on that

10   is the first document a CTR, which is a currency transaction

11   report.

12        MR. JONAS:  If we can go back to the El-Mezain

13   Wiretap No. 1 which were those communiques we were looking at

14   earlier.

15   Q.   (BY MR. JONAS)  Did the Defendant Mohammad El-Mezain

16   continue to receive these communiques, these reports after

17   Hamas is designated as a terrorist organization?

18   A.    Yes.

19        MR. JONAS:  And if we could turn to page 143.  I am

20   sorry, page 142.

21   Q.   (BY MR. JONAS)  What is the date of this report?

22   A.    April 13th, 1995.

23        MR. JONAS:  And if we can turn to the next page now.

24   Q.   (BY MR. JONAS)  Can you read that paragraph on this page.

25   A.    Yes.  This would be the last paragraph of this report.

1   And it says, "Zionist sources said that representatives of the

2   U.S. Federal Bureau of Investigation will take part in the

3   investigations on the suicide attack which occurred last

4   Sunday near Kfar Darum settlement in the Gaza strip.

5   According to the sources, having the investigators of the U.S.

6   Federal Bureau of Investigation join the investigation is due

7   to the death of an American citizen of a Zionist origin.  The

8   American citizen had come to the Zionist entity to study the

9   Torah in a Jewish religious institute in the city of

10  Jerusalem.  U.S. State Department's spokesman had said that,

11  'Sending representatives of the federal intelligence to the

12  Zionist entity comes in accordance with a U.S. law enacted in

13  1986 which allows the U.S. authorities to investigate

14  "terrorist crimes" carried out against Americans outside the

15  United States and bringing the defendants to trial before

16  American courts.'"

17  Q.   Agent Burns, as an FBI agent are you aware if the FBI

18  travels to other countries to investigate terrorist attacks

19  when Americans are killed?

20  A.   Yes, they are.

21  Q.   And does that include traveling to Israel?

22  A.   Yes.

23  Q.   All right.  Agent Burns, of the faxes that the Defendant

24  Mohammad El-Mezain received regarding Hamas, were any of them

25  in handwriting; in other words, not a printed report like we

1    have seen so far?

2    A.    There were a few that were in handwriting.

3    Q.    If you can turn to page 152.

4    A.    Okay.

5    Q.    What language is that in?

6    A.    That is in Arabic.

7    Q.    Is there a translation done?

8    A.    There is.

9    Q.    And if you will turn to page 154, please.  Is this

10   document -- Does this translation identify where this fax came

11   from or the information came from?

12   A.    Can I see the full page just to confirm?  On the

13   translation it does not, but on the original it has a date and

14   time stamp, and then apparently from the fax machine Gaza

15   Press is located.

16   Q.    Do you know anything about the Gaza Press?

17   A.    Nothing.

18   Q.    Were there additional faxes from the Gaza Press?

19   A.    There may have been one or two.

20   Q.    Turn to page 158.  This is a translation of one.  Is this

21   also from the Gaza Press?

22   A.    It is.

23   Q.    Do these items from the Gaza Press also discuss Hamas?

24   A.    They do.

25   Q.    And even after -- What is the date of this one?

1    A.    May 20th, 1995.

2    Q.    Did the Defendant Mohammad El-Mezain continue to receive

3    faxes, communiques in the same nature of the ones that we have

4    been discussing?

5    A.    Yes.

6    Q.    Okay.  Up through when?  When was the last one that the

7    FBI has?

8    A.    The last fax that we have that is being exhibited?

9    Q.    Yes.

10   A.    Sorry.  The last one in my collection is out of date

11   order, so bear with me.  I want to be accurate.

12   Q.    If it will be easier, let me just hand you the exhibit.

13   A.    Okay.  Thank you.  The latest date that we are exhibiting

14   is June 28th, 1995.

15   Q.    Okay.  You can put that down.

16   A.    Okay.

17   Q.    Agent Burns, did you come across anything in the Holy

18   Land Foundation material where suicide bombers were discussed?

19   A.    Yes.

20   Q.    Do you have before you HLF Search No. 28?

21   A.    I do.

22   Q.    What is that document?

23   A.    This is a transcript of an audiotape.

24   Q.    Was the audiotape found at the HLF?

25   A.    It was.

1    Q.   What is the date?  Do you have a date for it?

2    A.   I don't believe I do.  Let me check my cheat sheet.  It

3    discusses acts inside it that allow you to know that it

4    happened after a certain date, but the tape itself was not

5    dated.

6            MR. JONAS:  Your Honor, at this time I would offer

7    into evidence Government's exhibit HLF Search No. 28.

8            MS. HOLLANDER:  Objection, Your Honor; unless we

9    have some idea of time.

10            THE COURT:  She says you can tell from the tape.

11    Overrule that objection.  Admitted.

12    Q.   (BY MR. JONAS)  Agent Burns, from the content of this

13    audiotape are you able to determine the date?

14    A.   I think it was approximately 1996.

15    Q.   Why do you say that?

16    A.   Again, because of the content of the tape.  It discusses

17    several Hamas activities, including some suicide bombers and

18    also a martyr Yehia Ayyash.

19    Q.   Who is that?

20    A.   He was known as the engineer.  He was Hamas bomb maker

21    basically, and he was killed in early 1996.

22    Q.   So does the content of the tape discuss him being dead

23    already?

24    A.   Yes, it does.

25    Q.   So if this is 1996 or later, is this after or before

1   Hamas was first designated as a terrorist organization by the

2   United States?

3   A.    After.

4   Q.    How many pages does the translation go for?

5   A.    The translation is eight and a half pages long.

6   Q.    I am not going to have you read it, but have you read

7   this prior to testifying today?

8   A.    I have.

9   Q.    Could you just generally summarize what this is about?

10          MR. DRATEL:  Objection, Your Honor.

11          MS. HOLLANDER:  Objection, Your Honor.  That calls

12   for a narrative from the witness.  We ask for a question to

13   the witness.

14          THE COURT:  Overrule that objection.  You may

15   summarize.

16          THE WITNESS:  Okay.  The content of the tape, it

17   includes songs, and in there they are praising people like the

18   engineer bomb maker Yehia Ayyash.  On page 4 they discuss

19   several individuals who are involved in a bombing, Raed

20   Zakarnah Amar Amarnah, things like that.  In here they praise

21   martyrdom, they praise these acts, and describe them as

22   heroes.

23   Q.    What language was the audiotape in?

24   A.    Arabic.

25   Q.    So this is an English translation done by the FBI?

1  A.  That is correct.

2  Q.  Okay.  Where was this found again?

3  A.  This was found in the HLF offices.

4  Q.  Do you know which office?

5  A.  I do not know.

6  Q.  Dallas or New Jersey is my question.

7  A.  I can't tell from the transcript.

8  Q.  Okay.  In addition to the communiques seized by the

9  Defendant El-Mezain regarding the suicide bombing, were there

10  other calls -- We played one call so far.  Were there other

11  calls where the Defendant Mohammad El-Mezain gets a call about

12  a suicide bombing?

13  A.  Yes.

14  Q.  Do you have before you El-Mezain Wiretap No. 7?

15  A.  I do.

16  Q.  And who are the participants on this call?

17  A.  Mohammad El-Mezain and Riyad Mustafa, also known as Abu

18  Ahmad.

19  Q.  What is the date of this call?

20  A.  February 25th, 1996.

21       MR. JONAS:  Your Honor, at this time I would offer

22  into evidence Government's Exhibit El-Mezain Wiretap No. 7.

23       THE COURT:  And that is admitted.

24       MR. JONAS:  If we can play that call, please.

25       (Whereupon, El-Mezain Wiretap No. 7 was played,

1          while questions were propounded.)

2    Q.   (BY MR. JONAS)  Can you identify who the UM, AB, and MO

3    are?

4    A.   UM is an unknown male, AB is Abu Ahmad, and MO is the

5    Defendant Mohammad El-Mezain.

6    Q.   Okay.  Agent Burns, did something happen on that date in

7    Tel Aviv?

8    A.   Yes.

9          MR. JONAS:  If we can pull up Demonstrative No. 14

10   again.

11   Q.   (BY MR. JONAS)  Agent Burns, do you see the February

12   25th, 1996 Jerusalem No. 18 suicide bus bombing?

13   A.   I do.

14   Q.   What was the date of the call in relation to that

15   bombing?

16   A.   It was the same day.  And just to note, I think we said

17   Tel Aviv.  It was Jerusalem instead.  That was the city.

18   Q.   I am sorry.

19        Agent Burns, do you -- In reviewing the body of material

20   that you reviewed, the search warrant material and everything

21   else, did you come across something that was called a Fatwa?

22   A.   I did.

23   Q.   Do you know what a Fatwa is?

24   A.   It is basically an edict, a religious ruling.

25   Q.   And do you have before you what has been marked as HLF

1    Search No. 29?

2    A.    I do.

3    Q.    Where did that document come from?

4    A.    This came from the HLF San Diego office, which is the

5    office of the Defendant El-Mezain.

6    Q.    And was it in a loose piece of paper?  A folder?  How did

7    you find it?

8    A.    There was a folder containing several documents, and the

9    exhibit is the front cover of the folder and one of the

10    documents that was contained therein.

11    Q.    What was the label on the folder?

12    A.    HLF Fatwa, which means HLF edicts.

13            MR. JONAS:  Your Honor, at this time I would offer

14    into evidence HLF Search No. 29.

15            MR. DRATEL:  Objection; hearsay grounds, Your Honor.

16            THE COURT:  And that is overruled, and HLF Search

17    No. 29 is admitted.

18            MR. JONAS:  If we can put the first page on the

19    screen, please.

20    Q.    (BY MR. JONAS)  What is this that we are looking at?

21    A.    That is a copy of the front cover of the folder.  You can

22    see on the tab there at the top where it says HLF Fatwa.

23            MR. JONAS:  The next page, please.

24            THE WITNESS:  And that is the translation of the

25    folder cover.

1          MR. JONAS:  Okay.  Next page, please.

2     Q.    (BY MR. JONAS)  This page that you see here, what is it

3     entitled?

4     A.    Fatwa.

5     Q.    Was this found in English or Arabic?

6     A.    This page was originally in English.

7     Q.    Can you read this document please?

8     A.    Yes.  It says, "Paying zakat to those who work to restore

9     the Shar'a of Allah.

10         "We believe that the meaning of, 'in the path of Allah,'

11    includes supporting Islamic da'wa and making the word of Allah

12    high (prevail).  This is strongly supported because it is a

13    general term that includes jihad with arms to fight the

14    enemies which is more important than other things.  The same

15    term also includes everything that pleases Allah because of

16    the term's generality, and there is nothing to support its

17    specificity to jihad only, therefore it remains a general term

18    that includes all interests of Muslims, especially anything

19    that makes them victorious.

20         "There is no doubt that working to restore Islamic life

21    and to re-establish the Islamic state is a tremendous task and

22    a duty on everyone, to the best of his or her abilities, and

23    if the first opinion or meaning of them in the path of Allah

24    is applied to today's situation, it would mean to support

25    every effort that stops Kufr and its regimes and

1    re-establishes the Islamic state.

2         "It is therefore allowed to pay zakat to those parties,

3    groups, and Islamic societies in the West, for example,

4    because they aspire to restore Islamic life, erase Kufr

5    regimes, and replace them with the sharia'a of Allah.  It is

6    in fact enough that they would most likely influence the

7    realization of that goal even in a partial manner, for that

8    partially would grow through the years to become big, and at

9    that time zakat will be paid to every action that could be

10   considered as a means to reach that goal, because means are

11   considered that same as goals, and whatever is a precondition

12   or requirement to a duty 'wajid' is considered a duty 'wajid'

13   provided that means themselves or Islamically lawful.  This

14   opinion is supported by Sayid Rashid Rida, Dr. Yousef El

15   Karadawi, Sheikh Sayid Sabiq, and others."

16   Q.   Agent Burns, I am going to put back up on the easel

17   Government's HLF Search No. 87.  I don't know if you can see

18   that.

19   A.   I can.

20   Q.   Okay.  What is this document again?

21   A.   That is a list of the HLF's overseas speakers.

22   Q.   The name of the person on the bottom of HLF Search No.

23   29, the Fatwa that you just read, Yousef El Karadawi, is his

24   name anywhere on this overseas speaker list?

25   A.   It is, No. 65, second from the bottom there.

1    Q.    I see that the last name spelled slightly differently.

2    A.    Again, it is just a phonetic translation.  It is

3    pronounced the same way.

4    Q.    Did you find anything else in HLF Search No. 29, the

5    Fatwas, that are connected to the Defendants?

6    A.    Yes.  There was a note attached to this or with this

7    Fatwa.

8    Q.    Was the note in English or Arabic?

9    A.    It was in Arabic.

10   Q.    Did you have it translated?

11   A.    I did.

12         MR. JONAS:  If we can put the note on the page,

13   please, page 4.

14   Q.    (BY MR. JONAS)  Is that it?

15   A.    That is the Arabic version.

16         MR. JONAS:  Page 5, please.

17   Q.    (BY MR. JONAS)  If you can read that.

18   A.    Yes.  It says, "Honorable brother/Rasmi Al Mallah, Abu

19   Omar, may God protect him."

20         After greetings it says, "My greetings to you and to all

21   the brothers working with you in the school.  Attached with

22   this are the copies of the edicts as requested by brother

23   Marawan.  May God reward him, all that is good, to be sent to

24   brother Mufid.

25         "Asking the Almighty One to make you benefit from them

1    and to bring goodness to your hands.

2         "Your brother, Abu Ibrahim.

3         "12/1/1999."

4    Q.   And was Hamas designated as a terrorist organization at

5    this point?

6    A.   It was.

7    Q.   Have you ever seen -- Again, in the body of material that

8    you reviewed from the search warrants, did you come across

9    anything else involving Qaradawi?

10   A.   Yes.

11   Q.   Do you have before you what has been marked as HLF Search

12   No. 30?

13   A.   I do.

14   Q.   What is that item?

15   A.   It is a clipping from a newspaper that includes a

16   photograph of Qaradawi.

17   Q.   Okay.  Where was it found?

18   A.   At the HLF New Jersey office.

19        MR. JONAS:  Your Honor, at this time I would offer

20   into evidence Government's Exhibit HLF Search No. 30.

21        MR. WESTFALL:  No objection, Your Honor.

22        THE COURT:  Admitted.

23        MR. JONAS:  Put that on the screen, please.

24   Q.   (BY MR. JONAS)  Agent Burns, there is writing on the

25   bottom.  Do you see that?

1   A.   I do.

2   Q.   What language is that writing?

3   A.   In Arabic.

4   Q.   Does that Arabic writing describe who is in this picture?

5   A.   It does.

6   Q.   Is that translated?

7   A.   It was.

8   Q.   Do you have the translation before you?

9   A.   On page 2.

10  Q.   Agent Burns, if you can read the translation you have

11  while we keep the picture on the screen.

12  A.   Okay.  The caption under the photo says, "Sheik Hasan

13  Nasrallah is between the Muslim Egyptian preacher Sheik Yussif

14  al-Qaradawi and the official in Hamas movement Khaled Mishal

15  during their partition in the Islamic National Conference in

16  Beirut on Friday (Reuters.)".

17  Q.   Have we seen Khalid Mishal in this case before?

18  A.   We have.

19  Q.   For the record, I am putting up Demonstrative No. 17.  Is

20  he on this chart of Hamas leaders in the '90s?

21  A.   He is closest to me on the top row.

22  Q.   The individual I am pointing to?

23  A.   That is correct.

24  Q.   And then on this picture where would he be on this

25  newspaper clipping that was found in New Jersey?

```
1    A.    He is on the left.

2    Q.    According to the translation you read, which one would be

3    Yousef Qaradawi?

4    A.    The individual on the right with the glasses.

5    Q.    Was there anything else, any other pictures or anything

6    of that nature found at the New Jersey office that references

7    any Hamas leaders?

8    A.    Yes.

9    Q.    Do you have before you what has been marked as HLF Search

10   No. 31?

11   A.    I do.

12   Q.    And without describing the contents, what is that

13   document?

14   A.    It is a flier that was taken from the HLF New Jersey

15   office containing photographs of a Hamas individual.

16             MR. JONAS:  Your Honor, at this time I would offer

17   into evidence HLF Search No. 31.

18             MR. WESTFALL:  No objection, Your Honor.

19             THE COURT:  Admitted.

20             MR. JONAS:  If we can put that on the screen,

21   please.

22   Q.    (BY MR. JONAS)  Was this in English when the FBI found

23   it?

24   A.    It was.

25   Q.    What does this say?
```

```
1    A.   It says it was published by the Islamic Association for

2    Palestine in North America.  And to the right you can see

3    where it says, "One year anniversary of imprisonment Ahmed

4    Yassin."  And it indicates he was imprisoned May 18, 1989

5    through May 18, 1990, which would be the date of this because

6    his imprisonment extended past that date.

7    Q.   What year was this found?

8    A.   This was found in December of 2001 in Abdulrahman Odeh's

9    office.

10             MR. JONAS:  One moment, Your Honor?

11             THE COURT:  Yes.

12             MR. JONAS:  Your Honor, could we take our recess at

13   this time?  I know it is a few minutes early, but I just need

14   to confirm one thing.

15             THE COURT:  Let's take a recess.  Be back at 3:30.

16             (Whereupon, the jury left the courtroom.)

17             THE COURT:  All right.  We are in recess until 3:30.

18                      (Brief recess.)

19             THE COURT:  Mr. Jonas?

20             MR. JONAS:  Thank you, sir.

21   Q.   (BY MR. JONAS)  Agent Burns, we were talking about items

22   found in New Jersey office of HLF.

23   A.   Yes.

24   Q.   Do you have with you HLF Search No. 32?

25   A.   I believe that is a videotape.
```

1   Q.   Do you know where that videotape was found?

2   A.   The HLF New Jersey office.

3           MR. JONAS:  Your Honor, at this time I would offer

4   HLF Search No. 32.

5           THE COURT:  Admitted.

6           MR. JONAS:  I offered Baker Wiretap No. 7 and

7   El-Mezain Wiretap No. 7.  I wanted to make sure I also offered

8   No. 7-A.

9           THE COURT:  And you had not, so you are offering No.

10  7-A?

11          MR. JONAS:  Right.

12          THE COURT:  That is admitted.

13          MR. JONAS:  If we can play HLF Search No. 32.

14          (Whereupon, HLF Search No. 32 was played, while

15          questions were propounded.)

16  Q.   (BY MR. JONAS)  Agent Burns, are you able to date this

17  videotape?

18  A.   This videotape came from the period of the first

19  Intifada, so sometime between 1989 and 1992.

20  Q.   Agent Burns, you said you were able to date it

21  approximately '89 to '92, but when was this tape seized?

22  A.   December of 2001.

23  Q.   Agent Burns, were there any phone calls intercepted by

24  the FBI between the Defendants where they discussed any Hamas

25  leaders in the news?

1    A.    Yes.

2    Q.    Do you have before you Baker Wiretap No. 37?

3    A.    I do.

4    Q.    And what is that?

5    A.    This is a phone call between Defendants Shukri Abu Baker

6    and Ghassan Elashi.

7    Q.    What is the date of the phone call?

8    A.    August 2nd, 1995.

9         MR. JONAS:  Your Honor, at this time I would offer

10   into evidence Baker Wiretap No. 37 and 37-A.

11        THE COURT:  That is admitted.

12        MR. JONAS:  If we can play that phone call, please.

13        (Whereupon, Baker Wiretap No. 37 was played, while

14   questions were propounded.)

15   Q.    (BY MR. JONAS)  Agent Burns, who is the SH and who is the

16   GH?

17   A.    SH is the Defendant Shukri Abu Baker and GH is the

18   Defendant Ghassan Elashi.

19   Q.    With regard to Hamas and their leaders, what was going on

20   at this time, at the time of this call?

21   A.    Hamas leader Mousa Abu Marzook, who we have talked about

22   extensively, was arrested the end of July of 1995 in New

23   York's JFK Airport by Immigration, and he was placed into

24   extradition proceedings.

25   Q.    And what was the date of this call in relationship to

1  that?

2  A.   August 2nd, 1995, so shortly thereafter.

3           MS. MORENO:  Your Honor, may we approach briefly?

4           THE COURT:  Yes.

5           (The following was had outside the hearing of the

6           jury.)

7           MS. MORENO:  I actually had a question of counsel,

8  because I can't tell from this particular excerpt.  Is this a

9  portion of the entire transcript?

10          MR. JONAS:  I believe so, yes.

11          MS. MORENO:  Okay.  I wasn't sure of that, Your

12 Honor, because it is a bit confusing to go back and forth.

13     I would just bring to the Court's attention that I would

14 in cross examination be raising a 106 issue with the witness

15 on this particular transcript.

16          THE COURT:  That is fine.  You can go into it.

17          MS. MORENO:  I couldn't tell from my notes, but I

18 thought that it was a portion, but I couldn't tell.

19          MR. JONAS:  From a practical point, if there are

20 portions that Ms. Moreno wants to raise to question Agent

21 Burns and you want us to play that portion, we need to know in

22 advance because we are not going to have it ready to go at

23 that very second.

24          MS. HOLLANDER:  I am assuming we can do the 106 on

25 cross and just have her read them.

1          MR. MYSLIWIEC:  Use the transcripts.

2          MR. JONAS:  That is fine.  Of course, we may object.

3    It may not meet the grounds for 106.  But putting that aside,

4    if you want us to play portions I need advanced notice.

5          MS. MORENO:  I just couldn't tell, because I was

6    trying to match up the different conversations.  So I

7    apologize, but I just wanted to clear it up.

8          THE COURT:  All right.

9          MS. MORENO:  Thank you.

10          (The following was had in the presence and hearing

11          of the jury.)

12   Q.   (BY MR. JONAS)  Agent Burns, in your review of the

13   materials seized during the various search warrants, did you

14   come across a particular article that was read by the

15   Defendant Ghassan Elashi?

16   A.   I did.

17   Q.   Do you have before you InfoCom Search No. 73?

18   A.   I do.

19   Q.   What is that item?

20   A.   This is a copy of the article that the Defendants Baker

21   and Elashi were discussing.

22   Q.   Where was this found?

23   A.   At InfoCom, Ghassan Elashi's company.

24   Q.   When was it found?

25   A.   In September of 2001.

1        MR. JONAS:  Your Honor, at this time I would offer

2   into evidence Government's exhibit InfoCom Search No. 73.

3        MS. MORENO:  Objection to hearsay, Your Honor.

4        THE COURT:  That is overruled, and InfoCom Search

5   No. 73 is admitted.

6   Q.   (BY MR. JONAS)  Is that the copy of the article on the

7   screen?

8   A.   It is, the first half.

9   Q.   The first half of the screen?

10  A.   That is correct.

11  Q.   All right.  Agent Burns, were there other phone calls

12  between the Defendants where they discussed Hamas being

13  referenced in the media?

14  A.   Yes.

15  Q.   Do have before you Baker Wiretap No. 10?

16  A.   I do.

17  Q.   Who are the participants on that call?

18  A.   The Defendants Shukri Abu Baker and Ghassan Elashi.

19  Q.   And what is the date of that call?

20  A.   August 1st, 1997.

21  Q.   What was happening with Hamas around that time, if you

22  know?

23  A.   Two individuals had been arrested in New York in a

24  bombing plot, and in the media it was initially published that

25  they were part of Hamas.

1    MR. JONAS:  Your Honor, at this time I would offer

2  into evidence Government's Exhibit Baker Wiretap No. 10 and

3  10-A.

4         MS. HOLLANDER:  No further objections, Your Honor.

5         THE COURT:  Those two exhibits are admitted.

6         MR. JONAS:  If we can play the segments of that

7  call.

8         (Whereupon, Baker Wiretap No. 10 was played, while

9  questions were propounded.)

10  Q.  (BY MR. JONAS)  Agent Burns, could you just tell us who

11  GH and SH are in this call?

12  A.   GH is the Defendant Ghassan Elashi and SH is Shukri Abu

13  Baker.

14         MR. JONAS:  Your Honor, at this time I need to do

15  the housekeeping matter we talked about with Agent Burns.

16         THE COURT:  Yes.

17  Q.  (BY MR. JONAS)  Agent Burns, I want to just have you

18  identify certain exhibits, if you can, to offer them into

19  evidence, but I don't believe you will be testifying about

20  these particular exhibits.  And if you need to see them or a

21  listing of them to refresh your memory as to what they are,

22  that is fine.

23      HLF Bank Account No. 1.

24  A.   That is one of the HLF's bank accounts.

25         MR. JONAS:  Your Honor, at this time I would offer

1    into evidence HLF Bank Account No. 1.

2            THE COURT:  Any objection?  Admitted.

3            MR. JONAS:  Your Honor, if I may, so we don't have

4    to keep bringing these exhibits up to Agent Burns, the list

5    may refresh her recollection as to what the item is, so if I

6    may hand her my list.

7            THE COURT:  All right.

8    Q.   (BY MR. JONAS)  HLF Search No. 11 and HLF Search No. 12.

9    A.   HLF Search No. 11 is a phone bill and No. 12 is an

10   Airfone bill.

11   Q.   Whose phone bills are those?

12   A.   The first is for the HLF and the second is for El-Mezain,

13   the Defendant.

14           MR. JONAS:  I offer into evidence HLF Search No. 11

15   and HLF Search No. 12.

16           THE COURT:  Those are admitted.

17   Q.   (BY MR. JONAS)  Islamic Relief Account No. 1.

18   A.   That is a bank account for the Islamic Relief Committee.

19   Q.   Does that relate to the schedule we looked at the other

20   day of the payments to the Islamic Relief Committee?

21   A.   Yes, it is.

22           MR. JONAS:  Your Honor, I would offer into evidence

23   Islamic Relief Account No. 1?

24           THE COURT:  Admitted.

25   Q.   (BY MR. JONAS)  HLF Search No. 111.

1    A.    That is a videotape.

2    Q.    Taken from where?

3    A.    Taken from the HLF offices.

4         MR. JONAS:  Your Honor, I would offer into evidence

5    HLF Search No. 111.

6         THE COURT:  Admitted.

7    Q.  (BY MR. JONAS)  HLF Search No. 125.

8    A.    Also a videotape taken from the HLF offices.

9         MR. JONAS:  I offer into evidence HLF Search

10   No. 125.

11        THE COURT:  Admitted.  .

12   Q.  (BY MR. JONAS)  Mushtaha Search No. 8.

13   A.    That is a videotape as well taken from the yard of Fawaz

14   Mushtaha.

15        MR. JONAS:  I offer into evidence Mushtaha Search

16   No. 8.

17        THE COURT:  Admitted.

18   Q.  (BY MR. JONAS)  HLF Search No. 49?

19   A.    These are records taken from the HLF or during the HLF

20   search warrant relating to some financial transactions that we

21   will be discussing.

22        MR. JONAS:  I offer into evidence HLF Search No. 49.

23        THE COURT:  Admitted.

24        MS. HOLLANDER:  Your Honor, we are not objecting,

25   assuming that when we get a chance to look at them that they

1    are accurate.

2              THE COURT:  All right.  And you will have that

3    chance.

4              MS. HOLLANDER:  Thank you.

5    Q.   (BY MR. JONAS)  HLF Foreign Account No. 2.

6    A.   That would be an HLF foreign bank record.

7              MR. JONAS:  Your Honor, offer into evidence HLF

8    Foreign Account No. 2.

9              THE COURT:  Admitted.

10   Q.   (BY MR. JONAS)  HLF Foreign Account No. 6?

11   A.   That is also an HLF foreign bank account record.

12             MR. JONAS:  Your Honor, offer into evidence HLF

13   Foreign Account No. 6.

14             THE COURT:  Admitted.

15             MR. JONAS:  I apologize for jumping around, Agent

16   Burns.  My list isn't in a great order.  HLF Search No. 62.

17   A.   These are documents seized during the HLF search warrant

18   relating to financial transactions that we will discuss.

19             MR. JONAS:  Your Honor, I offer into evidence HLF

20   Search No. 62.

21             THE COURT:  Admitted.

22   Q.   (BY MR. JONAS)  HLF Search No. 76?

23   A.   This is correspondence relating to an organization to

24   whom the HLF was sending money, seized during an HLF search

25   warrant.

```
1              MR. JONAS:  I offer into evidence HLF Search No. 76.
2              THE COURT:  Admitted.  .
3    Q.   (BY MR. JONAS)  HLF Search No. 84?
4    A.   This is a manual relating to an entity to whom the HLF
5    was sending money taken from the HLF search warrant.
6              MR. JONAS:  I offer into evidence HLF Search No. 84.
7              THE COURT:  Admitted.
8    Q.   (BY MR. JONAS)  HLF Search No. 83?
9    A.   This is material taken from the HLF search warrant
10   relating to an individual within whom the HLF had a financial
11   relationship.
12             MR. JONAS:  I offer into evidence HLF Search No. 83.
13             THE COURT:  Admitted.
14   Q.   (BY MR. JONAS)  HLF Search No. 82?
15   A.   These are documents taken from the HLF or during the HLF
16   search warrant relating to an entity with whom the HLF had
17   financial connections.
18             MR. JONAS:  I offer into evidence HLF Search No. 82.
19             THE COURT:  Admitted.
20   Q.   (BY MR. JONAS)  HLF Search No. 81?
21   A.   Same thing.  HLF search warrant material that relates to
22   financial transactions with an entity.
23             MR. JONAS:  I offer into evidence HLF Search No. 81.
24             THE COURT:  Admitted.
25   Q.   (BY MR. JONAS)  HLF Search No. 62.  I am sorry Before I
```

```
1    do that -- I am trying to keep some sort of order here.  HLF
2    Search No. 77?
3    A.   This is a document taken during the HLF search warrant
4    relating to an entity with whom the HLF had financial
5    transactions.
6             MR. JONAS:  I offer into evidence HLF Search No. 77.
7             THE COURT:  Admitted.  .
8    Q.  (BY MR. JONAS)  HLF Search No. 75?
9    A.   This is a videotape taken from the HLF offices.
10            MR. JONAS:  I offer into evidence HLF Search No. 75.
11            MS. HOLLANDER:  We will have objections later, Your
12   Honor.
13            THE COURT:  That is admitted.
14   Q.  (BY MR. JONAS)  HLF Search No. 70?
15   A.   This is also a videotape taken during the HLF search
16   warrant.
17            MR. JONAS:  I offer into evidence HLF Search No. 70.
18            THE COURT:  Okay.  Admitted.
19            MR. JONAS:  HLF Search No. 62.
20            THE COURT:  I think you started off with No. 62.  I
21   show that in.
22            MR. JONAS:  Thank you, sir.
23   Q.  (BY MR. JONAS)  HLF Search No. 49.
24            MR. JONAS:  I am sorry, Your Honor.  I am told that
25   is already in.
```

```
 1              THE COURT:  Yes.

 2              MR. JONAS:  That saves that one.

 3   Q.  (BY MR. JONAS)  HLF Search No. 125.

 4              MR. JONAS:  That is in?

 5   Q.  (BY MR. JONAS)  Okay.  HLF Search No. 113?

 6   A.   This is a videotape taken during the HLF search warrant.

 7              MR. JONAS:  I offer into evidence HLF Search No.

 8   113.

 9              THE COURT:  Admitted.

10   Q.  (BY MR. JONAS)  HLF Search No. 109.  I think that one is

11   in.  HLF Search No. 105?

12   A.   This is material taken during the HLF search warrant

13   relating to the Islamic Center of Gaza.

14              MR. JONAS:  I offer into evidence HLF Search No.

15   105.

16              THE COURT:  Admitted.

17   Q.  (BY MR. JONAS)  HLF Search No. 32.

18              THE COURT:  I show that one in.

19   Q.  (BY MR. JONAS)  Okay.  HLF Search No. 36.

20   A.   HLF Search No. 36 are documents relating to financial

21   transactions taken from the HLF during the search warrant.

22              MR. JONAS:  I offer into evidence HLF Search No. 36.

23              THE COURT:  Admitted.

24   Q.  (BY MR. JONAS)  InfoCom Search No. 28?

25              MS. HOLLANDER:  It is in.
```

1           MR. JONAS:  Okay.

2      Q.  (BY MR. JONAS)  InfoCom Search No. 31?

3      A.   This is a set of correspondence from the Defendant Shukri

4      Abu Baker taken during the InfoCom search warrant.

5           MR. JONAS:  I offer into evidence InfoCom Search

6      No. 31.

7           THE COURT:  Admitted.  .

8      Q.  (BY MR. JONAS)  InfoCom Search No. 47?

9      A.   These are documents relating to HLF financial

10     transactions taken from InfoCom.

11          MR. JONAS:  I offer into evidence InfoCom Search

12     No. 47.

13          THE COURT:  Admitted.

14     Q.  (BY MR. JONAS)  InfoCom Search No. 58 through 65.

15     A.   InfoCom Search?

16     Q.   Yes.  InfoCom Search No. 58 through 65.

17     A.   Okay.  InfoCom Search No. 58 through 64 are letters

18     relating to entities with whom the HLF had a financial

19     relationship.

20          MR. JONAS:  I offer into evidence InfoCom search 58,

21     59, 60, 61, 62, 63, and 64.

22          MS. HOLLANDER:  Your Honor, so I don't have to keep

23     getting up, we may have objections to all of these that we

24     will raise at a later time.

25          THE COURT:  We will give you that opportunity.

1    Those are admitted for now.

2              MS. HOLLANDER:  Thank you.

3    Q.   (BY MR. JONAS)  InfoCom Search No. 65?

4    A.   That is a videotape taken from InfoCom.

5              MR. JONAS:  I offer into evidence InfoCom Search

6    No. 65.

7              THE COURT:  That is admitted.  .

8    Q.   (BY MR. JONAS)  InfoCom Search No. 79.

9    A.   This is also a videotape taken during the InfoCom search

10   warrant.

11             MR. JONAS:  I offer into evidence InfoCom Search

12   No. 79.

13             THE COURT:  Admitted.  .

14   Q.   (BY MR. JONAS)  Elbarasse Search No. 22.

15   A.   This is a letter to the Defendant Shukri Abu Baker taken

16   during the Elbarasse search warrant.

17             MR. JONAS:  Your Honor, I offer into evidence

18   Elbarasse Search No. 22.

19             THE COURT:  Admitted.  .

20   Q.   (BY MR. JONAS)  Okay.  Baker Wiretap No. 13 and 13-A.

21   A.   This is a conversation that was recorded during the Baker

22   Wiretap No. 13 that was from January of 1997.

23             MR. JONAS:  Okay.  Your Honor I offer into evidence

24   Baker Wiretap No. 13 and 13-A.

25             MS. HOLLANDER:  It was a conversation?  I thought it

1    was a fax.  Is it a fax?

2              THE WITNESS:  I am sorry.  It is a fax.  There is no

3    13-A.

4              MR. JONAS:  Your Honor, I offer into evidence Baker

5    Wiretap No. 13.

6              THE COURT:  All right.  And that is admitted.

7    Q.   (BY MR. JONAS)  Baker Wiretap 34 and 34-A.  I think if

8    you go to the very back you may find it.

9    A.   This is a conversation, the transcript and audio for a

10   conversation from Shukri Abu Baker's wiretap dated December

11   2nd, 1999.

12             MR. JONAS:  I offer into evidence Baker Wiretap No.

13   34 and 34-A.

14             THE COURT:  Admitted.

15   Q.   (BY MR. JONAS)  Baker Wiretap No. 38 and 38-A.

16   A.   This is also a conversation recorded on the Shukri Abu

17   Baker wiretap from December 3rd, 1999.

18             MR. JONAS:  I offer into evidence Baker Wiretap No.

19   38 and 38-A.

20             THE COURT:  Admitted.

21   Q.   (BY MR. JONAS)  And finally El-Mezain Wiretap No. 13.

22   A.   No. 13 and 13-A are the transcript and audio of a

23   conversation captured on the El-Mezain wiretap dated October

24   28, 1994.

25             MR. JONAS:  Offer into evidence El-Mezain Wiretap

1   No. 13 and 13-A.

2            THE COURT:  Admitted.

3            MR. JONAS:  Okay.  Your Honor, thank you very much.

4   That takes care of that housekeeping matter.

5            THE COURT:  All right.

6   Q.   (BY MR. JONAS)  Agent Burns, you have identified a number

7   of ways that the HLF and individual Defendants have raised

8   funds.  Did you examine where those funds went?

9   A.   I did.

10  Q.   Okay.  Did you create schedules of where those funds

11  went?

12  A.   I assisted in creating schedules, yes.

13  Q.   Can you tell us how you divided that up?

14  A.   Yes.  In preparing the schedules, we made them similar to

15  those charts that we talked about earlier on where there was a

16  line for each transaction, and they were in chronological

17  order with the date being first, the payee, you know, all

18  those different things on the chart.

19  Q.   I am sorry.  I don't think my question was clear.

20  A.   I am sorry.

21  Q.   That is okay.  It is my fault.  Did you create schedules

22  for every penny that the HLF sent?

23  A.   No, we did not.

24  Q.   Did you just focus exclusively on where some of the money

25  went?

1    A.    Yes.

2    Q.    How did you identify where to focus on where some of that

3    money went?

4    A.    We looked at the primary recipients of the HLF's money,

5    organizations in the West Bank and Gaza primarily, and

6    identified specific entities that we focused on.

7    Q.    For purposes of your testimony, did you create a chart

8    with some of these entities that the HLF sent money to in the

9    West Bank and Gaza Strip?

10   A.    We did.

11   Q.    Do you have before you those charts which are identified

12   as payments to certain organizations?

13   A.    I do.

14   Q.    Let's take the first one which is marked Payments to

15   IC/Hebron.  Do you have that before you?

16   A.    I do.

17   Q.    And what is that based on?

18   A.    The chart is based on bank records and search warrant

19   material.

20   Q.    Does this chart summarize the search warrant material and

21   the bank records that support these financial transactions?

22   A.    Yes.

23        MR. JONAS:  Your Honor, at this time I would offer

24   into evidence exhibit marked Payments to IC/Hebron.

25        MS. HOLLANDER:  Your Honor, again, these are going

1   to come up later, and we would like to reserve our objections.

2           THE COURT:  That is admitted conditionally.

3           MS. HOLLANDER:  Thank you, Your Honor.

4           THE COURT:  You have that under your summary charts?

5   Is that where you have it listed?

6           MR. JONAS:  Yes, sir.

7   Q.   (BY MR. JONAS)  Agent Burns, what does it say on the

8   sticker?

9   A.   The sticker says Payments to IC/Hebron.

10  Q.   And on the top of the chart what does it say?

11  A.   Payments to Islamic Charitable Society/Hebron.

12  Q.   Was Islamic Charitable Society too big to fit on the

13  sticker?

14  A.   It was.

15          MR. JONAS:  Your Honor, at this time I would offer

16  the into evidence the summary chart Payments to IC/Hebron.

17          THE COURT:  And that is admitted.

18          MR. JONAS:  If we could put the first page on the

19  screen, please.

20  Q.   (BY MR. JONAS)  This chart is based upon bank records and

21  search warrant material, Agent Burns?

22  A.   That is correct.

23          MR. JONAS:  Your Honor, I will move into evidence

24  those items.

25  Q.   (BY MR. JONAS)  Agent Burns, what is HLF Search No. 33?

1    A.    Those are search warrant materials that relate to the

2    transaction on this schedule.

3         MR. JONAS:  Your Honor, I will offer into evidence

4    HLF Search No. 33.

5         THE COURT:  Why don't just you have her identify

6    each of those that are supporting documents, and we will do

7    that all at once.

8    Q.    (BY MR. JONAS)  I know some of them repeat, but can you

9    say them one time?

10   A.    Okay.  I will try.  And I don't have a list of what has

11   already been admitted, so bear with me.

12        HLF Bank Account No. 3 would be an HLF bank account.

13   InfoCom Search No. 13 would be records obtained from InfoCom

14   during the search warrant relating to these transactions.

15        If we can scroll down.  I think those are all the same

16   exhibits.

17        If we could go to the next page.  InfoCom Search No. 12

18   are records obtained during the InfoCom search warrant that

19   relate to this transaction.  HLF Bank Account No. 1, again,

20   bank records of the HLF relating to these transactions.

21        If we can go to -- I am looking to see if there are any

22   additional exhibits.  Page 4.

23   Q.    (BY MR. JONAS)  Do you see any foreign bank accounts?

24   A.    I just found one on page 4.  The Islamic charity account,

25   which would be bank records relating to the Islamic Charitable

1    Society of Hebron.

2    Q.   Okay.

3    A.   I see a Bank One WRES.  It would be bank records relating

4    to these transactions.

5    Q.   Okay.

6         MS. HOLLANDER:  Can you say that again, please?  I

7    am sorry.  I was writing the last one.

8         THE WITNESS:  It says Bank One WRES at the bottom of

9    page 4.

10   Q.   (BY MR. JONAS)  Is that supposed to be wires?

11   A.   It probably is.  I can't see the I on my copy.

12   Q.   Is that all you identified?

13   A.   I want to make sure there are no others on page 7.  That

14   appears to be it.

15        MR. JONAS:  Your Honor, at this time I would offer

16   into evidence I think the ones that have not been admitted

17   already, HLF Search No. 33, InfoCom Search No. 12, Bank One

18   Wires, the exhibit number is Bank One Wires, the Islamic

19   Charity Account, which is a bank account for the Islamic

20   charitable account of Hebron.

21        THE WITNESS:  Excuse me, Mr. Jonas.  This chart is

22   quite lengthy, so just bear with me for a second.  There was

23   HLF Foreign Account No. 4 we have not mentioned, which are HLF

24   foreign bank records relating to these transactions.  And I

25   believe HLF Foreign Account No. 5, again an HLF foreign bank

1    record relating to these transactions.

2         MR. JONAS:  So I offer in addition HLF Foreign

3    Account No. 4 and 5?

4         THE WITNESS:  And I see HLF Foreign Account No. 6

5    and 8, again relating to this.

6         MR. JONAS:  And HLF Foreign Account No. 6 and 8.

7         THE COURT:  Why don't you take some time and just

8    put -- I am not sure I have it all right.

9         MR. JONAS:  Can I propose another way?  I have got a

10   little bit of a cheat sheet of my own.  If I can just go

11   through those with Agent Burns.  And this covers not just this

12   schedules but the additional schedules I am about to show her.

13        THE COURT:  At some point, so counsel can have all

14   this written down.

15        MR. JONAS:  Your Honor, I was just requested to go

16   slow.  So I am going to try to admit all the bank records and

17   the search warrant material that support the financial

18   transactions, get them out of the way, and then I will move

19   onto the schedules.

20        THE COURT:  Right.

21        MR. JONAS:  Thank you, sir.

22   Q.  (BY MR. JONAS)  Agent Burns, do you still have the

23   exhibit list that I handed you before so you can identify what

24   these documents are as we go through them?

25   A.   Yes, I do.

1        MR. JONAS:  And I apologize, Your Honor, if I

2   identify something that has already been admitted.

3   Q.   (BY MR. JONAS)  Agent Burns, InfoCom Search No. 77?

4   A.   These are documents relating to financial transactions of

5   the HLF.

6        MR. JONAS:  I offer into evidence InfoCom Search

7   No. 77.

8        THE COURT:  Admitted.

9        MS. MORENO:  Counsel, are we still on the IC/Hebron?

10       MR. JONAS:  No, ma'am.  I am just admitting all the

11  financials now, both search warrant and bank accounts, to

12  cover all the schedules that are coming up in the next few

13  minutes.

14       MS. HOLLANDER:  And these are part of the

15  conditional admissions?

16       THE COURT:  Yes.

17  Q.   (BY MR. JONAS)  HLF Search No. 48.

18  A.   Documentation relating to the HLF's financial

19  transactions.

20       MR. JONAS:  Offer into evidence HLF Search No. 48.

21       THE COURT:  Admitted.

22  Q.   (BY MR. JONAS)  HLF Foreign Account No. 2.

23  A.   That is an HLF foreign bank account.

24  Q.   When you say foreign bank account, can you describe what

25  you mean?

1   A.   A bank account that the HLF had somewhere else, and in

2   this instance it would be either the West Bank or Gaza.

3          MR. JONAS:  I offer into evidence HLF Foreign

4   Account No. 2.

5          THE COURT:  Admitted.

6   Q.  (BY MR. JONAS)  InfoCom Search No. 19?

7   A.   Documents relating to the HLF financial transactions.

8          MR. JONAS:  Offer into evidence InfoCom Search

9   No. 19.

10         THE COURT:  Admitted.

11   Q.  (BY MR. JONAS)  HLF Search No. 41?

12   A.   Documents relating to HLF financial transactions.

13         MR. JONAS:  Offer into evidence HLF Search No. 41.

14         THE COURT:  Admitted.

15         MR. JONAS:  Your Honor, HLF Foreign Account No. 4

16   and 5 are in?

17         THE COURT:  Yes.

18   Q.  (BY MR. JONAS)  InfoCom Search No. 21?

19   A.   Documents relating to HLF financial transactions.

20         MR. JONAS:  Offer into evidence InfoCom Search

21   No. 21.

22         THE COURT:  Admitted.

23   Q.  (BY MR. JONAS)  Islamic Association of Gaza Account.

24   A.   That is a foreign bank record relating to the Islamic

25   Association in Gaza with which the HLF had financial

1    transactions.

2            MR. JONAS:  Offer into evidence Islamic Association

3    of Gaza Account.

4            THE COURT:  Admitted.

5    Q.   (BY MR. JONAS)  HLF Search No. 43.

6    A.   Documents relating to the HLF financial transactions.

7            MR. JONAS:  Offer into evidence HLF Search No. 43.

8            THE COURT:  Admitted.

9    Q.   (BY MR. JONAS)  InfoCom Search No. 57.

10   A.   This is a videotape.

11   Q.   Does it pertain to financial transactions in any way?

12   A.   It does.  It relates to financial transactions at the

13   HLF.

14           MR. JONAS:  I offer into evidence InfoCom Search

15   No. 57?

16           THE COURT:  Admitted.

17   Q.   (BY MR. JONAS)  HLF Search No. 33?

18   A.   I am sorry.  You said No. 33?

19   Q.   HLF Search No. 33.

20   A.   Documents relating to HLF financial transactions.

21           MR. JONAS:  Offer into evidence HLF Search No. 33.

22           THE COURT:  Admitted.

23   Q.   (BY MR. JONAS)  InfoCom Search No. 13?

24   A.   Documents relating to HLF financial transactions.

25           MR. JONAS:  I Offer into evidence InfoCom Search

1    No. 13.

2              THE COURT:  Admitted.

3              MR. JONAS:  InfoCom Search No. 12 I believe, Your

4    Honor, I offered a little while ago.

5              THE WITNESS:  This is a newspaper article.

6    Q.   (BY MR. JONAS)  InfoCom Search No. 12?

7    A.   According to this list.

8              MR. JONAS:  Then I will not offer that one if that

9    is what it is.

10   Q.   (BY MR. JONAS)  Islamic Charity Account.

11             MR. JONAS:  I believe that one I offered already.

12             THE COURT:  You had offered 12 and 13.  So are you

13   withdrawing No. 12?

14             MR. JONAS:  Yes, sir.  I am withdrawing No. 12.

15   Q.   (BY MR. JONAS)  Islamic Relief Account, which may also be

16   in, I believe.  InfoCom Search No. 74.

17   A.   Documents relating to HLF financial transactions.

18             MR. JONAS:  I offer into evidence InfoCom Search

19   No. 74.

20             THE COURT:  Admitted.

21   Q.   (BY MR. JONAS)  HLF Search No. 45.

22   A.   Documents relating to HLF financial transactions.

23             MR. JONAS:  Offer into evidence HLF Search No. 45.

24             THE COURT:  Admitted.

25   Q.   (BY MR. JONAS)  HLF Search No. 35.

1   A.   Documents you relating to HLF financial transactions.

2            MR. JONAS:   I Offer into evidence HLF Search No. 35.

3            THE COURT:   Admitted.

4   Q.   (BY MR. JONAS)   InfoCom Search No. 14.

5   A.   Documents relating to HLF financial transactions.

6            MR. JONAS:   Offer into evidence InfoCom Search

7   No. 14.

8            THE COURT:   Admitted.

9   Q.   (BY MR. JONAS)   Agent Burns, just explain to us why there

10  are various InfoCom search exhibits and HLF search exhibits

11  that relate to financial transactions, how you broke it out.

12  A.   Well, generally there is a separate exhibit if there is a

13  separate item.   For the financial schedules, we tried to

14  combine all the materials from one search location that

15  related to financial transactions with a particular entity

16  into one exhibit.

17  Q.   Okay.   So if it is an HLF search number that is financial

18  transactions, that particular one would relate to one

19  particular schedule that we are going to talk about?

20  A.   That is correct.

21  Q.   Okay.   Jenin Zakat Account No. 1?

22  A.   That would be foreign bank record for the Jenin zakat,

23  which is an entity with which the HLF had financial dealings.

24  Q.   Same for Jenin Zakat Account No. 3?

25  A.   That is correct.

1          MR. JONAS:  Your Honor, I offer into evidence Jenin

2    Zakat Account No. 1 and Jenin Zakat Account No. 3?

3          THE COURT:  Admitted.

4    Q.  (BY MR. JONAS)  HLF Search No. 37?

5    A.  Documents relating to HLF financial transactions.

6          MR. JONAS:  I offer into evidence HLF Search No. 37.

7          THE COURT:  Admitted.

8    Q.  (BY MR. JONAS)  InfoCom Search No. 15?

9    A.  Documents relating to HLF financial transactions.

10          MR. JONAS:  Offer into evidence InfoCom Search

11   No. 15.

12          THE COURT:  Admitted.

13   Q.  (BY MR. JONAS)  Nablus Zakat Account No. 1 and Nablus

14   Zakat Account No. 2, two separate exhibits?

15   A.  Those are bank account records for the Nablus zakat,

16   which is an entity for which the HLF had financial dealings.

17          MR. JONAS:  Offer into evidence Nablus Zakat Account

18   No. 1 and Nablus Zakat Account No. 2.

19          THE COURT:  Admitted.

20   Q.  (BY MR. JONAS)  Tulkarm Zakat Account No. 1?

21   A.  That is a foreign bank record for an entity with which

22   the HLF had financials transactions.

23          MR. JONAS:  Offer into evidence Tulkarem Zakat

24   Account No. 1.

25          THE COURT:  Admitted.

1   Q.   (BY MR. JONAS)   InfoCom Search No. 18?

2   A.   Those are financial documents relating to an entity with

3   which the HLF dealt.

4          MR. JONAS:   Offer into evidence InfoCom Search

5   No. 18.

6          THE COURT:   Admitted.

7   Q.   (BY MR. JONAS)   Qalqilia Zakat Account No. 1 and Qalqilia

8   Zakat Account No. 3?

9   A.   Those are bank records relating to an entity with which

10  the HLF had financial dealings.

11  Q.   Two separate accounts?

12  A.   That is correct.

13         MR. JONAS:   I offer into evidence Qalqilia Zakat

14  Account No. 1 and Qalqilia Zakat Account No. 3.

15         THE COURT:   Admitted.

16         MR. JONAS:   Also Qalqilia Zakat Account No. 2.

17         THE COURT:   Those are admitted.

18  Q.   (BY MR. JONAS)   HLF Search No. 40?

19  A.   Financial documents relating to HLF transactions.

20         MR. JONAS:   Offer into evidence HLF Search No. 40.

21         THE COURT:   Admitted.

22  Q.   (BY MR. JONAS)   HLF Search No. 39?

23  A.   Financial documents relating to HLF transactions.

24         MR. JONAS:   Offer into evidence HLF Search No. 39.

25         THE COURT:   Admitted.  .

1   Q.   (BY MR. JONAS)   HLF Search No. 38?

2   A.   Financial documents relating HLF transactions.

3            MR. JONAS:   Offer into evidence HLF Search No. 38.

4            THE COURT:   Admitted.

5   Q.   (BY MR. JONAS)   InfoCom Search No. 16?

6   A.   Documents relating to HLF financial transactions.

7            MR. JONAS:   Offer into evidence InfoCom Search

8   No. 16.

9            THE COURT:   Admitted.

10  Q.   (BY MR. JONAS)   InfoCom Search No. 17?

11  A.   The same thing.

12           MR. JONAS:   Offer into evidence InfoCom Search

13  No. 17.

14           THE COURT:   Admitted.

15  Q.   (BY MR. JONAS)   Tulkarem Zakat Account No. 3?

16  A.   That is a foreign bank record for an entity with which

17  the HLF had financial dealings.

18           MR. JONAS:   Offer into evidence Tulkarem Zakat

19  Account No. 3.

20           THE COURT:   How do you spell that?

21           MR. JONAS:   T-U-L-K-A-R-E-M.

22           THE COURT:   Which ones did you offer?

23           MR. JONAS:   Tulkarem Zakat Account No. 3.

24           THE COURT:   Admitted.

25           MR. JONAS:   Your Honor, I think that is all I have.

1   I appreciate the Court's patience.  I think this will save

2   time down the road.  In the event that I missed one or two, I

3   will just come back later on and ask if we can admit them.

4           THE COURT:  All right.

5           MR. JONAS:  If we can get back to the schedules,

6   Payments to Islamic Charitable Society/Hebron schedule on the

7   screen, please.

8   Q.   (BY MR. JONAS)  Agent Burns, could you just walk us

9   through again and remind us how this schedule is set up?

10  A.   Yes.  This schedule deals specifically with HLF

11  transactions, financial transactions with an entity called the

12  Islamic Charitable Society of Hebron.  And the columns are

13  organized by date of the transaction the first column.  The

14  second column is the source, who the payment was from.  And on

15  this chart all of the payments will be from the Holy Land

16  Foundation.  The next column is like we saw in some of those

17  earlier charts, for the authorization it will note either a

18  check number or it will note that it was a wire transaction,

19  and if certain individuals were linked to that transaction

20  they are noted in this column.  Next we have an amount column.

21  Generally you will have one number indicating the amount of

22  the transaction.

23      As we spoke about earlier, in the later years sometimes

24  large transactions, large wire transfers were made to the

25  HLF's foreign bank accounts.  And from that smaller amounts

1    would be distributed to the ultimate recipient, so in that

2    instance you may see a larger amount with a slash and then the

3    smaller amount that actually ended up with the committee that

4    is the subject of the chart.

5    Q.    And how would you determine how much went from the HLF

6    foreign account to the committee?

7    A.    It could be -- We might look at the HLF foreign bank

8    records, if those indicate what exactly went.  Also we looked

9    at the internal search warrant documents to see where they

10   said the money was actually supposed to end up.

11   Q.    Okay.

12   A.    The next column is the destination.  That is to whom the

13   payment was made.  And on this chart these should all be the

14   same recipient, the Islamic Charitable Society of Hebron.  And

15   it notes there if there is a bank account affiliated with that

16   committee that we could identify, it will be in this column as

17   well.

18        Finally, the last column is your reference column.  That

19   has all the exhibits noted with page numbers where you can go

20   and actually see the evidence that we used to create this

21   specific transaction on this chart.

22   Q.    On the top, the first transaction, May 1st, 1991 under

23   the exhibit number where it says HLF Search No. 33.

24   A.    Yes.

25   Q.    Could you explain that in conjunction with the question I

1    asked you earlier about the search warrant material and how

2    you organized it to support your charts?

3    A.    Yes.    There was a large volume of material that we

4    gathered from the various search warrants, especially the HLF

5    search warrant, that related to financial transactions.    In

6    order to try to make it more understandable, we tried to

7    select all of the items that related to the HLF's financial

8    transactions with the Islamic Charitable Society of Hebron and

9    made those documents one exhibit.    In this case that exhibit

10   is HLF Search No. 33.    So that exhibit is going to contain a

11   number of HLF search warrant documents that will go to support

12   what is stated in this schedule.

13   Q.    So would there be any financial records from the search

14   warrant pertaining to payments to any other zakat committee in

15   HLF Search No. 33?

16   A.    There could be, if a specific page from the search

17   warrant material dealt with multiple transactions.    So you may

18   see a document that deals with HLF transactions with a number

19   of entities on a specific page, but, you know, that is how it

20   was.

21   Q.    Would that also include, then, that particular document,

22   as an example, of payment to Islamic Charitable Society of

23   Hebron?

24   A.    Yes.

25   Q.    There is also InfoCom Search No. 13.    Would you explain

1    that?

2    A.    Yes.  We did the exactly same thing with the InfoCom

3    search warrant material.  We tried to take all documents that

4    were seized in the InfoCom search warrant that related to

5    transactions on this schedule and make them one exhibit.  In

6    this case that exhibit would be InfoCom Search No. 13.

7    Q.    So, for example, when we go to another schedule we would

8    see HLF search 34, and that would pertain to that particular

9    zakat committee?

10    A.    That is correct.

11    Q.    Okay.  Let's look at -- Let's pick the transaction

12    October 31st, 1991 for $17,600 and look at the supporting

13    documentation.

14           MR. JONAS:  If we can pull up InfoCom Search No. 13,

15    page 10.

16    Q.    (BY MR. JONAS)  And can you explain that?

17    A.    Yes.  This document was again found at InfoCom, and it

18    notes -- It is what they call a project summary report for the

19    HLF, and on it it notes that it sent -- If you look at the

20    bottom under payment method, full payment, amount granted

21    $17,600.  And if you look up above, the organization that was

22    supposed to receive it under organization is the Islamic

23    Charity Society at Hebron.  And below that it indicates what

24    the money was supposed to go toward.

25           MR. JONAS:  And if we can turn to HLF Bank Account

No. 3, page 126.

Q.  (BY MR. JONAS)  And what is this item?

A.   This is the actual check that was issued by Ghassan
Elashi for the HLF transaction with the Islamic Charity
Society of Hebron in the amount of $17,600.

Q.   Okay.  This check is made out to cash, though.

A.   That is correct.

Q.   Okay.  How do you know it went to the Islamic Charitable
Society of Hebron?

A.   There are several ways.  Based upon the other documents
referenced on this exhibit, it appears that they basically
cashed the check and wire transferred the money over.

Q.   And what do you see in paren next to the word cash?

A.   It says Islamic Charity Society of Hebron.

Q.   Pretty good clue?

A.   That is one clue.

Q.   Okay.

          MR. JONAS:  And if we can turn to HLF Bank Account
No. 3, page 117.

Q.  (BY MR. JONAS)  And what is this?

A.   This is the HLF's bank statement from that time period.

Q.   Would the statement reflect the $17,600 check?

A.   It does.  If you will look about the middle of the page,
check No. 681, $17,600.

          MR. JONAS:  If we can go back to the Schedule

Payments to IC/Hebron schedule.  Let's go to page 4.

Q.   (BY MR. JONAS)  Agent Burns, could you explain the double

line that is in the middle of this page?

A.   Yes.  Again, these transactions are noted in

chronological order, and we noted on the schedules the dates

of the Hamas designation as a specially designated terrorist,

as well as the Hamas designation as a foreign terrorist

organization in a chronological order so that you can

determine what transactions occurred prior to the designation

and what transactions occurred after the designation.

Q.   Let's look at the first transaction right after the

designation.  It has a tab on the right after the last column.

A.   I see that.

Q.   And what does that mean?

A.   In the indictment in this case, certain transactions were

listed as part of the indictment, the charges that were made.

If one of these transactions relates specifically to a count

in the indictment or an overt act in the indictment, it is

noted to the right of that transaction.

     In this instance, this particular transaction on April

3rd, 1995 relates to Count 11 of the indictment, Overt Act 1,

and Count 22, Overt Act 1.

Q.   Why don't we look at the supporting documentation.

     MR. JONAS:  If we can pull up HLF Search No. 33,

please, page 14.

1   Q.   (BY MR. JONAS)   What is this on the screen?

2   A.   This is an HLF request for transfer of funds, and it

3   notes the date April 3rd, 1995, the amount $30,000, and the

4   recipient Young Men Muslim Association, care of Islamic

5   Charity S, which would be Islamic Charity Society in Hebron,

6   signed by Ghassan Elashi and stamped Shukri Abu Baker.

7        MR. JONAS:   Let's go to HLF Bank Account No. 1, page

8   627, please.

9   Q.   (BY MR. JONAS)   Agent Burns, while we are waiting for

10  that page to come up, were most of the transactions in the

11  form of checks or wire transfers?

12  A.   A majority were in the form of wire transfers.

13  Q.   What is this document we are seeing here?

14  A.   This is a copy of the wire transfer.

15  Q.   Okay.  And how do you know that this copy matches with

16  that same $30,000 transaction?

17  A.   Well, you can look at the bank statement for one, but

18  actually if you are looking at this particular form, you can

19  see the send date, and it says April 3rd, 1995.  And if you

20  look down a little bit farther it says "Okayed per S. Baker,"

21  which would be the Defendant Shukri Abu Baker.  And continuing

22  on down you can see the amount of the transaction is $30,000.

23       And I believe if you go on to the next page of the wire,

24  if you look at the bottom it indicates the originator of the

25  wire, which is the Holy Land Foundation, and it gives bank

1    information, and then it shows the beneficiary at the bottom,

2    the Islamic Charity Society.

3    Q.    Okay.  And then the last item marked on this supporting

4    documentation is HLF Bank Account No. 1, page 621.  And what

5    is this?

6    A.    This is a copy of the bank statement during that time

7    period.

8    Q.    Okay.

9         MR. JONAS:  If we can go back to the schedule.  If

10   we can go to page 6, please.

11   Q.    (BY MR. JONAS)  Now, there is another double line on this

12   page.

13   A.    Yes.

14   Q.    What is this double line?

15   A.    This double line indicates the Hamas designation as a

16   foreign terrorist organization, which occurred on October 8th,

17   1997, which is different from the Hamas designation as a

18   specially designated terrorist which took place on January

19   23rd, 1995.

20   Q.    Okay.  Agent Burns, let's look -- If you see on the

21   second transaction, and then all the transactions going down

22   under the destination payment to column.

23   A.    Yes.

24   Q.    There were names in bold.

25   A.    Yes.

1    Q.   What does that mean?

2    A.   If certain individuals from the recipient company could

3    have been identified as being directly connected to this

4    particular transaction, their names are noted under the

5    destination section.

6         For example on the November 7th, 1997 transaction that

7    you see there, you see an individual's name in bold under the

8    destination column.  That individual was linked directly to

9    that transaction.  He is a part of the Islamic Charity of

10   Hebron.  And the documents referenced in the exhibit column

11   will show you how he is connected to that transaction.

12            MR. JONAS:  Let's look at that.  HLF Search No. 33,

13   page 54, please.

14   Q.   (BY MR. JONAS)  And what is this document?

15   A.   This is a fund transfer notification from the HLF to the

16   Islamic Charity Society of Hebron for the transaction

17   referenced here in the amount of $21,699.  At the bottom is a

18   receipt.

19   Q.   Is this document translated?

20   A.   It is.

21            MR. JONAS:  If we can go to page 55.

22   Q.   (BY MR. JONAS)  And what is this?

23   A.   This is the translation of that document along with the

24   receipt at the bottom.  And you can see at the bottom that the

25   individual Saleh Salim Abdel Nabi signed the receipt on behalf

1    of the Islamic Charity Society of Hebron.  Therefore, his name

2    appears in the destination column.

3    Q.    Okay.

4            MR. JONAS:  Let's go to HLF Bank Account No. 1, page

5    1067.

6    Q.    (BY MR. JONAS)  And what is this document?

7    A.    This would be the bank statement for that time period for

8    the HLF.

9    Q.    Without going through -- Are the bank statements multiple

10   pages?

11   A.    Yes, they are.

12   Q.    We won't go through every page.

13          Did you also look at the bank account of the recipient,

14   if you had the bank account?

15   A.    If we had those records available to us, we analyzed

16   those as well.

17          MR. JONAS:  Let's go to Islamic Charity Account,

18   page 63.

19   Q.    (BY MR. JONAS)  What is this item?

20   A.    This would be the item from the Islamic Charity Society

21   of Hebron's account that indicated the receipt of that amount

22   of money.

23   Q.    Do you know if this page was translated?

24   A.    It was.

25          MR. JONAS:  Let's go to the next page, please.

1    Q.   (BY MR. JONAS)  And what is this?

2    A.   This is the translation of that particular item in the

3    Islamic Charity Society's bank account records showing -- If

4    you will look on November 8th, 1997, a wire received in the

5    amount of $21,684.

6    Q.   The wire received is about $15 short of the wire sent.

7    Do you have any idea why?

8    A.   Wire transfer fees, generally.

9    Q.   Okay.

10        MR. JONAS:  Let's go back to the schedule, please.

11   Let's go to page 8.

12   Q.   (BY MR. JONAS)  Do you see -- At the bottom half, do you

13   see there is a transaction on August 21st, 1998?

14   A.   I do.

15   Q.   This is after or before Hamas was designated?

16   A.   This is after Hamas was designated.

17   Q.   On the far right side of this column it says Count 3 on

18   this row.  And what is that?

19   A.   That means that this particular transaction is relevant

20   to Count 3 in the indictment in this case.

21        MR. JONAS:  Let's look at HLF Search No. 33, page

22   148, please.

23   Q.   (BY MR. JONAS)  What is this item?

24   A.   This item is a request for transfer of funds from the HLF

25   to the Islamic Charity Society of Hebron in the amount of

1   $11,686.  And if you will look -- Do you want me to explain

2   how we get to the ultimate amount?

3   Q.    Sure, yes.

4   A.    Often you will see multiple requests for transfer of

5   funds in smaller amounts, and to the same entity on the same

6   date for different purposes.  And if you add all those up you

7   will come up with the total.  This is the first page of

8   several.  And if you will note, to the right they had noted

9   that the total of these wire transfers was going to be

10  $24,211.  So if you scroll on through there should be several

11  more of these, and if you total them up they add up to this

12  amount.

13          MR. JONAS:  Let's look at HLF Bank Account No. 1,

14  page 1363.

15  Q.    (BY MR. JONAS)  What is this document?

16  A.    This is the record of the wire transfer itself.

17  Q.    Does the date match up on the top right hand side?

18  A.    It does.

19          MR. JONAS:  If you can scroll down, and enlarge the

20  center.

21  Q.    (BY MR. JONAS)  Do you see the amount for the total wire?

22  A.    Yes, the amount being $24,211.

23  Q.    And does that match the amount on the schedule?

24  A.    It does.

25          MR. JONAS:  And let's look at the Islamic Charity

1    Account, page 81.

2    Q.   (BY MR. JONAS)  Agent Burns, you have the schedule in

3    front of you.  Is that correct?

4    A.   I do.

5    Q.   Am I identifying every exhibit or document identifying

6    this transaction?

7    A.   No, you are just selecting certain ones.  There are more

8    referenced in there that you can look at.

9    Q.   What is this item before us, Islamic Charity Account,

10   page 81, I believe?

11   A.   This is the Arabic version of the item that indicates the

12   deposit of that money to the Islamic Charitable Society's

13   account.

14           MR. JONAS:  Page 82, please.

15           THE WITNESS:  This is the translation.

16   Q.   (BY MR. JONAS)  And where do you see the wire of $24,211?

17   A.   Okay.  If you will look are at the August 23rd, 1998

18   entry, it notes that a wire was received in the amount of

19   $24,196.

20   Q.   Okay.  Agent Burns, did you create a schedule of payments

21   to an entity known as Nablus zakat committee?

22   A.   I did.

23   Q.   Do you have that schedule before you?

24   A.   I do.

25   Q.   Is this schedule a summary of the search warrant material

1   and bank records which support the transactions of this entity

2   from the Holy Land Foundation?

3   A.   Yes.

4   Q.   And those items are now in evidence, the supporting

5   items?

6   A.   They are.

7           MR. JONAS:  Your Honor, I would offer into evidence

8   what has been marked as Payments to Nablus Zakat Committee.

9   On the sticker it says Payments to Nablus Z.

10          THE COURT:  Any objections?  The same?

11          MS. HOLLANDER:  Yes, Your Honor.

12          THE COURT:  That is admitted.

13  Q.   (BY MR. JONAS)  Agent Burns, is there anything different

14  about the way this chart is set up from the last one?

15  A.   No.  This chart is set up the same way as the last one.

16  Q.   Okay.  Why don't we look at a transaction that is on the

17  page, October 31st, 1991 for $11,600.

18  A.   Okay.

19  Q.   Where did this one go to?

20  A.   This payment went to the Nablus zakat committee.

21  Q.   Do you see where it says -- Under destination it says

22  "Cash (Nablus zakat committee), then it says "Arab Bank UK"

23  and "Tulkarem account" underneath that.  Can you explain that?

24  A.   Yes.  There was -- Some of these committees have a

25  relationship, and in this instance the money actually went to

1   a bank account under the Tulkarem zakat committee's name.

2   Q.   How do you know or why do you have it under the Nablus

3   zakat committee schedule?

4   A.   Because the search warrant material and the note on the

5   check indicate that the money was ultimately determined for

6   the Nablus zakat committee.

7   Q.   This says Tulkarem zakat had an account at the Arab Bank

8   U.K.   What and where is that?

9   A.   That is in the United Kingdom in England, I believe in

10  London.

11  Q.   Did several of the zakat committees have bank accounts in

12  London?

13  A.   That would be in the early 1990s they did.

14          MR. JONAS:   InfoCom search page 56, please.   I am

15  sorry.   InfoCom Search No. 15, page 56.

16  Q.   (BY MR. JONAS)   What is this document?

17  A.   This is a piece of correspondence in Arabic taken from

18  InfoCom relating to this transaction.

19  Q.   Was this translated?

20  A.   It was.

21          MR. JONAS:   If we can turn to the next page, please.

22  Q.   (BY MR. JONAS)   And what is this?

23  A.   This is notification of a transfer of money from the HLF

24  signed by Haitham Maghawri.   The date at the top is November

25  5th, 1991, and it is addressed to the Nablus zakat committee.

1    Would you like me to read it?

2    Q.   No.

3         Is this the translation from the prior page.

4    A.   It is.

5         MR. JONAS:  Okay.  If we can go to HLF Bank Account

6    No. 3, page 122, please.

7    Q.   (BY MR. JONAS)  I am sorry.  Before I ask you a question

8    about this, does the dollar amount in that last correspondence

9    match up with the dollar amount on the schedule?

10   A.   It does.

11   Q.   What is this on the screen?

12   A.   This is a check signed by Ghassan Elashi on behalf of the

13   Occupied Land Fund, which is the HLF, to cash for the same

14   amount, $11,600, noted for the Nablus zakat committee on

15   October 31st, 1991.

16   Q.   Okay.  And again, does the amount match the

17   correspondence as well as what is on your schedule?

18   A.   It does.

19        MR. JONAS:  Let's go to page 4, please, the second

20   transaction.  I am sorry.  My mistake.  Back to the schedule

21   Payments to Nablus Zakat.

22   Q.   (BY MR. JONAS)  The second transaction from the top dated

23   November 20th, 1996, this is after Hamas is designated?

24   A.   That is correct.

25   Q.   Without going to it on the prior page of the schedule, do

1    you have this double line identifying the date that Hamas is

2    designated?

3    A.    Yes, we do.

4    Q.    Is that on every schedule you have?

5    A.    Yes.

6    Q.    I don't need to keep asking you about it, do I?

7    A.    Yes.

8    Q.    Yes, I do?

9    A.    No.

10   Q.    Okay.  This particular payment, what is the date and the

11   amount?

12   A.    The November 20th, 1996 transaction is from the HLF to

13   the Nablus zakat in the amount of $8,023.

14   Q.    And this one under the authorization says, "Wire okay per

15   policy, Mohamad Tahir."  Do you know who that is or what that

16   means?

17   A.    It is -- We would have to pull up the item to really

18   explain specifically what okay per policy means, but Mohamad

19   Tahir was a representative of the HLF.

20           MR. JONAS:  If we can pull up HLF Search No. 37,

21   page 44 of that exhibit.

22   Q.    (BY MR. JONAS)  This is an Arabic document.  Was it

23   translated?

24   A.    It was.

25           MR. JONAS:  Go to the next page, please.

1    Q.   (BY MR. JONAS)   And what does that document say?

2    A.   It is addressed to the Nablus zakat committee indicating

3    that $8,023 was transferred for social services, and it is

4    dated November 15th, 1996.

5            MR. JONAS:  Okay.  If we can go to HLF Bank Account

6    No. 1, page 873.

7    Q.   (BY MR. JONAS)   What is this document?

8    A.   This is the wire transfer of that amount of money on that

9    date.

10   Q.   Where do you see the amount?

11   A.   Down at the bottom.  And then on the second page the

12   sender and recipient are noted at the bottom.  It says that

13   the originator is the Holy Land Foundation and the beneficiary

14   is the Nablus zakat committee, and it gives their account at

15   the bottom.

16           MR. JONAS:  If we can go to Nablus Zakat Account No.

17   2, page 45.

18       Your Honor, I am not sure if that account has been

19   scanned in, so I will move to another transaction.

20           THE COURT:  All right.

21           MR. JONAS:  It is there.

22   Q.   (BY MR. JONAS)   What is this?

23   A.   This is the statement from the account of the Nablus

24   zakat indicating this transaction.  This part is in Arabic and

25   then the next is in English.

1     MR. JONAS:  The next page, please.

2     THE WITNESS:  And you will see it notes again for

3  the Nablus zakat committee that there was a wire on November

4  24th, 1996 with a credit of $8,009.98.

5  Q.   Okay.

6     MR. JONAS:  If we can go back to the schedule for

7  the payments in Nablus zakat, and go to page 7.

8  Q.   (BY MR. JONAS)  Do you see, Agent Burns, there is a

9  transaction on April 18th, 2000?

10 A.   I do.

11 Q.   Who is that transaction from?  Who is the originator?

12 A.   The Holy Land Foundation.  However, it is from their

13 foreign bank account.

14 Q.   Were you able to trace that wire back to Dallas as

15 starting in Dallas?

16 A.   Not this one in particular.

17 Q.   Okay.  Did you find any supporting documentation for it

18 in any of the search warrant material?

19 A.   I wasn't able to link it specifically to specific

20 documentation, so that the only exhibit referenced in this is

21 the actual item out of the foreign bank record.

22    MR. JONAS:  Let's look at HLF Foreign Account No. 4,

23 page 336.

24 Q.   (BY MR. JONAS)  I realize that it is in Arabic, but do

25 you know what that is?

1    A.    I do.

2    Q.    What is that?

3    A.    This would be the check out of the HLF foreign bank

4    record for this transaction, and the next page should be the

5    translation.

6              MR. JONAS:  The next page, please.

7    Q.    (BY MR. JONAS)  So that indicates what?

8    A.    It indicates the transaction on April 18th, 2000 in the

9    amount of $10,583 paid to gentlemen of the Nablus alms

10   committee, which alms is a different translation for the word

11   zakat.

12   Q.    Did you create a schedule of payments to an entity known

13   as the Tulkarem zakat committee?

14   A.    Yes.

15             MR. JONAS:  Your Honor, I offer into evidence

16   Government's Exhibit Payments to Tulkarem Zakat Committee, or

17   payments to Tulkarem Z, as the sticker reflects.

18             MR. WESTFALL:  Your Honor, just to be clear, these

19   are being conditionally admitted subject to objections?

20             THE COURT:  Subject to your being able to review

21   them, and we will take objections at that time.

22             MR. WESTFALL:  Very well.

23             THE COURT:  And that is admitted.

24             MR. JONAS:  If we can put the first page on the

25   screen.

1    Q.    (BY MR. JONAS)   Agent Burns, do you see the transaction

2    March 14th, 1994?

3    A.    I do.

4    Q.    And what does that indicate?

5    A.    That indicates that the HLF sent $8,075 to the Tulkarem

6    zakat committee on March 14th, 1995.

7    Q.    All right.  What account did it go to?  Where was the

8    account?

9    A.    The account was in the United Kingdom, in England.

10         MR. JONAS:  Let's go to HLF Search No. 39, page 11.

11   Q.    (BY MR. JONAS)   What is this document?

12   A.    Well, this is -- The way the records were presented to

13   us, the electronic payments advice, often they were like

14   multiple ones per page, so the one on top here is the one that

15   is relevant to this transaction.  Okay?  And it shows that the

16   HLF wired $6,075 to -- If you will look up here, it says to

17   Arab Bank, London, England, in favor of, and there is an

18   account number and Tulkarem zakat committee.  So it shows that

19   the HLF sent the Tulkarem zakat committee $6,075 on March

20   14th, 1994, and that was to a bank account in London, England.

21   Q.    This document itself, where did it come from?

22   A.    This came from the HLF Dallas office from the HLF search

23   warrants.

24         MR. JONAS:  If we go to Tulkarem Zakat Account No.

25   1, page 65.

1    Q.    (BY MR. JONAS)  Agent Burns, what is this?

2    A.    This is an item from the Tulkarem's bank account there in

3    London, England indicating the receipt of that money that we

4    were talking about.

5    Q.    This identifies it -- This one identifies Holy Land

6    Foundation.  Correct?

7    A.    It does.

8    Q.    Agent Burns, on the last page of the schedule is there a

9    total what was paid to the Tulkarem zakat from the Holy Land

10   Foundation?

11   A.    Yes.  On most of the schedules you will see at the very

12   end there will be a total amount sent from the HLF to the

13   zakat committee, in this instance to the Tulkarem zakat

14   committee.

15   Q.    Does that total amount include both payments made before

16   Hamas was designated a terrorist organization and after?

17   A.    It does.

18   Q.    What is the total paid to the Tulkarem zakat committee?

19   A.    If you want to go to the last page, it is $366,585.  That

20   is the amount that I could identify as having gone to the

21   Tulkarem zakat committee.

22        MR. JONAS:  If we can jump back to ICS Hebron

23   schedule and go to the last page as well.

24   Q.    (BY MR. JONAS)  What is the total amount that the HLF

25   paid to the ICS Hebron?

1    A.    Between April of 1991 and -- Excuse me.  I have the wrong

2    chart.  Between May of 1991 and November 2001, the total was

3    $1,674,594.

4    Q.    And jumping to the Nablus zakat committee chart, on the

5    last page what was the total?

6    A.    From May of '91 through October of 2001, $475,715.

7    Q.    Did you create a chart of payments to the Jenin zakat

8    committee?

9    A.    I did.

10            MR. JONAS:  Your Honor, at this time I would offer

11   into evidence Government's Exhibit Payments to Jenin Zakat or

12   Jenin Z.

13            THE COURT:  Okay.  Just one of those?  One chart?

14   That is admitted.

15            MR. JONAS:  Thank you, sir.

16            MR. JONAS:  If we can put the first page on the

17   screen, please.

18   Q.    (BY MR. JONAS)  Agent Burns, if we walk through a sample

19   of some of these transactions, would we be seeing the same

20   documentation as we saw with the other schedules?

21   A.    Yes.  The schedule is set up just like the others, and

22   the same types of documentation are used to support what is

23   asserted in this chart.

24   Q.    Agent Burns, the authorization for many of these

25   transactions, and I am looking at the Jenin zakat committee

1   chart in particular, often seem to be either Ghassan Elashi or

2   the Defendant Shukri Abu Baker.  Is that accurate?

3   A.    That is --

4   Q.    Let me rephrase the question.  I am sorry.  Who

5   authorized most of the transactions from the HLF to these

6   zakat committees?

7   A.    A majority of the transactions were authorized by either

8   Shukri Abu Baker and/or Ghassan Elashi.

9   Q.    Did you see other names on occasion?

10   A.    Yes.

11   Q.    In particular, in this chart we see the name Basman

12   Elashi on some of the first few schedules, first few

13   transactions.  Do you know who Basman Elashi is?

14   A.    I do.

15   Q.    Does he have a relationship to the HLF?

16   A.    He does.

17   Q.    As what?

18   A.    Well, during the early years Basman Elashi was -- we see

19   him signing some of the HLF checks.  He obviously had some

20   power of authority over some of the financial transactions for

21   the HLF.

22       In addition, I believe on one of the IAP records that we

23   have already introduced, he is listed as an officer.  And also

24   he is noted as having involvement with the ICC, which was the

25   predecessor to InfoCom, the company that Ghassan Elashi was

1   affiliated with.  And finally, he is the brother of the

2   Defendant Ghassan Elashi.

3            MR. JONAS:  If we can jump to page 3 on this

4   schedule.

5   Q.   (BY MR. JONAS)  Do you see in this page all the

6   authorizations say Sam Baker?

7   A.   I do.

8   Q.   Who is Sam Baker?

9   A.   That is the Defendant Shukri Abu Baker.  For a short time

10  during the early years he used the name Sam occasionally.

11  Q.   Okay.

12           MR. JONAS:  And going to the last page, page 9.

13  Q.   (BY MR. JONAS)  How much did the Holy Land Foundation pay

14  to the Jenin zakat committee?

15  A.   Between May of 1991 and October of 2001, we were able to

16  identify $554,500.

17  Q.   Did you create a schedule of payments to the Ramallah

18  zakat committee?

19  A.   Yes, we did.

20  Q.   By the way.  These zakat committees we have identified so

21  far, where are they located?

22  A.   The ones that we have been discussing this afternoon are

23  located in the West Bank.

24  Q.   Okay.

25           MR. JONAS:  Your Honor, at this time I would offer

1    into evidence Government's Exhibit Payments to Ramallah Zakat

2    Committee.

3              THE COURT:  Admitted.

4              MR. JONAS:  If we can put the first page on the

5    screen.

6    Q.   (BY MR. JONAS)  Agent Burns, again, is this chart set up

7    the same way as the other charts?

8    A.   It is.

9    Q.   Okay.  And Agent Burns, how much did the Holy Land

10   Foundation pay in total to the Ramallah zakat committee?

11   A.   From September 1991 October of 2001, we were able to

12   track $494,252 to the Ramallah zakat.

13   Q.   And Agent Burns, the schedules we looked at so far all

14   end in 2001?

15   A.   That is correct.

16   Q.   Why is that?

17   A.   Because the HLF ceased operations in December of 2001.

18   Q.   Agent Burns, did you create a schedule of payments to the

19   Qalqilia zakat committee?

20   A.   We did.

21   Q.   Could you spell Qalqilia?

22   A.   There are is several ways you may see it spelled.  The

23   way we have it here is Q-A-L-Q-I-L-I-A, but you will often see

24   it spelled with a Y instead of an I.

25             MR. JONAS:  Your Honor, at this time I would offer

1   into evidence Government's Exhibit Payments to Qalqilia Zakat

2   Committee schedule.

3          THE COURT:  Admitted.

4   Q.  (BY MR. JONAS)  Agent Burns, what is the total amount

5   that the HLF paid to the Qalqilia zakat committee?

6   A.  From February of 1992 October of 2001, we were able to

7   track $295,187.

8   Q.  And just for clarification purposes, do you see where it

9   says in the exhibit column HLF Search No. 40?

10  A.  I do.  I see it.

11  Q.  Is that all the internal search warrant material that was

12  seized from the HLF pertaining to the financial transactions

13  to the Qalqilia zakat committee?

14  A.  It is all the records that relate to the ones that we

15  found relevant in this schedule right here.

16  Q.  All right.  Agent Burns, did you create a payment of

17  payments to the Islamic Science and Culture Committee?

18  A.  Yes.

19         MR. JONAS:  Your Honor, I would offer into evidence

20  Government's Exhibit Payments to Islamic Society Science and

21  Culture Committee.

22         THE COURT:  Admitted.

23         MR. JONAS:  If we can put the first page on the

24  screen, please.

25  Q.  (BY MR. JONAS)  Agent Burns, what time period and how

much money did the Defendants HLF pay to the Islamic Science

and Culture Committee?

A.   From May 1st, 1991 through July 18th, 1996 we were able

to track $485,468.

Q.   There were no payments after Hamas was designated as a

foreign terrorist organization.  Were there any payments made

after it was designated as a specially designated terrorist?

A.   Yes.

          MR. JONAS:  Go back one page, please.

Q.   (BY MR. JONAS)  Are those three of the four payments on

this page?

A.   Yes.  There were four payments made that we were able to

track after the designation of Hamas as an SDT, a specially

designated terrorist.

Q.   Agent Burns, did you make a schedule of payments to the

Islamic Society?

A.   I did.

Q.   Did we cover that one already in your testimony?

A.   Islamic Society of Gaza, no, we did not.

Q.   Do you have that schedule before you?

A.   I do.

Q.   Agent Burns, what is the full title of this schedule?

A.   The title or the sticker?

Q.   The title.

A.   Payments to Islamic Society/Islamic Association of Gaza.

Q.   Why does it have two names?

A.   I think I testified earlier that the Arabic word that
translates into society also translates into association, so
often you will see this entity referred to as the Islamic
Society of Gaza and the Islamic Association of Gaza.

          MR. JONAS:  Your Honor, at this time I would offer
into evidence Government's Exhibit Payments to Islamic
Society/Islamic Association of Gaza.  Just for the record, the
exhibit sticker says Payments IS Associate Gaza.

          THE COURT:  Okay.  That is admitted.

          MR. JONAS:  Put the first page on the screen.

Q.   (BY MR. JONAS)  Agent Burns, what time period and how
much in total did the HLF pay to the Islamic Society/Islamic
Association of Gaza?

A.   From November of 1992 through August 23rd of 2001, we
were able to track $201,196, plus an additional 68,792 Israeli
shekels.

Q.   Just so we are clear, does the $201,000 include the
68,000 converted into dollars?

A.   No, it does not.

Q.   Agent Burns, did you create a schedule of payments to
Bethlehem orphan society?

A.   Yes, we did.

Q.   Do you have that before you?

A.   I do not believe I have that one in front of me.

1          MR. JONAS:  Your Honor, if I can approach?

2          THE COURT:  Yes.

3   Q.   (BY MR. JONAS)  Is that based upon the same records, bank

4   accounts, search warrant material that you testified about?

5   A.   Yes.

6          MR. JONAS:  Your Honor, at this time I would offer

7   into evidence Government's Exhibit Payments to Bethlehem

8   Orphan Society.

9          THE COURT:  Admitted.

10         MR. JONAS:  If you can put the first page on the

11  screen, please.

12  Q.   (BY MR. JONAS)  Agent Burns, what time period and how

13  much in total did the HLF pay to the Bethlehem orphan society?

14  A.   From June of 1991 through October of 2001, we were able

15  to track $429,006.

16  Q.   Okay.

17         MR. JONAS:  One moment, Your Honor.

18      Your Honor, given the hour, I am at a real good breaking

19  point.

20         THE COURT:  Let's break here for the day.

21      Be back at 9:00 tomorrow morning.  Please recall the

22  instructions that we have been over.

23         (Whereupon, the jury left the courtroom.)

24         MR. JONAS:  Your Honor, I am just about finished

25  with Agent Burns.  I didn't want to pass her now because I

1    wanted to make sure I didn't miss anything.  So if I pass her

2    in the morning, we need to deal with the issue of the

3    Defendants' exhibits.  I don't know if you want to do that

4    tonight.

5            THE COURT:  We can do that in the morning.  Be back

6    at 8:30 in the morning, and go ahead and email to Jennifer

7    your objections.  Do you have their list?

8            MR. JONAS:  We have their list.

9            THE COURT:  So email us your objections so that I

10   can go ahead and start taking a look at those, and we will

11   take those up at 8:30 in the morning.

12       I was a little confused when you started going through

13   that list of exhibits.  You need to go back and get that in a

14   better -- You were bouncing around back and forth.  Get that

15   in a better format.  But some of those are on the list you

16   provided to the Defense.  Right?

17           MR. JONAS:  Most if not all of them.

18           THE COURT:  But you said some of them were not.  Did

19   I understand that?

20           MR. JONAS:  No, I believe all of them were.  I think

21   there was one document I showed Agent Burns this afternoon

22   that I informed Ms. Hollander of this morning.

23           THE COURT:  That was new?

24           MR. JONAS:  That was new, that I wasn't planning on

25   showing Agent Burns when I created that list.  I think other

1      than that, I think everything was on that list.

2          MS. HOLLANDER:  Your Honor, we just didn't -- He had

3      said that there were a lot of them that were just going to be

4      offered and then we were going to deal with later, so we

5      didn't deal with them yet, because we weren't able to deal

6      with all of them.  There is a huge amount of documents for us

7      to deal with.

8          THE COURT:  It is true, except you have had them now

9      since Sunday.  I thought maybe some of this wasn't on the

10     list, but if it has been there since Friday when you mailed

11     the list to everybody.  Of course, I didn't know that either,

12     and it is confusing, just to format.

13         MS. HOLLANDER:  It may have been misunderstanding,

14     Your Honor, but I thought we needed to deal with the ones that

15     we were going to deal with this time since she is not going to

16     come back for I guess --

17         THE COURT:  Right.  But here at the end, obviously,

18     he has been dealing with some of those, and if you --

19         MS. HOLLANDER:  We didn't understand he was going to

20     do that.  That was the confusion.  We thought he was going to

21     offer them and we were going to deal with them later.  That

22     was the confusion that I think Ms. Moreno was explaining also.

23         MR. JONAS:  Your Honor, I explained to Ms. Hollander

24     in an email -- I am not blaming anybody.  Apparently there is

25     a misunderstanding.  I thought I was clear in the email to

1    her, and I thought I was clear earlier when I spoke with

2    Defense counsel about what my plan was.

3         My understanding of what their concern was that I was

4    going to get into Agent Burns -- the substance of the zakat

5    committees in that their relationship to Hamas.  That is her

6    second testimony.  All I wanted to do today was just to show

7    that the HLF is sending money to the zakat committees to take

8    care of that, so the jury can see, "Okay.  Now we have heard a

9    little bit about zakat committees through Doctor Levitt.  Now

10   we see HLF is sending some money there," and later on we will

11   get into the meat --

12        THE COURT:  I think it wasn't clear.  Frankly, I

13   wasn't sure what you were going to do either, so it was

14   unclear I think to everybody.  But you are about through with

15   that part of it, then?

16        MR. JONAS:  Yes, sir.  I just want to make sure I

17   haven't missed anything, and then if I have I will cover it

18   first thing in the morning.  If I have not missed anything, I

19   will pass her.

20        THE COURT:  Go back through and group those

21   exhibits.  You know, you bounced back and forth, InfoCom

22   Search and then go to something else and come back to InfoCom

23   and back to HLF.  Just get us a list of everything that is

24   there.  That may be what you have here.  I don't know.  I

25   couldn't keep up with the way you were going.

1          MR. JONAS:  I apologize.

2          THE COURT:  I am going to have to go back and do

3     that.  But I would rather you just furnish me something like

4     that, and then I can go back and check that and make sure what

5     is in is in, and that way I will have a good record of it.

6          MR. JONAS:  Yes, sir.  There is a method to that

7     madness.  I know it seems like it is crazy, but they all

8     relate -- I did it by zakat committee.

9          THE COURT:  Right.  But when you are admitting them,

10    it is just easier -- I mean, nobody knew that method at the

11    time, and it was just very confusing.

12         MR. JONAS:  I understand, sir.  I also realize it

13    was very boring for the jury.

14         THE COURT:  That, too.  But I mean, it just made it

15    hard for us, I think for everybody to keep up in terms of what

16    was going on in terms of just admitting them.  Just get us a

17    better form for that.

18        Go ahead and get your objections to us and to counsel,

19    and then we will take that up at 8:30 in the morning.

20         MR. WESTFALL:  You weren't the only one confused,

21    Your Honor.  The representation that was made, you know,

22    misunderstandings aside, was that she was going to say, "Oh,

23    yeah, basically those are the schedules," and then we are done

24    with that.  But they went way into those schedules, and I am

25    afraid that that is all the evidence that they intend to put

1    on about what is in those schedules.

2        And I mean, are you going to revisit those schedules in

3    front of the jury?

4            MR. JONAS:  First of all, Mr. Westfall, I thought I

5    was very, very clear in my email to Ms. Hollander, and I can

6    produce that email to every Defense attorney as to my

7    intention.  I did not mislead any defense attorney in this

8    case as to what I was doing.  I clearly explained myself, and

9    I believe I lived up to my explanation, one.

10       Two, yes, we are going through the schedules.  We are not

11   done with them.

12           MR. WESTFALL:  Okay.  It seemed like a pretty in

13   depth bridge.  That is all.  And so I was concerned about a

14   scope objection later on.  And also some of the stuff that was

15   in those schedules is going to be objected to, and I mean,

16   they were being published all over the place.

17           THE COURT:  They were.  But those schedules were on

18   that list, though.  That is the concern that I had.  And so,

19   you know, I had asked for objections on everything that was on

20   the list and I didn't get any, so I assume you had looked at

21   those.  You have had them now for a week almost.

22           MR. WESTFALL:  I mean, that is I guess the root of

23   the misunderstanding.  There are an awful lot of exhibits on

24   there, and all those different classes, and then the schedules

25   that --

1          THE COURT:  Right.  And I understand that, but like

2     we discussed the other day, this isn't the first time you have

3     seen these exhibits.  You had an exhibit list long ago, and of

4     course you had them the last time.  So none of this is new

5     except maybe one or two today.

6          MR. WESTFALL:  The schedule has been changed.

7          MS. HOLLANDER:  It has been changed considerably,

8     Your Honor.

9          MR. JONAS:  If I can address this, they had the

10    schedules for a long time.  The changes that were made in the

11    schedules, some of the page numbers were off so we corrected

12    those items.  But the substance of the transactions have been

13    the same since we turned over to them, you know, prior to

14    trial.

15          THE COURT:  Mr. Dratel?

16          MR. DRATEL:  My understanding back from when we

17    received this last weekend was that a list -- the 13-page list

18    of exhibits was that essentially the last two pages were not

19    going to be part of her testimony this time, but really would

20    be admitted in terms of housekeeping, and as a result there

21    was less reason to be substantively concerned with those

22    because the volume of exhibits was so many to begin with.  I

23    am not suggesting that we have gone beyond that, or what the

24    intention was.  What I am suggesting is that those were

25    not -- I didn't interpret that as meaning that we were going

1   to get into the admissibility of those in the detailed level.

2         THE COURT:  But he has been saying all along,

3   regardless of the misunderstanding, and I think I was confused

4   as well as to how much you were going to get into them, but he

5   was saying all along he wanted to introduce them and get them

6   out of the way.

7         MR. DRATEL:  But purely a technical matter and not

8   an admissible matter.

9         THE COURT:  Admissibility is admissibility.  If you

10   are going to object, that would be the time to do it.  Anyway,

11   I assume admissibility -- We were going to deal with

12   admissibility issues.

13         MR. JONAS:  If I could just address that.  The last

14   two pages of the list were the items that I entered into

15   evidence before I even started the schedules, and she did not

16   testify about any of that, so you are correct in your

17   assumption.  The schedule and the supporting documentation for

18   the schedules were before those last two pages.  And I noted

19   on the list where it was going to be purely -- And that is

20   what it was.  So I don't think I deviated from what I told

21   you.

22         THE COURT:  Okay.  All right.

23     See you back at 8:30 in the morning.

24         MR. DRATEL:  May we approach on a scheduling matter?

25         THE COURT:  Sure.  Come on up.

1          THE REPORTER:  Mr. Dratel, do you want this on the

2   record?

3          MR. DRATEL:  It doesn't need to be.

4          (discussion at the bench, out of the hearing of the

5          reporter.)

6          THE COURT:  We are in recess.

7                    (End of day.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts          06/04/2009

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25