IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA       )  CAUSE NO. 3:04-CR-240-P
                               (
vs.                            )
                               (  OCTOBER 3, 2008
                               )  DALLAS, TEXAS
HOLY LAND FOUNDATION, ET AL    (  9:00 A.M.

_____

VOLUME 13 OF 37

_____

STATEMENT OF FACTS

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

_____

A P P E A R A N C E S

FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                      1100 COMMERCE, 3RD FLOOR
                      DALLAS, TEXAS  75242
                      BY:  MR. JIM JACKS
                           MR. BARRY JONAS
                           MS. ELIZABETH SHAPIRO

FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
(SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
                      20 FIRST PLAZA, SUITE 700
                      ALBUQUERQUE, NEW MEXICO 87102
                      BY:  MS. NANCY HOLLANDER
                           MS. TERESA DUNCAN

```
 1          FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
            (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
 2                               NEW YORK, NEW YORK  10005
                                 BY:  MR. JOSHUA DRATEL
 3                                    MR. AARON J. MYSLIWIEC

 4          FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
            (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
 5                               DALLAS, TEXAS  75204
                                 BY:  MS. MARLO P. CADEDDU
 6
            FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
 7          (GHASSAN ELASHI)     P.O. BOX 10985
                                 TAMPA, FLORIDA  33679
 8                               BY:  MS. LINDA MORENO

 9                               JONES DAY
                                 555 CALIFORNIA ST., 26TH FLOOR
10                               SAN FRANCISCO, CA  94104
                                 BY:  MR. JOHN D. CLINE
11
            FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12          (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                 FORT WORTH, TEXAS  76102
13                               BY:  MR. GREG WESTFALL

14          COURT'S LAW CLERK:   MS. JENNIFER HELMS
                                 1100 COMMERCE, RM. 1654
15                               DALLAS, TEXAS  75242

16          COURT COORDINATOR:   MS. BRENDA WEBB
                                 1100 COMMERCE, RM. 1654
17                               DALLAS, TEXAS  75242

18    OFFICIAL COURT REPORTER:   SHAWN M. McROBERTS, RMR, CRR
                                 1100 COMMERCE STREET, RM. 1654
19                               DALLAS, TEXAS  75242
                                 (214) 753-2349
20

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| LARA BURNS | |
| Direct By MR. JONAS | 36 |
| Cross By MS. HOLLANDER | 87 |
| Cross By MR. WESTFALL | 136 |
| Cross By MS. CADEDDU | 195 |

## Defendant Exhibits

| **Defendant Exhibits** | **Page** |
|---|---|
| No. 161 Admitted into Evidence | 12 |
| No. 1334 Admitted into Evidence | 55 |
| Secretary of State New Jersey 1 Admitted into Evidence | 141 |
| No. 204, 1016 Admitted into Evidence | 147 |
| No. 491, 750, 1005 Admitted into Evidence | 165 |
| No. 1350 Admitted into Evidence | 172 |
| No. 979, 984 Admitted into Evidence | 189 |
| No. 490 Admitted into Evidence | 192 |

 1          THE COURT:  Good morning.  All right.  Let's take up

 2    these objections.

 3        Who is going to be speaking on behalf of the Defense?

 4          MS. HOLLANDER:  Your Honor, I think it depends.

 5          THE COURT:  On the exhibit?

 6          MS. HOLLANDER:  On the exhibit.

 7          THE COURT:  Okay.  Let's start off with No. 94.  We

 8    have a hearsay objection.  Who wants to address that?

 9          MS. MORENO:  Is that U.N. resolution 799.

10          MS. HOLLANDER:  I believe so.

11          MS. MORENO:  Your Honor, I would ask you not to rule

12    on this.  This is just a mistake.

13          THE COURT:  It won't come in through Agent Burns?

14          MS. MORENO:  No.

15          MS. HOLLANDER:  Your Honor, I think what happened

16    was we sent the Government an initial list and then we changed

17    our cross.

18          THE COURT:  That is fine.  Let's go ahead and get on

19    to the other ones.  We have No. 161 and No. 164.

20          MS. HOLLANDER:  No. 161 is --

21          THE COURT:  That is the one from the mayor of San

22    Diego.

23          MS. HOLLANDER:  Yes.  And No. 164, the Kosovo

24    agreement.

25        Your Honor, these all came from the Holy Land files.

Some of them don't have the Holy Land bates number stamps on

them because -- And I think all but San Diego actually have an

FBI bates number on them.

What happened was my law firm represented Holy Land in

the civil case designation, and back in 2002 and 2003 we sent

people to the FBI to search for documents.  At that time our

clients couldn't join us.  It is all licensing issues.  We had

no interpreters.  We mostly searched for English documents.

And we brought them back.

The FBI knows every document we took because Lara Burns

was involved with that.  There is no document that we copied

that the FBI didn't know about, but it was before we bates

stamped them, so the Government knows these documents came

from their files.

They are obvious on their face that they came from their

files, and, I mean, if there is a problem, I will have my

partner Zachrey Ives come and explain to the Court the

procedure.  But it really -- they are Holy Land documents.  On

the face they are Holy Land documents.  If there is any issue,

it simply goes to weight.

MR. JACKS:  Your Honor, as to that issue,

Ms. Hollander is correct in the sense that her law firm came,

and I think it was in the spring of 2002, and scanned or

photocopied a lot of documents, and it was before the FBI had

been able to bates stamp the documents with their bates stamp.

1     The bates stamp on this document I am assuming was put there

2     by Ms. Hollander's law firm, and it is FBI --

3                 MS. HOLLANDER:  That is correct.

4                 MR. JACKS:  -- and then a series of numbers.  Well,

5     we later bates stamped all the documents and then forwarded

6     those documents to the Defendants, and for some reason, and I

7     am not sure why, rather than going and finding that document

8     with the FBI bates stamp on it, they used this copy that has

9     their own bates stamp on it.

10         And obviously Agent Burns cannot authenticate this

11    document.  If they want to put it in through a different

12    witness, then that is something else, but she didn't memorize

13    all these documents, so she relies on the bates stamp to be

14    able to testify that that came from the Holy Land documents.

15    And they have copies of these documents with the FBI bates

16    stamp on them.

17         Now, beyond just the source of the documents and the

18    authentication, of course, we still object on the grounds of

19    hearsay and relevancy.

20                THE COURT:  The hearsay, do you have the original

21    documents, the FBI?  Is that what you seized?

22                MS. HOLLANDER:  Yes.  They have the originals.

23                MR. JACKS:  Yes, sir.

24                THE COURT:  I mean, through self-authentication.

25    Certainly the second one, No. 164, that is a foreign

1   government record?

2           MS. HOLLANDER:  I think that is right.

3           MR. WESTFALL:  No. 164 is an agreement between

4   several parties to provide relief to Kosovo.

5           THE COURT:  That is right.  Catholic Relief Services

6   and Holy Land and some others.  Yes.

7           MR. WESTFALL:  And we do have the one with the HLDL

8   number on it.  In fact, my client was one of the signatories

9   to that.  So to the standpoint of hearsay it really kind of

10  goes to the state of mind not only of him but to charity,

11  because it is not aid to Palestine.  It is not money to

12  Palestine.

13          THE COURT:  What about the authentication issue?

14          MR. WESTFALL:  Well, I have seen the one with the

15  HLDL number a number of times, and I know I can probably find

16  it in about five minutes since it has to do with my client.  I

17  am sure it is in the computer.

18      The one -- nancy was intending to introduce this, and I

19  guess she used that one with the FBI number.  But I can have

20  the HLDL one immediately almost, if that will solve the issue.

21          THE COURT:  No.  161 appears to be

22  self-authenticating if you have the original.  That is from

23  the mayor.  It has a seal.  I think that satisfies 902 as far

24  as self-authentication, if that is the one I am thinking

25  about.  Some kind of commendation from the major of San Diego.

1          MS. HOLLANDER:  That is No. 161.

2          MR. JACKS:  Your Honor, I don't know what the

3    certification is.

4          THE COURT:  The copy I saw, it looks to have the

5    seal.  Of course you have the original.  You should be able to

6    tell on that whether that appears to be --

7          MR. JACKS:  I don't know where to find the original,

8    Your Honor.  It doesn't have a bates number on it.  So out of

9    millions of pages of documents, I wouldn't be able to --

10          THE COURT:  You wouldn't be able to find it very

11    quickly?

12          MR. JACKS:  Right.

13          MS. HOLLANDER:  If they can't find it, I can

14    guarantee you some of the reason we are using some of the FBI

15    documents is we have trouble finding anything.  We don't have

16    access to the FBI files unless we go to the FBI office and

17    search -- all of these were moved in different boxes from the

18    way we originally looked at them in the designation.  So we

19    have to use the ones that we got.  I mean, it takes hours and

20    hours and hours to find anything on this hard drive.

21          There is no question that these came from the Holy Land

22    files, that they go directly to showing our clients' intent,

23    our clients' charitable work.  The Government has said

24    directly several times that this is a purported charity.

25    Agent Burns talked about how little money we spent in foreign

1     countries and in this country.  And I mean, if anything there

2     is a weight issue, but there is just really not an issue about

3     where these documents came from.  There shouldn't be an issue

4     with this.

5             THE COURT:  Anything else on that, Mr. Jacks, on

6     those two, No. 161 and 164?

7             MR. JACKS:  I think we are talking about two or

8     three different things.  There is authenticity and there is

9     hearsay and relevance.  And --

10             THE COURT:  Well, the hearsay, the public document I

11     think would come under 803(8) if the authentication issue is

12     resolved, and it is a public document so that would seem to

13     take care of that.

14             MR. JACKS:  Your Honor, I don't think it has been

15     shown to be a public document.

16             THE COURT:  If you have the original I think we can

17     tell.  It appears to be.

18             MR. JACKS:  I don't know, Your Honor, because my

19     understanding of the certification is you get something from

20     the issuing authority and they say, "This is a document we

21     issued."

22             THE COURT:  But a document under seal I think is one

23     of the ways -- a public government document under seal is

24     self-authenticating.  And you have the original.  And you tell

25     me you can't find it, so I am going to hold that against you.

1    The copy seems to be authentic, just from what I see there.

2    So unless you can point to some way that it isn't or some

3    reason it isn't, the way to determine that -- In my notes I

4    have look at the original and we should be able to tell fairly

5    easily.  But if you can't produce the original and you have

6    it, well then --

7                MR. JACKS:  Your Honor, with regard to this one, I

8    am going to withdraw the objection.  I will just withdraw the

9    objection.

10               THE COURT:  If it is self-authenticating and it is

11   what it purports to be, also that comes in within a hearsay

12   exception.  The only other would be relevance, but I think

13   those come in for the Defense, No. 161 and 164.  Those

14   objections are overruled.

15               MR. JACKS:  I am sorry, Judge?

16               THE COURT:  No. 161 and 164.

17               MR. JACKS:  No. 164 I don't think has -- That it is

18   not a public document.

19               THE COURT:  What is that?

20               MR. JACKS:  It is some agreement for the production

21   of bread for Kosovo refugees.

22               THE COURT:  Right.

23               MR. JACKS:  And it is not -- It is hearsay.

24               MS. HOLLANDER:  Your Honor, it is signed by one of

25   the Defendants.

1          THE COURT:  I understand that.  I think you might be

2     able to establish it as a business record or some other way,

3     but I don't think the agent can do that.

4          MS. HOLLANDER:  Your Honor, it comes in at this

5     point because it is relevant to exactly what she said.  She

6     said --

7          THE COURT:  But Ms. Hollander, you keep confusing

8     relevance with getting it in properly, and we have been down

9     this road before.  It doesn't come in simply because it is

10    relevant.  They have a hearsay objection.  It appears to be

11    hearsay.  You have to have somebody to authenticate it as a

12    business record.  No. 161 is self-authenticating.  And once

13    you do that it also takes care of the hearsay objection.

14       How do you take care of the hearsay and authentication

15    problems with No. 164 other than it is relevant?  That doesn't

16    take care of it, so tell me how you take care of those

17    objections.

18          MS. HOLLANDER:  It also goes to the intent of our

19    clients.

20          THE COURT:  And you still haven't answered my

21    question.

22          MS. HOLLANDER:  Then if comes in under their intent

23    then it is not hearsay.  It comes in to show the work that

24    Holy Land --

25          THE COURT:  But you are still offering it for the

1    truth.  I think it is hearsay as to you.  You can't offer --

2    It may not be hearsay as to the opponent.  They may be able to

3    get it in, but you can't get your own statements in unless you

4    have some hearsay exception.  And you are offering it for the

5    truth, that this is what they do, that they are doing this

6    kind of work.  So I don't think that will get you there.  You

7    have to get it in under a business record or some exception

8    and you have to lay some predicate for that.  Do you have a

9    witness that can do that?

10         MS. HOLLANDER:  I believe that we do, Your Honor.

11    You know, but we can bring it in -- I think it really does fit

12    basically the business records exception.

13         THE COURT:  And I think it might, but you still have

14    to have a witness lay that foundation.  I can't assume and

15    speculate it.  You have to have somebody do it.

16         MS. HOLLANDER:  Okay.

17         THE COURT:  So No. 161 is in.  No. 164, the

18    objection is sustained subject to authentication and hearsay

19    exception, prove-up.

20    No. 174?

21         MS. HOLLANDER:  No. 174 is the same issue, Your

22    Honor.  This one has an FBI stamp on it.  It is not the same

23    issue as No. 164.

24         THE COURT:  This is that foreign ministry.  This is

25    the one I was actually thinking of earlier.  This appears to

1    be from some type of the Turkish ministry.

2            MS. HOLLANDER:  This was seized from the Holy Land

3    office, and the Government's objection is it can't be

4    authenticated.  Once again, they know this was seized from

5    their Holy Land.  We simply are using the one that we found so

6    as not to waste thousands of hours searching for the other

7    copy.  But that is their objection, and they know that that is

8    where we got it.  They have it in their files.

9            THE COURT:  Mr. Jacks?

10           MR. JACKS:  Even if it came from the Holy Land

11   doesn't authenticate it and make it true.  Someone could have

12   been, you know, creating these on the computer.  So it is not

13   authenticated.

14           THE COURT:  And that is a problem with not having

15   the original again here.  If you had the original, you would

16   be able to tell more about it in terms of does it in fact

17   appear --

18           MR. JACKS:  Your Honor, we have -- If they asked for

19   the originals, we went and found them, and so it is not a

20   matter of not being able to find them ever.  It is just with

21   this last minute notification.  Previously when they have

22   said, "We need the originals of these," we have located them

23   and turned them over.

24           THE COURT:  So why would it take so long.  I don't

25   know what kind of system you have.  Why would it take so long

1    to find it?

2              MR. JACKS:  I don't know, Your Honor.  It may not.

3              THE COURT:  I am going to withhold ruling on that

4    and see if we can find that.

5              MR. WESTFALL:  For the record, this Exhibit No. 174

6    and everything up to about 1200 we didn't change the exhibit

7    numbers in our exhibits.  These were exhibits last time.  And

8    there is about 500 bankers boxes in the possession of the FBI,

9    and that is all the originals.

10         On the standpoint of authentication, is it what it

11   purports to be, and anything above and beyond that really kind

12   of goes to weight.  And this certainly purports to be a

13   certificate from the Ministry of Foreign Affairs.

14             THE COURT:  But it is a foreign document, and that

15   can be a little trickier getting in a foreign document than

16   one under a public seal under the rules.  That is why I think

17   I would rather see the original.  I agree in looking at it

18   that it appears to be, but the point is these things can be

19   faked.  Obviously somebody can make these.  But if we see the

20   original, I think if it satisfies that and purports to be, I

21   am with you.  I think it comes in.  And it probably takes care

22   of the hearsay as well.  But that one, because it is a foreign

23   document rather than a domestic document, I think I would want

24   to see the original on that one.

25             MR. WESTFALL:  And just from the standpoint of the

1    hearsay, Your Honor, these documents that have come in up to

2    this point, it is the possession of those things that is being

3    used against the Defendants.

4            THE COURT:  Right.  But by -- The opposing party can

5    do that.  It is a little different than when you are offering

6    something that is hearsay for your benefit.  The Government

7    can offer it for intent easier than a party can offer it on

8    their own behalf.

9            MR. WESTFALL:  Once they raised that intent issue

10   with the possession of the documents, what we seek to do is

11   with the possession of the exact same types of documents, with

12   the same bates numbers on them, to rebut that, to meet that.

13           THE COURT:  Well, I don't know that that gets you

14   there because of these objections that they are posing with

15   these documents that purport to be from a foreign government.

16   So I don't know that that gets you there, simply their being

17   in their possession.  I will withhold ruling on 174.

18       That gets down to the photographs.

19           MS. HOLLANDER:  I think most of -- well, some of

20   them are mine.  Some are other people's.  Some of them may

21   be --

22           THE COURT:  It is going to be the same objection?

23           MS. HOLLANDER:  Well, Your Honor, maybe it is.

24           THE COURT:  The Government has it lumped under one

25   objection.

1           MS. HOLLANDER:  It is under one objection.  Right.

2      These photographs, which also -- all of which, the ones that I

3      plan to introduce, which is much smaller than that list,

4      actually, and I don't know whether some of those are other

5      people's or whether they are for later, which may be, they

6      have Holy Land logo on them.  There is no question about their

7      authenticity.  Several of them came in through the last trial.

8      Can I show them to, Your Honor?

9           THE COURT:  I saw them.  I have gone on your disk.

10          MS. HOLLANDER:  They have people who Burns can

11     identify who are Holy Land workers.  They have the Holy Land

12     logo --

13          THE COURT:  I think those that have the Holy Land

14     logo and she can identify individuals, I think those come in.

15          MR. JACKS:  Well, Your Honor, she hasn't been able

16     to look at these.

17          THE COURT:  They can show them to her and lay the

18     predicate.  If she can do that, they come in.  That is what I

19     am saying.  If she can't, then you are going to have to lay a

20     predicate some other way.

21          MS. HOLLANDER:  I mean, the ones that have the Holy

22     Land logo are pretty obvious.

23          THE COURT:  They are not obvious to me and not

24     obvious to the jury.  Just get Agent Burns to testify to that.

25     Okay?  I mean, some of them were, but I can't tell that.  And

1    if she recognizes Holy Land employees -- That is not obvious

2    to me or the jury.  You still need to lay your predicate.

3        If you can lay your predicate through her, I think they

4    come in, if she recognizes Holy Land logo, employees,

5    something like that.  If you can't, then you are going to have

6    to find some way to lay a predicate.

7              MR. JACKS:  My concern is all of a sudden if she

8    says this photograph came from the Holy Land Foundation, "Yes

9    that is their logo; yes, I recognize that person," then beyond

10   that she doesn't know where they were taken, when they were

11   taken, what was going on, my concern is that through their

12   questions that the lawyers are going to try to inject and put

13   before the jury some evidence about that beyond what Ms. Burns

14   can provide.

15             THE COURT:  And that is certainly a valid point.

16   Somebody want to address that?

17             MS. HOLLANDER:  Your Honor, I think that clearly

18   goes to weight.  It just clearly goes to weight.  These are

19   Holy Land projects, they come from the Holy Land office, they

20   have the Holy Land logo on them.

21             THE COURT:  Right.  But once you --

22             MS. HOLLANDER:  That is all I am going to do is I am

23   going to show her these pictures, show these pictures to the

24   jury to show that Holy Land is a charity, in direct response

25   to the Government's case.  We have to be able to meet the

1    Government's case.

2              THE COURT:  I understand that.  But you have to

3    still lay your predicates.  You can't just come in and start

4    saying this is relevant so it is in.

5              MS. HOLLANDER:  I understand.  But I think that

6    Mr. Jacks' objections go to the weight, not the admissibility,

7    because they are Holy Land photos found in the Holy Land files

8    with the Holy Land logo on them, and they are projects that we

9    can link.  In other words, there is wheelchair projects and

10   these are wheelchairs.  There is a bakery project.  There is

11   no question about that.  The Government knows that.  There is

12   a jillion documents on it.  And there is a bakery and Holy

13   Land workers that she can identify.  I know she can.

14             THE COURT:  Mr. Westfall?

15             MR. WESTFALL:  Your Honor, just one point.  I mean,

16   we know that just because we get a photograph in we are not

17   going to be able to tear off in a million different

18   directions.  I mean, we know that.  And I don't think that

19   putting a photograph in gives us the power to do that.

20        I think that if she can recognize the people, I agree

21   with the Court's ruling on that.  If she can recognize the

22   people or some other way to say this photograph more likely

23   than not is what it purports to be, then, you know, I agree

24   with the Court's ruling.

25        But as per Mr. Jacks' concern, the rules of evidence

1    aren't going to allow us to do what Mr. Jacks is concerned

2    about, and I doubt the Court would.

3              THE COURT:  Okay.

4              MR. JACKS:  Your Honor, they have been doing it.

5    They did it in their opening statement.  And there is no

6    question that they could probably get these in if they had a

7    witness that could provide the information, and for some

8    reason they are reluctant to go that route.  They want to put

9    them in through Agent Burns.

10         And as I said, she says -- Ms. Hollander says they are

11   photos of a Holy Land project.  There is nobody to say that.

12             THE COURT:  I agree with that.  But still if you can

13   show through Agent Burns that there is a Holy Land logo or

14   employees, something that connects it to the Holy Land, then I

15   think I am going to consider that sufficient to lay your

16   predicate.  But I am not going to let you go and start trying

17   to go beyond her knowledge in terms of what this is through

18   your statements of "This is obviously a wheelchair."  You can

19   describe what the picture shows and just leave it at that.

20         You are going to have to object -- If you think they are

21   going beyond that, you have to object and I will rule on it at

22   that time.

23             MR. JACKS:  May I assume, Your Honor, that the ones

24   that don't have the logo are excluded?

25             THE COURT:  Yes.  Well, and they can ask her and if

1    she can't identify anything then they haven't laid a predicate

2    and they are not in.  So I don't know which ones those are.  I

3    will let them ask the agent.

4         MR. JACKS:  As long as they are not displayed to the

5    jury on the screen.

6         THE COURT:  Nothing should be displayed until it is

7    admitted.  Once we know it is admitted, those are in and we

8    can go from there.

9         MS. HOLLANDER:  Your Honor, the -- I just wanted to

10   tell him, the photographs, I will just show her the ones that

11   I am going to use.  It doesn't apply -- some of these, and

12   there is a large group here, and some aren't coming in now

13   anyway.

14        THE COURT:  All right.

15        MR. JACKS:  Judge, there is particularly one I

16   wanted to touch on that seems different.  It is DX 1197.  It

17   has got -- The way the exhibit was delivered to us is there is

18   a series of photographs on a rolling file, I guess.  And taped

19   underneath it with scotch tape is a caption describing what is

20   supposed to be depicted in the picture.  And I am assuming

21   that was put there after the fact.

22        THE COURT:  Okay.  And I don't remember.

23        MR. JACKS:  It is the one with the U-Haul truck and

24   somebody typed underneath it and put the caption.

25        THE COURT:  Do you have that, Ms. Hollander?

                    MS. HOLLANDER:  I do.

                    THE COURT:  Let me take a look at that.  What about

the caption?

                    MS. HOLLANDER:  This was the way it was in the Holy

Land files, and I just printed it the way it was in the file

the way the Government seized it.

                    THE COURT:  Mr. Jacks?

                    MR. JACKS:  I would have to check and see.  I have

seen it, but I don't believe -- First of all, they weren't

scanned and they weren't in this sequence like that.  I will

have to go back and look and see.  But regardless, the caption

is certainly hearsay.

                    THE COURT:  What about that hearsay?

                    MS. HOLLANDER:  I am sorry.  He was telling me

something.

                    THE COURT:  He is objecting to hearsay as to the

caption.

                    MS. HOLLANDER:  Your Honor, again, I think that goes

to the Government's argument of weight.  It goes to show Holy

Land's intent, what they were doing.  It doesn't go to show

even the truth, if they are objecting to it.  But this is the

way it was seized.

                    THE COURT:  I understand.  But I still think the

caption is probably hearsay.  I think the picture -- If she

can identify the Holy Land employees, then the picture is

1    fine.  But that caption is hearsay, and you are in fact, I

2    think, offering it for the truth that that is what they were

3    doing.  I think that is why you are offering that statement,

4    so I think it is hearsay.

5              MS. HOLLANDER:  What I would like to do, Your Honor,

6    is offer it through her with the caption covered, and then

7    when we bring our witness in who can establish this as a

8    business record, then we will uncover the caption.

9              THE COURT:  I think if she can identify the Holy

10   Land employees, well then --

11             MS. HOLLANDER:  It has got Holy Land written on the

12   side of the sticker.

13             THE COURT:  That probably comes in without the

14   caption until you can lay your predicate for that.

15             MS. HOLLANDER:  If somebody has some of that white

16   tape, we will put it over it before it goes to the jury.

17             THE COURT:  And I have not looked at those DVDs and

18   videos.  Are you planning on getting into those today?

19             MS. HOLLANDER:  We are planning on showing one

20   today, Your Honor.

21             THE COURT:  Which one is that one?

22             MS. HOLLANDER:  That one is No. 1015.  It is the

23   tape "People in the Land."  And it was admitted without

24   objection in the last.

25             THE COURT:  I don't have a 1015 listed.

1          MS. HOLLANDER:  I don't know.  I gave it to Mr.

2     Jacks last night.

3          THE COURT:  Okay.  One of the new ones?

4          MS. HOLLANDER:  It has been on our exhibit list.

5          THE COURT:  It may be, but I don't have it on the

6     list that I asked you to provide.  It is not there.  Does

7     somebody have it?  The list I received from you as to the

8     exhibits, it is not there.  So the Government didn't object to

9     it either.  They don't have it on their list.

10          MS. HOLLANDER:  We sent them another list last night

11     with this one on it.

12          THE COURT:  And what is it about?

13          MS. HOLLANDER:  It is a documentary about Israel and

14     Palestine that Holy Land used in its fundraising.

15          THE COURT:  I am going to have to take a look at

16     that one.

17          MR. JACKS:  Judge, it is a PBS documentary, and it

18     is completely hearsay, and it is slanted toward the

19     Palestinian side.  And she says they used it in the

20     fundraising.  There is no evidence of that.  Until somebody

21     says that, then that threshold hasn't been crossed.  But it is

22     certainly hearsay.

23          MS. HOLLANDER:  Your Honor, the Government

24     introduced a form fundraising letter yesterday.  I believe it

25     is Government's No. 95.  I mean, Holy Land Search No. 95.  I

1   believe that it is a form letter signed by Shukri Abu Baker.

2   You know, it comes with the Holy Land ads, requests for funds,

3   and it specifically says in the letter that the Government

4   introduced, "A remarkable video of the current situation in

5   Palestine produced by Tom Hayes, an American journalist, will

6   leave you breathless."

7        The Government found the documentary by Tom Hayes in the

8   Holy Land search.  That is how we got it because the

9   Government found it.  It is used for fundraising.  It is not

10  being offered for the truth.  It is being offered to show the

11  Holy Land's intent, how they raised money.  The Government

12  has --

13           THE COURT:  And I have not seen that.  I am not

14  going to let you get into it until I see it.  It wasn't

15  provided in what I have, so you are just going to have to -- I

16  will try to take a look at it over the lunch hour.

17       How long is it?

18           MS. HOLLANDER:  What we did, Your Honor -- It is

19  about I think an hour and a half video, but we made last night

20  about a 15-minute clip of it.

21           THE COURT:  Let me take a look at that over the

22  lunch hour.  Just give that to Jennifer or Brenda there.

23           MS. HOLLANDER:  But the purpose, Your Honor, is

24  strictly to show our clients' intent.  The Government has

25  introduced this letter and has also introduced various

1  fundraising activities that Holy Land did.  And this was a

2  fundraising activity that Holy Land did that they didn't show

3  the jury.

4          THE COURT:  All right.  Okay.  And of course, the

5  difference that I see, the ones that the Government showed

6  mostly involve Holy Land.  This is some documentary by some

7  other third party.  Is that what you are saying?  A PBS

8  documentary?  That is a concern I am having with the hearsay.

9          MS. HOLLANDER:  It is not being offered for the

10  truth so it is not hearsay.  I mean, it is not being --

11          THE COURT:  I think I have to disagree with you

12  again on this one, Ms. Hollander.

13          MS. HOLLANDER:  I mean, it is offered to show -- The

14  Government has talked about how they raise money, and this is

15  how they raised money.  I mean, the Government opened the door

16  to every bit of this with their videos.

17          THE COURT:  I think opening the door to something

18  being relevant, again, going back to that, that doesn't create

19  an exception to the hearsay rule.  That is the concern I have

20  with that.

21          MR. DRATEL:  The Government focused, particularly

22  with respect to the letter and the fundraising matters, the

23  letters coming from people and what went back out, this is

24  referring to that.

25          They talk about Holy Land's message.  This is Holy Land's

message.  It is not going for the truth.  It is going to what

is Holy Land's message, regardless of whether it is true or

not.  And that goes to intent, state of mind, all the things

that are exceptions to the hearsay rule and would make this

admissible.

Thank you.

MS. HOLLANDER:  And they are the ones who introduced

this letter, and it is right in the letter.

THE COURT:  Okay.  I will take a look at that.  I

still don't think that does away with the hearsay, but I will

look at that in light of the arguments you are making.

That is the only one you are planning on getting into

today?

MS. HOLLANDER:  It is the only one I am planning on

getting into.  I don't know if anybody else is planning on

showing any videos.

THE COURT:  So what is the number of this one?

MS. HOLLANDER:  No. 1015.

THE COURT:  Okay.  All right.  Mr. Jacks, what about

that argument that this goes to intent, state of mind, rather

than --

MR. JACKS:  Your Honor, there is no evidence that

this is indicative or reflective of their state of mind.  If

someone were to take the witness stand and say something, that

might get them there, if one of the Defendants were to say

1    this is indicative of that, but out-of-court statements to

2    show a person's state of mind, a Defendant's state of mind, is

3    a very narrow exception and it has to be almost simultaneous

4    with the event or the other statement that is being looked at.

5    So just to broadly say that everything that was found at the

6    Holy Land Foundation shows their state of mind is not an

7    exception to the hearsay rule.

8         MR. DRATEL:  Two things.  I don't think the rule --

9    The rule does not distinguish between defendants and

10   non-defendants with respect to state of mind, and I don't

11   think the case law does either.  But even notwithstanding

12   that, even if that were the rule, there is a simultaneous.

13   That letter shows that it is their state of mind because they

14   are using that to fundraise.  They are saying, "Watch this."

15        THE COURT:  The problem I am having, this is a

16   statement, out-of-court statement, and it is what -- they have

17   introduced this letter from Mr. Baker and the HLF tapes.  That

18   is their statements and so that is what takes it out of the

19   hearsay.  You don't have that here.  You are trying to offer

20   something by PBS.

21        MR. DRATEL:  But it is not for the truth.  It is to

22   show -- They are talking about Holy Land's message.  They are

23   suggesting that because these letters are coming back about

24   jihad and all these other things --

25        THE COURT:  But this is somebody else's statement as

1    to what Holy Land was doing, see.

2              MR. DRATEL:  But it is Holy Land's message.  It is

3    not for the truth.  It is to show what they tried -- how they

4    tried to raise money.  Mr. Abu Baker says -- You know, they

5    have Holy Land sending books to people that were not written

6    by Holy Land.  I mean, we have an entire trove of things --

7              THE COURT:  But they adopted them by sending out.

8              MR. DRATEL:  And they adopted this by sending it

9    out.

10             THE COURT:  But you are offering your own client's

11   statements.  What I am saying, it comes in -- you are still

12   offering your own client's statement to show this state of

13   mind out of court.  That is not the same as the opposing party

14   offering it against an opposing party.

15             MR. DRATEL:  I think it is.  I don't think the cases

16   make any distinction that hearsay from a defendant for state

17   of mind is still an exception to the hearsay rule.  It does

18   not -- And there are cases that I can find for the Court that

19   are legion on that.

20             THE COURT:  You might want to work on finding those

21   legion cases, then.

22             MS. CADEDDU:  Your Honor, I just want to clarify one

23   thing, if I may.  The letter that Ms. Hollander is referring

24   to that says, "Here, hear watch," the Government introduced it

25   yesterday.

1          THE COURT:  Right.  But it is a letter from

2     Mr. Baker.

3          MS. CADEDDU:  It is already in evidence.

4          THE COURT:  It is in evidence, but that still

5     doesn't open up everything -- In terms of opening up an area

6     for relevance is what I am saying, it doesn't do away with the

7     hearsay exceptions.  You still have to -- It may open up an

8     area for questioning, but you still have to satisfy the rules

9     of evidence in getting evidence in.  We have a hearsay

10    objection.  That is what I am dealing with.

11         I don't want to spend too much time on this.  We are

12    already late with the jury.

13         MS. CADEDDU:  Can I just ask, you said it is your

14    client's statement that is hearsay, and I understood you to

15    say the statement in the letter, which is already in.

16         THE COURT:  Not the statement.  The letter is in,

17    but now we are going to a further statement.

18         MS. CADEDDU:  But that is not the statement of the

19    Defendants.  That is something they sent out for fundraising,

20    so it is not their statement.

21         THE COURT:  It is a third party statement is the

22    point I am making.  At the time the letter came in, that was

23    the Defendant's statement from the Government's perspective.

24         I don't want to spend too much time on this.  We will get

25    back on it.

1    All right.  One last word?

2        MR. MYSLIWIEC:  Just since we are on it and it is in

3   this context, yesterday, or earlier, the Government admitted a

4   newspaper article to explain the meaning of the Defendants'

5   conversation, you know the Hamas article in the Dallas Morning

6   News.  They put in this letter that was sent to Mr. Mahmoud

7   and they gave a meaning to this letter.  Well, this videotape

8   is like the newspaper article that they put in.

9        THE COURT:  I don't see it as the same, because the

10  conversation quoted verbatim, which is the reason I let that

11  newspaper article, it quoted virtually all of the substantial

12  substantive portions of the that editorial.  It was already

13  in.  This does not quote anything.  It just refers to it by

14  title.  It is just not the same thing.

15       And like I say, I have heard enough on that.  We need to

16  move on, because I don't want to keep this jury --

17       MR. WESTFALL:  I don't anything on that, Your Honor,

18  but there are a couple of other videos in there.  I don't want

19  to get lost in the shuffle.

20       THE COURT:  I asked which ones we are going to get

21  into today or this morning.  Any others you are planning on

22  getting into this morning?

23       MR. WESTFALL:  I am not going to be cross examining

24  this morning.

25       THE COURT:  Then we don't need to be worrying about

it.

MR. WESTFALL:  Very well.  Defense Exhibit No. 1013,
this is that map.  Is it a map of the West Bank?

MS. HOLLANDER:  I believe it is already in evidence.

THE COURT:  I thought it was, maybe through Doctor
Levitt.  It seems like something like that came in.  At least
it was shown.  I don't know if it is in evidence.

MS. HOLLANDER:  We moved it into evidence.

THE COURT:  You might want to take a look at that.
It has been shown.

No. 1019.  Well, you said that has already been admitted.

MR. JACKS:  I don't understand the purpose of
introducing it with a Defendants' sticker on it.  And I didn't
put them side by side to see if there was additional
information put in there.

THE COURT:  How are you getting this -- What is
the -- You are wanting it with your own exhibit number?  It is
already in evidence.

MS. HOLLANDER:  Which one are you referring to?

THE COURT:  No. 1019.

MS. HOLLANDER:  We are not using it, Your Honor.

THE COURT:  You are withdrawing it?

MS. HOLLANDER:  For Burns at least.  And No. 1013
was admitted on the 23rd of September.

THE COURT:  No. 1013 was admitted, that map?

1          MS. HOLLANDER:  Yes.

2          THE COURT:  So that will be admitted.

3      No. 1020, progress report of victims' families?

4          MS. HOLLANDER:  I don't think we are using that.  I

5  can tell you, of the things I am putting in, the only ones

6  they object to on theirs are --

7          THE COURT:  We are almost through here.  Who is

8  putting in No.  1020?  Who is offering that?  It is on the

9  list.

10         MR. MYSLIWIEC:  This may have been one we put on in

11  an abundance of caution, so I will defer on that one.

12         THE COURT:  Okay.  And then No. 1047, this amended

13  declaration of Mr. Baker.

14         MS. HOLLANDER:  That was just a total error.

15         THE COURT:  You are withdrawing that one?

16         MS. HOLLANDER:  Because we have -- the corrected one

17  is in evidence.

18         MR. JACKS:  Judge, there was a series before that.

19         THE COURT:  Yes.  I missed that.  You are right.

20  Those CAIR action alerts?

21         MR. DRATEL:  Yes.  They are faxes to Mr. El-Mezain,

22  just like the faxes they put in.  They are designed, not for

23  the truth, but to show the type of material that he received.

24         THE COURT:  Why is that relevant?

25         MR. DRATEL:  They make it seem like his fax machine

1    was just all these -- Judge Fish let these in for this precise

2    reason.

3              THE COURT:  I don't see how they are relevant, so

4    you have to convince me how they are relevant, not that Judge

5    Fish let them in.

6              MR. DRATEL:  I understand.  But the relevance was to

7    show they were received, to show other types of material he

8    got on his fax machine.  They are putting in one very narrow

9    piece which are these IAP faxes.

10             THE COURT:  Because it is relevant to the case.  I

11   wouldn't let them put in something that wasn't relevant, and

12   the same rule applies to you.  It has to be relevant.

13             MR. DRATEL:  It is relevant.  It is another

14   organization that he gets material from that is similar.  It

15   is Islamic.  It talks about issues that go on in the Islamic

16   community.  It shows the type of stuff that he gets by fax

17   just by sitting there.  It is not a question of him --

18             THE COURT:  I am sure he gets a lot of things by

19   fax, but it is not all relevant.

20        Mr. Jacks?

21             MR. JACKS:  That is our point.  Plus, what is

22   contained within it is hearsay.

23             THE COURT:  That is true.  I will sustain the

24   objection to those, No. 1023, 1025, 1029, 1030, and 1033.  It

25   is hearsay, as well, and I don't see those as relevant.

1    No. 1047 we have addressed.

2    No. 1048, you say you may not have any objection.  It is

3    a passport.

4         MR. JACKS:  Correct, Your Honor.  I am not sure -- I

5    don't remember how that came -- Was it in the possession of

6    the Government?

7         MS. CADEDDU:  That is another one of the ones -- Are

8    we talking about Mr. Abdulqader's passport?  That is one of

9    the ones we put on two days ago because it was something I

10   went through last time.  It came in based on some testimony of

11   Agent Burns that I don't know that she has given this time.

12   So I don't know that it will come in.

13        THE COURT:  Okay.  We can wait until we get there on

14   that one, then.

15        The last one that I show, next to the last one, No. 1057.

16   It looks like a corrected translation.  Who is offering that

17   one?

18        MS. HOLLANDER:  We can withdraw that at this time.

19        THE COURT:  Okay.  And then No. 1069, some Wales and

20   England committee finding on Interpal.

21        MS. HOLLANDER:  That is not coming in at this time.

22        THE COURT:  Okay.  Withdrawing that one.

23        My list that I had from you only went through No. 1320,

24   exhibit No. 1320.  So the last few that you have -- and there

25   is some objections to those.  I haven't seen them yet.  I just

1    got the disk this morning, so I have to take a look at those.

2    MR. DRATEL:  There were two that are on mine that I

3    certainly won't be doing this morning.

4    THE COURT:  Okay.  We will deal with those later.

5    MS. MORENO:  Your Honor, there is one of mine.  It

6    is Defense Exhibit No. 1334, which I guess you do not have,

7    but it is --

8    THE COURT:  I have it now, but I just got the disk

9    this morning when I got on the bench, so I haven't had the

10   opportunity to look at that.

11   MS. MORENO:  I don't think there is an objection

12   from the Government.

13   THE COURT:  If there is no objection, you are all

14   right.

15   MS. MORENO:  I just wanted to alert the Court.

16   THE COURT:  The ones where there are objections,

17   obviously I can't rule on them without seeing them.

18   MS. HOLLANDER:  Your Honor, there are two that we

19   have given the Government and added to our exhibit list, No.

20   1336 and No. 1337.  They are both documents involving the Holy

21   Land wheelchair programs, and these are two of them again that

22   bear the FBI stamps because they received them from Holy Land.

23   THE COURT:  But I haven't seen them is the problem.

24   I need to take a look at them.  Those are disks that I got

25   this morning, so I haven't had the opportunity to look at

1   them, and I don't want to make a ruling until I have seen

2   them.

3           MS. HOLLANDER:  I wanted to let you know their

4   objection to those is that they --

5           THE COURT:  That same issue we have been discussing.

6           MS. HOLLANDER:  Right.  And I can assure the Court

7   they came from the files.  That is why we put the stamp on

8   them.

9           MR. JACKS:  We also objected on hearsay grounds.

10          THE COURT:  I understand.  That is why I want to

11  look at them.  I can't make that determination without seeing

12  them.

13      Anything else, then, on those issues before we bring the

14  jury in?

15      Are you ready, Mr. Jonas?

16          MR. MYSLIWIEC:  Your Honor, I am going to be out for

17  this morning.

18          THE COURT:  All right.

19      Go ahead and bring in Agent Burns.

20      And go ahead and bring the jury in.

21          (Whereupon, the jury entered the courtroom.)

22          THE COURT:  Ladies and gentlemen of the jury, good

23  morning.  We are ready to proceed.

24      Mr. Jonas.

25          MR. JONAS:  Thank you, sir.

1    Q.   (BY MR. JONAS)  Agent Burns, good morning.

2    A.   Good morning.

3    Q.   If you recall, yesterday we finished with you going

4    through the financial schedules of payments between the Holy

5    Land Foundation and certain zakat committees in the West Bank.

6    Do you recall that?

7    A.   I do.

8    Q.   Are you going to be able to come back later in this trial

9    and testify in greater detail regarding the relationship

10   between the Holy Land Foundation and those zakat committees?

11   A.   Yes, I am.

12        MR. JONAS:  Your Honor, I pass the witness.

13        THE COURT:  And Ms. Moreno, I believe you stated you

14   were first?

15        MS. MORENO:  Yes.  Thank you, Your Honor.

16                    CROSS EXAMINATION

17   By Ms. Moreno:

18   Q.   Good morning.

19   A.   Good morning.

20   Q.   How are you?

21   A.   I am fine, thank you.

22        MS. MORENO:  May it please the Court.

23   Q.   (BY MS. MORENO)  Agent Burns, you have been testifying

24   for about a week now about a myriad of documents.  Correct?

25   A.   That is correct.

```
 1    Q.    And let's see.  You have described searches and bank
 2    accounts.  Correct?
 3    A.    That is correct.
 4    Q.    And you have created PowerPoints for the jury based on
 5    underlying documentation?
 6    A.    That is correct.
 7    Q.    You have commented on videos and lectures.  Correct?
 8    That you have found in the evidence?
 9    A.    That is correct.
10    Q.    You have even read some poetry and identified certain
11    pamphlets and certain journals for the jury.  Correct?
12    A.    That is correct.
13    Q.    Let's take a look in terms of the journals.
14          MS. MORENO:  And I am going to be using the elmo
15    only, Your Honor.
16          THE COURT:  All right.
17    Q.    (BY MS. MORENO)  HLF Search No. 108.
18    A.    Okay.
19    Q.    I am going to describe it to you.  I am sure you will
20    recognize it as soon as I put it on the elmo.  First of all,
21    do you see that?
22    A.    I do.
23    Q.    All right.  And you recognize that as a journal that was
24    seized, a copy of a journal that was seized from the Holy Land
25    Foundation.  Correct?
```

1  A.   That is correct.  Can you scroll down so I can see which

2  one it is?

3  Q.   It says, if you will accept my word, it says HLDL 111.

4  A.   Okay.  What was the HLF search exhibit number?

5  Q.   No. 108.

6  A.   Okay.

7  Q.   Do you remember seeing this document?

8  A.   I do.

9  Q.   It was admitted during your testimony.

10  A.   I do.

11       MR. JONAS:  Your Honor, I am sorry.  Just real quick

12  sidebar on this one issue regarding this.

13       (The following was had outside the hearing of the

14       jury.)

15       MR. JONAS:  Your Honor, she is using a copy from the

16  last trial.  It has the old exhibit number on it.  My only

17  concern is that there were no -- We admitted a redacted

18  version of this, and I wanted to make sure we are not going to

19  get into pages that aren't admitted.

20       MS. MORENO:  We aren't.

21       MR. JONAS:  Also I don't know if you want --

22       MS. MORENO:  I will show you the exhibit so you can

23  check on it.

24       MR. JONAS:  No, I trust you.  I just wanted to make

25  sure there is no confusion, because you are asking her about

1    the exhibit number, and the number on the screen is different.

2    And I am also concerned about reference to the prior trial.

3         MS. MORENO:  Well, I said HLF Search No. 108, and

4    she identified it, and then I directed her attention to the

5    bates number seized from the Holy Land office.  She identified

6    that.

7         THE COURT:  What is the exhibit number of this

8    trial?  Do you know?

9         MS. MORENO:  HLF Exhibit No. 108.

10        THE COURT:  What is on the screen is different.  I

11   think I was noticing that.

12        MR. JONAS:  I want to make sure there is no

13   confusion to the jury and that nothing comes out about the

14   prior trial and page numbers --

15        MS. MORENO:  Let me show you the exhibit.

16        MR. JONAS:  I am not making any accusations.

17        MS. MORENO:  Okay.  I know that.

18        MR. JACKS:  Is there a reason we are not using a

19   copy?

20        MS. MORENO:  I didn't have it for some reason.  That

21   is what I had.

22        MR. JONAS:  We can put it on the screen, if you

23   want.

24        THE COURT:  Well, let's go with this.  Hopefully

25   this won't be an issue, but let's see what happens.

         MS. HOLLANDER:  I don't think there is any way the
jury can identify this.

         THE COURT:  Probably not.

         MS. MORENO:  The whole document is in evidence.

         MR. JACKS:  But that is not the exhibit.

         MS. HOLLANDER:  That page is in your exhibit.

         MR. JACKS:  That item she is showing is not in
evidence, not that version of it.

         MS. MORENO:  Yes, it is.

         MR. JACKS:  No, it is not.

         MR. JONAS:  We will get the original, Your Honor.

         THE COURT:  Go ahead and pull the original.

         MR. JONAS:  And Ms. Moreno can use that.

         MS. CADEDDU:  The problem here is, as the Court told
us, and we tried to prepare using the documents that we had
before, we didn't get the Government's the CDs of any of their
exhibits until the Friday before trial, so we have tried to
prepare in advance, and we have done the best we can, and in
some cases have the old exhibits.  That is just by virtue of
the fact that we don't have them.

         MS. HOLLANDER:  They didn't send their exhibits when
they sent their list.  We got them later, only after we asked
for them.

         MR. JONAS:  It is very simple.  Let's just use the
one that is admitted.

         1              THE COURT:  Do you want to use the one that is

         2     admitted?

         3              MS. HOLLANDER:  It has that page on it.

         4              MR. JONAS:  It has the pages which is has been

         5     admitted, which is not the full version, and it also has the

         6     incorrect exhibit stickers.  There is a simple solution.

         7              MS. MORENO:  It has that first page, which Mr. Jacks

         8     says it does not.

         9              MR. JACKS:  I didn't say that.  That first page has

        10     an exhibit sticker on it that is not in evidence.

        11              THE COURT:  That is what you were saying is not the

        12     same.

        13              MR. JACKS:  Right.

        14              THE COURT:  Okay.  I took it like you took it.

        15              MS. MORENO:  That page is in evidence.  We will use

        16     that exhibit.

        17              THE COURT:  You are just concerned about that

        18     sticker.  All right.  Okay.

        19              (The following was had in the presence and hearing

        20              of the jury.)

        21              MS. MORENO:  Can you pull up HLF Search No. 108,

        22     please?

        23     Q.   (BY MS. MORENO)  I just want to talk about the exhibit.

        24     Okay.  HLF Search No. 108.  Do you see that?

        25     A.   I do.

1    Q.   Okay.  I think that you read a particular page, the

2    Government had you read a particular page from this exhibit,

3    but let's take a look at the different articles.

4         MS. MORENO:  Can the jury see that?

5    Q.   (BY MS. MORENO)  This first page indicates Middle East

6    Affairs Journal summer/fall 1996-1416.  Do you see that?

7    A.   Actually we can't see that.  That part is not viewed on

8    the screen.  I saw it a second ago, but right now I don't

9    think we can see that part.  If you just move it a little bit

10   it will --

11        MS. MORENO:  May I approach the witness, Your Honor?

12        THE COURT:  Yes.

13        THE WITNESS:  Now we can see it.  Thank you.

14   Q.   (BY MS. MORENO)  All right.  You agree with the date?

15   A.   I do.

16   Q.   Okay.  And the first article says, "Islamic Movements at

17   the End of the 20th Century," does it not?

18   A.   It does.

19   Q.   That is written by someone named Michael Collins Dunn.

20   Correct?

21   A.   That is what it says.

22   Q.   The next says, "How Dangerous are the Islamists?" written

23   by Nader Hashemi.  Correct?

24   A.   Yes.

25   Q.   Let's take one last one.  "Hamas' Military Operations:

1   Resistance or Terrorism?" by Khaled al-Hroub.  Do you see

2   that?

3   A.   I do.

4   Q.   All right.  Now, if you turn to the next page, you see

5   listed a board of advisory editors.  Do you see that?

6   A.   I do.

7   Q.   And on this board for this journal that was seized from

8   the Holy Land, we see a number of names from some prestigious

9   American universities.  Correct?

10  A.   There are names and universities listed, yes.

11  Q.   Dr. William Zartman from Johns Hopkins University.  Do

12  you see that?

13  A.   I do.

14  Q.   Do you see Dr. Louis Cantori from the University of

15  Maryland?

16  A.   I do, on the right side.

17  Q.   USA.  Correct?

18       Dr. Bruce Lawrence from Duke University USA.  I am

19  pointing to it.

20  A.   Yes.

21  Q.   All right.  And the very top Dr. John Entelis from

22  Fordham University USA?

23  A.   Yes.

24  Q.   Would you agree with me that these are some of the more

25  prestigious universities in the United States?

1    A.    I don't know how these universities are ranked, but they

2    are universities in the United States.

3    Q.    You have heard of Duke?

4    A.    Yes.

5    Q.    And heard of Fordham?

6    A.    I am not familiar with where Fordham is.

7    Q.    And this is the board of advisory editors for this Middle

8    East Affairs Journal.

9    A.    That is what it says.

10   Q.    Right?  And this is the document that you testified to?

11   A.    That is correct.  That came from the HLF search warrant.

12   Q.    Do you have any reason to doubt that this is not the

13   board of advisory editors for the Middle East Journal?

14   A.    That is what the document says.  I don't have any

15   personal knowledge of whether or not these individuals

16   actually sat on the board.

17   Q.    Okay.  Now, would it surprise you that in your testimony

18   over the last week that you have actually discussed over a

19   couple of hundred exhibits that were admitted?

20   A.    That sounds about right.

21   Q.    About 250, I think.

22   A.    I didn't count them, but that sounds about right.  That

23   wouldn't surprise me.

24   Q.    We are not going to go through 250 exhibits.

25   A.    Okay.

1    Q.   I am sure everyone is grateful for that.  But I would

2    like to go over some of the evidence that is unique to Mr.

3    Elashi.

4    A.   Okay.

5    Q.   And first I would like to begin with a volume of evidence

6    to orient the jury on exactly how much we are talking about

7    here.

8         I think you indicated that you have been on the case for

9    the last seven or eight years; since 2001.  Is that correct?

10   A.   That is correct.  Since December of 2001.

11   Q.   You have described the search, the seizure of documents

12   as filling 500 to 600 boxes.  Is that right?

13   A.   That is correct.

14   Q.   And you have observed perhaps not the content, but you

15   have seen at least the number of thousands of videotapes in

16   connection with this case.  Correct?

17   A.   Video and audiotapes, yes.

18   Q.   Video and audiotapes.  Thousands of them.  Right?

19   A.   Correct.

20   Q.   And some of the searches you were present for and some

21   you were not present for.  Correct?

22   A.   That is correct.

23   Q.   And in fact, the investigation in this case was

24   international in scope.  Is that right?

25   A.   Yes, it was.

```
 1    Q.    It was in Europe.  Correct?

 2    A.    I am not sure -- I want to be clear about what you are

 3    asking.  The HLF had connections internationally.  Therefore,

 4    our investigation inherently involved looking at individuals

 5    in other countries, but I am not sure what you are asking when

 6    you ask me specifically about Europe.

 7    Q.    Your investigation in this case was international in

 8    scope.  Right?

 9    A.    I think I just said yes, we looked at their international

10    connections.

11    Q.    Germany.  You looked at some evidence in Germany --

12    A.    Yes.  The HLF --

13    Q.    -- in this case.  Yes?

14    A.    The HLF had connections in Germany.

15    Q.    I think Sweden or the Netherlands or other places like

16    that, and France.  Correct?

17    A.    I am not sure what you are -- I don't recall any

18    investigation that we did in France.

19    Q.    England?

20    A.    Yes, we obtained records from England.

21    Q.    Okay.  But the biggest contributor of evidence from a

22    foreign country in this case is the government of Israel.

23    Correct?

24    A.    We obtained a number of documents from the government of

25    Israel.  I don't know in comparison what the volume of that
```

1    would be compared to what we received from England, but I

2    believe it was more.

3    Q.    Would you say that the government of Israel, after the

4    United States investigation, that the government of Israel

5    documents that are going to be in this case surpassed the

6    documents, in terms of volume, from any other country?

7    A.    I believe that the number of foreign government exhibits

8    that we are showing here today, that there are more of those

9    from the government of Israel than from the other foreign

10    countries.

11    Q.    Okay.  In fact, one of the first exhibits on the first

12    day of this case was, do you know, Government of Israel No. 1?

13    It was a videotape seized in Israel?

14    A.    I am familiar with the videotape.

15    Q.    Back to the volume a minute, Agent Burns.

16    A.    Okay.

17    Q.    The Holy Land offices were searched in Texas, New Jersey,

18    and California, and Chicago?

19    A.    That is correct.

20    Q.    Okay.  And then you -- Then the searches involved Mr.

21    Elbarasse's home.  Correct?

22    A.    That is correct.

23    Q.    And Mr. Mushtaha's backyard?

24    A.    That is correct.

25    Q.    And Mr. Ashqar's home?

```
1    A.    That is correct.

2    Q.    Any other searches I have left out?

3    A.    The InfoCom.

4    Q.    And the InfoCom searches.  Correct.  Thank you.

5    A.    That is correct.

6    Q.    Any other searches?

7    A.    I don't believe we discussed any other ones.

8    Q.    Okay.  And these documents and these videos that we have

9    seen in this case and will see in this case are labeled by the

10   FBI.  Correct?  Bates numbers, I think you called them.

11   A.    Yes.  For the most part they have the bates numbers on

12   them.

13   Q.    And the bates numbers are also unique to the particular

14   search, meaning the geographical location.

15   A.    That is correct.

16   Q.    So for the Dallas search we would see HLDL.  Right?

17   A.    That is correct, on the bates number.

18   Q.    And for New Jersey what would we see?

19   A.    HLNK.

20   Q.    And for San Diego, California what would we see?

21   A.    HLSD.

22   Q.    And for Chicago?

23   A.    HLCG.

24   Q.    And in terms of the searches for the documents and the

25   evidence retrieved from InfoCom?
```

1   A.   Those begin with SW.

2   Q.   And the Elbarasse searches?

3   A.   I believe that is ISE-SW.

4   Q.   And Mushtaha's backyard?

5   A.   I don't believe -- Because most of those were videotapes,

6   we didn't bates stamp videotapes.

7   Q.   So I think -- Are those just labeled video or V something

8   with a number?

9   A.   I can't recall exactly how they were labeled, but we

10  didn't bates stamp videotapes.

11  Q.   Okay.  Now, besides the searches, you had other tools for

12  your investigation, including surveillance.  Correct?  That

13  you have testified to?

14  A.   That is correct.

15  Q.   And before we get to that, let's talk a little bit about

16  the wiretaps in this case, so we can be clear.  How many years

17  were the wiretaps in place?

18  A.   Well, we have discussed a number of different wiretaps,

19  and there were different times for each of those.

20  Q.   Let's, instead of breaking it down like that, just give

21  me a range from the very beginning of the first wiretap to the

22  end of the last wiretap.  What years are we talking about?

23  A.   Well, again, as I said, there were different years for

24  the different wiretaps, and I am not positive about the dates

25  on all of them, but I will give you what I can.

1    I know that for the Defendant Mohammad El-Mezain,

2    coverage of his line began at some point in 1994 and extended,

3    with gaps, through I think 2003.  And the wiretaps of the

4    Defendant Shukri Abu Baker started possibly '94, '95, and

5    ended in approximately 2001.  Again, I was not present during

6    these, so I may have these dates a little off.  But generally

7    this is what my understanding is.

8        For the Defendant Mufid Abdulqader, there were

9    approximately eight months total of coverage, but there was a

10    gap in a couple of months in that coverage.

11        As far as the HLF, there was not extensive coverage of

12    that entity.  That I think began in 2000 or so and lasted for

13    maybe until they were shut down.

14    Q.    And Mr. Ashqar?

15    A.    He was either the first or second wire -- He and Muin

16    Shabib were covered in the very early years, so those were

17    around 1993, 1994.  They did not extend past 1995, I don't

18    believe.

19    Q.    So you think it was about a year for each of those,

20    Ashqar and the Shabib?

21    A.    Approximately.

22    Q.    Okay.  Now, it is true that my client Ghassan Elashi, he

23    was never wiretapped.  Correct?

24    A.    He was captured on wiretaps, but he himself was not the

25    subject of a FISA wiretap.

1    Q.    Meaning that his home was not wiretapped.  Correct?

2    A.    That is correct.

3    Q.    Okay.  And so there are no FISA wiretap warrants for

4    Ghassan Elashi in this case.  Right?

5    A.    That is correct.

6    Q.    All right.  But you did capture him in conversations with

7    others where the wiretaps were running?

8    A.    Yes.

9    Q.    And in fact, we have seen a couple of those already

10   captured on Mr. Abu Baker's wiretaps.  Correct?

11   A.    That is right.

12   Q.    All right.  The total amount of phone calls -- And I am

13   going to include the Philadelphia meeting because Mr. Elashi's

14   voice is heard there as well.  Correct?

15   A.    That is correct.

16   Q.    Would you agree with me that it is, in this case anyway,

17   the number of phone calls where you will hear Mr. Elashi's

18   voice, are under ten?

19   A.    That we are presenting here today?  I did not count them,

20   so I don't know for sure how many he is in.  I didn't count

21   them.

22   Q.    Does that figure sound right to you?

23   A.    I would hate to guess on the stand so I would like to

24   look through them.  I am not saying you are wrong, but I have

25   not counted them so I don't really have an idea how many he is

1    in, because I am not the only witness testifying.

2    Q.   Right.  But you are the case agent in this case.

3    A.   Right.  But I didn't testify regarding all of the

4    conversations that may include your client.

5    Q.   Well, you read the FISAs.  Right?

6    A.   I did.

7    Q.   Okay.  In fact, you have read about 9600 summaries of

8    FISAs.  Correct?

9    A.   That sounds about right.

10   Q.   So you are familiar with the phone calls where Mr. Elashi

11   is captured.  Correct?

12   A.   That is correct.  But he was captured on a lot of calls.

13   We are just playing a few.

14   Q.   Right.  Because you are using the calls that you believe

15   are relevant to the crimes in this case.  Right?

16   A.   For efficiency purposes, we limited the amount of calls

17   put here today so we all wouldn't be here for an extended

18   period of time.

19   Q.   So you are holding back on phone calls in this case?

20   A.   I would not say that we are holding back on phone calls.

21   You have all of them available to you.  I think that they were

22   all made available to you.

23   Q.   You are putting into evidence in this case, Agent Burns,

24   those phone calls where Mr. Elashi's voice is captured that

25   you believe are relevant to this indictment.  Correct?

1   A.   That is correct.

2   Q.   The surveillance, you have got a couple of photographs of

3   my client from the Philadelphia meeting.  Correct?  We saw a

4   couple of those photographs.

5   A.   Yes.

6   Q.   All right.  And those photographs were taken about 15

7   years ago.

8   A.   Yes; 1993.

9   Q.   October 1993?

10  A.   That is correct.

11  Q.   Fifteen years this month.

12  A.   That is correct.

13  Q.   Okay.  And I think on a video that was played a few days

14  ago, I think you pointed out Mr. Elashi walking out of the

15  screen past the camera angle.  Do you remember that?

16  A.   I do.  That was a 1990 festival in L.A.

17  Q.   1990 festival.  Let's talk about some of the evidence in

18  this case, and I am just going to break it down in terms of

19  some documents and some bank accounts.

20  A.   Okay.

21  Q.   First of all, you know what the designation dates are,

22  which are highly relevant in this case.  You have testified

23  about those.  Correct?

24  A.   That is correct.

25  Q.   All right.  And January 23rd, 1995 is important why?

1  A.    That is the date that Hamas was designated as a specially

2  designated terrorist.

3  Q.    And October the 8th of 1997 is also significant.  Why is

4  that?

5  A.    Because that is the date that Hamas was designated as a

6  foreign terrorist organization.

7  Q.    And on December the 4th of 2001, Holy Land ceased to

8  operate.  Do you agree?

9  A.    Yes.

10        MS. MORENO:  May I approach, Your Honor?

11        THE COURT:  Yes.

12  Q.    (BY MS. MORENO)  So do you see those dates?

13  A.    I do.

14  Q.    All right.

15        MS. MORENO:  Your Honor, I would like to offer into

16  evidence Defense Exhibit No. 1334, which is a timeline labeled

17  "time frame between Hamas designation and HLF closing."

18        THE COURT:  It is No. 1334?

19        MS. MORENO:  Yes, Your Honor.

20        THE COURT:  That is admitted.

21        MR. JONAS:  No objection as a demonstrative.

22        THE COURT:  I have it on the paper that you said no

23  objection, so that is admitted.

24  Q.    (BY MS. MORENO)  Okay.  One of the -- What I would like

25  to do on the next number of exhibits is focus just simply on

1    the time, the time period of these documents, according to

2    either what you have dated them to be by the content or what

3    they have expressly indicated is the date.  All right?

4    A.   Okay.

5              MS. MORENO:  And I am going to be using the elmo for

6    all of these, Your Honor.

7    Q.   (BY MS. MORENO)  Let's start with Elbarasse Search No. 1.

8    Do you see that?

9    A.   I do.

10   Q.   And this particular document is dated November 9th, 1991.

11   Correct?

12   A.   Correct.

13   Q.   And within it it discusses certain supplements, and those

14   are dated, and they are all predated 1991.  Correct?

15   A.   They predate the November 1991 date.

16   Q.   Right.  And the first one starts, "Supplement No. 1, the

17   substance of the long-term plan (1987)."  Do you see that?

18   A.   That is correct.

19   Q.   Okay.  So that is 1991.  Now, remember the lecture that

20   was played in Elbarasse Search No. 2?  Do you see that?

21   A.   I do.  I think we actually read this one.

22   Q.   You read portions of it.  Do you recall?

23   A.   I do.

24   Q.   "Ikhwan in America, Zeid."  Do you see that?

25   A.   Yes.

1   Q.   Now, this is 1982.  It was dated 1982.  Do you recall

2   testifying to that?

3   A.   I believe that was it.  I think we thought either 1982 or

4   1983, but very early '80s.

5   Q.   Elbarasse Search No. 3.  Do you see that?

6   A.   I do.

7   Q.   Okay.  And I believe this was determined -- "Strategic

8   goal for North America."  And that was dated May 22, 1991.

9   A.   Correct.

10  Q.   Now, Elbarasse Search No. 4, do you see that?

11  A.   I do.

12  Q.   And this is a document dated December 18th, 1988.

13  Correct?

14  A.   Correct.

15  Q.   Do you see that?

16       Let's go to Elbarasse Search No. 5.  Let me show you this

17  sticker so you can see that.  Yes?

18  A.   I do.

19  Q.   Okay.  And you remember testifying to all these Elbarasse

20  search documents.  Right?

21  A.   I do.

22  Q.   And this one is -- It says "Islamic Action for Palestine,

23  an internal memo, October 1992."  Correct?

24  A.   Correct.

25  Q.   Elbarasse Search No. 7.  Do you see Elbarasse Search No.

1  7?

2  A.   I do.

3  Q.   This document, December of '91.  Do you see that?

4  A.   I believe -- Well, it is April 2nd, 1991 is the actual

5  date.

6  Q.   And then underneath it it says December?

7  A.   It does.

8  Q.   April 21st, 1991, and then it says "outgoing #:  12/91"?

9  A.   Yes, it does.

10 Q.   Now Elbarasse Search No. 8, you testified, and this

11 involves Mr. Elashi.  Let's talk about this a minute.

12 Elbarasse Search No. 8.  Do you see that?

13 A.   I do.

14 Q.   And it says "Occupied Land Fund report."  Correct?

15 A.   It does.

16 Q.   There is no date on this one.  Do you recall?

17 A.   I do.

18 Q.   Okay.  So we don't know when this was created.

19 A.   Based on the content of the document, you can determine

20 it happened in 1991.

21 Q.   '91.  Okay.  And I think you pointed out on page 6 "The

22 Central Committee for charity work:

23      "Brother Ghassan is currently on a visit to Britain

24 representing the Fund in order to study the possibility of

25 forming a Central Committee for charity work."  Do you see

1  that?

2  A.    I do.

3  Q.    And I think you read that to the jury or you commented to

4  the jury.

5  A.    Yes, we read it.

6  Q.    Okay.  And where did he go in Britain and who did he

7  speak to?

8  A.    Other than the content of the letter, I don't know.  We

9  did not have surveillance on that meeting so I don't know

10  exactly with whom he met.  It says the brothers.  I would

11  presume Muslim Brotherhood members in England to discuss,

12  again, the creation of a Palestine Committee there just like

13  the one here.

14  Q.    Okay.  So you presume that he went to England to meet

15  with Muslim Brotherhood members.

16  A.    Based on the content of that.  As I said, I do not know

17  with whom he met.

18  Q.    And you don't know if he even went to Britain, do you?

19  A.    I think there are records that we don't have here that

20  indicate that he did travel in 1991 there, but we have not

21  discussed them here.

22  Q.    And these are records that you have withheld from this

23  case?

24  A.    No, ma'am.  I think you have all the records that are in

25  our possession.

1    Q.    When did he go to Britain?

2    A.    As I said just a minute ago, I am not sure exactly when

3    he went and I don't know who he met with.  This is their

4    report.

5    Q.    Are you sure that he went to Britain?

6    A.    Based on their report he did, unless they lied in their

7    report.

8    Q.    When you say "their report," you mean?

9    A.    The Holy Land Foundation, yes.

10   Q.    Let's talk about Elbarasse Search No. 10 for a minute.

11   You have referred to this chart a number of times.  Do you see

12   Elbarasse Search No. 10?

13   A.    I do.

14   Q.    And this is the Central Committee organization chart for

15   the year 1991.

16   A.    That is correct.

17   Q.    And let's go to page -- I think it says 7 of the

18   document.  And it has a number of names and different

19   organizations.  Do you see that?

20   A.    I do.

21   Q.    And where is Mr. Elashi's name on this chart?

22   A.    Ghassan Elashi's name is not on this document.

23   Q.    It is not on this document.  Let's go to the next page.

24   Does Mr. Elashi's name appear there?

25   A.    No, it does not.

1    Q.    But there is a Ghassan Dahduli there.  Correct?

2    A.    That is correct.

3    Q.    Who is Ghassan Dahduli?

4    A.    He was one of the other attendees at the Philadelphia

5    meeting who was also a member of the Palestinian Committee and

6    worked with the IAP.

7    Q.    Okay.  Now, in fact, I think that you used this

8    chart -- Let me get this right.  You were asked about an

9    individual Issam Al-Sarraj.  Do you remember that?

10   A.    I do.

11   Q.    Okay.  And you were asked a question about who he was,

12   and you referred to this chart and you said there he is, No.

13   21.  There he is--Issam Al-Sarraj?

14   A.    I recall pointing to his name, yes.

15   Q.    But you used this chart as an indication of who these

16   people were with respect to the committee.  Correct?

17   A.    This chart, the Ashqar one, and the Philadelphia meeting,

18   yes.

19   Q.    You used this chart to locate Mr. Al-Sarraj's name?

20   A.    When asked about him, yes.

21   Q.    When asked about him.  All right.  And this is the

22   Central Committee organization chart.  That is what it says.

23   Right?

24   A.    It does.

25   Q.    Now, so far we have seen two people named Ghassan.

1    Correct?  Ghassan Elashi and Ghassan Dahduli.

2    A.    That is correct.

3    Q.    And both were at the Philadelphia meeting.  Correct?

4    A.    That is correct.

5    Q.    Ghassan Salah Dahduli, he gave a report at the

6    Philadelphia meeting.  Do you recall that?

7    A.    He did.

8    Q.    And Mr. Elashi did not give a report at the Philadelphia

9    meeting.  Do you recall?

10   A.    He spoke during the Philadelphia meeting, but I do not

11   recall that he recited a report.

12   Q.    Right.  So you don't recall that he gave a report.

13   Correct?

14   A.    That is correct.

15   Q.    So when the documents in this case refer to Ghassan, one

16   has to look at the context to determine which Ghassan it is if

17   the last name is not included.  Would you agree?

18   A.    If the last name is not there, then you need to look to

19   the context to determine who is who.

20   Q.    Okay.  All right.  Elbarasse Search No. 9.  Do you see

21   that, Agent Burns?

22   A.    I do.

23   Q.    And again, this is a 1991-1992 document, according to the

24   document itself.

25   A.    That is correct.

1    Q.    Now, Elbarasse Search No. 11.  Do you see that?

2    A.    Yes, I do.

3    Q.    And this is a 1989 internally dated document.  Correct?

4    A.    Correct.

5    Q.    All these documents thus far are years before the

6    designation of Hamas.  Correct?

7    A.    That is correct.

8    Q.    Okay.  Now, Elbarasse Search No. 13.  Let me show it to

9    you quickly.  Do you see that?

10   A.    I do.

11   Q.    And this one indicates it is an annual report dated '89

12   to 1990.  Correct?

13   A.    Correct.

14   Q.    Do you know who authored this particular document?  Do

15   you remember this document?

16   A.    If you can turn to the next page, I believe this was the

17   Palestinian Committee report which was authored by someone

18   within the committee, but as I recall there is no author

19   noted.

20   Q.    Right.  So we don't know who authored this report.

21   A.    We don't know the individual who actually drafted the

22   document.

23   Q.    Correct.  We have Elbarasse Search No. 14.  I am showing

24   you the sticker.

25   A.    I see that.

1    Q.   And this document refers to events "preparing work
2    program for 1992," so we know it is 1992 or before.  Correct?
3    A.   Correct.
4    Q.   Now, here is a document again that discusses my client,
5    Elbarasse Search No. 15.  Do you see that?
6    A.   I do.
7    Q.   And this is dated February 22nd, 1991.  Correct?
8    A.   Correct.
9    Q.   And then there is a number of items listed.  Do you see
10   that?
11   A.   I do.
12   Q.   Now, this says in No. 7 that "Mr. Elashi will commit to
13   working four hours daily at the Fund as public relations
14   supervisor in compensation for $1500 monthly."  Correct?
15   A.   It does.
16   Q.   And then he is mentioned again in No. 10, "Brother
17   Ghassan Elashi will pay $17,000 to the financial controller of
18   the Central Committee."  Do you see that?
19   A.   I do.
20   Q.   There is no evidence that any of that happened with
21   respect to Mr. Elashi that you have found.  Correct?
22   A.   I did not find records indicating that he received the
23   money, but that is not determinative because I don't have all
24   the records as they were dated.
25   Q.   You have not seen any evidence that Mr. Elashi did any of

1  these things or received these amounts of money.

2  A.    I didn't find any checks for $1500 monthly, no.

3  Q.    So that would be -- You didn't find any evidence of that.

4  Correct?

5  A.    That is what I said.

6  Q.    Okay.  Now, I think in your -- Mr. Jonas had you look at

7  HLF Search No. 5.  Do you recall that?

8  A.    I do.

9  Q.    And that is -- appears to be on Occupied Land Fund

10  letterhead.  Correct?

11  A.    It does.

12  Q.    All right.  What is this in the center?

13  A.    It is a symbol or their symbol of Palestine to include

14  Israel.

15  Q.    What is in the middle of that?  Can you tell?

16  A.    It looks like a plant, maybe wheat.

17  Q.    Okay.  And what is the -- Can you read what is in English

18  under "the Occupied Land Fund"?

19  A.    It says up on the top, "The parable of those who spend

20  their possessions in the sake of God is that grain of

21  which" -- I am having a hard time.  I think that says

22  "...grows seven ears in every year a hundred grains.  For God

23  gives manifold increase to whom He wills, and God cares for

24  all and knows all things."

25  Q.    Okay.  And this is entitled "the board meeting minutes."

1    Correct?

2    A.   Correct.

3    Q.   And this is dated the first meeting 1991 in Los Angeles,

4    California.  Correct?

5    A.   Yes.  It says February 16th through 18, 1991.

6    Q.   Now, this document, Elbarasse Search No. 15--I just want

7    to be clear that I am showing you the first page--this doesn't

8    have a logo on it.  Correct?

9    A.   That is correct.

10   Q.   Okay.  And it doesn't have that same parable that you

11   just graciously read for us.  Correct?

12   A.   No, it doesn't.

13   Q.   And in fact, it begins with this salutation "In the name

14   of God the beneficent the merciful."  Correct?

15   A.   That is correct.  It was actually, if you look at the

16   last page, drafted by the Central Committee, "Your brothers,

17   head of the Central Committee."

18   Q.   I understand.  And that salutation does not appear on the

19   Occupied Land Fund board meeting.  Right?

20   A.   Not on the English version, no.

21   Q.   And these are also pre-1995.  Correct?

22   A.   That is correct.

23   Q.   Let's go to Elbarasse Search No. 16 and 17.  Now, this

24   Elbarasse Search No. 16, this is also a 1990 document.

25   Correct?

```
1    A.   Correct.

2    Q.   Elbarasse Search No. 17.  Let me first show it to you and

3    then I want to ask you a little bit about it.  This is a

4    document that is signed or it is indicated the words Seven Up,

5    and above it I says 7/20.  Correct?

6    A.   Correct.

7    Q.   When you were asked on direct who is Seven Up, you don't

8    know who Seven Up is.

9    A.   No, I don't.

10   Q.   So you don't know who authored this.

11   A.   You can tell it came from Hamas, but someone used a code

12   word to sign his name so we don't know.

13   Q.   And you can tell it came from Hamas because of the

14   content that is why it came from Hamas?

15   A.   Yes.  You can see they are requesting $100,000 for pieces

16   of metal for the Ezz Eddin al-Qassam Brigades.

17   Q.   And we don't know who wrote this and who it was written

18   to, according to this document?

19   A.   As I said, I don't know the identity of the author.

20   Q.   And you don't know who it was written to, according to

21   the document.

22   A.   I know that it was found in a section of documents

23   belonging to Mousa Abu Marzook in the Elbarasse search

24   warrant.

25   Q.   It was not found at the Holy Land Foundation.
```

1  A.   That is correct.

2  Q.   Or InfoCom.

3  A.   That is correct.

4  Q.   Now, this, along with some other documents, make up your

5  Demonstrative No. 8, I believe.

6  A.   I can't recall the number, but I will take your word for

7  it on that one.

8  Q.   Okay.  And this involves the Islamic Relief Committee.

9  A.   It does.

10  Q.   Correct?  Your Demonstrative No. 8.  Do you recall that

11  now?

12  A.   It does.

13  Q.   And the Islamic Relief Committee is a committee that you

14  have testified about.  Correct?

15  A.   That is correct.

16  Q.   And in fact, I think you made a summary chart about the

17  Islamic Relief Committee.

18  A.   Yes, we did.

19  Q.   Okay.  Now, in this indictment, and the charges against

20  my client and these other gentlemen, the Islamic Relief

21  Committee does not appear.  Correct?

22  A.   I don't believe that it does.

23  Q.   Right.  It is not a charged count in the indictment.

24  Right?

25  A.   It is not.

1  Q.   It is not an overt act in the indictment.  Correct?

2  A.   That is correct.

3  Q.   So, in fact, if you looked through the entire indictment,

4  you would never see the word Islamic Relief Committee.  Right?

5  A.   I don't recall that the Islamic Relief Committee appears

6  at all, and I know it was not part of a count.

7  Q.   Now, this Islamic Relief Committee, this is an Israeli

8  charity meaning that it is based in Israel.  You know that.

9  Right?

10  A.   It was located in Um El-Fahem which is within Israel, but

11  it was closed down in 1996, I believe.

12  Q.   Okay.  I didn't ask you when it was closed down.  And I

13  may ask you that, but now I am asking you, was it located in

14  Israel.  And what is your answer to that question?

15  A.   I am sorry.  I thought you said is it located in Israel.

16  At the time it was operating it was in Israel.

17  Q.   It was in Israel.  Okay.  And do you know that it was

18  established in 1991?

19  A.   I don't know the exact date that it was established.

20  Q.   So you don't know the history of the committee?

21  A.   I have read it in some of the HLF documents, but I don't

22  recall offhand the date of the creation.

23  Q.   Okay.  Now, in terms of your Demonstrative No. 8, let's

24  talk a little bit about context.  Okay?

25  A.   Can we put it up so I can see it?

1   Q.   Well, this is what I am talking about, this

2   demonstrative.  Do you remember this?

3   A.   I do.  I think there were two pages to it, so just to be

4   clear which exhibits we are speaking about.

5   Q.   Just where the Islamic Relief Committee is mentioned.

6   And we are talking about the year 1992.

7   A.   Correct.

8   Q.   Okay.  So let's stay with 1992.  In 1992, how long had

9   the Intifada been going on?

10  A.   The Intifada began in December of 1987.

11  Q.   So it was going on for five years?

12  A.   Almost, at that time.

13  Q.   And this is the first Intifada.  Correct?

14  A.   That is correct.

15  Q.   Now, how long in 1992 had the West Bank and the Gaza

16  Strip been occupied by Israel?

17  A.   The uprising was in December of 1987 as a result of the

18  occupation, so the occupation had been existing at that point.

19  Q.   Do you know when the occupation began?

20  A.   I am not an expert on the issue of Israeli occupation, so

21  I don't feel comfortable speaking about it.

22  Q.   Does the Six Day War ring any bell?

23  A.   It does.

24  Q.   1967.  So do you agree with me that at least since 1967

25  Israel has been occupying the West Bank and Gaza up until

1    1992?

2    A.    That is correct.  Israel was created in 1948, and I know

3    there were a number of battles between then and --

4    Q.    I am asking you about the beginning of the occupation of

5    the West Bank and Gaza from 1967.  Do you agree that in 1967

6    those areas were occupied by Israel?

7    A.    I know that Israel had a presence in those areas.  As I

8    said, I am not an expert on Israeli occupation, so I do not

9    feel comfortable testifying at length about it.

10   Q.    When you say a presence, what do you mean by that?

11   A.    As I stated, I am not an expert on Israeli occupation, so

12   I do not feel comfortable -- I don't know the extent of

13   Israeli presence --

14   Q.    Well, you just told the jury --

15           THE COURT:  Ms. Moreno, she says she doesn't know

16   much about that.  Get onto is something that she knows about.

17   Q.    (BY MS. MORENO)  So you don't know about the occupation.

18   A.    I know that Israel had a presence, but I am not

19   comfortable speaking about the extent of it, as I am not an

20   expert in that area.

21   Q.    Okay.  The Project 236 that you mentioned in connection

22   with the Islamic Relief Committee, do you remember testifying

23   about that?

24   A.    I do.

25   Q.    And you said that you had looked through the documents in

```
1    Project 236.

2    A.    That is correct.

3    Q.    All right.  And you said that it was confusing to you and

4    that the numbers didn't add up.  Do you remember that

5    testimony?

6    A.    Yes.

7    Q.    Now, the documents in 236 also include a number of

8    documents from the Red Cross.  Do you recall that?

9    A.    They do.

10   Q.    Okay.  And the Red Cross was involved with that Project

11   236 in some fashion or another.

12   A.    I don't know that I would say that they were involved.

13   They had issued certificates of security detention for

14   individuals who had been detained by the government of Israel.

15   So I don't know that the Red Cross -- I don't know what their

16   involvement was, other than to print those certificates saying

17   "These individuals are under arrest."

18   Q.    So in Project 236 you saw documents evidencing the Red

19   Cross and some sort of involvement, you don't know what it

20   was, in that project.

21   A.    If you want to, we can look at one of the certificates

22   and see, but what it is is the certificate of detention

23   appeared to have been printed by the Red Cross.  Other than

24   that, I am not aware of their involvement.

25   Q.    And you saw that in Project 236?
```

```
1    A.    If we can pull it up then I can say for sure.

2              MS. MORENO:  May I have a moment, Your Honor?

3              THE COURT:  Yes.

4              MS. MORENO:  Your Honor, there were so many

5    documents, may I approach the witness with --

6              THE COURT:  Sure.

7    Q.    (BY MS. MORENO)  The 21st Century demonstrative.

8    A.    Yes.  This is what I was talking about.

9    Q.    Can you describe it for the jury?

10   A.    Yes.  I wish we could put it on the screen for them to

11   see.  In the documents, along with the applications for the

12   families, generally there were attached a document and it had

13   a stamp on it and it said, "To whom it may concern:  According

14   to the records of the International Committee of the Red

15   Cross, Mr. and Ms."--and then it has the name, it tells where

16   they are from--"was arrested by the authorities for reasons

17   related to security on"--and it gives the date, and it tells

18   how long they were sentenced for, and where they are presently

19   detained.

20   Q.    And this is representative of the kind of Red Cross

21   documents that you saw in Project 236.  Would that be fair?

22   A.    Yes.  There are a number of those documents in that

23   project.

24   Q.    Thank you.  By the way, on this Islamic Relief

25   Committee --
```

1          MS. MORENO:  May I approach, Your Honor?

2          THE COURT:  Yes.

3     Q.   (BY MS. MORENO)  Showing you what has been marked as

4     Defense Exhibit No. 963, which is the blocking list.

5     A.   Okay.

6     Q.   Okay?  And when you talk about designation, you are

7     really referring to this list, are you not; the list that is

8     before you?

9     A.   I am not referring to this list.  This is a list of

10    entities that had been designated.  This particular list is

11    dated June 29, 2001, so this list provides, you know, a

12    listing of all the entities on that date that were designated

13    as a terrorist, whether it is a specially designated terrorist

14    or a foreign terrorist organization.

15    Q.   Right.  Is the Islamic Relief Committee a designated

16    terrorist organization on that list?

17    A.   I don't believe the Islamic Relief Agency is listed

18    individually under here.  It would probably fall underneath

19    the Hamas designation, but I don't believe it is individually

20    listed in this.  I will confirm.  It is not listed

21    individually.

22    Q.   And when you look at the Hamas designation, if you could

23    turn to the Hamas designation, underneath it you don't see the

24    Islamic Relief Committee.  Correct?  That is not in there.

25    A.   It says Hamas, aka Islamic Resistance Movement, and gives

1    several other names for it.  That designation would include

2    any part of Hamas.

3    Q.    Right.  The Islamic Relief Committee, the name of the

4    committee is not on the list.

5    A.    The name of the committee is not on the list.

6    Q.    So the committee is not a designated terrorist

7    organization according to the United States.  Correct?

8    A.    As I said, the individual committee's name is not on this

9    list.

10            MS. MORENO:  May I approach?

11            THE COURT:  Yes.

12   Q.    (BY MS. MORENO)  Here is another document, Elbarasse

13   Search No. 19.  Do you see that?

14   A.    I do.

15   Q.    It is a document you testified about that is in evidence.

16   Correct?

17   A.    Correct.

18   Q.    And again, we are talking about July 30th, 1994,

19   according to its own internal indication.  Right?

20   A.    That is correct.

21   Q.    Elbarasse Search No. 31.  Do you see that?

22   A.    I do.

23   Q.    Okay.  Again, this is internally dated 1988.  Correct?

24   A.    Correct.

25   Q.    Elbarasse Search No. 35.  I believe it is right there.

1    A.    It is.

2    Q.    Okay.  And we are looking at the dates now.  June 10th,

3    1992?

4    A.    That is correct.

5    Q.    Now, is it fair to say that all -- When was the Ashqar

6    search?

7    A.    In December of 1993.

8    Q.    Okay.  So it is fair to say that all of those documents

9    and any of that evidence that was retrieved from Ashqar

10   predates the designation of Hamas.

11   A.    Yes.  All of the Ashqar search documents would have been

12   December 1993 or before.

13   Q.    So all of that Ashqar evidence, however much it is, that

14   you have testified about the last week, that all predates the

15   designation date.

16   A.    Correct.

17   Q.    Let's talk a little bit about context again.  HLF Search

18   No. 7.  Do you remember testifying about this document?

19   A.    I do.

20   Q.    Okay.  And your attention was directed to this income by

21   year and these numbers next to it.

22   A.    Correct.

23   Q.    Do you remember that?

24   A.    I do.

25   Q.    Now, this was found in a computer.  Correct?

1    A.    In an HLF computer, yes.

2    Q.    In an HLF computer.  Right?

3    A.    Correct.

4    Q.    Where was this document used or filed?

5    A.    I don't know where it was used.

6    Q.    Okay.  So you don't know if it was ever used.

7    A.    I don't know.

8    Q.    You don't know if it was a draft.  Right?

9    A.    All I can say is that the document title was found on the

10   computer when the computer was seized in 2001.

11   Q.    That is all you can say about this document.

12   A.    I don't know how they used it.

13   Q.    Okay.

14        MS. MORENO:  If I may use one of the boards?

15   Q.    (BY MS. MORENO)  This is Government's Exhibit Bank

16   Accounts.  It is a summary of bank accounts that has been

17   used, and there is a number of accounts on there.  Do you

18   agree?

19   A.    I agree.

20   Q.    And not all of the accounts actually have been discussed

21   in this case, but let's just talk about the ones that have.

22        Now, all of the Occupied Land Fund -- What is missing

23   from this chart are dates.  Right?

24   A.    There are no dates on this.

25   Q.    No dates on here.  So the Occupied Land Fund NAIT series,

1    that all predates the designation.  Correct?

2    A.    Yes.

3    Q.    Those documents do?

4    A.    That is correct.

5    Q.    Okay.  A number of the HLF bank accounts, not all of

6    them, but a number of them predate the designation date.

7    Correct?

8    A.    I know that a number of the bank records that we had in

9    other bank accounts included transactions that occurred prior

10   to the designation, but without refreshing my memory and

11   actually looking at all the account records I would not want

12   to state that a number of these bank records in general

13   predate the designation.

14   Q.    Now, you with say the Marzook accounts predate the

15   designation.

16   A.    The records we discussed regarding the Marzook

17   transactions did predate the Hamas designations.  I can't

18   recall if there are some records in those bank accounts that

19   postdate the designation or not.  I would need to refresh my

20   memory.

21   Q.    There are nine accounts indicated as belonging to Mr.

22   Marzook.  Correct?

23   A.    Correct.

24   Q.    On this chart?

25   A.    That is correct.

1   Q.   Okay.  And the zakat committee bank accounts, we really

2   haven't gone into them yet.  Right?

3   A.   We have not.  He introduced them yesterday, but we have

4   not discussed them.

5   Q.   And we are going to go into that when you come back?

6   A.   That is correct.

7   Q.   So I will save my cross on that issue, then.

8        The charts that you prepared called OLF 1988, OLF 1989,

9   obviously predate the designation.  Right?

10  A.   That is correct.

11  Q.   The payments to IC Gaza, Islamic Center of Gaza, they

12  also predate the designation.  Correct?

13  A.   That is correct.

14  Q.   The videos, let's go back to the context issue on the

15  videos.  I am not going to discuss the videos too much.  I

16  think Ms. Cadeddu might get into those.  But certainly a

17  number of the videos that we have seen also predate the

18  designation.

19  A.   Yes, a number of them do.

20  Q.   InfoCom Search No. 56, HLF Search No. 71, Mushtaha Search

21  No. 1 and 6, and others, some of them are 1988, 1991, 1990.

22  Right?

23  A.   That is correct.

24  Q.   Now, let me just ask you, on those videos that were

25  played, there is interspersed at times on some of the videos

1   what appears to be documentary footage.  Do you recall?

2   A.    I know what you are talking about, yes.

3   Q.    And that appears to be scenes of fighting.  Correct?

4   A.    That is what it appears to be.  I don't know exactly

5   where the footage came from or who within the IAP put that in

6   there.

7   Q.    Those scenes appear to be fighting.  Correct?

8   A.    They do.

9   Q.    And those scenes appear to depict persons, children

10  throwing stones.  You saw that.  Right?

11  A.    I saw people throwing stones, yes.

12  Q.    And you also saw Israeli soldiers in those documentary

13  pieces.  Correct?

14  A.    I saw what appeared to be Israeli soldiers.  Again, I am

15  not sure where the footage came from.

16  Q.    And you saw what appeared to be in some of those cuts

17  Israeli tanks.  Correct?

18  A.    That is what they appear to be.

19          MS. MORENO:  Your Honor, at this time I want to move

20  into a phone call, a 106 phone call that has been agreed to

21  with the Government.

22          THE COURT:  All right.

23  Q.    (BY MS. MORENO)  This is Baker Wiretap No. 37.  Do you

24  see that?

25  A.    I do.  I think it has an old exhibit sticker on it.

```
1    Q.    Sorry.

2    A.    Okay.  Thank you.

3    Q.    No. 37.  Do you see that?

4    A.    I do.

5    Q.    And it was played for the jury, but not all of it was

6    played for the jury.

7    A.    Okay.  Correct.

8    Q.    Right?  So this particular call ended on page 7.  Do you

9    remember that?

10   A.    I do.

11   Q.    It says by Mr. Elashi.  Do you see that?

12   A.    I do.

13   Q.    Can you read pages 8 and 9 to the jury?

14   A.    Okay.  SH is Shukri Abu Baker and GH is Ghassan Elashi.

15         Shukri Abu Baker says, "Yeah.  Definitely, definitely."

16         Ghassan Elashi says, "So, they cannot tell me

17   because -- they cannot say that because a Muslim kills he is a

18   terrorist and when they kill it is their right."

19         Shukri:  "Hmm, hmm.  Yeah, yeah.  In the worst case

20   scenario, this is, what you call it.  This is an internal

21   civil dispute.  If we speak using their civilized language, an

22   internal civil dispute between two people, and we have nothing

23   to do with it in the country, to encourage the government, the

24   U.S. government to side with a particular party, this

25   is -- This is a very, very special case where two people are
```

struggling for the same land."

Ghassan:  "Yeah."

Shukri:  "And two people, if you can consider these people are using terrorist tactics, then Israel has -- has been established on terrorist tactics from the beginning."

"Exactly."

"From The beginning, I mean.  So if a Jewish person has the right to come to this country, a Palestinian person also have the right, too, to come to this country."

"Yeah, yeah."

"So, even Mousa has the right to live in that country."

"Yeah, yeah, yeah, yeah.  Because we didn't see that they deported none of the Jewish groups, not even one of those criminals.  On the contrary, they fled, went and came, those people charged and Alex Odeh.  Israel has not -- America has not extradited."

"It is harboring.  He sits there today."

"Yeah, yeah."

"Doesn't Israel harbor terrorists?"

"Yeah, it does.  Yeah, it is possible that a person speaks up in this country, but I'm not worried about north Texas, south Texas.  I'm not worried about nothing.  One should let it slide.  This is possibly an attempt to respond to -- to open --"

"I'm not going to respond to -- about the Foundation or

1   north Texas."

2       "Yeah, yeah, yeah."

3       "I'm talking about the philosophical basic of the

4   argument."

5       "Yeah, yeah, yeah."

6       "There is no argument.  This is a Steve Emerson article."

7       "Yeah, yeah."

8       "And also on what basis does the article talk about the

9   deportation?" What evidence does the writer of the

10  editorial --"

11      "Aha."

12      "What is the evidence?  Can you tell us what the evidence

13  is?"

14      "Exactly.  Right."

15      "Or is it that, from now on, any person that Israel

16  dislikes, I mean, has to leave the country?  Let Israel submit

17  a list of all the people it does not want so that they could

18  leave America.  This will be a precedent.  This won't -- I

19  mean, this won't weaken terrorism.  This will strengthen

20  terrorism everywhere when Israel begins to intimate the lives

21  of people, American citizens and green card holders even in

22  America.  This means who is ruling America?  That is the

23  question.  Who is ruling America?  And -- And what right does

24  Israel have to demand the deportation if there is no evidence

25  and says, 'Yes, deport it.  Deport him.'  Why?  And it was

1    issued a warrant for the arrest 6 days after his detention in

2    New York."

3         "Yeah, yeah, yeah."

4         "What is this?  If they had something against him,

5    wouldn't they have issued a warrant for the arrest long time

6    ago?"

7         "Yes, yes.  It is an opportunity it couldn't miss".

8         "What?"

9         "An opportunity that landed in its lap.  An opportunity

10   for Israel to distract eyes from its problems and stuff."

11   Q.   All right.

12        MS. MORENO:  Your Honor, with respect to those two

13   additional pages, there is an agreement with the Government

14   that it will be part of the original exhibit, Government

15   Exhibit No. 37.

16        THE COURT:  With the Baker Wiretap No. 37?  And you

17   are in agreement that this will be added to it?

18        MR. JONAS:  Yes.

19        THE COURT:  It is admitted.

20        MS. MORENO:  I just have a final question.

21   Q.   (BY MS. MORENO)  Agent Burns, you testified extensively

22   about the Philadelphia meeting.  Do you remember that?

23   A.   I do.

24   Q.   And there was a portion of the Philadelphia meeting that

25   was played that included something that my client said, which

1  was excerpt 14-E.  Do you recall that?

2  A.   I don't recall which excerpt it was.  I would like to

3  look at it if we are going to talk about it.

4       MS. MORENO:  May I approach?

5       THE COURT:  Yes.

6       THE WITNESS:  Thank you.

7       THE COURT:  You said excerpt 14-E of what exhibit,

8  counsel?

9       MS. MORENO:  Philadelphia Meeting 14-E.

10  Q.   (BY MS. MORENO)  Do you recall that?

11  A.   I do.

12  Q.   Okay.  Now, you told the jury -- There was a long passage

13  where Mr. Abu Baker had been talking, and it ended with -- The

14  last sentence I believe of that passage he says, "Our

15  relationship with everyone must be good regardless."  Do you

16  see that last sentence?

17  A.   I do.

18  Q.   Okay.  And then you told the jury that my client

19  responded, "Including the Islamists, of course."

20  A.   That is what it says.

21  Q.   Right.  And you know that that is incorrect.

22  A.   I believe it should have been corrected to say,

23  "Including the Muslims, of course."

24  Q.   Because you know there is a difference between Islamists

25  and Muslims.

1    A.    Yes, there is.

2    Q.    All right.  And so he said, "Including the Muslims."

3    Right?

4    A.    I believe there was a correction on the translation.

5    This does not say that, so I would like to confirm that the

6    corrected copy of the translation actually said Muslims.  But

7    I recall seeing something about that.

8              MS. MORENO:  May I approach?

9              THE COURT:  Yes.

10             THE WITNESS:  That is what I was thinking of.

11   Q.    (BY MS. MORENO)  Okay.  So in fact Mr. Elashi did not say

12   "Including the Islamists."  He said, "Including the Muslims."

13   Right?

14   A.    That is correct.  This should have been corrected.

15   Q.    And Mr. Abu Baker also did not say the Islamists.  He

16   also said the Muslims.  Correct?

17   A.    I believe, if I could see that again, but I believe in

18   the corrected version he still said the Islamists.  Okay.  The

19   third instance -- He did say it, but the first time he said it

20   was supposed to be Muslims, and the second time he said

21   Islamists.

22   Q.    So in that particular passage where you told the jury

23   that my client said Islamists, that was incorrect?

24   A.    That is correct.  The transcript was wrong.

25   Q.    And when you indicated that Mr. Abu Baker in the

1    immediate response used the word Islamists, that was also

2    incorrect.

3    A.    Correct.  He said Muslims first and then he said

4    Islamists.

5    Q.    And that was a translation that came from Mr. Shafik.

6    Correct?  The original false translation came from Mr. Shafik.

7    A.    I think that he had done the original translation, and he

8    also made the corrections after some discussion with the

9    parties, I believe.

10   Q.    All right.

11        MS. MORENO:  I have nothing further, Your Honor.

12        THE COURT:  All right.  Let's go ahead and take the

13   morning break.  Let's be back at 11:00.

14        (Whereupon, the jury left the courtroom.)

15        THE COURT:  Who is up next?  Ms. Hollander?  Okay.

16   We will be back at 11:00.

17                    (Brief Recess.)

18        THE COURT:  Ms. Hollander?

19        MS. HOLLANDER:  Thank you, Your Honor.

20                  CROSS EXAMINATION

21   By Ms. Hollander:

22   Q.    Good morning, Agent Burns.

23   A.    Good morning.

24   Q.    You testified that you have reviewed the majority of the

25   documents from the Holy Land Foundation.  Correct?

1   A.    That is correct.

2   Q.    And you have had them now since 2002 really, all the

3   documents.

4   A.    The ones from the Holy Land search, yes.

5   Q.    Right.  And so you have been through them and through

6   them and through them.  Would that be fair to say?

7   A.    I and a lot of other people.  There are a lot of

8   documents.

9   Q.    Right.  Many of them were in Arabic.  Correct?

10  A.    Yes.

11  Q.    And so you had to sit with your translator to work your

12  way through those.  Correct?

13  A.    Actually the way we had it done, we would have the

14  translators go through and initially conduct what we call a

15  triage of the boxes, and generally gives a summary of what

16  they were.  And we would go from there and determine what

17  needed to be translated verbatim and things like that.  So we

18  didn't actually sit with them while they were reviewing them.

19  Q.    So the translators made an initial judgment about what

20  was pertinent in that triage.  Correct?

21  A.    They were given instructions on what to look for, yes.

22  Q.    But they made the initial judgment based on their

23  instructions.  Correct?

24  A.    Correct.

25  Q.    Now, you have also mentioned, just so we get it straight,

1    that some people use what we refer to, and I am not sure it is

2    proper, as an Abu name.  Correct?

3    A.    That is correct.

4    Q.    And it is a custom to refer to the name of your eldest

5    son as Abu and then the name of the eldest son.  Correct?  For

6    men?

7    A.    That is correct.

8    Q.    And you have said that Shukri Abu Baker, my client, is

9    sometimes referred to as Abu Mohamed?

10    A.    That is correct.

11    Q.    And you are aware that he has daughters.  Correct?

12    A.    I am.

13    Q.    Right.  So Mohamed was a child who died.  Correct?

14    A.    I don't have any personal knowledge of that.  I think you

15    have mentioned that to me before, but I don't -- I am not

16    personally aware of what happened with that matter.

17    Q.    You are aware that he doesn't have any living son named

18    Mohamed.  Correct?

19    A.    That is correct.

20    Q.    Now, I am going to want to talk to you for a little while

21    about the Philadelphia meeting.

22    A.    Okay.

23    Q.    And that meeting occurred over the course of three days.

24    Correct?

25    A.    It did.  I think the actual meeting began on Saturday and

1    finished on Sunday, but they arrived on Friday.

2    Q.    Right.  So you have -- Actual recordings were marked by

3    date and tape number.  Correct?

4    A.    I believe that is correct.

5    Q.    Right.  So, for example -- We are going to have to use

6    the elmo, because I don't have access to all of these on here,

7    but I think we will be able to get this to work here.

8    A.    Okay.

9    Q.    I will just have to put it on and then talk to you about

10   it, because nobody can hear me if I am over there.

11   A.    Okay.

12   Q.    So bear with me a moment.

13        For example, if we look at this one, it says Government

14   Exhibit Philly Meeting No. 8.  Correct?

15   A.    Correct.

16   Q.    And then it has an audio file, too.  Right?

17   A.    Yes, up there.

18   Q.    And if you can't read it I will read it to you.  It says

19   MTGB_19931003_3.WAV.  Right?

20   A.    It does.

21   Q.    So that is how you know -- I mean, that is how you link

22   it to the audio file.  In other words, it is -- 19931003 would

23   be the 3rd of October and then No. 3.

24   A.    I believe that is correct, but I didn't personally deal

25   with any of the technical aspects of it, so I would rather

1    someone technical speak to that for certain.  But that seems

2    to stand to reason.

3    Q.    Okay.  The Government put these markings on basically so

4    you could identify them and keep them in order.  Right?

5    A.    I believe that is why the audio file designator is on

6    there.  But again, I didn't put that on there, so I am not

7    sure.

8    Q.    But the purpose is to keep them in order.

9    A.    That is correct.

10    Q.    Okay.  But even though you have this way of keeping them

11    in order, when you look at the Government's exhibits that you

12    have introduced -- that the Government has introduced of the

13    Philadelphia files, they are not in chronological order, are

14    they?

15    A.    I believe that the way that they are exhibited puts them

16    in chronological order.  I can't state for certain because I

17    didn't actually put the exhibits in their final order and I

18    don't know exactly what that audio file .WAV represents.  Like

19    I said, that is a technical issue that the technical people

20    dealt with.  I believe that they should be in chronological

21    order and that they are.  But if you have something different,

22    I would be happy to look at it.

23    Q.    Well, let's look -- That one is Philly Exhibit No. 4, and

24    it is .WAV file 11.  Right?  I am sorry.  Philly Exhibit No. 4

25    and it is .WAV file 15.  Correct?

1   A.   Correct.  I can read what it says.  But again, I don't

2   know what the .WAV files necessarily mean, so I don't know if

3   that means it is .WAV file 15.  I see it says

4   MTGB_19931002_15.WAV, but I don't know exactly what that

5   indicates.

6   Q.   Fine.  We will get at it a different way here in a

7   minute.

8        But you agree with me that for the jury to follow the

9   conversations they ought to all go in order.  Right?

10  A.   Yes, they should.

11  Q.   Okay.  Now, the Government introduced 18 Philadelphia

12  files.  Correct?

13  A.   That sounds right.

14  Q.   But in fact there were 24 tapes.  Correct?

15  A.   I don't know the exact number of tapes.  I know that

16  there were some of the hotel room phone calls that were

17  transcribed, very short conversations for the night before

18  that probably aren't included in the actual meeting

19  transcript, if that is what you are talking about.  But I am

20  not sure of exactly how many tapes there were.

21  Q.   Okay.  Well, we will get back to that, then, also.

22       Let me ask you some other things and we will get back to

23  that when we actually talk about the files.  And I think you

24  will see, then, that yours are out of order and then we can

25  straighten it out.  Okay?

1    A.    Okay.

2    Q.    Now, as an FBI agent, you sometimes attend meetings or

3    conventions, don't you?

4    A.    I do.

5    Q.    Okay.  And there are law enforcement agencies and

6    organizations that have calls to meetings, set up meetings,

7    and that you go to them.  Correct?  Occasionally?

8    A.    I have attended law enforcement meetings, yes.

9    Q.    Right.  And the fact that you attend a particular meeting

10   doesn't turn that into an FBI meeting just because you are

11   there, does it?

12   A.    Well, if I were attending a law enforcement meeting, I

13   mean, I am a law enforcement officer.  It is not an FBI

14   meeting, but it is certainly a law enforcement meeting.

15   Q.    But it doesn't make a FBI meeting just because you or you

16   and some of your colleagues show up.  Correct.  It is still

17   whatever the agency called it that is the meeting.  Correct?

18   A.    Correct.

19   Q.    Now, you testified that Shukri Abu Baker, my client,

20   stated that in his 2002 declaration -- You recall that

21   declaration?

22   A.    I do.

23   Q.    That the Philadelphia meeting was, and I will quote, "A

24   meeting of Islamic intellectuals, academicians, community

25   leaders, and representatives of American Islamic

1    organizations, such as the HLF."

2    A.    I recall that he said that, yes.

3    Q.    And that he said it was not a meeting of any

4    organization.  You recall that.

5    A.    I do.

6    Q.    And you talked about that, didn't you?

7    A.    Yes.

8    Q.    Okay.  Because you made a point of saying that this

9    wasn't a meeting of the Palestine Committee.  That is the

10   point you were making that that is what he said.  In other

11   words, that he didn't say this was a meeting -- I am sorry.

12   Strike that.  I said it all wrong.  Let me say it again.  You

13   made a point of saying that Shukri in his declaration didn't

14   say this was a meeting of the Palestine Committee.  Correct?

15   A.    That is correct.

16   Q.    Once I got it out of my mouth right.

17        And you were relying on a statement at the Philadelphia

18   meeting by Omar Ahmad that says, and I will quote, I think you

19   will remember this, "This meeting was called for by the

20   Palestine Committee."  And you compared that to what Shukri

21   said.  Right?

22   A.    I compared that, as well as the planning phone calls, and

23   the individuals who attended the meeting.  So there were a

24   number of things.  But yes, that was one of the things, when

25   Omar Ahmad announced it was a meeting of the Palestine

1    Committee.

2    Q.    And you prepared a summary of the Philadelphia meeting,

3    didn't you?  And you call it Philly Meeting Summary.

4    A.    Yes, we prepared a summary chart.

5    Q.    This is the chart.

6    A.    That is correct.

7    Q.    Correct?

8    A.    Uh-huh.

9    Q.    And it lists what organizations people are in, doesn't

10   it?

11   A.    It lists what organizations I could establish through the

12   evidence that we were introducing.

13   Q.    Right.  But not all of them are members of the Palestine

14   Committee, are they?

15   A.    I can't say that they are not members, but I cannot

16   indicate that they were because I didn't have evidence to say

17   for 100 percent that they were.

18   Q.    So you don't -- According to your chart, going by your

19   chart --

20   A.    Correct.

21   Q.    -- not all the members are listed as being members of the

22   Philadelphia committee.  Of the Palestine Committee.  Correct?

23   A.    Right.  There are some people on there that I was not

24   comfortable identifying as positively being members of the

25   committee.

1   Q.   So there are some people on this chart -- it is a very

2   simple question.   There are some people on this chart who,

3   according to your information, what you have available, are

4   not members of the Palestine Committee.   Correct?

5   A.   That is not what I said.   I said I didn't feel

6   comfortable indicating that they were members.   I didn't

7   say -- I said that I could not say that they were not members.

8   Does that make sense?

9   Q.   So you couldn't say that they were members either.

10  A.   That is correct.

11  Q.   Correct?

12          MS. HOLLANDER:   Your Honor, I guess I need to ask

13  you if you could ask the jury if it bothers anyone to have

14  that screen on between these?   If it is not glaring, I will

15  just leave it on.

16          THE COURT:   Anybody bothered by that monitor over

17  there?   Okay.

18          MS. HOLLANDER:   I just wanted to make sure it wasn't

19  too bright, because it is just easier to leave it on.   Thank

20  you.

21  Q.   (BY MS. HOLLANDER)   Now, some people you said got

22  together before the meeting to plan it.   Correct?

23  A.   They had phone calls to plan the meeting.

24  Q.   And you actually intercepted some of those phone calls,

25  and even told the jury about some of them, didn't you?

1    A.    That is correct.

2    Q.    Okay.  They decided that some people would deliver papers

3    on certain topics.  Correct?

4    A.    That is correct.

5    Q.    And they planned the sessions out and, you know, who

6    would work on what the topics for the sessions would be.

7    Correct?

8    A.    That is correct.

9    Q.    And who would deliver papers at each session?

10   A.    That is correct.

11   Q.    And the meeting was held at a Courtyard by Marriott;

12   courtyard Marriott in Philadelphia.  Correct?

13   A.    That is correct.

14   Q.    That hotel was open to the public while they were there,

15   wasn't it?

16   A.    The hotel was.  I don't think that the meeting room was,

17   but the hotel was obviously.

18   Q.    When organizations have meetings, they often don't invite

19   the entire public to them, do they?

20   A.    That is correct.

21   Q.    So there wasn't anything odd about that, was there?

22   A.    About --

23   Q.    About not inviting the entire public to the meeting.

24   A.    I think in their conversations when they were planning,

25   they discussed that they didn't want to invite certain people

1    because of --

2    Q.   Right.  That is not what I am asking.  I am asking about

3    the public.  The meetings weren't open to the public, were

4    they, as far as you know?

5    A.   As far as I know, the Philadelphia meeting, no, was not

6    open to the public.

7    Q.   Right.  But they all checked into the hotel using their

8    own names, didn't they?  As far as you know.

9    A.   From the records we received from the hotel, I know that

10   those individuals used their own names.

11   Q.   And that is the information that you have.  Right?

12   A.   Correct.

13   Q.   All right.  And you have provided that information for

14   the jury from the Marriott.  Correct?

15   A.   That is correct.

16   Q.   Shukri signed in using his name, didn't he?

17   A.   I don't recall if we actually saw his signature, but he

18   did use his name, yes.

19   Q.   And you were able to subpoena credit card information,

20   because people used credit cards there also.  Correct?

21   A.   Yes.  The HLF purchased those airline tickets and the

22   hotel rooms.

23   Q.   Right.  They didn't go in and pay in cash for their hotel

24   rooms, did they?

25   A.   I am not aware if anyone did that or did not, but I know

1    that the HLF paid for a number of rooms with their credit

2    card.

3    Q.    Right.  And you took surveillance photographs of people

4    coming and going.  Correct?

5    A.    The FBI did.  I wasn't there.

6    Q.    I am sorry.  When I say you, I suppose I should say your

7    organization.  I don't mean you personally.

8    A.    Yes, they did.

9    Q.    And they met in actual hotel meeting rooms.  Correct?

10   A.    I believe the records indicated there was a conference

11   room there at the hotel.

12   Q.    In fact, the FBI had set up cameras in that conference

13   room, but you weren't able to actually see very much.

14   Correct?

15   A.    They had cameras.  When I viewed the tapes they were

16   extremely grainy and very difficult to make out who was in

17   the --

18   Q.    Right.  But the FBI had gone in before they got there and

19   set up cameras.  Right?

20   A.    They did, yes.

21   Q.    And actually the FBI also set up some video cameras in

22   some of the individual hotel rooms that people were staying

23   in, didn't they?

24   A.    I recall at least one hotel room that did have a camera

25   in it.

1    Q.    And the people staying in that room didn't know, of

2    course, that they were being watched, did they?

3    A.    I don't know if they did or not.

4    Q.    You have no reason to think that they would know that,

5    did you?

6    A.    I know that in the Philadelphia meeting they did talk

7    about, you know, being aware of surveillance, so I don't know

8    if they thought they were being watched or not.

9    Q.    But you didn't provide the jury here with any of the

10   videos from the individual hotel room, did you?  We don't that

11   have information here, do we?

12              MR. JONAS:  We object to the question, Your Honor;

13   relevance.

14              THE COURT:  Overruled.  Go ahead.

15   Q.    (BY MS. HOLLANDER)  We don't have that information here

16   from the video that was used in someone's hotel room, do we?

17   A.    It has not been introduced.  I think you have a copy, if

18   we want to look at it.

19   Q.    No, that wasn't my question.  You guys -- You, the

20   Government, didn't introduce it, did you?

21   A.    No, we have not introduced it.

22   Q.    Thank you.

23        Now, you have discussed with the jury various portions,

24   and you have read various portions, and I am going to ask you

25   to read a few more portions.

```
1    A.    Okay.

2    Q.    I don't think they are going to be very long.  If you

3    have a problem with your voice, then I will take over.

4    A.    I think I can do it.

5    Q.    Okay.  Because you didn't tell the jury everything that

6    Shukri said during that three-day meeting, did you?

7    A.    No.  I think we would probably still be here with me

8    reading.

9    Q.    Right.  And we are not going to do that now either.  But

10   you have read the whole meeting, haven't you?

11   A.    I have.

12   Q.    And you helped the Government lawyers pick out the

13   sections to read, didn't you?

14   A.    We met and discussed the Philadelphia meeting and

15   determined what portions that we were going to introduce.

16   Q.    Right.  And you were part of that meeting?

17   A.    Yes.

18   Q.    All right.  And that was based, to some extent, on the

19   fact that you are knowledge about it because you have read it.

20   A.    I would hope that they appreciate the knowledge that I

21   have.

22   Q.    Right.  Because you have read it.

23   A.    Because I have read it.

24   Q.    Okay.  Now, you pointed out, to start with, and let's go

25   back to Shukri's declaration for a moment, that he said that
```

1  at the Philadelphia meeting everyone spoke their minds.  You

2  pointed that out to the jury from the declaration.

3  A.   That is correct.

4       MS. HOLLANDER:  Can I have just a minute to make

5  sure I have this correct?

6       THE COURT:  Sure.

7       MS. HOLLANDER:  Your Honor, can we approach?  I

8  think that will solve this problem.

9       THE COURT:  Sure.

10       (The following was had outside the hearing of the

11       jury.)

12       MS. HOLLANDER:  I thought she was going to tell me

13  that she understood how the .WAV files worked.  I know how

14  they work.  The Government knows how they work.  They go in

15  order.  But she said she didn't know.  The Government's Philly

16  meeting is all out of order, which I can show.

17       What I wanted her to read from, however, is Philly

18  meeting which I have identified as meeting 14.  It is one that

19  they didn't introduce.  There are six tapes that are not in

20  theirs, and theirs are completely -- I mean, I can show it.

21  It is going to come up in my cross that they are completely

22  jumbled.  But I had anticipated that once she told me the

23  order of the .WAV files, which I assumed she would know

24  because she has been working with these, I would just

25  introduce the entire Philly meeting which we have in the right

1    order.  And since she hasn't done that, the one I want her to

2    read is one of ours.

3        So I can just not identify it right now and just have her

4    read it, or we are going to have to -- I am going to have to

5    call someone, or the Government is going to have to

6    acknowledge that we can introduce these without objection.  I

7    mean, they are their tapes, but they didn't introduce all of

8    them and they are all out of order.

9            MR. JONAS:  First of all, I have no idea how these

10   .WAV files work, Your Honor.  I don't.  So I resent the

11   implication when she says that the Government knows, first of

12   all.

13       Second of all, I don't agree with her.  Just looking at

14   it, she had, from what I saw on the screen, one that was

15   October 2nd with the number 15 and October 3rd with a number

16   3.  So that doesn't mean that the .WAV file numbers indicate

17   that that is out of order.

18       I do acknowledge, these are not in chronological order.

19   It is partly miscommunication.  It was my fault.  I had given

20   a list to the paralegal of the order I was going to show --

21           THE COURT:  I am just trying to figure out why all

22   of this is relevant to the jury.

23           MS. HOLLANDER:  Well, it is relevant to the jury,

24   Your Honor, because the Government has provided them in a form

25   that they will never be able to find the consecutive things,

1    and that is --

2              MS. DUNCAN:  Your Honor, can I explain, because I

3    actually put this stuff together?

4         This were actually two sets of tapes, one for October 1st

5    and 2nd, and then a second set for October 3rd.  There are 18

6    tapes for the 1st through the 2nd, and then 6 for the 3rd.

7    And the last trial the Government put them all in order with

8    Government exhibit numbers.  So we compared the Government's

9    exhibits with the old exhibit list and then with the

10   Philadelphia tape, and so there are six that are missing.

11        We need to use -- We want to use one of those six that is

12   missing.  There are other portions where Shukri is speaking,

13   and which we are going to talk about in cross, and then what

14   he is saying continues on the next tape.  But if the jury

15   wanted to look at that independently through the Government's

16   exhibits, they couldn't do it because, where he starts, for

17   example, like on Government transcript No. 15, but then where

18   he finishes is Government transcript No. 13.

19        We wanted to put them all in order so if the jury wanted

20   to independently review what someone said, they would have it

21   in the right order to do so, because there are several

22   conversations and statements that continue over a transcript.

23              MR. JONAS:  Can I make a proposal?

24              MR. JACKS:  Judge, what they are saying is that they

25   are going to put them in what they believe is a chronological

order.

MS. HOLLANDER:  It is a chronological order.

MR. JACKS:  That is her testimony.  Nobody has said that the fact that these are numbered indicates that that is the sequence they were recorded, because these meetings went a long time.  You will see some of them where the tape ran out in the middle of the conversation, so I don't know -- Whoever numbered these recordings, I don't know what the code is that 19931002 -- That is probably on October 2nd, 1993 and then it has a number.  But does that mean that those tapes are numbered?

THE COURT:  I don't know any of this that you are talking about.  This is all Greek to me.  I don't want to get into that right now until we resolve it.  What is it you are about -- You want to get that conversation, and you object to that?

MR. JACKS:  It is already in.

MS. HOLLANDER:  It is not in.  It is not there.

THE COURT:  Take a look at it.

MR. JACKS:  This wasn't on their list either to what they were going to go into.

MS. DUNCAN:  I told you last night that we were --

MR. JACKS:  It is not on the list.

THE COURT:  Because none of the Philadelphia meeting was on the list.  Well, was it?

1          MS. HOLLANDER:  Well, I didn't think it was going to

2     be an issue because it is --

3          MS. DUNCAN:  I told him this last night.

4          MR. JACKS:  This was delivered last night, but we

5     weren't told this.

6          MS. DUNCAN:  I did.  I said, "These are the ones we

7     are going to use tomorrow.  I think there may be some more,

8     but of course" --

9          THE COURT:  What is your exhibit number on this?

10          MS. DUNCAN:  These are the Philly meetings.

11          THE COURT:  What is your exhibit number on it.

12          MS. DUNCAN:  It is D-Philly Meeting No. 1 through

13     24.

14          MR. JACKS:  Implicit in this is that they have put

15     them in chronological order, and there is nobody to say that.

16          MS. HOLLANDER:  Well, I can show it from the

17     conversation.

18          MS. DUNCAN:  Also this is the order that they had in

19     the first trial.  When you look at their exhibit list from the

20     first trial, it is clear.

21          THE COURT:  But they are saying it is not.

22          MS. HOLLANDER:  Well, he has admitted that they got

23     out of order.

24          MR. JONAS:  That doesn't mean that you put them in

25     the right order either.

1          MS. HOLLANDER:  Well, then you can look at them and

2     see.

3          THE COURT:  But this should have been done before

4     now is the problem.  I mean, here we have been keeping the

5     jury waiting again.

6          MR. JONAS:  If you want us to address this during

7     lunch, we can take a look at it then.  Right now I have to go

8     back and check ours to see if this is right.

9          MS. DUNCAN:  Can we break early and do this?

10          THE COURT:  We are already going to take a long

11     lunch, so we are going to work until 12:30.

12          MR. JONAS:  I don't know the procedure, Your Honor.

13     I need to take a look at this.

14          THE COURT:  I am not going to let you get into it.

15     You didn't put it on the list, so I have not had a chance to

16     look it.  They haven't had a chance to look at it.

17          MS. HOLLANDER:  We told them.

18          THE COURT:  Yes, but you told them this morning.  I

19     haven't looked at it either.

20          MS. HOLLANDER:  We told them last night.

21          THE COURT:  It is the same thing.  I haven't looked

22     at it, and I have got these objections, and of course I can't

23     resolve it because I haven't looked at it.  So I am not going

24     to let you get into it.

25       That was the whole purpose of exchanging these lists.

1    That defeats it when you are doing it late at night or in the

2    morning.  I didn't get it.  I still don't have it.  This is

3    the first time I have seen it.  I have some supplemental disks

4    this morning that I haven't seen, and still haven't seen.

5    That was the purpose of exchanging these lists is so we could

6    get their objections, I could look at it in advance, and avoid

7    these lengthy bench conferences.

8              MS. CADEDDU:  Your Honor, this is cross, and we

9    don't know until the end of cross --

10             THE COURT:  But I don't believe that.  You already

11   knew about this out of order and all of this.  I just can't

12   accept that you all just decided sometime this morning to use

13   this.

14             MS. CADEDDU:  Is the Court taking the position that

15   we have to disclose our cross exhibits early?

16             THE COURT:  No.  Well, yes I have on those, because

17   this is a retrial.  I have already been over that, Marlo.

18   There shouldn't be any surprises.  Everybody has seen these

19   exhibits.  And we are doing it witness by witness as we go in

20   advance so that I can take a look at objections to avoid this.

21             MS. CADEDDU:  I would object to disclosing all my

22   cross.

23             THE COURT:  That is not my ruling on it.  You have

24   your objection, but it is overruled.  And that is not my

25   ruling.

1          I am not going to let you go into this.

2          MS. HOLLANDER:  The problem, Your Honor, is I never

3     anticipated that the Government was going to have an issue

4     with this.  I mean --

5          THE COURT:  Part of the problem is they don't know

6     because he says he needs to read it.

7          MS. HOLLANDER:  I understand.

8          MR. CLINE:  Why don't we work this out over lunch.

9          THE COURT:  That is what I am saying.

10         MS. HOLLANDER:  Let me see if I can go to some other

11    part of my cross.  Just give me a minute.

12         THE COURT:  I can't resolve this now.

13         (The following was had in the presence and hearing

14         of the jury.)

15         MS. HOLLANDER:  Give me just a second, Your Honor.

16         MS. DUNCAN:  Your Honor, can we approach briefly?

17         THE COURT:  Sure.

18         (The following was had outside the hearing of the

19         jury.)

20         MS. DUNCAN:  Your Honor, we just checked -- I know

21    we were going to take a long lunch.  We just checked, and it

22    would be fine for them if we started it now and came back at

23    1:30.  So do the two hours starting now, resolve this issue,

24    and then come back at 1:30, which may be the fastest thing, if

25    that is okay with the Government.

1        MS. HOLLANDER:  That would help.

2        THE COURT:  All right.

3        MS. HOLLANDER:  Thank you.

4        (The following was had in the presence and hearing

5        of the jury.)

6        THE COURT:  Members of the jury, we are going to go

7    head and take a long lunch break because of some things I need

8    to take care of.  So I will let you go, and be back at 1:30.

9    We will plan on working until 5:00 or 5:30.

10        Please recall the instructions we have been over.  See

11    you back at 1:30.

12        (Whereupon, the jury left the courtroom.)

13        THE COURT:  Be back at 1:15, unless you get this

14    issue resolved.  If I need to make a ruling on it, be back at

15    1:15.  If you get it resolved, we can start at 1:30.

16        We will be in recess.

17                        (Lunch recess.)

18        THE COURT:  Where are we with respect to this

19    exhibit?

20        MS. HOLLANDER:  Your Honor, Mr. Jonas has I think

21    the ball is in his court.

22        THE COURT:  Mr. Jonas.  Mr. Jacks?

23        MR. JACKS:  Your Honor, with respect to the Philly

24    exhibits, as I understand it the Defense wants to introduce 24

25    transcripts of the conversations from the Philadelphia

1    meeting, and they want to introduce them and number them in

2    such a fashion and make --

3           THE COURT:  Twenty-four different conversations than

4    the ones that are in?

5           MR. JACKS:  No, sir.

6           THE COURT:  Okay.

7           MR. JACKS:  I believe there is six -- There are 18

8    in plus --

9           THE COURT:  Six additional?

10          MR. JACKS:  Correct.  And they want to number them

11   and tell the jury that these are in chronological order in the

12   way that the conversations occurred.  I don't believe that

13   there is any way to establish that, the chronological order

14   part of that argument.  The exhibits or the transcripts, or I

15   guess actually it would have been the tape recordings from

16   which the transcripts were made.

17       Someone, and I am not sure who it was, someone within the

18   FBI apparently gave them this numbering system of some

19   letters, 199310, which would be for October, and then either

20   02 or 03.  I think they are all either 02 or 03 indicating the

21   2nd or the 3rd of October, and then underscore, and then the

22   number, and then the term .WAV.  I don't think that term .WAV

23   was even known or in existence in 1993, so that term or that

24   labeling formula had to have been applied later.

25       I don't believe you can tell from looking at the

1    conversations necessarily that --

2            THE COURT:  The chronological order?

3            MR. JACKS:  That they are necessarily chronological.

4    Sometimes they are the same speaker, but you can't tell that

5    it is the continuation of the conversation on the prior tape.

6        The Government believes that it has yet to be shown that

7    it is necessary to arrange them in chronological order.  I

8    don't believe any justification or reason has really been

9    expressed that if they are put in this order then this point

10   can be made.  And I don't think that has been conveyed to the

11   Court, and for that reason we also would object.

12       As to the six extra conversations, they are hearsay to

13   these Defendants, and unless and until a hearsay exception can

14   be overcome or shown, I don't believe they are admissible.

15   And if -- Well, that is the extent of it.

16           THE COURT:  All right.  Ms. Hollander?

17           MS. HOLLANDER:  Ms. Duncan is the one who worked

18   this exhibit, Your Honor.

19           THE COURT:  That is fine.

20       Ms. Duncan?

21           MS. DUNCAN:  Thank you, Your Honor.  In terms of the

22   date issue, the order that we placed our transcripts in is the

23   same order that the Government had the transcripts in before,

24   during the last trial, and that is also according to these

25   .WAV numbers.  So the tapes that were turned over to us by the

1   Government, there were 18 tapes for the first two days and six

2   tapes for the second two days.  And so now we have numbered

3   the first two days 1 through 18 and the second -- the third

4   day 19 through 24.

5       What I would propose -- I mean, during her cross

6   examination of Agent Burns, Ms. Hollander can go through the

7   .WAV numbers and show we have 1003_3, 4, 5, 6, 7.  There are

8   some conversations that she is intending to get into where it

9   is very, very clear that a conversation starts, for example,

10  on our transcript 6 and it finishes on transcript 7.  I think

11  we have two places -- I am sorry.  On Defense 6 and 7.  Two

12  places where it is very clear that it is the same speaker

13  speaking on the same subject.  And I think when the jury hears

14  it that it will be apparent to them.

15      And so I think through, you know, explaining the .WAV

16  file numbering through Agent Burns, the jury can decide

17  whether the Government's are in order or ours are in order,

18  and it is really up to them to decide.

19          THE COURT:  But she didn't know about the .WAV

20  numbering, did she--Agent Burns?  I think Ms. Hollander was

21  already asking her some questions.  She didn't know that that

22  was necessarily a sequence.

23          MS. DUNCAN:  And I don't think that she has to know

24  for it to come in.  She has to acknowledge that the FBI put

25  these numbers here, and we can say, "Now this is .WAV_6, 7, 8,

1    9, 10," and then look at these certain conversations that we

2    show these numbers are in order, and then it is really up for

3    the jury to decide whether ours are in the correct order or

4    the Government's are in the correct order.  But they will have

5    both so that when they are considering this evidence

6    independently and making their verdict, they can look at both

7    and say, "Oh, the Defense makes more sense to me in this order

8    or the Government's."

9           THE COURT:  What about the six exhibits, the

10   additional exhibits that the Government didn't put in?  What

11   about that hearsay objection?

12          MS. DUNCAN:  First, Your Honor, the Government

13   represented to this jury that its transcripts represent the

14   whole of the meeting, and that is just not true.  There are 24

15   and they only introduced 18.  So it would come in for that

16   purpose.

17       As for the -- I think there is one transcript I believe

18   that Ms. Hollander wants to get into in substance before the

19   jury, and it is necessary under the rule of completeness to

20   understand what is being said by the speakers and the purpose

21   of the Philadelphia meeting.  The Government introduced the

22   entire meeting during the last trial, and I think you can't

23   just pull chunks out of a three-day meeting and still give the

24   jury the full sense of what was being said and what the

25   purpose of that meeting is.

1    And because the Philadelphia meeting is so critical here,

2    I think it is really important that the jury get that full

3    view, and that is what those six tapes do is they give the

4    jury the full view of the three-day meeting that the

5    Government has put so much weight on.

6         MS. HOLLANDER:  Your Honor, I just would like to add

7    that Mr. Jonas said to the jury this is the whole meeting, and

8    I asked Mr. Jonas several days ago when I realized that -- I

9    wasn't sure what they were going to do, I asked him, "Are you

10   putting in the whole meeting?"  And he responded that they

11   were putting in the whole meeting.  It took us quite a while

12   to figure out that they weren't.

13       Part of the problem here is the Government I think tried

14   to simplify -- The numbering system last year was very

15   confusing for everybody, and I think the Government tried to

16   simplify that, which in fact they have, by identifying what

17   things are.  Whether that is the right way to do it or not, it

18   does make it simple, Philly Meeting 1 through 18.  And, I

19   mean, it took us a long time to figure it out, because it says

20   Philly Meeting 1 through 18, we knew there were 24, the

21   Government kept saying, "We are putting them all in."  So it

22   took us a while to figure it all out.

23       But it is a whole meeting, and I just wanted to explain

24   partly why this is so confusing, because it took a long time

25   to kind of -- It is a huge document, and it takes time to sort

1    it out.

2            THE COURT:  Mr. Jonas?

3            MR. JONAS:  Your Honor, Ms. Hollander did ask me if

4    we were putting in the whole thing, and I checked with support

5    staff, and I thought the whole thing was going in.  Obviously

6    I was incorrect.  If I can explain how I got to that.

7        I did not take the numbering system from last year or

8    what we used in the last trial.  I decided to start over

9    fresh, because Agent Burns wasn't my witness in the last trial

10   and I wanted to start with a clean slate.  So I went through

11   the transcripts and identified the sections that I wanted her

12   to testify about as we went through in this court.

13       And then, without even thinking about whether the first

14   time was in chronological order or not, because I didn't find

15   that to be important, I arranged them by more subject matter,

16   because, as Agent Burns testified, they jumped around a lot at

17   the Philadelphia meeting what they talked about.  So I tried

18   to put it in some sort of subject matter relevance order.  And

19   to the best I could we did that.  And even when I questioned

20   her there was some jumping around as well between transcripts.

21       One thing I did do is I stayed basically with the first

22   ten or so transcripts, and for the most part left the rest

23   alone because we are going to get to that later following the

24   sequence of her testimony.  So that is what happened.

25           Clearly the Defense is not prejudiced here.  They are the

1    ones who were able to identify that there were six transcripts

2    not admitted at this time.  Ms. Hollander could have brought

3    this to our attention when she asked me and I told her that it

4    is my understanding the whole thing is being admitted.  We

5    could have then sat down and double checked, compared to the

6    prior list and what we had.

7         Having said all that, it still doesn't get around the

8    hearsay argument that Mr. Jacks raised.

9         THE COURT:  She raised an optional completeness

10   issue in terms of -- to give a context.  What about that?

11        MR. JACKS:  Well, Judge, I think it needs to be more

12   specific than just this general statement that these, however

13   long they are, 30 minutes, you know, however many pages, 15,

14   20 pages, needs to come in under rule 106.  I believe it has

15   got to be a more specific showing that these statements right

16   here are completing what is shown over here.  I think just

17   this global assertion that it all ought to come in under 106

18   is woefully insufficient.

19        And then to touch on something that Ms. Duncan talked

20   about, she says there is two instances where a conversation is

21   continued from one tape or one exhibit on to another.  Well,

22   then maybe those two instances need to be referenced or put in

23   sequence or just shown to the jury in sequence using the

24   Government's exhibits, but it doesn't require or certainly

25   doesn't justify the wholesale submission of all of these

transcripts again in what the Defendants claim is
chronological order.

And again, the Government has the right to put on the
evidence that it chooses to put on, in the order that it wants
to put on, with the exhibit labels that it wants to put on,
and however we choose to do that, and if it is different from
the previous trial, that is within our prerogative, but it
doesn't do away with the requirement that in order for the
Defendants to try to admit somebody else's statements outside
of court, it doesn't eliminate that requirement that there is
still a hearsay problem there.  And whatever happened in the
first trial does not change the admissibility or the
foundation that is still required for them to get these
exhibits in.

And as I said, I think we need to be careful here about
broad statements that, "Well, this exhibit will explain that."
I think we need to ask specifically where -- This gamesmanship
or holding -- trying to pull a surprise, now is the time to
say, "This phrase or statement right here on this page
explains better this statement over here on this."  Not just
this broad, "Well, it is part of this overall conversation."

And lastly, the answer to the response that Mr. Jonas
told the jury or had Ms. Burns say that these are all the
tapes, the answer to that point is, "Well, Ms. Burns, in fact
aren't there other transcripts of that meeting that have not

been introduced?"

"Yes."

And that is the end of it.  That doesn't mean that all of a sudden all of those other tapes become admissible.

THE COURT:  Okay.  Ms. Duncan?

MS. DUNCAN:  I will be brief.  You know, under rule 106 it is what ought in fairness to come in.  And we have a three-day meeting, 18 tapes of which are being brought in.  In fairness the jury should have the entire meeting to be able to put into context the statements that the participants made throughout the meeting.

We are not arguing that these tapes come in because the Government introduced them before.  We offered that as an explanation of why the order that we are putting them in, you know.

And secondly, in terms of the prejudice, the Government has said that they thought they were putting them in to begin with, so I don't know how they are prejudiced by us now putting in that which they say they intended to do from the beginning.

And for us -- We are entitled to comment on how the Government introduces evidence, which pieces they choose to introduce, and the order they choose to introduce it, because in this case we think that that order is misleading, and we are entitled to bring that to the attention of the jury.  So I

think -- I mean --

So with the hearsay, you know, it is necessary for the jury to be able to make that independent determination of what were these people talking about, why were they getting together, and they need to have all the tapes to make that determination.

MS. HOLLANDER:  Let me just add one thing.  The Government is backtracking here.  The Government told the jury, "We are putting in the whole Philadelphia meeting."

THE COURT:  But the fact is they didn't.

MS. HOLLANDER:  The fact is they didn't.  So now they are backtracking and saying --

THE COURT:  I don't know about backtracking.  They made a mistake.  They didn't put it in.  By stating that they were putting them in, that was a mistake.  But that doesn't make it admissible.  As the Government says, that doesn't make the rest of it admissible.  There has to be a basis for that.

And, frankly, I have not read all these transcripts, so I will have to take a look at them before I let you get into them.  I don't have them.

MS. HOLLANDER:  I understand, Your Honor.  I mean, I am concerned about a couple of things.  I mean, I understand what you are saying that you haven't looked at them.  And I will have to go -- You know, I mean, I had I was up to 1:30 in the morning putting this together so I could show the jury why

1    the Government's transcripts in the order they are in are

2    misleading, and it has to do with statements of my client that

3    either partially were introduced or weren't introduced that

4    specifically complete other statements.  And so you have to

5    start with one transcript and go back to another to finish.

6    And it would take me a little while to find that for Your

7    Honor to show you exactly why these complete --

8            THE COURT:  I will let you do that over the weekend.

9    We are not going to take the time now.

10           MS. HOLLANDER:  Well, basically -- I mean, that

11   means that I have to sit down and think about how I am going

12   to cross this witness, because --

13           THE COURT:  Well, if you are through crossing, you

14   are through.  I am not going to let you waste time, counsel.

15   You should have done this and you should have been ready.

16   That was one of the reasons I am asking for these exchange of

17   exhibits sufficiently in time and then objections so everybody

18   can look at this and I can make these rulings.

19       But if you don't have anything else to cross on, you can

20   sit down and come back Monday and cross if you need to.  But

21   we are not going to keep this jury sitting here much longer

22   and I am not going to let you waste time.

23       And I am still trying to understand, once I get those

24   conversations, to understand how were you planning on

25   establishing this chronology and that the Government's is

1    wrong?  Through the witness, just asking her to read all of

2    these --

3              MS. HOLLANDER:  To read some very specific parts,

4    and to read other parts that will show that it is just a

5    continuation of the same conversation.  And I will have

6    to -- I mean, I am not finished with my cross.  All I was

7    trying to say is I may have to start somewhere else and leave

8    this part.

9              THE COURT:  That is what you will need to do.

10             MS. HOLLANDER:  But it is going to take me a little

11   bit of time, which I can do over the weekend, to put it

12   together for Your Honor so that -- Because you obviously don't

13   want to read 500 pages of the Philly meeting.  And I will put

14   that together.  I will just have to start somewhere else and

15   then --

16             THE COURT:  So the entire transcript of the

17   Philadelphia meeting is 500 pages?

18             MS. HOLLANDER:  I am guessing, Your Honor.

19             THE COURT:  Roughly.  I understand.  About how much

20   is in?

21             MS. HOLLANDER:  Well, you know, they are more or

22   less the same size, and 18 of the 24, AND this is the whole

23   thing.

24             THE COURT:  Okay.

25             MS. HOLLANDER:  Ms. Duncan thinks maybe 50 pages are

1    not in.

2              THE COURT:  Maybe 50 pages are not in?

3              MS. DUNCAN:  I can actually look, Your Honor, right

4    now.

5              MS. HOLLANDER:  But what I will have to do is spend

6    some time organizing it so that I not waste your time.

7              THE COURT:  Right.  I mean, you don't have a hearsay

8    exception except perhaps the context and the optional

9    completeness, so you have to make a showing.  Mr. Jacks is

10   correct that you just can't globally say, "We want the rest of

11   the meeting in."  You have to make a showing that there is a

12   reason for that context.  I can't make that determination --

13   Obviously I will have to make the determination.  He doesn't

14   think it is proper.  You are saying it is.  I can't make that

15   determination without reading that.

16             MS. HOLLANDER:  I understand, Your Honor.  The

17   problem arose was we thought they were putting the whole thing

18   in and we didn't have to make that showing.  So that is where

19   the problem arose.

20             THE COURT:  Well, you can do that over the weekend,

21   and then I will need some time after that, of course, to look

22   at it.  In the meantime, we will just have to skip over that

23   and get onto your next issue.

24             MS. HOLLANDER:  Are there any other issues?  My

25   other exhibits?  Because they asked me about another exhibit.

1    Is there an issue?

2           MR. JONAS:  Your Honor, I understand from Ms.

3    Hollander that she is taking Government's exhibit Illa

4    Falistine No. 1 and putting a Defense sticker on it, and she

5    is claiming that there are translation differences, and I am

6    not quite sure I understand.

7           MS. HOLLANDER:  Well, there are translation

8    differences.  This raises another problem, Your Honor, which

9    we discovered quite by accident, and just discovered when we

10   were looking at the Illa Falistine and I asked my client to

11   translate something, because it looked like something was

12   missing.

13          THE COURT:  So how are you going to try to establish

14   the difference in the translation?  Through the agent?

15          MS. HOLLANDER:  Yes.  Because we have the

16   translation.  They are both their translations that -- What

17   has happened, and this raises another problem, the Illa

18   Falistine ad for the Occupied Land Fund that they put in last

19   time on Illa Falistine No. 1 includes a poem.  This time they

20   have basically air brushed that out, and that is -- It was my

21   client who noticed it.  So we went back to see what they did

22   last time.  And it has been translated.  And while doing

23   that --

24          THE COURT:  And both of them are the Government's

25   translations?

1      MS. HOLLANDER:  Yes, sir.  But while doing that, we

2  also discovered, because the Government, you will recall, a

3  few days ago introduced a poem that they attribute to my

4  client.  And we looked at that, and it has been translated

5  differently.  Some of the differences are subtle, but they are

6  different.

7      THE COURT:  So you want to ask her about the two

8  different translations made by the Government?

9      MS. HOLLANDER:  Yes, sir.  And -- Yes.  And I am

10 going to be asking the Government by letter to let me know if

11 there is any others, because there is no way for me to go back

12 through these thousands of pages and see if they have

13 translated things differently.  We found this one just by

14 accident.  But I do want to show her both the Government

15 translations and have her compare them.

16     MR. JONAS:  Your Honor, I mean, it was during the

17 lunch hour that Ms. Hollander pointed out that she is doing

18 this with this particular exhibit.  In the few minutes that we

19 have had, I had a call placed to the translator and I checked

20 with the person who pulled the exhibits from the last trial to

21 reuse in this trial.  What they both told me is there hasn't

22 been a single change made to the exhibits.

23     All I am asking is let Ms. Hollander -- and I looked for

24 our version of it from the last trial, and it wasn't where the

25 exhibits that were not using in this trial is, and the reason

1    is because we pulled it from the last exhibits and put it in

2    this set of exhibits.

3        So I asked Ms. Hollander, "Let me see a copy of what you

4    are talking about," and maybe I can figure out whether she is

5    right or not in terms of there being translation changes.

6            MS. HOLLANDER:  Well, I mean --

7            MS. DUNCAN:  I can just -- Your Honor, the other

8    translation from the last trial, that exhibit came off of the

9    Court's website of admitted exhibits.  So that may help you,

10   Mr. Jonas.

11           MS. HOLLANDER:  And I gave you the number of it.

12   And Ms. Duncan gave that to Mr. Jacks last night.

13           THE COURT:  Okay.

14           MS. HOLLANDER:  But I mean -- We gave it to him in

15   an electronic format.  I mean, I can show it to Mr. Jonas.  A

16   couple of them are very obvious.  The missing poem is

17   glaringly obvious.

18       But I am concerned that if things have been changed

19   internally from last time to this time, we have no way to know

20   that except if we discover it quite by accident, which this

21   was.

22           MR. JONAS:  Your Honor, I don't think it is proper

23   to question Agent Burns about this.  I think this is a

24   question for the translator if changes were made.

25           THE COURT:  I think at some level that is right.

1    But if you have the English versions and you have two

2    different English versions by the Government, I think she

3    probably can point that out through the agent, just because

4    that is easy enough to establish, so long they are the English

5    translations.  And if you want to bring in a translator to

6    explain that, or if there is a difference, I think you can do

7    that.

8              MR. JACKS:  Well, Your Honor, I would just ask that

9    we be afforded the opportunity to see what the issue is.  And

10   if there is an explanation, then fine.  But just to spring it

11   on Agent Burns, who we can't talk to, is unfair.  And so the

12   fact that she says these are two Government translations that

13   are different, I think if we were just asked that, maybe we

14   could go find out what the answer is, rather than just asking

15   Agent Burns in front of the jury, who may or may not know what

16   the answer is.

17       But before it is brought out in front of the jury, we

18   would like to have the opportunity to investigate what Ms.

19   Hollander says, and look at what she is talking about and see

20   if --

21             THE COURT:  Do you have those two documents that you

22   can show them now?

23             MS. HOLLANDER:  I do have them, Your Honor.

24             THE COURT:  Do you want to show them?

25             MS. HOLLANDER:  I can show you this one right here.

1    It is right here.  I have --

2            THE COURT:  Mr. Jacks, do you want to take a look at

3    that?

4            MS. HOLLANDER:  I have this year's and last year's.

5            THE COURT:  Mr. Jacks, or Mr. Jonas?

6            MR. JACKS:  Your Honor, there is nothing in the

7    record that shows that whatever other version was a Government

8    version.  We may all know that, but that is not in the record

9    in front of the jury.  That is why I believe that the proper

10   thing to do is if she has questions about the translation,

11   bring them to us, to the Government, and we will look at it,

12   we will check with the translator, and we can find out what

13   the answer is to the situation.

14       But just from looking at the two differences that she has

15   shown here, one of them shows just in brackets, it just says

16   "poem," and then another one shows the poem there.  Now, is

17   that a translation issue, or just that in one version the poem

18   was not included and then the other it is?  That is not really

19   a mistranslation.

20       And so I don't believe it is proper to try to confront

21   Agent Burns with these discrepancies and imply that the

22   Government has somehow changed something or done something

23   improper and try to make that point to the jury.

24           THE COURT:  So are you saying that in the last trial

25   that document was introduced without the poem?

1      MS. DUNCAN:  There is two changes, Your Honor.  One

2  is at the last trial the poem was included in the translation,

3  and it has been omitted in the exhibit that they have

4  introduced in this trial.  And then the second -- It is part

5  of the Holy Land Foundation ad.

6      But there is the second issue, there is a poem that they

7  claim was written by Mr. Abu Baker, and the translation of

8  that poem in the exhibit they introduced last year is

9  different from the translation of the poem that they are

10  introducing this year.

11      And there are portions of the Holy Land ad that they

12  included last year and this year where the words are

13  different.  For example, last year they had a sentence that

14  was translated "rebuild a mosque."  This year they have

15  translated it "refurbish a mosque."  So some of the changes

16  are a little more substantive than that, but there are these

17  subtle changes.

18      And in terms of the Government explaining away why there

19  were two translation, that is a proper topic for redirect.  It

20  is not a reason to prevent Ms. Hollander from going into it on

21  cross.  And she will be establishing that foundation through

22  her questions with Agent Burns and, therefore, bringing the

23  issue to the jurors' attention.

24      MR. JACKS:  Then, Your Honor, she would need a

25  certified copy of the translation from the earlier trial,

1    then.  She can't just represent that this is a translation

2    from the first trial.

3          MS. HOLLANDER:  Your Honor, it is right off the

4    Court's website.  I mean,  I pulled it right off the Court's

5    website.

6          MR. JACKS:  She is not a witness, Your Honor, so she

7    can't establish the foundation by telling the jury that it

8    came off the Court's website.

9      Again, Your Honor, it is not about finding out what these

10   documents say.  It is about trying to catch somebody in a

11   mistake.  And if the interest is to show what these documents

12   say, then let's get to that and let's talk about that.  But as

13   I said, this gamesmanship to hold back, not deliver these, not

14   point out these things that you are going to be bringing up so

15   that we are standing here for 30 minutes debating this while

16   the jury is waiting, that is the problem, Your Honor.  They

17   want to spring this on Agent Burns, and really don't have the

18   proper foundation to ask her these questions.  They are going

19   to assume and imply a lot of things in their questions, but

20   really they haven't done the proper foundation to use these

21   things as evidence in front of the jury.

22         MS. HOLLANDER:  Your Honor, this is cross

23   examination.

24         THE COURT:  I understand.  But still part of what he

25   is saying, you have to establish somehow, I guess through

1    Agent Burns by showing to her that this is a previous

2    translation prepared by the Government.

3            MS. HOLLANDER:  It has the Government's exhibit

4    sticker on it, Your Honor.  Now, I was --

5            THE COURT:  But --

6            MS. HOLLANDER:  It has the Government's exhibit

7    sticker.  It came from the Government's website.  The

8    Government knows that this is exactly what I have said it is.

9            THE COURT:  Mr. Jacks, let me ask you about it.  Do

10   you have any disagreement that in fact that is an earlier --

11           MR. JACKS:  I don't know, Your Honor, because I

12   haven't had time --

13           THE COURT:  You keep saying the Government knows,

14   but then the Government says, "We don't know," and so there

15   isn't agreement.  I think if you could establish that in fact

16   that is what it is, either through Agent Burns, and she is not

17   going to know without you just asking her cold, having the

18   exact doesn't establish that Ms. Hollander, in and of itself.

19           MS. HOLLANDER:  Then I would ask Your Honor that the

20   Court pull it off the website and certify that it is correct.

21           THE COURT:  No, actually what I want you to do is at

22   some point get with the Government and show them where they

23   are coming from, so they can satisfy themselves that in fact

24   that is a previous government translation.  And once that is

25   done, then we don't have to worry about where it came from.

1    You can just -- We can agree that that is a previous

2    Government translation.  We don't have to get into prior trial

3    or anything.  Just another, whether it is previous or

4    whatever, just another Government translation.

5         And I think you are entitled to get into that, but you do

6    still have to establish that there are two different

7    Government translations.

8              MS. HOLLANDER:  I understand.

9              THE COURT:  And you are telling me, "Well, this

10   comes off the website," but you are not a witness.  That can't

11   be established in terms of evidence as far as predicate.  And

12   so unless you can get Agent Burns to look at that and say,

13   "Yes, I know this is a previous Government translation," then

14   you are not going to have a predicate.  She is not going to

15   know, and we are going to be right back where we are spinning

16   our wheels.

17             MS. HOLLANDER:  I gave this to the Government

18   yesterday, and Mr. Jonas actually emailed me over lunch and

19   asked me, "What is the difference and where is the Government

20   exhibit?"  And I told him the Government number, the previous

21   Government number --

22             THE COURT:  But how many of these do you have that

23   you want to get into?

24             MS. HOLLANDER:  I have one, Your Honor.  I have one.

25   I mean, I am concerned that things are getting retranslated.

1           THE COURT:  You are what?

2           MS. HOLLANDER:  I am concerned that exhibits are

3    getting retranslated, and this one we just found by chance.

4       But, I mean, the Government knows and could have pulled

5    it up and looked at it if there was any question.  It

6    never -- I have to say, it never occurred to me that the

7    Government would think that I have made up a Government

8    exhibit from the last trial, that I invented it somehow, as

9    opposed to believing that this is the Government exhibit.

10          THE COURT:  Mr. Jonas, have you had the opportunity

11   to look at that.

12          MR. JONAS:  Other than just what we did now?  No.

13   It came late in the lunch hour.  One thing that we have done

14   is we went back to our translator Mr. Shafik, who testified,

15   and what he told us--I am hearing this third-hand now from the

16   person that called him--he has not changed the translations.

17      So Your Honor, we don't have an explanation.  I would

18   like to investigate to find out if there is a change in the

19   translation and what is going on.  This could be an earlier

20   draft.  Just because it is on the Court's website from the

21   last trial, there have been mistakes in the Court's website,

22   and I don't know if this is one of them or not.  So we need to

23   check it out.

24          THE COURT:  But are you disputing that that is a

25   Government translation?  Or you just don't know.

1          MR. JONAS:  I don't know, sir.  I don't know.  I

2     know the translation that is in the exhibit that is admitted

3     is a Government translation.

4          THE COURT:  In this case.

5          MR. JONAS:  In this trial.

6          THE COURT:  Okay.

7          MS. HOLLANDER:  I think we had it electronically

8     from the last trial.  I mean, the poem was clearly translated

9     again, because there is all kinds of subtle little differences

10    in it.  One says something has arrived and another says it has

11    come.  The poetry of it has essentially been effectively

12    removed, so it is now very difficult to read in the way it was

13    before.

14         And part of the Holy Land ad, which is how they

15    introduced these, has just vanished.  And, you know, we

16    literally just discovered this by chance.

17         But it never occurred to me, Your Honor, that the

18    Government would contest --

19         THE COURT:  Well, they are, and I can't resolve it,

20    obviously, with what I have before me, and so I will have to

21    make sure that that can be established either to their

22    satisfaction or my satisfaction.  Ultimately I am going to

23    have to make the ruling.  If you can satisfy them, then I

24    suspect there wouldn't be any objection.  But I can't rule on

25    that either, so I am not going to let you get into that, at

1    least not now.

2        What other area?

3                MS. HOLLANDER:  Well, I need a few minutes --

4                THE COURT:  You have had plenty of time, counsel.

5    You have had plenty of time.  This jury has been waiting 35

6    minutes, and I am not going to let them wait much longer.  You

7    are either ready to go or you are not.

8                MS. HOLLANDER:  I was just going to see whether one

9    of my other counsel wanted to go first.

10                THE COURT:  You can do that.  I will give you a

11    minute.

12                MS. HOLLANDER:  That is all I wanted.

13                THE COURT:  That is fine.  You can do that.  We just

14    need to get moving.

15                MR. JONAS:  Our paralegal checked from the last

16    trial, and what we checked the translations are the same as

17    the current trial.

18                THE COURT:  Okay.  Like I say, we will just have to

19    resolve that.

20                MS. HOLLANDER:  We are just going to change the

21    order and see if that will give me time to reorganize this so

22    that we don't have to wait.

23                THE COURT:  Right.  Okay.  Who is up next, then?

24                MR. WESTFALL:  I will go, Your Honor.

25                THE COURT:  And who is after Mr. Westfall?

1      MS. CADEDDU:  I am, Your Honor.

2      MS. HOLLANDER:  Do we need to explain somehow that I

3   started to examine her and now we changed?

4      THE COURT:  That is fine.  Do you want to do that,

5   that you are going to need to look at some things and we will

6   come back with you later on?

7      MS. HOLLANDER:  Can I do that?

8      THE COURT:  Yes, since we were hearing from you.

9      All right.  Bring the jury.

10      (Whereupon, the jury entered the courtroom.)

11      THE COURT:  Ms. Hollander?

12   Q.   (BY MS. HOLLANDER)  Good afternoon, Agent Burns.

13   A.   Good afternoon.

14   Q.   We have had a slight change of plans to reorganize, and

15   one of the other lawyers is going to be asking you questions

16   and then I will come back to you later.

17   A.   Okay.

18      MS. HOLLANDER:  Thank you, Your Honor.

19      THE COURT:  Mr. Westfall?

20      MR. WESTFALL:  Thank you, Your Honor.

21                      CROSS EXAMINATION

22   By Mr. Westfall:

23   Q.   Agent Burns, how is it going?

24   A.   Great, thanks.

25   Q.   I want to first talk to you the organizations, the

1   Palestine fund, the OLF and then the HLF.  Okay?

2   A.    Okay.

3           MR. WESTFALL:  May I have this document viewer?

4   Q.    (BY MR. WESTFALL)  Okay.  The first -- When the

5   organization was first begun, it was called the Palestine

6   Relief Fund.  Isn't that true?

7   A.    That is correct.

8   Q.    And that was in Plainfield, Indiana?

9   A.    That is correct.

10  Q.    And I am showing you what is already in evidence as

11  Secretary of State California No. 1.  Do you see that?

12  A.    I do.

13  Q.    Okay.  This is the articles of incorporation for the

14  Occupied Land Fund.  Can you see that okay on your screen?

15  A.    Yes, I can.

16  Q.    Okay.  And the articles of incorporation are from January

17  11, 1989.  Isn't that true?

18  A.    Yes.

19  Q.    And the Occupied Land Fund was what the Palestine Relief

20  Fund became.

21  A.    That is correct.

22  Q.    And it became that in January of 1989.

23  A.    I think it began actually using the name much earlier,

24  but by the time they were incorporated they were definitely

25  using the name Occupied Land Fund.

1   Q.   Okay.  And then on page 3 actually of the same exhibit is

2   an amendment to the articles of incorporation.  Isn't that

3   true?

4   A.   That is correct.

5   Q.   And this is September 16 of 1991.  Right?

6   A.   That is correct.

7   Q.   And it says, "It is hereby amended for the Holy Land

8   foundation for Relief and Development."  So it was September

9   16 of 1991 when the OLF officially became the HLF.

10   A.   That is correct.

11   Q.   Here at page 3 again, these are the officers of the

12   corporation.  Right?

13   A.   That is correct.

14   Q.   And Abdul Odeh wasn't one of the officers of the OLF.

15   Right?

16   A.   No, he was not.

17   Q.   And in fact, the entire life of the OLF predated Abdul

18   Odeh.

19   A.   He was not involved, he did not work for the HLF, to my

20   knowledge, when they were the Occupied Land Fund.

21   Q.   Right.  And he was not in the Philadelphia meeting.

22   A.   He was not at the Philadelphia meeting, no.

23   Q.   And there is nothing to suggest that he was a member of

24   the Palestine Committee.

25   A.   I think we saw him on a couple of the earlier videotapes

1    in the audience at some of these festivals; however, I have

2    not seen him on any documentation as a member of the Palestine

3    Committee.

4    Q.    Right.  And these videos, though, they weren't Palestine

5    Committee videos.  They were IAP videos.  Right?

6    A.    They were videos of IAP videos, which of course we have

7    stated the IAP was part of the Palestine Committee.

8    Q.    Perhaps I am not being clear in my question.  The

9    Palestine Committee is pretty well set out in those Elbarasse

10   documents.  Right?  And the al-Ashqar documents.

11   A.    Those lists are not exclusive, but those documents do

12   identify a number of members of the Palestine Committee.

13   Q.    And all of those, like the flow charts Ms. Moreno was

14   showing you, the organizational charts of the Palestine

15   Committee.  Right?

16   A.    Correct.

17   Q.    Odeh's name is not on those.

18   A.    No, it is not.

19   Q.    And he is not on the board or an incorporator of the

20   UASR.

21   A.    That is correct.

22   Q.    Not an incorporator of the IAP.

23   A.    That is correct.

24   Q.    It wasn't even an incorporator of the Holy Land

25   Foundation.

1   A.   That is correct.

2   Q.   And when I say an incorporator, his name being in the

3   articles of incorporation.

4   A.   That is correct.

5   Q.   Wasn't on the board of directors of the Holy Land

6   Foundation.

7   A.   That is correct.

8   Q.   I am showing you now Secretary of State Texas No. 4.  Do

9   you see that?

10  A.   I do.

11  Q.   And this is a certificate of authority for a non-profit

12  corporation dated November 18, 1992.

13  A.   That is correct.

14  Q.   And this is when the California corporation, which was

15  the Holy Land Foundation, came to Texas.

16  A.   That is correct.

17  Q.   And Odeh's name is not on this.

18  A.   It is not.

19  Q.   This is New Jersey -- Secretary of State New Jersey No.

20  1, which is already in evidence.  Right?

21  A.   I believe it is.

22  Q.   And this is filed June 2nd, 1994.  True?

23  A.   That is correct.

24  Q.   And what it is is the same thing we just saw, except for

25  New Jersey, when the Holy Land Foundation went to get a

1    certificate of authority to work in New Jersey.

2    A.    Yes.

3    Q.    And New Jersey is where Odeh worked.  Right?

4    A.    That is correct.

5    Q.    You said he was the only employee at the New Jersey

6    office.

7    A.    As far as I know he was, yes.

8    Q.    And when they went to get the certificate of authority,

9    Odeh is not even on the New Jersey one.  Right?

10   A.    He is not on this document, no.

11        MR. JONAS:  Your Honor, I don't believe that

12   document is in evidence.  I have no objection if he wants to

13   move it into evidence.

14        MR. WESTFALL:  I checked these lists twice.  If it

15   is not in evidence, do you want me to move it in on your

16   behalf?

17       May I approach the witness?

18        THE COURT:  Sure.

19   Q.    (BY MR. WESTFALL)  I am showing you what is marked --

20   just look and make sure it is the same one that you --

21   A.    I have seen this before.

22        MR. WESTFALL:  Your Honor, I move Government's

23   Exhibit Secretary of State New Jersey No. 1 into evidence.

24        MR. JONAS:  No objection.

25        THE COURT:  Admitted.

1         MR. WESTFALL:  I apologize.

2      This one is in evidence, isn't it?  It is Ashqar Search

3   No. 6, which is a phonebook.

4   Q.  (BY MR. Westfall)  Do you want to see the English part?

5   A.  I see what it is.  I am waiting for somebody to tell me

6   if it is admitted or not.

7         THE COURT:  I don't show it as in evidence.  I could

8   be off after yesterday afternoon, but I don't show it in,

9   counsel.

10         MR. WESTFALL:  Really?  Do you want me to move this

11   one in?

12      Your Honor, let me show it to her.

13         THE WITNESS:  Okay.

14         MR. WESTFALL:  Your Honor, I move for the admission

15   of Government's Exhibit Ashqar Search No. 6.

16         MR. JONAS:  No objection.

17         MS. MORENO:  Your Honor, may we approach?

18         THE COURT:  Yes.

19         (The following was had outside the hearing of the

20         jury.)

21         MR. CLINE:  Your Honor, I didn't cross this witness,

22   but may I speak to this objection.

23         THE COURT:  Sure.

24         MR. WESTFALL:  I will withdraw the offer.

25         MR. CLINE:  I certainly don't want to interfere with

1    Mr. Westfall's cross, but we have a series of objections to

2    these Ashqar exhibits on FISA grounds and hearsay grounds and

3    all kinds of other grounds.

4              MR. WESTFALL:  And I will withdraw the offer.

5              THE COURT:  All right.

6              (The following was had in the presence and hearing

7              of the jury.)

8              MR. WESTFALL:  Your Honor, I withdraw the offer of

9    Ashqar Search No. 6.

10             THE COURT:  All right.

11             MR. WESTFALL:  Lest I get beat up.

12        May I confer with Mr. Jonas?

13             THE COURT:  Yes.

14   Q.   (BY MR. WESTFALL)  Is it safe to say that Abdul Odeh is

15   not in Mr. Ashqar's phonebook?

16   A.   I did not see his name in there, no.

17   Q.   Okay.  And then this here is Mr. Marzook's phonebook.

18   A.   I am sorry.  I thought you were asking me about Marzook's

19   phonebook.

20   Q.   Mr. Ashqar's phonebook.  Ashqar had one, too, that they

21   got out of his house in '93.

22   A.   The document we are not bringing in?

23   Q.   Exactly.

24   A.   I don't think so.

25   Q.   Okay.  And then this one here is the Marzook's phonebook.

1    He is not in Mr. Marzook's phonebook?

2    A.    I don't recall seeing his name in there.

3    Q.    Okay.  Now, I want to show you what I am convinced is in

4    evidence is Holy Land Search No. 2.

5    A.    Okay.

6    Q.    And this is kind of a spreadsheet of all of the

7    employees, at least all the employees of Holy Land that are on

8    this sheet.  Right?

9    A.    I wouldn't want to say it is all the employees, but it is

10   a list of HLF employees.

11   Q.    That is why I said at least all of them on this sheet.

12   A.    Right.

13   Q.    Here is another one where I kind of highlighted the line

14   where Abdul Odeh is.

15   A.    Okay.

16   Q.    He was the New Jersey representative.  Right?

17   A.    That is correct.

18   Q.    This is another one where -- You mentioned also -- It is

19   the same thing.  I have just done some highlighting on it.

20   You mentioned also there were several different state

21   representatives at I guess different times.  Right?

22   A.    Yes.  The HLF had representatives in some states.  In

23   some states it had offices.  So there was a difference.

24   Q.    So here Abdullatif Alkosari who looks like -- The MI, is

25   that Michigan?

1   A.   It is.

2   Q.   And then Abdul Odeh.  And Ahmad Hatem in Florida.  Right?

3   A.   That is correct.

4   Q.   And then this one here is a California representative?

5   A.   Yes.

6   Q.   And I think you even mentioned Kifah Mustapha who is the

7   Illinois representative?

8   A.   That is correct.

9   Q.   So there -- He is one of eight representatives that are

10  on this page, I guess.  Right?

11  A.   That looks about right.  I didn't count them, but it

12  looks about right.

13  Q.   And this was the Holy Land Foundation Search No. 1.  Do

14  you remember this?  This came in your first day.

15  A.   I do.

16  Q.   And this is called a service agreement, but it is an

17  agreement between Abdul Odeh and Shukri Baker as to what his

18  job would be.

19  A.   That is correct.

20  Q.   And I want to talk about it a little bit.

21  A.   Okay.

22  Q.   Now, I am going to zoom it in some and we will move down

23  the document.  This will make it easier to see.

24       First of all, it looks like he has agreed to a monthly

25  fee of $2,079.  Roughly would be $25,000 a year; a little less

1  than $25,000 a year.

2  A.   That is correct.

3  Q.   And then these are sort of the things that he has agreed

4  to do, or at least the duties that are set out.

5  A.   That is correct.

6  Q.   Is to manage the HLF office in New Jersey; to build and

7  develop public relations in the New York and New Jersey area;

8  to market and present HLF literature, programs, and projects?

9  A.   That is correct.

10  Q.   And solicit specific donations on behalf of HLF and to

11  facilitate HLF guest needs, which basically translated to

12  running speakers around.  Right?

13  A.   He was the person responsible for the HLF speakers when

14  they came into the area.

15  Q.   Get them from the airport and get them to the mosque.

16  And that was Abdul who was doing that?

17  A.   And I believe he was also responsible for getting them

18  set up with the venues where they were supposed to speak and

19  things like that.

20  Q.   It looks like, at least initially, we were on like an

21  independent contractor status.  Yes, he had to report to the

22  headquarters.  Right?

23  A.   That is correct.

24  Q.   Mohammad El-Mezain supervised his work and issued

25  specific instructions.  And then we know at some point he

1    became an employee.

2    A.    Yes.

3    Q.    Now, I gave you a notebook, and would you please look in

4    it?  I did that so hopefully it will make it easier on you.

5    It has got two exhibits in it.  One is No. 1016 and one is

6    No. 204, and they are separated by those tabs.

7    A.    Okay.

8    Q.    And those are both exhibits, those are both documents

9    that you have seen before.

10   A.    I definitely recognize this one on top.

11   Q.    Take a look at that No. 204 there.  Does it have the HLDL

12   bates stamp on it?

13   A.    It does.  I have seen it before, but I am not really

14   fresh on what is in here.  So if you want to ask me questions,

15   I would like to look into it.

16   Q.    I have to get it in evidence first.  Does it appear to be

17   Abdul Odeh's personnel file?

18   A.    It does.

19          MR. WESTFALL:  Your Honor, at this time I will move

20   for admission of Defendants' 1016 and Defendants' 204.

21          MR. JONAS:  No objection.

22          THE COURT:  Those are admitted.

23   Q.    (BY MR. WESTFALL)  Let's go to No. 1016 first.

24   A.    Okay.

25   Q.    Now, it -- And I am looking at HLF Search again.  Okay?

1  A.   Okay.

2  Q.   And it said here that "Will present monthly reports of

3  all activities," but what ended up happening was weekly

4  reports.

5  A.   During the time period of this exhibit it appears that he

6  was giving weekly reports.

7  Q.   And the exhibit we are talking about there is No. 1016.

8  A.   That is correct.

9  Q.   I would like to go through some of those weekly reports

10  with you.

11  A.   Okay.

12  Q.   So go to page 12.  And I am going to put this on the

13  document viewer, too, in case you --

14  A.   Okay.

15  Q.   Now, this is pages 12 and 13.  Let me go out so you can

16  see it.  And this is one of the weekly reports.  Right?

17  A.   It is.

18  Q.   And it has two pages, and we will go through these in a

19  sec?

20  A.   Okay.

21  Q.   This particular weekly report covers the period of time

22  from June 1st to June 7th of 1996.  True?

23  A.   That is what it says, yes.

24  Q.   And on this first section we have an overview of office

25  hours and revenue generated for the week.

```
1    A.    Correct.

2    Q.    That is what it says?

3    A.    That is what it says.

4    Q.    And here we have a section where Odeh had to -- how many

5    times did he contact the headquarters office during the week.

6    So he apparently had to keep track how often he called

7    headquarters on this sheet.

8    A.    I don't know if he had to, but obviously he did in this

9    instance.

10   Q.    Okay.  And then "what was it regarding when you called,"

11   that is also on the sheet.

12   A.    That is correct.

13   Q.    Here in the office, office work, we just see I guess kind

14   of general stuff where he had to keep track of hours and such.

15   Right?

16   A.    Again, I don't know if he had to, but he did.

17   Q.    Right.  And the second page has some other categories.

18   One is field work, and displaying a booth in the masjid that

19   means mosque.  Right?

20   A.    That is correct.

21   Q.    So displaying a booth at a mosque or another place of

22   worship.

23   A.    That is correct.

24   Q.    And then a coin collection, you know that he had coin

25   boxes in different places where he had to tend to.
```

1  A.   Yes, you are correct.

2  Q.   Like stores, grocery stores and such?

3  A.   Things like gas stations where they would place the coin

4  boxes for donations.

5  Q.   And keep track of the needy family sponsorships and

6  orphan sponsorships and mailing lists, sending new names down

7  to headquarters so they can get on the list.

8  A.   Correct.

9  Q.   Now, this is June 7th of '96.  It references a trip to

10  Egypt.  Now, Odeh went to Egypt and took a relief mission to a

11  U.N. Camp there, didn't he?

12  A.   He did.

13  Q.   And that was called the Canada Camp.

14  A.   I believe that is correct.

15  Q.   This is page 18 out of the same exhibit.  You see here

16  where he contacted the headquarters about orphans?

17  A.   I see that.

18  Q.   Now, when Odeh would contact the headquarters about

19  orphans, the person he would talk to is Ibrahim al-Samnah Does

20  that name ring a bell?

21  A.   That does.  He was an officer at the HLF.

22  Q.   And he was like the orphan director?

23  A.   At one point he was, yes.

24  Q.   Which means that he was the one that I guess stayed in

25  touch with Palestine and got the orphan applications.  Does

1    that make sense?

2    A.    I believe at one time that was part of his duties, but I

3    am not -- I haven't looked at that in a while, so I don't know

4    exactly what he did in obtaining the orphan sponsorship, but I

5    believe his exact title was social services director.

6    Q.    All right.  And the orphans that the Holy Land Foundation

7    represented, I mean, you have seen the records of all the

8    orphan applications that are in those 500 boxes of bankers

9    boxes, haven't you?

10   A.    I have seen a number of lists of orphans.

11   Q.    There was orphans there not only from Palestine but also

12   from Kosovo.  Right?

13   A.    I am trying to recall.  I know they did administer aid in

14   Kosovo at one time, but I don't recall specifically seeing an

15   orphan's list from Kosovo.  There may have been one, but I

16   don't recall offhand.

17   Q.    And there was also Jordan?

18   A.    I recall seeing some orphans lists from Jordan in the

19   boxes.

20   Q.    And also from south Lebanon?

21   A.    I recall seeing some from Lebanon.

22   Q.    And they did a number of other things outside of

23   Palestine, like Bosnia.  They did some relief work in Bosnia?

24   A.    They did some.

25   Q.    Now, this is page 20 of the same exhibit.  You see here

1  where it says "quarterly meeting and the headquarters."

2  A.    I do.

3  Q.    Odeh would go four times a year to Dallas for these

4  meetings at headquarters, wouldn't he?

5  A.    I have seen records indicating he traveled to Dallas for

6  the meetings.  I don't know if he always traveled four times a

7  year or if there were more or less, but generally he traveled

8  to headquarters for meetings.

9  Q.    Right.  And in fact, AMEX 1 in evidence.  AMEX 1, page

10 30, if you want to pull that up or take my word for it, that

11 is Shukri's and the HLF American Express bill, AMEX 1.

12 A.    That is what AMEX 1 is.  That is correct.  That is the

13 HLF AMEX records, the set we talked about yesterday.

14 Q.    Page 30, it says A. Odeh, and says Newark to Dallas,

15 Dallas to Newark where it says HLF bought him plane tickets to

16 come to Dallas.

17 A.    I have to take the word for the page numbers, but I have

18 seen the records where they paid for his plane ticket.

19 Q.    Under here there is this a thing here called ICNA

20 convention.  Now, that is the Islamic Circle of North America.

21 Right?

22 A.    That is correct.

23 Q.    And they would have conventions, maybe not the exact same

24 ones that we have seen these videos of, but there was a number

25 of different organizations that had conventions where speakers

1   would come in and they would have dinner and fund-raise.

2   Right?

3   A.   I have not seen any videotapes of ICNA conventions that I

4   can recall, so I am not sure exactly what they did at their

5   conventions, but I am sure they had fundraising activities at

6   their conventions.

7   Q.   Right.  But there was ICNA and MAYA and the IAP?

8   A.   In the early years I think MAYA and IAP were the ones --

9   Are you asking specifically about HLF, or are you asking about

10  ICNA?  I just want to be clear.

11  Q.   I am just asking about in general there are more than

12  just the IAP that had conventions.  And, I mean, if you know

13  you know.  But like here is a reference to the ICNA

14  convention.  You know that ICNA has conventions.  Right?

15  A.   Yes.  I know -- Well, I have not seen any videos of them,

16  so, I mean, I understand from paperwork like this that ICNA

17  did hold conventions, but I have not seen any videos of them.

18  Q.   And you know that Odeh would go and work at these

19  conventions.  Right?

20  A.   Are we talking about all of them or just the ICNA.

21  Q.   At least the ones where he said he worked.  You know he

22  worked at conventions.

23  A.   I do know he worked at conventions.

24  Q.   On behalf of the Holy Land Foundation.

25  A.   Yes.

1          MR. WESTFALL:  Your Honor, may I approach?

2          THE COURT:  Yes.

3     Q.   (BY MR. WESTFALL)  I show you Defendants' No. 697?

4     A.   Okay.

5     Q.   Is that a photograph?

6     A.   It is a photograph.

7     Q.   And is that a photograph containing your bates label that

8     you all put on everything?

9     A.   It does.  It was seized in the HLF search warrant.

10    Q.   And that photograph there, I mean, you recognize the Holy

11    Land Foundation logo across the top of this booth.

12    A.   That is their logo, yes.

13    Q.   Okay.

14         MR. WESTFALL:  Your Honor, I move for admission of

15    Defendants' 697.

16         MR. JONAS:  Your Honor, based upon our previous

17    objection, we are going to object.

18         THE COURT:  You have that objection.  I have

19    overruled that.  No. 697 is admitted.

20         MR. WESTFALL:  Thank you, Your Honor.

21    Q.   (BY MR. WESTFALL)  Now, I am going to put No. 697, which

22    is that photograph we were just talking about, on the elmo.

23    Can you see this okay?

24    A.   I do.

25    Q.   It is a little bit washed out.  But see how it has got

1  the Holy Land Foundation across the top there are?

2  A.    I do.

3  Q.    And these are all photographs.  And you see, does it look

4  like handicrafts and stuff there on the desk, on the table?

5  A.    The screens on these monitors are not the best, but that

6  is what it appears to be.

7  Q.    Okay.  And this is the type of booth that the Holy Land

8  -- In fact, this is an exact booth that the Holy Land would

9  set up at these conventions.

10  A.    I never saw the booths that they set up at the

11  conventions, and I know this picture came from the HLF search

12  warrant material and it is of a booth, but as far as if that

13  is what they set up at the conventions, I never saw one so I

14  don't know if that is what they look like or not.

15  Q.    Okay.  So back to No. 1016 here, on Friday 7/5 traveled

16  to Fong Valley to attend the ICNA convention.

17  A.    I see that.

18  Q.    And you have seen this photograph before, haven't you?

19  A.    I have.

20  Q.    Okay.  Here is pages 22 and 23 of the same exhibit.  He

21  is writing down that he has called the home office again about

22  the ICNA convention, and then on page 23 displayed the booth

23  during the community activity which was the ICNA.

24  A.    Yes, that is correct.

25  Q.    Now, this is page 26 of this same thing.  We are up to

1  July of 1996 now.  Right?

2  A.    Correct.

3  Q.    And he is calling now and he is putting in his report

4  that he is asking for an orphan from Nablus.

5  A.    That is correct.

6  Q.    And in the work that you have done and what you have seen

7  in the 500 boxes, it is not unusual for a person who is going

8  to sponsor an orphan to request a particular type of orphan.

9  A.    I have seen that donors request specific type of orphans.

10  Q.    Right.  And also request, "I want an orphan who is a

11  girl," or "I want an orphan who comes from Palestine," or "I

12  want an orphan who comes from a specific place in Palestine."

13  A.    I have seen them make specific requests, yes.

14  Q.    Here on page 28 now, he is calling the headquarters or

15  writing down that he has called the headquarters because

16  somebody has asked for a martyr's family, specifically a

17  shahid's family?

18  A.    Correct.

19  Q.    And we see that also, don't we?

20  A.    Yes, we do.

21  Q.    And when we are talking about a martyr's family, from

22  what we have seen in I guess the advertising and such that the

23  Holy Land did, we are talking about like, for instance, the

24  al-Aqsa massacre.  Which I am not going to ask you if you are

25  familiar with that, other than have you seen references to

1    that in like the literature, in their materials?

2    A.    I have seen references to it.

3    Q.    Okay.  And the al-Ibrahimi mosque massacre.  And these

4    are things that would fall under the definition of martyr.

5    A.    I have seen that they do reference some of those

6    individuals as martyrs, as well as other individuals like bomb

7    makers' children.

8    Q.    Here two weeks in a row where he is calling and asking

9    for orphans.  We see this all over the place, don't we?  I

10   mean, these orphans -- Mr. Odeh, I mean, that was one of his

11   job duties was to have people to get sponsors for orphans.

12   A.    Yes, it was.

13   Q.    Here is page 34 of the same exhibit.  He is about to

14   start work with -- start doing another convention.  This one

15   is an IAP convention.

16   A.    It says an IAP activity so -- Let's see.  Hold on.  It is

17   an activity in the mosque.  I don't know that it would be

18   considered a convention, but it was an IAP activity.

19   Q.    Right.  And, you know, we have seen the ICNA now and the

20   IAP and talked about the MAYA.  Those were the ones who really

21   had the conventions.  Right?

22   A.    I don't know about ICNA conventions until later in the

23   '90s, but I know in the late '80s early '90s that MAYA was one

24   of the organizations in this community that held yearly

25   conventions at which the HLF participated and that the IAP

held festivals, what they called festivals, during that time
period, and that in approximately 1994 the IAP began to have
its own yearly convention at which the HLF participated.  I
have not seen information about ICNA conventions during that
time period.  There may have been some, but --

Q.   But I think you just said it there, that the IAP had the
convention and then HLF participated.

A.   That is correct.

Q.   There is one where this fellow I mentioned to you,
Ibrahim al-Samnah that is probably who he is referring to
there.  He calling and asking Ibrahim about orphans.

A.   Ibrahim al-Samnah the HLF handled social services, so
that would stand to reason, but I don't know that that is for
sure who it is.

Q.   Chances are.  But there was also people who would call
and specifically request like a martyr's child or martyr's
family.  "I specifically want to sponsor a martyr's family."

A.   Yes.

Q.   You know, in addition, let me also -- In addition to the
orphan sponsorships, there also were family sponsorships.

A.   There were.

Q.   And there were needy child sponsorships?

A.   Correct.

Q.   And there were student sponsorships.  Right?

A.   That is correct.

1    Q.    Eid gifts -- Do you know what Eid is?

2    A.    Like a holiday.  They were -- Yes.

3    Q.    Breaking of the end of Ramadan is the Eid.

4    A.    One of them.

5    Q.    And the Holy Land Foundation would also go out and

6    distribute gifts for that as well.

7    A.    According to the documentation that I have seen, that is

8    what they did.

9    Q.    And they would also do food packages.

10   A.    Food packages were one of their programs that they had

11   listed in their documentation.

12   Q.    And school bags and school books and stuff like that?

13   A.    Those were also listed, yes.

14   Q.    Here is one, page 56.  Someone is asking specifically

15   asking about the orphans from the Aqsa massacre.

16   A.    Actually based on this time frame, which was in 1996, I

17   don't think that would be the al-Aqsa massacre.  That was more

18   likely another event that happened.  There was an uprising in

19   1996 and people were killed during that uprising.  I think

20   that would probably be what that is referencing.  I can't say

21   for sure, but I know that the massacre that you are

22   referencing happened many, many years before this.

23   Q.    Really?  All I am asking about is what is on the paper.

24   What do you know about the al-Aqsa massacre?

25   A.    Well, I don't know which one that is referencing.  If we

1    are talking about the time period in September of 1996, which

2    is right after that, there was an uprising that occurred as a

3    result of some tunnels around the al-Aqsa mosque, and fighting

4    broke out and many of the people who were fighting ended up

5    getting killed.

6    Q.    Here we are talking about a MAYA convention.  Right?

7    A.    Correct.

8    Q.    And this would be an example I guess of Odeh, one of his

9    job duties being to take speakers around.

10   A.    That is correct.

11   Q.    This is page 76 of the same exhibit, and here he

12   references leaving on 1/15/97 and traveling to Jordan.  Do you

13   see that?

14   A.    I do.

15   Q.    And in 1997, which is this, he went to Jordan and went

16   and visited more U.N. refugee camps?

17   A.    I know he traveled to Jordan for the HLF on their behalf

18   to administer aid, but I do not recall which camps he visited

19   or if he actually visited camps.

20   Q.    Okay.  And then this, did you know he went to Jordan

21   twice in that year of 1997?  You knew he made two trips to

22   Jordan.  Right?

23   A.    I recall that he made one and possibly two, but I don't

24   know the dates of those.

25   Q.    Okay.  Do you have any reason to doubt, though, that '97

1    is the correct year?

2    A.    No, I do not.

3    Q.    Now, let's move along --

4    A.    Okay.

5    Q.    -- into No. 204.

6    A.    Okay.

7    Q.    And this is Odeh's personnel file.  And there were a

8    number of people at the Holy Land Foundation that Abdul had to

9    answer to that -- what I am trying to get to is where he is in

10   the hierarchy.  Okay?

11   A.    Okay.

12   Q.    Obviously he had to answer to Shukri.

13   A.    Yes.

14   Q.    And obviously he had to answer to El-Mezain.

15   A.    That is correct.

16   Q.    This is page 8.  These page numbers are in the lower left

17   hand corner.  He also had to answer to Akram Mishal.  Right?

18   A.    I am sorry.  Bear with me, because I think -- My copies

19   the page numbers are really light so -- I think I have it.

20   Q.    Do you have it?

21   A.    I think I did find it.  Yes, I did.

22   Q.    Okay.  It is a June 16, 1998 letter.  Obviously he had to

23   answer to Akram Mishal.  Right?

24   A.    He was also one of the directors at the HLF, yes.

25   Q.    This is Haitham Maghawri.  And he was also one of his

1  bosses.

2  A.   I don't know if you would consider him a boss, but

3  obviously he had some type of authority, based on this, over

4  Mr. Odeh's activities.

5  Q.   Now, in addition to the Egypt and Jordan we already

6  talked about -- Well, let me do this, first of all.  Please go

7  to page 76.

8  A.   Okay.  Can you tell me what the title of the page is,

9  because I am not seeing my page numbers down here.

10 Q.   Are you really not?

11         MR. WESTFALL:  May I approach, Your Honor?  I can

12 help her out.

13         THE COURT:  Yes.

14         THE WITNESS:  Unless I am missing it.

15 Q.   (BY MR. WESTFALL)  Also I can just put this on the

16 document camera.  This would be Odeh's resume.  Right?

17 A.   That is correct.

18 Q.   And it shows him he came over from Kuwait in 1982 to the

19 United States.

20 A.   Yes.  It indicates he was in Kuwait from 1977 through

21 1982.

22 Q.   And of course he became a U.S. citizen in the '80s.

23 Right?

24 A.   He did.

25 Q.   And then the previous page, this is the last page of his

employment application with the Holy Land Foundation.

A.    Correct.

Q.    And it shows his date of employment to be 2/1/94.

A.    That is what it says.

Q.    And this spreadsheet kind of -- It says 1/1/94.

A.    It did.

Q.    But it was 2/1/94.  There is no question that he became an employee on 2/1/94, is there.

A.    That is the date that this document is signed that indicates February 1st, 1994.

Q.    Right.  That is also the date of the service agreement as well.

A.    It was.  Correct.

Q.    Now, I want to -- I didn't make a copy of this for you. I want to go to HLF Search No. 94.

A.    Okay.

Q.    And what it is is the Sultan Mahmoud mailer.

A.    Okay.

Q.    Okay?  And on page 6 of that is this letter.  And this is a letter that the Holy Land Foundation sent, and it is a fundraising letter.  Right?

A.    Correct.

        MR. JONAS:  Your Honor, I am not sure this one is in.

        MR. WESTFALL:  Yes, it is.

1          MR. JONAS:  What is the exhibit number?

2          MR. WESTFALL:  HLF 94.

3          MR. JONAS:  Sorry.

4  Q.  (BY MR. WESTFALL)  Okay.  What this is talking about is

5  the situation in Kosovo where all the refugees were running

6  away from the Serbs from Slobodan Milosevic.  Wouldn't you

7  agree?

8  A.    That is correct.

9  Q.    And this particular humanitarian mission, the Kosovo

10  mission, Abdul Odeh went to Kosovo and worked on that.

11  A.    I believe that he did, yes.

12  Q.    And when he went there, he took flour and a bread machine

13  and facilitated them being able to make their own bread.

14  A.    That is correct.

15  Q.    And he also took two ambulances, or they called them

16  mobile clinics, ambulances like the EMTs use, with all the

17  stuff in them.

18  A.    I don't know what they had in them, but I saw that they

19  did take some ambulances.

20          MR. WESTFALL:  May I approach, Your Honor?

21          THE COURT:  Yes.

22  Q.  (BY MR. WESTFALL)  I am showing you No. 750, No. 491, and

23  then No. 1005.

24  A.    Okay.

25  Q.    On No. 1005, do you recognize the Holy Land Foundation

```
 1    logo?

 2    A.    I do.

 3    Q.    And you have seen that picture before?

 4    A.    Yes.

 5    Q.    And on the other two, do you recognize Abdul Odeh in both

 6    of those pictures?

 7    A.    I do.

 8    Q.    And you have seen those before?

 9    A.    I have.

10          MR. WESTFALL:  Your Honor, we move for admission of

11    Defendants' Exhibits No. 491, 750, and 1005.

12          MR. JONAS:  Your Honor, the same objections.

13          THE COURT:  Okay.  Those are overruled and those

14    exhibits are admitted.

15    Q.    (BY MR. WESTFALL)  This is Exhibit No. 750.  And is that

16    Abdul Odeh there?

17    A.    It is.

18    Q.    And of course, Kosovo is not in the Middle East.  It is

19    in eastern Europe.

20    A.    That is correct.

21    Q.    And you recognize Abdul Odeh here?

22    A.    I do.

23    Q.    And then this is the New Jersey office.  Right?

24    A.    That is correct.

25    Q.    And you know that in 1999 Abdul opened a pantry up there.
```

1    A.    I can't recall a specific date, but he did open a pantry

2    for the HLF.

3    Q.    Right.  And you know this was a pantry where people would

4    come to get food.

5    A.    I think that was the stated purpose.

6    Q.    Okay.  And you know that people did go there and get

7    food?

8    A.    I have seen videotape of its opening.  I don't know that

9    people came there on a regular basis.  I don't know a lot of

10   details about the pantry other than the opening of it.

11   Q.    You said you have seen a videotape?

12   A.    I have.

13   Q.    And you wouldn't know just from looking at the DVD, I

14   don't guess.

15              MR. WESTFALL:  May we approach for a second, Your

16   Honor?

17              THE COURT:  Yes.

18              (The following was had outside the hearing of the

19              jury.)

20              MR. WESTFALL:  This is the video that she just said

21   she had seen, and we didn't get a chance to talk about my

22   videos because I ended up cross examining a lot faster than I

23   thought I would.  This is the video of the pantry opening that

24   she just said she has seen before, and I would like to move it

25   into evidence.

1           MR. JONAS:  This is the problem.  She saw it during

2      the cross examination last year.  I don't know if there is any

3      evidence that she has seen it outside of last year's trial,

4      and that doesn't authenticate it.  And she maybe can recognize

5      Odeh or El-Mezain on it, but she can't talk about what is

6      going on other than Mr. Westfall leading her through it, as

7      with the pictures where all she can say is what just went into

8      evidence "That is Odeh."  But Mr. Westfall through his

9      questioning not even suggested, he said, "This is in Kosovo."

10     She can't say that, so there is this impression being left to

11     the jury about facts that Agent Burns isn't testifying to, and

12     that is the problem.

13          THE COURT:  How long is this video?

14          MR. WESTFALL:  Well, it is actually a whole lot

15     longer than what I would publish.  I would like to put the

16     video in now.

17          THE COURT:  Can she identify that as -- I know she

18     has seen it, but did she identify -- She could tell that was

19     the opening of that pantry?

20          MR. WESTFALL:  She did last year.  I have a record

21     of her doing it.  Now, what we did last year was gave her the

22     cassette tape, because it was one that they seized, and this

23     is a DVD minute-to-minute recording of that one that they

24     seized, and we gave her the videotape, let her have it

25     overnight, she watched it, she made herself satisfied that is

1    what it was, and the next day I came in, put it in actually

2    without objection.  And so yeah, she has seen or at least told

3    me she has seen the whole thing the night before when I gave

4    it to her.  And Exhibit No. 993 is the same Exhibit No. 993

5    that we put in last year.

6              THE COURT:  And she testified that she could tell

7    that this was from that opening of the pantry.  And how much

8    do you intend to play?

9              MR. WESTFALL:  Maybe five minutes of it.

10             THE COURT:  Okay.  All right.  If you can get her to

11   establish that, I will let you do that.

12             (The following was had in the presence and hearing

13             of the jury.)

14             THE COURT:  What exhibit number is this, again,

15   counsel.

16             MR. WESTFALL:  This is Exhibit No. 993, Your Honor.

17        May I approach?

18             THE COURT:  Yes.

19   Q.   (BY MR. WESTFALL)  This is a DVD, and there was a time

20   when you -- First of all, this was a tape -- The original

21   videotape was a tape that you all seized, or a tape that you

22   all had in your possession.  Isn't that true?  The pantry

23   videotape?

24   A.   I am not sure.  I would have to see the original

25   videotape to tell you if it was part of what was seized or

1   not.

2           MR. Westfall:  May I, Your Honor, refresh her

3   recollection?  May I approach?

4           THE COURT:  Yes.

5   Q.  (BY MR. WESTFALL)  Did that refresh your recollection

6   that you had seen it before?

7   A.   I remember that I did see it, but I just didn't recall

8   where it came from, but that reminds me that it did come from

9   the search warrant.

10  Q.   Okay.  So now you know it came originally from you all's

11  possession, and that is the DVD of that?

12  A.   That is correct.

13          MR. WESTFALL:  Your Honor, I move for admission of

14  Defendants' No. 993.

15          THE COURT:  Same objection, and that has been

16  overruled.  You may display a bit of that.  That is admitted.

17          MR. WESTFALL:  And I won't publish this at this time

18  because I don't have it queued up in my computer, so I will

19  press on and do that after a bit.

20          THE COURT:  Okay.

21  Q.  (BY MR. WESTFALL)  Now, you mentioned to maybe it was Ms.

22  Moreno the number of FISA wiretaps that there were, didn't

23  you?

24  A.   We spoke about it, I believe.

25  Q.   You said there was a wiretap on Shukri?

1   A.   That is correct.

2   Q.   That was about nine years?

3   A.   I believe that one was shorter because I believe it

4   started in '94, '95, and I think it ended in 2001.  But again,

5   I was not here so I am -- The dates are estimates, so bear

6   with me.

7   Q.   And I was thinking about Mr. El-Mezain.  It was Mr.

8   El-Mezain's that was about nine or ten years.

9   A.   I believe that is correct.  I think it started in '94 and

10  ended in approximately 2003.

11  Q.   And then Shukri's was about five or six years?

12  A.   That is correct.

13  Q.   And these -- And then the Holy Land was also surveilled

14  for how many years?

15  A.   It was a couple of years later on, but I am not sure of

16  the exact date.  I think it was around 2000, 2001.

17  Q.   These FISAs, these run, as long as you have them, they

18  run 24 hours a day, don't they?

19  A.   Yes.

20  Q.   And they go in three-month increments?

21  A.   I am not sure about that.  I have never administered a

22  FISA myself.  I worked the criminal side.

23  Q.   But when they do run, like they did for nine or ten

24  years, or whatever, it is 24 hours a day seven days a week.

25  A.   That is correct.

1    Q.   And so literally thousands, tens of thousands of hours of

2    conversation can be caught in this many FISA lines running.

3    Wouldn't you agree?

4    A.   With the number of FISA lines we had and the time frame,

5    there were thousands of calls.

6    Q.   It is like, I guess, one year at 24 hours a day seven

7    days a week is almost 9,000 hours, just that.

8    A.   I guess.  I would probably need a calculator to calculate

9    the number of hours.

10   Q.   The language specialist then goes through and summarizes

11   certain calls for you.  Right?

12   A.   That is correct.

13   Q.   And you don't speak Arabic?

14   A.   That is correct.

15   Q.   And he summarizes them, or whoever it is summarizes them

16   in English.

17   A.   That is correct.

18   Q.   And then you get the summary and you review them?

19   A.   That is correct.

20   Q.   And in this case you have reviewed up to -- upwards of

21   10,000 summaries?

22   A.   Probably close to it.

23        MR. Westfall:  At this time, Your Honor, I would

24   like to move into evidence Defendants' 1350.

25        MR. JONAS:  No objection, Your Honor.

1    THE COURT:  Admitted.

2    Q.  (BY MR. WESTFALL)  And one of those calls that you have

3    testified to in court was El-Mezain Wiretap No. 2.

4    A.  Correct.

5    Q.  And this is the call where Abdul Odeh is calling Mohammad

6    El-Mezain about doing something in Oklahoma City.

7    A.  That is correct.

8    Q.  I would like to just read through this call again.

9    A.  Okay.

10   Q.  And I will be Abdul and you be Mr. El-Mezain.

11   A.  Okay.

12       "Hello?"

13   Q.  "Peace be with you."

14   A.  "Peace and God's mercy."

15   Q.  "How are you, Sheik?"

16   A.  "Good.  May God bless you."

17   Q.  "How are you?"

18   A.  May God give you strength."

19   Q.  "A little while ago I spoke with Shukri."

20   A.  "Hmm."

21   Q.  "So I don't know.  I suggested to him that we must do

22   something regarding this crisis in Oklahoma City."

23   A.  "What do you want to do?"

24   Q.  "If they can go there, distribute water to those who work

25   there, send telegrams of condolence to the families of the

1    children who died or stuff, it is a good opportunity, Sheik,

2    for us to be highlighted that we do something in America."

3    A.    "Okay.  Let the -- let them study the matter from over

4    there."

5    Q.    "Huh?  No, I was just making a suggestion.  They are not

6    going to respond to us immediately, but --"

7    A.    "Let the people --"

8    Q.    "Because we said in the past in a meeting, my brother,

9    that we must do something in America or contact the American

10   Red Cross and tell them, 'Come, we would like to offer,'

11   because they showed in the news that they are distributing

12   food and water."

13   A.    "Yes."

14   Q.    "So why can't the Holy Land come, for instance, stand and

15   distribute water and stuff?"

16   A.    "It is close distance to them."

17   Q.    "It is close to them.  A four-hour car ride."

18   A.    "They won't allow them."

19   Q.    "Huh?"

20   A.    "They won't allow them in the present time."

21   Q.    "Okay.  How about contacting the families of the children

22   who died?"

23   A.    "Yes.  We can send cards or send something."

24   Q.    "Yes.  I mean, if we can benefit from the matter."

25   A.    "It will be good, God's willing."

1  Q.   Now, Defendants' 1350 is the exhibit I just put into

2  evidence, and this is actually more of the conversation.  I

3  would like to finish it up.

4  A.   Okay.

5  Q.   And this is -- I will start here.

6       "Yes.  I mean, if we can benefit from the matter."

7       "It will be good, God's willing."  Through the

8  highlighted part.

9       "Okay.  You think about the matter."

10 A.   "God's willing.  God's willing."

11 Q.   "It's like we're here.  We are an American organization,

12 and we're supposed to not only send stuff over there, but help

13 stuff over here as well."

14 A.   "God's willing, it will happen."

15 Q.   "Anyway, this is what I see.  Maybe --"

16 A.   "May God honor you."

17 Q.   "You guys are more aware of these things.  It will be

18 good."

19 A.   "We will do something, God's willing."

20 Q.   "I mean, just to improve things over here in the country.

21 What's wrong with you?  You sound tired."

22      And that is the end.

23      And the pantry, of course, was helping people in this

24 country also.  In New Jersey.  Right?

25 A.   I don't really know how to answer that, because I don't

1    know a lot about the pantry. I know that the documents state

2    they opened a pantry there and, as we said, I have seen the

3    opening video but I don't know specifically what aid they

4    administered to whom.

5    Q.   Did you also see that the Holy Land Foundation helped

6    with the floods in Iowa?

7    A.   They may have. I don't recall.

8    Q.   And of course, this Oklahoma deal, they did quite a bit

9    more than just send $5,000.

10    A.   As we talked about, they sent money and they had a blood

11    drive and did some other things.

12    Q.   And some folks actually did go up there?

13    A.   Yes, they did.

14    Q.   Now, there has been a couple of references made to how

15    much material -- how many boxes of things that you have as a

16    result of this investigation. Right?

17    A.   Yes.

18    Q.   And it is somewhere between 500 and 600 bankers boxes.

19    A.   That is correct.

20    Q.   In addition to that, I think there is thousands of

21    videotapes.

22    A.   Video and audiotapes, yes.

23    Q.   Video and audiotapes. And taken out of Mr. Odeh's office

24    up in New Jersey, I think we are looking at about 45 or 50

25    boxes right there.

1    A.    I think that is correct.

2    Q.    Plus videotapes and whatnot?

3    A.    Correct.

4    Q.    I want to show you a picture that I know is in evidence.

5          MR. WESTFALL:  May I confer with --

6          THE COURT:  Yes.

7          MR. WESTFALL:  For the record, this is the picture,

8    this picture here that you talked about yesterday.

9    A.    Yes.

10   Q.    It was yesterday afternoon.  Right?

11   A.    I believe it was.

12   Q.    Okay.  And this is the one with Qaradawi and Nasrallah

13   and Khalid Mishal?

14   A.    That is correct.

15   Q.    Now, this picture was found somewhere in Odeh's office.

16   A.    That is correct.

17   Q.    It was in one of those 45 or 50 boxes that you all have?

18   A.    It was in one of the boxes, yes.

19   Q.    And it has obviously been torn out of a newspaper.

20   A.    Correct.

21   Q.    And I guess in the translation it mentions that it is a

22   Reuters photo.

23   A.    Yes, it does.

24   Q.    Reuters is one of those international news agencies, like

25   AP.

1   A.   It is.

2   Q.   Do you have any idea when that is from, the photograph?

3   A.   If I recall, it was from around 2000.  I know it was

4   seized in 2001, but we would need to look at it again to see

5   if there was something on it to indicate the date.

6   Q.   Didn't it say something about the Islamic conference in

7   Beirut, Lebanon, something like that?

8   A.   It did reference a conference in Beirut, Lebanon, but I

9   can't recall if it referenced which conference.  I know for

10  sure it was seized in December of 2001.

11  Q.   I can help you out on this, because I do have the

12  translation.

13  A.   Okay.

14  Q.   The Islamic National Conference in Beirut on Friday,

15  Reuters.  The Islamic National Conference in Beirut, I guess

16  that is where the picture was taken?

17  A.   That would be, but there is no date noted on it so I am

18  not sure of the date.

19  Q.   Do you know anything about that Islamic National

20  Conference in Beirut?

21  A.   I don't know which one.  I know of a Jerusalem Foundation

22  Conference in January of 2001, but I don't know if that is the

23  same conference, so I wouldn't want to speculate on that.

24  Q.   This is HLF Search No. 31?

25  A.   Correct.

1   Q.   And this is the original of it.  Now, this appears to be

2   from 1990.  Right?

3   A.   Correct.

4   Q.   Published by the Islamic Association for Palestine?

5   A.   Correct.

6   Q.   It gives some facts about Yassin.

7        Do you know how if you have something thumbtacked to your

8   wall, it makes little holes?

9   A.   Yes.

10  Q.   There is no holes that would lead you to believe this was

11  thumbtacked to the wall, is there?

12  A.   I don't see any holes in it.

13  Q.   And you know how if you have something framed how you get

14  little fade marks around the edges?

15  A.   I don't know about that.  But it was not in a frame when

16  we seized it, if that is what you are asking.

17  Q.   Okay.  So this flier, I guess, was in the files in his

18  office, like that Nasrallah picture?

19  A.   I don't know exactly where it was in his office.

20  Q.   From 1990.

21  A.   That is correct.

22            MR. WESTFALL:  Do you have the original of HLF

23  Search No. 14?

24  Q.   (BY MR. WESTFALL)  Okay.  This here is HLF Search No. 14.

25  A.   Correct.

1  Q.   You discussed this yesterday as a booklet.  This is of

2  course in Arabic.

3  A.   It was, yes.

4  Q.   Now, the translation is the Jihadist School, and it

5  speaks about this Izz el-Din al-Qassam.

6  A.   Correct.

7  Q.   Have you read this translation?

8  A.   I have.

9  Q.   Mr. Al-Qassam was born in Syria in 1871.

10  A.   That is what it says.

11  Q.   According to this book.  Right?

12  A.   Correct.

13  Q.   And in all of the -- It kind of gives the history of him,

14  what he did.  In 1885 at the age of 14, went to Egypt.  Right?

15  A.   That is correct.

16  Q.   And it discusses, you know, this treaty of 1916, the

17  history of this, and kind of ends in the '40s, the early '40s,

18  something like that.

19  A.   I believe that is correct.

20  Q.   And did you notice that in this entire translation the

21  word Israel doesn't appear one time?

22  A.   I didn't look for the word Israel.

23  Q.   This guy fought against the British.

24  A.   That is correct.

25  Q.   Back in the British mandate, which was -- This is a

1    history book, I guess.  Right?

2    A.    The title of it is I believe the Jihadist School, so it

3    is the history of this individual.

4    Q.    By the way, at the end it has, and you testified to this,

5    this Palestine Relief Fund.

6    A.    Correct.

7    Q.    And so that would have had at least been prior to 1989.

8    A.    Correct.

9    Q.    This is HLF Search No. 109.

10    A.    Okay.

11    Q.    This is a copy of it.  Now, this is -- The copy in the

12    English numbering that you all did down at the bottom, it

13    appears to be roughly 250 pages long.

14    A.    Okay.  I don't have a copy in front of me, but I see --

15          MR. WESTFALL:  May I approach?

16          THE COURT:  Yes.

17    Q.    (BY MR. WESTFALL)  So it may be 260 pages long?

18    A.    Something like that.

19    Q.    Roughly?

20    A.    Roughly.

21    Q.    And of that we have eight pages of translation, if you

22    count the title page.

23    A.    I think that is correct.  I can't remember specifically

24    which one this is based on the cover.  If I could look at the

25    title page in English, it would help me remember which one it

1  is.

2         MR. WESTFALL:  May I approach, Your Honor?

3         THE COURT:  Yes.

4         THE WITNESS:  Okay.

5  Q.   (BY MR. WESTFALL)  And since you don't speak Arabic,

6  obviously somebody else translated it for you.

7  A.   That is correct.

8  Q.   And this is called the Palestinian Intifada in the Hebrew

9  Press, and I think you said yesterday a Study About Hamas,

10  which is I guess the subtitle.  And this was published in 1991

11  by the UASR.

12  A.   Correct.

13  Q.   And in it you actually published--or you -- Yeah, you

14  published, you read part of this to the jury and it is a

15  reporter speaking with Sheikh Yassin.

16  A.   Correct.

17  Q.   And this was Radio Israel on 9/23/89.  Right?

18  A.   That is correct.

19  Q.   Where he is giving this statement.  And it talks about

20  when Hamas was established.  And I don't know how far you

21  read.  You didn't read all of it though.  Right?

22  A.   I believe we stopped after -- because Mr. Jonas was

23  asking me about the Palestinian Mujahideen.

24  Q.   Okay.  Do me a favor.  Read the questions.

25  A.   All of them?

1   Q.   No, just start right here.

2   A.   Okay.  "Who among the known personalities in the West

3   Bank and Gaza Sector are members of this movement?"

4   Q.   "Whom do you mean?"

5   A.   "Dr. Ibrahim al-Yazouri for instance?"

6   Q.   "He is a member of Hamas in the political activity."

7   A.   "Who else among the known person amounts took part?"

8   Q.   "Among them is engineer Issa al-Ashqar, Dr. Abdel Aziz

9   al-Rantisi, Abdel Fattah and Salah Shehatah."

10  A.   "What is the relationship between the West Bank and Gaza

11  Sector in regards to Hamas?"

12  Q.   "A man called Jamil Hamami used to call us from the West

13  Bank.  He also used to convey information from our side."

14  A.   "Is the ongoing coordination?"

15  Q.   Now, this is Demonstrative No. 17.

16  A.   Correct.

17  Q.   And this Jamil Hamami I imagine is this person here?

18  A.   It is.

19  Q.   So in 1989 it doesn't appear as though Sheikh Yassin is

20  saying "Hamami used to speak with us."

21  A.   The next question is, "Is the ongoing coordination,"

22  which I am assuming means is the coordination ongoing, and he

23  says, "yes."  So I don't think that indicates that it stopped

24  in 1989.

25  Q.   Clearly he said "Jamil Hamami used to call us from the

1    West Bank."  Clearly he said that.  Right?

2    A.    That is what it says.

3    Q.    And then we know at some point after that Hamami is

4    coming to the United States.

5    A.    That is correct in 1999, I believe.

6    Q.    And then this book was from '91.  Right?

7    A.    I believe so.

8         MR. WESTFALL:  Do you have the original of HLF

9    Search No. 25?

10   Q.    (BY MR. WESTFALL)  Do you recognize this?

11   A.    I do.

12   Q.    This is the Sultan Mahmoud letter?

13   A.    That is correct.

14        MR. WESTFALL:  May I approach the witness, Your

15   Honor?

16        THE COURT:  Yes.

17   Q.    (BY MR. WESTFALL)  Does it appear to you -- I will just

18   hand this to you.

19   A.    Okay.

20   Q.    Does it appear as though the letter was folded up in the

21   envelope?

22   A.    It has crease marks.

23   Q.    It has creases like that is where it stayed.  Right?

24   A.    That is correct.

25   Q.    I want to talk to you a little bit about the Sultan

1    Mahmoud letter.

2    A.    Okay.

3    Q.    Have you ever spoken with Sultan Mahmoud?

4    A.    I have not.

5    Q.    Sultan Mahmoud, let me show you something in here.   In

6    his letter he actually puts the word Sultan Mahmoud in

7    quotation marks.

8    A.    He does.

9    Q.    And you notice right off, don't you, that the letter is

10   in English and not Arabic?

11   A.    That is correct.

12   Q.    And this was sent to the New Jersey office, which is this

13   2115, and Paterson, New Jersey.

14   A.    Correct.

15   Q.    From no return address.

16   A.    That is correct.

17   Q.    And the letter says modest.  He wasn't lying there, was

18   he?  "This is for relief supplies and weapons to crush the

19   hated enemy.  Thank you."  Is that what it says?

20   A.    That is what it says.

21   Q.    And then "nuclear weapons."  And then what was included

22   in the letter apparently was $25.  Stands to reason that MO

23   No. 6 means money order.

24   A.    That makes sense.  I don't know if it was in the form of

25   a money order or not, but it makes sense.

1  Q.   So assuming that the money order also didn't have a

2  return address, there is really not much that can be done with

3  it other than just throw it away.  Right?

4  A.   I don't know if the money order -- If there was a money

5  order, and I don't know if there were if it had a return

6  address on it, so I wouldn't want to speculate about what

7  could or could not have been done with it.

8           THE COURT:  Let's go ahead and take the afternoon

9  break.  Be back at 4:00.

10          (Whereupon, the jury left the courtroom.)

11          THE COURT:  We will be in recess until 4:00.

12                  (Brief Recess.)

13          THE COURT:  I understand counsel wants to take up a

14  matter.

15          MR. JACKS:  Yes, Your Honor.

16          THE COURT:  Maybe a couple of matters.

17          MR. JACKS:  Sorry.  Did I cut in front of you?

18          MR. DRATEL:  Your Honor, I understand that there are

19  -- not myself, but others, some travel issues if we could

20  break at 5:00, and I think the Government is in agreement.

21          THE COURT:  I think I told the jury, and I mentioned

22  yesterday that if we took the long lunch we would go until

23  5:30 or 5:30, so I am not agreeing to 5:00.  If you had told

24  me that yesterday, I wouldn't have taken the long lunch.  And

25  I specifically asked yesterday for that very reason.  I was

1    concerned that we would take the long lunch, and then somebody

2    would come up and say, "We need to leave early." So I asked

3    yesterday if working until 5:00 or 5:30 would work, and nobody

4    said a word. So we will -- I am not saying that time, we will

5    find a time, but we are not breaking at 5:00.

6              MR. DRATEL: Thank you, Your Honor.

7              MR. JACKS: Judge, you admitted Defense Exhibit No.

8    993, which is that DVD of the pantry, the HLF pantry, and we

9    have an additional objection to the audio portion of that, and

10   we would object to that as hearsay. And I believe, just

11   talking to Mr. Jonas, that that was the way it was admitted

12   last year. But if the video is admitted, certainly the audio

13   is hearsay and we would object to that and ask that it only be

14   admitted -- the video portion be admitted.

15             MR. WESTFALL: And at this time, Your Honor, I was

16   going to publish a portion of it without sound.

17             THE COURT: Today.

18             MR. WESTFALL: So maybe we can take that matter up

19   later on.

20        And I am also going to move for the admission of two

21   other videos, a little portion of those, and I am going to do

22   those without sound also.

23             THE COURT: Okay. Do you have those exhibit

24   numbers?

25             MR. WESTFALL: She has them right there. They are

1    Defendants' No. 979 and Defendants' No. 984.  And No. 984 is

2    the video of Jordan.  No. 979 is the video of Albania, Kosovo.

3    Both of them have Abdul in them, and both of them I intend to

4    publish without sound.

5              MR. JACKS:  Judge, we still object to lack of

6    foundation and hearsay.

7              MR. WESTFALL:  And Your Honor, these are also videos

8    she reviewed at the same time, and I have spoken with her

9    about it.

10   Q.   (BY MR. WESTFALL)  And do you still remember that?

11   A.   I recall seeing them, yes.

12             THE COURT:  And you can state what they relate to?

13             THE WITNESS:  I can state that Mr. Westfall showed

14   them to me last year, so I know that they came from the HLF

15   search warrants, but other than that I don't know what was the

16   basis underlying them, other than what is on the tape.

17             THE COURT:  Okay.

18   Q.   (BY MR. WESTFALL)  You recognize Odeh is in it?

19   A.   I do.

20   Q.   And also Dalell Mohmed is in one.  You recognize her?

21   A.   I do.

22             THE COURT:  And these are videotapes?

23             MR. WESTFALL:  They were videotapes that they

24   seized, and I put them on DVDs.

25             THE COURT:  Identifying someone from a photograph, I

1  think that is one thing.  If you want to try to sponsor a tape

2  because this is X event or Y event, it needs to be from

3  somebody that knows it is X event or Y event.  Are you saying

4  the tape itself establishes what it is?

5           THE WITNESS:  It has been about a year since I have

6  reviewed these.  On the HLF pantry opening, the tape itself

7  does establish what it is.

8      I can't recall on these two.  I remember the pictures and

9  the scenes, but I don't remember exactly what is in it.  I am

10 sorry.  I haven't reviewed it in like a year.

11 Q.  (BY MR. WESTFALL)  Do you remember that the very first

12 thing you see is a sign that says "Kosovo Relief"?  Do you

13 remember that?

14 A.  If you say so I will believe you.

15 Q.  And the Jordan one, there is a big sign that says

16 "Jordan", you know, "Iftar Food Parcel Project."

17          MR. Westfall:  It does self-identify what it is and

18 Odeh is in both of them.

19          THE COURT:  Okay.  Mr. Jonas?

20          MR. JONAS:  I am not sure that Agent Burns just

21 accepting Mr. Westfall's word is sufficient to lay the

22 foundation.

23          THE COURT:  I mean, you have seen -- Have you seen

24 these?

25          MR. JONAS:  Agent Burns?

1     THE WITNESS:  And I haven't seen them since they

2 were played in last trial, so I have minimal recollection what

3 is on there.

4     THE COURT:  But you are saying that they have that

5 there?

6     MR. WESTFALL:  Yes, Your Honor.

7     THE COURT:  All right.  I think that will be

8 sufficient then.  Those will be admitted.

9     MR. JACKS:  Your Honor, will the sound be admitted?

10     THE COURT:  No.  He said he wasn't playing them with

11 the sound.

12     MR. JACKS:  I want to make sure if and when they get

13 back to the jury there is no sound.

14     THE COURT:  We will resolve -- We are deferring a

15 ruling on the sound for now, and just remind me at some point

16 to take that up.

17   Go ahead and bring the jury in.

18     (Whereupon, the jury entered the courtroom.)

19     THE COURT:  Mr. Westfall?

20     MR. WESTFALL:  Thank you, Your Honor.

21   At this time, with permission of the Court, I would like

22 to publish three short video clips.

23     THE COURT:  All right.

24     MR. WESTFALL:  For the record, I am publishing these

25 without sound at this time, Your Honor.

1          THE COURT:  All right.

2          MR. Westfall:  No. 993.

3          (Whereupon, Defendants' Exhibit No. 993 was played,

4          while questions were propounded.)

5   Q.   (BY MR. WESTFALL)  Agent Burns, do you see that this here

6   is the same as that picture of the HLF pantry where Abdul's

7   office was?

8   A.   Yes.

9   Q.   Right over on the far left hand side of the screen, do

10  you recognize that as Abdul Odeh?

11  A.   I do.

12  Q.   And on the far right hand do you recognize that as

13  Mohammad El-Mezain?

14  A.   I do.

15          MR. WESTFALL:  At this time, Your Honor, I would

16  like to publish a portion of Defendants' 979.

17          THE COURT:  Yes, sir, you may do so.

18          (Whereupon, Defendants' Exhibit No. 979 was played,

19          while questions were propounded.)

20  Q.   (BY MR. Westfall)  Agent Burns, this is kind of grainy, a

21  little bit, but you see over here in the right hand part of

22  the screen?

23  A.   I do.

24  Q.   Does that look like Dalell Mohmed?

25  A.   It is hard to tell.  Maybe if we play a little bit more I

1    will get a better picture.  Right now I can't really tell who

2    that is.

3    Q.    Dalell Mohmed was like another relief worker that worked

4    with the Holy Land Foundation.  Right?

5    A.    She was an employee at the HLF, yes.

6    Q.    And she kind of did the relief missions.  Also she took a

7    relief mission to Turkey.  You knew that.

8    A.    She did travel on behalf of the HLF to foreign countries.

9    Q.    Do you recognize her name?

10   A.    I do.

11   Q.    You recognize the work she did.

12         And then this is Abdul Odeh.  Right.

13   A.    That is correct.

14   Q.    I didn't have you do this because I was still jacking

15   with my equipment, but this says Kosovo relief Holy Land

16   Foundation USA.

17   A.    That is what it says.

18   Q.    Here would be flour, or white bags that could be flour?

19   A.    It could be.

20         MR. WESTFALL:  Can you give me the elmo?

21   Q.    (BY MR. WESTFALL)  And this is Defendants' 491, again,

22   which is already in evidence.  And this is -- That is the same

23   little guy that was working the machine.  Do you recognize

24   him?

25   A.    It looks like him.

```
 1    Q.   But this is the bread.  Did it appear they were making

 2    bread?

 3    A.   It did.

 4         MR. WESTFALL:  Your Honor, may I approach?

 5         THE COURT:  Yes.

 6    Q.   (BY MR. WESTFALL)  I am showing you Defendants' 490.  Can

 7    you please tell me at least two of the people in that

 8    photograph do you recognize as being Dalell and Abdul Odeh?

 9    A.   I see Dalell in this photo but I don't see Mr. Odeh.

10    Q.   Oh, that is because he is not there.  Do you recognize

11    Dalell?

12    A.   I do.

13    Q.   And do you also see the Holy Land Foundation logo?

14    A.   I do.

15    Q.   Okay.

16         MR. WESTFALL:  Your Honor, we move for the admission

17    of Defendants' 490.

18         MR. JONAS:  Same objection.

19         THE COURT:  Okay.  Same objection.  And that is

20    admitted.

21    Q.   (BY MR. WESTFALL)  And this here is Dalell?

22    A.   That is correct.

23         MR. WESTFALL:  At this time, with your permission,

24    Your Honor, I will publish a short portion of Defendants' 984.

25         THE COURT:  All right.  Yes, sir.  You may do so.
```

```
 1                  (Whereupon, Defendants' Exhibit No. 984 was played,

 2             while questions were propounded.)

 3   Q.   (BY MR. WESTFALL)  Now, you remember we discussed earlier

 4   the trips that Abdul Odeh made to Jordan to work in -- to take

 5   a mission over there.

 6   A.   Yes.

 7   Q.   And that is Abdul there.  Right?

 8   A.   That is correct.

 9   Q.   Do you see that lady just went over to the table and did

10   something there before she picked up her bag?

11   A.   I didn't see exactly what she did.

12   Q.   You see they are doing something at the table first and

13   then going to pick up their bag of food?

14   A.   Yes.

15   Q.   All right.  Can you see that?

16   A.   I do.

17   Q.   It appears as though she is putting a thumbprint on a

18   piece of paper?

19   A.   It does.

20   Q.   Now, in the 500 boxes of materials from the Holy Land

21   Foundation, you have seen a lot of these forms that have these

22   fingerprints on them like this.  Right?

23   A.   I don't know that I would characterize it as a lot, but I

24   have seen forms where people have put their thumbprints.

25   Q.   Now, it appears we changed location.  Would you agree?
```

1    A.    It appears there is a different setting there, yes.

2    Q.    Right.  Are they handing their little book to them?

3    A.    Yes.

4    Q.    Some of these forms have like signatures and some have

5    the thumbprints?

6    A.    I have seen forms with both.

7                MR. WESTFALL:  Could I have this again?

8    Q.    (BY MR. WESTFALL)  Let me show you this one more time.

9    It is kind of grainy.  This right here, if we go out, does

10   that appear to be a U.N. symbol with the globe in the middle

11   and kind of light blue?

12   A.    I honestly can't tell on this screen.  Maybe it is better

13   on your picture, but here I see just kind of a blue tag with

14   something in the middle.  I can't tell on this one.  Do you

15   have the original of the photo?  You can't really tell

16   anything from --

17   Q.    Does that appear to be the same color shade as the U.N.

18   uses and the little white thing in the middle?

19   A.    It could be.

20   Q.    You know the Holy Land Foundation did ventures with the

21   U.N.

22   A.    I have seen that they administered aid to some of the

23   same projects the U.N. was working on, but I have no personal

24   knowledge that this was one of them.

25   Q.    Okay.  Agent Burns, thank you.

1    MR. WESTFALL:  Your Honor, I will pass the witness.

2    THE COURT:  Ms. Cadeddu?

3    MS. CADEDDU:  Thank you, Your Honor.

4                      CROSS EXAMINATION

5    By Ms. Cadeddu:

6    Q.    Good afternoon, Agent Burns.

7    A.    Hi.

8    Q.    I would like to talk to you first about a couple of the

9    exhibits that you looked at on direct examination.  Okay?

10   A.    Okay.

11   MS. CADEDDU:  I am going to need Government's

12   exhibits -- This is the Government exhibit Demonstrative

13   No. 15, page 16, please.

14   Q.    (BY MS. CADEDDU)  While we are waiting, Agent Burns, do

15   you have your list of exhibits that have been admitted?

16   A.    I do not.

17   Q.    No?  You might need that.  We will try to muddle through.

18   MS. CADEDDU:  Page 16, please.

19   Q.    (BY MS. CADEDDU)  Okay.  Agent Burns, this is a chart

20   that you made.  Is that right?

21   A.    That is correct.

22   Q.    And you made it, I think like some of the others, based

23   on other documents that are -- that the Government has

24   introduced.  Is that correct?

25   A.    That is correct.

1   Q.   And I think at the bottom --

2        MS. CADEDDU:  If you could enlarge the bottom right

3   hand corner, please.  You can't?  Okay.  I will just read it

4   to you.

5   Q.   (BY MR. CADEDDU)  The bottom right hand corner says --

6   See Elbarasse Search No. 5, Elbarasse Search No. 7, Elbarasse

7   Search No. 10, Elbarasse Search No. 31, Secretary of State

8   Virginia-1, and Elbarasse Search No. 20, Ashqar Search No. 1?

9   Okay?

10  A.   Okay.

11  Q.   So I want to take a look at some of those documents.

12       MS. CADEDDU:  Could we take a look at Elbarasse

13  Search No. 5, please?  And if we could go to the English, I

14  think -- I don't have the page, but the first page of the

15  English translation, please.  And if you could enlarge that,

16  please, the top.

17  Q.   (BY MS. CADEDDU)  Okay.  Agent Burns, this document is an

18  IAP internal memorandum.  Right?

19  A.   No.

20  Q.   Islamic Action for Palestine internal memorandum?

21  A.   It is an international Muslim Brotherhood memo.

22  Q.   Okay.  It says Islamic Action for Palestine internal

23  memo, October 1992.

24  A.   Correct.

25  Q.   And that the date on that, as I said, is October '92.

1    Right?

2    A.    Correct.

3    Q.    And that document does not contain Mufid Abdulqader's

4    name.  Right?

5    A.    Correct.

6            MS. CADEDDU:  Elbarasse Search No. 7, please.  And

7    the first page of the English translation, if you could.

8    Q.    (BY MS. CADEDDU)  This document is entitled -- Across the

9    top of this page it says, "Re:  A suggestion to amend the

10   bylaws of the Central Committee."  Right?

11   A.    Correct.

12   Q.    And the date on that is April 2nd, 1991.

13   A.    Correct.

14   Q.    Now, Mufid Abdulqader's name doesn't appear in that

15   document either.  Right?

16   A.    Correct.

17           MS. CADEDDU:  Elbarasse Search No. 10, please.

18   Q.    (BY MS. CADEDDU)  Okay.  Now, this document, the title on

19   it is "Central Committee organization chart for the year

20   1991."  Right?

21   A.    Right.

22           MS. CADEDDU:  And if you will please enlarge the far

23   left portion of that.  That is still kind of hard to see.

24   Q.    (BY MS. CADEDDU)  Can you see that, Agent Burns, on your

25   screen?

1    A.    Yes.

2    Q.    Okay.  The third one from the bottom there lists Sakhra

3    Group.  Is that right?

4    A.    That is correct.

5    Q.    But on that page at least, which is page 1, there are no

6    names of individuals.

7    A.    Correct.

8         MS. CADEDDU:  If you could turn to page 4 of that

9    translation, please.

10   Q.    (BY MS. CADEDDU)  And again this is -- Can you read it on

11   your screen, Agent Burns?

12   A.    I can.

13        MS. CADEDDU:  Your Honor, I am going to move over to

14   this edge, because I am trying to read them at the same time.

15   Q.    (BY MS. CADEDDU)  And this document contains a lot of

16   individuals' names, and I think you said that some of them are

17   repeated.  Is that right?

18   A.    That is correct.

19   Q.    And Mufid Abdulqader's name does not appear on this

20   document.

21   A.    Correct.

22   Q.    Now, actually I believe that there are a couple of band

23   member names that do appear on this document.  Isn't that

24   right?

25   A.    Yes.

1    Q.    For example, Fawaz Mushtaha?

2    A.    That is correct.

3    Q.    And he is the guy with the backyard?

4    A.    Yes.

5    Q.    And Munzer Taleb, his name also appears on this document.

6    Is that right?

7    A.    That is correct.

8    Q.    We are going to talk more about them in a minute.

9         MS. CADEDDU:  I would like to turn to Elbarasse

10   Search No. 31, please, and the first page of the English

11   translation.  If you could enlarge it, please.

12   Q.    (BY MS. CADEDDU)  Okay.  Now, this document is entitled,

13   and I want to read it correctly for you, "An introduction to

14   the bylaw of the Palestine Committee in America and Canada."

15   A.    I see that.

16   Q.    And you are familiar with this document.  Right?

17   A.    That is correct.

18   Q.    And this document does not contain Mufid Abdulqader's

19   name either.  Right?

20   A.    That is correct.

21   Q.    Now, could we -- There was -- There is actually an

22   exhibit listed on the page that we started with, the diagram

23   that you created, and I read the bottom right hand portion

24   that talks about which exhibits are included.  There was one

25   on there that is Elbarasse Search No. 20.  And we are not

1    going to talk about that today, because my understanding is

2    from my review that that is not in evidence.

3        So let's move on to Ashqar Search No. 1, please.  And

4    this is -- And I should have written down the page number for

5    this.  There is page number that has "Palestine Section,

6    important phone numbers."  If you could page to that.

7    A.    It is page 3, maybe page 4.

8    Q.    Okay.  And Mufid Abdulqader's name is not listed on this

9    document either.  Is that right?

10   A.    Correct.

11        MS. CADEDDU:  And so let's go back here to -- If we

12   could have Demonstrative No. 15 page 16 up again, please.

13   Q.    (BY MS. CADEDDU)  Okay.  Agent Burns, I just wanted to go

14   through that with you, because I want to understand the basis

15   for including --

16        MS. CADEDDU:  Actually if you could enlarge the

17   bottom left hand quadrant for me, I would appreciate it.  That

18   is right.  You can't enlarge it.

19   Q.    (BY MS. CADEDDU)  Do you see Mufid Abdulqader's picture

20   in the bottom?

21   A.    I do.

22   Q.    And his picture appears under the name Sakhra Band.

23   Right?

24   A.    It does.

25   Q.    So you have put him there because you know that he is a

1    member of the Sakhra Band.

2    A.    Based on all the videotapes we have shown here, yes.

3    Q.    Right.  But his name doesn't appear in any of the

4    documents that are listed here as the source documents.

5    A.    Not in the documents, no.

6    Q.    Okay.  And there are actually a whole large number of

7    band members who have been involved with the band over the

8    course of its history.  Isn't that right?

9    A.    During this time period I think maybe there were five or

10   six band members.

11   Q.    Okay.  Well, I would like to actually talk to you about

12   the band members who have at one time or another been a part

13   of the band, and you can identify for me those whose names you

14   can recollect.  Okay?

15   A.    Okay.

16   Q.    So we have Fawaz Mushtaha, of course.  We know he was

17   involved.

18   A.    Correct.

19   Q.    And we have seen him in some of the videos.  Is that

20   right?

21   A.    Yes, we have.

22   Q.    I am sorry.  I am so cold, my lips are numb and I can't

23   talk.

24        And Munzer Taleb is another band member whose name you

25   recognize?

1   A.   That is correct.

2   Q.   And we have seen him in some of the videos also?

3   A.   We have.

4   Q.   And Sammy Hamad.  Is that name familiar to you?

5   A.   I have heard it, but I would not know his face to put it

6   with his name.

7   Q.   Sure.  And I am not going to ask you to identify them,

8   but do you understand him to be a member of the band also?

9   A.   I believe that is correct.

10  Q.   How about Kifah Mustapha?

11  A.   Yes, he was.

12  Q.   As a matter of fact, Kifah Mustapha also worked at one

13  time for the Holy Land Foundation.  Is that right?

14  A.   He did.  And let me clarify my answer, because I know we

15  are talking about the band in general, but Al Sakhra Band was

16  the band's name in the earlier years.

17  Q.   Yes.  We are going to get to that, I promise.

18  A.   Well, just to be clear, I believe Kifah Mustapha was not

19  a part of that band, but was a part of the band later when it

20  became Al-Nujoom.

21  Q.   So you believe Kifah Mustapha wasn't involved in the

22  al-Sahkra Band itself?

23  A.   He may have been, but I know him to have been part of

24  Al-Nujoom I have not seen any tapes on him on it as part of Al

25  Sakhra.

1   Q.   Okay.  No problem.  How about Sabri Sabri?

2   A.   I have seen the name in connection with the IAP, but I am

3   not sure if he was a band member or not.

4   Q.   Okay.  How about Mahmoud Abu Hashem?

5   A.   I don't know that individual.

6   Q.   Okay.  Ibrahim Albers?

7   A.   I am sorry.  Can you repeat that.

8   Q.   Sure.  Ibrahim Albers.

9   A.   I don't know the individual.

10  Q.   Nadal el-Las?

11  A.   I don't know him.

12  Q.   Salah el-Muni?

13  A.   I have seen that name before, but I can't recall if it

14  was in the context of the band or not, so I am not sure about

15  that one.

16  Q.   Okay.  How about Amon Dahelrah?

17  A.   I don't know him.

18  Q.   Abdullah Gabiyen?

19  A.   I don't know him.

20  Q.   Okay.  Perhaps why don't I --

21          MS. CADEDDU:  May I approach and I will go through

22  these?

23          THE COURT:  Yes.

24  Q.   (BY MS. CADEDDU)  Agent Burns, would you take a look at

25  the list of names over here in the left hand column and see if

1  you recognize any of those as having been associated with

2  al-Sahkra?

3  A.   Okay.  And again, not to say that they are not.  I am

4  just telling you that I don't recognize these names.

5       Well, I know that -- You have Mohamed Abu Roth up here.

6  That is Mohamed Musphaka that we identified in one of the

7  videotapes.  But again, he appeared in the later years, so I

8  think technically the band had changed its name to Al-Nujoom

9  at this time.  I have not seen him perform with Al Sakhra in

10 the early years.

11      Let me see the other names.  I don't recognize these

12 other names.

13 Q.   Okay.  And would you take a look at this column, the

14 column on the right.  That actually comes from the Government

15 exhibit, and I can tell you which one it is.  It is the --

16 A.   Okay.

17 Q.   HLF Search No. 147.  That is actually a document that you

18 rely on in the summary for Mufid Abdulqader that talks about

19 an IAP convention.

20 A.   Okay.

21 Q.   Do you recognize any of those names?

22 A.   I don't know who any of these individuals except for

23 Abdulqader, depending on the exhibit.  I would need to look at

24 the context, but I presume since we are in this context it is

25 Mufid Abdulqader.  And I would like to look at the document,

1  because there may be a couple of others that I recognize.  But

2  in this form, I don't recognize the other individuals.

3  Q.   Okay.  Actually let's take a quick look at that form.

4  Let's take a quick at Government's Exhibit HLF Search No. 147,

5  please.  That is the one I was referring you to.

6       MS. CADEDDU:  And if you could enlarge the section

7  -- I believe the names start at line 7 through maybe 2.

8  Q.   (BY MS. CADEDDU)  Can you see that Agent Burns?

9  A.   I do.

10  Q.   Okay.  And this is the exhibit I was talking about

11  before.  Do you recognize any of those names as being involved

12  with the Al Sakhra Band?

13  A.   Again, we have No. 9 which would be Mufid Abdulqader, and

14  then two names below that is Monzer who is Munzer Taleb that

15  we discussed.  No. 5, I don't know how they have this

16  numbering system done, but No. 5 is Kifah, which would be the

17  HLF representative and band member Kifah Mustapha.  And if we

18  can scroll down the page a little bit, or I guess this doesn't

19  scroll.

20  Q.   I think those are actually all the names.  So would you

21  say that Kifah Mustapha would be another name?  Or that is the

22  one you said was associated with Al-Nujoom.  Is that right?

23  A.   I know him to be have associated with Al-Nujoom.  He may

24  have had affiliation a with Al Sakhra but I haven't seen it.

25  Q.   So it would be fair to say that to list -- That there are

1  other names that ought to be listed under the Al Sakhra Band.

2  It is not a band of one.  Would you agree with that?

3  A.   I can't base that on this document just because this is

4  for a document about an IAP convention.  I know that --

5  Q.   Agent Burns, I am sorry.  That was a very bad question.

6  Let me start over again because I think I am overcomplicating.

7       Based on the documents that we have just gone through, I

8  was comparing those with the Demonstrative No. 15, page 16,

9  and you had Mufid Abdulqader's name listed under the Al Sakhra

10  Band.  There were a number of band members under the Al Sakhra

11  Band umbrella.

12  A.   As I have stated, I base my answer on the videotapes that

13  I have seen of Al Sakhra Band, and there were generally five

14  to six people in Al Sakhra Band.

15  Q.   Okay.  That is what I was looking for.  So in other

16  words, Mufid Abdulqader's name is on that chart because he was

17  one of at least five or six other band members during that

18  time.  Is that right?

19  A.   His name is on the chart because he was a band member and

20  he is one of the Defendants in this case.

21  Q.   I understand.  But there are other members of the band.

22  A.   Correct.

23  Q.   Okay.  Now, let's --

24       MS. CADEDDU:  Thank you.  Actually let's keep this

25  one up, if you don't mind.  Let's take a look at this exhibit

again.  This is HLF Search No.  147.  And I would like to

actually -- Do you have the Mufid summary chart over here?

Q.   (BY MS. CADEDDU)  All right.  Can you see this, Agent

Burns?

A.   I can.

Q.   I hope I can see you after I put it up.  Okay.  So just

to reorient all of us, this is an exhibit that you put in as a

demonstrative exhibit as examples of Mufid Abdulqader's

activities as a band member and then as a Holy Land Foundation

volunteer.  And you have done this in a chronological order.

Is that correct?

A.   Correct.

Q.   And then over here you have the exhibits that you are

referring to.  Is that right?

A.   Correct.

Q.   And in 1988, which is the first entry that you have,

these exhibits that you are referring to over here are videos.

Is that correct?

A.   That is right.

Q.   And then we go down and we have -- I am not sure that

this is admitted yet, but we have the Philadelphia meeting

which we will get to, and then the entries all the way to -- I

believe it is all to the end of 1996, these are all

videotapes.  Is that correct?  Can you see it?

A.   Yes.  That is correct.

1  Q.  I know it is kind of far away.  And then below 1996

2  starting about here, this is documentary evidence.  Is that

3  right?

4  A.  Documentary, and there are telephone calls.

5  Q.  Okay.  Documents and telephone calls starting with 1997.

6  Right?

7  A.  Correct.

8  Q.  And so 1995-1996 is approximately when Mufid Abdulqader

9  moved to Dallas from Oklahoma City.  Correct?

10  A.  That is correct.

11  Q.  Okay.  So let's take a look -- I think HLF Search No. 147

12  is -- We are going to have to go all the way down to the

13  bottom here.  It is referred to IAP convention, $2,721

14  attributed to Mufid Abdulqader.  Do you see that?

15  A.  I do.

16          MS. CADEDDU:  Let's take a look at HLF exhibit 147,

17  please.  Could you actually pull out on the whole exhibit for

18  me for a second, please?  Okay.

19  Q.  (BY MS. CADEDDU)  Now, this document doesn't have a title

20  at all, does it, Agent Burns?

21  A.  It does not.

22  Q.  Okay.  And no signature or anything like that on it?

23  A.  That is correct.

24  Q.  And it appears to be a chart of expenses associated with

25  a band.  Is that right?

1    A.    Actually I don't know if it is expenses or not.  That is

2    why we put the word "attributed" on there.  I don't know if

3    these are expenses or amounts raised.  It just has the column

4    amount, so I wouldn't want to guess as to what those columns

5    in the amount column represent.

6    Q.    Sure.  So you are not actually really sure what the chart

7    represents, but Mufid Abdulqader's name appears there and it

8    appears there are other band members listed there, too.

9    Right?

10   A.    That is correct.

11   Q.    Okay.  And down at the bottom here it says -- It makes

12   reference to an IAP convention '97.

13   A.    It does.

14   Q.    Do you see that?

15   A.    I do.

16   Q.    And then it also talks about Isra band wedding paid

17   through Al-Nujoom and taken back.  Do you see that?

18   A.    I do.

19   Q.    And total expenses through the year--office, phone,

20   compensation--and it lists that number as $29,108.  Do you see

21   that?

22   A.    I do.

23   Q.    Now, there is also a notation here "tickets were

24   purchased on my credit card."  Do you see that?

25   A.    I do.

1  Q.   Up above that there is a line that says "total expenses

2  that were put on Kifah credit card, namely tickets," and has

3  an amount of $4,082.

4  A.   I see that.

5  Q.   Then down at the bottom underneath where it says "tickets

6  were purchased on my credit card," there is an amount it looks

7  like $4,276, and then it shows separate amounts added

8  together, and one of those is $4,082  Do you see that?

9  A.   I do.

10  Q.   So could it be that this is something that was produced

11  by Kifah Mustapha, since it talked about "my credit card" and

12  has that same number?

13  A.   It could be.  I believe this document, if we scroll down,

14  came from the HLF Chicago office.

15  Q.   So Kifah Mustapha actually worked at the HLF Chicago

16  office.

17  A.   That is correct.

18  Q.   Actually, as you said, Kifah Mustapha was a band member.

19  Are you aware of the fact that he managed the Al-Nujoom Band

20  in the 1997 time period?

21  A.   I know that he was a part of the Al-Nujoom.  I don't know

22  if he was a manager or not.

23  Q.   Okay.  And you also know that the Al-Nujoom Band, and

24  before that the Al Sakhra Band, were managed for a time by

25  Fawaz Mushtaha.  Right.

1    A.    I know that Fawaz Mushtaha managed Al Sakhra at some

2    point.  I don't know if he managed Al-Nujoom or not.

3    Q.    Okay.  And then is it your understanding that Munzer

4    Taleb took over management of the band at some point in the

5    later years?

6    A.    I don't know that.

7    Q.    But you know Mufid Abdulqader began managing the band in

8    2000.

9    A.    I don't recall that.  Maybe I knew that at one point, but

10   I don't remember it now.

11   Q.    All right.  Fair enough.  Okay.

12         MS. CADEDDU:  Let's take a look now if we can at HLF

13   Search No. 15, please.

14   Q.    (BY MS. CADEDDU)  And Agent Burns, this is actually an

15   invoice by Al-Nujoom Band.  I think it is one of the ones on

16   your list here, the summary list for Mufid Abdulqader.

17   A.    It is.

18   Q.    Okay.  And this is an invoice that dates from September

19   1st, 1998.  Does that look right?

20   A.    Correct.

21   Q.    And that invoice lists a number of band members who

22   include Kifah, Monzer, Mufid, and Sabri.  Do you see that?

23   A.    I do.

24   Q.    And do you see the bill to address up at the top?  Not

25   the bill to address; the address above the bill to address,

1  the address that is attributed to Al-Nujoom there?

2  A.   I do.

3  Q.   And do you recognize that address to be Munzer Taleb's

4  address at the time?

5  A.   I don't know if it is or not.  It may be.

6  Q.   Now, the band -- You are aware that the band was hired to

7  perform at a number of different cultural festivals.  Right?

8  A.   I know that they did perform at different events.

9  Q.   Okay.  So an IAP festival, a MAYA festival?

10 A.   Yes.  They performed at a lot of those.

11 Q.   Okay.  And they also performed at weddings and

12 graduations.

13 A.   I know that they did perform at weddings.  I don't know

14 about graduations.

15 Q.   And that they put out music CDs and sold those.

16 A.   I have heard that, but I have not seen any myself.

17 Q.   I can get you some if you like.

18      Al Sakhra, the name of the band, what do you understand

19 that to mean?

20 A.   I have not been told by a translator what it means.  I

21 have heard that it means the rock, but I don't know that for

22 sure.

23 Q.   Okay.  And you don't know what that would be a reference

24 to?  What it would mean beyond the words?

25 A.   What Al Sakhra means beyond --

1    Q.    What the significance of the words is?

2    A.    No.

3    Q.    Okay.  Now, the band changed its name, I think you said

4    at some point, and that would have been around 1994.  Right?

5    A.    I think that is correct.

6    Q.    And actually I know you don't have the exhibits.  We can

7    take a look, and we will in a little bit, at one of the

8    transcripts, and you can see in the transcripts of the videos

9    where the band name changes from Al Sakhra to Al-Nujoom.

10   Right?

11   A.    You can see the difference in the videos they announce

12   the band's name.

13   Q.    So that would be how you would conclude that the band

14   changed its name?

15   A.    That is correct.

16   Q.    And do you know what Al-Nujoom means?

17   A.    I don't.

18   Q.    Now, yesterday you talked a little bit about Baker

19   Wiretap No. 6.  That is -- Just to reorient you, that is a

20   conversation between Mufid and Akram Mishal from July of 1998.

21   Do you remember talking about that call?

22   A.    I do.

23   Q.    Okay.  And Akram Mishal is actually an HLF employee at

24   that time.  Right?

25   A.    He was.

1      MS. CADEDDU:  And could we take a look at Baker

2  Wiretap No. 6, page 2, please?

3  Q.   (BY MS. CADEDDU)  And I think you made a reference --

4      MS. CADEDDU:  Your Honor, I am sorry.  This is just

5  so hard it is over here.  I can't read it.

6      THE WITNESS:  I don't believe the transcript on the

7  screen is the conversation you are referring to.

8  Q.   (BY MS. CADEDDU)  I think you are correct.

9      MS. CADEDDU:  Okay.  Can you go to the next page,

10  please?

11  Q.   (BY MS. CADEDDU)  And I may have to do this with my paper

12  copy because it seems to be a little tough.  And you know why?

13  Because I have the wrong number.  It is actually Baker Wiretap

14  No.  7.  Let's do it on here.  I think this will be easier.

15      And I think you made reference to this transcript, and so

16  I would like to read a little bit of this with you.  I think

17  the part you referenced yesterday, Akram --

18      MS. CADEDDU:  I am sorry, Your Honor.  I am mixed

19  up.  I think I put No. 7 where No. 6 should be, and I think I

20  put No. 6 where No. 7 should be.  I am going to come back to

21  that later.

22  Q.   (BY MS. CADEDDU)  You testified yesterday about

23  interviewing Mufid Abdulqader in 2002.  Do you remember that?

24  A.   I do.

25  Q.   And you asked him how much money that he had raised in

1  that interview.  Do you remember that?

2  A.    Yes.  I asked him how much he raised on, you know,

3  average per event.

4  Q.    Sure.  And he told you that it was difficult to estimate

5  an average amount that he raised, because some of the funds

6  were in cash and some were in pledges.  Is that right?

7  A.    Initially he told me that he did not know because he

8  didn't handle the money.  When questioned further, he said

9  that he -- that some of the money was in cash and some was in

10  pledges and things like that.

11  Q.    And he told you during the interview that he raised an

12  average of $10,000 to $20,000 in cash at fundraising events.

13  Right?

14  A.    He ultimately said that, yes.  But he couldn't tell me

15  what his biggest day was or anything like that.

16  Q.    Right.  And you actually, after the interview -- One of

17  the three of you who are in attendance at this interview wrote

18  up a report of the interview.  Is that right?

19  A.    Correct.

20  Q.    Okay.  And that report reflects what happened during the

21  interview.

22  A.    That is correct.

23  Q.    And the description of how things went.

24  A.    Yes.

25  Q.    Okay.  And I am going --

1          MS. CADEDDU:  May I approach, Your Honor?

2          THE COURT:  Yes.

3    Q.   (BY MS. CADEDDU)  Agent Burns, I would like to ask -- I

4    am going to ask you to follow along with me as I read this.

5    In your report you state --

6          MR. JONAS:  I am going to object.  This report is

7    not in evidence.  It is hearsay.  It is not proper to read

8    from it.  She can ask questions about what went on during the

9    interview --

10         THE COURT:  If it is not in evidence, I agree.  Is

11   it in evidence?

12         MS. CADEDDU:  No, Your Honor, but the report

13   reflects something that is certainly in a different tenor than

14   the tenor that the witness is taking now, so I believe it is

15   impeachment.

16         THE COURT:  I will have to take a look at it.  Let

17   me take a look at it.  Come on around.

18         (The following was had outside the hearing of the

19         jury.)

20         THE COURT:  Okay.  What is this?

21         MS. CADEDDU:  Okay.  This is the FBI 302, and in it

22   they don't -- she doesn't talk about how he lied or he had to

23   be further questioned.  It is just sort of a general very

24   benign discussion of how the money was raised.  It is

25   consistent but without the tone that it was a lie, and so I

just want to --

THE COURT:  Consistent with what?

MS. CADEDDU:  It is inconsistent with her testimony that he lied and that he had to be pushed and all of that.  I believe the way it is written in here shows that it was just a conversation rather than, you know -- Agent Burns was making it out that he was mendacious and he had to be pushed and he lied, and so I want to say what it is that he said during the interview as it was written contemporaneously.

THE COURT:  And you want to read just this section here.

MS. CADEDDU:  Just this part here that she has testified to.  I mean, she has testified to the substance of it, but not the way it came out.

MR. JONAS:  I think this is improper.  She can question her, "Well, isn't it a fact that you had asked him, he answered truthfully after several" -- I mean, I think the question can be asked without having to read from the 302.  This is hearsay.  This is just another way of trying to get in a statement of the Defendant without him getting on the stand.

MR. JACKS:  Judge, another issue is that there were three people that attended the interview, three agents.  If you will look on the front --

MS. CADEDDU:  There are, but she signed it, and she testified at the first trial that she has to she reviewed it

1    and said that it was correct.  I mean, it is -- It doesn't say

2    who wrote it, and I can impeach her on this.

3              MR. JACKS:  That is not the way to impeach a

4    witness.

5              THE COURT:  You can impeach, but normally you don't

6    just -- Without laying a predicate, you just don't start

7    reading.  You have to call the party's attention to it.  And

8    your position is that it is inconsistent with her testimony,

9    this is inconsistent with her testimony here?

10             MS. CADEDDU:  Yes, I am making that contention,

11   because it doesn't say that he initially lied and that he had

12   to be pressed.  It just says that he was questioned and this

13   is what he said, and I want to say exactly how was that.

14             THE COURT:  Well --

15             MS. CADEDDU:  Every impeachment I have ever done, I

16   have said, "Okay.  You said X.  Isn't that correct?"  I mean,

17   you know, for impeachment you read something that someone has

18   approved of before that is inconsistent with what they are

19   testifying to.

20             THE COURT:  Generally you call their attention to

21   what it is that is supposed to be inconsistent, and if they

22   acknowledge -- she denies it is inconsistent, then you can get

23   into that.

24             MS. CADEDDU:  Perhaps I am being inartful because I

25   am tired and frozen.

1          THE COURT:  Just starting to read it, I think that

2     is improper just to begin to read it.  I think you have to

3     call the witness' attention to whatever it is you think is

4     inconsistent, and then ask her, "In these reports it doesn't

5     state that he lied," or whatever it is you think is

6     inconsistent.  But let her read it and then if she disagrees

7     with you, then I think you can get into that.

8          MS. CADEDDU:  She has to read the impeachment before

9     I can cross --

10          THE COURT:  You call her attention to it first, her

11     report, and in her report that she didn't state that he lied

12     and she had to prod him, or after further questioning.  Then

13     once you call her attention to the report -- You don't have to

14     show it to her, but you have to call attention to what it is

15     you are asking where she wrote it.  And then --

16          MS. CADEDDU:  I think I will just go about this a

17     different way because I am tired.

18          THE COURT:  We all are.

19          (The following was had in the presence and hearing

20          of the jury.)

21     Q.   (BY MS. CADEDDU)  Okay.  We are going to do this a

22     different way, Agent Burns.

23     A.   Okay.

24     Q.   And I just want to go back for a second to your testimony

25     that you gave just a few minutes ago and clarify.

1          You interviewed Mufid Abdulqader in 2002.  Right?

2    A.    That is correct.

3    Q.    And it was a pretty lengthy interview.

4    A.    It was.

5    Q.    In his attorney's office; not my office, a different

6    attorney.

7    A.    Correct.

8    Q.    And during that interview you asked him about a number of

9    subjects.

10   A.    That is correct.

11   Q.    One of those subjects was work that he had done with the

12   band.

13   A.    After looking at the 302, I don't believe that was a

14   topic of the interview.  I think afterwards he joked about

15   some CDs and some issues like that about the band.  But after

16   looking at the 302 I don't believe that we questioned him as a

17   result of the interview or as part of the interview about the

18   band.

19   Q.    Okay.  But you did question him about his volunteer work

20   with the Holy Land Foundation.

21   A.    That is correct.

22   Q.    And you asked him how much money he raised.  Right?

23   A.    Yes.

24   Q.    And he told you it was difficult to estimate an amount

25   that he raised.  Right?

A.   He stated originally, when we first asked him the

question, that he didn't really know because he didn't handle

the money.

Q.   Okay.  And then eventually he told you, when you asked

him again, that he didn't know -- Let's see.  It was difficult

to estimate the amount that was raised because not all of it

came in at that time.  Right?

A.   Right.  We talked about the pledges; some of it came in

pledges and some of it came in cash.

Q.   All right.  So some of it came in in cash that was

received on the spot.  Right?

A.   Correct.

Q.   And then some of it came in pledges, and people would

send their money in I guess later on.

A.   Correct.

Q.   And sometimes people would call the Holy Land Foundation

after a fundraiser and would donate over the phone with a

credit card.

A.   Correct.  Like we saw reference to in a conversation the

other day.

Q.   Okay.

          MS. CADEDDU:  In fact, if we can take a look at

that, Abdulqader Wiretap No. 1, please, at page 2.

Q.   (BY MS. CADEDDU)  Okay.  Now, this is actually a

conversation between Mr. Abdulqader and Ibrahim Khalil.

1    A.    That is right.

2    Q.    And we know that from the front page.  And you recognize

3    this conversation.  Right?

4    A.    That is correct.

5    Q.    And Ibrahim tells Mufid up here at the top, "We hear good

6    news about you."  Right?

7    A.    That is right.

8    Q.    And then what Ibrahim tells Mufid is that a woman has

9    called the Holy Land offices and donated money.  Right?

10   A.    That is correct.

11   Q.    And that happened as a result of one of Mufid's

12   fundraising speeches that he gave.

13   A.    Correct.

14   Q.    And so she called after the fact and donated with a

15   credit card.

16   A.    That is correct.  I can't recall if this says she donated

17   with a credit card, but she did call after the conference to

18   the Holy Land Foundation office and made her donation.  It may

19   say credit card, but I don't remember that.

20   Q.    I think it does on the next page, but we will get to that

21   in a second.

22        So Ibrahim tells Mufid that she said she just heard a

23   sermon and she was very impressed, and she would like to

24   donate.  Right?

25   A.    That is correct.

Q.   And then Mufid asks how, "Much did she donate?"  Right?

A.   Yes.

Q.   Because that is not a donation that came in at the time
of the original sermon.  Right?

A.   Correct.

Q.   And Ibrahim is joking around with him and says, "Well,
what do you think?"  And kind of makes him guess.  Right?

A.   Right.

        MS. CADEDDU:  Can we go to the next page, please?

Q.   (BY MS. CADEDDU)  And then you can see there, I think it
is the fourth line down, that Ibrahim finally tells Mufid that
she donated $5,000.  Right?

A.   Correct.

Q.   And I think she says -- I thought she said with a credit
card, but she may not have.  That could have been a pledge
that she mailed in.  Right?

A.   I don't recall offhand how she ultimately was supposed to
send the money.

Q.   Okay.

        MS. CADEDDU:  And if we can turn to page 4 of this
same exhibit, please.

Q.   (BY MS. CADEDDU)  Okay.  And this is a continuation of
the same conversation.  Right?

A.   Correct.

Q.   And Mufid is telling Ibrahim that he received $17,000 in

1    cash at the fundraising.  Right?

2    A.    Correct.

3    Q.    And then somebody donated -- someone donated $5,000,

4    which he said he would mail.  Do you see that on I think it is

5    the fifth line?

6    A.    I do.

7    Q.    And then there were four people who were going to donate

8    $1,000, and they said they would mail their money in after the

9    fact.  Right?

10   A.    Correct.

11         MS. CADEDDU:  Could we take a look at page 5,

12   please?

13   Q.    (BY MS. CADEDDU)  Now, this conversation is actually

14   talking about -- it is the same fundraising trip, but it is a

15   different locale.  Is that right?

16   A.    That is right.

17   Q.    So this was a Boston fundraiser?

18   A.    The topic on this page, yes.

19   Q.    Yes.  And so Mufid flew up to the northeast, and then

20   went to a couple of different cities and raised money for Holy

21   Land over I think a weekend or something like that.  Is that

22   your understanding?

23   A.    Yes.

24   Q.    And this one was in Boston.  Right?

25   A.    That is correct.

1  Q.   And there is a conversation -- Mufid makes a reference,

2  "Did the guys tell you that they take 15 percent?"  Do you see

3  that?

4  A.   I do.

5  Q.   And what he is talking about there is that when Mufid

6  raised the money in Boston, the place where he did that kept

7  some sort of a commission of 15 percent.  Right?

8  A.   Correct.

9  Q.   And in fact, they didn't give Mufid the cash to bring

10  back at all for Holy Land.  Isn't that right?

11  A.   They gave him a check, according to this.

12  Q.   Right.  They gave him a check less the 15 percent.

13  Right?

14  A.   Based on this, yes.

15  Q.   Okay.  I would like to turn --

16        MS. CADEDDU:  Thank you very much.  I am done with

17  that.  I need another summary here.

18  Q.   (BY MS. CADEDDU)  Can you see this, Agent Burns?

19  A.   Yes.

20  Q.   All right.  This right here is what you have put in as

21  the Philadelphia meeting summary.  Right?

22  A.   Correct.

23  Q.   Okay.  And perhaps I should put it up.  It is hard to

24  see.

25        THE COURT:  That is fine.

1    Q.    (BY MS. CADEDDU)  Okay.  And on this chart, this is how

2    you summarized the records that you have that relate to the

3    Philadelphia conference.  Right?

4    A.    Correct.

5    Q.    And you have over here Mufid Abdulqader's name listed --

6    I think you say he is the third one down on the list?

7    A.    Correct.

8    Q.    And here you have him listed with Al Sakhra Band, and you

9    also have Holy Land Foundation, HLF, noted right here.

10   A.    That is correct.

11   Q.    Do you see that?  And I guess that would be because the

12   Al Sakhra Band had performed at Holy Land fundraisers.

13   A.    The reason the HLF is on there is because he ultimately

14   became, you know, a fundraiser for the HLF.

15   Q.    Okay.  So it is not that he was actually a fundraiser for

16   Holy Land at the time the Philadelphia meeting took place.

17   This is on there because of his later association.

18   A.    Correct.

19   Q.    Okay.  And then we have got the Al Sakhra Band here.

20   Right?

21   A.    Correct.

22   Q.    And then we don't have any AMEX flight records that

23   relate to him.

24   A.    Not from the Holy Land AMEX records that we introduced.

25   Q.    Okay.  And then we have Marriott Hotel records, and we

1    will talk about those in just a second.

2    A.    Correct.

3    Q.    And then his name is not identified as one of the

4    speakers at the Philadelphia conference.

5    A.    That is correct.

6    Q.    Okay.  There are no surveillance photos of him.

7    A.    That is correct.

8    Q.    And then his name is also not listed in the Ashqar

9    planning meeting.

10   A.    That is right.

11         MS. CADEDDU:  Okay.  I would like to take a quick

12   look, if we could, at Ashqar Wiretap No. 1, page 4, please,

13   which is the planning call.  And could we enlarge actually the

14   top half of that document, please?

15   Q.    (BY MS. CADEDDU)  Okay.  Now, at this point in the

16   conversation Omar and Shukri are talking about how to organize

17   the meeting and the numbers of people who are going to be

18   included.  Right?

19   A.    Right.

20   Q.    And so here you see that Shukri says, "I mean, if the

21   number exceeds a certain limit, I think there will be a

22   counterbalance.  I mean, if there will be no -- if there is 30

23   people, each one wants to speak for five minutes, it will not

24   work.  I am afraid it will turn into a conference."  Do you

25   see that?

1    A.    Yes.

2    Q.    And is Shukri says, "A forum or an conference.  What we

3    want is a session, I mean, it is a session, a session or two,

4    especially that they will be coming from the festival."  Do

5    you see that?

6    A.    I do.

7    Q.    Okay.  Thank you.

8          MS. CADEDDU:  Now I would like to take a look at the

9    Marriott records, please, and I would like to start with page

10   4 of those.

11   Q.    (BY MS. CADEDDU)  Okay.  Now, if you -- Can you see that,

12   Agent Burns?

13   A.    I can.

14   Q.    This one looks pretty clear are.  This looks as if the

15   form has been preprinted.  You can see there it says Hasan

16   Sabri.  Do you see that?

17   A.    I do.

18   Q.    And it has an address 1000 West Spring Valley 237,

19   richardson, Texas, 75080.  Is that right?

20   A.    Correct.

21   Q.    And then next to the preprinted Hasan Sabri, it is

22   handwritten in Maghawri.  Is that correct?

23   A.    Correct.

24         MS. CADEDDU:  Could we take a look, then, at page 5,

25   please?

1    Q.   (BY MS. CADEDDU)  And this one again -- It looks similar

2    to the last page that we looked at.  Right?  With Hasan

3    Sabri's name preprinted on the form.  Right?

4    A.   It is printed on the form.  I don't know at what point

5    the hotel printed these up.

6    Q.   Well, it is printed.  It is not handwritten.

7    A.   Correct.

8    Q.   And it has got the same address--1000 West Spring Valley

9    237, Richardson, Texas.  Is that right?

10   A.   Yes.

11        MS. CADEDDU:  If we can take a look at page 8,

12   please.

13   Q.   (BY MS. CADEDDU)  And page 8 it looks like is actually

14   two forms, and there is -- Again, they both have Hasan Sabri's

15   name printed and the same 1000 West Spring Valley, Richardson,

16   Texas address on each of these two slips.  Do you see that?

17   A.   I do.

18   Q.   Okay.

19        MS. CADEDDU:  Could we take a look now, please,

20   at -- That was page 8.  Can I look at page 9, please?

21   Q.   (BY MS. CADEDDU)  Same deal here.  Right?  Hasan Sabri,

22   1000 West Spring Valley, and then there is a handwritten name

23   in there Haitham Maghawri.

24   A.   Correct.

25        MS. CADEDDU:  Could we look now at page 6, please?

Q.    (BY MS. CADEDDU)  Okay.  This form, and I think we looked

at this, I can't remember if it was yesterday or a couple of

days ago, this one looks different from the ones that we have

been looking at.  Right?  It has got a handwritten

name -- Well, let me do this.  The name is handwritten in.

Right?

A.    Correct.

Q.    And it says M. Abdulqader.  Do you see that?

A.    It does.

Q.    And the room number is handwritten in.  Right?

A.    Yes.  I think some of the other ones had the room number

written in, but the names were printed.

Q.    Okay.  And there is an address that is actually listed on

here and it is something like 929 St. Paul.  Right?

A.    I see that.

Q.    And do you understand that to be Munzer Taleb's address

in Dallas?

A.    I don't know.

Q.    Okay.  Well, you know that Mufid Abdulqader didn't live

in Dallas at the time.  Right?

A.    That is correct.

Q.    He lived in Oklahoma.

A.    That is correct.

Q.    And Munzer Taleb is one of the band members we talked

about before.  Is that correct?

1   A.   That is correct.

2   Q.   Okay.

3         MS. CADEDDU:  Back to the summary chart for a

4   second.

5   Q.   (BY MS. CADEDDU)  All right.  Now, we talked a little bit

6   about some of the entries down here.  I want to kind of turn

7   our attention to the videos, doing this kind of in reverse to

8   the videos that also formed the basis for this chart.

9   A.   Okay.

10   Q.   Okay?  The first video that is listed there at the top of

11   the chart is Mushtaha Search No. 7.

12   A.   Okay.

13   Q.   Is that right?

14   A.   It is.

15   Q.   Okay.  And that I believe you identified for us already,

16   and it says there on the chart that this video dates from

17   1988.  Is that correct?

18   A.   Let me check my cheat sheet to confirm that that is

19   correct.  Yes, that is the date we were able to determine was

20   1988.

21   Q.   And it is also -- This is in date order, and so the date

22   is also indicated there on the left.

23   A.   Correct.

24         MS. CADEDDU:  And could we take a look,

25   please -- Could you play for me Mushtaha Search No. 7-B?  And

1    I am going to tell you when to stop the video.

2         Your Honor, I am afraid the Government doesn't have the

3    Government's video exhibits here, and so that is --

4              THE COURT:  That is where you are.

5              MS. CADEDDU:  That is where I am.  I apologize for

6    that.  I have them, but not here.

7              THE COURT:  Let's break for the day.

8         Also for your planning purposes, we will see you back

9    Monday morning at 9:00.  Please recall the instructions.

10        Next week we will work three days--Monday, Wednesday,

11   Friday.  I have some things to take care of Thursday, and we

12   will take off Friday.

13        The following Monday, the 13th, is a federal holiday, so

14   we will have a long weekend in there.  I will remind you again

15   next week, but for planning purposes we will be here Monday

16   Tuesday and Wednesday of next week.

17        I am sorry.  That is how tired I am.  Monday, Tuesday,

18   Wednesday, those three days we will be here next week.  You

19   will be off Thursday, Friday, and the following Monday.  I

20   will remind you next week, but I wanted to let you know for

21   your planning purposes.

22        Have a good weekend.  We will see you Monday.

23             (Whereupon, the jury left the courtroom.)

24             THE COURT:  Anything we need to address?

25             MR. JONAS:  Your Honor, I wanted to address that

1    Illa Falistine No. 1 translation discrepancy issue.

2            THE COURT:  Everybody can be seated.

3            MR. JONAS:  We looked at the one on the Court's

4    website from the last trial, which is not the one that was

5    admitted in the last trial.  We gave a copy to our translator

6    Mr. Shafik.  He says that is not on FBI product.  We don't

7    know where it came from.  Maybe it did come from us, but if it

8    came from us we didn't produce it.  It is possible that it

9    could have been given to us by the person that gave us the

10   original document, and somehow that one went on the Court's

11   website instead of the one that was actually admitted in the

12   last trial and this trial.

13       I think it is completely improper for Ms. Hollander to

14   ask Agent Burns about the discrepancy to the translation that

15   we did not create.

16           THE COURT:  And I would agree, if that is the case.

17   So it is on the Court's website?

18           MR. JONAS:  It is on the Court's website.

19           THE COURT:  And how can you tell that that is not

20   the one that was admitted.

21           MR. JONAS:  There is a file number on it which is

22   not an FBI file number.

23           THE COURT:  And I understand, for the record, that

24   we found some mistakes on that website from the first trial.

25   We tried to get in there as we were dealing with some of these

1    early motions that were filed, motions for acquittal from I

2    think Ms. Cadeddu that we were dealing with early on.  So we

3    got on there looking at some of these exhibits, and we knew

4    that some of them were incorrect.  So that is not a completely

5    accurate, but I am just trying to determine how you know that

6    this particular exhibit is not --

7            MR. JONAS:  Besides the file number, there are other

8    markings on there that are inconsistent with what the FBI

9    would do in creating the translation, as well as having shown

10   it to Mr. Shafik who said that is not his product.

11       And everything we have regarding the exhibit for the

12   first trial, when we looked up on our documents as well as

13   some other indicators, all indicate the translation we are

14   using today is the exact same translation we used last time.

15       And for the Court, I think all we did was just take that

16   exhibit and slap a new sticker on it.  In fact, I am being

17   told on ours you can see the old exhibit sticker underneath

18   it.

19           MS. HOLLANDER:  Well, ours has the Government's

20   exhibit sticker on it, and I don't know how that could have

21   gotten on it unless it was the Government's.  And last time

22   they actually introduced the whole -- We had an issue about

23   Illa Falistine No. 1, and I believe they introduced a large

24   portion of it than they did this time.  But it had the

25   Government sticker on the front, and it is the one that we

1    have always believed was the one that was admitted.

2        I mean, I would like to see what it is that they have

3    found, and perhaps Mr. Jonas could explain to me why this one

4    with the Government's exhibit sticker on it is not a

5    Government product.  But it just seems odd to me it has the

6    Government's identification from that case on the front page.

7            MR. JONAS:  Your Honor, it is very possible that the

8    original exhibit in Arabic was the one that we used at trial,

9    and somehow there is another translation that was attached to

10   it that went to the Court.  Like I said, it could have been

11   the translation that came to us from a third party, and that

12   that somehow was the one that went for the website, but was

13   not the one --

14           THE COURT:  What third party was doing the

15   translation?

16           MR. JONAS:  If Your Honor will recall, there was

17   testimony about the Boim lawsuit that the HLF was sued at.  In

18   fact, that is where the depositions came from.  That document,

19   Illa Falistine No. 1, was a document that was shown to the

20   Defendant Shukri Baker and discussed in his deposition.  And

21   so with the deposition we got a copy of Illa Falistine No. 1.

22   So I am assuming, considering that, that the translation that

23   is on the Court's website is a translation that we received

24   from a third party.  I can't say that for sure, but I can say

25   that from everything that we have seen and being told is it is

1    not an FBI product.  It is not what was used in the last

2    trial.

3              THE COURT:  Why don't you get with Ms. Hollander and

4    show her what you have and what you are talking about in terms

5    of the markings and the things you are explaining here.  It

6    may be that we need to get the translator Mr. Shafik, get him

7    on the witness stand and testify at some point.

8              MR. JONAS:  He is here if you want to do it right

9    now.

10             MS. HOLLANDER:  I would like an opportunity to look

11   at this, and not do it right now if we can, Your Honor.

12             THE COURT:  All right.

13             MS. HOLLANDER:  Because I would like to be able to

14   sit down, look at this, look at ours, and see where they came

15   from.

16             THE COURT:  Do you have -- Did you get the exhibits

17   on disk the last time from the Government?

18             MS. HOLLANDER:  Yes.

19             THE COURT:  And do you still have those?  Have you

20   gone back to look at that?

21             MS. HOLLANDER:  Yes.

22             MS. DUNCAN:  We do have the disks, Your Honor.  We

23   pulled this off the website, and I haven't compared the

24   website --

25             THE COURT:  Go back and look at your disk and see

1    that, and then get with Mr. Jonas.  Maybe you can work it out.

2    If not, we will have to have a hearing and I will have to make

3    a decision on it.  But see if you can work that out.

4         MS. HOLLANDER:  We can look at the ones on our disk.

5    We just had no reason to think that the one on the website was

6    not correct.

7         THE COURT:  Well, except -- You wouldn't think that,

8    but we have found mistakes on there.  And of course we weren't

9    involved in that, so I don't have any explanation other than

10   we found mistakes on the website when we were going back

11   looking for exhibits for our orders that we were doing on

12   motions.  So we know it is not a perfect list, that website.

13        MS. HOLLANDER:  If Mr. Jonas would be in town

14   tomorrow we can --

15        MR. JONAS:  I haven't been home for a while.  I was

16   planning on going home tonight.

17        THE COURT:  Why not Monday morning, or if you have

18   time now, at least let her know what you are looking at.

19        MS. HOLLANDER:  If they can give me a copy of what

20   it is they think was on the website -- what it is they think

21   was introduced, then I will have that plus the website plus

22   ours.

23        THE COURT:  Okay.

24        MR. JONAS:  It is the same thing that is in

25   evidence.  We can print them a copy off the disk we have.

1          THE COURT:  So what you are saying is what is in

2     evidence now is what was introduced the same time.

3          MR. JONAS:  It is the same.

4          MS. HOLLANDER:  We will look at the disk.

5          THE COURT:  All right.  And then the issue that

6     remains still is this chronological order --

7          MS. HOLLANDER:  We have -- Tomorrow we are going to

8     try to figure out what of those six documents, those six parts

9     we actually -- As I said to you, I want to isolate what is

10    106.  I mean, I wasn't anticipating having to do it as 106,

11    but I will isolate that so you don't have to read 50 pages,

12    because we are not going to need to put in 50 pages nor will

13    50 pages be 106.

14         THE COURT:  And that is a separate issue of what

15    comes in, besides what the Government put in.  But then you

16    are still dealing with this issue of trying to establish the

17    chronological order, and that is a different issue.

18         MS. HOLLANDER:  We will see if we can find the

19    example --

20         THE COURT:  My concern there is, I mean, you have to

21    find somebody to do it through.  Obviously you can't do that.

22         MS. HOLLANDER:  I think it will be obvious.

23         THE COURT:  Well, yeah.  But somebody is going to

24    have to look at it and then make that determination that it is

25    obvious or not.

1          MS. HOLLANDER:  I mean, it may be that it is going

2     to have to be a jury decision if nobody knows.  They can

3     read --

4          THE COURT:  No.  You are going to have to present

5     some evidence that this is chronological.  I mean, you can't

6     introduce that as your exhibit and not have any evidence to

7     support what you are saying.  There has to be some evidence.

8          MS. HOLLANDER:  I think it will be obvious from

9     reading the transcript.

10          THE COURT:  Reading which transcripts?

11          MS. HOLLANDER:  Reading the transcript of how a

12     conversation flows.

13          THE COURT:  How it flows?  Okay.

14          MS. HOLLANDER:  Give me a chance to figure that out.

15     Otherwise I will figure out some other way.

16          Mr. Jonas admitted theirs are not in chronological order,

17     so my question is --

18          THE COURT:  I think they are saying they don't know

19     what the chronological order is.

20          MR. JONAS:  I tried to put it in order that followed

21     the logical -- followed the questions I was asking her.  I

22     struggled very hard with trying to come up with a way of

23     asking the questions regarding the Philadelphia conference in

24     a manner that flowed instead of saying, "Let's put in a tape

25     and play what are they saying."  So I ordered it that way.  I

1    can't say it was chronological order when I first started or

2    it ended up in chronological order or what.

3         And frankly, Your Honor, I understand Ms. Hollander's

4    point, but I don't think it makes a difference at the end of

5    the day.

6              MS. HOLLANDER:  I do think it makes a difference.

7    But let me see if I can figure out a way to make it obvious.

8              THE COURT:  Okay.  All right.

9              MS. HOLLANDER:  And that is what I will try to do.

10             THE COURT:  Okay.  All right.  Be back, then, at I

11   guess 8:30 Monday morning and we will take up some of these

12   issues and see where we are.

13                       (End of Day.)

14

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts            06/05/2009

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25