1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF TEXAS
2                     DALLAS DIVISION

3    UNITED STATES OF AMERICA      )  CAUSE NO. 3:04-CR-240-P
                                   (
4    vs.                           )
                                   (  OCTOBER 6, 2008
5                                  )  DALLAS, TEXAS
     HOLY LAND FOUNDATION, ET AL   (  9:00 A.M.
6
     _____
7

8                      VOLUME 14 OF 37

9    _____

10                    STATEMENT OF FACTS

11
              BEFORE THE HONORABLE JORGE A. SOLIS
12               UNITED STATES DISTRICT JUDGE
                        and a jury
13   _____

14


15               A P P E A R A N C E S

16


17


18       FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                               1100 COMMERCE, 3RD FLOOR
19                             DALLAS, TEXAS  75242
                               BY:  MR. JIM JACKS
20                                  MR. BARRY JONAS
                                    MS. ELIZABETH SHAPIRO
21
         FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
22       (SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
                               20 FIRST PLAZA, SUITE 700
23                             ALBUQUERQUE, NEW MEXICO 87102
                               BY:  MS. NANCY HOLLANDER
24                                  MS. TERESA DUNCAN

25

```
 1              FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
                (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
 2                                   NEW YORK, NEW YORK  10005
                                     BY:  MR. JOSHUA DRATEL
 3                                        MR. AARON J. MYSLIWIEC

 4              FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
                (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
 5                                   DALLAS, TEXAS  75204
                                     BY:  MS. MARLO P. CADEDDU
 6
                FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
 7              (GHASSAN ELASHI)     P.O. BOX 10985
                                     TAMPA, FLORIDA  33679
 8                                   BY:  MS. LINDA MORENO

 9                                   JONES DAY
                                     555 CALIFORNIA ST., 26TH FLOOR
10                                   SAN FRANCISCO, CA  94104
                                     BY:  MR. JOHN D. CLINE
11
                FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12              (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                     FORT WORTH, TEXAS  76102
13                                   BY:  MR. GREG WESTFALL

14              COURT'S LAW CLERK:   MS. JENNIFER HELMS
                                     1100 COMMERCE, RM. 1654
15                                   DALLAS, TEXAS  75242

16              COURT COORDINATOR:   MS. BRENDA WEBB
                                     1100 COMMERCE, RM. 1654
17                                   DALLAS, TEXAS  75242

18      OFFICIAL COURT REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                     1100 COMMERCE STREET, RM. 1654
19                                   DALLAS, TEXAS  75242
                                     (214) 753-2349
20

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| LARA BURNS | |
| Cross By MS. CADEDDU............................................. | 32 |
| Cross By MS. HOLLANDER........................................... | 88 |
| Cross By MR. DRATEL.............................................. | 223 |

## Defendants' Exhibits

| **Defendants' Exhibits** | **Page** |
|---|---|
| No. 1351 Admitted into Evidence | 5 |
| D-Philly Meeting No. 14 Admitted into Evidence | 9 |
| D-Illa Falistine No. 1 Admitted into Evidence | 12 |
| No. 894 Admitted into Evidence | 14 |
| No. 1017, 1018 Admitted into Evidence | 26 |
| Defense Ashqar No. 1 Admitted into Evidence | 31 |
| No. 1333 Admitted into Evidence | 31 |
| Defense Exhibit K&A Trading Admitted into Evidence | 91 |
| Marzook/Defendants Admitted into Evidence | 93 |
| OLF 1988 Admitted into Evidence | 94 |
| OLF 1989 Admitted into Evidence | 95 |
| Marzook/IAP Admitted into Evidence | 96 |
| Marzook/UASR Admitted into Evidence | 96 |
| No. 1051 Admitted into Evidence | 118 |
| No. 1017 Admitted into Evidence | 133 |
| D-Philly Meeting No. 14-A Admitted into Evidence | 174 |
| No. 119, 1055,1058,1059,1060 Admitted into Evidence | 197 |
| No. 894 Admitted into Evidence | 203 |
| No. 140, 161, 162, 175 Admitted into Evidence | 206 |
| No. 169,170,177,946,954 Admitted into Evidence | 209 |
| No. 474 Admitted into Evidence | 213 |
| No. 744 Admitted into Evidence | 214 |
| No. 404, 505, 506, 544 Admitted into Evidence | 222 |
| Defendant El Mezain Wiretap 11 Admitted into Evidence | 238 |
| Defense Shabib No. 1, 1-A Admitted into Evidence | 246 |
| Defense Ashqar Wiretap 1-A Admitted into Evidence | 258 |

1          THE COURT:  All right.  Ms. Cadeddu, I believe you

2    sent an email, and you had one exhibit you are planning on

3    getting into and Mr. Jonas you had no objections.  Is that

4    correct?  Let me hear from you or Ms. Shapiro.

5          MR. JONAS:  If I can just confer with Mr. Jacks.  We

6    have no objection.

7          THE COURT:  All right.  And what exhibit was that,

8    Ms. Cadeddu?

9          MS. CADEDDU:  Well, Your Honor, that exhibit is

10   Defense Exhibit No. 1351.

11         THE COURT:  And you are going to offer that?

12         MS. CADEDDU:  I am, Your Honor.

13         THE COURT:  And no objections, so that is admitted.

14         MR. JONAS:  If I can just inquire so we are on the

15   same page, that is the one that is multiple pages?

16         THE COURT:  The receipts that go with that check?

17         MS. CADEDDU:  Yes, sir.

18         THE COURT:  All right.

19    And then Ms. Duncan or Ms. Hollander, let's take up

20   yours.  I received your email, and I saw the transcript.  It

21   is a long transcript, and what I didn't have until just a few

22   minutes ago is what it was in 106 in relation to so I could

23   compare, so I haven't had an opportunity to do that.

24         MS. DUNCAN:  I can tell you orally how we see it

25   fitting into the Philadelphia meeting.

1          The conversations, generally speaking, about the need to

2     start a new organization that can work with the PLO and the

3     State Department and a more neutral organization, that

4     transcript pertains primarily to that.

5          And you may recall that Agent Burns, or the Government,

6     played several portions of the Philadelphia meeting related to

7     that topic and discussed an organization named CAIR suggesting

8     that that was in fact the new neutral organization.  So this

9     transcript sort of fleshes that out and gives more meaning to

10    why it is that they felt the need -- We were discussing this

11    need to start a neutral organization and puts those into

12    context.

13         They sort of talk about that new organization throughout

14    the Philly meeting in several transcripts, but I would say

15    primarily they talk about it in Philly Meeting No. 5 and 7 of

16    the Government exhibits.

17              THE COURT:  And those are in?

18              MS. DUNCAN:  Those are in.

19         The other thing, Your Honor, is and -- I know the

20    Government doesn't agree with the chronology, but when you

21    look at the same Philly meeting transcripts from the first

22    trial, which were in the order of those .WAV files, the

23    transcripts that we are seeking to introduce fit actually

24    right in between Government's Philly Meeting No. 16 and Philly

25    Meeting No. 4.  So it is a continuation of Philly Meeting No.

1    16 and it is an introduction to Philly Meeting No. 4.

2            THE COURT:  Are they also in?

3            MS. DUNCAN:  Those are also into evidence.

4        So the five Philly meeting transcripts that we are no

5    longer seeking to introduce were actually the last two

6    transcripts on the first day and the last three transcripts on

7    the second day.  So the only transcript that we are seeking to

8    introduce at this time is one that fell right between the

9    transcripts that the Government has already introduced into

10   evidence.

11           THE COURT:  All right.  And none of this portion of

12   the transcript that you are seeking to admit has been

13   admitted.  Is that correct?

14           MS. DUNCAN:  That is correct.  It was former

15   Government Exhibit No. 16-73.  It is about 11 pages.  And none

16   of this transcript has come in, Your Honor.

17           THE COURT:  Mr. Jonas, or Mr. Jacks?

18           MR. JONAS:  One moment, Your Honor.

19           THE COURT:  Sure.

20           MS. DUNCAN:  Your Honor, actually there was one

21   other thing I wanted to point out about that transcript.

22           THE COURT:  All right.

23           MS. DUNCAN:  There is a statement on page 9 of that

24   transcript, which is actually Mr. Abu Baker speaking, where he

25   is talking about -- It is kind of -- He is talking about the

1  approach that the participants should take to the new

2  developments in Palestine and sort of how they are going to

3  continue their work in the future, and he is asking the other

4  participants to keep an open mind and to not be so bound by

5  sharia rulings, which is Islamic law, but to be allow

6  themselves to be exposed to new and strange ideas.  And we see

7  that as a 106 also to the portions the Government played,

8  which suggested to the jury that everyone at this meeting came

9  in with this idea to derail the agreements and was open to no

10 other and had no other purpose for this meeting.

11            THE COURT:  Okay.

12            MR. JONAS:  Your Honor, we will have no objection to

13 the one transcript coming in.

14      I do want to make sure we are clear on the record that

15 besides just this one coming in, is there going to be an issue

16 with -- If I may address Ms. Hollander and Ms. Duncan.

17            THE COURT:  Sure.

18            MR. JONAS:  Have you dropped the issue of putting

19 them in what you consider them chronologically and

20 reintroducing them.

21            MS. DUNCAN:  We do not to plan to reintroduce the

22 transcripts other than this one.

23            THE COURT:  And apparently, from your email, you are

24 dropping that issue of trying to get some idea of the

25 chronological order before the jury.

1          MS. DUNCAN:  No, Your Honor, we are not dropping the

2     issue, but we are dropping trying to introduce the whole

3     meeting as a Defense exhibit.

4          MR. JONAS:  The only issue I have is Agent Burns

5     already said she doesn't understand that .WAV file, and if

6     they want to question Agent Burns whether that is in

7     chronological order or not, that is improper.

8          THE COURT:  We will see how they get into that

9     chronology, and we will deal with it at that time.

10        What exhibit number is this of yours?

11         MS. DUNCAN:  We were calling it D-Philly Meeting No.

12    14.

13         THE COURT:  So you are offering that.  You can offer

14    that -- I will go ahead and admit it now, and you can use it

15    during your cross.  So D-Philly Meeting No. 14 is admitted.

16        All right.  And then you also want to introduce the poem?

17         MS. DUNCAN:  Yes, Your Honor.  As you requested, we

18    looked at the record from the first trial about the

19    translation issue, and we confirmed that the Government was

20    correct that the translation version on the Court's website is

21    not the one that they read into the record, so we are

22    withdrawing that issue.

23        But if you look on page 3 of the original Illa Falistine,

24    there is this Holy Land ad, and when you look at the

25    Government's translation on page 8 you will see that they have

1  translated the left hand portion of the ad but they have not

2  translated the right hand portion.  Instead, they just put in

3  brackets the word poem.  And under Rule 106, we are seeking to

4  introduce a translation of that poem only, because it is part

5  of the ad, as you can see when you look on page 3.

6          THE COURT:  Mr. Jonas, were you able to see that

7  email this morning or yesterday?

8          MR. JONAS:  Yes, sir.  And we are objecting.  We

9  don't see how under 106 this poem explains or clarifies

10  anything in this particular exhibit.  We don't think they met

11  their burden or predicate under 106.

12          MS. DUNCAN:  Your Honor, if I can clarify, the

13  Government is introducing this to show Holy Land Foundation's

14  intent, what the face they are putting out to the donors, and

15  they are attaching significance to the fact that this ad

16  appears in a particular magazine, but then they don't want the

17  jury to see the words that Holy Land used to solicit the

18  donations.  So the jury should be able to consider the full

19  ad, the full statement of the Holy Land Foundation that the

20  Government has introduced in this case.

21          THE COURT:  Okay.

22          MR. JONAS:  Your Honor, I don't think I have

23  anything to add.  We still object.

24          THE COURT:  And I think that that is proper.  I will

25  overrule that objection and permit you to introduce that

1    translation with that poem.  Will that be the same exhibit

2    number, or are you going to give it a new exhibit number?

3            MS. DUNCAN:  Your Honor, we were going to give that

4    as an exhibit number D-Illa Falistine No. 1.

5            THE COURT:  Mr. Jacks?

6            MR. JACKS:  That is not the Government's

7    translation, so whoever translated that is not here and --

8            THE COURT:  That is not your translation?

9            MR. JACKS:  No, sir.

10           THE COURT:  Counsel, you are going to have to have a

11   sponsor for the translation.

12           MS. DUNCAN:  Your Honor, during the last trial we

13   sent translations to the Government, and Mr. Shafik would

14   review it and then we would introduce it that way when we

15   tried to do exhibits during the Government's case.

16       We sent it to the Government on Saturday and asked them

17   to review it and let us know if there were any problems.  They

18   haven't come back and told us that there were.  So I mean, we

19   can have a witness come in and sponsor it conditionally, but

20   at this point we asked them to review it and to tell us if

21   there was a problem and they haven't identified a problem.

22   During the first trial I think the changes, if any, to any of

23   our translations were very small.

24           THE COURT:  So you have a witness you can come in to

25   sponsor it?

1           MS. DUNCAN:  Yes, Your Honor.

2           MS. CADEDDU:  The translators we use is Mike

3    Mahler's group.  It is same group used by the Northern

4    District.  So we have used Mike Mahler's group again.

5           THE COURT:  All right.  I will permit that, with the

6    understanding that at some point you have to have somebody to

7    sponsor that, to testify that that is an accurate translation.

8        All right.  And tell me again what you are calling that

9    exhibit.

10          MS. DUNCAN:  It is D-Illa Falistine No. 1, Your

11   Honor.

12          THE COURT:  All right.  That is admitted.  And then

13   lastly, as I understand your email, Exhibit No. 894 and I

14   couldn't find that on my -- the disk that I had.  So I have

15   not been able to see that.  Mr. Jonas, have you been able to

16   see that disk?  They want to play it without the sound.  I

17   take it that it is like some of the disks we played last

18   Friday.

19          MR. JONAS:  Your Honor, I have not had a chance to

20   view it myself and as I understand Mr. Jacks has.

21          MR. JACKS:  Judge, our objections is the same as it

22   has been for these other photographs and videos.  It contains

23   hearsay, and it is really not authenticated.  And I don't even

24   know if Agent Burns has ever seen this one or looked at it.

25   With regard to what it purports to show, I don't believe

1  anybody is going to be presented to explain what it purports

2  to show.  For that reason we believe there is no foundation

3  and should not be admitted.  And then beyond that, it is

4  hearsay.

5            THE COURT:  They said they are not going to play the

6  sound, so it would amount to moving photos.

7            MR. JACKS:  I understand, and it has got lighting

8  and that type of thing.

9            THE COURT:  Can you tell the setting from looking at

10  it?  Do you know what it is about?  Can you tell.

11            MR. JACKS:  Only from what the people say.  And

12  again, you can't tell necessarily when it was made, where it

13  was made, those things.  It is spliced, or it stops and

14  starts, and you don't know if both things were done at the

15  same time; if they were put together.  There is none of that

16  type of foundation that can be established, certainly not

17  through Agent Burns.

18            THE COURT:  Okay.  Ms. Duncan?

19            MS. DUNCAN:  Your Honor, it is about a 25-minute

20  video -- The evidence will show during the cross of Agent

21  Burns that the Holy Land Foundation paid for volunteers to fly

22  to Oklahoma City to help with the relief efforts after the

23  Oklahoma City bombing in April of 1995.

24      This video shows people with Holy Land T-shirts filling

25  boxes with personal hygiene supplies for the victims of that

bombing.  We have taken out the sound, so what the video shows

is all these Holy Land Foundation workers, and Agent Burns

clearly can identify --

THE COURT:  I don't mind you showing some of that.

I don't want you to show 25 minutes of that.

MS. DUNCAN:  No, no, no.  That was in response to

the splicing.  We have cut it down to less than five minutes.

At the very end of the video you will see the actual Murrah

building which we will ask her to identify.

First of all, it is date and time stamped.  Secondly, at

the end of the video it shows a photograph of the Murrah

building and a Holy Land person in a Holy Land T-shirt at that

place.  And also if you look on the cover of the video, Agent

Burns has seen this video and I think we will be able to

establish that during the cross examination.

THE COURT:  And what are you calling that?  That is

Defense Exhibit No. 894?

MS. DUNCAN:  Correct, Your Honor.

THE COURT:  Okay.  And I will permit you to do that,

then.  That is admitted.

Any other issues, then, before the jury comes in?

MR. DRATEL:  Your Honor, we probably won't get to it

before the break, but I have a couple of 106 issues.

THE COURT:  Let's go ahead and take that up.

MR. DRATEL:  There are two that are in the motion

1    that I filed last night that are beyond -- Both 106 and also

2    801(c) the non-hearsay.

3        I also received back from the Government -- It was just a

4    mix-up in terms of the end of last week.  The Government has

5    agreed to some additional ones, but there are a couple -- I

6    think there is only one additional one that is not covered in

7    the papers at this point.  El-Mezain Wiretap No. 13, which is

8    an exhibit that the Government introduced through Agent Burns,

9    but it is actually going to be played with another witness, so

10   we will wait on that one.  So No. 13 we can defer.

11                   THE COURT:  Okay.

12                   MR. DRATEL:  With respect to No. 11, the Government

13   has agreed to go as far as the bottom of page 10 of the larger

14   transcript, but doesn't want the first two paragraphs on page

15   11, which is what we want, just the first two, which I think

16   completes that part of the conversation.  They are still

17   talking about the reporter and matters related to that.

18       And there is another conversation, Shabib No. 1, which

19   came in through Agent Burns, Shabib Wiretap No. 1.  The

20   Government has agreed to one of the sections, so we don't have

21   to discuss that, but there is a section which I can show

22   the --

23                   THE COURT:  In fact, I have not seen those because I

24   didn't get this motion until a few minutes before I came up

25   here.  If you will come up here -- You said it is just a

1    couple of paragraphs on that one.

2         Mr. Jonas, do you want to come up here a minute and let's

3    take a look at that.

4              (The following was had at the bench.)

5              MR. JONAS:  On El-Mezain Wiretap No. 11, I don't

6    know if you have that.

7              MR. DRATEL:  I do.  This is the one I have here.  I

8    wanted to show the Court where the Government --

9              MR. JONAS:  If we can go to the page that you wanted

10   to start, the additional part.  And for the record, this has

11   several segments, this call.  I played one segment with Agent

12   Burns.  The second that we are discussing now was not played,

13   so I am not sure if you want to do this with her or not.  I am

14   not sure if it is proper to do this with her or not, since it

15   wasn't played.

16             THE COURT:  Are you objecting to them playing it,

17   though?

18             MR. DRATEL:  Or just read it.

19             MR. JONAS:  I am objecting to playing or reading the

20   portions that they want, unless the whole portion that we

21   already admitted that I haven't played is played as well.

22             MR. DRATEL:  I see.  I understand.

23             MR. JONAS:  So if you want to wait --

24             MR. DRATEL:  Let me ask this question.  Are you

25   planning on using it with Agent Miranda?

1          MR. JONAS:  You have to ask Mr. Jacks that.  Agent

2    Miranda is his witness.

3          MR. DRATEL:  I mean, but are you not going to play

4    this at all?

5          MR. JONAS:  I honestly don't know.  If you want to

6    play this portion now, I don't have an objection to it as long

7    as our portion is played with it so the jury can see the whole

8    thing, because otherwise it is out of context.

9          THE COURT:  That is to all of El-Mezain 11 that he

10   wants?

11         MR. JONAS:  This particular segment.

12         THE COURT:  The one he is asking for.

13         MR. JONAS:  Yes, sir.

14   We stopped somewhere around here.  I agree that the

15   continuation, the rest of this paragraph up to a certain point

16   is a continuation of the conversation.  However, somewhere

17   around here, and it is difficult to read upside, here this is

18   Shukri Baker speaking I believe, and he changes subject.  He

19   says -- This is about the Gayle Reeves interview.  This is a

20   continuation of the Gayle Reeves interview, which is an

21   interview of the reporter of Shukri Baker, that we played

22   portions of.  He then calls El-Mezain and he discusses it.

23   And this is a continuation of Shukri Baker saying, "And this

24   is what else I told her."

25         But then over here he stops and changes subject and says,

1    "The day before yesterday there was an interview with Peres,"

2    who is Shimon Peres, one of the leaders of Israel, by the way,

3    and they talk about that interview, which is separate.  So we

4    object to this, but starting with the last page --

5            MR. DRATEL:  But he goes back to what he told Gayle.

6    He says, "So I told her that stuff.  So it is still the same.

7    And then Mr. El-Mezain responds.

8            MR. JONAS:  We object to that.

9            MR. DRATEL:  It is a continuation of their

10   conversation about Gayle Reeves.

11           MR. JONAS:  Your Honor, I think you will need to

12   read it.  Even just the fact that it is a continuation of the

13   conversation doesn't necessarily meet the 106 predicate.  It

14   has got to explain and put in context the rest of the

15   conversation that is in already.

16       I have agreed to continue the rest of the attribution,

17   even though I don't think the predicate is completely met, but

18   I understand that it is a close call on that prior paragraph.

19   I think at this point they it switch gears, and I think that

20   is why the rest of it, from the "By the way" forward needs to

21   come out.

22           MR. DRATEL:  And I think for two reasons, one of

23   which in fairness.  The rule is really about fairness.  And

24   there is also the parts of the motion that we filed I think,

25   regardless of 106, the whole question of 801(c) and

1   non-hearsay with respect to expressions of state of mind.

2           MR. JONAS:  Then, Your Honor, under Mr. Dratel's

3   definition any statement of the Defendant could be argued it

4   is state of mind.

5       And I just now have this motion.  It came in late last

6   night.  But my understanding of the cases, first of all, it

7   has got to be the state of mind of the speaker; and second of

8   all, it is narrowly defined.  In other words, if a person is

9   talking about events that happened previously, that is not

10  necessarily a state of mind at the time he is saying it.  So

11  if I can give an example --

12          MR. DRATEL:  But that to me is classic current state

13  of mind.

14          THE COURT:  This one?

15          MR. JONAS:  Whose state of mind is it?

16          MR. DRATEL:  El-Mezain's.

17          MR. JONAS:  Then offer just that.  And we object to

18  it as well.

19          MR. DRATEL:  Well, I think 106 would put that in to

20  give it context.  I am just saying I think it should come in

21  as well.  Obviously Mr. El-Mezain's statement is more

22  important, but I think in the context of this entire

23  conversation it all should come in in fairness.

24          MR. JONAS:  Now we are bootstrapping.

25          MR. DRATEL:  I don't think it is bootstrapping, but

1    it is just a matter of discretion.

2              MR. JONAS:  I will agree with you on that one.

3              THE COURT:  Yeah.  I think this goes with this other

4    portion of where they are talking about peace and living in

5    peace, so I will let you get into that.  I think this other

6    conversation with Peres and other interview, that is probably

7    off limits.

8              MR. DRATEL:  Okay.  Thank you.

9              MR. JONAS:  I am sorry, Your Honor.  Which portion,

10   then, is okay?

11             THE COURT:  Right here by El-Mezain.

12             MR. JONAS:  Just the El-Mezain part?

13             THE COURT:  They are discussing whether Israel

14   thinks that you should live, and he is talking about, "We

15   received them in peace back in 1915."  And this is Baker, and

16   so part of that this is where El-Mezain responds to that.  But

17   this Perez interview is sort of -- kind of a little

18   tangential.  So I will let you get that in.

19             MR. DRATEL:  And obviously if we put it in --

20             THE COURT:  You probably just want to read it, then.

21             MR. JONAS:  And just identify where it starts.

22             MR. DRATEL:  Actually I have to identify it for you.

23   So we will probably start right here at page 9, I guess.  So

24   we start with Shukri asking -- Let me just make a note.

25             THE COURT:  That is where you want to start it?

1           MR. JONAS:  Yes, sir.

2           MR. DRATEL:  And then we go to here, and then --

3           MR. JONAS:  I am sorry, Mr. Dratel.

4           THE COURT:  No, we cut it here.

5           MR. DRATEL:  Yes, right there.  And then this goes

6    out, this goes out, and then we include that.  Great.

7           THE COURT:  Is there another one?

8           MR. DRATEL:  A letter, but apparently Mr. Jonas he

9    just needs more time.

10          THE COURT:  To look at it?

11          MR. JONAS:  I wasn't made a aware of it until this

12   morning.

13          MR. JONAS:  If I can request--I am assuming you will

14   do this anyway--but that you at least preface this with Agent

15   Burns that this is the Gayle Reeves interview, so we can put

16   it in context, so it is not just some random conversation.

17          MR. DRATEL:  Sure.

18      The Government has agreed to parts -- Let's start here.

19          MR. JONAS:  This is Shukri Wiretap No. 1?

20          MR. DRATEL:  Yes.  The part before.  The Government

21   agreed to 5 and 6.

22          MR. JONAS:  I think it was an extension of what we

23   had played.

24          MR. DRATEL:  Yes.

25          MR. JONAS:  And we agreed to an additional page.

1    But you had said -- I want to make sure we are clear about

2    this.  I thought you had said when you stood up that there was

3    an additional segment of Shabib Wiretap No. 1, besides the one

4    we agreed to, which I was not aware of.

5            MR. DRATEL:  My mistake.  It was 13.  It is one

6    before and one after.

7            MR. JONAS:  So this is one additional page that we

8    are in agreement with.

9            THE COURT:  All right.

10           (The following was had in open court.)

11           THE COURT:  Have we addressed all of the evidentiary

12   issues remaining with Agent Burns?

13           MS. DUNCAN:  Your Honor, we had one other small 106

14   with Ashqar Wiretap No. 1, and the Government was going to get

15   back with us this morning about whether they objected to that.

16           THE COURT:  Have you had the opportunity to look at

17   that?

18           MR. JACKS:  I have gone blank right now, Your Honor.

19           THE COURT:  Do you want to show them what it is?

20           MR. JACKS:  The two paragraphs that are highlighted?

21           MS. DUNCAN:  Yes.

22           MR. JACKS:  We have no objection to that, Your

23   Honor.  There was a little bit of confusion, because it was at

24   the bottom of a page, and I didn't know if they were going to

25   include -- There were comments in between that were not

1    highlighted, so it wasn't clear to me if they were going to

2    strictly put in the highlighted parts.

3               MS. DUNCAN:  It is Shukri -- There is one thing

4    in between it.

5               THE COURT:  We are missing a juror also, so we are

6    not quite ready.

7               MS. CADEDDU:  Judge, can I register a strenuous

8    objection to the temperature?

9               THE COURT:  Is it too cold or too warm?

10              MS. CADEDDU:  I am freezing.  I had to pull out my

11   winter clothes.

12              THE COURT:  So did Jennifer.  You can commiserate.

13              MS. CADEDDU:  My lips are numb, my toes are numb, my

14   fingers are numb.

15              THE COURT:  Will that make you go faster?

16              MS. CADEDDU:  No, Your Honor.  It makes me go

17   slower.

18              MS. DUNCAN:  Your Honor, there are actually a couple

19   of defense exhibits you withheld ruling on.  It was Defense

20   Exhibit No. 174, 1336, and 1337, so the Government could find

21   the original, I believe.  This may actually be an better one

22   for Ms. Hollander, because I wasn't actually a part of that.

23              MS. HOLLANDER:  Your Honor, No. 174 was a

24   certificate from the Ministry of Turkey, and the other two

25   involve the Holy Land work with the wheelchairs of America,

1    and these were the ones that -- I believe what you said, you

2    probably remember what you said better than I do, but my

3    memory was that the Government was going to find the

4    originals, and if they couldn't find them, my understanding

5    was that the copies would come in, because there was a

6    question about the Ministry of Turkey that the only one we

7    have has a copy of the seal, because we don't have the

8    originals.

9         These are also the ones, just to remind you, that they

10   have a bates number on them that is a Government bates number,

11   because these are the ones we got from the Government before

12   they bates stamped them.

13              THE COURT:  Mr. Jacks or Mr. Jonas?

14              MR. JACKS:  I haven't heard back, Your Honor.  I

15   don't believe -- the two on the wheelchair, I don't believe

16   that was in that category that we were going to look for the

17   originals.

18              THE COURT:  Okay.

19              MS. HOLLANDER:  You may be right.

20              MR. JACKS:  The certificate from the Ministry of

21   Turkey was, and I am just looking in my notes to see if there

22   was any others, but I had --

23              THE COURT:  The mayor from the City of San Diego,

24   but I think I have admitted that one already.

25              MR. JACKS:  Yes.  So the only one I know that we

1    were supposed to look for was the one from Turkey, and I

2    haven't heard back.  But I will give you a report.

3             MS. HOLLANDER:  Does the Government object to the

4    other two?

5             THE COURT:  Those are the wheelchair agreements and

6    then the thank you.

7             MR. JACKS:  Yes, Your Honor; on hearsay grounds.

8             THE COURT:  Those were found in the HLF offices.

9             MR. JACKS:  Yes.  Well, that hasn't been established

10   in the record yet, because they have got some other bates

11   number on them.

12            MS. HOLLANDER:  That is why I thought they were part

13   of the same -- Those two also have the FBI bates numbers,

14   don't they?

15            MR. JACKS:  There was -- The tech records, which we

16   had no objection to, and the AMEX records which we don't have

17   an objection to as long as it is the part that you sent.

18            MS. HOLLANDER:  Okay.  And there was also one other

19   bank record, a Bank One the national security letter Bank One.

20            (Discussion amongst counsel.)

21            MR. JACKS:  So the Bank One exhibit we have no

22   objection to.

23            MS. HOLLANDER:  And the AMEX exhibit and, just for

24   the record, the Treasury exhibit.

25            THE COURT:  Give me those numbers one more time, Ms.

1    Hollander.  Give me those exhibit numbers.

2            MS. HOLLANDER:  Well, I would if I could.

3            MS. DUNCAN:  I can actually, Your Honor.  Just give

4    me one second.

5            THE COURT:  All right.

6            MS. DUNCAN:  It is Defendants' Exhibit No. 1017 and

7    Defendants' Exhibit No. 1018.

8            MR. JACKS:  Which one is which?

9            MS. DUNCAN:  That one I don't have.  It should be on

10   the list.  And there is a new exhibit, and we are just waiting

11   for our paralegal to come up with that exhibit number and we

12   will give it to the Court.

13           THE COURT:  It looks like No. 1017 you have listed

14   as the Bank One statements, and No. 1018 is the AMEX records.

15   And you have no objections to those, Mr. Jacks?

16           MR. JACKS:  No, sir.

17           THE COURT:  Admitted.

18           MS. HOLLANDER:  And the Treasury one is the one we

19   need to assign a number to, but they don't have an objection.

20   It is one they admitted last year.

21           THE COURT:  And you have given that a new number?

22           MS. HOLLANDER:  Yes, sir.

23           THE COURT:  Just let us know when you get it.

24           MS. HOLLANDER:  So the only ones I have left are No.

25   174, 1336, and 1337.

1          THE COURT:  The last thing we have heard is we have

2     a juror that is about 30 minutes away.  So why don't we just

3     be in recess for a few minutes, and as soon as we find out

4     that she is here we will come back.

5          Let's discuss -- The Government, you have provided the

6     list of exhibits you intend to introduce through Agent

7     Miranda, and those objections are due from the Defense today.

8          At some point, then, I need to Defense to provide the

9     list of exhibits you expect to introduce through Agent

10    Miranda.  Go ahead and provide that to the Government so that

11    we can get their objections.

12         And when could you do that.  Mr. Westfall, we will put

13    you in charge of that one.

14         MR. WESTFALL:  Okay.

15         THE COURT:  I am just asking, when could you have

16    that list?

17         MR. WESTFALL:  How long is his direct going to be?

18         MR. JACKS:  I estimated his direct would be

19    approximately a day.  It could be a little bit less; it could

20    be a little bit more.

21         THE COURT:  Of course they need to get it so we can

22    get their objections back.

23         MR. WESTFALL:  Is close of business tomorrow enough

24    time?  I am speaking for people that are actually going to

25    be -- I probably will not introduce a single exhibit through

1    him.

2              MS. HOLLANDER:  I can do it by then.

3              MR. JACKS:  That could be the end of his -- Part of

4    it is we don't know how long they are going to go with Agent

5    Miranda.

6              THE COURT:  How long do you anticipate cross, Ms.

7    Hollander?  Do you know how long on your cross?

8              MS. HOLLANDER:  I suspect a couple of hours.

9              MR. WESTFALL:  Your Honor, I feel like we could have

10   certainly a preliminary list of the exhibits that we will try

11   to introduce through Agent Miranda by -- Is lunchtime tomorrow

12   okay?

13             THE COURT:  I would think they would probably need

14   them by in the morning so that they can get their objections

15   in.  You probably would like to have them sometime later

16   tonight, because I need to look at the objections once I get

17   their objections in.  They have got to have some time to look

18   at them for the objections, and I have to have some time to

19   look at them to rule on them, we are going to do any good with

20   this.

21             MR. JACKS:  It is not only the exhibits you intend

22   to introduce, but also the ones to refer to.  And the reason

23   behind that rule is so we are not scrambling around trying to

24   find them at the last minute.

25             THE COURT:  I think all I had asked for was what

1   they intend to introduce for objections so we wouldn't have to

2   have objections.  And both sides, that is what I am asking;

3   just those exhibits that you intend to introduce.  And if

4   there is an objection, we will try to deal with as much as we

5   can.

6           MR. WESTFALL:  Then, Your Honor, when would you like

7   us to have it?  In the morning?

8           MS. CADEDDU:  Let me defer to Mr. Westfall and let

9   him finish his thought.

10          THE COURT:  Well, you have the list --

11          MS. CADEDDU:  Let me make a suggestion, and I am

12  speaking for everybody so I don't know if this will work, but

13  we can certainly take a look at his testimony from last year

14  and see what exhibits we admitted during his testimony last

15  year and provide a preliminary list tonight of the exhibits

16  that were admitted last year.

17      The problem, of course, is that the testimony doesn't

18  always come in in the same way and emphasize the same things,

19  so we will want to supplement that list.

20          THE COURT:  Sure.  And we did that with Agent Burns.

21  I understand that.  But in terms of what you can do, and what

22  you did last time, of course, would be a good starting place.

23          MS. CADEDDU:  So I think we can by -- It will have

24  to be later this evening, obviously, because we have to have

25  some time --

1          THE COURT:  Sometime later this evening?

2          MS. CADEDDU:  I want to make sure that we reserve

3     the right to supplement that after the close of his direct.

4     And, of course, I would also ask -- I mean, for all of these

5     when we disclose these to the Government, it is for the

6     purpose of objections and not for the purpose of preparing the

7     witness.

8          THE COURT:  It is solely for objections.

9          MS. CADEDDU:  So I would ask that they not be shared

10    with the witness.

11         THE COURT:  Correct.  I think that is the

12    understanding.

13        Provide that sometime tonight, then, with the email list,

14    and come back with your objections as soon as you can, maybe

15    by lunch tomorrow.  He should still be on direct, maybe, and I

16    will have a little time to look at them before the cross

17    starts.

18         MS. CADEDDU:  Is it okay with co-counsel?

19         MS. HOLLANDER:  It is okay.

20        I talked to Mr. Jacks about how he wants us to introduce

21    the 106 on the Ashqar No. 1.  We will create a new document,

22    show it to the Government to make sure it is accurate, and it

23    can be Defense Ashqar No. 1.

24         THE COURT:  Okay.

25         MS. HOLLANDER:  And do we have a new number now?

1    The other is No. 1333, the one we didn't have a number for.

2             THE COURT:  That is Defense Ashqar Wiretap No. 1?

3             MS. HOLLANDER:  Yes, sir.

4             THE COURT:  And you are not objecting to that.

5    Correct?

6             MR. JACKS:  Correct.

7             THE COURT:  So that is admitted.  And then give me

8    the last exhibit that you stated.

9             MS. DUNCAN:  No. 1333.  We will need to file a

10   supplemental list with that exhibit number on it.

11            THE COURT:  Okay.  And the Government has no

12   objection to that as well?  Which one is that one?  I think it

13   was agreed, but I am not sure which one it is.  What is

14   Exhibit No. 1333.

15            MS. DUNCAN:  I am actually finding out.  There may

16   be some confusion.  So No. 1333 are the tech records that show

17   when Mr. Abu Baker came into the country that the Government

18   is not objecting to.

19            THE COURT:  Mr. Jacks, you agree?

20            MR. JACKS:  Correct.

21            THE COURT:  Defense No. 1333 is admitted.

22      Let's be in recess until we hear -- Hopefully in about 20

23   minutes, so we don't get too far away.  Hopefully about 20

24   till we will be starting.

25            We will be in recess.

1                       (Brief recess.)

2               THE COURT:  Ladies and gentlemen of the jury, good

3      morning.  We are ready to proceed.

4          And Ms. Cadeddu?

5               MS. CADEDDU:  Thank you, Your Honor.

6      Q.  (BY MS. CADEDDU)  Good morning, Agent Burns.

7      A.  Good morning.

8      Q.  I think this morning where we left off we were going to

9      talk about some videos.  Remember?

10     A.  Okay.

11              MS. CADEDDU:  So could we take a look, please, at

12     Mushtaha Search No. 7 excerpt B, please.

13              (Whereupon, Mushtaha Search No. 7, Excerpt B was

14              played, while questions were propounded.)

15     Q.  (BY MS. CADEDDU)  Agent Burns, this is one of the videos

16     that were listed on the summary chart that you had for Mufid

17     Abdulqader, Mushtaha Search No. 7 dating from 1988.  Right?

18     A.  That is correct.  I probably would want to check the date

19     on here, but that is a tape that we played.

20     Q.  And this is a clip, this clip B here is a clip of the

21     band singing.  Right?

22     A.  Correct.

23     Q.  And can you identify for the jury the band members that

24     you see there?

25     A.  Yes.  Well, I don't know who one of them is, but on the

1    far left we have Fawaz Mushtaha.  Next to him is Munzer Taleb.

2    I have seen the gentleman next to him introduced, but I can't

3    remember his name.  And then we have the Defendant Mufid

4    Abdulqader.

5    Q.    So in this clip, who we see is four of the band members.

6    Correct?

7    A.    Correct.

8    Q.    From 1988?

9    A.    Do you want me to check the date to make sure?

10   Q.    Why don't you keep the chart out there, because we are

11   going to talk about these dates.

12   A.    Yes, I believe that was '88.

13   Q.    All right.

14         MS. CADEDDU:  Could we take a look at Mushtaha

15   Search No. 1, please?  And that is going to be clip D to

16   start.

17         (Whereupon, Mushtaha Search No. 1, Clip D was

18   played, while questions were propounded.)

19   Q.    (BY MS. CADEDDU)  Agent Burns, this one is a little

20   harder to see.  Can you identify the folks you see on the

21   screen there?

22   A.    I recognize the Defendant Mufid Abdulqader as second from

23   the left.  It is a little bit blurry, so if we just play for a

24   second I will tell you.  That is Fawaz Mushtaha.

25   Q.    Okay.  And Fawaz Mushtaha was identified as the founder

of the band.  Is that right?

A.    I think you asked me that the other day, and I said I am

not sure if he was a founder.  I believe he was identified on

one of these tapes as having been the founder, but I am not

positive that he was.

Q.    I think, as you said, he was identified on one of the

tapes as being the founder.  Correct?

A.    I believe I recall that.

Q.    Okay.

        MS. CADEDDU:  Could we now go to clip F, please?

Q.    (BY MS. CADEDDU)  And actually before we do that, Agent

Burns, I don't remember if I asked you this, but this

videotape is also you dated also to 1988.  Is that right?

A.    This was Mushtaha --

Q.    Mushtaha Search No. 1.

A.    From the content, I believe this was 1990.

Q.    This is Mushtaha Search No. 1.

        MS. CADEDDU:  Could we take a look at the document

camera, please?

Q.    (BY MS. CADEDDU)  And I am sorry, Agent Burns.  We are

going to have to switch back and forth.  So do you see up

there on the top where it says Mushtaha Search No. 1, 1988?

A.    I do.

Q.    And so this video we just watched is Mushtaha Search No.

8 Does this refresh your recollection that it was 1988?

1  A.   I am sorry.  I thought you said it was Mushtaha Search

2  No. 1.

3  Q.   Yes.  And that one here --

4       THE COURT:  You stated, counsel, the last video you

5  just watched is Mushtaha Search No. 8.

6  Q.   (BY MS. CADEDDU)  The one we just watched is Mushtaha

7  Search No. 1, and it is 1988.

8  A.   I believe it is 1990.  I believe it should have been

9  under the 1990 category.  That is probably just a mistake in

10 the print on the demonstrative.

11 Q.   Okay.  Well, we will correct that, then.

12      MS. CADEDDU:  Could we take a look at clip F,

13 please, of Mushtaha Search No. 1?  And could you freeze it,

14 please?  Okay.

15 Q.   (BY MS. CADEDDU)  So, Agent Burns, we have identified

16 this now as being 1990 instead of 1988?

17 A.   Correct.

18 Q.   And that was a little less than 20 years ago.  Right?

19 A.   Eighteen.

20 Q.   Do you remember who the president was then?  Was it

21 Ronald Reagan then?

22 A.   I would have to count back.

23 Q.   Mufid Abdulqader would have been about 29 or 30, 31.  He

24 was born in 1959.

25 A.   I can't remember the year of his birth, but --

1    Q.   Okay.  And the situation in Palestine at that time in

2    1990 would have been about between two and three years after

3    the beginning of the first Intifada.  Is that correct?

4    A.   That is correct.  The Intifada began in December of 1987.

5    Q.   And so in 1987 is when Hamas was created shortly after

6    the beginning of the Intifada.  Right?

7    A.   Correct.

8    Q.   And as of 1990, then, Israel had been militarily

9    occupying the West Bank and Gaza for more than 22 years.

10   A.   As I told Ms. Moreno, I am not an expert on the

11   occupation, so I don't want to speak about details that I am

12   not completely familiar with on the stand.

13   Q.   Okay.  You do know the occupation began in 1967.  Right?

14   With the Six-Day War?

15   A.   I know that Israel had a presence as of that time, but as

16   I stated, I am not an expert on the occupation so I don't want

17   to speak about it under oath.

18        MS. CADEDDU:  Just one moment, Your Honor.

19   Q.   (BY MS. CADEDDU)  And Agent Burns, I believe that you

20   testified in another proceeding in this matter.

21   A.   I did.

22   Q.   And when you were testifying in that matter, you were

23   under oath as well.  Is that correct?

24   A.   That is correct.

25   Q.   And you understood that it was important to be truthful.

1  A.   That is correct.

2  Q.   And to give correct testimony to the best of your

3  knowledge.  Is that right?

4  A.   That is correct.

5       MS. CADEDDU:  May I approach the witness, Your

6  Honor?

7       THE COURT:  Yes.

8  Q.   (BY MS. CADEDDU)  Agent Burns, in that proceeding you

9  were asked, "Now, when this was filmed, the West Bank and Gaza

10  were under military occupation.  Right?"

11       And you answered, "Yes."

12       Then the question was asked, "And in fact, the occupation

13  continues in some form today?"  And your answer was?

14       "In Gaza or the West Bank?"

15       The question was, "West Bank."

16       MR. JONAS:  Your Honor, I object to reading this.

17  This is not a proper way of doing this.

18       MS. CADEDDU:  It is, Your Honor.  It is inconsistent

19  testimony with what she said today.

20       THE COURT:  I am still not sure this is a proper

21  way, but go ahead.

22  Q.   (BY MS. CADEDDU)  Your response was, "In the West Bank I

23  still believe there is some occupation there."  Did I read

24  that correctly?

25  A.   You did.

1              THE COURT:  Counsel, that is not inconsistent with

2      what she was saying.  You were asking her from '67 to '89.

3      That talks about '87 and going forward.

4              MS. CADEDDU:  Your Honor, the witness understood

5      when she testified before that there was a military

6      occupation, and I was asking her to confirm.

7              THE COURT:  And you asked her just now, what she

8      didn't want to talk about, you said it continued since '67,

9      and that is what you were asking her about here.  She said she

10     does not want to speak about that occupation since then coming

11     up.

12             MS. CADEDDU:  Your Honor, she denied there was a

13     military occupation.

14             THE COURT:  Counsel, I am not going to argue about

15     it, but it is a different area than what you asked her about.

16     Q.   (BY MS. CADEDDU)  Now, let's take a look at this clip.

17     What you see here is two people.  The one on the right is

18     Mufid Abdulqader.  Right?

19     A.   Correct.

20     Q.   And he is playing the role of Hamas in this clip.

21     A.   He is.

22     Q.   And then there is another gentleman who is playing the

23     role of the Zionist.  Is that right?

24     A.   I believe he is playing the role of an Israeli soldier.

25     I think that is what he is depicting there.

1   Q.   And he identifies himself, he says, "I am the Zionist."

2   A.   Yes, he did.

3   Q.   And these characters are actually dressed for their

4   parts.  Isn't that right?

5   A.   They are.

6   Q.   So Mr. Abdulqader is dressed in green, and he has got a

7   Palestinian head scarf and he is carrying the Palestinian

8   flag.

9   A.   He is.

10  Q.   And the person playing the Zionist in this skit is

11  actually dressed as an army officer.  Right?

12  A.   I believe so.  He has got on a green military-type

13  outfit.

14  Q.   Fatigues?

15  A.   Correct.

16  Q.   And he is carrying a police baton.  You have seen this

17  skit before.  Right?

18  A.   I have.

19  Q.   Okay.  Now, what I would like to do now is take a look at

20  the words of this skit.  And I am going to need the document

21  camera because I think it is easier to do it that way.

22        MS. CADEDDU:  Your Honor, may we approach for a

23  moment?

24        THE COURT:  Sure.  Come on up.

25        (The following was had outside the hearing of the

1          jury.)

2          MS. CADEDDU:  Your Honor, this is the transcript

3     that the Government provided that are the closed captions for

4     the video, and so I would like to go through it with her, and

5     it is much faster to go through it in the written form than to

6     play it and stop the video every time.

7          THE COURT:  This is a video that is in evidence?

8          MS. CADEDDU:  Yes.  And this is the transcript of

9     this video.

10         MR. JONAS:  The transcript is not in evidence is the

11    issue.

12         MS. CADEDDU:  It is on the screen.

13         THE COURT:  I think that is permissible.  All of

14    this is in evidence through the video because it is on the

15    screen.  You are not offering this?

16         MS. CADEDDU:  No.

17         MR. JONAS:  Did you get this from us?

18         MS. CADEDDU:  Yes.

19         MR. JONAS:  Okay.

20         (The following was had in the presence and hearing

21         of the jury.)

22    Q.   (BY MS. CADEDDU)  Okay, Agent Burns, let's take a look at

23    what the characters say and the words they use in this video.

24    Okay?

25    A.   Okay.

1    Q.   Now, first up at the top Mufid Abdulqader introduces his

2    character as Hamas.  Right?

3    A.   That is what he says, what you have a checkmark beside.

4    Q.   And then a little further down here he says, "And I

5    protect my land."  Do you see that?

6    A.   I do.

7    Q.   And then the other man who has introduced his character

8    as the Zionist, and here we see it, "I am a Zionist."  Do you

9    see that?

10   A.   I see that.

11   Q.   That character says, "This Hamas is a new melody that you

12   have not gotten used to it."  Do you see him say that?

13   A.   I do.

14   Q.   And that is because Hamas has fairly recently been

15   created at the time this video is made.  Isn't that right?

16   A.   I think we were talking about 1990, so it had been about

17   three years.

18   Q.   Two or three years.  And the Zionist character says, "I

19   must take over Palestine and make it Israel."  Do you see

20   that?

21            THE COURT:  I am not sure that that is on the

22   screen.

23            MS. CADEDDU:  I beg your pardon, Judge.

24   Q.   (BY MS. CADEDDU)  Do you see that, Agent Burns?

25   A.   I do.

Q.    I have just circled it.  Isn't that right?

A.    Yes.

Q.    And you are aware in Israel at that time there were political parties that advocated taking over the entire territory as Israel.  Isn't that right?

A.    Yes, there were.

Q.    And the goal of those parties, some of them, was to get rid of all the Palestinians and exclude them from that territory.  Right?

A.    And I am not familiar with which parties had which platforms but there were extremists on each side that wanted to get rid of the Palestinians and to get rid of the Israelis.

Q.    Okay.  So the answer to that question would be yes?

A.    I don't know if you would say political parties, but there were extremists on both sides that wanted to get rid of the other parties for sure.

Q.    Okay.  Well, one of those parties was the Likud party.  Right.

A.    And I think that you have asked me about that, or someone has asked me about that party before, and I said I am not aware of their platform.

Q.    Okay.  And then further down the Zionist character says, "You want to wipe out the name of the Zionist, you yourself.  Armies will not wipe out the name of the Zionist, and you are coming to erase the name of the Zionist with a stone?"  Now

1    that stone reference is a reference to the Intifada.  Isn't

2    that right?

3    A.    This person on this tape is speaking -- I can't speak for

4    this person and say what he is referencing.  There were stones

5    that were used in the Intifada, but I can't say for sure that

6    that is what this person is referencing.

7    Q.    So you don't know what this means?

8    A.    If you would like me to explain the stone reference that

9    you are trying to ask me about, I can.

10   Q.    Well, I guess what I am asking you is "you are coming to

11   erase the name of the Zionist with a stone," that is a

12   reference to the Intifada and the stone throwing.  Would you

13   agree with that?

14   A.    It is a reference to the stone throwing, I would most

15   likely guess.

16   Q.    Okay.  Now, let's take a look at the next page.  There is

17   a reference here to Munkar and Nakir.  Do you know what that

18   is or who they are?

19   A.    I do not.

20   Q.    The Zionist character then in this skit says, I am the

21   Jew and I do not fight.  My daughters answer on my behalf."

22   Would you assume that to be the purpose of the skit is to call

23   the Israelis basically chickens, or to say that they are

24   cowardly?

25   A.    I wouldn't want to assume.

1    Q.   Okay.  Now, Mufid, the character that Mufid is playing,

2    says, "You as many as you kill of the children, elderly, and

3    women, and the people of Palestine do not die."  Do you see

4    that?

5    A.   I do.

6    Q.   And then the Zionist soldier responds, "This is not your

7    land.  This is our land.  And this is Yehuda and Samra and the

8    abundant land of my forefathers."  Do you know what Yehuda and

9    Samra mean?

10    A.   I believe it is an Israeli reference to parts of the West

11    Bank.

12    Q.   And Gaza, or just the West Bank?

13    A.   I am not sure.

14    Q.   Let's take a look on the next page.  And we are still,

15    for the record, on Mushtaha Search No. 1 clip F.

16        And now the Zionist says, the soldier says, "Do not say

17    Intifada.  This is nonsense.  The sling will not get me out,

18    nor the stone that is thrown on me."  And a sling I guess is

19    something you would use to throw a stone.  Right?  Like a

20    sling shot.

21    A.   Yes.

22    Q.   Now, you have said -- I think there is some question

23    about when this video dates from.  Originally the documents

24    that we looked at before the summary says 1988, but you are

25    now saying this is 1990.  Right?

1   A.   When I originally testified I identified it as 1990.

2   Apparently when the chart went off to print it got switched.

3   Q.   Which is five years before Hamas is designated?

4   A.   That is right.

5           MS. CADEDDU:   Could we take a look at Elbarasse

6   Search No. 32, please?   That is another video.   That would be

7   clip B.

8           (Whereupon, Elbarasse Search No. 32, Clip B was

9           played, while questions were propounded.)

10  Q.   (BY MS. CADEDDU)   Agent Burns, can you try -- I know it

11  is a little hard to see, but can you try to count the number

12  of band members you see in this clip for me?

13  A.   It looks like around eight.

14  Q.   Okay.

15          MS. CADEDDU:   Could you please show clip H, the

16  beginning?   Thank you, sir.

17          (Whereupon, Elbarasse Search No. 32, Clip H was

18          played, while questions were propounded.)

19  Q.   (BY MS. CADEDDU)   Now, Agent Burns, I think you had

20  originally identified this video as being from 1988 also.   Is

21  that correct?

22  A.   Elbarasse Search No. 32?   I believe so.

23  Q.   And so this one is Search No. 32.   This is actually --

24  What is going to come up in this clip is the same --

25  essentially the same skit we saw in the previous video.   Isn't

1   that right?  Or similar?

2   A.    It is similar.

3   Q.    And in both this character, who is dressed differently in

4   this skit, says, "I am the Zionist."  Isn't that right?

5   A.    He does.

6         MS. CADEDDU:  Could we take a look at Mushtaha

7   Search No. 8, clip B?

8              (Whereupon, Mushtaha Search No. 8, Clip B was

9              played, while questions were propounded.)

10  Q.    And this, Agent Burns, on the screen is Fawaz Mushtaha.

11  Isn't that right?

12  A.    Correct.

13  Q.    And once again, we see four band members here.  Is that

14  right?

15  A.    That is correct.

16  Q.    And I guess it looks like maybe Munzer Taleb, and the

17  other man you said you couldn't remember his name, Fawaz

18  Mushtaha, and Mufid Abdulqader?

19  A.    It looks like it.  I can't make out Munzer Taleb in this

20  frame, but we can see it later as the tape goes on.

21  Q.    The date of this tape, if you could check, is 1990.  Is

22  that right?  This is Mushtaha Search No. 8.

23  A.    It was '88 or '89.

24  Q.    Okay.

25         MS. CADEDDU:  Could we take a look at the document

1  camera again, please?

2  Q.  (BY MS. CADEDDU)  And I think there it says 1990.  Is

3  that a mistake also, Agent Burns?

4  A.  That is what I said.  I think when it went to print, they

5  flip-flopped those.  I think that is just a typo on the chart.

6  I think Mushtaha Search No. 8 should be where Mushtaha Search

7  No. 1 is.

8  Q.  Okay.  I just wanted to clarify that.

9       So that would have been about -- Mushtaha Search No. 8

10  would date from about seven years before Hamas was designated.

11  Is that right?

12  A.  About seven, yes.

13            MS. CADEDDU:  Could we take a look at InfoCom Search

14  No. 56, please?  And if you could look at clip C for me.

15            (Whereupon, InfoCom Search No. 56, Clip C was

16            played, while questions were propounded.)

17  Q.  (BY MS. CADEDDU)  Okay.  Agent Burns, would you count up

18  the number of band members you see on this video, please?

19  A.  I believe it is seven, if you count the half a guy off to

20  the left.

21  Q.  It is a little hard to get a full frame here, so I think

22  we will count it as seven.

23       And the date of this videotape, if you can check with me,

24  is 1991.  Is that right?  This is InfoCom Search No. 56.

25  A.  '91.

1    Q.   1991?

2              MS. CADEDDU:  Could we take a look at clip B,

3    please?

4              (Whereupon, InfoCom Search No. 56, Clip B was

5              played, while questions were propounded.)

6    Q.   (BY MS. CADEDDU)  Now, Agent Burns, this is a skit about

7    the Intifada.  Is that right?

8    A.   That is correct.

9    Q.   And this person here, who I think the Government has

10   identified as someone called Salah.  Is that right?

11   A.   He identifies himself on this tape.

12   Q.   Okay.  And he is playing an old man in this video.

13   A.   Yes.

14             MS. CADEDDU:  Could we have the document camera

15   back, please?

16   Q.   (BY MS. CADEDDU)  It is a little hard to read, Agent

17   Burns, because this one is kind of -- The margins are big.

18   But in this skit Salah, the guy who plays the older character,

19   says, "Today, today we will show the Jews a black day.  Yes,

20   of course, we are the youth of the Intifada or what?"  Is that

21   right?

22   A.   Yes.

23   Q.   And the reference to the youth is the reference to young

24   people in the Intifada throwing rocks.  Would you agree with

25   that?

1    A.   I think it says what it says there.  He is saying, "We

2    are the youth of the Intifada."

3    Q.   Okay.  And there was -- It was considered kind of a youth

4    movement.  Would you agree with that?

5    A.   The Intifada?

6    Q.   Uh-huh.

7    A.   It was an uprising, and it involved a number of parties,

8    and it was led by Hamas at this time.

9    Q.   Well, I am not asking you about that.  I am asking you

10   about the young people.  Was there -- Was it considered a

11   youth movement?  Was there a lot of discussion of the youth

12   and the youth throwing stones?

13   A.   I think you are talking about -- the term that they use

14   to reference youth is shabab, and it is a term of art in this

15   sense in that they consider themselves -- Like you said, this

16   gentleman on this tape is playing an old man and he still

17   considered himself a youth.

18   Q.   Okay.

19   A.   A part of the movement.

20   Q.   And shabab also means guys.  Right?

21   A.   I have seen it translated as youth.

22   Q.   And then the second part of this skit involves a

23   character played by Mufid Abdulqader.  Right?

24   A.   Yes.

25   Q.   Who comes into the screen.  And again I apologize.  It is

1    hard to read.  But the older man says to Mufid Abdulqader's

2    character, "Look here my son.  This stone is from Nablus."

3    And then he also says, "This, my son, is a stone.  It is from

4    Tulkarem."  And identifies a third stone that is from Silwad?

5    A.    Correct.

6    Q.    And would you agree those are the stones of the Intifada

7    and they are trying to be symbolic about the West Bank towns?

8    A.    The second part of your question about West Bank towns,

9    yes, those towns are in the West Bank.

10   Q.    Okay.

11   A.    I don't know about them being symbolic of the stones of

12   the towns.  I don't know about that.

13   Q.    That was an inartful question.  The reference to the

14   towns, those are towns on the West Bank.  This segment is an

15   attempt to invoke the towns of the West Bank.

16   A.    Those are towns in the West Bank.

17   Q.    Okay.

18          MS. CADEDDU:  Could we take a look, please, at HLF

19   Search No. 71, clip A, please?

20   Q.    (BY MR. CADEDDU)  And actually, Agent Burns, I think we

21   did this, but I want to make sure.  InfoCom Search No. 56, the

22   one we just looked at, the date of that is 1991.  Right?

23   A.    Correct.

24   Q.    And that would be four years before Hamas was designated.

25   A.    Correct.

1              MS. CADEDDU:  HLF Search No. 71, please, clip A.

2              (Whereupon, HLF Search NO. 71, Clip A was played,

3              while questions were propounded.)

4    Q.  (BY MS. CADEDDU)  Okay.  Here Agent Burns, we have five

5    band members.  Is that right?

6    A.  Correct.

7    Q.  Okay.  With Mufid Abdulqader I guess being--it is kind of

8    hard to see--but the second one from the left?

9    A.  That is correct.

10   Q.  And Fawaz Mushtaha to our right, the one in the middle?

11   A.  Correct.

12   Q.  This clip, I think you testified earlier, and you agreed

13   with Ms. Moreno, that there were other clips of documentary

14   scenes that were inserted into these videos.  Isn't that

15   right?

16   A.  They were there when we found the videos in the

17   originals.

18   Q.  So these are edited the way they were edited when you

19   found them?

20   A.  That is correct.

21   Q.  With documentary clips in the middle?

22   A.  I don't know that they are documentaries, but they are

23   scenes from abroad that are on these.

24   Q.  I just mean scenes not from the festival.  I am

25   contrasting those.

1    A.    Not from the festival.

2    Q.    Agent Burns, did you see where the scrolling text across

3    the bottom, "On December 8th we ignited it with our own

4    hands"?

5    A.    I did.

6    Q.    And that is a reference to the fact that the Intifada

7    started on December 8, 1987.  Is that right?

8    A.    That is what that reference is.

9    Q.    Agent Burns, can you see -- It is a little hard, but can

10   you see a number of band members up on the stage?  Can you

11   count how many there are?  There may be some obscured by the

12   flag.

13   A.    In the typical band uniform they wore I see four that are

14   not obscured by the flag, and then three possible guest

15   members dressed in the military fatigues.

16   Q.    Okay.  And then the flag that we see that is actually

17   obscuring our view a little bit, that is the Palestinian flag.

18   Right?

19   A.    Correct.

20   Q.    And this, Agent Burns, this is actually a clip from the

21   festival itself and it is another skit.  Is that right?

22   A.    It is a clip from the festival.  I think it was something

23   short like this, so I am not sure exactly what went on.

24   Q.    It appears to be a skit of Israeli soldiers beating

25   Muslims and pushing them off the stage.  Would you agree with

1   that?

2   A.   I think the little snippet was short, so it looks like

3   people in military fatigues and they have batons, but I didn't

4   see -- If we have more of the skit, I could probably answer

5   your question a little bit better, but from here I can't tell

6   that.

7   Q.   I think it is a brief segment.  Again, this video is from

8   1991.  Right?

9   A.   What was the videotape name?

10  Q.   It is actually HLF Search No. 71.

11  A.   I think we originally said '91 and then changed it to '90

12  when we were talking about it before, based on the content

13  inside it.  They were celebrating the end of the year of the

14  Intifada.  I think this is one I originally said 1991 and then

15  corrected myself with Mr. Jonas and said 1990.

16  Q.   Okay.  So we would need to correct that also on our --

17  A.   If it said 1991, it should say 1990.

18  Q.   1990 or 1989?

19  A.   1990.

20  Q.   '90.  Okay.  Now, what we are seeing here, what just came

21  on the screen is these would be, again, the interspersed

22  documentary, for lack of a better term, clips of the Intifada

23  that have been edited in.  Is that right?

24  A.   They are -- Can you repeat that one more time?

25  Q.   Sure.  These now are not the festival.

A.    Right.

Q.    These are clips of the Intifada.

A.    They are clips from abroad.  I don't know who put them in there, so I don't know exactly what they are clips of.

Q.    They appear to be the Intifada.

A.    Yes.

Q.    And that, when we are talking about the Intifada and stone throwing, this segment of the video clip depicts stone throwing at the --

A.    It does.  If you play a little bit more, you can see the people throwing stones.

Q.    Okay.  Let's continue.  And before we saw a video clip of an Israeli soldier beating a Palestinian man.  Did you see that?

A.    I did.

Q.    Now, Agent Burns, you have reviewed this videotape. Right?

A.    Yes.

Q.    With the translator I guess assisting you?

A.    The translators do the translations first, and then after we review the translation then we will watch the tape and they will make edits.

Q.    All right.  And this clip right here is a clip in which -- You see Mufid Abdulqader on the right?

A.    I do.

1    Q.    And in this clip this is another skit.  Correct?

2    A.    Yes.

3    Q.    And in this skit he is playing the character of Yasser

4    Arafat.  Right?

5    A.    I don't recall.

6    Q.    Yasser Arafat is the head of the PLO.  Right?  Or he was

7    before he died?

8    A.    He was.  He is deceased now, but he was.

9    Q.    And he was the head of Fatah, which is the secular

10   Palestinian party?

11   A.    That is correct.

12   Q.    Okay.  These are more Intifada clips.

13   A.    Yes.

14   Q.    Tear gas, I guess.

15         This, Agent Burns, would appear to be a barricade up in

16   the street.  Would you agree with that?

17   A.    I can't tell.  If you could rewind it just a little bit

18   and let me look at it.

19   Q.    Can you see that, Agent Burns, or is it too fuzzy?

20   A.    I can't really tell exactly what it is.

21   Q.    But you understand in the Intifada there were times when

22   the Palestinians barricaded off streets and gathered behind

23   those barricades.

24   A.    I have heard that.

25   Q.    Okay.  Thank you.  I am done with this one.

1      Could we take a look -- Let's actually go back to our

2  summary sheet, which I know is a little -- I am going to I

3  think correct -- Perhaps you can help me here.  Okay.  Just so

4  I have this right, Agent Burns, I think you said Mushtaha

5  Search No. 1 was 1990.

6  A.    That is correct.

7  Q.    And Mushtaha Search No. 8 is the one that is 1988?

8  A.    That is correct.

9  Q.    And then HLF Search No. 71 is actually 1990, we just

10  said.  Is that right?

11  A.    Yes.

12  Q.    Now, there are a couple of videos here that we haven't

13  talked about.  I am going through these in order, as you can

14  probably tell.  There is one in 1994, Mushtaha -- I am sorry.

15  HLF Search No. 125.  Can you see that, Agent Burns?

16  A.    I do.

17  Q.    Down here?

18          MS. CADEDDU:  Could we take a look at clip A of

19  that, please?

20          (Whereupon, HLF Search No. 125, Clip A was played,

21              while questions were propounded.)

22  Q.    (BY MS. CADEDDU)  Agent Burns, can you count up the

23  number of band members it shows on the screen here?

24  A.    It looks like eight.  I can't tell if the gentleman at

25  the podium -- It looks like he was speaking.  I don't know if

1   he was in the band or not.  So it is either eight or nine.

2   Q.   Eight or nine.  And in this video, as we said, I think,

3   is from 1994.  Right?

4   A.   That is correct.

5   Q.   Which would have been a year before Hamas was designated.

6   A.   It was October 30th, so it would have been a few months.

7   Q.   Okay.

8        MS. CADEDDU:  Could I have the document camera back,

9   please?

10  Q.   (BY MS. CADEDDU)  There was another video that you have

11  listed on the summary from 1994, and that is this one HLF

12  Search No. 11.  Right?

13  A.   Correct.

14  Q.   We are going to take a look at the transcript, the paper

15  transcript of that.  And here do you see that, Agent Burns?

16  It says, "God willing, we will introduce you to Al-Nujoom

17  Band."

18  A.   I do.

19  Q.   So that is one of the ways you dated the changing of the

20  band's name from Al Sakhra to Al-Nujoom?

21  A.   That is correct; seeing them introduced with a different

22  name.

23  Q.   And this was 1994.  Right?

24  A.   I believe it was December of 1994.

25  Q.   And then in 1995 you have identified that Hamas was

1    designated in January of 1995.  Right?

2    A.    That is correct.

3    Q.    And at that time it became illegal to provide material

4    support to Hamas.  Right?

5    A.    Yes.

6    Q.    But it didn't become illegal to talk about Hamas.

7    Correct?

8    A.    No, it did not.

9    Q.    And in fact, it has never been, and continues to this day

10   not to be illegal to talk about Hamas.  Correct?

11   A.    It is not illegal to talk about Hamas.  Correct.

12            MS. CADEDDU:  Let's take a look at HLF Search No.

13   124.  First I am going to keep the document camera for a

14   second.

15   Q.    (BY MS. CADEDDU)  This would have been the first video we

16   have seen that would postdate the designation of Hamas.

17   Correct?

18   A.    Correct.

19   Q.    And that is this one right here I have just marked, HLF

20   Search No. 124?

21   A.    It is.

22            MS. CADEDDU:  And I am going to ask for clip C to be

23   played, which is actually the only clip Mufid Abdulqader

24   appears in in this tape.  Could you play that for me, please?

25   Q.    (BY MS. CADEDDU)  That is actually Mufid Abdulqader that

1    the screen was just on.  Is that right?

2    A.    That is correct.

3    Q.    And now it is panning across.

4          MS. CADEDDU:  And then I believe document camera,

5    please.

6    Q.    (BY MS. CADEDDU)  We have one more, or actually two more.

7    We have one in 1996, HLF Search No. 112.  Do you see that one?

8    A.    I do.

9    Q.    And I believe you date that clip to sometime in 1996.

10   Right?

11   A.    Correct.

12          (Whereupon, HLF Search No. 112 was played, while

13          questions were propounded.)

14   Q.    (BY MS. CADEDDU)  Okay.  And again, we are going to take

15   a look at the words from that clip.  And in this clip we see

16   Munzer up here.  We have talked about him.  That is Munzer

17   Taleb.  Right?

18   A.    Correct.

19   Q.    And he is one of the band members you have identified and

20   we have identified a number of times from the videos.

21   A.    Yes.

22   Q.    And Munzer and the band are singing, and they say, "Under

23   the yolk of the Jew and the occupation, I do not fear if they

24   torture me while in detention."  Do you see that?

25   A.    I do.

1    Q.    And then there is a later clip in which Mufid Abdulqader

2    appears, and we are going to take a look at that, too, and

3    then we are going to play it.  Okay.  Do you remember this

4    clip, Agent Burns?

5    A.    I do.

6    Q.    And in this clip Mufid Abdulqader I think you said he was

7    speaking?

8    A.    He was.

9    Q.    And he is standing with a microphone and he says,

10   "Brothers and sisters, we received this message.  Brothers and

11   sisters we received this message.  The women's committee sends

12   a greeting from the bottom of the hearts to our captive Sheikh

13   Ahmad Yassin."  Do you see that?

14   A.    I do.

15   Q.    And Mr. Mufid Abdulqader is not a woman.  Right?

16   A.    No, he is not.

17   Q.    And he is not probably not on the women's committee.  Is

18   that correct?

19   A.    I don't know.

20   Q.    Unlikely.

21   A.    It is unlikely.

22   Q.    And he was reading from a piece of paper in this clip.

23   Is that correct?

24   A.    He was.

25           MS. CADEDDU:  Could we see the clip, please?  It is

1    HLF Search No. 112-B?

2              (Whereupon, HLF Search No. 112, Clip B was played,

3              while questions were propounded.)

4    Q.   (BY MS. CADEDDU)  Is there a piece of paper there in his

5    hand?

6    A.   Correct.

7    Q.   And he is still reading from the piece of paper.

8    Correct?

9    A.   Correct.

10   Q.   Thank you.  All right.

11            MS. CADEDDU:  Could we take a look -- Let's see

12   here.  The document camera again, please, for a second.

13   Q.   (BY MS. CADEDDU)  Now, we have come to the last of the

14   videos that are on your summary list, HLF Search No. 14.  Is

15   that right?

16   A.   Correct?

17   Q.   And that video dates, according to your chart, from 1996.

18   A.   Correct.

19            MS. CADEDDU:  Could we see clip A, please?

20            (Whereupon, HLF Search No. 14, Clip A was played,

21            while questions were propounded.)

22   Q.   (BY MS. CADEDDU)  Agent Burns, can you see how many men

23   there are standing behind the Palestinian flag?

24   A.   I think it is seven.

25   Q.   Okay.

1          MS. CADEDDU:  Could we take a look at clip B,

2     please?  And if you could play it.

3               (Whereupon, HLF Search No. 14, Clip B was played,

4               while questions were propounded.)

5     Q.   (BY MS. CADEDDU)  Okay.  Do you know who this gentleman

6     is who is standing here and I guess singing or chanting?

7     A.   I do.

8     Q.   Who is that?

9     A.   Mohamed Musphaka.

10    Q.   And the gentleman to his right who we will see in a

11    second that is not saying anything, is that Mufid Abdulqader?

12    Or to our right I guess, his left?

13    A.   It looks like it from here.

14    Q.   And so that was Mr. Abdulqader to that gentleman's left

15    or our right?

16    A.   Yes.

17    Q.   Is that right?

18    A.   Correct.

19    Q.   And he stood silent during the singing of this chant.  Is

20    that right?

21    A.   During that portion.

22    Q.   Uh-huh.

23          MS. CADEDDU:  If we could have the document camera

24    back.

25    Q.   (BY MS. CADEDDU)  And that, I believe, is the last of the

1   videos on this chart.  Is that right?

2   A.    That is correct.

3   Q.    And the date on those last two that we looked at is 1996,

4   as best you can tell?

5   A.    Correct.

6   Q.    Okay.  Before we talk about the rest of the chart, I am

7   actually going to turn right now to a conversation you talked

8   about in your direct examination with Mr. Jonas, and that is

9   Baker Wiretap No. 7.  And I am going to show you that on the

10  screen to reorient us.  And this is a conversation -- Actually

11  I think the part you put in is a conversation between Mufid

12  Abdulqader and Akram Mishal.  Is that correct?

13  A.    That is correct.

14  Q.    And it dates -- Let's look at the date here.  Can you see

15  that, Agent Burns?  It is from July 9th, 1998.

16  A.    Yes.

17  Q.    Akram Mishal is actually a Holy Land employee at this

18  time.  Is that right?

19  A.    He was.

20  Q.    And Akram suggests to Mr. Abdulqader, he says to him,

21  "And you start producing some sort of investment for yourself.

22  I mean, it will be -- There is an incentive for you to have a

23  certain percentage out of the revenue."  Correct?

24  A.    Correct.

25  Q.    And then a little further down Mr. Abdulqader says, "I've

been doing this for 12 years, Akram." And then he says, "My

brother, I've been working in this for 12 years." And Akram

says, "To become a senior, like they say, engineer and stuff.

So I expect that the best thing is for us to deal with you as

-- What do you think? Either on a certain task or --" And

then Mr. Abdulqader says, "Listen, listen. What do you think

of you and me sitting down together to discuss this issue?"

Is that right?

A. Correct.

Q. No resolutions come to at this meeting -- I mean in this

phone call.

A. No.

Q. Okay. And then we are going to take a look at Abdulqader

Wiretap No. 1. That conversation we just looked at, by the

way, we said was 1998. Right?

A. Correct.

Q. And then Abdulqader Wiretap No. 1, which is one of the

two that have been admitted that are from Mr. Abdulqader's

lines. Right?

A. Correct.

Q. That is dated January 2nd, 2000. Is that right?

A. Correct.

Q. Now, if we turn to page 9 of this exhibit, Abdulqader

Wiretap No. 1 -- Actually it is page 8, I believe. You know

what? The best laid plans.

1          MS. CADEDDU:  Give me one second, Your Honor.

2   Q.   (BY MS. CADEDDU)  All right.  I take that back, Agent

3   Burns.  Let's talk about Abdulqader Wiretap No. 2.

4   A.   Okay.

5   Q.   And that is -- Actually it looks like the same date.  Is

6   that right?

7   A.   I think we said the other one was the 2nd, didn't we?

8   Q.   So it is the next day.  And this conversation is between

9   Mufid Abdulqader and Sabri.  Right?

10  A.   Correct.

11  Q.   And Sabri is also a Holy Land employee.

12  A.   I know that he was affiliated with both the Holy Land the

13  IAP and the band, but I am not sure if he was an employee or

14  not.  I can't recall.

15  Q.   And do you -- Okay.  Well, anyway, he was -- The speakers

16  are Mufid Abdulqader and someone identified as Sabri.  Right?

17  A.   Correct.

18  Q.   Okay.  And they are talking in this -- To refresh your

19  recollection, they are talking in this excerpt about one of

20  the volunteer fundraising trips that Mr. Abdulqader had taken

21  to Boston and some other places.  Do you recall that?

22  A.   I recall the conversation.  I know that -- Well, we had 1

23  and 2.  One of them was to Boston one of them was to somewhere

24  else.

25  Q.   Okay.  Well, let's take a look here real quick.  Okay.

1    Down here at the bottom, "I went to Hartford, first of all.  I

2    went to Boston that night."  Do you see that?

3    A.    I do.

4    Q.    And then some discussion about Hartford, Connecticut at

5    the top?

6    A.    Correct.

7    Q.    Do you remember that conversation?

8    A.    I do.

9    Q.    Now, if we take a look at page 9 of Abdulqader Wiretap

10   No. 2, what we see is Mr. Abdulqader is talking to Sabri about

11   a fundraiser that he did at the Carrollton mosque.  Do you see

12   that?

13   A.    I do.

14   Q.    And Mufid says, "Of course, yesterday the brothers in

15   Carrollton had called me because they wanted me to do a

16   fundraising for their mosque in Carrollton.  So I prepared the

17   material yesterday.  I kept preparing the material yesterday,

18   and thanks be to God I prepared it and organized everything

19   and went over and did a fundraising for them as well, and also

20   collected about $35,000 to $40,000 for their mosque."  And

21   Sabri says, "Okay.  Why don't you take a percentage of what

22   you're collecting?"  Now do you remember that?

23   A.    I do.  You may want to scoot it over a little on the

24   screen.

25   Q.    Okay.  I am trying to get it big enough so it can be

1    read, and I am losing parts of it.  And what I just read is

2    this section and this section.  Is that right?

3    A.    Correct.

4    Q.    And let's go back.  Sabri says, "Why don't you take a

5    percentage of what you're collecting?"  And Mufid says, "No, I

6    uh" -- Do you see that?

7    A.    I do.

8    Q.    And then Mufid says, "If God the Almighty gives us a

9    reward for it and accepts it purely, I'll be happy.  That's

10   all I want."  Right?

11   A.    Correct.

12   Q.    And I would like to take a look again at the bottom part

13   of this Demonstrative No. 19.  And when I talk about the Mufid

14   summary chart, I am talking about Demonstrative No. 19.

15   Right?

16   A.    That is correct.

17   Q.    That is what we have been referencing throughout.

18   A.    That is correct.

19   Q.    Now, we talked last week about HLF Search No. 147, and I

20   am just going to put that up there.  That is the first one on

21   the list here after the videos.  Do you see that, Agent Burns?

22   A.    I do.

23   Q.    And that is a document that dates from 1997, according to

24   the chart?

25   A.    Correct.

1    Q.   And I am going to zoom out so we can see it, at least

2    what it looks like.  This is the chart we talked about before.

3    Right?

4    A.   Correct.

5    Q.   And I think we said that this is the one that looks like

6    it may have been put together by -- Was it Kifah Mustapha in

7    Chicago?

8    A.   That is whose office it was found in, yes.

9    Q.   And so since we have talked about that, I would like to

10   move on to the next exhibit on this list, which is HLF Search

11   No. 142.  Do you see that, Agent Burns?

12   A.   I do.

13   Q.   And that one, according to your chart, dates from 1998.

14   Correct?

15   A.   Correct.

16   Q.   There is about a year gap in between those two exhibits?

17   A.   Correct.

18   Q.   And I don't remember if we looked at this last week or

19   not.  This is actually a printout I guess of a computerized

20   scheduling program.  Is that what it looks like it is?

21   A.   It is a weekly to do list.  I can't tell if it was

22   printed off of a computer or not, but obviously it is

23   typewritten.

24   Q.   Okay.  And you can barely see it at the top, but does it

25   have a name under the weekly to do list?

1  A.   It says Akram.

2  Q.   And this there is a notation on here--I am going to try

3  to zoom in there--on Wednesday June 3rd of 1998 that says,

4  "Rescheduled the trip of Mufid to San Diego June 5th in early

5  flight to give Khutba in" -- I don't know how to say that.

6  "Masjid Annoor."  Do you see that, Agent Burns?

7  A.   I do.

8  Q.   And then over here Friday June 5th, the total amount

9  raised is $25,000.  Do you see that?

10  A.   I do.

11  Q.   Okay.  And that is an entry that is actually not talking

12  about the band, but about one of Mufid Abdulqader's volunteer

13  fundraising trips.

14  A.   It says he was going to speak, so that would indicate, as

15  opposed to singing in the band -- He may have sung in the band

16  as well, but that entry indicates he was going to speak there.

17  Q.   Okay.  Well, let's talk about the terminology that is

18  used over here.  It says Khutba, and that is the Friday sermon

19  at a mosque.  Right?

20  A.   Basically.

21  Q.   So he was going to speak at a sermon at a mosque to raise

22  money.

23  A.   Correct.

24  Q.   And then we are not going to look at it again because I

25  think we already have, but there was Baker Wiretap No. 6, and

1    that is a conversation that the Government put into evidence

2    with Haitham Maghawri about a volunteer fundraising trip to

3    Kent in Salt Lake City.  Do you remember that one?

4    A.   If we are going to talk about it, I probably want to look

5    at it.

6    Q.   We are not going to talk about it.  We talked about it

7    last week, or you did.  Right?

8    A.   Yes.

9    Q.   And that conversation took place in 1999.  Right?

10   A.   That is correct.

11   Q.   And that involved another one of those volunteer

12   fundraising trips taken by Mufid Abdulqader for Holy Land.

13   A.   It involved a fundraising trip.

14   Q.   A volunteer fundraising trip.  Correct?

15   A.   I don't know if he got paid for it or not.

16   Q.   You don't have any evidence in the record before the jury

17   that he got paid for it.  Right?

18   A.   That is correct.

19   Q.   All right.  So let's take a look at HLF Search No. 143.

20   And I don't remember seeing this either, so I just want to go

21   over it.  Can you see that, Agent Burns?

22   A.   I can, but if we are going to read at the bottom we may

23   have to --

24   Q.   I will zoom up.  I just wanted you to see the whole

25   thing.  Is that a daily planner page again?

1   A.   It is.

2   Q.   And it says again at the top Akram?

3   A.   Yes.

4   Q.   And then down here at the bottom it says, "Followed up

5   with Mufid, total raised in Austin $10,000 with Riad and

6   College Station $3200."  Right?

7   A.   Correct.

8   Q.   Can you read that there?

9   A.   Yes.

10  Q.   I kind of zoomed in a little too much.  That is another

11  one of those fundraising trips.  Right?

12  A.   That was a fundraising trip to the HLF, yes.

13  Q.   Again, the Government didn't put in any evidence that he

14  got paid for that trip.  Right?

15  A.   No.

16  Q.   All right.  And then we have Abdulqader Wiretap No. 1 and

17  2.  And we are not going to go through those again.  Those are

18  the two calls you went over with the jury last week.  Right?

19  A.   Correct.

20  Q.   And in one of those, Abdulqader Wiretap No. 2 is the one

21  we just looked at, you and I together.

22  A.   Correct.

23  Q.   And also I think with Mr. Jonas you took a look at that

24  Eid bonus check.  You went through that with him, the $1,000

25  check.

1   A.   We went through that exhibit, yes.

2   Q.   And Eid is a Muslim holiday.  Right?

3   A.   Correct.

4   Q.   So the next one on this list is HLF Search No. 145, and

5   that, you say, is a receipt for payment to Mufid Abdulqader.

6   Right?

7   A.   Correct.

8   Q.   And that -- It is actually not a receipt exactly.  It is

9   a check stub, like when you print out a check there is like a

10  bottom part.

11  A.   Right.

12  Q.   Let's take a look at that real quick.  All right.  So

13  this check, I guess it is check No. 4311, we see over here on

14  the right.

15  A.   I do, yes.

16  Q.   And it gives a date of September 12th, 2000.  Correct?

17  A.   Correct.

18  Q.   Can you see it?  And then there in the middle the

19  description, "San Diego and Florida events."  Is that right?

20  A.   That is correct.

21  Q.   And this is the Government's exhibit?

22  A.   It is.

23  Q.   It has one page?

24  A.   Yes.

25  Q.   Do you know what this check was for?

1   A.   It says San Diego and Florida events.

2   Q.   So did you take a look at any of the associated

3   documents?

4   A.   I did, but it has been a while.

5   Q.   All right.  Well, let's do that now.

6          MS. CADEDDU:  Your Honor, at this time I am going to

7   move Defense Exhibit No. 1351 and there is no objection, I

8   don't think.

9          THE COURT:  Yes.  That has been admitted previously.

10  Q.   (BY MS. CADEDDU)  Okay.  Agent Burns, this is the same

11  check again.  Right?  That we just took a look at before?

12  A.   Correct.

13  Q.   And this check I would like to direct your attention to,

14  and I am going to move it over.  This is, for the record, page

15  1 of Defense Exhibit No. 1351.  Do you see that little number

16  right down there in the bottom right of the check, Agent Burns

17  and the $3,489.90 figure?

18  A.   It is.

19  Q.   And that is the Government's bates stamp?

20  A.   Correct.

21  Q.   So HLDL is the Holy Land Dallas office.  Right?

22  A.   That is correct.

23  Q.   So these would be documents that came out of the Dallas

24  office of the Holy Land foundation?

25  A.   Correct.

1  Q.   And 22 would be, you all divided them up, put things into

2  boxes, and the 22 would be reference to box 22.  Right?  And

3  then these were all scanned in, and each page was actually,

4  front and back, was assigned a separate identification number,

5  and that is the number we see on the right.

6  A.   That is correct.

7  Q.   I would like to turn, if we can, to page 2 of Defendants'

8  Exhibit No. 1351 Can you see that, Agent Burns?

9  A.   I do.

10  Q.   And this again is the Government's bates stamp number

11  this is page 2 of Defendants' No. 1351.  Correct?

12  A.   Correct.

13  Q.   And that bates number is HLDL22, which indicates it comes

14  out of box 22 from the Holy Land Dallas office.  Right?

15  A.   That is correct.

16  Q.   Then the second number is 2453, which is the number that

17  identifies this particular page.

18  A.   Where it came in the box.

19  Q.   And do you happen to remember the bates number from the

20  check, or shall we take a look at that, too?

21  A.   Let's take a look.

22  Q.   Okay.  So the number on -- The bates number on the check

23  that we just looked at is the first page of Defense Exhibit

24  No. 1351, and also that is the entire exhibit of HLF Search

25  No. 145 is 2452.  Right?

1   A.   Right.

2   Q.   And then this number that appears on the second page of

3   Defendants' Exhibit No. 1351 is 2453.  Right?

4   A.   Correct.

5   Q.   So that shows it is the next page after the check in the

6   box.

7   A.   It does.

8   Q.   And then we are going to look at just the bates numbers

9   real quick.  And then page 3 of Defendants' Exhibit No. 1351

10  is bates No. 2454, which is again the consecutive page.

11  Right?

12  A.   Right.

13  Q.   Page 4 of Defense Exhibit No. 1351 is bates numbered

14  2456.

15  A.   Correct.

16  Q.   It looks like there might have been another page in the

17  middle there.  Right?

18  A.   It would have been 2455.

19  Q.   Right.  But it is two away from the others in the scan?

20  A.   Correct.

21  Q.   And then 2457, that is the next consecutive number?

22  A.   Correct.

23  Q.   No. 2458?

24  A.   Correct.

25  Q.   It looks like 2459, although it is kind of cut off.  Do

1   you see that?

2   A.   It looks like 2459.

3   Q.   So these pages, 2 through whatever that was, 6, those are

4   basically the consecutive pages that appear in the box that

5   the Government has behind the check that is Government's

6   Exhibit No. 145.

7   A.   Correct.

8   Q.   HLF Search No. 145.

9        Okay.  So let's take a look again at the check.  The

10  check is for the amount of $3,489.90.  Right?

11  A.   Right.

12  Q.   And then let's look at page 2 of Defendants' Exhibit No.

13  1351.  All right.  And this appears to be a handwritten

14  document.  It says July 16th, 2000, HLF San Diego.  Right?

15  A.   Correct.

16  Q.   And then it lists tickets, and it has Mufid and Ali

17  Ahmad.  Do you see that?

18  A.   I do.

19  Q.   It says $778.  Right?

20  A.   Correct.

21  Q.   Below it says Munzer, $392.  Right?

22  A.   Correct.

23  Q.   And it says "paid by Nujoom."  Do you see that on the

24  right there is a reference to Nujoom or Al-Nujoom on the

25  right?

1    A.    I can't see if it says paid to Nujoom -- I think it says

2    "pay to Nujoom."

3    Q.    It is the Nujoom I am directing your attention to.  It is

4    a reference to the band.  Right?

5    A.    Correct.

6    Q.    And then there is another name there with it looks like

7    the cost of a ticket, $364.

8    A.    Yes.  I can't tell what that name is, but that is what it

9    says.

10   Q.    I can't either, so we won't worry about it.  And then it

11   says below 4 participants.  4 times $250 is $1,000.  Right?

12   A.    Correct.

13   Q.    And so then the total we have of that is $2,534.

14   Correct?

15   A.    Correct.

16   Q.    On this handwritten document here.

17   A.    Yes.

18   Q.    Now, I am going to ask you to remember that $778 ticket

19   figure from page 2 of Defense Exhibit No. 1351, and we are

20   going to turn to page 3.  This actually looks like a travel

21   agency invoice.

22   A.    It does.

23   Q.    And then it says Mufid Abdulqader and Ahmad Ali.  Right?

24   A.    Correct.

25   Q.    And then down here in the bottom it has got the $778

1  figure we just talked about.  Right?

2  A.    Correct.

3  Q.    Okay.  Then this is page 4 of Defendants' Exhibit No.

4  1351.  This appears to be similar to the handwritten document

5  we took a look at before.  Right?  It has got fort Lauderdale,

6  6/25/2000.

7  A.    Correct.

8  Q.    And it lists three participants at $250 each.  Right?

9  A.    Right.

10  Q.    And then expenses.  And it lists here -- We don't have

11  tickets, but we have hotel, $143.03; car rental, $42.26; and

12  gas and maybe miscellaneous?

13  A.    Correct.

14  Q.    And that is $20.61, for a total of $205.90.  Right?

15  A.    Right.

16  Q.    And then I am going to ask you to try to remember those

17  $143, $42, and $20 figures.  Let's take a look at -- I don't

18  think we are going to do those in order, but what we have here

19  is some receipts.  Do you see that?

20  A.    I do.

21  Q.    And it says Lois BP.  Do you see that?

22  A.    I do.

23  Q.    And I guess that could be BP gas station?

24  A.    That would be my guess.

25  Q.    And then over here on the right we have Hess Express, and

1  it shows a 28 ounce hot dog, I think.

2  A.    I think it is 20 ounce.

3  Q.    Okay.  It would be a big hot dog, 28 ounces.  And then

4  merch, which I guess would be merchandise, for a total there

5  of $2.44.

6  A.    Correct.

7  Q.    It is a little hard to read, I know.  And then at the

8  bottom of that page it says Florida turnpike toll receipt.

9  Right?

10 A.    Correct.

11 Q.    And again, the bates number on this is 2457.  Can you see

12 that?

13 A.    I do.

14 Q.    All right.  And then the page that is bates number 2458

15 is -- It looks like it says -- This is not an invoice, but it

16 is from Hertz.  Right?

17 A.    Correct.

18 Q.    And then over on the side it says -- It has got a whole

19 bunch of numbers over here, subtotal $39, fuel and service.

20 Right?

21 A.    Correct.

22 Q.    And then down at the bottom or a little further down it

23 says adjusted $62.10, pay $44.81.  And then even further down

24 here there is a little notation here $42.26.  Do you see that?

25 A.    I do.

1  Q.   And I am actually going to go back to the handwritten

2  document.  Do you see that $42.26 there?

3  A.   I do.

4  Q.   And then the $20.61 would that be approximately what

5  those three little receipts totaled up to?

6  A.   I would need a calculator.

7  Q.   Well, take my word for it.  It is actually 16 cents off.

8  He didn't add the tax on it.

9  A.   All right.

10 Q.   Let's go back then to the last page of this exhibit,

11 which is bates number 2459.  This is one that was hard to

12 read.  Do you see that?

13 A.   I do.

14 Q.   This looks are like a credit card bill.

15 A.   It does.

16 Q.   And the cardholder is Mufid Abdulqader.

17 A.   Right.

18 Q.   It is kind of hard to see, I have a Braums Ice Cream in

19 Richardson Texaco, Citgo, and then Tampa Airport Hilton.  Can

20 you see that about three down?

21 A.   I do.

22 Q.   It is kind of above the Blockbuster and below the Citgo.

23 And if we scroll across the dollar figure, there is $143.03.

24 Right?

25 A.   Correct.

1  Q.   Okay.  And that figure once again, if we go back to the

2  Florida trip, handwritten $143.03 is the same figure we see on

3  this receipt.  Right?

4  A.   Correct.

5  Q.   So these receipts that we see that constitute Defense

6  Exhibit No. 1351 are the receipts that underlie the check that

7  is actually Holy Land Search No. 145.  Government's exhibit

8  Holy Land Search No. 145.  Correct?

9  A.   I can't say for sure that they underlie it, but they

10  certainly relate to the two trips to San Diego and Florida

11  referenced on that trip.

12  Q.   Those are the receipts for the expenses.

13  A.   That he turned over to them, but I would want to add them

14  up and see, you know -- They relate to it.

15  Q.   We can certainly -- Do you have a pen up there?

16  A.   I don't.

17  Q.   We can certainly add them up.  And in fact I should have

18  done that.  I apologize.  It happens that I have a pencil.

19        MS. CADEDDU:  May I approach, Your Honor?

20        THE WITNESS:  A calculator would be better.

21  Q.   (BY MS. CADEDDU)  I agree.  It is a math test.  So let's

22  take a look.  And if you, Agent Burns, could write down

23  $2,534.

24  A.   I guess my question is before I add all these up, if we

25  could look at the top, because I thought it said at the top

1    that the $778 was supposed to be paid to the travel company.

2    We can add them up.  I just wanted to see if all of these --

3    because I think what you are asking is if this amount should

4    have been paid to Mufid Abdulqader.  And based on this, it

5    just said pay to the travel company, so I am confused.

6    Q.   Well, I mean, what we have is what we have, so let's take

7    a look at the number on the bottom and add them together,

8    shall we?

9    A.   Okay.

10   Q.   $2,534.  Got that number?

11   A.   I do.

12   Q.   And then $205.90?

13   A.   Okay.

14   Q.   And those two figures added together, I hope, I think,

15   total -- I did it last night but I had a calculator.  They

16   total $3,489.90.

17   A.   I had $2,534 plus $205.90 equals $2,739.90.  And I think

18   that included what it indicated like $250 per band member per

19   event.  That was not explained.

20   Q.   I apologize.  You are right.  Okay.  Let's do this.

21   $2,534 plus--you are correct--$205.90, plus $750.

22   A.   And those are -- That is the three payments of $250 per

23   band member?

24   Q.   That is correct.  Tell me what you get?

25   A.   Well, it is close.  So I was adding $2,739.90 plus

1    $750.00.  $3,489.90.

2    Q.   There you go.  And that is the number.  That is the

3    amount on the check.  Is that right?

4    A.   Correct.

5    Q.   Okay.  Agent Burns, I would like to talk -- Let's see.  I

6    have got my papers all mixed up here.  There is one more on

7    our summary chart, and that is this one, No. 146.  And I think

8    we have HLF Search No. 23, but I think we are going to have

9    somebody else talking about that later.  Is that right?

10   A.   I believe so.

11   Q.   All right.  So HLF Search No. 146 is from 2001, and it

12   has an entry showing Abdulqader at a fundraiser in San Diego.

13   Is that what it says?

14   A.   Correct.

15         THE COURT:  Let's go ahead and take the morning

16   break.  Be back at 11:20.

17         (Whereupon, the jury left the courtroom.)

18         THE COURT:  We will be in recess until 11:20.

19               (Brief Recess.)

20         THE COURT:  Ms. Cadeddu?

21         MS. CADEDDU:  Thank you, Your Honor.

22   Q.   (BY MS. CADEDDU)  All right.  Agent Burns, I think we

23   were at the last entry we were going to talk about today on

24   the bottom of the summary chart.  Right?  Down here, 2001, HLF

25   Search No. 146.  Do you see that?

A.    I do.

Q.    Okay.  Let's take a look at that.  And again, this looks

like some sort of calendar entry, as best we can tell?

A.    This looks a little bit different than the others.  It

looks a little more like it is for a specific event, but it

definitely has your time and other information on it.  It is a

little different than those calendar entries.

Q.    And then at the bottom it lists -- First it says date,

location of the event, and this is from it looks like June

16th, 2001.

A.    That is correct.

Q.    And the location in San Diego.  And then it has got a

list of speakers, tickets, and how many will be issued or they

will try to sell, fliers and posters, and second from the

bottom it says band.  Do you see that?

A.    I do.

Q.    It says Mufid, Monzur, Sabri, and Kifah.  Right?

A.    Correct.

Q.    And Mufid is my client, Mufid Abdulqader.  And Monzur is

Munzer Taleb.  We talked about him before?

A.    That is correct.

Q.    We identified him from the videos?

A.    That is correct.

Q.    Sabri we talked about as someone who was in the band

occasionally.

1    A.    Correct.

2    Q.    And then Kifah is Kifah Mustapha from Chicago.  We talked

3    about him, too.  Right?

4    A.    Right.

5    Q.    I want to turn to a couple of other -- actually one other

6    document that you looked at earlier in your direct examination

7    testimony, and that is Holy Land Foundation Search No. 2.  Do

8    you recognize this document?

9    A.    I do.

10   Q.    It is hard to see.  This document is a Holy Land employee

11   list.  Right?

12   A.    That is correct.

13   Q.    And so we have got down this left side a list of names.

14   Right?

15   A.    That is correct.

16   Q.    And then across the top -- I am moving it this way

17   because it is so small it is hard to see.

18   A.    I understand.

19   Q.    Here if we pan across, we can see there are different

20   years.  Right?  Starting with 1990.  And it would appear that

21   the years correspond to the years that the particular people

22   on the row down the side worked for the Holy Land Foundation.

23   Is that right?

24   A.    Well, on the far right I believe is the column that lists

25   date of hire, although we have established a couple of those

1   were off a little bit, but I think that is where you look to

2   see generally the date of hire.

3   Q.   So the right hand column is date of hire and across the

4   top or across the rows it shows what the salary was for each

5   of those years?

6   A.   Yes.

7   Q.   For each of those employees?

8   A.   Yes.

9   Q.   Sorry.  I didn't mean to interrupt you.

10  A.   Okay.

11  Q.   And you have -- This is a Government exhibit.  Right?

12  A.   That is correct.

13  Q.   And you have reviewed this, of course --

14  A.   Yes.

15  Q.   -- in preparation for your testimony, and even before

16  that.

17  A.   That is correct.

18  Q.   And Mufid Abdulqader's name does not appear on this list.

19  Is that right?

20  A.   That is correct.

21  Q.   It would appear that it is alphabetical by first name.

22  Is that right?

23  A.   That is what it looks like.

24  Q.   And so if we pan down here to the Ms, you can see some

25  other names but no Mufid Abdulqader.  Right?

```
 1   A.   Correct.

 2   Q.   Okay.  And Mufid Abdulqader was not on the Holy Land

 3   board of directors.

 4   A.   No, he was not.

 5   Q.   His name is not listed on any of the Holy Land Foundation

 6   minutes.

 7   A.   None that we have discussed here.

 8   Q.   He didn't have a desk at the Holy Land Foundation office?

 9   A.   That is correct.

10   Q.   Didn't have a telephone?

11   A.   That is correct.

12   Q.   Didn't have a computer?

13   A.   That is correct.

14   Q.   And during the whole time that he was a Holy Land

15   volunteer fundraiser he was actually employed, as you know, by

16   the City of Dallas.  Correct?

17   A.   He was employed by the City of Dallas from 1995 until

18   approximately 2001, I believe.

19   Q.   Okay.  And he was a senior engineer with the City of

20   Dallas in their public works department.  Correct?

21   A.   That is my understanding.

22   Q.   And his name isn't on any of the Holy Land Foundation

23   wire transfer forms?

24   A.   The ones that we are talking about as far as the money

25   going overseas?
```

1    Q.   Yes.  His name is not on any Holy Land Foundation wire

2    transfer authorizations.

3    A.   That is correct.

4    Q.   He is not a signer on any Holy Land Foundation checks.

5    A.   That is correct.

6    Q.   And actually I think you said this already, but he is an

7    American citizen.  Right?

8    A.   Yes, he is.

9    Q.   And he moved to the United States in about 1980.  Is that

10   your understanding?

11   A.   Early '80s.  I am not sure of the exact year.

12        MS. CADEDDU:  Thank you, Your Honor.  Pass the

13   witness.

14        THE COURT:  Thank you.

15      Ms. Hollander?

16        MS. HOLLANDER:  Yes, sir.

17                     CROSS EXAMINATION

18   By Ms. Hollander:

19   Q.   Good morning, Agent Burns.

20   A.   Good morning.

21   Q.   It is morning.  I will try this again, if we don't freeze

22   to death.

23   A.   Okay.

24   Q.   Agent Burns, I am going to start going in a little bit

25   different order this time.  But kind of where we left off, you

1    had mentioned that Shukri Abu Baker is also called Abou

2    Mohamed.  Right?

3    A.    Yes, he is.

4    Q.    All right.  And Shukri is a citizen of the United States,

5    isn't he?

6    A.    He is.

7    Q.    But he was born in Brazil.  Correct?

8    A.    I think that is correct, but I am not positive on that.

9    Q.    Now, I want to go in chronological order.  We are going

10   to -- I don't want to leave this up because it blocks

11   everybody's view, but we are going to start in 1985.  Okay?

12   A.    Okay.

13   Q.    And that is actually off this chart, but ten years before

14   Hamas was designated.  Okay?

15   A.    Okay.

16   Q.    Now, you agree that the date that Hamas was designated as

17   a specially designated terrorist and the date that Hamas was

18   designated a foreign terrorist organization are important

19   significant dates, are they not?

20   A.    Yes, they are.

21   Q.    And you testified on direct that on your summary charts,

22   on some of your summary charts you actually added the two

23   lines showing those dates.  Correct?

24   A.    Yes, we did.

25   Q.    Okay.  But you didn't include that information on all of

the charts, did you?

A.    I am not sure.  I thought they were on all the financial

charts, but maybe not on the really early ones like the 1988

and 1989 disbursements, because those are self-explanatory

that those are for those years.

Q.    Let's just look at those just to make sure.  One of the

charts is K&A Trading.  Correct?

A.    Correct.

Q.    And that one doesn't have the dates on it, does it?

A.    No.  And I am sorry if there was some confusion.  I

thought we were talking about the charts of the HLF's money

being wired overseas to the committees, the charts we

introduced that last day that happened over a number of years.

Q.    Okay.  But this chart doesn't have the date on it, does

it?

A.    No, it does not.

Q.    So that would be correct to add to it, wouldn't it?

A.    You can add it, yes.

          MS. HOLLANDER:  Your Honor, since I changed the

Government's exhibit, I would like to introduce this as

Defendants' K&A.

          THE COURT:  You are calling it Defense K&A?

          MS. HOLLANDER:  I am calling it the same thing the

Government calls it for convenience, but it is just the

Defense.

1        THE COURT:  Okay.  Mr. Jonas?

2        MR. JONAS:  I guess I am kind of confused.  Is this

3   being offered as a demonstrative?  Ms. Hollander is the one

4   that testified about it.

5        MS. HOLLANDER:  No, I believe Agent Burns just

6   testified that those dates were correct, and I added them to

7   the chart, Your Honor, and I move this as an exhibit.

8        THE COURT:  Okay.  Objection to the chart?

9        MR. JONAS:  Is it being offered as a demonstrative

10  or is it being offered as a substantive --

11       MS. HOLLANDER:  It is being offered as a substantive

12  exhibit, Your Honor.

13       MR. JONAS:  Ours is in as a 1006 summary.

14       THE COURT:  So she is offering it also in the same

15  way as a substantive.

16       MR. JONAS:  We object to it as a 1006 summary

17  because what she wrote doesn't summarize the voluminous amount

18  of evidence.

19       THE COURT:  The exhibit is in.  I will overrule that

20  objection and admit that with that additional information.

21  That is admitted.

22       MS. HOLLANDER:  Thank you, Your Honor.

23  Q.   (BY MS. HOLLANDER)  Now, you also have a summary chart,

24  it is a three-page chart and it is entitled "payments between

25  Marzook and Defendants."  Correct?

```
 1    A.    Correct.

 2    Q.    Can you see this well enough to know that that is your

 3    chart?

 4    A.    Yes.

 5    Q.    Okay.  And there are three pages to that chart.  Correct?

 6    A.    Correct.

 7    Q.    And that summary ends on, it is hard to see, but

 8    12/26/1990.  Correct?

 9    A.    That is correct.

10    Q.    All right.

11    A.    Well, on that page I think this was one of those charts

12    where the transactions, because we were dealing with multiple

13    recipients, you will see if you look at it there would be a

14    set of transactions between two parties, and they would be in

15    chronological order.  So I think if you look back you are

16    going to have some dates later on between the HLF and Marzook

17    in '92.

18    Q.    Right.  You are correct.  And here is the '92.  Right?

19    A.    That is correct.

20    Q.    But the latest date on there is the 1992 date.  Correct?

21    A.    I believe so.

22    Q.    Okay.  Do you have any question about that?  Do you need

23    to look at that?

24    A.    No, I believe that is correct.

25    Q.    It is correct, based on the documents you reviewed.
```

1    Right?

2    A.    That is correct.

3    Q.    I mean, you intended it to be correct.  Correct?

4    A.    That is correct.

5    Q.    All right.  So even the 1992, that also was before Hamas

6    was designated in 1995.  Correct?

7    A.    Correct.

8    Q.    And before it was designated in 1997.

9    A.    That is correct.

10   Q.    So it would be correct to add, as you did to those other

11   summary charts, to add that those two dates are correct,

12   wouldn't they?

13   A.    That is correct, yes.

14          MS. HOLLANDER:  Your Honor, I move this as

15   Defendants' Exhibit Marzook/Defendants, a summary.  I am

16   moving it into evidence.

17          THE COURT:  Marzook/Defendants?

18          MS. HOLLANDER:  Yes, sir.

19          THE COURT:  Mr. Jonas?

20          MR. JONAS:  No objection, Your Honor.

21          THE COURT:  Admitted.

22   Q.    (BY MS. HOLLANDER)  And you also introduced one called

23   Occupied Land Fund 1988 disbursements.  Correct?

24   A.    Correct.

25   Q.    And that is this one.  Correct?

1    A.    That is correct.

2    Q.    And this one is four pages.

3    A.    I would have to look to count, but I am assuming you are

4    correct.

5    Q.    Okay.  And tell me if you need to look at the whole

6    thing, but I think every single date on here is 1988.

7    A.    That is correct.  It was a 1988 disbursement, so --

8    Q.    So that explains that, doesn't it?

9    A.    Yes.

10   Q.    So that one, too, if we add the dates that Hamas was

11   designated, that would be accurate, wouldn't it?

12   A.    Yes.

13   Q.    So adding that at the end of your chart.  Okay.

14   A.    Okay.

15          MS. HOLLANDER:  Your Honor, we will move to

16   introduce that as OLF 1988.

17          THE COURT:  Mr. Jonas?

18          MR. JONAS:  No objection.

19          THE COURT:  Admitted.

20   Q.    (BY MS. HOLLANDER)  I think we have two more, Agent

21   Burns.  You also had a summary chart of Occupied Land Fund

22   1989 disbursements.  Correct?

23   A.    Correct.

24   Q.    And that is this one.  Correct?

25   A.    Correct.

```
1    Q.   And since it is 1989 disbursements, that one is three

2    pages, and everything on it is 1989.  Correct?

3    A.   That is correct.

4    Q.   Just to speed things up, I have used some ellipses, but

5    that is accurate information as well, isn't it?

6    A.   Correct.

7              MS. HOLLANDER:  Your Honor, I move this one as

8    Defendants' OLF 1989.

9              THE COURT:  Mr. Jonas?

10             MR. JONAS:  No objection.

11             THE COURT:  Admitted.

12   Q.   (BY MS. HOLLANDER)  And then we have -- you made one

13   called payments from Marzook to IAP.  Correct?

14   A.   Correct.

15   Q.   And that is this one.  Correct?

16   A.   Yes.

17   Q.   And the dates on there, '85 -- Oh, that one -- I think I

18   actually typed it on this one, being a little ahead of myself,

19   being that the latest date on that is '99.  Correct?

20   A.   Correct.

21   Q.   So if we add the designations on there, that would be

22   accurate, too, wouldn't it?

23   A.   Yes.

24             MS. HOLLANDER:  Your Honor, I move this one into

25   evidence as Defendants' Marzook/IAP.
```

```
 1              THE COURT:  Mr. Jonas?

 2              MR. JONAS:  No objection.

 3              THE COURT:  Admitted.

 4   Q.  (BY MS. HOLLANDER)  We have one more.  And payments from

 5   Marzook to UASR.  Do you remember that one?

 6   A.    I do.

 7   Q.    Okay.  And that is it?

 8   A.    Correct.

 9   Q.    And the dates on there are all 1992.  Correct?

10   A.    That is correct.

11   Q.    You have a good memory.  So that was before Hamas was

12   designated also.  Right?

13   A.    That is right.

14   Q.    So if I add that, that would be accurate.  Correct?

15   A.    It would be.

16              MS. HOLLANDER:  We will mark this one, Your Honor,

17   and I move this into evidence as Defendants' Marzook/UASR.

18              MR. JONAS:  No objection.

19              THE COURT:  Admitted.

20              MS. HOLLANDER:  Thank you.

21   Q.  (BY MS. HOLLANDER)  Now, I want to talk about something a

22   little bit different.

23   A.    Okay.

24   Q.    But still keeping in the same time period.

25   A.    Okay.
```

1    Q.   Okay.  You have a summary chart, and we are going -- and

2    I am going to use the Government's for now just because I have

3    highlighted it so it will be easier for us to talk about.

4    A.   Okay.

5    Q.   And it is your summary chart of the payments between

6    Marzook and the Defendants.  Okay?

7    A.   Okay.  The one we already relabeled or --

8    Q.   Well, I am using yours.

9    A.   Okay.

10   Q.   Now, this chart shows six checks to Shukri.  Is that

11   correct?  And I will show you where they are.

12   A.   I was going to say I would need to count them.

13   Q.   Okay.

14         MS. HOLLANDER:  May I approach, Your Honor?

15         THE COURT:  Yes.

16         THE WITNESS:  Okay.  That is correct, six.

17   Q.  (BY MS. HOLLANDER)  Thank you.  Now, just for the jury,

18   the little numbers with the circles are the ones I added just

19   so we can find them.  Right?

20   A.   That is right.

21   Q.   Those weren't on your chart?

22   A.   That is correct.

23   Q.   But the one that says circle, No. 1, that is the first

24   check to Shukri.  Correct?

25   A.   That is correct.

1   Q.   And the second one where I have a No. 2?

2   A.   Yes.

3   Q.   And then these four additional ones.  Correct?

4   A.   Correct.

5   Q.   Now, those checks were all written between April 1985 and

6   July 1988.  Correct?

7   A.   Correct.

8   Q.   Okay.  And we are still now several years before Hamas

9   was ever designated.  Correct?

10  A.   Correct.

11  Q.   And most of them were written for relatively small

12  amounts?

13  A.   Yes, they were.

14  Q.   There was one for $243.97.  And we will look at them here

15  in a minute.  Okay?

16  A.   Okay.

17  Q.   And the largest one was for $1200?

18  A.   Yes.

19  Q.   There was another one for about $139?  Do you need to

20  look at those?

21  A.   I don't have the amounts memorized for sure.

22  Q.   I will get back to them so you can see them.  But you

23  didn't total them on the chart, did you?

24  A.   No, we didn't.

25  Q.   Okay.  Would you take my word for it that they total

1   approximately $1,886?

2   A.   I would think that sounds about right, but we did not

3   total them.

4   Q.   Now, your chart, this chart where it says authorization,

5   that means who either authorized or signed the check.

6   Correct?

7   A.   Based on -- It depends on the bank records.

8   Q.   Right.  If you have a signed check --

9   A.   Correct.

10  Q.   -- then it means the person who signed it.  Right?

11  A.   Correct.

12  Q.   With some of the NAIT records it means whoever authorized

13  NAIT to pay the bill.  Correct?

14  A.   It could be on correspondence and things like that.

15  Q.   Correct.  So the word authorization on here basically can

16  mean two different things.  It can mean -- It is not a trick.

17  I am just trying to understand it.  If you have a signature on

18  a direct check, that is what it means, who signed the check.

19  A.   If there was an individual who signed the check, then

20  that should be included in the authorization --

21  Q.   Right.  Okay.  But then if you -- Okay.  We will get into

22  the other meaning of it a little bit later.

23       Now, this was a joint account for Mr. Abu Marzook and Mr.

24  Elbarasse.  Is that correct?

25  A.   That is correct.

Q.    Okay.  And several of these exhibits deal with the checks

written from that joint account.  Correct?

A.    Let me back up.  I want to make sure, because Mr. Marzook

had a number of accounts, and if we can look at the bank

account chart just so I know, because he had some checking

accounts that were individual, some with his wife, and some

with Mr. Elbarasse, so I don't know offhand if the First

American Bank was a joint account or not.  I would need to see

the chart just to refresh my memory.

Q.    Well, I think I will be able to -- I don't know if I have

that chart here, but I think I will be able to refresh your

memory in another way.  And the checks would do it.  Is that

correct?

A.    That is correct.

Q.    That is how I was planning to do it.

A.    Yes.

Q.    Okay.  If we go back to -- Bear with me a minute here.  I

need page 4 of the Marzook/IAP, and I will just use this one

here.

      So if we look at the last two entries on page 4 of

Defendant Marzook and IAP --

            MS. HOLLANDER:  Something is wrong with my exhibit

here, Your Honor.  Hold on just a minute.  I am sorry.

Q.    (BY MS. HOLLANDER)  I may have to come back to this one.

Let me ask you this.  Can you identify Mr. Marzook's signature

1    and Mr. Elbarasse's signature?  You can, can't you?

2    A.    Yes, based on the signature cards we saw I think when I

3    was testifying, Mr. Jonas asked me about it.

4    Q.    Okay.  So this is one of the checks from the IAP account.

5    Correct?

6    A.    Well, it was made out to the IAP.

7    Q.    I am sorry.  From the joint account?

8    A.    That is correct.

9    Q.    And whose signature is that?

10   A.    That is Marzook's signature.

11   Q.    And here is another check from the same account.

12   Correct?

13   A.    Correct.

14   Q.    And whose signature is that?

15   A.    I believe if we look at the signature card on the bank

16   record, it looks a little bit different than Mr. Elbarasse's

17   signature so we would want to compare it to it, but I believe

18   those are the only two signatories on the account.

19   Q.    So this one is Elbarasse and not Marzook?

20   A.    It was not Marzook.

21   Q.    Since there were only two, we all assume this one is

22   Elbarasse.  Okay?

23   A.    Okay.

24   Q.    That is what you assumed?

25   A.    That is what I assumed.

```
 1    Q.   Okay.  Good enough.  Now, I want to go back to your
 2    chart, Marzook and the Defendants.  Well, maybe I will
 3    just -- Yeah, your chart.  And let's go back and look at the
 4    checks here, the payments to Shukri.  Okay?
 5    A.   Okay.
 6    Q.   Now, the first one -- It may not be the first one.  There
 7    it is.  The first one is check No. 120.  Do you see that?
 8    A.   I do.
 9    Q.   Okay.  And that one was signed by Mr. Elbarasse.
10    Correct?
11    A.   Again, I think if we look at the signature card, his
12    signature is a little bit different here than it is on the
13    signature card, so -- I know that there were only two
14    signatories, but I don't think it looks exactly the same.
15    Q.   It is not Mr. Marzook, is it?
16    A.   It is not Mr. Marzook.
17    Q.   And the second one is 147.  Correct?
18    A.   Correct.
19    Q.   And if you look at that check, that is not Mr. Marzook
20    either, is it?
21    A.   It is not.
22    Q.   So if going on your assumption that there were only two
23    people, then that would be Mr. Elbarasse.  Correct?
24    A.   My assumption would be something, but testifying that
25    that it is Mr. Elbarasse, I would be uncomfortable doing that
```

1  because I am not certain that it was.

2  Q.   But you know it wasn't Mr. Marzook.

3  A.   That is correct.

4  Q.   Now let's look at the other six.  The next one is 148.

5  Correct?  Check No. 148.

6  A.   Correct.

7  Q.   Do you see that there?

8  A.   I do.

9  Q.   And that is also on this joint account.  Correct?

10 A.   Correct.

11 Q.   And that is also not Mr. Marzook.

12 A.   Correct.

13 Q.   And then the check for $1200, the largest, that one

14 didn't have a check number, did it?  This was the check.

15 Right?  It doesn't have a check number.  It looks like it is

16 like a bank check or temporary check.

17 A.   It looks like a temporary check.

18 Q.   Okay.  And that one also is not signed by Mr. Marzook.

19 Correct?

20 A.   Correct.

21 Q.   And the fifth one, this is also on this joint account.

22 Correct?

23 A.   It is.

24 Q.   And that one also is not signed by Mr. Marzook.

25 A.   Correct.

```
1    Q.   And the last one of your list of checks to Shukri is

2    check No. 205.  Correct?

3    A.   Correct.

4    Q.   And that is that check.  Correct?

5    A.   Correct.

6    Q.   And that is not Mr. Marzook.

7    A.   No.

8    Q.   Too much paper.  Sorry.

9         So, all of these checks were dated before, well before

10   Hamas was designated.  Correct?

11   A.   Correct.

12   Q.   And you have -- you also pointed to the fact that the

13   Occupied Land Fund wrote three checks to Marzook and his wife.

14   Correct?

15   A.   I believe that number is correct.

16   Q.   That would be on -- Do you remember which summary chart

17   that is on?

18   A.   I think it was on Marzook/Defendants, because I think we

19   had transactions going both ways.

20   Q.   That is where I thought it was, too.  Somewhere we lost

21   the first page of that.  We may have to get that from the

22   Government here.

23        MS. HOLLANDER:  Can you pull up the first page of

24   the payments between Marzook and the Defendants?  I found it.

25   Never mind.  I just have too many pieces of paper that all
```

1    look alike.

2    Q.    (BY MS. HOLLANDER)  So this is where we would find it.

3    Correct?

4    A.    Yes.

5    Q.    And now, this one you have two of those checks that I

6    have highlighted that say authorized by Shukri.  Now, in that

7    case what you are talking about is not a check that was

8    actually signed by Shukri.  Correct?

9    A.    That is correct.  The NAIT records, they did things

10   differently, so it was correspondence.

11   Q.    Right.  So this is the second use of the term authorized.

12   A.    Right.

13   Q.    And one of those checks was written to Marzook.  Correct?

14   A.    That is correct.

15   Q.    And then two of them were written to Nadia Elashi.

16   Correct?

17   A.    Correct.

18   Q.    And Nadia Elashi is Mousa Abu Marzook's wife.  Is that

19   correct?

20   A.    That is correct.

21   Q.    So the two that were authorized by Shukri went to Ms.

22   Elashi.  Correct?

23   A.    They did.

24   Q.    Right.  And the one that went to Marzook you don't have

25   authorized by Shukri, do you?

```
 1   A.    It is not on there, no.

 2   Q.    Now, I want to, still talking about around the same time,

 3   draw your attention to some phone records that you introduced.

 4   Okay?

 5   A.    Okay.

 6   Q.    And you did a summary chart, you have a big one, I think,

 7   and I will just use the little version.  Okay?

 8   A.    Okay.

 9   Q.    This was your chart Marzook/Defendants phone calls.

10   Correct?

11   A.    That is correct.

12   Q.    Now, according to your chart, what you have here is that

13   calls were placed from the telephone number registered to

14   Marzook.  Correct?

15   A.    Correct.

16   Q.    To the phone number registered to Shukri Abu Baker.

17   Correct?

18   A.    Correct.

19   Q.    And it was 25 times between January 1989 through January

20   1990.  Correct?

21   A.    Correct.

22   Q.    Now, your chart doesn't have any calls going the other

23   way, does it?

24   A.    It does not.

25   Q.    Okay.  And in fact, the vast majority of those calls, the
```

1  calls on your chart right here, took place in a four-month

2  period between January and April 1989.  Correct?

3  A.   I would need too look at the records because they are not

4  broken down here.  I don't remember because they are not

5  marked down when each took place.

6  Q.   You have the underlying documents, don't you?

7  A.   Yes.

8  Q.   But you didn't break that down in this chart, did you?

9  A.   No.  We tried to make it as simple as possible.

10  Q.   But you could go back and count them up.

11  A.   Yes, the exhibits we have you can go can through.

12  Q.   That is about a 160-page exhibit?

13  A.   I think there were several exhibits.  I guess that was

14  just one.  It is a large exhibit.

15  Q.   Okay.  And now we are still six years before Hamas was

16  designated.  Correct?

17  A.   Five, I believe.

18  Q.   Five years.  Okay.  The latest call on your chart is

19  1992.  Correct?

20  A.   For which individual?  Because I think that the --

21  Q.   The calls --

22  A.   The time period noted on Mohammad El-Mezain was through

23  January of '93.

24  Q.   So that is the latest one, but that is Mr. El-Mezain.

25  Correct?

```
1    A.    That is correct.

2    Q.    But for Shukri and for Holy Land, the latest one is 1992.

3    Correct?

4    A.    Yes.  August '92 was the latest, and that was actually

5    HLF, a call from that office to Marzook.

6    Q.    And you did look at all these calls on your underlying

7    documents, didn't you?  You had to do that to make this chart.

8    Right?

9    A.    We looked at the underlying documents to make the chart,

10   yes.

11   Q.    So you know that as many as half of the 25 calls lasted

12   for less than a minute, don't you?

13   A.    I can't recall how long they lasted.  I know that some of

14   them were short.  They could have been faxes.  I am not sure.

15   Q.    And you don't know who placed the calls, do you?  You

16   can't tell from this who placed the calls.

17   A.    You can't tell from the phone records which individuals

18   picked up the phone.

19   Q.    And you don't know what individual received the calls

20   either, do you?

21   A.    We weren't there, so there is no way --

22   Q.    You don't know why the calls were made, do you?

23   A.    No.

24   Q.    And, in fact, you don't even know whether they were calls

25   or faxes.  Correct?
```

1    A.    I would say, based on the length of the shorter calls,

2    they were probably some faxes and some phone calls.

3    Q.    Okay.  Now, we haven't frozen yet so we will keep going.

4    I don't know how cold it is up there, but if my hands shake,

5    it is because they are ice.

6          I want to move to a different subject.

7    A.    Okay.

8    Q.    I want to look at the document the Government introduced

9    as Illa Falistine No. 1.

10   A.    Okay.

11   Q.    And it is this document.  Are you familiar with that?

12   A.    Yes.

13   Q.    Okay.  That was a portion of a magazine.  Correct?

14   A.    That is correct.

15   Q.    And this was published in 1989 or 1990.  Correct?

16   A.    I believe it was 1990, but we can check the translation

17   to confirm that if we need to.

18   Q.    Okay.  But it was 1990, or you think it was.

19         Okay.  Now, you see in here, one of the things that you

20   talked about on direct was that the Occupied Land Fund, which

21   was -- we have been using -- saying the Holy Land Foundation,

22   but the Occupied Land Fund at that time is what its name was,

23   placed ads in this magazine.  Correct?

24   A.    Correct.

25   Q.    All right.  And let me show you the Arabic.  This is the

1    Arabic version of the advertisement in that paper.  Do you see

2    that?

3    A.    It is one of them.  I think that most of these had, you

4    know, multiple ads, so I can't recall without looking at the

5    original whether this had one or more than one ad.  But it is

6    one of them.

7    Q.    Okay.  But this is one of the ads?

8    A.    Correct.

9    Q.    Okay.  And you see that now in the Arabic, to the extent

10   we can tell anything about it, because you and I don't speak

11   Arabic, this is writing over here.  Correct?

12   A.    Correct.

13   Q.    And I can pull it up and make it a little bigger, but it

14   won't make much difference because we won't be able to read

15   it.  And this is a picture that appears to be a picture of a

16   child.  Correct?

17   A.    It does.

18   Q.    Of a baby with a bandage on.  Correct?

19   A.    Correct.

20   Q.    And then there is writing on the other side.  Correct?

21   A.    Correct.

22   Q.    And then there is where to send your money to, et cetera.

23   A.    Correct.

24   Q.    Right here.  Okay.  Now, when the Government introduced

25   this document, this is how the translation looks.  At the top

1    it says advertisement.  Right?

2    A.    It does.

3    Q.    And then it says, "If you do not help today, then who

4    will?"  Correct?

5    A.    I mean, that is not verbatim, but that is the essence of

6    it, yes.

7    Q.    Well, "If you do not help today, then when?  And if not

8    you, then who?"

9    A.    Correct.

10   Q.    That is verbatim.  Right?

11   A.    That is verbatim.

12   Q.    And then it says "Occupied Palestine."  Right?

13   A.    It does.

14   Q.    And you know that to mean in 1990 the West Bank and Gaza

15   is what they are referring to.  Correct?

16   A.    That is what they are referring to, yes.

17   Q.    And then it says that donations are tax exempt.  Correct?

18   A.    It does.

19   Q.    Now, then it has a list and it says, "Your donations,

20   what can they do?"  Right?

21   A.    Right.

22   Q.    If you look at the Arabic.

23         Then it says "picture."  Right?

24   A.    It does.

25   Q.    And that is the picture of the little child.  Right?

1    A.   Correct.

2    Q.   And then it says "poem."  Right?

3    A.   It does.

4    Q.   And the Arabic has something under where it says poem,

5    doesn't it?

6    A.   It does.

7    Q.   But when the Government provided this, you didn't include

8    the poem, did you?

9    A.   It is not on there.

10   Q.   You didn't include it, did you?

11   A.   Well, it wasn't I that didn't include it.  The --

12   Q.   The Government didn't include it in their exhibit.

13   Correct?

14   A.   The translator noted it as a poem.

15   Q.   Right.  So the Government exhibit doesn't include that

16   part of the ad, does it?

17          MR. JONAS:  Objection, Your Honor.  She has answered

18   that question.

19          THE COURT:  You have asked it about five times,

20   counsel.

21          MS. HOLLANDER:  Well, I am just trying to get it.

22          THE COURT:  Counsel.

23          MS. HOLLANDER:  Okay.

24   Q.   (BY MS. HOLLANDER)  Can you see the part -- Can you read

25   it, or do I need to bring it up to you to read?

```
1    A.    I can read it.

2    Q.    Would you read this here where it says, "Your donations,

3    what can they do can," just read what it says the donations

4    can do?

5    A.    Okay.  It says, "Sponsor an orphan, support a widow,

6    treat a wounded person, support a disabled, support family,

7    shroud a dead body, equip a clinic, redeem a captive, feed a

8    hungry person, dress a needy person, plant a tree, build a

9    house, refurbish a mosque, educate a student, equip a school,

10   bring a smile, wipe out a tear, light a candle."

11   Q.    And you read what it says right here?

12   A.    Just in the box or above as well?

13   Q.    Well, just in the box.

14   A.    It says, "The Occupied Land Fund is an honest arm that

15   works on collecting and delivering donations" -- Can you scoot

16   it over just a little bit?  "...to occupied Palestine to

17   support its people's steadfastness.  Send your donation today

18   to OLF, P.O. Box 928, Los Angeles, California," zip code and

19   the telephone number and fax number.

20   Q.    Okay.  Thank you.  Now, I would like you to also read

21   what has been marked and previously admitted as Defendants'

22   Illa Falistine No. 1, which is a translation of the poem.

23   A.    Okay.

24   Q.    I am going to have to -- Is it easier for you if I bring

25   it to you to read?
```

1    A.    As long as I can see it all on the screen it is okay, so

2    if it is short.  But if you prefer to bring it to me --

3    Q.    Let me bring it to you, because once I make it on there

4    it is going to be too little to read.

5    A.    Okay.  Thank you.

6    Q.    Would you read that, please?

7    A.    Okay.  It says, "In the shaded rocky alleys, you hear the

8    sobbing of perseverance and the sigh of calamity.  Martyrs.

9    In the age of almond's blossom.  Wounded.  And their blood is

10   in the color of umber.  Captives.  Death is more merciful to

11   them than life.  Fetuses meet their graves, even before they

12   were born.  Camps without tents.  And the night of suffering

13   is like lava.  Blown up houses and exposed women.  Orphans of

14   pride without parents, and martyrs' wives with no consolation.

15   A disabled old man and a bereaving woman cry.  O Muslim, O

16   Islam, O Muslim, O Islam, O Muslim, O Islam, O Muslim, O

17   Islam, O Muslim, O Islam."

18   Q.    Thank you.

19         Now, the Government also introduced another one of these

20   magazines, Illa Falistine No. 2, this one.  Do you recall this

21   one?

22   A.    I do.

23   Q.    And it, too, had an ad from the Occupied Land Fund.

24   Correct?

25   A.    Correct.

1    Q.    And this is the add in Arabic.  Correct?

2    A.    Correct.

3    Q.    I will show the rest of it here in a minute.  It goes on

4    this way.  Right?

5    A.    Yes.

6    Q.    I am just trying to keep it big enough to see.  And this

7    is a picture of a woman and her children, it looks like,

8    doesn't it?

9    A.    It is a lady and some children, yes.

10   Q.    And an Israeli soldier.

11   A.    I see what looks to be a soldier there, but I can't make

12   out from this what nationality he is.  But it looks like a

13   soldier.

14   Q.    It does look like a soldier at least.  That much we can

15   tell.  Right?

16         And you translated -- The Government translated I am

17   sorry to say you, but the Government translated this one also,

18   didn't it?

19   A.    I believe so.

20   Q.    Okay.  And this is a translation, isn't it?

21   A.    Yes.

22   Q.    Okay.  Would you read first what it says just under

23   "picture"?

24   A.    Okay.  Reading the left hand column first and then the

25   right hand column --

1  Q.   What does it say just under "picture"?

2  A.   "A number of facts," and an asterisk.

3  Q.   And what is the asterisk?

4  A.   It says, "During 20 months from the beginning of the

5  Intifada."

6  Q.   Now, if you can read the left side where it says "65

7  martyrs."

8  A.   It says, "65 martyrs, 20,000 detainees and captives,

9  thousands of afflicted families, closed schools, 25,000

10 injured and wounded, 450 bombed houses, 400 cases of abortion,

11 and acute shortage in food and medical supplies."

12 Q.   And where it says abortion, you are aware that in Arabic

13 the word miscarriage and abortion are the same word?

14 A.   I am not aware of that.

15 Q.   You don't think that they meant they paid for 400 Muslim

16 women to get abortions, do you?

17 A.   I don't know what the word for abortion is, so I don't

18 know how it translates.

19 Q.   You know that abortions are not permitted for Muslims,

20 don't you?

21 A.   I don't know that.

22 Q.   Now, we have talked about these ads, and you introduced

23 these documents to show some other things, but to also show

24 the advertisements.  Correct?

25 A.   Correct.

1    Q.    That is part of the reason for introducing those?

2    A.    That is correct.

3    Q.    And those magazines were put out by the IAP.  Correct?

4    A.    They were.

5    Q.    Okay.  But that wasn't the only organization that Holy

6    Land advertised with, was it?

7    A.    No, it was not.

8    Q.    I would like to show you what has previously been

9    admitted --

10          MS. HOLLANDER:  I believe it has been admitted,

11   Defendants' No. 1051 the other day, Your Honor.  I believe it

12   was admitted without objection.

13          THE COURT:  Okay.

14          MS. HOLLANDER:  If it isn't, I move its admission

15   now, Your Honor, Exhibit No. 1051.  I can show it to Agent

16   Burns, if I can approach.

17          THE COURT:  Yes.

18   Q.    (BY MS. HOLLANDER)  These are documents that were seized

19   from the Holy Land office?

20   A.    That is correct.

21   Q.    And you have looked at them before, haven't you?

22   A.    Yes.

23   Q.    You are familiar with those?

24   A.    Yes.  I won't remember details unless I look at it, but I

25   have seen them before.

1          MS. HOLLANDER:  Your Honor, I move for the admission

2    of Defendants' Exhibit No. 1051, if it is not already in.

3          THE COURT:  I don't show it in, but I show you have

4    no objections to it.

5          MR. JONAS:  That is correct.

6          THE COURT:  That is admitted.

7    Q.   (BY MS. HOLLANDER)  Now, this was actually seized from

8    the HLF office in Dallas.  Correct?

9    A.   Correct.

10   Q.   And it shows, among other things, the Holy Land

11   Foundation's breakdown of expenses for a period of time.

12   Correct?

13   A.   I believe so.

14   Q.   Okay.  And it appears to be, does it not, a breakdown of

15   advertising expenses?

16   A.   There were advertising expenses that I saw in there, yes.

17   Q.   And this is a document -- Let me look at page 1.  This is

18   a document generated by the Holy Land Foundation.  Correct?

19   A.   Correct.

20   Q.   And it shows a payment to an Al Watan newspaper?

21   A.   Yes.

22   Q.   For $450?

23   A.   It does.

24   Q.   And another page of this document, Defendants' No. 1051,

25   shows advertisements.  Correct?

```
1    A.    Correct.

2    Q.    And that whole page is a page of advertisements, isn't

3    it?

4    A.    It is, except for I guess the adjustment entry, whatever

5    that is.

6    Q.    The general journal entry.

7    A.    Right.

8    Q.    And then it lists the media where they advertise.

9    Correct?

10   A.    Correct.

11   Q.    And that includes something called "International Truth."

12   Correct?

13   A.    Correct.

14   Q.    And Al Miraad?

15   A.    Yes.

16   Q.    Arab-American Council?

17   A.    That is correct.

18   Q.    Al Watan newspaper?

19   A.    Yes.

20   Q.    Nets International?

21   A.    Correct.

22   Q.    And then something called Al Jumuah.  Correct?

23   A.    Correct.

24   Q.    I.A.N.T.

25   A.    Correct.
```

```
1    Q.    Student Media at UCLA?

2    A.    That is correct.

3    Q.    And it has the amounts for each one, doesn't it?

4    A.    I believe that is the check number column, but it does

5    have the amounts there.

6    Q.    For that period of time for each one?

7    A.    Correct.

8    Q.    Right.  And it also has the IAP.  Correct?

9    A.    It does.

10   Q.    And then if we continued down, some of these repeat and

11   then there is some new ones like the Washington Report.

12   Correct?

13   A.    Correct.

14   Q.    And the next page of that document has additional

15   advertisements.  Correct?

16   A.    That is correct.

17   Q.    And some additional places like Arab Panorama.

18   A.    Correct.

19   Q.    And it also has IAP.  Correct?

20   A.    That is correct.

21   Q.    And a very large amount to an organization American-Arab,

22   and we can't read the rest of it.  Correct?

23   A.    That is correct.

24   Q.    Because they used some kind of a shorthand just for the

25   document.  Right?
```

1    A.    Correct.

2    Q.    And in fact, we actually have the underlying documents to

3    support this ledger.  Correct?

4    A.    I don't know that we have all of them there.  You may.

5    Q.    But we have --

6    A.    This is one.

7    Q.    This is one that supports it.  Right?

8    A.    Correct.

9    Q.    And this is another one.  Correct?  And it also has some

10   handwriting on it, but it has one color page, color charge,

11   $1300?

12   A.    Yes, that is what it says.

13   Q.    And this is one to Community Voice an invoice for a full

14   page ad?

15   A.    Correct.

16   Q.    Now, each one of these, for example, here is the record

17   in the ledger for The Minaret.  Correct?  For $800.  Can you

18   see that?  Do I need to make it bigger?

19   A.    I can.  I am just confused.  You said the record and the

20   ledger.  I think this is one of those portions of a check, I

21   think.

22   Q.    Okay.  So it might be the back of a check or the bottom

23   of a check?

24   A.    The bottom of it.  That is what it looks like.

25   Q.    But it coincides with this bill that was paid to The

1   Minaret for $800?

2   A.   Correct.

3   Q.   I will put these together here.  Here we have essentially

4   the same thing for Community Voice.  Correct?  We have the

5   $600 and then we have the invoice for $600.  Correct?

6   A.   That is correct.

7   Q.   And if you look through these, essentially that is what

8   all of them are, aren't they?  For example, I will show you

9   two more.  Here is another one for Community Voice and the

10  invoice.  Correct?

11  A.   Correct.

12  Q.   So these are all documents showing some ads for just one

13  period of time at the Holy Land Foundation at about the same

14  time as the Illa Falistine ad.  Correct?

15  A.   The Illa Falistine ad was in the late '80s early '90s,

16  and those all appear to be 1997, '98, '99, 2000.

17  Q.   So these were all for a much later time?

18  A.   They were.

19  Q.   The Illa Falistine were all before Hamas was designated.

20  Correct?

21  A.   That is correct.

22          MS. HOLLANDER:  Your Honor, I am moving to another

23  area.  Do you want me to --

24          THE COURT:  Go ahead and keep going.

25          MS. HOLLANDER:  You want me to keep going?

1              THE COURT:  Yes.

2    Q.  (BY MS. HOLLANDER)  I want to talk to you about two

3    documents you discussed about a visit to Palestine that Shukri

4    took in 1991.

5    A.   Okay.

6    Q.   Okay?  And you introduced -- The Government introduced

7    through you and you identified two documents that you claimed

8    reported on a meeting he attended in Gaza in 1991.  Correct?

9    A.   There was one from InfoCom that actually related to a

10   trip that Shukri Abu Baker took, and then there was another

11   document I believe from Abdel Haleem Ashqar's home that

12   referenced his trip.

13   Q.   Okay.  And that was your testimony, and that is exactly

14   what I want to talk to you about.

15   A.   Okay.

16   Q.   So we are on the same page here?

17   A.   Okay.

18   Q.   So this is 1991, still four years before Hamas was

19   designated.  Correct?

20   A.   Correct.

21   Q.   Now, the only one -- Those two documents--and we will

22   talk about both of them and remind the jury of which ones we

23   are talking about--the only one in which the author is

24   identified is the document that the Government has identified

25   as InfoCom Search No. 51.  Correct?  That one actually -- That

```
1    is this document.  Correct?

2    A.    That is correct.

3    Q.    Okay.  And to make our life easier, we will look at it in

4    the English.

5    A.    That would be helpful.

6    Q.    For all of us.  All right.  So just to reference, this is

7    the document that I just showed you in Arabic, which is

8    InfoCom Search No. 51.  Correct?

9    A.    Correct.

10   Q.    And in the original it wasn't signed by hand, but it says

11   Shukri Abu Baker, executive director.  Correct?

12   A.    I can't remember if it was signed by hand or not, but his

13   name was on there.

14   Q.    His name was on there.  Now, the other document is this

15   one.  That is Ashqar Search No. 2.  Correct?

16   A.    Correct.

17   Q.    And that one, just to reference, that was -- The original

18   is Arabic on a note pad.  Correct?

19   A.    Correct.

20   Q.    Is that handwritten?

21   A.    It appears to be.

22   Q.    So we will look at the English of that, too.  So that is

23   the first page of the English.  Correct?

24   A.    Correct.

25   Q.    Okay.  Now, that one -- The report that has Shukri's name
```

1  on it that you found at InfoCom, it actually says it is a

2  report about the trip to the occupied territories.  Correct?

3  A.   It does.

4  Q.   Okay.  So once again, we know that that is referring to

5  Gaza and the West Bank, because that is the area that Israel

6  occupied in 1991.  Correct?

7  A.   Based on the content of the document, I know they are

8  talking about West Bank and Gaza.

9  Q.   Right.  And that is the area they refer to as the

10 occupied territories.  Right?

11 A.   Correct.

12 Q.   All right.  And it has the date July 16th to August 31st.

13 Right?

14 A.   August 3rd, I believe.

15 Q.   I am sorry.  August 3rd.  Right.  And the other

16 one -- Now, the one that you refer to as Ashqar Search No. 2,

17 that is one of the ones that the FBI photographed at Mr.

18 Ashqar's home.  Correct?

19 A.   Correct.

20 Q.   And that is why it has this on it, because it is actually

21 was photographed.  Right?

22 A.   That is correct.

23 Q.   And that one says -- That one doesn't have a signature by

24 anyone, does it?

25 A.   It is not signed.

1   Q.   It is not signed.

2   A.   That is correct.

3   Q.   So we don't know who wrote this one, do we?

4   A.   We know it was someone from within the Palestine

5   Committee.

6   Q.   You don't know what individual wrote this, do you?

7   A.   Correct.

8   Q.   And it says a subject about the visit to occupied

9   Palestine.  Correct?

10  A.   That is correct.

11  Q.   And what are the dates it has?

12  A.   May 17th through June 4th, 1991.

13  Q.   Now, you pointed to a particular part of it, and I want

14  to direct you to that again.  You pointed to this part in

15  particular.  We are talking about the one that was

16  photographed at Mr. Ashqar's house.  Right?

17  A.   Correct.

18  Q.   And you pointed to this part "three investment projects

19  presented by Dr. Al-Zahar."  Correct?

20  A.   Actually Mr. Jonas -- We were talking about the Center

21  for Studies and Research, entry K.

22  Q.   This part here?

23  A.   That is correct.

24  Q.   Okay.  To open a Center for Studies and Research, and he

25  approved that.  Okay.

1      And then I am going to want you to spend a little time on

2   this other document that has Shukri's name on it, so we will

3   assume that Shukri authored it.

4   A.   Okay.

5   Q.   But I want to focus to what Shukri wrote about -- that

6   you pointed out.  Okay?  So would you read, please, this

7   paragraph right here?

8   A.   "I visited Gaza accompanied by Dr. Suliman where we met

9   with Mr. Abu Khalid, Abu Nasir, as well as another group of

10  officials and those concerned with charitable work.  We

11  discussed with Mr. Abu Khalid the issue of building a research

12  organization and means of supporting the university.  We

13  suggested to him to establish a central zakat committee for

14  the Gaza Sector."

15  Q.   I am going to want you to read more, but let's focus on

16  this for a while.  So the Ashqar -- the document found in

17  Ashqar, and that was dated -- It says that the report involves

18  a visit to Palestine from May 17th to June 4th.  Correct?

19  A.   That is correct.

20  Q.   1999.  And that is this one that is on the screen now.

21  Right?

22  A.   That is correct.

23  Q.   It talks about Dr. Al-Zahar.  And the one that Shukri

24  wrote, which you just read, that talks about a visit between

25  July 16th and August 3rd, 1991.  Correct?

1   A.   That is correct.

2   Q.   Okay.  So this one, the one that Shukri wrote, basically

3   begins after the Ashqar one ends, if you go by the dates.

4   Right?

5   A.   If you go by the dates, correct.

6   Q.   Now, in the one that Shukri wrote, he says he met with

7   Mr. Abu Khalid.  Right?

8   A.   That is correct.

9   Q.   And you testified that Abu Khalid is the Abu name for

10  Dr. Al-Zahar, didn't you?

11  A.   I did.

12  Q.   But Abu is sometimes connected to a last name, too, isn't

13  it?  For example, what is Shukri's last name?

14  A.   Abu Baker.

15  Q.   Right.  So that is -- His last name is Abu Baker.

16  Correct?

17  A.   That is correct.

18  Q.   Okay.  And for example, just to keep to people in

19  this -- that we have talked about, Mousa Abu Marzook, Abu

20  Marzook is his last name, isn't it?

21  A.   That is correct.

22  Q.   He has a different Abu name, doesn't he?

23  A.   Abu Omar.

24  Q.   Abu Omar is his name.  So if you were referring to him

25  you would refer to him, you would refer to Shukri, if you were

1   referring to him in his last name, as Mr. Abu Baker, wouldn't

2   you?

3   A.   Correct.

4   Q.   And Marzook is sometimes Mr. Abu Marzook.  Correct?

5   A.   Correct.

6   Q.   And if you refer to someone as their Abu name, you say

7   Abu Omar.  Right?

8   A.   I have seen people say Mr. Abu Omar and Abu Omar.  It can

9   be either way.

10  Q.   But he very clearly says Mr. Abu Khalid here.

11  A.   He does.

12  Q.   And he says Abu Nasir?

13  A.   He does.

14  Q.   And he says Mr. Abu Khalid again?

15  A.   He does.

16  Q.   And you know that Abu Khalid is one of those names that

17  is sometimes a last name also, don't you?

18  A.   I have not seen it that way, and in this context the Abu

19  Khalid I know is Mahmoud Al-Zahar.

20  Q.   So that is what you assumed it to mean, didn't you?

21  A.   Based on the documentation, that is who it is.

22  Q.   Did you do any research to see whether Abu Khalid is also

23  a last name used by Palestinians?

24  A.   It could be.  I don't know if it is or not.

25  Q.   But you didn't research that, did you?

1  A.   I did not look to see if it was a common last name, no.

2  Q.   And nowhere in Shukri's report does he say that he

3  referred to Abu Khalid, does he?  He always says Mr. Abu

4  Khalid in this report, doesn't he?

5  A.   I don't know if he does not.

6  Q.   He referred to him twice on that page as Mr. Abu Khalid,

7  didn't he?

8  A.   That is correct.

9  Q.   Now, I want to ask you about the differences in the

10  dates.  Okay?

11  A.   Okay.

12  Q.   And you said that Shukri's report on his visit is dated a

13  month later.

14  A.   That is correct.

15  Q.   In fact, you have, and you have seen in this case, and

16  you have documentation that is consistent with Shukri actually

17  being in Palestine the dates identified on his report, don't

18  you?

19  A.   That is correct.

20  Q.   Okay.  You have documents that show the dates he came in

21  and out of the country.

22  A.   That is correct.

23  Q.   And you have documents that show that he was in London

24  during -- previous to that.  Correct?

25  A.   We have seen records relating to his trip to London, yes.

1    Q.   Let's look at some of those.

2              MS. HOLLANDER:  Your Honor, I believe that

3    Defendants' Exhibit No. 1333 has been previously admitted.

4              THE COURT:  No. 1333?

5              MS. HOLLANDER:  Yes.

6              THE COURT:  Okay.  Yes.

7    Q.   (BY MS. HOLLANDER)  Agent Burns, you are familiar with

8    this document, aren't you?

9    A.   Yes, I am.

10   Q.   Okay.  And that is a document that the Government

11   obtained from the Treasury Department.  Correct?

12   A.   Correct.

13   Q.   And it is a document that actually shows when people come

14   into the country.  Isn't that right?

15   A.   It is.

16   Q.   Now, first it would identify who the person is that you

17   are looking for.  Right?

18   A.   That is correct.

19   Q.   Okay.  And these are sometimes very long documents, but

20   the only part I have here is the part that deals with Shukri.

21   A.   Okay.

22   Q.   Okay?  And this -- I have a version that is highlighted

23   here just to make it easier for us.  This is a page from that

24   document.  Okay?

25   A.   Okay.

1    Q.    Does that look like a page for you?

2    A.    Yes, it does.

3    Q.    Okay.  Because you have seen this before?

4    A.    Yes.

5    Q.    It is one of the documents that you gathered up in this

6    case.  Right?

7    A.    That is correct.

8    Q.    Now, it shows two times of the relevant period that

9    Shukri came into the United States.  Correct?

10   A.    That is correct.

11   Q.    Okay.  He came into the United States on 6/3/91.  Right?

12   A.    Correct.

13   Q.    Okay.  So that is June 3rd.  Right?

14   A.    Correct.

15   Q.    And he came in from -- And you also have documents that

16   show that you subpoenaed or sent a national security letter to

17   get Shukri's personal bank account.  Correct?  From Bank One?

18   A.    We have Bank One records, yes.

19   Q.    Okay.

20         MS. HOLLANDER:  Your Honor, I believe it is

21   previously been admitted, Defendants' No. 1017, the Bank One

22   records.

23         THE COURT:  Okay.

24         MS. HOLLANDER:  If not, I move it at this time.  I

25   don't believe there is any objection.

1   Q.   (BY MS. HOLLANDER)  Now, this was a record, the Bank One

2   record?

3                 THE COURT:  For the record, that is admitted.

4                 MS. HOLLANDER:  Thank you, Your Honor.

5   Q.   (BY MS. HOLLANDER)  You have seen this record before.

6   A.   Yes, I have.

7   Q.   Do you need to look at it?  Okay.  That is actually

8   Shukri Abu Baker's personal account.  Correct?

9   A.   I believe it was.  I would need to look at the top to

10  confirm, but I believe it was.

11                MS. HOLLANDER:  May I approach, Your Honor?

12                THE COURT:  Yes.

13       Let's go ahead and break here for lunch.  Be back at

14  2:00.

15                (Whereupon, the jury left the courtroom.)

16                THE COURT:  All right.  We will be in recess until

17  2:00.

18                          (Lunch recess.)

19                THE COURT:  Mr. Jacks, I received the email that you

20  sent over the lunch hour.

21                MR. JACKS:  Yes, Your Honor.

22                THE COURT:  Did counsel receive that?  Was this your

23  document, Ms. Duncan?

24                MS. DUNCAN:  Yes, Your Honor.

25                THE COURT:  Okay.  And you see where the Government

1    is objecting?

2              MS. DUNCAN:  Yes, Your Honor.

3              THE COURT:  And do you have any thoughts or response

4    to that?

5              MS. DUNCAN:  I do, Your Honor.

6         First of all, this section that the Government wants to

7    redact from is a discussion of the need to address American,

8    Palestinian, and Muslim communities or audiences a little bit

9    differently depending on their own experiences and

10   perspectives, and what the speaker is saying, once again,

11   gives context to other parts of speech.

12        As we have heard through the testimony, the Philadelphia

13   meeting, you know, there are chapters but people kind of go

14   back and forth between certain topics, and this is one of

15   those places where they are going back to that issue of a

16   different address.

17        It is troubling this idea that we are now going to go

18   through these transcripts and cut out this little sentence

19   that the Government doesn't like, or this little sentence that

20   the Government doesn't like.  I mean, it is important for the

21   jury to understand what these people said, and when the

22   Government starts pulling out a sentence here and a sentence

23   there, it changes the whole meaning of the speech in this

24   case.

25        And with respect to the Government's argument that this

1    shouldn't be allowed in because they can't cross examine this

2    speaker, this speaker speaks throughout this entire

3    transcript, throughout the 18 transcripts that they are

4    introducing, and, I mean, no one can cross examine.  That is

5    one of the problems with their reliance on so many documents

6    that really include speech by no one who is in this courtroom.

7         But they can't introduce these speakers and then just

8    take little parts out that then change, dramatically change

9    the meaning of the person's words.

10        You know, and we sent this transcript to them I think it

11   was Saturday, so they have had time to read it.  This is no

12   great surprise to them, and so I don't understand why we are

13   having this last minute objection after we have already gone

14   through this this morning, Your Honor.

15             THE COURT:  Mr. Jacks?

16             MR. JACKS:  Judge, to get to the rules of evidence,

17   this comment does not contribute to the 106 reasoning that the

18   Defendants have put forward to include this particular

19   transcript in the Philly transcripts.  And the Government has

20   the right to put in those transcripts that it chooses to do

21   so, and to follow the rules of evidence with regard to what is

22   admissible, and either as an admission of a party opponent or

23   as a co-conspirator statement.

24        The Defense has the opportunity or the ability to call

25   witnesses, if they choose to do so, to tell a different

1   version of what was said or to sponsor in other statements, if

2   those are shown to be admissible.

3       These two particular statements, it is the Government's

4   contention, do not so much contribute to the discussion about

5   what face to show to the American public versus the Arab or

6   Middle Eastern public.  These are the statements of one of the

7   speakers that appears to -- I don't know if it is to go off

8   topic or to simply start speaking his opinion about his views.

9       And as I said, they are, from the outset, hearsay to the

10  Defendants, and we would object.  And again, we believe that

11  these particular statements are unduly prejudicial and should

12  be excluded.

13          THE COURT:  Okay.  Ms. Duncan, anything else,

14  briefly?

15          MS. DUNCAN:  Your Honor, Rule 106 is a rule of

16  evidence, and it is statements that ought in fairness to be

17  considered with other statements.  These statements ought to

18  fairness to be considered with the other statements in the

19  Philadelphia meeting.

20      It not only goes to this discussion of different

21  addresses to audiences who have different experiences.  It

22  also goes to the issue of why some of these speakers in this

23  offense were opposing Oslo, the reasons for that.

24      The Government would like the jury to believe that

25  everyone who opposes Oslo is a terrorist and you only oppose

Oslo because you are a member of Hamas.  This discussion is a

discussion of explaining positions to Oslo, and these

statements give context.

     And once again, when you take those statements out you

change the meaning, and that is what Rule 106 is intended to

prevent, is to require that when the Government or a party

puts in a statement or a writing, that the jury is then given

a complete picture of what was said so that they can make

their own independent determination of that meaning.

          THE COURT:  Okay.  I am going to sustain the

Government's objections.  I don't think it changes the meaning

in terms of the discussion, the overall discussion.  A lot of

the conversation is still in about this organization and what

face to present to the American people and through the use of

the media.  I think this is adding additional information on

the politics in the region.  Now you are getting into Lebanon.

That is not relevant to this case and the issues involved in

this case and the issues that the jury has to resolve, so I

sustain those objections.

     Were you planning on reading that?

          MS. HOLLANDER:  We weren't planning to read that

section, Your Honor.  When we submit the exhibit finally, we

will redact those.

          THE COURT:  Okay.

          MR. JACKS:  Judge, I didn't know what the Defense or

1   the Court was going to do, but I have prepared a page that has

2   it redacted.

3          MS. HOLLANDER:  If you want to give me that, I will

4   put it in the exhibit.

5          THE COURT:  All right.  Ready for the jury?

6          MS. DUNCAN:  I wanted to bring one other issue to

7   the Court's attention.

8          THE COURT:  Yes.

9          MS. DUNCAN:  When we broke for -- Can I approach,

10  Your Honor?

11         THE COURT:  Sure.  Come on up.

12         (The following was had outside the hearing of the

13           jury.)

14         MS. DUNCAN:  When we broke for lunch today and were

15  going to the elevators, the jury was getting ready to go down

16  for the lunch break and the woman who was in here the other

17  day with the "hate speech is not free speech" was standing at

18  the elevators talking to a gentleman next to the jurors.  I

19  couldn't hear what she said, but I think it raises the issue

20  of the spectators being near the jury and the conversations

21  and the concerns we have about outside influence on the jury.

22    So on behalf of the Defense, I ask the jury be escorted

23  to the elevators and no one be allowed into that little foyer,

24  and then at that point everybody else can leave, to prevent

25  that from happening.

1          MR. JACKS:  Judge I was there, too, because I don't

2     know if the jury had already left.  So I am standing there in

3     that foyer, and here comes the Marshal with the jury.  I saw

4     the woman talking to that man, and they were talking about

5     something totally different.

6          And so -- I mean, I don't have any problem with that, but

7     I don't know where I would have gone if the participants are

8     not supposed to be there when the jury is coming through.  I

9     would have had to get buzzed through to the other side.

10          THE COURT:  All we can do is keep an eye on this.  I

11     don't want to make it that strict.  Obviously the jury is out

12     there.  They know they are not supposed to be talking to

13     anybody.  If they hear something, hopefully they will report

14     it if they hear something that is inappropriate.

15          They are going to run into people.  As long as they are

16     not hearing something that is inappropriate, then that is not

17     a problem.  So we can keep an eye on it, and if you hear

18     something that is improper, bring it to my attention.

19          And I will talk to the CSO and see if they are noticing

20     that there is a pattern of people hanging out, especially

21     certain people.  And if it appears to be that, we will

22     certainly, then, do that.  But I am not going to do something

23     just because somebody happened to be there.

24          MS. CADEDDU:  I was going to say last week we had

25     talked about calling up and inquiring of that woman whether

she had had contact with any member of the jury, because she

had been going up to people and showing them the publication

with my client's photograph in it that said "Hamas' rock

star."  So that is something I want to raise, and I don't know

if the Court wants to do that.

THE COURT:  No, not really, because I haven't heard

anything.  I talked to the CSOs and they didn't hear anything

inappropriate.  I don't know if it was the same situation you

saw, so I don't just want to start asking people.

MS. CADEDDU:  The concern is she went up unsolicited

in the hallway --

THE COURT:  I understand.  But unless we have

something more specific, I don't want to start interrogating

people.  They have heard me say what I have said, and the

juror has heard, and so unless we get something more concrete

than somebody just happened to be there when the jury is

there, that can't be avoided unless we just completely take a

different approach.

MS. DUNCAN:  I guess -- I didn't hear anything they

said, and I am not saying there was anything --

THE COURT:  And Mr. Jacks said he didn't hear

anything inappropriate.

MS. DUNCAN:  It is a concern that we always see the

same people that are hanging out where the jury is.

THE COURT:  You may not be noticing some of the

1    other people, but it is the same folks that happen to be here.

2    I am getting concerns coming from the other side.

3         The jury knows, and these people have heard me state what

4    I have stated, so hopefully they all know to avoid that.  If

5    you hear something specific, let me know.

6              (The following was had in the presence and hearing

7              of the jury.)

8              THE COURT:  All right.  Bring in the jury.

9              (Whereupon, the jury entered the courtroom.)

10             THE COURT:  Ms. Hollander?

11             MS. HOLLANDER:  Thank you, Your Honor.

12   Q.   (BY MS. HOLLANDER)  Good afternoon, Agent Burns.

13   A.   Good afternoon.

14   Q.   Now, we were talking about, just to remind you, this trip

15   that Shukri took to the occupied territories in 1991.

16   A.   Correct.

17   Q.   Okay.  The document that has his -- that he authored says

18   that he took that trip from July 16th to August 3rd of 1999.

19   Correct?

20   A.   Correct.

21   Q.   And the document that you photographed at Mr. Ashqar's

22   house has a trip from June 10th to May 17th of 1991.  Correct?

23   A.   I think it will be reversed.

24   Q.   I am sorry.  May 7th to June 10th.  Right?

25   A.   Right.

1  Q.   And I think that when we went to lunch, you had

2  identified Shukri's bank account, Defendants' No. 1017, a

3  purchase on 6/01 in Great Britain.  Correct?

4  A.   Correct.

5  Q.   And you also have -- And Fenwick's Limited is a

6  department store in England.  Right?

7  A.   I don't know about that.

8  Q.   Well, we know it is in England.  Right?

9  A.   That is correct.

10  Q.   Something Shukri paid for with his credit card?

11  A.   That is correct.

12  Q.   All right.  Now, you also have documents from American

13  Express.  Correct?

14  A.   Correct.

15  Q.   Okay.

16       MS. HOLLANDER:  Your Honor, I believe we previously

17  admitted Defendants' No.  1018.

18       THE COURT:  Yes.  No. 1018 is in.

19  Q.   (BY MS. HOLLANDER)  And this is part of the American

20  Express records I am going to show you here in a minute so you

21  can identify it, Shukri's American Express records.

22  A.   Yes.

23  Q.   Okay.  From the Occupied Land Fund.  Right?

24  A.   That is correct.

25  Q.   And that shows a purchase or a stay at the Ramada London

1  West.  Correct?  Do you see that?

2  A.   Yes.  That is correct.

3  Q.   And it says 26/5/91.  Since it is Europe, they reverse

4  the numbers.

5  A.   Correct.  That would be May 26th.

6  Q.   And that is also in London.  Right?

7  A.   Correct.

8  Q.   So to cut this a little bit short, it is safe to say that

9  on May 26th, 1991 and June 1st, 1991, Shukri was in London,

10 according to your records.  Correct?

11 A.   That is correct.

12 Q.   And that is right in the middle of the time that the

13 Ashqar document describes of May 17th to June 10th, 1991.

14 Correct?

15 A.   Correct.

16 Q.   And you also have records--I don't think I need to go

17 through them but let me ask you--that Shukri was out of the

18 country from July 16th, and certainly came back on August 5th.

19 Correct?

20 A.   I can't recall if we have indications of what day he

21 actually left.  We may have some plane records.  But I know we

22 just looked at the incoming records showing that he did come

23 back into the country.

24 Q.   He came back on the 5th of August.  Correct?

25 A.   That is correct.

1    Q.    And I think there is one more document, part of

2    Defendants' No. 1017 from his personal account, that he was at

3    the Seven Arches Hotel in east Jerusalem?  Correct?  On 8/03

4    is the transaction date?

5    A.    Yes.

6    Q.    Can you see that?

7    A.    I do.

8    Q.    Right.  And that is consistent with the time on that

9    report, too, isn't it?

10    A.    It is.

11    Q.    Okay.  Now, if your voice is okay today, I would like you

12    to read for the jury the report that Shukri wrote.  And if you

13    are okay putting it on here, or I can hand it to you, but I

14    can put it on here and we can read it page by page.

15            THE COURT:  What is the exhibit number, counsel?

16            MS. HOLLANDER:  That is a very good question, Your

17    Honor, because the exhibit is on the front page of the Arabic,

18    and I will tell you in just a second here.  Well, I don't

19    know.  It is the one we have just been talking about, but let

20    me get the exhibit number.  I am sorry.  I thought I was doing

21    well to get rid of the Arabic and now I have lost it.

22        It is InfoCom No. 51.

23            THE COURT:  Okay.

24    Q.    (BY MS. HOLLANDER)  And if I put it on here, the jury can

25    read along with you.  And just let me know if I need to make

1    it bigger or smaller.  Okay?

2    A.    Okay.

3    Q.    A little smaller?

4    A.    The right side is cut off.  That looks good right there.

5          Begin reading?

6    Q.    Go ahead.

7    A.    "Thanks be to God and peace be upon God's prophet.  To

8    proceed:

9          "Goals of the visit:

10         "It was decided that the executive director will visit

11   the occupied territories in order to achieve the following

12   goals:

13         "1:  Getting acquainted with the charitable organizations

14   and societies operating on the ground.

15         "2:  Following up the Fund's projects and work with the

16   organizations of the inside.

17         "3:  Removing administrative and technical obstacles

18   facing the bilateral relationship between the Fund and the

19   organizations of the inside.

20         "4:  Studying the possibility of opening an office for

21   the Fund in Jerusalem.

22         "Achievements relating to the first and second goal:

23         The Jerusalem area:

24         "I met Shaykh Muhammed Jum'a from the Jerusalem zakat

25   committee and got acquainted with the committee's activities.

1    The committee's headquarters was not visited after receiving

2    an advice due to the suspicions circulating relating around

3    the Shaykh.

4        "I also met with brother Amin Shweiki, the financial

5    controller of the Jerusalem central zakat and with Shaykh

6    'Abd-al-Azim Salhab.  I met with Mr. Baha'-al-Din Shanablah,

7    director of the office of the Charitable Means Society in

8    Jordan.  I accompanied him in some tours and we discussed the

9    possibility of mutual cooperation in supporting the projects

10   for the inside, exchange of technical expertise, and field

11   information.  I asked him to prepare a vision about joint work

12   fields and the five-year plan of their organization."

13   Q.    Can you see the beginning?

14   A.    In the Bir Nibalah area I visited the headquarters of the

15   committee of the Islamic Sciences and Culture Society, and I

16   discussed the pending problems between the two sides during a

17   business meeting.  I then visited the site of al-Iman School

18   for Girls, which the Fund was the number one contributor to

19   its building, and I discussed the issue of the orphans and the

20   needy families as well as other joint work fields.

21       "It was agreed that the Society will provide the Fund

22   with all the media coverage related to the joint activities,

23   and to provide the Fund with the necessary field studies

24   relating to the charitable work organizations in Palestine,

25   orphan sponsorship organizations and programs, and others.

1    "I also visited the Arab Orphan Society, which is

2    supervised by engineer Abu Suliman, and I got acquainted with

3    its pioneering work in the field of orphan rehabilitation.

4    "I met Mr. Ahmad Bayyud al-Tamimi, director of the

5    Islamic Orphan Industrial House in Jerusalem, and also met

6    with Sheikh Ibrahim Abu Salim, chairman of Bir Nibalah zakat

7    committee and I listened to their aspirations and projects

8    "Bethlehem.

9    "During my visit to the Bethlehem area, I was able to

10   meet with brothers overseeing the Bethlehem zakat committee,

11   and we took a look at al-Akh'a School, which was supported by

12   the Fund, and we found out its latest developments.  I visited

13   work sites in al-Ta'marah region where the 'Umar

14   Bin-al-Khattab mosque is being expanded and a group of good

15   youth is overseeing that.

16   "I met representatives from the Beit Fajar zakat

17   committee, on top of whom was Dr. 'Issa I got acquainted with

18   their activities and projects.

19   "I met with Beit Sahur zakat committee delegation, and I

20   got acquainted with their activities and projects.  I made an

21   exploratory visit to al-Duhayshah Camp and met with a number

22   of its residents and visited its mosque.  During the visit, I

23   met with the camp's zakat committee, which is budding one

24   showing signs of good things as it oversees the mosque, the

25   children nursery, and distributes aid to needy families.

1    Means for cooperation with the fund were discussed with 'Umar

2    Muhammad al-Afandi and the rest of the committee members."

3    Q.    It says Mr. 'Umar Muhammad al-Afandi.  Correct?

4    A.    Correct.

5    Q.    "Hebron area.

6          "In the Hebron area I visited the Islamic Charitable

7    Society and met those in charge in it, including Mr.

8    'Abd-al-Khaliq Al-Natashah and Kamal al-Tamimi, and we

9    discussed the issues of orphan sponsorships and the needy

10   families.  I made a tour to the knitting factory, the orphans

11   house, the school and the nursery.  I had excellent

12   impressions about work and those overseeing it, and I took a

13   photo album about their organization in addition to some other

14   informational materials.  In another tour we visited the

15   headquarters of the Hebron zakat and alms committee, and I got

16   acquainted with those in charge over there.  I reviewed their

17   orphans files and we discussed means for mutual cooperation.

18   I took informational material from the committee.

19         "As for the Young Men Muslim Association in Hebron, Mr.

20   Tadal Sidr accompanied me there and he acquainted me with

21   their educational activities and their efforts in the field of

22   children's nurseries as well as other educational activities.

23   I visited the Association's headquarters, which is still under

24   preparation, and I got acquainted with the Association's needs

25   of offices, employees, and others.  I took informational files

1    and a photo album covering all of the Association's

2    activities."

3         "Gaza.

4         "I visited Gaza accompanied by Dr. Suliman where we met

5    with Mr. Abu Khalid, Abu Nasir, as well as another group of

6    officials and those concerned with charitable work.  We

7    discussed with Mr. Abu Khalid the issue of building a research

8    organization and means of supporting the university.  We

9    suggested to him to establish a central zakat committee for

10   the Gaza Sector.  I visited the headquarters of al-Wafa'

11   Society for Senior Care, and I did not finish my trip to Khan

12   Yunis due to the brothers' remarks around the Khan Yunis zakat

13   committee.

14        "In another tour I visited the Palestine mosque to which

15   the Fund had approved an assistance in the past.  It is a

16   towering fortress which deserves all aid and support.

17        "Um al-Fahm.

18        "During two consecutive visits to Um al-Fahm, it was

19   agreed with the Relief Committee and the Islamic League on all

20   unresolved issues between the two sides and on the ideal means

21   for cooperation.  I visited the Committee's headquarters and

22   met with Shaykh Munir who works there.  I also visited the

23   headquarters of the health clinic, the youth club, and the

24   municipality.  I also visited Shaykh Kamal in Kafr Kana in

25   order to get familiar with their projects over there.

1        "Ramallah.

2        "Due to the deterioration of the situation in Ramallah,

3   and the curfew which was imposed for a while, I was not able

4   to meet the zakat committee in it, except for a passing

5   meeting with one of its officials, in addition to a visit

6   which I made to their health clinic over there.

7        "In the town of 'Atarah, Ramallah vicinity, I meet with

8   the village council which highlighted for me its project to

9   build an is islamic center for the town containing a prior

10  niche, a clinic, and a youth hall.  In the town of Silwad, I

11  was acquainted with the project for Silwad Club, which is

12  overseen by a group of observant youth in coordination with

13  the Ramallah zakat committee.

14       "Jenin.

15       "I visited the hospital in Jenin and its departments

16  which are operational.  I also visited with the headquarters

17  of the Orphans Rehabilitation School, which is still under

18  construction.  I made a tour in Qabatiyyah in Jenin's nearby

19  villages and I met brother Fawaz Hammad, the Fund's

20  representative for the north region.

21       "Nablus.

22       "During two hours of Nablus, I met with the building

23  committee of 'Abd-al-Rahman Bin-'Awf mosque which received an

24  assistance from the Fund, and I discovered with brothers Tariq

25  Sakf al-Hayt, Abu Hamzah, and Abu 'Umar fields of future

cooperation.  It [sic] was also acquainted with the personal

projects in the field of yarn and textile.  I also researched

with the brothers in charge in the area means of support in

the fields of education, development, and health."

"Due to the brothers' aspiration in the area and the

intensity of the countercompetition, their situation deserves

extreme attention.  I asked him to hand over all of the

important projects and to organize them according to their

priority.

"I also met with the Nablus zakat committee on top of

whom was Dr. 'Abd-al-Rahim Hanbali, who handed me a group of

projects."

"Tulkarem.

"I met the Tulkarem zakat committee and visited the sight

of a medical hospital which is still in a construction phase.

I also visited headquarters of the Islamic Association for

Food Supplies, and I listened to the brothers' vision

regarding the possibility of utilizing the country's

agricultural and animal resources for the purpose of building

an economic fortress and securing food for the West Bank

region.

"Jericho.

"I met with Shaykh Harb who explained the region's

worries and needs for support.  I asked him to submit his

projects under the banner of the charitable organizations in

the region, including the Jericho zakat committee which

suffers from crisis.

"Accomplishments of the third goal.  Removing obstacles

facing bilateral relations.

"Thanks be to God, an expanded (official) meeting at the

highest level was held in order to discuss all issues relating

to charitable work in Palestine.  The meeting was attended by

officials from Upper Galilee, Jerusalem, Ramallah, Tulkarem,

Hebron, and elsewhere.

"My demands were summarized in the following:

"It is necessary that the brothers inside submit a

unified strategy for charity work and priorities for every

stage in order to assist the Fund in taking the appropriate

funding decisions which help the authenticated organizations

in reaching its goals.

"It is necessary to adhere to the Fund's requirements

regarding projects and submitting projects according to the

scientific and objective conditions.

"It is necessary to develop charity work inside to mount

to the competitors' level.  I expressed the readiness of the

Fund to provide any possible assistance to the field of

exchange of expertise, information, and training.

"It is necessary to have brothers who are dedicated

solely to the field of charity work.

"These demands were met well and with understanding.  As

a result for continuous dialogue, the problem of the

representatives of the fund was resolved and it was agreed on

the following:

"Brother Ala'a Akil, a graduate from America, a

businessman, and a candidate to obtain a U.S. citizenship will

represent the Fund in the mid region.

"Brother Amin al-Shweiki, a businessman and a member of

the Jerusalem zakat committee will represent the Fund in the

south region.

"Brother Fawaz will continue in his position after all

problems regarding his work method were resolved.

"The medical committee.

"I was unable to find a medical representative with the

needed requirements, yet it is worth mentioning that a

domestic medical committee was formed, and it was agreed that

the medical projects will go through it chairman Dr.

'Abd-al-Karim Abu Samaha, who had no objection to becoming our

medical consultant publicly.

"Gaza status.

"Due to the lack of charitable organizations in Gaza to

cover the humanitarian needs of its residents, and in order to

avoid the legal entanglement in dealing with this situation,

it was agreed with the Islamic Relief Committee in Um al-Fahm

to play the role of the intermediary or the agent in carrying

out the Fund's projects over there and follow up its work

1    until an office for the Fund is established in Jerusalem.  All

2    parties agreed to this proposal.

3    Q.    Two short pages here.

4    A.    "Accomplishments of the fourth goal.  Opening an office

5    in Jerusalem.

6         "I discussed with attorney Bahij Jalal al-Tamimi and

7    brother Fawaz Hammad and some other brothers of the

8    possibility of opening an office for the Fund in Jerusalem.

9    The idea was met with a lot of welcome, particularly in light

10   of changing the legal name of the Fund.  From the legal

11   aspect, there are not obstacles worth mentioning in front of

12   the project.  Brother Fawaz made contacts with officials at

13   the U.S. Embassy and the Ministry of Affairs, and it was found

14   that what is required does not exceed some routine issues.  As

15   for the office space, they were available for an annual lease

16   that does not exceed $2,500, and employees can be hired for no

17   more than $1,800 monthly.  What is needed is to take a final

18   decision regarding the feasibility of the project before

19   taking the implementing steps."

20   Q.    And the conclusion?

21   A.    "There is a reasonable inclination among charity work

22   organizations inside to expand work fields.  However, it is

23   obvious that these aspirations lack any futuristic strategic

24   vision, something which created a lot of competition, a race

25   for the funding resources, and imitation of many consumer

projects that are not based on scientific basis, such as

nurseries and health clinics which are largely widespread.

"Coordination between the different regions has become a

pressing matter in light of the rationalization of financial

support.  Strategies for charity work must be put in place in

order to limit exhausting the resources and in order to

establish a comprehensive infrastructure which serves the

general Palestinian situation with all honesty and

objectivity.

"The domestic situation now calls for focusing on

productive developmental projects which should limit

unemployment and recession, and which contribute to finding

national economic substitutes for the Palestinian people.

"Our last prayer is thanks be to God, Lord of the worlds.

"Shukri Abu Baker, executive director."

Q.    Thank you.

Now, that document, just so we are clear, when you found

it at InfoCom it was in Arabic, wasn't it?

A.    It was.

Q.    Now I am going to turn to something else.

A.    Okay.

Q.    One of the other things that you discussed in your direct

examination involved a phone call between Shukri, Mr. Ashqar,

and someone named Omar Yehya in September of 1993.

A.    Okay.

1    Q.    This is known as Ashqar No. 1.  Okay?

2    A.    Okay.

3    Q.    And you recall -- Now, we are still before Hamas was

4    designated right?  1993?

5    A.    That is correct.

6    Q.    Okay.  And this was -- I believe you described it as kind

7    of a planning meeting for the meeting in Philadelphia.

8    Correct?

9    A.    Correct.

10   Q.    Okay.  And you read a section that concluded with part of

11   what Shukri was saying, so here is what I want you to do.

12            MS. HOLLANDER:  Your Honor, at this time before she

13   begins reading, I believe we have already -- You have already

14   admitted Defendants' Ashqar No. 1 this morning.  This is

15   the --

16            THE COURT:  Yes.  Ashqar Wiretap No. 1?

17            MS. HOLLANDER:  Yes.

18            THE COURT:  Yes, that is admitted.

19            MS. HOLLANDER:  And we have referenced it as

20   Defendants' Ashqar No. 1.

21            THE COURT:  Correct.

22   Q.    (BY MS. HOLLANDER)  Now, just to orient you, this is the

23   Government exhibit which was a -- This was a long call, wasn't

24   it?

25   A.    It was.

```
1    Q.    Right.  And so what you provided to the jury was a

2    portion of the call, or actually several portions.  Correct?

3    A.    That is correct.

4    Q.    So I want to draw your attention to this portion right

5    here, and do you see it says "I mean"?

6    A.    I do.

7    Q.    Okay.  Let's be clear here about who is speaking there.

8    So that is Shukri speaking.  Correct?

9    A.    Correct.

10   Q.    Okay.  And it starts right there?

11   A.    Yes.

12   Q.    And then the portion that you read ended right here where

13   it says, "I mean, there is, there is fear in it.  There is

14   fear."  Correct?

15   A.    I believe so.

16   Q.    Well then, this is your exhibit, I mean, the Government's

17   exhibit.  And then there is a line here which means it went on

18   to some other part of the call.  Correct?

19   A.    That is correct.  That line indicates that it was broken

20   and they started up a little later.

21   Q.    Okay.  So what I want you to do is read that -- Let me

22   make sure I get you to start at the right place here.  Here we

23   go.  So we get this back into, start -- Let's start on the

24   page before.  Okay?

25   A.    Okay.
```

Q.    Just so we get the whole gist of the conversation, if you will start right here, this is where -- This is Shukri again. Right?

A.    Correct.

Q.    Okay.  So I don't want you to have to read the whole thing, but if you will start right here, "There are some legal issues."

A.    Okay.  "There are some legal issues, I mean, that we need to know as well.  I mean, the brothers contacted me before now and asked me to do the sermon on Friday.  You see?

Omar Ahmad [sic] says, "Where?"

"Here in Richardson."

"Hmm."

"So far I am refusing to do so."

"Why?"

"Because I don't think I should play the role of an imam now and a guide for the nation, because the stuff I'm going to say, whether you like it or not, will be held against me because I'm a person in charge of the Foundation.  So I can get up on the pulpit and be a hypocrite.  I should talk in a clear, daring, and strong way.

Q.    Let me stop you a minute.  "So I can't get up."

A.    I am sorry.  "So I can't get up on the pulpit and be a hypocrite.  I should talk in a clear, daring, and strong way on the pulpit.  So I told him, 'Brothers, I have to think

1    about it until tomorrow morning.  We will see.  However, in

2    principle I am opposed.'  They are putting pressure on me to

3    deliver the sermon on Friday because there is nobody else in

4    the city who will talk about this subject and will talk about

5    this subject."

6         "Yes."

7    Q.    And then Shukri says?

8    A.    "You see?  So this is an issue that I'm working on.  But

9    I have no -- I mean, if someone puts pressure on me, I will go

10   up and deliver the sermon and it could because of a Friday

11   sermon that one gets the Foundation in grave trouble."

12        "Okay.  Excuse me, my brother.  I'm, I mean, your words

13   are reasonable if they are implemented in their entirety.

14   However, Abou Ibrahim, for example, is the president of the

15   Foundation and he preaches in the biggest mosque."

16        "So I don't know how do you --"

17        "I mean, Abou Ibrahim, he is more of --"

18        "Yes -- "

19        "-- an imam, my brother."

20        "No.  Abou Ibrahim is more known as the president of the

21   Holy Land Fund".

22        "No, I mean --"

23        "I resort to God."

24        "No.  From the legal point of view my position, my

25   position is more dangerous than Abou Ibrahim's because I am

1    the executive director."

2    Q.    Now this is still Shukri speaking.  Correct?

3    A.    Correct.

4         "I mean, I am the one who faces people.  Abou Ibrahim is

5    an employee of the mosque or an imam.  So when he talks as an

6    imam, as a religious guide, still has the -- I mean, two

7    formal positions.  The religious position is stronger or more

8    dominant in him than, than being the chairman.  Normally a

9    chairman is an honorary position.  As for me, to step on the

10   pulpit now and talk -- attack and speak honestly and then the

11   next -- the next hour the media comes to me at the office of

12   the Holy Land Foundation?  Of course, they will ask, 'Who is

13   this Shukri?'  They will tell him, 'He is the executive

14   director.'  They will come to my office and conduct an

15   interview with me.  Thus, my role will shift from a charitable

16   foundation to an organization for preaching, guidance,

17   political awareness, and public mobilization.  I mean, there

18   is -- There is fear in it.  There is fear.  It is still easier

19   for Abou Ibrahim because he is a sheik, my brother, he remains

20   a sheik.  I mean, no matter how much -- no matter how much the

21   media speaks about him in the past, they did not mention the

22   fact that he is chairman of the Holy Land Foundation.  His

23   social potion is that he a an imam.  His imam position remains

24   stronger and he still has leverage to preach the way he

25   desires to direct the public."

1    Q.   We are going to go onto the next page, but your snippet

2    ended right there where it said "There is fear."  Correct?

3    A.   Correct.

4    Q.   Let's read this final part that Shukri says.

5    A.   Okay.  Shukri says, "This is what I mean.  But, as far as

6    for us over here, I mean, under the spot -- It is possible

7    that one can say something, expressing his opinion, and he'll

8    be surprised that later on it was one way or another, at least

9    in the media it will represent the Foundation's point of

10   view."

11   Q.   Thank you.

12        Moving on to something else.  Actually we are now -- That

13   was just the beginning just before the meeting in

14   Philadelphia.  Correct?

15   A.   That is correct.

16   Q.   So if we are going in date order, as I have been trying

17   to do, we are now up to the Philadelphia meeting.

18   A.   Okay.

19   Q.   Now, that whole meeting was audiotaped.  Correct?

20   A.   That is correct.

21   Q.   Okay.  And it involved a lot of people speaking.

22   Correct?

23   A.   It did.

24   Q.   So if someone were to take the tape and edit it so a

25   statement that was made at the end was put next to a statement

1  that someone made at the beginning, that could change the

2  meaning, couldn't it?

3  A.    It could.

4  Q.    And this conference was -- And I don't want to repeat,

5  except very briefly what we talked about the other day, but

6  this conference was on October 2nd and 3rd of 1993.  Correct?

7  A.    Correct.

8  Q.    And the entire thing was audiotaped, except when they

9  were changing the tapes.

10 A.    Obviously when they were changing the tapes they would

11 miss --

12 Q.    They would miss something?

13 A.    Correct.

14 Q.    So all of them -- These are old fashioned tapes, so you

15 had to take one out, put one in, and if they could do it fast

16 they didn't miss too much; and if they did it a little more

17 slowly, they missed some of the talk in between.  Correct?

18 A.    That is my understanding.

19 Q.    Okay.  And then the audiotapes were converted to computer

20 files so they can be played on a computer.  Right?

21 A.    And this is the area where -- I am not the one who

22 handled any of the technical aspects of it, so I am not sure

23 exactly what they used to convert it.  All I know is that we

24 have it here and we can listen to it today.

25 Q.    All I am saying is it got converted to computer files.

1   A.   Right.

2   Q.   The way we have it isn't the way it was taped.

3   A.   Right.

4   Q.   They are little tapes.

5   A.   Right.

6   Q.   That go in a tape recorder; a word people don't even use

7   anymore.

8   A.   I don't know if they were cassette tapes or reel to reel,

9   or what they were.

10  Q.   Okay.  Now, I know you have that -- you are not sure what

11  this number is before the .WAV, but -- And I am not sure if I

12  asked you if you know what MTGB means?

13  A.   I don't.

14  Q.   Okay.  But this in between appears to be the date,

15  doesn't it, 19931002.

16  A.   It does appear to be the date.

17  Q.   Because there are some that are 19931002, and then there

18  are some that are 19931003.

19  A.   Frankly, I have not looked at this little audio file

20  code, so I am assuming there would be, since there were

21  recordings on the 3rd, but I don't know for sure because I

22  have never looked at that.

23  Q.   Well, let's just find one.  These are the Government's

24  exhibits.  The 3rd was a shorter day, wasn't it?

25  A.   It was.

1    Q.   There aren't as many of those.  Here is one.  So

2    we -- The first one we were looking at was Philly Meeting No.

3    4, and now we are looking at -- these are the Government's

4    Philly Meeting No. 12, and it has 19931003.

5    A.   Correct.

6    Q.   Okay.  Now, I want to look at the order of these.  The

7    Government introduced 12 of these.  I mean 18 of these.

8    Right?

9    A.   Correct.

10   Q.   Eighteen.  I am looking at a number here, 12, but it is

11   18 tapes, eighteen files.

12   A.   Correct.

13   Q.   Okay.  And the first one I want to look at is the one

14   that is called Philly Meeting No. 8.  I thought it was Philly

15   Meeting 8.  I may be wrong.  I am sorry.  It is Philly Meeting

16   18 is the one I want.  I can't even read my own handwriting.

17        All right.  Philly meeting 18.  This is Philly Meeting

18   18.  Okay?

19   A.   Okay.

20   Q.   And the very last page.  And we have Shukri speaking

21   again.  Right?

22   A.   Correct.

23   Q.   And if you can just read just that paragraph.

24   A.   Okay.  It says "May God give you strength.  May God bless

25   our brother, good and bless you.  Now, God's willing, we will

1    have approximately ten minutes from 10:30 -- 1:30 there will

2    be a break and a rest.  Abou Mohamed, have we appointed the

3    prayers time?  We -- Allow me, my brothers.  Allow me.  From

4    5:00 until 7:00 there will be prayers and lunch.  We will pray

5    together then go to lunch, or the other way around.  Let's

6    take a ten-minute break.  Those who want to drink coffee

7    and -- At 1:30.  It is 1:30 now.  Fifteen minutes, our

8    brothers, fifteen minutes.  We should be back here at 1:40,

9    Gods's willing.  We will start then.  Akram, Akram."

10   Q.    Now, that one said audio file MTGB.  Right?

11   A.    That is what it says.

12   Q.    19931002 and then it has 5.WAV.  Right?

13   A.    That is what it says.

14   Q.    All right.  And that was Philly Meeting No. 18, the last

15   one in the Government series.  Now, let's look at what the

16   Government has designated as Philly Meeting No. 14.  Okay?

17   A.    Okay.

18   Q.    And what is the first words there?

19   A.    "Group still in break the first 20 minutes of this

20   recording."

21   Q.    And what does that say?  Just read the audio file, what

22   it says there?

23   A.    "Audio file:  MTGB19931002_6.WAV."

24   Q.    So it would tend to support the theory, would it not,

25   that these numbers, the 5 and the 6, are actually the sequence

1    in which they were recorded, since they were going to prayer

2    and then they come back from prayer.  That supports that

3    theory, doesn't it?

4    A.    I am a little uncomfortable supporting a theory when I

5    don't know what that -- I am not the technical person.  We

6    have technical people who I am sure can answer that question,

7    but because I don't know what that represents or who put that

8    on there, I would hate to theorize under oath about it.

9    Q.    Okay.  Well, let's look at the substance of what was

10   said, and we will probably see some other examples.  Okay?

11   A.    Okay.

12   Q.    During your direct the Prosecutors introduced a number of

13   excerpts from the Philadelphia meeting.

14   A.    That is correct.

15   Q.    In which the speakers -- some of those the speakers

16   expressed opposition to the Oslo Accords.

17   A.    They did.

18   Q.    And there were some other segments where people, or

19   Shukri said that they should be open to other points of view.

20   Correct?  For example, let me show you an example.

21   A.    Okay.

22   Q.    I would like you to look at Government's Philly Meeting

23   No. 5.  This is Philly Meeting No. 5.  Okay?  We are going

24   to -- And specifically what I want to focus on here is talking

25   about the festivals.  Okay?

1   A.   Okay.

2   Q.   Because they did talk about the festivals in the Philly

3   meeting.  Right?

4   A.   They did.

5   Q.   Okay.  The part I would like you to read, it is not very

6   long, it is really just this page.  I may have to move it a

7   little bit for you to get all of it.  We will start right

8   there.  It is page 7.  That is Shukri speaking.  Right?

9   A.   That is correct.

10  Q.   Where he says, "The issue of the festivals."

11  A.   Okay.  It says, "The issue of the festivals, I believe it

12  is a matter of coordination.  I believe they would be a great

13  opportunity to be exposed to a large crowd.  There are about

14  15 festivals, and each festival has a large number of people

15  in it.  I see that we shouldn't follow the same old methods by

16  making the song the main show.  We should benefit from our

17  presence by making awareness the main show; we give more time

18  to the speaker and give him instructions that it shouldn't be

19  like a Friday sermon.  There is no need for the Friday sermons

20  my brothers, please.  The festival is not a Friday sermon.

21  Let's be a little bit objective and present issues and numbers

22  to people which will shock people and make them know what is

23  going on.  Let them get out of the festival educated and --

24       "Do you have a problem with the sheiks?"

25       "My point, my brothers, because we need to face people

1    with reality, let them come to the festival and benefit more

2    than listening to a certain tune.  This is one idea.  The

3    second thing is very intelligent, which is to involve people.

4    I suggest a third idea, which is to conduct a very quick

5    survey.  It can be designed now to let the people in

6    attendance participate in a survey made up of three or four

7    questions.  Do you approve of the accord?"

8         "A questionnaire."

9         "Let them -- At least we would have a poll from the

10   field.  We will know how people think, how people think.  This

11   will benefit us as we will know the nature of our public and

12   how they think.  You might be surprised that maybe 70 percent

13   of your public doesn't know or is not educated.  Let's do this

14   so that it help us with the awareness issue."

15        "We will conduct a survey after the songs and

16   everything."

17        "By God I say, you want to make it a main focus for the

18   song.  I believe that you are going to lose so much potential

19   that you could benefit from.  People are coming to you, my

20   brother and they are right there."

21   Q.   Thank you.  You also read, if I can find it, on page 8 of

22   the same exhibit something someone said right after Shukri

23   spoke, and now I am not finding it.  But I think that is what

24   Shukri said that I wanted you to read.

25        What you read -- Here is what you read.  In other words,

1    the part that you read to the jury was "In support of what our

2    brother Shukri said."  Right?  That is the part that you read

3    to the jury.

4    A.    I believe it is.  I believe it is.

5    Q.    Okay.  So what we have just read is what Shukri's actual

6    words were that he was responding to.  Correct?

7    A.    Correct.

8    Q.    Okay.  Now, I would also like to go to Government's

9    Philly Meeting No. 14.  I just want you to read one other

10   section here.  And that is where Shukri talks about needing to

11   act according to American law.  And this is Philly Meeting No.

12   14.  Right?

13   A.    Right.

14   Q.    And it is the very end of this.  We have to make one

15   correction here, because I am using a kind of old one.  We

16   corrected these words.  Right?  You corrected those?

17   A.    Correct.

18   Q.    Okay.  Now, what I would like you to do is read just this

19   page.  It is going to end on this page and starting where I

20   have highlighted it right after "strategies," where he says

21   "one."  And that is Shukri speaking.  Do you want me to go

22   back?  It is a very long section?

23   A.    It is Shukri speaking.

24   Q.    It is Shukri speaking.  Okay.  So we don't have to read

25   all of, it but starting there with "one."

1    A.    Okay.  It says, "One.  The address should steer totally

2    clear from any tension towards the issue of the self-rule."

3    Q.    Wait a minute.  I think I have something wrong here.

4    Hold on.  We will correct this before we get them, but some of

5    these translations have been corrected along the way.  Go

6    ahead and read it.

7    A.    "One.  The address should steer totally clear from any

8    tension towards the issue of the self-rule.  I believe that I

9    as a charity organization should not give an opinion or a

10   political judgment at all.  I have no relationship with that.

11   I am not a political institution.  I want to -- There is a new

12   reality I'm dealing with now.  It is not my job to attack the

13   self-rule.  This is my view.  Amicable relationship must be

14   maintained with all parties inside Palestine.  This goes

15   without saying, my brothers.  We must not put any factional or

16   partisan influence on the Foundation in America as it is the

17   charitable arm of this or that.  No, I say that this is wrong,

18   and we must act out of a charitable stand.  We must act as an

19   American organization which is registered in America and which

20   cares for the interests of the Palestinian people.  It doesn't

21   cater to the interests of a specific party.  Our relationship

22   with everyone must be good, regardless."

23        "Including the Muslims, of course."

24        "The Muslims, of course.  There is no problem, my

25   brother.  This is -- This is -- In the past we gave Islamists

1   $100,000 and we give others $5,000.  Just because they're --

2   we should never ever be the agents of others, but we should

3   maintain a balance.  Taking time before spending money during

4   this time.  What do I mean by taking time before spending

5   money?  The Foundation must stay on its legal track as far as

6   charitable projects are concerned without going after a

7   sentiment which could harm the foundation legally or which

8   consume its budget with an objective reason.  We must be

9   careful.  I know that there is a crisis now.  I know that

10  there is suffocation now.  But you are an organization and you

11  must care about your interests, the long-term and the

12  continuity.  It doesn't help me if a party asks me to send

13  $100,000 and we send it to them and -- Our goal to follow must

14  be objective, studied.  Every project ought to be documented,

15  documented and studied, and I can confront people with it

16  without trying to conceal anything from them.  This is very

17  important as a time might come and you -- which makes you

18  deviate from the legal track in order to satisfy a certain

19  issue and then --"

20  Q.   Now, it says page 7 or 8, but there is nothing on page 8.

21  Right?

22  A.   I don't see anything on that page.

23  Q.   There is nothing on page 8.

24  A.   Right.

25  Q.   Okay.  But in fact, he continues speaking, and just read

1    the end of what he says on that subject right here, this

2    paragraph.

3    A.    "And I say that the address doesn't necessarily have to

4    be the same one for newspapers or correspondence.  By address

5    I mean work methods.  When speaking to the Islamic community,

6    I use a certain address and I respond to certain needs.  The

7    American public has certain needs and the nationalist public

8    has other certain needs, and it is important that this

9    foundation does not -- I mean, it should diversify its

10   programs to absorb all the currents on the field.  It does not

11   represent the Foundation to have -- He who is going to give us

12   money, is he going to provide it under conditions?  Give me

13   the money, whether it is from an Arab or a Jew, I don't care,

14   just give me the money.  Okay?  The prohibited areas which we

15   might face are not many, but caution remains important.  I

16   mean, someone might try to frame you to bring disaster upon

17   you.  This is regarding the charitable organizations.  We

18   shouldn't take part in any illegal transactions.  Other than

19   that we can manage.  That's it."

20   Q.    Now, this first part where he was speaking was Philly

21   Meeting No. 14.  Right?

22   A.    Correct.

23   Q.    And that one says audio file MTGB19931002_6.WAV.  Right?

24   A.    That is what it says.

25   Q.    And where this appears to continue in the same subject,

1    it is Philly Meeting No. 13.  Right?

2    A.   And I can't state for certain without looking at the

3    tapes that this is a continuation of what he was saying right

4    there.

5    Q.   Okay.  I know you can't, but just follow along with me

6    here.  It is Philly Meeting 13.  Right?

7    A.   Correct.

8    Q.   And this one does say 19931002_7.WAV.  Right?

9    A.   It does.

10   Q.   So if these numbers might mean anything, it is 6 and 7.

11   Correct?

12   A.   If they do, it is.

13   Q.   All right.  Now, there is another section, the final

14   section I want to draw your attention to, and this is

15   Defendants' Exhibit D-Philly No. 14.

16        MS. HOLLANDER:  Which was introduced this morning

17   and admitted this morning, Your Honor?

18        THE COURT:  Yes.

19        MS. HOLLANDER:  And we also need to admit, we will

20   have to do it later, D-Philly Meeting No. 14-A, the audiotape

21   that goes with it.

22        THE COURT:  Okay.

23        MS. HOLLANDER:  I think all of them have audiotapes.

24   It is -- The audiotape is the real evidence, so we move

25   D-Philadelphia Meeting No. 14-A at this time.

1          THE COURT:  Mr. Jonas?

2          MR. JONAS:  Subject to what was discussed

3     previously.

4          THE COURT:  And D-Philly Meeting No. 14-A is

5     admitted.

6          MS. HOLLANDER:  Thank you, Your Honor.

7     Q.   (BY MS. HOLLANDER)  Now, just to orient you, Agent Burns,

8     because this is the Defendants' exhibit, and this one says

9     audio file 19931002_14, doesn't it?

10    A.   It does.

11    Q.   Okay.  And I just want you to focus on one part of that.

12    Just make sure I have got the right part, it is just one

13    paragraph that Shukri talks about in that transcript.  Okay?

14    A.   Okay.

15    Q.   It is this paragraph.

16    A.   Okay.  Do you want me to read it?

17    Q.   Yes, please.

18    A.   "I have a small remark, a point, and we will move

19    forward.  My brothers, frankly speaking, we have come from the

20    far ends of the world, and it is -- a fundamental part of our

21    work is to be exposed to strange and somewhat new ideas.  I

22    mean, we don't have to follow the same routine.  The situation

23    has changed and I see that we bear each other.  The second

24    thing is that we shouldn't be hasty.  Allow me, shouldn't be

25    too hasty with the sharia rulings.  I mean, we have a

1    disagreement over an issue and he says, 'You've deviated from

2    the religion.'  What does the sharia say?  For the sharia to

3    give a ruling on these issues, my brother, you need a

4    specialized council of scholars which understands the issues.

5    But for someone to present issues, certain ideas which sound

6    strange and then comes a person who wants to stop him and

7    says, 'This is permissible or prohibited in sharia,' my

8    brothers, this is not a way for discussion, because you're

9    blocking a lot of ideas.  Until now, until now the nature of

10   our relationship with the American society -- The brother

11   mentioned the Hindus.  We don't know the society.  We don't

12   know until now if the American society is being hostile to us

13   for a reason of principle, religion, or because of interests.

14   In other words, if we transformed all the Jewish lobby in

15   Washington into an Islamic lobby and we had the same power as

16   they do, will the U.S. policy change or not?  This is a big

17   question.  What I'm saying, that it is very hard for every

18   issue we discuss to judge it from a sharia stand and judge it

19   according to sharia within minutes that is prohibited or

20   permissible and let it slide.  Come on, next idea.  Let us be

21   a little bit open, and if we see an idea that is worth

22   studying, we can refer it to the is sharia councils and stuff

23   and make a judgment call on it."

24   Q.   Now, that particular transcript wasn't included in the

25   Government transcripts, was it?

1   A.   In the ones that we introduced today or this week?

2   Q.   Last week.

3   A.   I don't know if it was or not.  I know that the entire

4   meeting was supposed to have been exhibited.  But I did not do

5   the exhibiting, so I can't say for certain that that portion

6   was in there.

7   Q.   Well, let's just look.  Let me get the Government's No.

8   18, which is somewhat put out of order here and make sure they

9   are put back in order.

10            MS. HOLLANDER:  May I approach, Your Honor?

11            THE COURT:  Yes.

12            MS. HOLLANDER:  I can do this at her desk easier

13   than here.

14   Q.   (BY MS. HOLLANDER)  Now, Agent Burns, you have got all of

15   the Government's No. 18, don't you?

16   A.   Yes, I do.

17   Q.   And you have got Defendants' Philly Meeting No. 14.

18   Right?

19   A.   Correct.

20   Q.   And can you make sure that that one is not one of the 18?

21   A.   Okay.

22            THE COURT:  Counsel, how many pages is she going to

23   have to look through?

24            MS. HOLLANDER:  I think she is going to have to just

25   look at the fronts of them.  I can make it easier for her.

1              THE COURT:  Yes.

2              MS. HOLLANDER:  I remember now that I had a plan.

3              THE WITNESS:  No, it is not in here.

4              MS. HOLLANDER:  May I approach, Your Honor?

5              THE COURT:  Yes.

6    Q.   (BY MS. HOLLANDER)  Okay.  So now, of the Government's

7    No. 18, then Defendants' Philly Exhibit No. 14 wasn't one of

8    those.  Correct?

9    A.   That is correct.

10   Q.   Okay.  So that is one that you didn't introduce during

11   your direct examination.  Correct?  The Government didn't

12   introduce?

13   A.   It wouldn't have been admitted because it is not one of

14   those 18.

15   Q.   It is not one of 18.  Right.  But it is part of the

16   Philly meeting.  There is no question about that, is there?

17   A.   That is correct.

18   Q.   Okay.  Now, I want you to do one more thing in relation

19   to the Philadelphia meeting, and then we are going to move on.

20   I have written here just Philly Meeting No. 1 through 18.

21   Okay?

22   A.   Okay.

23   Q.   And I am going to give these back to you because I think

24   it will be easier if you have them rather than if I have to

25   keep moving things back and forth.  And I will just tell

1    you --

2            MS. HOLLANDER:  May I approach?

3            THE COURT:  Yes.

4            MS. HOLLANDER:  I think this will be easier now that

5    we have got them in order.

6    Q.  (BY MS. HOLLANDER)  Now, the one that is marked Philly

7    Meeting No. 1, what I am focusing on is this little number,

8    the little number that comes before .WAV.  The first one

9    doesn't have a number on it, does it?

10   A.   It doesn't.

11   Q.   For some reason it doesn't have anything where it says

12   audio file.  Right?

13   A.   Correct.

14   Q.   Okay.

15           MR. JONAS:  Your Honor, I object to this.  Agent

16   Burns has already testified she doesn't know what that

17   numbering system is.  She wasn't part of creating that

18   numbering system or the recording of this.

19           THE COURT:  She may ask the question.  Go ahead.

20           MS. HOLLANDER:  Thank you.

21   Q.  (BY MS. HOLLANDER)  So I am just going to put a line

22   there.  Okay?  Because we don't know even what the number is.

23   I am not asking you to -- I am just asking you to tell me what

24   it is.

25           Now Philly Meeting No. 2, what is the number that is

1    written there before .WAV?

2    A.    MTGB19931002_16.WAV.

3    Q.    Okay.  So that is No. 16.  So Philly Meeting No. 3, you

4    don't have to read the whole thing, just read the number that

5    is before .WAV?

6    A.    It doesn't have it on there.

7    Q.    That is the other one that doesn't have it on there.  It

8    doesn't say audio file or anything.

9    A.    Correct.

10    Q.    Now, Philly Meeting No. 4, what number does it have just

11    before .WAV?

12    A.    15.

13    Q.    And what about Philly Meeting No. 5?

14    A.    11.

15    Q.    Now, let me ask you one other thing.  I should have done

16    this.  Philly Meeting No. 2, there is one other thing I need

17    you to tell me, and that is that the October 2nd or October

18    3rd.  We don't know about the first one.  Right?  The first

19    one doesn't --

20    A.    That is correct.

21    Q.    Okay.  But for Philly Meeting No. 2, is that 1002 or

22    1003?

23    A.    1002.

24    Q.    So that is 1002.  And Philly Meeting No. 3 we don't know

25    anything about.

1    A.    It doesn't have a number on there.

2    Q.    So Philly Meeting No. 4, is that 1002 or 1003?

3    A.    It is 1002.

4    Q.    That is the one that was 15?

5    A.    Correct.

6    Q.    And Philly Meeting No. 5 is 11.WAV?

7    A.    It is 11.

8    Q.    And is it 1002 or 1003?

9    A.    It says 1002.

10   Q.    Philly Meeting No. 6?

11   A.    1002.

12   Q.    And what is the .WAV number?

13   A.    4.

14   Q.    And Philly Meeting No. 7?

15   A.    1002.

16   Q.    And the number?

17   A.    12.

18   Q.    Philly Meeting No. 8?

19   A.    1003.

20   Q.    I am going to put it out here so we can find it later.

21   And what is the number?

22   A.    3.

23   Q.    All right.  And No. 9, Philly Meeting No. 9?

24   A.    Sorry.  I had them out of order.  1003, 1.

25   Q.    Philly Meeting No. 10?

```
 1    A.    1002.

 2    Q.    And what --

 3    A.    3.

 4    Q.    No. 11?

 5    A.    1002.

 6    Q.    And what is the little number?

 7    A.    9.

 8    Q.    Philly Meeting No. 12?

 9    A.    1003.

10    Q.    And the little number before .WAV?

11    A.    2.

12    Q.    No. 13?

13    A.    1002.

14    Q.    And the little number?

15    A.    7.

16    Q.    No. 14?

17    A.    1002.

18    Q.    And the little number on that one?

19    A.    6.

20    Q.    No. 15?

21    A.    1002.

22    Q.    And the little number there?

23    A.    8.

24    Q.    No. 16?

25    A.    1002.
```

```
1    Q.   And the little number?

2    A.   13.

3    Q.   No. 17?

4    A.   1002.

5    Q.   And its little number?

6    A.   10.

7    Q.   And No. 18?

8    A.   1002.

9    Q.   And its little number?

10   A.   5.

11   Q.   Now, if we don't count the 03s, because those were a

12   separate day.  Right?  We have -- We don't have No. 1 and No.

13   2, but we are missing two.  Right?  We don't know what those

14   are.  Right?

15   A.   Correct.

16   Q.   But we have No. 3.  Right?

17   A.   Yes.

18   Q.   No. 4?

19   A.   Correct.

20   Q.   No. 5.  Correct?

21   A.   I don't see it on the screen.  I can't --

22   Q.   I am sorry.  No. 5?

23   A.   Yes.

24   Q.   No. 6?

25   A.   Correct.
```

```
 1    Q.    No. 7?

 2    A.    Yes.

 3    Q.    No. 8?

 4    A.    Correct.

 5    Q.    No. 9?

 6    A.    Correct.

 7    Q.    No. 10?

 8    A.    Correct.

 9    Q.    No. 11?

10    A.    Correct.

11    Q.    No. 12?

12    A.    That is correct.

13    Q.    No. 13?

14    A.    Yes.

15    Q.    And then it skips to No. 15.  Right?

16    A.    It does.

17    Q.    We don't have a No. 14, do we?

18    A.    Not that I see.

19    Q.    And then we have a No. 16.  Right?

20    A.    Correct.

21    Q.    And Defendants' Exhibit D-Philly No. 14, that is the No.

22    14, isn't it?

23    A.    I don't have that one up here.

24    Q.    It is right here.  That is No. 14.  Right?

25    A.    Correct.
```

1    Q.   So I am not going to ask you what those numbers mean

2    because you said you don't know.

3                MS. HOLLANDER:  Can I retrieve my exhibits, Your

4    Honor?

5                THE COURT:  Yes.

6                MS. HOLLANDER:  Do you want me to keep going?  I am

7    about to go to something else.

8                THE COURT:  Yes, go ahead.

9                MS. HOLLANDER:  I made this document on the stand

10   here, Your Honor.  I would like to mark it as a demonstrative,

11   Defendants' Demonstrative, and I don't know what number it is.

12   It would be D-1352.  And move it into evidence as a

13   demonstrative.

14               MR. JONAS:  Your Honor, I object.  I mean, there has

15   been no testimony what this means.

16               THE COURT:  I will sustain that until you connect it

17   in some way.  You can reoffer it later, if you can connect

18   it --

19               MS. HOLLANDER:  Okay, Your Honor.

20   Q.   (BY MS. HOLLANDER)  Just so we are clear before we leave

21   that Defendants' Exhibit, Philly No. 14 was part of the

22   Philadelphia meeting.  Correct?

23   A.   Correct.

24   Q.   And it was part that was not included in the original 18

25   that were introduced during your direct examination.  Correct?

1          MR. JONAS:  Your Honor, I object.

2          THE COURT:  That is about the third time you asked,

3    counsel.  She has answered.

4    Q.   (BY MS. HOLLANDER)  Let me move on to something else.

5    Okay?

6    A.   Okay.

7    Q.   And I am not going to ask you to read anymore, for a

8    while at least.

9    A.   Thank you.

10   Q.   Maybe not at all.  I want to talk to you a little bit

11   about the Oslo Accords, because you said that is what the

12   Philadelphia meeting was about, in your opinion.  Correct?

13   A.   I believe we said that the reason the meeting was called

14   was as a result of the signing of the accords, but that was

15   not what it was about.

16   Q.   You did testify that the accord was between the Israeli

17   people and the Palestinian people, on your direct.  That is

18   what --

19   A.   Correct.

20   Q.   A quote from you.  In fact, I am correct, am I not, that

21   it was the government of Israel on one side and the

22   Palestinian people on the other side, because at that time

23   there was no Palestinian government.  Correct?

24   A.   That is correct.

25   Q.   The Palestinian Authority was actually created as a

1  result of this accord.  Correct?

2  A.    It was.

3  Q.    And the political party in control of the Palestinian

4  Authority when it was controlled was the party known as Fatah,

5  F-A-T-A-H.

6  A.    That is correct.

7  Q.    And that is a secular party, not a religious party.  Is

8  that correct?

9  A.    That is correct.

10  Q.    Now, and it actually controlled -- It was the controlling

11  party of the Palestinian Authority until the elections of

12  2006.  Correct?

13  A.    Correct.

14  Q.    Okay.  Now, throughout the Philadelphia meeting, and

15  particularly in the parts that you read during your direct

16  examination, you heard Shukri Abu Baker talk about --

17  specifically about Gaza and Jericho.  Do you recall?

18  A.    I do.

19  Q.    And that is because those are the parts that were under

20  Palestinian control.

21  A.    And if we are talking about decisions --

22        MR. JONAS:  I will object, Your Honor.  She is

23  asking the witness her understanding of the reason why the

24  Defendant said something.

25        MS. HOLLANDER:  No, that is not what I am asking

1   her, Your Honor.  I am asking her --

2              THE COURT:  If she heard Mr. Baker specifically talk

3   about Gaza and Jericho, if she remembers hearing that.

4              MS. HOLLANDER:  And she said she did.

5              THE COURT:  Okay.

6   Q.   (BY MS. HOLLANDER)  Now, I want to show you what has been

7   marked as Defendants' -- Admitted as Defendant Exhibit No.

8   1013.  Okay?

9   A.   Okay.

10  Q.   And this is a map and it says at the top "Oslo 1995."  Do

11  you see that?

12  A.   I do.

13  Q.   You do know that the areas that were under Palestinian

14  control at that time were Gaza and Jericho and a few other

15  cities.  Correct?

16  A.   I do not know all of the specifics of Oslo.  I think we

17  have talked about this before.  I mean, I know that Gaza was

18  one of the areas that was a subject of that, but as far as

19  details of Oslo and what was to go to the Palestinians versus

20  remain with the Israelis, I am not sure on that.

21  Q.   Well, you have previously testified that -- when asked if

22  throughout the Philadelphia meeting the parts, that you had

23  read that you heard Shukri talk about Gaza and Jericho, that

24  is because they were under Palestinian control, and that is

25  what you previously testified, and I assume that you would

1   continue to testify that way.  Correct?

2   A.   I think that is the question you asked me and Mr. Jonas

3   objected, and then the Judge asked you if you asked me if I

4   heard Shukri talk about Gaza and Jericho and you said I did.

5   Q.   I am not talking about today.  I am talking about your

6   previous testimony.  You have previously testified --

7        Let me just go on.  Okay?  You see where Jericho is,

8   don't you?

9   A.   I do.

10  Q.   And it is over here.  Right?

11  A.   It is.

12  Q.   And you see Bethlehem?

13  A.   I do.

14  Q.   And Hebron?

15  A.   I do.

16  Q.   And Ramallah?

17  A.   Yes.

18  Q.   And Nablus?

19  A.   Yes.

20  Q.   Jenin?

21  A.   Yes.

22  Q.   Tulkarem?

23  A.   Yes.

24  Q.   And Qalqilya?

25  A.   Yes.

```
1   Q.   And those say area A.  Right?

2   A.   They do.

3   Q.   And you -- Is it your testimony today that you don't know

4   that those were the parts under Palestinian control?

5             MR. JONAS:  I am going to object.  One, this is

6   beyond the scope of direct; and two, we are getting into that

7   political area that Your Honor did not want us to get into.

8             THE COURT:  She may ask.  If you know you may answer

9   that, Agent.

10            THE WITNESS:  I am sorry.  What was your question?

11  Q.   (BY MS. HOLLANDER)  You do know that those were the areas

12  under Palestinian control, and that is why they were talking

13  about those areas.  Correct?

14  A.   I know that the specific towns in the west Bank, Qalqilya

15  Tulkarem, Nablus, that those areas were part of the

16  Palestinian territories.  The Jericho issue, I have never

17  looked at it so I don't want to speak about it because, again,

18  I know what they have talked about but I don't know the

19  details of Oslo.

20  Q.   Okay.  So you are really not an expert on Oslo at all,

21  are you?

22  A.   I never said I was.

23  Q.   And so you don't know who else might have opposed Oslo

24  other than these Defendants.  Right?

25  A.   I know that extremists on both sides opposed the peace
```

1  accords.

2  Q.   Well, but you know that there were Christian Palestinians

3  who didn't -- who opposed the Oslo, too, because they thought

4  it gave away too much land.  Correct?

5  A.   I am sure there were some Christian Palestinians who

6  opposed it.

7  Q.   Because they thought it gave away too much land.

8  A.   I never discussed it with them, so I don't know.

9  Q.   So you don't really know why people opposed -- the

10  different reasons people had for opposing Oslo, because you

11  haven't studied it?

12  A.   I know why Hamas and the Defendants opposed it--because

13  they did not want to compromise at all.

14  Q.   You don't know why other groups opposed it.  Is that

15  correct?

16  A.   I know that there were certain extremist groups, not just

17  Hamas, who opposed any type of peace or compromise whatsoever.

18  I am sure other people had specific issues with parts of Oslo,

19  but these Defendants opposed it in general.

20  Q.   Did you know that when Israel voted on it that almost

21  half of the people in the Israeli KNESSET voted against it?

22  Did you know that?

23  A.   I did not.

24  Q.   Did you know that an Israeli man who opposed the accord

25  actually killed the Israeli prime minister because he signed

1    it?  Did you know that?

2    A.    I know the Israeli prime minister was killed by an

3    extremist.

4    Q.    A Jewish extremist?

5    A.    That is correct.

6    Q.    Who opposed Oslo?

7    A.    I don't know if he did or didn't.

8    Q.    Do you know the positions of the political parties that

9    were in power in Israel and their positions regarding Oslo?

10   A.    I am not a politician so I don't study the politics of

11   Israeli political groups.

12   Q.    So you don't know?

13   A.    No.

14   Q.    Okay.  I want to direct your attention now to one of your

15   charts.  I will put this up here for a minute.  You talked on

16   direct examination about -- This was your chart or the

17   Government's chart that talks about Hamas leaders in the

18   1990s.  Right?

19   A.    Right.

20   Q.    And one of the people listed there is Jamil Hamami.

21   Correct?

22   A.    Correct.

23   Q.    And the chart says Hamas leader West Bank.  Correct?

24   A.    Correct.

25   Q.    And you testified on direct and you know that he came to

1    the United States.  Correct?

2    A.    That is correct.

3    Q.    I believe you testified on direct that he came to the

4    United States, you thought, in 1999.  Right?

5    A.    I am not sure on the dates, but I know it was late '90s,

6    early 2000 maybe.

7    Q.    I think you are probably right.  And I would like to

8    direct your attention to Defendants' Exhibit No. 86.  I am

9    sorry No. 87.  Okay?

10   A.    Okay.

11   Q.    Now, even though he is on this chart here as being a

12   Hamas leader, you are aware that he was invited to the United

13   States on behalf of the United States Information Agency.

14   A.    I am.

15   Q.    And that he came as a distinguished guest from the

16   occupied territories and traveled around the United States.

17   A.    I believe it was about three years after he was

18   excommunicated from Hamas.

19   Q.    You don't know that he was -- There is no such thing as

20   being excommunicated from Hamas.  It is not a Catholic church.

21   It is --

22   A.    It is not a Catholic church, but he was kicked out.

23   Q.    You are not -- You don't have any personal knowledge of

24   that, do you?

25   A.    I have actually met him and we talked about it.

1    Q.   But -- Well, but he came to -- Even though he was listed

2    as a leader in the '90s, the United States government invited

3    him here in 1999.  Correct?

4    A.   After he had stepped out of Hamas, yes.

5    Q.   All right.  So people change, don't they?

6         MR. JONAS:  Objection.

7    Q.   (BY MS. HOLLANDER)  Now, one of the documents admitted

8    during your direct testimony was a form letter from Shukri to

9    HLF donors.  Right?  I believe it was HLF Search No. 94.  Do

10   you recall this?

11   A.   I do.

12   Q.   Part of that exhibit included a letter -- This is the

13   letter.  Right?  In other words, it is on Holy Land logo.

14   A.   Correct.

15   Q.   And it was August 22nd, 1997.  Right?

16   A.   That is correct.

17   Q.   And in this letter, what I would like you to is real the

18   part that starts right in the middle.  It says -- You don't

19   have to read the whole thing, but "I am cordially inviting

20   you."

21   A.   It says, "I am cordially inviting you to attend this

22   year's annual fundraising event.  This year's program promises

23   to be unforgettable.  Five innocent victims of senseless

24   violence from the West Bank and Lebanon will be here to tell

25   you their horrifying, traumatic experiences.  While in the

1    States, these children will undergo numerous delicate

2    surgeries unavailable to them overseas.  A remarkable video of

3    the current situation in Palestinian produced by Tom Hayes, an

4    American journalist, will leave you breathless."

5    Q.    Now, you actually found that documentary by Tom Hayes in

6    the Holy Land search, didn't you?

7    A.    I may have.

8    Q.    And it is a documentary --

9          MS. HOLLANDER:  May I approach to refresh her

10   recollection, Your Honor?

11         THE COURT:  Actually approach the bench on that.

12         (The following was had outside the hearing of the

13         jury.)

14         MS. HOLLANDER:  I am not meaning to introduce it.

15         THE COURT:  Then you don't need to identify it.

16         MS. HOLLANDER:  I am not going to ask her --

17         THE COURT:  If we are not introducing it, we are not

18   going to identify it.  Is that the PBS documentary?

19         MS. HOLLANDER:  Yes.

20         THE COURT:  I am sustaining the objection.  You

21   brought up that you were going to go into this, I viewed it,

22   and I am going to sustain the objection to that.  We don't

23   need to discuss it or have her identify it because I am

24   sustaining the objection to that.

25         MS. HOLLANDER:  Let me ask you this, if I could just

 1    do this.  Could I just ask her if she identifies that she saw

 2    the documentary?

 3              THE COURT:  Why?  It is not coming into evidence.

 4              MS. HOLLANDER:  Well, I may need to make a proffer

 5    later.

 6              THE COURT:  We can do that outside the presence of

 7    the jury.

 8              MS. HOLLANDER:  She is the only one that can

 9    authenticate --

10              THE COURT:  We don't need to do that in front of the

11    jury, though.

12              (The following was had in the presence and hearing

13              of the jury.)

14              MS. HOLLANDER:  Your honor, I have one more area

15    that is kind of lengthy.

16              THE COURT:  Go ahead and start it.  We will work

17    about another five or ten minutes.

18              MS. HOLLANDER:  Okay.

19    Q.    (BY MS. HOLLANDER)  I want to shift your focus again.

20    A.    Okay.

21    Q.    I am trying to cover what you covered, so I am trying to

22    keep it in chronological order, but a little bit going back.

23    Well, actually I am not.  I am still staying pretty much

24    current, but I want to follow up on your direct examination

25    and also what you read here today, and that was a section in

1   the Philadelphia meeting where Shukri talked about how in the

2   past they have given $100,000 to Islamists and $5,000 to

3   others.  And you read it last week and read it again today.

4   Right?

5   A.    Correct.

6   Q.    Now, I have a few additional questions about this, but I

7   want to focus your attention on documents and items that you

8   found in the various searches showing what Holy Land actually

9   did after the Philadelphia meeting.  So let's -- You said

10  during direct examination that Holy Land gave $5,000 to

11  Oklahoma City after the explosion there in 1995.  Correct?

12  A.    I said they gave that and did several other things on

13  their behalf, but that was an example that they gave.

14  Q.    I think you said that they did that and some blood

15  donations.  So let's start with Oklahoma, $5,000.

16          MS. HOLLANDER:  And these exhibits I believe have

17  already been admitted, but in an abundance of caution

18  Defendants' No. 1058 is the first one.  I don't think there

19  was any objection.

20          THE COURT:  Any objection to that, counsel?

21          MR. JONAS:  One moment, Your Honor.

22          THE COURT:  I show no objection on your previous

23  filings.  That is admitted.  Why don't you read them all.

24          MS. HOLLANDER:  No. 1058, 119, then there is also

25  1059 and 1060.

1          THE COURT:  Okay.

2          MS. HOLLANDER:  And 1055, and after that we are

3   going to have to -- We get to the video.  Those are the ones I

4   am going to be dealing with at first.  Okay?

5          THE COURT:  All right.  And those exhibits are

6   admitted.

7          MS. HOLLANDER:  Thank you, Your Honor.

8   Q.   (BY MS. HOLLANDER)  Now, this is the check, is it not, to

9   the Oklahoma -- From right after the explosion there in 1995.

10  Correct?  $5,000 check?

11  A.   Yes, it is a check to Oklahoma City Relief.

12  Q.   And you know that Holy Land also sent volunteers, and I

13  think you mentioned this a little bit, they did some blood

14  donations.  Correct?

15  A.   That is correct.

16  Q.   Okay.  Defendants' Exhibit No. 119, this is a letter of

17  thank you to Holy Land from Blood Care in Dallas.  Correct?

18  A.   Correct.

19  Q.   Now, Holy Land also gave $2,500 to the Red Cross,

20  Defendants' Exhibit No. 1059, at the same time.  Correct?

21  A.   That is correct.

22  Q.   And it says that is for the Oklahoma explosion.  Right?

23  A.   It does.

24  Q.   $2,500  Right?

25  A.   Correct.

1    Q.   And these documents were actually -- This one, No. 1059

2    was in the Holy Land files.  That is where you found that one?

3    A.   That is correct.

4    Q.   And actually, you also know that a number of people flew

5    to Oklahoma City to actually help out there.  Correct?

6    A.   That is correct.

7    Q.   Okay.  And we can -- You have subpoenaed from American

8    Express their records, Defendants' Exhibit No. 1055 as part of

9    your American Express records.  Right?

10   A.   That is correct.

11   Q.   And that showed -- For example, on this page it shows

12   Airport Express, some kind of a taxi service in Oklahoma City.

13   Correct?  Do you see that?

14   A.   That is what it says, yes.

15   Q.   And you see at the bottom it has a number of -- It says

16   Delta Airlines.

17   A.   I see that.

18          THE COURT:  Ms. Hollander, did you want that -- I

19   don't show that as in evidence.

20          MS. HOLLANDER:  I think I said it wrong.  It is No.

21   1055.

22          THE COURT:  I don't show that, but I show no

23   objection from the Government so that is admitted, just so you

24   know.

25          MS. HOLLANDER:  Thank you.  I thought I included

```
 1   that.
 2               THE COURT:  You may have, but I don't show it.
 3               MS. HOLLANDER:  But it is admitted now?
 4               THE COURT:  Yes, it is admitted now.
 5               MS. HOLLANDER:  Thank you.  I am sorry.
 6   Q.    (BY MS. HOLLANDER)  So this shows plane tickets?
 7   A.    That is right.
 8   Q.    And you know a large number of people went to Oklahoma
 9   City from Holy Land.
10   A.    I believe that if you look through the bill, the HLF flew
11   a number of people up there.
12   Q.    So if we look at this one, the next page, these are all
13   tickets, aren't they, on Delta?
14   A.    Correct.
15   Q.    And if I tell you that I counted up a total of 39 on that
16   page, and I think 7 or 8 or 9 on the other page, does that
17   look about right?
18   A.    I did not count them, but I know there were a large
19   number of them.
20   Q.    And actually Mr. El-Mezain went to Oklahoma.  Right?  M.
21   El-Mezain.  Do you see that?
22   A.    I do.
23   Q.    And you see over here where it says G. Ashi.  That is
24   Ghassan Elashi.  Correct?
25   A.    That is correct.
```

1    Q.    I believe, if we find another, that Shukri went also.

2    Right?  Do you see this one also?

3    A.    That is correct.

4    Q.    Now, they went there to assist with a number of -- some

5    of the charitable work that was going on in Oklahoma.

6    Correct?

7    A.    I believe so.

8    Q.    Well, actually you know that is what they did, don't you?

9    A.    That is correct.

10   Q.    And also as part of Defendants' No. 119, one of the

11   letters they received was a thank you note from the Feed the

12   Children organization.  Correct?

13   A.    I believe so.  On that one, I haven't seen that one in a

14   while, so.

15   Q.    This will refresh your recollection.  Do you remember

16   this one?  Can you read what that says at the top?

17   A.    "Feed the Children, Larry Jones, International

18   Ministries, May 8th, 1995."

19   Q.    And can you read just the body of the letter, please.

20   A.    It says, "Dear Mohammad, I want to thank you for bringing

21   a number of your colleagues to Oklahoma City during a time of

22   great crisis and grieving.  We appreciate you coming and

23   helping us at Feed the Children.

24         "It was a great disservice to you and your people when

25   word was first announced that it was possibly someone from the

1    Middle East who had bombed the federal building.  As you know,

2    we Americans are sometimes too quick to judge.  Forgive us!

3         "If we can further work together on different projects

4    please give feed the children a call.  Our world has become a

5    very small place to live, and life is too short to entertain

6    judgment on groups whether it be from an ethnic, political,

7    religious, or racial point of view.

8         "May we work together to make no only the world a better

9    place...but a safe place.

10   Q.    And it is signed?

11   A.    "For the children, Larry.  Larry Jones."

12   Q.    And that is the Larry Jones presumably who runs this

13   organization?

14   A.    I would presume.

15   Q.    Holy Land made videos of many of its fundraising

16   activities, didn't it?

17   A.    It did.

18   Q.    And you found many of those in the Holy Land files,

19   didn't you?

20   A.    There were a large number of video and audiotapes.

21   Q.    And some of them were in Arabic and some of them were in

22   English.  Correct?

23   A.    That is correct.

24   Q.    That is two questions.  Some were in Arabic.  Correct?

25   A.    Yes.

1    Q.    And some were in English.

2    A.    Yes.

3    Q.    And the ones in English, like the ones Mr. Westfall

4    showed the other day.

5    A.    That is correct.

6    Q.    Right.  And there was actually one made of the people who

7    went from Holy Land to Oklahoma City after the explosion,

8    wasn't there?

9    A.    I recall seeing one.

10   Q.    Okay.

11            MS. HOLLANDER:  May I approach, Your Honor?

12            THE COURT:  Yes.

13            MS. HOLLANDER:  Or do you want to wait on it?

14            THE COURT:  Go ahead and get it identified, and we

15   will play it after the break.

16   Q.    (BY MS. HOLLANDER)  I have shown you what has been marked

17   as Defense Exhibit No. 894.  And you have previously reviewed

18   this particular tape, haven't you?

19   A.    That is correct.

20   Q.    In fact, it has a notation you made on it, doesn't it?

21   A.    It was from 2002, six years ago.

22   Q.    And then you reviewed it again?

23   A.    You guys showed it to me today.

24   Q.    Right.  And this is one of the tapes that Holy Land made,

25   and you could identify Holy Land people in the tape.  Correct?

1    I mean, you could identify people wearing Holy Land shirts.

2    A.    Correct.  I saw people with the Holy Land T-shirts on in

3    the video.

4    Q.    And you saw the date stamp of April 23rd, 1995.  Correct?

5    A.    I can't remember the exact date on the stamp, but it was

6    date stamped and it was from April of '95.

7    Q.    And that was consistent with when the people from Holy

8    Land went from Dallas to Oklahoma to assist there.  Correct?

9    A.    It was consistent.

10   Q.    Right.  And in fact, you saw a picture of the Murrah

11   building on that tape.

12   A.    Correct.

13        MS. HOLLANDER:  Your Honor, at this time we move

14   Defense Exhibit No. 894, and we will exchange this for a DVD

15   that the jury can actually look at.

16        THE COURT:  All right.  That was admitted this

17   morning, so No. 894 is in evidence.

18        MS. HOLLANDER:  Right.  So we will just want to play

19   a little bit of it.

20        THE COURT:  Let's go ahead and take the break and we

21   will come back and watch it.  Be back at 4:15.

22        (Whereupon, the jury left the courtroom.)

23        THE COURT:  So you are ready to play the excerpt?

24        MS. HOLLANDER:  I think taking the break now means

25   we can set it up and get it ready to go.

```
 1                THE COURT:  Be back at 4:15.

 2                         (Brief Recess.)

 3                MS. HOLLANDER:  Your Honor, at this time we would

 4    like to play the short clip of the video.  I think Mr.

 5    Westfall will assist me with that.

 6                THE COURT:  All right.  You may do so.

 7                MS. HOLLANDER:  And we are playing this without

 8    sound, Your Honor.

 9                THE COURT:  All right.

10                (Whereupon, Defense Exhibit No. 894 was played,

11                while questions were propounded.)

12    Q.   (BY MS. HOLLANDER)  This is the video that you reviewed.

13    I just want to make sure.  Right?

14    A.   That is right.

15    Q.   When the Holy Land people went to Oklahoma in 1995.

16    Correct?

17    A.   I believe that is what this is from.

18    Q.   Okay.  Does that appear to be a picture of some kind of

19    basic necessities?

20    A.   I believe that these are the items they are putting in

21    the boxes.

22    Q.   That they are putting in the boxes.  And do you know

23    whether this was part of Feed the Children, or was this some

24    other work they were doing?  Do you know?

25    A.   I don't know.
```

1    Q.   You don't know.

2        Is that a Holy Land T-shirt that he is wearing?  Is that

3    the Holy Land logo that you can identify?

4    A.   It is.

5    Q.   Okay.  And you can identify that.  Correct?

6    A.   It looks like the Murrah building.

7    Q.   Okay.  There was one person at the very end with a Holy

8    Land sign on it.  Could you see who that was?

9    A.   I couldn't.

10    Q.   You couldn't tell who that was?

11    A.   No.

12    Q.   Okay.  Thank you.

13        MS. HOLLANDER:  That is the end of that video.

14    Thank you.

15        THE COURT:  All right.

16    Q.  (BY MS. HOLLANDER)  Now, Agent Burns, I want to ask you

17    about a few other things.

18        MS. HOLLANDER:  And Your Honor, I believe these are

19    in evidence also, Defendants' No. 162, 175, 140, 161, those

20    for sure.  Those are my next group.  And I am not sure about

21    No. 177.

22        THE COURT:  I show No. 140 at least there is no

23    objection.  No. 161 is in.  No. 162 there is no objection so

24    that is admitted.  And No. 175 there is no objection so those

25    are all admitted.

Q.   (BY MS. HOLLANDER)  Let's get that far, then.  Now, in addition to going to Oklahoma, Holy Land also provided relief in north Texas, and you have seen this --

MR. JACKS:  Judge, I object to the form.  It is not even a question.  I object to the statement, and I just ask for a question and answer.

THE COURT:  Sustained.  Do you want to rephrase?

Q.   (BY MS. HOLLANDER)  Holy Land provided relief in north Texas in 2000.  Correct?

A.   Based on the documentation that I have seen from the search warrant material, they did.

Q.   This appears to be from the American Red Cross.  Correct?

A.   Correct.

Q.   And it was a $10,000 contribution.  Correct?

A.   Correct.

Q.   And you are aware in 1999 there were tornados in Oklahoma and Holy Land assisted there.  Were you aware of that?  Should I refresh your recollection?

A.   Please.  Let's look at it.

Q.   Let's look at D-175.  That is a document, a certificate of appreciation to Holy Land for assistance in the tornados.  Correct?

A.   That is correct.

Q.   And let me show you Defendants' Exhibit No. 140.  It is from the Associated Catholic Charities.  Correct?

1    A.    Correct.

2    Q.    And that is again for emergency essential supplies and

3    items for tornado victims.  Correct?

4    A.    Correct.

5    Q.    In 1999.  Correct?

6    A.    Correct.

7    Q.    And actually, it has the envelope from the Catholic

8    charities.  You found that envelope with it.  Correct?

9    A.    It was with it.

10    Q.    Defendants' Exhibit No. 161, I would like you to read

11    this one.  It is not very long.  Can you see that, or do I

12    need to make it bigger for you?  I can make it bigger.

13    A.    I think I can make it out.

14    Q.    Actually I can give you one.

15          MS. HOLLANDER:  May I approach?

16          THE COURT:  Yes.

17    Q.    (BY MS. HOLLANDER)  If you would just read that, please?

18    A.    It is entitled "The City of San Diego, Proclamation, Holy

19    Land Foundation for Relief and Development Day.

20          "Whereas, the Holy Land Foundation for Relief and

21    Development headquartered in Richardson, Texas, is a

22    non-profit and non-political humanitarian aid and disaster

23    relief organization which provides support to those in need

24    throughout the world and

25          "Whereas, the Holy Land Foundation for Relief and

1    Development is dedicated to find practical solutions for human

2    suffering through humanitarian programs; and

3         "Whereas, the Holy Land Foundation for Relief and

4    Development responds to both natural and manmade disasters

5    throughout the world; and

6         "Whereas, their work has taken them to camps in Jordan,

7    Lebanon, and Palestine, as well as tragedies in Bosnia,

8    Kosovo, Turkey; and

9         "Whereas, they have also done work here at home by

10   responding to floods in Iowa, the tornados in Oklahoma and

11   Texas, and the devastation of the Murrah Federal Building in

12   Oklahoma City; and

13        "Whereas, on July 16th, 2000 the local chapter of Holy

14   Land Foundation for Relief and Development will be hosting a

15   benefit to aid displaced children worldwide;

16        "Now, therefore, I, Susan Golding, the 32nd mayor of the

17   City of San Diego, do hereby proclaim July 16th, 2000 to be

18   Holy Land Foundation for Relief and Development Day in San

19   Diego, in recognition of their tireless dedication and

20   outstanding humanitarian effort to aid those in need

21   throughout the world.

22        "In witness hereof, I have hereunto set my hand this day,

23   and have caused the seal to be affixed hereto.

24        "Susan Golding, Mayor, July 16, 2000."

25   Q.   That is from the City of San Diego?

1    A.    That is correct.  I don't recall having seen this before.

2    Q.    And it looks like there was a seal on here on the

3    original.  Correct?  You can see it.

4    A.    That is what it looks like, but I didn't see the original

5    so I don't know.

6    Q.    Now, I want to talk a little bit and ask you some

7    questions about humanitarian work that Holy Land provided

8    outside the U.S., but for the moment outside Palestine.  Is

9    that okay?

10   A.    Okay.

11   Q.    We will get back to Palestine later.  You are going to

12   come back to talk about that later.  Correct?

13   A.    Yes, that is correct.

14          MS. HOLLANDER:  Your Honor, can I ask you about five

15   more and see if they are admitted?

16          THE COURT:  Yes.

17          MS. HOLLANDER:  No. 177, 169, 946, 170, and 954.

18          THE COURT:  169, 170 and 177, I don't show they are

19   in, but the Government stated there is no objection so they

20   are admitted.  And the Government states they don't have an

21   objection to the others, so those exhibits are admitted.

22   Q.    (BY MS. HOLLANDER)  So let me start with Kosovo.  You are

23   aware that there was a huge humanitarian crisis in the country

24   of Kosovo in the 1990s as a result of the war there.

25   A.    I know that there was a need for humanitarian aid in that

1    region.

2    Q.   And you know that the United States attempted to support

3    the Kosovars at that time also, don't you?

4    A.   I don't have a lot of personal knowledge about that.

5    Q.   Okay.  Well, let me draw your attention to Defendants'

6    Exhibit No. 177.  And this is a document from where?

7    A.   Care International.

8    Q.   And would you read it, please?  Let me ask you, it says

9    "Dear, Dalell."  Do you know a Dalell in relationship to Holy

10   Land?

11   A.   That would be Dalell Mohmed that we spoke about with Mr.

12   Westfall.

13   Q.   And she worked for Holy Land as a field worker in the

14   field.  Correct?

15   A.   I can't remember what her title was; but yes, she did

16   work for the Holy Land Foundation, and she did travel abroad

17   for them.

18   Q.   And so would you just read this letter, please?

19   A.   And I think you need to move it to the left just a bit.

20        It says, "Dear Dalell, it has been our pleasure to have

21   worked with the Holy Land Foundation for Relief and

22   Development during this unfathomable crisis that the Kosovar's

23   have endured.  Through your efforts we were able to meet their

24   needs and work towards a humanitarian solution providing

25   comfort along the way.  I look forward to working with the

1    Holy Land Foundation in the future."

2    Q.    And it is signed by someone that we can't read.  Is that

3    correct?

4    A.    I can't read it.

5    Q.    Okay.  But it appears -- the original to have been

6    signed.

7    A.    It does.

8    Q.    Now, let me also draw your attention, are you familiar

9    with the organization called Samaritan's Purse?

10   A.    I have heard it, but I don't know a lot about it.

11   Q.    Let me draw your attention to Defendants' Exhibit

12   No. 169.  And let's look at the top first.  Who is this letter

13   from at the top, the heading?

14   A.    It is on Samaritan's Purse letterhead.

15   Q.    Does it say who the president is, if you will read that.

16   It says, "Franklin Graham, President"?

17   A.    I can read that, yes.

18   Q.    Okay.  Are you aware that Franklin Graham is the reverend

19   Billy Graham's son?

20   A.    I don't know.

21   Q.    Okay.  Now, Samaritan's Purse is not an Islamic

22   organization, is it?

23   A.    I don't know enough about the organization to say whether

24   they are or not.

25   Q.    Now, Mr. Westfall discussed with you the bakery the other

1   day and you looked at some pictures of the bakery.  Correct?

2   A.    Correct.

3   Q.    And I would like you to just look at, rather than read

4   the whole letter, just this paragraph, "I would also like to

5   thank you."

6   A.    "I would also like to thank you for the donation of the

7   bakery.  I am pleased that Samaritan's Purse was able to move

8   the bakery from Albania to Kosovo where it was set up in an

9   8,000 foot warehouse.  It is now producing approximately 4,000

10  loaves of bread per day which is being distributed freely to

11  people in five kiosks in the Gjakove city.  Each person is

12  allowed three loaves."

13  Q.    Thank you.  You already talked about Dalell, and

14  Defendants' Exhibit No. 490 was introduced.  And that is

15  Dalell there.  Correct?

16  A.    That is correct.

17  Q.    You recognize her.  And this young man in the middle has

18  a Holy Land something on there.  Correct?

19  A.    That is correct.

20  Q.    And these appear -- This appears to be the shelves from

21  the bakery.  Correct?

22  A.    That is correct.

23          MS. HOLLANDER:  May I approach, Your Honor, to ask

24  about a photograph?

25          THE COURT:  Yes.

1  Q.   (BY MS. HOLLANDER)  Defendants' Exhibit No. 474 is a

2  photograph and that came from the Holy Land search.  Correct?

3  A.   It did.

4  Q.   And you can identify that it is something to do with Holy

5  Land, can't you?

6  A.   There is a Holy Land sign on it.

7           MS. HOLLANDER:  Your Honor, I move Defendants'

8  Exhibit No. 474.

9           THE COURT:  Counsel?

10          MR. JONAS:  Same objection.

11          THE COURT:  Same previous objection.  That has been

12  overruled, and this exhibit is admitted.

13  Q.   (BY MS. HOLLANDER)  And that is a little more about the

14  Kosovo situation.  Correct?  Just a photograph that says,

15  "Kosovo Relief, Holy Land."  Correct?

16  A.   That is what it says.

17  Q.   And you found this in Holy Land?

18  A.   That is correct.

19  Q.   Holy Land had a lot of photographs, didn't they?

20  A.   They did.

21          MS. HOLLANDER:  Your Honor, has No. 744 been

22  admitted or do I need to show that to you.

23          THE COURT:  No. 744?

24          MS. HOLLANDER:  Yes.

25          THE COURT:  No.

1          MS. HOLLANDER:  I need to show that one to her,

2    then.  May I approach?

3          THE COURT:  Yes.

4          MS. HOLLANDER:  Thank you.

5    Q.  (BY MS. HOLLANDER)  No. 744, another photograph that you

6    seized from in the search warrant for Holy Land?

7    A.    That is correct.

8    Q.    And it also has identifying marks that say Holy Land on

9    it?

10   A.    It does.

11   Q.    And Kosovo?

12   A.    That is correct.

13         MS. HOLLANDER:  Your Honor, I move Defendants'

14   Exhibit No. 744.

15         THE COURT:  Same objection?

16         MR. JONAS:  Yes, sir.

17         THE COURT:  That is overruled, and No. 744 is

18   admitted.

19   Q.  (BY MS. HOLLANDER)  What does this say on it, Agent

20   Burns?

21   A.    It says, "Holy Land Foundation for Relief and

22   Development, a gift from Kosova Relief Committee in

23   Minnesota."

24   Q.    Do you know what the Kosova Relief Committee in Minnesota

25   is?

1    A.    No.

2    Q.    I think I just asked you about No. 946.  Yeah, I did.

3    Okay.

4         Now, there was also an earthquake in Turkey in 1999.  Do

5    you recall that?

6    A.    Yes.

7    Q.    And you know that Holy Land was involved in relief

8    efforts in Turkey, too.  Correct?

9    A.    That is correct.

10   Q.    Let me direct your attention to Defendants' Exhibit

11   No. 946.  What organization is this?

12   A.    The International Blue Crescent.

13   Q.    Is that kind of like the Red Cross in other countries?

14   A.    I think it provides similar types of relief.

15   Q.    It is a charity?

16   A.    It is.

17   Q.    Okay.  And this is a receipt, is it not, or an invoice?

18   A.    It looks like it.

19   Q.    And it says for hot meals distributed in some city that I

20   can't read the name of.

21   A.    That is what it says.

22   Q.    And it is 40,250 -- $40,000 U.S. dollars.  Correct?

23   A.    It looks like it.

24   Q.    $40,250 U.S. dollars, to be exact.  Correct?

25   A.    Correct.

```
1    Q.   And the second page of that is from Holy Land.  Correct?

2    On Holy Land letterhead?

3    A.   It is.

4    Q.   And it says, "Beneficiary:  International Blue Crescent."

5    Correct?

6    A.   Correct.

7    Q.   And again, it has the same amount--$40,250?

8    A.   It does.

9    Q.   And it says for hot meal distribution in a town that

10   starts with the letter G?

11   A.   It does.

12   Q.   Do you know what town that is?

13   A.   I don't.

14   Q.   Just briefly, Defendants' Exhibit No. 170, that is also

15   from the International Blue Crescent?

16   A.   Correct.

17   Q.   And that is -- I don't think we need to read it, but it

18   is another letter thanking Holy Land for their humanitarian

19   help at that same time in 1999.  Correct?

20   A.   That is correct.

21   Q.   Now, there was also -- Let's see.

22        MS. HOLLANDER:  Your Honor, Defendants' Exhibit

23   No. 174?  I don't believe that one has been admitted yet.

24        THE COURT:  It has not been admitted.  And I think

25   that is the one we still have not resolved.
```

1          MS. HOLLANDER:  Right.

2          THE COURT:  It is not in.

3          MS. HOLLANDER:  Okay.  There are two others I asked

4 about, No. 1336 and 1337.  The same situation with those?

5          THE COURT:  I think that is right.  Yes.  Frankly, I

6 tried to find them on the disk that you all had given me.  My

7 computer was not showing those, so I have not been able to see

8 those.  I may need to get copies of those from you.

9          MS. HOLLANDER:  Could we just approach on those

10 three, Your Honor?

11          THE COURT:  Sure.

12          (The following was had outside the hearing of the

13            jury.)

14          MS. HOLLANDER:  This is No. 1336.  It is an extra

15 copy actually, and this is No. 1337.

16          MS. DUNCAN:  Those two, Your Honor, were included on

17 the supplemental disks.

18          THE COURT:  I put them on the computer, but for some

19 reason I was getting a blank screen.

20          MS. DUNCAN:  And I emailed the corrected files to

21 Mr. Jacks and Jennifer.

22          MS. HOLLANDER:  Your Honor, all of these are, as I

23 explained, we got from Agent Burns during the civil case, and

24 the Government is the ones that are going to have to be able

25 to find them.  We went through this last week, and my memory

1    from you was it was up to them to find them.  And, I mean,

2    there is no question that they came from the HLF search

3    warrant.

4         MR. JACKS:  I remember the discussion about the San

5    Diego thing, and she just said she doesn't remember seeing

6    that.

7         MS. HOLLANDER:  That is different from these.  That

8    one doesn't have the FBI stamp on them.

9         MR. JACKS:  And they don't have the bates number.

10        MS. HOLLANDER:  But that one doesn't even have an

11   FBI stamp.  These have the FBI stamp.

12        MR. JACKS:  Your Honor, an FBI stamp.  So to look

13   for it this does us no good to look for it.  We have to look

14   for it under the FBI bates stamp.  So that is what is taking

15   so long.

16        MS. HOLLANDER:  Here is my concern, Your Honor.

17   When the opposite party has the original, then generally a

18   reliable copy should come into evidence, and Mr. Jacks knows

19   that the way we got these was that my office came over and met

20   with Agent Burns.

21        THE COURT:  We have been over that.  I understand.

22        MS. HOLLANDER:  So I ask the Court to introduce

23   these two --

24        MR. JACKS:  The problem, Your Honor, is it is just

25   going to the copies that the Government gave them with the

1    Government's bates stamp.  For some reason they go to these

2    earlier copies and start using those instead of the ones that

3    the Government --

4         THE COURT:  That have the Government numbers on

5    them.  Can you find those?

6         MS. HOLLANDER:  Your Honor, I don't think you

7    understand how hard it is to find anything.

8         THE COURT:  Apparently they are having the same

9    problem.  I don't want to spend anymore time with the jury.  I

10   will get back with these later.  Go ahead and keep going.  We

11   will just have to do it at another time or when she comes

12   back.  I don't want to take anymore time keeping this jury

13   here waiting.

14        (The following was had in the presence and hearing

15        of the jury.)

16        MS. HOLLANDER:  Let me ask you, Your Honor, about

17   No.  954, I believe.  Is that one in evidence?

18        THE COURT:  Let me take a look.  Yes.  No. 954 is

19   in.

20        MS. HOLLANDER:  Thank you.

21   Q.   (BY MS. HOLLANDER)  Now, there is a country of Georgia.

22   I am not talking about the state of Georgia, but the country

23   of Georgia that is next to Russia.  Are you aware of that?

24        MR. JACKS:  I object to the statement.

25        THE COURT:  She may ask her, if she knows.

1           THE WITNESS:  What was the question?

2    Q.   (BY MS. HOLLANDER)  I am trying to direct your attention

3    to the country of Georgia and not the state of Georgia.  You

4    know there is a country called Georgia.  Correct?

5    A.   That is correct.

6    Q.   And it has been in the news recently.  Correct?

7    A.   That is correct.

8    Q.   Okay.  Now, in 2001 HLF provided assistance to the

9    country of Georgia.  Do you recall that, or do I need to

10   refresh your recollection?

11   A.   Let's look at it.

12   Q.   Okay.  Defendants' No. 954.  And who is this from?  Can

13   you read that?

14   A.   It says "United Nations High Commissioner for Refugees

15   Office in Georgia."

16   Q.   And that is the United Nations organization that assists

17   refugees; just what it says.  Correct?

18   A.   Correct.

19   Q.   And who is the letter addressed to?

20   A.   It says, "Dear, Mr. Elashi."  And "Ghassan" is

21   handwritten above it.

22   Q.   And it is pretty short.  Could you read that letter,

23   please?

24   A.   It says, "The United Nations High Commissioner for

25   Refugees would like to extend its most sincere thanks to Holy

1   Land Foundation for the contribution to the assistance of the

2   local population in the Pankisi Gorge.

3       "We would also like to take this opportunity to

4   acknowledge the good work of both Ms. Maia Samadashvili" --

5   Q.   I think you can skip the names.

6   A.   Okay.  "...without whom this operation wouldn't have had

7   such a high level of success."

8       "UNHCR has distributed the total of your donation

9   amounting to 150,000 kilograms of wheat flour, 24,000

10  kilograms of beans, 11,060 liters of vegetable oil, and 8,050

11  kilograms of sugar.  With your generosity donation,

12  approximately 6,000 local individuals were assisted.

13      Sincerely."

14  Q.   Somebody.

15  A.   Someone as the program officer.

16  Q.   And this was dated 25 July, 2001.  Correct?

17  A.   That is correct.

18  Q.   Now, you are also aware, are you not that Holy Land had

19  projects distributing wheelchairs.  Correct?

20  A.   I have seen documentation indicating that they purchased

21  wheelchairs.

22  Q.   Okay.

23          MS. HOLLANDER:  May I approach, Your Honor?

24          THE COURT:  Yes.

25  Q.   (BY MS. HOLLANDER)  Let me ask you as to Defendants'

1  Exhibit No. 404, 505, 506, and 544, were these all seized from

2  the Holy Land office?

3  A.   Are those the numbers of the ones we just looked at?

4  Q.   Yes.

5  A.   Yes, they are.

6  Q.   And they have your bates number where the FBI stamped

7  them.  Is that correct?

8  A.   That is correct.

9  Q.   And each one of them has the Holy Land logo that you can

10  see on each one.  Correct?

11  A.   It does.

12       MS. HOLLANDER:  Your Honor, I move the admission of

13  Defendants' 404, 505, 506, and 544.

14       THE COURT:  Same objection as previous?

15       MR. JONAS:  Yes, sir.

16       THE COURT:  And those objections are overruled.  The

17  exhibits are admitted.

18  Q.   (BY MS. HOLLANDER)  This is No. 404.  You said that you

19  saw evidence of Holy Land providing wheelchairs, buying

20  wheelchairs to provide for people.  Correct?

21  A.   I said I had seen evidence of the wheelchairs.

22  Specifically, I was recalling these pictures that you had

23  shown us.

24  Q.   And this one says -- And there is a Holy Land logo on it,

25  is there not?

1   A.   If you look behind the individuals, that banner includes

2   the Holy Land symbol and also the name of the Holy Land

3   Foundation.

4   Q.   And it also says -- Can you read what it says here,

5   "Donated by"?

6   A.   I believe it says "World Wheelchair Foundation."

7   Q.   And let me show you Defendants' Exhibit No. 505.  What is

8   that a picture of?

9   A.   A wheelchair with the HLF logo on it.

10  Q.   Defendants No. 506, what does that depict?

11  A.   Wheelchairs with the HLF logo.

12  Q.   And finally Defendants No. 544?

13  A.   It is also of a wheelchair with the HLF logo.

14  Q.   There appears to have somebody in it who has just

15  received it.  Correct?

16  A.   It has someone in it.  I don't know if they received it

17  or not.  I am assuming they did because he is in it, but I

18  don't know anything beyond what you see.

19  Q.   Okay.  Thank you.

20          MS. HOLLANDER:  Pass the witness, Your Honor.

21          THE COURT:  Mr. Dratel?

22          MR. DRATEL:  Yes, sir.

23                  CROSS EXAMINATION

24  By Mr. Dratel:

25  Q.   Good afternoon.

1    A.   Good afternoon.

2    Q.   I just want to draw your attention first to the wiretap

3    that you had in this case on Mr. El-Mezain.

4    A.   Okay.

5    Q.   And it began in the latter part of '94, I think August

6    '94.  Does that sound correct?

7    A.   It was sometime around there.

8    Q.   And it continued until sometime maybe November

9    of -- Withdrawn.  Until November 2003?

10   A.   I think that is approximately the right date.

11   Q.   Okay.  And you said there were 9,600 summaries that you

12   read in the course of the entire wiretap.

13   A.   I think that is about accurate.

14   Q.   Okay.  And that is not all the conversations that were

15   recorded in the case.

16   A.   That is correct.

17   Q.   And with respect to the summaries, some are a couple of

18   lines, a paragraph maybe, and others can be longer?

19   A.   That is true.

20   Q.   So there may be more than one summary on a page?

21   A.   Especially in the older summaries you may see more than

22   one call summarized on each page.

23   Q.   And some summaries may be longer than a page?

24   A.   That is correct.

25   Q.   And with respect to Mr. El-Mezain, just with respect to

1    Mr. El-Mezain and the conversations intercepted on his phone,

2    the number of summary pages is more than 7,000 pages.

3    A.    I couldn't tell you that specifically.  I haven't counted

4    the pages.

5    Q.    It is thousands, though.  Correct?

6    A.    There is a large number.

7    Q.    Well, did you testify previously that it was thousands?

8    A.    Thousands is probably a good approximation.

9    Q.    And that is just for Mr. El-Mezain alone.

10   A.    Yes, that is.

11   Q.    Now, when you -- With respect to a wiretap like the one

12   that was conducted in this case, isn't it true that you want

13   to have a broad sense of what is pertinent--and we will use

14   the term pertinent now and explain it, but pertinent is a term

15   of art--you want to have a broad sense of what is pertinent?

16   A.    Are you talking about while --

17   Q.    While the wiretap is ongoing.

18   A.    I did not administer this wiretap.  As you know, I was

19   not involved in that.  So if you are asking about the

20   parameters that they used, I don't know.  I, in fact, have not

21   administered a FISA wiretap.

22   Q.    It went on until 2003 for Mr. El-Mezain.  Correct?

23   A.    That is correct.  But that was out of the San Diego

24   office.

25   Q.    And you were already on the investigation by that point.

A.    I was in Dallas on the criminal investigation.

Q.    And you can go back and see whether there were specific

calls on specific dates.  Right?  You can instruct the

language specialist to check on a specific date to see if

there are conversations?

A.    That is correct.

Q.    And you would want -- When the language specialist does

that, you would want him to take sort of a broad view of

pertinent, meaning meaningful, conversations to report back to

you?

A.    If I were asking him to look at conversations on a

certain date, he would be looking for something specific, so I

would give him instructions of what to look for on that date,

if I knew what I was focusing on.

Q.    But you would want him to be overinclusive rather than

underinclusive, so as not to miss a meaningful call.

A.    Certainly if I were wanting him to look for something, I

would want him to let me know if he found it.

Q.    Okay.  Now, with respect to Mr. El-Mezain, he arrived in

the United States in 1983.

A.    That is correct.

Q.    He already had his Bachelor's degree from a university in

Egypt.

          MR. JONAS:  Your Honor, I am going to object.  There

is no question.  It is just a statement there.

1          THE COURT:  He is asking if she knows.  Go ahead.

2          THE WITNESS:  It is my understanding that he went to

3    school in Egypt and received a degree.  I am not sure if they

4    actually give Bachelor's degrees over there.  But before he

5    came here he went to school in Egypt.

6    Q.   (BY MR. DRATEL)  When he first arrived here he lived in

7    Colorado?

8    A.   That is correct.

9    Q.   And he attended Colorado State University?

10   A.   If that is the one in Fort Collins, I believe.  I know he

11   lived in Fort Collins.  I can't remember which Colorado

12   university is there.

13   Q.   But it was in Fort Collins?

14   A.   That is correct.

15   Q.   And he obtained his Master's degree from that institution

16   in Fort Collins?

17   A.   I am not aware if he obtained his Master's degree or not.

18   He may have.  I know he went to school there, but I am not

19   sure what level of education he achieved at that institution.

20          MR. DRATEL:  May I approach, Your Honor, to refresh?

21          THE COURT:  Yes.

22   Q.   (BY MR. DRATEL)  So you believe that is correct?

23   A.   I believe it is correct, but I am not sure.

24   Q.   Okay.  And in 1989 he moved from Colorado to New Jersey.

25   A.   Approximately that date.

1  Q.   And that is Paterson, New Jersey.

2  A.   That is correct.

3  Q.   And in 1999, ten years later, he moved from Paterson, New

4  Jersey to San Diego, California?

5  A.   Correct.

6  Q.   And both times with his family?

7  A.   Yes.

8  Q.   And with his children from Colorado to New Jersey, and

9  then with more children from Paterson to San Diego?

10  A.   I can't remember the ages of his children.  He did move

11  with his family, I don't know how many he had when he left

12  Fort Collins.

13  Q.   But he has a lot of children?

14  A.   He has several.  I am not sure how many.

15  Q.   And while he was in New Jersey, is it correct he was the

16  emam of the Islamic Center of Passaic County?

17  A.   That is correct.

18  Q.   And Paterson is in Passaic County?

19  A.   I believe so.

20  Q.   And he was also the director of financial resource

21  development for the Islamic Education Center?

22  A.   I know he worked for the Islamic Education Center.  That

23  may have been his title.  I can't recall right now what his

24  title was.

25  Q.   And that was in Paterson as well, in New Jersey?

1   A.   I believe it was in Paterson as well.

2   Q.   And is that a start-up entity at that time?  In other

3   words, the Islamic Education Center in Paterson, was that a

4   start-up project at the time?  In other words, was it just

5   beginning and he was trying to raise money for it?

6   A.   I am not sure if it was a start-up or not.

7   Q.   Okay.  And with respect to Holy Land Foundation, Mr.

8   El-Mezain was not involved in the day-to-day administrative

9   aspects in Dallas, was he?

10  A.   In Dallas?

11  Q.   Yes.

12  A.   No, he was not in Dallas.

13  Q.   Right.  And he also did volunteer work for organizations

14  like MAYA, which you have talked about.  Right?

15  A.   That is correct.

16  Q.   And for other Islamic organizations around the country?

17  A.   I believe that he did.

18  Q.   I want to draw your attention to what we will call the

19  documents seized in the search of Ismail Elbarasse.

20  A.   Okay.

21  Q.   And those were seized in 2005.

22  A.   I believe the Elbarasse search was in 2004.  It may have

23  been 2005, but I think it was 2004.

24  Q.   Okay.  You have put a number of those documents in

25  evidence through your direct testimony.  Correct?

1   A.   That is correct.

2   Q.   And some of those documents are handwritten?

3   A.   Yes, they are.

4   Q.   Some of those documents do not have an author.  Correct?

5   A.   That is correct.

6   Q.   Now, with respect to those documents, you didn't find any

7   documents that established that those documents were

8   communicated to any of the Defendants in this case.  Correct?

9   A.   Well, when you look at the context --

10  Q.   I just want to know -- I will be more precise.  Did you

11  find any fax cover sheets to any of the Defendants with those

12  documents?

13  A.   Fax cover sheets?

14  Q.   Yes.

15  A.   I don't recall if there were any or not.  I didn't look

16  for fax cover sheets.

17  Q.   Did you find any FedEx receipts?

18  A.   I don't even know if I looked for FedEx receipts.

19  Q.   Any Express Mail receipts?

20  A.   I don't recall if I looked for Express Mail receipts, but

21  I probably didn't.  There may have been some, but I don't

22  recall seeing any.

23  Q.   Did you check any FedEx accounts for any of the

24  Defendants, or anyone else, to see if the Defendants were ever

25  sent any of these documents?

1    A.    No.

2    Q.    Now, I want to draw your attention to the telephone

3    conversations involving Mr. El-Mezain that you put in evidence

4    on your direct examination.

5    A.    Okay.

6    Q.    And just to reorient, the specially designated terrorist

7    designation for Hamas was January 23rd, 1995.

8    A.    Correct.

9    Q.    And the foreign terrorist organization designation was

10   October 8th, 1997.

11   A.    Correct.

12   Q.    And with respect to Count 1 of the indictment, the only

13   one that applies, is the October 8th, 1997 designation date.

14   Correct?

15   A.    That is correct.

16   Q.    And that is the only count that Mr. El-Mezain is charged

17   with.  Correct?

18   A.    That is correct.

19   Q.    Now, with respect to the faxes, which is El-Mezain

20   Wiretap No. 1, and you put those in evidence, it is a

21   collection of about 150, 160 pages of faxes.  Correct?

22   A.    Correct.

23   Q.    And if you need to check it, that is fine.  I have it

24   available for you.  But the faxes that are in evidence begin

25   September 19th, 1994 and go until June 28th, 1995.  Is that

1    correct?

2    A.    I know they were from '94 and '95.  The exact days I am

3    not sure.  I have my copy if you want --

4    Q.    That would be good.  Thank you.

5    A.    I just can't remember the exact date and month, but I

6    know they were '94 and '95.  I am sorry.  What did you say was

7    the beginning day?  What were you asking me?

8    Q.    September 19th, 1994 would be the first one.

9    A.    That is the first date that I see.

10   Q.    And the last one, June 28th, 1995?

11   A.    Actually I think the last page is out of order and it is

12   actually September 8th, 1995.

13   Q.    Yes.  Okay.

14   A.    September 8th, 1994.

15   Q.    Right.  But if you go back a couple of pages, the last

16   report that was faxed of the type that you read from on

17   direct, is that --

18   A.    June 28th, '95.

19   Q.    Is that correct?

20   A.    Yes, that is correct.

21   Q.    So that is more than two years before October 8th, 1997.

22   Right?

23   A.    That is correct.

24   Q.    Now, in terms of the conversations, do you have them up

25   there with you?

A.   Yes.  They are not in order.

Q.   I know.  I will give you time.  Don't worry.  It is not a test.  If you could look at El-Mezain Wiretap No. 2.

A.   Okay.  Sorry.  I have a number of binders.  I have one more to check and then I may have to ask for the original.

Q.   Okay.  I have them right here if you need them.

A.   I found it.

Q.   Okay.  That is a conversation April 19th, 1995.  Correct?

A.   That is correct.

Q.   And if you look at El-Mezain Wiretap No. 4.

A.   It may be quicker if we go with the originals, just because mine are --

Q.   Sure.

A.   I have got five different binders here.

Q.   Here.  El-Mezain Wiretap No. 4.

A.   Thank you.

Q.   January 22nd, 1995?

A.   That is correct.

Q.   And that is a conversation where Mr. El-Mezain receives a call.  Correct?

A.   That is correct.

Q.   Someone calls him to tell him about a suicide bombing.  Right?

A.   That is correct.

Q.   And he receives that call.

1   A.   You are right.

2   Q.   Okay.  If you could look at -- Well, let me give it to

3   you.

4   A.   Okay.  It just may save time that way.

5   Q.   That is fine.  That is El-Mezain Wiretap No. 7.

6   A.   Correct.

7   Q.   And that one is from February 25th, 1996?

8   A.   That is correct.

9   Q.   And again, that is someone calling him about a suicide

10   bombing?

11   A.   Correct.

12   Q.   And he receives that call.  Right?  He doesn't make that

13   call.  He receives that call.

14   A.   Right.

15   Q.   This is El-Mezain Wiretap No. 11.  Right?

16   A.   Yes.

17   Q.   And that is from April 3rd, 1996.  Correct?

18   A.   That is correct.

19   Q.   And if you will just hold onto that, because it gets a

20   little more complicated at some point, but I want to go

21   through these.  El-Mezain Wiretap No. 13.  And that is October

22   24th, 1994.  Correct?

23   A.   Correct.

24   Q.   And let me show you Shabib Wiretap No. 1.  And that is a

25   call involving Mr. El-Mezain.  Correct?  That was on someone

1  else's line--Muin Shabib?

2  A.    That is correct.

3  Q.    And there was a wiretap on Muin Shabib's phone at what

4  time period?

5  A.    '93, '94.  I am not sure of the exact time period.

6  Q.    1993 there was also a wiretap on the phone of Mr. Ashqar.

7  Correct?

8  A.    That is correct.

9  Q.    And in fact, also there was the search in December of '93

10  of Mr. Ashqar's home.

11  A.    That is correct.

12  Q.    And that was two months after the Philadelphia meeting.

13  A.    Two and a half maybe.

14  Q.    Yes.  And do you know what time the wiretap on Mr.

15  Ashqar's phone, the length of time of the wiretap or the time

16  period?

17  A.    I don't.  It wasn't -- I mean, it didn't extend past '94,

18  '95, I believe.

19  Q.    But it was before the Philadelphia meeting, I believe.

20  A.    That is correct.  Because he was the one who was the

21  subject of the wiretap at the Philadelphia meeting.

22  Q.    And you have introduced some of his conversations before

23  the Philadelphia meeting.

24  A.    That is correct.

25  Q.    And the Shabib, do you have the date of that one?

```
 1   A.    I don't know the exact dates.  Again, it was in '93, '94.

 2   Q.    But it says --

 3   A.    On the call, yes, it says 1993.

 4   Q.    But not a specific date?

 5   A.    Correct.

 6   Q.    Now, all of those conversations, we have one, just to

 7   recap April '95, January '95 -- No. 2 is El-Mezain Wiretap

 8   No. 2, April '95; No. 4, January '95; No. 7, February '96; No.

 9   1, April '96 -- I left out one.  El-Mezain 12.  Do you

10   remember that?  I have it here in case you don't remember that

11   one.

12   A.    Okay.

13   Q.    And that is February 27th, 1995.

14   A.    Correct.

15   Q.    So that is February '95.  And then No. 13 is October '94.

16   And the Shabib 1 is 1993.  And that is even -- The latest one

17   of those is at least a year and a half before October 8th of

18   1997.

19   A.    That is correct.

20   Q.    And many of them are even before January of '95.

21   A.    That is correct.

22   Q.    Now, you have a copy of El-Mezain Wiretap No. 11 there.

23   Correct?

24   A.    I do.

25   Q.    Okay.
```

```
 1              MR. DRATEL:  May I approach, Your Honor?

 2              THE COURT:  Yes.

 3              MR. DRATEL:  I am just going to mark this so we know

 4     what we are doing here, Your Honor.

 5              THE COURT:  Okay.

 6              MR. DRATEL:  Now, Your Honor, this is one of the

 7     sessions we are in agreement on with the Government.

 8              THE COURT:  All right.

 9     Q.   (BY MR. DRATEL)  This was -- You put this conversation in

10     evidence.  Correct?

11     A.   Yes, we did.

12     Q.   And you played some sections.  Correct?

13     A.   That is correct.

14     Q.   And there was a section that you did not play, or at

15     least one section?

16     A.   At least one.

17     Q.   Right.  And the section we are going to read now includes

18     some of the material that was in the Government exhibit

19     section.

20     A.   Okay.

21     Q.   Correct?  And if we could start where I have

22     marked -- Let me just -- The participants are Shukri Abu Baker

23     and Mr. El-Mezain.  Correct?

24     A.   That is correct.  And at least one point Haitham Maghawri

25     was on the phone.
```

1   Q.   Right.  But in this particular section he is not, if you

2   could just look through these two and a half pages.

3   A.   Yes, just Shukri Abu Baker and Mohammad El-Mezain.

4   Q.   Right.  And this is that conversation where Mr. Abu Baker

5   is relating to Mr. El-Mezain Mr. Abu Baker's conversation with

6   the reporter Gayle.

7   A.   Okay.

8   Q.   Does that reorient you?

9   A.   Yes.

10  Q.   And just to reorient the jury, rather than having to

11  start all over again --

12          THE COURT:  For the record, which exhibit number is

13  this?

14          MR. DRATEL:  This is El-Mezain Wiretap No. 11.  And

15  what I would like to do is designate the Defendants' portion

16  of it, the part we are adding as Defendants' El-Mezain Wiretap

17  No. 11.

18          THE COURT:  All right.

19          MR. DRATEL:  Thank you, Your Honor.

20          THE COURT:  And that has been agreed to.  Correct,

21  counsel?

22          MR. JONAS:  Yes, sir.

23          THE COURT:  So that exhibit is admitted.

24  Q.   (BY MR. DRATEL)  Okay.  So if you could play the part of

25  Mr. Abu Baker in terms of reading, and I will read Mr.

1    El-Mezain's part.

2    A.    Okay.

3    Q.    And if you could start in the middle of that page where I

4    have marked it off in the middle of that.

5    A.    It says, "She is asking, 'Why was your policy in the

6    beginning that you -- that you were with Hamas and stuff, and

7    then lately just because there has been violence" --

8    Q.    "She was saying this stuff?"

9    A.    "Yes."

10   Q.    "Tell her we have no publication or announcement that we

11   are affiliated with any -- any --"

12   A.    I told her, 'I challenge you' -- to start with, I told

13   her, 'We don't have a connection with Hamas in the first

14   place, no connection to discontinue.  We -- I challenge you.

15   All of our literature, printed materials, and our speeches

16   during our fundraising, I challenge you to find that we one

17   day stood up or wrote asking for donations for Hamas.  I

18   challenge you.'  So she remained quiet.  I told her, 'It is

19   not that we started.'".

20   Q.    "Tell her, what -- what -- what Hamas -- I mean, I mean,

21   regarding donations to Hamas, at that time were not illegal.

22   Also in truth, they are an honor to the entire Palestinian

23   people in the first place."

24   A.    "She said, 'Okay.  You -- I mean, as long as they do good

25   work and stuff, I mean, what is the problem?'  I told her, 'I

1    personally visited the homeland three times.  We give

2    assistance to the parties which serve true assistance to the

3    Palestinian people.'  And by God, by God, she cited me an

4    example of Jamil Hamami and told me, 'Isn't he so and so, and

5    the one in charge of schools and stuff?'  I told her, 'Yes.'

6    I told her -- she said, 'Did you support them?'  I told her,

7    'Yes.  We supported them.  And that the fact that Hamami is

8    affiliated with so and so does not mean that I will deprive a

9    thousand students from the best schools, according to the

10   testimony of the Israeli Ministry of Education, the best

11   schools in -- This does not mean that.'  I told her, 'Our

12   policy that we give the organizations and we don't give to the

13   individuals.  We don't give to the individuals.'  I told her,

14   '75 percent of the Palestinian youth between the ages of 18 to

15   40 is imprisoned at least one time in the prisons of Israel.

16   Does that mean that I boycott 70 percent of the Palestinian

17   people?'  I told her, 'It is normal because this is the people

18   who live under occupation and under this and that.  Therefore,

19   it is normal that you find someone who is affiliated with

20   Hamas, someone with Fatah, a secular one and a communist one.

21   This is how the Palestinian people are today.  But as long as

22   they provide real services, our policy in the first place is

23   to offer assistance regardless of the religious or political

24   affiliation.'  I told her, 'We never look at the political

25   agenda of any group.  We speak about the charitable agenda.

If they provide charitable work, also we follow it to make sure it has really been spent the right way.  We will not have a problem then.'  So I told her that, 'You know what?  There are homes which were demolished, homes which Israel demolished.  There are people who call us, pressure us from here, from America, and tell us, "You must rebuild the homes which Israel demolished."'  I told her, 'It is because the homes which Israel demolished now do not belong to the -- TO the terrorists you are talking about.  They belong to their fathers, to their mothers, and some of them who are even rented.'  I told her, 'What is happening to the Palestinian people, the oppression, the injustice, and deliberate starvation, this stuff, if we come and follow Israel's racist policy that the Palestinian people, by God, according to Netanyahu, that every Palestinian person, every Palestinian orphan is a potential terrorist.  That means that we should stop' -- You know, what is she telling me?  She is asking me if the Jews have the right to live.  She told me, 'Do you believe in Israel's right to exist?'  I told her, 'See, whom am I?  I am a human being.  I am not a state or a government. I will not stand up against Israel.  Israel is a state.  I believe that the Jews have the right to live just like others as Jews.  And before the establishment of the state of Israel, we were the first ones to receive them in the Middle East.  We received them in 1916 and '15 when they escaped from Europe.

1  We received the Jews.'  I told her, 'We want peace.  But I am

2  telling you that the issue you should be asking is whether

3  Israel believes in the right of -- in the right to exist of

4  five disbursed people.  Aren't these supposed to return?'"

5  Q.   "By God.  I personally believe that people who want to

6  live in peace shall live in peace, and those who want to live

7  in killing, they will keep killing others, and they are the

8  ones claiming to be peace supporters."

9       And that is the end of that segment.  Correct?

10 A.   Correct.

11 Q.   Now, I just want to show you the version of Wiretap

12 No. 11, El-Mezain Wiretap No. 11, and just show you the part

13 that was put in evidence before through testimony when you

14 admitted this on direct, and just to ask you to look at where

15 the Government ended its segment.

16 A.   Okay.  Do you want me to read it?

17 Q.   No; just to look, and I will ask you a question about it.

18 A.   This one?

19 Q.   Yes.

20 A.   Okay.

21 Q.   And the Government's segment ended with Mr. Abu Baker

22 saying, "Our policy that we give the organizations and we

23 don't give to the individuals.  We don't give to the

24 individuals."  Right?

25 A.   That is correct.

1    Q.   And everything after that is the Defense Exhibit No. 11?

2    A.   Correct.

3    Q.   Okay.  Thank you.

4         Now, you also have El-Mezain -- No, I am sorry.  Shabib

5    No. 1.  Right?

6    A.   I do.

7    Q.   And let me come up and just organize this.

8              MR. DRATEL:  If I may, Your Honor?

9              THE COURT:  Yes.

10   Q.   (BY MR. DRATEL)  Now, this is also a conversation that

11   you admitted during your direct testimony.  Right?

12   A.   That is correct.

13   Q.   And it is a conversation between Muin Shabib and Mr.

14   El-Mezain.

15   A.   That is correct.

16   Q.   In 1993.

17   A.   Correct.

18   Q.   And they are talking about -- Just to recap, so we don't

19   have to start from the beginning, they are talking about a

20   dispute with Mr. Ashqar.  Correct?

21   A.   That is correct.

22   Q.   Okay.  And essentially it is tension between Mr. Abu

23   Baker and Mr. Ashqar in particular.  Is that discussed in

24   the -- If you just look a few lines higher than what is

25   highlighted.

1   A.   Well, one of them suggests there is a personal tension,

2   but the general problem was between the organizations.

3   Q.   Okay.

4           MR. DRATEL:  And Your Honor, I just would move to

5   admit this.  This is another one that the Court has ruled on.

6   I admit this as Defendants' Shabib Wiretap No. 1, please.

7           THE COURT:  And no objection to that, counsel?

8           MR. JONAS:  Correct.

9           THE COURT:  Are you also wanting the A that goes

10  with this.

11          MR. DRATEL:  I suppose so, Your Honor.

12          THE COURT:  So Shabib Wiretap No. 1 and 1-A?

13          MR. DRATEL:  Yes.

14  Q.   (BY MR. DRATEL)  And if you can read, and I hope it is

15  not too imbalanced that you have to do too much reading, but

16  if you would read the part of Mr. Shabib and I will read the

17  part of Mr. El-Mezain.

18  A.   Okay.  "What is Ismail's opinion?"

19  Q.   And Ismail is?

20  A.   Ismail Elbarasse.

21  Q.   "Ismail -- I didn't -- Ismail told him, 'Our intention

22  that we both help people over there.'  Also the agreement was

23  unanimous and not -- "

24  A.   "Shabib sighs."

25  Q.   And that is what it says in the transcript?

1   A.   That is correct.

2   Q.   "The man never insulted anybody.  He listened to him and

3   said, 'May God bless you.  By God, this shouldn't happen.  Why

4   is that?'  I am asking this question.  'Do we want this

5   organization in order in order to serve people to claim

6   leadership positions in it?'  Tell me.  Answer this question

7   for me."

8   A.   "There is no need for an answer.  It is obvious."

9   Q.   "Huh?"

10  A.   "It doesn't need an answer, my brother."

11  Q.   "We want to serve people.  Okay.  Here is someone who has

12  already established.  He is already serving you.  And by the

13  time you make people familiar with you, do you think people

14  will open their arms to you for two years in a time when

15  everyone is racing to slaughter you?"

16  A.   "Yes, by God, my brother."

17  Q.   "Are you with me?"

18  A.   "True, true."

19  Q.   "Instead of forming a strong organization, support it,

20  and make it the one which takes care of that, instead of

21  supporting ourselves, strengthening ourselves, let's do

22  something.  It is a small baby.  We want to nourish it and

23  give it antibiotic so it grows up.  I mean, it is not going to

24  benefit the cause at all, by God, my brother.  By God, it

25  won't benefit the cause in any -- Therefore, I told them, 'I'm

1  -- There are some people sitting with us who are not saying

2  what is just."

3  A.  "There is no might or power other than by God."

4  Q.  "Even if he came back and accepted our conditions, I

5  honestly -- My brother, the spirit and mentality do not belong

6  to people who seek a benefit, but to scatter people.  Why

7  scatter people?  You are working alone.  Alone really."

8  A.  "Alone.  He is alone.  That is true."

9  Q.  And that ends that segment.  Correct?

10  A.  Correct.

11  Q.  Thank you.

12        THE COURT:  For the record, I don't know that I

13  admitted that Shabib 1 and 1-A.  Those are admitted.

14        MR. DRATEL:  Thank you, Your Honor.

15  Q.  (BY MR. DRATEL)  Now, there are were also some videos

16  that you played during your direct examination, and some of

17  those videos included Mr. El-Mezain.  Right?

18  A.  That is correct.

19  Q.  And do you have your cheat sheet with you of dates?

20  A.  I do have that.

21  Q.  Okay.  Great.  Mushtaha No. 1.  That is a video that

22  includes Mr. El-Mezain.

23  A.  Correct.

24  Q.  And that is from 1990, you testified this morning?

25  A.  That is correct.

1    Q.    Mushtaha No. 6 is December 1988.  Correct?

2    A.    Correct.

3    Q.    Including El-Mezain.  And he is speaking on the first

4    anniversary of the Intifada?

5    A.    I believe that is correct.

6    Q.    The time would be correct.  Right?

7    A.    Yes.

8    Q.    And do you recall during that -- You have seen that more

9    than once, obviously.

10   A.    I have, but I have seen a lot of these more than once,

11   so --

12   Q.    Does he also -- Do you recall in that one that he says --

13   He is talking about someone who is martyred on the pulpit of

14   the Salah al-Din mosque?

15   A.    I don't recall that specifically.  If we play it, I am

16   sure it will refresh my memory.  But like I said, I have seen

17   so many of these.

18   Q.    Mushtaha Search No. 15.  Just to backtrack, it was

19   Mushtaha Search No. 1, Mushtaha Search No. 6, and now Mushtaha

20   Search No. 15.  Mr. El-Mezain appears in one of those clips as

21   well.  Right?

22   A.    Okay.

23   Q.    And that was 1988, the portion that he was in as well.

24   Right?

25   A.    We had that one dated somewhere in the first Intifada, so

1    it was before '93.

2    Q.    Well, yes.  Well, wasn't there an example in the video

3    itself that established it was again the first anniversary of

4    the Intifada?

5    A.    There may have been.  I just can't remember which tape it

6    is specifically.  If you want to play the clip, I am sure it

7    says that, but I would want to look at that.

8    Q.    But the latest you said it was 1993 under any

9    circumstances?

10   A.    1992, probably.

11   Q.    And HLF Search No. 124, that is a Chicago --

12   A.    Correct.

13   Q.    -- program.  Correct?  That Mr. El-Mezain spoke at?

14   A.    Yes.  That is that one.

15   Q.    And that is October 29th, 1995.

16   A.    Correct.

17   Q.    And so the first three that we talked about, Mushtaha

18   Search No. 1, Mushtaha Search No. 6, and Mushtaha Search

19   No. 15, they are all at least five years before October 8th,

20   1997.

21   A.    They were, yes.  I mean, they were several years before

22   the designation.

23   Q.    And also before January 23rd, 1995 even.

24   A.    That is correct.

25   Q.    And HLF Search No. 124 in October of 1995 is still

1    basically two years before October 8th, 1997.

2    A.    That is correct.

3    Q.    Now, about those videos, they were not necessarily in

4    complete condition, or they needed to be repaired and sent to

5    the lab, the ones that were recovered from Mr. Mushtaha's

6    backyard.

7    A.    That is correct.

8    Q.    And some of them were just bits and pieces of video that

9    could be recovered.

10   A.    It is my understanding that, you know, they were on the

11   reels, and so the ends were probably damaged and had mud on

12   them, or they were -- And that is the part that they had to

13   repair was what had been exposed.

14   Q.    And the part that couldn't be repaired, there is no way

15   of knowing what was on that part of the tape.

16   A.    And I don't know if that would be a second or a minute.

17   We need to ask someone from the lab about that.

18   Q.    But it could be a second, a minute, an hour?

19   A.    I don't know about that.  We would need to ask the lab.

20   Q.    And so we don't know also whether Mr. Mushtaha

21   taped -- Withdrawn.  We don't know whether Mr. Mushtaha used

22   the tapes for more than one event, let's say; put more than

23   one event on any particular tape, because we don't have some

24   of the complete tapes.  Right?

25   A.    I am not really sure what you are asking.

1   Q.   In other words, a tape could have been a series of events

2   and not just one tape from one a single event.

3   A.   Well, in fact, on a lot of these tapes from the Intifada

4   festivals, you can tell that the producer of the tape had

5   taken clips from various events during that time period.  The

6   IAP would have multiple festivals and put them on one tape.

7   So I don't know Mr. Mushtaha essentially did it, but these are

8   the tapes complete in their entirety.

9   Q.   And we don't know if Mr. Mushtaha or anyone else taped

10  over some of these tapes, part or all of them.

11  A.   We would need to ask the lab about that.

12  Q.   But you don't know?

13  A.   I don't.

14          MR. DRATEL:  Your Honor, may we approach for one

15  second?

16          THE COURT:  Sure.  Come up.

17          (The following was had outside the hearing of the

18          jury.)

19          MR. DRATEL:  Before we leave the wiretaps, there are

20  two tapes that I put on the list and the Government objects to

21  them.  I don't intend to move them into evidence, but they are

22  part of the El-Mezain wiretap, and I would like to

23  authenticate them through her just to see if she recognizes

24  them.  They are conversations recorded on the wiretap.  And

25  then move on.  And then if we move to admit them through

1    another witness, we don't have to call her back.

2             MR. JONAS:  I guess I don't understand the purpose

3    of having her authenticate this.  Are these -- What tapes are

4    you referring to?

5             MR. DRATEL:  No. 1340 and 1342, two conversations

6    with Mr. El-Mezain and his parents.

7             MR. JACKS:  Did you try to offer them last time

8    during the family issue?

9             MR. DRATEL:  Yes.

10            MR. JACKS:  We object to them.

11            MR. DRATEL:  But I am not moving to admit them.  I

12   am just wanting to authenticate them while she is here, and

13   then if there is another witness who it is relevant to I will

14   move them in and they can object.

15            THE COURT:  Okay.  So you want to just get the

16   foundation laid?

17            MR. DRATEL:  Yes.

18            THE COURT:  In case at some point?

19            MR. DRATEL:  Yes.

20            THE COURT:  Okay.  I think you can do that.

21            MR. DRATEL:  It is two or three questions.

22            (The following was had in the presence and hearing

23            of the jury.)

24            MR. DRATEL:  May I approach, Your Honor?

25            THE COURT:  Yes, sir.

1           MR. DRATEL:  Thank you.

2    Q.   (BY MR. DRATEL)  Let me show you what have been marked

3    for identification purposes as Defendants' No. 1340 and

4    Defendants 1342, and just ask you to look at them.

5    A.   Okay.

6    Q.   Do you recognize them?

7    A.   I recognize them as phone calls.

8    Q.   And just --

9           THE COURT:  If you would just answer yes or no to

10   that.

11          THE WITNESS:  Okay.

12          THE COURT:  Do you recognize them?

13          THE WITNESS:  Yes.

14   Q.   (BY MR. DRATEL)  And are they conversations involving Mr.

15   El-Mezain that were intercepted during the course of the

16   wiretap of Mr. El-Mezain's phone?

17   A.   Yes.

18          MR. DRATEL:  Thank you, Your Honor.

19       Also, to the extent --

20   Q.   (BY MR. DRATEL)  And there are audios that accompany

21   them?  Each of those calls there are audio files?

22   A.   Yes.

23   Q.   Okay.  Now, during your direct testimony you also put in

24   a document that you called Payments to IC/Gaza, the Islamic

25   Center of Gaza?

1    A.    Yes.

2    Q.    And do you have that up there with you?

3    A.    I probably do.  Let me check.  I do.

4    Q.    Okay.  And those are payments that Holy Land made to the

5    Islamic Center of Gaza.  Right?

6    A.    That is correct.

7    Q.    And some of the authorizations you testified on direct

8    were attributed to Mr. El-Mezain.

9    A.    That is correct.

10    Q.    Okay.  Now, if you look at that document, the

11    authorizations that Mr. El-Mezain made were July 25th, 1989.

12    Right?

13    A.    Correct.

14    Q.    August 1st, 1989?

15    A.    Correct.

16    Q.    August 14th, 1989?

17    A.    Correct.

18    Q.    September 21st, 1989?

19    A.    Yes.

20    Q.    And October 2nd, 1989?

21    A.    Correct.

22    Q.    And on your chart there are none after that.  Correct?

23    A.    That is correct.

24    Q.    And that last one, October 2nd, 1989, is essentially

25    eight years before October 8th, 1997.

1   A.   Correct.

2   Q.   Now, you also put in a chart of payments or transactions,

3   financial transactions between Abu Marzook and the Defendants.

4   Correct?

5   A.   That is correct.

6   Q.   Do you have that one with you?

7   A.   Let me just check.  I may have it in a different binder.

8   Actually I don't think I have that one up hear with me.

9        MR. DRATEL:  May I approach, Your Honor?

10       THE COURT:  Yes.

11  Q.   (BY MR. DRATEL)  And on your chart that you prepared.

12  Correct?

13  A.   I and some IRS agents.

14  Q.   But you participated in the preparation?

15  A.   I did.

16  Q.   And it lists checks -- All the checks go from Mr. Marzook

17  to Mr. El-Mezain.  Correct?  That are listed in terms of the

18  contact -- Withdrawn.

19       The financial transactions between Mr. El-Mezain and Mr.

20  Marzook are all payments, all checks from Mr. Marzook to Mr.

21  El-Mezain.

22  A.   Right.  The money is going one way.

23  Q.   Correct.  And those dates, I will just do the dates and

24  the amounts.  July 18th, 1988?

25  A.   Correct.

1   Q.   For $287?

2   A.   That is correct.

3   Q.   October 20th, 1989 for $2,000.

4   A.   Correct.

5   Q.   December 12th, 1989 for $1,000.

6   A.   That is correct.

7   Q.   February 8th, 1990 for $2,000?

8   A.   Correct.

9   Q.   April 1st, 1990 for $2,000.

10  A.   That is correct.

11  Q.   July 26th, 1990 for $4,000.

12  A.   Correct.

13  Q.   October 15th, 1990 for $5,000.

14  A.   Correct.

15  Q.   And December 26th, 1990 for $5,000.

16  A.   That is correct.

17  Q.   And so the last check December 26th, 1990 is almost seven

18  years before October 8th, 1997.

19  A.   That is correct.

20  Q.   Five years before Mr. Marzook was designated as a

21  specially designated terrorist.

22  A.   Correct.

23  Q.   And in fact, Mr. Marzook and Mr. El-Mezain are cousins.

24  A.   They are.

25  Q.   And they lived in the same city for a while in Colorado.

1    A.    That is correct.

2            MR. DRATEL:  Your Honor, I am about to get into a

3    longer area here.

4            THE COURT:  Let's go ahead and break here for the

5    day.  Be back at 9:00 in the morning.

6        Please recall the instructions we have been over, and see

7    you back in the morning.

8            (Whereupon, the jury left the courtroom.)

9            THE COURT:  Anything we need to address before we

10   recess, Mr. Jonas?

11           MR. JONAS:  I have one issue.  I think Agent Burns

12   has been on the stand on cross longer than we anticipated, and

13   perhaps longer than the Defense anticipated as well, given

14   what Ms. Hollander represented this morning as to how long it

15   would take her.  I am not faulting her.

16       Agent Burns is coming back for a second testimony.  That

17   could happen as early as midweek next week, maybe Thursday if

18   not Wednesday.  She is my witness.  I need to talk to her

19   about her second testimony, at least to get her to start

20   working on some things I need her to do.

21       I request permission for the Court to allow me to talk to

22   her about that testimony so we don't waste that time.

23           MR. DRATEL:  Your Honor, I am the last to cross

24   examine her, and I would really like to have that sanctity of

25   that rule observed.  I am going to take maybe an hour tomorrow

1    morning and then everything will be available.  We have a long

2    weekend this weekend for everybody to get together and do the

3    work that needs to get done.

4          MR. JONAS:  Except, Your Honor, I am not going to be

5    here this long weekend to work with her.  And I give my word

6    to the Court THAT I am not going to talk about her testimony

7    currently.  It is going to be about the upcoming testimony.

8    There are some things I need her to start working on.  I don't

9    see how this is going to prejudice Mr. Dratel in his cross

10   examination.

11         THE COURT:  I agree.  In light of the long weekend

12   coming up, and the fact you are going to be gone, you may

13   speak with her about what you stated; just what she needs to

14   be working on preparing for testimony the second time around.

15         MR. JONAS:  Thank you.

16         THE COURT:  And so you expect to get to Agent

17   Miranda sometime tomorrow?

18         MR. JONAS:  I see Mr. Dratel has a big stack of

19   documents.

20         THE COURT:  He says maybe he thinks another hour.

21         MR. DRATEL:  Maybe.  Having seen everyone else,

22   maybe I can trim it a little bit.

23         MR. JONAS:  Sir, yes.  My redirect I have to work on

24   tonight.  It could be anywhere -- I would say 45 minutes as I

25   stand here right now.  Don't hold me to that, please.  And of

1  course you have recross of five attorneys.  I would expect --

2          THE COURT:  If the redirect is fairly short, then

3  the recross should be fairly short.  We shouldn't have the

4  cross like the first time.

5          MR. JONAS:  I would expect Agent Miranda to get on

6  the stand tomorrow sometime.

7          MS. HOLLANDER:  Your Honor, I just neglected to when

8  I admitted Defense Ashqar No. 1, I also need to admit Defense

9  Ashqar No. 1-A, the audio.  And I didn't admit the audio.

10         THE COURT:  Defendants' Ashqar Wiretap No. 1 is in

11 but the A is not.  You want to offer that?

12         MS. HOLLANDER:  Yes.

13         THE COURT:  I don't know whether you objected or

14 not.  But if you did, same objection?

15         MR. JONAS:  Yes.

16         THE COURT:  Overruled.  That is admitted.

17     All right.  See you in the morning 9:00.

18                        (End of day.)

19

20

21

22

23

24

25

1    I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts          06/05/2009

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25