IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA    ) CAUSE NO. 3:04-CR-240-P
                              (
vs.                          )
                              ( OCTOBER 7, 2008
                         ) DALLAS, TEXAS
HOLY LAND FOUNDATION, ET AL   ( 9:00 A.M.

_____

VOLUME 15 OF 37

_____

STATEMENT OF FACTS

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

_____

<u>A P P E A R A N C E S</u>

FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                        1100 COMMERCE, 3RD FLOOR
                        DALLAS, TEXAS  75242
                        BY:  MR. JIM JACKS
                            MR. BARRY JONAS
                            MS. ELIZABETH SHAPIRO

FOR THE DEFENDANT:   FREEDMAN, BOYD, HOLLANDER,
(SHUKRI ABU BAKER)   GOLDBERG & IVES, P.A.
                        20 FIRST PLAZA, SUITE 700
                        ALBUQUERQUE, NEW MEXICO 87102
                        BY:  MS. NANCY HOLLANDER
                            MS. TERESA DUNCAN

```
 1           FOR THE DEFENDANT:  LAW OFFICE OF JOSHUA L. DRATEL
             (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
 2                               NEW YORK, NEW YORK  10005
                                 BY:  MR. JOSHUA DRATEL
 3                                    MR. AARON J. MYSLIWIEC

 4           FOR THE DEFENDANT:  LAW OFFICE OF MARLO P. CADEDDU
             (MUFID ABDULQADER)  3232 McKINNEY AVENUE, SUITE 700
 5                               DALLAS, TEXAS  75204
                                 BY:  MS. MARLO P. CADEDDU
 6
             FOR THE DEFENDANT:  LAW OFFICE OF LINDA MORENO
 7           (GHASSAN ELASHI)    P.O. BOX 10985
                                 TAMPA, FLORIDA  33679
 8                               BY:  MS. LINDA MORENO

 9                               JONES DAY
                                 555 CALIFORNIA ST., 26TH FLOOR
10                               SAN FRANCISCO, CA  94104
                                 BY:  MR. JOHN D. CLINE
11
             FOR THE DEFENDANT:  WESTFALL, PLATT & CUTRER
12           (ABDULRAHAM ODEH)   ONE SUMMIT AVENUE, SUITE 910
                                 FORT WORTH, TEXAS  76102
13                               BY:  MR. GREG WESTFALL

14           COURT'S LAW CLERK:  MS. JENNIFER HELMS
                                 1100 COMMERCE, RM. 1654
15                               DALLAS, TEXAS  75242

16           COURT COORDINATOR:  MS. BRENDA WEBB
                                 1100 COMMERCE, RM. 1654
17                               DALLAS, TEXAS  75242

18   OFFICIAL COURT REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                 1100 COMMERCE STREET, RM. 1654
19                               DALLAS, TEXAS  75242
                                 (214) 753-2349
20

21

22

23

24

25
```

## <u>INDEX</u>

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| LARA BURNS | |
| Cross By MR. DRATEL............................................. | 4 |
| Redirect By MR. JONAS.......................................... | 61 |
| Recross By MS. MORENO.......................................... | 131 |
| Recross By MS. CADEDDU......................................... | 136 |
| Recross By MS. HOLLANDER....................................... | 140 |
| Recross By MR. DRATEL.......................................... | 149 |
| ROBERT MIRANDA | |
| Direct By MR. JACKS............................................ | 155 |

## **Defendants' Exhibits**

| **Defendants' Exhibits** | **Page** |
|---|---|
| Defendants' Holy Land Search 29 Admitted into Evidence | 40 |
| D-174 Admitted into Evidence | 144 |
| No. 1336, 1337 Admitted into Evidence | 146 |

## **Government's Exhibits**

| **Government's Exhibits** | **Page** |
|---|---|
| Demonstrative No. 1 Admited into Evidence | 166 |
| Designation No. 5 Admited into Evidence | 203 |
| HLF Search No. 126 Admited into Evidence | 204 |
| HLF Search No. 88 Admited into Evidence | 206 |
| Elbarasse Search No. 28 Admited into Evidence | 216 |
| Elbarasse Search No. 29 Admited into Evidence | 219 |

1          THE COURT:  Ladies and gentlemen of the jury, good

2    morning.  We are ready to proceed.

3          Mr. Dratel?

4          MR. DRATEL:  Thank you, Your Honor.

5    Q.   (BY MR. DRATEL)  Good morning.

6    A.   Good morning.

7    Q.   Are you all set?

8    A.   Yes.

9    Q.   Just going back when we talked about the telephone

10   conversations that you have put in on your direct examination

11   involving Mr. El-Mezain, there was one I didn't mention.  I

12   just want to mention it, El-Mezain Wiretap No. 9.

13   A.   Okay.

14   Q.   And I have a copy just to confirm the date on it.  And

15   this one is May 18th, 2000.  Correct?

16   A.   Correct.

17   Q.   Now, another document that you put in evidence during

18   your direct testimony was the address book of Mr. Abu Marzook.

19   A.   That is correct.

20   Q.   And that was seized from him when he was arrested?

21   A.   That is correct.

22   Q.   And that was July of 1995?

23   A.   Yes.

24   Q.   So that is more than two years before October '97.

25   A.   That is correct.

1    Q.    And if you could pull that out for us, please.  Do you

2    have it in your binders?

3    A.    I do.

4    Q.    Thanks.

5    A.    I have it.

6    Q.    Okay.  Now, there is a gentleman named Mahmoud Abu

7    Marzook.  Do you know that name?

8    A.    I do.

9    Q.    And during the relevant time period during the mid to

10   late '90s, he was a general with the Palestinian Authority.

11   Correct?

12   A.    Correct.

13   Q.    And that was the group, the secular group that we have

14   talked about -- Well, the Palestinian Authority was a secular

15   government of West Bank, parts of the West Bank and Gaza under

16   the Oslo Accords.  Right?

17   A.    Correct.

18   Q.    And Hamas was opposed to that Government.  Correct?

19   A.    Yes, they were.

20   Q.    And Mahmoud Abu Marzook, a general in the Palestinian

21   Authority, is in fact Mousa Abu Marzook's brother.

22   A.    That is correct.

23   Q.    If you will look at page 57 of the address book.

24   A.    I have it.

25   Q.    And that has his brother listed.  Right?  Mahmud Abu

1   Marzook.

2   A.    It does.

3   Q.    And he was with Fatah.  Right?

4   A.    That is correct.

5   Q.    The secular party?

6   A.    That is correct.

7   Q.    And go to page 43, please.  Do you see an entry for

8   someone named Abu Hussein?

9   A.    I do.

10  Q.    And it says Abu Mazin's office director.

11  A.    It does.

12  Q.    And Abu Mazin is in fact the head of Fatah?

13  A.    Yes.

14  Q.    And he was the prime minister of the Palestinian

15  Authority during -- after the death of Yasser Arafat?

16  A.    He was -- Let me state I haven't checked this phone

17  number, so I can't tell you if this is the same Mahmoud Abu

18  Mazin.

19  Q.    But he is the most famous Abu Mazin.  Correct?

20  A.    He is.

21  Q.    And if you look down on page 62, the fourth entry, do you

22  see Riyad al-Za'noun?

23  A.    I do.

24  Q.    And in fact, he was the health minister for the

25  Palestinian Authority when Fatah controlled the Government.

A.   He was a minister.  I can't recall if he was the health

minister or not.

Q.   He was a minister in that government.  And as we noted

yesterday, Mr. El-Mezain and Mr. Marzook are related.

Correct?

A.   That is correct.

Q.   And Mr. El-Mezain has brothers as well.  Correct?

A.   He does.

Q.   One Dawud?

A.   Yes.

Q.   Who lives in Saudi Arabia?

A.   I think that is where he lives, or at least he did at one

time.

Q.   And Mahmoud who lives in the Gaza Strip?

A.   I believe that was his name.

Q.   Okay.  Thank you.

     You also put in -- You also used a demonstrative.  This

demonstrative I am showing you, I think it is called -- I am

not sure what it is called.  It is called Marzook/Defendants

phone calls.  Right.

A.   Correct.

Q.   And you have calls between Mr. El-Mezain and Mr. Marzook.

A.   That is correct.

Q.   During time periods 1989 through January of '93.

Correct?

1    A.   Correct.

2    Q.   And January of '93 represents more than two and a half

3    years -- more than four and a half years before October 8th,

4    1997.

5    A.   That is correct.

6    Q.   And this is based on -- By the way, Mr. El-Mezain's calls

7    are between December -- All in December of '92.  Correct?

8    A.   The ones he made to Marzook, for the records that we

9    have, that is correct.

10   Q.   Okay.  And you have his records for 1993 -- '92 through

11   the end of '93.  Right?

12   A.   Yes.

13   Q.   And those are in evidence as New Jersey Bell.  Right?

14   A.   Yes.

15   Q.   And the calls from Mr. Marzook to Mr. El-Mezain to the

16   numbers, the phone calls between those numbers are based on

17   phone records you have for Mr. Abu Marzook.

18   A.   That is correct.

19   Q.   And those are in evidence as well.  Right?

20   A.   That is correct.

21   Q.   Now, on a phone bill.  Right?  Which is what you were

22   operating off of.  Correct?

23   A.   That is correct.

24   Q.   You don't have any interceptions of those conversations.

25   A.   Not in those early years.

1    Q.   No transcripts or nothing.  Right?

2    A.   Not in the early years.

3    Q.   Since '94 you had a wiretap for virtually a decade until

4    November 2003 on Mr. El-Mezain's phone?

5    A.   On the phone numbers we had for him.

6    Q.   You had a wiretap on Mr. El-Mezain.

7    A.   That is correct.

8    Q.   Now, on a phone, a one-minute entry for a phone call is

9    the shortest entry possible.  Right?

10   A.   Correct.

11   Q.   And it could be someone leaving a message.

12   A.   Could be.

13   Q.   It could be calling and finding someone is not home.

14   A.   That is correct.

15   Q.   Could even be a hang-up.

16   A.   Could be.

17   Q.   And in fact, from a phone bill you can't tell who the

18   participants are on a phone call.

19   A.   You can't tell who answered the phone.  That is correct.

20   Q.   It could be Ms. Abu Marzook calling Ms. El-Mezain.

21   A.   I don't know.

22   Q.   It could be.  Right?

23   A.   Correct.

24   Q.   And it could be some of the children calling their

25   cousins.  Correct?

```
1    A.    Correct.

2    Q.    Now, I want to review that phone bill with you, those

3    phone bills, the phone records you worked off of for those

4    calls.  And this is from New Jersey Bell.  I will put it on

5    the elmo.  Can you see it?

6    A.    I can.

7    Q.    Okay.  Now the highlighted call, this is from Mr.

8    El-Mezain's phone number, charged to Mr. El-Mezain's phone

9    number, to the Abu Marzook number.  Correct?

10   A.    Correct.

11   Q.    And the highlighted call is a one-minute call.  Correct?

12   A.    Correct.

13   Q.    And that is December 2nd of 1992.  Right?

14   A.    Correct.

15   Q.    Okay.  So that is one.  I am going to keep a tally as we

16   go.  That is a one one-minute call.  Now I am going to go to

17   Bell Atlantic No. 1, which is one of the Abu Marzook phone

18   records.  Correct?

19   A.    Correct.

20   Q.    Can you see the highlighted call?

21   A.    I can.

22   Q.    And that is to Paterson, New Jersey.  Correct?

23   A.    Correct.

24   Q.    And that is one of the numbers for Mr. El-Mezain.

25   A.    It is.
```

```
1   Q.    Now, you had three lines.  Right?  That you listed on

2   your chart.  Right?

3   A.    I believe that is correct.

4   Q.    And the 3574 is the home number.  Right?

5   A.    Yes.

6   Q.    And the 7070 number is the mosque where Mr. El-Mezain

7   worked.  Is that correct?

8   A.    I can't recall which one that was.  I would have to look

9   at the records.

10  Q.    And the 6362 is a fax number.

11  A.    I believe that is correct.

12  Q.    So if you look at this one, which is January 19th --

13  A.    We can't see the date.

14  Q.    I will move it over.  Is the date visible now?

15  A.    It is.

16  Q.    So January 19th -- Do you know the year offhand?

17  A.    I would want to scroll up to the top to confirm.

18  Q.    Well, it is not on this one.  I will just find the

19  original exhibit so we can make sure.  And these are the phone

20  records.  Right?

21  A.    Correct.

22  Q.    So that would be '92.  Correct?  Would that be --

23  A.    I can't see the year.

24        MR. DRATEL:  May I approach, Your Honor?

25        THE COURT:  Yes.
```

1   Q.   (BY MR. DRATEL)   That is '92?

2   A.   It is.

3   Q.   1992.   And if you look at that call, that is a one-minute

4   call also.   Right?   To the home number?

5   A.   Correct.

6   Q.   Okay.   So that is two one-minute calls.   Can you see the

7   year of the highlighted call here?   I mean, the date, rather.

8   This is on page five.   Just one second.   That was page three

9   of the records.   This is page five.   Can you see the date?

10   A.   I think if you scoot it over just a little bit.   February

11   16th.

12   Q.   Right.   1992.

13   A.   Correct.

14   Q.   And that is another one-minute call.   Right?

15   A.   Correct.

16   Q.   To the home number for Mr. El-Mezain from Mr. Marzook's

17   number.   Let me show you page 15, and do you see -- first we

18   will do the bottom one.   September 27th.   Right?

19   A.   I see September 17th.

20   Q.   Look at the bottom, the second highlighted one.   Do you

21   see September 27th?

22   A.   I don't think we can see it on the screen.

23   Q.   It is not high enough.   There we are.   If you look at the

24   top you can see it says 10/26/92 bill date?

25   A.   It does.

```
1    Q.   Okay.  So this would be September 27th, 1992?

2    A.   That is correct.

3    Q.   That is a one-minute call?

4    A.   It is.

5    Q.   From Mr. Abu Marzook's number to Mr. El-Mezain's number?

6    A.   Correct.

7    Q.   That is four.  And if we look at the top one, that is

8    September 17th.  Right?

9    A.   Correct.

10   Q.   From Mr. Abu Marzook's number to Mr. El-Mezain's.

11   A.   Correct.

12   Q.   And it is a two-minute call.  Right?

13   A.   That is correct.

14   Q.   So we have one two-minute call so far.

15        Now we will go to Bell Atlantic No. 2.  That is another

16   set of Marzook records.  Correct?

17   A.   Correct.

18   Q.   Phone records.  These were obtained from the phone

19   company.  Right?

20   A.   These were obtained way before I came in, but I believe

21   that they were.

22   Q.   Okay.  Now can we see the date?

23   A.   I can.

24   Q.   Okay.  This is page 6 of Bell Atlantic No. 2.  And just

25   to orient all of us to the year, it is still 1992.
```

1    A.    That is correct.

2    Q.    Now, so can you see that call, the highlighted call?

3    A.    I can.

4    Q.    And that is to Mr. El-Mezain's home number?

5    A.    It is.

6    Q.    And that is a one-minute call?

7    A.    It is.

8    Q.    That is five.  This is page 9 of those records, and you

9    see four calls on February 3rd, 1992?

10   A.    Yes.

11   Q.    And the first two are to Mr. El-Mezain's home number.  Do

12   you see those?

13   A.    I do.

14   Q.    And those are both one minute?

15   A.    That is correct.

16   Q.    So it is two more, seven.  And then you see another one

17   to Mr. El-Mezain's home number for one minute.

18   A.    That is correct.

19   Q.    And then directly underneath that you see another one to

20   the 7070 number.  Correct?

21   A.    Correct.

22   Q.    And that is also a one-minute call.  Right?

23   A.    It is.

24   Q.    So there is four on that page for a total of nine now.

25         Now, page 10 Of Bell Atlantic No. 2.  Can you see the

1   information?

2   A.   I can.

3   Q.   Okay.  Now, you see the highlighted portion on February

4   16th?

5   A.   I do.

6   Q.   To the El-Mezain home number?

7   A.   Yes.

8   Q.   And that is a one-minute call.  Correct?

9   A.   Correct.

10   Q.   That is ten.  Page 12 of The Bell Atlantic records.  Can

11   you see the highlighted portions?

12   A.   I can.

13   Q.   The first one March 1st, 1992, that is to the El-Mezain

14   home number.  Correct?

15   A.   It is.

16   Q.   And it is a one-minute call?

17   A.   Correct.

18   Q.   And then on the second group, the first one is to the

19   home number for two minutes.  Right?

20   A.   That is correct.

21   Q.   And then right after that is a call to the 7070 number.

22   Right?

23   A.   That is correct.

24   Q.   And that is a five-minute call.

25   A.   It is.

1    Q.   So now we have two two-minute calls and 11 one-minute

2    calls.

3         Now we are at page 14 Of Bell Atlantic No. 2.  And you

4    see the three highlighted calls?

5    A.   I do.

6    Q.   The first one is to the El-Mezain home number for one

7    minute.  Right?

8    A.   That is correct.

9    Q.   That makes 12.  Then the next one is again the El-Mezain

10   home number for one minute.

11   A.   That is correct.

12   Q.   Thirteen.  And then there is a three-minute call right

13   after that to the 7070 number.  Right?

14   A.   Correct.

15   Q.   Now we have page 17, and that is May 16th of 1992.

16   A.   That is correct.

17   Q.   To the El-Mezain home number.

18   A.   Correct.

19   Q.   For two minutes.  Right?

20   A.   That is right.

21   Q.   So that is three two-minute calls.  Do you see the

22   highlighted call there on page 19?

23   A.   I do.

24   Q.   And that is May 16th?

25   A.   Correct.

1    Q.    And that is another call to the El-Mezain home number?

2    A.    It is.

3    Q.    For two minutes?

4    A.    Correct.

5    Q.    So that is another two-minute call.

6          Page 21, August 11th.  Do you see that one in the middle

7    of the page?

8    A.    Is it June or August 11th?

9    Q.    I am sorry.  You are right.  It is June 11th.  June 11th

10   to the El-Mezain home number for one minute.  Right?

11   A.    Correct.

12   Q.    So that is 14.

13         Do you see the call highlighted here?

14   A.    I do.

15   Q.    That is July 4th, 1992 to Mr. El-Mezain's home number for

16   two minutes.  Right?

17   A.    That is correct.

18   Q.    So that is five two-minute calls.

19         Now, if you look at the call that is highlighted in this

20   section, that is July 30.  Right?

21   A.    Correct.

22   Q.    1992.  It is a one-minute call.  Right?

23   A.    Correct.

24   Q.    That is 15.

25         And then down here, this is page 26, same page, August

1  10th, 1992 to Mr. El-Mezain's home number, a one-minute call.

2  Correct?

3  A.   Correct.

4  Q.   And the top one was also to Mr. El-Mezain's home number.

5  Right?

6  A.   Correct.

7  Q.   Those are the two calls that are on your Demonstrative

8  No. 8.  Right?

9  A.   Correct.

10 Q.   Now, those are one-minute calls.  Right?

11 A.   Correct.

12 Q.   We have no idea whether Mr. El-Mezain spoke to Mr. Abu

13 Marzook.  Right?

14 A.   Based on how --

15 Q.   You don't know, do you, whether they spoke?

16 A.   I was not there so I don't know who answered the phone.

17 Q.   Right.  And you don't know who made the call either.

18 A.   I know who spoke and --

19 Q.   But you don't know who made the call.

20 A.   Right.

21 Q.   Page 33.  This is October 29th, 1992.  Right?

22 A.   Correct.

23 Q.   A one-minute call from the Abu Marzook number to the

24 El-Mezain home number.  Right?

25 A.   Correct.

1   Q.   That is 17.

2        Same page, can you see that?

3   A.   I can.

4   Q.   November 8th to the El-Mezain home number, one minute.

5   A.   Correct.

6   Q.   Eighteen.

7        If you look -- Can you see the top one, November 30 call?

8   A.   Yes.

9   Q.   And that is a one-minute call to the El-Mezain home

10  number?

11  A.   It is.

12  Q.   Nineteen.

13       And you see the four in a row that are highlighted below

14  that?

15  A.   I do.

16  Q.   And the first one is to the home number for one minute.

17  Right?

18  A.   Correct.

19  Q.   That is 20.

20       The second is to the 7070 number for two minutes.  Right?

21  A.   Right.

22  Q.   That is another two-minute call.

23       And then there is a seven-minute call to the 7070 number.

24  Right?

25  A.   Correct.

1   Q.   And then there is a one-minute call to the home number.

2   Right?

3   A.   Correct.

4   Q.   So that is another -- That is 21 one-minute calls.

5       Can you see the information at the top of the page?

6   A.   I can.

7   Q.   Okay.  Now, this is page 39, and this would be January of

8   '93.

9   A.   That is correct.

10   Q.   And those are two calls, the first one to the home number

11   for Mr. El-Mezain and that is a one-minute call.  Correct?

12   A.   It is.

13   Q.   And that is followed by a call to the 7070 number.

14   A.   Yes.

15   Q.   And that is also a one-minute call.

16   A.   Right.

17   Q.   So that is 21 one-minute calls.

18       Now, the South Central Bell bill is also for Mr. Abu

19   Marzook.  Right?

20   A.   It is.

21   Q.   And that is also in evidence as well.  Right?  Do you

22   need to see the time period for that?

23   A.   I would like to if we are going to be discussing dates.

24         MR. DRATEL:  If I may, Your Honor?

25         THE COURT:  Yes.

1  Q.   (BY MR. DRATEL)  And this is 1990.  Correct?

2  A.   Correct.

3  Q.   Can you see that?

4  A.   I do.

5  Q.   And that is a call from the Abu Marzook phone number, a

6  phone listed in his name?

7  A.   Correct.

8  Q.   And it is to the home number for El-Mezain.  Right?

9  A.   That is correct.

10 Q.   One minute.  Right?

11 A.   That is.

12 Q.   So that is 24.  That was January 26th.  Do you want me to

13 put that back up there?  Let me put that back up for a second.

14 The page numbers on this one, it says 26, but that is January

15 26th, 1990.  Right?

16 A.   Correct.

17 Q.   Okay.  And you can see this one?

18 A.   Yes.

19 Q.   This is January 26th, 1990 as well?

20 A.   That is correct.

21 Q.   And it is a call to the El-Mezain home number?

22 A.   It is.

23 Q.   And it is one minute.  Right?

24 A.   Correct.

25 Q.   Now, this is December -- Can you see it?

1    A.    I can.

2    Q.    That is December 29th.

3    A.    That is correct.

4    Q.    1989.  Right?

5    A.    It would be.

6    Q.    And that is again to Mr. El-Mezain's home number.  Right?

7    A.    Correct.

8    Q.    And that is one minute.

9    A.    Yes.

10   Q.    Twenty-six.

11         Can you see the highlighted one?

12   A.    I do.

13   Q.    Okay.  And that is October 26th.

14   A.    Correct.

15   Q.    And that is 1989.  Do you need to see the top part?

16   A.    No, I can see it on the next sheet.

17   Q.    Yes.  So that is October 26th, 1989 from Mr. Abu

18   Marzook's number to Mr. El-Mezain's home number.  Right?

19   A.    Correct.

20   Q.    And that is one minute.

21   A.    It is.

22   Q.    Twenty-seven.

23         And you can see this information?

24   A.    I can.

25   Q.    And that is September 6th, 1989?

1    A.    Correct.

2    Q.    It is to Mr. El-Mezain's number?

3    A.    It is.

4    Q.    One minute?

5    A.    That is correct.

6    Q.    Twenty-eight.

7          And can you see both on this page?

8    A.    I can.

9    Q.    One is July 18th?

10   A.    Yes.

11   Q.    One minute?

12   A.    Correct.

13   Q.    And another July 18th, one minute, both to Mr.

14   El-Mezain's home number?

15   A.    Correct.

16   Q.    That makes 30 one-minute calls and 6 two-minute calls.

17   Right?

18   A.    I will trust your addition there because I haven't been

19   tallying them.

20   Q.    Out of the 56 calls that you listed on your chart.

21   A.    Correct.

22   Q.    Now, you testified on direct a bit about the Muslim

23   Brotherhood.  Correct?

24   A.    Correct.

25   Q.    And in an interview that you did of Mr. El-Mezain he told

1    you he was a member of the Muslim Brotherhood.  Correct?

2    A.   He did.

3    Q.   And by the way, the last of those calls -- Withdrawn.

4         Now, Mr. El-Mezain was chairman of the board originally

5    for Holy Land Foundation.  Correct?

6    A.   That is correct.

7    Q.   And during that time he was not paid a salary.  Right?

8    He was paid expenses.

9    A.   I have seen conflicting information on that.

10   Q.   Do you have any checks other than for expenses?

11   A.   I was going to say I have seen no bank records showing

12   payments to him.

13   Q.   Right.  And he was reimbursed for his expenses as

14   chairman.  Right?

15   A.   If you are referring to that 1999 phone call we listened

16   to on direct --

17   Q.   I am referring to HLF --

18            THE COURT:  Counsel, you are cutting her off.

19            THE WITNESS:  You were asking if he was reimbursed

20   for expenses.  We saw that phone call where Shukri Abu Baker

21   and Omar Ahmad discussed the $20,000 or so that they were

22   going to pay him for his fundraising.  So he wasn't

23   reimbursed.

24   Q.   (BY MR. DRATEL)  That wasn't my question.  My question

25   was not about that.  I was talking about during the course of

1    his -- from '89 to '99--not what is happening in '99--he was

2    reimbursed for his expenses.  Right?  They paid for his

3    American Express?

4    A.    He had an HLF American Express.

5    Q.    Right.  He did a lot of traveling.  Correct?

6    A.    He did.

7    Q.    In fact, he traveled to speak on behalf of the Holy Land

8    Foundation at various places.  Right?

9    A.    He did.

10   Q.    And he also spoke for other organizations as well.

11   A.    Yes, he did.

12   Q.    And that included mosques.  He raised money for mosques

13   around the country.

14   A.    I know he raised money for the mosque that he was the

15   emam at.  I don't no know if he raised any money for other

16   mosques.

17   Q.    And for the educational foundation, for the Islamic

18   Educational Foundation in Paterson, he raised money for that,

19   too.

20   A.    Yes, he did.

21   Q.    You also put in what is called El-Mezain Wiretap No. 1.

22   Right?

23   A.    That is correct.

24   Q.    And that is a collection of faxes?

25   A.    It is.

1    Q.    And those aren't all the faxes that Mr. El-Mezain

2    received during the period that the wiretap was going.  Right?

3    A.    That is correct.

4    Q.    Just the ones that you chose to introduce.  Right?

5    A.    The ones that were relevant to the subject matters we

6    were going to be discussing.

7    Q.    For your testimony.

8    A.    Correct.

9              MR. DRATEL:  Your Honor, may we approach for one

10   second?

11             THE COURT:  Yes.

12             (The following was had outside the hearing of the

13             jury.)

14             MR. DRATEL:  We had that outstanding issue with the

15   two page letter from Mr. Abu Baker, and I would like to get

16   into it during this part.

17             THE COURT:  Refresh my memory.

18             MR. DRATEL:  The solicitation letter that was faxed

19   to Mr. El-Mezain about Ramadan.  It was in our motion, and I

20   am moving it in under those cases for Mr. El-Mezain's state of

21   mind based on what others told him.

22             THE COURT:  Do you have it?

23             MR. DRATEL:  Yes.  Sure.

24             THE COURT:  Okay.  And your objection is hearsay?

25             MR. JONAS:  And if I need to address it unless, Your

1    Honor is going to deny his request.

2            THE COURT:  Who is this letter to?

3            MR. DRATEL:  It was faxed to Mr. El-Mezain It is

4    part of the original Government exhibit.  They redacted it

5    before they put it in.  They took these two pages out.  But I

6    don't think -- It is not an authenticity issue.  It was

7    intercepted on the wiretap.

8        In the cases that we cited in the motion, with respect to

9    that state of mind, it can come from what others tell you and

10   that forms your state of mind.  I think this goes directly to

11   that in terms of Mr. El-Mezain in the context of he is the

12   fundraiser for Holy Land.

13           MR. JONAS:  Your Honor, first of all, El-Mezain is

14   not the declarant so he is not declaring the state of mind,

15   one.

16       Two, there is no evidence that this affected his state of

17   mind or this was his state of mind.  All this agent can say is

18   that this was received by El-Mezain in this fax.  That is it.

19       Three, the cases that talk about entering state of mind

20   evidence where someone else makes a statement to the declarant

21   all have evidence where the Defendant shows he reacted to what

22   the declarant said to show his state of mind.  For example, I

23   believe some of the cases Mr. Dratel cited talk about

24   duress--"I delivered the drugs because I thought my life was

25   in danger," and the person who threatened me, that statement

comes in to show my reaction to that statement.  We have none

of that here.  All this is is a fax received by El-Mezain,

nothing more.

Now, if Mr. El-Mezain wants to get on the stand to say,

"This was my state of mind when I received it," maybe then we

can argue further about it.  Right now this is classic

hearsay.

MR. DRATEL:  Your Honor, they put in all the other

faxes, as well as thousands of pages of documents, all of

which have no connection to any Defendant reacting to them,

but yet all the stuff, the faxes to Mr. El-Mezain received,

there is no evidence that he reacted to any of that, yet they

have come in.

And the cases don't require some manifestation.  The

cases go to state of mind, because this is what the person

receives.  And there is no requirement in those cases that --

We cited I think a half a dozen cases.

THE COURT:  This is hearsay.  I am going to sustain

the objection.  I don't think it goes to your client's state

of mind, and I don't think you have an exception to the

hearsay rule.  I will sustain the objection.

(The following was had in the presence and hearing

of the jury.)

Q.  (BY MR. DRATEL)  Okay.  So the El-Mezain faxes, which are

in evidence.  Right?

1    A.    Correct.

2    Q.    And most of what you put in, I think, if not all, were

3    called reports.  Right?  From the IAP?

4    A.    A majority of them were.

5    Q.    Yeah.  Now, I just want to go over some of the entries

6    with you.  Okay?

7    A.    Okay.

8    Q.    And you can see the date there.  That says Sunday and

9    Monday, January 8th, 1995.

10   A.    Yes.

11   Q.    And by the way, that is more than two and a half years

12   before October 8th, 1997.  Right?

13   A.    Correct.

14   Q.    The now, page 2, can you see that?

15   A.    I can.

16   Q.    The highlighted section?

17   A.    I can.

18   Q.    Could you read that, please?

19   A.    It says, "The British Observer newspaper expressed a

20   conviction that the return of 'The Arabists' secretive

21   Zionists units to resume their activity in the Palestinian

22   occupied territories is linked to the decline in the

23   popularity of the prime minister government of the Zionist,

24   Yitzhak Rabin.  The newspaper noted that 'Soldiers from the

25   Samson and Dabdaban units killed seven Palestinians in one

1    week by carrying out public executions against them without a

2    trial.'"

3    Q.    And that is a report citing the British Observer

4    newspaper.  Right?

5    A.    That is what the IAP report is referencing.

6    Q.    Right.

7          This one from January 12th.  Do you see that?  January

8    12th, 1995?

9    A.    I do.

10    Q.    And could you read that entry, please?

11    A.    It says, "Jerusalem Post newspaper revealed in its last

12    issue that the Zionist 'Likud' party made a secret offer to

13    the Labor Party led by the government coalition in the Zionist

14    existence pledging Likud's support for the withdrawal of the

15    Zionist military from the occupied Golan Heights for the

16    purpose of reaching a peace treaty with Syria in exchange for

17    canceling the Zionist entity's redeployment operation of the

18    occupation army in the occupied West Bank."

19    Q.    Now, that sites the Jerusalem Post.  Correct?

20    A.    Correct.

21    Q.    That is an Israeli newspaper?

22    A.    The Jerusalem Post is an Israeli newspaper, yes.

23    Q.    And that is the source that is sited in that particular

24    section.  Right?

25    A.    That is who they reference.  I haven't seen the

1    underlying article.

2    Q.    You didn't try to look for the underlying articles?

3    A.    No.

4    Q.    Not for you?

5    A.    It is not relevant to this case.

6            THE COURT:   Counsel, let's not argue.

7    Q.    (BY MR. DRATEL)   Do you see this one, December 7th 1995?

8    A.    I do.

9    Q.    Now it says January in parentheses.

10   A.    It does.

11   Q.    Is that because it appears to have been faxed in January

12   of '95?

13   A.    If we can turn to the Arabic, I would like to see if the

14   parentheses are there.

15   Q.    If you look at the highlighted part above where the fax

16   legend is.

17   A.    Yes, that says January 8, 1995.

18   Q.    Right.   And, in fact, on the Arabic version, which is the

19   original, it is in English.   And I will highlight that for

20   you.   It is January of '95.   Right?

21   A.    That is what it says.

22   Q.    Sometimes people still put December and sometimes put the

23   wrong year.   Right?   When the year changes?   It is not

24   uncommon.

25   A.    I am not sure what you are asking me to answer.

1   Q.   Anyway, can you read the highlighted section from that

2   report, please?

3   A.   It says, "The extremist Kach Zionist movement recently

4   organized a language competition and distributed it in Zionist

5   schools to commemorate 'Baruch Goldstein' who carried out the

6   massacre of the Ibrahimi Mosque last February.  The movement

7   announced the competition under the title, 'What could

8   Dr. Baruch Goldstein have done.  May God avenge his memory in

9   his twentieth anniversary?'  The text of the competition read,

10  'The books of Meir Kahane, the pious and virtuous, may God

11  have mercy on his soul and avenge his killing, will be

12  distributed to winners.  The winner's prize is a key holder

13  that has the picture of the saint Baruch Goldstein and all the

14  books of Rabbi Kahane.  The contest must not be less than one

15  hundred and twenty words and contestants must be between 14

16  and 18 years of age.'"

17  Q.   Thank you.  Here is one for Sunday November 20th, 1994.

18  Correct?

19  A.   Correct.

20  Q.   And if you could read the highlighted portion, please?

21  A.   It says, "Professor Edward Sa'id, professor at Columbia

22  University in the United States of America, said that what

23  happened in the Gaza Sector the day before yesterday (is a

24  catastrophic situation).  He expressed his belief that these

25  events were premeditated from the start since the declaration

1   of principles in Washington was announced.  He pointed out

2   that the agreement which was reached between the Organization

3   and the Zionist existence 'Has in fact preserved the

4   occupation albeit in new methods.'  Sa'id said that

5   Palestinians 'realize with the passing of time that what they

6   got at the end is really nothing.'  Sa'id expressed his view

7   that 'The majority of the residents of Gaza see Arafat as an

8   executer for the policy of the occupation authorities and that

9   what they got is a tattered government,' stressing that the

10  exit from the current crisis is 'ending control by the

11  occupation authorities over the Bank and Gaza and the

12  elimination of the Zionist settlements from these

13  territories.'  He said that, 'This will not happen unless in

14  light of circumstances which were prevalent during the

15  Intifada.'"

16  Q.   And is Edward Said an extremist?  Was he?  He is deceased

17  now.

18  A.   Well, I actually tried to call him once.

19  Q.   I am asking you the question was he an extremist?

20  A.   I would say he was not unbiased.

21  Q.   Okay.  So that is -- What is the answer to him being an

22  extremist?  Biased means extremist.

23          MR. JONAS:  Objection.  She answered the question.

24          THE COURT:  Go ahead.  You may ask that question.

25  Q.   (BY MR. DRATEL)  Is biased extremist?

1    A.    I would not say that biased is necessarily extremist, and

2    I don't know all of his views.

3    Q.    Okay.  And by the way, you said -- Yesterday -- you just

4    talked about something that reminded me.  Yesterday you said

5    you spoke to Jamil Hamami?

6    A.    That is correct.

7    Q.    Where was that conversation?

8    A.    In Jerusalem.

9    Q.    When was it?

10   A.    Years ago.

11   Q.    How many years ago?

12   A.    I can't recall.

13   Q.    Can't you give us --

14   A.    It was probably -- I spoke to him twice.

15   Q.    What was the first time?

16   A.    Probably 2002.

17   Q.    And the second time?

18   A.    Maybe 2003, but I may be wrong on those years.

19   Q.    So both were in 2002 and 2003?

20   A.    Like I said, I may be wrong on the years, but it was

21   several years ago.

22   Q.    Both conversations?

23   A.    Yes.

24   Q.    Okay.  Thank you.

25         Okay.  Sunday October 16th, 1994, another of the faxes.

1   Right?  The report?

2   A.   Correct.

3   Q.   By the way, this was a fax sent out to many people.

4   Correct?  This report?  At least 80?

5   A.   I think 80 people were on the distribution list at this

6   time.

7   Q.   And on page 2 of that exhibit, do you see the highlighted

8   portion?

9   A.   I do.

10  Q.   It says, "Israeli security announced that siege is

11  expected to be partially lifted from Gaza Strip."  Right?  And

12  then it says, "Ha'aretz newspaper" -- and that is also a major

13  Israeli daily newspaper.  Correct?

14  A.   "Ha'aretz newspaper is an Israeli daily newspaper.

15  Q.   And, again, it says Ha'aretz newspaper --

16  A.   It does.

17  Q.   -- as the source.  Right?  Okay.  This is another one

18  from January 22nd this is that special report you read from.

19  Right?

20  A.   I can't recall if I actually read from this one.  Yes, it

21  is.

22  Q.   Look at that last paragraph on that page, the highlighted

23  portion.

24  A.   I see it.

25  Q.   "News agencies' reporters mentioned."  Right?

1    A.    It does.

2    Q.    And then later it says "Reporters added"?

3    A.    Yes, it does.

4    Q.    You also testified on direct about the document found in

5    the San Diego office of the Holy Land Foundation in the

6    search.  Right?

7    A.    Yes.

8    Q.    And that was in that folder called Fatwa?

9    A.    Correct.

10   Q.    And there were other documents in that folder other than

11   the one that you read from.  Correct.

12   A.    Yes.  There were a number of copies of the same document,

13   along with some other Fatwas, I believe.

14   Q.    There were other documents in there.  Correct?

15   A.    Correct.

16   Q.    Including a short written letter from Mr. El-Mezain.

17   Right?

18   A.    I believe the short letter was actually attached to this

19   exhibit.  If it was the one --

20   Q.    Are you sure?

21   A.    I would like to look at the exhibit to confirm, but --

22   Q.    Sure.  This is a copy of the entire folder.

23   A.    Okay.  So that is not the actual exhibit?

24   Q.    No.

25   A.    Okay.  Are you referring to the letter to Rasmi Al Mallah

1    from El-Mezain?

2    Q.   I think it is the one you put in evidence.  Right?

3    A.   That was in the original exhibit.

4    Q.   Along with all these other documents?

5    A.   Correct.

6    Q.   Right.  Can I have it back, please?

7    A.   Sure.

8    Q.   And Mr. El-Mezain's letter is --

9            MR. DRATEL:  I may I approach, Your Honor?

10           THE COURT:  Yes.

11   Q.   (BY MR. DRATEL)  In original it has a bates stamp.

12   Right?  1457?

13   A.   It does.

14   Q.   And the document that you put in yesterday --

15           MR. JONAS:  Your Honor, for the record --

16           MR. DRATEL:  Not yesterday.  I am sorry.

17           MR. JONAS:  That is not -- Can we get an exhibit

18   number?

19           MR. DRATEL:  It is HLF Search No. 29.

20   Q.   (BY MR. DRATEL)  So that was 1467.  Right?

21   A.   I believe that is what we said.

22   Q.   Okay.  And the document that you put in with it the other

23   day was in English.  It was already in English.  It wasn't a

24   translation.  Right?

25   A.   Correct.

1    Q.    Okay.  Now, as you mentioned, there are a couple of

2    different copies of that same thing in this document.  Right?

3    A.    That is correct.

4    Q.    In the folder?

5    A.    That is correct.

6    Q.    And these are numbered in consecutive order.  Right?

7    A.    Correct.

8    Q.    Okay.  I want to show you one.  That is the document.

9    Right?

10   A.    Correct.

11   Q.    And it is 1443.

12   A.    Correct.

13   Q.    Right?

14   A.    Uh-huh.

15   Q.    There is another copy, 1448, does that look like?

16   A.    Correct.

17   Q.    1453?

18   A.    Correct.

19   Q.    1458?

20   A.    Correct.

21   Q.    And there are no other copies in there.  I may have a

22   little bit more of this document, just to make sure.  There

23   were no other copies in there.  Right?

24   A.    In that stack that you had there weren't, no.

25   Q.    Right.  And then the rest of the exhibit, no additional

1    copies.  Correct?

2    A.    I didn't see any.

3    Q.    Now, there is another document -- By the way, Mr.

4    El-Mezain's original letter is in Arabic.  Right?

5    A.    That is correct.

6    Q.    And there is a translation that goes with that that you

7    put in as well.

8    A.    Correct.

9    Q.    Right?  Now, among the other documents that were in

10   there --

11            MR. DRATEL:  May I have a moment, Your Honor?

12            THE COURT:  Yes.

13            MR. DRATEL:  I am going to show you what we will

14   mark at Defendants' Holy Land Search No. 29, please, Your

15   Honor.  Actually -- Your Honor, just to save time, I will put

16   in the translation and we will just hook up with the original

17   Arabic later rather than try to find it.

18            THE COURT:  All right.

19   Q.    (BY MR. DRATEL)  This is from that same exhibit?

20   A.    From the same folder.

21   Q.    Yes.  From the same folder.  Okay.

22            MR. DRATEL:  Thank you, Your Honor.  I move Holy

23   Land Search -- Defendants' Holy Land Search No. 29 into

24   evidence, Your Honor.

25            THE COURT:  Mr. Jonas?

```
 1              MR. JONAS:  No objection.

 2              THE COURT:  Admitted.

 3     Q.   (BY MR. DRATEL)  Now, this is an English translation,

 4     what I will put on here, and it says on top -- Do you see

 5     where it says "Al Mojtama'a Edicts"?

 6     A.   Yes.

 7     Q.   And it is in fact from the same person who wrote the

 8     other one.  Right?  The Dean of Sharia College, University of

 9     Kuwait.  Do you want to see that?

10     A.   Can I see his name, please?

11     Q.   Sure.  Right?

12     A.   The last name is the same.  The first name on the

13     translation is spelled very differently, so I am not sure if

14     it is the same individual or not.  The last name is the same.

15     Q.   What about his position?

16     A.   It says the same position.

17     Q.   And in fact, Arabic to English transliteration can be

18     different depending on who is doing the translating.  Correct?

19     A.   Yes.  Phonetically it can be different.  This one is

20     really different, but it can be the writing on it was

21     difficult to read.

22     Q.   Really it is the first two or three letters.  Right?  One

23     says Akeel and the other is 'Ujeil.  Right?

24     A.   Yes.

25     Q.   So if you could read that first paragraph, please.
```

1    A.   Can you scoot it over to the left a little bit so I can

2    see the whole paragraph?

3         There the title is "Paying zakat to the parties working

4    to instill God's Sharia.

5         "Question:  Is it permissible to pay zakat to an Islamic

6    party, group or organizations which exist in countries that do

7    not uphold God's Sharia, keeping in mind that the goal of

8    these parties, groups or organizations, is to uphold the rule

9    of Islamic Sharia and to call for Islam, through democratic

10   ways, and that in order to reach their goals they have a lot

11   of expenses for advertising, lectures, booklets for elections

12   purposes, all of which require large sums of money.  So, is it

13   permissible to pay zakat to them for that purpose?"

14   Q.   Thank you.  Now, I will give you a break and I will read

15   this last paragraph here that I have highlighted from the same

16   document.

17        "It is permissible to pay zakat to these Islamic parties,

18   groups and organizations which seek to resume the Islamic

19   life, remove infidel systems and replace them with the God's

20   Sharia in their place.  It is sufficient to believe that they

21   are able to make an impact towards that even partially while

22   its impact grow over time.  Zakat then would be paid for every

23   action which becomes a means to achieve the mentioned goal

24   because means receive opinion as the means and what preludes a

25   duty is a duty.  Therefore, whatever duty needs to be

1    accomplished with is a duty provided that means are legal.

2    Therefore, if those overseeing these parties, groups and

3    organizations are people of trust, if their work is organized

4    and they followed the legal means without squandering, then

5    giving zakat to them is approved, whether their means are

6    educational, cultural, informative, electoral or political

7    advertising.  Their support should be ensured especially if

8    the governments don't support and strengthen them, or if the

9    enemy of Islam is supporting others and hindering their

10   progress."

11        I want to move on to another document that you put in

12   evidence during your direct testimony.  This is called InfoCom

13   Search No. 3.  Okay?  Do you know which document I am talking

14   about?

15   A.   I don't have the exhibit numbers memorized, so I would

16   need to look at it.

17   Q.   It is Project 236.  Do you remember that?

18   A.   I do.

19   Q.   It is a Holy Land project done through the Islamic Relief

20   Agency.

21   A.   Correct.

22   Q.   And that was located -- the Islamic Relief Agency was

23   located in Um El-Fahem, Israel.  That is where it was located.

24   A.   Correct.

25   Q.   Now, this is related to a $100,000 project, that $100,000

1  that Holy Land gave to the Islamic Relief Agency.

2  A.    Correct.

3  Q.    In August of 1982.  Right?

4  A.    '92.

5  Q.    I am sorry.  '92.  Yes.  And by the way, that is 15 years

6  before October 8th, 1997.  Five years.  I am sorry.  I am

7  stuck in the '80s.  Five years before 1997, before October.

8  A.    Yes.

9  Q.    Now, this is page 1 of that exhibit.  Right?

10  A.    Correct.

11  Q.    It says "project summary report"?

12  A.    It does.

13  Q.    It says, "Humanitarian."  You see "Project type"?

14  "Project Subject:  Needy families."  "Beneficiary party:  100

15  needy families in Gaza and WB."

16  A.    Correct.

17  Q.    And that means West Bank.  Right?

18  A.    It does.

19  Q.    Now, page 3 of the exhibit is a request for the transfer

20  of funds.  Right?

21  A.    Correct.

22  Q.    And if you see the bank name that it is going to at the

23  bottom, the last thing that is highlighted, it says Bank

24  Hapoalem?

25  A.    It does.

1    Q.    That is in Israel?

2    A.    Correct.

3    Q.    That is an Israeli bank?

4    A.    It is.

5    Q.    I will show you what is marked page 219.  And this

6    exhibit is hundreds of pages.  Right?

7    A.    It is.

8    Q.    And just to -- This is Occupied Land Fund.  Right?

9    A.    Correct.

10   Q.    It says "Needy families sponsorship project."

11   A.    It does.

12   Q.    And this particular form is representative of the forms

13   for each beneficiary.  Correct?  That is found in this

14   exhibit?

15   A.    It is in the same format.

16   Q.    Yes.  And this is an English translation of what is in

17   fact originally an Arabic document.  Right?

18   A.    That is correct.

19   Q.    And it has the name of the household, the name of the

20   head of the household.  Right?

21   A.    Correct.

22   Q.    And the address?

23   A.    Yes.

24   Q.    This one is Gaza-Khan Yunis camp.  Right?

25   A.    Yes.

Q.   That is a refugee camp?

A.   I believe it is.

Q.   You don't know?

A.   It says Khan Yunis camp.  I have not been there.  I believe it is a refugee camp, but I can't say for certain.  I have not seen it.

Q.   Well, do you know?

A.   I believe it is.

Q.   And it says "Date of birth, occupation, number of family members," a question, "Does the family receive aid from other parties?"  Right?  This is what the form has?

A.   Yes.

Q.   And then it says "Opinion of the social worker."  Do you see that?

A.   I do.

Q.   And then it says "name of supervising party," and that is the Islamic Relief Organization.  Right?

A.   Correct.

Q.   And it says "Suggested monthly assistance."  Right?

A.   Right.

Q.   $150.

A.   Correct.

Q.   Right?  And then there is a date?

A.   Yes.

Q.   Which is November of '91.  Right?

1    A.    Correct.

2    Q.    Now, right after that page is also a Red Cross form.

3    Right?

4    A.    This form follows it.

5    Q.    Right?  And in fact, it is for the same person.  Right?

6    If we want to go back, Mr. Abu Nimer?

7    A.    Yes.

8    Q.    Khan Yunis camp Gaza.  Right?

9    A.    Correct.

10   Q.    And again, there is a part of the form that is in Arabic.

11   Right?

12   A.    Correct.

13   Q.    But I don't know if I showed it, it has the Red Cross

14   logo.  Right?

15   A.    Correct.

16   Q.    There is a part there that -- Do you see where it says --

17   And I will highlight that.  "Was arrested by the authorities

18   for reasons" and typed in "security"?

19   A.    Yes.

20   Q.    And the part that says "Was arrested by the authorities

21   for reasons related to" is part of the Red Cross form.  Right?

22   A.    Correct.

23   Q.    And the authorities at that point is the state of Israel.

24   Right?

25   A.    In this case, yes.

1   Q.   Well, there was no Palestinian Authority in 1992, was

2   there?

3   A.   That is correct.

4   Q.   And the only authorities that existed in terms of

5   governmental authorities that existed in the West Bank or Gaza

6   in 1991 or '92 was the state of Israel.  Right?

7   A.   The authorities that are referenced in these reports --

8   Q.   Was there any other government?

9            THE COURT:  Counsel, you are still cutting her off.

10  And you asked that about three times and she has answered it.

11  You need to quit cutting her off.

12  Q.   (BY MR. DRATEL)  And the date of arrest is April 2nd,

13  1991.  Correct?

14  A.   Correct.

15  Q.   And essentially all of the forms here for the families

16  are accompanied by one of those Red Cross forms.  Right?

17  A.   A majority of them.

18  Q.   Yes.  By the way, when it says -- Let me go back to that

19  form.  When it says reason arrested "security," that means

20  administrative detention.  Right?

21  A.   I don't know what that means, other than they were

22  arrested for security reasons, which would be threats to

23  security to the state of Israel, which is the authority that

24  arrested them.

25  Q.   Did you not testify differently previously?

1    A.    I don't know exactly what you asked me previously, but I

2    know we have talked about these securities and I think you

3    asked me --

4            MR. DRATEL:  Objection, Your Honor.

5            THE COURT:  Do you want to ask the question?

6            MR. DRATEL:  Yes, Your Honor.  I am just looking for

7    a document.

8    Q.   (BY MR. DRATEL)  Did you not previously testify and were

9    asked this question and -- ASKED these questions and gave

10   these answers:  "In fact, every person who is an arrested

11   person in both of these exhibits were arrested for security?"

12       Answer:  "That's correct."

13       Question:  "And what that means is that they were

14   administratively detained.  Right?"

15       Answer:  "Yes."

16       Were you not asked those questions and gave those answers

17   in prior testimony under oath?

18   A.    If that is what you have in front of you --

19   Q.    Let me show it to you, and why don't you tell us whether

20   it is true or not that you gave those answers to those

21   questions.

22   A.    Mr. Dratel, I am not denying that that is what our

23   dialogue was.

24   Q.    I am not saying it is our dialogue.  I am asking you

25   whether you gave these questions -- whether you were asked

1    these questions and gave these answers in prior testimony.

2    A.    Yes.

3    Q.    And the answer is yes?

4    A.    Yes.

5    Q.    It is not, "I don't know.  I don't see it."  It is,

6    "Yes"?

7    A.    That is correct.

8    Q.    Okay.  I just want to review a couple of these forms.

9    This is for -- again to start with the Red Cross form.  Right?

10   A.    Right.

11   Q.    Person is arrested for security.  April 8th, 1991.

12   Right?

13   A.    Correct.

14   Q.    Resides Khan Yunis Gaza.  Right?  I am sorry.  It says

15   Abu Nasr.  Correct?

16   A.    It does.

17   Q.    Now, this is a translation of the Occupied Land Fund form

18   that goes with that.  Right?  You see it says Abu Nasr?

19   A.    It does.

20   Q.    And it says he is 60 years, the head of the household.

21   Right?

22   A.    Correct.

23   Q.    Unemployed.  Right?

24   A.    Correct.

25   Q.    Now, these are people actually who are out, not in.  The

1    first name is different.  Correct?  Of the person who is

2    detained and the person who is seeking the relief?

3    A.    The name of the head of the household is different than

4    the person who has been detained.

5    Q.    Right.  It says this person is 60 years old.  Unemployed.

6    Number of family members is nine.  Right?

7    A.    Correct.

8    Q.    Family does not receive aid from another source.  Right?

9    A.    That is correct.

10   Q.    And it says the opinion of the social worker, and I will

11   have to zoom out a little bit to get the entire sentence in,

12   and it says, "Family income stopped due to the arrest of the

13   two providing sons, noting that the family is large and the

14   children are in school.  The father is elderly and ill."

15   Right?

16   A.    Correct.

17   Q.    And it suggests $300 per month.  Right?

18   A.    That is correct.

19   Q.    And that is dated November 5th, 1991.  Right?

20   A.    That is correct.

21   Q.    Here is another one for the Abu Hatab family.  Right?

22   A.    That is correct.

23   Q.    Someone arrested for security.

24   A.    Correct.

25   Q.    March 17th, 1991.

```
1    A.   That is correct.

2    Q.   Outside the United States they tend to put the day first

3    then the month then the year?

4    A.   Yes.

5    Q.   So it says 17/3/91.

6    A.   That would be March 17th.

7    Q.   1991?

8    A.   Correct.

9    Q.   And this is related to that.  This is the English

10   translation related to that.  Can you see it says in the

11   opinion of social worker, "Family income stopped due to the

12   arrest of the provider since March 17th, '91.  He was

13   sentenced to eight months."

14   A.   I see that.

15   Q.   It says suggested $150 a month?

16   A.   Yes, it does.

17   Q.   November 5th, '91.

18   A.   Correct.

19             THE COURT:  Counsel, how many of these do you plan

20   on showing?

21             MR. DRATEL:  Just two or three more, Your Honor.

22             THE COURT:  Two.

23   Q.   (BY MR. DRATEL)  Do you see this one?

24   A.   I do.

25   Q.   In the opinion of the social worker, can you read that,
```

1    please?

2    A.    It says, "This young man was hit with shrapnel from a

3    bomb which prevented him from working and paralyzed him.  He

4    used to live with his brother, but the latter was arrested,

5    noting that he is married and the situation is very bad."

6    Q.    Thank you.

7          If you could read that one, please.

8    A.    Opinion of the social worker?

9    Q.    Yes.

10   A.    "Family is going through some difficult time due to the

11   demolition of their home and the ejection of three families

12   from their residence.  Please help to build a house in

13   addition to living expenses."

14   Q.    And this is representative of the documents here in terms

15   of the reports and the Red Cross forms and the Occupied Land

16   Fund forms.  Correct?

17   A.    That is correct.

18   Q.    And then there was a final report about two years later.

19   Right?  In November of '94?

20   A.    Correct.

21   Q.    And this is a report in Arabic sent back to the Holy Land

22   Foundation.  Right?

23   A.    Correct.

24   Q.    And it says the money was distributed to 500 families.

25   Right?

1    A.    That is what the final report says.

2    Q.    Right.  And InfoCom No. 4 is a similar document for

3    essentially a similar project.  Right?

4    A.    Correct.

5    Q.    With similar forms--Red Cross forms, forms for the

6    Occupied Land Fund laying out the same kind of information?

7    A.    Can I ask if that is Project 238?  Is that the other one

8    we introduced?

9    Q.    Yes.

10   A.    Yes.

11   Q.    By the way, one of the faxes from Mr. El-Mezain, one of

12   those reports, it said Gaza Press.  Right?  You have mentioned

13   that in your direct.

14   A.    That is correct.

15   Q.    Is that a newspaper or a press agency?

16   A.    I am not sure.

17   Q.    You didn't check?

18   A.    No.

19   Q.    Now, I just want to talk about some of the exhibits that

20   you put in as categories.  Okay?

21   A.    Okay.

22   Q.    And one were some related to the Philadelphia meeting.

23   Right?  These are those related to the Philadelphia meeting?

24   A.    Philly Meeting Summary, was that the demonstrative chart?

25   Q.    Uh-huh.

1    A.    Yes.

2    Q.    I am sorry.  All that is from 1993.  Correct?

3    A.    Correct.

4    Q.    Four years before October 1997.

5    A.    Correct.

6    Q.    And then you had material with respect to Mr. Ashqar.

7    Correct?

8    A.    That is correct.

9    Q.    Search and wiretap.

10   A.    Yes.

11   Q.    All before the end of 1993.  Right?

12   A.    The wiretaps may have gone into early '94.

13   Q.    But ended by early '94?

14   A.    Correct.

15   Q.    Three and a half years before October 8th, 1997?

16   A.    Correct.

17   Q.    Now, with respect to the search of Mr. Elbarasse's house

18   and the documents you put in from there, none of those

19   documents goes beyond July 30, 1994.  Right?

20   A.    The dates of the documents do not.

21   Q.    And many of them are even earlier.  Some go back to 1982,

22   according to the way you date them.  Right?

23   A.    Correct.

24   Q.    And many of them are from '89, '90, '91.

25   A.    Correct.

1  Q.   So none of those documents goes beyond July 30th, 1994,

2  which is over three years from October 8th, 1997.

3  A.   They were dated before then.

4  Q.   Here is a list of exhibits.  If you can't see it I will

5  zoom in.  It is hard to -- Tell me whether you can read it or

6  not, because it is a distance from that screen.  Can you read

7  that?

8  A.   I can.

9  Q.   Those are all related to Mr. Abu Marzook.  Right?  Some

10 of them are charts for payments to K&A at the bottom there, to

11 UASR, IAP, Marzook and the Defendants?

12 A.   The payments to K&A Trading, was that the chart about the

13 HLF payments to K&A?  Because if that is, that one doesn't

14 relate to Marzook.

15 Q.   Okay.  But there is a K&A that does relate.  But even if

16 it doesn't relate to Marzook, all of these documents -- none

17 of them go beyond -- Except for the Marzook phonebook, none of

18 them really go beyond 1993.  Right?

19 A.   Can I just -- Bear with me for a second.

20 Q.   Sure.

21 A.   The dates on the bank accounts, I believe those stop in

22 '93, '94, but I would want to look at those to confirm.  The

23 Marzook phonebook was seized in 1995, so obviously it was

24 dated as of 1995.  The tax records were from tax returns from

25 '92, so they were dated '93.  The Marzook Defendants phone

1    call summary we have already discussed.  Those all predate

2    1997.  And the payments did as well.

3    Q.    Now, the bank accounts wasn't one.  Marzook No. 2, isn't

4    that from 1985?

5    A.    I would have to look at it.  I don't have the exhibit

6    numbers memorized.

7    Q.    We won't take the time right now.  Do you remember

8    whether Marzook Bank Account No. 3 is from 1992?

9    A.    I know we had some bank records from 1992, but again, I

10   would like to look at the actual record before I give a date

11   on it.

12   Q.    Okay.  Illa Falistine, the last date on that is when?

13   A.    I believe we had some from 1989, 1990.  '91 may have been

14   the latest.

15   Q.    Okay.  At least six years before October 1997.  Right?

16   A.    Correct.

17   Q.    Mushtaha Search.  Right?  All before 1997?

18   A.    They were all dated before then, yes.

19   Q.    And in fact, I think the latest one is 1990.  Right?

20   A.    1990 or 1991.

21   Q.    Do you want to check your cheat sheet?

22   A.    Yes.

23   Q.    Do you have the Marzook on these also?

24   A.    No.  They are just the videotapes, because they are hard

25   to date because you have to look at the context.

1    Q.    We are looking at No. 1, 2, 6, 7, 8, 9 and 15.

2    A.    No. 15 was the one we knew was from the first Intifada,

3    but it may be up to '92.

4    Q.    '92 would be the absolute last day, and you don't even

5    know that it is '92.

6    A.    Correct.

7    Q.    It could be '88.

8    A.    Correct.

9    Q.    Again, at least five years, maybe more, before 1997.

10   A.    Correct.

11   Q.    The InfoCom Search, in fact none of those documents goes

12   beyond October 8th, 1997.  Right?

13   A.    I would want to look at those.  I know that a lot of

14   those were from earlier, the letters and things that we

15   introduced, but --

16   Q.    Do you want to take a quick look through them?

17   A.    I would like to look through them before we confirm that

18   none of them are post '97.

19   Q.    Sure.

20   A.    Do you have copies of them?  I can just flip through

21   really quick.

22   Q.    I don't have the full set copy.

23   A.    What would help is an exhibit list so I can identify what

24   it is.  I just don't have the exhibit numbers memorized.

25   Q.    Well, I just have it by -- Well --

1  A.   As long as I can see a descriptor, I will know what it

2  is.  I just can't remember what the number is.

3  Q.   This is a list.  These are my notes on it, so I don't

4  know.  I don't have an exhibit list from the Government that

5  has a description, so -- I mean, if you want to --

6          THE COURT:  Why don't we come back to that later?

7  We are going to take a break in a minute.  Maybe we can work

8  that out over the break.

9  Q.   (BY MR. DRATEL)  Okay.  And your demonstratives, the ones

10 having to do with the --

11          MR. DRATEL:  Can we take the break now?

12          THE COURT:  Let's move on.

13          MR. DRATEL:  I am basically finishing, so --

14          THE COURT:  Okay.  How much more time do you think?

15          MR. DRATEL:  Just really a couple of minutes.

16          THE COURT:  Let's go ahead and finish it up.

17          MR. DRATEL:  Okay.

18 Q.   (BY MR. DRATEL)  Here we go.  And if you just hang on a

19 second, I will read the numbers of the ones that were put in.

20 A.   Okay.

21 Q.   InfoCom Search No. 1.

22 A.   Okay.

23 Q.   Before 1997?

24 A.   It is a letter dated June 6, 1997.

25 Q.   So it is before October 8th, 1997.

```
1    A.    Correct.

2    Q.    InfoCom Search No. 3.

3    A.    That is from August of '92.

4    Q.    InfoCom Search No. 4.

5    A.    October of '94.

6    Q.    InfoCom Search No. 5.

7    A.    August of '95.

8    Q.    InfoCom Search No. 7.

9    A.    May of 1990.

10   Q.    InfoCom Search No. 8.

11   A.    That was undated.

12   Q.    InfoCom Search No. 9.

13   A.    I believe that was from the early '90s.

14   Q.    InfoCom Search No. 10.

15   A.    1991.

16   Q.    InfoCom Search No. 12.

17   A.    I don't think we introduced InfoCom search -- At least

18   the InfoCom Search No. 12 that is identified here.  It may

19   have changed --

20   Q.    InfoCom Search No. 13.

21   A.    I can't tell from the description here.

22   Q.    Let's go down to InfoCom No. 21.

23   A.    You may have to help me with this device, because I don't

24   know how to make it scroll.

25   Q.    Okay.  Hold on.  So you can't tell from the financial
```

1   schedules where they go to?  Right?  Okay.

2   A.   Right.

3   Q.   How about InfoCom Search No. 51?

4   A.   1991.

5   Q.   InfoCom Search No. 72.

6   A.   1994.

7   Q.   InfoCom Search No. 73.

8   A.   That was sometime after Marzook was arrested, so --

9   Q.   It is a week after he was arrested.

10  A.   So it would be '95.

11  Q.   But it would be before October 8th, 1997.

12  A.   Correct.

13  Q.   InfoCom No. 77.

14  A.   I can't tell.  This is relating to the financial

15  schedules, so on these they may be later.

16  Q.   And InfoCom Search No. 83.

17  A.   It is not on here.

18  Q.   It is not on there?

19  A.   I can't get it to scroll down past No. 79.

20  Q.   Let me try.

21  A.   It stopped at No. 79.

22  Q.   Now, InfoCom Search No. 83.

23  A.   Okay.  1991.

24  Q.   So all those we have identified today, we have identified

25  all before October 8th, 1997.

1   A.   Those we identified, yes.

2   Q.   All right.  With respect to the Holy Land search

3   documents, do you know that half of them that were put in

4   evidence by you are before October 8, 1997?

5   A.   I haven't counted them.

6   Q.   You didn't count them.

7          MR. DRATEL:  Nothing further, Your Honor.  Thank

8   you.

9          THE COURT:  Let's take the morning break.  Be back

10  at five till 11:00.

11          (Whereupon, the jury left the courtroom.)

12          THE COURT:  We will be in recess.  Be back at five

13  till.

14                    (Brief Recess.)

15          THE COURT:  Mr. Jonas?

16          MR. JONAS:  Thank you, sir.

17                REDIRECT EXAMINATION

18  By Mr. Jonas:

19  Q.   Good morning, Agent Burns.

20  A.   Good morning.

21  Q.   I am going to ask you questions in response to some of

22  the questions that the Defense attorneys asked you, but they

23  may not follow the order that they did.  So if you don't quite

24  recall or understand one of my questions because I am not

25  going in their particular order, let me know and I will

1    rephrase the question.

2    A.    Okay.

3    Q.    But I do want to start off with the question by Ms.

4    Moreno, which I believe it was Friday she questioned you.

5    A.    Okay.

6    Q.    She asked you a question about receiving foreign records,

7    records from other countries during the course of the

8    investigation.  Do you recall that question?

9    A.    I do.

10   Q.    She asked you about the majority of the foreign records

11   coming from Israel.  Why is that?

12   A.    Because that is the area of the world where most of these

13   activities are taking place.  That is where Hamas operates.

14   Q.    Do you recall she asked you a question about withholding

15   documents?

16   A.    Yes.

17   Q.    What was your understanding of what she meant by

18   withholding documents?

19   A.    That we had not given those documents to the Defense.

20   Q.    Okay.  Did you withhold any documents?

21   A.    Not to my knowledge.

22   Q.    Of the thousands of documents -- Well, I shouldn't

23   quantify it.  Approximately how many documents would you say

24   you received during the course of this investigation from all

25   sources?

1    A.    Millions.

2    Q.    Of the millions of documents, why haven't all of them

3    been exhibited in this case?

4    A.    Because we would be here until 2011.

5    Q.    Are all of them even relevant?

6    A.    No.

7    Q.    Several of the Defense attorneys asked you questions

8    about the volume of calls that were intercepted on the

9    telephones of the various Defendants.

10    A.    Yes.

11    Q.    Okay.  First I want to be clear.  Were all these

12    intercepted phone calls done pursuant to court order?

13    A.    They were.

14    Q.    That was the FISA we talked about?

15    A.    Correct.

16    Q.    Were they all done pursuant to intelligence

17    investigations or criminal investigations?

18    A.    Intelligence investigations.

19    Q.    During the course of these type of intelligence wiretaps,

20    are the wiretaps run continually 24 hours, seven days a week,

21    52 weeks a year?

22    A.    They run 24/7, but the FISAs go down and they have to

23    reinstitute them, so there may be gaps.

24    Q.    Can you explain why the FISAs go down?

25    A.    Sorry.  If you have an ongoing wiretap under the FISA

1    court, it will be during a period of time.  I am not sure

2    during this time how long that was.  But in order to continue

3    to have that wiretap coverage, the FBI, the Department of

4    Justice would have to go back to the court and request

5    authorization to renew that FISA.  Often that process takes a

6    while so that there may be a lag between when the wiretap

7    stops and when it picks back up again.

8    Q.   With regard to the wiretap where Shukri Baker, the

9    Defendant Shukri Abu Baker was the subject, where was that

10   phone that was being tapped?

11   A.   It is my understanding that was at the HLF office.

12   Q.   Do you know if his home phone was ever wiretapped?

13   A.   I don't think that it was.

14   Q.   How many lines at the HLF were being wiretapped?

15   A.   I am not sure about the number of lines.  And let me say

16   this.  I would want to check on the phone number, the home

17   phone for Shukri Abu Baker.  I wasn't there when this was

18   being operated.  It is my understanding this all took place at

19   the HLF.  I am not sure about the home phone.

20   Q.   Did the HLF have more than one phone line?

21   A.   They did.

22   Q.   Was the HLF, from your understanding, a busy

23   organization?

24   A.   Yes.

25   Q.   Were a majority of the phone calls that were intercepted

1    by the FBI at the HLF not relevant?

2            MS. HOLLANDER:  I object to leading.  This is

3    redirect.

4            THE COURT:  Do you want to rephrase?

5            MR. JONAS:  I will rephrase.  I apologize.

6    Q.   (BY MR. JONAS)  How many, approximately--I am not asking

7    for a specific number--of the phone calls by if FBI were not

8    relevant to this investigation at all?

9    A.   I know that originally I think upwards of 80 percent were

10   originally deemed non-pertinent, using that term of art.  But

11   even more than that were not considered relevant to the case

12   that we are discussing today.

13   Q.   Of the ones that were deemed relevant for the case, have

14   all of those even been admitted into evidence?

15   A.   Oh, no.

16   Q.   Why not?

17   A.   There are too many, and they are not all -- Even though

18   they may be relevant to some issue, they are not relevant to,

19   you know, matters that are pertinent to the indictment.

20   Q.   Have the Defense attorneys been provided with all of

21   these calls?

22   A.   They have.

23            MS. MORENO:  Excuse me, Your Honor, may we approach?

24            THE COURT:  Yes.

25            (The following was had outside the hearing of the

1          jury.)

2          MR. CLINE:  Your Honor, I am not the questioner, but

3   may I make the point?

4          THE COURT:  Sure.

5          MR. CLINE:  Agent Burns a couple of times on cross I

6   believe it was volunteered that these calls have been made

7   available to us, and Mr. Jonas just elicited the same fact,

8   and that is true.  Our concern, though, is that the jury may

9   have the impression that we have the ability to introduce them

10  into evidence and we don't because of --

11         THE COURT:  You might not.  It depends.

12         MR. CLINE:  Right.  But in general the statements of

13  our clients when we have attempted to offer those the

14  Government has objected and --

15         THE COURT:  To a large extent it has been sustained.

16         MR. CLINE:  It has been sustained because it is

17  hearsay.

18      So we would ask for an instruction so they are not misled

19  here, or perhaps Mr. Jonas could do it by further questions,

20  that under the rules of evidence the Defendants do not have

21  the ability in many instances to introduce their own

22  statements into evidence, so that the jury is not left with

23  the idea that we have, you know, we have surveyed this body of

24  calls and we decided that they are not helpful to us, because

25  we think many are helpful but we can't get them in.  And that

1    is not a complaint, that is just a fact.

2              MS. CADEDDU:  Can I add to that just one thing?  Our

3    clients were denied access to their statements under Rule 16.

4    These calls are almost all in Arabic, and we all don't speak

5    Arabic, and we were not permitted to have our clients listen

6    to them.

7              THE COURT:  Okay.

8              MS. MORENO:  The calls are still classified as well.

9              THE COURT:  That is what she was pointing out.

10             MR. JONAS:  First of all, my point was in response

11   to a question by Ms. Moreno that Agent Burns understood to

12   mean withholding from defense counsel.  Whether your question

13   meant that or not, it was her understanding of that.

14        Second of all, Defense counsel know that every time,

15   within reason, they came to us to declassify a particular

16   call, we did it.  That was a reasonable request, because at

17   times the requests were not reasonable.

18        Third of all, there are instances when they can, as Your

19   Honor knows, and will acknowledge that they try to admit a

20   call that may get into evidence.  I am not trying to imply

21   that they can do it every time.

22        I think this is an issue of law for the Court.  I don't

23   think this requires an instruction to the jury.  This is a

24   question of law.

25             MR. CLINE:  Your Honor, let me just say that my

1　point is really separate from the classification issue.  We

2　have our problems with that, but that is not what we are

3　talking about here.  Here we are talking about the calls that

4　we have been able to read that have been declassified that are

5　available to us and that we would like to put into evidence,

6　but we can't because of the rules of evidence, as Your Honor

7　has interpreted them.  That is what it is.  But the questions

8　leave the impression that if we wanted to we can put in these

9　calls, and of course we can't.  And whether --

10　　　　　THE COURT:  The problem I have with an instruction

11　is you might be able to; you might not.  Some of them have

12　come in.

13　　　　　MR. CLINE:  And that will be fine, Your Honor.  If

14　Mr. Jonas were to ask a question, or if Your Honor were to

15　tell the jury that the Defendants have a limited ability or

16　cannot in all cases, or something like that, introduce calls,

17　that would be fine.  I mean, because you are right.  In some

18　cases we have been able to put them in, but in other instances

19　we haven't.  And I am afraid that the jury has the impression

20　now that the fact that these calls aren't in evidence means

21　that we have determined that they are not helpful to us, and

22　that is just not the case.

23　　　　　MR. JONAS:  Your Honor, there is also another factor

24　that the Defendants aren't required to do put in any calls.

25　They are not required to do anything other than be to here.

1    Even an instruction like that may imply to the contrary.

2           THE COURT:  Yeah.  I am not sure what I should give,

3    what would be appropriate, frankly.

4           MS. MORENO:  May I just also remind the Court that a

5    few times in Agent Burns' cross examination to a couple of the

6    Defense lawyers, she would say, and I wrote it down a number

7    of times, "Well, you have all the evidence.  You have all the

8    documents.  You have all the calls."  And that clearly leaves

9    the jury with the impression --

10          THE COURT:  But at least in some of those -- I

11   noticed that, too.  She was saying that because I think there

12   was an implication about this wasn't all introduced.  That

13   could be taken because it wasn't offered in evidence, or you

14   didn't clarify.  That is kind of what started all this.  Some

15   of your questions that you asked imply some of that.  And

16   sometimes that is why she said that.  I wouldn't say that

17   every time, because I haven't kept up with it, but sometimes

18   that is what has brought that kind of a response.

19          MR. CLINE:  May I suggest this?  Why don't we --

20   Over lunch we will come up with an instruction that we will

21   ask the Court to give.  I am not suggesting we are going to

22   agree on it.  I suspect we will not.  But at least you will

23   have the language precisely what we are asking.

24          THE COURT:  Yes.

25          MR. DRATEL:  In the interim, we may want to cross on

1    it to clarify this issue if that occurs before lunch.

2         THE COURT:  No.  Because I don't want to go there

3    and start making an issue before the jury until I get it

4    resolved, so no cross on that.

5         MR. DRATEL:  What if we are done by the time lunch

6    comes?

7         THE COURT:  We will just have to come back and do

8    it.  She is coming back.

9         MR. CLINE:  We will provide that to you over lunch.

10        THE COURT:  All right.

11        (The following was had in the presence and hearing

12        of the jury.)

13        THE COURT:  Mr. Jonas?

14        MR. JONAS:  Thank you, sir.

15   Q.   (BY MR. JONAS)  Okay.  With regards to staying with the

16   FISAs for just a moment, and I don't think we clarified,

17   though.  Muin Shabib was the subject of a FISA.  Is that

18   correct?

19   A.   That is correct.

20   Q.   Have we played any of his calls during the course of this

21   trial?

22   A.   Yes, we have.

23   Q.   How have those been labeled?

24   A.   Shabib Wiretap.

25   Q.   Where was he located during the time of his wiretap?

1    A.    I believe it was northern Virginia.

2    Q.    Would that be right outside Washington, D.C.?

3    A.    Correct.

4    Q.    And Ashqar, was he the subject of a wiretap?

5    A.    He was.

6    Q.    Have we played several of his calls as well?

7    A.    We have.

8    Q.    He was also the subject of a search?

9    A.    Yes, he was.

10   Q.    Where was Ashqar located at the time of the wiretap and

11   the search?

12   A.    Mississippi.

13   Q.    Did any of the Defendants indicate that they knew that

14   they were being listened to by the FBI?

15   A.    Yes, they did.

16         MR. DRATEL:  Objection.  Your Honor; beyond the

17   scope of cross.  There was no cross on this.

18         THE COURT:  Overruled.  Go ahead.

19   Q.    (BY MR. JONAS)  Agent Burns, do you have before you Baker

20   Wiretap No. 5?  I hope you do.  If you don't, I can hand you

21   the transcript.

22   A.    I have five binders, so it may take me a minute to dig

23   through it.

24         MR. JONAS:  Can we bring up Baker Wiretap No. 5,

25   page 4, please?

1      Your Honor, may I approach?

2           THE COURT:  Yes.

3           MR. JONAS:  If you can just enlarge the top half,

4  please.

5  Q.   (BY MR. JONAS)  Agent Burns, who is talking in this call?

6  A.   This was Omar Ahmad and the Defendant Shukri Abu Baker.

7  Q.   Do you recall the general subject matter that they were

8  talking about?

9  A.   Yes, I do.

10 Q.   Which was what?

11 A.   How much to pay Mohammad El-Mezain for his fundraising

12 trips.

13 Q.   In particular, during this phone call what did they say

14 about their knowledge that they are being listened to?

15 A.   Well, they hear something on the phone, some static, and

16 Omar says, "What is wrong with your phone?"  And they go on

17 down to talk about how it is being monitored.

18           MR. JONAS:  If we can go down lower.

19 Q.   (BY MR. JONAS)  Can you read where it says Omar says,

20 "Yes, my brother."

21 A.   He says, "Yes, my brother."

22      Shukri Abu Baker says, "The line was gone."

23      Omar Ahmad says, "It is because of those monitoring your

24 phone."

25      Shukri Abu Baker says, "It looks like they tapped into

1    the number."

2          "No, the equipment is old," Omar says.

3          And then Shukri Abu Baker laughs.

4          Omar says, "Tell them to change it."

5          Shukri says, "I will tell them to save the tax money."

6          Omar says, "They will save it for us, for new equipment.

7    Tell them we can't hear."

8    Q.    Were there other calls where they also indicated they

9    were being listened to?

10   A.    Yes.

11   Q.    Is there going to be testimony shortly regarding --

12          MR. DRATEL:  Objection, Your Honor.

13          MR. JONAS:  I will withdraw that question, Your

14   Honor.

15   Q.    (BY MR. JONAS)  Agent Burns, do you recall Mr. Westfall

16   questioned you on Friday as well?

17   A.    I do.

18   Q.    Do you recall a question he asked you about the Defendant

19   Abdulrahman Odeh working at different conventions on behalf of

20   the HLF?

21   A.    Yes.

22   Q.    Different festivals?

23   A.    Yes.

24   Q.    Do you recall Mr. Westfall questioned you about working

25   at the MAYA, ICNA, and IAP festivals?

1   A.   I do.

2   Q.   What do those three groups have in common?

3   A.   They are all part of the Muslim Brotherhood seed

4   organizations, according to that document that we addressed

5   early in my testimony.

6   Q.   Would that be Elbarasse Search No. 2?

7   A.   Correct.

8   Q.   Would you like to see that to confirm?

9   A.   I think I recall it, but I can look in my binders, or if

10  you have a copy just to confirm.

11  Q.   I may have the wrong exhibit number.  Do you recall

12  seeing a list of Muslim Brotherhood in the Untied States?

13  A.   It was attached to the memorandum and where the

14  organizations were in English attached to the Arabic document.

15  Q.   Did you review that at the break?

16  A.   Yes.

17  Q.   And did that confirm what you were testifying to?

18  A.   Yes.

19  Q.   Do you recall Mr. Westfall asked you about a call that we

20  played when I questioned you earlier, El-Mezain Wiretap No. 2

21  between the Defendant Odeh and the Defendant El-Mezain talking

22  about the Oklahoma City bombing?

23  A.   Yes.

24  Q.   Do you recall Mr. Westfall read to you an additional

25  portion of that call that we didn't play during your first

1    testimony?

2    A.    Yes.

3    Q.    Do you recall that Mr. Westfall, during that part that he

4    read you, and I am paraphrasing here, read a portion where the

5    Defendant Odeh said something about "We must support America.

6    We talked about that in a prior meeting"?

7    A.    Yes.

8    Q.    And I am paraphrasing.  Correct?

9    A.    Correct.

10   Q.    Do you recall the gist, that that was the additional

11   portion he read to you?

12   A.    I do.

13   Q.    Where, if anywhere, have we seen a similar discussion in

14   a prior meeting about aiding America?

15   A.    At the Philadelphia meeting.

16   Q.    What was said in the Philadelphia meeting about that?

17   A.    And I will paraphrase because they talked about it in

18   several places, that they needed to do things in America to

19   help themselves so they could continue to operate here.

20   Q.    For what purpose?

21          MR. DRATEL:  Objection, Your Honor.

22   Q.    (BY MR. JONAS)  Based upon the Philadelphia meeting and

23   the transcripts you read, and the ones we reviewed during your

24   direct testimony, was there a purpose indicated as to why they

25   needed to continue to operate in America?

1    MS. HOLLANDER:  Objection, Your Honor.  She is

2  stating an opinion.  She is a fact witness.

3    THE COURT:  Overrule that objection.  She may

4  testify to that.

5    THE WITNESS:  Because they wanted to continue to do

6  their fundraising here for the ultimate support of the

7  movement.

8  Q.  (BY MR. JONAS)  Did they say anything about the purpose

9  of aiding America, if there is an incident in America about --

10    MR. DRATEL:  Objection to leading, Your Honor.

11    THE COURT:  Do you want to rephrase?

12  Q.  (BY MR. JONAS)  What, if anything, did they say about

13  providing funding to organizations other than Islamist

14  organizations or Muslim organizations?

15  A.  That they would provide the small portion to them and

16  that they would provide a larger portion to the Islamists.  I

17  think we read that several times.

18  Q.  Okay.  Mr. Westfall asked you about a book called "The

19  Jihadist School Book," HLF Search No. 14.

20  A.  Yes.

21  Q.  Do you recall that?

22    Where was that book found?

23  A.  What was the exhibit number again?

24  Q.  HLF Search No. 14.

25  A.  I believe that was "The Jihadist School Book"?

1    Q.    Yes, ma'am.

2    A.    Just to be clear on the exhibit numbers.

3          That was found in Mr. Odeh's office.

4    Q.    Mr. Westfall asked you what year that book was published.

5    Do you recall that question?

6    A.    I do.

7    Q.    Do you recall when it was published?

8    A.    I don't think there was a publication date on that book.

9    I think we dated it, based on the Palestinian Relief Fund

10   being in the back, which would be late '87, early '88.

11   Q.    What year was it found in the New Jersey HLF office?

12   A.    It was seized in December of 2001.

13   Q.    Do you recall he asked you, Mr. Westfall asked you about

14   HLF Search No. 109, which I have here?

15            MR. JONAS:  If I may approach, Your Honor?

16            THE COURT:  Yes.

17            THE WITNESS:  Thank you.

18   Q.    (BY MR. JONAS)  What is this item?

19   A.    This is a book entitled "The Palestinian Intifada in the

20   Hebrew Press.  A study about the Islamic Resistance Movement

21   Hamas."

22   Q.    Do you recall Mr. Westfall asked you a question about one

23   of the pages that was translated in this book regarding Jamil

24   Hamami?

25   A.    I do.

1      MR. JONAS:  If we can put up HLF Search No. 109,

2  page 141, please.

3  Q.   (BY MR. JONAS)  Do you see I guess it is the third

4  question and answer?  Could you just read that?

5  A.   The third question?

6  Q.   Right.  "What is the relationship between"?

7  A.   It says, "What is the relationship between the West Bank

8  and the Gaza Sector in regards to Hamas?"

9      Answer:  "A man called Jamil Hamami used to call us from

10  the West Bank.  He also used to convey information from our

11  side."

12  Q.   Do you recall Mr. Westfall asked you about that and the

13  tense of the answer, the past tense of the answer "used to

14  call"?

15  A.   Yes.

16  Q.   Is there anything else in this book discussing Jamil

17  Hamami and his relationship to Hamas?

18  A.   I believe there is.

19      MR. JONAS:  If we can turn to the next page, page

20  142.

21  Q.   (BY MR. JONAS)  And can you read that paragraph, please?

22  A.   It says, "Ma'aref newspaper writes, 'The Sheik allowed

23  members of the organization to work and to take advantage of

24  every opportunity and all available means to work against the

25  army.  Following operations, the Sheik would receive written

1    reports detailing the operation and its results.' The

2    newspaper adds, 'Also Sheik Ahmed Yassin did not neglect

3    outside contact, as in January 1988 A.D. he met with Jamil

4    Hamami, head of the Muslim Brotherhood in the Bank, and

5    suggested to him establishing a branch for Hamas over there.'

6    The Sheik and his aides" --

7    Q.    That is sufficient.  You addressed the Jamil Hamami part.

8         Do you recall Mr. Westfall asked you about other items

9    found at the New Jersey office of the Holy Land Foundation,

10   including a flier with Sheikh Yassin on it and the picture of

11   Khalid Mishal Nasrallah?  Do you recall that?

12   A.    I do.

13   Q.    And those are in evidence.  Correct?

14   A.    They are.

15   Q.    You testified about that before.  Were those documents --

16   Were those items found in boxes in the office?

17   A.    No.

18   Q.    Do you know who put them in any boxes?

19   A.    They were seized by the U.S. government and placed into

20   boxes by them.

21   Q.    Okay.  Do you  recall Ms. Cadeddu questioned you about

22   the Defendant Mufid Abdulqader?

23   A.    I do.

24   Q.    Do you recall she asked you about videos, and every time

25   she showed you a video when the band was on the screen she

1   would stop and ask you to count the number of band members?

2   A.   Yes.

3   Q.   Besides being in the band, what else did the Defendant

4   Mufid Abdulqader do for the Holy Land Foundation?

5   A.   He raised money for the Holy Land Foundation by speaking

6   at various events.

7   Q.   What time period was he raising money for them?

8   A.   Not counting what he was doing with the band, he actually

9   was a fundraiser in the mid to late '90s up until the time

10  they closed down in 2001.

11  Q.   Okay.  Did we hear some phone calls where he talked about

12  his fundraising?

13  A.   We did.

14  Q.   Do you recall the time period of those phone calls?

15  A.   1999-2000.

16  Q.   Was this before or after Hamas was designated?

17  A.   After.

18  Q.   Do you recall Ms. Cadeddu asked you about InfoCom Search

19  No. 56, which is a videotape, clip C, and she asked you about

20  the term youth?  If you recall, that was one of those skits

21  with someone pretending to be an old man.

22  A.   Yes.

23  Q.   Have you seen the term youth used in other documents or

24  phone calls or videos in this case?

25  A.   Yes.

```
1    Q.   Where have you seen it used?

2    A.   The Defendants used the term -- I believe they used it at

3    the Philadelphia meeting.  They used it quite frequently,

4    again, to describe themselves as being the youth of the

5    movement.

6    Q.   Do you recall Ms. Cadeddu showed you a clip where you

7    identified a flag?

8    A.   Yes.

9    Q.   Do you recall what flag it was that you identified?

10   A.   The Palestinian flag.

11        MR. JONAS:  If we can show HLF Search No. 114, Clip

12   A, please.

13        MS. CADEDDU:  Can we have a date, please?

14   Q.   (BY MR. JONAS)  Agent Burns, what is the date of the

15   video that Ms. Cadeddu played for you when she questioned you?

16   A.   What was the number again?

17   Q.   HLF Search No. 114.

18   A.   1996.

19        (Whereupon, HLF Search No. 114, Clip A was played,

20         while questions were propounded.)

21   Q.   (BY MR. JONAS)  Agent Burns, I know the flag is waving

22   back and forth pretty quickly, but were you able to see it?

23   A.   I have seen this flag with the writing on it before.

24   Q.   Is this flag the actual Palestinian flag?

25   A.   It is with some addition to it.
```

1    Q.    What is the addition?

2    A.    The writing in the middle is a saying that is often used

3    by Hamas and other Islamists.  That is what they like to put

4    on the Palestinian flag.

5    Q.    Okay.  With regard to the videos that we have seen and

6    Ms. Cadeddu questioned you about regarding the Defendant Mufid

7    Abdulqader, the ones where there are skits and songs all about

8    Hamas, were the majority of those videos pre-October 1993?

9    A.    The videos that we discussed?

10   Q.    Yes.

11   A.    Yes.

12   Q.    Did they discuss anything during the Philadelphia

13   conference about their rhetoric towards America?

14   A.    They did.

15   Q.    What did they say?

16   A.    They said they needed to tone it down.

17          MR. JONAS:  If we can pull up Philly Meeting No.

18   7-E, page 2, please.  If you can enlarge the middle section.

19   Q.    (BY MR. JONAS)  Can you just read where it says, "And

20   could you try to convince," if you see that.

21   A.    I am sorry.  Beginning where?

22   Q.    Read the first sentence that you see and go on, the first

23   whole sentence.

24   A.    "This is a question we must ask ourselves," is that where

25   you are talking about?

1    Q.    Sure.

2    A.    Okay.  "Who is going to read your ads and your

3    statements?  The only thing people will see is that there is a

4    new organization--and it is not known what it is--which writes

5    articles about the issue of the new Palestinian state.  And

6    you could try to convince people from behind tone it down a

7    little.  Thus, you want to address the enemy while you are

8    speaking to your friend."

9    Q.    That is good.

10        Was there any other discussion about toning down the

11    rhetoric?  Maybe not in those words.

12    A.    Yes.

13        MR. JONAS:  If we can turn to Philly Meeting No.

14    15-E, page 2.

15    Q.    (BY MR. JONAS)  Do you know who is speaking, by the way?

16    I can show you --

17        MR. JONAS:  If we can go to page 1 real quick.

18    Q.    (BY MR. JONAS)  Who is speaking?

19    A.    This is Omar Ahmad.

20        MR. JONAS:  Go back to page 2, please.  Enlarge the

21    center.

22    Q.    (BY MR. JONAS)  If you can read the last four or five

23    lines of the top attribution starting with "This is a

24    suggestion."

25    A.    "This is a suggestion.  The second suggestion is that if

1   we want to -- Brother Shukri suggested the idea of having

2   talks with the Americans about supporting the self-rule in

3   Gaza and Jericho.  I believe that our problem is that we

4   stopped working underground.  We will recognize the source of

5   any message which comes out of us.  I mean, if a message is

6   publicized we will know -- The media person among us will

7   recognize that you send two messages, one to the Americans and

8   one to the Muslims."

9   Q.   After Philadelphia did you see the rhetoric in the videos

10  get toned down?

11  A.   Yes.

12  Q.   Do you recall Ms. Cadeddu went through with you some

13  reimbursement expenses, a reimbursement expense check given by

14  the HLF to the Defendant Mufid Abdulqader to San Diego and

15  Florida, and she went through the math with you?

16  A.   Yes.

17  Q.   Through purposes -- Withdrawn.  Do you recall also Mr.

18  Dratel this morning asked you about whether the Defendant

19  Mohammad El-Mezain received a salary from the Holy Land

20  Foundation?

21  A.   I do.

22  Q.   Did he?

23  A.   I don't know.

24  Q.   Did he get paid at all for his work?

25  A.   He did.

1   Q.   For the purposes of your investigation, did it matter

2   whether the Defendant Mufid Abdulqader, Mohammad El-Mezain, or

3   any of the Defendants got paid a salary?

4   A.   No.

5   Q.   All right.  Why not?

6   A.   Because their role in this Palestine Committee and in

7   sending the money over to --

8            MR. DRATEL:  I will object, Your Honor, to the form

9   of the question.

10           THE COURT:  And the objection?

11           MR. DRATEL:  The form of the question, and it is --

12  It really calls for an opinion, and potentially legal issues

13  as well.

14           THE COURT:  She may give a 701 opinion based on --

15           MR. DRATEL:  Not as to a legal issue in terms

16  of -- I don't know where she is going with it.

17           THE COURT:  Overrule the objection.  You may answer.

18           THE WITNESS:  Consistent with what we have seen in

19  the Hamas charter, the Islamic Resistance Movement was just

20  that, a movement.  The motivation to support that movement did

21  not derive from finances or being paid.

22  Q.   (BY MR. JONAS)  Do you recall -- I want to move forward

23  to Ms. Hollander's questioning of you yesterday and some also

24  on Friday.  She had questioned you for a few minutes on

25  Friday.  Do you recall I believe it was yesterday she went

1   through some of the financial charts, one that involved

2   payments between I believe Marzook and the Defendants, between

3   the Holy Land Foundation and some of the Islamic societies

4   that there has been testimony about that had been run by

5   Sheikh Yassin, as well as to Khairi al-Agha?  Do you recall

6   that?

7   A.    I do.

8   Q.    Do you recall that she wrote on the charts the dates of

9   the designations, which are after the last transactions in

10  those particular charts?

11  A.    Yes.

12  Q.    Okay.  If those transactions between the Holy Land

13  Foundation, Marzook, the Islamic societies, and Khairi al-Agha

14  were prior to Hamas being designated, why is it important in

15  this case that we have shown it to the jury?

16  A.    Because of the nature of this --

17        MS. HOLLANDER:  Your Honor, I object.  I think she

18  is way beyond any 701 opinion, and we are really getting into

19  a legal question.

20        THE COURT:  Overruled.  Go ahead.

21        THE WITNESS:  I found it necessary in my

22  investigation to look at the beginning of the Holy Land

23  Foundation and the beginning of Hamas and to examine all

24  connections between the Holy Land Foundation and Hamas, the

25  Islamic Center of Gaza, those entities.

1       Whether or not those connections pre-existed the

2   designation does not change the fact that they had those

3   connections.  The individuals as we saw in Philadelphia noted

4   that they were going to be seen as terrorists and needed to

5   conceal their activities from the American public.  After that

6   time finding --

7           MR. DRATEL:  Your Honor, I object.  This is

8   non-responsive and this is really just a narrative.

9           THE COURT:  Overruled.  Go ahead.

10          THE WITNESS:  After that time, it became difficult

11  to find instances where they overtly in American eyes praised

12  Hamas.  So you have to go back to before they were actually

13  concealing their activities to find their true intent.

14  Q.   (BY MR. JONAS)  Ms. Hollander went through with you the

15  checks between Marzook and the Defendants.  If you recall, she

16  identified some checks to the Defendant Shukri Abu Baker that

17  you have identified the signatures not being Marzook's

18  signature.  Do you recall that?

19  A.   I do.

20  Q.   Okay.  What if any -- Do you recall, by the way, there

21  was a call that was played between the Defendant Shukri Abu

22  Baker and a reporter named Gayle Reeves?

23  A.   Yes.

24  Q.   That is Baker Wiretap No. 2.

25          MR. JONAS:  If we can put Baker Wiretap No. 2, page

1    6 on the screen, please.

2        Your Honor, if I may approach?

3            THE COURT:  Yes.

4    Q.   (BY MR. JONAS)  Agent Burns, do you have that before you?

5    A.   I do.

6    Q.   What is -- Who is on the call?

7    A.   Shukri Abu Baker and the reporter Gayle Reeves.

8    Q.   What is the date of the call?

9    A.   April 1st, 1996.

10   Q.   What is it that Shukri Baker is saying to Gayle Reeves

11   regarding his relationship or the HLF's relationship to Mousa

12   Abu Marzook?

13   A.   Do you want me to read it?

14   Q.   Yes.

15   A.   Okay.  He says, "I don't know ah if I should but, ah, ah,

16   ah, he might need to ask Mr. Abu Marzook himself."

17       "Well he..."

18       "I'm sure he will remember."

19       "He, he said he was speaking for Mr. Marzook."

20       "Yeah."

21       "Ah, so, I, but I don't know.  I was very, I was very..."

22       "Yeah."

23   Q.   Let me interrupt you for a moment.  You read this call

24   before?

25   A.   Yes, we have.

1  Q.   Who is -- When Shukri Baker is saying he was speaking for

2  Mr. Marzook, who is he talking about?

3  A.   He was talking about Mr. Abu Marzook's attorney.

4  Q.   And he says that in the prior --

5  A.   On the previous page.

6  Q.   Go ahead.

7  A.   And the reporter says, "I think we asked you this the

8  other night, and if we did I apologize.  But what was your

9  explanation or, it could be very simple, why Mr. Marzook would

10  have like your home phone and the Holy Land L.A. number in his

11  address book when he was arrested at JFK?"

12      "When he was arrested?"

13      "Yes."

14      "He has my home phone?"

15      "Yes."

16      "I don't...I don't as long, you know, along with another

17  thousand names maybe."

18      "Yes, that's right."

19          MR. JONAS:  Next page, please.

20          THE WITNESS:  "So this tells you, I mean, I mean,

21  the man is charismatic, is a philanthropist.  Maybe he picks

22  up my..."

23      "The man is what?  I didn't understand what you said."

24      "He, he, he's a philanthropist."

25      "Right."

1       "And he's a charismatic person.  Otherwise, he is not in

2   the position he's in right now."

3       "Sure."

4       "Maybe he picked up my number from the convention.  We

5   talked together about this donation.  And of course he would

6   have the number for the Holy Land Foundation because he was

7   either about to give a donation or he has already given.  I

8   don't know when he got these numbers, but I bet you it's

9   before, it's before he made the donation."

10  Q.   That is enough.

11       Does the Defendant Shukri Baker say anything to Gayle

12  Reeves about the phone calls that Marzook made to him?

13  A.   No, he doesn't.

14  Q.   Does he say anything about the money he received from the

15  joint bank account with Elbarasse?

16  A.   No, he doesn't.

17  Q.   Does he say anything about the money that he paid to the

18  Marzook's wife Nadia Elashi?

19  A.   No, he doesn't.

20  Q.   Do you recall Ms. Hollander showed you some of the Illa

21  Falistine exhibits?

22  A.   Yes.

23  Q.   Just quickly remind us what Illa Falistine is.

24  A.   It was an IAP magazine from the late '80s, early '90s.

25  Q.   Do you recall she also showed you documentation from the

1    HLF showing they placed ads in other magazines?

2    A.    Yes.

3    Q.    I want to show you Illa Falistine I believe it is 2,

4    page 9.  Agent Burns, I am going to hold it up.  This is the

5    cover.  Do you recall you have testified about this exhibit

6    before?

7    A.    Yes.

8    Q.    And who is on the cover?

9    A.    Abdullah Azzam.

10   Q.    Page 9, is this the beginning of an article?

11   A.    It is part of an article, yes.

12   Q.    Did you read this article during your direct?

13   A.    Yes.

14   Q.    I am not going to make you read the whole thing again.

15   If you can just read in the middle of the page where it says

16   "first."

17   A.    Okay.  It says, "First, we call on you to perform jihad

18   with your money for the sake of God by donating the maximum

19   amount you can to support the Intifada of your people in

20   Palestine.  You may send your donations in the name of

21   Occupied Land Fund."

22   Q.    Okay.  Is that an ad?

23   A.    It does not look like a typical ad that you would see in

24   a regular magazine.

25   Q.    Well, do you recall she showed you an ad and she had you

1    read the poem which was not on the translation that we

2    admitted into evidence in a different Illa Falistine issue?

3    A.    Yes.

4    Q.    Does that look like those type of ads?

5    A.    No.

6    Q.    Does this look like an ad?

7    A.    It looks like a request to send money for jihad.  And if

8    you look up above, this is about the Islamic Resistance

9    Movement, Hamas.

10   Q.    Is this an article?

11   A.    It is.

12         MR. JONAS:  If you can turn to page 12.

13   Q.    (BY MR. JONAS)  Agent Burns, is this also an article, or

14   continuation of an article?

15   A.    It is.

16   Q.    Did you testify about this article, this particular

17   article on the screen now, in your first testimony?

18   A.    Yes.

19   Q.    Do you see where it says "Occupied Land Fund"?

20   A.    I do.

21   Q.    Is that contained within the article, or is that a

22   separate ad?

23   A.    On this one?

24   Q.    Yes.

25   A.    It is within the article.

```
1    Q.    Okay.  So is that an ad?

2    A.    It does not appear to be a typical ad that you would see

3    in a normal newspaper.

4          MR. DRATEL:  I object, Your Honor, in terms of her

5    expertise and exposure to that.

6          MR. JONAS:  I will rephrase the question.

7    Q.    (BY MR. JONAS)  Is this an ad similar to the ad that

8    Ms. Hollander showed you?

9    A.    No, it is not.

10         MR. JONAS:  Illa Falistine 3, page 4.  If we can go

11   to Illa Falistine 4.  Page 4.  I am sorry.

12   Q.    (BY MR. JONAS)  Agent Burns, do you see what is on the

13   screen now?

14   A.    I do.

15   Q.    Can you read what is now in the center of the screen?

16   A.    Yes.  This is an article, and at the end it was signed

17   the Islamic Resistance Movement, Hamas.

18   Q.    You also testified about this in your direct testimony?

19   A.    I did.

20   Q.    What is below it?

21   A.    A request to donate to the Occupied Land Fund, "send your

22   tax deductible donations."

23   Q.    Does this look like the type of ad Ms. Hollander went

24   through with you?

25   A.    It is not the same.
```

1  Q.   Do you recall that Ms. Hollander questioned you about

2  InfoCom Search No. 51 and Ashqar Search No. 2?

3  A.   Yes.

4  Q.   Can you remind us what those documents are?

5  A.   The InfoCom exhibit that you are referring to I believe

6  was the report that Shukri Abu Baker made regarding his trip

7  to the Palestinian territories in 1991.

8  Q.   And what is Ashqar Search No. 2?

9  A.   That was the report found at Ashqar's home regarding

10 Hamas and activities that had gone on on a separate trip that

11 was taken in 1991.

12 Q.   Agent Burns, you talked about --

13        MR. JONAS:  Your Honor, if I may approach?

14        THE COURT:  Yes.

15 Q.   (BY MR. JONAS)  Agent Burns, you talked about in your

16 direct testimony and then on cross examination by Ms.

17 Hollander these two documents in conjunction with each other.

18 Is that correct?

19 A.   That is correct.

20 Q.   Okay.  What is it about these two documents that led you

21 to put them together?

22 A.   It was the fact that, as we stated earlier, Shukri Abu

23 Baker met with Hamas leader Mahmoud Zahar regarding the

24 Studies and Research Center, and that there was reporting on

25 the same issue of Mahmoud Zahar's, the Hamas leader's Studies

1    and Research Center in the other report.  That was about

2    Hamas.

3    Q.   Do you know if both reports were talking about the same

4    trip?

5    A.   I don't.  The time periods -- When looking at the time

6    periods, it appears that the Ashqar report, the Hamas report,

7    predated Shukri Abu Baker's trip.  So there may have been more

8    than one meeting, but they are still talking about the same

9    opening of the same organization the Studies and Research

10   Center with the Hamas leader Mahmoud Zahar.

11   Q.   Why is it you are calling the Ashqar report the Hamas

12   report?

13   A.   Because it was a report about Hamas in the territories.

14   Q.   Is it evident from the content?

15   A.   It is.

16   Q.   Does it use the word Hamas?

17   A.   It does.

18   Q.   Looking at InfoCom Search No. 51, that is the report by

19   Shukri Baker.  Correct?

20   A.   It is.

21   Q.   Yesterday Ms. Hollander had you read the whole thing.  Do

22   you recall that?

23   A.   Yes.

24   Q.   I am not going to ask you to do that.

25   A.   Thank you.

1    Q.   My question for you is this:  Did you recognize any of

2    the names that you read?

3    A.   I did.

4    Q.   Who did you recognize?

5    A.   Well, in addition to the individual that we have already

6    spoken about, there are a number of individuals in here that I

7    will be discussing at length later.  Would you like me to go

8    through and identify those people?

9              MR. DRATEL:  Your Honor, we object to that now, Your

10   Honor.

11             MS. HOLLANDER:  It is improper redirect, Your Honor.

12   She says she is going to be talking about them later.  It is

13   improper redirect.

14             MR. JONAS:  I am just asking about the names she

15   read yesterday and the ones she will be talking about later.

16   I think that is perfectly fine and in line with Ms.

17   Hollander's questioning.

18             THE COURT:  Overruled.  You may ask that.

19   Q.   (BY MR. JONAS)  Agent Burns, which names do you

20   recognize?

21   A.   Well, there is a sheik Ibrahim Abu Salim.  Going down

22   through -- do you want me to give you page numbers or run

23   through them quickly?

24   Q.   Run through them, but can you tell if they are affiliated

25   with any organization per the report?

1    A.    Yes.  Per the report, Ibrahim Abu Salim is identified as

2    being in Jerusalem with the Bir Nibalah zakat committee.

3    Scrolling down through -- bear with me for just one moment.

4    Q.    Sure.

5    A.    In the Hebron area, it identifies Mr. 'Abd-al-Khaliq

6    al-Natashah from the Islamic Charitable Society of Hebron as

7    well as Kamal al-Tanimi.  Those individuals are very familiar

8    to me, as well as Mr. Talal Sidr from the Young Men's MUSLIM

9    Association.

10   Q.   Were these organizations that the HLF sent money to, per

11   the financial schedules that we talked about at the end of

12   your testimony before?

13   A.    Yes.  In Um al-Fahm, Shukri Abu Baker reports on the

14   relief committee, which is the Islamic Relief Committee, and

15   Shaykh Munir, who is Munir al-Hajja.  Again, that is relating

16   to one of the entities that we have the financial schedules

17   for and one of the individuals that relates to that entity.

18        Under Nablus, Shukri Abu Baker reported meeting with

19   Dr. 'Abd-al-Rahim Hanbali of the Nablus zakat committee.  His

20   name is very familiar to me.

21        And then on the back page, or page 14, he references

22   "brother Fawaz who will continue his position with the HLF

23   after all the problems regarding his work method are

24   resolved," and that is Fawaz Hamad.

25        And then there is the individual with the medical

1    committee'Abd-al-Karim Abu Samaha.  And I may have missed one.

2    Q.    Okay.  Agent Burns, do you recall Ms. Hollander showing

3    you pictures of wheelchairs that were -- pictures taken from

4    the Holy Land Foundation?

5    A.    I do.

6    Q.    Do you recall what she asked you about regarding the

7    purchase of those wheelchairs?

8    A.    I don't recall specifically what she asked me.

9    Q.    Do you recall if she asked you if the HLF purchased those

10   wheelchairs?

11   A.    I recall she asked me about the HLF and wheelchairs.  I

12   don't recall exactly if she said purchased or not.

13            MR. JONAS:  Your Honor, may I approach?

14            THE COURT:  Yes.

15   Q.    (BY MR. JONAS)  Let me show you what has been marked as

16   HLF Search No. 175.

17   A.    Thank you.

18   Q.    Where did that document come from?

19   A.    The HLF Dallas office.

20   Q.    Is it on -- What letterhead is it on?

21   A.    The HLF letterhead.

22   Q.    Does it pertain to wheelchairs?

23   A.    It does.

24            MR. JONAS:  Your Honor, at this time I offer into

25   evidence HLF Search No. 175.

1          MS. HOLLANDER:  No objection.

2          THE COURT:  Admitted.

3    Q.    (BY MR. JONAS)  That is not scanned in, Agent Burns, so I

4    am not going to put it on the screen, but is there a portion

5    in there of that letter that identifies whether or not the HLF

6    itself purchased the wheelchairs that were referenced in the

7    pictures that you talked about yesterday?

8    A.    Yes.

9    Q.    What does it say?

10   A.    It says, "The Holy Land Foundation for Relief and

11   Development is requesting your assistance in facilitation of a

12   shipment from America.

13         "We have been bestowed a tremendous gift for the

14   Palestinian people who are handicapped and in need of

15   wheelchairs in order to live their lives more fully and with

16   the dignity aspired by all of us.  A gentleman in America has

17   donated to the foundation, with the ultimate destination of

18   the Palestinian people in Gaza, 494 new wheelchairs along with

19   50 amputee conversion kits and 200 elevating foot rests."

20   Q.    That is fine.  So does that letter indicate whether the

21   HLF purchased those wheelchairs themselves?

22   A.    It indicates that they were donated by an individual.

23   Q.    Okay.  Do you recall Ms. Hollander asked you a series of

24   questions regarding the Philadelphia meeting?

25   A.    I do.

1   Q.   And you recall she asked you about the hotel, the

2   Marriott Hotel where this meeting took place and whether the

3   participants, including the Defendants that were there,

4   checked in under their own name?

5   A.   Yes.

6   Q.   Did they check in under their own name?

7   A.   They did.

8   Q.   Do you recall she asked you about whether the hotel is

9   open to the public?

10  A.   Yes.

11  Q.   Have we already discussed the phone call or anything

12  where the Defendant Shukri Baker expressed concern about the

13  meeting being public?

14  A.   Yes.

15       MR. JONAS:  If we can put on the screen Ashqar

16  Wiretap No. 1 page 7, please.

17  Q.   (BY MR. JONAS)  Do you recall what this particular call

18  was about?

19  A.   I believe this was a planning phone call for the

20  Philadelphia meeting.

21  Q.   And who were the participants?

22  A.   Shukri Abu Baker, Omar Ahmad, and Abdel Haleem Ashqar.

23       MR. JONAS:  And enlarge the top, please.

24  Q.   (BY MR. JONAS)  What does Shukri Baker say?

25  A.   He says, "A large number, my brother, will be suspicious

1   and will attract attention, and I don't think that -- I mean,

2   it will be -- If we increase it more than what's necessary."

3   Q.   Agent Burns, did you come across any evidence that would

4   indicate why the head of a charity organization would be

5   suspicious about a meeting?

6   A.   No.

7   Q.   Agent Burns, during the course of the Philadelphia

8   meeting, did the Defendant Shukri Baker talk about providing a

9   cover for the meeting?

10  A.   He did.

11        MR. JONAS:  If we can put Philadelphia Meeting No.

12  3-E page 3, please.  Enlarge the top, please.

13  Q.   (BY MR. JONAS)  What does the Defendant Shukri Baker say

14  about providing cover for this meeting?

15  A.   It is when he is talking about the Samah code word, and

16  he says, "Please don't mention the name Samah in an explicit

17  manner.  We agree on saying it sister Samah.  We will talk

18  about her honor and this session is...the session here is a

19  joint workshop between the Holy Land Foundation and the IAP.

20  This is the official form.  I mean, please, in case some

21  inquired."

22  Q.   Do you recall Ms. Hollander had you read a portion of the

23  Philadelphia meeting where the Defendant Shukri Baker talked

24  about operating legally in America?  I am paraphrasing, of

25  course.

1    A.    Yes.

2    Q.    Was that -- If you can just remind us generally what she

3    had you read?

4    A.    It was a section where the Defendant Shukri Abu Baker was

5    telling the other participants in the meeting that they needed

6    to be sure and operate legally in America.

7    Q.    Okay.  Were there other portions of the Philadelphia

8    meeting where the Defendant Shukri Baker talked about the

9    presentation of the Holy Land Foundation or the participants

10   of the Palestine Committee to America?

11   A.    Yes.

12           MR. JONAS:  If we can put Philadelphia Meeting No.

13   5-E, page 4 on the screen, please, the bottom half.

14   Q.    (BY MR. JONAS)  Do you see where it says UI,

15   unintelligible, about a third from the bottom?

16   A.    I do.

17   Q.    Can you read from that point, and can you confirm who is

18   doing the speaking?

19   A.    This is Shukri Abu Baker.

20   Q.    Okay.

21   A.    It says, "It will be made up of some of our people, our

22   beloved ones."

23   Q.    I am sorry, Agent Burns.  Can you read a line above that?

24   I apologize.

25   A.    Yes.  It says, "We will form an organization for you to

show the Americans that you are -- It will be made up of some
of our people, our beloved ones.  And let's not hoist a large
Islamic flag, and let's not be barbaric-talking.  We will
remain a front so that if the thing happens, we will benefit
from the new happenings instead of having all of our
organizations classified and exposed.  I was telling brother
Aboul Hassan about Al Aqsa organization.  Why, 'Al Aqsa
educational?'  When you go to Oxford they will tell you:
'Sir, What is Aqsa?'  Make it 'The Palestinian General
Education Academy.'  Make yourself a big name like that and
give it a media twinkle and there is no need for Al Aqsa, Al
Quds, Al Sakhra and all that stuff.  Huh?  This is for
example.  And let's stay ahead of the events, our brothers.
We will find out later on that Fatah has 50 organizations here
in America and offices named 'Fatah offices' affiliated with
Fatah here in America like they like to affiliate them,
charity, educational and schools and everything while we are
sitting unable to work because all of us have become burned,
all of our organizations are purely Islamic organizations and
we don't know how we are going to be dealt with.  So, our
brother had a suggestion to form an organization--the format
he suggested was somewhat controversial, I didn't discuss it
with him, but I believe its concept is sound--that we should
start right now, my brothers, begin thinking about
establishing alternative organizations which can benefit from

1    a new atmosphere, ones whose Islamic hue is not very

2    conspicuous."

3    Q.   In the Elbarasse documents did you see a new organization

4    being formed or that was formed after Philadelphia that came

5    under the umbrella of the Palestine Committee?

6    A.   Yes.

7    Q.   What was that organization?

8    A.   CAIR, C-A-I-R.

9    Q.   Because there has been another Care mentioned?

10   A.   That is correct.

11       MR. JONAS:  If we can turn to Philly Meeting No.

12   9-E, page 3, please.

13   Q.   (BY MR. JONAS)  Do you see the center there with the

14   Defendant Shukri Baker speaking?

15   A.   I do.

16   Q.   Okay.  Does this portion of what he says also address

17   America?

18   A.   It does.

19   Q.   And can you read that?

20   A.   "There are three options which were presented as far as

21   the organizations are concerned.  One, the first option is

22   serving the movement on the inside; two, building the strength

23   of the community" --

24   Q.   I am sorry.  The movement on the inside, what does the

25   term movement mean as we have seen in this case?

1    A.    The Islamic Resistance Movement, Hamas.

2    Q.    Please keep going.

3    A.    "Three, marrying the two while keeping the departments

4    separate and specialized.  America represents five axises for

5    work; to be a safe place for the Movement, utilizing the

6    capabilities of the community for work on the inside, not only

7    on the American front, using the front as a pressure element

8    on the inside front, securing the human services we mentioned

9    before; five, leading the Palestinian political current in

10   America.  Our Islamic action organizations should be the ones

11   which lead the action, and they are the ones which cast

12   credibility on themselves and make themselves the credible

13   authority in regards to the Islamic point of view of the cause

14   of Palestine.  These are almost all the issues which were

15   mentioned.  There might be some issues which were mentioned by

16   the brothers in a different format, but this is the core of

17   the first session.  Now, would you like to say a point and

18   then vote on it, Abou Mohamed, or should we proceed?  Or is

19   there another point of view and we should open the door for

20   discussing them.  Most of the issues mentioned have near

21   unanimity.  I will give you an example.  What is needed is to

22   work to bring the goals of the agreement to failure on the

23   basis that beginning to form the infrastructure for the

24   Authority is rejected as a principle and that the agreement

25   takes the conflict out of its true core."

Q.   Agent Burns, did you come across anything in all the

material you reviewed to indicate why the head of a charity

would want to bring the goals of the Oslo Accords to failure?

A.   No.

Q.   Agent Burns, did Shukri Baker in the Philadelphia meeting

talk about being deceptive?

A.   He did.

        MR. JONAS:  If we can turn to Philly Meeting No.

7-E, page 5.

Q.   (BY MR. JONAS)  What does he say?

A.   He says, "I swear by your God that war is deception.  War

is deception.  We are fighting our enemy with a kind heart and

we never thought of deceiving it.  War is deception.  Deceive,

camouflage, pretend that you're leaving while you're walking

that way.  Or do we have to be -- Deceive your enemy."

    Omar Ahmad says, "This is like the one who plays

basketball.  He makes a player believe that he is doing this

while he is doing something else.  I agree with you.  Like

they say, politics is a completion of war."

    Shukri Abu Baker says, "Yes, politics, like war, is a

deception."

Q.   Did this term war is deception come up again in the

Philadelphia meeting?

A.   It did.

        MR. JONAS:  If we can go to Philadelphia Meeting No.

1      12-E, page 6, please, the bottom.

2      Q.    (BY MR. JONAS)   The last attribution, the UM, which means

3      what?

4      A.    Unidentified male.

5      Q.    If you can read that to the top of the next page.

6      A.    Beginning with "Of course"?

7      Q.    Yes.

8      A.    "Of course, regarding the point which was mentioned

9      yesterday that when we fight with the other Islamic

10     organizations it weakens our position and our political

11     address--about the Movement's position of the cause, and this

12     in order to make sure to continue to offer a clear Islamic

13     position to the Islamic community.  A special focus on the

14     Islamic community while being careful not to show the

15     Association as an opposition party with direct connections

16     with the inside.  It expresses its position.  It expresses the

17     Movement's position, but it doesn't say 'I represent this

18     side' or anything like that.."

19          Shukri Abu Baker says, "It should lie, you mean."

20          "It shouldn't talk.  It shouldn't lie.  It shouldn't

21     talk."

22          "War is deception."

23          And Omar Ahmad says, "Learn from your masters in the

24     Fund."

25     Q.    What is the Fund?

1   A.   The HLF.

2   Q.   Ms. Hollander asked you about the importance of the

3   chronology of these transcripts.  Do you know if the

4   transcripts the way they have been admitted are in any

5   particular chronological order?

6   A.   I originally thought they were in chronological order.

7   After looking at them, I don't know that they are.

8   Q.   Does it matter?

9   A.   It does not change the content.  The order of them does

10   not change the content.

11   Q.   When you say the content, what do you mean?

12   A.   I mean what they are saying.  What they are saying

13   doesn't change.

14   Q.   In fact, do they repeat themselves throughout all the

15   transcripts?

16           MS. HOLLANDER:  Objection; leading.

17           THE COURT:  Sustained.  Do you want to rephrase?

18           MR. JONAS:  Yes, sir.  Sorry.

19   Q.   (BY MR. JONAS)  I will withdraw that.  I will move on.

20      Ms. Hollander asked you about the Oslo Accords and the

21   groups that supported it.  I am sorry.  The groups that were

22   against it.

23   A.   Yes.

24   Q.   Do you recall that line of questioning?

25   A.   I do.

1    Q.    In discussing -- During the course of the Philadelphia

2    meeting, did the participants discuss their reaction to the

3    Oslo Accords?

4    A.    They did.

5    Q.    Did they discuss what they thought that needed to be done

6    with regard to the Oslo Accords?

7    A.    They did.

8    Q.    What did they say?

9    A.    They wanted to derail the peace accords, and they

10   referred to them as the peace agreement.

11   Q.    In discussing derailing the peace accords, they say they

12   wanted to derail it.

13          MS. HOLLANDER:   Objection, Your Honor.  He is

14   leading.

15          THE COURT:   He hasn't asked a question yet.  Go

16   ahead.

17   Q.    (BY MR. JONAS)  What, if anything, did they say regarding

18   supporting any Israeli extremist groups who also wanted to

19   derail the peace accords?

20   A.    They didn't say anything about supporting an Israeli

21   extremist group.

22   Q.    Do you recall her asking about that?

23   A.    I do.

24   Q.    And do you recall her asking about perhaps Palestinian

25   Christian groups that may be against the Oslo Accords?

```
1   A.   I do.

2   Q.   What, if anything, did the participants in the

3   Philadelphia meeting say about supporting any Palestinian

4   Christian group that may have been against the Oslo Accords?

5   A.   They didn't discuss supporting Palestinian Christian

6   groups who own opposed the Oslo Accords.  They referenced in

7   the meeting certain other groups that were opposed to the

8   accords, I think the communists, and said they didn't want to

9   align themselves with them.

10  Q.   You heard I believe Mr. Dratel asked you about Edward

11  Said and whether he was an extremist?

12  A.   Yes.

13  Q.   Do you know if he was against the Oslo Accords as well?

14  A.   I don't know.

15  Q.   Okay.  What, if anything, did they say about supporting

16  Edward Said during the Philadelphia meeting?

17  A.   Nothing.

18  Q.   Agent Burns, is there any particular group that they

19  discussed in the Philadelphia meeting with regard to their

20  support and being against the Oslo Accords?

21  A.   No, they only discussed supporting the Movement, the

22  Islamic Resistance Movement.

23  Q.   I said group.

24  A.   Sorry.

25  Q.   Was there any group that they discussed supporting --
```

1    A.    I thought you said was there any other group.

2    Q.    Was there any group at all?

3    A.    Yes.

4    Q.    That they discussed supporting with regard to derailing

5    the Oslo Accords?

6    A.    Yes.

7    Q.    What group was that?

8    A.    The Islamic Resistance Movement, Hamas.

9         MR. JONAS:  If we can pull Philadelphia Meeting No.

10   2-E, page 2 on the screen, please.  Enlarge the middle part,

11   please.

12   Q.    (BY MR. JONAS)  Do you see, Agent Burns, about six lines

13   or so from the top on the right hand side where it starts "The

14   programs"?

15   A.    I do.

16   Q.    Can you read that and the next few lines that follow?

17   A.    "The programs of the organizations overall should be in

18   complete harmony with the general directions of the Movement.

19   I say that once again because this is very important.  By

20   harmony I mean that they ought to serve it in a direct or

21   indirect manner.  But the format is the flexible part."

22   Q.    Okay.  That is good enough.

23        Agent Burns, I want to turn to Mr. Dratel's questioning

24   of you for a moment.  Do you recall yesterday afternoon in

25   discussing the Elbarasse search material he asked you about

1    whether or not you found any fax cover sheets or FedEx

2    envelopes indicating that those Elbarasse documents were sent

3    to any of the Defendants?  Do you recall that?

4    A.    I do.

5    Q.    Okay.  Have you come across any evidence at all that you

6    have testified about indicating that the Defendants or some of

7    the Defendants knew they were part of the Palestine Committee?

8    A.    Yes.

9    Q.    What was that?

10   A.    The telephone conversations that we had about the

11   conflict between Al-Aqsa --

12          MR. DRATEL:  Can we identify the Defendants, Your

13   Honor?

14   Q.    (BY MR. JONAS)  Which defendants in particular were part

15   of the Philadelphia meeting?  I mean Palestine Committee.

16   Agent Burns, which Defendants in particular were part of the

17   Palestine Committee, based on the Elbarasse documents that are

18   in evidence?

19   A.    Based on the documents that are in evidence, Shukri Abu

20   Baker, the Defendant Mohammad El-Mezain, Ghassan Elashi, and

21   then we had Mr. Abdulqader as part of the band which was part

22   of the Palestine Committee.

23   Q.    And what evidence have we seen where the Defendants or

24   particular Defendants participated in activities of the

25   Palestine Committee?

1    A.    Well, we have seen the videotapes of these festivals that

2    were reported on in these Palestine Committee reports

3    involving the Defendant Mufid Abdulqader, Defendant Mohammad

4    El-Mezain Shukri Abu Baker, Ghassan Elashi.  We have the

5    Philadelphia meeting where a number of the Defendants attended

6    or were invited.  We had the planning phone calls where the

7    Defendant Shukri Abu Baker actually participated in the phone

8    call and discussed who would be invited, including the

9    Defendant Mohammad El-Mezain.  Those are just some examples.

10   Q.    Was there also -- You mentioned an incident between the

11   Holy Land Foundation and the Al-Aqsa Educational Fund.

12   A.    Yes, there was.  During that incident the Palestine

13   Committee got together and resolved or attempted to resolve

14   the conflict between the two organizations, and several of the

15   individuals participated in that conference call of the

16   Palestinian Committee to resolve the issue.

17   Q.    And in everything you have seen about the Palestine

18   Committee, did any of the Defendants that were part of that

19   Palestine Committee ever deny being a member of the Committee?

20        MR. DRATEL:  Objection, Your Honor, to the form of

21   the question.

22        THE COURT:  Overruled.  You may answer that.

23        THE WITNESS:  I did not see anywhere in the

24   Elbarasse documents or the Philadelphia meeting or these

25   planning phone calls where any of the individuals ever denied

1    or declined to being members of the Palestine Committee.

2    Q.   (BY MR. JONAS)  Is what you did see, is that consistent

3    with being a member of the Palestine Committee?

4            MR. DRATEL:  Objection, Your Honor.

5            THE COURT:  Overruled.  You may answer finish your

6    question.

7    Q.   (BY MR. JONAS)  What you did see, was that consistent

8    with membership in the Palestine Committee?

9    A.   Yes.

10   Q.   Mr. Dratel went through with you the wiretap calls from

11   the Defendant El-Mezain's phone line and went through the

12   dates of the calls that have been admitted into evidence.

13   A.   That is correct.

14   Q.   Leading up to 1996 or 1997.  I can't remember the exact

15   time period.  Did the Defendant El-Mezain quit the HLF in

16   1997?

17   A.   No, he didn't.

18   Q.   Did he continue to work for them after 1997?

19   A.   He did.

20   Q.   Did he work for them up to the time the HLF closed in

21   2001?

22   A.   Yes.

23   Q.   What was his role again?

24   A.   He was chairman of the board for a time until 1999.  He

25   was also, as we saw on the videotapes, a fundraiser for the

1    HLF.  In 1999, although he stepped down as chairman of the

2    board, he became an officer of the HLF, and he ran the HLF San

3    Diego office, and he continued to do fundraising activities

4    for the HLF.

5    Q.   From 1995 when Hamas was designated up until 2001, did

6    any of the Defendants stop working for the HLF, either as a

7    volunteer, as an employee, as an officer or director, in any

8    way, shape, or form?

9    A.   No, they all worked there until the HLF closed down in

10   2001.

11   Q.   Do you recall that Mr. Dratel asked you about payments,

12   money between Mousa Abu Marzook and the Defendant Mohammad

13   El-Mezain?

14   A.   I do.

15   Q.   Okay.  Did you review the Defendant El-Mezain's sworn

16   deposition?

17   A.   I did.

18   Q.   Do you need a copy of it, or do you have in it front of

19   you?

20   A.   I may have a copy.  Let me check.  I have it.

21   Q.   Okay.  Did the Defendant Mohammad El-Mezain talk about

22   his relationship to Marzook during the deposition?

23   A.   He did.

24        MR. JONAS:  And if we can get page 4 on the screen,

25   please, the exhibit page 4.

Q.   (BY MR. JONAS)  Did he talk about Marzook -- Do you have

that in front of you?

A.   I do.

Q.   And for the deposition pages, it is pages 56 through 58.

A.   Okay.

Q.   I am not going to have you read it, but are you familiar

with this portion of his deposition?

A.   I am.

Q.   What did he say about his relationship with Marzook in

the deposition?

MR. DRATEL:  Object to characterizing, Your Honor.

It speaks for itself.

THE COURT:  Overruled.

THE WITNESS:  He said that he was related by

marriage to Mousa Abu Marzook, and that he had lived in the

same city as Marzook in Fort Collins and attended the mosque

with him, and that on occasion once a year, once every two or

three years, Marzook would call him around the time of the

mosque's festival.

Q.   (BY MR. JONAS)  Did he say anything about Marzook giving

him money?

A.   He did not.

Q.   If you recall, Mr. Dratel this morning went through the

phone bills, Marzook's phone bills with regard to calls

between Marzook and the Defendant Mohammad El-Mezain.  Do you

1  recall that?

2  A.    I do.

3  Q.    And he identified maybe 30 or so calls that were one or

4  two minutes in duration.  Do you recall that?

5  A.    I do.

6  Q.    How many calls in total were there between the Defendant

7  Marzook and El-Mezain per Marzook's phone records that the FBI

8  obtained?

9  A.    There were a large number of them.  If you could show me

10 the chart to refresh my memory on how many.  There were 52

11 calls from Marzook to Mr. El-Mezain and four calls from

12 El-Mezain to Marzook.

13 Q.    This was over about a two-year time period; little over

14 two years in total?

15 A.    '89 to '93 or January of '93.

16 Q.    Okay.  Do you recall that in showing you some of these

17 calls there were several pages on the phone bills where calls

18 were made four or five times in a row?

19 A.    I do.

20 Q.    Did you come across anything -- Withdrawn.

21      During the time period of these calls between Marzook to

22 El-Mezain, what was Marzook's role in Hamas?

23 A.    He was the number one leader of Hamas worldwide.

24 Q.    Did you come across any evidence that would explain why

25 the leader of Hamas would be trying to reach the Defendant

1    Mohammad El-Mezain so urgently where he would call one after

2    another after another?

3    A.    No.

4    Q.    Did you come across any evidence where the phone calls

5    between the Defendant Mohammad El-Mezain and Marzook were in

6    any way time-wise related to an HLF event or activity?

7    A.    Yes.

8    Q.    What?

9    A.    There were some board meetings that happened in the early

10   '90s, and there were phone calls between Marzook and the

11   Defendants around the time of those board meetings.

12        In addition to that, there were phone calls around the

13   times Marzook was sending those $100,000 payments that were

14   forwarded on to the Islamic Relief Committee.  So some of the

15   phone calls at least we can tie to or they occurred at times

16   when the HLF was having significant events.

17   Q.    You don't know what they were saying?

18   A.    I have no way of knowing.

19   Q.    Do you recall Mr. Dratel went through with you El-Mezain

20   Wiretap No. 1, which was all those faxes?

21   A.    Yes.

22   Q.    Okay.  Do you recall he asked you if those were all the

23   faxes received by the Defendant Mohammad El-Mezain that was

24   intercepted by the FBI?

25   A.    I do.

1    Q.    Were they all the faxes?

2    A.    No.

3    Q.    Why were these particular faxes chosen to be exhibited?

4    A.    Because they relate to the issues that we are discussing

5    in this case.

6           MR. JONAS:  If we can pull up El-Mezain Wiretap No.

7    1, page 105.  Enlarge the top, please.

8    Q.    (BY MR. JONAS)  Just read the first line.

9    A.    "Dr. Mahmud Al-Zahar, spokesman for the Hamas movement in

10   Gaza Strip said" --

11   Q.    That is sufficient.  That is all I need.  Did we see a

12   videotape with the Defendant Mohammad El-Mezain and Mahmoud

13   Al-Zahar?

14   A.    We did.

15          MR. JONAS:  Let's play Mushtaha Search No. 1,

16   clip A?

17          MR. DRATEL:  Object, Your Honor.  This is beyond the

18   scope.

19          THE COURT:  Overruled.

20          (Whereupon, Mushtaha Search No. 1, Clip A was

21          played, while questions were propounded.)

22   Q.    (BY MR. JONAS)  What is the date of Mushtaha Search

23   No. 1, that videotape?

24   A.    I believe that is the one from 1990 that we have been

25   discussing.  Yes.

1  Q.   So that was several years before this fax that we just

2  looked at?

3  A.   It was.

4  Q.   Okay.  Who do you see in the audience, Agent Burns?

5  A.   The Defendant Mohammad El-Mezain is there with the beard

6  seated next to Mahmoud Al-Zahar, the individual in the striped

7  tie.  And then on the other side is Jamil Hamami, the other

8  Hamas leader that we have been talking about.

9  Q.   Okay.  Thank you.

10      Agent Burns, do you recall Government's Exhibit HLF

11  Search No. 29?  That was the Fatwas taken from the San Diego

12  office, I believe.

13  A.   I don't have exhibit number memorized, but yes, I recall

14  the Fatwas.

15  Q.   Mr. Dratel showed you a few additional pages from that

16  exhibit?

17  A.   He did.

18          MR. JONAS:  If we can put HLF Search No. 29.  Go to

19  page 3, please.  Enlarge the top, please.

20  Q.   (BY MR. JONAS)  Agent Burns, I am going to hand you what

21  has been marked as Defendants' HLF Search No. 29.  Agent

22  Burns, the paragraph that is on the screen, that says

23  Government's HLF Search No. 29?

24  A.   Yes.

25  Q.   Okay.  That is written by whom?

1    A.    That is written by Akeel Al-Nashmi.

2    Q.    Can you read the first paragraph, please?

3    A.    "We believe that the meaning of 'In the Path of Allah'

4    includes supporting Islamic da'wa and making the Word of Allah

5    high (prevail).  This is strongly supported because it is a

6    general term that includes Jihad with arms to fight the

7    enemies which is more important than other things.  The same

8    term also includes everything that pleases Allah because of

9    the term's generality and there is nothing to support its

10   specificity to Jihad only, therefore it remains a general term

11   that includes all interests of Muslims especially anything

12   that makes them victorious."

13   Q.    Okay.  This says this was authored by the dean of the

14   University of Kuwait.  Was it adopted by anyone else at the

15   bottom of the page?

16   A.    It was.

17   Q.    Okay.  And you have talked about Yousef El Karadawi in

18   relation to this case.  Correct?

19   A.    Correct.

20   Q.    What was his relationship?

21   A.    He was a speaker for the HLF.

22   Q.    The Defendants' HLF No. 29, those additional two pages,

23   do you recall reading something about it being okay to give to

24   the West if it is legal?

25   A.    Yes.

1  Q.   Where was the person who wrote this located?

2  A.   At the University of Kuwait.

3  Q.   As far as you know, was it illegal or is it illegal to

4  give money to Hamas if you are in Kuwait?

5  A.   As far as I know --

6          MR. DRATEL:  Objection, Your Honor.

7          THE COURT:  You might establish a predicate if she

8  has any basis.

9  Q.   (BY MR. JONAS)  Do you know if it was illegal to give

10  money to Hamas if you live in Kuwait?

11  A.   I don't know.

12  Q.   Okay.  Do you recall Mr. Dratel went through with you

13  this morning Project 236, I believe?  It is InfoCom Search

14  No. 3.

15  A.   Yes.

16  Q.   And he put on the screen those pages of the Red Cross

17  forms.

18  A.   Yes.

19  Q.   Okay.  Do you recall when you testified about that

20  project as well during your direct testimony?

21  A.   Yes.

22  Q.   Can you remind us why -- what was the purpose of you

23  talking about it in your direct testimony?

24  A.   We were discussing the fact that Mousa Abu Marzook had

25  given $100,000 to the HLF after placing a phone call to the

Defendant --

MR. DRATEL:  Object to a rehashing of direct.  If it
is targeted to something on cross, then it is appropriate.

THE COURT:  He tied it into an issue that came up on
cross.  Go ahead.

THE WITNESS:  That Mousa Abu Marzook had given
$100,000 to the HLF, which the HLF then sent to the Islamic
Relief Committee for that project that he was referencing.

Q.   (BY MR. JONAS)  Okay.  Do you recall testifying about how
much money approximately in total was earmarked for the
recipients of the project binder per the paperwork in the
file?

A.    I do.

Q.    How much was that?

A.    Initially it was confusing, but if you looked at the
suggested amount for the families, the hundred needy families
they had the support for, would have been $20,000 as opposed
to $100,000.

Q.    Was there anything in the file indicating where the
remaining $80,000 went?

A.    Only the final project report that came back two years
later and said that they had supported 500 families.

Q.    Was there any supporting documentation to show that they
supported 500 families?

A.    No.

1    Q.   I want to go back for a moment to a question by Ms.

2    Moreno.  Do you recall she went through some of the Elbarasse

3    search documents with you?

4    A.   Yes.

5    Q.   She questioned you about the dates of those documents and

6    she circled the date in red.  Do you recall that?

7    A.   I do.

8    Q.   And I don't see her chart, but do you recall that she had

9    a timeline?

10   A.   I do.

11   Q.   It was a demonstrative chart?

12   A.   Yes.

13   Q.   And it was down next to the lectern?

14   A.   Yes.

15   Q.   And Ms. Moreno would draw on the side of the timeline the

16   time of the Elbarasse documents after you testified about it?

17   A.   Yes.

18   Q.   If these Elbarasse documents are before Hamas is

19   designated, why are they important to this case?

20   A.   Because, again, they go to show the intent of these

21   individuals and what they were thinking at the time when the

22   HLF was created, why it was created, why it began operating,

23   and why it continued to operate, and at a later date why you

24   see them concealing some of their activities and toning down

25   their rhetoric.

1   Q.   Do you recall Ms. Hollander asked you about Oklahoma City

2   bombing?

3   A.   I do.

4   Q.   And she played a video and you identified some people

5   wearing HLF shirts in the video?

6   A.   Yes.

7   Q.   And she showed you a letter from a man named Larry Jones

8   from Feed the Children to the HLF thanking them for their

9   support.  Do you recall that?

10  A.   I do.

11  Q.   Agent Burns, did you see anything in all the material

12  that you reviewed that indicates that the HLF told Larry Jones

13  that they were part of the Palestine Committee?

14          MR. DRATEL:  Objection, Your Honor.

15          THE COURT:  Overruled.

16          THE WITNESS:  No.

17  Q.   (BY MR. JONAS)  She asked you -- She showed you a

18  document from the mayor of San Diego that proclaimed an HLF

19  Day in San Diego.

20          MR. DRATEL:  Can we get a continuing objection to

21  this issue?  It is about people -- I mean, there is no basis

22  for these kinds of questions, Your Honor.  I think they are

23  improper.

24          THE COURT:  You will need to object.  I am not sure

25  what -- You just need to object, counsel, as you need to.  The

1    objection is overruled.

2    Q.   (BY MR. JONAS)  Do you recall about the mayor of San

3    Diego and a proclamation about being an HLF Day?

4    A.   Yes.

5    Q.   What evidence, if any, or what documents or any phone

6    calls or anything you reviewed indicated that the HLF told the

7    mayor of San Diego that they were part of the Palestine

8    Committee?

9    A.   I found nothing.

10            MR. DRATEL:  I object.

11            THE COURT:  Overruled.

12   Q.   (BY MR. JONAS)  You were asked questions about the

13   Catholic charities to the HLF, do you recall that?

14   A.   Yes.

15   Q.   What evidence if any did you come across that indicated

16   the HLF told the Catholic charities that they were part of the

17   Palestine Committee?

18            MR. DRATEL:  Objection, Your Honor.

19            MS. HOLLANDER:  I object.  This is not proper

20   redirect.

21            MR. DRATEL:  This is not proper examination to begin

22   with, Your Honor.

23            THE COURT:  I think it does respond to issues

24   brought up on cross, and he may ask.  Overrule those

25   objections.

1          THE WITNESS:  I found nothing.

2     Q.   (BY MR. JONAS)  Do you recall Ms. Hollander asked you

3     about aid the HLF gave to -- in Kosovo and in Turkey Do you

4     recall that?

5     A.   I do.

6     Q.   All right.  Do you recall that at the end of the your

7     direct testimony we went through financial schedules of

8     payments between the HLF and certain zakat committees and

9     other charitable organizations?

10    A.   Yes.

11    Q.   We concluded with that on Thursday, I think it was.

12    A.   Yes.

13    Q.   Okay.  Was the HLF paying these particular --

14         MR. DRATEL:  Objection, Your Honor.  This was not

15    part of the cross.  This was supposed to be part of the next

16    round of examination.

17         MS. HOLLANDER:  There was not one single word on

18    cross about this.

19         MR. JONAS:  This goes directly to the whole nature

20    of the questioning by the Defense attorneys, and I am not

21    going to go yet into the subject matter the Defense attorneys

22    are concerned about.  That is being saved for the second part

23    of Agent Burns' testimony.

24         THE COURT:  Overruled.  Go ahead.

25    Q.   (BY MR. JONAS)  Agent Burns, through those financial

1 schedules that we went through, was the HLF paying those zakat

2 committees and charitable organizations in the West Bank and

3 Gaza during the time period that the Elbarasse documents were

4 in existence?

5 A. Yes.

6 Q. Or created?

7 A. Yes.

8 Q. Okay.  Was the HLF paying the same committees during the

9 time period of the Philadelphia meeting?

10 A. Yes.

11    MS. HOLLANDER:  Objection.  This is all leading, and

12 it is really beyond the scope.

13    THE COURT:  Overruled.

14 Q. (BY MR. JONAS)  Was the HLF paying the same committees

15 during the time period of the dispute between the HLF and the

16 Al-Aqsa Educational Fund that was settled by the Palestine

17 Committee and Marzook?

18 A. They were.

19    MR. DRATEL:  Can we have a continuing objection to

20 this?

21    THE COURT:  Yes, you can, and it is overruled.

22 Q. (BY MR. JONAS)  Was the HLF paying the same zakat

23 committees in the West Bank and Gaza during the time period

24 Hamas was first designated as a specially designated terrorist

25 in 1997?

A.    Yes.

Q.    Was the HLF paying the same zakat committees in the West

Bank and Gaza during the time period Hamas was designated as a

foreign terrorist organization in 1997?

A.    Yes.

Q.    Did the HLF continue to pay the same zakat committees

when they were giving this aid in Kosovo and Turkey?

A.    Yes.

Q.    Was the HLF continuing to pay the same zakat committees

in the West Bank and Gaza when they were shut down in 2001?

A.    Yes.

            MR. JONAS:  Your Honor, I pass the witness.

            THE COURT:  Okay.  Let's go ahead and break for

lunch.  Be back at 1:45.

       Please recall the instructions we have been over.

            (Whereupon, the jury left the courtroom.)

            THE COURT:  All right.  We are in recess until 1:45.

            MR. DRATEL:  That line of questioning about did so

and so tell so and so, two completely unrelated people, has

been found improper in *United States v. Jones* from the Second

Circuit.  I will try to find the citation.  Obviously I don't

have it.  I was not anticipating those questions.  But that

particular type of question is just improper.

            THE COURT:  Okay.  All right.  The objection has

been overruled.

1          (Lunch recess.)

2          THE COURT:  I received, Mr. Mysliwiec, your proposed

3    instruction from all Defense counsel.  I am not prepared to

4    give this instruction just yet.  Let me give it some thought

5    and we will come back to that.

6          MR. JONAS:  We object to it, Your Honor.

7          THE COURT:  I think I got that at the bench

8    conference.

9          MR. CLINE:  Your Honor, if Your Honor ultimately

10   declines to give it, I just would like to read it into the

11   record, or somehow get it into the record because we just

12   emailed it to Your Honor.

13         THE COURT:  We will make sure that gets into the

14   record.

15         MR. DRATEL:  I just want to express again, I guess

16   it is an objection, to waiting on the instruction.  I think it

17   should be given at the time the evidence comes in so it

18   doesn't accumulate in a way that obviously would be contrary

19   to instructions later.  It is too much to overcome.

20         THE COURT:  All right.

21      Ready?

22         MS. MORENO:  Ready.

23         THE COURT:  Go ahead and bring the jury in.

24         (Whereupon, the jury entered the courtroom.)

25         THE COURT:  Ms. Moreno?

1     MS. MORENO:  Thank you, Your Honor.

2                 RECROSS EXAMINATION

3  By Ms. Moreno:

4  Q.   Good afternoon, Agent Burns.

5  A.   Good afternoon.

6  Q.   I just have a few questions based on your redirect from

7  Mr. Jonas.

8       Lets's talk a little bit about -- This is Government

9  Exhibit No. 175, which I believe is the only Government

10 exhibit that was introduced during your redirect.  Do you

11 remember this letter?

12 A.   I do.

13 Q.   Okay.  And this is a letter that you testified about on

14 redirect.  Do you remember that?

15 A.   I do.

16 Q.   Okay.  I am not sure that you can read it, Agent Burns.

17 Should I zoom in a little more?

18 A.   I can see it.

19 Q.   Okay.  Now, this is on Holy Land Foundation

20 correspondence letterhead.  Correct?

21 A.   Correct.

22 Q.   And it is dated December 2nd of 2000.

23 A.   Correct.

24 Q.   All right.  Now, it is addressed to a Dr. Riad Azanoun.

25 Correct?

```
1    A.   Correct.

2    Q.   And it indicates that his title is the Ministry of health

3    of the Palestinian National Authority.  Correct?

4    A.   Correct.

5    Q.   And the Palestinian National Authority is an entity I

6    believe you have discussed in this trial with Mr. Dratel and

7    others.  Is that right?

8    A.   Correct.

9    Q.   And the PNA was the secular -- is a secular organization.

10   Correct?

11   A.   I believe that this was the Palestinian Authority, the

12   party that was in control of the Palestinian territories,

13   which is secular.

14   Q.   And agree it is secular?

15   A.   Yes.

16   Q.   And in fact we are talking about a component of the PNA

17   is Fatah.  Correct?

18   A.   Correct.

19   Q.   And Fatah, I think you have discussed before, is the

20   rival of Hamas?

21   A.   That is correct.

22   Q.   So this is a letter from the Holy Land Foundation to the

23   Ministry of health of the rival organization of Hamas.  Agree?

24   A.   Yes.

25   Q.   Okay.  And in this letter it talks about some
```

1    wheelchairs.  Correct?

2    A.    It does.

3    Q.    Now, charities can receive donations and contributions in

4    a number of ways, including cash.  Would you agree?

5    A.    Yes.

6    Q.    And charities can also receive in kind donations.  Would

7    you agree with that?

8    A.    Yes.

9    Q.    And in fact, in your vast investigation of this case, you

10   have come across Holy Land Foundation in kind contributions in

11   addition to the cash that they received over the years.

12   Correct?

13   A.    Correct.

14   Q.    And in fact, some of those in kind contributions included

15   food.  Correct?

16   A.    I don't recall food specifically, but there were various

17   and different kinds of gifts in kind.

18   Q.    Do you recall backpacks?

19   A.    Yes.

20   Q.    Do you recall clothing?

21   A.    Yes.

22   Q.    Do you recall medicine?

23   A.    Are we talking about gifts?

24   Q.    In kind contributions.

25   A.    From the HLF or to the HLF?

1    Q.   To the HLF.  Well, let's start to the Holy Land

2    Foundation.

3    A.   Okay.  And I am sorry.  Which item were you asking about?

4    Q.   I was on to medicine.

5    A.   Okay.  Yes, there was medicine.

6    Q.   Okay.  And wheelchairs.  Correct?

7    A.   Correct.

8    Q.   And then the Holy Land Foundation would take those items

9    and facilitate their distribution in a fashion as evidenced in

10   this letter.  Correct?

11   A.   Correct.

12   Q.   All right.  Now, and this is something that charities do

13   all the time.  Would you agree?

14   A.   I am sure they do.

15   Q.   Okay.  Now, in this letter, this is the letter that

16   discusses a wheelchair contribution.  Correct?

17   A.   Correct.

18   Q.   And in fact, the letter says a gentleman here, and you

19   might have read this, a gentleman here in America has donated

20   to the Foundation with the ultimate destination of the

21   Palestinian people in Gaza 494 new wheelchairs along with 50

22   amputee conversion kits and 200 elevating foot rests.

23   Correct?

24   A.   Correct.

25   Q.   What is, if you know, an amputee conversion kit?

1    A.    I don't know.

2    Q.    Okay.  And so it wasn't just wheelchairs, but it appears

3    to have been these amputee conversion kits and these elevating

4    foot rests that were donated by a gentleman in America.

5    Correct?

6    A.    That is what it says.

7    Q.    To the Holy Land Foundation.  And the Holy Land

8    Foundation is writing the Palestinian National Authority in

9    order to get a humanitarian waiver of Custom duties.  Do you

10   see that?

11   A.    Yes.

12   Q.    Okay.  And in fact, who is Akram Mishal?

13   A.    He was one of the officers of the Holy Land Foundation.

14   Q.    And he signs his title as the Director of Projects and

15   Grants.  Do you see that?

16   A.    I do.

17   Q.    And in fact, in your investigation you saw evidence that

18   indeed he did manage the projects and grants.  Correct?

19   A.    That is correct.

20   Q.    Okay.  And how does he end -- Why don't you read to the

21   jury what the Holy Land Foundation expressed to the

22   Palestinian National Authority where it begins with "It is."

23   A.    Okay.  It says, "It is our humble honor to be a part of

24   the rehabilitation of Palestine.  Allow me to thank you in

25   advance for your generous assistance."

1          MS. MORENO:  Thank you, Your Honor.  Pass the

2    witness.

3          THE COURT:  Mr. Westfall?

4          MR. WESTFALL:  Your Honor, we have no further

5    questions for Agent Burns.

6          THE COURT:  Ms. Cadeddu?  We will just go in the

7    same order.  Any questions?

8          MS. CADEDDU:  Yes, Your Honor.

9                    RECROSS EXAMINATION

10   By Ms. Cadeddu:

11   Q.    Agent Burns, I think you testified on redirect that it

12   didn't matter to you whether Mufid Abdulqader was paid for

13   fundraising or not.  Is that correct?  Did you testify to

14   that?

15   A.    I did.

16   Q.    Did you make that statement?

17   A.    I did.

18   Q.    And this document here, which is Demonstrative No. 19, is

19   an exhibit that you created.  Is that right?

20   A.    I and some other people, yes.

21   Q.    And if you take a look at this exhibit HLF Search No.

22   147, the description is "IAP convention, $2,721 attributed to

23   Mufid Abdulqader."  Do you see that?

24   A.    I do.

25   Q.    That is a government exhibit.  Right?

1    A.    It is.

2    Q.    And you put that exhibit into evidence?

3    A.    We did.

4    Q.    And then this one, "Eid bonus payment" HLF Search No.

5    144, that is a Government exhibit?

6    A.    It is.

7    Q.    And you put that into evidence?

8    A.    Yes.

9    Q.    HLF Search No. 145 right below it, "receipt for payment

10   to Mufid Abdulqader from HLF for $3,489," that is also a

11   government exhibit.  Correct?

12   A.    It is.

13   Q.    And you put that into evidence?

14   A.    Yes, we did.

15   Q.    Now, I think that Mr. Jonas asked you on redirect to take

16   a look at a clip, HLF Search No. 144 clip A.  Do you remember

17   that?

18   A.    We looked at a couple of clips.  I can't remember exactly

19   which one it is, but I know that we looked at some.

20   Q.    And I think that was the one with the flag, and you

21   stated that the writing that was on the flag was a saying used

22   by Hamas and other Islamists.  Do you remember saying that?

23   A.    I do.

24   Q.    And that saying in fact is "No God but Allah," and there

25   is no God but Allah, and Muhammad is the profit of Allah."

1    That is what it says on the flag.  Right?

2    A.    That is correct.

3    Q.    That principle that there is a God but Allah and there is

4    no prophet but Muhammad is the first pillar of Islam, isn't

5    it?

6    A.    I think so.

7    Q.    I think you also testified on redirect that Mr.

8    Abdulqader sang in a band and volunteered for the Holy Land

9    Fund.  Do you remember that?

10   A.    I said he sang in the band and that he raised funds for

11   the HLF.

12   Q.    And those were the two -- the two sets of activities that

13   you were asked about on redirect.  Do you remember that?

14   A.    I do.

15   Q.    But, in fact, we have talked about a couple of other

16   people who also sang in the band.  Right?

17   A.    Yes.

18   Q.    Sabri Sabri is one of those?

19   A.    Yes.

20   Q.    And Sabri Sabri was also a Holy Land foundation

21   volunteer.  Correct?

22   A.    I believe that he was.

23   Q.    Kifah Mustapha, he was a band member who sang in the

24   band.

25   A.    Yes.

1   Q.   And Kifah Mustapha was actually an employee at Holy Land.

2   Right?

3   A.   He was.

4   Q.   In fact, if we take a look here at Government Exhibit HLF

5   Search No. 2 -- It is kind of hard to see?

6   A.   It is there in the middle of the screen.

7   Q.   Right here.  Right?

8   A.   Correct.

9   Q.   Kifah Mustapha.  And Munzer Taleb is another band member

10  you identified on the screen, and agreed had been singing with

11  the band since the beginning.

12  A.   That is correct.

13  Q.   And he was also a Holy Land volunteer.  Isn't that right?

14  A.   I believe he did some volunteer work for them.

15  Q.   In fact, if we take a look at Government's Exhibit No.

16  HLF Search 16, page 2, this is the local speaker list, we see

17  here Munzer Taleb listed right under Mufid Abdulqader.

18  A.   Correct.

19  Q.   And then I can't remember if we talked about this

20  gentleman or not, but Ali Ahmad is another band member?

21  A.   That was one that I said I am not real familiar with him.

22  Q.   Okay.  But he is a Holy Land employee.  Correct?  If we

23  go back to Holy Land Search No. 2, do you see his name?  Do

24  you see it right here, Ali Ahmad?

25  A.   I see that name.

1    MS. CADEDDU:  Pass the witness.

2    THE COURT:  Ms. Hollander?

3    MS. HOLLANDER:  Thank you, Your Honor.

4                RECROSS EXAMINATION

5    By Ms. Hollander:

6    Q.   Good afternoon, Agent Burns.  I just have a few

7    questions.

8         You mentioned in your redirect that you weren't sure

9    whether Shukri's phone had FISA wiretapped.

10   A.   Yes.  I can't recall.  I think I knew at one point, but

11   it has left me.

12   Q.   Okay.

13        MS. HOLLANDER:  Your Honor, may I approach and see

14   if I can refresh her recollection?

15        THE COURT:  Yes.

16   Q.   (BY MS. HOLLANDER)  Has your recollection been refreshed

17   that you did have a FISA wiretap on his home phone?

18   A.   Yes.  Thank you.

19   Q.   Okay.  Thanks.  A lot of numbers to remember.

20   A.   Too many.

21   Q.   Now, you also talked about the trip that Shukri took to

22   Palestine in 1991.

23   A.   That is correct.

24   Q.   And you had two documents, the InfoCom No. 51, which is

25   Shukri's report, and the document that was photographed at Mr.

1    Ashqar's house, Ashqar Wiretap No. 2.  Correct?

2    A.    Correct.

3    Q.    Okay.  Both those documents were originally in Arabic.

4    Correct?

5    A.    They were.

6    Q.    Okay.  And you mentioned that -- You also mentioned in

7    your redirect and I think you mentioned this on direct also,

8    that Holy Land and the Defendants toned down their language

9    after 1995?  Do you recall mentioning that?

10   A.    I think it was after 1993, after Oslo.

11   Q.    1993 after Oslo.  But in Shukri's report, that is InfoCom

12   No. 51, he doesn't mention Hamas anywhere, does he, in that

13   report?

14   A.    He doesn't.

15   Q.    Right.  And yet that report was written in 1991.

16   Correct?

17   A.    Correct.

18   Q.    Okay.  And Shukri's report says that he met with a Mr.

19   Abu Khalid.  Correct?

20   A.    Correct.

21   Q.    And Ashqar's -- The report from Ashqar says that they met

22   with Al-Zahar.  Correct?

23   A.    Correct.

24   Q.    Now, I have just a couple of questions from the

25   Philadelphia meeting, in talking about the work that Holy Land

1    did in Oklahoma City and various other places, and you

2    mentioned what they had said at the Philadelphia meeting.

3    A.    Yes.

4    Q.    Okay.  On page 7 of Philadelphia Meeting No. 14, what

5    they said was, "In the past we gave the Islamists $100,000 and

6    we gave the others $5,000."  Correct?

7    A.    Correct.

8    Q.    I just wasn't sure whether I heard you correctly when you

9    said it.

10        Now, you also talked from Philly Meeting -- this is

11   Government's Philly Meeting No. 5 at 14.  Let me just put this

12   on the elmo.  You mentioned this part, "We will form an

13   organization."  Do you see that?

14   A.    I do.

15   Q.    But now, he is quoting someone else there, isn't he?  He

16   says, "So, our brother is telling you, 'Instead of being taken

17   by surprise,'" and then he said -- so this is in quotes,

18   because it is not actually what Shukri said.  It is what

19   Shukri is quoting someone else saying.  Correct?

20   A.    He is referring to what someone else at the meeting was

21   discussing.

22   Q.    Right.  He was quoting someone else.

23   A.    Correct.

24   Q.    And also on Government's Philly Meeting No. 9 at page 4,

25   you quoted -- You read this part where he said, "There are

1    three options that are presented."

2    A.   Correct.

3    Q.   Now, in fact, if you go back to the beginning of Philly

4    Meeting No. 9, Shukri says the purpose of this session.

5    Right?

6    A.   He does.

7    Q.   Right.  And then on the next page.  "Okay.  The points

8    which were mentioned, our brothers, are as follows."  And then

9    he starts to list them.  Correct?

10   A.   He does.

11   Q.   So he is summarizing what points were made at the

12   previous session.  Correct?

13   A.   Correct.

14   Q.   So you have to know -- If you wanted to follow this, it

15   would be important to know what was said at the previous

16   session.  Correct?

17   A.   It would be important to know what was in the session,

18   but I think he itemizes it or sums it up pretty well.

19   Q.   He does sum it up.  And so the next page he continues to

20   sum it up.  Correct?

21   A.   Correct.

22   Q.   And the page you read, he was still summing up what other

23   people had said.  Correct?

24   A.   Correct.

25   Q.   Now, you were also asked by Mr. Jonas, and then Ms.

1    Moreno mentioned the -- Before I get to that, let me ask you

2    this.  You talked earlier about how much Holy Land gave to

3    others Islamists and to others.  Right?

4    A.    I was asked about that.

5    Q.    You were asked about that.  And, in fact, we talked a

6    little bit the other day about Turkey, and Holy Land actually

7    received appreciation from the Ministry from Foreign Affairs

8    in the Republic of Turkey, and you found those in the

9    documents.  Isn't that correct?

10   A.    I believe I recall seeing that.

11   Q.    Let me just --

12           MS. HOLLANDER:  May I approach, Your Honor?

13           THE COURT:  Yes.

14           MS. HOLLANDER:  Your Honor, at this time I would

15   like to move Defendants' Exhibit No. D-174, the document from

16   the Ministry of Foreign Affairs in Turkey that she just

17   identified.

18           THE COURT:  Mr. Jonas?

19           MR. JONAS:  Your Honor, no objection.

20           THE COURT:  All right.  That is admitted.

21   Q.    (BY MS. HOLLANDER)  And this is that document.  Correct?

22   A.    It is.

23   Q.    Would you just read the body of the document please?

24   A.    It says, "In profound appreciation of and with deep

25   gratitude for their contributions to the relief efforts in the

1    aftermath of the earthquake disaster in northwestern Turkey on

2    August 17th, 1999."

3    Q.   And who is it signed by?

4    A.   Minister Ismail Cem.

5    Q.   Now, the Government just mentioned on redirect this

6    project of Holy Land involving wheelchairs.  Correct?

7    A.   Yes.

8    Q.   I believe that we saw -- Let me ask you this.  Holy Land

9    also had wheelchair projects in Bosnia, did it not?

10   A.   It may have.  I would need to see, if you have some

11   information there to refresh my memory.  It has been a long

12   time --

13            MS. HOLLANDER:  May I approach, Your Honor?

14            THE COURT:  Yes.

15   Q.   (BY MS. HOLLANDER)  Now that your memory has been

16   refreshed, you do recall that you see seized some documents

17   regarding a relationship between the Holy Land Foundation and

18   the Wheelchair Foundation?

19   A.   Yes.

20   Q.   And it involves wheelchairs, two documents that I showed

21   you, and both of those came from Holy Land.  Correct?

22   A.   They did.

23   Q.   Okay.

24            MS. HOLLANDER:  Your Honor, I would like to move

25   Defendants' Exhibit No. 1336 and 1337 at this time.

1    MR. JONAS:  Your Honor, I am going to object.  This

2  goes beyond the scope of redirect.  The letter I showed Agent

3  Burns that we moved into evidence went directly to the

4  pictures of the wheelchairs that Ms. Hollander questioned

5  Agent Burns on on cross.  Ms. Hollander is now going into

6  other projects of the Holy Land Foundation that she could have

7  gone into on cross and she decided not to.

8    THE COURT:  I think they did.  I hadn't ruled on

9  those objections, frankly, and I think it is related to that

10  entire issue.  I will overrule that objection, and Defense

11  Exhibits No. 1336 and 1337 are admitted.

12  Q.  (BY MS. HOLLANDER)  Let me ask you a question, Agent

13  Burns, about these -- This document -- You said there are

14  about 500 boxes of documents?

15  A.  That is correct.

16  Q.  All right.  And this document that the Government

17  introduced during your redirect?

18  A.  Yes.

19  Q.  Can you read the number there, HLDL?  What does that say?

20  A.  HLDL130, and then it is No. 846.

21  Q.  Now, that means it is in box 130, doesn't it?

22  A.  That is correct.

23  Q.  And let me show you Defendants' Exhibit No. 1336.  That

24  was also in box 130, wasn't it?

25  A.  It was.

1    Q.    So that is in the same box with the document that the

2    Government introduced.

3    A.    Correct.

4    Q.    And this document involves a donation agreement between

5    the Holy Land Foundation and the Wheelchair Foundation.

6    Correct?

7    A.    Correct.

8    Q.    And it involves a donation of I think it says $450 each

9    totaling $112,000.

10   A.    Correct.

11   Q.    $112,500.  Correct?

12   A.    Yes.

13   Q.    And it says it is for Sarajevo, Bosnia?

14   A.    It does.

15   Q.    24 April, 2001.

16   A.    I am looking for the date.

17   Q.    You may not be able to read it.  It is right here.

18   A.    Oh, okay.  Yes.

19   Q.    Okay?  You haven't seen this document in quite a while,

20   have you?

21   A.    It has been a while.

22   Q.    And the second page simply says 250 wheelchairs,

23   essentially.  Correct?

24   A.    It does.

25   Q.    Now, document D-1337 was also in HLDL130.  Correct?

1   A.   Correct.

2   Q.   So this was in the same box with the document the

3   Government found.  Correct?

4   A.   That is correct.

5   Q.   And this one says that it is thanking -- the Wheelchair

6   Foundation is thanking Holy Land for basically providing it

7   with $36,000 so that it can buy more wheelchairs.  Correct?

8   A.   Correct.

9   Q.   And this photograph is a photograph showing Holy Land and

10  the Wheelchair Foundation working together to provide

11  wheelchairs in Palestine.  Correct?

12  A.   I can't see -- Hold on one second.  I can tell it is in

13  the Middle East, but I can't see where it references that it

14  is actually in Palestine.  I can't --

15  Q.   It is in Arabic, so I am assuming it is not in Bosnia, I

16  guess.

17  A.   That is correct.

18  Q.   It could be somewhere else in the Middle East, but it is

19  the Holy Land Foundation and the wheelchair --

20  A.   That is correct.

21  Q.   The World Wheelchair Foundation.  Correct?

22  A.   Correct.

23  Q.   Thank you.

24          MS. HOLLANDER:  I have no further questions.

25          THE COURT:  Okay.  Thank you.

1        Mr. Dratel?

2             MR. DRATEL:  I do, Your Honor.  Thank you.

3                    <u>RECROSS EXAMINATION</u>

4   <u>By Mr. Dratel</u>:

5   Q.   Good afternoon.

6   A.   Good afternoon.

7   Q.   You testified on redirect about the phone conversations,

8   about the phone records showing calls between Mr. El-Mezain's

9   number and Mr. Marzook's number.  Right?

10  A.   Right.

11  Q.   Do you remember that?  You talked about Mr. El-Mezain's

12  deposition.  Right?

13  A.   Correct.

14  Q.   And that deposition was September 10th, 2003.  Right?

15  A.   Correct.

16  Q.   So that is about ten and a half years after the last of

17  the phone contacts on your chart.  Right?  Which is April of

18  '93, those records?  April of '93.  Do you want to see it?

19  A.   No, I think it was January of '93.

20  Q.   So even more.  Right?

21  A.   Right.

22  Q.   More than ten years.  You talked about InfoCom Search

23  No. 3 and 4, project 236.  Do you remember that, on redirect?

24  A.   Yes.

25  Q.   With Mr. Jonas?  And you talked about the amount of money

1   and the number of families?

2   A.   Yes.

3   Q.   Right?  And that that is what confused you?

4   A.   That is correct.

5   Q.   Okay.  I show you part of InfoCom Search No. 3.  And you

6   see that number that says 135?

7   A.   I do.

8   Q.   Okay.  I show you another one, it says 148?

9   A.   Correct.

10  Q.   Right?  And just one more I will show you.  Do you see

11  this one, the number is 222?

12  A.   I do.

13  Q.   Okay.  And for InfoCom Search No. 4, which is a similar

14  project at a similar time.  Right?

15  A.   Correct.

16  Q.   Let me show you this one where it says number 532.  Do

17  you see that?

18  A.   That is what it says.

19  Q.   Is that what it says.  Right?

20  A.   That is what it says.

21  Q.   Yeah.  And that one is 583?

22  A.   That is what it says.

23  Q.   Correct?  Okay.

24       By the way, the final report on InfoCom No. 3 and 4 are

25  in Arabic originally?

1    A.    Yes.

2    Q.    Now, on redirect you read passages from the Philadelphia

3    meeting.  Correct?

4    A.    That is correct.

5    Q.    And one you read was from was Philadelphia Meeting No. 5,

6    transcript 5, the Government's Exhibit No. 5, and from page

7    14.  And I am just going to put it on the elmo again and I

8    will read it.  It says "So, our brother had a suggestion to

9    form an organization--the format he suggested was somewhat

10   controversial, I didn't discuss it with him, but I believe its

11   concept is sound--that we should start right now, my brothers,

12   begin thinking about establishing alternative organizations

13   which can benefit from a new atmosphere, ones whose Islamic

14   hue is not very conspicuous."  Do you remember that?

15   A.    I do.

16   Q.    And your answer was that the organization that was

17   started as a result of that was CAIR, C-A-I-R?

18   A.    That was an organization that was created after the

19   Philadelphia meeting as a result of this.

20   Q.    That was what the answer was by your question by Mr.

21   Jonas.  Right?  You said CAIR.  And you distinguish it from

22   Care, C-A-R-E.

23   A.    That is correct.

24   Q.    And that stands for the Council on American-Islamic

25   Relations.  Right?

1    A.    That is correct.

2    Q.    Just so we are clear, this is the one with the

3    inconspicuous Islamic hue?

4    A.    Correct.

5              MR. DRATEL:  Your Honor, may I approach a second?

6              THE COURT:  Yes.

7              (The following was had outside the hearing of the

8              jury.)

9              MR. DRATEL:  Your Honor, I know you kept these out

10   initially, but considering there are three reasons why I think

11   now they should come into evidence, actually four.

12        They put CAIR in on the cross as an organization that is

13   a part of the Palestine Committee and the Muslim Brotherhood.

14   Mr. El-Mezain receives these faxes from that organization.

15        Second, they said it is a less conspicuous Islamic hue.

16   These faxes impeach that 100 percent.

17        Three, on redirect she was asked why they didn't put in

18   any other faxes.  She said they used only the ones that are

19   relevant to the issues in this case.  They put CAIR in this

20   case and made it relevant to this case.  I did not mention

21   CAIR in my cross at all.  It impeaches her impeaches, their

22   theory, and it also goes to this whole withheld issue, because

23   really we are in a bind here, I mean, in the sense that "we

24   only put in the faxes that are relevant."  We have all the

25   faxes, and we would put in ones that are relevant.  These are

1   relevant --

2          THE COURT:  I don't think these are relevant.  I

3   have never understood why they are relevant.

4          MR. DRATEL:  Because they are saying CAIR is some

5   sort of a secret organization.  This is an organization that

6   is out there in Washington, D.C. lobbying out there talking

7   about Islamic issues.  It is not part of this secret Palestine

8   Committee thing.  This impeaches that 100 percent.

9       Also she said that they only put in the faxes that were

10  relevant.  They say CAIR is part of this conspiracy.  It is a

11  co-conspirator.  They are alleging CAIR is on the list.  So

12  now for them to say it is not relevant, "we put in all the

13  relevant faxes to the issue of this case," CAIR is an issue in

14  this case, according to their testimony, but now I can't put

15  those faxes in.  That makes the whole --

16         THE COURT:  CAIR is still not in this case.  It

17  doesn't have anything to do with the charges in this case.

18         MR. DRATEL:  It does have --

19         THE COURT:  You have now talked now for two or three

20  minutes.  It is my turn.

21      It doesn't have anything to do with the issues in the

22  case that the jury is going to decide and what the jury is

23  going to be asked to do.  This is a collateral issue.  I don't

24  know why it came in, but it is not in the case.  This case is

25  not about CAIR, and I don't think this is relevant.

1      Did you have any objections?

2           MR. JONAS:  Yes.

3           THE COURT:  I don't think it is relevant.  I think

4    it is a collateral issue.

5           MR. DRATEL:  I think it is all part of the

6    conspiracy that they are alleging of the Palestine Committee,

7    but I made my point.  Thank you.

8           (The following was had in the presence and hearing

9           of the jury.)

10   Q.   (BY MR. DRATEL)  And CAIR has an office in Washington,

11   D.C.  Right?

12   A.   It does.

13   Q.   And it lobbies governments and other organizations on

14   behalf of Islamic issues.  Correct?

15   A.   It does.

16   Q.   Now, also during your testimony on redirect, Mr.

17   El-Mezain was a fundraiser throughout the whole period we are

18   talking about, the whole relevant period for Holy Land

19   Foundation.

20   A.   Correct.

21   Q.   And traveling across the country doing that?

22   A.   Yes, he did.

23   Q.   And in 1999, you testified on redirect that his position

24   changed from chairman of the board to director of endowment.

25   Correct?

1  A.   I believe I said director of endowment, but he moved to

2  San Diego and that is what he became.

3  Q.   Right.  And he also received a $90,000 a year salary with

4  that director of endowment position.  Correct?

5  A.   Correct.

6          MR. DRATEL:  I pass the witness.

7          THE COURT:  Mr. Jonas, anything else?

8          MR. JONAS:  No, sir.

9          THE COURT:  Agent Burns, you may step down.  Thank

10 you.

11     Call your next witness.

12          MR. JACKS:  Your Honor, we call Special Agent Rob

13 Miranda.

14          (Whereupon, the oath was administered by the Court.)

15                    ROBERT MIRANDA,

16 Testified on direct examination by Mr. Jacks as follows:

17 Q.   Sir, would you tell us your name, please?

18 A.   It is Robert Miranda.

19 Q.   And how are you employed?

20 A.   I am a special agent with the FBI in the Dallas Division.

21 Q.   How long have you been employed by the FBI?

22 A.   A little over 11 years.

23 Q.   And during your career with the FBI, have you always been

24 assigned to the Dallas Division office?

25 A.   That is right.

1    Q.    Let me ask you a little bit about your background.   What

2    is your educational background?   Where did you go to college?

3    A.    I went to undergraduate school at the United States Air

4    Force Academy.   I have a Bachelor of Science in history,

5    European area studies.

6    Q.    And do you have any postgraduate degrees?

7    A.    Yes, I do.

8    Q.    What type of postgraduate degree do you have?

9    A.    I have a Master of Arts in national security affairs,

10   emphasis in Middle East studies.

11   Q.    Where did you obtain that Master's degree?

12   A.    From the Naval Postgraduate School in Monterey,

13   California.

14   Q.    Are you presently pursuing any other type of postgraduate

15   degree?

16   A.    Yes.   I have completed a year towards a second Master's

17   degree.

18   Q.    In what field?

19   A.    Homeland security.

20   Q.    And where are you attending or pursuing that degree?

21   A.    At the Center for Homeland Defense and Security, which is

22   also at the Naval Postgraduate School.

23   Q.    Where is that located?

24   A.    In Monterey, California.

25   Q.    When do you expect or when are you scheduled to receive

1    that degree?

2    A.    I graduate in March, sir.

3    Q.    Let me ask you a little bit about your employment

4    background.  As a graduate at the Air Force Academy, I am

5    assuming then you became an active duty officer in the Air

6    Force?

7    A.    Yes, sir.  I was commissioned in 1986.

8    Q.    And what was your assignment or job in the Air Force?

9    Where did you work?

10   A.    For approximately 10 of my 11 active duty years, I was a

11   special agent with the Air Force Office of Special

12   Investigations.

13   Q.    And is that a branch or an office within the Air Force?

14   A.    Yes, it is.

15   Q.    Within that branch of -- Is it called OSI?  Is that the

16   acronym for it?

17   A.    Yes, it is the common acronym.

18   Q.    Within OSI what was your area of responsibility or where

19   did you work?

20   A.    I primarily worked counterterrorism and

21   counterintelligence.

22   Q.    Were you ever deployed overseas?

23   A.    Yes; numerous times.

24   Q.    And where were you deployed overseas primarily for when

25   you were stationed overseas?

1   A.   I did two tours in Turkey.  So roughly 1990 through '92 I

2   was stationed in Turkey, and then again 1993, roughly, through

3   '95, plus numerous temporary assignments overseas.

4   Q.   In Turkey, where were you assigned or where did you work?

5   What part of the country?

6   A.   I was assigned on both occasions to the capital of

7   Ankara, and which is --

8   Q.   Did you work strictly with the United States military

9   personnel, or did you work with military personnel from other

10  countries?

11  A.   No.  Based on my job, sir, I interacted quite a bit with

12  Turkish security and intelligence services.

13  Q.   Did you work with other NATO countries?

14  A.   Yes, I did.

15  Q.   What rank did you achieve in the Air Force?

16  A.   I was promoted to a major, but I declined in order to

17  join the FBI.

18  Q.   You said -- I am sorry?

19  A.   I was going to say, although I still retain the reserve

20  commission of major.

21  Q.   You were in the Air Force for how long?

22  A.   Counting school, 15 years.

23  Q.   And when did you leave the Air Force and join the FBI?

24  A.   I left in August of '97 and I started Quantico, the FBI's

25  training academy, in September of '97.

1    Q.   And upon completion of your training at the FBI academy,

2    is that when you were assigned to Dallas?

3    A.   That is correct, sir.

4    Q.   In Dallas, what squad or what type of work were you

5    assigned to do?

6    A.   I have been on the North Texas Joint Terrorism Task Force

7    since I arrived in Dallas, and I have been on primarily the --

8    It has always been CD-1 or IT-1, which is the terrorism squad,

9    international terrorism.

10   Q.   Okay.  In your tenure within the FBI here in Dallas, have

11   you worked on -- And while being assigned to either the

12   counterterrorism squad or international terrorism squad, is

13   that just the different names that it has been referred or

14   gone by?

15   A.   That is right.  It has changed a little bit, but it is

16   the same thing.

17   Q.   In that time period did you work on criminal cases that

18   were related to either counterterrorism or international

19   terrorism?

20   A.   Yes, I did.

21   Q.   And did you also work on intelligence cases that we have

22   heard about during this trial?

23   A.   Yes, I have.

24   Q.   And I believe -- Are you also a member of the FBI SWAT

25   team?

1    A.    For about the last ten years, yes.

2    Q.    Okay.  With regard to this case which we are here about

3    today, did you work on this case, the investigation involving

4    the Holy Land Foundation?

5    A.    Yes, on the criminal side, basically from its inception.

6    Q.    And that would have been beginning in approximately

7    December of 2001?

8    A.    Right.

9    Q.    We have heard testimony from Agent Burns regarding the

10   types of materials that were collected or looked at in this

11   case, and were you also one of the agents that examined these

12   different sources of materials and evidence in this case?

13   A.    Yes.  It wasn't always the same materials.  We focused on

14   different areas, but yes.

15   Q.    Let me ask you specifically, in your examination of the

16   evidence in this case, did you examine the information

17   pertaining to overseas speakers or persons that the Holy Land

18   Foundation would bring to events that it sponsored or

19   participated in?  Did you look at that area of this

20   investigation?

21   A.    Yes, I did, sir.

22   Q.    Could you tell us what types of materials you looked at

23   to educate you about these speakers?

24   A.    I looked at various phonebooks, various Elbarasse

25   documents, Ashqar documents, Holy Land Foundation documents,

1     audiotapes, videotapes, open source material as well.

2     Q.    From your examination of the evidence in this case, the

3     speakers, can you describe for the jury where these speakers

4     came from?

5     A.    The speakers came from a variety of countries--Palestine

6     obviously, West Bank, Gaza, Israel proper, they came from

7     Turkey, Pakistan, Jordan, I believe there are some Egyptians

8     in there; all over the place really, but primarily the Middle

9     East.

10    Q.    What types of gatherings or meetings did these speakers

11    appear at?

12    A.    MAYA conferences.  We have talked about MAYA extensively.

13    MAYA conferences, functions relating to the Muslim holiday of

14    Ramadan, Palestine conferences of one sort or another, events

15    held by the Islamic Association for Palestine, the IAP; a

16    variety.

17    Q.    We have seen reference in several videos to what has been

18    described as Intifada festivals.  Did you see evidence that

19    speakers appeared at those festivals?

20    A.    Yes.

21    Q.    Were there any means or mechanism that the Holy Land

22    Foundation used to utilize speakers, other than actually

23    having them come into the United States and appear?

24    A.    Yes.  In addition to actually physically bringing in

25    speakers from overseas, they also had conference calls where

1    the overseas speakers would simply call in and if you wanted

2    to hear what they had to say, you could go ahead and dial in

3    to a particular number, sometimes that was arranged through an

4    organization like a mosque or an Islamic center, so you

5    might -- It is hard to say how many people on the other end

6    were actually listening to these.

7    Q.    Let me just ask you to perhaps clarify what you are

8    talking about.  What term did you use to describe speaking

9    engagements?

10   A.    Conference calls.

11   Q.    All right.  And as a general rule from what your

12   examination showed, would the speakers be inside the United

13   States or outside the United States?

14   A.    No, no.  They would be outside the United States.

15   Q.    And would there be -- How many speakers might be

16   participating in a conference call?

17   A.    I have seen a couple of instances where it would be two

18   or three.

19   Q.    Was it just the speakers that appeared on the conference

20   call, or was there a moderator or an interviewer?

21   A.    It was generally a moderator.

22   Q.    And how would a person, such as someone in the United

23   States, be able to listen or participate with that conference

24   call?

25   A.    Well, there would be an advertisement telling you what

1    number to call and what time and day to call, and you would

2    simply call the number and listen to the speaker talk.

3    Q.   And these conference calls, were they sponsored by any

4    group?

5    A.   The ones I am familiar with are from the Islamic

6    Association for Palestine, the IAP, but generally in,

7    association with the Holy Land Foundation.

8    Q.   And how would the Holy Land Foundation be mentioned in

9    the call?

10   A.   Well, at the end of the speaker's presentations, then

11   there would be the pitch for the money to the Holy Land

12   Foundation.

13   Q.   And you said something about the places where people

14   could go to listen to these calls, and what was that?  Did you

15   indicate?

16   A.   The Islamic centers, mosques, you could dial in

17   individually as well.

18   Q.   Would they be broadcast then over a speaker or something

19   like that into the place wherever they were listening?

20   A.   That is my understanding.

21   Q.   Okay.  The speeches, the comments by these speakers, and

22   the comments that occurred during these conference calls, can

23   you just kind of generally describe the nature of those?

24   A.   Well, generally they were against the peace process or

25   the Oslo Accords, however you want to characterize it.  They

1    often dehumanized the Jews as enemies and worse.  They pretty

2    much toed a certain line that I think has been mentioned

3    several times in reference to evidence we have seen here

4    already.

5    Q.    Were they political in tone?

6    A.    Yeah, they were.

7    Q.    Did they talk about jihad?

8    A.    Jihad was a common theme.  And in addition to that,

9    sometimes the symbolism of the conference calls was pretty

10   obviously supportive of Hamas; for example, using Hamas

11   figures, making reference to Hamas figures in heroic sort of

12   ways.

13   Q.    Did they talk about martyrdom?

14   A.    Martyrdom would be consistent.

15   Q.    In your investigation did you come across any evidence

16   that listed the speakers the Holy Land Foundation used?

17   A.    Yes, I came across a document on a computer from the Holy

18   Land Foundation.

19   Q.    And have you seen a document --

20         MR. JACKS:  I believe it has already been admitted,

21   so could you please bring up HLF Search No. 87?

22   Q.    (BY MR. JACKS)  Agent Miranda, can you see on the screen

23   what has been admitted as HLF Search Warrant No. 87?

24   A.    Yes, sir.

25   Q.    Now, this document, I believe you testified just a second

1    ago that it was located on a computer within the Holy Land

2    Foundation?

3    A.    Right.

4    Q.    And is that in the Dallas office?

5    A.    That is correct.

6    Q.    And whose computer was this document located on?

7    A.    The HLF officer Akram Mishal's computer.

8    Q.    Do you remember what his position was at the Holy Land

9    Foundation?

10   A.    He had various positions depending on the time.  I don't

11   really recall the title.

12   Q.    The document that we are looking at, did it have a

13   notation as to when it was last modified or worked on?

14   A.    The computer told us that it was last modified on

15   7/14/1999.

16          MR. JACKS:  May I approach the witness, Your Honor?

17          THE COURT:  Yes.

18   Q.    (BY MR. JACKS)  Agent Miranda, let me show you what has

19   been marked as demonstrative -- It is HLF Search No. 87, the

20   same as the exhibit shown on the screen.  Is this an

21   enlargement of that particular exhibit?

22   A.    It is an enlargement, and the original was actually two

23   pages, and I see here that we have put both pages on one

24   chart.  Additionally, the numbering to the far left was not

25   originally there.  I believe we added that for convenience.

1   Q.   All right.

2   A.   To make it easier on the jury.

3           MR. JACKS:  Judge, the Government has labeled this

4   Demonstrative No. 1, and we would offer it at this time.

5           THE COURT:  I believe you have no objections, what

6   you stated in writing?

7           MR. CLINE:  No objections.

8           THE COURT:  That is admitted.

9   Q.   (BY MR. JACKS)  Agent Miranda, you said that the only

10  difference between the demonstrative here and the actual

11  exhibit was that the exhibit as it was retained on the

12  computer was two pages in length?

13  A.   Yes, sir.

14  Q.   And it has been combined onto this single posterboard?

15  A.   Right.

16  Q.   And the numbers here on the left next to each person's

17  name, those have been added?

18  A.   Right.  So we can identify an individual by a number as

19  opposed to you trying to find a foreign name there.

20  Q.   All right.  Have you had the occasion during your

21  investigation to look at copies of the Hamas charter?

22  A.   I have, sir.

23  Q.   And is there any part of the Hamas charter that talks

24  about either the use of speakers or lecturers?

25  A.   Yes.  I think Articles 15 and 19 do address that issue.

1     MR. JACKS:  Could you please -- I believe it would

2   be Hamas Charter No. 1.  And I believe page 46 of that

3   exhibit.  Can you please go back to the first page?

4   Q.   (BY MR. JACKS)  Agent Miranda, do you recognize this

5   version of the Hamas charter?

6   A.   I do, sir.

7   Q.   Did Doctor Levitt testify regarding this particular

8   version?

9   A.   Yes.  This is the one he used.

10  Q.   And how is it identified?

11  A.   Hamas Charter No. 1 as the Avalon Project at Yale Law

12  School.

13  Q.   And you made reference or you testified regarding Article

14  15?

15  A.   Fifteen and nineteen, sir.

16       MR. JACKS:  Could you go to page 10 of this

17  document?

18  Q.   (BY MR. JACKS)  Do you see Article 15 displayed there on

19  the screen?

20  A.   Yes, sir.

21  Q.   Would you just read the caption and then read the first

22  paragraph and just a sentence or two of the second paragraph,

23  please?

24  A.   Yes, sir.  It says "The jihad for the liberation of

25  Palestine is an individual duty.

1    "Article 15.  The day that enemies usurp part of Muslim

2    land, jihad becomes the individual duty of every Muslim.  In

3    face of the Jews' usurpation of Palestine, it is compulsory

4    that the banner of jihad be raised.  To do this requires the

5    diffusion of Islamic consciousness among the masses, both on

6    the regional, Arab, and Islamic levels.  It is necessary to

7    instill the spirit of jihad in the heart of the nation so that

8    they would confront the enemies and join the ranks of the

9    fighters.

10    "It is necessary that scientists, educators and teachers,

11    information and media people, as well as the educated masses,

12    especially the youth and Sheikhs of the Islamic Movements,

13    should take part in the operation of awakening the masses."

14    Q.   Thank you.

15    A.   Yes, sir.

16    Q.   Now, now, directing your attention, then, to the

17    speakers, can you tell us whether or not some of these

18    speakers that the Holy Land Foundation used and that show up

19    on this list have been identified or referred to as Sheikhs?

20    A.   Yes, some have been.

21    Q.   And were some of them also identified or hold positions

22    as teachers or scholars?

23    A.   That term has been used as well, yes.

24    Q.   Any other sections of the Hamas charter that are

25    pertinent to these speakers or these festivals or conferences

1   that we have seen depicted?

2   A.   Yes, sir; Article 19.

3        MR. JACKS:  Would you please go to page 13 of that

4   document?

5   Q.   (BY MR. JACKS)  Do you see Article 19 depicted on the

6   screen there, Agent Miranda?

7   A.   I do, sir.

8   Q.   Would you please read the caption, the third paragraph as

9   it is depicted on the screen there?

10  A.   Yes, sir.  "The role of Islamic art in the battle of

11  liberation.

12       "Article 19.  The book, the article, the bulletin, the

13  sermon, the thesis, the popular poem, the poetic ode, the

14  song, the play, and others contain the characteristics of

15  Islamic art.  Then these are among the requirements of

16  ideological mobilization, renewed food for the journey, and

17  recreation for the soul."

18  Q.   Thank you.

19  A.   Yes, sir.

20  Q.   The term ideological mobilization, what does that refer

21  to?

22  A.   Getting the word out, getting Hamas' ideology across to

23  the masses.

24  Q.   In your examination of the evidence, did you come across

25  any evidence wherein any of the Defendants commented about

1    their use of speakers or the message that was being put forth

2    by the Holy Land Foundation?

3    A.    Yes, I did, sir.

4    Q.    Let me ask you about -- Were any of those comments, were

5    they made during the Philadelphia meeting that we have heard

6    about?

7    A.    That is correct.

8            MR. JACKS:  Could you please display Philadelphia

9    Meeting No. 6?

10   Q.    (BY MR. JACKS)  Agent Miranda, do you recognize this as a

11   transcript of that session of the Philadelphia meeting, which

12   has been referred to as Philadelphia Meeting No. 6?

13   A.    Yes, sir.

14   Q.    Let me direct your attention there -- Can you see on the

15   first page, who is the speaker shown there in the first

16   paragraph on the first page?

17   A.    That is the Defendant Shukri Abu Baker.

18   Q.    Do you see where the sentence begins, "So if you have

19   noticed"?

20   A.    I do, sir.

21   Q.    Would you begin reading there and read all of that page?

22   A.    Yes, sir.  "So, if you have noticed, in the past time we

23   used to focus on -- or the address was directed to the

24   Palestinian and Islamic public, truly in particular.  We used

25   to have an approach which probably had a glaring color, I mean

1    the jihadist, and this and that, focus on activism even

2    through our lectures conferences and seminars.  And maybe this

3    address was in harmony with the current -- the general current

4    was marching in that direction.  Therefore we were marching in

5    that direction.  We used to tell the Islamic and the

6    Palestinian communities about the heroism of the youths on the

7    inside.  They used to be happy and we encouraged them."

8        Omar Ahmad, that is the OM there says, "military

9    upbringing."

10       Shukri responds, "What?"

11       Omar says, "Military breeding."

12   Q.   Go to the next page.  And then just the first sentence?

13   A.   And then the Defendant Shukri Abu Baker says, "Military

14   breeding.  It was going in that direction."

15   Q.   Thank you.

16   A.   Yes, sir.

17   Q.   The two men that are speaking, Shukri Baker and Omar

18   Ahmad, would you refresh our memory regarding Omar Ahmad.  Who

19   was he?

20   A.   Omar Ahmad was a member of the Palestine Committee.  We

21   have seen that several times on several documents listing the

22   Palestine Committee members.

23   Q.   Do you know where he lived during this time period?

24   A.   I am familiar with him living in California in the Bay

25   area.

1    Q.   Okay.  And what circumstances or in what other evidence

2    has he appeared in this case?

3    A.   Right.  Agent Burns talked about a conference call that

4    was exhibited --

5              MS. HOLLANDER:  Your Honor, can we approach?

6              (The following was had outside the hearing of the

7              jury.)

8              MS. HOLLANDER:  Your Honor, the Government invoked

9    the Rule in this case, and the reason this witness is still in

10   here is because he is assisting in that case, but it is

11   improper for him to use the fact that he is here and to talk

12   about what another witness said.  And it is improper in any

13   event for this witness to say the other witness talked about

14   it.  He can just ask him questions.

15             MR. JACKS:  That is fine, Judge.  I will try to --

16             THE COURT:  Direct him away from that.

17             MR. JACKS:  Yes.

18             THE COURT:  Okay.

19             MS. HOLLANDER:  Thank you.

20             (The following was had in the presence and hearing

21             of the jury.)

22   Q.   (BY MR. JACKS)  Agent Miranda, let me ask you to direct

23   your attention to the evidence and the exhibits.  Specifically

24   with regard to Omar Ahmad, what other evidence has he appeared

25   in in this case?

1    A.    In addition to being on the Palestine Committee with

2    several of the Defendants here, he was also in an exhibit in

3    which he was directing the HLF officer Haitham Maghawri to

4    send $50,000 overseas to Lebanon.  And then there was

5    additionally another exhibit that Agent Burns talked about in

6    which he had a conversation that was played for you in which

7    he was directing the Defendant Shukri Abu Baker in how much he

8    should compensate the Defendant Mohammad El-Mezain for his

9    fundraising activities.

10              MS. HOLLANDER:  Your Honor, I object.  He is

11   characterizing another witness' testimony.

12              THE COURT:  He is talking about now what the tape

13   said, so overrule that objection.  Go ahead.

14   Q.   (BY MR. JACKS)  About was Mr. Omar Ahmad, did he have

15   anything with Abdel Haleem Ashqar with regard to his al-Aqsa

16   Fund and its continued operation?

17   A.    Yes.  He was part of those conversations in the dispute

18   between the Holy Land Foundation and Abdel Haleem Ashqar's

19   organization, the al-Aqsa Fund, to decide who was basically

20   going to get to stay open, and Omar Ahmad was on at least one

21   call in which that news was broken to him.

22   Q.   Do you recall any evidence in which any of the Defendants

23   discussed whether or not they used individuals from Hamas or

24   who supported Hamas to persons in the public eye or not within

25   their association?

1    A.    Yes.   There have been public statements regarding the

2    non-existence, if you will, of a relationship between the HLF

3    and Hamas.

4    Q.    And specifically, do you recall an item of evidence

5    involving a recorded conversation between the Defendant Shukri

6    Abu Baker and a reporter identified as Gayle?

7    A.    Yes, I am familiar with that.

8    Q.    And did Mr. Abu Baker -- I am not going to play the call

9    again, but did Mr. Abu Baker make any statement in that

10   conversation about whether or not the Holy Land Foundation

11   used Hamas members or Hamas supporters as speakers at its

12   events?

13   A.    Yes, he told the reporter something about that.

14   Q.    What did he tell them?

15   A.    He said they never did.

16   Q.    Did you examine this speakers list and examine other

17   evidence to try to identify or determine the background of

18   people that are shown on this speakers list?

19   A.    I did, sir.

20   Q.    Let me ask you specifically, I believe it is Government's

21   Demonstrative No. 17, and I am holding it here.  Do you

22   recognize this demonstrative exhibit?

23   A.    Yes, sir, I do.

24   Q.    And just for the record, what is the title?

25   A.    Hamas leaders in the 1990s.

1   Q.   And did you ever take this exhibit and compare it against

2   the individuals that are shown on this speakers list that is

3   on the easel here?

4   A.   Yes, I have, sir.

5   Q.   Are any individuals that are depicted on this

6   demonstrative chart, do they also appear on the speakers list?

7   A.   Two of them do.

8   Q.   Who would that be?

9   A.   There is Mahmoud Zahar, the Hamas leader out of Gaza.  He

10  is No. 41 on the big chart here.

11  Q.   Number what?

12  A.   No. 41, Mahmoud Zahar.

13  Q.   For the record, Mr. Miranda, I am going to use this

14  highlighter to highlight those that you make reference to.

15  A.   Yes, sir.

16  Q.   You said there was a second one?

17  A.   Yes.  The individual on the bottom right of the Hamas

18  leaders in the 1990s chart is Hamed Bitawi.

19  Q.   And you are talking about Demonstrative No. 17?

20  A.   Yes, sir.  That is Hamed Bitawi, and he is listed on the

21  HLF overseas speakers chart as No. 27.

22  Q.   And this speakers chart, what other information does it

23  have besides the individual's name?

24  A.   It has a column for the home phone numbers, a column for

25  the work phone numbers, and a column for faxes or the fax

1   number.

2   Q.   And so these two individuals are two individuals that are

3   also on the speakers list.  Correct?

4   A.   That is correct, sir.

5   Q.   Are there other individuals that have been identified

6   through exhibits or evidence as Hamas individuals that appear

7   on this chart?

8   A.   We do have some evidence related to that, yes, sir.

9   Q.   Which individuals have been referred to in this trial as

10  Hamas members or individuals?

11  A.   I am not certain if we have exhibited the evidence yet to

12  support it.

13  Q.   All right.  How about have you heard reference to

14  Mohammed Siam?

15  A.   Yes.  We have talked about him numerous times.

16  Q.   Does he appear on this speakers list?

17  A.   Yes.  In fact, he is also on the Hamas leaders chart.  I

18  missed him.  He is in the orange area there, the individual

19  all the way to the left on the demonstrative chart.

20  Q.   Okay.  And you are pointing or indicating the far left

21  photograph in the middle row?

22  A.   Yes, sir.

23  Q.   On Government's Demonstrative No. 17?

24  A.   Yes, sir.

25  Q.   Mohammed Siam, is he on the speaker's list?

1   A.   He is No. 47.

2   Q.   And where is he from?

3   A.   Originally he is from Gaza.  He has moved around some.

4   Q.   Let me ask you about specifically Bassam Jarrar.

5   A.   Yes, I am familiar with the name.

6   Q.   And has he been identified as a Hamas member?

7   A.   Yes, he has.

8   Q.   And let me ask you about Khalil Al-Kuka.

9   A.   Right.  He has as well.

10  Q.   All right.

11       MR. JACKS:  Can you please pull up the transcript

12  from Philly Meeting No. 13.  And if you would, please, show

13  page 5 of that transcript.  And if you would, please, enlarge

14  the top half.  If you would, scroll down, please, to the

15  bottom half.

16       May I have a moment, Your Honor?

17       THE COURT:  Yes.

18       MR. JACKS:  Let me ask that Philly Meeting 13-E be

19  posted.  And could you enlarge about the bottom half of the

20  page, please?

21  Q.   (BY MR. JACKS)  Let me ask you, Agent Miranda, if you

22  would, do you see where the word "unfortunately" appears there

23  about four lines down from the top?

24  A.   I do, sir.

25  Q.   Okay.  And would you begin reading there and read, I

1    believe it is going to go on to the next page?

2    A.    Right.  And can you just scroll up for a second?  I want

3    to confirm that is Muin Shabib continuing the conversation

4    there.  You may have to go to the previous page.  Yes.

5    Q.    MU represents Muin Shabib?

6    A.    Yes, it does, sir.

7    Q.    Okay.  And again, if you would, if you would start

8    reading there.

9    A.    Yes, sir.  It reads, "Unfortunately the board of trustees

10   for al-Alhi Hospital has three affiliated with us and three of

11   them.  But the chairman is one of us and we are supposed to

12   have a wait.  But because the chairman, my brothers, the

13   chairman's brother is a member of the negotiation delegation

14   and he must consult with his brother.  He must consult with

15   his brother.  At the end he must -- At the end, all the

16   efforts which collaborated for the sake of building this

17   hospital is our efforts and our hard work as Islamists abroad.

18   God's willing, this organization will be ours at the end,

19   particularly the hospital.  Al-Alhi Hospital in Hebron is

20   considered one of the largest hospitals in the West Bank among

21   governmental and non-governmental hospitals alike.  God's

22   willing, we will have a presence.  The Young Men Muslim

23   Association, its chairman is deported, the Beni-Naeem Society,

24   its chairman is deported."

25         Shukri Baker the Defendant says, "He returned."

1     Muin Shabib says, "He now returned?  He returned with,

2  with, with the last group of people who returned?  The

3  negative aspects of the past phase, our brothers, are, number

4  one, being run by exposed persons.  The Complex, Yasin; the

5  Islamic Society, al Koka."

6  Q.   All right.  And in that phrase is that the Khalil Al-Kuka

7  that is shown?

8  A.   Yes, it is.

9  Q.   And was he one of the deportee during 1992?

10  A.   Actually 1990, I believe, sir.

11  Q.   Okay.  And you said he is on this speakers list?

12  A.   Yes, sir.  He is No. 38.

13  Q.   Did you ever have the occasion to take this speakers list

14  and other -- look at other evidence to see if there was any

15  other people that appeared not only on this speakers list but

16  also on other items of evidence which we have seen in this

17  case?

18  A.   Yes, I have, sir.

19  Q.   Let me ask you, are you familiar with a document which

20  is -- has been admitted in this case as Ashqar Search No. 1?

21  A.   Yes, sir, I am familiar with that document.

22      MR. JACKS:  Could you display, please, Ashqar Search

23  No. 1?

24  Q.   (BY MR. JACKS)  Now, these items that came from the

25  search of Abdel Haleem Ashqar's house, those items were

1  actually photographed.  Is that correct?  As opposed to being

2  seized?

3  A.    That is correct, sir.

4  Q.    And is that because that was a foreign --

5          MS. CADEDDU:  Object to leading.

6          THE COURT:  Do you want to rephrase?

7  Q.    (BY MR. JACKS)  And why were they photographed as opposed

8  to taking the documents during this search?

9  A.    First off, it was an intelligence investigation.  I have

10  conducted one of these myself.  And the purpose is to gather

11  the intelligence without letting the subject know that he is

12  under investigation.  So you go in, you take the pictures, you

13  try not to disturb anything, and you get out.

14          MR. JACKS:  So the document Ashqar Search No. 1, can

15  you go please to the second page of that exhibit?

16  Q.    (BY MR. JACKS)  And is this how the exhibit appeared with

17  typewritten numbers and then Arabic writing on it?

18  A.    That is correct, sir.

19          MR. DRATEL:  Can we date this, Your Honor?

20          THE COURT:  Can you establish a date?

21          THE WITNESS:  The photograph was taken December

22  26th, 1993, sir.

23  Q.    (BY MR. JACKS)  And it was a two-page document

24  originally?

25  A.    Yes, sir.

1    Q.    Okay.

2              MR. JACKS:  Would you go to the next page, please?

3    Q.    (BY MR. JACKS)  And this is the English translation of

4    that document.  Is that correct?

5    A.    Yes, sir.

6    Q.    The heading on this page, what is the heading on this

7    page?

8    A.    "Important phone and fax numbers (Palestine

9    section/America)."

10             MR. JACKS:  And would you go to the next page,

11   please?

12   Q.    (BY MR. JACKS)  And what is the heading for this page of

13   the document?

14   A.    "Important phone and fax numbers (Palestine

15   section/outside America)."

16   Q.    Now, did you take this page of this Ashqar exhibit and

17   compare it to the names that are shown on the speakers list

18   from the Holy Land Foundation?

19   A.    Yes, sir, I did that.

20   Q.    And did you find persons whose name appeared on both

21   lists?

22   A.    Yes, sir, I have.

23   Q.    Let me ask you about an individual Dr. Hamam Saeed.

24   A.    Yes, sir.

25   Q.    And where does he appear -- Let me ask you first, where

1    does he appear in the Ashqar document?

2    A.    On the Ashqar document on the screen he is No. 13.

3    Q.    Where does it show that he is from?

4    A.    At that time Hamam Saeed was in Jordan.

5    Q.    And where, if he does, does he appear on the speakers

6    list?

7    A.    Yes, sir.  On the speakers list, the chart there, he is

8    speaker No. 28.

9    Q.    Any others that appear on the Ashqar Palestine section

10   list?

11   A.    Yes, sir.  If you go to speaker No. 14 on the screen from

12   the Ashqar list, that is Dr. Mohamed Eweida.  That is Amman,

13   which would be Jordan.  And Mohamed Oweedeh on the chart there

14   of the HLF overseas speaker list is No. 46.

15   Q.    Any others?

16   A.    Yes, sir.  On the screen speaker No. 15 from the Ashqar

17   list from the Palestine section outside America is

18   Dr. Mohammed Abou Fares.

19   Q.    And where does he appear, if so, on the speakers list?

20   A.    HLF overseas speaker No. 44.

21   Q.    Any others?

22   A.    Back to your screen the Ashqar list, the speaker No. 16

23   Ziyad Abou Ghanimah from the Palestine section is HLF overseas

24   speaker 66, the very last one.

25   Q.    Any others?

1    A.   Yes, sir, there are.

2              THE COURT:  Let's go ahead and take the afternoon

3    break.  Let's take a 20-minute break.  Be back at 20 till.

4              (Whereupon, the jury left the courtroom.)

5              THE COURT:  All right.  We will be in recess until

6    20 till.

7                        (Brief Recess.)

8              THE COURT:  Mr. Jacks?

9              MR. JACKS:  Thank you, Your Honor.

10   Q.   (BY MR. JACKS)  Agent Miranda, I believe when

11   we -- Before the break we were -- You were comparing the names

12   on the speakers list to see if any of those names also

13   appeared on Mr. Ashqar's Palestine section list outside of

14   America, and let me just ask you something.  The speakers

15   list, how does it appear to be organized or arranged?

16   A.   It is alphabetical, but not in the sense that we normally

17   do it in.  It is not alphabetical by last name.  It is

18   alphabetical by first name.

19   Q.   All right.  And I think before the break you were making

20   reference to Dr. Rageh Al Kurdi, and if -- Where does he

21   appear -- Does he appear in the Ashqar Palestine section list,

22   and where is he on the speakers list?

23   A.   Yes, sir.  On the screen on the Ashqar speakers list for

24   the Palestine Committee he is No. 29, Rageh Al Kurdi from

25   Amman, Jordan, and he is -- Give me just a second, please.  He

1  is going to be No. 55 on the HLF overseas speakers list.

2  Q.   The next one?

3  A.   Again turning to the screen, Dr. Omar Al Ashqar, No. 30

4  on the Palestine section outside America list there on your

5  screen, and I think you probably already got to him.  He is

6  No. 51 on the HLF overseas speakers list.

7  Q.   Are there others?

8  A.   One last one.  Back to your screen the speaker, or I

9  should say the individual that is on the Palestine section

10  list No. 32, Dr. Ahmad Nofel.  And if you go to your HLF

11  overseas speaker list, that is No. 13.

12  Q.   Did you also have occasion to examine the phone or

13  address book of Mousa Abu Marzook?

14  A.   Yes, I have.

15       MR. JACKS:  Would you please pull up the Marzook

16  Phonebook that has been admitted?

17  Q.   (BY MR. JACKS)  And let me just ask you, Agent Miranda,

18  do you know when this phonebook came into the possession of

19  the government?

20  A.   When the specially designated terrorist Mousa Abu Marzook

21  was on the chart there at the bottom entered the United States

22  at JFK Airport in New York in July 1995.  The phonebook was

23  seized at that time.

24  Q.   And that phonebook, is that depicted on the screen, the

25  outside cover of it?

1    A.    That is correct, sir.

2            MR. JACKS:  And could you just kind of flip through

3    the first two or three pages?

4    Q.    (BY MR. JACKS)  So the entries in there are in Arabic.

5    Is that correct?

6    A.    Yes, but there are occasionally some numbers that we

7    would recognize.  For example, if you want to stop on any page

8    you will see numbers that we can recognize.

9    Q.    All right.  And let me just -- Agent Miranda, in terms of

10   -- I am going to let you just talk about where you found

11   similar names.  In other words, if a name was in Marzook's

12   phonebook or address book, and if it appears on the speaker

13   list.  When you identify where it was in the phonebook, is

14   that by -- within the English translation?

15   A.    Yes.

16   Q.    Okay.  And is it by the page number of the exhibit?

17   A.    Yeah.  I will refer to the page number of the exhibit,

18   which is generally in the bottom right hand corner.

19   Q.    Okay.  Go ahead and just tell us the first ones.  Are

20   these going to be somewhat in alphabetical order?

21   A.    Maybe a little.  I will probably have to jump around a

22   little bit.

23   Q.    All right.  And if you would, give time -- Just tell us

24   what page of the address book you looked at and give them time

25   to display it, and then tell us if they appeared on the

1    speakers list.

2    A.    Sure.  If you can please go to page 34 of the exhibit,

3    please.  Okay.  And if you want to enlarge the middle section.

4    Q.    What name are you focusing on?

5    A.    It is the sixth name down Abdel Rahman Baroud.

6    Q.    All right.  The sixth printed line down?

7    A.    That is correct.

8    Q.    Does that person appear on the speakers list?

9    A.    Yes.  The home telephone number matches the HLF overseas

10   speakers list for No. 8 Abdulrahman Baroud.

11   Q.    All right.

12   A.    The next one, if you will go to page 36 of the exhibit,

13   please.  Look at the bottom half.  There is actually a couple

14   of numbers here.  There is a reference to Abou Mahmoud, which

15   is seventh entry under left column.

16   Q.    All right.

17   A.    That is actually Mohammed Siam's number a Yemeni number,

18   but we have already made reference to him.

19   Q.    And that entry, though, is that for Mohammed Siam?

20   A.    Yeah.

21   Q.    And is that an abu name or a/k/a name?

22   A.    It is an abu name.

23   Q.    And he is No. 47 on the list.  Correct?

24   A.    Yes.

25   Q.    The next one?

1    A.    If you go to the third from the bottom, Abu Majda.

2    Q.    All right.

3    A.    Now take a look on the HLF speakers chart there.  It is

4    speaker No. 44, Mohamad Abu Fares, you will notice that Abu

5    Majda and Mohamad Abu Fares share the same home telephone

6    number 841-286.

7    Q.    Does that lead you to believe that is his abu name?

8    A.    Yes.

9    Q.    And he has already been highlighted on the list, you said

10   No. 44?

11   A.    Yes, sir.

12   Q.    And the phone numbers match?

13   A.    Yes, at least the home phone numbers.

14   Q.    All right.  Is there another one; the next one that you

15   found in the Marzook phonebook?

16   A.    Page 40, please, of the exhibit.

17   Q.    Which entry?  Or if there is more than one entry on that

18   page, go ahead and tell us.

19   A.    It is going to be the second name from the top Abdel

20   Moneim Abou Zant.  That matches HLF speaker No. 7.  And that

21   is a match both by the name and you will see that they also

22   share the same home telephone number 793-993.

23   Q.    All right.  Any others on that page or the next one that

24   you located?

25   A.    Yes.  You have to go all the way to the very bottom of

1    this page, please.

2    Q.    And which one?

3    A.    You will see the entry for Dr. Ishak, the very last name,

4    with a telephone number of 665-711.  And you will see that

5    that matches your HLF overseas speaker list speaker No. 33,

6    who is Ishaq Alfarhan who shares the same home telephone

7    number.

8    Q.    Okay.  Other matches?

9    A.    Yes, sir, there is more.  Please go to page 42 of the

10   exhibit, please.  If you will go down to the bottom half,

11   please.

12   Q.    What name there?

13   A.    It is -- Actually it says the Middle East.  It is the

14   third entry down.  You will notice that there is a telephone

15   number there 613-451.

16   Q.    Yes.

17   A.    And there is also a fax 613-452.  And those match the

18   work and fax number for HLF speaker No. 35, Jawad Alhamad.

19   Q.    Alhamad is how it is spelled?

20   A.    Yes, sir.  That is HLF speaker No. 35.

21   Q.    Okay.  The next one you found a match?

22   A.    Just a second.  Let me see.  Page 44 of the Marzook

23   phonebook, please.  The first upper half, please.  Now here is

24   another reference to Ishak al-Farhan.  He is the second

25   speaker.  We have already mentioned him.  Go two down from

1    that under work that is Dr. Abdullah al-Akailah.

2    Q.    All right.  And is he No. 3?

3    A.    He is No. 3 on the HLF overseas speakers list.  And

4    Marzook, the terrorist Marzook has him in his phonebook by the

5    phone number 837-960.

6    Q.    The next match you found?

7    A.    Again if you go down where it says work underneath

8    al-Akailah, the name we just discussed, that is the sixth

9    entry down from the top there is a telephone number 68-0127.

10   Q.    Yes.

11   A.    That is the same work telephone number as the HLF speaker

12   No. 52.  You will see that 68-0127 number.

13   Q.    Omar Assiblehi?

14   A.    Yes.  And also the same work telephone number as the very

15   last entry that you have already highlighted Ziad Abu

16   Ghanimeh.

17   Q.    Other matches?

18   A.    Yes.  If we work our way further down to the bottom of

19   the page, third from the bottom Ahmad al-Kafawein, telephone

20   number 3352550.

21   Q.    And where on the speakers list does he appear?

22   A.    He is going to be No. 12 on the HLF overseas speakers

23   list.

24   Q.    And is it a match for the phone number?

25   A.    Yes, it is for the home phone number.

     1     Q.   Next?

     2     A.   Right under Kafawein is Dr. Ahmad al-Kofahi, the second

     3     from the bottom there.  He is the HLF speaker No. 11.  And the

     4     terrorist Marzook had his home telephone number as well.

     5     Q.   Okay.  Next?

     6     A.   Exhibit page 45, please.  Right under the entry that says

     7     left column, it says Zeeb Anis.  Zeeb Anees is the same as HLF

     8     speaker Deeb Anees who is No. 18, and the terrorist Marzook

     9     had the home telephone number for Deeb Anees or Zeeb Anis

    10     9993022.

    11     Q.   All right.  The next one?

    12     A.   He also had -- Let me point out, sir, he also had his

    13     work phone number, which is right under there, right where it

    14     says office right under Zeeb Anis, that is the work telephone

    15     number.

    16     Q.   Same on the speakers list?

    17     A.   Yes, sir.

    18     Q.   8555?

    19     A.   That is correct, sir.

    20     Q.   Next?

    21     A.   I think we have already covered Abdel Momeim Abu Zant,

    22     have we not, sir, No. 7?

    23     Q.   Is he highlighted?

    24     A.   Yes.  There is another entry for him there.  Page 47 of

    25     the exhibit, please.

```
1    Q.   And that exhibit is the phonebook?

2    A.   Yes, sir, the terrorist Marzook's phonebook.

3    Q.   Okay.  What entry did you find there that shows up on the

4    speakers list?

5    A.   The name for that would be the fifth name down under

6    right column Faisal Mawlawi.

7    Q.   All right.  And on the speakers list is that No. 22?

8    A.   No. 22, that is correct, sir.

9    Q.   Next?

10   A.   Page 49 of the phonebook, please.

11   Q.   Go ahead.

12   A.   Have you already highlighted No. 28, sir?

13   Q.   Yes, Hammam Said.

14   A.   That is an entry for his home telephone number.  If you

15   go on the very bottom, I am sorry.  Not the very bottom.  The

16   second to the last, Dr. Hammam, 844233, that is the home

17   telephone number for that speaker Hamam Saeed.

18   Q.   So on the Palestine section list in Ashqar's records, and

19   also in Marzook's phonebook?

20   A.   Yes.  And I should point out that there are going to be

21   multiple individuals on this chart who are going to appear in

22   various areas of my investigation or related to this chart, so

23   we may mention a name three or four times.

24   Q.   Okay.  Who is next?

25        MS. HOLLANDER:  What number is that on your chart?
```

1    MR. JACKS:  No. 28.

2    MS. HOLLANDER:  Thank you.

3    THE WITNESS:  The last name on the terrorist

4    Marzook's phonebook here on this page on the screen is Hamza

5    Mansour, 721419, and that is the same as the HLF overseas

6    speaker No. 29 Hamzeh Mansour.

7    Q.   Okay.  The next one?

8    A.   Page 50 of the phonebook, please.  The very last entry

9    there Hussein Abou Kweik, 951588.

10   Q.   And the speaker list number?

11   A.   That would be speaker No. 31.

12   Q.   Okay.

13   A.   It is not a match on the home telephone number, but I

14   will point it out.  The terrorist Marzook has it 951588.  The

15   HLF speaker has the 951582, so it is off by --

16   Q.   Sometimes the numbers are transposed?

17   A.   It is possible, sir.

18   Q.   Okay.  Next?

19   A.   Page 55 of the phonebook, please.  Fourth from the

20   bottom, Khorshed Ahmad.  That is equivalent to HLF overseas

21   speaker No. 39.

22   Q.   Okay.  Next one?

23   A.   Page 57 of the phonebook.

24   Q.   Okay.  What matches there?

25   A.   A couple of matches, sir.  First, to the top under -- the

1  second entry from the right column is the Middle East Center.

2  I believe we may have highlighted this number already.

3  Q.   All right.  And where is the match for that number on the

4  speakers list?

5  A.   That is going to be No. 35, Jawad Alhamad.  We have

6  already done that.  If you look at that line that says P.O.

7  Box 20543.

8  Q.   Okay.

9  A.   That is the same telephone number as the work number for

10  Jawad Alhamad.

11  Q.   All right.

12  A.   Further down we have already mentioned the Hamas

13  terrorist Mahmoud al-Zahhar Abou Khaled.  If you look right

14  before the break, it is the longest name on the page.

15  Q.   All right.  Okay.  And he already is obviously

16  highlighted on this list?

17  A.   He is.  And the terrorist Marzook had this terrorist's

18  home phone number 865288.

19  Q.   Next?

20  A.   Page 60 of the phonebook, please.

21  Q.   What matches are shown there?

22  A.   The second name from the top is Mohamed Fouad al-Wazir,

23  and that matches the HLF overseas speaker No. 24 who is Fouad

24  Abu Zeid.

25  Q.   Do the phone numbers match?

1   A.   Yes, sir.  They have the same home telephone number

2   501-649.

3   Q.   Okay.

4   A.   Further down where it says left column, the very first

5   name under left column is Mohamed Eweida.  I think we may have

6   already matched him under the Palestine Committee.

7   Q.   No. 46?

8   A.   That is correct, sir.

9   Q.   All right.  The next one?

10  A.   And let me just point out that Mohamed Eweida, the

11  terrorist Marzook had his home phone number.

12       Then there is Mohammed al-Hajj, the very next name.

13  Q.   All right.

14  A.   Mohamed Alhaj is No. 45, sir.  Once again Marzook had his

15  home telephone number 9-950-261.

16  Q.   Okay.  Next match?

17  A.   Further down, the fourth from the break there, Mahfouz

18  al-Nahnah, 203341388.  Do you see that?  It has the IL behind

19  it, Mahfouz al-Nahnah.  That is HLF speaker 40.

20  Q.   Okay.  Others?

21  A.   Yes, sir.  Fourth from the bottom on the screen there is

22  Majdi Akeel, 822462.

23  Q.   All right.  And No. 42 on the speakers list?

24  A.   He is No. 42 on the speakers list.  That is correct, sir.

25  And once again, the terrorist Marzook had his home telephone

1    number.

2    Q.    All right.  Others on that page 60?

3    A.    No, sir.  We will move now to page 62 of the phonebook.

4    Q.    Okay.  What matches did you find on there?

5    A.    The very first name Rami al-Bishtawi, which office

6    834555.  That is the same work telephone number as HLF speaker

7    No. 13.

8    Q.    All right.  Ahmad Noufel?

9    A.    Yes, sir.

10   Q.    All right.

11   A.    It is also the same work telephone number as No. 46,

12   Mohamed Eweida, whom I know we have highlighted several times,

13   and the same as No. 57, Salah Alkhaledi.  They all shared that

14   same work telephone number.

15   Q.    All right.  Other matches you?

16   A.    Page 67 of the phonebook, please.  Okay.  If you go five

17   down under right column it says Yousef al-Qaradawi for Qatar,

18   836090.

19   Q.    All right.

20   A.    So terrorist Marzook had the home telephone number for

21   Qaradawi, and that individual matches the HLF overseas speaker

22   No. 65 and they have the same home telephone number.

23        And then right under Qaradawi is Yasin Abdel Aziz,

24   201802.  If you look at HLF overseas speaker No. 62, same

25   name, same telephone number.

1    Q.   Okay.

2    A.   And then the second to the last name Yasser al-Za'atra,

3    692613.

4    Q.   This is still page 67 of the phonebook?

5    A.   That is correct, sir.

6    Q.   All right.  And where does that person appear on the

7    speakers list?

8    A.   Yes, sir.  Yaser Zatra is HLF overseas speaker No. 61.  I

9    will just point out that the 692613 in Marzook's book, or that

10   is the number in Marzook's book, and on the work telephone

11   number for Yaser Zatra it is 692612.  So it is off by a digit.

12   Q.   One number?

13   A.   Yes, sir.

14   Q.   Did you find other persons in the Marzook phonebook who

15   also appear on the speakers list?

16   A.   Yes, I did, sir.  If you go to page 68 of the phonebook,

17   again there is another entry for Ziyad Abou Ghanimah.  I think

18   we have already mentioned him a couple of times.

19   Q.   Does the home number match, 354, the last three digits.

20   A.   No, it does not, sir; not on this particular number.

21   Q.   All right.

22   A.   I will point out that in Marzook's phonebook the fax

23   number or the telephone number that Marzook has in his

24   phonebook is 661783, and if you will look at the fax number

25   for Ziyad Abou Ghanimah, that is the one all the way to the

1   right of the chart, that is 661773 as opposed to 783.

2   Q.   That is one number off?

3   A.   That is one number off.  I believe that completes the

4   Marzook phonebook, sir.

5   Q.   Okay.  Let me ask you, Agent Miranda, did compare the

6   speakers list to other items of evidence as well to see if

7   there were matches or similarities?

8   A.   Yes, I did, sir.

9   Q.   Let me ask you --

10          MR. JACKS:  Could you please display Hamas Letter

11   No. 1?

12   Q.   (BY MR. JACKS)  On the screen, Agent Miranda, you see

13   what has been admitted as Hamas Letter No. 1.  I believe that

14   has been identified as a letter sent to Senator Orrin Hatch in

15   1995.  And is there a phone number that appears, a phone and

16   fax number that appears at the bottom of that letter?

17   A.   Yes, sir, there are.

18   Q.   Who does that letter purport to be from?

19   A.   That is from the Hamas spokesman Ibrahim Ghousheh.

20          MR. JACKS:  And if you could zoom out, please, to

21   show the letterhead?

22   Q.   (BY MR. JACKS)  And does it in fact carry the Hamas logo

23   and the Islamic Resistance Movement name?

24   A.   It carries both, yes, sir.

25   Q.   Did you compare the speakers list and the phone numbers

1  on the speakers list with the phone number shown on the Hamas

2  letter sent to Senator Hatch?

3  A.   Yes, I did, sir.

4  Q.   Did you find any persons on the speakers list who shared

5  the same phone number as shown on this Hamas letterhead?

6  A.   Yes, I did, sir.

7  Q.   Okay.  Which ones?

8  A.   Can you enlarge the numbers on the bottom, please, on the

9  exhibit?  Thank you.  If you look at HLF speaker No. 7 Abu

10  Zunt, there is a work number there, 698997.  That is the same

11  as the fax number for Abu Zunt.

12  Q.   It is called the fax number on the letter?

13  A.   Fax number on Ibrahim Ghousheh's letter, and it is the

14  work number.

15  Q.   All right.

16  A.   Right.  Now if you go to HLF speaker No. 11.

17  Q.   All right.  Alkoufahi?

18  A.   Right.

19  Q.   All right.

20  A.   That is the same telephone number, same fax number as

21  Ibrahim Ghousheh the Hamas spokesman.

22  Q.   Any others that show to have the same number as the Hamas

23  letter?

24  A.   No. 12, Ahmad Kafaween, same telephone number, sir.

25  Q.   All right.  Any others?

1  A.   Yes, sir.  No. 28.

2  Q.   Said?

3  A.   Hammam Said, yes, sir.  That is the same telephone

4  number.

5  Q.   And fax number?

6  A.   No, actually it is off.

7  Q.   All right.

8  A.   No. 29, sir, on your speakers list.

9  Q.   Just for a second going back to Said, is it a different

10  fax number or is there just a small difference?

11  A.   It is large enough that I wouldn't be comfortable saying

12  it is similar.

13  Q.   What is the fax number for the Hamas letterhead?

14  A.   698997 are the last six digits.

15  Q.   Okay.  All right.  Go to the next one, then, that you

16  found who had the same phone number as the Hamas letter.

17  A.   Yes, sir.  Hamzeh Mansour, HLF speaker No. 29, had the

18  same work telephone that Hamas spokesman Ibrahim Ghousheh has.

19  Q.   All right.

20  A.   HLF speaker No. 33, Ishaq Alfarhan.

21  Q.   Work and fax number, as far as you can tell?

22  A.   That is correct, both, sir.

23  Q.   All right.  Any others?

24  A.   Yes, sir.  No. 44.

25  Q.   Mohamed Abu Fares?

1    A.    Mohamed Abu Fares had the same telephone and fax as the

2    Hamas spokesman.

3    Q.    Any others?

4    A.    Yes, sir, No. 63.  This may be a new name.

5    Q.    Yusuf El Athem?

6    A.    Telephone and fax number, sir.

7    Q.    Did you find others?

8    A.    I think that is it, sir.

9    Q.    Okay.  You -- Excuse me just one second.

10            MR. JACKS:  Just one moment, Your Honor.

11   Q.    (BY MR. JACKS)  Let me move to just a slightly different

12   area.  In the course of examining the evidence in this case,

13   Mr. Miranda, did you have an occasion to look at photographs

14   that were seized in this case?

15   A.    Yes, sir.

16            MR. JACKS:  Would you please display HLF search 30?

17   Q.    (BY MR. JACKS)  Do you recall where this -- Do you know

18   where this particular exhibit was seized?

19   A.    Yes, sir.  That came out of the HLF office in New Jersey

20   which is associated with the Defendant Abdulrahman Odeh.

21   Q.    And would you just refresh our memory as to who is

22   depicted in this photograph?

23   A.    Sure.  Looking at the screen, the individual all the way

24   to the right is Yousef al-Qaradawi who has been an HLF

25   speaker.

1    Q.    Which number -- Is he No. 65 on the list?

2    A.    Yes, sir.

3    Q.    And was he also in Marzook's phonebook?

4    A.    Yes, sir.

5    Q.    Okay.  The individual in the middle is who?

6    A.    That is Nasrallah.  That is the general secretary for the

7    designated terrorist group Hezbollah.

8    Q.    And general secretary, is that the leader of Hezbollah?

9    A.    Yeah, he is the leader.

10   Q.    And the individual on the left?

11   A.    That is the Hamas Political Bureau leader Khalid Mishal,

12   who is the brother of the Defendant Mufid Abdulqader.

13   Q.    And is he also the current head of Hamas?

14   A.    Current head, designated terrorist.

15   Q.    Have we seen images of Hassan Nasrallah earlier in this

16   trial?

17   A.    Yes, we did.

18   Q.    Did you see the video depicting the young children in the

19   school ceremony?

20   A.    Yeah.  The kindergarten video?

21   Q.    Yes.

22   A.    Yes, I have.

23   Q.    And was one of them dressed and speaking and posing and

24   pretending to be Hassan Nasrallah?

25   A.    That is correct.

1    Q.    Did he look -- Was the child dressed similarly to the way

2    that Nasrallah appears in this picture?

3    A.    It was a pretty good likeness.

4          MR. JACKS:  Will you please display Designation No.

5    5?

6    Q.    (BY MR. JACKS)  Let me show you what has been admitted as

7    Designation No. 5 and ask you -- First of all, do you

8    recognize this exhibit?

9    A.    Yes, sir, I do.

10         MR. JACKS:  Would you go to the second page, please?

11   Q.    (BY MR. JACKS)  And does this second page contain a list

12   of the specially designated organizations and individuals?

13   A.    Just some of them, yes, sir.

14   Q.    All right.  Do you see Hezbollah referenced in there?

15   A.    Yes, sir.  That is the fourth terrorist group down right

16   under Hamas.

17   Q.    Okay.  Hezbollah; a/k/a, Party of God; a/k/a, Islamic

18   Jihad, and so on and so forth?

19   A.    Yes, sir.

20         MR. JACKS:  Would you go to the next page, please?

21   Q.    (BY MR. JACKS)  And you have made reference and

22   identified in that photograph this individual Nasrallah.  Is

23   he shown on that page?

24   A.    Yes, sir.  Hassan Nasrallah is the second individual from

25   the bottom.

1  Q.   Secretary general of Hezbollah.  It shows a date of

2  birth, or several dates apparently, place of birth, and a

3  passport number.  Is that correct?

4  A.   That is correct, sir.

5  Q.   And that is the individual that was shown in the middle

6  of that newspaper photograph taken from the HLF's New Jersey

7  office.  Is that correct?

8  A.   Yes, sir, that is correct.

9  Q.   The person in the far right of that photograph, Yousef

10  Qaradawi, did you uncover any evidence in which he was

11  depicted from the HLF search warrant?

12       MR. CLINE:  Excuse me one second, Your Honor.  I am

13  not sure Designation No. 5 is in evidence.  Maybe it is, but I

14  don't have it in my record.  But we have no objection to it

15  and ask it be put in evidence.

16       MR. JACKS:  I show that it was, Your Honor.  But if

17  it isn't, we move its admission.

18       THE COURT:  That is admitted.  It is Government's

19  Exhibit Designation No. 5?

20       MR. JACKS:  Yes, Your Honor.

21  Q.   (BY MR. JACKS)  Agent Miranda, my question was with

22  regard to this individual No. 65 on the speakers list, Yousef

23  Qaradawi, and the individual on the far right in that

24  newspaper photograph, did you find other evidence at the Holy

25  Land Foundation in which he appeared or his image appeared?

1    A.    Yes, I did.

2    Q.    Are you familiar with HLF Search Warrant No. 126, a

3    videotape seized from the Holy Land Foundation?

4    A.    Yes, sir.

5    Q.    And is that videotape one of the items that was taken

6    from the Holy Land Foundation in Dallas?

7    A.    Yes, sir.

8          MR. JACKS:  Your Honor, I am not sure if it has been

9    admitted, but we move the admission of Holy Land Foundation

10   Exhibit No. 126, search exhibit.

11         MR. CLINE:  Your Honor, we object on the basis of

12   our written objections.

13         THE COURT:  That is overruled, and HLF Search No.

14   126 is admitted.

15         MR. JACKS:  Could you please bring up No. 126?  And

16   just pause it just for a second, Mr. Lewis.

17   Q.    (BY MR. JACKS)  Agent Miranda, the individual shown on

18   the screen, is that Yousef Qaradawi?

19   A.    Yes, it is.

20   Q.    And the individual on the speakers list and the

21   individual in that newspaper photograph?

22   A.    All the same.

23   Q.    Go ahead, please.

24         (Whereupon, HLF Search No. 126 was played, while

25         questions were propounded.)

1    Q.   (BY MR. JACKS)  Agent Miranda, the words being expressed

2    there by Qaradawi where the trees or the plants are talking,

3    "there is a Jew behind me, come and kill him," have you seen

4    those words before?

5    A.   Yes.  That closely resembles a section of the Hamas

6    charter Article Five, which is a hadith from the Prophet

7    Muhammad.

8            MR. JACKS:  Can you pull up the Hamas charter?

9    Q.   (BY MR. JACKS)  I am not sure.  Did you say Article Five

10   or Article Seven?

11   A.   It should be Seven.  If I said Five, I misspoke.

12           MR. JACKS:  Could you display Hamas Charter No. 1?

13   Q.   (BY MR. JACKS)  And is that Article Seven shown on the

14   screen there, Agent Miranda?

15   A.   Yes, it is.

16           MR. JACKS:  All right.  If you could go to the next

17   page, please.

18   Q.   (BY MR. JACKS)  And the continuation of Article Seven,

19   where is the reference to what Yousef Qaradawi was quoting or

20   saying there in that video?

21   A.   That is the second paragraph there.

22   Q.   All right.  And just read it, if you would?

23   A.   Sure.  "The day of judgement will not come about until

24   Moslems fight the Jews, killing the Jews, when the Jew will

25   hide behind stones and trees.  The stones and trees will say,

1  'O Moslems, O Abdulla, there is a Jew behind me.  Come and

2  kill him.  Only the Gharkad tree (evidently a certain kind of

3  tree) would not do that because it is one of the trees of the

4  Jews.'  Related by al-Bukhari and Moslem."

5  Q.   Does that appear to be the phrase or the language that

6  Qaradawi was using in that speech?

7  A.   Yes, sir.

8        MR. JACKS:  May I approach the witness, Your Honor.

9        THE COURT:  Yes.

10 Q.   (BY MR. JACKS)  Let me show you what has been marked as

11 Government Exhibit HLF Search No. 88, Agent Miranda.  Are you

12 familiar with that item?

13 A.   Yes, sir, I am.

14 Q.   Is that an item that was seized from the offices of the

15 Holy Land Foundation in Dallas?

16 A.   Yes, sir, it is.

17 Q.   Without reading from it, just describe physically what it

18 is?

19 A.   It is a pamphlet with a slogan on it.

20        MR. JACKS:  Judge, we move the admission of HLF

21 Search No. 88.

22        MR. CLINE:  And we object as stated in our written

23 objections.

24        THE COURT:  That objection is overruled.  HLF Search

25 No. 88 is admitted.

```
 1    Q.   You said it is a pamphlet.  Is it in Arabic?

 2    A.   Yes, sir, it is.

 3    Q.   If you would just hold it up for the jury.  All right.

 4    It is about three by five inches in size?

 5    A.   Yes, sir.

 6    Q.   Okay.  And about how many pages is it?

 7    A.   It says 40 pages.

 8    Q.   Okay.  And has it been --

 9    A.   I am sorry.  It is going to be -- About 40 pages.

10    Q.   Just an approximation.  That is fine.  And do you have a

11    translation there in front of you of what that document is?

12    A.   I think I do, sir.  Just a second.

13    Q.   If not, I can provide you one.

14    A.   No, I think I do, if you can give me just a second.

15    Okay.  I have it, sir.

16    Q.   All right.  This pamphlet, HLF Search No. 88, what is it?

17    A.   This is a pamphlet for the Islamic Action Front in

18    Jordan.

19    Q.   What is the Islamic Action Front?

20    A.   The Islamic Action Front is the Muslim Brotherhood's

21    party in Jordan.

22    Q.   Political party?

23    A.   Political party.

24    Q.   And is it related or connected to Hamas?

25    A.   Well, they are both offsprings of the Muslim Brotherhood,
```

1  and it has been already described in this trial as an ally of

2  Hamas.

3  Q.   The pamphlet, what type of information does it contain?

4  A.   Basically it is a listing for candidates for Islamic

5  Action Front for the years 1993 through 1997.  And Mr. Jacks,

6  I will take you up on your offer for a translation.

7  Q.   All right.  And again you already said, but what time

8  period does it purport to cover?

9  A.   1993 through 1997.

10  Q.   When was it found within the Holy Land offices?

11  A.   It was taken in 2001.

12  Q.   All right.  Now, again to go back to the speakers list

13  that we have been talking about this afternoon, did you look

14  at that pamphlet and determine if there were any individuals

15  who were depicted or described in and did they appear on the

16  HLF speakers list?

17  A.   Yes, I made that comparison, sir.

18  Q.   All right.  Let me ask you, first of all, the pamphlet,

19  does it contain any kind of an introduction or any kind of

20  statement about the party and its position?

21  A.   Yes, it lays out the party's platform.

22  Q.   Would you turn I think it is page 36.

23       MR. JACKS:  And if you could display that, please,

24  the exhibit.

25  Q.   (BY MR. JACKS)  Is the page on the screen the page -- the

1    translation of the page in the pamphlet?

2    A.    Yes, sir.

3    Q.    All right.  And if you would, just kind of read the

4    goals -- First of all, just read the heading and then I will

5    ask you to read a little bit of the narrative there.

6    A.    Sure.  It says, "Introduction.

7         "First:  Goals and principles.

8         "The Islamic Action Front party calls to Islam and works

9    for the resumption of Islamic life and the application of

10   Islamic sharia law, because it is the way to happiness in the

11   two worlds.  The almighty said, 'Whosoever follows my guidance

12   will not lose his way or fall into misery, but whoever so

13   turns away from my message, verily for him is a life narrowed

14   down, and we shall raise him up blind on the day of

15   judgment.'".

16              MR. JACKS:  Would you scroll down, please?

17   Q.    (BY MR. JACKS)  And read the paragraph that begins "The

18   party considers."

19   A.    Yes, sir.  "The party considers Palestine a holy land and

20   a public endowment for Muslims till the hour of resurrection,

21   and that no system or organization have the right to recognize

22   a state for the Jews on one hand-measure of Palestinian land.

23   We condemn all who agree to the self-rule and work on

24   liberating all the Palestinian territory and the annexed Arab

25   land by providing the nation with a comprehensive jihadist

1    education and rearing it to be loyal to God and his messenger

2    and the believers, and to belong to the nation and contribute

3    to its unity and freedom, and to resist the foreign, colonial

4    influence weighing down heavily on her chest and the invader

5    of her thought and culture, and to establish national unity

6    and the Shura system and to defend human dignity, human rights

7    and public rights, and to serve the public and care for

8    people's living affairs and comprehensive development

9    according to our distinguished Islamic system."

10   Q.    Now, this is a party in Jordan.  Correct?

11   A.    Yes, sir.

12   Q.    And it makes a reference there, "We condemn all who agree

13   to the self-rule."  Now, with regard to this document, you

14   said this document or this pamphlet makes reference to what

15   time period?

16   A.    It is '93 through '97, sir.

17   Q.    All right.  And the Oslo agreement was reached in

18   September of '93?

19   A.    Right.

20         MR. JACKS:  Would you go to page 53 of the exhibit,

21   please?

22   Q.    (BY MR. JACKS)  Agent Miranda, is this a part of the

23   narrative in this pamphlet?

24   A.    Yes.  I recognize it as such.

25   Q.    Would you please -- Let me ask you to just read the

1    heading, if you would.

2    A.    Sure.    "One:  Our staples on the Palestinian cause

3    level."

4    Q.    Would you read item No. 1 under that listing?

5    A.    Item No. 1, "Palestine is Arabic-Islamic, and its

6    liberation is a duty for all Arabs and Muslims and in all

7    situations.  Working to liberate Palestine remains a central

8    cause for all Muslims."

9    Q.    Would you read item No. 5?

10   A.    Item No. 5, "Jihad the path to liberate Palestine,

11   something which requires the jihadist mobilization of the

12   nation, the lining up of all resources, and the mobilization

13   of all capabilities to confront the imperial Zionist attack."

14   Q.    Would you read item No. 8, please.

15   A.    Item No. 8, "Supporting the Mujahideen for the sake of

16   God to liberate Palestine and assisting them is a sacred

17   legitimate duty today and tomorrow.  Jihad will continue in

18   Palestine until the land is liberated and the occupation is

19   eliminated."

20   Q.    All right.

21          MR. JACKS:  You can take that down for a moment.

22   Q.    (BY MR. JACKS)  You said, Agent Miranda, that you

23   compared this pamphlet and the speakers list -- Let me just

24   ask you.  Does the pamphlet contain information about

25   individuals, their photograph and other information about

1    them?

2    A.    Yes.

3    Q.    And these are -- Are those people represented to be

4    members of the Islamic Action Front?

5    A.    Yes.

6    Q.    All right.  Did you find any persons in that pamphlet who

7    also appear on the Holy Land Foundation speakers list?

8    A.    Yes, I did, sir.

9    Q.    And if you would, I guess just go through the pamphlet in

10   numerical order perhaps, and tell us what page to go to and

11   then the name of the person that you found and where they are

12   on the speakers list.

13   A.    Yes, sir.  If you can turn to page 49 of the exhibit,

14   please.  It reads, "Islamic Action Front candidates."  If you

15   look in the left hand column, you will see the name Abdel Aziz

16   Jabr Shabanah.  If you take a look at the HLF overseas

17   speakers chart there, No. 1 is Abdulaziz Jabr.

18   Q.    You said the pamphlet has photographs?

19   A.    Yes, sir.

20   Q.    Can you just show it to the jury just so they can see?

21   A.    Sure.

22   Q.    So it has just got like small maybe one-inch sized color

23   photographs of these individuals?

24   A.    Right.

25   Q.    All right.  Okay.  Any other persons in that pamphlet

1    that also appear on the HLF speakers list?

2    A.    Yes.    Just a second, sir.    On the left hand side of the

3    screen Hamman Said.    I think we have mentioned him several

4    times.

5    Q.    All right.    No. 28?

6    A.    Yes, sir, No. 28.

7    Q.    He is highlighted?

8    A.    Next to Hamman Said on the very bottom, Mohammed

9    Abu-Fares.

10   Q.    And I believe he is highlighted.    What number is he?

11   No. 44?

12   A.    No. 44, yes, sir.

13   Q.    All right.    Others?

14   A.    Go to the top right column on your screen here, Hamza

15   Mansour.    We should have mentioned him.    No. 29.

16   Q.    He is already highlighted?

17   A.    Yes, sir.    Sheikh Abdel Moneim Abu-Zant.    He is already

18   highlighted.    He should be No. 7.

19   Q.    Abu Zant?

20   A.    Yes, sir.

21   Q.    All right.

22   A.    Please turn to page 50 of the exhibit.

23   Q.    Was there is an entry there for Sheik Zeib Anis?

24   A.    Right.    The very bottom on the left hand side of the

25   screen, Zeib Anis, that is Deeb Anees.    We already highlighted

1    him, no. 18.

2    Q.   Okay.  Others?

3    A.   To the far right of the screen on the bottom is Mohamed

4    al-Hajj.  We should have highlighted him already, No. 45.

5    Q.   Okay.

6    A.   Kind of in the middle there to the right we have already

7    highlighted the name Mohamed Eweida.

8    Q.   No. 46 on the list?

9    A.   That is correct, sir.

10   Q.   All right.

11   A.   I think that is it on this page.

12        MR. JACKS:  If you can go to the next page, please,

13   No. 51.

14        THE WITNESS:  Okay.  Right on the bottom of the

15   screen there is four names.  Dr. Ahmad al-Kofahi, we should

16   have him, No. 11, already highlighted.

17   Q.   (BY MR. JACKS)  All right.  I believe you are correct.

18   Okay.  And he was also in Marzook's phonebook and also had the

19   phone number, same phone number as Hamas?

20   A.   Yes, the same phone number as the spokesman Ibrahim

21   Ghousheh that sent the letter to the Senate.

22   Q.   All right.  Any others on page 51?

23        MR. JACKS:  Go to page 52, then.

24        THE WITNESS:  All right.  Let's see.  Top right hand

25   corner Abdullah al-Akayla is the same as HLF speaker No. 3.

1    Q.   (BY MR. JACKS)   Okay.   We have already highlighted him,

2    then.   So he appears in the IAF pamphlet?

3    A.   Yes, sir.

4    Q.   All right.

5    A.   And further down, the four names on the bottom of the

6    screen, the second one Adnan al-Majali is HLF speaker No. 9.

7    Q.   Okay.   Any others that you determined also appeared on

8    the speakers list?

9    A.   I may have missed one, but I think that is it, sir.

10   Q.   Okay.   Did you uncover or locate exhibits identified or

11   indicate that these individuals on the speakers list are

12   affiliated with Hamas or associated with Hamas?   Other

13   exhibits that would tell you about these individuals'

14   backgrounds?

15   A.   Yes, sir.

16   Q.   Okay.   Let me direct your attention -- Could you --

17          MR. JACKS:   May I approach the witness, Your Honor?

18          THE COURT:   Yes.

19   Q.   (BY MR. JACKS)   Agent Miranda, let me show -- Just one

20   moment.   Agent Miranda, let me show you what has been marked

21   as Elbarasse Search No. 28, and ask you, do you recognize that

22   exhibit?

23   A.   Yes, sir, I do.

24          MR. JACKS:   Your Honor, I don't show if this has

25   been admitted or not, Elbarasse Search No. 28.

1          THE COURT:  It has not.  And there is an objection

2   to it?

3          MR. CLINE:  We object on the basis of our written

4   objections.

5          MR. JACKS:  We move its admission, Your Honor.

6          THE COURT:  And that is admitted.

7   Q.  (BY MR. JACKS)  Mr. Miranda, Elbarasse Search No. 28,

8   could you just describe what that is, what that exhibit is?

9   A.   Yes, sir.  It is a handwritten piece of note on a piece

10  of like school book paper.

11         MR. JACKS:  Could you please display Elbarasse

12  search 28?

13  Q.  (BY MR. JACKS)  Is this the document you have in front of

14  you, Mr. Miranda?

15  A.   It is, sir.

16  Q.   It is in Arabic?

17  A.   It is, sir.

18  Q.   And you said it is handwritten?

19  A.   Yes, sir.

20  Q.   Do you have a translation that is part of the exhibit?

21  A.   Yes, sir.

22  Q.   Is the original document one page?

23  A.   Yes, sir.

24         MR. JACKS:  And would you please show the second

25  page of the exhibit?

Q.   (BY MR. JACKS)  Is that the translation?

A.   That is correct.

Q.   All right.  If you would, just read that translation, Mr. Miranda.

A.   It reads, "The Islamic Association for Palestine in North America, Washington branch, presents, in Jerusalem, the stone has spoken, a national song, Palestinian Dabakah plays from the Intifada, et cetera.

     "Festival guests:  Khalid Aboul Arabia, the Palestinian poet author of, 'In Jerusalem, the stone has spoken,' poetical work.  One of the most prominent is Intifada poets.

     "Dr. Khalil al-Kouka:  One of the deported leaders of the Islamic Resistance Movement, Hamas.

     "Date:  Location.  For more information contact Dawoud Aboul Naeem Omaira."

Q.   This document, this piece of paper obviously makes reference to the Intifada.  Correct?

A.   Yes, sir.

Q.   So it is post December 1987?

A.   Yes, sir.

Q.   It also makes reference to --

          MS. HOLLANDER:  Your Honor, object to the leading.

          THE COURT:  Sustained, counsel.  Do you want to rephrase?

          MR. JACKS:  Yes.

1   Q.  (BY MR. JACKS)  Is there anybody mentioned in this

2   document that is shown on the Holy Land Foundation speaker

3   list?

4   A.  Sure.  That is Khalil Al-Kuka.

5   Q.  And what does it say about Dr. Khalil Al-Kuka?

6   A.  He is one of the deported leaders of the Islamic

7   Resistance Movement, Hamas.

8   Q.  Now, just to refresh our memory, when was this speakers

9   list last dated?

10   A.  July 14th, 1999.

11        MR. DRATEL:  Objection, Your Honor, in terms of

12   characterization of the prior wasn't dated.  That is when the

13   computer says it was last modified.

14        THE COURT:  Okay.  Overruled.  You may inquire about

15   that on cross.  Overruled.  Go ahead.

16        MR. DRATEL:  Thank you, Your Honor.

17        MR. JACKS:  You can take that down, please.

18   May I approach the witness again, Your Honor?

19        THE COURT:  Yes.

20   Q.  (BY MR. JACKS)  Mr. Miranda, let me show you what has

21   been marked for identification as Elbarasse Search No. 29.

22   A.  Yes, sir.

23   Q.  And can you identify that exhibit as an item that came

24   from the search of Ismail Elbarasse's house in Virginia?

25   A.  Yes, sir.  I am familiar with this item.

1    Q.   Okay.  And is that item one of the documents that was

2    seized during that search?

3    A.   Yes, sir, it was.

4              MR. JACKS:  Judge, we move the admission of

5    Elbarasse Search No. 29.

6              MR. CLINE:  Object on the basis of the written

7    objection.

8              THE COURT:  That is overruled.  Elbarasse Search

9    No. 29 is admitted.

10             MR. JACKS:  Can you display that, please?

11   Q.   (BY MR. JACKS)  Agent Miranda, how many pages is the

12   original exhibit of Elbarasse Search No. 29?

13   A.   Seven pages, sir.

14   Q.   And is it from -- The first page it looks like it has got

15   traditional numbers but also Arabic writing.

16   A.   Yes, sir.

17   Q.   And is that kind of followed throughout the document?

18   A.   Yes, sir.

19   Q.   All right.

20             MR. JACKS:  Could you just kind of scroll through

21   the original version, please?

22   Q.   (BY MR. JACKS)  And those are a couple of invoices that

23   were a part of the document or exhibit?

24   A.   Yes, sir.

25             MR. DRATEL:  Can we get A date for those invoices?

1          THE COURT:  Can you establish that?

2     Q.   (BY MR. JACKS)  Mr. Miranda, is there a date shown in the

3     left hand column for that Audiovisual Center invoice?

4     A.   Yes.  There is a date of 3/31/1990.  There is additional

5     dates on the document as well, sir.

6     Q.   All right.

7          MR. JACKS:  Could you go to the first page of the

8     translation, please?

9     Q.   (BY MR. JACKS)  And is this the first page of the

10    translation, Mr. Miranda?

11    A.   Yes, sir.

12    Q.   All right.  And just describe, if you can, what is shown

13    on this particular page.

14    A.   Yes, sir.  This is a translation obviously of the Arabic.

15    If you look on your screen, moving left to right, you have got

16    the date, a city name, an activity, for example a Friday

17    sermon, who the guest was, for example Jamil Hamami.

18    Donations, you have got a dollar amount listed and then you

19    have got some remarks.

20    Q.   For example, what is the first remarks on the top line?

21    A.   Abou Hamza took it.

22    Q.   And Jamil Hamami is depicted on this exhibit, is he not?

23    A.   Yes, he is.  He is on the bottom row.  He is the third

24    individual to the right in the white shirt.

25    Q.   For the record when I say this exhibit, it is

1    demonstrative -- Government's Demonstrative No. 17.  And he is

2    the individual, as you said, third from the left on the bottom

3    row?

4    A.    That is correct, sir.  That is him you pointed to.

5    Q.    And do you know -- Does he have an alias or an abu name?

6    A.    Abu Hamza.

7    Q.    And so does the name Abu Hamza appear several times on

8    these pages?

9    A.    Yes.

10   Q.    And if you would, just what time frame is covered by

11   these entries on this particular page?

12   A.    On this particular page it is from October 5th.  And I

13   know from other data -- Well, you said just on this particular

14   page.  October 5th through October 17th, sir.

15   Q.    And are there other information in this exhibit that

16   tells you what year?

17   A.    Yes, sir.  The year would be 1990 based on other

18   information in the exhibit.

19   Q.    All right.  And so you said it goes from October 5th to

20   October 17.

21   A.    On that first page, yes, sir.

22   Q.    Yes.  And if you would, the name -- First of all, you

23   said that Jamil Hamami, who is the individual depicted on the

24   poster here, and also goes by Abu Hamza, that those entries

25   are shown under the guest column.  Correct?

1   A.   Yes.

2   Q.   Okay.  There is an entry for an Abou Khaled, K-H-A-L-E-D?

3   A.   Right.  At 12/2 in New Orleans.

4   Q.   Yes.  Who goes by the name Abou Khaled?

5   A.   That would be the terrorist Mahmoud Zahar.

6   Q.   Mahmoud Zahar?

7   A.   He is on your chart there.

8   Q.   The man on the middle row to the far right?

9   A.   That is right.

10  Q.   And there is the name Abou Ibrahim that appears there,

11  and who uses that abu name?

12  A.   That is the Defendant Mohammad El-Mezain.

13  Q.   Could you go -- And I think we said that this covered

14  from October 5th to October 17th, but actually it looks like

15  there is a later entry there for New Orleans.  Correct?

16  A.   You are right, sir.  There is.

17  Q.   And that is what date?

18  A.   December 2nd.

19  Q.   How much money was purportedly donated on that event?

20  A.   $25,000.

21  Q.   And what happened to that money, according to this

22  document?

23  A.   Mahmoud Zahar took it.

24  Q.   And go back up to the entry for October 14th for Tulsa.

25  And what does that show to have occurred in Tulsa?  What was

1   the activity, who was the guest, the donations, and the

2   remarks?

3   A.    Yes, sir.  On October 14th in the city of Tulsa, a

4   lecture was given.  The guest was Abou Hamza, who is Jamil

5   Hamami who at that time was Hamas.  The donations were

6   $14,000.  And in the remarks section it says, "Sent to the

7   Fund."

8   Q.    Would you look at the October 16th event in Houston, and

9   what are the entries showing that activity?

10  A.    October 16th in Houston was a meeting with the community.

11  The guests were Abou Hamza, Abou Ibrahim, which is Jamil

12  Hamami and the Defendant Mohammad El-Mezain, the donations

13  collected was $42,000, and Mohammad El-Mezain it says Abou

14  Ibrahim took it.

15  Q.    Go down to the entries for Philadelphia on October 12th

16  and October 17th.  And what activities are reflected there?

17  A.    October 12th in Philadelphia there was a Friday sermon,

18  $1,000 was donated and Abou Ibrahim took it.  And then on

19  October 17th also in Philadelphia was a lecture by Abou

20  Ibrahim and Abou Hamza.  $12,000 was donated.  And it just

21  says Abou Ibrahim in the remarks.

22  Q.    All right.

23         MR. JACKS:  Go to the next page, please.

24  Q.    (BY MR. JACKS)  And does this appear just to be a blank

25  fax with some information filled in?

```
 1    A.    Yes.

 2    Q.    All right.  Who does it show to be from?  First of all,

 3    let me back up.  Is there a date on this memo fax?

 4    A.    Yes, there is, sir.  Top left hand corner, December 17th,

 5    '90.

 6    Q.    And what organization does it purport to be from?

 7    A.    From the IAP Islamic Association for Palestine.

 8    Q.    And what individual's name is shown?

 9    A.    In the from section, and also on the very bottom where it

10    says signature it says Basman.

11    Q.    And is there a Basman that is connected to any of the

12    Defendants in this case?

13    A.    Basman Elashi would be the brother of the Defendant

14    Ghassan Elashi.

15    Q.    Has Basman's Elashi's name appeared in certain evidence

16    in this case?

17    A.    Yes, it has.

18    Q.    All right.  We will come back to that.

19          It shows in the to category, about the middle of the page

20    it shows to Aboul Hasan.  Correct?

21    A.    Yes, sir.

22    Q.    And do you know who uses that abu name?

23    A.    Ashqar.

24    Q.    Abdel Haleem Ashqar?

25    A.    Abdel Haleem Ashqar, yes, sir.
```

1    Q.    The individual that I believe you said was in

2    Mississippi.  Is that where he lived?

3    A.    Mississippi, that is correct; oxford.

4    Q.    Oxford?

5    A.    Oxford, Mississippi.

6    Q.    And the message, please just read it for us, if you will.

7    A.    The message states, "Peace be upon you.  Attached is a

8    copy of an invoice I received today, and it is not attached

9    with the two previous reports a new one.  I do not have this

10   amount.  Please expedite your search and send the amount

11   because I will depart to the conference on 12/21/1990, or in

12   five days.  Please reply to us via fax."  It says "checked

13   please reply," no reply.  "X signature Basman, date 12/17/90."

14           MR. JACKS:  Could you go to the next page of the

15   exhibit, please.

16   Q.    (BY MR. JACKS)  And what is depicted on page 10 of the

17   exhibit, page 4, I guess, of the translation, Mr. Miranda?

18   A.    These are again similar to the first translated page.

19   These are again the dates the cities, the activities, the

20   guests who were listed, the donations collected, and remarks

21   section.

22   Q.    And refresh your recollection, Abou Hamza is the abu name

23   for who?

24   A.    That was the Hamas leader Jamil Hamami.

25   Q.    Abou Ibrahim is who?

```
1    A.    That is the Defendant Mohammad El-Mezain.

2    Q.    Abou Khaled is who?

3    A.    That is the Hamas leader Mahmoud Zahar.

4    Q.    And it has got apparently all of the activities described

5    as festivals.  Is that correct?

6    A.    Yes, sir.

7    Q.    The dates that are covered, the range, the date range

8    covered by this activity?

9    A.    Ranges from October 13th through December 9th.

10   Q.    And in terms of the dollar amounts, just what are the

11   larger dollar amounts that you see that are over -- let's just

12   say over $10,000?

13   A.    I see one for $16,200 on 11/3 in Detroit.

14   Q.    What else does it indicate was donated?

15   A.    Gold.

16   Q.    All right.  And who took that, or who does it show under

17   the remarks category?

18   A.    Abou Ibrahim.

19   Q.    All right.  What others above $10,000 are there?

20   A.    On 11/18 at Milwaukee there was $12,000 in donations.

21   Q.    And again, just tell us who it shows under remarks after

22   those?

23   A.    Under remarks it says Abou Ibrahim.  On 11/25 at Chicago,

24   $35,000 plus gold.  Remarks says Abou Ibrahim.

25   Q.    And who were the guests at that Chicago festival?
```

1    A.    That would be Abou Khaled, who is Mahmoud Zahar, and the

2    Defendant Abou Ibrahim, who is Mohammad El-Mezain.

3    Q.    Is there one for Dallas?

4    A.    Yes, sir.  In Dallas on December 1st for $14,000.

5    Q.    All right.

6    A.    And the remarks section says it was Abou Ibrahim.

7    Q.    Go back up, if you will, to the entry for Los Angeles and

8    just give us the information shown for that entry.

9    A.    Sure.  November 22nd is the date the city is Los Angeles,

10   the activity is a festival, the guests were Abou Khaled and

11   Abou Hamza, who we know to be Mahmoud Zahar and Jamil Hamami.

12   The donations amount is $1800.  And the remarks says Abou

13   Ibrahim, who is the Defendant Mohammad El-Mezain.

14   Q.    Are you familiar with I think it has been admitted as

15   Mushtaha Search No. 1, the video wherein in the audience you

16   see Mr. El-Mezain the Defendant El-Mezain Mahmoud Zahar, and

17   Jamil Hamami?  Are you familiar with that video?

18   A.    It is Mahmoud Zahar, Mohammad El-Mezain in the middle,

19   and then it is Jamil Hamami.  I am familiar with it.

20   Q.    I believe Agent Burns dated that video to 1990.

21   A.    That is correct.

22   Q.    Would this entry be consistent with that video?

23   A.    Yes, I think it is consistent.

24   Q.    Okay.  And then just the last -- You have already talked

25   about the one for Dallas.  The one for Washington and New

1    Jersey, it has got in the remarks column "same, same" under

2    the name.  Is that correct?

3    A.    That is right, sir.

4          MR. JACKS:  Can you scroll down a little bit,

5    please?

6    Q.    (BY MR. JACKS)  All right.  And the bottom half of that

7    page, just describe, if you will, what is shown there, Mr.

8    Miranda?

9    A.    In the bottom half are again basically the same

10   categories, except for now there is also a category for

11   Canadian dollars and U.S. dollars.

12   Q.    And it doesn't show any entry for who the guests were or

13   who took the money, does it?

14   A.    No, sir.

15   Q.    Is there a total shown there as far as this page?

16   A.    Yes, sir.  It says grand total Canadian $30,214.83.  Let

17   me start again.  $30,214.83.  And then it says U.S. $165,400.

18   Q.    Okay.

19         MR. JACKS:  Would you go to the next page, please?

20   Q.    (BY MR. JACKS)  And Agent Miranda, if you would just

21   generally describe what is shown on this last page?

22   A.    Yes, sir.  Again they are showing the same columns, date,

23   city, activity, guests, donations, and remarks, and there are

24   some totals on the bottom.

25   Q.    Okay.  And what is the total of donations shown on this

1    page of the exhibit?

2    A.   There is a total for $205,800, and there is also a total

3    that is $163,435.

4    Q.   Is there another page or is that the last page?

5    A.   Yes, there is.  It is actually in English.  You would

6    have to go to exhibit page 7, please, sir.

7           MR. JACKS:  Would you go to exhibit page 7?

8    Q.   (BY MR. JACKS)  All right.  And page 7 of the exhibit,

9    Agent Miranda, just describe what it is.

10   A.   Sure.  It is a page from the Islamic Association for

11   Palestine dated December 19th, 1990, and it is addressed to

12   the director of the OLF, the Occupied Land Fund.

13   Q.   All right.  And just if you would read that letter.

14   A.   Sure.  It says, "Mr. Director," then there is the Arabic

15   saying there.  "This is in reference to the 10 percent we

16   agreed upon last October to be paid by OLF to IAP to cover our

17   expenses for planning, managing, and executing the enclosed

18   list of activities that OLF has benefited from.  The enclosed

19   lists indicate that a total of Canadian $30,214.83, USA

20   $371,200, grand total USA $396,880."  There is a conversion

21   there for Canadian money.  "Accordingly, we would appreciate

22   sending us a check of the amount USA dollars $39,688 as soon

23   as possible.  May Allah bless your efforts and multiply your

24   rewards.  Truly yours, Y. Salah, president."

25   Q.   And the name Y. Salah, has that name appeared in evidence

1    earlier in this case?

2    A.    I am pretty sure he is on the Palestine Committee list.

3    Q.    What is the first name of that person that you are

4    referring to?

5    A.    Yousef.

6    Q.    Yousef?

7    A.    Yes.

8    Q.    All right.  Let me ask you, Mr. Miranda, in the course of

9    the investigation, did you look at financial records of the

10   Holy Land Foundation with a view toward determining if any

11   money was spent on these speakers on the speakers list?

12   A.    Yes, sir.

13              MR. JACKS:  Could you please --

14              MR. JACKS:  Your Honor, I believe AMEX No. 2 has

15   been admitted, but I just want to make sure.

16              THE COURT:  I believe that is in, yes.

17              MR. JACKS:  Okay.  Could you please show the first

18   page of AMEX No. 2?

19   Q.    (BY MR. JACKS)  Agent Miranda, can you see the display of

20   the first page of this exhibit on the screen?

21   A.    Yes.  But sir, can I correct myself real quick?  I said I

22   thought Yousef Salah was on the Palestine Committee list and I

23   misspoke.  I don't see him on the list.

24   Q.    All right.  Thank you.

25   A.    Yes, sir.

1   Q.   Turning now to the American Express records, do you

2   recognize the exhibits shown on the screen as Holy Land

3   Foundation American Express statements?

4   A.   It is Occupied Land Fund, but same difference.

5   Q.   Occupied Land Fund.  What are the dates -- For example,

6   on this first exhibit, what is the date of the statement

7   itself as indicated on the exhibit?

8   A.   Right.  Towards the top it says statement closing date

9   11/16, I believe that is 16, 1990.

10          MR. JACKS:  Can you enlarge the top half of the

11   page, please?  Thank you.

12   Q.   (BY MR. JACKS)  And you said that the card is in the name

13   of the Occupied Land Fund?

14   A.   Yes, sir; under the name Shukri Abu Baker the Defendant.

15          MR. JACKS:  And if you would, just scroll down,

16   please.

17   Q.   (BY MR. JACKS)  And on that particular page, how many

18   cards show to be issued to this particular account?

19   A.   There is two cards, sir.  There is one to the Defendant

20   Shukri Abu Baker and there is one to the Defendant Mohammad

21   El-Mezain.

22   Q.   And have you looked through these statements, Agent

23   Miranda, during the course of your investigation?

24   A.   I have, sir.

25   Q.   Would you go to --

1    MR. JACKS:  Could you display page 7 of this

2  exhibit, please?  And if you could, enlarge the top half at

3  least right now.

4  Q.  (BY MR. JACKS)  And if you would, just tell us, Agent

5  Miranda, what is shown on the first item shown on the top of

6  the page?

7  A.    It says Continental Airlines, so it is a ticket from

8  Continental Airlines.  The transaction date is October 27th,

9  1990 for what appears to be the Defendant Mohammad El-Mezain's

10  name.  And that is actually the account number for the card of

11  the Defendant Shukri Abu Baker there, the card member.

12  Q.    All right.  It ends in 91006?

13  A.    Yes, sir.  If you just compare that to the front page,

14  that will tell you the account.

15  Q.    All right.

16    MR. JACKS:  Can you scroll down, please?

17  Q.  (BY MR. JACKS)  And can you identify what is shown here

18  in two items shown on this page?

19  A.    Yes.  Let me start with the one on the bottom because

20  that is actually a little clearer.

21  Q.    Okay.

22  A.    You can see that it is a receipt or a ticket for

23  Southwest Airlines, and if you look towards the upper left

24  hand area, you will see the name "Hamimi/J."

25  Q.    Okay.  And do you know who that is?

A.    Yeah, that would be Jamil Hamami.

Q.    And the one above that, the ticket above that can you see the name of the passenger on that ticket?

A.    Yes.  It is kind of covered up a little bit, but you can pretty much make out the same name.

Q.    What does it show to be the date of travel?

A.    The date of travel would be 15 --

Q.    That is probably unfair.

A.    I can read it sir, 15 October.  Tulsa, 15 October; Houston Hobby 16 October; Dallas Love Field, 21 October.  And then it ends in Tulsa.

Q.    Okay.

        MR. JACKS:  The next ticket, please, if you could show that, the same page but the one below that.

Q.    (BY MR. JACKS)  And where does the travel show for that particular ticket and the date?

A.    It says Houston Hobby, and if you go over to the right it is going to be 6 October, and then New Orleans, 7 October.

Q.    Okay.

A.    And then it ends in Dallas Love Field.

        MR. JACKS:  Can you go to page 8, please, of this exhibit?  And if you could, the upper right receipt, if you could.

Q.    (BY MR. JACKS)  And who does that show to be the passenger?

A.    Hamimi/J.

Q.    All right.  And again, that is travel for where?

A.    From Houston, Texas to Dallas/Fort Worth.

MR. JACKS:  And if you would, please scroll down or zoom back.  And the two from the middle down, if you could. The bottom half of the --

Q.    (BY MR. JACKS)  The two there, the two ticket receipts shown for Delta Airlines, who does it show to be the passenger?

A.    Again it is going to be Hamimi/J., or Jamil Hamami.

Q.    And the travel is Birmingham, Orlando, and Orlando, Dallas/Fort Worth, Tulsa, Dallas/Fort Worth, back to Orlando. Is that correct?

A.    That is correct, sir.

Q.    These are purchased in October of 1990?

A.    October, yes; october of 1990.  That is correct.

MR. JACKS:  And if you would go to page 10 I think is the next page of the exhibit.

THE WITNESS:  Sir, just -- Could we return for just a second.

MR. JACKS:  Go back.

THE WITNESS:  So there is no confusion.

Q.    (BY MR. JACKS)  That would be page 8?

A.    Yes, sir.  In this instance, if you look at the card number that was used to purchase those, that is no longer the

1    Defendant Shukri Baker's card.  In this instance that is the

2    Defendant Mohammad El-Mezain's American Express card.

3    Q.    Ending in 91014?

4    A.    Yes, sir.

5    Q.    Okay.

6         MR. JACKS:  Now go to page 10, if you don't mind.

7    And if you would, enlarge the bottom half of the page.

8    Q.    (BY MR. JACKS)  And I direct your attention to the

9    receipt in the bottom left corner.  Who does that show to be

10   the passenger?

11   A.    Zahar/M.

12   Q.    Okay.  And traveling from where?

13   A.    From Los Angeles to Chicago, back to Los Angeles.

14   Q.    And at least the date of the transaction was what?

15   A.    11/18/90.

16   Q.    And whose card does that show to be charged on?

17   A.    This time it is going to be the Defendant Shukri Abu

18   Baker's.

19        MR. JACKS:  Go to page 14, please, of the exhibit,

20   and the bottom half, if you would, please.

21   Q.    (BY MR. JACKS)  And again, let's look at the receipt on

22   the bottom right.  Who does that show to be the passenger and

23   the route that that person is taking?

24   A.    Yes, sir.  That is Hamimi/J. from Washington, D.C. to

25   Newark.

```
1    Q.    And the date that that ticket was purchased?

2    A.    11/23/90.

3    Q.    Okay.

4            MR. JACKS:  Go to page 15, please.

5          (BY MR. JACKS)  Who is shown to be the passenger on that

6    receipt, Mr. Miranda?

7    A.    That is Zahhar/M. or Mahmoud Zahar.

8    Q.    And the cities?

9    A.    From Dallas/Fort Worth to New Orleans.

10            MR. JACKS:  Could you go to page 17 of the exhibit,

11   please?

12   Q.    (BY MR. JACKS)  The receipt on the right hand side of the

13   page, who does that show to be the passenger?

14   A.    Alqoqa/K.

15   Q.    What is the date shown to be the date that that was

16   purchased?

17   A.    October 19th, 1991.

18   Q.    And Alquqa is No. 38 on the speakers list.  Is that

19   correct?

20   A.    That is correct, sir.

21   Q.    And was he the one in that -- referred to in that

22   handwritten flier announcing the festival where he was going

23   to appear?

24   A.    Right.  The IAP saying he was a deported Hamas leader.

25   Q.    Yes.
```

1    A.    Yes, sir.

2           MR. JACKS:  Go to page 25, please, and I am going to

3    have to ask you to just do the top half, if you would.

4    Q.    (BY MR. JACKS)  All right.  It is -- The one on the

5    bottom right, the receipt there, who does that show to be the

6    traveler?

7    A.    Koka/KMR, or K MR.

8    Q.    And where is the travel from?

9    A.    Los Angeles to Reno, Nevada to Sacramento.

10   Q.    And what is the transaction date?

11   A.    December 1st, 1991.

12          MR. JACKS:  Could you scroll down on that same page?

13   Q.    (BY MR. JACKS)  Now, what is -- The two receipts at the

14   top on the screen, who does it show to be the travelers, the

15   transaction date, and the route that they are going?

16   A.    Sure.  Looking at the one on the upper left of the

17   screen, that is Memezyan/M or the Defendant Mohammad El-Mezain

18   and he is traveling also on December 1st, 1991 from Los

19   Angeles to Reno to Sacramento to Los Angeles.

20          Now, going to your right, top right, the traveler in this

21   case is Ashi/G, who would be the Defendant Ghassan Elashi,

22   again the same transaction date of December 1st, 1991.  The

23   travel is from Los Angeles to Reno to Sacramento to Los

24   Angeles.

25          MR. JACKS:  Could you go to page 29 of this exhibit,

```
 1    please?  And the middle of the page, if you could enlarge

 2    that, please.

 3    Q.   (BY MR. JACKS)  And that shows four receipts.  I must

 4    have written down the wrong page reference.

 5              MR. JACKS:  Go to page 36, please.  And if you could

 6    enlarge the airline receipts.

 7    Q.   (BY MR. JACKS)  I direct your attention to the one in the

 8    upper right corner, Agent Miranda.  Who does that show to be

 9    the passenger?

10    A.   That is Seyam/M.

11    Q.   All right.  And who on the speakers list is initial M.

12    Siam?

13    A.   That is the Hamas leader Mohamed Siam, who is No. 47.

14    Q.   All right.  And is he depicted on this demonstrative

15    exhibit?

16    A.   Yes.  In the orange section he is the individual in the

17    top left.  That is correct.

18    Q.   Okay.  And I believe we have seen other images of him

19    during this case?

20    A.   Yes, we have.

21    Q.   All right.  And where is he traveling to on this

22    particular are trip?

23    A.   In this particular case he is going from Los Angeles to

24    it says not available, and then it says Iguassu Falls, Brazil,

25    and then it says Rio De Janeiro, Brazil, and Los Angeles.
```

1    Q.    When was that ticket purchased?

2    A.    5/15/92.

3    Q.    And who purchased this ticket, which card?

4    A.    I believe that is the Defendant Shukri Abu Baker's card,

5    006.  Yes, sir.  That is going to be the Defendant Baker's

6    card.

7              MR. JACKS:  Can you scroll down?

8    Q.    (BY MR. JACKS)  Look at the receipt on the lower right

9    corner.  And who does that show to be the passenger?

10   A.    In this case it is Seyam/I.

11   Q.    And is there an individual whose first name begins with

12   I., last name Siam, that is associated with the Holy Land

13   Foundation?

14   A.    Or was, yes.

15   Q.    Was.  Sorry.

16   A.    Yes, sir.

17   Q.    Who is that?

18   A.    Islam Siam.

19   Q.    And is he related to Mohammed Siam?

20   A.    He is a son-in-law.

21   Q.    Son-in-law?

22   A.    Son-in-law.

23   Q.    They have the same last name.  Is he married to Mohammed

24   Siam's daughter?

25   A.    He is married to Mohammed Siam's daughter Raida,

1   R-A-I-D-A.

2   Q.   So he is traveling on this particular ticket to where?

3   A.   He is traveling from Los Angeles to Las Vegas, to

4   Dallas/Fort Worth, to Las Vegas, to Los Angeles.

5   Q.   Do you remember approximately when the Holy Land

6   Foundation moved its offices from Los Angeles to Dallas or

7   Richardson?

8   A.   '92 time frame approximately.

9   Q.   All right.  So at least this ticket would have been

10  within the same year or so?

11  A.   Yes, I think that is right.

12  Q.   Okay.

13          MR. JACKS:  Would you go to page 51, please?  And if

14  you could enlarge the middle of the page, please.

15  Q.   (BY MR. JACKS)  And I direct your attention to the

16  receipt on the upper left corner.  Who shows to be the

17  passenger?

18  A.   Hamaneh/J.

19  Q.   So they either learned how to spell his name or --

20  A.   They are getting closer.

21  Q.   All right.  Does it show where he is traveling?

22  A.   No, it does not, sir.

23  Q.   What airline does it show that this ticket was purchased

24  on?

25  A.   Royal Jordanian.

1   Q.   What date was the ticket purchased?

2   A.   3/22/1993.

3        MR. JACKS:  Let's go to page 58, please, and upper

4   right, I believe, of the page is the one I want to enlarge.

5   Q.   (BY MR. JACKS)  The receipt shown on the screen now, who

6   does that show to be the passenger?

7   A.   Hamam/J.

8   Q.   Traveling where?

9   A.   O'Hare Field, Illinois, and then Washington National in

10  D.C.

11  Q.   What date was that ticket purchased?

12  A.   3/6/1994.

13  Q.   And whose card was used for this particular purchase?

14  A.   006 is the Defendant Shukri Abu Baker's card.

15       MR. JACKS:  And could you scroll down, please?  And

16  I am sorry.  I want to move to American Express Records No. 2.

17       THE COURT:  Let's go ahead and break here for the

18  day.  We will start there tomorrow.

19       Be back at 9:00 tomorrow.  And remember, for your

20  planning tomorrow, it will be the last day we will work this

21  week.

22       Please recall the instructions we have been over about

23  not discussing the case with anyone or listening to or reading

24  anything about it.  See you back in the morning at 9:00.

25       (Whereupon, the jury left the courtroom.)

1          THE COURT:  Mr. Dratel, do we need to add -- Did you

2    want to do it up here?

3          THE COURT REPORTER:  Do you want this on the record?

4          MR. DRATEL:  It doesn't have to be.

5                    (End of day.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            I HEREBY CERTIFY THAT THE FOREGOING IS A

2      CORRECT TRANSCRIPT FROM THE RECORD OF

3      PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4      I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5      FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6      COURT AND THE JUDICIAL CONFERENCE OF THE

7      UNITED STATES.

8

9      S/Shawn McRoberts      06/05/2009

10     _____DATE_____
       SHAWN McROBERTS, RMR, CRR

11     FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25