IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA       )  CAUSE NO. 3:04-CR-240-P
                               (
vs.                            )
                               (  OCTOBER 8, 2008
                               )  DALLAS, TEXAS
HOLY LAND FOUNDATION, ET AL    (  9:00 A.M.

_____

VOLUME 16 OF 37

_____

STATEMENT OF FACTS

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

_____

A P P E A R A N C E S

FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                      1100 COMMERCE, 3RD FLOOR
                      DALLAS, TEXAS  75242
                      BY:  MR. JIM JACKS
                           MR. BARRY JONAS
                           MS. ELIZABETH SHAPIRO

FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
(SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
                      20 FIRST PLAZA, SUITE 700
                      ALBUQUERQUE, NEW MEXICO 87102
                      BY:  MS. NANCY HOLLANDER
                           MS. TERESA DUNCAN

```
 1                FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
                 (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
 2                                    NEW YORK, NEW YORK  10005
                                      BY:  MR. JOSHUA DRATEL
 3                                         MR. AARON J. MYSLIWIEC

 4                FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
                 (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
 5                                    DALLAS, TEXAS  75204
                                      BY:  MS. MARLO P. CADEDDU
 6
                 FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
 7               (GHASSAN ELASHI)     P.O. BOX 10985
                                      TAMPA, FLORIDA  33679
 8                                    BY:  MS. LINDA MORENO

 9                                    JONES DAY
                                      555 CALIFORNIA ST., 26TH FLOOR
10                                    SAN FRANCISCO, CA  94104
                                      BY:  MR. JOHN D. CLINE
11
                 FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12               (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                      FORT WORTH, TEXAS  76102
13                                    BY:  MR. GREG WESTFALL

14               COURT'S LAW CLERK:   MS. JENNIFER HELMS
                                      1100 COMMERCE, RM. 1654
15                                    DALLAS, TEXAS  75242

16               COURT COORDINATOR:   MS. BRENDA WEBB
                                      1100 COMMERCE, RM. 1654
17                                    DALLAS, TEXAS  75242

18        OFFICIAL COURT REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                      1100 COMMERCE STREET, RM. 1654
19                                    DALLAS, TEXAS  75242
                                      (214) 753-2349
20

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| ROB MIRANDA | |
|    Direct By MR. JACKS.......................................... | 18 |

## Government's Exhibits

| **Government's Exhibits** | **Page** |
|---|---|
| Baker Wiretap No. 21, 21-A Admitted into Evidence | 28 |
| Baker Wiretap No. 22 Admitted into Evidence | 33 |
| Baker Wiretap No. 23 Admitted into Evidence | 38 |
| El Mezain Wiretap No. 10 Admitted into Evidence | 42 |
| Baker Wiretap No. 24, 24-A Admitted into Evidence | 52 |
| Mushtaha Search No. 3 Admitted into Evidence | 57 |
| Mushtaha Search No. 11 Admitted into Evidence | 62 |
| Mushtaha Search No. 12 Admitted into Evidence | 63 |
| Elbarasse Search No. 21 Admitted into Evidence | 66 |
| Ashqar Search No. 14 Admitted into Evidence | 116 |
| Elbarasse Search No. 41 Admitted into Evidence | 123 |
| InfoCom Bank Account 7-10 Admitted into Evidence | 129 |
| InfoCom Aging Report 1-3 Admitted into Evidence | 137 |
| InfoCom Bank Account 5,6 Admitted into Evidence | 153 |
| InfoCom Search No. 94 Admitted into Evidence | 160 |

THE COURT:  Good morning.

Why don't we take up some of your objections to some of the Government's exhibits.

There has been a flurry of activity this morning, which is what took me so long to go over these last minute filings with these new objections plus what was filed from yesterday.

But let's take up the objection to HLF No. 27.

MS. MORENO:  Thank you, Your Honor.  We did the very best we could, Your Honor, in looking at the new exhibits, which No. 27 was not one.

THE COURT:  No.  Yesterday I think you had identified it as being in, and so I didn't have objections to it.  And I had looked through your list and saw that it wasn't in, but of course this is the first time I got the exhibit was this morning.  I hadn't read the transcript.  It is lengthy. But go ahead.

MS. MORENO:  It is my understanding that HLF Search No. 27 is in, Your Honor, already.  And our objection was just to a discreet portion of HLF No. 27.

THE COURT:  Okay.  What portion is that?

MS. MORENO:  That portion, Your Honor, is on page 4 and 5 of the exhibit itself.

In the first trial Agent Miranda did testify and actually read the portions on page 4 and page 5 starting with I believe, Your Honor, sort of a little past midway it says,

1    "And finally, O rulers of my country."

2            THE COURT:  I see that.  "The America of

3    oppression"?

4            MS. MORENO:  Yes, Your Honor.  And he read that

5    part, and I think he ended it around four or five lines from

6    the bottom being "...dragged like a dog behind the car."  He

7    read that part.  The Government then asked him, "By the way,

8    what are they referring to in this transcript?"

9        And I have a copy of the transcript and I can show Your

10   Honor.  I had actually emailed both to Your Honor and to Mr.

11   Jacks the copy of the transcript.

12           THE COURT:  I don't need the copies of the

13   transcript.  Go on with your objection.

14           MS. MORENO:  And Agent Miranda said, "They are

15   referencing the events made famous by the book and movie

16   Blackhawk Down."  An objection was made by Mr. Dratel

17   regarding Blackhawk Down.  It was sustained.

18       This is about Somalia, Blackhawk Down, and Al-Qaeda.  And

19   the objection, Your Honor, with that discreet portion is that

20   we had assured the jurors that they were not going to hear any

21   evidence about Al-Qaeda, and I believe this is a back doorway

22   of putting this in.

23       I would ask the Court to grant a 403 objection just to

24   that part and certainly limit Agent Miranda into his

25   commentary about Blackhawk Down.

1           THE COURT:  Okay.

2           MS. MORENO:  The second objection is to the second

3  part which goes on and they are actually talking about the

4  Hezbollah bombing of the American Marine barracks.  We believe

5  this is inflammatory, it is prejudicial, and it is irrelevant

6  to the charges in this particular case.

7           THE COURT:  What specific portion of the transcript?

8           MS. MORENO:  On page 4 starting with, "This is

9  America that forces you," and it goes on to "The heart of the

10  American Marines."  Top of page 5, your Honor, "Your Marine

11  forces, O America, after the Jewish invasion of southern

12  Lebanon."  The does the Court see that?

13           THE COURT:  Yes.

14           MS. MORENO:  Agent Miranda read, too, I think,

15  "Amidst hundreds of your Marine soldiers, they ran away after

16  tens were killed and tens were injured of them."

17      Then the Government asked, "What is that referring to?

18  What occurred in Lebanon involving American Marines?"

19      At the time Agent Miranda answered, I am quoting, "That

20  was the Hezbollah bombing of the American Marine barracks."

21      We would ask the Court for a 403 -- to grant our 403

22  objections as to those discreet portions on the basis of it is

23  inflammatory, it is irrelevant to this case and the charges in

24  this case, it is prejudicial, and we had already assured the

25  jurors they would not hear anything about Al-Qaeda.  So those

1    are my objections to No. 27, Your Honor.

2              THE COURT:  Mr. Jacks, do you want to respond to

3    that?

4              MR. JACKS:  Yes, Your Honor.  Your Honor, the

5    Government objects to the request to redact part of this

6    speech by this individual Abu Zant.  The speech just -- And

7    the Court may be well aware of this.  The speech was made

8    before the treaty was signed, right before the treaty was

9    signed between the Kingdom of Jordan and the government of

10   Israel.  Abu Zant is chastising the Jordanian government for,

11   as he puts it, giving into the American pressure.  He goes on

12   to describe America as weak and as demonstrated in Somalia and

13   North Korea and Lebanon.  He is telling the Jordanian

14   government they should have stood up to America and not made

15   peace with Israel, which is consistent with the views of

16   Hamas.

17        And the reason that this portion should remain in this

18   exhibit is that he is one of the speakers on their speaker

19   list, and it is part of our job to try to show the character

20   and the views of this individual, which was utilized by the

21   Defendants to raise money.  That is one of the things that we

22   have to do -- when we are making the point that the HLF is

23   utilizing these radical speakers to raise money, we have to

24   have evidence to show that.

25        This speech, it is made during the time of the

1    indictment.  It is made in October of 1994.  It is made during

2    the time that these events are being discussed in the trial.

3    The words reflected in this speech are reflective of Hamas'

4    view of the United States, that the United States is an enemy

5    government because of its support for Israel.  And it is

6    really an attempt to water down the evidence that this jury

7    sees regarding this individual.

8         And it is kind of indicative of what the Defendants were

9    talking about doing in that they want to show a different face

10   to America than they do to the Arabic or Islamic world.  And

11   this speech shows the true sentiment of this individual Abu

12   Zant, who they did use and continued to use during this time

13   as a fundraiser.

14        And it would really kind of be playing into their hands

15   to say that, "Well, we are prejudiced by these statements of

16   this individual that we used as a fundraiser and brought over

17   here," and it would be playing into their hands that they

18   would be able to successfully keep this jury from hearing

19   about statements that are being made by one of their speakers,

20   because it is -- As I said, one of the things that the

21   Government has to show is that the people that they were using

22   to raise funds were of this radical nature.

23        And I am sure you saw later on in the speech where he

24   talks about his support for Hamas and these issues.  The

25   objection to the peace agreement between Jordan and Israel is

1    exactly the same as the objection to the peace efforts between

2    the Palestinian Authority and Israel.

3         And there is -- You know, there has been lots of hateful

4    speech that has been already portrayed in this case, Your

5    Honor, and I think it is relevant.

6         And I guess on top of all that, Your Honor, this exhibit

7    was found at the Holy Land Foundation.  They are the ones that

8    kept it.  And I think the jury is entitled to see what they

9    keep.  So not only are they using this guy as a speaker, but

10   they are holding on to this tape.  And I think it is

11   indicative of their state of mind, what they believe is

12   important.  And the fact that it is prejudicial, I am sure it

13   is prejudicial, but it is not unfairly prejudicial, because

14   they are the ones that used him as a speaker, and they are the

15   ones that held onto this tape.  This speech was made in 1994.

16   They still have this tape in 2001.  And the fact that it is

17   prejudicial to them, that is because they kept it and retained

18   it, and we believe that the entire contents come in because it

19   basically demonstrates the radical nature of these individuals

20   that they are using.

21              THE COURT:  Okay.  Thank you.

22        Ms. Moreno?

23              MS. MORENO:  Your Honor, just very briefly, the

24   Government is incorrect.  Holy Land never utilized Mr. Zant as

25   a speaker.  There is absolutely no evidence that the

1 Government can present to the jury that this gentleman was

2 ever utilized.  Mr. Jacks kept saying they utilized this

3 particular gentleman to raise money.  That is not true.  His

4 name appears.  There is no question about that.  So I would

5 correct the record in that regard, and ask the Court to grant

6 those discreet 403 objections as to those parts.

7   And, Your Honor, this is a 13-page speech.  Agent Miranda

8 can read from other parts of it if he likes.  It is not like

9 we are asking the whole thing to be redacted.

10   So it is submitted, Your Honor.

11     THE COURT:  All right.

12     MR. JACKS:  Judge, he is not going to read the whole

13 thing.  He is going to read less than ten percent of it, if

14 that much.

15     THE COURT:  I am going to sustain the objection.  I

16 think you have what you need in terms of he is opposed to the

17 peace process and he praises Hamas, that you pointed out.

18 This case is about support of Hamas, and I think this is

19 adding these other portions that really aren't relevant to the

20 particular charges in this case, and probably may be overly

21 prejudicial 403.

22   So I sustain the objection, and those two portions, you

23 will need to make sure you don't read those and that those get

24 redacted from the tape and the transcripts that are admitted

25 before the jury.

1    All right.  And I have looked at the other Defense

2  objections.  I ruled on some of them yesterday.  I have looked

3  at those that I could see.

4         MS. MORENO:  I can short circuit this, Your Honor,

5  and make it easy.

6    I think there are 26 new exhibits given yesterday by the

7  Government that we were told they intend to introduce through

8  Agent Miranda.  And not to reiterate, I would like to

9  incorporate our objections that we made previously in a

10  filing, I believe it is document No. 1212, Your Honor, with

11  respect to these particular exhibits.  And the categories are

12  very simple.

13    All the Ashqar Search and the Elbarasse Search documents,

14  we are making the hearsay, lack of authentication, 403

15  objections as to those slew of documents.

16    The Ashqar, Baker, and Shabib Wiretap new exhibits, again

17  Your Honor, we are making the hearsay objections, we are

18  renewing our previous Constitutional and statutory objections

19  to the FISAs, and requesting limiting instructions.

20    There is one exhibit that appears, that was HLF No. 27,

21  which was already admitted.  And there is a map we have no

22  objection to as well.

23    There are just about three or four exhibits that I would

24  like the Court to allow me just to argue specifically on

25  those, and just those.

1      HLF Search No. 166 is a newspaper article from Jack

2  Kelley, Your Honor.

3              MR. JACKS:  May I interrupt, Your Honor?

4              THE COURT:  Yes.

5              MR. JACKS:  I don't think we are going to use that.

6              THE COURT:  And I think that is right.  I had

7  written a note here to sustain that objection.  I think that

8  would be improper to put in that newspaper article.  So that

9  is withdrawn.

10              MS. MORENO:  Thank you, Your Honor.  Thank you,

11  counsel.

12      HLF Search No. 176, your Honor.

13              THE COURT:  That is the other one.  I don't have

14  that.  That wasn't in the disks that I received from the

15  Government.

16              MS. MORENO:  These are two checks --

17              THE COURT:  Do you have copies of those, or are you

18  withdrawing that?

19              MR. JACKS:  I am not going to go into it at this

20  time, and I will let the Court know and the Defense counsel

21  know.  So right now I don't have any intention of using that.

22              THE COURT:  All right.  Let's just, then --

23              MS. MORENO:  Those are the CAIR checks, Your Honor.

24              THE COURT:  Yes.  And I had a question over those as

25  well.  But that is withdrawn for now, then, so the Government

1    will approach the bench if they want to get into that.

2              MR. JACKS:  Yes, Your Honor.

3              THE COURT:  Okay.

4              MS. MORENO:  Your Honor, there are three new

5    exhibits I have never seen before.  These are InfoCom Aging

6    Reports 1, 2, and 3.  And these appear --

7              THE COURT:  Have you received copies of those now?

8              MS. MORENO:  Just last night.

9              THE COURT:  I don't have copies.  That is where I

10   was going with that.  So I have not been able to see those.

11   Do you have extra copies of those, by any chance?  They were

12   not on the disk that you provided yesterday.

13             MS. MORENO:  I think those are -- the last set of

14   specific objections I have is to those reports, Your Honor.

15             THE COURT:  Let me take a look at those.  Apparently

16   we got a new disk from the Government this morning, but I have

17   not seen those.  They may be on there.

18        Mr. Jacks, let me hear from you.  What are these?

19             MR. JACKS:  Judge, those are records from the

20   InfoCom search.  They were I believe taken off the InfoCom

21   computer, or they may have been already found in paper form.

22   I would have to look at them again.  And they reflect part of

23   the financial relationship between InfoCom and Mousa Abu

24   Marzook.  And they were turned over to the Defense years ago,

25   Your Honor, in one of the first discovery productions in this

1    case, so they have had them.

2        I am not sure if Ms. Moreno was representing Mr. Elashi

3    at the time.  Mr. Evans may have been representing him at the

4    time.  But I would assume that she got all of the materials

5    from Mr. Evans.

6        But they are records indicative of the relationship

7    between InfoCom and Mousa Abu Marzook.

8            THE COURT:  Ms. Moreno?

9            MS. MORENO:  Well, Your Honor, the problem here is

10   that this goes beyond that.  This also discusses Nadia Elashi

11   and apparently investments into InfoCom.  These three

12   exhibits, we contend, formed the basis of the InfoCom trial,

13   which Mr. Elashi's conviction is up on appeal now.

14       And we are making not only a hearsay, lack of

15   authentication, and 403 objection as to those three reports,

16   Your Honor, but also double jeopardy objection.  We believe

17   that -- And also a relevance objection as to those three

18   reports only.

19       The facts involving InfoCom and Nadia Elashi were already

20   litigated, and Mr. Marzook, were litigated in the InfoCom

21   trial, and we believe it is improper to bring this up and

22   argue certain inferences in this case.  So we have an

23   additional double jeopardy objection as to those three

24   particular documents.

25       And there is one last document I do have specific

1    comments on.

2          THE COURT:  Well, go ahead on that last one.

3          MS. MORENO:  It is Ashqar Search No. 9, Your Honor.

4    It is an interesting document because Ashqar Search No. 9

5    might be a statement that was obtained through interrogation.

6    I say that because if you look at the document, it says that,

7    "This is his statement and he signed to its authenticity."

8    And that writing is not attributed to anyone.  This is a

9    January 1992 document.

10     We have a hearsay, authentication, 403 objection.  But --

11         THE COURT:  And I saw that on the computer earlier

12   this morning, but I don't have that with me.  Let me take a

13   look at that.  I will just see your copy, if you don't mind.

14         MS. MORENO:  I don't have them with me, Judge.

15   These are my notes.  Sorry.

16         MR. WESTFALL:  Your Honor, I have a disk I will

17   bring you.

18         THE COURT:  I have got it on a disk, but I just saw

19   so many exhibits they are all running together a little bit.

20   I had a question about it.  That is the reason I am asking.  I

21   did have a question about it.

22         MR. JACKS:  Your Honor, I don't intend to use this

23   exhibit through Agent Miranda.  If I included it on the list,

24   it was in error.

25         THE COURT:  Okay.  All right.  Withdrawn.  Okay.

1           MS. MORENO:  So that is withdrawn?

2           THE COURT:  It is, at least for now.  The

3    Government will --

4           MS. MORENO:  Then we can revisit our objections

5    when --

6           THE COURT:  If they ever decide to offer it, we can

7    revisit it then, but for now it is withdrawn.

8           MS. MORENO:  That would conclude are my objections,

9    Your Honor.  Thank you.

10          THE COURT:  As to the aging reports, then, I will

11   overrule those objections.  I think this does fairly go to

12   show, then, that relationship as Mr. Jacks explained it.

13       And I will overrule the double jeopardy, the hearsay,

14   they were InfoCom Search documents, so I think those were

15   properly admissible.

16       Did you want these back, Mr. Jacks?

17          MR. JACKS:  Yes, if that is okay.

18          THE COURT:  I did receive the Government's

19   objections to the Defense exhibits.  We can take those up

20   maybe at the lunch --

21       Yes?

22          MS. DUNCAN:  Your Honor, I think there is one other

23   exhibit coming up that we had an issue that I wanted to

24   clarify for the Court.  I think it is Picture No. 1.  It is

25   identified by the Government as a picture of Jamal Issa that

1    they are intending to introduce through Agent Miranda.

2         And it is our understanding that the sole basis of Agent

3    Miranda's knowledge of that picture is that he subpoenaed it

4    from Mr. Abu Baker's brother, and so that Mr. Abu Baker's

5    brother identified it to him.  So we have a hearsay and a

6    confrontation clause objection to Agent Miranda testifying

7    regarding that picture.

8              THE COURT:  Mr. Jacks, are you still seeking to

9    offer that picture?

10             MR. JACKS:  Yes, Your Honor.  It may be that I

11   believe last time it was entered without issue or objection,

12   but I will not do it --

13             THE COURT:  Okay.  Just approach the bench, then, if

14   you get to that point.

15             MR. CLINE:  Just for the clarity of the record, Your

16   Honor has ruled on these exhibits.  We made our objections in

17   writing.  Other than perhaps saying that we incorporate our

18   objections from the written pleading, is it okay if we do not

19   repeat the objections that we have already made?

20             THE COURT:  That would be fine.  You have them in

21   writing, and certainly they are carried forward.  And other

22   than to the extent I have sustained them, then they are

23   overruled.

24             MS. HOLLANDER:  Your Honor, can I just add to that

25   that we are asking for contemporaneous limiting instructions

1    as to each of these?

2            THE COURT:  Okay.  And I am denying that.  We are

3    still working on the limiting instruction and when and what we

4    give and as to which exhibits we give them.  So that is

5    denied, that request for the limiting instruction.

6        Are we ready for the jury?  Everybody here as far as the

7    jury?

8        Go ahead and bring them in.

9            (Whereupon, the jury entered the courtroom.)

10           THE COURT:  Ladies and gentlemen of the jury, good

11   morning.  We are ready to proceed.

12       Mr. Jacks?

13           MR. JACKS:  Thank you, Your Honor.

14   Q.   (BY MR. JACKS)  Agent Miranda, I believe yesterday we

15   were talking about the overseas speakers that were shown on

16   this exhibit found on the Holy Land Foundation computers, and

17   I wanted to ask you, did you find any evidence or records of

18   the Holy Land Foundation itself that talked about the use of

19   overseas speakers?

20   A.   Yes.

21   Q.   Could you --

22           MR. JACKS:  HLF Search No. 5, I believe that has

23   been admitted.

24           THE COURT:  Let me check real quick.  Yes, that is

25   in.

1      MR. JACKS:  Could you please display HLF Search No.

2    5?

3    Q.   (BY MR. JACKS)  And just to establish what we are looking

4    at, what is HLF Search No. 5, Agent Miranda?

5    A.    This is an English version of an Occupied Land Fund board

6    meeting minutes dated 16 through 18 February, 1991.

7    Q.    And from the bates number at the bottom, is this the form

8    that it was found in?  It was found as a paper document?

9    A.    Yes, sir.  It was a paper document at the Holy Land

10   offices here.

11   Q.    And it was not translated by the FBI.  Its original form,

12   it was in English as we see it?

13   A.    Yes, sir.

14   Q.    First of all, who does it show to be present at this

15   meeting, this board meeting of -- This refers to the Occupied

16   Land Fund.  Is that correct?

17   A.    That is correct, sir.

18   Q.    Was that the name that the Holy Land Foundation used

19   prior to changing its name to the Holy Land Foundation?

20   A.    Yes, sir.

21   Q.    And who was present at this board meeting?

22   A.    The Defendants Mohammad El-Mezain, Ghassan Elashi, and

23   Shukri Abu Baker.

24   Q.    And where was it taking place, according to the document?

25   A.    In Los Angeles, sir.

1    Q.   And if you would -- Now, I believe this exhibit has

2    minutes for other meetings.  Is that correct?

3    A.   Yes, sir.

4    Q.   Okay.

5         MR. JACKS:  Could you go to page 7 of this exhibit,

6    please?

7    Q.   (BY MR. JACKS)  And at the top, would you just tell us,

8    Agent Miranda, what meeting this refers to?  What time period?

9    A.   February 22nd, 1992.

10   Q.   And again, where is the meeting and who is supposed to be

11   present?

12   A.   It is still Los Angeles, and the Defendants present are

13   Mohammad El-Mezain, Shukri Abu Baker, and Ghassan Elashi.

14        MR. JACKS:  Could you scroll down, please?  Would

15   you go to the next page, please, of the exhibit?

16        May I have a moment, Your Honor?  Apparently I have the

17   wrong page marked in my notes.

18        THE COURT:  Yes.

19   Q.   (BY MR. JACKS)  Agent Miranda, do you have your copy of

20   HLF Search No. 5?

21   A.   I am looking now, sir.

22   Q.   Okay.

23   A.   Sir, I think you are looking for the meeting minutes for

24   25 through 26 July, 1990.

25   Q.   All right.

```
1              MR. JACKS:  That is on page 4 of the exhibit.

2              THE WITNESS:  I believe it is just the second page.

3    Q.   (BY MR. JACKS)  July 25 and 26 of 1990?

4    A.   Yes.  This is the correct one on the screen.

5    Q.   Okay.  All right.  And that meeting again was where and

6    who was there?

7    A.   It is taking place in Los Angeles, California; the dates

8    are 25 through 26 July, 1990; and present are the Defendants

9    Mohammad El-Mezain, Ghassan Elashi, and Shukri Abu Baker.

10   Q.   And is there a reference in that meeting about the use of

11   speakers?

12   A.   The first point would be Section D, which is near the

13   bottom of the page.

14   Q.   Yes.

15   A.   Which reads, "The upcoming fundraising campaign was

16   thoroughly discussed."

17        Can I make a comment, sir?

18   Q.   Yes.

19             MS. HOLLANDER:  Objection, Your Honor.

20             THE COURT:  Overruled.  Go ahead.

21             THE WITNESS:  I was going to say, I believe the

22   second point I was going to make is on the following page.

23   Q.   (BY MR. JACKS)  All right.  That would be page 5 of the

24   exhibit?

25   A.   I am not sure of the numbering.
```

1   Q.   Okay.  Is there a page missing, apparently?

2   A.   I have a bates label.

3   Q.   All right.  Let me -- We will come back to that.

4   A.   Yes, sir.

5   Q.   We will figure out -- Yesterday you testified regarding

6   some evidence that was found during the search of Ismail

7   Elbarasse's house.

8           MR. JACKS:  And could you please display Elbarasse

9   Search No. 29?

10   Q.  (BY MR. JACKS)  And do you recall testifying about this

11   exhibit, Mr. Miranda?

12   A.   Yes, sir, I do.

13           MR. JACKS:  And just could you go, please, to I

14   believe it is going to be the fourth page of the exhibit,

15   probably the first English translation.  If you could just

16   scroll through that exhibit, please.  Thank you.

17   Q.  (BY MR. JACKS)  And this particular page of the exhibit

18   is what, Mr. Miranda?

19   A.   This is a letter from the IAP to the director of the

20   Occupied Land Fund regarding the amount raised in a

21   fundraising campaign.

22   Q.   And what was the -- And is the other pages of this

23   exhibit, were those the pages that had the columns with the

24   city, the date, the guest, and how much was donated, and then

25   remarks as far as who took the money?

1   A.   Yes.

2   Q.   All right.  What was the total amount that is reported to

3   have been raised during this tour, or whatever you care to

4   call it?

5   A.   It reads that the grand total was $396,880.

6   Q.   And who was the person that signed this letter?

7   A.   Y. Salah.

8   Q.   And who in this case have we seen reference to that has a

9   first name beginning with Y and last name is Salah?

10  A.   Yousef Salah.

11  Q.   Does he go by a another name?

12  A.   Ahmed Yousef.

13  Q.   Has his named appeared in other evidence in this case?

14  A.   Yes, it has.

15  Q.   And what evidence was that?

16  A.   It was the Palestine Committee list.

17  Q.   And was that also -- Was that the Ashqar list or was that

18  just the list that was taken from the Elbarasse home?

19  A.   The Ashqar list is better.

20  Q.   Okay.  Is that Ashqar No. 1?

21  A.   I can confer with you in a second.  Yes, Ashqar No. 1.

22          MR. JACKS:  I believe it is going to be about the

23  fifth page of that exhibit.  Go back, please.  All right.

24  Q.   (BY MR. JACKS)  And is there a Yousef Salah or Ahmed

25  Yousef on that list?

1    A.    He is the third individual, sir.

2    Q.    All right.  And you said that he uses the name Ahmed

3    Yousef?

4    A.    Right.  That is why yesterday I said he was on the

5    Palestine Committee list.  I looked on the list.  I was

6    looking for Yousef Salah instead of Ahmed Yousef.

7    Q.    With regard to that letter from Yousef Salah, which

8    reflected how much money was raised during 1990, I believe

9    that letter was dated in 1990?

10   A.    Yes, sir, it was.

11   Q.    Did you have the opportunity to look at other evidence to

12   see how that dollar amount on that letter reflected, or if

13   it -- to compare it to other evidence in this case?

14   A.    Yes, sir.

15         MR. JACKS:  Could you display HLF Search No. 8,

16   which I believe has been admitted?

17   Q.    (BY MR. JACKS)  Agent Miranda, let me show you what has

18   been admitted as Holy Land Foundation Search No. 8.  And just

19   to reorient the jury, can you tell us, is this a document that

20   was found during the search of the Holy Land Foundation

21   offices?

22   A.    Yes, sir.

23   Q.    And it was found in paper form as opposed to on a

24   computer or something?

25   A.    Paper form, sir.

1    Q.   All right.  And just describe what it is.

2    A.   Well, it is an IRS form with the name of the organization

3    being the Holy Land Foundation for Relief and Development.

4    And the form, it says, "Support schedule for advance ruling

5    period."  And there is a date on the upper right hand corner

6    that reads April 1st, 1994.

7    Q.   All right.  And let me ask you or direct your attention

8    to the line for No. 1.  First of all, does the form have

9    entries for different years as you go across the page?

10   A.   Yes, it does, sir.

11   Q.   Okay.  What years does it purport to represent or have

12   information for?

13   A.   The years 1989 through 1993.

14   Q.   All right.  And below that you see the line that says

15   "gifts, grants, and contributions received"?  It is numbered

16   1.

17   A.   Yes, I see that.

18   Q.   All right.  And the numbers as you move across the page,

19   directing your attention to 1990, how much money is reported

20   that was received by the Holy Land Foundation?

21   A.   $884,090.

22   Q.   Now, did you take that letter from Yousef Salah that

23   talked about how much money was raised on that series of tours

24   or speeches, take that dollar amount and see what percentage

25   of this $884,000 is represented by that $300,000 something

1   dollars?

2   A.   Yes, I did, sir.

3   Q.   About what percentage did you come up with?

4   A.   Depending on whether you subtract fees the fees discussed

5   in the letter from the IAP to the OLF, it was 40 to 45 percent

6   of that total year's amount money raised.

7   Q.   All right.  And that tour, if you will, featured who as

8   the speakers?

9   A.   The Hamas leader Mahmoud Zahar, the Hamas leader at the

10  time Jamil Hamami, and the Defendant Mohammad El-Mezain is

11  mentioned also on the forms.

12  Q.   You said that was 40 to 45 percent depending on -- You

13  said something about fees.

14  A.   Forty-four percent would be the high amount, and the

15  lower amount would be approximately forty percent, and that is

16  depending on whether or not that ten percent that the IAP said

17  in their letter was owed to them from the OLF as fees, whether

18  you subtract that out.

19  Q.   All right.  You said that some of the -- One of the

20  mechanisms that was used by the Holy Land Foundation to raise

21  funds was through what you described as conference calls.  Did

22  you ever see any evidence of any of those conference calls

23  being captured by the wiretaps?

24  A.   Not by the HLF -- Let me clarify this.  The conference

25  calls were only captured if a line to the conference call was

on an existing FISA. The IAP, which organized these, was

never the target of any FISA surveillance, so the phone lines

there were never captured. So somebody had to be calling in

or listening in from a line that was captured, for example,

from the Holy Land Foundation.

Q. Well, and was there an instance where one of these

conference calls was picked up on a wiretap?

A. Yes, that is correct, sir.

          MR. JACKS: May I approach the witness, Your Honor?

          THE COURT: Yes.

Q. (BY MR. JACKS) Agent Miranda, I am going to show you

what has been marked as Baker Wiretap No. 21. It is simply a

transcript, but do you recognize this as a transcript of a

wiretapped conversation or telephone call from the Shukri Abu

Baker wiretap?

A. Yes, sir, I do.

Q. Do you have a copy of this with you here?

A. Yes, I do, sir.

          MR. JACKS: Judge, we move the admission of Baker

Wiretap No. 21.

          MR. CLINE: We renew our written objections.

          THE COURT: All right. And are you also seeking the

admission -- Is there a 21-A?

          MR. JACKS: Yes, Your Honor 21-A as well.

          THE COURT: And objections to both? Those are

1    overruled and those are admitted.

2            MR. JACKS:  And request admission to play Baker

3    Wiretap No. 21-A.

4    Q.   (BY MR. JACKS)  And Agent Miranda, this particular

5    exhibit, does it contain the entire conversation, or is it

6    excerpts of this conference call?

7    A.   I believe it is excerpts.

8    Q.   Okay.  Just to orient us, would you just tell us, did you

9    find a copy of the transcript?

10   A.   Yes, sir, I have it.

11   Q.   All right.  When was this particular telephone call

12   intercepted?

13   A.   2/10/96.

14   Q.   And as far as the participants that were picked up on the

15   conference call or on the telephone call, can you identify who

16   was on the call?

17   A.   Yes, sir.  There is an individual named Osama Ahmad, an

18   individual named Qadi Hussein, there is an individual named

19   Abdul Ghul, and there is an unidentified female and an

20   unidentified male.

21           MR. JACKS:  All right.  And if you would, just play

22   the first excerpt of that call, please.

23           (Whereupon, Baker Wiretap No. 21-A, Segment 1, was

24           played.)

25           MR. JACKS:  Would you go to the next segment,

1    please?

2         (Whereupon, Baker Wiretap No. 21-A, Segment 2, was

3         played.)

4    Q.   (BY MR. JACKS)  Agent Miranda, you testified that several

5    or many of these conference calls were sponsored by the

6    Islamic Association of Palestine.  Is that correct?

7    A.   That is my understanding of it, sir, yes.

8    Q.   According to this evidence, who is sponsoring this

9    conference call?

10   A.   Well, I recognize Osama Ahmad as an individual that was

11   associated with the IAP, but further in this conference call

12   this are direct references to the Holy Land Foundation.

13   Q.   Well, what does the operator say when she introduces the

14   conference call?

15   A.   Well, it says very obviously the Holy Land Foundation

16   conference call.

17        MR. WESTFALL:  Your Honor, under the rule of

18   completeness, may we have the jury hear the entire conference

19   call?

20        THE COURT:  That is hard for me to rule on, counsel.

21   I don't have the entire transcript before me.  I don't know

22   how long it is.  I am going to let the Government -- Go ahead

23   and play your portions of it.  Do you have a transcript I can

24   look at?

25        MR. WESTFALL:  I can get one, Your Honor.

1          THE COURT:  Okay.

2     Q.   (BY MR. JACKS)  And this man from Pakistan that is

3     speaking, he makes reference to the al-Aqsa mosque.  And we

4     have heard and seen a lot of references to al-Aqsa.  Just to

5     again orient, what does al-Aqsa refer to or what is the

6     al-Aqsa mosque?

7     A.   It is a mosque in Jerusalem which is considered the third

8     holiest spot for Muslims.

9     Q.   All right.  And the first two would be Mecca and Medina?

10    A.   Right.

11    Q.   In Saudi Arabia?

12    A.   Yes.

13    Q.   And you said that this mosque is located in the city of

14    Jerusalem?

15    A.   Yes.

16    Q.   And is it -- What part of the greater city of Jerusalem

17    is it in?

18    A.   It is in the old city.

19    Q.   What is the old city?

20    A.   It is the original part of Jerusalem.

21    Q.   And is it in fact a walled city?

22    A.   It is.

23    Q.   Okay.  And this -- So this -- And that is the name of the

24    mosque, the al-Aqsa mosque?

25    A.   Yes.

1    Q.   And have we seen images of it in the evidence that we

2    have seen in this trial?

3    A.   Yes, continually.

4    Q.   And is there another structure that is adjacent to the

5    al-Aqsa mosque?

6    A.   There are several.

7    Q.   Okay.  Describe in particular what images we have seen

8    that are reflective of the al-Aqsa mosque?

9    A.   Well, there is -- What images?

10   Q.   Yes.  What does it look like, and have we seen images?

11   A.   It is called the Dome of the Rock.  It is the famous

12   mosque with the gold dome.

13   Q.   So in a lot of these pictures and documents, or whatever

14   we have seen, you will see a picture of the dome of a

15   building.  Is that true?

16   A.   Right.

17   Q.   And does that appear to represent the dome of the al-Aqsa

18   mosque?

19   A.   Yes.

20   Q.   Okay.

21           MR. JACKS:  Would you go to the next segment,

22   please?

23           (Whereupon, Baker Wiretap No. 21-A, Segment 3, was

24           played.)

25   Q.   (BY MR. JACKS)  I believe you said this man's name Osama

1   Ahmad, did he make reference to the Holy Land Foundation?

2   A.   Yes, he did.

3   Q.   Was there other evidence that was located that was

4   demonstrative or relevant to these conference calls that you

5   have talked about?

6   A.   Yes, sir.

7   Q.   Are you familiar with -- I will show it to you.

8        MR. JACKS:  May I approach, Your Honor?

9        THE COURT:  Yes.

10  Q.   (BY MR. JACKS)  Let me show you what has been marked as

11  Baker Wiretap No. 22.  And do you recognize this exhibit?

12  A.   Yes, sir, I do.

13  Q.   Okay.  Is it a two-page document?

14  A.   Yes, sir.

15  Q.   And is it a fax that was intercepted on the Baker

16  wiretap?

17  A.   Yes, sir.

18       MR. JACKS:  Judge, we move the admission of Baker

19  Wiretap No. 22.

20       MR. CLINE:  And Your Honor, we incorporate our

21  previous written objections.

22       THE COURT:  That is overruled, and Baker Wiretap

23  No. 22 is admitted.  Did you want 22-A?

24       MR. JACKS:  This is not a recording.  This is a fax,

25  so there is no audio.

1          THE COURT:  Baker Wiretap No. 22 is admitted.

2          MR. JACKS:  Could you please display that?

3    Q.   (BY MR. JACKS)  And Agent Miranda, is the first page of

4    the exhibit shown on the screen now?

5    A.   Yes, sir.

6    Q.   And if you would, just describe what this appears to be,

7    upon examination.

8    A.   Well, this is a document that has the Holy Land

9    Foundation name and symbol to include the al-Aqsa mosque at

10   the top, and then on the left hand side is an English

11   advertisement for a telephone conference lecture with the

12   guests being Abdullah Idris and Kamal Al Halabawi, and it

13   gives a date and a time there.  And the right hand side is an

14   Arabic advertisement.

15   Q.   And who does it show that this Abdullah Idris is?

16   A.   It lists him as the ISNA president.

17   Q.   Do you know what ISNA stands for?

18   A.   I would be guessing at the initials.  I am familiar with

19   it, though, yes.

20   Q.   All right.  And the second speaker you said is Kamal Al

21   Halabawi?

22   A.   Yes.

23   Q.   And does this -- Does it reflect what you said regarding

24   how these calls are disseminated or how people are able to

25   listen to these calls?

1    A.    Right.

2    Q.    Where is that that it talks about how you can access this

3    call?

4    A.    Well, it says underneath Halabawi's name, it tells you a

5    date and time.  It says, "The conference call is free for

6    Islamic centers, $20 for individuals.  Please call your city

7    mosque or Islamic center for time and place."  And there is a

8    number for more information at the bottom.

9    Q.    And the right hand side of the page is in Arabic,

10   obviously.  Correct?

11   A.    Yes, sir.

12   Q.    And if you go to the second page of the exhibit, is this

13   the translation of that right hand side of the page?

14   A.    Yes, sir, it is.

15   Q.    And with regard to this particular side of the page, do

16   you notice any difference between what is shown in the English

17   version and what is shown in the Arabic version in terms of

18   the speakers?

19   A.    Yes, sir.  It might be easier if we can do like a split

20   screen.  Can we do that?  The first and second page.

21        Okay.  Let's look at the document on the right, the

22   advertisement.  There is an English version of it and it tells

23   you that that conference call is going to be in English.

24        Then when you go to the Arab side, the translation, it

25   tells you it is in Arabic.  Now, in this case in the Arabic

1    language conference call, the three speakers are the Hamas

2    leader Sheik Ahmed Al-Bitawi, Sheik Mohamed Siam, Hamas leader

3    and also a speaker on our chart, Dr. Kamal Al-Hilbawi, who we

4    have some information on as well.  But all three of these

5    individuals are on our overseas speaker list.

6    Q.    Let me interrupt you just for a second.

7    A.    Yes, sir.

8    Q.    And using Government's Demonstrative No. 17, this chart

9    entitled Hamas leaders in the 1990s, you said one of the

10   individuals listed on this flier or announcement is Bitawi?

11   A.    Yes, sir.  He is in the orange section on the bottom far

12   right.

13   Q.    All right.  The man with the gray beard there?

14   A.    That is right.

15   Q.    All right.  And you also said that one of the speakers is

16   this Mohammed Siam.  And where is he, if he is present in this

17   No. 17?

18   A.    Orange section, upper left hand corner.

19         So just to complete what I was stating, so in the Arab

20   telephone conference call you have two Hamas speakers and on

21   the English call those Hamas speakers are not there.

22   Q.    And you said that this Kamal Al-Hilbawi is on the

23   speakers list?

24   A.    All three of them are, sir.

25   Q.    All right.  And just --

1    A.    As well as Abdullah Idris.

2    Q.    And with regard to -- Okay.  No. 27 is Hamad Bitawi?

3    A.    That is correct, sir.

4    Q.    And Mr. Hilbawi, do you recall what number he is on the

5    list?

6    A.    Yes, sir, he is No. 36.

7    Q.    Okay.  And I don't believe he has been -- All right.

8    With regard to the English version of this announcement, what

9    is the date shown, announced for the conference call?

10   A.    The English version says that it is going to be -- at

11   that particular time it was the 24th of Ramadan, which equated

12   to the 2nd of February.

13   Q.    And as far as the Arabic version, which is on the right

14   hand side, what does the translation show as being the date

15   for the conference call?

16   A.    It was going to be on the 22nd of Ramadan, which equated

17   to January 31st.

18   Q.    And just to explain, with regard to the Islamic calendar,

19   is it different from the Gregorian calendar that we use in the

20   United States?

21   A.    The Islamic calendar works off of a lunar cycle, so it is

22   shorter than the Gregorian.

23   Q.    All right.  And so you have to -- If a date is referenced

24   by the Islamic calendar, then you would have to go look and

25   see how that converts to the traditional Gregorian calendar we

1   are used to?

2   A.   Yes.   There is formulas for that.

3   Q.   Okay.   And again, the sponsor for this conference call is

4   shown to be who?

5   A.   The Holy Land Foundation.

6   Q.   Let me ask you, Agent Miranda, if in fact this conference

7   call was intercepted by way of the wiretap?

8   A.   Yes, sir.

9   Q.   Okay.

10         MR. CLINE:   Excuse me, Your Honor.   I apologize for

11  interrupting, but I am confused and others may be as well.

12  Are we saying this is one conference call or two separate

13  conference calls?

14         THE COURT:   Mr. Jacks, do you want to clarify that

15  through the witness?

16         MR. JACKS:   I think it will be clear, Your Honor.

17         THE COURT:   Okay.

18  Q.   (BY MR. JACKS)   Agent Miranda, let me show you what is

19  marked Government's Baker Wiretap No. 23 the transcript, and

20  do you recognize this as at least a transcript of a

21  conversation intercepted on January 31st, 1997?

22  A.   I do, sir.

23  Q.   And it was intercepted pursuant to the court ordered

24  wiretap on the line at that time referred to as the Baker

25  wiretap?

A.   Yes, sir.

         MR. JACKS:  Judge, we move the admission of Baker
Wiretap No. 23.

         MR. CLINE:  Same objections.

         THE COURT:  That has been overruled, and Baker
Wiretap No. 23 is admitted.  .

Q.   (BY MR. JACKS)  Do you have a copy of the transcript?

A.   Yes, sir, I do.

Q.   And again, just to orient us, the date that this
particular conversation was intercepted?

A.   January 31st, 1997.

Q.   And this would be in the flier.  The Arabic version
talked about the call being on January 31st.  Is that correct?

A.   Yes, sir.

Q.   So this would appear to be the call that was referenced
in the Arabic side of that flier or announcement?

A.   Yes, sir, it is.

Q.   Okay.  And would you tell us who is indicated to be the
participants or the speakers in this call?

A.   The speakers are Hamid Al-Bitawi, H-A-M-I-D  A-L dash
B-I-T-A-W-I; the second name, Kamal Al-Hilbawi, which is
spelled K-A-M-A-L  A-L dash H-I-L-B-A-W-I; the last name is
Mohamed Siam, M-O-H-A-M-E-D  S-I-A-M.

Q.   And is there a moderator shown for this conference call?

A.   Yes.  It is Osama Mohamed.

1  Q.   Is that the same person that was the moderator on the

2  earlier conference call we listened to?

3  A.   Let me see if the same exact name is used.  On the

4  previous call they referred to him as Osama Ahmad.

5  Q.   All right.

6          MR. JACKS:  Your Honor, we request permission to

7  publish or play Baker Wiretap No. 23.

8          THE COURT:  Yes, sir.

9          MR. JACKS:  Play the first segment.

10          (Whereupon, Baker Wiretap No. 23, Segment 1, was

11          played, while questions were propounded.)

12  Q.   (BY MR. JACKS)  Agent Miranda, who is telling the

13  speakers what they want -- Who is instructing them what they

14  want them to speak about?

15  A.   That is OS, which is Osama Mohamed.

16  Q.   All right.  Agent Miranda, do you see the line where the

17  moderator is talking about introducing the speakers, and he

18  makes a reference to Abu Mahmoud and how he should introduce

19  him?  First of all who is Abu Mahmoud?

20  A.   That is the Hamas leader Mohammed Siam.

21  Q.   This man shown here in Demonstrative No. 17?

22  A.   Yes.

23  Q.   On the far left in the middle row?

24  A.   Yes, sir.

25  Q.   All right.  And what does Mohammed Siam say or if he

1    needs to be introduced?

2    A.    He says the whole world knows Abu Mahmoud.

3    Q.    Agent Miranda, you see the reference there to Yehia

4    Ayyash?

5    A.    Yes, sir.

6    Q.    Who is he?

7    A.    He was a very famous Hamas bomb maker.

8    Q.    Did he have a nickname?

9    A.    The engineer.

10   Q.    And the second reference is Ahmed Yassin.  Is he shown on

11   Demonstrative No. 17?

12   A.    He is at the top of the chart.

13   Q.    And the third individual referred to is Mousa Abu

14   Marzook.  Correct?

15   A.    That is correct, sir.

16   Q.    This man here on the right hand of the top row?

17   A.    Correct.

18   Q.    Do you see the reference there to Islamic movements?

19   A.    Yes, sir.

20   Q.    And what type of a movement is Hamas?  What is its true

21   name?

22   A.    Islamic Resistance Movement.

23   Q.    This conversation was -- This conference call was

24   sponsored by the Holy Land Foundation.  Is that correct?

25   A.    Yes, sir.

```
1   Q.   So far have you seen any reference to charity in this

2   call?

3   A.   I think you would have to be creative to find it.

4   Q.   Agent Miranda, does this conference call go on, then, for

5   some extended period of time?

6   A.   It does, sir.

7   Q.   Let me ask you if you came across other evidence that was

8   reflective of the speakers used by the HLF and what the result

9   was of those activities, speakers' activities and their

10  fundraising efforts?  Did you come across other evidence

11  reflected on that?

12  A.   Yes, sir.

13            MR. JACKS:  May I approach the witness, Your Honor?

14            THE COURT:  Yes.

15  Q.   (BY MR. JACKS)  Let me show you what has been marked for

16  identification as Government Exhibit El-Mezain Wiretap No. 10.

17  And let you just look at that for a second.  Does that appear

18  to be a facsimile that was intercepted by the wiretap on the

19  El-Mezain wiretap?

20  A.   Yes, sir.

21            MR. JACKS:  Judge, we would move the admission of

22  El-Mezain Wiretap No. 10.

23            MR. DRATEL:  Just the previous written objections,

24  Your Honor.

25            THE COURT:  Those are overruled, and that exhibit is
```

1    admitted.

2    Q.    (BY MR. JACKS)  Do you have a copy of it, Mr. Miranda?

3    A.    Yes, I do.

4           MR. JACKS:  If we could show the first page, please.

5    Thank you.

6    Q.    (BY MR. JACKS)  This document, Agent Miranda, the

7    original that was faxed, is it handwritten, or appear to be

8    handwritten?

9    A.    Yes, sir.

10   Q.    And how many pages is the Arabic original?

11   A.    I show three, sir.

12   Q.    And does it have a date at the top when it shows to have

13   been faxed?

14   A.    Yes, sir.  November 13th, 1994.

15   Q.    All right.  Is there an English translation regarding

16   this particular exhibit?

17   A.    Yes, sir.

18          MR. CLINE:  Your Honor, I apologize for

19   interrupting.  Just going back for a second to the question I

20   asked about the previous exhibit, the conference call, was

21   there one or were there two?  We have January 31st and then we

22   have February 2nd, and it was unclear to me whether there was

23   one or two calls.  We played the January 31st call.  It is not

24   clear whether there was a February 2nd call as well.

25          MR. JACKS:  The only call that has been exhibited is

1    the January 31st call.

2              THE COURT:  And of course you can inquire into that

3    on cross examination if you want to.  Go ahead.

4    Q.   (BY MR. JACKS)  Agent Miranda, directing your attention

5    to the English translation of El-Mezain Wiretap No. 10, first

6    of all, does anything on the exhibit indicate who authored or

7    wrote that document?

8    A.   Yes, sir.  There is a line at the very bottom which is

9    helpful.

10   Q.   All right.  And what does that indicate?

11   A.   It says, "Brother Usama, this is the report of Sheik Deeb

12   about the Brazil trip."

13   Q.   And I am not going to ask you to read this entire

14   exhibit, but can you summarize what is represented in this?

15   Sheik Deeb, is that a person or a name that appears on the

16   Holy Land Foundation overseas speakers list?

17   A.   Yes, sir.  He is No. 18.

18   Q.   And that would be this Deeb, and that is D-E-E-B, last

19   name Anees, A-N-E-E-S?

20   A.   Yes, sir.

21   Q.   And in this document, just what does this individual Deeb

22   Anees relate or describe?

23   A.   His fundraising activities in Columbia and Brazil.

24   Q.   And does he talk about where he went and who he met with?

25   A.   Yes, sir, he does.

1    Q.   Does he make reports about how much money was raised?

2    A.   He talks about that.

3    Q.   And with regard to -- You said this was received at the

4    residence of Mohammad El-Mezain.  Is that correct?

5    A.   Yes, sir.

6    Q.   On the fax machine there.  And do you see at the bottom,

7    who is it addressed to?  Is there a speaker that purports to

8    convey or refer this report?

9    A.   Yes, sir.  It is Sheik Deeb Anees' report.

10   Q.   Okay.  But is someone else --

11            MR. DRATEL:  Objection.  It says Sheik Deeb.

12            THE COURT:  You may point that out on cross,

13   counsel.  He may testify.  Go ahead.

14   Q.   (BY MR. JACKS)  At the bottom of the first English

15   translation?

16   A.   Yes, sir.  It says, "Brother Usama."

17   Q.   And just read that sentence.

18   A.   "Brother Usama, this is the report of Sheik Deeb about

19   the Brazil trip."

20   Q.   And above that there is a parenthetical that indicates

21   where that statement appears.

22   A.   Yes, sir.  It was written vertically on the right side of

23   the text.

24   Q.   Okay.

25            MR. JACKS:  Go back to the first page of the

1    exhibit, please.

2    Q.   (BY MR. JACKS)  Do you see some writing vertically on the

3    right side?

4    A.   Yes, sir, I do.

5    Q.   Would that appear to be where the translator is referring

6    to?

7    A.   Yes, sir, that is what I presume.

8    Q.   Okay.

9           MR. JACKS:  Your Honor, I don't know what your

10   schedule or preference is.

11          THE COURT:  Are you at a good breaking point?

12          MR. JACKS:  Yes, sir.

13          THE COURT:  Let's take the morning break.  Be back

14   at five after 11:00.

15          (Whereupon, the jury left the courtroom.)

16          MS. MORENO:  Your Honor, may I be excused until

17   after lunch?

18          THE COURT:  Sure.  We will see you after lunch.

19       We will be in recess.

20          MR. JACKS:  What time, Your Honor, did you say?

21          THE COURT:  Five after.

22          MS. HOLLANDER:  Your Honor, can I speak for just a

23   second on a funding issue?

24          THE COURT:  You don't need this on the record?

25          MS. HOLLANDER:  No.

1                    (Brief recess.)

2          THE COURT:  Mr. Jacks?

3          MR. JACKS:  Thank you, Your Honor.

4      Could you display El-Mezain again?

5  Q.   (BY MR. JACKS)  Agent Miranda, on the screen before you I

6  believe is the exhibit we were talking about before we broke,

7  and this is the fax received at the fax machine of the

8  Defendant Mohammad El-Mezain on November 13th, 1994.  Is that

9  correct?

10 A.   Yes, sir.

11         MR. JACKS:  And if you would, go, please, to the

12 fourth page of the exhibit, which is the first page of the

13 translation.

14 Q.   (BY MR. JACKS)  And you testified that this is a report

15 prepared by this Sheik Deeb Anees, and you indicated that on

16 the vertical right side of the text is what is shown at the

17 bottom addressing brother Usama.  And the name Usama,

18 U-S-A-M-A and O-S-A-M-A, are they sometimes used

19 interchangeably, or is that name sometimes spelled both with a

20 U and an O?

21 A.   Yes, sir.

22 Q.   And this name Usama, have we seen it in reference to

23 exhibits just earlier this morning?

24 A.   Yes, sir.  He was the moderator on some of the calls we

25 discussed.

1            MR. JACKS:  Okay.  And if you would, could you

2    enlarge the item listed as "second" there?

3    Q.   (BY MR. JACKS)  And there is a sentence or two there, Mr.

4    Miranda, beginning with "The financial situation."  Do you see

5    that?

6    A.   Yes, sir.

7    Q.   What does Deeb Anees report in those two sentences?

8    A.   It says, "The financial situation is very good.  Members

9    of the administrative body are all good.  They did not

10   disagree with nor were they surprised at my talk that included

11   news about the Islamic Movement."

12            MR. JACKS:  All right.  And if you would, please, go

13   to the next page, page 5 of the exhibit, the second page of

14   the translation.

15   Q.   (BY MR. JACKS)  And do you see the item -- Well, actually

16   there are two marked "fourth."  Do you see the second one that

17   is marked "fourth," Mr. Miranda?

18   A.   I see that, sir.

19   Q.   All right.  And would you just read that entry there or

20   that part of the report from Deeb Anees under -- it begins

21   with "The city of."

22   A.   Yes, sir.  "The city of Foz de Iguacu, a city bordering

23   Paraguay.  Khalid Taqi Eddin resides in it.  It has close-knit

24   community by virtue of how small the city is.  I gave the

25   Friday sermon there.  Its mosque is big and good.  The number

1  of worshippers was not more than 50 people.  In the second

2  day, I gave a sermon, about 75 people attended it and about 12

3  were collected in it.  I left with Khalid about 10 as you

4  said."

5  Q.   And the name Khalid Taqi Eddin, is that a name that has

6  appeared elsewhere in the evidence?

7  A.   Yes, it is.

8  Q.   Is he on the speakers list?

9  A.   Yes, sir.  Not on the speakers list, sir.  He is actually

10  on the Palestine Committee list, the outside America section.

11  Q.   Would you please go to or display -- First of all, before

12  you do that, you see in the report there he makes reference to

13  about 12 were collected.  Does that appear to indicate money?

14  A.   Yes, sir.

15  Q.   And he says, "I left with Khalid," and who in this report

16  goes by the name Khalid?

17  A.   Khalid Taqi Eddin.

18  Q.   "I left with Khalid about 10, as you said."

19  A.   Yes, sir.

20  Q.   All right.

21       MR. JACKS:  If you would, go to Ashqar No. 1 or

22  display Ashqar No. 1, please, the English translation.

23  Q.   (BY MR. JACKS)  Can you see that on the screen, Agent

24  Miranda?

25  A.   Yes, sir.

1   Q.   Just to refresh our memory, what is the heading for this

2   particular page?

3   A.   It reads, "Important phone and fax numbers, Palestine

4   section/outside America."

5   Q.   And you mentioned or you testified that this Taqi Eddin

6   is on this list.  Can you tell us where you locate him?

7   A.   He would be No. 12, sir.

8   Q.   What is the entry there for No. 12?

9   A.   It reads Khaled Taqi Eddin, Paraguay, and then a

10   telephone number.

11   Q.   The reference to Islamic Movement that he made in the

12   report about his message about the Islamic Movement -- And

13   what is referred to sometimes as the Islamic Movement?

14   A.   The Islamic Resistance Movement.

15   Q.   Okay.  What is that?

16   A.   Hamas.

17   Q.   I wanted to just go back for a moment to the conference

18   call.

19         MR. JACKS:  And if you could, please, display Baker

20   Wiretap No. 22.  And if you would, go to the next page, which

21   is the translation of the Arabic portion of the first page.

22   Q.   (BY MR. JACKS)  And what is the date that that conference

23   call is supposed to take place?

24   A.   January 31st.

25   Q.   And if you would --

1          MR. JACKS:  May I approach the witness, Your Honor?

2          THE COURT:  Yes.

3     Q.   (BY MR. JACKS)  Do you have your transcript of that call,

4     Baker Wiretap No. 23?

5     A.   Yes, I have that, sir.

6     Q.   Okay.  Just refresh our memory regarding when this actual

7     conference call was intercepted.

8     A.   It was intercepted on January 31st, 1997.

9     Q.   And is that after Hamas has been designated as a

10    specially designated terrorist organization?

11    A.   Yes, sir.

12    Q.   There was a -- We heard the comments by the first two

13    individuals Hilbawi and Siam.  I would like to play the

14    comments by the last individual.

15         MR. JACKS:  Your Honor, at this time we would

16    propose to just play a small portion of Baker Wiretap No. 23.

17         THE COURT:  All right.

18         (Whereupon, portions of Baker Wiretap No. 23 were

19              played, while questions were propounded.)

20    Q.   (BY MR. JACKS)  And the KA would indicate who is the

21    speaker?

22    A.   Kamal Hilbawi.

23    Q.   Again, Agent Miranda, the three individuals that this

24    speaker refers to, are they the same three individuals that

25    the earlier speakers referred to?

A.   Actually I believe they are the same -- Excuse me, sir.
Let me double check on that.  Actually it is Kamal Hilbawi who
references these three Hamas individuals twice.

Q.   All right.  The same three individuals, though?

A.   The same three Hamas figures.

Q.   Yehia Ayyash, Ahmed Yassin, and Mousa Marzook?

A.   Correct.

Q.   And who was soliciting for donations in the last part of
that conversation?

A.   The Holy Land Foundation, sir.

Q.   With regard to -- Going back to this individual that we
saw the report from South America, Deeb Anees, let me ask
you -- Strike that.  In your investigation, were there
conversations or evidence that was uncovered that was further
reflective of either the activity between the Holy Land
Foundation and this individual Deeb Anees?

A.   Yes, sir.

     MR. JACKS:  May I approach, Your Honor?

     THE COURT:  Yes.

Q.   (BY MR. JACKS)  I show you what has been marked for
identification as Government Exhibit Baker Wiretap No. 24.

A.   Right.

Q.   And is that a transcript of the interception of a
conversation on the Shukri Abu Baker wiretap?

A.   It is, sir.

1          MR. JACKS:  Judge, we move the admission of Baker

2    Wiretap No. 24 and 24-A.

3          MR. CLINE:  Our written objections again, Your

4    Honor, please.

5          THE COURT:  Those have been overruled, and Baker

6    Wiretap Exhibits No. 24 and 24-A are admitted.

7          MR. JACKS:  Judge, we request to publish Baker

8    Wiretap No. 24 and 24-A.

9          THE COURT:  Yes, sir.

10   Q.   (BY MR. JACKS)  Agent Miranda, before we begin playing

11   this particular conversation, can you tell us when this

12   conversation was intercepted?

13   A.   Yes, sir.  12/12/1999.

14   Q.   And who are the participants in this conversation?

15   A.   They are the Defendant Shukri Abu Baker and the Defendant

16   Abdulrahman Odeh.

17   Q.   All right.

18          MR. JACKS:  If you would, begin.

19          (Whereupon, Baker Wiretap No. 24-A was played, while

20          questions were propounded.)

21   Q.   (BY MR. JACKS)  Agent Miranda, again, the two persons

22   having this conversation are who?

23   A.   The Defendant Shukri Abu Baker and the Defendant

24   Abdulrahman Odeh.

25   Q.   And the individual -- one of the individuals they are

1    talking about is who?

2    A.    Sheikh Deeb Anees.

3    Q.    And it appears that the spelling is with a Z as opposed

4    to a D?

5    A.    Right.

6    Q.    But is that sometimes done or does that --

7    A.    I have heard it pronounced a little bit differently, and

8    I have seen it spelled two different ways.

9    Q.    All right.  Now, you testified yesterday about the means

10   and the manner in which the Holy Land Foundation would raise

11   funds.  Is that correct?

12   A.    Yes, sir.

13   Q.    And I think you testified that one of the ways that they

14   would do it was through appearing at mosques or on occasions

15   at mosques.  Is that correct?

16   A.    Mosques and other locations, yes, sir.

17   Q.    And with regard to the fundraising efforts at mosques,

18   when would those be done?

19   A.    Throughout the year it was done.  Fridays were popular,

20   of course.  After or during Ramadan, of course, was a huge

21   period.

22   Q.    All right.  And Ramadan is what?

23   A.    It is Muslim holy day.  It is a period of fasting,

24   lasting a certain length of time where Muslims are supposed to

25   fast and abstain from other activities during the hours of

1    daylight.

2    Q.    All right.  And you said that they would also attempt to

3    go into mosques and raise funds on Friday.  Why would Friday

4    be a better day, if it would?

5    A.    Friday prayer for Muslims is the communal prayer.  The

6    noon prayer is the one that they are encouraged to attend,

7    when possible.  So generally Friday prayer is the one that is

8    by far the most crowded.

9    Q.    All right.  And with regard to -- Who would the Holy Land

10   Foundation have to talk to to be able or get permission to do

11   these collections in these mosques?

12   A.    Well, it was generally the administration of the mosque,

13   which would be either a Shura Council, or an emam if maybe the

14   emam held maybe more prestige or pull in the mosque.

15   Q.    From your investigation in this case, was there

16   competition among groups to have access or be given the

17   opportunity to raise funds within a mosque?

18   A.    Absolutely.  Because if a community only has so much

19   money to give, sometimes the competition was to keep the money

20   within the community, maybe to build an addition to the mosque

21   or for a project that the local community was interested in,

22   as opposed to an organization coming from outside, like the

23   Holy Land Foundation, to collect for its purposes.  So there

24   was always a competition, as reflected throughout the

25   investigation, for the better days, the better time slots.

1    And by doing that you put yourself in a position to collect

2    more money.

3    Q.   Was there any evidence that any of these mosques or other

4    sites that would allow the Holy Land Foundation -- would limit

5    or restrict the number of days that they could come in and

6    seek to solicit funds?

7    A.   I have seen that as well.

8    Q.   Now, just -- In this particular conversation with regard

9    to Sheikh Deeb Anees, what does it appear that has happened?

10   A.   It appears that he was brought in to raise funds for one

11   purpose.  He started raising funds in the name of Palestine,

12   and as a result, a local mosque was upset, thinking that he

13   was raising funds for the HLF at that moment and therefore was

14   going to remove the HLF's slot that they already had

15   scheduled.

16   Q.   In the future that would be upcoming?

17   A.   Right.

18   Q.   Do you see the reference there where Shukri Baker is

19   saying, "My son, this, this man collects funds flatly and

20   publicly for the benefit of Samah and her sisters flatly and

21   publicly"?

22   A.   Yes, sir.

23   Q.   And have we seen that reference or that term before?

24   A.   We have seen it a couple of times.

25   Q.   And in what context or what was the definition or

1 term -- What was that reference?

2 A.   It is Hamas spelled backwards.

3 Q.   Is that -- Did you see that in the Philadelphia meeting?

4 A.   We saw that in the Philadelphia meeting and elsewhere.

5 Q.   Again, Agent Miranda, when was this call intercepted?

6 A.   12/12/1999.

7 Q.   Do you see the reference to Abu Ibrahim wanted to issue a

8 paper to recommend him?

9 A.   Yes, sir.

10 Q.   Who is Abu Ibrahim?

11 A.   That would be the Defendant Mohammad El-Mezain.

12 Q.   By the way, where was this mosque that this disagreement

13 was over?  Where was it located?

14 A.   New Jersey.

15 Q.   Agent Miranda, where on the speakers list does Deeb Anees

16 appear?

17 A.   No. 18, sir.

18 Q.   And where is he from?

19 A.   Jordan.

20 Q.   In the course of your investigation, did you locate

21 evidence such as videotapes that depicted or showed some of

22 the individuals that are listed on this speakers list?

23 A.   Yes, sir.

24 Q.   Are you familiar with a videotape identified as

25 Government's Exhibit Mushtaha Search No. 3?

1    A.    Yes, sir.

2    Q.    And is that a videotape that was seized or found in the

3    backyard of what used to be the residence of Fawaz Mushtaha?

4    A.    Yes, sir.

5    Q.    Is it one of those that was buried in that backyard?

6    A.    Yes, sir.

7              MR. JACKS:  Judge, we move the admission of Mushtaha

8    Search No. 3, the video.

9              MR. CLINE:  We make our written objections, Your

10   Honor.

11             THE COURT:  That is overruled, and Mushtaha Search

12   No. 3 is admitted.

13   Q.    (BY MR. JACKS)  Are you familiar, Agent Miranda, with the

14   persons that we are going to be seeing in this video?

15   A.    Yes, sir.

16   Q.    Okay.  Who is going to be shown in this video?

17   A.    Let me find my note on who is on this particular one.

18   Q.    I will tell you what.  Why don't we just go ahead and

19   play it, and I will ask you to identify the persons as they

20   appear.

21             MS. HOLLANDER:  Could we have a date, please?

22             MR. JACKS:  I believe it will be established from

23   the video, but it is 1990.

24             (Whereupon, Mushtaha Search No. 3 was played, while

25             questions were propounded.)

1    Q.    (BY MR. JACKS)   Agent Miranda, does this appear to be

2    like someone's home video or somebody is holding the camera?

3    A.    Yes, sir.

4    Q.    Who are the two persons shown on the screen right now?

5    A.    The individual on the right is the Hamas leader Mohammed

6    Siam; Abu Mahmoud, that is.

7    Q.    Let me go back to Demonstrative No. 17 and show us where

8    it is in the demonstrative.

9    A.    Upper left in the orange.

10   Q.    The man on the left in the picture?

11   A.    The individual on the left was the Hamas leader at the

12   time Jamil Hamami.

13   Q.    And he is shown at the bottom.   Is that correct?

14   A.    That is right.   The third one over from the left, he is

15   wearing the white shirt.

16   Q.    Although you can't see his face, who is the man on the

17   left now that is embracing Mohammed Siam?

18   A.    That is the current Hamas leader Zahar.

19   Q.    And is he the individual on Demonstrative No. 17, the

20   middle row to the far right?

21   A.    It is the same.

22   Q.    Okay.   Have we seen his image in earlier videos?

23   A.    Yes.   We saw a video where Mahmoud Zahar, the Defendant

24   Mohammad El-Mezain and Jamil Hamami were all sitting in a

25   theater listening to an HLF presentation.

1  Q.   Was that Mushtaha No. 1?

2  A.   I am not sure of the exhibit number.

3  Q.   Were they sitting in the audience?

4  A.   In the audience, correct.

5  Q.   Okay.  The man shown there on the left shaking Mohammed

6  Siam's hand, do you recognize that individual?

7  A.   I have seen him before.  I am not exactly certain who he

8  is.  I would be guessing.

9  Q.   All right.  The individual on the far right that is

10  kissing Mahmoud Zahar on the cheek, who is that?

11  A.   That is the Defendant Mufid Abdulqader.

12       MR. JACKS:  Would you go to the next segment,

13  please?

14       (Whereupon, Mushtaha Search No. 3, Segment 2 was

15       played, while questions were propounded.)

16  Q.   (BY MR. JACKS)  Before you start the next segment, Agent

17  Miranda, these segments were, or this videotape was --

18  whatever segments or parts are to it, that was the way it was

19  found.  Correct?

20  A.   Yes, sir.

21  Q.   Now, it may have been edited down for time constraints

22  for this trial, but in terms of what was on there, that is

23  what is on this tape?

24  A.   Other than the English scrolling on the bottom.

25  Q.   All right.

1          MR. JACKS:  Go ahead, please, Jim.  I believe it

2     will be segment 3.

3               (Whereupon, Mushtaha Search No. 3, Segment 3 was

4               played.)

5          MR. JACKS:  If you will go to the next segment,

6     please.

7               (Whereupon, Mushtaha Search No. 3, Segment 4 was

8               played, while questions were propounded.)

9     Q.   (BY MR. JACKS)  Do you see a reference on the caption to

10    al-Banna and al-Qassam?

11    A.   Yes, sir.

12    Q.   Al-Banna, do you know who that would refer to?

13    A.   That is Hassan al-Banna, the founder of the Muslim

14    Brotherhood.

15    Q.   And the al-Qassam, is that an individual?

16    A.   It is a reference -- it is the namesake of the Hamas

17    military wing.  Izz el-Din al-Qassam was the name of the

18    individual the military wing of Hamas is named after.

19    Q.   And was he killed sometime in the 1930s.

20    A.   '39, I believe.

21          MR. JACKS:  Would you go to the next segment,

22    please.  I believe it is segment 6.

23               (Whereupon, Mushtaha Search No. 3, Segment 6 was

24               played, while questions were propounded.)

25    Q.   (BY MR. JACKS)  Agent Miranda, who is this appearing on

1   the screen?

2   A.   That is the Defendant Mohammad El-Mezain.

3   Q.   Agent Miranda, does this appear to be the same setting,

4   the same stage where Mahmoud Zahar was speaking and Jamil

5   Hamami?

6   A.   I believe it is.

7   Q.   Same curtain?

8   A.   I believe it is.

9        MR. JACKS:  Would you go to the next segment,

10  please, Jim?

11       (Whereupon, Mushtaha Search No. 3, Segment 7 was

12       played.)

13       MR. JACKS:  The next segment, please.

14       (Whereupon, Mushtaha Search No. 3, Segment 8 was

15       played.)

16  Q.   (BY MR. JACKS)  Agent Miranda, were there other

17  videotapes that showed some of the speakers that the Holy Land

18  Foundation utilized and that appeared on the Defendants

19  speakers list?

20  A.   Yes, sir.

21  Q.   Are you familiar with Mushtaha Search No. 11, another

22  videotape seized within the backyard of what used to be the

23  home of Fawaz Mushtaha?

24  A.   Yes, sir.

25       MR. JACKS:  Your Honor, we move the admission of

1    Mushtaha Search No. 11.

2            THE COURT:  Same objection?

3            MR. CLINE:  Yes, Your Honor.

4            THE COURT:  That objection is overruled, and

5    Mushtaha Search No. 11 is admitted.

6            MR. JACKS:  If you will play the first segment, and

7    I will ask you to stop somewhere in there.

8            (Whereupon, Mushtaha Search No. 11, Segment 1 was

9            played, while questions were propounded.)

10   Q.   (BY MR. JACKS)  Who is the individual depicted there

11   holding the gun?

12   A.   That is the Defendant Mufid Abdulqader.

13           MR. DRATEL:  Can we have a date on this, please?

14           MR. JACKS:  1988.

15   Q.   (BY MR. JACKS)  For the record, Agent Miranda, who is the

16   individual appearing on the screen now?

17   A.   The Hamas leader Mohammed Siam.

18           MR. JACKS:  Is there one more segment?  Play that.

19           (Whereupon, Mushtaha Search No. 11, Segment 2 was

20           played, while questions were propounded.)

21   Q.   (BY MR. JACKS)  I believe there is one additional logo

22   that comes up, Agent Miranda.

23       Some of the speakers that you talked about, I think

24   you -- Did you testify about an individual Khalil Al-Kuka, No.

25   38 on the list?

A.   Yes.

Q.   And was there any documentary evidence that we have seen that referred to him in the last day or so?

A.   Yes, there was a document, a handwritten document from the search of Elbarasse's residence.

Q.   All right.  And did you uncover any videotapes where he was shown?

A.   Yes.

Q.   I direct your attention to what is referred to as Mushtaha Search No. 12.  Are you familiar with that videotape?

A.   Yes, sir.

Q.   And was that a videotape seized from the backyard of what was Fawaz Mushtaha's house?

A.   Yes, sir.

     MR. JACKS:  Judge, we would move the admission of Mushtaha Search No. 12.

     MR. CLINE:  The written objections.

     THE COURT:  That is overruled, and Mushtaha Search No. 12 is admitted.

     MR. JACKS:  And would you play the first segment of that, please?

     MS. HOLLANDER:  Can we have the date, please?

     MR. JACKS:  I believe it is going to be 1990 to '91.

     (Whereupon, Mushtaha Search No. 12, Segment 1 was played.)

```
 1              MR. JACKS:  The next segment, please.

 2              (Whereupon, Mushtaha Search No. 1  2, Segment 2 was

 3              played, while questions were propounded.)

 4   Q.   (BY MR. JACKS)  Do you know or can you recognize that

 5   individual?

 6   A.   Yes, I know who he is.

 7   Q.   Who is that?

 8   A.   That is Rashid Qurman.

 9   Q.   Has his name appeared on any documents that we have seen?

10   A.   Yes, sir.  He is on the Palestine Committee.

11   Q.   All right.  And we will come back to that in a moment.

12        The individual that is shown there wearing the

13   Palestinian flag and the keffiyeh or hood, what was he

14   carrying in his hand or what did he appear to be carrying in

15   his hand?

16   A.   He is holding the Quran.  And if I could say that it is

17   not actually the Palestinian flag because it has the writing

18   down the middle of it.  It is not truly the Palestinian flag

19   with that writing.

20   Q.   All right.  The man there shown holding the two children,

21   who is that?

22   A.   That is Sharif Battihki.

23              MR. JACKS:  The next segment, please.

24              (Whereupon, Mushtaha Search No. 12, Segment 3 was

25              played, while questions were propounded.)
```

1   Q.  (BY MR. JACKS)  All right.  Agent Miranda, the individual

2   in the center of the screen, who is that?

3   A.  You mean to the left with the microphone?

4   Q.  Yes.

5   A.  That is Khalil Al-Kuka.

6   Q.  The man we have been referring to?

7   A.  Right.  He is the Hamas individual.

8          MR. JACKS:  The next segment, please.

9          (Whereupon, Mushtaha Search No. 12, Segment 4 was

10          played, while questions were propounded.)

11   Q.  (BY MR. JACKS)  All right.  The man shown on the screen

12   is who?

13   A.  That was the Defendant Mohammad El-Mezain who just walked

14   on.

15          MR. JACKS:  Next one, please.

16          (Whereupon, Mushtaha Search No. 12, Segment 5 was

17          played, while questions were propounded.)

18   Q.  (BY MR. JACKS)  Who is the individual shown on the screen

19   now, Agent Miranda?

20   A.  That is the Defendant Shukri Abu Baker.

21   Q.  Did you see a reference in there to a city?

22   A.  Yes; dallas.

23   Q.  All right.  Did that indicate to you that it was

24   occurring in Dallas?

25   A.  Correct.

1    Q.   Were there additional videos that depicted persons on

2    those speakers list?

3    A.   Yes.

4    Q.   Are you familiar with Elbarasse Search Warrant No. 21?

5    A.   I would have to see it, sir.

6         MR. JACKS:  Your Honor, I believe it has already

7    been admitted, Elbarasse Search Warrant No. 21?

8         MR. CLINE:  I am sorry.  I don't show it as being --

9         THE COURT:  I don't see it either.

10        MR. CLINE:  And we have our written objections.

11        THE COURT:  You have your written objection, yes.

12   Q.   (BY MR. JACKS)  Do you recall viewing a videotape with an

13   individual Kofahi in it?

14   A.   Yes, I have.

15   Q.   And is that video one of the Elbarasse search warrant

16   videos that was seized from the house of Ismail Elbarasse?

17   A.   Yes, sir.

18        MR. JACKS:  We would move for the admission of

19   Elbarasse Search No. 21.

20        THE COURT:  And you have your written objections.

21   That is overruled, and that exhibit is admitted.

22        MR. JACKS:  Can you play that first part of that?

23        (Whereupon, Elbarasse Search No. 21, Segment 1 was

24        played.)

25        MR. JACKS:  Would you go to the next segment,

please?

        (Whereupon, Elbarasse Search No. 21, Segment 2 was

        played.)

        MR. JACKS:  And the next one, please.

        (Whereupon, Elbarasse Search No. 21, Segment 3 was

        played.)

Q.  (BY MR. JACKS)  And who is that gentleman Kofahi raising

funds for?

A.   For the Holy Land Foundation.

Q.   And this videotape was from what year?

A.   I think this was from -- I would have to see.  I thought

it was within the context of the video.

        MR. JACKS:  Let's go back to the first clip.

     (Whereupon, Elbarasse Search No. 21, Segment 1 was

     played.)

        THE WITNESS:  There it is.  Jerusalem festival 2000.

Q.  (BY MR. JACKS)  And when was Hamas designated as a

specially designated terrorist organization?

A.   1995.

Q.   When was it designated as a foreign terrorist

organization?

A.   1997.

Q.   Let me just ask you, Agent Miranda --

        MR. JACKS:  Would you please -- I believe it is

Elbarasse No. 10.  Can you display that, please?

1   Q.   (BY MR. JACKS)  Do you recognize this exhibit?

2   A.   Yes, sir.

3   Q.   And this was taken from the house of Ismail Elbarasse?

4   A.   Yes, sir.

5   Q.   And just to refresh, what is that first page?

6   A.   The Central Committee chart.

7   Q.   All right.  Central Committee refers to what?

8   A.   The Palestine Committee.

9        MR. JACKS:  Could you go, please, to I believe the

10  third or fourth page of the exhibit, please, the translation?

11  Q.   (BY MR. JACKS)  All right.  You made reference in I

12  believe that last videotape -- Excuse me.  The one before last

13  that made reference to Dallas, Texas to an individual Rashid

14  Qurman?

15  A.   Rashid Qurman.  That is right, sir.

16  Q.   Does he appear on this chart that was attached to this

17  Central Committee organizational chart?

18  A.   Yes.  If you -- I think the easiest way to do this if you

19  go down to point 6 where it says "organizational aspects."  It

20  is kind of in the middle.  Now go to your right and you will

21  see point No. 1 "rehabilitation and training committee."  If

22  you can expand that a little bit.

23       MR. JACKS:  First let's start with the bottom right,

24  if you would, No. 1 right there.  Just enlarge that, please.

25  Q.   (BY MR. JACKS)  All right.  And is that the reference to

1  Rashid that you were talking about?

2  A.   Yes, that is one reference.

3  Q.   All right.  And that is for rehabilitation and training

4  committee.  Is that correct?

5  A.   Yes, sir.

6        MR. JACKS:  Could you zoom out again, please?

7  Q.   (BY MR. JACKS)  And where else does he appear?

8  A.   If you go to kind of the upper right area, he is behind

9  No. 9.

10  Q.   Okay.  It is not aligned with the rest of the names in

11  the column.  Is that correct?

12  A.   That is correct, sir.

13        MR. JACKS:  Could you zoom out again, please?

14  Q.   (BY MR. JACKS)  And that was the man that came out and

15  was kind of the narrator or holding the microphone in the

16  first part?

17  A.   Right.  There is one more reference to him on the page.

18  There is two more references to him, if you want to kind of

19  enlarge the bottom left area.  There is one under No. 11.  It

20  says Rashid.

21        MR. JACKS:  Could you zoom back out to that corner

22  that says "committee chairman"?

23  Q.   (BY MR. JACKS)  Okay.  Now, you said he is No. 11?

24  A.   Right.

25  Q.   And how many people have names or numbers next to their

1    name there?  How many people are on that particular --

2    A.    It shows 15.

3    Q.    All right.  So if you looked at the list, what column

4    would that put him under?

5    A.    It appears to put him under the first column.

6    Q.    Which is what?

7    A.    The Central Committee.

8    Q.    And is that because it goes 1 through 8, and the next

9    number goes over to 9, Shukri?

10    A.    Yes, sir.

11    Q.    All right.  You said that there was another place where

12    his name appeared?

13    A.    Yes.  If you will just expand that and you will scoot

14    over a little bit to under No. 6, the organizational aspect,

15    there is another reference to him right there, Rashid.

16    Q.    Okay.

17          MR. JACKS:  Zoom back out, please.  Thank you.

18          THE WITNESS:  And I was going to say, to know the

19    last name Qurman, you just have to go to the exhibit that we

20    have used numerous times which is --

21    Q.    (BY MR. JACKS)  Ashqar No. 1?

22    A.    Correct; Ashqar No. 1.

23          MR. JACKS:  Can you display Ashqar No. 1, please?

24    Q.    (BY MR. JACKS)  Now, this was the list that was

25    photographed in the house of Abdel Haleem Ashqar in Oxford,

1    Mississippi, December '93?

2    A.   Yes, sir.

3    Q.   All right.  This is -- What is the heading of this page

4    again, just to orient us?

5    A.   "Important phone and fax numbers, Palestine

6    section/America."

7    Q.   Where is Rashid Qurman shown on here?

8    A.   He is No. 17, sir.

9         MR. JACKS:  Could you enlarge that, please?

10   Q.   (BY MR. JACKS)  And it shows what state next to his name?

11   A.   Alabama.

12        MR. JACKS:  Could you zoom back out, please?

13   Q.   (BY MR. JACKS)  All right.  Did you have the ability or

14   did you have the opportunity to take Ashqar No. 1, that

15   Palestine section list from Ashqar's house, and Elbarasse No.

16   10, the chart and the pages following it from Elbarasse's

17   house, and look at those names and then compare that to what

18   Mohammad El-Mezain said in his deposition in the lawsuit in

19   which he was deposed?

20   A.   Yes, I did, sir.

21        MR. JACKS:  Could you please pull up the El-Mezain

22   deposition?

23        MR. DRATEL:  May we have a moment, Your Honor?

24        MR. JACKS:  Would you be able to pull up -- Let's

25   start with Ashqar No. 1.  Can you pull it up as well?

1   Q.   (BY MR. JACKS)  Agent Miranda, can you see those exhibits

2   on the screen?

3   A.   Yes, I can, sir.

4   Q.   Directing your attention to No. 25, who is shown as No.

5   25 on the Palestine section/America list.

6   A.   Omar Yehya.

7   Q.   And you have testified about him yesterday.  Does he go

8   by another name?

9   A.   Omar Ahmad.

10  Q.   And where did you say that he is from, where he lives?

11  A.   In the Bay area, California.

12  Q.   And where else has he appeared in this evidence?  Just

13  examples.

14  A.   Giving orders for the Holy Land Foundation to send money

15  overseas, directing the Defendant Shukri Abu Baker to give the

16  Defendant Mohammad El-Mezain so much compensation, discussions

17  regarding the conflict between the Holy Land Foundation and

18  Abdel Haleem Ashqar's organization, which is the al-Aqsa

19  mosque or Al-Aqsa Educational Fund.

20  Q.   Was he at the Philadelphia meeting?

21  A.   Yes.

22  Q.   All right.  Did we see instances where he was speaking at

23  the Philadelphia meeting?

24  A.   We had the exhibit where they talked about how the Holy

25  Land Foundation's early fundraising efforts were kind of under

1    the tone of military breeding or upbringing.

2    Q.    All right.  That was him and Mr. Abu Baker speaking?

3    A.    That was an exchange between those two, yes.

4    Q.    Was Mr. El-Mezain questioned about his knowledge or

5    relationship with Omar Ahmad in his deposition?

6    A.    Yes, he was.

7    Q.    Could you, Agent Miranda, just go through the question

8    and answer there, and relate to us the question and answer as

9    it was asked of Mr. El-Mezain and his response about his

10   relationship with Omar Ahmad?

11   A.    Sure.  The question is by a lawyer and the answer is

12   going to be the Defendant Mohammad El-Mezain.  The question

13   reads, "Do you know a man by the name of Omar Ahmad?"

14        Answer:  "Yes."

15        Question:  "How is it that you know Mr. Ahmad?"

16        Answer:  "Met him in conference."

17        Question:  "Do you recall which conference or

18   conferences?"

19        Answer:  "I don't recall.  But it was in MAYA."

20        Question:  "At a MAYA conference?"

21        Answer:  "Yeah."

22        Question:  "Was it one or more conferences?"

23        Answer:  "More than one."

24        Question:  "And just so we're on the same page, for the

25   record when you say MAYA, you're referring to the Muslim

1    American Youth Association?"

2            MR. JACKS:  I believe it continues on to the next

3    page.  It would be page 25.

4            THE WITNESS:  Answer:  "You're right."

5        Question:  "The MAYA conferences that you are referring

6    to, do you recall where those were held?"

7        Answer:  "I don't recall exactly which one of them."

8        Question:  "Do you recall whether any of them were in

9    Kansas City?"

10       Answer:  "I don't recall."

11       Question:  "The MAYA conferences where you met Mr. Ahmad,

12   was either one of you a speaker at the conference?"

13       Answer:  "No."

14       Question:  "No.  Have you had any personal dealings with

15   Mr. Ahmad outside of the MAYA conferences --"

16       Answer:  "No."

17   Q.   Agent Miranda, anywhere in that deposition did Mohammad

18   El-Mezain acknowledge that he and Omar Ahmad were part of the

19   Palestine Committee?

20           MR. DRATEL:  I object to the form of the question,

21   Your Honor.

22           THE COURT:  Overruled.

23           THE WITNESS:  No, he never admitted that those two

24   individuals, he himself and Mr. Ahmad --

25           MR. DRATEL:  Object, Your Honor.  Beyond the scope.

1          THE COURT:  Overruled.

2     Q.   (BY MR. JACKS)  With regard, did he make any reference to

3     the Philadelphia meeting?

4     A.   No.

5     Q.   Did he make any reference or --

6          MR. DRATEL:  We object, Your Honor, really in terms

7     of the nature of the deposition and the questions asked and

8     answered that this is inappropriate.

9          THE COURT:  Overruled.

10    Q.   (BY MR. JACKS)  Any reference to the position or the fact

11    that Omar Ahmad was discussing what salary he was going to

12    received from the Holy Land Foundation?

13    A.   No, sir.

14         MR. DRATEL:  Object, Your Honor, again.  The

15    deposition speaks for itself.

16         THE COURT:  He is asking him to summarize, counsel,

17    without having to pull it up.  I overruled.  I understand the

18    objection and I have overruled it.  Go ahead.

19         Why don't we break here.  Let's take the lunch break.  Be

20    back at 1:45.

21         (Whereupon, the jury left the courtroom.)

22         THE COURT:  Ms. Hollander, is there something you

23    need to take up?

24         MS. HOLLANDER:  Yes.  I would just like to see Agent

25    Miranda's notes that he is using to refresh his recollection.

1          THE COURT:  Mr. Jacks, do you want to --

2      And we are adjourned.  Those who want to leave can leave,

3  and those who want to stay can stay.

4                      (Lunch recess.)

5          THE COURT:  Mr. Jacks?

6          MR. JACKS:  Thank you, Your Honor.

7  Q.  (BY MR. JACKS)  Agent Miranda, I believe when we broke

8  for lunch we were looking at the deposition of Mohammad

9  El-Mezain and the Palestine Committee list from the house of

10  Abdel Haleem Ashqar.

11          MR. JACKS:  Can you post both of those exhibits and

12  post them on a split screen?

13  Q.  (BY MR. JACKS)  I believe, Mr. Miranda, we had looked at

14  Mr. El-Mezain's remarks when asked about Omar Ahmad.  Was he

15  also asked about Ismail Elbarasse, the man whose house was

16  searched in August of 2004?

17  A.   Yes, sir.

18          MR. JACKS:  Would you go, it is to page 26 of the

19  actual deposition?

20  Q.  (BY MR. JACKS)  And beginning at line 5 there, would you

21  read all of that page?  And it think it goes on to the next

22  page.

23  A.   Yes, sir.  Again the questions are posed by a lawyer and

24  the answers are by the Defendant Mohammad El-Mezain.

25          Question:  "Do you know a man by the name of Ismail

1    Elbarasse?"

2         "Yes."

3         "How is it you know Mr. Elbarasse?"

4         "One of MAYA conferences also."

5         "Do you recall where the MAYA conference was held?"

6         "I don't know.  MAYA conferences years too long."

7         "Do you recall roughly what the time frame was you met

8    Mr. Elbarasse at a MAYA conference?"

9         "Is in eighties."

10        "How about Mr. Omar Ahmad?  Can you tell me the time

11   frame?"

12        "It is in the eighties."

13        "So you met both of these gentlemen at MAYA conferences

14   in the eighties?"

15        "Yeah."

16        "Other than the MAYA conference" --

17             MR. DRATEL:  Your Honor, I think we need to

18   approach.

19             THE COURT:  All right.

20             (The following was had outside the hearing of the

21             jury.)

22             MR. DRATEL:  This is the version that I was given.

23   It stops there.

24             MR. JACKS:  I think he has been given a later

25   version, Your Honor.

1        MR. DRATEL:  I don't know what I am supposed to do.

2  Guess?  This is the entire deposition.  Once it went past

3  there I don't know where we went.

4        THE COURT:  He says you have it all.

5        MR. DRATEL:  I just wanted to make sure.  I have the

6  whole deposition, but I mean, I was looking at that and I have

7  to go on from looking at this.

8        MR. JACKS:  I thought you were told that.  I mean,

9  the changes were made and then it was conveyed to you.

10        MR. DRATEL:  No.  It is not on the list from Mr.

11  Miranda.  This deposition is not on the list of exhibits from

12  Mr. Miranda, just so we are clear.

13        THE COURT:  What I had asked him were the ones they

14  were going to try to --

15        MR. DRATEL:  We got --

16        THE COURT:  -- to try to introduce.

17        MR. DRATEL:  We got a list of those introduced

18  already and those they were going to introduce.

19        THE COURT:  They are not required to give you a list

20  of all --

21        MR. DRATEL:  We were given a list that -- I am not

22  objecting.  I am just making it clear.

23        THE COURT:  They are not required to do that.

24        MR. DRATEL:  I want to know how far you want to go.

25  I don't even know how far they are going.

1           THE COURT:  I don't think they have to tell you that

2      in advance.

3           MR. DRATEL:  I think they do, because I may have 106

4      issues or objections to specific questions and answers.  I

5      don't know where they are going.

6           MS. DUNCAN:  I think part of the problem is when we

7      introduce an exhibit and then they start adding parts, they

8      are adding a new exhibit and we not on notice of them doing

9      it.  So all we are asking is that they give us notice when

10     they supplement so we can be prepared for it.

11          MR. JACKS:  I was under the belief that they had

12     been made aware.  I will check and see.

13          THE COURT:  That you had told them?

14          MR. JACKS:  Yes.

15          THE COURT:  They all seem to be saying no.  You

16     better check that and make sure that that is correct.  If you

17     have given them notice that this is how far you are going and

18     you are going beyond that, of course they need to owe.

19          MR. JACKS:  I need a second to check and see.  And I

20     may have a sheet of paper which delineates --

21          THE COURT:  Where you are going, the pages and

22     lines?

23          MR. JACKS:  Yes.  Let me look.

24          THE COURT:  Is this what you had been told?

25          MR. DRATEL:  This is what we have been told.  This

1    is --

2             THE COURT:  Your own notes?

3             MR. JONAS:  Sorry, Judge.  If I knew this was going

4    to be an issue that I would need to be involved in I would

5    have come up here.

6        I provided a copy of the deposition that is currently the

7    one that is being used to Aaron last week at some point.

8             MR. DRATEL:  This is the only one I have got.

9             MR. JONAS:  The copy we provided -- What we did, we

10   took out the blank pages and squenched it up.  I believe I

11   gave him a paper copy and a disk, but I very specifically

12   remember giving it to him.

13            MR. DRATEL:  This is all I have, and this is the one

14   that is marked.  I mean, how far do you plan to go?  I just

15   need to know how far you are going to go.

16            MR. JACKS:  This is how far I am going.

17            MR. JONAS:  This may be the older version.

18            THE COURT:  That is what Mr. Jacks was saying.

19            MR. JONAS:  Because we conferred as to the sections

20   they wanted in and out, and we had an understanding, and that

21   is when we made the changes and provided it to Aaron.  That

22   was last week.  The fact there are blank spaces tells me this

23   is an older version.

24            MR. DRATEL:  And which are you going to get into

25   now?  Are you going to get into all of them now?

1              MR. JACKS:  Yes.

2              MR. DRATEL:  I need to copy them down.  I mean --

3              THE COURT:  You can be looking at them.

4              MR. DRATEL:  If they have another copy, I can look

5    at them while we --

6              THE COURT:  Do you have another copy of this?

7              MR. JACKS:  No, I don't.

8              MR. MYSLIWIEC:  This does not include the part that

9    you agreed to keep out about the Treasury document.

10             MR. JACKS:  There is nothing in there about the

11   Treasury.

12             MR. JONAS:  This does not contain -- This contains

13   -- Because what I had done was based upon what Jim had wanted

14   in there and what I wanted in there, and I kept out what you

15   wanted out.  And in fact, the last page is that the one page

16   with just the correction that pertains to the portions we kept

17   in.  I remember I gave you a copy of this last week.

18             MR. MYSLIWIEC:  This document?

19             MR. JONAS:  No, no.  The final version of this.

20             MR. MYSLIWIEC:  A hard copy?

21             MR. JONAS:  I believe a hard copy -- If I remember

22   correctly, I believe I gave you a disk and then I asked you if

23   you wanted a paper copy and you said yes, and that is my

24   recollection.

25             MR. MYSLIWIEC:  Maybe he did.  I think I would have

remembered receiving a hard copy version that is different

than that, because I have kept all my hard copies of the

El-Mezain deposition in the same file.  But maybe it was on a

disk.  Was it on an evidence disk along with the other

exhibits?

MR. JONAS:  Yes, it was.  And there was a list that

we provided.  And I remember giving it to you, and I am pretty

sure, I said, "Do you want a paper copy as well?"  And you

said, "Yes."  And I handed you mine.  And it is the same

version that I used with Agent Burns that Mr. Jacks is now

using with Agent Miranda.

MR. DRATEL:  Except there was nothing different on

the one you used.

MR. MYSLIWIEC:  Then maybe it is a misunderstanding,

Your Honor, because I don't recall having a paper copy.  And,

you know, it is possible it is on a disk.  The problem is that

we get these disks --

MR. DRATEL:  Two times a day.

MR. DRATEL:  It is not what is delineated, what is

new, and not I am not going through every line on a disk that

was already in evidence.

MR. JONAS:  This deposition was provided before it

was admitted into evidence with Agent Burns, the version that

is currently being used, Your Honor.  And if Mr. Dratel

doesn't want to look at the exhibits, that is his problem.

1          MR. DRATEL:  I am not going to look at an exhibit

2     that was agreed and --

3          THE COURT:  We are not going to get into an argument

4     about that.

5          MR. DRATEL:  I have them written down.  Before he

6     goes into a specific area, since I just wrote them down, if I

7     can see if there is anything specific --

8          MR. JACKS:  I am going through them in numerical

9     order.

10         MR. DRATEL:  Okay.  Thank you, Your Honor.

11         MR. JONAS:  I am going to excuse myself and get my

12    file on this issue.

13         THE COURT:  Okay.

14         (The following was had in the presence and hearing

15         of the jury.)

16         THE COURT:  Mr. Jacks?

17    Q.   (BY MR. JACKS)  Agent Miranda, if you would resume.  Do

18    you see line 20 there, a question?

19    A.   Yes, sir, I do.

20    Q.   Would you resuming there?  And I believe it continues

21    onto the next page, so just picking up there at line 20.

22    A.   Yes, sir.  "So you met both of these gentlemen at MAYA

23    conferences in the eighties?"

24         "Yeah."

25         "Other than the MAYA conference or conferences where you

1    met Mr. Elbarasse, have you had any other personal dealings

2    with him at all?"

3        "No."

4        "Do you recall whether Mr. Elbarasse was a speaker at the

5    MAYA conference or conferences where you met him?"

6        "No."

7        "Are you familiar with a man by the name of Ghassan

8    Dahduli?"

9            MR. DRATEL:  Your Honor, that is beyond what we just

10   had on the list.

11           MR. JACKS:  This is also included on the list.  I am

12   sorry.  It picks up on page 26, line 6, yes.

13           MR. DRATEL:  Okay.

14   Q.   (BY MR. JACKS)  Just to go back, he was questioned about

15   Ismail Elbarasse and what he knew about him, and his answer

16   was he met him at MAYA conferences?

17   A.   It was Ismail Elbarasse and Omar Ahmad.

18   Q.   Is Ismail Elbarasse shown as a member of the Palestine

19   Committee?

20   A.   Yes.  He is No. 6.

21   Q.   And of course we have heard his name a great deal during

22   this case.  Correct?

23   A.   Yes, sir.

24   Q.   Directing your attention to page 42 of the exhibit, if

25   you --

1          MR. CLINE:  Your Honor, I think on this next one Mr.

2    Dratel informs me that we may have a *Crawford* confrontation

3    issue as to Mr. Elashi, so I object on that basis.

4          THE COURT:  Mr. Jacks?  And I don't have it before

5    me so I --

6          MR. CLINE:  It is up on the screen right now.

7          MR. JACKS:  Your Honor, I don't believe -- I mean,

8    it is his testimony about his knowledge of Mr. Elashi.  I

9    don't believe that it implicates *Crawford*, or if it is, it

10   certainly would just merely be a limiting instruction.

11         THE COURT:  Okay.  I don't have that.

12         MR. DRATEL:  We can bring it up to Your Honor.

13         THE COURT:  All right.

14         (The following was had outside the hearing of the

15         jury.)

16         MR. CLINE:  Sorry, Your Honor.

17         MR. DRATEL:  This is what -- This is the part that

18   is now coming in.

19         MR. CLINE:  This is the classic *Bruton/Crawford* kind

20   of situation where you have one --

21         MR. DRATEL:  He wants to put it up to here through

22   43-16.

23         MR. CLINE:  If the reference to Mr. Elashi were to

24   be removed, redacted, then we would argue that it is still

25   hearsay as to him, but a limiting instruction would be

appropriate when you have got one co-defendant in an

out-of-court statement talking specifically about another

Defendant, in this case Mr. El-Mezain Mr. Elashi.  That is the

*Bruton* situation where a limiting instruction is not

sufficient.  So we would ask that that even be left out.

MR. DRATEL:  He has already told the jury that it is

about Mr. Elashi.  He already told them that that is what he

testified about, so taking it out doesn't really matter at

this point.

MR. CLINE:  Redacting at this point would probably

mean just not reading at this portion at all.

MR. JACKS:  Your Honor, I am not sure that just

saying that he knows him and how he knows him --

THE COURT:  That is what I was thinking.  I am still

trying to understand how that implicates whether -- This is a

deposition of Mr. El-Mezain.  Whether he knows Mr. Elashi --

MR. CLINE:  Well, he is talking about Mr. Elashi --

THE COURT:  But just whether he knows him, where he

saw him.

MR. JACKS:  Your Honor, if I phrase the question,

"Did Mr. El-Mezain provide any information in the deposition

about his relationship with Mr. Elashi," it is going to be an

answer of no, and rather than what he did say.

MR. DRATEL:  That is not a true answer.  That may

seem like he hid something, and that is not right because he

1  didn't hide anything.

2          THE COURT:  What you have is --

3          MR. DRATEL:  He answered questions put to him.

4          THE COURT:  Basman Elashi, is that --

5          MR. CLINE:  That is Mr. Elashi's brother.

6          MR. JACKS:  I think what he says is already in

7  evidence in this case that they know each other, so I don't

8  know --

9          THE COURT:  I don't know that knowing is the

10  problem, but here you have got the question "And Ghassan

11  Elashi was originally one of the principals in the Holy Land

12  Foundation."

13          MR. JACKS:  That is shown on documents.

14          THE COURT:  I know there is other evidence.

15          MR. CLINE:  But that just makes it maybe harmless

16  error, but it is still inappropriate to come in.

17          THE COURT:  And it says "You are correct."  That is

18  all he says about your client.

19          MR. JACKS:  I will just skip over it.

20          THE COURT:  It looks like that is all he says about

21  your client just right here.

22          MR. JACKS:  I will just skip over it, anything about

23  Ghassan Elashi.

24          MR. CLINE:  You are not going to display it on the

25  screen either?

1          MR. JACKS:  Can you read it?

2          MR. CLINE:  Maybe just read it back and forth with

3     him.

4          MR. JACKS:  I am just going to go to the next

5     question about the next person.

6          MR. CLINE:  But the problem is if this is shown up

7     on the screen, the jury is obviously going to read it.

8          MR. JACKS:  I will go back and ask her if she can

9     enlarge it in such a way that she doesn't  --

10          MR. CLINE:  That takes out that portion?

11          MR. JACKS:  The next one, it is on the same page the

12     next line.

13          MR. CLINE:  But I bet she can figure out a way to

14     just show the portion that mentions after Mr. Elashi.

15          MR. JACKS:  Yes.

16          MR. DRATEL:  Your Honor, while we are here, the next

17     one is about the head of CAIR.  We are back at CAIR again.

18          THE COURT:  Are you going into CAIR?

19          MR. DRATEL:  It is the very next one.

20          MR. JACKS:  Well, I don't have my copy here.

21          THE COURT:  It is?  I was reading about Mr. Elashi a

22     few minutes ago.

23          MR. JACKS:  Okay.  Your Honor, I don't see how this

24     opens the door.  I mean, this is Mr. El-Mezain's statement,

25     and I don't see how it opens the door to everything.  I mean,

1    it is not so much what he said about Mr. Awad it is what he

2    didn't say about Mr. Awad.

3            MR. DRATEL:  He is not asked.  Besides, you said

4    CAIR is not part of this case.

5            MR. JACKS:  "Did you have any other personal

6    dealings with Mr. Awad?"

7        "No."

8            MR. DRATEL:  You can't have it half in and half out.

9    That is the problem.

10           THE COURT:  And I don't know that that opens the

11   door either, but why are you needing to get into CAIR?

12           MR. JACKS:  It is not CAIR, Your Honor.  It is that

13   he was asked about Mr. Awad and he didn't tell the whole truth

14   about his relationship with Mr. Awad.

15           THE COURT:  Who is he?

16           MR. JACKS:  He is at the Philadelphia meeting.

17           MR. DRATEL:  He is the head of CAIR.

18           MR. JACKS:  That is one aspect.  He was at the

19   Philadelphia meeting.  He is a member of the Palestine

20   Committee.  And that is the point that I am trying to make;

21   not that he is the president of CAIR.  I am not even trying to

22   seek that out.

23       But again, I don't believe that opens the door to all

24   these other --

25           THE COURT:  We can deal with that later on as to

1  whether it does or doesn't.  It is still hearsay, you still

2  have a hearsay problem --

3          MR. DRATEL:  It is not for the purpose of the truth,

4  I am not admitting it for the truth.

5          THE COURT:  I know that is your argument, but I

6  disagree that is why you want that in, otherwise it wouldn't

7  be relevant.

8          MR. DRATEL:  What I am saying, Your Honor said CAIR

9  is not in this case.  It can't be in for one side and out for

10  the other.

11          THE COURT:  It isn't because he is asking about an

12  individual who happens to be associated --

13          MR. DRATEL:  Not associated.  He is the head of CAIR

14  and he has been the head of CAIR.

15          THE COURT:  I don't want to play word games with

16  you, counsel.  You do that a lot.  I don't want to play word

17  games.  He is associated with CAIR.  If you want to call it

18  something else, you can call it something else.  I am going to

19  say he is associated with CAIR.  That doesn't necessarily

20  bring CAIR in.  He is asking whether he knows that individual

21  who was at the Philadelphia meeting.  That is the point of

22  that, but not about CAIR.

23          MR. DRATEL:  Your Honor, there are two things.  One

24  is, like I say, I don't think it is fair, I don't think it is

25  admissible for one side and not for other about CAIR.  And the

1    other thing is, I am going to object about him asking Mr.

2    El-Mezain questions about the Philadelphia meeting when it is

3    clear he wasn't there.  I mean, it is totally inappropriate.

4          THE COURT:  He can still ask him questions.  I don't

5    know what he is going to say the question itself is not

6    improper.  If he says he doesn't know anything, that is fine.

7          MR. DRATEL:  He is going to ask Mr. Miranda whether

8    El-Mezain in his deposition that Awad was at the Philadelphia

9    meeting, when in fact El-Mezain wasn't at the Philadelphia

10   meeting.  So it is not a proper question, just like it is not

11   a proper question when he asked before whether Mr. El-Mezain

12   mentioned in his deposition the subject of a phone

13   conversation that Mr. El-Mezain wasn't even on.  So I think

14   those kinds of questions are just simply not proper, and I

15   continue to object.

16         THE COURT:  You can object to that.  And I am not

17   making a rule on that.  It doesn't look to me that it opens it

18   up.  That is a separate issue.  If you want to go into that on

19   that individual, but we can hear argument later on on that.

20   But if that is where you are going, you are entitled to go

21   into that.

22         MS. SHAPIRO:  Just for the record, Mr. Jonas brought

23   the copy of the deposition that was provided to Mr. Dratel and

24   his client last week.

25         THE COURT:  He says he gave it.

1          MR. DRATEL:  That is right.

2          THE COURT:  And Mr. Mysliwiec hasn't denied it.  All

3    right.

4          (The following was had in the presence and hearing

5          of the jury.)

6    Q.  (BY MR. JACKS)  Was Mr. El-Mezain asked in his deposition

7    about an individual Nihad Awad?

8    A.   Yes.

9          MR. JACKS:  Can you show page 43 of the deposition

10   starting at line 17?  And just read the question and answer as

11   it relates to what he was asked about Nihad Awad.

12   A.   "Do you know a man by the name of Nihad Awad?"

13        "Yes."

14        "How is it that you know Mr. Awad?"

15        "Mr. Awad, I know him from CAIR, and before CAIR in one

16   of the conferences also."

17        "And CAIR is the Council on--see if I will get it

18   right--American Islamic relations?"

19        "You're right."

20        "Are you personally involved with CAIR?"

21        "No."

22        "You had mentioned that you knew Mr. Awad as being the

23   executive director of CAIR and through CAIR.  I was just

24   wondering -- "

25        "I see him many times in the TV, CNN, and al Jazeera.  He

1    became popular."

2        "So you knew him through his public speaking on behalf of

3    CAIR?"

4        "You're right."

5        "Have you met him personally?"

6        "Yes."

7        "Where did you meet Mr. Awad?"

8        "In the conferences."

9        "What conferences are those?"

10        "I met him last -- in the end of August in ISNA

11    conference.  He was there.  This is in Chicago."

12        "Any other conferences that you met Mr. Awad at?"

13        "I remember I met him a couple of times, three times, all

14    of them conferences."

15        "Aside from these conferences did you have any other

16    personal dealings with Mr. Awad?"

17        "No."

18    Q.   Okay.  And let me ask you to look at the Palestinian

19    section list shown on the right side.  And does Nihad Awad

20    appear on that list?

21    A.   Yes, he was No. 32 on the Palestinian Committee.

22            MR. JACKS:  Can you enlarge that, please, on the

23    right?

24    Q.   (BY MR. JACKS)  And you said No. 32?

25    A.   Yes, sir.

1   Q.   Fourth name up from the bottom?

2   A.   That is right, sir.

3   Q.   And I believe he resumes -- He is asked about a Nasser

4   Bushnaq?

5   A.   Yes, sir.

6   Q.   Would you read, I think it is going to be delineated

7   there, but beginning on line 24 of page 44 where it says "Do

8   you know."

9   A.   "Do you know a man by the name of Yasser Bushnaq?"

10      "Yes."

11      "And how is it you know Mr. Bushnaq?"

12      "I know Mr. Bushnaq in Dallas."

13      "I'm sorry?"

14      "In Dallas."

15      "Okay.  What in Dallas -- What events or circumstances

16   are -- "

17      "In the mosque.  I saw him in the mosque."

18   Q.   All right.  Continue reading at the top of the page

19   there.

20   A.   Is that the proper page?

21   Q.   Go to page 45.  It should be there.  Continue at line 9.

22   A.   "Other than seeing Mr. Bushnaq at the mosque in Dallas,

23   have you had any other personal dealings with Mr. Bushnaq?"

24      "Personal dealing?  No."

25      "Are you familiar with him in any other sense other than

1    through the mosque?"

2        "He has a human right organization.  I don't know its

3    name exactly."

4        "So you're familiar with him in that context?"

5        "Yes."

6        "Do you know of any relationship which Mr. Bushnaq had

7    with IAP?"

8        "I believe he had some relationship.  He used to have

9    some relation with IAP."

10        "Do you know if he used to be the president of IAP?"

11        "Possible."

12            MR. JACKS:  And would you go to the exhibit on the

13    right and enlarge it, please?

14    Q.   (BY MR. JACKS)  And is the individual Yasser Bushnaq

15    shown on that list of the Palestine section from Mr. Ashqar's

16    house?

17    A.   Yes.  He is No. 4.

18    Q.   And in fact, does it show, at least on this list, that

19    his city is Dallas?

20    A.   Yes, it does.

21    Q.   Just for a moment, do you recall the video that we saw in

22    which Jamil Hamami, Mahmoud Zahar, Mohammad Siam, and the

23    Defendant Mufid Abdulqader was kissing Mahmoud Zahar on the

24    cheek?  Do you recall that video we saw a little while ago?

25    A.   Yes, sir.

1    Q.   And there was another individual in there and you didn't

2    recognize him at the time.  Do you recall now who that person

3    was?

4    A.   Right.  That was Yasser Bushnaq.

5    Q.   So that is the person being asked about here on the

6    Palestine section?

7    A.   Yes, sir.

8    Q.   All right.  Was he asked about Ahmed Yousef, or Yousef

9    Saleh as you said he sometimes goes by?

10   A.   Yes, sir.

11   Q.   Can you go to page 50 line 12 of the deposition?  And if

12   you start reading there where it says on line 12, Agent

13   Miranda.  And I believe it continues a page or so.

14   A.   Yes, sir.  "Are you familiar with an entity known as the

15   United Associations for Study and Research?"

16        "Again?"

17        "The United Association of Study and Research.  It would

18   be based in Washington, Washington, D.C. area?"

19        "Yes."

20        "And how is it that you are familiar with that entity?"

21        "We met Dr. Ahmed Yousef at one of the conferences."

22        "And Doctor Yousef is one of the principals of UASR?"

23        "I don't know if he's a principal."

24        "He's involved in UASR?"

25        "He's a researcher, a researcher for them, researcher, I

1    believe."

2        "Do you recall what conference you met Mr. or Dr. Yousef

3    at?"

4        "I don't remember.  Either MAYA conferences or IAP

5    conferences.  I don't know what one."

6        "Do you recall what time those conferences took place?"

7        "Maybe eighties; maybe nineties."

8        "And I take it you don't recall what cities."

9        "No."

10        "Was he a speaker at the conference?"

11            MR. DRATEL:  Where are we now?

12            MR. JACKS:  I am sorry.

13            THE WITNESS:  It should be the top of page 53.

14            MR. JACKS:  It is page 52.

15            THE WITNESS:  Yes.  That is actually correct.

16            THE COURT:  Which one is correct?

17            THE WITNESS:  Page 53.

18    Q.  (BY MR. JACKS)  All right.  You have stopped there.

19    A.  Yes, I am sorry.  It should be the top of 53.

20    Q.  Let me ask -- Okay.

21    A.  Shall I continue, sir?

22    Q.  No.  I believe that is a different person that is -- Yes,

23    go ahead.  I am sorry.  Read through line 8.

24    A.  "Was he a speaker at that conference?"

25            MR. DRATEL:  Hang on.  Can we approach for a second?

1          THE COURT:  Yes.

2          (The following was had outside the hearing of the

3          jury.)

4          MR. DRATEL:  I had a blackout.

5          THE COURT:  I don't have it before me, so I don't

6    know what it is.

7          MR. DRATEL:  He said eighties and nineties.  He left

8    out this entire page and we are talking about someone else

9    now.  And we started up here.

10          THE COURT:  So he is saying you went from 51 to 53.

11          MR. DRATEL:  I know.  But it is not about the same

12    person.

13          THE COURT:  I am asking him.

14          MR. JACKS:  Judge, he talks again about Yousef Salah

15    on page 53.

16          MR. DRATEL:  But the reference is to someone else.

17    It is not about the person they were talking about before.

18          THE COURT:  It doesn't look like it.  Look at the

19    bottom of page 52.  You are asking him about Ashqar.  "I met

20    him at one of the MAYA conferences also."

21       "Can you tell me what time frame?"

22       "Maybe nineties."

23       "Was he a speaker?"  And he said no.  It doesn't look

24    like it flows the way you are going.

25          MR. DRATEL:  Correct.

1          THE COURT:  I think you are right.

2          (The following was had in the presence and hearing

3          of the jury.)

4    Q.   (BY MR. JACKS)  Agent Miranda, I believe I have already

5    asked you in an earlier examination, but is Ahmed Yousef a

6    member of the Palestine Committee?

7    A.   Yes, sir.

8    Q.   And with reference to the organization UASR --

9          MR. JACKS:  Can you show Elbarasse Search No. 10?

10   Q.   (BY MR. JACKS)  And tell us, Agent Miranda, is UASR

11   depicted on that organizational chart for the Central

12   Committee?

13   A.   Yes, sir.  It is the second committee from the left.

14   Q.   All right.  Going back, then, to the deposition, was he

15   asked about an individual by the name of Mohamed Salah?

16   A.   Yes, he was.

17         MR. JACKS:  Could you go to page 53 of the original

18   exhibit?  I am sorry; 53 of the deposition, and starting at

19   line 19.

20   Q.   (BY MR. JACKS)  Do you see that there?

21   A.   Yes, sir, I do.

22   Q.   And would you just go through the question and answer and

23   read down through page 55, line 4?

24   A.   "Do you know a man by the name of Mohamed Salah?"

25         "Yes, I know."

1    "How is it that you know Mr. Salah?"

2    "I know him Chicago, in the mosque and the conferences

3  also."

4    "Do you recall what conferences you know Mr. Salah

5  through?"

6    "MAYA conference."

7    "Can you give me a time frame for the MAYA conference or

8  conferences that you know Mr. Salah from?"

9    "Maybe early eighties or in early nineties or late

10  eighties.  I don't know exactly what time."

11    "Do you recall where that conference or those conferences

12  took place?"

13    "I don't recall what city."

14    "Okay.  So we have covered all of the places where you

15  know Mr. Salah--the mosque in Chicago and also MAYA

16  conferences."

17    "Yes."

18    "Do you recall the circumstances at the MAYA conference

19  that you met Mr. Salah?"

20    "Maybe in the halls or the bazaar.  He was living in

21  Chicago."

22    "At the time that you met Mr. Salah at the MAYA

23  conference or conferences in the late eighties or early

24  nineties, was he affiliated with any organization?"

25    "I don't know."

1          "He just happens to be a man that you met while you were

2      at these conferences?  Was he a speaker at any of these

3      conferences?"

4          "No, I never heard him speak."

5          "Have you had any other personal dealings with Mr. Salah,

6      other than having met him at MAYA conferences and meeting him

7      in the mosque?"

8          "I don't know."

9          MR. JACKS:  And can you show Ashqar No. 1, the

10     Palestine Committee America side?

11     Q.   (BY MR. JACKS)  And is Mohamed Salah shown on that list?

12     A.   Yes, sir.  He is No. 22 on that list.

13         MR. JACKS:  If you can enlarge that, please.

14     Q.   (BY MR. JACKS)  And while there is no entry for city or

15     phone number, he is No. 22?

16     A.   Yes, sir.

17     Q.   And with regard to -- I believe we have already covered

18     his being questioned about Mousa Abu Marzook through an

19     earlier witness.  Let me ask, did he -- Was the Defendant

20     Mohammad El-Mezain questioned about the connection, if any,

21     between the Islamic Association for Palestine and the Holy

22     Land Foundation?

23     A.   Yes, sir.

24         MR. JACKS:  Can you go to page 87 of the deposition

25     beginning at line 15?

1    Q.  (BY MR. JACKS)  Agent Miranda, would you just read the

2    question and answers in that segment there?

3    A.   Yes, sir.  "Do you know of any relationship or dealings

4    that any of you principals of Holy Land Foundation had with

5    the Islamic Association for Palestine in January of 1989 that

6    would have caused IAP to know about the Occupied Land Fund and

7    what it was doing?"

8        "No.  Actually we -- You asked me before about the people

9    of IAP, and I said to you, 'We know these people, but we don't

10   have any relation with them.'  And they know that we have

11   established Occupied Land Fund in that time.  Not only the IAP

12   actually.  It became like -- Let me see.  A custom with the

13   Muslim organizations to recommend a good organization for the

14   good cause."

15          MR. JACKS:  And can you pull up again Ashqar Search

16   Warrant No. 10, that organizational chart?  And if you could

17   enlarge it.

18   Q.  (BY MR. JACKS)  And Agent Miranda, are the IAP and the

19   HLF or OLF shown as a part of the organization of the Central

20   Committee there?

21   A.   Yes, sir.

22   Q.   Which blocks or boxes are depicted?

23          MR. JACKS:  If you could enlarge that, please.

24          THE WITNESS:  The IAP is the box all the way to the

25   left on the wire diagram, and the third one over is the OLF or

HLF.

Q.   (BY MR. JACKS)  All right.  Now, this deposition, I believe you testified it was September 10th, 2003?

A.   That is correct, sir.

Q.   The document on the right hand side, the Elbarasse documents, when were they discovered by the FBI?

A.   2004.

Q.   So they were not in the hands of the government at the time this deposition was taken.  Is that correct?

A.   No, sir.

Q.   Agent Miranda, in the course of -- I am switching just a little bit, and as you can see we have moved away from the speakers list at this time.  But in the course of your investigation, did you find documents that were in possession of either the Defendants themselves or persons who are alleged to be co-conspirators with them?

A.   Yes.

Q.   And did those documents shed any information or light on who the Hamas leaders were and at what point in time they might have been acting as Hamas leaders?

A.   Yes, I did.

Q.   Are you familiar with a document which the Government has labeled as Ashqar No. 7?

A.   Yes, sir, I am.

          THE COURT:  That is Ashqar Search No. 7?

1         MR. JACKS:  Yes, Your Honor.

2     May I approach the witness, Your Honor?

3         THE COURT:  Yes.

4   Q.   (BY MR. JACKS)  Agent Miranda, I am going to show you

5   what has been marked for identification purposes as Ashqar

6   Search No. 7.  And is this a document, or actually photographs

7   of a document that was photographed during the covert search

8   of Abdel Haleem Ashqar's house in Oxford, Mississippi in

9   December of 1993?

10  A.    That is correct, sir.

11        MR. JACKS:  Judge, we would move the admission of

12  Ashqar Search No. 7.

13        MS. DUNCAN:  Your Honor, I am sorry to ask this, but

14  may we approach?

15        THE COURT:  Come on up.  Somebody bring a copy of

16  that exhibit.  I have seen too many, I don't remember what it

17  is.

18        (The following was had outside the hearing of the

19        jury.)

20        MS. DUNCAN:  It is a report of a meeting between

21  some members of Hamas and the Government of Iran.

22        THE COURT:  I still don't remember.

23        MR. JACKS:  Here is the original.

24        THE COURT:  That is fine.  I was just trying to --

25  Do you want to offer this?

1    MR. JACKS:  It identifies who the leaders of Hamas

2    are.  In particular, it shows that as early as 1990 Mousa Abu

3    Marzook was attending meetings as the head of Hamas, as well

4    as Ibrahim Ghousheh who was on that letter that was sent to

5    Senator Hatch.  And it shows their representation on behalf of

6    Hamas and their interaction with the Iranian government.  And

7    it is in the possession of -- I don't think there is a lot of

8    people that are going to have that laying around their house.

9    It shows the relationship between Hamas and these individuals

10    and co-conspirators.

11    MS. DUNCAN:  Your Honor, this document was not found

12    in the Holy Land files.  It was found in the home of Abdel

13    Haleem Ashqar, so it is irrelevant as to these Defendants.

14    Secondly, there has been a ton of evidence that Marzook

15    is the leader of Hamas, and we have -- Mr. Jacks just had two

16    letters that are signed by Ibrahim Ghousheh identifying him as

17    a spokesman of Hamas.  So the relevance of this document is

18    extremely low.

19    And on the flipside of it, the potential for unfair

20    prejudice is extremely high in the political climate where we

21    have presidential candidates who are talking of bombing Iran

22    and continually talking about Iran as being an enemy of the

23    United States.

24    So, I mean, again the wealth of evidence that has been

25    presented, you can see from the highlighting this is all about

1    Hamas is aligned with Iran to bring Iran into this

2    prosecution, and our clients are not charged with anything

3    having to do with the government Iran.  So under relevance and

4    403, we ask you to exclude it.

5              MR. JACKS:  They are charged with supporting Hamas.

6              THE COURT:  Yeah.  To that extent that you are using

7    it to show some individuals--is it Marzook--their involvement

8    with Hamas, I think that would be proper.

9         There is a lot about Iran, and I don't know that we need

10   to get into any of that.  I don't see why that is relevant,

11   and it does inject issues that could be unfairly prejudicial.

12   But it is just not relevant to anything in the suit about

13   supporting Hamas, not their relationship with Iran.

14             MR. JACKS:  The other part about it, it shows that

15   as early as 1990 Marzook in documents was identified as the

16   head --

17             THE COURT:  That is what I am saying.  That is fine.

18   I think that is proper to the extent you are using it to show

19   who is identified with Hamas.  And I don't even have a problem

20   in meeting with Iranian administration.  I just don't want to

21   get into a lot of the other things.  Just to set a context for

22   a meeting and Hamas is there, but you have got a lot of stuff

23   about Iran.  Frankly, I don't think it is relevant here, and

24   it is prejudicial.

25        To the extent that you get into Hamas and leaders and how

early they were involved with Hamas I think that is proper,

but it will take a lot of redacting.  And I haven't looked at

it closely enough to really make a ruling on it now.

    This part where you were discussing a meeting, and then

he is mentioned there --

            MR. JACKS:  There is some other references in there,

too.

            THE COURT:  That is what I -- There is no reason to

get into Iran.

            MR. JACKS:  Judge, there will be evidence that this

man that is over on the poster, he was the Hamas

representative in Tehran.  The Defendants called him from

their offices, so there is --

            THE COURT:  He was Hamas?

            MR. JACKS:  The representative in Iran.

            THE COURT:  And that shows a link between whoever

called and Hamas.  But again, it doesn't matter that he was a

representative in Iran.  That is fine.  But you are getting

into much more than that.

            MR. JACKS:  Okay.  Well, Your Honor --

            THE COURT:  But I think to the extent that it shows

a link with Hamas you are okay, but I don't want to

get -- This goes too far.  It is just going too far.

            MR. JACKS:  What I would like to get into, and I

will let the Court tell me, but that this document shows a

1    meeting with the Iranian administration and when that took

2    place, and who was heading the delegation for Hamas, and then

3    it is explaining the Movement -- This document is written from

4    the Hamas side.  It is not from the Iranian side explaining

5    the Movement's program.

6              THE COURT:  And this is Hamas' --

7              MR. JACKS:  Yes.  The other part that is significant

8    is that it talks about opening a Hamas office in Iran, and it

9    talks about the government of Iran approving it.

10             THE COURT:  But that is what I don't want to start

11   getting into then.  I mean, you are claiming that Hamas had in

12   essence offices here, so I think the fact that they are trying

13   to get into Iran, that in and of itself is fairly neutral.

14   But I don't want to get anything as far as Iran supporting or

15   what Iran stands for or anything like that.

16             MR. JACKS:  Okay.  They make the point that the

17   Iranians emphasized that they want to keep the relationship

18   secret.  So if the Defendants are able to call the Hamas

19   representative in Iran, I don't imagine there are a lot of

20   people that can do that--pick up the phone and call Tehran --

21             THE COURT:  And that may be --

22             MR. JACKS:  So that sentence is one that I think is

23   probative of the fact that it was not well-known that Hamas

24   had an office in Iran.

25             MS. DUNCAN:  I mean, Your Honor, we don't know who

1    wrote this report.  I mean, it is clearly hearsay.  The

2    Government hasn't identified the government of Iran as a

3    co-conspirator in this case.

4         THE COURT:  But this came from documents they have

5    identified as being involved with Holy Land and Hamas.

6    Clearly it is Hamas.  We don't need to know the specific

7    author.

8         MS. DUNCAN:  I think there needs to be some evidence

9    that the speaker is a co-conspirator for it to come under the

10   co-conspirator exception.  It is not enough that someone has

11   this in their house.  I mean, if it was a co-conspirator

12   speaking, it comes within the co-conspirator exception, but

13   here --

14        THE COURT:  Except it appears to be, just from what

15   I read, a document that is produced by Hamas about their

16   meeting in Iran, so that is what it looks to be.  Of course

17   Hamas, they are here.

18        MS. DUNCAN:  I mean, I don't know that there has

19   been evidence -- First of all, Hamas is an organization, so I

20   don't know that you can say -- An individual can be a

21   co-conspirator, but to say that someone is a co-conspirator

22   with everyone associated with Hamas is very, very broad.

23        THE COURT:  And you are right.  That would be.  That

24   is not the law.

25        MS. DUNCAN:  I mean, I understand what Your Honor is

saying about introducing the paragraph that identifies these

people as Hamas, but anything beyond that it is bringing in

Iran and the political situation in Iran, and it is just

injecting something that really is a political issue that

shouldn't be a part of this prosecution.

If they want to bring in evidence that there is a Hamas

leader in Iran -- And again Mr. Jacks is saying Defendants.  I

don't know who he is talking about.  There are five Defendants

here, and I don't think there is evidence that they were all

sitting in a room calling the same person.  But if he wants to

bring in evidence that a particular Defendant called a Hamas

representative, that is fine.

But talking about a description of a delegation and pages

of pages and highlighting about a relationship with the

country that considers with it just a huge --

THE COURT:  You said 1990?

MR. JACKS:  It has got different dates.  It starts

in 1990, but it goes through '91, it goes through -- It shows

these meetings they had.  There is a series of meetings that

are described here.  You know, if you tell me what is --

THE COURT:  Well, the ones we discussed earlier.  I

am not sure about this one.  The ones that we talked about

earlier that you mentioned, those are okay.

MR. JACKS:  Which is who was in the delegation?

THE COURT:  Right.  And there was something else.  I

1      don't remember now what it was.

2              MR. JACKS:  About Hamas' position, what they told

3      the Iranians --

4              THE COURT:  Right.

5              MR. JACKS:  -- about explaining the Movement's

6      program.

7              THE COURT:  I think that is relevant.  But what this

8      is talking about is that the Iranians are in agreement to keep

9      the relationship secret, what does that add?  Why is that

10     relevant?

11             MR. JACKS:  Well, because the Holy Land Foundation

12     telephone records are going to have calls to that Hamas office

13     and to Imad al-Alami, the man shown on that poster.  So if it

14     is not -- If it is being kept secret, how do they know that

15     they can reach him over there.

16             MS. DUNCAN:  That is a different issue.  This

17     sentence is going to the relationship between of the

18     government of Iran is secret.  The alleged Iranian leader of

19     Hamas is a secret, that is a completely different issue.  They

20     are conflating the two.  This is Iran saying they want to

21     maintain its relationship secretly, if you believe this, and

22     that is talking about what everybody has.  The Hamas leader

23     and Iran's phone number, they are separate issues, and this

24     does not --

25             THE COURT:  I think that is probably right.  I think

1 that is probably right.

2    MR. JACKS:  All right, Judge.

3    THE COURT:  That Iran is agreeing to keep it secret.

4    MR. JACKS:  They both are.

5    THE COURT:  Right.  I mean, but your theory is that

6 they are a part of Hamas and connected, which would explain

7 why they would get the numbers, whether there was a secret

8 relationship or not.  I don't think this helps you establish

9 anything.

10    MR. JACKS:  If I just don't -- If I have Agent

11 Miranda just say what this document says it is, and then just

12 have him read -- just tell him --

13    THE COURT:  Just direct him to that portion there.

14    MR. JACKS:  Read that sentence?

15    THE COURT:  Yes.  And the portion where they are

16 talking about their programs.  I don't remember the specific

17 page.

18    MS. DUNCAN:  I think that portion was the first

19 page.

20    MR. JACKS:  The second page.  I am sorry.  Item 4

21 under heading 3.

22    THE COURT:  Okay.  And I have not read it all.  If

23 there are some others, let me take a look at it.  But what I

24 have seen so far --

25    MR. JACKS:  I will just have him read it and I won't

1    put the exhibit in, and it will be in evidence that way.

2              MR. CLINE:  Your Honor, just so the record is clear,

3    I think you know this from our objections, but we object to

4    the entire document on hearsay, 403, authentication.

5              THE COURT:  I understand that.  Those will be

6    overruled, except for the part that we have sustained, the

7    portions of it.

8         Everybody on the same page?

9              MS. DUNCAN:  Thank you, Your Honor.

10             (The following was had in the presence and hearing

11             of the jury.)

12             MR. JACKS:  Your honor, I will withdraw the offer of

13   Ashqar Search No. 7, but with the Court's understanding I will

14   ask Mr. Miranda to just read certain excerpts from it.

15             THE COURT:  All right.  Yes, sir.  You may do so.

16             MR. JACKS:  May I approach the witness, Your Honor?

17             THE COURT:  Yes.

18   Q.   (BY MR. JACKS)  Agent Miranda, let me show you what has

19   been marked for identification as -- I have already showed it

20   to you, Ashqar Search No. 7.  And this is a document that you

21   said was photographed during the search of Abdel Haleem

22   Ashqar's house in Oxford, Mississippi in December of 1993.  Is

23   that correct?

24   A.   That is correct, sir.

25   Q.   And let me show you -- This is -- the document itself is

1    in Arabic, and it is several pages.  Is that correct?

2    A.    Yes, sir.

3    Q.    And then there is an English translation of that

4    document.  Is that correct?

5    A.    Yes, sir.

6    Q.    Just if you would, I just want to ask you some very

7    specific questions.  On the first page of the document, what

8    is the title of the document?

9    A.    "Meeting with the Iranian administration."

10   Q.    And let me turn, then, to the third translation, and

11   there is an entry there.  And if you would, just read the

12   number, the date -- First of all, does this heading indicate a

13   meeting which took place with the Iranians?

14   A.    Yes.

15   Q.    All right.  And just read the sentences to where

16   my -- under this date, read the date, and read to where the

17   parenthetical ends.

18   A.    Yes, sir.  It says, "No. 1, 9/30/1990.  A meeting was

19   held in the Emirates.  Hamas was represented by Abu Omar, Abu

20   Annas, and Iran was represented by Ali Mohammedi, director of

21   the religious movements in the foreign ministry."

22   Q.    And going back to the second page of the English

23   translation -- And just, first of all, read the caption of the

24   first page.

25   A.    "Agenda of the meeting with the Iranian administration."

1    Q.   And then under item No. 3, what is the caption for item

2    No. 3?

3    A.   "The Movement's strategy and its mobility programs."

4    Q.   And the fourth item under that heading, "The Movement

5    strategy," what does it say?

6    A.   "Explaining the Movement's program and developing the

7    Intifada and escalating it."

8    Q.   And what is the Movement, or the reference to the

9    Movement refers to who?

10   A.   Hamas.

11   Q.   And the Intifada is the uprising that we have heard

12   about?

13   A.   Yes, sir.

14   Q.   Abu Omar is who?  Who goes by that name?

15   A.   That would be the terrorist Mousa Abu Marzook.

16   Q.   And he is a specially designated terrorist.  Is that

17   correct?

18   A.   He is a specially designated terrorist.  That is correct,

19   sir.

20   Q.   Did you find other documents that were probative or

21   relevant to showing who were the leaders of Hamas and when

22   they were acting in those leadership positions?

23   A.   Yes, sir.

24        MR. JACKS:  May I approach, Your Honor?

25        THE COURT:  Yes.

1    Q.    (BY MR. JACKS)  Let me show you, Agent Miranda, what has

2    been marked as Ashqar Search No. 14, and I will ask you do you

3    recognize this document?

4    A.    I recognize it.

5    Q.    Is this another document that was photographed during the

6    search of Abdel Haleem Ashqar's house in Oxford, Mississippi

7    in December of 1993?

8    A.    It is, sir.

9    Q.    Is it a one-page Arabic document with a one-page English

10   translation?

11   A.    As it stands now, yes.

12   Q.    Okay.  Was the document more pages than we have exhibited

13   here?

14   A.    That is correct.

15   Q.    Okay.  This is an excerpt?

16   A.    Yes, sir.

17   Q.    All right.

18          MR. JACKS:  Judge, we would move the admission of

19   Ashqar Search No. 14.

20          THE COURT:  Same objections?

21          MR. CLINE:  Yes, Your Honor.

22          THE COURT:  Those have been overruled, and those are

23   admitted.

24          MR. JACKS:  Would you please display Ashqar Search

25   No. 14?

1    Q.    (BY MR. JACKS)  And Agent Miranda, there on the screen,

2    is that the first page of the exhibit?

3    A.    Yes, sir.

4    Q.    Okay.

5              MR. JACKS:  Could you go to the second page?

6    Q.    (BY MR. JACKS)  And is that the actual -- It is actually

7    a photograph of the original document.  Is that right?

8    A.    Yes, sir.

9              MR. JACKS:  And if you could go to the second page.

10   Q.    (BY MR. JACKS)  And is that the English translation of

11   the document shown on the preceding page?

12   A.    Yes, sir.

13   Q.    First of all, tell us what is the heading for that

14   particular document?

15   A.    "Popular Arab and Islamic conference, general

16   secretarial."

17   Q.    And is it dated?

18   A.    Yes, it is, sir.  It is dated 1/3/1993.

19   Q.    And does it say what it relates to, what event?

20   A.    Yes.  It corresponds to the second session.

21   Q.    Okay.  Who does it show to be in attendance?

22   A.    For the Hamas delegation in attendance is Mousa Abu

23   Marzook, Ibrahim Ghosheh, Mohamed Siam, Imad al-Alami, Mohamed

24   Ahmad Abdullah.

25   Q.    And again, those individuals Mousa Abu Marzook is the

1    individual shown on Demonstrative No. 17 on the far right on

2    the top?

3    A.    That is correct, sir.

4    Q.    And it makes reference to Ibrahim Ghousheh Is he shown in

5    this poster?

6    A.    He is in the orange section, top row right in the middle

7    there.

8    Q.    All right.  Where else have we seen his name in evidence

9    in this case?

10   A.    He signed the two letters on the Hamas letterhead that

11   went to Senator Orrin Hatch's office.

12   Q.    All right.  Dr. Mohamed Siam, is that the same individual

13   that we have seen so many depictions of in this case?

14   A.    Yes, we have seen him numerous times.  He is on the chart

15   you are holding there and on the videos and on the HLF

16   speakers list.

17   Q.    All right.  And this is the Hamas delegation to this

18   popular Arab and Islamic conference in January of '93?

19   A.    Yes, sir.

20   Q.    And who were the other attendees representing other

21   parties?

22   A.    You mean Hamas or Fatah?

23   Q.    Fatah.

24   A.    Under Fatah is Yasser Arafat.

25   Q.    All right.  The other names are not necessary.  There is

1  a reference there to a Dr. al-Turabi.  Who is al-Turabi?

2  A.    Hassan al-Turabi from Sudan.

3  Q.    What was his position from the Sudanese government?

4  A.    I think at one point he was the president.

5  Q.    And if you would, there, he makes a statement where he

6  says "Yesterday."  Can you see that?

7  A.    I can see that, sir.

8  Q.    Just read that sentence, if you would.

9  A.    "Yesterday, we listened to brother Abou Ammar speak about

10  this point, and I leave the floor open for the brothers in

11  Hamas to speak about this issue."

12  Q.    Who goes by the name Abou Ammar?

13  A.    Yasser Arafat.

14  Q.    And Mousa Marzook makes a statement, and if you would,

15  just read two or three sentences there.

16  A.    Sure.  "To begin with, some points must be presented or

17  noted in order for the relationship to be founded on openness

18  and clarity.  For us in the Hamas movement, the start came

19  with the Intifada.  As for joining the unified leadership, the

20  position was connected to the outside as it reflected on the

21  inside."

22  Q.    Okay.  That is good.  Thank you.

23        MR. JACKS:  Could you go to the second page of the

24  exhibit, please?  I am sorry.  Backwards.

25        May I approach, Your Honor?

1    THE COURT:  Yes.

2    Q.  (BY MR. JACKS)  I am showing you, it is the second page

3    of the exhibit but it is the only page of the Arabic.  And do

4    you see something circled there on the upper left portion?

5    A.  Yes, I do.

6    Q.  All right.  Does that appear to be a number?

7    A.  Yes, it does.

8    Q.  All right.

9    MR. JACKS:  Could you go to the English translation,

10   please?

11   Q.  (BY MR. JACKS)  And in fact, did that translation or that

12   marking get included on the English translation as well?

13   A.  Yes, it did, sir.

14   Q.  This time it is on the right hand side.  Is that correct?

15   A.  Yes, sir.

16   Q.  Okay.  And that is consistent with where Arabic is read

17   from right to left?

18   A.  Yes, sir.

19   Q.  So if something is on the far left hand side, it is at

20   the end of the line?

21   A.  Yes, sir.

22   Q.  Okay.  We will come back to that in a moment.  I want to

23   move to a new area, Agent Miranda, and I would like to

24   question you about the entity known as InfoCom.  Can you tell

25   us, what is or what was InfoCom?

```
1   A.    InfoCom was a company based in Richardson, Texas, which
2   was a computer reseller and also an internet service provider.
3   Q.    And who were the owners or principals in InfoCom?
4   A.    The principals were the Defendant Ghassan Elashi and four
5   of his brothers.
6   Q.    What are their names?
7   A.    Bayan Elashi, Basman Elashi, Hazim Elashi, and Esan
8   Elashi was also employed there.
9   Q.    And Bayan Elashi, how does he spell his first name?
10  A.    B-A-Y-A-N.
11  Q.    Basman Elashi, how does he spell his first name?
12  A.    B-A-S-M-A-N.
13  Q.    And Hazim Elashi, how does he spell his first name?
14  A.    H-A-Z-I-M.
15          MR. JACKS:  Can you please display Ashqar Search
16  No. 1 again?  If you can go to the English translation of the
17  Palestine Committee/America.
18  Q.    (BY MR. JACKS)  And how many of the Elashi brothers are
19  shown on this particular list of the Palestinian section in
20  America?
21  A.    Three.
22  Q.    Okay.  And would you tell us which ones and where they
23  can be found on this list?
24  A.    Sure.  There is the Defendant Ghassan Elashi.  He is
25  No. 8.
```

1    Q.    Where does it show at that time the city or country?

2    A.    Los Angeles.

3    Q.    All right.

4    A.    Then there is the brother Hazim, No. 30, also in Los

5    Angeles.  And brother Basman Elashi, No. 31, also in Los

6    Angeles.

7    Q.    And again, this is the Palestine Committee.

8            MR. JACKS:  Would you please pull up Elbarasse

9    Search No. 10?  Can you please go to the -- I believe it is

10   the -- Scroll through those pages, if you would.

11   Q.    (BY MR. JACKS)  And is this -- Agent Miranda, is this the

12   translation of the preceding page and the diagram that was

13   shown there?

14   A.    Yes, sir.

15   Q.    And are any of the Elashi brothers, does their name

16   appear on this particular document?

17   A.    Yes, sir.  I see Basman Elashi's name on the column on

18   the far right, No. 18.

19   Q.    All right.  No. 18.  Thank you.  Does his name appear

20   elsewhere within that screen as you are looking at it?

21   A.    Yes, a little bit to the left on point No. 2 there is a

22   section that says "Palestinian Woman's Association, Basman."

23   Q.    All right.  And below that whose name appears?

24   A.    On No. 34 it is "Palestinian Youth League, Hazim."

25   Q.    Have you seen other documents in your investigation that

1   depict or show the name of any of the Elashi brothers?

2   Ghassan Elashi, Basman Elashi, Hazim Elashi, have their names

3   appeared on other documents?

4   A.   Yes, sir, they have.

5   Q.   Are you familiar with the document Elbarasse Search

6   No. 41?

7   A.   Yes, sir.

8           MR. JACKS:  May I approach the witness, Your Honor?

9           THE COURT:  Yes.

10  Q.   (BY MR. JACKS)  Agent Miranda, let me show you what has

11  been marked for identification as Government Exhibit Elbarasse

12  Search No. 41, and can you identify this as a document that

13  was taken during the search of Ismail Elbarasse's houses in

14  Virginia?

15  A.   Yes, sir, I can.

16          MR. JACKS:  Judge, we would move the admission of

17  Government's exhibit Elbarasse Search No. 41.

18          MR. CLINE:  We object.  I am not sure if you have

19  this in writing--hearsay, 403, authentication.

20          THE COURT:  All right.  And those are overruled, and

21  that is admitted.

22          MR. JACKS:  And could you display the first page of

23  Elbarasse Search No. 41?

24  Q.   (BY MR. JACKS)  On the screen, Agent Miranda, does that

25  show the first page of this document?

```
1   A.   Yes, sir, it does.

2   Q.   And it appears to be written on lined notebook paper?

3   A.   Yes, sir.

4   Q.   And does that appear to be handwriting?

5   A.   Yes, sir.

6   Q.   Okay.  And if you would, just scroll through the page so

7   the jury can see how many pages there are.  There are four

8   pages in Arabic.  Is that correct?

9   A.   Yes, sir.

10  Q.   And now are we looking at the English translation?

11  A.   Yes, sir, we are.

12  Q.   What is the heading on this particular page of the

13  translation?

14  A.   "Brothers who are specialized in media."

15            MR. JACKS:  And if you would, if you would go down

16  to the bottom of the page and enlarge the bottom of the page.

17  Q.   (BY MR. JACKS)  Is one of the Elashi brothers referenced

18  in that portion of the page?

19  A.   Yes, sir.  The Defendant Ghassan Elashi is No. 25.

20  Q.   And what does it say next to his name?

21  A.   "Publications."

22  Q.   And then further to the right?

23  A.   "South, Pacific."

24  Q.   And given where Ghassan Elashi was living at one time,

25  how does that correlate to south, Pacific where was he living?
```

```
 1    A.    He was living in Los Angeles, which of course is in
 2    California, which of course is on the Pacific coast and is in
 3    the south of California.
 4              MR. JACKS:  All right.  And if you would, go two
 5    more pages, if you would.  And if you could enlarge the top
 6    half of the page.
 7    Q.    (BY MR. JACKS)  And is one of the Elashi brothers' name
 8    referenced on that particular page?
 9    A.    Yes, sir.  Basman Elashi is No. 5.
10    Q.    And where does it show -- What geographical area does it
11    put next to his name?
12    A.    Ohio Valley.
13    Q.    What is the heading for this particular page?
14    A.    "Brothers who have security interests."
15    Q.    Do you know whether or not Basman Elashi at one time
16    lived in Ohio?
17    A.    Yes, I do.
18    Q.    Okay.
19              MR. JACKS:  Would you go to the next page, please?
20    And enlarge the top half.
21    Q.    (BY MR. JACKS)  Are there any of the Elashi brothers
22    referenced on this page?
23    A.    Yes, sir.  No. 31 is Hazim Elashi.
24    Q.    What is the heading for this particular page?
25    A.    "Brothers who have security interests."
```

```
1   Q.   Same as the previous page.  Is that correct?

2   A.   Same title, yes, sir.

3   Q.   All right.  And next to his name, what category or topic

4   does it show?

5   A.   "Weapons."

6   Q.   And again, what geographic area does it associate with

7   his name?

8   A.   "South, Pacific."

9   Q.   And there are other entries on that page which talk about

10  explosives for No. 35.  Is that correct?

11  A.   That is correct, sir.

12  Q.   The company known as InfoCom, when did it open?

13  A.   It depends on your point of view.  It existed under a

14  previous name in the early '90s, but it existed in Texas in

15  roughly 1992.

16  Q.   Prior to its name as InfoCom, what name did it go by?

17  A.   ICC.

18  Q.   And where did ICC begin business?

19  A.   Los Angeles.

20  Q.   And during what time period was it functioning in Los

21  Angeles?

22  A.   Early '90s.

23  Q.   What time period did InfoCom or ICC open in Dallas or

24  Richardson, Texas?

25  A.   '92.
```

1    Q.   And how does that compare to the Holy Land Foundation in

2    terms of when it changed its name from Occupied Land Fund to

3    the Holy Land Foundation?

4    A.   About the same time frame.

5    Q.   And when the Holy Land Foundation moved from California

6    to Texas or to Richardson, how does that compare to when

7    InfoCom relocated or opened in Richardson?

8    A.   Yeah, that is what I meant from your previous question.

9    They came here about the same time.

10   Q.   Where exactly was the office for InfoCom?

11   A.   630 International Parkway in Richardson.

12   Q.   And ultimately where was the office for the Holy Land

13   Foundation?

14   A.   Directly across the street.

15   Q.   Was there any evidence to indicate there was a financial

16   relationship between Mousa Abu Marzook and InfoCom?

17   A.   Yes, there was.

18   Q.   Did you see evidence or records that were indicative of

19   that financial relationship?

20   A.   I saw many records.

21          MR. JACKS:  May I approach the witness, Your Honor?

22          THE COURT:  Yes.

23   Q.  (BY MR. JACKS)  Agent Miranda, let me show you what has

24   been marked as Government Exhibit InfoCom Bank Account No. 7.

25   And it is several pages.  Have you seen this before?

1   A.   I have.

2   Q.   And are these records that were obtained during the

3   investigation either from the search of InfoCom or from the

4   acquisition of records from banks pertaining to the InfoCom

5   bank records?

6   A.   Yes, sir.

7   Q.   Let me show you what has been marked for identification

8   purposes as InfoCom Bank Account No. 8.  And likewise, these

9   are several pages.  Have you seen these documents before,

10   these pages?

11   A.   Yes I have, sir.

12   Q.   Are they also representative or are they also records

13   that were acquired in regard to InfoCom bank account records?

14   A.   Yes, sir.

15   Q.   I show you what has been marked for identification

16   purposes as InfoCom Bank Account No. 9.  And are these records

17   that were obtained during the course of your investigation?

18   A.   Yes, sir.

19   Q.   And are they a part of the records that you acquired that

20   relate to the banking transactions with InfoCom and Mousa Abu

21   Marzook?

22   A.   They are, sir.

23   Q.   I show you what has been marked for identification as

24   InfoCom Bank Account No. 10, several pages.  And have you seen

25   these pages before?

1    A.    Yes, sir.

2    Q.    And are they also records that you obtained in the course

3    of your investigation that are part of the bank records for

4    InfoCom Corporation and also records of transactions between

5    InfoCom Corporation and Mousa Abu Marzook?

6    A.    Yes, sir.

7              MR. JACKS:  Your Honor, we would move the admission

8    of InfoCom Bank Account Records No. 7, 8, 9, 10.

9              MR. CLINE:  Object on the grounds that Ms. Moreno

10   stated this morning.

11             THE COURT:  And those are overruled, and those

12   exhibits are admitted.

13             MR. JACKS:  Could you please display InfoCom Bank

14   Account No. 7?

15   Q.    (BY MR. JACKS)  Can you see on the screen, Agent Miranda,

16   that first page, is that the first page of that exhibit?

17   A.    Yes, sir, it is.

18   Q.    And exactly what is the document shown on page 1 of

19   InfoCom Bank Account No. 7?

20   A.    That is a Bank One electronic payments advice regarding

21   an electronic wire transfer from Mousa Abu Marzook to the

22   benefactor being InfoCom Corporation in the amount of $150,000

23   on the date of 7/24/1992.

24   Q.    And where is it that you determine that Mousa Abu Marzook

25   was the originator of that bank account?  I am sorry.  Wire

1  transfer?

2  A.    At the very top you will see ORG equals, which means

3  originator.

4  Q.    All right.  And who is the beneficiary of that wire

5  transfer, according to this document?

6  A.    The beneficiary is InfoCom Corporation.

7  Q.    And the date is shown on the right hand side?

8  A.    Yes.  If you look to that block to the right, you will

9  see several -- You will see account, amount, sequence, time,

10  and date.

11  Q.    And this particular piece of paper was found during the

12  search of InfoCom.  Is that correct?

13  A.    Yes.  I can tell that from the bates number, that small

14  little number, SW212, and there is a number after it, I think

15  it is 1453 based -- It is a little smudged here.

16         MR. JACKS:  If you could, go to the next page of the

17  exhibit, please.

18  Q.    (BY MR. JACKS)  And this appears to be just some

19  handwriting.  Is that correct?

20  A.    This would be on the backside of that wire transfer.

21  Q.    Okay.  All right.

22         MR. JACKS:  And then go to the next page, please.

23  Q.    (BY MR. JACKS)  Now, is this -- What is shown on this

24  particular page?

25  A.    This is InfoCom's Bank One statement for the same account

1    that that wire transfer of $150,000 was sent to.

2    Q.    And is that wire transfer shown on the bank statement?

3    A.    Yes.  It shows that -- If you go about the middle of the

4    page you will see the entry 7-24, $150,000, wire transfer

5    credit, and there is a sequence number that can be matched to

6    the original, the first document we just looked at.

7           MR. JACKS:  If you could show the bottom right

8    corner of that page, please.

9    Q.    (BY MR. JACKS)  And does that tell you, Agent Miranda,

10   that this actual paper document was found in the search of

11   InfoCom?

12   A.    That is correct, sir.

13   Q.    All right.

14           MR. JACKS:  Would you go to the fifth page of that

15   exhibit?

16   Q.    (BY MR. JACKS)  And is this simply another copy of that

17   page of the bank statement showing the deposit?

18   A.    Yes, sir, it is.

19   Q.    Okay.  And this copy, I believe, came from the bank

20   itself.  Is that correct?

21   A.    Yes, sir.

22   Q.    Okay.

23           MR. JACKS:  Would you go to the next page, please,

24   of the exhibit?

25   Q.    (BY MR. JACKS)  What is shown in this particular exhibit?

1   A.   This is a check from InfoCom Corporation dated 9/24/1992

2   to Mousa Abu Marzook in the amount of $5,750 signed by Bayan

3   Elashi.

4   Q.   This is 9/24/92.  Do you remember that document that

5   talked about the meeting with the Iranians?

6   A.   Right.

7   Q.   When was that document -- What was the date of that

8   meeting that was referred in there where Mousa Abu Marzook

9   headed up the Hamas delegation?

10  A.   9/30/1990.

11  Q.   So this is like two years after he had this meeting with

12  the Iranians?

13  A.   Almost to the day.

14       MR. JACKS:  Go to the next page, please.

15  Q.   (BY MR. JACKS)  Is this the back of the check that was

16  just shown?

17  A.   Yes.

18  Q.   Okay.

19       MR. JACKS:  And go to the next page, if you would.

20  You are going to have to enlarge this one.

21  Q.   (BY MR. JACKS)  Can you see -- I think it has been

22  highlighted to the extent that you can't see it, but is this

23  the bank statement that coincides with the check that was

24  issued --

25       MR. JACKS:  Maybe we can do it this way.  Go back to

1   the face of that check, if you could?  It would be two pages

2   back.

3   Q.   (BY MR. JACKS)  What is the check number?

4   A.   No. 1237.

5            MR. JACKS:  If you go two pages into the exhibit now

6   to the bank statement.  If you could enlarge the middle two

7   columns in the bottom that are shaded out.

8   Q.   (BY MR. JACKS)  I am not even going to ask you --

9   A.   If you have the original, I can take a look at it.

10  Q.   Actually mine is a photocopy as well, so let me -- I am

11  sure you have got younger eyes.

12  A.   Yes.  It is right there.

13  Q.   Does that appear to be the portion of the bank statement

14  that coincides with that check that was issued?

15  A.   Yes, sir, it does.

16  Q.   Okay.

17           MR. JACKS:  Go to the next page, please.

18  Q.   (BY MR. JACKS)  What is shown on the next page of this

19  exhibit?

20  A.   That is an InfoCom Corporation deposit slip dated

21  3/25/1993 in the amount of $50,000.

22  Q.   There is handwriting that appears to the right of the

23  Bank One logo.  What does that say?

24  A.   It says Mousa Abu Marzook, and then there is a number

25  there 3023.

1    Q.    Okay.  And that amount is $50,000.  Correct?

2    A.    Yes, sir.

3              MR. JACKS:  Would you please go to the next page,

4    please?  And would you enlarge the bottom half of that page,

5    of that document?

6    Q.    (BY MR. JACKS)  Agent Miranda, can you see -- That

7    deposit slip showed a date of March 25th, '93.  Is it

8    reflected on this next page of the exhibit?

9    A.    Yes.  There is an entry for a March 25th for $50,000 as

10   the deposit.

11   Q.    All right.

12             MR. JACKS:  Would you go to the next page, please?

13   Q.    (BY MR. JACKS)  What is shown in this page of the

14   exhibit?

15   A.    This is now a check from InfoCom Corporation to Nadia

16   Mahmoud Elashi in the amount of $3,000 dated May 11th, 1993

17   signed by Bayan Elashi from the same bank account as the

18   previous exhibits we have been talking about.

19   Q.    And Nadia Elashi is what relation to Mousa Abu Marzook?

20   A.    His wife.

21   Q.    And is she related to the Defendant Ghassan Elashi and

22   his brothers?

23   A.    His cousin, or their cousin.

24             MR. JACKS:  Would you go to the next page of the

25   exhibit?

1    Q.   (BY MR. JACKS)  Is this the back of this check that we

2    just looked at?

3    A.   Yes, it is, sir.

4    Q.   Is it endorsed?

5    A.   Yes, it is.

6    Q.   Are you able to identify the endorsement?

7    A.   I believe that is Nadia Elashi's endorsement.

8    Q.   All right.

9         MR. JACKS:  If you would, go to the next page of the

10   exhibit.  And about down there around April 16th, if you could

11   enlarge that portion.

12   Q.   (BY MR. JACKS)  Do you see a deposit referenced there on

13   April 16th?

14   A.   Yes, I do, sir.

15   Q.   And what is the amount of that deposit?

16   A.   $49,945.

17   Q.   Were you ever able to locate the deposit item that is

18   represented by this entry on the bank statement?

19   A.   No.

20   Q.   Were you ever able to locate anything within InfoCom's

21   records that referenced or correlated to that $49,945 deposit?

22   A.   Yes.

23        THE COURT:  Let's go ahead and take the afternoon

24   break.  Let's take a 20-minute break.  Let's be back at 20

25   till.

1          (Whereupon, the jury left the courtroom.)

2          THE COURT:  All right.  Be back at 20 till.

3                    (Brief Recess.)

4          THE COURT:  Mr. Jacks?

5     And we will break right around 5:00.  Try to find a good

6     stopping point around that time and we will break.

7          MR. JACKS:  Yes, sir.

8     May I approach the witness, Your Honor?

9          THE COURT:  Yes.

10    Q.   (BY MR. JACKS)  Agent Miranda, let me show you additional

11    Government exhibits.  I show you what is marked for

12    identification as Government Exhibit InfoCom Aging Report

13    No. 2.  Do you recognize that as a document that you obtained

14    from the search -- Excuse me.  From the records of InfoCom?

15    A.   Yes, sir.

16    Q.   And what has been marked for identification as Government

17    Exhibit InfoCom Aging Report No. 3, and is this multi-page

18    document something that you have seen before?

19    A.   Yes, it is, sir.

20    Q.   And does it represent or is it copies of records that

21    were acquired from the search that was executed at InfoCom?

22    A.   Yes, sir.

23    Q.   And just to reorient the jury, when was the search of the

24    offices of InfoCom?

25    A.   September 5 through 7, 2001.

1    Q.   So it took three days to execute that search.  Is that

2    correct?

3    A.   Yes, sir.

4    Q.   I have one more.  What is marked as InfoCom Aging Report

5    No. 1, is that also a document that was acquired from the

6    records of InfoCom?

7    A.   Yes, sir.

8    Q.   All right.

9              MR. JACKS:  Judge, we would move the admission of

10   InfoCom Aging Reports No. 1, 2, and 3.

11             MR. CLINE:  Your Honor, I think Ms. Moreno addressed

12   those this morning and you have overruled those.

13             THE COURT:  Yes.  Those are the objections we

14   addressed this morning.  Those have been overruled, and those

15   exhibits are admitted.

16             MR. JACKS:  Could you display, please, InfoCom Aging

17   Report No. 1?

18   Q.   (BY MR. JACKS)  Agent Miranda, do you recognize what is

19   shown on the screen as the document InfoCom Aging Report

20   No. 1?

21   A.   Yes, I do.

22   Q.   And is it referred by that term at the top?

23   A.   Yes, sir.

24   Q.   And the entry there that has the lines or markings

25   through it -- First of all, let me ask you, were those lines,

1    that squiggly line, was that on the document when it was

2    acquired by the Government?

3    A.    Yes, it was, sir.

4    Q.    And the markings there, what entry does that cover?  What

5    is the name of the individual and the information that is

6    shown there?

7    A.    It says "Mousa Abu Marzook, investor 01/01/93,

8    01/01/1994.

9    Q.    And is there a dollar amount shown?

10   A.    $250,000, sir.

11   Q.    Now, the exhibits that you looked at before the afternoon

12   break, and the ones that you testified about, can you just

13   briefly in terms of deposits to InfoCom summarize the deposits

14   that you testified about just before we took the afternoon

15   break?

16   A.    Sure.  There was a wire transfer from Mousa Abu Marzook

17   to InfoCom on I believe the date was 7/24.  Pardon me.  Yes,

18   7/24/1992, in the amount of $150,000.  Then there was a

19   deposit ticket that had Mousa Abu Marzook written on it for

20   $50,000, and then we saw another entry for $49,945.

21   Q.    All right.  And those three amounts would add up to

22   approximately $250,000?

23   A.    Correct.

24   Q.    Less that $55 that was missing from or not included in

25   that $49,945 deposit.  Correct?

```
1    A.   Correct.

2    Q.   All right.  And that was -- Two of them had Mousa Abu

3    Marzook's name on them.  Correct?

4    A.   That is correct.

5    Q.   And I believe you testified that you were able to,

6    through looking at other records, find where that $49,000 and

7    some odd change deposit was credited to Mousa Abu Marzook.  Is

8    that correct?

9    A.   Credited to his account with InfoCom, yes, sir.

10   Q.   All right.

11        MR. JACKS:  And if we could, would you please show

12   InfoCom Aging Report No. 2?  And if you could, enlarge the

13   bottom third of the page.

14   Q.   (BY MR. JACKS)  All right.  Mr. Miranda, do you see the

15   entry at the bottom of the page?

16   A.   I do, sir.

17   Q.   And again, these markings that are these handwritten

18   markings, were those on the paper when it was seized by the

19   Government?

20   A.   Yes, sir.

21   Q.   Do you see an entry there for Nadia Mahmoud Elashi?

22   A.   Yes, sir, I do.

23   Q.   And if you would, looking to the right do you see how

24   much was credited in her name now -- What dollar amounts were

25   credited in her name?
```

1    A.    $250,000.

2    Q.    And then what increments?

3    A.    $50,000, $50,000, $150,000.

4    Q.    But for the $55 that was not in that $49,000, does that

5    correlate to the deposits made by Mousa Abu Marzook?

6    A.    Yes.

7    Q.    In fact, could you just to go back what is the middle

8    entry, the middle $50,000 deposit?  What does it show to be

9    the date?  Is there a date out to the left of that?

10   A.    Yes, there is, sir.  It says 4/20/93.

11         MR. JACKS:  If you could display InfoCom Bank

12   Account No. 7, please.  And if you would, I am not sure what

13   page it is, but if you would just turn the pages through that

14   exhibit and I will tell you when to stop.  All right.  Could

15   you enlarge that page of the exhibit near the bottom?  And I

16   believe it would be on the next page, if you would continue

17   on.  That page, if you would near the bottom, I believe.

18   Q.    (BY MR. JACKS)  Okay.  Do you see the deposit that we are

19   talking about for $49,945?

20   A.    Yes, sir.

21   Q.    What date does it show to be made?

22   A.    4/16.

23         MR. JACKS:  And if you could go back to InfoCom

24   Aging Report No. 2.

25   Q.    (BY MR. JACKS)  And about what date is shown for that

1    $50,000 deposit that is in the middle there?

2    A.   4/20.

3    Q.   Agent Miranda --

4         MR. JACKS:  If you could display InfoCom Aging

5    Report No. 1.

6    Q.   (BY MR. JACKS)  And is this the records as reflected by

7    InfoCom's records in April of '93?

8    A.   Yes, sir.  There is a date in the upper left hand corner

9    April 30th, 1993.

10   Q.   All right.  And let me ask you, it has got this line

11   marked through for Mousa Abu Marzook.  Did you ever see in

12   your examination of all the records any records indicating the

13   infusion or deposit of money, the transfer of money by Nadia

14   Marzook or Nadia Elashi to InfoCom?

15   A.   No.

16   Q.   Was there money going the other way?  I think we have

17   seen some already, but after this delivery or transfer of

18   $250,000 to InfoCom, was there money going from InfoCom to

19   Mousa Abu Marzook or his family?

20   A.   Yes, there was.

21   Q.   And how was that done?  By what means was the money

22   transferred?

23   A.   Money was transferred in the form of either checks or

24   wire transfers to Nadia Elashi, Marzook's wife.

25        MR. JACKS:  Could you display, please, InfoCom Aging

1    Report No. 3?

2    Q.    (BY MR. JACKS)  Agent Miranda, you have identified these

3    records as InfoCom Aging Report No. 3, and I believe you said

4    these are records or documents that were maintained by InfoCom

5    itself.  These are their own records.

6    A.    That is right, sir.

7    Q.    And if you would, can you describe generally what is

8    shown on the first page of this exhibit?

9    A.    Right.  This shows transactions it is showing for a

10   period 1/1/1992 to 6/4/2003.  That date is as a result of the

11   FBI getting into the computers of InfoCom after the search and

12   pulling that information down.

13        The account is for Nadia Elashi, who we have already

14   described as the wife of Mousa Abu Marzook, and the first

15   instance there is an entry for 3/25/1993 it says Nadia Elashi

16   for $50,000.

17   Q.    Let me interrupt you.  Does that correlate with that

18   $50,000 deposit that had Mousa Abu Marzook written on the

19   deposit slip?

20   A.    Right.  That is the same date that the deposit slip said

21   Mousa Abu Marzook for $50,000.

22   Q.    And the next entry or debit or deposit, if you will.

23   A.    Then there is one on 4/16/93 for $49,945, which

24   corresponds with that bank statement entry that we saw.

25   Q.    All right.  So is that the bit of evidence that tells you

1    that that $49,945 amount was connected to Mousa Abu Marzook?

2    A.   Yes, that is part of it.

3    Q.   All right.  And so that is on the debit side.  And what

4    are the credit sides shown?

5    A.   Then starting on 5/11/1993 you start seeing $3,000

6    amounts, and with various memo entries, "return for

7    investment, payment on loan, payment on loan," et cetera,

8    going all the way down to 1/7/1994.

9    Q.   And all of those entries, except for one, are during the

10   calendar year 1993.  Is that correct?

11   A.   That is right, sir.

12   Q.   So if you subtract $3,000 for that last entry there, that

13   would have been $24,000 that would have been transferred to

14   Nadia Elashi.  Is that correct?

15   A.   Right.

16        MR. JACKS:  Would you go to the next page of this

17   exhibit, please?

18   Q.   (BY MR. JACKS)  And just describe what is on the next

19   page.

20   A.   Okay.  Now we are still looking at Nadia Elashi's name

21   there.  We start again 1/7/1994, which I believe is a

22   carryover from the last page, and we work our way all the way

23   down through 2/14/1995 with all of those being credits to her.

24   Q.   All right.  And so that is money going to, according to

25   these records, Nadia Elashi.

1    A.   Right.  $3,000 increments, except for the last two.  One

2    is a $6,000 increment and the last one is a $15,000 increment.

3    But instead of a check, you will see all the way to the left

4    it says a wire, so that is a wire transfer.

5    Q.   All right.  And that one was in calendar year 1995, that

6    last one?

7    A.   Yes, sir.

8    Q.   So if you subtract that $15,000, then that would be

9    $36,000 that was transferred under this account in the

10   calendar year 1994.  Is that correct?

11   A.   Yes, sir.

12   Q.   Okay.

13        MR. JACKS:  Would you go to the next page, please?

14   Q.   (BY MR. JACKS)  And what transfers are shown on this page

15   of the exhibit?

16   A.   Continuing, we have transfers in 1995, on 11/2/1995 all

17   the way to it looks like 4/1/1996.  The first is a wire for

18   $12,000, then there is a wire for $6,000, and then the rest

19   are wires in the amount of $3,000 each.

20   Q.   All right.  So on the previous page there was a $15,000

21   disbursement or transfer in February of '95.  So if you take

22   that $15,000 and $12,000 and $6,000 disbursement shown on the

23   top two lines there, does that total $33,000 for calendar year

24   1995?

25   A.   Yes, sir.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

```
1    Q.    Now, what year was Mousa Abu Marzook designated?

2    A.    1995.

3    Q.    Do you remember when he was designated?

4    A.    It was August '95.

5    Q.    And when I say designated, I mean designated as a

6    specially designated terrorist by the United States.  Is that

7    what you are referring to?

8    A.    The same, yes, sir.

9          MR. JACKS:  Would you please display Designation

10   No. 4?

11        And I believe this has been admitted, Your Honor, but if

12   not I would move its admission.

13        MR. CLINE:  No objection.

14        THE COURT:  Admitted, if it hasn't been.

15        MR. JACKS:  Just enlarge the middle of the page

16   there, if you would.

17   Q.    (BY MR. JACKS)  And Agent Miranda, the text that is typed

18   in there, just if you would read the first line or two.

19   A.    On the blocking notice, sir?

20   Q.    Yes.

21   A.    "Blocking notice FAC No. SDT-145769 on Abu Marzook, Mousa

22   Mohamed, a/k/a Marzook Mousa Abu, a/k/a Abu Marzook."

23   Q.    You don't have to read all the aliases.

24        MR. JACKS:  If you would go to the next page.  And

25   if you could enlarge the top half, please.
```

1    Q.    (BY MR. JACKS)   And if you would, Agent Miranda, just

2    read the first few lines.   And it is not necessary for you to

3    read all of the statute recitations, but just read the

4    language there in the blocking memorandum.

5    A.    "The Office of Foreign Assets Control, pursuant to

6    Executive Order 12947 prohibiting transactions with terrorists

7    who threaten to disrupt the Middle East peace process, and

8    Section 203 of the International Economics Power Act find that

9    there is reasonable cause to believe that on or since the

10   effective date," which is January 24th, 1995, "the individual

11   identified below and in evidentiary memorandum has been

12   determined to have acted or purported to act directly or

13   indirectly on behalf of a terrorist organization, which has

14   been named as a specially designated terrorist, and identified

15   in the annex to Executive Order No. 12947 or the authorities

16   thereof."

17         MR. JACKS:   Could you zoom out, please?   And just

18   highlight the paragraph under "individual."

19   Q.    (BY MR. JACKS)   And the first paragraph there, Agent

20   Miranda, does that appear to be identical to the paragraph on

21   the preceding page which you read?

22   A.    It appears to be, sir.

23   Q.    All right.   And would you read the next two paragraphs,

24   please?

25   A.    Yes, sir.   "Consequently, pursuant to Executive Order No.

1   12947 of January 23, 1995, the subject listed above and in the

2   attached memorandum is determined to be a specially designated

3   terrorist, and therefore, to be subject to the prohibitions

4   applicable under Executive Order No. 12947.

5       "In consequence whereof, all real and personal property

6   of the subject identified above and in the attached

7   memorandum, including but not limited to all accounts in which

8   the above-named subject has any interest, are blocked; and all

9   transactions involving U.S. persons and the subject named

10  above and in the attached memorandum are prohibited unless

11  licensed by the Office of Foreign Assets Control."

12          MR. JACKS:  Would you zoom out again, please?

13  Q.   (BY MR. JACKS)  And is that dated, Agent Miranda?

14  A.   Yes.  It is dated 8/16/1995.

15  Q.   All right.  So that is the effective date of his

16  designation.  Is that correct?

17  A.   Yes, sir.

18          MR. JACKS:  If you would, go back to InfoCom Aging

19  Report No. 3.  And I believe we were on page 3.  Thank you.

20  Q.   (BY MR. JACKS)  All right.  So in 1995 what were the

21  dates of disbursement of these funds that had been deposited

22  in InfoCom by Mousa Abu Marzook?

23  A.   November 2nd, 1995 and December 22nd, 1995.

24  Q.   After his designation.  Is that correct?

25  A.   After his designation.

1    Q.   After any assets that he has an interest in are to be

2    blocked.  Is that correct?

3    A.   Yes, sir.

4    Q.   Were there supposed to be any transactions by anyone in

5    anything that he had an interest in?

6    A.   None whatsoever.

7    Q.   You were telling us about the disbursements of this money

8    reflected in 1996.  And on this particular page how much was

9    disbursed in 1996?

10   A.   $12,000.

11        MR. JACKS:  And if you would, go to the next page.

12   Q.   (BY MR. JACKS)  The disbursements shown in 1996, how many

13   are there in addition to those on the previous page?

14   A.   Six there.

15   Q.   All right.  And those totaled to $18,000?

16   A.   Yes, sir.

17   Q.   And with that $18,000 shown on this page and the $12,000

18   shown on the previous page, how much does that result in being

19   disbursed in 1996?

20   A.   $30,000 in 1996.

21        MR. JACKS:  Would you go to the next page of the

22   exhibit, please?

23   Q.   (BY MR. JACKS)  Are there additional disbursements

24   reflected on this page?

25   A.   Yes, sir.  Disbursements in 1997 and 1998.

```
1    Q.   And approximately how many -- Not approximately.  How
2    many are there for 1997?
3    A.   I count nine, and I count four for 1998.
4    Q.   All right.  And the nine, if you were to add those, does
5    that total for 1997 to $26,000?
6    A.   Yes, sir.
7    Q.   The 1998 disbursements on this page, you said there is
8    four of them?
9    A.   Yes, sir.
10   Q.   All for $1,000?
11   A.   Yes, sir.
12        MR. JACKS:  Could you go to the next page, please?
13   Q.   (BY MR. JACKS)  And what calendar year is covered by the
14   disbursements shown on this particular page?
15   A.   1998, 1999, and 2000.
16   Q.   And with the disbursements -- Let me go back and look and
17   see if there are any duplicates.
18        MR. JACKS:  The four disbursements shown on page
19   five, could you just go back to that for a moment, the last
20   four disbursements?
21   Q.   (BY MR. JACKS)  Those are January, February, March, and
22   April.  Correct?
23   A.   Yes, sir.
24   Q.   For $1,000.
25        MR. JACKS:  If you go to page 6 now and show the
```

1  first four.

2  Q.   (BY MR. JACKS)  Do they appear to be repeated in the

3  first four disbursements on this page?

4  A.   Yes, sir.

5  Q.   All right.  So with the disbursements shown on this page

6  for 1998, is that an amount totaling $12,000 that was

7  disbursed?

8  A.   No.  I think it would be $20,000, wouldn't it?  $4,000 we

9  are subtracting?

10  Q.   No.  I am just saying we are not counting the $4,000 on

11  the previous page because they are typed in also on this page,

12  so all of the 1998 disbursements that are shown.  Do you see

13  that?

14  A.   Yes, sir.

15  Q.   Okay.  There is one each month, save and except for

16  November.  Is that correct?  If you look down the dates?

17  A.   Yes, sir.

18  Q.   Okay.  And then one of them is for $2,000 in October.

19  Correct?

20  A.   Right.

21  Q.   So that would be $12,000 for the calendar year 1998?

22  A.   Right, sir.

23  Q.   All right.  And then 1999 the disbursements continue?

24  A.   Yes, sir, they do.

25  Q.   And there appears to be seven or eight disbursements made

1   in 1999?

2   A.   I count nine, sir.

3   Q.   And the amount of $10,500, would that be the approximate

4   or exact amount that was disbursed then?

5   A.   Yes, sir.

6   Q.   And then there was one for the year 2000.  Is that

7   correct?

8   A.   Yes, sir.

9        MR. JACKS:  Would you go to the next page, please?

10  Q.   (BY MR. JACKS)  What years are shown in the disbursements

11  on this particular page?

12  A.   It starts the years 2000 and 2001.

13  Q.   All right.  How many for 2001?

14  A.   There is one on this page for 2001.

15  Q.   On what date?

16  A.   1/17/2001.

17  Q.   Who is Tareq Elashi?

18  A.   He is one of the children of Mousa Abu Marzook and Nadia

19  Elashi.  I believe he is the second oldest boy.

20  Q.   And was he the payee, if you will, on some of these

21  checks or wire transfers?

22  A.   Yes.

23  Q.   All right.  And if your math is correct, does that total,

24  then -- Excuse me.  I will have another question I need to ask

25  you.

1    In addition to this ledger entry, if you will, what bears

2    the name card transactions, did you find copies of either the

3    actual checks or the actual wire transfers reflecting these

4    disbursements?

5    A.   Yes, I did.

6    Q.   And I just want to clarify something.  These documents,

7    specifically InfoCom Aging Report No. 3, you can see there

8    where it shows a date range from 1/1/2000, for example, to

9    June 35th, 2003.  Now, these records were seized by the

10   Government.  Is that correct?  In September of 2001?

11   A.   Right.

12   Q.   Now, these dates for 2003, how is it that 2003 prints out

13   when these reports are printed?

14   A.   That is probably the date we pulled the information from

15   the computer.

16   Q.   All right.  So if you were to go back into this computer

17   and print it today, would you expect it to show 2008 as the

18   date that the report was generated?

19   A.   Right.

20   Q.   Okay.  But in terms of what is contained within these

21   reports, nothing of that has been changed.  Is that correct?

22   A.   No, sir.

23            MR. JACKS:  May I approach the witness, Your Honor?

24            THE COURT:  Yes.

25   Q.   (BY MR. JACKS)  Agent Miranda, I would like to show you

what has been marked for identify as InfoCom Bank Account

Records No. 5, InfoCom Bank Account No. 6.  And are these

documents or pages, are they copies of the checks which you

located which represent the disbursements shown on that

InfoCom Aging Document No. 3?

A.   Yes, sir, they are.

MR. JACKS:  Judge, we move the admission of InfoCom

Bank Account No. 5 and InfoCom Bank Account No. 6.

MR. CLINE:  Same objection.

THE COURT:  Those have been overruled, and those two

exhibits are admitted.

MR. JACKS:  Would you show the first page of InfoCom

Bank Account No. 6?  And if you could, enlarge the check

itself, please.  And can you at the same time show InfoCom

Bank Accounts Aging No. 3 exhibit on half the screen?  And if

you could, enlarge.

Q.   (BY MR. JACKS)  All right.  The first disbursement shown,

and I am talking about on the right hand side of the screen,

just go across the line there and identify the information on

line 3 of that exhibit.

A.   Sure.  If you are looking at the exhibit on the right,

you can see the number 2302.  That matches the check on the

left.  Then it says, "CD cash disbursement," then there is the

date 5/11/1993.  That is the same as the date on the check of

May 11th, 1993.  And then it is in the amount of $3,000, which

1    matches the amount of the check on the left, $3,000.

2    Q.   All right.  And did you locate all of the checks and wire

3    transfers that would be reflected in this disbursements list?

4    A.   I think we found all of them, yes.

5    Q.   All right.  With regard to InfoCom Bank Account No. 6 --

6         MR. JACKS:  Go to the next page of that exhibit.  It

7    should show the back.  All right.  Yeah.

8    Q.   (BY MR. JACKS)  And does that show the endorsement on the

9    back of the check?

10   A.   Yes, this particular check does.

11   Q.   All right.  And are you able to identify that

12   endorsement?

13   A.   I believe that is Nadia Elashi's signature.

14        MR. JACKS:  All right.  And just go to the next

15   page, please.

16   Q.   (BY MR. JACKS)  And is this the next check in the

17   disbursement sequence?

18   A.   Yes; 2476, yes, it is.

19        MR. JACKS:  Okay.  And go to the next page, please.

20   Q.   (BY MR. JACKS)  And the endorsement?

21   A.   The same--Nadia's.

22   Q.   All right.

23        MR. JACKS:  And go to the next page, please.

24   Q.   (BY MR. JACKS)  And again are these in chronological

25   order as they have been arranged in this exhibit?

A.    Yeah, I believe we put them in that order.  Yes, sir.

Q.    Okay.

        MR. JACKS:  Go to the next page, please, that one.

Q.    (BY MR. JACKS)  There it is a little different

endorsement, is it, or signature?

A.    Right.

Q.    Okay.

        MR. JACKS:  If you would just start progressing

through those exhibits, please, on the left.

Q.    (BY MR. JACKS)  While those are scrolling there, Mr.

Miranda, let me ask you, where was Mousa Abu Marzook and his

wife, where were they living at the time that these checks in

1993, 1994 were being disbursed?

A.    Northern Virginia.

Q.    Now, in relation to those documents we saw with regard to

the meetings with the Iranian delegation, again when was that

that Mousa Abu Marzook had that meeting or first meeting with

the Iranian delegation?

A.    The first meeting he had with the Iranian delegation as

Hamas was 9/30/1990.

Q.    How about the meeting in Africa where he met in the Sudan

as the head of the Hamas delegation with Mohamed Siam and

Ibrahim Ghousheh?

A.    I believe it was January 3rd, 1993.

Q.    The entries in the InfoCom Aging Report No. 3, InfoCom's

1    own records under the heading for Nadia Elashi, did you find

2    other checks that were not included on that ledger sheet, if

3    you will, that hadn't been updated?

4    A.    Yes.

5            MR. JACKS:  Would you display, please, InfoCom Bank

6    Account No. 5?  And I believe it is going to be on the left

7    hand column, the second one from the top, if you can enlarge

8    it.

9    Q.    (BY MR. JACKS)  And is this an InfoCom check to Nadia

10   Elashi?

11   A.    Yes, sir.

12   Q.    All right.  What is the date?

13   A.    It looks like 9/11/2000.

14           MR. JACKS:  And the next page, please.  I believe it

15   is the third one down on the left.

16   Q.    (BY MR. JACKS)  And these may be in reverse order.  What

17   is the date on this one?

18   A.    It looks like 10/4/2000.  It is hard to read on that one.

19   Q.    I believe you are right.

20           MR. JACKS:  The next page, please, top left.

21   Q.    (BY MR. JACKS)  What is the date?

22   A.    That looks like 10/8/2000.

23   Q.    Okay.

24           MR. JACKS:  Next page, please.  I believe it is

25   going to be the second one down on the left.

1  Q.  (BY MR. JACKS)  And is this one of those that is made out

2  to Tareq Elashi?

3  A.  It is, sir.

4  Q.  What is the date on this one?

5  A.  It looks like 1/17/2001.

6  Q.  I believe under that aging accounts receivable, was this

7  the only one that was posted on that ledger for 2001?

8  A.  For 2001 I believe it was, sir.

9        MR. JACKS:  Go to the next page, please.

10  Q.  (BY MR. JACKS)  Can you tell the date for that particular

11  disbursement?

12  A.  No, not on this screen here.  If you have the paper copy,

13  I will be glad to look at that.

14  Q.  Look below it.  Does it indicate in the computer below

15  that the date --

16  A.  I can't make that out, sir.

17  Q.  I am sorry.  Even below --

18  A.  Oh, sure.  The big numbers, you mean.  3/28/01.

19  Q.  It is called a computer.  And does the check number match

20  as shown there?

21  A.  Yes, 577.

22  Q.  And again, who is the payee on this one?

23  A.  Tareq Elashi.

24        MR. JACKS:  Next page, please.  Top left of the

25  column.

```
 1    Q.   (BY MR. JACKS)  And the disbursement on this one?

 2              THE DEFENDANT:  $1500, 4/26/01.

 3              MR. JACKS:  Next page.

 4    Q.   (BY MR. JACKS)  Who is the payee and the date?

 5    A.   Tareq Elashi, 7/3/01.

 6              MR. JACKS:  Next page, please, second one down on

 7    the right as well.

 8    Q.   (BY MR. JACKS)  And who is the payee for this

 9    disbursement and what is the dollar amount and the date?

10    A.   It says Nadia Elashi/Tareq Elashi for $1500 on 7/26/01.

11    Q.   Where does it show they live, or what is the address or

12    town?

13    A.   Falls Church, Virginia.

14    Q.   And do you remember where Ismail Elbarasse's house was?

15    A.   Falls Church, Virginia.

16              MR. JACKS:  Okay.  Go to the next page, please, the

17    right hand column second one down.

18    Q.   (BY MR. JACKS)  Who is the payee and the amount and the

19    date?

20    A.   It says Tareq Elashi is the payee, but the memo actually

21    I think says Nadia Elashi, and the date is 8/9/01.

22    Q.   All right.  And is that the last one on these records

23    that was located?

24    A.   Yes, sir.  Can I make a -- I want to make sure something

25    is clear on the record.  As we were going through the backs of
```

1    the checks you were asking me the names, and I didn't mean to

2    imply that every single one of them was signed by Nadia

3    Elashi.  In fact, I think at least one was signed by Mousa Abu

4    Marzook.

5    Q.   I will locate that one and let you look at it, and if

6    that is the case, we will display that one.

7    A.   Yes, sir.

8    Q.   I wanted to ask you, continuing in this discussion about

9    the financial arrangement between InfoCom and Mousa Abu

10   Marzook, you said and from looking at the records it appears

11   that these disbursements continued from or began in March of

12   1993 and continued until July of 2001.  Is that correct?

13   A.   Yes, sir.

14   Q.   Let me ask you, during your search of InfoCom in

15   September of 2001, did you ever find any records or evidence

16   that showed the involvement of anybody else from the Palestine

17   Committee in this arrangement in which InfoCom was sending

18   money to Marzook?

19   A.   Yes, I did, sir.

20         MR. JACKS:  May I approach the witness, Your Honor?

21         THE COURT:  Yes.

22   Q.   (BY MR. JACKS)  Let me show you what has been marked for

23   identification as Government's Exhibit InfoCom Search No. 94.

24   And is that a one-page document with a one-page English

25   translation?

A.   Yes, it is, sir.

Q.   And was this a document that was found during the search

of InfoCom in September of 2001?  September 5th, 6th, and 7th

I think you said are the dates the search was conducted.

A.   Yes, sir.

Q.   All right.

        MR. JACKS:  Judge, we would move the admission of

InfoCom Search No. 94.

        MR. CLINE:  Objection as provided by Ms. Moreno.

        THE COURT:  All right.  And those have been

overruled, and that is admitted.

Q.   (BY MR. JACKS)  Before we start talking about -- Let me

back up.  The document shown on the screen, Agent Miranda, is

this the document that has been identified as InfoCom Search

No. 94?

A.   Yes, sir, it is.

Q.   All right.  And just physically, just describe what kind

of document it was.

A.   It is a single piece of paper, handwritten, it looks like

on notebook paper, and it appeared to have been faxed.

Q.   All right.  And where was this document found or located

during the search of InfoCom?

A.   It was found in a locked safe in the office of the

president of InfoCom, Bayan Elashi's office.

Q.   Bayan Elashi?

1   A.    B-A-Y-A-N, correct; Bayan.

2   Q.    And were you present during the search when this document

3   was located?

4   A.    Yes, I was.

5   Q.    Were you in that office?

6   A.    Yes, I was.

7   Q.    Was Bayan Elashi in there?

8   A.    Yes, he was.

9   Q.    And you said the safe was locked?

10  A.    Yes, it was.

11  Q.    And what was done or said to gain entry to the safe?

12  A.    I asked him if he would open the safe.

13  Q.    What was his response?

14  A.    He didn't know the combination.

15  Q.    This is a safe sitting in his office?

16  A.    Yes, sir.

17  Q.    All right.  And then what was the next comment or

18  discussion by you?

19  A.    I told him that I had a federal --

20          MR. CLINE:  Excuse me.  Your Honor, I am going to

21  object and ask to approach on this.

22          THE COURT:  Come on up.

23          (The following was had outside the hearing of the

24          jury.)

25          MR. CLINE:  I am not sure what is coming here, but

1    there may well be hearsay or something.

2           MR. JACKS:  Well, it is not for the truth of the

3    matter because he did have the combination, so he said, "I

4    don't have the combination."

5       Agent Miranda told him, "If you don't open it, we are

6    going to get a locksmith and we are going open it ourselves

7    and it is going to be damaged," whereupon he opened it.

8           MR. CLINE:  Okay.  Your Honor, that particular piece

9    of evidence I would ask to exclude under 401 and 403.  It also

10   is hearsay.  I think it is hearsay.  Mr. Ghassan Elashi was

11   not involved in this episode at all.  I don't believe this

12   evidence, Bayan Elashi's alleged concealment or reluctance, or

13   whatever that would be, is relevant to Ghassan Elashi, so I

14   would ask to exclude that.

15      And then I have got another broader point I want to bring

16   up as well.

17          MR. JACKS:  Your Honor, Bayan Elashi I believe is

18   alleged as an unindicted co-conspirator.  His statement that

19   "I don't have the combination" is not offered for the truth,

20   because in fact he did have the combination.  And it is a

21   verbal act, and it just shows the context of what happened to

22   acquire this.  So it is not a hearsay statement.  It is just

23   to show that he made the statement.  Whether he did or didn't

24   have the combination is not what it is intended to prove.

25   This is in September of 2001, so even by their definition the

1    conspiracy still existed until December.

2              THE COURT:  What is your next objection?

3              MR. CLINE:  I want to -- We have already objected

4    this morning to this entire sequence of evidence about

5    these -- the payment or the investment in InfoCom by Mr.

6    Marzook and/or his wife and the payments back.  That was the

7    discussion you had this morning with Ms. Moreno, which she

8    raised double jeopardy concerns and other concerns.  This was

9    the subject of a separate trial in which Mr. Elashi was found

10   guilty.

11        It is being brought in here presumably as 404(b)

12   evidence.  It is not part of the charges in this case.  It is

13   a separate allegedly criminal act, and it is presumably being

14   introduced for some purpose, such as knowledge or intent.  So

15   I think going back to the question about Bayan Elashi, it

16   gives you a sense of how attenuated that evidence is.

17        On top of that, we would like a Rule 404(b) instruction

18   for all of this evidence that we have been hearing for the

19   last hour or so about the $250,000 invested in InfoCom by

20   Marzook and his wife, and that the repayments of that over the

21   years up until 2001, as to all of that evidence we would like

22   an instruction, number one, that Mr. Elashi is not charged

23   with that in this case; and number two, that it may be

24   considered by the jury solely as it bears upon Mr. Elashi's

25   knowledge and intent and not for any other purpose.

1          MR. JACKS:  Your Honor, the Government disagrees

2     that this is a 404(b) issue.  This activity is intrinsic to

3     all of these activities.  The evidence in this case has shown

4     that these Defendants, these companies that they set up, are

5     all intermingled, if you will--common directors, common

6     employees, common -- The evidence shows that InfoCom was used

7     to store Holy Land Foundation records.  A lot of Holy Land

8     Foundation records were there.

9          There is the commonality of Mousa Abu Marzook, who the

10    evidence shows was an unemployed graduate student, and he is

11    depositing hundreds of thousands of dollars in these entities

12    and then that money is being funneled back to him.  And all of

13    these relationships are part of this arrangement or this

14    conspiracy among these individuals to carry out the activities

15    of the Holy Land Foundation and the activities of others

16    associated with it.

17         And the evidence is going to show that this letter, in

18    fact, that came out of the safe was addressed to Ghassan.  It

19    is not addressed to Bayan.  It is addressed to Ghassan Elashi.

20    And it pertains to -- It is written by another -- this Ismail

21    Elbarasse.  It is written by another guy.  And the fact that

22    somebody else on the Palestine Committee is involved in trying

23    to collect money that Marzook has parked or placed or

24    invested, whatever name you want to put on it, shows that this

25    activity is all interrelated and it is intrinsic to this case

1    as --

2              THE COURT:  To the conspiracy charge?

3              MR. JACKS:  Yes, sir.

4              MR. CLINE:  Your Honor, it seems to me there are two

5    possibilities here.  One possibility is that, as Mr. Jacks

6    just argued, this conduct that they have been producing

7    evidence on for the last hour or so is intrinsic to this case.

8    Mr. Elashi has already been tried and convicted.  So if it is

9    intrinsic, there is a very serious double jeopardy problem

10   here, and we move to dismiss the charges against Mr. Elashi,

11   at least the conspiracy charges, because he has already been

12   tried and convicted for that same conduct.

13       Now, if it is not intrinsic, then it is 404(b), and we

14   ask for a 404(b) instruction to the effect that he is not on

15   trial for that conduct and it may be considered only as it

16   bears upon his knowledge and intent.  Those are the two

17   possibilities, as I see it.  And Mr. Jacks' argument is worse

18   for the Government than what I am asking for.

19             MR. JACKS:  Well, the fact that the evidence may

20   have also led to a separate conviction in another case doesn't

21   mean that the same evidence can't be used in another case to

22   show other charges or to support other charges.

23             MR. CLINE:  Other charges.  That is the key.

24             MR. JACKS:  There is no double jeopardy, because he

25   is not being prosecuted for dealing in the funds of a

designated terrorist.  He is not in jeopardy for that

violation.  He has already been convicted of it.

             THE COURT:  What was he convicted of in the first --

             MR. JACKS:  He was convicted of violation of

IEEPA--that is, dealing in the funds of a specially designated

terrorist.  This was in front of Judge Lindsay.

             THE COURT:  This involved the same money?

             MR. CLINE:  This precise conduct.  This is what he

got convicted of in that other case.  So if it is part of

these charges, as Mr. Jacks has just argued, then double

jeopardy bars these charges.

             MR. JACKS:  We are talking about the admissibility

of the evidence, not the charges.  It doesn't affect the

admissibility of evidence.  We are not trying to convict him

again, so there no double jeopardy.  Double jeopardy doesn't

bar the admissibility of evidence.  Double jeopardy deals with

the *Blockburger* test--are you being put in jeopardy for the

same crime--and he is not.

             MR. CLINE:  And if this is 404(b) evidence, then the

Supreme Court case law supports Mr. Jacks' position that

double jeopardy does not prohibit the use as 404(b) evidence

of a separate previously convicted offense.  But he is trying

to say it is not 404(b).  Then he is in trouble with double

jeopardy.  But if it is 404(b), then we are entitled to that

instruction.

1          MS. HOLLANDER:  And we would like an instruction on

2    behalf of the other Defendants that it is not 404(b) at all,

3    and a limiting instruction that says that it has nothing to do

4    with the rest of us.

5          MR. DRATEL:  And I agree with Ms. Hollander.  This

6    is an offense that is not charged against any of these

7    Defendants.  This is -- No one is charged with violating that

8    August 16, '95 order.  That is what all this evidence is

9    about; a totally separate crime, a totally separate trial.

10   And so we need to ask for severance, too.  He just spent 45

11   minutes on this.

12        And also the *Crawford* part of this, too, just with

13   respect to this particular conversation -- I would like to add

14   the *Crawford* part.  The FBI agent asking somebody questions,

15   he is answering, and now they are going to bring it in and we

16   don't have the right to confront.

17        MS. HOLLANDER:  And 404(b) requires notice that we

18   never got.

19        MS. CADEDDU:  That is correct.  And I would -- I

20   think it is clear already, but I would join in those

21   objections on behalf of Mr. Abdulqader.

22        MS. HOLLANDER:  And I would ask for a severance on

23   behalf of Mr. Abu Baker.

24        MS. CADEDDU:  As would I.

25        THE COURT:  I thought you were initially coming on

1    the *Crawford* issue, and she brings it up at the end.

2            MS. MORENO:  Your Honor, this is exactly what I

3    feared this morning, and this is why I brought it to the

4    Court's attention.

5            THE COURT:  I didn't know what the first conviction

6    was about.

7            MS. MORENO:  It involves this exact same evidence,

8    and Mr. Jacks knows that because he was the prosecutor on that

9    case.

10           THE COURT:  You may have some problems there.  I

11   have not researched the issue.  I mean, have you?  If it is

12   not intrinsic --

13           MR. JACKS:  Well, I have done research on 404(b),

14   but --

15           THE COURT:  That is easy enough.  We can give an

16   instruction that it applies only to Mr. Cline's client and not

17   any of the others for intent, knowledge, motive, whatever

18   other things it can come in for.

19           MR. JACKS:  They need some homework over this long

20   weekend, and I know Mr. Cline is the authority.

21           MR. CLINE:  That is true, we can.  On the other

22   hand, I don't want to send this jury away for five days with

23   this evidence in their mind and no limiting instruction,

24   because it can be prejudicial.

25           THE COURT:  What about the *Crawford* issue, that you

1  have got -- You are saying this is a co-conspirator statement.

2          MR. JACKS:  It could be either or both, Your Honor.

3  As I said, Bayan Elashi is named as an unindicted

4  co-conspirator, so his reluctance or making a false statement

5  is indicative of his trying to keep this conspiracy protected.

6      But again, just to "I don't have the combination," again,

7  it is not being offered for the truth, so it is just --

8          THE COURT:  But you are offering it to show that he

9  lied; this knowledge, this guilty knowledge that you are

10  trying to impute, which is the statement you were saying that

11  it shows that he was trying to conceal, and so that is how he

12  was trying to conceal it--by lying.

13          MR. JACKS:  That doesn't make it hearsay, though.

14          THE COURT:  I understand.

15          MS. HOLLANDER:  But it is clearly *Crawford*.

16          MR. DRATEL:  *Crawford* is not a hearsay rule.

17  *Crawford* is a confrontational rule.

18          MR. JACKS:  Do they want to confront him on whether

19  he had the combination or not?  Is that the point, that they

20  have a right to confront him about whether he did or didn't

21  have the combination?

22          THE COURT:  That is one of his statements that were

23  made, but as I understand it --

24          MR. CLINE:  May I make a suggestion?  It is a

25  quarter to 5:00.  We have a lot of complicated issues to sort

1    out here, but the one thing that I think we are entitled to,

2    at a minimum, and there may be more, is the 404(b)

3    instruction, because that is the best case for the Government

4    is the 404(b) instruction.  The worst case is they got a

5    double jeopardy --

6              THE COURT:  The best case is he says you don't get

7    any instructions--that it is intrinsic.  That is his argument.

8              MR. CLINE:  There is an internal inconsistency in

9    that argument.

10             THE COURT:  I don't know.

11             MR. JACKS:  I am not as smart as Mr. Cline, but I am

12   not sure --

13             THE COURT:  I don't know.  I am not familiar with

14   this at all.

15             MR. JACKS:  The fact it is intrinsic --

16             MS. HOLLANDER:  I share with Mr. Cline a big concern

17   for my client, who has nothing to do with this, that this jury

18   not go home like this.  And I know that Mr. Dratel has to

19   leave here at 5:00 for religious purposes, so I am a little

20   worried about the time here.

21             THE COURT:  Marlo, you wanted to say something?

22             MS. CADEDDU:  I want to make sure that my joining in

23   all of these objections is clear for the record.

24             THE COURT:  It is clear.

25             MR. DRATEL:  Can I articulate, the *Crawford* in terms

1    of what I am saying, it is not necessarily a hearsay rule.  It

2    is a confrontational rule, which is -- in *Crawford* itself

3    there was an exception to the hearsay rule that would have put

4    in those statements, just like plea agreements.  The cases

5    that they cite, plea agreements would come in because they are

6    admissions against penal interests.  Exceptions to the hearsay

7    rule is still barred by the confrontation clause.  So that is

8    what we have here.

9         MR. WESTFALL:  And for the record, my client either

10   was not with Holy Land or was in New Jersey the entire time

11   all of this stuff happened, and this is incredibly, incredibly

12   prejudicial.  This stuff is splashing all over my poor client

13   over there.  And we want limiting instructions -- I think

14   everything they have done this afternoon is completely

15   prejudicial, and we request a limiting instruction.

16        THE COURT:  It depends on what the law is, and I

17   don't know.

18        MR. WESTFALL:  And also, you know, the confrontation

19   issue -- I mean, the harm is greatest for Abdul because he is

20   in another state.  And I don't think that this whole, you

21   know, just naming 300 co-conspirators does away with *Bruton*,

22   does away with confrontation.  It is not a magic act that does

23   away with all these Constitutional protections, Your Honor.

24        MR. JACKS:  I don't see how the statement "I don't

25   have the combination" implicates anybody.

1          THE COURT:  Anybody but him.

2          MR. JACKS:  Right.

3          MS. CADEDDU:  But, Your Honor, if the whole point is

4    that statement is supposed to be concealing the conspiracy,

5    that implicates the others.

6          MS. HOLLANDER:  That is what they are going to

7    argue, Your Honor.

8          MR. JACKS:  I am just saying it is not even hearsay.

9    It is not for the truth.

10          MS. HOLLANDER:  That doesn't change the

11    confrontation issue.

12          MR. JACKS:  Yes, it does.  If it is not hearsay.  It

13    can't be a violation of the confrontation --

14          MS. HOLLANDER:  It can and he is wrong.

15          THE COURT:  You got me.  I don't know what the

16    answer is, again.

17          MR. JACKS:  I am not throwing out any cites here

18    either, Your Honor.

19          THE COURT:  Well, that is right.

20          MS. MORENO:  I apologize that I didn't give a more

21    cogent argument this morning to Your Honor, and point out the

22    exact issues with respect to this particular evidence.

23          THE COURT:  Well, I guess we are at the breaking

24    point.

25          And I am not going to give a limiting instruction.  I

1    will give it to them Monday if we need to.  They have heard a

2    lot of evidence.  I don't think this one -- they haven't heard

3    this last statement that he has made.  They have heard about

4    the money transactions.

5              MR. CLINE:  Your Honor, we would like the

6    instruction to be given now, of course, but if you are going

7    to give it, how about Tuesday instead of Monday.

8              THE COURT:  Yes.  I may not be here Monday either.

9    All right.

10        We will stop here and we will take a look at this and we

11   will see what we come up with on Tuesday.

12              (The following was had in the presence and hearing

13              of the jury.)

14              THE COURT:  Members of the jury, I have got a legal

15   matter that has come up that we have to take some time to look

16   at so we will let you go.  Of course, you are off tomorrow,

17   Friday, and Monday.  Monday is a federal holiday.  So be back

18   Tuesday at 9:00.

19        Please recall the instructions.  Don't discuss with

20   anybody about the case.  Don't let anybody talk to you about

21   it.  Don't read anything about it.  Don't listen to anything

22   about it.  See you back Tuesday.

23              (Whereupon, the jury left the courtroom.)

24              THE COURT:  Mr. Jacks, do you want to -- We are in

25   recess.  Anybody that is free to leave is free to leave except

the lawyers.

Of course we have the objections.  Were you intending on filing in writing, or do you want to rest on what you have here?

MR. CLINE:  We should file something shortly, Your Honor.  I mean, at this point I think the arguments are between the sort of double jeopardy, intrinsic, 404(b).  That is really the question I think that we have.

THE COURT:  Of course *Crawford* is still there.  I don't know that I need any briefing on that.  We can just take a look at that and see.

MR. JACKS:  May I just get clarification?  Are we discussing the issue of the admissibility of the statement of Bayan Elashi that "I don't have the combination"?  That is the --

THE COURT:  Well, I think they are expanding the double jeopardy, intrinsic, and 404(b) goes to the entirety of this evidence.

MR. CLINE:  I think there are two separate but related questions.  One is does Bayan, does he get to put in -- the Government to get to put in the comment by Bayan Elashi.  Second, are we entitled to a limiting instruction as to all this evidence that has come in this afternoon under 404(b), or perhaps if Mr. Jacks can be hoisted on his own petard of double jeopardy.  So those are the questions.

1    MS. HOLLANDER:  I think one more on behalf of the

2    other Defendants is a severance; I mean, *Crawford*, too,

3    everything that Mr. Cline said, but additionally a severance.

4         MR. DRATEL:  And even short of severance, I mean, I

5    ask for a severance, but if the Court does not --

6         THE COURT:  I am denying the severance.

7         MR. DRATEL:  We would be entitled, we believe, the

8    other Defendants, to a different instruction than with respect

9    to Mr. Elashi, even if it is 404(b) or not 404(b), not against

10   anyone here.

11        THE COURT:  A further limiting instruction.

12        MR. WESTFALL:  And on behalf of Abdul Odeh, I know

13   it is one objection for all, but specifically for Abdul we

14   request certainly a limiting instruction for the reasons I

15   mentioned to you up at the bench, and a severance, and a

16   mistrial as to Abdul.  I don't think we can overcome this.

17        MS. HOLLANDER:  I just wanted to make clear, and I

18   was going to add that to my list, which is that we are

19   requesting a mistrial on behalf of Mr. Abu Baker also.

20        MR. DRATEL:  I join as well.

21        THE COURT:  Everybody joins in that, and those

22   motions for mistrial are denied.

23        MS. CADEDDU:  I need to make my record also.  I join

24   in that request as well.

25        THE COURT:  All right.  And those motions are

1    denied.

2         You understand what we are briefing and what you are

3    going to respond to?

4              MR. JACKS:  Kind of.

5              THE COURT:  He is going to file something -- Mr.

6    Cline?  Yes, go ahead.

7              MS. CADEDDU:  Your Honor, may I approach for just a

8    moment, please?

9              THE COURT REPORTER:  Do you need this on?

10             MS. CADEDDU:  No.

11             (Discussion at the bench out of the hearing of the

12             reporter.)

13             THE COURT:  When are you going to file a brief?

14             MR. CLINE:  If we can get the little bit of the

15   transcript, I can file in 24 hours.  I would like to have it

16   as fast as possible.

17             THE COURT:  All right.  Anything else we need to

18   address before we recess for the week?

19             MS. SHAPIRO:  Your Honor, one small issue.  Next

20   week we anticipate that Steven Simon will be testifying, and

21   he should be I believe testifying on Wednesday.  Because we

22   start on Tuesday, I wanted to let the Court know there had

23   been a motion filed to exclude him in limine.  We oppose that,

24   obviously, but it would be helpful to take it up before he

25   actually arrives.

1        THE COURT:  He will be the next witness after Agent

2   Miranda?

3        MS. SHAPIRO:  No.  But he will be coming up

4   Wednesday morning regardless, probably.

5        THE COURT:  Okay.  I will take a look at that

6   motion.

7     All right.  We are in recess, then, until Tuesday

8   morning.

9                      (End of Day.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           I HEREBY CERTIFY THAT THE FOREGOING IS A

2           CORRECT TRANSCRIPT FROM THE RECORD OF

3           PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4           I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5           FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6           COURT AND THE JUDICIAL CONFERENCE OF THE

7           UNITED STATES.

8

9           S/Shawn McRoberts        06/05/2009

10         _____DATE_____
           SHAWN McROBERTS, RMR, CRR

11         FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25