1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2                  DALLAS DIVISION

3   UNITED STATES OF AMERICA     )  CAUSE NO. 3:04-CR-240-P
                                (
4   vs.                          )
                                (  OCTOBER 14, 2008
5                                )  DALLAS, TEXAS
    HOLY LAND FOUNDATION, ET AL  (  9:00 A.M.
6
    _____
7

8                      VOLUME 17 OF 37

9   _____

10                    STATEMENT OF FACTS

11
          BEFORE THE HONORABLE JORGE A. SOLIS
12               UNITED STATES DISTRICT JUDGE
                      and a jury
13  _____

14

15

                    A P P E A R A N C E S
16

17

18       FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                              1100 COMMERCE, 3RD FLOOR
19                            DALLAS, TEXAS  75242
                              BY:  MR. JIM JACKS
20                                 MR. BARRY JONAS
                                   MS. ELIZABETH SHAPIRO
21
         FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
22       (SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
                              20 FIRST PLAZA, SUITE 700
23                            ALBUQUERQUE, NEW MEXICO 87102
                              BY:  MS. NANCY HOLLANDER
24                                 MS. TERESA DUNCAN

25

```
1           FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
            (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
2                                NEW YORK, NEW YORK  10005
                                 BY:  MR. JOSHUA DRATEL
3                                     MR. AARON J. MYSLIWIEC

4           FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
            (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
5                                DALLAS, TEXAS  75204
                                 BY:  MS. MARLO P. CADEDDU
6
            FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
7           (GHASSAN ELASHI)     P.O. BOX 10985
                                 TAMPA, FLORIDA  33679
8                                BY:  MS. LINDA MORENO

9                                JONES DAY
                                 555 CALIFORNIA ST., 26TH FLOOR
10                               SAN FRANCISCO, CA  94104
                                 BY:  MR. JOHN D. CLINE
11
            FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12          (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                 FORT WORTH, TEXAS  76102
13                               BY:  MR. GREG WESTFALL

14          COURT'S LAW CLERK:   MS. JENNIFER HELMS
                                 1100 COMMERCE, RM. 1654
15                               DALLAS, TEXAS  75242

16          COURT COORDINATOR:   MS. BRENDA WEBB
                                 1100 COMMERCE, RM. 1654
17                               DALLAS, TEXAS  75242

18    OFFICIAL COURT REPORTER:   SHAWN M. McROBERTS, RMR, CRR
                                 1100 COMMERCE STREET, RM. 1654
19                               DALLAS, TEXAS  75242
                                 (214) 753-2349
20

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| ROBERT MIRANDA | |
|     Direct By MR. JACKS .......................................... | 31 |

## Government's Exhibits

| **Government's Exhibits** | **Page** |
|---|---|
| Demonstrative No. 5 Admitted into Evidence | 32 |
| InfoCom Search No. 23 Admitted into Evidence | 37 |
| HLF Search No. 177, 178 Admitted into Evidence | 44 |
| Designation No. 1 Admitted into Evidence | 54 |
| Ashqar Search No. 3 Admitted into Evidence | 68 |
| HLF Search No. 130 Admitted into Evidence | 74 |
| HLF Search 115, 117, 119 Admitted into Evidence | 76 |
| El-Mezain Wiretap No. 14 Admitted into Evidence | 87 |
| El-Mezain Wiretap No. 14-A Admitted into Evidence | 88 |
| Baker Wiretap 25-27, 25A-27A Admitted into Evidence | 91 |
| HLF Search No. 27 Admitted into Evidence | 99 |
| Demonstrative No. 6, 16 Admitted into Evidence | 135 |
| InfoCom Search No. 37 Admitted into Evidence | 139 |
| InfoCom Search No. 38 Admitted into Evidence | 144 |
| Baker Wiretap No. 31, 31A Admitted into Evidence | 145 |
| Demonstrative No. 2 Admitted into Evidence | 161 |
| HLF/InfoCom Map Admitted into Evidence | 166 |
| HLF Search No. 165 Admitted into Evidence | 175 |
| InfoCom Search No. 35 Admitted into Evidence | 184 |

1          THE COURT:  Good morning.

2      All right.  Let me -- Everybody present and accounted

3  for?

4          MR. CLINE:  Yes.

5          THE COURT:  Let's start off with that motion where

6  we left off last week, the Defendants' joint motion for relief

7  following admission of the evidence.

8      Mr. Cline, anything that you wanted to add beyond what is

9  in writing to this?

10          MR. CLINE:  No, Your Honor.  I think it is a

11  five-factor double jeopardy test.  Three of them the

12  Government acknowledges point our way.  We think the other two

13  do as well.  I think it is pretty clear, and I think those

14  three counts need to go, just those three.  The substantive

15  counts don't, but I think those three counts do.  Regardless

16  of your ruling on that, we do want a 404(b) instruction at

17  least as to the remaining counts.

18      And I think the other Defendants -- I think we have

19  collectively come up with a proposed instruction that is

20  patterned on the Fifth Circuit instruction.

21          THE COURT:  Is that what you have in the written

22  motion?

23          MR. CLINE:  Well, I had in the written motion a

24  version that focused just on Mr. Elashi.  I think the

25  instruction that we collectively want to propose is almost

1    identical that will add the other Defendants as well.

2        One other point I want to make, Your Honor, I think the

3    Government is now taking the position, contrary to what it

4    said on Wednesday, that this is 404(b) evidence.  Rule 404(b)

5    requires advanced notice or notice in advance of trial,

6    reasonably in advance of trial.  We didn't get notice of this

7    until the day before the evidence came in, if you can call

8    that notice.  We got notice in the form of these exhibits on

9    October the 7th.  The evidence was introduced on October the

10   8th.

11       The Court can excuse notice for good cause shown.  I

12   don't think there has any good cause here.  And for that

13   reason --

14            THE COURT:  Did you make a request for advanced

15   404(b) notice?

16            MR. CLINE:  I am confident in our discovery requests

17   over the years we have consistently asked for 404(b) notice.

18   I can't cite the Court to the record, but I can get that if

19   you like.

20       On that basis as well, in addition to all the other

21   grounds, we move to strike this evidence and to preclude any

22   further evidence along these lines.  In other words, these

23   Marzook, Nadia Elashi --

24            THE COURT:  InfoCom relations?

25            MR. CLINE:  Yes.

1      THE COURT:  Mr. Jacks, anything else besides what

2  has been stated here?

3      MR. JACKS:  No, Your Honor.  I think it is clear-cut

4  that we are talking about two conspiracies here, and if you

5  examine the universe of each conspiracy and the overt acts in

6  the InfoCom indictment, in that IEEPA conspiracy, and the

7  overt acts in this indictment, the fact that one talks about

8  dealing with Marzook, whereas this indictment talks about

9  taking donors' contributions and having transactions with

10  Hamas, or entities controlled or affiliated with Hamas.  I

11  think the two separate universes of those conspiracies are

12  very distinct and separate.

13      As to the notice provision, I don't recall off the top of

14  my head if the Defense filed a motion requesting advance

15  notice, but we believe that there is no prejudice to the

16  Defense.  They certainly knew about this evidence.  It was

17  turned over years ago.

18      And we believe that given the cross examination by Ms.

19  Moreno of Agent Burns in an effort to show the lack of any

20  contact or interaction with Marzook after his designation or

21  after the designation of Hamas, that this evidence is

22  admissible to rebut that impression, and that was the purpose

23  that the Government sought to go into it.  And we believe that

24  under 404(b) that there is no prejudice to the Defense from

25  this admission of evidence.

1    And as we said, we have no objection and think that

2    Ghassan Elashi is entitled to an instruction as to how the

3    jury can view this evidence, and I am speaking of the

4    transactions of funds going back to Mr. Marzook after his

5    designation.  And it goes to Mr. Elashi's intent, his

6    knowledge, that type of thing.

7              THE COURT:  Apparently in the '02 case there were

8    two separate trials?

9              MR. JACKS:  Yes, sir.

10             THE COURT:  And the first trial involved the

11   Lybian/Syrian exports, and then the second time is what

12   involved --

13             MR. JACKS:  Dealing in the funds of a designated

14   terrorist, namely Mr. Marzook.

15             THE COURT:  InfoCom/Marzook relationship, the

16   evidence that you went into.  Is that correct?

17             MR. JACKS:  Yes, sir.

18             THE COURT:  Was any evidence introduced at that

19   trial about any of the other Defendants that are here?

20             MR. JACKS:  The only thing I can recall, Your Honor,

21   was a telephone conversation between Ghassan Elashi and Shukri

22   Abu Baker where it was intercepted.  It was shortly after

23   Mr. Marzook had been detained at Kennedy Airport, and they

24   were talking about him being the head of Hamas and that it was

25   foolish of him to come into the United States, and it was

1    introduced to show Ghassan Elashi's knowledge that he was the

2    head of Hamas.  And I can't remember if it was -- Because he

3    came in in July of '95, and then he was designated about three

4    weeks or two weeks later in August, and I think the

5    conversation was in that two- or three-week time span.

6         But nevertheless, that is the only reference to, as I

7    recall, the Holy Land Foundation and the only other Defendant

8    in this case Mr. Abu Baker; nothing with regard to Mr.

9    El-Mezain, Mr. Odeh, Mr. Abdulqader.  None of that was a part

10   of that second InfoCom trial.

11              THE COURT:  All right.  Okay.

12        Ms. Moreno?

13              MS. MORENO:  May I briefly address the Court, Your

14   Honor?

15        With respect to the evidence, the InfoCom Aging Reports

16   is really what we are talking about that I had originally

17   objected to the Court on the double jeopardy basis, the emails

18   from the Government, and Mr. Jacks himself, described these

19   reports as new exhibits.  These are exhibits as I as Mr.

20   Elashi's attorney in this case have never seen before, nor did

21   Mr. Evans give me that evidence.

22        Now, perhaps Mr. Jacks is confused when he says that they

23   have had this evidence for years, he is talking about the

24   InfoCom trial.  I am talking about the Holy Land case.  These

25   reports were never turned over.  I never saw them before the

1  evening before the morning I made the objections to them.  And

2  in fact the Government described them in their emails to

3  Defense counsel as brand new exhibits.  So these were brand

4  new.

5          THE COURT:  Brand new exhibits is not the same as

6  they haven't turned it over previously.

7          MS. MORENO:  They didn't turn it over to me, Your

8  Honor, as counsel in this case for Mr. Elashi, nor did

9  Mr. Evans turn over any of these reports.  So I just wanted

10  the Court to be clear that when the Government makes that

11  representation, I am not sure what trial they are talking

12  about.  They might have turned it over in the InfoCom case.

13  We are talking about Holy Land, and in Holy Land I have never

14  seen these reports before, and the Government described them

15  as new exhibits to us.

16          THE COURT:  Okay.

17          MS. MORENO:  And they were not used in the first

18  trial.

19          THE COURT:  I understand.  That is in the written

20  motion.

21          MS. MORENO:  Thank you.

22          THE COURT:  Mr. Jacks, anything else?

23          MR. JACKS:  Your Honor, these exhibits, all of the

24  InfoCom exhibits were turned over to Mr. Evans, Tim Evans who

25  represented Mr. Elashi in both trials in that case.  That same

1   material was turned over again as a part of the Holy Land

2   Foundation trial discovery before the first Holy Land

3   Foundation trial.

4        Now, I can't recall -- I can't specifically recall the

5   location of this exhibit.  It may have been among those that

6   were on the computer hard drives that were turned over, but

7   these documents have been turned over to the Defense.  And the

8   Court is correct.  My use of the term new refers to new to

9   this trial.

10            THE COURT:  As exhibits?

11            MR. JACKS:  Yes, sir.

12            THE COURT:  Okay.  All right.  Well, and I have read

13   certainly the motions and gone back over the indictment in the

14   '02 case and then the indictment in this case.  I am going to

15   deny the motion for dismissal on double jeopardy grounds.

16        And actually I think it is a relatively close call.

17   Certainly there is arguments there for why it is one

18   conspiracy, but I think when you look -- some of the factors,

19   they do overlap.  And we will enter a more specific order.  I

20   just wanted to get an order on the record today so we can move

21   on.  Some of the factors overlap, but it appears that

22   agreement, the agreement in that case.

23        And as the Fifth Circuit cases discuss in a double

24   jeopardy conspiracy case that the central issue is whether

25   there is one or more agreement.  And it looks like that was

1    more a specific narrower agreement.  The time frame does

2    overlap, to a large extent.  Certainly it could be argued that

3    it is related.  But it appears to be a different conspiracy,

4    more narrowly defined, more specific agreement between a fewer

5    individuals that are involved here.  This appears to be a

6    broader conspiracy.  That appears to be solely between some of

7    the Elashis -- some of the principals involved with InfoCom

8    and Mr. Marzook and Mr. Marzook's wife.

9          The indictment that we have in this case that we are

10   currently in trial on is a broader indictment than that.  The

11   allegations are different.  The overt acts are different.  So

12   I think the differences are sufficient, and even in looking at

13   the specific evidence, the differences are sufficient that I

14   am going to find they are two separate agreements.

15         We will grant your request for a 404(b) limiting

16   instruction.  And then, of course, we will grant the other

17   Defendants' request that this evidence not be considered in

18   any way as to the other Defendants, which I think also does

19   away with the prejudice arguments.

20         That will be my findings on this case.  And like I said,

21   we will get an order out later.

22             MS. DUNCAN:  Your Honor, I think the Defendants

23   other than Mr. Elashi had worked on a proposed instruction,

24   which I think is actually quite similar to the one proposed in

25   the motion, with the exception of adding a sentence at the

1    very end that says exactly what Your Honor just said, that

2    they cannot consider this evidence --

3            THE COURT:  Actually I had that.  What I was going

4    to do, if you look at the one that you gave on page 10 of the

5    motion that you filed, on page 10 you have a proposed

6    instruction.

7            MS. DUNCAN:  Correct.

8            THE COURT:  So just give what you have, and then,

9    "You may not consider any of this evidence in any manner as to

10   any of the other Defendants for any purpose," something along

11   those lines?

12           MS. DUNCAN:  That is what we were thinking, Your

13   Honor.

14           THE COURT:  And we will add that sentence to that

15   effect there.

16           MS. DUNCAN:  And Your Honor, I am not sure if this

17   is clear.  We are asking that that instruction be given today.

18           THE COURT:  Yes, I think it is clear.  And I have

19   been debating it, but I will give it today since we are

20   discussing the evidence.

21           MR. JACKS:  Your Honor, when the instruction says

22   this evidence, what is the universe of the evidence that we

23   are talking about?

24           THE COURT:  It starts off with "Last Wednesday,

25   October the 8th, you heard evidence of acts of Defendant

Ghassan Elashi involving InfoCom, Mousa Abu Marzook, Nadia
Elashi, which may be similar to those charged in the
indictment." So it refers to that, the October the 8th
evidence involving InfoCom.

And then it goes on, "You must not consider any of this
evidence in deciding if Mr. Elashi committed the acts charged
in the indictment. However, you may consider this evidence as
to Mr. Elashi for other very limited purposes."

And then we will give them that, and then also the
limiting instruction that "You may not consider this evidence
for any purpose with regards to the other Defendants."

MR. JACKS: The Government in its response narrowed
its perspective that the payments going from InfoCom to
Marzook was really the extrinsic part.

THE COURT: The payments from Marzook coming this
way, that shouldn't be part of the limiting instruction?

MR. JACKS: Correct.

MR. CLINE: Your Honor, I think those were also part
of that other case. What happened here, as I understand it,
is Marzook and/or his wife--this is what the evidence seems to
show--invested a substantial chunk of money in InfoCom back in
'93 or '92, and then they received payments, or Nadia Elashi
received payments on that investment over the years. That is
all part of one coherent set of facts, and we view all of that
as 404(b) if it is not part of the same agreement, for double

1    jeopardy purposes.  And I think the instruction should apply

2    to all of them.

3                THE COURT:  I think I am inclined to agree.  Do you

4    have any other thoughts on that?  That is part and parcel of

5    that conviction, it appears to be, on the second InfoCom

6    trial.  That was all that part of that transaction that was

7    involved--money coming from Marzook to InfoCom, and then money

8    going back.

9                MR. JACKS:  I understand, Your Honor.  Of course,

10   our position is there was -- The money coming in from Marzook

11   to InfoCom is consistent with the money that Marzook was

12   investing.

13               THE COURT:  The other?

14               MR. JACKS:  Yes, Your Honor.

15               THE COURT:  I think the problem you have is that you

16   have gotten a conviction out of that particular transaction.

17   You indicted it separately, you had a trial, and you have

18   gotten a conviction and a sentence out of it now.

19               MR. JACKS:  As to the funds going out.

20               THE COURT:  Right.  But it all seems to be part of

21   that.  You connected it in the indictment.  You started off in

22   that '02 indictment with money coming from Marzook to InfoCom

23   and then money going back.  So I think it is going to be

24   related to that.

25               MR. CLINE:  Your Honor, may I ask whether there is

1    going to be anymore evidence along those lines?

2              THE COURT:  Mr. Jacks?

3              MR. JACKS:  Yes, sir.  We will go into the letter

4    that was found in Bayan Elashi's safe, and then show what

5    InfoCom and Ghassan Elashi did in response to that letter.

6    There is some bank documents that show that in response to

7    that letter they made a wire transfer that day to answer the

8    demand in the letter from Ismail Elbarasse.  There is about

9    three exhibits that are already admitted that address that

10   series of events.  And it --

11             THE COURT:  So you are going to offer the letter?

12   Is that in?

13             MR. JACKS:  I believe the letter is already in, Your

14   Honor.  It is just to further corroborate the fact that Ismail

15   Elbarasse is involved in these matters, and that the Defendant

16   Ghassan Elashi was the one that the letter was addressed to,

17   and that in response to that letter they transferred money to

18   Marzook's account.

19             MR. CLINE:  Your Honor, a couple of quick points on

20   that.

21        First, I don't think that letter is in.  I may be

22   mistaken, but I don't believe it is.

23        Second, we now have Ismail Elbarasse involved in these

24   events, who is another key figure in this case, further

25   sharpening the double jeopardy issue and showing the identity

1    between these two alleged sets of conspiracies.

2         And third, for all the reasons that we have pointed out,

3    lack of notice, 403, I think this evidence needs to be cut

4    off.  I really think, Your Honor, that we are playing with

5    fire here in terms of the kind of error and prejudice that

6    this produces.

7         Again, I think we went too far on Wednesday, and I think

8    now the Government just wants to go even further down a very

9    dangerous and mistaken road.

10        THE COURT:  Well, I think the 404(b) limiting

11   instruction takes care of a lot of what you have stated.  I

12   have stated I believe -- Certainly there is an argument that

13   the conspiracies are related, but I don't think they are the

14   same conspiracy.  I think that ruling is not affected.

15        MR. JACKS:  So, Your Honor, I would just make the

16   same argument that the Defense never raised this argument

17   before.  Regardless of whether the evidence comes in or not,

18   they never made this double jeopardy argument before, so

19   they --

20        THE COURT:  But they are raising it now in response

21   to you bringing in evidence.  You didn't offer this evidence

22   -- this evidence was not offered at the previous trial, and

23   so --

24        MR. JACKS:  But I guess my point is, regardless of

25   whether the evidence was offered or not, you know, if they

1    really believed that he had already been convicted of this

2    same conspiracy, it seems like they would have made that

3    argument pretrial and said, "This conspiracy in this Holy Land

4    Foundation is the same conspiracy that he was convicted of in

5    the InfoCom case."  They didn't do that, so I think that goes

6    to --

7           THE COURT:  Well, I think -- And that is a point,

8    but the charges, the overt acts are different, which is one of

9    the bases that I am using to find that they are separate

10   agreements.  But you have now brought into evidence this

11   evidence, in this case, evidence from the prior case.  And

12   that is I think what has created the issue more specifically,

13   in the sense of are you trying to use the same evidence now to

14   get a conviction on the charges in this case.

15      And of course the 404(b) instruction takes care of that.

16   You are not doing that.  And that addresses that issue.  But I

17   am a little concerned -- Once you get into Elbarasse, it looks

18   like you are getting beyond the 404(b).  That is a concern

19   that I am having.

20          MR. JACKS:  Your Honor, I will move on from that

21   issue and that --

22          THE COURT:  So you are not going into that anymore?

23          MR. JACKS:  No, sir.

24          THE COURT:  Okay.  It takes care of that, then.

25      All right.  Any other issues?

1    MR. JACKS:  Your Honor, I have one issue.  It has to

2  do with Ashqar -- It is Ashqar Search No. 7.  It is the

3  document that was taken in Ashqar's -- in the search of his

4  house.

5    THE COURT:  The one that refers to that Iran

6  meeting?

7    MR. JACKS:  Yes, sir.  And there are a couple of

8  passages in that exhibit that I would want to refer to through

9  Agent Miranda's testimony because they are relevant to a point

10  that we intend to make, and --

11    THE COURT:  And those were not part of what was

12  admitted last week?

13    MR. JACKS:  I don't believe so, Your Honor.

14    THE COURT:  Come on up here.  I don't have that

15  before me.  Let me take a look at those.

16    (The following was had at the bench.)

17    MR. JACKS:  Judge, the parts that I intend to refer

18  to are this.  I don't know how the pages are numbered on this

19  exhibit, but page 4, and it is just the part I bracketed there

20  that talks about Hamas' first official meeting, the minister

21  granted his approval by opening an office in Tehran and had

22  approved brother Imad al-Alami as a representative.

23    And the other part again is this.  And the reason that we

24  propose to introduce this is because very shortly Agent

25  Miranda is going to be talking about telephone calls that are

shown on the Holy Land Foundation telephone bills going to a

telephone number for Imad al-Alami in Tehran, and it is to

show the fact that they are calling the Hamas representative

in Tehran, and that it is not known that that is who it is.

THE COURT: Who is calling?

MR. JACKS: The Holy Land Foundation. It is on

their telephone bill. So those two excerpts we would propose

to introduce.

Now, I propose just to have Agent Miranda read that part

and then later redact -- provide a redacted exhibit for the

record.

MS. DUNCAN: Your Honor, this is hearsay. This is

-- "They" is the government of Iran or some representative, I

am guessing, and so they are not a conspirator in this case,

so that is not going to come within the conspirator exception.

With respect to this was Hamas' first official, again

this is hearsay. It is the minister of Iran. They can bring

in evidence, if they have it, of who the representative is in

Iran for Hamas, but this is hearsay. Iran is not a

co-conspirator in this case. And again, it is hugely

prejudicial given our country's current position with that

country.

And Mr. Jacks, during his questioning of Agent Miranda,

after raising that the limited portion the Court allowed him

to introduce, again was saying, "And let's talk about the

1    Hamas meeting with Iran."  So they don't need this.  It is

2    hugely prejudicial, it is hearsay, and we would ask that it be

3    excluded.

4            MR. JACKS:  Well, Your Honor, it is written from the

5    Hamas side, somebody from --

6            THE COURT:  Ashqar?

7            MR. JACKS:  Yes.  Somebody from the Hamas side is

8    describing it, you can tell it by reading it.  And we have

9    already gone through this issue about it is not necessary to

10   identify who the speaker is.  And if it is clear from the

11   evidence that he was a member of the conspiracy, the fact

12   that, you know, whatever the relationship is between the

13   United States and Iran, I mean, it is -- All probative

14   evidence is prejudicial, but it is not unfairly prejudicial.

15           THE COURT:  I am just trying to understand, why is

16   that relevant in this case?

17           MR. JACKS:  To show that they knew --

18           THE COURT:  That who knew?

19           MR. JACKS:  That the Defendants, the members of the

20   conspiracy knew who Imad al-Alami was, knew he was the Hamas

21   representative in Tehran.

22           THE COURT:  When the call goes over there to him?

23           MR. JACKS:  Exactly.

24           THE COURT:  So that is your link.  That is your

25   relevance.

1          MS. DUNCAN:  Your Honor, I mean, first of all, this

2    wasn't a document found at the Holy Land Foundation.  It was

3    found at Ashqar's house.  And the Government has no evidence

4    that it made it to anyone in this case.

5        Secondly, even if the report was written by someone in

6    Hamas, that doesn't make statements by Iranian officials come

7    in under the exception of hearsay.

8          THE COURT:  Why do you think that is a statement by

9    an Iranian official?

10          MS. DUNCAN:  That the minister granted his approval,

11    that the minister -- someone in Iran granted his approval is

12    hearsay, and the fact that someone in Hamas is reporting that

13    doesn't make it not hearsay because -- I mean, that would be

14    if someone in Hamas quoted Mr. Jacks, it doesn't suddenly make

15    Mr. Jacks a co-conspirator.

16          THE COURT:  That could be offered to show their

17    understanding, and then you have got this call.  They have an

18    office, this is a representative, and then you have got this

19    call from Holy Land, on Holy Land records going to this

20    individual that they understood is their representative over

21    there.  Why isn't that --

22          MS. DUNCAN:  Again, part of the problem is that

23    there is no evidence that any of the Defendants in this case

24    ever saw this document.  It was found in al-Ashqar's house in

25    '93.

1    THE COURT:  These conspiracy cases, once these have

2  come in they don't have to have seen it.  It becomes evidence.

3  I don't think they have to have seen all of the documents

4  generated by other members of the conspiracy.  That is not a

5  requirement.

6    MS. DUNCAN:  That is correct, Your Honor.  But in

7  this case this is somebody in Hamas apparently, and so it is

8  not a statement by Ashqar, in which case his knowledge would

9  be imputed against these Defendants.  This is someone else's

10  statement that was found in his house.  And there has to be

11  some evidence that the Defendants in this case had knowledge

12  of this document.

13    MR. JACKS:  Your Honor, later they are charged with

14  a conspiracy to support Hamas.  That puts them in the

15  conspiracy with Hamas.  Now, the fact that there is a lot of

16  people that are doing that, I don't think -- that goes to the

17  weight.  But the fact that this is a large number of people in

18  this conspiracy, and I am making this just kind of as a big

19  picture argument, but, you know, the evidence in the record so

20  far is much more narrow than that.  And I just agree with the

21  Court.

22    THE COURT:  I think you are right.  I think with

23  that link that you have made, I think that becomes relevant

24  and I think that is proper.

25    I am still trying to understand why is that relevant,

1  that Iran had agreed.

2         MR. JACKS:  Well, Your Honor, we think it is

3  significant that the Holy Land Foundation knew the number to

4  call in Tehran for the Hamas representative.

5         THE COURT:  Okay.

6         MR. JACKS:  Most people are not going to be able to

7  call to Tehran and get the Hamas representative.

8         THE COURT:  So it still shows the connection between

9  Holy Land and Hamas, that they would know that number?

10        MR. JACKS:  Yes, sir.

11        THE COURT:  Okay.  I think that is proper.

12        MR. DRATEL:  I just want to say two things.

13     One is the rules, even if something is not hearsay but

14  has hearsay within it, it still has to be evaluated at each

15  level of hearsay, and I don't think this qualifies.

16     The second thing, I think the Government makes a

17  breathtaking argument that is completely contrary to settle

18  the ball, which is that anyone is a conspirator who has any

19  contact with anyone, without identifying who they are, and

20  that they are a conspirator, that every anonymous person who

21  makes any statement in any document --

22        THE COURT:  I think they didn't go that far.  And I

23  have already admitted the Ashqar documents because there are

24  connections there.  The law is clear that you don't have to

25  have identity of other documents to make it admissible.  That

1    goes to weight.  You can argue whatever you want, they can

2    argue whatever they want, and it is going to be up to the

3    jury.

4           MR. DRATEL:  I just wanted to respond to that,

5    because the Government never made that argument before.

6           MS. MORENO:  Your Honor, as a different exhibit,

7    this is Holy Land Search No. 27, which the Court sustained --

8    This document is in evidence, but the Court sustained my 403

9    objections the last day we were before the Court regarding the

10   Blackhawk Down issue and Somalia on 403 issues.

11       I asked Mr. Jacks to please indicate what Agent Miranda

12   was going to go through to see if I had any further 403

13   objections.  He was kind enough to do so.  And I don't have

14   many, except I would point the Court to it is within -- these

15   are Mr. Jacks' brackets, and this particular sentence talks

16   about "...and bring it down, a storm over the Jews, especially

17   their leader Clinton."

18       We would object on 403 grounds, Your Honor, that that is

19   highly prejudicial and inflammatory and is so unrelated to the

20   charges in this case, and we would ask the Court to not allow

21   Mr. Jacks to question Mr. Miranda about this.  It was my

22   understanding Mr. Miranda was actually going to read this and

23   perhaps comment on it.  So that would be one objection.

24           THE COURT:  Mr. Jacks?

25           MR. JACKS:  We had gone through this exhibit before,

1    she had her objections, and I believe that that is not

2    unfairly prejudicial.  It is consistent with the tenor of what

3    the Defendants and Hamas have said.  This man is on their

4    speakers list, and this bringing down, whatever it says, on

5    the Jews --

6              THE COURT:  Storm.

7              MR. JACKS:  Storm is consistent with what the

8    evidence has shown about the mindset of the Defendants and the

9    individuals that they associate with, and we believe that

10   sentence is relevant to show that.

11             MS. DUNCAN:  And, Your Honor, I think if that

12   sentence is allowed, I think it opens the door for us to bring

13   in all the evidence and facts of why the Palestinian people

14   were upset with the American government's support of Israel in

15   the face of the atrocities committed against the Palestinian

16   people.

17             THE COURT:  Why is that relevant to any of the

18   issues that the jury is going to decide?

19             MS. DUNCAN:  Because this is the mindset, and also

20   we find it is relevant that this document is speaking against

21   Clinton, and it becomes relevant why people in Palestine --

22   that people care -- that Palestinian people would be

23   expressing those thoughts towards Clinton.

24             MS. MORENO:  Additionally, Your Honor, again, the

25   other sentence that he wants to go into, it says, "The scheme

concocted in the White House, may God envelope with it with

darkness, and hatred.  Say amen."  We believe this is 403.

There are other passages he has indicated that I in good

faith cannot make a 403 objection to, Your Honor, but those --

in particular those two I do.

Here is a long passage they are going to go into that

talks about Hamas, and, quite frankly, I don't have a good

faith objection to that.  But in those two discreet portions

where they are talking about Clinton and the White House, I

think this is absolutely 403.

The Defendants should not be convicted because

Palestinians harbor prejudice or hatred or animus against

Clinton and the White House.  They should be convicted because

there is evidence that shows they supported -- materially

supported Hamas.

And we believe -- In fact, there are other areas that

discuss Clinton that they are not going into, so I think those

are -- And again, where they want to go into issues that talk

about supporting Hamas and they have that inflammatory

rhetoric, I am not making a 403 objection, but those two

discreet sentences, Your Honor -- And in fact, in this

particular sentence I would ask the Court to just redact the

"...especially their leader Clinton," and stop "...after the

Jews."  I think that would be fair.  And I would ask the Court

not to allow them to go into this issue of the White House.

1          Those would be my two objections.

2          MR. JACKS:  Your Honor, this is again an attempt to

3    water down the evidence and distort it in front of the jury.

4          THE COURT:  I agree to some extent, but we can get

5    too far afield is the other problem that I have.  They keep

6    wanting to get into this mindset and why they are mad.  I

7    don't think that is relevant.  And the more you get into other

8    things, I think the more perhaps it does open it up.  I don't

9    think that is a place we need to go, because that is just not

10   an issue before this jury.

11         And it is probably true there.  I mean, the fact that

12   they are mad at Clinton, it is really not relevant to your

13   theory of the case.  You have been showing, of course, they

14   are upset with Israel and the Jews.  That is what all the

15   tapes and all that shows, and this shows that without having

16   to get into Clinton or the White House.  I think that does

17   implicate 403.

18         I am not even sure that that is really relevant; maybe

19   just even 401, that it is just not relevant to an issue.  They

20   may have those attitudes, but it is just not relevant to the

21   crimes they are charged with of supporting Hamas.

22         MR. JACKS:  And it is not Clinton generally.  It is

23   Clinton because of his support.  I mean, it is all linked.  It

24   is not just him generally.  But that is fine, Your Honor.

25         THE COURT:  What are they mad at?

1    MR. JACKS:  Support for Israel, and they equate

2    that, the Defendants and their supporters and co-conspirators

3    equate that with, you know, the actions of Israel.

4    THE COURT:  And I understand that is a mindset, but

5    I still don't understand how that particularly is relevant,

6    other than they believe that, how that is relevant to these

7    particular charges.

8    MR. JACKS:  It goes to motive and intent, Your

9    Honor.  As I said, this is a man that they had on their

10   speakers list.  This is an audiotape in the Holy Land

11   Foundation offices.

12   THE COURT:  I understand.  Part of it is coming in.

13   I am going to sustain the objection as far as -- just stop it

14   right there after "...the Jews."  Leave out about the White

15   House and --

16   MR. JACKS:  Let me make sure Agent Miranda

17   understands.

18   MR. DRATEL:  Two things.  One is cosmetic.

19   Mr. El-Mezain brought with him a blanket.  He has

20   arthritis, and so he may just use that during the day for his

21   legs.

22   THE COURT:  To cover?

23   MR. DRATEL:  Yes.

24   THE COURT:  That is fine.

25   MR. DRATEL:  The other thing, I think this is Mr.

1    Jonas' issue so we don't have to do it at the bench, but I

2    didn't know whether you wanted to address the Steve Simon

3    memo.  I mean the motion.

4         THE COURT:  At some point we will, but I don't want

5    to keep the jury waiting any longer.  Let's move forward and

6    pick that up at some point.

7         MR. DRATEL:  I think they plan to bring him in

8    tomorrow.

9         THE COURT:  Just remind me sometime later in the

10   day.

11        MR. WESTFALL:  I just wanted to put into the record

12   just basically for record purposes.  It will take me about a

13   minute or two minutes.  Do you want me to do it now?

14        THE COURT:  Yes, while we are here.

15        MR. WESTFALL:  Now, I was not in InfoCom.  Odeh was

16   not in InfoCom.  I don't know anything about InfoCom.

17        THE COURT:  I don't think any of these others were.

18        MR. WESTFALL:  And on behalf of Abdul Odeh, this is

19   InfoCom Aging Report -- And you know, Your Honor, that the

20   bates labeling system, we have heard testimony about that

21   HLDL, HLNK, and all that.  For the record I would like you to

22   know that InfoCom Aging Report No. 1 has an NYG something or

23   other bates number, not HLDL.  InfoCom Aging Report 2 has NYGJ

24   bates label.  InfoCom Aging Report No. 3 has no bates label,

25   which I believe is an indication that they backed it up off of

1    one of the computers.

2        I have never seen these.  I have no reason to have ever

3    seen these.  If I had seen them pretrial, I surely would have

4    moved for a severance, just like he says we ought to have.

5    Okay?  If I had any knowledge of this, I would have moved for

6    a severance.

7        So I do appreciate the Court's limiting instruction.  I

8    think that is correct.  However, I want the Court to

9    understand that I do not waive my request for a severance

10    based upon what they did with almost zero notice last

11    Wednesday.  The night before was the first time we ever knew

12    they were going to do this.  And I wasn't familiar with even

13    where that was going.

14        But on behalf of Abdul Odeh, despite the Court's

15    instruction, I still request a mistrial and I still request a

16    severance.

17            THE COURT:  And those are still denied.

18            MR. DRATEL:  Join for Mr. El-Mezain, Your Honor.

19            MS. HOLLANDER:  And I join for Mr. Shukri Abu

20    Baker.

21            MS. CADEDDU:  And I join for Mr. Abdulqader.

22            THE COURT:  We don't grant 404 severances simply

23    because 404(b) evidence comes in, and we don't grant mistrials

24    based on 404(b) evidence coming in.

25            MS. HOLLANDER:  I just wanted it for the record.

```
1              THE COURT:  And I just wanted my reasons on the
2    record.
3              (The following was had in open court.)
4              THE COURT:  Ready for the jury.
5         Bring the jury in.
6              (Whereupon, the jury entered the courtroom.)
7              THE COURT:  Ladies and gentlemen of the jury, good
8    morning.  We are ready to proceed.  I hope you enjoyed your
9    break.  You look rested.  We are ready to proceed.
10        Mr. Jacks.
11             MR. JACKS:  Thank you, Your Honor.
12   Q.   (BY MR. JACKS)  Good morning, Agent Miranda.
13   A.   Good morning, sir.
14   Q.   I want to go back just very briefly to talk once again
15   about the overseas speakers utilized by the Holy Land
16   Foundation.
17   A.   Yes, sir.
18   Q.   And let me show you what has been admitted as a
19   demonstrative of HLF Search No. 87.  And is that the overseas
20   speaker list taken from the Holy Land Foundation computers?
21   A.   Yes, sir.
22   Q.   And I believe last week you indicated that you found
23   evidence in the records of the Holy Land Foundation which
24   addressed the issue of using speakers.  Is that correct?
25   A.   Yes, sir.
```

1          MR. JACKS:  Could you please display HLF Search

2    No. 5?

3          And Your Honor, for the record, let me make a correction

4    here.  This exhibit was admitted previously, and there were

5    some pages missing.

6    Q.   (BY MR. JACKS)  And Agent Miranda, have you seen the

7    revised, for lack of a better word, HLF Search No. 5 with the

8    missing pages added?

9    A.   Yes, sir.

10          MR. JACKS:  So Your Honor, at this time we would

11    move to admit HLF Search No. 5 as it was revised and it has

12    additional pages added which have been provided to Defense

13    counsel.

14          THE COURT:  Counsel?

15          MR. CLINE:  I think the previous objections, Your

16    Honor.

17          THE COURT:  All right.  Those have been overruled.

18    That is admitted.

19    Q.   (BY MR. JACKS)  Agent Miranda, can you see on the screen

20    the first page of the exhibit?

21    A.   Yes, sir.

22    Q.   And the documents, just generally what type of documents

23    are these in this exhibit?

24    A.   Occupied Land Fund board meeting minutes.

25    Q.   And, for example, the first page here refers to what

1  board meeting?  When did it take place and who was there?

2  A.   It took place the 16th through the 18th of February,

3  1991, involving the Defendants Mohammad El-Mezain, Ghassan

4  Elashi, and Shukri Abu Baker, and that took place in Los

5  Angeles, California.

6  Q.   Do you see the items numerically listed below on that

7  first page?

8  A.   Yes, sir.

9       MR. JACKS:  Mr. Lewis, could you enlarge the bottom

10  half of the page, please?

11  Q.   (BY MR. JACKS)  And do you see item No. 4?

12  A.   Yes, sir.

13  Q.   Just read that into the record, please.

14  A.   "The OLF shall embark on telecommunication fundraising."

15  Q.   And at this time in 1991 the Holy Land Foundation was

16  still going by the name Occupied Land Fund.  Is that correct?

17  A.   Yes, sir.

18  Q.   And where were they located -- Where was their main

19  office located at that time?

20  A.   Los Angeles.

21       MR. JACKS:  Mr. Lewis, could you go to page 7 of the

22  exhibit?

23  Q.   (BY MR. JACKS)  Agent Miranda, what particular meeting

24  does this reference?

25  A.   This references a meeting on the 5th through the 6th of

1    May, 1990, again in Los Angeles, California, involving the

2    Defendants Mohammad El-Mezain, Ghassan Elashi, and Shukri Abu

3    Baker.

4             MR. JACKS:  And if you would, please go to the next

5    page, Mr. Lewis.  And if you could enlarge the first page,

6    please.

7         May I have a moment, Your Honor?

8             THE COURT:  Yes.

9             MR. JACKS:  Would you show page 5, please?

10   Q.  (BY MR. JACKS)  Agent Miranda, the board meeting minutes

11   shown on this pages of the exhibit reflect what meeting and

12   who was there and where was it?

13   A.   Again, it is the meeting of the OLF, Occupied Land Fund,

14   in Los Angeles on 25 through 26 July, 1990, with the

15   Defendants Mohammad El-Mezain, Ghassan Elashi, and Shukri Abu

16   Baker.

17   Q.  And does it show, for example, agenda items?

18   A.   Yes, sir.

19   Q.  Just a heading in that document?

20   A.   Yes, it does.

21             MR. JACKS:  Could you go to the next page, please,

22   Mr. Lewis, and enlarge the top half?

23   Q.  (BY MR. JACKS)  And would you read, please, the top

24   paragraph of that page, Mr. Miranda?

25   A.   Yes.  It reads, "Mr. Chairman confirmed that he is in

1   touch with the occupied land despite difficulties and that he

2   arranged for guest speakers to visit the USA for fundraising

3   purposes."

4   Q.   And go ahead and read the next paragraph, please.

5   A.   "The agreed [sic] that more special events are needed in

6   the field.  Therefore, it has been decided that the months

7   October through December should be the prime months for OLF

8   special events fundraising activities."

9            MR. JACKS:  And if we could scroll down a little

10  bit.

11  Q.   (BY MR. JACKS)  And just read Item A.

12  A.   Item A, "The board advised the executive director to

13  arrange activities during ISNA convention in September and

14  MAYA convention in December."

15  Q.   Who was the chairman of the board of the Holy Land, or

16  excuse me, the Occupied Land Fund at that time?

17  A.   I believe that was Mohammad El-Mezain at the time.  It

18  should be on the first page.

19           MR. JACKS:  Can you go back, Mr. Lewis, to page 5?

20           THE WITNESS:  That is correct.  Mohammad El-Mezain

21  is listed as chairman, sir.

22  Q.   (BY MR. JACKS)  All right.  And in one of those board

23  meeting minutes there was a reference to teleconference

24  fundraising, and did you find any documents that -- And you

25  testified last week about the use of teleconferences, or

1    conference calls I believe as you referred to them.  Is that

2    correct, sir?

3    A.    That is correct, sir.

4    Q.    And did we hear an example of that last week?

5    A.    Yes, we did, sir.

6    Q.    And did we see fliers announcing that?

7    A.    Yes, we have.

8    Q.    Did you find other evidence in your examination of the

9    evidence in this case that addressed the use of conference

10   calls?

11   A.    Yes, I have.

12          MR. JACKS:  Your Honor, do you show InfoCom Search

13   No. 23 as being admitted?

14          THE COURT:  Let me check.  No.

15   Q.    (BY MR. JACKS)  Agent Miranda, are you familiar with a

16   document that is identified as InfoCom Search No. 23?

17   A.    Yes, sir.

18   Q.    And is it part of the documents -- Let me back up.  The

19   InfoCom search was conducted when?

20   A.    September 5th through 7th, 2001.

21   Q.    And during the course of that search, did the FBI find

22   Holy Land Foundation documents within the premises of the

23   InfoCom offices?

24   A.    Many.

25   Q.    And the documents that are in InfoCom Search No. 23, are

1    they a part of those Holy Land Foundation documents that were

2    found within boxes within the InfoCom premises?

3    A.   Yes, sir.  That is correct.

4           MR. JACKS:  Judge, we would move for the admission

5    of InfoCom No. 23.

6           MR. CLINE:  No objection.

7           THE COURT:  That is admitted.

8           MR. JACKS:  Could you please display the first page

9    of that, please?

10   Q.   (BY MR. JACKS)  And can you see the item on the screen,

11   Mr. Miranda?

12   A.   Yes, sir.

13   Q.   And just describe, if you will, what is shown on the

14   screen, what the document references.

15   A.   This document is from the special events department and

16   it is from HLF officer Haitham Maghawri for the date 3/3/96.

17   Q.   And just to -- When was Hamas designated?

18   A.   In January of 1995.

19   Q.   How long after the designation of Hamas is this exhibit

20   dated?

21   A.   A year and a couple of months, roughly.

22   Q.   And just the headings on this page or the categories,

23   just what are they as shown on this first page?

24   A.   It starts with "achievement," and you can see it says

25   "field visits."  There is three paragraphs under there.  And

1    then it says "field trips."  And then point 2 is "conference

2    call" and point 3 is "infomercial and commercials, TV and

3    radio."

4    Q.   And under -- Do you see a heading for field visits?

5    A.   Yes, sir.

6    Q.   All right.  And item No. 2 on that particular heading,

7    would you please read that into the record?

8    A.   Yes, sir.  Item No. 2 reads, "The shortage and number of

9    speakers who were touring in that month, as an example we had

10   two speakers till the third weekend.  This affected us by

11   losing many cities."

12   Q.   Let me ask you, this document was found -- It was in

13   English when it was found.  Is that correct?

14   A.   That is correct, sir.

15   Q.   This was not something in Arabic and then translated by

16   the FBI?

17   A.   Right.

18   Q.   Read item No. 3 in that heading under field visits.

19   A.   Yes, sir.  It reads, "IAP also arranged a tour to Sheikh

20   Omar Sbeihi, and they tried not to create any conflict with

21   our program, but they failed in a couple of cities, such as

22   Tulsa, New Orleans, Puerto Rico.  Accomplishments."

23   Q.   And this Sheikh Omar Sbeihi, have we seen his name

24   before?

25   A.   Yes, sir.  He is on the overseas speakers list.

1   Q.   Do you know what number he is?  Is it No. 52?

2   A.   No. 52.  That is correct.

3            MR. JACKS:  Would you go down to the part that says

4   "field trips" and enlarge that.

5   Q.   (BY MR. JACKS)  Just read into the record about events,

6   money collected, that type of thing.

7   A.   Paragraph 1 says, "Field trips.  Held 58 event.

8   Collected $470,000.  Distributed 19,000 fliers."

9   Q.   And then the entry for conference call, if you would,

10  would you please read that entry, please?

11  A.   Yes, sir.  "Conference call.  Arranged two conference

12  call, first one in Arabic the 9th of February '96.  Speakers

13  were Dr. Hammam Saeed and Mohammed Seyam, moderator was Osama.

14  Performance was very good.  We collected $18,500.  This is

15  what we knew over the phone while the conference was going on.

16  The total Islamic centers who were on the line, 64.  The

17  second was on the 10th of February '96 in English.  Speakers

18  were Dr. Qadi Hussein and Abdullah Gul from Turkey.  The

19  performance wasn't good, especially Dr. Gul.  You can hardly

20  understand what he's saying.  Total lines were 93."

21  Q.   Thank you.  And again, the persons referred to -- Let's

22  take them in order.  Hammam Saeed, is he on the speakers list?

23  A.   Yes, sir.  He would be overseas speaker No. 28.

24  Q.   All right.  And again these names on the speakers lists

25  you said are arranged in what fashion?

1   A.   Alphabetical by first name.

2   Q.   Okay.  The individual obviously Mohammed Seyam, we have

3   heard a lot about him.  Is that correct?

4   A.   Yes, sir; the Hamas leader.

5   Q.   And in the diagram Demonstrative No. 17, which one is he?

6   A.   He is in the orange field, upper left corner.

7   Q.   Here where I am indicating?

8   A.   That is correct.

9   Q.   The individual identified as Dr. Qadi Hussein, is he on

10  the overseas speakers list?

11  A.   Yes, sir.  He is overseas speaker No. 54.

12  Q.   And is Abdullah Gul on the overseas speaker list?

13  A.   Yes, sir.  He is overseas speaker No. 5.

14  Q.   Let me again direct your attention, Agent Miranda, on the

15  topic of the speakers.  You testified last week about an

16  individual or gave testimony about an individual that went by

17  the name of Deeb Anees.

18  A.   Yes, sir.

19  Q.   And he is No. 18 on the speakers list?

20  A.   That is correct, sir.

21  Q.   Is he sometimes referred to as Zeeb Anees, with the

22  letter Z like in zebra?

23  A.   I have seen that variation as well.

24  Q.   Do you recall the intercepted telephone conversation that

25  we played last week between Mr. Abu Baker and Abdulrahman Odeh

1    where they were discussing this individual Deeb Anees?

2    A.    Yes, I do, sir.

3    Q.    And if you would, just refresh our memory.  What was the

4    subject matter of that particular conversation?

5    A.    The Defendant Abdulrahman Odeh was telling the Defendant

6    Shukri Abu Baker that Deeb Anees had raised some money in the

7    name of Palestine and this upset Mr. Baker.  And Mr. Baker had

8    said something to the effect that Deeb Anees raises money

9    openly in the name of Samah.

10   Q.    Samah being?

11   A.    Hamas spelled backwards.

12   Q.    All right.  And this fundraising, where was it supposed

13   to take place?

14   A.    New Jersey is my understanding.

15   Q.    And what caused the problem with the Holy Land

16   Foundation?

17   A.    There was a couple of issues in the conversation.  One

18   was that it wasn't previously coordinated with the Holy Land.

19   One was that it was done in the name of --

20           MR. WESTFALL:  Your Honor, he is misrepresenting

21   this conversation and we object.  They should read the

22   conversation, Your Honor.

23           THE COURT:  Mr. Jacks?

24           MR. WESTFALL:  It is in evidence.

25           THE COURT:  I understand.

```
1              MR. JACKS:  Your Honor --

2              THE COURT:  I think he is entitled to paraphrase.

3    If you want to cross examine on that you may do so.  Go ahead.

4    Q.  (BY MR. JACKS)  What was the second issue?

5    A.   That Deeb Anees was raising money in the name of

6    Palestine, and nobody does that except for the HLF.

7              Another issue was that Mr. Baker was saying, "If I take

8    $8,000 from this guy, he is going to ask me for $15,000."  And

9    then, of course, one of the issues discussed was how Mr. Baker

10   had some special circumstances and that Deeb Anees was going

11   to cause him problems.

12   Q.   With regard to Deeb Anees, was there other evidence

13   introduced last week showing his fundraising efforts for the

14   Holy Land Foundation?

15   A.   Yes.  We had evidence that he traveled to South America

16   in 1994 and collected some money, spoke about the Islamic

17   Movement, and that was in a fax that was sent to the Defendant

18   Mohammad El-Mezain.

19   Q.   And this conversation between Shukri Abu Baker and

20   Abdulrahman Odeh about this problem in New Jersey, that was on

21   December 12th, 1999.  Is that correct?

22   A.   Right, 12/12/1999.

23   Q.   Did you find other evidence among the records of the Holy

24   Land Foundation that reflected activity over a relationship

25   between the Holy Land Foundation and this Deeb Anees?
```

1    A.   Yes, sir.

2    Q.   Do you recall coming across some documents that bore the

3    title "HLF general activities"?

4    A.   Yes, sir.

5    Q.   And other documents that bore the title "solicitor

6    analysis report"?

7    A.   Yes, sir.

8          MR. JACKS:  Your Honor, we would move the admission

9    of --

10   Q.   (BY MR. JACKS)  Were those items found in the search of

11   the Holy Land Foundation materials or office materials?

12   A.   Yes, sir.

13   Q.   And were some of those found in the Newark office of the

14   Holy Land Foundation?

15   A.   Right, in the New Jersey office, yes, sir, some of them

16   were.

17   Q.   When I say Newark, what FBI office covers New Jersey?

18   A.   The Newark Division.

19   Q.   But the Holy Land Foundation office was in what town in

20   New Jersey?

21   A.   Paterson.

22   Q.   Okay.  And were some of those documents also found in the

23   Holy Land Foundation Dallas office?

24   A.   Yes, sir.

25          MR. JACKS:  Judge, we would move the admission of

1    Holy Land Foundation Search No. 177 and No. 178.

2              THE COURT:  Counsel?

3              MR. WESTFALL:  Your Honor, may I just confer with

4    Mr. Jacks for a second?  I received these about 1:00 this

5    morning.

6              THE COURT:  Sure.  Go ahead.

7              MR. WESTFALL:  No objection, Your Honor.

8              THE COURT:  That is HLF Search No. 177 and 178.

9    Those are admitted.

10             MR. JACKS:  Would you please display No. 177,

11   please, HLF Search No. 177?

12             MR. WESTFALL:  Your Honor, may I confer with

13   Mr. Jacks again?

14             THE COURT:  Yes.

15   Q.   (BY MR. JACKS)  Agent Miranda, I am going to use the

16   projector for these exhibits.  Is what is shown on the screen

17   the first page of HLF Search No. 177?

18   A.   Yes, sir.

19   Q.   And you said you found references to Deeb Anees, and can

20   you just indicate where on that exhibit those references

21   appear?

22   A.   Yes, sir.  On this page there are three entries for Theeb

23   or Deeb Anees.

24   Q.   If you would direct me where.

25   A.   If you go all the way to the left column it says the

first entry on 6/20/1994. There is one underneath that.

Q. This one her?

A. Yes. That looks like a 1, but it is actually a hole in the page. And there is an additional one, so there is three in a row there all apparently for 6/20/1994.

Q. And the column to -- The second column to the right, how is it headed or titled?

A. "Deposit."

Q. Okay. And those reflect deposits of what amounts next to the name of Theeb Anees?

A. $50, $50, and $25 respectively.

Q. This is the second page of this exhibit. Does it have any reference to this Theeb Anees or activity regarding him?

A. Yes, sir. If you go to the date 11/8/1995, you will see it reads, "Tolls, Sheikh"--which is abbreviated--"Theeb Anees for $10."

Q. All right. And that is under the column for what type of a transaction? What is the heading for that column?

A. It reads "tolls."

Q. No, but the column, the heading of the column is what?

A. The date?

Q. No, the column is called -- What is above it. What is the total for the column?

A. Yes, sir. On the very top of the page?

Q. Yes, sir.

A.   "HLF New Jersey activities."

Q.   All right.  And the column with the $10 in it is titled what?

A.   "Payment C."

Q.   Thank you.

A.   Yes, sir.

Q.   And going to the third page of the exhibit, any reference showing activity with this Deeb Anees?

A.   Yes, sir.  The third down on the date 10/31/1996 there is a transaction that reads "Lunch, Sheikh Anees Deeb" for the amount of $44.30.

Q.   And again that is in the payment column?

A.   Yes, sir.

Q.   Do you interpret that as money going out from the Holy Land Foundation that they wrote a check, or somehow --

A.   In this case they paid for lunch.

Q.   All right.  That is what it looks like to you?

A.   Yes, sir.

Q.   And let me just show you the next page of the exhibit. Does that appear to have another entry for that lunch for Sheikh Anees?

A.   Right, the second one there, the second line.

Q.   And the fifth page of the exhibit, does this appear to be like some kind of summary of these transactions in this account?

A.    Yes, sir.

Q.    All right.  And are the references to Deeb Anees, do they appear on this page?

A.    Yes, they do, kind of about -- not quite halfway down on the date 11/6.

Q.    All right.

A.    It says "Sheikh Deeb Anees," it says "DI," and "minus 70."

Q.    All right.  And to go to the next page, and I believe -- Again, this exhibit came from which HLF office?

A.    The New Jersey office, sir.

Q.    Is there a reference to this Deeb Anees on this page?

A.    Yes.  The very last entry is for -- It is kind of hard to read, but I think that is 11/6/1996.  If you go to the top of the page I would like to confirm.

Q.    The hole may have obliterated the month.

A.    I believe it is 11/6.  It corresponds to the $70 we saw on the previous page.

Q.    So it is another reference for the $70.

A.    Yes, this time for dinner.

Q.    And do those entries appear again on this final page of the exhibit for Deeb Anees?

A.    Right.  Just maybe a line above the hole in the page there on 11/6.  Actually there is a couple of entries on 10/31, "lunch Sheikh Anees," and then if you go down a little

1    bit right above that hole you can see 11/6, "Sheikh Deeb

2    Anees."  That is for the $70 we just looked at.

3    Q.    So apparently reimbursing him for lunch and dinner?

4    A.    Or money spent on lunch and dinner.

5    Q.    Okay.  And let me show you what has been admitted as HLF

6    Search No. 178.  And the title of this exhibit?

7    A.    "Solicitor analysis report."

8    Q.    And are there references on this report -- And what is

9    the date of this report?

10   A.    10/30/1997.

11   Q.    Is this where it is shown?

12   A.    Yes, sir.

13   Q.    And references to Deeb Anees, do they appear on this

14   exhibit?

15   A.    Yes, sir; right in the middle of the page within the

16   yellow highlighting.

17   Q.    And just read what the entry is on that line by the pen?

18   A.    Yes, sir.  It reads, "Anees, plus Mezain, plus Jabbar

19   $83,6300.30."

20   Q.    And the entry above that?

21   A.    "Anees plus Mezain by Said, $33,853.67."

22   Q.    Let me show you the second page of the exhibit, and are

23   there entries on that page that reflect activity in the name

24   of Anees?

25   A.    It is quite a few entries actually.

```
 1   Q.    Okay.  Just tell me where --
 2   A.    Probably the easiest way to do it is look under the
 3   column listed as "solicitor."  That is the column all the way
 4   to the right.
 5   Q.    And again, is there a reference to show what date is
 6   being talked about or referenced?
 7   A.    Just the year.  If you look all the way to the left, the
 8   first column says 1997.
 9   Q.    All right.  Just for the record what are the columns as
10   you go across the page?
11   A.    It reads "year," "city," "sum," and "solicitor."
12   Q.    All right.  And let's start going through what is shown
13   here that may have anything to do with Deeb Anees.
14   A.    Yes, sir.  It shows in '97 in Chicago the amount of $975,
15   the solicitors were Anees plus Mezain plus Jabbar.
16   Q.    I have been preempted on the elmo.  Is what you see the
17   electronic version of this?
18   A.    Yes, that is correct, sir.
19   Q.    Okay.  All right.  If you, you were looking at Chicago.
20   Is that correct?
21   A.    Right.  It says '97 Chicago, and I just read the amount
22   of $975.
23            MR. DRATEL:  Your Honor, may we approach for a
24   second?
25            (The following was had outside the hearing of the
```

1          jury.)

2          MR. DRATEL:  We just got these overnight, so the

3     notations, the handwritten notations, whose are they?  Are

4     they on the document originally?

5          MR. JACKS:  Yes.

6          MR. DRATEL:  Okay.

7          (The following was had in the presence and hearing

8          of the jury.)

9     Q.   (BY MR. JACKS)  For the record, Mr. Miranda, there are

10    marks, handwritten markings on this exhibit.  Were those on

11    there when they were seized?

12    A.   Yes, sir, to my knowledge they were.

13    Q.   Going back up to the entries you were talking about, 1997

14    Chicago, what two entries there reflect some activity or

15    attribution to Anees?

16    A.   Yes, sir.  The second one reads "$15,080, Anees plus

17    Mezain plus Said."

18    Q.   And is there one shown there for Detroit?

19    A.   Yes, sir.  "1997, Detroit, $400, Anees plus Mezain plus

20    Jabbar."

21    Q.   What is the next one shown there?

22    A.   It reads, "Los Angeles."  I believe this is still under

23    the time frame of 1997.  It reads, "$11,510, Anees plus Mezain

24    plus are Jabbar."

25    Q.   And just when was the -- When was Hamas designated as a

1    terrorist organization?

2    A.    1995.

3    Q.    And when was it designated as a foreign terrorist

4    organization?

5    A.    1997.

6    Q.    And you have talked about Los Angeles.  Could you

7    scroll -- Do you see others there on the screen now?

8    A.    Yes, sir.  There is one under New Jersey for $4,150,

9    Anees plus Mezain plus Jabbar.

10           MR. JACKS:  Could you scroll down, please, Jim?

11   Q.    (BY MR. JACKS)  And do you see one there in San Diego?

12   A.    Yes, sir.  I believe this is still under 1997 San Diego,

13   $1,775, Anees plus Mezain plus Jab.  Chicago $50, Anees plus

14   Mezain plus Jab, which is probably Jabbar.  Chicago $550,

15   Anees Mezain Jabbar.  Chicago, $10,450, Anees plus Mezain plus

16   Said.

17   Q.    Los Angeles in '97, do you see some entries?

18   A.    Yes, sir.  $2,000 for Anees, Mezain, Jab.  The next on is

19   $7,475, Anees plus Mezain plus Jabbar.

20   Q.    And New Jersey?

21   A.    New Jersey.  $750, Anees plus Mezain plus Jab.  The next

22   line is $3,500, Anees plus Mezain plus Jabbar.

23   Q.    Would you go to San Diego in 1997?

24   A.    $150, Anees plus Mezain plus Jab.

25           MR. JACKS:  Would you go to the next page of the

1    exhibit, please, Jim?

2    Q.   (BY MR. JACKS)  And what is the date on the heading

3    reflecting these records, Mr. Miranda?

4    A.   These are going to reflect 1998 and 1999 time frames.

5    Q.   Under -- What is the first entry that shows any reference

6    to Anees?

7    A.   It is 1999 Chicago for $200, Anees plus Mezain plus Jab.

8    The line underneath that is $4,000, Anees plus Mezain plus

9    Said.

10   Q.   And go down I guess to the Los Angeles entry.

11   A.   Yes, sir.  Still 1999 is the date, $1,550, Anees plus

12   Mezain plus Jab.  The next entry is $1,000, Anees plus Mezain

13   plus Jabbar.

14   Q.   New Jersey?

15   A.   Still 1999, $650, Anees plus Mezain plus Jab.  The next

16   line is $1,000, Anees plus Mezain plus Jabbar.

17   Q.   Would you go down to Orange County?

18   A.   Orange County is $70, Anees plus Mezain plus Jabbar.

19   Then there is one for $100, Anees plus Mezain plus Said.

20   Q.   And is there a total that reflects for all of these

21   entries how much is attributed to these different solicitors,

22   if you will?

23   A.   The grand total is $542,531.33.

24   Q.   And these records, according to the documents, makes

25   reference to the years 1997, '98, and '99?

1    A.    Yes, sir.

2    Q.    Agent Miranda, I want to move away from the overseas

3    speakers and the speakers in general and ask you about another

4    subject matter.

5          In the course of your participation in this

6    investigation, did you examine telephone records that were

7    either acquired by subpoena or found in the execution of

8    search warrants?

9    A.    Yes, sir, I did.

10   Q.    And you have already told us that one of the exhibits or

11   pieces of evidence that you looked at was a telephone book

12   taken from Mousa Abu Marzook.  Is that correct?

13   A.    Yes.

14   Q.    And when and where was that telephone book taken from

15   him?

16   A.    The telephone book was seized when he and his wife

17   attempted to enter the country at JFK Airport in New York in

18   July 1995.

19   Q.    Did you look at, among other things, the telephone book

20   and then see if there were any persons shown in that telephone

21   book who are now specially designated terrorists?

22   A.    Yes, sir, I did.

23   Q.    Did you find any persons that fit that category?

24   A.    Yes, sir, I found several.

25   Q.    All right.

1            MR. JACKS:  Could you please display Marzook

2    Phonebook, just the first page?

3    Q.   (BY MR. JACKS)  And is that a scanned copy on the screen,

4    Mr. Miranda, the first -- the outside cover of that phonebook?

5    A.   Yes, sir, it is.

6            MR. JACKS:  And Mr. Lewis, could you display what

7    has been admitted as Designation No. 1?

8    Q.   (BY MR. JACKS)  Agent Miranda, I believe you testified

9    previously regarding an individual Imad al-Alami?

10   A.   Yes, sir.

11           MR. JACKS:  And Mr. Lewis, could you please enlarge

12   designation No. 1?

13       Your Honor, I am not sure Designation No. 1 has been

14   admitted, and we would move its admission as a certified

15   Government document.

16           MR. CLINE:  No objection.

17           THE COURT:  Admitted.

18           MR. JACKS:  I apologize, Your Honor.  I thought it

19   had been admitted.

20       Mr. Lewis, can you show the second page of Designation

21   No. 1?  And the third page, if you would.

22   Q.   (BY MR. JACKS)  Agent Miranda, do you see a reference to

23   an Imad al-Alami?

24   A.   Yes, sir, I do.

25   Q.   And the fact that his name is there, what is the

1  designation -- what is the reference to him there?

2  A.   He is being designated as a specially designated

3  terrorist.

4  Q.   And is he contained within Mousa Abu Marzook's address

5  book or phonebook?

6  A.   Yes, sir, he is.

7  Q.   And what page was he shown on?

8  A.   I would have to look, sir.

9  Q.   Okay.

10        MR. JACKS:  Mr. Lewis, can you show I believe it is

11  going to be page 46 of the exhibit, of the phonebook exhibit,

12  if you don't mind.

13        THE WITNESS:  That is correct, sir.

14  Q.   (BY MR. JACKS)  And where is the entry for Imad al-Alami?

15  A.   He is the fourth entry down on the left hand of the

16  exhibit.  It reads, "Imad al-Alami, office," and then there is

17  two telephone numbers.

18  Q.   The first being 6069313?

19  A.   That is correct.

20  Q.   And the last one being 687885?

21  A.   Yes, sir.

22        MR. CLINE:  Your Honor, could we have a date on

23  Designation No. 1, please.

24        MR. JACKS:  Go back, Mr. Lewis, if you would, to the

25  second page -- the last page actually I believe of that

1    exhibit.

2    Q.   (BY MR. JACKS)  What is the date shown, Agent Miranda,

3    that this designation was entered into effect?

4    A.   8/21/03.

5    Q.   Okay.

6         MR. JACKS:  Would you go back, Mr. Lewis, on that

7    exhibit to page 4?

8    Q.   (BY MR. JACKS)  And do you see other persons that are

9    designated that were in Mousa Abu Marzook's phonebook?

10   A.   Yes, sir, I do.

11   Q.   Which one?  What is the first one?

12   A.   Khalid Mishal.

13   Q.   And his designation was in connection with which

14   organization?

15   A.   Hamas.

16   Q.   And the entry -- Of course Mr. Marzook is shown there.

17   And the entry under Mr. Marzook?

18   A.   Mousa Abu Marzook.

19   Q.   Under him.  I am sorry.

20   A.   I am sorry.  Abdel Aziz Rantisi.

21   Q.   Which organization is he with?

22   A.   Hamas.

23   Q.   Mr. Abdel Aziz Rantisi, is he in Mr. Marzook's phonebook,

24   please?

25   A.   I believe he is, sir.

1          MR. JACKS:  If you would go to page 38 of the

2    phonebook, please, and enlarge the bottom part of the page, if

3    you would.

4    Q.   (BY MR. JACKS)  Do you see an entry that is consistent

5    with Aziz Rantisi?

6    A.   Yes, sir.  There is an entry for Abdel Aziz.

7    Q.   And the 838017 number?

8    A.   Yes, sir.

9    Q.   And Khalid Mishal, was he referenced in Marzook's

10   telephone book?

11   A.   Yes, sir.

12          MR. JACKS:  Would you go to page 54, I believe?

13   Q.   (BY MR. JACKS)  Do you see a reference to Khalid Mishal?

14   A.   Yes, sir.  Fourth up from the bottom it reads Khaled

15   Abdel Rahim, 697163.

16   Q.   And is there other evidence or other exhibits that

17   connect that telephone number to Khalid Mishal that we will be

18   getting to?

19   A.   Yes, sir.

20   Q.   When you talk about telephone records and you use the

21   term telephone toll records, what do you generally refer to?

22   A.   That is a request to the telephone company for the

23   records of a particular phone.

24   Q.   And toll records are what type of records?  What do they

25   show?

1    A.    They are going to show generally who the subscriber to

2    the telephone is, whose account it is, telephones -- The dates

3    that somebody made a telephone call, the numbers called from

4    that account.

5    Q.    Do they generally include long distance calls or local

6    calls or both?

7    A.    Sometimes both.  Long distance generally are for sure

8    something you would see.

9    Q.    All right.  And in your experience -- You said you have

10   been with the Bureau for over ten years.  Is that correct?

11   A.    Over 11, yes.

12   Q.    Over 11 years.  Do telephone companies keep their toll

13   records indefinitely or forever?

14   A.    No.  They only keep them for a certain amount of time

15   before they destroy them.

16   Q.    All right.  And have you ever been told why that is?

17   A.    Presumably because it just takes too much information.

18   Q.    Do they purge their records periodically?

19   A.    Yes, they do.

20   Q.    And in the course of this case, did you ever come across

21   telephone records that were taken during the execution of a

22   search warrant?

23   A.    Yes, sir.

24   Q.    And those records that would be found during the

25   execution of a search warrant, what type of -- What form were

1    those telephone records in?

2    A.    Those were typically phone bills, just like you would

3    receive at home.

4    Q.    All right.  And did those bills include records of

5    itemized calls that would be included in a bill?

6    A.    Yes, sir, they did.

7    Q.    When you were looking at this evidence and these phone

8    bills or phone tolls, did you ever look to see if there were

9    telephone connections between any of the Defendants, the Holy

10   Land Foundation, and persons who have been or will be shown to

11   be members of Hamas?

12   A.    I did that given the extent of the information I had or

13   the limitations on the information I had, but yes, I did that.

14   Q.    You testified a moment ago about this individual Imad

15   al-Alami.  Is that right?

16   A.    Right.

17   Q.    And let me show you Demonstrative No. 17.  And is he

18   shown in this poster?

19   A.    Yes, sir.  He is in the black and white picture all the

20   way on the bottom left in the orange area.

21   Q.    Okay.  Bottom row far left?

22   A.    Correct, sir.

23   Q.    And according to -- Who was Imad al-Alami in connection

24   with Hamas?

25   A.    He was originally their -- I should say he was the

1   original Hamas representative in Tehran, Iran.

2   Q.   And did you ever locate any evidence that corroborated

3   that fact?

4   A.   Yes, I did.

5           MR. JACKS:   May I approach the witness, Your Honor?

6           THE COURT:   Yes.

7   Q.   (BY MR. JACKS)   Mr. Miranda, I am going to show you an

8   exhibit that is marked as Ashqar Search No. 7.   And for the

9   record, you were shown this exhibit last week and I believe

10  you read certain excerpts from this exhibit, and I would like

11  to ask you to do that again today.

12          Just for the purposes of the record, just look at that

13  and do you recognize that as a document photographed during

14  the search of Abdel Haleem Ashqar's house in Oxford,

15  Mississippi in 1993?

16  A.   Yes, sir, it is.

17  Q.   And the document consists of several pages in Arabic.   Is

18  that correct?

19  A.   Yes, sir.

20  Q.   And did the FBI later translate those pages into English?

21  A.   Yes.

22  Q.   Okay.   Let me direct your attention, then, to the first

23  page, and the English translation.   And I believe you have

24  already read the entry at the top which just contains a date

25  range, does it not?

1   A.   Yes, it does, sir.

2   Q.   And what is the date range shown on that particular

3   entry?

4   A.   October 13th through the 25th, 1991.

5   Q.   And does that entry talk about the Hamas delegation and

6   who was in it to visit Tehran?

7   A.   Yes, it does.

8   Q.   And the persons that are referenced in that delegation

9   are who?

10  A.   It says Abu Omar, who of course is Mousa Abu Marzook,

11  there is an Abdel Aziz, Abdel Bara, and Abu Mahmud, who I have

12  mentioned several times is the Abu name for Mohammed Siam from

13  our chart here and from the overseas speakers list.  There is

14  an Abu Hammam and an Abu Ali.

15  Q.   And the Abdel Aziz, who uses that name?

16  A.   Abdel Aziz Rantisi is one individual.

17  Q.   Is he on the chart, Demonstrative No. 17?

18  A.   Yes, in the orange section, top row, second from the

19  right.

20  Q.   All right.  And I am going to ask you if you would just,

21  Agent Miranda, would you read the entry that I have marked?

22  It is about three lines there.  Just read that into the

23  record.  And this is again under the heading the date range of

24  October 13th to the 25th of 1991.  Is that correct?

25  A.   Right, sir.  And it reads, "This was Hamas' first

1    official meeting with the Iranian government.  The minister

2    granted his approval to open an office for Hamas in Tehran and

3    to approve brother Imad al-Alami as a representative for the

4    Movement over there."

5    Q.   And I am going to turn to the next page, if you will, and

6    do these entries on these pages contain dates out to the side

7    attributing whatever is written in to a particular date?

8    A.   Yes, sir, they do.

9    Q.   Directing your attention to item No. 7, what is the date

10   shown there?

11   A.   5/22/1992.

12   Q.   And then going to the next page, is there a heading, and

13   if you would read the heading on the next page of the exhibit

14   which has --

15            MS. DUNCAN:  Your Honor, can we approach?

16            THE COURT:  Yes.

17            (The following was had outside the hearing of the

18            jury.)

19            MS. DUNCAN:  Your Honor, we discussed a very narrow

20   portion of this document.  Now Mr. Jacks is getting into a

21   whole bunch of different pages.  We have dates we haven't

22   discussed, and now we are getting into events we haven't

23   discussed.

24            MR. JACKS:  This is the heading I was going to have

25   him read and then have him read this sentence.

1          MS. DUNCAN:  I think I may have got the page wrong.

2    That wasn't the page that was up or you named because I

3    thought we were reading --

4          MS. HOLLANDER:  It is not.  He was reading this and

5    then the next page is totally different.  This is not the next

6    page on our exhibit.  Our exhibit doesn't have that.  It has

7    that.

8          MS. DUNCAN:  It goes to here and it goes to there.

9          MR. JACKS:  Okay.  I will just reference it by that

10   and have him read that and then that, so that the record is

11   clear that it is talking about that page, that page, and that.

12         MS. DUNCAN:  Okay.

13         MS. HOLLANDER:  Your Honor, I just want to raise a

14   problem that the Government keeps changing these exhibits

15   after we get them.  This is not the same exhibit that we have.

16   We have an entirely different order.

17         THE COURT:  It is the same exhibit.  It may be in a

18   different order.  Has it all come in?

19         MR. JACKS:  He has read from it, Your Honor.

20         THE COURT:  A few portions.

21         MR. JACKS:  Right.  And our proposal is to redact it

22   before it goes to the jury.

23         THE COURT:  What you send back is what has been

24   read?

25         MR. JACKS:  Yes.  What happened was I had my pages

1   out of order in the exhibit, and I apologize for that.

2           THE COURT:  Okay.  All right.

3           (The following was had in the presence and hearing

4           of the jury.)

5           MR. JACKS:  May I reapproach, Your Honor?

6           THE COURT:  Yes.

7   Q.   (BY MR. JACKS)  For clarity's sake, this was the page I

8   was about to ask you to read from.  And for reference, what is

9   the heading, if you will?  I am talking about these letters

10  and numbers up in the upper left.

11  A.   Ash, A-S-H, 1586.

12  Q.   That page, what is the heading for this particular page?

13  A.   "Useful information regarding the relationship with

14  Iran."

15  Q.   And are there a series of items below that that are

16  numbered?

17  A.   Twenty of them, yes.

18  Q.   Would you look at item No. 7?

19  A.   Yes, sir.

20  Q.   And just read that one line, please.

21  A.   Item No. 7.  "They are keen on maintaining the secrecy of

22  the relationship in the present time."

23  Q.   Getting back to your examination of the telephone

24  records, did you find any indication of phone calls from the

25  Holy Land Foundation to Imad al-Alami in Iran?

1   A.   Yes, sir, I did.

2   Q.   Are you familiar with a document identified as HLF Search

3   No. 9?

4   A.   Yes, sir.

5   Q.   And are those -- Is that a copy of phone bills that were

6   seized during the search of the Holy Land Foundation

7   materials?

8   A.   Yes, sir.

9          MR. JACKS:  Your Honor, we move the admission of

10  Holy Land Foundation Search No. 9.

11         MS. MORENO:  I think they are already in evidence,

12  Your Honor.

13         THE COURT:  Okay.

14         MR. JACKS:  Mr. Lewis, could you please display the

15  first page of that exhibit?  And just, if you would, enlarge

16  the top portion.

17  Q.   (BY MR. JACKS)  What company records are these, Mr.

18  Miranda?

19  A.   These are for the Occupied Land Fund.

20  Q.   And what is the company or telephone company that is

21  reflected?

22  A.   Pacific Bell.

23  Q.   And again, these records were found in the records of the

24  Holy Land Foundation, not -- These did not come from Pacific

25  Bell.  Is that correct?

1   A.   No.  These were found at the Holy Land Foundation.

2   Q.   All right.  And is there a date for this particular

3   statement?

4   A.   That particular statement is May 8th, 1990.

5   Q.   And is there anything that shows the telephone number?

6   A.   Yes; the account number.

7   Q.   Okay.

8   A.   Basically portions of the account number is the telephone

9   number.

10  Q.   Okay.  Which part of it represents the telephone number?

11  A.   213-568-9164.

12  Q.   Okay.  And where was the Occupied Land Fund located,

13  according to this record?

14  A.   At that time it was in Culver City, California.

15  Q.   And is that near Los Angeles or a suburb of Los Angeles?

16  A.   Yes, sir, it is.

17          MR. JACKS:  If you could go to page 7 of this

18  exhibit, please, Jim.

19  Q.   (BY MR. JACKS)  And is this another telephone bill from

20  Pacific Bell to the Occupied Land Fund?

21  A.   Yes, sir, it is.

22  Q.   And what is the date for this statement?

23  A.   This statement is dated March 8th, 1992.

24  Q.   And how about the phone number?  Is it the same or

25  different on this particular statement?

1    A.    No, it is different.  In this case it is 310-568-9164.

2              MR. JACKS:  Jim, could you go to page 27 of the

3    exhibit?  Could you go to the next page, please?  I am sorry.

4    Go back two pages, Mr. Lewis.  Can you enlarge the bottom

5    half, say, of that page?

6              MS. HOLLANDER:  What page of the exhibit?  I have

7    gotten lost there.

8              MR. JACKS:  Page 26.  I believe it is page 26.  Mr.

9    Lewis, would you just zoom out for a moment.

10   Q.   (BY MR. JACKS)  Mr. Miranda, what is the date of the bill

11   and then the date range, if you will, for the calls shown on

12   this particular page?

13   A.    The date of the bill is March 8th, 1992, and the calls

14   range from February 24th, 1992 through February 25th, 1992.

15             MR. JACKS:  And if you would, Mr. Lewis, just

16   enlarge the bottom half of that page, please.

17   Q.   (BY MR. JACKS)  Agent Miranda, are there calls to Iran

18   reflected on this particular bill?

19   A.    There are five phone calls to Iran on this bill.

20   Q.    And are the calls numbered on the far left column?

21   A.    Yes, they are.

22   Q.    So what numbers would they be?

23   A.    No. 32, 33, 34, 35, and 36.

24   Q.    All to the same number in Iran?

25   A.    Yes, sir.

1   Q.    And in the earlier evidence that you have shown us, what

2   number is that or whose number is that?

3   A.    This number is going to correspond to Imad al-Alami.

4   Q.    And was that in Marzook's phonebook?

5   A.    If it is not in Marzook's phonebook it is in Ashqar's

6   documentation.

7   Q.    And when you say Ashqar's documentation, what type of

8   documentation are you talking about?

9   A.    A phonebook for Abdel Haleem Ashqar.

10  Q.    And is that something that was taken or photographed

11  during the search of Ashqar's house in 1993?

12  A.    Yes, sir, it was.

13  Q.    Let me show you what has been marked for identification

14  purposes Ashqar Search No. 3.  And can you identify this as

15  the document you were just referencing?

16  A.    Yes, sir.

17  Q.    Okay.  And is this a page from a telephone or address

18  book photographed during the search of Ashqar's house?

19  A.    Yes, it is.

20          MR. JACKS:  Judge, we move admission of Ashqar

21  Search No. 3.

22          MR. CLINE:  We object on the basis of our written

23  objections.

24          THE COURT:  Those have been overruled.  Ashqar

25  Search No. 3 is admitted.

```
 1            MR. JACKS:  Mr. Lewis, can you do a split screen and

 2    show Ashqar Search No. 3?

 3    Q.   (BY MR. JACKS)  Agent Miranda, is that the first page of

 4    the exhibit that shows the reference to the camera roll and

 5    that type of thing?

 6    A.   Yes, sir.

 7    Q.   All right.  I am talking about what is shown on the right

 8    hand side of the screen.

 9            MR. JACKS:  Would you go to the next page?

10    Q.   (BY MR. JACKS)  Is that a photograph of the original page

11    of that address book?

12    A.   Yes, sir.

13            MR. JACKS:  Go to the next page, Jim.

14    Q.   (BY MR. JACKS)  Is that the translation that was done by

15    the FBI of that entry, that page of the Ashqar phonebook?

16    A.   That is correct, sir.

17    Q.   Is there an entry there for Imad al-Alami?

18    A.   Yes, it is the 7th down.  It says "Imad al-Alami

19    (Tehran)" and some telephone numbers after it.

20    Q.   And do those telephone numbers correspond to the numbers

21    shown on the phone bill from the Holy Land Foundation?

22    A.   The first number does.  The Holy Land phone bill is calls

23    to Iran are to 98212-29510, and Abdel Haleem Ashqar's

24    phonebook has it listed as 011-98212-29510.

25    Q.   Have you made overseas long distance calls yourself?
```

1    A.    Yes.

2    Q.    All right.  And to do that, do you have to dial certain

3    numbers first to start that process or to make an overseas

4    call?

5    A.    Yes, you do.

6    Q.    From the United States, what numbers do you need to dial

7    first?

8    A.    It depends on the country.

9    Q.    Okay.  But is there certain numbers you have to dial to

10   even get to the line to make an overseas call?

11   A.    Yes.

12   Q.    All right.  Now, we are familiar that areas within the

13   United States have area codes.  Is that correct?

14   A.    Right.

15   Q.    What about foreign countries?

16   A.    You have country codes and area codes.

17   Q.    All right.  And generally are country codes similar to an

18   area code that you would dial to reach some place within the

19   United States?

20   A.    In general, yes.

21   Q.    I mean, it is -- How many numbers generally are in a

22   country code?

23   A.    Three is what I am familiar with.

24   Q.    And then depending on the country, can you tell us are

25   there area codes within the country that you may have to dial?

1    A.    Right.  You have to do that, too.

2    Q.    All right.  And then would you also have to dial the

3    number for the specific telephone?

4    A.    Correct.

5    Q.    All right.  For example, in this particular case with

6    Iran, what is the country code for Iran, or what does it

7    appear to be?

8    A.    In this case the country code I believe is going to

9    be -- Let me back up the numbers here.  I think it is going to

10   be 98 or 982.

11   Q.    All right.  And then as I said, depending on the country

12   and perhaps the number of phones in the country, will there

13   sometimes be a city code within a country code that has to be

14   dialed?

15   A.    Right.

16   Q.    And is this one way from these exhibits or this evidence

17   that you connected this particular telephone number to Imad

18   al-Alami?

19   A.    Yes, sir.

20   Q.    And this particular phone bill I believe was May of '92,

21   and the reference to the establishment of an office in Tehran

22   for Hamas that you read from that Ashqar exhibit, when did

23   that begin?

24   A.    In 1992 after these phone calls from the HLF, shortly

25   after.

1    Q.   I believe you testified last week regarding other

2    evidence that you found that further identified Imad al-Alami.

3            MR. JACKS:  Can you please, Mr. Lewis, pull up

4    Ashqar Search No. 14?  And if you will go to the second page,

5    please.

6    Q.   (BY MR. JACKS)  Agent Miranda, do you recognize this as a

7    document photographed during the search of Ashqar's house?

8    A.   Yes, I do, sir.

9            MR. JACKS:  Could you go to the next page, please?

10   Q.   (BY MR. JACKS)  And is this a translation of that one

11   page of this exhibit?

12   A.   Yes, of that one page.

13   Q.   And is there identification of Imad al-Alami -- First of

14   all, this document makes reference to what type of event?

15   A.   It was the popular Arab and Islamic conference.

16   Q.   What date?

17   A.   1/3/1993.

18   Q.   And any reference in there identifying Imad al-Alami?

19   A.   Yes.  In the very first paragraph in the main body it

20   says "in attendance," and it says, "Hamas delegation," and

21   within the Hamas delegation Imad al-Alami is listed.

22   Q.   All right.  Did you examine telephone records from the

23   Holy Land Foundation or any of the Defendants and find any

24   reference to an individual identified as Mustafa Qanuo?

25   A.   Yes, I have.

1    Q.    And who is Moustafa Qanuo?

2    A.    He was the Hamas representative in Syria.

3    Q.    And are you familiar with --

4         MR. JACKS:  First of all, Jim, can you show Marzook

5    phonebook page 58 of the exhibit, please?  And can you find on

6    that particular page -- This is obviously the English

7    translation of what was in the address book.  Correct?

8    A.    Right, sir.

9    Q.    And at the top of the page you see the reference to page

10   21.  What does that represent?

11   A.    It is going to represent the page within Marzook's

12   telephone book.

13   Q.    All right.  And then it has kind of got descriptors like

14   right column?

15   A.    Correct.

16   Q.    And is there a reference there to a Moustafa?

17   A.    Right.  If you go to the section that says left column,

18   that second paragraph down it has the numbers and then there

19   is a line.

20   Q.    All right.  What is now the top line on the screen?

21   A.    Yes, sir.

22   Q.    And just describe -- It is not necessary that you read it

23   exactly, but just describe what is shown there.

24   A.    There is an entry for the Hamas representative Moustafa

25   al-Qanuo.

1    Q.    And are there phone numbers or apparent phone numbers?

2    A.    Yes, sir.

3    Q.    The 963 country code, do you know what country that is?

4    A.    Syria.

5    Q.    Below that there is an entry.  What is the entry on the

6    left hand side below the Moustafa al-Qanuo name?

7    A.    There is a entry for Munir with a Syrian telephone

8    number.

9    Q.    What are the last four digits of that particular

10   telephone number?

11   A.    1159.

12   Q.    Did you find that particular phone number had been called

13   by examining any records within the Holy Land Foundation

14   search warrant records?

15   A.    Yes, sir, I did.

16   Q.    Are you familiar with what has been marked as Holy Land

17   Foundation Search Records No. 130?

18   A.    Yes, I am.

19   Q.    Are those copies of phone bills that were seized during

20   the search of the Holy Land Foundation?

21   A.    Right, the Dallas office in this instance.

22         MR. JACKS:  Your Honor, we move the admission of

23   Holy Land Foundation Search No. 130.

24         MR. CLINE:  No objection.

25         THE COURT:  Admitted.

1       MR. JACKS:  And Jim, if you can just display that,

2  please.

3       THE COURT:  Before we get there, let's take the

4  morning break.

5       Be back at ten after 11:00.

6                         (Brief recess.)

7       THE COURT:  Mr. Jacks?

8       MR. JACKS:  Thank you, Your Honor.

9  Q.   (BY MR. JACKS)  Agent Miranda, before we broke you were

10  testifying regarding this examination that you did of Holy

11  Land Foundation and other persons' phone bills, and numbers

12  that they may have called.

13  A.   Yes, sir.

14  Q.   And did you examine the evidence in this case to see if

15  you could find records indicating calls to Mohammed Siam?

16  A.   Yes, I did, sir.

17  Q.   And again, Mr. Siam, Mohammed Siam is shown on

18  Demonstrative No. 17 in the middle row to the far left?

19  A.   That is correct, sir.

20  Q.   And how has he been identified in relation to Hamas?

21  A.   He is a Hamas roving ambassador essentially.

22  Q.   Has he been shown and depicted in some of the videos that

23  were seized in this case?

24  A.   Yes, we have shown some videos with him in it.

25  Q.   Let me just make reference to --

1       MR. JACKS:  May I approach the witness, Your Honor.

2       THE COURT:  Yes.

3  Q.   (BY MR. JACKS)  I show you was has been marked for

4  identification purposes as Holy Land Foundation Search

5  No. 115.  And are those -- Is that the original of some

6  telephone bills or a telephone bill that was seized from the

7  materials seized during the Holy Land Foundation search?

8  A.   Yes, sir, it is.

9  Q.   Let me show you what has been marked for identification

10 as Holy Land Foundation Search No. 117.  And is that also a

11 telephone bill that was seized during the search of the Holy

12 Land Foundation offices?

13 A.   Yes, again it is, sir.

14 Q.   And what has been marked for identification purposes as

15 Holy Land Foundation Search No. 119, is that also a telephone

16 bill seized during the search of the Holy Land Foundation

17 offices in Dallas?

18 A.   Yes, sir.

19      MR. JACKS:  Judge, we move the admission of Holy

20 Land Foundation Search No. 115, 117, and 119.

21      THE COURT:  I think you previously indicated no

22 objections on those.

23      MR. CLINE:  No objections.

24      THE COURT:  Those are admitted.

25      MR. JACKS:  And Jim, could you display Marzook

1    Phonebook, page 41 of the exhibit?

2    Q.   (BY MR. JACKS)  Agent Miranda, do you recognize part of

3    the English translation of the contents of Marzook's

4    phonebook?

5    A.   Yes, I do, sir.

6    Q.   And again, page 5 reference at the top refers to what?

7    A.   Page 5 of Marzook's phonebook.

8    Q.   And the names and the numbers entered there, could you

9    please just tell us for the record what names are there?

10   A.   There is the name Abu Mahmoud and Abu Hamzah.

11   Q.   And who uses the name Abu Mahmoud?

12   A.   The Hamas leader Mohammed Siam.

13   Q.   And the number that is shown there -- First of all, in

14   your investigation did you determine where Mohammed Siam lived

15   or stayed most of the time?

16   A.   Yes.

17   Q.   During this time frame?

18   A.   During this particular time frame, yes.

19   Q.   Where was that?

20   A.   Yemen.

21   Q.   Where is Yemen?

22   A.   Yemen is at the bottom of the Saudi Peninsula.

23   Q.   All right.  And there is other numbers there.  Did those

24   numbers reappear in the exhibits?

25   A.   Yes, sir.

1    Q.   Which numbers will you see or show us later on?

2    A.   We are going to see reference to the 3823 number.  That

3    would be -- The full number is 967 --

4    Q.   That has home written beside it?

5    A.   Yes, sir, home written beside it.  And also there is a

6    reference to the two numbers labeled office, the 216851, and

7    further out the 204733.

8    Q.   All right.  And from your investigation, are those

9    numbers also in the country of Yemen?

10   A.   Yes, sir.

11          MR. JACKS:  Mr. Lewis, could you display HLF Search

12   No. 119?  And if you could enlarge the page so that the

13   witness can see it, just the top part, please.

14   Q.   (BY MR. JACKS)  Agent Miranda, is this just an excerpt

15   from the telephone bill that is reflected here?

16   A.   That is correct, sir.

17   Q.   And who is the subscriber?  Whose telephone bill is it?

18   A.   It is to the Holy Land Foundation.

19   Q.   What is the invoice date?

20   A.   The invoice date is all the way to the far right and it

21   is March 10th, 1994.

22   Q.   So the calls that are reflected on this precede March

23   10th, 1994.  Correct?

24   A.   Yes, sir.

25          MR. JACKS:  If you would go to the next page,

1  please, and just enlarge the middle of the page.

2  Q.   (BY MR. JACKS)  And are there calls reflected on that

3  phone bill to the country of Yemen?

4  A.   Yes, sir.  The calls would be No. 25, 26, and 27, if you

5  look at the column all the way to the far left and just move

6  over to the right.

7  Q.   All right.  And then the numbers called?

8  A.   The first number is 9671204733.  That is the call

9  on -- That is No. 25.  The call No. 26 is telephone number

10  9671216851, and then call No. 27 is 9671203823, all of which

11  occurred on February 9th, 1994.

12        MR. JACKS:  And Mr. Lewis, if you could go back to

13  page 41 of Marzook Phonebook.

14  Q.   (BY MR. JACKS)  So you have calls to the 3823 number?

15  A.   Yes, sir; the home phone number for Mohammed Siam.

16  Q.   The 685 number?

17  A.   The office number, yes, sir?

18  Q.   And then the 3662 number.  Is that correct?

19  A.   No, sir.  I believe it was the 4733.

20  Q.   All right.

21  A.   That is correct.  It is 4733.

22  Q.   All right.  Were there other records indicating other

23  calls to Mohammed Siam?

24  A.   Yes, sir.

25        MR. JACKS:  Jim, could you display HLF Search

1    No. 115?

2    Q.   (BY MR. JACKS)  And these are records for what telephone

3    company?

4    A.   Coastal Telephone Company.

5    Q.   And for the Holy Land Foundation?

6    A.   Yes, sir.

7    Q.   What is the phone number that these calls go to?

8    A.   214-699-9868.

9    Q.   And this would have been after the Holy Land Foundation

10   relocated to Dallas or Richardson?

11   A.   Correct, sir.

12   Q.   And just looking at the first page, what is the billing

13   date --

14          MR. JACKS:  Go to the second page of the exhibit,

15   please.

16   Q.   (BY MR. JACKS)  The billing date shown on this particular

17   excerpt?

18   A.   March 5th, 1995.

19   Q.   And are there calls to Yemen shown on this particular

20   exhibit?

21   A.   Yes, sir.  I see four calls.

22   Q.   What number call is reflected in the column to the left?

23   A.   There is No. 83, No. 84, No. 89, and No. 90.

24   Q.   And what date are these calls made, according to the

25   exhibit?

1    A.    No. 83 and 84 are February 22nd, 1995, and calls No. 89

2    and 90 are February 25th, 1995.

3    Q.    In relation to Hamas being a specially designated

4    terrorist, is this before or after?

5    A.    After Hamas has been designated.

6          MR. JACKS:  Go to the next page, please.

7    Q.  (BY MR. JACKS)  Any other calls to Yemen on that page?

8    A.    Yes.  There is a call No. 197 on March 24th, 1995.

9    Q.    And is that to the same numbers that were shown, one of

10    the same numbers shown in Mousa Abu Marzook's address book or

11    phonebook?

12    A.    Yeah.  In this case, sir, it is Mohammed Siam's home

13    phone number.

14    Q.    All right.  And have all of the numbers that you have

15    testified about with regard to calls to Yemen been connected

16    to Mohammed Siam through that entry in Marzook's phonebook?

17    A.    Through the entries, yes.

18    Q.    All right.

19          MR. JACKS:  Could you display, please, Mr. Lewis,

20    HLF Search No. 117?  And enlarge the top of the page.

21    Q.  (BY MR. JACKS)  Whose phone number is this?  Whose phone

22    bill is this?

23    A.    This is for the phone bill or for the phone number

24    214-690-6069, AT&T.

25    Q.    And is that a part of the records of the Holy Land

1  Foundation?

2  A.   Yes, sir.

3          THE WITNESS:  Can you scroll to the bottom, Jim?

4  Yes, I can see the HLF; there is a bates label down there.

5  Q.   (BY MR. JACKS)  All right.  That means it came from the

6  search of the Dallas office of the Holy Land Foundation?

7  A.   That is right, sir.

8  Q.   Is there -- The top portion, what is the date for this

9  particular bill?

10 A.   The bill date is April 1st, 1995.

11 Q.   And are there calls there to Yemen or a call to Yemen?

12 A.   Yes.  Call No. 6 in the upper section there on February

13 19th is again to Hamas leader Mohammed Siam's home telephone

14 number.

15         MR. JACKS:  Would you go down to the next segment of

16 calls?

17 Q.   (BY MR. JACKS)  Do you see a call to Yemen on that

18 particular page?

19 A.   Yes, I see one on February 25th.  That would be No. 21,

20 and that again is to Mohammed Siam's home phone number.

21         MR. JACKS:  Would you go to the next page, please,

22 Mr. Lewis, and enlarge the second page of the phonebook there,

23 please?

24 Q.   (BY MR. JACKS)  Are there calls reflected there to Yemen?

25 A.   Yes.  Call No. 87 is once again to the home phone number

1   of Mohammed Siam.

2   Q.   And again, the time period when these calls were made,

3   according to the exhibit?

4   A.   This call occurred on March 11th, 1995.

5   Q.   Okay.  So this exhibit is for an AT&T account.  Is that

6   correct?

7   A.   Yes, sir.

8   Q.   And the earlier one for Coastal Telephone, which was also

9   during the 1995 period during the same time period.  Is that

10  correct?

11  A.   Yes, sir.

12  Q.   So does that indicate that Holy Land Foundation had more

13  than one telephone company service?

14  A.   Yes, sir.

15  Q.   Did you find evidence reflecting that fact that they used

16  more than one phone carrier?

17  A.   Yes, sir.

18  Q.   Did you find any evidence indicating that the Holy Land

19  Foundation or anyone, any Defendant in this case, had made

20  telephone contact to Abdel Aziz Rantisi?

21  A.   Yes, I did, sir.

22       MR. JACKS:  Your Honor, I show that New Jersey Bell

23  Exhibit has been admitted, Government's Exhibit New Jersey

24  Bell Exhibit has been admitted.  I just want to confirm that.

25       THE COURT:  Okay.  I am having trouble finding it.

1    Any objection to New Jersey Bell?

2              MR. DRATEL:  No, Your Honor.

3              THE COURT:  Oh, it is in.

4    Q.   (BY MR. JACKS)  Agent Miranda, did you examine telephone

5    records identified as Government Exhibit New Jersey Bell?

6    A.   I did, sir.

7    Q.   And whose telephone records were those?

8    A.   Those pertain to the Defendant Mohammad El-Mezain.

9              MR. JACKS:  Would you please display page 49?

10             MR. DRATEL:  May we get a time frame for these

11   records?

12             MR. JACKS:  They will be reflected on the record.

13             THE COURT:  All right.

14             MR. JACKS:  And if you would, Jim, enlarge the

15   lower -- First of all, enlarge the upper right part.

16   Q.   (BY MR. JACKS)  Agent Miranda, can you -- Do you see a

17   date there indicating the date for this particular telephone

18   bill in the middle of the page there?

19   A.   That one says August 1st, 1993.

20             MR. JACKS:  If you could zoom out, and if you would

21   go to the lower left portion of the page, Mr. Lewis, and all

22   the way to the bottom.

23   Q.   (BY MR. JACKS)  Did you look at the calls that are

24   reflected there to Israel, Agent Miranda?

25   A.   Yes, I looked at the calls.

1    Q.   What number calls are you talking about?

2    A.   There is calls No. 6 and 7 which correspond to July 5th,

3    and then there is a call, or I should say calls, on No. 1, 2,

4    3, and 4 at the very bottom which are all on July 6th.

5    Q.   What is the last four digits of the numbers called on the

6    calls 1, 2, 3, and 4?

7    A.   3313.

8    Q.   And the calls on No. 6 and 7 above that, just the last

9    four digits?

10   A.   2141.

11   Q.   Okay.  And did you find other exhibits or evidence

12   identifying who that phone number can be attributed to?

13   A.   Yes, I did, sir.

14   Q.   And was that reflected in Marzook's address book or

15   phonebook?

16   A.   It is reflected in Ashqar No. 3, Exhibit No. Ashqar 3,

17   sir.

18          MR. JACKS:  Mr. Lewis, can you pull that up, split

19   screen if possible?  And go to the last page of Ashqar No. 3.

20   And if you would kind of highlight the middle of the page

21   there, if you don't mind.

22   Q.   (BY MR. JACKS)  Do you see an entry there that correlates

23   to Abdel Aziz Rantisi, Agent Miranda?

24   A.   Yes, it is pretty much in the middle of the page on the

25   right hand side.

1          MR. JACKS:  Can you enlarge that, please, Mr. Lewis?

2     Q.   (BY MR. JACKS)  And is that the evidence that you used to

3     correlate those calls to Abdel Aziz Rantisi's residence?

4     A.   Yes.  You will see to the right to the exhibit on the

5     right hand --

6          MR. DRATEL:  Objection to mischaracterizing it as a

7     residence when it doesn't say that.

8     Q.   (BY MR. JACKS)  All right.  Is that the evidence that you

9     looked at to correlate that this was a call to Abdel Aziz

10    Rantisi's number?

11    A.   Yes.  There are six calls to Abdel Aziz Rantisi's

12    numbers.  If you look at the exhibit on the right hand side of

13    the screen, there is a fax number, 853313 that is going to

14    correspond to all your four phone calls on July 6th, and then

15    in parentheses you will see phone calls -- the phone calls on

16    July 5th are to 852141, and that is going to correspond to the

17    number in the parentheses in the exhibit on the right hand

18    side of the screen.

19    Q.   All right.  So perhaps these calls to the 3313 were

20    faxes?

21    A.   Yes, sir.

22    Q.   Did you come across any evidence in the course of your

23    work on this investigation, Agent Miranda, showing contact

24    between any of the Defendants and Khalid Mishal, the current

25    head of Hamas?

1    A.   Yes, sir.

2    Q.   And was that a phone record or an intercepted call?

3    A.   Intercepted phone call.

4    Q.   And the -- Was it one in particular intercepted call?

5    A.   Yes, sir.

6    Q.   And over what telephone line was that call intercepted?

7    A.   It was to the home telephone number of the Defendant

8    Mohammad El-Mezain.

9    Q.   And at that time where was he living?

10   A.   I believe that was New Jersey at the time.

11   Q.   Okay.

12        MR. JACKS:  Your Honor, we would move the admission

13   of El-Mezain Wiretap No. 14.

14        MR. DRATEL:  Just the previous objections, Your

15   Honor.

16        THE COURT:  All right.  And those are overruled, and

17   that El-Mezain Wiretap No. 14 is admitted.

18   Q.   (BY MR. JACKS)  Just for orientation purposes, the call

19   that we are about to hear, Mr. Miranda, about how long was it?

20   A.   It was very short; maybe a minute.

21   Q.   All right.  And was it an incoming call to El-Mezain's

22   telephone number?

23   A.   Yes, it was.

24        MR. JACKS:  Mr. Lewis, are you able to play it?

25   Q.   (BY MR. JACKS)  No. 14-A also, Your Honor.  I forgot to

1    move the audio file also.

2            THE COURT:  The same objections?

3            MR. DRATEL:  Yes, Your Honor.

4            THE COURT:  And that exhibit is also admitted.

5            MR. JACKS:  And request permission to play --

6    Q.  (BY MR. JACKS)  Do you remember -- Agent Miranda, do you

7    have a copy of the transcript of that call?

8    A.  Actually I don't, sir.

9    Q.  All right.  Let me get that for you.

10           MR. JACKS:  May I approach the witness, Your Honor?

11           THE COURT:  Yes.

12   Q.  (BY MR. JACKS)  I just ask you, Agent Miranda, what do

13   the records reflect in terms of when that call came in?

14   A.  10/4/1994.

15   Q.  And what time?

16   A.  9:12.

17   Q.  Morning?

18   A.  It is going to be a.m., yes, sir.

19   Q.  Okay.

20           MR. JACKS:  Mr. Lewis, would you please play that,

21   please?

22       (Whereupon, El-Mezain Wiretap No. 14 was played in open

23       court.)

24   Q.  (BY MR. JACKS)  Agent Miranda, this call was in early

25   October of 1994.  In connection with the designation of Hamas,

1   how much time difference is there?

2   A.   Less than six months.

3   Q.   All right.  Hamas was designated in January of '95?

4   A.   Yes, sir.

5        MR. DRATEL:  Your Honor, I am going to object for

6   reasons we already discussed to this line.

7        THE COURT:  Overruled.

8   Q.   (BY MR. JACKS)  And who in this case uses the name Abu

9   Walid?

10  A.   That is the current Hamas Political Bureau leader Khalid

11  Mishal.

12  Q.   And was he a leader in Hamas even as early as 1994?

13  A.   Yes, he was.

14  Q.   And with regard to the contents of that message, what was

15  he asking the Defendant El-Mezain to do?

16       MR. DRATEL:  Objection, Your Honor.  It speaks for

17  itself.

18       THE COURT:  Overruled.  He may ask and answer that.

19       THE WITNESS:  He was asking Defendant Mohammad

20  El-Mezain to come to Turkey for a meeting.

21  Q.   (BY MR. JACKS)  And the number that he gave as a

22  call-back number, is that number -- Has that been evidenced

23  and reflected in other exhibits that you have testified about?

24  A.   Yes, several times.

25  Q.   As being the number for whom?

1   A.   For Abu Walid, Khalid Mishal.

2   Q.   And that is this man here, the top left of the

3   Demonstrative No. 17.  Is that correct?

4   A.   Yes, sir.

5   Q.   Did you examine evidence, phone records, intercepted

6   calls, to see if there was any contact between the Holy Land

7   Foundation or any of the Defendants and the individual who has

8   been identified or referenced as Jamal Abu Baker?

9   A.   Yes, sir.

10  Q.   And who is -- Is it Jamil or Jamal?

11  A.   Jamal.

12  Q.   Who is Jamal Abu Baker?

13  A.   Jamal Abu Baker is the Defendant Shukri Abu Baker's

14  brother.  He is also known as Jamal Issa.  He is currently

15  head of Hamas in Yemen and former head of Hamas in the Sudan.

16  Q.   And is there any evidence indicating telephonic contact

17  between any Defendant and Jamal Abu Baker?

18  A.   Yes, sir.

19  Q.   And was that in the form of phone records or intercepted

20  phone conversations?

21  A.   Intercepted phone conversations; intercepted

22  conversations.

23  Q.   Which Defendant was having conversations with him?

24  A.   Shukri Abu Baker.

25  Q.   And are you familiar, then, with what is marked for

1    identification purposes as Baker Wiretap No. 25, 26, and 27?

2    A.    Yes, sir.

3    Q.    And are those intercepted conversations between the

4    Defendant Shukri Abu Baker and his brother Jamal Abu Baker?

5    A.    Yes, sir.

6              MR. JACKS:  Judge, we move the admission of Baker

7    Wiretap No. 25, 26, and 27.

8              THE COURT:  And you are also moving for the tapes?

9              MR. JACKS:  Yes, Your Honor.

10             THE COURT:  25-A, 26-A, 27-A?

11             MR. JACKS:  Yes, Your Honor.

12             THE COURT:  All right.  Ms. Hollander?

13             MS. HOLLANDER:  The objections we stated previously,

14   Your Honor.

15             THE COURT:  Those have been overruled, and those

16   exhibits are admitted.

17   Q.    (BY MR. JACKS)  Did you, Agent Miranda, participate in

18   preparing a demonstrative exhibit to kind of summarize or

19   group together the evidence that you have talked about

20   regarding these telephone contacts between the Defendants, the

21   Holy Land Foundation, Occupied Land Fund, and these Hamas

22   leaders?

23   A.    Yes, sir.

24             MS. HOLLANDER:  What number is this?

25             MR. JACKS:  It will be Demonstrative No. 16.

1  Q.   (BY MR. JACKS)  Let me show you what has been marked for

2  identification purposes, Agent Miranda, as Government's

3  Exhibit Demonstrative No. 16.  Is this the chart that you

4  assisted in preparing that is reflective of the testimony you

5  have given and your examination of these exhibits in evidence?

6  A.   Yes, sir.

7           MR. JACKS:  Judge, we move the admission of

8  Government's Exhibit Demonstrative No. 16.

9           MS. DUNCAN:  May we please have a second, Your

10 Honor?

11          THE COURT:  Sure.

12          MR. WESTFALL:  Your Honor, I have a specific

13 objection to this Demonstrative No. 16.  In New Jersey it says

14 New Jersey HLF and has three different phone calls.  That is

15 misleading.  It didn't come from New Jersey HLF.  It came from

16 New Jersey, but it was Mohammad El-Mezain who made the calls,

17 and just to say New Jersey HLF is misleading, Your Honor.

18          THE COURT:  Okay.

19          MR. DRATEL:  I think, if we can just approach for a

20 second?

21          THE COURT:  Okay.  Come on up.

22          (The following was had outside the hearing of the

23          jury.)

24          MR. DRATEL:  If it is not on the list of exhibits we

25 have been given for this witness, I have not looked at it

1    whether it is accurate.  I may have an objection.

2          THE COURT:  Is this something that is new that you

3    have given --

4          MR. JACKS:  No, it is --

5          MR. DRATEL:  The exhibit we have, but it was not on

6    the list for Agent Miranda so I did not review it for today

7    for purposes of determining whether I have an objection to it

8    or not.

9          MS. DUNCAN:  We didn't object to it in our written

10   pleadings because we were never given notice of it.

11         MR. DRATEL:  It wasn't listed.

12         MS. DUNCAN:  I think it is the second exhibit that

13   wasn't.  The first was short so we could make a decision

14   quickly.

15         MR. DRATEL:  I can look at it now, but I just

16   haven't had a chance.  And the other thing was on the other

17   issue with respect to the other objection with respect to

18   asking about Hamas designation in January of '95, you

19   understood that.

20         THE COURT:  I did.

21         MR. DRATEL:  I think it is outrageous to do that and

22   try to obscure the issue as to the --

23         THE COURT:  I think the jury understands the two

24   different designations, and you can point out on cross, as

25   everybody has been, so I don't think it is a question.

1          MR. JACKS:  Your Honor, that evidence is still

2    admissible.

3          THE COURT:  And that is why I am overruling that.

4    And you can point that out to the jury, but I think it is

5    relevant and admissible.

6          MS. HOLLANDER:  There have been several exhibits

7    that weren't on the list.  The ones we haven't looked at that

8    we could look at quickly we haven't complained about.

9          THE COURT:  As long as these were on the list --

10          MS. HOLLANDER:  This is one we may have some

11    objections to.

12          THE COURT:  That was given to you a long time ago.

13    If you were going to have objections --

14          MS. HOLLANDER:  We were told, my understanding was,

15    to raise the objections according to what was coming in that

16    day, and not to just -- I mean, otherwise --

17          THE COURT:  We didn't go that route until after the

18    trial had started, so I assume you all had looked at these

19    exhibits before then.

20          MS. DUNCAN:  That is not true necessarily of the

21    demonstratives.  We got the Government exhibits sort of over

22    time.

23          THE COURT:  But that is on the exhibit list that I

24    have a while back.

25          MS. DUNCAN:  I understand, Your Honor, but the

1    problem was we got the exhibit list without the exhibits, so

2    it would just say Demonstrative No. 16, and we would get them

3    later.

4              THE COURT:  I gotcha.

5              MR. JACKS:  It is not a very complicated exhibit.

6              THE COURT:  I know, but there is enough entries on

7    there that they need to look at it.  I mean, I think they need

8    to look at it.  Can you move on to something else and come

9    back and give them a chance --

10             MR. JACKS:  Yeah, I can.  I mean, it is disjointed,

11   but that is --

12             THE COURT:  I will let you use it if you want to

13   point to certain things, and we can correct it if in fact

14   there are certain corrections.  He has pointed to a specific

15   -- I am assuming you have some evidence that ties into this.

16             MR. JACKS:  What he has already testified about.

17             THE COURT:  Are you going to use the chart to

18   question him anymore?

19             MR. JACKS:  Briefly.

20             MS. HOLLANDER:  There is all kinds of things on

21   there.

22             MR. WESTFALL:  I stated mine already, but if they

23   are going to be allowed to get into it, we would ask once

24   again for a limiting instruction on the demonstratives, just a

25   general, you know, because there has been a couple of other

1   instances where things on these demonstratives have been a

2   little shaky.

3           THE COURT:  And you can inquire -- If there is a

4   disagreement as to exactly what is on there, you can inquire

5   to that on cross.  I am not going to give them another

6   instruction.  I have told them once.  They have got so much

7   evidence.  You can just inquire into that on cross if there is

8   a disagreement.

9           MS. HOLLANDER:  One of the problems, Your Honor, is

10  these jurors were advised by the Government to take notes, and

11  they are taking notes of all these demonstratives.  So unless

12  they are advised contemporaneously, these are demonstratives

13  they will have notes on.

14          THE COURT:  That is fine.  I have told them that the

15  notes are not evidence, so I don't think that is a problem.

16          MS. HOLLANDER:  I just for the record would ask for

17  a contemporaneous instruction.

18          THE COURT:  And that has been given, so I am not

19  going to give it every time.

20          MR. DRATEL:  The demonstrative, my objection is that

21  they have referred to Hamas officials, they put names there.

22  In fact, there are telephone numbers, except for maybe that

23  voice mail message where there is a person giving a name.  But

24  it is a phone number.  It is phone numbers, not the people.

25          THE COURT:  But they have it in some of the

1    documents.  I haven't looked at it all, but in some of them

2    they have Marzook Phonebook or in the Ashqar search they have

3    got names there so --

4              MR. DRATEL:  But to say -- I just think it

5    doesn't --

6              THE COURT:  The jury understands from these toll

7    records that we don't know who is on there.  They have been

8    hearing that.  They understand that.

9              MR. CLINE:  Your Honor, just an unrelated point but

10   I wanted to make it while we were up here.  We have been

11   saying for some of our objections "our previous objections" or

12   "based on our written objections."  In some instances with

13   respect to exhibits we did not specifically identify in our

14   written objections, because the Government hadn't given us

15   notice of them yet, I am guessing Your Honor understands that

16   when we say that we typically mean hearsay, Rule 403.

17             THE COURT:  Right.  What you previously stated to

18   those types of exhibits.

19             MR. CLINE:  Exactly.

20             THE COURT:  That is the way I am understanding it.

21             MR. CLINE:  I thought you did.  I just want to make

22   the record clear.

23             THE COURT:  All right.  Do you know where we are?

24             MR. JACKS:  Did he finish his objection?

25             THE COURT:  I am overruling Mr. Westfall's objection

1   to that specific one, but they want time to look at the

2   exhibits and I am going to give them the time in case there

3   are some issues they want to raise.

4            MS. DUNCAN:  Thank you, Your Honor.

5            (The following was had in the presence and hearing

6            of the jury.)

7   Q.   (BY MR. JACKS)  Agent Miranda, I am going to move away

8   from your testimony regarding these phone records and calls

9   and to whom they were made.  And you will be glad to know I am

10  moving back to the overseas speakers.  There was one item that

11  I wanted to finish up with regard to that particular subject

12  matter.

13           Directing your attention to HLF Search No. 87, the

14  overseas speakers list, who is No. 7?  And I am not going to

15  make you take an eye test.  Who is No. 7 on the list?

16  A.   Abdulmunim Abu Zant.

17  Q.   And did you find any evidence in your examination of the

18  evidence in this case that pertained to this Abu Zant person?

19  A.   Yes, sir.

20  Q.   And are you familiar with an audiotape that was found

21  during the search of the Holy Land Foundation in Dallas, their

22  office materials?

23  A.   Yes, sir, I am.

24  Q.   And again I apologize.  I am not sure this has been

25  admitted, but this has been identified for identification

1  purposes as Holy Land Foundation Search No. 27. Do you recall

2  that?

3  A.   Yes, sir.

4          MR. JACKS:  Judge, we would move the admission of

5  Holy Land Foundation Search No. 27 as modified per the Court's

6  ruling.  And if it will be agreeable with the Court and the

7  parties, rather than playing that audiotape and having the

8  transcript, I am just going to direct Agent Miranda to certain

9  portions of the transcript and ask him to read that.  And I

10  will also ask him some questions about the context of that

11  tape, just to put it in perspective.

12          THE COURT:  All right.  And that is fine.  You may

13  do that.  I guess for the record -- I am not sure I have

14  previously admitted HLF Search No. 27, and my records indicate

15  no objection to those except as we have discussed, so that is

16  admitted as modified.

17          MR. JACKS:  May I approach the witness, Your Honor?

18          THE COURT:  Yes.

19  Q.   (BY MR. JACKS)  Agent Miranda, I am going to show you a

20  document, and I will just ask you, is this a transcript, an

21  English transcript, translation, of this audiotape of this

22  individual Sheikh Abdulmunim Abu Zant?

23  A.   Yes, it is.

24  Q.   And is there a portion of the conversation in which an

25  unidentified individual identifies the date that the statement

1 is being made?

2 A. Yes, sir.

3 Q. All right. Let me ask you just to read, first of all,

4 the bracketed portion there where the unidentified male is

5 speaking, and in essence introducing Mr. Abu Zant.

6 MS. MORENO: What page are you reading from, please?

7 MR. JACKS: It would be page 2 of the transcript.

8 THE WITNESS: Yes, sir. It reads, "God's peace,

9 mercy and blessings. This is the sermon of his Eminence

10 Sheikh Abdul Mun'im Abu-Zant dated 16 1st Jarnadi, 1415 H,

11 corresponding to October 21st, 1994 A.D."

12 Q. All right. And you have read this transcript, I take it?

13 A. Yes, sir.

14 Q. All right. And in October, October 21st, 1994, what was

15 going on in the area of Israel and Jordan?

16 A. There was a peace treaty being worked out.

17 Q. Let me ask you because I am standing here, keep your

18 voice up so that everybody can hear.

19 A. Yes, sir.

20 Q. And what was going on at that time in October of 1994?

21 A. There was a peace treaty being worked out between Jordan

22 and Israel.

23 Q. And was that treaty eventually signed?

24 A. Yes.

25 Q. And in your review of this speech by this individual Abu

1    Zant, was he addressing the pending signing of that treaty?

2    A.   Yes, he was.

3    Q.   And was he in favor of it or critical of it?

4    A.   He was very critical of it.

5    Q.   All right.  Let me direct your attention -- Let's see.

6    You have it marked there.  Just the entry that there is a

7    sentence that begins, "Oh Lord, bring failure."  Would you

8    just read that sentence, please.

9    A.   Sure.  It reads "Our Lord, bring failure to the

10   reconciliation plot with the Jews.  Our Lord, bring failure to

11   the reconciliation plot with the Jews."

12   Q.   Reconciliation plot with the Jews, would that be

13   consistent with the signing of a treaty between Jordan and

14   Israel?

15   A.   Yes, sir, I think it is.

16   Q.   And let me ask you to read the portion at the bottom of

17   the page that begins, "O Lord, show us."  Just read that

18   portion there.  There is about a sentence there.

19   A.   Right.  "O Lord, show us the miracles of your strength

20   and the reconciliation with the Jews and the marvels of your

21   might next Wednesday and bring it down a storm over the Jews."

22   Q.   All right.  And let me ask you, if you would, to turn to

23   page 8, I believe, and do you see the spot that begins, "O

24   rulers of my country"?

25   A.   Yes, I have that.

1  Q.    Would you read that part of Abu Zant's speech and it is

2  about a paragraph or so?

3  A.    Yes, sir.

4  Q.    Just to the bottom of the page.

5  A.    "O rulers of my country, Hamas the beloved of the

6  Merciful, the beloved of Mohamed God's blessings peace be upon

7  him and his family.  Hamas, Hamas is the one who raised up the

8  heads of Muslims, and every Muslim who adheres to Islam in

9  this country and in the Muslim world is Hamas.  He is Hamas.

10  He is Hamas, why?  Because the hearts were attached to the

11  only God, the conqueror, and is reiterating every morning and

12  evening.  'We are the ones who pledge allegiance to Mohamed.

13  We will stay on the path of jihad forever.'  O rulers of my

14  country, if you are being pressured by America the oppressor,

15  the symbol of arrogance, but Hamas, the beloved of the

16  Merciful, is pressuring the Jews by the strength of God.

17  Firstly, the first lesson:  The withdrawal of the alleged

18  Israel from Gaza and Jericho, a bilateral withdrawal, came

19  after two operations, the operation of Al-Afula at the hands

20  of Hamas and Mohamedan hero, Raed Zakarnah, and Al-Khedira

21  operation at the hands of the Godly Mohamadan hero, Ammar

22  Amarnah, the first is from Qabatia and is second is from

23  Ya'bad.  These two operations are surrounding Tel Aviv until

24  the last operation came before yesterday in the heart of Tel

25  Aviv."

1    Q.    I think you skipped a word there?

2    A.    I am sorry.  Which one?

3    Q.    Just start, resume right there.  Before you resume

4    reading, the term operations, have you seen that term used by

5    Hamas and then looking at the evidence in this case?

6    A.    Yes, I have.

7    Q.    What does the term operation refer to in your examination

8    of the evidence?

9    A.    Terrorist attack.

10   Q.    All right.  If you would resume reading at "these."

11   A.    "These two operations are surrounding Tel Aviv until the

12   last operation came day before yesterday in the heart of Tel

13   Aviv.  I was hoping for my beloved brothers to see the

14   American and the European television how they exhibited the

15   blood and the bodies of the Jews as they scattered.  I was

16   hoping while they see the weeping males and females, God has

17   dedicated the television devices in America and in Europe to

18   say every five minutes no less than 500 times Hamas, Hamas the

19   Islamic Resistance Movement."

20   Q.    And if you would, turn to page 11 of the transcript and

21   beginning with, "O God, grant victory."  Just read that one

22   sentence.

23   A.    "O God, grant victory to your servants and beloved Hamas

24   and those who stand by Hamas, sympathize with Hamas, and who

25   supported Hamas."

1   Q.   Thank you.  That is all I need you to read.

2   A.   Yes, sir.

3   Q.   And this individual is No. 7 on the overseas speakers

4   list?

5   A.   Yes, he is, sir.

6   Q.   One last thing in this area of speakers, Agent Miranda.

7   You have testified about Mahmoud Zahar shown in the middle row

8   far right.

9   A.   Yes, I have.

10  Q.   Extensively in this case?

11  A.   Yes, I have, sir.

12  Q.   And he is No. 41 on the speakers list.  Is that correct?

13  A.   That is correct, sir.

14  Q.   Did you find anything in your examination of the evidence

15  indicating the announcements of any kind of speech by Mahmoud

16  Zahar?

17  A.   Yes, I did.

18  Q.   Let me direct your attention to what has been admitted as

19  El-Mezain Wiretap No. 1.  And that would be the series of

20  faxes intercepted from the fax machine at Mohammad El-Mezain's

21  house.

22       MR. JACKS:  And Mr. Lewis, if you could display page

23  180 of that exhibit, please.

24  May I approach the witness, Your Honor?

25       THE COURT:  Yes.

1    Q.    (BY MR. JACKS)  Agent Miranda, I am going to show you a

2    copy of three pages from the exhibit El-Mezain Wiretap No. 1,

3    pages 180, 181, and 182, which just appeared on the screen.

4    Is that one of the documents or one of the items of evidence

5    that you looked at in connection with your analysis of

6    speakers and who is on the speakers list and who may have been

7    advertised or promoted?

8    A.    Yes, sir.

9            MR. JACKS:  And the first page of the exhibit

10   there -- If you would, Jim, just go through the whole exhibit,

11   please.  And I think there is one more page.  So there is two

12   pages in Arabic and then one page --

13   Q.    (BY MR. JACKS)  And this particular last page bears the

14   name of what organization at the top.

15   A.    The IAP, Islamic Association for Palestine.

16   Q.    And obviously that page 3 is in Arabic.

17           MR. JACKS:  If you would go back to page 2.

18   Q.    (BY MR. JACKS)  And page 1, the first page of the exhibit

19   shown on the screen, that was as it was found.  Is that

20   correct?

21   A.    Right, sir.

22   Q.    It was in English?

23   A.    Yes.

24   Q.    Okay.  And what does it discuss or relate to?

25   A.    It relates to a telephone conference call for September

1   16th, 1994.

2   Q.   And what is the topic to be?

3   A.   The peace process and the Palestine National Authority.

4   Q.   Now, the peace process, what have we heard about what

5   event happened that would coincide with this reference to the

6   peace process?

7   A.   This is the Oslo Accords.

8   Q.   And this particular conference call is advertised to be

9   occurring on September 16th, 1994.  So in relation to the Oslo

10  Accords, what is the time difference as far as when the Oslo

11  Accords were announced?

12  A.   Pretty contemporaneous.

13  Q.   The Oslo Accords were in '93.  Correct?

14  A.   Oh, I am sorry.  Yes.  A year off, same month roughly.

15  Q.   And it talks about the Palestine National Authority.

16  What was the Palestine National Authority as a result of the

17  Oslo Accords?

18  A.   Well, it was -- Are you asking group-wise?

19  Q.   No.  What was it supposed to be?

20  A.   It was supposed to be the governing body.

21  Q.   And who is the speaker that they are promoting?

22  A.   That is the Hamas leader Mahmoud Zahar.

23  Q.   Okay.  Agent Miranda, I want to change focus again and

24  ask you whether or not when you worked on this investigation,

25  did you look at whether or not there were any family

1   relationships between the Defendants and members of Hamas?

2   A.   Yes, I did.

3   Q.   And were there any that you found?

4   A.   Yes, there are several.

5   Q.   Let me ask you just to go through the Defendants and the

6   evidence that you found with regard to.  I believe Agent Burns

7   testified about an interview of the Defendant Mufid

8   Abdulqader.  Do you recall that?

9   A.   I do.

10  Q.   And were you one of the agents that sat in on that

11  interview?

12  A.   I was.

13  Q.   And I believe the testimony was that that took place in

14  his lawyer's office, although he was not represented by Ms.

15  Cadeddu at that time.

16  A.   That is correct.

17  Q.   During the course of that interview, did you ever have

18  the occasion, you or the other agents that were participating

19  in this interview, did you have the opportunity to question or

20  ask Mufid Abdulqader about his family and to describe his

21  family and list his family and his siblings?

22  A.   Yes, we did.

23  Q.   And did he start to do that?

24  A.   Yes, he did.

25  Q.   And did he name indicate whether he had brothers?

A.   Yes.

Q.   Did he indicate whether he had sisters?

A.   Yes.

Q.   Did he name -- In the course of doing that, did he name Khalid Mishal as his brother?

A.   Eventually.

Q.   Was that -- Did he volunteer that or did -- Was he -- Did you have to specifically ask him about that?

A.   No, we asked about his family.  He went through quite a few family members, and then he stopped as if he was done and we said, "What about Khalid Mishal?"  And at that point he became uncomfortable, but eventually said yes.

Q.   All right.  And what did he say about how he was related to Khalid Mishal?

A.   It was his half brother.

Q.   And what is your understanding in terms of do they share the same father?

A.   The same father.  That is right.

Q.   Different mothers?

A.   Correct.

Q.   Did you find out in that interview from Mufid Abdulqader if there were other family ties that he had or his family had with other individuals that have been testified about in this case?

A.   Yes.

```
 1   Q.    And let me ask you specifically did Mohammed Siam's name,

 2   this individual in the middle row far left that we have heard

 3   about, did his name come up?

 4   A.    Yes.

 5   Q.    And what relation, if any, was shared between Mufid

 6   Abdulqader's family and Mohammed Siam's family?

 7   A.    The Mishals have a sister who is married to one of the

 8   sons of Mohammed Siam.

 9   Q.    And do you recall the name of the sister, the first name?

10   A.    I believe it is Mufida.

11   Q.    And I am not going to hold you to this, but M-U-F-I-D-A?

12   A.    Yes, that is how I would spell it.

13   Q.    You said that she is Mufid Abdulqader's sister.  Is that

14   right?

15   A.    Yes.

16   Q.    And who is she married to?  Do you know his name?

17   A.    It is Mohammed or Mahmoud, one of the two.  I forget.

18   Q.    All right.  And that is a son of Mohammed Siam?

19   A.    Yes, sir.

20   Q.    And did he shed any light on whether or not Mohammed Siam

21   had any other family in the Dallas area?

22   A.    Yes, he did.

23   Q.    And what did Mufid Abdulqader say about that?

24   A.    That Mohammed Siam has a daughter named Raida, R-A-I-D-A,

25   or D-I-A maybe.
```

Q.   All right.  And that she lives here in the Dallas area,

or did at the time?

A.   She did at the time, or maybe a little bit earlier than

the interview.

Q.   And Mohammed Siam, this man's daughter, what is her

family arrangement or situation?  Is she married, according to

Mr. Abdulqader?

A.   Yes.  She is married to Islam Siam.

Q.   And the same last name, but the same name as -- Not a

part of that family, or do you know?

A.   It could be part of the same family.  Same last name,

though, yes.

Q.   And Islam Siam, did he have any connection to any

organization or Defendants in this case?

A.   Yes.  Islam Siam worked for a period of time at the Holy

Land Foundation, and also for the InfoCom predecessor company

known as ICC.

Q.   All right.  Did Mufid Abdulqader ever indicate whether he

had had any meeting in Dallas with Mohammed Siam, or ever met

him in Dallas?

A.   Yes.  I believe he talked about a meeting.

Q.   And what was going on or what did he say about the time

when he met Mohammed Siam in Dallas?

A.   I think he said that -- It has been a while since I have

reviewed the interview, but I think he said that Mohammed Siam

1    came to visit Raida.

2    Q.    His daughter?

3    A.    Right.

4    Q.    And did Mufid Abdulqader meet with him or see him on that

5    event?

6    A.    Yes, my understanding he did.

7    Q.    All right.  Did you -- After talking about his

8    relationship with his half brother, did you have any questions

9    or ask him about any time that he might have seen his half

10   brother in the United States?

11   A.    Yes, we talked about that.

12   Q.    And did you ask him about a specific time or event?

13   A.    Yes.  I asked about a conference that took place in

14   Oklahoma City in 1992 in which Khalid Mishal was one of the

15   keynote speakers at an event that included HLF fundraising.

16   Q.    All right.  And what type of a conference, what

17   organization was the sponsor or host of that conference?

18   A.    I believe it was a MAYA conference.

19   Q.    And I know we have heard reference to MAYA, but what does

20   that acronym stand for, as you recall?

21   A.    Muslim Arab Youth Association.

22   Q.    All right.  And did you ask Mufid Abdulqader about that

23   specific MAYA conference in 1992 in Oklahoma City?

24   A.    Yes.

25   Q.    And did you ask him whether he saw his brother on that

1    occasion?

2    A.    Yes.  He said actually his brother stayed with him at his

3    house in Oklahoma City.

4    Q.    So he was living in Oklahoma City at that time?  Mufid

5    Abdulqader was living in Oklahoma City at that time?

6    A.    Correct.

7    Q.    Did you ask him about the conference and whether or not

8    he attended and whether or not his brother attended?

9    A.    Yes.

10   Q.    And what did he say about that?

11   A.    As I recall, they both attended, but he didn't know what

12   Khalid Mishal was doing there.

13   Q.    Did not know what Khalid Mishal was doing where?

14   A.    At the conference.

15   Q.    All right.  When you were doing this interview, did you

16   have evidence at the time that Khalid Mishal was one of the

17   main speakers at that conference?

18   A.    Yes.  I was aware and had reviewed a video of the MAYA

19   conference showing Khalid Mishal as one of the keynote

20   speakers, and Mufid Abdulqader was there present with the band

21   as -- In addition to several of the HLF Defendants,

22   specifically Shukri Baker and Mohammad El-Mezain come to mind,

23   raising funds on behalf of the HLF.

24   Q.    I want to turn to the Defendant Mohammad El-Mezain.

25            MR. DRATEL:  Your Honor, may we approach?

THE COURT:  Come on up.

(The following was had outside the hearing of the
jury.)

MR. DRATEL:  There is a demonstrative that wasn't on
the list for Agent Miranda, but I think this is where we are
going because I sort of recognize it.  But there is a
reference to a cousin of Mr. El-Mezain's.  It is from the 302.
It is not his 302.  He wasn't there.  So I don't know if he is
going to try to get it in through him, but it is total
hearsay.  So there is no other information he would have on
this person.

MR. JACKS:  Well, I think it is in evidence through
the testimony of Agent Burns.

MR. DRATEL:  No, she didn't testify at all about his
302.

MR. JACKS:  I would have to go back and check.  But
there is a reference in his deposition, he said that he is a
cousin of Marzook.

MR. DRATEL:  It is Marzook.  I am talking about
Hamdan.

MR. JACKS:  If you would let me get to where I am
going.

MR. DRATEL:  It is another person Hamdan.  There is
another cousin they are trying to put in through this
demonstrative.  There is no evidence about this person.  It is

1    all hearsay.

2          MR. JACKS:  We can tie it up, Your Honor, through

3    Agent Burns.  Mohammad El-Mezain admitted in the interview

4    with Agent Burns that he was related to this Ahmed Hamdan I

5    believe is his first name, and he was one of the deportees in

6    1992.  I thought that Agent Burns had testified about that.

7          THE COURT:  I don't remember.  She may have.  I just

8    don't remember.

9          MR. DRATEL:  I remember by the absence.

10          MR. JACKS:  I can check on that.  But I won't go

11    into that right now.  I don't have any intention to go into

12    this chart until after lunch.

13          MS. DUNCAN:  Your Honor, can I make a request?  We

14    have several exhibits now that we haven't been given notice

15    that were going to come up.  If we can get a complete list.  I

16    know we haven't looked at Demonstrative No. 6 on behalf of Mr.

17    Abu Baker.

18          THE COURT:  If you will give that over the lunch

19    hour.

20          MR. DRATEL:  I would just object to anything subject

21    to connection for a witness who is already testified.  She is

22    supposed to come back for a specific purpose, so I would just

23    object to that.

24          THE COURT:  I will let you connect it up if you need

25    to connect it up, but we will see what you have there.

1    MR. DRATEL:  I may have 106 issues on that as well

2    as the 302 on cross, but I will do that on cross with the

3    agent.

4        You know, it puts me in an awkward spot.  I would like to

5    deal with it now, and I don't want to wait two weeks for Agent

6    Burns.  I want to deal with it now.  So if he is going to put

7    in something based on something that is hearsay for him

8    because of a 302 he read, if it is in the 302, I will just get

9    all the rest of it.  It is probably a one question and answer.

10       MR. JACKS:  I am not sure what he wants to do.

11       MR. DRATEL:  It depends on what he does on direct.

12   If I see what happens on direct, then I will be able to --

13       MR. JACKS:  If the Court is going to allow me to

14   have Agent Miranda make reference to the fact that Mr.

15   El-Mezain admitted in his interview to Agent Burns that he was

16   related to this Hamdan individual, and then have Agent Burns

17   confirm that when she comes back, if that is --

18       THE COURT:  Then he wants to get into his 106 on the

19   302 right now with him.  And I guess we don't know what that

20   is going to be, so we have to deal with that then.  But I

21   think that would be appropriate.

22       (The following was had in the presence and hearing

23        of the jury.)

24   Q.   (BY MR. JACKS)  Agent Miranda, turning to the Defendant

25   Mohammad El-Mezain, you reviewed the deposition that he gave

1    that is in evidence and that was taken in connection with a

2    lawsuit filed against the Holy Land Foundation in Chicago, I

3    believe.  Correct?

4    A.    Yes, I have.

5    Q.    And in that interview, just to focus your answer, did he

6    acknowledge that he is related to Mousa Abu Marzook?

7    A.    He did.

8    Q.    And did he acknowledge that they were cousins?

9    A.    Yes.

10    Q.    Were you also aware that in his interview he was

11    interviewed by Agent Burns?  Correct?

12    A.    Correct.

13    Q.    Were you a participant in the interview?

14    A.    I think I was a participant in one of the interviews.

15    Q.    Do you recall, were you -- Did he make a statement to you

16    regarding his relationship to anyone that was a member of

17    Hamas during that interview?

18    A.    I would have to review the 302.  I believe the answer is

19    yes, but I would have to look at the particular 302 to make

20    certain.

21    Q.    All right.  Regardless, did he admit to either yourself

22    or Agent Burns during an interview that he was related to an

23    individual named Ahmed Hamdan?

24    A.    Yes.

25    Q.    And did he indicate what -- In terms of Ahmed Hamdan if

1　he had ever been associated with Hamas?

2　A.　Yes.　I recall that he said he was associated with Hamas,

3　that Hamdan was.

4　Q.　And how did he describe him as far as anything that had

5　happened to Ahmed Hamdan to show his association?

6　A.　He was one of, as I recall, one of the deportees, Hamas

7　deportees deported to southern Lebanon, Marj az-Zuhour, in

8　late 1992 approximately.

9　Q.　The name Marj al-Zuhour, is that an area in southern

10　Lebanon?

11　A.　Yes, it is an area in southern Lebanon.

12　Q.　Just across the border from northern Israel?

13　A.　Yes.

14　Q.　You said this deportation of Hamas individuals happened

15　in late 1992?

16　A.　Yes.

17　Q.　With regard to the Defendant Ghassan Elashi, I believe

18　you already testified as to his family relationship in this

19　case.　What relationship does he have, for example, with Mousa

20　Abu Marzook?

21　A.　Ghassan Elashi is first cousins with Nadia Elashi, and

22　Nadia Elashi is the wife of Hamas leader Mousa Abu Marzook.

23　Q.　With regard to the individual Akram Mishal that was one

24　of the Holy Land Foundation officers or employees, is he

25　related to anyone?

```
1    A.    Yes.  Akram Mishal is a cousin of both Mufid Abdulqader

2    and Khalid Mishal.

3               THE COURT:  Are you at a good stopping point?

4               MR. JACKS:  Yes, sir.

5               THE COURT:  Let's take the lunch break.  Be back at

6    1:45.

7               (Whereupon, the jury left the courtroom.)

8               THE COURT:  Be back at 1:45.  We will be in recess.

9                        (Lunch recess.)

10               THE COURT:  Mr. Jacks?

11               MR. JACKS:  Thank you, Your Honor.

12   Q.   (BY MR. JACKS)  Agent Miranda, before lunch I was asking

13   you about family or familial relationships between the

14   Defendants and individuals identified as members of Hamas.

15   You had indicated or you discussed Mohammad El-Mezain's

16   interview, and you believe that you had sat in on one of the

17   interviews in which he was interviewed by agents of the FBI.

18   Did you have an opportunity to check your recollection on

19   that?

20   A.   Yeah.  There was two interviews.  I thought I was at one.

21   I was mistaken.  I was not at one.

22   Q.   Was there another interview that you did of someone else

23   in this case in San Diego around that same time?

24   A.   Yes.

25   Q.   Okay.  The interviews that were done by the FBI of
```

1  Mohammad El-Mezain, were those done in San Diego, California?

2  A.   Yes.

3  Q.   You testified about the Defendant Shukri Abu Baker and

4  his brother Jamal Abu Baker who has been identified as a Hamas

5  representative in the Sudan and now Yemen.  Is that correct?

6  A.   That is correct, sir.

7  Q.   And you said that there were some intercepted

8  conversations that you looked at that shed light on that

9  aspect of your investigation.  Is that correct?

10  A.   Yes, sir.

11         MR. JACKS:  Your Honor, at this time the Government

12  would request permission to play Baker Wiretap No. 25 and

13  certain excerpts from that exhibit.

14         THE COURT:  Yes, sir.  You may do so.

15         MS. HOLLANDER:  Your Honor, may I just inquire?  The

16  whole call is in evidence.  Is that correct?

17         THE COURT:  Yes, No. 25 is in evidence.

18         MR. JACKS:  I believe it is excerpts, Your Honor,

19  that we are offering.

20         THE COURT:  She is asking whether the whole call was

21  in evidence.  Is that what you were asking, Ms. Hollander?

22         MS. HOLLANDER:  Yes.  The whole call was moved into

23  evidence.

24         MR. JACKS:  Actually I believe it is just the

25  excerpts we have chosen.

```
 1              MS. HOLLANDER:  The whole call is in.

 2              MR. JACKS:  All right.  We are just playing

 3    segments, Your Honor.

 4              THE COURT:  All right.

 5              (Whereupon, excerpts of Baker Wiretap No. 25 were

 6              played, while questions were propounded.)

 7    Q.   (BY MR. JACKS)  Agent Miranda, the speakers in this

 8    particular telephone call, how are they identified in the

 9    transcript?

10    A.   SH is the Defendant Shukri Abu Baker and JA is the Hamas

11    leader Jamal Abu Baker.

12    Q.   The brother of Shukri Abu Baker?

13    A.   Right.

14    Q.   All right.  Agent Miranda, in the conversation there does

15    Shukri Abu Baker ask his brother, "What is the last name you

16    used?"

17    A.   Yes.

18    Q.   Have you ever seen Jamal Abu Baker use another name?

19    A.   Yes.

20    Q.   What other name?

21    A.   Jamal Issa, I-S-S-A.

22    Q.   Agent Miranda, what were the Defendant Shukri Abu Baker

23    and his brother talking about, generally?

24    A.   Shukri's brother wanted to run a program over his

25    computer so he could speak over the computer, make long
```

1    distance phone calls.

2    Q.    Are you familiar with software called VOIP or voice over

3    internet protocol?

4    A.    I have heard of it, yes.

5    Q.    Do you know what that program is supposed to allow you to

6    do?

7    A.    Use your computer to make long distance phone calls.

8    Q.    And with regard to the payment, what was the discussion

9    about the payment that you observed?

10   A.    Jamal Abu Baker was asking his brother Shukri the

11   Defendant to put some money into his, Jamal's, account so he

12   could use this program.

13   Q.    And just to clarify something, during this call there was

14   reference to Sudan, and you indicated that this was one of the

15   calls that showed you that there were calls between the

16   Defendant Abu Baker and his brother in Sudan.  Where is Sudan,

17   just for the benefit of the jury?

18   A.    It is a country south of Egypt in Africa.

19   Q.    And on the eastern side of Africa?

20   A.    Yes.

21   Q.    Okay.  Were there other conversations in which Shukri Abu

22   Baker and his brother Jamal Abu Baker were intercepted?

23   A.    Yes.

24   Q.    Agent Miranda, is there an echo that you can hear in this

25   call?  Sometimes the speaker's voice is repeated?  You are

1    picking that up?

2    A.   Yes.

3    Q.   There was a reference, I believe it has already passed

4    off the screen, to the locusts or locust.  Is that correct?

5    A.   Yes.

6    Q.   And I believe Mr. Shafik translated locust -- on his

7    direct examination as to what the Arabic word is that

8    translates to locust.  Do you recall what that was?

9         MS. HOLLANDER:  Objection.  I don't believe there

10   was any such -- Was there?  Sorry.  My mistake.

11   Q.   (BY MR. JACKS)  What is the translation, the word in

12   Arabic that translates to locust?

13   A.   Jarada.

14   Q.   Can you spell that as near as you can?

15   A.   J-A-R-A-D-A.

16   Q.   And is there an individual named Jarada who showed up in

17   the investigation?

18   A.   Munir Jarada was the Hamas leader in Sudan immediately

19   prior to Jamal Issa or Jamal Baker becoming the Hamas leader

20   in Sudan.

21   Q.   And when you saw the reference to locust, does that

22   coincide with Munir Jarada's last name?

23   A.   Yes.  That is precisely what they are talking about here.

24   Q.   I want to direct your attention now to -- By the way,

25   Agent Miranda, I believe the evidence shows that that call was

1    January 30th of 2000.  Is that correct?

2    A.    That sounds correct, sir.

3    Q.    All right.

4            MR. JACKS:  At this time we request permission to

5    play the first segment of Government's Exhibit Baker Wiretap

6    No. 26.  And I believe the transcript that has been admitted

7    shows that it took place on October 13th, 1997.  So if we

8    could play that first segment, please.

9            (Whereupon, Segment 1 of Baker Wiretap No. 26 was

10           played in open court.)

11   Q.    (BY MR. JACKS)  Agent Miranda, in that portion of the

12   call that was just played, who was Shukri Abu Baker pretending

13   to be?

14   A.    A journalist.

15   Q.    All right.  Did you see the reference where he asks --

16   Who was asking whom, "Do your children speak Sudanese yet?"

17   A.    The Defendant Shukri Abu Baker is asking his brother

18   Jamal Abu Baker if his children speak Sudanese.

19   Q.    "I saw this guy Abu Khalid."  Who in this case uses that

20   alias name or Abu name?

21   A.    That is the Defendant Hamas leader Mahmoud Zahar that is

22   on the chart.

23   Q.    The man in the middle row here on the far right on

24   Demonstrative No. 17?

25   A.    That is right.

1    Q.    Okay.  And who is speaking behind Shukri's back?

2    A.    Mahmoud Zahar the Hamas leader.

3    Q.    All right.  Now, this call was in I believe the latter

4    part of 1999.  Excuse me October of 1997, I believe is what

5    the exhibit indicates.  Did you see the reference where he

6    says, "Did you say anything to the son of your homeland?"  And

7    then Jamal Abu Baker says, "By God, he had called me before,

8    ten hours before he got sick."  Do you see that on the screen?

9    A.    I do, sir.

10   Q.    Was there -- Immediately prior to October of 1997, was

11   there anything that happened to anyone that these individuals

12   would know that would coincide or match up with the reference

13   to getting sick?

14   A.    Yes.  Coinciding with this phone call there was the

15   assassination attempt on the Hamas Political Bureau Chief

16   Khalid Mishal on the top of our chart there.

17   Q.    The individual on the left.  Is that correct?

18   A.    Yes.

19   Q.    And where was this assassination attempt?  Where had it

20   happened?

21   A.    In Amman, Jordan.

22   Q.    And in -- What method was used to try to kill him?

23   A.    There was a poison of some sort that was injected into

24   Khalid Mishal's ear.

25   Q.    And who was held responsible -- Who was responsible for

1    that attempt?

2    A.    The Israelis.

3    Q.    And the reference to "the son of your homeland," what

4    does that indicate or who -- would that be consistent with

5    referring to Khalid Mishal?

6    A.    Right.

7    Q.    So Jamal Abu Baker says who had called him about ten

8    hours before he got sick?

9    A.    That would be Khalid Mishal had called Jamal Abu Baker.

10   Q.    The reference or the quotes there, "I told him, 'No, man,

11   your status is bigger than that.'  The world would -- the

12   world doesn't measure up to you, man.  They will host you and

13   give you stuff.'"  Who is Jamal Abu Baker apparently referring

14   to?

15   A.    Khalid Mishal.

16            MS. HOLLANDER:  Objection; speculation, Your Honor.

17            THE COURT:  Overruled.  He may testify to his

18   understanding.

19            THE WITNESS:  I understand that to be Khalid Mishal.

20   Q.    The reference there, "This was at night," this is Jamal

21   Abu Baker speaking this was at night.  "The next morning

22   malaria struck."  And is that consistent with the events in

23   which Khalid Mishal, the attempt was made to poison him?

24   A.    Yes, that is what I understand.

25   Q.    Do you see where Mr. Abu Baker says, "No.  We spoke with

1    his father and stuff and comforted them."  The reference to

2    his father, did you uncover evidence or see evidence in which

3    Abu Baker, Shukri Abu Baker contacted Khalid Mishal's father?

4    A.    Yes.    That was another piece of the evidence that I used

5    in determining that they were speaking about Khalid Mishal.

6    There was a phone call in which the Defendant Shukri Abu Baker

7    called the father of Khalid Mishal in Jordan and they spoke

8    about what happened.

9             MR. JACKS:  Play the next segment, please.

10   Q.    (BY MR. JACKS)  This is the same call, Agent Miranda.

11            (Whereupon, Segment 2 of Baker Wiretap No. 26 was played,

12            while questions were propounded.)

13   Q.    (BY MR. JACKS)  Agent Miranda, is Khartoum the capital of

14   Sudan?

15   A.    Yes.

16   Q.    (BY MR. JACKS)  Was there another call between the

17   Defendant Shukri Abu Baker and his brother Jamal Abu Baker?

18   A.    Yes, sir.

19   Q.    And was that call also intercepted?

20   A.    Yes.

21            MR. JACKS:  Judge, we move to play at this time what

22   has been admitted as Baker Wiretap No. 27.

23            THE COURT:  You may do so.

24            (Whereupon, Baker Wiretap No. 27 was played, while

25            questions were propounded.)

1    Q.    (BY MR. JACKS)   The reference where Shukri Abu Baker

2    says, "They are fine.   We sent them to Ramzi's," is there a

3    Ramzi that you know that is related to Shukri Abu Baker?

4    A.    Yes.   Ramzi Abu Baker is the brother of the Defendant

5    Shukri Abu Baker and Jamal Abu Baker.

6    Q.    And where does he reside?

7    A.    Here in Texas.

8    Q.    All right.   Do you see a reference where it says, "It was

9    about a 15-hour drive"?

10   A.    Right.

11   Q.    Has Ramzi Abu Baker ever lived outside of Texas that was

12   covered during this investigation?

13   A.    He previously lived in Denver.

14   Q.    You see the reference where Jamal Abu Baker is saying, "I

15   wanted to consult you regarding your work with Um Haitham."

16   The name Haitham has appeared throughout this case.   Is that

17   correct?

18   A.    Yes, sir.

19   Q.    And who does that refer to?

20   A.    It can refer to Haitham Maghawri, an HLF employee.

21   Q.    Do you know what nationality he is?

22   A.    Lebanese.

23   Q.    What is Um, what is that a reference to?

24   A.    Mother of.

25   Q.    So that reference could be interpreted as mother of

1    Haitham?

2    A.    Could be.

3    Q.    All right.  And you said he is from what country?

4    A.    Lebanon.

5    Q.    And do you see the reference where Jamal Abu Baker is

6    saying that "You open a regional office and appoint an

7    employee even if you have to send him from your end"?  What

8    business was Shukri Abu Baker in at the time of this call?

9    A.    The HLF.

10   Q.    And did it have other offices or what could be considered

11   regional offices during the time of its existence?

12   A.    It had some overseas offices and it also had some

13   regional offices in the United States.

14   Q.    As far as overseas offices, where did they have overseas

15   offices, that you recall?

16   A.    Gaza and the West Bank.

17   Q.    Do you see the statement by Jamal Abu Baker where he

18   says, "And it looks like that there are whispers that they can

19   possibly devour"?

20   A.    Right.

21   Q.    And then it is followed, he makes the statement, "So

22   don't fool these people," after which Shukri Abu Baker says,

23   "No, they, they would destroy our house and we won't work.

24   This is being considered, God's willing."

25         During this time frame in 1998, was there anything going

1  on in terms of the situation with Hamas and where its external

2  headquarters were located?

3  A.    Yes.

4  Q.    Where was Hamas' headquarters outside of the Palestinian

5  territories?

6  A.    It was in Amman, Jordan, capital of Jordan.

7  Q.    And in terms of what ultimately happened with that

8  office, was it ever -- Did anything happen to change the

9  location of the office?

10  A.    Yes.  In 1999 the Jordanians kicked out the Hamas

11  Political Bureau, including Khalid Mishal, Ibrahim Ghousheh

12  Mohamed Nizal, and there is one individual --

13  Q.    Marzook?

14  A.    Thank you.  Yes, Mousa Abu Marzook.  They were kicked out

15  of Jordan.

16  Q.    And eventually where did Hamas' external office relocate

17  to?

18  A.    To Damascus, Syria.

19  Q.    Is that where it still is?

20  A.    Yes.

21  Q.    Do you see the statement there where Jamal Abu Baker

22  says, "They said, 'by God, it is a sound idea,' and they asked

23  me to do it quickly, 'so that he can have time.'"  Any

24  indication from the evidence who he -- the they he is

25  referring to?

1          MS. HOLLANDER:  Your Honor, I object.  This is

2     really beyond speculation here.

3          THE COURT:  Overruled.  Go ahead.

4          THE WITNESS:  Based on one of the previous

5     sentences, which is partially off the screen at this time,

6     Jamal Abu Baker is saying he consulted with people that Shukri

7     Abu Baker would know, "our relatives, our cousins, and stuff."

8     I take that to mean Hamas.

9     Q.   And you see the statement there where Shukri Abu Baker

10    says, "No, God's willing, even in Amman we started the

11    procedures."

12    A.   Right.

13    Q.   And Amman is the capital of what country?

14    A.   Jordan.

15    Q.   Do you see the exchange between Jamal Abu Baker and

16    Shukri Abu Baker where he says, "Is my father -- Is my father

17    aware?"  And Shukri says, "Almost -- You know how your father

18    is."  And Jamal says, "Yes.  He told me, "Why -- why are you

19    naming the boy Issa?"  And again Issa comes from where?  What

20    is the relevance of that name?

21    A.   Jamal Abu Baker uses the Hamas name Jamal Issa.

22          MS. HOLLANDER:  May we approach?

23          THE COURT:  Yes.  Come on up.

24          (The following was had outside the hearing of the

25          jury.)

1           MS. HOLLANDER:  I have the version of Baker Wiretap

2    No. 27 that the Government sent us that is on their list and

3    it doesn't include this part.

4           MR. JACKS:  It doesn't include what?

5           MS. HOLLANDER:  What you played about Issa.  Here is

6    what is on here and there is nothing about that.  And I just

7    looked on the latest version of their exhibits and I don't see

8    anything on that.

9           MR. JACKS:  I will have to check, Your Honor.  It is

10   in the same conversation, and I am not sure why they have an

11   excerpt that doesn't have this part of it.

12          MS. HOLLANDER:  I can tell you why.  It is because

13   this is what the Government gave us.  This is one of the

14   problems, Your Honor, is they keep changing these internally.

15   They change their exhibits, but they gave us a disk just

16   before we left town, and then we asked them whether there were

17   any changes and there is a long list that says, "These are

18   changed.  These are changed.  These are changed."  I can go

19   into all of them, but I just looked at it now, the latest

20   version, and Ms. Duncan looked at it, the latest version.

21   Correct?

22          MS. DUNCAN:  Uh-huh.

23          MS. HOLLANDER:  And it is not on there.  So we have

24   to be able to rely on what the Government gives us that says

25   what they are going to introduce.

1          MR. JACKS:  Well, Your Honor, I would like to take

2     one thing at a time and I would like to check and see, you

3     know, where the problem is as far as this particular and see,

4     you know, where this transcript -- Because my belief is that

5     this transcript has been in this form for some time, and so I

6     am not sure why --

7          MS. HOLLANDER:  It has changed over time.

8          MR. JACKS:  I am not sure why the one she has got in

9     her hand doesn't have this excerpt or this portion of the

10    transcript on it.  I don't know that it was ever -- I don't

11    know the explanation.

12         THE COURT:  Can you tell how much you are missing so

13    far?

14         MS. HOLLANDER:  This particular part, which is

15    particularly important to them, they have not -- Evidently

16    they haven't put in, and I can show Mr. Jacks what I took from

17    their disk.

18         THE COURT:  We are going to do that later.  I am not

19    going to take that time to do that in front of the jury if

20    that is the only part that is missing.

21         MS. HOLLANDER:  This is a very significant part,

22    Your Honor.

23         THE COURT:  We still have to deal with it later.  I

24    am not going to deal with it while the jury is in here.

25         MR. DRATEL:  May I join Ms. Hollander's objection,

1  and just cite the case, I have the site but I will give you

2  the cite later, it is a recent Second Circuit case, *Mejia*,

3  M-E-J-I-A, *United States v. Mejia*, which very carefully talks

4  about the limits of testimony that goes from the general to

5  the specific and becoming a witness -- or this is essentially

6  summing up for the Government and giving a conclusion as an

7  expert, a law enforcement witness in particular, and I think

8  this is transgressing those bounds.

9          THE COURT:  I don't think he is talking about

10  conversations.

11          MR. DRATEL:  Things like it is his Hamas name and

12  that is why he took it, he is just expounding on that.

13          THE COURT:  He asked him about that.  You may just

14  need to lay a predicate for that rather than -- Some of it you

15  have, some you haven't.  It just comes out.  Some you may want

16  to lay a predicate.

17          MR. JACKS:  I understand.

18          (The following was had in the presence and hearing

19          of the jury.)

20          MR. JACKS:  Mr. Lewis, would you resume?

21          (Whereupon, Baker Wiretap No. 27 continued to be

22          played in open court.)

23          MS. HOLLANDER:  Your Honor, I object.  This is

24  exactly the same problem.

25          MR. JACKS:  Your Honor, we will conclude with this

1    exhibit and find out what the problem is.

2                 THE COURT:  All right.

3    Q.   (BY MR. JACKS)  Agent Miranda, in the course of -- I want

4    to --

5                 MR. JACKS:  Your Honor, before I move away from this

6    area, I would ask at this time, the Government would propose

7    to admit the demonstrative exhibit, which was the basis of a

8    bench conference earlier.

9                 THE COURT:  Of the phone calls?

10                MR. JACKS:  There is that one and then also another

11   one which has been made reference to or noticed to the

12   Defense, and we would propose -- There is one of them that

13   relates to the family relationships, and then --

14                THE COURT:  What is the number?

15                MR. JACKS:  The one with regard to the phone calls,

16   Your Honor.

17                THE COURT:  No. 16 is the phone calls.  What is the

18   number of the one with the family relations?

19                MR. JACKS:  No. 6, Your Honor.

20                THE COURT:  And you are offering both of those?

21                MR. JACKS:  Yes, as demonstrative exhibits.

22                THE COURT:  Counsel?

23                MR. DRATEL:  Previously stated objections, Your

24   Honor.

25                THE COURT:  Okay.  And those demonstrative exhibits

are admitted as demonstratives.

Q.   (BY MR. JACKS)  Agent Miranda, let me show you what has been admitted as Government's Exhibit Demonstrative No. 16.

MR. JACKS:  Would it be acceptable, Your Honor, for Agent Miranda to step down from the witness stand, if he will keep your his voice up, and explain this?

THE COURT:  Yes, sir.  Keep your voice up.

Q.   (BY MR. JACKS)  Let me ask you, Agent Miranda, this demonstrative exhibit generally, what is it intended to depict or show?

A.   It is intended to depict conversations or phone calls between some of the Defendants or the HLF offices and Hamas leaders overseas.

Q.   All right.  Let's take the top part.  What is represented by that arc going from California to Iran?

A.   This represents the five phone calls we discussed today to Imad al-Alami, who, as we pointed out with the evidence, is one of the representatives of Hamas in Tehran.

Q.   And is this the man down here in the bottom row far left in the black and white picture?  Is that right?

A.   Yes, sir.

Q.   And let's look at the second arc going from New Jersey to Syria.  What is represented by that arc?

A.   This was the telephone call on the cellular phone records from the Defendant Mohammad El-Mezain who was living in New

1    Jersey which had an HLF office and that was to Moustafa Qanuo,

2    who was the Hamas representative in Syria.

3    Q.    For clarity sake, the block saying HLF under the word New

4    Jersey is not intended to indicate or imply that the call was

5    made from the New Jersey office of the Holy Land Foundation.

6    A.    No, just to point out that there was an office there at

7    the time.    These offices -- The OLF started off in California.

8    That is why we put a box there.    Of course, it was

9    headquartered in Texas.    That is why we had a box there.    And

10   it had an office in New Jersey at that time as well.

11   Q.    And let's take the third arc, if you will, going from New

12   Jersey to Gaza and Abdel Aziz Rantisi.    That is to represent

13   what?

14   A.    These were the toll records of the Defendant Mohammad

15   El-Mezain and he had those, if I recall right, six phone calls

16   on one date and one on another, and those went to Abdel Aziz

17   Rantisi, who is a Hamas leader in Gaza on the chart there, the

18   second -- Yes.

19   Q.    And again, that was from the home phone as shown by the

20   records of Mohammad El-Mezain?

21   A.    Correct, sir.

22   Q.    Let's take the bottom arc that has an arrow going in a

23   different direction.    I am sorry.    My fault.    I am sorry.

24   What is represented by that arc going from Jordan to New

25   Jersey?

1   A.   This was a call we played for you earlier where Khalid

2   Mishal, who is represented here as the Hamas Political Bureau

3   leader, called the home phone of the Defendant Mohammad

4   El-Mezain and left a message on his answering machine saying

5   he was in Amman and that he wanted El-Mezain to come join him

6   in Turkey for a conference.

7   Q.   Let's go to the very bottom, these calls here in 1994, as

8   shown on the chart between it looks like Texas and Yemen and

9   Mohammed Siam.  What is that bottom arc representing or

10  intending to represent?

11  A.   We showed you earlier some phone records that indicated

12  that they were calling two office numbers in Yemen, and that

13  immediately after contacting those office numbers in Yemen

14  they called the home phone associated with Mohammed Siam.

15  Q.   Now, this block in the middle of this arc shows a date or

16  time period around February of '94, but in fact did the phone

17  records themselves show other calls to Yemen at different

18  times than just what is shown or represented in that block?

19  A.   Right.  This is not a complete listing of the phone calls

20  in this instance to Mohammed Siam.

21  Q.   And lastly, there is an arrow or an arc going from Sudan,

22  as you pointed out which is on -- below Egypt on the eastern

23  side of Africa, and it shows a link between Texas and Jamal

24  Abu Baker and what is represented by that arc and the dates

25  there?

1    A.    Right.  Jamal Abu Baker was at that point the Hamas

2    leader in the Sudan, and he was making some phone calls back

3    to his brother the Defendant Shukri Abu Baker.

4    Q.    Just while the map is up there, you said that Jamal Abu

5    Baker later or since these calls has relocated or located

6    somewhere else?

7    A.    Right.

8    Q.    Where is he now?

9    A.    He is in Yemen.

10   Q.    And the country of Yemen is located at the end of the

11   Saudi Arabian Peninsula just bordering the Arabian Sea and

12   slightly the Red Sea.  Is that right?

13   A.    Yes, sir.

14   Q.    All right.  I have one more demonstrative which I would

15   like you to address, Agent Miranda.  If you will just resume,

16   I will have to come back to that particular demonstrative in a

17   moment.

18        I want to ask you, Agent Miranda, if in the course of

19   your investigation you were able to find any evidence that was

20   indicative of or could be interpreted as showing any of the

21   Defendants' familiarity or knowledge with the laws of the

22   United States as they related to designated terrorists,

23   restrictions on designated terrorists, and that type of thing.

24   Was any evidence of that nature located during the course of

25   your investigation?

1   A.   Yes, sir.

2   Q.   And specifically --

3            MR. JACKS:  Just one moment, Your Honor.  I don't

4   want to refer to the wrong --

5   Q.   (BY MR. JACKS)  Are you familiar with what has been

6   referred to in this case as Executive Order No. 12947?

7   A.   Yes, sir.

8   Q.   And did you ever receive or uncover or locate a copy of

9   that exact executive order during any of the searches in this

10  case?

11  A.   I did.

12  Q.   Where was that located, that copy of Executive Order

13  12947?

14  A.   At InfoCom.

15  Q.   And was that as a result or during the search of InfoCom

16  in December of 2001?

17  A.   Yes, sir.

18  Q.   And where within the premises of InfoCom was that

19  particular exhibit located?

20  A.   In the office of the Defendant Ghassan Elashi.

21           MR. JACKS:  Judge, we move the admission of InfoCom

22  Search No. 37.

23           MR. CLINE:  No objection.

24           THE COURT:  Admitted.

25           MR. JACKS:  Would you please, Mr. Lewis, display the

1    first page of that exhibit?

2    Q.   (BY MR. JACKS)  Agent Miranda, what is shown on the

3    screen, is that a depiction of the paper document that was

4    recovered?

5    A.   Yes, sir.

6    Q.   And what is the -- What is the title of the document?

7    Where is it published, if you will?

8    A.   The Federal Register.

9    Q.   That is the vertical words there?

10   A.   Yes, sir.

11   Q.   And the date that shows for this particular document?

12   A.   January 25th, 1995.

13   Q.   And then just the caption on the right side of the page,

14   just read that into the record, if you would, please?

15   A.   "Part IX.  The President:  Executive Order 12947

16   prohibiting transactions with terrorists who threaten to

17   disrupt the Middle East peace process."

18          MR. JACKS:  Mr. Lewis, would you go to the next

19   page, please?

20   Q.   (BY MR. JACKS)  And is this the body of that particular

21   executive order?

22   A.   Yes, sir, it is.

23   Q.   And if you would, the second full paragraph where it

24   begins, "I, William J. Clinton," would you just please read

25   that paragraph?

1    A.    Yes.   "I, William J. Clinton, President of the United

2    States of America, find that grave acts of violence committed

3    by foreign terrorists that disrupt the Middle East peace

4    process constitute an unusual and extraordinary threat to the

5    national security, foreign policy, and economy of the United

6    States, and hereby declare a national emergency to deal with

7    that threat."

8    Q.    And if you would, if you would go down, do you see where

9    it says, "I hereby order," below that, below the last sentence

10   you just read?

11   A.    Yes, sir, I do.

12   Q.    Okay.   And below where it says, "I hereby order," there

13   are it looks like four subparts or three subparts i, ii and

14   "a" and "b."   Just summarize those or paraphrase them, if you

15   would, as you look at them?

16   A.    Sure.   It says, "The persons listed in the annex to this

17   order, foreign persons designated by the Secretary of State,

18   in coordination with the Secretary of the Treasury, the

19   Attorney General, because they have found have committed or

20   pose a significant risk of committing acts of violence that

21   have the purpose or effect of disrupting the Middle East peace

22   process, to assist in, sponsor, provide financial material or

23   technological support for or services in support of such acts

24   of violence, and, persons determined by the Secretary of the

25   Treasury, in coordination with the Secretary of State and the

1    Attorney General, to be owned or controlled by, or to act for

2    or on behalf of, any of the foregoing persons that are in the

3    United States that hereafter come within the United States, or

4    that hereafter come within the possession or control of the

5    United States persons are blocked."

6    Q.   Read paragraph little b there, please?

7    A.   Yes, sir.  "Any transaction or dealing by United States

8    persons, or within the United States, in property or interests

9    in property, of the persons designated in or pursuant to this

10   order is prohibited, including the making or receiving of any

11   contribution of funds, goods, or services to or for the

12   benefit of such persons."

13   Q.   And just read that one paragraph c, if you would?

14   A.   "Any transaction by any United States person, or within

15   the United States, that evades or avoids, or has the purpose

16   of evading or avoiding, or attempts to violate any of the

17   prohibitions set forth in this order, is prohibited."

18   Q.   This order was signed in January of 1995?

19   A.   Yes, sir.

20   Q.   And refresh our memory.  When was the Philadelphia

21   meeting we have heard testimony about?

22   A.   October '93.  It might have been earlier than that.

23   Yeah.

24   Q.   All right.

25            MR. JACKS:  Go to the next page, please, Mr. Lewis.

1  Q.   (BY MR. JACKS)  And this bears the signature of the

2  President and the date.  Is that correct?

3  A.   Yes, sir.

4         MR. JACKS:  And would you go to the next page, Mr.

5  Lewis?

6  Q.   (BY MR. JACKS)  And is this the annex that is referenced

7  in the body of the executive order?

8  A.   Yes, it is.

9  Q.   And in the annex are there several organizations listed?

10  A.   Yes, sir.

11  Q.   And what is the fifth organization listed there?

12  A.   The Islamic Resistance Movement, Hamas.

13  Q.   Okay.  You said you found this within the offices of

14  Ghassan Elashi at InfoCom.  Is that correct?

15  A.   That is correct, sir.

16  Q.   Were there other documents that related to legislation or

17  statutes that pertain to terrorism issues, that type of thing?

18  A.   Yes, sir, there was.

19  Q.   Directing your attention to InfoCom Search No. 38, a

20  document with background on the Omnibus Terrorism Act, do you

21  recall such a document being found?

22  A.   Yes, sir.

23  Q.   And was it also found within the offices of InfoCom?

24  A.   Yes, it was.

25  Q.   Where within the offices more specifically was it found?

```
1    A.    Ghassan Elashi's office.
2              MR. JACKS:  Judge, we move the admission of InfoCom
3    Search No. 38.
4              MR. CLINE:  No objection.
5              THE COURT:  Admitted.
6              MR. JACKS:  Mr. Lewis, would you display, please,
7    InfoCom Search No. 38?
8    Q.    (BY MR. JACKS)  Is this the document that was found
9    within that office?
10   A.    Yes, sir.
11   Q.    And at the top of the document does it indicate who is
12   disseminating this particular copy of this legislation?
13   A.    The Antidefamation League.
14   Q.    Okay.
15             MR. JACKS:  If you could scroll down, please.
16   Q.    (BY MR. JACKS)  Is there a bates number at the bottom?
17   A.    Yes, sir, there is.
18   Q.    And does this bates number indicate to you that this
19   document in the form it is in was found within the offices of
20   Ghassan Elashi at InfoCom?
21   A.    Yes.
22   Q.    How many pages --
23             MR. JACKS:  Mr. Lewis, would you just go through the
24   pages, please?  And go back to the first page, please, if you
25   don't mind.
```

1    Q.   (BY MR. JACKS)   And in terms of -- This document itself

2    does not bear a date on it.   Is that correct?

3    A.   I don't believe it does.

4    Q.   Okay.  And the date that it was found, though, was in

5    September of 2001.

6    A.   Right.  Between the 5th and the 7th.

7    Q.   Were there other items of evidence, if you will, that

8    were informative to you about the Defendants' familiarity or

9    knowledge about legislation or statutes that addressed

10   terrorism, specially designated terrorist groups, that type of

11   thing?

12   A.   Yes, sir.

13   Q.   Were there any intercepted calls that were -- That you

14   considered informative or relevant to that issue or that

15   knowledge?

16   A.   Yes, sir, there was.

17   Q.   Let me direct your attention to what has been marked as

18   Baker Wiretap No. 31, the call on April 15th of 1996.  Have

19   you reviewed that call?

20   A.   Yes, sir.

21         MR. JACKS:  Judge, we would move the admission of

22   Baker Wiretap No. 31 and 31-A.

23         MS. HOLLANDER:  No objection.

24         THE COURT:  Admitted.

25         MR. JACKS:  Would you play the first segment of

1    that, Mr. Lewis?

2            (Whereupon, Section 1 Baker Wiretap No. 31-A was

3            played, while questions were propounded.)

4    Q.  (BY MR. JACKS)  Agent Miranda, the answer "InfoCom

5    Corporation what does that indicate about where this call was

6    being placed to?

7    A.   To InfoCom.

8    Q.  And the initials GH and SH are reflective of who as the

9    participants in this call?

10    A.   GH would be the Defendant Ghassan Elashi and SH would be

11    the Defendant Shukri Abu Baker.

12    Q.  You see the reference to an individual whose initials TH

13    that says "This is America.  Speak English."  And I think we

14    just heard his voice.  Who was that person identified as?

15    A.   If I recall correctly, that is an individual named Thomas

16    Mohammed.

17    Q.  Agent Miranda, this passed by a second ago, but did you

18    see the reference to John Bryant?

19    A.   Yes, I did.

20    Q.  And there was a statement made that he was on the

21    Judiciary Committee.  Was he at the time a U.S. Congressman?

22    A.   He was a Congressman at one point, yes.

23    Q.  Did he later -- Is he also a lawyer?

24    A.   Yes.

25    Q.  Did he later represent the Holy Land Foundation?

```
1    A.    Yes.

2    Q.    Agent Miranda, the exhibit indicated that call was April

3    15th of 1996.  And there was a reference or a statement by the

4    Defendant Ghassan Elashi about Mousa Abu Marzook.  Did you

5    hear that?

6    A.    Yes, sir.

7    Q.    And was Mousa Abu Marzook still in custody in New York

8    during the time of this telephone call?

9    A.    Yes, he was.

10   Q.    And just to clear it up, he was not being held at the

11   airport, was he?

12   A.    No, he was not.

13   Q.    Okay.  He was in a detention facility there in New York?

14   A.    Yes, he was.

15   Q.    All right.  I want to change topics at this time to ask

16   you about did you -- Were you responsible or did you undertake

17   to look into investigation of, for lack of a better term, what

18   would be referred to as security or security measures that you

19   found in the evidence in this case?

20   A.    Yes.

21   Q.    And let me just ask you -- Again, you have testified that

22   you have been with the FBI for ore 11 years.  Is that correct?

23   A.    Yes, sir.

24   Q.    And you have a military career prior to that?

25   A.    Yes, sir.
```

1  Q.   In your military career -- In both of your careers have

2  you received training in regards to security, both security

3  from the standpoint of an organization of which you are a part

4  of, and then security from the standpoint of organizations or

5  individuals which may be an adversary to the organization that

6  you are a part of?

7  A.   Both.

8  Q.   All right.  Is the term operational security, is that

9  something that you were taught or was covered in your military

10 training?

11 A.   Yes, op sec.

12 Q.   Operation security, for a layperson, generally refers to

13 what?

14 A.   That is the security measures you take as an organization

15 to deny the enemy knowledge of your operations and what you

16 are up to.

17 Q.   And what areas might it touch upon or include?

18 A.   Telephone communications, maintenance of your security

19 documentation, security clearances, things of that nature.

20 Q.   And in the course of examining the evidence that was

21 found in this case, did you find specific items of evidence

22 that addressed the issue of security?

23 A.   Yes, I did.

24 Q.   Let me ask you if you are familiar with a document that

25 is identified as Elbarasse Search No. 15, specifically board

minute meetings.  Are you familiar with that document?

A.   Yes, sir.

Q.   And that document, was that one of the documents that was found in the search of Ismail Elbarasse's house in northern Virginia in August of 2004?

A.   Yes, sir.

MR. JACKS:  Judge, we would move the admission of Elbarasse Search No. 15.

MR. CLINE:  Your Honor I think it is in.  But if it is, not we have the same objection.

THE COURT:  It is in.

MR. JACKS:  Thank you, Your Honor.  I think it was admitted by Agent Burns.

Mr. Lewis, could you display the first page of Elbarasse Search No. 15?

Q.   (BY MR. JACKS)  And Agent Miranda, do you recognize this as the first page of Elbarasse Search No. 15?

A.   I do.

Q.   And the original document obviously is in Arabic. Correct?

A.   Yes, sir.

MR. JACKS:  And if you would just go through the pages.

Q.   (BY MR. JACKS)  All right.  The first page after the Arabic page, is that the English translation of the preceding

1    Arabic page?

2    A.    Yes, it is, sir.

3    Q.    And are there or is there a reference in that particular

4    page that addresses the issue of security?

5    A.    Yes, there is.

6    Q.    And first of all, just to orient the jury, if you would,

7    and I think Agent Burns has already testified about this

8    document, but just regarding the date and the title that this

9    document bears, would you read that into the record?

10   A.    Yes, sir.  There is a date that is 2/22/1991, and then

11   outgoing No. 7/91, and the title is "Relations relating to the

12   Occupied Land Fund."

13   Q.    That outgoing number, would that be or could that be

14   consistent with July of 1991?

15   A.    Yes, sir, it could be.

16   Q.    Okay.  And if you would, read the first line, second

17   line, and then that phrase there; not the numbered things, but

18   just the first three or four lines there?

19   A.    It says, "Dear brother/chairman of the board of directors

20   of the Fund.  May God keep and protect him.  God's peace,

21   mercy and blessings upon you.

22        "The following issues have been agreed on during your

23   presence and the brothers, members of the board of directors,

24   and the city of Los Angeles on 2/17/91."

25              MR. JACKS:  And Mr. Lewis, if you would zoom out,

1    please.

2    Q.   (BY MR. JACKS)  And let me introduce you to item No. 11

3    at the bottom of the page, the last entry on the bottom of

4    this page.  And if you would just read into the record what

5    item No. 11, what action item, or whatever you want to call

6    it, item No. 11 is.

7    A.   "Brother Izzat Mansour is requested to visit the office

8    of the Fund to take the necessary measures in regards to

9    maintaining security."

10   Q.   This is February of '91 and -- February 22nd of '91 is

11   when this meeting took place.  Correct?

12   A.   It looks like the meeting took place on February 17th,

13   '91, and then there was dated 2/22/91 with the other date as

14   well.

15   Q.   All right.  And in February of '91 -- And of course the

16   caption reads "Occupied Land Fund," so this document was

17   created during the time that the Holy Land Foundation was

18   still using the name Occupied Land Fund.  Is that a fair

19   statement?

20   A.   Yes, sir.

21   Q.   At the time in February of '91, where were their offices

22   located?

23   A.   California.

24   Q.   And do you recall approximately when they relocated to

25   Richardson, Texas?

1   A.   1992.

2   Q.   And so this reference to Izzat Mansour visiting the

3   office of the Fund, the Fund would be indicative or consistent

4   with the Occupied Land Fund?

5   A.   Yes, sir.

6   Q.   Has the name Izzat Mansour, did you see that in any other

7   documents to shed light on who he might have been?

8   A.   Yes, we have seen that in a couple of documents.

9   Q.   If we can go to the second page the signature line and

10  who got a copy of this, what is the translation of that?

11  A.   It says, "Your brother/head of the Central Committee,"

12  and it says "signed" in brackets.  And then courtesy copy, the

13  cc, "members of the Central Committee," courtesy copy,

14  "members of the Fund's board of directors."

15  Q.   And the term Central Committee, where else have we seen

16  that?

17  A.   Palestine Committee.

18  Q.   All right.  That is the reference to the Palestine

19  Committee?

20  A.   Yes, sir.

21  Q.   And of course the Fund's board of directors, according to

22  the evidence you have examined, who were the persons

23  most -- Were any Defendants members of the Fund's board of

24  directors?

25  A.   On the board of the directors at the time would be the

1    Defendant Shukri Abu Baker the Defendant Mohammad El-Mezain

2    and the Defendant Ghassan Elashi.

3    Q.   And let me ask you --

4         MR. JACKS:  Mr. Lewis, would you please display

5    Elbarasse Search No. 4?  And if you would, just go to the

6    first translation, please.

7    Q.   (BY MR. JACKS)  Now, Mr. Miranda, this document I believe

8    was admitted during the testimony of Special Agent Burns, and

9    do you recall having examined this document previously?

10   A.   I have seen it, but it has been a while.

11   Q.   And the first two or three pages, were they in Arabic or

12   English of the original document?

13   A.   Arabic.

14   Q.   All right.

15        MR. JACKS:  If you could, Mr. Lewis, go to the last

16   page of the exhibit.

17   Q.   (BY MR. JACKS)  And have you seen this particular chart

18   before?

19   A.   Yes, I have.

20   Q.   And with regard to the individual identified as Izzat

21   Mansour, is there a reference to an Izzat in this particular

22   document?

23   A.   Yes, there is.  If you look under the apparatus labeled

24   No. 14, "security."

25   Q.   Is that visible on the screen now?

1    A.    Yes, pretty much in the middle of those -- You can see it

2    with the No. 14 next to it.  The very first name is Izzat.

3    Q.    All right.

4              MR. JACKS:  And if you could, zoom out, Mr. Lewis.

5    Q.    (BY MR. JACKS)  The column that the word "security" and

6    the number 14 next to it, what is the heading for that column?

7    The person that created this chart, what does he call those

8    entries underneath?

9    A.    "The apparatuses."

10   Q.    And are there other places in here that -- Let me direct

11   your attention specifically to about halfway or two thirds of

12   the way down.

13             MR. JACKS:  Mr. Lewis, could you enlarge that part

14   of the page?

15   Q.    (BY MR. JACKS)  And do you see the term Izzat or the name

16   Izzat included in any of those blocks or boxes there?

17   A.    Yes.  On the line for No. 19, MAYA, if you go five over

18   you will see the name Izzat.

19   Q.    Where the curser is?

20   A.    Yes.

21   Q.    And MAYA is the organization you have previously

22   testified about?

23   A.    Yes, the Muslim Arab Youth Association.

24   Q.    All right.

25             MR. JACKS:  Let me ask Mr. Lewis if you could

1    display Elbarasse Search No. 10.

2    Q.   (BY MR. JACKS)  Do you recognize this exhibit?

3    A.   Yes, I do, sir.

4    Q.   And is this the I think either org chart, or wire chart

5    some people may have called it, for the Central Committee?

6    A.   Correct.

7    Q.   And in those blocks or boxes, at least the different

8    entities under each part of that committee?

9    A.   Correct.

10           MR. JACKS:  Would you go, please, to I believe it is

11   the last page of the exhibit, Mr. Lewis?  I am sorry.  The

12   next to the last, if you don't mind.

13   Q.   (BY MR. JACKS)  And let me ask you, Agent Miranda, is

14   there a reference to an Izzat Mansour or Izzat on this

15   particular translation of Elbarasse Search No. 10, that page?

16   A.   Yes, there is, sir.

17   Q.   If you would, start on the far right, which is the longer

18   list, and then if his name appears elsewhere move across the

19   page right to left does the name appear anywhere on the right

20   hand side?

21   A.   Yes, he is No. 23, Izzat Mansour.

22   Q.   All right.  No. 23?

23   A.   Correct, sir.

24   Q.   As you move across the page, is there any other reference

25   to Izzat in that particular document?

1    A.    Let me see.  I thought there was.  Maybe on another

2    document.

3    Q.    All right.  Regardless, with regard to Elbarasse Search

4    No. 4, he was shown as the number one person on the security

5    apparatus?

6    A.    Yes, sir.

7    Q.    Okay.

8              MR. JACKS:  Would you go to the next page of this

9    exhibit?

10   Q.    (BY MR. JACKS)  And there is no reference there on that

11   particular document to Mr. Mansour.  Correct?

12   A.    Correct.

13             MR. JACKS:  Mr. Lewis, would you display Ashqar

14   Search No. 1?

15             THE COURT:  Before we go there, let's take the

16   afternoon break.  Let's take a 20-minute break.  Be back at

17   ten till.

18             (Whereupon, the jury left the courtroom.)

19             THE COURT:  All right.  We will be in recess for 20

20   minutes.

21                         (Brief Recess.)

22             THE COURT:  Mr. Jacks?

23   Q.    (BY MR. JACKS)  Agent Miranda, we were focusing on

24   references to Izzat Mansour, and --

25             MR. JACKS:  Let me ask, Mr. Lewis, would you please

1    display Ashqar Search No. 1 on the screen?

2    Q.   (BY MR. JACKS)  Agent Miranda, this exhibit has been

3    admitted, and you have seen it several times, I am sure.

4         MR. JACKS:  Mr. Lewis, would you please go to I

5    believe it is going to be the fifth or sixth page of the

6    exhibit.  Go back to the next page, if you don't mind.

7    Q.   (BY MR. JACKS)  Agent Miranda, this has been admitted and

8    identified as a list taken or photographed in Ashqar's house.

9    And is the name of Izzat Mansour appear in this document?

10   A.   Yes.  Izzat Mansour is No. 41 on this particular

11   document.  I am sorry, No. 14.

12   Q.   Okay.  And is that his name at the very bottom?

13   A.   Yes, it is, sir.

14   Q.   And it shows a city of Ruston.  Is that right?

15   A.   Yes, sir.

16   Q.   Ruston is what state?

17   A.   Louisiana.

18   Q.   Who else have we heard in this case that lived in Ruston

19   for a period of time?

20   A.   The Hamas leader Mousa Abu Marzook.

21   Q.   And the list there, if you would -- Is there any -- Is

22   Marzook's name on this list as well?

23   A.   Yes.  Marzook's name is the first on the list.  There is

24   a similarity.

25   Q.   What is the similarity, other than they both show the

1    city of Ruston?  What else is similar between Izzat Mansour

2    and Marzook?

3    A.    They both share the same fax number, which is

4    318-255-6102.

5    Q.    All right.  With regard to this relationship between

6    Marzook and Izzat Mansour and the Occupied Land Fund/Holy Land

7    Fund, did you have occasion to prepare a demonstrative exhibit

8    that pulls the evidence together that refers to that

9    particular circumstance or situation?

10   A.    Yes, I did, sir.

11   Q.    Let me show you what is marked for identification

12   purposes as Demonstrative No. 2.

13   A.    Right.

14   Q.    And is this a demonstrative exhibit that seeks to connect

15   the exhibits or evidence that relates to this particular

16   topic?

17   A.    Yes, sir.

18   Q.    And there appears to be one exhibit on there that I

19   didn't get a chance to ask you about.  Let me just show you on

20   this demonstrative, there is an item on there, it is marked

21   for identification purposes as Marzook Bank Account No. 1, and

22   do you recognize that item as it appears on this

23   demonstrative?

24   A.    I do, sir.

25   Q.    And without describing the writing on it, what is it a

1  reproduction of?

2  A.   A check.

3  Q.   And is that a check that was acquired from the bank

4  records of Mousa Abu Marzook?

5  A.   Yes, sir.

6         MR. JACKS:  Judge, I don't remember if this was

7  admitted through Agent Burns or not, but it is Marzook Bank

8  Account No. 1.

9         THE COURT:  That is in evidence.  I show that in.

10        MR. JACKS:  Okay.  Could you please display that

11  exhibit, Mr. Lewis?  Let me ask you if you could scroll

12  through the pages.

13 Q.   (BY MR. JACKS)  Agent Miranda, does this show or identify

14 this bank statement as being a bank statement for Mousa Abu

15 Marzook in Ruston, Louisiana?

16 A.   Yes, it does, sir.

17 Q.   And the time frame for this particular statement, what is

18 the date of this statement?

19 A.   12/13/1990.

20 Q.   And just to refer back to put things in chronological

21 perspective, do you recall the exhibit that talked about the

22 Hamas delegation to Iran?

23 A.   Yes, I do.

24 Q.   And when was the first visit that was referenced in that

25 exhibit with regard to Mr. Abu Marzook and his heading up that

1  delegation?

2  A.   I believe it was September of 1990.  It may have been a

3  little bit earlier than that, but he headed up the delegation.

4  Q.   So it would predate this bank statement?

5  A.   Yes.

6       MR. JACKS:  Mr. Lewis, would you zoom out and go to

7  the next page, please?

8  Q.   (BY MR. JACKS)  And is this the item or the bit of

9  evidence that you found that is a further connection or link,

10  if you will, between Marzook and Izzat Mansour?

11  A.   Yes, sir.

12  Q.   Just describe it now for the record as far as what is

13  shown in this particular exhibit?

14  A.   Yes, sir.  This is a check from Mousa Abu Marzook with an

15  address on the face of the check from Ruston, Louisiana, dated

16  11/9/1990, and it is to the order of Izzat Mansour in the

17  amount of $3,218.  And it is signed with a signature that I

18  recognize as being of Mousa Abu Marzook.

19  Q.   All right.

20       MR. JACKS:  Mr. Lewis, go back to the preceding

21  page, if you would.

22  Q.   (BY MR. JACKS)  Does that bank statement there show the

23  check or the amount of the check being taken out of the

24  account?

25  A.   Yes, sir.

1    Q.    Up there kind of to the right side?

2    A.    Correct.

3    Q.    All right.

4          MR. JACKS:  Your Honor, the Government would move

5    for the admission of Government's Exhibit Demonstrative No. 2,

6    which pertains to this security issue for the Occupied Land

7    Fund/Holy Land Foundation.

8          MS. DUNCAN:  Your Honor, we object to this

9    demonstrative on the grounds it is misleading; it doesn't

10   fairly characterize the evidence on which it relies.

11         THE COURT:  Okay.  Overrule that objection, and

12   Government's Demonstrative No. 2 is admitted.

13         MR. JACKS:  Your Honor, may I again request the

14   Court's permission for Agent Miranda just to step down from

15   the witness stand to describe or explain Demonstrative No. 2?

16         THE COURT:  Yes, sir.

17   Q.    (BY MR. JACKS)  Agent Miranda, would you mind?

18   A.    Yes, sir.

19   Q.    In looking at Demonstrative No. 2 it bears the caption

20   "Marzook orders security for OLF (HLF)."  And what is the

21   evidence that supports the word "orders"?

22   A.    Right.  First we will work on this document.  This is the

23   document entitled "resolutions relating to the Occupied Land

24   Fund."  Point 11 was Izzat Mansour was to go to the office of

25   the Fund, which of course is the Occupied Land Fund, and take

1    the necessary measures in regards to maintaining security.

2    Q.    Just let me interrupt you.  Are these reproductions on

3    this chart, do they have their respective exhibit label

4    numbers or names next to them?

5    A.    Yes, out to the side here.

6    Q.    So the one -- The record doesn't show what you are

7    pointing to, so the one you are pointing to is identified how

8    on this particular poster?

9    A.    Elbarasse Search No. 15.

10   Q.    Okay.  Go ahead.

11   A.    So on the second page of this exhibit it said "Head of

12   the Central Committee," and then it was signed, and then it

13   said cc, courtesy copy that went to the board of directors of

14   the Occupied Land Fund.  Well, the head of the Central

15   Committee, this is a '91 letter, this is '91 organizational

16   chart for the Central Committee or the Palestine Committee.

17   And we have shown evidence that the head of the Central

18   Committee at that time was Mousa Abu Marzook, who we have

19   already discussed was greeting delegations of Hamas to Iran.

20   Q.    You are indicating on the lower left side of the poster

21   what has been identified as Elbarasse Search No. 10.  Is that

22   right?

23   A.    Yes.  I first went to the wire diagram on Elbarasse

24   Search No. 10, and you can see here it says "President Central

25   Committee," and those are the organizations underneath the

1    Central Committee to include the Occupied Land Fund.  And that

2    is by the way of diagram there is the name Mousa, which is

3    Mousa Abu Marzook, and it even says "the administrative aspect

4    chairman Mousa."  So that is his signature block at the bottom

5    of this letter telling Izzat Mansour to go do the security at

6    the HLF.

7         And as we just pointed out from Ashqar Search No. 1, this

8    is the Palestine Committee list we have already shown you that

9    Izzat Mansour was a member of the Palestine Committee in fact

10   living in the same town and sharing the same fax number as

11   Hamas leader Mousa Abu Marzook, and they even had a financial

12   relationship as well.

13   Q.   All right.  And directing your attention to Elbarasse

14   Search No. 10 as it is reproduced on this chart, is Izzat

15   Mansour shown on that chart -- I am sorry.  There is another

16   exhibit that is not depicted on this, but the apparatus chart

17   that we looked at, and is that a document that you also used,

18   even though it is not depicted on this particular poster, that

19   sheds light on this particular arrangement?

20   A.   Right.  Of course, this is saying for him to take care of

21   the security of the Occupied Land Fund.  And the document you

22   just mentioned was the one that had all the apparatuses, and

23   it had one for security, and the first individual listed for

24   security was Izzat.

25   Q.   All right.  And that was that larger chart with all the

1  boxes and the organizations down the left hand column?

2  A.   Correct.

3  Q.   Okay.  Just for clarification's purposes, the board of

4  director minutes have or contain a statement by the head of

5  the Central Committee.  Is that the terminology?

6  A.   Yes.  That is going to be on the second page of this, the

7  second page of the translation.

8  Q.   Okay.  But the original, did you look -- Was there a

9  signature on the original, and was it necessarily Marzook's

10  signature?

11  A.   No, it was not Marzook's signature.

12  Q.   All right.

13  A.   It said "head of the Central Committee," and then there

14  was a signature underneath that.

15  Q.   Okay.  Have you ever seen documents where under one

16  person's name someone signs for them?

17  A.   Yes.  I have done that myself lots of times.

18  Q.   All right.  Thank you.  You can resume the witness stand.

19       Staying in the area of security or security measures

20  -- Let me ask you this question.  In the course of your

21  participation in this investigation, did you have a chance to

22  look at evidence to see the relationship that existed between

23  the Holy Land Foundation and InfoCom and the extent and nature

24  of that relationship?

25  A.   Yes, I did, sir.

1   Q.   I believe you indicated that you were involved in the

2   search of InfoCom in September of 2001.  Is that correct?

3   A.   That is correct, sir.

4   Q.   Were you a primary agent or case agent on that portion of

5   that investigation?

6   A.   Yes, I was the primary case agent.

7   Q.   All right.  And obviously you went there on the date of

8   the search to InfoCom.  Had you been to that location prior to

9   that day, prior to September of 2001?

10  A.   Not on the interior, but I had been to the InfoCom area

11  numerous times prior to the date of the search or the days of

12  the search.

13  Q.   Did you or other agents -- First of all, let me ask you,

14  did other agents do periodic physical surveillance, just

15  watching the comings and goings?

16  A.   I and other agents, yes.

17  Q.   Okay.  What, if anything, did you observe as far as

18  activity between the Holy Land Foundation and InfoCom?

19  A.   There was a lot of foot traffic between both locations.

20  As I have mentioned before, they were directly across the

21  street, within a stone's throw of each other, and there was

22  always movement back and forth.

23  Q.   Let me ask you, are you familiar with what we have marked

24  as a Government exhibit called HLF/InfoCom Map?  Are you

25  familiar with that exhibit?

1   A.   I think I am, sir.

2   Q.   All right.  And is it an aerial photo of the location

3   where InfoCom and Holy Land Foundation were located in

4   Richardson, Texas?

5   A.   Yes, sir.  That is right.

6   Q.   And is it something that just was acquired from the

7   internet?

8   A.   Right.

9   Q.   Does InfoCom -- Excuse me.  Does Government Exhibit

10  HLF/InfoCom Map fairly and accurately portray what it attempts

11  to portray--that is, the physical relationship between the

12  offices of InfoCom and the offices of the Holy Land Foundation

13  in Richardson, Texas?

14  A.   It does.

15          MR. JACKS:  Judge, we would move the admission of

16  Holy Land Foundation/InfoCom Map.

17          MR. CLINE:  No objection.

18          THE COURT:  Admitted.

19      Would you please display that, Mr. Lewis?

20  Q.   (BY MR. JACKS)  This may be better, Agent Miranda.  Do

21  you recognize what is shown on the screen as HLF InfoCom Map

22  Government's exhibit?

23  A.   Yes, sir, I do.

24  Q.   And the heading is 630 International Parkway, Richardson,

25  Texas.  Whose address was that?

```
 1   A.   The address of InfoCom.

 2   Q.   All right.  And it has got a star in the middle of the

 3   street, but just, if you don't mind, would you kind of orient

 4   the jury -- Let me ask you questions regarding this particular

 5   location that we are looking at.  Is it east or west of

 6   Central Expressway?

 7   A.   East.

 8   Q.   And are you familiar with the east-west street known as

 9   Arapaho Road?

10   A.   Yes, I am.

11   Q.   And is Arapaho north what we are looking at or south?

12   A.   I believe it is north and then you come down

13   International Parkway, as I recall.

14   Q.   So the direction -- This direction is north.  Correct?

15   A.   Yes, sir.

16   Q.   So Arapaho would be somewhere off the map here and it is

17   an east-west street.  Correct?

18   A.   Yes, sir.

19   Q.   And this International Parkway that kind of bisects the

20   map, that is a north-south, generally, street?

21   A.   Yes, it is, sir.

22   Q.   And if you would, guide me to the location among these

23   buildings shown on this aerial map, which one of these contain

24   the offices of InfoCom?

25   A.   Do you see where the star is with the A right on the
```

1   middle of International Parkway?

2   Q.  Yes, sir.

3   A.  It is going to be to what amounts to the east.  Right.

4   Now, InfoCom did not have control of the entire building.

5   They had a portion of that building, and it was the southern

6   portion of the building.

7   Q.  All right.  Where the end of my pen is, is that where the

8   offices of InfoCom were located?

9   A.  Right.  Exactly.  There was, in fact, if you will -- You

10   will see kind of it cuts the corner there.  I guess that is

11   going to be the southwest corner where your pen is at, that

12   would be the main doorway into InfoCom.

13   Q.  All right.  And did their office space go from the west

14   side of this building to the back, the east side?  Did they

15   have that entire space?

16   A.  Yes, they did.  They just didn't control the entire

17   building.  But yes, it went from the west side all the way to

18   the east side of the building.

19   Q.  And as far as how much in a northerly direction, can you

20   tell me about where their office ended here?

21   A.  Not more than probably -- you can see a third vehicle

22   there.  Not more than there, I believe.

23   Q.  The vehicles there in front?

24   A.  Right.

25   Q.  So somewhere around there their office would have been

1  the southern end of this particular building that the pen is

2  over?

3  A.   Right.  In fact, if you look at the back of the building,

4  the east side, there is something that either looks like maybe

5  a delivery truck or some sort of vehicle possibly.

6  Q.   This object there?

7  A.   Right.  There was a loading dock back there, and the

8  loading dock was pretty much towards the northern end of the

9  extent of their building.

10 Q.   So somewhere in this area is where the loading dock was?

11 A.   Uh-huh, right.

12 Q.   And this other part of the building, that was other

13 tenants, other companies?

14 A.   Right, exactly.

15 Q.   Okay.  Now, the Holy Land Foundation offices were where

16 in relation to the InfoCom offices?

17 A.   Just across the street, diagonally across International

18 Parkway.

19 Q.   Diagonally this way or this way?

20 A.   The second way.

21 Q.   This building?

22 A.   Right.

23 Q.   And as far as their office space, was it limited in this

24 particular building?

25 A.   It was limited in that building.  I believe there was

1    other tenants again on the south side.

2    Q.    Down here?

3    A.    Yes, sir.

4    Q.    All right.  And so we are basically talking about this

5    part of this building, which would be the northeast portion of

6    this building on the west side of International Parkway would

7    be where the Holy Land Foundation offices were?

8    A.    Yes, sir.

9    Q.    And then on the east side of International Parkway the

10   southern part of this longer building would be where the

11   offices of InfoCom was.  Is that correct?

12   A.    Correct, sir.

13   Q.    Okay.  And you said that in your capacity being out

14   there, you would see foot traffic going back and forth between

15   the two?

16   A.    I would.

17   Q.    Did you, in looking at exhibits, find evidence of

18   individuals that were somehow associated or affiliated with

19   both organizations?

20   A.    Yes, I did.

21   Q.    Did you find any evidence indicating that they had

22   business transactions with one another?

23   A.    They had business transactions, yes, they did.

24   Q.     Directing your attention to the search that was

25   conducted at InfoCom in September of 2001, was that the first

1  time that you had ever been inside the premises or the offices

2  of InfoCom?

3  A.   Yes, that is correct.

4  Q.   And, if you would, I believe you have testified that

5  within the premises of InfoCom you found materials that

6  belonged to the Holy Land Foundation.  Is that correct?

7  A.   Yes, I did.

8  Q.   And what was it that led you to the conclusion that they

9  belonged to the Holy Land Foundation?

10  A.   Well, quite a few things.  First, there was -- Towards

11  the east side of the building there was a bit of a more narrow

12  section of the building that was essentially being used for

13  photography.  There were lights that you would find in any

14  studio, there was a big cardboard cut-out of the Dome of the

15  Rock, there was a cardboard cut-outs of kids, and --

16  Q.   Let me just stop you for a second.

17        MR. JACKS:  Mr. Lewis, would you mind turning on the

18  elmo again?

19  Q.   (BY MR. JACKS)  Agent Miranda, you called it a studio?

20  A.   Yeah, it was, exactly.

21  Q.   Okay.  What part -- To the extent that this photograph is

22  big enough, what part of the office were you talking about

23  where you found this studio?

24  A.   Towards the east side of the building, backside, it was a

25  narrow -- let's just describe it as a narrow triangle running

1    along the east side of the building.

2    Q.   Near the back?

3    A.   Or rectangle I should say, yeah.

4    Q.   And what led you to describe it as a studio?  What were

5    the things that you saw in there?

6    A.   Well, there were, again, some cut-outs, cut-out kids,

7    cut-out Dome of the Rock, cameras -- Not cameras, but the

8    typical lights that you would see in a photograph studio where

9    you go take a family picture or something.  And then off of

10   that was a closet big enough to walk in, probably no longer

11   than the front of the jury box here, and in that was quite a

12   few boxes to include things that were obviously on the face of

13   it Holy Land materials--Holy Land T-shirts, Holy Land coffee

14   cups, magnets for your refrigerator, that sort of thing.

15   Intermixed with all of that, there were pamphlets.  So it was

16   pretty easy to deduce that.

17   Q.   All right.  And just to refresh the jury's memory, you

18   said a photo of the Dome of the Rock.

19   A.   Uh-huh.

20   Q.   And what did it look like?  The Dome of the Rock refers

21   to what or is it part of a place that is known by another

22   name?

23   A.   Well, it is part of the noble sanctuary the Haram

24   al-Sharif in Jerusalem.  But it is the gold-domed mosque that

25   we have seen within various symbols within this case.

1    Q.   All right.

2    A.   I mentioned it is in Jerusalem, if I didn't mention that.

3    It is in the old city.

4    Q.   So it is a location, and I think you have testified about

5    this last week, that is one of the holiest sites in the

6    Islamic religion.  Correct?

7    A.   The third.

8    Q.   It is in the old city of Jerusalem?

9    A.   Yes, sir.

10   Q.   And there are at least two principal buildings within

11   that area.  Is that correct?

12   A.   Yes, sir.

13   Q.   And when you said this photo was there, is it the

14   building with the gold dome that we have seen in other

15   exhibits?

16   A.   Right.  There is a big cardboard cut-out which was

17   standing up.

18   Q.   Is it a backdrop?

19   A.   Exactly.

20   Q.   All right.  And you said there were cut-outs of kids.

21   Are those made from cardboard or posterboard or something?

22   A.   Yes, sir.

23   Q.   All right.  You have told us about the paraphernalia that

24   you saw in there.  Were there -- Was there other equipment

25   that you saw that you can tell us what it was or how it

1   appeared to be used, what type of equipment it was?

2   A.   Right.  Right off of what I described as the studio was

3   another room more to the interior of the building that had

4   lots of videotapes in it and lots of equipment that looked

5   like it was used to make videos, dub videos, mix videos.

6   Q.   Electronic equipment?

7   A.   Yes.

8   Q.   Or I guess it is electronic.

9   A.   Yes, sir.

10  Q.   And within all of this other area were there any paper

11  documents or paper records that were also located in this part

12  of InfoCom?

13  A.   Yes, there were, in that closet I described there were

14  various boxes, and Holy Land Foundation materials were within

15  those boxes.

16  Q.   And are some of those the documents that have been

17  admitted in this trial which bear the label InfoCom Search

18  whatever, 1, 10, 50, whatever?

19  A.   Right.  Either as an exhibit it will say InfoCom Search

20  or the bates label it will say SW, and that refers to the

21  InfoCom search warrant.

22  Q.   All right.  When you were looking at documents that were

23  recovered through this search, did you come across documents

24  that were indicative of a relationship between InfoCom and the

25  Holy Land Foundation transactually or a business-type

1 relationship?

2 A. Yes, I came across many.

3 Q. I want to direct your attention to what has been

4 identified as Holy Land Foundation Search, and this particular

5 document was found within the Holy Land Foundation offices.

6 Is that correct? If it bears the name Holy Land Foundation

7 search?

8 A. Yes.

9 Q. Okay. And did you find evidence that was indicative of a

10 contract between the Holy Land Foundation and InfoCom that

11 pertained to this space that you just finished telling us

12 about?

13 A. Yes, I did, sir.

14       MR. DRATEL: Your Honor, can we get a number on the

15 document? I think he said Holy Land Foundation Search.

16       MR. JACKS: No. 165. I may have stopped. I

17 apologize.

18    Judge, we would move the admission of Holy Land

19 Foundation Search No. 165.

20       MR. CLINE: No objection.

21       THE COURT: Admitted.

22 Q. (BY MR. JACKS) Agent Miranda, depicted on the screen is

23 a document, and can you tell us, is that a picture of the

24 document that has been admitted as Holy Land Foundation Search

25 No. 165?

A.   Yes, sir.  That is correct.

Q.   And the bates stamp at the bottom, the very tiny little letters that say HLDL and then it has got a series of numbers, what does that tell you about where it was found, in which premises or box materials from which premises?

A.   Holy Land Dallas is what that represents, HL being Holy Land, DL being the specific city of the search.  And the first two numbers afterwards indicate a box that it came out of, and then the number to the far right would be the number of the document within that box.

Q.   All right.

MR. JACKS:  Could you zoom out, Jim?  Thank you.

Q.   (BY MR. JACKS)  I didn't want to try to throw you a curve, but this particular document, whose letterhead is it on?

A.   InfoCom Corporation.

Q.   And does it have the address and telephone and fax numbers and that type of thing?

A.   Yes, in the upper right hand corner.

Q.   Is there a date?

A.   Yes, right under the InfoCom logo it is dated Monday July 31st, 2000.

Q.   And the heading of the first paragraph there tells us what kind of a document it is.  Is that correct?

A.   Yes, sir.  It says it is a services contract agreement.

1    Q.    Between what parties?

2    A.    The parties are the Holy Land Foundation for Relief and

3    Development and InfoCom Corporation, which is in the first

4    paragraph under agreement.

5              MR. JACKS:  Go down to the outline of services, Mr.

6    Lewis.

7    Q.    (BY MR. JACKS)  And Agent Miranda, does this part of the

8    document show what services InfoCom as the service provider is

9    going to be providing?

10   A.    Yes, sir, it does.

11   Q.    And it just specifies those there in that paragraph.  Is

12   that correct?

13   A.    Yes, sir.

14             MR. JACKS:  Could you go to the next page, please,

15   Mr. Lewis?

16   Q.    (BY MR. JACKS)  And the top of the page, does it continue

17   to list the things that InfoCom is supposed to be doing for

18   the Holy Land Foundation?

19   A.    Yes, it does, in paragraphs with kind of a main heading

20   there.

21   Q.    All right.  And does one of -- It just goes "maintenance,

22   management, local area network, consulting."  Correct?

23   A.    Yes, sir.

24             MR. JACKS:  Go to the next page, please, Mr. Lewis.

25   Q.    (BY MR. JACKS)  And the top of that page, does it have a

1  category or a paragraph for facilities?

2  A.   Yes, it does.

3  Q.   All right.  And what is represented as being provided by

4  InfoCom to the Holy Land Foundation under that part of the

5  document?

6  A.   It says, "The client"--which in this case is going to be

7  the Holy Land Foundation--"has the use of 1400 square feet of

8  InfoCom Corporation for the purpose of executing projects and

9  needs requiring technological facilities not available at

10  client location."

11  Q.   All right.  And the next sentence indicates what will

12  InfoCom provide?

13  A.   They will "supervise and offer consultation to the

14  client's information technology staff."

15  Q.   Okay.  And is there -- Then there is a part of the

16  contract that talks about compensation.  Is that correct?

17  A.   Yes, sir.

18  Q.   And what is the agreed upon compensation, according to

19  this document?

20  A.   The Holy Land was supposed to receive $6,000 per month

21  for 12 months.

22  Q.   Receive or pay?

23  A.   No, the Holy Land was to pay.  I am sorry.

24  Q.   Okay.

25          MR. JACKS:  If you would, go to the next page,

1   please.

2   Q.   (BY MR. JACKS)  And is this a continuation of that

3   agreement?

4   A.   Yes, sir.

5         MR. JACKS:  And the next page, please, Mr. Lewis.

6   Q.   (BY MR. JACKS)  And then again the agreement continues.

7         MR. JACKS:  Go to the next page.

8   Q.   (BY MR. JACKS)  And is this the signature page for the

9   agreement, Agent Miranda?

10  A.   Yes, sir, it is.

11  Q.   And who has signed for the different parties?  Who signed

12  for the Holy Land Foundation?

13  A.   The name is Haitham Maghawri.

14  Q.   Is that a name we have heard throughout this case?

15  A.   Yes, we have, sir.

16  Q.   And the signature for InfoCom?

17  A.   It is going to be Bayan Elashi.

18  Q.   And is that one of the Defendant Ghassan Elashi's

19  brothers?

20  A.   Yes, it is.

21        MR. JACKS:  Go to the next page, if you would.

22  Q.   (BY MR. JACKS)  And is this a check stub, for lack of a

23  better word a check stub, Agent Miranda?

24  A.   Yes, sir.

25  Q.   And who does it show to be the vendor or the person that

1    is being issued a check?

2    A.    InfoCom Corporation is being issued a check.

3    Q.    What amount of rent is being paid?

4    A.    The monthly rent is $1400.

5    Q.    And then there is a charge for what else?

6    A.    Design and development.

7    Q.    Okay.  And the date, please, for those two charges or

8    disbursements or whatever?

9    A.    7/3/2000 and 7/1/2000.

10            MR. JACKS:  Would you go to the next page, please,

11    Mr. Lewis?

12    Q.    (BY MR. JACKS)  Is this an invoice, Agent Miranda, from

13    InfoCom?

14    A.    Yes, I recognize this as an invoice from InfoCom.

15    Q.    To the Holy Land Foundation?

16    A.    Yes, sir.

17    Q.    And the amount of invoice as far as dollar amount?

18    A.    $3,000, I believe.  If we can go to the bottom.  Yes, it

19    is going to be $3,000, amount due.

20            MR. JACKS:  Would you go to the next page, Mr.

21    Lewis?

22    Q.    (BY MR. JACKS)  And this is a second invoice, a different

23    invoice?

24    A.    Yes.  This is for a different item.

25    Q.    What is the date on this particular invoice, either the

1    date it was issued or the date it bills for?  What dates

2    appear on this page?

3    A.   Well, the invoice date is 7/3/2000.  You can see that in

4    the box up to the right where it says "invoice," and there is

5    a due date there as well of 7/23/2000.

6    Q.   And what property or service was being charged for,

7    according to this invoice?

8    A.   You can see in the main body of the invoice towards the

9    bottom there it says, "Monthly rent, media room, July 2000,

10   (2) phone lines and PC connection for the internet."

11   Q.   And the price that is charged for that?

12   A.   $1600, it looks to be monthly.

13   Q.   All right.  Did -- The search of InfoCom, to your

14   knowledge, was the FBI aware that the Holy Land Foundation had

15   two additional phone lines across the street at InfoCom?

16   A.   No.

17   Q.   Was the FBI aware that the Holy Land Foundation had an

18   internet connection or access across the street at the

19   premises of InfoCom?

20   A.   I don't believe we were.

21   Q.   All right.  Now, is it fair to assume that -- You said

22   this search warrant at InfoCom lasted three days?

23   A.   Yes, sir.

24   Q.   So I take it that not everything in that search was

25   immediately able to be read within a day or two.  Is that

1  correct?

2  A.    No.  There was quite a few boxes and computers.

3  Q.    Okay.  So there was obviously some time that was required

4  to locate and review whatever was taken out of there.  Is that

5  correct?

6  A.    An extensive amount of time.

7  Q.    Okay.  And the closure of the Holy Land Foundation came

8  before or after the search at InfoCom?

9  A.    After.

10  Q.    About how much time after?

11  A.    Three months.

12  Q.    All right.  And the materials that were seized from the

13  Holy Land Foundation, were they available to be reviewed

14  immediately and extensively after they were seized?

15  A.    No, they were not.  By the FBI?

16  Q.    Yes.

17  A.    No.  The answer is no.

18  Q.    I want to direct your attention again back to your search

19  of the premises at InfoCom.  And within the area where you

20  said you found Holy Land Foundation records, was that area

21  close to or among these other Holy Land Foundation -- this

22  other Holy Land Foundation property that you have told us

23  about?

24  A.    Yes, it was.

25  Q.    And so the Holy Land Foundation paper records, paper

1    documents, were close in area to where the mugs and the

2    T-shirts and that type of stuff was located?

3    A.    Same area.

4    Q.    Okay.  And were those paper records in boxes?

5    A.    Yes, they were.

6    Q.    Were some of the documents within those boxes in their

7    own files?

8    A.    Yes.

9    Q.    Okay.  At some point in time after the FBI had time to

10   review that material, did you come across a document which

11   appeared to be related to or focused on security or security

12   issues?

13   A.    Yes, I did.

14   Q.    And was that document found -- Where was that document

15   found?  Was it found within the Holy Land Foundation search

16   materials or the Holy Land Foundation materials that came from

17   within InfoCom?  Which of those two?

18   A.    From within InfoCom.

19   Q.    Okay.  And was that document in its original form in

20   Arabic or in English?

21   A.    Arabic.

22   Q.    And was it eventually translated by the FBI?

23   A.    Yes, it was.

24   Q.    And I take it you have seen that document several times

25   since it was returned from translation?

1   A.   Yes, sir, I have.

2   Q.   Are you familiar, then, with the document identified as

3   InfoCom Search No. 35?

4   A.   Yes, I am.

5   Q.   And is this the document that we have been talking about?

6   A.   Yes, sir.

7        MR. JACKS:  Judge, we would move the admission of

8   InfoCom Search No. 35.

9        MR. CLINE:  We object as previously stated.

10       THE COURT:  And those are overruled, and InfoCom

11  Search No. 35 is admitted.

12  Q.   (BY MR. JACKS)  Now, Agent Miranda, I do not mean to beat

13  a dead horse, but I just want to make sure that it is clear.

14  This document was found within InfoCom.  Is that correct?

15  A.   Yes, sir.

16  Q.   But within the Holy Land Foundation boxes within InfoCom.

17  A.   Correct.

18  Q.   All right.

19       MR. JACKS:  Mr. Lewis, could you display the first

20  page of InfoCom Search No. 35?

21  Q.   (BY MR. JACKS)  And Agent Miranda, do you recognize that

22  as the first page of this document?

23  A.   Yes, I do, sir.

24  Q.   I am going to refer to it as a security document, for the

25  ease of reference.  Is that all right?

1    A.    Yes, sir.

2    Q.    All right.  First of all, this is a scanned picture of

3    that document.  Correct?

4    A.    Correct, sir.

5    Q.    And it obviously has smudges or discoloration on it.

6    What caused that?

7    A.    We attempted to fingerprint it.

8    Q.    So it was examined to determine if any fingerprints,

9    identifiable fingerprints could be raised or located on it?

10   A.    Yes, sir.

11   Q.    And were there any identifiable fingerprints located on

12   that?

13   A.    No, they couldn't determine.

14   Q.    All right.

15        MR. JACKS:  And if you would, Agent Lewis, would you

16   scroll through these pages, just the Arabic pages, if you

17   don't mind.

18   Q.    (BY MR. JACKS)  And again, Agent Miranda, Arabic is read

19   from right to left.  Correct?

20   A.    Right.

21   Q.    So the first part of a sentence or paragraph would begin

22   on the right side of the page and move across.  Correct?

23   A.    Correct.

24   Q.    The image that is shown on the screen now, is this the

25   English translation of the first page of that security

1    document?

2    A.    Yes, sir, it is.

3    Q.    And is there anything about the document, besides where

4    it was found, that leads you to believe that it was a document

5    that belonged to the Holy Land Foundation?

6    A.    The title.

7    Q.    What about the title?

8    A.    It reads "The Foundation's policies and guidelines."

9    Q.    And that is of course the heading of the document.

10   Correct?

11   A.    Yes, sir.

12   Q.    Is there a number that appears below the title?

13   A.    Yes, sir, No. 2.

14   Q.    And was that number in Arabic on the original page?

15   A.    Yes, sir.

16   Q.    So this No. 2 is not something put there by the

17   translator, other than the fact he translated something from

18   the original.  Is that correct?

19   A.    Correct.

20   Q.    All right.  I believe the original document was

21   approximately 10 or 12 pages in Arabic?

22   A.    Approximately.

23   Q.    Okay.  The English translation, can you just --

24           MR. JACKS:  Let me ask you, Mr. Lewis, if you could

25   just zoom out, please.

1   Q.   (BY MR. JACKS)  Agent Miranda, are there headings that

2   appear throughout this document?

3   A.   Yes, there are.

4   Q.   Okay.

5   A.   Headings and sub headings.

6   Q.   Okay.  Point out the two that are on this page.

7   A.   "No. 1, in meetings; A, periodical meetings."

8        MR. JACKS:  Mr. Lewis, go to the next page.

9   Q.   (BY MR. JACKS)  Headings under meetings, what are the

10  next headings that appear?

11  A.   "1-B, public activities; 1-C, courses."

12       MR. JACKS:  Go to the next page, please, Mr. Lewis.

13  Q.   (BY MR. JACKS)  Go ahead.  What is the next topic that

14  appears?

15  A.   "No. 2, documents safety."

16       MR. JACKS:  And the next page, Mr. Lewis.

17       THE WITNESS:  "No. 3, communications safety.

18  Administrative communications.  No. 1, communication between

19  levels of the apparatus and its field committees; no. 2,

20  communication between the general secretariat and work

21  committees in the apparatus; No. 3, field communication

22  between various institutions; A, mail correspondence."

23       MR. JACKS:  Go to the next page, Mr. Lewis.

24  Q.   (BY MR. JACKS)  What headings appear on this particular

25  page?

1   A.   "B, telephonic communication; C, communication via fax."

2   Q.   Continue.

3   A.   "D, communication via live (human) points.  Basic

4   security measures in communications, No. 4, safety of

5   relationships; A, relationship with the Administration."

6           MR. JACKS:  And the next page, please.

7           THE WITNESS:  "B, relationship with parties and

8   movements; C, relationship with the state and official

9   organizations, D, media and newspapers interviews; E,

10  contacting news agencies or different media outlets."

11          MR. JACKS:  And the next page, please, Mr. Lewis.

12          THE WITNESS:  "No. 5, travel and transportation

13  safety; No. 6, practical (or operational) names and

14  administrative skeletons; No. 7, safety of offices and firms."

15          MR. JACKS:  And the next page, please?

16  Q.   (BY MR. JACKS)  What are the headings -- Apparently this

17  is a continuation of the heading from the previous page.

18  A.   Yes, sir.

19          MR. JACKS:  Jim, go to the next page.

20  Q.   (BY MR. JACKS)  What is the heading for this page 11 as

21  it is labeled?

22  A.   "No. 8, safety of personal residences, work apartments,

23  cars, and possessions."

24          MR. JACKS:  Next page, please, Jim.

25          THE WITNESS:  "No. 9, money safety; No. 11, hotels

1   safety; No. 12, services and maintenance safety."

2           MR. JACKS:  Next page, please, Jim.

3   Q.   (BY MR. JACKS)  And this is a continuation of -- I

4   believe you said the previous page heading was services and

5   maintenance safety?

6   A.   Yes, sir.

7   Q.   This is a continuation of that?

8   A.   Correct.

9           MR. JACKS:  Next page, Jim.

10  Q.   (BY MR. JACKS)  What is the heading for this page?

11  A.   "Documents classification, appendix."

12          MR. JACKS:  And the next page, Jim.

13  Q.   (BY MR. JACKS)  And this is a continuation of that

14  document classification heading?

15  A.   Yes, sir.

16          MR. JACKS:  And the last page, please.

17  Q.   (BY MR. JACKS)  And does that appear to be a continuation

18  of document classification?

19  A.   Yes, sir.

20          MR. JACKS:  Go back, if you would, Mr. Lewis, to the

21  first page of the translation, which is going to be page 12.

22  Thank you.

23  Q.   (BY MR. JACKS)  All right.  Let's go back to the

24  different headings and examine this document and what it talks

25  about.

1      The heading meetings and the sub heading periodical

2   meetings, there is about 11 entries or guidelines or policies

3   typed out there.  Is that correct?  Excuse me.  No. 11, and

4   then they continue on below that gap in the page.

5           MR. JACKS:  Go to the next page, Mr. Lewis.

6   Q.   (BY MR. JACKS)  So how many guidelines or policies are

7   shown under that first heading for periodical meetings?

8   A.   Twenty-five.

9           MR. JACKS:  If you would go back to the first page.

10  Thank you.

11  Q.   (BY MR. JACKS)  Would you look at item No. 2, Agent

12  Miranda, and just read into the record?  What policy or

13  guideline is set forth in item No. 2 under periodical

14  meetings?

15  A.   Item No. 2 reads, "Agreeing on a cover for the reason of

16  the meeting, which is in harmony with the type of the

17  relationship."

18  Q.   And let me just ask you to go down to No. 13, and can you

19  read the policy or guideline that is labeled No. 13?

20  A.   Yes, sir.  No. 13 reads, "Agreeing on an upper ceiling

21  for what could be said in case of summons."

22  Q.   And those two policies, agreeing on a cover for the

23  reason for the meeting and agreeing on what can be said in

24  case of summons, did you ever find any evidence in

25  investigating this case that indicated that the Holy Land

1    Foundation or any of its officers or any of the Defendants

2    adhered to or appeared to be following these particular

3    guidelines or policies?

4    A.    Yes, I think there was a very good example of that in the

5    Philadelphia conference.

6          MR. JACKS:  Mr. Lewis, would you please go to

7    Philadelphia Meeting No. 1, and page 10, if you would?  And if

8    you would, enlarge where OM is speaking at the bottom of the

9    page, I would like you to enlarge are that.  Thank you.

10   Q.    (BY MR. JACKS)  And OM refers to who, Agent Miranda?

11   A.    Omar Ahmad.

12   Q.    Okay.  And if you would, do you see it is going to be the

13   third line where it begins "This meeting"?

14   A.    Yes, sir, I see that.

15   Q.    Would you read that sentence, please?

16   A.    "This meeting was called for by the Palestine Committee

17   in order to have a seminar or a meeting to the brothers

18   present here today in order to study the situation in light of

19   the latest developments on the Palestinian arena, its effects

20   and impact on our work here in America."

21   Q.    All right.  Thank you.

22         MR. JACKS:  Mr. Lewis, would you please go to

23   Philadelphia Meeting No. 3, page 10, likewise of that

24   transcript?  And if you would, the large paragraph kind of in

25   the middle of the page with SH, would you enlarge that,

1  please?

2  Q.   (BY MR. JACKS)  And who is SH that is speaking at this

3  part of the Philadelphia meeting?

4  A.   This is the Defendant Shukri Abu Baker.

5  Q.   And if you would, read about the first five lines of that

6  comment or that statement by Shukri Abu Baker.

7  A.   Yes, sir.  "My brothers, this talk is to be continued,

8  God's willing.  There are remarks now.  Please don't mention

9  the name Samah in an explicit manner.  We agree on saying it

10 as Sister Samah.  We will talk about her honor, and the

11 session is -- the session here is a joint workshop between the

12 Holy Land Foundation and the IAP.  This is the official form.

13 I mean, please, in case some inquired."

14 Q.   Thank you.  Those two statements, do they appear to be

15 consistent with those policies that you talked about on the

16 first page of the English translation insofar as periodic

17 meetings or meetings and how they are to be conducted?

18 A.   On the security document, yes.

19       MR. JACKS:  Mr. Lewis, would you put InfoCom Search

20 No. 35 back up there on the screen, please?  And I believe as

21 I said, page 12 is the first page of the English.

22 Q.   (BY MR. JACKS)  Would you look at item No. 5 or policy

23 No. 5 that is set forth there under periodical meetings and

24 read that policy into the record, please, Agent Miranda?

25 A.   Yes, sir.  No. 5 reads, "Avoiding having the meetings at

1    the homes of those who are under watch."

2    Q.   Would you go down to No. 8, and would you read into the

3    record that policy or guideline for periodical meetings?

4    A.   No. 8 says, "During the meeting, arrange papers and

5    meeting materials in a manner which makes them easy to get rid

6    of in an emergency."

7         MR. JACKS:  Let me ask you, Mr. Lewis, would you

8    scroll down, please, to the bottom of this page?  Thank you.

9    Q.   (BY MR. JACKS)  Do you see item No. 14, Agent Miranda?

10   A.   Yes, sir.

11   Q.   What is the policy or guideline that is set out next to

12   item No. 4?

13   A.   It reads, "Conducting distortion and detection techniques

14   to reveal any hidden equipment in the location before the

15   meeting is underway."

16        MR. JACKS:  Would you go to the next page, Jim?

17   Q.   (BY MR. JACKS)  Do you see -- Now, this next page

18   continues to list the policies for periodical meetings.  Is

19   that correct?

20   A.   Up to -- Yes, sir.  That is correct.

21   Q.   All right.  Do you see item No. 19 there?

22   A.   Yes, sir.

23   Q.   Would you read item No. 19 into the record?

24   A.   No. 19 reads, "Not arriving to the meeting place directly

25   from exposed locations (offices, centers, et cetera.)"

1  Q.   The word exposed, have we seen that word in other

2  evidence or exhibits in this case?

3  A.   Yes.

4  Q.   And will it be -- Does it appear other places in this

5  document?

6  A.   I believe it does.

7  Q.   Okay.  Let me direct your attention --

8       MR. JACKS:  Jim, if you could go down to sub heading

9  1-C, courses.

10  Q.  (BY MR. JACKS)  And do you see those entries, Agent

11  Miranda?

12  A.   Yes, I do, sir.

13  Q.   I direct your attention to item No. 2, and just read that

14  into the record?

15  A.   No. 2 reads, "Avoiding the overlapping of unexposed

16  elements from different committees in the same course to avert

17  being exposed."

18  Q.   So there is again a reference to the term exposed and

19  unexposed.  Correct?

20  A.   Yes, sir.

21  Q.   Do you see item No. 3 beneath that?  Would you please

22  read item No. 3 into the record?

23  A.   No. 3 states, "The rule is to avoid gathering individuals

24  who know others by their real names in the same course if they

25  have no knowledge of their roles in the apparatus, unless they

1   are in the same formation or will be later grouped in the same

2   formation due to work necessity."

3   Q.   The word apparatus that appears in item No. 3, have we

4   seen that word used in other documents in this case?

5   A.   Just today we saw it.

6   Q.   Remember the big chart that had all the blocks and small

7   print in it?

8   A.   Yes, I do.

9   Q.   What was the name for the entries on the far left hand

10  column?  What were they referred to as?

11  A.   The apparatuses.

12              MR. JACKS:  Would you go to the next page, Agent

13  Lewis?

14  Q.   (BY MR. JACKS)  And again this is under sub heading 1-C,

15  "courses," and would you read item No. 5 into the record, Mr.

16  Miranda?

17  A.   Yes, sir.  "Getting rid of any materials related to the

18  course after the meeting."

19  Q.   Item No. 6, would you read that, please?

20  A.   "Securing documents during moving and transportation."

21  Q.   The next segment is entitled "documents safety."  Is that

22  correct?

23  A.   Yes, sir.

24  Q.   And on this page at least, there are nine policies or

25  guidelines.  Is that right?

1    A.    That is correct, sir.

2    Q.    Item No. 3, the policy or guideline in item No. 3, would

3    you read that, please?

4    A.    Yes, sir.  No. 3 states, "Classifying documents with

5    every committee in four categories:  General, limited,

6    private, and very private.  (see appendix.)"

7    Q.    And does this policy make reference to the last two or

8    three pages that you referenced a few moments ago of this

9    document?

10   A.    That is correct, sir.

11   Q.    Would you go down to item No. 7?  Could you read item

12   No. 7, please?

13   A.    No. 7 states, "Destruction of documents is to be done by

14   burning or shredding.  Also all equipment used in saving

15   documents and which do not agree with the nature of the

16   location are to be removed."

17   Q.    Would you look at policy or guideline No. 9 under

18   "document safety" and read that, please?

19   A.    No. 9 states, "Using the computer to send faxes between

20   exposed offices, keeping in mind to encrypt the files before

21   they are sent.  This could be coordinated with the maintenance

22   committee."

23   Q.    Again there is the reference or use of the word exposed.

24   Correct?

25   A.    Yes, sir.

1  Q.   And the reference to the maintenance committee, do you

2  recall -- Strike that.  Let me just go to the next page.  This

3  is page 15 of the exhibit, I believe page 4 of the original.

4  And do you see the heading there for communication safety?

5  A.   Yes, I do, sir.

6  Q.   And then the sub headings it looks like, well, several.

7  Do you see the first entry numbered No. 1, "Communication

8  between levels"?

9  A.   Yes, sir, I see that.

10  Q.   Read that into the record, please.

11  A.   "Communication between levels of the apparatus and its

12  field committees."

13  Q.   And then would you go read item No. 2 of that underlined

14  Section 1?

15  A.   Yes, sir.  It reads, "Descending, ascending, and

16  horizontal communication are to be conducted through

17  committees chairmen or communication officers."

18  Q.   And in your experience what would be descending and

19  ascending communication?  In an organization what would that

20  be talking about?

21  A.   Orders up the chain or orders down the chain of command.

22  Q.   And then horizontal communication in an organization in

23  your experience would be what?

24  A.   Communication between organizations at the same level.

25  Q.   Or parts of an organization?

1    A.    Correct.

2    Q.    And what is the heading of the next section?

3    A.    "Communication between the general secretariat and work

4    committees in the apparatus."

5    Q.    All right.  The word or words "general secretariat,"

6    where have we seen that before?

7    A.    We have seen some early on.  Agent Burns had some

8    documents regarding the Muslim Brotherhood, regarding the

9    Palestine Committee.  We have seen that.

10   Q.    All right.  Is that a position within those

11   organizations?

12   A.    Yes, sir.

13   Q.    Underneath No. 2, do you see the entry for 2, there not

14   the one underlined but it begins "instructions and

15   follow-ups"?  Just read that sentence there.

16   A.    Yes, sir.  "Instructions and follow-ups are to be sent to

17   the work committees in the various countries through the

18   central communication point.  Responses are to be received

19   through the same points."

20   Q.    The phrase "in the various countries," what if anything

21   does that indicate to you about whether the organization that

22   created this document has parts or members in other countries?

23   A.    It indicates there are parts or members in other

24   countries.

25              MR. JACKS:  Go to the next page, please, Mr. Lewis.

1    Before you do that, I am sorry, go back to page 15.

2    Q.   (BY MR. JACKS)  The heading at the bottom of the page

3    beginning with No. 3 and then "A" below that, what are those

4    headings?

5    A.   "Fields communication between various institutions; A,

6    mail correspondence."

7    Q.   And then there is No. 1 and 2 shown there.  Correct?

8    A.   Yes, sir.

9          MR. JACKS:  Go to the next page.

10   Q.   (BY MR. JACKS)  And would you look at item No. 4 under

11   "mail correspondence"?

12   A.   Yes, sir.

13   Q.   Read that, please.

14   A.   No. 4 states, "Camouflaging the contents".

15   Q.   Do you see item No. 6 there?  What is the policy for mail

16   correspondence according to No. 6?

17   A.   No. 6 states, "Using human couriers to transport

18   important documents (traders, drivers.)"

19   Q.   And the heading below that is entitled what, the section

20   below the one you last read?

21   A.   That would be "telephonic communication."

22   Q.   What is the first policy or guideline under that

23   particular heading?

24   A.   No. 1 states, "Exposed individuals are not to contact

25   unexposed individuals or vice versa from home phones, but from

1  public phones."

2      MR. JACKS:  Would you go to the next page, please.

3  I am sorry, Jim.  Would you go back?  The bottom category,

4  "communication via fax."

5  A.   Yes, sir.

6  Q.   Would you read the two policies No. 1 and 2 under the

7  heading "communication via fax"?

8  A.   "Documents from the private and very private categories

9  are not to be faxed.  No. 2, documents from the second

10 category are to be faxed through a number of non-monitored

11 machines, with attempts at encryption and intermittent

12 faxing."

13     MR. JACKS:  Would you go to the next page, please,

14 Mr. Lewis?

15 Q.   (BY MR. JACKS)  The heading marked D reads what?

16 A.   "Communication via live (human) points."

17 Q.   The first policy under No. 1, read that, please.

18 A.   No. 1 states, "Assigning a live point of contact through

19 which contact with unexposed individuals could be

20 established."

21 Q.   And item No. 5 under that as far as the policies for

22 communication via live human points, read No. 5?

23 A.   No. 5 states, "Coordinating with the maintenance

24 committee and putting in place a covert monitoring system for

25 the live points if possible."

1    Q.   Covert means what?

2    A.   Hidden.

3    Q.   The heading entitled "basic security measures in

4    communications," do you see that?

5    A.   Yes, sir.

6    Q.   Would you read item No. 3?

7    A.   No. 3 states, "Not exposing parts of the work's

8    administrative skeleton."

9    Q.   And let me ask you, the next heading No. 4 is entitled

10   what?

11   A.   "Safety of relationships."

12   Q.   And the sub heading is entitled what?

13   A.   "Relationship with the Administration."

14        MR. JACKS:  Move to the next page, if you would, Mr.

15   Lewis.

16   Q.   (BY MR. JACKS)  And the second sub heading under "safety

17   of relationships" is entitled what?

18   A.   "Relationship with parties and movements.

19   Q.   Would you look at item No. 7, the policy or guideline

20   under that particular sub heading, and read that into the

21   record?

22   A.   Yes.  Item No. 7 states, "Regarding unexposed

23   individuals, caution should be practiced not to reveal true

24   identity."

25   Q.   Go down, if you would, to the heading D "media and

1    newspaper interviews."  What is the policy or guideline No. 1

2    under that sub heading?

3    A.   No. 1 states, "An interview is not to take place unless

4    preapproved by the concerned authority regarding the unexposed

5    elements."

6              MR. JACKS:  Would you go to the next page, Mr.

7    Lewis?

8    Q.   (BY MR. JACKS)  And what is the heading under item No. 5

9    there?  What area is it pertaining to?

10   A.   "Travel and transportation safety."

11   Q.   Item No. 2 under the policies and guidelines, would you

12   please read that into the record?

13   A.   Yes, sir.  Item No. 2 states, "Providing a suitable cover

14   for travel (commerce, tourism, visiting relatives), and

15   supporting it with documents, commercial samples, catalogs, or

16   tourist brochures.  Also achieving this pretext in the visited

17   country by taking tourist tours, making commercial meetings,

18   or reaching bargains."

19   Q.   Is there a reference to what to do with documents when

20   you travel?

21   A.   Yes, sir.

22   Q.   And that is under item No. 3?

23   A.   Yes, sir.

24   Q.   Just read item No. 3 and the three things underneath it.

25   A.   Item No. 3 states "Precaution regarding carried

1   documents.  Not carrying what is not necessary.

2       "Hiding them good.

3       "Agreeing on a pretext in case they are discovered upon

4   search."

5   Q.   Would you go down to item No. 7 under "travel and

6   transportation safety" and read that into the record, that

7   policy or guideline?

8   A.   Yes, sir.  Item No. 7 states, "Not taking regular phone

9   lists or phonebooks.  Alternatives are writing only necessary

10  phones for your trip on a piece of paper, writing them and

11  dispersing them among your luggage or using phone

12  organizers."

13          MR. JACKS:  Could you go to the next page and

14  continue -- This is under "travel and transportation safety."

15  And I would like to direct your attention to item No. 16 as a

16  policy or guideline, and ask you to read that into the record.

17  A.   No. 16 states, "Attempting reservation and travel on safe

18  Arab airlines or the ones with good relationship with the

19  adversary (from the Middle East) such as Jordanian, Saudi

20  Arabian, Kuwaiti."

21  Q.   If you would go down to the heading No. 7 "safety of

22  offices and firms."

23  A.   Yes, sir.

24  Q.   Do you see policy or guideline No. 2?

25  A.   Yes, sir.

1  Q.   Would you read that, please?  And I think it continues

2  one word on the next page so, if you will give Mr. Lewis time

3  to turn the page.

4  A.   Yes.  No. 2 states, "Not using firms as places to keep

5  work-related documents from the first and the second

6  categories."

7  Q.   Let me interrupt you there.  When it talks about

8  "documents from the first and second categories," and given

9  the examination of this document and what is contained herein,

10  what possibly could documents from the first and second

11  categories be referring to?

12       MS. HOLLANDER:  Objection, Your Honor.  He is asking

13  him what possibly it could be.  It calls for speculation.

14       THE COURT:  He asked him based on the document.  He

15  may ask it.  Go ahead.

16       THE WITNESS:  Can you repeat the question?  Sorry.

17  Q.   (BY MR. JACKS)  Apparently it wasn't that clear.  With

18  that sentence that says, "Work-related documents from the

19  first and the second categories," where it says "the first and

20  the second categories," is there anything else in this

21  document that sheds light on what this phrase "the first and

22  the second categories" are talking about?

23  A.   Yes, the appendix of this document.

24  Q.   Which deals with what subject?

25  A.   Document classification.

1    Q.   All right.  I interrupted you, so pick up from "the first

2    and the second categories" and resume reading.

3    A.   Yes.  "Not using firms as places to keep work-related

4    documents from the first and the second categories.  Documents

5    from the third category are allowed if there is a convincing

6    pretext for their presence."

7    Q.   And would you read the policy or guideline No. 3 under

8    "safety of offices and firms"?

9    A.   Yes, sir.  It reads, "Firms are to be used as covers

10   which bring together members of the same committee.  The

11   nature of their commercial or employment relationship is to be

12   ascribed according to the specialty of each member, as much as

13   possible.  (this relationship) is also to be used as a cover

14   to contact firms or other committees."

15   Q.   Policy No. 4, read that into the record.

16   A.   No. 4 states, "Technical supplies at the office have to

17   be in harmony with the nature of the company or the foundation

18   and with its financial standard."

19   Q.   The reference to technical supplies being in harmony with

20   the nature of the company, can you give an example of what

21   would be something technical that would not be in harmony with

22   the nature of a company; something that you can think of?

23   A.   Yeah, maybe some communications equipment at a facility

24   or an office that you would think would not need

25   communications equipment.

1    Q.   Let me ask you about talking about things being in

2    harmony.  Would you, given your involvement in this

3    investigation, or just your experience in the world, would you

4    think that this document that we are going through is in

5    harmony with a charitable organization?

6    A.   No, it is definitely not in harmony with a charitable

7    organization, and in fact it is labeled as such with the No. 2

8    on the very front which speaks to not supposed to be -- it is

9    not supposed to be at the foundation.  It is right there.  It

10   states it.

11   Q.   All right.  So going back, you are talking about the fact

12   on the preceding page --

13           MR. JACKS:  Mr. Lewis, if you would go back to page

14   20 item No. 2 at the very bottom.

15   Q.   (BY MR. JACKS)  Is that what you are talking about?

16   A.   Right.  No. 2 on the very front page of this document

17   that we pointed out, it says here, "not using firms as places

18   to keep work-related documents from the first and the second

19   categories."

20   Q.   Was this document found within the offices of the Holy

21   Land Foundation?

22   A.   No.  It was found across the street at InfoCom.

23           MR. JACKS:  Could you go back to the next page,

24   Agent Lewis?

25   Q.   (BY MR. JACKS)  And this continues to talk about safety

1   and document issues.  Correct?

2   A.   Yes, sir.

3   Q.   Item No. 8 on the page in the middle, do you see that?

4   A.   Yes.

5   Q.   Read that into the record.

6   A.   No. 8 states, "Having a shredding machine at the offices

7   to destroy documents which are justifiably present."

8   Q.   Now, did you ever in the Holy Land Foundation closure or

9   search, was there a shredding machine found, that you are

10  aware of?

11  A.   No.

12  Q.   Did you ever see any evidence to indicate that they had

13  acquired or used one?

14  A.   Yes.

15          MR. JACKS:  Go to the next page, Mr. Lewis.

16  Q.   (BY MR. JACKS)  This document or this page of the

17  document bears what heading, No. 8?

18  A.   "Safety of personal residences, work apartments, cars,

19  and possessions."

20  Q.   Item No. 1, the policy or guideline contained in item

21  No. 1, read that, please.

22  A.   "Constant observation of any individuals or unusual

23  phenomena in close neighbors and those around them."

24  Q.   Go down to item No. 5 and read that, please, just the

25  first sentence.

1   A.   Yes, sir.  "Using a specific suitable cover for the

2   apartment (students cover, for instance.)"

3   Q.   Item No. 6, what is the policy or guideline set forth

4   there?

5   A.   No. 6 states, "Avoiding use of the apartment by activists

6   at the same time to avoid exposing it."

7             MR. JACKS:  Would you go to the bottom of the page?

8   Q.   (BY MR. JACKS)  Agent Miranda, what is the policy or

9   guideline set out in item No. 16?

10  A.   No. 16 states, "Assuring the legal residence status of

11  those who work at the different offices and institutions and

12  not being subjects of previous legal problems."

13            MR. JACKS:  Go to the next page, please.

14  Q.   (BY MR. JACKS)  And the heading "money safety," item No.

15  9, do you see that, Agent Miranda?

16  A.   Yes, I do, sir.

17  Q.   Do you see item No. 2 under that topic?  What is the

18  policy set forth next to item No. 2?

19  A.   No. 2 states, "Transfers could be conducted between

20  exposed individuals or between commercial firms.  Other than

21  that, it is done by cash delivery."

22  Q.   And the heading "hotel safety."  It is item No. 11 or sub

23  topic 11.

24  A.   Yes, sir.

25  Q.   Would you look at policy No. 3 underneath "hotel safety"

1    and read that into the record?

2    A.    Yes, sir.  No. 3 states, "Avoiding contacting unexposed

3    individuals on the field from the room."

4    Q.    And again, there is the reference to exposed and

5    unexposed.  Just generically, exposed means what?

6    A.    The true nature of something.

7    Q.    Unexposed would indicate what?

8    A.    Hiding the true nature of something.

9    Q.    Do you see item No. 6 under "hotel safety"?

10   A.    No. 6 states, "Attempting to place the manager with a

11   companion in the same room or in connecting rooms."

12   Q.    Item No. 7?

13   A.    "Occupying the room directly across from the manager's

14   room for protection."

15   Q.    And item No. 8?

16   A.    "Thorough searching of the manager's room."

17   Q.    Did you take this to mean the manager of the hotel?

18   A.    No.

19   Q.    Okay.

20        MR. JACKS:  Would you go to page 25?  I believe that

21   is two pages, Mr. Lewis.

22   Q.    (BY MR. JACKS)  Is this the part of this document that is

23   the appendix or that is headed "documents classification,

24   appendix"?

25   A.    Yes, sir.

1  Q.   And is there anything on there that would be consistent

2  with its own document classification code?

3  A.   Yes.  There is the No. 2 in the upper left hand corner.

4       MR. JACKS:  Could you enlarge that part of it, Mr.

5  Lewis?  Thank you.  And zoom back out.

6  Q.   (BY MR. JACKS)  The first sentence under the title of the

7  document, would you please read that, Agent Miranda?

8  A.   Yes.  "Documents are to be classified into four

9  categories:  General, limited, private, and very private."

10 Q.   Agent Miranda, I guess you have worked for the government

11 your entire adult life.  Is that correct?

12 A.   Yes, sir.

13 Q.   All right.  Does the government have a document

14 classification index as it relates to the security of

15 documents that it generates?

16 A.   Yes, we do.

17 Q.   Can you kind of walk us through the lower security and

18 then the higher security that would be -- This talks about

19 four categories.  Can you give us about four categories that

20 the government would use in its classification?

21 A.   Sure.  At the lowest category is going to be for official

22 use only, then after that you are going to have confidential,

23 then secret, and then, of course, top secret.

24 Q.   And are there even sometimes documents that are above top

25 secret?

1   A.   Then there is different compartmentalizations; SCI, for

2   example.

3   Q.   Okay.  But the four basic are limited official use,

4   confidential, secret, and top secret?

5   A.   Yes, sir.

6   Q.   Those are the four major categories of document

7   classification?

8   A.   That is correct.

9   Q.   All right.  And what are the four categories this

10  document attempts to set up?

11  A.   General, limited, private, and very private.

12  Q.   And would those be from least secure to most secure, as

13  you read them?

14  A.   Yes.

15  Q.   And item No. 1, then, on this list -- First of all, let

16  me ask you, does it appear that this document has taken

17  different types of documents and given them a general category

18  that they are supposed to be put in or treated?

19  A.   Right.  It gives examples of the different categories of

20  documentation.

21  Q.   Just take the first one, item No. 1.  What does it say

22  and how is it supposed to be categorized?

23  A.   No. 1 is "overall plans for over a year period suggested

24  or approved, including budgets."  And they have it listed as

25  very private, which would correspond in the description I gave

1    as top secret.

2    Q.   And just go down to item No. 7.  Would you read what item

3    No. 7 says and how that type of material is classified?

4    A.   Yes.  Item No. 7 states, "Reports about any incidents

5    regarding individuals at level of head of a sector in a

6    committee or higher.  Very private."

7    Q.   Item No. 11, what is the item and how is it classified?

8    A.   Item No. 11 is "codes and passwords, very private."

9    Q.   Item No. 12?

10   A.   No. 12, "Work-related computer disk.  Very private."  It

11   is missing an E, but "very private."

12   Q.   Item No. 13?

13   A.   No. 13 states, "Reports related to matters which directly

14   touch the country where the report is written.  Very private."

15   Q.   And it continues onto the next page with some other

16   types.  Is that correct?

17   A.   Yes, it does.

18   Q.   Types of materials?

19   A.   Yes, sir.

20        MR. JACKS:  And if you go to the last page, please,

21   Mr. Lewis.

22   Q.   (BY MR. JACKS)  And this summary just has

23   categories -- It has the classification categories to the

24   left?

25   A.   Yes.

1   Q.   And columns for reviewing, copying, and temporary filing

2   and how those documents are to be treated?

3   A.   Correct, sir.

4        MR. JACKS:  Could you go to the first page of this

5   exhibit, Mr. Lewis?  I am sorry.  The very first page of the

6   Arabic version of the exhibit.

7   Q.   (BY MR. JACKS)  And do you see a number that can be seen

8   on that exhibit, Agent Miranda, that would be consistent with

9   this document classification category that is set out in the

10  appendix?

11  A.   Yes.  If you will see to the left hand side of the

12  document -- Not very far.  If you can go down further, Jim.  I

13  will tell you when to stop.  You can see the 2 off to the left

14  hand side with the number sign by it.

15  Q.   Also at the top, is there the number 2, does it appear

16  near one of those smudges?

17  A.   Yes.  It is kind of tough to tell, but left of the big

18  smudge there.

19  Q.   All right.

20       MR. JACKS:  And just if you would, Mr. Lewis, kind

21  of go through these pages.

22  Q.   (BY MR. JACKS)  And Agent Miranda, does the number 2

23  reoccur on these various pages?

24  A.   Yes, I see it there.  I see it there.

25  Q.   And that was there on the exhibit when it was seized.  Is

1    that correct?

2    A.    That is correct, sir.

3    Q.    Okay.

4          MR. JACKS:  Go to the next page, Mr. Lewis.

5    Q.    (BY MR. JACKS)  And you continue to see that 2 and then

6    number sign?

7    A.    Yes, sir.

8          MR. JACKS:  Go to page 8.  Page 9.

9    Q.    (BY MR. JACKS)  Do you see it on page 9?

10   A.    Yes, upper left hand corner.

11   Q.    And I believe that is it.

12         These policies and guidelines that are set forth in this

13   document, Agent Miranda, and the terminology that is used, the

14   reference to exposed, unexposed, and just the wording in

15   general, in your experience either in the military or with the

16   FBI, have you seen similar type terminology in documents that

17   relate to security?

18   A.    I have.

19         MR. DRATEL:  Objection, Your Honor.  He is not an

20   expert and I don't -- I think it goes back to the *Mejia* issue

21   I raised earlier.

22         THE COURT:  Overruled.  He asked him based on his

23   experience.  Go ahead.

24   Q.    (BY MR. JACKS)  Just to cover it again, when you were in

25   the Air Force, what was your -- You said you were in OSI,

1    which stands for what?

2    A.   I was a special agent for the Air Force Office of Special

3    Investigations.

4    Q.   What area did you -- were you involved in investigating?

5    A.   Counterintelligence and counterterrorism primarily.

6    Q.   And the groups that -- Whether it was in the FBI or

7    within the Air Force, did you see these types of documents

8    that were used by groups or organizations?

9    A.   Yes.

10             MR. DRATEL:  Your Honor, can we approach?

11             THE COURT:  Yes.  Come on up.

12             (The following was had outside the hearing of the

13             jury.)

14             MR. DRATEL:  I thought we were keeping other groups

15   out of this trial.  This is where we are headed right now with

16   this question.

17             MR. JACKS:  Judge, I am going to ask him, you know,

18   what types of groups use these, and they are terrorist groups,

19   organized crime groups, and intelligence agencies use this

20   type of terminology and language, and that is just going to be

21   his answer.

22             MR. DRATEL:  It is --

23             MR. JACKS:  He is not going to name Al-Qeada or

24   anything else.

25             MR. DRATEL:  That is what this is all about, the

1  inference without the name.  It is just way beyond what he is

2  supposed to do.

3         MS. HOLLANDER:  He is also not an expert witness and

4  no notice that he is going to give expert testimony.

5         THE COURT:  He is not doing it as an expert.  He is

6  asking his experience in the FBI and the Air Force.

7         MR. DRATEL:  That is exactly what the *Mejia* case

8  says he shouldn't be doing.

9         MR. JACKS:  The *Mejia* case had to do with

10  interpreting evidence, and he is giving --

11         MS. CADEDDU:  My objection is the same thing.  He

12  hasn't been qualified as an expert.  We haven't been given

13  notice as an expert, and this is basically an agent testifying

14  as an expert.  The Fifth Circuit has warned against it.  The

15  Second Circuit just reversed a conviction based on it.

16         THE COURT:  I think you are -- Interpreting

17  evidence, that is a different matter than testifying based on

18  experience.  I have a bit of a concern -- Organized crime, as

19  you start getting into --

20         MR. JACKS:  Terrorist groups are okay?

21         THE COURT:  That is what this is about.

22         MR. JACKS:  I understand.  I agree with you in that

23  regard.

24         THE COURT:  And what else is he going to say?  He

25  said the military, the government.

1    MR. JACKS:  What did he say?  Intelligence agencies

2  used this type of terminology.

3      Your Honor, I will just move on.

4          THE COURT:  Okay.  It sounds good.

5      How much longer do you expect to be in this topic?  He

6  says he is going to move on.

7          MR. JACKS:  I am almost -- No, I have got maybe 30

8  or 45 more minutes, and obviously I would prefer not to pass

9  him, but --

10          THE COURT:  We won't be here that much longer.

11          MR. JACKS:  If I could go back and look at my notes,

12  I may be at a stopping point.

13          THE COURT:  Okay.

14          MR. JACKS:  You know, because I think I was going

15  to -- I have gotten sub topics that I was going to go into, so

16  I may be about to go into one.

17          THE COURT:  Okay.  Just let me know when you are at

18  a good breaking point, then.

19          MR. JONAS:  This is the case decided by the Second

20  Circuit which discusses testifying as experts, which Mr.

21  Miranda has not been qualified as, and I don't think it is an

22  appropriate --

23          THE COURT:  And I haven't read it, but I will take a

24  look at it.

25          MR. DRATEL:  My position would be there is no

1   functional difference between what is improper here and what

2   they are trying to do here, whether he is an expert qualified

3   or not.

4           THE COURT:  Okay.  All right.

5           (The following was had in the presence and hearing

6           of the jury.)

7           MR. JACKS:  Your honor, that is -- In reviewing my

8   notes, that was my final question on this topic, so I was

9   going to be moving to another sub topic of this part, so if

10  the Court would like to stop.

11          THE COURT:  All right.  Let's go ahead and break

12  here for the day.

13      Be back at 9:00 tomorrow morning.  Please recall the

14  instructions we have gone over.  See you back in the morning.

15          (Whereupon, the jury left the courtroom.)

16          THE COURT:  Anything we need to address before we

17  leave?

18          MR. DRATEL:  Your Honor, the Simon motion, I think

19  we can save the Government some money and not have him fly

20  here tomorrow by precluding him today based on that motion.

21      The only thing I would add to my papers, by the way, Your

22  Honor, is the *Al-Moayad* case that obviously we have cited in

23  other pleadings.  The focus is on in terms of trying to

24  maintain an evidentiary threshold.  That is what is relevant

25  to the charges and what is relevant to the case.  And I think

1    we have set forth in our motion obviously this particular type

2    of testimony for why the statute is enacted.  It is really

3    unprecedented in a criminal case.  It is sort of off limits

4    for everybody and I think *Al-Moayad* would reaffirm that and

5    make it even stronger.

6             THE COURT:  Mr. Jacks?  Are you intending --

7    Ms. Shapiro, this is your witness.  Are you intending on

8    getting into why the statute was enacted?

9             MS. SHAPIRO:  Not exactly.  First of all, Mr. Simon,

10   he is a very short witness.  He was actually meant to testify

11   on the afternoon of Judge Sanders' memorial service, so we

12   meant for him to go a little earlier in the case.  He is going

13   to talk about the foreign policy and military and economic

14   reasons that animated the executive order that is at issue

15   here.

16        And the reason that that is relevant is because it is

17   important for the jury to understand why the United States has

18   an interest here.  A terrorist organization has a focus on a

19   geographic region that is far away from the United States, and

20   it is important for them to be able to tie the concerns that

21   animated the designation of Hamas so that they understand why

22   this case is relevant to them.

23             MR. JACKS:  May I have a moment, Your Honor?

24             THE COURT:  Sure.

25        Everybody can have a seat.  We are in recess, so you can

1  leave in you want to, or you are free to stay.  But you may

2  have a seat.

3          MR. WESTFALL:  But not the lawyers?

4          THE COURT:  Not the lawyers.  Well, you can leave.

5          MS. SHAPIRO:  Essentially the jury, this whole

6  subject matter is foreign to them.  Literally, it is outside

7  their normal experience and it is far away.  So basically what

8  this witness does very briefly is to explain the relevance of

9  it, and it is not uncommon or unprecedented that somebody will

10  explain the context of a matter or of a law.  And in fact we

11  cited in our opposition to Mr. Dratel's motion we cited a case

12  where -- I think it was the Lybian Sanctions case where

13  somebody did exactly that--explained the context behind a

14  designation, an expert designation.

15      So it is neither unprecedented nor unusual, and it is

16  necessary for the jury to be able to tie it back to their

17  common experience.  And in fact I believe in voir dire we

18  actually had a juror ask the question about why this is

19  happening here.  And that is directly relevant to I think what

20  jurors might ask themselves about why this case that takes

21  place overseas, why it concerns the United States.

22          MR. DRATEL:  Your Honor, that sounds like a much

23  longer version of why the statute was passed.  That is one.

24      Two, the case that the Government cites I think we

25  address in our reply which is a totally different case with a

1    totally different focus.  So I am not going to get into the

2    detail.

3        But the third thing is that this is really reverse juror

4    nullification.  And, you know, so I don't think it is proper.

5    And I think Mr. Cline has something to add as well.

6            MR. CLINE:  I would just sum up the argument like

7    this.  The law is the law, and why the law was enacted is

8    totally irrelevant.

9            THE COURT:  And generally that is true.  I mean, the

10   jury is under an obligation, we have told them in voir dire

11   and we will tell them again in the instructions, that they

12   have to follow the law.  It is not their place to question.

13   So I am struggling somewhat with the relevance of that.  That

14   is not something we normally get into in any law is why,

15   because we are all obligated to follow it.  We are supposed to

16   follow it and so is the jury.

17       Let me take a look at that further, and I will let you

18   know first thing in the morning.

19           MS. SHAPIRO:  I would simply add to that, the case

20   we cited, the First Circuit case I believe is directly on

21   point.  I think if Your Honor looks at that case it will --

22           THE COURT:  I haven't looked at that.  I intended to

23   after reading the briefs.  So I will take a look at that.

24           MR. WESTFALL:  Your Honor, we are precluded from

25   challenging the designation or the reasons behind the

1  designation, and because we are and we know we are and the law

2  says we are, it seems fundamentally unfair for them to bring a

3  witness to talk about the reasons behind the designation and

4  things that we couldn't challenge.  And it is like bringing

5  somebody after -- in a murder case bringing somebody in to

6  talk about why murder is so bad, you know, as a witness.  It

7  is unheard of, Your Honor.

8          MR. JACKS:  Your Honor, Mr. Westfall couldn't have

9  made my point better--that everybody understands murder and

10  why it is against the law, so you don't have to do that.

11         These jurors have, I guarantee you, had no clue what an

12  executive order was, a specially designated terrorist, the

13  Middle East peace process, and that is what makes this case

14  unique and why it is necessary to educate them and to help

15  them to understand the process.

16         MR. DRATEL:  Your Honor, Doctor Levitt actually

17  defined most of those terms and talked about them it is a

18  cumulative aspect as well.

19         Just, I mean, in terms of the case that the Government

20  cited, obviously we addressed that in our reply and I won't go

21  into that any further.  But all of the aspects of this, No. 1,

22  the preclusion on our side, the fact that there is no basis

23  for why a statute is on the books, Mr. Cline's position to the

24  Court acknowledged, and what the Court has said as well, I

25  think they all go to the fact that this is a witness who is

1    irrelevant and cumulative, if there is any marginal relevance,

2    which there isn't.

3         So I think on all those grounds it would be something

4    that this Court should preclude.  Thank you.

5              THE COURT:  Mr. Westfall, did you have anything?

6              MR. WESTFALL:  No, Your Honor.

7              THE COURT:  We will be in recess until 9:00 in the

8    morning.  Why don't you be here about 8:45.  I will let you

9    know of my ruling on this.

10                        (End of day.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         I HEREBY CERTIFY THAT THE FOREGOING IS A

2         CORRECT TRANSCRIPT FROM THE RECORD OF

3         PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4         I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5         FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6         COURT AND THE JUDICIAL CONFERENCE OF THE

7         UNITED STATES.

8

9         S/Shawn McRoberts       06/05/2009

10       _____DATE_____

           SHAWN McROBERTS, RMR, CRR

11       FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25