IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA ) CAUSE NO. 3:04-CR-240-P
(
vs. )
( OCTOBER 15, 2008
) DALLAS, TEXAS
HOLY LAND FOUNDATION, ET AL ( 9:00 A.M.

---

VOLUME 18 OF 37

---

STATEMENT OF FACTS

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

---

A P P E A R A N C E S

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
1100 COMMERCE, 3RD FLOOR
DALLAS, TEXAS 75242
BY: MR. JIM JACKS
MR. BARRY JONAS
MS. ELIZABETH SHAPIRO

FOR THE DEFENDANT: FREEDMAN, BOYD, HOLLANDER,
(SHUKRI ABU BAKER) GOLDBERG & IVES, P.A.
20 FIRST PLAZA, SUITE 700
ALBUQUERQUE, NEW MEXICO 87102
BY: MS. NANCY HOLLANDER
MS. TERESA DUNCAN

FOR THE DEFENDANT: (MOHAMMAD EL-MEZAIN)
LAW OFFICE OF JOSHUA L. DRATEL
14 WALL STREET, 28TH FLOOR
NEW YORK, NEW YORK 10005
BY: MR. JOSHUA DRATEL
MR. AARON J. MYSLIWIEC

FOR THE DEFENDANT: (MUFID ABDULQADER)
LAW OFFICE OF MARLO P. CADEDDU
3232 McKINNEY AVENUE, SUITE 700
DALLAS, TEXAS 75204
BY: MS. MARLO P. CADEDDU

FOR THE DEFENDANT: (GHASSAN ELASHI)
LAW OFFICE OF LINDA MORENO
P.O. BOX 10985
TAMPA, FLORIDA 33679
BY: MS. LINDA MORENO

JONES DAY
555 CALIFORNIA ST., 26TH FLOOR
SAN FRANCISCO, CA 94104
BY: MR. JOHN D. CLINE

FOR THE DEFENDANT: (ABDULRAHAM ODEH)
WESTFALL, PLATT & CUTRER
ONE SUMMIT AVENUE, SUITE 910
FORT WORTH, TEXAS 76102
BY: MR. GREG WESTFALL

COURT'S LAW CLERK:
MS. JENNIFER HELMS
1100 COMMERCE, RM. 1654
DALLAS, TEXAS 75242

COURT COORDINATOR:
MS. BRENDA WEBB
1100 COMMERCE, RM. 1654
DALLAS, TEXAS 75242

OFFICIAL COURT REPORTER:
SHAWN M. McROBERTS, RMR, CRR
1100 COMMERCE STREET, RM. 1654
DALLAS, TEXAS 75242
(214) 753-2349

# INDEX

## EXAMINATION

| Witness Name | Page |
|---|---|
| ROBERT MIRANDA | |
| Direct By MR. JACKS | 33 |
| Cross By MR. CLINE | 98 |
| Cross By MS. HOLLANDER | 122 |
| Cross By MS. HOLLANDER | 205 |
| Cross By MR. WESTFALL | 233 |
| STEVEN SIMON | |
| Direct By MS. SHAPIRO | 138 |
| Cross By MR. DRATEL | 153 |
| JOSEPH HUMMEL | |
| Direct By MR. JACKS | 176 |
| Cross By MR. CLINE | 185 |
| Redirect By MR. JACKS | 188 |
| Recross By MR. CLINE | 189 |

## Government's Exhibits

| Government's Exhibits | Page |
|---|---|
| Elbarasse Search No. 35 Admitted into Evidence. | 47 |
| HLF Seach No. 91 Admitted into Evidence. | 63 |
| InfoCom Search No. 36 Admitted into Evidence. | 68 |
| HLF Search No. 89 Admitted into Evidence. | 71 |
| HLF Search No. 90 Admitted into Evidence. | 80 |
| Demonstrative No. 6 Admitted into Evidence. | 84 |
| Demonstrative No. 3 Admitted into Evidence. | 89 |
| Demonstrative No. 5 Admitted into Evidence. | 90 |
| Demonstrative No. 4 Admitted into Evidence. | 92 |

## Defendants' Exhibits

| Defendants' Exhibits | Page |
|---|---|
| Demonstrative No. 2 Admitted into Evidence. | 220 |
| Defendants' No. 1087 Admitted into Evidence. | 254 |

THE COURT: All right. On the issue of Mr. Simon regarding the reasons why Hamas was designated, I am going to sustain that objection as to the reasons why.

In reading the *McKeever* case, what the Court allowed is that they were -- that Libya was connected to terrorism, but they didn't get into the why they made that determination, which as I understand it is where you are intending to go, Ms. Shapiro, unless I am misunderstanding or understanding improperly.

MS. SHAPIRO: Well, what we can do, Your Honor, is we don't even need to make reference to the law or why the executive order came about. I mean, really his testimony goes to why the Oslo process and peace in the region is important to the United States' interests. So, I mean, we can certainly put his testimony on without going behind the law.

THE COURT: Okay.

MR. DRATEL: Your Honor, I don't see any distinction. That is the reason for the law is it is about -- The purpose of the executive order is people who are potentially interfering with the Middle East peace process is what the executive order is about. That is the stated purpose. So really without stating it they just want to get the same thing in.

What they want to ask the jury is to convict because this is so important to the United States, regardless of what the

law is. They want to say this is a foreign policy objective of the United States that the jury should -- That is why I call it reverse jury nullification. So I think all of it is really about the same thing, and there is no way to carve it out in a way that doesn't do -- what is not relevant according to the case law and was is not proper under the case law and under -- You know, it is not an element of the offense.

There is no logical legal relevance of the question of U.S. foreign policy even if it were against U.S. foreign policy. Even if it were against U.S. foreign policy, it wouldn't be relevant. The fact that it is for U.S. foreign policy isn't relevant, and that is the whole basis for the executive order in the first place. It says so in the order itself. So to do that would just be to buttress that and really piggyback on it in a way that wouldn't be proper.

THE COURT: Ms. Shapiro, anything else?

MS. SHAPIRO: No, other than the context of the Oslo process and what Hamas was doing to damage that process and the interests of the United States in the region is important to help the jury put this case into context. We are not trying to convict them based on the contextual background, but it is important for them to understand that background.

THE COURT: Mr. Cline?

MR. CLINE: Your Honor, just one quick comment. You have endeavored throughout this trial to keep politics out of

it. I am not convinced that is entirely possible, but I know Your Honor has tried to do that. That is all this is. This is politics.

THE COURT: So what your intent is, then, is to discuss -- have him discuss the Oslo peace process and then the perception that Hamas was undermining that and then the designation?

MS. SHAPIRO: Right. Again, Your Honor, this would be a very short witness. He was meant to come earlier in the case where this probably fit a little more neatly. But he will essentially just give his background. He worked with the National Security Council during the mid '90s, and he will say what was going on at that time, the efforts that the NSC was engaged in to help the peace process along, how Hamas was undermining that process, and why it was in the interest of the United States to have a peaceful solution to the conflict.

THE COURT: When you say how Hamas was undermining that process, what are you intending on getting into?

MS. SHAPIRO: He will essentially say that there were attacks that were going on at the time that were aimed at -- they were timed toward certain events in the peace process, and they were efforts to undermine that process, and that that -- Well, I mean, initially the idea was to then have him explain how the executive order was intended to essentially buttress that peace process and get at the

terrorist organizations that were trying to undermine it, but I can excise that out, and then he would simply be getting at why a solution to the -- why a peaceful solution in the region is important to the United States' interests abroad.

MR. DRATEL: And, Your Honor, that is not relevant to this case. Doctor Levitt has already put in everything that they have said, any factual matter. We are really in *Al-Moyaad* territory here in the context of things that aren't relevant, that are designed to prejudice, and really has no purpose.

What she has just said -- What Ms. Shapiro has just said is the same thing. Hamas is undermining the peace process; therefore, we passed this executive order. The reasons underlying the executive order, it is the same path to the same -- It is the same destination and just different words and different paths, but it is really all the same thing. And the ultimate point they are trying to make is one that is impermissible.

THE COURT: And I am not sure that that is impermissible. It already is in, to a certain extent. As you pointed out, what is in the order is the terrorist activities that undermine the peace process. That is already in. I think Doctor Levitt testified to that as well. And I don't know that that prejudices the Defendants individually. It talks about Hamas.

The issue here is whether these Defendants were supporting Hamas. And so I don't know that that in and of itself is any prejudice as to these Defendants. It doesn't speak to that issue. But it does go to the issue of the context that is involved here.

And some of the Defense counsel made some statements in their opening statements that actually touched on that as well, which is why I have been struggling with this issue to some extent, because normally it wouldn't be something that we would go into, but there were statements made during opening that touched on those issues.

MS. SHAPIRO: I was just going to say, specifically I think Ms. Moreno stood up and said that the government of Israel was controlling U.S. foreign policy, and essentially telling the jury that they were running this case, which the evidence won't show, and I think is impermissible, and I think that it leaves putting forth the United States' independent interest here is relevant.

THE COURT: I will allow it to the limited extent that you have described, then, and excise that other portion that you were planning on going into. I think that is probably already in the case, and this is a proper witness, then, to get it in there. That will be my ruling.

MR. DRATEL: Thank you, Your Honor.

THE COURT: All right. And then I just received a

letter from Mr. Jacks, I guess it was dated yesterday, about the 302s.

MR. JACKS: Yes, sir. The letter sets out the chronology, and it is our position that those 302s are not required to be turned over. And we have tendered them to the Court, and gave I think an accurate recitation of Agent Burns' testimony on cross and why that does not trigger the necessity to produce those 302s.

Mr. Dratel?

MR. DRATEL: Your Honor, what the letter really doesn't address, and what we would ask the Court when it reviews these 302s to concentrate on, is the *Brady* aspect of this, and beyond what was disclosed to us in January 2006 with respect to Hamami, HLF, his relationship with Hamas, HLF's relationship with the organizations, and Hamami's organization as well, which is really what the thrust of the direct was. And, frankly, there is no doubt that it is a large issue in this case, and we feel we should have been advised of that a long, long time ago.

We should have been advised at a time where it would have done us some good for preparation of this trial. I realize they gave us something in 2006, but we believe based on what was said on cross examination and what we think is in those 302s really goes well beyond that. We ask the Court to read it with that in mind.

THE COURT: All right. I will take a look at those, then.

MS. HOLLANDER: Your Honor, do you have what was provided to us in 2006?

THE COURT: Did you attach that, Mr. Jacks? I think the letter states that you did.

MR. JACKS: Yes.

THE COURT: So apparently I do.

MS. HOLLANDER: Okay. It is not attached to ours.

THE COURT: I have got copies here.

MS. HOLLANDER: I just want to make sure it is the same thing I have. It is the letter.

THE COURT: We are still missing two jurors, by the way.

MR. JACKS: The Defense has provided some notice of exhibits that they intend to go through in their cross examination of Agent Miranda, and I don't know -- I am probably going to complete my direct examination this morning, and I don't know if you want to discuss those now.

THE COURT: Yes. Let's go ahead and do that since our jurors are out.

MS. HOLLANDER: Your Honor, I just ask Mr. Miranda not be in the room when we are discussing the cross examination exhibits.

THE COURT: Okay.

And then is it those Defense Exhibit 1087 and 1340 and 1342, those are still the objections you are making?

MR. JACKS: Yes. Looking at the list that was sent, and I don't have that one --

MR. JONAS: Yes, Your Honor. Those are the original exhibits that the Defense noticed the Government they are intending to show through Agent Miranda, and we filed a written response objection.

THE COURT: Right. And that is what I was looking at is your written responses. I was just wondering if that had changed. This is I think from last week.

MR. JACKS: That has not changed.

MR. JONAS: That has not changed. Mr. Westfall has notified the Government he intends on showing Agent Miranda some additional exhibits, which we object to as well.

MS. DUNCAN: And, Your Honor, we also have additional exhibits we have notified the Government.

THE COURT: You have notified the Government of those?

MS. DUNCAN: Yes. I think that we notified them of two additional exhibits in addition to the original list we provided to Mr. Jacks, and I don't know the Government's position as to those.

THE COURT: Mr. Jacks, I will just let you address which ones you are objecting to.

MR. JACKS: Yes, sir. I have received notification that they intend to try to admit Defendants' Exhibits 419, 444, and 721, which are photographs, and our objection is that while they may have come from the search of the Holy Land premises, they cannot be -- No further foundation can be laid to show their admissibility; certainly not through Agent Miranda.

They have noticed Defendants' Exhibits 1179 and 1180, which I don't -- They show to be photographs but I can't find them on my disk of Defense exhibits, and so I am not really sure what they show, but we would have the same objection--no foundation.

There is Defendants' Exhibit 1355, which is a photograph downloaded from the internet, and we would object again to the lack of foundation for that photograph.

Then there is a notice to Defendants' Exhibit No. 899, which I assume is a video and I am not sure what it shows, Your Honor, because the exhibit list just says "video" and then a number. And I haven't gone to locate that video and see what it shows. But again, we would object on the grounds of hearsay, and no foundation can be established through Agent Miranda.

Mr. Westfall sent me last night three documents which appear to be documents, I am assuming that he created them, and there is no way that Agent Miranda can authenticate or --

THE COURT: What are they?

MR. JACKS: Yesterday, Your Honor, there were some -- the Government admitted some exhibits which were -- I think this one was -- Sorry. I don't remember the number. Solicitor's analysis report. It had to do with this individual Deeb Anees and their records showing his entry and dates for '97, '98, '99, and I believe that was it, and just dollar amounts and cities and his name next to it. And it looks like Mr. Westfall has taken that information and reconfigured it or done something with it and put it into other forms and other exhibits, and Agent Miranda obviously has no idea what those exhibits show or how they were created, and I don't believe that that could be provided by Mr. Westfall to him.

THE COURT: What are those exhibit numbers? Do you have them?

MR. JACKS: I don't believe they had exhibit numbers at the time.

MR. WESTFALL: They do, Your Honor. But there were four of them, and I sent them to the Court also.

MR. JACKS: Four? I got three.

THE COURT: How did you send them to me?

MR. WESTFALL: To email.

MR. JACKS: I got three.

MS. HELMS: I got four.

           MR. JACKS:  Okay.  Regardless, Your Honor, these

documents, while they may be something that some other witness

could come in and introduce, certainly not Agent Miranda.

           THE COURT:  Okay.  And the other objections?

           MR. JACKS:  I believe that is all that I have been

notified about, Your Honor.

           THE COURT:  And the written ones, you objected to

Defense Exhibit 1087 and 1340 and 1342, the ones you filed

last week?

           MR. JACKS:  Yes, sir.  And I don't have that in

front of me.  We do renew those objections.

           THE COURT:  No. 1087, you say it has already been

admitted as your HLF Search No. 23.

           MR. JACKS:  Yes, sir.

           THE COURT:  The Defendants' version reorders the

information from chronological to alphabetical.  The

Government questions the need for the exhibit to be admitted

twice due to concern for potential confusion.

      No. 1340 and 1342 are transcripts, I take it, of

intercepted phone conversations.

           MR. JACKS:  Yes, sir.

           THE COURT:  Of Mr. El-Mezain and maybe a family

member.

           MR. JACKS:  Yes, sir.  And those obviously are

hearsay and are not relevant, is our position.

THE COURT: All right. Well, let's start with -- That is all of the objections. Let's start with those photographs. Who wants to address those?

MS. HOLLANDER: I can do the photographs, Your Honor.

These photographs Agent Miranda, has been through all of the material --

THE COURT: What are 419, 444, and 721? What are those photographs of?

MS. HOLLANDER: No. 419, I may not use all of them, but No. 419 -- I can show them to you. No. 419, No. 444, they are really all similar pictures.

THE COURT: What are they of, counsel? That is what I am asking.

MS. HOLLANDER: They are pictures of Holy Land employees with families with tents, families living in tents and providing them services.

THE COURT: I am actually looking at what Mr. Westfall emailed this morning.

MS. HOLLANDER: Do you want to see these?

THE COURT: Yes.

MS. HOLLANDER: I am sorry. I thought that is what you were looking at. I will tie it into his testimony. I just wanted to answer the first question, which is what they were.

THE COURT: Okay. I have seen them. Go ahead.

MS. HOLLANDER: The Government introduced a conference call and played part of the conference call and didn't play part of it where the speaker actually talks about demolished homes, and that is what this goes to, because the --

MR. JACKS: Which exhibit are we talking about now?

MS. HOLLANDER: We are talking about I believe it is HLF -- Baker Wiretap No. 23. I am pretty sure it is Baker Wiretap No. 23. The Government introduced the entire call but only played part of it, and I want him to read another part which specifically talks about demolished homes.

And in his direct examination Agent Miranda said there was no talk in the call about anything relating to charity, and HLF had a lot of projects involving providing resources for people whose homes were being demolished. So that is why those photos are relevant. I may not use all of them.

THE COURT: Well, of course, you will have to see if he recognizes something about those photos to be able to lay a predicate.

MS. HOLLANDER: And I will.

The other photograph, the one off the internet --

THE COURT: Do you have that?

MS. HOLLANDER: Yes, I do.

THE COURT: Let me take a look at that.

MS. HOLLANDER: It is a photograph -- Your Honor, it is a photograph -- Let me explain. Agent Miranda talked about an individual Nihad Awad who worked for CAIR, and he specifically mentioned him in his direct, and he mentioned that he was at the Philadelphia meeting.

Nihad Awad was invited to the White House, and the photograph, which I will show Your Honor, is a picture of him with President Bush at the White House. It goes to impeachment.

What I intend to introduce is -- I want to show you the website where I got it, but I only intend to introduce the photograph.

THE COURT: Let me see it.

MS. HOLLANDER: They were at a mosque, but he was invited by President Bush, and the picture comes right off the White House -- It is a White House press release where he was invited. And you can see what -- I was not planning on anything what President Bush says. I have just provided that to the Government and the Court to know where the photograph came from. But they have talked about him, they have talked about his organization being something that came out of the Philadelphia meeting, there has been a great deal of mention about him, and that is why I think it is relevant to show that this same person that Agent Miranda is talking about that has come up throughout this case was invited to the White House

and met with President Bush.

THE COURT: Mr. Jacks?

MR. JACKS: Judge, I don't believe Agent Miranda testified about Nihad Awad.

MS. HOLLANDER: Yes, he did.

MR. JACKS: I don't remember him discussing that. Even if he did, this photograph downloaded from the internet, that is not a sufficient foundation. All this conversation from Ms. Hollander that, you know, he was invited to the White House, or they went to a mosque, there is nothing in the record about that. Even if it is true, that doesn't make it admissible.

And just that picture in and of itself, there is no foundation that can be laid through Agent Miranda to what she just -- Unless she intends to try to put it in front of the jury in the form of a question, which we would also object to, which is the purpose of us having this discussion now outside the presence of the jury.

There is no indication that Agent Miranda is going to be able to say when and where and under what circumstances this photograph was taken, whether it has been Photoshopped or anything else.

And as I said, the fact that it is downloaded from the website, that doesn't make it admissible. The predicate and the foundation still has to be laid by some competent witness.

And so --

THE COURT: Well, let's lay aside the predicate issues. If that were to be laid, do you have an objection -- would you have objection to that photograph coming in?

MR. JACKS: Yes, sir, just on relevancy grounds. Again, relevancy in the sense that there is no context that can be provided to that. There is nobody that is going to be able to say this is what was happening, this is when it was taken, it is a fair and accurate representation of what --

THE COURT: I am saying let's assume that it is accurate, that what she has there with her off the internet, that is the way it happened. Let's just assume. It mentions a meeting with President Bush, has President Bush talking. Let's assume that that is accurate and correct. What would be your objection, then?

MR. JACKS: It is not relevant.

THE COURT: Not relevant to any issue?

MR. JACKS: Yes, sir.

MS. HOLLANDER: Your Honor, Agent Miranda, I mean, I somewhat recent the allegation that I may have Photoshopped something.

THE COURT: I don't want to get into that. Let's lay aside the predicate issues. Let's just lay that aside for now. I am getting just to the relevance of it and whether that needs to come in or should come in.

MS. HOLLANDER: You Know, Agent Miranda didn't mention it because Agent Miranda is telling the jury what the Government wants the jury to know about this individual and it is not complete, and that is what impeachment is for. That is why we have cross examination.

I believe without a doubt that Agent Miranda can identify Nihad Awad.

THE COURT: I am getting away from predicate, I am saying. You keep wanting to go back to predicate.

MS. HOLLANDER: And it goes to show that this person that the Government is saying is -- you know, these people all support Hamas and the Philadelphia meeting was all about support of Hamas is someone that the President of the United States would invite and meet and stand next to at a mosque. I think that that is important for the jury to hear.

And Mr. Jacks keeps saying when we have tried to redact things that we are giving the jury a false state of what the actual facts are. This is to provide facts for the jury in the form of cross examination and that -- I mean --

THE COURT: I am just trying to understand how that is relevant to the issues that jury has to decide, though--whether this individual was at the White House or not, how that is going to help the jury make a decision on the issues before them, the issues that they are going to have to decide about these Defendants on trial, how that is helpful to

that.

MR. CLINE: Your Honor, can I take a swing at it?

THE COURT: Yes.

MR. CLINE: The Government, whether it is through Agent Burns or Agent Miranda, it might have been Burns, offered evidence that CAIR was the Americanized organization that came out of the Philadelphia meeting. It was kind of a fraud being perpetrated on the American people; the Islamic face was hidden. This was the American organization.

Nihad Awad, who I believe was at the Philadelphia meeting, was and is the head of this organization. The Government I believe has identified him as a member of the Palestine Committee.

It is highly relevant that in September of 2001, during this alleged conspiracy, the President of the United States is meeting with this man, inviting him to meet with him in a way as a symbol of the good Muslims, the people in the United States we want to embrace, particularly at times like right after --

THE COURT: And I understand that that that is where you would go with that, but I am still trying to understand how that is relevant to the issues that the jury has to decide.

MR. CLINE: It is relevant, Your Honor, because the Government has sought to paint a picture of a kind of a secret

and, in a way, fraudulent sort of group of Muslims, of which our clients are alleged to be part, that has pretended to be friendly to America and peace-loving, but in reality is devoted to terrorism and supportive of Hamas.  Our clients are alleged to be part of that.

THE COURT:  But your clients are alleged to be part of that not through CAIR, but through other --

MR. CLINE:  But they painted this big picture of all of the organizations there that were woven together.  There is NAIT, there is ISNA, MAYA, CAIR.  They are all woven together. This is the Government's theory, now.

THE COURT:  Right.  But what evidence has come in after the creation of CAIR that it was involved in any of the activities that these Defendants are charged with?

MR. CLINE:  Well, the testimony was, Your Honor, that and it was very sort of portentous, let's say, that coming out of the Philadelphia meeting the idea was to turn away from sort of overt support of Hamas and turn toward a covert support for Hamas that was going to be masked in this sort of pro-American and pro-peaceful thing.  And CAIR was specifically identified by Agent Burns as the organization that was going to promote this.

I might add, Your Honor, that CAIR has been identified by the Government as an unindicted co-conspirator in this case. So, you know, CAIR is woven into this case.  And to me I can't

think of anything more sort of forcefully rebuts this picture the Government has painted than to have the head of CAIR, a supposed member of the Palestine Committee, one of the people on the inside of this supposed conspiracy to trick the American people and perpetrate this hoax, meeting with the President of the United States in September of 2001. What could be more probative, what could be more powerful to the jury than to see that?

MR. JACKS: Judge, I am concerned that we are just getting away from the rules of evidence, and I just want to address -- You know, they talk about that, you know, the Government has redacted things or prevented them from putting things into evidence. And there is a remedy for a lot of what they complain about and that is they can call witnesses, assuming the testimony is relevant, and present that.

My first concern is that we just have skipped over the rules of evidence in terms of how this stuff is going to come into evidence. And the traditional foundational requirements, they are not even talking about those. They immediately go to, "Well we need to do this because the Government has said this or that," and you know, the question that needs to be asked or the statement that needs to be made is, "Well, that may be true, but you can do that in your own case; you can do that through your own witnesses."

And I don't think there is, as with so many of these

exhibits, I don't think there is any foundation that has been laid from the Defense standpoint, so many of these photographs and other things that have come in, that there is no context virtually with any of those except what is provided by the attorneys through their statements.

That is my first concern is that they are attempting to put on their case without calling any witnesses, and I don't believe that under the rules of evidence, as we go through these things item by item, that they are able to do that. And that is -- Holding them to the rules of evidence is no worse than holding us to the rules of evidence.

And so that is my first concern with, you know, before we get to the issue of whether it is relevant and all that kind of thing, let's find out, first of all, if it can be properly admitted through the witness that is on the stand.

Now, to respond to this idea about CAIR and the fact that there is a picture of somebody standing next to the President, all this other discussion about that he had him there in September of 2001, there is nothing of that in the record. Once again, it is them, the lawyers, providing the context to the Court, and they are going to try to provide it to the jury improperly, because there is nobody that is going to get up there and say this was in 2001, this was when he was the President, this was when he was the Governor of Texas.

The fact that it is off the White House website, that may

be true, but if I have got a piece of evidence and the fact that it is true doesn't mean I can put it in evidence because it is true. That is not the test. The test is has the proper foundation been laid. The truth or the reality of the exhibit, or whatever it is, that is not the standard to determine whether it comes in or not.

So I would like us to get past, or not just go past that and automatically assume, "Okay, it is what you say it is because you have given me this article off the internet." But the issue with CAIR -- Okay, there is a picture of this individual standing with the President. Well, the rest of the story, as Paul Harvey says, is that he was criticized for that, and there are many reports and stories out there of Congressmen who have come out and at one time were supportive of CAIR and then as they found out about CAIR have publicly criticized and distanced themselves.

So that notion that a single picture presents this one position that the Defendants want to claim is not the whole story in context. And if the issue is going to become, you know, what all has CAIR done post 1993 or '95 or whatever, we are going to be here a long time. And I know that is an issue that the Court has tried to stay away from to the extent that it is not relevant. And I think this photograph falls right in that category. And, you know, if we are going to stay away from having CAIR be on trial in this case, then this

photograph is not relevant and should not be admitted.

And again, going back to the notion of, you know, even before you even get to that relevance question you have got to look at the rules of evidence and whether it can be admitted through this witness, or any witness that the Government puts on.

THE COURT: Mr. Cline or Ms. Duncan, you were standing up. Did you have anything you wanted to add?

MS. DUNCAN: Your Honor, I just had an additional point to add in terms of the relevance of the photograph.

The Government attempted -- They used Mr. Abu Baker's declaration where he said that the Philadelphia meeting was a meeting of the intellectual community leaders, and attempted to portray that as a lie; that this was really a dark secret meeting of people, and this picture goes to show that Nihad Awad, who was one of the members of that meeting, was in fact a leader of the Palestinian Committee. It sort of ties what Mr. Cline was saying to the evidence that has been introduced in this case as an additional point of relevance.

THE COURT: Thank you.

Mr. Cline?

MR. CLINE: Your Honor, I don't know if you are worried about this foundation issue.

THE COURT: Well, he has raised a point. Even if you go -- and I let some of the other pictures in because I

thought the pictures themselves, along with the agent identifying either the workers or employees, or somebody, and had "Kosovo relief," the picture appeared to be what it purported to be, which is the foundation for a picture.

All you can do with this picture is you can show an individual with President Bush. All this other information that you are talking about, you know, September after 9/11, none of that could come in, obviously.

MR. CLINE: I think foundation is an important requirement, and --

THE COURT: And so at that point when you just have a picture, I don't know --

MR. CLINE: Foundation issues are ones that we have visited often in this trial and will revisit when the Government has other exhibits to offer.

But if it were necessary to subpoena someone from the White House, the person in charge of the website, for example, to come and authenticate this picture, we can do that. It strikes me as an extraordinary waste of time and resources.

THE COURT: And I agree. Generally I agree, which is why I was getting to the relevance issue.

MR. CLINE: But if we have to do that, by goodness, we will issue that subpoena.

THE COURT: But then we have to deal with the relevance issue.

MR. CLINE: And on relevance, Your Honor, again what the Government wants to do here, and I am not faulting them, they are advocates just as we are, they want to open the door just enough to get in that little drop of poison, and then they want to slam it shut so we can't present any of our stuff. As soon as they put in their stuff, understandably, then when we want to put in our little bit to counter what they put in, they say, "That is too much. It is going to create a mess."

We are not asking to put in a bunch of stuff here. They have put in some information about CAIR. They put in Agent Burns' opinion that it was the American face going forward in '93, that was the new organization that I think Mr. Abu Baker was referring to at the end of his summary of what was going on in the Philadelphia meeting. They brought up Nihad Awad. They have shown exhibits portraying him as a member of the Palestine Committee.

All we want to do is put in one photograph. That is not opening the door. It is not prolonging the trial. It is not doing anything. It is just one picture.

MR. JACKS: Your Honor, they can also subpoena Nihad Awad. They don't have to subpoena the web host of --

THE COURT: Yeah, but I still think you are -- I agree that without somebody testifying to the context of the picture, all you can get a picture.

Clearly the picture on its face is a picture of President Bush with some individuals, and if the agent can identify that or somebody, that probably is fine in my view, because the foundation is does this appear to be what it purports to be, somebody that can testify to that. There is not any indication that that is in fact a made-up photograph.

MR. JACKS: I understand.

THE COURT: Because you can say that about any photograph that something is made up.

MR. CLINE: Can I interrupt? I apologize. I agree with Mr. Jacks to this extent--that if Agent Miranda cannot recognize Nihad Awad in the picture, then we can move on.

THE COURT: Absolutely. I am assuming that he can.

MR. CLINE: I am assuming he can as well.

THE COURT: If he can, then I am past where you are, but not as far as they are in the sense that doesn't establish 2001, doesn't establish he was invited, any of that. That doesn't come in. All you have is a photograph.

MR. CLINE: But what it does establish is that at sometime between the time President Bush became President --

THE COURT: Well, but we don't know that from the picture. It doesn't say he is the President, as Mr. Jacks pointed out. We just know it is a picture of President Bush and some individuals. That is really all you can tell from the picture, because we don't have a time frame for it. The

agent can't testify when that was taken, like a typical sponsoring witness would testify to the time frame for the picture. You are not going to have that.

MR. CLINE: I think the jury could reasonably infer from the appearance of the man whom we have seen for many years that this is during his presidency, which would put it during the relevant period.

Now, again if that is really an issue here, we can bring somebody in from the White House to they, "Yes, that is President Bush. That is Nihad Awad. This was taken on a particular date." But why go through all that when we all know what it is about, and the jury is going to know what it is about?

MR. JACKS: Your Honor, I spent a few bench conferences up there having to go through this with my exhibits, so the fact that it is one exhibit, it is not one exhibit. We are seeing this throughout this case of them seeking to introduce exhibits without calling any witnesses that really would be able to provide the foundation. So admittedly it is one exhibit, but it is one of many that they have sought to introduce through this same fashion with the same shortcomings, and they want to put that picture out there and then they are going to provide the context through their statements or questions or inferences, or whatever, and I just do not believe that they are able to lay a foundation. I

don't know if Agent Miranda will recognize Nihad Awad or not.

THE COURT: And if he doesn't, the ruling on the other photos was if the agent couldn't recognize anybody in there, then it doesn't come in.

I am going to sustain. I don't want to keep the jury waiting much longer. I am going to sustain the objection at this point, so don't go into that at this time on cross. Let me give that some more thought as to both the foundational as well as the relevance issue.

I am a bit concerned, you know, like you said, this is about Hamas, but you brought CAIR into the case, and Mr. Cline has a valid point that you want to be able to talk about it but you don't want them to talk about it. And this is relevance, not to foundation. That is why I am saying let's get past this. And then you don't think -- You don't want them to get into it because then there are other issues, but yet you are the one that injected CAIR into the case.

And I still don't know ultimately how that will help the jury. If we got into this big fight over CAIR and whether in fact it is what the Government says it is, just the American face of the terrorist movement, or it is what CAIR purports to be, that that would help the jury resolve the issues before them; that that would help them in any way resolve those issues that are before this jury. And I am leaning towards no. It would get us into a fight over that issue. But I

don't know ultimately how that would help this jury.

MR. CLINE: Well, Your Honor, I realize you are thinking about this issue and haven't made a final determination, but if Your Honor comes down there, then we would like an instruction, let's say, that nothing that the jury has -- And I am just making this up.

THE COURT: I understand you are thinking out loud, too.

MR. CLINE: I am thinking out loud. But we want some kind of an instruction that the jury is not to consider CAIR, draw any inference against the Defendants from CAIR, that they are to disregard the testimony about CAIR. I mean, if CAIR is not going to be in this case, it has got to be not in this case, and not just partly in the case the way the Government wants to portray it, which is how it is now.

THE COURT: We will give that some thought.

MR. WESTFALL: Just one other thing, Your Honor.

THE COURT: One other thing. No more. All right.

MR. WESTFALL: That is all. You know, bias is always in play, and the credibility of Agent Miranda is something the jury certainly will have to consider, and this really goes to that as well.

THE COURT: I disagree that it goes to that as much as you are making it out to go to that, but I understand those issues.

No, no more. We have got the jury waiting. I said we are going to stop.

Go ahead and bring in the jury in, and go ahead and get Agent Miranda.

(Whereupon, the jury entered the courtroom.)

THE COURT: Ladies and gentlemen of the jury, good morning. We are ready to proceed.

Mr. Jacks?

MR. JACKS: Thank you, Your Honor.

Q. (BY MR. JACKS) Good morning, Agent Miranda.

A. Good morning, sir.

Q. Yesterday when we broke for the day, I believe the last exhibit that we were making reference to was what had been referred to as the security document by me, but it is exhibit InfoCom Search No. 35.

MR. JACKS: Mr. Lewis, could you display InfoCom Search No. 35 again on the screen?

Q. (BY MR. JACKS) And Agent Miranda, is that the first page of this document that we were going through yesterday afternoon when we broke for the day?

MR. JACKS: Mr. Lewis, please go to I believe it is page 12, the first page. Thank you.

Q. (BY MR. JACKS) And this document is entitled "The foundations, policies, and guidelines." Correct?

A. Yes, it is.

Q. And did you find other documents in your examination of the evidence in this case that were of a somewhat similar nature to this particular document that talks about communication and security issues, that type of thing?
A. Yes I did, sir.
Q. Are you familiar with a document that has been identified as Ashqar Search No. 15?
A. Yes, sir.
Q. And is that a document that was photographed during the search of Abdel Haleem Ashqar's house in Oxford, Mississippi in December 1993?
A. Correct, sir.

MR. JACKS: Your Honor, we would move the admission of Ashqar Search No. 15.

MR. CLINE: Our previous objections, Your Honor.

THE COURT: All right. That is overruled. That is already in evidence.

MR. JACKS: All right. Thank you.

Q. (BY MR. JACKS) Agent Miranda, is that the first page of the exhibit Ashqar Search No. 15?
A. Yes, it is, sir.

MR. JACKS: Mr. Lewis, would you mind just -- Just scroll through the first I believe it is four pages, if you would. And you can go back to the first page now.

Q. (BY MR. JACKS) Agent Miranda, just if you would,

describe this document physically in terms of what it looks like and how it is laid out.

A. Well, it is four pages in Arabic. It is broken up into columns and each column has a different category assigned to it.

Q. And it was translated from Arabic into English. Is that correct?

A. Yes, sir.

MR. JACKS: Would you go to the fifth page of the exhibit, Mr. Lewis? Thank you.

Q. (BY MR. JACKS) Is this the first page of the English translation of the document?

A. Yes, sir.

Q. And if you would, would you please just describe how the document is structured or organized as shown on this particular page?

A. Yes, sir. There are five categories, columns. Starting on the left there are the goals, there are the means of execution or meeting those goals, a time frame that is set out, the party that executed or the execution party, and the party that is responsible for following up or the follow-up party.

Q. And do those headings continue throughout the document?

A. They do, sir.

Q. And directing your attention to the goal column on the

far left, what is the first goal that is shown in that particular column?

A. The first goal is "Building a solid communication apparatus to facilitate communication between."

Q. And then the sub heading?

A. There is No. 1, "The inside to the inside;" B would be "The inside to the outside."

Q. And have we seen that term or those terms the inside and the outside earlier in this case, those references, if you will?

A. Yes, sir.

Q. And insofar as your understanding and the context in which they have been used, what does the inside mean and what does the outside refer to?

A. The inside is going to refer to the West Bank, to Gaza, and to the Israel in terms of how it looked in 1948.

Q. And the outside would be what?

A. Anything outside of those areas.

Q. Does the document itself provide any kind of definition or explanation as far as what is considered the inside?

A. Yes. If you go to that section "means of execution."

Q. All right. The second big column, the wide one?

A. Right. And if you look at B, it has a little checkmark by it.

MR. JACKS: Agent Lewis, can you maybe enlarge that

a little bit, that part?
A. Right.
Q. And how does that go toward defining what is considered the inside?
A. Well, it is still in the section on communications between the inside and the inside, and it says there "Establishing three other computer centers in the Bank," which is the West Bank, "the sector," which is the Gaza Sector or the Gaza Strip, "and 48," which is Israel as it existed in 1948.
Q. If you would, just staying within that "means of execution" section as far as to how they are going to achieve these goals, just what is the first heading in the "means of execution"?
A. The first heading in the "means of execution" section is at the computer level.
Q. All right. And that means of execution, A, is what?
A. "Connecting computer machines in the existing centers in the Bank and the Sector."
Q. And what time is given for either that to be done or to be finished?
A. End of 2/90.
Q. February of '90, for the record?
A. Yes, sir.
Q. And who does it show to be the execution party?

A. Basman and Bayan.
Q. And have we seen or heard those names before in this case?
A. We have, sir.
Q. Who goes by the name Basman that has been mentioned in this case?
A. Basman Elashi.
Q. And who goes by the name Bayan that has been mentioned in this case?
A. Bayan Elashi.
Q. And are they related to the Defendant Ghassan Elashi?
A. They are his brothers.
Q. And has their name appeared in any documents that are part of the Palestine Committee?
A. Basman Elashi has shown up on the Palestine Committee list.
Q. All right. On the follow-up party, who is shown in that column to be the person responsible for following up on this execution?
A. Well, the first name is Abdel Haleem. That is the one with the line through it, and the second name is Izzat.
Q. And who in this case is known by the name Abdel Haleem?
A. That would be Ashqar.
Q. And in fact, you said this document was found in his house. Is that correct?

A.   Yes, sir.

Q.   All right.  His name is marked through and the name Izzat

is underneath it.  Has the name Izzat appeared earlier in this

case?

A.   Yes.  That is Izzat Mansour.

Q.   And is he the same person that was tasked with doing

security work at the Holy Land Foundation offices?

A.   Yes, sir, the same individual.

Q.   Was he on that apparatus chart as the person, the

chairman of the security committee?

A.   That is correct.

Q.   Okay.  Just to go on down, if you will, just quickly read

in the other means of execution and who is responsible for

them?

A.   The means of execution, B is "establishing three other

computer centers in the Bank, the Sector, and 48."  The party

responsible is the inside.

Q.   I want to interrupt you because you said the Bank, the

Sector, and the 48.  Given your work on this case, the 48

would be consistent to refer to what?

A.   Israel particularly as it existed in 1948.

Q.   All right.  Is that the relevance of the term 48?

A.   Yes.

Q.   All right.  And then just as far as who is charged with

those responsibilities, execution and then follow up?

A. The execution in that "means of execution" is the inside, and the follow-up is "As above," which is a reference to Izzat, because right below it is Abdel Haleem.

Q. All right. And then the other executions of that goal, who is supposed to be carrying those out?

A. Well, the "means of execution" is "providing the inside with computers suitable for communications," and the execution party is supposed to be Izzat Mansour and Abdel Haleem Ashqar, and the follow-up party is Abu Omar.

Q. And who in this case has been identified as going by the name Abu Omar?

A. The Hamas leader Mousa Abu Marzook.

Q. Go ahead and go through these things they are doing or planning to do.

A. Right. At the computer level, again for "building communications on the inside to the inside," D is to "purchase modem machines from the two brands and providing them to the inside (4 machines)." The execution and follow up party are the same as in the previous notation, C, which is Izzat Mansour Abdel Haleem Ashqar and Mousa Abu Marzook.

Q. Just go through the means of execution, then and we can just read who is the follow-up party and the execution party.

A. Yes, sir. No. 2 at the personal level, "Agreeing on individuals to become communication points and others in case of an emergency; B, providing the inside with the ink needed

for written correspondence."

Q. And then as far as the goal of building a solid communication apparatus, the inside to the outside, what are the means of execution?

A. No. 1 is "purchasing 8 fax machines for the inside and another one for the outside."

Q. Item No. 2?

A. "Purchasing a fax for the outside."

MR. JACKS: Let's go to the next page.

Q. (BY MR. JACKS) Does the first goal continue on, that being "establishing or building a solid communication apparatus"?

A. Yes, sir, it does.

Q. And just what are the means of execution that are supposed to be carrying out, this goal?

A. Point 6 reads "Purchasing a computer which meets the committee's requirements for communication;" point No. 7 is "Purchasing a communication program and providing it to the inside;" No. 8 is "Sending delegations to the inside at a rate of one delegation every two months; and No. 9 is "Receiving delegations from the inside once every five months."

Q. And do you see the reference in item No. 6 above there to the committee? Is the committee within this document further defined or explained within the document?

A. There are references to it, indirect references.

Q. And in this case, what committee have we heard reference to?
A. The Palestine Committee.
Q. Is it also known as the Central Committee or referred to as the Central Committee sometimes?
A. Yes, it is.
Q. Go ahead and just go through the goals, and just read the goals and then the means of execution.
A. Right. The goals here, which are still under the title of "building a solid communication apparatus to facilitate communication" is now the outside to the outside, and there is three points under that--"committee members," "support points," and they reference "Egypt, Jordan, and Britain," and the "other committees." The means of execution -- Should I continue with that, sir?
Q. Yes.
A. The means of execution are now "telephone, fax, mail, computer, and personal."
Q. Go ahead.
A. Yes, sir. "Providing the points with the necessary communication devices."
Q. Let me ask you, do you see how in the column for "goal" it is listed "committee members" is item A, and then there is No. 1 under the means of execution? Is that correct?
A. Yes, sir.

Q. And then item B, "support points," and if you move to the right, it also has that item numbered 1. What does that indicate to you about the connection between B, "Support points, Egypt, Jordan, and Britain," and then the second No. 1 in the "means of execution"?
A. Those two appear to be that necessary communication devices need to go to points which include Egypt, Jordan, and Britain.
Q. All right. And let me -- Over across you see in "execution party" for the line for "committee members"?
A. Yes, sir.
Q. And it has got the name Akram?
A. Right.
Q. All right. And has the name -- Do you recall or have you seen the name Akram in the Palestine Committee?
A. There is Mohammad Akram Adluni.
Q. All right. And do you recall if he was the author of any other documents that have been in this case?
A. I think he was, but I would have to be shown the documents to be certain.
Q. Do you recall the document that talked about the grand jihad and self-destruction of the West or inside destruction of the West?
A. I am familiar with it, yes.
Q. And do you know if he was the author of that document?

A. I don't know. I would have to look at that, sir.
Q. All right. Go ahead and resume, if you would, just the goals and then the means of execution.
A. Yes. Continuing on under "Means of execution," it says, "Personal communication (visits.)" And then under the goal C, the "other committees," in the "means of execution" it says "committee's secretariat."
Q. And is that title a title we have seen in other documents early in this case, earlier in this case?
A. Yes, it is, sir.
Q. All right. With regard to the Palestine Committee?
A. We have seen it in the Palestine Committee, and then there is also a reference to the secretariat with reference to the security document we have seen yesterday.
Q. What is the second goal that is set forth there on this page?
A. The second goal, 2, which is all the way to the bottom left is "Developing the communication devices."
Q. And just go to item No. 4 as far as a means of execution.
A. Item No. 4 says, "Designing communications systems in the inside and the outside and developing the systems currently used."
MR. JACKS: Would you go to the next page, please, Mr. Lewis?
Q. (BY MR. JACKS) What is the third goal that is listed

there on this next page?
A. That is the media aspect.
Q. And in terms of the subparts to that goal, what are they?
A. Subpart A is "Establishing a media company headquartered in Jerusalem with an office in Chicago," and sub point B is "information exchange between the inside and the outside."
Q. And then as far as means of execution, just read into the record what they list as the means of execution for information exchange?
A. No. 1 is "via mail (nonurgent and non-serious material.)" No. 2 is "Via computer (urgent and serious material.)"
Q. And just who is the execution party on that particular item?
A. That would be Izzat Mansour.
Q. All right. And item No. 3?
A. No. 3 is "Via fax (urgent and non-serious material.)"
Q. And do you see the reference to -- Excuse me. Go ahead. Go to item C, if you would, the goal in item C.
A. "Providing the inside with the approved bulletin."
Q. What is the fourth goal, according to this document?
A. The fourth goal is "the political aspect."
Q. All right. And what are the subparts of that goal?
A. Subpart A is "exchanging bulletins and magazines with the inside." Subpart B is "Making resolutions in regards to communications and news from Gaza." Subpart C is "Delivering

political resolutions outside to the inside and vice versa."

MR. JACKS: If you would go to the next page, please.

Q. (BY MR. JACKS) What is the fifth and final goal as set forth in this document?

A. It is the financial aspect.

Q. And what is the subpart of that goal or the elaboration of that goal?

A. It is "delivering funds from the outside to the inside."

Q. And how is it supposed to be carried out?

A. Point No. 1 for the means of execution for that goal is "sending checks to those in charge in the inside."

Q. And the -- Go ahead.

A. No. 2 is "Establishing commercial companies for electronics in the Bank, the Sector, and the 48." No. 3 is "strengthening al-Baraq Company."

Q. Do you know what al-Baraq Company refers to?

A. I do not.

Q. Okay. Go ahead.

A. No. 4 is "Dispatching 25 students from the inside for postgraduate studies."

Q. This No. 4, "Sending 25 students from the inside," that is as a means of executing the financial aspect? Is that how you read that?

A. Yes, sir.

Q. Okay.

MR. JACKS: Mr. Lewis, would you mind going back to InfoCom Search No. 35? And if you would, go to page 14 of that exhibit.

Q. (BY MR. JACKS) What is the heading on this exhibit, Agent Miranda?

A. "Document safety."

Q. Item No. 3, what is that?

A. Item 3 reads "Classifying documents with every committee in four categories: General, limited, private, and very private (see appendix.)"

Q. Did you find other evidence or documents that appeared to be consistent with these policies or Guidelines?

A. Yes, sir.

Q. I want to direct your attention -- Are you familiar with a document that was taken during the search of Ismail Elbarasse's house in August of 2004 which when translated bore the title "the trust"?

A. Yes, sir.

Q. And that document was seized in that search?

A. Yes, sir.

MR. JACKS: Judge, we would move the admission of Elbarasse Search No. 35.

MR. CLINE: We reiterate our previous objections.

THE COURT: And that is admitted.

MR. JACKS: Agent Lewis, would you mind showing -- Thank you.

Q. (BY MR. JACKS) Agent Miranda, I want you to help me because one of these documents, the security document, was InfoCom Search No. 35 and this document is Elbarasse Search No. 35, so if I misspeak please let me know.

With regard to Elbarasse Search No. 35, is that it, the first page of it that appears on the screen?

A. Yes, sir.

Q. And it is in Arabic. Is that correct?

A. Yes, sir.

MR. JACKS: And if you would, go to the last -- Just scroll through the pages, Agent Lewis, if you don't mind.

Q. (BY MR. JACKS) That is the fourth page, Agent Miranda?

A. Yes, sir.

MR. JACKS: Stop right there, please.

Q. (BY MR. JACKS) do you recognize that logo depicted there?

A. Yes, sir.

Q. What logo is that?

A. That is the symbol for Hamas.

Q. And the symbols that are depicted there, let's go to the top of that logo, the shape there between the two banners that come up. What does that represent?

A. It is either Israel or Palestine, depending on your

perspective.

Q.   And the building or structure there, what does that
represent?

A.   That is the Dome of the Rock.

Q.   Which you have testified about earlier?

A.   Yes, sir.

Q.   And in color is that the building that has the gold dome?

A.   Yes, sir.

Q.   And then what is crossed in front of the Dome of the
Rock?

A.   Two swords.

Q.   And I am not going to ask you to translate the Arabic.  I
am sure it is later on.

        MR. JACKS:  If you would go to the next page,
please.

Q.   (BY MR. JACKS)  And is this the first page of the English
translation?

A.   Yes, sir, it is.

Q.   And with regard to the upper left --

        MR. JACKS:  If you would, Agent Lewis, can you go
back to the first page?

Q.   (BY MR. JACKS)  Now, on that page is there handwriting on
the upper left corner?

A.   Yes, sir, there is.

Q.   Was that there when it was seized?

A. Yes, it was.

Q. And that is in Arabic. Correct?

A. Yes, sir.

MR. JACKS: Agent Lewis, if you will go to page 7.

Q. (BY MR. JACKS) And what does the translation show that handwriting to be?

A. "Documents file for the secretariat general."

Q. And just what are the dates -- This was apparently a faxed document?

A. Yes, sir.

Q. What is the date of the fax?

A. 6/10/92.

Q. And with regard to the title again, just what is the title? Read the title into the record.

A. The title is "the trust."

Q. And then below that, what does it state regarding the information about this particular document?

A. "A special non-periodical bulletin."

MS. HOLLANDER: We need to approach.

(The following was had outside the hearing of the jury.)

MS. MORENO: Excuse me, Your Honor. I have Elbarasse Search No. 35 was admitted on September the 25th subject to limitations. Do you have that?

MR. JONAS: Your Honor, the Defense objected saying

it was hearsay within hearsay. I don't think, Your Honor, I -- There were certain portions that were hearsay within hearsay, but we say it is all part of a co-conspirator statement because this is all part of the Muslim Brotherhood and the Palestine Committee. We agreed at that moment that I was only going to have Agent Burns address certain portions, and clearly Agent Miranda's testimony goes beyond those certain portions, so I think the issue is still hanging out there with regard to their objection as to hearsay within hearsay.

THE COURT: Except he offered it and I admitted it again, and that was subject to previous objections. Do you remember the specific objections?

MR. JONAS: I think if I recall correctly, and I could be wrong on this, I think the ball was left in the Defense's court to identify those specific instances of hearsay within hearsay.

MR. MYSLIWIEC: I don't think it was left in our particular court. There are some parts of this document that have quotes from other people, and we argued that the quotes from other people certainly should be excluded because that is clearly hearsay within hearsay, and these aren't quotes alleged to be co-conspirators. They have nothing to do with the state of mind of somebody in Hamas or anything like that. So I think those were the limitations.

MR. JONAS: This document is, I think it says on its face, is a publication by the international Muslim Brotherhood for the various -- for Hamas for the Palestine Committees worldwide, and we have established there is a connection in this case. And anything in it is a co-conspirator statement. If there is a quote by an individual, it is sort of adopted by Hamas in creating this newsletter.

MR. MYSLIWIEC: But reporting on what somebody said is not adopting what somebody is saying.

MR. JACKS: It is not being offered to show what that person said is true. It is being included to show that this is what they are spreading to their members. It is not -- We are not saying whatever is in quotes is true or not, but this is what they are putting in their newsletter or periodical, whatever you want to call it, and they are distributing it among their members. So whatever those persons said, and some of it talks about attacks or whatever, you know, that evidence is not intended to prove that is true. It is intended to prove this is what they communicated to their members. So that part of it is not hearsay.

MS. MORENO: I think that the Government's position on this, Your Honor, it seems that the term co-conspirator applies to anybody who says something and that quote appears in this particular document. I think it is a rather breathtaking argument to make in this regard.

And I would like the Court at least to take a look at the document and see if some of those portions at least can be redacted or Agent Miranda can stay away from those portions that we originally objected to within the quotes.

THE COURT: I need to take a look at them. I am not going to order them to redact them if I left the objection not ruled upon, if it is still open. I haven't sustained anything yet.

MS. MORENO: Apparently not, Your Honor.

MR. JONAS: No, Your Honor.

THE COURT: So it is still outstanding. I have to look at them. But I still wanted to see what the quotes are, the ones you are objecting to, the hearsay within hearsay, I can't make a determination obviously without taking a look of that. Has any come up on the screen yet?

MR. MYSLIWIEC: I don't think so. I have a feeling they are not intending to even get into the hearsay within hearsay, but I could be wrong. Are you doing any reading where it is a reading of what someone told somebody? I suspect that they are not.

MR. JACKS: No.

MR. MYSLIWIEC: Because it is not relevant to why they want to put it in anyway. If we can agree to redact those portions because they are not even trying to have the witness testify about them.

                    MR. JACKS: I would like to see what it is. I am still looking for quotes in here.

MR. JONAS: I think, Your Honor, for the moment--and jump in if I am wrong--we can continue with Agent Miranda's questioning, and I think we can deal within the quotes.

THE COURT: If you get to a quote, we can deal with it specifically. So far you haven't run into one.

MR. JACKS: No.

THE COURT: And then we will have to deal with that issue at some point.

MR. JONAS: I think it is best if the Defense could identify them since it is their objection.

THE COURT: Identify which particular portions you are objecting to, and I will take a look at that.

MS. MORENO: Thank you.

(The following was had in the presence and hearing of the jury.)

MR. JACKS: Agent Lewis, would you please show the first page of -- Thank you, sir.

Q. (BY MR. JACKS) Agent Miranda, is this the first page of the English translation of this document called "the trust"?

A. Yes, sir.

Q. And I think you were going to read above the introduction, that line above the introduction just as far as what it states.

A. Yes, sir. It says "A special non-periodical bulletin, Issue 1, 1 October, 1992."
Q. And if you would, in the first paragraph would you go down to, do you see the sentence that begins "The Movement"?
A. Yes.
Q. Just begin reading those two sentences, if you would?
A. There is two sentences that say "The Movement." The first or second?
Q. Start with the second one.
A. Yes, sir. "The Movement has now a weight that is taken into consideration abroad, and it is the one leading the powers that are opposed to the peaceful settlement, and it amasses all the capabilities for that purpose."
Q. The Movement, what organization does it refer to, that term?
A. Hamas.
Q. And how is the Movement -- What is Hamas' full name?
A. The Islamic Resistance Movement.
MR. JACKS: Go to the next paragraph, please, Mr. Lewis.
Q. (BY MR. JACKS) And if you would, beginning where it says "Due to all of this," would you begin reading there?
A. "Due to all of this, it was decided to issue a private non-periodical bulletin dealing with all the aforementioned (the Movement's positions and news, news of the inside,

directions...). The first issue of 'The Trust' is between your hands, and we ask God to help us and you to fulfill the proper duty towards the trust. We find it necessary to make some remarks which should be observed precisely."

Q. And just the reference to "the first issue is between your hands," what does that indicate to you?

A. We are giving it to you, and you have got to take care of it.

Q. You are looking at it?

A. Yeah.

Q. All right. Go ahead. The part about remarks that should be observed precisely, would you read those three remarks?

A. Yes, sir. No. 1, "The bulletin is specifically for the brothers, the Masuls of (Palestine Committee in every country only), and it is the trust in their necks."

Point 2, "The brothers are to study the bulletin in the periodical meeting of the committee, and it is not to be photocopied, meaning that the original copy should remain the only one."

Point 3, "The brothers should work on spreading the contents of the bulletin and the ideas contained in it among the Ikhwans and the collective Islamists."

Q. And these comments about the document being a trust in their neck, in that it is not to be photocopied and should only -- should be the only copy, is that relating back to the

security document and the document security issues that you observed in that document?

A. Yes, sir.

MR. JACKS: If you would, go to the next page.

Q. (BY MR. JACKS) And does this document, then, purport to convey the information that it indicated it was intended to convey?

A. Yes, sir.

Q. All right. What is heading there on the first page?

A. "News on the inside."

MR. JACKS: If you would, go to the next page.

Q. (BY MR. JACKS) And the first heading there?

A. "Eliminating collaborators."

Q. And would you just read, say, the first half of that paragraph?

A. Yes, sir.

Q. I am sorry. Read that whole paragraph.

A. Yes, sir. "At home, Hamas was distinguished by its effective role in killing collaborators. It chooses the most dangerous ones among them, interrogates him, takes his confessions, records it on tape, and fears God in what it does. It has murdered a dangerous collaborator called (Ibrahim Salamah) in Gaza. Fatah has claimed a collaborator and considered him a martyr holding a very large eulogy for him. Hamas then made public the tape of his confessions

during the interrogation and issued a statement clarifying the matter in its entirety and severely blaming Fatah for these actions. It is strange that the said collaborator had taken part with the special Israeli units in killing masked people to the point he shot a cousin of his who was masked."

MR. JACKS: And if you would, go to the right hand column?

Q. (BY MR. JACKS) What is the heading for the right hand column?

A. "Prisoners' release."

Q. Just read that paragraph?

A. "Hamas Movement issued a statement at home denouncing the size of the unfair releases by the enemy's authorities, as most of those released by instructions from Rabin as a good faith initiative toward the Palestinian people are from the Fatah Movement. It proved that in numbers, as the total number of those released in all areas from Fatah are (270) and only (17) from Hamas."

MR. JACKS: And go to the next page, Agent Lewis.

Q. (BY MR. JACKS) Do you see the heading entitled "positions"?

A. Yes, sir.

Q. And just read the first -- the introductory paragraph under that heading?

A. Yes, sir. It reads, "The Movement has decided to adopt

the following position from the self-rule: Rejecting the administrative self-rule, rejecting the elections related to it, refusing to take part in them, and calling upon the Palestinian people to boycott them. Based on that, the Movement has decided to take the following steps."

Q. And then are there a series of numbered items there?

A. Yes, sir.

Q. And what is item No. 5, if you would read that?

A. Item No. 5 is "Escalating jihad actions against the Zionist enemy."

MR. JACKS: Would you go to the next page, please, Agent Lewis?

Q. (BY MR. JACKS) And is there a heading there in this periodical, the topic "meetings"?

A. Yes, sir.

Q. And if you would, can you see just read the first sentence or two under that title "meetings"?

A. "The Movement delegation conducted several meetings and made contacts with some Palestinian powers and personalities during the past September. The most important topic was the self-rule and how to confront it and derail it, working to develop the Intifada and to attempt to mobilize the powers of our people where they exist."

Q. All right. And do you see beneath that they list meetings that took place? Do you see that?

A. Yes, sir.
Q. And you see item No. 3 making reference to a meeting between Hamas and something called "The Popular, the Democratic, and the General Command." Do you know what the Popular, the Democratic, and the General Command are?
A. Those are three terrorist groups.
Q. What are they called?
A. The PFLP.
Q. What does that stand for?
A. Popular Front for the Liberation of Palestine.
Q. All right.
A. There is the DFLP, the Democratic Front for the Liberation of Palestine, and then there is a Popular Front for the GC, General Command.
Q. And are those organizations all designated terrorist groups?
A. Yes.
Q. And as far as the discussions or the topics, what were the fundamentals that were discussed during that meeting with those groups? A and B is what I am asking you to read into the record.
A. Yes. A is "Self-rule and means to derail it, and B is "The Intifada, its continuation and development."
Q. If you would, there is a reference -- Do you see item No. 6? Go to the next column on the top right. And read the

first couple of sentences of item No. 6.
A. "The Movement delegation met with (9) Palestinian factions in Damascus over three days. These factions have approved a joint work plan to confront the self-rule, escalate jihad and armed resistance against the Zionist enemy, and also to call for a general strike on 9/23 in all the areas where Palestinians exist inside the occupied territories, Jordan, Syria, and Lebanon in order to express the rejection to the current settlement draft." Shall I continue, sir?
Q. No. That is fine. Thank you.
A. Yes, sir.
Q. Let me ask you --
MR. JACKS: Go to the last page, before I move from that. It will be page 17 of the exhibit, Mr. Lewis.
Q. (BY MR. JACKS) And at the bottom, would you read, please, just the translation at the bottom?
A. Yes, sir. The one in bold?
Q. Yes.
A. "A slogan to be adopted in the sixth anniversary for the start of the blessed Intifada."
Q. The first Intifada broke out in December of 1987. Is that correct?
A. Yes, sir.
Q. And the sixth anniversary, then would be December of what year?

A. '92.

Q. Or is it '93? I always get, depending on when it started, whether it is the start of the sixth year or --

A. Yeah. Right.

Q. Okay. And then the logo is translated, or the terms?

A. "Palestine, the Islamic Resistance Movement, Hamas."

Q. And that is what is written on the logo on those banners that we saw?

A. Yes, sir.

Q. Okay. Going back to this security document --

MR. JACKS: If you would, Agent Lewis, InfoCom Search No. 35, if you could pull that up, please. And if you would go to page 20 of the exhibit.

Q. (BY MR. JACKS) What is the captioned policy No. 7 at the bottom?

A. "Safety of offices and firms."

MR. JACKS: Would you go to the next page, please?

Q. (BY MR. JACKS) And do you see there is, like beginning No. 3, 4, 5, there are these policies and guidelines that are listed. Is that correct?

A. Yes, sir.

Q. Go down, please, to item No. 12. And what is the policy that is set forth for item No. 12?

A. It is, "Conducting necessary maintenance measures for the foundation (individuals, location, equipment) and using

advanced equipment for that."

Q. All right. And it says the word "foundation" in that sentence. Correct?

A. Yes, sir.

Q. "The foundation." Did you find any evidence indicating that the Holy Land Foundation attempted to do anything that would be consistent with this policy or guideline?

A. Yes, sir.

Q. Are you familiar with what has been marked for identification purposes as Holy Land Foundation Search No. 91?

A. Yes, sir.

Q. And is that a document, a paper document or series of pages that was found within the premises or the material taken from the Holy Land Foundation?

A. Yes, sir.

Q. Its Dallas office?

A. Yes, sir.

MR. JACKS: Judge, we move the admission of Holy Land Foundation Search No. 91.

MR. CLINE: No objection.

THE COURT: Admitted.

MR. JACKS: Could you display the first page of that?

Q. (BY MR. JACKS) Agent Miranda, do you recognize this as the first page of Holy Land Foundation No. 91?

A. Yes, sir, I do.
Q. And does it appear to be a letter?
A. Yes, sir.
Q. And on whose letterhead is this letter created?
A. The Executive Protection Group, Incorporated.
Q. At the top of the letter, is there a statement or saying?
A. Yes, sir, there is.
Q. Just read it into the record, please.
A. "With Allah's Name, The Merciful Benefactor, The Merciful Redeemer."
Q. And who is the letter addressed to?
A. It is addressed to the Defendant Shukri Abu Baker.
Q. And the date?
A. It is dated 29 July, 2000.
Q. And the subject matter according to the reference there below the address?
A. "Technical surveillance countermeasures. Basic RF sweep results and recommendations."
Q. And RF in your experience and background is an acronym for what?
A. Radio frequency.
Q. All right. And if you would, just read the letter, please?
A. Yes, sir. "Dear Brother Baker, As-Salaamu-Alaikum. This letter is to thank you and your organization for allowing EPG,

Inc. to provide a Basic RF Counter-Surveillance Sweep of your facilities on Wednesday 23 August, 2000. We were pleased to provide this service as a 50 percent discount, as a small contribution to your on-going work on behalf of the community. Al-Hamdulilah!

"Following please find a Statement of Results for the sweep, as well as information regarding Technical Surveillance Countermeasures and Recommendations for your specific situation."

Q. All right. That is fine. You don't need to read the rest of the letter.

A. Yes, sir.

Q. And who signed the letter?

A. An individual by the name of Shihan Dr. F.D. Hale.

Q. What title does he put for himself?

A. President and CEO of EPG and regional director of security, Muslim American Society.

MR. JACKS: Would you go to the next page, Agent Lewis?

Q. (BY MR. JACKS) And is this the referenced page that contains statement of results?

A. Yes, sir.

Q. All right. And would you please read the first two paragraphs under that statement of results?

A. It reads, "On Wednesday, 23 August, 2000, after the close

of normal business hours, Executive Protection Group, Inc. performed a Technical Surveillance Countermeasures Basic RF Sweep of the Holy Land Foundation for Relief and Development facility located at 504 International Parkway, Suite 509, Richardson, Texas, 75081.

"The Basic RF Counter-Surveillance Sweep determined that certain aspects within the facility, and therefore the Foundation, have been under technical surveillance by unknown entities for an undetermined period of time. At the time of the sweep, certain recommendations were made regarding these findings, as well as some general suggestions."

Q. And just from your reading of that paragraph, as far as the results of this purported examination, is there any indication that this individual located any kind of electronic surveillance or was saying there was any kind of electronic surveillance there?

A. I don't think so, based on what he is saying.

Q. Does he anywhere in this document further elaborate on what his opinion was?

A. No.

Q. Okay.

MR. JACKS: Agent Lewis, would you go back to InfoCom Search No. 35, page 19?

Q. (BY MR. JACKS) The heading on this page of this security document for policy, No. 35, or whatever is what, Agent

Miranda?

A. "Travel and transportation safety."

Q. What is the second guideline or policy described there?

A. It is, "Providing a suitable cover for travel (commerce, tourism, visiting relatives) and supporting it with documents, commercial samples, catalogs, or tourist brochures. Also achieving this pretext in the visited country by taking tourist tours, making commercial meetings or reaching bargains."

Q. All right. Did you find anything in your examination of the evidence in this case that indicated that the Holy Land Foundation or any of the Defendants did anything that would appear to be consistent with this policy?

A. Yes, sir.

Q. Are you familiar with the document which has been labeled for identification purposes as InfoCom Search No. 36?

A. Yes, sir.

Q. And is that a document that was seized from the premises of InfoCom during its search in September of 2001?

A. Yes, sir.

MR. JACKS: Judge, we move the admission of InfoCom Search No. 36 if it has not already been admitted.

MR. CLINE: I am not sure if it has been. We object on the grounds stated.

THE COURT: No. 36 has not been admitted. And that

objection is overruled. That is admitted.

Q. (BY MR. JACKS) Agent Miranda, is InfoCom Search No. 36 shown on the screen?

A. Yes, sir.

Q. And that is a one-page document in English?

A. Yes, sir.

Q. And does it appear to be a letter?

A. Yes, sir.

Q. And to whom is it addressed?

A. To the Embassy of Saudi Arabia, Counselor Section, Washington, D.C.

Q. Does it bear a date?

A. It does, sir, dated January 2nd, 1996.

Q. And it is addressed to "Dear Counselor"?

A. Yes, sir.

Q. And if you would read the contents of the letter.

A. It reads, "I would like you to assist Mr. Akram Mishal in obtaining a business visa to visit our offices in Saudi Arabia. He carries a United States of America passport No. 014856775 issued in Washington, D.C. on June 3rd, 1992 and valid till June 2nd, 2002. Mr. Mishal represents InfoCom Corp. and works as its International Sales Manager. His visit to us is very much needed to strengthen the existing relations between our companies. United International represents several products and services that InfoCom Corp. provides

since 1990."

Q. And Akram Mishal is who?

A. Akram Mishal was an officer at the Holy Land Foundation and relative of the Defendant Mufid Abdulqader.

Q. And was Akram Mishal, in any records that you looked at, that he was an employee of InfoCom?

A. No, he was never an employee of InfoCom.

Q. In your investigation, did you look at the payroll records of InfoCom?

A. I did.

Q. Did you look at records with the Texas Workforce Commission to see who should to have earned wages at InfoCom, or any company such as that?

A. I did.

Q. Anything to indicate -- Did you find anything to indicate that Akram Mishal worked for InfoCom?

A. No, I found nothing.

Q. It represents in this letter that he works for InfoCom and works as its international sales manager. Is that true?

A. No.

Q. Who was the international sales manager for InfoCom?

A. The Defendant Ghassan Elashi.

Q. And where was this letter found?

A. In Ghassan Elashi's office at InfoCom.

Q. This letter is signed by -- not signed, but it bears the

typed name of what?

A. Mansour Alnaser.

Q. Do you have any idea who that is?

A. I think he was related to the company that is mentioned here, United International. It sounds familiar to me.

Q. All right. Was this letter as we see it -- Excuse me. This letter was in English when it was found. Correct?

A. Yes, sir.

Q. And so there was no signature on this letter. Is that correct?

A. No, sir.

Q. Did you find other examples in your examination of the evidence indicating that the Holy Land Foundation or any of its employees or the Defendants may have on other occasions taken steps to travel under false pretenses?

A. Yes, sir.

Q. Are you familiar with documents which have been identified as HLF Search No. 89?

A. Yes, sir.

Q. And are those a series of documents that were seized during the search of the Holy Land Foundation Dallas office materials?

A. Yes, sir.

MR. JACKS: Judge, we move the admission of Holy Land Foundation Search No. 89.

MR. CLINE: No objection.

THE COURT: That is admitted.

Q. (BY MR. JACKS) Agent Miranda, on the screen there before you, is that the first page of Holy Land Foundation Search No. 89?

A. Yes, sir.

Q. And does it appear to be a letter?

A. Yes, sir.

Q. And on whose letterhead is the letter prepared?

A. It is for a company you can see the name in the upper left hand corner Jamjun Advanced Technology.

Q. All right. And below that to whom is the letter addressed?

A. It is addressed to the Consular Section of the Saudi Embassy.

Q. And the H.E., the ambassador, and then the custodian of the Two Holy Mosques Embassy, is that a reference to Saudi Arabia?

A. That is correct.

Q. The Two Holy Mosques being located in Saudi Arabia?

A. Yes, sir.

Q. All right. And the subject matter of this letter, according to the letter?

A. The subject matter is "Request for issue a visit visa."

Q. And just the body of the letter, if you would just read

that into the record.

A. It reads, "Dear Sir, we are in urgent need to have Mr. Shukri Ahmad Baker and Mr. Akram Mishal, whose particulars are given below, with us in Jeddah for consultation of some important business related to our firm."

Q. And then it contains identifiers for Akram Mishal and Shukri Ahmad Baker. Is that correct?

A. Yes, sir.

Q. And the closing paragraph or sentence, read that, please?

A. "We request you to kindly issue a visit visa to above gentlemen to enable them to visit us in Jeddah and Riyad as soon as possible."

Q. And then it is signed by this Marwad Ahmed Jamjun?

A. There is a signature there, yes, sir.

MR. JACKS: Go to the next page, please.

Q. (BY MR. JACKS) And this is an Arabic part of this exhibit, Agent Miranda?

A. Yes, sir.

Q. All right.

MR. JACKS: And if you would, go to the next page.

Q. (BY MR. JACKS) This page of the exhibit was also connected, found with this letter?

A. Yes, sir.

Q. And what is depicted on its page 3 of the exhibit? What is this document?

A.    This is a visa application for Saudi Arabia.

Q.    Now, I take it you have traveled overseas a fair amount.

Is that correct?

A.    Yes, sir.

Q.    And just in layman's terms, what is a visa?

A.    A visa is something that has to go in your passport which

tells you basically how long you are allowed in a country.

Q.    And are there certain countries that require a visa and

certain countries that don't require a visa?

A.    Yes.  Depending on which country you are from, there are

visa requirements or those visa requirements are waived.

Q.    And are there instances where, depending if you are

traveling on business as opposed to pleasure, under one

circumstance you may be required to obtain a visa and under

another circumstance you may not be required to have a visa?

A.    Right.  Or official government travel, for instance, also

applies.

Q.    And as far as who decides whether you need a visa or not

in the policies, is that something that is subject to the

country that you are visiting?

A.    Right.  The country you are visiting decides whether or

not a visa is required of you.

Q.    For example, if I wanted to take a trip to the Chech

Republic, for example, where would I go to find out if I need

a visa, and if I did where would I go from the United States

to try to obtain a visa?

A. Generally you can go on to the internet to the State Department, our State Department's websites, and those generally give you good information. But you could also look up the Embassy of the country you are going to, in this case your example the Chech Republic, and you would see what the visa requirement is for somebody that wants to come over for business or pleasure or official travel, depending on what your circumstances are.

Q. And are visas issued by the government of the country you are going to visit?

A. Yes. You generally turn in your passport and they put the visa in the passport.

Q. Okay. So if you want a visa and you are going somewhere, you have to make contact with some representative of that country's government?

A. That is correct.

Q. And it can be done through the embassy or the consular's office which may be around the country. Is that right?

A. Generally, yes, sir.

Q. So whose visa application is this?

A. This is the visa application for the defendant Shukri Baker.

Q. And if you will, it has various personal identification. Is that correct?

A.   Yes, sir.

          MR. JACKS:  Agent Lewis, I just want to identify the
date.  If you could go down to about the bottom quarter of the
page.

Q.   (BY MR. JACKS)  And do you see a date there, Agent
Miranda, when this document was signed?

A.   Yes, sir, 4/3/01.

Q.   And does it appear to be signed by Shukri Baker?

A.   Yes, sir.

Q.   And if you would, continue --

          MR. JACKS:  If you would, go back up, Agent Lewis,
to the middle of the page.

Q.   (BY MR. JACKS)  And where it says "purpose of travel."

A.   Yes, sir.

Q.   And there are some boxes there that can be checked or
filled in?

A.   Yes, sir.

Q.   What markings are there?

A.   There is two markings.  There is a circle and some lines
for work and then there is a circle around "visit."

Q.   Okay.

          MR. JACKS:  And if you would, go back down, Agent
Lewis, to the bottom.

Q.   (BY MR. JACKS)  If you would, is there information
provided there to be filled in by the applicant?

A. Yes, sir.

Q. And what does it say about what is the information filled in there?

A. It says, "The name of the applicant is Shukri Ahmad Baker. His nationality is USA. Company name is InfoCom Corporation."

Q. Is there an address?

A. Yes. That is the address for InfoCom.

Q. That is the address for InfoCom. Correct?

A. Yes, sir, it is.

Q. That we saw on the map yesterday?

A. Yes, sir.

Q. All right. And I will ask you the same question about Akram Mishal. Did you find any evidence indicating that Shukri Abu Baker worked for InfoCom or was an employee of InfoCom?

A. No, he was never an employee or worked for them.

Q. All right.

MR. JACKS: Would you go to the next page?

Q. (BY MR. JACKS) Is this simply a duplicate of the letter that was shown on the first page of the exhibit?

A. Yes, sir, it appears to be a duplicate.

Q. And this handwriting and that such a thing, was it on there when it was seized?

A. Correct.

MR. JACKS: Would you go to the next page, which I think is page 35.

Q. (BY MR. JACKS) And is this another visa application, Agent Miranda?

A. It is, sir.

Q. And who is this for?

A. This is for the HLF officer Akram Mishal.

MR. JACKS: And if you would, go down to the purpose of travel. Let me --

Q. (BY MR. JACKS) Do you see where it says business address and telephone number?

A. Yes.

Q. What did Akram Mishal put in there?

A. InfoCom Corporation, 630 International Parkway, Suite 100, Richardson, Texas, and there is a telephone number as well.

Q. What did he mark as the purpose of travel?

A. He marked "visit."

Q. And the dates of travel, are those shown there under "date of departure"?

A. The date of departure was April 20th, '01; the date of arrival is April 15th, '01; and the duration of the stay is seven days.

Q. All right. So I don't know if it is in reverse order, I guess as far as the country the date you are going to arrive

in you are visiting, and the date you are going to leave?

A. The date of arrival in the country is April 15th, '01 and the date of departure is April 20th, '01.

MR. JACKS: And if you would go down and show the date this was signed and who signed it.

Q. (BY MR. JACKS) Do you see that, Agent Miranda?

A. I do, sir.

Q. What date was it signed and by whom?

A. 4/3/01 by Akram Mishal.

Q. And if you go on down to the part completed by the applicant, what does he show as his company name?

A. InfoCom Corporation.

Q. And again the same address?

A. Yes, sir.

MR. JACKS: And if you would, go back to page 3, the application for Shukri Abu Baker.

Q. (BY MR. JACKS) The part up there about where the business address, on that particular application is there anything filled in for the business address?

A. No, sir.

Q. All right. At the bottom, though, he does represent that he works for InfoCom Corporation. Is that correct?

A. Yes, sir.

MR. JACKS: If you would just scroll through the pages. Go to the next page, please, the next one, and the

next one.

Q.   (BY MR. JACKS)  And is that a photocopy of the inside of Akram Mishal's passport?

A.   Yes, sir.

          MR. JACKS:  And the next page, please, Mr. Lewis.

Q.   (BY MR. JACKS)  Does that purport to be a photocopy of the first page inside cover of Shukri Abu Baker's passport?

A.   Yes, sir.

          MR. JACKS:  If you would, go to page 9, please.

Q.   (BY MR. JACKS)  And is this -- Can you see that, Agent Miranda?

A.   Yes, sir.

Q.   And the date that is translated -- There was an Arabic version of this letter in there.  Correct?

A.   Yes, sir.

Q.   Is this the translation of that Arabic page?

A.   Yes, sir.

Q.   And the date that was translated as being the corresponding date?

A.   4/21/2001.

Q.   All right.  And this activity of representing themselves as employees of InfoCom, was that something that you noticed as it relates to this security document and the policies set forth in there?

A.   Yes, sir.

Q. Did you ever locate any evidence that might have been relevant or explanatory or pertinent to this trip that was referenced in this earlier exhibit?
A. Yes, sir.
Q. And are you familiar with HLF Search Warrant No. 90?
A. Yes, sir.
Q. And was that a document seized from the offices of the Holy Land Foundation in Dallas?
A. Yes, sir.
MR. JACKS: Judge, we move the admission of HLF Search Exhibit No. 90.
MR. CLINE: No objection.
THE COURT: Admitted.
Q. (BY MR. JACKS) And Agent Miranda, is that the first page of this exhibit?
A. Yes, sir.
Q. And was it a one-page document in Arabic?
A. Yes, sir.
Q. On the Holy Land Foundation letterhead?
A. Correct.
MR. JACKS: If you would, go to the next page, please.
Q. (BY MR. JACKS) And is this a translation of that one-page Arabic document?
A. Yes, sir.

Q. And does it appear to be a letter of some type?
A. Yes, sir.
Q. And if you would, it is on Holy Land Foundation letterhead?
A. Correct.
Q. What is the date shown on the letter, please?
A. 6/18/2001.
Q. And to whom is it addressed?
A. To the honorable Mr. Ghalib al-Hamad.
Q. And if you would, where it begins "We at your Foundation," would you just read those two paragraphs, the body of the letter?
A. Yes, sir. It reads, "We at your Foundation, the Holy Land Foundation for Relief and Development, are pleased to offer our most sincere prayers to God to protect you, care for you and to bless your efforts to serve Islam and Muslims' issues, and may He accept from us and you the best of deeds.
"We write this letter to your honorable person hoping to visit you during our upcoming visit to The Kingdom of Saudi Arabia in the company of the Foundation's General Director, Mr. Shukri Abu Baker, during the last week of the current month, hoping that you allow us to visit you on the 27th or the 28th of the current month in order to introduce the achievements of the Foundation during the al-Aqsa Intifada and to inform you of the Foundation's goals and projects."

Q. And the al-Aqsa Intifada refers to what, Agent Miranda?
A. The second Intifada.
Q. Now, the second Intifada, is that another uprising?
A. It is.
Q. And when did it initiate or begin?
A. 2000 or late 1999.
Q. All right. And who signed this letter?
A. Akram Mishal.
Q. And the same individual that was depicted in the earlier visa applications and that you have testified about in this case?
A. Yes, sir.
Q. And this Ghalib al-Hamad, what organization or entity is he associated with?
A. I believe he is associated with the Islamic Development Bank.
Q. And is that a bank located in Saudi Arabia or headquartered in Saudi Arabia?
A. Yes, sir.

MR. JACKS: Your Honor, I am going to switch topics for a second.

THE COURT: Let's take the morning break. Be back at five after 11:00.

(Whereupon, the jury left the courtroom.)

THE COURT: We will be in recess.

(Brief Recess.)

THE COURT: Mr. Jacks?

MR. JACKS: Thank you, Your Honor.

Q. (BY MR. JACKS) Agent Miranda, in the course of your investigation, in preparing for your testimony did you -- We have already seen one demonstrative exhibit that you have assisted in preparing in connection with the utilization of Izzat Mansour to conduct a security check at the offices of the Holy Land Foundation.

A. That is right, sir.

Q. And are there other demonstrative exhibits that you assisted in preparing that are illustrative of your testimony and to pull together certain parts of your testimony to demonstrate the subject matter of your testimony?

A. Yes, sir.

Q. You testified about the familial relationships between the Defendants and other persons at the Holy Land Foundation, and members of Hamas. Do you recall that testimony?

A. Yes, sir.

Q. And did assist in preparing a demonstrative exhibit that summarizes those relationships, as you testified in your examination of the evidence, that would be useful in illustrating that testimony?

A. Yes, sir.

MR. JACKS: Your Honor, the Government at this time

would move the admission of Demonstrative No. 6, which is that
exhibit, and at the present time we have it in electronic
version only, but we would move the admission of Demonstrative
No. 6, which illustrates the familial relationships Agent
Miranda testified about.

             THE COURT:  Counsel?

             MR. DRATEL:  Your Honor, just my prior objection,
Your Honor.

             THE COURT:  All right.  And that is overruled and
demonstrative No. 6 is admitted.

             MR. JACKS:  And I will ask, Agent Lewis, if you can
post Demonstrative No. 6 on the screen there.

Q.   (BY MR. JACKS)  Agent Miranda, can you see Demonstrative
No. 6 on the screen?

A.   Yes, sir.

Q.   And just the heading for the document or the exhibit
itself is what, if you would read that into the record?

A.   "HLF's familial relationships to Hamas leaders overseas."

Q.   Okay.  And the individuals that are listed, the writing
beneath their pictures identifies them.  Is that correct?

A.   Yes, sir.

Q.   And if you would, in some of them are some of them
represented in same photographs that appear on Demonstrative
No. 17?

A.   Yes, sir.

Q. Okay. The first individual that is shown in the upper left hand corner is who?
A. Khalid Mishal.
Q. And he is shown here on the top row far left. Is that correct? On Demonstrative No. 17?
A. Yes, sir.
Q. And what connections are shown to Khalid Mishal with any Defendants or individuals with the Holy Land Foundation, if you would just walk us through and narrate the connections that you testified about?
A. Right. On the screen if you look at Khalid Mishal, there is a line going to HLF officer Akram Mishal because they are cousins. Then there is a line going to the Defendant Mufid Abdulqader because they are half brothers. Then there is a line from Khalid Mishal to Mufida Abdulqader, his sister.
Q. All right. And if you would, the second individual to the right of Khalid Mishal is Mohammed Siam?
A. Yes, that is correct.
Q. And that picture is the same as the picture shown here on Demonstrative No. 17?
A. It is a portion of it, yes.
Q. Okay. And what are the family connections shown by this exhibit, as you testified yesterday?
A. Mohammed Siam's son Mahmoud is married to Mufida Abdulqader, the sister of the Defendant Mufid Abdulqader and

the sister of the Hamas leader Khalid Mishal. And then Mohammed Siam's daughter Raida Siam is married -- you follow that line all the way down to Islam Siam, a former employee of the Holy Land Foundation and the predecessor company to InfoCom.

Q. All right. That photograph of the man with the beard who is facing to the right as you look at it, is that a photograph of Islam Siam?

A. Yes, it is.

Q. All right. And then the caption where there is not a picture, who is represented by that entry in the exhibit?

A. That is Jamal Issa or Jamal Abu Baker.

Q. And he is the brother of the Defendant Shukri Abu Baker?

A. That is correct, sir.

Q. And I believe you testified he is the Hamas representative first in the Sudan and later in Yemen?

A. Yes, sir.

Q. And as far as the line that goes down to the graphic image there, who is represented where there is not a photograph but the name?

A. There is the brother that they share named Ramzi Abu Baker.

Q. All right. And then the photograph obviously connected between the lines of that -- Between the line from Jamal Issa to Shukri Abu Baker, that is a photograph of him. Correct?

A.    Correct.

Q.    All right.  And then Mousa Abu Marzook is the individual
on the top row to the far right?

A.    Yes, sir.

Q.    And that is the same photograph that is used in
Demonstrative No. 17?

A.    Yes, sir.

Q.    And the familial relationships to Mousa Abu Marzook and
the Defendants, could you just describe those as shown by this
exhibit?

A.    Sure.  Mousa Abu Marzook, if you follow the line down, it
says "cousins," and that is a picture of the Defendant
Mohammad El-Mezain.  And then if you follow the line out to
the side there where it says "married" from Marzook, that is
Nadia Elashi his wife, and she has a line that says "cousins,"
and that is connected to Ghassan Elashi.

Q.    All right.  And that photograph of Nadia Elashi, you have
seen her and you can testify that that is her photograph?

A.    That is an official photograph from her Immigration
records.

Q.    All right.  The individual that is shown in the center in
the line up from the Defendant Mohammad El-Mezain there is not
a photograph, but the name Ahmad Hamdan, is that the
individual that you testified about yesterday that Mr.
El-Mezain acknowledged was a relative of his and was one of

the Hamas deportees in?
A. Yes. He acknowledged that to Agent Burns.
Q. And I believe you said with regard to Islam Siam, the man at the bottom in the photograph --
A. Right.
Q. That he worked for the Holy Land Foundation, but he also worked for InfoCom for a period of time?
A. Right.
Q. Okay.
A. Or InfoCom's predecessor company.
Q. Predecessor?
A. Yes, sir.
Q. In Richardson?
A. It may have been briefly in Richardson. I would have to look at the records again.
Q. All right.
MR. JACKS: Thank you, Mr. Lewis. You can take that down, please.
Q. (BY MR. JACKS) did you -- You testified yesterday regarding the security document that we looked at, and its guidelines for meetings, and then you pointed to something in the Philadelphia meeting that seemed to illustrate that policy or be consistent with that policy. Do you recall that?
A. I do.
Q. And did you prepare a demonstrative exhibit to try to

pull together or to illustrate that circumstance or example that you were testifying about?

A. Yes, sir.

Q. Let me show you what has been marked for demonstrative purposes as Demonstrative No. 3. Is that a poster or enlargement of the documents that you utilized in your testimony to give this example of following the directives of the security manual?

A. Yes, sir.

MR. JACKS: Your Honor, we would move the admission of Demonstrative No. 3.

MR. CLINE: No objection, other than the ones to the underlying documents.

THE COURT: All right. Demonstrative No. 3 is admitted.

Q. (BY MR. JACKS) Agent Miranda, let me ask you, if you think it is shown on the screen, but also if you would, just tell the jury what is represented in Demonstrative No. 3.

A. To the left here we have got exhibit InfoCom Search No. 35, which we have been describing as the security document. This will be the first page of the translation, the first page of the Arabic. And under it the category of "periodical meetings" it says point No. 2, "Agreeing on a cover for the reason of the meaning which is in harmony for the type of relationship."

And then these are two pages from excerpts from the Philadelphia meeting. The first one is where the speaker says, "This is a meeting of the Palestine Committee," and the second one is, I testified yesterday, where the Defendant Shukri Abu Baker says, "This is a joint workshop between the Holy Land Foundation and the IAP. This is the official form. I mean, please, in case some inquire." Which I have lines coming back to pertinent parts of the security document.

Q. Okay. And you can just stay there. Did you also prepare a demonstrative exhibit that illustrated the point you were testifying about today regarding the Holy Land Foundation's use of a company for technical surveillance or to detect technical surveillance?

A. Yes, sir, I did.

Q. I am going to show you what has been marked for identification as Demonstrative No. 5, and is that a poster that covers that aspect of your testimony and the exhibits that you were referring to in that regard?

A. Yes, sir.

Q. All right.

MR. JACKS: Judge, move the admission of Demonstrative No. 5.

MR. CLINE: No objection as a demonstrative.

THE COURT: Admitted.

Q. (BY MR. JACKS) Let me ask you, Agent Miranda, if you

could, just describe what Demonstrative No. 5 shows and the reproductions that you have included on there.

A. Yes, sir. Again, this is the security document that we have been discussing, which is InfoCom Search No. 35. That is the exhibit number. The page that I believe is pertinent is here. This is the Arab translation behind it. And it says, "12. Conducting necessary maintenances measures for the foundation (individual, location, equipment) and using advanced equipment for that."

And these are the two letters we introduced this morning from this Executive Protection Group wherein this individual says that they came in and swept for bugs.

Q. Agent Miranda, did you also prepare a demonstrative or assist in the preparation of a demonstrative exhibit that would serve to illustrate your testimony regarding the procedures and guidelines in the security manual regarding travel and the evidence regarding travel by Shukri Abu Baker and Akram Mishal on behalf of the Holy Land Foundation?

A. Yes, sir.

Q. And let me show you what has been marked for identification purposes as Demonstrative No. 4. And is that a demonstrative exhibit which contains reproductions of the exhibits that you were referring to during your testimony regarding this particular activity?

A. Yes, sir.

MR. JACKS: Judge, we move the admission of Demonstrative No. 4.

MR. CLINE: Just our objections to the underlying documents, not the demonstrative.

THE COURT: All right. Demonstrative No. 4 is admitted as a demonstrative.

Q. (BY MR. JACKS) Agent Miranda, would you please just explain what is shown On Demonstrative No. 4, the exhibits that are reproduced therein and how you have sought to connect them or show their relationship?

A. Yes. Again, this is the security document, InfoCom Search No. 35, being the exhibit number. This is the page that I believe is pertinent with the Arab behind it, the Arabic version. And it says, "Providing a suitable cover for travel, commerce, tourism, visiting relatives, and supporting it with documents, commercial samples, catalogs, and tourist brochures. Also achieving this pretext in the visited country by taking tourist tours, making commercial meetings, or reaching bargains."

And then I have drawn arrows to the documents we discussed after that, including the 1996 letter in which a visa is being requested in the name of Akram Mishal under the InfoCom Corporation being the business where Akram Mishal is allegedly the international sales manager, and then the two visa applications to Saudi Arabia dated on the same date for

the two individuals Mishal and the Defendant Baker with the information related to InfoCom.

Q. The two reproductions that you have shown from HLF Search No. 89, these relate to travel in the year 2001. Correct?

A. Yes, sir.

Q. And this InfoCom Search No. 36 relates to travel or expected travel in 1996 by Akram Mishal. Is that correct?

A. Correct, sir. And the exhibit numbers are on there.

Q. Thank you. You can take the stand.

A. Yes, sir.

MR. JACKS: May I have just a moment, Your Honor?

THE COURT: Yes.

MR. JACKS: I pass the witness, Your Honor.

THE COURT: Okay. Mr. Cline?

MR. CLINE: Your Honor, may we approach for one moment?

THE COURT: Sure. Come on up.

(The following was had outside the hearing of the jury.)

MR. CLINE: Now that we have reached the end of direct examination, we would ask that the Court to give that 404(b) limiting instruction to the jury before the cross begins.

THE COURT: Okay. Any objections on that?

MR. JACKS: I haven't seen it in writing yet. I

mean, I don't think I do, Your Honor, but --

THE COURT: The only question I still had -- That I had was over what it covers. You raised an issue as to the pre-designation evidence, the money that came from Marzook to InfoCom.

MR. JACKS: You know, Your Honor, I think I would just -- I would not object if the Court included that. But I still have not seen the final wording, and I --

THE COURT: It is in their motion.

MR. JACKS: I thought they changed it.

THE COURT: No. We only added the language that it didn't apply to any of the other Defendants, but that stayed in tact as far as the 404(b) limiting instruction language.

MR. JACKS: Is there a chance we can look at it?

THE COURT: Does anybody have it handy?

MS. DUNCAN: I have it on my computer.

THE COURT: Congratulations on finishing. I was beginning to wonder, only because you said 30 to 45 minutes yesterday. It was a long 30 to 45 minutes.

MR. JONAS: And he said one day on direct.

THE COURT: We were talking about that very thing.

MR. JACKS: I accept all of that.

THE COURT: Yes, in good humor. You covered a lot of ground.

MS. SHAPIRO: We are now -- I mentioned to Jennifer,

and we agreed with the Defense that because the timing of

getting all our witnesses here is so difficult for all of us,

that we have two very brief witnesses that we would like to

interrupt the cross examination for, and we will provide them

the same courtesy.

THE COURT:  Sometime today?

MS. SHAPIRO:  After lunch.  Mr. Simon needs to

essentially get on right after lunch, and then Joe Hummel, a

former FBI agent, who will have a very brief testimony.

THE COURT:  Everybody in agreement with that?

MR. CLINE:  We have no objection to the timing out

of sequence.  The only concern that we have, we made our

objections to Simon's testimony, and I think you have ruled on

those.

As to Mr. Hummel, I believe he is going to testify that

he seized Marzook's phonebook from him at JFK Airport.  We are

not going to have a problem with that testimony, but then I

think he also wants to say that Marzook initially denied

having the phonebook, and we will be objecting to that

testimony about what Marzook said.  So I don't know if you

want to take that up now, but when we get to that moment maybe

right as he takes the stand we would like to be heard on that.

THE COURT:  Maybe remind me as we break for lunch,

or come back from lunch before we take up his testimony while

the jury is not here.

MR. CLINE:  Right.  We will do that.

MR. JACKS:  I have no objection to that instruction.

THE COURT:  Okay.  Let me make sure I can find it.
I have it here somewhere.  That is the one, I think.

MR. CLINE:  That is the Government's --

THE COURT:  Here it is.

MR. CLINE:  This is the instruction as to Mr.
Elashi, and then you will add a sentence about the other
Defendants.

THE COURT:  I started it there, but you want it at
the end?

MS. DUNCAN:  It would make more sense at the end.

THE COURT:  They may not consider this evidence for
any purpose as to any of the other Defendants?

MS. DUNCAN:  Yes, Your Honor.

(The following was had in the presence and hearing
of the jury.)

THE COURT:  Members of the jury, before we go to
cross examination I am going to give you an instruction.

You may recall that last Wednesday October the 8th you
heard some evidence from Agent Miranda about some acts of the
Defendant Ghassan Elashi involving InfoCom, Mousa Abu Marzook,
and Nadia Elashi.  That was the money that was being sent from
InfoCom to Ms. Elashi and perhaps her son, and that may be
similar to some of the acts charged in the indictment.  Those

acts, though were committed on other occasions.

The limiting instruction is you may not consider any of this evidence in deciding if Mr. Elashi committed the acts charged in the indictment. However, you may consider that evidence, that particular evidence as to Mr. Elashi only for other very limited purposes. If you find beyond a reasonable doubt from other evidence in this case that the Defendant Mr. Elashi did commit the acts charged in the indictment against him, then you may consider this evidence of this money exchange allegedly committed on other occasions to determine whether Mr. Elashi had the state of mind or intent necessary to commit the crimes charged in the indictment. This is a limited purpose for which any of that evidence can be considered against Mr. Elashi.

Also in that regard, you may not consider that evidence, that money going to Ms. Elashi, you may not consider that as to any of the other Defendants for any purpose. So that is a limited purpose evidence that was admitted. And I will give this to you again in the written charge at the end so you don't have to memorize it, but have in mind that that is admitted for a limited purpose to help you, if it does, to help determine the intended state of mind of Mr. Elashi.

Mr. Cline?

MR. CLINE: Thank you, Your Honor.

CROSS EXAMINATION

By Mr. Cline:

Q. Good morning, Agent Miranda.

A. Good morning, sir.

Q. I want to start by asking you some questions about InfoCom Search No. 35, the security document.

A. Yes, sir.

Q. You are familiar with the document I am talking about?

A. Yes, sir.

Q. That document was found in a box at InfoCom. Correct?

A. Yes, sir.

Q. The HLF documents at InfoCom were generally older documents. Correct?

A. Yes, sir.

Q. No copy of the security document was found at HLF headquarters in Richardson. Correct?

A. Right.

Q. And no copy of the security document was found at HLF offices in New Jersey or Chicago or San Diego. Correct?

A. Correct.

Q. You tried to get fingerprints from the security document. Correct?

A. Correct.

Q. And you were unable to get any fingerprints that you could identify. Correct?

A. Right.

Q. Now, InfoCom Search No. 35, which is the security document, refers to certain committees. Correct?
A. Yes, sir.
Q. It refers, for example, to a maintenance committee in several places. Right?
A. Yes, sir.
Q. And I take it that you have not seen any internal HLF documents that refer to an HLF maintenance committee. Is that correct?
A. Correct.
Q. The security document refers to a sorting committee. Correct?
A. Correct.
Q. And I take it that you have not seen any internal HLF documents that refer to an HLF sorting committee. Correct?
A. Right.
Q. The security document refers to work committees and field committees. Correct?
A. Correct.
Q. Now, HLF had people out working in the field. Correct?
A. Correct.
Q. But in this context, you have not seen any internal HLF documents that refer to HLF work committees or field committees. Correct?
A. Correct.

Q. Now, you testified I believe about a document classification appendix that is part of the security document. Right?
A. Yes.
Q. And the appendix establishes a scale that ranges from general to very private. Right?
A. Yes.
Q. And general requires the least protection and very private requires the most. Right?
A. Yes.
Q. Now, according to that appendix, a limited document is designated by the No. 1. Right?
A. I would have to see the appendix again, sir, just to make sure.
Q. I am going to put the appendix up on the elmo and ask you to take a look at it. Okay?
A. Yes, sir. Yes, sir, I see it.
Q. Do you see it down there at the bottom?
A. Yes, sir.
Q. And you see that the symbol No. 1 is to be used for limited classification?
A. Yes, sir.
Q. The symbol No. 2 is to be used for the private classification. Right?
A. Yes, sir.

Q. And the symbol No. 3 is to be used for very private classification. Correct?

A. Yes, sir.

Q. And documents that don't have any number at all are in the general category. Right?

A. Possibly, sir.

Q. Now, the Government and the Defense have introduced into evidence in this case quite a number of documents that were seized in the InfoCom search. Correct?

A. Yes, sir.

Q. And this document here, InfoCom Search No. 35, the security document, is one of those. Right?

A. Yes, sir.

Q. Now, InfoCom Search No. 35 has a 2 on it. Right?

A. Yes, sir.

Q. Which would suggest that it is the private classification. Right?

A. Yes, sir.

Q. Are there any other InfoCom search documents in evidence that have one of these classification numbers on it?

A. No, sir.

Q. Now, we have also introduced into evidence a number of documents that were seized in the search of HLF. Correct?

A. Yes, sir.

Q. Are there any HLF search documents in evidence that have

one of these classification numbers on it?
A. No, sir.
Q. We have introduced into evidence, or the Government has, a number of documents that were seized in the search of Mr. Elbarasse's home. Correct?
A. Yes, sir.
Q. Are there any Elbarasse documents in evidence that have one of these classification numbers?
A. I thought there was one. I am not certain of that, sir.
Q. All right. So perhaps there is one, but there would only be one. Right?
A. Perhaps, sir, yes.
Q. And even the one you are not sure of. Right?
A. Correct.
Q. We may get a break here for lunch at some point. We probably are all hoping. Would you mind checking on that over lunch to --
A. Sure, I can do that.
Q. Very good. Thank you.
I want to go through a couple of the items in the security document, and if you don't remember these off the top of your head let me know and I will be happy to put it up on the elmo for you. Okay?
A. Yes, sir.
Q. On page 2 of the English version, item No. 20, this is

talking about meetings. Okay?

A. Yes, sir.

Q. Page 2 item No. 20 says, "Avoiding talking about meetings and their times on the phone and fax." Do you recall that?

A. I do.

Q. You do?

A. Yes, sir.

Q. Okay. Now, you were here for Agent Burns' testimony. Right?

A. Portions of it, yes.

Q. And do you recall that she played some intercepted conversations in which Mr. Abu Baker and others talked on the phone about arranging the Philadelphia meeting?

A. Yes.

Q. On page 3 item No. 9, we are talking now about document safety. That is the heading in the security document. Okay? Page 3 item No. 9 says, "Using the computer to send faxes between exposed offices, keeping in mind to encrypt the files before they are sent." Do you remember that?

A. Yes, sir.

Q. We have seen a number of faxes that have been introduced into evidence in this case. Correct?

A. Yes, sir.

Q. Were any of the faxes in evidence in this case encrypted?

A. No.

Q. On 8 of the English version of the search of the security document, there is an entry for travel and transportation safety. Do you recall that?
A. Yes, sir.
Q. And item No. 6 says, "A traveler is to empty his residence totally of any documents or items relating to the work, i.e., the Movement, when traveling." Do you recall that?
A. Yes, sir.
Q. Now, Mr. Ashqar's home was searched on December the 26th of '93. Correct?
A. Yes.
Q. And he was away, I take it, when that happened?
A. I don't know.
Q. Well, his home was searched. FBI agents came in and they took photos of a number of documents that they found.
A. I don't know if he was traveling or just out of the house. I thought that was The implication of your question.
Q. I see. You don't know whether he was traveling or not.
A. I don't know if he was traveling or just out of the house for a couple of hours.
Q. I follow you. Okay. In any event, there were a number of documents found in Mr. Ashqar's home. Correct?
A. Yes, sir.
Q. Simply Mr. Elbarasse's home. Correct?

A. Yes, sir.

Q. Page 11 of the security document, this is now talking about the safety of personal residences, work apartments, cars, and possessions. Item No. 4, "Assigning individuals to live in offices after formal work hours." Do you recall that?

A. I have read that, yes, sir.

Q. Did you come across anybody that was assigned to live in the HLF office after formal work hours?

A. No.

Q. Anybody who was assigned to live in the InfoCom offices after formal work hours?

A. No.

Q. Page 12 item No. 5, this has to do with hotel safety. Okay?

A. Yes, sir.

Q. Do you remember that? Item No. 5, "In general, hotel rooms are not a safe place for conducting meetings." Do you recall that?

A. Yes, sir.

Q. And do you recall that the Philadelphia meeting was conducted at a Marriott Courtyard hotel?

A. Yes, sir.

Q. Now, I want to turn to the speakers list for a moment.

MR. CLINE: May I approach for a second, Your Honor?

THE COURT: Yes.

Q. (BY MR. CLINE) Agent Miranda, I don't know if you can see that. You probably can't.
A. Just a little bit of it.
Q. Do you recognize that as a big version of the overseas speakers list?
A. Yes, sir.
Q. And you testified about this list on direct. Correct?
A. Yes, sir.
Q. And you went through the speakers list with Mr. Jacks, and you highlighted names that fell in certain categories. Right?
A. Yes, sir.
Q. For example, you highlighted names of people who appeared in Mr. Marzook's phonebook. Right?
A. Yes, sir.
Q. You highlighted names of people who appeared in Ashqar phone list. Correct?
A. Yes, sir.
Q. I think I remember you doing that. I can't tell you that for certain.
A. I think there is some crossover there, so I will answer yes.
Q. All right. You identified some of the people on this list as Hamas leaders, and you highlighted those names. Correct?

A.    Yes, sir.

Q.    All right.  What I would like to do is to talk about a

different list and see how this overseas speakers list matches

up there.  On your direct testimony you talked about specially

designated terrorists.  Correct?

A.    Yes, sir.

Q.    And just to remind the jury, specially designated

terrorists are people who have been designated under that

Executive Order No. 12947.  Correct?

A.    Yes, sir.

Q.    And there is a process there, and we will go through that

in a few minutes, but the -- at the end point of that process

is that a person or an organization is designated by the

Secretary of State or the Secretary of Treasury, or a

combination, as a specially designated terrorist.  Correct?

A.    Yes, sir.

Q.    Sometimes we call that an SDT.  Right?

A.    Yes, sir.

Q.    And once someone or an organization is designated as a

specially designated terrorist, they go on a list that the

Treasury Department maintains.  Correct?

A.    Yes, sir.

Q.    And that is known as the specially designated nationals

and blocked persons list.  Right?

A.    Yes, sir.

Q. And that is maintained on the Treasury Department website. You can find it there today. Right?
A. Yes, sir.
Q. And I don't know if you were here for this, but the version of the list that was in effect on June 29th, 2001 was placed in evidence as Defense Exhibit No. 963. Do you recall that?
A. Yes, sir.
Q. And I don't know if you remember the explanation, but we picked that date because it is a few days after the last transaction identified in the indictment. Are you with me?
A. Yes, sir.
Q. Okay. Now, calling your attention back to this overseas speakers list, I would like to go through it from top to bottom and have you tell me each name on that list that shows up on the Treasury Department specially designated nationals and blocked persons list as of June 29th, 2001. And I have got the list here if you want to check it.
A. Right.
Q. Could you tell us, please?
A. There is not anybody on it.
Q. No one, not a single person on this list is on that Treasury Department list. Is that right?
A. Correct.
Q. And in fact, if one were to look at that list today on

the Treasury Department website, not a single one of these names would be on it. Correct?
A. That is correct.
Q. You talked a little bit about Jamal Baker or Jamal Issa, I think you called his Hamas name. Do you recall that?
A. Yes, I do.
Q. Mr. Jamal Baker isn't on the June 29th, 2001 version of that Treasury Department list, either in his Baker name or his Issa name. Correct?
A. Correct.
Q. And if you looked at the Treasury Department list today and pulled it off the website, you wouldn't find Mr. Baker there under either of his names, would you? Right?
A. Correct.
Q. Just this morning you were talking about a document, I believe it was Elbarasse Search No. 35, although I confess I might have the number wrong, but it was the document about the trust. Do you remember that?
A. Yes.
Q. And in that document, it referred to a series of organizations, the PTLP -- It was like an alphabet soup but you remember what I am talking about. Right?
A. Yes.
Q. And I think Mr. Jacks asked you whether those were designated terrorist organizations. Do you remember that?

A. Yes.

Q. And in fact today they are. Right?

A. Yes.

Q. That document was dated 1992. Right?

A. Yes.

Q. In 1992 none of those organizations had been designated as a terrorist organization. Right?

A. Correct.

Q. In fact, designations started to occur no earlier than January 23rd, 1995. Right?

A. Correct.

Q. Now, I want to take you back for a minute to March of 2002. All right? Now, just to orient you and the jury in time, we are talking about four months after Holy Land closed. Okay? Are you with me?

A. Yes, sir.

Q. All right. Now, on March 26th, 2002, you recommended to an FBI supervisory special agent named Mike Reznik that several people be designated as terrorists. Correct?

A. Correct.

Q. Now, Agent Reznik was an agent up at FBI headquarters in Washington, D.C. Right?

A. Yes.

Q. And you told Agent Reznik, "Dallas" -- And by that you meant the Dallas FBI office. Right?

A. Yes.
Q. "Dallas believes the designation process will ultimately benefit the captioned investigations, one being InfoCom; the other being Holy Land." Right?
A. Yes.
Q. "As well as future FBI criminal and intelligence investigations." Right?
A. Right.
Q. And you told Agent Reznik that you had selected the people that you wanted designated based on their potential impact on the captioned cases, their non-U.S. status and unlikely return to the United States. Correct?
A. Correct.
Q. And again, the captioned cases you were referring to there were the Holy Land case and the InfoCom case. Correct?
A. Correct.
Q. Now, one of the people that you told Agent Reznik you wanted designated was Khalid Mishal. Right?
A. Right.
Q. And in fact, on August 21st, 2003, Khalid Mishal was designated a specially designated global terrorist. Right?
A. I am not sure of the date, but yes, I understand him to be an SDT.
Q. Let me see if I can refresh your recollection on the date. I am going to show you, Agent Miranda, on the elmo here

Government's Exhibit Designation No. 1, which I believe is in evidence.
A. Right.
Q. I am going to start by showing you the front page of it. Do you recognize it?
A. Yes, sir.
Q. All right. And I am going to turn to the fourth page and have you look at the top. You see Khalid Mishal?
A. I do, sir.
Q. And this is the document designating him as a specially designated global terrorist. Right?
A. Yes, sir.
Q. And then I am going to turn to the last page so you can see the date. Do you see that--8/21/03?
A. Yes, sir.
Q. Does that refresh your recollection that in fact Khalid Mishal was designated as a specially designated global terrorist in August 2003?
A. Yes, sir.
Q. When Mr. Jacks was asking you questions, you mentioned a couple of times that Mr. Mishal has been designated as a terrorist. Right?
A. Yes, I was aware of it.
Q. It is also in the indictment. It alleges that he was designated as a specially designated global terrorist in

August 2003. Correct?

A. Yes, sir.

Q. Now, you also recommended to Agent Reznik back in March of 2002 that Jamil Hamami be designated as a terrorist. Right?

A. That is right.

Q. And you made that recommendation again on March 26th of 2002. Right?

A. Yes, sir.

Q. And that is the same Jamil Hamami we have been hearing about in this case, who the United States Information Service had invited to visit the United States in '98 and '99. Correct?

A. Yes, sir.

Q. And it is the same Jamil Hamami whom Agent Burns testified had been excommunicated by Hamas. Right? Were you here for that testimony?

A. Yeah, I was. I was going to -- The answer is yes.

Q. In March of 2002 was Mr. Hamami engaging in terrorist activity?

A. No, not according to what he said later in 2004.

Q. And as it turned out, Mr. Hamami was not designated. Correct?

A. Correct.

Q. I want to talk with you a little bit about the

designation process. We have kind of touched on it here, but I want to talk about it in a little bit more detail. Okay?

This list, this Treasury Department list, the specially designated nationals list, that began with an executive order that President Clinton issued on January 23rd, 1995. Correct?

A. Yes, sir.

Q. That is Executive Order No. 12947?

A. Yes, sir.

Q. And I think on your direct you pointed out that a copy of that executive order was found in Mr. Elashi's office at InfoCom. Right?

A. Yes, sir.

Q. I believe it is InfoCom Search No. 37.

A. I don't recall the exhibit number, sir.

Q. All right. I am just going to stick it up here on the elmo to make sure we are on the same page. Can you read down there?

A. Yes, I can. It reads InfoCom Search No. 37.

Q. All right. We will talk about this document more here in just a second.

And again, people designated under that executive order are specially designated terrorists. Correct?

A. Yes, sir.

Q. And they go on that Treasury Department list that we have talked about before. Correct?

A. Yes, sir.

Q. Now, I want to talk to you about how a person or an organization comes to be designated as a specially designated terrorist, and I am going to refer you to the second page of InfoCom Search No. 37, which is the copy of the executive order that was found in Mr. Elashi's office. Okay?

A. Yes, sir.

Q. And I want to focus you in on the portion of the order that is at the center of the screen right now, at least the center of my screen, under Section 1. Do you see that?

A. Yes, sir.

Q. And are you able to read it there on the screen?

A. Yes, sir.

Q. Okay. Now, a person can become a specially designated terrorist in several different ways, and I want to go through them with you. The first way is that you could be included in the annex to the executive order itself. Correct? Do you see that?

A. Yes, sir.

Q. A person is listed in the annex to this order?

A. Yes, sir.

Q. And in fact, there were some people and some entities that were listed in the annex to Executive Order No. 12947. Correct?

A. I thought it was just organizations.

Q. Well, there was Hamas, of course. Right?

A. Yes, sir.

Q. But Sheikh Yassin was also included in that list. Correct? The individual?

A. On this one, sir? I would have to look at it. I didn't think he was.

MR. CLINE: Your Honor, is Designation No. 5 in evidence? I believe it is.

THE COURT: I believe it is as well. Let me check. Yes, it is in.

Q. (BY MR. CLINE) All right. Agent Miranda, let me show you on the screen Government Designation No. 5. Do you see the exhibit sticker down there in the bottom?

A. I do, sir.

Q. Let's go to the first page. It is a special designation and blocking memorandum. Do you see that?

A. Yes, sir. I understand what you are saying, but I don't think -- I didn't think that was your question. On the previous exhibit I thought you were asking about the annex to that exhibit, and I said I didn't think there was any individuals on it. If you turn to the last page of that annex.

Q. All right.

A. Maybe I misunderstood your question.

Q. Well, let's do it this way.

A.   Sure.

Q.   When that executive order came into effect on January

23rd, 1995, certain individuals and organizations were

designated as of that date.  Correct?

A.   No, I think that is my point.  I thought it was only

organizations as of the date that you are referring to.

Q.   All right.  And we are getting confused on something that

doesn't really matter here, but just let me clarify it for

you.  Okay?

A.   Sure.

Q.   Taking Designation No. 5, let me put up the second page,

and this page shows Hamas as having been designated.  Correct?

A.   Yes, sir.

Q.   All right.  Then let me go to page 3, and that begins a

list of individuals.  Correct?

A.   Correct.

Q.   And then let me go to the last page, and you see there

Sheikh Yassin.  Correct?

A.   That is correct.

Q.   And then you look at the date and it is January 23rd,

1995.  Correct?

A.   Correct.

Q.   So putting aside the question of whether these people

were included in the annex to the order, all of them as of

January 23th, 1995, the date of the executive order, were

designated as specially designated terrorists. Correct?
A. That is correct.
Q. Including Sheikh Yassin?
A. Correct.
Q. Okay. Now, let's go back to the executive order. And again, I want to go through the different ways that people can be designated as terrorists. Okay?
A. Yes, sir.
Q. So the first way is the persons can be listed in the annex to this order. Correct?
A. Yes, sir.
Q. And we can certainly agree, whatever Sheikh Yassin's situation is, that Hamas was designated in the annex to the order. Right?
A. Yes, sir.
Q. All right. Then the second way that people can be designated as specially designated terrorists is in the next paragraph down, and it says, "Foreign persons designated by the Secretary of State, in coordination with the Secretary of the Treasury and the Attorney General, because they are found:" and then it gives a couple of different possibilities there. Right?
A. Yes, sir.
Q. The first one is if they are found "to have committed, or to pose a significant risk to committing, acts of violence

that have the purpose or effect of disrupting the Middle East peace process." Right?

A. Yes, sir. That is what it says.

Q. And the second possibility is, "To assist in sponsor, or provide financial material or technological support for or services in support of such acts of violence." Right?

A. Yes, sir.

Q. So those are -- If people or entities are found to have done those things by the Secretary of State, in coordination with other officials, they can be designated as specially designated terrorists. Right?

A. Yes, sir.

Q. And then the third possibility in Section 1 is, "Persons determined by the Secretary of the Treasury, in coordination with the Secretary of State and the Attorney General, to be owned or controlled by, or to act for or on behalf of, any of the foregoing persons that are in the United States that hereafter come within the United States, or that hereafter come within the possession or control of United States persons." Do you see that?

A. Yes, sir.

Q. That last part really refers to the property, but the people who are going to be designated are people who are determined to be owned or controlled by or to act for or on behalf of any of the foregoing persons. Right?

A. Yes, sir.

Q. All right. And anyone who is designated under any of these three possible ways ends up on that Treasury Department specially designated nationals list. Right?

A. Yes, sir.

Q. And looking at this third possibility, "People who are owned or controlled by, or act for or on behalf of, any of the foregoing persons," Mr. Marzook was designated in August of '95 under that provision. Correct?

A. Yes, sir.

Q. And he then went on the specially designated nationals list. Right?

A. Yes, sir.

Q. Where he remains to this day. Right?

A. Yes, sir.

Q. And the terrorist organization that Mr. Marzook was found to have acted directly or indirectly on behalf of, of course, was Hamas. Right?

A. Yes.

Q. A quick aside here. Nadia Elashi you testified about somewhat on direct. Correct?

A. Yes, sir.

Q. She is Mr. Marzook's wife. Right?

A. Yes, sir.

Q. And Mr. Elashi's cousin, you testified?

A. Yes, sir.

Q. When Mr. Marzook was arrested at JFK Airport in July 1995, Nadia Elashi was with him. Correct?

A. That is correct.

Q. And the Government knew at that point at least that she was his wife. Correct?

A. Correct.

Q. Nadia Elashi has never been designated as a terrorist. Correct?

A. No.

Q. Her name is not on that Treasury Department list that we have been talking about. Correct?

A. Correct.

Q. Now, the version of the list in effect in June 2001 is in evidence as Defendants' Exhibit No. 963. Correct?

A. Yes, sir.

Q. And that list does not include the names of any of these zakat committees or societies mentioned in the indictment. Correct?

A. Correct.

Q. And even today the names of those zakat committees and societies are not on that list. Correct?

A. Correct.

MR. CLINE: Your Honor, those are all my questions for now.

Agent Miranda if you could check on that one point over lunch, that being whether any of the Elbarasse documents had those classification numbers, I would appreciate it.

THE WITNESS: I understand. I will do that.

MR. CLINE: If I may reserve that one question for after lunch?

THE COURT: You may do that.

MR. CLINE: Thank you, sir.

THE COURT: Who is next? Ms. Hollander?

MS. HOLLANDER: Your Honor, I am happy to begin and we will have -- I won't be able to finish, and then we will have to take the other witnesses.

THE COURT: All right. We will work until about 12:30.

CROSS EXAMINATION

By Ms. Hollander:

Q. Good morning. Oh, it is afternoon.

A. Good morning, ma'am.

Q. I think we are into afternoon.

I have several questions, but I wanted to ask you first about your Demonstrative No. 3, if we could find it. It is hard to do this and stay at the microphone. I have one question for you from your Demonstrative No. 3.

A. Yes, ma'am.

Q. And I will show this to you, but you testified that you

used this demonstrative when you talked about the stated purpose of the Philadelphia conference. Do you recall that?

A. The cover?

Q. What you wrote here "stated purpose"?

A. Yes, right.

Q. And I believe you testified, unless I misunderstood you, that the meeting was a meeting of the Palestine Committee. Correct?

A. Yes, ma'am.

Q. Okay. I would like you to just, and I will bring this up to you, what it says here on Philly Meeting No. 1 page 10 that you put into your demonstrative.

MS. HOLLANDER: May I approach?

THE COURT: Yes.

Q. (BY MS. HOLLANDER) If you could just read this sentence here.

A. "This meeting was called for by the Palestine Committee in order to have a seminar or a meeting to the brothers present here today in order to study the situation in light of the latest developments on the Palestinian arena, its effects, and impact on our work here in America."

Q. Thank you?

A. You are welcome, ma'am.

Q. So what the underlying document actually said was this was a meeting called for by the Palestine Committee. Correct?

A.    Right.

Q.    Now, you have testified a bit about the calls between

Shukri Abu Baker and his brother Jamal Abu Baker.  Correct?

A.    Yes, ma'am.

Q.    And I want to ask you a few questions about those calls.

Okay?

A.    Yes, ma'am.

Q.    The first one I want to ask you about is the one that the

Government refers to as Baker Wiretap No. 26.  Now, these

calls -- I believe -- Well, let me ask you a preliminary

question, because I think there is something we need to

correct.  When it says Baker Wiretap, that means that Shukri

was the target of that FISA.  Correct?

A.    Yes, ma'am.

Q.    Okay.  And some of those calls were made.  In other

words, his home phone was wiretapped under the FISA.  Correct?

A.    I think that is correct.

Q.    And the Holy Land office phones.

A.    Yes, ma'am.  That is correct.

Q.    So even though it says Baker Wiretap, we have calls that

he wasn't actually making or receiving from Holy Land.

Correct?

A.    That is going to be the case in some instances, yes,

ma'am.

Q.    And then later there was actually another FISA for which

the Holy Land Foundation was the actual target.  Correct?

A.   That is correct, ma'am.

Q.   And so those, in the documents we have here, are
identified as HLF wiretaps.

A.   Yes, ma'am.

Q.   Okay.  Now, the calls between Shukri and his brother were
from his home phone, weren't they?

A.   I believe that is correct, ma'am.

Q.   And I want to ask you first about a few of the
participants on that call, Baker Wiretap No. 26.  Can you see
that?

A.   Yes, ma'am, I can.

Q.   I think it is clearer on yours than mine, so I assume you
can see it.

     You have talked just about Shukri and Jamal when you
played this call, but there were actually a number of people
on that call.  Correct?

A.   Yes, ma'am.

Q.   And they are family members, are they not?

A.   Yes, ma'am.

Q.   And the one who is described as SM right here, do you see
that one?

A.   Yes, ma'am.

Q.   That is Shukri's mother.  Correct?

A.   Yes, ma'am.

Q.   And you know her name to be Zuhaira Gerizoni Baker.
Correct?

A.   That is correct.

Q.   And the Gerizoni is because she is Brazilian.  Correct?

A.   Right.

Q.   And there is another one.  Wijdan Abu Baker is Shukri's
wife.  Correct?

A.   I don't recall if it is his wife or daughter.

Q.   You just don't remember.  If I tell you it is his wife,
will you accept that?

A.   I will accept that.

Q.   Thank you.  Okay.  And Nida is one of his daughters.
Correct?

A.   Again, I don't recall all the children's names.

Q.   But there are a number of children on this call.

A.   Right.

Q.   And nieces and nephews who were his brother's children.
Correct?

A.   Yes.

Q.   Okay.  Now, I recall you talking about a part of that
call where his brother actually gave him his post office box
address, didn't he?

A.   Yes.

Q.   You recall that?

A.   Yes, I do recall something about a post office box.

Q. You didn't play the whole call. Correct? You just played parts of it.
A. That is correct.
Q. Do you see where he says here, Shukri asks him to give him his post office box number and he does?
A. Right.
Q. Now, I also want to refer you to the InfoCom Search No. 35 document. That is the one that we have been referring to as the security document. Correct?
A. Correct.
Q. And I would like to turn to page 16 of that document, which I will put on the elmo here. Can you read the part I have highlighted? Do you see where it says "telephonic communication"?
A. Yes, ma'am.
Q. Would you read the first one there, No. 1?
A. Sure. No. 1 reads, "Exposed individuals are not to contact unexposed individuals or vice versa from home phones, but from public phones." No. 5, "Avoiding calls during unusual times" --
Q. No, I am sorry. Just that one. I just wanted you to read No. 1 for now.
A. Sure.
Q. Thank you. But Shukri was calling from his home phone to his brother. Correct?

A. Or vice versa.
Q. Or vice versa. Right. But the calls were made to home phones?
A. Yes.
Q. And the time of that call, what was the time of that call?
A. It reads 12:17 and 27 seconds.
Q. And what would that be? Would that be noon or midnight?
A. I don't know if they are using a 24-hour military time on this or not. It could be either or.
Q. It could be either or?
A. Sure.
Q. Now, I also would like to point your attention to the security document on page 15 where it says "mail correspondence." And can you read the last line there, and then it goes on to the next page?
A. Yes, ma'am. No. 2, "Avoiding mail correspondence, unless other means of communication are not available."
Q. Thank you.
A. Yes, ma'am.
Q. And just so we are clear, this is the document that was found at InfoCom that you referred to as a security document that I just read from. Correct?
A. Yes, ma'am.
Q. And yet he gave him a post office box. That is where one

gets mail. Is that right? At a post office box?

A. Yes, ma'am.

Q. Now, I would like to go to -- I am sorry. There is a lot of paper here and I don't want to get lost. I want to ask you about another call, and that was Baker Wiretap No. 25. That was one of the other calls. Okay?

A. Yes, ma'am.

Q. I will show you the first page just so you know which one I am talking about. This one is at 11:02. Right?

A. Yes, ma'am.

Q. And I think you have actually previously testified that that call was made in the middle of the night. Could that be possible?

A. That is possible, yes.

Q. And this one, too, there are a number of family members. Correct?

A. Yes, ma'am.

Q. And this one also you only read parts of it on direct, but I think it scrolled. You actually didn't read it. It scrolled?

A. That is correct.

Q. It scrolled. That is what I mean. But in fact this was a long call, wasn't it? Do you recall?

A. I don't recall if that one was, but I know there are long calls.

Q. Well, this one, the transcript of Government's Exhibit Baker Wiretap No. 25 is actually 27 pages.

MR. JACKS: Your Honor -- Never mind.

Q. (BY MS. HOLLANDER) And again, now, all these people have the last name Abu Baker. Correct?

A. Yes, ma'am.

Q. Okay. And you said that Jamal, I think he said in one of these calls he goes by Baker and then you said he goes by Issa. Correct?

A. I think I said his Hamas name is Issa.

Q. But we have seen Abu, the word Abu, A-B-U, used two different ways here, and in this case it is part of the last name, isn't it?

A. Yes, ma'am.

Q. And then sometimes it means father of. Correct?

A. Yes, ma'am.

Q. So you kind of have to know which way it is being used to understand whether somebody is being referred to as a familiar name or a last name. Correct?

A. Or maybe from the context.

Q. From the context. Right?

A. Or maybe. I wasn't disputing what you were saying. I was saying or maybe, in addition you can determine from the context.

Q. But Abu Baker isn't the only name you have seen that uses

the Abu as part of the last name. Correct?

A. Correct.

Q. Now, on this call, Baker Wiretap No. 25, the grandparents actually talk to their grandchildren, don't they?

A. I don't recall if that is on that call, but I don't dispute that.

Q. Okay. I would like you to read a little bit of this call. I am not going to ask you to read 27 pages, but I would like you to read a few of the beginning pages, and identify who the people are, and if you -- I think what might make it easier for you actually is if I bring you the first page so you can identify them, and then I will put this on the elmo. Okay?

A. Yes, ma'am.

MR. JACKS: Your Honor, I am going to object to this. I think Ms. Hollander is mistaken. The entire call is not in evidence. We admitted excerpts from the call and audio file of the excerpts.

MS. HOLLANDER: Can I have a second, Your Honor?

THE COURT: Sure.

MS. HOLLANDER: Can we approach?

THE COURT: Let's take the lunch break. Be back at 1:45.

(Whereupon, the jury left the courtroom.)

THE COURT: Be seated.

Ms. Hollander?

MS. HOLLANDER: Your Honor, I have HLF trial exhibits 10/8/08 delivered to me from the Government. I checked again last night because I asked yesterday if this entire thing was admitted, and I checked last night and that is what is on here. The entire exhibit is on here.

I also, as you recall yesterday, raised an issue about another one that they played that they played part that I didn't have and that part isn't on here. I mean, I have to go by what the Government says. Last week after what happened we keep getting new exhibits from the Government, and then we have some issues where they were changed later. So we asked the Government to provide us a disk of all of their exhibits correctly, and what we got was this disk. And we also received -- I am not sure I have it. We also received just a list of all the exhibits.

And then after -- At one point I think Mr. Dratel wrote to the Government and asked them to tell us which ones had changed because we had an issue, and we received -- After we got this document, after we got the disk, we received a very long list from the Government which has new version, new version, new version, new version, new exhibit, so they keep internally changing their exhibits. And this is a real problem, frankly, because there is no way that we can go back. But this is what I have.

THE COURT: That is really -- What I want to know is what was admitted. I don't know that you need to get into all of that.

MS. HOLLANDER: As far as I know, this is what the Government provided me.

THE COURT: Do you have the transcript?

MS. HOLLANDER: I have the transcript. It is exactly the same as what is on here. That is what I am using.

THE COURT: Mr. Jacks?

MR. JACKS: Your Honor, on many of the intercepted calls, as with the video, the Government has taken those calls and pulled excerpts from those calls, and there are transcripts which reflect only the excerpts, and there are also audio files that reflect only the excerpts. And some calls are admitted in their entirety, but some calls have been redacted by the Government. And we have conveyed that fact to the Defendants before trial and told them that we were going to do that.

And we have provided not only the full call but we have also provided an audio file of the redacted version, and those have been provided so that they can see from listening, if they choose to listen to what the full call is and what the redacted part is and what will be played, and then the transcripts reflect also what has been redacted.

MR. DRATEL: Your Honor, that is not true because

what we received from the Government was not just an audio file that was complete. You know, we received the redacted versions of the transcripts themselves in terms of what the Government was going to put in So we get an exhibit marked El-Mezain Wiretap No. 4. It is what the Government wants to put in we also have the entire transcript. What they put in for this conversation with the exhibit number is the entire conversation.

MS. HOLLANDER: There are other ones on there.

THE COURT: You say you received a redacted transcript?

MR. DRATEL: No. I am saying when they put in a redacted transcript, that is what we receive. We don't receive a full transcript and audio file clips. We receive -- When they redacted the transcript, we received a redacted transcript. In this one we received the entire transcript.

MS. HOLLANDER: I can make it clear. This is the Government's disk of all of their exhibits today. It has this one complete. It has the other ones which they have redacted exactly as they redacted them. So you know, what Mr. Dratel is saying is correct. For example, the other one that I complained about, it has the redactions the way I thought they were going in which was different.

MS. DUNCAN: May I add something to that? I just wanted to address a problem. I mean, this transcript was a

full transcript, and when we are getting ready to put together our crosses, we rely on Government's exhibits to determine our 106 arguments and to come up with our questions. So when we are looking, as Ms. Hollander said, sometimes they give us their snippets and we can compare those snippets to the full conversations.

THE COURT: So you are getting the full transcript?

MS. DUNCAN: No, not now. We have had those. In the first trial the Government introduced the full transcripts. So we compare those to the first trial and see what they have redacted. So, you know, we have been relying on their exhibits to determine what they are bringing in and so for them to stand up now in the middle of cross and say, "Oops, we gave you the wrong one," it is just not fair.

THE COURT: I don't know that he said that. He said that they told you which ones they were redacting. I guess you need to check into that, Mr. Jacks, and find out.

MS. HOLLANDER: I can give you an example, Your Honor. Baker Wiretap No. 26, the one that I referred to the first time, what is on this disk is this and it says Baker Wiretap No. 26. We printed it off and it is like six or seven pages long, seven pages.

MR. JACKS: May I make a suggestion?

MS. HOLLANDER: May I finish?

THE COURT: Let him make a suggestion. This is not

telling me a whole lot, Ms. Hollander. Go ahead, Mr. Jacks.

MR. JACKS: When Ms. Hollander says this or this, if she can talk about what she has got in her hand.

MS. HOLLANDER: I will do that.

THE COURT: Here is what -- No. Here is what I want. You to get with Mr. Jacks, the Government, over lunch and see what you have. Show them what you have. I don't know what -- I haven't seen any of it, so I don't know what you are talking about, frankly. And he is correct. When you say, "I have this," and they gave me this," it is meaningless to me. What I want you to do is get with the Government attorneys and then see if this can be worked out. If it can't be worked out, obviously I will have to resolve something. He is telling me they let you know the redacted ones and you are saying, "No, they didn't."

MR. DRATEL: The bottom line is this. For this conversation they put in evidence the entire --

THE COURT: I understand that, but they are denying that, Mr. Dratel, and I don't know.

MR. DRATEL: Look at the disk.

THE COURT: And I don't have it, though.

MR. DRATEL: We will be happy to provide it.

THE COURT: Mr. Jacks said he did something different. Get with him and show him what you have, and it may be that it can be resolved. If it can't, we will have to

deal with it.

MR. DRATEL: Thank you, Your Honor.

MS. HOLLANDER: I don't mean to be unclear, Your Honor.

THE COURT: Well, you are unclear. It is unclear. And I want you to handle it that way before I hear another 15 minutes of argument that is basically meaningless to me. It doesn't help me. I will have to look at this eventually if you can't resolve it. Just listening to you, it doesn't tell me anything other than I know you are saying different things. But see if you can resolve that. If not, we will have to deal with it.

We will be back at 1:45.

(Lunch recess.)

THE COURT: Are you ready? Are we going to your witness.

MS. SHAPIRO: Yes. I think we are going to interrupt at this point and go out of order. I don't know if you wanted to tell the jury that.

THE COURT: We can. I will explain. We have two we are going to take up out of order?

MS. SHAPIRO: Yes.

MR. CLINE: Your Honor, as to Mr. Simon, rather than the continuous objecting, may we have a continuing objection based on our earlier --

THE COURT: Yes, you may have that continuing objection.

(Whereupon, the jury entered the courtroom.)

THE COURT: Ladies and gentlemen of the jury, we are going to take two witnesses out of order. Agent Miranda is going to step down from the witness stand. We have two witnesses in from out of town, maybe out of state, so we are going to take them out of order, and then we will come back to finish Agent Miranda's testimony.

Ms. Shapiro?

MS. SHAPIRO: Thank you, Your Honor.

The Government calls Steve Simon.

(Whereupon, the oath was administered by the Court.)

STEVEN SIMON,

Testified on direct examination by Ms. Shapiro as follows:

Q. Good afternoon, Mr. Simon. Could state your name and spell it for the record, please?

A. Steven Simon, S-T-E-V-E-N S-I-M-O-N.

Q. And where do you live, Mr. Simon?

A. I live in, Virginia.

Q. Okay. And do you have a college degree?

A. I do.

Q. And what is that degree in?

A. It is in classics and near eastern languages.

Q. Okay. And where did you graduate from?

A. Columbia University in New York.
Q. Okay. And do you know any near eastern languages?
A. Yes.
Q. We ones?
A. I have studied Arabic, Hebrew, Aramaic, Akkadian, and some Ugaritic, and some Syriac, which is kind of like Aramaic but a different alphabet.
Q. I won't ask you what all of those are.
Do you have a post graduate degree?
A. I have a post graduate degree in religion, religious studies, and one in international relations and economics.
Q. And where did you get those degrees from?
A. The religious studies one was from Harvard, and then the other one was from Princeton University.
Q. And after you finished -- Is that the end of your academic career, or were there additional degrees?
A. I was a university fellow at Brown University involved in translating some ancient semitic religious texts, and then I was at Oxford for a while.
Q. And what did you do at Oxford?
A. Middle eastern studies, and I at the Oriental Institute at Oxford.
Q. Okay. Did you get a degree from Oxford, or was that post graduate work?
A. No. I was a fellow, so, you know, it is sort of neither

fish nor foul. You aren't really a student but you aren't really a professor either.

Q. And what did you do professionally after you finished your graduate work?

A. I had kind of a checkered career. I did various things before entering the federal government, including being a freelance writer, but also working for New York City government and the human resources area, mostly having to do with policy on public welfare and medical assistance to the indigent, to the poor in New York City.

But then I switched to the federal government, worked for a short time at the Office of Management and Budget on the National Security spending plan, the White House spending plan, and then I moved to the State Department where I worked for about 20 years.

Q. Okay. And while you were at the State Department, did you have the opportunity to work for other federal government agencies?

A. Yes. I spent about five years, a little more than five years at the White House as a detailee. In other words, I was sent over by the State Department to work on the White House staff.

Q. And what years were you on detail at the White House?

A. '94 through '99. 1994 through 1999.

Q. Okay. And when you say you were on detail, does that

mean that the State Department continued to pay your salary while you worked over at the White House?
A. Well, strictly speaking, the State Department paid my salary for I think three of those years, and then my last two my salary was paid out of the White House travel budget or something. There was some, I don't know -- Accounting is way beyond me. But in any case, I was getting a federal paycheck.
Q. Okay. And what particular part of the White House did you work for?
A. Well, I was on the staff of the National Security Council.
Q. Could you explain for us what the National Security Council is?
A. Sure. It is a small group of mostly government employees, well, all government employees, but some from the State Department, some from the Defense department, some from the CIA, some from the FBI, from a variety of agencies that work to coordinate the President's foreign and defense policy; that is, to make sure that U.S. government agencies were doing the sorts of things that they needed to be doing to carry out the President's policies.
Q. And when you were at the National Security Council, who did you report to?
A. I reported in the first term to Anthony Lake, who was the national security advisor then, and subsequently to Samuel

Berger who was the national security advisor in the second term.

Q. Okay. And those people, Mr. Lake and Mr. Berger, they then reported directly to the President, or was there another person in between?

A. No, they would have reported directly to the President. Their title was Assistant to the President for National Security Affairs.

Q. Okay. And you said you left the NSC in 1999?

A. In the fall of 1999.

Q. What did you do after that?

A. I was assigned by the State Department to London where I served as the second in command, so-to-speak, of a research organization, the International Institute for Strategic Studies, and I did that for about three years, whereupon I was very close to retirement so I worked at the embassy for a while, and then was transferred back to the United States.

Q. And did you go -- What did you do once you got back to the United States?

A. I worked for the Rand Corporation.

Q. And what is the Rand Corporation?

A. It is a federally funded research and development corporation. It is a non-profit firm that helps the U.S. government work through mostly policy problems of a very practical nature that U.S. government agencies don't have the

personnel to work on.

Q. And how long did you work at Rand?

A. I was there for three years.

Q. Did you focus on any particular area when you were there?

A. Well, some of the work I did was classified, obviously, in the national security domain. I wrote or participated in some -- on the writing of some books on Middle East politics, and I ran, along with a colleague, a large project on building a successful Palestinian state; you know, what would be the best way to do that.

Q. And after you left Rand what did you do after that?

A. I went to the Council on Foreign Relations, which is basically another research organization, and I am the senior fellow there for Middle Eastern studies.

Q. And that is where you are currently employed, or is that an honorary position?

A. I am also kind of a professor, too, elsewhere, but yes. Well, it is not so much an honorary position, the Council on Foreign Relations. I just go and work for a living.

Q. And you said you teach. Do you teach at a university?

A. I teach at Princeton University in New Jersey.

Q. Do you teach a course there?

A. Yes.

Q. What course is that?

A. It is a course -- This semester I am teaching

undergraduates, and it is a seminar on political violence.

Q. Is that an undergraduate course?

A. Yes.

Q. Okay. And over the course of your career have you written books?

A. Yes.

Q. Can you tell us what those books are that you have written and published?

A. I published a book in 2003 called Iraq in the Shadow of Regime Change, which was about -- it was a study of Iraqi society and the relationship between Iraqi society and the Iraqi state in the period preceding the U.S. invasion of 2003.

Then I did a book called The Age of Sacred Terror, which was about the origins of a holy war and how it came to be carried out against the United States, but also it was about the way in which the United States responded to the emergence of this very serious development.

And afterward I wrote another book with the same colleague called The Next Attack, which took the story from 9/11 through to the present.

Q. Okay. I want to focus your attention on the time that you spent at the National Security Council, which I believe you said was 1994 through 1999. Is that correct?

A. That is correct.

Q. Okay. What was going on between the Israelis and the

Palestinians during that period of time?

A. Well, there was a lot going on -- Excuse me. I have a bad cough, as you can tell. What was going on at one level was actually very favorable. In 1993 the Israelis and Palestinians had signed a document called the Declaration of Principles, which was -- I am not an historian, but it was quite an important event because it entailed the recognition by Israel of a Palestinian leadership with political authority, and was thought at that time to be the first step toward an agreement between Israelis and Palestinians that would result in a state for the Palestinian people. At the same time there was a lot of fighting.

Q. Were that principle of agreement, was that also known as the Oslo Accords?

A. Yes. The Declaration of Principles came out of the Oslo Accords.

Q. Okay. And what was the role of the National Security Council with respect to the Oslo Accords?

A. Well, it was -- You know, the role was multi-layered. It wasn't just one thing. The National Security Council staff was involved in helping the Israelis and Palestinians figure out how to work through some of the problems, the log jams that arose in the process of these negotiations, and in particular advising the President of the United States on how best to interact with leaders on the Palestinian and on the

Israeli side, and also making sure that the State Department was doing what it was supposed to do, and the CIA, too, because all sides needed information about what was going on because it was important in a negotiating process to keep all the parties honest. So the National Security Council staff was involved in making sure that all these things were happening as they should be.

Q. I just want to make clear, since you -- Presumably at the National Security Council you had access to classified information. Is that right?

A. I did, yes.

Q. But you are not relying on any classified information in your testimony today. Correct?

A. Oh, certainly not, no.

Q. Okay. During the time that you were at the National Security Council and these negotiations were going on, was there anything happening that tended to impede those negotiations?

A. Well, yes. There were things on both sides that were problematic, but 1993 was the year in which the Declaration of Principles was signed, and that was followed in 1994 by a lot of terrorist violence by Palestinian groups that were looking to bring the peace process to a halt, if they could.

Q. And was Hamas one of those organizations?

A. Hamas was one of those organizations, yes.

Q. And was there anything about the timing of those terrorist attacks that coincided with events going on in the negotiations?

A. Well, you know, the negotiations were at that point almost a non-stop process, because the issues were very complicated and the differences between the two sides on some of them was quite wide, and there was a lot of diplomatic work entailed in bridging those differences. So the negotiations never really stopped. And certainly there were U.S. diplomats going back and forth that whole time trying to keep the train on the track, if I can use that expression.

Q. And so how did the terrorist attacks impact that process of constant negotiation?

A. Well, the terrorist attacks were, you know, serious problems, because the key to a successful agreement, most people thought, and I think it is kind of hard to argue with this, but the key to a successful agreement was going to be trust between the two parties. The two parties had to sign up to, you know, a pretty long-term marriage basically in very close proximity to one another, so trust was really key.

And, you know, at the same time as the Palestinian leadership that was involved in the negotiations was trying to build this sort of trust --

Q. What was that Palestinian leadership, if I can just interrupt you a second? What was that called?

A. It was the Palestinian Authority.

Q. And that was -- The Palestinian Authority was created as a part of this negotiation process?

A. Correct.

Q. Okay. I am sorry. Continue.

A. And just as the Palestinian Authority was trying to build the sort of trust that would move things along, these terrorist attacks were undermining that trust by convincing the Israeli public that the other side, that the Palestinian side couldn't really be trusted, so it was damaging.

Q. And did the United States have an interest in having a successful resolution to those negotiations?

A. The U.S. had a strong interest in this, yes.

Q. And can you explain for us what some of the United States' interests were in having a negotiated resolution to the conflict between the Israelis and the Palestinians?

A. Well, U.S. interests are closely bound up with Middle Eastern politics.

Q. In what way?

A. Well, you know, to be blunt, oil is extremely important to the United States, and the U.S. economy relies very heavily on energy that comes out of the Middle East region, which has, apart from Russia, the preponderance of oil. They have just got most of the oil. And the U.S. has since the Second World War maintained close relations with most of the oil producers,

just as a matter of a strategic interest, vital strategic interest.

Q. And how does the peace or lack of peace affect our relationships with oil-producing countries?

A. Well, you know, the links are many, and they combine with one another. I will give you a few examples. The U.S. relies on the cooperation of Arab states, not just oil producers but important Arab states that surround the oil producers, for military cooperation as well as economic cooperation, and these ties are necessary to protect and advance our national interest in maintaining a secure access to the energy supplies that we need.

Well, I think, you know, most of us have a sense that the countries out there on whom we rely aren't exactly democracies in many cases, but that doesn't mean that public opinion is not very important, because even in countries that aren't democracies, at least in the Middle East, I don't know about other areas, governments need to maintain some kind of legitimacy. They need to to satisfy public opinion. And here is the rub. Public opinion in those countries cares a lot about the fate of the Palestinians and whether or not the Palestinians get a state. People just really care.

Q. So how does conflict in that region spill over to the United States' interests?

A. Well, to the extent that America is seen as not doing

enough to help the Palestinian cause, then Arab governments have to answer to their people, so-to-speak, about why it is they are so close to the United States and they are doing the U.S. so many favors when the U.S. isn't dealing with a problem that the Arab public really care about. "What is going on," they will ask.

Q. Would it help the United States' relationship with those countries if the Israeli-Palestinian conflict were taken off the table, so-to-speak?

A. Yes, I think it would. It is not a magic bullet, but I think it would help a great deal.

Q. Are there other national security interests of the United States that are put at issue through this conflict, this ongoing conflict in the Middle East?

A. Yes. I mentioned that, you know, there were a number of factors and they were interlocking. And apart from the fact that the United States has had a military presence in the region for a long time, for which it needs bases and needs support, requires security, the fact that the United States has a fleet, has actually two fleets in the region, it has a fleet in the Mediterranean and a fleet in -- nowadays a fleet in the Persian Gulf, and had the makings of a fleet even back in the early '90s after the first Gulf War in that area, there is a lot of military support that is needed. Then there were proliferation concerns.

Q. What do you mean by proliferation?

A. Well, what I mean by that is there is at least one country in the region, Iran, that is seeking nuclear weapons, and which doesn't really like the idea of a very strong American presence in their neighborhood. Well, you know, that makes the cooperation of the Arab states in that region all the more important for the United States. The United States needs to keep those countries on its side in this long-simmering battle, really, with Iran over who is going to have the greater influence in that very important part of the world.

And at the same time, you know, Iran is trying to extend its influence to other parts of the region, particularly Lebanon, but also Iraq, and this also, in turn, puts a premium on the U.S. getting the support of Arab countries in the region.

Since the perception that the U.S. is really trying to help the Palestinians and Israelis find a solution to their problem is important to these countries, then it follows that it is important to America's national interests that the United States find a way to work productively with Israelis and Palestinians to bring that conflict to an end.

Q. Okay. So let me just come full circle. Why is it that we in the United States should care about an organization like Hamas that is trying to undermine the Middle East peace

process? And I won't limit that just to Hamas, but any terrorist organization.

A. The problem now, and we all know this since 9/11, is not just that the U.S. has powerful interests in maintaining a secure supply of oil, but we now know that people from there who are angry at the United States are motivated and capable of coming over here and hurting us quite badly; and if not hurting us here badly, hurting us elsewhere badly. The United States is a global power. We are all over the place. We are very exposed. So, you know, to the extent that the United States can remove one cause of resentment against America, we reduce the threat against the United States correspondingly. It is hard to do, but it is very important work.

MS. SHAPIRO: May I have a moment, Your Honor?

THE COURT: Yes.

Q. (BY MS. SHAPIRO) The interests that you were just talking about just a moment ago, is it fair to say that that applied -- that it was equally true during the time that you served in the National Security Council between 1994 and 1999?

A. Yes. There was a good deal of concern at that time about the extent of resentment against the United States, and there were numerous studies that were being done that crossed my desk when I came to the White House in 1994 on this subject.

And, you know, the Israeli-Palestinian issue we knew had been kind of a real irritant, you know, for Arabs for a long

time, for the Arab states for a long time, but we were beginning to come under somewhat greater pressure from Arab governments to do something about it, because these governments wanted to, in fact, they needed to maintain close relations with the United States, but they didn't want to have, you know, those diplomatic and other relations complicated at home by questions about the appropriateness from, you know, the perspective of Arab publics of such a close relationship between their governments and the United States government.

Q. Thank you.

MS. SHAPIRO: Pass the witness.

THE COURT: Mr. Dratel?

CROSS EXAMINATION

By Mr. Dratel:

Q. Good afternoon.

Now, you spoke about interlocking factors, a number of interlocking factors that go into U.S. national interests in the Middle East. Right? And one of the things that you talked about also was Arab governments and Arab populations and resentment over the failure to resolve the PalestinianIsraeli issue. And obviously one of those resentment -- Withdrawn.

Isn't it true that one of the causes of resentment in that part of the world, the Arab governments, Arab

populations, was the perception that the U.S. was supporting Israel as opposed to the Palestinians?

A. Yes.

Q. And part of the reason that Arab governments came to the United States to do something was the perception that the U.S. government could have some influence with Israel in moving Israel towards a peaceful solution.

A. Yes.

Q. And part of the resentment has to do with historical factors. Right? In the Arab world?

A. History just gets involved.

Q. And I will be more specific, but I just wanted to preface it with -- And these are among the factors, obviously, that go into this whole catalog of factors that go into the U.S. interests. And one is obviously in 1948 the birth of Israel and the displacement of hundreds of thousands of Palestinians. Right? You have to answer yes or no.

A. I am sorry. Yes, indeed.

Q. And created a refugee crisis, essentially.

A. Yes.

Q. And created an -- And in response to that refugee crisis, one of the things that was created was an entire United Nations refugee organization that still exists today.

A. The U.N. Relief and Works Agency.

Q. UNWRA we will call it. Right? And that is designed to

try to help this refugee problem get resolved, even though it is still sixty years down the road, and still operating to do that.

A. Correct.

Q. And another aspect of this resentment is Israel's occupation since 1967 of the West Bank and Gaza. Right?

A. Yes.

Q. And that was a military occupation. Right?

A. Yes.

Q. And that was as a result of the Six Day War in 1967 where Israel essentially captured that territory?

A. Yes.

Q. And that created more refugee camps. Right? Or at least an aggravation of the problem of the existing refugee camps.

A. Yes.

Q. And Israel not only was a military occupier during this period, but also was essentially the administrator of these territories, West Bank and Gaza, during that period.

A. Yes.

Q. And there was no Palestinian government at all during that period.

A. During which period?

Q. '67 to '94in In the West Bank and Gaza.

A. '67 and '93, I believe.

Q. '93. Well, the PA was created by the Oslo Accords.

Right? And it took a year or so to get up and running. Is that fair to say?

A. It is still getting up and running.

Q. But the occupation, the military occupation by Israel of the West Bank and Gaza created economic problems in those territories. Right? For the Palestinians?

A. Periodically when there were closures following terrorist attacks.

Q. But in addition, also, wasn't there also a problem with respect to settlement activity by Israel that created --

A. There was a source of serious resentment.

Q. Yes. That the Israelis established settlements in some of these occupied territories.

A. That is correct.

Q. And that was not only among Palestinians, but others as well around the world.

A. Correct.

Q. Not just Palestinians. I am saying, not just Palestinians around the world, but others as well.

A. Correct.

Q. And not just Muslims.

A. Correct.

Q. And as far as some of these economic problems, the confiscation or the taking of land for settlements and other purposes by Israel created economic problems for Palestinians

in the territories.

A. Yes.

Q. And water rights and water diversion is another issue with respect to how much water Israel lets flow from the Jordan River to the Palestinians for their use, as opposed to what Israel takes for its use, is another issue. Right?

A. There is a water issue, but that is not it. But your point is correct, there is a water issue.

Q. Okay. And the first Intifada, you are familiar obviously with that. And that is the latter part November, December 1987. And in large part, the first Intifada is an outgrowth of these conditions that we are talking about and this resentment building up from 1967.

MS. SHAPIRO: Your Honor, I am just going to object as beyond the scope. I kept my direct very focused.

THE COURT: I will overrule it at this point.

THE WITNESS: I am sorry. Could you repeat?

Q. (BY MR. DRATEL) Sure. That the first Intifada is essentially an outgrowth of this 20-year period of military occupation.

A. Yes.

Q. Now, I want to focus on Oslo a bit. You talk about the Oslo Accords, we will call them, the Declaration of Principles that followed. That was part of your direct. And it is one of these interlocking factors in terms of United States --

involvement in United States' national interests.

Now, it is true, isn't it, that there were people, in fact many people who opposed the Oslo Accords on both sides--on the Palestinian side and on the Israeli side? You have to answer.

A. Sorry. Yes.

Q. And not just extremists, but people who might not be characterized as extremists.

A. Yes.

Q. Are you familiar with Edward Said?

A. Yes.

Q. He was a Columbia professor. Right?

A. Yes, comparative literature.

Q. Yes. Did you actually take any of his classes?

A. No, but I signed his book.

Q. And he was opposed to Oslo. Right?

A. Yes.

Q. And he was a spokesperson for Yasser Arafat, who resigned, who actually left in protest over Oslo. Right?

A. Who resigned?

Q. Said.

A. Yes.

Q. And he called the Oslo Accords, and I am quoting here, "the repackaging of the occupation."

A. Yes.

Q. And as you mentioned, Oslo is really a first step and not the end result of -- not a fully packaged peace plan, but a first step. Right?

A. Yes.

Q. And it did not -- In terms of when we are talking about resentment in Arab countries and Arab countries putting pressure on the U.S., and even after Oslo, to continue the process and the opposition to Oslo among people, let's say non-extremists, like Edward Said -- Would you consider him a non-extremist?

A. He was not an extremist, not really, no.

Q. Okay.

A. I don't think he ever strangled anyone with his bare hands.

Q. But part of their reasons for opposing Oslo is that it did not in fact create a Palestinian state; that they felt they didn't go far enough?

THE COURT: Counsel, I don't know why we need to get into all the detail about the Oslo Accords.

MR. DRATEL: We are talking about the resentment?

THE COURT: We don't need to get into that kind of detail. You established resentment. That is not here before the jury.

Q. (BY MR. DRATEL) And did it also cede too much territory to Israeli control? You are familiar with Areas A, B, and C?

A. Yes.

MR. DRATEL: And if I could put what is already marked and is in evidence as Defendants' -- If we can have the elmo, please. What is already in evidence as Defendants' No. 1013.

Q. (BY MR. DRATEL) And I am going to show you the bottom first -- Can you read what is on the document on the screen?

A. I can, yes.

Q. Okay. So the orange areas is Area A. Right?

MS. SHAPIRO: Your Honor, I am just going to again object that this is well beyond the scope of direct and we are getting into the specific details of the Oslo Accords.

THE COURT: This map is in evidence. I think it has been discussed. Go ahead.

MR. DRATEL: Thank you, Your Honor.

Q. (BY MR. DRATEL) So the orange area is Palestinian cities?

A. Yes, that is what this says, but I am not familiar with this nomenclature. It doesn't correspond to what I recall.

Q. Okay. Well, could you describe A, B, and C?

A. But I can read it, yes.

Q. And B would be Palestinian villages. Right?

A. That is what this says, yes.

Q. And C is Israeli settlement, military areas, and state lands.

A. That is what it says, yes.
Q. And just to define it in more simple terms or plain terms, Area A is an area that is under the control of the Palestinian Authority. Is that right? Would that be?
A. And B is shared, and C is under Israeli control.
Q. When you say shared, what do you mean by shared?
A. Authority is divided along some lines that, to be honest, I can no longer remember.
Q. Is it military controlled by the Israelis and administrative control by the Palestinians?
A. I don't remember.
Q. Okay. Oslo itself, the Oslo process was in fact done secretly by the Palestinians and the Israelis, the PLO, the Fatah, Arafat organization, and the Israelis. Right? The U.S. actually didn't participate in those direct negotiations that led specifically to the Oslo Accords.
A. Not initially.
Q. And in fact the U.S. was trying on another front with the Madrid Conference to try to promote an agreement separately.
A. Yes. Well, the United States was doing both. It was following the Madrid Conference on the one hand, and when the Israelis and Palestinians reached an impasse in the Oslo process, the United States intervened and helped the two sides broker the deal that resulted in the Declaration of Principles.

Q. Okay. And another aspect if you talk about resentment and one of these factors that goes into it, another cause of resentment that the U.S. had to address in the context of trying to broker something and satisfy its Arab allies were Israeli detention policies. Right? I mean, there was concern about Israeli security detention, administrative detention without trial.

A. The Israeli government and the military administration practices pretrial detention.

Q. And there is also torture of detainees. The Israeli Supreme Court found that.

MS. SHAPIRO: Objection, Your Honor.

THE COURT: Counsel, sustained.

Q. (BY MR. DRATEL) Another factor right before you joined essentially, or maybe a year, but the 1992 deportation of about 400 persons by Israel to Lebanon. Right? That was another factor that caused resentment in the Arab world, and around the world, in fact.

A. It got a lot of publicity.

Q. And in fact the U.S. Signed a U.N. resolution condemning Israel. Correct? 799?

A. I actually wasn't working on this account in 1993 or whenever that was. No, this is the 400 going to --

Q. Yes, Lebanon.

A. Oh, yeah. I was working on something else then.

Q. Okay. Now, during the course of your tenure at the National Security Council wasn't there also continued resentment among people, let's say in the Arab world and elsewhere in the context of the Israeli-Palestinian issue, about Israel's failure to meet certain post Oslo deadlines; in other words, certain deadlines that were set forth in the Oslo agreement that Israel failed to meet in terms of surrendering territory and other matters?

A. I know the administration in Washington wanted the Israelis to move quicker on these things, but I don't know about other countries actually.

Q. But weren't there specific deadlines that Israel failed to meet in the context of --

A. There were deadlines that both sides had to meet.

THE COURT: Counsel, that is the whole problem about getting into the politics of both sides --

THE WITNESS: Neither side actually met the deadlines.

THE COURT: You asked the question.

MR. DRATEL: I understand, but --

THE COURT: Move on to another area now besides all the politics. You are wanting to get further and further into that, and that is not involved here.

MR. DRATEL: Your Honor --

THE COURT: Counsel, we discussed this before.

MR. DRATEL: May we approach, Your Honor?

THE COURT: No. We have discussed it before.

Q. (BY MR. DRATEL) And was another factor that you had to address on the National Security Council in terms of U.S. interests and factoring all these things into account was violence by Israelis or Jews against Palestinians? You have to answer --

A. In the time frame we are talking about, I don't think that that was a major concern. Are you talking 1994?

Q. Yes. Baruch Goldstein was in 1994.

A. That was Baruch Goldstein and the massacre of 29 I guess -- I think it was 29 Arab worshippers.

Q. Yes.

A. -- in Hebron was a serious crisis, but it wasn't repeated and it was quite apparently the act of, you know, a deranged person.

Q. But there were other plots as well. There was a temple mount plot to destroy the temple mount, that was halted. Right?

A. That was halted, yes. In fact, it never really got anywhere.

Q. And is there an organization in Israel called Gush Emunim?

MS. SHAPIRO: Objection, Your Honor.

THE COURT: Sustained.

THE WITNESS: Gush Emunim --

THE COURT: You don't need to answer that.

Q. (BY MR. DRATEL) These are part of the things that you have to factor in the Israeli political -- Don't you have to also factor in the Israeli political --

THE COURT: Counsel, he may have but we are not going into those here.

MR. DRATEL: But she asked about U.S. factors.

THE COURT: And he discussed certain things, and you can discuss those, but now you are expanding the area.

Q. (BY MR. DRATEL) I am saying, is that a U.S. factor, the political situation in Israel. When you were in the political situation in Israel a factor that you had to -- something you had to factor in in U.S. security interests?

A. Yes.

Q. Okay. And Gush Emunim was a --

THE COURT: Counsel, I sustained the objection to that.

MR. DRATEL: I thought I established a predicate to that, Your Honor.

Q. (BY MR. DRATEL) And the Likud party was one of the major parties in Israel. Right?

A. Correct.

Q. And the Likud party's position was opposed to Oslo and surrendering any land for a Palestinian state.

A. No.

Q. That is not their platform?

A. The Likud prime minister Benjamin Netanyahu, who participated in the accords, negotiations, and ratified the kinds of concessions of the map that you displayed represent.

Q. Now, did you also have to address as part of these factors the Palestinian perception of bias against Palestinians in favor of Israel in the U.S. in terms of the U.S. government?

A. Yes.

Q. And as part of your job at the National Security Council you were involved in preparing other administration officials, government officials for appearances in front of what might be termed pro-Israel organizations. The American-Jewish Committee. Is that fair to say?

A. I might have I just don't remember.

MR. DRATEL: May I approach, Your Honor?

THE COURT: Is it a follow-up to these last questions you are asking?

MR. DRATEL: Yes.

THE COURT: Do you have an objection to this area of questioning?

MS. SHAPIRO: I object to relevance and outside the scope.

THE COURT: Sustained.

MR. DRATEL: Your Honor, it has to do with his job at the NSC. This is part of what he did at the NSC.

THE COURT: But we are getting into areas that are just not relevant to this case before this jury, counsel. There are a lot of things he did with the NSC but are not relevant here.

Q. (BY MR. DRATEL) Does it have to do with --

THE COURT: Counsel --

Q. (BY MR. DRATEL) Was another factor that had to be factored in was the need of the Palestinians and the need to continue humanitarian aid to the West Bank and Gaza?

A. If I recall correctly, the issue at that time was maintaining economic performance.

Q. But was there need --

A. Because there wasn't a humanitarian crisis.

Q. You don't think there was a humanitarian crisis at that point. Okay.

MR. DRATEL: I have nothing further, Your Honor.

THE COURT: Thank you.

Who is next? Anybody?

MR. CLINE: No, Your Honor.

MR. WESTFALL: No, Your Honor.

THE COURT: Ms. Cadeddu, any questions?

MS. CADEDDU: NO, Your Honor.

THE COURT: And Ms. Hollander, any questions?

MS. HOLLANDER: No, sir.

THE COURT: Ms. Shapiro, any follow-up?

MS. SHAPIRO: Just a moment, Your Honor.

THE COURT: Okay.

MS. SHAPIRO: No further questions, Your Honor.

THE COURT: Mr. Simon, you may step down. You are free to go. Thank you.

Next witness?

MR. DRATEL: Your Honor, may we approach?

THE COURT: You can come up while we are getting the next witness.

(The following was had outside the hearing of the jury.)

MR. DRATEL: I talked about politics. That is all I was getting into. And I was not permitted to go through all the factors --

THE COURT: You were getting into --

MR. DRATEL: I am wanting to --

THE COURT: I am not going to argue with you.

MR. DRATEL: I am not arguing.

THE COURT: Yes, you are.

MR. DRATEL: I am just making a record.

THE COURT: Go have a seat before you get in trouble.

MR. DRATEL: I am going to --

THE COURT: Go have a seat before you get in trouble.

MR. DRATEL: I am asking for a mistrial.

THE COURT: You have a seat before you get in trouble.

MR. JACKS: You wanted to talk about this next witness. He is an FBI agent, retired FBI agent who found Marzook's phonebook in New York. Mr. Cline wanted to raise an objection. He is going to get into some of the answers Mr. Marzook gave him, and he objected to those as hearsay. Our position is they are not for the truth; that it is just to show the conversation they had. He was asked, "Where is your contact information? Do you have an address book?" He said, "No, I don't." So it is not being offered for the truth of his answers, but just to show the give and take that he had that led to the decision to search them.

MR. CLINE: We have no objection to the testimony that he recovered the address book from Marzook. I think that is undisputed in the record. We do object to the witness' recitation of what Marzook said.

We object on confrontation clause grounds, hearsay grounds, but also on Rule 401 and 403 grounds. This wasn't one of the Defendant's books. There is no evidence that the Defendants had any idea that Marzook had the phonebook with him, that he was going to deny it, that they advised him to

deny it, that they knew he was denying it. It has nothing to do with the Defendants. It is being offered to effectively impute the Defendants on the scene, on the spot deceptiveness, and I think under 401 and 403 it should not come in.

THE COURT: What about his argument that they are not offering it for the truth?

MR. CLINE: That may or may not take care of the hearsay and the confrontation issues. I don't believe it does. But putting those aside for a minute, there is still a relevance and 403 problem, even if it is not hearsay, because what does it have to do --

THE COURT: Confrontation --

MR. CLINE: But all of that aside for a moment, what does it have to do with the Defendants? The only way it could be relevant is if somehow Marzook's deceptiveness about the phonebook, or whatever it is, the address book, could be imputed to the Defendants, and there is no evidence connecting that to the Defendants at all. It appears he was arrested, to his surprise, at the airport, and on the scene he is questioned by agents and he lies to them about the phonebook. It has nothing to do with the Defendants.

MR. JACKS: Judge, the relevance doesn't turn on whether or not they knew he was carrying it. They knew he was coming in. That is not what decides the relevance. If him lying about whether he had an address book or not is

prejudice, what about him being the head of the terrorist organization?

I mean, when you put the two side by side and say, "This is under 401 him lying about it, it is prejudice to our client," but the fact that he is the head of a terrorist organization, that is -- I guess I didn't make my point clearly. But it is needed to tell the story, to make the story flow about the meeting with him, the conversation.

THE COURT: Why do you need that? The point is you got this phonebook. You are trying to get in this conversation to show he lied.

MR. JACKS: The security document talks about concealing, you know, address books and phonebooks. That is exactly what he did. It was hidden within his wife's undergarments, and it corroborates --

THE COURT: Why don't you establish where they found it without getting into what he said.

MR. JACKS: Your Honor, I mean --

THE COURT: You can establish that.

MR. JACKS: I mean, Mr. Cline is almost conceding that it is not hearsay and it is not confrontation.

MR. CLINE: I am not conceding anything.

MR. JACKS: I understand. Statements not offered for the truth, they are just contextual and they are just statements. It is clear that he lied when he said, "I don't

have an address book," and he did. So we are not trying --

THE COURT: You don't think that imputes anything to the Defendants?

MR. JACKS: It is relevant in the case, but in terms -- It is certainly not unfairly prejudicial. You can impute to it that a co-conspirator came into the country and was hiding his address book, to the extent that that can impute something to them, but it certainly doesn't do anything under 401 and 403 to keep it out.

MR. CLINE: It is just not relevant to anything the Defendants in this case did. The fact that he is a Hamas leader, that is clearly relevant in light of the Defendants' connections with him and so on. The fact that he went and was questioned at the airport about his address book and he lies has nothing to do with the Defendants in this case. And of course the jury is going to impute that to the Defendants. Otherwise they are not -- That is the only reason the jury can figure it is in this case is because it has something to do with the Defendants, and it doesn't.

If they want to testify about the agent looking at his wife's luggage and finding it, they can do it, but they shouldn't be able to get in this statement.

MR. JACKS: He is a co-conspirator as well, so he can justify it as a co-conspirator statement, that he is making a false statement to keep the conspiracy under wraps,

to keep these law enforcement officers from finding his address book which has the names and phone numbers of all these other people that are on the Palestine Committee. So there is two prongs there under which this conversation can come in. And as I said, in the --

THE COURT: This was in 1995?

MR. JACKS: 1995, and really in the middle of this time frame we are talking about.

THE COURT: What about the co-conspirator statement? Why wouldn't it come in under that?

MR. CLINE: Putting aside the fact that Your Honor has not made any findings at all about the co-conspirators yet, and won't until the end of the case, even if one were to assume that it was a co-conspirator statement, that doesn't overcome the relevance of the 403 issues. The question is what is the relevance of this man's on-the-scene lying, apparently, to an agent where there is no evidence that it had any connection whatsoever to any of the Defendants? It doesn't have -- It is --

THE COURT: But you are saying that for a statement of a co-conspirator to be admissible it has to have connection with all of the rest of the Defendants. That is not true. If it is a co-conspirator statement, it seems to me that it would come in.

MR. CLINE: There would have to be a showing to be a

co-conspirator statement that it has to be in furtherance of
the conspiracy.

THE COURT:  That is why I was asking about
Mr. Jacks' argument.  They arrested him.  The evidence is that
he was the head of Hamas.  There has been some evidence
linking HLF with Marzook.  Does he have the Defendants' names
and numbers in the phonebook?

MR. JACKS:  Yes, sir.

THE COURT:  There is other evidence --

MR. JACKS:  He has three of them.

THE COURT:  He links it with some of them, and there
is other evidence linking Marzook with HLF.  So when they ask
him and he lies, trying to cover it up and hide it, that would
seem to be in furtherance of trying to keep --

There is case law that deception, as long as it is during
the conspiracy, would appear to be in furtherance, because
that is the only reason he would have for keeping that
information from law enforcement officers.  So it would be
appear to be -- It didn't have to be successful, but it would
appear to be in furtherance of the conspiracy.

Once you are there, why wouldn't it come in?

MR. CLINE:  Well, I think it would not come in
because there is nothing to suggest, first of all, that that
was his reason for lying; second, that the Defendants --

THE COURT:  But isn't that up to the jury?  I think

1    you can argue whatever, and ultimately that is for the jury to

2    decide.  But that is an inference and a reason.  Ultimately it

3    is for the fact-finder.  But I still am having trouble why,

4    once you are there, that it doesn't come in.  And the jury

5    will give it whatever weight they choose to give it

6    ultimately.

7              MR. CLINE:  To me, if it has any marginal relevance,

8    it is a 403 issue, and it is going to be imputed -- Apart from

9    hearsay and confrontation, it is going to be imputed to the

10   Defendants that this man was somehow lying on their behalf or

11   at their behest or some sort of agreement, and there is just

12   no evidence of that.

13             THE COURT:  They have statements where Baker is

14   talking to somebody about deceiving, and it is just two people

15   talking and it still comes in, even though none of the others

16   had anything to do with that.

17             MR. CLINE:  Well, we have those --

18             THE COURT:  But I let those in.  I think it is

19   admissible, frankly.  I thought those were admissible.  That

20   is why I let it in.  Once it is a co-conspirator statement, I

21   am having trouble -- I mean, if it is not a co-conspirator

22   statement I think you would be correct.  But I think he has

23   laid out the fact that it appears to be a co-conspirator

24   statement, and so I think it comes in.  Objection overruled.

25             (The following was had in the presence and hearing

of the jury.)

MR. JACKS: Your Honor, at this time we would call Joe Hummell.

(Whereupon, the oath was administered by the Court.)

JOE HUMMELL,

Testified on direct examination by Mr. Jacks as follows:

Q. Sir, would you tell us your name, please?
A. Joseph Hummel.
Q. Would you spell your last name for the record?
A. H-U-M-M-E-L.
Q. And how are you employed, Mr. Hummell?
A. I am the director of the investigative services for the National Football League.
Q. How long have you worked for the National Football League?
A. It will be two years this November.
Q. And where do you work? Where is your office?
A. 280 Park Avenue, New York; NFL headquarters.
Q. Prior to going to work for the National Football League, how were you employed?
A. I was a special agent with the Federal Bureau of Investigation.
Q. How long did you work for the FBI?
A. From 1983 to 2006.
Q. And where were your postings or where were you assigned

during your career with the FBI?

A. I did my first two years in the New Orleans office, '83 to '86. From '86 to 99 I was assigned to the New York field office. From '99 to 2006 I was assigned to the LEGAT office in London, England, and I returned to New York and retired out of New York.

Q. And for those that might not know, LEGAT is short for what?

A. The legal attache's office.

Q. All right. So you represented -- You, among other agents, represented the FBI in London in the United Kingdom?

A. Yes, sir. That is correct.

Q. Before you went to London, you said you were stationed in New York?

A. Yes, sir. That is correct.

Q. And during that time period what type of work or what type of cases were you assigned to work on?

A. I was there, as I said, from '86 on. So initially I was assigned to the Foreign Counterintelligence Squad, and subsequently went on to the Joint Terrorism Task Force.

Q. I want to direct your attention to the summer of 1995. And during that particular summer, would that have been the time period that you were working counterterrorism cases?

A. Yes, sir. That is correct.

Q. And did you have an occasion in July of 1995 to come into

contact with an individual that you learned or knew to be by the name of Mousa Abu Marzook?

A. Yes, sir, I did.

Q. And where did you meet Mousa Abu Marzook?

A. On July 25th, 1995 I met Mr. Marzook at John F. Kennedy International Airport as he attempted to reenter the United States from the U.K.

Q. And had you been sent to Kennedy Airport with the purpose or the expectation of talking or meeting with Marzook?

A. Yes, sir, I had.

Q. Whoever notified you, did you know that he was going to be entering or attempting to enter the United States? Prior to your being notified to go to the airport, were you aware that he was going to be coming into the United States?

A. No, sir, I wasn't.

Q. Where within Kennedy Airport did you come into contact with Mousa Abu Marzook?

A. We met Mr. Marzook inside the Immigration Secondary Unit at JFK.

Q. And were there any other law enforcement personnel there that you met with?

A. Yes, sir, there were. Immigration officers were there, and I was accompanied to JFK by my partner from the New York field office.

Q. Another special agent?

A. He I was actually an Immigration officer assigned to the task force.
Q. That would have been at that time the Immigration and Naturalization Service?
A. That is correct.
Q. Did you have a conversation with Mousa Abu Marzook in Kennedy Airport?
A. Yes, sir, I did.
Q. And what was the focus of your questions that you were asking Mousa Abu Marzook?
A. Well, we had gone out to the airport to interview Mr. Marzook, first of all, to confirm that he was identical to the Marzook who had previously resided in the United States, and also to determine his activities in relation to the Hamas organization, his activities while he was out of the United States, his movements while he was outside the United States, and what his intentions were now that he was attempting to reenter the United States.
Q. Before you went to the airport, did you know who Mousa Abu Marzook was?
A. Yes, sir.
Q. And did you know about his affiliation with Hamas and the fact that he had been out of the country?
A. Yes, sir, I did.
Q. And in general, you said that you wanted to ask of him

where he had been while he was out of the country, who he had been in contact with?
A. Yes, sir.
Q. And what, among other things, what his plans were if he were allowed to reenter the United States. Is that correct?
A. That is correct.
Q. Was anybody with Mr. Marzook that was traveling with him?
A. Yes, sir. He was traveling with his wife and children.
Q. All right. And in response to your questions about where he had been, what did he tell you?
A. What Mr. Marzook explained was that in May he had been in Jordan, and in early May the Jordanian government informed Mr. Marzook that they were revoking his status and he had 30 days to leave. Mr. Marzook explained that he left --
MR. CLINE: I apologize for interrupting, Your Honor. Can we have a continuing objection to this?
THE COURT: Yes, you may have that.
Q. (BY MR. JACKS) Go ahead.
A. Mr. Marzook explained beginning in June he departed Jordan and between June and when we encountered him on July 25th he had been moving back and forth between the United Arab Emirates and Egypt.
Q. And did you inquire of him about where he had been staying in the United Arab Emirates and Egypt and who he had been staying with and how you might verify or confirm that?

A. Yes, sir, we did. We asked him for contact details for while he was in Jordan, and his explanation was he really couldn't explain it because the streets were difficult to identify and he stated that he had been -- The family had a residence behind an English school, and that is all the could information he could provide with respect to his time in Jordan.

As far as his time in the United Arab Emirates, he explained at the time he could be contacted through a friend Issa Mohammed Abdel Majid, and with respect to his time in Egypt he had no contact detail.

Q. Meaning that he didn't have any contact with anybody or he couldn't provide you any information about their names and phone numbers?

A. He was unable or unwilling to provide details.

Q. Did you ever ask him if he -- what kind of papers he I was bringing into the country?

A. Yes, sir. At the beginning of the interview we asked Mr. Marzook to produce all his travel documents or any telephone books, address books he had in his possession.

Q. Did he -- What did he indicate about whether or not he had any kind of address book or phonebook?

A. He indicated he did not.

Q. That particular question, to ask him if he had an address book or a phonebook or anything like that, how many times was

he asked that question?

A. Numerous times throughout the interview, because when we asked him about his intentions with respect to entering the United States he was also evasive, non-committal as to where he was going or to be staying, so we just continually asked him for an address book, some way we could verify what he was telling us.

Q. At some point in time did this conversation or interview with Mousa Abu Marzook come to an end?

A. Yes, sir.

Q. And with regard to him and his wife and children, where were they after this -- Where were they located after this first conversation or this conversation that you have related ended?

A. When we finished interviewing Mr. Marzook, he was allowed to return to his family in Secondary, and they were together in a room.

Q. All right. And is that a part of the airport that is controlled by Immigration or Customs, and it is the people in there that still have not technically entered the United States?

A. That is correct.

Q. All right. What about his luggage and the items that he was bringing with him? Were those -- Where were those located during this time?

A. Prior to the interview beginning, U.S. Immigration and Customs asked Mr. Marzook and the family for all their luggage so that it could be searched. That luggage was searched, and as I recall, that was set off in a corner of that room. That is the best of my recollection where that luggage was.
Q. When you say the room, you are talking about the room they were allowed to wait in?
A. Yes, sir. That is correct.
Q. All right. Did he bring or have -- Did Mr. Marzook have any briefcases or attache cases or cases similar to that?
A. At the conclusion of the interview, as I said, Mr. Marzook was allowed to rejoin his family. My partner at the time decided he had one more question to ask Mr. Marzook about the currency he was traveling with, and my partner entered the room and noticed that there were two small briefcases on the ground seated next to Mr. Marzook.
Q. And did you or your partner, either by asking Mr. Marzook or simply by inspecting, were you able to open and see the contents of those briefcases?
A. We spoke with Customs and Immigration and we determined they had not been searched in the initial search, and at that time Customs and Immigration opened them up.
Q. And what type of documents were in those briefcases?
A. They had financial records, college diplomas, birth certificates, I think --

Q. Any address book or phonebook?
A. No, sir.
Q. And after the search of the luggage and the search of the briefcases or attache cases, or however you want to describe them, after the interview of Mousa Abu Marzook, was any further decision made about other avenues to determine if Mr. Marzook or anybody with him was in fact carrying any further documents or papers?
A. Yes, sir. Once the briefcases were opened and we found those documents, we determined that Mr. Marzook had not been completely forthcoming during the interview when we asked him for those types of documents, so the decision was made to have all the family members searched by U.S. Immigration officers.
Q. And when you say searched, are you talking about where they would have to start removing articles of clothing if need be to find out what they might have on their person?
A. That is correct.
Q. And was that done with Mousa Abu Marzook?
A. Yes, sir.
Q. Was it also done with his wife Nadia Elashi?
A. Yes, sir, it was.
Q. And with regard to Nadia Elashi, who did that?
A. Two female Immigration officers conducted that search.
Q. And was that in another room?
A. Yes, sir, it was.

Q. And after they went in that room, was there anything that one of the Immigration officers brought out with her?
A. Yes, sir; a small telephone address book.
MR. JACKS: May I approach the witness, Your Honor?
THE COURT: Yes.
Q. (BY MR. JACKS) Mr. Hummel, let me show you what has been admitted as Government Exhibit Marzook Phonebook. And can you identify that?
A. Yes, sir.
Q. And is this the address book that the Immigration officer -- Was it Customs or Immigration?
A. It was Immigration, I believe.
Q. That they brought out of the room after searching Nadia Elashi?
A. Yes, sir.
Q. Does it appear to be in the same condition as you saw it on that day, July 25th, 1995?
A. Yes, sir.
Q. And did you retain it then and keep it for evidence purposes from that point forward?
A. Initially it was in Immigration custody and then turned over to the FBI; but yes, sir, we did.
Q. All right, sir.
MR. JACKS: I pass the witness.
THE COURT: Any cross examination? Mr. Cline?

CROSS EXAMINATION

By Mr. Cline:

Q. Good afternoon, sir.

A. Good afternoon, sir.

Q. When you went out to the airport that day to JFK in July of '95, did you know that you were going to arrest Mr. Marzook?

A. No, sir.

Q. So as far as you were concerned, it could be that you would arrest him, it could be -- You would certainly interview him and then you could let him go?

A. Yes, sir.

Q. Answer this next question only if you have personal knowledge of it. Did the government of Israel have any input into the decision to have you go and have this encounter with Mr. Marzook?

A. I won't answer that.

Q. I beg your pardon?

A. On your advice I have no personal knowledge.

Q. No personal knowledge of that. Very well.

Now, Mr. Marzook arrived on a British airways flight. Correct?

A. That is correct.

Q. And he had with him his wife. Right?

A. That is correct.

Q. And his wife was named Nadia Elashi? Did you learn that?
A. Yes. That is correct.
Q. Was she arrested as well?
A. No, sir.
Q. And in the course of your discussion with Mr. Marzook, he indicated that he was traveling under a valid United States Department of Justice Immigration and Naturalization Service reentry permit?
A. That is correct.
Q. And was that true?
A. That was true.
Q. He did have a valid reentry permit?
A. Yes, sir.
Q. He indicated that he filed U.S. tax returns. Is that right?
A. Yes, sir.
Q. And was that true?
A. Yes, sir.
Q. And in the course of your discussion with him, he provided you with a list of educational institutions that he had attended while residing in the U.S. Correct?
A. That is correct.
Q. And I am not going to go through the whole list with you, but there were a series starting in 1982 and running through 1992. Correct?

A. That is what he told us, yes, sir.
Q. And did you check that out?
A. Yes, sir.
Q. And he had been at those institutions?
A. As I recall, some of those institutions were --
Q. Mail order?
A. Yes.
Q. Okay. Some were -- he was actually physically present and some were mail order?
A. I can't speak -- I don't recall, but I know some were mail order.
Q. All right. And then he gave you some biographical information--date of birth, when he arrived in the U.S., when he became a permanent resident of the U.S., those kinds of things. Right?
A. Yes, sir.
Q. All right.

MR. CLINE: Thank you.

THE COURT: Any other questions?

MS. HOLLANDER: No, sir.

MR. WESTFALL: No, Your Honor.

MR. DRATEL: No, Your Honor.

MS. CADEDDU: No, Your Honor.

THE COURT: Any redirect?

MR. JACKS: Just a couple of questions, Your Honor.

REDIRECT EXAMINATION

By Mr. Jacks:

Q. Mr. Hummel, when you say mail order college degree, do you mean like a diploma mill?

A. Yes. That is correct.

Q. Send them your money and they will send you a degree?

A. Yes. That is correct.

MR. JACKS: That is all?

MR. CLINE: Now, Your Honor, I have to ask a few follow-up questions.

THE COURT: Sure.

RECROSS EXAMINATION

By Mr. Cline:

Q. I don't want to insult anybody here, but Colorado State University, is that a real school?

A. Yes, sir.

Q. George Washington University in Washington, D.C., is that a real school?

A. Yes, sir.

Q. You wouldn't call that a diploma mill, would you?

A. No, sir.

Q. Columbia State University in Missouri, is that a diploma mill?

A. I don't remember that one.

Q. Okay. You are a football man. Right? Louisiana Tech

University, is that a diploma mill?

A. No, sir.

Q. It is a football power but it is not a diploma mill. Right? You agree?

A. Yes, sir.

Q. All right.

MR. CLINE: Thank you.

THE COURT: Anything else?

MR. JACKS: No, Your Honor.

THE COURT: Mr. Hummel, you may step down. You are free to go. Thank you.

Are you ready for Agent Miranda?

MS. HOLLANDER: Your Honor, may I approach just for a scheduling issue?

THE COURT: Yes.

And Agent Miranda, you are under that oath that was administered before the break.

(The following was had outside the hearing of the jury.)

MS. HOLLANDER: Two things. One, before I start, I would like three minutes to go to the restroom.

THE COURT: We haven't been in here long enough for a break.

MS. HOLLANDER: The other thing is we have a few issues that need to be resolved and maybe -- I don't know

whether -- We have to deal with the one just before lunch, and then there were a couple of other issues.

THE COURT: Did that not get resolved?

MS. HOLLANDER: Yes and no. We figured out the problem, and Mr. Jacks can correct me if I am wrong, but I think that what happened is that the Government -- Mr. Jacks intended for a document to be redacted, and then -- Mr. Jacks, you should listen to this because I want to make sure I get this right. I believe that Mr. Jacks thought that the document had been redacted, but the document that was actually introduced and is on the Court's website and that we got is a complete document, so he thought one thing and I thought the other. And that is what happened.

THE COURT: And I suspected that is what happened. Just from what everybody was saying, you intended one thing but something else happened.

MS. HOLLANDER: Something else happened, so we had no way of knowing that. And that is why I was confused yesterday. But we would like under -- He wants to replace it with what he thought it was supposed to be. And, you know, these things happen, so if he wants to replace the admitted document, the much smaller one, but that leaves me in a different situation, and under Rule 106 -- This was a very long conversation, primarily family chitchat with all these people talking, and a few pages of them is what the Government

introduced.

I would like to introduce and have Agent Miranda read just a couple of pages of the family conversation, because I think in fairness the jury needs to see that that is what this was, was a family talking. It is the grandmother, the kids. And they are real short, because they are real short questions and real short answers, and most of the 27 pages is actually the family.

Now, I am content to -- All I was going to ask him to do anyway was to just read a couple of pages to give the jury the flavor of what the whole thing was, and that is what I would like to do.

MR. JACKS: Judge, it was a mistake, and in terms of what -- Each one of the Government's exhibits is an audio file and a paper transcript of the conversation. This transcript of this conversation was the wrong one. There is a redacted transcript. And I am not going to try to explain how the CD that they ended up, with the latest version had the full 27-page page transcript instead of the 7- or 9-page transcript that was supposed to be in the file.

If this case dealt with English language recordings, the law is clear that the recording is the actual evidence and the transcript is an aid. Well, when the conversation is in a foreign language which none of the jurors presumably speak, then that attaches more significance to the transcript. But

notwithstanding that, the only thing in evidence as far as an audio file is the segments, the redacted portion that we played, and so the transcript has to stand on the audio file that is in evidence. And that is why the fact that this full transcript has been mistakenly --

And I don't think posting it on the Court's website attaches any significance to it. The jury hasn't seen it yet. So it is our intention to replace it with the redacted transcript, because that is what is supposed to be in that file. That is what we propose to do with regard to correcting the record.

Now, this other part that Ms. Hollander wants to have Agent Miranda read, they are going to have to read it because there is no audio file. But she told me -- she showed me, and it is about three pages, and it is pages of the kids talking to grandma and saying, "I miss you," and "You are so pretty," and it is irrelevant and that is why we redacted it in the first place.

As far as 106 explaining or rebutting or clarifying what is said in the part already in evidence, this does not do that. The only reason that this part is put in there is to curry favor with the jury. It is sympathy to show these children, they have grandkids, grandmothers, and that is the only reason.

And if she wants to have Agent Miranda say, "There was

more to this conversation, wasn't there?"

"Sure, there was 15 minutes of children talking," then she can bring it out. But to have him actually read the back and forth between the grandkids and the grandmother getting on the phone and then somebody else gets on the phone, that is irrelevant, and there is no legal reason to do that but for to show this jury that there is grandkids and grandmothers involved in this case, and that is not an issue.

MS. DUNCAN: Your Honor, It is a very brief portion, just three pages, and it is relevant. The Government is taking things out of context and suggesting that Mr. Abu Baker and his brother are calling for these very specific purposes, and that is simply not true. All the phone calls they have introduced include these conversations about family, and so all that we are seeking to do is to put that into context.

And in fairness, the jury needs to understand that these are family phone calls, and that the snippets the Government has chosen to play are just brief portions over what is overall a family phone call.

We just want the jury to -- We think the jury is entitled to know under 106 what the nature of these phone calls were, and that is what these three pages will do. So it is relevant. It is not to drag these kids in, but it is to put the Government's own evidence into context.

MS. HOLLANDER: And the Government has the audio

file of the whole thing and so do we. That is not -- I am not sure the whole audio file -- I mean, nothing -- It is true nothing has gone to the jury, but what was put on the website is what was supposedly introduced.

THE COURT: What were the other issues you wanted to take up?

MS. HOLLANDER: You wanted to think about Nihad Awad and the photograph with him and Bush, and although it is not how I originally intended my cross, I would be willing--and this is what I wanted to say at the last thing but you didn't let me--I was willing to just show him the picture and just show him or ask him, "Can you identify Nihad Awad that you talked about," and if he says no, I wouldn't ask anything else. If he says yes, then I would show him the picture.

THE COURT: Then any other issues?

MS. HOLLANDER: I wouldn't ask him anything else.

THE COURT: Any other issues?

MS. HOLLANDER: I don't have any other, but there is one other that the Government raised and that is a video.

MR. JACKS: Which I still don't --

MS. HOLLANDER: This is a video that they have had for six years and it has been on our list.

THE COURT: Right. What is it about?

MS. HOLLANDER: Agent Miranda testified that at InfoCom they had this movie set and had a cut-out with little

cut-out children, and this is an infomercial. We have cut it down to just a couple of minutes so he can identify the cut-out and show --

THE COURT: Do I have that? Is that on one of the disks?

MS. DUNCAN: I am not sure that the videos are on the disk. I can bring it up on my computer.

THE COURT: But you are objecting to that?

MR. JACKS: Yes, sir.

MS. HOLLANDER: The point is, Your Honor, our concern is that, again, the way it is now, it leaves a false impression with the jury that they really didn't go and do this charity, which the Governments keep calling it a purported charity that they --

THE COURT: What is the video about?

MS. HOLLANDER: The video, what he said was cut-outs of children --

THE COURT: I remember that.

MS. HOLLANDER: The video shows Shukri with the cut-out of the children. We can do it without sound. And then it shows some real kids. And, I mean, just pictures, nothing weird, no Israelis, no shooting, none of that. And it shows Holy Land people with Holy Land T-shirts bringing food, food packages, Holy Land projects --

THE COURT: To the kids or just carrying them?

MS. HOLLANDER: Carrying them and some women taking them out. It is really short. I mean, it is three minutes. But I think they raised that, and I don't want the jury just left with the impression that there weren't any real people in Holy Land, and that is the impression that they have now is they had cut-outs of children and there weren't real people.

And, you know, I am sure he can identify what he saw because he did the search at InfoCom, and then he can identify the Holy Land logo on people just --

MR. JACKS: Your Honor, we tend to ramble up here, but I want to get back to, she wants to ask him, "Can you recognize Nihad Awad in this picture?" I object to that, to the suggesting of the name of the person.

MS. HOLLANDER: No, no, no. I was going to ask if he could identify, before I show him the picture. I am not going to do it the way you guys do it.

MR. JACKS: And this video, I haven't seen it, and if the linchpin to bring it in is Agent Miranda is testifying about this backdrop that he saw at the InfoCom offices, that is, you know, I just don't see -- It is not in dispute. If they are going to try to prove -- They are trying to prove it exists, so we have put in testimony that it exists, so the part about with no sound Shukri Abu Baker standing I guess standing in front of a false backdrop, you know, then that would be the end of it.

But I don't think Agent Miranda can say, "Yes, I can tell that this video was shot in that location." There is no way that he is going to be able to say that.

THE COURT: Where did this come from?

MS. HOLLANDER: It came from the Government. This is some of their videos.

THE COURT: One that the Government seized?

MS. HOLLANDER: Yes, sir.

MR. JACKS: And there were thousands of those, and there may be multiple copies at Blockbuster or somewhere. But to think we have these memorized somewhere and can get them quickly, that is just not the case.

THE COURT: Well, I am assuming you got it when they listed it as an a exhibit.

MR. JACKS: They list it and put a number by it, which is a numbering system the FBI used, but they don't give a copy back.

MS. HOLLANDER: They gave us a copy, Your Honor. They may have to go and look at it just like we have to look at their exhibits.

THE COURT: You are raising a foundational problem you have been raising all along with all of these, like some of the photos, because I thought the photos themselves along with the agent testifying she recognized Holy Land people in there was sufficient.

MS. HOLLANDER:  I think this is really the same thing.

THE COURT:  It is hard to say without looking at it. I had the pictures and looked at them.  I think I still need to look at the video.

MS. DUNCAN:  It is less than three minutes tops.

THE COURT:  I can take a look at it at the break. How much longer do you think you have on your cross?

MS. HOLLANDER:  I just barely started.  I am really bad at this but let me say --

THE COURT:  I am going to start writing down and holding you to it.

MS. HOLLANDER:  No, that is what I am afraid of.  An hour and a half.  I would say an hour.

THE COURT:  We will take a break, then.  So if you will get me that, I will take a look.

MR. CLINE:  Before you take the break, can I ask that one question I had pending over lunch?

THE COURT:  Yes.  I will let you do that.  Why don't you start off at that.

MS. HOLLANDER:  And then can we take our break?

THE COURT:  Well, we have been over here a little longer than we thought.  You guys are just long-winded.  It is time for a break.  We have been in here about an hour and 45 minutes.

MS. HOLLANDER: And then we can resolve this and get through my cross.

THE COURT: Okay.

(The following was had in the presence and hearing of the jury.)

THE COURT: Sorry for that delay.

Mr. Cline?

Q. (BY MR. CLINE) Agent Miranda, I think we had agreed that over lunch you were going to look at the Elbarasse documents in evidence and see if any of them had that little classification number on them. Did you have a chance to do that?

A. Yes. There was one document I wanted to double check and there was nothing on it.

Q. Okay. So after checking, is it correct that none of the Elbarasse documents in evidence had that classification number on them?

A. Correct.

Q. All right. Thank you for taking the time to do that.

A. You are welcome, sir.

THE COURT: Members of the jury, let's take a break. We have been in here about an hour and 45 minutes, and I need to resolve an issue. So see you back about ten till.

(Whereupon, the jury left the courtroom.)

THE COURT: All right. We are in recess.

                          (Brief recess.)

THE COURT: Ms. Hollander, I have looked at the video, and that doesn't have the information in it like those photographs that I let you introduce previously through Agent Burns.

MS. HOLLANDER: You didn't see the Holy Land --

THE COURT: I saw that, but it doesn't say anything about where it is. The others had Kosovo Relief Fund, other identifying information, and Agent Burns was able to identify that and was aware they had been over there. This doesn't have anything like that.

MS. HOLLANDER: Your Honor, the witness is here while we are talking about it.

THE COURT: Well, so I am going to sustain the objection to that. I think you need to lay a predicate. And if you can lay a predicate, then of course like any other picture, it may be admissible.

MS. HOLLANDER: I thought I would have to lay a predicate.

THE COURT: So I was letting you do that the last time through the agent because of how much the pictures show. This just doesn't have that kind of information, so I will sustain the objection this time pending laying a predicate.

MS. HOLLANDER: But I can try to lay a predicate?

THE COURT: Yes. With respect to those other

photos, if you can lay a predicate those come in.

And with respect to the third issue?

MS. HOLLANDER: It was another photo. Oh, the transcript.

MR. JACKS: The transcript --

THE COURT: Yes. There was still one other and that was the issue, Mr. Cline, the photograph, George Bush and Nihad Awad. I am going to sustain the objection to that, to going into CAIR as just not relevant at this time. And if you can -- There is a foundational problem as well in terms of all we have is the picture. Even if you get the agent to identify the individual with George Bush, that is still all we know.

MS. HOLLANDER: At some point, Your Honor, I would like to make a proffer.

THE COURT: And I will let you. And I will revisit that issue in terms of if you can lay a predicate in terms of just the admissibility of that issue. That is the bigger issue that I am wrestling with is just the admissibility of going into that. I am thinking, and I want to look at it a little bit more, but it is really more along the lines of trying to -- You are offering it for impeachment, and it is impeachment on what I see as a collateral issue.

MR. CLINE: Here is just a question for Your Honor, and you may not be prepared to answer this question, but if the issue were foundation, what we would probably do is

subpoena somebody from the White House to come in and say, "This is our thing. This picture was taken on such and such a date." If the issue is relevance we don't want to put somebody out.

THE COURT: Right. So don't go there yet, because I am still wrestling with that bigger issue. If you will remember from this morning, I kept asking Mr. Jacks let's forget foundational for now. As I understand it, this came from an official website. So the foundational may not be as difficult as having to go to that extent.

MR. CLINE: That is kind of what I figured.

THE COURT: But I have just I think a question on the broader issue of what I see as perhaps impeachment on a collateral issue because of the statements that I was making earlier this morning, that it ultimately, other than impeachment on a collateral issue it doesn't go to any real issue before the jury. And so that is where I am looking. So if you want to do some looking on that, you can be doing it as well.

MR. CLINE: All right. That is fine. And maybe sometime before the end of the week we can take five minutes and just bring this issue to closure one way or the other.

THE COURT: If you remind me. And I will continue to be looking at that. So that is out for now. I sustained that objection.

And the transcript, Ms. Duncan?

MS. DUNCAN: Your Honor, just to clarify the record, for the video, to make it clear, we are not offering it in the same way to show what Holy Land did in Oklahoma City or Kosovo. We are offering it as an example of the infomercials that were made.

THE COURT: That is the problem. We don't know any of that. If you can lay a foundation and predicate that is one thing, but the video doesn't do that.

MS. DUNCAN: I was clarifying for that when she tries to do that.

THE COURT: I think that has come out here, but I can't tell from the video. From the pictures we could tell what it was, and the agent could. You don't have it from the video, and I don't think you are going to get that from the agent either, so you will have to find another source for predicate, likely. But we will find out.

And then on the transcript, I think in light of the mistake and we can -- Mr. Jacks, you agreed that they could ask the rest of the conversation, how many minutes between family members, I will let you read those two or three pages you were talking about, in light of this mistake that you thought the entire exhibit was in evidence. So I will let you have that.

Ready for the jury?

MS. HOLLANDER: Yes, sir.

THE COURT: Bring the jury in.

(Whereupon, the jury entered the courtroom.)

THE COURT: Ms. Hollander?

MS. HOLLANDER: Thank you, Your Honor.

Q. (BY MS. HOLLANDER) Now it is afternoon, Agent Miranda. And it is the story of my life in this case to stop my crosses and start them. But just to remind us where we were, we were about to read a portion of what was introduced as Baker Wiretap No. 25. It was one of the calls between Shukri and his brother. Correct?

A. Yes.

Q. Okay. And just to remind us where we are, this was a call with --

A. I am sorry, ma'am. I am not getting a -- I am not seeing anything on my screen. I am willing to look at a copy of that, if you have one.

THE COURT: He is checking that. Give him a second. You will have to work with a copy, perhaps.

MS. HOLLANDER: I only have one copy. We will have it here in a second, Your Honor. Here is what we are going to do. We will be a little ingenious. What I am going to give you is the front page of the call with all the people's names on it, and then I am going to -- I guess I should give you --

Well, I don't know how to do this. Are you thinking he

is going to have the computer? Is that what you are thinking? If he has the paper copy then the jury can't see it.

Q. (BY MS. HOLLANDER) I am going to give you the computer. That is what I am going to do. This is just for a couple of pages, and we just have to work it out.

MS. HOLLANDER: Is that okay, Your Honor?

THE COURT: Sure, that is fine.

MS. HOLLANDER: Can I approach?

THE COURT: Yes.

Q. (BY MS. HOLLANDER) What I am going to ask you to do is I am going to give you this page and just say who is talking.

MS. HOLLANDER: Thank you, Your Honor. Twenty-first century courtroom.

Q. (BY MS. HOLLANDER) What I would like you to do is read the first couple of pages, and I will put them on the elmo so the jury can follow along. And just say who is speaking. Okay?

A. All right.

Q. And you can start with who is speaking and then, "Hello, hello."

A. Yes, ma'am. This is going to be Nida Abu Baker, "Hello, hello."

Jamal Abu Baker says, "Hello. Peace be with you."

Nida says, "And with you."

Jamal says, "Who are you?"

Nida says, "NidaJamal says, "How are you, daughter?"

Nida says, "Thanks be to God."

Jamal says, "Do you know who I am?"

Nida says, "Er."

Jamal says, "Who am I?"

Wijdan Abu Baker says, "Uncle JamalJamal says, "You got it very good. How are you doing? Are you happy?"

Nida says, "Thanks be to God."

Jamal says, "Hello."

Wijdan says, "Yes. Your voice -- your voice is repeating."

Nida says, "what?"

Jamal says, "Should I let you speak with a beautiful one like you?"

Nida says, "Yes."

Jamal says, "Come over here. Talk with one of my girls."

Asthma says, "Hello."

Nida says, "Hello."

Asthma says, "Peace be with you."

Nida says, "And with you."

Asthma says, "What is your name?"

Nida says, "NidaAsthma says, "What grade are you inNida says, "What?"

Asthma says, "What grade are you inAnd Nida says, "Er."

Asthma says, "How old are you?"

Nida says, "five years."

Asthma says, "Yes, you have not gone to school yet?"

Nida says, "I go to" --

Asthma says, "Listen."

Nida says, "What?"

Asthma says, "you are as old as my sister Isra the little one."

Asthma says, "Listen, is Uncle Shukri there?"

Nida says, "What?"

Asthma says, "Is your dad there? Is your dad there?"

Nida says, "Yes."

Asthma says, "Let me talk with him."

Nida says, "She wants to talk to Dad."

Q. Okay. Thank you.

Now, Agent Miranda although I am not asking you to read the rest of it, you are familiar with this call, aren't you.

A. Portions of it better than others, but yes.

Q. But there was a lot more family talk like that in the call, wasn't there?

A. Yes.

Q. And the grandparents talked to the kids, and they went back and forth kind of like that.

A. Yes.

Q. In between the parts that you read. Correct?

A. Yes.

Q. Now, let me direct your attention back to part of what you read, or I should say of what scrolled on your direct examination, and if I can direct your attention, I believe it is page 13.

MS. HOLLANDER: Mr. Jacks, I believe I have this correct.

Q. (BY MS. HOLLANDER) I know you can't see it, but I am going to tell you what it is. This was a conversation about where they were talking about credit. And do you recall that?

A. Is this about the phone system?

Q. The phone system?

A. Yes.

Q. You recall that?

A. Yes.

Q. And they talked about making telephone calls, what they cost. Correct?

A. Yes.

Q. And they talked about making calls, what they cost to go to Brazil and what they cost to go to Jordan. Do you remember that?

A. Yes.

Q. Now, they have family in both those places, don't they? In Brazil -- They are from Brazil. Correct?

A. I don't know what the family situation currently is in Brazil.

Q. But that is where they were from?
A. Originally, yes.
Q. And they have family in Jordan. Correct?
A. Yes.
Q. And they are talking about setting up a Net2 phone account. Correct?
A. Yes.
Q. And then at one point Jamal says, "I'm talking with you free. The free one doesn't work with me every time." Do you remember that?
A. Yes.
Q. And they are talking about the programs where you can speak over the computer internet, talk over the computer. Correct?
A. Yes.
Q. That is what this Net2 is.
A. Yes.
Q. And it is like Skype. Are you familiar with Skype?
A. Yes.
Q. Or Vonage?
A. Yes.
Q. Any of those?
A. Yes.
Q. Okay. And he tells them what his name is on the Net2 account. Right? GIMI. Right?

A. Yes.

Q. Now, if you look back at InfoCom Search No. 35, the security document, and again you are not going to be able to see it but I will read it, and the jury can see it, you recall that it talks about telephonic communications?

A. Yes.

Q. If you need to see the actual document, let me know. Otherwise we will do it this way. And it says in there No. 5. And instead of having you read it, I will read it. It says, "Avoiding calls during unusual times such as at night or at dawn." Correct?

A. Yes.

Q. And you are not sure whether this call was in the middle of the night or late at night or in the middle of the day. Correct?

A. I don't recall, ma'am.

Q. Okay. Would it refresh your recollection if you previously thought that it was 11:00 at night?

A. Yeah. I don't know that I said it was 11:00 or that it was --

Q. Very late at night?

A. I think I said I am not sure if it is on a 24-hour clock. So it could be 11:00 a.m. or 11:00 p.m. I am not sure.

Q. You previously testified that the call was very late and your answer was that it sure was. Is it possible that you

remembered that earlier?

A. How long was the call? Do we know the duration?

Q. The duration of the call?

A. Was it one lasting over 20 minutes?

Q. Yes.

A. It was probably the late one.

Q. And the security document says to avoid calls late at night. Correct? That is what the document says--"avoiding calls during unusual times such as late at night or at dawn."

A. Correct.

Q. Correct. Okay. Now, you also testified about Shukri and Akram's trip to Saudi Arabia. Correct?

A. Yes.

Q. And you said on that trip that Shukri applied for a visa and he listed InfoCom as the company name. Correct?

A. Yes.

Q. Okay. And I am going to put that up again for the jury, and I will let -- Now, you will have to let me know if you need help remembering this document. But he applied to the embassy of Saudi Arabia for his visa. Correct?

A. Yes.

Q. Now, he put in his correct home address, didn't he? Do you need to see it?

A. No, I can actually see it. I think that is the correct address.

Q. And he put in the correct address for InfoCom. Correct?
A. He did.
Q. But in the middle of the page where it asks for a business address and telephone number, he left that blank. Correct?
A. Yes.
Q. Okay. And he paid for it with a check, didn't he? Do you see where it shows circles -- Do you remember that it is checked "check"?
A. I can see that. That is what it appears to say.
Q. And he used his correct passport number. Correct?
A. Yes.
Q. And of course his name was correct also. So everything matched up from his identification. Correct? His name, his home address, his passport number. Correct?
A. That part is correct, yes.
Q. Now, let's look back at the security document once again, page 20 of the security document. And I don't know if you can see that, but it says there that one of the things not to do, and I am going to read it, No. 14, "Not using credit cards or tourist checks during travel. Cash money is the most suitable during travel." Do you see that?
A. I do.
Q. And No. 17 says that the reservation should be in a name that doesn't reveal the manager's known identity. Correct?

First and second name.
A. Yes.
Q. And one of the other things that you pointed out was that they -- They met with someone from a bank there. Correct? Or you thought that it was someone from a bank.
A. There was a letter indicating they wanted to see --
Q. They wanted to see someone?
A. I don't know if they met that person or not.
Q. Now, I also want to ask you a few questions about the Holy Land overseas speaker list, and that was HLF Search No. 87 and your big board. Mousa Abu Marzook's name isn't on that list, is it?
A. No, ma'am.
Q. And you have also talked about, while we are on the subject of Mr. Marzook, that is another one of those names where the last name has an Abu. It is Abu Marzook as part of his last name. Correct?
A. Yes, ma'am.
Q. Okay. In the phonebook, and I may have to show you this if you can't see it, he has a phone number for Abu Ammar. Right? Do you know who that is?
A. That is an Abu name used by or was used by Yasser Arafat.
Q. Right. He was the head of Fatah. Correct?
A. Yes, ma'am.
Q. We also refer to him as at one time he was the president

of the Palestinian Authority. Correct?

A. Right.

Q. A rival of Hamas. Correct?

A. Right.

Q. But his numbers are on page 38. And then on page 40 we see his name again. Correct?

A. Yes.

Q. And again on page 42. And actually the numbers on page 42 are the same as the numbers on page 40. Correct?

A. I have not made that comparison.

Q. Well, there is one at least that is actually, if you look at it -- You didn't compare the numbers for Abu Ammar for Yasser Arafat?

A. Compare them to each other?

Q. Right.

A. No.

Q. You didn't determine whether these all applied to the same person?

A. No, I didn't compare the telephones of Abu Ammar to Abu Ammar.

Q. If we compare them, we see that at least 824670 are the same numbers. Right? Those are the same number, are they not?

A. I will take your word for it.

Q. You can't see them, but those are the numbers on 42 and

40, so those two numbers compare.

And he also had in his phonebook somebody whose name is Abu Hussein, Abu Mazin's office director. Now, who is that?

A. I have a guess. Do you want me to take a guess?

Q. Sure.

A. I am thinking that is the individual who took over for Yasser Arafat as the president of the PNA of Arafat died, but that is a guess.

Q. Abu Mazin?

A. Yes.

Q. Did you check that phone number?

A. No.

Q. One of the other phone numbers was somebody named Riyad al-Zanoun. Correct?

A. Yes.

Q. And you know who that is. That is the Palestinian Minister of Health. Correct?

A. No, I didn't know that.

Q. Well, did you check that phone number?

A. No, I did not.

Q. We previously have seen in this case Defendants' Exhibit No. 136. I actually have two copies of that.

MS. HOLLANDER: Can I approach, Your Honor?

THE COURT: Yes.

Q. (BY MS. HOLLANDER) And that is the same name, isn't it?

A. It appears to be.

Q. And he signed that as the Minister of Health. Correct?

A. Yes.

Q. I don't know that we have actually -- I think we have already discussed that letter, but I was just trying to remind us of who he is.

And Riyad Mansour is also on that page. Correct? And he is the current PA, not Hamas, representative to the United Nations. Correct?

A. I don't know that.

Q. You didn't check that?

A. When you say check it --

Q. You didn't check to see who he was?

A. No. I checked to see whether or not they were on the HLF speakers list.

Q. Now, let's stick here with talking about Marzook for a little bit. You created a document, a demonstrative called the "Marzook Orders Security for OLF," and I could put it up there for you. I will put it on the screen, but since there is a demonstrative I will get it so you can see it. Tell me if you can't see it. Of course now I can't see you. I am trying to be creative here.

Now, the point of creating a demonstrative is just to pull together actual documents that are in evidence. Correct?

A. I guess, yes.

Q. And the demonstrative is supposed to accurately portray what the underlying documents say. Correct?
A. Yes.
Q. Now, this demonstrative says -- I want to talk about it in kind of one word at a time. First it says "Marzook orders security." Correct?
A. Yes.
Q. So the first thing it says is Marzook, and you base that on Elbarasse Search No. 15. Correct?
A. Yes.
Q. Since we have that one up there, I am going to take this down for a minute. Elbarasse Search No. 15 wasn't signed by Marzook, was it?
A. No, it was not signed by him. I think I pointed that out.
Q. It was actually signed -- It was signed, though, wasn't it?
A. It was a signature.
Q. Right. But that is an unknown signature. Correct?
A. Unknown to me.
Q. Unknown to you. Okay. So we are going to take this and we are going to change it here. And in case you can't read it, what I have written, I crossed out "Marzook" and have written "unknown person" there. The next thing it says is that -- Now, this unknown person ordered security for OLF.

That is what it said up there is it ordered security. Correct?

A. Yes.

Q. And for that you actually also looked at that same document on page 2. And the document says, "Brother Izzat Mansour is requested to visit the office of the Fund to take the necessary measures in regards to maintaining security." Do you recall that is what the document says?

A. Yes, ma'am.

Q. So I am going to change this from "orders" to "requests," because that is what the document says, doesn't it?

A. Yes, ma'am.

Q. Now, you didn't present any evidence that Izzat Mansour did actually visit the Holy Land office at that time, did you?

A. No, ma'am.

Q. And your demonstrative also makes reference to a check, November 1990 check. Correct?

A. Yes, ma'am.

Q. And that is a check that does have Marzook's signature that you can identify. Correct?

A. Correct.

Q. To Izzat Mansour. Correct?

A. Correct.

Q. And that was from the big document Marzook Bank Account. Correct?

A. Yes.

Q. And the check is dated November 9th, 1990. Right?

A. Right.

Q. But the request from this unknown person to Mansour was made in February of 1991. Correct?

A. Right.

Q. And there is nothing written on the memo line of this check, is there?

A. No.

Q. And you didn't present any evidence showing what this check is for, did you?

A. Right.

Q. So I am going to cross the check out and I am going to mark this as Defendants' Demonstrative No. 2.

MS. HOLLANDER: Your Honor, I move it into evidence at this time as a demonstrative.

THE COURT: Defendants' Demonstrative No. 2. Mr. Jacks?

MR. JACKS: We object, Your Honor. It is just -- It is her handwriting and we object.

THE COURT: Well, it was done here in the courtroom. I think that is permissible. That is overruled, and Defendants' Demonstrative No. 2 is admitted.

MS. HOLLANDER: Thank you, Your Honor. I am going to take this down now since I am too short to see around it.

Q. (BY MS. HOLLANDER) Another thing you discussed on direct was a video, and it was a video -- It was HLF Search No. 126, and it was a video you played, the Government played a brief portion showing Yousef Qaradawi speaking. Do you remember that?
A. Yes.
Q. You are familiar with that?
A. Yes.
Q. But actually that wasn't a video that Holy Land made, was it?
A. They made?
Q. That Holy Land produced.
A. I don't know who produced it. What is the search warrant? What is the exhibit number, ma'am?
Q. Well, in fact, it is a video from a MAYA conference in 1993. Correct?
A. I would have to take a look at the video, please.

MS. HOLLANDER: Can I approach, Your Honor?

THE COURT: Yes.

THE WITNESS: What was your question now, ma'am?

Q. (BY MS. HOLLANDER) So now that you have looked at this tape, let me ask you a few questions about it. Okay?
A. Yes.

MR. JACKS: Judge --

MS. HOLLANDER: I am not moving this into evidence.

MR. JACKS: All right.

Q. (BY MS. HOLLANDER) When Holy Land was searched, a large number of videos were seized. Correct?

A. Yes.

Q. Okay. And the Government either kept the original labels on them so that you would know what they were or somehow could identify them. Correct?

A. We kept the labels on, yes.

Q. So you would know what they were.

A. Well, it is just not our policy to mess around with the evidence.

Q. Right. And also if you take the labels off, you would never know where they came from. Right?

A. That is true as well.

Q. That is one of the reasons why you don't mess around with the evidence. Right?

A. Right.

Q. Okay. And in fact this tape, which was -- It was Holy Land Search No. 126. I think that was the answer to your previous question.

A. Yes, ma'am. Thank you.

Q. I am sorry. I didn't compute that quite right. But it is Holy Land Search No. 126, and that tells us it was taken from the Holy Land office. Correct?

A. Yes, ma'am.

Q. Okay. And this was the portion that you played involving a speech by Yousef Qaradawi. Right?
A. Right.
Q. But in fact, he was speaking at a MAYA conference in 1993. Correct?
A. Right.
Q. Okay. And that was before Hamas was designated. Correct?
A. Yes.
Q. Now, the tape is two hours long. Correct?
A. I don't know that.
Q. Well, you only played about 18 minutes of it. Correct? Will you take my word for that?
A. I will take your word for it.
Q. Actually you only played a minute or two, but he only spoke for 18 minutes.
A. Okay.
Q. You didn't play anything else from this MAYA conference, did you?
A. I don't believe we did.
Q. And you didn't in your direct explain that this actually was a MAYA conference where he spoke, did you?
A. I don't know if I was asked that question.
Q. You didn't -- You weren't asked that question, were you?
A. I don't recall. I don't think so.

Q. You also --

MS. HOLLANDER: I may have to read this section, Your Honor. I am trying to figure out how to do the next part in my head, but let me see if I can do it without the overhead.

Q. (BY MS. HOLLANDER) You played something called Baker Wiretap No. 23. Do you recall what that is? It is a conference call.

MS. HOLLANDER: Can I approach the witness so I can show him what it is?

THE COURT: Yes.

Q. (BY MS. HOLLANDER) Okay?

A. Right.

Q. And just so the jury knows, this is Baker Wiretap No. 23, and it is 16 pages. And I assume I have the correct one here. A number of people were speaking during that conference call. Correct?

A. Right.

Q. And the Government played a small portion of it.

A. Right.

Q. And the people on this call were emams of the al-Aqsa mosque. Correct? That is how they identified themselves. Correct? Or the former speaker Dr. Abu Mahmoud, the former speaker of al-Aqsa mosque. Do you remember that?

A. That is one reference, yes, ma'am.

Q. And chairman of the Islamic University is how he was described?

A. That is how he described himself. Right.

Q. I was going to ask you to read this.

MS. HOLLANDER: But I think I am going to have to read it, if that is all right with Your Honor.

THE COURT: Yes.

MS. HOLLANDER: Okay. Thank you.

Q. (BY MS. HOLLANDER) One of the things that -- Now, just -- I believe you testified that the al-Aqsa mosque is particularly significant for Muslims all over the world. Is that correct?

A. Right.

Q. It is like the third holiest place in the whole Muslim world. Am I correct?

A. Yes.

Q. Okay. And one of the things that he says here is that "al-Aqsa mosque is a holy site which concerns Muslims generally as it is known to you. Jerusalem is the city of holy sites which concerns the entire world. It is not lawful to keep these sites away from the hands which are capable of protecting them, the hands which protect them from the fooling of racism, the fooling of sectarianism, the fooling of grudge, the fooling of narcissim" --

MR. JACKS: Your Honor, can we have a page number or

reference or something?

MS. HOLLANDER: It is page 8, bottom of 8 and the top of 9. I am sorry. Do you need me to show it to you. Can I confer with Mr. Jacks for just a moment?

THE COURT: Sure.

Q. (BY MS. HOLLANDER) So I was reading that they want to protect the al-Aqsa mosque "...from the hands that protect them, from the fooling of racism, the fooling of sectarianism, the fooling of grudge, the fooling of narcissim which is a status today. Today the holy sites in Jerusalem in particular and in Palestine in general fall in fooling hands. There must be a general global mobilization to save these holy sites, to return them to those who guard them with sincerity. If the world pretends to be dumb as it does today, ignore or overlook the matter under media pressure, racist pressure, or under biased pressure so Muslims are supposed to rise, and they are numerous, to defend their holy sites, and they are entrusted with the holy sites of all the people, whether Christian holy sites or Jewish holy sites, and not the Zionist holy sites that are far from the true path."

That was also part of what he said that day. Correct?

A. Yes.

Q. Now, I want to move on to one of -- Because the jury will have all of this, but I just wanted to highlight a little bit of it. The next one who is described as Sheikh Bitawi.

Correct?

A. Hamad Bitawi.

Q. Correct. And he is also described here as an al-Aqsa speaker, and also had something to do with the al-Aqsa mosque. Correct?

A. I think he did.

Q. One of the things that you said on your direct was that one would have to be very creative to find any charity in this tape. Do you recall saying that?

A. I do.

Q. Let's read this part. Let me read this part from Sheikh Bitawi. "I send you my greeting and greetings of your steadfast Palestinian people which still suffers under the detested Israeli occupation and its unjust practice of confiscating the land of our people to build settlements for strangers who have neither a religious nor historical connection to Jerusalem, while a day doesn't pass when Israeli bulldozers destroy the homes of people under the excuse of having no permit."

Now, it goes on to say, "It is not permissible for its nightingales to sing, but permissible for birds of every color" -- I am sorry. I didn't read that right. "Is it not permissible for its nightingales to sing, but permissible for birds of every color. The Israeli occupation still fights the daily bread of our people as it besieges them, to humiliate

them, and to bring them down to it knees. The Israeli occupation still holds over 5,000 detainees and prisoners among the children of people in its prisons. The occupation still bars citizens from the West Bank and Gaza, Gaza Sector, from entering Jerusalem or passing by it, and entering the blessed al-Aqsa mosque to pray in it. The Israeli occupation carries out these unjust deeds, even though it signed accords and agreements for the Palestinian Authority."

Now, he mentions there that Israeli bulldozers destroy the homes of people under the excuse of having no permit. And you are aware that Israel has destroyed homes of people who have no permit. Correct?

A. No, I am not actually familiar with that. I am familiar with homes being bulldozed, but for reasons related to terrorism.

Q. So you haven't really investigated all the other reasons that Israel destroys homes to make way for settlements and other reasons, have you?

A. I am only familiar with what I just said.

Q. But you do know from dealing with the Holy Land case and the search that Holy Land had some projects involving demolished homes. Correct?

A. There were references to that, yes.

Q. Okay.

MS. HOLLANDER: May I approach, Your Honor?

THE COURT: Yes.

Q. (BY MS. HOLLANDER) Let me ask one question first. And you are familiar with the -- You said you saw Holy Land T-shirts when you were at InfoCom?

A. Yeah, I have seen T-shirts before.

Q. And you know what the Holy Land logo looks like?

A. Right.

MS. HOLLANDER: May I approach?

THE COURT: Yes.

MR. JACKS: Your Honor, could we have this on the record and not some private conversation.

MS. HOLLANDER: I am sorry. I will repeat that.

Q. (BY MS. HOLLANDER) Can you identify, without discussing the photographs because they are not in evidence, identify -- Do you see the bates number from the search?

A. I see the bates label, yes, ma'am.

Q. And do you see the Holy Land logo --

MR. JACKS: Could we have an exhibit number, Your Honor?

THE COURT: Counsel, what is the exhibit number?

MS. HOLLANDER: I was going to get to that.

THE COURT: You are already getting into what is in the photo and you haven't gotten to the exhibit number.

MS. HOLLANDER: Let's do them one at a time.

Q. (BY MS. HOLLANDER) Let's start with Defendants' Exhibit

No. 444. Do you see the bates number on that?

A. I do.

Q. And do you see a logo that you can identify on that?

A. Well, right. I need to kind of look at one to see if I can make it out on the others. That is pretty small.

Q. It is.

A. It is probably it.

Q. How about -- Let's go in order. Defendants' Exhibit No. 721. Does that come from the Holy Land search? Do you see a Holy Land logo on there?

A. Yes, it does.

Q. That one is pretty clear, isn't it, the logo?

A. Yeah.

Q. And would you look at Defendants' No. 1179? Do you see the Holy Land -- the bates number on there identifying your search?

A. Yes, I do.

Q. And do you see a logo on there?

A. Yes, I do.

Q. And No. 1180, is that -- Do you see a bates number on there that you can identify?

A. Yes, I do.

Q. And a logo?

A. Right.

MS. HOLLANDER: Your Honor, I move the admission of

Defendants' No. 444, 721, 1179 and 1180 as all pictures that the agent identifies as coming from Holy Land, and he identifies a Holy Land logo on them.

THE COURT: Mr. Jacks?

MR. JACKS: Your Honor, may I take the witness on voir dire?

THE COURT: Yes.

Q. (BY MR. JACKS) Agent Miranda, these photographs, other than the fact that they were seized from within the materials taken from the Dallas Holy Land foundation office, do you know where these photographs were taken, when they were taken, under what context they were taken?

A. No.

Q. Do you have any other information you can add other than what you said--they appear to have come from the search warrant of the Holy Land Foundation?

A. No.

Q. Do you know any of the people shown in there?

A. No.

MR. JACKS: Your Honor, we would object on the grounds that there is no foundation.

THE COURT: Sustained.

MS. HOLLANDER: That is fine. Very well.

Q. (BY MS. HOLLANDER) The video that you showed that we just discussed also discussed settlements. Correct?

Discussed "the unjust practice of confiscating the land of our people for the settlement of strangers."

A. I am sorry. Are we talking about Yousef Qaradawi?

Q. Bitawi.

A. In the section you just read?

Q. Yes.

A. That was in there I think.

Q. And that wasn't part of the section you read, was it?

A. I don't believe so, ma'am.

Q. I show you what has been previously marked as Defendants' Exhibit No. 1110.

MR. JACKS: Your Honor, is this in evidence?

MS. HOLLANDER: Yes, sir; previously admitted as Defendants' No. 1110.

Q. (BY MS. HOLLANDER) And I don't know if you can see that, but are you familiar with the fact that there are settlements throughout the West Bank?

A. Yeah, I have heard of that.

Q. Have you ever been to the West Bank?

A. It kind of depends. I think I accidentally crossed into it.

Q. Agent Miranda, you understand that it is not a crime to listen to a speech, even if it is a speech that supports Hamas. Correct?

MR. JACKS: Your Honor, I object to that as

argumentative.

THE COURT: Sustained. I am going to sustain that objection.

Q. (BY MS. HOLLANDER) You discussed the Hamas charter, didn't you?

A. Yes.

Q. And you have -- You don't believe it is a crime to own a copy of the Hamas charter, do you?

A. No.

Q. In fact, Yale University has published the Hamas charter in English, hasn't it?

A. I think that is what Doctor Levitt used.

Q. Right. And expressing political views isn't a crime either, is it?

A. Probably not.

MS. HOLLANDER: Your Honor, I will pass the witness.

THE COURT: Mr. Westfall, are you up?

MR. WESTFALL: I am, Your Honor.

CROSS EXAMINATION

By Mr. Westfall:

Q. Hello, Agent Miranda.

A. Hello, sir.

Q. We are almost done. Now, Abdul Odeh was not in the Muslim Brotherhood. Isn't that correct?

A. I don't know that. I have not --

Q. Okay. Let me phrase it like this, then. There has been no evidence presented in this trial that Abdul Odeh was ever a member of the Muslim Brotherhood.

MR. JACKS: Objection, Your Honor. That is argumentative.

THE COURT: He may ask him based on the evidence whether he is aware of the evidence.

THE WITNESS: I am more comfortable with the way you just phrased it.

Q. (BY MR. WESTFALL) Okay.

A. No, there has not.

Q. And there has been no evidence in this trial that Abdul Odeh was a member of the Palestine Committee.

A. I don't know if that is correct. I am not sure -- May I explain?

Q. The Palestine Committee of the Muslim Brotherhood?

A. Yes. Would you -- Do you want my answer or not?

Q. You know, what the heck.

A. I think I have seen Mr. Odeh's name on the Islamic Association for Palestine for some documents there, and I understand that the Islamic Association for Palestine, the IAP, is part of the Palestine Committee, so I am a little uncomfortable answering my questions in these black and white yes or nos.

Q. Because you haven't been here for some of the trial?

A. No, it is not that, sir. It is that I have seen lots of information, and I don't know whether or not the particular information that I am aware of is in or whether we have discussed it or not.
Q. Then I will ask you the same thing Mr. Cline did.
A. Okay.
Q. Would you do me a favor and look through the documents that have been admitted in this trial?
A. Admitted. Right?
Q. Right. And see if there is anything that --
A. I will be glad to do that.
Q. That will clear that question up.
A. I will be glad to do that for you, sir.
Q. I appreciate it.
Abdul Odeh was not at the Philadelphia conference. Correct?
A. Right.
Q. And he was never on the board of directors of the Holy Land Foundation. Correct?
A. Correct.
Q. Or on the IAP?
A. I don't think he was on the board of directors, no.
Q. And his name does not appear in Marzook's phonebook. Correct?
A. No.

Q. And his name does not appear in Ashqar's phonebook. Correct?
A. I think that is correct.
Q. And his office in fact was in New Jersey. True?
A. Yes.
Q. And he never officed -- There is no evidence that he ever officed in Dallas. In this --
A. You are right.
Q. Okay. Now, I want to talk to you just a little bit about these conferences, these conferences where the speakers would speak. Are you with me?
A. I am with you.
Q. Okay. There would be a number of different activities of these like folk dancing and speaking, and then there would be the fundraising. Right?
A. There were a number of activities.
Q. And then from the fundraising there was a number of different ways that that could be done. It could be done through cash donations. Right?
A. I have seen that.
Q. People would write checks?
A. Right.
Q. Sometimes we see references to women donating jewelry.
A. Right.
Q. And there also would be pledges. Right?

A. Yes.
Q. Where you fill out your form and promise to pay.
A. Right.
Q. And then there also would be sponsorships of orphans; people would volunteer to sponsor an orphan. True?
A. Right.
Q. And then you could also sponsor a family if you wanted to. True?
A. Right.
Q. And specifically about the orphan sponsorships, what the payment was on that, the prevailing payment was $50 a month. Correct?
A. That sounds correct.
Q. And some people would pay that monthly. Right?
A. Right.
Q. And some people would pay that quarterly.
A. I am more familiar with it as monthly, but I am not disputing what you are saying.
Q. And you see them paying annually $600 in one lump sum. Right?
A. That is probably correct.
Q. And you could have that done either with a payment or the auto debit. You have seen that as well.
A. I have seen that.
Q. And if you didn't pay, you know, if you made a pledge and

didn't pay, then the Holy Land Foundation had a mechanism for sending you mail to remind you. You have seen that in the 600 boxes.

A. That sounds right. I can't recall, but it sounds familiar.

Q. Right. The family sponsorships were $100 a month. Right?

A. I think that is right.

Q. And once again, some people just pay $1200 for the whole year.

A. I think that is correct.

Q. And then the commitment on that was kind of open-ended.

A. Right.

Q. Which means that you would get a reminder notice or whatever and you would pay and you would sponsor this orphan for like -- from now on or until you stopped. But it was kind of an open-ended commitment.

MR. JACKS: I object to the form of the question in that it is not a question. It is a statement.

THE COURT: Do you want to rephrase?

Q. (BY MR. WESTFALL) Have you seen in the 600 boxes of the, you know, documents and such that were taken from Holy Land, evidence that people would sponsor orphans and families for, you know, kind of an open-ended period of time, a long period of time?

A.   Yes.

Q.   And the orphan and family sponsorships would be signed up
for at the conferences as well as the other forms of donations
we talked about.

A.   That is one form of signing up for the orphans, yes.  One
method, I should say.

Q.   But people did it at the conferences?

A.   That is my understanding.

Q.   In fact, speakers would encourage people to sponsor an
orphan or pay $500.  I mean, we have seen that.

A.   I think that is correct.

Q.   And the Holy Land Foundation kept track of how much money
some of their speakers brought in, didn't they?

A.   Some of them.

Q.   And in fact, speakers would get credit for some of these
orphan applications.

A.   I am not sure about the orphan applications.  They get
credit for money pledged, I guess, in their name.

Q.   Right.

A.   Or during their fundraising effort.

Q.   And they get credit sort of as the pledges rolled in.

A.   I think that is right.

Q.   I want to switch gears just a little bit and speak with
you about Demonstrative No. 16.  Is your monitor still not
working?

A. Not working, sir.
Q. Can you see that over there?
A. Yes, I can, sir.
Q. Now, that may be helpful, too. Now, yesterday I think Mr. Jacks' question said that the HLF box right here. Okay?
A. Yes.
Q. The one in New Jersey.
A. Right.
Q. Was just to indicate that there was an office in New Jersey at the time. Is that what you said?
A. I think I said that, yes.
Q. Okay. Now -- Can you see that okay?
A. Yes, I can, sir.
Q. If somebody didn't know better, you could look at this and think that these phone calls actually were generated from the New Jersey office; that someone who didn't know any better, you look at that and that is a conclusion you could draw, couldn't it?
A. I think that is why I pointed that out saying those were calls related to the Defendant Mohammad El-Mezain, not the HLF office. I was trying to be very specific. I wasn't trying to implicate Mr. Odeh in those particular phone calls.
Q. Okay. I want to just talk to you just a little bit more about that.

MR. WESTFALL: May I approach?

THE COURT: Yes.

Q. (BY MR. WESTFALL) I am showing you what is already in evidence, and I am doing this because I don't have the projector.

A. Right.

Q. This is already in evidence --

MR. WESTFALL: Can you hear me, Mr. Jacks?

MR. JACKS: Yes.

Q. (BY MR. WESTFALL) -- as Secretary of State New Jersey No. 1?

A. Right.

Q. Are you familiar with this document?

A. No.

Q. Please just take a look at it for a second.

A. Sure.

THE COURT: While he is doing that, let's take a quick five-minute break.

(Whereupon, the jury left the courtroom.)

THE COURT: We had a juror that had an emergency so we needed to take a quick break. Let's just take about a five-minute break.

(Brief Recess.)

THE COURT: Mr. Westfall?

Q. (BY MR. WESTFALL) Okay. Here is the document that I was showing you. This is Secretary of State New Jersey No. 1.

MR. WESTFALL: May I approach, Your Honor?

THE COURT: Yes.

Q. (BY MR. WESTFALL) Just look at that and familiarize yourself with it.

A. Okay. Go ahead, sir.

Q. Okay. Does that appear to you to be a certificate of authority for the Holy Land Foundation to do business in New Jersey?

A. Yes.

Q. Okay. And you see where it says filed June 2nd, 1994?

A. Right.

Q. So we already know that the New Jersey HLF box doesn't apply. I just want to try to get some of the reasons behind it. Okay?

MR. JACKS: I will object to the statement.

THE COURT: Sustained.

Q. (BY MR. WESTFALL) June 2nd, 1994 is when these articles or this certificate of authority to do business in New Jersey were filed, which is when a business begins. True?

A. When business begins legally, yes.

Q. Okay. This call here would have been almost a year prior to the New Jersey office being officially opened. True?

A. That is right.

Q. And we also know that that call actually went to the residence of Mohammad El-Mezain.

A.   No, this is the call that went from Mohammad El-Mezain to the residence of Abdel Aziz Rantisi, the Hamas leader in Gaza.
Q.   Hence the arrow that goes the opposite way from the United States.  I am sorry.  I got crossed up there.
A.   That is all right.
Q.   But nonetheless July 1993, and we officially opened in New Jersey June of 1994.  True?
A.   That is right.
Q.   And then this 3/27/94 call to Qanuo, that was also before the New Jersey office officially opened.
A.   Right.
Q.   And then there was this one call from Jordan.  I guess that is where Khalid Mishal left a message on Mohammad El-Mezain's voicemail.
A.   That is correct.
Q.   And this one technically would have been after the official opening of the Holy Land office.
A.   That is correct.
Q.   But it didn't go to the Holy Land office.
A.   No.  These are all phone calls related to the Defendant Mohammad El-Mezain Sir, I just said these are all phone calls. I meant the three that you had on the screen at the time.  I don't want to mislead the jury that the other phone calls had nothing to do with other Defendants.
Q.   I want to talk to you about the speakers list.  Okay?

A. Yes, sir.

Q. And you know what I am talking about when I say the speakers list?

A. Sure.

Q. Let me put it on here. It is the HLF Search No. 87. Are we oriented?

A. Yes.

Q. Your Demonstrative, I don't know, No. 1?

A. I believe it is.

Q. This came off of I think you said Akram Mishal's computer.

A. It came off of an HLF computer, and it was -- the file was related to Akram Mishal.

Q. Okay. This does not bear an HLDL number?

A. No.

Q. Because it was on the computer at the time, not a hard copy.

A. Right.

Q. Right? There wasn't a hard copy of this around, was there?

A. No.

Q. So this computer that was linked back to Akram Mishal, was it a stand-alone computer or was it on a server?

A. I don't know.

Q. Was it an Apple or was it an IBM?

A. I don't know.
Q. The file name, you know that when something like this is on a computer it is called a file and it is going to have a name like something dot something?
A. Yes.
Q. What was the file name for this?
A. I don't recall.
Q. What computer program could you use to open it?
A. I don't know that I opened it. I think that was something found by the computer experts.
Q. So you don't know?
A. I don't think so.
Q. How many computers were there at Holy Land?
A. I have no idea. The computer people handle all that. And to clarify your question, I am not sure whether you mean hard drives, hard drives laptops, hard drives laptops, loose media.
Q. It just came off a computer. Right?
A. That is my understanding.
Q. Did you actually see it on the computer?
A. There was -- Let me try to explain this. The computer experts put materials from the HLF on computers that we could view, but we weren't viewing the HLF's computers. Does that make sense? They mirror the hard drives, they access the information, and then they put it on computers that the FBI

can then use so that agents can't make mistakes and intentionally or unintentionally add or delete something from a document. Does that make sense?

Q. Well, sure. That makes sense. But I am trying to find out really kind of exactly how it got to HLF and how it got here. Can you tell whether it was sent via email or actually created in the HLF office?

A. My understanding it was on an HLF computer. Beyond that, you know, I am not the computer examiner.

Q. You can't tell us how this thing got created, when it got created?

A. There was a creation date associated with it, or I should say maybe a last access date. I think I testified already about that. July of '99 I believe was the last time.

Q. So the last time it would have been opened was July of '99?

A. Or accessed or manipulated or something to that effect.

Q. Or if you download it in July of '99 that would affect that, too, possibly? I mean, do you know?

A. If you downloaded it?

Q. If you, for instance, get it via email and downloaded it.

A. I couldn't say. I don't know.

Q. We have talked about a number of the names on this overseas speakers list. I want to ask you just specifically, as we have seen some of these speakers or some of these names

in AMEX records, the AMEX Records No. 1 and AMEX Records No. 2. Right?

A. Yes.

Q. And those are American Express records from Holy Land dating back to the '93 to '95 time frame?

A. I think we have seen them maybe '92 up to '95, but thereabouts.

Q. Right. Well, this looks like -- This is AMEX No. 2. And it looks like this one starts in about 1990. Right?

A. Right.

Q. November of '90?

A. Right. That is right. They go that early because they relate to some folks up there.

Q. And it looks like the last date is April of '94. Does that sound about right?

A. It sounds about right.

Q. And this is AMEX No. 1, and the first date on there is 1993. Right?

A. Yes, sir.

Q. There is some '94. Right?

A. Right.

Q. And it looks like '94 is the latest it goes.

A. Right.

Q. In these -- There was tickets bought, plane tickets bought for overseas speakers.

A. Right.

Q. And we have seen some of those. And then we saw some videos with some of the people that are on this list. Right?

A. Yes.

Q. And then we have --

MR. WESTFALL: May I approach, Your Honor?

THE COURT: Yes.

Q. (BY MR. WESTFALL) This is already in evidence as HLF Search No. 23. Do you recognize this?

A. Yes.

Q. And we will talk about it a little bit more here in a bit, but this also is something that has the names of speakers in it. Right?

A. Yes.

Q. Now, let's talk about the evidence that has been admitted. Once again we will narrow it down to make it precise.

A. Yes, sir.

Q. In the evidence that has been admitted in this trial, is there any evidence that the Holy Land Foundation used Ziad Abu Ghanimeh as an overseas speaker; that he actually spoke?

A. I don't know. Have you looked in the book?

Q. Yes.

A. Okay. Then in the evidence that is admitted I don't think so.

Q. Yousef Qaradawi. He is the one that we saw on the video, the MAYA video.
A. Right.
Q. Is there any evidence in this trial that the Holy Land Foundation used Yousef Qaradawi, actually used Yousef Qaradawi as a speaker?
A. I need to double check.
Q. What do you need to double check?
A. I know he was in Kansas City in '89 or '90, and I want to make sure whether we have got it in evidence or not.
Q. That is where the MAYA conference was. Right?
A. There was a lot of MAYA conferences, sir. There was one MAYA conference, and I am aware that he was at a MAYA conference that was an HLF fundraiser, yes.
Q. And that would have been '88, '89?
A. It was Kansas City, it was '90, it was third Intifada festival or something to that effect. You are asking me whether I recall whether it is in evidence, and I am telling you -- I am trying to be up front and telling you I am aware he was a speaker. I am not aware whether or not it is in evidence.
Q. Or whether it was for HLF. I mean, it was for MAYA.
A. It was an HLF fundraiser is my understanding.
Q. Let's talk about the fundraisers a little bit, then. These fundraisers would be put on by MAYA, actually these

festivals. Right? MAYA put on the festival?
A. Festivals, fundraisers, yeah.
Q. And IAP --
A. Right.
Q. -- would put on festivals. They are the ones that did the series of Intifada festivals?
A. They did.
Q. And ICNA?
A. ICNA is really more of a Pakistani group. I am not sure how much they were involved, is my understanding.
Q. Did you know ICNA put on festivals?
A. I think they did. I don't know of the relationship to the HLF.
Q. And ISNA would have festivals?
A. ISNA.
Q. And the way this would work, particularly with the ISNAs and the MAYAs and all that, is that there were a number of organizations that would apply or come in to raise funds at that festival. Right?
A. I don't know about that.
Q. I mean, there would be like, for instance, Palestine would have a night potentially, Bosnia would have a night potentially, but more than just the HLF would go to these and try to raise funds.
A. No.

Q. Is that jogging your memory?

A. No. I am going to have to disagree with you, sir. There were festivals that to my understanding were pretty strictly Palestinian HLF, and then I believe there were other festivals which were larger in scope which I think were more encompassing of other groups. But to say that they always diversified, I don't believe that is accurate.

Q. And I was being a little bit unclear. What I meant to say was -- Let's set aside these IAP festivals, you know, during the Intifada festival days.

A. Okay.

Q. Because we had those videos that say, you know, "Send your contributions to the OLF." Right?

A. Right.

Q. But the ones like the MAYA conferences are the ones that have more than just the Holy Land Foundation coming up to raise funds. Wouldn't you agree?

A. I think so.

Q. Okay. All right. Yusuf Islam. Now, is that Cat Stevens?

A. I think it is.

Q. That is what he changed his name to after he converted to Islam?

A. Uh-huh.

Q. Any evidence the Holy Land Foundation used him as a

speaker?

A. I am not aware there is.

Q. Yousef el-Athem, is there any evidence in this trial that the Holy Land Foundation used him as a speaker?

A. I am not aware.

Q. Yassin Abdul Aziz. Is there any evidence in this trial that the Holy Land Foundation used him as a speaker?

MR. JACKS: Your Honor, I am going to have to object to the form of the question. The list itself is labeled overseas speakers, so it is really misstating the evidence. So I object to the question in the sense that it mischaracterizes the evidence.

THE COURT: I think you can argue that to the jury, counsel. That will be ultimately for the jury to decide.

I wonder how many you are going to go through, counsel. That is a long list. How many names are you going to go through? If it is a lot, the answer is no.

MR. WESTFALL: It was characterized as though we had used all of these people.

THE COURT: You can ask him how many were or some other way to do it. I am not going to let you go name by name and ask these questions as to each name. If you want to come up with some shorter way of establishing a certain number weren't, how many weren't, I will let you do that, but not name by name. That is a long list. We are not going to spend

our time doing that.

MR. WESTFALL: Okay.

Q. (BY MR. WESTFALL) Clearly there are many names on this list that there is no evidence in this trial that the Holy Land Foundation ever used. Correct?

A. Right.

Q. And also just because these names are highlighted on this Demonstrative No. 1 doesn't mean that the Holy Land Foundation -- that there is evidence in this case that the Holy Land Foundation ever used any of these people. Correct?

A. No. Actually some of them were big fundraisers in fact.

Q. I know. But just because they are highlighted doesn't mean that the Holy Land Foundation actually used them as speakers. True?

A. Right. I don't think that was the intent.

MR. WESTFALL: May I approach the witness, Your Honor?

THE COURT: Yes.

MR. WESTFALL: Your Honor, may I come back to this list?

THE COURT: Sure.

Q. (BY MR. WESTFALL) I am showing you what has been marked for identification as Defendants' No. 1087. Just take a look at that and tell me, do you recognize that document, Agent Miranda?

A. Yes.

Q. And is that a document that you have actually on an earlier occasion relied upon in coming up with amounts and the such for speakers?

A. Yes.

Q. And it also is a --

A. Can you repeat your last question?

Q. That is a document that you relied upon in some testimony that you gave in an earlier proceeding.

A. Right.

Q. And that is also a document that came off of I guess a disk that was in the Holy Land office?

A. I don't recall if it was a disk, sir; obviously something computer-generated.

Q. But it came from the Dallas office.

A. Right.

Q. Of Holy Land Foundation.

MR. WESTFALL: Your Honor, I move for admission Defendants' No. 1087.

THE COURT: Mr. Jacks?

MR. JACKS: May we have a moment, Your Honor?

THE COURT: Sure.

MR. JACKS: No objection, Your Honor.

THE COURT: Defendants' Exhibit No. 1087 is admitted.

MR. WESTFALL: Thank you, Your Honor.

Q. (BY MR. WESTFALL) And the next part -- I am at a breaking place. The next part I am going to get into --

THE COURT: Go ahead. We will go forward a little longer.

MR. WESTFALL: Okay.

Q. (BY MR. WESTFALL) I am going to put on here what came into evidence yesterday as HLF Search No. 178. Okay? And that is this solicitors analysis.

A. Right.

Q. Now --

MR. WESTFALL: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (BY MR. WESTFALL) It is so small on this screen I just want to give you a copy. Does this appear to be the same exhibit you talked about yesterday?

A. Yes, sir.

Q. Okay. And it didn't copy all that well, but over here on this corner those are years. Right?

A. Right.

Q. And this year here is '97?

A. Right.

Q. And then see where Chicago is?

A. Right.

Q. And then Chicago here starts '98.

A. No. I think '98 starts on the next page, sir, doesn't it?

Q. I know there is another '98 up there, but then there is '99 where we got Chicago starting again.

A. It might be on the previous page. I probably need to look at the original, sir.

Q. And I don't have it. But you see how there is Chicago in '97 and then Chicago and this hole?

A. Right.

Q. And then the next one there is Chicago and then the '99?

A. Right.

Q. But it doesn't appear the one with the hole is '98?

A. I am going to be guessing, sir. If I could just see the original I will give you an answer.

MR. WESTFALL: Do you have the original, HLF Search No. 178?

THE COURT: Mr. Westfall, he is handing it to you.

MR. WESTFALL: Okay.

THE WITNESS: I don't see anything. See there is the '98 where I pointed to, but there is no '98 on the second page, sir.

Q. (BY MR. WESTFALL) Let's do this, then. Okay. So I just want to point out a number here that I think you all might have pointed out yesterday, and that is this Anees, Mezain,

and Said. Do you see that there?
A. Yes, I do.
Q. And $15,080?
A. Yes, sir, I do.
Q. And this is 1997.
A. Yes.
Q. And Chicago.
A. Yes.
Q. Now, this $15,080, you can't really tell from this exhibit, the one you all put in yesterday, you can't really tell whether that came in one conference or several conferences or what it was. Right?
A. You just got to go by the document.
Q. And what does the document say to you?
A. It says $15,080 is associated with Anees, Mezain, and Said connected to '97 in Chicago.
Q. Does this document tell you how that $15,080 was raised?
A. No.
Q. I show you the first page of HLF Search No. 23. This here -- This is already in evidence. And you recognize this document. Right?
A. I recognize that, yes, sir.
Q. And what this is--correct me if I am wrong--is a printout from a file that was in Dallas giving the names of people. Right?

A. Yes, sir.
Q. And then a date. Correct?
A. Right.
Q. And a city name oftentimes?
A. Right.
Q. Sometimes there is no city name. It says "null." Right?
A. Right.
Q. And then over here on this side there is a dollar amount. True?
A. Right.
Q. And this one document is 231 pages long.
A. Okay.
Q. Do you want to see it?
A. That is okay.
Q. I am just seeing if you remember it. I don't have an extra copy for you.
A. That is okay.
Q. And this one sets the data up chronologically. Now, do you know where this came from, what computer this came off of?
A. No.
Q. Do you know what program --
A. Just off the HLF.
Q. Right. Do you have any idea what program this one used?
A. No.
Q. Whether it was Oracle or whatever?

A. No.
Q. Now, it starts in 1989. True?
A. Right. That is the first entry.
Q. And then ends in 2000. Right?
A. Right.
Q. And it is in chronological order the entire way.
A. Right.
Q. Now, No. 1087, what we just put into evidence, is the exact same data. True? Meaning the same entries are on it. Right?
A. Can you repeat that again?
Q. This one that we just put in.
A. Right.
Q. The other thick one right here, Defendants' No. 1087, is the exact same data. True? Do you know what I mean when I say that?
A. No. Because you are -- I am sorry. You are confusing me a little bit. You are comparing apples and oranges. What are we talking about, sir?
Q. It is apples and apples.

MR. WESTFALL: May I approach to show him the documents? It is going to make it easier.

THE COURT: Yes.

THE WITNESS: We are not dealing with this at all.

Q. (BY MR. WESTFALL) No, we are not messing with this.

Right. That is apples and oranges. This document right here, which is Defendants' No. 1087 and HLF Search No. 23, this is the exact same data. It is just arranged differently. Isn't that true?

A. No. One shows a city -- Let me see here. Okay. I am with you. Yes.

Q. This one is strictly chronological. This one is alphabetical by last name.

A. I am with you.

Q. Here is from page 48 of that exhibit and you see this Anees, Mezain, and Said.

A. Right.

Q. And 13 December, '96, Chicago.

MR. JACKS: Your Honor, can he identify which exhibit he is referring to?

MR. WESTFALL: Defendants' No. 1087.

THE COURT: All right.

Q. (BY MR. WESTFALL) Now we will look at HLF Search No. 178, which is this thing, this solicitor deal.

A. Right.

Q. And can you see that that is exactly how it is listed on here--Anees, Mezain, and Said?

A. Yes.

Q. Do you see it is Anees plus Mezain plus Said in both places?

A. Right.

Q. I want to skip over to another document that is in evidence that was spoken about yesterday, and this is HLF Search No. 177. Do you recognize this?

A. Yes, sir.

Q. The HLF general activities. And in this document you pointed out in October of 1996, and this came out of Abdul Odeh's office. HLNK New Jersey.

A. Yes, sir.

Q. And in October of 1996, there is a lunch apparently purchased for Deeb Anees. Right?

A. Yes, sir.

Q. And in November of 1996 there was a dinner purchased for Deeb Anees. Right?

A. Right.

Q. And you looked for other things like this where Deeb Anees had been given lunch and dinner, I am sure.

A. I ran his name, yes.

Q. And this is what we have--1996. Right?

A. I think there was a couple of other documents.

Q. That are in this batch?

A. Maybe not with that batch.

Q. What did you say?

A. I said maybe not with that batch.

Q. Well, this batch is what you put in yesterday. Right?

A. Yes.

Q. And this is the fall of 1996.

A. Right.

Q. Now I am showing you page 37 of Defendants No. 1087. Okay? And there is two different ways that Deeb Anees turns up in this record. One of them is in conjunction with --

MR. JACKS: Your Honor, I am going to object to the form of the question. There is no question.

THE COURT: Well, he is asking. Go ahead and ask your question.

Q. (BY MR. WESTFALL) One is Anees, Mezain, and Jabbar. Isn't that true?

A. Yes.

Q. And then the other one is that Anees, Mezain, and Said we saw before. True?

A. We have seen that, yes.

Q. And here we show in the alphabetical list basically where the names start. Right?

A. Yes.

Q. Do you see how in 1996 we have amounts like this $3,000? Do you see that?

A. I do.

Q. And in November of '96 we got amounts like $4,825.25?

A. Right.

Q. In November of '96 we've got $7,300 in San Diego.

THE COURT: Your numbers are not on --

MR. WESTFALL: I am sorry.

THE WITNESS: Yes.

Q. (BY MR. WESTFALL) Let me back it up a little bit. Anees, Mezain, and Jabbar in November of '96, $3,300 Right?

A. Right.

Q. Here is where we start getting into '97. Do you see this? Can you see that?

A. Yes.

Q. As we move into '97, do you see how the amounts become much smaller and all seemingly divisible by $50 increments?

A. Yes.

Q. And as we move through 1997, do you see how that continues, by and large?

A. Yes.

Q. Here is more of '97. Do you agree that doesn't change? Do you accept my representation on that?

A. Through '97?

Q. Through '97, yes. Do you want to see more?

A. No, I think that is fine.

Q. And I have skipped ahead a couple of years, and now we are up in 2000. Do you see how '99 and 2000 are starting to get in there?

A. Yes.

Q. And these are still small amounts all divisible by $50.

Wouldn't you agree?
A. Yes.
Q. Shifting now you Anees, Mezain, and Said, do you see how this is 13 December of '96?
A. Yes.
Q. And under this new name can you see we sort of start over again on the years, under this new combination we start over on the years? We are back to '96.
A. Yes, kind of. Pardon me.
Q. I am sorry?
A. I said kind of. There is '97 in there, too, but --
Q. Right. It is kind of mixed up that way. But by and large it kind of starts in '96 and ends this 2000 with some -- But here is November 27, November '96, $650; 25 of October '96, $10,000 --
THE COURT: Your quantities are still not on the screen, counsel.
Q. (BY MR. WESTFALL) $10,565. Right?
A. Yes, sir.
Q. And here is 19th of November '96, $2000. December '96, $1,800. Right?
A. Right.
Q. And as we move through the fall of 1996, here is February of '97, Chicago, $1,050. Do you see that?
A. Right.

Q. But then after that it kind of does the same thing. As we move out of the spring of '97 and into the fall of '97, it drops down into these small amounts all divisible by $50. Do you see that?
A. Yes, sir.
Q. This here is page 52 out of the same exhibit. Spring of '98, all small amounts divisible by $50, isn't it?
A. Right.
Q. This is '99; same thing. Let me show you the whole thing. Is that the same thing?
A. Yes, sir.
Q. And then here is where it ends. Anees, Mezain, and Said, the last one looks like 26th of August of 2000 and it is 50 bucks. Do you see that?
A. Right.
Q. $50. Now, back to HLF Search No. 178, the one you had in evidence yesterday. Do you see this 1997 number?
A. Right.
Q. This is page 48 out of HLF Search No. 23. And this is the chronological one. Do you see that?
A. Yes.
Q. Anees, Mezain, and Said.
A. Yes, I see that.
Q. And then over here, that highlighting there is $50 and $200.

A. Correct.

Q. Now, as a time savings measure, if I represented to you that I highlighted every transaction from Anees, Mezain, and Said in Chicago --

MR. JACKS: Your Honor, I will object to this. It is his testimony now, and not Agent Miranda's.

THE COURT: Let's ask the question. This time savings measure, I am in favor of it.

MR. JACKS: I am, too.

THE COURT: Let's let him ask the question and see what he says.

Q. (BY MR. WESTFALL) If I represented to you and went through and added up all of the 1997 Chicago Anees, Mezain, and Said transactions, that it totaled exactly $15,080, is that a representation you would accept?

MR. JACKS: I object, Your Honor.

THE COURT: Do you want to rephrase the question, counsel? Maybe he knows. Let him rephrase.

MR. JACKS: It doesn't matter whether he accepts it or not.

THE COURT: I am asking him to rephrase, so let's see where he is going.

Q. (BY MR. WESTFALL) I know at one point -- Let me just ask you. At one point didn't you add up the amounts that the different speakers raised?

A.   Yeah.  At one point I added up various amounts of certain

speakers, not all speakers.  The book is not reflective of all

money.  It does not reflect money raised by Hamas speakers for

the most part, so I am going to give a caveat on your question

there.

Q.   Right.  By it certainly reflects Deeb Anees.  Right?

A.   Deeb Anees is throughout that.  That is correct.  I agree

with that.

Q.   And that is one of the ones that you added up.

A.   Yeah, I think I had a figure for him at some point.

         MR. WESTFALL:  May I ask him to add them up, Your

Honor?

         THE COURT:  Not right now.  Do you have some idea

what that number was?  Does that $15,000 sound --

         THE WITNESS:  I added at one point the major

speakers, and I probably have a figure somewhere.  I don't

have a problem --

         THE COURT:  You can do that after the break.  We

don't need to take the time to do that right now.

         MR. WESTFALL:  Very well.

Q.   (BY MR. WESTFALL)  Well, certainly this book here gives

you the ability to add up what is in this book.  True?  You

can take the names like Anees, Mezain, and Said, and you can

add up all of the numbers that are in here.

A.   Right.  You can add up the figures in the book.

Q. Right.
A. Right.
Q. And then you can take those figures and see if they match what is in your HLF Search No. 178, couldn't you?
A. Sure.
Q. And this document here actually has an HLDL number on it. True?
A. That is correct, yes.
Q. So this document came from I guess a different place than the totals document. Right?
A. No, not necessarily. This is -- I am sorry. The one you have on the screen is HLF Dallas.
Q. Right.
A. Are we referring now to the Defendants' exhibit or the other one?
Q. Maybe place wasn't the clearest term in the world. I am not talking about location. I am talking about this here obviously is a hard copy because it has HLDL.
A. That is correct.
Q. So these don't have HLDL, so they were on some computer somewhere in the Dallas office.
A. Right.
Q. Okay. And you can take -- It would be possible to take the amounts in the chronological book or in this book and separate them by year. Wouldn't it be possible to do that?

A. Right.

Q. And it would also then be possible to see if they actually match this other number on a document that was found in a different physical location than these.

A. Sure.

Q. Did you do that?

A. Did I match this with those?

Q. Yes.

A. No.

Q. To see if it matched.

A. No.

Q. Now, we have been through the numbers, and we saw this in this exhibit here.

A. I am sorry, sir. Tell me what this exhibit means. What are we talking about? The Defendants' --

Q. Defendants' No. 1087.

A. All right.

Q. And HLF Search No. 23.

A. Okay.

Q. Okay? And we have been through this now for 20 or 30 minutes going through the amounts.

A. It seems longer.

Q. Okay. I know. And the later it gets the longer it is going to seem.

A. Yes, sir.

Q. Would you agree with me that there was a spike in the fall of '96 and then it quickly reduced to these small amounts?

A. Yes.

Q. And would you agree with me that that is consistent now--you used that word yesterday, consistent--is that consistent with Deeb Anees being actually in the country of fall of '96 when Abdul Odeh was taking him out to lunch?

A. That is possible.

Q. And then after that, the rest of the money that came in would be consistent with either pledges or orphan application money or family sponsorships coming in.

A. Probably, yes.

Q. And the phone call where Shukri is telling Odeh, "Don't take Deeb Anees' money," that phone call we discussed.

A. Uh-huh, yes.

Q. Was in December of 1999. True?

A. Right.

Q. And basically the upshot of that phone call is Shukri is telling Abdul Odeh, "Don't mess with this guy because he speaks for Samah flatly or bluntly."

A. I am going to disagree with you on that. There were three or four reasons Mr. Baker gave for not dealing with him. Do you want me to run through some of those?

Q. It seemed like Odeh just wasn't getting it, didn't it?

Let's just look at the conversation, then. There was never one time in this conversation where Shukri told Odeh to take Deeb Anees' money. Right?

A. To take it?

Q. Yes.

A. No, I don't think he said take it.

Q. Okay. He said every time, for whatever reason, do not accept the money that this guy is trying -- And basically Deeb Anees didn't have the money. Somebody withheld the money and was offering to give it to the Holy Land because Deeb Anees collected it in the name of Palestine. Right?

A. That is what I understood.

Q. And at no time did Shukri tell Odeh, "Okay. Take the money."

A. No, he didn't say that.

Q. And he gave -- I guess he said, "Deeb Anees is dishonest. Deeb Anees will hold us up for ransom." But one of the reasons was "Deeb Anees speaks flatly and publicly for Samah."

A. That was one of the reasons, yes.

Q. Okay. So the upshot of this conversation is that Shukri is telling Deeb Anees or telling Abdul Odeh, "Do not take Deeb Anees' money." True?

A. Right.

MR. WESTFALL: May I have just a moment, Your Honor?

THE COURT: Sure.

MR. WESTFALL: Pass the witness, Your Honor.

THE COURT: All right. Let's go ahead and break here for the day. Be back at 9:00 in the morning.

Please recall the instructions, and we will see you back at 9:00.

(Whereupon, the jury left the courtroom.)

THE COURT: For your planning schedule for this week, we will plan on working all day tomorrow. Friday I have a commitment at 3:00, so what I am planning on doing is working through the noon hour again and breaking at 1:00 and we will break for the day. So tomorrow we will plan on working a little later again, Ms. Cadeddu, in case you need some notice. So that will be the plan.

MR. CLINE: And we will break at 1:00 on Friday?

THE COURT: Yes. We will work straight through until 1:00 and break for the day.

Anything we need to discuss that we need to be early for?

MR. JONAS: The only issue are the remaining Defense exhibits.

THE COURT: Which ones are those?

Everybody can be seated by the way.

MR. JONAS: I know there for sure No. 1340 and 1342 I anticipate Mr. Dratel may try to admit, I am not sure if there are any others.

MR. DRATEL: The witness is in the room.

THE COURT: Yes.

MR. JONAS: Those are the only two I am aware of.

THE COURT: Those two, 1340 and 1342?

MR. DRATEL: I think everything else is in evidence that I am using.

THE COURT: I think that is all we had left from this morning. But are you planning on offering those?

MR. DRATEL: Probably.

THE COURT: The objection is hearsay. Correct? I think that is what --

MR. JONAS: Hearsay and relevance.

MR. DRATEL: The reason they are offered is twofold. One is state of mind, and the other that it is related to as well, Mr. Jacks has two specific questions of Agent Miranda--"Do you see any evidence that indicates that the Defendants' knowledge of the law or designation knowledge of the law," and "Are there any telephone conversations about that." And my position is that these conversations would show that Mr. El-Mezain is adamant about not letting this person Abu Nimer, who is his cousin but also a Hamas person, which is already in the record already, to get involved in the hospital Dar el-Salam that Holy Land is funding in Gaza.

And so my point is that that is an answer to that question that the Government hasn't put in that we would like to put in to show that to impeach or show state of mind.

THE COURT: And that is one of those conversations?

MR. DRATEL: They are both. One is with his brother and one is with his parents.

THE COURT: But they are discussing that hospital?

MR. DRATEL: Yes. And I would not be reading the entire conversation. There is other stuff -- I would be picking out parts. I will be reading because obviously it is in Arabic.

THE COURT: And the part you are primarily interested in, if I understand you right, is where they are discussing this individual working at the hospital?

MR. DRATEL: Yes, and the impact that would have on Holy Land and that --

THE COURT: Anybody want to address that?

MR. JACKS: Well, Judge, that does not go to knowledge of statutes; certainly not to the specificity that we did. We presented evidence that they had copies of specific statutes, they being Ghassan Elashi. And having a discussion with your parents about someone is not -- I don't believe it is indicative of knowledge of legislation.

And secondly, state of mind, as I said earlier, is a very specific exception where a Defendant is allowed to put his own out-of-court statements into evidence, and I don't believe that these conversations are the type of conversations that are intended or qualified to show state of mind -- The cases

that I have examined talk about state of mind at a particular point in time, and for that reason I don't believe that they would come in for that purpose.

And also they are not to counter the Government's evidence regarding what knowledge the Defendants had of legislation. Specifically, the conversations that we have admitted dealt with Shukri Abu Baker and Ghassan Elashi, and I don't believe there has been a conversation admitted yet that deals with Mohammad El-Mezain.

MR. DRATEL: Your Honor, two things. One is that he asked a question about all Defendants. He didn't ask about Mr. Abu Baker and Mr. Elashi exclusively.

But the other thing is what Mr. Jacks is talking about goes to weight and not admissibility. I ask the Court to review the conversations, see the state of mind, see the consciousness, the implications that having someone like that be involved with that hospital would have for Holy Land and its work in Palestine. And I think, as I said, it goes to weight and not admissibility in that regard.

THE COURT: All right. I will review those and then we will finish up, Agent Miranda.

How long do you anticipate your cross?

MR. DRATEL: I will try to keep it to an hour max. Some depends on the give and take and how long it takes. A lot of yes answers and it gets moving.

THE COURT: And Ms. Cadeddu, how long?

MS. CADEDDU: Short, if at all.

THE COURT: Would you expect much redirect?

MR. JACKS: No, Your Honor.

THE COURT: Okay. So it looks like we will finish him sometime in the morning, then. And then are we still planning to getting to Mr. Levitt?

MR. JONAS: Yes.

THE COURT: And I will need to rule on those objections, that motion. You filed a motion on that, so I will need to rule on that, then.

Why don't go ahead and be here at 8:45 and we will try to address that issue with Doctor Levitt.

We will see you in the morning.

(End of day.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.

S/Shawn McRoberts 06/22/2009

__________________________DATE____________
SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER