1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2                  DALLAS DIVISION

3    UNITED STATES OF AMERICA      )  CAUSE NO. 3:04-CR-240-P
                                   (
4    vs.                           )
                                   (  OCTOBER 16, 2008
5                                  )  DALLAS, TEXAS
     HOLY LAND FOUNDATION, ET AL   (  9:00 A.M.
6
     _____
7

8                     VOLUME 19 OF 37

9    _____

10                     STATEMENT OF FACTS

11
           BEFORE THE HONORABLE JORGE A. SOLIS
12              UNITED STATES DISTRICT JUDGE
                        and a jury
13   _____

14

15                  A P P E A R A N C E S

16

17

18        FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                                1100 COMMERCE, 3RD FLOOR
19                              DALLAS, TEXAS  75242
                                BY:  MR. JIM JACKS
20                                   MR. BARRY JONAS
                                     MS. ELIZABETH SHAPIRO
21
          FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
22        (SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
                                20 FIRST PLAZA, SUITE 700
23                              ALBUQUERQUE, NEW MEXICO 87102
                                BY:  MS. NANCY HOLLANDER
24                                   MS. TERESA DUNCAN

25

```
 1              FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
                (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
 2                                   NEW YORK, NEW YORK  10005
                                     BY:  MR. JOSHUA DRATEL
 3                                        MR. AARON J. MYSLIWIEC

 4              FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
                (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
 5                                   DALLAS, TEXAS  75204
                                     BY:  MS. MARLO P. CADEDDU
 6
                FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
 7              (GHASSAN ELASHI)     P.O. BOX 10985
                                     TAMPA, FLORIDA  33679
 8                                   BY:  MS. LINDA MORENO

 9                                   JONES DAY
                                     555 CALIFORNIA ST., 26TH FLOOR
10                                   SAN FRANCISCO, CA  94104
                                     BY:  MR. JOHN D. CLINE
11
                FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12              (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                     FORT WORTH, TEXAS  76102
13                                   BY:  MR. GREG WESTFALL

14              COURT'S LAW CLERK:   MS. JENNIFER HELMS
                                     1100 COMMERCE, RM. 1654
15                                   DALLAS, TEXAS  75242

16              COURT COORDINATOR:   MS. BRENDA WEBB
                                     1100 COMMERCE, RM. 1654
17                                   DALLAS, TEXAS  75242

18      OFFICIAL COURT REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                     1100 COMMERCE STREET, RM. 1654
19                                   DALLAS, TEXAS  75242.

20                                   (214) 753-2349

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| ROBERT MIRANDA | |
| Cross By MR. DRATEL............................................... | 14 |
| Redirect By MR. JACKS............................................ | 59 |
| Recross By MS. HOLLANDER......................................... | 83 |
| Recross By MR. WESTFALL.......................................... | 86 |
| Recross By MR. DRATEL............................................ | 92 |
| MATTHEW LEVITT | |
| Direct By MR. JONAS.............................................. | 101 |
| DAWN GOLDBERG | |
| Direct By MR. JONAS.............................................. | 132 |
| Cross By MS. DUNCAN.............................................. | 163 |
| Cross By MR. CLINE............................................... | 172 |
| Redirect By MR. JONAS............................................ | 175 |
| Recross By MS. DUNCAN............................................ | 179 |
| STEVE McGONIGLE | |
| Direct By MR. JONAS.............................................. | 179 |
| Cross By MR. WESTFALL............................................ | 200 |
| Cross By MS. MORENO.............................................. | 202 |
| Cross By MS. HOLLANDER........................................... | 219 |
| Redirect By MR. JONAS............................................ | 223 |
| Recross By MR. WESTFALL.......................................... | 225 |
| Recross By MS. HOLLANDER......................................... | 226 |
| MOHAMED SHORBAGI | |
| Direct By Mr. Jacks............................................. | 229 |

## Government Exhibits

| **Government Exhibits** | **Page** |
|---|---|
| HLF Tax No. 10 | 152 |
| HLF Tax No. 11 | 155 |
| HLF Tax No. 1-9 | 157 |
| Government's Exhibit MAYA Conf. | 272 |

## Defendants' Exhibits

| **Defendants' Exhibits** | **Page** |
|---|---|
| No. 1340, 1340A, 1342, 1342A Admitted into Evidence. | 27 |
| No. 1080-1082 Admitted into Evidence. | 165 |
| No. 1083 Admitted into Evidence. | 170 |
| No. 669 Admitted into Evidence. | 214 |

```
1          THE COURT:  Let's take up the issue of Defense

2   Exhibit No. 1340 and 1342.  You wanted to try to get those in

3   through Agent Miranda?

4          MR. DRATEL:  Yes.

5          THE COURT:  And what is the state of mind issue that

6   you see that these go to?

7          MR. DRATEL:  Well, that if a Hamas person is in

8   charge of that hospital, which is this issue, that it is a

9   problem for the Foundation because it is going to undercut the

10  whole work of the foundation.

11         THE COURT:  I thought that was it, but I wasn't

12  sure.

13         MR. DRATEL:  And also his efforts obviously to stop

14  it.

15         THE COURT:  Mr. Jacks, any other thoughts on that?

16         MR. JACKS:  Well, Your Honor, again, it is his own

17  statements, and they -- As the cases state, generally a

18  Defendant cannot introduce his own statements.  And in terms

19  of my understanding of the cases that permit a Defendant to

20  introduce his own statements to show his state of mind, it is

21  a very narrow exception for specific instances at specific

22  times.  And I don't believe that particular conversation falls

23  into that category.  It is a general conversation.

24         THE COURT:  Who is the conversation with, the first

25  one?
```

1          MR. DRATEL:  With his brother.  The second one is

2    with his parents.

3          THE COURT:  The hospital conversation is with the

4    dad?

5          MR. JACKS:  And we don't believe it fits within the

6    exception, Your Honor.  Obviously he can get up and testify

7    about it, but it is not within that exception.

8          THE COURT:  All right.  And I think it does come in.

9    It is arguable as far as what the conversation is subject to,

10   but I think that is ultimately for the jury.  It could be

11   argued that it goes to the state of mind.

12      So the objections to Defense Exhibit No. 1340 and 1342

13   are overruled.

14         MR. DRATEL:  I guess the accompanying audio, I will

15   move those.  We don't have those teed up, but we will get them

16   ready.

17         MR. JACKS:  Your Honor, I haven't looked at the

18   entire transcript with a view toward there are other parts

19   that are extraneous, but I will do that.

20         THE COURT:  Take a look at those.  A lot of it is

21   about the hospital.  There were other things, but most of it

22   would --

23         MR. DRATEL:  I think I have --

24         THE COURT:  Did you say you were going to read

25   those, or do you want to play the tapes?

1    MR. DRATEL:  I don't want to play the tapes, and it

2    is in Arabic and I don't have the translation scrolling.  At

3    some point I may want to play those parts, but I have a couple

4    of sections that I would like to read.

5    THE COURT:  At some point when you determine that,

6    let the Government know --

7    MR. DRATEL:  I will try to show them right now where

8    they are.

9    THE COURT:  All right.  And then with respect -- And

10   I think that covers the remaining exhibits as far as Agent

11   Miranda.

12   With respect to the motion to exclude the second trial

13   testimony of Dr. Matthew Levitt, I have read the briefs and

14   the cases, and I am going to deny the motion.  I think they

15   are entitled to put him on.  I don't think there is any undue

16   prejudice in allowing them to call him a second time.

17   I understand your objections based on the *Mejia* case, but

18   that is just going to have to be a question by question issue.

19   If a particular question is asked that you think is improper,

20   you just need to object and I will make a ruling on it at that

21   point.  But I will permit the Government to put on Doctor

22   Levitt again.

23   Any other issues, then, that we need to take up this

24   morning?

25   MR. JONAS:  No, Your Honor, not from the Government.

THE COURT:  Anything from over here?  All right.

We are still short a few jurors, so we are wait for a few
minutes.

Yes?

MR. CLINE:  May I mention one thing, Your Honor, as
long as we have got a few minutes here.

It is a defense issue we won't see for some time, but his
name is Edward Abington.  We filed a CIPA notice which
addresses part of the issue involving him.  We filed that with
Ms. Helms, I think.  We are going to be filing an unsealed
motion that will address a related aspect of his testimony.  I
just wanted to alert the Court that that is coming probably
sometime this week, or maybe early next week we will file
that.

And then there was that -- Your Honor may recall that
discovery order that Your Honor entered I think shortly before
trial, if I recall correctly, and we filed a supplemental memo
and the Government disagreed with our view of what should
happen going forward on that.  And that evidence, were it to
be produced to us, would relate to Mr. Abington's testimony.
So we have those three things --

THE COURT:  Is this where you were seeking to have
some evidence produced to the Court in camera, or am I
thinking of something else?

MR. CLINE:  We were.  Essentially what happened is

1    Your Honor ordered some production, the Government --

2              THE COURT:  I do recall.

3          And Mr. Jacks, Mr. Jonas, I am going to require

4    production in camera.  I am not sure -- So we are all on the

5    same page, we actually have a draft order but I haven't

6    finished it.  There was some documents that I had ordered

7    produced that was Rule 16 and perhaps *Brady*.  It was those --

8              MR. CLINE:  It was the reports by --

9              THE COURT:  CIA reports.

10             MR. JONAS:  Your Honor, can we do this at a sidebar?

11             THE COURT:  Yes.

12             (The following was had at the bench.)

13             MR. JONAS:  First with regard to the CIPA matter

14   that Mr. Cline has raised, we forwarded that notice to the

15   CIA, and they are going to be the ones who will be required to

16   respond.  So I reached out to them again today to find out

17   about them getting response to that.  I think we have a few

18   weeks to deal with that, because I doubt he is getting on in

19   the next couple of weeks.

20             MR. CLINE:  It depends on how fast you finish.

21             MR. JONAS:  With the matter of production, we don't

22   have a problem with that, but collectively we looked at over a

23   thousand documents, and we did not know which ones mentions

24   zakat committees and which ones didn't.  We were looking for

25   which ones said these zakat committees would be favorable to

1    the Defense and which was zero.  This stuff is like gold to

2    the Government.

3        How does Your Honor want to proceed?  I mean, in talking

4    to the CIA again, I know in a brief discussion with them a

5    while ago they said it wouldn't be a problem.  I think they

6    may have to have a classified computer down here.  It is a

7    thousand documents.  Your Honor, it is time consuming.  I

8    don't know how you want to do it.

9            THE COURT:  I probably won't have time to look at a

10    thousand documents.  If there is some kind of an index or --

11            MR. JONAS:  There is an index.  I am not sure if the

12    index will be helpful.  Let me reach out to the CIA again

13    during the break, or maybe I will just step out during Agent

14    Miranda's testimony and try to reach out to them and see if

15    they can get the index down here, and see if you can start

16    with that.

17            MR. CLINE:  And Your Honor, one possible way to deal

18    with this is -- And maybe Mr. Jonas could propose this to the

19    CIA.  We, the Defense, have clearances for this stuff.  It may

20    well be, as Mr. Jonas says, that there is nothing helpful in

21    there to the Defense even under our view.  If there is not, of

22    course we are not going to pushing to introduce it.  We are

23    happy to keep it out.

24        But if we could look at this material, we could go to

25    Washington and look at the material and just go through it.

1    First of all, that would narrow it substantially because I

2    suspect a lot of it is irrelevant.  The thousand documents I

3    mean.  It is not irrelevant.  They are peripheral, let's say.

4        My guess is there are going to be a few documents in

5    there that we are going to have a different view of than the

6    Government.  That is just the way it normally is.  And we

7    could probably limit the necessity for the Court to review to

8    a small fraction of that thousand documents if they would give

9    us the opportunity --

10            THE COURT:  That would be helpful.

11            MR. JONAS:  I understand that would be helpful, and

12   I will propose it to the CIA.  I seriously doubt they are

13   going to agree to that, because there is very sensitive

14   information in some of these cables.  And even though the

15   Defense attorneys have the clearance --

16            THE COURT:  Can they excise what they consider to be

17   sensitive, or is that just too --

18            MR. JONAS:  It is very time consuming.  And they

19   would need our guidance as to which ones are even relevant,

20   and we are here not there.

21            THE COURT:  Okay.

22            MR. JONAS:  Let me -- If we can take this one step

23   at a time, let me reach out to them.

24            THE COURT:  And if there is some of it that

25   redacting or there are some documents that don't have any of

1    that, maybe they could agree to those at least.  Any way to

2    narrow it.

3              MR. JONAS:  Let me make a suggestion here.  If Your

4    Honor wants, and I would just suggest we do this, if Your

5    Honor wants to speak to the CIA yourself --

6              THE COURT:  If they want to that is fine.  I don't

7    mind it.

8              MR. JONAS:  They may not want Defense counsel in the

9    room at the time.  And we are fine not being there ourselves.

10   I can arrange the call.  But again, let me talk to them and

11   see what they want to do.  I am just trying to expedite

12   things.  I think cutting out the middleman may help.

13       So I will step out during Agent Miranda's testimony and

14   try to reach out to them this morning and try to get some more

15   information.

16             MR. CLINE:  That is fine.  And just to clarify what

17   I am suggesting and asking that Mr. Jonas suggest to the CIA,

18   they wouldn't even have to give us copies of this stuff.

19   Maybe even no note beyond just a bare description of the date

20   of the document so we can specify the ones that we think Your

21   Honor needs to look at.

22       Any protective measure they want to keep us from doing

23   something that they are worried about is fine.  It just would

24   cut through a lot of time, and it is just the case -- I mean,

25   going back to that Supreme Court case *Alderman,* we are the

1    advocates here and Your Honor of course isn't.  We have been

2    in this case forever.  I think it is just inevitable that we

3    are going to have a better idea of what is helpful to us than

4    you are.

5          MR. JONAS:  I understand, but it is also the

6    prosecutor's responsibility to make that first decision to

7    provide the material, and if we are exercising our discretion

8    and that is what is helpful or not.  And if we are wrong it is

9    going to come back and haunt us.

10         Having said that, I think the only protective measure the

11   CIA would agree to is yet to be invented.  It was in the movie

12   Men In Black.  If we could flash you and remove your memory

13   after you walk out to the CIA, they would probably agree to

14   that.

15         In all serious, when we take notes, no matter what we are

16   writing down, we have to leave those notes with the CIA and

17   they scrub them and send them to us a few weeks later.  So

18   even if you took notes, you are not walking out of there with

19   those notes.

20         MS. SHAPIRO:  And that is not even the real problem.

21   The real problem is that each of these cables is intermixed

22   with information that people wouldn't have a need to know and

23   would not be cleared.  I am not even sure that -- Some of them

24   may be above the secret level.  And I have a fair amount of

25   experience with this.  I am about 99.9 percent sure that that

1    will not be permitted.

2           MS. HOLLANDER:  I just want to add for the record

3    here that some of us, myself, Ms. Duncan, and I am not sure

4    who else, already have top secret clearances,

5    compartmentalized clearances.  So if in fact the issue is that

6    this stuff -- I understand the need to know.  But if it is

7    above the secret level, some of us have been cleared for top

8    secret compartmentalized information.  I think Mr. Cline is,

9    too.  So it is not an argument that our clearances are not

10   sufficient.

11          MS. CADEDDU:  And I would point out also, I want to

12   add to what Ms. Hollander said.  When we were cleared, that

13   would include me, they cleared us for top secret.  They didn't

14   give us top secret because they didn't believe there were any

15   documents that were top secret that we needed to see, but we

16   have all been cleared for the top secret.  We went through the

17   clearance process for top secret.

18          MR. JONAS:  It is more than that.  It is more than

19   that.  I will --

20          MR. CLINE:  And the bottom line for us, and I

21   understand what Mr. Jonas is saying, but anything we can do to

22   expedite this -- We are happy to do travel to Washington and

23   look at documents.  We would like to speed it along.

24          MR. JONAS:  We appreciate that.  And Ms. Shapiro

25   would like to have us over to her house for dinner.

1    We are not trying to be obstructive here.

2         THE COURT:  I understand that, and somebody else

3    will be making those decisions and we will go from there.

4         MS. MORENO:  Your Honor, it seems perhaps the order

5    of witnesses has changed somewhat, and one of these witnesses

6    may come on earlier than I had anticipated, Mr. McGonigle.

7    And all my materials are back at the hotel, so if it is all

8    right with the Court, at some point in time I may leave the

9    courtroom.

10        THE COURT:  That is fine.

11        (The following was had in open court.)

12        THE COURT:  Bring in the jury.

13        (Whereupon, the jury entered the courtroom.)

14        THE COURT:  Ladies and gentlemen of the jury, good

15   morning.  We are ready to proceed.

16    And Mr. Dratel, you are up.

17        MR. DRATEL:  Thank you, Your Honor.

18                      CROSS EXAMINATION

19   By Mr. Dratel:

20   Q.   Good morning.

21   A.   Good morning.

22   Q.   On your direct testimony, I think it was close to the

23   beginning, you talked about intelligence investigations.  Do

24   you recall?

25   A.   Yes, sir.

1    Q.   And you talked a little bit about the search of Mr.

2    Ashqar's house in December of '93.  Correct?  You didn't

3    participate in that, but you talked about the general nature

4    of how those are conducted.

5    A.   Yes, sir.

6    Q.   And they are done obviously at a time when the person is

7    not at home because the object is to search the house for

8    documents and other materials.

9    A.   They are done so it is covert.

10   Q.   Right.  And so the person doesn't even know when he comes

11   back.

12   A.   In theory.

13   Q.   Yes.  And as a result, you would have to monitor in

14   advance to know when the person is going to be gone for a

15   sufficient amount of time.

16   A.   Yes.

17   Q.   So if the person was just going to the grocery store, you

18   wouldn't go in and spend hours in the house, or if you didn't

19   know where they were going, if you didn't know how long they

20   would be gone.

21   A.   Possibly.

22   Q.   It might put the intelligence operation in jeopardy if

23   you took a chance like that.  Right?

24   A.   There are ways around that.

25   Q.   There are ways around having the person come home?

A.   Yes, sir.

Q.   So you could interfere with that in other ways?

A.   It is possible, yes.

Q.   Like a car stop or something like that?

A.   It is possible.

Q.   Okay.  But that would require, obviously, resources and a lot of coordination.

A.   Yes.

Q.   During your direct testimony, you put in I think through you El-Mezain Wiretap No. 10.  Do you recall that?

A.   Can you repeat your question?

Q.   During your direct testimony you put in an exhibit called El-Mezain Wiretap No. 10.  Right?

A.   Yes.

Q.   Okay.  And that was a fax to Mr. El-Mezain.  Right?

A.   Yes.

Q.   I am just going to put this on the elmo.  And that is the -- I am just going to zoom out.  That is the Arabic version.  Correct?

A.   Yes.

Q.   And the date of this fax is -- I will zoom in so you can see it if you don't recall.  Can you read it?

A.   Yes, sir.  It reads November 13th, 1994.

Q.   Right.  And that is about three years before October 8th, 1997, the designation of Hamas as a foreign terrorist

1   organization?

2   A.   Yes.

3   Q.   And this fax is not addressed to Mr. El-Mezain.  Right?

4   His name doesn't appear anywhere on it?

5   A.   No.

6   Q.   And there is a note from somebody about brother Osama in

7   the margin?

8   A.   Yes.

9   Q.   And you are assuming that it is a particular -- Osama who

10  is mentioned in other documents.  Right?

11  A.   Yes.

12  Q.   But you don't know that for sure?

13  A.   No.

14  Q.   There may be many Osamas?

15  A.   There may be many Osamas, but not that many that work for

16  the IAP.

17  Q.   But you don't know necessarily that the person who faxed

18  this worked for the IAP.  You don't know for sure that the

19  person who wrote that note is the same one.  That is an

20  assumption you are making based on context.

21  A.   Context and my interview of Osama.

22          MR. DRATEL:  I object, Your Honor.

23          THE COURT:  You asked him what it was based on.  He

24  didn't get into it.  You can't limit him like that.

25  Q.   (BY MR. DRATEL)  Now, for Demonstrative No. 16, that is

1    the demonstrative with the phone calls back and forth.

2    A.    Yes.

3    Q.    Can you read that?

4    A.    Yes.

5    Q.    Is that large enough to read on the screen?

6    A.    It is.

7    Q.    The reason I ask is the contrast here is very difficult.

8    I can only see that one clearly.

9          Now, with respect to those New Jersey Bell records.

10   Right?  Those are the records of Mr. El-Mezain's phone.

11   A.    Yes.

12   Q.    Right?  And those are the calls to the number associated

13   in the Marzook phonebook with Doctor Rantisi.

14   A.    The two numbers, correct.

15   Q.    And those calls are in a two-day period, July 5th and 6th

16   of 1993.  Right?

17   A.    Yes.

18   Q.    More than four years before October 8th, 1997.  Right?

19   A.    Right.

20   Q.    And if you look, I have highlighted the calls, and there

21   are six calls total.  Right?

22   A.    Right.

23   Q.    And five of them are one-minute calls.  Right?

24   A.    Right.

25   Q.    And in fact, if you look at the ones after the break

19

1    there, which to the 3313, they are all made one minute after

2    the other.  Right?

3    A.    I think that is right.  Can you just maybe enlarge that a

4    little bit?

5    Q.    Oh, certainly.  I can do more.  I think we have room to

6    do more.

7    A.    I think we can see that.  My response is yes.

8    Q.    Okay.  And you don't know whether Mr. El-Mezain You don't

9    know who spoke to whom in that conversation or in any of those

10   conversations, if they were conversations at all.

11   A.    Right.

12   Q.    It doesn't say in that address book whether it is a home

13   or office number.

14   A.    In the Marzook book?

15   Q.    Yes.

16   A.    No.

17   Q.    So if it is an office, it could be other people in that

18   office.  Right?

19   A.    Yes.

20   Q.    And this is -- Doctor Rantisi was one of the people who

21   was deported in late November/December 1992 by the Israelis to

22   Lebanon.  Right?

23   A.    He was.

24   Q.    And isn't it true that in July 1993, seven months later,

25   he still had not been returned?

1   A.   That is correct.

2   Q.   So he wasn't even there?

3   A.   That is correct.

4   Q.   So Mr. El-Mezain even if it was Mr. El-Mezain calling

5   that number, he would not have spoken to Doctor Rantisi.

6   A.   No, not necessarily.

7   Q.   Now, with respect also to Marzook, the Marzook

8   phonebook --

9           MR. DRATEL:  If I may just have a second, Your

10  Honor?

11          THE COURT:  Sure.

12  Q.   (BY MR. DRATEL)  You went through the Marzook phonebook

13  trying to line up some telephone numbers.  Right?

14  A.   Yes.

15  Q.   Among other things with that.

16          MR. DRATEL:  Can we have page 58 of the Marzook

17  Phonebook, please?  Thank you.

18  Q.   (BY MR. DRATEL)  I think it is the bottom part of the

19  page.  Now, there is one call on your demonstrative where you

20  have a call going to Syria from Mr. El-Mezain's house.

21  Correct?

22  A.   Right.

23  Q.   And that is March 27th, 1994.  Right?

24  A.   Right.

25  Q.   And that is three and a half years before October 8th,

1    1997.

2    A.    Right.

3    Q.    And you said it was to a number Moustafa Qanou in the

4    middle.  See that?  3711159?

5    A.    Yes.

6    Q.    And there is a Munir right underneath that with basically

7    the same number.  It has a prefix for Syria, but the last

8    digits --

9    A.    Right.

10   Q.    That is how you connected that to Moustafa Qanou?

11   A.    And the other numbers across, sir.

12   Q.    Right.  But in fact those ones were crossed out in the

13   notebook.  Right?

14   A.    Yes.

15   Q.    So you are assuming that that was Moustafa

16   righteousness's number and it is not Munir's number and put

17   next to Moustafa righteousness and then crossed out?

18   A.    No, that is not my assumption.

19   Q.    Now, again on this exhibit, the Demonstrative No. 16, all

20   those calls, except for the calls between Mr. Abu Baker and

21   his brother, all those calls are before 1995.  Right?  On this

22   demonstrative?

23   A.    Yes.

24   Q.    And in fact, of all the people to whom these calls were

25   made, the only people who were ever designated were Khalid

```
1   Mishal in 2003.  Right?
2   A.    Right.
3   Q.    And Rantisi was designated as well?
4   A.    And Ahmad al-Alami.
5   Q.    Ahmad al-Alami, the Tehran number.
6   A.    That is right.
7   Q.    But not at that time that these calls --
8   A.    There was no designation process at that time.
9   Q.    Now, you also admitted El-Mezain Wiretap No. 14.  Right?
10  That is the voicemail from Khalid Mishal.
11  A.    Right.
12  Q.    Do you recall the date on that?
13  A.    '94.  I don't have the exact date.  October '94, I
14  believe, but it is on the demonstrative.
15  Q.    So it is October of '94.  Right?  Three years before
16  October 8th, 1997.
17  A.    I think it is October.  We can look.
18  Q.    It is October 4th.
19  A.    It is before 1997.  That is right.
20  Q.    And it talks about a conference in Turkey.
21  A.    Right.
22  Q.    And Mr. El-Mezain didn't go to a conference -- Withdrawn.
23  Mr. El-Mezain didn't go to Turkey that month.
24  A.    I am not aware that he did.
25  Q.    And as we have seen before when Ms. Hollander used, there
```

1    are searches that can be done with respect to people coming in

2    and leaving the country.

3    A.    Actually searches on people entering the country, sir.

4    Q.    Entering.  Okay.  So if someone comes back from

5    somewhere.  Right?

6    A.    Not exactly as you describe it.

7    Q.    Demonstrative No. 6, the family relationships, do you

8    remember that one?

9    A.    Yes, sir.

10   Q.    Is that -- Can you see the part basically about Mr.

11   El-Mezain Is that legible?

12   A.    No, not really, but we will work through that.

13   Q.    Let me try to zoom in, because this is obviously a Xerox.

14   Is that better?

15   A.    That is good enough, sir.

16   Q.    Okay.  Okay.  Now, when you wrote here that Ahmed Hamdan

17   was a member of Hamas, you are saying that you base that on

18   Agent Burns' interview.  Correct?

19   A.    Right.

20   Q.    And in fact, didn't Mr. El-Mezain tell her that -- Mr.

21   El-Mezain told her that he was -- about his relationship with

22   Mr. Ahmed Hamdan.  Right?

23   A.    Right.

24   Q.    And in fact, didn't he say that his cousin Mr. Ahmed

25   Hamdan was a supporter of Hamas?  Correct?

```
1    A.   I would have to look at the 302, sir.

2            MR. DRATEL:  May I approach, Your Honor?

3            THE COURT:  Yes.

4            THE WITNESS:  Right.

5    Q.   (BY MR. DRATEL)  So that demonstrative is incorrect.  He

6    wasn't -- Mr. El-Mezain didn't say he was a member of Hamas,

7    his cousin was a member.  He said his cousin was a supporter.

8    Correct?

9    A.   He said he was a supporter and a deportee along with

10   those 400 --

11   Q.   So --

12   A.   I am sorry.  I haven't finished.

13   Q.   So you don't distinguish between member and supporter.

14   A.   What I was attempting to answer was that --

15   Q.   Do you distinguish --

16           THE COURT:  Counsel, you cut him off.  Go ahead.

17           THE WITNESS:  First off, Mr. El-Mezain said that

18   Hamdan was a supporter, but he also said he was a deportee

19   with the 415 other individuals that went to Marj al-Zahour.

20   Those individuals were largely Hamas members or members of

21   another terrorist organization.

22       In addition, Mr. El-Mezain through his deposition hasn't

23   been exactly forthright --

24           MR. DRATEL:  Objection, Your Honor.  That is

25   completely --
```

1          THE COURT:  Let's not go there.

2          THE WITNESS:  Yes, sir.

3    Q.   (BY MR. DRATEL)  Mr. El-Mezain also told Agent Burns that

4    he was unaware if Mr. Hamdan, his cousin, supported the

5    military wing of Hamas.  Correct?

6    A.   Did you say support, or was a military wing member?

7    Q.   No.  Did Mr. El-Mezain didn't he also tell her he was

8    unaware whether Mr. Hamdan was a supporter of the military

9    wing of Hamas?

10   A.   May I see that again?

11   Q.   Sure.

12   A.   That is right.

13   Q.   Thank you.  By the way, the deportation that talks about

14   in 1992, that was the same incident we talked about during

15   this trial that brought international condemnation on Israel.

16   Right?

17   A.   I don't know about the international condemnation.

18   Q.   You weren't here when Doctor Levitt testified about that?

19   A.   I don't recall that section of his testimony.  If that is

20   what he said, that is what he said.

21   Q.   Now, you know who Mahmoud Marzook is.  Right?

22   A.   Yes.

23   Q.   He was a general in the Palestinian Authority in the

24   '90s.

25   A.   Right.

1    Q.   During this relevant period we have been talking about.

2    A.   Right.

3    Q.   And he was Mousa Abu Marzook's brother, and is still his

4    brother.  Correct?

5    A.   Right.

6    Q.   And they are on opposite sides even though they are

7    brothers.  One is Palestinian Authority; one is Hamas.

8    A.   Right.

9    Q.   And they are -- And Mr. El-Mezain would tell people who

10   called from Gaza to say hello to General Marzook, the brother,

11   Mahmoud.  Correct?

12   A.   I think I recall something like that a long time ago.

13   Q.   Now, you didn't put General Marzook on the chart.  Right?

14   A.   He is not Hamas.

15   Q.   Abu Marzook's brother?

16   A.   No.

17   Q.   But relationships -- You have heard of the Dar el-Salam

18   Hospital.  Correct?

19   A.   Yes.

20   Q.   In Gaza.  Right?

21   A.   Yes.

22   Q.   And Holy Land provided funding to that hospital.

23   A.   Yes.

24   Q.   And when you talked about family.  Right?  There is also

25   another family member --

```
1          MR. DRATEL:  Well, I am going to move No. 1340 and
2   1342 into evidence at this time, Your Honor.
3          THE COURT:  Did you also want the A portions with
4   that?
5          MR. DRATEL:  Yes; No. 1340-A and 1342-A.
6          THE COURT:  Mr. Jacks, same objection?
7          MR. JACKS:  Yes, Your Honor.
8          THE COURT:  Those have been overruled, and
9   Defendants' Exhibit No. 1340 and 1340-A and 1342 and 1342-A
10  are admitted.
11         MR. DRATEL:  Your Honor, I am informed the way we
12  did it on our exhibit list is that No. 1341 was the audio for
13  1340, and 1343 was the audio -- I think it is better that we
14  conform it to the A, and we will change that.
15         THE COURT:  All right.
16         MR. DRATEL:  Thank you.
17  Q.   (BY MR. DRATEL)  Now, Ahmed Nimer is a person who is
18  affiliated with Hamas.  Correct?  There is an Ahmed Nimer who
19  is affiliated with Hamas?
20  A.   I think that is correct.
21  Q.   And he is a cousin of Mr. El-Mezain.
22  A.   I think that is correct.
23  Q.   And I just want to show you --
24         MR. DRATEL:  If I may approach, Your Honor?
25         THE COURT:  Yes.
```

1  Q.   (BY MR. DRATEL)  No. 1340 and 1342 are telephone

2  conversations intercepted by the wiretap on Mr. El-Mezain's

3  phone.  Correct?

4  A.   Yes.

5  Q.   And could you just give the dates of those two, please?

6  A.   No. 1342 is dated 10/26/1995.  No. 1340 is dated

7  0/25/1995.

8  Q.   Thank you.  And I will show you No. 1340.  Can you see

9  that?

10  A.   Yes.

11  Q.   So the participants in this call are Mohammad El-Mezain.

12  Correct?

13  A.   Yes.

14  Q.   That is Mr. El-Mezain.  Right?

15  A.   The Defendant, yes.

16  Q.   And his brother Dawud El-Mezain.

17  A.   I wasn't aware that that is his brother.

18  Q.   You weren't here when Agent Burns testified that he had a

19  brother named Dawud?

20  A.   I may have heard that.

21       MR. JACKS:  I don't believe there is any testimony

22  in the record --

23       MR. DRATEL:  I asked Agent Burns and she said yes.

24  Q.   (BY MR. DRATEL)  Let's go to page 3.  And we will -- Can

25  you read that?

```
 1    A.    Yes.

 2    Q.    I will be Mr. El-Mezain and you will be Dawud El-Mezain.

 3    Okay?

 4    A.    Right.

 5    Q.    "We are in a catastrophe."

 6    A.    "What?"

 7    Q.    "A catastrophe with our cousin."

 8    A.    "Who?"

 9    Q.    "Mr. Ahmad."

10    A.    "Why?"

11    Q.    "Because of the hospital."

12    A.    "What happened?"

13    Q.    "When he stopped coming to the hospital three months ago

14    he was in jail."

15    A.    "Okay."

16    Q.    "The people of the hospital brought his son and hired him

17    without an intermediate or any qualifications."

18    A.    "Okay."

19    Q.    "They signed a contract with him for three months as a

20    training period to try him to see if he can do it or not.  If

21    he couldn't do it, everyone will go on his way and those who

22    want to fill out a new application, let them fill out a new

23    application and they would be hired anew if they passed.  The

24    policy.  It is the policy, that is."

25    A.    "Ah."
```

1  Q.    "His son Ismail, it looks like they put him in the lab."

2  A.    "Ah."

3  Q.    "He was in the lab and he applied and he used to get out

4  wrong results.  And the -- based on the results were wrong, so

5  he didn't pass the evaluation.  A resolution was made by the

6  chairman of the board of directors that the new hires who want

7  to submit new applications for work should do so in order to

8  be hired.  Everybody applied except Ismail.  So Ismail came

9  and told Doctor Mufid, 'Save yourself the trouble.  I am not

10  going to apply.  I have been appointed, and it is better for

11  you to keep quiet and not to tell me this kind of stuff.'  Of

12  course I learned this stuff because -- on Sunday from Mohamed

13  al-Najar.  The youth didn't tell me that.  So I called him

14  Saturday in Dallas.  I had just arrived from a trip which God

15  only knows how it went.  He told me, 'Man, you want a shop in

16  an alley of your own, this is yours and this is ours.  Let

17  people take a their hands off of the camp so that people can

18  enter.'  He said that Sheikh Ahmad is saying, 'If you don't

19  keep quiet, I will stand up in the hospital and say, "This

20  hospital is ours, and that hospital belongs to so and so

21  people, and those who like it, fine, and those who don't like

22  it should leave."'"

23  A.    "What is that?"

24  Q.    "What?"

25  A.    "To whom it belongs?"

1   Q.   "To him, that is."

2   A.   "How come?"

3   Q.   "Yeah.  Ahmad is saying that this hospital belongs to so

4   and so parties.  He who wants to work, let him, and he who

5   doesn't work should not work.  Of course all of that is wrong

6   from beginning to end; talk which harms and doesn't benefit.

7   There are some people who are waiting for such a day, and I

8   found that the youths are upset.  We told them not to get

9   upset.  'I will make the call right now.'  And we decided not

10  to resort to -- until at the end when all ways were blocked.

11  So Doctor Mufid, go to hell.  There is an appointment without

12  a hiring process and stuff like that, and this is our

13  hospital, and the corruption at the hospital must be

14  corrected.  It is the first hospital to serve all kinds of

15  people, my brother.  You say 'my hospital.'  Not all of the

16  women are veiled.  One is like this and one is like that.  Not

17  at all.  This so and so people, this female doctor, and this

18  female doctor?"

19  A.   "Who?"

20  Q.   "This female doctor wears knee-length clothes.  I mean,

21  there are four employees and this person works with this party

22  while that person works with this party and stuff like that.

23  I verified the talk and it is true.  Even if I am alone, he

24  said.  Those are the corrupt ones, the collaborators and --

25  very ugly talk.  He said, 'You made Abou Sakr greedy.  You did

1   this, that, and I don't know what else.'  Before I called him

2   I told his father, "Father, may God be pleased with you.  Go

3   tell him to stop his evil.  Let him be fair and that if the

4   solution is hiring his son, the youths are willing to hire his

5   son so that the problem ends, but in a way in which the

6   chairman of the board of directors, a person like Mufid, is

7   not destroyed by them.'  They tell him, 'Resign from the

8   hospital and stay and this week four clinics will be open

9   here.'  And then he comes and treats the hospital in such a

10  manner?  By God, this is not right.  So our brother in God

11  went and told Sami al-Agha, he went and told Sami al-Agha that

12  'If you're not quiet, we will say this and that, kick the

13  people out, and take over the hospital within two hours.'

14      "So I want to find Aboul Khodary, I want to see, and I

15  want to see this and that person.  Of course when they told me

16  that stuff, I told his father.  'Tell them, Father, by God.

17  Let him find his occupation in Dawa'a to God the Almighty, and

18  correcting people and stay away from the hospital.  Otherwise

19  if he starts circulating this kind of talk around, it is over.

20  I mean, there won't be a connection or anything else.  He told

21  me, 'Son, I will do whatever you want.'  I told him, 'Yes,

22  Father.  Go, by God.'

23      "It was 10:00 at night.  He took the car with Halima and

24  Mahmoud and they went over to his place.  And I told them, 'I

25  will call with you later.'  I called him for an hour over the

1  phone and the man's heart won't change.  The man, do you know

2  what he is saying?  He is saying, 'I want everything to be

3  under my control,' he told him.  I asked him, 'Who are you,

4  sir?  What do you mean "everything under my control?"'  He

5  said, 'I mean appointing people.'  I told him, 'This is not

6  your business.  The hospital belongs to all Muslims.  It

7  doesn't belong to Zeid or Amr.  And the people who are in the

8  board are approved by us, and this is the Foundation's

9  business and not your business.'  He said, 'My friend, take it

10  away from under my control.'  I told him, 'Yes, I will take it

11  away from under your control.'  I told him, 'Be the head of

12  reform and not the head of corruption.'  Honestly, I mean, I

13  said extremely harsh things to him.  I said, 'By God, I resort

14  to God from your work, from listening to you and from your

15  tongue.'"

16  A.    "You told him that."

17  Q.    "Yes, I told him that.  I told him, "Man, fear God.  This

18  is people's sweat.  All over the world right now there is not

19  one hospital like it, not among the organizations which built

20  things in the inside.  Haider Abdel Shafi was visiting us a

21  few days ago -- two months ago, I mean, he said great things

22  about people in Gaza, about the Foundation's work here and

23  there and while people are going and coming to the buffet are

24  heaping praise right and left, you are coming to say you want

25  to do this.  Do you think that you can do what you please?  He

1    said, 'I don't keep quiet in what is right.  I vent out at

2    al-Khodary.  Why did you keep Abou Sakr?  Why did you keep --"

3    everybody in the country agree that he is a fool.

4    A.    "He is a fool, Sheik."

5    Q.    I am going to go to page 8.  I am going to start right

6    here.

7          "And they keep coming and going.  What do you guys want?

8    This is a national organization we told you.  And because one

9    female employee wore long or short dress and because you want

10   to divert attention, you would rise the entire world against

11   you?  And what do you mean I want everything under my control?

12   No, in management, the general business, there is nothing

13   called everything under your control.  Let everything be under

14   your control, my brother.  By God, I don't know what to do

15   Abou Ahmad."

16   A.    "Does he want to a bribe?"

17   Q.    "What?"

18   A.    "Does he want to a bribe?"

19   Q.    "He wants everything to be under his control."

20   A.    "Does he want to get a bribe like highway robbers?  If

21   that is what he wants we will give him a bribe.  Tell him

22   that."

23   Q.    "By God, we won't pay him a bribe."

24   A.    "If that is what he wants -- If he wants to be highway

25   robbers, huh?  A highway robber means a thief -- he should

1  understand that.  What is this son-of-a-gun?"

2  Q.   "By Almighty God, yesterday I was -- Do you know, the

3  entire sector would seethe for Aboul Naji, the entire sector

4  in the West Bank would seethe for Mufid, the entire sector and

5  the West Bank would seethe for Omar.  Dr. Sami al-Agha,

6  Zakaria's brother, is an honor to the entire world.  He is an

7  honorable person, a radiologist and a well-known person.  He

8  has -- all of them have Ph.D.s.  I am telling him, 'Abou

9  Mohamed, neither I nor you know anything about the hospital,

10 my brother.  Let's out in its administrative and practical

11 affairs.'"

12 A.   "He needs a beating."

13 Q.   "Huh?"

14 A.   "He needs a beating."

15 Q.   "Who needs a beating?  He is the one who gives beatings,

16 my brother.  He is with them or against them under the slogan,

17 'For God or his profit.'"

18     I am going to go to page 15 and start under the yellow

19 line.

20     "God forbid, if something happens, that's it, many happy

21 returns to you.  I mean, he would have ruined matters for the

22 whole Foundation in this manner, and this is what people over

23 here and over there are waiting for."

24 A.   "Yes."

25 Q.   "Because of someone who is -- "

```
 1   A.   "So, what are you the legal action you are talking

 2   about?"

 3   Q.   "Huh?"

 4   A.   "What legal action?"

 5   Q.   "Legal action?  I would call the U.S. embassy."

 6   A.   "Yes."

 7   Q.   "There are legal action but, of course, this is wrong, by

 8   Almighty God.  I can line up 60 attorneys over there.  This

 9   guy is an idiot and I know, there will be spilled blood then

10   and it won't benefit Zeid or Amr.  By God, how about if

11   someone did something to Mufid, Omar, or Aboul Naji in order

12   to banish them from Khan Younis?  Gaza and Khan Younis..."

13        I am going to go to No. 1342.  And this is between Mr.

14   El-Mezain and his parents.  Right?  I will put it on here.

15   A.   Yes.

16   Q.   I am going to start under the yellow line.  MO is Mr.

17   El-Mezain?

18   A.   Yes, sir.

19   Q.   And just to go back, MF is Mr. El-Mezain's father?

20   A.   Yes, sir.

21   Q.   "It is a different issue from Ahmad's father, they hired

22   Ahmad's son, Ismail, when Ahmad was in jail and they put him

23   -- they put everybody in the hospital in training for three

24   months."

25   A.   "Yes."
```

37

1    Q.    "And after the three months were up, they were evaluating

2    people to see if he should continue or not.  Ahmad's son

3    turned out to be incompetent in the specimens he was

4    analyzing, and they were prescribing the wrong medications,

5    and Ahmad's know.  And Ahmad's anger is not for God's sake.

6    It is anger to have his way.  And Father, if I am in charge of

7    something, I must try to please Almighty God, and I don't want

8    to please any other human being.  My brother, God willing,

9    even if I sell my children, by God, I will not be negligent

10    with him.  But I don't want to -- "

11    A.    "May God make things easy."

12    Q.    "But I don't want to -- "

13    A.    "May God makes things easy for you, be pleased with you,

14    and shield you from human's evil."

15    Q.    "But just listen to me, Father.  Let me tell you.  For me

16    to hire -- But for me to hire an employee who doesn't know how

17    to work, by God, this is not from the religion.  They also

18    told me, man, a decision has been reached by the entire board

19    of directors.  Go tell Hajj Mohamed what happened.  Tell them,

20    man, Ismail will stay and we will give him his salary.  But

21    instead of him being a person in charge, he will train in

22    order to learn how to do the work.  He will be in training for

23    six months.  And then Abou Mohamed comes and says this kind of

24    stuff.  By God, this is wrong of him and shows lack of

25    religion with him, this kind of things.  And for your own

1  knowledge, there is not a single person who heard about the

2  issue but got upset at Abou Mohamed.  By God, Father, the

3  issue is not like the hospital belongs to Abou Ibrahim,

4  Father."

5  A.   "I -- Son -- We know the hospital doesn't belong to you."

6  Q.   "By God, it doesn't belong to me, and neither does it

7  belong to anybody.  It is a public venue for all Muslims,

8  Father.  Am I going to -- How did I know Mahmoud wanted to

9  work at the hospital?"

10  A.   "Son, son."

11  Q.   "Don't be upset with me.  I have no other person in the

12  world for you to get upset with me."

13      Can you see -- Okay.  We are going to read between the

14  yellow lines here.

15  A.   Yes, sir.  Should I start?

16  Q.   Yes, sir.

17  A.   "I went to him at his end at night, at 12 o'clock that

18  night.  He said, 'Never, never, never.'  Okay.  What should I

19  do with him?  Should I fight with him, son?"

20  Q.   "No, Father, I told you don't fight with him."

21  A.   "Yes, I tried to convince him peacefully."

22  Q.   "No, no, no.  Between you and me, I want to get my aunt

23  on the line and speak with her and tell her -- What."

24  A.   "Listen to me.  Listen to me."

25  Q.   "Yes."

```
 1        "He doesn't listen to your aunt, he doesn't listen to

 2   anybody or anything.  He says, 'I want martyrdom.  I want to

 3   die.'"

 4   A.    Is that my line?

 5   Q.    I am sorry.  I apologize.

 6   A.    "He doesn't listen to your aunt, he doesn't listen to

 7   anybody or anything.  He is saying, 'I want martyrdom.  I want

 8   to die.'"

 9   Q.    "Let him go to hell and die."

10   A.    "He won't listen to your aunt or anyone else."

11   Q.    "Man, let him go to hell and die.  Do those who want to

12   die -- I mean, Ahmad Nimr died.  Abou Ibrahim died.  The world

13   won't stop.  But, one should leave people in agreement behind

14   him, that people are not in dissension because of him."

15        I just want to go back to page 8 for just a moment, and

16   if you can start with "shut down business."  Do you see that

17   at the third or fourth from the bottom?

18   A.    Yes, sir.  "Shut down business -- he wants to shut down

19   business?  By God, may God guide him, may God guide him."

20   Q.    "This is due to -- this is due to a lack of religion."

21   And it says crying there.  Right?

22   A.    Yes, it does.

23   Q.    Okay.

24   A.    "Why are you crying?  Stop crying."

25   Q.    "I am crying because I feel that you are still upset with
```

1  me."

2  A.   "No.  I'm not upset with you nor am I mad at you.  By

3  God, I'm not mad at you.  By God, I say prayers for you day

4  and night and say, 'May God bring you good people around you.

5  May God assist you.  May God make you successful.  May God

6  keep people's evil away from you.'  Why is Ahmad acting that

7  way?  He is neither educated, nor does he understand."

8  Q.   "Ahmad pretends that he is the one who understands

9  things, Father, while he doesn't."

10  A.   "I went to him.  I went to him at his house."

11  Q.   "By God, he didn't respect you.  By God, he didn't

12  respect you.  And he is circulating among the people that this

13  hospital belongs to El-Mezain's household."

14  A.   "He didn't respect me.  He didn't respect me.  He didn't

15  respect me, and neither did he tell me -- At the end I told

16  him, 'Do as you please.  God will make things easy for

17  Mohamed.  He will be with him.'  Ahmad didn't respect me

18  neither did he respect any other person."

19  Q.   Thank you.  Now let's go to page -- This is the last one.

20  Okay.  Can you see under the highlighted --

21  A.   Yes.

22  Q.   "Would Ahmad Nimr dare to do the same thing at Nasser

23  hospital.  Would Ahmad Nimr dare to do the same thing with a

24  governmental agency?  Let him fear God with his beard."

25       That is the mother; that is El-Mezain's mother, MM.

1   A.   Right.  "It is because his son is --"

2   Q.   "Give me my father so I can tell him that."

3   A.   "Son, don't upset yourself.  Forget all of them."

4   Q.   "Mother, he lies to you.  He lies to you, unfortunately.

5   His beard is leaky, his beard is leaky.  He doesn't possess

6   any religion, this guy."

7   A.   "Son, we're not intervening in anything.  May God be

8   pleased with you."

9   Q.   "Don't go to see him, don't greet him, and don't say to

10   him more than 'Peace be with you.  And peace be with you,

11   too.'  And I ask you, by God, to get my aunt to make a vow and

12   tell her, 'Be upset with him if he doesn't straighten up.'"

13   A.   "By God, I don't answer her, son.  By God, I don't answer

14   her, son."

15   Q.   "Give me my father, by God."

16   A.   "I went to her when he was in jail."

17   Q.   "Give me -- Okay, by God, he was giving people hard time

18   in Lebanon, he was giving people hard time in jail inside and

19   outside.  Mother, what do you want to tell me -- When a person

20   grows up, he should get wiser.  But he -- I ask almighty God

21   for forgiveness."

22       Now, Mr. El-Mezain's parents live in Gaza.  Correct?

23   A.   Correct.

24   Q.   So that is where they are during this conversation?

25   A.   It is my understanding.

1    Q.   And that family part is not on your demonstrative either.

2    Right?

3    A.   No.

4    Q.   Now, I want to turn to Elbarasse Search No. 29.  Do you

5    remember that document?

6    A.   If you hold it up --

7    Q.   Sure.  This is the Arabic?

8    A.   Yes, I recall that.

9    Q.   Okay.  And it is essentially a full 1990 fundraising

10   recap for IAP.  It is from IAP.

11   A.   To the OLF.

12   Q.   And it talks about money that has been raised by various

13   people, including Mr. El-Mezain?

14   A.   I think it is just three people--two Hamas and Mezain.

15   Q.   And this is 1990.  Right?

16   A.   Right.

17   Q.   It is seven years at least before the October 8th, 1997

18   designation.

19   A.   Right.  The foreign terrorist -- Yes.

20   Q.   And I just want to show you one notation here on page 2

21   of the translation where I am pointing.  Can you read that?

22   A.   Yes.

23   Q.   It says, "Abu Ibrahim took it."  Now, you don't think

24   that Mr. El-Mezain pocketed the money.  Right?

25   A.   No.

```
1    Q.    That he just forwarded it to the organization; that he
2    was responsible for taking the money that he raised and making
3    sure it got to the right place.
4    A.    I interpret that to mean that he took possession of the
5    money at the fundraiser.
6    Q.    And a bunch of these, if you look down at the bottom, and
7    they are all under Abu Ibrahim, who is Mr. El-Mezain.  Right?
8    A.    No, there is some --
9    Q.    No, I am just talking about from here down.
10   A.    Oh, from that point down, yes.
11   Q.    They are all Abu Ibrahim.  That is why the little line is
12   there.  Right?
13   A.    Right.
14   Q.    And that is Mr. El-Mezain?
15   A.    Right.
16   Q.    And we have I think six in a row Friday sermons.  Right?
17   A.    Right.
18   Q.    Okay.  So that would be at a mosque.  Correct?
19   A.    Right.
20   Q.    And there are -- all the same day.
21   A.    Right.
22   Q.    They are listed from Milwaukee, Cleveland, Toledo,
23   Detroit, Chicago, and New Jersey.
24   A.    Right.
25   Q.    Do you think he could be in all those places in one day?
```

1    A.    Probably not.

2    Q.    Now, do you know any arrangements, or if there were

3    arrangements with speakers in terms of whether they received a

4    commission on money they raised or expenses?

5    A.    I have seen some evidence of that.

6    Q.    Okay.  Do you know the amounts -- Do you know the figures

7    or the arrangements with each percentage or anything?

8    A.    No.

9    Q.    Okay.  And in fact, when this occurred there were no

10   designation statutes at all.  This is five years even before

11   the 1995 --

12   A.    Right.

13   Q.    And all the Mushtaha search videos that you put in or

14   that you talked about, Mushtaha Search No. 3, that is the one

15   with El-Mezain at the end talking about the developmental

16   programs, economic programs, the girls' high school.  Do you

17   recall that?

18   A.    I am trying to figure out which one -- Was that with the

19   other speakers?

20   Q.    That was with other speakers before.  I mean, it is the

21   one where at the beginning there is Mohammed Siam being

22   greeted and Jamil Hamami --

23   A.    When they are kissing on each other?

24   Q.    Yeah.

25   A.    I am familiar.

Q.   That is 1990 also?

A.   Yeah, I think that is '90.

Q.   Do you recall Mushtaha Search No. 11 and 12, the dates?

A.   No.  I am sorry.  I don't have them memorized by exhibit
number.

Q.   One is at the OLF.  If it has OLF, obviously it is going
to be before 1991.  Right?

A.   No.  It could be -- Probably.  It is -- I don't want to
say that is a hard and fast rule.

Q.   And the Dallas -- Do you remember the Dallas video,
Mushtaha No. 12, that is also 1990, '91?

A.   Is that the one where the guy comes dressed up with the
flag and holding the Quran in the air?

Q.   I don't recall that one.  I just know Mr. El-Mezain is in
that one.

A.   I would have to see a portion of it, or maybe you could
show me a bit of the transcript.  I don't recall which one
that is.

Q.   Okay.  Now, Elbarasse Search No. 28.  Right?  I will put
the English translation --

A.   Thank you.

Q.   Can you see that?  Can you read it?

A.   Yes.

Q.   Now, it is a handwritten Arabic original.  Right?

A.   Yes.

1    Q.    And it talks about -- It is essentially a handwritten

2    version of announcement for an event.  Right?

3    A.    Yes.

4    Q.    Do you know if this event ever took place?

5    A.    I don't know.

6    Q.    And just from the context, you would think it is during

7    the first Intifada.  Correct?  The name of the poem is "The

8    stone has spoken."

9    A.    Oh, I am sorry.  I thought you were trying to address a

10   specific year.  Yes, it would be sometime probably within the

11   first Intifada.

12   Q.    Which would be years before the 1997 designation.

13   A.    Yes.

14   Q.    And a couple of years even before the 1995 designation.

15   Right?

16   A.    Right.

17   Q.    With respect to InfoCom Search No. 35, the security

18   document.

19   A.    Yes.

20   Q.    Right?  There is a section -- I will put it on here.  Do

21   you see that one that is highlighted?

22   A.    Yes.

23   Q.    "Avoiding having the meetings at the homes of those who

24   are under watch."  Right?

25   A.    Yes.

```
 1    Q.    And in fact, in 1994, in the spring of '94 there was a
 2    meeting at Mr. Ashqar's house.  Correct?  It has been put in
 3    evidence through Agent Burns.  Right?
 4    A.    Are we talking the meeting with Zahar and Siam?  Which
 5    meeting are we talking about, sir?
 6    Q.    Yes, yes.
 7    A.    Yes.
 8    Q.    And you see that section there?
 9    A.    Yes.
10    Q.    The highlighted section, it talks about suitable cover
11    for travel?
12    A.    Yes.
13    Q.    Right?  And it says, "Commerce, tourism, visiting
14    relatives, and supporting with documents, tourist brochures,
15    commercial samples, catalogs."  Right?
16    A.    Right.
17    Q.    Now, you are aware.  Right?  That Jamil Hamami came to
18    the United States in 1998 and again in '99 for the United
19    States Information Agency.  Correct?  That was the sponsor.
20    A.    I don't know who the sponsor was, but I heard that he
21    came here.
22    Q.    The United States Information Service.  I am sorry.  Do
23    you want to --
24              MR. DRATEL:  If I may refresh his recollection?
25              THE COURT:  Yes.
```

1          MR. DRATEL:  This is in evidence.  This is

2    Defendants' No. 87.

3          THE COURT:  All right.

4          THE WITNESS:  Do you mind if I move this?

5    Q.  (BY MR. DRATEL)  Sure.  I am not going to discuss the

6    entire exhibit.  I don't know if you are reading --

7    A.   Very good.

8    Q.   My initial question is the United States Information

9    Service was the sponsor of his trips.  Correct?

10   A.   That is what it appears to be.

11   Q.   Yes.  And this is one of the pages, and I am going to

12   highlight -- Do you see the top where it says United States

13   Information Service up here?

14   A.   Yes.

15   Q.   Can you read that?

16   A.   Yes.

17   Q.   And do you see what I am highlighting here?  It says,

18   "Our office will provide the ticket for travel to the U.S. and

19   per diem to cover hotel and meal costs"?

20   A.   Yes.

21   Q.   Now, this is October 28th, 1998.  Right?

22   A.   Right.

23   Q.   So it is in the time period of both designations, the

24   1995 designation of Hamas and the 1998 designation -- The 1998

25   designation of Hamas.  Correct?

1    A.    No, sir.  It was '97.

2    Q.    I am sorry.  '97.  Yes.  Thank you.  It is within the

3    period of both?

4    A.    Right.

5    Q.    And so the United States during this period paid for his

6    ticket.  Right?

7    A.    It said it would pay, yeah.

8    Q.    And he came here.  Right?

9    A.    Actually I don't have any independent knowledge of that.

10   Q.    And would -- You put in evidence with an American Express

11   No. 2, you showed those receipts where back in 1990 or from

12   1992 there was a trip that Holy Land paid for Jamil Hamami.

13   Right?

14   A.    Right.

15   Q.    And that was four years before even the first

16   designation.

17   A.    Right.

18   Q.    Okay.  And I just want to show you here, do you see

19   that--February 5th, 1999?

20   A.    I do.

21   Q.    And it is to Mr. Hamami, Sheikh Jamil Hamami at the

22   Doubletree Park Terrace in Washington, D.C.

23   A.    Yes.

24   Q.    It says, "It is a pleasure to welcome you to Washington,

25   D.C. and to the United States."

A.   Yes.

Q.   Right?  And it says later in that paragraph, "In
cooperation with the U.S. Information Agency"?

A.   Yes.

Q.   And this is February 17th, 1999 from the same exhibit,
"Dear Mr. Hamami, welcome to Cincinnati.  The International
Visitors Council is pleased to coordinate your Cincinnati
program.  Your packet includes" -- Here it says, "Your packet
includes a map of information about the city, which we hope
will be helpful to you."

     Was that part of the security document?  Was that
according to the security document that they did this?

A.   No.

Q.   Now, also with respect to the security document, now,
Holy Land Foundation stored numerous boxes, how many boxes, at
InfoCom?

A.   I am guessing 20 maybe.  Probably less than that.  Well,
are you talking T-shirts and coffee mugs?

Q.   That was also there, too.  Right?

A.   Right.

Q.   And they were stored across the street from the Holy Land
Foundation?

A.   At InfoCom, yes.

Q.   At a firm that was run by one of the founders of Holy
Land.  InfoCom was run by one of the founders of Holy Land.

1    A.    Right.

2    Q.    Ghassan Elashi.

3    A.    Right; Ghassan Elashi.

4    Q.    And it is a firm that Holy Land had a written contract

5    for use of that space.  Right?

6    A.    Yes.

7    Q.    That Holy Land kept in its records?

8    A.    Yes.

9    Q.    And that around these boxes were also -- in that vicinity

10   where these promotional items--T-shirts, mugs, all these

11   things with Holy Land identification on it?

12   A.    Yes.

13   Q.    And in these records were all sorts of documents.  Right?

14   Telephone bills.  Right?  Included?

15   A.    Yes.

16   Q.    American Express bills?

17   A.    I think there were some, yes.

18   Q.    And some of these were ten years old at the time the

19   search occurred in 2001.  Right?

20   A.    Yes.

21   Q.    Some of them were 10, 11, 12 years old, some of them.

22   Right?

23   A.    Approximately, yes.

24   Q.    Now, I want to talk just about speakers.  You talked a

25   lot about speakers.  If you recall with respect to Holy Land

1    Search No. 27, that is the Abu Zant audiotape.  Right?  Do you
2    recall that one?
3    A.    Yes.
4    Q.    I am not going to get into the content.  That is from
5    October '94.  Right?  And that is the one that you initially
6    made a mistake that said that Oslo was at that time, when in
7    fact Oslo was a year earlier.  Right?
8    A.    Right.  Oslo was '93.  The peace treaty with the
9    Jordanians was '94.  I think there was some confusion on that.
10   Q.    It was a failure of memory.  It is ten years ago.  It is
11   almost 15 years ago.
12   A.    I wouldn't call it a failure of memory.  I just confused
13   the dates.  That is all.
14   Q.    Okay.  And with respect to El-Mezain Wiretap No. 1, which
15   are the faxes.  Right?
16   A.    Yes, sir.
17   Q.    And you put in three pages.  You talked about three
18   pages.  The whole exhibit is in, but you talked about three
19   pages.  Some were fliers at the end for the telephone
20   conference.  Do you recall?
21   A.    The Zahar conference?
22   Q.    Yeah.  I will show you.
23   A.    Okay.
24   Q.    There are two conferences, rather.  I am sorry.  Just
25   this conference.

1    A.    Right.  There were several conferences.  I just wanted to

2    confirm which one you were talking about.  Right.  I am

3    familiar with that.

4    Q.    Right.  And that is faxed from the IAP.  Correct?

5    A.    Right.

6    Q.    Right?

7    A.    Right.

8    Q.    And that is September 16th, 1994?

9    A.    Right.

10   Q.    Right?  That is three years before the designation, the

11   October 8, 1997 designation.

12   A.    Right.

13   Q.    Now, do you recall Baker Wiretap No. 21?

14   A.    No.

15   Q.    Okay.

16   A.    Can you show me a front page.

17   Q.    Yeah, yeah.  That is what I am looking for here.

18   A.    Yes, sir.

19   Q.    Do you see that one?

20   A.    Right.

21   Q.    Okay.  Now, one of the speakers there is Abdullah Gul.

22   Right?

23   A.    Right.

24   Q.    And he is currently the president of Turkey.  Right?

25   A.    Right.

1   Q.   And he is also -- And you served two tours in Turkey.

2   Right?

3   A.   Right.

4   Q.   And he was the first Turkish president to visit Armenia

5   this past year.  Right?  He did that?

6   A.   I don't know about that.

7   Q.   And there is another person mentioned.  Do you see where

8   it says, "We are still trying to get through to Sarajevo to

9   get either brother Izetbegovic or his advisor"?

10  A.   I see that.

11  Q.   And Mr. Begovic became the president of

12  Bosnia-Herzegovina in 1990.  Right?

13  A.   I wasn't aware of that.

14  Q.   You didn't check who he was?

15  A.   He wasn't on the speakers list.

16  Q.   But he was supposed to be part of this conference call.

17  A.   That is what it says.

18  Q.   Yeah.  And Qadi Hussein?

19  A.   Who?

20  Q.   Qadi Hussein, another person on the call?

21  A.   Yes.

22  Q.   He is the head of a political party in Pakistan to this

23  day.  Right?

24  A.   Right.

25  Q.   Now, with respect to Baker Wiretap No. 23, No. 22 and 23,

1    just to show you what they are.  That is for the two

2    conference calls.  Right?

3    A.    Right.

4    Q.    And No. 23 is the face page of the conference call for

5    that right side of the page that is in Arabic?

6    A.    Right.

7    Q.    And that was the conference call that was in Arabic.

8    Right?

9    A.    Right.

10   Q.    And isn't it a fact that Sheikh Mohammed Siam and Sheikh

11   Al-Bitawi don't speak English, and that is why it is in

12   Arabic.

13   A.    I don't know whether they speak English or not, sir.

14   Q.    Now, you also put in, and I don't think you can see it on

15   the Xerox, but do you recognize this is HLF Search No. 88?

16   A.    Yes.

17   Q.    And this is the platform for the Islamic Action Front in

18   Jordan.  Correct?  It is a party platform.

19   A.    Right.

20   Q.    It is a political party.

21   A.    Right.

22   Q.    And we have photos in of people who are actually on the

23   platform running for office.  Right?

24   A.    Yes.

25   Q.    And many of them in fact have been elected from time to

1    time to the Jordanian parliament.

2    A.    Right.

3    Q.    And it says 1993 to '97, but in fact this is 1993, this

4    document, because they are talking about the 1993 to 1997

5    term.  Right?

6    A.    That makes sense.

7    Q.    And I want to talk about some of the people in here.  Abu

8    Zant, he is one of the people who is in here.  Right?

9    A.    Yes.

10   Q.    And he was elected to the parliament?

11   A.    Yes.

12   Q.    Al-Kofahi, elected to the parliament?

13   A.    Yes.

14   Q.    Hamzah Mansour?

15   A.    Yes.

16   Q.    And in the platform, you read from parts that talk about

17   the position on Palestine.  Correct?

18   A.    Yes.

19   Q.    But it doesn't mention Hamas.  Correct?

20   A.    I don't know if they mention it indirectly.

21   Q.    And the platform, by the way, is a long document.  Not

22   all of it has been translated into English.  Right?

23   A.    I don't know if the entire thing has been translated.

24   Q.    It is a whole list of legislative objectives and the

25   objectives of the party for the electorate in Jordan to make a

1    determination.  Right?

2    A.    That is my understanding.

3    Q.    And by the way, the Muslim Brotherhood is permitted in

4    Jordan.  Right?  It is active.

5    A.    It is.

6    Q.    And that is what the Islamic Action Front, to an extent,

7    embodies in the political arena.

8    A.    No, I think it is -- not embodies.  I don't think that is

9    strong enough.

10   Q.    Now, the Islamic Action Front is not designated here in

11   the United States.  Right?

12   A.    No.

13   Q.    And the Muslim Brotherhood is not designated here in the

14   United States.  I mean, there is no terrorist -- specially

15   designated terrorist or foreign terrorist organization for

16   Muslim Brotherhood.  Right?

17   A.    No.

18   Q.    Or for -- no meaning correct.  There is no designation?

19   A.    Say that again.

20   Q.    There is no designation for the Muslim Brotherhood.

21   Right?

22   A.    No, just -- No.  The answer is no.

23   Q.    Well, I am saying is there a designation for the Muslim

24   Brotherhood?

25   A.    I said the answer is no.

1    Q.   I just want to make sure I phrased the question properly.

2    And the same is true for the IAF, for the Islamic Action

3    Front.

4    A.   Correct.

5    Q.   An emam, that is an Arabic term for a spiritual prayer

6    leader in the mosque?

7    A.   I think it has greater meaning than that, depending on

8    what you are talking about.  You could also be talking about

9    the 12 emams and the Shia.

10   Q.   So the answer --

11   A.   So there is -- It also could mean leader in a sense, so

12   there is variations of the definition.

13   Q.   So it could have a larger religious meaning as well, in

14   addition to just a community meeting?

15   A.   Yes.

16            MR. DRATEL:  Thank you.

17            THE WITNESS:  You are welcome.

18            MS. CADEDDU:  On behalf of Mr. Abdulqader, I have no

19   questions of this witness.

20            THE COURT:  Mr. Jacks, any redirect?

21            MR. JACKS:  Mr. Lewis, could you post the Marzook

22   phonebook on the screen, please?

23                    REDIRECT EXAMINATION

24   By Mr. Jacks:

25   Q.   Agent Miranda, do you see the depiction of the Marzook

1   phonebook on the screen?

2   A.   Yes, sir.

3   Q.   And that is the picture of the cover?

4   A.   Yes, sir.

5   Q.   You were asked about the calls -- Just one moment.  For

6   the record, I have posted on the easel Demonstrative No. 16.

7   Is that the demonstrative that shows the phone calls going

8   between individuals or telephone numbers assigned to

9   individuals and to different Hamas officials?

10  A.   Just some of the phone calls, but yes.

11  Q.   Okay.  And you were asked about this call from Mr.

12  El-Mezain's telephone to Moustafa righteousness.  And again

13  Moustafa righteousness, his relevance in this case is what?

14  Who is he?

15  A.   He was the Hamas representative in Syria.

16        MR. JACKS:  Okay.  And if you would, I believe it

17  was page 58, Mr. Lewis, and the bottom of the page.

18  Q.   (BY MR. JACKS)  And Agent Miranda, is this entry in Mousa

19  Abu Marzook's phonebook one of the pieces of evidence that is

20  used to link up this telephone call --

21  A.   Yes.

22  Q.   -- to Moustafa righteousness?  And the name is obviously

23  -- I think you have testified, and others, sometimes the names

24  are spelled differently in English?

25  A.   Right.

1    Q.    But are intended to convey the same name.

2    A.    Correct.

3    Q.    And you said the number that actually appeared on the

4    phone bill on Mr. El-Mezain's phone bill was this 1159 number?

5    A.    11159.

6    Q.    Okay.

7    A.    I am sorry.  With the Syrian prefix.

8    Q.    Okay.

9          MR. JACKS:  Agent Lewis, could you zoom out, please?

10   Q.    (BY MR. JACKS)  And Agent Miranda, at the top of this

11   page there is a page 21, and what does that reference?

12   A.    Page 21 of Marzook's phonebook.

13   Q.    The original phonebook?

14   A.    Correct, the original phonebook.

15         MR. JACKS:  Agent Lewis, could you go to page 21,

16   please, of the exhibit or the phonebook?  I believe it would

17   be page 21 of the exhibit.

18   Q.    (BY MR. JACKS)  All right.  Now, Agent Miranda, does it

19   appear that the entries in that phonebook are grouped

20   together?

21   A.    Yes.

22   Q.    All right.  And so that there are phone numbers -- each

23   entry has the capacity for three lines?

24   A.    Right.

25   Q.    Okay.  And then in the other column there would be

1    corresponding information.  Is that correct?

2    A.    Right.

3    Q.    Okay.  And so if you go back to page 58, and are those

4    kind of broken up there in the entry as well?

5    A.    Right.

6    Q.    Okay.  You were questioned about some telephone calls

7    that were between the Defendant Mohammad El-Mezain and his

8    parents, and I think one of them was between Mohammad

9    El-Mezain and a person represented to be his brother.  Do you

10   recall being asked about those?

11   A.    Yes.

12   Q.    And I believe Mr. Dratel asked you if those calls were

13   reflected on Demonstrative No. 16, and your answer was they

14   were not.  Is that correct?

15   A.    Yes.

16   Q.    What is the title of Demonstrative No. 16?

17   A.    HLF phone calls to top Hamas officials.

18   Q.    Okay.  Any indication -- I assume that there is no

19   indication that Mohammad El-Mezain's parents are top Hamas

20   officials.

21   A.    No.

22   Q.    Nor his brother?

23   A.    No.

24   Q.    I want to ask you a couple of questions about those calls

25   which you read, and it was represented to you that the person,

1   one of the persons that was being talked about was this person

2   Ahmad Nimr.  Do you recall that?

3   A.    Yes, sir.

4   Q.    And was there a reference in that phone call to the fact

5   that he had been in jail?

6   A.    Yes.

7   Q.    And then there was a reference to an individual I believe

8   by the name of Ismail who was his son and was working at this

9   hospital.  Is that correct?

10  A.    The one at the lab?

11  Q.    Yes.

12  A.    Yes.

13  Q.    I just want to show you a part that was read.  Are you

14  able to see that?

15  A.    Yes, sir.

16  Q.    And just that last statement.  Let me move it over so you

17  can see who is speaking.  MO is Mohammad El-Mezain?

18  A.    That is right, sir.

19  Q.    And he is speaking and he says, "He was in the lab and he

20  applied and he used to get out the wrong results."  And is

21  Mohammad El-Mezain relating information about this individual

22  Ismail and the conversation that Mohammad El-Mezain had with

23  Ahmad Nimr about his son Ismail?

24  A.    Right.

25  Q.    And let me just, then, go to the next page.

A.    Or he is relaying a conversation concerning the topic.

Q.    Okay.  Well, let me go to the next page.  And do you see

the continuation of Mr. El-Mezain's statement, if you would

see where it says unintelligible, and then it says, "He said."

A.    Yes.

Q.    Can you read that sentence?

A.    "He said that Sheikh Ahmad is saying, 'If you don't keep

quiet I will stand up in the hospital and say this hospital is

ours, and that hospital belongs to so and so people, and those

who like it fine, and those who don't like it should leave.'"

Q.    Okay.  The reference to "ours," did you take note of that

use of the possessive pronoun?

A.    I have discussed this with Agent Burns.

Q.    All right.

        MR. DRATEL:  Objection, Your Honor.

Q.    (BY MR. JACKS)  But that was the possessive pronoun that

was used?

A.    Yes.

Q.    And does it appear that Ahmad Nimr was threatening to

reveal something about the hospital?

A.    That is exactly what I was trying to say, yes.

Q.    And was his threat, from your reading of the

conversation, an effort to keep his son Ismail employed at the

hospital?

A.    Precisely.

1    Q.   And in that same conversation between Mohammad El-Mezain

2    and this person Dawud El-Mezain represented to be his brother,

3    let me direct your attention to a part that you read.  And if

4    you -- Do you see where the brother says, "He needs a

5    beating"?

6    A.   Yes, sir.

7    Q.   And Mr. El-Mezain says, "Who needs a beating?"

8    A.   Yes, sir.

9    Q.   And he says, "He is the one who gives beatings, my

10   brother."  And then you see the statement by Mohammad

11   El-Mezain that begins, "By Almighty God, my brother."  Would

12   you read that?

13   A.   "By Almighty God, my brother, I don't know whom to talk

14   to, honestly.  By God, if you know someone at your end whom he

15   would have regard for, tell him to be quiet before the

16   hospital" --

17   Q.   That is fine.

18            MR. DRATEL:  What page is that, Mr. Jacks?

19            MR. JACKS:  Page 9.

20   Q.   (BY MR. JACKS)  Now, you were questioned about some of

21   the persons that were on the speakers list and some of the

22   persons that were in the conference call.  One of them that

23   you were asked about is this person Abdullah Gul who was from

24   Turkey.  And you testified that he was elected to be the

25   president of Turkey.  And what party is he a part of in

1    Turkey?  What political party?

2    A.    The Justice and Development Party.

3    Q.    And is that an Islamist party in Turkey?

4    A.    Yes.  That party is derived from the Refah Party, which

5    is an Islamist party.

6    Q.    Will you spell Refah?

7    A.    R-E-F-A-H.

8    Q.    Thank you.  You were also asked about individuals in the

9    Islamic Action Front and whether some of those persons on the

10   speakers list in fact were elected to parliament.  And you

11   said that the Islamic Action Front is -- I believe you were

12   asked is it some relation to the Muslim Brotherhood, and you

13   said that is not a strong enough statement.  What is the true

14   answer that you would give regarding the Islamic Action Front

15   and the Muslim Brotherhood in Jordan?

16   A.    Yes.  I was asked if it embodied, and I said it wasn't

17   strong enough.  It has already been described as the ally of

18   Hamas in Jordan.

19   Q.    Well, as far as the Islamic Action Front --

20          MR. DRATEL:  I don't think that was the question.  I

21   asked -- my question was about Muslim Brotherhood and IAF, not

22   about Hamas, so I don't know why he put Hamas.  I don't

23   understand that to be the question.

24          THE COURT:  I think it was brought up by the

25   question that you asked and then he asked another question

1    related to that.  Go ahead.

2    Q.   (BY MR. JACKS)  My question is, is the Islamic Action

3    Front the same as the Muslim Brotherhood in Jordan?

4    A.   Yeah, absolutely.

5    Q.   And again, Hamas, how does it describe itself as relates

6    to the Muslim Brotherhood?

7    A.   Hamas is the Palestinian wing of the Muslim Brotherhood.

8    It is right there in the charter.

9    Q.   So that statement is in their charter that we have seen

10   in this case?

11          MR. DRATEL:  Asked and answered, Your Honor.

12          THE COURT:  Overruled.  Go ahead.

13          THE WITNESS:  Those are Hamas' words.

14   Q.   (BY MR. JACKS)  Is it uncommon or rare for Middle Eastern

15   politicians to support and praise Hamas?

16   A.   No, not at all.

17   Q.   In fact, did Saddam Hussein praise Hamas?

18          MS. HOLLANDER:  Objection, Your Honor.

19          THE COURT:  Sustained, counsel.  We are getting far

20   afield.

21   Q.   (BY MR. JACKS)  With regard to many of these politicians,

22   have we heard speeches and remarks where they have praised

23   Hamas?

24          MS. HOLLANDER:  I am going to object.

25          THE COURT:  I am going to sustain if you ask

1   generally.  He asked about some specific names on the list.

2   If you want to ask about those.

3              MR. JACKS:  That is what I was implying.

4              MS. HOLLANDER:  Your Honor, I have a motion to make

5   at an appropriate time.

6              THE COURT:  All right.

7   Q.   (BY MR. JACKS)  Have we heard, for example, individuals

8   that have praised Hamas, politicians, persons that are

9   politicians in this case?

10             MS. HOLLANDER:  Your Honor.

11             THE COURT:  Counsel, I still think that is a little

12  too broad.  Which politicians?

13  Q.   (BY MR. JACKS)  Was Deeb Anees at one time elected to the

14  Jordanian parliament?

15  A.   Yes.  He is Islamic Action Front.

16  Q.   And in fact, are many -- Is Hamas now the -- Or prior to

17  the summer of 2007, were many of these Hamas individuals in

18  fact elected to the Palestinian parliament?

19  A.   Yes.  In fact, several of the speakers on the overseas

20  speakers list were members of the Hamas government.

21  Q.   After January of 2006.  Is that correct?

22  A.   Right.  I am talking not the municipal elections but the

23  national.

24  Q.   So persons that have been shown or talked about in this

25  case in fact now have some kind of government position in the

68

1    Palestinian Authority.  Is that correct?

2    A.    Yes.  For instance, Mahmoud Zahar, who we have seen the

3    videos of the early fundraising, listing on the overseas

4    speakers, there was a couple of exhibits we showed this

5    morning, he is essentially the Hamas government's foreign

6    minister.

7    Q.    You were asked about the documents, the Holy Land

8    Foundation documents found inside InfoCom.  Correct?

9    A.    Yes, sir.

10   Q.    And you indicated -- Let me ask you, when the search

11   warrant was being prepared for InfoCom, were you expecting or

12   anticipating that you would find Holy Land Foundation

13   documents in there?

14          MR. DRATEL:  Objection, Your Honor.  We don't have a

15   foundation at this point.

16          THE COURT:  He was asking "Were you expecting."  He

17   may answer.

18          MR. DRATEL:  I also think it is leading as well.

19          THE COURT:  Overruled.  Go ahead.

20          THE WITNESS:  I was aware of a close relationship

21   between InfoCom and the HLF.  I was hopeful, but I was quite

22   honestly surprised at what I found at InfoCom as it relates to

23   the Holy Land Foundation.

24   Q.    (BY MR. JACKS)  I want to clarify something with you.  We

25   have made reference in this case to the Baker wiretap, and I

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

1   think it is sometimes Shukri Abu Baker wiretap and the Holy

2   Land Foundation wiretap.  And if you could explain if -- Are

3   some of the Shukri Abu Baker wiretap calls calls that were

4   from electronic intercepts at the Holy Land Foundation office?

5   A.   Phrase that one more time.  I want to make sure I get it

6   right.

7   Q.   Let me rephrase it another way.

8          THE COURT:  Before you do that, let's take the

9   morning break.  Let's take 20 minutes.

10         (Whereupon, the jury left the courtroom.)

11         THE COURT:  Counsel, come on up.

12         (The following was had outside the hearing of the

13         jury.)

14         MR. JONAS:  I wanted to give an update on the issue

15  I discussed earlier.  I spoke with John McPherson, who is head

16  of the Litigation Division of the Office of General Council of

17  the CIA.  I related to him our conversation from this morning

18  with regard to Mr. Cline's suggestion that Defense attorneys

19  travel to Virginia to view the material.  As suspected, no.

20  With regard to Your Honor viewing the material, not a problem.

21      I asked him about the index.  As I said earlier, he

22  doesn't think it is going to be very helpful, but he is

23  willing to print it up and secure fax it down here.

24      I also suggested to him about the call that maybe you and

25  he speak directly during lunch.  He is completely fine with

that.

So Your Honor, what time do you want to do that?  I can pass the phone number for him to Ms. Helms.

THE COURT:  We will probably break around 12:30, like we usually do, so any time between 12:30 and 1:00 our time.

MR. JONAS:  And do you want to initiate the call yourself?

THE COURT:  I can do that.  We will do that and call.

MR. CLINE:  Your Honor, this is what I would say about the call.  I have no problem with Your Honor speaking to him without us present.  What I would ask is that to the extent that the call is unclassified, and I suggest it will be, that we get at least a summary of what was discussed.

THE COURT:  Sure.

MR. JONAS:  That is fine.  And Mr. Cline raises a point.  When I mentioned to Mr. McPherson about the call with Your Honor, he didn't say what I am about to say, but in my experience in dealing with the CIA, they often like to speak on secure lines.  So just an FYI, he may at some point in the conversation suggest that you move to a secure line.  I don't know if Your Honor has one.

THE COURT:  I don't know what they are, frankly.

MS. HOLLANDER:  I don't think there are any in the

1    building.

2              MR. JONAS:  In the U.S. Attorney's Office there is a

3    secure line.  If Your Honor needs, we can make arrangements

4    for you to make the call from down there.  And we won't be

5    present during the call so it is fair that both sides aren't

6    there.

7              THE COURT:  Okay.  And the call you think -- What

8    would that be about?

9              MR. JONAS:  Just for you to make arrangements for

10   him, for Your Honor to review the materials that are in

11   question, so you can talk to him about whether you want it in

12   paper or computer form or if you want this guy to come down

13   here.

14             THE COURT:  I guess our court security officer, she

15   mentioned, I had talked about that when we were working on the

16   order based on the motion, and they oftentimes want to be

17   here.

18             MR. JONAS:  I can give her a heads up.

19             THE COURT:  I don't have a problem.  Whatever we

20   need to do.

21        Are we done with that one?

22             MR. JONAS:  I think so.

23             MS. HOLLANDER:  Your Honor, I want to move for a

24   mistrial on the basis of Mr. Jacks mentioning Hussein.  Your

25   Honor has been very clear throughout this case that we are not

1    going to bring these things in, and he did it, and he did it

2    in a leading manner.  There was no reason for it, no excuse

3    for it.  It was an attempt to inflame this jury and add Saddam

4    Hussein, which he knows brings in all the fears that everyone

5    has.  And Your Honor has been so clear about this.  And I

6    think it was intentional on Mr. Jacks' part, and I move for a

7    mistrial.

8             MS. MORENO:  I would also add, Your Honor -- And I

9    would join in the motion.  I would also add that there are

10   jurors, specifically my recollection is Juror Fabela who

11   currently has a son in Iraq, and so this just exacerbated the

12   prejudice and the aggravation, so I would join in the mistrial

13   motion.

14            MS. CADEDDU:  On behalf of Mufid Abdulqader, I would

15   also.

16            MR. DRATEL:  And on behalf of Mr. El-Mezain.

17            MR. WESTFALL:  I will too, Your Honor.

18            MR. JONAS:  If I can briefly address that, I don't

19   know if Mr. Jacks has something else to address, there is

20   material contained within the Holy Land documentation we

21   haven't admitted yet which we plan on admitting, subject to

22   Your Honor's ruling, that has Saddam Hussein's name as

23   providing $10,000 to the same family members that the HLF is

24   supporting themselves, so I do think there is a connection

25   between him in this case.

1          MR. JACKS:  The other thing is, Your Honor, Mr.

2     Dratel purported to reference that Abdullah Gul is now the

3     president of Turkey and this other man is head of a political

4     party, leaving the impression that high ranking government

5     officials, you know, wouldn't -- you know, the inference being

6     they are respectable, therefore --

7          THE COURT:  I understand.  I am going to deny the

8     motion for mistrial.  It was opened up, that area of

9     questioning was opened up by what Mr. Dratel's questioning

10    was, that area.  But, you know, we don't want to mention

11    Al-Qeada or mention those kinds of things.  I think before you

12    ask about those individuals, you need to go ahead and approach

13    the bench before you mention those types of individuals.

14         MS. HOLLANDER:  Does that include Hussein?

15         THE COURT:  That includes Hussein.

16         MS. CADEDDU:  I would point out that the people Mr.

17    Dratel -- I want to make sure the record is clear on this.

18    The people he was talking about, Mr. Gul and Mr. Qadi and Mr.

19    Begovic, those people were specifically named in a Holy

20    Land --

21         THE COURT:  The record will be clear, but I don't

22    think he is limited to that because of the impression he was

23    trying to lay.  And he is correct on that.  So you are not

24    necessarily limited to those names.  I wanted to limit it to

25    some extent to the names that were mentioned, that were named

1   in those papers, but you were clearly trying to lay an

2   impression that because they were involved in politics -- he

3   was trying to explain that just because they are in politics

4   does not mean they aren't tied in with Hamas.  I think it was

5   fairly raised by that.  But we don't need to get into Hussein

6   or Al-Qeada or those kinds of issues.

7           We will be in recess.

8                   (Brief Recess.)

9           THE COURT:  Mr. Jacks?

10          MR. JACKS:  Thank you, Your Honor.

11  Q.   (BY MR. JACKS)  Agent Miranda, I wanted to clarify

12  something, and I think I started to ask you that before the

13  break, but with respect to the references to the Shukri Abu

14  Baker wiretap and the Holy Land Foundation wiretap, did

15  they -- Is that a naming distinction as opposed to a location

16  distinction?

17  A.   It is more of a naming distinction.  It used to be that

18  there was -- the Bureau made a big deal about always saying on

19  the title blocks of our paperwork that, you know, that you had

20  to have individuals as opposed to organizations.  So the title

21  of a FISA kind of reflected that attitude that it would be the

22  Baker FISA.  Does that make sense?  I don't know if it makes

23  sense, out of the bureaucracy that I live in.

24  Q.   So while it may be referred to as the Baker wiretap, it

25  actually was a wiretap that existed at the offices of the Holy

1    Land Foundation and also on the home telephone of Shukri Abu

2    Baker.

3    A.    Right.  The logic eventually caught up with the

4    paperwork.

5    Q.    So later on the terminology changed, and then as to the

6    wiretap at the offices that became or was referred to as the

7    Holy Land Foundation wiretap?

8    A.    Yes.

9    Q.    Later in time during the lifetime of that electronic

10   intercept?

11   A.    Right.

12   Q.    All right.  During your cross examination you were asked

13   regarding -- you were questioned regarding a couple of

14   exhibits by Mr. Westfall.  The first one was Holy Land

15   Foundation Search Exhibit No. 23, which I am just holding up

16   the original.  And that is this multi-page, 231-page document

17   which has been identified I believe by Agent Burns actually as

18   a list of individuals' names and dollar amounts and cities.

19   And it has been interpreted to represent who is being credited

20   for donations or money raised.  Is that a fair statement?

21   A.    Right.  Or possibly sponsoring of children or families.

22   Q.    Right.  But with regard to Government's Exhibit No. 23,

23   this is in the original form in which it was -- This document

24   was an electronic form when it was originally located?

25              MR. WESTFALL:  Your Honor, I am just going to object

1    to the leading nature of the question.

2          THE COURT:  Do you want to rephrase?

3    Q.   (BY MR. JACKS)  Government's Exhibit No. 23, what form

4    was it in?  Was it in paper form as first found or electronic

5    form found on the computer?

6    A.   On electronic form on the computer.

7    Q.   When that electronic form is printed out, is that what is

8    represented by Government's Exhibit No. 23?

9    A.   Right, the chronological version, yes.

10   Q.   All right.  And it goes from -- The oldest entry

11   reflects--and if you need to look at it, I will be happy to

12   show it to the you--1989, and then the most recent entry

13   reflects something in the year 2000, August of 2000.  Is that

14   correct?

15   A.   That is correct.

16   Q.   And then you were asked about a Defense exhibit, I

17   believe it was No. 1087, which is a version of this

18   Government's Exhibit HLF Search No. 23 wherein the entries had

19   been re-sorted, if you will, into alphabetical order.  Is that

20   correct?

21   A.   Correct.

22   Q.   And it still had the same entries so it would have the

23   same -- Would it still have the same chronological range, if

24   you will, from 1989 to 2000, although in alphabetical order?

25   A.   Right.  Now it was just sorted by who the speakers were.

1    Q.   All right.  And as a part of your investigation, if you

2    will -- And just --

3              MR. JACKS:  May I approach the witness, Your Honor?

4              THE COURT:  Yes.

5    Q.   (BY MR. JACKS)  I am just going to show you HLF Search

6    No. 23.  And my question is, does that document have a total?

7    I mean, is there any math that appears to have been done, or

8    is it just entries so the numbers -- Are the numbers added up

9    and totaled anywhere in there?

10   A.   No.

11   Q.   I want to direct your attention to Elbarasse Search

12   No. 29.  And Agent Miranda, this is a document which you

13   testified about on direct examination.  And I believe you were

14   also asked about this on cross examination by Mr. Dratel.

15   Correct?

16   A.   Yes, sir.

17             MR. JACKS:  Agent Lewis would you go to the fourth

18   or fifth page which is in English?

19   Q.   (BY MR. JACKS)  And Agent Miranda, is this a -- Just tell

20   us again what this is, this page of the exhibit.

21   A.   Well, this is a letter on the letterhead of the Islamic

22   Association for Palestine dated December 19th, 1990, so

23   clearly it is at the end of the year.  It is to the director

24   of the Occupied Land Fund.  And the IAP is saying, "In

25   reference to the ten percent we agreed upon last October to be

1   paid by the Occupied Land Fund to the Islamic Association for

2   Palestine, for the expenses that the IAP incurred in the

3   enclosed activities that they performed on behalf of the

4   Occupied Land Fund," and they mention that they basically

5   raised $396,880, and so they wanted their ten percent.

6            MR. JACKS:  And if you would, Agent Lewis, go to the

7   next page, please.

8   Q.  (BY MR. JACKS)  And does this exhibit contain a reference

9   to who the speakers were that were a part of this fundraising

10  tour or campaign?

11  A.   Yes.  I testified previously that this includes then

12  Hamas figure Jamil Hamami, also current Hamas figure Mahmoud

13  Zahar, and Abu Ibrahim, who is the Defendant Mohammad

14  El-Mezain.

15  Q.   And just to go back to what was -- Whether it was

16  Defendants' Exhibit No. 1087 or Government's Exhibit HLF

17  Search No. 23, did you look at the two exhibits and compare it

18  to this exhibit to do a comparison?

19  A.   You mean this exhibit to this exhibit?

20  Q.   Yes.

21  A.   Yes.

22  Q.   And you are pointing --

23  A.   I am not sure that is clear to the Court.  Meaning the

24  exhibit on the screen to HLF Search No. 23, yes, I have done

25  that comparison.

1  Q.   And the exhibit on the screen is HLF Search No. 29.  And

2  in doing that comparison, did you find any indication that

3  this $390,000 was included in that list?

4  A.   No.  Actually there was only one entry in this for 1990,

5  and it was for Shukri Baker for $3,000, which falls kind of

6  short of $396,000.

7  Q.   Let me direct your attention to --

8        MR. JACKS:  Agent Lewis, if the you would post what

9  has been admitted as InfoCom Search No. 23.

10 Q.   (BY MR. JACKS)  Agent Miranda, this is an exhibit that

11 you talked about on your direct examination.

12       MR. JACKS:  And the bottom part of the page, Agent

13 Lewis.

14 Q.   (BY MR. JACKS)  And does that have a heading for

15 conference call?

16 A.   Yes, sir, it does.

17 Q.   And does that document purport to refer to a conference

18 call that was played during this trial?

19 A.   No.  We didn't play this conference call, sir.  I don't

20 believe we captured this one, but we spoke of this one.

21 Q.   All right.  I am sorry.  Then spoke of it.  All right.

22 And does it reflect a dollar amount that was supposedly

23 collected?

24 A.   Yes.  It says right there on the sentence starting with

25 "The performance was very good.  We collected $18,500.  This

1    is what we knew over the phone while the conference was going

2    on."

3    Q.    And who were the guests or the speakers that were

4    speaking during that conference call, according to this

5    document?

6    A.    Hammam Saeed and Hamas figure Mohammed Siam.

7    Q.    And did you take this piece of information and look at

8    either Government's Exhibit HLF Search No. 23 or Defendants'

9    No. 1087 and were you able to match or was there a

10   corresponding entry that could be -- that would indicate that

11   this information on InfoCom Search No. 23 was reflected on

12   either HLF Search No. 23 or Defendants No. 1087?

13   A.    Well, I did the comparison, and here is what I found.  I

14   looked for money corresponding to speakers Hammam Saeed and

15   Mohammed Siam from the 9th of February when this conference

16   call took place, and I looked for a bit, a period of time.  I

17   accounted for approximately $7,000 that was attributed to

18   Mohammed Siam over various days after the 9th of February, but

19   I didn't come anywhere near $18,500.

20   Q.    And is that -- Did you find or do you have that page in

21   front of you?

22   A.    Sure.

23             MR. JACKS:  Can I approach, Your Honor?

24             THE COURT:  Yes.

25             THE WITNESS:  For example, this is page 23 of

1    Exhibit HLF Search No. 23.  And there is an entry on 15

2    February for $2,000 to Mohammed Siam.

3    Q.    (BY MR. JACKS)  If you would, let me just stop you.  And

4    how many pages do we need to go through here to cover the

5    pages that you examined?

6    A.    Just a second, sir.  Four up to this point.  I am still

7    looking.  I think four pages, sir, unless I have missed one.

8    Q.    And that -- The individual in those four pages that is

9    referenced that you have been looking for or comparing to is

10   who?

11   A.    M. Siam.

12   Q.    And was there any reference for Saeed?

13   A.    I mean, there is lost of references to Saeed in this but

14   not -- not together with Mohammed Siam to reflect this

15   particular conference call.

16   Q.    What dollar amount did you say that you were able to

17   locate -- What time period are you talking about there that

18   you are looking at?

19   A.    Yes.  To clarify, this conference call on the InfoCom

20   Search No. 23 exhibit says it took place on the 9th of

21   February, so I started looking on the 9th of February in HLF

22   Search No. 23, the exhibit.  The first entry I come across for

23   money attributed to Siam would be 15 February, '96 for $2,000.

24   Then I come across another one on 16 February, '96 for $3,650.

25   I come across another one on 21 February for $1,304.

1    Q.    Any others?

2    A.    1 March, '96 for $425.

3    Q.    And that is over a year after this conference call took

4    place.  Is that correct?

5    A.    Not a year, sir.  Maybe a month.

6    Q.    I am sorry.  You said '96?

7    A.    Yes.  And 5 March, '96 for $250.

8    Q.    All right.  And you said that the total that you came up

9    when you added those numbers up was about $7,000?

10   A.    Yeah, I did it real quick last night.  I don't have the

11   exact figure.  But anyhow I was uncomfortable -- I didn't feel

12   I could account for the total $18,500 through this document.

13   Q.    All right.  You were not able to locate what appeared to

14   be the $18,000 or the amount of $18,000 that is indicated on

15   InfoCom Search No. 23.  Is that correct?

16   A.    Right, yes.  Short answer, yes.

17   Q.    And I believe you were asked about the speakers list by

18   Mr. Westfall.  Do you recall that?

19   A.    Yes, sir.

20   Q.    And that was HLF Search No. 87, and this is an

21   enlargement of that.  And just for clarity's sake, this

22   document you said was found on the Holy Land Foundation

23   computer.  Correct?

24   A.    Right.  A computer.

25   Q.    And this -- But for -- You said the document was how many

1   pages on the computer?

2   A.   It is two pages.  That is why you see the break on the

3   bottom.

4   Q.   Here?

5   A.   Right.

6   Q.   But for putting it on one page on this poster board and

7   the numbers here, is this document exactly as it was found?

8   A.   Exactly.

9   Q.   So this heading "overseas speakers," was that on there

10  when you found it?

11  A.   Sure.

12  Q.   That is not something that was added to illustrate this

13  chart?

14  A.   No.  That is theirs.

15  Q.   All right.

16          MR. JACKS:  I pass the witness.

17          THE COURT:  Mr. Cline?

18          MR. CLINE:  No additional questions, Your Honor.

19          THE COURT:  Ms. Hollander?

20          MS. HOLLANDER:  Yes, sir.

21                    RECROSS EXAMINATION

22  By Ms. Hollander:

23  Q.   Just a few questions, Agent Miranda.

24       You talked about Demonstrative No. 16, these calls?

25  A.   Yes, ma'am.

1    Q.    You can see it?

2    A.    I can see it, ma'am.

3    Q.    Good.  Now, the only call referenced on here after Hamas

4    was designated is the call between Jamal Abu Baker and HLF.

5    Correct?

6    A.    The two calls, yes, ma'am.

7    Q.    Two calls.  Correct?

8    A.    Yes, ma'am.

9    Q.    1998?

10   A.    Yes, ma'am.

11   Q.    And Jamal Abu Baker is not designated, is he?

12   A.    No, he is not.

13   Q.    You also mentioned -- Mr. Jacks asked you about the

14   Muslim Brotherhood.  You were talking about the Muslim

15   Brotherhood and the Islamic Action Front in Jordan.  And he

16   asked you about the Hamas charter.

17   A.    I think I mentioned it.  I don't know if he asked me

18   about it, but I mentioned it.

19   Q.    You mentioned that according to the Hamas charter that

20   Hamas is the Muslim Brotherhood wing in Palestine.  That was

21   your testimony.

22   A.    Palestinian branch of the Muslim Brotherhood.

23   Q.    Right.  And in fact, what the Hamas charter says is that

24   the Islamic Resistance Movement, which we know to be Hamas, is

25   one of the wings of the Muslim Brotherhood.  Correct?

1   A.   I think it depends on which charter you are looking at,

2   which definition.  Are you looking at the Yale version or the

3   one found at the IAP?  I am not sure, ma'am.

4   Q.   So they are different in what they say.  Is that what you

5   are saying?

6   A.   Yeah, I do believe there is variations in the two, the

7   translations.  The Yale one is slightly different.  I would

8   have to compare the two to see if that is correct.

9   Q.   You know that the Muslim Brotherhood still exists in

10  Palestine separate from Hamas.  Correct?

11  A.   I am not certain of that, ma'am.

12  Q.   You are aware that Yasser Arafat was a member of the

13  Muslim Brotherhood, weren't you?

14  A.   I think somebody mentioned that earlier on.  I don't have

15  any independent knowledge of that.

16  Q.   And you know that the United States sent observers to the

17  election in Palestine in 2006.  You know that, don't you?

18  A.   No, actually I don't.

19  Q.   Now, you also talked about Dar el-Salam hospital.

20  Correct?

21  A.   We discussed it.

22  Q.   You discussed that with both Mr. Dratel and then with Mr.

23  Jacks.  Correct?

24  A.   Yes, ma'am.

25  Q.   Okay.  And you knew that there was an issue, a conflict

1    that -- the one that Mr. El-Mezain talked about in the call.

2    Correct?

3    A.    Yes.

4    Q.    You were aware of that?

5    A.    Indirectly by talking with one of the other agents on

6    this case.  It wasn't really my area of investigation, but I

7    was aware of it.

8    Q.    And you were aware also that Shukri was concerned about

9    that, too, weren't you?

10   A.    No, I am not sure that I am aware of that, ma'am.

11   Q.    One of the people mentioned in that call was Haider Abdel

12   Shafi, who was head of Palestinian delegation to Madrid.  You

13   knew that, didn't you?

14   A.    No.  What is the name?

15   Q.    Dr. Haider Abdel Shafi?

16   A.    No.

17              MS. HOLLANDER:  I will pass the witness, Your Honor.

18              THE COURT:  Mr. Westfall?

19              MR. WESTFALL:  Yes, Your Honor.

20                        RECROSS EXAMINATION

21   By Mr. Westfall:

22   Q.    Hello, Agent Miranda.

23   A.    Good morning, sir.  How are you?

24   Q.    I am doing well.  How are you?

25   A.    Fine, thank you.

1   Q.   So after court broke yesterday evening you went home and

2   you looked at Defendants No. 1087 and the HLF Search No. 23

3   and you did some calculations?

4   A.   Kind of.  I knew it before, but you didn't give me the

5   opportunity to say it last night.  I went and calculated the

6   Siam money, but I already knew about the $396,000.

7   Additionally there is another section we haven't even

8   discussed yet missing.  But anyhow, I calculated the $7,000.

9   Q.   Did you do calculations last night?

10  A.   Yeah.

11  Q.   And did you do this at the direction of Mr. Jacks?

12  A.   No.

13  Q.   While you were doing your calculations, did you have a

14  chance to calculate up the 1997 Anees Mezain to verify that it

15  adds up to this?

16  A.   I did not, but I didn't ignore your question.  I did find

17  a piece of paperwork relating to Anees with the figure, so I

18  guess I am trying to say I looked into what you are saying.  I

19  did not add up those figures.

20  Q.   This is page 141 out of Defendants No. 1087.  Okay?

21  A.   Okay.

22  Q.   Who is that?

23  A.   That is Jamil Hamami.

24  Q.   Who is that?

25  A.   That is Mohammed Siam.

```
 1            MR. JACKS:  Can we have a time period that is shown

 2   on the entry?

 3   Q.   (BY MR. WESTFALL)  I am sorry.  I didn't tell you a page

 4   number.  Is that Mohammed Siam for 14 April, '94?

 5   A.   Right.

 6   Q.   And there are several in here for Siam.  Right?

 7   A.   Yes.

 8   Q.   In the 500 bankers boxes that were taken from the Holy

 9   Land Foundation, there are literally tens of thousands of

10   pages of financial documents.  Wouldn't you agree?

11   A.   There is tens of thousands of pages.  I don't know how

12   many there are going to be in terms of financial.  They are

13   certainly not all financial documents, sir.  There are lots of

14   financial documents.  I would hate to put a figure on it.

15   Q.   Right.  But there are thousands and thousands of these

16   wire transfer requests.  Wouldn't you agree?

17   A.   There is a lot, yeah; sure.

18   Q.   And lists of orphans that were supposed to be paid?

19   A.   Yes.

20   Q.   And Quicken, you know, like accounting records, real

21   accounting records?

22   A.   Yeah, I think there is some of those, too.

23   Q.   And there were also like end of year financial

24   statements.  True?

25   A.   Yes.
```

1    Q.   And so, when we are talking about these financial records

2    here, there is a whole lot more financial records where these

3    came from.  Wouldn't you agree?  Being the Holy Land office?

4    A.   I am sorry.  When you say "these here," you are holding

5    up --

6    Q.   Defendants No. 1087.

7    A.   I have not seen a report like that other than the one

8    generated from the computer.  I am just trying to be precise.

9    Q.   Okay.  And you have at some point added up how much

10   people made based upon this document, the Holy Land Foundation

11   No. 23.  At some point you have added that up, I guess.

12   A.   I have added some of the individuals who were on the HLF

13   overseas speakers list who were significant because of

14   connections, so I didn't -- For example, there are individuals

15   on there that were domestic fundraisers, which was not what I

16   was looking at.  I looked at people who had Hamas connections

17   or were Hamas, Islamic Action Front, that sort of thing.  So I

18   don't want to give you the impression that I added up

19   everything for everybody.

20   Q.   So people that you added up were the folks that you

21   thought were Hamas.  Is that what you are saying?

22   A.   That I thought were Hamas?  No, that are Hamas or are

23   connected to organizations like the Islamic Action Front.  I

24   also had a category I believe for individuals who had the same

25   telephone number as Hamas spokesman Ibrahim Ghousheh, the guy

1  who wrote the two letters to the Senate.  I had those sorts of

2  categories, sir.

3  Q.   And those would be the things that you would call

4  relevant to the investigation?

5  A.   This is a trial about Hamas, is it not?

6  Q.   So whether numbers like this, which is your exhibit,

7  whether that can be verified is not really relevant to you, I

8  guess.  Right?

9  A.   You know, I didn't -- I never got the point of what you

10  were trying to say yesterday, so to me --

11          MR. JACKS:  Your Honor, I object as argumentative.

12          THE COURT:  Go ahead.  I will let him continue.  I

13  am not sure where you are going, but go ahead.

14          THE WITNESS:  I guess my short answer was I wasn't

15  sure of the relevance yesterday, and I am still not sure of it

16  today, sir.

17  Q.   (BY MR. WESTFALL)  Okay.  Well, this here is HLF Search

18  No. 178.  And you put this exhibit into evidence.  You

19  sponsored this exhibit, didn't you?

20  A.   Yes, sir.

21  Q.   And you spoke about this exhibit.

22  A.   Right.

23  Q.   And when you put this exhibit into evidence, you didn't

24  explain anything else about it other than this reflects money

25  raised by Jamil Hamami.  Isn't that what you did?

A.   I don't know about that.  I guess we can look at the

record and find out what questions I was asked.

Q.   And it was in the context of this December '93 phone call

or December '99 phone call, you discussed that first, and then

you put this up without any further explanation.  Isn't that

what you did, Agent Miranda?

A.   I don't know.  We can look at the record.

Q.   All right.  Did you check the evidence that has been

admitted in this trial?

A.   Yes, I did.  I looked for the evidence admitted in this

trial, and my answer is no, I did not find anything for your

client related to him being, I think your question was, Muslim

Brotherhood.

Q.   Right.

A.   Or Palestine Committee.

Q.   Right.

A.   My answer is no, I didn't find anything in the exhibits,

sir.

Q.   Very well.

        MR. WESTFALL:  Your Honor, pass the witness.

        THE COURT:  Mr. Dratel?

        MR. DRATEL:  Yes, Your Honor.

                    RECROSS EXAMINATION

By Mr. Dratel:

Q.   There was a discussion with Mr. Jacks and Ms. Hollander

1    about the Hamas charter and the Muslim Brotherhood.

2    A.    Right.

3    Q.    And you talked about different versions.

4    A.    No --

5    Q.    Different translations of different -- I am sorry.

6    Withdrawn.

7              MR. DRATEL:  Can we pull up Hamas Charter

8    Demonstrative, slide 4, please?

9    Q.    (BY MR. DRATEL)  That was put in by Doctor Levitt.

10   Right?  The PowerPoint presentation on the Hamas charter?

11   A.    Yeah.

12   Q.    That is from Doctor Levitt?

13   A.    Yes.

14             MR. DRATEL:  Okay.  I can move on and come back if

15   it takes -- Okay.  I will go to a different area and come

16   back.  Thank you.

17   Q.    (BY MR. DRATEL)  There may have been some confusion with

18   respect to what I was asking you about the phone conversations

19   that were read, that we read between Mr. El-Mezain and his

20   relatives.  You didn't put those on Demonstrative No. 6.

21   Right?  That is the one I was asking you about.  That is the

22   family relationships.  Right?

23   A.    Right.

24   Q.    You didn't put anything about Ahmad Nimr.  Right?

25   A.    Right.

1    Q.   And he is Hamas.  Right?

2    A.   Right.

3    Q.   And with respect to those conversations, you and Mr.

4    Jacks read some sections.  Right?  Ahmad Nimr's threat.

5    Right?

6    A.   Right.

7    Q.   Okay.  And this is from No. 1340, defendants No. 1340,

8    which is a conversation between Mr. El-Mezain and Dawud

9    El-Mezain.  Correct?

10   A.   Correct.

11   Q.   Can you read that section right here that is highlighted?

12   A.   Can you focus it just a little bit?

13   Q.   Certainly.

14   A.   That is fine.  "Ahmad is saying, 'This hospital belongs

15   to so and so parties.  He who wants to work, let him, and he

16   who doesn't work should not work.'  Of course, all of that is

17   wrong from beginning to end; talk which harms and doesn't

18   benefit."

19   Q.   Okay.  Now, if you look this next section where it starts

20   "you say."

21   A.   Yes, sir.

22   Q.   Can you just read that?  "You say my hospital."

23   A.   Sure.

24   Q.   Read the highlighted part?

25   A.   Sure.  It says "You say, 'My hospital.'  Not all of the

1    women are veiled.  One is like this and one is like that.  Not

2    at all."

3    Q.   And the next highlighted section of the next paragraph?

4    A.   "This female doctor wears knee-length clothes."

5    Q.   And that would not be very Islamic.  Correct?  In terms

6    of for women to be immodest in that way.  Right?  To be

7    unveiled?

8    A.   I don't know about that.  I lived in the country where

9    there were a lot of Muslims that dressed with knee-length

10   skirts.  I wouldn't say they weren't Muslim.

11   Q.   I didn't say Muslim.

12   A.   You said Islamic.

13   Q.   Meaning religious.

14   A.   I was conveying the same thing, sir.

15   Q.   Hamas is a religious party organization.

16   A.   It is a terrorist group that is strongly influenced by

17   the religion, yes.

18   Q.   Same conversation.  Could you read that highlighted

19   section?  Can you see it?

20   A.   Yes, sir.  Is this Mr. Mezain talking.

21   Q.   Yes, it is.

22   A.   Okay.  "I told him, 'This is not your business.  The

23   hospital belongs to all Muslims.  It doesn't belong to Zeid or

24   Amr, and the people who are in the board or approved by us,

25   and this is the Foundation's business and not your business.'"

1    Q.    And No. 1342 is the conversation between Mr. El-Mezain

2    and his parents?

3    A.    Yes, sir, it is.

4    Q.    And I will be Mr. El-Mezain and if you can be Mr.

5    El-Mezain's father.

6    A.    Yes, sir.

7    Q.    Can you read that?

8    A.    Yes, I can.

9    Q.    "I -- Father, he should keep his evil away from us.  I'm

10   entrusted over money, Father.  When we tell people that we are

11   building a hospital in Khan Younis, is Ahmad going to come

12   over and take over the hospital, Father?"

13   A.    "No."

14   Q.    "Should Ahmad Nimr come and appoint whoever he wants in

15   the hospital?  Do you know what he told me?  Do you know what

16   he told me yesterday?  Do you know what he told me yesterday?"

17   A.    "No."

18   Q.    "He told me, 'Tell these people I want.'  This was the

19   day before yesterday when you're visiting him, and you heard

20   him.  He told me he wants everything to be under his control.

21   I told him, 'By God, you won't see joy in that.'"

22   A.    "Under his control?"

23   Q.    "Yes.  He wants everything to be under his control.  I

24   told him, 'By God, you won't see joy in that."

25   A.    "How come, son, he wants things to be under his control?"

1   Q.   "I, er, I, er" --

2   A.   "Why is that?"

3   Q.   "Ahmad Nimr is now a messenger of God in the Sector."

4   A.   Oh God, oh God, oh God.  Everybody is mad at him."

5   Q.   "No, he won't see joy in that.  And also -- also let me

6   tell you, this is an American organization, Father.  By God, I

7   tell you, if one makes a phone call from here to the embassy

8   at your end, he won't remain free for a day.  Let him fear

9   God.  It is dishonor.  We don't want to do this villainous

10  work.  Father, let's not destroy our work.  It is wrong.  Keep

11  these words to yourself and don't tell anyone.  But we don't

12  do these things.  Thanks be to God, Lord of the two worlds.

13  Wherever people come, they comment about this work and this

14  trust and this day."

15      And one more, if you can read that.  That is Mr.

16  El-Mezain talking.  Can you read that paragraph please?

17  A.   Yes, sir.  "May God bless you, Father.  Have absolute

18  trust that I won't do other than as you instructed me.  The

19  verse you recited for me a little while ago, when I went to

20  Egypt in '72 you told me, 'Son, he who does righteousness

21  should not fear injustice nor unfairness.'  God's willing, we

22  will not be unjust with Ahmad, and we will not be unjust with

23  anybody other than Ahmad, and neither will we sever our ties

24  with our brother or our cousins.  Let's be better and let's

25  those who want something bad be handled by God."

1    Q.   And going back to No. 1340, and this is just part of a

2    section we read the first time.  And where I am pointing, Mr.

3    El-Mezain's brother says, "What legal action?"

4         And Mr. El-Mezain says, "Legal action?  I would call the

5    U.S. embassy."

6         Right?  That is what is in there?  Right?

7    A.   Yes, sir.

8              MR. DRATEL:  If you could, please.  Slide 4, please.

9    That is not it.  It is the -- I can fill in.

10   Q.   (BY MR. DRATEL)  InfoCom Search No. 23.  I will just put

11   it on the elmo.  Well, can I show it to you?

12   A.   Sure.

13   Q.   You discussed that with Mr. Jacks just now.  Right?

14   A.   Right.

15   Q.   And that is a document that doesn't have a translation.

16   It is actually an English document.  Correct?

17   A.   Yes, sir.

18   Q.   Found at InfoCom?

19   A.   Yes, sir.

20   Q.   In 2001.

21   A.   Correct.

22   Q.   And the date of the document is 1996?

23   A.   Correct.

24   Q.   Okay.  Thank you.  Just with respect to HLF Search No. 23

25   and Defendants No. 1087.  Right?  Do you know what I am

```
 1    talking about?  That is right.
 2        Initially you in fact -- When I say you, I should say the
 3    Government, or you personally, or someone you directed,
 4    printed that out in alphabetical order.  Correct?
 5    A.   Printed it out as it was you mean?
 6    Q.   No.  Directed that it be printed in alphabetical order.
 7    A.   It was eventually sorted, yes.
 8    Q.   So you did that on the computer as well.  In other words,
 9    you made it alphabetical at some point.
10    A.   No, I didn't.
11    Q.   But someone at your direction.
12    A.   Yeah.
13    Q.   Okay.  Can you read that, the top part?
14    A.   Uh-huh, yes, sir.
15    Q.   Okay.  And it says, does it not, "the Islamic Resistance
16    Movement is one of the wings of the Muslim Brotherhood in
17    Palestine"?
18    A.   Yes, sir, it says that.
19    Q.   Thank you.  And the IAP version you think has something
20    different?
21    A.   I think you are taking what I said wrong.  I said that
22    the translations -- there are two translations.  One is the
23    Yale translation which Doctor Levitt relies on, and then there
24    is a translation from the IAP.  I know there are variations in
25    those two.  I think I said that the -- Hamas is the
```

1    Palestinian branch of the Muslim Brotherhood.

2    Q.    So you are saying the Yale version is not one of the

3    wings?

4    A.    No.

5    Q.    Didn't you just say there is a variation on the one on

6    the screen?

7    A.    I am saying there is variation between the two charters.

8    I am not saying anything about the first article.

9    Q.    This is Article 2.

10   A.    I am sorry.  I am not saying about that.  I just read it.

11   Q.    So that is the one -- You are not saying there is any

12   other version somewhere that you know of for that particular

13   sentence.

14   A.    I must be misunderstanding you.  That sentence, I am not

15   aware how that is varied or not varied from the IAP version.

16   All I am saying is there is two translations out there, a Yale

17   version and an IAP version.  I am not saying anything about

18   there being a difference between Article 2 in the Yale version

19   and Article 2 in the IAP version.  That is it, sir.

20   Q.    When Ms. Hollander spoke to you and when I just asked

21   you, did we discuss anything but that particular article?

22   Were we asking about that?

23   A.    You didn't ask me an article at all.  You asked me if I

24   knew whether it was part of the Palestinian --

25   Q.    What it said in the charter, no?

1    A.    I am trying to answer --

2              MR. DRATEL:  Pass the witness, Your Honor.

3              THE COURT:  Ms. Cadeddu, any questions?

4              MS. CADEDDU:  No, Your Honor.

5              THE COURT:  All right.

6         Anything further, Mr. Jacks?

7              MR. JACKS:  No, sir.

8              THE COURT:  Agent Miranda, you may step down.

9              THE WITNESS:  Thank you, sir.

10             THE COURT:  Call your next witness.

11             MR. JONAS:  Your Honor, the Government calls Matthew

12   Levitt.

13             THE COURT:  Doctor Levitt, good morning.  Have a

14   seat there.

15        And you have been sworn previously.  You are still under

16   that oath.

17             MR. JONAS:  Your Honor, I am assuming I don't have

18   to requalify Doctor Levitt as an expert.

19             THE COURT:  That is correct.  He has been on the

20   stand previously.

21                          MATTHEW LEVITT,

22   Testified on direct examination by Mr. Jonas as follows:

23   Q.    Welcome back, Doctor Levitt.

24   A.    Pleasure.

25   Q.    I want to ask you some questions about certain exhibits

that have been admitted into this case since you testified

last.  Okay?

        MR. DRATEL:  May we have a continuing objection.

        THE COURT:  Yes, you may.

Q.  (BY MR. JONAS)  Okay?

A.  Yes.

Q.  I want to start with one that has been marked as Marzook

Defendant Phone Calls.

        MR. JONAS:  If we can put it on the screen, please,

and I will put an enlargement on the easel as soon as I can

find it.

Q.  (BY MR. JONAS)  Do you see that exhibit, Doctor Levitt?

A.  I do.

Q.  And you looked at it before.  Correct?

A.  I did.

Q.  Okay.  I am going to ask you some questions about this in

a moment.  I just want to establish that you have seen this

and this is an exhibit we are going to talk about shortly.

A.  Okay.

Q.  And what is your understanding of what this chart

reflects?

A.  It reflects phone calls between Mousa Abu Marzook at the

various phone numbers on the left in blue with several of the

Defendants marked in yellow or orange on the right between the

period of 1989 and 1993.  And the direction of the arrow

1    indicates the direction of the phone call.

2    Q.   Okay.

3         MR. JONAS:  If I can approach to give him this stack

4    of exhibits?

5         THE COURT:  Yes.

6    Q.   (BY MR. JONAS)  Doctor Levitt you have before you what

7    has been marked as Marzook's Phonebook.  Can you open that up,

8    please?  And there is -- You have the hard copy before you.

9    Correct?  The original?

10   A.   Yes.

11   Q.   These are also photocopies of that with the translations?

12   A.   Yes.

13   Q.   Okay.

14        MR. JONAS:  If we can put Marzook Phonebook on the

15   screen, page 48, please.

16   Q.   Doctor Levitt do you see the name of the Defendant

17   Ghassan Elashi?

18   A.   I do.

19   Q.   Is it a 214 area code?

20   A.   Yes.

21        MR. JONAS:  If we can put page 59, please.

22   Q.   (BY MR. JONAS)  Do you see the name of the Defendant

23   Mohammad El-Mezain anywhere?  And he may be under his Abu

24   name.

25   A.   The very last section the second name and a 201 area,

1    Mohamed Abu Ibrahim.

2    Q.    Do you know where the 201 area code is?

3    A.    New Jersey.

4          MR. JONAS:  If we can go to page 63.

5    Q.    Doctor Levitt do you see the name of the Defendant Shukri

6    Abu Baker on this screen?

7    A.    Yes, in the second pairing, the second name Shukri Abu

8    Baker, 310 area code.

9    Q.    Doctor Levitt based upon your research as an expert, is

10   there any significance to the fact that three of the

11   Defendants' phone numbers are found in the phonebook of Hamas

12   leader Mousa Abu Marzook?

13   A.    It is.  This is the personal phonebook --

14          MS. CADEDDU:  We would object.

15          MS. MORENO:  701 and 702, your Honor.

16          MS. CADEDDU:  And the written objections.

17          THE COURT:  Those are overruled.  Go ahead.

18          THE WITNESS:  It is significant.  This is the

19   personal phonebook of someone who is at the time the chief of

20   the political wing of Hamas, and then became the deputy chief

21   under Khalid Mishal.  This is personal and direct evidence of

22   a relationship.  These people are in his personal literally

23   black book.

24   Q.    (BY MR. JONAS)  I want to show you another chart, and

25   this is Demonstrative No. 16.  I am going to have this put on

```
1    the screen.  You should have a copy of this before you also,
2    Doctor Levitt.  If you don't, do you see it on the screen?
3    A.    I see it on the screen.
4    Q.    Have you looked at this chart before?
5    A.    I have.
6    Q.    All right.  Do you recognize any of the names of the
7    people on the right hand side of the chart?
8    A.    These are all names of Hamas leaders.  Abdel Aziz
9    al-Rantisi in Gaza, Khalid Mishal at the time in Jordan, Jamal
10   Abu Baker at the time in Sudan, Mohamed Siam in Yemen, Imad
11   al-Alami at the time in Iran, and Moustafa righteousness
12   Syria.
13   Q.    In fact, did you talk about some of these people during
14   your first testimony?
15   A.    Yes.
16   Q.    Many of these phone numbers were found -- there has been
17   testimony that many of the phone numbers of these individuals
18   on the right side of the screen that you have just identified
19   have been found in Marzook's phonebook Is there any
20   significance to that?
21   A.    Yes, it is significant and it shouldn't surprise since
22   these are Hamas officials on the right hand side of this
23   chart, and Mousa Abu Marzook was and is one of the chief
24   leaders of Hamas.
25   Q.    And based upon your studies of Hamas, taking into account
```

everything you reviewed and the people you have everything you

testified about in your first testimony, are the phone numbers

of these individuals, as well as Mousa Abu Marzook, publicly

available?

A.   No.

Q.   In your studies, have you found if anyone can get their

phone numbers, these individuals' phone numbers?

A.   I presume you mean just anyone.

Q.   Just anyone.

A.   No.  These dates are prior to the advent of the internet,

but even in the age of the internet one cannot just go online

and get the personal phone numbers of individuals who are

officials of an organization like Hamas.

        MR. JONAS:  If we can put Hamas letter No. 1 on the

screen.

Q.   (BY MR. JONAS)  And Doctor Levitt, you may have a copy of

that in front of you, THE actually the original letter.  Do

you see -- What letterhead is this letter on, whose

letterhead?

A.   Hamas, the Islamic Resistance Movement, Palestine.

        MR. JONAS:  And if we can enlarge the bottom half.

Q.   (BY MR. JONAS)  Do you recognize the name of the

individual who signed this letter?

A.   Ibrahim Ghousheh we spoke about last time I was here, was

at the time the primary spokesman of Hamas.

Q.   So the fact that it says Hamas spokesman under his name,

is that consistent with your testimony?

A.   I would think so, yes.

Q.   Do you see under that there is a phone number?  It says

T-E-L --

A.   Yes, there is a telephone number and a fax number.

Q.   Do you recognize the country code for that phone number?

A.   It is the country code for Jordan.

Q.   The fact that there is a letter with Hamas letterhead and

a phone number on it, what significance does that have to you

in terms of the public's availability of contacting Hamas?

A.   Well, people who had access --

        MS. CADEDDU:  Your Honor, we would object again.

This is not the proper basis for an expert testimony.  He

hasn't been shown to be an expert on what these people do not

have and have.

        THE COURT:  Overruled.  Go ahead.

        THE WITNESS:  This is a letter that was not made

public to the world.  Those who had access to this letter

would have access to this phone number, of course.  But it

does clearly establish a connection between Hamas and this

phone number.

Q.   (BY MR. JONAS)  Are you aware, based upon again your

studies of Hamas and all the research you have done on the

organization, if an individual were to call that number would

1    they be able to speak to Mousa Abu Marzook, Khalid Mishal, or

2    any of the other individuals on Demonstrative No. 16, the

3    chart that is on --

4              THE COURT:  They have an objection before you answer

5    that.

6              MS. HOLLANDER:  Your Honor, I have a different

7    objection that he hasn't established any foundation that he

8    knows whether phone numbers of individuals in these countries

9    are available, whether they there are phonebooks or whether --

10             THE COURT:  You may ask that on cross examination

11   overruled.  You may answer the question.

12             THE WITNESS:  Can you ask the question again.

13   Q.   (BY MR. JONAS)  If I can remember it.  Based upon your

14   research of Hamas, okay?  Everything you have looked into in

15   this organization, can anyone call the number that is on Hamas

16   Letter No. 1, anyone meaning just someone from the public,

17   call that number that is on Hamas Letter No. 1 on the bottom

18   of that letter and ask to speak to Mousa Abu Marzook, Khalid

19   Mishal, or any of the other individuals that you have

20   identified as leaders of Hamas?  And when I say ask to speak,

21   I mean get a response where these individuals actually get on

22   the phone.

23   A.   That is the answer is they can ask, but they are not

24   likely to get the senior leaders of an organization, any

25   organization, Hamas or some other organization.  The boss

1    isn't going to pick up the public phone that is listed on a

2    letter.  You wouldn't get me if you called my office picking

3    up the phone directly either.

4            MS. HOLLANDER:  Your Honor, I object.  This is

5    speculation.

6            THE COURT:  Overruled.

7    Q.   (BY MR. JONAS)  Doctor Levitt, have you formed an opinion

8    regarding the significance of phone calls between the Holy

9    Land Foundation and some of the Defendants and these leaders

10   of Hamas that you have testified about?

11   A.   The fact that there are connections with so many --

12           MS. MORENO:  Objection, Your Honor; improper; no

13   foundation; 701, 702, 703.

14               .

15           THE COURT:  Overruled.

16           THE WITNESS:  The fact that there are connections

17   with so many Hamas leaders is not coincidental, cannot be

18   coincidental.  These are connections with individuals with

19   whom most of them are not related, they are over a period of

20   time.  And most telling, they are in a period of time when

21   these connections with Hamas would not have been so much of a

22   problem for them, meaning prior to the designation of Hamas

23   and in some cases prior to the Oslo Accords when it became

24   more difficult to be perceived as being opposing the budding

25   peace process.  So this is when one would expect these types

1    of open communications to be prominent.

2    Q.   (BY MR. JONAS)  Does it matter -- Well, withdrawn.  The

3    fact that it is more open during at this time period in the

4    earlier '90s before Oslo and Hamas is designated, does it mean

5    that these Hamas leaders are more open and available to the

6    public?

7              MS. MORENO:  Objection; leading.

8              THE COURT:  Overruled.  You may answer that.

9              THE WITNESS:  No.  And all the research I have done

10   on Hamas, including on many of these leaders, I have never

11   heard or seen of anybody just being able to call them up and

12   being able to reach out, with the exception perhaps of Ibrahim

13   Ghousheh who was a public spokesman and was relatively

14   available in Jordan.

15   Q.   (BY MR. JONAS)  And just so I am clear, that covers the

16   time period from the early '90s up through today?

17   A.   Correct.

18   Q.   Does the fact that some of these phone calls may have

19   been a duration of one or two minutes make a difference in

20   your analysis?

21   A.   There is a lot of phone calls.  Some of them are going to

22   be long, some of them are going to be short, some of them are

23   going to be short in succession, meaning someone really wanted

24   to get through.  It is the totality.  And, of course, it is

25   not just the phone calls either.

1          MS. MORENO:  Objection; non-responsive to the

2    question.

3          THE COURT:  Overruled.

4    Q.  (BY MR. JONAS)  I want to pull up another chart, if we

5    can.  If we can pull up the chart of payments to K&A Trading.

6    I believe you should have a copy of that in front of you,

7    Doctor Levitt.

8          Doctor Levitt, in your last testimony you talked about an

9    individual named Khari al-Agha.

10   A.   Correct.

11   Q.   Do you recall that?

12   A.   Yes.

13   Q.   Okay.  The evidence has since come in to show that there

14   have been payments made to K&A Trading from the Occupied Land

15   Fund, and that the bank records supporting this chart show

16   that K&A Trading is Khari al-Agha.

17         Do you have any -- Have you reviewed this chart prior to

18   testifying?

19   A.   I have.

20   Q.   Have you formed an opinion on the fact that the HLF, at

21   the time the Occupied Land Fund, provided $250,000 to K&A

22   Trading?  Is there any significance to that?

23   A.   The significance is, as I testified earlier, that Khari

24   al-Agha is known to be a major fundraiser for Hamas.  So here

25   you have relatively significant financial relationship between

1    the Occupied Land Fund, which later became the Holy Land

2    Foundation, and Khari al-Agha.

3    Q.    Does it matter in your analysis that this was -- It was

4    five transactions over a very short period of time that

5    occurred in the late '80s.  Does that play into your analysis

6    at all?

7    A.    Clearly in late '80s this was a means that they were --

8    funds being sent.  I don't know what they were being sent for

9    or why this was the method that they chose then and not later.

10   What is significant is you have a significant financial

11   connection.

12          MR. JONAS:  If we can pull up the chart K&A Money To

13   Marzook.  I think it is K&A/Marzook may be the title of the

14   chart.

15   Q.    (BY MR. JONAS)  Doctor Levitt, you may have a copy of

16   that chart in front of you.

17   A.    I do.

18   Q.    Do you see this chart, Doctor Levitt?  It is on the

19   screen now.

20   A.    Yes, but it is different from what I have in my hand.

21          MR. JONAS:  Your Honor, I will grab the chart from

22   Doctor Levitt and put it on the elmo.  It will be quicker.

23          THE COURT:  Sure.

24   Q.    (BY MR. JONAS)  I will try to zoom in so you can see it

25   better.

1          MR. WESTFALL:  What is the title of the chart?

2          MR. JONAS:  The title of the chart is

3    K.Agha/K&A/Marzook.  It may have a longer title in the list.

4    Q.  (BY MR. JONAS)  Doctor Levitt, can you read that, or do

5    you need me to zoom in further?

6    A.  I can read it here.

7    Q.  This chart reflects payments roughly in the same time

8    period as the prior chart, a little bit after, between K&A

9    Overseas Trading that same organization that the HLF sent

10   money to, and Mousa Abu Marzook.  Okay.  We have it on the

11   screen.  Let me hand you back your copy.

12   A.  This is not the same.

13   Q.  Okay.

14         MR. JONAS:  Sorry, Your Honor.

15   Q.  (BY MR. JONAS)  Doctor Levitt, let me ask you, did you

16   look at this chart reflecting payments between Khari al-Agha

17   and Mousa Abu Marzook prior to testifying?

18   A.  I did.

19   Q.  Okay.  What, if anything, did these payments -- How, if

20   anything, did these payments play into your analysis of the

21   money between the Holy Land Foundation and Khari al-Agha?

22   A.  You have around the same period of time significant

23   amounts of money going between and among these three parties,

24   demonstrating the relationship between the Holy Land

25   Foundation here, Khari al-Agha in Saudi Arabia, and Mousa Abu

1    Marzook the head of Hamas.

2    Q.   Does this have any play in your analysis of who Khari

3    al-Agha is?

4    A.   I knew of Khari Al-Agha from beforehand, but it fits with

5    the known information about him as a facilitator of

6    fundraising for Hamas on behalf of people like Mousa Abu

7    Marzook.

8          MR. JONAS:  If we can now get the screen the chart

9    of payments between Marzook and the Defendants that you had on

10   before.

11   Q.   (BY MR. JONAS)  Doctor Levitt, you should have that one

12   before you as well.  On the screen, is that the chart you have

13   before you?

14   A.   Yes.

15   Q.   And does this -- What does this reflect, this chart?

16   A.   Payments between Mousa Abu Marzook and the Defendants, as

17   it is entitled, primarily Occupied Land Fund and later under

18   the name Holy Land Foundation.

19   Q.   And what are the individual Defendants reflected on this

20   chart.

21   A.   Shukri Abu Baker is on the chart several times, Holy Land

22   Foundation, a member of the Elashi family, and Mousa Abu

23   Marzook.

24   Q.   If you can turn the page and scroll through, you may find

25   other Defendants.

A.    Ghassan Elashi, Mohammad El-Mezain, more Mohammad

El-Mezain.

Q.    Okay.  Do you attach any significance to the movement of

money between three of the Defendants plus the Holy Land

Foundation and Mousa Abu Marzook?  I mean, directly between

them.

A.    Yes.  This is a direct relationship, a financial

relationship between the head of the Hamas organization and

several of the Defendants, in relatively large sums of money,

not all of them but many of them, which indicates not only a

financial relationship but a relationship of trust.  I mean,

this is significant money.

Q.    In your studies of Hamas, have you seen movement of money

between Marzook and other individuals?

A.    Not like this, no.

Q.    These other individuals that we have seen movement of

money for, are they individuals that you have learned were

associated with Hamas?

A.    Yes.

Q.    I want to move on to another area, and I want to play

just a couple of video clips for you.  Okay?

      MR. JONAS:  If we can play Mushtaha Search No. 9 clip C,

please.

?

Q.    (BY MR. JONAS)  Doctor Levitt do you recognize the

1    individual on the screen?

2    A.    This is Abdullah Azzam.

3    Q.    You have testified briefly about him in your last

4    testimony.  Can you remind us who he is?

5    A.    Abdullah Azzam is largely considered kind of the father

6    or figurehead of the jihadist movement.  Originally from

7    Palestine, he is seen as a source of inspiration for Hamas

8    members, and is often cited by them, but also has been

9    involved in other jihad causes elsewhere.

10   Q.    All right.  Let's play, and I am going to have some more

11   questions about him in a moment.

12          Doctor Levitt, do you recall testifying about a term you

13   used, economic jihad?

14   A.    Yes.

15   Q.    And I believe you had another term.

16   A.    Arabic jihad bin mal, jihad with money literally.

17   Q.    Do you see what it says?

18   A.    I told you last time I testified I didn't make up the

19   term myself.  Jihad with money.

20   Q.    Do you place any significance, in your opinion based upon

21   all your research, to the fact that this term is being used

22   and on the screen at the moment that term is being used it

23   says "Send your donations to Occupied Land Fund"?

24   A.    I think it is extremely significant.  The message is

25   everyone has an obligation if they can't go themselves to

1    participate in a physical jihad -- Again, we talked about the

2    common sense test.  This is not a jihad for self-improvement.

3    This is a jihad of fighting the enemy.  And if you can't do it

4    one's self, one should be doing it by providing one's money to

5    those who can.  And if you are at all in doubt where to send

6    your money, that is being flashed on the screen for you as

7    Abdullah Azzam himself is speaking.  "Send your donations to

8    the Occupied Land Fund."

9              MR. JONAS:  If we can play Elbarasse Search No. 32,

10   please, Clip I.

11             MR. DRATEL:  Can we get a date on this, Your Honor,

12   please.

13             THE COURT:  Counsel?

14             MR. JONAS:  I believe the videotape is dated around

15   1988, although seized in 2004, I think.

16   ?

17   Q.   (BY MR. JONAS)  Doctor Levitt, you testified just now

18   that Abdullah Azzam was an inspiration?

19   A.   Yes.

20   Q.   Can you elaborate on that, and as well discuss the words

21   that he is saying that are on the screen now?

22             MR. DRATEL:  Your Honor, this is beyond the scope of

23   what this particular aspect of his testimony was going to be

24   at this time.

25             THE COURT:  Overruled.

```
 1              MR. DRATEL:  I don't see how it is related.

 2              THE COURT:  Overruled.  Go ahead.

 3              THE WITNESS:  As mentioned earlier, Abdullah Azzam

 4    was himself a Palestinian and before moving on to other venues

 5    was involved in orchestrating small scale attacks against

 6    Israel.  But much more significantly was his role as an

 7    ideologue or as an inspiration and the way that he describes

 8    the need to live with self-respect or die honorably, that

 9    Palestinians need to pledge themselves to death, is something

10    that has come full circle, as it is not uncommon for Hamas

11    suicide bomb bombers and the living wills that they tape

12    before going out on their suicide mission --

13              MR. DRATEL:  I object to al-Moayad in particular.

14              THE COURT:  Overruled.  Go ahead.

15              THE WITNESS:  -- to specifically cite Abdullah Azzam

16    in that living will.

17              MR. JONAS:  One more video clip, please.  Mushtaha

18    Search No. 1 B.

19              MR. DRATEL:  Can we get a date on this one, too,

20    please, Your Honor?

21              MR. JONAS:  I believe it is 1990, but again seized

22    with the other Mushtaha tapes in 2004, 2005.

23         (Whereupon, Mushtaha Search No. 1 was played, while

24         questions were propounded.)

25    Q.  (BY MR. JONAS)  Doctor Levitt, you saw that was the
```

1    Defendant Mohammad El-Mezain talking about Abdullah Azzam?

2    A.    Correct.

3    Q.    How public a figure was Abdullah Azzam?

4    A.    He was an extremely public figure.

5    Q.    Was he accessible to anybody and everybody?

6    A.    No.  He was a public figure in the fact that he was

7    well-known, but he was not accessible to the general public.

8    Q.    I want to move on and show you what has been marked as

9    HLF Search No. 87.  You should have that before you.

10         MR. JONAS:  For the record, I am going to put the

11   enlargement on this is the overseas speakers chart.

12   Q.    Have you looked at this prior to testifying, Doctor

13   Levitt?

14   A.    I have.

15   Q.    Do you recognize any names?

16   A.    I do.

17   Q.    Who do you recognize?

18   A.    A lot of names.  Bassam Jarrar for example, is a Hamas

19   sheikh in the West Bank; Hamed Bitawi we discussed last time I

20   was here, a senior Hamas official; Ahem Zahar we discussed

21   last time another, a senior Hamas official; Mohammed Siam

22   towards the bottom of the page.

23         There are several members of the Islamic Action Front in

24   Jordan that we discussed last time as well, Deeb Anees Mansour

25   and others.

1      And there are more names on the second page as well,

2   including people like Yusuf Qaradawi who we discussed last

3   time as the head of the Union of Good which serves as an

4   umbrella organization for charities sending money to Hamas

5   from around the world, as well as Rashid Ghanoushi Muslim

6   Brotherhood activists, al-Nahda, Tunisia, and others.

7   Q.    In your studies of Hamas, have you come across any

8   institutions that uses a collection of individuals like you

9   just described?

10  A.    It is not uncommon for Hamas institutions to use

11  individuals like this as speakers, fundraisers on their

12  behalf.

13          MR. JONAS:   Your Honor, may I approach?

14          THE COURT:   Yes.

15  Q.    (BY MR. JONAS)   I am going to show you what is in

16  evidence as El-Mezain Wiretap No. This is a collection of

17  faxes.

18          MR. JONAS:   If we can pull up the first page.

19  Q.    (BY MR. JONAS)   Doctor Levitt, do you see what is on the

20  screen?

21  A.    I do.

22  Q.    And if you want to flip through the book, is this

23  document on the screen, page 1, just a representative of the

24  faxes, a majority of the faxes contained in this exhibit?

25  A.    Yes, it is.

1    Q.    Have you seen this type of document before?

2    A.    I have.

3    Q.    Where?

4    A.    In the course of this case and others, in the course of

5    my research, after material had become public from other

6    cases.  You can see at the top from the fax line this is from

7    the IAP Information Office, the Islamic Association for

8    Palestine.

9    Q.    And what is it about this document -- Do you connect this

10   document to Hamas, these faxes, in any way?

11   A.    It is easier for me to do it once we have the translated

12   version, but the IAP Information Office served as an

13   information office for Hamas.  As we discussed in my last

14   testimony, they had publicized and translated the Hamas

15   charter, and would send out via fax Hamas communiques of

16   various types commenting on political events, taking

17   responsibility for attacks, et cetera.

18   Q.    Okay.  Doctor Levitt, with regard to the various exhibits

19   we have looked at, the telephonic contact, the monetary

20   contact, Azzam videos and the use of Azzam on videos with the

21   HLF, have you formed an opinion regarding the significance of

22   all these contacts with these Hamas leaders?

23   A.    There is a totality of different types of contacts which

24   are beyond circumstantial or coincidental.  What you have here

25   is individuals who are in contact of various types with all

1    kinds of Hamas officials and supporters, suggesting some type

2    of relationship.

3    Q.   Is this common?

4    A.   No.

5    Q.   Have you seen this type of contact before, this level of

6    contact?

7    A.   In my experience I have seen this level of contact

8    before, but only in the context of activity in cooperation

9    with groups like this.

10   Q.   Does it factor into your opinion that a lot of this

11   contact was before Hamas was designated as a terrorist

12   organization?

13   A.   It is what one would expect to find.

14   Q.   Can you explain?

15   A.   That is to say that the more sensitive activity, that is

16   to say activity in cooperation with a group like Hamas, a

17   terrorist organization, would be much more -- expected to be

18   more covert --

19            MR. DRATEL:  I object, Your Honor.  There is no

20   evidence of that.

21            THE COURT:  Overruled.

22            THE WITNESS:  Would be expected to be more covert,

23   meaning you would expect to find fewer phone calls or emails

24   or different types of public interaction after a group is

25   designated and that becomes contact with a banned illegal

1  organization.

2      Frankly, you would even expect it a little bit as in this

3  case '93 or '94 when the Oslo peace process started, because

4  then, too, it became -- that kind of contact was contact with

5  an organization that was -- seemed, deemed, and perceived to

6  be opposing the peace process which had great promise at the

7  time.  And so the question are there relationships that

8  continue, such as the speakers bureau list, for example, or

9  other types of activities, for example, ongoing relationships

10  with some of the committees, the charity committees, the zakat

11  committees in the West Bank and Gaza that were tied to Hamas,

12  does that continue, or does all of the relationships cease.

13              MR. JONAS:  I will pass the witness.

14              THE WITNESS:  One of these folders, just so you know

15  is empty.

16              MR. DRATEL:  May we approach, Your Honor?

17              THE COURT:  Sure.

18              (The following was had outside the hearing of the

19              jury.)

20              MR. DRATEL:  Doctor Levitt's testimony transgressed

21  I think all bounds of permissible expert testimony, not only

22  in regard to the opinions that he is issuing with respect to

23  the *Mejia* opinion, but the content as well, specific content.

24  The *al-Moayad* opinion that reversed the conviction had the

25  very same --

                    THE COURT:  Counsel, I don't want to hear a lot of

argument right now.  We have got a jury waiting.  I understand

you are objecting.  I will hear argument later.  What is your

objection?

                    MR. DRATEL:  I am asking for a mistrial.

                    THE COURT:  Deny that.

                    MR. DRATEL:  Or in the alternative that his

testimony be stricken and the jury be instructed to disregard.

                    MS. HOLLANDER:  We would join that.

                    MS. CADEDDU:  As do I on behalf of Mr. Abdulqader.

                    MS. MORENO:  Join on behalf of Mr. Elashi as well.

                    MS. HOLLANDER:  I have one other request.  It is

12:20.  I wonder if we could break so we can start our crosses

-- It will be a lot better if you give us lunch.

                    THE COURT:  Who is going to start the cross?  Have

you decided that?

                    MS. HOLLANDER:  We will decide it --

                    THE COURT:  I will ask when we come back.

                    (The following was had in the presence and hearing

                    of the jury.)

                    THE COURT:  We will go ahead and break and begin the

cross examination after lunch.

        Let me go over a couple of things.  For your planning

tomorrow, I have got a matter in the afternoon that I am going

to have to tend to, so we will work through the lunch hour,

1    work until 1:00, like we did that last time, and then you will

2    be done for the day.  And then next week we will plan on

3    working on Monday through Thursday.  And we will plan on

4    working a little later again tonight like we did last night to

5    make up for some of the hours that we are missing tomorrow.

6         So we be back at a quarter to 2:00, 1:45.

7              (Whereupon, the jury left the courtroom.)

8              THE COURT:  We will be in recess until 1:45.

9                   (Lunch Recess.)

10             THE COURT:  For the lawyers, while the jury is

11   coming in, that matter we were discussing at the bench right

12   before lunch, remind me and we will have another sidebar at

13   the break.  I did have the phone conversation.

14        And who is up?

15             MS. HOLLANDER:  Your Honor, on behalf of Mr. Abu

16   Baker I have no questions of this witness.

17             THE COURT:  Mr. Westfall?

18             MR. WESTFALL:  Your Honor, on behalf of Abdul Odeh I

19   have no questions.

20             THE COURT:  Mr. Dratel?

21             MR. DRATEL:  Same.  On behalf of Mr. El-Mezain no

22   questions.

23             THE COURT:  Mr. Cline or Ms. Moreno?

24             MS. MORENO:  No questions on behalf of Mr. Elashi

25   based on this testimony.

1          THE COURT:  Ms. Cadeddu?

2          MS. CADEDDU:  No questions for Mr. Abdulqader.

3          THE COURT:  Doctor Levitt, you are free to go.  You

4     may step down.  You are free to go.

5          MR. JONAS:  Your Honor, the Government calls Dawn

6     Goldberg.

7          Your Honor, she will be up here any moment.

8          THE COURT:  That is fine.

9          MR. JONAS:  I will just wait outside for her.

10         THE COURT:  That is fine.

11         While we are doing that, I will ask counsel to come up

12    and we will have the bench conference that we were talking

13    about.

14         (The following was had at the bench.)

15         THE COURT:  I did have that phone conversation with

16    Mr. McPherson.  It was a short one.  It wasn't classified.  We

17    just talked about the logistics.  And he is going to fax me

18    the index this afternoon.

19         MR. JONAS:  And it is coming to us?

20         THE COURT:  Yes.  And so then bring that up to us.

21    And what we discussed, preliminarily, tentatively, they will

22    have somebody here next Thursday.  And they need to be here

23    until I finish looking at it.  We will look some Thursday

24    afternoon, and then of course all of Friday since we won't be

25    in Court, and hopefully finish it then.

1    What I am going to do is I am going to look at the index.

2    He doesn't think it is going to be particularly helpful, as he

3    told you, but the way he described it, I want to take a look

4    at it to see if that will help me narrow.

5    And then he also mentioned about perhaps--it is several

6    thousand pages--about maybe sending a sample.  So I am going

7    to look at the index and give that sample issue some thought.

8    And then I told him I would let him know no later than Monday

9    exactly what to send.

10    MR. JONAS:  May I make a suggestion?  The Defense

11    may object to my suggestion.  You may want to narrow your time

12    frame, because the majority of the ones that we saw were mid

13    2000s forward.  I don't know if that helps or not.  In other

14    words, the time period that the Defense is interested in,

15    because this came up through the testimony of Mr. Abington,

16    was in the '90s.  So if Your Honor wants to look at the time

17    period, that is going to cut out a significant number of

18    these.

19    THE COURT:  That is a good point.

20    MR. CLINE:  I think that is actually a useful --

21    THE COURT:  So what time period would you be looking

22    at, then?

23    MR. CLINE:  We would be looking at I would

24    say -- When did Abington --

25    MS. HOLLANDER:  I would say --

1           MR. CLINE:  '97?

2           MS. HOLLANDER:  You mean, when did he leave there?

3           MR. JONAS:  Can I make a decision.  If you would

4    just say up to 2000, that will be a huge difference.

5           MR. CLINE:  Why don't we cut it off at 2000.

6           THE COURT:  Through 2000?

7           MS. HOLLANDER:  Up to.

8           MR. CLINE:  I would say through 2000.

9       One other suggestion, Your Honor, and some courts have

10   done this in these cases, it happened in *Libby*, it happened in

11   *North*, in *Poindexter*, I think, you might consider--and this is

12   in the supplement we filed, I think--letting us come in and ex

13   parte but without seeing the documents give you obviously a

14   somewhat hypothetical argument about what you might want to

15   look for.

16          THE COURT:  Yes.

17          MR. JONAS:  I think there is no secret here, Your

18   Honor, considering we went through the last trial, so I don't

19   see the need for an ex parte.

20          THE COURT:  We could do an ex parte on the record.

21   Frankly, it can be helpful to me in terms of -- Because I know

22   you all look at things differently and I look at things

23   differently, so I don't always have quite their perspective,

24   so that could be helpful to me.

25          MR. CLINE:  And certainly on the record.  No

1    question about that.

2              THE COURT:  And just have it there.  That is a good

3    idea.

4              MS. HOLLANDER:  If we go through 2000, will that cut

5    out a lot?

6              MR. JONAS:  I would say at least 75 percent is my

7    estimate.

8              THE COURT:  Let's do that, then.

9              MS. HOLLANDER:  Let's do that.

10             MS. MORENO:  Are we done with this subject?

11             MR. JONAS:  I am.

12             MS. MORENO:  I just wanted to make sure.

13        On a completely unrelated issue but with respect to the

14   next witness after Dawn Goldberg is Steven McGonigle, Your

15   Honor, and the Defense is requesting the admission of three or

16   four photographs.  I have shown then to Mr. Jonas.  I think he

17   will probably want to make objections.  I have them for you to

18   look at, so whenever it is opportune.

19             MS. HOLLANDER:  I actually have some, too.

20             THE COURT:  If you have them I can be looking at

21   them.

22             MR. JONAS:  Are the ones you plan on doing in the

23   email you sent?

24             MS. HOLLANDER:  I am not sure.

25             MR. JONAS:  I have the ones they sent in the email.

1          THE COURT:  How long do you expect putting on Dawn

2    Goldberg?

3          MR. JONAS:  Not long.  I think Dawn Goldberg will be

4    maybe a half an hour, assuming cross is the same as last time.

5          MS. MORENO:  Not long.

6          MR. JACKS:  Judge, may I be excused?

7          THE COURT:  Certainly.

8          MS. MORENO:  Your Honor, Mr. McGonigle is a reporter

9    for the Dallas Morning News, and he testified in the first

10   trial.  And his testimony, and I anticipate because Mr. Jonas

11   has told me it is going to be the same testimony essentially,

12   that he went to Gaza and he met with Mr. Abu Moharram, and in

13   fact he talks about Mr. Abu Moharram and he talks about what

14   he saw in Gaza, the conditions.  And he also says he went to

15   the Holy Land office in Gaza.

16       This is all I am asking is to admit -- First of all, I am

17   going to ask him to try to lay the predicate about Mr.

18   Moharram and then ask him if he can identify Mr. Moharram and

19   then also ask him if he went to the Gaza office, which I am

20   sure Mr. Jonas will bring up in direct like he did in the

21   first trial.  I am going to show him that, can he identify

22   this, and if he can, Your Honor, I think the predicate will be

23   laid.  I think it is relevant because -- so I think the

24   foundation will be laid, and I think, as this gentleman

25   actually went to Gaza saw these conditions and met

1    Mr. Moharram and went there.

2         But the relevance issue, which is the objection I

3    anticipate also from the Prosecution, my answer to that, Your

4    Honor, is that his testimony is being offered by the

5    Government to show that the Holy Land Foundation principals,

6    including my client, actually manipulated the interviews that

7    Mr. McGonigle had in Gaza with Sheikh Yassin and Mahmoud

8    Zahar.  Again, this shows the intent of our clients, that this

9    was charitable work.  And he will talk a little bit about that

10   charitable work.  I know this because he did this in the first

11   trial.

12             THE COURT:  Okay.

13             MS. MORENO:  And also there are, as you can see,

14   Your Honor, there are Holy Land logo shirts.

15             THE COURT:  Okay.

16             MS. MORENO:  So that is it.

17             MS. HOLLANDER:  These are also on the list.  And I

18   go after Linda, so I may or may not offer these.  But they

19   are --

20             THE COURT:  Similar?

21             MS. HOLLANDER:  They are all the same person.  And

22   the only one that is different, and this is the one I don't

23   know if you saw, he may or may not mention this this time that

24   what he saw at the office, and last time he mentioned that he

25   saw the backpacks.  I don't know if he is even going to

1    mention it this time.  So I was going to show him this one,

2    but then I discovered it was Lebanon.

3           MR. JONAS:  With regard to these pictures, we are

4    going to object to the foundation.  Ms. Moreno says it is

5    charity, but this witness doesn't know what is going on in

6    these pictures.  So I am going to ask if I can voir dire the

7    witness to ask him the same questions Mr. Jacks did.

8        With regard to the picture Ms. Hollander showed, I think

9    that is even further removed.  There is no Holy Land logos or

10   anything on that one.

11          MS. HOLLANDER:  And I may or may not introduce it.

12          MR. JONAS:  If she does introduce it.

13          THE COURT:  If she seeks to.

14          MR. JONAS:  I have a stronger objection.

15          THE COURT:  All right.

16          MR. JONAS:  And Ms. Goldberg is here.

17          (The following was had in the presence and hearing

18          of the jury.)

19          MR. JONAS:  Your Honor, as previously stated, the

20   United States calls Dawn Goldberg.

21       If I may approach the witness stand and give her the

22   exhibits?

23          THE COURT:  Yes.

24          (Whereupon, the oath was administered by the Clerk.)

25                       DAWN GOLDBERG,

1   Testified on direct examination by Mr. Jonas as follows:

2   Q.   Ms. Goldberg, what do you do for a living?

3   A.   I work for the Internal Revenue Service as a revenue

4   agent.

5   Q.   Okay.  And how long have you been with the IRS?

6   A.   Since 1985.

7   Q.   What is a revenue agent?

8   A.   The revenue agent is basically the accounting position

9   for the Internal Revenue Service.  We look at books and

10  records, we do examinations, we do audits.

11  Q.   Okay.  You said accounting or counting?

12  A.   Accounting.

13  Q.   Accounting.  Okay.  Who does the IRS audit?

14  A.   We audit -- Well, a revenue agent has a full realm.  We

15  can audit individual tax returns, we can do business returns,

16  we can look at returns for tax exempt organizations.

17  Q.   Okay.  Do you yourself conduct audits?

18  A.   Yes, sir.

19  Q.   Is the IRS divided into different divisions and groups

20  and sub groups?

21  A.   Yes, sir.

22  Q.   Okay.  What part of the IRS are you with?

23  A.   I actually work for an organization which is called Tax

24  Exempt Government Entities, and the business unit under that

25  is Exempt Organizations.

1   Q.   Tax Exempt Government Entities.  Is that what you said?

2   A.   Yes, sir.

3   Q.   There is a sub unit under that called what?

4   A.   Exempt Organizations.

5   Q.   Okay.  What is an exempt organization?

6   A.   What is an exempt organization?

7   Q.   Yes, ma'am.

8   A.   An exempt organization is an organization that is a

9   non-profit that is basically not paying taxes.  It doesn't pay

10  tax.

11  Q.   Are you familiar with something called the 501(c)(3)

12  organization?

13  A.   Yes, sir.

14  Q.   What is that?

15  A.   The Internal Revenue Code has different subsections, and

16  501(c)(3) is a subsection within the Code.  That is the subset

17  that talks about organizations that are tax exempt.  That is

18  the largest of all the tax exempt organizations.

19  Q.   Are there different codes or sub codes within the IRS

20  Code that address these tax exempt organizations?  Are there

21  different sections within the IRS code that addresses

22  organizations that can be tax exempt?

23  A.   Yes, sir.  Well, there is approximately 30 different

24  types of tax exempt organizations.  501(c)(3) is the largest

25  category.

1    Q.    Okay.  So that covers a few types of tax exempt

2    organizations?

3    A.    Yes, sir.

4    Q.    What type of tax exempt organizations are covered by

5    501(c)(3)?

6    A.    The largest part of that is going to be the charitable,

7    religious, educational organizations, scientific purposes.

8    Q.    Okay.  For purposes of your testimony here today, I just

9    want to focus on charities.

10   A.    Yes, sir.

11   Q.    And to be clear, charities fall under 501(c)(3)?

12   A.    Yes, sir.

13   Q.    What does an organization have to do in order to become a

14   501(c)(3) tax exempt charity?

15   A.    In general, an organization that wants to be recognized

16   as tax exempt would submit an application, which is a Form

17   1023, to the Internal Revenue Service.  The application is

18   submitted with some basic information for us to determine

19   whether they are going to operate -- whether they are

20   organized and operated for an exempt purpose.

21   Q.    Okay.  Would that application go to your section?

22   A.    No.  There is actually -- Within the Exempt Organization

23   Business Unit there is actually three sections.  There is the

24   Examination Section, which I am a part of; the Rulings and

25   Agreement which handles the applications, which would be what

1    we call the Determinations Section, where they actually get

2    the applications and determine whether they should be exempt;

3    and we have a Customer Education Section.

4    Q.    Okay.  So the section that it is sent to, you said, is

5    Rulings and --

6    A.    Rulings and Agreements, yes, sir.

7    Q.    What information is supplied on the application?

8    A.    Well, the application begins with a general

9    information--the organization's name, their address, it goes

10   into their activities, who the officers are, it talks about

11   their financial, either proposed or current financial

12   information, and --

13   Q.    Does it also include their charitable purpose?

14   A.    Yes, sir.

15   Q.    All right.  And when it is submitted, what happens?

16   A.    In general, the application is submitted to our folks in

17   Cincinnati, and they evaluate it.  And again, all applications

18   are looked at by somebody who is an exempt organization.  They

19   are going to look at it for activities to make sure their

20   activities are related to an exempt reason, and then they are

21   going to look at -- If everything required is submitted, let's

22   say their activities are correct and all the required

23   documentations are provided, because they send us their

24   articles of incorporation and their bylaws, if they submit

25   everything required, we basically issue a favorable ruling,

1    which means they get a determination letter saying that we

2    recognize them as tax exempt.

3    Q.    So basically if they supply all the information you need,

4    they get the tax exempt status?

5    A.    Yes, sir.

6    Q.    What happens if they don't supply all the information you

7    need?

8    A.    If information is missing or if the activities don't seem

9    to be for an exempt purpose, it would get assigned to an

10   exempt organization specialist who would be working with the

11   organizations to correct or get additional information on the

12   application.

13   Q.    Are you familiar with something called an employer

14   identification number?

15   A.    Yes, sir.

16   Q.    Do they also go by the acronym EIN?

17   A.    Yes, sir.

18   Q.    What is that?

19   A.    An EIN is similar to a social security number, also

20   called an SSN.  It is a unique number assigned to a business

21   entity.

22   Q.    Okay.  I ask you to slow down a little bit.

23   A.    Yes, sir.  Sorry.

24   Q.    It is okay.  Does the IRS try to work with organizations

25   in order for them to get their tax exempt status?

1   A.   The whole point of the Determinations Section, the Ruling

2   Agreement Section, is that is what their function is.  They

3   are there -- If somebody submits an application that is

4   missing information or doesn't quite tell us what they are

5   doing that qualifies to be exempt, we will work with them to

6   have the application be corrected.

7   Q.   So it is customer friendly?

8   A.   Yes, sir.

9   Q.   What type of investigation, if any, does the IRS do of

10  the entity or organization that is applying for tax exempt

11  status to make sure that it is a true charity?

12  A.   Well, since the application 1023 is submitted under

13  penalties of perjury, signed under penalties of perjury, we

14  are believing -- we work on the assumption that the

15  application is correct as filed, so we don't do any

16  investigations.

17  Q.   So do most organizations that apply for tax exempt status

18  get it?

19  A.   It is my understanding, sir, they do.

20  Q.   Are you familiar with something called the Form 990?

21  A.   Yes, sir.

22  Q.   What is that?

23  A.   That is the annual information return that a tax exempt

24  organization files.

25  Q.   If an organization is tax exempt, why do they need to

1    file a return with the IRS?

2    A.    The Form 990 is actually not a tax return.  It is an

3    information return.  And what that is, it puts out information

4    to the public -- Not only does it tell the IRS what the

5    organization is doing so we can make sure they are still

6    operating for an exempt purpose, but it also tells the public

7    what activities involved in, what their finances look like,

8    who the officers are, so that the public can make an informed

9    decision on whether to donate to this organization or not

10   donate to the organization.

11   Q.    Are most tax returns made available to the public?

12   A.    Most Form 990s?

13   Q.    All tax returns?

14   A.    No, sir, not all tax returns.

15   Q.    But are 990s made available to the public?

16   A.    Because Form 990s are an information return, they are a

17   public record.  In fact, there are several web sites.  You can

18   actually pull them up online.

19   Q.    What information is called for on a Form 990?

20   A.    The Form 990 begins with the basic

21   information--organization's name, address, their EIN, employer

22   identification number, it goes into the income of the

23   organization, it talks about the expenses of the organization,

24   officers, the activities.

25   Q.    Does it list out where they gave their money to in

1   furtherance of the charitable purpose?

2   A.    Absolutely; yes, sir.

3   Q.    Do charities ever have their Form 990s or their

4   organizations audited?

5   A.    They could.  That is the section I am assigned to.

6   Q.    That is what you do?

7   A.    Yes, sir.

8   Q.    When a charity is audited, what exactly do you look

9   through?  What sort of documents and such are you looking

10  through?

11  A.    Well, the organization of a Form 990 tax exempt

12  organization is a little different than looking at the 1040

13  for the individual or a corporate return.  The 990

14  examination, we are looking at not only the financial records

15  but we are also looking at the activities--what is the

16  organization doing, we would look at things like their

17  website, their meeting minutes, we would look at if they had

18  any contracts, anything that would show us what kind of

19  activities the organization was involved in.

20  Q.    Meeting minutes?

21  A.    Yes, sir.

22  Q.    What exactly is that?

23  A.    Meeting minutes are basically notes taken from -- during

24  a meeting.

25  Q.    And that is the type of thing -- What do you look for

1    when you are doing an audit of a charity in a meeting minute?

2    What type of information are you trying to gather?

3    A.    Again, because it is an activity examination, we are

4    trying to find out what kind of activities they are involved

5    in, where their money is going, what kind of donations they

6    are receiving.

7    Q.    And that is usually reflected in meeting minutes?

8    A.    It should be reflected -- Normally it is reflected in

9    meeting minutes.

10   Q.    Can you -- I should have done this a few minutes ago.

11   Can you define what you mean by meeting minutes?

12   A.    Define what we mean --

13   Q.    When you say meeting minutes, just give us exactly what

14   you mean.  What is a minute of a meeting?

15   A.    For example, if a board of directors gets together for an

16   annual meeting or a periodic meeting, there will be people

17   present and somebody would take notes, and those are

18   considered meeting minutes.

19   Q.    So is it like the transcript of what you are saying now,

20   though maybe not word for word?

21   A.    Correct.  Usually it is like a summary what happened

22   during that time.

23   Q.    Okay.

24        MR. JONAS:  Your Honor, a couple of exhibits I

25   forgot to show that I need to put up there.

1    Q.   (BY MR. JONAS)  Ms. Goldberg, I just handed you two

2    exhibits that are already in evidence.  If you look at HLF

3    Search No. 5.

4            MR. JONAS:  If we can put that on the screen,

5    please.

6    Q.   (BY MR. JONAS)  It is on the screen, and you have the

7    hard copy before you.  What is this document, if you can

8    identify it from your job.

9    A.   This appears to be the board meeting minutes for the

10   Occupied Land Fund from the date 16th to 18th February, 1991.

11   Q.   And who does it say the board members that are in

12   attendance?

13   A.   Present was Mohammad El-Mezain chairman; Ghassan Elashi;

14   and Shukri Abu Baker.  Sorry.

15   Q.   It is okay.  Is there anything unusual

16   about -- Withdrawn.  Is this the type of documentation you

17   would look through in conducting an audit of a charity?

18   A.   Certainly.

19   Q.   Have you looked through this before testifying today?

20   A.   I did look at this briefly a couple of days ago.

21   Q.   Okay.  Can you just tell us if there is anything unusual

22   about these board meeting minutes?

23   A.   Well, it has an agenda which talks about what they are

24   going to talk about.  It has the action plan of what their

25   objectives are.  It talks about their budget, the report.  It

1    appears to be regular meeting minutes.

2    Q.    Nothing unusual?

3    A.    No, sir.

4    Q.    Okay.  Also before you is what has been marked and in

5    evidence as Elbarasse Search No. 15.

6            MR. JONAS:  Can we do a split screen?

7            MR. CLINE:  Your Honor, may we approach for just one

8    moment?

9            THE COURT:  Yes.

10            (The following was had outside the hearing of the

11            jury.)

12            MR. CLINE:  Ms. Goldberg I don't believe testified

13    in this area last year, so I am surmising that what Mr. Jonas

14    has in mind is to show her what they consider to be the Arabic

15    minutes of the Palestine Committee meeting that happened

16    around the same time, and inquire whether there is something

17    unusual about having two sets of minutes and so on.

18        The bottom line is she has never looked at these

19    documents in the course of her work; only for her testimony.

20    The company was never audited.  These minutes were never

21    examined.  She doesn't even have records that go back this far

22    because the IRS didn't keep them.  So it is entirely

23    speculative on her part.

24        She is not testifying as an expert, and I think it is

25    beyond her personal knowledge, it is speculative, and it is

1    403 material to allow her to start comparing these two sets of

2    minutes, if that is what he has in mind.

3            MR. JONAS:  My question is going to be -- First of

4    all, I don't think we ever posed this whole Elbarasse Search

5    No. 15 is Palestine Committee minutes.  I think we postured

6    that they are minutes of the HLF board of director meetings,

7    and maybe there is more to it.  Anyhow, this is the type of

8    the material she reviews when she conducts audits.  She just

9    testified to that.

10           My question is going to be is there anything unusual

11   about these other minutes meetings which I think are pretty

12   clear on the face is from the same meeting--the dates, the

13   locations are the same.  It says The Fund in Elbarasse one,

14   and "Is there anything unusual?"  And she is going to testify

15   that, "I would expect there is information in the Elbarasse

16   one that I would expect to be in the HLF one, that I normally

17   would expect to see."

18           MR. CLINE:  That assumes that they are the same

19   meeting, and we don't concede that they are, and there has

20   been no testimony that they are.  It is equally plausible that

21   there was a Palestine Committee meeting that occurred in the

22   same place and overlaps.  These actually aren't the same.

23   They overlap, but they are not the same.

24           MR. JONAS:  I think two points.  One, it goes to

25   weight and argument.  Two, if you want to concede that your

1    client was a part of the Palestine Committee and this was

2    minutes of a meeting that he attended, then I would be happy

3    to withdraw the question.

4         MR. CLINE:  I am not conceding anything, but my

5    point is that this witness has no personal knowledge of this

6    whatsoever, and to ask her to compare and draw inferences --

7         THE COURT:  But she is comparing and drawing

8    inferences from documents that are in evidence.

9         MR. CLINE:  The documents are in evidence, but they

10   are not documents that she has any knowledge of.  She is going

11   to be drawing inferences --

12        THE COURT:  But from her knowledge.  You are asking

13   her based on her experience?

14        MR. JONAS:  Her experience as an auditor of

15   charities and the type of material that she looks through when

16   she audits charities, is this what she would normally see, and

17   she --

18        THE COURT:  Why is that improper for her to look at

19   documents that are in evidence based on her experience?

20        MR. CLINE:  Because she doesn't know what these

21   documents are.  She is going to --

22        THE COURT:  I understand that is subject to

23   questioning, but why doesn't that go to weight?  I am talking

24   about what she is going to say.  Looking at these documents,

25   you are going to ask her to compare them.  I don't have the

documents before me.  I am assuming it is something that can

be argued either way as to whether it is the same meeting or

not.  It would appear to go to the weight.  You all can argue

that, and the jury can make its own determination.  But what

she is going to say, that is not what she will testify about.

She is going to look at the documents.  You are going to ask

her what is in the documents, and she will give her opinion.

MR. CLINE:  But the premise of her opinion -- And by

the way, she is not an expert.

THE COURT:  He is asking her to talk about what she

does, so she can do that.

MR. CLINE:  The premise is going to be that these

are basically a double set of minutes from the same meeting.

THE COURT:  I understand, and I understand you are

disputing that.  But what I am saying, why doesn't that go to

the weight and the jury has to resolve that?  Her opinion

isn't going to go to whether they are the same meeting or the

same organizations or the same meetings, but just what is on

the documents.  She is not going to give any opinion on this

disputed issue between the parties.

MR. CLINE:  I think at some point weight figures

into the 403 calculus, because you are weighing probative

value against unfair prejudice.

THE COURT:  Why is this unfair prejudice?

MR. CLINE:  Because the implication through this

witness' testimony on a matter for which she has no personal

knowledge is that these are two sets of minutes from the same

meeting, and that is an unfair inference to permit to be

drawn.

THE COURT:  It might depend on the conclusion that

is drawn as to that issue, which will be for the jury.  She is

not going to make that conclusion.

MR. CLINE:  Well, I am a little worried she is going

to.

MR. JONAS:  I am going to ask her do the dates and

locations match up, which they do.

THE COURT:  But that is from documents.

MR. JONAS:  It is from the documents.  And the

document talks about the Fund, which I think we have

established the Fund is a shorthand term for --

THE COURT:  There is evidence to that.

MR. JONAS:  So I am not going to ask her to draw a

conclusion that they are same, but I am just going to ask her

those questions and let the jury draw their own conclusion.

MR. CLINE:  I think the question only has

significance if they are from the same meeting.

THE COURT:  I understand.

MR. JONAS:  It is cross examination.

THE COURT:  And I think that is an issue that is in

dispute, and I think that still goes to the weight.  I

1    overrule the objection.  You may ask about that.

2              (The following was had in the presence and hearing

3              of the jury.)

4              THE COURT:  Mr. Jonas?

5              MR. JONAS:  Thank you sir.

6    Q.  (BY MR. JONAS)  Ms. Goldberg, I am assuming you had a

7    moment to look at Elbarasse Search No. 15 while we were on the

8    sidebar.

9    A.    Yes, sir.

10   Q.    Okay.

11             MR. JONAS:  If we can do a split screen, please.  On

12   Elbarasse Search No. 15, can we go to the first page of the

13   English?

14   Q.  (BY MR. JONAS)  Ms. Goldberg, Elbarasse Search No. 15,

15   which is the Arabic document, what is the date of that?  The

16   date of the meeting?

17   A.    "The following issues have been agreed on during the

18   meetings of the board of directors in the city of Los Angeles

19   on 2/17/1991."

20   Q.    And how does that compare to the date of the meeting

21   minutes HLF Search No. 5, the ones in English?

22   A.    It is the same dates.  The other one is 16th through 18th

23   of February.

24   Q.    How about location?

25   A.    Same location, Los Angeles.

1    Q.   And does the Elbarasse Search No. 15, the Arabic one,

2    does that indicate anywhere as to who it is addressed to?

3    What organization?  You may find that near the top.

4    A.   It is addressed to "Dear brother, chairman of the board

5    of directors of the Fund.  May God keep and protect him."

6    Q.   And whose board meeting minutes are HLF Search No. 5,

7    which is the English one?

8    A.   I am sorry.  What is the question?

9    Q.   What organization is on HLF Search No. 5?

10   A.   The Occupied Land Fund.

11   Q.   Okay.  Now, Ms. Goldberg, is there anything unusual about

12   these two documents?  Based upon your experience as someone

13   who conducts audits for the IRS, and that these are the type

14   of documents you would look at, is there anything unusual, now

15   looking at these two documents?

16   A.   Well, there are some contradictory information.  In the

17   Arabic document it talks about the Fund is going to pay

18   $25,000 annually to the Central Committee.  It talks about

19   brother Baker's salary is going to be $36,000 annually.

20   Q.   I am sorry.  Say that again.

21   A.   "Brother Shukri Abu Baker's salary will be $36,000

22   annually, including everything.  Brother Ghassan Elashi will

23   commit to working four hours daily at the Fund as a public

24   relations."  These are items that should be in the general

25   meeting minutes.

1   Q.   Are they?

2   A.   I didn't see any indication of that, sir.

3   Q.   Okay.  Thank you.  You can put that aside.

4       With regard to charities, are there -- 501(c)(3)

5   charities, are there any type of restrictions on what they can

6   do with their money?

7   A.   Well, certainly.  501(c)(3) says an organization has to

8   be operated for an exempt purpose.  So the expenses have to be

9   related to the exempt purpose.  They couldn't use any of the

10   funds for, like, benefiting an insider.  An officer or

11   director couldn't be paying themselves excessive salaries.

12   They can't do any political activity.  They can't do anything

13   illegal.  The earnings have to cannot inure to the benefit of

14   someone.

15   Q.   What do you mean by inure to the benefit of someone?

16   A.   The money cannot actually be used for someone's personal

17   use.

18   Q.   Okay.  When you say they can't do anything illegal, what

19   do you mean by that?

20   A.   Well --

21   Q.   More specifically, with regard to the funds that they are

22   distributing that are ostensibly for the charitable purposes,

23   can you explain -- Does the statement you made about they

24   can't do anything illegal relate to their distribution of

25   funds?

1    A.    Well, because a 501(c)(3) is a public charity, it has to

2    benefit the public.  It has to be doing public good.  If it is

3    doing something illegal, that is not really in the public

4    interest.  So that would not be a good thing.

5    Q.    Are these restrictions, such as not using the money for

6    anything illegal, published anywhere?

7    A.    Yes, sir.  There has been published guidance since at

8    least the 1980s.

9    Q.    Published by whom?

10    A.    Published by the Internal Revenue Service.

11    Q.    Does the IRS expect a charity to be familiar with these

12    type of restrictions?

13    A.    Well, a charity is like any other business.  They need to

14    know what their responsibilities are and follow the law.

15    Q.    In 1995, Hamas was designated as a specially designated

16    terrorist organization, making it illegal to give money to

17    Hamas.  Is a charity allowed to make payments to a terrorist

18    organization that has been designated by the United States

19    government?

20    A.    Absolutely not.

21    Q.    How about if Hamas was using the money for what would

22    appear to be charitable purposes?

23    A.    It wouldn't make a difference.  It is still benefiting

24    Hamas.

25    Q.    Is there anywhere in the Form 990 that would reflect a

charity being able to give money to a terrorist organization?
A. Well, since a tax exempt organization, cannot give to a terrorist organization, there wouldn't be a place for it on the 990.
Q. Have you heard of the Holy Land Foundation?
A. Yes, sir.
Q. Are you aware if they themselves became a 501(c)(3) tax exempt organization?
A. I received information on their application, so yes, I am aware they are tax exempt, sir.
Q. You have before you HLF -- what has been marked and not in evidence HLF Tax No. 10. I am sort of skipping to the bottom of the pile first. Without reading the contents of the document, what is that?
A. This is the Form 1023 application for recognition of exemption.
Q. Is that the application filed when someone wants to become a tax exempt organization?
A. Yes, sir.
Q. Whose name is that in?
A. It is under the name of the Occupied Land Fund.
Q. Is that a certified copy? In other words, the blue sheet in front of it, does it make it certified?
A. Yes, sir. It says "Certificate of official record."
MR. JONAS: Your Honor, at this time I would offer

into evidence HLF Tax No. 10.
MR. CLINE: No objection.
THE COURT: Admitted.
Q. (BY MR. JONAS) Ms. Goldberg, you said this is for Occupied Land Fund. Is this document signed by anybody?
A. On the front page it is signed by -- The signature is a little blurry, but yes, it is signed.
Q. Can you read the name? If not, don't worry about it.
A. It looks like the last name is Elashi, secretary.
MR. CLINE: We will stipulate, Your Honor.
MR. JONAS: Thank you, sir.
Q. (BY MR. JONAS) Does this have an employment identification number, the EIN number you testified about earlier?
A. Yes, sir.
Q. And what is that number?
A. 95-4227517.
Q. 95-422?
A. That is what it appears to be on this copy.
Q. Okay.
A. Maybe it is a 922.
Q. Okay. It is either 922 or 422. But you are going to talk about their number again later on?
A. Yes, sir.
Q. In other documents?

1    A.    Yes, sir.

2    Q.    And on other documents is it typewritten?

3    A.    I believe so, sir.

4    Q.    Okay.  Does it say anywhere in this Form 1023 what the

5    charitable purpose of the Occupied Land Fund was purported to

6    be?

7    A.    Yes, sir.

8    Q.    Okay.  Where is that?

9    A.    On the second page, which is Part III, activities and

10   operational information.

11   Q.    Okay.  Can you read that?

12   A.    "The organization has developed out of a working

13   relationship with another non-profit organization by which it

14   has acquired the experience needed to carry out its goals.

15   Its goals include principally to provide disaster and medical

16   relief to refugees in war torn areas of the world, and to make

17   contributions to other organizations that have charitable

18   activities benefiting the poor and indigent needy throughout

19   the world.  The organization is ready to commence mail

20   solicitation activities under its own auspices, but will wait

21   appropriate approval of its exempt status with the Internal

22   Revenue Service.  It has incorporated itself under the laws of

23   the State of California as a non-profit public benefit

24   corporation, and has applied for exemption from taxation

25   within that state."

1    Q.   If an organization is part of a larger organization,

2    should that be reflected anywhere on this form?

3    A.   I don't understand the question.

4    Q.   An affiliation where there is a larger organization that

5    oversees it.

6    A.   Certainly.

7    Q.   Is there anything like that contained within the Form

8    1023?  In fact, let me be more specific with my question.

9    Does it say anywhere in this Form 1023 that the Holy Land

10   Foundation, or the Occupied Land Fund at that time, is

11   affiliated with something called the Palestine Committee?

12   A.   I need a second to review the return.

13   Q.   Sure.

14   A.   I don't see anything on here to say it is affiliated with

15   the Palestine --

16   Q.   Committee?

17   A.   Committee.

18   Q.   Okay.  What is the date, by the way, of this application?

19   A.   This application was received by the Internal Revenue

20   Service on July 19th, 1989.

21   Q.   Do you know if the Holy Land Foundation was ever granted

22   tax exempt status?

23   A.   Actually I did review a document which was the letter

24   granting them exempt status, the tax exempt letter.

25   Q.   Before you is what has been marked as HLF Tax No. 11.  Do

1    you have that?

2    A.    Yes, sir.

3    Q.    Okay.  Again, without reading the contents, what is that

4    document?

5    A.    This is the letter 1045, which is the letter granting

6    them tax exempt status.

7    Q.    Them being who?

8    A.    It was issued to the Occupied Land Fund on January 8th,

9    1990.

10   Q.    Is this form also certified?

11   A.    Yes, sir.

12        MR. JONAS:  Your Honor, at this time I would offer

13   into evidence HLF Tax No. 11.

14        MR. CLINE:  No objection.

15        THE COURT:  Admitted.

16   Q.    (BY MR. JONAS)  Ms. Goldberg, what is the date of the

17   letter granting them the tax exempt status?

18   A.    January 8th, 1990.

19   Q.    And when did the tax exempt status go into effect?

20   A.    The tax exempt status was actually effective January

21   11th, 1989.

22   Q.    Can you explain how the IRS granted tax exempt status a

23   year prior to the letter being issued?

24   A.    Certainly.  Organizations that submit an application

25   within 15 months of formation can actually receive tax exempt

1  status as of the date of formation, so in this case it would

2  be January 11th, 1989, so it is kind of a retroactive

3  exemption.

4  Q.   You should have also before you what has been marked as

5  HLF Tax No. 1 through 9, nine separate folders.

6  A.   Yes, sir.

7  Q.   Okay.  Can you take a quick look at those and confirm

8  what they are?

9  A.   These appear to be the Form 990s beginning in 1992, and

10 they are certified copies.

11 Q.   Form 990s for whom?

12 A.   For the Holy Land Foundation for Relief and Development.

13 Q.   Okay.

14 A.   And they seem to go all the way to 2000.

15 Q.   Are they all certified?

16 A.   Yes, sir.

17        MR. JONAS:  Your Honor, at this time I would offer

18 into evidence HLF Tax No. 1 through HLF Tax No. 9.

19 Q.   (BY MR. JONAS)  I believe No. 1 is what year, Ms.

20 Goldberg?

21 A.   No. 1 is the 1992.

22 Q.   Okay.

23        MR. JONAS:  And I believe, Your Honor, No. 1 is

24 1992, No. 2 is 1993, so forth, up until 2000.

25        MR. CLINE:  No objection.

THE COURT:  Those are admitted.

Q.  (BY MR. JONAS)  Ms. Goldberg, did these copies come from the IRS?

A.  They are certified copies, so it appears this is a copy that came from the Internal Revenue Service, yes, sir.

Q.  If you know, why is there no return for 1991, 1990, and the prior years?

A.  Well, it is my understanding that we requested all the different years, and prior to '92 there were no returns available.  We have something called retention period, when after so much time they actually do go in and destroy records.

Q.  So it isn't that they didn't file any returns prior to '92; it is just that the IRS didn't keep them?

A.  That is correct, sir.

Q.  We talked a moment ago about an EIN number, employer identification number.  I had you read off of that first form from the Occupied Land Fund.

A.  Yes, sir.

Q.  Can you just connect up that Form 1023, the letter that the IRS sent to the HLF granting its tax exempt status, and these tax returns, because I think the first two documents were addressed to the Occupied Land Fund and these documents, these later documents are the Holy Land Foundation tax returns.  How do you connect the two?

A.  As I mentioned, the EIN number, the employer

1    identification number, is a unique number, kind of like the

2    social security is unique to us as individuals.  So on the 990

3    for 1992, it has the same EIN number, 95-4227517, which is the

4    Holy Land Foundation for Relief and Development.  So that is

5    how you connect them.  They are the same EIN number.

6    Q.    When you say it is the same number, it is the same number

7    on the application and the letter granting the tax exempt

8    status?

9    A.    Yes, sir.

10   Q.    Okay.  Are the Form 990s, HLF Tax No. 1 through HLF Tax

11   No. 9 the same in terms of the information called for on the

12   form?

13   A.    During these years the forms did not change

14   substantially.  They are substantially the same.

15   Q.    So let's just pick one and walk through it.  Okay.  And

16   we will take the last one, HLF Tax No. 9, which is 2000 year.

17         MR. JONAS:  And if we could put the second page on,

18   the first page after the certification.

19   Q.    (BY MR. JONAS)  Okay.  Can you just walk us through the

20   information in the top half of the form, please?

21   A.    Sure.  The beginning part talks about the name of the

22   organization, their address.  Again, their employer

23   identification number is on the right in box D.  It has a

24   telephone number.  It talks about in Part I -- The first part

25   is basically general information as to what the organization

1    is.

2          As you are scrolling down, the Part I talks revenue

3    expenses.  And that is exactly what that is--the source of

4    contributions, whatever income they received, like in this

5    case they had some interest and dividends from securities.

6    Q.    Is that unusual for a charity to have interest off

7    securities?

8    A.    No, not at all.

9    Q.    Okay.  It says in line 1A, "direct public support:  $13

10   million."  What does that mean?  What is direct public

11   support?

12   A.    That would be contributions they receive from the public.

13   Q.    Donations?

14   A.    Donations, yes, sir.

15   Q.    Okay.  Now if we can scroll down, is there anywhere on

16   here that shows how much money they spent?

17   A.    Well, on line 13 through 17 is the expense section, and

18   line 17 is the total expense.

19   Q.    Okay.  I notice on line 21 it says "Net assets," and it

20   is $5 million.  Can you explain that?

21   A.    That is basically the assets, like the property or

22   whatever assets they have, their cash in the bank, whatever,

23   and that actually comes from the balance sheet.

24   Q.    Let me move up.  On line 18, it says excess for the year,

25   "Excess of deficit."  There is an excess of $3 million.  Is it

1    unusual for a charity to take in more money than it gives out?

2    A.    Not at all, because even though it is a non-profit, we

3    expect them to make money so they can have money to do their

4    exempt purpose.  They may be saving the money to build a

5    building, they may be using that money for multiple purposes.

6    So no, that is not unusual at all, sir.

7    Q.    I want to go back to line 13 program services under the

8    expense side.  What exactly is that?

9    A.    Program services are the expenses that directly relate to

10   the organization accomplishing their exempt purpose.

11   Q.    Okay.  It refers to line 44 column B.

12        MR. JONAS:  If we can go to the next page, please.

13   Q.    (BY MR. JONAS)  Is line 44 column B on this page?

14   A.    Yes, sir.

15   Q.    And can you explain that?  Just break it down for us.

16   A.    Well, Part II is a statement of functional expenses, and

17   what this is, all organizations complete column A, which is

18   the total amount of expenses they incurred -- total amount of

19   expenses they paid.  Program services are those expenses

20   directly relating to accomplishing their exempt purpose.  The

21   management fees, which is column C, is going to be like people

22   running the office, the administrative stuff.  And fundraising

23   would be if they are doing any calling or doing any direct

24   mail-outs or anything.  But a charity would complete all the

25   columns.

1   Q.   Okay.  So program services includes different expenses as

2   well as how they distribute their money in furtherance of

3   their charitable purposes?

4   A.   Yes, sir.

5   Q.   Okay.  Can you tell us if this return is signed?

6   A.   The signature will be on page 6, which I believe is page

7   7 of your document because you have the cover sheet.  And it

8   is signed at the bottom.  And yes, sir, it is signed.

9   Q.   Who signs it?

10  A.   Well, the signature is not really legible, but it is --

11  To the right it says Ghassan Elashi, chairman.

12  Q.   Okay.  And I just need to go back to the prior return,

13  HLF Tax No. 8, and go to page 7 of that one also.

14  A.   Is that the tax year 1999?

15  Q.   You tell us.

16  A.   You did say Exhibit No. 8.  Right?

17  Q.   HLF Tax No. 8.

18  A.   In that case the signature line is going to be on page 9.

19  Q.   Okay.  And who does it appear to have signed that one, if

20  you can tell?

21  A.   I am sorry.  The signature is not really legible.

22  Q.   Okay.  And if we can go back one more return, HLF Tax

23  No. 7.

24  A.   That would be on page 7.

25  Q.   What year is that for?

1   A.   And this is for tax year 1998.

2   Q.   Okay.  Who signed that one?

3   A.   That one I can read.  Actually the signature is not

4   clear, but to the right it says Shukri A. Baker, CEO.

5   Q.   Okay.  Ms. Goldberg, did you go through the returns and

6   total up the amount of donations that the HLF received from

7   the returns you have before you?

8   A.   Yes, sir.

9   Q.   Was a tax return filed for 2001?

10  A.   No, sir.

11  Q.   Did you look -- were you able to determine how much in

12  donations that the HLF received for 2001?

13  A.   Using the bank records, I determined the deposits, which

14  is basically I took the deposits that came in and took off

15  anything that was not taxable, like transfers, and came up

16  with a total for that, yes, sir.

17  Q.   Approximately how much in donations did the HLF receive

18  from 1992 through 2001?

19  A.   From my recollection, it was approximately $56 million or

20  $57 million.

21  Q.   Did you also try to determine how much was paid out,

22  according to the program services line on the returns, from

23  1992 through 2000?

24  A.   We did for 1992 through 2000.  2001 the records were not

25  available.  For those years, from '92 to 2000, it was

1    approximately $36 million.

2    Q.    You say the records weren't available.  You just haven't

3    looked through them?

4    A.    I didn't have access to the records.

5    Q.    Okay.

6              MR. JONAS:  One moment, Your Honor?

7              THE COURT:  Yes.

8              MR. JONAS:  Pass the witness.

9              THE COURT:  Okay.  Ms. Duncan?

10                        CROSS EXAMINATION

11   By Ms. Duncan:

12   Q.    Good afternoon, Agent Goldberg.

13   A.    Good afternoon.

14   Q.    Now, you said that although you requested all available

15   returns, you did not receive tax returns for the Occupied Land

16   Fund in 1989, '90, or '91.  Is that correct?

17   A.    That is correct, ma'am.

18   Q.    And you also testified that the IRS has a document

19   retention policy that requires the destruction of documents

20   after a certain period of time.  Is that right?

21   A.    I know we have a retention period, but I don't know what

22   the period is or anything.

23   Q.    Okay.  But after that period then documents are

24   destroyed.  Is that correct?

25   A.    It is my understanding that they are destroyed.

1  Q.   Okay.  So the bottom line is that the IRS did not have

2  copies of the Holy Land Foundation or Occupied Land Fund

3  returns for those years.  Is that correct?

4  A.   For the years you mentioned, no, ma'am.

5  Q.   Okay.

6           MS. DUNCAN:  Your Honor, may I approach?

7           THE COURT:  Yes.

8  Q.   (BY MS. DUNCAN)  I am showing you what is marked as

9  Defense Exhibits No. 1080, 1081, and 1082.  If you could take

10  a look at these for me, please.

11  A.   Okay.  These appear to be copies of the '89, '90, and

12  1991 Form 990.

13  Q.   And those do not appear to come from the IRS, do they?

14  A.   No, ma'am, because our copy would have our stamp on the

15  front.

16  Q.   Okay.  And just to clarify, Defense Exhibit No. 1080, can

17  you tell me what return for what year that is?

18  A.   This is for tax year 1989 for the Occupied Land Fund.

19  Q.   And Defense Exhibit No. 1081, could you give me the same

20  information?

21  A.   Sure.  It is the Occupied Land Fund's Form 990 for 1990.

22  Q.   And the same for Defense Exhibit No. 1082?

23  A.   It is the Form 990 for 1991 for the Holy Land Foundation

24  for Relief and Development.

25  Q.   Thank you.

1          MS. DUNCAN:  Your Honor, we move the admission of

2     Defendants' Exhibits No. 1080, 1081, and 1082.

3          MR. JONAS:  No objection.

4          THE COURT:  Those are admitted.

5          MS. DUNCAN:  Thank you.

6     Q.   (BY MS. DUNCAN)  Now, as a 501(c)(3) tax organization,

7     the Holy Land Foundation was required to keep certain

8     financial records.  Is that correct?

9     A.   That is correct.

10    Q.   But they were not required to keep documents that went

11    back as far as 1989, were they?

12    A.   No, ma'am.

13    Q.   And in fact the standard for a 501(c)(3) organizations is

14    that they are require to keep records for three years.  Is

15    that correct?

16    A.   In general, yes, but it kind of depends.  If they had

17    property they bought or sold, or assets they were

18    depreciating, they could retain them longer.

19    Q.   Okay.  But for information, for example, bank statements,

20    they are required to keep those for only three years.  Is that

21    right?

22    A.   In general, yes, ma'am.

23    Q.   Okay.  And canceled checks, receipts, also three years?

24    A.   Same.

25    Q.   Okay.  Now, you testified--I am not sure if you did--but

1   the IRS never audited the Holy Land Foundation.  Is that

2   correct?

3   A.   My review of the records indicated we did not do an audit

4   for this organization.

5   Q.   But the IRS could have audited them had it chosen to do

6   so.  Is that right?

7   A.   Yes, ma'am.

8   Q.   And the Holy Land Foundation would have been required to

9   show you those records?

10  A.   Certainly.

11  Q.   To back up the information provided on the Form 990.  Is

12  that right?

13  A.   Yes, ma'am.

14  Q.   Now, I would like to ask you about the Holy Land

15  Foundation's return for 1992, which is Government Exhibit HLF

16  Tax No. 2.

17  A.   Did you say 1992, ma'am?

18  Q.   Yes.  You know, I think I grabbed the wrong one.  I think

19  I have the one for 1993.

20  A.   Because the exhibit Tax No. 2 is 1993.

21  Q.   Okay.  We will look at that one.  It has the same

22  information.  I would like to turn to page 7 of this exhibit.

23  Actually, you know what?  That is the wrong page.  Oh, yes, to

24  page 7.  And can you tell us what this document is?

25  A.   Are you talking about the Schedule A?

1    Q.    That is right.

2    A.    The Schedule A is the organization 501(c)(3) supplemental

3    information.

4    Q.    This is a schedule that is attached to the Form 990.  Is

5    that correct?

6    A.    Yes, ma'am.

7    Q.    And I would like to turn to page 8, and I want to go down

8    to line No. 26.  And could you tell us, please, what

9    information is required in line 26?

10   A.    It says, "For organizations described in lines 10 or 11."

11   Q.    So let's go back up to line 10 or 11.  And are either of

12   those boxes checked?

13   A.    Yes, ma'am; 11a is checked.

14   Q.    And what is that check?  Could you just read what 11a

15   says, please?

16   A.    Certainly.  "An organization that normally receives a

17   substantial part of its support from a governmental unit or

18   from the general public.  It is a Section 170(b)(1)(A)(vi)."

19   Q.    And now can we go back to line 26, and if you could tell

20   me what information is required there, please?

21   A.    You are going to enter two percent of the amount on line

22   24, and you are going to attach a list showing the names and

23   amount contributed by each person whose total gifts for 1989

24   through '92 exceeded the amount in line 26a.

25   Q.    And there is an amount written there.  Is that correct?

1    A.    Yes, ma'am.

2    Q.    If we could now turn to page 14.  In the middle of the

3    page you see here where it says Part IV, line 26b?

4    A.    Yes, ma'am.

5    Q.    And that would correspond with the line you just read.

6    Is that right?

7    A.    That is correct, ma'am.

8    Q.    And we see three contributions.  Is that right?

9    A.    Yes, ma'am.

10    Q.    And in the middle we see a contribution under the name

11    Mousa Abu Marzook, and then for the total gift, and it says

12    here 1989 to 1992.  Is that correct?

13    A.    Yes, ma'am.

14    Q.    So a total gift of $210,000.  Is that right?

15    A.    Yes, ma'am.

16    Q.    Okay.  And turning back to page 9, and if we could look

17    at the entry on line 28, please.  Now, this provision requires

18    attachment of a schedule showing unusual grants for that same

19    period.  Correct?

20    A.    That is correct.

21    Q.    1989 through 1992?

22    A.    That is correct.

23    Q.    Okay.  And if we turn back one more time to page 14, so

24    we see the same sort of information.  Correct?  We see the

25    year is 1989, 1990, '91, and '92?

1   A.   Yes, ma'am.

2   Q.   And looking at 1992, the first entry there is Mousa Abu

3   Marzook, $210,000, and then one time cash.  Is that correct?

4   A.   Yes, ma'am.

5   Q.   And that is included among other large donations that

6   were made during that period.  Is that correct?

7   A.   That is correct.

8   Q.   And I think that you testified on direct that these

9   forms, these Form 990s were public.  They were public forms?

10  A.   Yes, ma'am.

11  Q.   Now, you discussed the letter that reflected Holy Land

12  Foundation's tax exempt status.  Is that right?

13  A.   Yes, ma'am.

14  Q.   And you are aware that Holy Land Foundation maintained

15  its tax exempt status until it closed in 2001?

16  A.   That is my understanding, yes, ma'am.

17  Q.   Okay.

18           MS. DUNCAN:  Your Honor, may I approach?

19           THE COURT:  Yes.

20  Q.   (BY MS. DUNCAN)  I am showing you what has been marked as

21  Defense Exhibit No. 1083.  And do you recognize that document?

22  A.   Yes, ma'am.

23  Q.   And could you tell us what it is?

24  A.   This is a letter that is issued by our Cincinnati office.

25  It appears somebody contacted -- the Holy Land Foundation for

1    Relief and Development contacted the IRS by telephone on May

2    30th and asked for a copy of the determination letter, which

3    is the letter we discussed earlier.  And what this is, this

4    basically saying our records reflect that --

5              MR. JONAS:  Your Honor, it is not in evidence yet.

6              THE WITNESS:  I am sorry.

7              MS. DUNCAN:  Your Honor, we move the admission of

8    Defense Exhibit No. 1083.

9              MR. JONAS:  I would like to see a copy.  I wasn't

10   notified of these exhibits.

11             THE COURT:  Do you want to let him take a look at

12   it, counsel?

13             MR. JONAS:  No objection, Your Honor.

14             THE COURT:  Admitted.

15   Q.   (BY MS. DUNCAN)  Okay.  Go ahead.  Could you tell us what

16   is in this letter?

17   A.   Yes.  What this is, if somebody loses their exemption

18   letter, which was the 1045 letter we looked at earlier, they

19   can contact the Service and ask for either a copy of it or

20   information.

21        This letter was issued to them on May 30th, 2000 that

22   says, "In response to your telephone request on May 30th, this

23   letter takes the place of the copy of the letter you

24   requested."  And it basically talks about what code section

25   they are exempt under, and that as of May 30th they were still

1   a tax exempt organization.

2   Q.   Thank you.  Now, you said that when you were tallying of

3   the total contributions for the foundation from I believe 1992

4   to 2001, that you did not have complete information for 2001.

5   Is that right?

6   A.   The only records that I had was the bank deposits which

7   show the income and the transfers.

8   Q.   For 2001?

9   A.   For 2001.  For the other years I took the calculation off

10  of the Form 990 itself.

11  Q.   Okay.  So for the years 1992 to 2000 you had information

12  regarding both the income and the expenditures for those

13  years--the program expenses.  Is that correct?

14  A.   Well, the only thing I had was the 909s themselves.  I

15  didn't have any actual records.

16  Q.   I am sorry.  I am not being clear.  But the numbers that

17  you told us about, the totals that you came up with, those

18  were calculated using the Form 990.  Is that correct?

19  A.   Yes.

20  Q.   For those years.  But then for 2001, you added income

21  based on your review of the bank records?

22  A.   That is correct.

23  Q.   Right?  But you didn't have information regarding the

24  program expenses for 2001.  Is that right?

25  A.   That is correct.

1  Q.  Okay.  But that doesn't mean that there weren't

2  expenditures in 2001.  You just didn't have the records.

3  A.  That is correct.

4  Q.  And did you calculate what the total income was just for

5  the period of -- for just the period 1992 to 2000, the years

6  that you also had program service expenses?

7  A.  Again, using the 990 I added those up.  I didn't bring my

8  notes with me, so I couldn't tell you how much they were

9  without the last year.

10  Q.  Okay.  So when you testified about the income from 1992

11  through 2001 using the Form 990, and then also bank records,

12  and then also testified about the program service expenses for

13  1992 to 2000, the time periods of those two numbers don't

14  match.  Is that right?

15  A.  That is correct, because we didn't look at program

16  expenses for 2001.

17  Q.  Thank you.

18      MS. DUNCAN:  No more questions, Your Honor.

19      THE COURT:  Mr. Cline?

20        CROSS EXAMINATION

21  By Mr. Cline:

22  Q.  Good afternoon.

23  A.  Good afternoon, sir.

24  Q.  I have just a few questions for you.

25      You testified a few moments ago about two sets of minutes

1    from February of 1991.  Do you recall that?

2    A.    Yes, sir.

3    Q.    When was the first time you saw those two documents?

4    A.    In preparing to testify, those documents were provided to

5    me.

6    Q.    And how long ago was that?

7    A.    I don't recall exactly.

8    Q.    A day or two?

9    A.    No, it was a few weeks.  To be honest with you, I think

10   it is a couple of months ago.  I am not exactly sure of the

11   date.

12   Q.    Within the last few months was the first time you saw

13   those documents?

14   A.    Yes, sir.

15   Q.    I take it you never encountered those documents as part

16   of an IRS audit, or anything like that?

17   A.    No, sir.  We have nod conducted an audit of this

18   organization, to my knowledge.

19   Q.    So to your knowledge, no one from the IRS ever relied on

20   these documents as part of an IRS audit.  Correct?

21   A.    I can't testify to that because I don't know who else had

22   access to them.

23   Q.    Well, you know that there was no IRS audit conducted of

24   the Holy Land Foundation.  Right?

25   A.    That is correct.

Q.   And if there was no audit conducted, then there was no

one from the IRS relying on documents in conducting an audit.

Right?

A.   Okay.

Q.   Are you with me on that?

A.   I am following, yes, sir.

Q.   Okay.  Good.  I take it that you have no personal

knowledge of the meeting or meetings reflected in those two

sets of minutes.  Correct?

A.   That is correct, sir.

Q.   Did you notice that the date on one was February 16

through 18, 1991, and the date on the other was February 17,

1991?

A.   Yes, sir.

Q.   I take it, ma'am, that you have no personal knowledge

whether those minutes reflect the same meeting or two

different meetings.  Correct?

A.   That is correct.

        MR. CLINE:  Thank you.

        THE COURT:  Mr. Westfall, any questions?

        MR. WESTFALL:  Your Honor, I have no questions.

        THE COURT:  Mr. Dratel?

        MR. DRATEL:  No, Your Honor.

        THE COURT:  Ms. Cadeddu?

        MS. CADEDDU:  No, Your Honor.

1          THE COURT:  Mr. Jonas, any redirect?

2          MR. JONAS:  Yes, sir.

3                    REDIRECT EXAMINATION

4     By Mr. Jonas:

5     Q.    Ms. Goldberg, with regard to the tax returns that Ms.

6     Duncan showed you of I guess it is '89, '90, '91 tax returns,

7     do you know where they came from?

8     A.    No, sir.

9     Q.    Do you know if they were filed with the IRS?

10    A.    No, sir.

11    Q.    You don't know either way.

12    A.    Well, we know something was filed.  I don't know if those

13    were the returns that were filed.

14    Q.    Okay.  With regard to the letter she showed you for the

15    year 2000, Defendants' Exhibit No. 1083, is that the letter

16    you are holding in your hand right now?

17    A.    Yes, sir.

18    Q.    Okay.  Do you know, as part of your work with the Exempt

19    Organizations Section, does the FBI ever notify your section

20    when an intelligence investigation is being conducted of a

21    charity?

22    A.    I don't understand the question.

23    Q.    Does the FBI ever call up your office and say, "Hey, we

24    are conducting an investigation, an intelligence

25    investigation, not a criminal investigation, of a charity"?

1   A.   Because it is a public charity, the Form 990s are public,

2   so is the application, so if somebody who worked for the FBI,

3   they could call up and ask for a copy.

4   Q.   You misunderstand me.  I am not asking you for any

5   information.  I am not saying the FBI is asking you for copies

6   of any documents.  I am just saying, does the FBI, when they

7   conduct an intelligence investigation of a charity, do you

8   know if they call your office and say, "Hey, we are conducting

9   an intelligence investigation"?

10  A.   To my knowledge, that is not something they would do, but

11  that is not something I would deal with.

12  Q.   Okay.

13  A.   Sorry.

14  Q.   I want to go to the 1992 tax return.  I believe it is HLF

15  Tax No. 2.  Or the 1993 return.  I am sorry.  Whichever return

16  that Ms. Duncan was questioning you about when she showed you

17  those donations from Marzook.  Do you have that before you?

18  A.   Yeah.  I believe that was Exhibit No. 2, 1993.

19  Q.   Okay.  And for the record, HLF Tax No. 2.  Okay.

20  A.   Yes, sir.

21  Q.   I would like to show you --

22        MR. JONAS:  If I may approach, Your Honor?

23        THE COURT:  Yes.

24  Q.   (BY MR. JONAS)  A document that is already in evidence

25  that has been marked as Marzook Tax No. 1.  Now, Ms. Goldberg,

1    with regard to -- Just staying for a moment with the HLF tax

2    return.  Okay?  With regard to that $210,000 contribution by

3    Marzook, as reflected on the return -- And you recall she

4    questioned you about that?

5    A.    Yes, sir.

6    Q.    Should the HLF have given Marzook a receipt for that

7    money?

8    A.    An individual is required to have a receipt.  The

9    organization is not required to give one, but the organization

10   usually does because they want to have people continue to

11   give.

12   Q.    Would you expect the organization to give an accurate

13   receipt?

14   A.    Of course.

15   Q.    What would you have expected the HLF receipt to be in

16   this case?

17             MR. CLINE:  We are in the realm of speculation.

18             MR. JONAS:  Let me rephrase the question, Your

19   Honor.

20   Q.    (BY MR. JONAS)  Based upon your experience as an IRS

21   agent for 20 something years, including your experience

22   working for the Exempt Org Section.  Okay?  And what you have

23   seen in conducting your work, what would a charity -- what

24   would the amount of the receipt be for the charity to give in

25   this situation for a $210,000 donation?

1    A.    Well, they should give a receipt for $210,000 for that

2    one time cash donation.

3              MR. JONAS:  If we can put page 11 on the screen,

4    please, of Marzook tax return No. 1.  Enlarge the top half,

5    please.

6    Q.    (BY MR. JONAS)  If you go to page 11, Ms. Goldberg.  I

7    tabbed it to make it easier for you.

8          How much did Marzook report as this donation to the Holy

9    Land Foundation?

10   A.    Well, if it is Holy Land Fund, it is $25,000.

11             MR. JONAS:  If we can turn to page 13.

12   Q.    (BY MR. JONAS)  Do you see the receipt on the bottom

13   half?

14   A.    Yes, sir.

15   Q.    How much is the receipt for the Holy Land Foundation for

16   the donation by Mousa Abu Marzook in 1992?

17   A.    $25,000.

18   Q.    Does that match up with what is reported on the HLF tax

19   return for the amount of the donation for the same year?

20   A.    No, sir.

21             MR. JONAS:  No further questions.

22             THE COURT:  Ms. Duncan?

23             MS. DUNCAN:  May I have a moment, Your Honor?

24             THE COURT:  Sure.

25             MS. DUNCAN:  I just have a few questions, Your

1    Honor.

2                        RECROSS EXAMINATION

3    By Ms. Duncan:

4    Q.    Agent Goldberg, the receipt that Mr. Jonas just showed

5    you, was it signed?

6    A.    No, it was not signed.

7    Q.    Thank you.

8            MS. DUNCAN:  No further questions.

9            THE COURT:  Mr. Cline?

10           MR. CLINE:  Nothing further.

11           THE COURT:  You may step down.

12       Next witness?

13           MR. JONAS:  Your Honor, the United States calls

14   Steve McGonigle.

15           (Whereupon, the oath was administered by the Clerk.)

16                        STEVE McGONIGLE,

17   Testified on direct examination by Mr. Jonas as follows:

18   Q.    Sir, can you state and spell your name for the record,

19   please?

20   A.    Steve McGonigle, S-T-E-V-E  M-C-G-O-N-I-G-L-E.

21   Q.    Mr. McGonigle what do you do for a living?

22   A.    I am a reporter with the Dallas Morning News.

23   Q.    How long have you been with the Dallas Morning News?

24   A.    Twenty-seven years.

25   Q.    Do you have a particular beat?

1    A.    No.  I am assigned to our projects desk, but I am what is

2    called a general assignments reporter.

3    Q.    Okay.  Have you always been a general assignments

4    reporter?

5    A.    No, I have had various reporting jobs.  This is just my

6    latest.

7    Q.    I want to turn your attention to 1999.

8    A.    Okay.

9    Q.    Were you with the Dallas Morning News then?

10   A.    I was.

11   Q.    What was your assignments back then?

12   A.    I was a general assignments reporter.

13   Q.    Did you ever travel to the Middle East during that year?

14   A.    I did.

15   Q.    Where?

16   A.    I traveled to Israel, and from Israel into Gaza, and also

17   into the West Bank.

18   Q.    What was the purpose of your trip?

19   A.    It was to work on a story about Holy Land Foundation and

20   its works and its potential ties to Hamas.

21   Q.    Do you remember specifically in 1999 when you went?

22   A.    It was the first week of December.

23   Q.    What was -- When you first got there, where did you land?

24   A.    I landed at the airport in Tel Aviv, Israel.

25   Q.    Did you spend time in Israel first?

1    A.    I did.  I went from Tel Aviv to Jerusalem; stayed in

2    Jerusalem for approximately a day.

3    Q.    Where did you go from Jerusalem?

4    A.    From there to Gaza, drove to Gaza.

5    Q.    How did you get into Gaza?

6    A.    Drove myself to the border checkpoint at Erez, which is

7    on the Israeli side, left my car, and walked across the border

8    crossing into Gaza.

9    Q.    Did someone meet you on the other side in Gaza?

10   A.    Yes.

11   Q.    Who was that?

12   A.    A Palestinian journalist named Taher Shriteh.

13   Q.    Had you known Taher Shriteh before that day when you met

14   him?

15   A.    I had not met him, but I had spoken with him and

16   exchanged messages with him.

17   Q.    Can you try to spell his last name, please?

18   A.    S-H-R-I-T-E-H.

19   Q.    Thank you.

20        If you had not met him, how did you come to become in

21   contact with him.

22   A.    He was recommended to me by other journalists in Israel

23   as someone who was very well acquainted with Gaza and people

24   in it.

25   Q.    What was the purpose of hooking up with him?

1    A.    He would act as my interpreter and my guide.

2    Q.    Is there a term used by reporters for someone like that?

3    A.    A fixer.

4    Q.    When you got there in Gaza and he met you in the Gaza

5    side of the crossing, what did you do with him?

6    A.    We went from the border crossing to the home of

7    Dr. Mahmoud Al-Zahar.

8    Q.    Why did you go to Doctor Zahar's home?

9    A.    Doctor Zahar was one of the co-founders of Hamas, was

10   someone who frequently spoke with reporters on behalf of

11   Hamas, and had agreed to speak with me.

12   Q.    Okay.  I am going to hold up what has been marked as

13   Demonstrative No. 17.

14         MR. JONAS:  Your Honor, if I can just take a moment

15   to clean away some of those.

16   Q.    (BY MR. JONAS)  Do you see on the screen -- This is an

17   enlargement, like a lineup.  Do you see Doctor Zahar you met

18   in 1999?

19   A.    It is a really dark picture, but that is him to the far

20   right.

21   Q.    Do you want to hold this enlargement up?

22   A.    Yes.  That is Doctor Zahar to the far right,

23   approximately where you have your left hand.

24   Q.    That is the top row, the orange section?

25   A.    Correct.

1    Q.    Who arranged the interview with Doctor Zahar?

2    A.    Taher did, my guide.

3    Q.    What did you talk about with Doctor Zahar?

4    A.    We talked about Hamas, the charitable works of Hamas, and

5    I also talked to him about what he knew or what he was willing

6    to talk to me about regarding Holy Land Foundation.

7    Q.    What did he say about the Holy Land Foundation?

8    A.    He was aware of their existence, but he claimed not to

9    know very much about their work or about them.

10   Q.    Did he say if he met any of the -- Withdrawn.  What did

11   he say his knowledge of their existence was?  Did he give you

12   any details?

13   A.    What I recall is he was aware that they operated within

14   the territories within Gaza, and he had -- he mentioned to me

15   that he had once met Shukri Abu Baker.

16   Q.    Did he say anything else about the Holy Land Foundation?

17   A.    Not really, other than he contended that there was no

18   connection between the Foundation and Hamas.

19   Q.    Did he tell you what his meeting with Shukri Abu Baker

20   was about?

21   A.    He said he had met Mr. Baker at a function in California.

22   I believe it was a banquet or a dinner.  He portrayed it as a

23   very casual meeting and conversation where Mr. Baker asked him

24   a medical question about a member of Mr. Baker's family.

25   Doctor Zahar was a doctor.

1    Q.   I forgot to ask you, is this meeting with him in English

2    or in Arabic?

3    A.   In English.  He spoke very good English.

4    Q.   I am going to put up an enlargement of what has been

5    admitted as HLF Search No. 87.

6         MR. JONAS:  If we can put that on the screen.

7    Q.   (BY MR. JONAS)  Do you have that before you?

8    A.   Yes.

9    Q.   Okay.  Taking a look at this document, which is entitled

10   "overseas speakers," do you see Doctor Zahar's name anywhere?

11   It is alphabetical by first name, if that helps.

12   A.   Yes, I see it.

13   Q.   Okay.  Did Doctor Zahar tell you that he was an overseas

14   speaker for the HLF?

15   A.   He did not.

16        MR. JONAS:  If we can show Mushtaha Search No. 1,

17   the last clip, please.  One moment, Your Honor.

18   Q.   (BY MR. JONAS)  While that is coming up, how long did the

19   interview last?

20   A.   I would say the better part of an hour, 45 minutes maybe.

21   Q.   Could you describe the atmosphere of the meeting?

22   A.   Very casual.  We were at his home.  We were in kind of a

23   living room/dining room kind of area in his home, and it was

24   very casual.  We sat and drank tea and talked quite amicably

25   for 45 minutes or so.

1          (Whereupon, Mushtaha Search No. 1 was played in open

2          court.)

3   Q.   (BY MR. JONAS)  Mr. McGonicle, did Mahmoud Zahar tell you

4   that he attended this festival where he was thanked by Shukri

5   Abu Baker?

6   A.   That wasn't the way he described the way he met

7   Mr. Baker, no.

8   Q.   Okay.  Thank you.  After you met with Mahmoud Zahar,

9   where did you go?

10  A.   We went to a hotel in Gaza where we were staying and had

11  lunch.

12  Q.   Okay.  From there?

13  A.   Pardon?

14  Q.   And after lunch?

15  A.   After that we went to the home of Sheikh Ahmed Yassin,

16  the spiritual leader of Hamas.

17  Q.   Why did you go see Sheikh Yassin?

18  A.   He, too, was one of the co-founders of Hamas, was someone

19  who did on occasion speak about Hamas and its works, and I

20  wanted to speak with him about what he knew about Holy Land

21  Foundation.

22  Q.   Who arranged this interview?

23  A.   Taher Shriteh did.

24  Q.   Where did this interview take place?

25  A.   At a home in Gaza that I believe to be Sheikh Yassin's

1    home that was distance-wise maybe a mile or so from Doctor

2    Zahar's home.

3    Q.   Could you -- How did you get there?

4    A.   Taher drove his car.

5    Q.   When you got there, who was there?

6    A.   Aside from the people who were with me, which was my

7    translator and a photographer, Sheikh Yassin was there and

8    probably two or three other people in the home that I saw who

9    I presumed to be the Sheikh's bodyguards or assistants.

10   Q.   Could you describe the atmosphere during this interview?

11   A.   I would describe it as a much more formal, even tense

12   atmosphere than at Doctor Zahar's home.  There was not a lot

13   of casual banter between us.  It was strictly business, and I

14   had been told it was going to be a relatively brief exchange.

15   So we kind of got down to business right away.

16   Q.   Was the interview in English or in Arabic?

17   A.   He spoke Arabic and Taher translated to me in English.

18   Q.   How did you greet him when he came into the room?

19   A.   Sheikh Yassin was a paraplegic and was in a wheelchair,

20   and I had been told ahead of time that the appropriate way to

21   greet him was to walk up to him and touch him on the back of

22   one of his hands.  And I believe I said as-salamu alaykum,

23   which is Arabic for peace be with you.

24   Q.   Did you talk to him about the Holy Land Foundation?

25   A.   I attempted to, yes.

1    Q.    What did he say?

2    A.    He pretended to know next to nothing about it.

3    Q.    Did he say anything at all about it or did you describe

4    to him what Holy Land Foundation was?  Can you tell us a

5    little bit more about the conversation?

6    A.    I did.  I asked him if he was aware of the Foundation.

7    He indicated to me that he was not aware of it.  I asked him a

8    few more questions as a follow-up to that about whether or not

9    the Foundation was involved in the works of Hamas, whether he

10   knew people in the Holy Land Foundation, and he indicated to

11   all those questions that he didn't know what I was talking

12   about.

13   Q.    Did he make a joke with you?

14   A.    He did make a slight joke to me when I asked him about

15   whether Holy Land and Hamas were connected.  He said -- When I

16   told him they were a charitable organization, he said that is

17   perhaps they could give him money for the school he was

18   building, and he joked about that.  He treated it as though

19   that was a joke.

20   Q.    Do you know if in fact Hamas builds schools?

21   A.    They do.

22   Q.    Okay.  How long did the interview with Sheikh Yassin

23   last?

24   A.    It was a shorter interview than with Doctor Zahar.  I

25   would say about 30 minutes.

1   Q.   What did you do after you meet with Sheikh Yassin?

2   A.   From there it was getting on towards dusk, and we drove

3   to the Holy Land Foundation's office in Gaza, a short

4   distance.

5   Q.   Was this a prearranged interview?

6   A.   It was not.

7   Q.   What was the purpose of going to the Holy Land

8   Foundation's office in Gaza?

9   A.   To speak with whoever worked there about the works of the

10  organization in Gaza.

11  Q.   Why didn't you arrange this interview in advance?

12  A.   Because I thought it would be more spontaneous if I

13  simply appeared and asked if they would speak with me.

14  Q.   When you got there what happened?

15  A.   I was greeted by the office manager, a man by the name of

16  Mohammad Moharram.  He was very friendly.  We sat and talked

17  for a while about the Foundation and its works.  And shortly

18  thereafter, I would say within 30 minutes, perhaps longer, the

19  chairman of the Holy Land Foundation's board in Gaza Dr. Asad

20  Abu Sharkh appeared and we carried on the conversation.

21  Q.   Generally what did you talk about?

22  A.   The works of the Foundation in Gaza, the kind of work

23  that they did, the kind of people that they helped.  And of

24  course we talked about affiliations with Hamas, which they

25  denied.

1    Q.    Did you tell them who you were?

2    A.    Sure.  Yes, I did.

3    Q.    Did you tell them the purpose of your visit?

4    A.    Yes.  I told them I was there to work on a story about

5    the Holy Land Foundation.

6    Q.    How did the meeting end?

7    A.    Very politely, very amicably.  We had discussed the

8    possibility of me talking with some of their clientele at some

9    future date, and we parted company with kind of an

10   understanding that we would get back in touch.

11   Q.    That you would get back in touch with him?

12   A.    Yes.

13   Q.    And did you?

14   A.    Yes.

15   Q.    Explain that.

16   A.    Well, that evening Doctor Abu Sharkh came to my hotel and

17   we talked some more that evening, and then the next day I came

18   back to their office and they arranged for me to be taken to

19   where some of their clients lived.

20   Q.    What was the atmosphere like the next day?  You said the

21   first day when you met with them the night before was

22   friendly.  Was it still friendly when you went back the next

23   day?

24   A.    Not as friendly.  Clearly they had spoken with folks back

25   in Texas, and I would say they were more formal than they had

1    been the day before.

2    Q.   Okay.

3    A.   Not unfriendly, but more formal.

4    Q.   You said you asked to see some clients.  What do you mean

5    by clients?

6    A.   Well, the Foundation, of course, said that they assisted

7    the poor and the sick and people in need in Gaza, and so I

8    asked to meet with the people that they helped.

9    Q.   And did you?

10   A.   I did.

11   Q.   Who took you to meet people they helped?

12   A.   Mr. Moharram arranged for another member of his staff to

13   show us--myself, Taher, and my photographer--where the clients

14   lived.  And Taher drove -- We drove in separate cars, but he

15   led us to the homes where the clients lived.

16   Q.   Did you ask to meet with a certain type of people, or did

17   they just choose who you were going to meet with?

18   A.   The latter.  I did not specify what kind of people.  I

19   just asked if I could meet with clients.

20          MR. JONAS:  Your Honor, at this time I would like to

21   play an intercepted conversation that is already in evidence.

22   I am going to play for the record the entirety of the call.  I

23   may interrupt a few times to ask Mr. McGonigle questions.

24          THE COURT:  Do you want for the record to identify

25   the exhibit?

```
 1              MR. JONAS:  Yes, sir.  It is Baker wiretap 34-A is

 2    the audio that will be played.

 3    Q.   (BY MR. JONAS)  Before we start, this is a call that

 4    involves an individual named Haitham Maghawri.  Do you know

 5    who that is, Mr. McGonigle?

 6    A.   Yes, I do.

 7    Q.   Who is that?

 8    A.   He was the executive director of the Holy Land

 9    Foundation.

10    Q.   Okay.  And it also involves Shukri Abu Baker.  Do you

11    know who that is?

12    A.   Yes.

13    Q.   Who is that?

14    A.   Mr. Baker is one of the co-founders of the Foundation,

15    and was the executive director, as well as its president.

16    Q.   And then Mohammad Abu Moharram, that is the individual

17    you met with in Gaza?

18    A.   Yes.  My understanding is he was the office manager of

19    the Gaza office of the Holy Land Foundation.

20              MR. JONAS:  Please play the call.

21              (Whereupon, Baker Wiretap No. 34-A was played, while

22              questions were propounded.)

23    Q.   (BY MR. JONAS)  You see the next line under the yellow,

24    it says, "His name is Steven McGonigle."  Would that be you?

25    A.   Yes.
```

1  Q.    Do you see where Haitham says, "Right now he is in the

2  middle of the meeting with Doctor Asad Abu Sharkh"?

3  A.    Yes.

4  Q.    Is that the individual you mentioned a moment ago that

5  you referenced you had dinner with?

6  A.    Yes.

7  Q.    While it is paused, do you see where it says -- Shukri

8  Baker says, "Tell them don't take him to any family to any

9  martyr's family"?

10  A.    Yes.

11  Q.    Do you know if you went to a martyr's family or not?

12  A.    I do not know.

13  Q.    Do you see Haitham Maghawri says, "Do you know Taher

14  Shriteh?"

15  A.    Yes.

16  Q.    Is that the person you referred to as your fixer?

17  A.    Yes.

18  Q.    Did you tell anybody when you were in Gaza that you were

19  Shukri's friend?

20  A.    No, I did not.

21  Q.    Mr. McGonigle, do you see where it says, "based on his

22  conversation with Doctor Asad," referring to Taher Shriteh

23  bringing you over, did you know if Taher Shriteh contacted the

24  Holy Land Foundation in advance of you guys going over to the

25  office?

1    A.    No, I was not aware of that.

2    Q.    Was that something you would have wanted him to do?

3    A.    No, it wouldn't have been.

4    Q.    Do you see where it says, "He talked to him at noon today

5    and made an appointment"?  Were you aware if there was an

6    appointment made for you to go to the Gaza office?

7    A.    No.

8    Q.    It says -- Shukri Baker says, "This journalist is a

9    Zionist."  Are you a Zionist?

10   A.    No, sir.

11   Q.    When you spoke with Moharram, did he tell you the Holy

12   Land Foundation sponsored Christians?

13   A.    I don't specifically remember that he told me that, but

14   certainly I had been told that by people associated with the

15   Foundation.

16   Q.    How about that they sponsored Jews?

17   A.    Yes, I had heard that as well, although I can't say

18   specifically that Mr. Moharram said it.  I just don't recall.

19   Q.    Mr. McGonigle, are you in cooperation with the Jewish

20   lobby?

21   A.    No, sir.

22   Q.    Mr. McGonigle, do you know if your meeting with Abu

23   Moharram was recorded?

24   A.    Initially my recollection is no, when we first met there

25   was no recording.  The recording device did not appear until

1   the next day.

2   Q.   Did you record the conversation?

3   A.   I did not.

4   Q.   Either one either day?

5   A.   No.

6   Q.   Did you allow them to record the conversation?

7   A.   Yes, they told me they had a rather large, almost like a

8   boom box, that they were going to use to record, and they told

9   me they were going to record and I said that was fine.

10  Q.   Did they give you a copy of the recording?

11  A.   No, sir.  And I didn't ask for one either.

12  Q.   Mr. McGonigle, do you see where Haitham Maghawri says,

13  "It is important to keep away, keep away from the families

14  that Shukri talked about?"  Were you aware in the second day

15  when they took you around if they were keeping you away from

16  certain families?

17  A.   No, I wouldn't say that I was aware of it, but I knew

18  that they were choosing whomever they wanted me to see.

19          MR. JONAS:  Your Honor, I am going to play another

20  call.

21          THE COURT:  Let's take a 15-minute break until about

22  five till, and then we will take another break since we are

23  working later.

24          (Whereupon, the jury left the courtroom.)

25          THE COURT:  All right.  We will be in recess.

1          (Brief Recess.)

2          MR. JONAS:  Your Honor, can we just do a quick

3     sidebar?

4          THE COURT:  Yes, come on up.

5          (The following was had outside the hearing of the

6          jury.)

7          MR. JONAS:  While we are waiting, the CIA is trying

8     to secure a fax of that index that you wanted.  I understand

9     there is problems with the fax machine on their end, and they

10    are trying to work with the U.S. Attorney's Office to work it

11    out.  So as soon as it is here, it will be brought up to us

12    and I will give it to you at the break.

13         THE COURT:  Even if it is in the morning, that is

14    okay.

15         MS. CADEDDU:  There is always email.

16         MR. JONAS:  You would think it is easy, wouldn't

17    you, but when it comes to secure email, no.

18         MS. HOLLANDER:  Can I ask a real quick funding

19    thing?

20         (discussion off the record.)

21         (Whereupon, the jury entered the courtroom.)

22         THE COURT:  Mr. Jonas?

23         MR. JONAS:  Thank you, sir.

24    Q.   (BY MR. JONAS)  Mr. McGonigle, I am going to play another

25    call for you.  It is in evidence as Baker Wiretap No. 38.  The

1    call we just played before the break was December 2nd, 1999.

2    This call is December 3rd, 1999.  Does that correlate to the

3    time period that you were in this area in Gaza?

4    A.   Yes.

5            MR. JONAS:  If we could play Baker Wiretap No. 38-A,

6    the audio.

7        Before we start it, for the record the participants are

8    Shukri Baker, Ghassan Elashi, Haitham Maghawri, and Mohammad

9    Abu Moharram.  They are the same participants from the

10   previous calls, except we also have Ghassan Elashi.

11       (Whereupon, Baker Wiretap No. 38-A was played, while

12   questions were propounded.)

13   Q.   (BY MR. JONAS)  Mr. McGonigle were you surrounded so

14   tightly?

15   A.   I am not sure exactly what that means.  I certainly

16   didn't feel like I was surrounded tightly.

17   Q.   Do you see where it says, "Taher is very intelligent.  He

18   went in advance to Sheikh Ahmed and told him," and it goes on?

19   Do you know if Taher Shriteh went to see Sheikh Yassin in

20   advance of your interview with Sheikh Yassin to inform him of

21   the interview?

22   A.   I did not know that, no.

23   Q.   Do you know if he told Sheikh Yassin that you were

24   targeting the Foundation?

25   A.   No, I wouldn't know that.

1  Q.   All right.  Do you see where it says, "Sheikh Yassin

2  played a little dumb"?

3  A.   Yes.

4  Q.   Could you tell if Sheikh Yassin was playing dumb when you

5  were questioning him about the Holy Land Foundation?

6  A.   Sheikh Yassin is a very intelligent, highly political

7  individual, and I didn't expect him to share everything he

8  knew with me, so I was certainly skeptical of what he said,

9  but I didn't know him well enough to know precisely whether he

10  was playing dumb.

11  Q.   Where it says with them quoting Sheikh Yassin saying,

12  "What is the Holy Land Foundation?  I don't know anything

13  about it," and goes on into the dark area about building a

14  school, is that consistent with what Sheikh Yassin did say to

15  you?

16  A.   Yes, it is consistent.

17  Q.   Do you see they are referring to a report?

18  A.   Yes.

19  Q.   Do you know anything about a report being written

20  regarding your visit?

21  A.   No, I do not.

22  Q.   Was there a side conversation while Taher Shriteh was

23  talking to someone else that Abu Moharram is now referring to?

24  A.   I am sorry.  Could you repeat that?

25  Q.   Sure.  Mohammad Abu Moharram is saying that he had a side

1    conversation with you while Taher Shriteh was having another

2    conversation.

3    A.    Yes, that is true.

4    Q.    That is true?

5    A.    That is true.

6    Q.    During that side conversation did you say, "Again, I know

7    the Holy Land Foundation and Shukri is my friend"?

8    A.    I did not say Shukri is my friend.  I did say I knew the

9    Holy Land Foundation, I did say I knew people associated with

10   it, I did say I knew Shukri.  I did not say he was my friend.

11   Q.    Okay.  Do you see where it says, "His newspaper"--I guess

12   it means your newspaper--"was about to summon him"?

13   A.    Yes, I see it.

14   Q.    Were you about to be summoned by the Dallas Morning News?

15   A.    I am not sure exactly what summoned means, but to my

16   knowledge I was not being summoned by my newspaper, no.

17   Q.    Okay.  Mr. McGonigle, do you see where they talk about

18   you visiting a hospital?

19   A.    Yes.

20   Q.    Did you visit a hospital?

21   A.    No, I asked but they declined.

22   Q.    Did you visit the outside of a hospital?

23   A.    No, I did not.

24   Q.    Okay.  Do you see where Mohammad Abu Moharram was saying

25   you were caught in a trap?

```
 1    A.    Yes.

 2    Q.    When you were there, did you feel like you were caught in

 3    a trap?

 4    A.    No, I didn't feel like I was caught in a trap.

 5    Q.     Do you see where Shukri Baker asks if you visited anyone

 6    in the Authority?

 7    A.    Yes.

 8    Q.    Did you visit anyone from the Palestinian Authority on

 9    this trip?

10    A.    Not in Gaza, no.

11    Q.    Was your initial contact with Taher Shriteh through

12    email?

13    A.    It could well have been.

14    Q.    Okay.  Do you see where it says in the dark part and

15    continues "Taher Shriteh went to Sheikh Yassin and told him

16    such and such and so and so is coming and targeting the Holy

17    Land," meaning he is targeting it?  Were you aware if Taher

18    Shriteh went to Sheikh Yassin before your meeting and told him

19    you were targeting the Holy Land Foundation?

20    A.    No, I was not aware of that.

21    Q.    After the second day where you went back and was given

22    the tour of some of the clients, did you have anymore meetings

23    with anyone from the Holy Land Foundation in Gaza?

24    A.    No.

25    Q.    Okay.
```

1          MR. JONAS:  Your Honor, I will pass the witness.

2          THE COURT:  Mr. Westfall?

3                    CROSS EXAMINATION

4   By Mr. Westfall:

5   Q.    Hello, Mr. McGonigle.

6   A.    Hello, Mr. Westfall.

7   Q.    I am Greg Westfall.  You don't have to call me mister.

8   It sounded like listening to the conversation that Shukri and

9   Haitham and the folks at the Holy Land Foundation were

10  genuinely surprised that you were there.

11  A.    Yes.  I took it that way as well.

12  Q.    Certainly you didn't consult with them before you went.

13  A.    No, I did not.

14  Q.    And it sounds like two weeks prior, I mean, if we take

15  Taher at his word, you started emailing with Taher to set this

16  up.

17  A.    I couldn't tell you precisely how many weeks it was, but

18  it was in advance.  I work several weeks in advance of my trip

19  to set things up with him, yes.

20  Q.    Right.  And Taher, was there mention in there that he is

21  on the TV, that he is a journalist also?

22  A.    Yes.  He described himself as a Palestinian journalist.

23  He had a small news office in Gaza City very close to where

24  Sheikh Yassin lived.

25  Q.    Right.  And I guess this is common to have somebody like

1   Taher who kind of smoothes the path for you to be able to

2   visit folks?

3   A.    It is.

4   Q.    Now, Doctor Zahar is a medical doctor?

5   A.    Yes.

6   Q.    Where does he work?

7   A.    To my knowledge, he worked at he clinics in the area,

8   hospitals in the area.  I don't know that their set-up as

9   completely comparable to ours in terms of being affiliated

10  with any one medical institution, but he is a very well-known

11  physician and works in a number of places, or worked at that

12  time.

13  Q.    And of course let me show you, this is one of the

14  exhibits in evidence.  It is a demonstrative exhibit called

15  Government's Demonstrative No. 17.  And this is Mahmoud Zahar

16  right there?

17  A.    Correct.

18  Q.    Do you see -- And this is Sheikh Yassin.  Right?

19  A.    Yes, it is.

20  Q.    Is this the man that you went to visit?

21  A.    It is.

22  Q.    And you see how he is like the number one person in the

23  Hamas chain here?

24  A.    Yes.

25  Q.    And then Mahmoud Zahar, if we assume that this is above

1    these two, he is kind of like on the second and a half level

2    or the third level?

3    A.    Yes.

4    Q.    But he is a high ranking Hamas guy?

5    A.    He was.

6    Q.    And you spent an hour in his house having tea with him.

7    A.    Correct.

8    Q.    And then you went and paid a personal visit to Sheikh

9    Yassin in his house?

10   A.    Correct.

11   Q.    And did this via setting it up email with a guy named

12   Taher?

13   A.    Correct.

14   Q.    Whom you had never met?

15   A.    Correct.

16   Q.    And you don't have -- Well, thank you.  I am not even

17   going to ask.  Mc, is what Irish or Scottish?

18   A.    Depending on who you ask, yes, Irish.

19           MR. WESTFALL:  Your Honor, pass the witness.

20           THE COURT:  Ms. Hollander, any questions?

21       Ms. Moreno?

22                      CROSS EXAMINATION

23   By Ms. Moreno:

24   Q.    Good afternoon.

25   A.    Hello, Ms. Moreno.

1  Q.   Good afternoon, sir.  How are you?

2  A.   I am fine, thank you.

3  Q.   Good.  I want to talk to you about two different areas,

4  and I am going to start with these phone conversations that we

5  have been hearing, the two phone conversations.

6       It is fair to say that in those phone conversations you

7  were described in unflattering terms.  Would you agree with

8  me?

9  A.   Perhaps not ones I would have preferred, yes.

10 Q.   All right.  These people did not trust you.  Is that

11 fair?

12 A.   I think there were some trust issues.

13 Q.   There were some trust issues.  Okay.  Let's talk about

14 those trust issues.  It is true, is it not, that -- Let's see

15 now.  This took place in December of 1999.  Correct?

16 A.   Correct.

17 Q.   And I believe the first story that you wrote about the

18 Holy Land Foundation was in April of 1996.  Would that be

19 correct?

20 A.   That is when it was published.  Correct.

21 Q.   And in fact, from April of 1996 until December of 1999

22 you were really sort of the point person writing stories about

23 the Holy Land Foundation for the Dallas Morning News.  Is that

24 fair?

25 A.   Yes.  I would say that I wrote the majority of the

1    stories about the Foundation that were written during that

2    time, yes.

3    Q.    Okay.  And those stories, do you have an idea of how many

4    stories you wrote during that three-year period of time?

5    A.    It would be strictly a guess, but I would say it was

6    somewhere around 10, maybe less.

7    Q.    Okay.  But no one else at the Dallas Morning News was

8    really writing these stories about the Holy Land Foundation.

9    A.    There were a few of my colleagues that wrote I would say

10   smaller scale stories, but in terms of larger scale stories I

11   was the primary writer of those.

12   Q.    And these stories, let's talk about the very first story

13   that you wrote.  Do you recall the headline of the first story

14   that you wrote about the Holy Land Foundation?

15   A.    No, I am sorry, I don't.

16   Q.    Does this sound correct--"Paper trail leads to Hamas"?

17   A.    It sounds correct, yes.

18   Q.    Okay.  And in fact, the headlines for the subsequent

19   stories, and I am really talking about this discreet period of

20   time up until December of 1999, the stories were viewed by

21   certainly the Muslim community of being unfair and inaccurate.

22   Would you agree with me?

23   A.    Certainly some members of the community who were

24   sympathetic towards Holy Land Foundation felt that they were

25   unfair, yes, ma'am.

1    Q.   Okay.  And they felt that they were inaccurate as well.

2    Correct?

3    A.   Yes, I think that is a fair statement.  Again, it was a

4    portion of the community which was sympathetic towards HLF.

5    But yes, I think it is fair to say that they thought the

6    stories were unfair.

7    Q.   And, in fact, those members of the community or

8    supporters of the work that the Holy Land Foundation was

9    doing, they wrote letters to the editor of your newspaper, did

10   they not?

11   A.   I am sure they did, yes.

12   Q.   And those letters to the editor of the newspaper were

13   highly critical of your reporting.  Is that fair?

14   A.   I don't know if I would say highly critical.  They were

15   certainly critical.

16   Q.   They weren't supportive of the reporting.

17   A.   That is fair to say, yes.

18   Q.   And they also wrote letters to the president of the

19   Dallas Morning News.  Correct?

20   A.   That I do not -- I am just not aware of that.

21   Q.   Okay.  You saw personally supporters of the Holy Land

22   Foundation protesting in front of the very building that you

23   worked out of.  Correct?

24   A.   Many times.

25   Q.   Okay.  And in fact, they were picketing in front of the

1    Dallas Morning News office.

2    A.    Yes, ma'am, they were.

3    Q.    And they had signs.  Correct?

4    A.    Yes, ma'am, they did.

5    Q.    In fact, do you recall ever seeing my client Mr. Elashi

6    with signs in front of your building?

7    A.    I certainly recall Mr. Elashi in front of the building.

8    Whether he was holding a sign, I don't recall that, but I

9    certainly recall seeing him in front of the building, yes,

10   ma'am.

11   Q.    And would that have been in the context of protesting the

12   kind of reporting that we are discussing right now?

13   A.    Yes, ma'am.

14   Q.    Okay.  And you say you don't have any personal knowledge

15   whether the principals of the Holy Land Foundation actually

16   sought redress from your editorial board?

17   A.    You asked me about a letter.  I don't know anything about

18   a letter.  In terms of meeting with people in our editorial

19   operation, I am aware there were meetings.

20   Q.    Okay.  And the meetings -- Are you aware that the

21   meetings were with the principals of the Holy Land Foundation

22   and the editorial board?

23   A.    I believe -- I know that Mr. Elashi and Mr. Abu Baker

24   were there, and I know that -- I can recall at least one

25   member of our editorial operation, not our editorial board,

1    but our president and general manager at that time.

2    Q.   And these meetings with the editorial board were really

3    there, is it fair to say, to complain about what they

4    perceived as unfair and inaccurate reporting by yourself, sir?

5    A.   Of course I wasn't there, so I don't know precisely what

6    was said.  Given the context of the events, I didn't think it

7    was to write me a Christmas card.

8    Q.   You weren't getting any emails that the Holy Land

9    Foundation was commending your work as a reporter.

10   A.   No, ma'am, I was not.

11   Q.   Now, these conversations, then, that took place that we

12   heard, were three years into the kind of reporting that was

13   perceived as highly critical, as highly unfair, and inaccurate

14   of the Holy Land Foundation.

15   A.   I am sorry.  I missed that.  Are you talking about 1999

16   now?

17   Q.   Yes.

18   A.   Yes, it was approximately three years, three and a half

19   years after the first article had been published.

20   Q.   And I am trying to give the context to the jury.  So the

21   first article which title was "Paper trail leads to Hamas" was

22   about the Holy Land Foundation.  Right?

23   A.   Yes, ma'am, it was.

24   Q.   And subsequently, the ten articles or so that you

25   published were critical of the Holy Land Foundation up to

1    December of '99.  Correct?

2    A.    Well, I don't know if the word critical would be the word

3    I would use, but there were certainly stories about the Holy

4    Land Foundation, yes, ma'am.

5    Q.    They weren't supportive about the humanitarian relief

6    work being done by the Holy Land Foundation.  Right?

7    A.    Again, when you say supportive, I am not sure precisely

8    what you mean.  They were stories about the Foundation and any

9    kind of controversy surrounding the Foundation.

10   Q.    And the controversy, according to you and your paper, was

11   some sort of link between the Holy Land Foundation and Hamas,

12   the terrorist organization?

13   A.    That is what we were told, yes, ma'am.

14   Q.    That is the angle of the reporting that came out of the

15   Dallas Morning News with respect to the Holy Land Foundation.

16   A.    I am sorry.  Could you repeat that for me?

17   Q.    That was the angle.  The angle that the stories took from

18   your pen were critical of the Holy Land Foundation because of

19   what you claimed was a link between Holy Land and Hamas.

20   A.    Again, what I would say is the reporting was based on

21   what we found to be criticisms of the Foundation and

22   assertions, allegations against the Foundation that it was in

23   fact connected with Hamas, yes, ma'am.

24   Q.    Okay.  Now, when you went to Israel, Gaza, and the West

25   Bank in December of 1999, you were there to do research on

1    this next story.  Correct?

2    A.   Yes, ma'am.

3    Q.   And I think you spent a couple of weeks in the area, all

4    told?

5    A.   Probably just a little bit less than that, yes.

6    Q.   And in doing your research -- Let me just get a few

7    things clear.  You said that you in Gaza did not speak to

8    anyone from the Palestinian Authority.  Is that right?

9    A.   I believe that is correct, yes.

10   Q.   And in the other areas that you went to in doing any

11   research, did you get to talk to anybody from the Palestinian

12   Authority, meaning from the West Bank, or in Israel?

13   A.   I am straining to recollect here, but my recollection is

14   that I talked to a very, very low level official in the

15   Palestinian Authority in Ramallah in connection with the Holy

16   Land Foundation's office in Ramallah.

17   Q.   Okay.  Let's talk about Ramallah for a minute.  You

18   actually visited a zakat committee in Ramallah.  Correct?

19   A.   Yes, ma'am, I did.

20   Q.   And, in fact, the zakat committee you visited was the

21   Ramallah zakat committee.

22   A.   That is my recollection, yes.

23   Q.   And when you visited the Ramallah zakat committee, you

24   did not see in the offices of the zakat committee anything of

25   a political nature.  Correct?

1    A.    Well, let's put it this way.  I don't speak or read

2    Arabic, and there was nothing that caught my attention as

3    being anything overtly political.  But given that I don't

4    speak or read Arabic, there could have been things, but I

5    certainly did not recognize them as such.

6    Q.    When you went to the Ramallah zakat committee, did you

7    have a translator with you?

8    A.    I did.

9    Q.    Okay.  And did you ask the translator to translate what

10   you saw on the walls?

11   A.    I am sorry.  I don't recall.  I just don't recall.

12   Q.    And when you went to the Ramallah zakat committee, who

13   did you talk to there?

14   A.    I couldn't tell you the man's name.  He was an office

15   worker of some kind.  He could well have been the office

16   manager.  I don't recall his name and I don't recall his

17   title.

18   Q.    Okay.  And did you put anything that you learned from the

19   Ramallah zakat committee into your story?

20   A.    I am sorry.  I don't recall that either.  It is possible

21   I did not.

22   Q.    Okay.  But your story was about a link between the Holy

23   Land Foundation and Hamas.  Right?

24   A.    It was examining purported links, yes, ma'am.

25   Q.    And you didn't put anything in that story examining that

1   link about the Ramallah zakat committee that you personally

2   visited.  Correct?

3   A.   Again, I don't recall.  I don't believe I did.  I just

4   don't recall.

5   Q.   Okay.  Now, let's talk about your meeting at the Holy

6   Land Foundation Gaza office, if I may.  You met with the

7   gentleman who has been identified as Mohammad Moharram.

8   Correct?

9   A.   Yes.

10  Q.   And, in fact, we heard Mr. Moharram's voice on the two

11  phone calls?

12  A.   Yes.

13  Q.   And you met with Mr. Moharram on both days.  Correct,

14  sir?

15  A.   Yes.  That is right.

16  Q.   And you also visited I think you described it as the Gaza

17  office of the Holy Land Foundation?

18  A.   Yes, ma'am.

19  Q.   All right.  Now, putting before you what has been marked

20  as Defense Exhibits 698, 426, 706, and 709, can you take a

21  look at those top four photographs, and we will discuss the

22  fifth one in a moment.

23  A.   Okay.

24  Q.   And do you recognize the gentleman in the photographs?

25  A.   I am sorry, I don't.  It could well be Mr. Moharram.  I

1  just don't recall.

2  Q.   Does the Defense exhibit --

3       MS. MORENO:  May I approach, Your Honor?

4       THE COURT:  Yes.

5  Q.   (BY MS. MORENO)  Does Defense Exhibit No. 698 appear to

6  have been taken in Gaza, the Gaza that you visited?

7  A.   I just don't have any way to tell.  It could well be.  It

8  is not inconsistent with what I saw in Gaza, but I just can't

9  tell from the photograph.

10 Q.   And you don't recognize the gentleman in the photographs?

11 A.   Well, let's put it this way.  It is a very vague

12 recollection.  It could well be him.  I just couldn't tell you

13 I was positive about it.

14 Q.   Taking a look at Defense Exhibit No. 669, do you

15 recognize that office building that is depicted in No. 669?

16 A.   I am sorry.  Yes, No. 669.  It is a little difficult to

17 tell, but it is possible.  I mean, I am reading the sign.  It

18 is not inconsistent with what I recall the Gaza office of Holy

19 Land Foundation looking like.

20      MS. MORENO:  Your Honor, I am going to move into

21 admission Defense Exhibit No. 698, 426, 706, 709, and 669.

22      MR. JONAS:  We object, Your Honor.  If I can voir

23 dire the witness on this?

24      THE COURT:  Go ahead and voir dire.

25 Q.   (BY MR. JONAS)  Mr. McGonigle, the pictures that

1    Ms. Moreno showed you that you have before you, do you

2    recognize for sure anybody in these pictures?

3    A.    Do I recognize for sure?  No, I couldn't say for sure.

4    Q.    Okay.  Do you recognize the areas where these pictures

5    were taken?

6    A.    I do not recognize the area in Defense Exhibit No. 698,

7    although, as I said earlier, it is possible it was in Gaza,

8    but I just cannot tell from the photograph where it was taken.

9    And in No. 669, I cannot see the entire building, but again,

10   it seems to be consistent with what the office in Gaza of HLF,

11   looked like.

12   Q.    What about the other pictures--426, 706, and 709?

13   A.    No. 426, I cannot tell where that was taken.  No. 706 and

14   709, I would say the same thing.  I cannot tell for sure where

15   they were taken.

16   Q.    Do you any of the people in either No. 706 or 709?

17   A.    Aside from the fact that the man in the gray suit could

18   be Mr. Moharram, I am not certain, I do not know the other

19   individuals.

20   Q.    Do you know what is going on in these pictures?

21   A.    Not of my own personal knowledge.  I just -- I see what

22   anyone else would see, which is someone walking around talking

23   to people.

24   Q.    Mr. McGonigle, you don't need to describe it; just if you

25   know.

1  A.    I am sorry.

2  Q.    It is okay.  Do you know when these pictures were taken?

3  A.    No, sir.

4        MR. JONAS:  Your Honor, we object.  I don't think

5  there is a foundation that has been laid.

6        THE COURT:  Any other questions you want to ask on

7  that, on the foundation?

8        MS. MORENO:  No, Your Honor.

9        THE COURT:  I will sustain as to 698, 426, 706, 709.

10 I will overrule as to 669 and that one is admitted.

11       MS. MORENO:  May I approach, Your Honor?

12       THE COURT:  Yes.

13 Q.    (BY MS. MORENO)  Now, Mr. McGonigle, you met with

14 Mr. Moharram twice.  Correct?

15 A.    Yes.

16 Q.    You met with him the first day that you went to the Gaza

17 office.  Correct?

18 A.    Yes.

19 Q.    And you talked to him about the work that the Holy Land

20 Foundation did.

21 A.    Yes.

22 Q.    Do you remember that?

23 A.    Yes, ma'am.

24 Q.    And you also remember that you saw backpacks in the Holy

25 Land Gaza office.  Correct?

1    A.   Yes, ma'am, I do.

2    Q.   And this was during the period of Ramadan.  Do you

3    remember that?

4    A.   Yes.

5    Q.   And you had a conversation with Mr. Moharram about the

6    charitable work that the Gaza office did.  Do you recall that?

7    A.   Yes, I do.

8    Q.   And then you discussed going to -- You talked about that

9    you wanted to meet with some families.

10   A.   Yes.

11   Q.   Do you remember that?

12   A.   Uh-huh.

13   Q.   And Mr. Moharram helped facilitate that.  Do you recall

14   that?

15   A.   Yes.

16   Q.   And then the next day you saw Mr. Moharram again.

17   Correct?

18   A.   Yes.

19   Q.   And you talked to him further about the work and the

20   families and various other things.  Is that fair?

21   A.   Yes.

22   Q.   But you can't recall if the gentleman in these pictures

23   is Mr. Moharram.  Right?

24   A.   It has been nine years, and I am sorry, I just don't

25   recall.

Q.   But you recall after having tea for one hour with Mahmoud

Zahar.  Right?

A.   A very, very well-known Hamas figure, yes, ma'am.

Q.   You recall him.

     The next day, the second day when -- It might have been

the first day.  You said that a gentleman who was I believe

you called him a member of the board came, a Dr. Asad Abu

Sharkh.  Do you recall that?

A.   Yes, ma'am.

Q.   And you spoke with Doctor Sharkh.  Correct?

A.   I did, yes.

Q.   Now, you have been shown this a couple of times.  Do you

see Doctor Sharkh on this chart?

A.   No, ma'am, I do not.

Q.   Of Hamas leaders?

A.   No, ma'am, I do not.

Q.   And that is because Doctor Sharkh is a member of Fatah.

Correct?  You knew that?

A.   I am not sure that I know that, no, ma'am.

Q.   You didn't know that?

A.   I don't recall.  I don't recall knowing that.

Q.   Did you do research about the Gaza office board of the

Holy Land Foundation in preparation for your story?

A.   No, ma'am, I didn't.  In preparation for my story or in

preparation for my trip?

1    Q.    For the story that you wrote.

2    A.    In terms of talking to people about the office and about

3    the people in the office, I mean, I am sure that I talked

4    somewhat to people about that, yes, ma'am.

5    Q.    So is the answer yes, you did research about the board of

6    the Holy Land Foundation Gaza office?

7    A.    Did I ask questions about the members of the board and

8    specifically Dr. Abu Sharkh?  I am sure I did inquire about

9    that, because I spent a considerable amount of time talking to

10   him.

11   Q.    And did you find out if he was a member of Hamas?

12   A.    I don't recall anybody telling me that, no, ma'am.

13   Q.    And did you find out if anybody else on the board of the

14   Gaza office was affiliated with Hamas?

15   A.    No, ma'am.  But I can't say that I really inquired about

16   any other member of the board.

17   Q.    You didn't inquire?

18   A.    Not to my knowledge, no, ma'am.

19   Q.    Okay.  Only the phone call -- I think it was the second

20   phone call where they were talking about the families and

21   visiting the hospital, do you remember that part of that call?

22   A.    Yes.

23   Q.    And I think Mr. Jonas asked you if you went to visit a

24   hospital.  Do you remember that?

25   A.    Yes, ma'am.

```
 1    Q.    Okay.  And I think you said they declined?

 2    A.    That is what I was told, yes.

 3    Q.    All right.  And so did you go by yourself to a hospital?

 4    A.    No, I did not go.

 5    Q.    Okay.  Remember the part of the phone call which was

 6    right around that discussion of the hospital where I

 7    believe -- Hold on.  There was a discussion about a father who

 8    was paralyzed?

 9    A.    Yes, I recall that.

10    Q.    And there was a further discussion about a family living

11    on the roof?

12    A.    Yes, I recall that, too.

13    Q.    Okay.  And is that sort of representative of the kind of

14    poverty that you saw in Gaza?

15    A.    Of those two families you mean?

16    Q.    Yes.

17    A.    Yeah, I would say so.

18    Q.    Okay.

19              MS. MORENO:  May I have a moment, Your Honor?

20              THE COURT:  Yes.

21    Q.    (BY MS. MORENO)  With respect -- Just one or two more

22    questions.  With respect to the families that you actually

23    met, you asked the Holy Land people to select families for

24    you.  Right?

25    A.    Yes, ma'am.
```

1    Q.    You asked them to select the families?

2    A.    Yes, ma'am.

3          MS. MORENO:  Pass the witness, Your Honor.  Thank

4    you.

5          THE COURT:  Ms. Hollander?

6          MS. HOLLANDER:  Thank you, Your Honor.

7                    CROSS EXAMINATION

8    By Ms. Hollander:

9    Q.    Feel like a gauntlet yet?  You are almost finished.

10         Good afternoon.

11   A.    Good afternoon, Ms. Hollander.

12   Q.    You don't have any -- Mohammad Moharram was the head of

13   the office in Gaza.  Is that your understanding?

14   A.    He was the office manager.  He worked for the board and

15   Dr. Abu Sharkh.

16   Q.    He spoke little English?

17   A.    He spoke pretty good English.  It was not as good to

18   Doctor Zahar, for example.

19   Q.    Right.  So this whole conversation about friend or not

20   friend, it is possible that he could have misunderstood you,

21   isn't it?

22   A.    Yes, ma'am, it is possible.

23   Q.    And you don't have any evidence that he was Hamas, did

24   you?

25   A.    No, ma'am, I don't.

1  Q.    Now, you did talk to him.  You actually went into their

2  office.  Correct?

3  A.    Yes.

4  Q.    Did you see anything else there besides backpacks?

5  A.    I mean, as I recall, it was a fairly sparsely furnished

6  place.  You know, I was in his personal office.  It was a

7  relatively large building.  I saw only a few rooms, and I

8  really don't recall anything that caught my eye other than you

9  saw the backpacks when you walked in.  They were very brightly

10 colored, so it was very hard to miss.

11 Q.    Did you talk to them about the backpack program?

12 A.    I wouldn't be surprised if we had some casual

13 conversation about it, just noting that I had seen the

14 backpacks, and I was aware that the Foundation, this was one

15 of the things the Foundation did was to provide backpacks

16 during Ramadan.  So we probably had some conversation about

17 it.

18 Q.    And the backpacks were filled with things that kids

19 needed?

20 A.    That I couldn't tell.  I didn't see any opened.  They

21 were zipped up and sitting on the floor, and I couldn't tell

22 whether they were full of things or not.

23 Q.    Okay.  Do you recall a conversation with Abu Moharram or

24 perhaps with the board people, whoever else you talked to,

25 about how they explained that the families came in and filled

1  out a form to become a client of the Holy Land Foundation?

2  A.    Yes, ma'am, I do.

3  Q.    Did you actually look at any of the forms?

4  A.    I did and I saw a blank one.  I recall that specifically.

5  Q.    And do you remember what they explained to you?

6  A.    I am sorry.  Could you repeat that?

7  Q.    Do you remember what they explained to you about the

8  forms and the families?

9  A.    My recollection is that Mr. Moharram told me that

10 families -- This was essentially an application for relief,

11 for assistance, and that families would come in and fill out

12 these forms in order to be considered for relief.

13 Q.    Were there social workers there?

14 A.    If there were I didn't recognize them as such.

15 Q.    Now, you heard these calls played, and you heard Shukri

16 say on the call that he wanted you to see the work they were

17 doing.

18 A.    Yes, I heard that.

19 Q.    Okay.  And in fact, a few months before that Shukri sent

20 you an email suggesting you go to Gaza and see that work.  Do

21 you recall that?

22 A.    My recollection actually is that they made that offer to

23 me quite a bit before that.  It would probably have been

24 during the initial meetings we had back in 1996.

25 Q.    But Shukri suggested that you should go there and see it

1    for yourself?

2    A.    In 1996 he and Mr. Elashi I believe both did.    But I

3    remember specifically that Shukri did.

4    Q.    And was Gaza -- Were you surprised by what you saw in

5    Gaza?

6    A.    I am trying to think of the right word to use.    Surprise

7    wouldn't necessarily be the word, but it was a place that you

8    could not visit and not come away affected by it.    That would

9    be the way I would put it.

10   Q.    And why would you say that one would be affected by it?

11              MR. JONAS:    I object on relevance.

12              THE COURT:    Overruled.    Go ahead.

13              THE WITNESS:    It is an extremely desperate place;

14   people in very desperate conditions.

15   Q.    (BY MS. HOLLANDER)  Did it have any affect on you

16   personally?

17   A.    Yes, ma'am, it did.

18              MS. HOLLANDER:    Nothing further, Your Honor.

19              THE COURT:    Mr. Dratel, any questions?

20              MR. DRATEL:    No, Your Honor.

21              THE COURT:    And Ms. Cadeddu?

22              MS. CADEDDU:    No, Your Honor.

23              THE COURT:    Mr. Jonas, any redirect?

24              MR. JONAS:    Yes, sir.

25                        REDIRECT EXAMINATION

By Mr. Jonas:

1

2  Q.   Mr. McGonigle, Mr. Westfall asked you about spending an

3  hour with Doctor Zahar and the meeting with Sheikh Yassin, and

4  he showed you the demonstrative where Sheikh Yassin is at the

5  top and Doctor Zahar is lower on the list of Hamas leaders.

6  Do you know, if you know, why would these Hamas leaders meet

7  with you if they knew nothing about the Holy Land Foundation

8  and that is what you wanted to talk to them about?

9  A.   I do not know their motivation.  I can tell you that they

10 did on occasion speak with journalists about topics related to

11 Hamas, and that is all I know.

12 Q.   Did you ask them specifically questions about Hamas and

13 those topics that they talked to journalists about?

14 A.   I was not so much interested in Hamas' political agenda

15 and Hamas' military operations or Hamas' view of Israel and

16 its existence as I was Hamas' charitable organizations and

17 whether they overlapped or coincided with Holy Land.

18 Q.   Ms. Moreno asked you questions about your reporting on

19 the HLF.  Do you recall those series of questions a few

20 moments ago?

21 A.   Yes.

22 Q.   Do you have a personal vendetta against the HLF?

23 A.   No, I don't.

24 Q.   What did you base your stories on?

25 A.   What I read and was told.

```
1    Q.    You did interviews?

2    A.    Yes; many.

3    Q.    And you base your stories on those interviews and the

4    information you gathered?

5    A.    Yes.

6    Q.    And she talked -- Ms. Moreno questioned you about a

7    controversy and that caused pickets in front of the Dallas

8    Morning News.  Were you looking to create a controversy with

9    the HLF?

10   A.    Not necessarily, no, sir.

11   Q.    Did you make up any of the information you put in your

12   story?

13   A.    No, sir, I did not.

14   Q.    Did HLF sue the Dallas Morning News?

15   A.    Yes, sir, they did.

16   Q.    What was the result of that lawsuit?

17   A.    The lawsuit was dismissed right after 9/11.

18   Q.    Who dismissed it?

19   A.    HLF did.

20   Q.    Was that before or after they were closed?

21   A.    It was pretty close to the time.  I am sorry.  I don't

22   remember exactly.  Pretty close to the time they were closed.

23   Q.    Ms. Hollander, the last few questions to you was about

24   your reaction to Gaza.

25   A.    Uh-huh.
```

1    Q.   You said you came away personally affected by that.

2    A.   Yes.

3    Q.   Did your personal response to these situations in Gaza

4    want to make you go out and want to provide support to Hamas?

5    A.   No, sir.

6    Q.   Thank you.

7              MR. JONAS:  No further questions.

8              THE COURT:  Mr. Westfall?

9                        RECROSS EXAMINATION

10   By Mr. Westfall:

11   Q.   What was the year again that you went to Gaza?

12   A.   '99.

13   Q.   '99?  And the fact is that the person that got you to be

14   able to see Sheikh Yassin and Doctor Zahar in their homes was

15   a journalist.

16   A.   That is a what he called himself, yes, sir.

17   Q.   And not a Hamas operative.

18   A.   That I have no knowledge of.  I knew him as a Palestinian

19   journalist who assisted other journalists in meeting with

20   various people, be they Hamas or otherwise.

21   Q.   And you had never met him before?

22   A.   Not in person, no, sir.

23   Q.   And you had never met Doctor Zahar before?

24   A.   No.

25   Q.   And you had never met Sheikh Yassin before?

1    A.   No.

2    Q.   And Taher, has he also worked for Reuters?

3    A.   He has done -- my understanding is he did stream work for

4    Reuters, yes, sir.

5    Q.   And he has been a freelance writer with CBS News?

6    A.   My understanding is he did work with CBS as a freelance

7    writer, yes.

8    Q.   He did work with the BBC?

9    A.   That I don't know.

10   Q.   How about the New York Times?

11   A.   My understanding is he has done stream work for the New

12   York Times, yes.

13   Q.   So a fairly established journalist?

14   A.   A very well known guy, yes, sir.

15            MR. WESTFALL:  Thank you.

16            THE COURT:  Ms. Moreno?

17            MS. MORENO:  Nothing further.

18            MS. HOLLANDER:  Your Honor, I have one additional

19   question.

20            THE COURT:  All right.

21                       RECROSS EXAMINATION

22   By Ms. Hollander:

23   Q.   Mr. McGonigle, did the fact that you were personally

24   affected by what you saw in Gaza make you want to help these

25   people?

1  A.   I am not sure I understand what you mean by help these

2  people.  I wanted to write an accurate story that reflected

3  what I saw.

4  Q.   Did you understand why people would want to provide

5  charity assistance to these people?

6  A.   Certainly, yes.

7            MS. HOLLANDER:  Thank you.

8            THE COURT:  Mr. Jonas, anything else?

9            MR. JONAS:  No, sir.

10           THE COURT:  Mr. McGonigle, you may step down.  You

11  are free to go.  Thank you.

12     Next witness?

13           MR. JACKS:  May we approach, Your Honor?

14           THE COURT:  Yes.

15           (The following was had outside the hearing of the

16           jury.)

17           MR. JACKS:  Our next witness is in custody, so I

18  don't know if it is going to be a moment or two before he is

19  brought down.

20           THE COURT:  Who is it?

21           MR. JACKS:  Mohamed Shorbagi.

22           MS. HOLLANDER:  Can I ask a question?  Is it going

23  to take more than an hour?  Is your direct going to be more

24  than an hour?

25           MR. JACKS:  Yes.

1          MS. HOLLANDER:  The only reason, we just got the

2    3500 material.  I just need overnight before I cross him.

3          THE COURT:  How long do you expect on your direct?

4          MR. JACKS:  A couple of hours.

5          THE COURT:  All right.

6          MS. HOLLANDER:  I just wanted overnight before

7    cross.

8          MR. JACKS:  How late did you want to go?

9          THE COURT:  6:30 to 7:00.  Find a good breaking

10   point.

11         MS. HOLLANDER:  You are going to stay until 7:00?

12         THE COURT:  6:30 to 7:00.

13         (The following was had in the presence and hearing

14         of the jury.)

15         THE COURT:  Let's go ahead and take our second

16   break.  Let's take 15 minutes, and we will come back and

17   start.

18                   (Brief Recess.)

19         THE COURT:  Ready for the witness?

20         MR. JACKS:  Yes, sir.  Did you want to bring him in

21   first?

22         THE COURT:  Yes, we will bring him in first.  That

23   was the idea.

24      Go ahead and bring the jury in.

25         (Whereupon, the jury entered the courtroom.)

1    THE COURT:  Go ahead and have a seat.  And raise

2  your right hand.

3    (Whereupon, the oath was administered by the Court.)

4    <u>MOHAMED SHORBAGI</u>,

5  Testified on direct examination by Mr. Jacks as follows:

6  Q.   Would you tell us your name, please?

7  A.   Yes.  My name is Mohamed Shorbagi.

8  Q.   Would you spell your first name and last name for the

9  court reporter?

10 A.   First name is M-O-H-A-M-E-D; last name Shorbagi,

11 S-H-O-R-B-A-G-I.

12 Q.   And where were you born, Mr. Shorbagi?

13 A.   I was born in the city of Khan-Yunis in the Gaza strip.

14 Q.   And is that in the area adjacent to Israel?

15 A.   Israel is pulled out from there about three years ago,

16 yes, sir.

17 Q.   And how old a man are you?

18 A.   I am 44 years old.

19 Q.   And did you grow up in Khan-Yunis in Gaza?

20 A.   Yes, sir.  I grow up till I was 18 and a half.

21 Q.   Is Khan-Yunis a town within the Gaza Strip?

22 A.   It is a town within the Gaza Strip.  Right.

23 Q.   And it is spelled K-H-A-N, first word, and then?

24 A.   U-Y-I-N-S [sic].

25 Q.   All right.  And you said you lived there until you were

1    18 years old.  Is that correct?

2    A.    That is correct, yes, sir.

3    Q.    And when you turned 18, did you come to the United

4    States?

5    A.    Yes, sir.  I came to the United States on a student visa.

6    Q.    And did you graduate from high school in Gaza?

7    A.    Yes, sir.

8    Q.    And when you came to the United States, did you come with

9    the intention of enrolling in college?

10   A.    Correct.

11   Q.    And where did you come to within the United States to

12   attend college?

13   A.    The first college I attended was in Texas here in a city

14   called Jacksonville, Jacksonville College.

15   Q.    And is that in east Texas?

16   A.    South of Tyler, yes.

17   Q.    All right.  And how long did you attend school at

18   Jacksonville College?

19   A.    For six months.

20   Q.    And was that in the spring semester?

21   A.    Spring of '83.  Right.

22   Q.    1983?

23   A.    Correct.

24   Q.    And then did you transfer or relocate to attend a

25   different school?

```
 1    A.    Correct.

 2    Q.    Where did you go?

 3    A.    To Blinn College in College Station, Bryan/College

 4    Station.

 5    Q.    And did you enroll in Blinn College?

 6    A.    Correct.

 7    Q.    And would that have been the next semester?

 8    A.    Next year.

 9    Q.    The fall of '83?

10    A.    The summer, fall, and spring of '84.  Right.

11    Q.    All right.  And did you relocate or move to attend a

12    different school after you attended Blinn College?

13    A.    Yeah.  I was trying to admit to Oklahoma State in

14    Stillwater but it did not work out, so I came back to Texas.

15    Q.    And did you ever -- How long were you in Oklahoma?

16    A.    For about six months.

17    Q.    And you said that you tried to enroll in Oklahoma State

18    at Stillwater.  Did you attend school at all while you were in

19    Oklahoma?

20    A.    Yes, I attended the fall of '84.

21    Q.    And what was the name of the school that you were

22    enrolled in?

23    A.    I attended Oklahoma State for fall of '84, but then after

24    that they wouldn't transfer all the credits that I have, so I

25    started the spring in a college south of Stillwater and then I
```

1   came back to Texas.

2   Q.   And do you recall the name of the college that you were

3   attending south of Stillwater?

4   A.   I think Seminole, something like that.

5   Q.   Seminole College?

6   A.   Right, uh-huh.

7   Q.   And you said that after you attended Seminole College you

8   returned to Texas?

9   A.   Correct, yes.

10  Q.   Where in Texas did you relocate to?

11  A.   To Prairie View A&M University.

12  Q.   What city is that in?

13  A.   In Prairie View.

14  Q.   And what city is it near?

15  A.   Houston, Texas.

16  Q.   And when did you enroll in Prairie View A&M?

17  A.   Like summer of '84.  Summer of '85.  I am sorry.

18  Q.   In '85?

19  A.   Right.

20  Q.   What was your field of study at Prairie View A&M?

21  A.   Electrical engineering.

22  Q.   Did you receive a degree from Prairie View A&M?

23  A.   Correct.

24  Q.   Was that in electrical engineering?

25  A.   Correct.

1    Q.   And could you tell us when you received that degree?

2    When did you graduate from Prairie View A&M?

3    A.   December '87.

4    Q.   December 1987?

5    A.   Correct.

6    Q.   After you received your undergraduate degree, did you

7    continue to study or take any post-graduate courses?

8    A.   I took some Master courses at the same university in the

9    spring of '86.

10   Q.   At Prairie View A&M?

11   A.   Correct.

12   Q.   And I am sorry.  You said you graduated -- Your

13   undergraduate degree you received in December 1987?

14   A.   Correct, yes.

15   Q.   Okay.  When you graduated from Prairie View A&M and while

16   you were taking graduate courses, were you employed?

17   A.   Correct.

18   Q.   What kind of work did you do or who did you work for?

19   A.   I worked for Maxwell House Coffee in the engineering

20   field.

21   Q.   I am sorry?

22   A.   In the engineering field, PLC, programming language

23   control with Maxwell House.

24   Q.   And how long did you work for the Maxwell House Coffee

25   Company there in Houston?

```
 1    A.    Three years.

 2    Q.    So that would be from -- Did you go to work for Maxwell

 3    House shortly after you received your undergraduate degree?

 4    A.    Correct, yes.

 5    Q.    So that would have been in 1988?

 6    A.    Correct.

 7    Q.    And you said you worked there for three years, so

 8    approximately when did you leave Maxwell House or stop working

 9    there?

10    A.    In the summer of '89.  I am sorry.  Summer of '91.  I am

11    sorry.

12    Q.    All right.  And did you take up another job after you

13    left Maxwell House?

14    A.    First I went to Gaza for a summer.  I stayed there for

15    almost five months, got married, came back in November of '91.

16    Q.    Approximately when did you go back to Gaza in 1991?

17    A.    The beginning of August of '91, after the first Gulf War.

18    Q.    When you make reference to the first Gulf War, are you

19    talking about the war that resulted from Iraq's invasion of

20    Kuwait?

21    A.    Correct.

22    Q.    And how long did you stay in Gaza that trip?

23    A.    About five months.

24    Q.    You said you got married during that trip?

25    A.    Correct.
```

```
 1    Q.    And when did you return to the United States?

 2    A.    Late November of '91.

 3    Q.    When you returned to the United States in November of

 4    1991, did you take up another job or start working anywhere?

 5    A.    Correct.  I took another job.  Right.

 6    Q.    Where did you work?

 7    A.    I tried to get back at Maxwell House.  They wouldn't take

 8    me because there was a lot of layoff after the Gulf War, last

 9    year of the Bush administration, the father, and so I applied

10    for a job and got a job in a shipping company in Houston,

11    Texas.

12    Q.    I am sorry.  What kind of company?

13    A.    A Middle East shipping company.

14    Q.    A shipping company?

15    A.    Right.

16    Q.    What kind of products did they ship, or was it all kinds

17    of products?

18    A.    It was a temporary job for shipping cars, containers

19    overseas.

20    Q.    And how long did you work for that shipping company?

21    A.    One year.

22    Q.    And at the end of that one year, what did you do in the

23    way of employment?

24    A.    After the year?

25    Q.    Yes.
```

1    A.    I left that company and got another job in the same

2    field, Southwest Shipping, for three months, before I got a

3    job in Rome, Georgia.

4    Q.    And is that -- You are saying Rome, Rome, Georgia just

5    like roam Italy?

6    A.    Correct, R-O-M-E.

7    Q.    What part of Georgia is Rome, Georgia in; what part of

8    the state?

9    A.    It is northwest of Atlanta, about one hour northwest of

10   Atlanta.

11   Q.    All right.  The company that you went to work for in

12   Rome, Georgia what kind of company was that?

13   A.    Called Alexandria Carpet.  They used to manufacture

14   carpet and ship overseas.

15   Q.    And I am sorry.  You are a little bit hard to understand.

16   You are saying carpet?

17   A.    Yes, correct; C-A-R-P-E-T, carpet.

18   Q.    Thank you.  When did you begin working at Alexandria

19   Carpet?

20   A.    1993 before the Waco accident.  I think April 1993.

21   Q.    All right.  How long did you work there?

22   A.    Till I got to jail, until I got in jail two years ago.

23   Q.    Till 2006?

24   A.    2006.  Right.

25   Q.    Let me direct your attention back to when you first came

1    to this country on a student visa.  Well, first let me ask

2    you, are you a United States citizen?

3    A.    No, sir.

4    Q.    So during your tenure in the United States, has it been

5    with either a visa or some kind of -- as a lawful resident

6    alien?

7    A.    Correct.  I am a permanent resident.  Right.

8    Q.    And when you first came to the United States as a

9    student, did you become involved in any organizations that

10   were affiliated or that other people on campus were associated

11   with?

12   A.    Correct.

13   Q.    And let me ask you, was one of those organizations an

14   organization known as MAYA?

15   A.    Correct.

16   Q.    And MAYA is M-A-Y-A.  Is that correct?

17   A.    Correct.

18   Q.    What does MAYA stand for?

19   A.    It stands for Muslim Arab Youth Association.

20   Q.    And does its name generally reflect who its members or

21   participants are?

22   A.    Yeah.  The name reflects that they are Muslims and they

23   are Arabs.  Correct.

24   Q.    And is it a student organization or is it open to others

25   that are not students as well?

1    A.   It is mainly a students organization.  Correct.

2    Q.   Are there persons who are not students that also are

3    members or participate in MAYA activities?

4    A.   Mostly like former students who graduated and then got a

5    job and they have families so they are no longer students, but

6    originally they were students.  Mainly it was for students.

7    Correct.

8    Q.   All right.  But former students continue to be members

9    and continue to participate.  Is that correct?

10   A.   Correct, yes.

11   Q.   Did you continue -- After you had finished your studies,

12   did you continue to attend MAYA events and participate in MAYA

13   activities?

14   A.   Correct, yes.

15   Q.   And the name Arab is a part of the title, so is it

16   primarily for Arab individuals?

17   A.   Correct.

18   Q.   As opposed to Indonesians or Pakistanis or Afghans or

19   that type of thing, is the principal membership Arab

20   individuals?

21   A.   The Arabic speaking language, yes, sir; middle

22   Easterners.

23   Q.   And for example, would there be Saudi Arabians, Saudis in

24   that organization?

25   A.   Correct.

Q. Kuwaitis?
A. Uh-huh.
Q. Let me ask you to say yes or no, because when you go back and read uh-huh you can't tell if it is a yes or a no.
A. Okay.
Q. Egyptians?
A. Correct.
Q. Lebanese?
A. Yes.
Q. Syrians?
A. Correct.
Q. Iraqis?
A. Uh-huh. Yes. I am sorry.
Q. And then persons from Yemen?
A. If you want me to tell you the names, there is 24 Arab countries, you go from Algeria, Morocco, Tunisia, Lybia, Egypt, Sudan, Somalia, Saudi Arabia, Yemen, Palestine, Iraq, Lebanon, Syria, Iraq, United Arab Emirates, Bahrain, Qatar.
Q. So it is the Arab-speaking countries that generally this organization focuses on as far as its membership?
A. Correct.
Q. And did you participate or attend MAYA activities when you were a student at Jacksonville College?
A. No.
Q. When you transferred or relocated to College Station and

1    were attending Blinn College did you participate in MAYA

2    activities?

3    A.    Correct.

4    Q.    And what type of activities would MAYA have that you

5    would attend?

6    A.    MAYA mainly focused on the teachings of Islam for

7    students who come from the Middle East to this country for the

8    culture shock.  We grow up in a very conservative society.  We

9    don't date, we don't drink, we didn't party.  To come to a

10   very open society like this, a lot of students could be lost

11   in this culture here, so MAYA came to preserve that Islamic

12   tradition, Islamic culture for those students to keep their

13   Muslim Islamic morals and Islamic behavior.

14       So the whole conference mainly were about the Islamic

15   teachings, from the Quran and the Sunnah Prophet Muhammad,

16   peace be upon Him, and also some other parts about the

17   politics that is going on in the Middle East.

18   Q.    You said conferences.  And did MAYA hold conferences?

19   A.    Correct, yes, sir.

20   Q.    And would it hold several conferences or one conference

21   during a year?

22   A.    They mainly held one conference during the Christmas

23   time, because that is the students are off school.  As you

24   say, MAYA is mainly for students.  So usually around December

25   the 25th, two days before the Christmas, Christmas day, and

1    two days after Christmas day, so five days and nights.

2    Q.    And was that an annual event, these MAYA conventions, or

3    conferences as they were called?

4    A.    Yes, they were annual events.  Correct.

5    Q.    And were they always in the same place, or did they move

6    around?

7    A.    They were moved around, mainly in the central part of the

8    United States, so it would be like fair for students living in

9    the east and others living in the west, so just like states in

10   the middle for both the students to travel to.

11   Q.    And do you recall, when was the first MAYA conference

12   that you attended?

13   A.    It was 1983, St. Louis, Missouri.

14   Q.    And you said those conferences generally were five days

15   long?

16   A.    Correct.

17   Q.    And what would take place at those conferences?  What

18   kind of activities?

19   A.    The first day will be opened by the mayor of the city, he

20   will give a speech welcoming the visitors to his city.  And

21   then after that there will be the opening statement by the

22   chairman of the conference welcoming all the visitors or the

23   members, non-members, coming to the conference.  And after

24   that there will be a lay-out of the program, what the program

25   can be for the next five days.

1  Q.   Were there speeches?

2  A.   Correct.  There were speeches.  Right.

3  Q.   Was there entertainment such as skits and music

4  performances?

5  A.   Yeah.  The last night usually is reserved for

6  entertainment.  Right.

7  Q.   And were there dinners or meals that were served to

8  groups?

9  A.   Correct.  There were lunch and dinner.  Right.

10 Q.   Was there ever a portion or was there always a portion

11 when there was fundraising or solicitation for donations?

12 A.   Yes.  Sometimes during the last night after the

13 entertainment there will be call for fundraising.  Right.

14 Q.   Did every conference or convention have some portion of

15 it that was devoted to fundraising?

16 A.   In every conference there was fundraising.  Right.

17 Q.   Are you familiar with an organization known as the Muslim

18 Brotherhood?

19 A.   Correct, yes.

20 Q.   And what type of an organization is the Muslim

21 Brotherhood?

22 A.   The Muslim Brotherhood was founded by a very well-known

23 man in Egypt named Hassan al-Banna and probably the same

24 ideology of the -- MAYA has the same ideology of the

25 Brotherhood, to keep the morals of Islam into the Muslims.

1    Because once the countries were taking their independence from

2    the Europeans, a lot of countries were with the European

3    culture and values, so the Muslim Brotherhood came to preserve

4    the Islamic tradition again based on the Quran and the

5    tradition of the Prophet MuhammadProphet Muhammad peace be

6    upon Him.

7    Q.    And when growing up were you an observant Muslim?

8    A.    Correct.  Yes, sir.

9    Q.    And what did that entail?  To do that, what were the

10   things that you practice?

11   A.    To grow up in a conservative family, my father and my

12   mother used to pray.  So I started praying when I was seven

13   years old, fasting Ramadan.  Same thing for my other six

14   brothers and six sisters, we used to pray, fast.  So we grow

15   up in a Muslim family that you don't talk to girls, you don't

16   hug girls, you don't date, you don't drink, you don't say bad

17   words, you don't do bad things, you don't harm others, you

18   always keep humbling yourself, being peaceful.  All the good

19   morals that is shared by the three major religions, that is

20   what we grow up on.

21   Q.    And are you familiar with the term Islamist?

22   A.    Correct, yes.

23   Q.    Are you an Islamist?

24   A.    Yes, I can say I am Islamist.  Right.

25   Q.    And as an Islamist and as an observant Muslim, does that

1    mean that you believe in sharia law--that that is the type of

2    law that should be enacted or enforced or followed?

3    A.    Correct.  Yes.  Islam to us is a way of life.  It is not

4    like taking into the mosque, and then outside the mosque then

5    you do whatever.  For us Islam is a way of life from the

6    minute you go to sleep to the minute you wake up.  It is a

7    comprehensive package that God sent to Prophet Muhammad peace

8    be upon Him, that this is the way a man should be, not the

9    devil's way, but God's way.

10   Q.    And you -- Is MAYA a Muslim Brotherhood organization?

11   A.    I would say most of the scholars that were invited to the

12   MAYA conferences, not all of them, most of them were from the

13   Muslim Brotherhood, because you got other scholars also from

14   Saudi Arabia who don't belong to Muslim Brotherhood, scholars

15   from Kuwait, scholars from Egypt who don't belong to Muslim

16   Brotherhood.  But yeah, there were a big number of scholars

17   came to MAYA conference from the Muslim Brotherhood.  Correct.

18   Q.    And does the Muslim Brotherhood have members in the

19   United States?  Does it have a branch in the United States?

20   A.    I really don't know about that.  I attended USRA in 1985

21   in Stillwater, but I don't know exactly if they had like, as

22   you say, a branch in the United States.

23   Q.    Are there Muslim Brotherhood members in the United

24   States?

25   A.    I would imagine so, yes, sir.

1    Q.   Have you in fact met with and know people that are

2    members of the Muslim Brotherhood?

3    A.   Correct.  The one who invited me to USRA, Eribhi

4    Bishtawi, he was a member of the Muslim Brotherhood.

5    Q.   What was that individual's name?

6    A.   Eribhi, E-R-B-I-H-I is first name.  Last name is

7    Bishtawi, B-I-S-H-T-A-W-I.

8    Q.   And he was a member of the Muslim Brotherhood?

9    A.   Correct, yes, sir.

10   Q.   And where did you meet him?

11   A.   In Stillwater, Oklahoma.

12   Q.   Was he a student when you were there?

13   A.   He was doing his Ph.D. in chemical engineering.  Right.

14   Q.   And you said he invited you to an USRA meeting.  Correct?

15   A.   That is correct.

16   Q.   And that is spelled U-S-R-A?

17   A.   Correct.  USRA in Arabic means a family, so you got like

18   a family, like group of like four or five sitting down.  We

19   call it USRA.  During like one hour, two hours, we read Quran,

20   we study Quran, the sayings Prophet Muhammad, peace be upon

21   Him, and study the morals of Islam.

22   Q.   And does the Muslim Brotherhood have open meetings, such

23   as you attended, as well as closed meetings that are not open

24   to other people?

25   A.   Yeah, I heard there are closed meetings.  Correct.

Q.   And how many of these USRA meetings did you attend while
you were in Oklahoma?

A.   Every like two weeks we had one.

Q.   And about how many people would participate in these
meetings?

A.   The USRA that I attended there were five people.

Q.   You said that you got your undergraduate degree in
December of 1987.  Is that correct?

A.   Correct, yes.

Q.   Even though you were a student and living in the United
States, did you keep up with events that were going on back in
Israel or in Palestine?

A.   Correct, yes, sir.

Q.   A little bit or a lot?

A.   A lot.

Q.   And would that be something that you did every day to
either check the newspapers or see what you could find out?

A.   Yes, sir.

Q.   Is that something that you and your fellow Arab friends
did together--keeping up with the events back in the Middle
East?

A.   Look, as someone who was born under the Israeli
occupation there, so you grow up seeing the Israeli army every
day around you, and you grow up with a lot of things that is
happening around you.  I have been there 18 years.  I was born

1    there and raised there, so a lot of things were going on.  So

2    the only thing that you really grow up with is seeing the

3    occupation, the killing, the destruction, and so on.

4        I mean, my family were in Gaza just like for a year and a

5    half.  They just came -- just a month ago came back.  My son,

6    when I went to jail he was one-year-old.  Now he is three

7    years old.  When he came back, he knows more about Hamas and

8    Fatah more than his own father.  So when he came back, he was

9    talking about which uncle is Hamas, which uncle is Fatah, and

10   which cousin, and so on, and he is just three years old.

11       So growing up into that environment, that is the only

12   thing you really talk about and that is the only thing you

13   really are mainly concerned about.

14   Q.   So your answer is that even though when you were in this

15   country, you kept very close track of what was going on in

16   that part of the world?

17   A.   Correct, yes, sir.

18   Q.   And just to cut to the point, Mr. Shorbagi, you are a

19   supporter of Hamas.  Correct?

20   A.   Yes, sir, I am.

21   Q.   And you believe in Hamas.

22   A.   Correct.

23   Q.   And you have done things to support Hamas and its goals.

24   Correct?

25   A.   Yes, sir.

1          MS. HOLLANDER:  Your Honor, I am going to object to

2    the continuous leading.

3          THE COURT:  Sustained, counsel.

4    Q.   (BY MR. JACKS)  When went from Oklahoma to Houston, were

5    you -- This person that invited you into the Muslim

6    Brotherhood meeting, this Bishtawi, did he refer you or

7    introduce you to anybody in Houston?

8    A.   No.

9    Q.   And were you connected or able to find anybody in Houston

10   that was -- that knew Mr. Bishtawi?

11   A.   When I went to Houston, I went to the Islamic Society of

12   Greater Houston, ISGH, and I started attending the Friday

13   prayer there.  And then from there I started knowing other

14   people from the Gaza Strip--Palestinians and Arabs.

15   Q.   But did you have any kind of introduction that you took

16   with you or that was conveyed to Houston by persons in

17   Oklahoma that referred you to persons in Houston?

18   A.   No.

19   Q.   When you went to Houston, did you continue to participate

20   in MAYA activities?

21   A.   Correct, yes, sir.

22   Q.   And did you ever do any work for MAYA, either as a

23   volunteer or as an employee?

24   A.   No, I never been employee at MAYA.  Most of MAYA are

25   volunteer basis.

1    Q.    Did you ever volunteer and do any work for MAYA after you

2    got to Houston?

3    A.    Correct, yes, sir.

4    Q.    What would you do for MAYA?

5    A.    The main event for MAYA, as I said, was in December, but

6    during the year MAYA used to invite, send an invitation for

7    some of the permanent scholars in the Middle East, they will

8    get a visa from the U.S. embassies there, and then they will

9    come to this country during the year, like March or April and

10   so on.

11        So when there is a scholar around, then they will

12   designate them to different cities and then I will be their

13   representative in Houston by going to the airport, pick him

14   up, take him to hotel or my apartment for accommodation, and

15   then take him to Friday sermon, giving the speech on Friday

16   sermon.  And then after that at night -- Of course, there will

17   be announcements about the scholar in town before his arrival,

18   and then at night there will be special night for the scholar

19   to talk about the subject that he came for.

20   Q.    And then would there be fundraising after the scholar had

21   spoken?

22   A.    I remember really most of that time in '85 was during the

23   Russian invasion to Afghanistan, there was some donation for

24   the Mujahideen in Afghanistan.

25   Q.    So there would be fundraising, though?

```
1    A.    Sometimes, yes.

2    Q.    And are you familiar with an organization known as the

3    IAP?

4    A.    Correct, yes.

5    Q.    And is that the Islamic Association of Palestine?

6    A.    The Islamic Association for Palestine, yes, sir.

7    Q.    And is it an organization that is associated with MAYA?

8    A.    I think MAYA, IAP they all belong to a big organization

9    called ISNA, Islamic Society of North America.  That is

10   considered like the Muslim leadership, national leadership in

11   this country.

12   Q.    And did the IAP and MAYA work together and conduct events

13   together?

14   A.    Correct, yes, sir.

15   Q.    Did you ever do any work for the IAP?

16   A.    I was the IAP representative in Houston, yes, sir.

17   Q.    And when did you perform or work as the IAP

18   representative in Houston?

19   A.    I started working for MAYA, then around '86, before the

20   start of the first Intifada, I started working for IAP, again

21   voluntarily.  Same thing, speakers would come to the city and

22   I would do the same thing with those speakers.

23   Q.    When did you start working or volunteering for the IAP?

24   A.    In '86.

25   Q.    And who were the principals or the leaders of the IAP?
```

```
 1              MR. DRATEL:  Your Honor, can we get a time frame,
 2   please?
 3   Q.   (BY MR. JACKS)  When you started working for the IAP in
 4   1986-'87, who were the leaders of the IAP?
 5   A.   I don't know who was in '86, but '87 I think Yasser
 6   Bushnaq was the president of IAP.
 7   Q.   Who else, do you know, that was --
 8   A.   After Yasser a man by the name Omar Ahmad I think.
 9   Q.   Is he from northern California?
10   A.   Yes, sir.
11   Q.   Well, Yasser Bushnaq and Omar Ahmad didn't work by
12   themselves.  They weren't the only persons working for the
13   IAP.  Correct?
14              MR. DRATEL:  Objection to leading, Your Honor.
15              THE COURT:  Sustained, counsel.  Do you want to
16   rephrase?
17   Q.   (BY MR. JACKS)  Who else did you know that worked with
18   the IAP or was an officer in the IAP or had some position with
19   the IAP?
20   A.   I know Osama Ahmad.
21   Q.   Excuse me?
22   A.   Osama.  I think the last name -- What is his last name
23   They have an office here in Dallas, and I used to come to the
24   office here in Dallas.  I mean, I really don't know most of
25   the guys here, but only the most important one I know was
```

1    Yasser Bushnaq.

2    Q.    And was Dallas or Richardson the national office of the

3    IAP?

4    A.    Correct, yes, sir.

5    Q.    The national headquarters, I should say.

6    A.    Correct, yes.

7    Q.    And you said, whereas MAYA was Muslim Arab Youth

8    Association, the IAP was Islamic Association for Palestine.

9    Correct?

10   A.    Correct.

11   Q.    So it was more specific than MAYA.

12          MS. HOLLANDER:  Objection; leading.

13          THE COURT:  Sustained, counsel.

14   Q.    (BY MR. JACKS)  Was IAP focused on Palestine issues?

15   A.    I would say yes.

16   Q.    The IAP What were the activities that you participated in

17   and that were held or conducted by the IAP when you were in

18   Houston?

19   A.    As I said, before the Intifada, it was mainly like the

20   MAYA, guest speakers will come and I will pick them up or

21   arrange for someone else to pick them up and then move them to

22   the program.  After the Intifada started in December of '87,

23   things completely changed.

24   Q.    Was the -- Did the Intifada begin, the first Intifada,

25   begin at the same time that you graduated from Prairie View

1    A&M?

2    A.    Correct, yes, sir.

3    Q.    And was the IAP a part of or connected to an organization

4    that began after the first Intifada?

5    A.    Be connected to organization?

6    Q.    Yes.

7    A.    No, sir.

8    Q.    Was it connected to Hamas?

9           MS. HOLLANDER:  Objection, Your Honor.

10          MR. DRATEL:  Leading.

11          THE COURT:  That is not suggesting an answer.  You

12   may ask.  Go ahead.

13   Q.    (BY MR. JACKS)  Was the IAP connected to Hamas?

14   A.    No, sir.

15   Q.    Did the IAP do anything in connection with Hamas?

16   A.    Okay.  When the Intifada started in '87, the IAP started

17   getting the leaflets of Hamas.  There were issued in the Gaza

18   Strip or West Bank, then the IAP will reprint these leaflets

19   and then mail them to different Islamic Centers in the United

20   States.  I used to get these leaflets by Hamas in ISGH, make

21   copies, and then distribute them to the public after the

22   Friday sermon in Houston.

23   Q.    When you talk about leaflets, how long are these

24   documents?

25   A.    About one page.

1   Q.    And what kind of information was on them?

2   A.    It was about what the occupation were doing in the

3   occupied territories, and how to fight the occupation, resist

4   the occupation, to get rid of the occupation for the homeland

5   of the Palestinians.  They were subjected to occupation for

6   the last 20 years when the Intifada started.

7   Q.    What else was contained within these leaflets?

8   A.    It contained, some of it, like how to be helping each

9   other as families because of the pressure by the Israelis, and

10  some of it on days sent by Hamas for resisting or throwing

11  stones at the Israeli occupation.

12  Q.    Did these leaflets contain reports about things that

13  Hamas had done?

14  A.    About what?  I am sorry?

15  Q.    Reports about activities that Hamas had coordinated or

16  caused to happen?

17  A.    That happened later on in I think '88 or '89 when I think

18  Sheikh Ahmed Yassin was arrested by the Israelis.  I think

19  Hamas kidnapped two soldiers in order to get the release for

20  Sheikh Ahmed Yassin, who was paralyzed, and they could not

21  meet -- or the Israelis did not release the Sheikh, so they

22  killed the two soldiers, so Hamas took the responsibility for

23  that.

24  Q.    Well, and then were those reports or those claims printed

25  in these leaflets or communiques?

1    A.    Correct, yes.

2    Q.    And you testified earlier that these communiques would be

3    printed or typed up or written in Gaza or in the territories.

4    Correct?

5    A.    Correct.

6    Q.    And then how were they conveyed to the United States?

7    A.    They used to be faxed to the United States.

8    Q.    And where would they be faxed to?

9    A.    To the IAP office in Dallas.

10   Q.    And you said from there they were distributed by the IAP?

11   A.    IAP will reprint them and then mail them different

12   centers in the United States.  Right.

13   Q.    And where did you receive these?

14   A.    They used to be sent to the ISGH main office in Houston,

15   the Islamic Society of Greater Houston.

16   Q.    I am sorry.  Your voice trailed off.  What is ISGH?

17   A.    The Islamic Society of Greater Houston.

18   Q.    And that name, what does it consist of?  Is it a mosque?

19   A.    It is an Islamic Center that have about like 16 centers

20   spread around the greater city of Houston under one

21   leadership.  It is -- At that time mainly was mosques.  Now

22   after that there were schools, like kindergarten, and then

23   different schools around the city of Houston.

24   Q.    Well, as far as the structure or the building that you

25   went to, did it have offices?

1    A.    Correct, yes.  It has -- Yes, there is like the mosque,

2    and then the offices for the administration of the mosque.

3    Right.

4    Q.    And is that the place that you would go to to do anything

5    with the Islamic Center or society?  What is it called?

6    A.    Islamic Society of Greater Houston.

7    Q.    All right.  But that is the facility that you would go to

8    -- Is that where you receive these communiques in the mail?

9    A.    That is correct.  I will use their -- I mean, I used to

10   go there before Friday sermon, take that leaflet, and go to

11   Kinkos, make like a few copies, like 200, 300 copies, and then

12   go back to the mosque and distribute them.

13   Q.    Do you know an individual named Mufid Abdulqader?

14   A.    Yes, sir.

15   Q.    And when did you first meet him?

16   A.    I met him very briefly in Stillwater, Oklahoma.

17   Q.    This would have been during the time period of --

18           MR. DRATEL:  Objection to leading, Your Honor.

19           THE COURT:  He has already testified to that.  Go

20   ahead.

21   Q.    (BY MR. JACKS)  In 1984-'85?

22   A.    1984.  Correct.

23   Q.    And where did you meet him?

24   A.    I met him in the mosque.

25   Q.    And did you ever have an occasion to go anywhere with him

1    or take a trip with him?

2    A.    One time I think in the MAYA convention in Oklahoma City

3    in '84 we were a group of students that left Stillwater to

4    Oklahoma City to attend the MAYA conference.

5    Q.    And was he one of those students that traveled to

6    Oklahoma City with you?

7    A.    Correct, yes, sir.

8    Q.    Do you know Mohammad El-Mezain?

9    A.    Yes, sir.

10   Q.    And when -- First of all, where did you meet him for the

11   first time?

12   A.    I met Mr. El Mezain in Houston I think in '87 or '88;

13   late '80s.

14   Q.    And where did you meet him in Houston?

15   A.    I think the first time I met him -- I am trying to

16   remember.  I think before '87 I met him in the MAYA

17   convention, one of the MAYA conventions.  And then he came to

18   Houston in 1990.  That time the Israelis invaded the al-Aqsa

19   mosque, and there were a lot of people who got killed, shot

20   there, and he came in there because the Israelis also

21   destroyed the system, the speaker system of al-Aqsa mosque.

22   He came in there for fundraising for the speakers of al-Aqsa

23   mosque that were destroyed by the army, the Israeli army.

24   Q.    Well, then let me back up.  You said you first met him at

25   a MAYA convention.

```
1   A.   Correct, yes, sir.

2   Q.   Where was that?

3   A.   I think in Kansas City, '88.

4   Q.   Kansas City, Missouri?

5   A.   Kansas City, Missouri.  Correct.

6   Q.   1988?

7   A.   Correct, yes, sir.

8   Q.   And did you personally meet him; in other words, walk up

9   and talk to him?

10  A.   Yes, sir.  I think I was introduced to him by someone,

11  because he is from the same city I am from, and that is how I

12  was introduced to him and I got to know him.  Right.

13  Q.   Do you recall who it was that you introduced you to him?

14  A.   I don't remember, sir.  No.

15  Q.   And you said that he is from the same city that you are?

16  A.   Correct, yes, sir.

17  Q.   Khan Yunis?

18  A.   Correct, yes, sir.

19  Q.   What was he doing at the MAYA convention?  What was his

20  purpose in being there?

21  A.   I think like everybody else.  He was attending --

22         MR. DRATEL:  Your Honor, basis of knowledge.  He

23  asked him what Mr. El-Mezain was doing at the MAYA convention.

24  I object to the form of the question on basis of knowledge.

25         THE COURT:  Do you want to ask another question and
```

1    lay a predicate, if he knows.

2    Q.    (BY MR. JACKS)  Do you know what Mr. Mohammad El-Mezain

3    was doing there at the MAYA convention?

4    A.    As I said, just like any other person attending the MAYA

5    conference.

6    Q.    Was he just sitting in the audience?

7    A.    Sitting in the audience?

8    Q.    Did he have a role?  Did he get up on the stage?

9    A.    I remember him getting for donation, yes, in '88.

10   Q.    On behalf of who?

11   A.    That time there was an organization called the Occupied

12   Land Fund, OLF.

13   Q.    Occupied Land Fund?

14   A.    Correct, yes.

15   Q.    Did that organization change its name later?

16   A.    Correct.

17   Q.    What name did it change to?

18   A.    Holy Land Foundation.

19   Q.    What was he doing at this Kansas City convention in 1988

20   for the Occupied Land Fund?

21   A.    Calling for the donation for the needy families and the

22   poor families in the occupied territories.

23   Q.    Did you see Mr. El-Mezain after that over the years?

24   A.    Right.  As I said in 1990.

25   Q.    Other times would you see him periodically while you were

1    in Houston and while you were in Georgia?

2    A.    Correct, yes, sir.

3    Q.    And as you would see him through the later years, who was

4    he working for?

5    A.    He was working for the Holy Land Foundation.

6    Q.    Did you see Mufid Abdulqader ever at MAYA conventions

7    through the years?

8    A.    The only time -- As I said, I knew Mufid only very, very

9    briefly.  The only time I see him is singing in the MAYA

10   conventions.

11   Q.    What about at IAP conventions or festivals?

12   A.    Correct, yes, sir.

13   Q.    And what was he doing at those events?

14   A.    He had a nice voice, so singing in these conventions.

15   Q.    Did he have a band?

16   A.    He belonged to a band.  Right.

17   Q.    What was the name of the band?

18   A.    It was called Al Sakhra, the rock.

19   Q.    Do you know a man by the name of Abdel Haleem Ashqar?

20   A.    Yes, sir.

21   Q.    And how long have you known Abdel Haleem Ashqar?

22   A.    I met him just a few times, and I didn't see him since

23   like '94 or '95.  I think the first time I met him was in '92.

24   Q.    Where did you meet him?

25   A.    In Oklahoma City.

1   Q.   And how did you meet him?

2   A.   I was introduced to him by a friend of mine from Houston.

3   Q.   Who was that friend?

4   A.   Jamil Dalu.

5   Q.   J-A-M-I-L?

6   A.   Right.

7   Q.   And the last name?

8   A.   D-A-L-U.

9   Q.   D-A-L-U.  And how did Jamil Dalu know Abdel Haleem

10  Ashqar?

11          MR. DRATEL:  Objection; hearsay.

12          THE COURT:  Do you want to ask if he knows.

13  Q.   (BY MR. JACKS)  What did Jamil Dalu tell you regarding

14  how he knew --

15          MS. HOLLANDER:  Objection.

16          MR. JACKS:  Your Honor, I am not offering it for the

17  truth.  It is just to show what was expressed to him when he

18  was introduced to Mr. Ashqar.

19          MR. DRATEL:  Then I don't think it is relevant, Your

20  Honor.  I don't know why that is relevant.

21          MS. HOLLANDER:  If it is not true, it certainly is

22  not relevant.

23          THE COURT:  Overrule the objection.  Go ahead.

24  Q.   (BY MR. JACKS)  What was represented to you about how

25  Jamil Dalu knew Abdel Haleem Ashqar?

1   A.   They were attending the university in West Bank called

2   Bir Zeit University.

3   Q.   They went to school together?

4   A.   Correct.

5   Q.   And you said that you first met him in 1992?

6   A.   Correct, yes.

7   Q.   And you said the last time that you saw him was when,

8   approximately?

9   A.   About '94.

10  Q.   And in that interim period would you see him

11  periodically?

12  A.   Not really, other than the MAYA convention if he was

13  there.  That is the only time.

14  Q.   At these conventions, were there things for sale at the

15  conventions?

16  A.   Yes, sir.

17  Q.   What types of things?

18  A.   Like those lectures that were made by the guest speakers,

19  MAYA will make them available in tapes, cassette tapes or

20  videotapes.  They will be sold there.  Books will be sold

21  there, clothes, food, things like that nature.

22  Q.   And did you purchase -- ever purchase videotapes of these

23  speeches or audiotapes of speeches?

24  A.   Correct, yes, sir.

25  Q.   Did you ever in the audio -- Excuse me.  In the

1   videotapes did you ever see Ashqar depicted?

2   A.   Right, yes, sir.

3            MR. JACKS:  Your Honor, at this time I would request

4   permission to play a video which has been admitted.  I believe

5   it is HLF Search No. 32.

6            THE COURT:  All right.

7            MR. DRATEL:  Your Honor, we need to approach on

8   this.

9            (The following was had outside the hearing of the

10           jury.)

11           MR. DRATEL:  I was going to defer to Ms. Duncan,

12  because I think -- Looking at it, it apparently has been

13  admitted conditionally.  I don't know if we remember

14  precisely.  It wasn't a familiar number, which is why I was

15  kind of curious.

16           MS. DUNCAN:  This was one of the exhibits introduced

17  conditionally through Agent Burns in bulk.

18           MS. HOLLANDER:  They were admitted, and they were

19  all admitted -- I think that is one of the housekeeping ones

20  through Agent Burns, and we said that if we had objections to

21  them we could make them later.

22           THE COURT:  So do you have an objection?

23           MR. DRATEL:  We didn't know it was coming today.

24           MS. HOLLANDER:  I was not anticipating this one.

25           MR. JACKS:  It has already been played, Your Honor.

1          MS. HOLLANDER:  I don't think so.

2          MR. DRATEL:  I don't believe it has been played.

3          MS. HOLLANDER:  I am concerned about what he is

4   going to do.

5          MR. JONAS:  Your Honor, this is one of the same

6   videos we have played already.  If it hasn't been played, it

7   is the same nature, so I don't see --

8          MR. DRATEL:  Can we just perhaps get a proffer of

9   what is going to be on this particular snippet, maybe it won't

10  be a --

11         MS. HOLLANDER:  If it has already been played, why

12  is it being played again?

13         THE COURT:  One at a time.

14         MR. JACKS:  He is going to identify one of the

15  individuals as Ashqar in that video.

16         THE COURT:  Okay.

17         MR. DRATEL:  May I inquire just, is it just Ashqar?

18  Is there audio we are going to hear?

19         MR. JACKS:  Yes.  It is Ashqar making a speech

20  wearing a hood.  He knows that is Ashqar.

21         THE COURT:  Okay.

22         MR. DRATEL:  We object on 403 grounds.

23         MR. JACKS:  It has already been played, Your Honor.

24         MR. DRATEL:  It has not been played.

25         THE COURT:  I am going to let you play it.

1        MS. HOLLANDER:  I think it maybe has been played,

2   but -- And I know -- Now I know which tape this is, and I do

3   object 403 grounds.  And I also object that I don't know that

4   they can play it -- lay a foundation that he knew who this was

5   before the Government played it for him before, because it is

6   almost like a show-up; you know, they are going to play him a

7   tape that I belief they played for him before and told him who

8   it was, and we don't have any way of knowing that.

9        MS. CADEDDU:  And I am concerned about foundation,

10  given the testimony that just came out that he will see him

11  occasionally at the MAYA conventions.  But how he is going to

12  identify his voice, I don't know that he has a foundation to

13  do that.

14       THE COURT:  He is going to ask him, and of course

15  you can cross examine him.  I don't know either.

16       MR. DRATEL:  Your Honor, I just -- I was not here

17  for half a day, and I think probably that is when it was

18  played.  I don't remember it, but if everybody else does I am

19  sure it was played.

20       MS. HOLLANDER:  I don't know if it is played.  I

21  know the tape, whether it was played here or whether I

22  remember it from somewhere else.

23       THE COURT:  All right.  You can play it, then.

24            (The following was had in the presence and hearing

25            of the jury.)

1              MR. JACKS:  Please play HLF Search No. 32.

2              (Whereupon, HLF Search No. 32 was played, while

3              questions were propounded.)

4    Q.    Have you seen this tape before, Mr. Shorbagi?

5    A.    Yes, sir.

6              MR. JACKS:  Go to the next segment, please.

7    Q.    (BY MR. JACKS)  Mr. Shorbagi, do you see the object in

8    the top of the screen there?

9    A.    Yes, sir.

10   Q.    What is that?  What is shown there?

11   A.    That is the Palestinian flag.

12   Q.    And describe the colors, if you would.  It is not a very

13   clear picture, but what colors is it when it is visible?

14   A.    The top is black and then you have got the middle is

15   white and the bottom is green and the triangle is the red.

16   Q.    And the Arabic writing in the white part, what does that

17   say?

18   A.    It says in Arabic Islamic Resistance Movement, Hamas.

19   Q.    Do you recognize that voice?

20   A.    Yes, sir.

21   Q.    Whose voice is that?

22   A.    I knew later on that was the voice of Abdel Haleem

23   Ashqar.

24   Q.    You have talked to him?  You have talked to him?

25   A.    Right.

```
 1    Q.    And you have heard his voice?

 2    A.    Correct, yes.

 3    Q.    To you is it a distinctive voice?

 4    A.    I would say yes, uh-huh.

 5    Q.    Did you see the caption on the screen, the Majd

 6    Organization?

 7    A.    Yes, sir.

 8    Q.    What is that?

 9    A.    It says right in Arabic it is the security authorities.

10    Q.    Well, do you know what it is without having seen it on

11    the screen?  Do you know what that --

12    A.    I was reading in the newspaper --

13    Q.    No.  I am not asking what you read in the newspaper.  Do

14    you know what that organization is, the Majd Organization?

15    A.    No, sir.

16    Q.    Who is that speaking on the screen?

17    A.    That is Abdel Haleem Ashqar.

18    Q.    Say it a little slower.

19    A.    That is Abdel Haleem Ashqar.

20    Q.    Do you see the reference there to the al-Majd

21    Organization?

22    A.    Correct, yes.

23    Q.    And seeing it there, do you know what it refers to?

24          MR. DRATEL:  Object.  It has been asked and

25    answered.
```

1          THE COURT:  Overruled.  Go ahead.

2     Q.   (BY MR. JACKS)  Have you heard of the al-Majd

3     Organization?

4     A.   Correct, yes.

5     Q.   What is it?

6     A.   Al-Majd is the security apparatus that was looking after

7     the collaborators of Israel in the occupied territories,

8     interrogate them, and then investigate their collaboration

9     with Israel.

10    Q.   For who?  What organization are they a part of?

11    A.   They are part of Hamas.

12    Q.   And what do they do to persons they perceive as

13    collaborators?

14    A.   It depends on what collaboration, like either a small

15    one, a middle one, or a big one.  A big one, who joined the

16    Israeli army by shooting at the Palestinians, and if they

17    found that he killed Palestinians, they have to get a decree,

18    an Islamic decree for him to be killed, so some of them, yeah,

19    they were killed.

20    Q.   And how soon after they were captured were they killed?

21    A.   I really don't know, but I knew they would be taken for

22    interrogation, and then if there is a decree for him to be

23    executed they will execute him.

24    Q.   Is there appeal from that?  Can you appeal that if you

25    are accused of being a collaborator?

```
 1              MS. HOLLANDER:  Your Honor, may we approach?

 2              THE COURT:  No.  Overrule the objection.  Go ahead.

 3              THE WITNESS:  Excuse me.

 4    Q.   (BY MR. JACKS)  A person that Hamas determines to be a

 5    collaborator, do they have an appeal from that?

 6    A.   You are talking about occupation.

 7    Q.   I am sorry.  My question was --

 8              MR. DRATEL:  Your Honor, if he can let him answer.

 9              THE WITNESS:  No, there was no appeal, sir.

10              MS. CADEDDU:  Have you given a date for this video?

11              MR. JACKS:  I am sure we have but I don't remember

12    it.

13    Q.   (BY MR. JACKS)  And is that still Mr. Ashqar?

14    A.   Correct.

15    Q.   Mr. Ashqar?

16    A.   Correct, yes.

17    Q.   Do you know who that is shown on the screen?

18    A.   I read about him in the newspaper.  Right.

19    Q.   What did he do?

20              MR. DRATEL:  Objection, Your Honor.

21              THE COURT:  Sustained.

22    Q.   (BY MR. JACKS)  Is this part of the information that you

23    have kept up with regarding your home?

24    A.   Correct, yes.

25    Q.   Have you talked to people about this?
```

1   A.   Correct.  I mean, that was a very, very popular accident.

2   That was broadcast all over the news--ABC NBC, CBS, about the

3   bus accident.

4   Q.   The bus accident?

5   A.   Right, yes, sir.

6   Q.   What did this person do?

7         MR. DRATEL:  Objection, Your Honor, if he heard it

8   on the news.

9         THE COURT:  Which person are you referring to,

10  counsel?

11        MR. JACKS:  The person that was depicted on the

12  screen a moment ago.

13        THE COURT:  If he knows personally.  But if he is

14  talking about news reports, that has been sustained.

15  Q.   (BY MR. JACKS)  Sir, the flag that was shown in that

16  video, you said it was the Palestinian flag?

17  A.   Correct, yes.

18  Q.   And now, the official Palestinian flag, what does it look

19  like?

20  A.   It looks like the one that was shown on the screen--the

21  black in the top, white in the middle, green in the bottom,

22  and the red is the triangle.

23  Q.   And does it have writing in the white part in the middle,

24  the official Palestinian flag?

25  A.   The official Palestinian flag that was founded like late

1   '20s early '30s, it doesn't have any writing.

2   Q.   What flag -- Who displays the flag with the writing in

3   the middle?

4   A.   When the Intifada started in '87, in order for Hamas to

5   distinguish themselves from the other factions of the PLO,

6   whatever they used to go into the administration, they used to

7   hold the Palestinian flag with the writings of the Shahada

8   which there is no God but one, and Muhammad, peace be upon

9   Him, is his messenger, so to distinguish himself from the

10  other factions of the PLO.

11  Q.   So Hamas had its own version of the Palestinian flag?

12  A.   It is the same flag but with the Shahada in the middle of

13  it, so Hamas has its own -- like their own Palestinian flag.

14  Q.   What else may be written in that white part in the Hamas

15  flag?

16  A.   Sometimes, as you see on the screen, it will say the

17  Islamic Resistance Movement.

18  Q.   And the name of the expression or the religious saying

19  that you said was written in some of these Hamas flags?

20  A.   Correct.  That is the Shahada.  Right.

21  Q.   I want to direct your attention to 1992.  Do you

22  recall -- Did you go to a MAYA convention in 1992?

23  A.   Correct, yes.

24  Q.   Where was that convention held?

25  A.   In Oklahoma City.

1   Q.   And have you looked at a video that is referred for

2   identification purposes as Government's Exhibit MAYA

3   Conference?  Have you seen a video of that conference?

4   A.   Correct, yes.

5   Q.   And is that video a true and accurate representation of

6   the events as they happened at that conference?

7   A.   Correct, yes.

8        MR. JACKS:  Judge, we would move the admission of

9   Government's Exhibit MAYA Conference.

10        THE COURT:  Counsel?

11        MS. HOLLANDER:  We never got a list for this.  This

12   has not been admitted before, and it was not on any list that

13   we knew --

14        THE COURT:  Did you give a list in advance --

15        MR. JACKS:  This is the only exhibit, Your Honor,

16   that he is going to introduce.

17        THE COURT:  We didn't discuss about a list on this

18   one, counsel, and that is inappropriate to be going into that

19   right now.  Is it on the exhibit list that counsel received in

20   advance?

21        MR. JACKS:  Yes, sir.

22        THE COURT:  Well, I am hearing -- Anybody know?  Is

23   it on the exhibit list?

24        MR. DRATEL:  I don't know.

25        THE COURT:  The general exhibit list.

1          MR. DRATEL:  I will have to check.  No, Your Honor.

2          THE COURT:  It is not on the exhibit list?

3          MR. JACKS:  It is, Your Honor.

4          THE COURT:  I show it on page 35.

5          MR. WESTFALL:  It is on the list, Your Honor.  It is

6    on that list that we were provided at the beginning.

7          MR. DRATEL:  I am looking at the disk that we

8    received the 8th of October.

9          THE COURT:  Objection overruled.  MAYA Conference

10   Exhibit is admitted.

11         MR. JACKS:  Mr. Lewis?

12         MR. DRATEL:  Your Honor, I am going to object on 403

13   grounds as well.

14         THE COURT:  That is overruled.

15   Q.   (BY MR. JACKS)  Sir, what does Mujahideen translate to?

16   A.   Mujahideen is the plural of a single Mujahid.  Mujahid in

17   Arabic means the one who is struggling for the best.  There

18   could be different explanation for it.  But mainly when he is

19   referring to Mujahideen, the same thing when you say the

20   freedom fighters, the one who is fighting for their homeland.

21   Q.   Fighters?

22   A.   Freedom fighters, yes, sir.

23   Q.   Mujahid is singular and Mujahideen is plural?

24   A.   That is correct.  Mujahid is single, and Mujahideen is

25   plural of Mujahideen.

Q.   The word on the screen is plural, fighters?

          MR. DRATEL:  Objection, Your Honor.  It is not what

he said the definition is.

Q.   (BY MR. JACKS)  Is it?

A.   Yes, sir.  It is the freedom fighters, yes.

          MR. WESTFALL:  Can we have a date on this movie?

          MR. JACKS:  December 1992.

?

Q.   (BY MR. JACKS)  The caption that just appeared, is that

consistent with what you have said about the association

between MAYA and the Islamic Association for Palestine?

A.   Correct, yes.

Q.   The man on the right there is who?

A.   That is Mufid.

Q.   Do you see him in the courtroom today, Mufid Abdulqader?

A.   Yes, sir.  He is right there.

          MR. JACKS:  May the record reflect he has identified

the Defendant Mufid Abdulqader.

          THE COURT:  It may do so.

Q.   (BY MR. JACKS)  Just for the record, do you know Ghassan

Elashi?

A.   Yes, sir.

Q.   Do you see him in the courtroom?

A.   Yes, sir.  He is right there.

          MR. JACKS:  May the record reflect --

```
 1              THE COURT:  That is too vague--"He is over there."

 2              THE WITNESS:  He is sitting next to the female

 3    there.

 4    Q.   (BY MR. JACKS)  The woman in the black dress, to her

 5    right?

 6    A.   Yes, sir.

 7    Q.   And Mohammad El-Mezain?

 8    A.   Yes, sir.

 9    Q.   Is he in the courtroom?

10    A.   Yes, sir.  He is in the courtroom.

11    Q.   What colored coat is he wearing?

12    A.   I think that is beige color.

13    Q.   All right.  And do you know Shukri Abu Baker?

14    A.   Yes, sir.

15    Q.   And where is he in the courtroom?

16    A.   He is sitting by the female -- between the two females

17    there.

18              MR. JACKS:  May the record reflect he has identified

19    those Defendants?

20              THE COURT:  It may do so.

21    Q.   (BY MR. JACKS)  Do you know Abdulrahman Odeh?

22    A.   No, sir.

23              MR. JACKS:  If you will resume it, please, Jim.

24         (Government's Exhibit MAYA Conference continued to be

25           played, while questions were propounded.)
```

```
 1    Q.   (BY MR. JACKS)  Do you know that man on the screen?

 2    A.   Yes, sir.

 3    Q.   Who is that?

 4    A.   That is Fawaz Mushtaha.

 5    Q.   The man on the far right, do you know him?

 6    A.   Yes.

 7    Q.   Who is that?

 8    A.   That is Munzer Taleb.

 9    Q.   Who was that person?

10    A.   That is Kamal Hilbawi.

11    Q.   H-I-L-B-A-W-I?

12    A.   Correct.

13    Q.   Who is that on the screen?

14    A.   That is Khalid Mishal.

15    Q.   And what was his position, if any, with Hamas?

16    A.   Now?

17    Q.   Now.

18    A.   He is the head of Hamas political wing.

19    Q.   What was his position in 1992?

20    A.   I don't think that he has any position in 1992.  He was

21    -- I met him in 1994, and then he was introduced as one of the

22    leaders of Hamas.

23    Q.   Who is the man on the right of Mr. El-Mezain?

24    A.   That is Shukri Abu Baker.

25    Q.   The man on the left, who is that?
```

A.    The man on the left is Omar Ahmad.

Q.    The man you made reference to earlier?  You said he was from?

        MR. DRATEL:  Objection, Your Honor.

        THE COURT:  Sustained.

Q.    (BY MR. JACKS)  Sir, what is going on now on the screen? What part of the program is this?

A.    This is the fundraising during the MAYA convention.

Q.    Who is raising funds?

A.    Mr. Mohammad El-Mezain.

Q.    For what organization?

A.    For the Holy Land Foundation.

Q.    Do you see the caption on the screen?

A.    Right.

Q.    And it says Rome mosque in Georgia?

A.    Correct.

Q.    And did you after this date become or have an association with that entity?

A.    This thing was in '92.  In 92 I was in Houston.  I moved to Rome in '93.

Q.    Did you after this date have an association with this mosque in Rome, Georgia?

A.    Correct, I did.

Q.    Did you see the reference to brother Samir for a $50,000 donation?

1   A.   Correct, yes.

2   Q.   Do you know who that person is?

3   A.   Yes, I know who that person is.

4   Q.   And who is that?

5   A.   He was the founder of Alexandria Carpet He passed away,

6   and peace be with his soul, last year.

7   Q.   And is he the person that you went to work for after you

8   left Houston?  When you moved to Rome, Georgia is that the man

9   you went to work for?

10  A.   Correct.

11  Q.   It is difficult to see, but do you see the man in the

12  center of the screen?

13  A.   Yes, I do.

14  Q.   And who do you recognize in that picture, the man in the

15  middle of screen?

16  A.   The one who is sitting down wearing the Afghan dress,

17  wearing the Afghan hat is Hadj Samir Khatib.

18  Q.   I am sorry.  You said that fast.  Who is that?

19  A.   Samir Khatib.

20  Q.   He is the man wearing -- You described it as an Afghan

21  what?

22  A.   The Afghan dress and the Afghan hat.

23  Q.   All right.  Is he the individual that had donated the

24  $50,000?

25  A.   Correct, yes.

```
1   Q.    Do you see the man moving down the aisle?

2   A.    Right.

3   Q.    Who is that?

4   A.    That is Omar Ahmad.

5   Q.    The one holding the container or box or whatever?

6   A.    Correct.

7   Q.    Do you know what he was doing?  At that moment what was

8   he doing?

9   A.    That is the time when people were pledging money and

10  people donating money, so he was holding a box moving around

11  people for whoever wanted to donate money so they can put it

12  in a box.

13  Q.    Is that Mr. al-Khatib in the close zoomed in picture?

14  A.    Yes, that is Hajj Khatib.

15  Q.    The man behind the two men in the foreground.  Is that

16  correct?

17  A.    Yes, sir.  That is correct.

18  Q.    Who is that man that is depicted on the front row there?

19  A.    That is Khalid Mishal.

20  Q.    The man on the far left on the front row, who is that?

21  A.    That is Moustafa al-Mansour.

22  Q.    What was his position?  What title did he hold?

23  A.    He was the general chairman of the Muslim Brotherhood.

24  Q.    For the entire world?

25  A.    Correct, yes.
```

1          MR. JACKS:  Your Honor.

2          THE COURT:  You are at a good stopping point?

3          MR. JACKS:  Yes, sir.

4          THE COURT:  Let's break here for the day.  We will

5    See you back in the morning at 9:00.  Remember we will work

6    until 1:00, and then we will be done for the day.

7          (Whereupon, the jury left the courtroom.)

8          THE COURT:  Anything we need to address?

9          MR. DRATEL:  Yes, Your Honor.  If we could, after

10   the witness is gone.

11         THE COURT:  All right.  You may go ahead and take

12   Mr. Shorbagi.

13       And you can be seated, those that want to stay.

14       Do we need to have a sidebar, or from there?

15         MR. DRATEL:  We may.  I have two other things first.

16       First is, again we have and I will be quick, the

17   introduction of acts of violence, and these Defendants are not

18   charged with any.  Collaboration killers, collaborators, that

19   has nothing to do with this case.  This is again -- I will

20   cite *al-Moayad* again.  This is really beyond the pale.  I am

21   going to ask for a mistrial again.  I just feel compelled to

22   do so.

23         THE COURT:  The request for mistrial is denied.

24         MR. DRATEL:  And, Your Honor, just with respect to

25   the exhibits, just so you understand logistic issues for us, I

1  get a disk on October 8th that says -- where I am told these

2  are all the Government exhibits.  This tape is not on there,

3  so I don't know that I have to go back to another list that I

4  got when --

5          THE COURT:  Well, but we know there are multiple

6  lists and multiple disks.  The best thing to do is don't say,

7  "No, I don't have it."  Take a look and look at what you have.

8          And Ms. Hollander, you do that repeatedly.  You are

9  sitting over there shaking your head no all the time.  You

10  obviously haven't looked, because then it turns out that they

11  are there.

12          And the list you were talking about was this convenience

13  list that we have been doing with the longer witnesses.  We

14  didn't do that with this witness.  That is not a basis for

15  excluding anything.  And that is certainly improper getting

16  that in front of the jury that you don't have something, and

17  then we go through this exchange and then you do have it.

18  That is improper.

19          MR. DRATEL:  I was told when I was given that disk

20  that it superseded all prior exhibits, so that is what I am

21  working on.  If I know now I have to check six or seven lists,

22  then --

23          THE COURT:  Just check your list.  We checked our

24  list and it is on there, the very first list.  I say the

25  first.  It is one of those lists we got; not the superseding

1    ones.  It is on there.

2            MR. DRATEL:  Okay.  I understand.  I just wanted you

3    to understand what we are dealing with here.

4            THE COURT:  That is fine.  I know we are all dealing

5    with a lot, but the best thing to do is if you don't know,

6    just don't--in front of the jury especially--be claiming that

7    you don't have it, that it wasn't given to you, before you

8    check.  Just hold off and then we can check.

9            MR. DRATEL:  Fair enough, Your Honor.

10        Also I was also under the impression, by the way, that

11   the Court had ordered that prior to witnesses, and I didn't

12   know that applied to certain ones.

13           THE COURT:  We haven't discussed any past Agent

14   Miranda the longer witnesses.  We can discuss that.  I didn't

15   know how many more exhibits we have left.  I saw where you did

16   that with Agent Burns, and that is good because that is a

17   fairly long list, so I want to get objections to those.

18           MS. HOLLANDER:  Your Honor, I am sorry, but when you

19   said was it on the list, I thought you meant the list for this

20   exhibit.

21           THE COURT:  No, you were the one that objected,

22   counsel.  You objected first that it wasn't on the list that

23   they were supposed to have turned over to you, and I assume

24   that you were speaking of that convenience list.  You said,

25   "It is not on the list that they plan on introducing with this

1    witness."  We have never discussed exchanging that with this

2    witness.  That has just never come up.

3            MR. DRATEL:  Your Honor, maybe this is an issue that

4    we should approach on.

5            (The following was had at the bench.)

6            MS. HOLLANDER:  I am sorry, Your Honor.  I thought

7    that was for all of us.  It is my mistake.  I am sorry.

8            MR. DRATEL:  That paragraph which I am pointing to,

9    the second paragraph on page 3 -- The Government gave us a

10   letter today this afternoon with respect to Mr. Shorbagi, and

11   it is about sort of unredacting a redacted 302.  However, the

12   unredacted part still has a redacted part.

13       I think that at the very least the Court should look at

14   it to determine whether it is relevant and --

15           THE COURT:  You are talked about second redacted and

16   unredacted.

17           MR. DRATEL:  In other words, this is supposed to be

18   something that is fully unredacted, and then it is still

19   redacted.

20           MS. HOLLANDER:  The letter says we previously --

21           THE COURT:  Just a minute.  Let me read it.  Okay.

22   So what is it here that we are dealing with?

23           MR. DRATEL:  Well, It says --

24           THE COURT:  What is it that you want?

25           MR. DRATEL:  I want to know who the redacted parts

1    are.  It may be very well relevant to this case and relevant

2    to impeaching this person, and we are talking about money to

3    Hamas.

4              THE COURT:  What is your position?

5              MR. JACKS:  I will tender it to the Court.  And let

6    me check with the agent, because some of this activity may

7    involve other investigations and that may be the reason other

8    districts -- And let me find out.  I will have to see.

9              THE COURT:  That is fine.

10             MR. JACKS:  I will be happy to tender it to the

11   Court.

12             THE COURT:  Anything else on that?

13             MR. DRATEL:  No.  Thank you, Your Honor.

14             THE COURT:  Anything else?  See you at 9:00.

15                       (End of day.)

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts              06/05/2009

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25