IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA    )  CAUSE NO. 3:04-CR-240-P
                        (
vs.                        )
                        (  OCTOBER 17, 2008
                       )  DALLAS, TEXAS
HOLY LAND FOUNDATION, ET AL  (  9:00 A.M.

_____

VOLUME 20 OF 37

_____

STATEMENT OF FACTS

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

_____

A P P E A R A N C E S

FOR THE GOVERNMENT:  UNITED STATES ATTORNEY'S OFFICE
                    1100 COMMERCE, 3RD FLOOR
                    DALLAS, TEXAS  75242
                    BY:  MR. JIM JACKS
                        MR. BARRY JONAS
                        MS. ELIZABETH SHAPIRO

FOR THE DEFENDANT:  FREEDMAN, BOYD, HOLLANDER,
(SHUKRI ABU BAKER)  GOLDBERG & IVES, P.A.
                    20 FIRST PLAZA, SUITE 700
                    ALBUQUERQUE, NEW MEXICO 87102
                    BY:  MS. NANCY HOLLANDER
                        MS. TERESA DUNCAN

```
 1              FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
                (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
 2                                   NEW YORK, NEW YORK  10005
                                     BY:  MR. JOSHUA DRATEL
 3                                        MR. AARON J. MYSLIWIEC

 4              FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
                (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
 5                                   DALLAS, TEXAS  75204
                                     BY:  MS. MARLO P. CADEDDU
 6
                FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
 7              (GHASSAN ELASHI)     P.O. BOX 10985
                                     TAMPA, FLORIDA  33679
 8                                   BY:  MS. LINDA MORENO

 9                                   JONES DAY
                                     555 CALIFORNIA ST., 26TH FLOOR
10                                   SAN FRANCISCO, CA  94104
                                     BY:  MR. JOHN D. CLINE
11
                FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12              (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                     FORT WORTH, TEXAS  76102
13                                   BY:  MR. GREG WESTFALL
                COURT'S LAW CLERK:   MS. JENNIFER HELMS
14                                   1100 COMMERCE, RM. 1654
                                     DALLAS, TEXAS  75242
15
                COURT COORDINATOR:   MS. BRENDA WEBB
16                                   1100 COMMERCE, RM. 1654
                                     DALLAS, TEXAS  75242
17
        OFFICIAL COURT REPORTER:     SHAWN M. McROBERTS, RMR, CRR
18                                   1100 COMMERCE STREET, RM. 1654
                                     DALLAS, TEXAS  75242
19                                   (214) 753-2349

20

21

22

23

24

25
```

# <u>INDEX</u>

**EXAMINATION**

| Witness Name | Page |
|---|---|
| MOHAMED SHORBAGI | |
| Direct By MR. JACKS | 17 |
| Cross By MS. MORENO | 124 |

1          THE COURT:  I understood there was a matter we

2   needed to take up.

3          MR. CLINE:  Yes, Your Honor.  May we approach the

4   bench?

5          THE COURT:  Yes.  Come on up.

6          (The following was had at the bench.)

7          MR. CLINE:  I wanted to do this outside the hearing

8   of the witness.

9       We have had a chance to read through the witness' 302s

10  and transcripts.  Now, that is the royal "we" because I can't

11  say I read every one of them.

12      We have a couple of concerns that we just want to alert

13  the Court to so you will understand why we are objecting when

14  we are objecting.

15      I think the Court observed yesterday the witness is a

16  little bit of a loose cannon.  He is not like the agents and

17  experts we have had before who are pretty disciplined.

18      He has a tendency to say "everyone knew" such and such,

19  "everyone knew they were Hamas."  "Everyone knew this."

20  "Everyone knew that."

21      We believe that is improper testimony because of lack of

22  personal knowledge, hearsay, 403, and so on.  And so we may be

23  objecting if he starts to say that.  But I would also ask the

24  Government to make the questions pretty precise with him to

25  avoid eliciting that kind of thing.

 1          The second thing that I think he has a little bit of a

 2     tendency to do is he will testify to a fact that it turns out

 3     he knows only from reading it in the paper, let's say.  There

 4     was what I think might be an example of that yesterday,

 5     although I may have misinterpreted something.  He identified

 6     the voice on that video as Mr. Ashqar.  We are not disputing

 7     it is Mr. Ashqar, but from reading the 302 it looks like he

 8     learned that was Ashqar because somebody told him.  That is

 9     how he learned that it was Ashqar on the tape.  So now he is

10     repeating as his own knowledge something that he really

11     learned from somebody else.

12          The thing about Ashqar I don't think makes any

13     difference, but the point is that we may be attempting to ask

14     the Government through foundation objections, lack of personal

15     knowledge objections, asking the Government to lay a personal

16     knowledge predicate in a bit more precise a way than we have

17     asked with the agents and the experts when it is a different

18     kind of issue.

19          I just wanted to alert the Court to that to make sure

20     that you understood the background.

21               THE COURT:  Sure.  Right.

22               MR. JACKS:  Your Honor, let me address the one about

23     Mr. Ashqar.  It is true that initially he was told by a friend

24     of his that that was Mr. Ashqar, but then later --

25               THE COURT:  Was he at that conference?

1           MR. JACKS:  No.  But later after he met Ashqar and I

2    think had several conversations with him, he confirmed what

3    his friend had told him.  He recognized his voice.  And so

4    while initially it may have been his friend said, "Yeah, that

5    is Ashqar," he later had personal dealings with them.  Their

6    wives would talk on the phone.  I mean, they knew each other.

7    So that is how he is able to testify, among other things, that

8    that is Ashqar.

9           The other thing, with regard to his testimony or his

10   statements that everybody knew, that is basically the nature

11   of his answers is that it was just such common knowledge among

12   this group about who was involved in doing things for Hamas

13   and what these organizations were about and what they were

14   doing and who these individuals were, and I understood that,

15   you know, from a traditional standpoint that you would probe a

16   person's knowledge, but his answer is going to be just from

17   conversations with his friends and associates and other people

18   that were doing this a same thing he was doing, going to these

19   conventions; that it was just common knowledge and well known.

20          And the reading of the newspaper or checking the

21   internet, his testimony is that that just confirmed or

22   corroborated what he knew.  So in the sense that, you know, to

23   try to have him break it down to specific instances where

24   somebody told him or, you know, who was that person and was it

25   what was that occasion, I mean, you can try to do that, but

you are going to end up in a situation where he is just going to say, you know, everybody knew.

And so I think there are certain things that if they are just so well-known among a certain group that when you try to ask somebody to articulate, you know, a point in time or a person or whatever that they are not going to be able to do it, or if it will become to the point that he would just start ticking off conversations he had.  And that is the nature of his testimony.

MR. CLINE:  Your Honor --

MR. JONAS:  If I may add, first of all, in our experience this is very common.  A lot of Palestinians that we have spoken to have similar statements that everybody knew.  I know that doesn't get around the rules of evidence.  I believe, though, and I have to check some case law because I did do research on this, that I think it comes under opinion; that, you know, he can say "in my opinion," blah, blah, blah.  I think that is proper.

MR. CLINE:  Your Honor, he is not an expert.  He --

THE COURT:  You don't have to be an expert to give an opinion.

MR. CLINE:  But it has to be based on personal perception, and what he is basing it on is not personal perception of something a Defendant told him or being, you know, together in a Hamas event or something like that.  What

1    he is basing it on is hearsay.  He is basing it on what other

2    people told him.

3              THE COURT:  There is Fifth Circuit law that at some

4    point--and this is nebulous, and that is the problem--that at

5    some point, just a general knowledge, a common knowledge that

6    something is well-known isn't hearsay.  Somebody can testify

7    and know this just because "I know it.  It is common

8    knowledge."  Now, it is nebulous and they have approved that

9    and there is Fifth Circuit law on that.

10       The problem that comes at what point -- Where I was going

11   is you probably need to lay a predicate anyway.  How much

12   longer do you have on your direct?

13             MR. JACKS:  Maybe an hour.

14             THE COURT:  So we are going to be here awhile.  Lay

15   a predicate on how he knows.  And if it is, "Well, I read the

16   newspaper," or "one person told me," that probably is going to

17   be hearsay.  That is hearsay.

18       If you can lay this predicate that it was general

19   knowledge, common knowledge, and ask him, without getting into

20   conversations how he knew, meetings or whatever, I think that

21   will get him there.  But I think you have to lay that

22   predicate, because he has also shown on at least that one

23   question where it just came the from the media.  That is not

24   going to get you there.  Or if one person told him one or two

25   times, that is probably not going to get him there either.

1    That is not general or common knowledge.

2       That is about the best I can do in terms of that because

3    it is a nebulous area.

4        MR. CLINE:  We will object question by question.

5    The only thing I want to add, and I know Your Honor knows this

6    already, but this is a cooperating witness who of course has

7    an incentive to try to please the Government.  And this is the

8    most important issue in the case, and so we ask the Court to

9    be particularly --

10       THE COURT:  I understand.  Just make sure you lay

11    your predicate on these questions where you are talking about

12    knowing something.

13       MR. JACKS:  Mr. Cline, you said something about "We

14    will object question by question."

15       MR. CLINE:  We will object as we go along when you

16    attempt to elicit this type of evidence.

17       MR. JACKS:  Okay.

18       MR. WESTFALL:  Or when you lead, Mr. Jacks.

19       MS. CADEDDU:  I was going to say, I have a general

20    objection, especially with this witness.  We will object to

21    leading.

22       THE COURT:  I don't mind a little leading and

23    background leading.  But when you get down to the issues that

24    are really in the case, that needs to come from the witness,

25    so watch that.

1      MR. JACKS:  Your Honor, There is some degree of

2  being a hostile witness.

3      THE COURT:  I saw that, certainly.  I understand

4  that.  But there is still some areas where you are just

5  putting it out there for him.  If he begins to be hostile, you

6  can do something else.  But I think initially you just need to

7  make sure on those areas that you let it come from the

8  witness.

9      MR. JONAS:  If I can just Quickly raise another

10 matter, just housekeeping on that issue with the CIA.  Just to

11 let you know, we have that index you want.  There is a

12 question of classification of it, and I am trying to resolve

13 whether it is top secret.  I have spoken to Erin Hogarty.  I

14 am still waiting for some more information.  If it is top

15 secret, I can give it to Your Honor.  If it is not, Ms.

16 Hogarty will have to give it to Your Honor next week before

17 they come down with the laptop.

18      THE COURT:  Okay.

19      MR. DRATEL:  Has the Court received the 302 on this

20 redaction issue?

21      THE COURT:  I had not, unless that is part of the

22 302s you gave me previously.

23      MR. DRATEL:  The redaction redaction?

24      MR. JACKS:  No.  Some of these were actually already

25 provided, but --

1           MR. DRATEL:  I don't think this one is.

2           MR. JACKS:  Which one?

3           THE COURT:  The one we discussed last night.

4           MR. JACKS:  I will provide that to the Court and an

5    explanation.  Whenever you want me to do that I will give that

6    to you.

7           THE COURT:  Okay.

8           MR. JACKS:  Essentially it was redacted because it

9    relates to a different investigation, and that person's name

10   is included in that investigation.  That is the reason that

11   name was redacted.

12          THE COURT:  Okay.

13          MR. DRATEL:  We are two and a half years down the

14   road from the statement itself, so I don't know whether that

15   is still an issue in terms of whether that requires some

16   redaction or not.  But it is up to the Court to look at it.

17          THE COURT:  And it depends of course on the

18   information they give me.  If they tell me there is still an

19   ongoing investigation, there is an ongoing investigation.

20   Investigations can go on for years.  This case is a prime

21   example.

22       And so that is what they are telling you is that he is

23   still the subject of an ongoing --

24          MR. JACKS:  Well, he is involved in it.  I don't

25   know if he can be considered a subject, but he may a source in

1    that.

2              MR. DRATEL:  I think the Court would probably still

3    have to do a *Roviaro* type analysis if it is exculpatory.

4              MS. HOLLANDER:  We do need you to look at that.

5              THE COURT:  Just at some point provide that

6    information and I will take a look at it.

7              MR. DRATEL:  It is March 13th, 2006, page 6.

8              MR. WESTFALL:  And I am not going to take up the

9    Court's time right now unless you want to, but there is an

10   issue with some exhibits that were provided yesterday that

11   weren't on the list.  I spoke with Mr. Jonas about it.  I am

12   not sure we are going to be able to work it out.  But it would

13   be important if we can't to speak with you today, because it

14   is going to affect both of our trial strategy next week.

15             THE COURT:  Who is it coming in?

16             MR. JONAS:  Agent Burns.  Major Lior is next and

17   Agent Burns.

18             MR. WESTFALL:  Do you want to do it right now?

19             THE COURT:  No, let's wait.  Just remind me at the

20   lunch break or some break.  Well, there is not a lunch break.

21   But at 1:00.  I don't need to take care of my thing until an

22   hour or so later.

23             MR. JONAS:  Just a scheduling issue.  Major Lior, he

24   needs to get on Monday morning because his people are leaving

25   Monday afternoon, and then Agent Burns will go after that.

1    If it happens that we finish with this witness at some

2    point today, and I don't know if that is going to happen or

3    not, can we just break for the day and we can start fresh.

4        THE COURT:  That occurred to me Monday after we left

5    so late, I was thinking if this guy doesn't get through the

6    day, then we didn't need to work late last night.

7        MS. HOLLANDER:  If we don't, we will just put him

8    off until after Lior but not until after Burns?

9        MR. JONAS:  Correct.  If we don't finish with this

10   witness today, we will start with Lior Monday morning and then

11   back with this witness.

12       MR. WESTFALL:  That is an Interesting contrast.

13       MS. MORENO:  Your Honor, I think Ms. Shapiro and I

14   are going to be handling Major Lior, and there are a number of

15   exhibits that are going to come through Major Lior that I am

16   going to have objections to.

17       THE COURT:  Can you get those -- You have already

18   filed a list --

19       MS. SHAPIRO:  I have given a list to Defense

20   counsel, and I provided Jennifer with a binder of the hard

21   copies.

22       THE COURT:  Can you get those objections in today?

23       MS. MORENO:  Yes.  And would the Court like it in

24   email form?

25       THE COURT:  It doesn't matter.  If you get it to

1    Jennifer, she will get it to me.

2              MR. CLINE:  Can I interrupt just a second?  You

3    filed a motion.

4              MS. SHAPIRO:  I was just going to say, I am having

5    somebody pull -- I think there are three or four motions on

6    this subject that are out there, and I am having her pull

7    those.

8              MS. MORENO:  And we filed a motion.

9              MS. SHAPIRO:  They filed motions.  We filed motions.

10   I have a motion that incorporates all the prior motions by ECF

11   number, and I am having those collected so that I can provide

12   them to Your Honor so you will know the certain universe of

13   the argument out there.

14             THE COURT:  I will have it all there at once.

15             MR. CLINE:  I think there is actually a government

16   motion filed back in maybe May sometime pending basically to

17   adopt Judge Fish's ruling on the Government of Israel

18   documents, which is addressed to these Lior documents.  We

19   filed an opposition to that.  You probably filed a reply.  I

20   can't recall.

21             MS. SHAPIRO:  Yes.  And it is that motion that then

22   incorporates and lists the prior motions that were filed on

23   that subject in the last trial.

24             MS. MORENO:  So I think the best way for our side to

25   handle this is also to perhaps send you once again, so you can

1    just see the motion that we filed, which we filed one motion

2    on all these documents.  And if you would allow us time to

3    argue some of those exhibits, we would greatly appreciate it,

4    Your Honor.

5              THE COURT:  This is for Major Lior?

6              MS. MORENO:  This is just for Major Lior.

7              THE COURT:  So we need to be here early Monday

8    morning.

9              MS. MORENO:  I think that would be best, giving his

10   confined schedule.

11             THE COURT:  Okay.

12             MS. MORENO:  At least Ms. Shapiro and I.

13             MR. JONAS:  There was one other thing, and I drew a

14   blank.

15             THE COURT:  We have one thing to take up.  That is

16   what I was told.

17             MR. JONAS:  I am going to step out of the courtroom

18   when we start this morning to prepare.

19             MR. JACKS:  This witness Mr. Shorbagi is in the

20   witness protection program in custody, and that requires a lot

21   of manpower.  There is a lot of Marshals, a lot of security.

22   And if as we get close today, if we are close to finishing

23   him, if the Court would at least consider the possibility of

24   going a little bit longer just to finish him.  And I

25   understand if you have a commitment.

1        THE COURT:  I do, but I have some time.  I don't

2   need to leave right at 1:00.  My main concern is the jury.  We

3   are not going to take a lunch break.  But we can go certainly

4   15, 20, 30 minutes.  It is not a problem.

5        MS. HOLLANDER:  I guess my concern is that if we are

6   doing a cross and the jury has been sitting here without lunch

7   and it is 1:30, it is kind of not fair.

8        THE COURT:  It depends on how much longer you have

9   to go.  If we can do it 15 to 30 minutes, we can do it.  If we

10  can't, we can't.

11       MS. MORENO:  I can't do cross on an empty stomach.

12       THE COURT:  You just need to go first.

13       MS. MORENO:  I am going first.

14       THE COURT:  You will probably be all right.  It is

15  the last ones that will be in trouble.

16     And your redirect, if you have an hour to go, and it is

17  already almost 9:30.

18       MR. CLINE:  And that is a Jim Jacks hour.

19       THE COURT:  Exactly, yes.  We have seen him in

20  action the last few weeks.

21       MS. HOLLANDER:  I don't think we are going to get

22  there.

23       THE COURT:  We will deal with that then.

24       MS. CADEDDU:  And Judge, anymore more than half an

25  hour or so --

1          THE COURT:  No.  I have got to get going.

2          MS. CADEDDU:  I have made commitments with my family

3    to take my husband to the airport.  They are leaving for

4    vacation without me.

5          THE COURT:  All right.  We will give it a half an

6    hour at the most, and then we will break.  I wouldn't want to

7    keep the jury any longer than that when We are not going to

8    have lunch.

9          (The following was had in open court.)

10          THE COURT:  Everybody ready for the jury?

11     Go ahead and bring the jury in.

12          (Whereupon, the jury entered the courtroom.)

13          THE COURT:  Ladies and gentlemen of the jury, good

14    morning.  We are ready to proceed.

15     Mr. Jacks?

16          MR. JACKS:  Thank you, Your Honor.

17    Q.   (BY MR. JACKS)  Mr. Shorbagi, yesterday at the end of the

18    day you had identified a videotape as a videotape of a MAYA

19    convention in Oklahoma City.  Do you recall viewing that

20    videotape?

21    A.   Correct.

22    Q.   And who were some of the persons that you saw on that

23    videotape that you identified?

24    A.   You mean the speakers?

25    Q.   Yes, the speakers.

1    A.    I identified Mr. Kamal Hilbawi, Khalid Mishal.

2    Q.    That is fine.  And I asked you yesterday if Khalid Mishal

3    was or had a position in Hamas at that time, and let me ask

4    you the question again.

5          Well, let me back up.  Had you ever seen or heard of

6    Khalid Mishal before December of 1992 in Oklahoma City?

7    A.    No, sir.

8    Q.    And did you later learn whether or not he had a position

9    in Hamas?

10   A.    Correct.

11   Q.    And what position in Hamas did he hold -- First, let me

12   just ask this.  When you learned about his position in Hamas,

13   did you -- did the position have a title at the time?

14   A.    No.  When I met him later on in '94, he was introduced as

15   one of Hamas' leaders, the political wing of Hamas.

16   Q.    After this -- Excuse me.  Strike that, please.  You

17   described what goes on at these conventions.  Do you recall

18   that?

19   A.    Correct, yes, sir.

20   Q.    And I believe you said that there were speeches and

21   dinners and entertainment.  Is that correct?

22   A.    Correct.

23   Q.    Would there be what some people call break-out groups?

24   A.    Correct.

25   Q.    And when you -- When a person that is attending these

1   conventions would get there, would there be an agenda or a

2   schedule showing what events are going to be happening during

3   the convention?

4   A.    You mean in the general convention?

5   Q.    Yes.

6   A.    Yes, sir.  There will be a program given out.

7   Q.    And did you attend those different events?  Would you go

8   to break-out groups or go to the speeches in the big

9   auditorium?

10  A.    Yes.  Some of them I will attend.  Right.

11  Q.    Were there any meetings that were not on the agenda?

12  A.    Correct.

13  Q.    And did you attend those meetings?

14  A.    Correct.

15  Q.    Or meeting, I should say.

16          MR. DRATEL:  Could we get a time frame, Your Honor?

17          MR. JACKS:  We are still talking about the December

18  1992 MAYA convention.

19          THE COURT:  All right.

20  Q.    (BY MR. JACKS)  And how did you learn about this meeting

21  that was not on the agenda?

22  A.    I was attending the Oklahoma City conference, the MAYA

23  conference in '92, and I was invited to a closed meeting by a

24  friend of mine from Houston, Jamil Dalu, and I attended this

25  meeting.

1    Q.   Is this Jamil Dalu a person you testified about

2    yesterday?

3    A.   Yes, sir.

4    Q.   And before, when he invited you to that meeting, did he

5    tell you what was going to be the nature or subject matter of

6    that meeting?

7    A.   The thing that he told me about, there will be a meeting

8    for individuals, a closed meeting, and it will be about Hamas

9    from inside, meaning from Hamas inside the territory.

10   Q.   And was this -- The MAYA convention in 1992 that we are

11   talking about, where was it held in Oklahoma City?  What type

12   of facility was it at?

13   A.   You mean the convention?

14   Q.   Yes.

15   A.   The convention, they usually rent like two or three big

16   hotels, like the Hyatt, Marriott, and they are also in the

17   convention center.

18   Q.   All right.  So some type of auditorium or convention

19   center in Oklahoma City?

20   A.   Correct.

21   Q.   And this closed meeting, where was it held in relation to

22   the other parts of the convention?

23   A.   It was held inside one of the rooms in one of the hotels.

24   Q.   And when you referred to it as a closed meeting, what do

25   you mean by that?

1   A.   Only by invitation.  It is not like publicly announced.

2   Q.   About how many persons were in this closed meeting?

3   A.   About 150.

4   Q.   And were any Hamas leaders in this meeting?

5   A.   In 1992, you mean the speaker or --

6   Q.   The speakers.  We will start with the speakers.

7   A.   The speaker was Mousa Abu Marzook.

8   Q.   Were there any other Hamas leaders that spoke in that

9   meeting?

10  A.   No, just Mousa Abu Marzook was the main speaker.

11  Q.   And was Khalid Mishal in that meeting?

12  A.   '92?

13  Q.   Yes.  Did he go in that meeting?

14  A.   I don't remember seeing him in that meeting.

15  Q.   Did any of the Defendants, were they in attendance at

16  that meeting?

17  A.   Yes, they were.

18  Q.   Can you name those?

19  A.   I remember seeing Ghassan Elashi, Shukri Abu Baker,

20  Mohammad El-Mezain others like Abdel Haleem Ashqar and so on,

21  I saw them in that meeting.

22  Q.   But as to the Defendants, just those three that you

23  named, Defendants in this case?

24  A.   Correct, yes, sir.

25  Q.   And you said Mousa Abu Marzook was the speaker?

```
 1    A.    Correct.

 2    Q.    Or the person that spoke in the meeting?

 3    A.    Correct.

 4    Q.    What was his topic?  What did he talk about?

 5    A.    He talked about Hamas.  Do you want me to tell you what

 6    the --

 7    Q.    Just generally what he talked about.

 8    A.    He talked really how Hamas is becoming a major player in

 9    the Middle East, because Hamas started in '87.  It started on

10    the throwing of stones against the Israeli occupation.  Now we

11    are talking about four years after the start of the Intifada,

12    so it is not going to be just fighting the Israelis in the

13    street, but Hamas was becoming a major player in the politics

14    of the Middle East.  And to be a major player in the politics

15    of the Middle East, and being a Palestinian, you have got to

16    do something big when it comes to the Israeli occupation.  So

17    he used the word that Hamas will start creating things or

18    creating facts on the ground by creating activities on the

19    ground in the occupied territories.

20    Q.    And what, if anything -- Was there anything conveyed or

21    what was expected of these people in this meeting or in this

22    group, was there anything conveyed to them about what their

23    role was to be or why they were being called into this

24    meeting?

25    A.    The main role is really as Palestinians and as concerned
```

1    to help the role of Hamas to grow up to be a major political

2    player in the Middle East.

3    Q.    Did he say whether or not Hamas --

4              MR. DRATEL:  Objection, Your Honor; leading.

5              THE COURT:  Well, he hasn't asked the question yet.

6    Go ahead.

7    Q.    (BY MR. JACKS)  Did he say whether or not Hamas needed

8    anything from the people in that room?

9    A.    There was no specifics really.  It was a general talk.

10   That was the year '92.  There were not specifics like, "What

11   we need to do."  Just like, "We need to really help Hamas to

12   become bigger in the Middle East."

13   Q.    At that Oklahoma City convention, you said that was in

14   December of 1992.  Is that correct?

15   A.    Correct.

16   Q.    And had anything happened that affected Hamas just prior

17   to that meeting or that convention taking place?

18   A.    Correct.

19   Q.    What was it?

20   A.    It was the Israelis deporting 415 of the prominent

21   figures of the Palestinian people to south Lebanon.

22   Q.    Was that a topic -- First of all, was that a topic in the

23   convention in the big room in the auditorium?

24   A.    Yes, sir, it was.

25   Q.    Was it a topic and was it discussed in the closed meeting

1   that you attended?

2   A.   Correct.

3   Q.   And was there anything discussed in that closed meeting

4   about what would be done or needed to be done with regard to

5   those deportees?

6   A.   I don't really remember that he discussed the deportees.

7   But the statement that he said that surely Israel did the

8   favor to Hamas by bringing Hamas from being local in the

9   occupied territories to be an international organization that

10  everybody knows about Hamas now by Israel deporting these

11  figures to south Lebanon.

12  Q.   That it raised their prominence or notoriety?

13  A.   It raised their fame and raised their name in the

14  international community.

15  Q.   Was he saying that as if it was a good thing?

16  A.   Not like in the matter -- It is a bad thing that people

17  were taken out of their homes and deported, but in the matter

18  of international publicity, that Hamas' name is becoming very

19  well-known in the war now because of the deportees issues.

20  Q.   You testified yesterday about -- I believe you were

21  testifying about the leaflets that would come from Hamas in

22  the territories to IAP in Richardson and then be distributed,

23  and you said you received those leaflets in the mail.  Do you

24  recall that testimony?

25  A.   Correct, yes.

1   Q.   You testified about, as an example, that in those

2   communiques or leaflets, one example of information was

3   stories of Israeli soldiers or policemen that had been

4   kidnapped and eventually killed.

5   A.   Correct.

6   Q.   And those incidents that you testified about, the

7   kidnapping and killing of the Israeli soldier or police

8   officer --

9        MR. DRATEL:   Your Honor, may I have a continuing

10  objection based on my earlier objection on this type of

11  testimony?

12       THE COURT:   You may have that, yes.

13       MR. DRATEL:   Thank you, Your Honor.

14  Q.   (BY MR. JACKS)   What was the proximity of those

15  kidnappings to the deportation in time?  Were they close in

16  time?

17  A.   Now, the things I testified about yesterday, that was in

18  1988, the kidnapping of the two Israeli soldiers Ilan Sa'adon

19  and Avi Sasportas, to release Sheikh Ahmed Yassin.  But now in

20  1992 there was another attempt to secure the release of Sheikh

21  Yassin by kidnapping an Israeli officer, Nassim Tulidano

22  (phonetic), and the Israeli Government did not cooperate with

23  the kidnappers for the release of Sheikh Yassin, so he was

24  killed.  And that time the prime minister was Yitzhak Rabin,

25  so he made a decision to gather the leaders of Hamas and the

1    Islamic Jihad in the occupied territories and deport them to

2    south Lebanon.

3    Q.    You made reference to an organization called Islamic

4    Jihad.

5    A.    Correct.

6    Q.    What is the full name that that organization goes by?

7    A.    I think that is the full name, Islamic jihad in

8    Palestine.

9    Q.    All right.  And is it also a designated terrorist group?

10   A.    By the U.S. Department of State, yes, sir.

11              MR. DRATEL:  Can we get a time frame on that, Your

12   Honor?

13              MR. JACKS:  We are still talking December 1992, Your

14   Honor.

15              MR. DRATEL:  I mean of the designated terrorist

16   group.

17              THE COURT:  Counsel, you may inquire about that on

18   cross examination.

19              MR. DRATEL:  Thank you, Your Honor.

20   Q.    (BY MR. JACKS)  When you attended the 1992 Oklahoma City

21   convention, you were still living in Houston.  Is that

22   correct?

23   A.    Correct.

24   Q.    And in that videotape that we saw yesterday, you

25   identified a man named Samir Khatib.  Is that correct?

A.    Correct, yes, sir.

Q.    And in the video we saw yesterday, what was going on with

him -- In that video what had he done or what was going on

with him during the time that that video was on him, the

camera was on him?

A.    As I said, Samir Khatib was a very religious man.  He

passed away last year.  And he was also blessed by money.  He

was a rich man.  And being religious, he likes to donate

money.  So at that time in Oklahoma City when there was a call

for the nation to help the families of the deportees, he

donated $50,000 for the cause of the deportees' families.

Q.    And at that 1992 Oklahoma City convention, did you meet

Samir Khatib at that convention?

A.    Yeah, I meat him later on after I was introduced to him

by another friend that was working with Samir Khatib, and his

name is Ahmad Harara.  I was introduced to Samir Khatib by

that friend.

Q.    For the court reporter's benefit, just the person that

introduced you to Samir Khatib was Ahmed?

A.    Harara, H-A-R-A-R-A.

Q.    All right.  And what was the connection between Ahmed

Harara and Samir Khatib?

A.    He was working for Samir Khatib's company.

Q.    And where was that located?

A.    In Rome, Georgia.

1    Q.   And did you and Ahmed Harara discuss Samir Khatib and his

2    company?

3    A.   Yes, we did.  Right.

4    Q.   And what did you -- Specifically did you discuss anything

5    about you and Samir Khatib's company?

6              MS. HOLLANDER:  Objection; hearsay.  Hearsay as to

7    both.

8              THE COURT:  Why is that not hearsay, counsel?  Are

9    you seeking to get into the conversation?

10             MR. JACKS:  Well, it is to explain what he did after

11   this.

12             THE COURT:  Well, I will let him answer that yes or

13   no, and then you can get into what he did.  Did you have that

14   conversation?  Go ahead and answer.

15             THE WITNESS:  Yes, sir.

16   Q.   (BY MR. JACKS)  All right.  And did Mr. Khatib ask you or

17   invite you to go to work for Samir Khatib's company.  I am

18   sorry.  Mr. Harara.

19             MS. MORENO:  Objection; hearsay.

20             THE COURT:  Overruled.  Go ahead.

21             THE WITNESS:  Yes.  We talked about the Alexandria

22   Carpet, it is a big company, it is a nice company in the city

23   of Rome.  And he talked to me about if I am willing to come

24   down to Rome and work for the company, yes.

25   Q.   (BY MR. JACKS)  What was your answer at that time?

A.   My answer was not really yes or no; just like, "Let me

think about it and I will see."  So I didn't give him yes.  I

told him "Okay, maybe."  But my answer was no.

Q.   Did the topic come up again or were you approached again

about doing that?

A.   Yes.  When I went back to Houston I got a phone call from

him again.

Q.   And him being?

A.   Ahmed Harara.

Q.   Okay.

A.   Offering me the job.  But I did not really accept the job

because Ahmed Harara was a regular employee working for the

company, so I said in order for me to accept the job it has to

come from the one in charge the company.  So the next day I

get a call from Nassim Khatib, who is a brother of Samir

Khatib, who was a physician, who was overseeing the company.

Q.   Would you spell his name, please, for the court reporter?

A.   N-A-S-S-I-M.

Q.   And Khatib is?

A.   K-H-A-T-I-B.

Q.   All right.  So is he the brother of Samir Khatib?

A.   He is the brother of Samir Khatib.

Q.   Samir Khatib is the man that we saw in the video in the

Afghan-type clothing.  Is that correct?

A.   Right.

```
 1    Q.   All right.

 2    A.   Now let me just clarify one thing here, if you don't

 3    mind.  Samir Khatib is, as I said, he is like very genius in

 4    business, but also he diagnosed with manic depression.

 5    Q.   We will come to that.

 6    A.   All right.

 7    Q.   Samir Khatib, what nationality is he?

 8    A.   He is from the West Bank, but he is I think a naturalized

 9    U.S. citizen.

10    Q.   He is deceased now, though.  Correct?

11    A.   Correct, yes, sir.

12    Q.   But he is Palestinian by birth?

13    A.   Correct, yes, sir.

14    Q.   And did you end up going to work for Alexandria Carpet?

15    A.   Correct.  I accepted the job.  I went there, yes.

16    Q.   When did you go there and start working?

17    A.   In late March '93.

18    Q.   And this is in Rome, Georgia.  Correct?

19    A.   Correct, yes.

20    Q.   What was your job to be when you went to work for them?

21    A.   Oversee the shipping overseas.

22    Q.   Shipping?

23    A.   Yes.

24    Q.   Okay.  And you said you worked there until 2006?

25    A.   Correct, yes.
```

1    Q.   And there was a reference in that video to a donation

2    from the Rome mosque.  Do you recall that?

3    A.   Correct.

4    Q.   And where was the Rome mosque the Rome, Georgia mosque in

5    Rome, Georgia?  Where was it located?

6    A.   It was across from -- Like there is the company, the

7    office of Alexandria, and then the parking lot, and then the

8    Khatib family bought two houses down the road, and one of the

9    houses they use it as -- they were using it as a mosque.

10   Q.   All right.  So it was a converted house?

11   A.   Correct.

12   Q.   And what -- Did you have any connection or develop a

13   connection to that mosque?

14   A.   Now, when I went there in '93, Ahmed Harara was the emam

15   of the mosque.  He left Rome in late '93, I think November

16   '93, to Chicago.  He got another job in Chicago.  So I became

17   the emam of that mosque until I was arrested.

18   Q.   And as the emam, what were your responsibilities?

19   A.   The Juma prayer, the Friday sermon, we had weekend school

20   Saturday and Sunday, and different activities during Ramadan,

21   like iftar, breaking fasting during Ramadan, and also

22   collecting zakat after the end of Ramadan, days of Ramadan,

23   and different activities.

24   Q.   All right.  And did you actually -- Were you responsible

25   for delivering sermons during the Friday sessions?

1    A.    Yeah, I was the only one who was giving the sermon on

2    Fridays, yes, sir.

3    Q.    And how long after you moved to Rome, Georgia did you

4    become -- How long afterwards was it that you became the emam

5    when Ahmed Harara left?

6    A.    Actually when Ahmed Harara was there in March, April, and

7    May, he asked me start helping him in giving the sermons, so I

8    started giving sermons in May and June, but I was not

9    considered the emam until he left, so probably I can say

10   November of '93.

11   Q.    And while you were there, you said that one of the

12   responsibilities of the emam was to collect zakat or

13   donations.  Is that correct?

14   A.    Correct.  Now, there is like zakat, which is the 2.5 of

15   the surplus of the wealth, which is an obligation, and there

16   is a donation which is something that is, like, up to you.

17   You give it up.

18   Q.    They are separate?

19   A.    Zakat is an obligation.  It is 2.5 of the surplus of the

20   wealth you have, but donation is something that if you are

21   willing to give, giving extra.

22   Q.    All right.  Zakat, is it similar to tithing in other

23   religions?

24   A.    Yes, sir.

25   Q.    All right.  Did you collect funds at the mosque that were

1  then forwarded to the Holy Land Foundation?

2  A.    Correct.

3  Q.    And how often would that be done from the persons

4  attending the mosque?

5  A.    Okay.  Now, on a very regular basis at the end of

6  Ramadan, because Ramadan is a fasting month, but before the

7  end of Ramadan you must give away some money to clarify or

8  purify your fasting, so that was an annual thing that by the

9  end of the last two days of Ramadan I start collecting the

10 Ramadan zakat.

11      And other occasions if there is other things happening in

12 the West Bank and Gaza, like destruction of homes and so on, I

13 will call for the people to give -- to donate money different

14 than the zakat, to donate some money.  Now, this is No. 2.

15      No. 3 there is zakat general, not Ramadan zakat, zakat

16 general, I used to consult with people who worked there and

17 have money that do the calculation for their zakat, and I will

18 collect their zakat, so all these three parts I will send to

19 the Holy Land Foundation.

20 Q.    And was that something that was being done by Ahmed

21 Harara before you became the emam?

22 A.    Not really on this basis.

23 Q.    And what, if any, discussions -- Your action of sending

24 it to the Holy Land Foundation, did the Holy Land Foundation

25 have anything to do with that decision to send those donations

1    to the Holy Land Foundation?

2                 MR. DRATEL:  Object to the form of the question,

3    Your Honor.

4                 THE COURT:  Overrule that.  Go ahead.

5                 THE WITNESS:  I am sorry.  I didn't understand the

6    question.

7    Q.   (BY MR. JACKS)  All right.  When you would send what

8    money you took in, and for whatever reason, and send it to the

9    Holy Land Foundation, was that -- had that been discussed with

10   the Holy Land Foundation or its representatives before you did

11   that?

12   A.   Right.  Yes.  Yes.

13   Q.   And who did you have those discussions with?

14   A.   My main contact really was with the Holy Land Foundation

15   to Haitham and Mohammad El-Mezain, but mainly Haitham because

16   Haitham was in the office of the Holy Land Foundation in

17   Dallas here.

18   Q.   And you are referring to Haitham Maghawri?

19   A.   Correct.

20   Q.   I want to go back to the time period when you were in

21   Houston.  When you had moved from Oklahoma and moved to

22   Houston, was it your testimony that in Houston you did

23   volunteer work for MAYA and volunteer work for the IAP?

24   A.   Correct.

25   Q.   And I asked you yesterday if the IAP was a part of Hamas

1    and do you recall what your answer was yesterday?

2    A.    I said no.

3    Q.    And what were -- When you said no, what time period were

4    you thinking about?

5    A.    Okay.  Now, when you asked me yesterday about IAP in

6    1986, yes, I did volunteer work for IAP in 1986.  And you said

7    IAP and Hamas, my answer was no because there was no Hamas in

8    '86.

9    Q.    All right.  And did IAP ever become a part of Hamas?

10   A.    After that, yeah, IAP was completely concerned about

11   Hamas, and all of the work of IAP was for Hamas.

12   Q.    Let me ask you the same question about the Occupied Land

13   Fund or the Holy Land Foundation.  Was it a part of Hamas?

14   A.    Now, later on I can say yeah, but in '92 -- Are you

15   talking about '92, or are you talking about in general now?

16   Q.    I am talking about in '90, '91, '92, in your experience

17   is --

18            MR. DRATEL:  Just object on basis that we discussed

19   before.

20            THE COURT:  Overruled.

21            THE WITNESS:  I am sorry?

22   Q.    (BY MR. JACKS)  In 1990, '91, and '92, did you have

23   contact or dealings with the Occupied Land Fund or the Holy

24   Land Foundation?

25   A.    Correct, yes, sir.

```
 1    Q.   And in '90 or '91, what was the nature of your contact
 2    that you would have with the Occupied Land Fund, or anybody
 3    that worked for it, or the Holy Land Foundation as it came to
 4    be known?
 5    A.   Help them to collect money.
 6    Q.   And who were they collecting money for?
 7              MR. DRATEL:   Same objection, Your Honor.
 8              THE COURT:   Okay.  Overruled.
 9              THE WITNESS:   The general knowledge that everybody
10    knows that you collect money --
11              MS. MORENO:   Objection, Your Honor; no foundation.
12              THE COURT:   Do you want to lay a predicate for that
13    knowledge, counsel?
14    Q.   (BY MR. JACKS)  Let me walk you through this, sir.  With
15    regard to your knowledge about the Occupied Land Fund or the
16    Holy Land Foundation, whichever time period applies, what was
17    the basis of your knowledge about their relationship to Hamas?
18    A.   Okay.  Listen.  In the occupied territories, in the West
19    Bank and Gaza, there are two major groups there, you are
20    talking about '88, '89, '90, '91, Hamas and Fatah.  Hamas has
21    its own organizations or institutions or functions, societies.
22    Fatah has its own functions.
23    Q.   Let me just stop you for clarification.  You are saying
24    Fatah, F-A-T-A-H?
25    A.   Correct.
```

1   Q.   And that is a party.  Is that correct?  A political

2   party?

3   A.   It is not really just a political party.  It is just like

4   Hamas.  It is also a struggle movement.

5   Q.   And is there a connection between Fatah and the PLO, the

6   Palestine Liberation Organization?

7   A.   Right.  PLO consists of like 13 organizations, but the

8   main one that controlled PLO, like 99.9 percent of the PLO was

9   controlled by Fatah that was controlled by the late Yasser

10  Arafat.

11  Q.   So you are describing in the territories there are two

12  main organizations.  Is that what you said?

13  A.   Correct, yes, sir.

14  Q.   And with regard -- To bring that back to the Occupied

15  Land Fund, what was -- Did you have conversations with other

16  persons similarly situated to you, other Palestinians, other

17  Palestinians that were still living in the territories?

18       Let me just take it one step at a time.  During this time

19  period we are talking about, the late '80s and the early '90s,

20  did you have conversations with Palestinians still living in

21  the territories?

22       THE COURT:  Counsel, ask him who he had

23  conversations with, rather than leading.  Ask him who he had

24  conversations with about it.

25  Q.   (BY MR. JACKS)  All right.  Who would you talk to during

1    this time period?

2    A.    My family members.

3    Q.    What about in the United States, who would you talk to

4    about these issues?

5    A.    My friends.

6    Q.    And were they similarly situated to you?  Were they

7    similarly situated to you?  Were they Palestinians?

8    A.    Correct.  I am sorry.  Yes.

9    Q.    And were they living in the United States?

10   A.    Correct, yes.

11   Q.    And were they persons that would go to these --

12            MS. HOLLANDER:  Your Honor, I object to leading.

13            THE COURT:  Overruled.  Go ahead.

14   Q.    (BY MR. JACKS)  Were they persons that would go to these

15   MAYA conventions?

16   A.    Correct, yes.

17   Q.    Would they go to these -- Were they individuals that

18   would go to these IAP conventions and festivals?

19   A.    They were the same stature as mine.  They are

20   Palestinians, number one, from the occupied territories; they

21   are in the United States; and number three, they are very

22   concerned about the situation there, yes.

23   Q.    Were they supporters of Hamas, as you were?

24   A.    A number were supporters of Hamas, yes.

25   Q.    And your information or your answering any relationship

1    between Hamas and the Holy Land Foundation or the Occupied

2    Land Fund, without saying what that information was, where did

3    that come from?

4    A.    It was, as I said, it was known that --

5              MR. DRATEL:  We object again, Your Honor.

6              THE COURT:  Overruled.  Go ahead.

7              THE WITNESS:  I am from the city of Khan Yunis.

8    Q.    (BY MR. JACKS)  Let me ask you to slow down just a little

9    bit so the court reporter can keep up with you.

10   A.    Okay.  As I said, even when I was there I was also

11   involved in too many activities inside the occupied

12   territories before I came to the United States.  So one of the

13   known figures in the city of Khan Yunis is Ahmed Bhar,

14   A-H-M-E-D  B-H-A-R.  And he was a very known person that is

15   fighting the Israelis, he went to jail several times, and he

16   is very well-known Muslim figure or Islamist figure in the

17   city of Khan Yunis.  So you know that the money is going to

18   Ahmed Bhar.  And now in the '80s there was no Hamas, but after

19   that when Hamas was founded, he was one of the leaders of

20   Hamas, you know the money is going to Ahmed Bhar going to

21   Hamas.

22             MR. DRATEL:  I object, Your Honor, on the same

23   grounds.

24             THE COURT:  Overruled.

25   Q.    (BY MR. JACKS)  All right.  I want you to give us more

1    examples and explain to the jury how it is that you knew these

2    things that you are talking about.

3    A.    Okay.  Again, as I said, I was involved in activities

4    there, so one of the activities I was involved in is in what

5    we called the Islamic Compound in the city of Khan Yunis.

6    Q.    I am sorry.  Just -- Islamic what?

7    A.    Compound.

8    Q.    Compound.

9    A.    Compound.  I am sorry.

10        MS. HOLLANDER:  Your Honor, I am confused.  Can we

11    have a date now?

12        THE COURT:  Can you establish a time frame?

13    Q.    (BY MR. JACKS)  Sir, you just said that you were involved

14    with the Islamic Compound.

15    A.    Correct, yes, sir.

16    Q.    What time period or how old were you at the time?

17    A.    I was about 15 and 16 years old.

18    Q.    So about what year would that have been?

19    A.    It will be in '79, '80, '81, '82.

20    Q.    All right.  So go ahead and resume your answer about

21    explaining how it is that you have come to this answer about

22    the connection, if any, between the Occupied Land Fund and

23    Hamas.

24    A.    Okay.  Again, as I said, this Islamic Compound, I don't

25    know how you call it, now, it has like a sports center, it has

1    kindergarten, it has school and so on.  There was no Hamas but

2    the idea was the Islamic movement, how to teach the kids to be

3    a Muslim, to be a good Muslim, and to be also concerned about

4    Palestine.  So the money used to come to the Islamic Compound

5    through the Islamic Society, another organization, to the

6    Islamic University in Gaza.

7         So these kind of places that you know that they were

8    founded by the Islamic movement in the occupied territories by

9    Sheikh Ahmed Yassin and others, and they follow the Muslim

10   Brotherhood ideology.  And later on Hamas came to exist by

11   these people.

12   Q.   And how does that explain your answer about the Occupied

13   Land Fund and its connection?  What was the connection between

14   the Occupied Land Fund and Islamic Compound?  What

15   relationship did they have?

16   A.   They are the same.  The money goes from the Occupied Land

17   Fund to these organizations.

18   Q.   And how do you know that or how did you learn that?  How

19   were you made aware of that?

20   A.   Because I heard that from, like whenever we collect a

21   donation, you want to know where is this donation going to,

22   because, like I said, you have two major groups there, Fatah

23   and Hamas, and the money is going to these organizations, the

24   Islamic Compound, Islamic University Islamic Society Ahmed

25   Bhar, Ahmed Nimer, and so on.

1    Q.    And let me just take this a step at a time.  Ahmed Bhar,

2    is that the person you testified about just a moment ago?

3    A.    Correct, yes, sir.

4    Q.    And you said Ahmed Nimer.

5    A.    Correct.

6    Q.    And who is Ahmed Nimer as you are describing him?

7    A.    That is the when I grow up and learning from him and

8    teaching us the Islamic Compound in Khan Yunis.

9    Q.    Did he have a connection to Hamas?

10   A.    Later on he was one of the leaders, actually not one.  He

11   is the main leader of Hamas in Khan Yunis, yes, sir.

12   Q.    And again, to take it back to the Occupied Land Fund or

13   the Holy Land Foundation, how did you know -- how was it

14   conveyed to you that the Occupied Land Fund or the Holy Land

15   Foundation was sending money to these organizations?

16   A.    I heard that.

17   Q.    From who?

18   A.    From Mohammad El-Mezain.

19   Q.    And anybody else?

20   A.    You know, to be honest, during like 1988, '89, '90, '91,

21   when you mentioned the Occupied Land Fund or the Holy Land

22   Foundation, up until probably '92, '93, it equals Mohammad

23   El-Mezain.  Mohammad El-Mezain equals Occupied Land Fund.  So

24   he was the main person in that organization.

25   Q.    And what about the persons that would have been below him

1  but connected to the Occupied Land Fund?  Who were those

2  persons?

3  A.    To be honest, as I said, like the only name I knew when

4  it was Occupied Land Fund was Mohammad El-Mezain.  But you

5  mean in the United States.  Right?

6  Q.    Yes.

7  A.    There were, like as I said, like other names, Mousa Abu

8  Marzook, and so on, but their names were not connected to the

9  Occupied Land Fund.  The Occupied Land Fund mainly was

10  Mohammad El-Mezain.

11  Q.    And let's move to the time when it was called the Holy

12  Land Foundation.  Did you later learn of other officials that

13  were in charge of the Holy Land Foundation?

14  A.    Correct, yes, sir.

15  Q.    Who were those officials?

16  A.    Now, later on Shukri Abu Baker's name came into the

17  picture.  Haitham's name came into the picture also.

18  Q.    And was there occasion, did you ever have contact with

19  Ghassan Elashi?  I am talking about ever, later on?

20  A.    Oh, yes, yes, yes, sir.

21  Q.    And was that in connection with any organization?

22  A.    Yes.  Ghassan also -- I remember Ghassan came into Rome

23  with Mohammad El-Mezain I knew Ghassan before he came into

24  Rome, but Ghassan is like a business serious man, so I never

25  had any kind of relationship with him other than the time he

```
 1    came in to visit Rome with Mohammad El-Mezain talking about

 2    donation for the Holy Land Foundation.

 3    Q.   And was he -- Had he come to Rome on business for the

 4    Holy Land Foundation?

 5    A.   Not business; donation for the Holy Land Foundation.

 6    Q.   Okay.  All right.  During the time period that you were

 7    in Rome, Georgia, you said that Ahmed Harara had left this

 8    company that you worked for.  Is that correct?

 9    A.   Correct; late '83.  '93, I am sorry.

10    Q.   And would you tell us the name of the company again?

11    A.   Alexandria Carpet.

12    Q.   What did that company do, just briefly?

13    A.   This company used to manufacture carpet on a commission

14    basis.  They have salespeople in the Middle East, major Arab

15    gulf countries such as Saudi Arabia, Kuwait, United Arab

16    Emirates, Bahrain, Qatar, so those salespeople will send

17    orders to the office in Rome.  Based on the orders, we will

18    manufacture a placed order with the carpet manufacturers,

19    buying the raw material, which is the fiber, spin it, tuft it,

20    dye it, finish, and ship it.

21    Q.   Where were most of the customers for Alexandria Carpets

22    located?

23    A.   Mainly it was Saudi Arabia.

24    Q.   And was it a successful company?

25    A.   Yes, sir.
```

1    Q.    This man that you have told us about, Samir Khatib, you

2    said that he was rich.  Is that correct?

3    A.    Correct, yes, sir.

4    Q.    And did the fact that he was wealthy, did people ask him

5    for donations?

6    A.    Correct, yes, sir.

7    Q.    And were you ever a part or involved in circumstances

8    when people would come and seek money from Samir Khatib?

9    A.    Yes, sir.  Actually they wouldn't come without consulting

10   me first.

11   Q.    And you said that Samir Khatib, I believe you testified

12   earlier that he had mental health issues?

13   A.    Correct, yes, sir.

14   Q.    What was his mental health condition?

15   A.    Manic depression.

16   Q.    And how did that manifest itself?  What would happen when

17   he would have episodes of this condition?

18   A.    Samir's era during the year moves from the mania, which

19   is mania, to depressed.  When he is manic -- I was around him

20   most of the time.  Really when he was manic and when he was

21   depressed, I was very, very close to him.  So when he was

22   manic, he could say three, four, five days without sleeping,

23   and then I will be around him and then I will break down and

24   sleep, and then he will be just running around because of the

25   medication that he takes.  And his appetite for food is like

overwhelmed.  So he needs a person around him, because he will

think himself at that time he is the king of the world, so he

needs a person around him to being humble with him and take

him in a nice way in order to comfort him and calm him down.

Now, he found that person in myself, so we established that

strong relationship there.

Now, the other period -- This period could stay like two

or three months, because he will have too many fights within

the family because of that period of him being manic, within

his own family, like his wife, kids, and brother, and so on.

So I will be always stepping in there to calm these disputes.

The other period that he will come into is the depression

area.  The depression he could stay sleeping for almost maybe

two months, just literally laying down in the bed and just

like drinking milk with coffee or eating a banana or apple.

So his appetite for food will be down.

Q.    Let me stop you and just focus my question.  Were there

ever occasions when he would be in his manic state when people

would approach him for money?

A.    Correct, yes, sir.

Q.    And when that would happen, what kind of actions or what

would he do during those times if he was approached for money

when he was in a manic state?

A.    He will give money.  I remember one time that he was

willing to give a million dollars for the Holy Land

1   Foundation.

2   Q.   And was that something that happened more than once, when

3   he would be asked for money, he would be in a manic state and

4   he would pledge or give a large sum of money?  Did that happen

5   more than once?

6   A.   Yes, sir.

7   Q.   When you were in Rome, Georgia did you continue to travel

8   to these MAYA conventions that would take place?

9   A.   Correct.

10  Q.   And with regard to these MAYA conventions, did IAP take

11  part in the MAYA conventions or have some association during

12  these MAYA conventions?

13  A.   The IAP usually had a day within the MAYA convention

14  called the Day of Palestine.

15  Q.   And just explain what you mean by that, when they had a

16  day, or a Palestine Day.  What would go on and --

17  A.   That day will be mainly, like either from the morning

18  till the night ends we will start with lectures about

19  Palestine, tapes showing about Palestine, and there will be

20  like an expo about things -- pictures about the Palestinian

21  uprising and Palestinian destruction and so on.  And at night

22  there will be the entertainment by The Rock band, and then

23  there will be collection of money.

24  Q.   And what organization was responsible for in charge of

25  the collection of money?

1    A.    The Holy Land Foundation.

2    Q.    And is it your testimony that the IAP was --

3               MR. DRATEL:  Your Honor, it is leading.

4               THE COURT:  Do you want to rephrase?

5               MR. JACKS:  Yes, sir.

6    Q.    (BY MR. JACKS)  All right.  Let me strike that.  Did

7    there ever come a time that the MAYA and IAP programs were

8    separated?

9    A.    Yes, sir.

10   Q.    And about when did that happen?

11   A.    The rift really start after the Gulf War, the first Gulf

12   War after Saddam Hussein invaded Kuwait.

13   Q.    I am sorry.  You said the rift?  Is that what you said?

14   A.    That is correct.  It started actually within MAYA itself,

15   MAYA, IAP.  So because seeing that the Palestinians took one

16   side of that war, and the Saudis, the Kuwaitis Egyptians took

17   another side --

18               MS. HOLLANDER:  Your Honor, I think we need to

19   approach on this.

20               THE COURT:  All right.  Come up.

21               (The following was had outside the hearing of the

22               jury.)

23               MS. HOLLANDER:  I am sorry to do this, but I think I

24   know where this is going.  I think he is about to testify that

25   the Palestinians, as though they were a block, took the side

1    against the United States side, in other words took Saddam

2    Hussein's side.  And the rift was caused because there were

3    some Palestinians who took that side, and there were the

4    Kuwaitis who were involved these organizations.  But I just

5    want him to avoid him saying the Palestinians and though every

6    Palestinian took the side of Saddam Hussein when the United

7    States was fighting Saddam Hussein.  So if we can just avoid

8    that and just get past this, that there is just a rift.  It is

9    a 403 issue, because there is no reason except that they had a

10   rift.

11          MR. DRATEL:  In fact, it was Yasser Arafat that took

12   the position in favor of Saddam Hussein, so it is kind of

13   ironic to be out there for the jury.  If we just say there was

14   a rift and that it separated the Arabs from the Palestinians

15   and then go on.

16          MR. JACKS:  They can clear that up on cross

17   examination.  He will honestly explain it.  He may agree with

18   you.

19          MS. HOLLANDER:  It is not a matter of agreeing with

20   me.  It is a matter that from the perspective of this jury, he

21   is taking a position -- He is going to say they took the

22   position on the side of Saddam Hussein, which Yasser Arafat

23   did, and that just gets into a huge 403 issue given the United

24   States' position and Saddam Hussein and 9/11 and what people

25   think about that.

1    MR. DRATEL:  And Your Honor, I think it injects into

2  the case something that the Court, and all of us, have tried

3  to keep out, and rightfully so.  But the other thing is it is

4  not relevant to the ultimate point which is there was a

5  separation between MAYA and IAP.

6    THE COURT:  That is kind of where -- I am tending to

7  agree.  I don't mind him saying as a result of the Gulf War,

8  you know, without getting into a lot of detail because it is

9  not necessary.  It is just not necessary.  And it does open up

10  issues that probably don't need to be gone into.  You can

11  direct him there without --

12    MS. HOLLANDER:  He has already said -- We won't

13  object to leading that there was a rift and they ended up on

14  separate --

15    THE COURT:  He wants to take off.  I know.

16    MR. JACKS:  He will even testify that it was so

17  ridiculous that the Kuwaitis --

18    THE COURT:  Why is that relevant?

19    MR. JACKS:  I understand.

20    THE COURT:  Then why are we spending time on that?

21  The Gulf War caused a rift, and then we can go from there,

22  without getting into a lot of detail.

23    (The following was had in the presence and hearing

24    of the jury.)

25  Q.  (BY MR. JACKS)  Let me just ask you or redirect my

```
1    question.  You said that there developed a rift after the
2    first Gulf War in 1991.  Correct?  Within or between MAYA and
3    IAP.  Is that correct?
4    A.    Correct, yes, sir.
5    Q.    And without going into the reasons for the rift, who was
6    on one side of the issue and who was on the other side?
7    A.    The Palestinians were on one side along with people from
8    Yemen, and the other side were the Egyptians and Saudis.
9    Q.    And we are talking about people that -- members of MAYA
10   and members of IAP.  Correct?
11   A.    Correct, yes, sir.
12   Q.    And as a result of that rift, what happened to this
13   situation where the IAP would have a Palestine Day within the
14   overall MAYA convention?  Did that practice continue or did it
15   end?
16   A.    I think it ends by either '94, '95 IAP starts to have its
17   own convention.  The day after the MAYA ends or the same day
18   the MAYA ends, the IAP will kick in.
19   Q.    Would they be in the same city?
20   A.    It will be the same city, it will be the same hotel, yes,
21   sir.
22   Q.    Same hotel?
23   A.    Correct.
24   Q.    Or facility, auditorium, or whatever?
25   A.    No, because the audience will be like less in number, so
```

1    if MAYA has two hotels, the IAP will choose one of the hotels

2    and stay in that hotel.

3    Q.    I believe my question earlier was whether or not

4    you -- after you moved to Georgia did you continue to attend

5    MAYA conventions?

6    A.    Correct, yes, sir.

7    Q.    What kind of get-togethers or conventions, if any, did

8    the IAP have?

9    A.    I think it is like mainly one day, but after that I think

10   it moved to the weekend, which is Friday night, Saturday, and

11   then Sunday in the afternoon, maybe in '95, '96.  But just

12   like the same thing, but mainly talks about Palestine and the

13   events going on inside the occupied territories.

14   Q.    Now, are you talking about the once-a-year convention

15   when you are talking about what you just said of IAP?

16   A.    Correct.

17   Q.    Did IAP have other events at other times during the year?

18   A.    Correct.  After the start of the Intifada in '88, the IAP

19   came up with the idea of the Palestinian festivals, which

20   starts in early October of every year in different cities, big

21   cities, like New Jersey, Chicago, Los Angeles, Houston,

22   Dallas, and so on.  And every weekend there is a festival and

23   these festivals leads to the MAYA convention.

24   Q.    And these festivals, what name did they go by?

25   A.    Mostly al-Intifada festivals.

1    Q.    And this was to commemorate the outbreak of the Intifada?

2    A.    To commemorate -- Yes, sir.

3    Q.    And you said that -- You said that these festivals would

4    begin in what month or time of the year?

5    A.    Around the first of October of every year.

6    Q.    And did you attend some of those festivals?

7    A.    Correct.

8    Q.    And as far as where they would be held, you said that it

9    was in major cities?

10   A.    Correct.

11   Q.    What would go on at these festivals?  What kinds of

12   activities would be conducted?

13   A.    These festivals were only a few hours, probably four or

14   five hours.  There will be a guest speaker coming from

15   overseas, and there will be a dinner served, and there will be

16   The Rock band, music, singing, and there will be donation.

17   Q.    I am sorry?

18   A.    Donation.

19   Q.    And at these IAP festivals who was collecting --

20         MR. WESTFALL:  Your Honor, what year are we talking

21   about or time frame we are talking about on these particular

22   festivals?

23         THE WITNESS:  We are talking about the year --

24   Because the Intifada started in December of '87, so these

25   festivals started in October of 1988, '88, '89, '90, '91, '92,

1    '93, I think '94 also.  It might continue after that.

2    Q.   And you said that there would be guest speakers.  Is that

3    correct?

4    A.   Yes, sir, correct.

5    Q.   And can you give an example of some of the persons you

6    know that you saw speak at these Intifada festivals?

7    A.   One of the very well-known figure was from Kuwait Sheikh

8    Ahmed Qatan, and also Mohamed Siam.  He was the ex-president

9    of the Islamic University.  Now, are you talking about in

10   general the whole years or just specific time periods?

11   Q.   I am just talking about at these Intifada festivals that

12   the IAP put on, just a sample of some of the persons that

13   would be invited to speak.

14   A.   Right.  So I said Ahmed Qatan, Mohamed Siam, Ahmed

15   al-Kofahi.

16   Q.   All right.  Are there others?

17   A.   Jamil Hamami, Ahmed al-Kofeein, K-O-F-E-E-I-N.  I am

18   trying to remember others.

19   Q.   That is fine.  And what organization was in charge of

20   collecting donations at these IAP festivals?

21   A.   HLF.

22   Q.   Was anybody there representing -- Who was there

23   representing HLF during those IAP festivals?

24   A.   Mohammad El-Mezain.

25   Q.   Was Shukri Abu Baker ever there?

```
1    A.   Yes, sir.

2    Q.   Did you see Ghassan Elashi there?

3    A.   Now, because I attended -- You are talking about the

4    festivals.  Right?

5    Q.   Right.

6    A.   Correct.  So like the one that I attended, like in

7    Houston, we had two times in Houston, so only Mohammad

8    El-Mezain came in there.  I attended one in Dallas, and yes, I

9    saw Shukri and Ghassan.  They were in Dallas.  I attended the

10   one in New Jersey.  I saw only Mohammad El-Mezain there.

11   Q.   And you said that these festivals would occur during the

12   latter part of the year every weekend.  Is that correct?  Or

13   almost are every weekend?

14   A.   Yes, sir.

15   Q.   You said that The Rock band would perform.  And do you

16   mean -- What band are you talking about?

17   A.   The one we saw on the tape last night, yes, sir.

18   Q.   The band that Mufid Abdulqader was a part of?

19   A.   Mufid, Fawaz, and Munzer, yes, sir.

20   Q.   With regard to -- Strike that, please.  I want to direct

21   your attention to -- Was there a MAYA convention in 1994?

22   A.   Yes, sir.

23   Q.   And that would be two years after this Oklahoma City

24   convention.  Is that correct?  The one that we saw yesterday?

25   A.   Correct, yes, sir.
```

1    Q.   Did you attend the MAYA convention in 1994?

2    A.   Yeah.  It was held in Chicago.  Yes, I attended.

3    Q.   And was it similar in terms of the length of time of the

4    convention and the activities that would go on?  Was it

5    similar to the other conventions that have taken place

6    earlier?

7    A.   Correct, yes, sir.

8    Q.   Was the IAP -- Did the IAP at that time in 1994 still

9    have a day as a part of the MAYA convention?

10   A.   Correct.

11   Q.   And in the 1994 MAYA convention, was there another closed

12   meeting that you were invited to attend?

13   A.   Correct.

14   Q.   And was it written or referenced on the schedule or

15   agenda for the whole MAYA convention?

16   A.   No.

17   Q.   And where did this meeting take place?

18   A.   It took place inside one of the meeting rooms inside the

19   hotel.

20   Q.   And about how many people were in attendance at this

21   closed meeting?

22   A.   About 150.

23   Q.   And who was in that meeting?  Let me back up.  Were there

24   any Hamas figures at that meeting?

25   A.   You mean the speaker?

1    Q.    Just either speaking or in attendance.

2    A.    Yes, sir.

3    Q.    Who do you recall being there?

4    A.    The speaker was Khalid Mishal.  I recall seeing there

5    Mohammad El-Mezain, Shukri, Ghassan, Abdel Haleem Ashqar,

6    Jamil Dalu invited me there.

7    Q.    You need to slow down, if you don't mind, so the court

8    reporter can keep up.  You said Mohammad El-Mezain, Shukri Abu

9    Baker, Abdel Haleem Ashqar?

10   A.    Ghassan.

11   Q.    Ghassan who?

12   A.    Ghassan Elashi.

13   Q.    All right.  And I think you were naming some other

14   people?

15   A.    Jamil Dalu.

16   Q.    Your friend from Houston?

17   A.    Yes, uh-huh.

18   Q.    Were there others there that were in attendance, other

19   Hamas figures?

20   A.    I think Muin Shabib was there also.

21   Q.    Muin Shabib?

22   A.    Right.

23   Q.    What about from out of the country?  Were there any were

24   there any persons from outside the United States in

25   attendance?

1    A.    That is the one I mentioned, Khalid Mishal from outside.

2    Q.    And what was his position in connection to Hamas at that

3    time?

4    A.    At that time also Khalid Mishal was not publicly known,

5    but when he was introduced he was introduced as one of Hamas'

6    leaders within the political wing of Hamas.

7    Q.    And is that within this closed meeting that you are

8    referring to?

9    A.    Yes, sir.

10   Q.    Did you meet him?

11   A.    Yes, sir.

12   Q.    And did you speak to him or greet him?

13   A.    Yes, sir.

14   Q.    Who spoke in that closed meeting?  And if it was more

15   than one person, tell us who that would be.

16   A.    Mousa Abu Marzook introduced Khalid Mishal to speak.

17   Q.    Did Marzook speak to the group?

18   A.    No.  It was mainly for Khalid Mishal's speech.

19   Q.    And what was the subject matter that he spoke of?

20   A.    Khalid Mishal spoke about the emerging of Hamas.

21   Q.    You are saying emerging?

22   A.    How did Hamas develop during the past years, and what is

23   the role of Hamas in the future, and what is our role in this

24   country to help Hamas.

25   Q.    And you said "our role."  Who are you referring to when

1    you say "what was our role in helping Hamas"?

2    A.    The attendees.

3    Q.    And was anything conveyed to the audience in this closed

4    meeting about what was expected of them or requested of them?

5    A.    Khalid Mishal spoke about how the Palestinians inside the

6    occupied territories did everything in order to fight the

7    occupation, sacrificing their plot, their homes, their money,

8    themselves, and they are bringing the name of Hamas to this

9    level.  So we need to keep up with that work and do work along

10   with Hamas in order to keep moving the movement of Hamas.

11   Q.    After -- Did anybody other than Khalid Mishal speak to

12   the group as a whole?

13   A.    Abdel Haleem Ashqar made a comment after the meeting.

14   Q.    Once these speeches, or whatever you call them, were

15   given, did the audience have any participation in what was

16   going on in the meeting?

17   A.    Mousa Abu Marzook stepped in and he called for the

18   breaking of the attendees into groups.

19   Q.    And what kind of groups was he talking about?

20   A.    He said in order to follow up with Mishal's speech, that

21   we will divide into groups, such as the media group, the

22   political group, the money group, in order to really to

23   organize our work.

24   Q.    Your work?

25   A.    Organize our work as attendees.

1    Q.   All right.  And was it announced or stated in the meeting

2    who was to head up these different committees or groups or

3    sections?

4    A.   Correct, yes, sir.

5    Q.   And can you tell us who was heading up -- who was

6    designated as the person to head up the different committees

7    or sections?

8    A.   Ahmed Yousef was the head of the media group.

9    Q.   Does he go by another name?

10   A.   That is the only name I know him by, Ahmed Yousef.

11   Q.   And do you know what entity or organization he was

12   associated with?

13   A.   UASR.

14   Q.   Do you know where that organization was located?

15   A.   I think New Jersey.  Washington, D.C., I think.

16   Q.   And what was the purpose or what was your understanding

17   about what that organization did?

18   A.   It is a research organization.

19   Q.   All right.  And so he was head of the media section or

20   committee?

21   A.   Correct.

22   Q.   All right.  What were some of the other -- You said there

23   was a political section or committee?

24   A.   Right.

25   Q.   And who was designated as the head of that?

1    A.    Mousa Abu Marzook.

2    Q.    You said there was a financial or funds section, money

3    section.

4    A.    Correct.

5    Q.    Who was the head of that?

6    A.    Mohammad El-Mezain.

7    Q.    And was that -- What was your understanding about what

8    that section or committee was supposed to be involved with or

9    take care of?

10            MR. DRATEL:  Objection; basis, Your Honor.

11            THE COURT:  Overruled.

12            THE WITNESS:  Donate, collecting money.

13   Q.    (BY MR. JACKS)  What was your understanding about how

14   that money was to be applied or to whom it was to be

15   delivered?

16            MR. DRATEL:  Same objection, Your Honor.

17            THE COURT:  Overruled.

18            THE WITNESS:  To organization controlled or founded

19   by Hamas in the occupied territories.

20   Q.    (BY MR. JACKS)  What were -- After this closed meeting,

21   what happened -- And after this announcement or decision about

22   these other groups, what followed that?

23   A.    I was chosen to be within the media group.  My job was to

24   follow up with the news, make a report.  So I was given that

25   assignment in that meeting right there to watch the news, the

1    hearings on C-SPAN and the Congress and the Senate and make a

2    report.

3    Q.   And at some point in time did you begin to do that?

4    A.   Yes, sir.

5    Q.   I would like to show you a video?  I believe it has been

6    admitted as Government's Exhibit No. 125.

7              MR. JACKS:  Your Honor, it has already been

8    admitted, and I would request permission -- I am sorry.  HLF

9    Search No. 125, Your Honor.

10             THE COURT:  Okay.

11   Q.   (BY MR. JACKS)  And sir, if you would just watch on your

12   screen, and I will have some questions for you.

13             (Whereupon, Government's Exhibit HLF Search 125 was

14             played, while questions were propounded.)

15   Q.   (BY MR. JACKS)  Are you able to read the caption, sir, on

16   the screen to see what this is described as?

17   A.   That is one of the festivals we talked about, yes, sir.

18   Q.   And festivals put on by the IAP?

19   A.   Correct.

20   Q.   And do you see the date that this festival is taking

21   place?

22   A.   Yes; october 30, '94, Chicago.

23   Q.   All right.  Do you recognize the names of the persons

24   listed under the word speakers?

25   A.   Sheikh Harb Jaber from the city of Jericho in the West

1    Bank.

2    Q.   And I am sorry.  Just if you could say that a little more

3    slowly.

4    A.   Okay.

5    Q.   He is from where?

6    A.   He is from the city of Jericho in the West Bank.

7    Q.   All right.  And then the second person?

8    A.   Sheikh Mohammad El-Mezain.

9    Q.   Is that the Defendant Mohammad El-Mezain?

10   A.   Correct.

11   Q.   The next person?

12   A.   Sheikh Jamal Said.

13   Q.   And the next person?

14   A.   Rafeeq Jaber.

15   Q.   Jamal Said, do you know who he is?

16   A.   He is currently, and was before and still, the emam of

17   the mosque, I think Mosque Foundation south of Chicago.

18   Q.   All right.  Rafeeq Jaber, do you know who he is?

19   A.   He became the president or chairman of the IAP I think

20   late '90s, '97, '98.

21   Q.   All right.  Do you know where he is from, where he lives?

22   A.   I know he is Palestinian, but I really don't know what

23   city in Palestine he is from.

24   Q.   And then the person shown as the master of ceremony, do

25   you know that person?

1   A.    Yeah.  Sabri Ibrahim, I know him, again a Palestinian,

2   from Jordan, and he lived in Chicago.

3   Q.    What is hanging in front of the podium where the speaker

4   is speaking, Mr. Shorbagi?

5   A.    That is the Palestinian flag with the Shahada on the

6   white strip there.

7   Q.    And whose version of the Palestinian flag is that?

8   A.    That is the Hamas version.

9   Q.    Can you see those flags that those men are waving?

10  A.    Correct, yes, sir.

11  Q.    And are they -- What types of flags are they?

12  A.    That is the Hamas flags -- Not the Hamas flag, but the

13  Palestinian flag with the Shahada, which is the version of the

14  Hamas flag of the Palestinian flag.

15  Q.    Let me ask you, what is being depicted in this video, Mr.

16  Shorbagi?  Is that consistent with the other festivals that

17  were held by the IAP?

18  A.    Correct.

19  Q.    Did you have an occasion to ever see or meet with any of

20  the Defendants in Rome, Georgia where you lived?

21  A.    Yes, sir.

22  Q.    Let me take them one at a time.  With regard to Mohammad

23  El-Mezain, did he ever come to Rome, Georgia?

24  A.    Correct.

25  Q.    What was his purpose in coming to Rome, Georgia?

1  A.   Mohammad El-Mezain used to come when there is a guest

2  speaker, like he came a few times with Sheikh Mohamed Siam and

3  Sheikh Deeb Anees.

4          MR. DRATEL:  Can we get a time frame, Your Honor?

5          THE WITNESS:  He came in with Sheikh Deeb Anees in

6  '93, late '93, like August, September '93.  And he came in

7  with Sheikh Mohamed Siam in '94, and he came another time with

8  Sheikh Deeb Anees in '95.  And then Mohamed Siam came by

9  himself in '96.

10  Q.   (BY MR. JACKS)  Let me go back.  I am going to show you

11  what has been admitted as Government's Exhibit Demonstrative

12  No. 17.  And just if you can, is Mohamed Siam that you are

13  referring to depicted on this chart?

14  A.   Right there, yes, sir.

15  Q.   You are pointing to the middle row the far left?

16  A.   Correct, yes, sir.

17  Q.   And do you know -- Strike that.  About how many time do

18  you remember Mohammad El-Mezain whether he came alone or

19  coming with somebody coming to Rome, Georgia?

20  A.   Probably five times.

21  Q.   And that would be from what year to what year?

22  A.   From '93 till '99.

23  Q.   And do you recall some of the -- Let me back up.  You

24  said that he would come when there were guest speakers.

25  A.   Right, correct.

1   Q.   Did the guest speaker come with him, or was the guest

2   speaker already there when he would come?

3   A.   They used to come together.

4   Q.   And the guest speaker, is it Mohamed Siam and Deeb Anees

5   and those individuals that you are referring to?

6   A.   Correct.

7   Q.   Are there any others that you can think of that came with

8   Mohammad El-Mezain as guest speakers?

9   A.   There were other guest speakers that came to Rome, but

10  mainly these are the two that Mohammad El-Mezain came with.

11  Q.   And when you say they were guest speakers, where were

12  they speaking?

13  A.   At the Rome mosque.

14  Q.   And was -- Do you know if they were making guest speaking

15  appearances at anywhere else in the area?

16  A.   Right.  They would be invited to come to the United

17  States to speak.

18  Q.   Invited by whom?

19  A.   By the Holy Land Foundation.  And they will be around

20  different cities in the United States, and one of the cities

21  will be Rome.

22  Q.   And where would they speak?  Physically where would they

23  give their talk or speech?

24  A.   Now, most of those speakers will go to big cities on

25  Friday, but to Rome most of the times we choose not Friday

1  because it is a small community, and we could gather people on

2  like a fast note in the.  Town, but mainly also they would

3  come for a very certain purpose, which is meeting Samir

4  Khatib.

5  Q.   All right.  And were they soliciting money when they

6  would meet with Samir Khatib?

7  A.   Correct, yes, sir.

8  Q.   And what were some of the -- Were you involved in these

9  arrangements in setting up these meetings with Samir Khatib?

10  A.   Yes, sir.

11  Q.   And how would you get notified or how would these

12  meetings be set up?

13  A.   I will get a call from either Haitham or Mohammad

14  El-Mezain and I will respond by, "Okay.  This week, or next

15  week.  It depends on the condition of Samir Khatib, the health

16  condition."  And when they come they come to the Atlanta

17  airport.  I will be there, I will take them from the airport

18  to the hotel or to my home, and before they come in I will let

19  Nassim, who is Samir's brother, and Samir know they were

20  coming.  So we will have a dinner at either my home or Samir's

21  home.

22      After that we will go to the mosque.  There will be a

23  talk by either Mohamed Siam or Deeb Anees.  And then after

24  that we will go back to Samir Khatib's home, like just us and

25  Mohammad El-Mezain whoever the guest speaker is, myself,

1    Nassim, Samir, and Samir will either pledge the money either

2    at the mosque or at his home.

3    Q.    Were there donations solicited from the other members of

4    the mosque or other attendees at the mosque?

5    A.    Yes, sir.

6    Q.    Was there anything -- With regard to these visits by

7    Mohammad El-Mezain, do you recall any of the projects that he

8    was seeking money for?

9    A.    Yes, sir.

10   Q.    Just can you tell us some that you recall?

11   A.    In '94, '95 of the Holy Land Foundation their main

12   projects were what they called, two projects mainly, the food

13   package and the school supplies; the food package for the

14   needy families, the poor families, and the school supplies for

15   the kids going back to school that they could not afford

16   buying the materials for school.

17   Q.    What was your understanding about how that money was to

18   be used or how it was to move through whatever process it

19   moved through?  What was your understanding?

20            MS. MORENO:  Objection; hearsay.

21            THE COURT:  Overruled.

22            THE WITNESS:  In '94 the PLO or the Palestinian

23   Authority came to exist in the West Bank and Gaza, those

24   organizations in the West Bank and Gaza, such as the Islamic

25   Society and so on, as the resistor with the Palestinian

1    Authority, so they have a registration number, so the money

2    will go to these organizations and these organizations will

3    distribute the food packages to the families there.

4    Q.   (BY MR. JACKS)  What type of organizations are you

5    referring to or talking about?

6    A.   Like the Islamic Society in Gaza or the Islamic Compound

7    in also Gaza or Khan Yunis.

8    Q.   Any other examples that you can give us about other

9    organizations that would receive this money?

10    A.   Correct.  Such as the Islamic University.  This is in

11    Gaza.  In the West Bank, they have something called the zakat

12    charity, and those zakat charities were founded at the time of

13    Jordan ruling over the West Bank back in the '40s, and they

14    still existed.  And these zakat charities will get the money

15    from the Holy Land Foundation.  They have a list of the poor

16    families, and they will give the money -- the food packages

17    which consist of rice, meat, and flour and so on, to these

18    families.

19    Q.   Were there any particular zakat committees that were to

20    receive these funds?

21    A.   Now, the Holy Land Foundation has -- they have like a

22    small newsletter published bi-weekly, so they will list the

23    names of those zakat.  One very well-known is Nablus zakat led

24    by Sheikh Hamed Bitawi, one of the Hamas prominent figures in

25    the West Bank.  And the other one, Jenin zakat charity by --

1          MR. DRATEL:  Object, Your Honor, on basis.

2          THE COURT:  Overruled.  Go ahead.

3          THE WITNESS:  So those zakat charities, as I said,

4     in the West Bank.  But in the Gaza there were no zakat

5     charities, but they were those other organizations.

6     Q.   (BY MR. JACKS)  And who controlled those zakat committees

7     in the West Bank?

8     A.   Some of them were --

9          MS. MORENO:  Objection; hearsay, Your Honor, and

10    foundation.

11         MR. DRATEL:  Basis.

12         THE COURT:  Do you want to lay a predicate?

13    Q.   (BY MR. JACKS)  Did you have an understanding or a

14    knowledge as to who controlled those committees?

15    A.   Some of them they were controlled by --

16         MR. DRATEL:  Objection, Your Honor; non-responsive.

17         THE COURT:  Just answer that yes or no.

18    Q.   (BY MR. JACKS)  One step at a time.  Did you have a

19    knowledge or understanding about who controlled those

20    committees?  Yes or no.

21    A.   Yes, sir.

22    Q.   And where did that knowledge come from?

23    A.   It came from different sources.  It came from newspapers,

24    it came from Hamas leaflets, it came from Hamas -- the

25    internet later on '98, '99, the website of Hamas, and came

1    from also talking among friends.

2    Q.   Well, and when you say friends, are these friends persons

3    that were similarly situated to you?

4    A.   Correct, yes, sir.

5    Q.   Were they persons that were supporting the Holy Land

6    Foundation and the IAP and Hamas?

7    A.   Yes, sir.

8    Q.   And what was your understanding or knowledge about who

9    controlled these zakat committees?

10             MS. HOLLANDER:  Objection, Your Honor.

11             THE COURT:  Overruled.  Go ahead.

12             THE WITNESS:  Sorry.  Say the question again.

13   Q.   (BY MR. JACKS)  Who controlled the zakat committees that

14   the Holy Land Foundation was sending these either food

15   packages or money to buy food packages, who controlled those

16   zakat committees in the West Bank?

17   A.   There are a number of zakat committees in the West Bank.

18   Some of them are controlled by Hamas; others run by different

19   people, not necessarily Hamas.

20   Q.   Well, the ones that -- Do you know which ones -- Which

21   ones, was it your understanding were controlled by Hamas?

22             MR. DRATEL:  Objection, Your Honor, as to the nature

23   of the source, and just -- to hearsay and --

24             THE COURT:  Overruled.

25             MR. DRATEL:  -- all the objections we have made.

1    THE COURT:  Overruled.  Go ahead.  You may answer.

2    THE WITNESS:  The question again.  I am sorry.  I am

3  lost there.

4  Q.  (BY MR. JACKS)  Which committees did you know or

5  understand to be controlled by Hamas or Hamas committees?

6  A.    Zakat charity -- I am sorry.  Nablus zakat charity,

7  Jenin, Ramallah, Hebron.  That is the ones I know.

8  Q.   Getting back to the purposes that Mohammad El-Mezain

9  stated in terms of what he was seeking money for, do you

10  recall that I had asked you about that?  Just do you recall my

11  asking you about that?

12  A.    Correct, yes, sir.

13  Q.   Okay.  Are there other recollections that you have about

14  other trips that he made and what he said he wanted the money

15  for?

16    MR. DRATEL:  Objection to the form of the question,

17  Your Honor.

18    THE COURT:  Overrule the objection.

19    THE WITNESS:  I am sorry?

20  Q.  (BY MR. JACKS)  Can you recall or tell us other reasons

21  that Mohammad El-Mezain came seeking money, according to him?

22  A.    Yes, sir.

23  Q.   Okay.  Give us one that you recall.

24  A.    As I said, in '94-'95 mainly was food packages and school

25  supplies.  After that the Holy Land Foundation moved to the

1    next stage which is the stage of projects.  And the projects

2    that I helped by the money of the Khatib family there was the

3    el-Salam Peace Hospital in Khan Yunis, which is a very

4    moderate hospital, because most of the time there was closure

5    on the Gaza Strip so sick people could not would not be able

6    to leave the Gaza Strip to go to Egypt for special treatment

7    or special surgery so they needed that hospital in Khan Yunis.

8    That hospital cost a few million dollars, so they had the

9    hospital in Khan Yunis.

10        They also had a very public library in Hebron.  There was

11   no -- Most of the big cities don't have a public library, so

12   they had a public library in Hebron.

13        And later on came also the project of the wells, the

14   water from the ground that a lot of people there don't have

15   facility for clean water, so they were working also on these

16   projects.

17   Q.   Did Mohammad El-Mezain ever solicit money from Samir

18   Khatib for --

19            MR. DRATEL:  Objection, Your Honor.  It is leading.

20            THE COURT:  Do you want to rephrase?

21   Q.   (BY MR. JACKS)  Can you tell us whether or not Mohammad

22   El-Mezain ever solicited money for something that would have

23   been separate --

24            MR. DRATEL:  Objection, Your Honor.  It is still

25   leading.

1          THE COURT:  Overruled.  Go ahead and finish up.

2     Q.    (BY MR. JACKS)  Separate and apart from the Holy Land

3     Foundation?

4     A.    I am sorry.  I didn't really understand fully the

5     question.

6     Q.    Let me approach it this way.  During the time that

7     Mohammad El-Mezain came to Rome, where was he living?

8     A.    The early '90s he was living in New Jersey, and then I

9     don't really know what year he moved, probably '95-'96 he

10    moved to California.

11    Q.    When he was living in New Jersey, what was he doing?  Did

12    he have any other activity or role there?

13    A.    Yes, sir.

14    Q.    What was that?

15    A.    I know that he was the emam of the Paterson Islamic

16    center there.

17    Q.    And is there a mosque connected to that Islamic center?

18    A.    Yes, sir.

19    Q.    And what other -- Did he ever appear in Georgia on behalf

20    or seeking anything for that center?

21    A.    I remember the first time I saw him in Rome he came for

22    the Islamic Center of Paterson, and Sam gave him the amount of

23    $50,000.

24    Q.    I am sorry.  I couldn't hear the amount.

25    A.    Okay.  $50,000.  They needed money because they bought

1     that building and they owe money to the owner or to the

2     company that owned the real estate, that owned the building.

3     And they were falling behind, so he came and asked Samir

4     Khatib for donation, and Samir Khatib gave him the $50,000.

5     Q.    And did anybody come with him on that trip?

6     A.    Yes.  Sheikh Deeb Anees was with him that trip.

7     Q.    Was there ever any repercussions for that fact?  Was

8     there ever any comment or did you ever hear anything about

9     that from the Holy Land Foundation?

10    A.    Yes, sir.

11    Q.    And what was -- Who did you hear from from the Holy Land

12    Foundation?

13    A.    From Haitham and Shukri.

14    Q.    And what was their reason for calling you?

15    A.    They did not like the idea that Mohammad El-Mezain is

16    collecting money from Samir Khatib for a project or a mosque

17    inside the United States; that New Jersey people should take

18    care of their own mosque, and the money from Khatib should

19    always go to the West Bank and Gaza.

20    Q.    And who was supposed to be the recipient or the person

21    that would get that money to the West Bank and Gaza?

22    A.    From the Holy Land Foundation?

23    Q.    Yes, but from Samir Khatib to the West Bank, who was --

24    A.    The Holy Land Foundation.

25    Q.    And what, if anything, else was said by either Haitham

1    Maghawri or Shukri Abu Baker about why they were upset with

2    Mohammad El-Mezain for collecting money for this mosque in New

3    Jersey, or school?

4    A.    They called inquiring about like they knew that Mohamed

5    was with Sheikh Deeb Anees.  As I said, Sheikh Deeb Anees was

6    invited by the Holy Land Foundation, so they paid for his trip

7    and they paid for his accommodation.

8    Q.    To Rome?

9    A.    To Rome and to the United States.  Right.  But also to

10   Rome.  Right.

11   Q.    All right.

12   A.    So when he was in Rome, Haitham called about the visit,

13   the trip, and then that was my contact, me and Haitham.  And I

14   told him that, yes, they came and got $50,000.

15         "And what was it for?"

16         "For The Islamic center of Paterson."

17   Q.    And you said that he made another trip with Deeb Anees,

18   and how many times do you recall Mohammad El-Mezain coming to

19   Georgia with Mohamed Siam?

20   A.    Two times.

21   Q.    And do you recall or are you able to recall what they

22   were collecting money for on those occasions with regard to

23   Mohamed Siam being there?

24   A.    They came in -- During these two times they were

25   collecting money one time for the Holy Land Foundation.

1    Q.    Was money collected every time that Mohamed Siam came

2    there?

3    A.    No, sir.

4    Q.    You said he came there one time by himself?

5    A.    Correct.

6    Q.    Was he given any money then by Samir Khatib?

7    A.    Really that time me and Haitham and the Holy Land

8    Foundation we discussed this issue that the community in Rome,

9    especially the Khatib, didn't want them to feel every time a

10   guest speaker will come will come just for the money.  So

11   sometimes the guest speaker will come just for being with the

12   community there, talking to them, and enjoy the time with them

13   and leave without calling for money.  So not every time there

14   is a visit there is money.

15         So yes, Mohamed Siam came in one time.  That was the end

16   of Ramadan, celebration of Eid.  He stayed with us during that

17   day, we went to the park, and he stayed with us all day long.

18   And we went to Samir Khatib, we had dinner there.  It was a

19   nice occasion, but no money collected during that term.

20   Q.    Was that unique or unusual that no money would be

21   collected when they came to Samir Khatib?

22   A.    It has to be done, because they always send -- the Khatib

23   family always send money to the Holy Land Foundation.

24   Q.    What was your understanding about the reason that the

25   Holy Land Foundation, either a representative of the Holy Land

1    Foundation or a speaker, was coming to Georgia?  Was it to see

2    the --

3              MS. HOLLANDER:  Objection.  It is leading.

4              THE COURT:  Rephrase, counsel.

5    Q.  (BY MR. JACKS)  Who was the person that they most were

6    interested in seeing?

7    A.   You mean in Rome?

8    Q.   Yes.

9    A.   Now, if are you talking about the community, they don't

10   really much care who is coming because all of them are good

11   speakers, either Deeb Anees or Mohamed Siam.  But Samir Khatib

12   personally, most of the times he would like to see --

13             MR. DRATEL:  Objection; hearsay, Your Honor.

14             THE WITNESS:  That is what he was telling me.

15             THE COURT:  Hold on a second.

16             MR. JACKS:  I will rephrase it, Your Honor, if you

17   would like me to.

18   Q.  (BY MR. JACKS)  With regard to representatives of the

19   Holy Land Foundation, Mohammad El-Mezain or Shukri Abu Baker

20   or you said Ghassan Elashi came one time.  Correct?

21   A.   Correct, yes, sir.

22   Q.   Who was it that they came to see?

23   A.   Samir Khatib.

24   Q.   You made reference to an incident or an occasion when

25   Samir Khatib was in a manic phase and he pledged or agreed to

1    donate a million dollars.  Is that what you said?

2    A.    Correct, yes, sir.

3    Q.    And can you tell that story to us, please?

4    A.    Yes.  I remember --

5           MS. HOLLANDER:  Your Honor, I am going to object to

6    a narrative.

7           THE COURT:  Overruled.  He may explain.  Go ahead.

8    Q.    (BY MR. JACKS)  Do you remember about when this was?

9    A.    I think that was in either '94 or '95.

10   Q.    All right.  Go ahead.

11   A.    I remember Alexandria wanted to go into a big project,

12   and they put money into it.  And then it did not work out

13   well, but successfully Alexandria were able to get all their

14   money back.  So Samir at that time was in his manic era, so he

15   called --

16          MR. DRATEL:  Object to hearsay, Your Honor.

17          THE COURT:  Overruled.  Go ahead.

18          THE WITNESS:  We were at the office of Alexandria,

19   and he told me, "I want to donate a million dollars to the

20   Holy Land Foundation."  Nassim was out of the country at that

21   time.

22   Q.    (BY MR. JACKS)  That is Samir's brother?

23   A.    Samir's brother.  Right.  The one that was overseeing the

24   company.  Now, that was a big number for the amount of money,

25   and knowing Samir had the mental problem, but again when he is

1    in that mental problem he doesn't want anyone to say no.

2    Everybody must say yes because, as I said, he thinks he is the

3    king.

4    Q.    All right.  What happened after can he made that

5    statement?

6    A.    He got a check from his son Kareem.  Kareem was on the

7    signatory of Alexandria.  And he asked him to sign the check

8    without telling him to whom or what the amount.  So Kareem,

9    his son who was I think in early 20s at that time, he signed

10   the check.

11        So we took the check and he said, "Let's go to the post

12   office."  So I went to the post office with him.

13   Q.    Let me stop you there.  At this time that you are talking

14   about when he is getting the check from his son and you and he

15   are making the trip to the post office, had he communicated

16   anything to the Holy Land Foundation about this upcoming

17   donation?

18            MR. DRATEL:  I object again on hearsay, Your Honor.

19            THE COURT:  You are asking about the donor

20   communicating?

21            MR. JACKS:  Yes, sir.

22            THE COURT:  All right.  Go ahead.  Overrule that.

23            THE WITNESS:  Yeah, he called -- Okay.  When he said

24   a million dollars, he said, "Go ahead and call Mohammad

25   El-Mezain at my office in Alexandria.  So I got Mohammad

1   El-Mezain's number in New Jersey, so I dial his number and he

2   talked to him and he said, "I will send a million dollars

3   today to you by check."

4   Q.   (BY MR. JACKS)  I am sorry.  Who talked to Mohammad

5   El-Mezain?

6   A.   Samir Khatib.

7   Q.   Okay.  All right.  And so then you -- What happened as

8   you all were going to the post office?

9   A.   Okay.  I took the check with me, the signed check, and

10  the envelope, the stamp, we took the address for Mohammad

11  El-Mezain his home address in New Jersey, and we went to the

12  post office.

13      I told him, "Listen, Samir.  I will write the check and I

14  will put it in the mail, but not now because I am busy now.  I

15  am doing other things."

16      He said, "No, no, no.  You come with me now."

17      I said, "Okay.  I will go now."  Because I knew this is a

18  big amount and I have to consult with Nassim.  But once Samir

19  is saying something, because he is the one who owns the money,

20  but the okay has to come from Nassim.

21      Anyway, we went to the post office, and he said, "Go

22  ahead and write down Holy Land Foundation."  I wrote down Holy

23  Land Foundation, the date, and then $1 million.  And I wrote

24  $1 million, put it in an envelope, and then address of

25  Mohammad El-Mezain.

He said, "Let's go and deposit it in the bank," [sic}
because he did not trust me that I will do that, so he wanted
to go with me into the post office.  And I was not really
happy at that time that he is doing this because I don't want
to be involved with something like this without the approval
of Nassim.

But finally, luckily, he said, "I tell you what.  You go
to the post office.  I need to smoke a cigarette."  Because he
kept smoking because of his mania.  So he stayed outside
there.  I went to the post office, and then I just dropped the
check in my pocket.  I did not send it in the mail.

He said, "You send it?"

I said, "Yes I send it."

"You sure?"

I said, "Yes, I am sure I send it.  Yes, absolutely."

"Okay.  Let's go back and talk to Mohammad El-Mezain."

And I went back, again I called El-Mezain, I told him,
"Listen, you know, this is a big amount."  And Samir at that
time was not around.  He was using the bathroom.  But I
explained to Mohammad El-Mezain that, "Whenever Samir talked
to you, that I am sending the money, and you tell him, 'Okay.
Thank you very much.  Whenever I give the money I will let you
know.'"

And we talked again to Mohammad El-Mezain that day, and a
few other, like two or three days later on, like giving the

1    mail a few more days, he came to the office and said, "Call

2    Mohammad El-Mezain."

3    Q.    Is this Samir?

4    A.    Samir Khatib, and orders like, "Call now."

5          "You got the money?"

6          And then Mohammad El-Mezain said, "Yes, we got it.  Thank

7    you.  Thank you very much."  Just to calm Samir that things

8    are okay.  Because I explained to Mohammad El-Mezain that we

9    have to get the approval of Nassim, and he understood that.

10   Q.    Well, was there at any time during that transaction when

11   Mohammad El-Mezain --

12             MR. DRATEL:  Object to leading, Your Honor.

13             THE COURT:  Go ahead and finish your question.

14   Q.    (BY MR. JACKS)  Was there any time when he expressed a

15   desire that he wanted the money or expected the money?

16   A.    Yeah, absolutely.  This is a million dollars for the Holy

17   Land Foundation in '94.  It is a big amount.  Yeah.  But the

18   thing, as I explained it to Mohammad El-Mezain, this is what

19   should happen, but he wanted the money.

20   Q.    And what did he do to convey that he wanted that money

21   after you had initially -- after Mr. Khatib had initially

22   said, "I am sending you this check," what did Mohammad

23   El-Mezain do in the days following that?

24   A.    I met him at the MAYA conference after that, because this

25   happened late in '94, and he asked me about the money and the

1    check, and I told him, "Really it is in the hand of Nassim

2    now."  So he asked me about the money, but really -- I mean,

3    he wanted me to try to see if I can get the money from Nassim

4    to -- Nassim, not Samir, to the Holy Land Foundation, but I

5    told him it is really in the hand of Nassim now.

6    Q.   Did Shukri Abu Baker come to Rome, Georgia?

7    A.   Yes, sir, he came only one time.

8    Q.   And do you know about when that was?

9    A.   I think late '99.  I think '99.

10   Q.   And what was the purpose of his trip?

11   A.   They were working on the project of wells, the water

12   wells, and he came into Rome with some posters like this, and

13   he had a videotape.  And he came into the Atlanta mosque first

14   and talked about the same project.  I went to Atlanta, I met

15   him in Atlanta, and then I brought him to Rome.  I think it

16   was Ramadan at that time.  Yeah, it was Ramadan.  We had iftar

17   at the -- breaking fast at the mosque.  And after that he led

18   prayer there, and he talked about these wells.  He had a

19   videotape about the sick people in the West Bank and Gaza, and

20   he talked mainly about these wells.

21   Q.   Did he meet with Samir Khatib?

22   A.   Yes, sir.

23   Q.   And did he solicit money from him?

24   A.   Not like in private, because Samir was at the mosque and

25   Samir was watching this tape, and he was -- he saw what the

1    project is talking about, and he pledged I think $60,000.

2    Because each well costs $20,000, so he pledged three wells.

3                THE COURT:  Let's go ahead and take the morning

4    break.  We have been here awhile.  Let's take a 20-minute

5    break.  Be back at 11:30.

6                (Whereupon, the jury left the courtroom.)

7                THE COURT:  We will be in recess until 11:30.

8                          (Brief Recess.)

9                THE COURT:  Mr. Jacks?

10                MR. JACKS:  Thank you, Your Honor.

11   Q.   (BY MR. JACKS)  Sir, I wanted to clarify something.  You

12   said that one of the organizations to which the Holy Land

13   Foundation sent funds, or some of the organizations, was the

14   Islamic Center?

15   A.   Islamic Society.

16   Q.   Islamic Society.  And is there also -- Is there an

17   Islamic Compound, or is that a physical location?

18   A.   There is a name called Islamic Compound, and there is

19   another one called Islamic Society.

20   Q.   And did the Holy Land Foundation send money to the

21   Islamic Compound?

22   A.   Yes, sir.

23                MS. HOLLANDER:  Objection, to he knows if they sent

24   money.

25                THE COURT:  Overruled.  Go ahead.

```
 1   Q.   (BY MR. JACKS)   And the -- I think one of the other
 2   entities you said was the Islamic University of Gaza?
 3   A.   That is correct.
 4   Q.   Was it provided money by the Holy Land Foundation?
 5   A.   Correct.
 6   Q.   Those three entities, what organization controls those
 7   three entities?
 8   A.   Hamas.
 9   Q.   Are you familiar with a man by the name of Fuad Abu Zeid?
10   A.   Correct.
11   Q.   And who is he?
12   A.   He was what we call the appointed scholar for the city of
13   Jenin, and he was overseeing the zakat charity in Jenin.
14        MR. DRATEL:   Your Honor, I object as to the basis
15   for knowledge.
16        THE COURT:   Overruled.
17   Q.   (BY MR. JACKS)   Is he a Hamas leader?
18   A.   Yes, sir.
19        MR. DRATEL:   Same objection, Your Honor.
20        THE COURT:   Okay.   Overruled.
21   Q.   (BY MR. JACKS)   Are you familiar with an Abdel Khaleq
22   Natshe?
23   A.   Yes, sir.
24   Q.   And is he a Hamas leader?
25        MR. DRATEL:   Again, Your Honor, same objection.
```

```
1              MS. HOLLANDER:  And foundation, Your Honor.
2              THE COURT:  Overruled.  Go ahead.
3    Q.   (BY MR. JACKS)  Do you know him to be a Hamas leader?
4    A.   Yes, sir.
5    Q.   And what organization is he associated or affiliated
6    with?
7    A.   He is from the city of Hebron, and he was also overseeing
8    the zakat charity in Hebron.
9    Q.   Now, is it a zakat?  You said zakat and then you said
10   society.
11   A.   Zakat charity.
12   Q.   Charity.  Do you know the name of that organization?
13   A.   The zakat charity?
14   Q.   The official name of that organization?
15   A.   That is the official name, zakat charity of Hebron.
16   Q.   All right.  Have you heard the term bin mal?
17   A.   What is that?
18   Q.   Bin mal?
19   A.   Bin mal?
20   Q.   Yes.  Maybe I am mispronouncing it.  Have you ever -- In
21   these meetings that you have attended, did any of the speakers
22   talk about jihad with money or financial jihad?
23   A.   Correct, yes.
24   Q.   And how was it described?  What did they say about it?
25   A.   You know, like --
```

1          MR. DRATEL:  Object as to hearsay, Your Honor.

2          THE COURT:  Overruled.  Go ahead.

3          THE WITNESS:  Like there is a jihad with the self,

4    when it comes to the Palestinian issue the jihad with self you

5    are fighting the Israeli occupation.  And when it come to the

6    money, jihad with the money, you are helping the people in

7    Palestine there to stay in Palestine, and you are helping also

8    with, as jihad in money, you are helping by giving money to

9    those organizations there.

10   Q.   You indicated that after this Chicago MAYA convention,

11   that you were appointed or assigned to be a part of the media

12   committee.  Is that correct?

13   A.   Correct, yes, sir.

14   Q.   And what was -- What were you told that was to be your

15   responsibilities?

16   A.   The media groups, I knew that they were divided into

17   individuals.  Someone will watch like the newspapers, New York

18   Times, Los Angeles Times, and so on.  Others will watch the

19   TV.  So I was the one who will be watching the different top

20   news, ABC, CBS, CNN, and especially the C-SPAN hearings.  So I

21   used to watch the C-SPAN hearings in the middle of the night

22   looking to their program what hearings will be the

23   Congressional hearings, and taking notes and then send these

24   notes to UASR.

25   Q.   Was anyone else doing similar work that you know of?

```
 1    A.    I know Iyad Hindi, I-Y-A-D  H-I-N-D-I.

 2    Q.    What about Iyad Hindi?

 3    A.    After we were done with the Chicago, he told me about --

 4    Because already I was --

 5              MR. DRATEL:  I object to hearsay, Your Honor.

 6              THE COURT:  And I don't know this individual.  Why

 7    is that not hearsay?

 8    Q.    (BY MR. JACKS) Let me ask you, who is Iyad Hindi?

 9    A.    Iyad Hindi was working for Alexandria Carpet the same

10    time I was working there '94-'95, and he lived in Rome also.

11    Q.    Was he -- Did he attend these MAYA conventions?

12    A.    Yes, sir.

13    Q.    Was he in the closed meeting in Chicago in 1994?

14    A.    Correct.

15    Q.    And was he a member or person that was assigned to work

16    on one of these committees?

17    A.    Correct.

18    Q.    Which committee was he working on?

19    A.    The media group.

20    Q.    All right.  Did you and Iyad Hindi have a conversation

21    about the work that you were doing?

22    A.    Correct.

23    Q.    And about how long after the Chicago meeting in 1994 are

24    we talking about?

25    A.    At that time he was not working at Alexandria.  I am
```

1    sorry.  He was working in Alexandria, but after the meeting, I

2    am not really sure, probably like a few months, we talked

3    about the media group, and he gave me a number that this is

4    what I will be doing, watching the C-SPAN, writing notes of

5    these hearings.  And then he gave me a phone number.  He said

6    the phone number is in a coded way, that it has been written

7    backwards.  So if the number is let's say 415, so it will be

8    written 514 so I can read it backwards.  So that is a fax

9    number to fax these documents to write down of the hearings,

10   and I fax them to that number.

11   Q.   All right.  Now, let me walk you through this.  You were

12   supposed to be watching reports or programs on television.  Is

13   that correct?

14   A.   Correct, yes, sir.

15   Q.   What type of programs were you supposed to be watching?

16   A.   Now, '94-'95 Hamas, after the deportees and then the

17   deportees came back to the occupied territories, is becoming

18   now a big name, so the United States State Department, and the

19   Congress and the Senate start looking into this new phenomenon

20   of Hamas.  So they had many hearings at the Congress and the

21   Senate.  The unfortunate things is that these hearings were

22   shown only late at night, so I used to look into their

23   program, the C-SPAN program, and find out when are these

24   programs.  And I stayed up nights watching these Congressional

25   hearings of what is the approach of the United States toward

1    Hamas.

2    Q.    What were you supposed to do after you watched these

3    programs?

4    A.    First I used to tape the hearing, stayed for hours, and

5    then after that go over it minute by minute taking notes.  And

6    after taking notes, write it in a neat way and then fax it

7    over to the UASR.

8    Q.    Fax it to who?

9    A.    To that number, the fax number that was given to me, and

10   later on I knew it was the UASR.

11   Q.    That is the organization in Washington or northern

12   Virginia?

13   A.    Correct.

14   Q.    And who did you say was the head of that organization?

15   A.    That was Ahmed Yousef.

16   Q.    And who provided you with the phone number to fax these

17   reports to?

18   A.    Iyad Hindi.

19   Q.    And you said it was something about -- it was encoded or

20   in some kind of a code?

21   A.    Just like I kept the number in my pocket so if the number

22   were ever lost or something, or misplaced or someone got the

23   number wouldn't know what number was that, so it was like a

24   backwards number.

25   Q.    All right.  Do you know an individual named Jamil Hamami?

```
 1    A.    Correct.

 2    Q.    And what organization was he associated with?

 3    A.    He is from Jerusalem, and he was overseeing al-Aqsa

 4    Center in -- I think like an education center in Jerusalem.

 5    Q.    Was he a member of Hamas?

 6    A.    Yes, sir.

 7    Q.    Did you ever meet him?

 8            MR. DRATEL:  Objection, Your Honor; again,

 9    foundation.

10            THE COURT:  Overruled.

11    Q.    (BY MR. JACKS)  Did you ever meet him?

12    A.    I met him twice.

13    Q.    Where did you meet him?

14    A.    I met him in '90 in Houston.

15    Q.    What was the occasion?  What was going on in Houston when

16    you met him?

17    A.    It was October 1990, the famous massacre in al-Aqsa

18    mosque, and Jamil Hamami being from there he came in, again

19    with Mohammad El-Mezain about the speakers at the mosque that

20    were destroyed by the army, and that was the first time he

21    came in.

22        And the second time he came in in February of '94, the

23    famous Hebron massacre he came in to Rome after that for

24    collection of money for his center in Jerusalem.

25    Q.    The occasion in 1990 where you met him in Houston, what
```

1    kind of a conference or meeting was that?

2    A.    It was really no conference.  Houston is a big city, so

3    there are a lot of rich people in the big city among the

4    Muslim community.  So after what happened in al-Aqsa, I am not

5    sure if we called or somebody else called and spoke to

6    Mohammad El-Mezain that Jamil Hamami is here.  So we had a

7    lunch meeting in one of the fancy restaurants there, and we

8    invited those businessmen to that restaurant, we paid for the

9    ticket, for the food, and they came in, Mohammad El-Mezain

10   came in, Jamil Hamami came in, I gave the speech there, and

11   then Jamil Hamami spoke, I translated, Mohammad El-Mezain

12   spoke, and there was collection of money.

13   Q.    And who was the organization collecting the money?

14   A.    The Holy Land Foundation.

15   Q.    And you said that the speakers had been destroyed in the

16   al-Aqsa mosque.  Are you talking about the sound speakers, the

17   sound system?

18   A.    The audio system, the sound system.  Right.

19   Q.    You said in '94 you met Jamil Hamami in Rome, Georgia.

20   Is that correct?

21   A.    Correct, yes, sir.

22   Q.    And did anybody come with him on that occasion?

23   A.    Yeah, Muin Shabib came with him.

24   Q.    And did they collect or receive money from Samir Khatib?

25   A.    He came in, as I said, after February.  It was Ramadan

1   also February '94 was Ramadan.  I remember it was Ramadan, the

2   17th of Ramadan, and he came in and --

3   Q.   May I stop you?

4   A.   Yes.

5   Q.   Did he collect money from Muin Shabib.  I am sorry.  From

6   Samir Khatib?

7   A.   Only $5,000.  It was not a big amount.  Yes, he did.  I

8   am sorry.

9   Q.   And did the Holy Land Foundation find out about that?

10  A.   Yes.

11  Q.   How do you know they knew about it?

12  A.   Because Jamil Hamami came in -- Let me explain this.

13  Jamil Hamami came in invitation by al-Aqsa Education Fund, not

14  the Holy Land Foundation.  So the Holy Land Foundation knew

15  that Jamil Hamami is in the country by the invitation of

16  al-Aqsa Education Fund.  So when they knew that he came into

17  Rome, they got upset.  Haitham got upset, Shukri got upset,

18  that the Khatib family money is supposed to go only for the

19  Holy Land Foundation, nobody else.

20  Q.   Who said that?

21  A.   Haitham.

22  Q.   You said you had met Ghassan Elashi in Rome on one

23  occasion.  Is that correct?

24  A.   Correct.

25  Q.   And about when was that?

```
1    A.    If I am not mistaken, I think that was '95.

2    Q.    Who else came with Ghassan Elashi on that trip?

3    A.    Mohammad El-Mezain, Sheikh Deeb Anees, and Ghassan.

4    Q.    And what was their purpose?  What were they seeking?

5    A.    Money for Holy Land Foundation.

6    Q.    And what did Ghassan Elashi say, if anything, about money

7    that he would receive?

8               MR. DRATEL:  Objection; leading, Your Honor.

9    Q.    (BY MR. JACKS)  Did Ghassan Elashi discuss either with

10   you or Samir Khatib what he wanted to do with the money or aid

11   money?

12   A.    Ghassan Samir was in his manic era at that time, he was

13   very, very manic.  So he saw Samir.  So when we sat in the

14   hotel, he suggested to establish a Khatib Foundation that will

15   save the money for Sam, because when he saw Sam in that manic,

16   that Sam might lose all of his money or most of his money, but

17   this Khatib foundation will save his money in this foundation.

18   His money will be saved.

19   Q.    But what would be done with the money while it is in that

20   foundation?

21   A.    I am not really sure.  Like when he was talking about the

22   Khatib foundation, like -- Okay.  The Khatib -- I remember

23   now.  The Khatib family or the Khatib Foundation will have the

24   money, but also the Holy Land Foundation can like have

25   investment from that money and like run it as a business or
```

1    something of that nature.

2    Q.    Well, how would that benefit the Holy Land Foundation?

3    A.    That it will get a portion of that from that investment.

4    Q.    And whose idea was this?

5    A.    Ghassan.

6    Q.    Did that come about?  Did that happen?

7    A.    No, sir.

8    Q.    You said that Deeb Anees was there on that visit as well?

9    A.    Yeah, but he was not in that talk there.

10   Q.    Do you recall other occasions when either Mohammad

11   El-Mezain or Shukri Abu Baker or Ghassan Elashi acquired or

12   obtained money from Samir Khatib, large amounts of money?

13   A.    Yes, sir.

14   Q.    What -- Can you just tell us the amounts of money that

15   were obtained and when that was and who?

16          MR. DRATEL:  And who, Your Honor, specifically.  He

17   just lumped three people.

18          MR. JACKS:  And that is who.

19   Q.    (BY MR. JACKS)  You may answer.

20          THE COURT:  Go ahead.

21          THE WITNESS:  I saw several times Samir Khatib I was

22   there when, or Nassim Khatib giving money to Holy Land

23   Foundation.  I remember $80,000 in '93, other than the $50,000

24   to the New Jersey mosque; and another time when Sheikh Deeb

25   Anees was there, $60,000 to the Holy Land Foundation.

```
1    Q.   (BY MR. JACKS)  And when was that, approximately?

2    A.   That was the years like '94, '95.  I mean, every year

3    there is a big donation by Samir Khatib or by the Khatib

4    family to the Holy Land Foundation, around $100,000, $150,000.

5    Q.   And would that be true in 1996?

6    A.   Yes, sir.  But I don't think it was the $100,000, maybe

7    like $50,000 or $60,000.

8    Q.   Did Samir Khatib give money to the Holy Land Foundation

9    in every year until you left the company?

10   A.   Every year until like '99.

11   Q.   All right.  And let me back up.  At some point did you

12   become aware of the fact that the Holy Land Foundation had

13   closed?

14        MR. DRATEL:  It is leading, Your Honor.

15        THE COURT:  Overruled.  Go ahead.

16   Q.   (BY MR. JACKS)  At some point did you become aware of the

17   fact that the Holy Land Foundation had closed?

18   A.   Correct.  In 2001 after 9/11.  Right.

19   Q.   And so between say 1995 and 2001, did Samir Khatib

20   continue to donate money to the Holy Land Foundation during

21   those years?

22   A.   Yes, sir.

23   Q.   And in what approximate dollar amounts are we talking

24   about?

25   A.   As I said, in like '94 and '95, it was like in the
```

1    $100,000, $150,000, and then the number around $50,000,

2    $60,000 a year after that.

3    Q.   And were you aware of a point in time when Hamas became

4    designated as a terrorist organization?

5    A.   Yes, sir.

6    Q.   And was that something that you paid attention to?

7    A.   Correct.

8    Q.   And is that something that -- With regard to these people

9    that you were associating with, the people at the Holy Land

10   Foundation, the people at the IAP, was that something that was

11   discussed among yourselves?

12   A.   Yes, sir.

13   Q.   And do you know how many times Hamas was designated as a

14   terrorist organization?

15   A.   I know it was designated two times.

16   Q.   And each time that it was designated, was that noted or

17   discussed among the people that you were associating with?

18   A.   Right, yes.

19   Q.   And did anything change in regard to the operation of the

20   Holy Land Foundation from before the designation of Hamas to

21   after the designation?  Were there any changes in the way that

22   things were done or operated?

23   A.   Yes.  I remember some of the changes they were having.

24   Q.   What were some of the changes?

25          MS. HOLLANDER:  I believe some of the changes -- I

1    thought he said some of the changes he heard, and I object on

2    hearsay basis.

3              THE COURT:  I don't think that is what he said.  Go

4    ahead.

5              THE WITNESS:  Some of the changes took place; others

6    stayed the same.

7    Q.   (BY MR. JACKS)  Okay.  What changed?

8    A.   Changed, Holy Land Foundation opened an office in the

9    Gaza Strip.

10             MR. DRATEL:  Your Honor, I am going to object just

11   on foundation grounds.

12             THE COURT:  Do you want to lay a foundation for that

13   predicate?

14   Q.   (BY MR. JACKS)  How did you become aware of that?

15   A.   They had the newsletter, the Holy Land Foundation

16   newsletter, and also they have videotapes about their office

17   activity in the Gaza Strip.

18   Q.   All right.  So go ahead.  They opened an office in the

19   Gaza Strip.  What other changes took place?

20   A.   Also I remember Shukri was mentioning that he stopped

21   sending money to individuals, such as Ahmed Bhar in Khan

22   Yunis, and the money now will start going to their office in

23   Gaza, and then Gaza will be in charge of the money

24   distribution there.

25   Q.   And what about in terms of who the money was intended to

1    benefit?  What organization?  Did that change?

2    A.    No, the same organization.  That is the thing that did

3    not change.

4    Q.    And when I say organization, what organization are you

5    talking about in terms of who the money was to benefit?

6    A.    Okay.  Like their office in Gaza will still give the

7    money to the Islamic Society, Islamic Compound, the Islamic

8    University in the West Bank, the same zakat charities.

9    Q.    And those were organizations that were controlled by

10   Hamas?

11            MR. DRATEL:  Objection, Your Honor.

12            MS. HOLLANDER:  Objection.

13            THE COURT:  Overruled.  Go ahead.

14            THE WITNESS:  Yes, sir.

15   Q.    (BY MR. JACKS)  What about the conduct or the statements

16   that were made at these conventions or festivals?  Was there

17   any change in that nature?

18   A.    Yes.

19   Q.    How did those things change?

20   A.    Pre the Hamas designation as a terrorist organization,

21   like Hamas was publicly saying Sheikh Ahmed Yassin, Hamas, I

22   mean, you can see it in the tapes, songs, and the name, but

23   after the designation of Hamas there was no mentioning of

24   Hamas anymore in the songs.

25   Q.    Well, what about in the speeches?

1    A.   Same thing as speeches.

2    Q.   So how did they refer to or what terms or terminology did

3    they use in place of using the word Hamas?

4    A.   I heard really people sometimes use the word --

5              MR. DRATEL:  Objection, Your Honor.  He heard.

6              THE COURT:  Okay.  Do you want to ask him to clarify

7    that?

8    Q.   (BY MR. JACKS)  Are you talking about what you have heard

9    in the speeches?

10   A.   No.  I heard it from friends, like when we talk among

11   friends.

12   Q.   All right.  Did you ever, either in person or from

13   watching videos of these conferences, did you ever see

14   speeches that were made after the designation of Hamas?

15   A.   Yes.  There were still speeches about especially the

16   peace process and the Oslo agreement, the Palestinian

17   Authority, and in the speeches they were mentioning --

18             MR. DRATEL:  Your Honor, he hasn't answered the

19   question; basis of knowledge.

20             THE COURT:  Overruled.  Go ahead.

21             THE WITNESS:  In these speeches there will be

22   mentioning to Hamas, the peace process.  But again, in singing

23   and those songs, there is no more mentioning of the name

24   Hamas.  But most of the times whenever I talked, like on the

25   phone, because now everything changed and the phones are

1    monitored, so I started using the word the good hands or the

2    clean hands, like whenever -- like I am going to send money,

3    especially myself when I used to send money to my parents,

4    they are giving it to the good hands, meaning the Hamas

5    people.

6    Q.    And why did you refer to them as the good hands or the

7    clean hands?

8    A.    Because they are the clean hands.

9    Q.    Compared to who?

10   A.    Compared to the corrupted Fatah people.

11   Q.    The PLO?

12   A.    PLO or the Palestinian Authority.  Correct.

13   Q.    Just to clarify, you said that at these conventions you

14   could purchase videotapes.  Is that correct?

15   A.    Correct, yes, sir.

16   Q.    Were any of those videotapes tapes of either earlier

17   conventions or festivals, or that current convention or

18   festival?

19   A.    Both.

20   Q.    Did you ever acquire those?  Did you ever buy those or

21   receive them?

22   A.    Yes, correct.

23   Q.    Did you watch them?

24   A.    Correct.

25   Q.    And were there speeches by individuals shown on those

1  videotapes?

2  A.    Correct.

3  Q.    On the subject of videotapes, did you ever receive or

4  acquire videotapes that had been filmed by Hamas, that

5  contained films made by Hamas?

6  A.    Correct, yes.

7  Q.    What types of films were on those videotapes?

8  A.    There was a program, I am not really sure if it was 60

9  Minutes or Nightline, Hamas videotaped the interrogation of

10  some of the big collaborators in the Gaza Strip.

11        MR. DRATEL:  We object, Your Honor, for reasons

12  stated yesterday.

13        THE COURT:  Approach the bench on that.

14        (The following was had outside the hearing of the

15        jury.)

16        THE COURT:  Where is he going with this?

17        MR. JACKS:  Hamas would film these interrogations

18  and pronounce their judgment and then execute the person.

19  They wouldn't show the execution, but show the body

20  afterwards.  Those would be distributed to the supporters,

21  and he -- That is one of the things that was sent to him or

22  that he obtained.

23        MR. DRATEL:  Your Honor, I think it is not relevant.

24  And to the extent there would be any marginal relevance, 403.

25  And in the *al-Moayad* opinion, clearly this is the kind of

1    stuff that ought to be kept out.

2         MR. JACKS:  Your Honor, this is what this

3    organization does.

4         THE COURT:  I know.  But the problem is you are

5    going to start getting into an area where you start running

6    the risk that they are going to convict because this is a bad

7    organization, but that is not what this is about.  The issue

8    is did they give money to Hamas, not are they going to convict

9    because Hamas is bad.  They should not convict because Hamas

10   is a bad organization.  If they are going to, it needs to be

11   because they supported Hamas, as you alleged in the

12   indictment.  That is the problem.

13        So you start running the risk of just making Hamas out --

14   You are getting all this bad stuff about Hamas, and

15   potentially influence the jury in that direction.  They should

16   not be influenced in that direction.

17        MR. JACKS:  I understand.  But I think the case law

18   says that it is not only permissible to, you know, prove the

19   Defendants committed the acts, but also to show the nature of

20   what they were doing.  And there is cases that talk about, you

21   know, for the jury to understand the organization that they

22   supported, they are entitled to know, you know, what this

23   organization did and what these people that were supporting it

24   were aware of.  He was aware this was going on, and so it is

25   going to be reflected on him that, you know, he knew this

1    stuff was going on and he still supported this organization.

2        So I think it goes to intent, their degree of support,

3    the fact that even knowing all of this, that they would still

4    support this organization, and I think that is a part of this

5    offense.

6            MR. DRATEL:  Your Honor, it is not part of the

7    offense.  It is not illegal to support Hamas.  Your Honor has

8    stated the offense.  This is designed exactly what Your Honor

9    said.  It is not relevant and, like I said, 403 would keep

10   this out under any circumstances.  There has been so much

11   evidence already.  We have a timeline of suicide bombings.

12   What more do we need about the nature of Hamas?

13           MS. DUNCAN:  This witness' intent is not an issue in

14   this case.  So whether he watched that and then decided to

15   still support Hamas is really largely irrelevant.  It is about

16   the intent of the Defendants.  And they are talking about

17   things on TV that he saw, not things that these Defendants

18   said or things that these Defendants made.  And it is just

19   that we are getting to this huge body of evidence that is

20   really irrelevant for the men on trial here.

21           MR. WESTFALL:  And we are not even talking about a

22   video now that was in the Holy Land possession.

23           THE COURT:  No, he is just trying to get information

24   about Hamas.  And I let you do some, because I think some is

25   appropriate.  But I think you are crossing the line on this

1    one.  I am going to sustain the objection.

2         MS. SHAPIRO:  I just was going to make one comment

3    about the nature of the organization.  The Defense's case is

4    going to focus very heavily on the fact that Holy Land did

5    charity work, so they are really --

6         THE COURT:  Yes, I understand.  But all the jury

7    needs to know about Hamas really is they have been designated

8    a terrorist organization.  That is really what they need to

9    know.  Now, I understand nothing in this operates in a vacuum,

10   so that is why you have gotten into some of what they do and

11   why they are designated, but I think you have gone too far and

12   this goes too far, and I think this is 403 excludable.

13              (The following was had in the presence and hearing

14              of the jury.)

15   Q.   (BY MR. JACKS)  Let me ask you, sir, you have told us

16   that at a point in time the MAYA conventions and the IAP

17   conventions separated or were held separately.  Is that

18   correct?

19   A.   Correct.

20   Q.   Did you ever attend an IAP convention in Chicago?

21   A.   Correct.

22   Q.   And do you know about when that was?

23   A.   I think that was '97 or '98.

24   Q.   And do you recall where that convention -- I am sorry.

25   You said it was in Chicago.  Do you recall where it was in

1   Chicago, what hotel?

2   A.   I think it was close to the Midway Airport in Chicago, a

3   hotel close to there.

4   Q.   And who did you see there that you have testified about

5   earlier in this case?  Did any of the individuals that you

6   have testified about, did you see them there at that IAP

7   convention?

8   A.   Yeah, I saw most of the persons that I know, I saw them

9   there, right.

10  Q.   Did you see the Defendants there, any of the Defendants?

11  A.   Correct, yes.

12  Q.   Which ones do you recall seeing there?

13  A.   I saw Shukri Abu Baker, I saw Mohammad El-Mezain, I don't

14  remember Ghassan, but of course Mufid because of The Rock

15  band.

16  Q.   And as far as -- Do you remember who the speakers were?

17  A.   I remember there was some kind of like what they call the

18  crossfire between Mohamed Siam and Gazi el-Husseini.  Mohamed

19  Siam represented the Hamas view of the current peace process,

20  and Husseini represented the PLO over the peace process the

21  Oslo agreement.

22  Q.   And before I forget, I want to go back to Jamil Hamami.

23  And to your knowledge did he ever leave Hamas?

24  A.   He was --

25              MR. DRATEL:  Object as to foundation, Your Honor.

1          THE COURT:  He may ask that--"To your knowledge did

2    he ever leave."

3          THE WITNESS:  He was kicked out of Hamas, yes, sir.

4    Q.   What was the reason for that?

5    A.   Okay.  I think he was forced out of Hamas in --

6          MS. HOLLANDER:  Objection, Your Honor.  He said, "I

7    think he was."

8          THE WITNESS:  I am saying the year.

9          THE COURT:  Overruled.  Go ahead.

10          THE WITNESS:  I am talking about the year.  I think

11    it was '94.  But he was forced out of Hamas in I think the

12    year '94 or '95.  But the reason for that was because there

13    was a conference held in Copenhagen, Denmark called the

14    Intellectuals Peace Conference, intellectuals from among the

15    Israelis and among the Palestinians, to discuss the issue of

16    coexistence between the two people, the Israelis and the

17    Palestinians.  And Jamil Hamami attended that conference and

18    he was not supposed to attend the conference because he

19    represented Hamas, and he was forced out of Hamas.

20    Q.   Did Hamas ever make any public statements that you saw in

21    your work with the IAP or the Holy Land Foundation?

22    A.   Yeah.  I heard read that in the newspaper, and then later

23    on it was on the islamicinfo.info.  That is one of Hamas'

24    websites in London.

25    Q.   What is the name of the website?

```
 1   A.    Palestine which is P-A-L-E-S-T-I-N-E, palestineinfo.info.

 2   Q.    And whose website is that?

 3   A.    That is for Hamas website in London, United Kingdom.

 4   Q.    Did Hamas in any of its publications make a statement

 5   about Jamil Hamami being kicked out?

 6   A.    Yes, sir.

 7   Q.    What kind of publications did you see that in?

 8   A.    It was a statement that Jamil Hamami is no longer -- It

 9   was from what you call the media center or media office, that

10   Jamil Hamami is no longer with the Hamas group.

11   Q.    Where did you see that?  What type of documents or

12   publications did you see that statement produced in?

13   A.    That was later in '96, the internet was becoming popular

14   but slow, so it was on the website that I gave you.

15   Q.    Were there magazines or newsletters published by the IAP?

16   A.    Yes, there was a newspaper published by the IAP.

17   Q.    And you said the IAP was a part of Hamas after the

18   Intifada.  Is that correct?

19   A.    Correct, yes, sir.

20   Q.    What magazines or publications were put out by the IAP?

21   A.    There is a newspaper, monthly newspaper called the

22   Al-Zaytouna, the olive.

23   Q.    Al-Zaytouna?

24   A.    A-L  Z-A-Y-T-O-U-N-A.

25   Q.    What other publications were put out by the IAP?
```

1   A.   They had also other books, tapes, songs, songs and tapes,

2   and things kind of --

3   Q.   I am talking about newspapers or magazines.  What other

4   newspapers or magazines did you receive?

5   A.   Before Al-Zaytouna there was a publication, a bi-weekly

6   publication called Illa Falistine to Palestine.  It was eight

7   by eleven newsletter, about probably 20, 15 pages, before

8   Al-Zaytouna came.  And also they were sponsoring a magazine

9   called Falistine al-Muslimah A-L  M-U-S-L-I-M-A-H, the Islamic

10  Palestine.  This magazine is published in London, United

11  Kingdom.  They used to sponsor getting this magazine here and

12  distribute it to members for subscription.

13  Q.   And was that considered a Hamas publication?

14  A.   Yes.

15  Q.   And you said the IAP distributed it in the United States?

16  A.   Correct.

17  Q.   Was it in Arabic or English?

18  A.   It was in Arabic.

19  Q.   And with regard to Illa Falistine, was that considered a

20  Hamas publication?

21  A.   It was mainly -- Not mainly, totally about Hamas, yes.

22  Q.   And did the Occupied Land Fund or later the Holy Land

23  Foundation advertise in those publications?

24  A.   Correct, yes.

25  Q.   Were you ever represented or listed as a Holy Land

1    Foundation representative?

2    A.    In Georgia, yes.

3    Q.    In Georgia?

4    A.    Correct.

5    Q.    And were there other representatives around the country

6    that were similar to you?

7    A.    Right.

8    Q.    Have you ever in the time that you were -- Have you ever

9    made trips to Dallas in connection with any of these

10   activities with regard to the Holy Land Foundation?

11   A.    Correct.

12   Q.    How many trips to Dallas did you make?

13   A.    I made one trip in 1998.

14   Q.    And what was the purpose of the trip?  What was going on?

15   A.    There was a conference held by Holy Land Foundation in

16   Dallas here, and there were some people called to attend that

17   conference from the United States and outside the United

18   States.  And from the United States I was invited.  Outside of

19   the United States there were people from different countries

20   and there were people, officials from the government of the

21   Palestinian Authority, the Jordanian government, the Lebanese

22   government.  Officials were present at that conference.

23   Q.    Did you see the Defendant Mohammad El-Mezain did you see

24   him there?

25   A.    Correct.

1    Q.    Shukri Baker?

2    A.    Correct.

3    Q.    Ghassan Elashi?

4    A.    Correct.

5    Q.    Do you recall if Mufid Abdulqader was there?

6    A.    No.

7    Q.    And how about Abdulrahman Odeh?  Do you know if he was

8    there?

9    A.    I don't really recall him being there.

10   Q.    And what was the focus or the subject matter of this

11   conference?

12   A.    Now, when Shukri started talking about the aim of the

13   conference was that the Holy Land Foundation now is trying to

14   move from like just like a regular organization to be an

15   official organization within, he mentioned the United Nations,

16   that they will have charter with the United Nations as a

17   non-profit organization, the NOGs [sic}, and also start

18   dealing directly with the officials in the countries instead

19   of dealing with the organizations, such as the Islamic Society

20   and so on, but now they will start dealing with officials in

21   the Palestinian Authority, the Jordanian government, the

22   Lebanese government.  That is why they were invited to that

23   conference.

24   Q.    During this time, however, was the Holy Land Foundation

25   still supporting the same organizations that it had

1   previously?

2   A.   Correct.

3           MR. DRATEL:   Objection, Your Honor; the same

4   objection.

5           THE COURT:   Overruled.

6   Q.   (BY MR. JACKS)   Was Shukri Baker the moderator or master

7   of ceremonies of this meeting?

8   A.   Correct.

9   Q.   I believe you mentioned you were familiar with an

10  individual named Sheikh Kofahi.   I think you named him

11  earlier.

12  A.   Yes.

13  Q.   Was he an individual that the Holy Land Foundation

14  brought to the United States to speak and raise money?

15  A.   Correct.

16  Q.   And did you ever see him in Georgia?

17  A.   He came I think two times to Rome.

18  Q.   And did anyone from the Holy Land Foundation come with

19  him?

20  A.   No, the two times he came by himself.

21  Q.   Do you know how he -- Did the Holy Land Foundation have

22  any involvement with his coming?   Did they pay for his trip or

23  let you know or arrange it?

24          MR. DRATEL:   Objection, Your Honor; leading and

25  basis; foundation.

1          THE COURT:  Do you want to rephrase, counsel?

2     Q.   (BY MR. JACKS)  What, if any, involvement did the Holy

3     Land Foundation have with him coming to Rome, Georgia?

4     A.   They paid for his ticket and they paid for his coming to

5     the United States.

6     Q.   And what was -- Who was he raising money for?

7     A.   For the Holy Land Foundation.

8     Q.   And did he do that in Rome?

9     A.   Yes, sir.

10    Q.   And I am sorry.  You said this was about what time?

11    A.   I think this was in '99.

12    Q.   And do you recall -- Did he give a speech or speeches

13    while he was in Rome?

14    A.   Okay.  When Kofahi came into Georgia, we had two

15    functions; one in the city of Atlanta where there was also --

16    It was during Ramadan.  We had iftar there for the fasting,

17    and people came in and donated money and he was -- There was

18    collection of $80,000 in the city of Atlanta.  Then we had him

19    in Rome, and the same thing.  We did the same program in Rome

20    on a small scale, and there was about the same amount of money

21    collected in the city of Rome.

22    Q.   And was anyone from the Holy Land Foundation present at

23    either one of those fundraising events, either in Atlanta or

24    Rome?

25    A.   No.

1    Q.    Were they aware of them?

2    A.    Yeah, yeah.  Me and Haitham were in contact during Kofahi

3    visit to Georgia.

4    Q.    And how much money was -- If you recall, about how much

5    money was raised by Sheikh Kofahi on that trip to Rome?

6    A.    That is what I am saying.  In Atlanta I think it was

7    about like $86,000 and in Rome about the same amount, about

8    $80,000.

9    Q.    Was there any response or reaction to the amounts raised

10   by anyone from the Holy Land Foundation?

11   A.    They praised it.  I mean, I am sorry, if I understand the

12   question correctly.

13   Q.    Well, did anyone in the Holy Land Foundation say anything

14   about the amounts raised in Atlanta versus the amounts raised

15   in Rome?

16   A.    Oh, yeah.  I remember Haitham made a statement that

17   Atlanta now is becoming better than Rome in collecting money,

18   because Haitham made a statement -- Because this was in '98.

19   Around '96 or '97 I think the amount of Rome was like $50,000

20   $60,000 and wasn't the usual $100,000 or $150,000, and so it

21   looks like now Atlanta is becoming a competitive place with

22   Rome.

23   Q.    Did Sheikh Kofahi talk about Hamas?

24   A.    To be honest, in these two trips he did not mention Hamas

25   by the name.  His main concern was the collection of money to

1    the Holy Land Foundation.

2    Q.    Did he talk about jihad?

3    A.    The jihad by money, yes.

4    Q.    And what did he say about jihad by money?

5    A.    That this is an obligation.

6    Q.    And did he say anything about the Holy Land Foundation to

7    the audience?

8    A.    Yes.  He was always praising the Holy Land Foundation as

9    "This is your clean hands or clean middle hand to take your

10   money to the needy and the poor in the occupied territories."

11   Q.    During the time that you were involved with either the

12   Occupied Land Fund or the IAP or the Holy Land

13   Foundation, -- Strike that.

14        You have testified that the IAP when Hamas was created

15   became a part of Hamas.  Is that correct?

16   A.    Correct.

17   Q.    And what would be your testimony with regard to the Holy

18   Land Foundation as to its relationship?  Was it a part of

19   Hamas?

20   A.    Correct.

21             MR. DRATEL:  Objection, Your Honor; same bases.

22             THE COURT:  Overruled.  Go ahead.

23   Q.    (BY MR. JACKS)  What was your answer?

24   A.    Correct.

25   Q.    And the places where the money that was received by the

1    Holy Land Foundation before the designation of Hamas and then

2    after the designation of Hamas, was that ultimately the same

3    -- for the benefit of the same organization?

4    A.   Correct.

5    Q.   You have stated a couple of times that you went to jail

6    and that you are in jail.  You are in custody now.  Correct?

7    A.   Right.  I am custody of the Bureau of Prisons.  Correct.

8    Q.   And what did you do that led to your being in jail?

9    A.   After the closure of the Holy Land Foundation in 2001, I

10   used to get money and send it to my father and to my

11   father-in-law in Gaza.  I asked my father to give money to

12   Ahmed Bhar, Hamas.  I am sorry.  Ahmed Nimer in Khan Yunis,

13   and my father-in-law to give money to Ahmed Bhar in Gaza city.

14   Q.   Are both of these men Hamas leaders?

15   A.   Correct.

16   Q.   What about with regard to your employer?  Did you take

17   money from your employer?

18   A.   Correct.

19   Q.   And what was your job at Alexandria Carpets, or whatever

20   the company was called?

21   A.   I was really doing too many jobs there.  I was overseeing

22   the shipping, accounts receivable, accounts payable.

23   Q.   And how did you take money from your employer?

24   A.   With the commission on the shipping overseas.

25   Q.   Did you inflate the commission?

1   A.    Right.

2   Q.    And were you working with someone else in another company

3   to accomplish this?

4   A.    Correct.

5   Q.    And these inflated commissions, what would you all do,

6   you and this other person, what would you all do with this

7   money?

8   A.    This is like a kickback commission on the shipping, that

9   he will take a portion of it and I will take a portion of it.

10  Q.    Did you -- How much money did you end up acquiring by

11  that method?

12  A.    About $240,000.

13  Q.    And what did you do with some of that money?

14  A.    Some of the money I used it in my home, other was sent

15  overseas.

16  Q.    Did you build an apartment in Gaza?

17  A.    Correct.

18  Q.    Did you put an addition onto your house?

19  A.    Correct.

20  Q.    Did you pay your bills with that money?

21  A.    Correct.

22  Q.    And did you -- Obviously you kept this from your

23  employer.  This was done without his knowledge or consent.

24  Correct?

25  A.    Correct.

1  Q.   And were you eventually charged in federal court with a

2  crime?

3  A.   Correct.

4  Q.   And were you charged with providing material support to

5  Hamas through the Holy Land Foundation?

6  A.   Correct.

7  Q.   Did you plead guilty to that charge?

8  A.   Correct.

9  Q.   And were you sentenced?

10  A.   Correct.

11  Q.   What sentence did you receive?

12  A.   Ninety-two months.

13  Q.   Ninety-two months?

14  A.   I pleaded guilty for 15 years.  They brought it down from

15  life to 15, and then to 92 months.

16  Q.   In your pleading guilty to the charge of providing

17  material support to Hamas through the Holy Land Foundation,

18  the charge of defrauding your employer, was that also taken

19  into consideration in that case?

20  A.   Correct.  That the money should be paid in restitution

21  back to the company.

22  Q.   And was that part of the judgment in the case that you

23  had to make restitution to your employer?

24  A.   Correct.

25  Q.   And in your plea agreement did you make any agreements

1   with the Government about what you would do if asked by the

2   Government?

3   A.    Yeah.  The plea agreement is to say the truth and to

4   being honest in saying the truth.

5   Q.    Did the Government ask you or indicate to you that it

6   might interview you or perhaps call you as a witness in other

7   cases in areas in which you might have knowledge?

8   A.    Correct.  That is when we started, the plea agreement

9   came down from life to 15, that you will be called to testify

10  in cases.  Right.

11  Q.    And the prosecuting office that this agreement was struck

12  with was which prosecuting office?

13  A.    The Atlanta Rome prosecution office.

14  Q.    And of the U.S. Attorney's Office in Atlanta?

15  A.    Right.

16  Q.    And what was your understanding about what was expected

17  of you if asked by the Government?

18  A.    The Government asked me in order for them to recommend

19  this kind of reduction to the federal judge, that I will be

20  called to testify, and my testimony that I should say the

21  truth.

22  Q.    And what would the Government -- Did the Government make

23  any kind of agreement as to what it would do if you complied

24  with their request, if they were to call you as a witness

25  anywhere and you were to testify, did the Government make any

1    kind of agreement as to what action they would do in exchange

2    for that cooperation?

3    A.    They would recommend a sentence cut to the federal judge.

4    Q.    What is your understanding about whether or not the judge

5    has to accept that recommendation or whether he can do

6    something else?  What is your understanding?

7    A.    He can either approve it or disapprove it.

8    Q.    What is your understanding about who decides, first of

9    all, whether your sentence is changed at all?  What is your

10   understanding about who decides that?

11   A.    That is the federal judge.

12   Q.    And what is your understanding about who decides how

13   much, if any, sentence change you would get?

14   A.    The federal judge.

15   Q.    Was there a period of time after you pled guilty that you

16   were not sent to prison, not incarcerated, and -- Let me ask

17   it one step at a time.  Was there a period of time after you

18   pled guilty that you were not incarcerated right away?

19   A.    I was taken into the custody of the FBI.

20   Q.    And during that time period were you meeting with either

21   FBI agents or prosecutors?

22   A.    Correct.

23   Q.    And about how long did that time period cover?

24   A.    About four months.

25   Q.    And after that time period did you at some time report to

1   a federal prison to start serving your sentence?

2   A.   Correct.

3          MR. JACKS:  May I have a moment, Your Honor?

4          THE COURT:  Yes.

5   Q.   (BY MR. JACKS)  Sir, with regard to the testimony that

6   you gave yesterday and today, have you told the truth

7   according to the -- As you are expected and were requested to

8   do?

9          MR. DRATEL:  Objection, Your Honor; bolstering.

10         THE COURT:  Overruled.  Go ahead.

11         THE WITNESS:  Yes.

12  Q.   (BY MR. JACKS)  And I may not have made this clear, but I

13  wanted to ask you, you said that before Hamas was designated

14  and then after Hamas was designated, the Holy Land Foundation

15  gave to the same organizations.  Is that correct?

16  A.   Correct.

17  Q.   And who was -- Who benefited or who controlled or who

18  were those organizations affiliated with?

19  A.   They were founded and controlled by Hamas.

20         MR. JACKS:  I pass the witness, Your Honor.

21         MR. CLINE:  May we approach for a moment, Your

22  Honor?

23         THE COURT:  Yes.

24         (The following was had outside the hearing of the

25         jury.)

1          MR. CLINE:  Mr. Jacks, not unexpectedly, brought out

2    that the man has been convicted and that his plea involves the

3    Holy Land Foundation and his activities with the Holy Land

4    Foundation.  We would like an instruction to the jury that

5    they may consider his conviction only as it bears upon this

6    man's credibility and not as evidence of any Defendants' guilt

7    in the case.

8          THE COURT:  And that would normally be in the

9    Court's charge to the jury anyway, but you want an instruction

10   now?

11         MR. CLINE:  Yes, please.

12         THE COURT:  Anybody ready to start cross?

13         MS. MORENO:  I will be, Your Honor.

14         MR. WESTFALL:  Unless we can just break for the day.

15         THE COURT:  Let's work until 1:00.  Let's work until

16   1:00.

17         MS. CADEDDU:  Not after 1:00?

18         THE COURT:  We are obviously not going to finish the

19   cross, so no.

20         MS. MORENO:  I can finish at 1:00, Your Honor.

21         (The following was had in the presence and hearing

22         of the jury.)

23         THE COURT:  Members of the jury, we will start the

24   cross examination in a minute and work until 1:00.

25      As we discussed, you heard testimony that Mr. Shorbagi

has been convicted of a felony offense related to the Holy

Land Foundation, and the instruction is you may not consider

the fact that he pled guilty to that in any way as to the

guilt or innocence of these Defendants.  In other words, he

has pled guilty.  You will have to make the judgment about

these Defendants based on the evidence that has been presented

here.  That testimony is only admissible so you can consider

his credibility, as to how that might weigh on his

credibility.

     Ms. Moreno?

        MS. MORENO:  Thank you, Your Honor.

CROSS EXAMINATION

By Ms. Moreno:

Q.    Good afternoon, Mr. Shorbagi.

A.    Hello.

Q.    My name is Linda Moreno, and I represent Ghassan Elashi.

A.    Yes, ma'am.

Q.    I am not going to question you really about the

conditions of your agreement with the Government with respect

to your conviction, but I just wanted to make one thing clear

because I can't see you from where I sit.

     I believe that you said that the conviction, as you

understood it, the time that you could serve, it went from

life to 15 years to 92 months so far.  Is that right, sir?

A.    Correct.

1    Q.    Okay.  I want to go back to yesterday when you began your

2    direct testimony with Mr. Jacks.

3    A.    Okay.

4    Q.    And I think that you -- You talked about being born in

5    Khan Yunis.  Correct?

6    A.    Correct.

7    Q.    And I think you were there for the first 18 years of your

8    life?

9    A.    Correct.

10   Q.    Okay.  And then you came to America.  Is that right?

11   A.    Correct.

12   Q.    And correct me if I am wrong, but you talked about

13   growing up under the Israeli occupation.

14   A.    Correct.

15   Q.    And you said that it was all you knew and it was all

16   around you.

17   A.    Correct.

18   Q.    Is that right, sir?

19   A.    Right.

20   Q.    And you talked about that in the occupation what you saw

21   growing up was the destruction and the killing.  Do you

22   remember that?

23   A.    Correct.

24   Q.    Can you discuss that a little more, please?

25            MR. JACKS:  Your Honor, I object to the form of the

1  question.  It is open-ended and doesn't focus on a specific

2  question or answer.  Just "can you discuss that a little

3  more," I will object to it.

4       THE COURT:  I will overrule it at this point.  Go

5  ahead and answer that.

6  Q.  (BY MS. MORENO)  Thank you.

7  A.  I am sorry.  Say the question again, please.

8  Q.  I am asking you to describe what you saw and what you

9  experienced when you talked to Mr. Jacks about growing up

10  under the occupation.

11  A.  Okay.  In 1948 when Israeli came to exist, a lot of

12  Palestinians were forced to leave their homes from big cities

13  such as Haifa and so on, and those people were forced to leave

14  their homes and live in refugee camps in the Gaza Strip and

15  West Bank, or refugee camps, Lebanon.  They are still since

16  1948 living in refugee camps.

17       My father originally is from Khan Yunis.  My mother was

18  one of the ones who was forced to leave their home in Haifa

19  and lived in Khan Yunis.  So my father is a resident of Khan

20  Yunis, and we have a farm there.  My mother is a refugee from

21  Haifa.  But so -- We never lived in the refugee camp.  We

22  lived in a home, but I have friends in the refugee camps, so I

23  used to go visit these friends.

24  Q.  When you say the refugee camps, Mr. Shorbagi, this is a

25  refugee camp in Khan Yunis where you are from?

1   A.    Yes, ma'am.  There is a refugee camp I used to have

2   friends that I would go by and visit, or the school I attended

3   going through it --

4           MR. JACKS:  Your Honor, again I object to the

5   narrative.  This was not the subject of my questions.  His

6   answers were non-responsive to my questions, if the Court

7   would like to look back, and so I object to the narrative.

8           THE COURT:  Okay.  Well, at some point you have go

9   back to question and answer, but I overrule that objection.

10  Go ahead.

11  Q.    (BY MS. MORENO)  You can answer, sir.

12  A.    So yes.  What was your question about the refugee camp?

13  Q.    You established that the refugee camp where you had

14  friends was in Khan Yunis.  Is that correct?

15  A.    Correct, yes.

16  Q.    And you were talking about growing up and what you saw in

17  terms of the occupation there before you left and came to

18  America.

19  A.    Correct.

20  Q.    Let me ask you something.  You -- You talked about going

21  to jail, and you talked about your three-year-old son

22  yesterday.  Do you remember that?

23  A.    Right, yes.

24  Q.    And I think, sir, you said that your son knows more about

25  Hamas.  Do you remember saying that?

1    A.    Knows more about Hamas, more and Fatah, more than me.

2    Q.    And I think you said something like which uncle is Hamas

3    and which uncle is Fatah.  Do you remember that?

4    A.    Correct.  Because I got cousins working for the Hamas

5    executive force, and I got two nephews working for the Hamas

6    executive force, and I have a brother working for the Hamas

7    border security, and I got other brothers working for Fatah.

8    So the brothers are divided into these two groups.  The

9    cousins are also divided into these two groups, so that is

10   like -- that is the talk of the town, as they say.  So he is

11   around the small cousins or the big cousins or the uncles, so

12   that is the talk of the town.  You have the two groups

13   discussing the issues of Hamas and Fatah.

14   Q.    And Hamas and Fatah are the opposing political parties in

15   the occupied territories.

16   A.    They are the major two groups there.  Correct.

17   Q.    And they are rivals.  They oppose each other.  Correct?

18   A.    That is correct.

19   Q.    And it is not uncommon in families, would you agree, Mr.

20   Shorbagi, it is not uncommon in Palestinian families to have

21   members who are pro-Fatah and members who are pro-Hamas?

22   A.    My father is pro-Hamas my mother is pro-Fatah.  The

23   family is always divided like that.

24   Q.    Now, let me ask you, do you agree with me that people can

25   change their opinions as they get older?

```
 1              MR. JACKS:  Your Honor, I am going to object;
 2    relevance.
 3              THE COURT:  Overruled.  Go ahead.
 4              THE WITNESS:  I am sorry?
 5    Q.   (BY MS. MORENO)  I will try it again.  Do you agree with
 6    me, sir, that as we grow up and we get older, our opinions can
 7    change about things?
 8    A.   Correct, yes.
 9    Q.   People who may have in their youth perhaps supported
10    Fatah, is it your personal experience that you have come
11    across people who have changed their support from Fatah to
12    Hamas, or the other way around?
13    A.   An example of that, I was pro-Fatah.  There was, of
14    course, no Hamas but then later on in the years I changed.
15    Q.   Okay.  And is that an experience that you found common in
16    the Palestinian community where you grow up?
17    A.   Absolutely.
18    Q.   Okay.  So you originally began as someone who was
19    pro-Fatah.  Is that correct?  When you were younger?
20    A.   Fatah was the only organization really in the West Bank
21    and Gaza.  That is like -- The time I grow up in the '70s and
22    the '80s was only Fatah.  There was other PLO factions, but
23    they were not really more of interest to me than Fatah, yes,
24    ma'am.
25    Q.   And in fact, I think in interviews that you have given
```

1    you have actually -- currently you feel that you are not only

2    pro-Hamas but you are also pro-Fatah with respect to your

3    support to certain of their ideas.  Isn't that right?

4    A.    Correct.

5    Q.    And being pro-Hamas, what does that really mean?  When

6    you say you are a supporter of Hamas, what did you mean by

7    that?

8    A.    I mean by that when it comes to the money they are the

9    truly honestly the clean hands there are when it comes to the

10   money.  Fatah is very corrupted people when it comes to the

11   money.  They use their money -- I mean, there are too many

12   examples, but they use their money for their own.  The money

13   is given by United States, by European Union, you talk about

14   hundreds of millions of dollars.

15        Like in the city of Gaza, there is a refugee camp there

16   called the Beach refugee camp.  I have uncles living in homes

17   close to the refugee camp from my mother's side.  So I used to

18   go pray in the mosque there, the Beach mosque.  So I knew the

19   refugee camp is there and the refugee camp.

20        When the Palestinian Authority came in in '94 -- I will

21   give you an example.  Mahmoud Abbas, the current boss of the

22   Palestinian Authority, built a mansion that cost $7 million

23   just two miles away from that refugee camp.  So people still

24   lived in the refugee camp.  The prime minister built another

25   mansion that cost $5 million, and people still lived in the

1    refugee camp.  So those people are terribly corrupted when it

2    comes to money.

3    Q.   You said I think in your interviews that you supported --

4    you were pro-Fatah because you supported the peace programs?

5    A.   Correct.  I supported the two-state solution, which is

6    supported by almost the whole world, including the President

7    of the United States.

8    Q.   So even though you told this jury yesterday in response

9    to Mr. Jacks' question that you are a supporter of Hamas, you

10   are a supporter of the two-state solution.  Is that right?

11   A.   Correct, yes, ma'am.

12   Q.   Now, you told Mr. Jacks yesterday I think that in 1991

13   you went back to Gaza.  Is that right?

14   A.   Correct.

15   Q.   How old were you in 1991?

16   A.   Twenty-seven.

17   Q.   Twenty-seven.  And then you -- I think you said you

18   stayed five months and you got married?

19   A.   Correct.

20   Q.   And then you came back to America.  Is that right?

21   A.   Correct.

22   Q.   Now, in 1991 how many years had the first Intifada been

23   going on?

24   A.   It started in December '87, so it went '88, '89, and part

25   of '90, three years almost.

1    Q.    And in 1991, the Occupied Land Fund, to your knowledge,

2    was collecting donations for the needy in the occupied

3    territories.  Correct?

4    A.    Correct.

5    Q.    And when I say the needy, and you were in the occupied

6    territories in 1991, please describe what you saw with respect

7    to the condition of the people who were being helped by the

8    Occupied Land Fund.

9    A.    Okay.  Israel has a policy of demolishing homes of

10   so-called suspected terrorists, so if someone is doing any

11   kind of activity against the Israeli army, either by throwing

12   stones or molotov bombs, so they will demolish their home.  So

13   you got a family living in a shelter because of a demolished

14   home.

15         You got families there that don't have any resources.

16   You got a lot of needy families there because of the continued

17   closure of the occupied territories that they need the basic

18   needs for living.  So as I said, you got the two groups there,

19   the Hamas and the Fatah, and these two groups try to take care

20   of these needy people.

21         Now, in order for someone like me to send money, I will

22   send money to the Holy Land Foundation and the Holy Land

23   Foundation will send it to these organizations that is founded

24   or supported by Hamas, because I know and they know that this

25   money or that money will reach to the needy people.

```
1   Q.   Let me ask you something.  In 1991 I think you said that
2   you went to Gaza.  Is that right?
3   A.   Yes, correct.
4   Q.   But you didn't go to the West Bank.  Is that correct?
5   A.   I cannot go to the West Bank, no.
6   Q.   And you left when you were 18 years old originally.
7   Correct?
8   A.   Correct.  Correct.
9   Q.   Now, during that 18-year period of time you lived in
10  Gaza.  Is that right?
11  A.   Khan Yunis.
12  Q.   Khan Yunis.  I am sorry.  And did you ever go into the
13  West Bank then?
14  A.   No, ma'am.
15  Q.   So you have never been to the West Bank.  Is that right?
16  A.   Correct.
17  Q.   And you have never visited, then, any of the zakat
18  committees personally in the West Bank.
19  A.   No, ma'am.
20  Q.   All right.  A few questions about these IAP leaflets and
21  the magazines, the media surrounding the conferences.  You
22  were asked about Palestine Day.  Do you remember that?  You
23  were asked about Palestine Day by Mr. Jacks.
24  A.   Right.  I am sorry.  Yes.
25  Q.   The Palestine Day that -- I guess it was one day that was
```

1  devoted to the issues of Palestine.  Is that correct?

2  A.   Correct.  That is during the MAYA convention.  Correct.

3  Q.   During the MAYA convention.  And during that particular

4  day was there education going on about what the conditions

5  were in Palestine?  Is that fair?

6  A.   Correct.

7  Q.   Okay.  And that was through books and videos and

8  leaflets.  Is that right?

9  A.   Correct.

10  Q.   And through speeches.  Correct?

11  A.   Correct.

12  Q.   And now, you indicated at some point in time you were

13  assigned to the media, that you were assigned to watch

14  American television.

15  A.   Correct.

16  Q.   Do you remember that?

17  A.   Correct.

18  Q.   During this period of time when the Palestine Days were

19  being organized at these conventions, and as someone who was

20  watching the media, did you see that the conditions in

21  Palestine were being accurately reported in the American

22  media?

23  A.   During the first Intifada, the '88, '89, '90, '91, that

24  is correct.  There was an accurate presentation, because it

25  was like a full coverage of what is going on in the stone

1    throwing and demolition of homes and so on.  That is correct.

2    Q.    What about the second Intifada?

3    A.    No.

4    Q.    No meaning?  What do you mean by no?

5    A.    Okay.  I will tell you.  Like there is a scale there.  I

6    would say the coverage of the first Intifada in the United

7    States media was probably 80 percent.  The second Intifada was

8    probably five percent.

9    Q.    And when you talk about the stone throwing in the first

10   Intifada, you are talking about some of those pictures that we

11   have seen in the videos of people throwing stones at tanks.

12   Is that right?

13   A.    Correct.

14   Q.    And those tanks were Israeli tanks.  Correct?

15   A.    Correct.  Correct.

16   Q.    Because the Palestinians, they don't have any tanks, do

17   they?

18   A.    No.

19   Q.    Now, you talked with Mr. Jacks about some Holy Land

20   projects in 1994 and 1995.

21   A.    1994 and 1995.  That is correct, yes.

22   Q.    And I think you mentioned, Mr. Shorbagi, food packages

23   and school supplies.

24   A.    Correct.

25   Q.    And what were in those food packages?

1    A.    They had the necessity, needs for the families, like I am

2    not really sure, like rice, wheat or flour, canned vegetables,

3    sugar, tea, stuff of that nature.

4    Q.    And were these -- So these were actually packages of food

5    that were being sent to the occupied territories.  Is that

6    right?

7    A.    No, no.  The money will be sent by the Holy Land

8    Foundation to these organizations we talked about, and these

9    organizations will buy from the stores there or from the

10   business people will buy big amounts buying them wholesale,

11   and then they have a center there and they will divide it into

12   packages inside the territories there.

13   Q.    So it is your understanding that all the food was

14   purchased there in the occupied territories?

15   A.    Correct.

16   Q.    And do you have any knowledge of food, flour, rice, or

17   wheat that was actually sent from outside of the occupied

18   territories to there?

19   A.    I knew that like countries like Egypt and so on sometimes

20   used to send food across the border.

21   Q.    I am talking about Holy Land Foundation.

22   A.    No, ma'am, I am not aware of that, no.

23   Q.    You talked about school supplies, sir.

24   A.    Correct.

25   Q.    And what did you mean by the school supplies?

1    A.    The basic supplies for students in school, like pencils,

2    papers, sometimes because in school you have to buy the

3    textbooks, like for the second grade such and such textbook,

4    so all of this will be in a package, and they will be given

5    like the first grade book for first grade, second grade for

6    the second grade; so these things, the supplies for the whole

7    year for the student.

8    Q.    And that would include backpacks as well, school

9    backpacks?

10   A.    That is correct.  I am sorry.  Yes.  That is correct.

11   Q.    You said that the projects moved from that to the

12   hospital?

13   A.    Yes.

14   Q.    And you described a particular hospital, and I think you

15   said it was moderate.  Do you remember that?

16   A.    Right.

17   Q.    And that this was a hospital in Khan Yunis.  Yes, sir?

18   A.    Correct.  The Peace Hospital.

19   Q.    And that most of the time I think you said there is

20   closure.  What did you mean by that; that the hospital was

21   closed?

22   A.    No, no.  The territory is closed.  When the Israelis took

23   over the Gaza Strip or the West Bank they divided the cities,

24   like Gaza is divided from Khan Yunis by an Israeli military

25   post.  Khan Yunis is divided from Rafah, another city, by an

```
 1    Israeli military post.  And the whole border is sealed, so

 2    nothing can go in or out to Gaza without the permission of the

 3    Israelis.

 4    Q.   And are you saying that even medicine and medical

 5    supplies cannot go into the territories?

 6    A.   Correct.

 7    Q.   And so part of what you knew that the Holy Land

 8    Foundation was doing was actually sending those kinds of

 9    supplies, medical supplies to in particular this hospital?

10    A.   Now, this hospital, the Holy Land Foundation started this

11    hospital not by sending -- Because it was like what happened,

12    they send the money, the money was used to buy the building,

13    and then they used money to buy machines.  I am not really

14    sure.  The machines were bought in Germany or -- Or I am not

15    sure.

16    Q.   Medical machines?

17    A.   Yes.  So the machines were shipped to that building, and

18    then money was sent to buy medication.  I am not sure if they

19    bought medication and sent it to the hospital.

20    Q.   Okay.  You also mentioned the Hebron public library --

21    A.   Correct.

22    Q.   -- was a project of the Holy Land Foundation?

23    A.   Correct, yes.

24    Q.   And this was -- Are there many public libraries

25    throughout the occupied territories?
```

1    A.    No, ma'am.

2    Q.    To your knowledge?

3    A.    No.  Because you got occupation there, there is no supply

4    of public libraries.

5    Q.    You mentioned the wells project.

6    A.    Yes.

7    Q.    And you are talking about clean water when you are saying

8    wells.  Correct?

9    A.    Correct.

10   Q.    What is the problem with clean water in the occupied

11   territories?

12   A.    It is not the problem of clean water.  There is no supply

13   of water, so people has to really go to other places to buy

14   their water or get their water.  So a lot of communities

15   living in places that they don't have access to water, so

16   building a well in the community that will save them a lot of

17   headache by going to other places and get the water.

18   Q.    Because there is no infrastructure for that, sir?

19   A.    Correct.

20   Q.    And finally, I think in one of your interviews you were

21   talking about the situation in the occupied territories, and I

22   think you said if you leave people with no hope they will do

23   terrible things.  Do you remember saying that?

24   A.    In one of my interviews?

25   Q.    Yes.

1    A.    Correct, yes, ma'am.

2    Q.    Do you agree with me that when you feed people, and you

3    give them water, and you give them books, that you give them

4    hope, sir?

5    A.    Correct, yes.

6    Q.    All right.

7           MS. MORENO:  Pass the witness.

8           THE COURT:  Let's go ahead and break here for the

9    day, and see you back Monday morning at 9:00.  Please recall

10   the instructions we have been over about not discussing the

11   case with anyone.

12         Let's keep it quiet.  I am talking to the jury, and we

13   need to be quiet until we finish.

14         Please recall the instructions that we have been over.

15   Do not discuss the case with anyone or let anyone talk to you

16   about it, watch any reports about it.  And we will see you

17   back Monday morning, 9:00.

18           (Whereupon, the jury left the courtroom.)

19           THE COURT:  I have to ask the people coming into the

20   courtroom, yesterday we were having a hearing up here with the

21   lawyers and we couldn't hear.  There are so many people in

22   here, and I don't want have to close the courtroom, but we

23   need to make sure while we are in here we don't make a lot of

24   noise.  Don't talk.  There is business being transacted.

25         And you are welcome to be here, entitled to be here, but

1    we have to have an atmosphere where we can operate and do what

2    we need to do here.  So I ask you to remember that when you

3    are ready to start talking to someone, wait until you move

4    outside the courtroom.

5         Let me see the lawyers up here for just a minute.

6              (The following was had at the bench.)

7              THE COURT:  Was there some issues we needed to

8    address that we discussed about saving for the break?

9              MR. DRATEL:  The redaction issue on the 302s.

10             THE COURT:  Right.

11             MR. WESTFALL:  I had my one issue on the exhibits.

12             THE COURT:  What was that?

13             MR. WESTFALL:  There is evidence out there, and it

14   came in in the last trial, that my client Abdul Odeh sponsored

15   children of a guy named Yehya Ayyash.  We were given our

16   exhibits and our exhibit list before trial.  Of course, I am

17   very interested in that issue.

18        I combed through those exhibits and there was not a

19   single scrap of information about my client's relationship

20   with Ayyash, and it was so noticeably absent that I concluded

21   that they had made a strategic decision that they weren't

22   going to do that, for one reason or another.  It is a bit of a

23   double-edged sword, so it is not an unreasonable decision for

24   them to make.

25        I made the decision I was not going to open on it, I

didn't open on it, I have never mentioned it to the jury, and the first time I have ever seen anything in this trial about it was on Tuesday, actually in an unrelated exhibit. It mentioned that my client had an orphan in some of the Deeb Anees stuff. Okay? Well, then yesterday we get exhibits that were not included on the exhibit list and these --

THE COURT: Which exhibit list? Like the original?

MR. WESTFALL: Or any amended list, any since then. And in there this is the exhibits they are going to prove up that the Holy Land Foundation gave money to special segments, and in this proof they are going to prove that my guy sponsored this orphan.

Now, I have spoken with Barry about this. I am not imputing any sort of malice aforethought or anything like that, but I have relied, clearly to my detriment, on their list, and I ask the Court to please consider excluding that one fact. It will not affect their proof on the special segments one little bit. It wouldn't affect the fact that the Holy Land Foundation actually supported the children of Yehia Ayyash. The only fact I am asking to be excluded is the fact my client sponsored him. That is the only fact, and it won't affect their proof on anything.

MR. JONAS: It does. It affects his client. And let me start off and do the mea culpa. I thought these were on the exhibit list. It is my fault that they weren't. It is

1    a group of exhibits pertaining to a certain portion of Agent

2    Burns' testimony.  The fact that I left off this group when I

3    transmitted my exhibits to our support staff to create the

4    exhibit list, it was inadvertent and I apologize for that.

5         Clearly this issue isn't something that is a surprise to

6    the Defense attorneys.  Obviously Mr. Westfall said he was

7    looking for the issue in the original list, so he knows that

8    it is out there.

9         As soon as I realized the error, which was the other day,

10   I immediately instructed our support staff to gather the

11   exhibits, give them new exhibit numbers, put them on a disk,

12   and we have since turned them over.

13        So as far as Mr. Westfall's reliance on them in his

14   opening, the fact that he hasn't said anything at all about it

15   in the opening, I don't think this is to his detriment.  He

16   can certainly address it in closing.  It is not as if he went

17   in opening and said, "My client didn't support any children

18   who were the children of terrorist leaders."

19             MR. WESTFALL:  That would have been suicidal.

20             MR. JONAS:  I know.  So I don't think -- It is

21   almost a neutral fact.  He can cover it in his closing.  There

22   is no prejudice or harm.  I apologize to the Court and Defense

23   counsel for turning this over late.  It is my mistake.  Here

24   we are.  We turned it over a week before we are going to get

25   into it in Agent Burns' testimony.

1           MR. WESTFALL:  Well, I mean --

2           THE COURT:  Anything else on that?

3           MR. WESTFALL:  Like I said, I mean, the fact

4    remains, and whether it was pure hard empty head or a

5    strategic decision on their part, I am not even arguing that.

6    I am just saying that there is more -- There is more than just

7    one little -- I mean, the fact that the entire class of proof

8    as to that relationship between Yehya Ayyash and my client is

9    missing, and it wasn't just like one little exhibit and there

10   is -- The entire universe was missing.  And I mean, I thought

11   the whole reason for exhibit lists and all that was so that we

12   could rely on them.  And that is what I did.  And the absence

13   of that one little fact wouldn't affect their overall, you

14   know, strategy, so I am asking the Court to exclude that one

15   fact.

16          THE COURT:  All right.  Let me get back to that one.

17   We have this list now.

18          MR. WESTFALL:  Yes, sir.  And this was the only

19   exhibit that I could find that actually -- There are some

20   others that kind of mention both of them, but it doesn't

21   matter.  This is the one -- did you find that other one?

22          MR. JONAS:  There is nothing -- There is other

23   pieces of the puzzle that don't mention it, like you just

24   said.  They -- It is several exhibits I have to put together

25   to come to the fact that Mr. Westfall's client was supporting

another orphan and immediately dropped that orphan to start

sponsoring the orphan of Yehia Ayyash once he was killed by

the Israelis.  So these other pieces we have to put them

together.  I don't think there is one that is as clear as the

one that Mr. Westfall is currently objecting to.  That has

Mr. Odeh's name on it.  If you turn the page you can see

that -- And there is a reference to a particular child.

MR. WESTFALL:  Where is the evidence that he like

immediately dropped, because that is your theory, that he

immediately dropped an orphan.

MR. JONAS:  Maybe immediately is not the right word.

MR. WESTFALL:  I am talking about these actual

documents.

THE COURT:  So these are the actual documents that

you are objecting to?

MR. WESTFALL:  Just that one.

MR. JACKS:  Your Honor, I think there is other

issues to be considered.  This evidence was presented in the

first trial, as Mr. Jonas said, so he knew it was out there.

He knew it existed.  He knew the Government had presented it.

He certainly could have asked, you know, before he looked and

didn't see it in there, he could have asked and said, "Are you

going to go into this," and it would have brought it to our

attention.

But secondly, I mean, his statement that this has altered

1    or changed his trial strategy, that is not apparent to us.

2    And so it is not something that is obviously visible.  And

3    again as I said, even if the development had been that at mid

4    trial we thought, "Okay.  This is something that we need to,

5    now that we are in here and we see the way the issues are

6    being framed," we would have been free to go get this evidence

7    and use it.  So I don't know that you can restrict the other

8    side from presenting evidence that you know about, you know it

9    exists, you know how it was intended to be used by the

10   Government, and then somehow come in and say, "Well, this is

11   my trial strategy.  I am not going to tell you what it is, but

12   this affects my trial strategy, and, therefore, you, the other

13   side, shouldn't be able to use this evidence."

14       And again his statement that this doesn't affect your

15   case is a very erroneous statement, because if you --

16            THE COURT:  Not accurate, from your perspective.

17   All right.

18       Anything else on that, then?  Okay.

19       I mean, you are not saying you would have tried the case

20   any differently up to this point.

21            MR. WESTFALL:  Well, sure I would have.  I would

22   have opened on it.

23            THE COURT:  Other than opening.

24            MR. WESTFALL:  I would have spoken with Agent Burns

25   about it the first time, which is what I did in the last

trial.  I brought it up to her before she brought it up to me,

which is what I did in the last trial, and they know that.  It

is in the record.

          MR. JONAS:  Agent Burns hasn't testified about this

yet.  She will be testifying about it the next time.

          MR. WESTFALL:  She testified about it in the first

trial because I asked her about it --

          THE COURT:  But you are still going to get that

opportunity to ask her.  I don't know what you are losing

there.

          MR. WESTFALL:  Well, I mean --

          THE COURT:  And opening on it, I mean, if the jury

remembers anything anybody said on opening, I will take that

bet, give or take a statement or two.

          MR. WESTFALL:  I am also carefully cataloging all of

Mr. Jacks' arguments here, because needless to say, I am going

to have to meet this evidence.

          THE COURT:  I understand.  And you don't have an

obligation to ask him about it.  Obviously nobody has an

obligation to ask the other side about it, to call their

attention to something that you may not want in there either.

So that is not an issue.

     I think primarily -- I take what you say at face value,

so it is not a bad faith issue, and I don't see the prejudice.

          MR. WESTFALL:  I am trying to be a very careful to

1    not argue that is not bad faith.

2         THE COURT:  And you made that clear up front.

3         MR. JONAS:  And I think Mr. Westfall knows that I am

4    trying to be open and honest with all Defense counsel whenever

5    they ask me questions.

6         THE COURT:  Well, this is a big case.  I mean, lots

7    of things have happened as far as exhibits and the like.  But

8    I think -- I am not going to find bad faith.  And I don't see

9    any prejudice.  You still are entitled -- I think you will be

10   able to do whatever you are going to do with it in crossing

11   Agent Burns.  You still have that opportunity, and then you

12   can address it in close.  I don't see any prejudice to you, so

13   likely I am going to let it in.  I will give it a little

14   thought, but that is what I am thinking right now.

15        MR. WESTFALL:  You will see the prejudice when it

16   happens.

17        THE COURT:  I am sure I will.  That is right.

18        MS. MORENO:  Your Honor, on the issue of exhibits,

19   Ms. Shapiro and I do have those exhibits, and I think you were

20   going to --

21        MS. SHAPIRO:  Right.  I pulled the prior filings

22   just to save your staff from having to do that.  I also pulled

23   the motions you filed.  That is what I was going to show you

24   so you could check to see that all your filings were in there,

25   and then we can just tender them to the Court so you will have

1    those.

2              THE COURT:  When are you going to be able to do

3    that?

4              MS. SHAPIRO:  I have them right here.  And I can

5    show them to you and you can check to see that those are in

6    there.

7              THE COURT:  Good.  And this is on -- Who are these

8    exhibits on.

9              MS. SHAPIRO:  Major Lior.

10             THE COURT:  And he is coming up first thing Monday?

11             MR. DRATEL:  So we are interrupting?

12             THE COURT:  We are going to interrupt.

13             MS. SHAPIRO:  But he will be short?

14             MR. DRATEL:  How long for your direct?

15             MS. SHAPIRO:  About an hour.

16             THE COURT:  Your direct will be about an hour, you

17    are expecting.

18             MS. SHAPIRO:  I think so.  I mean, it went a little

19    longer --

20             THE COURT:  You are pretty accurate, unlike another

21    member of your team.

22             MS. SHAPIRO:  Last year we had interpreter issues.

23    We had an interpreter who didn't really speak the language.

24             MS. HOLLANDER:  That is for sure.

25             MS. MORENO:  Ms. Duncan also reminded me that in

1   last year's rulings Judge Fish did keep out some of the

2   Palestinian Authority documents, and there is a --

3           MS. SHAPIRO:  I included the transcript in the

4   materials that I prepared for you.  Also --

5           MS. MORENO:  There is also -- I remember looking at

6   the exhibit list when we first got it a month or so ago that

7   there were photographs that had bin Laden in it.

8           MS. SHAPIRO:  I took them out.

9           MS. MORENO:  Okay.  I just learned that just now

10  when you said it.

11          MS. SHAPIRO:  Well, because when I sent you the

12  exhibit list, if you looked at the exhibits --

13          MS. MORENO:  Which exhibit list, counsel?

14          MS. SHAPIRO:  The one that I sent everybody a few

15  days ago.

16          THE COURT:  How many exhibits total are you --

17          MS. SHAPIRO:  There is about 40.

18          THE COURT:  And how many of those are you objecting

19  to; all 40?  I know you might have some general --

20          MS. MORENO:  No, not necessarily.  I am trying to

21  figure out how early we need to be here Monday morning to

22  address this.

23          MS. MORENO:  At least 8:30.  I would ask the Court

24  to look at all the exhibits.  There is no question about it.

25          THE COURT:  That is what I was getting at.  That is

1    why I need the list today.

2        And then how much time do you think we need to resolve

3    this come Monday morning?

4            MS. MORENO:  I think 8:30.

5            THE COURT:  We will just limit it to that.

6            MS. MORENO:  And I will be prepared to argue.

7            THE COURT:  We have one issue we want to take up,

8    and there are five others we want to take up.

9            MS. SHAPIRO:  Logistically the reason I wanted to

10   put together all the pleadings for you is I think you will see

11   that there has been a fairly exhaustive back and forth, both

12   in the last trial and in the lead-up to this trial with the

13   motions.  So I think if you have that ahead of time, that will

14   short circuit --

15           THE COURT:  It could do that.

16           MS. SHAPIRO:  Also with respect to the exhibits, I

17   have taken many of the Palestinian Authority exhibits out, so

18   when you go through the list I think as you are preparing you

19   will see we are not offering all of the exhibits that we

20   offered last year.

21       And I did pull out any of the photographs of bin Laden

22   that were in there, and compiled, again, a hard copy in a

23   binder for Your Honor so that you have every exhibit that will

24   be moved in, again just to make it easier and shorter.

25           THE COURT:  That will be helpful.

1        MR. DRATEL:  The exhibits themselves are short.  It

2   is not like a hundred pages.  When we say exhibit now we are

3   talking about a page.

4        THE COURT:  Good.

5        MR. CLINE:  Are you finished with that issue?

6        MS. SHAPIRO:  Yes.

7        MR. CLINE:  Your Honor, we had asked you I believe

8   to look at some 302s involving Hamami a while back.  I just

9   wanted to remind the Court about that.  We have heard about

10  Hamami a fair amount, which I think is probably helpful in

11  giving you some context for why we think it is *Brady* or

12  possibly *Giglio* material.

13       THE COURT:  Yes.  And I plan on looking at those

14  this weekend.

15       MS. SHAPIRO:  One final issue.  With respect to the

16  witness on Monday, I have not even been to the overflow

17  courtroom.  I don't know what it looks like or sounds like in

18  terms of the camera direction.  But the camera that they had

19  last year was different than this year.  Where the camera

20  could just be redirected away from the witness, this year I

21  understand the audio and visual are in one machine and they

22  can't really be separated.  And that will be an issue in terms

23  of -- And I don't know if there is anybody up there or --

24       THE COURT:  That brings up that issue.  What do we

25  need to do?  Close the courtroom?  Is that what Judge Fish

1    did, close the courtroom except for immediate family.

2              MS. SHAPIRO:  Except for immediate family.

3              MS. HOLLANDER:  And the other thing he did was he

4    had the witness come in, because he comes with all his

5    bodyguards and dudes.

6              MS. SHAPIRO:  He has no bodyguards.  He has a

7    lawyer.

8              MS. HOLLANDER:  He comes with dudes.  He comes in

9    the back way.  What he did is have them, like you did with the

10   prisoner, and come in and be there so the jury --

11             THE COURT:  We will be here anyway handling an

12   issue, so we will have him in before the jury.

13             MS. HOLLANDER:  Last year the jury did see him a

14   couple of times being escorted in and out, until we got it all

15   worked out.

16             MR. MYSLIWIEC:  He is using an interpreter.

17             MS. SHAPIRO:  There are two interpreters, because

18   they need to switch off.  Apparently that is the protocol

19   because they get tired.

20             THE COURT:  That is typical when people testify.

21             MS. SHAPIRO:  And again, I am hoping direct will be

22   short and it won't be too tedious.

23             MR. CLINE:  I have a scheduling issue that I would

24   like to be up off the record.

25             THE COURT:  Anything else need to be on the record?

1      One more thing and that is with respect to -- This

2  witness is gone.

3      I am a little concerned.  Obviously I let you go into

4  some of the conditions there because he brought it up,

5  responsive or not, he got into, but I don't want that to be

6  construed as opening the door to getting into what I have been

7  limiting out.  So I just wanted to make sure that we don't

8  have to get into that again next week.

9      Some of what he stated is fair ground.  I still don't

10 want to get into a lot of the Israeli-Palestinian politics

11 because I think it is irrelevant, and it just muddles up the

12 case.

13         MS. MORENO:  Your Honor, just so that I can tell the

14 Court what I was thinking --

15         THE COURT:  And I overruled the objections to yours.

16         MS. MORENO:  It is about the need.

17         THE COURT:  I understand.  Right.  But this guy kind

18 of takes off on everything else.  We need to talk to him

19 really more than anybody.  I don't know that that will do any

20 good.

21         MS. CADEDDU:  Speaking of talking to him, Your

22 Honor, he is on cross now, so I just want to make sure we are

23 all clear that he is on his own this weekend.

24         THE COURT:  I just thought about it when he answered

25 a couple of your questions, because you were asking fairly

1   precise questions, but he just wants to just go off.  The only

2   one that I had a question was what the American media is

3   portraying.  I am not sure why that is relevant to anything.

4   I thought of interrupting you, but tell me why you think that

5   is relevant?

6           MS. MORENO:  Because they want to infer insidious

7   terrorist implication into all of the literature, the

8   conferences, the leaflets, the faxes.

9           THE COURT:  What does that have to do with the

10  American media?

11          MS. MORENO:  And they use the term "wanted to get

12  their message out."  Well, you know what?  The Palestinians

13  wanted to get the message out because the message wasn't

14  getting out through the American media.  That is my point, and

15  I think it is a fair point, so that is why I asked the

16  question.

17      Getting the message out, Your Honor --

18          THE COURT:  But what message is it that they are

19  wanting to get out?

20          MR. DRATEL:  What is happening.

21          MS. MORENO:  The need and the suffering of the

22  Palestinians.  Now, you can't ignore -- the reason there is

23  that is because of the occupation.  I mean, we just simply

24  can't divorce it.

25          THE COURT:  Right.  That is why some of that is in

1    there, but we don't want to get into a lot of the details of

2    that in terms of the politics and what is going on.  That is

3    what we want to avoid.  And actually a lot of the details in

4    general.  You are entitled to show there is a need.  I don't

5    think there is any dispute about that.  I understand that is

6    your Defense, that that is what they were trying to meet, but

7    I still am trying to keep it from getting too far out.

8            MR. DRATEL:  I think we will be sufficiently focused

9    with cross on either other areas or areas that are

10   specifically covered in direct that need some clarification

11   with respect to things that.

12           THE COURT:  I just wanted to let you know where I

13   was coming from--that that hasn't changed.

14           MR. WESTFALL:  Can I say something on that?  You

15   remember Mr. Shafik said he reads Arabic newspapers, the idea

16   that these are Hamas papers or a Hamas website, I mean, that

17   is as much of an opinion as saying CNN is a Zionist -- You

18   know.  And everyone has got their own opinion over there.

19       But from the standpoint of like this palestineinfo.info

20   will report actual occurrences, actual things happening that

21   would never get into the mainstream media.  So the fact that

22   somebody is looking at this palestineinfo.info, the quote

23   unquote Hamas website, doesn't necessarily mean that they are

24   Hamas, because they find out what is going on on the street in

25   the middle of Gaza where CNN reporters don't go.  And so that

1    is kind of the idea.

2            MS. MORENO:  Thank you, counsel.  It was a much

3    better articulation.

4            MR. CLINE:  I think, Your Honor, we understand your

5    guidance, and we will comply with it.

6            THE COURT:  Do you want this on the record?

7            MR. JACKS:  No.

8            (Discussion at the bench, out of the hearing of the

9            reporter.)

10                    (End of day.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25