IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA    )  CAUSE NO. 3:04-CR-240-P
                        (
vs.                      )
                        (  OCTOBER 20, 2008
                      )  DALLAS, TEXAS
HOLY LAND FOUNDATION, ET AL  (  9:00 A.M.

_____

VOLUME 21 OF 37

_____

STATEMENT OF FACTS

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

_____

A P P E A R A N C E S

FOR THE GOVERNMENT:  UNITED STATES ATTORNEY'S OFFICE
                      1100 COMMERCE, 3RD FLOOR
                      DALLAS, TEXAS  75242
                      BY:  MR. JIM JACKS
                            MR. BARRY JONAS
                            MS. ELIZABETH SHAPIRO

FOR THE DEFENDANT:  FREEDMAN, BOYD, HOLLANDER,
(SHUKRI ABU BAKER)  GOLDBERG & IVES, P.A.
                      20 FIRST PLAZA, SUITE 700
                      ALBUQUERQUE, NEW MEXICO 87102
                      BY:  MS. NANCY HOLLANDER
                            MS. TERESA DUNCAN

```
 1              FOR THE DEFENDANT:    LAW OFFICE OF JOSHUA L. DRATEL
                (MOHAMMAD EL-MEZAIN)  14 WALL STREET, 28TH FLOOR
 2                                    NEW YORK, NEW YORK  10005
                                      BY:  MR. JOSHUA DRATEL
 3                                         MR. AARON J. MYSLIWIEC

 4              FOR THE DEFENDANT:    LAW OFFICE OF MARLO P. CADEDDU
                (MUFID ABDULQADER)    3232 McKINNEY AVENUE, SUITE 700
 5                                    DALLAS, TEXAS  75204
                                      BY:  MS. MARLO P. CADEDDU
 6
                FOR THE DEFENDANT:    LAW OFFICE OF LINDA MORENO
 7              (GHASSAN ELASHI)      P.O. BOX 10985
                                      TAMPA, FLORIDA  33679
 8                                    BY:  MS. LINDA MORENO

 9                                    JONES DAY
                                      555 CALIFORNIA ST., 26TH FLOOR
10                                    SAN FRANCISCO, CA  94104
                                      BY:  MR. JOHN D. CLINE
11
                FOR THE DEFENDANT:    WESTFALL, PLATT & CUTRER
12              (ABDULRAHAM ODEH)     ONE SUMMIT AVENUE, SUITE 910
                                      FORT WORTH, TEXAS  76102
13                                    BY:  MR. GREG WESTFALL

14              COURT'S LAW CLERK:    MS. JENNIFER HELMS
                                      1100 COMMERCE, RM. 1654
15                                    DALLAS, TEXAS  75242

16              COURT COORDINATOR:    MS. BRENDA WEBB
                                      1100 COMMERCE, RM. 1654
17                                    DALLAS, TEXAS  75242

18       OFFICIAL COURT REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                                      1100 COMMERCE STREET, RM. 1654
19                                    DALLAS, TEXAS  75242
                                      (214) 753-2349
20

21

22

23

24

25
```

# <u>INDEX</u>

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| MAJOR LIOR | |
| Direct By MS. SHAPIRO | 35 |
| Cross By MS. MORENO | 48 |
| Cross By MS. HOLLANDER | 63 |
| Cross By MR. DRATEL | 65 |
| Cross By MS. CADEDDU | 69 |
| Cross By MS. HOLLANDER | 76 |
| Cross By MR. DRATEL | 97 |
| Redirect By MR. JACKS | 122 |
| Recross By MR. WESTFALL | 149 |
| Recross By MS. HOLLANDER | 152 |
| Redirect By MR. JACKS | 155 |

## Government Exhibits

| **Government Exhibits** | **Page** |
|---|---|
| HLF Hebron No. 1 Admitted into Evidence | 45 |
| Jenin Zakat No. 1-7 Admitted into Evidence | 45 |
| Nablus Zakat No. 1-6 Admitted into Evidence | 46 |
| Nablus Zakat No. 7 Admitted into Evidence | 46 |
| Qalqilya Zakat No. 1 Admitted into Evidence | 47 |
| Tulkarem No. 1-7, 9, 10 Admitted into Evidence | 47 |
| el-Isla No. 1 Admitted into Evidence | 48 |
| PA 2, 8, 9 Admitted into Evidence | 48 |

1        THE COURT:  Good morning.

2     Is Mayor Lior still going to be your first witness up?

3        MS. SHAPIRO:  Yes.

4        THE COURT:  Ms. Moreno, good morning.

5     I think we are on the issue that Ms. Moreno has been

6  dealing with, and this is the motion to adopt -- The

7  Government's motion to adopt the Court's previous rulings

8  regarding these exhibits that we are dealing with this

9  morning.

10        MS. MORENO:  May I address the Court, Your Honor?

11        THE COURT:  Yes.

12        MS. MORENO:  I don't know how the Court wishes to

13  take it, but first let me make a record with respect to all of

14  those exhibits that the Government wishes to introduce through

15  Major Lior, and say -- Of course, we urge our previous

16  objections that were filed.  And to make the record clear, we

17  object to all the exhibits on hearsay, confrontation, and 602

18  grounds, lack of personal knowledge.  And with respect to a

19  number of them we have 401 and 403 objections.

20     Particularly troublesome, Your Honor, are the exhibits

21  where the content of them clearly either occurred or was

22  produced after the closure of Holy Land Foundation.  And there

23  are a number of those, if the Court wishes me to delineate

24  those, if I may, Your Honor.

25        THE COURT:  Yes.

1    MS. MORENO:  I don't have them, unfortunately, in

2    alphabetical order.  I will do the very best I can.

3        PA No. 9, which is a letter to the Palestinian Authority

4    identifying the Ramallah zakat committee as belonging to

5    Hamas.  And again the Court would bear in mind that with

6    respect to all of these, I am always asking the Court to

7    consider the hearsay, confrontation, 601, 401, 403 objections,

8    but I am pointing out some of them in particular.

9        This is a letter that is dated December 22nd, 2001, Your

10   Honor.  So we believe that that is certainly a 401 and a 403

11   matter.  Would you just like me to list the post-closure.

12           THE COURT:  Yes.

13           MS. MORENO:  The post-closure, Jenin Zakat No. 1,

14   this is an internal Hamas document written May the 23rd, 2004,

15   which is some three years after the closure of the Holy Land

16   Foundation.

17       Al-Isla No. 1 -- I am not sure about Al-Isla No. 1.  I

18   know that we know.  If I may have a moment?

19           THE COURT:  All right.

20           MS. MORENO:  Let me move on while counsel is looking

21   for that, Your Honor.

22           THE COURT:  All right.

23           MS. MORENO:  Jenin Zakat No. 7 is -- Well, that is

24   an unsigned letter dated May 2003, almost two years after the

25   closure of Holy Land, a year and a half I think, to be

1   perfectly accurate.

2           THE COURT:  These are the exhibits that the

3   Government is offering not for the truth.  Is that correct,

4   Ms. Shapiro?

5           MS. SHAPIRO:  I am sorry?

6           THE COURT:  The Jenin Zakat No. 1 and Jenin Zakat

7   No. 7, those are the documents that you are offering not for

8   the truth, the documents seized from the zakat committees, or

9   am I missing something there?

10          MS. SHAPIRO:  Jenin Zakat No. 1, right, is an

11  internal Hamas document found within the committee, being

12  offered to show that it was at the committee.

13          THE COURT:  As I understand the briefing, and

14  correct me if I am wrong, what was seized from the zakat

15  committees -- Let me go back.  What you are offering, what is

16  in the binder that you gave me Friday, they were either seized

17  from the various zakat committees or the Palestinian

18  Authority.  Correct?

19          MS. SHAPIRO:  That is correct.

20          THE COURT:  And the ones, the documents you seized

21  from the zakat committees, you are not offering those for the

22  truth.  Is that correct?

23          MS. SHAPIRO:  Well, there is one document that we

24  would offer for the truth.

25          THE COURT:  Which one is that one?

1              MS. SHAPIRO:  Or not.  But alternatively that is ICS

2    Hebron No. 1, which would certainly fall within a

3    co-conspirator exception.  It is an internal Hamas document

4    that was found in the ICS Hebron offices, and it is dated

5    January 18th, 2001.  And it talks specifically about using the

6    zakat committees to funnel money for Hamas, and Holy Land

7    supported this committee.

8              THE COURT:  ICS Hebron No. 1, and then the PA

9    documents, those are the ones you are offering for the truth?

10             MS. SHAPIRO:  Yes, Your Honor.

11             THE COURT:  All right.  Go ahead, then, Ms. Moreno.

12   I just wanted to make sure I had the understanding correct.

13             MS. MORENO:  We discussed Jenin Zakat No. 7, Your

14   Honor.

15             THE COURT:  Yes.

16             MS. MORENO:  The Nablus Zakat No. 7, I believe that

17   is a new -- Did you offer that last time?  This is about 55

18   pages, Your Honor, of what the Government terms shahid files,

19   files of suicide bombers, and within those documents they have

20   the dates.  And it appears as I went through the dates that

21   these are also all post-closure of the Holy Land Foundation,

22   meaning that these events occurred after the closure of the

23   Holy Land Foundation, for the most part.

24        So Nablus Zakat No. 7, we would argue, falls into that

25   category.  There is just a few more, Your Honor.  ICS Hebron

1   No. 6.  Again, I believe that is post-closure.

2          THE COURT:  It appears to be April 11, 2002.

3          MS. MORENO:  Yes, Your Honor.  I think the same

4   would be true for ICS Hebron No. 6 and ICS Hebron No. 7.  I

5   believe those are both post the closure.  Tulkarem Zakat

6   No. 4, there is no -- I don't believe -- I don't have the

7   document before me, but I don't believe there is a date on

8   there.  However, the testimony in the first trial indicates

9   that what is being described within that document occurred

10  after the Holy Land Foundation closure regarding some sort of

11  military operation.  So we are talking about events

12  post-December 2001.  The same would be -- And I think it is

13  the same event.  Counsel can correct me if I am wrong.

14         The same would be for Tulkarem Zakat No. 5.  And I think

15  that has a date of March 27th, '03.  The same would be true of

16  Tulkarem Zakat No. 6.  We have Jenin Zakat No. 4 and 5, again

17  post the closure of the Holy Land Foundation.  These are

18  postcards, Your Honor.

19         Now, Jenin Zakat No. 6 is a video of a school graduation

20  ceremony that the Government says was sponsored by the Jenin

21  zakat committee.  This video was made in 2004, three years

22  after the Holy Land Foundation closure.

23         So with respect to that category of exhibits, Your Honor,

24  post the closure of the Holy Land Foundation, should not be

25  admitted, irrelevant, 401, 403, and all the other objections.

1          I would like to point out to the Government that ICS

2    Hebron No. 10, this is a series of what the Government says

3    are Hamas posters from the hard drive of a computer seized

4    from an orphan school in Hebron.  Now, not only is a lot of

5    the content post the closure, but there are photographs of bin

6    Laden within that exhibit, and it was my understanding counsel

7    was not going to move into evidence any of those photographs.

8    On pages 15 and on page 40 we have photographs of bin Laden.

9    So, of course, that would be a 403 objection, a very strong

10   403 objection, Your Honor, with respect to those.

11        May I just have one brief moment?

12             THE COURT:  Yes.

13             MS. MORENO:  And if the Court would accommodate me,

14   if during the testimony of Major Lior I happen to realize that

15   another exhibit is post the closure, I would, of course, be

16   objecting and bringing that to the Court's attention.  I think

17   that exhausts that category.

18        With respect to all the other documents we have our

19   objections, Your Honor.

20             THE COURT:  All right.  Ms. Shapiro?

21             MS. HOLLANDER:  Your Honor, I have some additional

22   objections.

23             THE COURT:  Let me hear your objections, then.

24             MS. HOLLANDER:  Two specifically.  As to Hebron

25   No. 1 that Ms. Shapiro said they might introduce for the

1    truth, if you look at that document it simply is a writing.

2    It has no date, it has no beginning, it has no end.  It is

3    some piece of typewritten paper, and that is all it is, in

4    English and Arabic.  It starts with the words "Missing text,"

5    and near as I can tell it just ends.  So we have no idea what

6    that is.  It hardly is a co-conspirator statement because it

7    is a three or four -- I don't remember how many pages, left in

8    a zakat committee by some unknown person.

9        As to Nablus No. 7 specifically, in addition to what

10   Ms. Moreno said, that is a document that was not used during

11   the first trial, and I again object in addition that the

12   Defense has been denied to search for these documents

13   ourselves.  We filed in April a motion for letters rogatory

14   which has not been ruled on.  The Government's expert Matthew

15   Levitt testified that he was able to go to Israel and look at

16   these documents.  He also testified that he actually had an

17   index from the Government of Israel that we were not even

18   permitted to see.  And the Defense has not been permitted the

19   opportunity to go through these documents that evidently lay

20   individuals can go through, since he did.  So on the grounds

21   of due process, Your Honor, we object to the Government

22   introducing any of these documents.

23       Mr. Jacks said previously at the bench when we were

24   trying to redact one document that we were trying to give the

25   jury a false idea of what the documents show.  We believe that

1    the Government is providing a false idea of these documents by

2    plucking them without the Defense having that opportunity to

3    go through them.

4              THE COURT:  Okay.  Thank you.

5         Ms. Shapiro?

6              MS. SHAPIRO:  Yes.  Let me start with the bin Laden

7    pictures.  We have no intention of using --

8              THE COURT:  Those are out?

9              MS. SHAPIRO:  Yes.  In fact, I pulled them out.  I

10   don't know why they still appear in Ms. Moreno's.  She was

11   probably looking in the exhibit from last year.  I have no

12   intention of introducing bin Laden pictures.  There is a disk

13   of posters from the zakat committees, but I am not going to

14   show anything that depicts bin Laden, so that is a non-issue,

15   I think.

16             THE COURT:  Okay.

17             MS. SHAPIRO:  With respect to the date span, it is

18   our position that these documents are plainly relevant, even

19   if they post-date the closure of the Holy Land Foundation,

20   because what the documents go to show is that the committees

21   are controlled by Hamas, and our position is that these

22   committees were controlled by Hamas beginning in the early

23   '90s, sometimes earlier, but in the early '90s, and all the

24   way through to very recently.  And it goes to the argument

25   that if the committees are Hamas at this early time period and

then they are Hamas at a later time period and then they are

Hamas even post the closure of Holy Land, it is fair for the

jury to believe that they have been controlled by Hamas

throughout this entire period.

So the fact that a week or two after Holy Land closes you

have this sort of material in the committees, and some of the

documents Ms. Moreno pointed to were documents that were dated

a week or two literally after the closure of Holy Land, it is

certainly fair for the jury to believe that if two weeks in

late December of 2001 these committees are Hamas, then it is

certainly fair to believe three weeks earlier they also were.

It is a question that goes to weight, but it is certainly

relevant to the question of whether these committees are part

of the Hamas social infrastructure.

I think the specific exhibits that she cited, several of

them were in 2001, some are 2003, some are 2004. There were

various operations where these documents were seized in '02,

'03 and '04 that I believe this collection comes from, and

those are the documents that we have from the committees.

And as I say, they are relevant to show that there was

this continuation of control by Hamas over these committees.

With respect to ICS Hebron No. 1, that document is dated

-- I think I cited the date. It was of '01, and January 18th,

2001. And this isn't just any writing. This is a very

sensitive internal Hamas document, which is evident from the

content of the document.  It talks about the election of

Khalid Mishal in recent Hamas elections, which is corroborated

by the actual events.  He was elected on those dates, and it

talks about how the outside leadership of Hamas should

communicate with the inside parts of Hamas, and all kinds of

elaborate communication procedures.  And then it has a call

number in Switzerland with a code name to call into at the end

if there is a need for contact.

It is clearly the kind of document that you would not

expect a nonpartisan, ordinary charity to have in its

possession, and it is clearly relevant and it is clearly a

co-conspirator statement.

The other general objections I think are going to have

been addressed thoroughly in previous pleadings, but relevance

is clear.  I don't think there is anything 403 in these

documents.  These are the committees that Holy Land gave its

money to.

And with respect to authentication, we have gone to great

effort to bring a witness to authenticate them, and the

testimony will show that the documents are what they purport

to be, certainly by a preponderance.  And that burden is not

an especially high one to meet in any event, but we have more

than met it, we believe.

And there was an objection to his personal knowledge, but

he is the commander of the unit that seized these documents,

1   and there is a military chain of command and there are orders

2   that were followed, and he will testify to that procedure.  I

3   think that more than satisfies the chain of custody.

4       And I think that covers the range of objections.  If Your

5   Honor has any specific questions on the documents, I am happy

6   to answer them.

7           THE COURT:  No.  That is fine.  You gave me copies

8   of the motions that have been filed previously, as well as the

9   Government's motion that was filed back in May of this year to

10  adopt, and I have read those so I don't need to hear

11  additional argument.

12      I am going to overrule the objections.  I think the

13  exhibits are admissible.  I think they are relevant.  And with

14  respect to the PA documents and those that you are offering

15  for the --

16      Yes?

17          MS. SHAPIRO:  I am sorry.  I completely forgot to

18  address those and I did want to address them separately.

19      Last year we offered a large number of PA documents under

20  the 807 catch-all hearsay exception.  This time we are

21  offering just three, and the ones we are offering I think have

22  clear indicia of the reliability.  They are on PA stationery

23  or reflect the PA office in it.  And they, again, are the

24  kinds of documents that the Federal Rules recognize as

25  reliable, because if this was a state or government with which

1    we had a mutual legal assistance treaty, we would simply get

2    these documents certified and there wouldn't be any hearsay

3    problem at all.  But because the Palestinian Authority is not

4    a state with which we have an MLAT treaty, there is no way to

5    accomplish that, but these are exactly the kinds of documents

6    that would be certified and fall within the hearsay exception.

7         We believe they are very reliable since the PA has an

8    incentive to gather information about Hamas.  And the Defense

9    has reiterated that the relationship between the PA and Hamas

10   is one in which Hamas was trying to undermine the PA, and that

11   the PA had certainly a reason to be wary of them.  And they

12   were gathering information, and we believe the information has

13   all the indicia of reliability that the rules recognize as

14   coming within the hearsay exceptions.

15        The 807 requires that there be relevance, that there be

16   indicia of reliability, and that there be a circumstance in

17   which -- that the rules would ordinarily recognize that this

18   is the type of document that could be relied on.

19        In addition to that, since last year the Palestinian

20   Authority has taken actions against these committees, and has

21   systematically reorganized the zakat system, essentially

22   reaffirming and recognizing in a public way that these

23   committees have been controlled by Hamas and are Hamas, and

24   that in itself is affirmation of the reliability of this

25   information.

1          THE COURT:  Do you want to address that last issue?

2          MS. MORENO:  Yes, just that last issue.

3     Your Honor, even their own experts describe the

4  Palestinian Authority as being corrupt.  And what the

5  Government wants the Court to believe and adopt is that the

6  bitter foe and rival of another entity should be relied upon

7  for the content of documents that criticize the other party.

8  There are three PA exhibits.  The first one is undated and

9  unsigned.  That would be PA No. 2.

10     PA No. 8 is a 30-page document, and only two pages of it

11  have been translated; again undated and I believe unsigned.

12  And PA No. 9 is one of those that fell into the category of

13  the post-closure of the Holy Land Foundation, Your Honor.

14  These documents, the PA documents as a whole were sustained by

15  Judge Fish, and so we think for the very same reasons those

16  three documents should also be kept out.

17          THE COURT:  Okay.

18          MS. SHAPIRO:  Very briefly, Your Honor.  The PA

19  No. 8 is dated as 5/22/2000, and the pages that -- It is a

20  whole booklet, and it is about the Ramallah zakat committee.

21  And there is one portion of it that is entitled "Institutions

22  affiliated with Hamas."  And we translated the portion that

23  talks about the Ramallah zakat committee being controlled by

24  Hamas.

25     PA No. 2 is signed and initialed.  And PA No. 9 is dated

1    12/22/01, so it post-dates the Holy Land closing by a couple

2    of weeks.  And these -- I forgot what I was going to say about

3    them.  I am sorry, Your Honor.  I have a cold and so it is

4    hard for me to -- Everything is jumbled up in my head right

5    now.  Now I can't remember the point I was going to make.

6            THE COURT:  Let's do this.  I have read the motions

7    and gone through the briefs.  I am going to overrule the

8    objections with respect to these exhibits as well.  I think

9    they are admissible.  The arguments you make, certainly there

10   is something to those arguments, but that goes to weight.

11   That is something for the jury to decide.  They will have all

12   of the circumstances, and they already have most of those

13   circumstances in terms of that division there and the conflict

14   and how they are rivals, and so they can weigh all that into

15   determining what weight to assign.

16       But they were seized from the Authority offices, as I

17   understand it, and at least two appear to have some kind of

18   letterhead, so there is sufficient indicia of reliability.

19   The circumstances under which they were seized, they were

20   seized, they weren't prepared it didn't look like in advance

21   for something like this.  So I think the objections ultimately

22   go to the weight and I find those are admissible.

23       Those objections are overruled, and the exhibits that the

24   Government has identified in this binder that they gave to the

25   Court Friday, they are admitted.

1         MS. MORENO:  May we approach on the separate issue?

2         THE COURT:  Yes, come on up.

3         (The following was had at the bench.)

4         MS. MORENO:  Judge, as you can see, Mr. Cline is not

5    here.  He is ill today.  I am also ill, but I came in because

6    I knew the importance of Major Lior and the scheduling issues.

7         I would ask the Court if you could accommodate me and

8    perhaps adjourn sometime earlier than 5:00 this afternoon.  I

9    have to sometimes run to the bathroom.  I am going to be fine

10   I think for most of the morning, but I really am not feeling

11   well at all.  And I just bring that to the Court's attention

12   and ask the Court to accommodate me in any way.  And I have

13   run this by the Government --

14         MS. SHAPIRO:  I am sick, too.

15         MS. MORENO:  I am not sure they have any objection.

16         THE COURT:  We will work with you on that.  Just

17   keep me posted in terms of when you finally feel that you have

18   to -- I am not talking about leaving.  You can leave at any

19   time as far as going out if you need to, but in terms of

20   breaking.

21         MS. MORENO:  I appreciate that, Judge.

22         MS. HOLLANDER:  Your Honor, Agent Miranda is reading

23   a book called The Psychology of Terrorism.  Now, I think he is

24   trying to keep the spine away from the jury, but I don't know

25   that he is.  And, frankly, I object.  He is here -- I mean,

1    the Government invoked the Rule.  He is here as an exception

2    to assist the Government, but if all he is doing is sitting

3    there reading a book, first of all, I think it is rude when we

4    are talking to the jury; and secondly, I am concerned about

5    what the book is; and third, if he is not necessary, he was

6    reading it quite a bit last week, and I just think for all

7    those reasons --

8              THE COURT:  Mr. Jacks said he would take care of

9    that.

10             MS. SHAPIRO:  I was just going to say, with respect

11   to Major Lior there is one area of cross examination last year

12   about essentially the issue that Ms. Hollander raised, the

13   issue of them wanting to have had access to the collection of

14   documents that were seized in Israel.  I think that issue has

15   been addressed in papers.

16       I don't know that they have ever made a formal request of

17   the government of Israel for access to those documents.  We

18   offered, suggested that they do that some years ago.  I know

19   they did it a few months before they submitted the letters

20   rogatory before trial, but even before that we had suggested

21   that they approach the government.

22       I only raise it because I don't think it is an

23   appropriate area of cross examination with this witness to

24   essentially probe into a discovery issue and to ask him

25   questions about whether or not they had access to the

documents.

THE COURT:  I tend to agree.  Does anybody plan on going into that?

MS. CADEDDU:  Well, we may, and the reason for that is because the whole issue of the context of the documents that were pulled in the entire universe, I mean, the Government's position is this Hamas document was found in the zakat committee and so, therefore, it is a Hamas zakat committee.  But we want to probe the fact that there were lots and lots of documents found, and that they only pulled some of these and that we haven't had the opportunity to go and pull out the ones that were found also with it.

In other words, if there is a Hamas key chain and a Fatah key chain and PIJ key chain and some other kind of key chain all found in the same place, we would have no way of knowing that.

Also we don't know whether documents are found in the trash --

THE COURT:  I am just wondering if this the witness to do that with.  I think you can ask who they pulled.

MS. CADEDDU:  He is the only witness.

THE COURT:  Well, he is the one that gathered them, but he wasn't the one that was in charge of what you got, was he?  He is the one that gathered -- The soldiers under his command, as I understand it, gathered, they went and seized

these documents, and they were taken at some point some place

there, and then they were taken to Israel.  And then who was

in charge of finally ultimately getting the documents that --

MS. SHAPIRO:  We had an MLAT request that went to

the government of Israel.

THE COURT:  Was he involved in that?

MS. SHAPIRO:  He would have been given -- He would

have been involved.  He has ultimate control over the original

collection, but it had to be higher than him.

THE COURT:  But he would have to have received an

order, so he would have been involved.  I assumed he wasn't

involved.

MS. SHAPIRO:  Yes.

MS. HOLLANDER:  Also Matthew Levitt said that he

looked at them and he wasn't part of the MLAT.

THE COURT:  I don't know that I want to get into

that you haven't had the opportunity.  I think you can -- That

is a discovery issue.  I think you can get into that only

certain were pulled and what other kinds of documents were

there.  I think that is all right.

MS. CADEDDU:  Well, I mean, the concern here, of

course, is that we filed a motion for letters rogatory --

THE COURT:  But there are a lot of issues

surrounding that.  I haven't addressed it yet.  I will get an

order out.  You filed it late.  You have had -- I got it like

1    in March or April.  It was tied into the funding issue because

2    you also had an expert to go with that.  That was denied.  And

3    you do have -- We discussed this.  You do have, you know,

4    hired counsel that has hired some experts, so there has been

5    other avenues.  There are just issues that I don't want to get

6    into that are tied in --

7                MS. CADEDDU:  Certainly the funding issues --

8                MS. HOLLANDER:  Right.  We didn't raise those and we

9    wouldn't go into that.

10               THE COURT:  But it is tied into that, and you are

11   raising that that permission wasn't given.  But if it is tied

12   in with the expert to got with it, then to me that was just

13   subsumed in that.  If you couldn't have the expert to go do

14   what you needed, then that took care of that issue.

15        And we discussed whether or not you could get some

16   private funding for certain things, and I know certain private

17   funding has been given for certain things.  I just think that

18   is a decision you all had to make.  That is just a broader

19   issue than just simply "We haven't had access"--this is my

20   point--"we have a motion pending before the Court and the

21   Court hasn't granted it."  It is just broader than that.

22               MS. CADEDDU:  And it is not really the funding issue

23   that is the issue.  It is the fact that there is a universe of

24   documents that they have gotten to go through that we can't go

25   through.  And it is not just a funding issue that we can't go

1    through them.  I mean, we don't have access to them.

2              THE COURT:  We don't know that.

3              MS. CADEDDU:  Well, they testified last year that we

4    couldn't just show up.

5              THE COURT:  I am sure that is true.  But if you had

6    provided a motion separate and apart from a funding issue --

7              MS. HOLLANDER:  Actually the letters rogatory was

8    separate.

9              THE COURT:  Yes, but along with it I got a motion to

10   approve funding for an expert who was going to go and look at

11   it, and that was denied.  I couldn't approve that on my own.

12             MS. HOLLANDER:  I don't want to disagree with you

13   except I think accept that I do.  I mean --

14             THE COURT:  You think I should have ruled on that

15   motion.

16             MS. HOLLANDER:  Yes.  I think you should have ruled

17   on the letters rogatory so that the government of Israel could

18   begin the process of determining whether we could even go or

19   not.

20             THE COURT:  And I just saw the two as related.

21             MS. HOLLANDER:  That is what we tried to explain.

22             THE COURT:  Well, anyway that is just a broader

23   issue.  I saw the two as related.  I couldn't give you the

24   expert on my own without getting Fifth Circuit approval, until

25   we finish the budget process.  And, of course, they ultimately

         denied it. I was holding off because I saw the two as interrelated.

MS. HOLLANDER: I didn't realize that, because I thought you realized that the government of Israel wouldn't do anything until we got the letters rogatory. The government didn't even object to it.

THE COURT: I understand. And like I said, I just saw the two as related. And this has been out for a while. And I get this file at the same time we are going through the budget issues, so it is still a broader issue.

MS. HOLLANDER: I am sorry there was that misunderstanding.

MS. CADEDDU: I am sorry about that, too. I guess what I would propose, if it is okay with everybody, is I think it is appropriate to inquire and to talk about the fact that he helped select them; that the government of Israel --

THE COURT: I think that is right.

MS. CADEDDU: They chose what was gathered up.

MS. HOLLANDER: Did he meet with Levitt?

MS. SHAPIRO: No. I mean, we physically and together with our expert selected them. But he is really, as I think you will see, he is somebody who takes orders. If somebody from above him in the chain of command says, you know, "Give access," then he will do that. Now, he will keep records of who has access.

1          MS. CADEDDU:  I misunderstood.  I thought you were

         2   saying he helped select them.

         3          MS. SHAPIRO:  No.

         4          MS. CADEDDU:  But the fact of the matter is that not

         5   everything is selected.

         6          THE COURT:  Right.  And I think that is proper, and

         7   the fact that not everything is here, all of that is proper.

         8   I just don't want to get into discovery issues in terms of "We

         9   haven't been given an opportunity," and these types of things,

        10   because there are broader issues involved.  But the fact they

        11   were culled and only a portion of them are here, I think that

        12   is certainly fair game.  And you can ask him what other kinds

        13   of documents, I think you did that last the time, somebody was

        14   asking what other kinds of --

        15          MS. HOLLANDER:  But he didn't meet with you all to

        16   go through them?

        17          MS. SHAPIRO:  No.  I mean, he met with us because we

        18   had to get access from him because he is the physical

        19   custodian, but he didn't have any process in selecting the

        20   documents.

        21          MS. HOLLANDER:  I think that question is

        22   appropriate, don't you?

        23          THE COURT:  What is that?

        24          MS. HOLLANDER:  That he met with the Government to

        25   give them access.

1          THE COURT:  Sure.  Do you intend to go through your

2     predicate in terms of the admissibility?  I don't think we

3     need to go into that anymore.

4          MS. SHAPIRO:  Okay.  So how would -- I was just

5     going to go through essentially the chain of custody, and then

6     to --

7          THE COURT:  That won't take too long, will it?

8          MS. SHAPIRO:  Right.  That won't take too long.  He

9     has the binder in front of him, and to ask him to identify,

10    without discussing the contents.  But if I don't have to, I

11    will just offer them.

12         THE COURT:  I am going to admit them.  I am going to

13    adopt Judge fish's ruling, and of course what I stated this

14    morning.  And I understand you still have to have the context

15    for where they came from and which committees and you want to

16    do all that, but we don't have to go through everything that

17    you would normally go through to get a document admitted.  I

18    think that has been done once.  I read the transcript.

19         MS. SHAPIRO:  I was planning on just admitting them

20    in groups, the ICS Hebron group, the Nablus group, the Jenin

21    group.

22         MS. MORENO:  I will be doing the cross examination

23    of Major Lior, Your Honor, but you are going to go into where

24    they are seized from and what date they were seized.  Right?

25         MS. SHAPIRO:  I was going to ask him whether

1    documents were seized from this location, he will say yes, and

2    then I will say, "You have before you documents Nablus No. 1

3    through 7."

4         MS. MORENO:  When the Court says she doesn't have to

5    go into the predicate, I just need to be clear, what does the

6    Court --

7         THE COURT:  Well, the objection that you have --

8    Now, they are going to have to establish in front of the jury

9    where these came from.  Obviously that is relevant.  And so

10   they will do that.  But I just didn't want to get into all the

11   details, because you have a number of objections, of trying to

12   satisfy the predicate foundation to admit them.

13        MS. MORENO:  I see.  Those objections that I made

14   the last time, you don't want me to make them over, and I have

15   no intent of doing that again.

16        THE COURT:  They are on the record.  If you want to

17   make them here, you can have them.  I mean, obviously those

18   are there.  We already had a hearing.  Judge Fish heard all of

19   that, he ruled on them, and I have reviewed that, and so I

20   don't think we need to repeat that again.

21        MS. HOLLANDER:  And that is part of the record?

22        THE COURT:  Yes.  And so I am granting the

23   Government's motion, I guess, to adopt, supplemented by

24   whatever was said this morning.

25        MR. DRATEL:  But they still have to go through the

1    procedures that were followed when they were seized in terms

2    of --

3            THE COURT:  I don't think they have to.

4            MR. DRATEL:  That is part of the tampering of

5    documents, Your Honor.

6            THE COURT:  But that has already been done.

7            MR. DRATEL:  But not before this jury.

8            THE COURT:  That is all preliminary for

9    admissibility, counsel.  That does not need to be done.  Once

10   they are admitted, the jury doesn't have to concern themselves

11   with that.

12       Now, you can go through whatever you need to in terms of

13   where it came, from, what committee, but --

14           MR. DRATEL:  How his soldiers -- the orders that he

15   gave his soldiers, what they did, that is what I meant by

16   procedures.  I don't mean technical procedures.  I mean the

17   way that these documents were --

18           THE COURT:  But there was quite a bit of questioning

19   about that the last time, and I understood that went to

20   admissibility issues.

21           MS. HOLLANDER:  Not necessarily.

22           THE COURT:  It went to the integrity?

23           MS. HOLLANDER:  So we would like to be able to cross

24   about those.

25           MS. MORENO:  We are talking about weight,

1  selectivity of the soldiers, what they left behind, did they

2  take photographs.  I intend to go into all of that.

3          THE COURT:  I think you are entitled to go into

4  that.

5          MS. MORENO:  I am not going to make any objections,

6  Your Honor, in front of the jury, but I will ask probably for

7  a continuing objection once in front of the jury as to all the

8  documents.

9          MS. HOLLANDER:  And that will be for all of us.

10          THE COURT:  Certainly.

11          MR. DRATEL:  You have those two 302 issues, Agent

12  Burns and the other one.

13          THE COURT:  I looked at that.  Remind me to get back

14  to that later.

15      As far as closing the courtroom, was there some agreement

16  as to which --

17          MS. SHAPIRO:  There are a few mechanical things.

18  Immediate family of the Defendants.

19          THE COURT:  What does that mean?

20          MS. SHAPIRO:  Spouses and children.

21          MS. HOLLANDER:  And parents.

22          MR. DRATEL:  We have a daughter-in-law as well.  We

23  think that would qualify.

24          MS. HOLLANDER:  I think my client only has his wife

25  here today, but there may be -- sometimes there are --

1          MR. DRATEL:  A son and daughter.

2          THE COURT:  Mr. Elashi's daughter is usually here.

3          MS. MORENO:  She is here and his brother-in-law.

4          THE COURT:  So spouses, children, and I guess

5   children's spouses and parents.  Anybody have a parent here.

6          MS. CADEDDU:  I think there may be some parents

7   here.

8          MS. SHAPIRO:  I have to trust counsel.  I don't know

9   the people.

10          MS. HOLLANDER:  We told those people not to come

11   until later so we don't have too many extraneous people.

12      Did we get the overflow room to work?

13          THE COURT:  I think so.  I haven't heard this

14   morning.  I think somebody had told me that the camera wasn't

15   showing the witness.

16          THE COURT REPORTER:  They put a post-it over the

17   lens so you can't --

18          MS. CADEDDU:  That is a high-tech solution.

19          MS. SHAPIRO:  But the audio should still be on.

20          THE COURT:  Yes, that is what it is.

21          MS. SHAPIRO:  The other thing is that we had an

22   agreement, Ms. Moreno and I, last year, that the jury needs to

23   be told something about why this witness is not using his

24   name.  And I think we had agreed to say something along the

25   lines that this witness is not testifying under his true name

1    because Israeli law requires it.  Is that your memory?

2              MS. MORENO:  I have got the transcript.

3              THE COURT:  I read it.

4              MS. MORENO:  There is a little --

5              THE COURT:  That is what he stated.  He stated that

6    apparently Israeli law required this.

7              MS. CADEDDU:  He added something to that last year.

8              THE COURT:  I don't remember that part.

9              MS. HOLLANDER:  That we liked or didn't like.

10             MS. MORENO:  I have the transcript.

11             MS. HOLLANDER:  As long as it doesn't say "for

12   security reasons."

13             MS. CADEDDU:  That was not part of the stipulation.

14   Judge fish just added that.

15             MS. HOLLANDER:  The stipulation is simply that

16   Israeli law requires this, without saying anything about

17   security.

18             THE COURT:  Okay.

19             MS. HOLLANDER:  And, of course, he will come in and

20   out without the jury seeing him.  I don't know how they do it

21   back there.

22             THE COURT:  They are aware of that.  So I will leave

23   out "for security reasons."

24             MS. SHAPIRO:  The other issue is that this witness,

25   as well as the expert has a lawyer with him, and the purpose

1    of the lawyer is in case there is an issue of classified

2    information.  And the agreement last time was that if there

3    was an issue with classified information, that the lawyer

4    would be able to consult --

5              THE COURT:  I saw that in the transcript where that

6    happened.

7              MS. SHAPIRO:  And I am hoping that doesn't happen,

8    but I don't want the jury to think that -- I mean, it would be

9    odd for a lawyer and a witness --

10             THE COURT:  I think Judge Fish explained to the jury

11   that this was an attorney.  Do you want some kind of statement

12   that --

13             MS. HOLLANDER:  If it happens, just explain that,

14   you know, under Israeli law he has to talk to his lawyer.

15             THE COURT:  He has his lawyer here, as Israeli law

16   requires, and he is given an opportunity to talk to him on

17   certain issues.

18             MS. SHAPIRO:  Right.  To make sure that no

19   classified information is disclosed.  I just don't want them

20   to get the impression that there is something strange going on

21   that the jury doesn't understand.

22             MS. HOLLANDER:  I think if you just leave it to

23   that, that is fine.

24             THE COURT:  All right.  Anything else?

25             MR. MYSLIWIEC:  I am going to be out for part of the

1    morning.

2           MS. HOLLANDER:  And Ms. Duncan is out working on

3    other witnesses.

4           THE COURT:  I am going to clear the courtroom and

5    then we will bring Major Lior in.

6           (The following was had in open court.)

7           THE COURT:  Is Major Lior ready?

8           THE COURT:  Members that are here in the audience, I

9    am going to have to clear the courtroom.  At this time we do

10   have a witness that is going to be testifying under a

11   different name, and so the only people that will be permitted

12   to remain in the courtroom will be immediate family

13   members--spouses, children, spouses of children, and parents

14   if any parents are here.  Everyone else will have to leave the

15   courtroom until this witness completes his testimony.

16       There is an overflow courtroom on the 16th floor.  You

17   are welcome to go up where you will be able to hear the

18   testimony, but you won't be able to see anyone but just simply

19   hear.

20       You may go ahead and step out.

21           MS. MORENO:  My client's daughter is here along with

22   her uncle.  I ask the Court to allow her uncle to stay.  I

23   think the Government has on objection to that.

24           MR. JACKS:  We would object to that.

25           THE COURT:  I think just immediate family is the

```
1    agreement.  Her uncle would not qualify.  We could expand it

2    rapidly if we started going down that road.

3                 MS. CADEDDU:  Your Honor, I don't know who everybody

4    else is, but I don't think they all need to be here either.  I

5    don't know all these other folks --

6                 THE COURT:  That is what they are checking on now.

7                 MS. CADEDDU:  I would object to all the agents and

8    everybody else.

9                 THE COURT:  If you will administer the oath to the

10   interpreter.

11                (Whereupon, the oath was administered by the Clerk.)

12                MS. CADEDDU:  Your Honor, could we identify --

13                THE COURT:  I know who they are.  We are okay.

14                MS. WEBB:  Judge, do you want me to swear the

15   witness now?

16                THE COURT:  Sure.

17                (Whereupon, the oath was administered by the Clerk.)

18                THE COURT:  Are we ready for the jury?  All right.

19   Go ahead and bring in the jury.

20                (Whereupon, the jury entered the courtroom.)

21                THE COURT:  Ladies and gentlemen, good morning.  And

22   we are ready to proceed.

23         And you may have noticed, we have a different witness up

24   here than where we ended up Friday.  The parties have agreed

25   to take this witness out of turn due to scheduling issues.  So
```

you will hear this witness and then we will go back to the

cross examination of Mr. Shorbagi, whom you were hearing from

last week, and we will finish that testimony once this witness

finishes.

     This witness, and you will hear this once we start the

examination, the questioning of the witness, he is a member of

the Israeli Defense Force.  He will be testifying under a name

other than his real name because this is required by Israeli

law.  And so you will be hearing -- You won't hear his real

name.  Also he has been sworn in.  He is under oath when he

testifies.  The oath has been administered to him.

     Ms. Shapiro?

          MS. SHAPIRO:  Thank you, Your Honor.

                          <u>MAJOR LIOR</u>,

Testified on direct examination by Ms. Shapiro as follows:

Q.    Good morning.

A.    Good morning.

Q.    Can you please state the name that you are testifying

under today?

A.    My name is Lior, L-I-O-R.

Q.    And what language do you speak?

A.    Hebrew.

Q.    Okay.  And do you speak any English at all?

A.    A little.

Q.    Do you also speak Arabic?

```
1    A.    Yes.

2    Q.    Okay.  And you have an interpreter here today.  Correct?

3    A.    Yes.

4    Q.    Okay.  What is your profession?

5    A.    I am a unit deputy commander.

6    Q.    Okay.  And what division are you a deputy commander?

7    A.    I serve in Intelligence.

8    Q.    And is that within the Israeli Defense Forces?

9    A.    Yes.

10   Q.    And is the Israeli Defense Forces equivalent to the army,

11   the Israeli army.

12   A.    Intelligence is a division inside the military.

13   Q.    And what rank do you hold, sir?

14   A.    I am a major.

15   Q.    And how long have you served altogether in the military?

16   A.    Twenty-five years.

17   Q.    And how long have you been within your particular

18   Intelligence Unit?

19   A.    In this specific unit I have been close to eight years.

20   Q.    And what does the particular unit that you are in, what

21   does it do?

22   A.    This unit within the Intelligence Division, its job is to

23   collect intelligence from seized items that includes documents

24   and other items.

25   Q.    And you have soldiers who work under your command?
```

A.    Yes.

Q.    And these soldiers, do they read and speak Arabic or read

and understand Arabic?

A.    This is the professional field; to read and to translate

the Arabic documents mainly.

Q.    And what is the purpose of having a unit that gathers

documents?

A.    Mainly this information, this intelligence that is

gathered from those items is transferred to the combat units

at the time of the combat, and the rest is transferred to

research, intelligence research forces in the field of

research to other units.

Q.    Okay.  So are you familiar with a military operation

called Operation Defensive Shield?

A.    Yes.  I have been on this assignment from the beginning.

Q.    Okay.  And what was Operation Defensive Shield?

A.    The Defensive Shield was a regular military operation --

          MR. DRATEL:  Can we get a time frame, Your Honor?

          THE COURT:  He will get to that, counsel.  Give her

a minute.

          MS. SHAPIRO:  We will get there.

Q.    (BY MS. SHAPIRO)  Go ahead.

          MS. MORENO:  Excuse me.  If the interpreter could

speak into the microphone, I am having trouble hearing her.

Thank you so much.

1          THE INTERPRETER:  The interpreter will try.

2     Q.   (BY MS. SHAPIRO)  Did you finish your answer?

3     A.   Can you please repeat the question?

4     Q.   I think I had asked you, what was Operation Defensive

5     Shield.

6     A.   As I said, it was a military operation.  After a long

7     period of terror that was going on in Israel, which culminated

8     in the terrorist attack of the Park Hotel in Netanya --

9          MS. MORENO:  Objection; non-responsive.  Move to

10    strike that part of the answer.

11         THE COURT:  Overruled the objection.  Go ahead.

12    Q.   (BY MS. SHAPIRO)  You can finish your answer.

13    A.   In any event, the Israel Defense Force went out to do

14    this operation in order to break and stop the terrorism in

15    Israel.

16    Q.   And what happened at the Park Hotel?

17         MR. DRATEL:  I object, Your Honor, based on

18    al-Moayad and a variety of other 403 grounds.

19         THE COURT:  Sustain the objection.

20    Q.   (BY MS. SHAPIRO)  Okay.  You said this was a military

21    operation.  As a part of Operation Defensive Shield, did your

22    unit collect documents from various societies and charity

23    committees in the West Bank?

24    A.   Yes.  As I said before, our job was to go into the enemy

25    entities with the combat forces, and then to perform the job

1  of intelligence, which includes collecting the documents and

2  other items.

3  Q.   And did you select the targets yourself that you were

4  going to collect documents from?

5  A.   No.  Usually these targets are selected by entities that

6  are above us, entities that are interested in checking certain

7  targets.

8  Q.   So you essentially are following orders that you are

9  getting from elsewhere in terms of selection.  Right?

10 A.   That is correct.

11 Q.   And what are the procedures once you receive these orders

12 that your unit uses when it goes in and collects documents?

13 A.   First of all, we recruit the people, the troops that are

14 supposed to conduct this professional work.  Afterwards, they

15 are briefed by me regarding what they are supposed to do

16 inside the target.

17 Q.   And what do they do once they get inside?

18 A.   I am getting to it.  They join the combat units inside

19 the targets and then they perform the work, which includes

20 collecting all the items inside boxes.  On the boxes we

21 indicate the date of seizure, the time of seizure, the

22 location of seizure.  Afterwards those boxes are transported

23 to a central base, which is decided on in advance by my

24 soldiers.  For example, for Defensive Shield the base was Beit

25 El.  Of course it was a military base.

1    Q.   Let me interrupt you for a moment just so that we

2    understand the process.  The documents are boxed up?

3    A.   Yes.

4    Q.   They are transported to this military base.  Is that

5    right?

6    A.   Yes, as an intermediary stage.

7    Q.   And then what happens once you get to that intermediary

8    stage at this base?

9    A.   From that moment on we establish a transporting unit from

10   my unit, whose only job it is to transport those documents and

11   other items from this intermediary bases to a home base in the

12   center of Israel, and there we are doing a more in depth -- We

13   deal with the documents more in depth.

14   Q.   And at each stage of this process are the soldiers who

15   are handling the documents always under your command?

16   A.   Yes.  I would only like to underscore we are talking here

17   about three teams.  The first team is the one that collects

18   those documents and items from the targets.  The second team

19   is the one in the intermediary station which receives those

20   items from them and records them.  And the third team is the

21   one that moves those items from that station to the center of

22   Israel.

23   Q.   And are each of those teams under your command?

24   A.   Yes.

25   Q.   Do you ever personally go to the base at Beit El to

oversee the process?

A.    Yes.  During the Defensive Shield I did go to Beit El

from time to time.  In later operations I also take an active

operational part in these operations.

Q.    These were the later operations you are talking about?

A.    Later operations.

Q.    What happens once you get to the home base, I think you

called it, what happens to the documents at that point?

A.    In this base we have several professional teams in the

field of translating the documents.  Every box is opened.  It

receives a series of numbers according to the place from which

it was taken.  Every document inside the box receives a

running serial number for this particular document.

     Afterwards we issue an index, organized index for all of

the documents that were taken out of this particular box.  The

index includes the date of seizure, the locations and a short

recap of the substance of the document, with this tribute,

this index to all the consumers that need this material.

Q.    What do you mean by consumers?

A.    When I talk about consumers, I am talking, for example, a

security unit like the Israel Security Agency, research

entities inside the military, and sometimes civilian entities

that receive the authorization from my superiors.

Q.    Let me ask you, when your units go into these

destinations, do they take everything that is there or just

1    certain things?

2    A.    Our goal is to take everything.  However, sometimes we

3    encounter time constraints for how long we can stay at a

4    certain place, so we take as much as we can.

5    Q.    And do you remember during Operation Defensive Shield

6    whether everything was taken, or whether only some things were

7    taken?

8    A.    Defensive Shield since it was an operation, after a long

9    period that there were no operations, most of the material was

10   taken.

11   Q.    When you say no operations, you mean operations by the

12   Israeli military?

13   A.    Yes.

14   Q.    And after Operation Defensive Shield -- Tell us, first of

15   all, when exactly was Operation Defensive Shield?  What were

16   the dates?

17   A.    Operation Defensive Shield started on March 28th, 2002

18   and ended on April 19th, 2002.

19   Q.    And after that time were there subsequent operations of a

20   similar nature that your unit was involved in?

21   A.    Yes.

22   Q.    And through subsequent operations were documents also

23   collected from some of these same committees and

24   organizations?

25   A.    Yes, there was also evidence, more correctly the

1  documents collected from the places like in the Defensive

2  Shield operation, pursuing similar orders to the ones that we

3  had during Defensive Shield, because actually this is the job

4  of this unit.

5  Q.   So it is fair to assume that the same procedures that

6  were employed during Operation Defensive Shield were used in

7  these later operations with respect to document collection.

8  Is that right?

9  A.   Yes.

10 Q.   Okay.  And did there come a time when the United States

11 government requested permission to use some of the original

12 documents from those operations in this case?

13 A.   Yes, but not directly from me; from my superiors.

14 Q.   And was permission granted?

15 A.   Yes.

16 Q.   Okay.  You should have in front of you, Major Lior, a

17 binder.  Are these documents copies of the documents that were

18 provided to the United States from your collection?

19 A.   Yes.

20 Q.   Okay.  If I can just draw your attention to the exhibits

21 in your binder that are labeled -- Let me ask you, first of

22 all, during Operation Defensive Shield or subsequent

23 operations, did your unit collect documents from the Islamic

24 Charitable Society of Hebron?

25 A.   Yes.

1    Q.   Okay.  And I just draw your attention to the documents in

2    your binder labeled ICS Hebron No. 1 through 12.

3    A.   Yes.

4    Q.   And can you just generically tell us what kinds of things

5    are in those exhibits?

6    A.   We are talking here documents, posters, and -- Yes,

7    documents and posters.

8              MS. SHAPIRO:  Your Honor, at this time we move the

9    admission of ICS Hebron Exhibits No. 1 through 12.

10             THE COURT:  And you have the previous objections.

11             MS. MORENO:  Yes, Your Honor.  May we have a

12   continuing objection as to this list of documents.

13             THE COURT:  You may have that continuing objection,

14   and those objections are overruled and those exhibits are

15   admitted.

16   Q.   (BY MS. SHAPIRO)  During Operation Defensive Shield, or

17   from subsequent operations, did your unit collect documents

18   from the Holy Land Foundation office in Hebron?

19             THE INTERPRETER:  Can you repeat, please?  From

20   where.

21   Q.   (BY MS. SHAPIRO)  From the Holy Land Foundation office in

22   Hebron.

23   A.   Yes.

24   Q.   Okay.  If I could direct your attention to the exhibit

25   marked HLF Hebron No. 1 in your binder.  What kind of a

1    document is that?

2    A.    It is a document regarding money.

3    Q.    Okay.

4          MS. SHAPIRO:  Your Honor, we would move at this time

5    the admission of HLF Hebron No. 1?

6          THE COURT:  Admitted.  .

7    Q.    (BY MS. SHAPIRO)  And during Operation Defensive Shield,

8    or subsequent operations, did your unit collect documents from

9    the Jenin zakat committee?

10   A.    Yes.

11   Q.    And I draw your attention to the exhibits labeled Jenin

12   Zakat No. 1 through 7.  And what kind of things are found in

13   those exhibits, generically?

14   A.    These are documents, posters, and a videotape.

15         MS. SHAPIRO:  Your Honor, move the admission of

16   Jenin Zakat No. 1 through 7.

17         THE COURT:  Admitted.  .

18   Q.    (BY MS. SHAPIRO)  During Operation Defensive Shield, or

19   subsequent operations, did your unit collect documents from

20   the Nablus zakat committee?

21   A.    Yes.

22   Q.    I direct your attention to the exhibits labeled Nablus

23   Zakat No. 1 through 6.

24   A.    Yes.

25         MS. SHAPIRO:  Your Honor, move the admission of

1    Nablus Zakat No. 1 through 6.

2            THE COURT:  Admitted.

3            THE WITNESS:  What about No. 7.

4    Q.  (BY MS. SHAPIRO)  That is coming.  During Operation

5    Defensive Shield, or subsequent operations, did your unit

6    collect documents from the al-Tadhamon committee?

7    A.   Yes.

8    Q.   And I direct your attention to the exhibit labeled Nablus

9    No. 7, Nablus Zakat No. 7.

10   A.   Yes.

11   Q.   Okay.  And what sort of a document or what is that

12   generically?  What is that exhibit?

13   A.   This particular exhibit is a personal file.

14   Q.   Okay.

15           MS. SHAPIRO:  Your Honor, move the admission of

16   Nablus Zakat No. 7.

17           THE COURT:  Admitted.  .

18   Q.  (BY MS. SHAPIRO)  During Operation Defensive Shield, or

19   subsequent operations, were documents -- Did your unit collect

20   documents from the Qalqilya zakat committee?

21   A.   Yes.

22   Q.   I direct your attention to the exhibit behind the tab

23   Qalqilya Zakat No. 1?

24   A.   Yes.

25   Q.   What is that exhibit generically?

```
1    A.   We are talking about a personal file of an orphan.

2    Q.   Okay.

3              MS. SHAPIRO:  Your Honor, move the admission of

4    Qalqilya Zakat No. 1.

5              THE COURT:  Admitted.

6    Q.   (BY MS. SHAPIRO)  And during Operation Defensive Shield,

7    or subsequent operations, did your unit collect documents from

8    the Tulkarem zakat committee?

9    A.   Yes.

10   Q.   I direct your attention to the exhibits labeled Tulkarem

11   Zakat No. 1 through 7 and 9 through 10.

12   A.   Yes.

13   Q.   And what are those exhibits generically?

14   A.   Posters and a document.

15             MS. SHAPIRO:  Your Honor, I move the admission of

16   Tulkarem No. 1 through 7 and 9 through 10.

17             THE COURT:  Admitted.

18   Q.   (BY MS. SHAPIRO)  During Operation Defensive Shield, or

19   subsequent operations, did your unit collect documents from

20   the el-Isla committee?

21   A.   Yes.

22   Q.   I direct your attention to the document labeled al-Isla

23   No. 1.

24   A.   Yes.

25   Q.   And what is that exhibit generally?
```

```
1    A.    A document.

2              MS. SHAPIRO:  Your Honor, I move the admission of

3    el-Isla No. 1.

4              THE COURT:  Admitted.

5    Q.    (BY MS. SHAPIRO)  And during Operation Defensive Shield,

6    or subsequent operations, did your unit collect documents from

7    the offices of the Palestinian Authority compound in Ramallah?

8    A.    Yes.

9    Q.    I direct your attention to the exhibits labeled PA No. 2

10   PA No. 8, and PA No. 9.  And generally what are these

11   exhibits?

12   A.    We are talking about documents and a booklet.

13   Q.    Okay.

14             MS. SHAPIRO:  Your Honor, I move the admission of PA

15   No. 2, PA No. 8, and PA No. 9?

16             THE COURT:  Admitted.

17             MS. SHAPIRO:  Your Honor, I have no further

18   questions.  Pass the witness.

19             THE COURT:  Ms. Moreno?

20                     CROSS EXAMINATION

21   By Ms. Moreno:

22   Q.    Good morning, Major Lior.

23   A.    Good morning.

24   Q.    You talked about the period of time of Operation

25   Defensive Shield as lasting from March 28th, 2002 to April
```

1    19th, 2002.  Correct?

2    A.    Yes.

3    Q.    In fact, there were several other subsequent incursions

4    into these committees with respect to the documents you have

5    just testified to.  Correct?

6    A.    Yes.

7    Q.    Okay.  Let's talk about some of those different dates.

8    If you will look in your binder at ICS Hebron No. 12.

9    A.    Yes.

10   Q.    This was seized in August 24th, 2003.  Correct?

11   A.    To the best of my knowledge on the 24th of March.

12   Q.    24th of March, 2003?

13   A.    Yes.

14   Q.    And then ICS Hebron No. 11?

15   A.    ICS Hebron No. 11, yes.

16   Q.    This was seized April 20th, 2004, about a year later.  Is

17   that correct?

18   A.    Yes.

19   Q.    And we are talking about the same charitable society.

20   Correct?  ICS Hebron?

21   A.    It is not the same thing.  The Exhibit No. 12 -- ICS

22   No. 12 is from the Committee of Young Muslims, and in contrast

23   to that ICS No. 11 is from the Islamic organization in Dura.

24   Q.    In Dura?

25   A.    Yes.  It is a place in Hebron.

1    Q.   So these are two separate places where these documents

2    were seized?

3    A.   Yes.

4    Q.   Take a look, please, Major Lior, at ICS Hebron No. 8 that

5    was seized on September 20th, 2004.  Correct?

6    A.   Would you repeat that, please?

7    Q.   ICS Hebron No. 8.

8    A.   Yes.

9    Q.   Those documents were seized on September the 20th, 2004.

10   Is that right, sir?

11   A.   Yes.

12   Q.   And how does that differ from the other previous

13   locations?

14   A.   Here, too, it is a different place within Hebron, which

15   is called Shuyuk.

16   Q.   Is that a zakat committee?

17   A.   Yes.

18   Q.   And what is the name of the zakat committee?

19   A.   I can tell you that it is a branch of the Islamic Charity

20   Organization Committee in Shuyuk.

21   Q.   And ICS Hebron No. 11, what is the name of that zakat

22   committee?

23   A.   The Islamic Charitable Committee in Dura.

24   Q.   And ICS Hebron No. 12, what is the name of that zakat

25   committee?

1   A.   The Young Muslims Committee.

2   Q.   Okay.  So in those three locations are we talking about

3   three different committees?

4   A.   I don't know whether these are three separate committees.

5   I don't delve into that professional aspect of it.  However,

6   involved are three separate locations.

7   Q.   Okay.  Let's go to the Jenin zakat committees.  Jenin

8   Zakat No. 7.

9   A.   One second, please.  Yes.

10  Q.   This was seized on October 19th, 2003.  Is that correct,

11  sir?

12  A.   Yes.

13  Q.   Okay.  And that would have been a year and six months

14  after the end of Operation Defensive Shield.  Correct?

15  A.   A year and a half, six months.  Just one moment.  Yes.

16  Approximately a year and a half.

17  Q.   And Jenin Zakat No. 1, these items were seized in July of

18  2004.  Correct?

19  A.   Yes.

20  Q.   And Jenin Zakat No. 6, those items were seized in

21  November of 2004.  Correct?

22  A.   Yes.

23  Q.   Now, those three Jenin zakat locations, are those all the

24  same locations?

25  A.   Again, as I have stated previously, I am unable to

1    provide you with an exact specific answer as to the location,

2    but we are speaking of the charity organization committee in

3    Jenin.

4    Q.   Is it the same location is my question, or are they three

5    separate locations?

6    A.   To the best of my knowledge, these are different

7    locations.

8    Q.   Okay.  Now, part of the reason you can't tell the jury

9    more specific information is because you yourself did not

10   accompany your soldiers when they went into these committees.

11   Correct?

12   A.   No, absolutely not.  Every operation on which my soldiers

13   go out on, we go through a properly organized debriefing

14   process in regards to the entire operation, and we do a

15   debriefing.

16   Q.   Okay.  You yourself, however, do not go into these

17   locations with your soldiers.  Correct?

18   A.   Correct.

19   Q.   Correct.  Okay.  And so you depend upon what your

20   soldiers tell you when they return back to headquarters.

21   Correct?

22   A.   Yes.

23   Q.   Okay.  And there aren't any videos that are made of these

24   seizures.  Correct?

25   A.   The videographing of operations is not performed by my

1    unit, but there is another unit that on occasion does perform

2    such videographing, but it is more in the operational aspect

3    of it.

4    Q.    Are there any videos of the seizures of documents that

5    you have testified to today?

6    A.    Not in my possession.

7    Q.    Are there any photographs of the locations from which

8    these documents and posters and key chains were seized?

9    A.    No.

10   Q.    Generally speaking, let's talk about posters that were

11   seized from different places.

12   A.    Yes.

13   Q.    Other than the fact that they were seized from a

14   particular committee, you have no personal knowledge from

15   where in the committee those posters were seized.  Correct?

16   A.    Only if my soldiers remember, write down and notate this

17   information.

18   Q.    Okay.  So we should expect to see, with respect to some

19   of these posters, where they were located within the

20   committees?

21        THE INTERPRETER:  Will the question be repeated?

22   Q.    (BY MS. MORENO)  So we should be able to see, with

23   respect to the posters, exactly where they were?

24   A.    No.  At the committee, yes, but not literally where

25   within.

1   Q.   So, for instance, the posters could be on the wall.

2   Correct?

3   A.   Most certainly.

4   Q.   The posters could also be laying on a table.  Correct?

5   A.   Certainly.

6   Q.   And the posters might also be in the trash can.  Correct?

7   A.   Very possibly.  However, if I might add, it is in fact

8   our modus operandi to also search the garbage cans as well.

9   Q.   Okay.  And have you indicated or your soldiers indicated

10  with respect to all these documents if any of them were found

11  in the trash cans?

12  A.   No.

13  Q.   And the same would be true for the key chains and the

14  photographs.  Correct?

15  A.   Yes.

16  Q.   Now, the documents that came from the Palestinian

17  Authority, PA 2, 8, and 9, these were seized during operations

18  Defensive Shield, I believe.  Is that correct?

19  A.   Yes.

20  Q.   And this was al-Mukata.  Correct?  In Ramallah?

21  A.   Just to be precise, it is Mukata.

22  Q.   Thank you.  Mukata.  What is that place?

23  A.   This was the building of Fatah, the governmental building

24  of Fatah in Ramallah.

25  Q.   And on April the 5th, 2002, when you went in there, your

1   soldiers went in there and Yasser Arafat was there.  Correct?

2   A.    Yes.

3   Q.    He was living there.  Correct?

4   A.    Yes.

5   Q.    Now, just to be clear for the jury, when you say that

6   your soldiers go into these places, they follow combat troops.

7   Is that right?

8   A.    Correct.  Just as far as the previous question, even

9   though Arafat's bureau was in the Mukata, the soldiers, both

10  ours and the combat ones were not permitted -- We did not

11  permit entering his offices.

12  Q.    Okay.  Your soldiers and the combat soldiers are all

13  armed.  Correct?  During all of these operations?

14  A.    Yes.  We are talking of military operations, as I have

15  stated earlier.

16  Q.    Right.  And besides going into zakat committees, you have

17  gone into mosques and seized items.  Correct?

18  A.    In general the Israeli Defense Force avoids entering

19  mosques, unless you have a situation where terror is emanating

20  or being directed from such a place.

21  Q.    Okay.  Take a look at Tulkarem No. 1.  Now, Tulkarem

22  No. 1 --

23  A.    Just a moment, please.  Yes.

24  Q.    That is a poster.  Correct?

25  A.    Yes.

```
1    Q.   And that poster was taken from a mosque.  Correct?

2    A.   Yes.  It was mosque Zeid, or to be more precise Eben

3    Zeid.

4    Q.   Now, besides mosques and charity committees, you have

5    gone into schools.  Correct?

6    A.   As I have stated earlier, if there was previous

7    intelligence --

8    Q.   I am asking -- Excuse me.

9              MS. MORENO:  I object it is non-responsive.

10   Q.   (BY MS. MORENO)  You have gone into schools.  Correct?

11   A.   Yes.

12   Q.   You have gone into orphanages.  Correct?

13   A.   Yes.

14   Q.   And you have seized orphan forms.  Correct?

15   A.   As well, yes.

16   Q.   And you have seized books.  Correct?

17   A.   I am not certain of that.

18             MS. MORENO:  May I have a moment, Your Honor?

19   Q.   (BY MS. MORENO)  Ics Hebron No. 4 is a book.  Right?

20   A.   Just a moment, please.  Yes.

21   Q.   And you have also seized report cards and birth

22   certificates.  Correct?

23   A.   Are you speaking of ICS No. 4?

24   Q.   No.  I have left ICS No. 4, and I am asking you the

25   general question that in the evidence today that you have
```

1   sponsored for the jury, some of it are report cards and birth

2   certificates.

3   A.    Yes.

4   Q.    Okay.  Now, please take a look at Nablus Zakat Committee

5   No. 3?

6   A.    If you would wait just one moment.  Yes.

7   Q.    Now --

8            MS. MORENO:  May I approach, Your Honor, to see?

9            THE COURT:  Yes.

10  Q.    (BY MS. MORENO)  And that is a photograph of key chains.

11  Is that right?

12  A.    Yes.

13  Q.    Now, there is a translation that accompanies that.

14  Correct?  On the next page, I believe.

15  A.    Yes.

16  Q.    Okay.  And the translation indicates that this was found

17  during operation, "Leavened Elimination" in Nablus.  Correct?

18           MS. SHAPIRO:  Objection, Your Honor.  The document

19  that she is reading from is not on the exhibit.  Maybe if we

20  can approach?

21           THE COURT:  Yes.

22           (The following was had outside the hearing of the

23           jury.)

24           MS. SHAPIRO:  Your Honor, this is it, and I can show

25  you the original.  It is a key chain.  This is a translation,

1    but apparently this page translated a Xerox that had some

2    Hebrew writing on it, which the exhibit doesn't.  So what Ms.

3    Moreno is reading from, it says "Hebrew text under key chain."

4    She is reading from a prior copy of this exhibit that was

5    provided a long time ago.  This obviously should not be in

6    here, and we will amend this because it doesn't translate

7    anything from the exhibit.  This is only Arabic, the little

8    Arabic writing.  This where it says "Hebrew text under key

9    chain," there is no Hebrew text on the key chain.

10           MS. MORENO:  Your Honor, then I ask to mark it for

11   identification and ask him what Leavened Elimination is.

12           THE COURT:  I think you can ask him about Leavened

13   Elimination.

14           MS. SHAPIRO:  He won't have a clue, but you can ask

15   him.  The exhibit itself we will substitute the translation,

16   because there is nothing in Hebrew on these key chains.

17           THE COURT:  So this just doesn't apply?

18           MS. SHAPIRO:  It doesn't apply at all.  In other

19   words, what we originally provided the exhibits to the

20   Defense, they were copies, because we didn't have all the

21   originals.  And there was probably analysis that people in

22   Israel had done that had written something in Hebrew, and when

23   we translated it and gave it to the other side, that

24   apparently got translated by somebody, not us, and the

25   original doesn't have any of that.  Obviously the original is

1    the evidence.  So I don't know why this is attached here.  The

2    Arabic text on the key chain says Sheikh Yassin.

3              MS. MORENO:  I ask to be allowed to mark it and move

4    it in and question him about it, Your Honor.

5              MS. SHAPIRO:  Your Honor, here is the key chain

6    itself.

7              THE COURT:  So at some point this appeared in the

8    translation that you gave to the Defense?

9              MS. SHAPIRO:  In a translation of a picture of the

10   key chain that must have had some Hebrew writing on it,

11   because we got all of these things from the government of

12   Israel years and years ago in a bunch of big binders, and we

13   turned them over before we had the originals.  So that must

14   have been some translation by somebody, but not us.  We don't

15   have any Hebrew translators.

16             MS. MORENO:  Your Honor, I will withdraw my request

17   to move it in, but I would like to be able to ask him what is

18   this Leavened Operation.  He is the guy conducting all of

19   these operations.

20             MS. SHAPIRO:  But the thing is that that is -- I

21   don't know what that is.  It is probably a mistranslation or

22   something.  The translator won't even know how to translate

23   it.  It will create confusion.

24             MS. MORENO:  Let's try.

25             THE COURT:  I think they are entitled to question

```
 1    him on that.  It got on there.  We will just have to see what

 2    happens.  Somehow it got on there.

 3               MR. DRATEL:  Just one thing beyond cold this

 4    morning, I am going to have to steal some of this clothing.

 5               MS. HOLLANDER:  All the jurors are coughing.

 6               THE COURT:  We will check into that.

 7               (The following was had in the presence and hearing

 8               of the jury.)

 9    Q.   (BY MS. MORENO)  Sir, this key chain was seized by your

10    soldiers --

11    A.   Which exhibit are we speaking of?

12    Q.   Nablus Zakat No. 3.  And this key chain was seized by

13    your soldiers.  Correct?

14    A.   Yes.

15    Q.   And it was seized in Nablus.  Right?

16    A.   Yes.

17    Q.   And it was seized during this Operation Leavened

18    Elimination.  Correct?

19    A.   Yes.

20    Q.   Why was this operation called Leavened Elimination?

21    A.   I have no idea.

22    Q.   With respect to the items that were left behind during

23    all of these seizures, Major Lior, there was no inventory done

24    by your soldiers of what they left behind in a particular

25    committee.  Correct?
```

1    A.    Generally there is no precise detailing inventory, but

2    most certainly, most probably if there is sufficient time, if

3    there was sufficient time they would not have left it there in

4    the first place.

5    Q.    Okay.  So in those operations where there was a time

6    constraint, you took everything, your soldiers took

7    everything?

8    A.    When there was a time constraint we took everything?

9    Q.    Yes.

10    A.    As much as we were able to.

11    Q.    Okay.  And you can't tell this jury what items were left

12    behind in these committees by your soldiers.  Correct?

13    A.    No.

14    Q.    Okay.  You met with the Prosecutors in this case in

15    Israel around these documents.  Correct?

16          THE INTERPRETER:  The interpreter missed it.

17    Q.    (BY MS. MORENO)  At some point in time you met with the

18    Prosecutors in Israel about these documents.  Correct?

19    A.    Yes.

20    Q.    And you showed the Prosecutors a lot of evidence that was

21    taken from the committees.  Correct?

22    A.    Only evidence that I received about which I received

23    authority to do so.

24    Q.    And the evidence that you received authority, was it many

25    more exhibits than what you have in that book before you, sir?

1    A.    To be precise, the transfer of items or documents, or any

2    item of any sort is not transferred directly to the

3    Prosecutors, but is done, rather, by the Israeli Security

4    Agency.

5    Q.    Okay.  My question is different.  My question is, was

6    there a lot more evidence seized from the zakat committees and

7    the schools and the mosques than what you have presented today

8    in this binder?

9    A.    There were more items, but perhaps those were such that

10   were not related or relevant to the matter at hand.  They were

11   transported to the Israeli Security Agency, and I don't know

12   what they used and what they did not use.

13   Q.    You didn't make the determination of relevance.  Correct?

14   A.    No.

15   Q.    They made the determination of relevance.  Right?

16   A.    I assume so.

17   Q.    All right.

18           MS. MORENO:  Pass the witness, Your Honor.

19           THE COURT:  Let's go ahead and take the morning

20   break.  Take a 20-minute break.  Be back at ten after.

21           (Whereupon, the jury left the courtroom.)

22           THE COURT:  All right.  We will be in recess.

23       Let's hold on a second so we can get the jury cleared.

24   Give us just a minute.

25           We will be in recess.

1          (Brief recess.)

2          THE COURT:  Who is up?  Ms. Hollander, are you?

3          MS. HOLLANDER:  Yes, sir.

4                    CROSS EXAMINATION

5    By Ms. Hollander:

6    Q.   Good morning, sir.

7    A.   Good morning.

8    Q.   I just have a few questions.

9          You mentioned Beit El.  That is a settlement, is it not?

10   A.   Yes, except I underscored that in this location there is

11   both a military base and a settlement.

12   Q.   Are they connected or do they just have the same name?

13          MS. SHAPIRO:  Object to relevance, Your Honor.

14          THE COURT:  Overruled.  Go ahead.

15          THE WITNESS:  Just the name.  They are not

16   connected.

17   Q.   (BY MS. HOLLANDER)  And the items you took, you seized,

18   you also seized items during one of these operations from the

19   land office in Ramallah.  Correct?  The office that holds the

20   documents -- property documents.

21   A.   Could you please concentrate the question, focus it?  I

22   don't understand what you mean.

23   Q.   Okay.  There is an office in Ramallah that contains

24   property documents.  The documents, titles to land, and

25   building permits.  My question is, I believe that your

1   officers also took, seized documents from that office.

2   Correct?

3   A.   I don't base my answers here on beliefs, but if it was

4   one of the targets in which intelligence documents were

5   located, then yes.

6   Q.   So you don't know?

7   A.   I don't.

8   Q.   Now, you described that you created an index of documents

9   that were seized.  Correct?

10  A.   Yes.

11  Q.   Is that the index that you have with you today?

12  A.   No.

13  Q.   And what index do you have with you today?

14  A.   This is a table which specifies all the documents or all

15  the exhibits that were presented in this particular folder.

16  Q.   Okay.  Now, you also mentioned that -- Going back to your

17  index that you created, you mentioned that you provided it to

18  some civilians.

19  A.   Specific civilian entities, yes.

20  Q.   Did you provide it to Dr. Matthew Levitt?

21  A.   No.

22  Q.   Have you met with Doctor Levitt?

23  A.   No.

24  Q.   And you said that you went -- did your seizures with

25  combat troops.  They arrived in tanks.  Correct?

1          MS. SHAPIRO:  Object to relevance, Your Honor.

2          THE COURT:  Overruled.  Go ahead.

3          THE WITNESS:  I didn't say tanks.  I said that to

4    every operation you go in with vehicles, but these are combat

5    vehicles.

6    Q.   (BY MS. HOLLANDER)  Are they tanks?

7    A.   Usually not.

8    Q.   And you -- These seizures were at night.  Correct?

9    A.   Usually.

10   Q.   And when you went into the orphanages, were the children

11   there?

12   A.   Sometimes.

13   Q.   And the soldiers went into the orphanages, when the

14   children were there, with their guns?

15   A.   Not into the places where the orphan children were.

16   Q.   But you went to the orphanages at night also.  Correct?

17   A.   Yes, for operational reasons, yes.

18          MS. HOLLANDER:  Nothing further, Your Honor.

19          THE COURT:  Mr. Westfall, any questions?

20          MR. WESTFALL:  I don't, Your Honor.

21          THE COURT:  Mr. Dratel?

22          MR. DRATEL:  Yes, I do, Your Honor.  Thank you.

23                       CROSS EXAMINATION

24   By Mr. Dratel:

25   Q.   Good morning.

1    A.    Good morning.

2    Q.    The places that were searched, do you know the size of

3    the places?  In other words, the buildings?

4    A.    It could have been a building.  It could have been a

5    room.  It depended on the circumstance.

6    Q.    But your soldiers' instructions were to search the

7    entirety of the target, whatever was named as the target of

8    the operation.

9    A.    The modus operandi of my troops is that first they do a

10    superficial search of the whole structure, and then they go in

11    to take care of the relevant locations.

12    Q.    Okay.  And they determined on scene what was relevant and

13    what was not.

14    A.    Yes.  They have the capability to determine whether it is

15    an operational room or whether it is a kitchen, so the

16    probability is that they will go into the operational room.

17    Q.    And once they determine it is an operational room, they

18    try to take everything that is in there.

19    A.    As I stated, if there is time, then they do.

20    Q.    So from these locations, there are numerous boxes of

21    materials from each location that was seized that was brought

22    back to Beit El.

23    A.    Yes.

24    Q.    Can you give an estimate of how many boxes total from

25    let's say just Operation Defensive Shield?

```
1    A.    About 2,000 boxes.

2    Q.    2,000 boxes.  Now, what is the capacity of Beit El in

3    terms of as a storage facility?  How much is stored there?

4    A.    As I stated before, Beit El is only an intermediary

5    station.  The materials are never stored there for good.  The

6    unit, the transporting unit that I assigned keeps going back

7    and forth between Beit El and the home base, and they keep

8    bringing those boxes back to the home base in the center.

9    Q.    Do you know what the capacity is in terms of storage for

10   the home base?

11   A.    I don't understand your question.

12   Q.    How much material is stored at the home base from these

13   seizures?

14   A.    All the material.

15   Q.    Right.  But can you give us an estimate of how much?

16   Withdrawn.  You said about 2,000 boxes from Operation

17   Defensive Shield, and then there were additional seizures

18   within the next couple of years.  Right?

19   A.    Yes.

20   Q.    So starting with 2002, Operation Defensive Shield, you

21   said about 2,000 boxes.  And then through the 2004 seizures,

22   how many more boxes are stored at the main facility from those

23   seizures?

24   A.    Up until 2004?

25   Q.    Sure.
```

1  A.    Approximately 150 additional boxes.

2  Q.    And anything after 2004?

3  A.    We continue operating to this day.

4  Q.    And how many more boxes have you seized and sent over to

5  the home base since 2004?

6  A.    After 2004 these are just the intermittent very few

7  operations, and the material accumulated from them is very

8  sparse, very little.

9  Q.    Okay.  Now, when your troops perform these military

10  operations, they did not give warning that they were going to

11  these locations.  Right?

12  A.    As I stated before, we accompany the combat units that

13  are operating in the area, and they are the ones that go into

14  the targets.  And after they get into the target, we do our

15  professional work.

16  Q.    Right.  But let's say for operational reasons you would

17  want to go by surprise and not give advanced notice that you

18  were coming.

19  A.    As I said before, I touch upon these operations as

20  a -- in my professional intelligence capacity.  I have

21  knowledge of the operational aspect as being a military

22  officer for many years.

23  Q.    So I will ask the question again.  Was surprise an

24  element of the operation in terms of going after these

25  targets?

1    A.    The surprise element is a very, very important

2    element -- It is a very important element when we are talking

3    about a military operation.

4    Q.    And the people who might have been in these locations, if

5    there were people in these locations when you searched them,

6    they didn't have the choice whether to refuse entry to the

7    troops.  Right?

8    A.    No.  They cannot refuse entry.

9            MR. DRATEL:  Pass the witness, Your Honor.

10           THE COURT:  Thank you.

11      Ms. Cadeddu?

12           MS. CADEDDU:  Yes, Your Honor, just a few.

13                      CROSS EXAMINATION

14   By Ms. Cadeddu:

15   Q.    Mr. Lior, I would like to ask you a couple of questions

16   about the Intelligence and Terrorism Information Center.

17   A.    Yes.

18   Q.    The Intelligence and Terrorism Information Center is an

19   Israeli organization that the army sends some of these seized

20   documents to.  Is that correct?

21   A.    Subject to orders and directions that I receive from

22   above.

23   Q.    So the army does send some of these seized documents to

24   the Intelligence and Terrorism Information Center.

25   A.    Yes.

1    Q.    And that Center is also sometimes referred to as the

2    IICC.  Right?

3    A.    I am not familiar with it.

4    Q.    Okay.  Is another name for the Center the Israeli

5    Intelligence Heritage and Commemoration Center?

6    A.    It is called the Intelligence and Terrorism Center.

7    Q.    Okay.  But that is a part of the Israeli Intelligence

8    Heritage and Commemoration Center.  Right?

9    A.    Yes.

10   Q.    And that center used to also be referred to in the past

11   as the Center for Special Studies?

12   A.    I am not familiar with it.

13   Q.    Okay.  Well, the Intelligence and Terrorism Information

14   Center gets some of these documents from you, as you said, and

15   it displays them for the Israeli public.  Right?

16   A.    Yes, subject to directives, as I stated before.

17   Q.    And another thing that the Intelligence and Terrorism

18   Information Center does is perform analyses of these

19   documents, and those are called special information bulletins.

20   Right?

21   A.    Yes.

22   Q.    And the Intelligence and Terrorism Information Center is

23   a part of the Israeli army and also a part of an intelligence

24   or security part of the government.  Right?

25   A.    No.  It is a civilian entity which works with the army.

1    Q.    Okay.  So it is your position that it is not part of the

2    army or part of another security unit?

3    A.    That is right.

4    Q.    And I believe, Mr. Lior, that you testified in another

5    proceeding in this case.

6    A.    Yes.

7    Q.    And when you testified in that proceeding, you were also

8    then testifying under oath.  Isn't that right?

9    A.    Yes.

10   Q.    And you understood at that time that it was important to

11   be truthful?

12   A.    Yes.

13   Q.    And to provide complete and truthful responses to the

14   questions you were asked?

15   A.    Yes.

16   Q.    And at that time you were asked whether the Intelligence

17   and Terrorism Information Center is a part of the military.

18   Do you remember that, sir?

19   A.    Yes, I remember, and I checked my answer, and the answer

20   that I am giving now is an accurate answer.

21   Q.    So in fact when you testified that it was a part of the

22   army and another security unit, that was false?

23   A.    You can say so, but my mistake stemmed from the fact that

24   the person who is managing this center used to work for the

25   military, and that is why I made this mistake.

1   Q.   Well, in fact, before you answered that question, you

2   consulted with the government lawyer who is provided to you.

3   Is that correct?

4   A.   Yes.

5   Q.   And after consulting with that lawyer during the previous

6   proceeding, you stated that the Intelligence and Terrorism

7   Information Center was a unit that belongs both to the army

8   and another security unit.

9           MS. SHAPIRO:  Your Honor, I object to the

10  mischaracterization and referring to consultation of counsel.

11          MS. CADEDDU:  Would you like us to approach, Your

12  Honor?

13          THE COURT:  Yes.

14          (The following was had outside the hearing of the

15          jury.)

16          THE COURT:  What is the mischaracterization, do you

17  think?

18          MS. SHAPIRO:  The reason he consulted with counsel

19  was not the answer, but that he could give the answer.

20          MS. CADEDDU:  I have no idea what the lawyer said,

21  but the fact of the matter is after --

22          THE COURT:  This is relevant for what reason?

23          MS. CADEDDU:  He changed his answer.

24          THE COURT:  Well, that is irrelevant.

25          MS. CADEDDU:  Well, this is the center Doctor Levitt

1    gets all his information from, so the fact of whether it is an

2    Israeli government operation or civilian operation matters.

3    It goes to his credibility.  It goes to the credibility of the

4    source he uses for all of his analyses, and the fact is that

5    he changed his testimony.

6              THE COURT:  I know, but it still has to be relevant

7    to something.

8              MS. HOLLANDER:  It goes to bias, too, and to the

9    relationship with the government and the government of Israel

10   in this case, and the access that Matthew Levitt had to these

11   documents and whether he got that access by going to the

12   Israeli government, since he was an expert for the Government,

13   and it really goes to that issue of bias.

14             MS. SHAPIRO:  He testified he doesn't even know

15   Doctor Levitt, so I am not sure how it is relevant whether or

16   not the place where Doctor Levitt may have gotten his

17   information is or is not connected to the military.

18             MS. HOLLANDER:  Well, the fact that he doesn't know

19   Doctor Levitt doesn't change where Doctor Levitt got the

20   information.  And he is the witness who testified last time

21   that it was part of the government and this time he is

22   testifying that it isn't.

23             MS. CADEDDU:  It is the primary source for Doctor

24   Levitt's information is the center.

25             THE COURT:  All right.  I will overrule the

1    objection.  Go ahead.

2              (The following was had in the presence and hearing

3              of the jury.)

4    Q.   (BY MS. CADEDDU)  So, Mr. Lior, as I recall the question,

5    the last time you testified before you answered the question

6    whether the Intelligence and Terrorism Information Center is

7    part of the Israeli government, you consulted with counsel,

8    and then you answered, "This unit belongs both to the army and

9    another security unit authority."  Isn't that correct?

10   A.   That is what I answered, yes.

11   Q.   And in fact, as you mentioned a few moments ago, the

12   Intelligence and Terrorism Information Center's founder and

13   chief is a man named Reuven Erlich.  Isn't that right?

14   A.   Yes.

15   Q.   And he is in fact, as I understand it, and correct me if

16   I am wrong, a retired Israeli Intelligence officer.

17   A.   Yes.

18             MS. CADEDDU:  Pass the witness.

19             THE COURT:  Ms. Shapiro?

20             MS. SHAPIRO:  No redirect, Your Honor.

21             THE COURT:  Major Lior, you may step down.  You are

22   free to go.

23        Are you ready for Mr. Shorbagi?

24             MR. JACKS:  Yes, Your Honor.

25             THE COURT:  Is he where he can --

1        MR. JACKS:  Your Honor?

2        THE COURT:  Come on up.

3        MR. JACKS:  We need just a minute or two to bring

4    him down.

5        MS. CADEDDU:  Your Honor, I need to put something on

6    the record I need to put on the record Major Lior got up and

7    was escorted out of the room by his people, and we had asked

8    that that not happen in the presence of the jury and went out

9    the back door instead of having the jury be excused first.

10        THE COURT:  Okay.  It is on the record.

11        MS. HOLLANDER:  We ask that when Avi comes that that

12    not happen.

13        THE COURT:  We will think about it.

14        MS. HOLLANDER:  Are you going to invite people back

15    to the courtroom.

16        THE COURT:  Yeah, we can.  They can come in.  I am

17    not going to stop and invite them but they can come in.

18        MS. HOLLANDER:  I think you just have to tell the

19    marshals.

20        THE COURT:  I am not going to worry about it.  They

21    can come in but I am not going to stop and announce it.

22        (The following was had in the presence and hearing

23        of the jury.)

24        THE COURT:  Let's take a recess while we bring this

25    witness down.  If you will step into the jury room for just a

few minutes.

(Whereupon, the jury left the courtroom.)

THE COURT:  We will be in recess for a few minutes until we get some information.  It should be just a few minutes.

(Brief recess.)

THE COURT:  Ms. Hollander?

MS. HOLLANDER:  Thank you, Your Honor.

THE COURT:  Mr. Shorbagi, you are under the oath you took last week.  You are still under the oath.

CROSS EXAMINATION

By Ms. Hollander:

Q.    My name is Nancy Hollander.  I represent Shukri Abu Baker.  And I just have not too many questions.

You mentioned in your direct testimony that you went to school in Gaza.  Correct?

A.    Correct.

Q.    And did you go to school with the children from the refugee camps?

A.    Yes, ma'am.

Q.    So you went to the U.N. school?

A.    No, the primary school, the middle school, they have two different schools.  They have the government school and they have the refugee schools.  But the high school they mixed together, so I went to Khan Yunis high school, which has both

1    the students from the refugee the United Nations school and

2    the Israeli government schools.

3    Q.    They were mixed in high school?

4    A.    That is correct, yes, ma'am.

5    Q.    And in the earlier grades the children from the refugee

6    camps went to the U.N. schools.  Correct?

7    A.    That is correct.

8    Q.    And that is the United Nations Work and Relief

9    Association.  Correct?

10   A.    UNWRA Correct.

11   Q.    We call that UNWRA?

12   A.    Correct.

13   Q.    Is that what you are saying?

14   A.    UNWRA.  Right.

15   Q.    And you know that the United States is the largest

16   financial supporter of UNWRA.  Correct?

17   A.    I think so.  I am not really sure, yes.

18   Q.    You know that the United States provides funds for UNWRA.

19   Correct?

20   A.    Correct.  Yes, I know.

21   Q.    Now, UNWRA continues to run the schools in Gaza to this

22   day.  Correct?

23   A.    Correct, yes.

24   Q.    So that is even after Hamas took over.  Correct?

25   A.    I really don't know, ma'am, but I know they run the

1    school and still running the school.  Correct.

2    Q.    Okay.  And every child in the refugee camp is allowed to

3    go to the UNWRA school.  Correct?

4    A.    Correct, yes.

5    Q.    And that is even if their fathers are in prison or

6    detained by Israel.  Correct?

7    A.    Correct, correct.

8    Q.    Now, I want to ask you a little bit about the videos that

9    you discussed in your direct testimony.

10   A.    Correct.

11   Q.    One of those videos showed some -- I think they were

12   children or young people throwing stones at Israeli soldiers.

13   Correct?

14   A.    Yes, ma'am.

15   Q.    And those kids were not necessarily Hamas supporters,

16   were they?

17   A.    Are you talking about 1987, '88, the first Intifada?

18   Q.    Yes.

19   A.    Yes, it could be any kids--Hamas, Fatah, regular kids.

20   Right.

21   Q.    But we saw that some of them had their faces covered.

22   You saw that.  Correct?

23   A.    Yes, ma'am.

24   Q.    That was so they couldn't be identified by the Israelis.

25   Correct?

1    A.    Yes, ma'am.

2    Q.    And that was because if the Israelis knew who they were,

3    they might destroy the houses of their relatives.  Correct?

4    A.    Correct.

5    Q.    Or Israel might actually find them and put them into

6    administrative detention.  Correct?

7    A.    Bottom line, they will be in trouble.

8    Q.    And might target their relatives, too.  Correct?

9    A.    Correct.

10    Q.    Now, another video was a MAYA convention in 1992.

11    Correct?

12    A.    Yes, uh-huh.

13    Q.    And you pointed out that Khalid Mishal was in the

14    audience.  Correct?

15    A.    Was the speaker.  Right.

16    Q.    Right.  And do you remember that during -- We saw the

17    video pan and you could see him sitting in the audience at one

18    point?

19    A.    Yes, I remember that.

20    Q.    Surrounded by other people who were there.  Correct?

21    A.    Correct, yes.

22    Q.    And that was during the general session of the

23    conference.  Correct?

24    A.    Correct, yes, ma'am.

25    Q.    Now, at these MAYA conventions, there were as many as

1    6,000 or 8,000 people present.  Correct?

2    A.    Correct, that is right.

3    Q.    And any of those 6,000 or 8,000 people were sitting there

4    with Mr. Mishal.  Correct?

5    A.    Actually he was sitting in the first row and then people

6    sitting like either right, left, or the other rows.

7    Q.    All around him.

8    A.    Yes, uh-huh.

9    Q.    Right.  And that was a big auditorium.  Correct?

10    A.    Correct, yeah, it was a big auditorium.

11    Q.    Have that many people there?

12    A.    Correct.

13    Q.    You also said that one of the topics at that MAYA

14    convention, which was held in December of 1992, was the issue

15    of the deportees.  Correct?

16    A.    Correct, true.

17    Q.    People were raising money for the deportees at that time.

18    Correct?

19    A.    Correct.

20    Q.    And for their families?

21    A.    Yes, ma'am.

22    Q.    Correct?

23    A.    Uh-huh.

24    Q.    And that was because Israel rounded up these 400 men and

25    took them to the border and left them there in the Winter.

```
 1    Correct?

 2    A.    Yeah.  Actually they crossed the border and then they

 3    left them in south Lebanon.

 4    Q.    And that created a very big humanitarian and economic

 5    crisis, didn't it?

 6    A.    Correct.

 7    Q.    These men needed food.  Correct?

 8    A.    I remember when they deported them to south Lebanon they

 9    left them in an area called no man's land or no man's zone,

10    and the United Nations stepped in.  Correct.

11    Q.    Because they needed food.  Correct?

12    A.    Correct.

13    Q.    And they needed shelter.  Correct?

14    A.    Correct.

15    Q.    Because there was snow on the ground?

16    A.    Right.  It was snowing time.  Correct.

17    Q.    And some of them needed medicine.  Correct?

18    A.    Yeah.  Some of them are old men.  Correct.

19    Q.    And you know that the Holy Land Foundation also raised

20    money to provide charity for these men.  Correct?

21    A.    Correct.

22    Q.    And you said the United Nations was there also.  Correct?

23    A.    Correct, yes, ma'am.

24    Q.    And the Red Cross?

25    A.    I am not really sure about Red Cross, but I know the
```

1    United Nations was there.

2    Q.    And other charities -- Do you know other charities were

3    there, too?

4    A.    Correct, yes, ma'am.

5    Q.    And money you said was also raised for their families.

6    Correct?

7    A.    Correct.

8    Q.    Because the families, the wives and children were left

9    without anyone to provide for them at the same time because

10   the men were deported.  Correct?

11   A.    Correct.

12   Q.    And you know also that the United Nations joined the

13   international community in condemning Israel for this

14   deportation.  Correct?

15   A.    Yes, ma'am.

16   Q.    There was actually a United Nations resolution at that

17   time, wasn't there?

18   A.    Yes, there was a United Nations resolution.  Correct.

19   Q.    And eventually they all came back.  Right?

20   A.    Because they stayed in that area for one year, and after

21   one year Israel, the government of Israel let them back again.

22   Correct.

23           MS. HOLLANDER:  May I have a minute?  I am being

24   summoned.

25           THE COURT:  Yes.

1    Q.   (BY MS. HOLLANDER)  I am told I may have misspoken.  The

2    United States joined the international community in condemning

3    Israel.  Correct?

4    A.   I really don't remember, but I know that there was a

5    resolution by the United Nations condemning the deportees.

6    Right.

7    Q.   Now, on direct examination you also mentioned something

8    you called two famous massacres that the various speakers

9    discussed when they came to Rome, Georgia.  Correct?

10   A.   Actually I said one was in 1990 and that is when I was in

11   Houston.  The other one was in 1994.

12   Q.   Okay.  And let me ask you about when you were in Rome in

13   1994.  Correct?

14   A.   Correct.

15   Q.   So you were referring to what is known as the Hebron

16   massacre.  Correct?

17   A.   Correct, yes, ma'am.

18   Q.   And as a result of that massacre, there were families in

19   need.  Correct?

20   A.   Correct, yes.

21   Q.   Okay.  And that massacre resulted from a Jewish settler

22   who killed 29 men who were praying in the mosque.  Correct?

23   A.   Dr. Baruch Goldstein.  Correct.

24   Q.   And that was with a gun.  Right?

25   A.   Right.  He entered the mosque and with a machine gun, he

1    was residing illegally in the city of Hebron, and started

2    shooting at the people while they were prostrating and he

3    killed about 29 people.  Correct.

4    Q.    And wounded many more.  Correct?

5    A.    About 50 wounded.  Right.

6    Q.    And people were raising money for their wives and

7    children also.  Correct?

8    A.    Correct.

9    Q.    Now, these innocent 29 men who were murdered as they

10   prayed, in your religion they would be considered martyrs.

11   Correct?

12   A.    Yes, ma'am, correct.

13   Q.    And would that be true -- Would all Palestinians consider

14   them martyrs?

15   A.    Absolutely.

16   Q.    Right.  Not just Hamas supporters.

17   A.    No, ma'am.  Actually the whole Arab and Muslim countries

18   consider them martyrs, not just the Palestinians.

19   Q.    All Muslims would consider them martyrs?

20   A.    Correct, yes, ma'am.

21   Q.    Okay.  I want to ask you about I think one more.  You

22   also mentioned about donating money.  You talked on direct

23   about how you asked people to donate money when Israel

24   destroyed the homes of people.  Correct?

25   A.    Correct, yes, ma'am.

1   Q.   And this also created a severe economic hardship for

2   families.  Correct?

3   A.   True, because the family, the average family of Palestine

4   is a total of about seven, nine people, so they are left

5   without a home.  Correct.

6   Q.   And this was even if the families were innocent of any

7   wrongdoing.  Correct?

8   A.   Yes, ma'am.

9   Q.   Now, do extended families sometimes live together in

10  Gaza, parents and grandparents and cousins?

11  A.   That is about 80 percent true.

12  Q.   About 80 percent true?

13  A.   Correct.

14  Q.   Is that because there is not enough housing there?

15  A.   The area is small, so they don't have like a big portion

16  of the land, so they tend to build like floor after floor, and

17  they live in the same building.  Correct.

18  Q.   Okay.  And Israel sometimes destroyed homes of whole

19  families because somebody threw rocks.  Correct?

20  A.   Correct.

21  Q.   Now, one of the times you said you raised money was when

22  Israel destroyed 70 homes at one time in Rafah.  Correct?

23  A.   Yes, ma'am.  That was during when I was in Rome.  I gave

24  a sermon Friday sermon about that.  The Israelis went to Rafah

25  and destroyed 70 homes in less than two or three hours.  Yes,

1    I did collect money for that.

2    Q.   And that was without warning.  Correct?

3    A.   Correct, yes, ma'am.

4    Q.   And people died in that?

5    A.   Yes, ma'am.

6    Q.   Those people who died defending their homes, they would

7    be considered martyrs in your religion?

8    A.   Yes, ma'am.

9    Q.   And that also would be by all Muslims or just Hamas

10   supporters?

11   A.   No, no.  That is something very well-known in the Islamic

12   religion.

13   Q.   Now, you also said that you are part Hamas and part

14   Fatah.  Correct?

15   A.   Myself?

16   Q.   Yes.  You are 50 percent Hamas and 50 percent Fatah.

17   A.   Oh, okay.  You are saying -- Well, as I said, when it

18   comes to the money I am with Hamas 100 percent.  Correct.

19   Q.   Right.  But you also said you support a two-state

20   solution.  Correct?

21   A.   Correct, correct.

22   Q.   To have a state of Palestine and a state of Israel is

23   what you mean by a two-state solution.  Correct?

24   A.   That is correct.

25   Q.   And to have real borders between them?

1    A.    If Israel will let us have it, yes, ma'am.

2    Q.    Because there is no real border right now, is there?

3    A.    There is none.  Correct.

4    Q.    But that is not what Hamas supports, is it?

5    A.    No, ma'am.

6    Q.    So that is one way that you are different from Hamas.

7    Correct?

8    A.    That is correct.

9    Q.    And you also don't support suicide bombings either, do

10   you?

11   A.    That is correct, yes, ma'am.

12   Q.    So that is another way that you are different from Hamas?

13   A.    That is correct.

14   Q.    Okay.  Am I correct, sir, that what you care about is

15   that the charity actually reached the needy people in

16   Palestine?  Correct?

17   A.    Correct.

18   Q.    That is what matters to you.  Correct?

19   A.    That is correct, yes, ma'am.

20   Q.    And you knew that Holy Land gave aid to the needy.

21   Correct?

22   A.    Yes, ma'am.

23   Q.    And it was given to help the Palestinian people survive

24   under the harsh conditions of the occupation.  Correct?

25   A.    Correct, yes, ma'am.

1    Q.    So as long as the aid reached the needy Palestinians, it

2    didn't matter to you what charity or organization it went

3    through.  Correct?

4    A.    Well, it does matter.  As I said, like it has got to be

5    going to the right people that you know that they are not

6    going to keep the money in their pocket, that they will give

7    it to the poor people.

8    Q.    Right.  What matters is that the needy people get the

9    money.  Correct?

10    A.    That is correct, yes, ma'am.

11    Q.    That is more important than whether the charity is run by

12    Hamas or Fatah or somebody non-political.  Correct?

13        Let me ask it another way.  I will strike that.  What

14    matters is that the aid reaches the needy and doesn't get

15    diverted to build somebody a $7 million mansion.  Correct?

16    A.    Correct.

17    Q.    That is what I mean when I said it didn't matter who ran

18    the charity.  It matters that the needy people get it.

19    A.    Correct.  But let me just clarify a single point.  You

20    are talking about West Bank and Gaza.  There are two ways

21    only, this way or that way, either with Hamas or with Fatah.

22    So if you want your money to get to the needy, you got to go

23    with Hamas.  If you want your money to go to anybody else,

24    then you got to go to Fatah, so that is the only two ways.

25    Q.    You are talking about Gaza.  Right?

A.    Gaza and West Bank.

Q.    Gaza.  Well you never were in the West Bank.  Correct?

A.    Correct.

Q.    In fact, you weren't allowed to go to the West Bank.

A.    No, I am not.

Q.    And that is not just because of who you are.  That is
because people from Gaza aren't allowed to go to the West
Bank.

A.    Palestinians from Gaza are not allowed to go to the West
Bank.  Palestinians from the West Bank are not allowed to go
to Gaza.

Q.    Now, you also attended -- And the last time you were in
Gaza was in 1991.  Correct?

A.    1991, correct.

Q.    Right.  You also attended an IAP festival in 1997 or 1998
in Chicago.  Correct?  That was the one -- To remind you, that
was the one that you discussed there was a political debate?

A.    Yes, yes, ma'am.

Q.    That was in Chicago.  Correct?

A.    That is correct, yes.

Q.    And that was in '97 or '98?

A.    I think '97.  Right.

Q.    And the IAP invited Mr. Abu Huseinni to debate the PLO
side.  Correct.

A.    Huseinni was the PLO to debate the Hamas side, Mr. Siam.

1  Q.   And Mr. Huseinni is a leading person in the PLO.

2  Correct?

3  A.   Correct.

4  Q.   From one of the leading families in Palestine.  Correct?

5  A.   Correct, yes, ma'am.

6  Q.   I mean, it was his relative who was famous for fighting

7  the British in the '40s.  Correct?

8  A.   His grandfather, we call him the grand mufti of

9  Palestine, Amin Husseinni who fled Palestine during 1948 to

10 Lebanon, and then he died in Lebanon.  Correct.

11 Q.   Okay.  And the IAP invited Mr. Huseinni to engage in this

12 political dialogue even though the PLO and Hamas are political

13 rivals.  Correct?

14 A.   Correct.

15 Q.   In fact, isn't it true, sir, that in general you would

16 say that Palestinians spend a lot of time debating how they

17 are going to deal with the occupation?

18 A.   For the last 60 years we have been debating, yes, ma'am.

19 Q.   And that is on people's minds all the time, isn't it?

20 A.   Correct.

21 Q.   And people talk about it all the time.

22 A.   This is their daily food as a Palestinian Correct.

23 Q.   And debate the best way to do it?

24 A.   Correct.

25          MS. HOLLANDER:  Nothing further, Your Honor.

1          THE COURT:  Mr. Dratel?

2          MR. DRATEL:  Can we approach for a moment, Your

3  Honor?

4          THE COURT:  Yes.

5          (The following was had outside the hearing of the

6          jury.)

7          MR. DRATEL:  Just two things.  The two matters that

8  were before Your Honor, and another one about cross

9  examination a preview for the Court before going into it,

10  there is -- He -- There is an envelope that he received at

11  some point back that has to do with Ashqar a little bit, but

12  someone else, this gentleman named Hindi who he spoke about,

13  he lied in a series of lies to the Government initially about

14  his possession of the envelope, reading the envelope, all of

15  that.  I don't want to get into the contents.  I don't think I

16  am opening the door to the contents of the envelope, which is

17  really someone's confession.  It is a series of confessions to

18  the Israelis that were taken in interrogation by people back

19  in the 1993.

20      I just didn't want to open the door, and I just sort of

21  wanted to get an advanced ruling so that if I get into it just

22  that he was lying, that he read the documents and whether he

23  opened the envelope, but nothing about the contents, that I

24  wouldn't be opening the door to get back into that on

25  redirect.  So that is the question I am asking.

1          MR. JACKS:  Judge, I didn't go into that on direct

2     because I don't believe it has anything to do with what he is

3     testifying about in this case, so it is outside the scope of

4     his direct examination.

5          MR. DRATEL:  But this is credibility, because he

6     lied to the Government about it in his -- in a series of

7     interviews.  Really for months he lied to the Government about

8     his involvement with this particular envelope.

9          THE COURT:  It is pretty abstract to me.  I am

10    hard-pressed to tell you whether are it is opening the door or

11    what is going on, since this is all I am hearing is a little

12    snippet.

13         MR. DRATEL:  I can tell you that the Government

14    confronted him with the envelope from his briefcase.

15         THE COURT:  What is in the envelope?  The

16    confessions?

17         MR. DRATEL:  Yes.  It is a cover letter from

18    someone, and he is supposed to hold it for Mr. Hindi I think.

19    And his first reaction is, "I don't know how it got in my

20    briefcase."  And they press, and he says, "Well, I was given

21    this envelope years ago, but I never opened it."  Then it

22    turns out he did open it.  He says, "Well, I opened it but I

23    never read it."  And it turns out -- Then he said he glanced

24    at the cover letter.  This is over a series literally of like

25    two months, three months time.  And finally he acknowledges

1    that he read the materials in them.

2        That is essentially what I want to do, and it is a matter

3    of credibility, it is a matter of the evolution of his

4    involvement, his cooperation with the Government, it is

5    impeachment in the context of how he got to where he is and

6    what kind of person he is.

7                MR. JACKS:  Well, I mean, if you go into that story,

8    then you need to go behind the story and find out okay, you

9    know, why is he lying about it?  What is it that would cause

10   him to lie about it, and that would go into the contents of

11   these envelopes.  And, I mean, if you are going to show --

12   Okay.  What was going on in his mind that would cause him to

13   lie about whether he had opened it and whether he had read it

14   and then how much of it he had read.  So I think to complete

15   the story he needs to tell what that stuff is.

16               MR. DRATEL:  I don't see why contents -- It is

17   something, maybe he felt if the Government knew would put him,

18   you know -- would make him look guilty of something.  But not

19   to get into the specific contents, because we don't want to

20   get into all these *Crawford* issues and the variety of things

21   that go into that.  So I think that it can be done -- that he

22   was worried about what was in the documents, but the actual

23   contents of the document doesn't affect the fact that he kept

24   lying about it.

25               THE COURT:  If you open the door *Crawford* doesn't

apply.  If you open the door, then he has to get into it.  I

will probably have to take a look at what is that is in there

to be able to make that determination.  Frankly, I am not able

to make that determination as to whether that opens the door

for them to get into the contents or not from what I am

hearing here.  I just can't tell.

           MR. DRATEL:  Okay.

           THE COURT:  But I think if you did it and opened the

door, I think that would waive any *Crawford* issue, because you

have opened the door.  And if you don't want to open that

issue, then probably you have to stay away from it.  But I

don't know, frankly.

           MR. DRATEL:  May I make a suggestion?  It is 12:20

which is about when we usually break.  Let me consider what I

want to do, and if I want to submit some material on it that

gives you a sense of what it is and then you can make a

decision.

           THE COURT:  Sure.

           MS. HOLLANDER:  There was another 302 issue.

           THE COURT:  What is going on with that?

           MR. JACKS:  I sent you one, and was there two parts,

more than one?

           MR. DRATEL:  It was one sentence.

           THE COURT:  Do you want that name?

           MR. DRATEL:  He lied to someone about sending money

1    to Hamas when he actually did.

2         THE COURT:  I think they are entitled to keep that

3    information a secret.  I don't think you are entitled to that.

4    And I don't know what form I have it in, but we will seal it

5    and make it a part of the record.

6         MR. DRATEL:  Thank you, Your Honor.

7      Our objection is noted?

8         THE COURT:  Yes.  Anybody else have any cross.

9         MR. WESTFALL:  Your Honor, if I change my mind over

10   lunch, but right now presumptively not.

11        MS. CADEDDU:  I am considering it.  I may not.

12        THE COURT:  You just don't know, Ms. Cadeddu?

13        MS. CADEDDU:  I am not sure.

14             .

15        MR. WESTFALL:  I can tell you this.  From where I am

16   coming now, there is no way I can come up with an hour of

17   cross.

18        MR. JONAS:  Just for scheduling, are we going to

19   stop --

20        THE COURT:  I am not sure how long we are going to

21   go, what your situation is.  You have already crossed him,

22   haven't you?

23        MS. MORENO:  Unless there is a recross, and it might

24   be one or two questions, but at this point I don't think so.

25        MR. JONAS:  I am just asking whether we are going to

1    put Agent Burns on the stand.

2            THE COURT:  How long do you anticipate your cross?

3            MR. DRATEL:  I would say probably less than an hour.

4            THE COURT:  Okay.  What do you think about your

5    redirect?

6            MR. JACKS:  Thirty minutes.

7            THE COURT:  MS. MORENO:  Given my colleagues' time

8    limits, his own analysis -- Forget it.  What I am trying to

9    say is I don't feel well at all, and I am wondering that if

10   the three hours that Mr. Jacks is really going to take on

11   redirect, that perhaps we can take for the day that would be

12   my --

13           THE COURT:  I wanted to try to finish him up today.

14           MS. MORENO:  Finish him today, yes.

15           MR. JACKS:  Several people told me they want to make

16   sure they get out of here.

17           MS. HOLLANDER:  She is saying if we finish him --

18           MS. CADEDDU:  After that if we can break.

19           THE COURT:  We can certainly do that.  That is not a

20   problem.

21           MS. MORENO:  I appreciate that, Your Honor.  Thank

22   you very much.

23           THE COURT:  All right.  So you want to take a lunch

24   break?

25                   (The following was had in the presence and hearing

1          of the jury.)

2          THE COURT:  Let's go ahead and take the lunch break.

3    Be back at 1:45.

4          (Whereupon, the jury left the courtroom.)

5          THE COURT:  We will be in recess until 1:45.

6              (Lunch recess.)

7          THE COURT:  Mr. Dratel?

8          MR. DRATEL:  Thank you, Your Honor.

9                    CROSS EXAMINATION

10   By Mr. Dratel:

11   Q.   Good afternoon.

12   A.   Good afternoon.

13   Q.   Now, I want to take you back to March 9th, 2006.  Is it

14   fair to say that the FBI came and confronted you with the fact

15   that you had stolen a lot of money from your employer and that

16   you were in a bad situation?

17   A.   Not really.

18   Q.   You didn't testify to that previously?

19   A.   Yes.

20   Q.   You did?

21   A.   Right.

22   Q.   That you were in a bad situation as a result of that?

23   A.   Right.

24   Q.   So you agree with that?

25   A.   Right.

```
 1    Q.    And that they told you that you were looking at 20 years
 2    on each count of fraud.  Right?
 3    A.    Right.
 4    Q.    And they told you at that point they only
 5    had -- Withdrawn.  This was in 2006.  Correct?
 6    A.    Correct.
 7    Q.    And the Holy Land indictment had already been public at
 8    that point.  Right?
 9    A.    Correct.
10    Q.    And you were concerned about what was going to happen to
11    you?
12    A.    Correct.
13    Q.    And you asked them what is going to happen to you.  You
14    asked the agents who were talking to you.
15    A.    Right.
16    Q.    And you asked about what your sentence might be.
17    A.    Right, correct.
18    Q.    And you wanted it to be as low as possible.  Right?
19    A.    Correct.
20    Q.    And the agents told you it wasn't up to them, it was up
21    to the prosecutor as to whether or not they could do anything
22    for you about your sentence.
23    A.    Correct.
24    Q.    But they told you it was important to tell the truth.
25    A.    Correct.
```

```
1    Q.    Now, your employer was Alexandria Carpet?

2    A.    Correct.

3    Q.    It was also known as AI.  Right?

4    A.    They changed the name to AI.  Right.

5    Q.    And that was run by Samir Khatib?

6    A.    Right.

7    Q.    And that is the person you talked about last Wednesday

8    and Thursday when Mr. Jacks was talking to you?

9    A.    Thursday and Friday.  Right.

10   Q.    He was the person who was in the Afghan outfit in that

11   video?

12   A.    Correct.

13   Q.    Someone you said suffered from manic depression.

14   A.    Correct.

15   Q.    Who you established a strong relationship with?

16   A.    Correct, yes.

17   Q.    And someone who you said you were very much close to?

18   A.    Correct.

19   Q.    And he needed someone to be humble and nice and to calm

20   him down through his manic depressive periods.

21   A.    Correct.

22   Q.    And he trusted you.  Right?

23   A.    Correct.

24   Q.    And you were supposed to look out for him during these

25   manic and depressive periods.
```

A.   Not really.  I was doing just like on just the basis that

he is a good man.  I looked after him.

Q.   And he is the person you stole all that money from.

A.   But he was not running the company.

Q.   But his company was the one you stole it from.

A.   Correct.

Q.   And this fraud that you committed on him occurred between

2001 and 2005.

A.   Correct.

Q.   That whole period.

A.   Correct.

Q.   Right?  And it started I guess in the same year that HLF

closed down.  Right?

A.   Right.

Q.   Had you been skimming money from HLF, the stuff you

raised for HLF, and needed something to replace it?

A.   Ask the question again, please.

Q.   Had you been taking money from HLF, from the money you

raised for HLF at the mosque, had you been taking some of that

for yourself and you needed something to replace it when HLF

closed down?

A.   No, sir.

Q.   The agents asked you about that.  Right?

A.   I don't remember.  I think the agents asked me about the

money that was collected in the mosque, and I told them I

1    didn't take the money from the mosque.

2    Q.    Because you put that in your personal account before

3    sending it off.  Right?  The money collected at the mosque.

4    A.    Well, sometimes I will take cash and then make a money

5    order and send it to Holy Land Foundation.  The checks I send

6    directly to Holy Land Foundation.  Sometimes, yes, cash I

7    would put in my account and then cut a check from my account.

8    Correct.

9    Q.    Now, with respect to the fraud you committed on Samir

10   Khatib, you arranged with someone who you did business with

11   outside the company that they would inflate their costs to AI,

12   to Alexandria.

13   A.    Correct.

14   Q.    And those inflated costs you would share the difference

15   with him.

16   A.    Correct.

17   Q.    And, of course, you didn't tell Mr. Khatib or anyone at

18   the company about this arrangement.

19   A.    Correct.

20   Q.    And in fact, in 2004 and 2005, between two and six

21   occasions you actually prepared fraudulent shipment

22   documentation to hide this arrangement.

23   A.    Correct.

24   Q.    And you also used AI's funds to pay personal credit card

25   bills.

1    A.    Correct.

2    Q.    Without their knowledge.  Right?

3    A.    Without --

4    Q.    AI's knowledge.

5    A.    Correct, right.

6    Q.    And in order to further conceal the money you were

7    stealing from AI, you created payments to legitimate business

8    accounts, but in fact the payments were going to you.

9    A.    Correct.

10   Q.    And you only stopped that fraud, you only stopped

11   stealing when you knew that the federal authorities were onto

12   you.

13   A.    Not really.  Way before that.

14   Q.    So you are saying it is not a fact that you stopped

15   splitting commission with the freight forwarder when you

16   learned that the federal authorities were investigating the

17   conduct?

18   A.    Yeah, but you said when they came, and they came in March

19   and I stopped in May I think or June 2005.

20   Q.    But you knew they were investigating.

21   A.    Right.

22   Q.    Oh, when you stopped.  Okay.

23   A.    Right.

24   Q.    Now, you testified on Thursday that you defrauded Mr.

25   Khatib Samir Khatib and Alexandria of approximately $240,000.

```
 1   A.   Correct.

 2   Q.   But in fact -- And you had a restitution order.  Mr.

 3   Jacks referred to a restitution order.  Correct?

 4   A.   Correct.

 5   Q.   And in fact that restitution order is for $610,000.

 6   A.   Correct.

 7   Q.   So in fact you stole $610,000?

 8   A.   Correct.

 9   Q.   So what you said Friday wasn't true, under oath.

10   A.   No, no.  I pleaded guilty for 240, and then when the

11   sentence was made, 610.

12   Q.   Because that is what actually you stole.

13   A.   Right.

14   Q.   Yeah.  Now, at some point August of 2006 you reached an

15   agreement with the Government.  Right?

16   A.   Correct.

17   Q.   And that you would plead guilty.

18   A.   Correct.

19   Q.   And that means you don't go to trial.  Right?  You didn't

20   go to trial.

21   A.   Yeah, we agreed from the judge.

22   Q.   No jury, no witnesses, nothing.

23   A.   Correct, right.

24   Q.   And as part of that agreement, you forfeited your right

25   to appeal essentially.  Right?
```

```
1    A.   Correct, right.

2    Q.   And a plea agreement is a written document.  Right?

3    A.   Correct.

4    Q.   That you signed.  Right?

5    A.   Uh-huh.

6    Q.   Your lawyer signs.

7    A.   Correct.

8    Q.   And the Government lawyer signs.

9    A.   Correct.

10   Q.   And this is with the prosecutors, the Government lawyers

11   in Georgia.

12   A.   Correct.

13   Q.   It is an agreement where you agree to do certain things

14   and the Government agrees to do certain things.  Right?

15   A.   Correct.

16   Q.   So it is like a contract in that sense.

17   A.   Correct.

18   Q.   And when you signed that agreement you had read it and

19   understood it.

20   A.   Correct.

21   Q.   Now, you are familiar with the agreement.  Right?

22   A.   Correct.

23   Q.   So you know in there there is something called the

24   Sentencing Guidelines calculation.  Right?

25   A.   Yeah, uh-huh.
```

1    Q.   And you know the Sentencing Guidelines give a judge who

2    is sentencing someone a guide to an appropriate sentence for

3    that person.

4    A.   I guess so.  That is why I have a lawyer, to look into

5    these things.

6    Q.   Right.  But you read the agreement.  Right?

7    A.   Right.

8    Q.   And you know that your Guidelines level was way above 15

9    years.  Right?

10   A.   Correct.

11   Q.   It could go to life even.

12   A.   Uh-huh.

13   Q.   Is that a yes?  I am sorry.  The court reporter --

14   A.   I am sorry.  Yes.

15   Q.   But the Government let you plead guilty to one count of

16   material support for terrorism.  Right?

17   A.   Correct.

18   Q.   And that capped you at 15 years, because that is all one

19   count -- That is a maximum for one count.  Right?

20   A.   Right.

21   Q.   And that is a substantial benefit to start with.  Right?

22   A.   Okay.  If you want to call it that.  Okay.

23   Q.   And you could have been charged with every single

24   instance in which you sent money overseas for Hamas.  You

25   could have been charged with each of those instances as a

1    separate count.  You understand that.

2    A.    Correct.

3    Q.    Right.  That would have been 15 years and 15 years and 15

4    years, possibly.

5    A.    Uh-huh.  I am sorry, yes.

6    Q.    And you knew that -- Withdrawn.  And so in the agreement

7    the Government agreed that you would be -- They agreed not to

8    bring additional criminal charges against you so that you were

9    exposed to lower penalties than you otherwise would be.

10   A.    Correct.

11   Q.    And in fact, you didn't even plead to this fraud for

12   $610,000.  Right?

13   A.    Correct.

14   Q.    You have never had to plead guilty for that.

15   A.    No, it was part of the plea agreement.

16   Q.    Right.  But you did not plead guilty to it.

17   A.    As I say, it was part of the plea agreement.

18   Q.    But did you plead guilty to the fraud?  Did you get up in

19   front of a judge and say, "I committed this fraud, I am

20   guilty," and get sentenced for it?

21   A.    I don't know how you are going to call it, but it is part

22   of the plea agreement that you get the restitution paid.

23   Q.    Were you charged ever officially with the offense?

24   A.    No.

25   Q.    You were only charged with the official support to Hamas.

```
1    A.    Correct.

2    Q.    And you know from the Guidelines, as well with the fraud

3    counts, that the more money you steal the higher the

4    Guidelines sentence will be.

5    A.    Correct.

6    Q.    Now, you told some lies to the FBI.  Right?

7    A.    Correct.

8    Q.    You weren't charged with lying to an FBI agent either.

9    Right?

10   A.    Correct.

11   Q.    Even though that is a crime.

12   A.    Correct.

13   Q.    You weren't charged with failure to report the money you

14   stole on your tax returns.  Right?

15   A.    I reported that, sir.

16   Q.    You reported it as stolen money?

17   A.    No, no, not that way, but I reported all the income as

18   income.

19   Q.    Right.  But the fact is some of it was stolen, so you

20   didn't report the source of it.  Right?

21   A.    No.

22   Q.    So you lied on those returns in terms of the source of

23   the money.

24   A.    Correct.

25   Q.    You weren't prosecuted for that.
```

1    A.    Correct.

2    Q.    And wasn't it one year you didn't report the money at

3    all?

4    A.    I am sorry?

5    Q.    Wasn't there one year where you didn't report the money

6    at all?

7    A.    Yeah.  Correct, I am sorry.

8    Q.    Now, in return you agreed to cooperate with the

9    Government.

10   A.    Correct.

11   Q.    And to testify.

12   A.    Correct.

13   Q.    And the Government would make the judge who sentenced you

14   in Georgia aware of your cooperation.  Right?

15   A.    Right.

16   Q.    That is part of the agreement.

17   A.    Correct.

18   Q.    And you testified once.  Right?

19   A.    Correct.

20   Q.    And then you were sentenced.

21   A.    Correct.

22   Q.    And you were sentenced to 92 months.

23   A.    Correct.

24   Q.    Which is less than 15 years; about half of 15 years.

25   Right?

```
1   A.   Seven years and eight months.  Correct.

2   Q.   Right.  And that is already a big benefit.  Right?

3   A.   Correct.

4   Q.   And there is a part of your agreement that says you can

5   be sentenced and still get a reduction of sentence if you

6   continue to cooperate.  Right?

7   A.   Is that a legal term or is that --

8   Q.   Your sentence can still be reduced.  Correct?

9   A.   Correct.

10  Q.   After this case, after you testify here.

11  A.   No, no, no.  Let me clarify that.  Only the Government

12  will recommend.

13  Q.   Right.

14  A.   The judge will make that approval or disapproval.

15  Q.   Right.  But there is a part of your agreement that says

16  if your cooperation is completed after your are sentenced, you

17  can still get a reduction if the Government makes a motion.

18  A.   Correct.  If the Government is willing to make a motion.

19  Right.

20  Q.   And only if you provide substantial assistance.  Right?

21  A.   Correct.

22  Q.   And only the Government gets to decide whether you have

23  provided substantial assistance.

24  A.   Correct.

25  Q.   It is not a decision the judge makes; in other words, to
```

1   make the motion.

2   A.   Yeah.  Correct.

3   Q.   And your lawyer doesn't get to do that either, to make

4   that motion; only the Government.

5   A.   It is the Government.  Right.

6   Q.   Now, the Government hasn't committed yet.  They haven't

7   made that motion yet.  Right?

8   A.   Correct.

9   Q.   You were sentenced about a year and a half ago?

10  A.   Correct.

11  Q.   The Government is waiting for this case to end.

12  A.   Correct.

13  Q.   Now, under your agreement you are required to testify in

14  this case.  Right?

15  A.   Correct.

16  Q.   Now, you said on direct that your agreement requires you

17  to tell the truth.  Right?

18  A.   Correct.

19  Q.   But the determination as to whether you tell the truth

20  will be made by the Government.  Correct?

21  A.   I don't think so.  It is the truth that I lived through

22  it.

23  Q.   But what I am saying is in terms of whether or not the

24  Government -- whether or not you get a sentence reduction or

25  complied with your agreement, it is the Government's decision.

1    A.    It is the Government to make the recommendation, but it

2    is my own senses to say the truth.

3    Q.    But who is going to judge whether that is the case or

4    not?  The Government.  Right?

5    A.    Correct.

6    Q.    And you are hopeful that the Government will make that

7    recommendation.

8    A.    Hopeful, yes.  You can call it hopeful.  Right.

9    Q.    And you expect it, don't you, after you finish testifying

10   here?

11   A.    As I said, it is up to the Government here.  If they are

12   willing to do it, that is fine.

13   Q.    Now, you received some additional benefits from your plea

14   agreement beyond those we have discussed.  Right?

15   A.    Such as?

16   Q.    Such as certain of your family members who traveled

17   overseas and were having trouble getting documents to come

18   back into the U.S.

19   A.    Correct.

20   Q.    The Government made sure that they got back.

21   A.    Yeah.  They got the paper for my wife to come back.  My

22   kids are U.S. citizens.

23   Q.    But your wife.

24   A.    Correct.

25   Q.    And the Government also agreed to assist you to be able

1    to reside legally in the United States.

2    A.    Right.    Correct.

3    Q.    Because as a felon -- You pled guilty to a felony.

4    Right?

5    A.    Correct.

6    Q.    As a felon you would be deportable.    Right?

7    A.    Correct.

8    Q.    Now, the restitution was due immediately.    Right?    Upon

9    your being sentenced.

10   A.    Correct.

11   Q.    Have you paid any of it?

12   A.    No.

13   Q.    Now, you testified last week also that you spent four

14   months in FBI custody essentially after the Government first

15   came and confronted you in March of 2006.

16   A.    Correct.

17   Q.    And you met with them dozens of times?

18   A.    Correct.

19   Q.    And throughout this time between 2006 and now you have

20   met dozens of times with various prosecutors.    Right?

21   A.    Various prosecutors?

22   Q.    Agents or prosecutors.

23   A.    Right, correct.

24   Q.    From Georgia, from Texas.    Right?

25   A.    Correct.

1    Q.    And you didn't even have to post bail.  Right?

2    A.    Correct.

3    Q.    You even met with Mr. Jacks between Wednesday and

4    Thursday's testimony.  You had conversations with him

5    overnight Wednesday or Thursday morning about your testimony.

6    A.    Wednesday and Thursday.  Correct.

7    Q.    Now, while these meetings were going on, the FBI would

8    show you videos and documents as well.

9    A.    Correct.

10   Q.    Now, your first meeting with the Government, March 9th,

11   2006.

12   A.    Uh-huh.

13   Q.    You lied to them because you told them that you stole the

14   money because you were afraid to ask for a raise.  Right?

15   A.    Correct.

16   Q.    And ultimately you admitted to the Government that you

17   never even asked for a raise.

18   A.    Correct.

19   Q.    In fact, you had received a pay raise before March 9th.

20   A.    Uh-huh.  Correct.

21   Q.    You lied to the Government when you told them you didn't

22   use fraudulent invoices as part of your scheme.

23   A.    Correct.

24   Q.    Now, with the money you stole, you initially told the

25   Government it cost $40,000 to build the apartment in Gaza.

1    A.    No, initially I think I said $30,000.

2    Q.    Okay.  But then you later testified under oath it was

3    $25,000.  Right?

4    A.    That is the numbers right there.  Numbers started with

5    25, went up to 30 because we are just building an apartment so

6    we think it is going to cost 25.  That is what started the

7    number, and then the number kept going up to $40,000.

8    Q.    But that wasn't happening while you were telling your

9    story to the FBI and testifying.  That happened before 2006?

10   A.    The same thing I was talking to you now, that is the

11   initial --

12   Q.    I am asking you a different question.  The apartment was

13   already built by the time you first talked to the Government.

14   A.    Right.  March 2006.

15   Q.    Okay.  Now, you also had an addition put onto your house

16   with the money.

17   A.    Right.

18   Q.    And that is why you stole $91,000 in a single year.

19   Right?

20   A.    Correct.

21   Q.    And when the FBI came and searched your house, they took

22   almost everything.  Right?

23   A.    Correct.

24   Q.    And they found $29,500 in cash in a lockbox.

25   A.    Correct.

1    Q.   In $100 bills.

2    A.   Correct.

3    Q.   Now, when the FBI came into your house, you assured them,

4    I think you said absolutely not that they would find any Hamas

5    or Fatah related material on your computer.  Right?

6    A.   I think so, yes.

7    Q.   But that was not true.  Right?  They found that kind of

8    material on your computer.

9    A.   No, that was true, because what they did, like they went

10   over the hard drive, and I used to go on the internet looking

11   at the news and they could retrace the sites that I looked at.

12   Q.   Some of them were related to Fatah and Hamas.

13   A.   Correct.

14   Q.   Now, that March 9th you weren't arrested.  Right?

15   A.   Correct.

16   Q.   And you had another meeting March 13th.  Right?

17   A.   Uh-huh.

18   Q.   And you lied about a lot more things in that second

19   meeting, too.

20   A.   Such as?

21   Q.   I don't know.  Did you not testify when asked about that

22   meeting, you said -- about what did you lie about, and you

23   said "maybe everything.  I don't remember."

24   A.   Right, uh-huh.

25   Q.   And you were trying to get on the agents' good side.

1    Right?

2    A.    Sorry?

3    Q.    You were trying to get on the agents' good side.  Right?

4    A.    No, not really.  Listen --

5    Q.    Okay.

6    A.    Let me just explain one thing.  Okay?  Because what

7    happened is this.  Okay?  I did contribute a lot of money to

8    Hamas.  Okay?  And for so many years after the closing down of

9    the Holy Land Foundation.  So when the FBI came in with all

10   these questions, I thought that if I can lie I just can go

11   home and then forget about it.

12       Now, the FBI were watching me over a lot of previous

13   years.  When they start really facing me with these things,

14   that they are monitoring my phone calls and my visitation and

15   so on, then yes, I lied because I was afraid.  I mean, this is

16   the FBI.  I got five kids I got a wife and a lot of things.  I

17   lied about the money to Hamas thinking that they will just

18   leave me alone.  But when things start showing me what did I

19   do, then I came and said the truth.  So it is not really I

20   took the side of the FBI.

21   Q.    I didn't say that.  That is not my question.  By the way,

22   it was not only about your relationship in terms of money

23   funding, it was also about stealing that $610,000.  Right?

24   A.    Right.

25   Q.    So you lied at that time because you wanted to go home.

1    A.   Correct.

2    Q.   And they let you go home?

3    A.   Correct, right.

4    Q.   They didn't arrest you that day.

5    A.   Correct.

6    Q.   And what I meant was you tried to get on their good side,

7    you tried to -- Didn't you say you were pro-Reagan, pro-Carter

8    pro-Bush?  That is what you told the agents.

9    A.   No, no.  Listen --

10   Q.   Did you tell them that?

11   A.   No.

12   Q.   You didn't tell them that?

13   A.   I said I was pro-Bush in 2002 because that was an Islamic

14   leadership that they want to vote for Bush, not for Al Gore

15   and Lieberman.  That is what I meant.  So I didn't say

16   pro-Reagan or pro-Carter.

17   Q.   You didn't say that?

18   A.   If I say that it might be true, but that is what I mean.

19   I mean pro-Bush after the Clinton era voting for Bush.  I

20   mean, what is the big deal about pro-Reagan and pro-Carter.

21   Q.   Did you say it or not?

22   A.   I don't remember if I said it or not.

23   Q.   Okay.

24        MR. DRATEL:  May I approach, Your Honor?

25        THE COURT:  Yes.

1    Q.   (BY MR. DRATEL)  I am going to show you -- I ask you to

2    read that highlighted portion.

3              MR. JACKS:  Your Honor, I am going to object to him

4    attempting to cross examine him with something that is not his

5    written statement.

6              MR. DRATEL:  Just to refresh his recollection.

7              THE COURT:  Is this prior testimony under oath?

8              MR. DRATEL:  No, Your Honor.  Do you want to --

9              THE COURT:  Yes, come on up here.

10             (The following was had outside the presence and

11                hearing of the jury.)

12             MR. DRATEL:  The old evidentiary adage is you can

13   refresh recollection with a whiff of perfume.

14             THE COURT:  Is this off a 3202?

15             MR. DRATEL:  Yes.

16             THE COURT:  And the FBI agent states that is what he

17   told him?  Okay.

18             MR. JACKS:  For the record, though, so the jury

19   doesn't think that this is some written recording of what he

20   said, it is someone's recollection or notes about what he

21   said.  And, you know, this was turned over necessarily as a

22   *Jencks* statement, because it is not his *Jencks* statement, but

23   it is something they can use to see if he said something

24   inconsistent.  But it is not his statement.

25             MR. DRATEL:  I am not going to ask him if it is his

1    statement.  I am going to ask if it refreshes his recollection

2    if he told them that, and I am stuck with his answer.

3              THE COURT:  Okay.

4              (The following was had in the presence and hearing

5              of the jury.)

6    Q.   (BY MR. DRATEL)  I ask you to read this highlighted

7    sentence.  Don't read it out loud.  I am sorry.  Read it to

8    yourself.

9    A.   I am sorry.  Right.

10   Q.   And does that refresh your recollection that you told the

11   agents that you were pro-Carter, pro-Reagan and pro-Bush?

12   Does it refresh your recollection?

13   A.   Maybe so.

14   Q.   Okay.  Now, the Government caught you in a series of lies

15   over a period of time while you were talking to them.  Right?

16   A.   Correct.

17   Q.   And at any time did they say, "We have had enough of you,

18   Mr. Shorbagi.  You have lied too many times"?

19   A.   No.  Listen, what happened --

20   Q.   Yes or no.  Did they ever tell you they weren't going to

21   use you as a witness because of that?

22   A.   I am sorry.  Say that again.

23   Q.   Did they ever tell you they were not going to use you as

24   a witness even though you lied to them over this period of

25   time?

```
1    A.    Are you talking about the early stages or --

2    Q.    I am talking about any stage.  Did they ever tell you

3    they weren't going to use you as a witness?

4    A.    I am not really sure if I understand your question.

5    Q.    Did the FBI ever say to you, "You have lied too many

6    times.  We are not going to have an agreement with you"?

7    A.    No, they never said that.

8    Q.    Okay.  Now, you are in jail right now.  Right?

9    A.    Excuse me?

10   Q.    Not this moment, but you are in jail?

11   A.    Correct.

12   Q.    Serving your sentence.

13   A.    Correct.

14   Q.    And you have five children.

15   A.    Correct.

16   Q.    Right?  And a wife?

17   A.    Correct.

18   Q.    And you mentioned on Thursday, I think, that it is

19   disappointing to you and upsets you that your child knows more

20   about what is happening in Gaza necessarily than he knows his

21   own father.

22   A.    It is not really upsetting.  It is a fact.

23   Q.    You are comfortable with that?

24   A.    Yeah, it is fine with me.

25   Q.    So jail is fine with you?
```

```
1    A.    Jail is okay.

2    Q.    Do you want to get back to your family as soon as you

3    can?

4    A.    I want to get back to the family, but I am paying the

5    price for a crime I did, so I deserve to go to jail for a

6    crime I did.  Fine.

7    Q.    But I am saying, you want to get back to your family as

8    soon as you can.

9    A.    Uh-huh, yes.

10   Q.    And in order to do that you have to fulfill your contract

11   with the Government and testify here.  Right?

12   A.    Again, you coming to the point that the only one who

13   makes that decision is the federal judge, not the Government.

14   Q.    The Government makes a decision whether to recommend.

15   Right?

16   A.    Correct.

17   Q.    You will never even get in front of a judge if the

18   Government doesn't recommend.

19   A.    It is up to the Government.  The Government may choose

20   not to file a motion.

21   Q.    That will be after your testimony here.

22   A.    Correct.

23           MR. DRATEL:  Pass the witness, Your Honor.

24           THE COURT:  Ms. Cadeddu, any questions?

25           MS. CADEDDU:  No, Your Honor.  On behalf of Mr.
```

1    Abdulqader, no questions.

2              THE COURT:  Mr. Westfall?

3              MR. WESTFALL:  No, Your Honor.

4              THE COURT:  Mr. Jacks, any redirect?

5              MR. JACKS:  Yes, Your Honor.

6                    REDIRECT EXAMINATION

7    By Mr. Jacks:

8    Q.   Sir, I want to ask you some questions about questions you

9    were asked on cross examination, and I will start with the

10   more recent questions by Mr. Dratel and then move back from

11   there.

12        The money that you raised in the mosque or elsewhere, in

13   Rome or wherever, for the Holy Land Foundation, did you take

14   any part of that money for yourself?

15   A.   No, sir.

16   Q.   Did you send all of that money to the Holy Land

17   Foundation?

18   A.   Yes, sir.

19   Q.   And you testified on cross examination that you had not

20   received a raise -- How long did you work at Alexandria

21   Carpets or Alexandria International?

22   A.   About 13 years.

23   Q.   And you testified about not receiving a raise or

24   something such as that.  Is that correct?

25   A.   Correct.

1    Q.    And is that how you tried to rationalize or justify your

2    taking this money?

3    A.    I mean, wrong is wrong.  It is wrong.

4    Q.    But was that what you said in your own mind to justify

5    it?

6    A.    Correct.

7    Q.    I mean, do you still think that that is an excuse for

8    what you did?

9    A.    No.

10   Q.    Your testimony I believe on direct examination was that

11   you took about $240,000 from the company.  Is that correct?

12   A.    Correct.

13   Q.    And yet the restitution that you are required to pay back

14   is $600,000.  Is that correct?

15   A.    Correct.

16   Q.    And there was another person or persons involved in this

17   fraudulent scheme that also received profits?

18            MS. CADEDDU:  Your Honor, I object to leading.

19            MR. JACKS:  I will rephrase it, Your Honor.

20   Q.    (BY MR. JACKS)  Was there another person that also

21   received profits from this fraudulent scheme?

22   A.    Correct.

23   Q.    And did that person receive a portion of the funds?

24   A.    Correct.

25   Q.    Are you responsible -- Are you held responsible for a

1   part or all of the proceeds that were received as a result of

2   this fraudulent scheme?

3   A.    All of it.

4   Q.    One of the possible things -- You said that the

5   Government, one of the things that the Government did for you

6   as a result of this plea agreement was to obtain some kind of

7   document to allow your wife to re-enter the United States.  Is

8   that correct?

9   A.    My wife be in this country for 15 years, but when these

10  things happened I went to jail and the recommendation was for

11  her, because of the financial situation, to go and settle with

12  the kids in Gaza.  They went there for almost a year and a

13  half, the time I was in jail.  And because of the school, my

14  kids are -- The oldest is 16 and 14, they couldn't really find

15  a good school to attend there, so they decided to come back,

16  so they came back a month and a half ago.

17  Q.    Well, you said that your children were U.S. citizens.  Is

18  that correct?

19  A.    Correct, yes.

20  Q.    So what was the document?  Who needed the document to

21  come back into the country?

22  A.    Only for my wife.

23  Q.    And she is not a United States citizen?

24  A.    She is not.

25  Q.    You testified that one of the things that the Government

1   agreed to take into consideration or consider doing was

2   arranging for you to remain in this country.  Is that correct?

3   A.   Correct.

4   Q.   And as an alien, as a legal resident alien after your

5   sentence?

6   A.   As a permanent resident.  Right.

7   Q.   And one of the things that would possibly happen to you

8   as a result of your conviction would be your deportation.

9           MS. CADEDDU:  Objection; leading.

10          THE COURT:  It has been gone into.  Go ahead.

11  Q.   (BY MR. JACKS)  You mentioned one of the things that

12  could happen to you is being deported.

13  A.   Correct.

14  Q.   As a result of being convicted of a felony.  Correct?

15  A.   Correct.

16  Q.   Where would you be deported if you were deported?

17  A.   I think it will be to Egypt and then from there to Gaza.

18  Q.   Ultimately where would you end up being sent?

19  A.   Gaza.

20  Q.   And do you want to return to Gaza?

21  A.   I mean, my kids have the experience there.  They

22  couldn't --

23  Q.   Let me just ask you --

24          MS. HOLLANDER:  Objection, Your Honor.  He was

25  answering.

1          THE COURT:  He was being unresponsive.  Go ahead.

2     Q.   (BY MR. JACKS)  Do you want to return to Gaza?

3     A.   No, sir.

4     Q.   Are you concerned for your safety if you return to Gaza?

5     A.   Yes, sir.

6     Q.   Was that part of the reason that that request --

7          MR. DRATEL:  Objection, Your Honor.  It is leading.

8          THE COURT:  Sustained on that one, counsel.

9     Q.   (BY MR. JACKS)  The provision that the possibility exists

10    that you might be allowed to stay in that country, why did you

11    request that?

12    A.   Concerning security in Gaza, sir.

13    Q.   You testified regarding your work for MAYA and IAP and

14    then you were questioned about these conventions that you

15    attended.  Do you recall that?

16    A.   Correct.

17    Q.   And I believe you testified about these communiques that

18    would come in.

19    A.   Correct.

20    Q.   And refresh the jury's recollection, where were those

21    communications authored?

22    A.   Those are the Hamas leaflets coming from either West Bank

23    or Gaza to IAP office in Dallas, and then IAP will reprint

24    them and then it will mail them to different centers.  I used

25    to get those, make copies, and distribute them to the public

1    after Friday prayer.

2    Q.   And did the place where those communiques were written

3    ever change?

4    A.   I am sorry.  I didn't understand that.

5    Q.   Did you ever write any of those communiques?

6    A.   Write?

7    Q.   Yes.  Compose.

8    A.   No.

9    Q.   Did you ever write any leaflets on behalf of Hamas?

10   A.   No.

11   Q.   You were asked about the deportees, and I believe it was

12   in conjunction with the 1992 MAYA convention in December in

13   Oklahoma City.  Do you recall that?

14   A.   Correct.

15   Q.   And how soon in time was that convention to the time when

16   those individuals were deported to southern Lebanon?

17   A.   I think probably one week or two weeks.

18   Q.   And the individuals you said were approximately how many

19   that were deported?

20   A.   Excuse me?  I did not hear you.

21   Q.   How many individuals approximately were deported?

22   A.   About 412.

23   Q.   And what organizations did they belong to?

24   A.   Mainly two organizations, Hamas and Islamic Jihad in

25   Palestine.

```
1    Q.   And where were they deported to?

2    A.   To south Lebanon.

3    Q.   And were they offered the opportunity to go somewhere

4    within Lebanon and then leave from there?

5    A.   They were offered the opportunity to go to Lebanon and

6    then from Lebanon go to whatever country they wanted to.

7    Q.   What was their response to that offer to go somewhere

8    else?

9           MR. DRATEL:  Objection, Your Honor.  He is speaking

10   for all 412 people?

11          THE COURT:  Do you want to rephrase, rather than

12   "What was their response?"

13   Q.   (BY MR. JACKS)  What was your understanding -- You talked

14   about this deportation.  What was your understanding about

15   their response for a chance to move away from this baron area?

16          MS. HOLLANDER:  Your Honor, I am going to object on

17   hearsay grounds and beyond the scope.

18          THE COURT:  Overruled.

19          THE WITNESS:  Say the question again, please.

20   Q.   (BY MR. JACKS)  What was your understanding about what

21   these persons that were deported said or what were

22   they -- What was their reaction to the offer from the Lebanese

23   government "You can leave, you can come through and go to

24   whatever country"?

25   A.   They choose not to.  They choose to stay in there.
```

```
1    Q.   All right.  And was the -- What was the situation with

2    regard to the media and its coverage of this camp?  Was it

3    covered in the media?

4    A.   I mean, I remember CNN was there 24 hours minute by

5    minute.

6    Q.   Okay.  So were there -- Did they have telephones there?

7    A.   Correct.

8    Q.   I am talking about the deportees.  Did they have access

9    to telephones?

10   A.   Yes, correct.

11   Q.   Did they make statements, issue press releases from

12   there?

13   A.   Correct.

14   Q.   Did they have fax machines that they could send out

15   statements?

16   A.   Correct.

17   Q.   And did the Holy Land Foundation do something to provide

18   aid to those individuals?

19   A.   To provide -- I am sorry.

20   Q.   Did the Holy Land Foundation do something for those

21   individuals, provide aid to them?

22   A.   Yes, sir.

23   Q.   And do you know whether they were proud of that, or did

24   they keep it quiet?

25   A.   Holy Land Foundation --
```

```
 1              MR. DRATEL:  Objection to the form of the question.

 2              THE COURT:  Are you referring to HLF?

 3              MR. JACKS:  Yes.

 4              THE COURT:  Overruled.  Go ahead.

 5   Q.   (BY MR. JACKS)  Did you understand my question?

 6   A.   No.  Say it again, please.

 7   Q.   Was the Holy Land Foundation proud of the fact that they

 8   had provided aid, or did they keep it quiet?

 9   A.   No, they were very proud of it.

10   Q.   What did they say about how soon they were able to

11   provide aid to those individuals?

12   A.   I think very soon, like after the deportees were in south

13   Lebanon, the video you were shown in Oklahoma City, Haitham

14   Maghawri was there about two weeks after the deportees

15   happened.

16   Q.   Did you ever see any materials or hear any speeches by

17   anyone on behalf of the Holy Land Foundation where they

18   boasted or bragged about being the first charity or group to

19   aid those people?

20   A.   Yeah.  Haitham was on the video, that videotape, and then

21   they were talking about -- It was talking about during the

22   MAYA convention.

23   Q.   And what was the -- From your understanding, what was the

24   activity that precipitated this action by the Israeli

25   Government?
```

1          MR. DRATEL:  Objection, Your Honor; beyond the

2     scope, irrelevant.

3          THE COURT:  Overruled.  Go ahead.

4          THE WITNESS:  Excuse me?

5     Q.  (BY MR. JACKS)  What was your understanding about the

6     activity that occurred within Israel that precipitated this

7     deportation?

8          MR. DRATEL:  Your Honor, also we have a 403

9     objection, *al-Moayad*.

10         THE COURT:  Overruled.

11         THE WITNESS:  Sheikh Yassin was taken to an Israeli

12    jail.  Hamas kidnapped Nassim Tulidano in early December to

13    secure the release of Sheikh Yassin Israelis refused to

14    release him.  Hamas people killed Nassim Tulidano.  Israeli

15    reacted by collecting 412 or 415 Hamas, Islamic Jihad and

16    deported to south Lebanon.

17    Q.  (BY MR. JACKS)  Was the abduction and murder of this

18    officer the only incident prior to the deportation?

19         MR. DRATEL:  Objection.

20         THE COURT:  Overruled.

21         THE WITNESS:  Yes, sir.

22    Q.  (BY MR. JACKS)  Were there other kidnappings that

23    happened around the same time?

24         MR. DRATEL:  Objection.

25         MS. HOLLANDER:  Leading.

1    MR. DRATEL:  Asked and answered.

2    THE COURT:  Overruled.  Go ahead.

3    THE WITNESS:  I am sorry.  Say the question again.

4  Q.  (BY MR. JACKS)  Were there other kidnappings and murders

5  that happened around the same time?

6  A.   I don't remember.  Like I remember in '88, but after that

7  the one that happened after '88 was Nassim Tulidano December

8  1992.

9  Q.   You were asked I believe by Ms. Hollander about the

10  conditions in Gaza, and specifically you were asked about

11  demolished homes.  Do you recall being asked that?

12  A.   Correct.

13  Q.   And I believe you were asked about demolished homes in

14  Rafah in Gaza.  Is that correct?

15  A.   That was a time in '95.  Correct.

16  Q.   And Rafah is in what part of Gaza?

17  A.   It is in the south part of Gaza.

18  Q.   What is across the border from Rafah?

19  A.   Egypt.

20  Q.   Excuse me?

21  A.   Egypt.

22  Q.   And have there been demolished homes within that area by

23  the Israelis?  Have the Israelis demolished homes in Rafah,

24  Gaza?

25  A.   You mean that year or before that?

1   Q.   Whenever you were talking about.

2   A.   I am sorry.  I probably didn't understand the question

3   correctly.

4   Q.   All right.  Were there homes in Rafah that had tunnels

5   underneath them?

6   A.   Correct.

7   Q.   Where did those tunnels go to?

8   A.   They go to Egypt.

9   Q.   What were those tunnels used for, according to your

10  understanding?

11          MR. DRATEL:  I object to foundation, Your Honor.

12          THE COURT:  Overruled.

13          THE WITNESS:  You get two point of views there.  You

14  have the Palestinians' point of view that they use these

15  tunnels for people to cross from Egypt to Gaza Strip or from

16  Gaza to Egypt, and also humanitarian.  The Israelis say that

17  they also smuggle weapons.

18  Q.   (BY MR. JACKS)  Weapons?

19  A.   Correct.

20  Q.   And these tunnels, how sophisticated are they?

21  A.   Correct?

22  Q.   No, how sophisticated?

23          MR. DRATEL:  Objection; foundation.

24          THE COURT:  Overruled.

25  Q.   (BY MR. JACKS)  What is your understanding about how

1    sophisticated they are?

2    A.    They are good -- You can say they are sophisticated ones.

3    Q.    Do they have electricity?

4    A.    Correct.

5    Q.    And are they braced with support beams and that kind of

6    thing?

7              MS. MORENO:  Objection; leading the witness, Your

8    Honor.

9              THE COURT:  Overruled.  Go ahead.

10             THE WITNESS:  Correct.

11   Q.    (BY MR. JACKS)  And where do these tunnels come above

12   ground on the Gaza side?

13   A.    Mostly in homes.

14   Q.    And were these some of the homes that were demolished by

15   the Israelis in Gaza?

16   A.    Correct.

17   Q.    Who is Yehia Ayyash?

18   A.    The engineer.

19   Q.    Is he a Palestinian Was he a Palestinian?

20   A.    He was a Palestinian from the West Bank.  Right.

21   Q.    And was he a Hamas leader?

22   A.    He was one of Hamas leaders.  Correct.

23   Q.    And how did he gets his nickname?

24   A.    I am sorry?

25   Q.    How did he get his nickname?

1    A.    He went to school at West Bank Bir Zeit graduated in the

2    college of engineering, so he is an engineer.

3    Q.    What did he do to earn notoriety?

4              MR. WESTFALL:  Object; beyond the scope.

5              THE COURT:  Do you want to approach the bench?

6              MR. JACKS:  Either way.

7              THE COURT:  Come up here.

8              (The following was had outside the hearing of the

9              Jury.)

10             THE COURT:  I don't remember his name coming up, so

11   what is --

12             MR. JACKS:  It has come up.

13             MS. MORENO:  Not in my cross examination.

14             MS. HOLLANDER:  Not in mine.

15             MR. DRATEL:  Not in mine.

16             MR. JACKS:  Your Honor, they brought out I think it

17   was Ms. Hollander that his only reason for helping was to help

18   the needy, and that is not true.  He idolized this man.  He

19   was the person that devised the suicide vest.  That was his

20   invention.  And he will testify that he thinks he is a great

21   man and a hero.  So it is -- His motivation is not just

22   helping the needy.

23             MS. HOLLANDER:  That should have come out on direct.

24             THE COURT:  I think he is entitled to get into that

25   based on the questions you all asked him on cross.  Go ahead.

1           (The following was had in the presence and hearing

2           of the jury.)

3           MR. DRATEL:  Your Honor, may I add a 403 *al-Moayad*

4   objection.

5           THE COURT:  Yes.  That is overruled.

6   Q.  (BY MR. JACKS)  I believe my last question to you was

7   with regard to Yehia Ayyash How did he get his nickname?

8   A.   As I said, for two things.  Number one, he got a degree

9   from the college of engineering electrical from Bir Zeit

10  University and then he started -- He is the one for Hamas that

11  started making bombs.

12  Q.   And what device did he design or perfect?

13  A.   The suicide bombers.

14  Q.   And you are talking about the vest?

15          MR. DRATEL:  Objection; leading.

16          THE COURT:  Sustained, counsel.

17  Q.  (BY MR. JACKS)  What device?

18  A.   Yes, the vest that suicide bombers use to blow up

19  themselves.

20  Q.   That was his design?

21  A.   Correct.

22  Q.   And what was the attitude, to your knowledge, of the

23  Palestinian or Hamas certainly, toward him?

24  A.   Toward him?

25  Q.   Yes.

```
1    A.    I mean, most of the Palestinians praised him highly.

2    Q.    What was your view towards him?

3    A.    I praised him highly.

4    Q.    What kind of person did you think he was?

5    A.    He is the real engineer to me.  I mean, at that time,

6    yes.

7    Q.    All right.  So in fact let me ask you, he was killed by

8    the Israelis eventually.  Correct?

9    A.    January 16th of 1996.  Correct.

10   Q.    You know the exact date that he was killed.  Correct?

11   A.    Because I loved the man.  Correct.

12   Q.    And what kind of turn-out was there for his funeral?

13   A.    In Gaza probably half a million people attended his

14   funeral.

15   Q.    After his death did you speak about him at the sermon the

16   next -- that next Friday at the mosque?

17   A.    He was killed on Wednesday and I gave the sermon on

18   Friday, and we did a special prayer for him on Friday.

19   Correct.

20   Q.    And his activity for Hamas, was it in the nature of

21   charity?  Was his job in the charity area for Hamas?

22   A.    He was in al-Qassam Brigades.

23   Q.    And do you still believe that he was a great man and a

24   hero?

25   A.    Yes, sir.
```

1    Q.    After his death, what did Hamas do in response to his

2    death?

3              MR. DRATEL:  Objection, Your Honor; 403.

4              THE COURT:  Overruled.

5              THE WITNESS:  I remember these days, I mean, was

6    very big for Hamas for Yehia Ayyash to be assassinated that

7    way, because they stopped suicide bombers for some time.  So

8    they took all, themselves, that they would revenge very hard.

9    They did revenge very, very hard.

10   Q.    With suicide bombings?

11             MR. DRATEL:  Objection, Your Honor; leading.

12             THE COURT:  Rephrase, counsel.

13   Q.    (BY MR. JACKS)  How did they avenge or revenge his death?

14   A.    They waited 40 days after his assassination, and then

15   they started a wave of suicide bombers.  I think the first

16   week after the 40 days there were two suicide bombers, one in

17   Jerusalem and one in Tel Aviv.  The second week exactly the

18   same day, Sunday, there was another three suicide bombers.

19   The week after that there was another.  It really shook the

20   state of Israel, that three weeks after the 40 days of

21   mourning of Yehia Ayyash.

22   Q.    After his death how were his family members treated?

23   A.    Yehia Ayyash family?

24   Q.    Yes?

25             MR. DRATEL:  Objection; foundation.

1          THE COURT:  Overruled.  If he knows he may answer.

2          THE WITNESS:  I know his family stayed in Gaza for

3    some time, and then they were -- because the Palestinian

4    Authority were in control of West Bank and Gaza in 1996, and

5    then the Palestine Authority arranged for his family to move

6    from Gaza back to their village in West Bank.

7    Q.   (BY MR. JACKS)  Was his family criticized?

8          MR. DRATEL:  Objection, Your Honor; leading.

9          THE COURT:  Overruled.  Go ahead.

10   Q.   (BY MR. JACKS)  Were they criticized or revered or how

11   was his widow and children regarded?

12   A.   As I said, half a million people attended his funeral.

13   He is still considered a hero to the Palestinian people.

14   Q.   Was his family compensated?

15   A.   I don't know, sir, about that.

16   Q.   To go back to this notion that you and your

17   co-conspirators were motivated by charity --

18         MR. DRATEL:  Object to that, Your Honor.

19         THE COURT:  Overruled.

20   Q.   (BY MR. JACKS)  You said that you attended numerous MAYA

21   conventions, an IAP convention or two, as well as IAP

22   festivals.  Is that correct?

23   A.   Correct.

24   Q.   And there were speakers at these conventions.  Is that

25   correct?

1    A.    Correct.

2    Q.    And did those speakers at MAYA and IAP conventions and

3    IAP festivals, did they speak about jihad?

4    A.    Correct.

5    Q.    Did they speak about and preach about martyrdom?

6          MS. HOLLANDER:  Objection, Your Honor.  This is

7    leading.

8          THE COURT:  You are leading, counsel.  Rephrase.

9    Q.    (BY MR. JACKS)  Tell us whether or not they spoke about

10   martyrdom.

11   A.    Yes, sir.

12   Q.    Tell us whether or not they praised the Intifada.

13   A.    Yes.

14   Q.    Tell us whether or not they praised --

15          MS. MORENO:  Excuse me.  May we approach, Your

16   Honor?

17          THE COURT:  Yes.

18          (The following was had outside the hearing of the

19          jury.)

20          MS. MORENO:  Your Honor, Mr. Jacks is asking leading

21   questions.  Whether he says -- whether he rephrases it to say

22   "Tell us whether or not," the leading question is a question

23   where the witness can just answer yes or no.  That is exactly

24   what he has been doing for the last hour, and I must object to

25   the leading nature of his questions, Your Honor.  He is

1    leading this witness.

2         THE COURT:  Leading is basically suggesting an

3    answer.  He can answer a question sometimes yes or no, that

4    can be proper, but that is leading.  The question whether or

5    not, just ask him what they said about the Intifada, that

6    doesn't suggest anything.  You are asking whether they praised

7    it, you are already couching it in a way.

8         MR. JACKS:  But there are certain -- I don't want

9    him to just ramble on.

10        THE COURT:  You can cut him off.

11        MR. JACKS:  I am trying to focus --

12        THE COURT:  I let you do that once.  He wasn't being

13   responsive, and I let you cut him answer.

14        MR. DRATEL:  Just one thing, Your Honor, and I will

15   expand this application later, but just a continuing objection

16   to the gratuitous introduction of violence into this when it

17   is not relevant, it is not --

18        THE COURT:  I understand, but I think you all raised

19   this through your cross and you all went into some of what

20   Israel was doing.  Yes, you did, counsel.  And you raised it

21   through some of your questioning, Gaza and demolishing the

22   houses, and they are entitled to explain the other side.  Once

23   you open those it goes in.

24        And you all questioned on specific Israeli massacres that

25   happened, and so this is the other side, so I think you opened

 1   all this up.  That is why I am letting it in.  So I wanted to

 2   repeat that on the record.

 3        MR. DRATEL:  I just want to expand on it later.  I

 4   don't want to take time now.

 5        .

 6        THE COURT:  I don't need any later.  The objection

 7   is overruled.  I gave you my reasons.  You have your

 8   objection.

 9        MR. JACKS:  If it wasn't for the violence, we

10   wouldn't be here.  They wouldn't even be designated.

11        THE COURT:  I understand.  But they opened it up.

12   You all have opened it up is my view on this.

13        MR. DRATEL:  I just want to say that Yehia Ayyash he

14   wasn't mentioned under cross.  There was a wave of suicide

15   bombings after that --

16        THE COURT:  I understand, and that is why I called

17   you up here, because that name hadn't been mentioned before,

18   but that was in response to some questioning that it is all

19   about charity, I don't need you to get into argument.  I think

20   you opened it up.  I know you disagree.

21             (The following was had in the presence and hearing

22              of the jury.)

23   Q.   (BY MR. JACKS)  You were asked -- You have been

24   previously asked about the term Mujahideen.  Do you recall

25   that?

1    A.    Yes, sir.

2    Q.    How does that word translate from Arabic into English?

3              MR. DRATEL:  Your Honor, beyond the scope.

4              THE COURT:  Overruled.  Go ahead.

5              THE WITNESS:  Holy warriors.

6    Q.    (BY MR. JACKS)  And was that term referenced in these

7    speeches at these conventions?

8    A.    The word Mujahideen, yes, sir.

9    Q.    Did you see any skits when you went to these festivals?

10   Did you see any skits performed by individuals?

11   A.    I am not really sure.

12   Q.    Plays or scenes acted out by persons on stage?  Did you

13   see any of those at MAYA conventions or IAP festivals?

14   A.    Mostly IAP festivals.

15   Q.    What type of skits did you see?

16   A.    You mean masked people with marching and stuff like that?

17   Q.    Persons acting or posing as characters in a short play or

18   skit?  Do you know what is skit is?

19   A.    Uh-huh.

20   Q.    Did you see any of those?

21   A.    Correct.

22   Q.    Have you ever seen anybody in this case perform in a

23   skit, any Defendant perform in a skit?

24   A.    Yes.  I am sorry.

25   Q.    Who?

1    A.    Abdulqader, Mufid Abdulqader.

2    Q.    What were the nature of those skits?

3              MS. CADEDDU:  Your Honor, I am going to object.  I

4    didn't do a cross.  This is certainly outside the scope.

5              THE COURT:  Overruled.  Go ahead.

6              THE WITNESS:  That was like the play of the

7    Intifada, was going on in the Intifada.

8    Q.    (BY MR. JACKS)  What would happen in those skits?

9    A.    Like what happened, like people throw stones or killing

10   Israelis and stuff like that.

11   Q.    You saw these skits.  Correct?

12   A.    Correct.

13   Q.    You heard the songs sung.  Correct?

14             MR. DRATEL:  Objection; leading, Your Honor.

15             THE COURT:  Sustained.

16   Q.    (BY MR. JACKS)  Did you hear songs?

17   A.    Correct.

18   Q.    Did you hear speeches by people?

19             MS. HOLLANDER:  Your Honor, this is still leading.

20   He is suggesting the answer to every question.

21             THE COURT:  Overruled.  "Did you hear speeches," he

22   may answer that.

23   Q.    (BY MR. JACKS)  Did you hear speeches by these people?

24   A.    Correct.

25   Q.    Are you familiar with the phrase or the reference to

1   Jewish people as sons of pigs and monkeys?

2   A.   Correct.

3   Q.   And were those phrases used in these meetings and in

4   these festivals?

5   A.   Correct.

6            MR. JACKS:  One moment, Your Honor?

7            THE COURT:  Yes.

8   Q.   (BY MR. JACKS)  Your testimony earlier about not wanting

9   to go back to Gaza.

10  A.   Correct.

11  Q.   Do you recall that?

12  A.   Correct.

13  Q.   What is your concern?

14           MR. DRATEL:  Objection, Your Honor.

15           MS. MORENO:  Asked and answered.

16           THE COURT:  Overruled.  Go ahead.

17           THE WITNESS:  Security, sir.

18  Q.   (BY MR. JACKS)  What does that mean?

19           MR. DRATEL:  Your Honor, may we approach?

20           THE COURT:  Yes.  Come on up.

21           (The following was had outside the hearing of the

22           jury.)

23           MR. DRATEL:  I have no idea where this is going, but

24  if he is going to start talking about fear of people, it is

25  really beyond --

                    MR. JACKS:  He brought it up.

                    THE COURT:  He did.  That is why I -- What is he
going to say?

                    MR. DRATEL:  Now they are explaining why.  He
explained there was a benefit.

                    MR. DRATEL:  I understand.  He said security.  To
get further into it is such a 403 issue that I think it really
should be cut off.

                    MS. HOLLANDER:  Our clients are not charged with any
violence.

                    MR. DRATEL:  Or any threats.

                    THE COURT:  He is not saying it is from your
clients.

                    MR. DRATEL:  We don't know what he is going to say.

                    MR. JACKS:  He is going to say he is afraid he will
be killed.

                    MS. HOLLANDER:  Right.  And that implies that his
fear --

                    THE COURT:  I don't think that implies -- It implies
he is afraid to go back to Gaza, and that is why they are
helping him stay here.

                    MR. DRATEL:  It is pretty clear.  He doesn't have to
say "I think I am going to be killed."  Security is pretty
clear.  He doesn't have to get --

                    THE COURT:  They don't know what this means.  It

1    doesn't matter.  It is not that clear.  They are entitled to

2    get into it.

3              (The following was had in the presence and hearing

4              of the jury.)

5    Q.   (BY MR. JACKS)  Sir, when you say security, what are you

6    talking about?

7    A.   I guess Hamas security.

8    Q.   What?

9    A.   Hamas security.

10   Q.   What do you mean?

11   A.   I think it is not going to be a place for me to stay in

12   because Hamas is in control of Gaza.

13   Q.   And why would that be a concern of yours?

14   A.   Maybe because of my testimony.

15             MR. JACKS:  May I ask a specific question, Your

16   Honor.

17   Q.   (BY MR. JACKS)  Are you concerned for your physical --

18             MR. DRATEL:  Objection, Your Honor.  He has asked

19   and answered the questions.

20             THE COURT:  He hasn't answered it yet.  Go ahead and

21   answer the question.

22             THE WITNESS:  Say the question, please.

23   Q.   (BY MR. JACKS)  Are you concerned for your life, for your

24   physical safety?

25             MS. HOLLANDER:  Objection, Your Honor.

```
1              THE COURT:  Overruled.

2              THE WITNESS:  Yes.

3              MR. JACKS:  That is all I have.

4              THE COURT:  Ms. Moreno, I believe you were first.

5              MS. MORENO:  May I have a moment, Your Honor?

6              THE COURT:  Sure.

7              MR. WESTFALL:  Your Honor, may I approach just

8   briefly?

9              THE COURT:  Okay.

10             (The following was had outside the presence and

11             hearing of the jury.)

12             MR. WESTFALL:  Will the Court allow me to recross

13  even though I didn't cross?

14             THE COURT:  Yes.

15             MS. CADEDDU:  Me, too?

16             THE COURT:  They got into your client, so certainly.

17             (The following was had in the presence and hearing

18             of the jury.)

19             THE COURT:  Ms. Moreno, are you ready to proceed?

20             MS. MORENO:  I have no questions, Your Honor.

21             THE COURT:  Ms. Hollander?

22             MS. HOLLANDER:  I need to consult with Mr. Westfall

23  a moment.

24             THE COURT:  Mr. Westfall, you are up?

25  Q.  (BY MR. WESTFALL)  Hello, Mr. Shorbagi We haven't met.  I
```

```
 1   am Greg Westfall.

 2   A.    Nice to meet you.

 3   Q.    And I represent Abdul Odeh.

 4   A.    Okay.

 5   Q.    You talked about Yehia Ayyash.

 6   A.    Correct.

 7   Q.    And you believe he was assassinated on January 16 of

 8   when?

 9   A.    Wednesday January 16, 1996.  Correct.

10   Q.    January 16, 1996?

11   A.    Correct.

12   Q.    Do you know how he was assassinated?

13   A.    He was given a cell phone, and he was talking to his

14   father on the cell phone and then an Israeli Apache in the air

15   at that time, they sent the signal--it was very

16   high-tech--they sent a signal to the bomb and the bomb

17   exploded in his face.  He died instantly.

18   Q.    When he -- What do you know about him?  You know he had

19   two sons?

20   A.    He had two sons, yes.

21   Q.    And how old were his sons when he died?

22   A.    The first one was named after his father.

23   Q.    Bara'a was the first one?

24   A.    Right.  He was two years old, and the second son I think

25   was a few weeks I think or a few months.
```

1    Q.    A few weeks old when his father was killed?

2    A.    Right.  He has a name, and then they renamed him Yehia

3    for his father.

4    Q.    Right.  So his two sons at the time he was killed were

5    Bara'a who was three?

6    A.    Yes.

7    Q.    And the child that they then named Yehia?

8    A.    Correct.

9    Q.    Who was a few weeks old when his father was killed?

10   A.    Correct.

11   Q.    Now, do you believe that those children were terrorists?

12              THE COURT:  Counsel, that is not a relevant

13   question.

14              MR. WESTFALL:  Okay.

15   Q.    (BY MR. WESTFALL)  The fact that their father was public

16   enemy No. 1 to Israel, do those children, do you believe that

17   should impair their ability to receive support?

18              MR. JACKS:  That is argumentative, Your Honor.

19              THE COURT:  Sustained.

20   Q.    (BY MR. WESTFALL)  You just told us you believe that

21   Yehia Ayyash was a great person.

22   A.    Correct.

23   Q.    Why did you think he was a great person?

24   A.    I mean, to me as a Palestinian I lived under occupation,

25   so to me he was fighting the occupation so he was a great

1    person.

2    Q.    You told us you are against violence.

3    A.    Correct.

4    Q.    So how can you think he is a great person and be against

5    violence?

6    A.    Because once the violence exceeded its limitation, then I

7    think it will be met by violence.

8    Q.    So do you believe you resist the occupation?

9    A.    Myself?

10   Q.    Yes.

11   A.    Yes, sir.

12   Q.    How do you resist the occupation?

13   A.    When I was there I did resist the occupation when I was

14   in high school, and then here by sending money to the families

15   there.

16   Q.    And just taking care of needy people is a way of

17   resisting the occupation, isn't it?

18   A.    Yes, sir.  Correct.

19   Q.    Just giving medical services to people is a way of

20   resisting the occupation.

21   A.    Any kind of needs.  I mean, the families, a lot of

22   families need a lot of help there, so giving them that kind of

23   help, absolutely you are resisting the occupation.

24   Q.    There is nothing wrong about that, is there?

25   A.    I mean --

```
 1          THE COURT:  Counsel, I am not sure what you are

 2   asking, but if you saying it doesn't violate the law, that is

 3   improper.

 4          MR. WESTFALL:  All right, Your Honor.

 5   Q.   (BY MR. WESTFALL)  What is important in the final

 6   analysis is just helping these people out, isn't it?

 7   A.   I am sorry?

 8          MR. JACKS:  I object to that.  That is a statement.

 9   It is not a question.

10          THE COURT:  He is asking him.  He may ask.  Go

11   ahead.

12          MR. JACKS:  Argumentative, also.

13   Q.   (BY MR. WESTFALL)  Just helping the Palestinian people

14   out, that is what is important, isn't it?

15   A.   Correct.

16          MR. WESTFALL:  Thank you, Mr. Shorbagi.

17          THE COURT:  Ms. Hollander?

18          MS. HOLLANDER:  Yes, sir.

19                  RECROSS EXAMINATION

20   By Ms. Hollander:

21   Q.   You followed the politics pretty closely in 1996, didn't

22   you?

23   A.   Yes, ma'am.

24   Q.   So you know that before Israel assassinated Yehia Ayyash

25   Israel and Hamas were in a situation of a cease fire.
```

1  Correct?

2  A.   Correct, yes, ma'am.

3  Q.   Right.  And Israel broke that with that assassination.

4  Correct?

5  A.   Yes, ma'am.

6  Q.   Before he was assassinated, he didn't get any kind of

7  trial, did he?

8  A.   Trial?

9  Q.   Trial.

10  A.   No, ma'am.

11  Q.   Now, you also mentioned when you testified on direct that

12  Mujahideen means freedom fighter.  Correct?

13  A.   Correct.

14  Q.   And that is correct, isn't it?  People who are fighting

15  for the freedom of their land.  You said that under oath, and

16  you meant it, didn't you?

17  A.   Yes, ma'am.

18  Q.   You also talked about these -- You were asked by Mr.

19  Jacks about the deportees.  After this Israeli officer was

20  kidnapped, none of these 412 men were ever charged with that

21  crime, were they?

22  A.   No.  They were rounded like two or three days after the

23  killing.

24  Q.   Right.  And that was -- Would you call that collective

25  punishment?

1    A.    Yes, ma'am.

2    Q.    None of them was ever charged with that crime, were they?

3    A.    No.

4    Q.    In fact, ultimately Israel didn't even claim they were

5    responsible for that crime, did they?

6    A.    They have nothing to do with that individual.  I mean,

7    the two al-Qassam Brigades who kidnapped Nassim Tulidano they

8    have nothing to do with that.

9    Q.    That the people deported, that included some professors.

10   Correct?

11   A.    Correct.

12   Q.    Judges?

13   A.    Correct.

14   Q.    Lawyers?

15   A.    Correct.

16   Q.    Doctors?

17   A.    Correct.

18   Q.    You also mentioned these that Israel demolished these

19   homes in Rafah.  And that was collective punishment, too,

20   wasn't it?

21   A.    Correct.

22   Q.    They didn't all have tunnels under them, did they?

23   A.    Really that time the 70 homes has nothing to do with the

24   tunnels.  There was rockets.  I am sorry.  There were grenades

25   thrown at an Israeli post.  Sharon got so mad, as usual, so he

1    just sent his bulldozers and just swept the whole area.

2    Q.    Right.  Even though there was one grenade, that wasn't

3    because of tunnels.  Right?

4    A.    Yes, ma'am.

5    Q.    And 70 houses were just demolished without warning.

6    Correct?

7    A.    That is Sharon's business like this, yes, ma'am.

8              MS. HOLLANDER:  Nothing further, Your Honor.

9              THE COURT:  Mr. Dratel?

10             MR. DRATEL:  I have nothing, Your Honor.

11             THE COURT:  Ms. Cadeddu?

12             MS. CADEDDU:  No questions, Your Honor.

13             THE COURT:  Mr. Jacks, anything further?

14             MR. JACKS:  Yes, sir.

15             THE COURT:  Ms. Hollander, that is the last warning

16   I am going to give you about this.

17                       <u>REDIRECT EXAMINATION</u>

18   <u>By Mr. Jacks:</u>

19   Q.    Sir, with regard to your last answers, you said there

20   were -- Preceding this home destruction there was grenades,

21   and I believe you started to say rockets that were fired at

22   Israeli positions.  Is that correct?

23   A.    Correct, yes, sir.

24   Q.    And with regard to the kidnapping and murder of this

25   soldier that led to the deportation, Hamas admitted or claimed

1    responsibility for that.  Correct?

2              MR. WESTFALL:  Object to leading, Your Honor.

3              THE COURT:  Overruled.  Go ahead.

4    Q.  (BY MR. JACKS)  And with regard to Mr. Westfall's

5    question about helping people out is what is important, do you

6    recall being asked about that?

7    A.   Correct.

8    Q.   What about following the law?  Is following the law

9    important?

10             MR. WESTFALL:  Object; argumentative.

11             THE COURT:  Overruled.

12             THE WITNESS:  I think that is why I am in jail, sir.

13             MR. JACKS:  Thank you, sir.

14             THE COURT:  Any recross?

15             MS. HOLLANDER:  No, sir.

16             MR. WESTFALL:  No, Your Honor.

17             MS. MORENO:  No, Your Honor.

18             MR. DRATEL:  No.

19             MS. CADEDDU:  No, Your Honor.

20             THE COURT:  All right.  Mr. Shorbagi, you are free

21    to go.  You may step down.

22             THE WITNESS:  Thank you, sir.

23             THE COURT:  Let me ask counsel to approach the

24    bench.

25             (The following was had outside the hearing of the

1          jury.)

2          THE COURT:  How are you feeling?

3          MS. MORENO:  She sounds worse than I feel.

4          MS. HOLLANDER:  I am sorry.

5          THE COURT:  You have got to quit doing that.  I see

6     you doing that all the time.  Every time you disagree, you

7     start leaning over and start shaking your head.  It is very

8     unprofessional.  You have just got to stop.

9          MS. HOLLANDER:  Okay.  I am sorry.

10          THE COURT:  You all disagree.  I disagree with you,

11    too, but I try to be professional out there, so I expect the

12    same way from you.

13          MS. HOLLANDER:  I am sorry.  I am sorry, and you are

14    correct.  I am sorry.  I apologize.

15          MS. MORENO:  Your Honor, I would ask the Court to

16    adjourn.

17          THE COURT:  Who is next?

18          MR. JONAS:  Agent Burns.  And based on the

19    conversation before lunch, we sent her home.

20          THE COURT:  I think you are safe, then.

21          MS. MORENO:  Well, then I feel much better.

22          THE COURT:  We will just break for the day.  That is

23    fine.  That is what he -- I was just trying to push another

24    hour if I could.  All right.

25          (The following was had in the presence and hearing

1          of the jury.)

2          THE COURT:  Members of the jury, we are going to

3   recess for the day.  Please recall the instructions we have

4   gone over, and see you back at 9:00 in the morning.

5          (Whereupon, the jury left the courtroom.)

6          THE COURT:  Be seated.

7      Counsel, have we received objections as to the exhibits

8   coming through Agent Burns the next time around?

9          MR. DRATEL:  I think they are coming.  I think they

10  are being prepared.  That is why Ms. Duncan is not here today.

11         MR. WESTFALL:  The first round of them, Your Honor.

12         THE COURT:  Right.  So let's be back at 8:30 in the

13  morning.  And so I will get the objections sometime this

14  afternoon?  Is that what I am hearing?

15         MR. DRATEL:  Can we email --

16         THE COURT:  Yes, but I am saying sometime this

17  afternoon.

18         MR. DRATEL:  We will email and let you know.

19         MS. HOLLANDER:  I don't know, because other lawyers

20  are working on it.

21         THE COURT:  I would like to get them this afternoon

22  so I can take a look at them and rule on them in the morning.

23  I mean this afternoon, not midnight.

24         MR. WESTFALL:  Are you going to be here until 5:00,

25  your Honor.

1          THE COURT:  Yes.

2          MR. WESTFALL:  We probably can send you whatever we

3   have.

4          THE COURT:  All right.  See you in the morning at

5   8:30.

6                    (End of day.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         I HEREBY CERTIFY THAT THE FOREGOING IS A

2         CORRECT TRANSCRIPT FROM THE RECORD OF

3         PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4         I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5         FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6         COURT AND THE JUDICIAL CONFERENCE OF THE

7         UNITED STATES.

8

9         S/Shawn McRoberts       06/06/2009

10       _____DATE_____

          SHAWN McROBERTS, RMR, CRR

11      FEDERAL OFFICIAL COURT REPORTER