IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CAUSE NO. 3:04-CR-240-P |
| | ( | |
| vs. | ) | |
| | ( | OCTOBER 21, 2008 |
| | ) | DALLAS, TEXAS |
| HOLY LAND FOUNDATION, ET AL | ( | 9:00 A.M. |

_____

VOLUME 22 OF 37

_____

STATEMENT OF FACTS

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

_____

A P P E A R A N C E S

FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                      1100 COMMERCE, 3RD FLOOR
                      DALLAS, TEXAS  75242
                      BY:  MR. JIM JACKS
                           MR. BARRY JONAS
                           MS. ELIZABETH SHAPIRO

FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
(SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
                      20 FIRST PLAZA, SUITE 700
                      ALBUQUERQUE, NEW MEXICO 87102
                      BY:  MS. NANCY HOLLANDER
                           MS. TERESA DUNCAN

```
 1              FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
               (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
 2                                  NEW YORK, NEW YORK  10005
                                    BY:  MR. JOSHUA DRATEL
 3                                       MR. AARON J. MYSLIWIEC

 4              FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
               (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
 5                                  DALLAS, TEXAS  75204
                                    BY:  MS. MARLO P. CADEDDU
 6
                FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
 7              (GHASSAN ELASHI)     P.O. BOX 10985
                                    TAMPA, FLORIDA  33679
 8                                  BY:  MS. LINDA MORENO

 9                                  JONES DAY
                                    555 CALIFORNIA ST., 26TH FLOOR
10                                  SAN FRANCISCO, CA  94104
                                    BY:  MR. JOHN D. CLINE
11
                FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12              (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                    FORT WORTH, TEXAS  76102
13                                  BY:  MR. GREG WESTFALL

14              COURT'S LAW CLERK:   MS. JENNIFER HELMS
                                    1100 COMMERCE, RM. 1654
15                                  DALLAS, TEXAS  75242

16              COURT COORDINATOR:   MS. BRENDA WEBB
                                    1100 COMMERCE, RM. 1654
17                                  DALLAS, TEXAS  75242

18      OFFICIAL COURT REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                    1100 COMMERCE STREET, RM. 1654
19                                  DALLAS, TEXAS  75242
                                    (214) 753-2349
20

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| LARA BURNS | |
| Direct By MR. JONAS .......................................... | 11 |

## Government's Exhibits

| Government's Exhibits | Page |
|---|---|
| Islamic Center of Gaza Summary Admitted into Evidence | 13 |
| HLF Search No. 102 Admitted into Evidence | 165 |
| Mushtaha Search No. 5 Admitted into Evidence | 202 |

1          THE COURT:  Good morning.

2      All right.  Starting with the objections to Agent Burns'

3  second round of testimony, I have looked at the ones where you

4  had specific objections, and then through some of the others,

5  and I am going to overrule the objections.

6      I think you have withdrawn No. 9 at this time?

7          MR. JONAS:  Yes, sir.

8          THE COURT:  Ashqar Search No. 9 and No. 7, you are

9  going to limit it to the parts already admitted?

10          MR. JONAS:  If I even use it with Agent Burns.

11          THE COURT:  And with respect to InfoCom No. 68 and

12  those three -- That would be HLF InfoCom No. 68 and then HLF

13  86, 183 and 184, I am overruling those objections as well.

14  Those are HLF records and they were found there and they made

15  them.  I think the Government is entitled to use them as they

16  are.  So I will overrule those objections.

17      Any other issues on those, Ms. Duncan?

18          MS. DUNCAN:  Your Honor, I understand your ruling on

19  InfoCom Search No. 68.  Can I clarify the record a little bit

20  about that videotape?

21          THE COURT:  Sure.

22          MS. DUNCAN:  The very beginning of the videotape,

23  and I don't know if Your Honor has seen it.

24          THE COURT:  I have not seen the tape.  I didn't have

25  access to that.  I was going on the basis of what --

1          MS. DUNCAN:  I actually snippeted it up so you can

2    see what it looks like, but the very beginning of the tape are

3    the video footage of different demonstrations.  I am not sure

4    that they are all in Palestine.  I am not sure that they are

5    even the same.  So what you will see are different protesters

6    and a scene of people walking on the American flag and people

7    burning the American flag, and a blank spot where that clip

8    ends, and then another clip will start.

9         And in the middle there appears to be maybe an election

10   or people are signing little pieces of paper, and there is a

11   box that looks like they are putting it in which looks to be

12   completely unrelated to those other videos.

13        So then that sort of starts and stop of different

14   protests, and then the voting starts, and then it starts this

15   recording of the opening of a library that was funded by the

16   Holy Land Foundation.

17        So this is not a video that was made by the Holy Land

18   Foundation.  This is a video that was made by someone in

19   Palestine who was copying onto a tape a video of the opening

20   of the library.  So the two segments, the protesting and it

21   looks like election to me, or people signing something, and

22   the opening of the library, those are very separate things.

23   And the only part of it that pertains to the Holy Land

24   Foundation is the opening of the library.

25        And so with the two tapes -- I looked at the two tapes

1    and they are identical, but I think it is -- There is a note

2    attached to one of the videos that says, "Please make me two

3    copies of the opening of the library."  I can't remember the

4    exact wording but, "the stuff at the beginning, I don't want

5    it," or "The protests at the beginning, I don't want it."

6         So I think it is clear that the video itself was kept in

7    the Holy Land offices because it showed the opening of a major

8    public library.  We have heard testimony about it.  That was

9    funded by the Holy Land Foundation.  And when you watch the

10   actual video itself with the stopping and the starting, it is

11   clear that someone just recorded that opening on a tape that

12   had other stuff on it, but the two are completely different.

13   And it wasn't -- there is no evidence that a Holy Land person

14   made the tape.

15        THE COURT:  Okay.  All right.  Mr. Jonas, do you

16   want to address that?

17        MR. JONAS:  Factually she is accurate, except for

18   one thing.  I think the very first demonstration they show the

19   burning of an American flag and Israeli flag chanting of death

20   to America is a Hamas rally.  I think Agent Burns can testify

21   to that based upon the head gear worn by the participants in

22   this rally.  So I think there is a nexus in this case.

23        We don't know who made the tape.  It was found within the

24   HLF records at InfoCom, and there is that note on there one of

25   the copies.  But the fact that they had this tape, and whoever

1    is making it for them, if they themselves are not making it

2    themselves, and we don't know, goes to show the type of

3    material they are collecting, the type of people they are

4    dealing with.  It is all part of the conspiracy, their intent

5    and knowledge.  So we do think it is relevant.

6         THE COURT:  I had understood, of course, your

7    argument from your written motions and their response, so that

8    was the reason for my ruling.  It still is an HLF record, and

9    I think they are entitled to show it as is.

10         MS. CADEDDU:  Your Honor, I would register an

11    objection to Agent Burns opining that it is an Hamas rally.  I

12    don't think she is an expert.  She said she can't identify

13    anything on these videotapes.  She couldn't even identify the

14    stone-throwing was the Intifada.  So I think that would be

15    improper.

16         THE COURT:  That will be overruled.  She may give

17    her opinion based on her experience and understanding.

18         MR. DRATEL:  Just to be clear, I would register a

19    403 objection on that.

20         THE COURT:  I understand 403 is really over all of

21    these exhibits.  That is there.  And certainly I understood it

22    with respect to these, and then the applications that had the

23    references to the saying.  But, again, as I said, these are

24    HLF records.  They are in their office.  They are maintaining

25    them there, so I think the Government gets to show them.  I

1    don't think you can come back in and clean them up for the

2    jury.  I think these come in as they are.  They are entitled

3    to do that.

4         MR. DRATEL:  I think the Court has kept out some

5    other types of stuff like that, and I think this gets us into

6    the danger area.

7         THE COURT:  As I stated, because these are HLF

8    records, rather than something that someone else was doing.

9    These are their records.  I think the Government is entitled

10   to show them as they are.  And that is the distinction that I

11   made in my mind in terms of the difference in rulings that I

12   made.

13        MS. DUNCAN:  And Your Honor, we would like to burn

14   the full video into a DVD and make it into a court exhibit

15   just to preserve our record on this issue.

16        THE COURT:  Sure.  Remind me to do that and we will

17   make that part of the record.

18        Any other issues with regard to these exhibits or

19   anything else with Agent Burns that we need to address?

20        MR. DRATEL:  Not with Agent Burns.

21        THE COURT:  We are moving on to other things.  We

22   have a few minutes.

23        MR. DRATEL:  With respect to Mr. Shorbagi's

24   testimony, I would move, with respect to Mr. El-Mezain, to

25   strike it, and for an instruction to that effect on collateral

1   estoppel and double jeopardy grounds.

2          THE COURT:  That is overruled.

3       Anything else that we need to address?

4          MR. JONAS:  Very briefly.  There is one

5   demonstrative exhibit I am going to show through Agent Burns

6   that is being created.  I informed the Defense about that, and

7   I believe I described what it is supposed to be.

8          THE COURT:  Do you have it with you?

9          MR. JONAS:  I don't.  It is still being worked on.

10  I don't think I will get to it until the end of her testimony.

11         THE COURT:  What is it?

12         MR. JONAS:  There is two exhibits that we are

13  admitting.  One is a list of victims of the Ibrahimi massacre

14  at the mosque there by Baruch Goldstein that has been

15  testified about.  HLF supported some of those victims.

16      And then there is a U.N. document that lists out -- I

17  don't know if it is called an official list, but it is a list

18  of the victims as well as other people who have died in

19  Palestine and the West Bank and Gaza, I am not sure exactly

20  where, and we want to put both those lists on a poster board.

21         THE COURT:  So one list will be the list --

22         MR. JONAS:  Of people that the HLF supported that

23  died in the massacre.

24         THE COURT:  In that one particular massacre, or

25  multiple?

1          MR. JONAS:  Per their records.

2          THE COURT:  Per whose records.

3          MR. JONAS:  HLF records, people died in that

4    massacre --

5          THE COURT:  That they are supporting?

6          MR. JONAS:  Correct.  And then there is a U.N list

7    of people who died with many of the same people, and we want

8    to have those two side by side.

9          THE COURT:  Okay.

10         MS. HOLLANDER:  Your Honor, I may have missed this

11   but I am not sure how the U.N. list comes in, what foundation

12   is for that.

13         THE COURT:  Do you want to address that?

14         MR. JONAS:  First of all, there is a certification

15   from the U.N. that that is an authentic --

16         THE COURT:  That accompanies the list you have?

17         MR. JONAS:  Yes, the actual exhibit.  And in terms

18   of -- If there is a hearsay objection, there is case law out

19   there that talks about U.N. documents being public records.  I

20   can pull up the cases if the Court wants.  There is one case

21   in particular that is a reverse.  There is a U.N. document

22   that says, "We have got nothing," and there is that hearsay

23   exception that says lack of public record.  So because this

24   document has something, we are saying it is the converse of

25   that.

1          THE COURT:  Ms. Hollander, anything else on that,

2     then?

3          MS. HOLLANDER:  Can I have just a minute, since we

4     have a few minutes?

5          THE COURT:  Yes.  We have a few minutes.

6     Why don't we be in recess until we get -- the juror shows

7     up.  We will be in back.

8                    (Brief Recess.)

9          THE COURT:  Ladies and gentlemen of the jury, good

10    morning.  We are ready to proceed.

11    Mr. Jonas?

12    And Agent Burns, you are still under the oath you took

13    when you first got here.

14         THE WITNESS:  Yes, Your Honor.

15                    LARA BURNS,

16    Testified on direct examination by Mr. Jonas as follows:

17    Q.   Good morning, Agent Burns.

18    A.   Good morning.

19    Q.   Welcome back.

20    A.   Thanks.

21    Q.   When we ended your last testimony a few weeks ago you had

22    testified about payment schedules to certain zakat and

23    charitable committees in the West Bank and Gaza.  Do you

24    recall that?

25    A.   I do.

1    Q.   Okay.  Did you review the body of material that you

2    accumulated through the investigation--bank accounts, search

3    warrant material, et cetera--to see if there were other

4    connections between the Holy Land Foundation and these zakat

5    committees separate and apart from the financial connections

6    that you testified about?

7    A.   I did.

8    Q.   And approximately how much material did you cull from

9    your body of material that goes to the connections between the

10   HLF and zakat committees?

11   A.   A large number of documents, videotapes, wiretaps.

12   Q.   Have you created a summary schedule per committee that

13   summarizes all this material and this connection between the

14   HLF and some of these committees?

15   A.   Yes.

16   Q.   Did you create one schedule per committee?

17   A.   I did.

18   Q.   Would those schedules assist the jury in understanding

19   your testimony?

20   A.   They will.

21   Q.   Do you have before you binders of the schedules as well

22   as other material?

23   A.   I have the underlying materials, not the schedules.

24   Q.   Okay.

25            MR. JONAS:  Your Honor, if I may approach the

1   witness?

2           THE COURT:  Yes.

3   Q.   (BY MR. JONAS)   What is the first schedule -- Withdrawn.

4        Do you have the Islamic Center of Gaza schedule?

5   A.   I do.

6   Q.   What is that based upon?

7   A.   Search warrant material, financial records, videotapes,

8   wiretaps, things like that.

9   Q.   Is some of the underlying documentation already in

10  evidence?

11  A.   It is.

12  Q.   And is some not?

13  A.   That is correct.

14          MR. JONAS:  Your Honor, at this time I offer into

15  evidence the schedule known as Islamic Center of Gaza Summary.

16          THE COURT:  The previous objections?

17          MS. MORENO:  Yes, Your Honor.

18          THE COURT:  All right.  Those are admitted.

19          MR. JONAS:  Before we put on this particular

20  schedule on the screen, just to remind all of us of the

21  financial schedules, if we can put the schedule of payments to

22  the Islamic Center of Gaza on the screen, please.

23  Q.   (BY MR. JONAS)   And Agent Burns, I understand the titles

24  of these two schedules are very similar.  One is called

25  payments to and one is just called the name of the committee.

1    Correct?

2    A.    That is correct.

3    Q.    Okay.  Agent Burns, can you just remind us how this

4    schedule is set up?

5    A.    Yes.  This is again the financial schedule which shows

6    the payments from the Holy Land Foundation to the Islamic

7    Center of Gaza.  And I believe this is the wrong financial

8    schedule on the screen for what we are looking at.

9          MR. JONAS:  It will just take a moment, Your Honor.

10    If I can have the elmo.

11    Q.    (BY MR. JONAS)  Okay.  Agent Burns, is that the right

12    schedule?

13    A.    It is.

14    Q.    And can you walk us through this chart real quick?

15    A.    Yes.  Again, this schedule reflects the payments from the

16    Holy Land Foundation to the Islamic Center of Gaza.  It is

17    prepared in chronological order with the date in the first

18    column, the source of the payment, which in this case on this

19    schedule is the Holy Land Foundation every time, the

20    authorization column indicating if there were a wire transfer

21    or a check, and if a specific individual were involved with

22    that particular transaction their name will be included in

23    that authorization column.  The next column, if we can scoot

24    it over --

25    Q.    I understand we may be able to put it on the computer.

1    A.    Okay.

2            MR. JONAS:   There we go.   Enlarge the top half,

3    please.

4            THE WITNESS:   The next column is the amount, which

5    will be the amount of the check or the wire transfer.   The

6    following column is the destination.   And on this particular

7    schedule that recipient is always going to be the Islamic

8    Center of Gaza, also known as the Islamic Complex.   And the

9    final column, again, is the exhibit number and page number so

10   that if you want to go and look at the actual item that proves

11   what this states, you can go to that exhibit number and that

12   page number and find that item.

13   Q.    (BY MR. JONAS)   What is the first payment made to the

14   Islamic Center of Gaza?

15   A.    April 26, 1989.

16   Q.    Okay.

17           MR. JONAS:   If we can turn to the last page, page 3.

18   Q.    (BY MR. JONAS)   What is the last payment?

19   A.    July 28th, 1994.

20   Q.    And how much in total was the Islamic Center of Gaza paid

21   by the HLF?

22   A.    $733,245 plus $5600 Israeli shekels.

23           MR. JONAS:   Let's look behind one of these

24   transactions.   If we can go back to the first page and enlarge

25   the bottom half, please.

1    Q.   (BY MR. JONAS)  Agent Burns, do you see the transaction

2    that is one on the very bottom, October 2nd, 1989?

3    A.   I do.

4    Q.   Who authorized that transaction?

5    A.   It says Abu Ibrahim, who is the Defendant Mohammad

6    El-Mezain, and brother Shukri who is the Defendant Shukri Abu

7    Baker.

8    Q.   How much is that for?

9    A.   $100,000 plus the wire transfer fees.

10        MR. JONAS:  If we can pull up NAIT, page 106.

11   Q.   (BY MR. JONAS)  Is that the document that supports this

12   transaction?

13   A.   It is.

14   Q.   Do you see the transaction on this page?

15   A.   I do.

16   Q.   Just explain how this supports the transaction, this

17   document.

18   A.   This is the request from the North American Islamic

19   Trust, which is the entity through which the HLF held its

20   first bank account, and it is a request for $100,000.  You can

21   see amount to be transferred.  The name of the payee is the

22   Islamic Center of Gaza with the account number, the bank

23   information, and then at the bottom it says "withdrawal

24   requested by brother Abu Ibrahim/brother Shukri."

25   Q.   Can you remind us why this is through NAIT, the North

1    American Islamic Trust?

2    A.   Yes.  In the beginning the HLF had an account under the

3    Islamic Society of North America, also known as ISNA, that was

4    held through NAIT, which is the North American Islamic Trust.

5    They were like an Islamic bank.

6    Q.   Okay.

7              MR. JONAS:  Now, if we can go to the summary

8    schedule, the Islamic Center of Gaza summary schedule.

9    Q.   (BY MR. JONAS)  Now, Agent Burns, can you explain to us

10   the top line, the title, and the line below that.

11   A.   Okay.  On these summary charts, you will see they are

12   three pages in length.  Everything in this chart is going to

13   relate to the Islamic Center of Gaza.  So that is the title of

14   the summary chart.

15        Underneath that are a number of names of individuals.

16   Those individuals are individuals who were leaders within that

17   with whom the HLF had some type of connection.

18        Do you want me to continue the exhibit columns?

19   Q.   No.  How is it that you connected these people to

20   the -- Is that the exhibit column?

21   A.   Yes.

22   Q.   Okay.  But before we do that, what is the last column on

23   the far right?

24   A.   The last column is the general committee column.  And it

25   will become a little bit more clear as we explain this chart,

1   but basically the purpose of this chart is to show you what

2   types of evidence relate -- that we have that you will see

3   that relate to this organization.  And if a particular piece

4   of evidence relates to one of these individuals there is an X

5   in the column.

6        And we had to make a general committee column because

7   some of the evidence relates specifically to the committee as

8   opposed to one of the individual leaders.

9   Q.   Do you know if there are more people that are involved in

10  this organization?  And let me back up for a second.  Withdraw

11  that question.  The questions I want to ask you now are

12  just -- Let me withdraw that question.  Are all the charts set

13  up the same way?

14  A.   Yes, they are.

15  Q.   Okay.  The people that are listed on the charts, and I am

16  using this one as an example for a moment before we get into

17  the substance of the chart.

18  A.   Okay.

19  Q.   Are these all the people associated with a particular

20  committee?

21  A.   No.

22  Q.   Then why are these particular people here?

23  A.   These individuals were key leaders within the

24  organization over a period of time, and these individuals were

25  also identified in evidence relating to the HLF showing that

1  they had knowledge of these individuals or connection to these

2  individuals who were leaders.

3          MR. DRATEL:  May we approach, Your Honor?

4          THE COURT:  Yes.

5          (The following was had outside the hearing of the

6          jury.)

7          MR. DRATEL:  Two fundamental objections with respect

8  to this kind of testimony.  One is that this all sounds like

9  hearsay without foundation.  It is all going to be hearsay.

10 The second is this is really a summation.

11         MS. CADEDDU:  There is a lot of Fifth Circuit case

12 law, and I can get the Court the cites, about the impropriety

13 of --

14         THE COURT:  I have pulled up those cases because I

15 knew this was coming, so I am prepared.  It is proper to a

16 certain extent.  It is proper.  You can cross the line, but I

17 don't think they have gotten there.

18     It isn't hearsay because she is explaining the chart and

19 then the exhibits and then how these connections are made, so

20 I haven't heard any hearsay yet.

21         MR. DRATEL:  When she says they are all top leaders,

22 that has all got to be hearsay.  She has no personal --

23         THE COURT:  Well, you can ask her about that.  I am

24 not sure what --

25         MS. CADEDDU:  My concern is also, Your Honor, that

1    the other summary exhibits list which particular documents

2    support them.  These are general categories.  We have no idea

3    which video, we have no idea which -- I mean, these are lists

4    with no supporting documents.

5                THE COURT:  She said they are documents that are in

6    evidence.

7                MR. JONAS:  If you turn to the next schedule and

8    then the third page.

9                THE COURT:  The specific exhibits, yes, and the

10   page.

11               MS. CADEDDU:  All right.

12               MR. DRATEL:  One of the problems with hearsay is you

13   can't cross examine it.  So giving us the opportunity to go

14   into it is not a solution for us.

15               THE COURT:  Well, I don't think it is hearsay.  I

16   think that is where we disagree.  I haven't heard what I think

17   is improper hearsay.

18               MS. HOLLANDER:  My concern is when she says these

19   are key people, these are leaders, I mean, the problem is that

20   is all hearsay because she just knows, you know, what she

21   knows, but that is all information that I think if you asked

22   her she would say she got from the experts.

23               THE COURT:  Or from her investigation, the

24   documents, just the things -- there is lot of sources of

25   information I think she does know.  That is why she is saying

1  that and that is why I think you can cross examine her and you

2  can ask her specifically where it came from.

3           MS. CADEDDU:  It is that kind of testimony that the

4  Fifth Circuit has disapproved that when it goes from

5  summarizing to actually rendering an opinion on what the

6  meaning of that is.

7           THE COURT:  She can render some opinions, a summary

8  witness can, and this kind of witness can render some

9  opinions.  And as long as it is being based on her

10 investigation, the documents in evidence, I think she can do

11 that, because it is a voluminous case.  And I don't think this

12 is improper.  I haven't heard it yet.

13      Certainly you can object as we get further down the road,

14 but so far I think he has asked proper questions.

15           MR. JONAS:  While we are here --

16           MR. MYSLIWIEC:  Where do you think the line is, Your

17 Honor?

18           THE COURT:  Well, you start getting into where you

19 start summarizing what other witnesses said, and then if you

20 start getting beyond the investigation where I guess it can

21 get a little murky as to exactly what it is.  So far she has

22 testified to the documents are in evidence.  I guess the big

23 problem we are having here is this opinion conclusion she

24 stated that these are key leaders.

25           MR. DRATEL:  Your Honor, this is something that I

1    think Agent Miranda -- In my cross examination of Agent

2    Miranda, which is something that -- it is hard to parse out,

3    which is I asked him a question, and he said, "Well, that was

4    based on interviewing someone."  So this raises underlying

5    *Crawford* issues as well when you talk about how you know this

6    stuff.  She knows it from interviews and stuff --

7             THE COURT:  That is different because she can still

8    render an opinion.  Even if the underlying bases for the

9    opinion is not admissible, you can still render an opinion.

10            MR. DRATEL:  As an expert, not as a summary, not a

11   lay witness.

12            THE COURT:  That is a good point.

13            MS. MORENO:  That is what she is being presented as,

14   Your Honor.  That is the problem we have.

15            THE COURT:  I still think she is relying on

16   documents, she said.  There may be some underlying -- I mean,

17   you were asking him what he was relying on, but you were

18   trying to actually say he was relying on something, and it

19   wasn't it was more than that.  I thought that is why you were

20   stuck with the answer because you were trying to make it look

21   like this is what he was relying on.

22            MR. DRATEL:  I understand that.  What I am saying is

23   this testimony is the same problem, we just don't hear it.

24   Because when she says --

25            THE COURT:  This is a lot more than just interviews.

Just what she stated so far and what we have heard so far, I

know it is a lot more than interviews.  She is talking about

all these documents, so I just don't see the problem yet.

MR. DRATEL:  Just so long as we have our objection.

THE COURT:  You have it.

MR. JONAS:  Just for housekeeping, I need to move in

some -- some are in.  I need to move in the rest.  I will do

it at some point.

THE COURT:  In fact, even all these others we took

up this morning, rather than offering, they are in.  They are

admitted.  The objections we took up this morning, they are in

evidence.  I already looked at the exhibits.  That has been

admitted into evidence.  And that way you don't have to go

through all that.  It is going to be the same objections, so

no point in going through that.

MS. HOLLANDER:  So we have a continuing objection?

THE COURT:  You have your objections to those on the

record.

(The following was had in the presence and hearing

of the jury.)

Q.    (BY MR. JONAS)  Agent Burns, you said a moment ago that

these are top Hamas leaders.  I want to -- with regard to the

individuals on the chart Islamic Center of Gaza.  Okay?

A.    Okay.

Q.    You said these are top Hamas leaders, key leaders?

```
1    A.    I am sorry.  I thought I said key leaders within the
2    committee, the organization.
3    Q.    Are you getting that from the records themselves that
4    support the schedule?
5    A.    Yes.
6    Q.    I think I had asked you before the objection if there is
7    other individuals who were maybe associated with the
8    committee, not just this committee, the Islamic Center of
9    Gaza, but the other committees we are going to talk about, who
10   are not on your schedules?
11   A.    Yes.
12   Q.    Why is it, then, there are particular individuals -- and
13   I may have asked you this, and I apologize if I did, but I
14   want to make sure I am clear on it.  Why are there particular
15   individuals on the schedules?
16   A.    These individuals are on the schedules because these are
17   the individuals that most predominantly appear in the evidence
18   that we have reviewed, all of the evidence we have talked
19   about throughout the trial.
20   Q.    So if there are other people that may be associated with
21   the committees that are not on the schedule, is that because
22   they are not mentioned in any of the evidence that you
23   reviewed during the course of the investigation and which are
24   in evidence in this case?
25   A.    No.  There are some that are mentioned maybe in one
```

1  document in a list of seven or eight people, but there is no

2  other information relating to that individual, or they are

3  just not key to the organization; whereas the other

4  individuals are referenced in multiple times or in multiple

5  pieces of information.

6  Q.   All right.

7       MR. JONAS:  Let's go -- If we can enlarge are the

8  left hand column, please, that says exhibits.

9  Q.   (BY MR. JONAS)  And if you can walk us through what these

10 are.  Let's take them one at a time.  It says videotapes.

11 What do you mean by videotapes?

12 A.   Okay.  Videotapes would be any of the videotapes that

13 were seized in any of the search warrants that we have talked

14 about, the HLF search warrant, the InfoCom search warrant, the

15 Elbarasse search warrant, things like that.

16 Q.   Generally speaking, what is it about videotapes that

17 relate to committees?

18 A.   Often you will have individuals who actually appear on

19 these videotapes speaking, or you may have an individual who

20 is referenced in the videotape by someone else.  So generally

21 for the purpose of these charts when videotapes are

22 referenced, either the individual is going to appear on the

23 videotape or someone is going to be speaking about that

24 individual on the tape.

25 Q.   And when you say the individual, again you mean someone

1   who is listed on the schedule?

2   A.   Exactly.  For example, under this column Ahmed Yassin has

3   an X by the videotape.  There are videotapes in which he is

4   referenced.  People speak about him in these videotapes.

5   Q.   Okay.  The next line underneath "videotape" says "general

6   HLF/InfoCom."  What does that mean?

7   A.   This is a column, or a row rather, I guess, that refers

8   to general documentation seized in the HLF and InfoCom search

9   warrants.  It could be correspondence like thank you letters,

10  it could be signed receipts, various documents like that;

11  documentary evidence.

12  Q.   Okay.  When you say correspondence, can you give us an

13  example of between who to who?

14  A.   Yes.  For example, you might have a letter from the Holy

15  Land Foundation to the committee or to the individual at that

16  committee, or vice versa.

17  Q.   The next item says "1991 Shukri report."  What is that?

18  A.   I believe --

19  Q.   I skipped one.  It says "InfoCom list."  I apologize.

20  A.   Seized from InfoCom was a list of a number of committees,

21  zakat committees and Islamic societies in the West Bank and

22  Gaza.  It was like a pamphlet that contained the names of the

23  committees, individual members who are part of that committee,

24  bank account information, phone numbers.  That is what the

25  InfoCom list is.

1    Q.   Is that a list that you testified about in your earlier

2    testimony, if you recall?

3    A.   I believe we did reference that in one specific section.

4    Q.   So the first two categories, videotape and again HLF,

5    that was a variety of items?

6    A.   Correct.

7    Q.   This is one specific document?

8    A.   One document.

9         MR. JONAS:  If we can pull up InfoCom Search No. 28,

10   please.

11   Q.   (BY MR. JONAS)  Is this the document?  I know this is the

12   Arabic part, but I just want to identify it.

13   A.   It is.

14   Q.   Are we going to go back to this document in the course of

15   your testimony?

16   A.   Yes, we are.

17        MR. JONAS:  Get back to the schedule, please.

18   Q.   (BY MR. JONAS)  Agent Burns, the next item is the 1991

19   Shukri report.  What is that and what is the significance of

20   it?

21   A.   This is, again, just one document, and this is the letter

22   or the report from 1991 written by Shukri Abu Baker, that we

23   discussed in my first testimony briefly, about his trip to the

24   territories in 1991.

25   Q.   And how does that document relate to these charts?

1  A.   Therein he references a number of the committees that we

2  are going to be talking about today.

3         MR. JONAS:  If we can pull up InfoCom Search No. 51,

4  just to remind us what this document looks like.

5  Q.   (BY MR. JONAS)  Is this the document?  I know it is in

6  Arabic.

7  A.   It is.

8  Q.   Is this the document you are referring to?

9  A.   It is.

10  Q.   Does this document, many of the items in this column

11  refer to multiple committees or individuals on multiple

12  committees?

13  A.   Yes.  These documents, like the InfoCom list and this

14  report, you are going to see on basically every chart for

15  every committee.

16         MR. JONAS:  If we can go back to the chart, please.

17  Q.   (BY MR. JONAS)  After the letter to Shukri, there is

18  Philadelphia meeting.  What is that?

19  A.   We skipped bank records and letters.

20  Q.   I skipped a few things.  Bank records.  What are the bank

21  records?

22  A.   Those are just the domestic and foreign bank records of

23  the HLF.  Also you will see references to some foreign bank

24  accounts for the actual committees that we are going to be

25  talking about, in addition American Express records of the

HLF.

Q.   What is it about the foreign bank accounts, the accounts
of these committees, that are significant to these charts?

A.   What is significant to these charts are the individuals
who were in control of those bank accounts.  The individuals,
for example, on those -- You know, I don't think we have bank
records on this chart, but the individuals who were on the
bank accounts as the signatories as the people who had control
over the money.

Q.   Is that one way of helping you identify who was part of
the committee?

A.   Yes.

Q.   And with regard to these particular bank accounts that
are on these charts, was there a connection between them and
the HLF?

        MS. HOLLANDER:  Objection to leading, Your Honor.

        MR. JONAS:  I will rephrase.

        THE COURT:  All right.

Q.   (BY MR. JONAS)  What, if any, connection is there between
these bank accounts and the HLF?

A.   The HLF sent money to these bank accounts.

Q.   Next is "letter to Shukri."  What is that?

A.   This is a document that was seized in the Elbarasse
search warrant, and it is a letter that is addressed to
Shukri.

```
1    Q.    Okay.

2          MR. JONAS:  If we can pull up Elbarasse Search

3    No. 22.

4    Q.    (BY MR. JONAS)  Was this a document that you testified

5    about in your first testimony?

6    A.    I don't recall if we discussed this one on our first

7    testimony or not.

8    Q.    Okay.

9          MR. JONAS:  If we can scroll through, please.

10   Q.    (BY MR. JONAS)  Does it look familiar?

11   A.    Oh, it does look familiar.

12   Q.    Did you testify about this previously?

13   A.    Yes, in one respect we did.

14   Q.    Okay.  We are going to cover it throughout the testimony?

15   A.    In more detail.

16   Q.    All right.

17         MR. JONAS:  Go back to the schedule, please.

18   Q.    (BY MR. JONAS)  Now, I believe it says we are up to the

19   Philadelphia meeting.

20   A.    It does.

21   Q.    What is that about?

22   A.    In that Philadelphia meeting that we discussed from

23   October of 1993, that meeting that the FBI wiretapped, during

24   that meeting there were discussions about some of these

25   committees, and if these committees or individuals were
```

1    discussed at that meeting, you will see an X in the

2    appropriate column on the chart.

3    Q.    Next it says "MEZ deportee."  What does that mean?

4    A.    That is short for Marj al-Zuhour, which is in Lebanon,

5    and in 1992, in December of 1992 the Government of Israel

6    deported over 400 individuals from the territories to Marj

7    al-Zuhour, Lebanon.  A majority of these individuals were

8    known to be Hamas members.  There were also some Palestinian

9    Islamic Jihad members, as well as some other people.  But a

10   majority of them were known to be Hamas members.

11   Q.    What is the significance about that deportation in these

12   charts?

13   A.    The HLF directly supported the deportees and their

14   families, and also supported some of these individuals in

15   other ways, but more specifically a number of these

16   individuals who were deported were leaders in these committees

17   that we are going to discuss.

18   Q.    Okay.  Did you find any videotapes seized from the HLF or

19   InfoCom of the deportation?

20   A.    Yes.

21   Q.    InfoCom Search No. 27, does that sound like one of those

22   videotapes?

23   A.    It does.

24          MR. JONAS:  If we can play InfoCom Search No. 27,

25   please, both clips.

1           (Whereupon, InfoCom Search No. 27 was played, while

2           questions were propounded.)

3    Q.   (BY MR. JONAS)  Agent Burns, do you see the individual in

4    the center of the screen holding the handheld mic that goes to

5    the bullhorn?

6    A.   Yes.

7    Q.   Do you recognize who it is?

8    A.   It is very blurry here, but from before it was Ismail

9    Haniya.

10   Q.   We haven't pulled out Demonstrative No. 17 in a few days,

11   the chart entitled "Hamas leaders in the 1990s."  Is he on

12   this chart anywhere?

13   A.   He is on the bottom, the second from me, Ismail Haniya.

14   Q.   Do you see that?

15   A.   I do, yes.

16   Q.   Were there other videotapes seized from InfoCom that

17   pertain to the deportation?

18   A.   Yes.

19           MR. JONAS:  If we can play InfoCom Search No. 26,

20   please, just the first two clips.

21           (Whereupon, InfoCom Search No. 26, Clips A and B,

22           were played, while questions were propounded.)

23   Q.   (BY MR. JONAS)  Agent Burns, did you see a moment ago he

24   said, "All the brothers belong to either jihad or Hamas"?

25   A.   Yes.

1  Q.   Is that part of why you have this Marj al-Zahour category

2  on these schedules?

3  A.   Yes.

4  Q.   Agent Burns, do you see there was a reference to Sheikh

5  Yassin?

6  A.   Yes.

7  Q.   When you testified earlier about videotapes and being

8  references to individuals and that is why it is on the chart,

9  the name and the videotape, is that an example of that?

10  A.   That is an example of that.

11  Q.   Did you recognize anyone else in that last picture, that

12  last clip?

13  A.   I did.

14  Q.   Who?

15  A.   Hamas Abdel Aziz Rantisi.

16  Q.   And let me pull out Demonstrative No. 17 again.  Is

17  Rantisi on the chart?

18  A.   He is.

19  Q.   If you can point him out.

20  A.   He is second from you on the second row.

21  Q.   Right where I am pointing to?

22  A.   Yes.

23  Q.   Did you find any documentation anywhere in the search

24  warrant material that pertained to the deportation?

25  A.   I did.

```
1    Q.   And the individuals who were deported?

2    A.   Yes.

3              MR. JONAS:  If we can put InfoCom Search No. 25 on

4    the screen, please.

5    Q.   (BY MR. JONAS)  Is this that item you are referring to?

6    A.   It is.

7    Q.   I realize this is in Arabic.  Are we going to go to this

8    document more in your testimony?

9    A.   Yes, we will see it frequently.

10   Q.   I just wanted to pull it up to identify it.  Has it been

11   translated?

12   A.   It has.

13   Q.   Fairly thick document?

14   A.   It is.

15             MR. JONAS:  If we can go back to the schedule,

16   please.

17   Q.   (BY MR. JONAS)  Did you come -- Staying with the

18   deportees, did you come across any intercepted phone calls

19   from any of the Defendants discussing the deportees being

20   Hamas?

21   A.   Yes.

22             MR. JONAS:  If we can play Baker Wiretap No. 2.

23   Q.   (BY MR. JONAS)  We played portions of that phone call

24   between Shukri Abu Baker and Gayle Reeves during your last

25   testimony.  Do you recall that?
```

```
 1   A.   I do.

 2   Q.   This is going to be another clip from that, clip C, Baker

 3   Wiretap No. 2-A.

 4            (Whereupon, Baker Wiretap No. 2, Clip C was played,

 5            while questions were propounded.)

 6   Q.   (BY MR. JONAS)  Agent Burns, did you interview any of the

 7   Defendants regarding the deportation?

 8   A.   I did.

 9   Q.   Who?

10   A.   The Defendant Mohammad El-Mezain.

11   Q.   And what did he say about his knowledge of who was

12   deported?

13   A.   He said that it was reported in the media at that time

14   that a majority --

15            MS. MORENO:  Objection, Your Honor.  May we

16   approach?

17            THE COURT:  Yes.

18            (The following was had outside the hearing of the

19            jury.)

20            MS. MORENO:  Your Honor, with respect to any

21   statements that Mr. El-Mezain made in his deposition, we

22   suggest that that raises a *Bruton* issue.  Oh, it is a 302.  We

23   suggest that raises a *Bruton* issue, and ask for a limiting

24   instruction, and also object on confrontation grounds.

25            MR. JONAS:  We don't have any issue with limiting
```

1    instructions to the items that were said that were being

2    offered for the truth, which this is one of them.  I think the

3    instruction is appropriate at the end when you give the

4    general instructions to the jury.  We don't have a problem

5    with an instruction.

6            THE COURT:  And you don't see any *Bruton* -- I don't

7    see what is coming, but --

8            MR. JONAS:  No, because the testimony doesn't

9    pertain to any of the other Defendants in this case.

10           MS. MORENO:  This is a conspiracy case, Your Honor.

11   The reason they are offering --

12           THE COURT:  It is not a *Bruton* issue.  I understand,

13   but that is overruled.  But the *Bruton* issue is what I was

14   asking specifically about.  You don't see one?

15           MR. JONAS:  No.  In fact, this goes to an objection

16   raised by the Defendants during the testimony of Agent

17   Miranda, I believe, when he was talking about the family

18   members, and there was one thing Agent Miranda said about a

19   relationship between the Defendant Mohammad El-Mezain and

20   another individual as part of the deportation.  And Mr. Jacks

21   said, "We are going to get to that."  We are there.  It is

22   covering that earlier objection as well.

23           MR. DRATEL:  He is going to go beyond that, you

24   know.  I assume we get to it on cross examination as to what

25   he actually said.

THE COURT: I don't know what he is going to say.

MR. DRATEL: You are going to talk about what he said about the deportees and not just Hamdan.

MR. JONAS: Am I really? I guess I will find out, because Mr. Dratel knows.

MR. WESTFALL: Your Honor, just for clarification, objection for one is an objection for all?

THE COURT: Yes. I think we discussed that several times. You have that.

(The following was had in the presence and hearing of the jury.)

Q. (BY MR. JONAS) Agent Burns, I was asking about an interview you conducted of the Defendant Mohammad El-Mezain with regard to the deportees.

MR. DRATEL: Can we get a time frame, Your Honor, please?

Q. (BY MR. JONAS) When was he interviewed?

A. It was either 2003 or 2002, somewhere -- It was after the HLF was shut down.

Q. Okay. Did Mohammad El-Mezain talk to you about if he had any family members that were part of the deportation?

A. Yes, he did.

Q. What did he say?

A. He said that he had a cousin who had been deported who was known to be a Hamas supporter.

1  Q.   What was the name of that cousin?

2  A.   Ahmed Hamdan.

3  Q.   Okay.  A moment ago we pulled up InfoCom Search No. 25,

4  which you identified as coming from InfoCom.  That is in the

5  Arabic document, and we said we will get to later.

6  A.   Yes.

7  Q.   Just remind us again what that document is about.

8  A.   That was a list of deportees to Marj al-Zuhour in 1992.

9  Q.   Is the Defendant Mohammad El-Mezain's cousin listed in

10 that list?

11 A.   He is.

12 Q.   Identified in that list?

13 A.   He is identified, yes.

14 Q.   Okay.

15      MR. JONAS:  If we can go back to the summary chart,

16 please.

17 Q.   (BY MR. JONAS)  I believe we are up to "Marzook's

18 phonebook."  And what is the significance of Marzook's

19 phonebook to these schedules?

20 A.   It was one of the pieces of evidence that I analyzed

21 regarding these committees and the members of the committees.

22 And if the committee or an individual who was on one of these

23 charts as a leader of the committee is listed in Marzook's

24 phonebook that was seized in 1995 from Marzook, then there

25 will be an X in that column under that person's name.

1   Q.   The next item is "Ashqar's documents."  What is that?

2   A.   We discussed the December 1993 covert search of Abdel

3   Haleem Ashqar's home where they took photographs of those

4   documents.  If any of these committees or individuals are

5   referenced in those documents, you will find an X in that

6   column.

7   Q.   The next one is "Elbarasse's documents."  What is that?

8   A.   That is the same thing for the Ismail Elbarasse search

9   warrant.  If any of these entities are listed in a piece of

10   evidence seized in that search warrant, there will be an X in

11   that column.

12   Q.   The last item on this column is "phone calls/faxes."

13   What are those?

14   A.   Those are the wiretap calls and faxes.  If we selected an

15   item from one of those wiretaps that will be discussed that

16   references one of these individuals or the committee, there

17   will also be an X in that column or row.

18   Q.   Agent Burns, there is a picture on this chart.  Who is

19   that?

20   A.   That is Sheikh Ahmed Yassin.

21   Q.   Is that the same picture of the one admitted into

22   evidence of him?

23   A.   I don't know if it is the identical picture, but it is

24   the same individual.

25   Q.   Do all the charts have pictures on them?

1    A.    No.

2    Q.    Just this one?

3    A.    Yes.

4    Q.    You testified there are Xs where the item on the other

5    exhibits and the name or the general committee column

6    intersect, as if there is an item that references that

7    individual on the committee.  Correct?

8    A.    Correct.

9    Q.    But there are some spaces with no Xs.  Can you just

10   explain that?

11   A.    Well, if there is not an X, that means that in the

12   evidence that is being presented, that individual is not

13   identified.

14   Q.    For that particular item?

15   A.    For that particular item.  For example, under bank

16   records here there is no X under Ahmed Yassin's name.  That

17   means that no bank records we are introducing or discussing

18   discuss or reference Ahmed Yassin.

19   Q.    Okay.

20   A.    But I might add, there is another column that has an

21   asterisk with "see payments under general committee."  Just to

22   explain that, we looked at the financial schedules for these

23   committees.  Well, the financial documents that went in to

24   make up those financial schedules are also evidence that

25   sometimes relate to the summary charts.  So when you see an

1    asterisk and it says "See payments to the Islamic Center of

2    Gaza," you also need to reference the financial schedule and

3    those underlying documents.

4    Q.   Why didn't you just list out all those underlying

5    documents in that schedule all over again in this schedule?

6    A.   Because, one, it would have one made it very cluttered;

7    and two, it would have just been, you know, double the work

8    for -- I mean, when you can just go directly to the other

9    schedule and look at it, it is much easier.

10            MR. JONAS:  If we can go to page two 2 of the

11   schedule.

12   Q.   (BY MR. JONAS)  Can you explain what this page is about?

13   A.   Yes.  On -- There are three pages to this exhibit, so we

14   looked at the first page.  The second page again shows the

15   committee's name on the top, and the same list of exhibit

16   types on the left.  Then for every exhibit that will be

17   discussed that relates to this committee, it is sorted by

18   type.

19        So videotapes, the exhibit numbers that pertain to this

20   committee are listed out beside videotapes.  HLF Search No. 32

21   is a videotape.  HLF Search No. 113 a videotape.

22            MR. JONAS:  If we can go to the last page, page 3 of

23   the schedule.

24   Q.   (BY MR. JONAS)  Are you going to explain this page?

25   A.   To help make it easier, since the records are so

1    voluminous, I tried to break it down by individual and page

2    number, because some of these exhibits are a rather large.  So

3    all of the same individuals are listed on the third page that

4    are listed on the first, and underneath them are the exact

5    exhibit number with page number, so that if you want to go and

6    look and see where Ahmed Yassin is referenced as it relates to

7    this summary chart, you can look up the exact exhibit number

8    and the page number and turn right to the page and see where

9    he is referenced.

10   Q.   Are the exhibits on this page that are sorted by the

11   individual or the general committee the same exhibits that are

12   on the second page that are sorted by the source, the exhibit

13   itself?

14   A.   Yes.  They are just -- Here you have the additional

15   benefit of page number, and it is broken down by specific

16   individual.

17   Q.   Okay.  Agent Burns, I want to now go through this chart.

18   And we are not going to go through every single exhibit that

19   supports the chart, but I want to go through some

20   representative samples.

21   A.   Okay.

22   Q.   And first let's start with the first person, Ahmed

23   Yassin.

24        MR. JONAS:  And let's go to HLF Search No. 108, page

25   11.

```
 1    Q.   (BY MR. JONAS)  What is this document and what does it

 2    say about Yassin?

 3    A.   Well, this is one of the Middle East Affairs Journals

 4    that was taken during the HLF search warrant.  It is a

 5    document or a journal that was published by the United

 6    Association for Studies and Research, UASR, and in it there is

 7    an article that discusses Yassin and --

 8    Q.   Can you remind us what the UASR is?

 9    A.   Yes.  They were one of the three initial organizations

10    that were a part of the Palestine Committee.  You had the HLF,

11    the IAP, and UASR that we saw referenced multiple times in

12    these early Palestinian Committee documents.

13    Q.   And based upon the evidence, who created or who was part

14    of starting the UASR?

15    A.   That was Mousa Abu Marzook the Hamas leader.

16    Q.   Okay.

17              MS. HOLLANDER:  What was that document number?

18              MR. JONAS:  This is HLF Search No. 108, page 11.

19    Q.   (BY MR. JONAS)  Agent Burns, if we can just point out

20    where in this page it mentions Yassin, if you can see it?

21    A.   He is discussed throughout, but if you look in the first

22    paragraph it talks about how he established the al Mojama

23    al-Islami, the Islamic Center we are talking about, in Gaza.

24    Q.   Is this one of the items you relied on to connect Yassin

25    to the Islamic Center?
```

A.    Yes.

            MR. DRATEL:  Same objection, Your Honor.

            THE COURT:  Overruled.

            MR. JONAS:   Okay.  Let's look at InfoCom Search

No. 28, page 98, please.

Q.   (BY MR. JONAS)  Agent Burns, while we are waiting for

that document to pull up, you testified that -- Well,

withdrawn.  What is the purpose of this chart?

A.    To assist everyone in looking at the specific evidence

that relates to the committees and the people who control

them.

Q.    Okay.  Are you looking -- Is one of the purposes to

connect the HLF to the committee?

A.    Yes.

Q.    Is also one of the purposes to identify who in

the -- Withdrawn.  Who runs the committees?

A.    Yes.

Q.    Okay.  Is one of the purposes also to see if there is any

information contained within the body of evidence gathered in

this case connecting those individuals or the committee to

Hamas?

A.    Yes.

Q.    Okay.  So there are three purposes?

A.    Right.

Q.    All right.  This particular item, InfoCom Search No. 28,

1    page 98, what is the purpose of this particular item?

2    A.    This particular item shows that, again, the Islamic

3    Center, which is also known as the Islamic Complex, was

4    founded by Sheikh Ahmed Yassin, the document taken from

5    InfoCom.

6    Q.    Does this support that prior document we just looked at,

7    the Middle East Affairs Journal?

8    A.    It does.

9          MR. JONAS:    If we can pull back and enlarge the

10   middle half.

11   Q.    (BY MR. JONAS)    Agent Burns, are there documents that

12   reference multiple individuals per committee?  And I am asking

13   not with regard to this particular schedule, but just

14   generically with the other schedules as well.

15   A.    Yes.

16   Q.    So do you reference that document under each person's

17   name if it identifies each person?

18   A.    I do.

19   Q.    So this particular one, does this identify individuals

20   who are on your chart, as well as Sheikh Yassin that you

21   discussed a moment ago, in the top half of the page?

22   A.    Yes.

23   Q.    Can you tell us who else is on your chart--which I

24   realize is not on the screen right now, but you have in front

25   of you--is identified, per this exhibit, as being connected to

1    the Islamic Center of Gaza?

2    A.    I can.  It would be nice -- is there any way to pull it

3    up on the screen with it?

4           MR. JONAS:  Can we split screen it, please.  If you

5    can enlarge the names on the right schedule.

6           THE WITNESS:  Actually I think this will be okay, if

7    we leave it like this, because I wanted to show how the Xs

8    appear.

9           MR. JONAS:  Okay.  Enlarge on the left page InfoCom

10   Search No. 28, the names.  Thank you.

11          THE WITNESS:  Okay.  So again, this is -- If you

12   will look on the right side of your screen on the summary

13   chart, under exhibits, the third one down is InfoCom list, and

14   then there are Xs under specific individuals' names.  The

15   document on the left is that InfoCom list, and it referenced,

16   as we saw, Yassin in the first paragraph.  And then No. 1, as

17   chairman of that organization is Ibrahim al-Yazouri.  And if

18   you look over to the right there is an X under his name

19   showing that he appears in this list.

20         The same thing with No. 2, Mohammed Hassan Shama'ah.  He

21   is also on the summary chart and has an X under his name in

22   this row.

23         And finally Mohammed Saleh Taha is referenced in the

24   summary chart and has an X under his name in this row.

25   Q.    So when we talk about these individuals, we don't need to

1   go back to that document now, do we?

2   A.   I hope not.

3   Q.   Okay.  I want to staying with Yassin.  Did you come

4   across -- Is there anything in your chart that references

5   Sheikh Yassin's connection to Hamas?

6   A.   Yes.

7            MR. JONAS:  If we can pull HLF Search No. 109, page

8   140, please.

9   Q.   (BY MR. JONAS)  What is this item, by the way?

10  A.   This is a book that was seized from Abdulrahman Odeh's

11  office.

12  Q.   Do you recall the title?

13  A.   It was regarding a study about Hamas.  I can't remember

14  the exact title, but that was the essence of it.

15  Q.   Can you remind us again who Abdulrahman Odeh is?

16  A.   That is the Defendant Abdulrahman Odeh.

17  Q.   What was his connection to the HLF?

18  A.   He was the HLF New Jersey representative.

19  Q.   Where was this book found?

20  A.   In the HLF New Jersey office.

21  Q.   Page 140, which is a translation, how does it reference

22  Yassin's reference to Hamas?

23  A.   It is actually reporting on an interview with Sheikh

24  Ahmed Yassin, and identifies him of the head of the Hamas

25  movement in the territories.

```
 1    Q.   Was there other items that you came across that connected

 2    Yassin to Hamas?

 3    A.   Yes.

 4         MR. JONAS:  Let's look at one more.  If we can go to

 5    El-Mezain Wiretap No. 1, page 89, please.

 6    Q.   (BY MR. JONAS)  And just can you remind us again what

 7    El-Mezain Wiretap No. 1, what that exhibit consists of?

 8    A.   Those are a number of faxes that were obtained from the

 9    wiretap on Mohammad El-Mezain's phone.

10    Q.   And on this particular page where does it identify Sheikh

11    Yassin?

12    A.   In the first paragraph it says -- it identifies Sheikh

13    Ahmed Yassin.

14         MR. DRATEL:  Same foundation objection, Your Honor.

15         THE COURT:  Overruled.

16         MR. JONAS:  Enlarge that first paragraph, please.

17         THE WITNESS:  And it says, "Sheikh Ahmed Bhar, one

18    of the Hamas movement leaders in Gaza Strip, confirmed in a

19    mass festival attended by thousands of Hamas supporters in the

20    Strip, on the seventh anniversary of the movement that Hamas

21    was established by a decision from the Islamic leadership and

22    Sheikh Ahmed Yassin, and that it came to fulfill the desire of

23    the Palestinian masses to ignite the fire of revolution

24    against the occupier on December 8, 1987."

25         MR. JONAS:  If we can go back to the summary
```

1    schedule, please, for the Islamic Center of Gaza.

2    Q.   (BY MR. JONAS)  The next individual is Atef Abed.  Am I

3    pronouncing that correctly?

4    A.   Right.

5    Q.   And again, just before I leave Yassin for a moment, on

6    page three of the schedule --

7             MR. JONAS:  If we can go to that page real quick.

8    Q.   (BY MR. JONAS)  There are other items that we have not

9    covered?

10   A.   That is correct.

11   Q.   That support Yassin's connection to the committee and

12   Hamas?

13   A.   Yes.  So you would want to look at all of those.

14   Q.   Okay.  We are not going to do that now.

15   A.   Okay.

16   Q.   But it is all material that is in evidence.  Correct?

17   A.   Yes, that is correct.

18   Q.   Let's just move on to Atef Abed.

19            MR. JONAS:  If we can pull up InfoCom Search No. 49,

20   please, page 8.

21   Q.   (BY MR. JONAS)  What is this item?

22   A.   It is a letter I believe to the HLF from Atef Abdulrahmen

23   Abed of the Islamic Center, you can see there on the signature

24   line.

25   Q.   This came from where?

```
 1   A.   This came from the -- I can't remember if it is the Holy

 2   Land Foundation or InfoCom.  It is the HLF.

 3   Q.   This is InfoCom Search No. 49.

 4   A.   InfoCom search.

 5   Q.   The title of the exhibit, does that give you any help?

 6   A.   It does.

 7             MR. JONAS:  If we can turn to the HLF Search No.

 8   149, please, page 11.

 9   Q.   (BY MR. JONAS)  And what is this?

10   A.   This again is a thank you letter from Atef Abed from the

11   Islamic Center, also known as the Islamic Complex--it is a

12   different way of translating the same word--to the HLF, and

13   it was found at the HLF.

14   Q.   With regard to the material again that you reviewed and

15   that you made part of your chart, did you find a connection

16   between every individual in the chart and Hamas?

17   A.   Not within the evidence that we are presenting here.

18   Q.   That is what I am asking.

19   A.   Yes.

20   Q.   So with regard to this individual, on the chart it just

21   has these two exhibits we have pulled up that just connect

22   them to the committee, as well as there is a connection to

23   HLF.  Did you come across anything within the body of material

24   that you reviewed that is in evidence and supports this chart

25   connecting Atef Abed to Hamas?
```

1    A.    Not other than his connection through the Islamic Center.

2    Q.    Okay.  If we can go to -- The next person on the chart is

3    Ibrahim al-Yazouri.  We don't need to keep going.  Do you see

4    he is the third name?

5    A.    Yes.

6    Q.    Let's look at a few of the examples.  When we pulled up

7    InfoCom No. 28, when we were talking about Shiekh Yassin, was

8    al-Yazouri's name on that document?

9    A.    Yes.  Actually I believe he was listed as the chairman on

10   the document.

11         MR. JONAS:  Let's go to an HLF Foreign Account No.

12   1, page 67.

13   Q.    (BY MR. JONAS)  And what is HLF Foreign Account No. 1

14   Agent Burns?

15   A.    That is one of the HLF's foreign bank accounts in the

16   territories.

17   Q.    And how do you connect this -- You have this exhibit

18   listed under the Ibrahim al-Yazouri column.  What is it about

19   this exhibit that connects him?

20   A.    This is a payment to him as director of the Islamic

21   Assembly--and assembly is just a different way of translating

22   the same word Islamic Center--and from the HLF.  So it is a

23   direct financial connection between the HLF and this

24   individual.

25   Q.    Okay.

1    MR. JONAS:  Let's go to HLF Search No. 109, page

2  143, please.

3  Q.   (BY MR. JONAS)  This is the book we looked at a moment

4  ago?

5  A.   It is.

6  Q.   Is there anything in this document, in this book, that

7  connects Ibrahim al-Yazouri to Hamas?

8  A.   Yes.

9  Q.   What is that?

10  A.   I am looking for the specific paragraph.  There he is

11  listed, if you look, it says the Islamic Resistance Movement,

12  Hamas, in Gaza, six people who are Salah Shehatah, Mohamed

13  Shma'a who is also listed on this chart, Ibrahim Yazouri who

14  is the individual we are speaking about, Abdel Aziz al

15  Rantisi, Abdel Fattah Dokhan, and Issa AL Nashar.  So it

16  identifies him as a leader of Hamas.

17  Q.   Abdel Aziz Rantisi, that is the individual we saw on the

18  deportee tape that we pointed out a few moments ago?

19  A.   That is correct.

20  Q.   Okay.  Let's move to the next person on the list, then.

21  You identified a guy named Mohamed Shama'ah?

22  A.   Yes.

23  Q.   Correct?  He has been now -- I think we have seen his

24  name twice on some of these exhibits.  Is that correct?

25  A.   That is correct.  We saw him on the InfoCom list and we

```
1   saw him there -- as identified with the committee.  And then

2   we saw him there in that Middle East Affairs Journal

3   identified as a leader of Hamas.

4   Q.   Okay.  Let's look at one more on him.  Okay?

5   A.   Okay.

6            MR. JONAS:  InfoCom Search No. 25, page 24.

7   Q.   (BY MR. JONAS)  And while that is pulling up, can you

8   remind us what InfoCom Search No. 25 is?

9   A.   Yes.  It is a list of those deportees to Marj al-Zuhour,

10  Lebanon that was taken from InfoCom.

11  Q.   Okay.  And on page 24, which is the English translation,

12  where do we see Mohamed Shma'ah's name?

13  A.   He is the last individual listed on this page.

14  Q.   Okay.  Let's move on to the next individual, Mohamed

15  Taha, T-A-H-A.

16           MR. JONAS:  I am sorry.  Go back to that page,

17  InfoCom Search No.  25.  I am sorry.  My mistake.  Don't worry

18  about that.

19  Q.   (BY MR. JONAS)  Have we seen Mohammed Taha's name already

20  this morning?

21  A.   It was in InfoCom Search No. 25 on page 64.

22  Q.   Okay.

23  A.   It was also in the InfoCom list.

24           MR. JONAS:  Let's look at another one.  InfoCom

25  Search No. 48, page 217.
```

1    Q.    (BY MR. JONAS)   Is that Mohammed Taha there?

2    A.    I think there is a typo on the page number.

3          MR. JONAS:   Try page 123.

4          THE WITNESS:   Yes.

5    Q.    (BY MR. JONAS)   Okay.   And what is this item?   What is

6    this exhibit?

7    A.    This is a -- We talked about the prisoners projects,

8    these needy family projects in my first testimony, with the

9    individuals that had been detained for security reasons who

10   were supported by the HLF.   This is a certificate of one of

11   the individuals who was supported by the HLF who had been

12   detained for security reasons.

13         So this particular individual was supported by the HLF as

14   a prisoner in 1991, and as a deportee when he was deported in

15   late 1992, early '93, and he was also identified on the

16   InfoCom list as a member of this committee, of the Islamic

17   Center of Gaza.

18   Q.    And everything you just testified to, is that contained

19   within the exhibits we just looked at?

20   A.    Yes, it is just listed here on the third page.

21   Q.    Let's go to the general committee column.

22         MR. JONAS:   Go back to the schedule, please, the

23   third page.

24   Q.    (BY MR. JONAS)   We see a series of exhibits that are

25   under the general committee column.   And generally speaking,

1    can you tell us what these exhibits say with regard to this

2    committee?

3    A.    Well, the HLF search and InfoCom search documents will be

4    a little bit different.  Those are usually letters, thank you

5    letters, things like that.  The Ashqar documents, I believe

6    those are more phone lists, things like that.  Actually Ashqar

7    No. 5 I know is also a letter.  It is a Hamas letter.  And

8    Elbarasse Search No. 18 is the fax from the Islamic Relief

9    Committee, from my first testimony that we discussed, wherein

10   Hamas was requesting weapons, and they also requested aid to

11   prisoners' families.

12   Q.    Does that relate to the Islamic Center of Gaza?

13   A.    It does.

14   Q.    I want to go back to something you said a moment ago

15   about the HLF search and InfoCom search, and those are

16   letters.  What is the purpose of those documents on this

17   chart?

18   A.    To show connection between the HLF and the Islamic Center

19   of Gaza.  And on this chart, because the Islamic Center of

20   Gaza is a little bit different, it goes to show their general

21   connection with the committee.

22            MR. JONAS:  Let's pull up Elbarasse Search No. 18,

23   page 14, please.  Before we do that, we need to read the

24   bottom of page 12.  So let's go back to page 12 and then we

25   will go to page 14.

1   Q.    (BY MR. JONAS)  Can you just read this bottom paragraph?

2   A.    Yes.  And again, this is that fax from the Islamic Relief

3   Committee, that we initially talked about in my first

4   testimony, from 1992, and this is part of it.  And it says,

5   "You do not know how happy people become when they watch those

6   Mujahideen and how proud they feel when they parade in their

7   uniforms and weapons, and the extent of their honor when they

8   carry out their jihadist operations against the Jews and their

9   tentacles.  It is a feeling that no taste or enjoy its flavor

10  except the one who lives it.  Jihad in Palestine is different

11  from any jihad.  The meaning of killing a Jew for the

12  liberation of Palestine cannot be compared to any jihad on

13  earth.  This is the meaning that I came out with from there."

14  Q.    Okay.

15        MR. JONAS:  If we can go now to page 14.

16  Q.    (BY MR. JONAS)  What is it on this page that caused you

17  to put this on the Islamic Center of Gaza chart?

18  A.    Well, after the writer goes and requests aid for weapons,

19  he says that he appeals to the reader to take quick action to

20  feel the needs of the people inside.  And he lists the

21  delivery channels, the channels through which that aid could

22  be given.  And the first one is the detainees and the needs of

23  their families.  And if you scroll down, he lists the Islamic

24  Complex, which is the Islamic Center of Gaza as one of the

25  channels for delivering funds.

```
1   Q.   Okay.  The last thing I want to ask you about on this
2   particular schedule is the Philadelphia meeting.  You said
3   that they talked in the Philadelphia meeting about some of
4   these committees.
5   A.   Yes.
6   Q.   Okay.
7            MR. JONAS:  If we can play Philadelphia Meeting
8   No. 13, clip A, please.
9            (Whereupon, Philly Meeting No. 13, Clip A was
10           played, while questions were propounded.)
11  Q.  (BY MR. JONAS)  Who is speaking?
12  A.   This is Muin Shabib.
13  Q.   He said, "We must speak about the situation and the
14  organizations on the inside."  Have we heard that terminology
15  in this case?
16  A.   Yes.
17  Q.   And what is that terminology?  How has that terminology
18  been defined as in this case?
19  A.   Inside the Palestinian territories as opposed to outside
20  the Palestinian territories.
21  Q.   Okay.
22           MS. CADEDDU:  I would object to that testimony as an
23  improper summary.
24           THE COURT:  Overruled.
25  Q.  (BY MR. JONAS)  Agent Burns, do you see where he refers
```

1    to the Islamic Complex?

2    A.    Yes.

3    Q.    Is that the Islamic Center of Gaza that you have been

4    testifying about?

5    A.    That is correct.

6    Q.    Does he go on and talk about other zakat committees that

7    the HLF gave money to?

8    A.    He does.

9    Q.    That we are going to talk about soon?

10   A.    Yes.

11   Q.    I am just going to let this clip play out.  It is going

12   to be easier, if that is okay with you.

13   A.    Okay.

14   Q.    Do you see where he refers to al-Salah Society?

15   A.    Yes.

16   Q.    Is that a society you are going to testify about?

17   A.    It is, just as the Islamic Society of Gaza, the one he

18   mentions just before it.

19   Q.    Okay.  Do you see the Nablus zakat committee?

20   A.    Yes.

21   Q.    Did the HLF give money to the Nablus zakat committee?

22   A.    Yes.

23   Q.    Do you see the reference to Islamic Movement?

24   A.    Yes.

25   Q.    Have we seen that mentioned in this case before?

1    A.    Yes.

2    Q.    And based upon the evidence, what is the Islamic

3    Movement?

4    A.    That will be the Islamic Resistance Movement, Hamas.

5    Q.    He references in Jenin a zakat committee.  Did the HLF

6    give financial aid to the Jenin zakat committee?

7    A.    They did, as well as the hospital that is referenced

8    there.

9    Q.    Tulkarem.  Did the HLF give money to the Tulkarem zakat

10   committee?

11   A.    Yes.

12   Q.    And he mentions Qalqilya.  Was there a Qalqilya zakat

13   committee that the HLF gave money to?

14   A.    Yes.

15   Q.    Do you see where it says SH and UI?

16   A.    Yes.

17   Q.    What is the UI?

18   A.    That means unintelligible.  The translator couldn't

19   understand what was being said.

20   Q.    Who is the SH?

21   A.    That is the Defendant Shukri Abu Baker.

22   Q.    Do you see where he says, "In Jerusalem will remain some

23   organizations, particularly the Islamic Sciences and Culture

24   Society"?  Did the HLF give money to the Islamic Sciences and

25   Culture Society?

A.    Yes.

Q.    And I know we are going to get to that soon, but who ran that society back when the HLF was giving money to it?

A.    Particularly Hamas leader Jamil Hamami.

Q.    Agent Burns, do you see where it says, "We could say that the Ramallah zakat committee is ours, including its management and officers"?  Did the HLF give money to the Ramallah zakat committee?

A.    Yes.

        THE COURT:  Let's go ahead and take a break at this point.  Be back at a quarter till 11:00.

        (Whereupon, the jury left the courtroom.)

        THE COURT:  We will be in recess until 15 till.

        MR. DRATEL:  Your Honor, I think the problem now with respect to the type of testimony we have had is that things that came in to show that Holy Land had them in their files or that things were faxed to Mr. El-Mezain have now come in for the truth.  In other words, she has been reading as a foundation, things that are in the Middle East Journal articles and things like that, and using that for the truth. And I think that is one of the problems of not having an instruction contemporaneous with when those things came in initially, what they are being introduced for.  Now I think it is completely muddled, and they are coming in for a purpose that they were not initially put in for.  So that is my

1    objection.

2         MR. JONAS:  Your Honor, I don't recall any

3    limitation on these particular exhibits.  And while there are

4    some exhibits, and not these ones in particular, that may have

5    been offered to show that the HLF had them, these exhibits are

6    documents that were created by co-conspirators in this case.

7    For example, The Middle East Affairs Journal was published by

8    the UASR, which we have established is a co-conspirator as

9    part of the Palestine Committee.

10        That book that Agent Burns testified about with the red

11   cover taken from the office of Defendant Odeh, if I remember

12   correctly, and Agent Burns can correct me if I am wrong, has

13   the HLF as the OLF in the back of it with an IAP publication.

14   I am being told no.  It is not that particular book.  There is

15   another book like that, though.

16        So I think we -- And we are arguing that these are

17   co-conspirator statements made in furtherance of.

18        THE COURT:  And I don't remember the limitations,

19   counsel, on these documents that they were admitted not for

20   the truth.  I don't remember that.  The record will reflect

21   that.

22        MR. DRATEL:  I thought your basis for admitting

23   them, Your Honor, was that they were found in the Holy Land

24   files or they were received --

25        THE COURT:  I don't remember that conversation.

1  That doesn't mean that they come in not for the truth because

2  they were found there.  That doesn't mean there is a

3  limitation what they can be used for.

4       MR. DRATEL:  They have hearsay within them, and I

5  think that just because they were found --

6       THE COURT:  Counsel, but part of what I am hearing

7  here, that is the reason I asked the Government to give you in

8  advance the exhibits so we could get objections.  I have

9  admitted these exhibits.  They have been admitted.  There were

10  no limitations on those exhibits, except those that we

11  specifically discussed.  And there were a few that we

12  discussed.  But there wasn't a general limitation on these

13  documents that they were being admitted not for the truth.

14  And I wanted objections back then before I admitted; not now

15  that they are in.  I am getting these objections now.  These

16  exhibits are in.

17      If you didn't make those objections, in my view they are

18  untimely now and they have been waived.  That is why I had the

19  Government give you that list, so I could hear objections.  I

20  am not going to sit here and go through all these exhibits and

21  listen to them to figure out what is right and what is wrong.

22  That is your job.  There is a lot more of you than me.  So I

23  need to hear the objections from counsel.  And I dealt with

24  those objections as I received them, and then we dealt with

25  them.  Some have been limited, some of them have been admitted

1   in part, and some of them are in.  But those that are in are

2   in.  And if there was a limitation, the record will reflect

3   it.  I don't recall any limitations, like you are discussing,

4   on these exhibits.  So if they are in for all purposes they

5   are in and this is not improper then.

6           MR. DRATEL:  Your Honor, and I don't think it is

7   untimely when the witness is testifying, but also --

8           THE COURT:  I think it is untimely if the exhibit

9   has already been admitted into evidence.  You have been given

10  an opportunity to object, and you didn't object on the basis

11  you are now objecting.

12          MR. DRATEL:  I am objecting to the use which they

13  are putting it.

14      But the other issue is that, for example, for example,

15  the UASR Middle East Journal, it is not written by them.  It

16  is written by someone else.  They haven't proved that person

17  is a co-conspirator who wrote the articles.  This expands the

18  co-conspirator exception beyond the breaking point.

19          THE COURT:  All right.

20          MS. HOLLANDER:  Your Honor, I just thought, and I

21  could be wrong, but I thought that when these documents came

22  in originally that, and I have --

23          THE COURT:  Like the first time she testified?

24          MS. HOLLANDER:  Right.  Originally when they first

25  came in, Mr. Jacks said, and I wrote it down, the quote, "The

1    jury is entitled to see what HLF kept as an indication of

2    their state of mind," that they were being offered to show --

3             THE COURT:  But that doesn't establish that they

4    weren't offered for the truth.  I don't ever recall having

5    that limitation just generally on these exhibits that we are

6    having now.

7        And then we did admit some housekeeping towards the end

8    of her first time that she testified, and there I think it was

9    subject to some other provisions, and I don't recall the

10   limitations.  But now you have been given the list,

11   housekeeping that she discussed later, and you have had the

12   opportunity to object.  That is the point I am making.  That

13   is what that list was for.  You have had this list since when?

14            MR. JONAS:  This particular list with regard to this

15   testimony, Thursday maybe.

16            THE COURT:  Last week sometime.  And so that is why

17   you received it, so I could get the objections.  I have

18   received the objections yesterday, and so now I have ruled on

19   them and I am hearing more and more and more objections.  So

20   you have now had your objections.  These objections raised now

21   were not raised previously.  You had, I guess to the extent

22   you had hearsay or 403 generally, but now you are objecting to

23   specific portions.  You have previously objected to specific

24   portions of some of these exhibits, and we have kept out part

25   of them.

1    So I am assuming when I get objections that these are

2   your objections, and that is the reason we were doing that, so

3   we would haven't to keep doing this every time a line or a

4   sentence is played.  That is your job to give me the

5   objections that you want to make.  And I have now ruled on

6   those, so as far as I am concerned the exhibits are in, and I

7   don't need to be hearing additional objections.  They are

8   untimely, and I consider them waived, to the extent that you

9   previously haven't made it.

10    But if you have previously made it, you have it.  It is

11   on the record.  It is there.  But if it is something you

12   haven't previously made, or to a specific portion that you

13   haven't previously pointed out, then, you know, I consider

14   that untimely and waived.

15    All right.  We will be in recess.  Be here at a quarter

16   till.

17                    (Brief Recess.)

18        THE COURT:  Do we need to take up a matter before

19   the jury comes in?

20        MS. DUNCAN:  Yes, Your Honor.

21    I think that part of the confusion from this side is that

22   there are -- This morning you had overruled objections we had

23   to some specific exhibits that we identified in our motion,

24   and we had identified in particular those that we thought we

25   needed to argue about, and we tried to include as many others

1    stating objections we had stated before.

2        And so I think what is happening is because Mr. Jonas

3    isn't identifying those exhibits that are coming into evidence

4    today, we are getting confused whether they were in before or

5    they are coming in today, and so that there are some, like,

6    for example, hearsay objections that don't require any kind of

7    argument but we need to make our objections to those.

8        We tried to identify them all in the motion, but we may

9    have missed some, and we are having a difficulty

10   distinguishing what was admitted before and today.

11       I spoke to Mr. Jonas, and we would appreciate it if Mr.

12   Jonas would just identify this exhibit is coming in today for

13   all those exhibits, except for the ones the Court specifically

14   considered this morning which we already have written down.

15           MR. JONAS:  Your Honor, just so I can maybe add to

16   that, a list that I sent on Thursday were exhibits that had

17   not been admitted.

18           THE COURT:  Yes.  Some of them actually have been,

19   but that has happened on every list.  But by and large I would

20   say 90 percent were not admitted.  So these were new exhibits,

21   which is what the list is designed to do.  I am not asking you

22   to give each other lists of exhibits that are already in that

23   you want to talk with the witness about.  I am asking about

24   new exhibits that aren't in so that we can get objections, and

25   then I can try to resolve those before we start questioning

1  the witness.

2      So the purpose behind the list, both ways, is new

3  exhibits that are not in evidence that you intend to use with

4  any particular witness, and I want the objections in advance

5  so then we can resolve them.

6      So when I get objections, I am treating those as these

7  are the objections.  And when I get a hearsay objection, 403,

8  your standard objections that you have to all of these

9  exhibits, virtually, I am treating it as an objection to the

10  exhibit as a whole, unless you identify a particular problems,

11  which you have done on occasion.  And I am treating those as

12  objections to the exhibit as a whole, and then I will look at

13  those exhibits, or I have done that mostly.  And once I rule

14  on it, then the exhibit is in.

15      If it is in for a limited purpose, of course it is for

16  that limited purpose, but once it is in, it is in.  So I don't

17  need to be hearing additional objections you didn't think

18  about, or whatever happens.  That is where I am, and that the

19  purpose for the -- That is the only reason to have this change

20  of exhibits is to avoid these objections during the trial and

21  the discussions that come with it.  All these bench

22  conferences we were having to have that first or second day of

23  trial that we spent so much time up here was designed to fix

24  that.

25          MS. DUNCAN:  Right, Your Honor.  And with our

1  pleading, we hoped to identify all of those that would require

2  us to go in depth into our objection, but there were some that

3  we may not have identified.  When we were just sort of

4  reurging our prior objections, there may be some where we have

5  those hearsay or 403, which the Court has overruled before, so

6  they weren't identified in that motion just because we were

7  going through it --

8          THE COURT:  And in your objections they were not

9  identified?

10         MS. DUNCAN:  Yes, Your Honor.

11     So what we are asking, if we could simply identify the

12  exhibits that are coming in today, being introduced today,

13  versus the ones that were introduced, for example, during

14  Agent Burns' testimony the first time.  That would allow us to

15  make sure we have got what we need today, so we are not going

16  to be reurging objections to exhibits that were introduced two

17  weeks ago, and just deal with the exhibits coming in for the

18  first time today.

19         MR. JONAS:  Let me just make a suggestion.  As I am

20  going through these exhibits with Agent Burns, I am just doing

21  a representative sample of what supports the list, so my

22  assumption is based on the sidebar that they are all in.

23     I had created my own cheat sheet, for lack of a better

24  term, for exhibits I thought I needed to admit per the

25  schedule that had not previously been admitted.  As long as I

1    know I can get this back, I am happy to give this to Ms.

2    Duncan as a guide.  Maybe that helps them so they can see what

3    has not been admitted.

4         THE COURT:  Let's do this.  Also with respect to

5    other lists, we have had objections that you had submitted,

6    and you identified in those objections exhibits that you saw

7    that had already previously been admitted, and you identified

8    that in your objections.  So that has been there, that we know

9    some of those get on these lists.

10        MS. DUNCAN:  Correct, Your Honor.  We have like --

11   All of us have master lists, the Government's exhibit list,

12   and we are just keeping track of when exhibits are coming in

13   and overruled, that sort of thing.  So it is happening.

14       What I think is causing some confusion, as we try to do

15   that for exhibits coming in today, we are not able to do it

16   quickly, because normally the Government will say, "We move

17   into evidence Elbarasse Search No. 23, and we find it.  But I

18   think because that is not happening, it is causing some

19   confusion and so I think we are confusing what was introduced

20   a couple of weeks versus what is today.

21        MR. JONAS:  My list, I am having a copy made.  That

22   way I don't have to worry.

23        THE COURT:  Those are the exhibits that you have

24   identified as not having been previously introduced and

25   submitted?

          MR. JONAS:  Correct.  And just to be clear, it only
goes with regard to these specific zakat schedules, because
after I move beyond these schedules I am going to go into a
new area that may also have exhibits that have not been
previously admitted, so I am clear.

          THE COURT:  With Agent Burns, you are going to go to
another --

          MR. JONAS:  Yes.

          THE COURT:  Then they are on the list?

          MR. JONAS:  Yes, sir.

          THE COURT:  Then they are admitted from this
morning?

          MR. JONAS:  Yes.  What I am saying is The list I am
going to give them of ones not admitted prior to this morning
only covers the zakat schedules.

          THE COURT:  I got you.

          MR. JONAS:  When I am done going through the
schedules, there is another section of her testimony that
covers additional exhibits which are now admitted per Your
Honor's ruling.

          THE COURT:  That were admitted this morning?

          MR. JONAS:  Correct.  So I will address those with
the Defense during lunch and let them know that this is the
ones that were not admitted until this morning.

     Are we clear on that?

1          MS. DUNCAN:  Thank you.

2          MS. HOLLANDER:  I think maybe I am confusing things,

3     but I think I figured something out.  You admitted -- Your

4     Honor admitted these exhibits, the majority of those that we

5     had put into our objections?

6          THE COURT:  Right.

7          MS. HOLLANDER:  Some we had put into our objections.

8     But I think what Ms. Duncan -- And she was in charge of this,

9     and I think she didn't hear Your Honor say that.  And that is

10    part of the problem is that that didn't include all of

11    our -- It included as much as we could get done by 6:00

12    yesterday afternoon.  There are still some that we just need

13    to preserve, and those are the ones that she wants to be able

14    to make the objection even if --

15         THE COURT:  That is a problem that I have.  We will

16    have to discuss that further.  I guess we can resolve that

17    right now, because in my mind I had received the objections

18    and it has been resolved, but we will go back to that.

19         MS. HOLLANDER:  I think that is the problem, Your

20    Honor.

21         THE COURT:  I am not going to allow objections

22    throughout the trial to the same exhibits.  I want objections,

23    I want to rule on them, and then we are done, and that is the

24    procedure.

25         MS. MORENO:  And I appreciate that, Your Honor.  Our

1    intent is not to waste the Court's time.  Once in a while an

2    exhibit will have 40 or 50 pages.

3               THE COURT:  I understand that, counsel, but you have

4    had these exhibits for months and months.  I haven't.

5               MS. MORENO:  I understand.

6               THE COURT:  And there may be some new ones, but a

7    lot of them have been there for a long time.  These lists have

8    been out -- This is not the first time around.  That is still

9    your job.  That is just not acceptable to me that somehow you

10   haven't had the time.

11              MS. MORENO:  No.  That wasn't my point, Your Honor.

12   I am not quibbling with the Court.  All I am saying is that

13   sometimes there is a different focus on a particular exhibit.

14   And so on some discreet portions of a particular exhibit from

15   time to time I certainly have brought the Court's attention to

16   certain areas.

17              THE COURT:  I understand that.  But that is the

18   point I am making is we just can't keep allowing that to go on

19   for the duration of the trial.  Once you have been given an

20   opportunity to object, and then I make the ruling anything,

21   after that I am considering it waived and untimely, once you

22   have been given that opportunity.  We just don't keep going

23   and going and going, and "I thought of something else."  It

24   doesn't work that way.  That is really what you are saying,

25   for whatever reason, you know, something else has come up; or

as Mr. Dratel was saying earlier, the use to which they are being put. Well, we don't know what they are being put in for, but once they are in they are in. Either side can use them for whatever purpose is proper. But We can't take new objections.

MS. MORENO: So I understand the Court's direction, is the Court saying that once you make your rulings, for instance in the morning to this comprehensive list, that the Court is not going to allow any further objections as to those particular --

THE COURT: As to those exhibits, yes. You have been given an opportunity to object. And that is why I am having the parties exchange the lists in advance is to avoid these objections during the testimony of the witness. And there are a lot of attorneys and a lot of objections, so it delays it. That is the purpose behind that, along with just the particular procedural posture of this case, that I didn't think that that would cause any harm to anybody.

MR. JONAS: Your Honor, Two quick things.

One is Mr. Jacks gave the Defense a copy of that demonstrative I mentioned earlier this morning. It has been created and they have copies now.

And I late to do this. We need to have a real quick sidebar.

THE COURT: Come on up.

```
 1                    MR. JONAS:  I don't need this on the record.
 2                    (discussion at the bench, out of the hearing of the
 3               reporter.)
 4                    THE COURT:  All right.  Ready?
 5                    (Whereupon, the jury entered the courtroom.)
 6                    THE COURT:  Mr. Jonas?
 7                    MR. JONAS:  Thank you, sir.
 8     Q.  (BY MR. JONAS)  Agent Burns, when we broke we were
 9     playing a portion of the Philadelphia meeting.
10     A.    Yes.
11     Q.    We have one more clip to play.
12                    MR. JONAS:  Play Clip C, please, Philadelphia
13     Meeting No. 13, clip C.
14                    (Whereupon, Philly Meeting No. 13, Clip C was
15               played, while questions were propounded.)
16     Q.  (BY MR. JONAS)  Agent Burns, do you see it says "Islamic
17     Charitable Society located in Hebron"?
18     A.    Yes.
19     Q.    Did the HLF give to the Islamic Charitable Society in
20     Hebron?
21     A.    Yes.
22     Q.    Agent Burns, do you see where he says, "The complex,
23     Yassin"?  What is the complex as it relates to your testimony
24     this morning?
25     A.    That is the Islamic Center of Gaza, and that is sheikh
```

1    Ahmed Yassin.

2    Q.   And it says, "Islamic Society al-Kuka."  Did the Holy

3    Land Foundation give money the Islamic Society?

4    A.   Yes.  The Islamic Society of Gaza.

5    Q.   Does al-Kuka mean anything with regard to the Islamic

6    Society of Gaza?

7    A.   Yes.

8    Q.   What is that?

9    A.   Khalil al-Kuka was one of the leaders of the Islamic

10   Society.  We have seen him in one of our videotapes.

11   Q.   Agent Burns, since we just discussed Islamic Society of

12   Gaza, why don't we go to that chart.

13   A.   Okay.

14        MR. JONAS:  Before we pull up the specific chart on

15   the zakat schedules, lets go to the payment schedule first.

16   If we can pull up Payments to Islamic Society of Gaza, please.

17   Q.   (BY MR. JONAS)  Agent Burns, is this the right exhibit

18   for the society?

19   A.   Yes.

20   Q.   Can you tell us the time period of payments between the

21   Holy Land Foundation and the Islamic Society of Gaza, the

22   first and last?

23   A.   Yes.  You can see that the first transaction that we have

24   located here was November 23rd, 1992.

25        MR. JONAS:  Go page by page, please, Agent Lewis.

1  Q.   (BY MR. JONAS)  Before we go on, Agent Burns, what do we

2  see in this page with regard to the transactions?

3  A.   Again, these payments are listed chronologically by date,

4  and so here because we have payments that go after the Hamas

5  designation date, you have the line for January 23rd, 1995

6  indicating the date that Hamas was designated, and then

7  payments that are listed thereafter.  And then there is the

8  date for the Hamas designation as a foreign terrorist

9  organization.

10  Q.   Okay.

11  A.   And the transactions thereafter.

12  Q.   And the transactions continue after Hamas was designated

13  as a foreign terrorist organization?

14  A.   Yes.

15  Q.   When was the last transaction with the Islamic Society?

16  A.   The last that we were able to track here was August 23rd,

17  2001.

18  Q.   How much total did the HLF pay to the Islamic Society?

19  A.   $201,196 plus 68,792 Israeli shekels.

20  Q.   Do you see where it says "destination payment to" on the

21  previous page?

22  A.   I do.

23  Q.   Is there an individual listed?

24  A.   Yes.

25  Q.   Who is that?

```
1    A.    Ahmad Bhar.

2    Q.    Who is he?

3    A.    He was one of the leaders of the Islamic Society of Gaza.

4    Q.    Is he on the schedule we are about to go over for this

5    organization?

6    A.    Yes.

7    Q.    Did all the payments after a certain time, were they all

8    in Israeli shekels from a certain time forward?

9    A.    I see that -- You know, you see the Israeli shekels and

10   then there will be a dollar payment, and then there is Israeli

11   shekels and a dollar payment.  If you scroll to the next page

12   I can confirm.  No, they were intermixed.

13   Q.    Okay.

14         MR. JONAS:  If we can just look at -- Go back to the

15   prior page, please.  And let's look at HLF Foreign Account

16   No. 1, page 281.  This is a transaction on March 28th, 1995.

17   Q.    (BY MR. JONAS)  What is this document?

18   A.    This is a translation of the Arabic on the previous page.

19   It is a record from the HLF's Bank of Palestine account

20   showing that the HLF paid Ahmad Bhar, and the payment

21   identified him as the president of the Islamic Society, and it

22   lists the amount in shekels.

23   Q.    Okay.

24         MR. JONAS:  Can we go back to the payment schedule,

25   please?
```

1    Q.   (BY MR. JONAS)  Agent Burns, with regard to the

2    transaction that I just showed you, there is only one exhibit

3    listed as supporting that transaction, the one we looked at.

4    Did you or other agents search all the material that the FBI

5    gathered to see if there is any other documentation supporting

6    this transaction?

7    A.   Yes.  And other IRS agents examined the records and did

8    not locate additional documentation regarding those specific

9    transactions.

10   Q.   Okay.  If the FBI was not able to get the HLF bank

11   account in the Bank of Palestine, would you have been able

12   to -- How would you have been able to learn about this

13   particular transaction to the Islamic Society?

14   A.   Well, based on what we located, we would not have known

15   about those had we not obtained the foreign accounts.

16   Q.   In your experience as an agent, how does the FBI or the

17   Government normally gather bank records?

18   A.   Normally we subpoena the bank records.

19   Q.   And what about if bank accounts are located in other

20   countries?

21   A.   Well, if it is a country that we have a mutual legal

22   assistance treaty with, then we will seek those records

23   officially through that mutual legal assistance treaty.

24   Q.   Do you know if there is a mutual legal assistance treaty

25   with the Palestinian Authority?

1    A.    There is no official relationship with them at all.

2    Q.    How did the FBI get these records?

3    A.    Through special subpoenas that came into effect

4    after -- in recent years, like Patriot Act subpoenas, Nova

5    Scotia subpoenas, things like that.

6    Q.    Those are subpoenas that are authorized by law?

7    A.    Yes.

8    Q.    And those require the banks to provide these records?

9    A.    They do.

10   Q.    Is this a new technique available to the FBI to gather

11   bank records?

12   A.    Yes, very recent.

13   Q.    If it wasn't for this technique, would the FBI, would the

14   Government have learned of these particular transactions to

15   the Islamic Society after Hamas was designated?

16   A.    I would not have learned of them, no.

17   Q.    Okay.

18         MR. JONAS:  Let's go to the Islamic Society of Gaza

19   summary chart.  So we are clear for the record, not the

20   payments chart but the other chart that we discussed earlier.

21   Q.    (BY MR. JONAS)  Agent Burns, let's start with the first

22   individual.  Who is that?

23   A.    Ahmad Bhar.

24   Q.    You already mentioned him?

25   A.    Yes.

1    Q.    Okay.

2           MR. JONAS:  Let's look at HLF Search No. 156, page

3    6, please.

4    Q.   (BY MR. JONAS)  And what is this document?

5    A.    This is a letter from the Islamic Society of Gaza dated

6    November 12th, 2000 to the Holy Land Foundation, and it is

7    signed by that individual Ahmad Bhar.

8    Q.    Okay.

9           MR. JONAS:  If we can look at El-Mezain Wiretap

10   No. 1, page 89, please.

11   Q.   (BY MR. JONAS)  Is Ahmad Bhar's name mentioned anywhere

12   in this document?

13   A.    It is, in paragraph one.

14   Q.    Where does it say his name?

15   A.    It says "Sheikh Ahmad Bhar, one of the Hamas movement

16   leaders in the Gaza Strip."  And this document I believe, if

17   we go up to the date you can see that it predates that thank

18   you letter by many years--December 17th, 1994.

19   Q.    Okay.

20           MR. JONAS:  Going back to the summary chart, please.

21   Q.   (BY MR. JONAS)  We will move to the next individual.  Who

22   is that?

23           MR. JONAS:  Before we do that, can you just enlarge

24   the top portion?

25   Q.   (BY MR. JONAS)  Can you just identify the names of the

1    people associated with the committee, since we will see their

2    names on several documents together?

3    A.    Yes.  The names of the individuals that we will be

4    discussing relating to this committee are Ahmed Bahr, Muhamad

5    Barud, Khalil al-Kuka, Hamad al-Hassanat, and Ismail Haniya.

6    Q.    Okay.  Let's just go to Barud for a moment.  Actually

7    before we do that, has there been a videotape that identifies

8    any of these individuals?

9    A.    Yes.

10   Q.    Where was the videotape seized from, if you recall?

11   A.    I believe the one that we are referencing was seized at

12   InfoCom.  There were several videotapes.

13   Q.    Okay.

14         MR. JONAS:  If we can play InfoCom Search No. 57.

15   Q.    (BY MR. JONAS)  Agent Burns, before this plays, does this

16   videotape -- is this in connection to the Islamic Society of

17   Gaza that you are now testifying about?

18   A.    Yes.  This tape relates to a summer camp that was funded

19   by the HLF through the Islamic Society of Gaza.

20   Q.    Does this videotape identify some of the members of the

21   committee?

22   A.    It does.

23   Q.    If we can play the tape, please.

24         (Whereupon, InfoCom Search No. 57 was played, while

25         questions were propounded.)

1    Q.    (BY MR. JONAS)   Agent Burns, can you see what they are

2    holding?

3    A.    Yes.

4    Q.    What?

5    A.    Automatic weapons.

6    Q.    Okay.   Agent Burns, did you see where it says -- in the

7    top right hand side it is a translation of the banners.   Is

8    that correct?

9    A.    Yes.   You are going to see these children carrying

10   banners, and as the banners come into view, the translation

11   will appear up in the right hand corner.

12   Q.    We first saw "Quran is our" -- do you recall what it said

13   a moment ago?

14   A.    "Quran is our constitution," I think, or some form of

15   that.

16   Q.    And "jihad is our path"?

17   A.    Correct.

18   Q.    Have we seen that phrase, or at least this being part of

19   a larger phrase, in the evidence in this case?

20   A.    In the evidence in this case we have seen it.

21   Q.    Where?

22   A.    In the Hamas charter.

23   Q.    Agent Burns, where he says, "Who are deported from it in

24   Marj al-Zahour," is that the deportation you testified earlier

25   about in Lebanon?

1    A.    It is.

2    Q.    Khalid al-Kuka, is he on your schedule?

3    A.    He is.

4    Q.    Ahmad Bhar, is he on your schedule?

5    A.    He is.

6    Q.    You testified about him already?

7    A.    Yes.  He was the one identified in the fax as one of the

8    Hamas leaders.

9    Q.    Hamad al-Hassanet, is he on the schedule for the Islamic

10   Society of Gaza?

11   A.    He is.

12   Q.    Muhamad Barud, is he on the schedule?

13   A.    He is.

14   Q.    Ismail Haniya, is he on the schedule for the Islamic

15   Society of Gaza?

16   A.    He is.

17   Q.    Have we seen him elsewhere in this case?

18   A.    Yes.  In one of the videotapes that we played of the

19   deportees, he was one of the individuals that was chatting and

20   identified on that tape.  He is also on your Hamas leader

21   chart.

22   Q.    Demonstrative No. 17?

23   A.    Yes.

24   Q.    I won't pull that one out again.

25            MR. JONAS:  If we can go back to the schedule.

1   Q.   (BY MR. JONAS)  Khalil al-Kuka, you identified him twice.

2   I believe his name was mentioned in the Philadelphia Meeting

3   No. 13, the clip we played, as well as that last clip?

4   A.   Yes.

5          MR. JONAS:  If we can go to HLF Search No. 109, page

6   143, please.

7   Q.   (BY MR. JONAS)  Do you see Khalil al-Kuka's name anywhere

8   in the document?

9   A.   I do.  It says -- I am trying to figure out where to

10  start reading.  "It started those by deporting one of the most

11  renowned preachers in the Gaza Sector."

12  Q.   If you could slow down, please.

13  A.   I am sorry.  And I should probably start reading from

14  above that.  It says, "The occupation authorities, political,

15  administrative, and security apparatuses intensified their

16  scrutiny of Hamas.  They worked through their agents and eyes

17  to collect as much information as possible, through which they

18  could reach the suitable way to deal with this movement.  This

19  does not mean that the enemy during this stage has been lax in

20  dealing with Hamas and ignored its moving and effectiveness,

21  but it worked while monitoring it to deal preventative blows

22  to it.  It started those by deporting one of the most renowned

23  preachers in the Gaza Sector, sheikh Khalil al-Kuka, and

24  followed that a few months later by deporting 21 members of

25  the teaching staff of the Islamic University of Gaza."  And it

1  goes on.

2  Q.  Okay.

3      MR. JONAS:  Let's go back to the schedule, please.

4  Q.  (BY MR. JONAS)  The next person there is Hamad

5  al-Hassanet.  Was his name mentioned in the clip from the

6  summer camp that we just played?

7  A.  Yes.

8  Q.  Is there another video that he appears on?

9  A.  Yes, there are two.

10 Q.  Okay.  We are going to play one of them.

11 A.  Okay.

12     MR. JONAS:  HLF Search No. 70, if we can pull that

13 up.

14 Q.  (BY MR. JONAS)  Agent Burns, I assume you have seen this

15 video?

16 A.  Yes.

17 Q.  Can you just tell us -- First of all, where was this tape

18 seized from?

19 A.  This tape was seized from the HLF offices.

20 Q.  And so I am clear, with this video, as with all the

21 videos that have been played in this case, has the FBI changed

22 the content in any way at all?

23 A.  No.  We only selected portions to play, but those

24 portions are in tact as they were on the original tape.

25 Q.  Okay.  Where is this tape -- where does the tape take

1    place?

2    A.    Let me add that we added the translations.

3    Q.    Okay.

4    A.    Okay?  This tape takes place are during the deportations

5    of the Marj al-Zahour deportees.

6    Q.    Okay.  Let's play the tape, please.

7              (Whereupon, HLF Search No. 70 was played, while

8              questions were propounded.)

9    Q.    (BY MR. JONAS)  Agent Burns, just so we can orientate

10   ourselves, this picture that is on the screen right now, is

11   this from -- If you know, if you know, is this from the Marj

12   al-Zahour deportation?  Is this Lebanon?

13   A.    No.  This is the introduction, so this is not -- This was

14   an introduction, and then it will go on to the area of Lebanon

15   to where they were deported.

16   Q.    Is this introduction telling you -- setting up what you

17   are going to see?

18   A.    Yes, it is about to tell you that it is an interview with

19   the deported brothers.

20   Q.    So when you identify what this tape is about, did you get

21   that identification from the tape itself?

22   A.    From the tape itself.

23   Q.    Okay.  Agent Burns, the individual on the left, who is

24   that?

25   A.    That is Abdel Aziz Rantisi, the Hamas leader on your

1  chart there.

2  Q.   Okay.  Agent Burns, the individual who is speaking, who

3  was identified on the screen as Ghazi, Do you see that?

4  A.   Uh-huh.

5  Q.   Let me show you -- I am holding up HLF Search No. 87, the

6  overseas speakers chart.  Are you familiar with this document?

7  A.   I am.

8  Q.   Is his name on this document?

9  A.   It is.

10       MR. JONAS:  Your Honor, I am approaching the

11  witness.

12       THE WITNESS:  No. 25.

13  Q.   (BY MR. JONAS)  No. 25?

14  A.   Yes.

15  Q.   Agent Burns, did the FBI put that symbol on the screen?

16  A.   No.  That symbol was on the tape in its original form.

17  Q.   Who is this individual?

18  A.   This individual is Hamas al-Hassanat, who is one of the

19  individuals on the chart that was identified in the previous

20  video as a leader in the Islamic Society of Gaza.

21  Q.   And he is on your schedule?

22  A.   Yes.

23  Q.   Okay.  It says Islamic Society.  Is that the same Islamic

24  Society of Gaza that you are testifying about right now?

25  A.   Yes.

1  Q.   "He is the father of martyr Yasser al-Hassanat."  Are we

2  going to talk about his son a little bit later?

3  A.   Yes.

4  Q.   What is Izz el-Din al-Quassam?

5  A.   That is the military wing of Hamas, and you saw that

6  referenced when they were speaking of Yasser Hassanat, Hamad

7  al-Hassanat's son, as well.

8  Q.   Agent Burns, do you know who this individual is?

9  A.   Aziz Dwaik.

10  Q.   Is he involved in any of the zakat committees?

11  A.   I don't have him listed on any of these zakat charts.

12  Q.   Okay.  Agent Burns, are there other individuals on this

13  tape that are referenced in your zakat charts for other

14  committees, not just the Islamic Society of Gaza?

15  A.   Yes.

16  Q.   Have we come across any others yet?

17  A.   We have one I believe in the beginning.  I can't remember

18  exactly who it was, but I know we passed him.

19  Q.   Okay.  If you see any others that are going to be

20  referenced later in your testimony that are on your schedules,

21  let us know, we will pause it, and you can identify it.  This

22  way we don't have to play the clip for each schedule.

23  A.   Okay.

24       This is one of those individuals.

25  Q.   Who is this?

```
 1    A.    This is Jamal Mansour.  He is referenced on the Islamic

 2    Relief Committee schedule.

 3    Q.    Did the HLF Give money to the Islamic Relief Committee?

 4    A.    Yes.

 5          This is one of those individuals.

 6    Q.    And who is this?

 7    A.    This is Mohamed Fuad Abu Zeid of the Jenin zakat

 8    committee.

 9    Q.    Did the HLF give money to the Jenin zakat committee?

10    A.    Yes.

11    Q.    I take it he is 59 years old during this video?

12    A.    Yes.

13          This is one of those individuals.

14    Q.    Which committee is he affiliated with?

15    A.    The Nablus zakat committee.

16    Q.    Is your information as to where these individuals are

17    associated with which committees, is that all coming from the

18    evidence like we are seeing it on the tape now as they

19    self-identify?

20    A.    Yes.  Here often they self-identify and identify which

21    committee they are a part of, but once we get to those charts

22    there is also other evidence listing those individuals and

23    their connections to the committee.

24    Q.    Okay.

25    A.    This is one of those individuals.
```

1    Q.    Which committee is he with?

2    A.    With the Islamic Charitable Society of Hebron.

3    Q.    Did the HLF give money to the Islamic Charitable Society

4    of Hebron?

5    A.    Yes.

6    Q.    Agent Burns, do you see it says MAYA?

7    A.    Yes.

8    Q.    Muslim Arab Youth Association?

9    A.    That is correct.

10    Q.    Have we seen MAYA mentioned in this case before?

11    A.    Yes.  There is a videotape actually from this MAYA

12    conference in late 1992 that has been addressed in this case.

13    We have also seen it listed as part of the U.S. Muslim

14    Brotherhood's organizations, and Shukri Abu Baker was linked

15    to it on some of those documents that we looked at in my first

16    testimony.

17    Q.    Okay.  Who is Mahmoud Zahar?

18    A.    He is a Hamas leader in Gaza that is on your

19    Demonstrative No. 17.

20    Q.    Have we seen him in other videos in this case?

21    A.    We saw him in the video from 1990 seated in the audience

22    next to the Defendant Mohammad El-Mezain and Hamas leader

23    sheikh Jamil Hamami.

24    Q.    Is he referenced by any of the Defendants in that

25    particular video?

1   A.   He was.  He was thanked by Shukri Abu Baker for

2   attending.

3   Q.   Who is Sheikh Mohammad El-Mezain?

4   A.   That is the Defendant.

5   Q.   On the screen it says brother Shukri Abu Baker.  Who is

6   that?

7   A.   The Defendant Shukri Abu Baker.

8   Q.   Who is Haitham Maghawri?

9   A.   He was one of the HLF officers.

10  Q.   Agent Burns, what does the Hamas charter say about peace

11  initiatives?

12  A.   They are opposed to any type of compromise or peace

13  process with the Israelis.

14  Q.   Do you recognize who is speaking?

15  A.   I do.

16  Q.   Who is that?

17  A.   That is Hamas leader Mahmoud Zahar.

18  Q.   Is he also on Demonstrative No. 17, the Hamas leaders

19  chart?

20  A.   Yes.

21  Q.   Agent Burns, did you see in that second clip where

22  Ghazi--or the third clip, I can't remember--was referring to

23  traveling around the United States at the request of the Holy

24  Land Foundation?

25  A.   Yes.

1    Q.    And in that clip you saw the symbol of Hamas on the clip?

2    A.    Yes.

3          MR. JONAS:  If we can turn to Baker Declaration,

4    page 2, please.  Enlarge the middle.

5    Q.    (BY MR. BAKER)  What does Shukri Baker say in his sworn

6    statement in the first line of paragraph 7?

7    A.    In his sworn statement he says, "Neither I nor to my

8    knowledge any of the other founders of this charity have had

9    any connection whatever to Hamas, or to any terrorist groups,

10   or to terrorism.  I do not believe that suicide bombing is

11   countenanced by the Islamic religion.  I have always opposed

12   radicalism.  I have always been for dialogue and for peace,

13   and I am firm in these convictions.  I am confident that the

14   other founders of the Holy Land Foundation feel the same way.

15   Our objective was, and has always been, simply to alleviate

16   suffering in Palestine and elsewhere."

17         MR. JONAS:  Go back to the chart for Islamic Society

18   of Gaza.  Enlarge the top, please.

19   Q.    (BY MR. JONAS)  We didn't discuss any exhibits supporting

20   Ismail Haniya, but have we seen his name several times in your

21   testimony this morning?

22   A.    Yes, we have.

23         MR. JONAS:  We will move on to the general committee

24   section of this chart.  If we can turn to HLF Search No. 85,

25   page 3, please.

```
1    Q.    (BY MR. JONAS)   What is this item?

2    A.    This is a thank you letter from the Islamic Society of

3    Gaza to the Holy Land Foundation dated December 24th, 1999.

4    Q.    Was this after or before Hamas was designated as a

5    terrorist organization by the United States?

6    A.    This was after.

7              MR. JONAS:   If we can go to El-Mezain Wiretap No. 1,

8    page 150, please.

9    Q.    (BY MR. JONAS)   Is there anything in here referencing

10   anyone from the Islamic Society of Gaza or the committee

11   itself?

12   A.    Yes.

13   Q.    And what is that?

14   A.    Hold on.  I think it is at the top up above where it says

15   "Palestinian sources in the Gaza Strip said that Palestinian

16   police continued its arrest campaign in the ranks of Hamas

17   Movement.  Sources from the town of Jabalia near the city of

18   Gaza said that members of the police arrested Dr. Muhammad

19   Shihab from the Hamas Movement who also heads of the Islamic

20   Society in town."

21   Q.    Is Shihab on your list?

22   A.    No.

23   Q.    Is that the same Islamic Society that you have been

24   testifying about?

25   A.    It is.  And actually it is the same branch, the Jabalia
```

1    branch.  They had little field offices, and it is that same

2    branch that we saw in the previous letter.

3    Q.    Okay.  Finally, Agent Burns, I am not going to replay

4    this, tape but in the Philadelphia Meeting No. 13 that we

5    played --

6    A.    Yes.

7    Q.    -- Was the Islamic Society mentioned?

8    A.    It was.

9    Q.    Okay.

10          MR. JONAS:  May I have the elmo real quick?

11   Q.    (BY MR. JONAS)  Do you see where I am highlighting?

12   A.    I do.

13   Q.    That is the Islamic Society?

14   A.    Yes.

15   Q.    Thanks.

16         Are you ready to move on to another schedule.

17   A.    Okay.

18   Q.    Are you familiar with an organization called the al-Salah

19   Society?

20   A.    I am.

21   Q.    Did the HLF make payments to the al-Salah Society?

22   A.    They did.

23         MR. JONAS:  If we can get that chart on the screen,

24   please, Payments to al-Salah.

25   Q.    (BY MR. JONAS)  Agent Burns, when is the first payment

1    that the HLF made to the al-Salah Society?

2    A.    November 2 3rd, 1992.

3    Q.    When is the last date?

4          MR. JONAS:  If we can go to the next page.

5          THE WITNESS:  March 3rd, 1999.

6    Q.    (BY MR. JONAS)  How many transactions were there after

7    Hamas became designated as a specially designated terrorist in

8    1995?

9    A.    Through bank records I was only able to track one.

10   Q.    Did you come across any evidence that we are going to

11   talk about that there were additional transactions that you

12   were not able to find financial transactions supporting?

13   A.    Yes.

14   Q.    Okay.  How much in total did the HLF pay to the al-Salah

15   Society?

16   A.    The payments we were able to track through the bank

17   records were $234,022.

18          MR. JONAS:  Let's look at HLF Bank Account No. 1,

19   page 414.  And look at the transaction on May 20th, 1994 for

20   $13,500.  Before we go there, if you can go back to the last

21   page, since you pulled it up.

22   Q.    (BY MR. JONAS)  Agent Burns, what is this document?

23   A.    This is part of -- the signature card for one of the

24   HLF's bank accounts at Bank One.

25   Q.    Who are the signatories on this?

1    A.    The Defendants Ghassan Elashi and Shukri Abu Baker.

2    Q.    Okay.

3          MR. JONAS:  If we can go to page 414, please.

4    Q.    (BY MR. JONAS)  Does this page anywhere reference a

5    payment to al-Salah?

6    A.    This indicates the wire transfer.

7    Q.    Okay.

8          MR. JONAS:  If we can go back to the payment

9    schedule, please.

10         Go a back to HLF Foreign Account No. 1, page 483, please.

11   I apologize.  It is HLF Bank Account No. 1.

12   Q.    (BY MR. JONAS)  And Agent Burns, what is the difference

13   between HLF Bank Account No. 1 and HLF foreign account?

14   A.    HLF Bank Account No. 1 would be from an HLF bank account

15   in the United States, and we have that chart showing exactly

16   which bank that would be from.  And a foreign account

17   obviously would be one of its bank accounts in the

18   territories.

19         MR. JONAS:  I am going to move on.  Can we pull up

20   the al-Salah Society schedule; not the payment schedule.

21   Q.    (BY MR. JONAS)  Okay.  Agent Burns, you only have one

22   individual listed on this schedule.

23   A.    Yes.

24   Q.    Why is that?

25   A.    Because that was the primary individual with whom the HLF

1    dealt in this committee.

2    Q.    Okay.

3            MR. JONAS:  Can we pull up HLF Search No. 157, page

4    4, please?

5    Q.    (BY MR. JONAS)  What is this document?

6    A.    This is a letter from Ahmad al-Kurd of the al-Salah

7    Society to the HLF, thanking them for their assistance and

8    services.  And it is dated June 13th, 1999.

9    Q.    Did you find any documents to support this payment, any

10   documents within the HLF search warrant material, InfoCom

11   search warrant material, or anything else?

12   A.    I could not link this specifically to a transaction

13   through the financial records from the United States.

14   Q.    Were you able to link this through records from overseas

15   bank accounts?

16   A.    No.

17   Q.    Other than this letter, do you know -- was there any

18   evidence to show that this transaction actually happened?

19   A.    Not that I and the IRS agents found.

20   Q.    And al-Kurd who signs it, is that the al-Kurd that is on

21   the schedule for al-Salah Society?

22   A.    It is.

23           MR. JONAS:  If we can turn to InfoCom Search No. 90,

24   page 4, please.

25   Q.    (BY MR. JONAS)  What is this document?

A.    This is a project report.  This is the second page.  The
document was originally in Arabic, and it was two pages in
Arabic and two pages of translation.  This is the second page
of the translation just showing that the letter from al-Salah
you can see at the bottom was signed by the person in charge
Ahmad al-Kurd, the same individual on this chart, and the
date, and he was listed as chairman of the association.

Q.    Did you come across any evidence that you testified about
that connects al-Salah to Hamas?

A.    Yes.

        MR. JONAS:  If we can turn to El-Mezain Wiretap
No. 1, page 80, please.

Q.    (BY MR. JONAS)  Is al-Salah referenced here?

A.    It is in the last paragraph on this page.

Q.    What does it say about this?

A.    It says, "Al-Salah Islamic Society in the Gaza Strip
announced it will sponsor families and victims of the bloody
confrontations which took place in the Gaza Strip this
November 18th.  Sheikh Ahmad al-Kurd, head of the Society,
said that his association decided to sponsor the children of
all martyrs killed during the events of sad Friday.  Al-Kurd
also pointed out that his society supports hundreds of
families of martyrs.  It is worth mentioning that the Society
is closely associated with the Hamas movement."

Q.    And El-Mezain Wiretap No. 1, Who received that?

1    A.    That was the Defendant Mohammad El-Mezain That was

2    obtained from his fax.

3          MR. JONAS:  If we can go to the top of the page,

4    please.

5    Q.    (BY MR. JONAS)  What is the date of the fax?

6    A.    November 27th, 1994.

7    Q.    Was al-Salah Society mentioned in the Philadelphia

8    meeting?

9    A.    Yes.

10   Q.    Any videotapes of al-Salah Society?

11         MR. JONAS:  Actually, before we do that, let's pull

12   up HLF Search No. 102, page 7, please.

13   Q.    (BY MR. JONAS)  Agent Burns, what is this document?

14   A.    This is a school backpack report showing that the Holy

15   Land Foundation financed this project that was executed by the

16   al-Salah Islamic association in the year 2000.

17   Q.    Was this document before or after that fax to the

18   Defendant Mohammad El-Mezain identifying al-Salah as being a

19   part of Hamas?

20   A.    Six years after the Defendant El-Mezain received the fax

21   identifying the society as Hamas.

22   Q.    Any videotapes of al-Salah Society, or referencing

23   al-Salah Society.

24   A.    Yes.

25         MR. JONAS:  If we can play InfoCom Search No. 66.

1          (Whereupon, InfoCom Search No. 66 was played, while

2          questions were propounded.)

3   Q.   (BY MR. JONAS)  Where it says al-Kurd, is that the

4   individual identified on your chart as Ahmad al-Kurd?

5   A.    Yes.  Just before this there was a caption that announced

6   that it was the al-Salah Society and Ahmad al-Kurd, and he is

7   speaking here.

8   Q.    Do you know what year this videotape is from?

9   A.    I was not able to date this.

10  Q.    Agent Burns, did you notice a progression of

11  payments -- Withdrawn.  The first two committees we talked

12  about, the Islamic Center and the Islamic Society, both of

13  Gaza, where are they located?

14  A.    They are in Gaza, as is the al-Salah Society.

15  Q.    Okay.  Did you notice a progression of payments coming

16  from the HLF to these committees that we are talking about and

17  will be talking about over a period of time?

18  A.    Yes.

19  Q.    Okay.  Can you explain what you noticed?

20  A.    In the beginning, in the very beginning we noticed that

21  the payments were initially going to the Islamic Center of

22  Gaza and to Gaza, in addition to one other organization in

23  Israel.

24  Q.    Is that what you testified about in your first testimony

25  when you pulled up those schedule of payments in the early

1    years of HLF 1988 and '89?

2    A.    That is correct.

3    Q.    Okay.

4    A.    Then we noticed in approximately 1991 the HLF started to

5    expand and send its money to certain committees in the West

6    Bank as opposed to Gaza.  We will talk about that or those

7    committees in a little bit.

8    Q.    Is there any evidence that we have seen or will be seeing

9    that addresses that as not being a coincidence?

10    A.    Yes.

11            MR. JONAS:  If we can put up on the screen Elbarasse

12    Search No. 22, please.

13    Q.    (BY MR. JONAS)  What is this document, Agent Burns?

14    A.    This is a letter that was seized at the home of Ismail

15    Elbarasse during that search warrant in like 2004, and it is a

16    letter to Shukri from 1991, and it is in Arabic and the

17    English translation is -- the individual is writing to Shukri

18    about the zakat committees and the endorsed charitable

19    organizations.  And below it is a list of committees and a

20    column called "percentage," which shows what amount of control

21    they have over the committee, and then remarks.

22    Q.    Okay.  How are you able to date this document?

23    A.    It is dated on top July 14th, 1991.

24    Q.    Does this document identify the committees that the HLF

25    gave financial support to that you have already testified

1    about in your payment section of your testimony?

2    A.    It references those committees.

3    Q.    How does this feed into what you testified about of the

4    progression of payments starting with Gaza and then spreading

5    to include the West Bank over time?

6    A.    Taking into account this exhibit, as well as another

7    exhibit from the Ashqar search that we will probably talk

8    about in a minute, and the Philadelphia meeting that we have

9    already discussed, these individuals were studying the

10   committees and attempting to take control of them, and this

11   document in 1991 --

12            MS. MORENO:    Objection, Your Honor; improper

13   opinion, "attempted to take control."    There is no basis of

14   that improper summary testimony.

15            THE COURT:    Do you want to lay a predicate?

16   Q.    (BY MR. JONAS)    Agent Burns, when you are saying they are

17   attempting to take control, where are you getting that from?

18   A.    Based on the language and context within this document,

19   within the document entitled Ashqar No. 5, or labeled Ashqar

20   No. 5, and the Philadelphia meeting, where these individuals

21   that are part of this Palestine Committee discuss what amount

22   of control they have over these committees.

23   Q.    Okay.    Starting with this document, can you point to us

24   where --

25            MS. CADEDDU:    In which case, I object as an improper

1   expert testimony.

2           THE COURT:  Overrule that objection, and overrule

3   the previous objection by Ms. Moreno.

4   Q.   (BY MR. JONAS)  Can you point to us where in this

5   particular document it says that?

6   A.   We can take, No. 1, for example, where it says, "Ramallah

7   zakat committee, all of it is ours."

8   Q.   Okay.  And where does it say about taking control of the

9   committees in here?

10  A.   Well, by the context it says, like under Bethlehem zakat,

11  "we have 7 out of 11, and it includes the individuals' names.

12  And then if you scroll on down, there will be a committee that

13  says, "We have nobody in it."

14  Q.   Okay.

15  A.   And then under Qalqilya it says, "All of it is ours, and

16  it is guaranteed."

17  Q.   Will we come back to this document?

18  A.   Yes.

19          MR. JONAS:  Next page, please.

20          THE WITNESS:  And, for example, under No. 13, under

21  Bir Nibalah zakat it says, "Guaranteed, trustworthy, and we

22  have the final word in it."

23  Q.   (BY MR. JONAS)  Okay.  So how do you go from this

24  document to they, being Hamas, was trying to take over the

25  committees?

1    A.    Well, this document was from 1991.

2    Q.    Right.

3    A.    The document Ashqar No. 5 was from 1988, which shows --

4            MR. JONAS:  Let's go to Ashqar No. 5.  If we can get

5    it on the screen, please.

6    Q.    (BY MR. JONAS)  And we may be doing this in reverse

7    order.

8    A.    It is important to look at these in the chronological

9    order, this document being the earlier one from, based on the

10   content, around '88, '89.

11   Q.    Okay.

12           MR. JONAS:  Next page.

13   Q.    (BY MR. JONAS)  It is in Arabic, obviously?

14   A.    Yes, it is.

15           MR. JONAS:  Keep going to the English, please.

16           MS. CADEDDU:  Your Honor, can we have a continuing

17   objection to improper expert testimony, please?

18           THE COURT:  You may have that, and that is

19   overruled.

20   Q.    (BY MR. JONAS)  Where is this document talking about the

21   committees?

22   A.    I believe it is around page 20 for the reference.  Yes,

23   here it is.

24           MR. JONAS:  May I approach?

25           THE COURT:  Yes.

1          THE WITNESS:  Thank you.  And just -- The first page

2     indicates that this is a work paper on rearranging the frame

3     of the work inside.  And the document talks about various

4     items dealing with the inside, including items and Hamas.

5          Under this section on page 20 it is entitled "social and

6     charitable work," and it says, "This work is considered the

7     Movement's pulse among the masses and its banner in solving

8     their problems and alleviating their worries, as the enemy

9     does not provide even the least minimum"  --

10    Q.    (BY MR. JONAS)  I am sorry.  Do you see on the page you

11    are referring to on the screen?

12    A.    Yes.

13    Q.    Which portion of the page, so we can follow along?

14    A.    I was just kind of giving the context in the first

15    paragraph.  I think you were asking me where the committees

16    were listed, and they are just below.

17         And again this document, based on the content, can be

18    dated around 88 to '89, so it is an early document.  And it

19    lists the committees and identifies how many people and what

20    kind of presence they have in these committees.

21         And, for example, in Nablus it has two Islamists and the

22    rest are dignitaries.  The next one, it says, "The Islamic

23    Charitable Society in Hebron, there is a decent Islamic

24    presence in it."  Under the Islamic Center of Gaza, "Its

25    management is entirely in the hands of the Islamists, but the

1    Authority places hurdles in front of it."

2        The Islamic Society of Gaza, "Same thing as the Islamic

3    Center."  The Nablus zakat committee, "One of the brothers

4    work in it and the rest are dignitaries."  And it goes on,

5    showing that they only had one or two people in these

6    committees.

7        The same thing for Jenin zakat.  It says, "Same as the

8    previous," which is "two are supporters and the rest are

9    dignitaries."

10        So if you look at what they are saying in this document,

11    which is 1989 to 1989, and then you go to the document that we

12    were just looking at from 1991 --

13    Q.   Hold on.  Let's pull that up.

14            MR. JONAS:  Elbarasse Search No. 22, please.

15            THE WITNESS:  According to what they say, "They have

16    gained more control.  All of it is ours."  Under Jenin zakat,

17    which in 1988 they only had two in, "This one is now

18    guaranteed, by virtue of Mohammad Fuad Abu Zeid's position."

19    So that is what I was talking about with the progression.

20    Q.   (BY MR. JONAS)  When did the Philadelphia meeting happen

21    again?

22    A.   In 1993, two years after this letter.

23    Q.   And we played that -- Withdrawn.  Did we play the portion

24    of the Philadelphia meeting that addressed what you are

25    referring to right now?

A.   Yes.  We played the part where Muin Shabib identified

"our organizations," is what he said.

Q.   So based upon these documents and what Muin Shabib says

at the Philadelphia meeting, were you able to track a

progression of control over some of these committees?

A.   Yes.

Q.   Okay.  And from that did you look at the HLF payments to

these committees and see a correlation in where the payments

were going?

A.   Yes.

Q.   And what was that correlation?

A.   It was that in approximately 1991, the year that this

letter came out, the HLF -- we began seeing payments from the

HLF to some of these committees in the West Bank, including

the Jenin zakat committee that is listed as guaranteed here.

Q.   Okay.  We will talk more about the Jenin zakat committee,

then.

          MR. JONAS:  If we can put on the screen the schedule

labeled "Payments to Jenin Zakat Committee."  Enlarge the top,

please.

Q.   (BY MR. JONAS)  Agent Burns, when was the first payment

to the Jenin zakat committee?

A.   May 1st, 1991.

Q.   And who made those payments or who authorized those

payments?

1   A.    The Defendants Ghassan Elashi and Shukri Abu Baker.

2            MR. JONAS:   If you can scroll through the schedule,

3   please.

4   Q.   (BY MR. JONAS)   Did the HLF continue making payments to

5   the Jenin zakat committee after Hamas was first designated as

6   a specially designated terrorist organization?

7   A.    Yes.

8   Q.    Did they continue making payments after Hamas was again

9   designated by the U.S. Government as a foreign terrorist

10  organization?

11  A.    They did.

12  Q.    Agent Burns, when was the last payment to the Jenin zakat

13  committee?

14  A.    October 11th, 2001.

15  Q.    How much in total did the HLF pay to the Jenin zakat

16  committee?

17  A.    We identified $554,500.

18  Q.    Do you see on this page that three of the four

19  transactions only have one supporting documentation to show.

20  A.    Yes.

21  Q.    Can you explain that?

22  A.    Well, the supporting documentation in those transactions

23  came from the HLF foreign bank records that we received

24  showing payments out of the HLF's foreign bank account in the

25  territories to the Jenin zakat.

1    Q.    And again, if you didn't have those foreign bank records,

2    would you have been able to locate -- Based upon the evidence

3    you gathered in the United States, were you able to identify

4    this transaction?

5    A.    Based on what we looked at, we did not find those

6    transactions in the information that we had over here.

7    Q.    Do you see the transaction marked June 14th, 2001 as the

8    second one from the top?

9    A.    Yes.

10   Q.    There is a tab on the far right.  Can you remind us what

11   that is?

12   A.    That means that that particular transaction is referenced

13   in the indictment in Count 1, Overt Act No. 8.

14   Q.    And that particular transaction also has two numbers next

15   to it?

16   A.    Yes.

17   Q.    The amount and amount to Jenin can you explain what that

18   is again?

19   A.    Well, that means that the first amount listed was the

20   total wire transfer that was transferred from the Holy Land

21   Foundation bank account here in the U.S. to the HLF foreign

22   bank account at the Cairo Amman Bank and that we were able

23   through the records to trace $4,412 of that money to the Jenin

24   zakat.

25   Q.    Of the $192,000 wire?

1   A.   Correct.

2   Q.   Cairo Amman Bank, do you know where the branch was that

3   the HLF had their account?

4   A.   It was either in Gaza or Hebron, I believe.  It was

5   somewhere in Gaza or the West Bank.

6   Q.   Not in Cairo, Egypt?

7   A.   No.

8   Q.   Okay.

9        MR. JONAS:  Let's pull up HLF Search No. 36, page

10  188, please.

11  Q.   (BY MR. JONAS)  Let's look at the documents supporting

12  that transaction.  What is this document?  Does this relate to

13  this transaction?

14  A.   I think we are waiting on the page to be pulled up.

15       MR. JONAS:  HLF Search No. 35.  I am sorry.  I

16  couldn't read the number on the screen.  My fault, Your Honor.

17       THE WITNESS:  It is No. 35.

18       MR. JONAS:  HLF Search No. 35, page 186.  That is

19  better.

20  Q.   (BY MR. JONAS)  How does that -- What is this document

21  and how does it relate to the transaction?

22  A.   This is part of the internal documentation that goes to

23  support that $192,403 wire transfer.  There were a number of

24  these requests for transfer of funds found at the Holy Land

25  Foundation which tended to show where the money was destined,

1   and you often have to add them up to come to the total.

2        MR. JONAS:  Can we go to HLF Foreign Account No. 6,

3   page 44, please?

4   Q.   (BY MR. JONAS)  Agent Burns, on the schedule it says HLF

5   Foreign Account No. 6, page 44.  If we go to that in the hard

6   copy, would that support that transaction as well?

7   A.   Yes.

8        MR. JONAS:  Let's go to the Jenin zakat committee

9   schedule, not the payments to, the other schedule.

10  Q.   (BY MR. JONAS)  There is a lot of names on this one.

11  A.   Yes.

12  Q.   Can you identify for us who are the members of the

13  committee based on the evidence in this case?

14  A.   The individuals that we identified that were important in

15  this committee were Fawaz Hamad, Zeid Zakarneh, Ahmed Salatna,

16  Mohamed Fuad Abu Zeid, Adeeb Aboushi, Ziyad Abdel Ghani Issa,

17  Walid Jarrar, and Naser Yusef.

18  Q.   Okay.  I am not going to start with the first one, Fawaz

19  Hamad.  I am going to jump to the middle.  It doesn't mean I

20  am not going to get to Fawaz Hamad, but I want to start with

21  someone else.  Let's start with Mohamed Abu Zeid.

22       MR. JONAS:  Let's look at InfoCom Search No. 30,

23  page 10, please.

24  Q.   (BY MR. JONAS)  What is this document?

25  A.   This is a letter from Fawaz Hamad, who is also on the

1    schedule, and it is a letter to the Defendant Mohammad

2    El-Mezain regarding the Jenin zakat committee and its

3    hospital, and the members of the hospital board and the zakat

4    committee board.

5    Q.    Okay.  And is Mohamed Abu Zeid listed anywhere in this?

6    A.    Yes.  He is listed toward the bottom of page 10 as No. 1,

7    the board of directors for the hospital, which is the Jenin

8    zakat committee's hospital is Sheikh Mohamed Fuad Abu Zeid,

9    chairman, deportee brother.  And as we saw in the previous

10   deportee tent he was the 59-year-old, and had the head dress.

11   Q.    Okay.  Is there anyone else in this listing here that is

12   on your schedule, just so we don't have to keep going back to

13   this document?

14          Yes.  You have No. 1, Mr. Abu Zeid; No. 2, Zeid

15   Zakarneh; No. 3, Adeeb Aboushi; No. 4, Walid Jarrar; and if

16   you are scroll to the next page there may be another.  I will

17   have to check.  No. 9, Fawaz Hamad; and No. 10, Ziyad Abdel

18   Ghani, which is Ziyad Abdel Ghani Issa.

19   Q.    No. 10, Ziyad Abdel Ghani, where it says deportee

20   brother, did we see him in -- We will call that that tent

21   video where they sat around the tent and identified

22   themselves.  For reference it is HLF Search NO. 70 for the

23   record, but for our conversation here, if you will just call

24   it the tent video.  In that tent video, was he in that?

25   A.    No, but he was in that list of deportees we identified as

1    coming from InfoCom.

2    Q.   Okay.  Okay.  Staying with Mohamed Abu Zeid, did we see

3    him mentioned in another video?

4    A.   Yes.

5         MR. JONAS:  What I would like to play is the video

6    MAYA conference.  If we can play Clip F, starting at the

7    four-minute mark.

8         (Whereupon, MAYA Conference Video, Clip F at 4

9              minutes was played, while questions were

10             propounded.)

11   Q.   (BY MR. JONAS)  Who is this individual?

12   A.   This is Hamas leader Khalid Mishal, and this is taking

13   place at the MAYA conference in 1992 that was discussed in

14   that tent video.

15   Q.   It says Sheikh Mohamed Fuad Abu Zeid.  Is that part of

16   what you are referring to, part of the Jenin zakat committee?

17   A.   Yes.

18        MR. JONAS:  That is enough.  Let's look at HLF

19   Search No. 109, page 142.

20   Q.   (BY MR. JONAS)  Is Mohamed Abu Zeid mentioned in this?

21   A.   Is this -- It should be HLF Search No. 109, page 142.

22   Q.   What is HLF Search No. 109, agent Burns?

23   A.   It is the book about Hamas that came from the Defendant

24   Abdulrahman Odeh's office that we have referenced several

25   times, and he is mentioned in that and he is mentioned in that

1    translation.

2              MR. JONAS:  It could be page 143.

3    Q.   (BY MR. JONAS)  Where do you see his name?

4    A.   In the paragraph it says, "The occupation authorities

5    also arrested many ranking personalities and figures and

6    sentenced them to various administrative sentences.  The most

7    ranking among those are," and the first person listed is

8    Sheikh Mohamed Fuad Abu Zeid.

9    Q.   What is the subject matter of this book?

10   A.   It is a study of Hamas.

11   Q.   Okay.

12             MR. JONAS:  Elbarasse Search No. 22, please.

13   Q.   (BY MR. JONAS)  Remind us what this document is.

14   A.   This is the letter to Shukri from 1991 analyzing the

15   breakdown of the committees.

16             MR. JONAS:  Page 40, please.

17             THE WITNESS:  And under Jenin zakat, you can see

18   there No. 3.  It says, "It is guaranteed by virtue of Mohamed

19   Fuad Abu Zeid's position, and that is the same individual that

20   we saw in the tent video and we saw reference by Khalid

21   Mishal.

22   Q.   What committee is that referencing?

23   A.   The Jenin zakat committee.

24   Q.   That is the one we are talking about now?

25   A.   That is correct.

                    MR. JONAS:  Let's go back to that schedule.

Q.   (BY MR. JONAS)  Let's now go back to the name on the far
left, Fawaz Hamad.

A.   Okay.

Q.   Let's look at what connects him to the committee.

                    MR. JONAS:  InfoCom Search No. 93 page 2, please.

Q.   (BY MR. JONAS)  What is this document?

A.   This is a letter from the Tulkarem zakat to the HLF
through their respectable representative in the Jenin zakat
committee Mr. Fawaz Hamad.

Q.   Did Fawaz Hamad wear two hats?

A.   Yes.

Q.   What do I mean when I say two hats?

A.   He had two jobs, basically, in this context.

Q.   What were those two jobs?

A.   He was a representative of the Jenin zakat committee and
he was also the HLF representative in Jenin area.

Q.   Does this letter on the screen now, InfoCom Search No.
93, which job does this reference?

A.   His job with the Jenin zakat committee.

Q.   Okay.

                    MR. JONAS:  If we can go to HLF Search No. 160, page
69, please.

                    THE WITNESS:  I believe this is the Arabic.

                    MR. JONAS:  Next page.

1   Q.   (BY MR. JONAS)  And what does this say?

2   A.   This is a letter and it refers to Fawaz Hamad as a

3   representative of the HLF.

4   Q.   Is this where you are getting, or a letter like this is

5   where you are getting the connection?

6   A.   This, among other things.

7   Q.   His other job to the HLF?

8   A.   Yes.

9   Q.   Okay.

10          MR. JONAS:  InfoCom Search No. 30, please.

11  Q.   (BY MR. JONAS)  We have seen this document before.

12  Correct?

13  A.   Yes, we just looked at a very small portion of it.

14  Q.   How does this relate to Fawaz Hamad?

15  A.   This is a letter from him, and you see at the top of

16  page 8 the translation.  It is addressed to brother Abu

17  Ibrahim, who is the Defendant Mohammad El-Mezain.  And in this

18  letter you can see he discusses the Jenin zakat's hospital as

19  well as the Jenin zakat and their board members, as you go

20  through it.

21  Q.   Is this what we looked at a moment ago to identify

22  Mohamed Abu Zeid as well as other Jenin zakat members?

23  A.   Yes, but I think we wanted to look at a couple of more

24  pages in it.

25  Q.   Okay.

A.    Here on this page 9 he is still talking about the zakat

committee's hospital, and he has noted individuals at the

bottom who are current employees, and then he identifies them

as Islamists or a returning deportee, supports the Islamic

block, things like that.  He has actually broken them down by

what they are.

Q.    Agent Burns, did you come across any evidence that would

explain why the hospital needs to know whether the doctors are

Islamists or not?

A.    No.

      MR. JONAS:  The next page, please.

Q.    (BY MR. JONAS)  This is the page we looked at before?

A.    It is, identifying again the hospital board, and it

identifies them as Islamists.

      MR. JONAS:  Let's go to Ashqar search --

Q.    (BY MR. JONAS)  I am sorry.  Go ahead.

      THE WITNESS:  There were a couple of more pages I

think that --

      MR. JONAS:  If we can go back to that, InfoCom

Search No. 30.  Sorry.  I jumped the gun.

      THE WITNESS:  And if you scroll through to the next

page, he starts talking about the actual members of the

committee itself; again, most of the same individuals.  And he

identifies whether they are Islamists.  One of the individuals

listed is No. 12 Abdel Qader Azzam, who is listed here as the

1    brother of martyr Abdullah Azzam.

2    Q.   Have we seen Abdullah Azzam in this case?

3    A.   Yes.  He was the individual seen on the videotapes where

4    the HLF ads were playing.  He was the Palestinian martyr.  He

5    was also in that Illa Falistine that we saw where his

6    martyrdom was announced.

7         If you scroll again to the next page.

8              MR. JONAS:  Go back to the bottom again.

9    Q.   (BY MR. JONAS)  What does that last few lines say?

10   A.   "Generally speaking, there is a control by the brothers

11   of the zakat committee and matters run as they wish.  The

12   committee's chairman is very sympathetic to Islamists'

13   requests, and no one is hired without consulting to the

14   brothers."

15        And if you scroll again to the next page, he goes on to

16   describe the future of the charitable organizations.  And I

17   won't bore you with reading all of it.

18        If you scroll to the next -- Actually go back to the

19   previous page just for a second.  At the bottom he says, "I

20   expect that Arafat will try to build bridges of trust with the

21   opposition in the beginning of the self-rule and will avoid

22   confrontation due to his occupation with internal conflicts,

23   the strength of the opposition, and the deep family roots in

24   Palestine which will make it hard for him to strike the

25   Islamists as it is happening in Egypt."

1          If you go on to the next page, at the top he says,

2    "Therefore exaggerated fear is not desirable and work ought to

3    be done with the same strength but with more logic.  In that

4    respect, a number of projects could be carried out under

5    national companies whereby a number of brothers obtain a

6    license for health, productive, or educational projects, and

7    they are not under the Authority.  This is in regards to

8    Hamas' money which does not come from official

9    organizations."

10              MR. WESTFALL:  What year is that?

11   Q.   (BY MR. JONAS)  Do you know the year this document was

12   created?

13   A.   Based on the content, it is discussing the upcoming

14   self-rule, so it is around the time of the signing of Oslo.

15              MR. DRATEL:  And that would be?

16              THE WITNESS:  1993.

17         If you look actually at the last paragraph, it says, "The

18   Accord the dead and stillborn, and that forward steps must be

19   taken.  The strength of the Islamists in the zakat committees

20   in the Bank depends on the strength of the brothers in

21   Jordan."  Because he is referencing the Accord again, I would

22   say that it happened in 1993.

23              MR. JONAS:  Let's go to Ashqar Search No. 6, please,

24   page 13.

25   Q.   (BY MR. JONAS)  Again, we are talking about Mohamed Abu

1    Zeid for the moment?

2          THE COURT:  Well, this looks like it is a good

3    breaking point for lunch.

4       Lets's take a lunch break.  Be back at 1:45.

5          (Whereupon, the jury left the courtroom.)

6          THE COURT:  Anything else we need to address?

7          MS. CADEDDU:  Yes, Your Honor.  I just want to make

8    something clear for the record.  I want to renew and make sure

9    I have preserved an objection under 403, 701, and 702 to Agent

10   Burns testifying as she has been; and under 701, that would be

11   improper lay opinion; 702, that she hasn't been qualified as

12   an expert and lack of notice if she is going to testify as an

13   expert.  And the case law I would like to address the Court's

14   attention to, the first case is *U.S. v. Lopez-Moreno*, 420

15   F.3d, 420.  That is Fifth Circuit 2005.  And in that case

16   Chief Judge King in a specially concurring opinion opined that

17   a Government lay witness is dangerously close to evading

18   strictures on lay testimony.  The witness was a Border Patrol

19   agent.  And the Government asked whether based upon his

20   training he could identify that passengers in a car were

21   illegal aliens, and he opined that they were.

22       In *U.S. v. Garcia*, a DEA agent testified that in his

23   opinion the Defendant was a partner in the charged conspiracy,

24   and the testimony was found to be improper expert testimony in

25   the guise of lay testimony because the agent was testifying

1    based on his specialized training and experience.

2         And then also *U.S. v. Castillo* was a case, 77 F.3d, 1480,

3    Fifth Circuit 1996.  In that case the Fifth Circuit said it is

4    possible for a witness to be a summary expert and in that

5    capacity to render an opinion about the underlying exhibits,

6    but that in that case the witness was merely a summary witness

7    and thus couldn't opine as to the underlying documents.

8         And then finally in *U.S. v. Brito*, 136 F.3d, 397, Fifth

9    Circuit 1998, the Court disapproved testimony that the

10   Defendants met a certain drug organization profile.  And this

11   is actually a slightly different objection, Your Honor.  In

12   this case the detective opined about how difficult it was to

13   infiltrate a particular organization and that, therefore, it

14   was hard to get evidence about particular facts.  And I would

15   object to Government witnesses testifying that it is difficult

16   to -- Similar kinds of testimony that it is difficult to

17   obtain evidence from overseas and so forth.  And in *Brito* the

18   Court said it is -- that that leads to the conclusion or it

19   implies that the Defendants should be convicted on a lower

20   standard of proof, that the Government should have a lower

21   burden of proof, and that an instruction as to burden of proof

22   is proper.

23        So I just wanted to put those into the record.

24             THE COURT:  And assuming that those are timely, they

25   are overruled.  I don't know that you objected to all of that

1    at the time they were made.  I have read some of those cases.

2    They are clearly distinguishable from what we have going on

3    here.

4            MS. CADEDDU:  And I just want to make sure that we

5    have a continuing objection on all those grounds.

6            THE COURT:  Well, to the extent that they are

7    talking about that, yes.  If you have a specific objection,

8    you need to make it.  I am not going to give a continuing

9    objection on broad grounds like that.  You just need to object

10   as to each particular one, because not all this testimony

11   falls under this category.

12           MS. CADEDDU:  I will make the appropriate objection.

13   Thank you, Your Honor.

14           THE COURT:  We will be in recess.  Be back at 1:45.

15                   (Lunch Recess.)

16           THE COURT:  Mr. Jonas?

17           MR. JONAS:  Thank you, sir.

18           MR. JONAS:  If we can put the Jenin zakat summary

19   schedule back on the screen, please.

20   Q.  (BY MR. JONAS)  Agent Burns, we had left off right before

21   lunch with Fawaz Hamad, the first name on the left, but I want

22   to go back to Mohamed Abu Zeid.  There is something I forgot

23   about.

24   A.  Okay.

25   Q.  What number is he; what name, on this column or row?

1    A.    He is the fourth name.

2    Q.    Just remind us, where did he we see him this morning when

3    you testified about him?

4    A.    He is the older gentleman in the tent video with the head

5    dress who identified himself as the head of the Jenin zakat

6    committee.  He was also the individual who was referenced by

7    Hamas leader Khalid Mishal at the MAYA conference as one of

8    their people who had been deported.  And he was also

9    referenced in that UASR publication that was found in

10   Abdulrahman Odeh's office that listed Hamas leaders, and he

11   was one of them.

12   Q.    Okay.  Were there any videos of him, any additional

13   videos of him that were seized by the FBI?

14   A.    Yes.

15         MR. JONAS:  If we can play InfoCom Search No. 7,

16   clip D, please.

17         (Whereupon, InfoCom Search No. 7, Clip D was played,

18         while questions were propounded.)

19   Q.    (BY MR. JONAS)  Is this the same individual you have

20   identified as being part of the Jenin zakat committee?

21   A.    Yes.

22   Q.    Have you been able to date this particular tape?

23   A.    No.

24   Q.    Agent Burns, it looked like the audio and his mouth was

25   moving were not synced.  Did the FBI do that?

```
 1   A.    No.  The tape was as it was.

 2   Q.    Okay.  Getting back to Fawaz Hamad, he is the individual

 3   that you said had two jobs--one for the HLF as their

 4   representative and one on the Jenin zakat committee.  We were

 5   going over some things identifying him, connecting him to the

 6   committee, and we had gone over one document, InfoCom Search

 7   No. 30, which talked about the hospital and Islamists members,

 8   or Islamists.  Do you recall that?

 9   A.    Yes.

10   Q.    Did the HLF receive anything indicating that he himself

11   got into trouble with the law?

12   A.    Yes.

13          MR. JONAS:  If we can pull up Baker Wiretap No. 19,

14   please.  The next page.

15   Q.    (BY MR. JONAS)  What is this document?

16   A.    This is a fax in Arabic from the al-Razi Hospital in

17   Jenin, which is the Jenin zakat committee's hospital, dated

18   February 21st, 1998.

19   Q.    Okay.

20          MR. JONAS:  Next page, please.

21   Q.    (BY MR. JONAS)  Is this a translation of that fax?

22   A.    It is.

23   Q.    And who is this addressed to?

24   A.    It is addressed to the brothers in the Holy Land

25   Foundation.
```

1    Q.    This is marked as Baker Wiretap No. 19, so where was this

2    sent to?

3    A.    This would have been sent to Shukri Abu Baker.  It may

4    have been either at the HLF office or at home.  I am not sure.

5    I would have to check the phone number.

6    Q.    Can you just read this document?

7    A.    It says "Dear honorable and respectable brothers at the

8    Holy Land Foundation, God's peace, mercy, and blessing be upon

9    you.

10        "We ask that you send the following papers concerning my

11   husband Fawaz Abd'al-Rahman Hammad who is presently detained

12   the Israel.

13        "A certificate proving that Mr. Fawaz Abd'al'Rahman

14   Hammad was working as an economic consultant for your projects

15   with charitable legal organizations.

16        "A copy of the Holy Land Foundation licensing."

17        "A copy of the cancellation of the order to close down

18   the Holy Land Foundation.

19        "These papers were requested by the attorney defending my

20   husband because it seems that the matter is related to his

21   work with you.  We hope that you take care of this and send

22   them quickly.

23        "May God reward you good.

24        "Your sister, Sumaia Hammad, Fawaz Hammad's wife."

25   Q.    After this letter was sent in February of 1998, are there

1    additional calls that are listed in your schedule that

2    indicate that he continued to work for the HLF after this

3    date?

4    A.    Yes.  After he got out of prison he went to work with the

5    HLF.

6    Q.    How do you know that?

7    A.    Based on documents and phone calls.

8    Q.    And are those documents and phone calls listed in the

9    Jenin zakat committee schedule under his name as exhibits?

10   A.    Yes.

11   Q.    Okay.

12            MR. JONAS:  I want to go to Ashqar Search No. 6

13   specifically page 13, please.

14   Q.    (BY MR. JONAS)  What is Ashqar Search No. 6, Agent Burns?

15   A.    This is a list of names and phone numbers that was taken

16   from the home of Abdel Haleem Ashqar in December of '93.

17   Q.    And is Fawaz Hamad's name and phone number anywhere on

18   this list?

19   A.    It is.

20   Q.    Where is that?

21   A.    Well, it is down at the bottom, Fawaz Hamad.

22   Q.    Have you looked at this phone list?

23   A.    I have.

24   Q.    Are there any other individuals on here that you already

25   talked about?

```
1    A.    Yes.

2    Q.    Who?

3    A.    Well, individuals that have been mentioned are one

4    Dr. Soliman just above Fawaz Hamad.  He is the individual with

5    the Islamic Relief Committee that we talked about the other

6    day.  And I believe another individual is Ahmad al-Alami, the

7    Hamas leader in Iran.  And Jawad Hamad we saw referenced in

8    context of the Palestinian Committee overseas during my first

9    testimony.

10   Q.    I want to stay with this phone list for a moment, but I

11   want to step away from the Jenin zakat committee and ask you a

12   question regarding this exhibit.

13         Are you familiar with someone named Steve McGonigle?

14   A.    Yes.

15   Q.    Were you here when he testified in this trial?

16   A.    No.

17   Q.    Are you familiar with his testimony, though?

18   A.    Yes.

19   Q.    Are you familiar that he traveled over to --

20              MR. DRATEL:  Objection, Your Honor.

21              MR. JONAS:  I am trying to lay a foundation to get

22   to this document.

23              THE COURT:  He can lay a foundation.  He didn't get

24   into what he said yet.  Go ahead and ask this question.

25              MR. DRATEL:  He prefaced by saying "It is his
```

1    testimony that" --

2            THE COURT:  He hasn't gotten there yet, counsel.

3    Let's see where he is going.

4    Q.   (BY MR. JONAS)  Are you aware Steve McGonigle traveled to

5    Gaza to do a story on the Holy Land Foundation?

6            MR. DRATEL:  Objection as to hearsay.

7            THE COURT:  She may answer yes or no.

8            THE WITNESS:  Yes, I am.

9    Q.   (BY MR. JONAS)  Are you aware of an individual who met

10   Mr. McGonigle to accompany him and set up interviews for him

11   and act as a translator for him.

12           MR. DRATEL:  Same objection, Your Honor?

13           MS. MORENO:  Objection; hearsay and leading.

14           THE COURT:  Overruled.  Go ahead.

15           THE WITNESS:  Yes, I am.

16   Q.   (BY MR. JONAS)  Do you see that individual's name on --

17   Have you seen that individual's name in this exhibit?

18   A.   Yes.

19           MR. JONAS:  If you can turn to page 11, please.

20   Q.   (BY MR. JONAS)  Where is that name?

21   A.   The second name on the list, Taher Shretah.

22           MS. HOLLANDER:  Your Honor, as to this testimony I

23   would also like to object under 701 and 702 specifically.

24           THE COURT:  Overruled.

25   Q.   (BY MR. JONAS)  Have you seen Taher Shretah's name in any

1   other document seized by the FBI?

2   A.   Yes.

3          MR. JONAS:  If we can turn to Elbarasse Search

4   No. 24, page 3, please.

5   Q.   (BY MR. JONAS)  Where do you see his name?

6   A.   I see it here.  If you go down the list the names of the

7   individuals we have talked about above, and then Taher

8   Shreiteh (Gaza).  And if you could scroll up just a little

9   bit, I would like to see the whole document.

10         MR. JONAS:  Can you enlarge the top half?

11  Q.   (BY MR. JONAS)  Do you see any other names of people that

12  have been discussed in this case that you have testified

13  about?

14  A.   Yes.  Jamal Mansour was one of the individuals on that

15  list of the deportees where we saw the Hamas symbols flashing

16  on and off.  Dr. Soliman is with the Islamic Relief Agency.

17  We have talked about -- Bassam Jarar is one of the individuals

18  listed in that Middle East Affairs Journal as a Hamas leader,

19  HLF Search No. 109.  Mahmoud Romhi we will talk about later,

20  as well as Hashem Natsheh.  Dr. Aziz Dweik was also one of the

21  individuals who was one of the deportees in that tent video

22  where you saw the Hamas symbol flashing.  He was also an HLF

23  speaker.  And then Mahmoud Zahar is Hamas leader in Gaza on

24  your chart.

25         And if you could expand out, you can see, again we have

1    Ahmad Bhar.  We identified him as part of the Islamic Society

2    of Gaza earlier today.  He is one of the individuals that was

3    identified in the faxes to Mohammad El-Mezain as being close

4    to Hamas.  Again, Ismail Haniyah, Hamas leader on your chart

5    listed in several exhibits we have presented today.  And then

6    skip down three or four names and you have Taher Shreiteh.

7              MR. JONAS:  Go back to the Jenin zakat committee

8    chart, please.

9    Q.   (BY MR. JONAS)  The next name after Fawaz Hamad is Zeid

10   Zakarneh.

11             MR. JONAS:  And if we can go to Baker Wiretap

12   No. 13, page 3, please.

13   Q.   (BY MR. JONAS)  What is this document?

14   A.   This is a fax to the HLF Jerusalem office, and it

15   identifies the names of the representatives of the committees

16   that they are dealing with, and the date of the document is

17   January 25th, 1997.

18   Q.   Okay.  And do you see Zaid Zakarnah's name on that

19   document?

20   A.   I do.  He is listed under Jenin zakat committee, with a

21   telephone, fax number, and then the person in charge is noted

22   to be Sheik Zaid Zakarnah.

23   Q.   Okay.  And there are other committees listed as well?

24   A.   Yes.

25   Q.   Do you have this document listed under the individuals

1   who is identified on these committee charts that we are going

2   to be speaking about shortly?

3   A.   Yes.   This document is referenced on a number of charts.

4   Q.   Okay.

5           MR. JONAS:   Let's go to Jenin Zakat Account No. 1,

6   page 2.

7   Q.   (BY MR. JONAS)   This is one of the exhibits you have

8   listed under Zeid Zakarneh on your chart.

9           MR. JONAS:   Jenin Zakat Account No. 1.

10  Q.   (BY MR. JONAS)   Do you see Zeid Zakarneh's name there?

11  A.   He is listed as Zaid Mahmoud Ahmad there.   It is part of

12  his name.

13  Q.   Okay.   Do you see -- Is he a signatory on the account?

14  A.   Yes.

15  Q.   This is an account for the Jenin zakat committee, but do

16  you know what bank this account is from?

17  A.   Arab Bank.

18  Q.   Do you know where the branch of Arab Bank was located

19  that the Jenin zakat committee had an account?

20  A.   It shows an address in Jenin, so it was in the West Bank

21  of the Palestinian territories.

22  Q.   Do you know if any of the zakat committees had bank

23  accounts in any other countries besides the West Bank and

24  Gaza?

25  A.   I have seen some.

1    Q.    Where?

2    A.    In the early years I know that Tulkarem, and one other of

3    the zakat committees had an account in London for a little

4    while.

5    Q.    Okay.  Let's go to the next name on the chart.  Ahmed

6    Salatna.  Am I pronouncing it wrong?

7    A.    I pronounce it Salatna, but my pronunciation may not be

8    any better than yours.

9    Q.    Okay.  Let's see what connects him to the committee.

10        MR. JONAS:  HLF Search No. 160, page 2, please.

11   Q.    (BY MR. JONAS)  What is this document?

12   A.    If you go back to the Arabic version, page 1, or the

13   original it will be easier for me to explain it.

14        This is a copy or a document that is very difficult to

15   read.  It has been a fax.  But it is a fund transfer

16   notification, and it shows for social dues to the Jenin zakat

17   and an amount of money, what the money was supposedly allotted

18   for, and the date.  And then down below there is a space for a

19   signature for the receipt.  And as you can see on this

20   receipt, there is only a signature in Arabic, so that is the

21   portion that is translated on the following page.  It is the

22   signed portion of the receipt.  So if you go to the

23   translation on page 2 --

24   Q.    Before we do that, where was this document taken from?

25   A.    This was taken from the HLF office.

1    Q.    Whose wire transfer is it?

2    A.    The HLF wire transfer.

3    Q.    To?

4    A.    To the Jenin zakat committee.

5    Q.    Okay.  So one top half is in English; the bottom half is

6    in Arabic?

7    A.    That is correct.

8    Q.    Is the actual paper document easier to read than what is

9    on the screen?

10   A.    It is.  But it is not great either, because it was faxed.

11   Q.    Okay.  And now we are on the translation page.  And how

12   do you connect this to Salatna?

13   A.    He signs the receipt on behalf of the Jenin zakat

14   committee as office director.

15   Q.    Okay.

16          MR. JONAS:  If we can go back to the Jenin zakat

17   schedule.

18   Q.    (BY MR. JONAS)  The next person is Adeeb Aboushi.  Is

19   that right?

20   A.    That is correct.

21          MR. JONAS:  And looking at what connects him, if we

22   can look at InfoCom Search No. 30, page 10.

23   Q.    (BY MR. JONAS)  And what is this document?

24   A.    This again is that letter to the Defendant Mohammad

25   El-Mezain from Fawaz Hamad that identified the members of the

Jenin zakat committee and their hospital, and identified a lot

of them as Islamists.

    Can you scroll up a little bit, please?

    Mr. Adib Abboushi is listed No. 3 under the hospital's

board as an Islamist.

Q.   Are there other names on the Jenin zakat committee that

we haven't discussed that are also on this list?

A.   There are.  And if you -- Just as a reminder, when you

are looking at the Jenin zakat committee chart if you want to

see specifically what individuals appear there, you can go to

page 3 of the chart and look under their name under InfoCom

Search No. 30 and see if they appear there.

Q.   While you have the chart in front of you, can you just

tell us, so we don't have to keep going back to this document,

who else on your chart is listed in this document?

A.   Okay.  I think we may have done this earlier, but No. 1

Sheik Mohammad Fouad Abu Zeid, someone we have already spoken

about, is on this chart; sheik Zeid Zakarneh is on this chart;

Adib Aboushi; Walid Jarrar; and then if you scroll to the next

page Fawaz Hammad and Ziyad Abdel Ghani, who is Ziyad Abdel

Ghani Issa those people are on the Jenin zakat summary chart.

Q.   I want to go now to the general committee section of this

chart.  Okay?

A.   Okay.

Q.   We have read -- I am sorry.  We have heard the portion

1    from the Philadelphia meeting from Muin Shabib talking about

2    committees, but I want to go back to that.

3            MR. JONAS:  And if I could get the elmo.  I am not

4    going to play the whole portion again.

5    Q.    (BY MR. JONAS)  Do you see what I highlighted?

6    A.    I do.

7    Q.    Agent Burns, this is from Philadelphia meeting No. 13.

8    Could you just read the portion that I highlighted regarding

9    the Jenin zakat committee?

10   A.    Can you bring it out a little bit?

11          "In Jenin, the zakat committee there has built a hospital

12   which is really ours."

13   Q.    Okay.  If you -- I know I didn't highlight the rest of

14   the sentence, but you might as well read the rest of the

15   sentence?

16   A.    "For the Islamists, either in management or in the teams

17   working in it."

18   Q.    Is this language "is ours" and talking about Islamists

19   consistent with this other document that we looked at earlier,

20   Ashqar Search No. 5?

21   A.    Yes.

22          MR. JONAS:  Can we put Ashqar Search No. 5 on the

23   screen, please?

24   Q.    (BY MR. JONAS)  Again, just give us -- The Philadelphia

25   meeting was when?

```
 1   A.    '93.

 2   Q.    And Ashqar Search No. 5 is?

 3   A.    '88, '89.  This is very early on.

 4         MR. JONAS:  If you can scroll to the English page,

 5   please.

 6   Q.    (BY MR. JONAS)  What does this say about the Jenin zakat

 7   committee?

 8   A.    It says, "At this time"--which again is very early

 9   on--"it is the same as previous, which is two supporters are

10   in it and the rest are dignitaries."

11         MR. JONAS:  If we can go to Elbarasse Search No. 22,

12   please, page 4.

13   Q.    (BY MR. JONAS)  I know we referenced this document

14   earlier, but I want to go back because I want to ask you about

15   the language we have seen connecting these -- discussing these

16   committees.

17   A.    Okay.

18   Q.    Is the language in this document similar to the Ashqar

19   document we just looked at in the Philadelphia meeting that

20   you just read with regard to it "being ours"?

21   A.    Yes.

22   Q.    Can you point out where that is?

23   A.    Okay.  This is from 1991, which is two to three years

24   after that Ashqar document, and under No. 3 it says "Jenin

25   zakat committee, guaranteed by virtue of Mr. Mohamed Fouad
```

1   Abou Zeid's position."

2   Q.   Let's move to another committee.

3   A.   Okay.

4   Q.   Ramallah zakat committee.

5        MR. JONAS:  If we can put up on the screen the

6   schedule of payments to Ramallah zakat.

7   Q.   (BY MR. JONAS)  Agent Burns, do you see that schedule?

8   A.   I do.

9   Q.   What is the date of the first payment to the Ramallah

10  zakat committee?

11  A.   September 23rd, 1991.

12  Q.   Okay.

13       MR. JONAS:  If we can scroll through this document,

14  please.

15  Q.   (BY MR. JONAS)  Did the HLF continue making payments to

16  the Ramallah zakat committee after Hamas was designated as a

17  specially designated terrorist?

18  A.   They did.

19  Q.   Did they continue making payments to THE Ramallah zakat

20  committee after Hamas was designated as a foreign terrorist

21  organization?

22  A.   Yes.

23  Q.   And on those payments do you see any of the Defendants

24  listed as authorizing the wires?

25  A.   I do.

1   Q.   Who?

2   A.   The Defendant Shukri Abu Baker and Ghassan Elashi.

3           MR. JONAS:  If we can go to the next page.  Keep

4   scrolling to the last one.

5   Q.   (BY MR. JONAS)  What is the date of the last transaction

6   between the Holy Land Foundation and the Ramallah zakat

7   committee?

8   A.   October 11th, 2001.

9   Q.   And how much total did the HLF give the Ramallah zakat?

10  A.   We were able to track $494,252.

11  Q.   Okay.  There are a couple of footnotes on this schedule.

12  Do you know what those are about?

13  A.   They would be referencing -- If you see an asterisk and

14  it says "See payment to Islamic Charitable Society of Hebron,"

15  that would indicate that that transaction likely came through

16  the Islamic Charitable Society of Hebron.  I would have to

17  look at the specific example to tell you for certain that that

18  is what happened, but those comments explain the transaction.

19  Q.   Did you see on occasion where a transaction went to one

20  zakat committee and then based upon internal records it was

21  meant for another?

22  A.   Yes.

23  Q.   Was that common?

24  A.   I saw it more than once.

25  Q.   Okay.

```
 1              MR. JONAS:  If we can go to the schedule of the

 2   Ramallah zakat committee summary.

 3   Q.   (BY MR. JONAS)  Agent Burns, we see seven names on this

 4   schedule.  Can you tell us who these people are?  Who are the

 5   names?

 6   A.   Mahmud Rumahi, Hosni Abu Awad, Omar Hamdan, Mahmoud

 7   Mosleh, Darwish Zein, Hamza Deeb, and Fadel Hamdan.

 8   Q.   Okay.  I want to start with Mahmud Rumahi, the first name

 9   on the left.

10              MR. JONAS:  If we can go to HLF Search No. 152, page

11   3, please.

12   Q.   (BY MR. JONAS)  And what is this document?

13   A.   This is the second page of a translation of a letter from

14   Mahmoud Romhi to the HLF.

15   Q.   Does this connect him to the Ramallah zakat committee?

16   A.   It does.

17   Q.   How so?

18   A.   In this particular letter he is signing as the Ramallah

19   zakat hospital's general director, but there are other

20   documents that you will see where he actually signs as a

21   representative of the committee as well.

22   Q.   Okay.

23              MR. JONAS:  Let's turn to InfoCom Search No. 32,

24   page 10, please.

25   Q.   (BY MR. JONAS)  What is this document?
```

A.    This is a letter from Shukri Abu Baker at the HLF to

Mahmud Romhi as the chairman of the Ramallah zakat committee.

Q.    Have we seen Mahmud Rumahi's name in anything else that

you have previously discussed?

A.    We have seen his name and also seen references to him in

the Philadelphia meeting.

Q.    What did they say in the Philadelphia meeting?  And if

you want the transcript, maybe that will be easier.

A.    It is up to you.  I can tell you generally what they

said.  When they were talking about the area of Ramallah, they

mentioned that the head of the syndicate there was --

Q.    I am sorry.  Would this be in the section that has been

played regarding the committees?

A.    Yes.

Q.    This would be Philadelphia Meeting No. 13?

A.    That is correct.

Q.    Okay.

A.    They are discussing the head of their syndicate there and

saying that he was arrested and under investigation and it was

causing problems for them.  They referred to him as being a

doctor who started the hospital, and that is Doctor Mahmud

Rumahi, this individual.

Q.    Okay.  The next person on the list is Hosni Abu Awad.

        MR. JONAS:  Let's look at the Ramallah Zakat Account

No. 1, page 34.

Q.   (BY MR. JONAS)  What is this document?

A.   This is a document that indicates the members of the
Ramallah zakat committee.

Q.   This is from their bank account?

A.   It is.

Q.   Does it identify Hosni Abu Awad?

A.   It does.  It lists him here as Hasan, but if you go on
further through the bank account records you see where he is
referenced as Hosni Hasan Abu Awad.

Q.   Okay.  Before I do that, there are other names on this
document.  Is there anyone else who is listed on this document
that is also on your schedule?

A.   Yes.  No. 2 Darwish Zein is on the list.

Q.   Okay.

A.   I believe he is the only one from this particular list.

Q.   Okay.  Now just so we are clear on something, No. 8, do
you see that name?

A.   I do.

Q.   Is that the same Mahmoud Zahar that you have testified
about previously?

A.   No.  He resides in Gaza.  This is in the West Bank in
Ramallah.

          MR. JONAS:  Let's turn to page 36 of this exhibit,
Ramallah Zakat Account No. 1.

Q.   (BY MR. JONAS)  What is this document?

1    A.    These again are records from the Ramallah zakat bank

2    account.

3    Q.    Does this identify the same individuals or some of the

4    same individuals that are on the schedule?

5    A.    Yes.

6    Q.    Who is that?

7    A.    Darwish Zein.  And again, these translations are done

8    phonetically so there are variations in the spelling.  No. 3

9    is Husni Abu Awad.

10          MR. JONAS:  Let's go to another exhibit, InfoCom

11   Search No. 32, page 26, please.

12   Q.    (BY MR. JONAS)  What is this document?

13   A.    This is a letter from Ramallah.  I am trying to see who

14   it is -- It is addressed to Dr. Hosni Abu Awad, the man that

15   we have been talking, about as chairman of the

16   Ramallah/Al-Bireh zakat committee, and it says, "I am pleased

17   to inform you of the approval of the director of the zakat

18   fund to reform the Ramallah/Al-Bireh zakat committee as

19   follows."  And it lists the individuals who are members.  And

20   this is from 1989.

21   Q.    And this was taken from where?

22   A.    This was taken from InfoCom.

23   Q.    Does that list have other people who are on your

24   schedule?

25   A.    It does.

1    Q.   All right.  By the way, the bank account we looked at a

2    moment ago, do you remember what time period these records are

3    for?

4    A.   I believe those were from '89 as well.

5    Q.   Those bank records?

6    A.   To state, the ones we looked at were from '89, but if you

7    scroll through that bank account, you will see records as they

8    progressed in time, so they are not just limited to 1989.  You

9    can see records that go on beyond that time period.

10   Q.   Let me ask you a general statement.  In the records that

11   you have compiled that support your schedules, is there

12   anything to indicate that any of these individuals left the

13   committee?

14   A.   No.  And in a lot of the individuals I found documents,

15   like in this one, where they appear in 1989, and then you will

16   see another document referencing the individual in the year

17   2000, over a decade later.  And I found nothing on the

18   individuals listed on here that indicated they left the

19   committee, with a small exception of a couple of individuals

20   who have died.

21   Q.   I guess that means they left the committee.

22   A.   Yes.

23   Q.   Okay.  So I haven't really focused on with you the time

24   period, but would you say -- I mean, can you tell us whether

25   or not, just so we are clear, that these records focus on a

1    particular sliver of time, or are they covering multiple years

2    period?

3    A.   What we tried to do when putting this picture together

4    was to take the picture in general from the HLF's beginning to

5    end, so that a lot of the evidence will come from the

6    beginning to show with whom they were dealing in the beginning

7    when we have all these videotapes of these festivals that we

8    have shown, and to show that those same individuals were the

9    people they were dealing with much later on after the Hamas

10   designation and until they closed down.

11   Q.   And the exhibits that we have shown with regard to

12   particular individuals, have they been all the exhibits or

13   just a sample?

14   A.   They are a sample.

15   Q.   Okay.  Let's move on to Omar Hamdan.  I think he is the

16   next name on the list?

17   A.   Yes.

18   Q.   Is he also on this schedule, before we go away from this?

19   A.   He is listed as the treasurer, No. 3.

20        MR. JONAS:  And if we can go to the Ramallah Zakat

21   Account No. 1, page 10, please.

22        THE WITNESS:  I don't think that is the Ramallah

23   zakat account.

24        MR. JONAS:  No, Ramallah Zakat Account No. 1.

25   Q.   (BY MR. JONAS)  What is this document?

A.    This is part of the Ramallah zakat bank records.  This

also is dated -- It lists the account date opening for 1989,

and it shows that one of the signatures on the account,

authorized signatures is Omar Muhammad Ahmad Hamdan, who is

the individual listed on this chart.

Q.    The next person on the chart is a person Mahmoud Mosleh,

M-O-S-L-E-H.

A.    Yes.

Q.    Is there a videotape involving him?

A.    There are several.

Q.    All right.

        MR. JONAS:  Elbarasse Search No. 23.

Q.    (BY MR. JONAS)  Does he appear in that?

A.    Yes.

        MR. JONAS:  If we can play Elbarasse Search No. 23.

        (Whereupon, Elbarasse Search No. 23 was played,

        while questions were propounded.)

Q.    (BY MR. JONAS)  Is that the individual Mahmoud Mosleh

that is listed on your Ramallah zakat schedule?

A.    It is.

        MS. DUNCAN:  Your Honor, can we approach for just a

moment?

        THE COURT:  Yes.

        (The following was had outside the hearing of the

        jury.)

1          MS. DUNCAN:  Your Honor, I think in our written

2     objections one thing we didn't raise with this video is it is

3     video of people being interrogated or detained in prison, so

4     we have a *Crawford* objection that their statements are clearly

5     testimonial.  We objected on hearsay grounds but did not raise

6     the *Crawford* objection, so I just wanted to lodge that

7     objection now.

8          MR. JONAS:  I think they are being interviewed.  I

9     don't think it is interrogation, because I think this was

10     seized at Elbarasse's house.  And it appears to be a TV

11     interview, or some sort of interview, not an interrogation.

12          MS. DUNCAN:  They are identified as being detained

13     in Israeli prisons.  Is that right?

14          MR. JONAS:  That is how it starts.  I made my point.

15     I will stop the video, but we still think it is admissible.

16     It identifies him as who he is.  I don't need --

17          THE COURT:  All of it, or just this part?  You are

18     saying it is admissible.

19          MR. JONAS:  I think the whole thing is admissible,

20     yes.

21          THE COURT:  I haven't seen it.  I would have to take

22     a look at it.

23          MR. JONAS:  I made the point.  I wanted to show who

24     he was, so I don't need to play anymore.

25          THE COURT:  All right.  He is not going to play the

1    rest of it.

2              MS. DUNCAN:  Is it not coming in?

3              THE COURT:  We will have to deal with it later.  He

4    says it is admissible, you don't want it, so I will have to

5    look at it.  I haven't listened to this yet.

6              MS. HOLLANDER:  So we can put off whether it is

7    coming in or not?

8              THE COURT:  Yes.

9              MS. HOLLANDER:  Is there another one like this.

10             MR. DRATEL:  I think there is another one.

11             THE COURT:  A disagreement again.

12             MR. DRATEL:  Is that the only one?

13             MR. JONAS:  Of him.

14             MS. DUNCAN:  There was another?

15             THE COURT:  On at a time.  This is on the record,

16   guys.

17             MR. JONAS:  You need to be a little more clear.  Are

18   there other TV interviews of people, or other interviews of

19   people in prison?

20             MR. DRATEL:  Prison.

21             MR. JONAS:  Not that I am aware of.

22             MS. DUNCAN:  I think you may be thinking of is it is

23   an actual document that you said you are not going to use, one

24   of the Ashqar --

25             MR. DRATEL:  I just thought there were two of those

1     interviews, but maybe I was mistaken.

2               MR. JONAS:  I am not aware of that.

3               MR. DRATEL:  Okay.

4               THE COURT:  All right.  For now.

5               (The following was had in the presence and hearing

6               of the jury.)

7     Q.   (BY MR. JONAS)  Agent Burns, I just want to be clear.  In

8     that videotape, it identified the individual who is on the

9     Ramallah zakat committee schedule?

10    A.   That is correct.

11              MR. JONAS:  Let's go to HLF Search No. 106, page 5.

12    Q.   (BY MR. JONAS)  Again we are staying on Mahmoud Mosleh.

13    What is this document?

14    A.   This is part of a journal that was taken from the Holy

15    Land Foundation, and this is an article that was contained in

16    it that says "Communique from Islamic Resistance Movement,

17    Hamas, in Palestine, August 17th, 1998."

18              MR. JONAS:  If we can go to page 10 of this

19    document.

20    Q.   (BY MR. JONAS)  Does this identify Mahmoud Mosleh

21    anywhere?

22    A.   It does.

23    Q.   Where is that?

24    A.   It says -- It is discussing -- If you go from the top it

25    talks about the process of arresting Palestinians in mass has

1    never ended.  It is referring to the PA has adopted the

2    techniques of the Israeli security forces, arresting hundreds

3    of innocent people.  So it is talking about the Palestinian

4    Authority arrests.

5         And then it goes down in the third paragraph and says,

6    "Arresting Palestinian mothers, wives, and fathers of wanted

7    Palestinians by the intelligence agencies has not stopped.

8    Police harassment against suspects of resistance went beyond

9    the common person on the street all the way to the political

10   leaders, such as Abdulaziz Ranteesy, Ibraheeem Maqadmeh,

11   Mahmoud Mosleh, and Jamal Mansour.

12   Q.   Have we seen Jamal Mansour anywhere else already?

13   A.   Yes, he was also in that deportee video in the tent, and

14   he is a member of the Islamic Relief Committee as he

15   identified himself.

16   Q.   Okay.  Let's move on to the next person on the schedule,

17   Darwish Zein.  I may be completely mispronouncing that one.

18   A.   Yes.

19   Q.   Am I mispronouncing it, or is that right?

20   A.   No, I know who you are talking about.

21   Q.   Is he connected to the Ramallah zakat committee?

22   A.   He is.

23        MR. JONAS:  If we can go to InfoCom Search No. 32

24   page 26, please.

25   Q.   (BY MR. JONAS)  Is he listed there?

1    A.    Yes.

2    Q.    Where is he what number?

3    A.    No. 6.  And again, these names are, the translations are

4    phonetic, and so sometimes you will see different spellings

5    that sound the same way.  So Zayn, Z-A-Y-N.

6    Q.    The next person is Hamza Deeb.  Is he also listed on this

7    particular document, InfoCom Search No. 32?

8    A.    Yes, No. 2.

9    Q.    The next person after that is Fadel Hamdan.  Same

10   question.  Is he listed?

11   A.    Yes, No. 12.

12   Q.    Okay.  Why don't we go to the general committee section

13   for this particular committee, the Ramallah zakat committee.

14            MR. JONAS:  If we can go first to Baker Wiretap

15   No. 13.

16   Q.    (BY MR. JONAS)  I know we covered this document, but how

17   does this document relate to the Ramallah zakat committee?

18   A.    It just indicates that the HLF's representative for the

19   Ramallah zakat is Abu Tareq, but I don't know who he is so

20   that is why this document is referenced under the general

21   committee to show that they were dealing with them, but not

22   under an individual because I can't say who Abu Tareq is.

23   Q.    You said the HLF representative to the Ramallah zakat

24   committee?

25   A.    The Ramallah zakat committee's representative with whom

1    the HLF is dealing.

2          MR. JONAS:  Let's go to Elbarasse Search No. 22,

3    please, page 4.

4    Q.   (BY MR. JONAS)  I know we have gone to this document a

5    few times, but because you list so many committees I want to

6    go back to it again.

7          With regard to Ramallah zakat committee, what does it

8    say.

9    A.   It says, "All of it is ours."

10   Q.   And by the way, one thing I didn't ask you.  Who is this

11   addressed to?

12   A.   The Defendant Shukri Abu Baker.

13   Q.   Did they discuss the Ramallah zakat committee in the

14   Philadelphia meeting?

15   A.   Yes.

16          MR. JONAS:  If I can have the elmo, please.

17   Q.   (BY MR. JONAS)  Agent Burns, I will try to move this

18   without making you nauseous.  If you can just read what I

19   highlighted.

20   A.   Okay.  It says, "The Ramallah region really has some

21   noticeable activity for our organizations, and particularly

22   the activity of the zakat committee.  We could say that the

23   zakat committee is ours, including its management and

24   officers."

25   Q.   Okay.  I just want to make sure I am clear.  I am told

1    the whole thing might not have been on the screen.  Just read

2    that last line again.

3    A.    "Ramallah zakat committee is ours, including its

4    management and officers."

5    Q.    Okay.  Is that language consistent with Elbarasse Search

6    No. 22, the document from a couple of years earlier regarding

7    the Ramallah zakat committee that we just put on the screen a

8    moment ago?

9    A.    Yes.  That is what they said in 1991 and in 1993.

10   Q.    Okay.  I want to move now to the Islamic Charitable

11   Society of Hebron.

12            MR. JONAS:  If we can put the schedule Payments to

13   ICS Hebron.

14   Q.    (BY MR. JONAS)  And is ICS Hebron sort of a nickname or a

15   shortened name of Islamic Charitable Society of Hebron?

16   A.    It is an easier way so you don't have to say the Islamic

17   charity society of Hebron every time.

18   Q.    So if I refer to it as ICS Hebron, you will know what I

19   am talking about?

20   A.    I will.

21   Q.    With regard to the payments made from the Holy Land

22   Foundation to ICS Hebron, when was the first payment?

23   A.    May 1st, 1991.

24   Q.    Did the Holy Land Foundation continue making payments to

25   ICS Hebron after Hamas was first designated by the United

1    States?

2    A.    Yes.

3    Q.    Did it continue making payments after Hamas was

4    designated as a foreign terrorist organization?

5    A.    Yes.

6    Q.    Who was authorizing those payments?

7    A.    The Defendant Shukri Abu Baker and also Ghassan Elashi.

8    Q.    When is the last payment between the Holy Land Foundation

9    and ICS Hebron?

10   A.    November 1st, 2001.

11   Q.    And how much did the Holy Land Foundation pay in total to

12   the ICS Hebron?

13   A.    We were able to track $1,674,594.

14   Q.    Okay.  If we can just look at the last transaction dated

15   November 1st.  It says HLF Foreign Account No. 5, page 137, if

16   I am reading that right.

17           MR. JONAS:  Can you pull that up?  HLF Foreign

18   Account No. 5, page 137.

19   Q.    (BY MR. JONAS)  Agent Burns, this part is in Arabic?

20   A.    It is.

21           MR. JONAS:  Can you scroll to the next page and look

22   for the English?

23   Q.    (BY MR. JONAS)  Is this the transaction that you just

24   referred to, the last transaction on that schedule?

25   A.    That is correct.

1   Q.   Who is this from?

2   A.   It is from the HLF's foreign bank account to the Islamic

3   Charity Society in Hebron.

4   Q.   On the payment schedule to ICS Hebron, for this

5   transaction this is the only document.  Were you able to find

6   anything else supporting this transaction besides this foreign

7   bank account record?

8   A.   No.  And just to be clear, because we have had several

9   instances like this, in the domestic bank records I did not

10   find anything to indicate anything else about this

11   transaction.  I and a team of IRS agents looked through the

12   search warrant material and did not locate documentation

13   surrounding this transaction.  A lot of their paperwork, it

14   was very voluminous and quite confusing, but this is what we

15   found.

16   Q.   Okay.

17        MR. JONAS:  If we can go to the ICS Hebron Summary

18   Schedule.

19   Q.   (BY MR. JONAS)  We have a lot of names on this schedule,

20   Agent Burns --

21   A.   Yes.

22   Q.   -- connecting to ICS Hebron.  We will try to go through

23   them one at a time, but I am assuming there is a lot of the

24   same documentation covering multiple names.

25   A.   Yes; a lot of the documents we have already talked about

1    and the videos.

2    Q.   Okay.  So we may be able to go through this at a fairly

3    quick pace.  Starting with the first one Abdel Khaleq Natshe,

4    let's look at what you have listed connecting him to the

5    committee.

6             MR. JONAS:  Starting with InfoCom Search No. 51,

7    page 11.

8    Q.   (BY MR. JONAS)  What is this document?

9    A.   This is that 1991 report from the Defendant Shukri Abu

10   Baker regarding his tip trip to the Palestinian territories in

11   1991.

12   Q.   And does he identify who he met?

13   A.   Yes.  He says, "In the Hebron area," which is what we are

14   discussing, "I visited the Islamic Charitable Society and met

15   those in charge in it, including Mr. 'Abd'al'Khaliq al-Natshah

16   and Kamal al-Tamimi."

17   Q.   Okay.  Abdel Khaleq Natshe is the first name I asked you.

18   Is Kamal al-Tamimi also on the list?

19   A.   Yes.  He is No. 4 on the summary chart.

20             MR. JONAS:  Let's go to InfoCom search 89, page 12,

21   please.

22   Q.   (BY MR. JONAS)  What is this document?

23   A.   This is the second page of a translation of an Arabic

24   project report.

25   Q.   Is this somehow -- How do you connect this to Abdel

1    Khaleq Natshe?

2    A.    The project report is signed at the bottom by a Abdel

3    Khaliq al-Natsheh, the committee's secretary.

4              MR. JONAS:  If we can go to Marzook Phonebook, page

5    45.

6    Q.   (BY MR. JONAS)  What to you see there related to this

7    particular schedule?

8    A.    The last name on this page is this individual Abdel

9    Khaleq al-Natsheh with his phone number.

10              MR. JONAS:  And let's go to InfoCom Search No. 25,

11    page 111.

12    Q.   (BY MR. JONAS)  Can you remind us what InfoCom Search

13    No. 25 is?

14    A.    This is the list of the deportees taken from InfoCom,

15    which was the business of the Defendant Ghassan Elashi.  And

16    so in this list we have the names of the deportees.  And

17    specifically, the first one on this page is this individual

18    'Abd'al'Khaliq Natshah.  And just to be clear, these

19    individuals generally have four to five names, so you may have

20    to look -- In this instance he is referred to as

21    'Abd-al-Khaliq Hasan Shathili al'Natshah, although I probably

22    pronounced that wrong, but we are using Abdel Khaleq Natshe.

23    It is an easier way to write it.

24              MR. JONAS:  I want to go back to Elbarasse Search

25    No. 22, if we can pull that up.

```
1    Q.   (BY MR. JONAS)  Is his name mentioned anywhere in this

2    document?

3              MR. JONAS:  Going to page 5, please.

4              THE WITNESS:  Yes.

5              MR. JONAS:  If we can enlarge the middle section.

6    Q.   (BY MR. JONAS)  Agent Burns, this is a page of the

7    document I don't think you have referred to yet, and as a

8    separate category that says "to the charitable organizations."

9    Does this divide up to the zakat committee and charitable

10   organizations?

11   A.   Yes.

12   Q.   What is the first one underneath "charitable

13   organizations"?

14   A.   Again, this is the letter to Shukri from 1991, just

15   because it looks different on this page, under charitable

16   organizations the first one listed the Islamic Charity

17   Society, Hebron.  "All of it is ours it has Adnan, Abdel

18   Khalik Al Natshe, and Hashm El Natshe, our people."

19   Q.   Is Hashem El Natshe on your schedule?

20   A.   Yes, and so is Adna, both of them.

21   Q.   Do you know if they are related?

22   A.   I believe that they are, but I don't know if they are

23   cousins or what.  From the same general family, but it is a

24   large family.

25   Q.   Okay.
```

1    A.    But Adnan is Adnan Masouwda.  So Abdul Khaleq Natshe is

2    No. 1 on the summary chart.  Hashm Natshe is No. 2 on the

3    summary chart.  And Adnan Masouwda is No. 5 on the summary

4    chart.

5    Q.    Let's talk about Hashem.  Besides this document

6    connecting him to the committee --

7              MR. JONAS:  Let's go to InfoCom Search No. 28, page

8    87.

9    Q.    (BY MR. JONAS)  What is this document?

10   A.    This was that list taken from InfoCom, which again was

11   the business of Ghassan Elashi, that list of all the

12   committees with their members and bank information, things

13   like that.  And this is the second page of the list on Islamic

14   Charitable Society of Hebron.

15   Q.    Who does it list here that is on your schedule?

16   A.    It lists No. 2, that is Hashem Sadek Abdel Nabi Al

17   Natasheh, which is No. 2 on the chart, Hashem Natshe, just a

18   shortened version of his name.

19   Q.    And can you tell us their role in the committee if it is

20   listed?

21   A.    Yes.  Here it is vice president.  And then Saleh Salem

22   Abdel Nabi Natsheh is listed as treasurer.  He is listed as

23   No. 7 on the summary chart.  No. 5 on the list -- on the

24   InfoCom list is Adnan Abdel Hafiz Masouda, house director.

25   And he is No. 5.  He was also one of the people referenced as

1  "our people" in that letter to Shukri.  And then No. 8 is Mr.

2  Mohamed Eid Misk, and he is No. 3 on the summary chart.

3  Q.   Okay.  And so we are clear, we have nine people listed in

4  this document but not everyone you have named is on your

5  summary chart.  How come you didn't name everybody in this

6  document on your summary chart?

7  A.   Because there were a number of people with whom the HLF

8  dealt or whose names appeared in multiple sources of the

9  evidence.  Those are the people that we focused on.  And as

10  you can see, there were a number of them.  The other people in

11  comparison just did not appear that frequently.

12  Q.   Okay.  Staying with Hashem Natshe --

13       MR. JONAS:  And if we can pull up the ICS Hebron

14  Account No. 1, the bank account, page 43, please.

15  Q.   (BY MR. JONAS)  Agent Burns, do you see that on the

16  screen?

17  A.   I do.

18  Q.   Okay.  Are you able to make it out?

19  A.   No.

20       MR. JONAS:  Next page, please.  And a translation of

21  that document.

22       THE WITNESS:  That looks like a travel document or

23  an identification document.  It gives an I.D. number, and then

24  it shows the person's name, which is -- The first name is

25  Hashim under personal name.  Father's name would be Sadiq.

1    Family name last name Al-Nitshah.  It is just a variation

2    phonetically in the spelling.

3    Q.   So does this document connect Hashem Natshe to the IC

4    Hebron bank account?

5    A.   Yes.

6              MR. JONAS:  Let's go to Baker Wiretap No. 15.

7    Q.   (BY MR. JONAS)  What is this document?

8    A.   This is a fax received on April 18th, 1999 regarding the

9    HLF library in Hebron.

10   Q.   The HLF library?

11   A.   Well, it was a library funded by the HLF in Hebron

12   through the Islamic Charitable Society of Hebron.

13   Q.   How do you connect -- I am sorry.  Say that again.  It

14   was funded through?

15   A.   The Islamic Charitable Society.

16   Q.   Does this document referencing that?

17   A.   Yes.

18   Q.   Does this document identify any of the people on your

19   chart?

20   A.   It does.

21   Q.   Who?

22   A.   Hashem Natshe is identified in this document as well as

23   Mohammed Eid Misk.  I believe the second page here he is

24   listed Hashem Natshe as the -- listed as the chairman of the

25   chamber of commerce, but if you go to the next page it has him

1    listed as the president of the Society, the Islamic Charitable

2    Society.  And scrolling on he is referenced again.  Keep

3    scrolling.

4        And then it identifies in the last sentence that the

5    appointed educator at the library as the library director

6    would be Eid Misk, who is Mohamed Eid Misk, who is No. 3 on

7    this chart.

8    Q.   Does this reference the opening of the library?

9    A.   It does.

10   Q.   I thought I saw the name the Defendant Shukri Abu Baker

11   in there.

12   A.   Yes.

13   Q.   What was his connection for this document?

14   A.   He delivered a speech over the telephone at the opening

15   of the HLF -- or of the library in Hebron.

16   Q.   Did you see any videotapes of the opening of the library?

17   A.   Yes.

18   Q.   Where did that tape come from?

19   A.   InfoCom.

20   Q.   How many copies of the tape did the FBI come across?

21   A.   Two.

22   Q.   Is there anything else on the tape besides the opening of

23   the library?

24   A.   Yes.

25   Q.   What?

1      MS. MORENO:  Your Honor, may we approach, please?

2      THE COURT:  Yes.

3      (The following was had outside the presence and

4      hearing of the jury.)

5      MS. MORENO:  I need to be excused.  The problem is I

6  can't leave my client unrepresented, so I would ask the Court

7  to take an early break now, but I really have got to go.

8      THE COURT:  All right.

9      MS. MORENO:  Sorry.

10     THE COURT:  Go ahead and go, and then we need to

11  discuss an issue anyway on this question.  Are you planning on

12  going over every one of these charts and everybody's names?

13     MR. JONAS:  I am hoping I can speed it along as I

14  move along.

15     THE COURT:  I don't see the point in going over

16  every name.  You have covered six charts and you have six left

17  and over 20 names, and I don't see the point of that.  I mean,

18  I think you are entitled to get into amounts, things that show

19  control.  I mean, I think you have made your point, but I

20  don't see the point of every name.  They are in evidence -- I

21  will give you a chance in a minute.  They are in evidence, and

22  you have got the document.  You have made your point where the

23  jury can go and find -- Go ahead.

24     MR. JONAS:  The comment Your Honor just made, you

25  made your point actually is a good one, because speaking to my

1    colleagues, there is a difference of opinion as to when I made

2    my point.

3              THE COURT:  You made it.

4              MR. JONAS:  I am very mindful of boring this jury.

5    There are -- Part of what I am doing, though, is laying the

6    foundation for a witness later on, for Avi.  But I will

7    absolutely move faster.  There are some points where I need to

8    stop because it is not the same thing.

9              THE COURT:  Yes.  And I will let you use your own

10   judgment as to what you need to get in.  And I know you

11   probably want to cover some for each committee, but we just

12   don't need to go over every name for every committee.  There

13   is 20 plus left.  That is too much time.  We don't need to do

14   that.

15             MR. JONAS:  Yes, sir.  I fully appreciate that.

16             THE COURT:  Find some way --

17             MR. JONAS:  I will absolutely do that.

18             THE COURT:  Okay.  All right.

19        Anything else while we are up here?

20             MR. JONAS:  If I can raise something, since we are

21   up here?

22             THE COURT:  Let me let the jury go.

23        Members of the jury, we are going to take our afternoon

24   break.  Be back at ten after.

25             (Whereupon, the jury left the courtroom.)

1          MR. JONAS:  I mentioned this to Jennifer before we

2     started up this afternoon, and Ms. Duncan, there were to two

3     mistakes on my list, the courtesy list.  One Ashqar --

4          THE COURT:  For this witness?

5          MR. JONAS:  For this witness.  Ashqar Search No. 7,

6     that was objected to.  I realize it is supposed to be Ashqar

7     Wiretap No. 7 instead of Search No. 7.

8          THE COURT:  Okay.

9          MR. JONAS:  The other one is HLF Search No. 102

10    wasn't on my list.  That was inadvertently left off.  It is on

11    Agent Burns' schedule.  In fact, I did pull up a document from

12    there already.  I don't know if the Defense wants to raise

13    additional objections besides the ones that currently covered.

14         MS. DUNCAN:  As to HLF Search No. 102, we don't have

15    additional objections.  I haven't looked at Ashqar Wiretap No.

16    7.  I haven't looked at that, Your Honor.

17         THE COURT:  Take a look at that one.  And then what

18    is the other one?

19         MR. JONAS:  HLF Search No. 102, which I believe is

20    written down right there.

21         THE COURT:  Okay.

22         MS. HOLLANDER:  I have one other thing.

23         THE COURT:  You don't have any additional

24    objections?

25         MS. DUNCAN:  No.  And I will look at Ashqar Search

1   No. 7.

2            THE COURT:  You have the general objections on

3   those.  Those are overruled, and HLF Search No. 102 is

4   admitted, then.

5            MR. JONAS:  I apologize, Your Honor.

6            THE COURT:  That is all right.  We have all made

7   mistakes at this trial.

8        It is something we have to deal with?

9            MS. HOLLANDER:  This video they are about to play is

10  one we talked about this morning that shows the American flag

11  being stomped on.

12           THE COURT:  Burned and --

13           MS. HOLLANDER:  We would like Your Honor to look at

14  it so that you can make a ruling on whether you think under

15  403 whether it should come in.

16           THE COURT:  I made that ruling.  You described it

17  and you described it in your motions, and it was found there

18  at the HLF premises, so I have already made my ruling on that.

19  It is within the HLF material at InfoCom.

20       And one other thing, and this is on the summary witness.

21  I think one question that you are asking is improper when you

22  are asking her is consistent with this.  That is more into

23  argument.

24       You can certainly direct her to where you find the names

25  and documents, because there are so many documents.  I think

1    that is helpful to the jury.  But once you start saying, "Is

2    this consistent with this," you are really getting into

3    argument and she becomes a summary argument witness, and is

4    what the Court has spoken against.

5              MR. JONAS:  I will make sure I don't do it again.

6              THE COURT:  Avoid that.

7                   (Brief recess.)

8              THE COURT:  I understand we need a bench conference.

9              MS. CADEDDU:  Yes.

10             (The following was had at the bench.)

11             MS. CADEDDU:  Your Honor, I think at the end of the

12   bench conference before you indicated that you believe that

13   the questions that Mr. Jonas was propounding to Agent Burns

14   about whether something was consistent with something else

15   were improper, and so we would ask the Court to strike those

16   questions and answers, and to instruct the jury to disregard

17   those as being improper.

18             THE COURT:  Okay.  And I will deny that request.  I

19   don't remember how many of them there were.  I remember one at

20   the end, and I don't even remember what it was about, so I

21   will deny that request.

22             MS. DUNCAN:  I had said I would look at Ashqar

23   Wiretap No. 7, and we would state our standard objections as

24   to hearsay.

25             THE COURT:  What is that?

1          MR. JONAS:  Honestly I have to look.  I am sorry.

2          THE COURT:  Do you remember?

3          MS. DUNCAN:  I looked at it very, very quickly.  It

4    is call between Jamil Hamami and Ashqar, I think.

5          MR. JONAS:  It is on the Islamic Science and Culture

6    schedule, part of connecting Jamil Hamami to everything we

7    have been connecting him along with, the Islamic Science and

8    Culture Committee to Hamas.  It is all in the same vain.

9          MS. HOLLANDER:  Which reminds me, there are also

10   some Hamami 302s you are looking at.

11         THE COURT:  Right.

12         MS. HOLLANDER:  We will need those before cross,

13   particularly to see if he said anything about HLF and its

14   relationship to Hamas.

15         THE COURT:  Before cross on this witness?

16         MS. HOLLANDER:  Yes.

17         THE COURT:  How much longer do you anticipate on

18   this witness?

19         MR. JONAS:  I think I will take to the end of the

20   day.  If I can ask Ms. Moreno a question on that.  You had

21   asked me about objecting if we break an hour early.

22         MS. MORENO:  However the Court can accommodate me.

23   I am trying really hard, Your Honor.

24         THE COURT:  Let's see if we can make it until about

25   4:30 or so.  I would like to work at least an hour.  That will

1    give us a little over an hour.

2              MR. JONAS:  I am not going to pass her today.

3              MS. HOLLANDER:  You aren't anyway?

4              MR. JONAS:  Because we are breaking early, and even

5    speeding things up I don't think I will pass her today, but I

6    think it will be sometime mid morning.  So that we are not

7    using a chit, at the request of the Defense they ask that we

8    put Robert McBrien from OFAC on tomorrow, because Mr. Cline is

9    only going to be here tomorrow and he is going to be the one

10   to cross him.  So tomorrow we will have to stop Agent Burns

11   and put Mr. McBrien on.

12             MS. HOLLANDER:  That is one for us.

13             MS. CADEDDU:  There is a chit list?

14             MR. JONAS:  You guys let us know whenever you want

15   to put him on.

16             MS. CADEDDU:  Can we talk to John about that?

17             MR. JONAS:  Sure.

18             MS. DUNCAN:  Do you guys have a sense of how long he

19   will be on direct?

20             MR. JONAS:  Not long.  It is Betsy's witness.  Maybe

21   half an hour, 45 minutes.

22             MS. HOLLANDER:  As long as we can finish him

23   tomorrow.

24             MR. JONAS:  So we might want to wait until later in

25   the day.  Whatever you want to do.

1    MS. DUNCAN:  We will talk to John.

2    (The following was had in open court.)

3    THE COURT:  Go ahead and bring the jury in.

4    (Whereupon, the jury entered the courtroom.)

5  Q.  (BY MR. JONAS)  Agent Burns, I was asking you about a

6  videotape.  There are two copies of the tape found at InfoCom?

7  A.   Yes.

8  Q.   This pertains to the opening of the library at Hebron?

9  A.   Yes.

10  Q.   That the HLF supported?

11  A.   Yes.

12  Q.   Besides opening of the library, is there something else

13  on the tape?

14  A.   Yes.

15  Q.   Before you play the tape, can you briefly describe what

16  it is?

17  A.   Yes.  Prior to the opening of the Hebron library, there

18  are clips from a demonstration on the videotape.  They were on

19  there as it was -- I mean, that is the way we seized it.

20  Q.   Is it one demonstration, or does it appear to be multiple

21  demonstrations?

22  A.   I wasn't there so I can't say that it wasn't different

23  parts of one demonstration, but there are several clips of

24  different crowds demonstrating.

25  Q.   Is it the same -- Are these demonstrations on both copies

1    of the tape that was found by the FBI?

2    A.    Yes.  The tapes were identical.

3    Q.    Was there a note on one of the tapes?

4    A.    There was.

5    Q.    What was that note?  What did it say?

6    A.    The note was a handwritten note, and it said something to

7    the effect of, "Please make me two copies of this tape.  There

8    is a demonstration at the beginning.  I don't want it."

9    Q.    Was that note in English or Arabic?

10   A.    I am not sure.  A translator brought it to my attention,

11   so I don't know if I saw a translation or if I saw what was

12   written on a note.

13   Q.    Okay.  And then just so I am clear, it goes from the

14   demonstrations on the videotape into the opening of the Hebron

15   library?

16   A.    That is correct.

17   Q.    Are we seeing the whole tape this morning, or this

18   afternoon?

19   A.    No.  We are seeing clips of the demonstrations that

20   preceded the opening of the library, and then a small clip

21   from the opening of the library.

22   Q.    Okay.  And again, so we are clear, you are saying

23   demonstrations that preceded the demonstration of the opening

24   of the library.

25   A.    On the tape.

1    Q.   Do you know if those demonstrations actually occurred in

2    the front of the library?

3    A.   I don't know.

4    Q.   Or the time the library was opened?

5    A.   I don't know.

6    Q.   Did the FBI alter this tape in any way?

7    A.   No, other than to put the translations on it so we can

8    see what is being said.

9    Q.   And on the part of the library portion, do we see any of

10   the ICS Hebron representatives that are in your chart?

11   A.   Yes.

12        MR. JONAS:  If we can play InfoCom Search No. 68,

13   please.

14        (Whereupon, InfoCom Search No. 68 was played, while

15   questions were propounded.)

16   Q.   (BY MR. JONAS)  Agent Burns, do you see the headbands

17   around these individuals?

18   A.   Yes.

19   Q.   Have we seen those same headbands before in other videos?

20   A.   Yes.

21   Q.   Those green headbands that they are wearing that you said

22   we have seen earlier, in what context were the people wearing

23   it where we have seen it earlier?

24   A.   To symbolize Hamas.

25   Q.   Agent Burns, the individual on the left is wearing a red

1   headband.  Do you know if that is a Hamas headband?  I know it

2   is off the screen now.  Were you able to see if that is a

3   Hamas headband, or is Hamas' color red?

4   A.    Hamas' color is green.

5   Q.    Do you know if there were any other parties whose colors

6   are red?

7   A.    I can't see the headband well enough to describe it, so I

8   wouldn't want to discuss that.

9   Q.    Okay.  Agent Burns, do you see the way it jumped

10  sometimes, kind of spliced out and spliced in?

11  A.    Yes.

12  Q.    Did the FBI do that?

13  A.    No.  On the original tape it did like that.  And that is

14  what I was saying.  I couldn't tell if it was from different

15  clips of the same protest or different protests themselves.

16      Then the last -- In the last clip at the end you could

17  see them holding a photograph in the background, and that was

18  of the bombmaker Yehia Ayyash.

19  Q.    Is the individual, the name on the screen, Hashim

20  al-Natshe, is his name on the list?

21  A.    Yes, Hashim Natshe, the second on the Islamic Charitable

22  Society chart.

23           MR. JONAS:  If we can get back to the chart the

24  Islamic Charitable Society of Hebron summary.

25  Q.    (BY MR. JONAS)  Agent Burns, there are two names on here

1   Mohamed Eid Misk and Kamal Al Tamimi.  Did these two

2   individuals have two jobs?

3   A.   Yes.

4   Q.   Could you explain that?

5   A.   Yes.  Kamal Al Tamimi also was the HLF's representative

6   in the Hebron area, and Mohamed Eid Misk was the administrator

7   of the library, and he was on the HLF's payroll.

8   Q.   And is that information coming from documents that are

9   referenced on this list?

10  A.   Yes.

11  Q.   We discussed an InfoCom Search No. 25 exhibit.  What was

12  that again?

13  A.   That was the list of deportees taken from InfoCom, the

14  business of the Defendant Ghassan Elashi.

15  Q.   Was Kamal Tamimi's name on that list?

16  A.   Yes.

17  Q.   There is a bunch of names on here, and I am going to jump

18  to the general committee section.  Just so we are clear, the

19  people whose names are on here, if we turn to page 3 of the

20  chart, in looking at your chart if someone just went to those

21  exhibits listed under their names would they find connections

22  between these individuals and the committee and HLF, or Hamas

23  if applicable?

24  A.   Yes.  Considering we were just discussing a very few of

25  these, one would, to see a better picture, would go to and see

1    all the exhibits referenced under these individuals and look

2    at those exhibits to get a broader picture than just the

3    highlights that we are looking at today.

4    Q.    Okay.

5    A.    Excuse me.  As well, not to forget to look at the

6    financial schedule and the underlying exhibits for the

7    financial schedules, because those underlying exhibits tend to

8    relate to the committee and these individuals as well.

9    Q.    Okay.  Have which seen any of these people on the tent

10   video?

11   A.    Yes.

12   Q.    Who?

13   A.    Azzam Halsab, the eighth person on the chart.

14   Q.    Okay.  And is there --

15         MR. JONAS:  Elbarasse Search No. 22 which lists out

16   the committees, if we can pull that up real quick.

17   Q.    (BY MR. JONAS)  Is there anyone on this Islamic

18   Charitable Society of Hebron committee listed?

19   A.    On this letter to Shukri, page five, the next page, if

20   you look under Young Men Muslim Association, No. 5, which is

21   affiliated with the Islamic Charitable Society of Hebron --

22   Excuse me.  No. 3.  The Young Men's Muslim Association which

23   is affiliated with the Islamic Charitable Society of Hebron,

24   it identifies "brother Talal Sadr as one of our people," and

25   he is the last person on this Islamic Charitable Society of

1    Hebron chart.

2    Q.   The connection between the Young Men's Muslim Association

3    and the Islamic Charitable Society of Hebron, is that

4    connection contained within the documents that support this

5    chart?

6    A.   Yes.  You can see it on some exhibits that are referenced

7    specifically in here.  Money was sent to the Young Muslim

8    Association through the Islamic Charitable Society of Hebron

9    on several occasions.

10   Q.   Okay.  And what does it say about the Islamic Charitable

11   Society of Hebron on this document?

12   A.   "All of it is ours.  It has Abdel Khalik Al Natshe and

13   Hashem Al Natshe, our people."

14   Q.   Do they discuss the ICS Hebron committee in Philadelphia?

15   A.   Yes.

16           MR. JONAS:  If I can get the elmo real quick.

17   Philly Meeting No. 13.

18   Q.   (BY MR. JONAS)  Agent Burns, if you can read what I

19   highlighted.

20   A.   "In Hebron, Hebron is a city, is a place where we

21   consider that we have a good presence and weight as Islamic

22   organizations such as the Islamic Charitable Society."

23   Q.   Okay.  Let's move to the next committee.  Nablus zakat

24   committee.

25   A.   Okay.

Q.   And it is called Payments to the Nablus zakat committee

chart.   Okay.   Agent Burns what chart is this?

A.   I am sorry?

Q.   What chart is this on the screen now?

A.   Payments to the Nablus zakat committee.

Q.   When was the first payment made to the Nablus zakat

committee made by the HLF?

A.   May 1st, 1991.

Q.   Did the HLF continue to make payments to the Nablus zakat

committee after Hamas was designated as the terrorist

organization?

A.   Yes.

Q.   And it goes to the second designation as an FTO.   Same

question.

A.   That is correct; they did.

Q.   Who was making the payments -- Who is authorizing the

payments to the Nablus zakat committee?

A.   Defendant Shukri Abu Baker, Ghassan Elashi, and several

other HLF employees.

Q.   Okay.

     MR. JONAS:   Go to the last page.

Q.   (BY MR. JONAS)   What is the date of the last payment to

the Nablus zakat committee?

A.   October 11th, 2001.

Q.   And how much was paid in total from the HLF to the Nablus

1  zakat committee?

2  A.   We tracked $475,715.

3        MR. JONAS:  If we can put on the screen the chart

4  Nablus Zakat Summary.

5  Q.   (BY MR. JONAS)  Agent Burns, there is four individuals on

6  this one, and we are not going to hit them all but I do want

7  to talk about the first one, Hamad Bitawi.

8  A.   Okay.

9  Q.   Were there any pictures of Hamad Bitawi seized from the

10 Holy Land Foundation?

11 A.   Yes.

12 Q.   Do the pictures identify him as Hamad Bitawi?

13 A.   Some of them do.

14        MR. JONAS:  If we can put HLF Search No. 101 on the

15 screen, and go to the second picture, please.

16 Q.   (BY MR. JONAS)  Is there a translation of the document

17 and identification of the individuals in this picture

18 somewhere in this exhibit?

19 A.   There are several pictures.  Hamad Bitawi is in the black

20 the white hat and the long white beard.  If you go back to the

21 previous picture, you can recognize him from that tent video

22 that we saw.  He is the second one from the left.  We saw him

23 on the tent video.  But in one of these pictures on the back

24 of the picture he is identified.

25 Q.   Okay.

1    MR. JONAS:  If we can go to the translation.

2    Q.  (BY MR. JONAS)  Does that identify him?

3    A.  It is probably the next one.  There.

4    Q.  Okay.  Is there another picture of him seized from the

5    Holy Land Foundation?

6    A.  Yes, I believe from the computers.

7    Q.  When you say you believe from the computers, what do you

8    mean?

9    A.  Items that were downloaded off of the HLF computers that

10   were seized during the search warrants.

11   MR. JONAS:  If we can put HLF Search No. 131 on the

12   screen, please.

13   Q.  (BY MR. JONAS)  Is that Hamed Bitawi?

14   A.  It is.

15   Q.  Is there writing on this that you have seen from the

16   downloaded picture that is kind of whitewashed out of this

17   picture because it is kind of bright?

18   A.  Yes.  When you are looking at the actual image from the

19   computer on the disk, the word Hamas in English is behind his

20   head, but when printed out the ink is too light or something

21   and it will not print out, so the only way you can see that is

22   by looking at the actual image from the computer.  But you can

23   still see the gun in his hand and I guess the Quran in the

24   other one.

25   Q.  Did we see him in any of the videos we have played today?

A.    In the tent video.

Q.    Okay.  Is he praised or referenced in any other videos we have seen?

A.    He has been praised by Hamas leader Khalid Mishal in the 1992 MAYA conference and also a videotape that we haven't played wherein he discusses the HLF.

Q.    Okay.

      MS. HOLLANDER:  Is there a date for this picture?

Q.    (BY MR. JONAS)  Do you know the date of the picture, the date the picture was taken.

A.    I don't.  We would have to ask the computer people what date the image was created.  I don't know.

      MR. JONAS:  If we can go to Baker Wiretap No. 22.

Q.    (BY MR. JONAS)  Staying with Hamed Bitawi, is he mentioned in this document?  Withdrawn.  What is this document?

A.    This is a flier regarding an HLF fundraising event or events.  One side of it is the English discussing one evening I guess with speakers, and then the other side is in Arabic discussing another evening with other speakers.

Q.    Is Hamed Bitawi on the other English side?

A.    No.

Q.    What does the translation say with regard to Hamed Bitawi?

A.    It indicates during the Ramadan program that Sheikh Hamed

1   Bitawi would participate, and it is a Holy Land Foundation

2   teleconference.

3   Q.   I am holding up HLF Search No. 87, which is the overseas

4   speakers list.  Is Hamed Bitawi on the overseas speakers list?

5   A.   He is, No. 27.

6   Q.   All right.  Hamad Bitawi is there any evidence listed on

7   this chart that connects him to the Nablus zakat committee?

8   A.   Yes.

9        MR. JONAS:  Nablus Zakat Account No. 2, page 1.

10       THE WITNESS:  We need to note the picture, because

11  this is the first document -- These are the bank records, and

12  this is his identification document.  You can see his face.

13  Because his name, as I stated before, they have very long

14  names, and so his name, as noted on the translation, is just a

15  portion of his name, and you will see what I am talking about,

16  so that is why I wanted us to look at the picture.

17  Q.   (BY MR. JONAS)  These are the bank accounts for?

18  A.   Nablus zakat.

19  Q.   And on the translation do we see his name?

20  A.   You see part of his name.  You see Hamid Sulaiman Khdeir.

21  You don't see the last name Bitawi.  You see it later on in

22  the bank records, but not here.

23  Q.   Okay.  Do they discuss Nablus in the Philadelphia

24  meeting?

25  A.   Yes.

1   Q.   On Elbarasse Search No. 22, which is that letter to

2   Shukri Baker listing out committees, where it says, "Some of

3   it is ours," "all of it is ours," "guaranteed," is the Nablus

4   zakat committee listed on that document?

5   A.   It is.

6   Q.   What does it say for that document?

7              MR. JONAS:  Just pull it up.  I am sorry.  Elbarasse

8   Search No. 22.  If we can put that on the screen, please.

9              THE WITNESS:  At this point in '91 they say, "We

10  have nobody in it.  His wife is one of us.  We have a

11  relationship with Haj Yaish."

12             MR. JONAS:  If I can get the elmo, please.

13  Q.   (BY MR. JONAS)  Again I am going to refer back to

14  Philadelphia Meeting No. 13, which occurred how long after

15  Elbarasse Search No. 22?

16  A.   A couple of years.

17  Q.   And do you see where it is marked Nablus zakat committee?

18  A.   Yes.

19  Q.   Reading from I guess -- I am looking for where the

20  sentence starts.  Do you see it says, "In the West"?  Do you

21  see that?

22  A.   I am looking for it, but there is so little print on --

23  Q.   Start from there.  Do you see, "In the West"?  Do you

24  want me to hand it to you?  Would it be easier?

25  A.   No, it is okay.  "In the West Bank in the north region,

which includes Nablus, Jenin, Qalqilia, and Al Biqa'a

[valley], there was relatively old activity such as Nablus

zakat committee in Nablus, which was founded in 1976.  It is

very advanced in comparison with the other committees.  For

instance, they have over 1,000 orphans, over 2200 families

which are sponsored monthly.  They have investment activities

and other activities.  But when we speak about it as a zakat

committee, we tie it to us."

Q.    Okay.  Let's move on to another committee.  Islamic

Science and Culture Committee.

        MR. JONAS:  If we can pull up Payments to Islamic

Science and Culture on the screen, please.

Q.    (BY MR. JONAS)  Agent Burns, do you see that?

A.    I do.

Q.    What is the date of the first payment to the Islamic

Science and Culture Committee by the HLF?

A.    May 1st, 1991.

Q.    And if we can scroll through this document, do they

continue making payments after Hamas was first designated as a

specially designated terrorist?

A.    Yes.

Q.    Did they continue making payments after Hamas was

designated as a foreign terrorist organization?

A.    No, they stopped after July 18th, 1996.

Q.    How much in total did the HLF pay the Islamic Science and

1    Culture Committee?

2    A.    $485,468 that we identified.

3          MR. JONAS:  If we can go to the Islamic Science and

4    Culture Committee Summary, please.

5    Q.    (BY MR. JONAS)  There are four names here, and the first

6    name is Jamil Hamami, who there has been quite a bit of

7    testimony about.  Was there a videotape that was seized that

8    shows Jamil Hamami?

9    A.    Yes.

10   Q.    Were there several?

11   A.    Yes.

12         MR. JONAS:  All right.  Let's play InfoCom Search

13   No. 67.

14         (Whereupon, InfoCom Search No. 67 was played, while

15            questions were propounded.)

16   Q.    (BY MR. JONAS)  Is Jamil Hamami in this screen?

17   A.    He is.  He is the individual on the right of the screen

18   with the long beard.

19   Q.    Do you know when this video was taken?

20   A.    This would have been late '80s, early '90s.

21   Q.    The picture on Demonstrative No. 17 of Jamil Hamami, if

22   you can see it, shows him with a shorter beard?

23   A.    Yes.

24   Q.    So the fact he has a dark beard in this video, does that

25   help approximate the date?

1   A.    It does.  And let me modify my statement, because this

2   was when the funding of the al-Noman School was going on.

3   This would have been early '90s.

4   Q.    Who is brother Abu Ibrahim?

5   A.    That would be the Defendant Mohammad El-Mezain.

6   Q.    And brother Shukri?

7   A.    That is brother Shukri Abu Baker.  And in looking at

8   this, you can determine -- you can even more narrow down the

9   date, because it shows that the Holy Land Foundation had

10  already changed its name and moved to Dallas, so that would

11  mean that it was at least 1992.

12  Q.    Okay.  Agent Burns, were there discussions about Jamil

13  Hamami at the Philadelphia conference?

14  A.    Yes.

15  Q.    Specifically him?

16  A.    Yes.

17  Q.    Okay.

18           MR. JONAS:  So I don't have to keep going back to

19  the elmo and moving the document around, I am going to try to

20  pull up the transcript.

21      Can We have page three, please?  Can you enlarge the

22  center?

23  Q.    (BY MR. JONAS)  Agent Burns, do you see where it says,

24  "This is one of the problems which are not solved"?

25  A.    Yes.

1    Q.   Can you read from there?

2    A.   It says, "This is one of the problems which are not

3    solved, the affiliation of the organization with exposed

4    people, so when a problem happens with a man, a problem

5    happens with the organization.  I mean, the Islamic Sciences

6    and Culture Society used to have a research center which was

7    the nucleus for a huge research center until the person in

8    charge Sheik Jamil Hamami was arrested and this became an

9    obstacle and a hindrance for the development of that project.

10   We have a school and a kindergarten and some orphan

11   sponsorships in that region."

12   Q.   Okay.  Did you come across anything in the search warrant

13   material connecting Jamil Hamami to Hamas?

14   A.   Yes.

15        MR. JONAS:  If we can go to HLF Search No. 108, page

16   13.

17   Q.   (BY MR. JONAS)  What is this document?

18   A.   This is a Middle East Affairs Journal taken from the HLF

19   offices reporting on Hamas.

20   Q.   What does it say about Jamil Hamami?

21   A.   In the paragraph next to the last at the bottom it says,

22   "Yassin"--who is the Hamas founder Sheikh Ahmed Yassin--"in

23   consultation with the six other founding members managed the

24   complexities of administers Hamas' affairs.  Prior to his 1989

25   arrest, Yassin was al-Mas'ul al'Am (director general) of the

1   Movement.  He assigned Shaykh Jamil Hamami, a brotherhood

2   activist in the West Bank, to establish with his colleagues a

3   branch for Hamas there.  Hamami thus became the liaison

4   between the leadership in Gaza on the one hand and the Hamas

5   command in the West Bank and the brotherhood command in Jordan

6   on the other."

7   Q.    Okay.  Is the Islamic Science and Culture Committee also

8   referenced in Elbarasse Search No. 22, the letter we have gone

9   to a few times?

10  A.    Yes.

11        MR. JONAS:  If we can pull that one up real quick,

12  page 5.

13  Q.    (BY MR. JONAS)  And what does this letter to Shukri Baker

14  say about the Islamic Science and Culture Committee?

15  A.    The writer says, "We have three of our people in it."

16  Q.    Okay.  Are you ready to move on to another committee?

17  A.    Yes.  Just to point out, though, that Jamil Hamami we

18  have been discussing him as a Hamas leader.  Just as a

19  reminder --

20        MS. HOLLANDER:  Objection, Your Honor.  I don't

21  think there is a question on the floor.

22        THE COURT:  Sustained.

23  Q.    (BY MR. JONAS)  Agent Burns, let's move to Islamic Relief

24  Committee.

25        MR. JONAS:  If we can get to Payments to Islamic

1    Relief Committee schedule on the screen, please.

2    Q.   (BY MR. JONAS)  And when did the HLF start making

3    payments to the Islamic Relief Committee?

4    A.   April 12, 1991.

5              MR. JONAS:  If we can scroll forward.

6    Q.   (BY MR. JONAS)  Did they make payments after Hamas was

7    first designated as a specially designated terrorist?

8    A.   Yes.

9    Q.   How about after they were designated as a foreign

10   terrorist organization?

11   A.   No.

12   Q.   How much in total did the HLF give the

13   Islamic -- Withdrawn.  What is the date of the last

14   transaction between the HLF and the Islamic Relief Agency?

15   A.   February 15, 1996.

16   Q.   How much in total did the HLF give to the Islamic Relief

17   Committee?

18   A.   $1,430,811.

19             MR. JONAS:  If we can go to the Islamic Relief

20   Committee summary chart, please.

21   Q.   (BY MR. JONAS)  You have got three names on here.  I want

22   to talk to you just about one of them, Jamal Mansour.  He is

23   the name on the far right.

24   A.   Actually there is four names.

25   Q.   Right.  He is still the name on the far right?

```
 1    A.   Yes.

 2    Q.   Have we seen him today, this morning?

 3    A.   Yes.

 4    Q.   Where?

 5    A.   He was in the deportees video in the tent.  He identified

 6    himself as a representative of the Islamic Relief Committee.

 7    Q.   HLF Search No. 70, the tent video?

 8    A.   Yes.

 9         MR. JONAS:  If we can pull up also --

10    Q.   (BY MR. JONAS)  is he referenced in Marzook's phonebook?

11    A.   Yes.

12         MR. JONAS:  If we can pull up Marzook Phonebook,

13    page 52.

14    Q.   (BY MR. JONAS)  Where is that?

15    A.   He is about halfway down, Jamal Mansour.

16         MR. JONAS:  Finally, if we can look at Elbarasse

17    Search No. 24, page 3.

18    Q.   (BY MR. JONAS)  What is this document?

19    A.   This is a list that we looked at a little bit earlier

20    with some of the Hamas leaders' numbers on it, and Jamal

21    Mansour's number, he is the second one listed.

22    Q.   Okay.  Getting back to the committee as a whole, under

23    the general committee column --

24         MR. JONAS:  I want to turn to Elbarasse Search No.

25    18.
```

```
1    Q.   (BY MR. JONAS)  I believe this is a letter you may have

2    testified about in your first testimony.

3    A.   Yes.

4    Q.   Okay.

5         MR. JONAS:  If we can go to the English, please.

6    Q.   (BY MR. JONAS)  What is this document?

7    A.   This is the fax from the Islamic Relief Committee in

8    August of 1992 that was found in the Elbarasse materials,

9    along with some other Marzook documents.

10   Q.   What is this letter asking for?

11   A.   It is asking for money for weapons for jihad.

12        MR. JONAS:  Scroll down, please.

13   Q.   (BY MR. JONAS)  Do you have a copy of the letter before

14   you?

15   A.   I do.

16   Q.   You haven't pulled out your binders in a while.

17   A.   I just have to figure out which binder it is in.

18   Q.   Can you just tell us where within the letter it asks for

19   money for weapons that the Islamic Relief Committee is sending

20   out this letter?

21   A.   Okay.  There are several references in the letter, so

22   just bear with me for a second as I identify the specific

23   paragraphs.

24        If you turn to page 12, there is a portion of it where it

25   talks about the pride of jihad and martyrdom and the Al-Qassam
```

1    Brigades.

2             MS. MORENO:  Where is she reading from?

3    Q.   (BY MR. JONAS)  Can you identify on the screen the

4    portion of the letter?

5    A.    Yes.  Right there, "If we have another source of pride

6    and glory, I cannot but convey to you the people's feelings

7    and joy for the pride of the jihad and martyrdom and for the

8    bearers of the banner of dignity and glory Al-Qassam

9    Brigades."  And it goes on to talk about the paragraph that we

10   read this morning.

11        The next page the first paragraph he says, "Do not rest

12   and do not twinkle until you care about us, and provide us

13   with what helps us of funds and weapons, weapons, weapons, our

14   brothers."

15   Q.    Okay.

16   A.    There are several other references throughout the letter

17   to needing weapons.

18             MR. JONAS:  Okay.  And finally on this committee,

19   let's go to Ashqar Search No. 11 page 3, please.

20   Q.   (BY MR. JONAS)  And does this have any reference to the

21   Islamic Relief Committee?

22   A.    Yes.  It actually has Sulieman Ighbariya, No. 43.  That

23   is one of the individuals on this chart referenced as a leader

24   in the Islamic Relief Committee.

25   Q.    Okay.  Do you see anything else pertaining to the Islamic

1    Relief Committee?

2    A.    I see the Islamic Relief Committee in No. 45, and it is

3    referenced Dubai, but I can't say for certain that that is the

4    same committee.

5    Q.    What is the title of this document, this particular page?

6    A.    "Important phone and fax numbers."

7    Q.    Okay.  Let's move on to another committee.  The Bethlehem

8    Orphan Society.  Did the HLF make payments to the Bethlehem

9    Orphan Society?

10   A.    Yes.

11        MR. JONAS:  If we can pull the Payments to Bethlehem

12   Orphan Society schedule on the screen, please.

13   Q.    (BY MR. JONAS)  And when was the first payment made?

14   A.    June 20th, 1991.

15   Q.    Okay.

16        MR. JONAS:  If we can scroll through this exhibit.

17   Q.    (BY MR. JONAS)  Were there payments made after Hamas was

18   designated as a specially designated terrorist organization?

19   A.    Yes.

20   Q.    How about after Hamas was designated as a foreign

21   terrorist organization?

22   A.    Yes.

23   Q.    Who was making authorizing the payments?

24   A.    The Defendants Shukri Abu Baker and Ghassan Elashi.

25   Q.    When is the date of the last payment?

1    A.    October 23rd, 2001.

2    Q.    A how much in total did the HLF pay to the Bethlehem

3    Orphan Society?

4    A.    Let me just state for clarification purposes, on this

5    chart initially the payments were being made to the Bethlehem

6    zakat committee, and then to the Bethlehem Orphan Care

7    Society, so this is actually two societies.

8    Q.    Okay.

9    A.    And it is $429,006.

10    Q.    Is there a reason why both of them are on one chart?

11    A.    Yes.

12    Q.    And what is that?

13    A.    An individual named Ghassan Harmas was the primary person

14    that the HLF had contact with through the Bethlehem zakat, and

15    in the late '90s he moved to the Bethlehem Orphan Society and

16    so did their money.

17    Q.    Did they continue giving money to the Bethlehem zakat

18    committee after Ghassan Harmas left that organization?

19    A.    I did not identify any payments to the Bethlehem zakat

20    committee after they began paying to the Bethlehem Orphan Care

21    Association.

22    Q.    Was there payments to the Bethlehem Orphan Society prior

23    to Ghassan Harmas going to that organization?

24    A.    No.

25    Q.    So they basically followed him?

A.    Yes.

          MR. JONAS:  If we can go to the Bethlehem Orphan

Society summary schedule.

Q.    (BY MR. JONAS)  Agent Burns, there is only three names on

this one, and one of them is Ghassan Harmas that you just

mentioned, so I want to talk about him for a moment.  Did he

have two jobs?

A.    He did.

Q.    And what were his two jobs?

A.    Well, he was with these committees, as we have talked

about, and he also served as the HLF's representative in

Bethlehem, according to a videotape I have seen.

Q.    Is that referenced in this particular schedule that is on

the screen?

A.    Yes.

          MR. JONAS:  If we can turn to HLF Search No. 109,

page 2, please.  Go back one page, please.

Q.    (BY MR. JONAS)  This is the book that we referenced

several times.  Without going back to it all, is Ghassan

Harmas referenced in this book?

A.    He is.

Q.    InfoCom Search No. 25, the list of deportees taken from

InfoCom, was Ghassan Harmas a deportee, based upon that

document?

A.    Yes.

1    Q.    Okay.  Let's move on to the next committee, the Qalqilya

2    zakat committee.

3              MR. JONAS:  If we can put on the screen the Payments

4    to the Qalqilya Zakat Committee schedule.

5    Q.    (BY MR. JONAS)  Agent Burns, when was the first payment

6    to the Qalqilya zakat committee?

7    A.    February 20th, 1992.

8              MR. JONAS:  If we can scroll through this schedule.

9    Q.    (BY MR. JONAS)  Did they continue making payments after

10   Hamas was designated?

11   A.    They did.

12   Q.    And after Hamas was designated a second time as a foreign

13   terrorist organization?

14   A.    Yes.

15   Q.    Who is authorizing the payments to the Qalqilya zakat

16   committee?

17   A.    The Defendant Shukri Abu Baker, Ghassan Elashi, and

18   several other HLF employees.

19   Q.    What is the date of the last payment?

20   A.    October 11th, 2001.

21   Q.    And by the way, Agent Burns, have a lot of these last

22   payments, not all of them certainly, but a lot of them been in

23   the year 2001; the last payments between the HLF and some of

24   these zakat committees --

25   A.    The final payment?

1    Q.   The final payment.

2    A.   I just wanted to make sure I understood your question.

3    Q.   Yes.

4    A.   Yes.  On a number of these charts that we have been

5    discussing today, the final payments were made in late 2001.

6    Q.   Okay.  Did the HLF continue to do business after 2001?

7    A.   No, they did not.

8    Q.   Does that explain why we don't see anymore payments after

9    that time period?

10   A.   Yes.  They did not exist after then.

11   Q.   How much in total did the HLF pay to the Qalqilya zakat

12   committee?

13   A.   $295,187.

14          MR. JONAS:  If we can go back to Elbarasse Search

15   No. 22, please.

16   Q.   (BY MR. JONAS)  I am not going to ask you any questions

17   about the Qalqilya members, which there are three.  You know

18   what?  Before we do that, I jumped ahead.

19          MR. JONAS:  If we can pull up Qalqilya zakat

20   committee Summary on the screen.

21   Q.   (BY MR. JONAS)  Now you see there are three members of

22   the Qalqilya zakat committee referenced on the schedule?

23   A.   Yes.

24   Q.   I am only going to ask you about the last column, the

25   general committee.  Is Qalqilya zakat committee referenced in

1   Elbarasse Search No. 22?

2   A.   It is.

3           MR. JONAS:   If we can go to that exhibit, please.

4   Q.   (BY MR. JONAS)   Where is it referenced?

5   A.   No. 7, it says, "All of it is ours and it is guaranteed."

6   Q.   Okay.   Let's move to the last schedule, Tulkarem zakat

7   committee.

8           MR. JONAS:   And if we can get on the screen the

9   payments to the Tulkarem zakat committee schedule.

10  Q.   (BY MR. JONAS)   Agent Burns, when was the first payment

11  made to the Tulkarem zakat committee?

12  A.   May 1st, 1991.

13          MR. JONAS:   And if we can scroll through this

14  exhibit, please.

15  Q.   (BY MR. JONAS)   Were there payments made after Hamas was

16  first designated a as specially designated terrorist?

17  A.   Yes.

18  Q.   Payments continue after Hamas was designated as a foreign

19  terrorist organization?

20  A.   Yes.

21  Q.   What is the date of the last payment to the Tulkarem

22  zakat committee?

23  A.   October 25th, 2001.

24  Q.   How much in total did the HLF give the Tulkarem zakat

25  committee?

```
1   A.    We tracked $366,585.

2   Q.    Okay.

3           MR. JONAS:  If we can get on the screen the summary

4   schedule Tulkarem Zakat Committee Summary.

5   Q.    (BY MR. JONAS)  Agent Burns, you have got seven

6   individuals on this schedule.  I am going to ask you about a

7   couple of them.  There is a name Bilal Khamis, the third name.

8   Do you see that?

9   A.    I do.

10          MR. JONAS:  If we can pull up Elbarasse Search

11  No. 22, page 4, please.

12  Q.    (BY MR. JONAS)  And is his name anywhere there?

13  A.    It is -- Under Tulkarem zakat it says, "We have one, Haj

14  Aref El Jayoussi, director of Tulkarem endowments, and Bilal

15  Khamis, a supporter.  The rest are merchants without an

16  inclination."

17  Q.    Okay.

18          MR. JONAS:  Going back to the summary schedule.

19  Q.    (BY MR. JONAS)  Do you see the name Bashar Al Karami?

20  A.    I do.

21  Q.    I stumbled over that for some reason.  Can you pronounce

22  that for me?

23  A.    Al Karami.

24  Q.    Is he one of the deportees, per that InfoCom Search No.

25  25 exhibit?
```

```
1    A.    Yes, that list.

2    Q.    Do you see the last name Abu Samaha?

3    A.    Yes.

4          MR. JONAS:  If we can turn to Ashqar Search No. 3,

5    page 3, please.

6    Q.    (BY MR. JONAS)  Is his name anywhere on the Ashqar list?

7    A.    Yes.  It is down toward the bottom.  This list we have

8    looked at several times.  He is fifth from the bottom.

9          MR. JONAS:  Finally, with regard to the general

10   committee, if we can go to Ashqar Search No. 5, page 20.

11   Q.    (BY MR. JONAS)  Is the Tulkarem zakat committee

12   referenced in this document?

13   A.    It is.

14   Q.    How so?

15   A.    It says, "Two supporters are in it and the rest are

16   dignitaries."

17   Q.    Okay.  Agent Burns, you have identified several

18   individuals in these zakat committees that had two jobs, using

19   the phrase that we have used?  Did the HLF, besides having

20   representatives that you have identified that also worked in

21   some of the zakat committees have representatives who were not

22   affiliated with the zakat committees but that worked for the

23   HLF?

24   A.    Yes.

25   Q.    I just want to ask you about one of them.  Are you
```

```
 1    familiar with a man named Akram Kharoubi?

 2    A.    I am.

 3    Q.    Was he -- Who was he, in relationship to the HLF?

 4    A.    In relationship to the HLF, he was the HLF's

 5    representative in Ramallah for a time.  Prior to that he was

 6    in the United States.

 7    Q.    Is that based upon the documents that you reviewed as

 8    part of this case?

 9    A.    Yes.

10    Q.    Okay.

11          MR. JONAS:  If we can look at Mushtaha Search No. 5.

12    Q.    (BY MR. JONAS)  What is this document?

13    A.    This is a letter from Akram Kharoubi.

14          MR. JONAS:  If we can scroll to the English, please.

15    Q.    (BY MR. JONAS)  What does this document say?

16    A.    It is addressed to the executive committee of Dar

17    al-Hijrah, which is a mosque.  And it is from 1991.  And he is

18    requesting that the mosque -- If you see in the second

19    paragraph, "I propose to the executive committee at Dar

20    al-Hijrah to do the following things which would support the

21    cause of the steadfastness of our Muslim people in the

22    occupied homeland:

23        "1.  Granting permission to place a permanent donation

24    box for the Occupied Land Fund, a charitable organization that

25    is tax exempt."
```

1          And "5.  Soliciting donations on appropriate occasions to

2    support jihad in Palestine."

3          And he signs it in this case "Dr. Akram Kharoubi,

4    chairman of the Islamic Association for Palestine."

5    Q.    Okay.

6    A.    Which is the IAP.

7    Q.    Agent Burns, I am going to show you the meeting summary

8    chart.  We haven't looked at this for a while.  Is Akram

9    Kharoubi's name on here?

10   A.    It is.

11   Q.    Where?

12   A.    He is No. 5.

13   Q.    He is listed as an HLF person?

14   A.    Yes.

15   Q.    It says IAP and PC.

16   A.    Palestine Committee.

17   Q.    It is checked off he is a speaker, so did he -- The

18   transcripts show that he spoke at the Philadelphia meeting?

19   A.    Yes, they do.

20   Q.    Since we are speaking about Philadelphia, let me ask you

21   some questions about that.

22          MS. DUNCAN:  Mr. Jonas, we don't show Mushtaha

23   Search No. 5 in evidence.

24          MR. JONAS:  I apologize.  It is one I missed.

25          I offer it into evidence Mushtaha Search No. 5.

1           MS. DUNCAN:  It wasn't on the list.  Can we have the
2      time to look over it?
3           THE COURT:  Do you have it available where you can
4      show it to them?
5           MS. DUNCAN:  I do have it.  I just haven't looked at
6      it.
7           MR. JONAS:  I apologize, Your Honor, and apologize,
8      Ms. Duncan.  I moved on from there.
9           THE COURT:  Is this what you were just reading from?
10          MR. JONAS:  Yes, sir.  And I offer it into evidence
11     at this time.
12          THE COURT:  Give her a minute, then.
13          MS. DUNCAN:  Your Honor, I am sorry.  Can we just
14     approach briefly?
15          THE COURT:  Sure.  Does somebody have it and can
16     bring it up here?
17          MR. DRATEL:  I can bring it up on a computer.
18          THE COURT:  That is fine.  Bring it up.
19          (The following was had outside the hearing of the
20               jury.)
21          MR. JONAS:  There is a search warrant of Mushtaha's
22     house that was done a couple of years prior to -- While he
23     lived there they executed a search warrant, and then he moved
24     out and that is when the current homeowner moved in and did
25     the digging.  I think she may have mentioned it.

1          MS. HOLLANDER:  I think our objections are the --

2          MS. DUNCAN:  If you can clarify that it wasn't dug

3    up.

4        I think with the contents, I don't know if anyone has

5    specific objections, but we object on the basis we have been

6    raising for the Ashqar, the Elbarasse, and the Mushtaha that

7    it is hearsay.

8          MR. DRATEL:  In addition to collateral estoppel and

9    double jeopardy.

10          THE COURT:  Those are overruled.  Mushtaha Search

11    No. 5 is admitted.

12          (The following was had in the presence and hearing

13          of the jury.)

14    Q.   (BY MR. JONAS)  Agent Burns, before I ask you about

15    Philadelphia again, the Philadelphia meeting, I just want to

16    go back real quick to Mushtaha Search No. 5, which is a letter

17    you read on the screen a few moments ago.  There were

18    videotapes you talked about, and another witness talked about,

19    being dug up in the backyard.  Was this letter dug up in the

20    backyard from his house?

21    A.   No, this was found within the house.

22    Q.   Okay.  Was this found at the same time that was dug up,

23    or was it a separate matter?

24    A.   It was found in a search warrant which preceded, came

25    before, the unearthing of the videotapes.

1    Q.    All right.  I want to talk to you about the Philadelphia

2    meeting with regard to these zakat committees, but not the one

3    that you have read already, Philadelphia meeting No. 13.

4        Did the participants at the Philadelphia meeting have

5    other conversations regarding the societies over in the West

6    Bank and Gaza?

7    A.    Yes.

8        MR. JONAS:  If we can put on the screen Philadelphia

9    Meeting No. 5-E, page 4, please.

10   Q.    (BY MR. JONAS)  Agent Burns, do you see the larger

11   portion on the bottom, the larger segment?

12   A.    Yes.

13   Q.    Who is speaking?

14   A.    This is the Defendant Shukri Abu Baker.

15   Q.    Okay.

16       MR. JONAS:  If we can enlarge just the middle

17   portion that starts, "the second thing."

18   Q.    (BY MR. JONAS)  Agent Burns, can you read just that

19   sentence that starts with "The second thing"?

20   A.    "The second thing we were talking about that in the

21   morning is that our brothers in the occupied territories will

22   be -- pretend to go along with the self-rule and none of their

23   societies will be shut down, and this is a matter that hasn't

24   been settled yet."

25   Q.    Okay.

1      MR. JONAS:  Let's go to Philadelphia Meeting No. 11,

2  if we can play -- This one we will play, Philadelphia Meeting

3  No. 11, Clip D, please.

4      (Whereupon, Philly Meeting No. 11, Clip D was

5      played, while questions were propounded.)

6  Q.   (BY MR. JONAS)  Agent Burns, the Young Men's Muslim

7  Association, have you testified about that?

8  A.   Yes.

9  Q.   What is it connected to?

10  A.   The Islamic Charitable Society of Hebron.

11  Q.   Agent Burns, when the law was created in 1996 which

12  allowed the Government to start designating organizations as

13  foreign terrorist organizations, did any of the Defendants

14  have a conversation about this law?

15  A.   Yes.

16  Q.   Who?

17  A.   The Defendant Shukri Abu Baker and Ghassan Elashi.

18      MR. JONAS:  If we can play Baker Wiretap No. 11,

19  11-A, the audio.

20      (Whereupon, Baker Wiretap No. 11 was played, while

21  questions were propounded.)

22  Q.   (BY MR. JONAS)  Agent Burns, is Ghassan Elashi listing

23  out some of the organizations that you identified today as

24  ones that receive payments from the HLF?

25  A.   Yes.

1    Q.    Agent Burns, as far as you know --

2              MS. MORENO:  Excuse me, Your Honor.  May we

3    approach?

4              THE COURT:  Yes.

5              (The following was had outside the hearing of the

6              jury.)

7              MS. MORENO:  Counsel, this is not the entire

8    conversation that we had an agreement on that you were going

9    to admit through Agent Burns, is it?

10             MR. JONAS:  We did not an have an agreement that we

11   were going to play the entire conversation.  We were asked if

12   we would play the call.  I said yes.  We were never going to

13   play the entire conversation.

14             MS. HOLLANDER:  That was my understanding.

15             MR. JONAS:  That was not my understanding.

16             MS. MORENO:  Your Honor, if I may, this call is

17   extremely important to Mr. Elashi, and I think to Mr. Baker.

18   We got it in in the first trial after a motion practice, and I

19   am not saying that the entire -- I am not referring to the

20   entire conversation.  The conversation that we got in the last

21   time that was the subject of discussions with counsel is an

22   abbreviated part, but it is more than what you have just

23   played.  Isn't that right?

24             MR. JONAS:  Absolutely it is right, but you never

25   came to us and said which portions you want.  All the question

1   was is "Are you going to play this call?"  And the answer is,

2   "Yes, we are going to play the call."  We have rarely played a

3   full call, and you yourself are acknowledging now you are not

4   asking for the whole call.  If you approached me with a

5   segment that you wanted us to play, we would have considered

6   it.  We still have that opportunity.  We are at the end of the

7   day, per your request.  If you have a 106 request, come to me

8   and we can talk about it.  You never approached us with

9   additional --

10          MS. MORENO:  We absolutely did.  Let me finish.  You

11  have had your say.  We gave them the exact transcript of last

12  year's, which was the redacted portion.  It was far more than

13  this, and counsel knows that.  We looked at the same

14  transcript.

15      We are not going to agree on this now, Your Honor, but I

16  want the opportunity to have a 106 and go into those portions

17  that I believe Mr. Cline will also agree that was the subject

18  of an agreement with the Prosecution that they were going to

19  play; not the whole conversation, but that redacted portion

20  that they played during the first trial, which is not this

21  portion.

22          MR. JONAS:  No, absolutely not.

23          THE COURT:  Obviously we are not going to resolve

24  it.  He is saying take it to him and see if you can agree on

25  whatever it is you are going to play.  If you don't agree,

1    tell me in the morning.

2        Are you ready to stop?

3            MS. MORENO:  Yes.

4            MS. CADEDDU:  I am starting to feel very bad.

5            THE COURT:  You are, too?

6            THE COURT:  We will just break.

7            MS. HOLLANDER:  I just don't want to be near them.

8            THE COURT:  Why don't we go ahead and break, and be

9    back by 8:45 in case you all don't reach agreement.

10           MR. JONAS:  Your Honor, other than Mr. Westfall

11   giving me a disk of exhibits he anticipates offering from

12   Agent Burns, I have not received a list of exhibits from

13   defense counsel.  I understand they are working on it, but we

14   need an opportunity to object.  And I will be passing her

15   sometime tomorrow, probably mid morning.

16           THE COURT:  What about that?  I would like to see

17   the objections this afternoon so I can look at them.  I will

18   not have a chance tomorrow before the cross.  Well, we will

19   have the one witness.

20           MR. JONAS:  I still need time to look at their list

21   of the objections.

22           THE COURT:  I need time to look at that as well.

23   When are you going to be able to get your list of exhibits to

24   the Government as far --

25           MS. DUNCAN:  We are meeting right after court to

1    talk about that.

2              THE COURT:  Let's go ahead and let the jury go.

3              (The following was had in the presence and hearing

4              of the jury.)

5              THE COURT:  Members of the jury, we are going to

6    recess here for the day.  There are some matters I need to

7    take up, so we will recess you.

8        Recall the instructions that we have been over, and see

9    you back at 9:00 in the morning.

10             (Whereupon, the jury left the courtroom.)

11             THE COURT:  Agent, you can step down.

12             MS. DUNCAN:  We had another matter we wanted to take

13   up at the bench.

14             THE COURT:  Come on up.

15             (The following was had at the bench.)

16             MS. DUNCAN:  Your Honor, I just wanted to move on

17   behalf of Mr. Abu Baker based on InfoCom Search No. 68, as

18   Your Honor saw, the portion having to do with the American

19   demonstrations took up five to seven minutes, which the part

20   having to do with the issues in this case, the library, was no

21   more than ten minutes.  And the jury's reaction was palpable,

22   covering their mouths.  There is an extreme emotional reaction

23   to that part.  So based on that we just don't think Mr. Abu

24   Baker can get a fair trial, and move for a mistrial.

25             MR. DRATEL:  I would join.  Some things cannot be

cross examined or instructed away, and this was one of them.

MS. MORENO: Join on behalf of Mr. Elashi.

MS. CADEDDU: Join on behalf of Mr. Abdulqader.

MR. JONAS: I assume Mr. Westfall will as well.

MS. HOLLANDER: I just want to add, it was completely political, the thing Your Honor has said you are trying to keep out of this case, and that was the only reason to bring it in.

MS. CADEDDU: Your Honor, I would say -- I mean, it is irrelevant to the issues. Whether people were burning American flags is irrelevant to the issues.

THE COURT: And those motions for mistrial are denied.

MR. DRATEL: Your Honor, I have a separate mistrial motion based on the collateral estoppel, and I will just point out a couple of exhibits that were referenced specifically to Mr. El-Mezain, all which predate InfoCom No. 30--El-Mezain Wiretap No. 1. And they were all specifically Mr. El-Mezain received this, this was directed to Mr. El-Mezain, this was a letter to him. The tent video where people talk about him. Ashqar Search No. 13.

I asked for instruction before, I am asking for instruction now. I think a mistrial is the only remedy, but I am also still asking for an instruction because the jury is getting all this, is absorbing all of this, and it will be too

1    late at the end of the case --

2                THE COURT:  What instruction is it you are wanting?

3                MR. DRATEL:  They are not to consider that with

4    respect to collateral estoppel and those issues.

5                THE COURT:  I think they are properly before the

6    jury for consideration, so I will deny that motion as well.

7                MR. JONAS:  One matter I want to inform the Court

8    on, and you may be aware of this.  I don't know.

9         During the night a motion was filed regarding Defense

10   witness Abington.

11               THE COURT:  That motion in limine?

12               MR. JONAS:  Yes.  I just want -- The CIA was

13   concerned about the motion, and they asked it be removed from

14   the ECF docket.

15               THE COURT:  Yes.  And we did.

16               MR. DRATEL:  I don't know if you know that we

17   resolved it.

18               THE COURT:  We are still on the record.  One at a

19   time.

20               MS. DUNCAN:  Can the Defendants leave, Your Honor?

21               THE COURT:  The Defendants can leave, yes.

22               MR. MYSLIWIEC:  I told Barry we were submitting or

23   exchanging the exhibits, because I accidentally filed two

24   letters that relate to another witness.  Those were not

25   letters that were exchanged in a classified manner or anything

1  like that.

2          MR. JONAS:  That is not the CIA's concern.  The

3  concern about the substance of the motion I can't address, the

4  concern.  That is coming from them.  And I think they will

5  probably address it with Your Honor at some point.  You know

6  they will be here Thursday.

7          THE COURT:  Are they planning on filing a

8  written --

9          MR. JONAS:  I don't know.

10          THE COURT:  Are you going to file a written response

11  to the motion in limine?

12          MR. MYSLIWIEC:  They are concerned about the

13  substance of the motion itself?

14          MS. HOLLANDER:  Not about the motion.

15          MR. JONAS:  I know they are concerned about

16  something in the motion, and the I think their knee-jerk

17  reaction was "Let's get it off the public docket until we get

18  a better chance to evaluate it."

19          MR. DRATEL:  Mr. Cline has been in touch with them

20  as well to try to find out exactly what the concern is.

21          MR. JONAS:  I believe Mr. Cline spoke to the court

22  security officer.  I am not downstairs, so I don't know

23  exactly the latest.  I just wanted to make sure Your Honor was

24  aware.

25          THE COURT:  I was aware, and we have also heard from

1  them as well.  And it has been taken off the docket, and we

2  will eventually put it back on there.  We need to get it on at

3  some point.  It needs to be part of the record.

4          MR. DRATEL:  In whatever form it is.

5          THE COURT:  If you get it resolved, then yes.

6          MR. JONAS:  It is the CIA's issue, so I need to take

7  direction from them as to how it is going to be responded to

8  by the Government.

9          THE COURT:  You will wind up with Agent Burns, then,

10  sometime in the morning?

11          MR. JONAS:  Yes.

12          THE COURT:  And we will take this witness out of

13  turn?

14          MR. JONAS:  If you want to take him next, that is

15  fine with us, and then back to Agent Burns.

16          THE COURT:  And then the cross of Agent Burns.

17          MR. JONAS:  We have a witness we are scheduling for

18  Thursday, Bruce Hoffman.

19          THE COURT:  Is he an expert?

20          MR. JONAS:  Yes.

21          THE COURT:  I need to start looking over those

22  motions.  So he will be the first one, Hoffman?

23          MR. JONAS:  Yes.

24          MS. HOLLANDER:  We have a pending Daubert motion.

25          THE COURT:  And who do you expect after him?

1          MR. JONAS:  Avi.  So Bruce Hoffman is sort of

2   limited to Thursday and Friday, and this week I know Friday we

3   don't have court.

4          THE COURT:  How long do you expect your direct of

5   Hoffman?

6          MR. JONAS:  Less than an hour; maybe an hour tops.

7          MS. HOLLANDER:  And I can't be here Friday.  We have

8   Friday off.

9          THE COURT:  Right.

10          MR. JONAS:  We have a scheduling issue.  We need to

11   get him on Thursday.

12          THE COURT:  What is your expected direct of Avi?

13          MR. JONAS:  It is at least a day.

14          THE COURT:  So a couple of days for him.

15          MS. HOLLANDER:  Is he the last one?

16          MR. JONAS:  I believe so.  There are some witnesses

17   between.  I am sorry.  There is Robert McBrien is tomorrow.

18   We have a witness from USAID who will testify.  He is not

19   going to be long at all.  There is a woman from the FBI

20   computer section who is not going to testify long, to get in

21   some evidence that was seized that was taken from the HLF

22   computers, Bruce Hoffman, and Avi.  The order, of course, is

23   dictated by the timing.  We are scheduling Bruce Hoffman

24   Thursday, so I need to get him on Thursday.

25          THE COURT:  So that is all you have left?

1           MR. JONAS:  Yes, sir.

2           THE COURT:  All right.

3           MR. DRATEL:  We argued, I don't know if you

4     remember, probably, in voir dire we argued about Hoffman and

5     the question of whether it is appropriate or cumulative, all

6     those things.

7           THE COURT:  Okay.  Let me go back at the motions and

8     get refreshed.

9           MR. JONAS:  We should file something on that today.

10          MR. DRATEL:  I am not sure if it is a response or

11    reply or whatever.

12          MR. JACKS:  It is called trial memo.

13          MR. DRATEL:  In regard to Mr. Hoffman?

14          MR. WESTFALL:  Simon was probably enough to bring

15    9/11 into this as much as it needs to come in.

16          MR. JONAS:  Let me just say, Bruce Hoffman is not

17    going to talk about 9/11, and doesn't have to talk about

18    Al-Qaeda.  That is not his intention.  That is not his purpose

19    for his testimony, and will not mention Al-Qeada.  It doesn't

20    have to -- He will mention other terrorist groups that follow

21    along with -- it is in our brief, Your Honor.  I can leave it

22    to that.

23          THE COURT:  The one you filed today?

24          MR. JONAS:  Yes.

25        The lack of disbelief on the part of Defense counsel

notwithstanding, we think that their actions in cross
examining certain witnesses, especially Shorbagi, has
completely opened the door for Doctor Hoffman to come in.

MS. HOLLANDER:  Let me just state on the record,
last Sunday I met with Mr. Jonas before Shorbagi and -- I
believe it was Sunday.

MR. JONAS:  It was a few days ago.

MS. HOLLANDER:  And asked him, and he said, "We are
absolutely calling Hoffman."

MR. JONAS:  That is right.  And I said the actions
of Defense counsel have made it even more obvious his need.

THE COURT:  I haven't read the brief.  Let me take a
look of that.

MS. CADEDDU:  I would ask Your Honor, if you can, to
take a look at -- The Government in its brief, and I have read
the brief, and it doesn't talk about particular -- It doesn't
identify which other terrorist groups he is going to talk
about, that I can recall, but it does make reference to a part
of Ms. Hollander's cross and says that she brought up in cross
the clean hands.  That was actually brought out on direct by
Mr. Jacks.  And I just would like you to review the record on
that.

MR. JONAS:  Either way, Your Honor, I think the
progression of the cross, starting with the opening
statements, the progression of the cross, all the witnesses

1    culminating in Shorbagi --

2              THE COURT:  Let me read that.  Are you planning on

3    filing any written response?

4              MS. HOLLANDER:  It just came while we were here.  I

5    have been reading it for about five minutes.

6              THE COURT:  We are looking at next week for Hoffman

7    anyway --

8              MR. JONAS:  No, Thursday; day after tomorrow.

9              MR. DRATEL:  We will look at it and do something

10   tonight.

11             THE COURT:  As long as it is sometime tomorrow.

12             MR. JONAS:  It sounds like after I am done with

13   Agent Burns' direct then you guys want to do McBrien?

14             MR. DRATEL:  Yes.  We want to make sure --

15             MR. JONAS:  And he shouldn't be too long either.

16             THE COURT:  Okay.  8:45 in the morning.

17                          (End of day.)

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts              06/30/2009

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25