1      IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
2                 DALLAS DIVISION

3    UNITED STATES OF AMERICA      )  CAUSE NO. 3:04-CR-240-P
                                   (
4    vs.                           )
                                   (  OCTOBER 22, 2008
5                                  )  DALLAS, TEXAS
     HOLY LAND FOUNDATION, ET AL   (  9:00 A.M.
6
     _____
7


8                     VOLUME 23 OF 37

9    _____


10                   STATEMENT OF FACTS

11

12        BEFORE THE HONORABLE JORGE A. SOLIS
             UNITED STATES DISTRICT JUDGE
13                   and a jury
     _____

14


15              A P P E A R A N C E S

16


17


18        FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                                1100 COMMERCE, 3RD FLOOR
19                              DALLAS, TEXAS  75242
                                BY:  MR. JIM JACKS
20                                   MR. BARRY JONAS
                                     MS. ELIZABETH SHAPIRO
21

22        FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
          (SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
23                              20 FIRST PLAZA, SUITE 700
                                ALBUQUERQUE, NEW MEXICO 87102
24                              BY:  MS. NANCY HOLLANDER
                                     MS. TERESA DUNCAN

25

```
 1              FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
                (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
 2                                   NEW YORK, NEW YORK  10005
                                     BY:  MR. JOSHUA DRATEL
 3                                        MR. AARON J. MYSLIWIEC

 4              FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
                (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
 5                                   DALLAS, TEXAS  75204
                                     BY:  MS. MARLO P. CADEDDU
 6
                FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
 7              (GHASSAN ELASHI)     P.O. BOX 10985
                                     TAMPA, FLORIDA  33679
 8                                   BY:  MS. LINDA MORENO

 9                                   JONES DAY
                                     555 CALIFORNIA ST., 26TH FLOOR
10                                   SAN FRANCISCO, CA  94104
                                     BY:  MR. JOHN D. CLINE
11
                FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12              (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                     FORT WORTH, TEXAS  76102
13                                   BY:  MR. GREG WESTFALL

14              COURT'S LAW CLERK:   MS. JENNIFER HELMS
                                     1100 COMMERCE, RM. 1654
15                                   DALLAS, TEXAS  75242

16              COURT COORDINATOR:   MS. BRENDA WEBB
                                     1100 COMMERCE, RM. 1654
17                                   DALLAS, TEXAS  75242

18      OFFICIAL COURT REPORTER:     SHAWN M. McROBERTS, RMR, CRR
                                     1100 COMMERCE STREET, RM. 1654
19                                   DALLAS, TEXAS  75242
                                     (214) 753-2349
20

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| LARA BURNS | |
| Direct By MR. JONAS | 6 |
| Cross By MR. WESTFALL | 157 |
| JOHN ROBERT McBRIEN | |
| Direct By MS. SHAPIRO | 62 |
| Cross By MR. CLINE | 88 |
| Redirect By MS. SHAPIRO | 140 |
| Recross By MR. CLINE | 151 |
| Redirect By MS. SHAPIRO | 152 |

## Government's Exhibits

| **Government's Exhibits** | **Page** |
|---|---|
| Demonstrative No. 32 Admitted into Evidence | 54 |
| OFAC No. 1 | 68 |
| OFAC No. 3 | 74 |
| OFAC No. 5 | 84 |
| InfoCom Search No. 55 | 86 |
| OFAC No. 4 | 108 |

## Defendants' Exhibits

| **Defendants' Exhibits** | **Page** |
|---|---|
| No. 1402 | 112 |
| No. 1403 | 113 |
| No. 1404 | 210 |

1          THE COURT:  Let me ask counsel to come up here for a

2     minute to approach the bench on the objections to Mr.

3     McBrien's testimony.  That is what I want to discuss up here.

4               (The following was had at the bench.)

5          MR. CLINE:  I think, Your Honor, one of the issues

6     has been resolved.  I think they are going to redact the HLF

7     designation.  We will want to talk about the redaction and

8     make sure it is not obvious what is taken out.

9          MS. SHAPIRO:  I just intend to display the size of

10    the document, not go through, it and I instructed our people

11    to redact it from the original exhibit.

12         MR. CLINE:  That is fine.

13       The only other issue I believe, Your Honor, is whether

14    the regulation actually gets introduced into evidence.  We

15    object.  It is like introducing a statute or something.  It is

16    something for Your Honor to instruct on.

17         MS. SHAPIRO:  These are Treasury Department

18    regulations that go to the issue of whether an entity needs to

19    be on a designation list or whether it is sufficient that it

20    is acting on behalf of the designated entity, and it is an

21    important issue because one of the primary defenses in this

22    case is that these charities didn't appear on the designation

23    list and, therefore, it is okay to give to them.  And we did

24    emphasize the point that that is not true.

25         THE COURT:  So you are going to limit the rest of

1    that issue?

2            MS. SHAPIRO:  Yes; just to one subsection of a reg.

3            MR. CLINE:  Which reg?  We have a packet of them.

4            MS. SHAPIRO:  I don't have the number off hand.  It

5    is the one that specifically goes to charitable organizations.

6            MR. CLINE:  I think it is 595.408.  I think I know

7    which one.  We object.  It is something that was in the jury

8    instruction lasts time.  We think that is the appropriate way

9    to handle it.

10           THE COURT:  I think you can go into that.  I will

11   overrule that objection.  That has been an issue in the case.

12       That covers the objections to these exhibits?

13           MR. CLINE:  Yes.

14           THE COURT:  I am still working on your

15   objections -- your objections to I guess Mr. Jonas' objections

16   to the exhibits you are introducing.  I am still working my

17   way through those.  Hopefully after the lunch hour I will have

18   the ruling on those for you.

19       And the 302s, I am still looking through those.  I don't

20   think you are going to be entitled to the 302s, but I am still

21   working through those.

22           MR. CLINE:  These are the Hamami 302s.

23           THE COURT:  Yes.  But I am still looking at that.

24   And I had to set them aside for other things, but I will get

25   back and pick them up before the lunch hour and give you a

1    ruling after the lunch hour, after we get back to Agent Burns.

2                 (The following was had in open court.)

3                 THE COURT:  Is the jury all here?  Go ahead and

4    bring in the jury.

5                 (Whereupon, the jury entered the courtroom.)

6                 THE COURT:  Ladies and gentlemen of the jury, good

7    morning.  We are ready to proceed.

8        Mr. Jonas?

9                 MR. JONAS:  Thank you, sir.

10   Q.   (BY MR. JONAS)  Agent Burns, when we broke yesterday we

11   were listening to a phone call between Ghassan Elashi and

12   Shukri Abu Baker.  It was marked Baker Wiretap No. 11.  Do you

13   remember that?

14   A.   I do.

15   Q.   We are going to continue playing that phone call.

16                MR. JONAS:  If we can take up where we left off on

17   Baker Wiretap No. 11.

18                (Whereupon, Baker Wiretap No. 11 was played, while

19                questions were propounded.)

20   Q.   (BY MR. JONAS)  Agent Burns, I want to move on to a new

21   subject matter with regard to where some of the money over in

22   the West Bank and Gaza may have been used for, based on the

23   records that are in evidence and what the Defendants discussed

24   them.

25   A.   Okay.

1    Q.    Specifically, did you come across through the search

2    warrant material any videotapes of any Hamas leader discussing

3    the use of money for Hamas?

4    A.    From one of the search warrants I did.

5    Q.    Okay.  Is that an Elbarasse videotape?

6    A.    That is correct.

7    Q.    What I mean by Elbarasse videotape, I mean seized from

8    Elbarasse's home.

9    A.    That is correct.

10           MR. JONAS:  If we can play Elbarasse Search No. 33,

11   please.

12   Q.    (BY MR. JONAS)  And before we start this one, do you

13   recall who is doing the speaking in this tape?

14   A.    Yes.

15   Q.    Who is that?

16   A.    Hamas leader Khalid Mishal.

17           (Whereupon, Elbarasse Search No. 33 was played,

18           while questions were propounded.)

19           MS. CADEDDU:  Can we have a date for this video?

20   Q.    (BY MR. JONAS)  Agent Burns, do you know when this video

21   was recorded?

22   A.    It was not dated.  It was seized in 2004.  Based on the

23   content, I believe it was likely after the second Intifada.

24           MS. HOLLANDER:  I object to speculation.

25           THE COURT:  Overruled.  Based on the content, she

1    may answer.

2            THE WITNESS:  It was likely after the beginning of

3    the second Intifada after 2000, but I can't state for sure

4    because the tape was not dated.

5    Q.   (BY MR. JONAS)  Agent Burns, did you see where Khalid

6    Mishal was talking about supporting the children and martyrs

7    and prisoners?

8    A.   Yes.

9    Q.   Was this also discussed in the Philadelphia meeting?

10   A.   It was.

11           MR. JONAS:  If we can play Philadelphia Meeting

12   No. 11, Clip B.

13           (Whereupon, Philly Meeting No. 11, Clip B was

14           played, while questions were propounded.)

15   Q.   (BY MR. JONAS)  Agent Burns, were there other discussions

16   about supporting families of prisoners and martyrs in the

17   Philadelphia meeting?

18   A.   Yes.

19   Q.   And if you recall, yesterday near the end of your

20   testimony I asked you about during the Philadelphia meeting if

21   there were discussions about providing cover for the

22   societies, their societies over in the West Bank and Gaza.  Do

23   you recall that?

24   A.   I do.

25   Q.   Was there further conversation regarding that as well?

1    A.    Yes.

2    Q.    Okay.

3            MR. JONAS:  If we can put on the screen Philadelphia

4    Meeting No. 12-E, page 3, just the transcript, please.

5    Enlarge the bottom half.

6            THE WITNESS:  Can we go to the first page just to

7    see who the speaker is?

8            MR. JONAS:  Go back to page 1 to see who AK is.

9            THE WITNESS:  It is Akram Kharoubi.

10   Q.    (BY MR. JONAS)  Okay.  And did you testify about Akram

11   Kharoubi yesterday?

12   A.    He ultimately became the HLF's representative in

13   Ramallah.

14   Q.    Okay.  Who is SH that is right above Akram Kharoubi?

15   A.    The Defendant Shukri Abu Baker.

16   Q.    Okay.  Can you read what Akram Kharoubi says in this

17   portion of the Philadelphia meeting?

18   A.    Yes.  It says, "There is an inclination to stay away from

19   the political address in the charitable organization's name.

20   Also there is a direction towards all forms of address.  They

21   are already in place now.  But we now have a larger scope for

22   the Americans--to address all people in regards to the things

23   they are interested in.  For instance, addressing Muslims now

24   about the issue of Jerusalem, the issue of protecting the

25   Islamic organizations in Palestine, the issue of maintaining

the steadfastness of Muslims in Palestine and Jerusalem, for

example.  Also issues relating to jihad which will continue,

such as supporting the injured, the martyrs, and prisoners.  I

mean their families.  These are directions for Muslims.  As

for the American society, opening the door to the American

society through participating with them in building the

infrastructure of Palestine to have our charitable

organizations become a front for that kind of work.  And there

is more acceptance by the Americans now for this kind of work.

Encouraging investors, attempting to get governmental support

if possible for some projects.  It is possible to form some

economic committees which benefit from the changing situation.

Securing protection for the Islamic organizations in

Palestine, and it can be done in America through fraternity,

for instance, through registering some of the charitable

organizations in Palestine under the names of people living

abroad in order to make it hard to hit them in the inside and

closing them."

Q.   Agent Burns, did you come across any documentation during

any of the search warrants regarding supporting prisoners' and

martyrs' families?

A.   Yes.

          MR. JONAS:  If we can put Ashqar Search No. 5, page

22 on the screen, please.

Q.   (BY MR. JONAS)  Agent Burns, remind us again what this

1  document is.

2  A.   This was the document taken from Abdel Haleem Ashqar's

3  home that discusses Hamas, and it was from 1988, 1989, and

4  listed the committees during that time and the amount of

5  control they had over those committees.

6  Q.   Where in this document does it talk about supporting

7  prisoners?

8  A.   I believe it is on this page.

9  Q.   Would it be the top half?

10  A.   Yes.  Under our goals in that field, if you look at

11  No. 3, it says, "Providing for families of martyrs or the

12  detainees and their families."

13  Q.   And who are the detainees again?

14  A.   The prisoners.

15  Q.   If we -- Was there also documentation that also addressed

16  this issue?

17  A.   Yes.

18  Q.   That was seized during the course of the investigation?

19  A.   Yes.

20         MR. JONAS:  If we can turn to Ashqar Search No. 2,

21  page 10, please.

22  Q.   (BY MR. JONAS)  Does this document address the issue?

23  A.   It is not on the screen yet.

24  Q.   All right.

25  A.   Mr. Jonas, I think it may be Ashqar No. 6, if you will

1    give me a second.

2    Q.    All right.  I may have written the wrong number down.

3    A.    Let me check.

4    Q.    Sure.

5    A.    No, and I don't have Ashqar No. 2 here.

6    Q.    Agent Burns, it is Ashqar No. 2, and I have a copy that I

7    can put on the elmo.

8    A.    Okay.

9    Q.    This is page 10 of Ashqar No. 2, Agent Burns.  And let me

10   just show you what the top of the page says.  It says the

11   north region?

12   A.    It does.

13   Q.    What areas -- According to this document, what areas

14   cover the north region?

15   A.    The cities of Nablus, Jenin, and Tulkarem.

16   Q.    Is that the West Bank or Gaza?

17   A.    That is in the West Bank.

18   Q.    Can you remind us what this document is?

19   A.    If we can go to the first page so I can --

20   Q.    I assume you want the first page of the English.

21   A.    Please.

22         MR. JONAS:  And for the record, that is page 7 of

23   the exhibit.

24         THE WITNESS:  Okay.  This is the document that we

25   talked about that was a report of someone from the Palestine

1    Committee taking a trip to the territories in 1991, and they

2    were reporting on, as you can see there in the first

3    paragraph, the Hamas movement.

4    Q.   Okay.  Let's go back to page 10, north region.  Let me

5    show you -- Do you see there are a series of items listed by

6    letter?

7    A.   I do.

8    Q.   Can you read what it says for K?

9    A.   Yes.  It says, "The situation of the brothers in jails is

10   good and they are in the best of conditions."

11   Q.   Can you also read I?

12   A.   "There are brothers who are fugitives in the region, and

13   the brothers feel they should be linked to the outside as the

14   region needs those brothers in order to protect the

15   organization."

16   Q.   Okay.  Any other documents that you came across during

17   this search warrant that discusses support for prisoners and

18   martyrs?

19   A.   Yes.

20           MR. JONAS:  If we can pull up on the screen

21   Elbarasse Search No. 18, page 13, please.

22   Q.   (BY MR. JONAS)  And Agent Burns, remind us what this

23   document is?

24   A.   This is the fax from the Islamic Relief Committee from

25   1992 that we talked about yesterday wherein they request money

1    for weapons, and then it also discusses several other issues

2    like the Islamic Society and Islamic Center of Gaza.  That is

3    why we brought it up yesterday, because it related to the

4    committees.

5    Q.    With regard to the support of prisoners and martyrs, what

6    does this document say?

7    A.    In this document it discusses the need for money, and it

8    says that the delivery channels are open, and it lists

9    delivery channels.  One of the delivery channels, and I

10   believe it was on page -- I believe it was on page --

11   Q.    The next page, 14?

12   A.    Yes.  If you see here, it says, "Examining the delivery

13   channels, placing each channel in its main purpose without

14   using its funds for other channel means."  No. 1 is "The

15   detainees and the needs of their families.  Their funds are to

16   be in a specific channel and distributed throughout the

17   Strip."

18   Q.    Did you come across evidence taken from the HLF that

19   shows that the HLF supported prisoners?

20   A.    Yes.

21   Q.    Did they support prisoners of Hamas leaders?

22   A.    They did, through the Islamic Relief Committee, whom that

23   fax was from.

24   Q.    Did they only support prisoners?

25   A.    No, no.

```
1    Q.   Did they only support prisoners of Hamas leaders?

2    A.   No.

3         MR. JONAS:   If we can pull up InfoCom Search No. 3,

4    page 186, please.

5    Q.   (BY MR. JONAS)   Agent Burns, what is InfoCom Search

6    No. 3?

7    A.   This is a project, an HLF project to the needy families

8    that we discussed earlier.

9    Q.   Can you remind us what you discussed about it?

10   A.   Yes.  If you could go back to the first page.  This is

11   one of the $100,000 projects that the HLF funded through the

12   Islamic Relief Committee after it received the $100,000 from

13   Mousa Abu Marzook.  There were approximately 100 needy family

14   applications attached.  A majority of those families were

15   families of prisoners.  We talked about this because I

16   couldn't get the figures to add up to $100,000, which is what

17   was ultimately sent.

18   Q.   First, did you testify about this because of the relation

19   in time between the Marzook money and this money going out, as

20   well as some of the letters involving the Islamic Relief

21   Committee?

22   A.   Yes.  All of this happened in the same like month, month

23   and a half period.  The letter from the Islamic Relief

24   Committee that we just saw, the other letter that we saw in my

25   first testimony requesting weapons, $100,000, these projects,
```

1    the phone calls from Marzook, they all happened together and

2    we actually had that little PowerPoint summary that had the

3    timeline on it.

4    Q.    Okay.  Was a month and a half period or was it more like

5    a week period?

6    A.    The first letter we looked at was from July 20th, and the

7    second letter -- The first wire transfer we saw was from

8    August 1st and then August 10th.  And I believe the fax was

9    from August 12th, so less than a month.

10   Q.    Okay.  Now, you testified before that this was a $100,000

11   project, but you only were able to account for $20,000 based

12   upon the supporting documentation.

13   A.    I wouldn't say that I accounted for $20,000.  I just --

14   Every which way I added it up, I couldn't come up with a way

15   that it would have been more than $20,000.

16   Q.    Of the $20,000 that was spent, according to this

17   documentation, did they support any leaders, Hamas leaders

18   while they were in prison?

19   A.    Yes.

20   Q.    All right.

21            MR. JONAS:  And if we can turn to page 186, please.

22   Q.    (BY MR. JONAS)  Does this page indicate someone who was

23   supported by the HLF?

24   A.    It does.

25   Q.    Let me be clear about something.  Do you know for sure

1    that this money actually went to support families of martyrs

2    and prisoners?

3    A.    I know what the documents say.

4    Q.    And whose document is this?

5    A.    This is the HLF documents, the Islamic Relief Committee

6    documents.

7    Q.    So based upon what the document says, which Hamas leader

8    was supported in this project?

9    A.    This would be the wife of Hamas leader Sheikh Ahmed

10    Yassin.

11    Q.    The spiritual leader of Hamas?

12    A.    Yes.

13    Q.    On the Demonstrative No. 17 at the top of the chart?

14    A.    Yes.  At the time of this aid, Yassin was in prison.

15    Q.    What was the time period of this?

16    A.    This was 1990, 1991.

17    Q.    Is there any other Hamas member you discussed who is

18    supported in this project?

19    A.    I believe so.

20          MR. JONAS:  If we can turn to page 227, please.

21    Q.    (BY MR. JONAS)  Who is being supported in this project?

22    A.    This is Khalil Al-Kuka, the Hamas leader that we

23    discussed in one of those books yesterday that was found at

24    the Holy Land Foundation identified him as a Hamas header, and

25    also he was identified as a member of the Islamic Society of

1   Gaza.

2   Q.   So is he on your schedule, your summary schedule for the

3   Islamic Society of Gaza?

4   A.   He is.

5   Q.   Were there other project binders, prisoner project

6   binders similar to this one that you found?

7   A.   Yes, that the HLF funded through the Islamic Relief

8   Committee.

9   Q.   Okay.  Were there other project binders involving

10  projects not involving the Islamic Relief Committee?

11  A.   Yes.  Excuse me.  I don't know about binders.  There were

12  other documents, but these were actual binders.

13  Q.   Excuse me.  I shouldn't use binders.  Documents.

14          MR. JONAS:  If we can turn to InfoCom Search No. 45.

15  Just go to the first page.

16  Q.   (BY MR. JONAS)  And what is this?

17  A.   This is another project that the HLF, according to this

18  document, funded through the Islamic Relief Committee in March

19  of 1992 for $25,000, and it says aid to 25 families.

20          MR. JONAS:  If we can turn to page 19.

21  Q.   (BY MR. JONAS)  Who is being supported, according to this

22  document?

23  A.   This is -- If we can look at the Arabic just before this

24  just so I can explain a little bit.  You can scroll to the

25  next page.  I was looking for the security certificate, which

1    is likely on the next page.  This is Mohammed Salman, Mohammed

2    Baroud.

3    Q.    Have we seen his name before?

4    A.    Yes; as affiliated with the Islamic Society of Gaza.

5    Q.    Is he on your Islamic Society of Gaza schedule?

6    A.    He is.

7              MR. JONAS:  And if we can go to page 21 of this

8    document.

9    Q.    (BY MR. JONAS)  What is this document?

10   A.    This is just another document that was contained within

11   that project advising Mr. Baroud that he had been fired.

12   Q.    Fired from where?

13   A.    It says Gaza Strip Civil Administration.

14   Q.    Is that the Islamic Society of Gaza committee that you

15   were talking about?

16   A.    No.

17   Q.    It is a separate organization?

18   A.    Yes.

19   Q.    Okay.

20             MR. JONAS:  Let's go to InfoCom Search No. 46, page

21   34, please.

22   Q.    (BY MR. JONAS)  Agent Burns, do you know what this is?

23   A.    I do.

24   Q.    What is this document?

25   A.    This is another one of those certificates showing that

1    this individual had been arrested.  I am looking for where it

2    says.

3    Q.   Read the next page with the translation.

4    A.   I was just looking at this first to see where it said the

5    reason for arrest.  You can go to the next page.  Anyway, it

6    was Ismail Abu Shanab.

7    Q.   Do you recognize that name?

8    A.   Yes.

9    Q.   And have you testified about him already?

10   A.   I believe so.

11   Q.   Who is he?

12   A.   I am not sure that we have addressed Ismail Abu Shanab

13   yet.

14   Q.   Do you know who he is?

15   A.   Yes.

16   Q.   Who was he?

17   A.   He was a Hamas leader before he was assassinated.

18   Q.   Let's do one more.

19            MR. JONAS:   InfoCom Search No. 48.

20   Q.   (BY MR. JONAS)  And what is this document?

21   A.   This is another project similar to those that we have

22   been discussing that the HLF funded through the Islamic Relief

23   Committee.  Accord to this document, 100 needy families in the

24   West Bank and Gaza received $100,000.  And again, a majority

25   of these families were families of prisoners, according to the

1    attached documentation.

2              MR. JONAS:  Let's go to page 228 of this.

3    Q.   (BY MR. JONAS)  What is this?

4    A.   This is a request for aid for Amal Mohamed Hania.  And I

5    believe the security certificate is on the next page.  Yes.

6    For her husband Ismail Hania, who was detained for security

7    reasons.

8    Q.   Who is Ismail Haniya?

9    A.   He is a major Hamas leader and he is on your chart.  We

10   also saw him in the deportees tape chanting, and also is a

11   member of the Islamic Society of Gaza.

12   Q.   Holding up Demonstrative No. 17, where is Ismail Haniya?

13   A.   He is second from me on the bottom row.

14   Q.   You say we saw him on the deportee tape yesterday?

15   A.   One of them.

16   Q.   Not the tent video?

17   A.   No.

18   Q.   The other one where they were chanting?

19   A.   Where they were chanting.

20   Q.   Okay.  Is this just to -- Are these all the Hamas members

21   or leaders that the HLF supported while they were in prison?

22   A.   No.

23   Q.   Just a representative sample?

24   A.   That is correct.

25   Q.   Okay.  Did you come across any other documentation, not

1   like this, but other documentation indicating that they

2   supported other Hamas leaders?

3   A.   Yes.

4        MR. JONAS:  If we can pull up InfoCom Search No. 39,

5   please.

6   Q.   (BY MR. JONAS)  Do you know what this document is?

7   A.   I do.

8   Q.   Is it translated?

9   A.   It is.

10       MR. JONAS:  Next page, please.

11  Q.   (BY MR. JONAS)  What does the translation say?

12  A.   It says, "Statement.  I, the wife of Dr. Abdel Aziz Al

13  Rantissi, state that I received the sum of 10800 shekels, or

14  what is the equivalent to $4,000 U.S. Dollars.  This is a

15  statement from me with that."  And she signs her name.

16  Q.   And who is Abdel Aziz Rantisi?

17  A.   The Hamas leader that is on your demonstrative exhibit.

18  Q.   Did we see him in any of those deportee tapes?

19  A.   Yes, we did.  He was on the tent videotape.

20  Q.   Was there any documentation or phone calls intercepted by

21  the FBI where any of the Defendants discuss support for

22  martyrs and prisoners?

23  A.   Yes.

24       MR. JONAS:  If we can play HLF Wiretap No. 3, audio

25  3-A, please.

1          (Whereupon, HLF Wiretap No. 3-A was played, while

2          questions were propounded.)

3   Q.   (BY MR. JONAS)  Do you know who is speaking?

4   A.   Yes.  This is HLF officer Akram Mishal.

5   Q.   Do you know who he is speaking with?

6   A.   A social worker for the HLF.  I believe Mirvat.  I can't

7   recall her last name, but it is one of the social workers for

8   the HLF.

9   Q.   Okay.  Agent Burns, do you know when that call took

10  place?

11  A.   I was going to ask you if we could look at the first

12  page.

13          MR. JONAS:  May I approach, Your Honor?

14          THE COURT:  Yes.

15  Q.   (BY MR. JONAS)  Let me show you HLF Wiretap No. 3, the

16  first page.  Give me the date.

17  A.   This was May 14th, 2001, and they were referring to the

18  second Intifada, which began in October of 2000.

19  Q.   Okay.

20          MR. JONAS:  If we can go to InfoCom Search No. 96.

21  Q.   (BY MR. JONAS)  What is this document, Agent Burns?

22  A.   This is a letter from the Holy Land Foundation to Mr.

23  Shaheer Assad dated July 8, 1993.

24  Q.   Okay.  Was it translated?

25  A.   It was.

1              MR. JONAS:  The next page, please.

2    Q.    (BY MR. JONAS)  Who wrote the letter?

3    A.    Shukri Abu Baker.

4    Q.    If you can read the letter, please?

5    A.    All of it?

6    Q.    Go ahead, yes.

7    A.    "I Thank you for your kind letter dated February 1993

8    which contains a request for inquiry about the family of the

9    deceased Subhi Salim 'Ardah, and I do apologize to you for

10   replying late because, first, I was on a trip, and then

11   because I was waiting for a response from the director of our

12   office in Jerusalem regarding this case.

13        "Today I have received a report from the Jenin zakat

14   committee about the condition of the family of the deceased.

15   In it it was mentioned that the number of the family members

16   is four children, the eldest of whom is 12 years old, in

17   addition to their mother Ms. Fatima Fu'ad Sadiq.

18        "It was mentioned in the report that the family is in

19   fact poor and doesn't have any source of income except some

20   assistance from the Jenin zakat.

21        "The truth is that although the Foundation supports the

22   poor families, its effort is focused now on the relief of the

23   afflicted families in Gaza and the families of the deported,

24   the detainees, and the martyrs.  There are some families that

25   the Foundation supports, but it is within the Poor Family

Sponsorship Program, as their assistance does not come from
the general account, but comes to us from sponsors and
philanthropists to benefit certain families.

"Therefore, the Foundation is fully ready to cooperate
with you if you want to help this family by receiving any
amount you, or someone you know among the people of good
deeds, can transfer.

"The Foundation cannot every household in America [sic],
and it relies on the people of zeal and charity like you to
spread its humanitarian message. Hopefully this case will
constitute the beginning toward a joint humanitarian action."

Q. Were there other letters where someone from the HLF talks
about focusing their aid primarily on martyr, deportees, or
detainees?

A. Yes.

MR. JONAS: If we can pull up InfoCom Search No. 97,
please.

Q. (BY MR. JONAS) What is this?

A. This is a letter from the Holy Land Foundation.

MR. JONAS: Next page, please.

Q. (BY MR. JONAS) Who is this letter from?

A. HLF officer Haitham Maghawri.

Q. Who is it addressed to?

A. Respectable brother Majed.

Q. Okay. Can you read the body of this letter, please?

1    A.    "God's peace, mercy, and blessings be upon you.

2          "My honorable brother, please nominate some names from

3    the children of the martyrs and write a synopsis about the

4    condition of each child, his level of cooperation, and

5    expression, in case there is a simple dialogue in front of the

6    audience.  As for the festivals, they start the last week of

7    September and continue until the end of November, so please

8    take that into consideration.

9          "On the other hand, the sum of $5,000 has been

10   transferred to your account from Darul Quran daycare in Deir

11   Dibwan on Monday October 8, 1992.  Please hand it over to the

12   people overseeing this daycare, who are Mohamed Awad El

13   Jimzawi, Mohamed Dawoud Ghanam, and Ali El Khatib.  The

14   nearest phone to them is 957444.  Please send a receipt for

15   this amount of money.  May God reward you good."

16   Q.    Any other letters?

17   A.    Yes.

18          MR. JONAS:  If we can go to InfoCom Search No. 98.

19   Q.    (BY MR. JONAS)  And what is this?

20   A.    This is a letter from the HLF's eastern office.

21   Q.    What is the HLF eastern office?

22   A.    The New Jersey office.

23          MR. JONAS:  If we can get to the next page, please.

24   Q.    (BY MR. JONAS)  Who is this from?

25   A.    This is from the Defendant Abdulrahman Odeh.

```
1    Q.   Who is it addressed to?

2    A.   Ibrahim Elsamneh, an officer at the HLF.

3    Q.   And what does this letter say?

4    A.   "Greetings.  I send to you sponsorships for two orphans

5    and sponsorship for a family of a martyr.  Please do the

6    necessary on behalf of the New Jersey office and send receipts

7    to the donors and to our office as well.  Your brother Abdel

8    Rahman Odeh."

9    Q.   Any other letters from Odeh where he discusses support

10   for martyrs?

11   A.   Yes.

12        MR. JONAS:  If we can turn to HLF Search No. 186,

13   please.

14   Q.   (BY MR. JONAS)  Before we do that, what is the date of

15   this letter?

16   A.   February 29th, 1996.

17   Q.   Okay.  Is this before or after Hamas is first designated?

18   A.   After.

19        MR. JONAS:  If we can go to HLF Search No. 186,

20   please.

21   Q.   (BY MR. JONAS)  What is this document, Agent Burns?

22   A.   It is on HLF letterhead.  I would need to see the

23   English.

24        MR. JONAS:  If we can go to the next page.

25   Q.   (BY MR. JONAS)  What is this?
```

A.   It is a letter to an officer at the HLF regarding money

that is to be distributed by Akram Kharoubi.

Q.   Is there anything in this letter about support for

martyrs?

A.   Yes.  I believe a little bit later on in the letter.

          MR. JONAS:  If we can go forward, please.  The next

page.

Q.  (BY MR. JONAS)  Is that it?  Okay.  All right.  This may

not be the letter I am thinking of.

A.   I was thinking there was more to this.  I thought this

was a several-page document.

Q.   We can move on.  The last letter, though, that we did

see, InfoCom Search No. 98, was from whom again?

A.   That was from the Defendant Abdulrahman Odeh.

Q.   Okay.  Did you come across any evidence showing Odeh

himself supported a martyr?

A.   Yes.

Q.   Okay.

          MR. JONAS:  If we can look at InfoCom Search

No. 179.

          THE WITNESS:  And to clarify my response, the family

of the martyr.  Obviously the martyr was dead.

Q.  (BY MR. JONAS)  Right.  That is what I meant.

          MR. JONAS:  My mistake.  If we can go to InfoCom

Search No. 99.

Q.   (BY MR. JONAS)  What is this item?

A.   This is a letter from the HLF's eastern office.

     MR. JONAS:  If we can go to the next page, please.

Q.   (BY MR. JONAS)  What does it say?

A.   It is from the Defendant Abdulrahman Odeh to again

Ibrahim Elsamneh, the HLF officer, dated June 21, 1996.

     After greetings, "I send to you checks whose numbers

appear below to be deposited for needy families.  They are

check No. 244, and particularly check No. 1906 for the Ayyash

family for six months.  Receipts are to be sent to the donors

and to our office as well as follows."

Q.   Do you know who the Ayyash family is?

A.   That would be for the children of the engineer Yehia

Ayyash, the master bombmaker who was assassinated.

Q.   Was there any other documentation showing that Odeh

himself personally supported the children?

A.   One of them, one of the children.

     MR. JONAS:  If I can have the elmo, please.  I am

going to put ton screen HLF search 179.

Q.   (BY MR. JONAS)  Who is this addressed to?

A.   This is addressed to Abdulrahman Odeh from the HLF's

headquarters.  And you will note there is a number up here

above his name, 240091.

Q.   Right.

A.   That is the HLF's I.D. number for Odeh.  We will see that

1   a little bit later.

2   Q.   Okay.  Let me show you the second page of this document.

3   Can you read that?  Is it clear enough for you?

4   A.   It says, "Thank you for your generous contribution to the

5   Orphan Sponsorship Program.  It is because of your support

6   that we are able to reach many orphans giving them the love

7   and assistance they desperately need.

8        "I know that you love your sponsored child so dearly.

9   Thus, I became a little worried when I learned that we have

10  not received your sponsorship gift.  I hope everything is fine

11  with you.  It's not too late.  You can send your check today.

12  I have enclosed a return envelope for your convenience."

13       And it is signed Ibrahim Khalil, which is Ibrahim

14  Elsamneh of the HLF office, the same person we saw in the

15  correspondence.

16  Q.   What does the bottom of this document identify?

17  A.   The orphan's name, which is the child of Yehia Ayyash,

18  Yehia Yehia Ayyash.

19  Q.   Okay.  Did you come across any documentation to

20  show -- This letter indicates that the Defendant Odeh was not

21  making a payment.

22  A.   Or that he was late making a payment.

23  Q.   Did you come across any documentation showing that he was

24  making payments?

25  A.   Yes.

1    MR. JONAS:  If we can pull up HLF Search No. 37,

2    please.

3    Q.   (BY MR. JONAS)  What is this document?

4    A.   This is a series of financial records relating to the

5    Nablus zakat committee.

6    Q.   Okay.  Is this a document that supports your Nablus zakat

7    committee schedule?

8    A.   Yes.

9    MR. JONAS:  If we can turn to page 158.

10   Q.   (BY MR. JONAS)  What is this?

11   A.   This is one of the documents that was obtained from the

12   HLF that supported one of the transactions between the HLF and

13   Nablus zakat.  There is a list entitled orphans list, and it

14   has several names on it.  And if you will look about the

15   middle of this list, it shows that -- That again is

16   Abdulrahman Odeh's I.D. number 240091, and the orphan's name

17   Yehia Yehia Ayyash, the child of the engineer.  And it shows

18   that in the city of Nablus that he paid $90 for that time

19   period, so a two-month time period.

20   Q.   What is that time period?

21   A.   February 28th, 1999 through April 30th, 1999.

22   MR. JONAS:  Let's go to page 186, please.

23   Q.   (BY MR. JONAS)  What do we see here?

24   A.   Again we see the same thing.  This is a supporting

25   documentation for one of the transfers between the HLF and the

Nablus zakat. And it shows third from the bottom that

Abdulrahman Odeh paid for the Yehia Yehia Ayyash through the

Nablus through the time period August 31st, 1999 through

November 30th, 1999, $135.

Q.    Okay. And do we see this type of documentation repeated

throughout this exhibit?

A.    Yes.

Q.    I am not going to make you look at every single one.

A.    Okay.

Q.    Was there any material seized from the Holy Land

Foundation where they discuss Yehia Ayyash?

A.    Yes.

        MR. JONAS:  If we can turn to HLF Search No. 28,

please.

Q.    (BY MR. JONAS)  What is this document?

A.    This is an audiotape that we discussed during my first

testimony related to something else. It is chants, songs that

were on this audiotape found at the HLF offices.

        MR. JONAS:  If we can turn to page two, please. And

this tape, does it reference Yehia Ayyash at all?

A.    Yes; he and several other suicide bombers.

Q.    What does it say in here?

A.    One of the references, and I won't try to sing it, is the

second paragraph in the bottom, and it says, "Ayyash, the

maker of bombs and explosives, and the inventor of the hope

1    stage realizes that he is the number one target of his enemy.

2    He trusts God's fortitude in paving his pathway.  He had

3    stated repeatedly, 'I know that my day will come.  However, I

4    hope that after my death I will leave 1,000 engineers and

5    1,000 Ayyashes.'".

6    Q.   So we are clear, you said this document praises Ayyash

7    and other suicide bombers.  Was he a suicide bomber?

8    A.   No.  He was the bombmaker for the suicide bombers.

9    Q.   Does this tape go on and praise him in other portions of

10   the tape?

11   A.   It does.  I think there are a couple of other passages

12   that we could look at.

13   Q.   Okay.

14        MR. JONAS:  Page 3.  Look at one more.

15   Q.   (BY MR. JONAS)  And where in this document does it talk

16   about him on this page?

17   A.   It begins talking about his birthday at the top.  If you

18   look at the previous page, it says -- it talks about Ayyash at

19   the top.  But it says, "He has now become embroidered in the

20   memory of everyone amongst us.  Here is Yehia, who rises from

21   the wheat kernels as another kernel.  The sun blesses him with

22   its light.  Its rays brown his tender forehead."  And it goes

23   on to talk about him.  It said, "Who amongst us knew him and

24   did not love him?  Who amongst us did not wish to be entwined

25   with the color of his angry eyes."

1    And then you go farther down, I won't read everything, it

2    says, "The genius who made Zionist experts in explosives stand

3    aside, incapable of disarming his miracle car bomb that he had

4    assembled and was discovered near the Ramat Af-al settlement

5    in Tel Aviv.  Those people did not have an alternative other

6    than letting it explode in its place.  Since that time, since

7    November of 1992, Ayyash deals death at them and becomes the

8    number one and most wanted person by the occupying authorities

9    and their intelligence systems."

10    Q.   It says in paren right where you said "sounds of bombs

11    exploding."  What does that mean?

12    A.   Well, this is an audiotape where, again, there are

13    chants, and so the translator of the tape noted when the

14    sounds appeared.  So they were sound effects, basically, of

15    bombs exploding.

16    Q.   Okay.  Were there other documentations that you reviewed

17    in the course of the evidence that talk about Ayyash?

18    A.   Yes.

19         MR. JONAS:  If we can go to El Mezain Wiretap No. 1,

20    page 117, please.

21    Q.   (BY MR. JONAS)  And what are these documents again?

22    A.   These are faxes that were obtained from the wiretap of

23    the Defendant El Mezain's home.

24    Q.   Okay.  And does it talk about Yehia Ayyash in these

25    faxes?

1    A.    Excuse me.  I don't know if that was his home or office,

2    but it was his fax machine.

3          Yes.  In the first paragraph you see it says, "Zionist

4    security" -- Excuse me.  The date is January 18th, 1995, so a

5    year before his death.  "Zionist security sources said that

6    thousands of soldiers and elements from the security and

7    intelligence forces take part in the largest manhunt campaign

8    targeting the Palestinian fighter Yehia Ayyash, 28 years, who

9    is considered to be the coordinator of suicide operations and

10   the mastermind of the explosion of the booby-trapped vehicles

11   which activists from the Hamas movement carried out against

12   various Zionist targets."

13   Q.    What is the date of this again?

14   A.    January 18, 1995.

15   Q.    The documents that we looked at showing that the

16   Defendant Odeh supported at least one of his children, what

17   was the date of those documents?

18   A.    After this.  After his death, and he died in January of

19   '96.

20   Q.    Are there other references to him contained within these

21   faxes?

22   A.    There are many references to him in these faxes from Mr.

23   El Mezain's wiretap.

24   Q.    We are not going to go through them.  Do you remember

25   yesterday we watched a videotape of the library, and there was

1   a Hamas demonstration at the beginning of the videotape?

2   A.   Yes.

3   Q.   Did you see a picture of Yehia Ayyash in that videotape?

4   A.   Yes.  Just before the send of the demonstrations in the

5   back of the crowd you could see someone holding a picture of

6   him.  It was a famous picture of Yehia Ayyash that I have seen

7   a lot.  He is wearing like a scarf around his neck.

8   Q.   Is there a picture of him that has been admitted into

9   evidence?

10  A.   Yes.

11          MR. JONAS:  If we can put Tulkarem Zakat No. 3 on

12  the screen.

13  Q.   (BY MR. JONAS)  Okay.  What is this?

14  A.   This is a photograph a poster of Yehia Ayyash holding a

15  child and an automatic weapon.

16  Q.   Do you know where this poster was taken from, seized

17  from?

18  A.   The Tulkarem zakat committee.

19  Q.   Where is Tulkarem?

20  A.   In the West Bank.

21  Q.   Agent Burns, there is one thing I skipped before when we

22  were talking about HLF support for Hamas leaders in prison.

23  If you recall yesterday the tent video --

24  A.   Yes.

25  Q.   There was an individual named Hassanat.

```
 1    A.    Yes.

 2    Q.    Can you remind us who he is?

 3    A.    He on that tape identified himself as a leader in the

 4    Islamic Society of Gaza.  That is why we were looking at him.

 5    He also identified himself as the father of Yasser Hassanat,

 6    whom he also identified as a martyr for the Al-Qassam

 7    Brigades, the Hamas military wing.

 8    Q.    I had asked you yesterday if we were going to refer to

 9    that individual.

10    A.    Yes.

11    Q.    Okay.  That is what I skipped.  I just want to go back to

12    that.

13    A.    Okay.

14              MR. JONAS:  If we can pull up HLF Search No. 62,

15    page 10, please.

16    Q.    (BY MR. JONAS)  What is this document?

17    A.    This is another one of those orphans lists that were

18    found at the HLF that were relating to wire transactions from

19    the HLF through various entities.  And I can't recall which

20    entity offhand this one went through.  I think it is the HLF

21    Gaza.

22    Q.    Okay.  And how does this relate to Hassanat?

23    A.    It identifies -- Actually this one I believe -- Hold on

24    one second.  I am looking -- There it is at the bottom.  This

25    indicates support for Tasneem Yaser Alhasanat, who would be
```

1    the child of Yasser Hassanat, the martyr referenced on that

2    videotape.  In this culture the father's name is taken as the

3    middle name, or one of the many names if you see the entire

4    name, four or five.  But this would be one of the children of

5    that Izz el-Din al-Qassam martyr, the Hamas military wing.

6    And you can see the date of support on this document is May

7    31st, 1998 through July 31st, 1998.  And this is just one of

8    his several children, and one of several of these documents.

9    Q.    Okay.  What was the date of the tent video?

10   A.    That was from December of 1992.

11   Q.    Okay.  So they are supporting the children up through

12   1998, or at least in 1998?

13   A.    That is correct.

14   Q.    Okay.

15          MR. JONAS:  And if we can go to page 28 of this

16   document, please.

17   Q.    (BY MR. JONAS)  And what is this?

18   A.    This is the same type of list.  On this one, about a

19   third of the way down from the bottom you see the support for

20   another one of that Izz el-Din al-Qassam martyr's children,

21   Banan Yaser Alhasanat also in 1998.

22   Q.    And are there more references to the support for these

23   children, this martyr's children in this document?

24   A.    Yes.

25   Q.    Okay.  Based upon the documentation that was seized by

1    the FBI, was there an indication on some of these project

2    binders or orphan applications or any documentation indicating

3    where some of the HLF money may have went showing that other

4    people besides the HLF were supporting these children, these

5    families?

6    A.    Yes.

7            MR. JONAS:  If we can go to HLF Search No. 183,

8    please.  And let's go to page 13.  I am going to put on the

9    elmo HLF Search No. 183.

10   Q.    (BY MR. JONAS)  What is this document?

11   A.    This is a donation form for the Holy Land Foundation.

12           MR. JONAS:  And if we can go to the last page.

13   Q.    (BY MR. JONAS)  Can you read that?

14   A.    "As for the economic situation, the martyr was working in

15   Israel and the family relied entirely on his income.  But with

16   closure and siege, the family became in need for food to be

17   provided to the children.  Therefore, the father went out

18   seeking a source of provision but he did not return,

19   eliminating their last hope to have an income.  The large

20   number of family members increases their needs of food,

21   clothes, education expenses, accumulated electricity and water

22   bills.  All the expenses do not have income against them.  The

23   family is in need of help, as the assistances which were

24   provided to it did not exceed Saddam Hussein's assistance of

25   $10,000.  But the family did not receive the entire sum, as

1   the martyr's family, father and mother, divided the money and

2   took one third of the money.  Therefore, I see that the family

3   need a sponsorship."

4   Q.   Were there other indications of sponsorship and aid

5   provided to these same families by Iraq?

6   A.   Yes.

7         MR. JONAS:  Let me grab HLF Search No. 184.

8   Q.   (BY MR. JONAS)  And what is this document?

9   A.   This is another HLF donation form.  I don't know if there

10   is a date on it.

11   Q.   Is there a picture of the child on the document as well?

12   A.   That is correct.

13         MR. JONAS:  If we can turn to page 11 of HLF Search

14   No. 184.

15   Q.   (BY MR. JONAS)  Do you see where it says "economic

16   situation"?

17   A.   Yes.

18   Q.   Does it indicate any money coming from someone else

19   besides the HLF?

20   A.   Yes.  It says, "The head of the household brings in 500

21   shekels monthly.  Intermittent assistance from relatives'

22   zakat of money.  The family received a check for $10,000 as an

23   assistance for a family of a martyr from Iraq."

24   Q.   Any other exhibits where money is shown coming from Iraq?

25   A.   Yes.

```
 1              MR. JONAS:  How about one more.  HLF Search No. 185.

 2   Q.   (BY MR. JONAS)  What is this?

 3   A.   An HLF donation form.

 4   Q.   I am not sure if I wrote the page number down for this

 5   one.

 6        Well, have you reviewed this form before testifying.

 7   A.   Yes.

 8   Q.   And is this another one of those documents that indicates

 9   support from Iraq?

10   A.   I believe that it is.

11   Q.   Do you want me to hand it to you so you can double check?

12   A.   Please.  I have looked at too many documents to remember

13   specifically.

14   Q.   Can you tell us if this is another one of those

15   application forms that indicate money coming from Iraq to the

16   family?

17   A.   Yes.  It says, "The other charitable organizations that

18   have assisted this family, one time assistance of $1,000 from

19   al-Salah Society," the society we talked about in Gaza,

20   "$2,000 from the Social Affairs, $10,000 from Iraq, and $2500

21   from the Emirates.  That would be the UAE.

22   Q.   Which is what?

23   A.   United Arab Emirates.

24   Q.   A country?

25   A.   A country.
```

1    Q.   Was there any indication that some of the people the HLF

2    gave money to didn't need money?

3    A.   I have seen documents indicating that some of the family

4    situations was good or excellent, compared to others who do

5    not have a good financial situation.

6    Q.   Did some of the documents indicate financial situation

7    was bad?

8    A.   Absolutely.

9    Q.   All right.

10        MR. JONAS:  If we can go to search HLF Search No.

11   160, please, page 36.  Let's go to page 1, first.

12   Q.   (BY MR. JONAS)  What is this item, if you can recognize

13   it from the first screen?

14   A.   This is another one of those documents that contained a

15   bunch of financial exhibits, or exhibits related to financial

16   transactions.

17        MR. JONAS:  If we can go to page 36, please.

18   Q.   (BY MR. JONAS)  What does this say about the economic

19   situation about some of the people the HLF was giving money

20   to?

21   A.   It is entitled, "List of orphans of the Holy Land

22   Foundation, supervising party of the Jenin zakat."  So this

23   document, according to the document, relates to HLF orphans

24   supported through the Jenin zakat committee.

25        And if you will look, it has the name, the city, the

1    sponsorship amount, a column for recipient signature.  And

2    then again, this is a translation, so if you look at the

3    original there are some signatures on the original.  And in

4    the notes column there are notes.  And by some of the

5    individuals' names --

6    Q.   Let me interrupt for a moment.  I am sorry.

7         MR. JONAS:  If we can enlarge the right side,

8    please, the notes column.

9    Q.   (BY MR. JONAS)  Okay.  Go ahead.

10   A.   On the first orphan it says, "Financial situation is

11   excellent."  On the third it says, "Financial situation good.

12   Student's behavior is not good."  The next one says, "Incoming

13   sponsorship.  They have more than one."  Further down, one of

14   the notes "Has a second sponsorship.  Financial situation is

15   good."  Going on down, again you will note where it says,

16   "Financial situation is good."  And I think there are several

17   more pages of this.

18        MR. JONAS:  Let's to page 39 of this document, HLF

19   Search No. 160.

20   Q.   (BY MR. JONAS)  What do we see here on the notes column?

21   A.   Again, this is the same type of sheet with the name of

22   the orphan, the date, the amount that was paid.  And you see

23   the first one says, "Has a second sponsorship.  Financial

24   situation is excellent."  The next one says, "This girl is

25   handicapped."

1      But then you go on down and for one of the children that

2   received money, it says, "Financial situation is good, but he

3   has bad morals."

4   Q.   And just so we are clear, on some of those applications

5   we looked at where Iraq or Saddam Hussein is giving money,

6   what did it say about the financial situation of those people?

7   Not on this document; on the prior documents.

8   A.   Well, it depended on the particular situation of the

9   orphan.

10  Q.   Have you seen ones where it said the financial situation

11  is bad?

12  A.   Yes.

13  Q.   And here we see ones where it says the financial

14  situation is good?

15  A.   Yes.

16  Q.   Does this document here, the one that is on the screen,

17  HLF Search No. 160, for these people where it says financial

18  situation is good, does it indicate anywhere that there is a

19  financial need for those families?

20  A.   Not on this document.

21  Q.   Okay.  Did you come across any videotapes seized in the

22  course of the investigation where the HLF is interviewing

23  or -- I am sorry.  Withdrawn.  Any videotapes seized where

24  people are being interviewed, apparently in the West Bank or

25  Gaza, regarding the HLF?

```
1    A.    Yes.

2    Q.    Okay.

3          MR. JONAS:  If we can play HLF Search No. 113.

4          (Whereupon, HLF Search No. 113 was played, while

5          questions were propounded.)

6    Q.    (BY MR. JONAS)  Agent Burns, where is this from, based

7    upon what it says?

8    A.    Okay.  It was taken from the HLF, but it says Ramallah

9    zakat committee.

10   Q.    And was this one of the committees you testified about

11   yesterday that the HLF provided money to?

12   A.    Yes.

13   Q.    Okay.  Do you know the date of this video?

14   A.    No, I don't.

15   Q.    Okay.

16   A.    Excuse me.  You asked me the date on the bottom of the

17   screen.  It says September 5th, 1993.

18   Q.    Okay.  Thank you.

19         Do you recognize this individual.

20   A.    Yes.

21   Q.    Who is he?

22   A.    Mahmoud Mosleh.

23   Q.    Have we seen him before, or have you testified about him

24   already?

25   A.    Yes.
```

```
1    Q.    How?

2    A.    He is a member of the Ramallah zakat committee.  He is on

3    that summary chart that we did yesterday, and we saw a brief

4    interview with him yesterday on a videotape.

5    Q.    Okay.  Did you testify about this individual Hosni Abu

6    Awad?

7    A.    Yes.  He is a member of the Ramallah zakat committee and

8    is on the chart.

9    Q.    Okay.  Hamzah Deeb, is he on your schedule?

10   A.    Yes.

11   Q.    Is this man on your list, on your schedule.

12   A.    No.

13   Q.    Okay.  Is this individual Ibrahim Abu Salem on your list?

14   A.    He is, but with a different committee; with the Islamic

15   Science and Culture.  He had affiliations with several

16   entities.

17   Q.    Okay.  Omar Hamdan, is he on your list?

18   A.    He is.

19   Q.    Which committee?

20   A.    The Ramallah zakat committee.

21   Q.    Okay.  Agent Burns, were there other videos seized where

22   they were sort of interviewing people, like they did in the

23   last clip?

24   A.    Yes.

25              THE COURT:  Let's take the morning break.  Let's
```

1    take a 20-minute break.  Let's be back at 11:00.

2              (Whereupon, the jury left the courtroom.)

3              THE COURT:  We will be in recess until 11:00.

4              MR. DRATEL:  Your Honor, I just want to move for a

5    mistrial based on the repeated transparent gratuitous

6    references to Iraq.  There is no relevance to money coming

7    from there with respect to where specific sources were.

8              THE COURT:  The motion for mistrial is denied.

9              MR. JONAS:  Just a housekeeping matter we can take

10   up when we get back if you want.

11             THE COURT:  Go ahead.

12             MR. JONAS:  Of the exhibits listed on my courtesy

13   list yesterday that were all moved in en masse, there was

14   about eight that I decided I am not going to question Agent

15   Burns about that I would like to withdraw.  I can just give a

16   list to Ms. Helms, if you want.

17             MS. MORENO:  We may have an issue about one of them.

18             MS. DUNCAN:  We may have an issue as to more than

19   one.

20             THE COURT:  Let him give you a list.

21        We will be in recess.

22                  (Brief Recess.)

23             THE COURT:  Mr. Jonas?

24             MR. JONAS:  Thank you, sir.

25   Q.   (BY MR. JONAS)  Agent Burns, when we broke we watched the

1  videotape where a child was being interviewed.  Were there

2  other videotapes of other people being interviewed that appear

3  to be taken in either the West Bank or Gaza?

4  A.   Yes.

5  Q.   And these tapes were found at either HLF or InfoCom?

6  A.   Yes.

7          MR. JONAS:  If we can play InfoCom Search No. 80.

8          (Whereupon, InfoCom Search No. 80 was played, while

9          questions were propounded.)

10  Q.   (BY MR. JONAS)  Agent Burns, were there any videotapes

11  seized from the Holy Land Foundation showing children in the

12  United States?

13  A.   Yes.

14          MR. JONAS:  If we can play HLF Search No. 72,

15  please.

16          (Whereupon, HLF Search No. 72 was played, while

17          questions were propounded.)

18  Q.   (BY MR. JONAS)  Do you recognize anyone on the screen,

19  Agent Burns?

20  A.   Yes.  That is on the right the Defendant Mohamed El

21  Mezain, and next to him is the HLF representative from Chicago

22  Kifah Mustapha.

23  Q.   Any other videotapes involving children?

24  A.   Yes.

25          MR. JONAS:  If we can play HLF Search No. 73,

1  please?

2          MS. HOLLANDER:  Can we have the date for that?

3  Q.  (BY MR. JONAS)  Do you know the date of the video that we

4  played?

5  A.  I don't know the date.

6  Q.  Do you know the date of the one we are about to play?

7  A.  I don't believe we could date it.

8          MR. JONAS:  HLF Search No. 73, please.

9          (Whereupon, HLF Search No. 73 was played, while

10         questions were propounded.)

11 Q.  (BY MR. JONAS)  What is being held up, if you can see in

12 the middle of the screen?

13 A.  The boy in the back is holding a gun in his left hand.

14 Q.  Agent Burns, can you see what that child is holding in

15 his hands?

16 A.  It is a rifle.

17 Q.  Do you recognize anyone on the screen?

18 A.  You can see Munzer Taleb as one of the band members in

19 the background.

20 Q.  Agent Burns, there has been discussion in this case about

21 a massacre that happened at the Ibrahimi mosque.  Are you

22 familiar with that?

23 A.  Yes.

24 Q.  In reviewing the documentation again that the FBI

25 gathered in the course of this investigation, did you come

1    across any documentation that the HLF supported some of the

2    victims of the Ibrahimi mosque massacre?

3    A.   Yes.

4    Q.   That is where Baruch Goldstein just went in and started

5    shooting people up?

6    A.   Yes.

7    Q.   Okay.  Let me give you several exhibits.  Do you have

8    before you InfoCom Search No. 13?

9    A.   I do.

10   Q.   What is that document?

11   A.   This is a group of financial documents that relate to the

12   Holy Land Foundation's transfers involving the Islamic

13   Charitable Society of Hebron.

14   Q.   And InfoCom Search No. 100, what is that?

15   A.   This is a set of payment vouchers that relate to one of

16   the transactions referenced in the financial exhibits.

17   Q.   And does InfoCom Search No. 100 relate to payments

18   regarding the Ibrahimi mosque massacre?

19   A.   Yes.

20   Q.   And do you have before you also what has been marked as

21   U.N. General Assembly Document?

22   A.   I do.

23   Q.   And what is that document?

24   A.   This is a United Nations report of the special committee

25   to investigate Israeli practices affecting the human rights of

1    the Palestinian people and other Arabs of the Palestinian

2    occupied territories.

3    Q.    Does this document list out individuals who were killed

4    in the Ibrahimi mosque?

5    A.    It does.

6    Q.    Has a demonstrative exhibit been created comparing the

7    list of InfoCom Search No. 100 of the victims HLF supported

8    against the U.N. list?

9    A.    Yes.

10   Q.    Is that this demonstrative exhibit comparing those two

11   exhibits?

12   A.    It is.

13            MR. JONAS:  Your Honor, I offer into evidence

14   Demonstrative No. 32 as a demonstrative.

15            THE COURT:  Counsel?

16            MR. DRATEL:  Can we approach just for a second?

17            (The following was had outside the hearing of the

18            jury.)

19            MR. DRATEL:  I think it is misleading because --

20   This is one we got yesterday afternoon.  It is misleading

21   because it is not -- It takes two parts of a document that are

22   disconnected and tries to put them together and tries to make

23   it look like it is straight through.  The U.N. document, the

24   one on the right -- And also they are not Ibrahimi massacre

25   victims, they are not all victims.  There are three in the

1    bottom that aren't.

2         MR. JONAS:  First of all, the U.N. document is a

3    fairly thick document that discusses people killed by the

4    Israelis and sections of people killed by Hamas and other

5    factions.  It is fairly thick.  Most of it is irrelevant.  The

6    relevance here is that HLF supported what they listed as 22

7    victims.  It is in InfoCom Search No. 100.  The U.N. listed

8    out the victims.  They also listed out three other people who

9    died a month later.  Those three other people who died the HLF

10   supported under the Ibrahimi mosque massacre.  Those people

11   who died per the U.N. document were suspected of being Hamas.

12       So our point is HLF is supporting Hamas members under the

13   guise of this Ibrahimi mosque massacre, people who didn't die

14   at the massacre.

15        MR. DRATEL:  That is completely misleading because

16   that is not what the HLF -- There was a Ibrahimi mosque

17   massacre committee.  It is not the HLF that characterizes them

18   as Ibrahimi mosque victims.  It is the committee in Hebron

19   that characterized them that way.

20        MR. JONAS:  It is on their documents, these

21   particular ones taken from InfoCom.  If they want to argue --

22        THE COURT:  It identifies those victims as victims

23   of that particular massacre?

24        MR. JONAS:  Yes.

25        THE COURT:  I think that is going --

1          MR. DRATEL:  No, it doesn't.

2          MR. JONAS:  Do you want me to pull the exhibit?

3          THE COURT:  I will have to look at it.  This is

4    InfoCom No. 100?

5          MR. JONAS:  Yes.  These are payment vouchers.  These

6    are the translations.  You can look at all the names.  I won't

7    point out the ones that are at issue.

8          THE COURT:  And that is what you are having listed

9    on that demonstrative?

10         MR. JONAS:  The demonstrative has the names on the

11   left side.  On the right side is both the U.N list of the

12   massacre --

13         THE COURT:  What you are saying is misleading?

14         MR. DRATEL:  This is not Holy Land saying this is

15   the Ibrahimi mosque massacre.  It is the committee that

16   characterized it that way, not Holy Land.  So I think the

17   demonstrative -- If they want to use the documents, that is

18   fine, but the demonstrative is misleading.

19         THE COURT:  I will overrule that.  You can argue

20   that.  The documents are in evidence.  You can argue to the

21   jury what you are saying.

22         MR. DRATEL:  We have 106 issues, too, with respect

23   to a document, with respect to that list as well.

24         THE COURT:  Okay.

25         MR. JONAS:  We can address the 106 issue later,

1    because we will have issues regarding that.

2              (The following was had in the presence and hearing

3              of the jury.)

4              THE COURT:  Demonstrative No. 32, that is admitted.

5    Q.   (BY MR. JONAS)  Agent Burns, I showed you two InfoCom

6    documents just now, I believe No. 13 and 100.

7    A.   Correct.

8    Q.   I just want to be clear, those were found where?

9    A.   Within the HLF materials at InfoCom.

10   Q.   So these are HLF documents?

11   A.   Yes.

12   Q.   Did HLF create the documents, as far as you can tell?

13   A.   It appears so.

14             MR. JONAS:  If I may approach, Your Honor?

15             THE COURT:  Yes.

16   Q.   (BY MR. JONAS)  I will give you a hard copy of that.  I

17   don't know if you can see the screen.  We don't have that

18   scanned so we can't put it on the screen.

19        Agent Burns, looking at this demonstrative, what is on

20   the left hand side?

21   A.   On the left hand side you have a list of individuals from

22   InfoCom Exhibit No. 100 that were labeled as martyrs of --

23   Q.   I am sorry, Agent Burns.

24   A.   That were labeled as victims of that Ibrahimi mosque

25   massacre.

1          MR. JONAS:  If we can put on the screen InfoCom

2    Search No. 100, the first page, please.

3    Q.   (BY MR. JONAS)  Okay.  Is this what the exhibit looks

4    like?

5    A.   Yes.  There were 22 of these payment vouchers.  They were

6    in Arabic and we had them translated.  Actually there were 44,

7    but they were duplicates, two sets of the same 22 payment

8    vouchers.

9          MR. JONAS:  And if we will go to page 8.  If we can

10   enlarge the one on the bottom right hand corner, please.

11   Q.   (BY MR. JONAS)  I just want to use this one as an example

12   for a moment.  How do you know -- First of all, are all these

13   payment vouchers identical other than the recipient?

14   A.   No.

15   Q.   What are the differences?

16   A.   Some people received more money than others.

17   Q.   Is that listed on Demonstrative No. 32, the amount of

18   money people received?

19   A.   It is.

20   Q.   Besides the amount of money, are the payment vouchers

21   identical?

22   A.   Yes.

23   Q.   Where on the payment voucher does it identify that these

24   people are receiving funds because of someone dying in the

25   Ibrahimi mosque massacre?

1    A.    It says on the top of the payment voucher "The committee

2    for the families of the Ibrahim Sanctuary Massacre."  And if

3    you also look at the paperwork that went with these payment

4    vouchers, which is in InfoCom Search No. 13, it states that

5    these were part of the Ibrahimi mosque massacre victims.

6    Q.    Okay.  On the right hand side of Demonstrative No. 32,

7    can you explain to us the first portion of that?

8    A.    The first portion of that is a list that was published by

9    the United Nations General Assembly.  The date is to the left,

10   which is the date of that massacre of those people, February

11   24th, 1994.  And next to it is a list of the names and ages of

12   the people who died during that massacre.  The place of

13   residence is noted next to that, and then remarks.  And it

14   tells how they were shot dead by that individual Baruch

15   Goldstein.

16   Q.    Are there any names listed in InfoCom Search No. 100,

17   that is on the left side of this Demonstrative No. 32, as

18   being supported by the Holy Land Foundation that are not on

19   the U.N. list of victims of the Ibrahimi massacre?

20   A.    Yes.

21   Q.    Who?

22   A.    Two of them are Iyad Hussein Abu Hadid Abu Isneinah.

23   Q.    Okay.  I don't know if you can see where I am pointing,

24   but it is that seven from the bottom?

25   A.    Right there, that guy.

```
1    Q.    Is that where I am pointing?

2    A.    Yes.

3    Q.    Anyone else?

4    A.    If you move down third from the bottom, Mohamed Ayhid Abu

5    Isneinah al-Atrash.

6    Q.    How much did those two individuals receive?

7    A.    Both of those individuals received 900 shekels.

8            MR. DRATEL:   Objection.  The individuals did not

9    receive it.

10           MR. JONAS:   Thank you.

11   Q.    (BY MR. JONAS)  How much did their family members

12   receive?

13   A.    Their family members received 900, and it says shekels on

14   here.  I am not sure if it was shekels or dollars.  It says

15   900 shekels.

16   Q.    Those two individuals you just identified as not being

17   victims listed on the U.N. list, are they anywhere in that

18   U.N. document?

19   A.    They are.

20   Q.    And are they on a different page than the listing of the

21   victims?

22   A.    Yes.  They are on page four.

23   Q.    Okay.  Before we go to that, do you see on the screen one

24   of those payment vouchers on InfoCom Search No. 100?

25   A.    Yes.
```

```
 1    Q.   Is that a payment voucher for one of those individuals

 2    you just identified as not being part of the U.N. list of

 3    victims?

 4    A.   Yes.

 5    Q.   Okay.

 6              MR. JONAS:  If we can go to the U.N. document, page

 7    4, please.

 8    Q.   (BY MR. JONAS)  Is this part of page 4 on the bottom half

 9    of the right side of Demonstrative No. 32?

10    A.   It is.

11    Q.   And what -- Does this identify two of those people that

12    are on the HLF list?

13    A.   Yes.  The two that you pointed out on the chart are noted

14    here.

15    Q.   And how are they listed in the U.N document?

16    A.   Iyad Abu Sneineh and Mohammed Abu Sneineh.

17    Q.   How do you know those two are the same individuals on

18    this list?

19    A.   Because they have the same names and family names.  A lot

20    of these individuals will have four, five, six names as a part

21    of their whole name, but their first names and family names

22    are the same.

23    Q.   What does it say about who these people are on the U.N.

24    document and how they died?  Well, before you go there, what

25    was the date of the massacre?
```

1    A.    The date of the massacre was February 25th, 1994.

2    Q.    Okay.  What date did these people die, according to the

3    U.N. document?

4    A.    March 23rd, 1994.

5    Q.    So that roughly a month later?

6    A.    Yes.

7    Q.    What does it say in the U.N. document as to who these

8    people were?

9    A.    It says, "The three"--because there were three--"were

10   reportedly leaders of Hamas in the West Bank.  Killed in a

11   30-hour-long shoot-out with the Army in Hebron.  The

12   confrontation ended when their hide-out was demolished by

13   explosives.  Four bodies retrieved from the rubble."

14   Q.    Did you look to see how much money the HLF paid to the

15   members of the victims' families from the mosque, per the HLF

16   or the InfoCom records that you have?

17   A.    According to the exhibits that we have, a majority of the

18   people received $300 or shekels, as opposed to $2900 these two

19   individuals received.  There were a couple of individuals,

20   including the nephew of Abdel Khaleq Natshe, one of the

21   leaders of the Islamic Charitable Society of Hebron, who

22   received $900 or 900 shekels.  And there was one individual

23   who received $1350.  But for the most part, all but -- Let me

24   count them.  There were 22 payment vouchers.  Six of those

25   individuals received more than $300, two of those individuals

1    are the people who were killed a month later, and one of those

2    individuals was the nephew of Abdel Khaleq Natshe, the leader

3    of the Islamic Charitable Society of Hebron.

4    Q.    Was there any documentation indicating how much the HLF

5    paid as a project?

6    A.    According to their documentation, the project information

7    attached to these payment vouchers, which part of that is

8    contained in InfoCom Search No. 13, indicates that the HLF

9    paid to the Islamic Charitable Society of Hebron $43,000 for

10   these individuals.

11   Q.    And just so we are clear, InfoCom Search No. 100, was

12   that sort of broken out in order to be made as a separate

13   exhibit?

14   A.    Yes.

15   Q.    Of the payment vouchers or payment coupons?

16   A.    That is correct.

17   Q.    Okay.  Of the $43,000 that was paid, going through the

18   records were you able to account for all $43,000, based upon

19   the supporting documentation?

20   A.    Based upon the supporting documentation that they had

21   that was attached, there were 22 separate payment vouchers for

22   22 individuals that we have just identified.  Adding up all of

23   those amounts, assuming those amounts were dollars, because

24   dollars are more than shekels, only that $5,000 was accounted

25   for, according to their supporting documentation.

1   Q.   Was there any indication as to where the remainder may

2   have gone?

3   A.   Not in the information that was attached to that project

4   report.

5   Q.   Okay.

6              MR. JONAS:  Your Honor, I will pass the witness.

7              THE COURT:  Do you want to approach the bench a

8   minute?

9              (The following was had outside the hearing of the

10             jury.)

11             THE COURT:  Is this when we had agreed to break?  We

12  agreed to break, so are you ready to call your next witness?

13             MR. JONAS:  Yes.

14             THE COURT:  All right.  Let's do that, then.

15             MS. SHAPIRO:  I just need to send somebody out to

16  get him.

17             THE COURT:  All right.  We will work until about

18  12:30.

19             (The following was had in the presence and hearing

20             of the jury.)

21             THE COURT:  Members of the jury, the parties have

22  agreed to take another witness out of turn, so Agent Burns

23  will step down at this time, and then we will hear from

24  another witness who needs to testify today.  And then she will

25  come back on the witness stand sometime this afternoon and be

1    cross examined by counsel for the Defense.

2             MS. SHAPIRO:  Your Honor, the Government calls Bob

3    McBrien, and he is on his way in.

4             THE COURT:  All right.

5             (Whereupon, the oath was administered by the Clerk.)

6                   JOHN ROBERT McBRIEN,

7    Testified on direct examination by Ms. Shapiro as follows:

8    Q.    Good morning, Mr. McBrien.

9    A.    Good morning.

10   Q.    Could you please state and spell your last name for the

11   record, please?

12   A.    My name is John Robert McBrien, M-c-B-R-I-E-N.

13   Q.    Okay.  Mr. McBrien, where are you employed?

14   A.    I am employed in the U.S. Treasury Department, Office of

15   Foreign Assets Control, known as OFAC.

16   Q.    What is the Office of Foreign Assets Control?

17   A.    We are the entity of the Government that enforces and

18   administers economic sanctions programs imposed by the

19   President or by some other act of Congress.

20   Q.    And what is your job title within OFAC?  I will call it

21   OFAC, if that is okay.

22   A.    Yes.  I am the associate director for investigation and

23   enforcement.

24   Q.    How long have you been the associate director?

25   A.    I have been associate director since May of 2005.

```
1    Q.    May of 2005?

2    A.    Yes.

3    Q.    And what was your position before that time?

4    A.    Before that time I was the chief of what was then called

5    the International Programs Division.

6    Q.    And how long were you the chief of the International

7    Programs Division?

8    A.    From roughly the beginning of 1988 until the change.  We

9    reorganized.

10   Q.    Okay.  And so how long altogether have you been with the

11   Treasury Department's Office of Foreign Assets Control?

12   A.    Twenty years.

13   Q.    And are you familiar with the term specially designated

14   terrorist?

15   A.    Yes, I am.

16   Q.    What is that?

17   A.    Specially designated terrorist is a person, and that can

18   be an entity or an individual, that has been defined further

19   under the authority of an executive order as being a

20   prohibited party for U.S. persons to have transactions of any

21   sort with, and whose assets will be blocked within U.S.

22   jurisdiction.

23   Q.    Let me break that down a little bit.  First of all, what

24   is an executive order?

25   A.    An executive order is a legal action taken by the
```

President of the United States.  In the case of what OFAC

does, it is dependent upon the President making a finding that

is an unusual, an extraordinary threat to the U.S. national

security foreign policy or economy, the threat essentially

emanating principally or exclusively from abroad, and having

made that finding to deal with the threat, he imposes an

economic sanctions program of some sort.

Q.    Okay.  And let me show you what has been entered into

evidence as InfoCom Search No. 37.

        MS. SHAPIRO:  If we could pull that up, please.

Q.    (BY MS. SHAPIRO)  Is this a copy of Executive Order

12947?

A.    Yes, it is.

Q.    Okay.

        MS. SHAPIRO:  If we could go to page 2 of that

exhibit, please.

Q.    (BY MS. SHAPIRO)  Can you see that on the screen?  Let's

try to enlarge the top half, please.  Could you just read

where it starts, "I, William J. Clinton"?

A.    I, William J. Clinton, President of the United States of

America, find that grave acts of violence committed by foreign

terrorists that disrupt the Middle East peace process

constitute an unusual and extraordinary threat to the national

security, foreign policy, and economy of the United States,

and hereby declare a national emergency to deal with that

1    threat."

2    Q.    Okay.  And does this executive order then go on to

3    explain that certain transactions are blocked or prohibited?

4    A.    Yes, it does.

5    Q.    Okay.  Could you continue reading down --

6            MS. SHAPIRO:  If you could enlarge the bottom third

7    of that page, please, where it says Section (b).

8    Q.    (BY MS. SHAPIRO)  Could you read Subsections (b) and (c),

9    please?

10   A.    "(b) any transaction or dealing by United States persons

11   or within the United States in property or interests in

12   property of the persons designated in or pursuant to this

13   order is prohibited, including the making or receiving of any

14   contribution of funds, goods, or services to or for the

15   benefit of such persons."

16   Q.    Okay.  Let me interrupt you for a moment.  When it says

17   United States persons, does that also include organizations?

18   A.    Yes.

19   Q.    Okay.  Continue.

20   A.    "(c) any transaction by any United States person or

21   within the United States that evades or avoids, or has the

22   purpose of evading or avoiding, or attempts to violate, any of

23   the prohibitions set forth in this order is prohibited."

24   Q.    Okay.  And when we talk about being blocked, in sort of a

25   layperson's language what does that mean?

1    A.    It means the property is frozen.  It is not seized by the

2    United States in the sense that it would be taken and there is

3    ultimately a forfeiture, but it is blocked and held -- It is

4    essentially the use of the property is incapacitated,

5    immobilized.

6    Q.    A freezing?

7    A.    Freezing.

8    Q.    And is Hamas designated as part of this executive order?

9    A.    Yes, it is.

10            MS. SHAPIRO:  Can we just go to the page, the last

11   page of this exhibit, please?  If we can just make that

12   bigger.

13   Q.    (BY MS. SHAPIRO)  And do you see where Hamas appears on

14   that list?

15   A.    Yes, I do.  Islamic Resistance Movement, Hamas.

16   Q.    Okay.  Now, are you familiar with the term specially

17   designated national?

18   A.    Yes, I am.

19   Q.    What is that?

20   A.    A specially designated national is a person that is an

21   entity or individual that is -- Under this executive order it

22   can be someone committing acts of violence or that may be

23   committing acts of violence to further terrorism.  It may be

24   providing material financial services or support, or it may

25   be, and this is a standard comment to most executive orders, a

1    party owned or controlled by, or acting for or on behalf of

2    another designated party, including those on the annex.

3    Q.   Okay.  Does the specially designated nationals list, does

4    that include more than specially designated terrorists?

5    A.   Yes, it does.

6    Q.   In other words, does OFAC administer more programs other

7    than terrorists programs?

8    A.   Yes, we administer more than 20 programs.

9    Q.   Okay.  And the specially designated national list, does

10   that include all of the OFAC designations?

11   A.   Yes, that list does.

12   Q.   Is there -- Can you access the specially designated

13   national list off the Treasury Department website?

14   A.   Yes, you may.

15   Q.   Can you also access a subset of that list for just

16   specially designated terrorists under this particular

17   executive order that we just looked at?

18   A.   Yes, you can.

19   Q.   And do you have a set of exhibits in front of you, Mr.

20   McBrien?

21   A.   Yes, I do.

22   Q.   Okay.  Can you look at what has been marked as OFAC

23   No. 1?

24   A.   Yes, ma'am.

25   Q.   And without going into the substance of the document, can

1    you tell us generally what this document is?

2    A.   That is a print copy of the specially designated

3    terrorist list.

4    Q.   Okay.

5         MS. SHAPIRO:  Your Honor, I move the admission of

6    OFAC No. 1.

7         MR. CLINE:  No objection, subject to the discussion

8    we had this morning.

9         THE COURT:  And that is admitted.  .

10   Q.   (BY MS. SHAPIRO)  Okay.  I just wanted you to see what

11   this looks like.  Does this look like a list of just specially

12   designated terrorists or SDTs?  Do you see SDT?

13   A.   Yes.

14   Q.   Okay.  And just to show you the thickness of this list,

15   it is a fairly small list.  Correct?

16   A.   Yes, ma'am.

17   Q.   Is this smaller than the specially designated nationals

18   list?

19   A.   Substantially.

20   Q.   About how thick is the specially designated nationals

21   list?

22   A.   I believe it is around 400 pages at the moment.

23   Q.   Okay.  Now, Hamas appears on this list.  Is that right?

24   A.   That is correct.

25   Q.   Okay.  And when the -- Well, who can make a designation,

1    first of all?

2    A.    Well, when he issues an executive order, the President

3    may name parties in the executive order, and he can do it in

4    the body of the order, in the preface, or as in an annex --

5    Q.    My question -- I am sorry to interrupt you.  I don't know

6    if you understood the question.  The question is does the

7    President or can only the President designate, or can the

8    Treasury Department also designate?

9    A.    Treasury also can designate.

10   Q.    All right.  So when the President or the Treasury

11   Department designates an organization as a specially

12   designated terrorist, do they typically designate every

13   sub-group of that organization or every component of that

14   terrorist organization?

15   A.    Not typically, no.

16   Q.    And why not?

17   A.    Depending upon the different programs, the nature of the

18   organizations may be so comprehensive that naming all the

19   parties is a task beyond the resources, and beyond the wise

20   use of the resources we are devoting to the program.

21   Q.    And why is that beyond the wise use of the resources?

22   A.    Well, we seek to target what are the key nodes or the

23   umbrella aspects of the organizations, particularly in the

24   specially designated terrorism program.

25   Q.    Why is that.

1    A.    Basically we get the most bang for the buck.  We can stop

2    the most money flowing at one point by designating those

3    parties.

4    Q.    And are there other concerns also with respect to trying

5    to designate every single sub-entity of a terrorist

6    organization?

7    A.    Yes.  There are other factors such as their diplomatic

8    concerns that may come into play in a particular case.  There

9    may be interests of other federal agencies, investigative

10   agencies, intelligence agencies, where our action might

11   adversely impact something that they were considering or had

12   underway.

13   Q.    And in your experience do terrorist organizations

14   sometimes work through front organizations?

15   A.    Very commonly.

16   Q.    And what is a front organization?

17   A.    A front organization is a representative that tries to --

18   normally tries to conceal its linkage the parent, the

19   specially designated terrorist organization.  It is a straw

20   man, a middleman.  It can be an entity, it can be an

21   individual could be a straw man.  It is a way of trying to

22   avoid trying to be identified what or who you really are.

23   Q.    Can front organizations change?

24   A.    Yes.  In our work we tend to call them transformers.

25   They are those that change frequently.

1   Q.   I would like to play for you what has been admitted into

2   evidence as El Mezain Wiretap No. 13.  This is an excerpt of a

3   conversation between Abdel Haleem Ashqar and Mohamed El

4   Mezain.

5         (Whereupon, Government's Exhibit El Mezain Wiretap No. 13

6         was played in open court.)

7   Q.   (BY MS. SHAPIRO)  Do you see where it says --

8         MR. DRATEL:  Can we get a date on the conversation,

9   Your Honor, please?

10        MS. SHAPIRO:  I believe the witness won't know the

11  date, Your Honor, but it is in evidence as October 24th, 1994.

12  Q.   (BY MS. SHAPIRO)  Do you see where it says, "The name

13  changes and the work continues as is.  And if it did not come

14  through point A, it will come through point B.  And God knows

15  all secrets"?

16       Is that consistent with your rationale for why not every

17  sub-entity or component of a terrorist organization is

18  designated?

19  A.   Yes.

20        MR. WESTFALL:  Your Honor, we object to not being

21  consistent with rendering an expert opinion through this

22  witness, Your Honor.

23        THE COURT:  Okay.  Overrule that objection.  Go

24  ahead.  You may answer.

25        THE WITNESS:  Yes, ma'am.  That is consistent with

1   the shell game that is often played by these kinds of

2   organizations.

3   Q.   (BY MS. SHAPIRO)   Now, sometimes individuals are

4   designated.   Is that right?

5   A.   That is correct.

6   Q.   Does OFAC try to designate all individuals connected to a

7   terrorist organization?

8   A.   No, we do not.

9   Q.   I want to turn your attention specifically to the

10  designation of Hamas.   Hamas is designated under Executive

11  Order 12947.   Correct?

12  A.   That is correct.

13  Q.   Is the social wing of Hamas separately designated?   Is it

14  designated in the executive order?

15  A.   The social wing of Hamas is encompassed within the

16  designation of Hamas.   The U.S. government's action doesn't

17  recognize a distinction between the social wing and the

18  military wing.

19  Q.   So is it okay to give money if the money is going

20  strictly to the social side of Hamas?

21  A.   No, it is not.

22  Q.   And is there a reason why the social wing is not broken

23  out from the military wing?

24  A.   A couple of reasons.   One is that Hamas as an overall

25  organization uses its social side to promote its agenda and

1   itself as an organization, and it is itself a terrorist

2   organization.  So that is supporting terrorism through that

3   social aspect as well.  Even if you want to call it community

4   building, it still is enforcing the Hamas structure and the

5   Hamas infrastructure.

6        The other aspect is that the funds that go to Hamas, any

7   aspect of Hamas, and even some physical goods that could go to

8   Hamas are fungible.  They can be used for whatever purpose the

9   organization decides to use them.  If they want to bleed off a

10  small part of the funds for terrorism or a large part of the

11  funds for terrorism they, can do so with impunity.

12  Q.   Okay.  Now, if not every person or every sub-component or

13  element of Hamas appears on the designation list separately

14  listed, then how do people know not to give to that

15  organization?

16  A.   Well, first the organization is named, and then the

17  executive order itself is expansive and our regulations spell

18  out who the party is.

19  Q.   When you say the organization is named, do you mean Hamas

20  is named?

21  A.   Hamas is named.

22  Q.   Okay.  And so how do people -- What do people need to do

23  in order to be sure that they are not giving to any part of

24  Hamas, even those who are not listed?

25  A.   They need to exercise good faith, due diligence to

1   understand what parties they are dealing with, particularly

2   those that are dealing in a high risk area such as the Middle

3   East.

4   Q.   So are they expected to do more than just check the list?

5   A.   Yes.

6   Q.   Okay.  Do you have before you what has been marked as

7   OFAC No. 3?

8   A.   Yes, I do.

9   Q.   And again, without going into the substance of the

10  document, can you identify what this document is?

11  A.   The documents, the Treasury Department's antiterrorist

12  financing guidelines, in particular the voluntary best

13  practices for U.S. based charities.

14       MS. SHAPIRO:  Your Honor, I move the admission of

15  OFAC No. 3.

16       MR. CLINE:  No objection.

17       THE COURT:  Admitted.  .

18  Q.   (BY MS. SHAPIRO)  I am not sure this is in the computer.

19  Let me just check.  Is this OFAC No. 3?

20  A.   Yes, ma'am, it is.

21  Q.   Okay.  And I am going to try to make larger the bottom

22  part of this.  Is that too small to read?

23  A.   No, I can read that.

24  Q.   Okay.  And I think -- Do you have a copy of this in front

25  of you as well?

1    A.    Yes, I do.  That is easier.

2    Q.    Okay.  Can you read, starting from the first sentence

3    starting from, "These Guidelines"?

4    A.    "These Guidelines are designed to assist charities that

5    attempt in good faith to protect from terrorist abuse and are

6    not intended to address the problem of organizations that use

7    the cover of charitable work, whether real or perceived, to

8    provide support to terrorist groups or fronts operating on

9    behalf of terrorist groups."

10   Q.    Okay.  And if you are an organization that is acting as a

11   front or using a charitable organization as a cover, then do

12   these Guidelines actually apply to you?

13   A.    Would you repeat the question, please?

14   Q.    Yes.  If the intent of an organization is to act as a

15   front or a cover for a designated organization, do these

16   guidelines really have any application to you?

17   A.    No.  These guidelines are to avoid that and to deal with

18   good faith organizations.

19   Q.    Okay.  Let's look at another part of this document, if

20   you could turn to page 10.  And if you could read starting

21   with that paragraph (b)(1), and then the first sentence of the

22   footnote that it references.

23   A.    "(b)(1), The charity should conduct basic vetting of

24   grantees as follows:  The charity should conduct a reasonable

25   search of publicly available information to determine whether

1    the grantee is suspected of activity relating to terrorism,

2    including terrorist financing or other support.  Charities

3    should not enter into a relationship with a grantee where any

4    terrorist-related suspicions exist."

5    Q.    And footnote 1?

6    A.    "List-checking alone, as described throughout this

7    section, does not guarantee the safe and secure delivery of

8    charitable funds and services in high risk areas.  For this

9    reason, the guidelines encourage charities to employ all

10   reasonably available resources, both when determining the

11   level of risk in a particular charitable operation and when

12   engaging in appropriate vetting procedures."

13   Q.    Okay.  And if we could turn to the next page.  If you

14   could read in footnote 3 starting about a third of the way

15   down, the word "although."

16   A.    "Although the SDN list includes persons meeting the

17   criteria established in the authorities or executive orders

18   that define certain OFAC sanctions, programs transactions with

19   actors not named on the SDN list may nevertheless violate U.S.

20   sanctions due to interests of designated parties in such

21   transactions or prohibitions owing to country-based OFAC

22   administered sanctions programs."

23   Q.    You can continue to the end of that footnote.

24   A.    "For example, if a charity engages in a particular

25   transaction with a party not on the SDN list that involves the

1  property or interests in property of a designated actor, the

2  transaction may be subject to OFAC sanctions.  This

3  underscores the importance of charities knowing their grantees

4  and monitoring their programs and transactions through the use

5  of appropriate due diligence measures.

6      "Therefore, while the SDN list is a critically important

7  compliance tool that can assist charities in meeting their

8  legal obligations under the variety of sanctions programs that

9  OFAC administers, it should only form one part of a charitable

10 organization's broader risk-based approach to protect against

11 the risks of terrorist abuse."

12 Q.   Okay.  Thank you.  So according to this document, based

13 on your experience, ultimately whose responsibility is it to

14 ensure that money is not going to any sub-entity or front

15 organization, or any organization in which a listed

16 organization has an interest?

17 A.   It is the entity or individual making the contribution,

18 particularly an entity or individual that accumulates funds to

19 move forward as a charitable organization.

20 Q.   So if you knew that one of these sub-organizations not

21 separately listed on the list, if you knew it was connected in

22 some way, or benefited a listed organization, would it be okay

23 to give to that sub-entity because it doesn't appear on the

24 list?

25 A.   No.

1   Q.   Now, you testified that OFAC generally does not go down

2   and designate separately these sub-components or sub-entities

3   of a listed organization, but from time to time does that

4   happen, too?

5   A.   Yes, that does.

6   Q.   Are you familiar with an organization called the al-Salah

7   Society in the Gaza strip?

8   A.   Yes, ma'am, I am.

9   Q.   I am going to show you what has been admitted as Defense

10   Exhibit No. 1052.  Do you have a copy of that in front of you?

11   I think we might be able to bring this up on the computer.

12   Okay.  It will be a little easier to read.

13   A.   I have it.

14   Q.   Can you read the date and the title of this, and the

15   first paragraph, please?

16   A.   The date is August 7th, 2007.  The title is "Treasury

17   designates al-Salah Society key support note for Hamas."

18   Q.   And if you will read the first paragraph?

19   A.   "The U.S. Department of the Treasury today designated the

20   al-Salah Society one of the largest and best known Hamas

21   charitable organizations in the Palestinian territories.

22   Al-Salah Society's director Ahmad al-Kurd was also designated

23   today."

24   Q.   Okay.  Now, I think the Defense already read the next

25   paragraph, so let's skip to the third paragraph.  And then if

1   you could finish the page, please.

2   A.    "The al-Salah Society supported Hamas-affiliated

3   combatants during the first Intifada and recruited and

4   indoctrinated youth to support Hamas' activities.  It also

5   financed commercial stores, kindergartens, and the purchase of

6   land for Hamas.

7       "One of the most senior Gaza-based Hamas leaders and

8   founders, Ismail Abu Shanab, openly identified the al-Salah

9   Society as one of the three Islamic charities that form Hamas'

10  welfare arm.  The al-Salah Society has received substantial

11  funding from Persian Gulf countries, including at least

12  hundreds of thousands of dollars from Kuwaiti donors.

13      "The al-Salah Society is directed Ahmed al-Kurd a

14  recognized high ranking Hamas leader in Gaza.  Al-Kurd's

15  affiliation with Hamas goes back over a decade."

16  Q.    Could I stop you for a moment?  It says al-Kurd's

17  affiliation with Hamas goes back for over a decade.  So let's

18  say that in 2001, for example, somebody wanted to give money

19  to the al-Salah Society.  Okay?  Would that have been okay

20  because the al-Salah Society is not listed on the SDN or the

21  SDT list?

22  A.    If they had no knowledge and had no reason to know, it

23  would not have been prohibited.

24  Q.    And if they had a reason to know that Ahmad al-Kurd and

25  the al-Salah Society were connected to Hamas, would that have

1   been okay?

2           MR. CLINE:  Your Honor, I object to the legal

3   opinion and also to expert opinion from someone who hasn't

4   been designated.

5           THE COURT:  Overruled.  You may answer.

6           THE WITNESS:  Would you repeat the last question,

7   please.

8   Q.   (BY MS. SHAPIRO)  Yes.  If someone knew that the al-Salah

9   Society and Ahmad al-Kurd were connected to Hamas, but

10  al-Salah and Ahmad al-Kurd were not listed on the SDT list,

11  would it have been okay to give to Ahmad al-Kurd or the

12  al-Salah Society?

13  A.   No, it would not.  It would be prohibited.

14  Q.   Can you continue after -- I think we stopped at the words

15  "over a decade."  Could you continue with "During the first

16  Intifada"?

17  A.   "During the first Intifada, al-Kurd served as a Hamas

18  Shura Council member in Gaza.  As of late 2003 al-Kurd was

19  allegedly the top Hamas leader in Deir al-Balah in Gaza.

20  Since mid-2005, he has served as the major of Deir al-Balah,

21  elected as a Hamas candidate.

22      "The al-Salah Society has employed a number of Hamas

23  military wing members.  In late 2002 an official of the

24  al-Salah Society in Gaza was the principal leader of a Hamas

25  military wing structure in the al-Maghazi refugee camp in

1  Gaza.  The founder and former director of the al-Salah

2  Society's al-Maghazi branch reportedly also operated as a

3  member of the Hamas military structure in al-Maghazi,

4  participated in weapons deals, and served as a liaison to the

5  rest of the Hamas structure in al-Maghazi.  And Least four

6  other Hamas military wing members in the al-Maghazi refugee

7  camp in Gaza were tied to the al-Salah Society.

8      "The al-Salah Society was included on a list of suspected

9  Hamas and Palestinian Islamic Jihad affiliated NGOs whose

10  accounts were frozen by the Palestinian Authority as of late

11  August 2003.  After freezing the bank accounts, PA officials

12  confirmed that the al-Salah Society was a front for Hamas."

13  Q.    Okay.  Now, is there something -- Is there any reason

14  from this statement why al-Salah Society and Ahmad al-Kurd

15  might have been singled out for designation despite the

16  general practice of not listing sub-components or all fronts

17  of a listed organization?

18  A.    No. 1, it is identified as a major Hamas organizational

19  element, No. 2, it is linked to both the Hamas and to the

20  Palestinian Islamic Jihad, another designated terrorist

21  organization, and No. 3, there was action taken by the

22  Palestinian authorities, and it is not uncommon in U.S.

23  government efforts to encourage bilateral and multilateral

24  support against terrorist organizations for the U.S. to take

25  action as well as another government.

1    Q.   Okay.   Thank you.   Now, does OFAC sometimes do outreach

2    to organizations or government agencies with respect to

3    compliance issues?   In other words, does OFAC sometimes go out

4    and talk to agencies or organizations about what they need to

5    do with respect to complying with the designation program?

6    A.   Yes, we do.

7    Q.   And have you sometimes done that yourself?

8    A.   I have done that myself.

9    Q.   And do you tell organizations that they can rely on the

10   designation list alone with respect to where they can send

11   their money?

12   A.   No, we do not.

13   Q.   Is the designation list an exclusive list?

14   A.   No, it is not.

15   Q.   And is it an exhaustive list?

16   A.   No, it is not.

17   Q.   Does the designation list give someone a blank check to

18   give to any organization it wants so long as it is not on the

19   list?

20   A.   No.

21   Q.   What is the test for whether you can give to someone or

22   some place that is not on the designation list itself?

23           MR. DRATEL:   Your Honor, I object to the legal

24   question.

25           THE COURT:   Overruled.   He may answer that.   Go

1    ahead.

2            THE WITNESS:  The basic test is, is the entity or

3    the individual owned or controlled by or acting for or on

4    behalf of the designated entity or the designated

5    organization.  To make that in a simpler way of describing

6    that, it means are you acting as an intermediary for them, are

7    you acting as their front organization, are you their straw

8    man, are you their go between.  And it doesn't matter whether

9    the organization set itself up that way or if a person who

10   wants to contribute to the prohibited party to the SDT finds

11   someone to fulfill that role.  It is still a prohibited

12   situation.

13   Q.   (BY MS. SHAPIRO)  Okay.  So if an organization is acting

14   to the benefit of a listed organization, is that still

15   prohibited?

16   A.   Yes.

17   Q.   Okay.  And is that sort of test that you just

18   articulated, is that embodied anywhere within OFAC's

19   regulations?

20   A.   Yes, it is.

21   Q.   Do you have in front of you what has been marked as OFAC

22   No. 5?

23   A.   Yes, ma'am.  Yes, I do.

24   Q.   And generally what is this document?

25   A.   This is the Code of Federal Regulations provision for the

1    specially designated terrorist program under Executive Order

2    12947.

3              MS. SHAPIRO:  Your Honor, I move OFAC 5.

4              MR. CLINE:  Previous objections, Your Honor.

5              THE COURT:  That is overruled and OFAC No. 5 is

6    admitted.  .

7    Q.   (BY MS. SHAPIRO)  I want to direct your attention--I will

8    put it up on the elmo--to page 8 of this document, which is

9    defined as Section 595.408.

10   A.   That is good.

11   Q.   Can you read that?

12   A.   That is fine.

13   Q.   All right.  Okay.  If you could just read subsection (a),

14   or the title of this and then subsection (a), which I think

15   carries over to the next page.

16   A.   The title is "charitable contributions to specially

17   designated terrorists."

18   Q.   Okay.

19   A.   "Unless otherwise specifically authorized by the Office

20   of Foreign Assets Control by or pursuant to this part, no

21   charitable contribution or donation of funds, goods, services,

22   or technology to relieve human suffering, such as food,

23   clothing, or medicine, may be made to or for the benefit of a

24   specially designated terrorist.  For purposes of this part, a

25   contribution or donation is made to or for the benefit of a

1    specially designated terrorist if made to or in the name of a

2    specially designated terrorist; if made to or in the name of

3    an entity or individual acting for or on behalf of, or owned

4    or controlled by, a specially designated terrorist; or if made

5    in an attempt to violate, to evade, or to avoid the bar on the

6    provision of contributions or donations to specially

7    designated terrorists."

8    Q.    Thank you.  Now, you said a few moments ago that OFAC

9    sometimes does outreach about compliance issues.  Do sometimes

10   people call OFAC to talk about compliance issues?

11   A.    Yes, that does happen.

12   Q.    Okay.  Do you remember a time after Executive Order 12947

13   was signed that a number of Arab-American organizations

14   requested a meeting with OFAC?

15   A.    Yes.

16   Q.    And when was that?

17   A.    That was, to the best of my recollection, February of

18   1995.

19   Q.    And was that request to have a meeting granted?

20   A.    Yes.

21   Q.    And so there actually was a meeting?

22   A.    We actually held a meeting, yes.

23   Q.    Where was that meeting?

24   A.    That meeting was in OFAC.

25   Q.    And were you in that meeting?

```
1    A.    Yes, I was.

2    Q.    And were any of the Defendants in this case in that

3    meeting?

4    A.    Yes.

5    Q.    Who?

6    A.    Ghassan Elashi.

7    Q.    Ghassan Elashi?

8    A.    Yes.

9          MR. CLINE:  To avoid any confusion, it is Ghassan

10   Elashi.

11   Q.    (BY MS. SHAPIRO)  I will point you to what has been

12   marked as InfoCom Search No. 55.  You should have that in

13   front of you.

14   A.    Yes, I have.

15   Q.    And what is this document?

16   A.    That is a list undated of people who were present during

17   a meeting at OFAC concerning the terrorism sanctions.

18         MS. SHAPIRO:  Your Honor, I move the admission of

19   InfoCom Search No. 55.

20         MR. CLINE:  No objection.

21         THE COURT:  Admitted.  .

22   Q.    (BY MS. SHAPIRO)  All right.  Do you see your name on

23   this list, Mr. McBrien?

24   A.    Yes, I do.

25   Q.    And do you see Ghassan Elashi's name on this list?
```

A.    Yes, I do.

Q.    And who is Ghassan Elashi representing?

A.    He is representing the Holy Land Foundation.

Q.    Okay.  What is this document generally?  I mean, what is it?

A.    It is simply a list of the people who were present during the meeting.

Q.    Okay.  And what was the subject matter of this meeting?

A.    The subject matter of the meeting, as best I recall, was the new executive order and its implications for charitable giving by American Muslims.

Q.    Okay.  And did you address that meeting?

A.    I was one of those who addressed, the director and I both did.

Q.    And the director is?

A.    Richard Newcomb.

Q.    He is the first person on that list?

A.    Yes.

Q.    And did Richard Newcomb or you tell the participants in that meeting that they could give to any organization so long as it wasn't on the designation list?

        MR. CLINE:  I apologize.  I object to the leading.

        THE COURT:  Sustained, counsel.  Do you want to rephrase.

Q.    (BY MS. SHAPIRO)  What is it that you talked about at

1   that meeting?

2   A.   We talked about the executive order and the limitations

3   of the executive order, and the White House press release that

4   explained the overall purpose of the executive order.

5   Q.   And based on your practice of addressing compliance

6   issues, is there any chance that you might have told that

7   group that the list itself was the exclusive guidance for

8   charitable giving?

9            MR. CLINE:  Object to asking him to speculate.

10           THE COURT:  Overruled.  He may answer, if he

11  remembers or knows.

12           THE WITNESS:  To the best of my recollection, that

13  would have been one of the key points that we would have

14  made--that our lists are not exclusive, that the list can

15  change and will change over time, and that it is not

16  sufficient to simply look at that at that point and the annex

17  to the executive order and some additional names that OFAC had

18  designated simultaneously.

19           MS. SHAPIRO:  Could I have a moment, please?

20           THE COURT:  Yes.

21           MS. SHAPIRO:  Pass the witness.

22           THE COURT:  Mr. Cline?

23                      CROSS EXAMINATION

24  By Mr. Cline:

25  Q.   Good morning, sir.

1    A.    Good morning, sir.

2    Q.    I want to begin by asking you some questions about the

3    designation process under Executive Order 12947.

4    A.    Yes, sir.

5    Q.    I have a copy of it here.  Now, just to back up a little

6    bit, persons or organizations that are designated under 12947

7    are known as specially designated terrorists.  Correct?

8    A.    That is correct, sir.

9    Q.    Also sometimes referred to as SDTs?

10    A.    Yes, sir.

11    Q.    And then there are other forms of terrorist designation

12    that came into existence later on.  Correct?

13    A.    Subsequent executive orders, yes, or other statutory

14    authority.

15    Q.    For example, there is the foreign terrorist organization

16    designation.  Correct?

17    A.    That is correct.

18    Q.    There is also now something called a specially designated

19    global terrorist.  Right?

20    A.    Yes, sir.

21    Q.    All right.  But I want to focus with you on this

22    Executive Order 12947 SDT type designation.  Okay?

23    A.    Yes, sir.

24    Q.    Now, I am going to put this up here on the elmo, and I

25    have focused you in on this section.  You able to see that?

1    A.   Yes, sir, I am.

2    Q.   All right.  I want to go through with you quickly the

3    different ways that a person or organization can end up

4    designated as a specially designated terrorist.  Okay?

5    A.   Yes, sir.

6    Q.   The first way is that you can be listed in the annex to

7    this order.  Correct?

8    A.   That is correct.

9    Q.   And, for example, Hamas was designated as part of the

10   annex to this order.  Right?

11   A.   Yes.

12   Q.   The second way is that foreign persons can be designated

13   by the Secretary of State in coordination with the Secretary

14   of the Treasury and the Attorney General because they are

15   found to have done certain things that are specified there in

16   paragraph A and B.  Correct?

17   A.   That is correct.

18   Q.   And then the third way to be designated is a person

19   determined by the Secretary of the Treasury, in coordination

20   with the Secretary of State and the Attorney General, to be

21   owned or controlled by or to act for or on behalf of any of

22   the foregoing persons.  Correct?

23   A.   That is correct.

24   Q.   And those foregoing persons, that refers back to people

25   who are designated under one of those first two means.  Right?

1    A.    Yes, sir.

2    Q.    Now, regardless of how you get designated, under which of

3    those three methods, a person or an organization is

4    designated, its name goes on the Treasury Department list of

5    specially designated nationals and blocked persons.  Correct?

6    A.    That is correct.

7    Q.    So you can be -- If you are on that annex to the

8    executive order the way Hamas was, Hamas' name goes on the SDN

9    list.  Correct?

10   A.    Yes.

11   Q.    And when I talk about the list or the SDN list, I am

12   talking about the master list that the Treasury Department

13   maintains on its website called the specially designated

14   nationals and blocked persons list.  Are you with me on that?

15   A.    Yes.

16   Q.    Okay.  If a foreign person is designated by the Secretary

17   of State under that second provision that we talked about,

18   that person's name as well will go on the list.  Right?

19   A.    Yes.

20   Q.    And if a person is designated on this third prong because

21   the person is owned or controlled by or acts for or on behalf

22   of some other designated person, that person's name also goes

23   on the SDN list.  Correct?

24   A.    That is correct.

25   Q.    Now, focusing for a second just on that third prong, the

1    roman number (iii) talking about persons determined by the

2    Secretary of the Treasury, in coordination with others, to be

3    owned or controlled by or to act for or on behalf of the

4    foregoing persons -- Are you with me?

5    A.    Yes.

6    Q.    The Secretary of the Treasury has delegated the authority

7    to designate persons under that provision to OFAC.  Right?

8    A.    Yes.

9    Q.    Which again is the Office of Foreign Assets Control.

10   Right?

11   A.    Yes.

12   Q.    And that is the group you have been part of for 20 years

13   now.  Right?

14   A.    Yes, sir.

15   Q.    And OFAC can designate someone under that part, that

16   Roman numeral (iii), if it has a reasonable belief that the

17   person is owned or controlled by or acting for or on behalf of

18   one of the designated parties.  Right?

19   A.    That is correct.

20   Q.    So again what is required for a designation under that

21   provision is a reasonable belief.  It is not, for example,

22   proof beyond a reasonable doubt.  It is not proof by a

23   preponderance of the evidence, like you have in court.  It is

24   a reasonable belief.  Right?

25   A.    That is correct.

1  Q.   And as you know from what you have heard in court this

2  morning, we have rules of evidence that apply here in court.

3  Right?

4  A.   That is correct.

5  Q.   When OFAC is making a designation under this provision we

6  have been talking about, you don't have to abide by any

7  particular rules of evidence.  Right?

8  A.   We don't have rules of evidence under the criminal

9  procedures.

10  Q.   That is what I am talking about.  The rules of evidence

11  you hear us arguing about here in court don't apply to your

12  OFAC designation.

13  A.   They do not apply to OFAC.

14  Q.   And OFAC uses in making these designation determinations

15  whatever evidence is available.

16  A.   We use whatever information is available that we assess

17  as being relevant and valuable.

18  Q.   Sure.  And you can use -- For example, sometimes you get

19  information from foreign governments.  Right?

20  A.   That is correct.

21  Q.   You can use media reports.  Right?

22  A.   Yes.

23  Q.   You can get information off the internet, for example?

24  A.   Yes.

25  Q.   You get can information from CIA and other intelligence

1   agencies.  Right?

2   A.    Yes.

3   Q.    I won't ask you anything more than that, just that

4   question.  And you may get information from the FBI?

5   A.    Yes.

6   Q.    And again, when OFAC designates someone under that

7   provision when it comes to a reasonable belief that the person

8   is owned or controlled by or acting for or on behalf of one of

9   these other designated parties, that entity or person's name

10  goes on the SDN list.  Correct?

11  A.    Yes, sir.

12  Q.    Now, one purpose of the designation is to cut the entity

13  off from the U.S. financial system.  Right?

14  A.    That is correct.

15  Q.    Another reason for the designation of an organization is

16  to alert the world to its true nature.  Right?

17  A.    Yes, sir.

18  Q.    I want to just call your attention to something.  Do you

19  have a boss?

20  A.    Yes.

21  Q.    What is his name?

22  A.    Adam Szubin.

23  Q.    Let me just have you read something from an exhibit that

24  Ms. Shapiro showed you just a moment ago.  Can you read that

25  second paragraph?

1   A.   Yes.

2   Q.   What I am showing you here is Defense Exhibit No. 1052,

3   which Ms. Shapiro had you read portions of a few minutes ago.

4   Do you remember that?

5   A.   Yes, sir.

6   Q.   And this is a statement that the Treasury Department put

7   out in August of 2007 when it designated the al-Salah Society.

8   Correct?

9   A.   Yes, sir.

10  Q.   Would you read that second paragraph, please?

11  A.   Yes, sir.  "'Hamas has used the al-Salah Society, as it

12  has many other charitable fronts, to finance its terrorist

13  agenda,' said Adam Szubin, director of Treasury's Office of

14  Foreign Assets Control, OFAC.  'Today's action alerts the

15  world to the true nature of al-Salah and cuts it off from the

16  U.S. financial system.'"

17  Q.   All right.  Thank you.

18          MR. CLINE:  Your Honor, would this be a good place

19  to break?

20          THE COURT:  Let's take the lunch break.  Be back at

21  1:45.

22          (Whereupon, the jury left the courtroom.)

23          THE COURT:  We will be in recess until 1:45.

24                    (Lunch Recess.)

25          THE COURT:  Mr. Cline?

1          MR. CLINE:  Thank you.

2    Q.    Mr. McBrien good afternoon.

3    A.    Good afternoon, sir.

4    Q.    I want to turn back with you, sir, to Executive Order

5    12947.

6    A.    Yes, sir.

7    Q.    I am going to put it back up on the screen here.  And do

8    you recall that you testified on direct about subsection

9    (1)(b) of that order?

10   A.    Yes, sir.

11   Q.    And subsection (1)(b) "prohibits any transaction or

12   dealing by United States persons or within the United States,

13   in property or interests in property, of the persons

14   designated in or pursuant to this order, including the making

15   or receiving of any contribution of funds, goods, or services

16   to or for the benefit of such persons."

17   A.    Correct.

18   Q.    Yes, sir.  Now, you also testified about a particular

19   regulation from the Department of Treasury that expands upon

20   this for the benefit of language.  Correct?

21   A.    Yes, sir.

22   Q.    All right.  And I don't know if you described this in

23   your direct testimony, but that regulation that you talked

24   about and which I am going to ask you about here in a minute

25   is part of the Code of Federal Regulations.  Correct?

A.    That is correct.

Q.    And the Code of Federal Regulations is a compilation of all the regulations from all the various executive agencies. Correct?

A.    Yes, sir.

Q.    And it runs in total to hundreds of thousands of pages. Correct?

A.    Yes, sir.

Q.    Now, the Treasury Department has a particular segment of the Code of Federal Regulations that it uses.  Correct?

A.    Yes, sir, Part 5.

Q.    I beg your pardon?

A.    Part 5.

Q.    Title 31, and in that OFAC is Part 5.  Correct?

A.    Correct.

Q.    And Title 31 itself, which is the Treasury division of the Code of Federal Regulations, is fairly lengthy.  Correct?

A.    Yes, sir.

Q.    Now, I may have to move back and forth here a little bit, but I am going to put up 31 Code of Federal Regulations Section 595.408(a), which is what you testified about this morning.  Correct?

A.    Yes.

Q.    And first of all, the caption, the heading to that is "Charitable contributions to specially designated

1    terrorists."

2    A.    Yes, sir.

3    Q.    And specially designated terrorists are those persons and

4    entities that we talked about this morning that appear on the

5    list.  Correct?

6    A.    Yes.

7    Q.    And then in the first fairly long sentence, it more or

8    less paraphrases Section (1)(b) of the Executive Order 12947.

9    Correct?

10   A.    Yes.

11   Q.    Then there is a sentence that begins "For purposes of

12   this part."  Do you see that?

13   A.    Yes, sir.

14   Q.    And that sentence then goes on to explain what is meant

15   by the phrase "to or for the benefit of."  Correct?

16   A.    Yes, sir.

17   Q.    Now, that language beginning with "For purposes of this

18   part" doesn't appear in the executive order itself.  Correct?

19   A.    No, it does not.

20   Q.    Because it comes from one page to the other I am going to

21   read it to you and then put up on screen the part I really

22   want you to focus on.

23   A.    Yes, sir.

24   Q.    That language says--and again I am reading now from the

25   regulation, not from the executive order--"For purposes of

1    this part, a contribution or donation is made to or for the

2    benefit of a specially designated terrorist, if made to or in

3    the name of specially designated terrorist."  So that is one

4    meaning for "to or for the benefit of."  Correct?

5    A.    Yes.

6    Q.    "Or if made to or in the name of an entity or individual

7    acting for or an behalf of, or owned or controlled by a

8    specially designated terrorist."  So that is another meaning

9    assigned to the phrase "to or for the benefit of."  Correct?

10   A.    Yes, sir.

11   Q.    And then it says, "or if made in an attempt to violate to

12   evade or to avoid the bar on the provision of contributions or

13   donations to specially designated terrorists."  Correct?

14   A.    Yes, sir.

15   Q.    And that last language actually picks up a notion that is

16   captured in paragraph (1)(c) of the executive order.  Correct?

17   A.    Yes.

18   Q.    Now, that language that I want to ask you a couple of

19   questions about is this language "if made to or in the name of

20   an entity or individual acting for or on behalf of or owned or

21   controlled by a specially designated terrorist."  Okay?

22   A.    Yes.

23   Q.    That language is very similar to the language that we

24   talked about earlier that appears in subsection (1)(a)(3) of

25   the executive order.  Correct?

1     A.    That is correct.

2     Q.    And that language that appears in subsection (1)(a)(3) of

3     the executive order is language that defines one of the

4     grounds on which an entity can be designated.  Right?

5     A.    Correct.

6     Q.    And then once designated it is put on the list as we have

7     come to call it.  Correct?

8     A.    Correct.

9     Q.    All right.  I want to change subjects and move to the

10    February 1995 meeting that you testified about.

11          Now, to orient us a little bit in time, the designation

12    of Hamas as a specially designated terrorist occurred in

13    January 1995.  Correct?

14    A.    Yes.  January 23rd, 1995 it was signed by the President,

15    and he referred to it either the same day or the day before in

16    the State of the Union that it would be occurring.

17    Q.    And there is a press or an information release that came

18    out from the White House dated January 24th, 1995.  Correct?

19    A.    That is correct.

20    Q.    And I want to ask you --

21    A.    I have to check the date.

22    Q.    You have it right.  It is January 23rd, '95.  And I want

23    to ask you about that press release here, or the statement in

24    just a moment.  But let me ask you some questions about the

25    meeting first.  And if you need to look for something, take

1   your time.

2   A.    I have it in front of me.  Thank you.

3   Q.    Okay.  Now, in February of '95 some people who were

4   affiliated with certain Arab-American or Muslim-American

5   groups asked to meet with the Department of Treasury.

6   Correct?

7   A.    That is my recollection, sir, yes.

8   Q.    And they represented a range of organizations.  Correct?

9   A.    Yes, sir.

10  Q.    And one of those organizations was the Holy Land

11  Foundation.  Correct?

12  A.    Yes, sir.

13  Q.    And the Holy Land Foundation was represented at this

14  meeting by Mr. Ghassan Elashi.

15  A.    Yes, sir.

16  Q.    And the organizations themselves requested this meeting.

17  Right?

18  A.    Yes.

19  Q.    And the meeting was held in Washington, D.C.

20  A.    In Washington, D.C., yes.

21  Q.    Was it held in the Treasury Department building?

22  A.    In the Treasury Department in the Office of Foreign

23  Assets Controls offices.

24  Q.    Is that within the Treasury Department?

25  A.    In an annex building.

```
 1    Q.    Right next to the White House?

 2    A.    Yes.

 3    Q.    Now, Mr. Richard Newcomb attended for the Treasury

 4    Department.  Right?

 5    A.    Right.

 6    Q.    Was he the head of OFAC at the time?

 7    A.    Yes, he was.

 8    Q.    So he was the top guy at OFAC?

 9    A.    Right.

10    Q.    You attended?

11    A.    Yes.

12    Q.    And you were a --

13    A.    I was the chief of the International Programs Division at

14    that time.

15    Q.    All right.  So you were a significant official within

16    OFAC.  Correct?  Don't be modest.

17    A.    I was a little more senior.

18    Q.    All right.  And then a Stephen Pinter from the Treasury

19    Department attended.  And who was he?

20    A.    He headed the Licensing Division of OFAC.

21    Q.    They are the people who either allow or don't allow you

22    to engage in transactions with specially designated

23    terrorists.  Correct?

24    A.    Among others.  Correct.  They make the decisions upon

25    application.
```

```
 1   Q.    Yes.  And then a Serena Moe it looks like?

 2   A.    Yes.

 3   Q.    And who was Ms. Moe?

 4   A.    Ms. Moe was senior member of our chief counsel's office.

 5   Q.    A lawyer, in other words?

 6   A.    Yes.

 7   Q.    And a Charles Bishop attended.  Correct?

 8   A.    Yes.

 9   Q.    And who was Mr. Bishop?

10   A.    Mr. Bishop was another member of the Licensing Division

11   at that time.

12   Q.    Okay.  Now, Mr. Elashi -- We have InfoCom Search No. 55

13   here in front of us.  He signed in, used his own name, gave

14   his phone number, and listed he was affiliated with the Holy

15   Land Foundation.  Correct?

16   A.    Yes.

17   Q.    Now, one purpose of this meeting was for the Treasury

18   Department to tell these Arab-American and Muslim

19   representatives how Executive Order 12947 was operating.

20   Correct?

21   A.    Yes, sir.

22   Q.    The people, the Arab-Americans who attended this meeting,

23   expressed concern, did they not, that the Executive Order

24   12947 was causing a chilling effect on charitable giving

25   required by the Muslim faith.
```

1    A.    That is correct.

2    Q.    And the Arab-American attendees at this meeting were

3    seeking guidance from the Treasury Department in terms of who

4    they could send money to and who they couldn't send money to.

5    Correct?

6    A.    That is correct, sir.

7    Q.    And the Treasury Department told them, the Arab-American

8    attendees, it was not going to make a determination for them

9    as to who they could or couldn't send money to beyond the

10   entities already listed in Executive Order 12947.  Correct?

11   A.    That is correct.  I believe it limits somewhat the way we

12   described it or would ordinarily describe that, which is that

13   the list is not exhaustive but the list is a guide, because

14   those parties on the list are clearly prohibited.  But it is

15   not an exhaustive list, and the prohibitions are not limited

16   to the list.

17   Q.    Sir, do you remember testifying in this courthouse in a

18   different matter on March 31st, 2005?

19   A.    Yes, sir.

20   Q.    And you were asked about this meeting, were you not?

21   A.    Yes, sir.

22   Q.    And you were asked these questions and gave these

23   answers.  Correct?  Page 718 line 8.

24        Question, "But in general terms, they were seeking

25   guidance from you and asking would it be logical for you to --

because of the nature of that meeting, that they would have
asked for guidance of who they could send money to and who
they couldn't send money to, in general terms.

Answer, "yes."

Question, "All right.  And OFAC made a determination at
some point in time that they weren't going to decide who they
could send money to and who they couldn't.  Correct?"

Answer, "At the time of that meeting we did not have
other than those parties who had about [sic] named by the
President and by OFAC's own actions."

Those were questions and answers that were asked and
given at that testimony.  Correct?

A.   Yes, sir.

Q.   And then you were asked on page 719 line 2, question,
picking up in the middle of the question, "Did you or OFAC,
the agency, Treasury rather, who was the representative at
that meeting, indicate to them that you were not -- you the
agency was not going to make a determination for them as to
who they could or couldn't send money to, period."

Answer, "Beyond those already listed, correct."

Question.  "Right.  Obviously the ones listed were the
ones that had been designated."

Answer, "Right.  That is my point."

That was your testimony.  Correct?

A.   Yes, sir.

1   Q.   Now, sir, how long did this February 1995 meeting last?

2   A.   I actually don't recall.  Normally a meeting of that sort

3   would last an hour, roughly an hour.

4   Q.   Roughly an hour?  And there were some fairly senior OFAC

5   officials there.  Correct?

6   A.   Yes, sir.

7   Q.   In fact, the top man, among others.

8   A.   Correct.  The director, yes.

9   Q.   And some representatives from the Arab-American

10   community, Mr. Elashi for example, traveled some distance?

11   A.   I really don't know where they all came from, but yes.

12   Q.   All right.  A number of representatives, from what you

13   understood, to be leading Arab-American institutions.

14   Correct?

15   A.   Correct.

16   Q.   Now, I take it, sir, that you have searched for any kind

17   of notes or records of this meeting.  Is that right?

18   A.   That is correct, sir.

19   Q.   And other than this handwritten sign-in sheet that has

20   been introduced as InfoCom Search No. 55, you have not found

21   anything.  Right?

22   A.   No, sir, including the original of that.

23   Q.   Even this was found at InfoCom not in the Treasury

24   Department files.  Correct?

25   A.   Correct, sir.

1  Q.   Now, you knew -- This is your signature on this document?

2  A.   Oh, yes.  That is my printing, yes, my name.

3  Q.   No doubt that this is an authentic record?

4  A.   No doubt it was authentic.

5  Q.   I am sorry?

6  A.   There is no doubt that is authentic.

7  Q.   Apart from this document, which you say you didn't find,

8  there is not a single scrap of paper anywhere in the

9  Department of Treasury reflecting what went on at this

10  meeting.

11  A.   We have not located any.

12  Q.   By the way, in that meeting -- I think you testified on

13  direct that in that meeting you directed the attendees or

14  referred them to the statement released by the White House on

15  January 24th, 1995 relating to Executive Order 12947.

16  Correct?

17  A.   I believe that is correct, yes.

18       MR. CLINE:  May I approach, Your Honor?

19       THE COURT:  Yes.

20  Q.   (BY MR. CLINE)  Sir, I am showing you what has been

21  marked as OFAC No. 4, and I ask you to look at that, and let

22  me know if that is the thing you referred the attendees to.

23  A.   Yes.  I do not know whether we actually handed it to them

24  or whether we simply used it as a reference.

25  Q.   All right.

1  A.   It could have been handed out.  It is a White House press

2  release.

3       MR. CLINE:  Your Honor, I offer -- It is marked as a

4  Government Exhibit No. OFAC 4.  Even though I am a defendant,

5  I will offer into evidence.

6       MS. SHAPIRO:  No objection, Your Honor.

7       THE COURT:  Admitted.

8  Q.   (BY MR. CLINE)  Now, I am not going to have you read this

9  whole thing, I know you will be glad to know, but will you

10 read the sentence beginning --

11 A.   "It is also intended"?

12 Q.   If you would read that one sentence.

13 A.   "It is also intended to reach charitable contributions to

14 designated organizations to preclude diversion of such

15 donations to terrorist activities.  These measures are being

16 taken under the authority of the International Emergency

17 Economic Powers Act."

18 Q.   That is fine.  And then I want to turn the page the

19 second page.  This is something called a fact sheet.  Right?

20 A.   Yes, sir.

21 Q.   All right.  And I want to call your attention down at the

22 bottom of the page and have you read that last item on the

23 bottom of the page?

24 A.   "These measures are also intended to preclude diversion

25 of charitable contributions to fund terrorism activities by

1    prohibiting the transfer of funds by U.S. persons to these

2    groups."

3    Q.    And these groups there is referring to the groups that

4    have been designated under Executive Order 12947.  Correct?

5    A.    Yes, sir, the groups on the annex.

6    Q.    Yes.  I am going to change the subject again.  I want to

7    talk with you now about the voluntary antiterrorist financing

8    guidelines this you testified about on direct.  Are you with

9    me?

10   A.    Yes, sir.

11   Q.    All right.  I want to discuss a couple of different

12   things about those guidelines.  The first one is this.  The

13   Treasury Department issued the first version of those

14   guidelines in November of 2002.  Correct?

15   A.    To the best of my understanding, yes, sir.

16   Q.    Well, let me show you something that may refresh your

17   recollection.  I am going to put up Government's Exhibit OFAC

18   No. 3, which is already in evidence, and have you take a look

19   at footnote No. 1, which it is on the screen there if that

20   helps.  It is a little hard to read, but do you see this

21   document is a revised version of the original antiterrorist

22   financing guidelines voluntary best practices for U.S. based

23   charities released by the U.S. department of the treasury in

24   November 2002?  Do you see that?

25   A.    Yes, sir.

1    Q.    And does that refresh your recollection that the initial

2    version of these guidelines came out in November 2002?

3    A.    Yes, it does.

4    Q.    Now, the Holy Land Foundation closed in December 2001.

5    Correct?

6    A.    Yes, sir.

7    Q.    So these guidelines that you testified about on direct,

8    the first version of those came out almost a year after HLF

9    closed.  Right?

10   A.    Correct.

11   Q.    And during the entire period from January 23rd, 1995 when

12   Hamas was designated until December 2001 when HLF closed,

13   there were no antiterrorist financing guidelines voluntary

14   best practices issued by the Department of the Treasury.

15   Correct?

16   A.    Not that I am aware of, sir.

17   Q.    And if they existed, you would have been aware of them.

18   Right?

19   A.    I would hope.

20   Q.    I would, too.  Now, when the guidelines first came out in

21   November of 2002 -- Let me back up.  Did you have any part in

22   devising these guidelines?

23   A.    Very little.

24   Q.    Did you see drafts and stuff as they --

25   A.    I saw an occasional draft.

1  Q.   All right.  You knew they were being developed, in other

2  words.

3  A.   Yes.

4  Q.   And you had some peripheral input.  Is that fair?

5  A.   Yes.

6  Q.   So when they first came out in November 2002, they came

7  in for a fair amount of criticism.  Is that right?

8  A.   I actually don't recall if they came in for criticism or

9  just comment.

10  Q.   Let's call it comment.  There were thoughts that they

11  perhaps should be different in certain ways.  Correct?

12  A.   I am assuming now, sir, because I was not involved in the

13  process of receiving the comments on them or reviewing the

14  comments.

15  Q.   I don't want you to assume.  The Treasury Department

16  hosted what it called an initial outreach in April of 2004 to

17  discuss the comments from people in the charitable sector

18  about these guidelines.  Correct?

19  A.   I honestly don't know, sir.

20  Q.   All right.  Let me see if I can show you something that

21  may jog your memory.

22          MS. SHAPIRO:  Objection, Your Honor.  He did not say

23  that he did not remember this.  He said he didn't know.

24          THE COURT:  You may show it to him and see what that

25  does.  Go ahead.

1    MR. CLINE:  May I approach?

2    THE COURT:  Yes.

3  Q.  (BY MR. CLINE)  Take a look at the bottom of the page

4  there and tell me if that refreshes your recollection.

5  A.   Actually I have to tell you that it doesn't refresh my

6  recollection.

7  Q.   That is fine.

8  A.   I don't deny the fact.  It is a Federal Register, and

9  that is a copy.

10  Q.   That is fine.

11    MR. CLINE:  Your Honor, I had not intended to admit

12  this, but I think I would like to offer it now.  Let me give

13  Ms. Shapiro a copy.

14    Your Honor, I am going to offer this as Defense Exhibit

15  No. 1402, and I will have it marked appropriately and present

16  it to the Court.

17    THE COURT:  All right.

18    MS. SHAPIRO:  No objection, Your Honor.

19    THE COURT:  That is admitted.

20    MR. CLINE:  May I approach?

21    THE COURT:  Yes.

22  Q.  (BY MR. CLINE)  I am going to hand you now what is in

23  evidence as Defense Exhibit No. 1402.

24  A.   Thank you.

25  Q.   And I am just going to let you keep that because I will

1    be referring to it from time to time.

2    A.    Yes, sir.

3             MR. CLINE:  And actually as long as I am at it here,

4    I am going to offer No. 1403 as well, because they are sort of

5    complementary.

6             MS. SHAPIRO:  No objection.

7             THE COURT:  Admitted.

8             MR. CLINE:  May I approach?

9             THE COURT:  Yes.

10   Q.    (BY MR. CLINE)  To make it easy, I am just going to write

11   the exhibit numbers on these and we will formalize it later.

12   Okay?

13   A.    Okay.

14   Q.    All right.  So let's go back to where we were.  When the

15   guidelines first came out in November of 2002, they came in

16   for a certain amount of criticism.  Correct?  Or comment?

17   A.    Right.

18   Q.    And the Treasury Department hosted what it called an

19   initial outreach.  And I am just referring you now to the

20   bottom of page 1 of Defendants' Exhibit No. 1402.

21   A.    Yes, sir.

22   Q.    And you see where it says, "After receiving numerous

23   comments from the sector" -- And that is referring to the

24   charitable sector.  Correct?

25   A.    I believe so.

```
1   Q.   "...regarding these guidelines, Treasury hosted an

2   initial outreach event in April 2004, at which time Secretary

3   Snow committed that Treasury would continue to work with the

4   Sector to amend and revise the guidelines to improve their

5   utility for the sector in protecting against terrorist abuse."

6   Do you see that?

7   A.   Yes.

8   Q.   You see the term initial outreach there.  Correct?

9   A.   Yes.

10  Q.   And initial, in general parlance, means first.  Right?

11  A.   First.

12  Q.   So this was an initial, a first outreach by the Treasury

13  Department to the charitable sector to discuss these

14  guidelines.  Correct?

15  A.   Yes, sir.

16  Q.   Now, and I think it is obvious from what you said before,

17  but let me just make sure, you were not at that meeting?

18  A.   No, I was not, sir.

19  Q.   Now, the Treasury Department issued a revised set of

20  guidelines for comment in December of 2005.  Correct?

21  A.   Yes.

22  Q.   And if you look at Defendants' Exhibit No. 1403, does

23  that appear to you to be the revised guidelines being issued

24  publicly for comment?

25  A.   I am looking at my copy here.  To the best of my
```

1   recollection, yes, sir.

2   Q.   So in December 2005 this revised best practices is

3   issued, published in the Federal Register the way a document

4   like this is supposed to be published.  Right?

5   A.   Yes.

6   Q.   And then there were additional comments about this

7   version.  Correct?

8   A.   That is my understanding, yes.

9   Q.   And in fact if you look at Defendants' Exhibit No. 1402,

10  you will see that the first several pages of that document is

11  addressing various comments that have been received on that

12  December 2005 set of guidelines.  Do you see that?

13  A.   Yes, I do.

14  Q.   And some of those comments the Treasury Department agreed

15  with and some it didn't agree with.  Right?  I just mean in

16  general.

17  A.   I would have to say apparently so, but I have not read

18  this document.

19  Q.   All right.  And then on October 31st, 2006, and this is

20  Defendants' Exhibit No. 1402, the Treasury Department issued

21  the current set of guidelines, the ones that you were working

22  from.  Correct?

23  A.   Yes.

24  Q.   And those were issued October 31st, 2006.  Right?

25  A.   That is what the document reflects, sir.

```
1    Q.   Now, this is almost five years now after Holy Land

2    closed.  Right?

3    A.   Yes.

4    Q.   And it indicates that they were published on Treasury's

5    website on September 29th, 2006.  Right?

6    A.   Yes, sir.

7    Q.   Now, there is one particular comment and this is in

8    evidence that I just want to quickly touch on.  If you look on

9    page 6 of Defendants' Exhibit No. 1403.

10   A.   No. 1403?

11   Q.   Yes.

12   A.   Yes, sir.

13   Q.   If you look at the top, now, these are the December 2005

14   version of the guidelines.  Correct?

15   A.   Correct.

16   Q.   All right.  And if you look up at the top under (B)(1)

17   where my finger is.

18   A.   Yes.

19   Q.   The recommendation there is that "The charity should

20   conduct a reasonable search of public information, including

21   information available via the internet, to determine whether

22   the recipient is suspected of activity relating to

23   terrorism."  And so on and so on.  Do you see that?

24   A.   Yes, sir.

25   Q.   Now, that recommendation drew some criticism.  And to
```

1    show you that, let me refer you to Defendants' Exhibit

2    No. 1402 at page 5.  See where my finger is there?

3    A.    Yes, sir.

4    Q.    It says, "Many commenters objected to the inclusion of

5    the publicly available information 'including the internet' as

6    a means to vet grantees or employees.  They argued that

7    internet searches would yield widely varying and unverified

8    searches of organizations or individuals."

9    A.    I see that, yes.

10   Q.    And the Treasury Department, if you turn over to page 6,

11   agreed with the criticism.  Correct?

12   A.    With respect to the internet, yes.

13   Q.    It says, "We agree with commenters that the internet

14   often provides information that may be false or unverified."

15   Right?

16   A.    Correct.

17   Q.    And for that reason the specific reference "to the

18   internet" was removed, although Treasury still recommended

19   people use publicly available information.  Correct?

20   A.    Yes, sir.

21   Q.    Now, I want to talk a little bit about the significance

22   of these guidelines.  And I guess the first thing I want to

23   ask you is, these are voluntary.  Correct?

24   A.    That is correct, sir.

25   Q.    So the failure to follow the guidelines does not by

1    itself violate any law.  Correct?

2    A.    That is correct.  The guidelines say that.

3    Q.    In fact, footnote 1 of the guidelines says,

4    "Non-adherence to these guidelines in and of itself does not

5    constitute a violation of existing U.S. law."  Correct?

6    A.    Correct.

7    Q.    On the other side of the page, following the guidelines

8    doesn't mean that you are not violating the law.  Correct?

9    A.    That is correct.

10   Q.    And let me show you the relevant portion of these 2006

11   guidelines.  Still in that footnote beginning where it says,

12   "Conversely," it says, "Conversely, adherence to these

13   guidelines does not excuse any person individual or entity

14   from compliance with any local, state, or federal law or

15   regulation, nor does it release any person from or constitute

16   a legal defense against any civil or criminal liability for

17   violating any such law or regulation."  Correct?

18   A.    Yes, sir.

19   Q.    And it actually goes on even from there.  Correct?

20   A.    Yes, it does.

21   Q.    So to sum up the effect of those two notions, you don't

22   have to follow the guidelines, and if you do you can still be

23   prosecuted.

24   A.    If you are violative, yes.

25   Q.    Now, these October 2006 guidelines, the ones that you

1    were reading from --

2    A.    Yes, sir.

3    Q.    -- refers at several points to the Treasury Department

4    specially designated nationals list.  Correct?

5    A.    Yes, sir.

6    Q.    And it, for example, recommends that the charity assure

7    itself that its grantees do not appear on that list.  Correct?

8    A.    I believe that is correct, sir.

9    Q.    Let me just show you the language.  It is up there at the

10   top of the page, right up here.

11   A.    Yes.

12   Q.    "The charity should assure itself that grantees do not

13   appear on OFAC's master list of specially designated

14   nationals," et cetera.

15   A.    "...and are not otherwise subject to OFAC sanctions."

16   Q.    "...and are not otherwise subject to OFAC sanctions."

17   Correct?

18   A.    Yes.

19   Q.    Now, the guidelines also recommend, and this is in

20   footnote 11, that charities check something called the

21   terrorist exclusion list.  You are familiar with that.

22   A.    Yes.

23   Q.    And the terrorist exclusion list, otherwise known as the

24   TEL, is a list created under a law which allows the U.S.

25   government to exclude or deport aliens who provide material

1    assistance to designated TEL organizations.  Right?

2    A.    I don't have sufficient familiarity beyond what is in the

3    document here to tell you that.

4    Q.    Are you not familiar with the TEL list?

5    A.    I am familiar with it only in the most general sense.  We

6    don't use the TEL list per se for our purposes.  That is not

7    an OFAC document.

8    Q.    It is a State Department document?

9    A.    It is a State Department document.

10   Q.    Do you know whether Hamas is on the TEL list?

11   A.    No, I don't know.

12   Q.    Okay.  Did you know -- You don't know anything about that

13   list other than State Department maintains it.

14   A.    Very little.

15   Q.    Now, you testified on direct examination about a sentence

16   in footnote 11 on page 10 of these 2006 guidelines.  Do you

17   see that first sentence?

18   A.    Yes, sir.

19   Q.    It says, "List-checking alone as described throughout

20   this section does not guarantee the safe and secure delivery

21   of charitable funds and services in high risk areas."

22   Correct?

23   A.    Yes, sir.

24   Q.    And then it goes on to encourage charities to employ

25   other available resources, et cetera.  Correct?

A.    Yes.

Q.    Now, that sentence that you read in your direct testimony
that was pointed out, that does not appear in the December
2005 version of these guidelines, does it?

A.    I would have to check back on them to know that, sir.

Q.    All right.  Why don't you take a look at Defendants'
Exhibit No. 1403, which is in evidence, and I would refer you
to page 6 of footnote 7 which is the footnote in the December
2005 version of the guidelines that refers to the TEL and
seems to correspond with footnote 11 of the 2006 guidelines.

A.    Yes, I have read that, sir.

Q.    All right.  Do you see that sentence, "List-checking
alone does not guarantee the safe and secure delivery," and so
forth?

A.    No, I do not.

Q.    And is it fair to assume, then, that that sentence was
added somewhere between the December 2005 and the October 2006
version of these guidelines?

A.    I think that is a fair assumption, yes.

Q.    All right.  Now, you also read on your direct testimony
from footnote 13 of the October 2006 guidelines on page 11.
And in particular, you read some language that appears around
the middle of that footnote, which I will read here.

      It says, "Although the SDN list includes persons meeting
the criteria established in the authorities or executive

1    orders that define certain OFAC sanctions programs,

2    transactions with actors not named on the SDN list may

3    nevertheless violate U.S. sanctions due to interests of

4    designated parties in such transactions or prohibitions owing

5    to country-based OFAC administered sanctions programs.  For

6    example, if a charity engages in a particular transaction with

7    a party not on the SDN list that involves the property or

8    interests in property of a designated actor, the transaction

9    may be subject to OFAC sanctions."

10        Do you see that language?

11   A.   Yes, sir.

12   Q.   And you recall reading that language on direct?

13   A.   Yes, sir.

14   Q.   That language, in fact that entire footnote did not

15   appear in the December 2005 version of these guidelines.

16   Correct?

17   A.   I don't recall that from the looking that I have done

18   here today.

19   Q.   Why don't you take a moment and take a look at

20   Defendants' Exhibit No. 1403.  I refer you generally to pages

21   6 and 7, and see if you see that language or footnote 13

22   generally in that version.

23   A.   I do not see that paragraph.

24   Q.   All right.  So again, is it fair to assume that that

25   footnote 13 was added between the December 2005 and the

1   October 2006 versions of these guidelines?

2   A.   Yes, sir.

3   Q.   So let me back up a second and just run through a quick

4   timeline with you, sir.  HLF closed in December 2001.

5   Correct?

6   A.   Correct.

7   Q.   The first version of these guidelines appeared in

8   November 2002.  Right?

9   A.   Yes, sir.

10  Q.   The indictment in this case occurred in July of 2004.

11  Right?

12  A.   Yes, sir.

13  Q.   The revised guidelines appeared in December 2005 without

14  that language that you read on direct to the jury.  Right?

15  A.   Yes, sir.

16  Q.   The amended guidelines with that language appeared in

17  December 2006.  Right?

18  A.   Yes.

19  Q.   And you read it to the jury here in October 2008.  Right?

20  A.   Yes.

21  Q.   Are you familiar with something called the risk matrix

22  that OFAC has published on its website?

23  A.   Yes.

24  Q.   And the risk matrix is a set of factors for members of

25  the charitable sector to consider when they are contemplating

1    charitable contributions.  Correct?

2    A.    Yes.

3    Q.    And that was published in March of 2007.  Correct?

4    A.    I believe that is the correct date.  I don't have it with

5    me to double check.

6    Q.    We don't have to nail it down to the day or month, but

7    does 2007 sound right?

8    A.    Yes.

9    Q.    A number of years after the Holy Land Foundation closed.

10   Right?

11   A.    Yes, sir.

12   Q.    And the factors that the risk matrix recommends -- By the

13   way, the risk matrix, like these guidelines, is voluntary.

14   Correct?

15   A.    Yes.

16   Q.    It doesn't violate any law not to consider these factors

17   in making a donation.  Right?

18   A.    No.  It just puts you on a risk.

19   Q.    Well, the matrix is designed to permit a charity to

20   assess the risk associated with a contribution.  Right?

21   A.    Right.  It is a guideline to help avoid risk.

22   Q.    Right.  It is not a legal requirement.

23   A.    Correct.

24   Q.    And the factors include things like whether the grantee

25   has explicit charitable purposes.  Right?

1    A.    Yes, sir.

2    Q.    Whether the grantee discloses how the funds are used with

3    specificity.  Right?

4    A.    Yes, sir.

5    Q.    Whether the grantee has a history of legitimate

6    charitable activities.  Right?

7    A.    Yes, sir.  I find it a bit difficult without the document

8    to refer to.

9              MR. CLINE:  May I approach, Your Honor?

10             THE COURT:  Yes.

11   Q.    (BY MR. CLINE)  Again, it is not my intention to

12   introduce this into evidence, although let's try refreshing

13   your recollection.

14   A.    I have seen these before.  I just don't have them

15   memorized.

16   Q.    Sure.  I am just running through a few of the factors.  I

17   don't mean to suggest I am covering them all.  I am hitting a

18   few of them.

19   A.    I understand.

20   Q.    Whether the grantee has a history of legitimate

21   charitable activities.  Right?

22   A.    Correct.

23   Q.    Whether the grantee has an existing relationship with the

24   charity.  Right?

25   A.    I am now lost as to --

1    Q.   We don't need to go through them all.  I just wanted to

2    give the flavor of some of these factors.  That is the kind of

3    thing that is in there that charities are recommended to

4    consider in deciding whether to make a donation.  Right?

5    A.   Yes, sir.

6    Q.   And this risk matrix, again, like the guidelines, wasn't

7    available to charities at any time between January 23rd, 1995

8    when Hamas was designated and December 2001 when Holy Land

9    closed.  Correct?

10   A.   That is correct, sir.

11   Q.   Now, you can put that aside.

12        You testified, at least I thought I understood you to

13   testify, that the designation of an entity such as Hamas

14   encompasses its component parts.  Is that a fair statement of

15   your view.

16   A.   Yes, sir.

17   Q.   And I think you also testified that OFAC generally does

18   not designate separately component parts.  Correct?

19   A.   We don't generally designate all component parts of an

20   organization.  It varies by program.  Some programs have a

21   much greater capability of doing that and it has a different

22   effect because of the nature of the target.

23   Q.   All right.

24   A.   In something as comprehensive as terrorist organizations

25   designating all the component parts is not necessarily the

1    best use of our resources, and as I testified earlier, there

2    are other factors that come into play such as diplomatic

3    concerns and law enforcement intelligence activity concerns.

4    Q.    I recall that testimony.

5          Now, I want to discuss these matters in connection with

6    Hamas.  OFAC considers -- You are familiar with an

7    organization called Interpal.  Correct.

8    A.    Yes.

9    Q.    And OFAC considers Interpal to be controlled by Hamas.

10   Correct?

11   A.    Yes.

12   Q.    Interpal is an organization located in the United

13   Kingdom?

14   A.    Yes.

15   Q.    And Interpal was separately designated by OFAC in 2003.

16   Correct?

17   A.    I don't recall the precise year, but yes, Interpal was

18   designated by OFAC.

19   Q.    I can show you if you want, but will you take my word

20   that it was 2003?

21   A.    Yes.

22   Q.    All right.  OFAC considers an organization called -- you

23   have heard an organization called CBSP?

24   A.    The initials don't ring a bell for me, sir.

25   Q.    Let me tell you what I am going to do.

1          MR. CLINE:  May I approach?

2          THE COURT:  Yes.

3  Q.   (BY MR. CLINE)  I am going to hand you what is in

4  evidence as Government's Exhibit Designation No. 1, and just

5  use that to refresh your recollection as I ask you about these

6  things.  Okay?

7  A.   Uh-huh.

8  Q.   Now, I asked you about Interpal, and you see Interpal on

9  that document.  By the way, that document is an OFAC blocking

10 memorandum.  Correct?

11 A.   Yes, sir.

12 Q.   And that is the document that results from the

13 designation of an entity as a specially designated terrorist,

14 or in this case a specially designated global terrorist.

15 Right?

16 A.   That is correct, sir.

17 Q.   So back to CBSP, do you see that on there?

18 A.   Yes, I do.

19 Q.   It is an organization located in France.  Correct?

20 A.   Yes, sir.

21 Q.   And OFAC considers it to be controlled by Hamas.  Right?

22 A.   Controlled or acting for or on behalf of, I believe.

23 Q.   And that is the language from the executive order.

24 Correct?

25 A.   Yes.

Q.   If I say controlled, can we use that as a short form for

that whole formulation?

A.   Yes.

Q.   Okay.  And CBSP was separately designated in 2003.

Right?

A.   Yes, sir.

Q.   Do you see Mr. Newcomb's signature on that?

A.   No, that is not Mr. Newcomb's signature.

Q.   Mr. Newcomb's name?

A.   Mr. Newcomb's name is not on the document.

Q.   Really?

            MR. CLINE:  May I approach, Your Honor?

            THE COURT:  Yes.

            MR. CLINE:  My memory is failing me.

Q.   (BY MR. CLINE)  You are right.  It is David Aufhauser

General Counsel, Department of Treasury.  In any event, it has

a Treasury official's name on there.

A.   That is correct, yes, sir.

Q.   You are familiar wan organization called Sanabil.

Correct?

A.   Yes, sir.

Q.   And it is an organization located in Lebanon?

A.   Yes, sir.

Q.   And OFAC considers Sanabil to be controlled by Hamas.

Right?

1   A.   Yes.

2   Q.   And Sanabil was separately designated in 2003.  Correct?

3   A.   Correct.

4   Q.   You are familiar with an organization called the

5   Palestinian Association of Austria, also known as PVOE.

6   Right?

7   A.   Yes.

8   Q.   That is an organization located in Austria?

9   A.   Yes.

10  Q.   OFAC considers PVOE to be controlled by Hamas?

11  A.   Correct, sir.

12  Q.   And PVOE was separately designated in 2003.  Correct?

13  A.   Yes.

14  Q.   You are familiar with an organization called I am going

15  to butcher the pronunciation here, the Association de Secours

16  Palestinian.  Right?

17  A.   Yes.

18  Q.   An organization located in Switzerland?

19  A.   Correct.

20  Q.   OFAC considers it to be controlled by Hamas.

21  A.   Correct.

22  Q.   And it was separately designated in 2003.  Correct?

23  A.   Yes, sir.

24  Q.   You are familiar with an organization called the al-Aqsa

25  Foundation?

1    A.    Yes.

2    Q.    It is an organization in Germany and other countries.

3    Right?

4    A.    Yes.

5    Q.    OFAC considers al-Aqsa to be controlled by Hamas.  Right?

6    A.    Correct.

7    Q.    And al-Aqsa was separately designated in 2003.  Correct?

8    A.    It wasn't on this document, but yes, I know it was

9    separately designated.

10   Q.    You know it was separately designated.  Okay.  We have

11   talked about the al-Salah Society.  Correct?

12   A.    Yes, sir.

13   Q.    That is a charitable society in the Gaza Strip.  Right?

14   A.    Correct.

15   Q.    And OFAC considers al-Salah to be controlled by Hamas.

16   Right?

17   A.    Yes, sir.

18   Q.    And it was separately designated in August of 2007.

19   Right?

20   A.    Yes.

21   Q.    Do you know who Sheikh Yassin is?

22   A.    Yes, sir.

23   Q.    Founder of Hamas.  Yes?

24   A.    Yes.

25   Q.    And he was separately designated twice, first as an SDT

1   by OFAC right after Executive Order 12947 and later as an SDGT

2   under Executive Order 13224.  Right?

3   A.    That is correct.

4   Q.    Do you know who Mousa Abu Marzook is?

5   A.    Yes, sir.

6   Q.    He is a Hamas leader.  Correct?

7   A.    Correct.

8   Q.    He was separately designated twice by OFAC.  Right?

9   A.    That is correct, too.

10  Q.    You know who Khalid Mishal is.  Right?

11  A.    Yes.

12  Q.    He is a Hamas leader.  Correct?

13  A.    Yes.

14  Q.    Separately designated by OFAC?

15  A.    Correct.

16  Q.    Imad al-Alami Usama Hamdan Aziz Rantisi, either are or

17  were Hamas figures?

18  A.    Yes.

19  Q.    All separately designated?

20  A.    Yes.

21  Q.    Ahmad al-Kurd?

22  A.    Yes.

23  Q.    He is the head of the al-Salah Society He is separately

24  designated.  Right?

25  A.    Yes.

1   Q.   Now, you know the zakat committees that are named in the

2   indictment in this case.  Correct?

3   A.   Yes.

4   Q.   You are familiar with them?

5   A.   I am familiar from having read the indictment.

6   Q.   The Qalqilya zakat committe, the Tulkarem zakat

7   committee, the Jenin zakat committee, does that all sound

8   familiar to you?

9   A.   These names are familiar.

10   Q.   None of those zakat committees has been separately

11   designated.  Correct?

12   A.   Not at this time, no, sir.

13   Q.   And none of the officers or board members of any of those

14   zakat committees has been separately designated.  Correct?

15   A.   Without -- I don't know whether we have designated one of

16   them in some other capacity dealing with Hamas or not.

17   Q.   You don't know?  Is that the short answer?

18   A.   That is my short answer.

19   Q.   All right.

20        MR. CLINE:  That is all my questions.  Thank you,

21   sir.

22        THE WITNESS:  Thank you, sir.

23        THE COURT:  Any other counsel have cross?

24     Ms. Hollander?

25        MS. HOLLANDER:  No cross.

1            MR. WESTFALL:  No.

2            MR. DRATEL:  No.

3            THE COURT:  Ms. Cadeddu?

4            MS. CADEDDU:  No, Your Honor.

5            THE COURT:  Ms. Shapiro, any redirect?

6            MS. SHAPIRO:  Yes, Your Honor.  May we approach for

7    a moment?

8            THE COURT:  Yes.

9            (The following was had outside the hearing of the

10           jury.)

11           MS. SHAPIRO:  I think Mr. Cline has opened the door

12   wide open at this juncture that I have to get into the

13   designation of HLF.  The reason for that is because he has

14   pointed out that the organizations that he just denoted

15   Interpal, CBSP, al-Aqsa are all designated.  Those

16   organizations are umbrella organizations.  They are charities,

17   just like the Holy Land Foundation, that exist in England,

18   Germany, Austria, France.  They are umbrella organizations

19   that give money to the same zakat committees that Holy Land

20   gives to.

21       By pointing out that all of those organizations are

22   designated, he has created a false impression because Holy

23   Land was also designated, and we need at this juncture to

24   bring out that Holy Land was also designated.

25           MR. CLINE:  Your Honor, I did that same cross with

1    Doctor Levitt and I heard no door opening argument then.  But

2    I would add that the point is not that Holy Land is or isn't

3    designated.  We will never make an argument one way or the

4    other on that.

5        The point is he testified that when you designate Hamas

6    you designate all of its component entities, and I pointed out

7    by my cross that in fact OFAC designated a whole slew of

8    component entities or entities that it views as component

9    entities.  So this argument "We designate the big group and

10   that takes care of all the components" is not true.  They do

11   designate components and they designate individuals.  That was

12   the only point of that argument.

13       And we are never going to make from that argument, we

14   will never argue that Holy Land is or isn't on the list, that

15   there is any inference to be drawn from that.  It just won't

16   be made.

17           MS. SHAPIRO:  Your Honor, his testimony was that

18   they designate the umbrella organizations.  Holy Land is an

19   umbrella organizations, like these other organizations he just

20   named.

21           MR. CLINE:  He doesn't know anything about those

22   other organizations except they are controlled by Hamas and

23   got designated.

24           MS. SHAPIRO:  But now they know they are designated

25   and Holy Land is missing from that picture.  He is trying to

1    make Mr. McBrien look inconsistent in his testimony, but in

2    fact the truth is that they designate the umbrella

3    organizations of which -- These organizations were umbrella

4    organizations, as was Holy Land, and we want to bring out that

5    those organizations Mr. Cline just named give money to the

6    same zakat committees that are at issue in this case and they

7    were designated just as Holy Land Foundation was designated

8    for giving money to these same zakat committees.  None of

9    these zakat committees are designated, but they don't need to

10   be.  That is consistent with his testimony.

11          MR. JONAS:  The impression that is left is if you

12   are not designated you are not part of Hamas, and that is just

13   not the case.

14          MR. CLINE:  This has nothing to do with Holy Land,

15   the cross doesn't and the argument doesn't.  It has to do with

16   whether those individual zakat committees needed to be

17   designated at the time as a matter of notice, if nothing else,

18   to the Defendants.  The designation was -- There has been

19   evidence in this case the Defendants, the Baker Wiretap No.

20   11, for example, played this morning that the Defendants are

21   looking to the list to tell them what is legal and what isn't,

22   and none of those individual zakat committees was put on the

23   list.  None is on the list today.  That is the point.  And

24   their response to that point this morning was "you don't have

25   to put them on the list.  They are automatically on the list,

1    because Hamas is designated."

2        My cross was designed to show that that is not true, that

3    in fact OFAC goes to great lengths to designate a whole slew

4    of component individuals and so on, and it was designed simply

5    to rebut his testimony that once you designate Hamas it has

6    taken care of all the zakat committees.

7            MS. SHAPIRO:  Your Honor, if his cross was limited

8    to the equivalent component entities we are talking about,

9    like zakat committees or like the al-Salah Society then that

10   would be fine and I wouldn't need to go into it.  But when we

11   are talking about the greater umbrella organizations, that

12   OFAC has designated Holy Land is among those and you can't

13   leave that out of the picture.  You have an absolute

14   misimpression for the jury.

15           THE COURT:  I think I have heard enough.  I just

16   don't know what the decision is.

17           MS. HOLLANDER:  Putting in the Holy Land designation

18   would be like putting in a criminal complaint.

19           MS. SHAPIRO:  Then he shouldn't have brought it up.

20           MS. HOLLANDER:  One has nothing to do with the

21   other.

22           MS. SHAPIRO:  Well, he has said he has heard enough.

23           THE COURT:  What else do you have on redirect?  Are

24   you planning on getting into anything else on redirect?

25           MS. SHAPIRO:  I have some questions that I can do.

1   It is not terribly extensive, ten minutes or less.

2           THE COURT:  I am going to keep that out at this

3   point.  I still don't think that -- I mean, I agree with what

4   point you were trying to make.  I don't think you have to go

5   into that, and I don't think that undermines your argument in

6   terms of what you are trying to do.  And Holy Land, I don't

7   think that changes that one way or another, because the zakat

8   committees are different.

9           MS. SHAPIRO:  Can I point out that I would like to

10  be able to go into the fact that these organizations are

11  umbrella organizations and that they give to the same zakat

12  committees that Holy Land gives to?  I think that is fair,

13  because he is trying to make an equivalency between the zakat

14  committee level and the umbrella --

15          MR. CLINE:  If that is the extent of the point that

16  Ms. Shapiro wants to make, they are umbrella organizations and

17  they gave to some of the same zakat committees, and that is as

18  far as it goes, I don't have an objection to that.

19          THE COURT:  I guess part of the problem is, I am not

20  familiar with all these groups and so I don't know that the

21  jury is either.  These distinctions you were making, I wasn't

22  making them.  The jury sure isn't making them.

23          MS. SHAPIRO:  That is part of the problem, Your

24  Honor, is they are not making the distinction --

25          THE COURT:  That is why it doesn't make any

1    difference.  That is why I am saying I don't know that it

2    makes a difference, the distinction you are making.  I am

3    hearing this for the first time, and a lot of these groups,

4    some of them I recognize, but most of them I didn't, the CVOE

5    and the CBSP --

6              MR. CLINE:  You have never heard of those.

7              THE COURT:  I haven't.

8              .

9              THE COURT:  I know they have been designated, but I

10   don't know what their equivalency is because I don't know

11   anything about them, so I don't know how they compare to HLF

12   versus zakat.

13             MS. SHAPIRO:  To a certain extent it goes to the

14   subject of the next expert witness, but the idea is, just for

15   Your Honor's background, if you recall the Elbarasse documents

16   talk about Palestine committees and setting them up all around

17   the world.  Holy Land was one of them.  But they were set up

18   in all different countries in Europe, so these organizations,

19   Interpal, al-Aqsa PVO, they are other organizations and they

20   all sent money into the territories in the same way.  They

21   raised money in the same way.

22             THE COURT:  And that is what you are going to go

23   into with Doctor Hoffman?

24             MR. CLINE:  Avi.

25             MS. SHAPIRO:  Avi.  But probably not very

extensively, because they are sort of extraneous to a certain

extent.  But Mr. Cline is creating an equivalency between the

zakat committees and those higher echelon organizations.

THE COURT:  Why don't you just point out that --

MS. SHAPIRO:  That is what I intend to do.

MR. CLINE:  I think that is fine.

THE COURT:  Rather than getting into more of the

designation.  That is not the same thing.  Let's go with that.

(The following was had in the presence and hearing

of the jury.)

<u>REDIRECT EXAMINATION</u>

<u>By Ms. Shapiro</u>:

Q.   Good afternoon, Mr. McBrien.

A.   Good afternoon.

Q.   I have just a few additional questions for you.

A.   Yes, ma'am.

Q.   Mr. Cline started, or somewhat early on he read to you

some testimony by you in another proceeding.  Do you remember

that?

A.   Yes, ma'am.

Q.   Okay.  That was a different matter.  Correct?

A.   Correct.

Q.   And what you said in that proceeding was true.  Correct?

A.   Correct.

Q.   Okay.

1          MR. WESTFALL:  Objection; leading, Your Honor.

2          THE COURT:  Okay.  Do you want to rephrase your

3    question, counsel?

4    Q.   (BY MS. SHAPIRO)  And was everything that you testified

5    to this morning consistent with what you said in that earlier

6    proceeding?

7    A.   I believe so, yes.

8    Q.   Okay.  Now, I think Mr. Cline also talked about that you

9    did not give Mr. Elashi, and the others who were with him at

10   that meeting, you did not give him a list of organizations to

11   which it was okay to give to.  Is that more or less

12   paraphrasing?

13   A.   That is correct.

14          MS. CADEDDU:  I object to leading, Your Honor.

15          THE COURT:  Do you want to rephrase that question?

16          MS. SHAPIRO:  Sure.

17   Q.   (BY MS. SHAPIRO)  With respect to your advice to Mr.

18   Elashi and the others that were with him during that meeting,

19   did you provide those participants with any sort of a list of

20   organizations that were okay to give to?

21   A.   No, we did not.

22   Q.   Okay.

23   A.   We did not provide what we call a white list.

24   Q.   I was going to ask you if you know what a white list

25   means.

1    A.    Yes.

2    Q.    What is a white list?

3    A.    A white list is essentially a list of organizations that

4    has been, in essence, authorized or cleansed by the U.S.

5    government so someone can deal with it without fear that they

6    are going to be in violation of the sanctions prohibitions.

7    Q.    Does the Treasury Department ever -- does it have a white

8    list?  Has it ever had a white list?

9    A.    It has not had a white list in this context at all.

10   Q.    And why not?

11   A.    It is very difficult to create a white list.  It makes

12   the entities on the white list themselves, they may become the

13   subject of attempts to subvert their good purposes and turn

14   them, willingly or unwittingly, into channels of prohibited

15   transfers.

16        Plus, it requires that we know at the time such a list

17   goes out that all the participants in the list are not

18   otherwise involved in illicit activity, and that is a very,

19   very difficult thing to know.

20   Q.    So it is basically, is it fair to say, that the good seal

21   of approval of Housekeeping, or what have you, Treasury

22   doesn't provide that for any --

23   A.    That is not our business.  Our business is to identify

24   prohibited parties insofar as we can and within an overall

25   strategy.

Q.   And whose responsibility is it to determine whether the recipient organization is connected to a designated organization, one that appears on the specially designated terrorist list?

A.   That would be our mission, along with the mission of other investigative agencies.

Q.   I didn't phrase that question well.  If you are a donor or somebody that wants to give money, I mean, whose responsibility is it to make sure that the organization that is the recipient of the money is not connected to a listed organization?

     MR. DRATEL:  Objection to the form of the question, Your Honor.

     THE COURT:  Overruled.  Go ahead.

     THE WITNESS:  It is in the first instance the donor's responsibility.  We have tried to provide assistance through such things as the guidelines, and of course we have the specially designated nationals list which is another simple way of having an idea of who you can and cannot deal with.  But as I have said, it is not exhaustive.  It is not exclusive.  It increases over time.

Q.   (BY MS. SHAPIRO)  Okay.  So the list alone -- Is the list alone enough to verify or know that the money that you are giving to the organization that you are giving to is not connected to a listed organization?

1    A.   No, it is not.

2    Q.   Okay.  Now, Mr. Cline pointed out the press statement and

3    talking points that came out with Executive Order 12947.

4    Correct?

5    A.   Yes, ma'am.

6    Q.   You recall that?

7    A.   Yes.

8    Q.   And I think he read to you the sentence, "These measures

9    are also intended to preclude diversion of charitable

10   contributions to fund terrorism activities by prohibiting the

11   transfer of funds by U.S. persons to these groups."

12   A.   Yes.

13   Q.   Do you recall that?

14   A.   Yes, ma'am.

15   Q.   Okay.  And in that executive order, when this refers to

16   "these groups," it is referring to the organizations that are

17   listed.  Correct?

18   A.   Yes.

19   Q.   Okay.  And is Hamas listed --

20   A.   Yes.

21   Q.   -- in that executive order as designated?

22   A.   Yes.

23   Q.   And that would include all parts of Hamas.  Correct?

24        MS. HOLLANDER:  Objection; leading.

25   Q.   (BY MS. SHAPIRO)  Would that include all parts of Hamas?

1   A.   Yes.

2   Q.   Now, Mr. Cline spent a good deal of time going over the

3   best practices document.  Do you remember that document?

4   A.   Yes.

5   Q.   And he took you through a timetable.

6   A.   Yes.

7   Q.   And he pointed out that those guidelines --

8           MS. CADEDDU:  Objection; leading.

9           MS. SHAPIRO:  I am just summarizing.

10          THE COURT:  She is summarizing what Mr. Cline asked.

11  Go ahead.

12  Q.   (BY MS. SHAPIRO)  He pointed out those guidelines were

13  first issued in 2002.  Do you remember those questions?

14  A.   Yes, I do.

15  Q.   I am just going to put up those guidelines for moment on

16  the elmo.  This is OFAC No. 3.  Do you see the highlighted

17  portion?

18  A.   Yes, ma'am.

19  Q.   And do you remember we read this and we talked about that

20  on direct?

21  A.   Yes, ma'am.

22  Q.   Can you read that again, that sentence, please?

23  A.   "These guidelines are designed to assist charities that

24  attempt in good faith to protect themselves from terrorist

25  abuse and are not intended to address the problem of

1    organizations that use the cover of charitable work, whether

2    real or perceived, to provide support to terrorist groups or

3    fronts operating on behalf of terrorist groups."

4    Q.   Do these guidelines have any relevance to organizations

5    that are attempting to circumvent the law by giving to a

6    designated organization through a front organization?

7    A.   They are relevant that for those which are not good faith

8    organizations the guidelines don't count.  If someone is

9    trying to evade us, the guidelines aren't going to matter to

10    them.

11    Q.   So if someone knows that an organization is connected to

12    a listed organization--and I mean listed on the specially

13    designated terrorist list or the specially designated national

14    list, the bigger list--if somebody knows that, does it matter

15    whether or not the organization that you are giving money to

16    is on the list?

17    A.   No.

18          MR. DRATEL:  Objection; calls for a legal conclusion

19    and misstates the law.

20          THE COURT:  Overruled.  Go ahead.

21    Q.   (BY MS. SHAPIRO)  What was your answer?

22    A.   The answer is no.

23    Q.   And was that true prior to the date that these guidelines

24    issued?

25    A.   Yes.  That has been true from the time the order was

1    issued.

2    Q.    And does the executive order itself address that issue?

3    A.    Yes.

4    Q.    Where in the executive order?  Let me put up -- This is

5    InfoCom Search No. 37.  I think Mr. Cline pointed you to this.

6    Look again at the highlighted portion of subsection (b).

7    A.    I have lost the right margin here.

8    Q.    Sorry.

9    A.    There we go.

10   Q.    Can you read that?

11   A.    Yes, ma'am.  "Any transaction or dealing by United States

12   persons or within the United States, in property or interests

13   in property, of the persons designated in or pursuant to this

14   order is prohibited, including the making or receiving of any

15   contribution of funds, goods, or services to or for the

16   benefit of such persons."

17   Q.    So as of the date of this executive order, which was what

18   date again?

19   A.    January 24th was its effective date, 1995.

20   Q.    Was it prohibited to give money to any organization that

21   acted for or to the benefit of a listed organization?

22   A.    Yes.  It was illegal.

23   Q.    And that is as of 1995?

24   A.    As of 1995.

25   Q.    Now, Mr. Cline went through a series of organizations and

1    asked you if they were separately designated.  Do you recall

2    that?

3    A.    Yes, ma'am.

4    Q.    And he listed organizations such as Interpal.  Correct?

5    A.    Yes, ma'am.

6    Q.    You are familiar with Interpal?

7    A.    Generally, yes.

8    Q.    And he also mentioned the al-Aqsa Foundation?

9    A.    Yes.

10   Q.    Are you familiar with that organization?

11   A.    Yes, ma'am.

12   Q.    And he mentioned CBSP.

13   A.    Which I did not recognize immediately, but when I saw it

14   in the document I certainly recognized it.

15   Q.    That is in France.  Is that right?

16   A.    Yes.

17   Q.    Are you familiar with that organization?

18   A.    Yes.

19   Q.    And he mentioned Sanabil?

20   A.    Yes.

21   Q.    And I think he might have mentioned PVOE or another

22   organization in Austria.

23   A.    Yes, he did.

24   Q.    On direct we talked about umbrella organizations.  Do you

25   recall that?

1    A.    Yes, ma'am.

2    Q.    Does OFAC designate, prefer to designate umbrella

3    organizations?

4    A.    Yes, it is part of our overall strategy is to try to, as

5    I say, get the most bang for the buck--that is, to capture by

6    our designation those organizations or possibly individuals

7    who play the most key role and have the most pieces under

8    them, so that by impeding and prohibiting transactions with

9    that particular sector, we cut off the greatest flow of money

10   at one point.

11   Q.    Okay.  And these organizations that I listed for you a

12   moment ago, Interpal, al-Aqsa, CBSP, are those umbrella like

13   organizations?

14   A.    To the best of my understanding, yes.

15   Q.    And do you know where they send their money, those

16   organizations?

17   A.    The money, to the best of my recollection, the money goes

18   to the West Bank or Gaza.

19   Q.    And does it go to zakat committees in the West Bank and

20   Gaza?

21         MR. CLINE:  Object to the leading and also lack of

22   personal knowledge.

23         THE COURT:  Do you want to rephrase your question?

24   Sustained on leading.

25   Q.    (BY MS. SHAPIRO)  Where does the money go in the West

1    Bank and Gaza, to the best of your knowledge, generally?

2    A.    It generally goes through zakat committees.

3    Q.    And those zakat committees are not separately designated?

4    A.    No, they are not, with one exception.

5    Q.    Which one is that?

6    A.    al-Salah.

7    Q.    So al-Salah is an exception, and we talked about that

8    exception?

9    A.    Yes, ma'am.

10   Q.    But these other organizations, the European organizations

11   that Mr. Cline mentioned, are those the same thing as the

12   zakat committees, or are those of a different nature?

13   A.    They are a different nature.  Again, they are the

14   external more umbrella like organizations that accumulate

15   funds or fundraisers external to Gaza and the West Bank, pull

16   the funds together under charitable auspices, and then move

17   them into the West Bank and Gaza.

18   Q.    Okay.  So let me ask you this.  If you know that a zakat

19   committee is connected to Hamas, if you know that --

20          MR. DRATEL:  I am going to object, Your Honor,

21   "connected to."

22          THE COURT:  Okay.  Overruled.  Go ahead.

23   Q.    (BY MS. SHAPIRO)  You know that a zakat committee is

24   connected to Hamas.

25   A.    Yes.

1    Q.    Can you give to that zakat committee simply because the

2    zakat committee itself does not appear on the list of

3    specially designated nationals?

4    A.    No, you may not.  It is prohibited.

5    Q.    Okay.

6            MS. SHAPIRO:  Thank you.

7            THE COURT:  Mr. Cline?

8            MR. CLINE:  Yes, please, Your Honor.

9                    RECROSS EXAMINATION

10   By Mr. Cline:

11   Q.    Just a couple of things, Mr. McBrien.

12   First those umbrella organizations that I asked you about and

13   Ms. Shapiro asked you about, those were designated in 2003.

14   Is that correct?

15   A.    That is correct, sir.

16   Q.    The second thing, Ms. Shapiro in a number of her

17   questions to you has used the phrase "connected to Hamas."  Do

18   you remember that phrase?

19   A.    Yes.

20   Q.    And I have been looking while she has been talking at

21   Executive Order 12947 and also 595.408, that regulation, and I

22   don't see that language.  Does that come out of an executive

23   order or regulation?

24   A.    No, it does not.  I think "connected to" in this instance

25   is somewhat like when we use "controlled" during your initial

1   cross examination of me, kind of a generic term I believe that

2   is what she indicated.

3   Q.   All right.

4   A.   Was she meant here.

5   Q.   It is a paraphrase, not the actual legal standard.

6   A.   The actual words are "owned or controlled by or acting

7   for or on behalf of."

8   Q.   Yes.  You got it just right.

9        MR. CLINE:  Thank you, Your Honor.

10        THE COURT:  Anything further?

11        MS. SHAPIRO:  May I ask one last question?

12        THE COURT:  Yes.

13                    REDIRECT EXAMINATION

14   By Ms. Shapiro:

15   Q.   Does the legal language also contain the words "to the

16   benefit of"?

17   A.   Yes, ma'am.

18        MS. SHAPIRO:  Thank you.

19        THE COURT:  Mr. Cline, anything else?

20      Mr. McBrien you are free to go.  You may step down.

21   Thank you.

22        THE WITNESS:  Thank you, Your Honor.

23        MR. JONAS:  Before we resume with Agent Burns, can

24   we have a quick sidebar?

25        THE COURT:  Yes.

1           (The following was had outside the hearing of the

2           jury.)

3           MR. JONAS:  Your Honor, yesterday when we moved en

4    masse all the exhibits, I wasn't --

5           THE COURT:  Yes.

6           MR. JONAS:  Let formally move to withdraw those,

7    because I understand Ms. Moreno is going to have objection to

8    the withdrawal of at least one of them.

9           THE COURT:  Which one?

10          MS. MORENO:  It is Government's Exhibit No. HLF

11   Search No. 110, Your Honor, is the only one that I have an

12   objection.

13          THE COURT:  You don't object to the others?

14          MS. MORENO:  No objection to any of the others, Your

15   Honor.

16          And if I may, it is a video, and it is a video that came

17   in last year, and there was an additional part to that video

18   that they did not include this year.  What happened was they

19   gave us the list, I prepared my cross examination thinking

20   this was going to be included in their cross, and then Ms.

21   Duncan approached Mr. Jonas and said we have a 106 issue on

22   that one specific video.  And then apparently what happened is

23   Mr. Jonas said he was going to then withdraw the video.  So I

24   have an issue with that, Your Honor.

25          So I would ask the Court to allow me to bring in the last

clip that is not included in the exhibit that they first

admitted, you admitted, and then they tried to withdraw on the

basis of 106. This is a video -- The part that I want is

about four minutes long, and what I really want to do -- I

don't even need to play the video. I am attempting to get

just the text of the transcript and read it through Agent

Burns.

We did this during the first trial, so this is no

surprise. So that is my basis for my request to the Court.

THE COURT: Okay.

MR. JONAS: The fact this was done in the first

trial doesn't mean it has to be done --

THE COURT: Well, tell me why you want to withdraw

it.

MR. JONAS: We want to withdraw that exhibit because

we didn't play it. I decided I didn't want to use it. We

feel it is unnecessary to our case, and I think it is our

prerogative as to what we admit and don't admit as evidence.

If Ms. Moreno wants to put on a case and put on that

exhibit through another witness, she is entitled to do that.

THE COURT: If it is in and she wants it as 106,

would you object to the 106?

MR. JONAS: Yes, because that goes to another issue.

I think she needs to explain how the section she wants in

explains the section we don't want to play. Just saying it is

1    106 doesn't cover it.

2            THE COURT:  Of course I can't make that decision

3    without reading your part of it and reading your part of it.

4    So I can't make a ruling on it as to whether I will let you

5    get in that 106 issue.

6        Do you have a transcript?  I am not going to take a break

7    to do it.  I will have to do it this afternoon.

8            MR. JACKS:  Your Honor, it just seems kind of

9    fundamental that before 106 even comes into play, the first

10   part, it has got to have something that it is explaining,

11   rebutting, or putting into context, and there is nothing to

12   explain, rebut, or put in context because it hasn't been shown

13   to the jury.  So that seems kind of --

14           THE COURT:  It hasn't been shown to the jury, but it

15   is in evidence.  It doesn't have to be shown to the jury for

16   it to be in evidence.  It is in evidence.

17       I haven't run across this too often.  I am not sure what

18   to do with that.  So that is why I was jumping over to the

19   106.  Because whether it has been exhibited to the jury or

20   not, that is not what determines whether it is in evidence.

21   And I admitted them, so it is in evidence.

22       So I will consider your request to withdraw it, but I

23   will also consider your 106 in case it stays in.  So if you

24   can give me a copy of the transcript at some point and then

25   your portion of it separately so I can know what it is that

1    you are trying to get in.

2          MS. MORENO:  Right.  And I would request -- The

3    transcript is the transcript of the video of last year,

4    because the excerpts of the video this year of course don't

5    have the four-minute version at the end of the --

6          THE COURT:  Just delineate where it starts.

7          MS. MORENO:  We can do that.

8          MR. JONAS:  I don't know if we have a transcript.

9          MS. MORENO:  I have got the times.

10          THE COURT:  Just get with her and make sure that is

11    what we have.

12          MR. JONAS:  If there is a transcript from the video

13    last year, I certainly have it.

14          MS. MORENO:  Thank you, Your Honor.

15          MR. CLINE:  May I be excused following the break?

16          THE COURT:  Sure.

17          MR. CLINE:  I want to thank the Government for

18    calling Mr. McBrien.

19          THE COURT:  All right.  Okay.

20          MS. SHAPIRO:  May I also be excused, Your Honor.

21          THE COURT:  Yes.

22          MS. HOLLANDER:  I don't know when we are going to

23    get to my cross, but I will need for you to give me a ruling

24    on the 302s on Jamil Hamami.

25          THE COURT:  Remind me before you cross.

1          MS. HOLLANDER:  I am not the first one.

2          THE COURT:  Who is up first?

3          MS. MORENO:  Mr. Westfall.

4          MS. HOLLANDER:  It may not even be today.

5          THE COURT:  All right.

6          (The following was had in the presence and hearing

7          of the jury.)

8          THE COURT:  Mr. Westfall?

9          MR. WESTFALL:  Thank you, Your Honor.

10          THE COURT:  Agent Burns, you are under that oath

11   administered when you first started testifying.

12                        CROSS EXAMINATION

13   By Mr. Westfall:

14   Q.    Hello again, Agent Burns.

15   A.    Hi.

16   Q.    I want to show you what is in evidence as Payments to

17   Nablus Zakat.  Do you recognize this as one of the schedules?

18   A.    Yes.

19   Q.    One of the payment schedules?  And I know you went over

20   it a little bit.  I just want to go over it just a little bit

21   more here and kind of -- That is the title on each one is

22   payments to a certain zakat committee or organization.  Right?

23   A.    That is correct.

24   Q.    And then we go through a source of payment, the date, and

25   they are all dates of the transaction.  Right?

1    A.    That is correct.

2    Q.    And then the source payment from, who authorized it, the

3    amount, the destination of the payment, and then over here the

4    label is on top of this, but that is the exhibits that you

5    have relied on and that are supposed to be in evidence at this

6    point.  Right?  That underlie each transaction?

7    A.    That is correct.

8    Q.    Now, just to be clear, over here in the authorization

9    column, on every single payment schedule we have, Abdul Odeh's

10   name is not going to be in that column.  Is that true?

11   A.    That is true.

12   Q.    And these authorizations for these payments all came out

13   of Richardson.  Right?

14   A.    I think generally they did.  I wouldn't want to say.

15   Q.    Except for the ones that happened actually in Palestine.

16   A.    Correct.

17   Q.    But otherwise, they all came out of Richardson?

18   A.    They came out of the bank accounts for the headquarters

19   office.

20   Q.    Right.

21   A.    Which we saw the signature card on one of those bank

22   accounts.

23   Q.    Right.  And then oftentimes you get this name -- Here see

24   these are checks, but then we move a little bit further and we

25   start to get into the wires.  Right?

1   A.   Correct.

2   Q.   And those authorizations for the wires, of course there

3   is none of those from Abdul Odeh either.

4   A.   You are correct.

5   Q.   And in all the bankers boxes of materials, we never have

6   seen a wire with Abdul Odeh's name on it, have we?

7   A.   I have not seen one.

8   Q.   Now, I want to talk to you about the financial records of

9   the Holy Land Foundation.  Okay?

10  A.   Okay.

11  Q.   One other thing I forgot to -- Over on the side here, do

12  you see this?

13  A.   I do.

14  Q.   And this is not -- All of the schedules that you have in

15  evidence that you have testified about involve counts in the

16  indictment.  Isn't that true?

17  A.   That is correct.

18  Q.   But the schedules that do involve counts in the

19  indictment, wherever the actual transaction pertains to the

20  indictment, to a specific count in the indictment, it is going

21  to be listed here on the side.  Isn't that true?

22  A.   It should be.  That was the plan.

23  Q.   Okay.  Assuming the plan worked.

24  A.   Assuming it worked.

25  Q.   That is the design.  Right?

1  A.  Right.

2  Q.  Okay.  Now, there was -- In the spring of 2002, you came

3  into possession of all of these records.

4  A.  The search warrant records from the Holy Land Foundation

5  office in the spring of 2002.

6  Q.  Not Elbarasse and all that, but there was no Holy Land

7  Foundation financial records at Elbarasse's place or Ashqar's

8  place or anything like that.  Right?

9  A.  The financial records that we used to compose those

10  schedules did not come from the Elbarasse or the Ashqar

11  searches.

12  Q.  Right.  And so I am talking about the stuff that you

13  seized that you got with the search warrant on the Holy Land

14  Foundation.

15  A.  Okay.

16  Q.  Okay?  And all of those records, you got them sometime in

17  the spring of 2002.  Right?

18  A.  From the Holy Land Foundation, those records, yes, we

19  did.

20  Q.  Right.  And you got them from Chicago and San Diego and

21  New Jersey and here in Richardson--Dallas.

22  A.  That is correct.

23  Q.  And all of these records were then -- ultimately they

24  made it to the FBI office.

25  A.  That is correct.

1    Q.    And that is where they remain?

2    A.    Yes.

3    Q.    And they have been at the FBI office since you first came

4    into possession of them in 2002, haven't they?

5    A.    That is correct.

6    Q.    And you all bates stamped them and put them in boxes for

7    storage and for your review.

8    A.    That is correct.

9    Q.    And there is no public access to them, obviously.  Right?

10   A.    No.

11   Q.    Someone couldn't -- A reporter couldn't walk in off the

12   street and say, "Hey, I sure would like to look through all

13   the Holy Land records."

14   A.    No.

15   Q.    And in fact, if I want to go over there and see the Holy

16   Land records, I have to make an appointment.  Right?

17   A.    That is correct.

18   Q.    And then come over, and somebody will supervise me

19   looking through kind of a box at a time and bring them out.

20   Isn't that the way it works?

21   A.    It is, because it is evidence so we can't just let

22   evidence walk out the door.

23   Q.    Right.  Not that I would carry it out the door.  Right?

24   A.    I am not implying that you would.

25   Q.    In these boxes, there were lots and lots of financial

1    records.  Wouldn't you agree?

2    A.    Yes, I would agree.

3    Q.    And there was -- Of course there were wire transfers.

4    Right?

5    A.    Yes.

6    Q.    And the way a wire transfer works here, and probably

7    everywhere, is there is like a request for a wire transfer.

8    Right?

9    A.    That is correct.

10   Q.    And then there is this little receipt you get back from

11   the bank saying that a wire transfer occurred?

12   A.    I have seen the electronic payments advice I think is

13   what they are called, EPAs.

14   Q.    Right.  And you found those things in these boxes.

15   A.    A large number of them, yes.

16   Q.    And in fact, the financial records that you found in

17   these boxes, some of them dated all the way back to like 1991?

18   A.    And maybe even earlier.  I can't recall the earliest

19   date, but there were a large number for a large period of

20   time.

21   Q.    They just didn't throw anything away.

22   A.    Well, I think the phone call between Mr. Baker and Mr. El

23   Mezain, the one about getting rid of the documents, says

24   differently, but they still had a lot of documents.

25   Q.    Right.  Well, you testified that you did a financial

1    investigation.

2    A.    I and some IRS agents.

3    Q.    Right.  And when you did this financial investigation,

4    those wire transfers and the wire transfer receipts were

5    something that you took into account, that you considered?

6    A.    Yes.

7    Q.    Right?  There also were statements from the bank

8    statements from the bank that were kept.  Right?

9    A.    That is correct.

10   Q.    And you had those bank statements?

11   A.    That is correct.

12   Q.    And you used those also?

13   A.    Yes.  I mean, I don't know -- I don't believe there were

14   bank statements for all the time periods, but I did see bank

15   statements.  I can't recall from what time periods or from

16   which banks.

17   Q.    Right.  Right.  But certainly there were a lot of bank

18   statements.

19   A.    There were bank statements.

20   Q.    From a number of different bank accounts.

21   A.    I can't recall which bank accounts, but I did see bank

22   statements.

23   Q.    There were orphan lists?

24   A.    Yes, there were.

25   Q.    There were lists of needy families?

1    A.    Yes.

2    Q.    There were like students and needy children lists and

3    stuff that had been generated by the Holy Land Foundation.

4    A.    Correct.

5    Q.    Right?  There were -- Let me show you a couple of things

6    here.  This is HLF Search No. 160, page 1.

7    A.    Okay.

8    Q.    Now, you commented earlier this is not a very good copy.

9    It has been faxed several times.  But this right here -- This

10   is some Arabic writing and some English writing, but this is a

11   request for wire transfer, kind of a cover sheet for one of

12   these transactions, isn't it?

13   A.    I don't know if it would be called a cover sheet, but it

14   was part of one of the transactions.  We saw these with a lot

15   of transactions.

16   Q.    And then this down here is a receipt that came back from

17   for instance, the zakat committee.  True?

18   A.    That is what it appears to be.

19   Q.    And you had a number of these translated, didn't you?

20   A.    Yes.

21   Q.    And this here is a stamp -- We oftentimes see the stamp

22   on the receipt that comes back.  True?

23   A.    I have seen a number of stamps on these types of

24   documents.

25   Q.    This is still in the exhibit, I guess page 21.  You

1    discussed this today.  Actually this is in the supporting

2    documents --

3    A.   Okay.

4    Q.   -- that you have listed.  This is a document in Arabic,

5    but then this is a translation that you all had done.  Right?

6    A.   That is correct.

7    Q.   And this is another receipt.  We don't need to get off

8    into it, but can you see that is a thank you note, I guess?

9         MR. JONAS:  Mr. Westfall, what page are you looking

10   at?

11        MR. WESTFALL:  It is page 22.

12   Q.   (BY MR. WESTFALL)  A thank you note from Jenin zakat?

13   A.   That is what it says.  It indicates it is a thank you

14   note from the Jenin zakat committee to the HLF.

15   Q.   Right.  And then beginning at page 23 we have these

16   things.  And you saw lots of these also.  Right?

17   A.   I did.

18   Q.   And you have had a few of them, a relatively few of them

19   translated.

20   A.   That is correct.

21   Q.   But this is a sheet where the children or the families

22   who actually received the aid, the money, will sign or put a

23   fingerprint.

24   A.   The document the way it is set up would indicate that

25   that is what it is for.  I don't know in this specific

1    instance who signed the document, but that is what it purports

2    to be.

3         When you look at the translation it has the name, the

4    amount -- If we can go to the translation it might be a little

5    easier to see.

6    Q.   Because this is one of the ones you translated.  Here is

7    the next page, page 24, and can you see the name?

8    A.   Yes.

9    Q.   And Qabatyah, that is a town?

10   A.   That is a town.

11   Q.   And 30 Dinars is I guess what they received.  Right?

12   A.   According to this.

13   Q.   And then under the thing that says recipient's signature,

14   it identifies who signed, doesn't it?

15   A.   Yes, that is what it says.

16   Q.   The mother, mother, mother, and then mother's fingerprint

17   is one of those.  Right?

18   A.   That is what -- I mean, that is what it says.

19   Q.   Which would kind of correspond with the -- Because this

20   is the one that you translated.  Right?

21   A.   This is one of the ones that was translated, yes.

22   Q.   And these signature sheets, you have thousands of pages

23   of these, don't you?

24   A.   I didn't count the pages.  I don't know how many pages of

25   those there were.

1   Q.   You had a lot of them.

2   A.   There were a number of documents like that that I saw.

3   Q.   Also there is photographs.  Correct?  Of aid projects?

4   A.   I have seen photographs in the HLF evidence.

5   Q.   And there is a lot of photographs?

6   A.   There are a lot of photographs.

7   Q.   And photographs of like children with backpacks, stuff

8   that in other parts of the -- there is evidence that HLF

9   funded.  Right?

10  A.   I have seen photographs with children with backpacks.

11  Whether or not they relate to the documents and things like

12  that, we would have to study them on an individual basis.  But

13  I have seen photographs with children in them.

14  Q.   Right.  And I wasn't being very clear.  There has been in

15  the records -- There are records of the Holy Land Foundation

16  sending money for the purpose of backpacks.

17  A.   Yes.

18  Q.   And then also in the records there are pictures of

19  children with backpacks.

20  A.   In the records, I don't think we have introduced any, but

21  I have seen pictures of children with backpacks in the HLF

22  evidence.

23  Q.   And pictures of children in like a computer lab?

24  A.   I don't recall if I saw any pictures of children in

25  computer labs.

Q.   Various projects.  And we have pictures of that that
appear to be pictures of projects.

A.   I have seen a lot of pictures.

Q.   Videos of projects as well.  Right?

A.   I have seen some videos.

Q.   And in addition, there was internal accounting records.
I mean, they used accounting software at the Holy Land
Foundation.  Right?

A.   They did.

Q.   And there were reports, like annual reports done by the
Holy Land Foundation?

A.   What type of annual reports are you --

Q.   Annual reports of money raised, money spent, income,
revenue.  What do you call those reports that companies
generate at the end of the year?  Annual reports.

A.   You know, I probably have seen some.  I can't recall
offhand if I did, but if you have one I would be glad to look
at it.

Q.   And then there is -- Each one of these little wire
transfers is called a grant.  Right?

A.   I know that they called some of their transfers grants,
but I think they had different terminology that they used for
different expenditures, so I wouldn't want to say that they
are all referred to by them as grants.

Q.   They had a thing called a grants list, don't they?

1    A.    Yes, I have seen those.

2    Q.    That was issued each year for a number of years?

3    A.    I don't know on what basis, like how frequently they

4    issued them, but I have seen a number of them in the records

5    that we have seized.

6    Q.    And those grants list contain the wire transfer

7    transactions.  Isn't that true?

8    A.    They contain names of recipients and amounts in like a

9    date range, as I recall.

10   Q.    And that was something that was internally produced by

11   the Holy Land Foundation.  It was in the records.

12   A.    Correct.

13   Q.    Now, when you did your financial investigation, did

14   you -- Let me ask you this.  You took the financial records

15   that you had and you analyzed them, didn't you?

16   A.    We took the records that we had and tried to put them in

17   some order.

18   Q.    Right.  And once you did that you arrived at how much

19   money was going to here and there, and you basically -- Surely

20   you did kind of an accounting.

21   A.    I know that we analyzed certain of their transactions,

22   but we never did a full accounting of every dollar that they

23   spent.

24   Q.    Okay.  So you never did an audit of the Holy Land

25   Foundation materials?

1    A.    I am not an auditor, so I wouldn't even know where to

2    begin doing an audit.

3    Q.    Did you have a CPA working on it?

4    A.    We had IRS agents.  One or more of them were CPAs.

5    Q.    Did one or more of them do a forensic audit?

6    A.    They did a detailed analysis of the financial documents,

7    but to my knowledge they never tried to identify where every

8    single penny went.

9    Q.    Okay.  Did you do a detailed analysis?

10   A.    I assisted in the detailed analysis.

11   Q.    This is the payment schedule for Ramallah.  What I would

12   like to do is move into the supporting documents that underlie

13   these.

14   A.    Okay.

15   Q.    And speak about this a little bit.

16   A.    Okay.

17   Q.    And what some of these documents look like.  Okay?

18   A.    Okay.

19   Q.    Sitting right where you are, Agent Burns, can you read

20   that okay?

21   A.    You might want to focus it just a little bit more.

22   There.  I may have a little bit of trouble with the numbers.

23   You may have to help me out.  But I can at least see the --

24          THE COURT:  Before we get there, let's take an

25   afternoon break.  Let's take a 20-minute break.

1           (Whereupon, the jury left the courtroom.)

2           THE COURT:  We will be in recess for 20 minutes.

3                       (Brief recess.)

4           THE COURT:  Mr. Westfall?

5           MR. WESTFALL:  Thank you, Your Honor.

6  Q.   (BY MR. WESTFALL)  What I would like to do now is go

7  through a little bit of supporting documentation on some of

8  these transactions.

9  A.   Okay.

10  Q.   And I haven't made an extra copy of this for you, but I

11  am going to put everything on the elmo.

12  A.   Okay.

13  Q.   Over here in the exhibit number, here it shows InfoCom

14  Search No. 16.

15  A.   Yes.

16  Q.   Do you see that?  And then here HLF Search No. 38.

17  Right?

18  A.   Correct.

19  Q.   And what that means is that the InfoCom Search No. 16 and

20  HLF Search No. 38, those are the main supporting exhibits for

21  the Holy Land files for this particular schedule.

22  A.   That is correct.

23  Q.   And this is InfoCom Search No. 16.

24  A.   Okay.

25  Q.   Which is in evidence.  And this is HLF Search No. 38,

1    which is also in evidence.

2    A.    Okay.

3    Q.    Now, I am going to page 69.  And for the time being,

4    Agent Burns, the only thing I am going to talk about are

5    transactions that are actually counts in the indictment.

6    A.    Okay.

7    Q.    Okay?  And this particular one is this $34,563.

8    A.    Okay.

9    Q.    Which is a count in the indictment.

10   A.    Okay.

11   Q.    And this is what the cover sheet looks like.  Now, this

12   transaction, do you know what this transaction is?

13   A.    I mean, I know it is referenced on the schedule.  I am

14   not sure if you are --

15   Q.    On here you can't tell what the individual transaction is

16   on, can you?

17   A.    I am sorry.  You can't tell what?

18   Q.    What the money went to; only where it went from the

19   schedule.  Right?

20   A.    You can tell it went to the Ramallah zakat committee.

21   Q.    Right.  But you can't tell what it went there for.

22   A.    That is correct.

23   Q.    Now, you are familiar with the term social dues.

24   A.    Yes.

25   Q.    What is social dues?

1   A.   That is a term that the HLF used to describe its social

2   programs, I guess.

3   Q.   Like the orphan payments and the needy child payments and

4   the families payments?

5   A.   They use that terminology to refer to those things.

6   Q.   Right.  Now, what I want to do is just kind of hold this

7   up so you can see it.

8   A.   Okay.

9   Q.   That will be easier than this elmo.  This here is the

10  cover sheet, page 69.  Correct?

11  A.   Again, I don't know if I would call it a cover sheet, but

12  it is one of the documents that relates to that transaction.

13          MR. WESTFALL:  Your Honor, if I was to keep my voice

14  loud, could I stand next to her and just show her these

15  documents?

16          THE COURT:  All right.

17  Q.   (BY MR. WESTFALL)  Go ahead and just look at them.

18  A.   Okay.  Do you want me to go through all of them?

19  Q.   Well, let me do this.  This page 69, is this the cover

20  sheet?  Do you see it?  Is that the cover sheet?

21  A.   When you keep calling it a cover sheet, it is a fund

22  transfer notification with a receipt at the bottom.

23  Q.   And this particular one you have had translated.

24  Correct?

25  A.   Correct.

1  Q.   And that is on page 70?

2  A.   Yes.

3        MR. WESTFALL:  And I will walk back out here, Your

4  Honor.  I am just going to have to fight with the elmo.

5  Q.   (BY MR. WESTFALL)  On page 70 -- Let me show you what

6  that translation looks like.  It is the translation of the

7  wire transfer request form, the thing I was calling the cover

8  sheet.

9  A.   That is correct.

10 Q.   Okay.  And you all had that translation done.

11 A.   Yes.

12 Q.   And then there are documents that look like this, which

13 we will call request for transfer of funds, the wire transfer

14 requests.

15 A.   Yes.

16 Q.   That is what these are?

17 A.   Yes.

18        MR. JONAS:  Mr. Westfall, will you tell us the page

19 numbers?

20        MR. WESTFALL:  Page 72.

21 Q.   (BY MR. WESTFALL)  And in particular, this page 72 is the

22 reference and the project number, and it says families dues

23 from 3/1/97 to 6/30/97.  Right?

24 A.   That is what it says.

25 Q.   And it is to be paid to the Ramallah zakat committee.

A.   That is correct.

Q.   Page 73 is a request for transfer of funds, and it is the NC, needy child dues.

A.   That is correct.  That is the abbreviation they used to reference that.

Q.   And it is the same time period?

A.   Yes.

Q.   And there is a dollar amount?

A.   Correct.

Q.   And Ramallah zakat committee.

A.   Yes.

Q.   And then there is the orphans dues.  Right?

A.   That is what it says.

Q.   Here is another families dues.  True?

A.   Correct.

Q.   And then another orphans dues, which is page 76.  And page 71, rather, is expenses for an orphan's party.

A.   That is what it says.

Q.   Now, what you will see oftentimes, is here there will be sort of a breakdown on this fund transfer notification.  True?

A.   Yes.

Q.   Of the orphans, the family, needy child, et cetera.  Right?

A.   That is what it says.

Q.   And then -- And I am only going to do this once.  There

1    will be what is called an orphans list.  Right?

2    A.    In some cases.  Since we are only doing an example of

3    these, I just want to note that in all cases we were not able

4    to link lists like this to the others.  But in this instance,

5    yes.

6    Q.    But you tried, though, didn't you?

7    A.    Yes.

8    Q.    Because this would be important information to have if

9    you were going to do a financial investigation.

10   A.    Well, the financial investigation relates to the actual

11   financial transactions between the HLF and the committees.  I

12   actually requested that while they were doing it that everyone

13   who was working on the project attempt to pull together

14   information so that we could see what the HLF was saying their

15   money was going for.  Since we are not there, we have no way

16   to know exactly where the money went, I at least wanted to see

17   what they were saying that the money was going.

18   Q.    Did it matter to you whether the money went to children

19   or anything else.  I mean, for purposes of your investigation,

20   did it matter to you that the money was going to children?

21   A.    The most important aspect of this analysis was that the

22   money was going to the committee.  Where they said it went was

23   of interest to me, but when you say does it matter, that is

24   kind of a broad question that kind of needs to be broken down

25   a little bit.

1    Q.   Well, let's say for purpose of your investigation,

2    because you have spoken before about what information was

3    relevant to you.

4    A.   Correct.

5    Q.   You know, relevant to your investigation.

6    A.   Yes.

7    Q.   And the fact that the money is going to children, was

8    that relevant to your investigation?

9    A.   Well, the fact that they said that it was going for

10   children, and that they had orphans lists along with it was

11   relevant.  And it was also relevant when they said that it was

12   going for children and there were no orphans lists.

13        But generally, the existence of the financial

14   transactions we were looking for with respect to the financial

15   investigation, we were looking to see if the HLF was

16   supporting the special segment of the population, like

17   marters' children.  I would look at these lists to see if

18   those specific types of people were on these lists.

19   Q.   Okay.  We will talk more about that in a bit.

20        Do you see here where it says $11,305?

21   A.   I do.

22   Q.   Do you see this orphan dues fund transfer also says

23   $11,305?

24   A.   Yes.

25   Q.   Here is a list of families' dues.  Do you see that?

1    A.    I do.

2    Q.    And do you see where it says $2812?

3    A.    I do.

4    Q.    Do you see that there is a wire request for $2812 for

5    families' dues?

6    A.    Yes.

7          THE COURT:  We are having some computer problems.

8    Let's stop for just a moment.

9                    (Pause in proceedings.)

10   Q.    (BY MR. WESTFALL)  I will pick up with page 76.  And page

11   76 is an orphan dues in the amount of $17,038.  True?

12   A.    Yes.

13   Q.    And then here is page 86, 87, 88.  This is a list of

14   orphans.  Is that what it looks like?

15   A.    That is what it is entitled, orphans list.

16   Q.    And then the amount here is $17,038.  Which is the same

17   amount?

18   A.    That is correct.

19   Q.    Now, page 89 is a translation that you did on the Arabic

20   orphans.  Right?

21   A.    The translator did it.

22   Q.    Okay.  You were I guess looking for particular names?

23   A.    Well, on the exhibits that we were introducing, we tried

24   to have all of the Arabic in English so you could read it.

25   Q.    Okay.  Page 75 is family dues of $1264.

1   A.   That is what it says.

2   Q.   And then there is $1264 family dues.  Right?

3   A.   That is correct.

4   Q.   And then to wrap it up, needy child, which is $144 on the

5   list.  Can you see that there?

6   A.   I do.

7   Q.   And then $144 there?

8   A.   Correct.

9   Q.   And it all adds up to $34,563, which is the amount that

10   you have on your schedule.

11   A.   Correct.

12   Q.   Now, these -- All of these records here that we just went

13   through have an HLDL number on them.  Right?

14   A.   That is correct.

15   Q.   Which means they were seized in Dallas, and you have had

16   them since 2002.

17   A.   Correct.

18   Q.   Now, at some point after that you sent out subpoenas or

19   some form of process to foreign banks and got the records of

20   foreign banks where these transactions actually went through.

21   Isn't that true?

22   A.   We were able to get some of them; not all of them.

23   Q.   Right.  This particular transaction, and I believe

24   certainly every transaction that is in the indictment that is

25   specified with one of these.  Right?

1    A.    It is supposed to be, yes.

2    Q.    You have foreign bank records to back up these

3    transactions.  Right?

4    A.    I don't know about that.

5    Q.    You don't know about that?

6    A.    No.  Again, the financial analysis was from the HLF to

7    the zakat committee, so it wasn't always necessary to have

8    foreign bank records to show that wire transfer or that

9    financial transaction.

10    Q.    Well, I guess what I am asking is there is not a doubt in

11    your mind that this money actually went to that zakat

12    committee.  Right?

13    A.    No.  It went.

14    Q.    And then all of the investigation that you did

15    afterwards, what you did basically was confirm that the money

16    that the Holy Land Foundation said went to the zakat

17    committees actually went to the zakat committees.  True?

18    A.    Are you talking about on this particular transaction --

19    Q.    Yes.

20    A.    Or are you talking in general.

21    Q.    On this particular transaction No. 1, let's start there.

22    Is that true for that?

23    A.    Can we look at the schedule to see if there are foreign

24    records?  I don't recall.  There were so many transactions, I

25    don't recall offhand if foreign records were actually used on

1    this one.

2    Q.   There were transactions here?

3    A.   Correct.

4    Q.   It doesn't show any foreign records listed, but I think

5    you have told me already there is no doubt in your mind that

6    this money actually went to the zakat committee?

7    A.   That is correct, because we had the evidence showing the

8    wire leaving here and the bank records showing the intended

9    recipient.  It went over.

10   Q.   Right.

11   A.   And maybe I am misunderstanding your question.  I thought

12   you were asking me about having the foreign bank records to

13   prove it.

14   Q.   To the -- When we hit one that has foreign bank records,

15   I will  talk to you about that.

16   A.   Thank you.

17   Q.   I was getting a little bit ahead of myself.

18   A.   Okay.

19   Q.   While we are on the subject of the orphans list, this

20   shows the amount of money each one received.  Isn't that true?

21   A.   According to their records, that is how much they

22   received.

23   Q.   And of course, you know, this total amount is going to

24   match the wire.  Right?

25   A.   It should.

1    Q.    Right.  And sometimes, for instance, there will be an

2    orphan gift that will be added to it, and then that will match

3    the wire.  Have you seen that?

4    A.    I have seen that.

5    Q.    But if you took this number here and you added up all of

6    these numbers, it would add up, assuming all the sheets were

7    there.

8    A.    In this particular instance it does add up.

9    Q.    Okay.  So it is reasonable to assume that this is the

10   amount of money that each person received is what is out here.

11   Right?

12   A.    According to their records.  I can't say beyond that,

13   because obviously I am not in Ramallah, so I can only tell you

14   what their records say.

15   Q.    There were also signature sheets.  Right?

16   A.    There were.

17   Q.    Like the ones we just looked at.

18   A.    Correct.

19   Q.    And what those signature sheets showed was at least a

20   signature or a fingerprint and that some money was purportedly

21   disbursed.  True?

22   A.    That is what it shows.

23   Q.    I have been through this, and the only signature sheet

24   that I have found were the ones you showed this morning.  I

25   don't find any signature sheets in this entire deal for the

1    zakat committee we are talking about right now--Ramallah.

2    A.    Okay.

3    Q.    There is no signature sheets in there.

4    A.    I Would have to look through it to tell you if there are

5    or there aren't.  It is quite possible there are or aren't.  I

6    know there were some signature sheets in some of the exhibits,

7    but I can't say that they are in the Ramallah exhibit.

8    Q.    There are a lot of signature sheets in the case, but just

9    in looking through them I have seen a very, very, very small

10   number that actually have been translated.  Does that sound

11   accurate to you?

12   A.    We have had a small number of them translated, yes.

13   Q.    See this right here, this $95,000 transfer?

14   A.    I do.

15   Q.    I want to show you now page 107 just really fast.

16   A.    Okay.

17   Q.    And this is the fund transfer notification for that.

18   A.    Okay.

19   Q.    Does that look familiar?

20   A.    It does, although this is for the Islamic Charitable

21   Society of Hebron.  I don't know if we are on that one.

22   Q.    True.  That is one of the things I wanted to go over with

23   you.  Here is the English translation.  This appears to be an

24   example of a food parcel project.

25   A.    That is correct.

1   Q.   Would you agree?  And it was a food parcel project that

2   went to a number of different locations--Hebron.  It doesn't

3   show it here.  It just shows it on the receipt.  It is the ICS

4   Hebron, but it is in Ramallah.

5   A.   If that is the same one.  I can't recall offhand if that

6   is the same transaction or not.

7   Q.   But one of the things we will see with food parcels

8   particularly, or backpack projects, is these final reports.

9   Isn't that true?

10   A.   We do see final reports.

11   Q.   And here is page 110.  Well, here is 109, which is an

12   Arabic document.  Page 110 is the translation of that Arabic

13   document.  And it is a report on the Ramadan project.  Isn't

14   that true?

15   A.   Yes.

16   Q.   And you see how there is a number of different zakat

17   committees listed?

18   A.   I do.

19   Q.   Number of food packages that went to each one?

20   A.   Yes.

21   Q.   So what this was is a transaction that--here is Ramallah

22   right here--that went to a number of different places.

23   A.   That is correct.

24   Q.   And this particular transaction, this $95,000 transaction

25   turns up in a number of the different payment schedules.  Does

1    that ring any bells?

2    A.    It does.

3    Q.    And did you know there is also signature sheets for these

4    food parcel projects?

5    A.    There may have been.

6    Q.    The Holy Land Foundation also had a number of purchase

7    receipts and stuff in their records, too, where they had

8    purchased food or equipment and the such.  They had paperwork

9    like that in there, too.

10   A.    I have seen purchase receipts.

11   Q.    This is another indictment transaction.  It is 5/18/99.

12   5/20/99 is the date on it.  And I just wanted to show you one

13   thing on this.  This is the receipt that would come back from

14   the zakat committee.  Isn't that true?

15   A.    That is what this one is, and it appears to be based on

16   the date.  I mean, I have -- I can't say that it is the same

17   transaction without seeing the amount and all that, but this

18   is again one of those forms that we talked about that would

19   have the receipt at the bottom.

20   Q.    Right.  Well, you see this 9280 there?

21   A.    Yes.

22   Q.    Here is the one without the receipt--9280.

23   A.    Correct.

24   Q.    And it is of course in the same materials in your

25   supporting documents.

1   A.   Correct.

2   Q.   As the rest of the stuff.  So this is the receipt in fact

3   for this transaction.  Wouldn't you agree?

4   A.   Yes.

5   Q.   And this stamp here, the next page is a translation of

6   that.  See how the stamp says Palestinian National Authority?

7   A.   I see that.

8   Q.   Ministry of Endowments and Religious Affairs?

9   A.   I see that.

10  Q.   That Palestinian Authority stamp turns up on a lot of

11  these, doesn't it?

12  A.   I think it would be a mischaracterization to call that a

13  Palestinian Authority stamp.  That is a Ramallah zakat

14  committee stamp wherein they note if they are under the

15  Palestinian National Authority, Ministry of Endowment.  So it

16  is not like the Palestinian Authority is stamping that

17  document.  That is the Ramallah zakat committee stamp.

18  Q.   Right.  And it comes under the Ministry of Endowments and

19  Religious Affairs zakat fund directorate.  Is that true?

20  A.   That is correct.

21  Q.   Ramallah, by the way, is in the West Bank.  Right?

22  A.   It is.

23  Q.   And in fact, all of the zakat committees that are

24  transactions in the indictment are West Bank entities.  True?

25  A.   Correct.

1    Q.    Every single one of them over in the West Bank?

2    A.    One in Jerusalem.

3    Q.    Which Jerusalem is not Gaza.  Right?

4    A.    That is correct.

5    Q.    I will move to ICS Hebron, and I just have a couple of

6    questions about ICS Hebron.

7    A.    Okay.

8    Q.    The Holy Land Foundation did pay for a children's library

9    to be built over in Hebron.  True?

10    A.    That is correct.

11    Q.    This is one of the transactions where they are sending

12    money over for that purpose.  Isn't that right?

13    A.    That is what it says at the top--"children library Hebron

14    construction."

15    Q.    Here is another indictment transaction.  I haven't seen

16    one of these yet.  HLF Search No. 33.  This is the electronic

17    payments advice that you mentioned.  Right?

18    A.    Correct.

19    Q.    Now, this is page 333.  Is this the fund transfer

20    notification for ICS Hebron?  And ICS Hebron actually has a

21    number of different locations.  Isn't that true?

22    A.    They have several branches.

23    Q.    And each one -- There is like the Beit Oula zakat

24    committee, the Islamic Charity Committee of Yatta, there is

25    Doura, Beit Oula, and those -- We see those names -- Like, for

1    instance, here is an orphans list.  Do you see where it says

2    IC?

3    A.    Yes.

4    Q.    Here is ICBN.  True?

5    A.    Yes.

6    Q.    And here is DZ, and that would be Doura zakat.  Does that

7    ring any bells?

8    A.    Yes, but I don't know that I would refer to that

9    particular entity as a branch of the Islamic Charitable

10   Society of Hebron.  I believe that is a different entity maybe

11   through whom the HLF, you know, did business.  But I wouldn't

12   call it a branch like the other ones are.  The Islamic Charity

13   Society Doura branch.  So just a small distinction there.

14   Q.    Right.  But they have a tendency to be on these.  And my

15   point is this.  These ICS Hebron transactions had a tendency

16   to be pretty large with a lot of different pages.

17   A.    They did.

18   Q.    And so if we were to do what I just did on that single

19   transaction with Ramallah, it would take about 30 minutes?

20   A.    I don't know how long it would take, but you would have

21   to do a lot of adding.

22   Q.    Now, I am moving into Jenin.  And this is going to be all

23   out of HLF Search No. 35.  Here is page 52, and this is a

24   transaction that occurred 4/3/98.  And what we see here is

25   wire transfers but no orphans list.

```
 1   A.    Okay.

 2   Q.    Now, did you -- Did you make an exhaustive search for

 3   these orphan lists?

 4   A.    I know that we looked for them.  I don't know -- I can't

 5   say on that one whether there were orphans lists or not.  I

 6   know we found some orphans lists for some of the transactions

 7   and for some of them we didn't, but I don't know if that is

 8   one of them or not.

 9   Q.    But some of the -- Like for instance these bates numbers,

10   if the bates numbers were not sequential, did you go looking

11   for the orphans list anywhere else?

12   A.    Like I said, we looked in the records for orphans lists.

13   Just because it is not in there doesn't mean it doesn't exist,

14   but we were successful in locating some and unsuccessful in

15   locating others.

16   Q.    Here is a -- There is four indictment transactions in

17   Jenin.

18   A.    Okay.

19   Q.    And those four transactions are all missing documents.

20   So was it just you that was looking, or were other people

21   looking, too?

22   A.    When you say missing documents, what are you saying?

23   Q.    For instance, missing orphan lists mainly, but missing

24   also wire transfers and such.

25   A.    Well, when you say missing, the orphans lists are not
```

1    part of the financial analysis so I wouldn't consider that a

2    missing document for that purpose.  If they are not there --

3    Like I said, we may have located them; we may not have.

4         But generally on the wire transfer, the wire transfer

5    notifications we sought to find all that would add up to the

6    total.  Generally we were able to find those.  In some

7    instances we weren't.  So when you ask me about missing

8    documents, I mean, I wouldn't consider the orphans list not

9    being there a missing documents list.

10   Q.   You don't consider that a missing documents list?

11   A.   No, not for the financial analysis.

12   Q.   I am going to skip over to Nablus, which again is in the

13   West Bank.  Correct?

14   A.   Correct.

15   Q.   And your documents that underlie Nablus are InfoCom

16   Search No. 15 and HLF Search No. 37.

17        Now, at page 53 in HLF Search No. 37, this is an example

18   of a final report.  Isn't that true.

19   A.   It is.

20   Q.   And we have seen a lot of these as well.

21   A.   Yes.

22   Q.   And here is the translation of the final report.  And

23   this one was food packages.  True?

24   A.   That is correct.  That is what it says.

25   Q.   And this $2985 matches with -- Well, $3,000 was

1  transferred; $2985 was received.  Now, whenever you wire

2  money, there is a little wire transfer cost in there, isn't

3  there?

4  A.   Generally.

5  Q.   Is it $15?

6  A.   From what I have seen in most of these documents, it was

7  $15.

8  Q.   And these final reports, like this would be either sent

9  or faxed back from the committee or the beneficiary back to

10  the Holy Land Foundation office.

11  A.   They should be.

12  Q.   Okay.  Now, I want to switch gears a little bit and speak

13  with you about the Ayyash children.

14  A.   Okay.

15  Q.   And these are the children of the engineer.

16  A.   Correct.

17  Q.   Who was -- He died in January of '95 or '96?

18  A.   1996.

19  Q.   And he had two sons.  Right?

20  A.   As far as I know he had two.

21  Q.   And the older one was Bara'a.  Does that ring a bell?

22  A.   I think that is the way you pronounce it.

23  Q.   And the younger one was Yehia Yehia Ayyash?

24  A.   Correct.

25  Q.   We have heard he was weeks old when his father was

1    killed.  Have you heard that?

2    A.    He was an infant.

3    Q.    And Yehia Yehia Ayyash is the orphan that my client Abdul

4    Odeh sponsored.

5    A.    He was the child of, yes, Yehia Ayyash, that your client

6    sponsored.

7    Q.    Well, early in that period, that '96 period, they were in

8    Gaza.  Right?  I mean, you saw the funds going to Gaza, the

9    orphan sponsorships going to Gaza.  Right?

10   A.    The money that the HLF is sending over for the two

11   children was initially going through Gaza, yes.

12   Q.    Right.  And then ultimately they came over to Nablus, and

13   we see the money going to Nablus.

14   A.    I see the money going to Nablus.  I can't state for sure

15   that they moved because I don't know, but I know that the

16   money started going to them through Nablus.

17   Q.    I am in Nablus.  This is page 48 of HLF No. 37.  And this

18   is an orphan list.  Right?

19   A.    Correct.

20   Q.    And you see there where it says Bara'a Yehia Ayyash?

21   A.    I do.

22   Q.    That is the older one.  Right?

23   A.    That is correct.

24   Q.    And it says Gaza.

25   A.    Correct.

1    Q.    And he is getting, according to this, $135.  Right?

2    A.    That is correct.

3    Q.    And if we just look at all of the names on the list,

4    every single one of them appears to be getting $135.  Correct?

5    Except for a couple that are getting zero or something?

6    A.    Except for those.

7    Q.    And certainly on these forms where you found the Ayyash

8    children, you went through and looked for other special

9    subjects or interesting children to see if there were any

10   other names that you could recognize, didn't you?

11   A.    I noticed some other names on the orphans lists that I

12   recognized.

13   Q.    Did you look through all of these names?

14   A.    I am sure I did, but this was one of many documents that

15   I looked at.

16   Q.    It doesn't appear you made any notations.  He is

17   receiving the same money as everyone else.  Right?

18   A.    He is, except for those that have the zeros marked.

19   Q.    Here is page 98.  This is another orphans list, and there

20   is Bara'a.  Appears to be receiving the same $135 as the other

21   kids, except for the ones that are getting $66.

22   A.    There are a number on there that are getting $66.

23   Q.    Page 133.  Here is Bara'a again, and still receiving

24   basically the same amount as everybody.  Now it is $85.50,

25   except for a couple of people who get $42.75.  Isn't that

1  true?

2  A.    The numbers you have cited are true.  I wouldn't

3  characterize that as the same amount, because it is the twice

4  amount of the ones getting $45, but the amount you stated is

5  correct.

6  Q.    Certainly.  And the vast majority of kids on this list

7  are getting $85.50.  True?

8  A.    I would say a majority.

9  Q.    And you look over here at the amount and it is $90 and

10  then $45.  Isn't that right?

11  A.    That is correct.

12  Q.    And you see over here where it says 1/31/99 to 2/28/99 --

13  Do you see that?

14  A.    I do.

15  Q.    $45?

16  A.    I do.

17  Q.    Do you see where it says 12/31/98 to 2/28/99, $90?

18  A.    Yes.

19  Q.    So this, it would stand to reason, is one month's pay and

20  this is two.

21  A.    Actually it would be two months and three months.  It

22  would be January and February, and the other one would

23  be -- Actually, yes, it would be January and February, and

24  then the other one would be just for February.

25  Q.    The month of February?

1    A.    I am sorry.

2    Q.    So this $45 or $90, what have you, goes to the zakat

3    committee, and then that is what is paid out to the orphan.

4    They take this little five percent.  Isn't that the way these

5    appear?

6    A.    That is the way these appear.

7    Q.    So once we have figured this out, then Bara'a Ayyash is

8    receiving the exact same amount as everyone else on this

9    sheet.

10   A.    In that sense, yes.

11   Q.    Okay.  Now, this is page 155, 156, 157, 158, and we are

12   now in February April of 1999.  And there is Bara'a again.

13   Right?

14   A.    Correct.

15   Q.    $85.50.

16   A.    Correct.

17   Q.    And then more orphans.  And then finally Yehia Yehia

18   Ayyash is on the list in Nablus, and he is receiving the same

19   $85.50.  Isn't that true?

20   A.    That is correct.

21   Q.    And I will just cut to this.  This is page 197, page 209,

22   page 220, page 231, and page 240.  Now, I know I went through

23   those kind of quick, but in every single one of those wasn't

24   either Bara'a or Yehia Yehia Ayyash receiving the same money

25   as everyone else?

1    A.    From what I could tell.

2    Q.    And that was -- Basically an orphan sponsorship was $50 a

3    month.  Right?

4    A.    During that time period.

5    Q.    And during this time period a sponsor would pay sometimes

6    monthly, sometimes quarterly, sometimes annually for their

7    orphan.  Isn't that true?

8    A.    I have seen that the HLF paid sometimes monthly,

9    sometimes for two months at a time, and sometimes for three

10   months at a time.  I don't know about the donors.

11   Q.    Okay.  The prevailing rate I guess, though, for orphan

12   sponsorships is $50 a month.  Right?

13   A.    During that time period, yes.

14   Q.    And the time period I am talking about is the time period

15   of the indictment.

16   A.    Okay.

17   Q.    All right?  And the reminder notice that got sent to

18   Abdul Odeh was $50 a month.  Right?

19   A.    I believe that it was.

20   Q.    And then family sponsorships was $100 a month.  True?

21   A.    It varied, so I can't recall.  I think initially it was

22   $50, and it may have gone up to $100.  I can't recall the

23   specific amount.  But they had a standard amount that they

24   used for needy families.

25   Q.    I am going to switch gears.  Now I want to talk to you a

1    little bit about your summary charts.

2    A.    Okay.

3    Q.    You went through those yesterday?

4    A.    Yes.

5    Q.    I think you told us that the aims of the summary charts

6    were -- There were three basic aims.  One of them was to show

7    Holy Land's connection to the members of the zakat committee

8    and the zakat committee itself.  Right?

9    A.    Correct.

10   Q.    One of them -- One of the aims was to show the members of

11   the zakat committees in your summary charts, their connections

12   to the zakat committees.

13   A.    Correct.

14   Q.    And then the final aim of the summary charts was to show

15   the members that are listed on your summary charts, their

16   connections to Hamas, if any.

17   A.    That is not entirely true, because what we base -- The

18   third purpose was to show if there were any evidence within

19   the search warrant material, and that limited bit of evidence

20   between the members and Hamas.

21   Q.    Okay.

22   A.    So I wouldn't say all evidence.  I would just say limited

23   to the specific types of evidence that are referenced in that

24   chart.

25   Q.    Right.  And that is exactly what I meant.

1    A.    Okay.

2    Q.    So let's talk about that and let's talk about -- When I

3    asked you about evidence of Hamas, I am asking you about the

4    search warrant materials.

5    A.    Okay.

6    Q.    Okay?

7    A.    Just because -- I want to be clear, because I don't want

8    to say that that is all the evidence that there is when it is

9    not.

10   Q.    And I do, too.  And certainly that is what you testified

11   to yesterday was the materials that you got via the search

12   warrant.

13   A.    Correct.

14   Q.    Right?  I have four summaries here.  One is the Islamic

15   Center of Gaza, the one with Sheikh Yassin's picture on it.

16   One is the Islamic Relief Committee.  True?

17   A.    Correct.

18   Q.    And one is the Islamic Society of Gaza.  And the other

19   one is the al-Salah Society.  Now, these four summary charts

20   do not cover counts of the indictment.  Isn't that true?

21   A.    They are not identified in specific counts in the

22   indictment.

23   Q.    So I will set those aside, then.  But just on the Islamic

24   Center of Gaza, because you went over this one for a good part

25   of the morning yesterday.

1    A.    Okay.

2    Q.    And on this guy here Atef Abed.

3    A.    Yes.

4    Q.    What you told us I believe is that the only evidence you

5    were able to find in the search warrant materials that he had

6    any connection to Hamas was the fact that he was on this

7    committee.  Did you say that?

8    A.    I belief I was asked if there was any evidence linking

9    him to Hamas in the search warrant material, and said not

10   other than through the Islamic Center of Gaza.

11   Q.    Other than the fact that he was a member of the

12   committee.

13   A.    Correct.

14   Q.    I want to first talk to you about the Jenin zakat

15   committee.

16   A.    Okay.

17   Q.    And one of the things I am going to be using a lot when I

18   speak with you is--I will show this--is this InfoCom Search

19   No. 28.  You recognize that.  Right?

20   A.    I do.

21   Q.    That is the -- I don't know --

22   A.    They call it the InfoCom list.

23   Q.    The InfoCom list.  Okay.  The Jenin zakat committee does

24   not have a membership list in the InfoCom list.  True?

25   A.    It is referenced in there -- I believe two or three of

1  the individuals' names are listed in there, but it doesn't

2  have what some of them do, where they break them down and

3  usually number them 1, 2, 3, 4, 5.

4  Q.    Right.  This is what we have for Jenin, and this is at

5  page 119.  These are the names we talked about under the

6  account number and account name.

7  A.    Correct.

8  Q.    But in InfoCom Search No. 30, which is this document

9  which actually is kind of a greenish color -- I will show you

10  the translation and you will remember it.

11  A.    I know what the exhibit is.  I don't remember it being

12  green.

13  Q.    Okay.  I know it is some sort of a color.  It covers the

14  al-Razi Hospital.  Right?

15  A.    It does.

16  Q.    And the al-Razi Hospital is a hospital that is run by the

17  Jenin zakat committee.  Isn't that true?

18  A.    That is correct.

19  Q.    But then at page 11 of that there is the members of the

20  zakat committee.

21  A.    Correct.

22  Q.    Well, what I have highlighted there are the members of

23  that zakat committee that are on your summary sheet.  Okay?

24  A.    Okay.

25  Q.    I will just tell you that.

1    Now, what we have, we have 13 members that are listed

2    here on this zakat committee.  Isn't that true?

3    A.    There are some of them that aren't identified by name,

4    like "Hajj, whose name I don't remember now," but there are 13

5    numbers on there.

6    Q.    Right.  And you never heard of "Hajj, whose name I don't

7    remember now"?

8    A.    No.

9    Q.    Apparently they are talking about some person.  Right?

10   A.    Correct.

11   Q.    So there is 13 members, and it says members of the zakat

12   committee.  True?

13   A.    Correct.

14   Q.    And here are the eight that you have put on your summary

15   chart.  And then the highlighted ones are the ones that are

16   both on your summary chart and a part of this members of the

17   zakat committee list.  All right?

18   A.    Okay.

19   Q.    So there is four highlighted, and there is four

20   highlighted.

21        Now, -- And I do recognize that Fawaz Hamad is involved

22   with the hospital, Dr. Ziad Abdel Ghani, both of whom are on

23   your list are on there.  Okay?  I recognize that.

24   A.    Okay.

25   Q.    All right.  Now, what I want to ask you is how many

1    members -- And Let's speak about the time of the indictment,

2    which would be -- I mean, every single transaction that is

3    listed in all your payment schedules came after the first

4    designation in January of '95.  Isn't that true?

5    A.    In the indictment?

6    Q.    Yes.

7    A.    The counts in the indictment, yes.

8    Q.    Right.  So let's talk about from 1995 until 2001.

9    A.    Uh-huh.

10   Q.    Okay?  And tell me, how many members were there on the

11   Jenin zakat committee during the period from 1995 to 2001?

12   A.    I don't know how many members there were.  I only know

13   from the evidence which members the HLF was dealing with.  I

14   don't know how many members were on the zakat committee.

15   Q.    Can you tell me the dates of service of these members

16   that you have on your summary chart?  Can you tell me the

17   dates they were on the zakat committee?

18   A.    Well, I can generalize the dates that the HLF had contact

19   with them through the Jenin zakat committee.

20   Q.    Okay.  What are those?

21   A.    I mean, the evidence that we have looked at shows that

22   the HLF's connection with Fawaz Hamad was from I think 1990

23   until basically they were closed down.

24   Q.    Okay.

25   A.    But both before and after his arrests.

1    Q.    Zeid Zakarneh?

2    A.    I think we would want to pull up the actual documents to

3    see the earliest dates, but we see him post designation

4    referenced in a 1997 fax, a 1998 thank you letter, there is a

5    video involving him that I don't think has been played yet,

6    but I believe that is after the Intifada in October of 2000.

7    But to be sure on the dates, we may want to bring up these

8    documents to look at them because I wouldn't want to guess.

9    Q.    Well, how about Naser Yusef?

10   A.    He was the one who signed a lot of the lists that we were

11   talking about earlier that identified the recipients and their

12   financial situations, and those were I think from the mid to

13   late '90s.  But again, I would like to look at the documents

14   to give you specific dates.  But he did not appear very

15   frequently.  It was Fawaz Hamad, Zeid Zakarneh, Ahmed Salatna.

16   Those people appeared much more frequently in contact with the

17   HLF.

18   Q.    Let's look at Fawaz Hamad, Zeid Zakarneh -- Now, is there

19   evidence in the search warrant materials that you have seen

20   that link Fawaz Hamad to Hamas?

21   A.    In the search warrant material?

22   Q.    Yes.

23   A.    Not that I have seen.

24   Q.    Okay.  Is there evidence in the search warrant materials

25   that links Zeid Zakarneh to Hamas?

1    A.    Not in the search warrant material.

2    Q.    Is there evidence in the search warrant materials that

3    links Ahmed Salatna to Hamas?

4    A.    Not in the search warrant material.

5    Q.    Mohamed Abu Zeid I guess was in that book.  Right?

6    A.    Yes.  He was in the book listed as one of the Hamas

7    founders in the West Bank I believe, and also in the deportee

8    tent.

9    Q.    How about Adeeb Aboushi?  Is there evidence in the search

10   warrant materials that links him to Hamas?

11   A.    Not in the search warrant materials.

12   Q.    How about Ziyad Abdel Ghani?

13   A.    He was one of the deportees.

14   Q.    Okay.  Now, the deportees, I guess for purposes of this

15   we will just assume that that gives a yes answer.  But that

16   one guy yesterday seemed to cut off in mid sentence where he

17   said some of the brothers are this or that, and then there are

18   some brothers, and it cut off.  Did you notice that?

19   A.    I think he said most of the brothers were Hamas and some

20   were jihad is what he said.  And he said, "And there were some

21   other brothers that were," and it did cut off.  I think he was

22   saying who were not affiliated with those.

23   Q.    Now, that was a snippet that you all made of that video?

24   A.    That was a clip, yes.

25   Q.    All right.  Walid Jarrar.  Any evidence in the search

1    warrant materials that he is involved with Hamas?

2    A.    Not in the search warrant material.

3    Q.    Naser Yusef?

4    A.    Not in the search warrant material.

5    Q.    I want to talk to you next about Bethlehem Orphan

6    Society.  Okay?

7    A.    Okay.

8    Q.    And Bethlehem Orphan Society, page 14 out of the InfoCom

9    list, appears to have seven members on the zakat committee.

10   True?

11   A.    Actually this is when it was the Bethlehem zakat

12   committee, not the Bethlehem Orphan Society.

13   Q.    Okay.  Well, morphed.  Right?

14   A.    I am sorry?

15   Q.    It morphed.

16   A.    The Bethlehem zakat committee stayed.  It didn't go away.

17   It is just the Bethlehem Orphan Society moved over there and

18   the transfers moved over there.

19   Q.    So do we not have a list of the members of the Orphan

20   Care Society?

21   A.    Well, this list predated the existence of the Orphan Care

22   Society.  The Orphan Care Society founded in 1997, I think

23   around there, 1996, '97, '98.

24   Q.    Do we not have a list of the entire membership of the

25   Orphan Care Society?

1   A.   I think there was a list that I have seen of the members.

2   Q.   Which exhibit is it?

3   A.   I don't think it is referenced on there.

4   Q.   Oh, okay.  Well, this is your summary chart and you have

5   three names on it Bethlehem Orphan Society.

6   A.   Correct.

7   Q.   During the relevant period how many members were there on

8   the entire zakat committee?

9   A.   I don't know.  Again, I focused on who the HLF was

10  primarily dealing with, so I don't know how many members there

11  were on the committee at the time; or the Society, rather.

12  Q.   And these you have Ghassan Harmas, Rabah Abdeen, and

13  Ismail Abdel Fattah?

14  A.   Correct.

15  Q.   Ghassan Harmas, if I remember correctly, is in the book

16  and there is evidence in this record in the search warrant

17  materials that he has some connection to Hamas.  Isn't that

18  true?

19  A.   There was evidence in the search warrant material linking

20  him -- identifying him as a leader of Hamas.

21  Q.   How about Rabah Abdeen?

22  A.   There is nothing in the search warrant material, although

23  I cannot recall what the exact reference was in Elbarasse

24  Search No. 22.  So we might want to look at that and see how

25  he was identified in that.

1    Q.    Okay.  What was Elbarasse Search No. 22?  Have you got

2    that handy?

3    A.    I just can't recall specifically how he was referenced in

4    that.

5              MR. WESTFALL:  May I approach, Your Honor?

6              THE COURT:  Yes.

7              THE WITNESS:  It says --

8    Q.    (BY MR. WESTFALL)  It talks about Bethlehem zakat,

9    doesn't it?

10   A.    Yes.

11   Q.    Let me show the jury.  And this is the Muslim Brotherhood

12   document.  Right?

13   A.    Actually it is the letter to Shukri.

14   Q.    Oh, okay.  Bethlehem zakat committee.  That is the one

15   you said predated it?

16   A.    That is correct.

17   Q.    And it says there is 11 members.  But this predates this

18   other one, too.

19   A.    Yes.  But it said, "We have 7 out of 11," and included

20   him, so I would consider that a link to Hamas.

21   Q.    Okay.  But you said that the Bethlehem zakat committee

22   closed down.  I am not quibbling with you, but you said

23   Ghassan Harmas left and started this Bethlehem Orphan Society.

24   A.    No, I never said the Bethlehem zakat committee shut down

25   and I didn't say that Ghassan Harmas started the Bethlehem

1    Orphan Society.  He moved to the Bethlehem Orphan Society.

2    And I am sorry.  I thought your question was about was there

3    anything connecting Rabah Abdeen with Hamas.  I thought we

4    were checking the letter and --

5    Q.    You didn't see anything in that?

6    A.    That is what I was saying.  Based on the content of the

7    letter, that is a connection to Hamas.

8    Q.    Was his name in there?

9    A.    Yes.

10   Q.    I will take your word for it.  Ismail Abdel Fattah?

11   A.    Nothing in the search warrant material.

12   Q.    Now, this InfoCom Search -- No, wait a minute.  This is

13   HLF Search No. 4, which is the OCS Bethlehem supporting

14   documents.

15   A.    Okay.

16   Q.    Okay?  Do you see this name right here?

17   A.    I do.

18   Q.    Ghassan Issa and M-O-H, period?

19   A.    Yes.

20   Q.    Ghassan Issa Mohammad?

21   A.    Yes.  If you will look for his full name, I believe you

22   can go to InfoCom Search No. 25, page 89, and it gives you the

23   full name.

24   Q.    Okay.  And is that full name this Ghassan Harmas?

25   A.    That is the last name.  It shows like the multiple parts

1    of his name Ghassan Issa.  If we want to double check to be

2    sure, go to InfoCom search 25, page 89, and check to be

3    accurate.

4    Q.    How about Walid Daoud, who replaced him as director?

5    W-A-L-I-D  D-A-O-U-D, who turns up signing these same forms as

6    director after the time period reflected in your supporting

7    documents.  All of a sudden there is no Ghassan Issa Moh.

8    There is Walid Daoud?

9    A.    If you can show me one.  I don't recall seeing his name.

10   I recall seeing this name, but I don't recall seeing the other

11   name.  If you would like to show me, maybe it will refresh my

12   memory.

13            MR. WESTFALL:  May I have a moment, Your Honor?

14            THE COURT:  Yes.

15   Q.    (BY MR. WESTFALL)  Let me get back to you on it.

16   A.    Okay.  Sorry about that.

17   Q.    No.  Wait a minute.  Here it is right on top.

18            MR. WESTFALL:  May I approach, Your Honor?

19            THE COURT:  Yes.

20            THE WITNESS:  I don't know who that individual is.

21   Q.    (BY MR. WESTFALL)  So as of 9/20/99, somebody is signing

22   these same fund transfers that Ghassan was signing, and you

23   don't know who that is and he is signing as director?

24   A.    I don't know who that is, and I don't know -- I haven't

25   analyzed it, so I don't know if he was also signing as

1    director at the same time that Ghassan Harmas was.  I don't

2    know.  I don't know who that individual is.

3                 MR. WESTFALL:  May I approach again, Your Honor?

4                 THE COURT:  Yes.

5    Q.   (BY MR. WESTFALL)  Aside from the fact that you don't

6    recognize his signature, does the document bear an HLDL bates

7    number?

8    A.   It was.

9    Q.   And does this appear to be a document in you all's

10   possession since 2002?

11   A.   It was.

12   Q.   And it deals with the Orphan Care Society?

13   A.   Yes.  That is correct.

14   Q.   And has the Orphan Care Society stamp on it?

15   A.   It is not translated so I can't identify it as a stamp,

16   but it does relate to the Bethlehem Orphan Care Society.  That

17   is what it says.

18                 MR. WESTFALL:  Your Honor, may I move this into

19   evidence as the next -- as our next number, whatever that may

20   be?  No. 1404.

21                 MR. JONAS:  Your Honor, we have no objection to

22   this.

23                 THE COURT:  That is admitted.

24   Q.   (BY MR. WESTFALL)  And there is Walid Daoud, and this is

25   9/20/99.  True?

1    A.    That is what it says.

2    Q.    Let's go to Islamic Science and Culture really fast.

3    Now, this is your summary chart Islamic Science and Culture.

4    Right?

5    A.    That is correct.

6    Q.    And looking in No. 28 here, Islamic Science and Culture

7    in the InfoCom list, it does not seem to have a membership

8    list in there.

9    A.    I don't believe that it did.

10   Q.    During -- We have four people on here, including Jamil

11   Hammami, Ibrahim Abu Salem, Jamal Tawil, Abdel Azim Salhab.

12   A.    Correct.

13   Q.    And during the relevant time period from 1995 to 2001,

14   how many members were on the Islamic Science and Culture zakat

15   committee?  How large was the membership?

16   A.    I don't recall.  There were a few other members, but I

17   don't recall how many.  Like I said, I focused on the ones

18   that the HLF was primarily dealing with.

19   Q.    I will tell you what.  I am going to put a checkmark over

20   Jamil Hamami.  We have talked about him a lot during this

21   trial.  Right?

22   A.    We have.

23   Q.    Is there anything in the search warrant material that

24   shows -- I am kidding.

25        Ibrahim Abu Salem, it looks like he is in the book.

1    A.    Yes.  And he was also in one of these deportee

2    videotapes, but I did not include it on here.

3    Q.    Jamal Tawil?

4    A.    He is listed as one of the deportees.

5    Q.    Abdel Azim Salhab?

6    A.    Nothing.

7    Q.    Let's talk about Ramallah.  And Ramallah is another zakat

8    committee that the membership list is not given in this book.

9    Right?  This InfoCom No. 28?

10   A.    I believe there is one individual referenced on that one.

11   Q.    Mahmoud Al Rohmi?

12   A.    Yes.  I believe he is listed as a contact.

13   Q.    Right.  And I take it that you don't know how many

14   members there actually were on the zakat committee during 1995

15   to 2001?

16   A.    No.

17   Q.    And then you have got seven individuals here.  And

18   talking about the search warrant evidence, the evidence that

19   Mahmoud Rohmi is connected to Hamas?

20   A.    Yes.

21   Q.    Yes?

22   A.    I am sorry.  Will you ask me the question again?

23   Q.    Any connection to Hamas in the search warrant material?

24   A.    Yes, in the search warrant material; not admitted.

25   Q.    Hosni Abu Awad?

1    A.    Nothing in the search warrant material.

2    Q.    Omar Hamdan?

3    A.    Nothing in the search warrant material.

4    Q.    Mahmoud Mosleh?

5    A.    We had the videotape and also he is referenced in the

6    article about Hamas there.

7    Q.    Darwish Zein?

8    A.    Nothing in the search warrant material.

9    Q.    Hamza Deeb?

10   A.    Nothing in the search warrant material.

11   Q.    Fadel Hamdan?

12   A.    Actually he was referenced in HLF Search No. 109 omitted

13   from the chart, hopefully to be corrected.

14   Q.    Okay.  So three of seven on this form here.  True?

15   A.    Out of the search warrant evidence, yes.

16   Q.    Okay.  I am going to go to Nablus now.  And Nablus is

17   InfoCom Search No. 28, the InfoCom list, this is page 22.  And

18   these are the members of the committee as they existed when

19   this list was made.  Does that look familiar?

20   A.    It does.

21   Q.    And the ones I have highlighted are the four that you

22   have on your summary chart--Hamed Bitawi, Abdel Rahim Hanbali

23   Adly Rifat Yaish, Mohamed Radi Hanbali, and all four of those

24   are on there.  Right?

25   A.    That is correct.

1    Q.   Now, during the relevant time period from '95 to 2001, I

2    assume that you cannot tell us exactly how many members were

3    on this committee.

4    A.   No.

5    Q.   Search warrant materials.  Hamed Bitawi, yes or no?

6    A.   A lot of it, yes.

7    Q.   Abdel Rahim Hanbali?

8    A.   Nothing in the search warrant material.

9    Q.   Adly Rifat Yaish?

10   A.   He was one of the deportees.

11   Q.   Mohamed Radi Hanbali?

12   A.   Not in the search warrant material.

13   Q.   Now, these other members -- This is page 22 out of

14   InfoCom No. 28.  All right?  Clerk at the Ministry of

15   Agriculture, that would be a position with the PA, wouldn't

16   it?

17   A.   I would be guessing if I answered that question.

18   Q.   Okay.  Well, the Director of the Public Works.  Sounds

19   like a government entity of some sort, doesn't it?

20   A.   It does.

21   Q.   Vice chairman of the al-Tadhamon Islamic Clinic and

22   Agricultural Engineer.  Merchant.  And it is not surprising to

23   see folks like this on these zakat committees, is it--folks

24   with -- kind of like the people in their communities.  It is

25   kind of the pillars of their communities, I guess.

1    A.    Really I don't know how to answer that question if it is

2    surprising or not.

3    Q.    We can look at some other lists and see if it comes up.

4          I am going to go to Tulkarem now.

5    A.    Okay.

6    Q.    And this is page 117 out of the InfoCom list.  It is

7    another one that has a membership list the Tulkarem zakat

8    committee.  And their membership list goes two pages.  There

9    is actually 16 members on it.  Do you see that?

10   A.    I do.

11   Q.    And the ones I have highlighted, five are the ones you

12   have on your summary chart.  Hosni Khawaja, Hamed Qadan, Bilal

13   Khamis, Amar Badawi, Bashar Al Karami, Fathi Qarawi, Abdel

14   Karim Abu Samaha -- Am I correct you also do not know exactly

15   how many members there were on this zakat committee from '95

16   to 2001?

17   A.    I don't know.

18   Q.    Hosni Khawaja, yes, no?

19   A.    Nothing in the search warrant material.

20   Q.    Hamed Qadan?

21   A.    Nothing in the search warrant material.

22   Q.    Bilal Khamis?

23   A.    He was identified in the Elbarasse letter.

24   Q.    Amar Badawi?

25   A.    Nothing in the search warrant material.

```
 1    Q.    Bashar Al Karami?

 2    A.    He was a deportee.

 3    Q.    Fathi Qarawi?

 4    A.    He was a deportee.

 5    Q.    Abdel Karim Abu Samaha?

 6    A.    Well, he was listed on I think Ashqar No. 3.  If we want

 7    to pull it up, it was a list of other Hamas members.  For the

 8    sake of this let's just say nothing in the search warrant

 9    material.

10    Q.    The other 11 members of the committee, do you know

11    anything about them?

12    A.    I know that the No. 1 died in like '90 or '91.

13    Q.    Okay.  The president?

14    A.    Yes.  I have seen bank records indicating that he died

15    very early on the -- in the time period we are talking about

16    here, '91.

17    Q.    Islamic Charitable Society of Hebron?

18    A.    Okay.

19    Q.    The Islamic Charitable Society of Hebron, I also assume

20    you don't know the exact number of members during the relevant

21    time period.

22    A.    No.

23    Q.    In InfoCom No. 28 it shows nine members and then four of

24    those are on your summary chart.  So Abdel Khaleq Natshe?

25    A.    Yes.
```

1   Q.   Hashem Natshe?

2   A.   Yes.

3   Q.   Mohammed Eid Misk?

4   A.   Not in the search warrant material.

5   Q.   Kamal Al Tamimi?

6   A.   Yes.

7   Q.   Adnan Masouwda?

8   A.   Yes.

9   Q.   Adel Juneidi?

10   A.   He was one of the deportees, yes.

11   Q.   Saleh Salim Natshe?

12   A.   Nothing in the search warrant material.

13   Q.   Azzam Salhab?

14   A.   Yes.

15   Q.   Mustafa Shawar?

16   A.   Yes.

17   Q.   Talal Sadr?

18   A.   Yes.

19   Q.   And those yes answers on six of them were based upon the

20   deportee status.  Right?

21   A.   If you will scroll back up I can tell you for sure, but a

22   number of them were deportees.  For some -- Of the other ones,

23   there were additional information like they were identified as

24   "ours" in that Elbarasse letter.

25   Q.   And you can consider them Hamas if that Elbarasse letter

1    said they are "ours"?

2    A.    I believe that is a connection to Hamas, yes.

3    Q.    Okay.  Here is the -- That is the deportee line.  Right?

4    A.    You forgot one over, Abdel Khaleq Natshe.  But some of

5    those people had other information linking them to Hamas as

6    well.

7    Q.    Now, can you --

8    A.    In the search warrant material.  Sorry.

9    Q.    And you already said you don't know how many folks were

10   actually on the committee during the relevant time period.

11   A.    That is correct.

12   Q.    Okay.  The last one is Qalqilya.  Now, in InfoCom No. 28,

13   the list, there is members of the committee here.

14   A.    Yes.

15   Q.    And there are five on that and five on this page.  There

16   is ten members on this committee.  Does that ring a bell?

17   A.    Yes, I recognize that.

18   Q.    And your summary chart you have three, one of whom also

19   appears on that list.  Right?

20   A.    Actually two of them appear on that list.  The first guy

21   on that list was Ibrahim Abdel Rahim Mostafa.  He is also

22   known as Ibrahim Dawoud.  You will see that in some of the

23   banks records.  So No. 1 is also on there, so there are two on

24   the list that are on this chart.

25   Q.    Then I will fix that.  And yes or no?

1  A.    No.

2  Q.    Ibrahim Zahran?

3  A.    No.

4  Q.    Riyad Rashi Walwil?

5  A.    Can you scoot it over to make sure he was not a deportee?

6  No.

7          MR. WESTFALL:  May I have just a moment?

8          THE COURT:  Yes.

9          MR. WESTFALL:  Pass the witness.

10         THE COURT:  Let's go ahead and break here for the

11 day.  Be back at 9:00 in morning.  Please recall the

12 instructions we have been over.

13         (Whereupon, the jury left the courtroom.)

14         THE COURT:  All right.  9:00.  Maybe we need to be

15 here a little early.

16         MR. JONAS:  There is the issue of the Bruce Hoffman

17 issue.

18         THE COURT:  He is going to come on tomorrow?

19         MR. JONAS:  Yes.

20         THE COURT:  And then I guess some of the outstanding

21 issues with respect to the exhibits.

22         MR. WESTFALL:  Yes.

23         THE COURT:  Okay.  Better be here at 8:30.

24         MR. WESTFALL:  I didn't put any in through her

25 because we didn't have a chance to talk about -- The ones I

1    want to put in are pretty non-controversial.

2              THE COURT:  But they are objecting to them?

3              MR. WESTFALL:  They are objecting to them.

4              MR. WESTFALL:  That is just by way of saying it

5    shouldn't take us long, even though they are pretty thick.

6              MS. MORENO:  Has the Court been provided with a

7    transcript of that exhibit?

8              THE COURT:  I haven't seen it yet.  Do you have

9    that, Jennifer?

10             MR. DRATEL:  Your Honor, just I want to renew my

11   collateral estoppel motion based on Mr. McBrien's testimony

12   because it was solely about the '95 designation executive

13   order; for severance and mistrial, but also mistrial for two

14   aspects of his testimony.  The one was about "connected to it"

15   is a misstatement of the law.  Even though Mr. Cline managed

16   to correct it, by the end I think it sowed confusion.

17        And the second part is that by putting the burden on the

18   donor, which is nowhere in the law, in the material support

19   law, to vet the destination of the money relieves the

20   Government, dilutes the burden of proof, reverses it in fact.

21        And for those reasons I move for mistrial or to strike

22   his testimony with an instruction.

23             THE COURT:  Those requests are denied, the mistrial

24   and motion to strike.

25             MS. MORENO:  May I ask a question about scheduling?

1   Does the Court intend to go past 5:00?  If you do, I just need

2   to change my flight schedule.

3           THE COURT:  You might want to change your flight

4   schedule.  Well, not too much past 5:00.  We have some

5   individuals coming in tomorrow that I will need to talk to,

6   one of the matters we have been dealing with.

7           MS. MORENO:  Yes.

8           THE COURT:  They are coming in, so I don't want to

9   keep them waiting too long.  So we probably will break 5:00 to

10  5:30, like today.

11          MR. DRATEL:  Does Your Honor want to hear from us on

12  that issue?

13          THE COURT:  Yes, at some point we will need to.

14          MR. DRATEL:  Just let us know.  We are available.

15          THE COURT:  All right.

16          MS. HOLLANDER:  Your Honor, I would just like to

17  join in all of the motions that Mr. Dratel made, except the

18  collateral estoppel which doesn't apply to my client.

19          MS. CADEDDU:  Ditto, Your Honor.

20          MS. MORENO:  Also.

21          MR. WESTFALL:  I thought it was automatic.

22          MS. HOLLANDER:  I am not sure that it is automatic

23  when it is specific to his client.

24          THE COURT:  We had talked about objections.  I don't

25  know that we talked about motions for mistrial.

1          MR. WESTFALL:  For the record, I will join.

2          THE COURT:  Those are denied.

3     Anything from the Government?

4          MR. JONAS:  No, sir.

5          THE COURT:  Be here at 8:30 in the morning.

6                    (End of day.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2          CORRECT TRANSCRIPT FROM THE RECORD OF

3          PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4          I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5          FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6          COURT AND THE JUDICIAL CONFERENCE OF THE

7          UNITED STATES.

8

9          S/Shawn McRoberts        06/05/2009

10         _____DATE_____

            SHAWN McROBERTS, RMR, CRR

11         FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25