IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA        )  CAUSE NO. 3:04-CR-240-P
                                (
vs.                             )
                                (  OCTOBER 23, 2008
                                )  DALLAS, TEXAS
HOLY LAND FOUNDATION, ET AL     (  9:00 A.M.

_____

VOLUME 24 OF 37

_____

STATEMENT OF FACTS

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

_____

A P P E A R A N C E S

        FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                              1100 COMMERCE, 3RD FLOOR
                              DALLAS, TEXAS  75242
                              BY:  MR. JIM JACKS
                                   MR. BARRY JONAS
                                   MS. ELIZABETH SHAPIRO

        FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
        (SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
                              20 FIRST PLAZA, SUITE 700
                              ALBUQUERQUE, NEW MEXICO 87102
                              BY:  MS. NANCY HOLLANDER
                                   MS. TERESA DUNCAN

```
1        FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
         (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
2                             NEW YORK, NEW YORK  10005
                             BY:  MR. JOSHUA DRATEL
3                                  MR. AARON J. MYSLIWIEC

4        FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
         (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
5                             DALLAS, TEXAS  75204
                             BY:  MS. MARLO P. CADEDDU
6
         FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
7        (GHASSAN ELASHI)     P.O. BOX 10985
                             TAMPA, FLORIDA  33679
8                             BY:  MS. LINDA MORENO

9                             JONES DAY
                             555 CALIFORNIA ST., 26TH FLOOR
10                            SAN FRANCISCO, CA  94104
                             BY:  MR. JOHN D. CLINE
11
         FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12       (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                             FORT WORTH, TEXAS  76102
13                            BY:  MR. GREG WESTFALL

14       COURT'S LAW CLERK:   MS. JENNIFER HELMS
                             1100 COMMERCE, RM. 1654
15                            DALLAS, TEXAS  75242

16       COURT COORDINATOR:   MS. BRENDA WEBB
                             1100 COMMERCE, RM. 1654
17                            DALLAS, TEXAS  75242

18  OFFICIAL COURT REPORTER:  SHAWN M. McROBERTS, RMR, CRR
                             1100 COMMERCE STREET, RM. 1654
19                            DALLAS, TEXAS  75242
                             (214) 753-2349
20

21

22

23

24

25
```

# INDEX

**EXAMINATION**

**Witness Name**                                                    **Page**

LARA BURNS
   Cross By MS. MORENO ............................................. 37
   Cross By MS. HOLLANDER ......................................... 73
   Cross By MR. MYSLIWIEC ......................................... 121
BRUCE HOFFMAN
   Direct By MR. JONAS ............................................ 149
LARA BURNS
   Cross By MR. MYSLIWIEC ......................................... 180

## Government Exhibits

**Government Exhibits**                                              **Page**

No. 170, 171 Admitted into Evidence                                  146

## Defendant Exhibits

**Defendant Exhibits**                                              **Page**

No. 1065, 1070 Admitted into Evidence                                22
No. 698, 708, 798 Admitted into Evidence                             65
No. 1394-1397, 1400,1401 Admitted into Evidence                      146

1          COURT:  All right.  Who is up this morning cross

2    examining Agent Burns?

3          MS. MORENO:  I am next, Your Honor.

4          THE COURT:  So we need to take up your issue do you

5    happen to have a an extra copy of your transcript?  I know you

6    emailed it to Jennifer but let me see what you have.  Have you

7    had a chance to look at it?

8          MR. JONAS:  Yes, sir.

9          MS. MORENO:  Your Honor, what I am handing to the

10   Court and what we emailed counsel -- May I approach the

11   lectern?

12         THE COURT:  Sure.

13         MS. MORENO:  Good morning, Your Honor.  What I have

14   handed to the Court is a one-page -- Well, on the second page

15   there is one line.  I will wait until the Court is finished.

16         THE COURT:  Okay.  I have finished.

17         MS. MORENO:  Thank you, Your Honor.  This is a

18   translation that the Government approved of last year that was

19   used last year in respect to a 106 request that Judge Fish

20   granted on what is now called Holy Land No. 110.  The exhibit

21   was admitted, as the Court recalls, a couple of days ago.

22         THE COURT:  Yes.

23         MS. MORENO:  I am asking the Court to allow me to

24   play this portion -- Now, this part of the video that I am

25   asking the Court to allow me to play is three minutes long.

1  There is no scrolling on the bottom.  This is the only thing

2  that is relevant with respect to what is being said by this

3  one woman.  I am asking under 106 for a variety of reasons.

4      And if the Court recalls yesterday, the Government did

5  play InfoCom No. 80, and InfoCom No. 80 was a video with three

6  segments.  Two of the segments were with women and one was

7  with a little boy.  And the inference was clear that the Holy

8  Land Foundation was coaching these people to say that they

9  needed aid, and thanking the Holy Land Foundation, and if they

10  didn't say it right enough and loud enough that they coached

11  them again.  That was the inference that was left.

12      I am asking -- And with respect to many other things that

13  have been admitted with respect to the aid, I am asking the

14  Court to allow me to play just these three minutes with this

15  translation, in fairness, with respect to InfoCom No. 80 also,

16  to show that indeed this woman isn't being coached.  This is

17  also in Gaza.

18      Abu Muharam, who has been identified in this case, and

19  who Agent Burns will identify, just as she did last year in,

20  this very portion of the video is the Holy Land Foundation

21  representative in Gaza whom we have heard about asking this

22  woman about the Foundation and about what she needs.

23      So that is my request to the Court.

24      I would also point out one last thing.  If the Court

25  recalls when I was cross examining Steve McGonigle, I tried to

1    get some photographs into evidence of Abu Muharam.  He

2    couldn't identify them and they didn't come in.  It turns out

3    Defense Exhibit No. 698, which is one of the photographs with

4    Mr. Muharam that Mr. McGonigle couldn't identify, is taken

5    from this particular video.  It is earlier on, and I can show

6    the Court exactly where, but this photograph is an absolute

7    replica of a scene where they are walking down the street.

8         So I would ask the Court to allow me to play that

9    three-minute segment and allow me to use this translation.

10             THE COURT:  Okay.  Mr. Jonas?

11             MR. JONAS:  Your Honor, we would stand on our

12   objections.

13        The first thing, we are requesting that the exhibit be

14   removed from evidence.  It is our prerogative which evidence

15   we want to put before the jury.  I decided I didn't want to

16   play that.  There has been enough documents and papers already

17   before the jury, and that is why I moved for that video, as

18   well as several others -- We decided we don't need, we don't

19   want to overburden the jury.

20        As far as the 106 goes, and I am going off of

21   recollection.  I am not challenging what Ms. Moreno says about

22   it being a 106 issue last year.  My recollection is that the

23   whole tape went into evidence.  I don't think 106 is

24   applicable.  The portion she wants to play should have been in

25   evidence already.  This time we only introduced just two

1   clips, so 106 would be an issue last time as opposed to this

2   year.

3       We don't think that the clip she wishes to play certainly

4   explains or elaborates or sheds any light on the two clips

5   that currently in evidence, assuming they stay in evidence.

6   And we don't think they necessarily explain the other clip.

7   They don't go to the effect of the coaching.  I am glad that

8   our point was made.  Ms. Moreno obviously picked it up that

9   people were coached.

10      The fact that this woman may not have been coached on the

11  video doesn't mean anything.  She certainly could have been

12  coached beforehand and it may have been edited out by the Holy

13  Land Foundation.  The fact some people were coached doesn't

14  necessarily mean other people were coached.  So I don't think

15  this clip sheds light and explains under 106 the other video

16  InfoCom Search No. 80, and we ask the Court not allow it to be

17  played.

18          THE COURT:  I think I have heard enough.  It is in

19  evidence.  And I understand you have the right to offer and

20  put in evidence what you wish.  The problem is you listed it,

21  and Defense relied on it, and I admitted it, so it is in

22  evidence.  And I am going to allow Ms. Moreno to play this.

23      I guess you are just going to read it, or do you want

24  play it?

25          MS. MORENO:  I want to just play--I have it queued

          1    up, Your Honor, and I can speak with Mr. Lewis--just those

          2    three minutes.

          3             THE COURT:  Are you going to want to play the other

          4    part of it if she does that?

          5             MR. JONAS:  I have to think about it.

          6             THE COURT:  Think about that and see what you want

          7    to do.  But I will permit you to do that.

          8             MS. MORENO:  Thank you, Your Honor.  And if I may

          9    coordinate with Mr. Lewis those discreet three minutes.

         10             THE COURT:  You may do that.

         11        Now, with respect -- Who wants to argue.  I have a list.

         12    Ms. Duncan or Mr. Westfall, are you going to argue?

         13             MR. WESTFALL:  About the exhibits?

         14             THE COURT:  Yes.

         15             MR. WESTFALL:  I have the lion's share on those in

         16    there, Your Honor, so I can take the lead.  And other people,

         17    their numbers, the ones I don't talk about, I frankly don't

         18    even know what they are.

         19             THE COURT:  A lot of these the Government has

         20    hearsay objections to them.  Do you want to address them?

         21             MR. WESTFALL:  Here is the ones that I was planning

         22    to offer through Agent Burns--No. 1356, 1357 -- Well, it is

         23    1356, 1357, 1358, 1359, and 1360, 1362, 1363, and 1364, and

         24    then 1393.

         25        But 1356 is indictment transactions pertaining to the

1   Islamic Science and Culture.  And what I am about to say is

2   true of all of these.  They are the transactions in the

3   indictment put together, you know, all the paperwork put

4   together, and then put in the order that they appeared in the

5   payment schedules.

6       So with that being said, No. 1356 is Islamic Science and

7   Culture, which is the indictment transactions; No. 1357 is

8   Jenin zakat committee; No. 1358 is Orphan Care Society;

9   No. 1359 is IC Hebron; No. 1360 is Nablus zakat; No. 1362 is

10  Ramallah; No. 1363 is Tulkarem; No. 1364 is Qalqilya; and No.

11  1393 is HLF Territories.  Again, each one of these is a count

12  in the indictment.

13      THE COURT:  Right.  But the documents that you are

14  seeking to introduce, they are not already in evidence, are

15  they?  Did you say something about they are just rearranged,

16  the order?

17      MR. WESTFALL:  I would say that 85 percent is

18  documents that are already in evidence in their -- I found

19  more than Agent Burns did, but they are certainly documents of

20  the same type of what she did.  But these primarily are in the

21  order of the payment schedule and, therefore, would make it

22  extremely easy for the jury to be able to look at these

23  indictment transactions.  Most of them, as I said, are already

24  in evidence.

25      And then any translations that appear in there are

1    translations that the Government made to -- like the receipts

2    that came back from the zakat committee.

3          THE COURT:  So all the translations you are offering

4    are translations you obtained from the Government?

5          MR. WESTFALL:  Yes, Your Honor.

6          THE COURT:  You are not offering any translations

7    made by anyone else?

8          MR. WESTFALL:  No, Your Honor, not in those

9    exhibits.  And I am not sure there are any in the other

10   exhibits, but these are the ones I am focusing on.

11         MR. JACKS:  Your Honor, it is still not clear to me

12   how much of these exhibits, what parts of them are already in

13   evidence.  And to the extent they are already in evidence,

14   then these exhibits are redundant and cumulative and could be

15   confusing to the jury.

16         THE COURT:  Well, my thinking on that would be if

17   they want to do it in a different order for their purposes, I

18   think that is permissible.  I don't think they have to do it

19   in the order, you know, whatever you choose.  I think they can

20   do that.

21       I guess the bigger issue, then, if you could take a look

22   at that, and I know there is a lot of pages, but he has

23   limited a lot, thankfully, and we will deal with the others

24   later, but he is saying 85 percent of that is in.  Take a look

25   at that.  And he is saying the translations are your

1  translations.  So those have been, of course, authenticated by

2  the translator previously, at least what you offered.  So that

3  is in, so we may be dealing with just a few documents.  And we

4  either can leave those out, or I can rule on them separately.

5      But I think they are entitled, if they think it will help

6  their presentation of the case to have a different order, they

7  are entitled to do that.

8          MR. JACKS:  I don't understand the Court's

9  statement.

10         THE COURT:  Which one?

11         MR. JACKS:  The time -- He says there is other

12 documents or pages in there that are not in the Government's

13 exhibits.

14         THE COURT:  I am not sure -- I want you to take a

15 look at those and see, you know, if -- Obviously your hearsay

16 objection is valid.  You are entitled to put these in through

17 the party opponent exception.  They don't have that, so they

18 would have to lay a predicate.  So that is true to all of

19 these exhibits, and that is the problem that you are facing.

20     I had a question on the translation.  If it was another

21 translation, then obviously they would have to lay that

22 predicate as well.

23         MR. JACKS:  But I think I was under -- Some of them

24 I can look at and say because of the form and the font of the

25 type and that type of thing, it is a pretty good indication

1    that it was done by the Government.  But there are some in

2    there that are different, and I just had a question about

3    those.

4            THE COURT:  Let's focus just on these seven or

5    eight, ten exhibits that he is identified that has to do with

6    specific committees, it looks like.  So maybe take a look at

7    those.

8            MR. JACKS:  If he can tell me which ones have the

9    additional documents that he has put in, then that will focus

10   my response.

11           MR. WESTFALL:  Your Honor, just briefly, when I

12   tendered these to the Government, I made a list and turned it

13   over to the Court and to them of the ones that I actually

14   was -- you know, this list, to narrow it down.  I also told

15   Mr. Jacks, "Don't worry about this rule about not showing

16   these to your witness because she is on cross."  So, you know,

17   they are absolutely free, and I will answer any questions they

18   have.

19       I will say and I will represent to the Court and to

20   Mr. Jacks that the other 10 to 15 percent that is new is

21   orphan lists, in some cases wire transfer forms.  They all

22   have the HLDL number.  They were all search warrant materials

23   and all materials that pertain to the counts in the indictment

24   and, therefore, presumably the Government will be familiar

25   with them.

1    So in addition to hearsay, of course, there would be 106

2  issues as well, because I believe they can be authenticated

3  very easily.  But I stand ready to actually point out, you

4  know, how the documents work and all that, if it can help

5  them.

6        THE COURT:  You probably need to do that with

7  Mr. Jacks and work with him and resolve whatever is left

8  unresolved.  That is those exhibits.

9    You listed a number of other exhibits.

10        MR. WESTFALL:  And Your Honor, here is the deal on

11  those.  I happen to have those put those together at the time.

12  Okay?  And by and large what they are is Government exhibits

13  where they first tendered the entire exhibit and then went

14  back and decided they were only going to use a few pages so

15  they didn't put all the other pages into evidence.

16    But the larger issue is I have no intent of using those

17  with Agent Burns.  So we can defer rulings on those just to

18  save time.

19        THE COURT:  That will be good.  If you get with

20  Mr. Jacks on those particular exhibits, and then see what you

21  can work out, and then we will go from there.

22    Any other exhibits, then, that are intending to come in

23  through Agent Burns?

24        MR. MYSLIWIEC:  Yes.

25        THE COURT:  You are going to cross examine Agent

1    Burns?

2              MR. MYSLIWIEC:  Yes.

3              THE COURT:  All right.  Go ahead.

4              MR. MYSLIWIEC:  There are a lot, but they are quick.

5        I think yesterday most of what is on the disk that I gave

6    to the Court in the afternoon and gave to Mr. Jacks in the

7    afternoon have to do with one of the central issues in the

8    case, which is the HLF on notice that these zakat committees

9    are controlled by Hamas.  That is one of the central questions

10   here.  And a lot of the evidence that the Government has put

11   in about the search warrant materials and so forth is designed

12   to go to that question.

13       And in testifying, Agent Burns has frequently said, "Are

14   they on notice about this?"

15       "According to what the documents say."

16       Just on the evidence of the documents, not whether these

17   documents are in fact true but what do they say.

18       So one of the first sections of my cross examination has

19   to do with a number of documents that were in evidence last

20   year, most of which the Government put into evidence last year

21   and which Agent Burns was cross examined about.  And they have

22   not offered those exhibits this year.  Many of them aren't

23   even on their list, and we turned them around and turned them

24   into Defense exhibits.

25             THE COURT:  Are you speaking your separate list?

1    You gave us a disk and that is all you are addressing?

2            MR. MYSLIWIEC:  Yes.  Along with some other things,

3    but I am taking this one first.

4            THE COURT:  Okay.

5            MR. MYSLIWIEC:  And those are Defense Exhibit

6    No. 1065, Defense Exhibit No. 1070, which I believe previously

7    had been provided.  But then in line with those Defense

8    Exhibit No. 1395, 1396, 1397, 1400, 1401, and then I believe

9    -- And the additional ones were part of Government exhibits,

10   as I mentioned.

11       And then Holy Land HLF Search No. 170 and HLF Search No.

12   171, where were actually exhibits that were on the initial

13   exhibit list of the Government at the trial and they decided

14   to withdraw them.  So those I just kept their exhibit numbers

15   on them.

16           MR. JONAS:  For clarity's sake, HLF No. 170 and 171

17   were not part of the ones that were actually admitted into

18   evidence.

19           THE COURT:  And I don't think he is saying that.  He

20   said it is in your initial list, but they have not been

21   offered.

22           MR. MYSLIWIEC:  And I think these documents fall

23   into two categories.  There are a couple of documents that

24   have to do with licenses granted to zakat committees either by

25   the Palestinian National Authority or the Civil

1    Administration, which essentially was an arm of the Israeli

2    government.  Those documents purely go to the issue of is HLF

3    on notice, according to what documents say, about what these

4    zakat committees are.  These are documents that were found in

5    HLF's possession or in the InfoCom search.  There is -- So

6    they go to that issue.

7         And then the second group of documents or the second

8    category that is in here are about what are they on notice of

9    that is involved, according to the documents, in some of the

10   projects.  We haven't -- I am not seeking to go into hundreds

11   of pages here.  They are specific letters from zakat

12   committees about what funding was designed and went to as part

13   of the projects.  It will be quick.  I am not going to

14   spend --

15              THE COURT:  What about the translations?  Who did

16   those?

17              MR. MYSLIWIEC:  One of the translations is of a

18   Hebrew document.  I believe that Sento did it last year.  That

19   is a document that came into evidence last year.  And the

20   other one I believe was done --

21              MR. JACKS:  Your Honor, it is very difficult to keep

22   up when we talk about one of the documents.  We don't talk

23   about an exhibit number.

24              MR. MYSLIWIEC:  I can go specifically to the

25   exhibits.  I think it is 1070 is the one that is in Hebrew and

1    it is the one that involves a civil administration of --

2            MR. JACKS:  Excuse me.  The only list I got from you

3    is this handwritten list.  Is there a separate --

4            MR. MYSLIWIEC:  This was on Terry's.

5            THE COURT:  This was on the big list that they

6    initially gave.

7            MR. MYSLIWIEC:  Because you filed objections to

8    them.

9            THE COURT:  The ones you filed objections to.

10           MR. MYSLIWIEC:  And you raised the translation

11   issue, I think.

12       There was no objection to this translation last year.  If

13   this comes down to purely translation issue, we can put it in

14   subject to connection.  That is one of them.

15       The second one is another -- I believe it was translated

16   by a translator we have used with CJA funding.  There was no

17   objection to the translation last year, as well as Defense No.

18   1065 there was no objection to the translation that it wasn't

19   accurate.  So the Government signed off in the previous trial

20   that it was accurate.

21           THE COURT:  That is No. 1065 and 1070.

22           MR. MYSLIWIEC:  So that is the first group.

23       If Mr. Jacks wants to respond to that, and then I can go

24   on to the seconded category.

25           THE COURT:  Give us the numbers for the first group

1    that you are referring to.

2              MR. MYSLIWIEC:  1065, 1070, 1395, 1396, 1397, 1400,

3    1401 HLF Search No. 170, and HLF Search No. 171.

4              THE COURT:  So two of them, No. 1065 and 1070 are

5    from the bigger list, and then the others are from the list

6    you provided yesterday?

7              MR. MYSLIWIEC:  That is right.

8              THE COURT:  Do you want beyond what you have in

9    writing?

10             MR. JACKS:  Well, Your Honor, as we stated in our

11   written objections, as to those two exhibits, and there is no

12   description of them, so --

13             THE COURT:  Which two are you referring to?

14             MR. JACKS:  I am sorry.  No. 1065 and 1070.  Still

15   we object on the grounds of hearsay.  The fact that the

16   translations were acceptable or agreed to last year, that

17   didn't prevent us from having to put a witness up there this

18   year to authenticate those translations.  So I am not sure how

19   much weight should be attached to that fact.

20        Stepping beyond the translations, with regard to

21   No. 1065, it appears that it is an exhibit that has been

22   assembled from different parts, and I don't know that Agent

23   Burns is going to be able to articulate or explain how this

24   exhibit was put together, and so I don't believe that she can

25   provide any information other than that it appears that those

1   documents that have the bates stamps were seized from the

2   search.

3           MR. MYSLIWIEC:  She did that last year during the

4   trial.

5           THE COURT:  Did what?

6           MR. MYSLIWIEC:  They came in through her.

7           THE COURT:  The same exhibit?

8           MR. MYSLIWIEC:  Yes.

9           THE COURT:  How did you deal with the hearsay issue?

10          MR. MYSLIWIEC:  Well, that is why I started off by

11  saying that the issue in the case and the way this evidence is

12  represented, it is for a non-hearsay purpose.  It is for what

13  is the notice to HLF of whether these are controlled by Hamas.

14  These licenses which are granted by the Palestinian National

15  Authority, which is obviously in some way in this case

16  represented as a foe or enemy of Hamas, and the second one,

17  the Civil Administration, which is a government of Israel

18  Civil Administration, so that is not Hamas, they issued

19  licenses for specific projects for specific zakat committees.

20  Those documents then came to the Holy Land Foundation and

21  provided notice of what these zakat committees were.

22      It is not for the truth of those documents.  It is purely

23  for the notice issue according to what the documents say, just

24  as Agent Burns testified.

25          MR. JACKS:  I am sorry.  Which exhibits?

THE COURT:  No. 1065 and 1070.

MR. MYSLIWIEC:  Right.  And I think HLF Search -- I think it is just those two that are licenses.

MR. JACKS:  Your Honor, we still submit that those documents are being submitted for the truth of the matter asserted therein, and there is -- a lot of this might be facilitated if this were a Defense witness that could come up there and testify about these documents and testify about where they came from and how they were kept and that kind of thing.  A lot of our issue is the fact that trying to bring them out through Agent Burns is simply not the vehicle to do this, and it skips a step and it is asking her -- And I am not sure why they want to bring them in through her.  They have an accountant or someone that worked for the Holy Land Foundation on their witness list, so I am not sure why the need to bring them out through Agent Burns exists when she at best can say that these pages appear to have been taken in the search of the Holy Land Foundation.

But in terms of specifically the notion that, well, these go to show that -- these go to rebut the notion that the Holy Land Foundation was on notice that these committees were connected to Hamas, these documents don't -- Even if you allow them in for the truth, or just for the facial statements they contain, at best they are neutral.  So they don't really rebut that point.  So for that reason I don't think they are

probative of what the Defense claims they are probative of.

And again, I think they are also clearly being introduced for the truth that is contained therein.

MR. MYSLIWIEC:  Your Honor, I will stick to the points.

The first is, we are open to a limiting instruction that tells the jury these aren't admitted for the truth.  It couldn't be more clear.  Whether you want to give that instruction today or whether you want to give it at the end of the case, that satisfies that issue.

The second thing is a lot of the arguments Mr. Jacks is making go to the weight of the document, whether it is -- It is clearly relevant and probative.  We disagree about how probative it is, and that is a classic weight argument.

THE COURT:  And I agree that goes to the weight. And if you are not offering it for the truth, it takes care of the hearsay issue.  And they are agreeable to a limiting --

MR. MYSLIWIEC:  If there is a lingering problem, you can clear it up with an instruction.

THE COURT:  And that leaves the translation, and you say you can connect that if you need to, if the Government ends up not agreeing with you.

MR. MYSLIWIEC:  Right.

THE COURT:  I have certainly permitted the Government to introduce evidence subject to later connecting.

1    So I think on those two you are okay, then.

2        Mr. Jacks, any other thoughts on that?  That is my

3    inclination.

4            MR. JACKS:  Just the last point, Your Honor, that

5    there is no testimony that we relied on these things.  There

6    is nobody from the Holy Land Foundation that said these

7    documents are things that we relied on, and that is not in

8    evidence.

9            THE COURT:  It is circumstantial.  It is addressed

10   to Holy Land and that is circumstantial evidence.  That goes

11   to the weight probably more than admissibility.

12       Anything else?  Defense Exhibit No. 1065 and 1070 are

13   admitted.

14       What about No. 1395 -- These are different type of

15   letters, like thank-you letters.  What about those No. 1395,

16   1396, 1397, I guess 1400, 1401.

17           MR. MYSLIWIEC:  I think all of these documents fall

18   into the category of notice to the HLF about what funding went

19   for as evidenced by the documents.  And again, this is for

20   exactly the same purpose for which it is being offered.

21           THE COURT:  So you are not offering for the truth.

22           MR. MYSLIWIEC:  Not offering for the truth.  And

23   again, if the Court feels to account for the objection that

24   the Government is raising that it is appropriate to give a

25   limiting instruction, we don't object to that.

1           THE COURT:  Okay.

2           MR. MYSLIWIEC:  And you know, we have selected just

3      a few documents.

4           THE COURT:  And then the translations, how about

5      those?

6           MR. MYSLIWIEC:  These were all Government exhibits

7      in the last trial, so the translations are governments

8      translations.

9           THE COURT:  You are using the Government

10     translations here?

11          MR. MYSLIWIEC:  Yes.

12          THE COURT:  Mr. Jacks?

13          MR. JACKS:  I am assuming we are discussing --

14          THE COURT:  The new list that he gave you.

15          MR. JACKS:  No. 1395, 1396, 1397, 1400, and 1401.

16     Your Honor --

17          THE COURT:  I guess are you including in that HLF

18     170 and 171?

19          MR. MYSLIWIEC:  Yes, I am.

20          THE COURT:  HLF Search No. 170 and 171 are also part

21     of this list.

22          MR. JACKS:  Your Honor, it is our position that

23     again these documents are hearsay, and to say that they are

24     not being offered for the truth but merely to show that the

25     Holy Land Foundation was on notice, or this was basically

1   their state of mind, I don't believe that these documents

2   are -- I don't believe that you can make the argument that

3   these documents go to show their state of mind in

4   that -- First of all, as I mentioned previously in the case,

5   the exceptions -- For hearsay to come in to show a person's

6   state of mind, at least to that --

7           THE COURT:  Except here -- I don't know that they

8   are offering it under a hearsay exception.  He says they are

9   offering it not for the truth.  So they are not offering it as

10  803(3) exception.  They are just saying it is 801 by

11  definition not hearsay because they are offering it not for

12  the truth, and willing to take a limiting instruction.

13          MR. JACKS:  I think that is a very thin argument,

14  Your Honor, in order to get in these statements.  And one of

15  them is, I just called it a collection of attaboys.  It is

16  like 389 pages.

17          THE COURT:  But some of that -- a lot of those

18  arguments in terms of what it means probably go to weight as

19  well.  I think that is a problem you are running into there.

20  You obviously have your interpretation and they have theirs.

21      And the translation, they are saying they are your

22  translations that you used last time, so you can certainly

23  verify that.

24          MR. JACKS:  The time it would take, Your Honor, for

25  these 389 pages --

1          THE COURT:  We are not going to do that in front of

2    the jury obviously.  I didn't know how many of these are 300

3    pages.  We are not going to spend that kind of time.

4          MR. MYSLIWIEC:  They are not.  The ones that are on

5    the disk --

6          THE COURT:  They are not that long?  Okay.  That was

7    the other list, and so far they haven't gotten into many of

8    those.

9          MR. MYSLIWIEC:  We refer to where these documents

10   came from in the Government exhibits, but we didn't take the

11   entire Government exhibit and turn it into a Defense exhibit.

12   It is just the pages that are on the disk.

13         THE COURT:  Right.  I don't think any that were on

14   your list were very long.  I don't remember any that were very

15   long.

16      And HLF No. 170 and 171 are not in evidence?  Or are

17   they?

18         MR. MYSLIWIEC:  They are not.  They are the ones

19   that put on the exhibit list at the beginning of trial.

20         THE COURT:  And change their mind.

21         MR. MYSLIWIEC:  They have never been offered by the

22   Government.

23         MR. MYSLIWIEC:  They are Government exhibits.

24   Should I move on to the second category?

25         THE COURT:  Let's give Mr. Jacks a second here.

1          MR. JACKS:  Your Honor, again, without having each

2    specific exhibit in front of the Court to talk about, we don't

3    believe that every single one of these is intended to show the

4    knowledge on the part of the Holy Land Foundation.  It is

5    strictly -- it is being offered for the truth and to show what

6    was stated within the letter, because, as I understand it, it

7    is to refute the notion that the Holy Land Foundation was

8    aware that these committees were connected with Hamas, and

9    these exhibits don't do that.  And the only way that they can

10   argue that they can do is to argue that they are true.

11         THE COURT:  I don't know that they need to argue

12   they are true.  They can just argue that this is what they

13   were told.  So that is why they are saying it doesn't go to

14   the truth.  They are not trying to prove that in fact that is

15   true, but that this is the information the HLF received from

16   these individuals.

17       And you, frankly, you offered some exhibits along the

18   same lines with that same argument that I did admit.  It isn't

19   because they were offered for the truth.  I think some of

20   these posters and writings found in the zakat committees, you

21   weren't trying to prove what was asserted there, but just the

22   fact that it was there.  And I think that is, if I understand

23   him correct, that is along the lines they arguing here.  They

24   are not arguing that this is true, but that this is the

25   information they are getting, so this is what HLF knew or

1    thought.

2        And then where you argue with that, that is maybe where

3    it is subject to interpretation, that goes more to

4    admissibility unless it just clearly can't go there.  That

5    goes more to weight rather than admissibility, rather.

6            MR. JACKS:  Your Honor, just to take one specific,

7    Defendants' Exhibit No. 1401 appears to be a letter to

8    Mohammad El-Mezain from the Jenin zakat committee asking for

9    money.  Now, I don't know how that goes to that issue.

10            THE COURT:  Mr. Mysliwiec?

11            MR. MYSLIWIEC:  It is asking for money for a

12    specific project.

13            THE COURT:  What was the project involved there?

14            MR. MYSLIWIEC:  I think it was a hospital.

15            THE COURT:  Okay.

16            MR. MYSLIWIEC:  The el-Razi Hospital, which I think

17    they did put some information in evidence about it.

18            THE COURT:  About that hospital?

19            MR. JACKS:  We may have, Your Honor, but it still

20    doesn't do away with the rules of evidence in terms of if they

21    want to put evidence in about that issue, they can call a

22    witness to do that.

23            MR. MYSLIWIEC:  Again, the limiting instruction I

24    think cures any potential problem.

25            THE COURT:  Certainly.  I guess the only issue that

1    is left, reading what he is maybe getting at, it is simply not

2    relevant, even if you offer for the truth is what you are

3    saying, Mr. Jacks, on that particular issue they are offering

4    it to.  But I still think the arguments you are making go more

5    to the weight, what weight the jury will give to these

6    documents rather than admissibility.  It is their knowledge

7    and they are not offering it for the truth.

8         MR. JACKS:  Well, Your Honor, my concern is that

9    this would just in essence -- you basically have done away

10   with the rule and that anything in their records they can

11   offer and say, "We are not offering it for the truth, but just

12   to show what was in our head or what we knew."  So --

13        THE COURT:  I understand that concern.  He is

14   offering maybe a handful, maybe six or seven documents.

15        MR. MYSLIWIEC:  At some point it would be

16   cumulative, and that would be an appropriate objection.

17        THE COURT:  All right.  And then let me get back

18   with you on that.  You said there was one more?

19        MR. MYSLIWIEC:  There is a second category that

20   relates to the al-Ibrahimi massacre, which the Government

21   talked, about and they had a Demonstrative No. 32.  And they

22   also put in a redacted version of the U.N. report.

23        THE COURT:  That is your No. 1394 exhibit you are

24   wanting to get in?

25        MR. MYSLIWIEC:  Yes.

1          THE COURT:  Go ahead.

2          MR. MYSLIWIEC:  On this, much of Agent Burns' direct

3     in this round, Your Honor, had to do with looking at financial

4     transactions to determine whether money went to special

5     segments, whether it was martyrs, orphans, deportees, or

6     families thereof.  And this exhibit is specific to the martyr

7     special segment.

8          And the demonstrative that the Government put up had a

9     list of people who Holy Land had supported who were families

10    of martyrs, InfoCom Search No. 100, and they had a redacted

11    version of Defense Exhibit No. 1394 which is the U.N. report.

12         This are two other documents which the Government I

13    believe entered into evidence last year that go to martyrs,

14    families of martyrs supported through ICS Hebron and specific

15    to the al-Ibrahimi massacre committee and those, are the other

16    documents that I have in here that I have listed.

17         So this just -- It is sort of a Rule 106 issue on the

18    U.N. report, and then the two other exhibits are also Rule 106

19    because they go to families of martyrs that were funded

20    relating to the al-Ibrahimi massacre.

21         MR. DRATEL:  Your Honor, if I can just explain a

22    little?

23         THE COURT:  Sure.

24         MR. DRATEL:  Agent Burns' demonstrative was these

25    list of victims for the al-Ibrahimi massacre and then these

three additional people who were killed a month later in
Hebron that were also supported.  Right?  On that same list on
the InfoCom No. 100, this is another person who was not in the
massacre who was supported by HLF and he is in the U.N. report
also a month later; not killed as part of some military
operation, but a person killed on the street, essentially.  It
is the massacre committee that made those decisions.  HLF
supported that person.

In addition, we have redacted the U.N. document entirely,
with the exception of those persons from Hebron who were
supported by HLF in that time period from the Ibrahimi mosque
committee that are in HLF's records that the Government put in
last year.  So there is really know doubt about the
authenticity of them or the relevance.  So we have redacted
very carefully to limit it to only those people.  There are no
extraneous ones; no one outside that.

It completes the picture that the Government gave a very
small slice of as to what kind of support, the breadth of the
support that Holy Land gave with respect to the al-Al-Ibrahimi
mosque massacre at the request of the committee.  And this
just completes the picture of what that support was.

So what we have now is the Government basically saying
they supported X number, 18 people in the massacre and then
these two other people who were really Hamas people killed in
a shoot-out.  Well, it is not true.  They supported a lot more

1    people from that whole context from the committee, including

2    people we can match up with the U.N. report and Holy Land's

3    records as being supported.

4              THE COURT:  Mr. Jacks?

5              MR. JACKS:  Judge, I am not clear on Mr. Mysliwiec's

6    reference to other two exhibits.

7              THE COURT:  I am not either, frankly.  All I have

8    seen is No. 1394.

9              MR. MYSLIWIEC:  It is HLF Search No. 139 and HLF

10   Search No. 137.

11             THE COURT:  Are they in evidence?

12             MR. MYSLIWIEC:  No, they are not.  I thought they

13   were on the disk.  If not, I can provide copies and we can

14   discuss it at the break because I am not going until the

15   break.

16             MR. DRATEL:  They are two pages each.

17             MR. MYSLIWIEC:  I have extra copies.

18             MR. DRATEL:  They are on the Government's list.

19             MR. MYSLIWIEC:  Right.  Which is why they have HLF

20   search on them.

21             MR. JACKS:  Your Honor, I would have to look at

22   those exhibits and see.  The Government's purpose in putting

23   this U.N. document into evidence was to show that while

24   certain persons or families of persons that were killed during

25   the massacre were supported by the Holy Land Foundation, there

1    were also other persons that were not killed during that

2    massacre but were listed as being victims of that massacre and

3    were supported by the Holy Land Foundation.

4        And these other individuals on here, it appears to be

5    just an attempt to bring in other allegations and bad actions

6    by the Israelis, and it is not really -- It is certainly not

7    106 in the sense that it explains or clarifies the point that

8    the Government was seeking to make through this particular

9    exhibit.

10        MS. CADEDDU:  May I address this for just a moment,

11    Your Honor?  Because I actually helped Mr. Mysliwiec put these

12    together.

13        The names that are on Defense Exhibit No. 1394, which is

14    the U.N. list, every name is redacted that was not supported

15    by Holy Land.  So the names that are left on that list are

16    names that in Government exhibits are people who were

17    supported by Holy Land in connection with the al-Ibrahimi

18    mosque massacre.  So they are not random bad acts of the

19    Israelis.

20        The Government is putting in some people who were

21    supported who were Hamas.  There are other people from the

22    Holy Land records who were supported by Holy Land in

23    connection with that Massacre whose names appear on the list

24    whose names are not Hamas, and that is what we are seeking to

25    get in.

1          THE COURT:  Mr. Jacks, do you want to look at those

2     two exhibits that go with it?

3          MR. JACKS:  Yes, sir.  No. 136 and 137.

4          MR. MYSLIWIEC:  No. 137 and No. 139.  I have hard

5     copies here.

6          THE COURT:  You say you are not going until after

7     the break, so we can take that up later, and I will give you

8     on the other, No. 1395, et cetera.  I will give you a ruling

9     on those.

10          MS. HOLLANDER:  Your Honor, I don't have any

11     exhibits that have not already been admitted for my cross,

12     which I believe is right after Ms. Moreno's, but I do have the

13     issue with the 302s that you were reviewing.

14          THE COURT:  And I have looked at those 302s, and I

15     don't believe you are entitled to those 302s based on the

16     evidence the way it came in.

17          MS. HOLLANDER:  I need to perhaps at the bench just

18     put something on the record about those.

19          THE COURT:  Sure.  Just remind me.  We will give you

20     that opportunity.

21          MS. HOLLANDER:  And I would like to make them Court

22     exhibits.

23          THE COURT:  Sure.  Make them part of the record.  We

24     can do that.

25          MS. HOLLANDER:  And then just put something on very

1    briefly.

2         THE COURT:  Mr. Jacks or Jonas, I actually marked on

3    those that I had.  I was making notes and things on them, so

4    if you will give me some clean copies, we will make those part

5    of the record.

6         MR. JONAS:  Do you want me to approach now?

7         THE COURT:  That is fine.  And I have your letter

8    and that will be part of it.

9         MR. WESTFALL:  May I approach with Mr. Jacks?

10         THE COURT:  Yes.

11         (The following was had outside the hearing of the

12              jury.)

13         MR. WESTFALL:  They have told us that they may be

14    calling their computer lady today.  These are the exhibits

15    they told us they are going to get in through her--HLF No. 47,

16    50, and 51.  What I have done is I have made two copies of

17    this, and I will give one to the Court and one to the

18    Government?

19         THE COURT:  This is what you are seeking to

20    introduce?

21         MR. JACKS:  Yes.

22         MR. WESTFALL:  What I have done is circled all of

23    the pictures that I believe are Osama bin Laden.

24         THE COURT:  That are objectionable.

25         MR. WESTFALL:  Yes.

1          MR. WESTFALL:  And like the list of designated

2     individuals, it is not exclusive nor exhaustive, so if I

3     missed one, but I did try my best to find them all.  And we

4     just ask that those be taken out by the time --

5          MR. JACKS:  Yes.  We went through there and took

6     them out.

7          THE COURT:  They are aware of that.

8          MR. WESTFALL:  Just to be sure.

9          MR. JACKS:  That may be referring to another Osama.

10    One of these suicide bombers may have been named Osama, but I

11    will check and see.

12         MR. WESTFALL:  I think it would probably be better

13    to take the picture out, unless you are going to throw someone

14    up that explains that distinction.

15         THE COURT:  If they can say it is somebody else,

16    that is probably okay.

17         MR. WESTFALL:  If your computer lady can testify to

18    that, which I don't imagine she can.

19         THE COURT:  So the line-up today is finish Agent

20    Burns, and then you are going to call Hoffman, and then if we

21    time you are going to try to get to this person.  Is that the

22    plan?

23         MR. JACKS:  Yes.

24         MS. SHAPIRO:  I hate to do this, but may by excused

25    this morning for some witness juggling?

1    THE COURT:  I understand.  Feel free to come and go

2  as you need to.

3    MR. WESTFALL:  Are we going to take up the Hoffman

4  issue?

5    THE COURT:  We will.  I will let you put on Hoffman,

6  and we will get into discussions on the record eventually, but

7  you can put on Hoffman.  The primary concern seems to be

8  hearsay, but we will address all that.  We will have a

9  conference.  I am going to let him put him on, but we will

10  address the specifics of that later.

11    MS. MORENO:  Since I am up next, should I be at the

12  lectern?

13    THE COURT:  Why don't you go ahead and do that.

14    MR. JONAS:  For scheduling purposes, my

15  understanding from the Defense, and this is their hand, that

16  they think they will be done by 12:00-ish.

17    MS. MORENO:  Half an hour, Your Honor.

18    MR. JONAS:  Mr. Hoffman is going today, but we can

19  wait until after lunch to put him on.

20    MS. MORENO:  We will accommodate the Government.

21    MR. JONAS:  But we can wait.

22    THE COURT:  Are you putting him on?

23    MR. JONAS:  Yes, sir.

24    THE COURT:  How long are you anticipating?

25    MR. JONAS:  Not even an hour, and a chunk of that is

1   just qualifying.  So we can wait to see if Agent Burns will be

2   finished today.

3               THE COURT:  All right.

4               (The following was had in the presence and hearing

5               of the jury.)

6               THE COURT:  Bring in the jury.

7               (Whereupon, the jury entered the courtroom.)

8               THE COURT:  Ladies and gentlemen of the jury, good

9   morning.  We are ready to proceed.

10       Ms. Moreno?

11              MS. MORENO:  Thank you, Your Honor.

12                        CROSS EXAMINATION

13  By Ms. Moreno:

14  Q.   Good morning, Agent Burns.

15  A.   Good morning.

16  Q.   I want to begin our discussion with the InfoCom Search

17  No. 28, which is has a list of zakat committees, I think about

18  40 charities.  Do you recall that particular document?

19  A.   I do.

20  Q.   Okay.  And, in fact, I will try to do this.  So do you

21  agree with me that this is the first page of that particular

22  Government exhibit?

23  A.   I believe it is the first page of the translation.

24  Q.   Of the translation.  Thank you.  And it indicates -- It

25  introduces a table of contents that has I believe 44 zakat

1    committees and charities.  Correct?

2    A.    Correct.

3    Q.    Okay.  And I would like to discuss just the ones that are

4    in the indictment.

5    A.    Okay.

6    Q.    All right.  Now, the committee -- Can you read that,

7    Agent Burns, or do you need it --

8    A.    I can read it.

9    Q.    You can?

10   A.    Uh-huh.

11   Q.    This is the committee of the Islamic Science and Culture

12   Society.  Correct?

13   A.    Correct.

14   Q.    And there is evidence in this case about this particular

15   society?

16   A.    That is correct.

17   Q.    Okay.  And why don't you read from the synopsis, please.

18           MR. JONAS:  Ms. Moreno, can we get a page number,

19   please?

20           MS. MORENO:  Page 83.  I am sorry.

21   A.    It says, "Synopsis:  The committee of the Society of

22   Islamic Sciences and Cultures is a charitable organization

23   which was founded in Jerusalem in 1984."

24   Q.    And that 1404, what is that again?

25   A.    That is a date according to the Muslim calendar.

1    Q.    Okay.

2    A.    It just -- you can convert it into the year as we know

3    it.

4    Q.    And the conversion into 1984 is something that the

5    translator did for us.

6    A.    I am not sure in this case.  Generally when there was a

7    date like that, the translator would translate it, but on some

8    of these documents both dates were on there, and I don't know

9    -- On this one I can't recall if it had both dates or if that

10   was the translator.

11   Q.    Okay.  But what we are to understand from this is the

12   1404 is equivalent to 1984.  Is that fair?

13   A.    Correct.

14   Q.    Okay.  And the year that Hamas was founded was 1987.  Is

15   that correct?

16   A.    Correct, yes.

17   Q.    So this would have been three years before the founding

18   of Hamas?

19   A.    That is correct.

20   Q.    Let's talk about this particular society's scope of work.

21   Again, if you can't see, please tell me and I will do my best

22   up here.

23         Could you read the society scope of work, please.

24   A.    Okay.  "Society's scope of work:

25         "1.  Building children's kindergartens.

1          "2.  Building educational institutions.

2          "3.  Spreading the Islamic culture by opening a public

3    library and publishing books and leaflets.

4          "4.  Orphan sponsorships."

5    Q.   And the projects that are overseen by the society, if you

6    could please read that for the jury.

7    A.   "1.  Al Iman kindergarten.

8          "2:  Al Iman school.

9          "3.  Al Iman clinic.

10         "4.  Young girls rehabilitation center.

11         "5.  Building a library which contains scientific and

12   cultural books and Islamic references.

13         "6.  Orphan sponsorship project."

14   Q.   Thank you.

15         And finally, I think as in all of these summaries there

16   is a list of future projects.  Could you read that?

17   A.   Under future projects it says, "1.  Building a modern

18   exemplary school.

19         "2.  Building a private print house.

20         "3.  Building al-Iman school, a comprehensive school

21   which cares for all the orphans."

22   Q.   And that would be, according to the document, the future

23   projects of the committee of the Islamic Science and Culture

24   Society.  Correct?

25   A.   Correct.

1   Q.   Okay.  Let's talk about the Islamic Charitable Society of

2   Hebron, page 86.  This is also -- We have heard evidence about

3   this particular organization.  Correct?

4   A.   That is correct.

5   Q.   Okay.  And there does not seem to be -- The synopsis

6   about the committee, if you could read that for the jury.

7   A.   It says, "The Islamic Charitable Society was founded in

8   1977 in Hebron with a goal to provide care to the orphans and

9   to the needy."

10  Q.   Now, that would have been, say, some ten years, would you

11  agree with me, before the founding of Hamas?

12  A.   That is correct.

13  Q.   Thank you.

14       And I am not going into the committee members, Agent

15  Burns.

16  A.   Okay.

17  Q.   Just the scope of work.  If you could please read that.

18  A.   Okay.  "1.  Orphan sponsorships."

19       "2.  Overseeing some mosques and their affiliated

20  clinics, kindergartens and a sports hall."

21  Q.   And finally, the projects overseen by the Society, if you

22  could read those five.

23  A.   "1.  Hebron House for Male Orphans established in 1962.

24  It provides complete care for 500 orphans, providing them with

25  education, health, and social care, food, shelter, and cover.

1          "2.  Hebron House for Female Orphans.  Established in

2     1983, it provides care for about 300 orphans.

3          "3.  Boys' Sharia School.  Established in 1977, and

4     provides education for 800 students, 520 of whom are orphans.

5          "Girl's Sharia School.  Established the 1987, and

6     provides education for 600 students, 300 of whom are orphans.

7          "5.  Committee's knitting shop."

8     Q.   And so three of those projects overseen by this

9     particular society were all founded clearly before Hamas, in

10    1987.  Correct?

11    A.   That is correct.

12    Q.   And then the Girls' Sharia School was established in

13    1987, and that also would have been, you agree with me, the

14    first year of the first Intifada.  Correct?

15    A.   That is correct.

16    Q.   Okay.  We have heard about the Young Men's Muslim

17    Association.  Correct?

18    A.   Yes.

19              MS. MORENO:  Page 88.

20    Q.   (BY MR. MORENO)  When was this founded, Agent Burns?

21    A.   In 1985.

22    Q.   Okay.  And registered in the occupied territories in

23    Jordan.  Correct?

24    A.   That is correct.

25    Q.   And it indicates that part of their activities are

1    opening kindergartens.  Right?

2    A.    It does.

3    Q.    A medical clinic.  Correct?

4    A.    That is what it says.

5    Q.    It also talks about opening 32 Quran memorization centers

6    in which 600 male and female students are enrolled.  Right?

7    A.    Yes, it does.

8    Q.    Providing aid to needy families, such as food and

9    clothes.  Correct?

10   A.    That is what it says.

11   Q.    And then a place for sports activities.

12   A.    Correct.

13   Q.    We have also heard about the Qalqilya zakat committee.

14   A.    Yes, we have.

15   Q.    And why don't you tell the jury when they were founded?

16   A.    The committee was established in December 18th, 1982.

17   Q.    Again, five years before Hamas.  Correct?

18   A.    That is correct.

19   Q.    If you could read the scope of work for the jury, please?

20   A.    Yes.  It says, "1.  Providing free health services to the

21   poor through Al Shifa Islamic Clinic which is affiliated with

22   the Committee.

23        "2.  Providing aid to needy families by raising and

24   distributing donations, as well as assisting poor students in

25   Islamic College of Sciences.

```
 1          "3.  Building kindergartens."

 2   Q.    Now, it talks about the city of Qalqilya.  Have you ever

 3   been to Qalqilya?

 4   A.    I have not been to Qalqilya, no.

 5   Q.    Have you been to any of the areas in the West Bank where

 6   the zakat committees are?

 7   A.    I have been to Ramallah.

 8   Q.    And did you go to the Ramallah zakat committee?

 9   A.    No.

10   Q.    We won't go into the members the projects which are

11   overseen by the committee.

12          If you could read those ten projects, please.

13   A.    "1.  Enlarging the medical center.

14          "2.  Providing mobile clinics.

15          "3.  Opening another kindergarten branch in the city.

16          "4.  Providing Eid sacrifices."

17   Q.    Let me stop you there.  Do you know what the Eid

18   sacrifices are?

19   A.    Eid is a holiday and they sacrifice animals for meat for

20   celebration on the Eid, the holiday.

21   Q.    Okay.  And No. 5?

22   A.    "Distributing milking sheep."

23   Q.    Please continue.

24   A.    "6:  Opening Al Akha Islamic library.

25          "7:  Overseeing the honey bee farm."
```

1    Q.   Let me stop you there.  Have you seen other documents in

2    connection with this case that talk about projects like honey

3    bee farms?

4    A.   I have seen other documents referencing honey bees.

5    Q.   Okay.  And have you seen -- I think the next one is "Eid

6    Jalout cow project."  Do you see that?

7    A.   I do.

8    Q.   Have you seen documents in this case talking about farms?

9    A.   I have.

10   Q.   Okay.  And No. 9 is a poultry project.  Correct?

11   A.   Correct.

12   Q.   And No. 10 is the orphans sponsorship project.

13   A.   Correct.

14   Q.   And we are going to go through the rest of these, but in

15   most if not all of these, the projects regarding orphan

16   sponsorships is generally included.  Would you agree with me?

17   A.   Generally.

18   Q.   Future projects, what are they, please?

19   A.   "1.  Building a radiology center.

20       "2.  Building a full medical clinic and a laboratory.

21       "3.  Expanding the mobile clinic project.

22       "4.  Starting a Turkey farm.

23       "5.  Opening a brick factory.

24       "6.  Opening a housing project for the needy.

25       "7.  Expanding the poultry farm."

1  Q.   And again, this is the Qalqilya zakat committee that Holy

2  Land gave money to.  Correct?

3  A.   That is correct.

4  Q.   The Islamic Charitable Society al-Bireh.  Now, I think

5  there might be some confusion.  Are there a couple of Islamic

6  charitable societies in different locations?

7  A.   Yes.

8  Q.   And what are they, first of all--the locations?

9  A.   Well, the primary Islamic Charitable Society that we have

10 discussed in this case, its headquarters offices in Hebron.

11 It has branches in places like Bani Na'im, excuse my

12 pronunciation, Dura, different areas around the Hebron area.

13 Q.   So when we refer to the Islamic Charitable Society, are

14 we just talking about Hebron?

15 A.   No, usually we are talking about villages outside of

16 Hebron.

17 Q.   So we would also be talking about al-Bireh?

18 A.   Actually al-Bireh, this is a village outside of Ramallah,

19 and I am not certain that this committee is the same.  It may

20 be affiliated.  I just don't know, because this is a different

21 area.

22 Q.   So you are not sure that this is affiliated with anything

23 in the indictment?

24 A.   That is correct.

25 Q.   So we won't go there.  But we know that Tulkarem is.

1   A.   That is correct.

2   Q.   If you could read the synopsis please, Agent Burns?

3   A.   It says, "The committee was founded in 1981 to serve the

4   public and its needs.  A women's committee is affiliated with

5   this committee to employee the female potentials within an

6   Islamic frame.  The administrative body includes ten college

7   educated sisters."

8   Q.   And the scope of work, please.

9   A.   "1.  Orphan sponsorships.

10        "2.  Productive projects.

11        "3.  Providing health services."

12  Q.   And again we are not going to get into the members of the

13  committee.

14        The projects overseen by the committee.  Now, the first

15  one says "committee's hospital."  What is that?

16  A.   In this particular case there was -- the Tulkarem zakat

17  committee had a hospital affiliated with it.  I can't recall

18  if it was the Al Makased or not.  I wouldn't want to be stuck

19  with the name because I can't recall offhand the name of the

20  hospital.

21  Q.   But this is not the al-Razi Hospital?

22  A.   No, that is Jenin zakat committee.

23  Q.   That is the Jenin zakat committee.  Correct?

24  A.   Correct.

25  Q.   Now, again, we see the projects of poultry farms and

1    honey bee farms, sewing projects.  What evidence have you seen

2    in this case about sewing projects?

3    A.   I have seen some of the HLF documents referencing sewing

4    projects, but I can't give you specifics.

5    Q.   Do you recall if the evidence you have seen that talks

6    about training persons in the West Bank to become tailors?

7    A.   It may have.  It has been a long time since I have looked

8    at it.

9    Q.   And then we see educational sponsorships.  Correct?

10   A.   Correct.

11   Q.   And then supporting dawa'a and guidance.  Correct?

12   A.   Correct.

13   Q.   And of course we know that Holy Land gave money to the

14   Tulkarem zakat committee.

15   A.   That is correct.

16   Q.   Okay.  Do you think that the Jenin zakat committee is the

17   biggest zakat committee in this case?  Would you say that?

18   A.   Well, if we are being technical as far as zakat

19   committees, yes; but as far as charitable organizations, I

20   believe that the Islamic Charitable Society of Hebron may

21   actually have a larger scope of work and larger constituency.

22   But as far as zakat committees, Jenin zakat is one of the

23   biggest.

24   Q.   And when you say a larger constituency, do you mean that

25   they serve more people?

1    A.    Larger population.

2    Q.    Larger population?

3    A.    Correct.

4    Q.    Okay.  Jenin zakat committee.  If you can see in the

5    synopsis, when was this established?

6    A.    In 1985.

7    Q.    All right.  And the scope of work again, please?

8    A.    "1.  Orphan sponsorships.

9          "2.  Medical relief campaign.

10         "3.  Productive projects."

11   Q.    And why don't you read the synopsis about the Jenin

12   region.

13   A.    "Jenin is located in a northern most part of the West

14   Bank and suffers from lack of services.  Its estimated

15   population is 120,000 people distributed to 79 villages."

16   Q.    Thank you.  And finally, what projects are overseen by

17   the Jenin zakat committee, please?

18   A.    "1.  Orphan sponsorships for 500 orphans and poor

19   families.

20         "2.  Emergency medical and food relief program for

21   villages under siege.

22         "3.  Islamic orphans house, a boarding home for 300

23   orphaned students with vocational shops.

24         "4.  Girls' rehabilitation center.

25         "5.  Productive projects such as poultry and honey bee.

1           "6.   The Islamic hospital."

2     Q.    Now, will that be the al-Razi Hospital, do you think, or

3     is it a different hospital?

4     A.    It doesn't say the al-Razi Hospital, so I suppose it

5     could be another hospital.

6     Q.    It could be?

7     A.    It could be.

8     Q.    Nablus zakat committee.  We gave money to Nablus.

9     Correct?

10    A.    The HLF did.

11    Q.    When was that founded, please, according to the document?

12    A.    In 1977.

13    Q.    It says it is registered as a charitable society in 1983.

14    Do you see that?

15    A.    I do.

16    Q.    And what does that mean when it says it is registered as

17    a charitable society?

18    A.    I am not sure what they mean in this document that they

19    were registered.

20    Q.    Now, you have seen evidence in this case about the zakat

21    committees being registered.  Correct?

22    A.    I have seen and we have talked about different types of

23    registrations, licenses, and things like that.  I don't know

24    what this is referencing.

25    Q.    And the different licenses and registrations with respect

1   to these zakat committees usually -- And we are talking about

2   zakat committees thus far that have been founded before the

3   founding of Hamas.  Correct?

4   A.    Correct.

5   Q.    And they are all in the West Bank.  Correct?

6   A.    These are, yes.

7   Q.    Yes.  And who would have been the licensing authorities?

8   A.    Well, it depends on if you are talking about a license

9   from the Endowments that we talked about yesterday, which is

10  the, you know, kind of the charitable office, or if you are

11  talking about from the Government of Israel.  That is why I

12  say I am not sure if they are talking about they got a license

13  through the Endowments or they got -- I just can't tell from

14  this.

15  Q.    And talking about Israel for a minute, there is -- I

16  think you have made some charts about the Islamic Relief

17  Agency, which is also known as the Islamic Relief Committee.

18  Correct?

19  A.    Correct.

20  Q.    They are one and the same thing.  Right?

21  A.    They are.

22  Q.    Okay.  But the Islamic Relief Agency/Committee is not a

23  count in the indictment.  Right?

24  A.    That is correct.

25  Q.    Nor is it an overt act.  Correct?

1    A.    It is not listed in an overt act.

2    Q.    In fact, the Islamic Relief Agency or Islamic Relief

3    Committee, that title is nowhere in the indictment in this

4    case.  Correct?

5    A.    I haven't read the indictment in a long time.  I know it

6    is not in a count or an overt act, but I am not sure if it is

7    in the indictment or not.

8    Q.    Will you take my word for it that it is nowhere in the

9    indictment?

10   A.    Okay.

11   Q.    Okay.  Thank you.

12        Now, Nablus, if you could read the scope of work of this

13   committee.

14   A.    "1.  Financing Al Tadhamon Islamic Clinic.

15        "2.  Dispatching philanthropy caravans to remote

16   villages.

17        "3.  Assisting poor students.

18        "4.  Sponsoring Quran memorization centers.

19        "5.  Contribution to the establishment of Sharia college

20   at Dar Al Najah's National College.

21   Q.    What is a philanthropy caravan?  Do you know?

22   A.    I don't know.

23   Q.    Skipping over the members, what are the projects overseen

24   by this particular committee?

25   A.    According to this document, it says, "1.  Orphan

1    sponsorships.

2         "2.  Poor family sponsorships.

3         "3.  Paying salaries of doctors and nurses at Al Tadhamon

4    Clinic.

5         "4.  Teachers and callers to Islam salaries.

6         "5.  Quran memorization centers.

7         "6.  Al Tadhamon Islamic Hospital."

8    Q.   Thank you.  I think I it continues to the next page?

9    A.   "7.  Assistance to Al Tadhamon Islamic Clinic.

10        "8.  Eid sacrifices.

11        "9.  Poor families, rehabilitation.

12        "10.  Ongoing charity."

13   Q.   And with respect to the future projects, please, of this

14   committee.

15   A.   "1.  Building a specialized Islamic hospital in Nablus.

16        "2.  Building an investment project for pasturized milk.

17        "3.  Building a technical institute for male orphans in

18   Nablus."

19   Q.   Thank you.

20        Hebron is in this case, the Hebron committee.  Correct?

21   A.   The Islamic Charitable Society of Hebron.

22   Q.   Ramallah.

23   A.   Yes.

24   Q.   We will just do Ramallah for now.  And when was this

25   founded, please?

A.    1977.

Q.    If you could read the synopsis, please?

A.    It says, "The committee was founded in 1977 by a group of Muslim activists who felt the need for the directed social activism and the need to provide for the thousands of needy Muslims.  The committee has a permanent headquarters in Jerusalem."

Q.    If we could drop down to the scope of work.

A.    "1.  Raising poor families' standard of living.

      "2.  Urging people to pay their zakat and then distributing it to the needy.

      "3.  Building clinics and laboratories."

Q.    The projects overseen by Ramallah, please.

A.    "1.  Providing aid to approximately 1500 needy families.

      "2.  Sponsoring 3500 Muslim orphans.

      "3.  A knitting shop for girls.

      "4.  Sponsoring needy students.

      "5.  Supporting other charitable organizations such as the blind, the deaf, and the dumb, children's, kindergartens', and mosques' committees.

      "6.  Distributing Eid sacrificed meat to the needy.

      "7.  Providing healthcare through regular and mobile clinics who reach 14 remote villages."

Q.    And the future projects?

A.    "1.  Enlarging the knitting shop.

1          "2.  Developing the health clinic to become a

2     comprehensive health clinic.

3          "3.  Building a radiology department."

4     Q.   And it talks about a knitting shop.  Did you see evidence

5     in this case about again knitting projects?

6     A.   I have seen references like these.

7     Q.   Okay.  And the last three?

8     A.   "4.  Building different specialized clinics.

9          "5.  Health insurance.

10         "6.  The Islamic hospital, which includes all

11    specializations.  Work in it has already started."

12    Q.   And have we heard evidence in this case about Halhul?

13    A.   No.

14    Q.   So all of these that we have gone over, these are all

15    zakat committees that the Holy Land Foundation worked with and

16    gave money to.  Correct?

17    A.   Correct.

18    Q.   And all of these were founded before Hamas.  Correct?

19    A.   That is correct.

20    Q.   Okay.  Let's turn to another subject, please.  Now, I

21    think yesterday you went through -- On direct you went through

22    two particular Government exhibits, HLF Search No. 184.  I

23    will show you the -- I am just going to go through one or two

24    of these.

25    A.   Okay.

```
 1    Q.    HLF Search No. 184.  Do you see that?

 2    A.    I do.

 3    Q.    Okay.  And this is the donation form of the Holy Land

 4    Foundation.  Correct?

 5    A.    Correct.

 6    Q.    Now, you have testified that you have reviewed a lot of

 7    evidence in this case.  Correct?

 8    A.    That is correct.

 9    Q.    Hundreds of boxes of materials.  Right?

10    A.    Over a number of years.

11    Q.    Thousands of summaries you have read.  Correct?

12    A.    That is correct.

13    Q.    I think at one point you said maybe even millions of

14    pages in connection with this case, or in this case.  Correct?

15    A.    There are millions of pages in this case.

16    Q.    Orphan applications.  You have seen thousands of orphan

17    applications in this case.  Correct?

18    A.    I have seen a lot of them.

19    Q.    Okay.  Now, would you agree with me that this is

20    typically what you would see in the documents in this case?

21    So you would see this donation form by the Holy Land

22    Foundation.  Right?

23    A.    I would say depending on the time period, just to be

24    correct.  The orphan sponsorship forms tended to evolve over

25    the years.  This is definitely one of the more recent ones.
```

1   Q.   This was typical of a certain class of donation forms.

2   Correct?  That you would see?

3   A.   From the later years, like 2000, 2001.

4   Q.   Okay.  And so this particular donation form has got the

5   biographical -- some of the biographical information of the

6   person who wants to contribute money.  Correct?

7   A.   Correct.

8   Q.   And how much money they are going to contribute.  And

9   here it is 100 bucks a month for six months.  Do you see that?

10  A.   I do.

11  Q.   And then you would also see -- Again, this is all in the

12  same exhibit.  Sometimes you would see the pictures.  Right?

13  A.   There was a picture attached to this one.

14  Q.   Right.  Of children or family members of the needy.

15  Correct?

16  A.   There were pictures attached to some of them.

17  Q.   Okay.  And you would also see these kinds of letters that

18  went out from these -- form letters that went out from the

19  Holy Land.  Right?  You would see these.  Correct?

20  A.   For the forms in later years.  Again, as I said, things

21  tended to evolve.  This was typical in the time period, 2001.

22  Q.   And it tells the person who is donating money, the name

23  of the recipient.

24  A.   Correct.

25  Q.   And he says he lives in an old community in Gaza and he

1    is unable to work because of the bad economic situation in his

2    country.  You see that.  Right?

3    A.    That is what this says.  I don't know if that came from

4    him or not.  It looks to be on HLF stationery in English, so I

5    don't know that it actually came from that person.

6    Q.    Okay.  And then you would see these documents in Arabic.

7    And these were translated.  Correct?

8    A.    Correct.

9    Q.    Let's go to the translation.  And this is general

10    information on the family.  Right?

11    A.    Correct.

12    Q.    Now, this is one of two orphan application exhibits that

13    you brought before the jury and you testified to yesterday.

14    Correct?

15    A.    This is one of the ones I was asked about yesterday.

16    Q.    Right.  There were two yesterday.  Correct?

17    A.    I believe there were three.

18    Q.    Okay.  We will get to the second one in a minute.

19    A.    Okay.

20    Q.    But we didn't go into the need of the family, so let's do

21    that for a minute.  All right?

22    A.    Okay.

23    Q.    And it says that this person was born in Rafah.  Right?

24    A.    It does.

25    Q.    And where is Rafah?

1    A.    Rafah is in the Gaza Strip.

2    Q.    Okay.  And then it talks about how many family members

3    there are.  Correct?

4    A.    It says number of family members, six.

5    Q.    Right.  And it talks about that the head of the household

6    was a vegetable vendor, then and experienced in commerce.

7    That is what it says.  Right?

8    A.    It does.

9    Q.    And then it says that he brings in, going down to page

10   two, if you can read that, I am not sure you can, but it says

11   that he brought in 500 shekels monthly.  Do you see that?

12   A.    I do.

13   Q.    And that he -- Assistance from relatives, it says

14   intermittent assistance from relatives of zakat of money.  You

15   see that?

16   A.    I do.

17   Q.    And then you pointed out to the jury No. 4, which was

18   assistance from a charitable party.  "Family received a check

19   for $10,000 as an assistance for a family of a martyr from

20   Iraq."  Do you see that?

21   A.    I do.

22   Q.    Okay.  Now, and then it says a total of 500 shekels is

23   equivalent to $120.  Right?

24   A.    That is what it says.

25   Q.    And that is what he claims this person makes a month.

1   Right?

2   A.    That is what it says.

3   Q.    Right.  Do you have any reason to dispute this?

4   A.    I don't know the person or their financial situation,

5   other than what is in this document.

6   Q.    Well, you told the jury -- you pointed out to the jury

7   that the family received a check for $10,000 as an assistance

8   for a family of a martyr from Iraq.  Right?

9   A.    That is correct.

10  Q.    Okay.  So is that what the document says or is that true?

11  A.    That is what the document says.

12  Q.    Okay.  So you don't even know if that is true.  Right?

13  A.    I can't say for certain that the family received $10,000.

14  I am relying on their documentation and what it says.

15  Q.    Okay.  And then it says, does it not, general evaluation,

16  "The family lives in a very narrow house which is one room."

17  Right?

18  A.    I am sorry.  I am just looking for where you are.

19  Q.    I am sorry.  I am trying here.

20  A.    Thank you.  Yes, it does.

21  Q.    "And that it enlarged the house using the money received

22  from Iraq."  To you see that?

23  A.    I do.

24  Q.    And that there are children and they still need a lot of

25  care.  Correct?

1    A.    That is what it says.

2    Q.    In reviewing these application forms, one of your

3    purposes in doing that was looking for what you call special

4    segments.  Is that fair?

5    A.    That was one of the items that we looked for.

6    Q.    Okay.  And also with respect to a lot of these forms, you

7    would also see birth and death certificates.  Correct?

8    A.    I have seen some birth certificates and death

9    certificates, yes.

10   Q.    And you would also see United Nations refugee cards in

11   this case.  Correct?

12   A.    I don't recall specifically seeing any of those in orphan

13   applications.  There may have been with some, but I don't

14   recall seeing any.

15   Q.    You never saw any you don't recall seeing any?

16   A.    As I said, I may have, but I don't recall seeing any in

17   the sponsorship applications.

18   Q.    Okay.  All right.  Let me move on to -- Now, you have

19   looked at a lot of the videos in this case.  Correct?

20   A.    That is correct.

21   Q.    And you have seen videos of Abu Muharam.  Correct?

22   A.    I have.

23   Q.    And please tell the jury who Abu Muharam is again.

24   A.    Mohammad Abu Muharam was one of the HLF's representatives

25   in Gaza in the mid 1990s to 2000, 2001.  He was not their

first Gaza representative, but he was one of their

representatives in the later years.

MS. MORENO:  Your Honor, may we briefly approach?

THE COURT:  Yes.

(The following was had outside the hearing of the

jury.)

MS. MORENO:  I didn't want to do this in front of

the jury, and I wanted to explain to the Court that I am going

to ask her to -- And I didn't alert this to the Prosecution,

although I referred to them this morning.  I don't think I

made the record that I was going to try to have her identify

Mr. Muharam in these three pictures and seek their admission,

so that is why I approached so the Government can lodge its

objections.  But I am confident she will be able to identify

him.

MR. JONAS:  Your Honor, even if she can identify

this individual, she still doesn't know anything about the

situation that the picture was taken.  She doesn't know who

took the picture or where it was taken, so we don't think a

proper foundation can be laid.

MS. MORENO:  What I can do, as I told the Court,

this particular exhibit is a photograph right out of the

video, which I wasn't going to play that part, but it precedes

the three minutes that I was going to play, and I can preview

it for the Court at some other time.

1          THE COURT:  Why don't you ask if she may recognize

2     it, and direct her to a video and see if she does recognize

3     it.

4          MS. MORENO:  And the video, Your Honor, that Your

5     Honor is allowing me to play, you hear his voice, and I am

6     sure she will say it is his voice as well.

7          THE COURT:  On this you need to lay the predicate,

8     besides it is him as far as the photographs.  That one, if she

9     can identify from the video, you have got it.  The others, you

10    just have to lay a predicate.

11         (The following was had in the presence and hearing

12         of the jury.)

13         MS. MORENO:  May I approach, Your Honor?

14         THE COURT:  Yes.

15    Q.   (BY MS. MORENO)  Agent Burns, showing you what has been

16    marked as Defense exhibits No. 698, 706 and 709, if you could

17    take a look at those, please.

18    A.   Okay.

19    Q.   Without discussing the contents, do you recognize the

20    gentleman in those three photographs?

21    A.   I recognize one of the gentlemen.

22         MS. MORENO:  Your Honor, at this time I move for

23    admission of those three exhibits.

24         MR. JONAS:  Your Honor, may I voir dire the witness?

25         THE COURT:  Yes.

1  Q.  (BY MR. JONAS)  Agent Burns, do you recognize where those

2  pictures were taken?

3  A.  No.

4  Q.  Do you know what is going on in those picture?

5  A.  No.

6  Q.  Do you recognize anything -- any other individuals in

7  those pictures?

8  A.  No.

9       MR. JONAS:  Your Honor, we object; no foundation.

10      MS. MORENO:  Your Honor --

11      THE COURT:  Do you want to ask some further

12  questions?

13  Q.  (BY MS. MORENO)  In those three photographs you see

14  persons who have a T-shirt.  Correct?

15  A.  I see individuals wearing T-shirts.  I can't make out the

16  symbols on any but Defense No. 709, and I recognize the symbol

17  on that T-shirt.

18  Q.  And what is that symbol?

19  A.  The Holy Land Foundation symbol.

20  Q.  And the other two photographs also have persons in

21  T-shirts.  Correct?

22  A.  They do.

23  Q.  With symbols?

24  A.  They do.

25  Q.  Please look at them closely.

1  A.   I am sorry.  I am trying.  They are a little farther

2  away, so they could be the same.  I just -- They could be the

3  same.

4  Q.   And you recognize the gentleman in all three of them.

5  Correct?

6  A.   Yes, I do.

7         MS. MORENO:  Your Honor, I would seek to move to

8  admit them.  I think the predicate has been laid.  She knows

9  who that person is.  I am not going to ask her about the

10  contents of what they are doing.

11         THE COURT:  You are offering them for that

12  individual?

13         MS. MORENO:  Yes.

14         THE COURT:  Mr. Jonas?

15         MR. JONAS:  We still object.  We still don't think a

16  proper foundation is laid.  It is difficult to excise out one

17  individual that she recognized from the whole picture.

18         THE COURT:  I overrule those objections.  Those are

19  admitted, No. 698, 708 and 798.

20  Q.   (BY MR. MORENO)  And who is the individual in that

21  photograph?

22  A.   The one I recognize is Mohammed Abu Muharam, the man you

23  just asked me about.

24  Q.   Thank you.  Now, I you know part of Abu Muharam's duties

25  was to go into certain homes and inquire about the need of

1   some of these families.  Correct?

2   A.    I have seen videos of him doing just that.

3   Q.    Okay.  And in inquiring about the need of some of these

4   families, sometimes they would have forms or checklists or

5   certain questions that they would ask the families.  Do you

6   agree?  You have seen that?

7   A.    Let me back up just so that I am correct on this.  I know

8   that Mr. Abu Muharam, as I said, I have seen videos of him

9   visiting families to distribute money as opposed to obtain

10  information on their need.  I don't know if he personally did

11  that.  The HLF had social workers who actually I think

12  gathered the information, so just so we are clear.

13  Q.    Okay.  But you have seen videos of Mr. Muharam actually

14  going into homes.  Correct?

15  A.    That is correct.

16  Q.    Right?

17        MS. MORENO:  Your Honor, with respect to Holy Land

18  Exhibit No. 110, the clip is ready to be played, if we may.

19        THE COURT:  Okay.

20  Q.    (BY MS. MORENO)  I am going to play a clip from the Holy

21  Land Foundation Exhibit No. 110.  Okay?

22  A.    Okay.

23  Q.    And I am going to ask you, first of all, if you -- I am

24  going to run it.  There will be nothing said.  And I am going

25  to ask you if you recognize this particular clip, and then we

1   will read the translation.  Okay?

2   A.   Okay.

3            (Whereupon HLF Search No. 110 was played, while

4            questions were propounded.)

5   Q.   (BY MS. MORENO)  Now, you have seen this clip before.

6   Correct?

7   A.   I have.

8   Q.   In fact, in another proceeding you have testified about

9   it.  Correct?

10  A.   Correct.

11  Q.   Let's read the comments of the lady on the video.  If you

12  could read up to where it says, "Woman," please.  Can you see

13  that, Agent Burns?

14  A.   I do.  So you want me to begin with the sign "A gift from

15  the Holy Land Foundation for Relief and Development supported

16  by the Arab and Islamic communities in the United States of

17  America."  And then there is a poster with a picture that

18  says, "al-Aqsa martyr, ambulance operator Bassam el-Balbisi.

19  Poster with picture star above the forehead."

20  Q.   Now, why don't you tell the jury who Bassam el-Balbisi

21  was, please.

22  A.   He was an ambulance driver who was killed in the

23  crossfire between terrorists and the Israeli army.

24  Q.   I am going to read the woman's comments, and if you could

25  read Abu Muharam's.  Okay?

1    A.    Okay.

2    Q.    "I am the wife of the martyr Bassam el-Balbisi who was

3    martyred in the Qud's battle during the intifada.  The reason

4    of his martyrdom is that he went to save the life of the child

5    Mohamed al-Dura.  When he went to save his life, his friends

6    tried to help, but he has forsaken himself.  He has sacrificed

7    his blood.  He has sacrificed everything to save the child.

8    But they, the Jews, did not have mercy for him.  They did not

9    have mercy for what is on his shoulder, the crescent, the

10   Palestinian red crescent.  Neither did they have mercy for the

11   child.  No mercy for the children.  No mercy for anything.

12   What can we say?  Praise be to God.  He died as a martyr.  It

13   is an honor for the entire country.  For us and Gaza and all

14   the Arabs, what can we do?  All his children can be forsaken

15   for the country and the people.  We thank you.  We thank the

16   Foundation that came to help us and support us, the American

17   Foundation.  Our family is made of 12 people.  The youngest is

18   one-year-old.  My mother-in-law and I, 11, 12, 13 years

19   together.  All together 13 people living in one 40 meters

20   room, as you can see.  There is no one to provide for us, and

21   we thank the Holy Land Foundation that came to help and

22   support us.  We thank them."

23   A.    "Do you need anything from the foundation."

24   Q.    And she says, "We only need to put a roof over our house.

25   We don't want anything else.  Thanks to God.  Food is plenty.

1    But you all can see our situation and the poor shape of our

2    house."

3        Now, in fact, the camera kind of panned up at one point.

4    Remember that?

5    A.    It did.

6    Q.    And there were holes in the ceiling of that particular

7    place.  Correct?

8    A.    I can't remember.  I wasn't looking to see if there were

9    holes, so.

10    Q.    Okay.  I am going to end our discussion with Baker

11    Wiretap No. 11 that was played.  This was a conversation

12    between Ghassan Elashi and Shukri Abu Baker.  Do you remember

13    that?

14    A.    I do.

15    Q.    It was on April 23rd, 1996.  Do you recall that?

16    A.    Correct.

17    Q.    Now, April 23rd, 1996, this would have been about a year

18    after Ghassan Elashi traveled to Washington, D.C. to meet with

19    the OFAC people, with the Treasury people.  Correct?

20    A.    I am not sure of that exact date of his meeting.

21    Q.    Were you here yesterday when Mr. McBrien testified?

22    A.    Not during that part.

23    Q.    Okay.  Have you ever seen -- You have seen this

24    particular exhibit InfoCom Search No. 55, this sign-in sheet.

25    Correct?

```
 1   A.   I have.

 2   Q.   You have.  Okay.  And this is a sign-in sheet of the

 3   meeting with Mr. Elashi and the Treasury official.  Correct?

 4   A.   That is correct.

 5   Q.   All right.  Taking just a few excerpts from -- Now, this

 6   conversation, it was played at the end of the day on Tuesday.

 7   Do you remember that?

 8   A.   I believe that was the day that we played it.

 9   Q.   Okay.  And then it was played -- The rest of it was

10   played the following morning.  Do you recall that?

11   A.   I do.

12   Q.   Okay.  Now, you will be Mr. Abu Baker and I will be Mr.

13   Elashi.

14   A.   Okay.

15   Q.   If you can hold on just one second here.  And it will

16   just be the highlighted portions.  Do you see that, Agent

17   Burns?

18   A.   I do, but I can't see who is speaking.  If you can move

19   it out so I don't say your part.

20   Q.   Sorry.

21   A.   That is okay.

22   Q.   Let me try.

23   A.   That is good right there.

24   Q.   Okay.

25   A.   Shukri Abu Baker says, "But meanwhile you have to abide
```

1    by the law.  You could raise your voice --"

2    Q.    "Well, I'm gonna abide by the law because I won't be able

3    to make a transfer.  I know that."

4    A.    "Yeah."

5    Q.    "But meanwhile, what I'm gonna do, I'm going to be

6    severely outspoken.  I'm going to put my neck on the whole

7    issue, because this shouldn't happen."

8          And when he says "this shouldn't happen," he is talking

9    about the new law.  Correct?

10   A.    The designation of Hamas.

11   Q.    The designation.  Right.  And -- Well, he is talking

12   about the list.  Correct?

13   A.    That is correct.

14   Q.    Right.  And he says, "I know you cannot violate the law,

15   that you cannot make a transfer."

16   A.    "Yeah."

17   Q.    "Because if you made a transfer they will consider it a

18   violation and they will throw you in jail for it."

19   A.    "Exactly."

20   Q.    "We know that."

21         And then later on he says, "I tell you something."

22   A.    Yes.

23   Q.    "If this happens, we should not leave any corner in

24   Dallas, not even in Texas, if possible in America, that we

25   don't get the message right."

1    A.    "I agree with you one hundred percent."

2    Q.    "And I will start in this town and I will not leave any

3    church, any mosque --"

4    A.    "You're right."

5    Q.    "And any corner, until I stand in it and say that this is

6    injustice.  This is the situation, this is America and this is

7    Israel, and Israel is South Africa, and this is siege on the

8    Palestinian people, and this is so and so."  And Shukri says?

9    A.    "One hundred percent."

10   Q.    Now, later do you see where later in Shukri's

11   conversation he says, "Thank God" -- He is talking again to

12   Ghassan, and he says, "Thank God you are an American."

13   A.    I see that.

14   Q.    Do you see that?  And the Government seized Mr. Elashi's

15   citizenship papers at a certain point.  Correct?

16   A.    Are you referring to his passport?

17   Q.    And his passport?

18   A.    I know that they seized his passport.

19   Q.    Well, you know that Mr. Elashi is an American citizen,

20   don't you?

21   A.    I do.

22         MS. MORENO:  If I may have a moment, Your Honor.

23   I pass the witness, Judge.

24         THE COURT:  Ms. Hollander?

25                   CROSS EXAMINATION

1    By Ms. Hollander:

2    Q.    Good morning, Agent Burns.

3    A.    Good morning.

4    Q.    I am going to be using the Government exhibits, so they

5    should show up on here without having to use the elmo.  So I

6    am going to turn it off for now.

7    A.    Okay.

8    Q.    Let's see if we can get this to work.  I want to talk to

9    you a little bit about several different subjects, so the

10   first one is you testified earlier that the Philadelphia

11   meeting was called by the Palestine Committee.  Correct?

12   A.    According to Omar Ahmad.

13   Q.    Right.  And that the Palestine Committee was a committee

14   of the Muslim Brotherhood.  Correct?

15   A.    Correct.

16   Q.    Okay.  And Mr. Elbarasse was a member of the Muslim

17   Brotherhood.

18   A.    And the Palestine Committee.

19   Q.    And the Palestine Committee.  Right?

20   A.    Yes.

21   Q.    Now, the Muslim Brotherhood is an Islamist organization.

22   Correct?

23   A.    It is.

24   Q.    I would like to look at a few documents.  The first is

25   Elbarasse Search No. 22.  And this document is dated in 1991.

1    Correct?

2    A.    Correct.

3    Q.    Okay.  You can't see that on the Arabic on there.

4    A.    Actually the date is in English on the top.

5    Q.    Great.  And this came from Mr. Elbarasse's house.

6    Correct?

7    A.    It did.

8    Q.    It looks to be handwritten.

9    A.    It does.

10   Q.    And if we go to the English now, you had this translated.

11   Correct?

12   A.    That is correct.

13   Q.    Okay.  The English is page 4.  And this document,

14   according to what it says, someone is writing to my client

15   Shukri.  Correct?  Or we assume it is Shukri Abu Baker.  It

16   says, "Dear brother Shukri."

17   A.    Correct.

18   Q.    And you assume that means Shukri Abu Baker?

19   A.    Yes.

20   Q.    And the document refers at various places, it says the

21   word "ours," for example, "All of it is ours."  Do you see

22   that?

23   A.    I do.

24   Q.    Right.  And you discussed that.  Right?

25   A.    Correct.

1    Q.    And you took the position that this referred to Hamas.

2    Correct?

3    A.    That is correct.

4    Q.    Right.  Now, the word Hamas does not appear anywhere in

5    the three pages of this document, does it?

6    A.    No, it doesn't.

7    Q.    Not anywhere?

8    A.    No.

9    Q.    But this document, which you claim was found in the home

10   -- which the document was found in the home of Mr. Elbarasse,

11   and it is your position that he was a member of the Muslim

12   Brotherhood.  Correct?

13   A.    He was.

14   Q.    And this was in 1991.  Correct?

15   A.    Correct.

16   Q.    Now, you showed us a lot of videos of people talking

17   about Hamas in 1991, didn't you?

18   A.    I did.

19   Q.    And people singing songs about Hamas in 1991.

20   A.    That is correct.

21   Q.    And documents that referred to Hamas in 1991.  Correct?

22   A.    That is correct.

23   Q.    But this document doesn't mention Hamas, does it?

24   A.    This particular one does not.

25   Q.    Okay.  Now, let's look next at InfoCom Search No. 30.  We

     1    will start with the first page in the Arabic.  This is again

     2    an Arabic document.  Correct?

     3    A.    That is correct.

     4    Q.    And this was found at InfoCom.  Correct?

     5    A.    That is correct.

     6    Q.    We know that from the --

     7    A.    Title of the exhibit.

     8    Q.    Title of the exhibit.  Thank you.  And this one, too,

     9    looks to be handwritten, doesn't it?

    10    A.    It does.

    11    Q.    And it is undated.  Correct?

    12    A.    That is correct.  I believe we looked at the content to

    13    date it around the time that the peace accord was signed.  It

    14    refers to the accords on the last page.

    15    Q.    So it is around 1993, '92, '93.  Correct?

    16    A.    Correct.

    17    Q.    About a year or maybe two after the Elbarasse No. 22 that

    18    we just looked at.

    19    A.    A couple of years.

    20    Q.    Right.  Okay.  And if we go to the first page of the

    21    English, which should be page 8, it says that it is a letter

    22    to honorable brother Abu Ibrahim.  Correct?

    23    A.    Correct.

    24    Q.    And you assume that is Mr. El-Mezain.  Correct?

    25    A.    I know that is Mohammad El-Mezain.

1    Q.    And this document describes people in various different

2    ways.  For example, if we look at page 10, it talks about some

3    people, it says "Islamist and brother."  Do you see that?

4    A.    I do.

5    Q.    And some other people it says "Islamist and

6    semi-brother."  Do you see that?

7    A.    I do.

8    Q.    And another one on -- Also on page 10, fawaz Hamad, you

9    talked about him before.  Correct?

10   A.    That is correct.

11   Q.    And we are assuming this is the Fawaz Hamad, you assume

12   this is the one that worked for Holy Land?

13   A.    It is the one that worked for Holy Land.

14   Q.    And it refers to him on page 10 right in the middle as

15   "medium or good, God willing."  Correct?

16   A.    It does.

17   Q.    All right.  And it refers to one person as a deportee and

18   a brother.  Correct?

19   A.    It does.

20   Q.    And one person is referred to as Islamic direction.

21   Correct?

22   A.    It does.

23   Q.    Now, on page 11 it refers to Fawaz Hamad as Islamist and

24   brother.  Correct?

25   A.    It does.  If we could turn it over so we could all see

1    it, page 11.

2    Q.    Page 11.  I am sorry.  Right at the top, "Islamist and

3    brother."

4    A.    That is correct.

5    Q.    And I believe -- And the Muslim Brotherhood is an

6    Islamist movement.  Correct?

7    A.    It is.

8    Q.    Now, let's look at Ashqar Search No. 5.  This document

9    which we are going to talk about has to have been written at

10   least before December 26th, 1993.  Correct?

11   A.    Absolutely.  That is when it was seized.

12   Q.    Right.  Because it was seized -- Just in order to kind of

13   get us a date.  I am trying to go in chronological order.  And

14   that is important, isn't it, to go in chronological order?

15   A.    Well, it helps to understand the story better.  We didn't

16   really go in chronological order yesterday, but it helps to

17   see the progression if you go in order.

18   Q.    Right.  And when you and Mr. Jonas were talking, you kind

19   of went back and forth, didn't you?

20   A.    Correct.

21   Q.    Now, just so we -- I think we all have talked about these

22   enough, but we know that date because that is the date the FBI

23   went into Mr. Ashqar's house and photographed these documents.

24   Correct?  And that is what is reflected on the front of this.

25   A.    That is the date that it was seized.  I think yesterday

1    when we were talking about it, the document itself does not

2    have date on it.

3    Q.   Right.  Right.  But in terms of knowing that it couldn't

4    be after that date.

5    A.   That is correct.  But I think if you look at the content,

6    and I would have to refresh my recollection as to what items

7    are in there, we were able to date it to the '88, '89 time

8    period.

9    Q.   So we are actually going a little bit backwards here.

10       Okay.  Now, let's look at the first page of the

11   translation, which is page 14.  Now, you went through this

12   document with the Prosecutor, did you not?

13   A.   Yes.

14   Q.   I don't think you read this page to the jury, did you?

15   A.   I know we looked that the page, but I don't think -- I

16   know we didn't read the entire document, so I can't recall

17   what off of this page that we read.

18   Q.   Okay.  Let's talk about this page for a minute.  The

19   writer calls this "A suggested working paper on rearranging

20   the frame of work on the inside."  Correct?

21   A.   Correct.

22   Q.   And we take that to mean the occupied territories--the

23   West Bank and Gaza.  Correct?

24   A.   Correct.

25   Q.   And he or she--I am assuming it is a man for the

1    moment--describes the contents and lists various roles

2    assigned to each party.  Correct?

3    A.   Correct.

4    Q.   Now, he first defines who the parties are going to be.

5    You see it says, "Lines of the suggested frame of work and the

6    concerned parties"?

7    A.   Yes.

8    Q.   Okay.  And if we look right in the middle there, it says

9    1, 2, 3, and what is No. 1?

10   A.   It says "Muslim Brotherhood."

11   Q.   Right.  And it describes -- It says the group

12   organization line, and the concerned party is the Muslim

13   Brotherhood.  Correct?

14   A.   Correct.

15   Q.   And then No. 2 is the resistance line and the concerned

16   party is the Islamic Resistance Movement.  Correct?

17   A.   Correct.

18   Q.   And later he explains that that is Hamas.  Correct?

19   A.   Yes.

20   Q.   Okay.  And the third is the parallel line and the

21   concerned party is the Islamic Movement in 1948.  Correct?

22   A.   That is what it says.

23   Q.   Right.  And that refers to, and he explains it later, a

24   different organization that is in the 1948 territories.

25   Correct?

```
 1    A.    It is in Israel.

 2    Q.    Right.  And I was going to get there.  You are a little

 3    ahead of me.  When he refers to the 1948 territories, he means

 4    Israel as opposed to the West Bank and Gaza.  Correct?

 5    A.    That is correct.

 6    Q.    Okay.  I just want to make sure everyone else understands

 7    what you understand.

 8    A.    Okay.

 9    Q.    Page 14, Ashqar No. 5.  I am sorry.  I didn't mean to

10    confuse you.  Okay.  Now, he defines -- The writer defines the

11    roles for the three, each party.  Correct?

12    A.    Correct.

13    Q.    Right.  And for the Muslim Brotherhood, would you read

14    for the jury what the roles of the Muslim Brotherhood are to

15    be?

16    A.    "A.  Education:  Reality, goals, means.

17          "B.  Social and charitable work:  Reality, goals, means.

18          "C.  Economic work:  Reality, goals, means.

19          "D.  Dawa, direction, and organization:  Reality, goals,

20    means.

21          "E.  Financial affairs:  Reality, goals, means.

22    Q.    Okay.  And that includes -- You said B was the charitable

23    work.  Correct?

24    A.    That is what it says.

25    Q.    Now, then he says what in this working paper Hamas is
```

1   supposed to do.  Correct?

2   A.    That is correct.

3   Q.    And that includes -- Why don't you read those.

4   A.    "A.  Legal affairs and prisons."  I am just going to skip

5   reading the reality, goals, and means.

6         "B.  Political affairs.

7         "D.  Media affairs.

8         "E.  Popular and public committees and syndicates.

9         "F.  Financial affairs."

10  Q.    And then he describes what this other organization, the

11  Islamic Movement in the 1948 territories, are going to be.

12  And we haven't really discussed that organization, have we?

13  A.    No.

14  Q.    Okay.  So let's -- Now, he then -- If you turn to page

15  15, what you see is he is going through, and again toward the

16  bottom it says right here, "As for the issue of the group,

17  Hamas, the Movement in the '48."  So he is talking about three

18  different organizations there.  Right?

19  A.    He says and the positive action.

20  Q.    "And the positive action."  Right.  We didn't talk about

21  that one, but I am trying to kind of focus on the group and

22  Hamas here, and the Movement and the '48.  So he defines these

23  four things.  Correct?

24  A.    Correct.

25  Q.    And then you can just flip to page 16, he doesn't say

very much, and then we go to 17 and here he is going to go

into detail about what each group is going to do.  So now he

comes back and says, kind of repeating the group movement

line, that is the brotherhood; the resistance line, Hamas; and

then the parallel line, the Islamic Movement inside the '48;

and then the positive work, the specialized apparatus.  Right?

A.    Correct.

Q.    And then you will see --

MS. HOLLANDER:  If we could highlight from here, the

group movement to the bottom there.

Q.    (BY MS. HOLLANDER)  Now he, is going into detail about

what the Muslim Brotherhood part will do.  Correct?

A.    That is what it says.

Q.    Right.  And he says, "The following departments are under

it."  Do you see that?

A.    I do.

Q.    And the first one he talks about there is education.

Correct?

A.    Correct.

Q.    And I am not going to ask you to read all of that, but

the rest of that page is about education.  It talks about

universities.  Correct?

A.    It talks about -- kind of analyzes who has got control

over which institution and who is in control of the leadership

and how that is a problem.

1    Q.    Right.  But he is talking about universities and

2    education in general.

3    A.    That is correct.  That is the topic.

4    Q.    Right.  Okay.  And then page 18 is a little more about

5    universities.  Right?

6    A.    Correct.

7    Q.    Lists two organizations.

8          Page 19 he talks again about universities and who

9    controls which ones.  Right?

10   A.    Correct.

11   Q.    And the goals for the Muslim Brotherhood in regard to the

12   universities.

13   A.    It says, "Our goals in this field," and in this instance

14   in this context there is really no distinction between the

15   Brotherhood and Hamas.

16   Q.    Wait a minute.  Let's go back a minute.  Let's go back to

17   page 17.  And you see where the No. 1 is and it says, "the

18   group movement, the Muslim Brotherhood."

19   A.    I do.

20   Q.    Okay.  Now let's just for a minute skip forward to page

21   25.  We are going to go back, but page 25.  And you see about

22   in the middle of that page it says No. 2, "The resistance

23   line, Hamas."  Right?

24   A.    I see that.

25   Q.    Okay.  And that is where he starts talking about Hamas,

1    because he is writing a paper and it is going in an order.  Do

2    you see that?

3    A.    I do.

4    Q.    Okay.  Now let's go back to where he is still talking

5    about the Muslim Brotherhood to page 20.  And what I would

6    like you to do is, it says --

7              MS. HOLLANDER:  If you will highlight there, Mr.

8    Lewis, the first two.

9    Q.    (BY MS. HOLLANDER)  And would you read those two

10   paragraphs, please?

11   A.    "This work" --

12   Q.    Start at the top, "The social and charitable work."

13   A.    "Social and charitable work.  This work is considered the

14   Movement's pulse among the masses and its banner in solving

15   their problems and alleviating their worries, as the enemy

16   does not provide even the least minimum of services, and many

17   of the families list live in abject poverty due to the absence

18   of a dependable provider.  Also collective punishment policies

19   which are practiced in a barbaric and savage manner through

20   home demolitions, home bombing, and closure of parts of them,

21   dismissal from work, or prevention from leaving a village or a

22   camp, then the cases of tree-cutting, forfeiture of land, or

23   prevention from travel, all of that represent a heavy burden

24   if you add to it the detention of thousands of men and youths

25   along with thousands of victims and wounded who are in need of

1   food, medicine, or health and social care, not to mention the

2   martyrs, their families, and children."

3       "There are also the sanctuaries which are in need of

4   repair, the public needs clinics and hospitals.  Due to the

5   enemy's policies of expelling people, pressuring them

6   economically and militarily, and putting them in a state of

7   continuous worry and anxiety, this puts a mandate on the

8   Movement to mobilize, to alleviate the anxiety, and to find

9   work opportunities, and this cannot be done except through the

10  building the organizations which work in this field or assist

11  in developing it.  There are many societies and committees

12  which operate in that field, but they are not sufficiently

13  effective."

14  Q.   Thank you.

15      And the last thing it says there, before we get into the

16  committees, is "Here are some details."  Correct?

17  A.   Correct.

18  Q.   And then it starts on the committees, and that is the

19  part that Mr. Jonas had you read.  Correct?

20  A.   I believe we read some of the top part, too; but yes, we

21  focused on the committees.

22  Q.   Right.  And if you look at page 22, and we haven't come

23  to page 25 which I talked about a minute ago, but if we look

24  at page 22, they now talk about "Our goals in that field."  Do

25  you see that?

```
1   A.    I do.

2   Q.    And No. 6 particularly says, "Bringing the brothers into

3   organizational work and dealing with people."  Do you see

4   that?

5   A.    I do.

6   Q.    And then just so we don't skip any, page 23 talks about

7   their goals in the economic field.  And then if you go down to

8   No. 4, it says, "Dawa guidance and organization."  Do you see

9   that?

10  A.    I do.

11  Q.    And then look at No. 1 under that.  It has "the group" in

12  capital letters.  Do you see that?

13  A.    I do.

14  Q.    And No. 4, where it talks about al-Aqsa and the Islamic

15  endowment, it also says, "This department is considered the

16  group's true frame of work."  Do you see that?

17  A.    I do.

18  Q.    So they are still referring to the group.  And if you

19  will go back to page 14 just for a minute, do you see where at

20  the top it said, "The group organization line," and that

21  referred to the Muslim Brotherhood.  Do you see that?

22  A.    The group is the term they used to refer to the Muslim

23  Brotherhood.

24  Q.    And that is what they are referring to here.  Right?

25  A.    That is correct.
```

1   Q.   Okay.  And now, going to page 24, finishes that out.

2        And then we come to page 25.  And if you look at

3   financial affairs, it specifically says, "Finances of the

4   group is considered separate from Hamas finances or any other

5   apparatus."  Do you see that?

6   A.   I see it.

7   Q.   And then it goes to No. 2 and starts talking about Hamas.

8   Right?

9   A.   That is correct.

10  Q.   Do you see that?  And then it refers to the same things

11  that he referred to in the outline at the beginning.  In other

12  words, it says, "legal affairs and prisons."  Correct?

13  A.   It does.

14  Q.   Right.  And goes on from there.

15       And then later in the document he talks about the Islamic

16  Movement in the '48 and the apparatus.  Correct?

17  A.   The positive.

18  Q.   The positive.  Correct.

19       Okay.  Now, I would like you to look at HLF Search

20  No. 108.  This was a magazine, and the Government introduced a

21  portion of this primarily I think to discuss an article about

22  Sheikh Yassin.  Correct?

23  A.   I believe that is correct.

24  Q.   Do you remember that?

25            MS. HOLLANDER:  Let's go to page -- It doesn't have

1   page numbers here, but it would be the sixth page.  Well, your

2   pages are different from mine.  It is an article, and it says,

3   "Ahmed Yassin, a leader in limbo," if we can find it.  There

4   you go.

5   Q.   (BY MS. HOLLANDER)  Okay.  So that is the article I just

6   wanted to reference.  Do you recall this article?

7   A.   I do.

8        MS. HOLLANDER:  Okay.  And according to mine, what I

9   am looking for is on page 13.  If you go through this article,

10  I think that is the page.  Yes.

11  Q.   (BY MS. HOLLANDER)  This is part of this same article.

12  Right?

13  A.   It is.

14       MS. HOLLANDER:  And if you just highlight this first

15  sentence that starts with the word "given," Mr. Lewis.  It is

16  down at the bottom.  There you go.

17  Q.   (BY MS. HOLLANDER)  Now, that sentence in that article,

18  that was an article about Sheikh Yassin and how he started.

19  He was in the Muslim Brotherhood and then he founded Hamas.

20  Correct?

21  A.   Yes.

22  Q.   I mean, that is primarily what the article was about.

23  A.   The article is about him and his founding of Hamas.

24  Q.   Right.  Okay.  And the article says, "Given that all the

25  founders" -- Now we are talking about Hamas here."  Right?

```
 1   A.    Correct.

 2   Q.    "...were brethren" -- And we are talking about Muslim

 3   Brotherhood.  Correct?

 4   A.    Correct.

 5   Q.    "Given that all the founders were brethren, Hamas'

 6   structure borrows heavily from the Movement."  Do you see

 7   that?

 8   A.    I do.

 9   Q.    So the Movement there refers to the Muslim Brotherhood,

10   doesn't it?

11   A.    It does in this context.

12   Q.    Thank you.  So you have to know the context to know what

13   Movement means, don't you?

14   A.    Well, generally it is very easy to tell from the context.

15   Q.    Thank you.

16         MS. HOLLANDER:  I am going to move to another area,

17   Your Honor.  Do you want me to keep going?

18         THE COURT:  We will take the break.  Let's take the

19   morning break.  Be back at 11:00.

20         (Whereupon, the jury left the courtroom.)

21         THE COURT:  We will be in recess until 11:00.

22              (Brief Recess.)

23         THE COURT:  Ms. Hollander?

24         MS. HOLLANDER:  Thank you, Your Honor.

25   Q.    (BY MS. HOLLANDER)  We are going to turn to a different
```

1    topic, as I said.  And I want to talk to you briefly about the

2    chart you compiled that showed donations from the Holy Land to

3    the Islamic Society in Gaza.

4    A.   Okay.

5    Q.   Now, of course, the indictment doesn't charge any of

6    these men with giving money to the Islamic Society, does it?

7    A.   It does not.

8    Q.   But you spent quite a bit of time on this.  I want to

9    spend a little bit of time on it and just ask you a few

10   questions.

11        First, I would like to turn to the exhibit Payments to

12   Islamic Society/Islamic Association of Gaza and look at the

13   last page of that exhibit.  It is a three-page payment

14   exhibit.

15   A.   Okay.

16   Q.   Okay.  If we can look at page three.  Now, the first

17   entry on that page is August 26th, 1999.  Do you have the

18   right one?

19   A.   That is correct.

20   Q.   Okay.  Great.  And the total amount indicates $30,000 was

21   donated.  Correct?

22   A.   Correct.

23   Q.   And that amount was sent to the HLF office in Gaza.

24   Correct?  It says destination payment to --

25   A.   It looks like it when to the HLF Gaza Arab Land Bank

1   according to the schedule.

2   Q.   And it refers you to Holy Land Search No. 43, page 8.

3   Correct?

4   A.   Correct.

5   Q.   Okay.  Now, if we -- We have to go back and forth a

6   little bit.

7              MS. HOLLANDER:  If we can go to HLF Search No. 43 at

8   page 8.

9   Q.   (BY MS. HOLLANDER)  And that is the back-up that shows

10  $30,000.  Correct?

11  A.   Correct.

12  Q.   From the Holy Land office in Dallas to the Holy Land

13  office in Gaza.  Correct?

14  A.   Correct.

15  Q.   And it says at the very top "referenced backpack."

16  A.   It does.

17  Q.   And these were one of the backpack programs.  Correct?

18  A.   According to this.

19  Q.   You actually saw photographs of the backpacks, too,

20  didn't you?

21  A.   I have seen photographs of backpacks, but the photographs

22  that I saw I don't recall any dates, so I have no idea if they

23  relate to this specific document or not.

24  Q.   I am not asking if they relate to this specific one, but

25  you have seen photographs of the backpacks.

1    A.    Yes.

2    Q.    And you have seen photographs actually of the supplies

3    that go in backpacks for the various backpack projects that

4    were lined up in the offices of Holy Land.

5    A.    I have.

6    Q.    You recall seeing the school supplies and things.

7    A.    I do.

8    Q.    Okay.  Some of the photographs didn't have specific dates

9    on them is what you are saying.

10   A.    That is correct.

11   Q.    Right.  And there were backpack programs in -- various

12   backpack programs.  Correct?  Not just one.

13   A.    I have seen documentation indicating multiple backpack

14   programs.

15   Q.    Okay.  Now, you have a footnote to that --

16          MS. HOLLANDER:  If we go back to the payments to

17   Islamic Society to page 3.

18   Q.    (BY MS. HOLLANDER)  There is a footnote there by that

19   $30,000.  Do you see that?

20   A.    I do.

21   Q.    And it says, "This money was not distributed directly to

22   the Islamic Society of Gaza."

23   A.    Yes.

24   Q.    In fact, actually there wasn't money distributed to the

25   Islamic Society of Gaza on that occasion.  Correct?

1   A.   I can't recall this transaction offhand.  I would need to

2   look at the actual paperwork underlying it to make sure.  I

3   don't know if they gave them the supplies or if they actually

4   gave them the money.  I would have to look at the paperwork.

5            MS. HOLLANDER:  Let's look back at HLF Search No. 43

6   at page 10.

7   Q.   (BY MS. HOLLANDER)  And that is a thank you letter from

8   the Islamic Society.  Correct?

9   A.   Correct.

10  Q.   And it says, "The social committee at the Islamic Society

11  in Gaza provinces has the pleasure of expressing its deep

12  gratitude and its thanks to your excellency for the school

13  backpack" -- but we have to assume there is more than one.

14  Correct?

15  A.   Correct.

16  Q.   "...that you provided to the committee."  So it appears

17  what was provided were backpacks, according to this.  Correct?

18  A.   Again, I can't tell from this.  I would need to look at

19  all the records to see if the backpacks were provided or the

20  money for the backpacks.  I can't tell from this letter if

21  they are thanking them for money for the backpacks or the

22  backpacks.  There may be other records indicating specifically

23  that, but I can't recall without looking at those materials.

24  Q.   Okay.  But according to this document, it would be

25  backpacks.  Correct?  The document that you have here that you

1    reference, HLF Search No. 43, page 8 to 10, that is your

2    reference, and it says backpacks.  Correct?

3    A.    Correct.

4    Q.    Now, if we look at the last entry, if we can go back

5    again to the Payments to the Islamic Society, and we look at

6    that, the total amount is $219,126.  Correct?

7    A.    Yes.

8    Q.    That is the last amount, the last reference there.  And

9    the underlying documents show that that amount was sent to the

10    Holy Land's office in Gaza.  Correct?

11    A.    I believe it was the Holy Land's office in Gaza.  I know

12    it was to their bank account in the Cairo Amman bank.

13    Q.    Okay.  And all the bank records referenced in your chart

14    for that day confirmed that it was sent to Holy Land Gaza.

15    That is what all those references would mean.  Correct?  That

16    is why you have those.

17    A.    Yes, at least the domestic bank records.  I can't recall

18    specifically what the foreign records show, but the domestic

19    bank records show that the wire transfer went from the HLF

20    here to the destination, the HLF's account over there.

21            MS. HOLLANDER:  If we look at -- If we go back to

22    HLF Search No. 43 at page 14.

23    Q.    (BY MS. HOLLANDER)  Under community development you see

24    in the middle there, and then you see education?

25    A.    Yes.

1    Q.    $75,000 went to the backpack project for Gaza and the

2    West Bank.  Correct?

3    A.    Correct.

4    Q.    And that was for the West Bank and Gaza is what it says.

5    Right?

6    A.    That is what it says.

7    Q.    Right.  But if you go back to your summary, Payments the

8    Islamic Society, you have if we go back to the third page of

9    the payments, you have the $75,000 all going to the Islamic

10   Society.  Correct?

11   A.    That is what is on here.

12   Q.    And that is -- You created this.  Right?

13   A.    I and a team of people, so I don't remember any of these

14   transactions offhand.  I would need to look at the underlying

15   records to help explain them.

16   Q.    Right.  And we just looked at these underlying records.

17   That is the one that you referenced there.

18   A.    Right.

19   Q.    And it says that $75,000 went to the back to school

20   project for Gaza and the West Bank.  Correct?

21   A.    That is correct.  We haven't looked at the HLF foreign

22   account records.  I can't recall what they show.

23   Q.    Well, if you look at HLF Search No. 43 at 13, which is

24   one of the others that you reference, you see at the bottom

25   there it talks -- It has what was originally a stamp, and it

1  says the Islamic Society.  Do you see that?

2  A.    I do.

3  Q.    And it lists 15 backpacks or 15 names of children.

4  Correct?

5  A.    It does.

6  Q.    And at the top it says this is the list of beneficiary

7  families from the school backpack project.  Correct?

8  A.    It says list of beneficiary families.  Correct.

9  Q.    So that document which you have included as your back-up

10  would seem to suggest that part of the school backpack

11  project, 15 backpacks, went to the Islamic Society.  Correct?

12  A.    Correct.

13  Q.    Now, let's look at the second to last entry in the last

14  page of your summary, Payments to Islamic Society.  And that

15  is dated July 7th, 2001, the second to last one.  Do you see

16  that?

17  A.    I do.

18  Q.    And it says that Holy Land Gaza paid $3,000 to the

19  Islamic Society.  Correct?

20  A.    Correct.

21  Q.    And in support of that you direct -- The chart actually

22  directs the jury, and the purpose of this was to know which

23  were the correct underlying documents.  Correct?

24  A.    Correct.

25  Q.    And that directs the jury to Holy Land Foreign Account

1  No. 4.  Correct?

2  A.    It does.

3  Q.    At page 132 and 133.

4  A.    Correct.

5  Q.    All right.

6        MS. HOLLANDER:  Now, if we can pull that up, and go

7  to the next page.

8  Q.  (BY MS. HOLLANDER)  And this is -- Is there anything on

9  there that refers to this $3,000?

10 A.    Well, this is the document showing who the signatories

11 are on the HLF's bank account at the Cairo Amman Bank.

12 Q.    Right.  But there is nothing --

13       MS. HOLLANDER:  And go to the next page, then.  And

14 that is --

15 Q.  (BY MS. HOLLANDER)  Correct.

16 A.    Mine says page two at the bottom.

17 Q.    Well, mine say page 132 and 133.

18 A.    Okay.  Now, this page now says 132.

19 Q.    There we are.

20 A.    Okay.

21 Q.    These are big documents.  Sometimes it is hard to find

22 them, isn't it?

23 A.    Yes.  And the translations I think originally were behind

24 all of the Arabic, and then they put them back to back.

25 Q.    Now we have found the right page.

1    A.    Okay.

2    Q.    Okay.  So do you see anything on there that refers to

3    this $3,000?

4    A.    No.  Can we go to the next page that was referenced just

5    to let me look?

6    Q.    Sure.  There is nothing on that page either, is there?

7    A.    There isn't.  There is maybe a typo on the schedule,

8    which wouldn't be the first.

9    Q.    So this isn't accurate is all we know.  This isn't the

10   right place to support that.  Right?

11   A.    Apparently there is a typo on either the page number, or

12   it could be -- there were several HLF foreign accounts, so,

13   maybe there was a typo on the foreign account.

14   Q.    Okay.  So --

15   A.    And I say that based on looking at this right here.  I

16   mean, you know, obviously I haven't looked at it.

17   Q.    But based on this, this wouldn't be accurate.  Correct?

18   A.    That is correct.

19   Q.    Okay.  Now, I want to go back to the Payments to Islamic

20   Society just for a moment back to that page.  And you see

21   where you have the source payment from?  Sometimes in some of

22   these that is the Holy Land Foundation in Richardson, and

23   sometimes it is the Holy Land Foundation in Gaza.  Correct?

24   A.    Correct.

25   Q.    Okay.  For example, on that page we have one of each,

1  don't we?  We have the Holy Land Foundation, Bank One, and

2  then we have the second one Holy Land Foundation, the Cairo

3  Amman Bank.  Correct?

4  A.   Correct.

5  Q.   Okay.  So one of those means the source was in Dallas or

6  Richardson and one was the source was in Gaza.  Correct?

7  A.   Correct.

8  Q.   Okay.  Now, I want to ask you very briefly about some

9  payments to al-Salah Association.  And that one is not named

10  in the indictment either, is it?

11  A.   No, it is not.

12  Q.   So we will only discuss that very briefly.

13        MS. HOLLANDER:  And if you can turn to Payments to

14  al-Salah Association.  And the last page, the second page.

15  Q.   (BY MS. HOLLANDER)  Now, this is -- The last entry on

16  your summary chart, this is the only transaction made after

17  Hamas was designated here.  Correct?

18  A.   That we were able to identify through the bank records.

19  Q.   Right.  And that is $1,722.  Correct?

20  A.   Correct.

21  Q.   Okay.  Now, the total amount indicates that HLF paid

22  $54,725 for the total amount of payments.  Correct?

23  A.   That would have been the wire over.  It would have been

24  the total for the wire over.

25  Q.   Right.  And that amount was sent to the HLF office in

1    Gaza.  Correct?

2    A.    Correct.

3    Q.    And in the column marked "amount to al-Salah," you have

4    indicated that the $1,722 was sent to them.  Correct?

5    A.    Correct.

6    Q.    And support for that is Holy Land Foundation and bank

7    records.  Correct?

8    A.    Correct.

9    Q.    Now, if you look at the underlying documents that you

10   have listed, the only evidence to support the assertion that

11   the Holy Land foundation sent $1,722 to al-Salah in March of

12   1999 are the Holy Land records themselves.  Correct?

13   A.    Again, I don't have these transactions memorized, but I

14   believe in this instance there were foreign bank records which

15   showed the actual transfer of the money, because I know when

16   we had thank you letters and things like that, if we couldn't

17   link them to a specific payment we couldn't put it on the

18   chart.  So before I answer that question I would like to look

19   at the HLF foreign account records to see if in fact there was

20   a payment.

21            MS. HOLLANDER:  Let's look at HLF Foreign Account

22   No. 2, page 32 to 34.

23   Q.    (BY MS. HOLLANDER)  I don't know if you can read that.

24   A.    This is like the statements.  It is not going to show the

25   names of the recipients.

1  Q.   Okay.  We are looking for -- Are these the right pages?

2  A.   I have no idea.

3  Q.   HLF foreign bank Account No. 2 pages 32 to 34.  Here is

4  page 33.  And this doesn't show anything specifically to

5  al-Salah, does it?

6  A.   No, it doesn't.  If we could look at the next page just

7  in case.

8  Q.   Sure.  And that one doesn't either, does it?

9  A.   It doesn't.  But I think I recall seeing the item.  So

10  again, it may be that --

11  Q.   I am not saying it wasn't sent.  All I am asking you is

12  that the information came from the Holy Land documents.  There

13  is nothing on these three pages that would alert you to where

14  that went.  Correct?

15  A.   That is correct.

16  Q.   That is all I am saying.  I am not saying it didn't

17  happen.  I am saying that you got the information from the HLF

18  bank accounts and the HLF search information.

19  A.   Correct.

20  Q.   Okay.  Now, if we go back to Payments to al-Salah, there

21  is -- The last page, there is a footnote there again.  Do you

22  see that?

23  A.   I do.

24  Q.   Footnote No. 3, and that is referenced in this last

25  transaction again.  Right?

1    A.    Yes.

2    Q.    And it says, "The transaction is distributed to the

3    target organization," and that means al-Salah Association.

4    Correct?

5    A.    It does.

6    Q.    That is the target.  "By means of a wire sent to the bank

7    account of another party."  Do you see that?

8    A.    I do.

9    Q.    Now, the other party is the Holy Land Foundation in Gaza,

10   isn't it?

11   A.    I presume from this.  But again, it has been a long time

12   so I can't recall specifically.

13   Q.    Well, I mean --

14   A.    I know it went through the HLF bank account, so I am

15   assuming that is what is meant by that.

16   Q.    In every other schedule you created you treat the HLF

17   Gaza office the same as the Dallas office as part of the

18   source.

19   A.    Yes.  The HLF Gaza office is part of the HLF.

20   Q.    So this one, al-Salah, which was designated as a

21   terrorist in 2007, is the only one where you described the

22   Holy Land Gaza office as another party, as another party than

23   the Holy Land Gaza office?

24   A.    I didn't put that comment there, so I am not sure what

25   that is referencing, so I would wouldn't want to speculate

1    that they were referring to another party as the HLF Gaza

2    without talking to the person who actually put the comment on

3    there.

4    Q.    You are not aware of any other party other than HLF Gaza

5    from your records, you are?

6    A.    It could have been that the payment went through an

7    individual being the other party, meaning to al-Kurd or some

8    other leader.  I don't recall this transaction specifically,

9    so I would want to look at the records before I would tell you

10   under oath what is meant by another party as the HLF's Gaza

11   office.

12   Q.    You didn't reference any other individual on this

13   schedule, did you?

14   A.    There is no other individual referenced.

15   Q.    I want to move to another subject.

16   A.    Okay.

17          MS. HOLLANDER:  If you could pull up, please,

18   Government's Philly Meeting No. 12, at page 14.

19   Q.    (BY MS. HOLLANDER)  You discussed a statement in your

20   direct examination from this --

21          MS. HOLLANDER:  Go back to the first page.

22   Q.    (BY MS. HOLLANDER)  And it was a statement made by AK.

23   And who is that?

24   A.    Akram Kharoubi.

25   Q.    Okay.

1          MS. HOLLANDER:  And now go to page 14, please.

2          THE WITNESS:  I believe this is the excerpt.  That

3    is why there is no 14.  If you go to Philly meeting No. 12,

4    you will probably find a page 14.

5    Q.   (BY MS. HOLLANDER)  Okay.  Now, you see -- You read this

6    paragraph that Akram stated.  Correct?

7    A.   Correct.

8    Q.   And that was regarding avoiding politics for charitable

9    work, supporting the families of prisoners and martyrs.  Do

10   you remember that?

11   A.   Yes.

12   Q.   Now, you didn't read to the jury what he said right after

13   that on the same page, did you?

14   A.   I don't believe we read that far.

15   Q.   No.  So let's go down after the paragraph that you read,

16   go down and read the rest of what he says.

17   A.   Do you want me to begin with "unknown male"?

18   Q.   You can begin with "unknown male."

19   A.   Okay.  "Register them in the name of some people who are

20   out of the country?"

21          "No, if you, for instance, register them in the names of

22   some people inside and outside, it is possible that -- I don't

23   know."

24          "He is just telling you --"

25          "What?"

1      "Legally, are those who are absent allowed that?"

2      Akram says, "It is possible now.  I mean, getting

3   acclimated to -- trying to protect the organizations using any

4   possible legal means."

5   Q.   And you didn't read that part about his saying "any

6   possible legal means," did you?

7   A.   No.

8   Q.   Now, you also discussed two videos, HLF Search No. 72 and

9   HLF Search No. 73.  And HLF Search No. 72 had a gentleman and

10  a young boy singing.  Do you recall?

11  A.   Yes.

12  Q.   And HLF Search No. 73 showed some other people singing,

13  and it had Munzer Taleb in it.  You identified him.

14  A.   Yes.

15  Q.   Right.  And Kifah Mustapha?

16  A.   Yes.

17  Q.   Now, HLF Search No. 72, in fact, and I don't believe you

18  said this, it came from Chicago.  Correct?

19  A.   It may have.  I am not sure which HLF office it came

20  from.

21  Q.   But it includes the Chicago representative Kifah Mustapha

22  in it.  Correct?

23  A.   If that is the one with the little boy singing, then yes,

24  Kifah Mustapha was on that tape.

25  Q.   And No. 73, you know that that was seized from Chicago,

1   don't you?

2   A.   I can't recall again which office.  It may have been.  As

3   I recall, at the beginning of the tape something indicated

4   that that event took place in Chicago, so it would stand to

5   reason that it came from the HLF Chicago office.

6   Q.   And if you previously testified that it was seized from

7   the Holy Land Foundation in Chicago, that would be correct.

8   A.   That would be correct.

9   Q.   And it was Celebration of Solidarity Society, the Youth

10  of Chicago.  Correct?

11  A.   That sounds familiar.

12  Q.   And it had Kifah Mustapha in it.  Correct?

13  A.   I don't recall seeing him yesterday, but if we looked at

14  more of it before and he was there, then I would agree that he

15  was.

16  Q.   Now, these tapes didn't have Shukri in them, did they?

17  A.   No, they didn't.

18  Q.   In fact, you have shown the jury several videotapes

19  throughout the course of this case and your testimony.

20  Correct?

21  A.   I have been asked about several videotapes.

22  Q.   Right.  And you have watched them, instead of showed

23  them.

24  A.   Yes.

25  Q.   You are correct.  You watched them with us.  In fact,

1    Holy Land had many, many boxes of videos, didn't they?

2    A.   They did.

3    Q.   And there were a lot of boxes of videos of the projects

4    that they did.  Correct?

5    A.   There were videos of their projects.  I can't recall how

6    many.

7    Q.   And there were projects -- There were videos that they

8    made showing why the charity was necessary in the various

9    places they went, showing individuals and the need, too.

10   Correct?

11   A.   I have seen videos where Holy Land Foundation

12   representatives talked about the need, if that is what you are

13   asking, but I don't recall specific videotapes or where they

14   were taken or what they depicted.

15   Q.   You have seen videotapes of people in tents, haven't you?

16   A.   Yes.

17   Q.   And you have seen -- And there were also many

18   photographs.  Correct?

19   A.   There were.

20   Q.   And there were photographs of people in tents.  Right?

21   A.   There were.

22   Q.   And people who were receiving the necessities after they

23   had demolished homes projects.  Correct?

24   A.   Well, you can't tell from a picture -- I mean, the

25   picture is what it is, so I can't determine what they are

1  receiving their aid as a result of.

2  Q.   Well, you saw pictures of people receiving refrigerators

3  and gas generators and mattresses.  Correct?

4  A.   I don't recall mattresses.  I saw people receiving items.

5  If you have specific ones you want to show me, but I can't

6  recall gas generators.  I don't know if I would know what that

7  looked like.

8  Q.   But you know that Holy Land had demolished homes

9  projects, too.  Correct?

10  A.   I know that they did.

11  Q.   Right.  And that means to help people whose homes had

12  been demolished.  Correct?

13  A.   I think there were different types of demolished homes

14  aid.

15  Q.   And all of the millions of documents in this case were

16  scanned.  You all scanned them into a database.  Correct?

17  A.   That is correct.

18  Q.   And you had a translator who would help you translate any

19  of them that you needed translated.  Correct?

20  A.   We had translators to help us.

21  Q.   And you have had all of these documents since 2002.

22  Right?

23  A.   Yes.

24  Q.   And you have personally looked at many of these videos,

25  haven't you?

1    A.    I have.  I have looked at summaries of a majority of

2    them, and then I have looked at -- actually viewed certain

3    tapes.  But very early on I realized it didn't do me very much

4    good to watch tapes in Arabic because I had no idea what was

5    going on, so most of them were filtered through the

6    translators and summaries were provided.

7    Q.    And you also looked at a lot of photographs?

8    A.    Yes, I have looked at a lot of photographs.

9    Q.    You also discussed -- I am changing the subject again.

10   A.    Okay.

11   Q.    You also discussed martyrs and prisoners whose families

12   Holy Land assisted.  Correct?

13   A.    Yes.

14   Q.    What is your definition of a martyr?

15   A.    My personal definition or the definition in the context

16   of this case?

17   Q.    The definition you are applying when you refer to people

18   being martyrs.

19   A.    Well, I am using -- In this case the people that we have

20   referred to as martyrs are people that the Defendants

21   themselves refer to as martyrs.  I can give you examples.  One

22   of the martyrs that they referred to was Yehia Ayyash, the

23   bombmaker who was killed.  Another one of the martyrs that

24   they referred to, as we saw the other day, was the martyr and

25   actually the father referred to him as that the martyr Yasser

1    Hassanat who was a military person.

2        We have also seen the Defendants use the term martyr in

3    the context of the Ibrahimi mosque victims, innocent people

4    who were killed as a result of the massacre by Baruch

5    Goldstein.

6        So I don't use the term martyr in my personal sense.

7    When we are talking about martyrs in this context, we are

8    referring to terminology that the HLF and these people that we

9    have been discussing have used it.

10   Q.   And when you discussed prisoners, do you include those in

11   administrative detention in Israel?

12   A.   Yes.

13   Q.   Now, you know that under Israeli law people can be

14   detained without any charges, don't you?

15   A.   I do.

16            MR. JONAS:  I object, Your Honor; relevance.

17            THE COURT:  Sustained.

18   Q.   (BY MS. HOLLANDER)  Well, you -- Let me refer you to

19   InfoCom No. 45 at page 21.  Now, InfoCom No. 45 was a large

20   document, wasn't it?

21   A.   It was.

22   Q.   And that included information that you translated about a

23   number of people who Holy Land assisted.  Some of them Holy

24   Land assisted.  Correct?

25   A.   Correct.

```
1   Q.   And these were some of the people identified by the
2   international Red Cross.
3   A.   As detainees.
4   Q.   As detainees.  Right?
5   A.   Correct.
6   Q.   So when we are talking about detention, for example, this
7   person was one who Mohammed Salman Mohammad Baroud, this is
8   one of the documents you had.  Correct?
9   A.   Correct.
10  Q.   And this document says that the Gaza Strip civil
11  Administration -- Now, this is dated 1991.  Correct?
12  A.   Correct.
13  Q.   So that would be Israel.  Correct?
14  A.   The Civil Administration would be an Israeli office.
15  Q.   An Israeli office?
16  A.   Correct.
17  Q.   And it says "Government Apparatus person in charge."
18  Correct?  Is the translation?
19  A.   Yes, it does.
20  Q.   So that must be the person who is writing the letter.
21  Correct?  Or writing the memo?
22  A.   It is signed "Supervisor of Apparatus."
23  Q.   And this tells Mr. Baroud that, "I advise you of my
24  decision to fire you from the service starting 12/24/90 which
25  is the day of your detention."  Correct?
```

1    A.    Correct.

2    Q.    And it says it is due to security reasons.  Correct?

3    A.    Correct.

4    Q.    So he is one of those people who was in administrative

5    detention.  Correct?

6    A.    Correct.

7    Q.    And you know from your research in this case that Israel

8    detained people sometimes just for throwing rocks.  Correct?

9    A.    I am not personally aware of the detention of people for

10   people throwing rocks.  They may have.  The security

11   certificates that I reviewed in this case generally were for

12   other things.

13   Q.    But you didn't investigate why all these people were

14   detained, did you?

15   A.    I investigated why some of them were.

16   Q.    Some of them.  Okay.  And you didn't investigate the

17   situations of the families to whom HLF provided assistance,

18   did you?

19   A.    Well, we had the translations of their applications

20   noted, so I would consider that investigation.

21   Q.    You relied on those.

22   A.    I looked to those to see what their documentation said.

23   Q.    Right.  Now, you know that the Palestinian Authority has

24   a ministry dedicated to the families and children of martyrs

25   and prisoners, don't you?

1    A.    I have seen documentation to that effect.

2    Q.    Right.  And a ministry like -- I don't mean like a

3    religious ministry.  I mean like what we would call the

4    cabinet.  Correct?  The minister of?

5    A.    I have seen documentation indicating they had a ministry

6    for the prisoners affairs.

7    Q.    A government office is what I am trying to say?

8    A.    Correct.

9    Q.    Right.  And during the years up until 2006 the

10   Palestinian Authority was controlled by secular organizations.

11   Correct?

12   A.    Correct.

13   Q.    And in fact, you are aware of the fact that virtually

14   every Muslim country has a government office dedicated to the

15   families and children of martyrs and prisoners.  Correct?

16   A.    I don't know that.

17   Q.    Now, we have -- I want to talk to you a little bit about

18   things that Shukri has said.

19   A.    Okay.

20   Q.    And what Shukri has done.  One of the things that Holy

21   Land did was to build a library in the city of Hebron.

22   Correct?

23   A.    That is correct.

24   Q.    And this was a children's library.  Correct?

25   A.    That is what it was stated to be.

1    Q.   And I would like to just play, this is the third clip of

2    InfoCom No. 68.

3              (Whereupon, InfoCom Search No. 68, Clip C was

4              played, while questions were propounded.)

5    Q.   (BY MS. HOLLANDER)  You heard -- This was in 1999.

6    Correct?  Will you take my word for it?

7    A.   2000.

8    Q.   It was right around then.  And you heard my client Shukri

9    actually extending his thanks to Chairman Yasser Arafat?

10   A.   I did.

11   Q.   And he referred to him as brother Arafat, didn't he?

12   A.   I think he did.

13   Q.   And Yasser Arafat was at that time the president of the

14   Palestinian Authority.  Correct?

15   A.   Correct.

16   Q.   He was not Hamas, was he?

17   A.   That is correct.

18   Q.   Now, there was also an article in a Palestinian newspaper

19   about this.  Correct?

20   A.   Correct.

21             MS. HOLLANDER:  And if we can turn to Baker Wiretap

22   No. 15.

23   Q.   (BY MS. HOLLANDER)  Now, this front page is the Arabic,

24   just showing where it came from.  Right?

25   A.   Correct.

1    Q.    Okay.

2           MS. HOLLANDER:  And if you turn to the next page, if

3    you could.

4    Q.    (BY MS. HOLLANDER)  Now, I believe you showed this to the

5    jury during your direct examination, but we didn't read it at

6    that time.  So what I would like you to do is to read the

7    first paragraph.

8    A.    Okay.

9    Q.    And start at -- Let me just read the top.  It says, "In

10   the presence of a number of officials and national

11   personalities Al Tamimi opens Al Anwar Al Ibrahimia children's

12   library in Hebron."

13          And if you will read the next paragraph?

14   A.    Okay.  It says, "Hebron -- Al Hayat Al Jadida -- Fawzi Al

15   Shweiki -- under the auspices of Chairman Yasser Arafat who

16   was represented by Ahmad Saeid Al Tamimi, Deputy Minister of

17   Interior, the Holy Land Foundation for Relief and Development

18   America, and the administrative body of the Islamic Charitable

19   Society in Hebron celebrated the opening of Al Anwar Al

20   Ibrahimia children's library in the Al Huda Building.  This

21   was in the presence of engineer Mustafa Al Natsha, head of the

22   municipality, Minister Dr. Abdel Hafiz Al Ashhab, Sheik Taysir

23   Bayoud Al-Tamimi, acting Chief Judge Hajj Hashem Al Natsha,

24   chairman of the Chamber of Commerce, the President of the

25   Islamic Charitable Society; Sherif Jaradat, Director of Social

1    Affairs; Haj Taher Al Muhtaseb, vice Chairman of the Chamber

2    of commerce; directors and managers of organizations, national

3    and Islamic personalities, and a large crowd of citizens."

4    Q.    Thank you.  And it is describing here all the people who

5    were present for the opening of the library.  Correct?

6    A.    Correct.  Except Yasser Arafat was not present.

7    Q.    Right.  He was represented by Al Tamimi, his Deputy

8    Minister of the Interior.  Correct?

9    A.    Correct.

10   Q.    Now, Chairman Arafat's representative Mr. Al Tamimi also

11   made some statements.  And if you go down to the last two

12   paragraphs there, it starts with "in his speech," those two

13   paragraphs.  If you would read those two paragraphs, please.

14   A.    It says, "In his speech Ahmad Saeid Al Tamimi said:  'I

15   am honored and happy on this occasion to represent Chairman

16   Yasser Arafat, and I will not talk to you on this pioneering

17   scientific occasion as he pointed out that our people have

18   long suffered from occupation in all of its forms to bring us

19   to ignorance but the awareness of our people is much more that

20   it had imagined.'

21        "Education is one of the weapons our people is armed

22   with.  He said:  'In spite of the obstacles and the

23   conspiracies, our people is on equal footing with nations with

24   large resources on the scientific and cultural level even if

25   it is not on equal footing with the occupation resources since

1  studies says that it is much bigger.  We consider ourselves

2  ahead of developed nations in this field.'"

3  Q.   And on the next page he also continues with his speech,

4  the top paragraph, the top two paragraphs.

5  A.   It says --

6  Q.   Actually it is the top paragraph is what he says, so just

7  read that.

8  A.   "During his speech Al Tamimi pointed out that 'We speak

9  today on the occasion of the Prophet's Noble emigration during

10  which prophet Muhammad, God's prayers and mercy be upon him,

11  emigrated for the purposed [sic] of establishing the Islamic

12  Nation, and on another sad occasion which is the anniversary

13  of the martyrdom of the hero struggler, Abou Jihad, "the

14  prince of martyrs."'"

15  Q.   And then I think the article talks about what some other

16  people say, and that the final two paragraphs it discuss what

17  Shukri Abu Baker said.  And if you would read those two

18  paragraphs, please.

19  A.   It says, "The representative of Holy Land Foundation,

20  Shukri Abu Baker, delivered a speech over the phone from

21  America greeting the sponsor of this festival, Chairman

22  Arafat, who sent in his place Ahmad Al Tamimi and Haj Hashem

23  Al Natsha, Director of the Society, emphasizing that him and

24  those residing in America will continue their support and aid

25  for their children of our nation whether inside or outside the

1    camps.

2        "He also sent his greetings and appreciation to the

3    people of Hebron, the city of martyrs.  And during his

4    live-broadcast phone call, he delivered his apologies for not

5    being able to attend this festival for reasons beyond his

6    control.  A number of children delivered speeches emphasizing

7    certain points.  Afterwards the sponsor of the festival cut

8    the ribbon announcing the opening of this library and everyone

9    toured its different sections.  It is to be noted that the

10   Islamic charitable society decided to appoint educator Eid

11   Misk a library director."

12   Q.    Thank you.

13         Now, finally, I want to go back to Baker Wiretap No. 11.

14   And this is a conversation between Shukri Abu Baker and

15   Ghassan Elashi.

16   A.    Correct.

17   Q.    And this is the one Ms. Moreno and you read part of

18   earlier today.

19   A.    Okay.

20   Q.    And just to remind us, this was in 1996.  Correct?

21   A.    That is correct.

22   Q.    About a year after the meeting at OFAC.  Correct?  Or at

23   least the next year?

24   A.    She asked me and I said I can't remember when the date

25   was of that meeting.

1    Q.    Okay.  Do you remember it was sometime in 1995, though?

2    You don't remember?

3    A.    I don't.

4    Q.    Okay.  Well, we have had it here, so we will -- Other

5    people might remember.

6              MS. HOLLANDER:  If I could have the elmo.  I am

7    going to read just a brief part of this.

8    Q.    (BY MS. HOLLANDER)  This is Shukri speaking.  Correct?

9    A.    Correct.

10   Q.    "You see now, you're a political -- you're now -- Imagine

11   a law is made in America which states that it is a felony or a

12   crime to criticize Israel.  This is a politician who used the

13   law to shut you up and that is exactly what is happening.

14   Imagine in a year or two, a law could be made whoever

15   criticizes Israel -- Just like what happens in our countries;

16   in the Islamic countries whoever curses the religion in the

17   middle of the street, they put him in jail, in some of the

18   Muslim countries, or he who declares he is not fasting during

19   Ramadan, they put him in jail.  We might reach a stage in

20   America in which they tell you if you criticize Israel openly

21   we will put you in jail."

22             MS. HOLLANDER:  And finally there is one more

23   section of that that I would like to publish to the jury, and

24   I believe Mr. Lewis can actually scroll to this one so we can

25   hear Shukri.

1          (Whereupon, a portion of Baker Wiretap No. 11 was

2          played.)

3    Q.   (BY MS. HOLLANDER)  Those were Shukri's words.  You

4    recognize his voice, don't you?

5    A.   That is correct.

6          MS. HOLLANDER:  Pass the witness, Your Honor.

7          THE COURT:  Okay.  Mr. Mysliwiec?

8                      CROSS EXAMINATION

9    By Mr. Mysliwiec:

10   Q.   Good afternoon.

11   A.   Hi.

12   Q.   On direct examination, just to review, you covered zakat

13   committees.  Right?

14   A.   Correct.

15   Q.   We are going to do real broad brush terms here.  The

16   information in the search warrant documents referencing zakat

17   committee members.  Right?

18   A.   Correct.

19   Q.   Talking about Holy Land Foundation giving to martyrs.

20   Right?

21   A.   Correct.

22   Q.   Talking about the deportees.  Right?

23   A.   Correct.

24   Q.   And then there were some other topics you discussed as

25   well.  And a large piece of what you discussed on direct and

1    also with Mr. Westfall had to do with some table charts

2    relating to organizations, some zakat committees, some

3    organizations in Gaza.  Right?

4    A.   Correct.

5    Q.   Okay.

6              MR. MYSLIWIEC:  Can I have the elmo?

7    Q.   (BY MR. MYSLIWIEC)  So just A reminder of those charts,

8    that is the one for the Ramallah zakat committee.  Correct?

9    A.   Correct.

10   Q.   And it has different names and then different categories

11   of evidence on the left hand side.

12   A.   Correct.

13   Q.   Like videotapes.  And the evidence in the left hand side

14   is evidence that you went through.  Right?  In conducting your

15   investigation?

16   A.   Correct.

17   Q.   And you went through in preparing to testify?

18   A.   Correct.

19   Q.   And it basically boils down to videotapes, wiretaps, and

20   documents.

21   A.   For the most part.

22   Q.   Some computer documents, too, but those are still

23   documents.

24   A.   Correct.

25   Q.   Okay.  And as you know, I represent Mohammad El-Mezain

1    with Joshua Dratel.  Right?

2    A.    I do.

3    Q.    And he is charged with one count in the indictment.

4    Right?

5    A.    That is correct.

6    Q.    Your charts regarding these organizations had to do with

7    the Jenin zakat committee, the Ramallah zakat committee, the

8    ICS of Hebron, Nablus zakat committee, Qalqilya zakat

9    committee, Tulkarem zakat committee, the Islamic Science and

10   Culture committee, the Bethlehem Orphan Society, and then also

11   the Islamic Society of Gaza, the Islamic Relief Committee, the

12   Islamic Center of Gaza, and al-Salah Society.  Right?

13   A.    That is correct.

14   Q.    Those last four I just mentioned, those don't appear in

15   the indictment.  Right?

16   A.    That is correct.

17   Q.    The previous ones that I mentioned do appear in the

18   indictment.  Correct?

19   A.    Yes.

20   Q.    And of those I think it is eight organizations, only six

21   of them are in Count 1.  Right?

22   A.    I can't recall specifically, but I will take your word

23   for it on Count 1.

24   Q.    And that is the count that Mohammad El-Mezain is charged

25   with.

1    A.    That is correct.

2    Q.    A conspiracy count.

3    A.    That is correct.

4    Q.    To materially support a foreign terrorist organization.

5    A.    Correct.

6    Q.    And just to remind everyone here, Hamas was designated a

7    foreign terrorist organization on October 8th of 1997.  Right?

8    A.    That is correct.

9    Q.    And that is the designation that relates to Count 1.

10   A.    That is correct.

11   Q.    There is this other designation in the case as well.  It

12   is January 25th, 1995.  And that is when Hamas was designated

13   a specially designated terrorist.  Right?

14   A.    That is correct.

15   Q.    And that represents the two dates and the two

16   designations there.  Right?

17   A.    I think -- Generally, yes.

18   Q.    Now, when you talked about these organizations, you

19   talked about the evidence and the search warrant material that

20   connected, in your view, some of the people to Hamas.  Right?

21   A.    We talked about some of those.

22   Q.    And connected the organization to Hamas, in your view.

23   A.    I am trying to think.  Are you talking about all of them

24   or are you talking about just the ones in the indictment?

25   Q.    The ones in your summaries.

A.   The ones in the summaries, there were some of the search warrant material that connected some of the committees, but generally I think we were talking about the individual members to Hamas yesterday.

Q.   All right.  And many of the documents that you relied on were search warrant materials recovered at the Holy Land Foundation.  Right?

A.   That is correct.

Q.   And also search warrant materials from InfoCom.  Right?

A.   That is correct.

MR. MYSLIWIEC:  Your Honor, can I approach for just a moment?

THE COURT:  Sure.

(The following was had outside the hearing of the jury.)

MR. MYSLIWIEC:  I thought you had clearly ruled that everything in the first category we talked about was in for the limited purpose of notice, non-hearsay purpose.  I am about to go there on some of these documents, so I didn't want to do that if I am running afoul --

THE COURT:  I ruled that No. 1065 and 1070 are in for sure.  I don't remember, frankly, if I did on the others.

MR. JACKS:  I don't think you did.

MR. MYSLIWIEC:  They are coming in for the same non-hearsay purpose, and I am not going to spend a ton of time

1   on them; just about the notice issue.

2           THE COURT:  That is just a lot to look at, so I

3   haven't finished it yet, so just stick with No. 1065 and 1070

4   now so I will have a chance to go back and finish those.

5           (The following was had in the presence and hearing

6           of the jury.)

7   Q.  (BY MR. MYSLIWIEC)  I am going to show you a document

8   that has been admitted into evidence while the jury wasn't

9   here, so they haven't seen it yet.  It is Defense Exhibit

10  No. 1065.

11  A.  Okay.

12  Q.  That is not very clear.

13          MR. MYSLIWIEC:  May I approach, Your Honor?

14          THE COURT:  Yes.

15  Q.  (BY MR. MYSLIWIEC)  Here is a copy for you.

16  A.  Okay.  Thank you.

17  Q.  That has one of those Holy Land bates numbers on there,

18  the HLDL number.  Right?

19  A.  It does.

20  Q.  Meaning that it was recovered from the Holy Land Dallas.

21  Right?

22  A.  That is correct.

23  Q.  It is a document that was in their files.

24  A.  You are correct.

25  Q.  Right?  And it is a document that is about -- Well,

1    according to what the document says, it is about the

2    Tulkarem's alms committee.  Correct?

3    A.    That would be the Tulkarem zakat.

4    Q.    And on its face, according to the document, it is stamped

5    with the Palestinian Authority Ministry of Finance stamp.

6    Right?

7    A.    That is in the letterhead.

8    Q.    And that is what that letterhead looks like.  Right?

9    A.    Correct.

10   Q.    So we have Palestinian National Authority, and then you

11   have this eagle symbol.  Right?

12   A.    Yes.

13   Q.    It is the symbol for the waqf?

14   A.    I believe it is.  And, you know, I wouldn't want to state

15   for certain because -- I have seen it, but I don't know if it

16   is the official symbol or not.  It may be.  I just don't know.

17   Q.    You see it on the Palestinian National Authority

18   documents?

19   A.    I have seen it on other Palestinian National Authority

20   documents, yes.

21   Q.    That are like government documents, in a sense.

22   A.    I have seen it on some, yes.

23   Q.    And this is dated October 24th, 1998.  Right?

24   A.    It is.

25   Q.    Now, just to review, and Ms. Hollander talked a little

1    bit about this, but the Palestinian National Authority is not

2    Hamas.  Right?

3    A.    That is correct.

4    Q.    It is not controlled by Hamas.

5    A.    Well, let's say at the time of this letter it was not.

6    Q.    Okay.  And at the time of this letter it was a rival of

7    Hamas.  Right?

8    A.    That is correct.

9    Q.    Can you read the substance of this document?

10   A.    Yes.

11   Q.    You can read it from your copy of it, too.  I think it is

12   page one.

13   A.    You know, if you want the jury to see it, we may need to

14   pull out a little bit.

15         It says, "Dear Tulkarm's Alms Committee.

16         "We would like to inform you that the Registration No.

17   Tulkarm's Alms Committee as a non-profitable establishment at

18   the Value Added Tax Department is"--and it gives a

19   number--"for the clearance purposes for buying or having any

20   services to the committee from Israel.

21         "With regards,"

22         "V.A. tax department manager, Osama Abdul-Aziz."

23   Q.    So according to this document -- Well, let me take a step

24   back.  Earlier in this case we had somebody, a witness Dawn

25   Goldberg from the IRS, who testified about non-profit

1    organizations in the United States.  Right?

2    A.    Yes, we did.

3    Q.    Okay.  And how organizations get 501(c)(3) status.

4    Right?

5    A.    I was not present for her testimony, so I know the

6    general subject matter, but I was not here when she testified.

7    Q.    You are familiar with 501(c)(3) status?

8    A.    I know what it is.

9    Q.    This isn't the same thing, but it seems to be notifying

10   the Tulkarem zakat committee that they have something like

11   that status in the West Bank.  Right?

12           MR. JONAS:  Your Honor, I am going to object.  This

13   document has been admitted for a limited purpose, and think I

14   we are going beyond that purpose now.

15           MR. MYSLIWIEC:  I can rephrase the question.

16           THE COURT:  Go ahead.

17   Q.    (BY MR. MYSLIWIEC)  On the face of this document it is

18   notifying the Tulkarem zakat committee that it is getting a

19   registration number as a non-profitable establishment.  Right?

20   A.    That is what it says.

21   Q.    And that this is being given for clearance purposes for

22   buying or having any services to the committee from Israel.

23   Right?

24   A.    That is what it says.

25   Q.    If you go to page 2 of that exhibit, we have what looks

1    to be a certificate.  Right?

2    A.    Yes.

3    Q.    It has got that eagle on there again.  Right?

4    A.    It does.

5    Q.    Page 3 is an English translation of that certificate.

6    Right?

7    A.    That is correct.

8    Q.    So the certificate is from October 19th, 1998.

9    A.    That is the fax date.

10   Q.    I am sorry?

11   A.    I think it says at the bottom --

12   Q.    It was executed on December 30th, 1997.

13   A.    That is correct.

14   Q.    It is from the Palestinian National Authority.  Right?

15   A.    Correct.

16   Q.    And it is a license certificate.  Right?

17   A.    It is.

18   Q.    Can you read what it says under "license certificate"?

19   A.    It says, "The Ministry of Endowments and Religious

20   Affairs/Zakat Fund Directorate, by the authority vested in it

21   by Article 14 Section 6 of the Zakat Fund Law in force since

22   1990, hereby certifies that the Zakat Committee of Tulkarem,

23   which was founded in 1981, adheres in its work and activities

24   to the Zakat Fund Law and Regulations.  This ministry approves

25   this committee for the continuation of its work and the

1  performance of its mission by providing its humanitarian,

2  health, social, educational, religious and cultural services

3  in accordance to the instructions issued in this regard."

4  Q.   And then it is signed by the Minister of Endowments and

5  Religious Affairs.  Right?

6  A.   That is correct.

7  Q.   And that is the same Tulkarem zakat committee that you

8  had a summary chart on.  Right?

9  A.   That is correct.

10  Q.   And it is the same Tulkarem zakat committee that is named

11  in Count 1 of the indictment.

12  A.   It is.

13          MR. MYSLIWIEC:  May I approach the witness, Your

14  Honor?

15          THE COURT:  Yes.

16  Q.   (BY MR. MYSLIWIEC)  Now, I am showing you another exhibit

17  that was admitted while the jury wasn't here, so they haven't

18  seen this before.  It is called Defense Exhibit No. 1070.

19  A.   Okay.

20  Q.   This is also a document that was seized from the Holy

21  Land Foundation.  Right?

22  A.   Correct.

23  Q.   Because it has that HLDL stamp on it again.

24  A.   Yes.

25  Q.   And so this was in the Holy Land Foundation's files in

1    Dallas.  Right?

2    A.    That is correct.

3    Q.    And according to the document, it is from the Civil

4    Administration of Judea and Samaria Medical Services, the

5    Department of the Medical Services Officer.  Right?

6    A.    Correct.

7    Q.    And according to the document, it relates to or it has

8    been faxed from the al-Razi Hospital in Jenin.  Right?

9    A.    Correct.

10   Q.    And that is the letterhead right there?

11   A.    It is.

12   Q.    Dated November 24th, 1993?

13   A.    Correct.

14   Q.    It is a document that was addressed to the head of the

15   Jenin zakat committee.  Right?

16   A.    Correct.

17   Q.    Do you know what the Civil Administration of Judea and

18   Samaria is?

19   A.    I know it is an Israeli office in the West Bank, but

20   beyond that my knowledge is very limited.

21   Q.    So by Israeli office in the West Bank, you mean an office

22   connected to the government of Israel.

23   A.    That is correct.

24   Q.    And the content of this letter on its face is from this

25   government of Israel office to the zakat committee about this

1   hospital.  Right?

2   A.   That is correct.

3   Q.   Can you read the text of the letter, starting with "The

4   Honorable Mr. Zakarnah"?

5   A.   "The Honorable Mr. Zakarneh,

6      "Subject:  General Hospital for the Zakat Society of

7   Jenin -- preliminary license.

8      "Pursuant to Article 80 of the Health law No. 43 of 1966,

9   and in accordance with the approval of all concerned

10  authorities, I have decided to grant you a preliminary license

11  to the Zakat Society -- Jenin -- for the construction of a

12  general hospital.

13     "This license allows you to open a hospital containing 90

14  beds distributed as follows:

15     "Internal Medicine Department--17 beds.

16     "Pediatrics Department--15 beds.

17     "Surgery Department--17 beds.

18     "Obstetrics and Maternity--16 beds.

19     "Ear, Nose and Throat Department--10 beds.

20     "Urinary Tract Department--10 beds.

21     "Premature Births Department--5 incubators.

22     "In addition, the hospital must be equipped with

23  operations rooms that meet all the conditions and a birth

24  room, and also administrative and technical medical services

25  that are required to operate such a hospital.

1          "After completing the construction of the hospital and

2     before operating it, you must report back to me in order to

3     obtain a license to begin operations.

4          "You are required to work according to the Public Health

5     Laws that are in force and the legislations and laws that are

6     announced from time to time.

7          "With our wishes for our success,

8          "Dr. Itzhak Sefer,

9          "Medical Services Officer in Judea and Samaria."

10    Q.    And it copies on the face of the document to other

11    government type officials.  Right?

12    A.    Correct.

13    Q.    Like a Chief of Civil Administration, a Chief of the

14    Administration and Services Department, a Director of Public

15    Health.

16    A.    That is what it says.

17    Q.    Okay.  And that is a document that was originally in

18    Hebrew.  Right?

19    A.    The third page of the document is in Hebrew, so I guess

20    it was in Hebrew and Arabic.

21    Q.    And Arabic.  Right.  And this Jenin zakat committee is

22    the same zakat committee that is named in Count 1 of the

23    indictment.

24    A.    The one referenced in this letter is the same one.

25              MR. MYSLIWIEC:  I am about to go to another section,

1    Your Honor.

2              THE COURT:  Let's go about another ten minutes.

3              MR. MYSLIWIEC:  Okay.

4    Q.  (BY MR. MYSLIWIEC)  Okay.  Let's go back to this one

5    again.  This is the date of the foreign terrorist organization

6    designation date for Hamas.  Right?

7    A.   Right.

8    Q.   October 8th, 1997.

9    A.   Correct.

10   Q.   I am going to take just one of your summary tables here

11   regarding the Islamic Center of Gaza, and I am going to the

12   document back-up page.  Actually that is the wrong one.

13   Sorry.

14        Let's just do it this way.  In some of those tables, some

15   of the document back-up is from an El-Mezain wiretap.  Right?

16   A.   That is correct.

17   Q.   El-Mezain Wiretap No. 1.

18   A.   Correct.

19   Q.   And that Wiretap No. 1 is a collection of faxes.  Right?

20   A.   It is.

21   Q.   Those are faxes that Mohammad El-Mezain received.  Right?

22   A.   That is correct.

23   Q.   Just as a reminder for the jury, that wiretap was over

24   approximately a ten-year period.  Correct?

25   A.   It began I think around in 1994 and, you know, again, we

1   talked about the lapses, but ultimately I think ended in 2003.

2   Q.   And of all of the faxes that were sent and received from

3   that fax machine, El-Mezain Wiretap No. 1, represented the

4   ones that the Government wanted to put in as its exhibit for

5   those faxes.  Right?

6   A.   Those faxes represent the ones that were deemed relevant

7   to the material that we were talking about and were exhibited.

8   Q.   From that entire ten-year period?

9   A.   Correct.

10  Q.   And that exhibit is about 179 pages?

11  A.   I mean, I don't know how many pages it was.

12  Q.   None of them are faxes that Mr. El-Mezain sent.  Right?

13  A.   To my recollection, they were all received.

14  Q.   Okay.  And they are in chronological order according to

15  when they were received in the exhibit.

16  A.   I believe they are supposed to be.

17  Q.   Again, it doesn't represent every fax received, but the

18  ones that were put into this exhibit, they are listed in

19  chronological order.

20  A.   Yes.  But as I recall when we were going through it,

21  there were a couple of faxes in the back that were out of

22  chronological order, but for the most part they are in

23  chronological order.

24  Q.   What is the last dated fax on that exhibit?

25  A.   I can't remember.  I think it was from '95, maybe '96.

1    Q.    Maybe June 28th, 1995?

2    A.    Could be.

3    Q.    So the last fax in that exhibit, whether it is '95 or

4    '96, is before that October 8th, 1997 date.  Right?

5    A.    Correct.

6            MR. MYSLIWIEC:  Could we pull up the NAIT exhibit,

7    page 57.  I am sorry.  It is not one I told you about.

8    Q.    (BY MR. MYSLIWIEC)  This is a document in the upper right

9    hand corner dated July 25th, 1989.  Right?

10   A.    Correct.

11   Q.    And it represents -- describes a wire transfer to the

12   Islamic Center of Gaza.  Right?

13   A.    Correct.

14   Q.    And this is I think the one NAIT document that you

15   discussed which has Mohammad El-Mezain's name in the

16   "withdrawal requested by" section.  Right?

17   A.    I believe this is one we discussed yesterday.

18   Q.    Okay.  And again, that is from 1989.  Right?

19   A.    Correct.

20   Q.    I am going to skip back briefly to some zakat committee

21   HLF documents.

22           MR. MYSLIWIEC:  Could I have InfoCom Search No. 29,

23   page 9, please?

24   Q.    (BY MR. MYSLIWIEC)  That is a certificate document again.

25   Right?

A.    It looks like it.  Can we look at the translation?

Q.    Sure.

          MR. MYSLIWIEC:  It is page 20.

          THE WITNESS:  Thank you.

Q.    (BY MR. MYSLIWIEC)  Do you want to just read that exhibit?

A.    Yes.  It says, "The Hashemite Kingdom of Jordan, Ministry of Labor Social Department.

          "I certify that the Young Men's Muslim Association/Hebron was registered in accordance with the social associations and organizations Law number 33 of the year 1966 on the ninth of February 1987.

          "Issued with my signature in Amman today, the ninth of February 1987.

          "The Minister of Labor and Social Development."

Q.    Okay.  So that is a Ministry of Labor registration certificate.  Right?

A.    That is what it says.

Q.    And this is an organization that is connected to ICS Hebron.  Right?

A.    The Young Men's Muslim Association?

Q.    Yeah.

A.    Yes.

Q.    And that is also an organization that HLF gave some money to.  Right?

1  A.  Correct.

2  Q.  And through that organization it is one of the places

3  that HLF gave money to martyrs.  Right?  Or families of

4  martyrs?

5  A.  It may have.  I can't recall offhand if it did, if that

6  was one of the items that it had documentation for through

7  this committee or not.  I know that it did give money to the

8  committee.  I just can't recall offhand for what.

9       THE COURT:  Lets go ahead and break for lunch.  Be

10 back at 1:45.

11      (Whereupon, the jury left the courtroom.)

12      THE COURT:  Mr. Mysliwiec, you were mentioning that

13 second group of exhibits that you thought -- you were asking

14 whether they were in or not.  What are those numbers?

15      MR. MYSLIWIEC:  It is No. 1395, 1396.

16      THE COURT:  Up to No. 1401?

17      MR. MYSLIWIEC:  Exactly.

18      THE COURT:  I started looking at them over the break

19 but I wasn't able to finish.

20      MR. MYSLIWIEC:  There is the second category that

21 had to do with the al-Ibrahimi massacre and U.N. report.

22      THE COURT:  That is on the same disk that has these

23 other exhibits?

24      MR. MYSLIWIEC:  It is the second group I talked

25 about this morning.

1          THE COURT:  I will let you know after the break.

2                      (Lunch recess.)

3          THE COURT:  Let me ask counsel to approach the

4    bench.

5               (The following was had at the bench.)

6          THE COURT:  Looking at these documents that you

7    have, what is the link you are trying to make between 1394,

8    1395, 1396, 1397, 1400, 1401, and as I understand your issue

9    it goes to this issue of notice Hamas didn't control these

10   zakat committees.  Is that it?

11         MR. MYSLIWIEC:  Partly and partly the notice of what

12   the committee projects were.

13         THE COURT:  What does notice of the committee

14   projects, what does that touch on?

15         MR. MYSLIWIEC:  Whether or not they had reason to

16   think they were legitimate.

17         MR. DRATEL:  Your Honor, one of the -- Mr. McBrien's

18   testimony put in those Guidelines in order to get

19   documentation about the work that is to be done with your

20   money.

21         THE COURT:  On the ones that don't cover the

22   projects, which ones are the ones that you are looking at that

23   go to the issue of control?

24         MR. MYSLIWIEC:  The issue of control?

25         THE COURT:  Who controls the zakat committee.

1      MR. MYSLIWIEC:  I don't know that any

2 specifically -- They go to whether or not they had a reason to

3 think the projects were legitimate, notice of whether these

4 projects are legitimate.  So that is how they get at the

5 control issue.  It is not like there is a document that

6 says --

7      THE COURT:  I understand that.

8      MR. MYSLIWIEC:  -- Hamas doesn't control us.  There

9 is no document like that.

10      THE COURT:  I know.  But some of these other two,

11 the two that I admitted earlier, they were from official

12 government agencies that were licensing them, or whatever it

13 is, so that would be some kind of legitimacy that you can

14 argue, you know, that the government had given permission to

15 do business.  But you are approaching it from the projects.

16    Mr. Jacks?

17      MR. MYSLIWIEC:  Mr. Dratel's point is -- I mean, I

18 wasn't here for Mr. McBrien's testimony, but to the extent

19 that he said that you have to get copies of forms, then -- And

20 there are hundreds of pages of these things, and I have really

21 tried to narrow it down.  And I can narrow it down further,

22 too.  If the Court says go ahead and go into three or four of

23 them, but don't go into seven or eight of them, I can do that.

24    And again, the limiting instruction, we do not object to

25 that even if it is at the time of the exhibits.

1    THE COURT:  Did you have any other thoughts on this?

2  I have gone back and looked at them in light of what you were

3  arguing this morning.  Of course, it makes more sense than

4  when I was just looking at them.  They all were hearsay at

5  that point.

6    MR. JACKS:  Your Honor, I don't do know that these

7  exhibits show one way or the other who controls the committee,

8  and so it is the Government's position that, you know, what

9  the Defendants were doing was supporting the social side of

10  Hamas.  And to just dump in a bunch of evidence that is

11  initially hearsay, that doesn't really show one way or the

12  other -- it may show that these things were done, but it

13  doesn't show who it is for the benefit.

14    MR. MYSLIWIEC:  I mean, the irony of that argument

15  in a way is it is only if these things were actually done that

16  it is to the benefit of Hamas, so the Government actually is

17  arguing for them to be true, because if they didn't happen

18  then nothing happened for the benefit of Hamas.

19    THE COURT:  It seems to me when you are arguing that

20  these projects are legitimate, that you going to the truth of

21  the documents.

22    MR. MYSLIWIEC:  And we are not going to argue that

23  they are legitimate.  We are going to put in that there was

24  paperwork on its face was sent to the HLF --

25    THE COURT:  But the legitimacy of it in this case,

1    doesn't it hinge on whether it is controlled by Hamas?

2              MR. MYSLIWIEC:  That is what they are going to

3    argue.

4              THE COURT:  But That is what makes it illegitimate;

5    not that they built a hospital or a school.  If the funding is

6    going through a committee that is controlled by Hamas, that is

7    the illegal act, not the building of the hospital or the

8    school.

9              MR. DRATEL:  They also made arguments about money

10   that is not accounted for and differences between money spent.

11   This goes to the fact --

12             THE COURT:  Still to me it seems like that has to be

13   going to the truth if you are trying to show those things,

14   because you can use that "We are not offering it for the

15   truth" as you were pointing it out this morning, fairly

16   broadly.  It just follows if you are showing it accounts for

17   this money, doesn't that go to the truth.

18             MR. DRATEL:  No.  This is that they were told this

19   is what the money goes for.  It goes to the due the diligence,

20   which is exactly what they said the charity should do.

21             THE COURT:  That is fine, but --

22             MR. MYSLIWIEC:  But one of the issues here is

23   knowledge.  That is the key issue.  And so if this is notice

24   of projects according to the zakat committee, then the

25   knowledge of Holy Land is this is the paperwork we got from

1    the zakat committees.

2              MS. HOLLANDER:  Whether it is true or not.

3              THE COURT:  Because that doesn't directly go to that

4    knowledge in terms of whether it is controlled by Hamas or

5    not.  These projects could get built whether those committees

6    are controlled by Hamas or not.  And nothing that I saw in

7    there went to that.

8              MR. MYSLIWIEC:  But it could bear on the Defendants'

9    knowledge, because they are going to argue --

10             MR. WESTFALL:  Isn't that kind of the weight?  It

11   goes to the weight of it about what we thought we were doing

12   was sending money to a hospital, this is our state of mind,

13   not whether or not that hospitals are controlled by Hamas.

14             THE COURT:  You are trying to get in these documents

15   through somebody that really can't sponsor them.  That is the

16   concern.  So the way you are trying to back into it is say,

17   "We are not offering any of them for the truth," but you know,

18   you are using that to try to show knowledge, which I don't

19   know how that establishes whether or not Hamas controlled or

20   didn't control.  It is just kind of neutral.  It just doesn't

21   say anything to that issue, in my view.  And that is the

22   issue.  I mean, I agree, it is who controlled Hamas and then

23   did your clients know that, those two issues.

24             MS. CADEDDU:  One other thing that Mr. McBrien said

25   was that in order to -- That we won't give you a white list.

1    And in order for the people who are giving to these

2    organizations to -- I mean, one of the things that they have

3    to do is satisfy themselves by doing these various things, and

4    one of the various things is collecting documentation about

5    the work done.

6              THE COURT:  But ordinarily you get that stuff in

7    through a proper sponsor of documents.  You know, you don't

8    get it in through the back door.

9              MS. CADEDDU:  We have one.

10             THE COURT:  That is the other thing.  You are going

11   to have a witness who can sponsor this?

12             MS. CADEDDU:  Oh, yeah.

13             MR. WESTFALL:  It also goes to the impact of her

14   investigation; what she did and didn't take into account in

15   her investigation.  And we are not trying to get out of

16   calling a witness, but it does bear open the cross

17   examination.

18             MS. HOLLANDER:  And it goes to her investigation.

19             THE COURT:  Well, if you are telling me that you are

20   going to have a witness that can sponsor these documents, as

21   business records --

22             MS. CADEDDU:  Yes.

23             THE COURT:  -- or some way, I will let them put on

24   out of order, subject to connecting them up.  I will let you

25   do it, if that is what you are telling me you can do that.

1     That is the way to do it, rather than trying to back-door it

2     this way.  I would feel better doing that than this other way.

3          Any other thoughts on that?  So what is admitted is

4     Defense Exhibit No. 1394, 1395, 1396, 1397, 1400, 1401, HLF

5     170 and HLF 171.

6          The U.N. report, I had concerns with just that it is an

7     investigation into Israel's practices.  I don't see that as

8     relevant.  If this was on a list --

9               MS. CADEDDU:  It is already on there.

10              THE COURT:  Oh, it is already on there?  Then you

11    don't have anything to worry about.  So you are looking to add

12    this to complete the picture of what you are saying, what your

13    Defendants did, and I think that is permissible.  So I think

14    you are entitled to do that.

15              MR. MYSLIWIEC:  Then there are the underlying

16    exhibits that were former Government exhibits -- that are

17    current Government exhibits.

18              THE COURT:  HLF No. 137 and 139?

19              MR. MYSLIWIEC:  Right.  That cross reference the

20    names.

21              THE COURT:  So you want to offer those as well?

22              MR. MYSLIWIEC:  Yes.

23              THE COURT:  Any other thoughts on this?

24              MR. JACKS:  No.

25              THE COURT:  I think they are entitled to do this.

1        MR. JONAS:  We are going to put Hoffman on now so we

2   can make sure we get him on.

3        THE COURT:  We didn't discuss this morning with

4   everybody here, I am going to deny the motions to exclude his

5   testimony and let you put him on.  And you already indicated

6   that the first part of your direct is going to be laying the

7   foundation predicates.  So that will be our hearing as far as

8   I am concerned.  You can object at that time before they get

9   into the substance.

10        MS. CADEDDU:  Can I just ask, Your Honor, because

11   the bulk of his writing and stuff he does is Al-Qaeda, I would

12   like to know in advance what the delineation is of his

13   testimony.

14        THE COURT:  They know not to go into Al-Qeada.

15        MR. JONAS:  He is going to talk about the use of

16   charities, social terrorist groups, and he is going to give

17   some examples.  And I am going to ask him a couple of

18   questions about the examples, where is that group located, to

19   show that this is global.  And that is it.  He won't mention

20   Al Qaeda.  I already told him not to.

21        MR. WESTFALL:  Is he going to mention Hamas?

22        MR. JONAS:  Yes.

23        MS. HOLLANDER:  I thought he didn't know anything

24   about Hamas.

25        MR. JONAS:  He knows as much about Hamas --

1          THE COURT:  His credentials are there, and I think

2     they are entitled to put him on.  This is an issue in the

3     case, so they are entitled to put that on.

4        If you want to object once they finish laying their

5     qualifications, you can approach the bench at that point.

6          MR. DRATEL:  Our other bases, just so we don't have

7     to get up and say them at the time, are that this is not a

8     subject for expert testimony because it is self-evident, to a

9     certain extent.  To another extent it is cumulative of Doctor

10    Levitt.  And the third is that the *Crawford* part of it as

11    well, that his opinion is going to be relying on interviews of

12    people and hearsay documents, things like that that don't pass

13    the 703 threshold.

14          THE COURT:  And I think the relying on those is not

15    the problem, as long as he didn't state them here in court,

16    and I think you are aware of that.

17          MS. CADEDDU:  And 403.

18          THE COURT:  You have to throw in 403.

19          MS. CADEDDU:  My favorite rule.

20          MS. HOLLANDER:  Your Honor, if I could make my

21    argument on Hamami, because it takes just a couple of minutes.

22          THE COURT:  I don't want to keep this jury waiting

23    too much longer.  Just remind me and I will give you the

24    opportunity.

25          MS. DUNCAN:  I have a brief scheduling issue.  I

1    need to leave at the break.

2            THE COURT:  Sure.

3            MS. HOLLANDER:  Are you going to want us to talk to

4    you about this?

5            THE COURT:  At 5:00 we will break.  Whoever is on,

6    just look at 5:00 for a good breaking point.

7            MS. HOLLANDER:  So maybe I can do it then.

8            (The following was had in the presence and hearing

9            of the jury.)

10           THE COURT:  Members of the jury, again because of

11   scheduling issue it is parties have agreed to take another

12   witness out of turn, so we are going to take another witness

13   at this point and go back to Agent Burns.

14           MR. JONAS:  The Government calls Bruce Hoffman.

15           (Whereupon, the oath was administered by the Clerk.)

16                       BRUCE HOFFMAN,

17   Testified on direct examination by Mr. Jonas as follows:

18   Q.   Good afternoon, Mr. Hoffman.

19   A.   Good afternoon.

20   Q.   Could you state and spell your name?

21   A.   Bruce Hoffman, B-R-U-C-E  H-O-F-F-M-A-N.

22   Q.   Mr. Hoffman, where do you live?

23   A.   Washington, D.C.

24   Q.   Do you have a college degree?

25   A.   Yes, I do.

```
 1    Q.    Where is that from?

 2    A.    Connecticut College.

 3    Q.    What is your degree in?

 4    A.    Government and history.

 5    Q.    Do you have any advanced degrees?

 6    A.    Yes, I have two.

 7    Q.    What are they in?

 8    A.    International relations -- My British equivalent of an

 9    American Master's is in international relations with a

10    specialization in Middle Eastern politics, and my doctorate is

11    also in international relations with a focus in Middle Eastern

12    history.

13    Q.    When you say your British equivalent, what do you mean?

14    A.    I suppose it is more than a Master's in the United

15    States.  It was a two-year degree both by examination and by a

16    full thesis.

17    Q.    And have you -- You said you have equivalent of a Ph.D.

18    Are you known as a doctor?

19    A.    Yes.  It is a Ph.D.

20    Q.    Not a medical doctor, though.

21    A.    No, not a medical doctor though.

22    Q.    To get your Ph.D., did you have to write a dissertation?

23    A.    Yes.

24    Q.    What was your dissertation on?

25    A.    My Master's dissertation was about Jewish terrorist
```

1  groups active in Palestine during the 1940s and the

2  Palestinian terrorist groups active in the region from 1949 to

3  I guess 1972.  I completed that in 1978.  And then my doctoral

4  dissertation was on the role the Jewish terrorism played in

5  British decision-making in Palestine from 1939 to 1947.

6  Q.   And where did you get your dissertations.  Sorry.  Not

7  where did you get them, but where did you get your degrees

8  from?

9  A.   Both of my graduate degrees are from Oxford University in

10  England.

11  Q.   Where are you currently employed?

12  A.   I am currently employed at Georgetown University in

13  Washington, D.C.

14  Q.   What do you do?

15  A.   I teach in the school of foreign services, teach courses

16  on service studies.

17  Q.   Can you elaborate?

18  A.   I teach elective courses in terrorism and

19  counterterrorism and also insurgency and counterinsurgency and

20  also the core course in theory and practice of international

21  security; in essence, the conflict aspects of international

22  relations.

23  Q.   Are these courses that you teach undergraduate level or

24  graduate level?

25  A.   At present for the past four years I have only taught at

1    the graduate level, the Master's level, and also I sit on a

2    Ph.D. committee.

3    Q.    What does that mean?

4    A.    Well, I am one of a committee of persons that supervises

5    doctoral dissertations from students at Georgetown and at

6    other universities in the United States.

7    Q.    Could you explain what a dissertation is?

8    A.    A dissertation is original research that is overseen by

9    established academicians, professors, that then is written up,

10   requires that the research be original, that the methodology

11   be sound, and that the candidate puts forth an analytical

12   interpretation of what their fundamental thesis question is.

13   Q.    So sitting on the board of what did you call it?

14   Dissertation --

15   A.    Committee.

16   Q.    -- committee, what do you do?

17   A.    I guide and direct students' research.  I exercise a form

18   of quality control over it that helps them improve their

19   research.  I see my main responsibility is asking the tough

20   questions ahead of time so they are thoroughly prepared by the

21   time they submit their dissertation for oral examination, and

22   then provide extensive comments on their work and writing.

23   Q.    What is the subject matter of the people that you

24   supervise who are getting their dissertation?

25   A.    Well, these days almost without exception some form of

1     terrorism or counterterrorism, insurgency or

2     counterinsurgency.

3     Q.    How long have you taught at Georgetown?

4     A.    Four and a half years now.

5     Q.    Where were you prior to that?

6     A.    I spent most of my career at the Rand Corporation which

7     is an independent think tank; actually I think the original,

8     the first think tank in the United States.  I also spent five

9     years teaching at St. Andrews University in Scotland where I

10    was the founder and first director of one of the first

11    academic centers for the study of terrorism.

12    Q.    Were you doing those simultaneously?

13    A.    No.  I was at Rand from 1981 to 1994, and then at St.

14    Andrews University from 1994 until the end of 1998, and then I

15    returned to Rand and worked at Rand from 1998 until 2006, when

16    I came to Georgetown full time.

17    Q.    Okay.  What is Rand You said it was think tank.  Do they

18    specialize in a particular area that they think about, or is

19    it general?

20    A.    Well, it is matters of public policy, whether they are

21    issues of national security or issues you might call education

22    policy, energy policy, health policy, but as well I worked

23    mostly though in the security or national defense section of

24    Rand.

25    Q.    Would that also involve under that umbrella of security

1    and national defense matters or terrorism?

2    A.    Yes.    Rand was one of the first think tanks, in fact

3    perhaps it was maybe the first think tank in the United States

4    in the 1970s that set up a research program specifically to

5    examine terrorism.    I joined in 1981.    It had been created in

6    1972.    Eventually I became the director of Rand databases that

7    were responsible for the collection of information on

8    terrorist incidents and events around the world.    I managed

9    those for, gosh, at least a decade, I think about eight or

10   nine years, and then I was also the first holder of the Rand

11   Corporation corporate chair in counterterrorism and

12   counterinsurgency.

13   Q.    While at Rand did you publish any material, any articles,

14   or books or anything like that?

15   A.    Yes.    During my career at Rand I must have published over

16   400 reports or papers.

17   Q.    On what subject matter?

18   A.    I would say the vast majority on terrorism, secondarily

19   insurgency and then also military operations, but I also

20   worked with our criminal justice division and did research on

21   criminal justice matters in the United States.

22   Q.    When you went to St. Andrews, could you tell us again

23   what you did there?

24   A.    I went to St. Andrews in 1994 to help establish, as I

25   said, the first academic center for the study of terrorism and

1   political violence.  I was also chairman of the international

2   relations department there.  I was a teacher, in essence.

3   Q.   Prior to Rand what did you do?

4   A.   I was in graduate school.  I came straight from graduate

5   school to Rand.

6   Q.   That is where you were in Oxford?

7   A.   Yes.

8   Q.   With regard to your research, do you ever travel overseas

9   to conduct research?

10  A.   Yes, almost always.

11  Q.   Where have you gone?

12  A.   Well, extensively to Israel and Palestine, Iraq,

13  Afghanistan, Pakistan, Indonesia, Malaysia, Singapore,

14  Thailand, Turkey, Germany, United Kingdom, Northern Ireland,

15  Sri Lanka, several times to the Zhejiang Province of China in

16  essence is where my travels have taken me.

17  Q.   When you go overseas to a foreign country, what type of

18  research do you conduct there?

19  A.   Primarily interviews.  It is an effort to obtain

20  additional validation for what one might have learned or

21  gathered from conduct, regular searches, literature searches,

22  review of documents and so on in an effort to get multiple

23  sources to ensure what you are arguing or presenting is

24  correct or accurate.

25  Q.   We will get to that research in a moment.  I just want to

1    focus for a moment on the interviews.  What type of interviews

2    are you conducting?  In other words, who are you interviewing?

3            MR. DRATEL:  Your Honor, this goes to one of my

4    objections.

5            THE COURT:  We haven't gotten into any statements

6    yet.

7    Q.   (BY MR. JONAS)  I am not asking to say what the person

8    said or to give names, but generally what are the type of

9    people you are interviewing when you do these research trips?

10   A.   As wide an array as possible.  On one end of the spectrum

11   government officials, military officers, police officers,

12   journalists, certainly fellow academicians; on the other hand,

13   community organizers, political activist members of various

14   legal and illegal organizations that may be engaged in

15   violence or support violence.  You know, one casts as broad a

16   net as is possible.

17   Q.   Why?

18   A.   To ensure that you can have as full a picture as possible

19   and that your information is as accurate as possible.

20   Q.   You said you interviewed, when you can, members of

21   illegal organizations.  Would that be terrorist organizations?

22   A.   Yes.

23   Q.   Again, without getting into what people have said, but

24   can you tell us some of the terrorist organizations where you

25   interviewed members?

1  A.    Yes.  Hamas, the Islamic Resistance Movement, Palestine

2  Liberation Organization, al-Fatah, Jewish Defense League,

3  Jewish terrorist groups from the 1940s, the Arguing Sua

4  Alumni, the national military organizations.

5  Q.    Could you try to spell that?

6  A.    I-R-G-U-N  T-S-U-A-I  L-E-U-M-I, which was active in the

7  1940s.  Jewish settlers, for example, who may or may not

8  belong to organizations.  I have interviewed members of

9  various jihadi organizations in Indonesia, members of

10  Al-Qeada, affiliates and associates, members of Turkish left

11  wing and right wing terrorist organizations, members of Tamil

12  terrorist organizations, members of various Irish terrorist

13  organizations, left wing terrorists in the United States,

14  right wing terrorists in the United States, national

15  separatist terrorists in the United States.  Again, what I

16  have been researching, I have tried to make contact with the

17  actual protagonists.

18  Q.    When you say terrorists in do you mean groups based in

19  the United States or individuals of other foreign terrorist

20  groups living here?

21  A.    In this case that is back in the 1980s and 1990s.  These

22  were groups based in the United States; some people in prison,

23  and other cases people not in prison.

24  Q.    When you conduct these interviews, is it in English or a

25  foreign language?

1   A.   Well, the vast majority of them are in English, although

2   as needed I have a translator.  Again, that is an interest of

3   accuracy.

4   Q.   Now, you said that when you are conducting interviews you

5   are doing it to verify other information that you have

6   gathered.  What sort of other information do you gather in

7   your research in terrorist groups?

8   A.   Well, one starts with academic analyses and academic

9   publications.  But again, you want to assume not that what you

10   are reading is incorrect or inaccurate, but you start with

11   that as a base, and then what you are trying to do in your own

12   research is verify that through newspaper accounts, magazine

13   accounts, interviews.  In this day and age, of course,

14   compared to when I started with terrorism 30 years ago, it was

15   much more difficult to get information from the terrorists

16   themselves, but now there is a vast array of websites and

17   propaganda and an array of above-ground support groups that

18   put out propaganda or information that is either in support or

19   sympathy of terrorist groups.  So you would research local

20   newspaper accounts, and then speak with local journalists,

21   local aid workers, members of NGOs, and people from the

22   region, whether they are in official capacities or sometimes

23   in oppositional, as it were, capacity.

24   Q.   You talked about websites, that terrorists have websites.

25   How do you know that those websites are actually the terrorist

1  website?

2  A.    Well, I mean, it is a very good question.  It is rare

3  that terrorist groups have websites that use their own names.

4  In fact, I would say these days that probably is not the case.

5  Before 2001 that was much more of the case.  In essence, you

6  just read their message.  Their messages invariably -- They

7  may have a different and much more benign sounding name, but

8  the messages and their information on them very clearly link

9  up to terrorist organizations that certainly extol the virtues

10  of known leaders of terrorist organizations.

11        They are often selling things as well that is promulgated

12  or advancing or embellishing terrorist activities.

13  Videotapes, flags, calendars with terrorist emblems on them to

14  me shows a very close connection, even though the name of the

15  organization on the website might not be a terrorist group's

16  name.

17  Q.    Have you written any books on terrorism?

18  A.    I have.

19  Q.    What are the names, the titles of the books?

20  A.    The most important one is Inside Terrorism, which was

21  written in 1998, and a second edition was published in 2006,

22  and is widely regarded to be sort of the standard text on

23  terrorism.  It is used in many universities in the United

24  States and throughout the world.  I wrote a book that was

25  published in Israel entitled, or titled British Military

1    strategy in Palestine 1939 to 1947, which was an analysis of

2    how British military and police operations were used against

3    the Jewish terrorists during that period.  And then in my

4    career at Rand I published, as I said, many reports that in

5    some cases were the length of books but not put out by a

6    commercial publisher.  They were published by Rand.

7    Q.    The books that you published, Inside Terrorism and the

8    one you said that was published in Israel, as wall as in other

9    articles -- Well, withdraw that question.  Have you written

10   articles, besides the books you mentioned and besides what you

11   wrote at Rand, have you written articles in journals or

12   magazines or newspapers?

13   A.    Well, yes.  I have haven't counted them up, but they are

14   in the scores.  And they -- Again, there is a spectrum.  They

15   are from opinion pieces, book reviews, articles for popular

16   magazines, to articles for scholarly journals, which are a

17   very different caliber, and also quality and requirements.

18   The articles for academic journals, for example, are routinely

19   peer reviewed, which means that they are anonymously reviewed

20   by at least two academics or professors who are specialists in

21   that field and anonymously provide comments on your work.  And

22   they are performing the same role as I designed as a Ph.D.

23   supervisor.  They are looking for sound methodology, they

24   provide comments, and respond to the comments, and only after

25   you have satisfied those two reviewers and then the editor of

1    the journal it is in fact published.

2    Q.    With regard to your book Inside Terrorism, was that peer

3    reviewed?

4    A.    Yes.  But as -- It was published in the United States by

5    the University Press, and the requirement to the University

6    Press again is that at least two anonymous, referees is what

7    they are called, review it and provide comments.

8    Q.    Do these reviews have a lot of comments or criticism of

9    your book?

10   A.    No.  I was very lucky.  In both editions their comments

11   were minimal to nonexistent.  And these were Middle Eastern

12   specialists.  At least I was told.  I don't know who they

13   were.

14   Q.    Are you a member of any organization?

15   A.    Yes.

16   Q.    What organization?

17   A.    The Council on Foreign Relations based in New York City.

18   Q.    Let's get these one at a time.  And what exactly is the

19   Council on Foreign Relations?

20   A.    The Council on Foreign Relations is the oldest foreign

21   policy association in the United States.  Its membership is by

22   nomination, you have to be proposed and seconded and then

23   election only.  It is entirely typical that persons who are

24   nominated are not voted admission to the council the first

25   time they apply.  So it is very selective.  And then

1  admission -- The council publishes the <u>Journal Foreign</u>

2  <u>Affairs</u>, which is also thought to be the leading foreign

3  policy journal in the United States.

4  Q.   How long have you been on the Council of Foreign

5  Relations?

6  A.   Nearly ten years since 1999.

7  Q.   What do you do for them?

8  A.   Council membership is kind of a two-way street.  When

9  asked, you are expected to serve on task forces, for example,

10  that deliver independent objective analyses of key foreign

11  policy issues.  So some years ago I was on the Council on

12  Foreign Relations task force on U.S. policy towards Iran.

13      You are also often asked to sit in on panels at the

14  council.  One of the council's strengths isn't only its

15  <u>Journal of Foreign Affairs</u>, but also has on a weekly basis

16  meetings in New York and Washington and around the country,

17  and they have experts who provide part of a panel, often with

18  opposing views, that are moderated to inform the public in

19  general, and members of the council, and you are expected to

20  identify members and to nominate them.  I suppose a softer

21  requirement is to publish in the <u>Journal of Foreign Affairs</u>,

22  which I have also done.

23  Q.   Have your publications been on terrorism?

24  A.   Yes.

25  Q.   Are you a member of any other organizations?

A.    I am a member of the Royal United Services Institute in London, which is the oldest sort of military history and strategic studies institute in the United Kingdom that, much like the Council on Foreign Relations, you have to be nominated and then elected.  It publishes its own journals.  It has meetings.  I go less frequently because I don't live in the United Kingdom.

Q.    Are you a member on any editorial board?

A.    Yes.  I am on the editorial in chief of the journal Studies in Conflict and Terrorism, that is published by Taylor & Francis, which is the leading scholarly, in fact I think it is the oldest scholarly publishers in the world founded in 1769.  I have been editor in chief since 1996, and I was associate editor from 1992 to 1996.  I am on the editorial board of Terrorism in Political Violence.  I am on the editorial board for the Journal of Policing and Intelligence published in Australia.  And I am also on the editorial board of a journal in the United Kingdom that specializes in diaspora communities, immigrant communities.  And I am also contributing editor to the National Interest magazine in Washington, D.C.

Q.    You used the term diaspora.  What is that?

A.    Basically immigrant communities living abroad that have left their homeland and relocated elsewhere.

Q.    Have you testified before Congress?

1    A.    I have, I would say at least three dozen times in the

2    past 20 years.

3    Q.    On what subject matters?

4    A.    Terrorism and insurgency.

5    Q.    Have you testified before in a trial?

6    A.    I have been an expert witness in trial proceedings.   I

7    have never been in court before.

8    Q.    The methodology you described of your research, is that

9    the accepted methodology in your field?

10   A.    Yes.  I mean, there is a variety of methodology.  Since I

11   was trained primarily as an historian, I first and foremost

12   attempt to work with our archival material documents.  In the

13   study of terrorist groups that is often difficult, so one

14   supplements that with interviews, oral histories, as it were,

15   as well as research of open source literature.

16   Q.    Why is it difficult for archival material with terrorist

17   groups?

18   A.    I can go to the national archives in Washington and look

19   at the records that have been declassified, because especially

20   the State Department or Department of Justice or Department of

21   Defense keeps those records and releases them.  Terrorist

22   groups very rarely maintain documents or archives because

23   often they are incriminating.

24   Q.    Have you studied as part of your study of terrorism the

25   relationship between a terrorist group and the community where

1   it is based?

2   A.   Yes.   There is a symbiotic relationship -- It is

3   impossible to study terrorism in a vacuum.   You have to look

4   at the grievances and the communities from which the

5   terrorists seek to draw recruits in, and support, and also

6   finances.

7   Q.   Are you getting paid for your testimony?

8   A.   I haven't been paid yet.

9   Q.   You hope to get paid?

10  A.   I will get paid, I assume, yes.

11  Q.   What is your hourly rate?

12  A.   My hourly rate is $434.50, which is the standard rate for

13  all of my consulting work, whether it is government or

14  non-government, private sector or public sector.

15          MR. JONAS:   Your Honor, I offer Doctor Hoffman as an

16  expert in the field of terrorism.

17          THE COURT:   Counsel?

18          MR. DRATEL:   We have our previous objections.

19          THE COURT:   And those are overruled, and Doctor

20  Hoffman is accepted as an expert in the field of terrorism.

21          MR. JONAS:   Thank you, sir.

22  Q.   (BY MR. JONAS)   Doctor Hoffman, are you familiar with

23  Hamas?

24  A.   I am.

25  Q.   Okay.   What is your understanding of what Hamas is?

1    A.   Hamas is an acronym in Arabic of Islamic Resistance

2    Movement.  It is a group that was formally established in

3    1987, and its purpose is the destruction of the state of

4    Israel and establish a Palestinian state based on Islamic

5    precepts or Islamic law.

6    Q.   Are you familiar with Hamas, that it has a social or

7    charity wing?

8    A.   Yes, I am.

9    Q.   Is Hamas the only terrorist organization that uses social

10   activity or charities as part of the organization?

11   A.   No, not at all.  But I would say that it is only the

12   more, quote unquote, professional or the more established

13   terrorist organizations that are able to develop those kinds

14   of relationships.  That is in essence what sustains the

15   terrorist organizations is their relationships with their

16   communities or constituents.

17   Q.   What sort of -- Why?

18   A.   Well, terrorism doesn't really exist in a vacuum.  Often

19   it is portrayed as wanton or mindless homicidal violence, but

20   in fact it is violence that has a purpose, and the purpose is

21   also political.  And if the purpose is political -- Terrorism

22   is politics, it is about power, it is about having control and

23   having the ability to influence and to exert some sort of

24   sovereignty and control over both population, symbiotic

25   relationship over either sometimes self-perceived or in many

1    cases actual constituents or supporters and sympathizers.

2    Q.   Can you be more specific in layman's terms?

3    A.   Individuals who themselves may not commit acts of

4    violence, but either actively or passively support the aims

5    and activities of a terrorist organization.

6    Q.   How does these terrorist organizations that have these

7    social wings -- First of all, what sort of services do they

8    provide to that local population, or constituency as you call

9    it?

10   A.   This is why it is not something in a vacuum, that in many

11   cases it is a two-way street where terrorist organizations

12   again the most -- I think the most established ones will

13   routinely engage in the provision of socioeconomic support and

14   activities to those communities for two reasons.  One because

15   if they are engaged in setting up schools, health clinics,

16   providing jobs, providing counseling, they then believe that

17   they can legitimately claim that they are not terrorists; that

18   they are doing social welfare.  So it is to launder or burnish

19   or sort of depict their relationship with the community in a

20   different way and to show that they are not terrorists.

21        They also do it because they are looking to get the

22   support of that community, and they are looking in essence to

23   be a shadow government to replace either other rival

24   terrorists or political groups, or to replace the established

25   government in an area and, therefore, to win over the hearts

1    and minds of the population to their side.

2    Q.   You said a few things there that I want to break down a

3    little bit.  And you mentioned briefly some services that are

4    provided.  Can you elaborate a little more on that on

5    generally the successful terrorists groups that have these

6    what sort of services are they providing to that local

7    community?

8    A.   The services span a gamut.  It is in essence what can

9    bring them closer to the community and favorably impress the

10   community.  It is also, I would argue, an instrument that

11   enables the terrorist to exert control over the community as

12   well.  So many terrorist organizations throughout history,

13   many places throughout the world, for instance, engage in what

14   we would superficially say is a positive thing.  They create

15   schools, they provide teachers, they provide textbooks, they

16   establish curricula.  The problem is, of course, it is not as

17   we know schooling and school boards that are reflected and

18   that represent the community, but rather are designed, at

19   least in my view, to provide a very narrow vision, very

20   self-serving education, that is designed to convince the

21   community that the terrorist viewpoint is not only the right

22   one, but the only viewpoint, and, therefore, I would argue to

23   gain a stranglehold over the shaping of the young minds,

24   although this is portrayed as benevolent activity.

25   Q.   What other types of services are being provided to exert

1    control over the community?

2    A.    Terrorism doesn't occur in a vacuum.  It is often a

3    response to a variety of grievances.  In many cases the

4    grievances are the inability of local host governments or

5    occupying governments to provide basic services.  So terrorist

6    groups will provide medical treatment, for example.  And

7    obviously the desire, at least in my view, it is not entirely,

8    again, benevolent.  If someone is providing you with medical

9    treatment, obviously you are going to support them in

10   elections or support them against rival groups, or support

11   them against various governments.

12        Many terrorist groups throughout the world, as both a

13   form of income generation but also of patronage, run

14   businesses, restaurants, bakeries, shoe factories, I mean, you

15   name it, and basically what they are doing is giving people

16   jobs, so it is almost like the political machines, the bosses

17   that existed in the United States in the 19th century when

18   immigrant would arrive in the country that would take people

19   under their wing, give them jobs, perhaps give them some food,

20   help them with food, medical needs perhaps, and they would

21   create a patronage relationship which meant the people would

22   support those who were providing jobs, medical services,

23   access to education, in place of either the established

24   government or in place of other political parties.

25   Q.    So if the terrorist group provides these services and you

1    are saying people will support them, how are the people

2    supporting them?

3    A.    Well, certainly if and when a political environment

4    matures to the point where it can have elections, they would

5    vote for them, but that is probably more rare.  I would say

6    that they provide support in terms of -- I mean, the terrorist

7    through their roles in schools and community services have

8    created a potential pool of recruits or sympathizers and

9    supporters who will give money, provide information, provide

10   logistical assistance.  The shooting and bombing is only a

11   small part of terrorism.  There is often a large logistical

12   trail of safehouses, of places where you can stash arms,

13   fundraising money laundering through perfectly legal

14   commercial concerns.  All these things feed into how a

15   terrorist organization sustains itself.

16   Q.    Can you give some examples of successful terrorist

17   organizations that have used this type of social network to

18   support itself?

19   A.    Sure.  In the United States I would say a particularly

20   important example was Noraid the Northern Ireland Aid

21   Committee, which was established in 1970 by an individual who

22   had fought for Irish independence in the 1910s and 1920s and

23   emigrated to the United States.  And then when the so called

24   troubles, when the violence and terrorism began in Northern

25   Ireland in 1969, the following year he set up this committee

1    and described it as pursuing humanitarian purposes in the

2    United States that sought to tap into the vast Irish-American

3    community here to raise funds, which they claimed was going to

4    help the families of imprisoned Irish terrorists widely,

5    according to the British and American press, roughly 75

6    percent of the money raised went to actually buy arms and

7    ammunition.  Money did go to the prisoners as well, but this

8    was an organization that operated openly in the United States

9    that said it was on a humanitarian mission, but was very

10   closely connected to the Irish Republican Army.

11   Q.   And was the IRA a what you would call a successful or

12   long-standing terrorist group because of the aid they were

13   receiving?

14   A.   Absolutely.  Again, government officials in both the

15   United States and Britain have said the IRA would have

16   survived would it not have been from the support they were

17   able to Garner from Noraid in the United States.

18   Q.   What about organizations that win the hearts and minds of

19   the local population through the social services?  Besides the

20   IRA are there other examples?  I mean, is Hamas one of them?

21   A.   Yes.  And including the IRA, but certainly Hamas as well

22   in both the West Bank and Gaza strip provides these forms of

23   services--schools, medical, jobs, counseling.

24   Q.   Any other terrorist groups that are successful because of

25   this?

1   A.   Well, I think the model is probably the Palestine

2   Liberation organization, that of course in the 1960s was not

3   only engaged in violence but also pioneered this sort of dual

4   role of both running schools, providing social benefits,

5   providing jobs.  Hezbollah in Lebanon certainly is another

6   case that has been a model for many other groups.  The Tamil

7   Tigers in Sri Lanka would be another case where you see

8   activities in terms of fundraising among the diaspora creation

9   of a parallel socioeconomic activities in Sri Lanka.  The PKK

10  is active in similar ways in Germany and Eastern Turkey.

11  Q.   Is the PKK an Islamist organization or Muslim

12  organization?

13  A.   Well, kurds are Muslims, but I wouldn't say it is a

14  religious organization.  I would say it is more of a left wing

15  socialist organization.

16  Q.   Are there terrorist groups out there that do not have a

17  social wing or a social network?

18  A.   There are, but they are generally the least consequential

19  ones.  They are the ones that have the greatest difficulty

20  surviving.  They are the ones that rarely can go beyond

21  isolated sporadic acts of violence and that are not able to

22  position themselves on the world stage or not able really to

23  attract attention to themselves or to create the kind of

24  constituency that they believe can propel them into power.

25  Q.   In your opinion, in your research is there a correlation

1    between the successful ones that have these social wings and

2    the non-successful ones that don't?

3    A.    I would say almost without exception the successful

4    terrorist organization is one that has created these social

5    wings and is able to operate in this fashion.

6    Q.    When these terrorist organizations do have these social

7    wings, do they provide the services -- You testified about the

8    education and everything else, the jobs.  Do they exclusively

9    provide them to those who are their supporters, or do they

10   provide them to the community in general where they are based?

11   A.    Well, generally, first and foremost to its supporters.

12   But you are talking about sort of a process designed to

13   radiate outward, to draw more and more people in.  So it is

14   initially addressed particularly to the supporters, and you

15   will find these organizations are strongest in communities

16   where there is the greatest support, because basically these

17   groups are not run out of town by people that expose them.

18   Q.    So do the services go to supporters?  So I understand

19   what you are saying, it is used to recruit supporters?

20   A.    Right.  It is designed to build on the success and

21   gradually expand your influence or activities.

22   Q.    The social network.  How does the terrorist group provide

23   the services to the people?

24   A.    Almost exclusively through front organizations.

25   Q.    What do you mean by a front organization?

1    A.    Organizations that don't have the same name as the

2    terrorist group that I suppose publicly conceal their

3    identities, but then in these communities it is widely known

4    that there is this connection.

5    Q.    Let me break that down for a moment.  When you say they

6    publicly conceal their identities, why?

7    A.    Well, because generally if it was publicly known or

8    publicized that a terrorist group was running one of these

9    non-governmental organizations or running one of these

10   humanitarian organizations, I mean, they would be closed down.

11   They would be seen as an extension of a terrorist

12   organization.  So there is a delicate balancing game, I would

13   argue, that is often played where the terrorist organizations

14   want to conceal overtly their involvement, but under the

15   surface when you become involved and are familiar with their

16   activities, it is made clear where the money or resources are

17   coming from.

18   Q.    In order to garner the support of the local community

19   where did the local community need to go to know that this

20   front organization is actually affiliated with the terrorist

21   groups?

22   A.    Usually word of mouth is enough to take care of that.

23   The people in the local communities know where it is coming

24   from, and certainly there are individuals that are happy to

25   talk about it.  I would say it is probably rarer that you

1   would see something printed that makes that actual connection,

2   but certainly word of mouth often is sufficient.

3   Q.   When you say word of mouth, do you mean word of mouth in

4   that community?

5   A.   In the community.

6   Q.   Otherwise, how could the terrorist group get credit for

7   what they are doing and get the recruits if they don't

8   advertise within the community?

9   A.   Precisely.  That is the delicate balancing act.  The

10  overt connection is deliberately concealed, but it is known

11  amongst the community, it is known certainly amongst the

12  authorities who is behind it.  If I can give you an example?

13  Q.   Sure.

14  A.   Noraid was conceived -- this Northern Ireland Aid is a

15  completely independent entity, but yet it was widely known

16  that it was closely affiliated with the Irish Republican Army.

17  You would never find a document that says Noraid walls equals

18  IRA, but there was overwhelming membership.  For example, the

19  newspapers often had illusions.  Certainly the newspapers

20  always had favorable coverage of the IRA, so it was a

21  certain -- I won't say the overt connection was made, but

22  certainly the group didn't hide its support of the Irish

23  Republican Army, but it wouldn't maintain that it was a part

24  of the Irish Republican Army.

25  Q.   As a researcher if you were to approach somebody, a

1   member of one of these front social organizations, would you

2   expect them to tell you that?

3   A.   Well, in my case, especially as a terrorism researcher, I

4   would think they would want to conceal it.

5   Q.   Why?

6   A.   Terrorism is illegal and a terrorist organization always

7   wants to conceal its involvement with legitimate organizations

8   for fear of tainting those legitimate organizations; I mean,

9   in essence killing the goose that lays the golden egg.

10  Q.   But why not tell you?  What would you do with the

11  information?

12  A.   Well, given that as an academician, as a researcher, my

13  job is in essence to do research and then to publish it, so I

14  would publish and publicize it.

15  Q.   What would you expect to happen to these organizations if

16  you published it?

17  A.   I would expect the authorities -- More attention would be

18  focused on these relationships, and the authorities would

19  doubtlessly investigate them and offer them up still further

20  proof that there is still this connection despite the game

21  that is played.

22  Q.   As a researcher, how would you determine which what did

23  you call non-profit organizations or charity groups located in

24  these areas where you have the group that you identified

25  Hezbollah Tamil Tigers, Hamas, as a researcher how would you

1    determine which groups are affiliated with the terrorist

2    organizations and which ones are not?

3    A.    Well, newspaper accounts, court transcript, for example,

4    analyses by other academics by academic institutions, think

5    tanks, and ideally what you want to do is do field work, to go

6    to that location and speak to persons, government authorities,

7    police officers, but also speak with people in the community,

8    knowledgeable people, and this could include academics,

9    community workers, journalists, of course local officials.

10   Q.    Have you studied how the terrorist organizations usually

11   get the money for these social services that they provide?

12   A.    Yes.

13   Q.    How so generally?

14   A.    Both elicit and licit activities.  Many terrorist

15   activities are involved in robbing banks, kidnapping people

16   and holding them as hostages, trafficking in narcotics,

17   trafficking in weapons and other contraband, but I would say

18   almost without exception again, these established terrorist

19   groups engage in above-ground legal activities.  Unfortunately

20   fundraising and charity is one of the main ones.

21   Q.    One question I forgot to ask you a moment ago when I was

22   asking research which front and which ones aren't.  Would you

23   also look at who is running those front groups?

24   A.    Yes, especially to see if there is overlapping

25   membership, especially to see what their past history was.  I

1   mean, in the case of Noraid, many of the people had previous

2   service in terrorist organizations and now are working in the

3   charitable arm.  I mean, it may be they were reformed, or

4   maybe not be, but that would be an important indicator.

5   Q.   Jump back now to what you were talking about a moment ago

6   in the funding.  If an individual wants to give money to an

7   organization, a charity organization in one of these areas of

8   the world that these terrorist groups operate, are there, in

9   your studies, legitimate charities that have that are not

10  affiliated with terrorist groups that they can give money to?

11  A.   Absolutely, almost without exception.

12  Q.   And have you seen any in the West Bank or Gaza?

13  A.   Of course.  Palestine Red Crescent for example, United

14  Nations Relief and Welfare Agency, UNICEF for instance.

15  Q.   Have you found in your research when governments try to

16  cut off the funding to a terrorist organization, including the

17  social network, does that have an impact on the terrorist

18  organization?

19  A.   Absolutely.  I think -- You know, for a terrorist

20  organization, again part of their budget may be spent on bombs

21  and bullets, but another part is spent on the social welfare

22  to gain the allegiance or support that they can draw upon.  So

23  if you are cutting off their money, you are in essence making

24  it far more difficult for them to cultivate these

25  relationships with their communities.

1    Q.    In your opinion, in your expert opinion, is charity in

2    the hands of a terrorist organization a good thing or a bad

3    thing?

4    A.    It is absolutely a bad thing.

5    Q.    And why is that?

6    A.    Well, as I said, one of my problems as a researcher is

7    terrorists don't have the same sorts of transparency or the

8    same sorts of book keeping or archival records, or even a

9    responsibility for the truth as the governments or established

10   corporations have.  So in this sense often their books are not

11   open, they are engaging in this subterfuge to begin with, and

12   since the terrorist groups are in the back of legal charities

13   are very innocent or benign sounding charities I think the

14   main problem is that charitable organizations are in the

15   business to doing good works, to engage in charitable

16   activities.  I mean, terrorist organizations are in the

17   business to kill people and part of their bid to gain power.

18   So whether they are advancing to power on the bodies and the

19   bloodshed of others or through the subterfuge or through this

20   clandestine provision of charity and welfare, it is to the

21   same end.  It is enabling them to obtain power and influence.

22   Q.    What if the terrorist groups are taking care of orphans

23   or giving backpacks to children or providing food to people?

24   How is it a bad thing?

25   A.    Well, I mean, in my view charities do this because it is

1    a good thing, and they are not looking for anything in return.

2    Terrorist groups are looking for something in return.  They

3    are looking for on the one hand the allegiance to the people

4    or suborn the people, and they are looking to develop  or to

5    exercise control over a population.

6                    MR. JONAS:  Pass the witness.

7                    THE COURT:  Who is first up?

8                    MR. WESTFALL:  I have no questions.

9                    THE COURT:  Ms. Hollander, any questions?

10                   MS. HOLLANDER:  No questions.

11                   THE COURT:  Mr. Dratel?

12                   MR. DRATEL:  I have no questions.

13                   MS. MORENO:  No questions.

14                   MS. CADEDDU:  No, Your Honor.

15                   THE COURT:  Doctor Hoffman, you may step down.  You

16   are free to go.

17                   THE COURT:  Agent Burns, once again.  Who

18   was -- Counsel, you are up?

19                   MR. MYSLIWIEC:  Yes, Your Honor.

20   Q.   (BY MR. MYSLIWIEC)  If I can quickly backtrack to

21   something we were looking at before lunch.

22        InfoCom Search page 20.  I am sorry.  InfoCom search 29,

23   page 20.

24   Q.   (BY MR. MYSLIWIEC)  If we look at the top of that

25   document, this is about -- The content has to do with the

1    Young Men's Muslim Association of Hebron.  Right?

2    A.    Correct.

3    Q.    And it is a certification that this association was

4    registered in accordance with law No. 33 of the year 1966 on

5    the 9th of February 1987.  And at the top there it talks about

6    the Hashemite Kingdom of Jordan.  Right?

7    A.    Yes.

8    Q.    This is an example of how some zakat committees were

9    originally authorized under Jordanian law.  Right?

10    A.    Some of the zakat committees originally were underneath

11    -- I think their Endowments Section was underneath Jordanian

12    law.

13    Q.    Okay.  I don't think we covered this document.

14              MR. MYSLIWIEC:  HLF Search No. 81, this is in

15    evidence.  Correct?

16              THE COURT:  Let me check.

17              MR. JONAS:  Our records show that it is.

18              MR. MYSLIWIEC:  Thanks.

19        If I could go to page 5.

20    Q.    (BY MR. MYSLIWIEC)  Okay.  At the bottom right hand

21    corner there is one of those -- Actually let's go to the top

22    there.  It has got that eagle again.  It looks like a

23    certified, or maybe not a certified document, but a document

24    with this official logo on it.  Right?  The top center?

25    A.    It has the stamp on it.  I mean, it not appear to be

1   certified.

2   Q.   Right.  And that is the Arabic document.  Right?

3   A.   That is correct.

4        MR. MYSLIWIEC:  If we could go to page 55.  This is

5   the English translation of that document.  If we could go to

6   the top left hand corner.

7   Q.   (BY MR. MYSLIWIEC)  And it says, "The Palestinian

8   National Authority Ministry of Endowment and Religious

9   Affairs," and the document is dated April 6th, 1999.

10  A.   That is the date.  This is Jenin zakat committee

11  letterhead.

12  Q.   Could you read the text of what is in the box, and go on

13  to the first paragraph?

14  A.   It says "The honorable brothers in the Holy Land

15  Foundation -- America -- God protect you.

16       "God's peace, mercy and blessings be upon you.

17       "The Zakat Finance Committee of the Governorate of Jenin

18  would like to express its deepest thanks and utmost gratitude

19  for the services and assistance that you provide to the poor

20  and the orphans.  We also would like to thank you for

21  contributing to the success of the charitable committee's

22  projects, last of which was your effective contribution in the

23  sacrifices project for the year 1999.  The committee received

24  34 sacrifices from your esteemed organization, may God reward

25  it well, and they were distributed to about 550 poor and needy

1    families.  This had a good effect on the souls of those

2    Beneficiaries, especially because it came in the appropriate

3    time."

4    Q.   Okay.  And this Jenin zakat committee, as we covered

5    earlier, is the same zakat committee that is identified in

6    Count 1 of the indictment.  Right?

7    A.   Correct.

8         MR. MYSLIWIEC:  I am going to go back to the elmo

9    now.

10        May I approach the witness, Your Honor?

11        THE COURT:  Yes.

12   Q.   (BY MR. MYSLIWIEC)  This is another exhibit I believe

13   that was admitted outside the presence of the jury.  It is a

14   government prepared exhibit, HLF Search No. 171.  Can you just

15   identify what the document says up at the top?

16   A.   It says "Alms Committee Tulkarm Governorate," which would

17   be the Tulkarem zakat committee.

18   Q.   Okay.  And if you could read through -- It is dated July

19   14th, 1981.

20   A.   That doesn't --

21   Q.   No, it is dated October 31st, 1995.

22   A.   Yes, that is it.

23   Q.   Right.  That other date has to do with the establishment

24   of the alms committee.

25   A.   I can't tell from this particular document, but it

definitely is not the date of the document.
Q. Right. And can you read No. 3?
A. Okay. Under "aims"?
Q. Yes.
A. "To supervise the Alms Committee Hospital at Tulkarm and to manage its affairs and working to develop it so it can help the Arabic and human society in all the medical fields by any possible means, and mainly by:
"Establishing a hospital as the modern bases and measurements of the developed medical centers and can hold many beds.
"The hospital includes the following main sections:
"1. Remedy section for children.
"2. Birth and women's diseases section.
"3. Developed medical center for eye diseases and surgery.
"4. General surgery section.
"5. Abdomen diseases and heart section.
"6." I think that you should be orthopedics.
Q. You can stop there. And at the top underlined is "Basic System of the Deans Council of the Alms Committee Hospital at Tulkarm." Right?
A. Yes.
Q. Okay. And under No. 5 it talks about council membership for this alms committee. Right? Alms Committee Hospital?

1  A.   It is for the hospital.

2  Q.   Yes.  Can you just read --

3  A.   It says --

4  Q.   No. 5, "Council membership," until you get to C.

5  A.   "Council membership:

6       "a.  The council consists of at most 20 members.

7       "b.  The membership of the new member is approved by

8  nomination and selecting by the existing council.  Also the

9  new membership is approved by secret election.  The Deans

10  Council should inform the Ministry of 'Wakf' about this

11  matter.  The Minister can reject any member who is not applied

12  to.

13       "c.  The member should meet the following conditions."

14  Q.   Okay.  You can stop there.

15       MR. MYSLIWIEC:  If we can go to the next page.

16  Q.   (BY MR. MYSLIWIEC)  No. 10 has to do with the council's

17  financing.  Can you read No. 10?

18  A.   It says, "a.  The budget of the council consists of

19  commitments, contributes, offers, hospital's income, the

20  hospital's wakf, and from any other legitimated sources

21  decided by the council.

22       "b.  The money of the council is kept at the bank/banks

23  which the council assigns and can be drawn by the signee of

24  the accredited by the Deans Council.

25       "c.  The year begins at the beginning of January and ends

1    at the end of the December of each year.

2        "d.   The council assigns an accounting preciser who gives

3    an annual report for the council.

4        "e.   The money of the council is to be spent to achieve

5    its goals by the budget items, and is not to be spent for any

6    other purpose.

7    Q.    Okay.  Now, this document also seems to talk about

8    loosening of the council, which is No. 12.  Can you read

9    No. 12, 12-a, what appears under 12-a?

10   A.    Okay.  "12.  Loosening the council.

11       "A.   The council can't be loosened by any group outside

12   the council, and this right is to the Minister of Wakf in

13   addition to his job in the following two cases:

14       "Presenting the Minister an explained memorandum signed

15   by 2/3 of the council's members demanding to loosen the

16   council.

17       "If a decision was made by a special court to loosen the

18   counsel, the Minister approves this decision and the decision

19   of the court must be final."

20   Q.    And then if you turn to the next page -- By the way, that

21   Minister of Wakf again is a department of the Palestinian

22   Authority.  Right?

23   A.    It is under the Palestinian Authority.

24   Q.    If you turn to the next page, and if you will go to c,

25   can you read c?

A.    "If the council is loosened for any reason, the

hospital's rental with all including furniture and public or

private medical tools transferred or fixed and any other money

returns finally to the Alms Committee at Tulkarm Governorate

and next to the Ministry of Wakf for the benefit of Tulkarm

citizens."

Q.    So this seems to be saying if the council is loosened,

the money and other property will first go to the alms

committee at Tulkarem.  Right?

A.    That is what it says.

Q.    And the alms committee at Tulkarem is the Tulkarem zakat

committee in Count 1.  Right?

A.    Correct.

Q.    And after it goes there, the document identifies the next

place the money is supposed to go, which is to the Ministry of

Wakf for the benefit of Tulkarem citizens.  Right?

A.    That is what it says.

Q.    Sticking with the Tulkarem zakat committee for a moment.

            MR. MYSLIWIEC:  Your Honor, may I approach?

            THE COURT:  Yes.

Q.    (BY MR. MYSLIWIEC)  This is a document that has been

admitted outside the presence of the jury, and this is also a

Government prepared document which the Defense has moved into

evidence called HLF Search No. 170.  You can see that right

down there.  Right?

1    A.    I do.

2    Q.    And again it has got an HLDL bates stamp on it, and it

3    was recovered at the offices of the Holy Land Foundation.

4    Right?

5    A.    That is correct.  And just to note, I think these two

6    documents may also appear in another exhibit.  These may have

7    been duplicate copies.  We may see them in the evidence twice.

8    Q.    Okay.  And it has got a heading for the Palestinian

9    National Authority on it, "Tulkarm Zakat Committee."  Right?

10   A.    This is Tulkarem zakat committee letterhead.

11   Q.    It identifies the Holy Land Foundation for Relief and

12   Development.

13   A.    Yes.

14   Q.    And it says then, "Dear directors," and can you read what

15   it says up until it gets to the chart?

16   A.    "Dear directors:

17        "Thank you for your generous assistance for our zakat

18   hospital.  As you know, we are in a critical situation

19   experiencing very difficult conditions.  With your support our

20   emergency department will provide for the management of

21   critically wounded people as urgent cases arise.  To

22   facilitate this mission the following medical supplies are

23   needed."

24   Q.    We don't have to go through all of these, but just to

25   give a sample of some of the things that are asked for or

1  needed, there are wheelchairs, four wheelchairs are needed.

2  Right?

3  A.   That is what it says.

4  Q.   No. 12, four stretchers are needed?

5  A.   That is what it says.

6  Q.   An ambulance is needed?

7  A.   That is what it says.

8  Q.   And a mobile X-ray unit is needed?

9  A.   Correct.

10 Q.   Things a hospital would need?

11 A.   Correct.

12 Q.   This is another exhibit that has been admitted outside

13 the presence of the jury.  It is called Defendants' Exhibit

14 No. 1395.  And it has the Palestinian National Authority

15 symbol on there.  Right?

16 A.   This is Halhul Security letterhead with that eagle on it.

17 Q.   Now, Halhul zakat committee is not a zakat committee that

18 you made a summary chart for.  Right?

19 A.   That is correct.

20 Q.   And it is not a zakat committee that is in the

21 indictment.

22 A.   That is correct.

23 Q.   But it is a zakat committee that the Holy Land Foundation

24 also sent donations to.

25 A.   That is correct.

1    Q.    Page 21 -- I am sorry.  It is actually numbered at --

2    Page 22 of the exhibit is a translation of page 21 of the

3    previous document.  Can you just read after it says, "God's

4    peace, mercy and blessings be upon you"?

5    A.    It says, "The school backbag project left the best

6    impression on the poor students of the town of Halhul.  We

7    extend to you, on their behalf and on behalf of the residents

8    of Halhul in general,

9         "Our sincere thanks and appreciation, praying to God that

10   your work is added to the scale of your good deeds on the Day

11   of Judgement.  Amen, O Lord of the two worlds.

12        "And may God reward you well.

13        "And may you remain to be the continued support to the

14   students of knowledge in Palestine in general."

15   Q.    And it is signed Halhul Zakat and Charity Committee.

16   Right?

17   A.    Correct.

18   Q.    And it is to the honorable brothers at the Holy Land

19   Foundation?

20   A.    Correct.

21   Q.    If we can go to page 53, we have another document in

22   Arabic.  Right?

23   A.    Yes.  I am just trying to find it in my paper copy.  Do

24   you know what page it is in here?

25   Q.    It has the number --

```
1    A.    I see it.

2    Q.    -- 53 in the lower --

3    A.    I have it.  What was your question?

4    Q.    Just that the original document is in Arabic.  Right?

5    A.    That is correct.

6    Q.    It appears that it is addressed to the honorable

7    brothers, the Holy Land Foundation.  Right?

8    A.    That is what it says.

9    Q.    And can you read the first paragraph there?

10   A.    "On the 10th anniversary of the establishment of the Holy

11   Land Foundation, it pleases me to present to you the kindest

12   felicitations on this great occasion that is cherished by the

13   hearts of the Palestinian people within and abroad and by the

14   hearts of the oppressed everywhere."

15   Q.    This document is dated June 13th of 2000.  Right?

16   A.    Yes, sir.

17   Q.    And if we go to page 55, we have another -- Let me pull

18   this out a bit.  Another Arabic document.  Correct?

19   A.    Correct.

20   Q.    And the next page is an English translation.

21   A.    It is.

22   Q.    That is dated May 18th, 2000.  Right?

23   A.    Correct.

24   Q.    It has the Palestinian National Authority Ministry of

25   Social Affairs as part of the letterhead.  Correct?
```

1    A.    It does.

2    Q.    And that is the -- Well, this one is also addressed to

3    the Holy Land Foundation for Relief and Development.  Correct?

4    A.    Correct.

5    Q.    And it has the seal of the Ministry of Social Affairs as

6    well.  Right?

7    A.    That is what the seal says.  I can't personally identify

8    it, but that is what it says.

9    Q.    According to the document?

10   A.    Right.

11   Q.    Can you read the first paragraph there?

12   A.    It says, "The Ministry of Social Affairs (the General

13   Directorate for the Family and Childhood) presents its finest

14   greetings and felicitations to you for the elapse of the first

15   decade on the journey of giving under the heading of 'Ten

16   Years of Making Life.'"

17   Q.    And if you can continue on through the rest of the

18   letter.

19   A.    "We value your constructive efforts to serve and protect

20   the childhood through your services and the variety of

21   assistance that are presented to the childhood through the

22   caring for the Palestinian family and what this family suffers

23   from oppression and deprivation as a result of the

24   deteriorating economic situation.

25        "We reiterate our deep gratitude to what you have given

1    and continue to give from help and support, and we hope from

2    your excellency the continued support of our children with the

3    resources that you have available to you, considering the

4    importance of your effective role in alleviating the

5    sufferings of our people."

6    Q.    And it is signed by the director of the Department of

7    Children and Hardships.  Right?

8    A.    That is what it says.

9    Q.    It looks to be a letter that comes from the Palestinian

10   National Authority Ministry of Social Affairs.

11   A.    I am reading the letterhead.

12   Q.    According to what the document seems to say?

13   A.    Correct.

14   Q.    And 2000 is roughly, give or take a year or two, the

15   ten-year anniversary of Holy Land Foundation?

16   A.    They began in early '88, so 12 years.

17   Q.    Okay.  And so this seems to be a congratulation about the

18   work that the Holy Land Foundation has done over a decade.

19   A.    I mean, it says, "We reiterate our deep gratitude to what

20   you have done," so.

21   Q.    And if I go back to page 54, that seems to be the same

22   kind of document congratulating the Holy Land Foundation on

23   its tenth year anniversary from a different division of the

24   Palestinian National Authority, that Ministry of Planning and

25   International Cooperation Institutional Building and Human

1    Development Directorate.  Right?

2    A.    That is what it says.

3    Q.    And there is another letter on page 113, what is

4    described as page 113 of the exhibit right here, another

5    letter in Arabic, and it has the eagle on it.  Page 114 has an

6    English translation.  This letter appears to be from another

7    division of the Palestinian National Authority, the Ministry

8    of Industry Ministers Office.  Correct?

9    A.    That is what it says.

10   Q.    It is dated in 2000 as well, May 17th of 2000.  Correct?

11   A.    Correct.

12   Q.    Could you read this letter, too, please?

13   A.    "The Palestinian Ministry of Industry presents its

14   heartfelt congratulations to the brothers at the Holy Land

15   Foundation for Relief and Development in America on the

16   occasion of celebrating the first decade of the Foundation's

17   journey under the title (Ten Years of Making Life).  As we

18   take advantage of this occasion, we hope that the brothers at

19   the Foundation increase the assistance that is offered to our

20   people in Palestine."

21   Q.    And I know this can cause some eyestrain, but hopefully

22   we are getting there.  This is another -- This is the next

23   page, page 115, it is another Arabic document.  This time it

24   is the PLO, the Palestine Liberation Organization.  Correct?

25   A.    That is what it says.

1    Q.    Office of the President?

2    A.    That is what it says.

3    Q.    Who was Yasser Arafat?

4    A.    Yes.

5    Q.    The next page indicates that this is dated May 24th,

6    2000.

7    A.    It does.

8    Q.    Can you read from, "The brothers"?

9    A.    It says, "The brothers/The Holy Land Foundation for

10   Relief and Development, may God keep them.  Best greetings.

11        "In appreciation of your efforts in assisting the poor

12   and doing the humanitarian work, we congratulate you in the

13   10th anniversary of the establishment of your benevolent

14   foundation for the Holy Land, wishing you all success and

15   progress in serving your people."

16   Q.    And it seems to be signed by a president's advisor, an

17   advisor to the president of the PLO?

18   A.    It says President's Advisor for Tribal Affairs.

19   Q.    These are the last two pages of this exhibit.  This is

20   another Arabic document.  It is page -- It is labeled page

21   143.  This has different letterhead at the top which says the

22   Jordanian Hashemite Fund for Human Development.  Right?

23   A.    It does.

24   Q.    And the next page is an English translation.  This

25   document is dated October 7th, 1999.  Could you read from

1  "respectable gentlemen at the Holy Land Foundation" through

2  the end?

3  A.    "Respectful gentlemen at the Holy Land Foundation Fund

4  for Relief and Development.  Best regards to proceed.

5        "It pleases me to send you the best regards and sincere

6  wishes for a continuous success.

7        "I would like to express my deepest gratitude and thanks

8  for your continued cooperation with the Charity and

9  Philanthropy campaign which is being carried out by the

10  Jordanian Hashemite Fund for Human Development to assist the

11  needy families, the last of it was the school backbags, which

12  was distributed at the beginning of the school year.

13        "Your participation in the campaign by distributing 2000

14  school backbags to the poor students in various areas had the

15  most positive effect, because it expresses your keenness in

16  extending a helping hand and to give the assistance for this

17  faction of our brothers, the conditions of whose life have

18  become difficult and who have fallen a prey to dire need.

19        "As I confirm my appreciation for you and your good

20  cooperation, I look forward to continuing this cooperation and

21  reinforcing its horizons in all aspects to achieve our common

22  goals.  Wishing you all good and health."

23  Q.    And Jordan kicked Hamas out of its country in roughly --

24  Was it the mid '90s?

25  A.    Actually the Hamas leaders were exiled from Jordan in

1     1999, I believe.

2     Q.   Okay.

3     A.   I think it was September of 1999, September or October.

4     I may be wrong on that date.

5     Q.   You think it is September of '99?

6     A.   I think it is.

7     Q.   And this is a letter dated October of '99 from a

8     Jordanian Hashemite Fund thanking the Holy Land for its work

9     there for its contributions?

10    A.   Correct.  And excuse me.  I am sorry.  I don't know what

11    the Jordanian Hashemite Fund for Human Development is.  That

12    may be a charitable organization.  I don't know what that is,

13    so I don't know that it would be affiliated with the Jordanian

14    government.

15    Q.   I am not saying what it is.  That is why I said

16    specifically what the title is.

17    A.   Okay.

18    Q.   I am going to hand up another exhibit.  This is what has

19    been admitted outside the presence of the jury as Defense

20    Exhibit No. 1396.  And it has a couple of pages in Arabic.

21    Right?

22    A.   It does.

23    Q.   And then it has English translations.  Correct?

24    A.   Correct.

25    Q.   And the English translation indicates that in the

1    letterhead this is from the zakat committee in Nablus.  Right?

2    A.    That is correct.

3    Q.    Going back to this list, the Nablus zakat committee is

4    one of the zakat committees that is listed in the indictment

5    and in Count 1.  Right?

6    A.    That is correct.

7    Q.    And this is a letter to the Occupied Land Fund that is

8    dated September 4th, 1990.  Right?

9    A.    Correct.  Although there is a fax date on top for '91, so

10    I don't know if that it is 1990 or 1991.

11    Q.    Okay.  It says, "Dear honorable brothers, Occupied Land

12    Fund."  If you could read from this paragraph regarding one of

13    the issues outlined in the letter?

14    A.    It says, "Therefore, we appeal to those brothers to

15    multiply the donations.  And may God almighty reward them

16    greatly on our behalf and bless their lives, offspring,

17    health, and monies.  He is the all hearing all answering."

18    Q.    And, you know, maybe I started a paragraph too late.

19    In the paragraph before that, it seems to outline some of the

20    magnitude of suffering right before it makes its request to

21    multiply donations.  Correct?

22    A.    I see what it says there.

23    Q.    That is what it appears to do.  Right?

24    A.    Correct.

25    Q.    At the end it summarizes some projects.  Right?

1   A.   It does.

2   Q.   Some vocational projects that families can engage in to

3   support themselves.

4   A.   Correct.

5   Q.   We don't have to go through all these, but if we could

6   just look, you know, and I basically picked out three at

7   random here.  No. 3 is a project to grant ownership of a Swiss

8   textile machine passive rand to the poor Palestinian family.

9   The project cost $3,000.  Right?  That is what is in the

10  letter?

11  A.   Correct.

12  Q.   No. 6 is a project to train the poor families to raise

13  poultry, a single project that cost $6,000 U.S. dollars.

14  Right?

15  A.   Correct.

16  Q.   And No. 7 is a project to train the poor family to raise

17  egg laying poultry, 1,000 chickens.  Its cost is 7,000 U.S.

18  dollars.  Right?

19  A.   That is what it says.

20  Q.   And then it says -- Noting that Nablus zakat committee

21  "possesses the experience to supervise these projects in order

22  to protect the beneficiary families and guard them against the

23  abuse of profiteers."  Right?

24  A.   Correct.

25  Q.   Are you familiar with that saying if you give a man a

1  fish he eats for a day, but if you teach a man to fish he can

2  eat for a lifetime?

3          MR. JONAS:  Objection; relevance.

4          THE COURT:  He may ask.  I am not sure where he is

5  going.

6          THE WITNESS:  I don't think I have ever heard

7  exactly that one.

8  Q.   Something like that?

9  A.   I have heard something like that.

10  Q.   These seem to be projects that are like micro loans.

11  Right?

12  A.   I don't know if they are micro loans or not.  I am just

13  reading the text, and it says they are projects and says how

14  much they cost.

15          MR. MYSLIWIEC:  If I can approach, Your Honor?

16          THE COURT:  Yes.

17  Q.   (BY MR. MYSLIWIEC)  This is -- What I have handed you is

18  Defense Exhibit No. 1397, which was just admitted today, again

19  like the others.  It is four pages, and they are pages that

20  are numbered 9, 10, 48 and 50, but they are two pages in

21  Arabic and then it is the corresponding English translations.

22  Correct?

23  A.   And then a final page of Arabic that doesn't have a

24  translation attached to it.  You know what I think?  The copy

25  of the front page is also attached to the back, so yes.  I

1    think that is probably just an extra copy.

2    Q.   All right.  If we could go to what is numbered page 48.

3    Actually I am sorry.  If we can go to what is numbered at page

4    50.

5         MR. MYSLIWIEC:  If I could have just one moment,

6    Your Honor.

7         THE COURT:  Yes.

8    Q.   (BY MR. MYSLIWIEC)  Okay.  If you go to page 50, that is

9    a document that is dated August 25th of 1991.  Right?

10   A.   Correct.

11   Q.   There is a seal that has been translated, and that seal

12   is for the committee of the Islamic Science and Culture

13   Society.  Right?

14   A.   Correct.

15   Q.   Just to remind us, it is one of the organizations listed

16   in the indictment.  Right?

17   A.   It is.

18   Q.   It is not in Count 1, but it is one of them.

19        Now, it seems to identify a specific project which has

20   two components--building a school library and a cafeteria.

21   Right?

22   A.   Correct.  This relates to the project that we discussed

23   yesterday.

24   Q.   And it is for the al-Mughtaribin School.  Right?

25   A.   Correct.

1    Q.    A private school?

2    A.    That is what it says.

3    Q.    Okay.  And that term means a westernizing school.  Right?

4    A.    What term?

5    Q.    Mughtaribin?

6    A.    I don't know what that means.

7    Q.    You don't know what it means?

8    A.    No.

9    Q.    A westernizing school would be one that gives exposure to

10   people who would study abroad.  Right?

11          MR. JONAS:  Objection.  She just said she doesn't

12   know what it means.

13          THE COURT:  She may know what a westernizing school

14   is.  If she knows.

15          THE WITNESS:  I don't know.

16   Q.    (BY MR. MYSLIWIEC)  You don't know.  And if I go to the

17   page before that, that appears to be an English translation of

18   a document that is on Holy Land Foundation letterhead.  Right?

19   A.    Correct.

20   Q.    And that is dated shortly after that other document,

21   September 16th, 1991.  Right?

22   A.    Correct.

23   Q.    And it says, "We have received your request concerning

24   the matter mentioned above," which is the al-Mughtaribin

25   school.  Right?

1    A.    Correct.

2    Q.    "And after studying the request, it was noticed that the

3    request didn't have some information."  Right?

4    A.    "It was noticed that the following information marked

5    with Xs are missing."

6    Q.    And then it says, "Please provide them to us so that we

7    can make a final decision."  Right?

8    A.    Correct.

9    Q.    And then there are four Xs marked.  One for total

10   expenses for the project, the remaining expenses, the amount

11   of contribution, a postal correspondence address and the phone

12   and fax number, the name and address of the bank in English

13   and account number in it, and then this one down here, other,

14   "Is the school registered as a charitable entity or is it

15   legally affiliated with a registered charitable entity, or is

16   it a private commercial school?"  Right?

17   A.    Correct.

18   Q.    One last document on this.

19   A.    Okay.

20   Q.    This is Defense Exhibit No. 1400.  It has been admitted

21   like the others, and previously in the same manner.  It is a

22   one-page document in Arabic, and then it has one page that is

23   an English translation.  Right?

24   A.    That is correct.

25   Q.    Again, it has that eagle symbol in the letterhead.

1    Right?

2    A.    It does.

3    Q.    And it translates the logo.  It says the Palestinian

4    National Authority Ministry of Religious Endowments and

5    Religious Affairs, Qalqilya zakat committee.  Right?

6    A.    This is Qalqilya zakat committee letterhead.

7    Q.    Okay.  And that is one of the zakat committees in the

8    indictment.

9    A.    Right.

10   Q.    It is addressed to the Chairman of the Holy Land

11   Foundation, February 3th, 1997.  Right?

12   A.    Correct.

13   Q.    And it is a report on a break of fast, zakat.  Can you

14   read what it says in the text of the letter?

15   A.    It says, "Since receiving the news of your generous

16   contribution of $2,000 for distribution of break of fast

17   zakat, the Qalqilya zakat and alms committee has undertaken to

18   distribute the sum in cash to needy families, families of

19   martyrs and orphans.  It has done so because of the shortness

20   of time and the fact it received notice of this sum during the

21   final days of Ramadan.  May God reward you good and God's

22   peace and mercy be upon you."

23   Q.    I am about to start another --

24          THE COURT:  Let's take the afternoon break.  Be back

25   at 4:00.

1          (Whereupon, the jury left the courtroom.)

2          THE COURT:  How much longer do you anticipate on

3    your cross?

4          MR. MYSLIWIEC:  I would say a half hour to 45

5    minutes.  It depends on how long it takes to go through those

6    other documents.  It may be --

7          THE COURT:  Which other documents.

8          MR. MYSLIWIEC:  The ones we talked about at the

9    bench.

10          THE COURT:  You have gone through most of them.

11          MR. MYSLIWIEC:  Category two regarding the U.N.

12    report.

13          THE COURT:  The U.N. report?

14          MR. MYSLIWIEC:  Right.  The Defense exhibit --

15          THE COURT:  Why would that take 30 to 45 minutes?

16          MR. MYSLIWIEC:  I am not sure it will.  I expected

17    to move through these more quickly.

18          THE COURT:  So have I.  Frankly, I would have

19    limited to how many I was going to let in if it was going to

20    take this long.

21          MR. MYSLIWIEC:  I am going to try to move through

22    this quickly.

23          THE COURT:  All right.  Be back at 4:00 clock.

24                    (Brief recess.)

25          THE COURT:  Mr. Mysliwiec?

```
 1   Q.   (BY MR. MYSLIWIEC)  All right.  Moving on to a new topic.

 2   A.   Okay.

 3   Q.   Which you covered in direct examination, this is relating

 4   to the issue of martyrs.

 5   A.   Okay.

 6   Q.   And you testified about the massacre at the Al

 7   Al-Ibrahimi mosque on February 25th, 1994.  Right?

 8   A.   Correct.

 9   Q.   And that was a massacre of Muslims who were praying in

10   the mosque.  Correct?

11   A.   That is correct.

12   Q.   Carried out by Baruch Goldstein.  Right?

13   A.   That is correct.

14   Q.   Okay.  So just keep that date in mind, February 25th,

15   1994.  And there were a number of reactions to this massacre,

16   but one of them was an outpouring of support for families of

17   those people who were killed.  Right?

18   A.   Correct.

19   Q.   Okay.  It also led to some continued violence for several

20   weeks.  Right?

21   A.   There was a lot of rioting.

22   Q.   And the support also stretched out for families,

23   stretched out over several weeks?

24   A.   I think support stretched out for years.

25   Q.   And in Hebron there was a committee formed called the
```

1  committee for the families of the Ibrahimi sanctuary massacre.

2  Right?

3  A.   I have seen that in documentation.

4  Q.   In fact, it is -- InfoCom Search No. 100 has that

5  committee listed in it.  Correct?

6  A.   It does.

7  Q.   That was obviously a document that was recovered from

8  InfoCom.  Right?

9  A.   That is correct.

10 Q.   And that relates to Holy Land sending money to that

11 committee.  Right?

12 A.   Correct.  Well, actually I think the money went through

13 the Islamic Charitable Society of Hebron.  The payment

14 vouchers came back from that committee.

15 Q.   Now, you had covered Government's demonstrative I think

16 it was No. 32.  And you had pointed out that the people on the

17 left were listed in InfoCom Search No. 100, they were

18 documents regarding those people.  Right?

19 A.   Correct.

20 Q.   And then on the left you had an excerpt from this U.N.

21 general assembly document.  On the right, rather.

22 A.   Correct.

23 Q.   Now, this top part here is a list of people who were

24 killed in the mosque.  Right?

25 A.   Right.  In the massacre.

1    Q.   And then there is a list of these other names.  Right?

2    A.   The three others that were killed on March 25th.

3    Q.   Different day?

4    A.   Right.

5    Q.   About a month later?

6    A.   Correct.

7    Q.   Probably in some of the violence that occurred after the

8    massacre.  Right?

9    A.   There is a description down there that talks about how

10   they were in a shootout with forces, I think it said 30 hours

11   or something like that.

12   Q.   And it says they were reportedly leaders of Hamas?

13   A.   It does.

14        MR. MYSLIWIEC:  And let's go to InfoCom Search

15   No. 100, page 8.

16   Q.   (BY MR. MYSLIWIEC)  But keep in mind these two names,

17   Iyad Abu Sneineh and Mohammed Abu Sneineh.

18        This is an English translation of the preceding page, and

19   these are -- How would you describe these four -- They are

20   essentially like receipts or itemizations of donations to

21   specific families of martyrs.  Right?

22   A.   They are called payment vouchers.

23   Q.   Yeah.  And can you focus on the top left hand one?  Now

24   in the upper left hand corner, it says that this is a

25   payment -- It identifies it as a payment voucher from the

1    committee for the families of the Ibrahimi sanctuary massacre.

2    Right?

3    A.    That is what it says.

4    Q.    Okay.

5         MR. MYSLIWIEC:    If we could go to the one in the

6    lower right hand corner.

7    Q.    (BY MR. MYSLIWIEC)  And that is Iyad Hussein Abu Hadid

8    Abu Isneinah.  Right?

9    A.    Correct.

10   Q.    The family of.  Right?

11   A.    The family of.

12   Q.    That is one of the two people that I just identified on

13   Demonstrative No. 32.  Correct?

14   A.    That is correct.

15   Q.    And this is a payment voucher of this committee that

16   identifies this martyr.  Right?

17   A.    Well, let me be clear.  As I said, in the paperwork that

18   is in InfoCom Search No. 100, the HLF paid the money for this

19   project through the Islamic Charitable Society of Hebron.  The

20   final project report was also signed by the Islamic Charitable

21   Society of Hebron, Abdel Khaleq Natshe, the uncle of one of

22   the people who received this money.  These payment vouchers

23   were attached.  I don't know if the committee for families of

24   Ibrahimi sanctuary massacre was something that the Islamic

25   Charitable Society of Hebron itself created.  I don't know.  I

1  know that the money went to Islamic Charitable Society of

2  Hebron, and that the final project report and these payment

3  vouchers came back from the Islamic Charitable Society of

4  Hebron.

5  Q.   And We are just talking about what the document says.

6  This document says it is a payment voucher and it lists from

7  the committee for the families of the Ibrahimi sanctuary

8  massacre.  Right?

9  A.   That is what it says.

10  Q.   And then that payment voucher identifies this martyr.

11  A.   It does.

12  Q.   Okay.  And if we go to page 10, the lower right hand

13  corner, this is the same kind of document.  But now for the

14  father of Mohammad Aybid Abu Isneinah al-Atrash.  Right?

15  A.   Correct.

16  Q.   Which is the second individual that I pointed out on

17  Demonstrative No. 32.

18  A.   Correct.

19  Q.   Both of these -- I think both of them are dated November

20  24th, 1994.  Right?

21  A.   That is the date on there.

22  Q.   All right.  And part of what you discussed on direct was

23  looking at financial transactions to determine whether dollars

24  went to special segments.  Right?  Categories of people,

25  special categories of people?

A.    Well, I think we are mixing -- We did the financial

analysis of the money going to committees, and then we also

talked about whether or not the HLF targeted any individuals

as part of a special segment, being martyrs or prisoners

families, things like that.

Q.    Right.  And you talked about on this Demonstrative No. 32

some of the different amounts that were identified as

associated with some of the different people in InfoCom -- in

the InfoCom No. 100 list.  Right?

A.    That is correct.

Q.    300 shekels, 900 shekels, 1350 shekels.  There was one of

those three amounts for everybody.  Right?

A.    Correct.

Q.    Okay.  Now, there is other documentation in Holy Land's

files regarding money that went to martyrs.  Correct?

A.    There is.

Q.    I have here what has been marked as Defense Exhibit No.

1394.  It has been admitted.  And you have had a chance to

review it.  Correct?

A.    Yes, I have just reviewed it.

        MR. MYSLIWIEC:  If I could switch to the elmo.

Q.    (BY MR. MYSLIWIEC)  Now, this is a United Nations General

Assembly document.  Right?

A.    Correct.

Q.    And the Government introduced a version of this document.

1  Right?

2  A.  They introduced a portion of it.

3  Q.  Right.  And part of that was part of Demonstrative

4  No. 32.  This is a version of that document that includes ten

5  additional names.  Correct?

6  A.  It does include additional names.

7  Q.  And it is ten?  That is all right.  But we went through

8  that shortly before the jury came back.  Right?

9  A.  That is correct.

10  Q.  And in the HLF files there was a document in which the

11  Government found, and it was then labeled as HLF Search

12  No. 37.  Right?

13  A.  Correct.

14  Q.  And you have a copy of that up there?

15  A.  I do.

16  Q.  Okay.  And this document has a caption Muslim Youth

17  Society of Hebron.  Right?

18  A.  That is correct.

19  Q.  And you had a chance to review this over the break.

20  Right?

21  A.  That is correct.

22  Q.  And this is documentation of allocations to families of

23  martyrs from the Holy Land Foundation.  Right?

24  A.  Correct.

25  Q.  And on page 6 of this document, and this is the English

1    translation, it identifies a person who has been highlighted

2    in pink, Abdelrahim Mohammed Ajlouni.  Right?

3    A.    Yes.

4    Q.    And one of the ten names that has been added to this

5    document as a martyr who -- or as a family of the martyrs that

6    the Holy Land Foundation supported is this name Abdelrahim

7    Mohammed Ajlouni.  Right?

8    A.    Correct.

9    Q.    He is on page 22.  Right?

10   A.    I can't see my page numbers, but we will look on the

11   screen here.

12   Q.    It is the upper left hand corner.

13   A.    I see.  I was expecting a handwritten page number.

14   Sorry.  Yes.

15   Q.    It is right up here.  And let's just go, before I come

16   back to -- Let's go to the front of this document just to

17   reorient the jury as to what this document is.  It is a United

18   Nations document.  And the United Nations is an international

19   organization.  Right?

20   A.    It is.

21   Q.    Its headquarters are in New York?

22   A.    I believe so.

23   Q.    Okay.  And the United Nations human rights report that

24   was excerpted and put on Demonstrative No. 32 was for the year

25   1994.

1    A.    Correct.

2    Q.    And it says -- It is a report of the special committee to

3    investigate Israeli practices affecting the human rights of

4    the Palestinian people and other Arabs of the occupied

5    territories.  Right?

6    A.    Correct.

7    Q.    Even this version is a redacted version of the entire

8    document.

9    A.    It is.

10   Q.    So now we go back to page 22.  It is really small print.

11   Can you even see the print?

12   A.    You might want to back a little bit away from it.  It is

13   a little bit blurry.  You can see his name there.

14   Q.    That is a little better focused here.

15         Now, we were talking about one of the people who appeared

16   in the Muslim Youth Society document as identified as a martyr

17   and allocations to families of martyrs from the Holy Land

18   Foundation, a man by the last name of Ajlouni.  Right?

19   A.    Correct.

20   Q.    And that person is listed here.

21   A.    That is correct.

22   Q.    Okay.  And there is a date next to his name, February

23   28th, 1994.  Right?

24   A.    Correct.

25   Q.    Now, that is not the date of the massacre.  Right?

1   A.   No, that is after the massacre.

2   Q.   Okay.  It is three days later.

3   A.   Correct.

4   Q.   And his name is listed.  Right?

5   A.   It is.

6   Q.   And then there is a description of how he was killed.

7   Right?

8   A.   There is.

9   Q.   Now, I have handwritten, and this is not on -- Just where

10  this marks up, it is HLF Search No. 137, page 6, which is what

11  we looked at before.

12  A.   Correct.

13  Q.   And I am going to show another document which has been

14  admitted into evidence.  That is HLF Search No. 139.  And we

15  will get to see it in just a couple of minutes.

16  A.   Okay.

17  Q.   But that tracks to some other names.  Right?

18  A.   It does.

19  Q.   And you have had a chance to familiarize yourself with

20  that document over the break?

21  A.   I did.

22  Q.   Because I wanted to speed this up a little bit.

23  A.   Right.

24  Q.   These names are supported by documentation in the Holy

25  Land Fund documents.  Right?

1   A.   Yes.

2   Q.   As having sent funds to these families of martyrs.

3   A.   The Holy Land documentation indicates that these

4   individuals that we are going to discuss were supported as

5   martyrs.

6   Q.   Okay.  This is HLF Search No. 139.  Right?

7   A.   It is.

8   Q.   It is an extremely difficult document to read.  Right?

9   A.   It is.

10  Q.   Even when it is highlighted.  Right?

11  A.   Right.

12  Q.   And that highlights the other nine names that were added

13  to this U.N. document.  Right?

14  A.   Correct.

15  Q.   Okay.  And you have had a chance to compare and know that

16  this document supports those other nine names, and we just

17  went through that.  Right?

18  A.   We had ten names total.  Right.

19  Q.   Right?

20  A.   There were eight in here, one in here, one in --

21  Q.   You are right.  It is actually eight and one, and then

22  there is a tenth which is Osama Mustafa Abu Ghazala.  Right?

23  A.   Correct.

24  Q.   And that is a person who was identified in InfoCom Search

25  No. 100.

1   A.   Right.  In those payment vouchers.

2   Q.   In those payment vouchers from the committee?

3   A.   Correct.

4   Q.   So now we are just going to go through this one document

5   which is -- And we know where the back-up for it comes.

6   A.   Okay.

7   Q.   Okay?  So we are going to go through the U.N. General

8   Assembly and just go through these names that have been added

9   as examples.

10           MR. JONAS:  Your Honor, can we approach?

11           THE COURT:  Yes.

12           (The following was had outside the hearing of the

13           jury.)

14           MR. JONAS:  I am sorry for asking for a sidebar, but

15   I am very confused.  It was my understanding that the purpose

16   of this exercise was to connect that these additional people

17   in the U.N. documents are connected somehow to the Ibrahimi

18   mosque massacre.  That was the 106.  I am not seeing that it

19   is going anywhere near there.

20           MR. MYSLIWIEC:  I just connected the first one to be

21   within three days of the Ibrahimi mosque massacre.

22           MR. JONAS:  That doesn't mean that it is any part of

23   the massacre.  This is just an intent, if you read the

24   description how these people died, to further --

25           MR. DRATEL:  The one he just mentioned is on their

document.  It is on the demonstrative.  He did not die in the

massacre three days later, but he is part of that.  The

documents No. 137 and 139 in parentheses list these people in

the same manner and they are funded by the same organizations,

the Hebron Muslim students, the same people who were

doing -- around the massacre; in the time periods are around

the massacre.

MR. JONAS:  That doesn't go to the point I was

making what 106 is for.  We were addressing that massacre.

And if the Government misrepresented what happened, that is

the purpose of 106.  Just because other people died a few days

later or a few months later and were paid for by the same

committee doesn't mean it explains what the Government put

forth.  There has been a misrepresentation here.

MR. DRATEL:  No, there hasn't.  If you look at

Demonstrative No. 32, the first name on this list is this

Saleh.  He is paid for with a coupon from the Ibrahimi mosque

massacre.  He did not die in the Ibrahimi mosque massacre,

just like the two guys at the bottom that they want to talk

about.  He died later.  He is in the U.N. report.  He is

matched up perfectly.  He is in their demonstrative, to make

it clear that not everybody on that InfoCom No. 100 is from

the Ibrahimi massacre, and not just the two people they want

to talk about who are listed as Hamas people, but another

innocent victims who were killed around that time, but

1    nevertheless was included by the Ibrahimi mosque massacre

2    committee.  That person is in the U.N. document.  She

3    testified about this last year.  The others are in another

4    document.  If you look at 137 and 139, talk about what is in

5    the parentheticals.  They are about this whole issue.

6            MR. JONAS:  First of all, she didn't testify about

7    this last year.  We never got into this last year.

8            MR. DRATEL:  I cross examined her on it.  I put

9    those documents in.

10           MR. JACKS:  That document was not here last year.

11           MR. JONAS:  The U.N. document was not in last year.

12           MR. DRATEL:  This is No. 137 and 139.

13           MR. JONAS:  This is not clarifying this point.  If

14   one person on the Government's demonstrative InfoCom No. 100

15   is on the U.N. document, fine, then show that one person.  But

16   that is not what is happening here.

17           THE COURT:  What are you getting ready to do?

18           MR. MYSLIWIEC:  I am just going to go through the

19   names that were supported that were given to families of

20   martyrs.

21           MR. JONAS:  How does that connect to the massacre?

22           THE COURT:  Does that connect to the massacre or

23   not?

24           MR. MYSLIWIEC:  It is within that time period that

25   -- The same that they brought out as part of Hamas when they

1    brought out the two people.

2            THE COURT:  So you don't know.

3            MR. JONAS:  We directly expected the two to be

4    connected to the massacre because it is the same time period.

5    It doesn't explain --

6            MS. CADEDDU:  The U.N. documents describe them as

7    being killed in the aftermath of the massacre, and they are

8    related to the massacre.  Your point was we snuck these Hamas

9    people in as the Ibrahimi mosque massacre people.  Our point

10   is that people in this area, the committees consider anyone

11   who was killed in the surrounding clashes as being Ibrahimi

12   mosque massacre victims.

13           MR. JONAS:  How are you proving that?  Who is going

14   to testify to that?

15           MS. CADEDDU:  The documents.

16           MR. JONAS:  This document says the committees

17   consider these people as dying as part of the massacre.

18           MS. CADEDDU:  No, but the names come from the

19   supporting documents.

20           MR. JONAS:  You are not saying --

21           MS. CADEDDU:  The Muslim Young Men's Association,

22   those are all Ibrahimi mosque massacre people, all of them.

23           MR. JONAS:  Show the documentation then.

24       I am not seeing it, Your Honor.

25           MR. MYSLIWIEC:  Part of that is because I tried to

shorten this whole thing up.

THE COURT:  So you have the documentation.  He is asking for the documentation.

MR. MYSLIWIEC:  He has it.  It is No. 139 and 137.

MR. JACKS:  If you can find them on there, Your Honor, good luck to you.  I tried and we just flew right by it.

MS. CADEDDU:  Because the point was to try to shorten it up.  She went through every one and identified that they are in there.

MR. JACKS:  Not in front of the jury she didn't.

MR. MYSLIWIEC:  That is why I shortened it up, so we didn't spend an hour and a half going through each name, going to this document and that document.  I mean, that is the reason why it was done that way.  So she confirmed that there is back-up documentation.

THE COURT:  What is this a list of?

MR. JACKS:  I will let them answer this.  I think it is a list of people they supported or martyrs they supported.

MR. MYSLIWIEC:  This is a document that came in last year.

MR. JONAS:  It is not a Government exhibit.  We didn't admit this in evidence.

MS. CADEDDU:  It is in the list from last year.

MR. JONAS:  Show me the rule of evidence -- I am

1    sorry, Your Honor.

2         MS. CADEDDU:  Presumably she knows what it is since

3    she prepared it for trial and marked it with a Government

4    exhibit.

5         MR. JONAS:  That doesn't mean it comes in.

6         THE COURT:  It doesn't mean she prepared it for this

7    purpose, what you trying to offer it for.  Of course, without

8    going through this I don't know what is going on.  I am still

9    trying to figure it out.  So you are trying to connect these

10   names that Holy Land also supported, and you are claiming they

11   came from the massacre, and you saying they don't have the

12   evidence to prove that?

13        MR. JONAS:  That is correct.

14        MR. JACKS:  I don't think they are claiming it came

15   from the massacre.

16        THE COURT:  That is what they are saying, or the

17   aftermath.

18        MR. MYSLIWIEC:  Just like the two names of the

19   people that they say are Hamas.

20        MR. JONAS:  The two names are on their list coming

21   from the massacre.

22        THE COURT:  It goes back to this one, but you have

23   nine others you are claiming.  What do you have to show that,

24   other than they are on the U.N. report that shows it?

25        MS. CADEDDU:  They are in here.

1          THE COURT:  How do we know what this is?

2          MS. CADEDDU:  She testified about where it came

3    from.

4          MR. JONAS:  Connected to the massacre.

5          THE COURT:  You have to connect it.  Just the fact

6    it is a Government exhibit by itself doesn't establish --

7          MR. DRATEL:  Like last year she testified -- I

8    crossed her last year on this and she testified it was related

9    to a handwritten list from the Muslim Youth Association, and

10   they administered the massacre funds.  They didn't put InfoCom

11   No. 100 in last year or the U.N. report.  It was this they put

12   in, and it had all these martyr names and we talked about the

13   Ibrahimi ones.

14         MR. JONAS:  It is -- It doesn't mean it is part of

15   the massacre.

16         THE COURT:  And have you asked her -- Have you asked

17   her whether these names --

18         MR. MYSLIWIEC:  I did.  On the first one I did.

19         THE COURT:  But the one name.

20         MR. MYSLIWIEC:  I am not talking about Ghazala.  I

21   asked her about Ajlouni.  February 28th, 1994.  It is from

22   diagram 137.

23         MR. JONAS:  How does that connect to the massacre?

24         MR. MYSLIWIEC:  It is three days later.  It is in

25   the aftermath of the massacre.

1          THE COURT:  Three days later doesn't mean that.  You

2     are making a leap.

3          MR. MYSLIWIEC:  But they brought in the two Hamas

4     people and they are almost a month after the massacre.

5          THE COURT:  But they died later.  Right?

6          MR. JONAS:  They died a month later, but HLF's

7     records say they were paid as part of the massacre.

8          MS. CADEDDU:  Let me also point out this guy Saleh,

9     he died on the second march also in the aftermath.  This was

10    on InfoCom No. 100.  So the Government's point is invalid,

11    which is what this goes to.

12        These people considered everyone who died in this

13    aftermath a martyr.  Okay?  It wasn't like they were sneaking

14    in these people.  These people who died in the aftermath are

15    listed among this.

16         THE COURT:  Is it your position that they can't link

17    these individuals to the massacre?

18         MR. JONAS:  Right.

19         THE COURT:  So you are considering -- This has notes

20    about in the aftermath with the IDF.

21         MR. JONAS:  This doesn't say anything about all

22    about these people dying in the massacre, and there is nothing

23    in the HLF records that says they supported these people

24    because they died in the massacre, even if they died a month

25    later.  That is what I am saying.  What I thought they were

going to do was show an HLF document, a payment coupon,

Ibrihimi massacre, and the name being on the U.N. list of

someone who died later.  We haven't seen that.

MS. CADEDDU:  Yes, we have.  This guy right here.

MR. JONAS:  You are saying one guy go.  Fine, then

go into the one guy.

MS. CADEDDU:  But there are -- The Muslim Youth

Association, those are all Ibrahimi massacre victims.  They

are like -- and they are people who were killed in the

aftermath and people who were killed during the massacre, and

we didn't actually --

THE COURT:  I don't want to keep this jury waiting.

Why don't you go to something else, because we are not going

to resolve it for a while.  And we are going to break at 5:00,

so I don't want to use all this time.

MR. MYSLIWIEC:  I have two other topics.

THE COURT:  That is fine.

(The following was had in the presence and hearing

of the jury.)

MR. MYSLIWIEC:  We are going to put that one on

hold.  And we are not working past 5:00?

THE COURT:  We will break at 5:00.

Q.   (BY MR. MYSLIWIEC)  This involves one of these exhibits

but it is a different topic.  This is Demonstrative No. 32,

and these are the amounts listed for these families of

1    martyrs.  Right?

2    A.    Right.

3          MR. MYSLIWIEC:  If we could go to page 70 of InfoCom

4    Search No. 13.

5    Q.    (BY MR. MYSLIWIEC)  This is a document you testified

6    about yesterday.

7    A.    Correct.

8    Q.    Okay.  And it is a document that was sent to the Holy

9    Land Foundation.  Right?  I am sorry.  The other way around.

10   A.    This one came from the Holy Land Foundation.

11   Q.    July 5th, 1994.  Right?

12   A.    Correct.

13   Q.    Roughly five months, or about four months after the

14   massacre.

15   A.    The massacre was February 25th.

16   Q.    Right.  And the subject of this document, if we could

17   just highlight the subject line, "Assistance to families of

18   the Ibrahimi sanctuary massacre."  And in the text of the

19   document, if we go to the paragraph, it says, "Respectable

20   Messrs, God's peace, mercy and blessings upon you.

21         "We would like to inform you of the following:  Your

22   request in regards to the above subject has been approved by

23   an assistance in the amount of only $43,000 in one

24   installment."  Right.

25   A.    Correct.

1    Q.   Now, according to InfoCom No. 100 --

2         MR. MYSLIWIEC:  If we could pull that up.

3    Q.   (BY MR. MYSLIWIEC)  And the next page, these voucher

4    payments have to do with disbursements on November 23rd, '94.

5    Right?

6    A.   That is what the date is on the --

7    Q.   Right.  Roughly four months after the July fax we just

8    talked about?

9    A.   Correct.

10   Q.   And I think that you talked about the total amount of

11   money that is identified in Demonstrative No. 32.  Right?

12   Have you totaled up these numbers?

13   A.   I did.

14   Q.   I think you estimated them -- Well, regardless of what

15   you estimated them at, those numbers total up to an amount of

16   $10,650.  Right?  Do you want me to take you through the math?

17   A.   We need to go through the math again because there was a

18   question about whether or not they were in shekels or dollars.

19   A lot of the receipts actually said shekels, but I think we

20   were assuming they were in dollars.  And there were 22 of

21   them, so I would like to re-add them.

22   Q.   Okay.

23   A.   If we need to be specific -- If you are just trying to

24   estimate, that is one thing, but if you want to be specific

25   let's add them again.

1    Q.   Okay.

2              MR. MYSLIWIEC:  If I can have the elmo back.

3    Q.   (BY MR. MYSLIWIEC)  Okay.  These are the numbers in the

4    column that I just pointed to on Demonstrative No. 32.

5    A.   All right.

6    Q.   I am going to do this the old fashioned way in terms of

7    adding.  All right?

8    A.   Okay.

9    Q.   If you go through, there are sixteen 300 numbers.

10   A.   That is correct.

11   Q.   Okay.  300 times 16 is 4800.

12   A.   Correct.

13   Q.   There is five 900 numbers.  Right?

14   A.   Correct.

15   Q.   That is 4500.

16   A.   It is.

17   Q.   And then one 1350 number.

18   A.   That is correct.

19   Q.   If you add those three numbers up, you get $10,650.

20   A.   Okay.

21   Q.   Now, as we mentioned, the massacre was in February of

22   '94.  Right?

23   A.   Correct.

24   Q.   And that fax about the $43,000 one time installment was

25   roughly four months and a week or so later.  Right?  July '94?

1  A.   Well, the document we looked at was July '94.

2  Q.   If you multiply this 10,650 number by four, you get a

3  number that is 42,600.  Right?

4  A.   But that is not what the project said.  It is a one time

5  payment, not a four-month installment.  So it is a one time

6  payment.  And if we can look at the final project report, we

7  can probably get a better idea of exactly what they were

8  saying.  I don't know if you have it with you.

9  Q.   I don't actually.  But this is a one time payment that

10  occurs, according to that document, or approved to occur

11  roughly four months after the massacre.  Right?

12  A.   Well the payment vouchers themselves show only a receipt

13  of $10,650, so, I mean, you can add it times four months, but

14  the supporting documentation only indicates there was one

15  payment.

16  Q.   I understand.  But I don't think that was my question.  I

17  understand what your point of view is on this and what your

18  view of these documents are and the conclusions that you have

19  drawn from them.  This amount multiplied by four represents

20  $42,600.  Right?

21  A.   Correct.

22  Q.   And as you mentioned, support for the families of martyrs

23  stretched out years.  Correct?

24  A.   Those were if you look --

25  Q.   I am just asking you the question.  Did the support

1    stretch out for years?

2    A.    But --

3    Q.    I am not even saying from Holy Land Foundation.  It is

4    just a yes or no question.

5    A.    I don't want my answer to be misleading, though.  Yes,

6    there were additional sponsorships of these people in

7    different payment amounts, but I just want to be clear that I

8    am not stating that this money went for additional

9    sponsorships.  Yes, in general people -- The HLF supported

10   these individuals for a longer period of time with different

11   money than this $43,000 payment.

12   Q.    Okay.  Let's go back to the zakat committee summary

13   charts.  Okay?

14   A.    Okay.

15   Q.    Mr. Jonas asked you questions about them.  Mr. Westfall

16   asked you questions about them.

17         Now, just taking you back to yesterday for a moment when

18   you and Mr. Westfall had a discussion about what information

19   was available based on search warrant material, for most of

20   the people you could recall without refreshing your

21   recollection at all with documents, videos, or anything else,

22   what search warrant evidence in your view did or did not

23   connect them to the zakat committees.  Right?

24   A.    I am not sure I understand your question.

25   Q.    I guess my question is you were able to recall the

1    connections off the top of your head without looking at the

2    supporting documents.  Right?

3    A.    No, not really.

4    Q.    A lot of them.

5    A.    Some of them I do.  On the shorter exhibits that list a

6    number of those individuals, those are easy to remember.  But

7    no, I do not have the exhibits memorized.

8    Q.    But when he was asking you those questions and asked you

9    is there anything in the search warrant material that connects

10   this person to Hamas, he went through, you know, 20 or 30 at

11   least different people.  Right?

12   A.    We did, and I had my little summary charts with the

13   exhibits listed out.

14   Q.    Okay.  And as we have mentioned, among the things that

15   were included in that search warrant evidence were wiretaps,

16   videotapes, and documents.  Right?

17   A.    That is correct.

18   Q.    And those are all things you have been looking at for

19   several years.  Right?

20   A.    That is correct.

21   Q.    And you have been involved in following up on this

22   evidence, too.  Right?  Through your investigation?

23   A.    I am not sure what you mean.

24   Q.    You follow up things you see in these documents to try to

25   find out other information.  Right?

1    A.    If I see something in a document that needs further

2    investigation I will conduct that further investigation, or

3    see that someone does.

4    Q.    Exactly.  Or you direct other people to do it.

5    A.    Correct.

6    Q.    Let's talk about a different topic.  You discussed during

7    your testimony the deportees.  Right?

8    A.    That is correct.

9    Q.    And these were roughly 412 people who were deported by

10   the government of Israel.  Right?

11   A.    Correct.

12   Q.    And you have studied who these deportees were.  Right?

13   A.    I have seen a lot of evidence regarding these deportees.

14   Q.    And what these deportees said.  Right?

15   A.    That is correct.

16   Q.    And by looking at, among other things, videos.  Right?

17   A.    Yes.

18   Q.    And you played some of those videos in court the other

19   day.  Yesterday.

20   A.    Yes.

21   Q.    And it is fair to say the deportees have been an

22   important part of your investigation.

23   A.    That was one component of the investigation.

24   Q.    An important part?

25   A.    I would think so.

1   Q.   Okay.  Now, when those people were deported, it caused a

2   lot of publicity.  Right?

3   A.   I don't recall the publicity, but according to

4   individuals who were paying attention to it that, there was

5   some publicity over it.

6   Q.   And Israel's actions generated a lot of publicity.

7   Right?

8   A.   Again, as I said, I don't recall any of the publicity.  I

9   understand through others that there was publicity of the

10  event, but I don't know what the content of that publicity

11  was, other than when I asked Mr. Mohammad El-Mezain what his

12  understanding of the deportation was.

13  Q.   Okay.  And the men who were deportees became well known.

14  Right?

15  A.   In certain communities.

16  Q.   And a lot of other organizations and countries became

17  involved in this deportee issue.  Right?

18  A.   I am aware that some other countries were involved in I

19  guess the resolution of the deportation issue.

20  Q.   Including the United States?

21  A.   That is correct.

22  Q.   And the United Nations as an organization.  Right?

23  A.   That is my understanding.

24  Q.   Okay.  The Red Cross as well.  Right?

25  A.   I don't know -- I know that the Red Cross administered

1    some aid to them.

2    Q.    And also the Holy Land Foundation.  Right?

3    A.    Yes, they did.

4    Q.    And we have seen some videos of people giving thanks to

5    the Holy Land Foundation.  Right?

6    A.    That is correct.

7    Q.    In fact, some of the -- Mohammad El-Mezain at one point

8    was thanked specifically.  Right?

9    A.    Yes, he was, in the tent video.

10   Q.    All right.  And this was in -- This deportation occurred

11   in late 1992.  Right?

12   A.    December of 1992.

13   Q.    And the videos, which obviously they were taken at the

14   time of this incident because they are actual shots of what

15   people were saying who were deported.  Right?

16   A.    Correct.

17   Q.    Now, Mr. Jonas and you discussed an exhibit called

18   InfoCom Search No. 26.  Right?

19   A.    I recall that.  I don't recall specifically which exhibit

20   that is, but the number is familiar to me.

21   Q.    We are going to play -- It is the one with the man who in

22   clip A is talking about Hamas and the organization Palestine

23   Islamic Jihad.  Palestinian Islamic Jihad.

24   A.    Okay.

25   Q.    And on that clip he is talking about who the deportees

1    are.  Right?

2    A.    He does.

3    Q.    And Mr. Jonas specifically pointed out that he said that

4    all the brothers belonged either to Hamas or jihad.  Right?

5    A.    I think he said a majority.  I can't remember the exact

6    term he used.  He said there are some others.

7    Q.    But when Mr. Jonas was talking about it, he said all the

8    brothers belonged to either Hamas or jihad.  Right?

9    A.    I can't remember what Mr. Jonas said.  I think he asked a

10   question.

11            MR. MYSLIWIEC:  Can we play that clip?

12            (Whereupon, InfoCom Search No. 26, Clip A was

13            played, while questions were propounded.)

14   Q.    (BY MR. MYSLIWIEC)  Okay.  He says, "I just wanted to get

15   the -- After speaking with the brothers, we found that they

16   are all" -- and then he goes on to "...Muslims and belong to

17   the movement of either jihad or Hamas."  Right?

18   A.    Right.

19   Q.    And then he goes on --

20            MR. MYSLIWIEC:  If we could go to the next snippet.

21   Q.    (BY MR. MYSLIWIEC)  And then he says, "And there are some

22   brothers that do not belong to any movement, but," and then

23   that clip ends.  Right?

24   A.    Right.

25   Q.    And that tape doesn't end there.  That is a clip that the

1   Government put there.  Right?

2   A.    That is correct.

3   Q.    The Government ended that clip right there.  Right?

4   A.    Yes.

5   Q.    Okay.  Now, you have watched this whole tape.  Right?

6   A.    I believe I have, but it has been a while.

7   Q.    Because it is about the deportees.  Right?  Which is a

8   pretty important part of your investigation, as you said.

9   A.    Actually the translators watched it, they summarized it,

10   then we go back and watch parts of it with the translator.

11   They show us which parts they talked about that are in the

12   translation.  Then it goes to the editing company and gets the

13   translations put on it.  So to say I have seen the entire

14   thing, I am not sure if I have seen the entire tape or not.

15   Q.    That sentence cut off mid sentence.  Right?

16   A.    I believe we have the transcript of the rest of it.

17   Q.    Right.  So you have seen the transcript of what he

18   continues to say.  Right?

19   A.    Yes, but that doesn't mean I have seen the whole tape.

20   Q.    Okay.  I understand what you are saying.  But you are

21   familiar with what he goes on to say to complete that

22   sentence.  Right?

23   A.    Yes, but I would need to see the transcript to make sure

24   what I said is accurate.

25   Q.    Do you have it available?

```
 1   A.   No, not unless you give it to me.

 2   Q.   Let me ask you this question.

 3           MR. MYSLIWIEC:  Can I approach for a moment?

 4           THE COURT:  Yes.

 5   Q.   (BY MR. MYSLIWIEC)  Does that refresh your recollection

 6   about what he continued to say in that sentence?

 7   A.   I don't recall.  I mean, it may be, but I don't recall.

 8   I am used to seeing it in like the transcript form.  So I am

 9   not disputing that it is, I just -- It doesn't refresh my

10   memory.

11   Q.   Okay.  So right now you don't know what he said at the

12   end of that sentence?

13   A.   If I could just see our English transcription I could

14   tell you for sure.

15   Q.   I don't have that.

16           MR. MYSLIWIEC:  Your Honor, I am done for today,

17   depending on that other issue.

18           THE COURT:  We need to go ahead and break here.  I

19   have some matters I need to tend to at about 5:10, so we will

20   finish.

21       Be back Monday morning at 9:00.  Please recall the

22   instructions.  Enjoy your weekend away from here.  We will see

23   you back on Monday.

24           (Whereupon, the jury left the courtroom.)

25           THE COURT:  We will be in recess.  Give us a few
```

1    minutes for the jury to clear out, and I will see counsel in

2    the jury room for a minute.  And then if you will stick around

3    a little bit, maybe we will discuss this issue further.  The

4    individuals are waiting for us upstairs, so I don't want to

5    take too much time, but maybe we can spend a little time.

6         We will be in recess.

7              MS. CADEDDU:  Which issue was that?

8              THE COURT:  The one we were discussing at the bench.

9              MS. CADEDDU:  I think we can probably resolve it

10   with the Government.

11             THE COURT:  Then take a shot at it.

12             MS. MORENO:  Your Honor, may I be excused from the

13   classified part?

14             MR. DRATEL:  Same here.

15             THE COURT:  Yes.

16             MR. MYSLIWIEC:  Your Honor, can we approach for a

17   moment?

18             (The following was had at the bench.)

19             MR. MYSLIWIEC:  I just want to ask for a copy of

20   that transcript.

21             MR. JONAS:  I will provide it and see what he says.

22             MR. MYSLIWIEC:  If you could just email it.

23             MR. JONAS:  If we have one that goes past, I want to

24   go on with the caveat.  Okay.  Because we transcribed what we

25   played.  So I need to look to see if we have one that goes

1 past that one.  But if we do, we will send it to you.

2          THE COURT:  All right.

3          MR. MYSLIWIEC:  We are probably going to have a 106

4 issue on it.  I don't think we have gotten it before.

5          THE COURT:  Okay.

6          MR. JONAS:  We just need warning.

7          MR. MYSLIWIEC:  I understand.

8          THE COURT:  Do you know what was said, though?

9          MR. MYSLIWIEC:  I have a pretty good idea what was

10 said.

11          THE COURT:  I don't need to know.  I was just

12 curious.

13          MR. MYSLIWIEC:  I have our translation and it is not

14 from a translator.  Our clients speak the language, so I have

15 got the full video, and there is the rest of that sentence.

16          THE COURT:  All right.  Marlo thinks you can work

17 this issue out, the United Nations, so I am happy to see if

18 you can work it out rather than discuss it.

19          MS. CADEDDU:  Let us look at it again, and I want to

20 look at the testimony about that particular document.  I don't

21 know if it was No. 139 or 137 last year.  Let me pull it and

22 take a look at it, and I don't think we need to spend time on

23 it.

24          THE COURT:  That suits me.

25          MR. JONAS:  Your Honor, I gave -- This is a new

1    exhibit.  I may want to show it to Agent Burns on redirect as

2    a result of questioning by Ms. Hollander about the Hebron

3    library.  I just wanted to give you a copy of it, Your Honor.

4            MR. WESTFALL:  I have a copy of it.

5            MR. JONAS:  I apologize for my behavior in the last

6    sidebar.  I was getting a little heated.

7            THE COURT:  All right.  We will take this up I guess

8    Monday morning.

9        How much longer do you have on your cross?

10           MR. MYSLIWIEC:  I would say 15 minutes tops, and

11   that is if we go into this.

12           THE COURT:  And how much do you expect?  Do you

13   know?  Not sure yet?

14           MS. CADEDDU:  Probably not.  I am still --

15           MR. JONAS:  Probably not long or --

16           MS. CADEDDU:  Probably not going.

17           THE COURT:  And how much on your redirect?

18           MR. JONAS:  Half an hour.

19           THE COURT:  Is Avi going to testify Monday?

20           MR. JONAS:  We have another witness that is between

21   Avi and Agent Burns.

22           THE COURT:  You are going to finish Agent Burns

23   before you go to the other witness?

24           MR. JONAS:  Yes.  The other witness is very quick.

25           MR. DRATEL:  It is a Dallas FBI agent?

1          MR. JONAS:  She is not an FBI agent.

2          THE COURT:  And you said that is going to be fairly

3     brief?

4          MR. JONAS:  Yes.  It is Mr. Jacks' witness; so

5     whatever he says, double it.

6          THE COURT:  And then Avi after those two, finishing

7     Agent Burns and then that witness?

8          MR. JONAS:  Yes, sir.

9          THE COURT:  And will that be the end of your

10    testimony?

11         MR. JONAS:  It depends upon what they do with Avi,

12    what the Defense questions Avi on.  So I don't want to say for

13    sure definitely, but if there is anymore it is not going to be

14    very long at all.

15         THE COURT:  So when are you thinking of finishing?

16         MR. JONAS:  I guess Wednesday.

17         THE COURT:  That is what I was thinking.

18         MS. CADEDDU:  Is it the witnesses on your witness

19    list?

20         MR. JONAS:  Yeah.

21         MS. HOLLANDER:  But it is a secret?

22         MR. JONAS:  No, it is the U.S. I.D. --

23         MS. CADEDDU:  I forgot about him.  I lost track.

24         MR. JONAS:  He would be after Avi.

25         THE COURT:  We don't need this on the record

1    anymore.

2                        (Brief recess.)

3           (Sealed Defense ex parte meeting with the Court.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2          CORRECT TRANSCRIPT FROM THE RECORD OF

3          PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4          I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5          FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6          COURT AND THE JUDICIAL CONFERENCE OF THE

7          UNITED STATES.

8

9          S/Shawn McRoberts        06/22/2009

10         _____DATE_____
           SHAWN McROBERTS, RMR, CRR

11         FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25