IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA ) CAUSE NO. 3:04-CR-240-P
(
vs. )
( OCTOBER 27, 2008
) DALLAS, TEXAS
HOLY LAND FOUNDATION, ET AL ( 9:00 A.M.

---

VOLUME 25 OF 37

---

STATEMENT OF FACTS

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

---

A P P E A R A N C E S

FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
1100 COMMERCE, 3RD FLOOR
DALLAS, TEXAS 75242
BY: MR. JIM JACKS
MR. BARRY JONAS
MS. ELIZABETH SHAPIRO

FOR THE DEFENDANT: FREEDMAN, BOYD, HOLLANDER,
(SHUKRI ABU BAKER) GOLDBERG & IVES, P.A.
20 FIRST PLAZA, SUITE 700
ALBUQUERQUE, NEW MEXICO 87102
BY: MS. NANCY HOLLANDER
MS. TERESA DUNCAN

FOR THE DEFENDANT: (MOHAMMAD EL-MEZAIN)
LAW OFFICE OF JOSHUA L. DRATEL
14 WALL STREET, 28TH FLOOR
NEW YORK, NEW YORK 10005
BY: MR. JOSHUA DRATEL
MR. AARON J. MYSLIWIEC

FOR THE DEFENDANT: (MUFID ABDULQADER)
LAW OFFICE OF MARLO P. CADEDDU
3232 McKINNEY AVENUE, SUITE 700
DALLAS, TEXAS 75204
BY: MS. MARLO P. CADEDDU

FOR THE DEFENDANT: (GHASSAN ELASHI)
LAW OFFICE OF LINDA MORENO
P.O. BOX 10985
TAMPA, FLORIDA 33679
BY: MS. LINDA MORENO

JONES DAY
555 CALIFORNIA ST., 26TH FLOOR
SAN FRANCISCO, CA 94104
BY: MR. JOHN D. CLINE

FOR THE DEFENDANT: (ABDULRAHAM ODEH)
WESTFALL, PLATT & CUTRER
ONE SUMMIT AVENUE, SUITE 910
FORT WORTH, TEXAS 76102
BY: MR. GREG WESTFALL

COURT'S LAW CLERK:
MS. JENNIFER HELMS
1100 COMMERCE, RM. 1654
DALLAS, TEXAS 75242

COURT COORDINATOR:
MS. BRENDA WEBB
1100 COMMERCE, RM. 1654
DALLAS, TEXAS 75242

OFFICIAL COURT REPORTER:
SHAWN M. McROBERTS, RMR, CRR
1100 COMMERCE STREET, RM. 1654
DALLAS, TEXAS 75242
(214) 753-2349

# INDEX

## EXAMINATION

**Witness Name** — **Page**

LARA BURNS
- Cross By MR. MYSLIWIEC ........ 26
- Redirect By MR. JONAS ........ 38
- Recross By MR. WESTFALL ........ 72
- Recross By MS. MORENO ........ 89
- Recross By MS. HOLLANDER ........ 100
- Recross By MR. MYSLIWIEC ........ 109
- Recross By MR. JONAS ........ 115

JACKIE NORTHRUP
- Direct By MR. JACKS ........ 117
- Cross By MS. WESTFALL ........ 146
- Cross By MS. HOLLANDER ........ 162
- Redirect By MR. JACKS ........ 164
- Recross By MR. WESTFALL ........ 165

AVI
- Direct By MS. SHAPIRO ........ 168

## Government's Exhibits

| Government's Exhibits | Page |
|---|---|
| Payments to Islamic Society Admitted into Evidence | 42 |
| HLF Search No. 47, 50, 51  Admitted into Evidence | 134 |
| Demonstrative No. 30  Admitted into Evidence | 184 |
| Demonstrative No. 10  Admitted into Evidence | 187 |
| German Document No. 2  Admitted into Evidence | 192 |

## Defendant Exhibits

| Defendant Exhibits | Page |
|---|---|
| No. 1356-1360, 1362-1364, 1393 Admitted into Evidence | 72 |
| No. 1415 Admitted into Evidence | 76 |
| No. 1416 Admitted into Evidence | 88 |
| No. 1417 Admitted into Evidence | 89 |
| No. 1407 Admitted into Evidence | 148 |
| No. 1406 Admitted into Evidence | 148 |
| No. 1408 Admitted into Evidence | 151 |
| No. 1405 Admitted into Evidence | 157 |

THE COURT: Good morning.

MR. JONAS: Your Honor, we were just discussing the issue from Friday. This is the first time we had to talk. I think we are resolving it. And if we could just approach the bench?

THE COURT: Sure.

(The following was had at the bench.)

MR. JONAS: I will explain my understanding. I think we are on the same page.

The Defense has created this list of names they received from two of the Government's Exhibits, InfoCom Search No. 90 and InfoCom Search No. 100. InfoCom Search No. 100 is the payment vouchers that says Ibrahimi mosque massacre. So we delineated with the two asterisks is from No. 100 and one asterisk is from 90.

And we are in the process of creating a new revised general assembly document. This is the very originally one unredacted, and I am assuming they will substitute the one that they admitted that will identify these people and how they died.

And in InfoCom Search No. 90, it is a request from the al-Salah Society to the HLF to support some of these people, and it says they died in the aftermath of the Ibrahimi mosque massacre. What the Defense will show is that in the U.N. document these people did not die as part of the massacre;

that they died on related or some other way.

And the point is, and correct me if I am wrong, and I am not sure if this is brought out through Agent Burns or this will be made argument later on, it is not the HLF who is determining who died in the massacre, it is the requesting committee.

InfoCom Search No. 90 only has about six pages with regard to this issue. I think there were more pages that in order to help both the Defense and the Government we need to flesh it out and add some additional pages. Agent Burns is the one that needs to identify that.

So I know this is a little unusual, but when she is off the stand, I think the Defense and Government can sit down and identify those additional pages to flesh out the issue for both sides regarding the payments to people and add those additional pages.

MS. CADEDDU: What are those additional pages?

MR. JONAS: You will have to ask Agent Burns. I am not allowed to ask her.

MS. CADEDDU: You are talking about Exhibit No. 90 is incomplete?

MR. JONAS: It is from boxes of records, so there are additional pages that pertain to this particular issue.

What I am proposing is -- If we don't agree on it we don't agree on it. If we agree that these pages need to go --

I will give you an example. InfoCom Search No. 90 which has the additional names that you guys want to admit to show that there were people that were paid under this massacre, there is no indication that they were actually paid, versus InfoCom Search No. 100 we have payment vouchers. No. 90 just has a list that says, "We want to support these people," and that is it.

MS. CADEDDU: That is your exhibit and it is in. Right?

MR. JONAS: If you don't want --

MS. CADEDDU: I am just asking. I am not being combative.

MR. JONAS: It is our exhibit and it is in. And what I am saying is I am going to come back and argue saying there is nothing to indicate HLF actually supported these additional people. What I am proposing is we sit down and we look to see what additional paperwork is on this and maybe flesh out the issue so it is more supported. I think this works to both sides' benefit.

MS. CADEDDU: Here is what I would propose, Your Honor. I helped Mr. Mysliwiec put this together. I would propose that there be additional exhibit if there are some additional pages, rather than substituting -- What concerns me is I am losing track of which exhibits -- they come in and then we talk about them and then they change later, and what

concerns me is I just think that is confusing to us and to the jury.

So maybe we can do like an A. You know what I mean? Like an InfoCom No. 90-A that is additional pages that the Government wants to put in later and make it a separate exhibit. So that would be my proposal, that would be my preference just so that I can keep track of what went before.

MR. JONAS: That is fine with me, but we need to sit down with Agent Burns collectively at some point.

THE COURT: Is she going to be first up this morning?

MR. MYSLIWIEC: Cross is still continuing, which I hope won't take longer than 20 minutes.

MS. CADEDDU: Would you recall her?

MR. MYSLIWIEC: One of the reasons we are doing this is to speed it up also, because we will have gone over these exhibits a little bit with Agent Burns.

MR. JONAS: I don't know that it is necessary to recall her. I think the points are being made by the parties in this testimony. I think we just need to supplement the pages for the record. I hear a yes and a no so I am not sure.

THE COURT: You start working it out and see where you wind up with that, and if you can't resolve it let me know.

MR. JONAS: At the end of the day if we end up with

the exhibits just the way they currently are, that is fine with the Government as well.

MS. CADEDDU: My only point if that we are going to later substitute exhibits if we have already talked about them, then I think what we need to do is add a new exhibit or do like an A, some way to differentiate. Because otherwise what happens is we talked to the jury with certain exhibits and then later they get substituted and changed and I get confused.

MR. JONAS: This particular issue InfoCom Search No. 90 I am speaking only for.

THE COURT: That is fine. So you can try to work that out.

So you plan on finishing her, and who is the next witness?

MR. JONAS: It will be the computer lady.

THE COURT: How long do you expect her?

MR. JONAS: She is Mr. Jacks' witness, but I don't think she will be on the stand more than a half hour. I mean, it is really just to get some computer stuff in evidence.

THE COURT: Okay. And how long did you expect your redirect of Agent Burns?

MR. JONAS: Maybe 15, 20 minutes. It is not going to be long at all.

THE COURT: You are expecting Avi to start this

morning, then?

MR. JONAS: Yes, barring unforeseen circumstances, yes.

MS. CADEDDU: So we are going to have to eject everyone again.

MS. HOLLANDER: I don't understand. Are you working this out before she takes the stand?

MR. JONAS: No, because you won't let us talk to her.

THE COURT: That is why you were talking about whether they have to recall her or not. You work out what you can, and we will do what we have to do.

MS. HOLLANDER: I am on a separate issue.

MS. SHAPIRO: I have a few issues, too.

MR. MYSLIWIEC: Is this considered in now? There is no objection from the Government. It is a summary exhibit.

MR. JONAS: That is correct. No objection to this Defense Exhibit No. 1414. Is it a summary or demonstrative?

MR. MYSLIWIEC: Summary.

MR. JONAS: I thought it was a demonstrative.

MR. MYSLIWIEC: It is just like your summaries charts based on information in 90 and 100.

MR. JONAS: Except the difference is a 1006 summary has to summarize voluminous amounts of evidence. This summarizes two exhibits that have very few pages in them. The

zakat schedule summarized many, many, many exhibits. That is why what we did with this issue was admit it as a demonstrative. I have no objection as a demonstrative. I do have an objection as a 1006 summary.

MR. MYSLIWIEC: It also summarizes what is in the U.N. report, so it actually summarizes three separate documents. And the reason it is a summary is it is such a complicated cross-referencing process, that that has the effect of being voluminous, because it really takes about three hours to cross reference all of these names on the different exhibits.

MR. JONAS: Not the way they were redacted, Your Honor. It only took me about 15 minutes yesterday to cross reference the names.

MR. MYSLIWIEC: He must be moving at lightning speed because it took me quite a bit longer.

MR. JONAS: I don't want to comment on your work.

MR. MYSLIWIEC: In terms of where these are on No. 90 or 100, the names are a little bit different in terms of spelling.

THE COURT: Let me take a look at those documents, and then I will get back to you. It is admitted, and then we will decide whether it is demonstrative or a substantive document depending on what is there.

Anything else on this one, then?

MR. MYSLIWIEC: No. I just need a couple of minutes.

THE COURT: I think we have some other issues.

MS. HOLLANDER: Yes. We got an email from Ms. Shapiro that the Government wanted to change another exhibit that has been admitted, a summary exhibit, and I would object again to changing an exhibit that has been admitted that we have cross examined the jury about. If they want --

MS. CADEDDU: The witness.

THE COURT: Which one are you wanting to change?

MS. SHAPIRO: Well, there were a few things.

One, last week I gave the Defense a disk of I think four or five exhibits that had errors in the translation; nothing in the original exhibit, but there is extraneous material. I think we addressed that at the bench during the cross examination of Major Lior. And I didn't hear an objection, so I don't know if there is an objection.

MS. HOLLANDER: That was admitted.

MS. SHAPIRO: Yes.

MS. CADEDDU: I think the Judge admitted that translation, did you not?

THE COURT: You got me. I am not sure I know what you all are talking about, frankly.

MR. JONAS: The key chain issues.

MS. SHAPIRO: There was an issue with the key chain. The issue was that when these documents were all turned over

many years ago, literally, like 2005, we had not the originals. We had copies at that point. And the copies had analysis on it from the Israeli government. And the Arabic translators didn't know Hebrew. So when they translated those documents initially, they would put Hebrew text in brackets. I guess on one occasion there was some Hebrew translated.

In any event, the originals don't have any of that on that. Somehow some of the translations should have been swapped out last year but they weren't.

There were three I think exhibits like that where we want to substitute just the translations that the exhibit doesn't have that extra brackets Hebrew text, because it is not on the exhibit. The witness hasn't discussed these exhibits. He substantively can't discuss them.

THE COURT: I don't want to keep the jury waiting on this. It is an issue we are just going to have to deal with and pick it up sometime earlier in the morning or later in the day when the jury is not here. And I will probably want to look at them and see what is there.

MS. SHAPIRO: The one that we may want to just address now because Mr. Jonas may need it for his redirect, there is one document PA No. 8, I believe, where the cover page wasn't translated, and we wanted to make sure that the translation is in.

THE COURT: You want to offer the translation?

MS. SHAPIRO: Exactly.

MS. HOLLANDER: Have we seen it?

MS. SHAPIRO: It is on the disk we gave you last week. It is the cover page and the table of contents and that is it.

MS. HOLLANDER: If we can just quickly take a look at it.

MS. MORENO: We will look at it.

MS. HOLLANDER: And the others we will just hold off. We have some others.

THE COURT: Yes, because I don't want to keep the jury waiting.

MS. SHAPIRO: And I can shortcut some discussion. I am not going to offer the "Eye On America" videos. I think we would be spinning our wheels on that one.

THE COURT: Right. I think you are right. I don't know that I would have heard that much argument, but I don't know that I was going to let it in. I already knew what I was going to do.

The German documents, why are you wanting those? Why are those relevant?

MS. SHAPIRO: Those are relevant because Sheikh Yassin is writing them on behalf of an organization that the Holy Land gave to, a co-conspirator organization. And they talk about some of the educational institutions that the

expert will be talking about that are clearly co-conspirator statements in furtherance of.

THE COURT: That is German Documents No. 2 and 4?

MS. SHAPIRO: Yes.

THE COURT: Not No. 3.

MS. SHAPIRO: No, I am not using No. 3.

THE COURT: Anything else besides what you have in writing?

MS. DUNCAN: I don't think so, Your Honor.

THE COURT: Okay. German Documents No. 2 and 4?

MS. DUNCAN: On No. 2 and 4 is that there hasn't been any evidence of a co-conspiracy between HLF and the al-Aqsa Foundation. I know Your Honor is reserving ruling on those.

THE COURT: I will hold off -- I guess you will need to lay a predicate through your witness, or you got in what you have?

MS. SHAPIRO: He will talk just a little bit.

THE COURT: And the "Eye on America," you are withdrawing that.

MS. SHAPIRO: I Am withdrawing that, but I want to be clear the witness has seen it and relied on it in talking about the letters that were written from the committees in response to that.

THE COURT: The letters are in?

MS. SHAPIRO: The letters are in, and the only reason that we listed the video was to give context to the letters, but we don't need to have the video. We can just ask him if he has seen it and whether it alleged a link between Holy Land and Hamas, and that these letters came in in response.

MS. HOLLANDER: The letters were part of what was conditionally admitted, because they admitted a bunch of stuff and we asked that we get an opportunity to object when they actually were going to use them.

THE COURT: That is where we are now. And your objections to the letters?

MS. DUNCAN: I think we were objecting to hearsay and relevance, Your Honor.

And if I could just clarify with Ms. Shapiro, you are planning to ask him, "You saw this video, and it alleges a link between Holy Land and Hamas," and that is the end of it for you?

MS. SHAPIRO: Yeah. And was he aware of a letter-writing campaign from certain committees, and then we will show him the letters that are from people that the Holy Land had extensive relationships with and committees that they supported that are at issue in this case.

MS. DUNCAN: I think with that, it is the same as the letters, and we object on hearsay and relevance.

MS. SHAPIRO: He is an expert and can rely on hearsay.

MS. HOLLANDER: Well, some hearsay.

I am going to have another objection to Avi. Do you want to take it up later?

THE COURT: Anything to Avi, now, yes.

MS. HOLLANDER: I am going to object to his relying on any interrogations. And the fact that he doesn't say they are interrogations I don't believe cures the confrontation issue in *Crawford*. There is case law on this that an expert can't rely on something that would violate the confrontation clause. And so -- I was going back through last year's testimony, and we objected to this. And he will say, you know, "so and so gave a statement," or "I am relying on something that somebody said." And if that was something that was in the course of an interrogation, then he can't rely on that without violating *Crawford*.

MS. SHAPIRO: This issue came up last year, and Judge Fish ruled on it, actually wrote an opinion, and I will bring that up to Your Honor. I can't remember the ECF number. But he said so long as the expert is not relying exclusively on an interview or interrogation, that as long as it was just part of the body of material that he was relying on, that is fine.

THE COURT: I think you cited it --

MS. SHAPIRO:  It was actually in the context of
Colonel Fighel, because we weren't sure which we were going to
use at that point.  But this issue was briefed and he decided
it was equally applicable with this witness.

MS. CADEDDU:  We actually disagree with that ruling
and we believe it is an error.

MS. HOLLANDER:  And I actually believe it is a
serious error because it is a confrontation issue.

THE COURT:  Okay.

MR. DRATEL:  And also because this 3500 material
catalogs about three or four dozen statements that he has
integrated into his expertise and to his opinions and
analyses.

MS. HOLLANDER:  He talks, for example, there is a
guy named Mahmoud Rumhi, and he talks about him, and in his
3500 material he specifically says that he was, you know,
detained in 1992, and he said this, this, this, and this.

THE COURT:  So you are not going to solicit from him
what these statements were?

MS. SHAPIRO:  In terms of what people said?

THE COURT:  Yes.

MS. SHAPIRO:  No.  But the fact that somebody was
arrested is public knowledge.  Sometimes that is publicized in
the media.

THE COURT:  But that is not making any statements.

I am talking about the statements that were elicited.

MS. SHAPIRO: He is not going to be repeating statement, but to the extent that he has learned things through his research, and part of his research is reading statements, and these are police statements, that, I mean, yes, that is one of the many things he relied on.

THE COURT: He is going to be stating an opinion and what he has learned, rather than quoting statements from any of these --

MS. SHAPIRO: Right. He is not going to quote. I think there are a couple of anecdotes that he was going -- not anecdotes, but examples that sort of illustrate how the social welfare wing works; that it is derived from a variety of materials, including interrogations. But --

THE COURT: I agree with Judge Fish's order. I read that last week, and I agreed with his ruling, so those objections are overruled on that issue.

The GOI-3, this is a designation of --

MS. SHAPIRO: I don't intend to use that right now. But it is a certified designation, so even if we were going to use it, it wouldn't be an issue.

THE COURT: So you are withdrawing it for now?

MS. SHAPIRO: Yes.

THE COURT: And then what about GOI-1? Are you wanting to get into that?

MS. CADEDDU: Judge, if it is the one you just said you are withdrawing for now, if in fact the Government decides to use it at some point, we would like the opportunity to object to that because we do have objections.

MS. SHAPIRO: GOI-1 is already admitted.

MS. DUNCAN: That was played during Doctor Levitt's testimony.

THE COURT: And then we have got the pictures and demonstratives that go with it?

MS. SHAPIRO: And Demonstrative No. 10 I think they objected to, but again, that is a demonstrative that shows the type of material that this expert relies on. And also it shows sort of his enhanced credentials as an expert because he is able from his house to see Hamas television, which not every academic in this field can do. And this is an example of a school ceremony and an institution that Holy Land supported that he himself downloaded from al-Aqsa TV. And we are only admitting it as a demonstrative to show the type of material that he relies on to form his opinion.

MS. DUNCAN: Your Honor, I would say -- I mean, it is one thing to say, "I live close enough to be able to watch Hamas programs on TV." It is another thing to admit this kind of a video, particularly given that we have already got a kindergarten video in evidence that Doctor Levitt testified is representative of Hamas controlled schools.

And because it is being offered to illustrate this expert's testimony, as we argued in the motion, the balancing of probative versus prejudice is flipped, and that the probative value for the purposes of illustrating his testimony has to substantially outweigh the prejudice.

And given the contents of the video, I mean, it is an extremely prejudicial and disturbing video, and that limited probative value that counsel has outlined does not substantially outweigh the prejudice.

MS. CADEDDU: And it is from 2007.

MS. HOLLANDER: Holy Land stopped giving money to this institution in 1994, and this is a video from 2007. Holy Land closed in 2001. The political climate changed drastically, too. It just has nothing to do with the Holy Land.

MS. DUNCAN: The concern we have also, Your Honor, is that because there is some evidence of the Islamic Center, that the jury will be confused by this and think that somehow it pertains to conduct in this period up to 1994, when it clearly doesn't. I mean, because of the change in the political climate and just the passage of time. So there is no evidence that any program Holy Land funded works like this.

MS. HOLLANDER: And it is not in the indictment.

MS. SHAPIRO: That is not true. And Holy Land funded the Islamic Society through 2001, which is where the

first video, GOI-1 came from. So in fact Holy Land was funding institutions that ran exactly these kind of schools.

And whether or not Doctor Levitt relied on GOI-1 to show the types of things he relied on, every expert this has be evaluated differently and this expert has this material to show the kinds of things he relies on, and that he has access to al-Aqsa TV.

And he will also talk about the Islamic Center from its beginning and all the way to the present. And the Holy Land Foundation did give money to that center. It is part of its plan.

And we also heard testimony about after 1995 there was a concerted effort by Holy Land to conceal its money going into these --

THE COURT: What about the fact this ceremony is from 2007?

MS. SHAPIRO: I don't think that matters, because these have been a continuous run of the way that Hamas runs its schools, and this is illustrative of the kind of educational programs that Hamas runs.

THE COURT: Anything else on that?

MR. DRATEL: Let me just say, there is a 13-year span between the last Holy Land payment to this organization and the date of the video. None of the payments from Holy Land to this organization come within the designation

framework, so it wouldn't be a crime anyway. Even if that -- Even if it was in '94, even if they had these programs in '94, it still wouldn't be a crime.

If someone wanted to give money to an organization in 1994, and now they are showing what the platform is in 2007, when it is not even a crime in '94, just it is a potential for confusion, particularly in light of what they put in through Doctor Levitt, which is another kindergarten video from another place, and the jury is going to have to distinguish between them and the time frame.

When you look at the probative value next to that, it can't meet the 703 standards of substantially outweighing the prejudice.

MS. SHAPIRO: We are not admitting this, just to be clear. We are just showing it as a demonstrative.

MS. DUNCAN: Your Honor, although the experts are clearly different people, my understanding is that Avi also relied on GOI-1, which is the video that is already in evidence that was played by Doctor Levitt's testimony.

So, you know, I mean, given that the video, the jury has seen it, and Avi relied on it, the probative value of Demonstrative No. 10 is not there.

THE COURT: I am going to overrule the objection. I think it does go to an issue that is in the case that the jury is having to deal with, and they will understand the

difference that you have been explaining here as far as the

different ceremonies, the time frame.  You can argue that to

the jury and the jury can sort through all that.

MS. CADEDDU:  Your Honor, I just -- What was the

issue that it goes to?  I am just trying to clarify the

Court's ruling for myself--that it goes to an issue in the

case?

THE COURT:  The issue about Hamas and what they do

and what they stand for, and the issues that have been

explored here with the jury, versus just charity and those

kinds of things.

MS. CADEDDU:  Okay.

MS. HOLLANDER:  We would ask for a limiting

instruction as to every one of these 703 issues

contemporaneously when they come in.

MS. DUNCAN:  Let me clarify.  The videos are not

being offered under 703.  Is that correct?

MS. SHAPIRO:  It is being shown as a demonstrative,

and it won't go back to the jury.

MS. DUNCAN:  We will be asking for a demonstrative

instruction.  I just wanted to clarify that.

THE COURT:  We will give a demonstrative instruction

in the Court's charge to the jury at the end.

MS. HOLLANDER:  I am asking for both.

THE COURT:  I understand that, but I am telling you

what I am going to do.

MS. HOLLANDER: Right. I just wanted to be clear what I was asking for.

THE COURT: The record is clear on that. I don't need to hear it three times.

Anything else on Avi?

MS. SHAPIRO: You have the pictures and the posters.

THE COURT: Yes. And I think those are subject to -- As long use can lay the predicate, I think you get those in, as long use lay the predicate.

Anything else?

MR. JONAS: One real quick housekeeping matter on Agent Burns' redirect.

During Ms. Hollander's cross she asked Agent Burns about this particular transaction, the Islamic Society of Gaza. Agent Burns said that this was a typo, and in fact it is in a typo. So I am going to question her about it, but I just wanted to move in the -- replace the last page, page 3 of the exhibit Payments to Islamic Society of Gaza. It should be reflecting HLF Foreign Account 6, not 4.

MS. HOLLANDER: Your Honor, I would request that since I questioned her and part of my questioning is that these were not accurate, that they move this in as a new exhibit. They can call it A or B or whatever, but the exhibits that are there should stay there.

MR. JONAS: We object to that. It is one transaction that Agent Burns said was a typo, and in fact it is a typo. And in fact Ms. Hollander questioned her about her second transaction, and she incorrectly has identified it, assuming you are talking about the second transaction as being a mistake and inaccurate, it wasn't inaccurate. Ms. Hollander didn't go to the correct page that is listed in that transaction, which I may or may not do with Agent Burns.

MS. HOLLANDER: I didn't say this was inaccurate. I said this one was inaccurate. That was the only one I said was inaccurate. And Your Honor, it was inaccurate. And, I mean, that is an issue for us, that these summaries are not accurate. And they can question her, and I would request that they just put in a second one and not change things that are in evidence.

MR. JONAS: We object. We don't think there is a need for that.

THE COURT: Well, except that it was in evidence, and it was in evidence in that form, and she questioned her on that, so I think that probably would be the better practice in this one. Just label it as A, and that way they will have that.

MR. JONAS: Okay.

THE COURT: Because they did question the witness on that.

MS. CADEDDU: And I know we are holding the jury up, but I just wanted to mention, the Court has probably seen -- I filed two *Daubert* motions yesterday. And so we need to take -- I mean, this is obviously the week we are putting on our case, and these are coming five months after the motions deadline, so we need to address those I think in pretty short order. So I don't know when the Court wants to address that.

THE COURT: We will get to those before you start your case. Or before you put them on, just let me know at some point and we will discuss --

MS. CADEDDU: Are you going to need us to file written responses?

THE COURT: It is up to you.

MS. CADEDDU: What concerns me about this is, of course, they are coming five months after the deadline.

THE COURT: A lot of things have been filed late every day in this case as we start. Go have a seat.

(The following was had in the presence and hearing of the jury.)

THE COURT: Go ahead and bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT: Ladies and gentlemen of the jury, good morning. We are ready to proceed.

Mr. Mysliwiec?

Q. (BY MR. MYSLIWIEC) Good morning, Agent Burns.

A. Good morning.

Q. Let's just briefly go back to InfoCom Search No. 26, which was that video clip that I think we ended with on Thursday afternoon. All right?

A. Okay.

Q. This was the one that cut off as the person on the video is saying a sentence, and it seemed to cut off about halfway through that sentence.

MR. MYSLIWIEC: Could we play InfoCom No. 26, Clip A, and then freeze it at the end?

(Whereupon, InfoCom Search No. 26, Clip A was played, while questions were propounded.)

Q. (BY MR. MYSLIWIEC) So the sentence ends with the word "but," "and there are some brothers that do not belong to any movement, but," dot dot dot. Over the weekend Mr. Jonas and I agreed on the translation for the rest of that sentence. Okay?

A. Okay.

MR. MYSLIWIEC: Could I have the elmo?

Q. (BY MR. MYSLIWIEC) And this is the rest of the sentence. "And some brothers did not belong to any group, but they got used to praying at the mosque, and they grow their beards, so they arrested them. We consider this probably an assault, not just on the land of Palestine, but on all Muslims worldwide."

Let's move on to Demonstrative No. 32, which is this

board that the Government had prepared and is an exhibit for the Government.

What I have here on the screen is the same demonstrative Okay? Except I have merely highlighted these three names at the bottom who you and Mr. Jonas discussed and the last name up at the top left hand corner which we will get to. All right?

A. Okay.

Q. So this demonstrative involves information regarding HLF's alleged support for the families of martyrs. Right?

A. That is correct.

Q. And specifically martyrs relating to the al-Ibrahimi massacre or around the time of the al-Ibrahimi massacre. Right?

A. Correct.

Q. Now, on the left side of this demonstrative, just to reorient the jury from last week, is a summary of information that comes from InfoCom Search No. 100 which, are those payment vouchers. Right?

A. Correct.

Q. And those payment vouchers on the face of the document connect to martyrs. Right?

A. That is correct.

Q. Okay. And according to what the payment vouchers say, these martyrs were corrected to the al-Ibrahimi mosque

massacre.

A. That is correct.

Q. Mr. Jonas compared those names to a U.N. report which we also saw on Thursday, and that U.N. report is of the committee to investigate Israeli practices affecting the human rights of the Palestinian people and other Arabs of the occupied territories. Correct?

A. Right.

Q. And you discussed with Mr. Jonas that three of the names of martyrs from the payment vouchers were not people actually killed at the Ibrahimi mosque. Right?

A. I think we discussed two of the ones that weren't.

Q. Okay. But also the three names here that are on the lower right hand corner come from this U.N. report. Right?

A. That is correct.

Q. And they are names of people who were killed approximately a month after the massacre. Right?

A. That is correct.

Q. And two of those names are part of InfoCom No. 100 but weren't actually killed at the massacre itself.

A. That is correct.

Q. Okay. Now, in the U.N. report, just so the jury is clear, the top part of your right hand column, February 25th, 1994 is on one page of that U.N. report, and then the three names from March 23rd appear in the report three or four pages

later. Right?

A. It is later in the report. I can't remember how many pages are in between.

Q. And the jury will have that exhibit and they can look at that.

A. Right.

Q. Now, according to the U.N. report, these three were reportedly leaders, the three I am talking about now in the lower right hand corner were reportedly leaders of Hamas in the West Bank. Right?

A. Correct.

Q. Let's look at other martyrs who died around the time of the mosque massacre and whose family, according to documents, the HLF supported.

Now, we have here on the top left another person who is identified in InfoCom Search No. 100, and that is the top left there as well, but I will zoom in a bit. Osama Mohamed Ghazal al-Masri. Correct?

A. Correct.

Q. And you have a version of that U.N. report up there as Defense Exhibit No. 1349. Right?

A. I do.

Q. And he appears he was a martyr identified by the committee that put together the payment vouchers. He was identified as a martyr associated with the mosque massacre.

Right?

A. Well, he was on that paperwork, but just to be clear again, that paperwork was included with the final project report from the Islamic Charitable Society of Hebron, so I don't know if the Islamic Charitable Society of Hebron created that paperwork or who did. But he was listed as an Ibrahimi mosque massacre victim within those payment vouchers.

Q. And the payment vouchers have in the upper left hand corner that it is the committee for the families of the Ibrahimi sanctuary massacre. Right?

A. That is correct.

Q. Okay. Now, as you can tell, and the jury can look at this report themselves, but just to move things along, on page 22 halfway down of the U.N. report, that is where this man's name appears. Right?

A. That is correct.

Q. And it indicates that he died on March 2nd, 1994 about a week after the massacre. Right.

A. That is correct.

Q. According to the U.N. report, he died after being fatally wounded during clashes that erupted in Hebron after the curfew was lifted in the city. Right?

A. That is what it says.

Q. And the report doesn't describe Mr. Ghazal as a member of Hamas or any other organization. Right?

A. It does not.

Q. Not in the report. According to InfoCom -- Well, now, I will rephrase that question. Exhibit No. 1394, Defense Exhibit No. 1394 contains some additional names. That is, the U.N. report you are looking at contains some additional names that were in the Government's version of this document. Right?

A. Correct.

Q. We are not going to go through all the names, but these are the names of people who we have described, according to the two documents in evidence, InfoCom Search No. 90 and InfoCom Search No. 100, these are people whose families the HLF supported or were identified as people connected to the Ibrahimi mosque massacre. Right?

A. That is a little bit of a complicated question, so let me break it down. In InfoCom No. 90 there is a list from al-Salah Society of individuals that it calls martyrs and says who fell in Gaza following the Hebron massacre. So that would be, you know, in a separate part of the territories in Gaza a as opposed to in Hebron and around the time.

Q. Okay.

A. But this InfoCom No. 09 does not show that the HLF actually supported them. It just shows a list of them. It just --

Q. It lists people and it associates them with the Ibrahimi

massacre. Right?

A. Correct.

MR. MYSLIWIEC: Can we pull up InfoCom Search No. 90 for a moment and go to page 6? And if we can highlight the paragraph, just the top paragraph part there.

Q. (BY MR. MYSLIWIEC) And this is where it says that -- It says, "We also attach for you a list containing the names of the martyrs who fell in the Gaza Sector following the Hebron massacre," and it gives a date and a sic in brackets, which means that it is a misstatement of the date on this formulation. But it is meant to mean February 25th, 1994, which is when the massacre was. Correct?

A. Correct.

Q. Now, also in Defense Exhibit No. 1394 let's go to page 24.

MR. MYSLIWIEC: And if I could have the elmo.

Q. (BY MR. MYSLIWIEC) As I said, we are not going to go through all the names, but just to provide some additional information.

Now, I am going to zoom in in a moment, but this is the page where these three names on the bottom right hand corner came from.

A. Yes. That is correct.

Q. Okay. And then the U.N. report gives its description of the reason for their death. Right?

A. It does. It says remarks.
Q. Okay. And that is where it contains this information about the three being reportedly leaders of Hamas in the West Bank. Right?
A. Correct.
Q. Now, also on this page are six additional names. Right?
A. Correct.
Q. And these are names of people who were killed about five days, reportedly killed five days after these other three purported Hamas leaders. Right?
A. Correct; march 28th, 1994.
Q. And this is a description of who these six people are. Right? According to the report?
A. According to the report, yes.
Q. And can you read the remarks section? I am going to try to do this in a way that the jury can follow along. Could you read that remarks section?
A. It says, "The six members of the Fatah Hawks were killed by an undercover IDF patrol in the Jabalia refugee camp, although they were not on the wanted list. According to the Palestinian eyewitnesses quoted in the Jerusalem Times, the men were wearing uniforms and distributing leaflets and did not shoot. According to B'tselem, undercover soldiers shot to kill and did not act in self-defense. No warning shots were reportedly fired into the air. One of the men was initially

only wounded and reportedly tried to escape, but was subsequently shot in the head at point blank range. According to the version of the IDF, an IDF unit identified suspected terrorists dressed in fatigues, some of whom were marked and armed with two Kalashnikov assault rifles and two pistols. The soldiers fired at these persons who were inside two parked cars, and killed them after they had opened fire on the patrol."

Q. Okay. Now, I am going to take you to another exhibit in just a moment, but again, those six people were also killed roughly a month after the Ibrahimi massacre. Right?

A. Correct.

Q. Okay. Except they were identified with Fatah instead of Hamas. Right?

A. In this report.

Q. Yes. Let's go to Defense Exhibit No. 1414. Now, you had a chance to review this before you got on the stand this morning. Right?

A. I did.

Q. Okay. Can you read off what the title of the exhibit is?

A. It says, "Martyrs killed in Ibrahimi mosque massacre and aftermath supported by the Holy Land Foundation in 1994." And then it says sources of information, and it lists the Government and Defense exhibits.

Q. And this is compiled based on two source -- well, three

sources of information. The first source of information is that list that we just looked at and InfoCom Search No. 90 of people that the al-Salah Society identified as being connected to the Ibrahimi mosque massacre.

A. The aftermath.

Q. That is No. 1. The second source of information is InfoCom Search No. 100, which is those payment vouchers. Right?

A. Correct.

Q. And then after the names from there have been assembled, they are compared to the U.N. report document, Defense Exhibit No. 1349. Correct?

A. Correct.

Q. And only the names that appear in that U.N. report and also appear in InfoCom Search No. Or 100 then appear on this summary exhibit. Right?

A. That is correct.

Q. Okay. And one of the things the U.N report does, as we just went through it, is it has that remarks column and describes what happened about the death of these people in certain ways. And sometimes it provides two versions of it or one version of it, but that information then leads to the description of each column at the top. Right?

A. That is correct.

Q. Okay. So, for example, six people are from Fatah.

Right?

A. Right. Those were the ones referenced in the little paragraph that we just looked at.

Q. Exactly. Then there are also six people who have been purportedly connected to Hamas, according to that U.N. report. Right?

A. That is correct.

Q. Okay. And then in the next column is the Ibrahimi mosque massacre victims. Right?

A. Correct.

Q. And that identifies 18 people.

A. Yes.

Q. And then the final column is killed in the Ibrahimi aftermath, and that identifies two people. Right?

A. It does.

Q. The three of those people were purportedly involved in violent acts. Right?

A. According to the report.

Q. And nine people are other victims killed in one fashion or another. Right?

A. Correct.

MR. MYSLIWIEC: I have no further questions, Your Honor. Pass the witness.

THE COURT: Ms. Cadeddu?

MS. CADEDDU: On behalf of Mr. Abdulqader, I have no

questions for this witness.

THE COURT: Mr. Jonas?

MR. JONAS: Yes, sir.

REDIRECT EXAMINATION

By Mr. Jonas:

Q. Good morning, Agent Burns.

A. Good morning.

Q. I know you have been on the stand for a long time, but I think the light is at the end of the tunnel.

A. I hope so.

Q. I want to just quickly start with where you just left off on InfoCom Search No. 90 and InfoCom Search No. 100. What is the difference between those two exhibits?

A. InfoCom Search No. 100 dealt with payment vouchers of individuals who, according to the vouchers, actually received money from the HLF and under a project called the Ibrahimi mosque massacre victims. InfoCom Search No. 90 is an exhibit which contains correspondence from al-Salah Society with a list of names of individuals who died in fighting after the mosque massacre.

Q. The two individuals -- And since the demonstrative is up, I will use it as a reference. The two individuals paid out of InfoCom Search No. That have been identified as having died afterwards, is there anything in the payment vouchers in InfoCom Search No. 100 that shows that they died afterwards,

just the way InfoCom Search No. 90 describes those people?
A. No. On the paperwork itself it lumps them in with the other victims of the Ibrahimi mosque massacre.
Q. Okay. Moving on, do you recall Ms. Hollander asked you about some of the financial schedules?
A. I do.
MR. JONAS: If we can put Payments to al-Salah Association on the screen, please. The last page of that exhibit, please.
Q. (BY MR. JONAS) Ms. Hollander questioned you about the last transaction. Do you see that?
A. I do.
Q. Do you recall those questions that she asked you?
A. I do.
Q. All right. And if I recall correctly, she talked to you about HLF Foreign Account No. 2 and questioned you about where this transaction was found within that paperwork.
A. Yes.
Q. All right. Do you see on the right hand column where it says exhibit number, and there is several exhibits that support this particular transaction?
A. Yes.
Q. Generally speaking, why would there be multiple exhibits supporting a transaction?
A. Well, depending on the type of transaction, we may need

to look at several different pieces of paper to understand where the money was going or for what the money was going.

Q. Did you see instances where a transaction was sent to one committee and then further distributed out to others?

A. Yes.

Q. Did you see instances where transactions went from HLF Dallas to HLF Gaza, or some place in the West Bank, and then were further distributed out?

A. Yes.

Q. Is this one of those instances?

A. It is.

Q. Do you see where it says -- Do you see where it says HLF Search No. 48, page 1 to 3?

A. I do.

MR. JONAS: If we can go to that exhibit, please, HLF Search No. 48, specifically page 2.

Q. (BY MR. JONAS) Did you see the letterhead that this document was on?

A. Holy Land Foundation.

Q. Do you see where it says the number 1722?

A. I do.

MR. JONAS: If we can turn to the third page.

Q. (BY MR. JONAS) What does that translate to?

A. Al-Salah Society families, 15 families, $1722.

Q. Is that the same amount in that last transaction on these

schedule payments to al-Salah Association?
A. Yes.
Q. So that transaction is on your schedule. Is that correct?
A. It is.
Q. If we can go to move on to a second transaction she questioned you about, which was Payments to Islamic Society/Islamic Association.
MR. JONAS: If we can put that schedule on the screen. Go to the last page, please, page 3.
Q. (BY MR. JONAS) Do you see the second transaction from the bottom dated July 7, 2001?
A. I do.
Q. Do you recall she asked you questions regarding that particular transaction?
A. Yes.
Q. And I don't recall if she pulled up the actual exhibit or not, HLF Foreign Account No. 4. She may have. And do you recall you said it could be a typo?
A. I believe that we did look at it and I thought there might be a typo there.
Q. And it currently says HLF Foreign Account No. 4, page 132 to 133?
A. It does.
MR. JONAS: If we can pull up HLF Foreign Account

No. 6, page 132, please.

THE WITNESS: I think this is just the Arabic. The translation may be on the next page.

Q. (BY MR. JONAS) Is this the translation for this page?

A. It is.

Q. This is page 133, as per the schedule. Is this now the transaction dated July 7th, 2001 for $3,000 to the Islamic Society of Gaza?

A. It is.

Q. All right. So the schedule itself, that is a typo?

A. It is. It should have been HLF Foreign Account No. 6, I believe you said this was.

MR. JONAS: Your Honor, pursuant to the discussion earlier, I am going to offer into evidence a substituted or an additional page for this schedule, and we will call that third page Payments to Islamic Society/Islamic Association of Gaza A.

THE COURT: Counsel?

MS. HOLLANDER: No objection.

THE COURT: That is admitted.

Q. (BY MR. JONAS) Did Ms. Hollander show you any other transactions that you recall?

A. I don't recall.

Q. Okay. Do you recall if there were any other ones where there may have been a typo?

A. I can't remember.
Q. That was it?
A. I think so.
Q. Okay. Mr. Westfall also went through some transactions with you, and I am not going to go through them but I just want to ask you a general question. Did you come across transactions where in the internal HLF paperwork there was a wire transfer but it didn't match up exactly with the wire transfer through the bank account?
A. Yes. I did come across transactions where the internal paperwork showed that money was being sent from the HLF offices here to the HLF bank accounts in the territories, and that it was supposed to be disbursed in a certain manner to various entities. And when I looked at the foreign bank records there were instances, not always, but there were instances where the amounts did not always correlate.
Q. Let me ask you, you didn't quite understand my question and I apologize for that. Were there instances where a wire transfer coming from the domestic bank records from the Holy Land Foundation was much larger than one particular piece of paper indicating a wire transfer to that same organization overseas?
A. Okay. I am sorry. I did misunderstand your question.
Q. Do you understand my question now? I am trying to be vague, but I don't want to lead. Can you explain that?

A. If I am understanding your question, and I apologize if I am not, often there would be large wire transactions from the bank account here to the bank account there, and there would be a number of different wire transfer requests I guess in different amounts that if you take them together and add them up and they are supposed to equal the total amount of money going over on that particular day.

Q. You did understand my question. So if one looks at a particular transaction and sees a wire transfer, an internal HLF wire transfer request and the amount is lower than what is on the schedule, what would they have to do to reconcile the other two?

A. Look at the other supporting paperwork and put them together.

Q. Total them up?

A. Right.

Q. Okay. I am moving on now, and I am hitting a couple of things that the Defense attorneys asked you. I am not going to go over everything they questioned you about.

A. Okay.

Q. Ms. Moreno played for you part of a video, HLF Search No. 110, and she questioned you about it regarding an ambulance driver. Do you recall that?

A. I do.

Q. What I would like to do -- Withdrawn. Did we play any of

that video with you when I questioned you on your direct testimony?

A. No.

Q. Let's do that now.

A. Okay.

MR. JONAS: If we can play Clips A and B for HLF Search No. 110.

(Whereupon, HLF Search No. 110, Clips A and B, were played, while questions were propounded.)

Q. (BY MR. JONAS) Agent Burns, who was the individual questioning her, that woman in that second clip, if you know?

A. That was the Holy Land Foundation's Gaza office representative at that time Mohamed Muharam. That would have been October 2000 and afterwards.

Q. And was he the same individual in the first clip?

A. Yes.

Q. And how much food did this woman ask for from him?

A. In that clip, nothing.

Q. Backpacks?

A. No.

Q. Agent Burns, I want to move on to another line of questioning from another Defense counsel.

I believe Ms. Hollander questioned you about Ashqar Search No. 5. And I have the exhibits up here if you need to take a look at them.

MR. JONAS: Your Honor, may I approach to hand Agent Burns the exhibits?

THE COURT: Yes.

MR. JONAS: If we can put Ashqar Search No. 5 on the screen, please.

Q. (BY MR. JONAS) What is the first page of the English, Agent Burns?

A. Page 14.

Q. Agent Burns, Ms. Hollander went through this document with you and it talked about the Muslim Brotherhood taking care of the social wing and Hamas taking care of other matters. Correct?

A. Correct.

Q. All right. If this divides -- Why did you consider this document as part of your investigation?

A. Because, as I said, when we talked about this document initially, this is from the very early years of the Hamas creation, and it discusses the progression of Hamas in the territories to include their influence and control over the social and charitable organizations. And in the beginning, it actually says you can look in the first paragraph and it talks about, even before the title, it says, "A jihad in your path in order to liberate the best of the blessed regions." In this document it discusses how to go about achieving that goal in the territories.

 In Gaza and the West Bank, prior to the out break of the first Intifada in December of 1987, the Muslim Brotherhood --

MS. HOLLANDER: Your Honor, I am going to object. First of all, she is not an expert. Second of all, this is a narrative. There is no question on the floor.

THE COURT: Overruled. Go ahead.

THE WITNESS: Sheikh Ahmed Yassin led the Muslim Brotherhood in the territories, and had established--and this is according to the documents that we have looked at, including this one; many of the documents we talked about in my first testimony--had established a significant infrastructure, social infrastructure in Gaza and the West Bank.

With the outbreak of the Intifada, Sheikh Ahmed Yassin, the leader of the Muslim Brotherhood in the Palestinian territories, and other leaders of the Muslim Brotherhood in the territories, created Hamas. They began to use immediately the existing Muslim Brotherhood social infrastructure to achieve Hamas' goals. That is why this paperwork is important. Individuals like Sheikh Ahmed Yassin, who on day one were identified as Hamas, were exposed individuals, and you will see countless references to exposed individuals and how they could cause danger to the societies.

If you will recall, in the Philadelphia meeting they talked about how they had problems with the organizations that

were run by exposed people, and Sheikh Ahmed Yassin was one of those people.

So this is a breakdown of basically how Hamas was going to a chief its goals in the territories using that existing Muslim Brotherhood infrastructure.

Ms. Hollander asked me if there was a difference, or referred to a difference between the Muslim Brotherhood and Hamas in the territories at this time, and there was the same goal. It was the same -- There was no distinction at this point between the two.

Q. (BY MR. JONAS) Mr. Westfall went through with you the zakat summary schedules. Do you recall that?

A. I do.

Q. And he specifically said, and some of the other Defense attorneys said this as well, that the Islamic Center of Gaza, Islamic Relief Committee, Islamic Society of Gaza, and al-Salah Society are not part of the indictment. Do you recall that?

A. I do recall that.

Q. Mr. Westfall put those particular summary schedules aside and didn't ask you any questions about the individual members. Do you recall that?

A. I do.

Q. Okay. Why is it, then, important to your investigation, why have you testified about is Islamic Center of Gaza,

Islamic Relief Society, Islamic Society of Gaza, and al-Salah?
A. Because those entities, through evidence that we have discussed, were controlled by Hamas, and the Holy Land Foundation did give to those entities, and was affiliated with the individuals that were identified, according to the evidence, who are also Hamas leaders.

So in looking at the big picture, it was very important to see what the Holy Land Foundation was doing, with whom it was associating, and who it was sending its money. As we discussed, when the HLF was first created, the primary recipient of the money was the Islamic Center of Gaza, the Hamas institution that was founded by Sheikh Ahmed Yassin when he was still a leader of the Muslim Brotherhood.
Q. You are familiar with the indictment?
A. I am.
Q. Does the indictment represent every single payment that the HLF made to a Hamas institution?
A. No, it does not.
Q. Mr. Westfall also went through the individuals -- On the schedules that he covered with you that are in the indictment, he went through the individuals on your summary schedule and he checked off and read those that you testified are Hamas, based upon the search warrant evidence. Do you recall that?
A. I do.
Q. Okay. Did he go through every single column on your

schedule?

A. No.

Q. What did he miss?

A. The general committee.

Q. Was there evidence that you testified about that is in this case that refers to or discusses the general committees--I say the general committees; I mean the committees, not the individuals--as being Hamas?

A. Yes.

Q. All right. And you should have before you Elbarasse Search No. 22.

A. I do.

MR. JONAS: If we can put that on the screen, please.

Q. (BY MR. JONAS) What is this document? Remind us.

A. This is the letter to the Defendant Shukri Abu Baker that was found at Ismail Elbarasse's home from July of 1991 that talks about which committees are theirs.

Q. Okay. Ms. Hollander questioned you about this document as well, and she asked you if the word Hamas is anywhere on this document. Do you recall that?

A. I do.

Q. Well, is Hamas anywhere on this particular document?

A. The word Hamas is not on this document.

Q. If the word Hamas is not on this document, then why have

you considered it as part of your investigation?

A. Because this document was from July of 1991, it was a part of the Palestinian Committee documents. Based on all the Palestinian Committee documents that we have looked at in this trial and the Philadelphia meeting, those individuals, the Palestinian Committee, the HLF, were Hamas. They were designed to support Hamas. And when this document, which is a document from those individuals at the same time that we are watching the videos where these people are praising Hamas says, "This is ours," to me that is Hamas.

Q. Did you -- Well, what does this say about the Ramallah zakat committee?

A. "All of it is ours."

Q. What does it say about the Jenin zakat committee?

A. "Guaranteed by virtue of Mohamed Fouad Abu Zeid's position."

Q. Is Mohamed Abu Zeid on the summary schedule?

A. He was identified in HLF search warrant evidence as a Hamas leader in Jenin.

Q. What does it say about the Nablus zakat committee?

A. "We have nobody in it. His wife is one of us. We have a relationship with Haj Yaish."

Q. Do you know who he is?

A. There were actually two Yaishes that were affiliated with the Nablus zakat committee. One was an older gentleman named

Borhan Yaish, and the other was Adly Rifat Yaish. Adly Rifat Yaish was one of the individuals that we saw in numerous exhibits, and he was one of the Hamas deportees.

Q. What does it say about the Tulkarem zakat committee?

A. It says, "We have one, Hajj Haj Aref El Jayoussi, director of Tulkarem Endowments, and Bilal Khamis, a supporter. The rest are merchants without an inclination."

Q. Do you know who El Jayoussi is?

A. I am not familiar with that individual, but I am familiar with Bilal Khamis.

Q. Who is that?

A. He is one of the individuals with the Tulkarem zakat committee we talked about during my second testimony.

Q. What does it say about the Qalqilya zakat committee?

A. "All of it is ours and it is guaranteed."

MR. JONAS: The next page, please?

Q. (BY MR. JONAS) And we are just focusing on the zakat committees that you testified about that you made summary schedules for.

A. Okay.

Q. This distinguishes between zakat committees and charitable organizations. Right?

A. It does.

Q. What does it say about the Islamic Charitable Society of Hebron?

A.   It says, "All of it is ours.  It has Adnan Abdel Khalik

Al Natshe and Hashem El Natshe, our people."

Q.   What does it say about the Sciences and Culture Society?

A.   It says, "We have three of our people in it."

Q.   Is that the one that is run by -- Who runs the Islamic

Science and Culture, or who ran it?

A.   At this time their contact there was Jamil Hamami, the

Hamas leader.

Q.   And were these zakat committees and charitable

associations discussed in the Philadelphia meeting?

A.   They were.

     MR. JONAS:  We can go to Philly Meeting No. 13-E,

please, page 2.

Q.   (BY MR. JONAS)  We are not going to read this whole

thing, Agent Burns, but --

     MR. JONAS:  If you can enlarge the bottom half,

please.

Q.   (BY MR. JONAS)  I am just going to ask you about certain

committees.  Tell me if you can find where it references those

committees, if it does at all.  The Nablus zakat committee?

A.   Yes.  Toward the top it says, "There was relatively old

activity such as Nablus zakat committee in Nablus."  It talks

about how many orphans and families it sponsors, and it says,

"But when we speak about it as a zakat committee, we tie it to

us.

Q. "The Jenin zakat committee.

A. "In Jenin there is a large Islamic school and there is an orphan center. In Jenin, the zakat committee there has built a hospital, which is really ours, for the Islamists, either in management or in teams working in it."

MR. JONAS: If we can go to the next page, please.

Q. (BY MR. JONAS) We are not going to hit every single one because you testified about this before, but I wanted to address what Mr. Westfall questioned you about.

MR. JONAS: The bottom of the page 3.

Q. (BY MR. JONAS) What does it say about the Ramallah zakat committee?

A. It says, "We could say that the Ramallah zakat committee is ours, including its management and officers."

Q. Moving up a little higher in that page, what does it say about the Islamic Sciences and Culture Society?

A. It says, "the" Islamic Science and Culture Society used to have a research center, which was the nucleus for a huge research center until the person in charge of it, sheik Jamil Hamami, was arrested, and this became an obstacle and a hindrance for the development of that project. We have a school and a kindergarten and some orphan sponsorships in that rejoin.

Q. If you will go right where you are, but the top line where it says "In Jerusalem."

A. "In Jerusalem, there remains some organizations, particularly the Islamic Science and Culture Society, which is directly counted with us."

MR. JONAS: The next page of this exhibit, please. We will do one more, the top, please.

Q. (BY MR. JONAS) What does it say about the Islamic Charitable Society of Hebron?

A. It says, "In Hebron, Hebron is a city, is a place where we consider that we have a good presence and weight as Islamic organizations, such as the Islamic Charitable Society, which was founded in 1962 and which has over 1,000 employees."

Q. All of these committees I have asked you about, both with Elbarasse Search No. 22 and the Philadelphia Meeting No. No. 13, are those all committees that the HLF gave money to?

A. Yes.

Q. Both before and after Hamas was designated?

A. Yes.

Q. With regard to Elbarasse Search No. 22, what time period was that? That is the letter to Shukri we went through a moment ago.

A. July 1991.

Q. And the Philadelphia meeting was when?

A. October of 1993.

Q. Who was running the Palestine Committee at this time? Who is the head of it, per the Elbarasse documents?

A. According to the Elbarasse documents, Hamas leader Mousa Abu Marzook.

Q. And What was his role in Hamas at time?

A. He was the political bureau chief, the No. 1 guy worldwide for Hamas.

Q. In the Philadelphia meeting it discussed some of the committees and when they were formed. I believe it said the Islamic Charitable Society of Hebron was formed in 1962, if I remember correctly?

A. That is correct.

Q. If you recall InfoCom Search No. 28. You don't have that one in front of you.

MR. JONAS: Your Honor, if I may approach and hand this one to her?

THE COURT: Yes.

Q. (BY MR. JONAS) And hand some additional exhibits that we will get to in a moment.

A. Thank you.

MR. JONAS: And InfoCom Search No. 28, if we can put that on the screen, please.

Q. (BY MR. JONAS) Agent Burns, since I don't have -- I handed you my copy. What is the first page of the English?

A. Page 78 is the first page of the English.

Q. Ms. Moreno questioned you about this exhibit. What is it in this exhibit that is significant?

A. The identity or the identification of the various committees and the HLF's contacts at those committees, and also some of the committees list out their membership, the day they wore founded, their bank account information.

Q. Okay. The date it was founded. Ms. Moreno went through that with you and questioned you about the date some of these committees were founded. Do you recall that?

A. I do.

Q. And many of the ones, according to this document, were founded prior to the formation of Hamas.

A. That is correct.

Q. Well, Agent Burns, if these committees were formed prior to the formation of Hamas, then what is it you testified about, based upon the exhibits, that indicates that Hamas took them over?

A. Well, according to a number of the exhibits that we analyzed, there was a study of these committees and the leadership of these committees, and you can track the exhibits by date and the progression of the individuals that they had in control of these committees. Even the ones that pre-existed the Hamas -- the creation of Hamas, they sought to control these organizations and place their people in the management. And that is directly from the exhibits that we have discussed.

Q. And I want to be clear and make a distinction here. You

testified that some of these charitable organizations, including, for example, the Islamic Society of Gaza, were Muslim Brotherhood organizations at the time of creation.

A. That is correct.

Q. So are the zakat committees in the West Bank distinctive from the charitable associations and Societies in Gaza?

A. Yes.

Q. Can you just explain that, based on the exhibits that we have seen in evidence here?

A. Based upon the exhibits, you can see that Sheikh Ahmed Yassin was responsible for creating the Islamic Center of Gaza. Before Hamas was created it was a Muslim Brotherhood organization. That is even printed in I believe HLF Search No. 108 and 109 where it discusses the creation of these organizations originally as Muslim Brotherhood organizations.

The zakat committees in the West Bank were a bit different in that they were charitable committees that were founded under the waqh that you have heard about, and the leadership of those committees was not always necessarily Muslim Brotherhood or not. That is why they were seeking to gain control of the leadership of those committees as opposed to the Islamic Center of Gaza and the Islamic Society of Gaza, which were solid Muslim Brotherhood organizations from the get go.

Q. Okay. You were questioned about some of the documents in

the HLF material from these committees that had what appeared to have PA licensing symbols on them.

A. I saw there was the eagle on the letterhead.

Q. Okay. When I say PA I mean Palestinian Authority.

A. I understand that.

Q. And when Mr. Westfall was questioning you about your summary schedules he questioned you about material taken from the search warrants.

A. That is correct.

Q. Is there material that is now in evidence not taken from the FBI search warrants that discuss the PA's view, the Palestinian Authority's view of some of these committees?

A. Yes.

Q. Do you have before you what has been admitted as Exhibit PA No. 8?

A. I do.

MR. JONAS: If we can put PA No. 8 on the screen, please.

Your Honor, this is one where we move in the translated pages of the first two Arabic pages of this exhibit, which is the cover page and the table of contents. They are not currently in the exhibit as moved in last week.

THE COURT: What is not in that exhibit? The first two pages.

MR. JONAS: The first two pages in Arabic. We

translated them, and we seek to add those to this exhibit.

THE COURT: So they were not in the exhibit that was admitted originally?

MR. JONAS: Yes, sir.

THE COURT: All right. So are you offering those now?

MR. JONAS: Yes, sir.

THE COURT: Counsel, any objections to those additional pages?

MS. DUNCAN: Your Honor, we just renew the same objection to the rest of the document, which is not admissible under 803(8).

THE COURT: Those have been overruled and these additional pages are admitted.

MR. JONAS: Thank you, sir.

If we can go to the first English page, please.

Q. (BY MR. JONAS) Agent Burns, can you tell us why we are scrolling through what is the number of the last Arabic page?

A. The last Arabic page is page 30.

Q. Okay. Agent Burns, do you know where these pages came from?

A. I do.

Q. Where?

A. They were seized as a part of Operation Defensive Shield.

Q. From where?

A. From the Palestinian Authority offices.

Q. What is the title of this document?

A. "Palestinian National Authority general intelligence Ramallah and al-Bireh Government, security work plan."

MR. JONAS: If we can go two more pages, page 33, and enlarge that.

Q. (BY MR. JONAS) Can you read what this says?

A. I can. It says, "The committee's office is in Ramallah al-Bireh Governorate, al-Ramuni Building, near the police station.

"The committee was establish in the seventies and was under the auspices of the Islamic Endowment Directorate.

Dr. Husni Abu- 'Awad chairs the committee, and he is a pediatrician in Hamas clinics in addition to Darwish al-Zein.

Q. Let me pause you. Do you know the name Husni Abu Awad?

A. I do.

Q. How do you know that name? Withdrawn. Have you testified about him already?

A. Yes.

Q. How so?

A. As being a leader of the Ramallah zakat committee.

Q. And is he on your summary schedule for the Ramallah zakat committee?

A. He is, and so is Darwish al-Zein.

Q. Continue reading, please.

A. "The committee's overt objectives is collecting zakat from wealthy Muslims and distributing it to the poor and the needy.

"The committee has financial relations with several companies and banks. The most important are the Arab Bank, Jordan Bank, Beit al-Mal, Sunqrot Company, and al-'Ajuli for Currency Exchange."

Q. Let me pause for a moment. You said you gathered records of some of these zakat committees from overseas. Do you recall, if you recall, whether the Ramallah zakat committee had an account that you gathered from any of these banks?

A. We did recover or we did obtain some bank records for the Ramallah zakat committee. I can't recall. I believe they were at the Arab Bank, but I probably need to refresh my memory on that.

Q. Continue, please.

"The committee has relations with the Islamic Movement inside the green line, as well as the Jerusalem zakat committee, as it is its founder."

Q. What is the Islamic Movement?

A. In this context the Islamic Movement is a movement inside of Israel that was affiliated with Hamas.

Q. Continue, please.

A. "In addition to the funds generated from zakat in charitable contributions, the committee receives fund

transfers from numerous Arab and non-Arab countries, most importantly Kingdom of Saudi Arabia, Kuwait, United Arab Emirates, and Qatar as such funds are transferred through the aforementioned banks and companies.

"The committee has several branches.

"Zakat committee at Ein Barud.

"A warehouse in Ramallah in front of the Sharia Court.

"A warehouse in the industrial zone, Ramallah.

"A center to teach knitting, Ramallah."

MR. JONAS: Next page, please.

Q. (BY MR. JONAS) What does this say?

A. "The most important active members of the zakat committee in Ramallah and al-Bireh governorate," and then it lists Husni Mohamed 'Abd-al-Qadir Abu-'Awad.

Q. You don't need to read their numbers. And is he on the schedule?

A. It is. It says he is Hamas and committee chairman.

Q. The next name?

A. Darwish el-Zein.

Q. Is he on the schedule?

A. He is.

Q. What does the Palestinian Authority say about him?

A. Hamas.

Q. Next name?

A. Omar Hamdan.

Q. Is he on your schedule?
A. He is.
Q. What does the Palestinian Authority say about him?
A. He is Hamas.
Q. And when I say he is on your schedule, did you base your schedule in identifying who is part of the committee from this document?
A. No.
Q. Did you base it upon documents, other documents?
A. Search warrant material, wiretaps, videotapes.
Q. Okay. The next person?
A. 'Aqel Rabi'e.
Q. What does it say about him?
A. It doesn't say anything.
Q. Is he on your schedule?
A. No.
Q. Next name?
A. Nabil Mansur.
Q. Is he on your schedule?
A. No.
Q. What does the Palestinian Authority say about him?
A. That he is Hamas.
Q. Next name?
A. Madhi Mahmoud Ibrahim Muslih.
Q. Is he on your schedule?

A. No, But Mahmud Musleh his father is.
Q. What does it say about him, this individual?
A. Hamas. His son is Hamas spokesman.
Q. And the last name?
A. Excuse me. Mahdi would be Mahmoud Musleh's father.
Q. Okay.
A. If I stated that correctly.
Q. So where it says his son is a Hamas spokesman, is his son the one that is on the Ramallah schedule?
A. Yes, Mahmud Musleh.
Q. And the last name?
A. Mahmoud al-Romhi.
Q. Is he on your schedule?
A. Yes.
Q. And is he on your schedule for the Ramallah zakat committee?
A. Yes.
Q. What does the Palestinian Authority say about a-Romhi?
A. Hamas. "His relative was in the committee, was arrested by us."
Q. Would you read the rest of the document?
A. "Through our follow-up, it was determined that the committee transfers funds from overseas to Hamas.

"The committee's office in Ramallah was raided and some documents were seized.

"After the arrest of Mahmoud al-Romhi by the other party, and the actions that were taken against committee activists, the committee's activities in Hamas diminished.

"Follow-up results indicate that the committee is currently opening medical and social centers in order to collect funds after the cessation of funds transfers to Hamas.

"Our follow-up concludes that the committee does not constitute a risk at the present time."

Q. Do you know when this document was seized, approximately?

A. The document was seized in I think 2003.

Q. This was after the Holy Land Foundation was closed?

MR. DRATEL: Can we have a date on the document, Your Honor?

MR. JONAS: If I can first ask my question.

Q. (BY MR. JONAS) Was this seized after the date the Holy Land Foundation was closed?

A. Yes.

Q. Are you able to date this document from its contents?

A. The front page says May 22nd, 2000.

Q. Okay. Was the Holy Land Foundation providing money to the Ramallah zakat committee prior to that date?

A. Yes.

MR. JONAS: If can with go to PA 9, palestinian Authority No. 9.

Q. (BY MR. JONAS) Agent Burns, you should have that

document before you.

A. I do.

Q. Okay. What is the first page of the English?

A. Page 2.

Q. It is just a two-page document?

A. It is.

Q. One page Arabic; one page English?

A. Yes.

Q. Where was this document seized from?

A. This was seized also from the Palestinian Authority offices.

Q. What does this document say?

A. It says well -- "Palestinian National Authority, Palestinian General Security." And then it says, "Brother, director of intelligence service of the Ramallah and al-Bireh governorate. May God protect him. Greetings of the homeland.

"Subject the zakat committee."

Q. Slow down a little bit, please.

A. Sorry.

Q. What is the date of this document?

A. December 22nd, 2001.

Q. And what does it say under "Subject: The zakat committee"?

A. It says, "Address: Ramallah, al-Ramuni Building.

"Financing: Foreign support from several countries.

"This committee supports families of detainees and families of deportees. It financially supports needy students and distributes money and clothes to the orphans and the poor.

"Officials and members of this committee are associated with Hamas movement, and some of them are activists in the Movement.

"Please accept utmost respect."

Q. Do you recall, I believe it was Ms. Hollander asked you questions about that tape we played, and I am drawing a blank on the number. I think it was InfoCom Search No. 68, the Hebron library video. Do you recall that?

A. I do.

Q. It started with the demonstrations and then clipped into the library?

A. Yes.

Q. And in that videotape Shukri Baker is heard on a speakerphone to the people who are in the audience.

A. Yes.

Q. Okay. What does Shukri Baker say about Yasser Arafat, the head of the Palestinian Authority when he was alive, in that video, if you recall?

A. I believe he thanked him for -- I can't exactly remember.

Q. Was he offering praise?

A. Yes.

Q. Okay. Any documents in evidence that identifies the

Palestinian Authority's view towards the Holy Land Foundation?

A. Yes.

MR. JONAS: If we can pull up Palestinian Authority No. 2.

Q. (BY MR. JONAS) Do you have that before you, Agent Burns?

A. I do.

MR. JONAS: Okay. And if we can scroll to the English. I don't believe this is a long document. Enlarge the top, please.

Q. (BY MR. JONAS) Agent Burns, what is this called? What is the title of the document?

A. It says, "Information political security Hamas. Who is financing Hamas."

Q. If you can read this at a slower clip than you read the last one.

A. Sorry.

Q. It is okay.

A. It says, "At the beginning of April in one of the cars heading towards Damascus City Center, there sat Imad al-Alami, a 39-year-old engineer and one of Hamas' icons overseas."

Q. Let me stop you for a moment. I am holding up Demonstrative No. 17, a chart we have become very familiar with. Is Imad al-Alami on this chart?

A. He is closest to me on the bottom row, the Hamas leader in Iran.

Q. Please continue reading.

A. "He is the public relations figure with Iran. The man was heading to Damascus center to attend an important meeting. He was scheduled to meet with one of the staff at the Iranian embassy who had a sealed envelope for him. It was the bonus. The bonus for the missions he carried out in Israel through Hamas' suicide operatives during the months of February and March. According to Western sources, al-Alami has received about $1 million as a gift from Iran, noting that Iran's gifts to Hamas usually do not exceed a small percentage of Hamas' revenue worldwide. Security experts believe that extremist Palestinian movement's income reached $70 million annually. According to Western security organizations, Hamas was able to enter the financial sector and was able to transfer funds into Gaza through trustworthy traders and persons to the point that funds were even legitimately transferred through Israeli banks."

MR. JONAS: Scroll down, please.

Q. (BY MR. JONAS) What is the next section called and what DOES it say?

A. "Hamas foreign finance sources." It says, "There are three sources for Hamas funds.

"1. The United States of America, where Hamas collects approximately ten percent of its force through donations and the sale of newspapers and zakat funds."

Q. That is enough. We don't need to read the rest.

MR. JONAS: If we can go to the next page.

Q. (BY MR. JONAS) Before we do that, on al-Alami who you have read, in the top part of this document that I showed you, was there any connection between the HLF and him?

A. There were telephone calls between the HLF and him in Iran.

Q. All right.

MR. JONAS: The next page, please.

Q. (BY MR. JONAS) What does this next page say about the Holy Land Foundation?

A. It says under "Hamas financial resources worldwide, No. 1, the United States of America, Texas, the Islamic Association for Palestine, the Holy Land Fund."

Q. Have we seen the Islamic Association for Palestine anywhere else in this case?

A. Yes. That is the same as the IAP, one of the three organizations that constituted the Palestinian Committee.

Q. And the Holy Land fund, is that short for something?

A. That is the Holy Land Foundation, the HLF.

Q. Any other organizations on this screen that you have identified previously in your testimony?

A. Yes. Under Virginia, the United Association for Studies and Research, the UASR, was the third organization under the Palestine committee.

MR. JONAS: Your Honor, pass the witness.

THE COURT: Mr. Westfall, I believe you were up first?

MR. WESTFALL: Yes, Your Honor.

At this time, Your Honor, I will offer several Defense exhibits into evidence, and I believe there is no objection to them, No. 1356, 1357, 1358, 1359, 1360, 1362, 1363, 1364, and 1393.

THE COURT: Counsel, any objection to those?

MR. JONAS: No objection, Your Honor.

THE COURT: Those are admitted.

RECROSS EXAMINATION

By Mr. Westfall:

Q. Now, Agent Burns, you all have had these exhibits for a little while. Have you had a chance to go through them? Here is what I want to know.

MR. WESTFALL: May I approach one more time, Your Honor?

THE COURT: Yes.

Q. (BY MR. WESTFALL) On each one of those there is -- the payment schedule is on top. Okay?

A. Okay.

Q. And you see the yellow tabs on the side?

A. I do.

Q. Those are on pages where there are indictment counts, and

those should correspond to yellow tabs on the left hand side.

A. Okay.

Q. And what I want you to do is just be able to satisfy that those represent the indictment transactions on those schedules.

A. Okay.

Q. And you may have already looked at them and decided that. I don't know.

A. I have not looked at these.

MR. WESTFALL: May I approach, Your Honor? This may make it easier.

THE COURT: Yes.

Q. (BY MR. WESTFALL) Agent Burns, I will go ahead -- Do you see how this here is the 1/26/98 transaction for $95,000?

A. I do.

Q. Is this the 1/26/98 transaction for $95,000?

A. It is.

Q. Okay. And that is how it works.

A. Okay.

Q. Then the next one down is this one -- and all of them are marked like that.

A. Okay.

Q. And I want you to be comfortable that it is all there, but if you want to you can accept my representation that it is.

A. Okay. That basically these documents that are tabbed relate to these counts?
Q. Yes.
A. Okay.
Q. Are you good with accepting that for me?
A. I am.
Q. Okay. Very well. Then please do me a favor. Your very first one there, what exhibit number is it?
A. Defense No. 1357.
Q. Okay. And what do those transactions relate to?
A. Transactions with the Jenin zakat committee.
Q. So set that one aside. What is the next one?
A. The next one is Qalqilya zakat committee.
Q. What is the number?
A. Defense No. 1364.
Q. Okay. What is the next one?
A. Okay. The next one is summary of indictment transactions.
Q. Look on the second page. Do you see those that are circled there?
A. I do.
Q. And what I am calling that, and tell me if you agree with me, is just transactions going to HLF Hebron or HLF Gaza.
A. The ones that you have marked?
Q. Yes.

A. The ones that are highlighted appear to be either the HLF Hebron account or the Gaza account.
Q. Okay. Those were just some that didn't appear in any of the other zakat committees.
A. Okay.
Q. Used to be called territories.
A. Okay.
Q. What number is that?
A. Defense No. 1393.
Q. Okay. We will call that HLF Hebron/Gaza. Is that okay?
A. Okay.
Q. What is the next one?
A. Ramallah zakat committee.
Q. What number is it?
A. Defense No. 1362.
Q. Okay. The next one?
A. Nablus zakat committee.
Q. What number is it?
A. No. 1360.
Q. Next one?
A. Islamic Science and Culture.
Q. Okay. What number is it?
A. No. 1356.
Q. Next one?
A. Bethlehem Orphan Care Society.

Q. Okay. What number?
A. No. 1358.
Q. And then No. 1359 is?
A. That is Islamic Charitable Society of Hebron.
Q. And what is No. 1363?
A. That is Tulkarem zakat committee.
Q. Okay. Is that fair--indictment transactions?
A. Okay.
Q. Okay.

MR. WESTFALL: Your Honor, I offer this one piece of paper as a summary exhibit. I believe it would be No. 1415 at this point.

MR. JONAS: Your Honor, we object. This is nothing more than an exhibit list. It doesn't summarize anything other than identify the exhibits, which are clear from the face of them, as Agent Burns just testified to.

THE COURT: I will overrule that objection, and Defense Exhibit No. 1415 is admitted.

MR. WESTFALL: May I approach?

THE COURT: Yes.

Q. (BY MR. WESTFALL) I now have in my hands No. 1357, and I just want to -- The way this works, Agent Burns, it shows here on payments to Jenin zakat, you all's summary schedule, do you see the first payment is dated 1/26/98?
A. Yes.

Q. And it is for $95,000?
A. Correct.
Q. And then you go all the way over to the side here and it has got the tab indicating that it is an indictment transaction.
A. Correct.
Q. And you see the first page on Defendants No. 1357 is the 1/26/98, $95,000 transaction?
A. Correct.
Q. And then the second one is a transaction for $24,173. Do you see that?
A. I do.
Q. And the second transaction on this one that -- it has a tabbed indictment transaction. Do you see that?
A. I do.
Q. Is $24,173.
A. Correct.
Q. Okay. Now, there is one other thing I wanted to show you, and I am going to go to HLF Search No. 35. I am keeping the elmo. I am just saying this for the record, HLF Search No. 35, pages 79, 80, 81, 82, 83, and 84. And those are the documents that underlie this one indictment transaction. Wouldn't you agree--HLF Search No. 35, 79 through 84?
A. Yes.
Q. And what those are, this is a request for a transfer of

funds. Right?
A. Correct.
Q. And then this thing that I was calling a cover page with the receipt that came back.
A. Correct.
Q. And then the translation for the transmittal page and the receipt.
A. Correct.
Q. Another copy of the transmittal page and the receipt, and then another transaction for the transmittal page and receipt.
A. Translation.
Q. Another translation. And there were no orphan lists in you all's supporting documentation for that transaction.
A. I don't recall offhand. I would have to look and see, but --
Q. It says here page 79 to 84, and that was 79 to 84 that we just looked at. Right?
A. Correct.
Q. Now, see how these documents came out of box 14, HLDL 14?
A. Yes.
Q. And Defendants' No. 1357 at page 12, this same -- You see this is the same 8389 transaction?
A. Yes.
Q. And this is out of box 137. Right?
A. Correct.

Q. In the multitudinous banker boxes of the HLF search warrant material, you saw many different copies of kind of the same documents in different places.

A. That is correct.

Q. Here is an orphan list, and this is page 18 out of the Defense exhibit, and this is HLDL 47.

A. Correct.

Q. Does that appear to be an orphans list?

A. It does.

Q. Does that appear to be a family dues list?

A. It does.

Q. Can you see how much that is for?

A. I think it says $1816.

Q. Is that right?

A. $1116.

Q. And then here is the request for transfer of funds for $1116. Right?

A. Correct.

Q. So they certainly appear to match and belong in that transaction.

A. Those do, yes.

Q. This is the same Government's Exhibit HLF No. 35. This is pages 52, 53, 54, 55, 56, and 57. And this is a transaction for $24,173. Do you see that?

A. I do.

Q. And does it appear to be an indictment transaction, $24,173?
A. It does.
Q. And these were all out of HLDL box 1. And can you see that?
A. I can.
Q. Okay. Do you agree with that?
A. Yes.
Q. And in the pages 52 to 57 that you have cited in your schedule, there appears to be no orphans list in this.
A. Correct.
MR. JONAS: Your Honor, I am going to object. This is beyond the scope of redirect. It is nothing more than a continuation of Mr. Westfall's cross of Agent Burns.
THE COURT: I think we agreed to do that.
MR. JONAS: I don't think we anticipated that there would be this questioning of them.
THE COURT: All right. Overrule the objection.
MR. WESTFALL: We are a second away from being done with this, Your Honor.
THE COURT: All right.
Q. (BY MR. WESTFALL) Now, page 1 of Exhibit No. 1357, those that you all had were box 1. Do you see where this is box 121?
A. I do.

Q. And then in here there is orphans lists. Does that appear to be an orphans list?

A. If you just scroll down. Let me make sure that is the title. It looks like an orphans list.

Q. That is a continuation of the orphans list. Does it also say box 121?

A. It does.

Q. I want to talk to you about the summary schedules again.

A. Okay.

Q. And just to refresh everyone's memory, the schedules that you and I actually went through are the committees where there are counts in the indictment that involve those committees.

A. Correct.

Q. Right? And for each one of them what we did is went through and looked at the membership in whatever documents we could find, whether it was InfoCom No. 28 or something else, and then kind of went through the membership, and then ultimately put red checkmarks over every one that you could say the search warrant materials gave some evidence that these people were involved with Hamas. Right?

A. Correct.

Q. And you still -- I guess for any of these you still can't tell us how many members there were on the committee during the relevant time period.

A. No.

Q.    And now the Islamic Society of Hebron, this is once again

based on the search warrant materials.  Right?

A.    Correct.

Q.    There is ten members on your summary schedule?

A.    Correct.

Q.    And out of those ten it appears eight are checked.  True?

A.    True.

Q.    Now --

        MR. WESTFALL:  Your Honor, may I have just one

moment?

        THE COURT:  Yes.

Q.    (BY MR. WESTFALL)  what I want to do is go through these,

and I want you to tell me if each name here that has got a red

check on it, if your only evidence of that that you considered

for purposes of this schedule is the deportee video.

A.    Okay.

Q.    Okay.  And I believe the deportee video is -- No.  I am

sorry.  The deportee list.

A.    Okay.

Q.    And I believe that deportee list is InfoCom No. 25.

A.    No. 25.

Q.    Okay.  So Talal Sadr?

A.    No, that was not the only exhibit.

Q.    Okay.  Mustafa Shawar?

A.    For the purposes of this chart, that was the only

exhibit.

Q. Azzam Salhab?

A. No, that list was not the only exhibit.

Q. Adel Juneidi.

A. For this chart, the only one was the list.

Q. Adnan Masouwda?

A. The same thing for this one.

Q. Kamal Al Tamimi?

A. That was not the only exhibit.

Q. Hashem Natshe?

A. It was not the only exhibit.

Q. And Abdel Khaleq Natshe?

A. It was not the only exhibit.

Q. So these three, basically the only thing that we are looking at, the ones that I have highlighted in orange, the only thing we are looking at is the MEDZ deportee video?

A. Not the video, the list.

Q. Correct. Okay. So on here when you say MEDZ deportee, what that means is InfoCom Search No. 25.

A. Or they appear on a videotape.

Q. You have listed here InfoCom Search No. 25.

A. Correct.

Q. You don't have the videotape listed.

A. It is probably under the videotape section.

Q. There it is. Which one is that one?

A. Well, I think we played four. I don't have all of the exhibit numbers memorized, but I know HLF Search No. 70 and 75 were two of them.

Q. There is No. 70 and there is No. 75, and then InfoCom Search No. 68, and the videos are up here. Okay. Very well. What I have just done is put orange highlight on the InfoCom Search No. 25. Okay?

A. Okay.

THE COURT: Let's take the morning break. Be back at 11:15.

(Whereupon, the jury left the courtroom.)

THE COURT: We will be in recess.

(Brief recess.)

THE COURT: Mr. Westfall?

MR. WESTFALL: Thank you, Your Honor.

Q. (BY MR. WESTFALL) Okay. Continuing on, Agent Burns, InfoCom Search No. 25 is the list of the expelled.

A. Correct.

Q. Right? Now, when I am going through these here, what I want to know is -- And this is all based on search warrant materials. Correct?

A. Search warrant, wiretaps.

Q. All these summaries, search warrant and wiretaps. So what I am trying to do is find out the names of the people who have a red checkmark because of InfoCom Search No. 25.

A. Right.
Q. Okay. And we are in Jenin now. And is Ziyad Abdel Ghani Issa one of those people?
A. He is.
Q. This is the Islamic Science and Culture Committee.
A. Okay.
Q. Is Jamal Tawil one of those?
A. Yes.
Q. We are in Nablus.
A. Okay.
Q. Is Adly Rifat Yaish one of those?
A. Yes.
Q. Okay. We are in Tulkarem. Fathi Qarawi and Bashar Karami?
A. Yes.
Q. There was some I didn't go through, like Qalqilya who has no red checkmarks.
A. Correct.
Q. What I am going to write on here is "Checkmark equals some evidence of Hamas in the search warrant materials," and then "orange equals evidence of Hamas is InfoCom Search No. 25." Would those two representations be fair?
A. If you put search warrant material, I think you should also put wiretaps.
Q. And wiretaps. Okay. Here is what I have written.

"Checkmark equals evidence of Hamas in search warrant materials and wiretaps," and "orange equals evidence is InfoCom Search No. 25 deportee list."

A. Correct.

Q. Now, when I say evidence of Hamas, some of those things are certainly in contention. Isn't that right? Like the Ashqar documents, whether they mean Muslim Brotherhood or Hamas. Right?

A. Not to me.

Q. I know. But in contention. They are issues in this case.

A. Not to me. I mean, you may disagree with me.

Q. I mean, you have had people disagree with you from this lectern in this trial. That is what I am talking about.

A. Yes.

Q. And then, for instance, either the Ashqar or the Elbarasse document that says "All ours," whether that means Hamas or Muslim Brotherhood, that is an issue that is in contention in this trial. Wouldn't you agree?

A. I believe you disagree with me.

Q. Okay. So when I say "evidence of Hamas in search warrant materials and wiretaps," can I put "alleged evidence of Hamas"?

A. I mean, it is your writing, so --

Q. Are you okay with that?

MR. JONAS: I am going to object to that. It is not alleged evidence. It is evidence that is before this jury now, and Mr. Westfall's own interpretation of alleged is not proper here.

THE COURT: I think it is evidence. I don't think alleged -- I understand where you are going. If you can find another way, a better way to state it, I might agree with you, but I don't think alleged evidence --

Q. (BY MR. WESTFALL) Evidence which you all allege shows ties to Hamas?

THE COURT: By the Government?

MR. WESTFALL: That the Government alleges shows ties to Hamas.

MR. JONAS: I object to that. He is characterizing. It is not proper. And if he is seeking to admit this document he is now currently creating, I will object to that also.

THE COURT: I know you are going to object to that, but we aren't there yet. We are here at the first part.

Q. (BY MR. WESTFALL) Okay. I am just going to leave it like that.

A. Okay.

MR. WESTFALL: Your Honor, I do move this into evidence as a summary exhibit, Defendants' No. 1416.

THE COURT: Counsel?

MR. JONAS: We object. This is not summarizing

voluminous amounts of evidence. This is just Mr. Westfall's highlighting and writing. If he wants to become a witness, that is fine.

THE COURT: Agent Burns is the one who testified that reflects her testimony. The objection is overruled. Defense Exhibit No. 1416 is admitted.

MR. WESTFALL: Thank you, Your Honor.

Q. (BY MR. WESTFALL) Now, what was the exhibit number of the deportee video where the guy was talking and it cut off in mid sentence?

A. I can't remember the exact exhibit number. I remember the tent video was either No. 70 or 57, but I can't remember the exhibit number.

MR. WESTFALL: InfoCom No. 26? Okay.

Q. (BY MR. WESTFALL) And when you all made the edits to those videos, I mean, you watched the videos and you knew what was being said in them. Right? Before you decided to use them in this trial?

A. That is correct.

Q. And you knew that that cut off in mid sentence. Right?

A. I didn't recall it. But yes, I mean, obviously it cut off in mid sentence.

Q. Because what he says, "And some brothers did not belong to any group, but..." and then the video clip ends.

A. That is correct. But your translation is missing the

part that I would consider important. I mean, you have highlighted a part of it, but you are forgetting to include where it says "a majority of the brothers belong to Hamas or jihad."

Q. So if we were to take that translation that is actually in InfoCom No. 26 and combine this with it, that would be a complete statement at that point. Wouldn't you agree?

A. It would. But obviously there is more to the tape than that.

Q. But as to that one statement, it would be a complete statement. Correct?

A. Correct.

MR. WESTFALL: Your Honor, I move this into evidence as Defendants' No. 1417, as a continuation of the translation agreed by the Government, and the witness has adopted it.

MR. JONAS: No objection.

THE COURT: Admitted, Defendants No. 1417.

MR. WESTFALL: And I will pass the witness.

THE COURT: Okay. And Ms. Moreno, were you up next?

MS. MORENO: I believe it is my turn, Your Honor.

RECROSS EXAMINATION

By Ms. Moreno:

Q. Good morning.

A. Hi.

Q. I am going to talk to you just about one piece of

evidence that Mr. Jonas brought up in his redirect of you. And we are going back to HLF Search No. 110, which is the videotape. Okay?

A. Okay.

Q. And I am going to refer to it as the ambulance driver videotape. And what I mean by that is the part that I played referred to Mr. Balbisi. Do you recall that?

A. I do.

Q. And Mr. Balbisi, just to orient the jury, was an ambulance driver who was shot and killed while he was driving his ambulance. Correct?

A. That is my understanding.

Q. Okay. And in fact, in the portion that I played in my examination with you, Agent Burns, that was an interview with his wife who said, "I am the wife of al-Balbisi." Do you remember that?

A. That is correct.

Q. And she said that -- She was talking about her husband and she said, "They did not have any mercy for what was on his shoulder, the crescent, the Palestinian Red Crescent." Do you remember her words?

A. I do; something general like that.

Q. And the Palestinian Red Crescent is -- What is the Palestinian Red Crescent, if you know?

A. It is my understanding that it is another charitable

society.

Q. Okay. Similar to the Red Cross?

A. That is my understanding.

Q. Okay. And then she went on to say, "They did not have mercy for what was on his shoulder and they did not have mercy for the child." Do you remember those words?

A. I do.

Q. Okay. And when she says "they," she is talking about the Israeli Defense Force soldiers. Right?

A. That would be an assumption on my part.

Q. And you have been testifying about a lot of documents and telling the jury what your opinions and your assumptions are, so I am going to ask you in this particular case when she says they had no mercy, she is talking about the Israeli soldiers. Correct?

A. Correct.

Q. All right. Now, the Government, Mr. Jonas then said to you in his redirect that he was going to play clips A and B. Correct?

A. Correct.

Q. And now, just so that the jury is clear, Holy Land Search No. 110 is a Government exhibit. Right?

A. That is correct.

Q. And it is a video that was seized from Holy Land. Correct?

A. That is correct.

Q. And you have seen this video. Right?

A. I have.

Q. And the video has much more to it than what clips A and B that Mr. Jonas played for you. Correct?

A. There is more on the tape than what you played and what he played.

Q. Right. But the original Exhibit No. 110 today, or when you testified about it originally, originally only had clips A and B which Mr. Jonas played today for you. Correct?

A. It may have. I am not -- I don't recall if it did or not.

Q. Well, you know that the exhibit that the Government wanted to show the jury did not have the clip of the widow of Mr. Balbisi. You know that?

MR. JONAS: I am going to object to the form of the question, wanting to show the jury. This is improper.

THE COURT: Sustained. It is argumentative, counsel.

MS. MORENO: It goes to bias.

THE COURT: Sustained. Rephrase.

MS. MORENO: Thank you.

Q. (BY MS. MORENO) The Government exhibit as assembled by the Prosecution in this case did not include the portion that I had the jury view. Correct?

A. I don't think it did. I can't say for certain, but I don't think it did.
Q. Okay. And in the portion that I played for the jury, Mr. Al-Balbisi, his widow calls him a martyr. In fact, she says, "I am the widow of the martyr al-Balbisi." Correct?
A. Correct.
Q. And he is considered a martyr. Right?
A. Correct.
Q. And he was shot while he was driving an ambulance. Correct?
A. That is my understanding.
Q. Okay. Now, clip A, I don't think we are going to have to play it, but we may, so I want you to think back to what clip A was. And if you agree with me, clip A began showing a truck. Do you remember that?
A. I do.
Q. And the translation said that this was from the Holy Land Foundation from the Islamic and Arabic Communities of America. Do you recall that?
A. I do.
Q. Okay. And in the truck -- It showed the back of the flat bed. Do you remember?
A. Yes.
Q. And in the back of the flat bed there were bags of flour or food. Do you recall that?

A. There were bags. I don't know what was in them.

Q. Okay. Do you recall testifying at another proceeding about this tape?

A. I do.

Q. And do you recall being asked these questions and giving these answers:

"And this would be bags of food, flour, rice, or sugar in the back of one of the trucks. Do you see that?"

Answer: "I do."

Question: "And that gentleman walking in the orange shirt, that is Abu Muharam. Correct?"

Answer: "Correct."

Question: "And following him are persons with some kinds of bags of flour or rice. Right?"

Answer: "Right."

Do you remember giving those answers?

A. I do. That was an assumption. I was agreeing with your leading question. So they were bags. They could have that in there, but I don't know for sure because they weren't opened.

Q. Okay. Now, and that was Abu Muharam that you identified. Right?

A. That is correct.

Q. And in the beginning of that video he is going into a home with a number of family members. Remember that?

A. I do.

Q. And he is going in with persons who have T-shirts that have the Holy Land logo on them. Do you recall that?
A. I do.
Q. Okay. And those persons have these bags of what you previously testified under oath were food or flour. Right?
A. What I had agreed with you they could be. Yes.
Q. Right. Well --
A. Let's just assume that they are.
Q. Let's go back to the question that I asked you and your answer.

MR. JONAS: This has been gone over already, Judge, and she already answered the questions.

THE COURT: Overruled. Go ahead.

Q. (BY MS. MORENO) I asked you, "And this would be bags of food, flour, rice, or sugar in the back of one of the trucks. Do you see that?" And you said, "Yes." You said, "I do."

And then I asked you, "And following him are persons with some kinds of bags of flour or food. Right?" And you said, "Yes."

You didn't say, "I don't know," did you?
A. I did not.
Q. And you did not say, "I assume so," did you?
A. I did not.
Q. No. You said, "yes." Right?
A. I said, "I do."

Q. That is what you said.

Okay. And then we see Mr. Abu Muharam talking to the family members. Remember? I am still talking about clip A.

A. Okay.

Q. Okay. And he says to them, "We are with the Holy Land Foundation, and we are here to help the families of martyrs, the wounded, and the needy." Do you recall him saying that?

A. I do.

Q. And he refers to the current Intifada.

A. Correct.

Q. And you have -- I think you dated clip B to October 2000. Is that your testimony as to clip A? Do you have a date on that particular clip?

A. I think based on the content of the tape, we knew it resulted, or all of that had happened after the beginning of the second Intifada, which I said was October 2000. So I don't know the exact date, but those events that were in the tape happened as a result of the second Intifada.

Q. Okay. So the best you can tell the jury about the dates of both of those clips would be during the second Intifada. Correct?

A. Correct.

Q. And that would be post October 2000?

A. Correct.

Q. Other than that, you can't be anymore specific. Is that

right? Is that fair?
A. Yes. I mean, there may be something in there that maybe can help us narrow it down, but generally yes.
Q. Okay. And then the gentleman who is being interviewed, he says to Mr. Abu Muharam that his brother was martyred. Do you remember that?
A. Yes.
Q. And he said that his brother was martyred during shooting. Correct?
A. He did.
Q. Okay. And that would have been shooting with the Israeli Defense Force soldiers. Correct?
A. I believe so.
Q. Okay. Then we go to clip B, and clip B is the interview with that woman who has got a picture of I guess her son in her lap. Remember that clip?
A. I do.
Q. But in the beginning of that clip, the camera pans up and shows the same photographs of her son. Do you remember that part?
A. I do.
Q. And there are logos on those pictures. Correct?
A. I believe there are.
Q. And they are not Hamas, are they?
A. I don't believe that they are. I believe that individual

might have been with al-Aqsa Martyrs Brigade.

Q. And why don't you tell the jury who al-Aqsa Martyrs Brigade is.

A. That would be the terrorist wing of Fatah.

Q. Right. That would be Fatah, who is the bitter rival of Hamas. Correct?

A. Correct.

Q. Okay. And so the Government has shown the jury a clip of Holy Land aid to a family of someone who, according to the picture, was in Fatah. Correct?

A. Correct.

Q. And not Hamas.

A. Correct.

Q. Okay. Now, with respect to that last clip, Agent Burns, this woman who is mourning her son is asked, "Do you want assistance?" Do you remember Abu Muharam is off camera asking, "Do you want assistance?" Do you remember that?

A. Yes.

Q. And that answer is kind of a long, painful, angry answer. Would you agree with me?

A. It was a long answer.

Q. Okay. And she talks about -- Because Mr. Jonas pointed this out to the jury. This was important. Right? That she is asking for weapons. Right?

A. She was asking for weapons.

Q. And that is important to the theory of your prosecution. Right?
A. Actually, no, because giving to Hamas is giving to Hamas' charitable side, just as it is anything. So the fact that she is asking for money for weapons is not determinative.
Q. All right. And she says to Mr. Muharam, "Not to let them come in our homes and kill us," when he is asking her what she wants and what she needs. She says that. Right?
A. She does.
Q. And when she says the "them," she is talking about the Israeli Defense Force soldiers. Correct?
A. I would assume.
Q. You would assume. Okay. And then Mr. Jonas asked you, "Well, she wasn't asking for food or backpacks." Do you remember that question?
A. I do.
Q. Yeah. Okay. What benefit could her dead son get from food or backpacks, Agent Burns? Any?
A. His children could.
Q. Okay. What benefit could he get?
A. He is dead, so --
Q. That is right.

MS. MORENO: Pass the witness.

MS. HOLLANDER: I am next, Your Honor.

RECROSS EXAMINATION

By Ms. Hollander:

Q. Still good morning.

A. Barely.

Q. I want to talk to you briefly about a few of the documents that you discussed today. One of them was the document we referred to as Ashqar No. 5.

A. Yes.

MS. HOLLANDER: Can we pull that up so we can remind the jury what it is?

Q. (BY MS. HOLLANDER) Now, this is a document that was taken from Mr. Ashqar's house, or photographed in Mr. Ashqar's house. Correct? It is not actually taken. And this is a document that we discussed and you discussed again that lists what the Muslim Brotherhood will do and then what Hamas will do. Correct?

A. Correct.

Q. Okay.

MS. HOLLANDER: And if we can go to the first page of the English, I think it was page 14.

Q. (BY MS. HOLLANDER) Now, there is no date on this, is there?

A. That is correct.

Q. So all you know, it was before December of 1993 when the agents went into his home. Correct?

A. And again we talked about this. Based on the content,

which it has been a while since I reviewed it for that purpose, it was '88, '89.

Q. But you are just assuming that. Correct? Because there is no date on it.

A. There is no date on it.

Q. And you don't know who wrote it either, do you?

A. Well, there is no author that signed it.

Q. Right. So you don't know who actually authored it, do you?

A. I know that it is a Hamas paper, but I do not know the name of the actual author.

Q. So the answer is that you don't know who wrote this document.

A. Not the person.

Q. All right. And you don't know that Shukri Abu Baker ever saw it either, do you?

A. I don't know.

Q. Okay.

MS. HOLLANDER: Now, let's look at Elbarasse No. 22, please, Mr. Lewis.

Q. (BY MS. HOLLANDER) Now, let me stop right there. That is a handwritten document. Correct?

A. It is.

Q. And you don't know who wrote that one either, do you?

A. No author signed it.

Q. No. And it is dated -- There is a date on a fax line. It looks like a fax line. Correct?

A. Correct.

Q. But the fax line doesn't say -- You can't tell whether it is coming in or going out fax line. It is just a fax line. Right?

A. Right. It just has the date and a time.

Q. So when you put a fax in your own machine and it goes out it gets a line. Right? And when a fax comes in it gets a line.

A. Correct.

Q. We don't know which this is.

A. Correct.

Q. So we don't know whether this was somebody sending it or whether it was received into Mr. Elbarasse's house. Correct?

A. That is correct.

Q. Okay. And although I believe it says --

MS. HOLLANDER: If we can go to the first page of the English.

Q. (BY MS. HOLLANDER) It says, "Dear brother Shukri" on it, doesn't it?

A. It does.

Q. But you never found a copy of this in Holy Land, did you?

A. I did not.

Q. Or in InfoCom?

A.    No.

Q.    So you don't have any way of knowing whether Shukri ever
saw this.

A.    Outside his membership in the Palestinian Committee, no,
I did not find a copy at HLF or InfoCom.

Q.    So you don't know if he ever saw this document, do you?
You don't have any evidence that he ever saw this document, do
you?

A.    Correct.

Q.    Okay.  Now, you also talked about some documents that the
Israeli army seized from the Palestinian Authority offices.
Correct?

A.    Correct.

Q.    And that was in 2002 during Operation Defensive Shield.

A.    And that year may be more accurate.  I knew it was 2002
or 2003.  I can't remember which year.  It was after the HLF
was no longer operating.

Q.    Right.  And that was when--and we have had testimony to
this--when the Israeli Defense Forces went in and seized a lot
of documents from the West Bank.  Correct?

A.    Correct.

Q.    And one of them in particular was Palestinian Authority
No. 2.

        MS. HOLLANDER:  If you could put that up for me,
please.

Q. (BY MS. HOLLANDER) Now, this document, if you go to the first page of the English, this document is also -- You can't read the signature. Correct? It says "illegible."

A. Yes, it does.

Q. And it is also undated, isn't it?

A. It is.

Q. And it doesn't have any official stamp on it that shows that it is a Palestinian Authority document, does it?

A. It says, "Information Political Security." Can we go back to the front page? I just can't remember what it looks like.

Q. Sure. There is no stamp -- There is no eagle on this of the Palestinian Authority, is there?

A. There is not.

Q. No. There is nothing on this that shows that it was written under the authority of the Palestinian Authority, is there?

A. In its letterhead -- I can't determine that from the letterhead.

Q. Is right. So you don't know again who wrote this document, do you?

A. I have not studied the entire thing. I mean, we have read portions of it, but I can't say who the author is because we can't read his signature.

Q. And you don't know the authority of that person to write

this particular document either, do you?
A. Because I don't know who that person was, I can't say.
Q. And you don't know whether the statements in this were somebody's opinion, do you?
A. I don't know.
Q. And you don't know whether it was just a collection of something that someone had read in a newspaper article, do you?
A. This does not look like newspaper article materials. It says on the translation that it is related to security, so -- There is no indication that came from a newspaper.
Q. But you don't know where this person got this information, do you?
A. And if we can look back to the English text, just to let me --
Q. The person talks about sources, but it doesn't say what those sources are, does he?
A. It talks about Western sources and security experts.
Q. Right. But it doesn't say what they are, does it?
A. It doesn't say what they are.
Q. And you know that there is a stipulation in this case that as of the date of the Philly meeting, 1993, the HLF had been publicly named as associated with Hamas. Correct?
A. Correct.
Q. You know that the Palestinian Authority was widely

accused of being corrupt. Correct?

A. I do.

Q. I am talking about when Fatah was controlling the Palestinian Authority.

A. Yes.

Q. And Yasser Arafat was the leader of Fatah. Correct?

A. Yes, he was.

Q. And it was accused of essentially stealing money. That is what we mean by corrupt. Correct?

A. I have heard those accusations.

Q. And you also know that the Palestinian Authority was trying to get financial control of the zakat committees, don't you?

A. They may have. I don't recall seeing anything to that effect.

Q. Now, you will -- I want to switch topics here and talk about the Hebron massacre just for a minute.

A. Okay.

MS. HOLLANDER: If I could have the elmo.

Q. (BY MS. HOLLANDER) The document I am referring to is Defendants' No. 1394. And just to -- This is just so we know what we are talking about here. This is a portion of the United Nations -- a document from the United Nations.

A. Correct.

Q. Correct? Now, you discussed this particular item from

the United Nations, and it said that -- It is a little hard to read here, but if I make it any bigger we are going to lose it. "Six members of the Fatah Hawks were killed by an undercover IDF patrol in the Jabalia refugee camp, although they were not on the wanted list." Do you see that?

A. I do.

Q. And it says, "According to the Palestinian eyewitnesses quoted in the Jerusalem Times. Now, the Jerusalem Times is an Israeli newspaper. Correct?

A. Correct.

Q. And it is just a regular newspaper like the Dallas Morning News or something like that, but it is the Jerusalem Times.

A. It is a newspaper.

Q. Right. And it is published in Hebrew and in English. Correct?

A. I believe that is correct.

Q. And it says, "According to the eyewitnesses quoted in the Jerusalem Times, the men were wearing uniforms and distributing leaflets and did not shoot." Do you see that?

A. I do.

Q. And then it says, "According to B'tselem, undercover soldiers shot to kill and did not act in self-defense. No warning shots were reportedly fired into the air. One of the men was initially only wounded and reportedly tried to escape,

but was subsequently shot in the head at point blank range." Do you see that?

A. Yes.

Q. And B'tselem is an Israeli non-governmental organization, the full name of which is the Israeli Information Center for Human Rights in the Occupied Territories. Correct?

A. I don't know anything about it.

Q. You have never researched B'tselem or looked into anything that they have written?

A. No.

Q. And then you see that the police, I mean the army had a different version of all of this. Correct?

A. Correct.

Q. Right. A different version than the Jerusalem Times. Correct?

A. Well, according to the Palestinian eyewitnesses that were quoted in it.

Q. Right. The Israeli army had a different version. Correct?

A. Correct.

Q. And a different version than the Israeli NGOs report, B'tselem's report?

A. I don't know what B'tselem is, so --

MS. HOLLANDER: I have nothing further, Your Honor.

THE COURT: Mr. Mysliwiec?

MR. MYSLIWIEC: Can we pull up InfoCom Search No. 100?

RECROSS EXAMINATION

By Mr. Mysliwiec: ?

Q. And the top left hand corner you can see there a logo. Right?

A. Correct.

Q. And that is a logo of the Ibrahimi mosque. Right? Do you want us to make it larger?

A. I don't know enough about it to say yes or no.

Q. Okay. But this is the document where the mosque massacre committee is identified. Right?

A. Correct.

MR. MYSLIWIEC: Can we go to page 2?

Q. (BY MR. MYSLIWIEC) And in the upper left hand corner, right there it says the committee for the families of the Ibrahimi sanctuary massacre. Right?

A. Correct.

Q. Now, this has a number of payment vouchers. We covered that at length when I was talking to you earlier. But the vouchers make no distinction between someone who was killed at the mosque or someone who was killed in the aftermath. Right?

A. Except for the amounts of the money that some of them got paid.

Q. But it doesn't say anything about any amounts of money,

does it?

A. Under the shekels it says 300, and then under the two guys that weren't a part of it it says 900, so they got paid more. I mean, that is one distinction, but --

Q. Let's go back to what my question was. Okay? It makes no date distinction between those killed at the mosque and those killed at the aftermath. Right?

A. The voucher does not.

Q. That is right. So just looking at a voucher, you don't know if the intention of this voucher is to name someone who was killed at the mosque or was killed in the aftermath. Right?

A. Well, I would look at the committee for the families of the Ibrahimi sanctuary massacre, the massacre was something different than people who were killed when they were revolting or rioting or anything in the aftermath.

Q. Okay. But if we look at Demonstrative No. 32, this Mr. Ghazal al-Masri is identified. Right?

A. Yes, he is.

Q. And as we know from earlier that he wasn't killed in the massacre. Right?

A. Correct.

Q. He was killed about a week later. Right? March 2nd, 1994.

A. Yes.

Q.   There is no distinction by date in this payment voucher

document about whether he was killed at the massacre or

whether he was killed in the aftermath, is there?

A.   There is no date on there.

Q.   Okay.

A.   I mean, other than -- You are correct.

Q.   The only dates in these documents are about when the

payments were supposedly made to the families.  Right?

A.   Correct.

Q.   And just sticking with this one for a second, this one

says 1/23/94.  Right?

A.   It does.

Q.   Which is actually an error in the translation.

        MR. MYSLIWIEC:  If we could go back to the first

page and highlight the date in the top.  It is the lower right

hand corner of the top left hand voucher.

Q.   (BY MR. MYSLIWIEC)  See, it has an 11 there?

A.   Yes.

Q.   So it is really November?

A.   It should be 11 instead of 1.

Q.   And that is -- All of these vouchers have the same date.

Right?

A.   As I recall.  I mean, it has been a while since I looked

at the dates, but I think they all do.  It would be easy

enough to scroll through and look at them.

Q.   And just going back to a point you raised about
distinctions in amounts, these two people aren't the only
people who got 900.  Right?

A.   That is correct.

Q.   And in fact, this person here got 1350.  Right?

A.   He did.

Q.   And you haven't presented any evidence about this person
being connected to Hamas.  Right?

A.   That is correct.

Q.   Or connected to Fatah.  Right?

A.   That is correct.

Q.   Different people on this chart got different amounts of
money.

A.   There were six people that got more than 300 dollars or
300 shekels.

Q.   So different people on this chart got different amounts
of money.  Right?

A.   That is correct.

Q.   Now, also in these payment vouchers there is no evidence
in the vouchers itself about whether the voucher is meant to
be an example of a monthly payment that was given or whether
the voucher is a one-time payment and that is the only time
the payment was ever made.  Right?

A.   Not on the vouchers, but the final project report that
was connected to this explains in better detail what the

payment vouchers were for.

Q. That is your view of the final report project, but in this set of vouchers itself it doesn't indicate whether or not it is an example of a monthly payment that was made over several months or whether it was just a one-time payment. Right?

A. The vouchers are receipts for payments, and it is one payment that these vouchers are receipts for.

Q. But it doesn't indicate whether or not it is meant to be an example or not. Just on this document itself it indicates one date. Right?

A. This document indicates one payment.

MR. MYSLIWIEC: Could we go to InfoCom Search No. 90, please, page 6?

Q. (BY MR. MYSLIWIEC) Now, this was the list from al-Salah Society of people who it identified as being martyrs connected to the Ibrahimi massacre. Right?

A. Correct.

Q. Some of those people were killed at the massacre; some weren't. Right?

A. It says they fell in the Gaza Sector and --

Q. I am sorry. You are right. But there is nothing in this document indicating the date of when those people were killed. Right?

A. Not other than it was in the -- following the massacre,

which would have been after February 25th, 1994.

Q. And that is how the document itself identifies these people. Right?

A. That is correct.

Q. Okay. Ms. Hollander asked you some questions again about Defense Exhibit No. 1349, which is that United Nations report. Right?

A. Correct.

Q. And the full report is over 80 pages long. Right?

A. I have not actually seen the full report, so I am not sure how many pages are in it.

Q. And that report had to do with Israeli practices affecting human rights. Right?

A. That is what the title was.

Q. And it lists -- Among other things, it lists people killed in the mosque massacre on page 20. Right?

A. Correct.

Q. Okay. And it lists additional pages naming and describing people who were killed. Right?

A. It does.

Q. Four pages of names and descriptions after the list of mosque victims is where the three purported Hamas leaders' names are listed. Right?

A. I think approximately four pages later.

Q. And that is also where the six Fatah names are listed.

Right?

A. Yes. Well, yeah. That was on the same page. Sorry.

MR. MYSLIWIEC: No further questions, Your Honor.

THE COURT: Counsel?

MR. JONAS: Briefly.

THE COURT: Yes.

REDIRECT EXAMINATION

By Mr. Jonas:

Q. Agent Burns, Ms. Moreno asked you about the videotape, specifically HLF Search No. 110 clip B, where the woman was asking for weapons, and at the end talks about, you know, "Don't let them come into our house." Do you recall how she said her son died?

A. She said he prepared and went out and was martyred.

Q. Did she say the Israelis came into her house?

A. No.

Q. Ms. Hollander asked you about the PA Document No. 2, the one that identifies Holy Land Foundation as giving money to Hamas.

A. Yes.

Q. And Ms. Hollander pointed out that there is a stipulation between the Government and the Defense that after the Philadelphia meeting Holy Land Foundation was publicly identified as being supportive of Hamas. Do you recall that?

A. I do.

Q. Okay. In the PA document did it identify other organizations that are related to the Holy Land Foundation as well as Hamas?
A. It does.
Q. Which two?
A. The IAP and the UASR.
Q. Has there been a stipulation between the Defense and the Government, as far as you know, that the IAP and UASR were publicly identified as being part of Hamas as well?
A. I am not aware of any stipulation.
Q. Are you aware, prior to this trial, if they were publicly identified as being part of Hamas back in the '90s?
A. I believe the IAP was identified in newspaper articles like the HLF was.
Q. What about the UASR?
A. I am not sure about them.

MR. JONAS: No further questions.

THE COURT: Ms. Moreno, any questions?

MS. MORENO: No, Your Honor.

MR. WESTFALL: I have no more, Your Honor.

MS. HOLLANDER: Nothing else, Your Honor.

MR. MYSLIWIEC: No, Your Honor.

THE COURT: Agent Burns, you may step down. You are free to go.

Call your next witness.

MR. JACKS: Call Jackie Northrup, Your Honor.

(Whereupon, the oath was administered by the Clerk.)

JACKIE NORTHRUP,

Testified on direct examination by Mr. Jacks as follows:

Q. Would you tell us your name, please?

A. Jackie Northrup.

Q. And spell your last name, please, for the record.

A. N-O-R-T-H-R-U-P.

Q. How you are employed?

A. I am employed by the Federal Bureau of Investigation.

Q. And how long have you worked for the FBI?

A. Thirteen years.

Q. What is your position with the FBI?

A. My title is information technology specialist, computer forensics examiner.

Q. And how long have you held that position with the FBI?

A. Eleven years.

Q. And in layman's terms can you tell us what you do in that position?

A. The position is basically the detailed forensic analysis of any digital media that is brought to the lab. We also assist in search warrants and assist any investigators in criminal matters.

Q. When you talk about digital media, can you give us examples of what you are talking about?

A. Any computers, floppies, CDs, cameras, cell phones, iPods, anything that can hold digital data.
Q. All right. What kind of training have you had for the position that you hold now?
A. The training started with the certification program. It consisted of about three weeks of classroom training, also with a proficiency test, and then months of on-the-job training with a certified examiner. Currently we have to take two weeks of forensics training a year, along with a proficiency test annually.
Q. And do you presently hold a certification from the FBI as a forensic examiner?
A. Yes, I do.
Q. Okay. And you said that every year you have to go back for additional continuing education or training?
A. Correct.
Q. Okay. What is CART? What does that acronym stand for?
A. CART stands for Computer Analysis Response Team.
Q. And is that a team within the FBI?
A. That is a unit within the FBI, yes.
Q. Are you a part of that team?
A. I am.
Q. And can you tell us, in your current job are you assigned to a particular part of the Dallas Division office of the FBI?
A. My current assignment is with the NTRCFL, which stands

for North Texas Regional Computer Forensics Laboratory.

Q. And that section, if you will, what is it set up to do or what is its function?

A. It is laboratory made up of local, state, and federal law enforcement personnel whose dedicated job is to conduct forensic analysis on any kind of digital media, and also assist investigators in search warrants.

Q. You said you have been doing this kind of forensic examination for how long?

A. About 11 years.

Q. And in that time period, have you testified before in court?

A. I have.

Q. As a forensic examiner?

A. Yes, I have.

Q. Do you ever train other individuals that come to work at the computer laboratory?

A. Yes, I do. I mean, we offer training classes, and I am also currently assigned to a new trainee as we speak.

Q. Okay. Ms. Northrup, did you perform forensic examination on computers that were seized as a result of the execution of search warrants on the Holy Land Foundation materials?

A. I did.

Q. And when you receive materials in the form of computers and that type of thing, how do you generally receive them?

A.   Typically the investigator brings the computers to the lab.
Q.   You indicated that on occasion you, and I assume other examiners, will go out when a search warrant is being executed.  Is that correct?
A.   That is correct.
Q.   And can you tell us whether or not you did that in connection with this case, or whether the computers were simply brought to you after they had been seized in a search warrant?
A.   I did not go out on-site to retrieve these computers. They were brought to us.
Q.   Okay.  And when -- Just generally.  I am not asking you for an exact number.  But approximately how many computers were brought to you, if you recall?
A.   There were approximately 45 physical computers and about 560, 570 pieces of loose media.
Q.   Loose media being what?
A.   CDs, floppies, tapes, thumb drives.
Q.   Okay.  The computers -- That would have been the total number of computers taken from the offices of the Holy Land Foundation.  Is that your understanding?
A.   That is my understanding.
Q.   Okay.  And can you tell us whether those computers were desktop, or laptop, or some combination thereof?

A.   The majority of them were desktops.  I believe there were a couple of laptops in there as well.

Q.   All right.  And when you get computers in such as that, what type of -- What do you do to start your analysis or to start your recordkeeping?

A.   Well, originally when the computers are brought in, they are given a lab number, an NTRCFL, number and they are bar coded.  Each individual item is given a unique bar code sticker, and then they are set aside into the evidence room.

Q.   All right.  Now, when you have, for example, a desktop computer, what part of it gets a bar code?  Do you take it apart and give it a bar code?

A.   No, we just put the sticker on the outside of the computer.

Q.   All right.  And what about monitors and keyboards and that kind of thing?  Are they given --

A.   No, we don't review those.

Q.   All right.  Are monitors and keyboards even brought to your office or department?

A.   Typically not.

Q.   Okay.  Is that because there is no need -- there is nothing to examine with regard to those?

A.   That is correct.

Q.   With regard to the -- What is the term for the part that you examined?  What is the terminology or acronym for the part

that you actually examine of a computer?
A. The hard drive, hard disk drive.
Q. Is there a term for the box that it comes in or that it is located in?
A. We refer to that as the computer or a CPU.
Q. What does CPU stand for?
A. Central processing unit.
Q. Central processing unit? So do you -- Let me just for clarification, is the hard drive located inside the CPU?
A. That is correct.
Q. And when you begin to work with the hard drive, do you leave it in the CPU, or do you unplug it and take it out of the CPU?
A. Its depends upon the computer. I believe in this case I left the hard drive in. But what happens is I get the computer, I do all the documentation on it, I record the make, model, serial number of the machine, I open the case, I record the hard drive information, the make, and the serial number. Sometimes I take the hard drive out to process it and sometimes I leave it in there to make the copy.
Q. Okay. Now, you said that you record certain information from these CPUs and from the hard drives. With regard to a CPU, if don't mind telling us again, what information do you at attempt to record?
A. The make, the model, and the serial number.

Q. And in your experience do all computers have a unique serial number that is unique to them?
A. Not all of them, no.
Q. With respect to those that are manufactured by a brand or company, do those have unique serial numbers?
A. Typically they do. I mean, the known makers, like Dell or IBM, they will have a make, model, or serial number. Sometimes we get machines that are homemade. We call them a generic machine or a clone machine. And they don't have a serial number recorded on them.
Q. With regard to the computers that you examined in this case, were they all brand names like Dell or Hewlett-Packard or Compaq or whatever, or were these clone or generic or some combination thereof?
A. They were a combination. If I recall, most of them were generic.
Q. And generally what is indicated when you see a computer that is not a name brand, if you will, or a generic as you have described it, what is that indicative of?
A. It usually tells me that it has been made by someone, put together by someone, all the pieces were put together to make the computer work.
Q. And I take it that it is possible for individuals to go either to a retail place and buy these parts and put their own computer together?

A.   Yes, that is true.

Q.   You also talked about the hard drives and the information that you record off the hard drives.  And again, if you don't mind saying, what was that information that you try to record?

A.   I record the maker of the hard drive and the serial number.

Q.   And do most hard drives have a brand name on them?

A.   They do.

Q.   And as far as in case a person doesn't know, a hard drive, what does it look like, an internal hard drive that you are talking about in this case?

A.   It is like a six by three square silver box.

Q.   And inside of that are there just circuits?

A.   There is platters.

Q.   But is it self-contained within that particular box?

A.   It is self-contained.

Q.   After you have recorded this information -- And by the way, do you do that for as many CPUs and hard drives as are presented to you?

A.   Yes, I record every single CPU and hard drive.

Q.   Okay.  And after you have done that, do you begin your examination, or at some point after that do you begin your examination?

A.   No.  The next step would be making a mirror image copy.

Q.   And what does that involve or what does that mean?

A. It is just making a duplicate copy of the physical hard drive itself, just a bit-for-bit image. Every data that is on that hard drive gets copied off.

Q. And what is one of the reasons that you do that?

A. Just to get an exact duplication of what was on that machine.

Q. The original hard drive that was in that computer when it is brought to you, is it changed in any way by making this mirror image hard drive?

A. No. There are no changes made, there are no writes made to the hard drive during the imagining process.

Q. When you say writes, are you talking about W-R-I-T-E-S?

A. W-R-I-T-E-S, yes.

Q. Is it by design or on purpose that you do not change anything on the original hard drive?

A. It is by design.

Q. And when you say that you make a mirror image, what is that mirror image contained on or within?

A. Well, in this case it was written to a tape drive, and the tape drive was used as our archive copy.

Q. And when you say archive copy, what does that refer to?

A. It is considered our best evidence at this point. We keep it in our evidence room and it is just our -- We work off that copy. After I make the image, I put the original computer machine back up and then do everything else off that

tape drive.

Q.   And just if you don't mind, just describe what the tape drive would look like, if you could, to a layperson.  What would it resemble or look like?

A.   The actual tape itself, it looks like a cassette tape.

Q.   And is it bigger or a different size than a cassette tape that you might play in your automobile?

A.   It is probably a little bit smaller.

Q.   Okay.  And you said once that archive is created that is the copy that you work from?

A.   Yes.

Q.   And what do you do to perform your forensic analysis with regard to that archive copy?

A.   Well, I take the archive tape and I copy all of the data from the tape to one of our forensic workstations.

Q.   Is that just another computer?

A.   It is just another one of our computers at the office, yes.

Q.   Okay.

A.   And from there I run it through a forensic program that kind of sorts through the data in preparation for the analysis.

Q.   Now, the data, if you will--and you have talked about this software that sorts the data--what kind of types of data might you find on a typical computer?

A.    Well, there is all kinds of types, but this particular

type of program sorts mainly by graphic files, document files,

databases, spreadsheets, and emails.

Q.    Emails would be electronic mails that were either sent to

or from that computer?

A.    Correct.

Q.    And you said there were spreadsheets?  That was one type?

A.    Uh-huh.

Q.    And document files?

A.    Document files.

Q.    What would document files be like?

A.    A Word document, a WordPerfect document, HTML file, RTF

file.

Q.    Okay.  And then you said it would sort graphic files into

one group.  Is that correct?

A.    That is correct.

Q.    And a graphic file would be what?

A.    Anything that you can view graphic, like a JPEG, a JIF,

those are graphic file types.  A picture.

Q.    A picture.  Okay.  Anything other than pictures that

would be lumped into the graphic files or might be sorted by

this software and put into the graphic file section?

A.    Can you repeat that?

Q.    Anything other than pictures that would be put in there?

A.    No.

Q. And so you -- Did you use this software to sort the information that was on these various hard drives?
A. I did.
Q. Okay. And did you subsequently -- Were there, with regard to these computers, graphic files or photographs, pictures, that were located on these computers?
A. There were graphic files and pictures located on these computers, yes.
Q. And did you make that work product, if you will, that information, available to the agents that were working on this investigation?
A. I did.
Q. Okay. And in the course of your analysis, did you break down those graphic files according to which computer they would have been found on or which hard drive they would have been found on?
A. Yes, I did. Each process that is done, it is done by individual computer, so each set is its own -- it is only on that one computer.
Q. So if you had a computer from the Holy Land Foundation Dallas office, and after this software -- if it was run through this software, it would sort out these files into various categories, including these graphic files. Is that correct?
A. That is correct.

Q. Just generally with regard to all of these computers, did you find -- If you recall, did you find graphic files or pictures on virtually all of these computers?

A. Pretty much, yes, as I recall.

Q. The hard drives or the computers that you took from these different offices, not that you took from these different offices but that were taken from these different offices, did you give them a number so that you could keep track of which one you were looking at?

A. As part of the documentation process when I am documenting all of the attributes of the computer, I assign each physical machine what we call a Q number. And Q stands for questioned item, and starting with Q-1 to however many machines there are.

Q. And were there other letters in that number that you would put in there to identify it or distinguish it?

A. Yeah. Typically we refer to them as Qs, but we define them on our reports as QDL. And DL stands for Dallas.

Q. Just to indicate that this work is being done in the Dallas FBI office?

A. That is correct.

MR. JACKS: May I approach the witness, Your Honor?

THE COURT: Yes.

Q. (BY MR. JACKS) Ms. Northrup, I am going to hand you what has been marked for identification purposes as Government's

Exhibit No. HLF Search No. 47, Government's Exhibit HLF Search No. 50, and Government's Exhibit HLF Search No. 51.

A. Okay.

Q. And let me ask you, first of all, have you seen these three exhibits before today?

A. I have.

Q. And do they appear to be photo albums, three separate photo albums?

A. They are.

Q. And do they contain individual photographs that are inserted into clear plastic sleeves?

A. They are.

Q. Okay. And let me just take these one at a time.

With regard to HLF Search No. 47, can you tell us the photographs contained within this exhibit, were they located on certain of the computers that you examined? Or the hard drives, I should say.

A. They were.

Q. Okay. And this exhibit, HLF Search No. 47, these photographs came from what computers?

A. They came from computer Q-17, Q-21, Q-22, Q-23-1, Q-24-1, Q-24-2, Q-31, Q-34, Q-36, Q-37, and Q-38.

Q. Now, that collection of computers or hard drives was located in what office?

A. In the Dallas office.

Q. Of the Holy Land Foundation?
A. Yes.
Q. Okay. And were you -- Are these pictures, when you found them obviously they were in electronic format on the computer. Is that correct?
A. That is correct.
Q. And were you able to print them out, or was someone able to print them out?
A. Yes, they were actually put on a CD ROM and given to the investigator and the investigator printed them out, and then I reviewed the pictures after they were printed.
Q. Okay. So you have, since they were printed out, looked at these photographs in this book and made sure that they were actually on these computers, these respective computers?
A. I have verified each picture, yes.
Q. Okay. Let me move to HLF Search No. 50 and ask you, does this exhibit contain photographs? And if so, again are they individual photographs that are inserted in clear plastic sleeves in this photo album?
A. Yes, they are.
Q. And these particular photographs, where were they found? On which computer or hard drive were they found?
A. On Q-42.
Q. And Q-42 is a computer from what FBI office?
A. Newark.

Q. All right. And just -- Would that be the HLF New Jersey office? Is that what was represented to you?
A. All I know is they came from Newark, yes.
Q. Okay. And is Newark where the FBI office is that covers New Jersey?
A. Yes.
Q. Okay. Let me show you HLF Search No. 51. And again, does this exhibit -- is it a photo album and does it contain a series of photographs that are printed out and then placed into individual clear plastic sleeves?
A. Yes, they are.
Q. And let me ask you, just keep your voice up, if you would, even though I am stand right here.

These photographs in HLF Search No. 51, what computers did they come from?
A. Q-40 and Q-41.
Q. And those computers were located where?
A. Chicago.

MR. JACKS: Judge, we move the admission of HLF Search No. 47, 50, and 51.

MS. DUNCAN: Your Honor, may we approach for just a moment?

THE COURT: Sure.

(The following was had outside the hearing of the jury.)

MS. DUNCAN: We just object generally speaking on relevance grounds and also 403.

There was one photograph that I pointed out to Mr. Jacks that we have a specific 403 objection to.

MR. JACKS: I just marked it for your -- It is not --

MS. DUNCAN: The Government has pulled out -- Our objection is basically the name here. It shows "Arab America, September 18th, 2001." Given the proximity of the date to September 11th, whatever probative value these images may have is vastly outweighed by the risk of unfair prejudice by that photo, and coupled with the file name.

MR. JACKS: Judge, I don't know that the Government was going to highlight that, but it has an Israeli flag and it has also got an American flag. And again, it is the materials that they, you know, looked at and downloaded. So to try to filter it out -- We have already taken out all the pictures of bin Laden, all the pictures -- I just think this shouldn't be removed.

This is from, by the way, the Chicago office.

MR. WESTFALL: I mean, I think -- They have obvious weaknesses. I mean, they can't trace them to any particular person or anything like that. They were found in the Holy Land Foundation's computers. I mean, I think there are certainly 403 issues and, you know, I thought that was kind of

the basis of the objection.

THE COURT: She made that objection.

MR. WESTFALL: Of course, burning American flags and stuff --

MS. DUNCAN: There are other images in here also, the burning American flags that we object to. This one in particular I wanted to draw your attention to because of its proximity to September 11th.

MR. WESTFALL: We probably have had enough of that.

MS. DUNCAN: We definitely have.

THE COURT: And that is -- The caption that was on the picture is what was on the computer?

MR. JACKS: Yes.

MS. DUNCAN: We also note there is no evidence of who gave that name to that file.

MS. HOLLANDER: That is all hearsay, I assume.

THE COURT: Well, except it is off of HLF records. If it was somewhere else maybe, but it is all off of HLF records and computers. Right?

MR. JACKS: Yes, sir.

THE COURT: And that is why I have let them in before. I will overrule the objection. No. 47, 50, and 51 are admitted.

Jim, how much longer do you have on your direct?

MR. JACKS: Maybe five or ten minutes.

THE COURT: Okay. Are you all expecting much cross?

MR. WESTFALL: I will be crossing her, and it might be 20 or 30 minutes.

THE COURT: I was trying to do it before lunch so we could start with --

MR. JACKS: You know, I would rather not pass her. If we can just break for lunch and I will finish with her just to make sure -- I mean, if that is okay with you.

THE COURT: Are you ready to break now, then?

MR. JACKS: Sure.

(The following was had in the presence and hearing of the jury.)

THE COURT: Members of the jury, let's go ahead and take the lunch break here. Be back at 2:00.

(Whereupon, the jury left the courtroom.)

THE COURT: We will be in recess until 2:00.

(Lunch recess.)

THE COURT: Let me ask counsel to approach the bench.

(The following was had outside the hearing of the jury.)

THE COURT: On that picture, burning the American flag, I want to ask that you remove that caption, that 9/18/01 the Arab-American 9/18/01. If you will remember that. The picture is fine, but that is just too close to 9/11. The jury

will be thinking about things that they shouldn't be thinking about. So if you will remove that.

(The following was had in the presence and hearing of the jury.)

THE COURT: Mr. Jacks?

MR. JACKS: Thank you, Your Honor.

Q. (BY MR. JACKS) Ms. Northrup, I think before we broke for lunch we had admitted --

MR. JACKS: Judge, I just want to make sure that these photo albums have been admitted.

THE COURT: No. 47, 50, and 51, yes, sir, those are admitted.

Q. (BY MR. JACKS) Ms. Northrup, you had testified before lunch as to each one of these photo albums, which office they reportedly came from, whether it be a Dallas, the Dallas office computer, a Chicago office computer, or a New Jersey office computer. Is that correct?

A. That is correct.

Q. Okay. And the exhibits as to -- And I believe you testified to this. As to the Dallas office, these exhibits came from 11 computers. Correct?

A. Correct.

Q. And as to the New Jersey office, they came from one computer?

A. That is correct.

Q.   And as to the photographs from the Chicago office
computers, they came from two computers.   Correct?

A.   Yes.

Q.   Now, these photographs, where were they found in the
computer?   What kinds of files were they found within?   You
said graphic files?

A.   They were graphic files, yes.   They were found in a
folder called "temporary internet files."

Q.   Okay.   And does this mean that these photographs would
have been originally something that was on the internet?

A.   That is correct.

Q.   And is it possible that these photographs would have been
printed out or otherwise used by whoever accessed them on the
internet?

          MS. HOLLANDER:   Objection, Your Honor.   I object to
speculation.

          THE COURT:   Overruled.   Go ahead.

          THE WITNESS:   The photos could be printed out, yes.

Q.   (BY MR. JACKS)   And in fact, that is what you did, or the
investigators did.   Is that correct?

A.   That is correct.

Q.   And the photographs as they appear in these photo albums,
are they exactly as they appeared in electronic format on the
computer?

A.   Yes, they are.

Q. Was anything done to them to change them in any way from the way that they appeared on the computer?
A. They were not altered in any way, no.
Q. With respect to the various computers that you examined, are there things you can look at that might indicate who was a particular user of that computer?
A. Yes. On each computer there is a few places that you can look to determine maybe who the user or users might be of that computer.
Q. And what are some of those places that you would look if you were trying to determine okay, whose computer was this?
A. The first place that I would look would be in Windows, the Windows users that were set up. There is also network users that might be defined on there. And there is also email that you could look at to see who might be emailing on that computer.
Q. All right. Let me go to the first category that you talked about, Windows user. And when would that information and how would that information be put onto the computer?
A. Typically in Windows -- Initially when you set the Windows application up, you can define a user, but there is also a place in "control panel" where you can go in and add users at any time.
Q. Okay. So, if the person just, for example, has a computer at home and they want to set it up for the husband

and the wife and the children to use it, can they all be registered as users of that computer in Windows?
A. Yes, they can.
Q. Okay. You said a second way was -- I am sorry. What was the second way?
A. Another way was network definitions. These computers appeared to be connected to a network, just from the files that I looked at on them, so there was network information out there.
Q. Okay. And so that would be if more than one computer were tied in with other computers. Is that correct?
A. That is correct.
Q. And so people -- Are you talking about where people would simply have a name, either if it is an email name or whatever, or is it separate and apart from an email name?
A. It is typically separate, but they could use the same name. I mean, it could be a given name. It could be like a workstation I.D.
Q. Okay.
A. A name or a number.
Q. So that when you logged onto your computer in the morning, you would enter your I.D. name?
A. Correct.
Q. And you said the third category that you could look at would be the email category. Is that correct?

A. That is correct.
Q. And what about -- What would you look at in the email category that might give you a clue as to who used this computer most of the time?
A. You could look in the inbox and just see who all the emails are to, or you could look in the sent folder to see who sent the emailed item.
Q. Okay. Let me just ask you about -- And I think you have some notes, do you not?
A. Correct.
Q. And you said that the way that you would separate your identity of these computers or hard drives, you would give them a unique number. Is that correct?
A. That is correct; a Q number.
Q. I just want to ask you -- For example, let me ask you about QDL No. 17. And is that a computer from the Dallas office?
A. Yes, it is.
Q. And was there a registered -- first of all, a registered organization for that computer?
A. Yes.
Q. Who was that?
A. The registered organization was HLF.
Q. And was there a registered owner of that computer in terms of who registered as the user of that computer?

A. Yes. The registered owner was Ibrahim.
Q. Just that first name?
A. Yes.
Q. Okay. And then as far as -- Were there users that were listed on that computer?
A. There were.
Q. Okay. And can you just give us the three names, the three most common names that you found?
A. There was Haitham, Hayman, and Ibrahim.
Q. Okay. Let me ask you to look at QDL No. 21. Is that also a computer from Dallas?
A. Yes, it is.
Q. And the registered organization, was that Holy Land Foundation?
A. It was Holy Land Foundation, yes.
Q. And as far as the registered owner or individual, what name was registered?
A. Ayman, A-Y-M-A-N.
Q. And as far as the users what name did you find there as a user registered?
A. The user was Ayman.
Q. And Let me ask you, if you would, turn to QDL No. 24-1. And was that also a computer from the Dallas office?
A. That was a Dallas computer.
Q. And the registered organization?

A.    HLF.

Q.    And the registered owner, according to what was entered?

A.    Akram.

Q.    And who was the network login name?  In whose name was the network login name under?

A.    Akram.

Q.    Let me ask you about -- If you would, turn to QDL No. 36. Was that also a computer from the Dallas office?

A.    Yes.

Q.    The registered organization for that computer?

A.    QDL No. 37?

Q.    No. 36?

A.    The registered organization is Holy Land Foundation.

Q.    And the registered owner, according to whatever was put in there?

A.    HLF.

Q.    Okay.  And QDL No. 37, let me ask you about that.  Was that also a computer from the Dallas office?

A.    It was.

Q.    And who was the registered user for that computer?

A.    Haitham.

Q.    And with regard to the QDL No. 40, which I belief came from the Chicago office.  Is that correct?

A.    That is correct.

Q.    And who was shown as the registered owner of that

computer?

A. I am going to spell it because I can't pronounce it. It is K-I-F-A-H, and the last name of M-U-S-T-A-P-H-A.

Q. And did you also find email accounts in that first name Kifah or Kifah Mustapha?

A. I did, yes.

Q. QDL No. 41, also from Chicago, who was the registered owner recorded on that computer?

A. The registered owner was HLF.

Q. And the name below that or the person that was shown to be the user?

A. The registered owner is Kifah, K-I-F-A-H.

Q. Okay. I think you may have answered both, but the HLF was carried as what on that computer?

A. Excuse me?

Q. The HLF was -- That name was carried as what?

A. The HLF was the registered organization.

Q. Okay. And the registered owner was Kifah?

A. The registered owner was Kifah.

Q. And let me direct your attention to QDL No. 42. And that was the New Jersey computer?

A. That is correct.

Q. And as far as the registered organization, was there any name entered for that?

A. No, there was not.

Q. Okay. As far as the registered owner, was there any unique name entered for that?
A. The registered owner was defined as "user."
Q. Just U-S-E-R?
A. Correct.
Q. Do you know if that is a default name, or is that just a name that somebody would have to type in?
A. That is a name that somebody would have to type in.
Q. Okay. As far as email accounts, did you find the record of any email accounts on the New Jersey computer?
A. I did, yes.
Q. And if you would, just what type of email accounts were they?
A. These were AOL.
Q. And what was the first one you found?
A. Broly space Odeh space 2002.
Q. Broly being B-R-O-L-Y?
A. Correct.
Q. Then space, and then Odeh, O-D-E-H?
A. Correct.
Q. Okay. And then what it was next one you found?
A. The second one was Monkey space Bunker, 201.
Q. Okay. Monkey, just M-O-N-K-E-Y?
A. Correct.
Q. Space B-U-N-K-E-R, 201?

A. Correct.

Q. What was the other one, if any, that you found?

A. Monkey bunker 206.

Q. And then were there any others?

A. The last one was AOdeh.

Q. A-O-D-E-H?

A. Correct.

Q. And those were all AOL accounts?

A. Those were all AOL accounts.

Q. What would the name represent as far as the AOL account?

A. Typically their user I.D.

Q. Okay. The photographs that are contained within these respective photo albums, are they all of the photographs that were found on those computers or just a part?

A. They were a very small part.

MR. JACKS: May I have a moment, Your Honor?

THE COURT: Yes.

Q. (BY MR. JACKS) Ms. Northrup, lastly, were there -- Directing your attention to the Dallas computers, and were there computers within the Dallas office that either had a generic name or did not have a specific individual's name attached to them as either an owner or a user?

A. Are you asking just from the Qs that we have gone over today?

Q. Yes.

A. May I look at my notes?

Q. Sure.

A. And repeat the question, please.

Q. Yes. Were some of the computers that we have gone over today, did some of them not have a specific individual listed as either the registered organization or registered owner or user?

A. That is correct.

Q. Okay.

MR. JACKS: I pass the witness.

THE COURT: Mr. Westfall?

MR. WESTFALL: Yes, sir.

CROSS EXAMINATION

By Mr. Westfall:

Q. Hello, Ms. Northrup.

A. Hello.

MR. WESTFALL: Your Honor, may I approach?

THE COURT: Yes.

Q. (BY MR. WESTFALL) Okay. I have now placed in front of you what is marked for identification as Defendants No. 1406 and Defendants No. 1407. First of all, do those look like documents that you created?

A. Only one of them.

Q. Which one did you create?

A. The spreadsheet.

Q. The spreadsheet?
A. Uh-huh.
Q. Okay. And that would be No. 1407?
A. That is correct.
Q. Now, No. 1407 pretty much --

MR. WESTFALL: Well, let me just offer it, Your Honor. We offer Defendants No. 1407.

THE COURT: Counsel?

MR. JACKS: We haven't seen the relevancy shown yet. All that is in the record is it is a document she created.

THE COURT: Do you want to establish that?

MR. WESTFALL: Yes.

Q. (BY MR. WESTFALL) This document here, does it pertain to the computers that you analyzed?
A. It does.
Q. And does it contain a good deal of information about the computers that you analyzed?
A. It does.
Q. Including serial numbers and QDL number?
A. Correct.
Q. And does it in fact encompass all of the computers and the media that you analyzed in connection with this case?
A. Yes.

MR. WESTFALL: Your Honor, we offer No. 1407.

THE COURT: Counsel?

MR. JACKS: No objection.

THE COURT: Admitted.

Q. (BY MR. WESTFALL) Now, No. 1406, is this a document that you relied upon in your testimony today?

A. Yes, it was partly -- It was created by one of the investigators. It was kind of a guideline.

Q. Right. And it also discusses the Q numbers and the particular places where you found images, I guess?

A. Correct.

Q. Okay. And those are computers which are contained on No. 1407?

A. Correct.

MR. WESTFALL: Your Honor, we offer No. 1406.

THE COURT: Mr. Jacks?

MR. JACKS: No objection, Your Honor.

THE COURT: Admitted.

MR. WESTFALL: Thank you.

Q. (BY MR. WESTFALL) Now, this is Defendants No. 1407, and this is the one you said you created. Right?

A. Correct.

Q. And over here these are the QDL numbers running down this way?

A. On the right hand side?

Q. Yes. Can you see that?

A. I can, but no, that is not.

Q. These are over here. I am on the left hand side.
A. Yes, the left hand side. I am sorry.
Q. Right as I am standing here. The left hand side.
A. Correct.
Q. And then these are the drives. Right? The size of the drives?
A. That is correct.
Q. And these are the CPU types. You discussed a little bit about that.
A. Correct.
Q. And then this here, this generic, this is what you were talking about on ones that might have been just made by parts that you would buy at Frye's or something. Right?
A. Correct.
Q. This is one of your numbers. Right? The bar code?
A. That is correct.
Q. But then here is the type of drive that was found in each computer, if the computer had a drive.
A. Correct.
Q. And then the drive serial number is here. Right?
A. Yes.
Q. And every single one of those drives of course had a unique serial number?
A. Yes.
Q. And then from those computers I show you now No. 1416.

These highlighted numbers are the ones that had images that are made a part of those three exhibits. Right?

A. Correct.

Q. And --

THE COURT: I believe you said 1416.

MR. WESTFALL: No. 1406. I am sorry.

Q. (BY MR. WESTFALL) All these that say HLF Richardson next to them, these are the numbers that make up that exhibit, the HLF Richardson, HLF Dallas exhibit, which is HLF Search No. 47.

A. Correct.

Q. And then this is HLF Chicago. These are the two computers that make up that. Right?

A. Yes.

Q. And then this is the one computer that makes up the Newark package. Correct?

A. Yes.

MR. WESTFALL: May I approach?

THE COURT: Yes.

Q. (BY MR. WESTFALL) Now, Ms. Northrup, I want to talk a little bit about temporary internet files. And I have laid before you what I intend to offer as a demonstrative exhibit, Defendants' No. 1408. And in explaining what temporary internet files are for the jury and how they come onto the computer and exactly what they are, would this image here help

us to make that understood?

A. It would be an example of a web page, yes.

Q. Okay. So yes?

A. Yes.

Q. All right.

MR. WESTFALL: Your Honor, I will offer Defendants' No. 1408 as a demonstrative.

MR. JACKS: No objection, Your Honor.

THE COURT: Admitted.

Q. (BY MR. WESTFALL) I had it in color, but we will just use it in black and white.

MR. WESTFALL: So can I have the elmo back?

Q. (BY MR. WESTFALL) Okay. Defendants' No. 1408 is eBay. Now, when we talk about temporary internet files, these are -- Temporary internet files are made by Internet Explorer. Isn't that true?

A. They are files that are copied from Internet Explorer.

Q. Right. Right. And they load automatically when you go to a website?

A. The page loads and the files copy down.

Q. Right. Images that would be captured in these temporary internet files are like this stuff. Right?

A. Yes, that could be considered as an image.

Q. And even the little eBay thing could be considered an image?

A. Correct.

Q. And this little deal over here and the thing that says "search," those could all be images, couldn't they?

A. That is correct.

Q. A component part of a website, all of the -- virtually all of the little inset things in here are images of some sort.

A. It depends on how the page is coded, but yes, it could be.

Q. Right. And you know, if it is a moving image then it could be like a little flash video or something like that?

A. Correct.

Q. But those get downloaded also, don't they?

A. They get copied, yes.

Q. Then the actual outline of the page and possibly the text will be what is called the HTML?

A. That is correct.

Q. What is HTML?

A. Hyper text mark-up language.

Q. And that forms kind of the skeleton of the web page.

A. That is correct.

Q. And then you put your images in it?

A. That is correct.

Q. And the reason why Internet Explorer does this is so that if you go to the web page on one day and then you go to it the

next day, the next day it will come up faster.

A. It is used for speed and efficiency. Correct.

Q. That is why our home page comes up faster than any other page if with we are using Internet Explorer.

A. That is correct.

Q. So if we went to eBay today and pulled this up and then went back tomorrow, the only things that would be changed would be only the things that have changed in the last 24 hours would be redownloaded into our computer?

A. It would be redownloaded unless the user hit the refresh button.

Q. Assuming we don't hit the refresh button, we go back to the web page, and that is the way it becomes more efficient. It doesn't have to repeat all those steps.

A. Yes. It takes the files from the temporary internet folder instead of going out to the web server.

Q. And this process here that the computer goes through, this is different than downloading, isn't it?

A. Correct.

Q. If it is downloading, you actually have to go through some procedure to make the file come down into your computer.

A. Correct.

Q. Whereas this -- What you do, you go to the website and it automatically comes into your computer.

A. That is true.

Q. Once these come into the website, now, Internet Explorer re-collates the folders for them, doesn't it?
A. Yes.
Q. And these folders are also created automatically?
A. Correct.
Q. And the folders are assigned I guess like random names?
A. That is true.
Q. And there can be a dozen or so of these folders, potentially more, on a computer, can't there?
A. Yes.
Q. And these folders seem to have somewhere between 1,000 and 1500 or so things in each one of them.
A. I haven't counted, but yeah, there is quite a bit.
Q. Would 1,000 to 1500 sound reasonable for what one of these folders can hold?
A. That would sound reasonable, yes.
Q. And within those 1,000 to 1500 things in each folder, there would be a good number of images, JPEG, bitmaps, and whatever the other one is you said. Right?
A. Correct.
Q. Now, you have seen obviously these pictures.
A. Yes.

MR. WESTFALL: I want to publish these pictures. May I do that?

Q. (BY MR. WESTFALL) You all didn't show these to the jury,

did you?

A. Not that I am aware of.

Q. These are the contents of HLF Search No. 50. Do these mean anything to you without what the agents have said? Would these pictures mean anything to you?

A. They don't mean anything to me, no.

Q. Now, as I count it, there is 11 pictures contained in this exhibit.

A. Okay.

Q. I am showing you now what is in evidence as HLF No. 51. These are in the Chicago pictures. Let me just pull this one page out. Are you familiar with this picture?

A. I have seen it in the folder, yes, in the photo album.

Q. And that was pulled off the Chicago computer. Right? One of the Chicago computers.

A. Correct.

Q. Now, I have another report you did, or I have some more of this material if you need to refresh your recollection, but tell me this. It seems to me that every single picture that is in this is one of these temporary internet files. Is that true?

A. That is correct.

MR. WESTFALL: May I approach, Your Honor?

THE COURT: Yes.

Q. (BY MR. WESTFALL) Now, is this -- I put before you

Defendants' No. 1405.

A. Correct.

Q. And is this the part of this No. 1406 that applies to QDL-42?

A. Correct.

Q. And these are the actual images that are in this exhibit, the HLF exhibit, which is No. 50 I guess, pertaining to Newark. Correct?

A. It is Newark, yes.

MR. WESTFALL: Your Honor, I offer Defendants No. 1405.

MR. JACKS: Your Honor, may we approach?

THE COURT: Yes.

(The following was had outside the hearing of the jury.)

MR. JACKS: I am not sure what the purpose of this is, but if it is to show the limited number of pictures from this computer, that is misleading, because there are a lot of pictures that the Court has directed us to take out. And so I am just I am concerned that these are the ones that we selected, and now he is taking --

MR. WESTFALL: That is not my purpose. But what I can do is I can offer it as a demonstrative, because there are some questions I want to ask her in terms of the file name and all that. But to sit here and harp on the fact that these are

all the pictures, I have no intention of saying these are all of the pictures. I have seen the hard drive. I know that is not true, and I have no intention of doing that. But I can use this as a demonstrative to get the points out. That is not one of them. I can assure you.

MR. JACKS: Well, I think some of this at least this name is on there. I don't know if that is enough -- It is on the individual pictures.

MR. WESTFALL: The path name is not on there.

MR. JACKS: Okay. Okay. Your Honor, I was just given this just this second.

MR. WESTFALL: This is the last three pages of something I gave you already. It was something given to me by her.

MR. JACKS: Does this correspond to the pictures -- how many pictures are in there from the New Jersey --

MR. WESTFALL: There was 11. Just the one Osama bin Laden got redacted out.

MR. JACKS: Okay.

THE COURT: Any objection?

MR. JACKS: Not based on those representations.

THE COURT: Okay.

(The following was had in the presence and hearing of the jury.)

THE COURT: And Defense Exhibit No. 1405 is

admitted.

MR. WESTFALL: Thank you, Your Honor.

Q. (BY MR. WESTFALL) Now, this here is what is called a path name. Right?

MR. JACKS: I am sorry. I just want to make sure, Your Honor, was this a demonstrative?

MR. WESTFALL: It will be for demonstrative purposes, Your Honor. I am fine with that.

THE COURT: All right.

Q. (BY MR. WESTFALL) This is what is called a path name. Correct? This full path?

A. Correct.

Q. And QDL-42 is the computer it came off of?

A. Yes.

Q. And then I don't know what that is--part 1?

A. Partition.

Q. Partition. Windows 98. And that is a file system. Right? Windows, local settings, but then temporary internet files. Right?

A. Yes.

Q. And that is how we know it came from temporary internet files. Correct?

A. Correct.

Q. And then content IE5 means Internet Explorer Version 5. Correct?

A. Not necessarily. It means Internet Explorer, but not necessarily Version 5.
Q. Okay. Very well. So it just means Internet Explorer.
A. Right.
Q. And then this here is the sort of folder that Internet Explorer has created. Right?
A. That is correct.
Q. Now, have you ever looked at this to determine how many unique Internet Explorer created folders there are on here?
A. I have not.
Q. Do me a favor and look at your copy there and just check and see if this is accurate.
MR. JACKS: There is something on the screen that is not in evidence. I don't know what it is. We object to it.
MR. WESTFALL: It is derivative of No. 1405. I can offer it, Your Honor.
MR. JACKS: She didn't create it, he is not a witness, so we object to it.
Q. (BY MR. WESTFALL) Would you please just count them up? I was trying to help out.
A. Count what?
Q. How many images came from each unique file?
MR. WESTFALL: May I approach, Your Honor?
THE COURT: Yes.
Q. (BY MR. WESTFALL) They may be helpful to you.

A. You have written on here 11 that have come from these folders. Is that what this is?
Q. Right. And how many came from each of those unique files?
A. One came from one folder, two pictures came from the second folder, two pictures another one, two pictures on the next one, two pictures on the next one, one picture on the next, and one picture on the last one.
Q. Okay. So there are seven unique files represented there.
A. Yes.
Q. And those are the same types of files that we discussed earlier that the Internet Explorer creates on its own?
A. It appears to be, yes.
Q. Now, in examining these -- Let me go back to Demonstrative No. 1408. If this were, say, instead of eBay, the CNN website, there would be a little CNN up here and some other CNN related stuff and news stories instead. Those images would go in the computer the same way the eBay images would, wouldn't they?
A. That is correct.
Q. And so, for instance, you saw during your looking at these things CNN icons, didn't you?
A. Yes, I did.
Q. You saw BBC icons?
A. I did.

Q. There is a BBC, arabicbbc.co.uk?
A. I can't say that I saw that particular one, but I saw several different icons.
Q. You saw al Jazeera icons?
A. Al Jazeera.
Q. And other news outlets, you saw their icons as well?
A. Uh-huh.
Q. And we can't tell from looking at these pictures exactly what website they came off of, can we?
A. No not unless the website is identified on the picture, perhaps.
Q. Exactly. And there are some of those.
A. Yes, I believe there are.
Q. Chicago, we saw one that says palestineinfo.net on the picture?
A. Yes.
Q. We also saw one that says the IDF website on the picture, or something like that?
A. I don't recall that one, but they were on there.
Q. All right. This is out of Exhibit No. 51, the Chicago, a picture of Ahmed Yassin. Do you see what it says there? Official site of the IDF spokesman, the Israeli Defense Forces?
A. Yes.
Q. And that is the type of thing that is going to be an

instance where you can identify where the -- what website they came off of.

A. It doesn't necessarily link it to the website. It is just on the picture.

Q. Okay. So that would be some potential evidence that it came off the IDF website.

A. It is possible, yes.

Q. And just like palestinianinfo.info would be some potential evidence that it came off the Palestine info website.

A. It could be, yes.

MR. WESTFALL: Pass the witness, Your Honor.

THE COURT: Anyone else?

Ms. Hollander?

CROSS EXAMINATION

By Ms. Hollander:

Q. Good afternoon.

A. Hi.

Q. I just have a couple of questions.

I just want to make sure we are clear. If someone has a computer and their home page, for example, is Google News, and that could be a home page. Right?

A. It could be.

Q. So every time you start up your computer, you get whatever is on Google News.

A. Correct.
Q. And all of that goes to these temporary internet files. Right?
A. Correct.
Q. And then you hit refresh --
A. Yes.
Q. -- an hour later to find out how bad the market slipped or whatever, and you are looking at how bad the market slipped and a lot of pictures come up of other things. Right?
A. They could.
Q. And they all go into your temporary internet files?
A. They do.
Q. They do?
A. Uh-huh. Every picture that comes up that you pull up on a web page gets copied out to these temporary internet files.
Q. And what about -- For example, you know, sometimes people want to see something on YouTube, for example, and you go to YouTube to look at a particular -- somebody speaking about something, let's say, a speech. Right? And on YouTube, YouTube kind of advertises other speeches by the same person, so there would be other little pictures of that person.
A. Could be, yes.
Q. And if there were other pictures of that person, those would go into the temporary internet files.
A. Typically, yes.

Q. Even though you didn't even care about them, particularly.

A. Correct.

MS. HOLLANDER: That is all. Pass the witness.

THE COURT: Any other counsel?

MS. MORENO: No questions, Your Honor.

MS. CADEDDU: No questions, Your Honor.

THE COURT: Mr. Jacks, any redirect?

MR. JACKS: Just a couple, Your Honor.

REDIRECT EXAMINATION

By Mr. Jacks:

Q. Ms. Northrup, so the user or the person operating that computer would have to go to a website in which that picture was displayed. Correct?

A. That is correct.

Q. And you have -- Just to clarify, you have seen the photographs contained within these photo albums. Correct?

A. Yes.

Q. And you have seen all of the photographs that are contained on the hard drives at one point or another. Is that correct?

A. I have not seen every single file, no.

Q. All right. But are these -- Of the pictures that are in this photo album, is that just a part of the pictures that were contained on these hard drive?

A.   Yes, it is a part of them.

          MR. JACKS:  That is all I have, Your Honor.

          THE COURT:  Mr. Westfall?

                    RECROSS EXAMINATION

By Mr. Westfall:

Q.   What we have in the demonstrative we just looked at, we have seven unique Internet Explorer created temporary folders. Right?

A.   Yes.

Q.   And we have 11 pictures.

A.   Correct.

Q.   And you testified that each one of these folders can contain 1,000 or 1500 different things?

A.   They can contain quite a bit, yes.

Q.   All right.  You know, Mr. Jacks mentioned something to you about printing.  Now, are you talking about just making a print of the website?

A.   No, just printing the picture itself.

Q.   Going into the temporary internet file, finding the picture, and then printing it?

A.   Yes.

Q.   That would have to be a person who kind of knew their way around Internet Explorer, wouldn't it?

A.   Sure.

Q.   Those temporary internet files that are in there, a lot

of people don't even know that they exist. Isn't that true?

A. It is possible. Some do and some don't.

Q. But that is what makes them wonderful things for forensic analysis is because only very savvy computer users even know about them to destroy them. Isn't that true?

MR. JACKS: Your Honor, I object to the question. It is speculative and argumentative.

THE COURT: Overruled. She may answer.

THE WITNESS: Can you rephrase it or repeat the question?

Q. (BY MR. WESTFALL) These temporary internet files are valuable oftentimes to you as a forensic examiner, because the people using the computers don't know they exist.

A. That is correct.

MR. WESTFALL: Thank you, Your Honor.

THE COURT: Ms. Hollander, any other questions?

MS. HOLLANDER: No, sir.

THE COURT: Anyone else?

MR. DRATEL: No, Your Honor.

MS. MORENO: No, Your Honor.

MS. CADEDDU: No, Your Honor.

THE COURT: Ms. Northrup, you may step down. You are free to go.

MR. JACKS: May we approach, Your Honor?

THE COURT: Yes. Come on up.

(The following was had outside the hearing of the jury.)

THE COURT: Do you want to excuse the jury?

MR. JACKS: Yes.

MS. SHAPIRO: May I have just a few minutes to set up?

THE COURT: Yes. You can do that while I tell the members of the audience.

(The following was had in the presence and hearing of the jury.)

THE COURT: Members of the jury, if you will step out into the jury room for just a few minutes, there is a matter I need to take up.

(Whereupon, the jury left the courtroom.)

THE COURT: For those members that are here observing the courtroom proceedings, we are now getting ready to take up another witness who will be testifying anonymously, so we will have to ask you to step outside the courtroom.

You may go upstairs to floor 16 to the overflow courtroom, except for immediate members of the family of each of the Defendants.

You need a few minutes to set up? We will be in recess for a few minutes.

(Brief Recess.)

(Whereupon, the oath was administered by the Clerk.)

THE COURT: Bring in the jury.

(Whereupon, the jury entered the courtroom.)

THE COURT: Ladies and gentlemen of the jury, this is another witness who is a member of the Israeli government, and so he will be testifying again under a name other than his real name, as is required by Israeli law, as we explained to you last time you heard from such a witness. He has been placed under oath, so he is under oath.

Ms. Shapiro?

MS. SHAPIRO: Thank you.

AVI,

Testified on direct examination by Ms. Shapiro as follows:

Q. Good afternoon.
A. Good afternoon.
Q. What name you are testifying under today?
A. Avi.
Q. Avi. Okay. Is English your native language, Avi?
A. No.
Q. What is your native language?
A. Hebrew.
Q. And can you speak English well enough to be able to testify today in English?
A. I think so.
Q. Okay. We have an interpreter here. If you need help understanding my questions or in your answer please, feel free

to use the interpreter. Okay?

Do you speak any languages other than Hebrew and English?

A. No.

Q. Do you read any other languages?

A. I read a little Arabic.

Q. And where are you from?

A. Israel.

Q. What part of Israel did you grow up in?

A. I am from a small town near Tel Aviv.

Q. Tel Aviv is a city in Israel?

A. Yes.

Q. Okay. And did you finish your schooling in Tel Aviv?

A. In the same place that I was born.

Q. And did you go to university?

A. Yes.

Q. Where did you go to university?

A. Tel Aviv University.

Q. Okay. Before you went to university, what did you do after you finished school?

A. After I finished school I joined the army.

Q. Okay. Does Israel have a compulsory Army service like a draft?

A. Yes.

Q. How long is a typical army service for men?

A. Three years.

Q. Three years. Do women also have army service?
A. Yes.
Q. How long do women serve?
A. Two years.
Q. Are you still in the army?
A. No.
Q. Okay. What rank did you achieve in the army?
A. Major.
Q. Okay. And after your army service what did you do?
A. I went to law school and studied law.
Q. And that was at which university again?
A. Tel Aviv University.
Q. Is law a first degree in Israel, or is it a second degree like here in the States?
A. It is a first degree.
Q. And how many years did you study law?
A. I studied five years.
Q. And was that just law or were you also studying other things?
A. I also studied medical studies.
Q. Medicine?
A. Medicine.
Q. Were you doing a joint degree initially?
A. No.
Q. No? What year did you obtain your law degree?

A. In 1997.
Q. 1997?
A. Yes.
Q. And what did you do after that?
A. After that I joined the ISA and started to practice law in ISA.
Q. Let me start with, what is the ISA?
A. It stands for the Israeli Security Agency.
Q. Okay. And what is the Israeli security agency?
A. It is -- The Israeli Security Agency is very similar to the FBI, except we don't deal with -- we deal with terrorism and only issues and subjects that relate to terrorism. We don't have the regular criminal crimes. That part is handled by the police.
Q. Okay. So the police handles crime and the ISA handles terrorism-related issues. Is that fair?
A. Yes.
Q. And when you joined the ISA, what did you join as? What was your job?
A. My job was a legal advisor. I started to practice law at the ISA, and then I became a legal advisor for the ISA.
Q. Okay. As a legal advisor, you are a lawyer there. Correct?
A. Correct.
Q. Are you an agent of the ISA?

A. No.
Q. No. Just a lawyer?
A. A lawyer.
Q. Okay. How long have you been at the ISA altogether?
A. Ten years.
Q. And how long have you been a legal advisor at the ISA?
A. Eight years.
Q. Okay. So let's talk for a moment about what your responsibilities are as a legal advisor. Can you tell us what your general responsibilities are?
A. As a legal advisor, I give advice for units of my division, which is the Counterterrorism Division in the ISA, and I also support cases, support cases that goes to the prosecution, and that is in general what I do.
Q. Okay. And do you do research as part of your job?
A. Yes.
Q. And do you do research relating to Hamas?
A. Yes, I support cases related to Hamas, and I also research -- My research is related to Hamas.
Q. When you say cases, do you mean legal cases that may be brought to court, like this one?
A. Yes.
Q. Were you -- Are you familiar with a case in Israel against the Islamic Movement and an individual named Raed Salah?

A. Yes.
Q. And were you involved in any way in that case?
A. Yes.
Q. What is the Islamic Movement?
A. The Islamic Movement is a branch of the Muslim Brotherhood in Israel. The leader of the Islamic Movement is Raed Salah And the Islamic Movement in Israel holds a very similar ideology and philosophy like the Hamas organization.
Q. Okay. And will we be talking about Raed Salah a little later?
A. Yes.
Q. What did you do for that case against the Islamic Movement? What was your responsibility?
A. I was in charge of a team that supported a case and had to collect material, evidence, and research, and the whole system, the whole financial system of Hamas. And then I was working and supporting the prosecution team during all of this period of time that the case lasted.
Q. And as part of your work on that case, did you meet with other experts in the area of funding of this movement?
A. Yes, from other agencies we had many meetings with police agents, from the IDF, and other ministries, other agencies in Israel.
Q. What is the IDF?
A. IDF stands for the Israeli Defense Force.

Q. Is that the Israeli army?
A. Yes.
Q. Okay. And as part of your work on this case -- How long did the case last?
A. It started in the end of 2000 and it ended in January 2005.
Q. About five years?
A. A little less, yes.
Q. Over the course of those years did you review documents?
A. I reviewed many documents during this period of time.
Q. And did any of those documents relate to Hamas and various committees inside the West Bank and Gaza?
A. Also, yes.
Q. And did you study during the course of this case specifically the social infrastructure of Hamas?
A. Yes.
Q. And as a result of your work on that case, did you develop a specialization within the ISA?
A. Yes.
Q. And what was that specialization?
A. That specialization was the financial or the structure of the social wing or social branch of the Hamas organization, and financial methods regarding to the structure of the social wing of Hamas.
Q. And since you finished your work on the Islamic Movement

case, have you done anything to keep up your expertise in this area?

A. Yes.

Q. And what have you done to keep on top of this subject matter?

A. First of all, after this case I continued to support cases related to Hamas and to the social branch, other cases that dealt with the same subject. And also I continued to review documents and many documents related to this subject to be updated with news or material that came from all kinds of operations. I just continued to work on almost a daily basis on this subject.

Q. Do you use public source material like the media?

A. Yes.

Q. And what kind of public source material do you rely on and keep up on?

A. It can be articles, internet, television, publication like even books, academics, academics reviews that I read.

Q. Do you rely on articles and news sources from the Arab media?

A. Yes.

Q. And do you -- What are some examples of some of the Arab newspapers that you might keep abreast of?

A. There is a lot of newspapers around the Middle East. It can be add al-Ahram, al-Asuaq, al-Wasat.

Q. I am going to ask you to go back and spell those in a moment for our court reporter.

A. Okay. It can be al-Hayat, al-Jadida, al-Ahram in Ramallah, many newspapers that I review.

And also there are television channels that I usually keep watching, like al Jazeera, al-Arabiya, al-Hoah, al-Aqsa television of the Hamas, Palestinian television.

Q. Okay. How about if afterwards at the break we will bring those down for the court reporter. Is that okay? So that we don't have to take the time to spell each one? Okay.

Do you also rely on internet research?

A. Yes.

Q. And what kinds of internet sites do you look at?

A. First I look at the Hamas-related internet site, like the Palestinian Info.

Q. What is Palestine Info?

A. Palestine Info is an internet site that expresses the views and the philosophy and the ideology of Hamas and the Muslim Brotherhood, a very known internet site that relates to Hamas.

Q. Does Hamas have more than one website?

A. Yes. For example, the Izz el-Din al-Qassam Brigades which is the military wing of Hamas, is also a website quassam.net, quassam.org, many sites that relate to Hamas. I also review internet sites that relate to the Muslim

Brotherhood, sites like Islam Online, also a website of the newspapers, website of those newspapers that I just mentioned, television news sites like al Jazeera, many internet sites that I review. Also forums like Fatehforum. Many internet sites that I review.

Q. Do some of the committees that we are going to be talking about a little later on, do some of those have websites?

A. Yes.

Q. Which ones have websites that you can recall, just off the top of your head?

A. For example, the Islamic Society website, the MujamaIslami which is the Islamic Center or the Islamic Complex al-Salah in Gaza, the Islamic Charitable Society in Hebron, these kind of sites.

Q. And as part of your research in this area, have you reviewed videotapes?

A. Yes.

Q. More than one?

A. I would say hundreds.

Q. And where are those tapes from?

A. Those tapes can be from material that was seized from all kinds, many kinds of places; hamas offices in the West Bank, it can be videos that I was downloading from the internet, there are many videos that I also recorded from TV, from channels. So there is also video that I review from the IDF

Special Unit, which concentrates in collecting open material, a special unit of the ARMY that deals with --

Q. And the IDF is the Israeli army?

A. Yes.

Q. So we don't confuse acronyms.

A. Yes.

Q. And you said that you regularly conduct this sort of research you said about a daily basis. Is that right? What I heard you say?

A. Almost of course not every day. Of course, sometimes there are busy days. But I will try to do it on a daily basis.

Q. And you do this as part of your work with the ISA?

A. This is part of my work in the ISA.

Q. And have you ever collected any of your work product on this into a written product?

A. Into a summary that really tried to summarize some of the material that I review, some of the sources into a review.

Q. And are you -- As someone who works for the Israeli Security Agency, are you permitted to publish books or articles or anything like that?

A. No.

Q. So the information that you have collected on your research, you have not published that. Is that right?

A. That is right.

Q. Have you had occasion to meet with other governments about the financial infrastructure of the Hamas social wing?
A. Yes.
Q. And do you read academic publications on the subject?
A. I read some academic publications about the subject.
Q. And have you read books about it, about Hamas?
A. I have read books in general about Hamas. I have read some books, yes.
Q. Okay. Can you give us an example of some books that you have relied on?
A. Ziad Abu Amar book, Azzam Tamimi, The Hamas Story From Within, Ronny Shaked is an Israeli publisher of Khalid Mishal book, those books.
Q. Okay. And would you say that your expertise in this area in the social wing of Hamas, does it drive more from books or more from practical experience?
A. I think more from practical experience. This is my job and this is what part of my duty is to read, to analyze, to educate myself with new material.
Q. Is it important to the mission of the Israeli Security Agency that the information you gather be accurate?
A. Yes. The ISA is a preventive agency, terrorism preventive agency. And my information and what I am doing in reviewing information is to prevent terrorism. And it is to be accurate, and I am trying to rely on as much sources as I

can, because a mistake here can be important for us to be very accurate and to rely -- reliable material.

Q. Do Government officials within Israel recognize you as an expert on the subject matter of the social wing of Hamas?

A. Yes.

Q. Have you been invited to speak to other government agencies in Israel about the subject?

A. Yes.

Q. And do foreign governments consider you an expert in the area of Hamas' social wing?

A. Yes.

Q. Do you have As part of your job with the ISA, do you hold a security clearance?

A. Yes.

Q. Are you relying on any classified information at all in your testimony today?

A. No.

Q. You mentioned all these different sources of information that you rely on. Do you ever rely just solely on one source of information?

A. No.

Q. Why not?

A. As I just explained, my conclusion, the conclusion that I achieve my work is to be accurate, because the goal of my agency is to prevent terrorism. And if the information is not

correct and I based only on one source that is not reliable or not true or false, so this is of course is not serving the goal of preventing terrorism.

Q. Now, you testified that you read some Arabic but you don't speak it. Do you translate your own Arab language documents?

A. I don't translate my own documents that I read. I just use it for initial primary sorting. I deliver this material to professional translators working in the IDF, the Israeli Defense Force or a professional translator working in the ISA, the Israeli Security Agency.

Q. Okay.

MS. SHAPIRO: Your Honor, at this time I offer Avi as an expert in the area of financing of Hamas' social wing structure.

MS. MORENO: There will be an objection based on our previous objections to the Court and our motions.

THE COURT: That is overruled, and Mr. Avi is accepted in that area.

MS. SHAPIRO: Thank you.

Q. (BY MS. SHAPIRO) Okay. I want to start by just doing a little background, giving a little background about the Hamas organization and its social wing. So can you just explain for us a little bit the general organization of Hamas?

A. In general, the Hamas is divided into three branches--the

political branch, the social branch, I would say, and the military branch what is called the Izz el-Din al-Qassam Brigades. But this is not clear, there is no clear boundaries between those branches and I can see a lot of overlap, overlaps, links, connection between those wings that I just mentioned.

Q. Okay. Let's talk about just the social wing, understanding that you can't really separate them, but let's just talk for a moment about the social wing of Hamas. Is the social wing important to the organization?

A. The social wing is very important to the organization. And I am talking about Hamas. The Hamas needs, really needs the social wing for several reasons. This is -- First of all, it serves the Hamas philosophy, the Hamas ideology. Hamas uses it to recruit new members to the military wing, for example. This is a way of funneling money to the organization, a lot of money through the social wing. It is very important for Hamas to have a social or wide infrastructure. And of course it is important for the Hamas to have social infrastructure which supports the people, for the people to support them. This is the idea-- win the hearts and minds of the people to reach the people.

Q. You said that the social wing is important for bringing in large amounts of money. Why is that?

A. The social wing -- First of all, the social wing needs a

lot of money to operate. But for Hamas it is, of course, more convenient, let's say more safe, to bring money into the territories without targeting -- I mean, without relying on sources that support directly the military wing or other wings of Hamas, otherwise they can be targeted by governments who banned Hamas in their own countries, so the social wing is the best way to bring money into the territories.

Q. And what kinds of services does the social wing provide?

A. Services?

Q. Uh-huh.

A. Okay. The social wing of Hamas gives a lot of services to the Palestinian population, and I will just -- It is in all areas of civilian life, like education, like supporting special segments of the population, mosques, schools, kindergartens, it gives a lot of services among the Palestinians. It is not a majority of the services, but it gives a lot of services in the Palestinian territories.

Q. Did you assist in creating a demonstrative exhibit, a PowerPoint to help explain your testimony today?

A. Yes.

Q. Okay.

MS. SHAPIRO: Your Honor, I move to admit Demonstrative No. 30.

THE COURT: Previous objections?

MS. DUNCAN: Previous objections, Your Honor.

                    THE COURT:  That has been overruled.  Demonstrative

No. 30 is admitted.  .

                    MS. SHAPIRO:  Could we display, please, the first

slide of that demonstrative?

Q.    (BY MS. SHAPIRO)  What did you call this slide?

A.    I call the slide the life cycle of a typical Hamas

activist, typical, in general.  This slide demonstrates the

stages, all kinds of stages where the social wing of Hamas

supports the population; stages like kindergartens, like

schools, like summer camps, like healthcare services, building

mosques and supporting them, memorization of Quran, centers,

university that is very important.  In each stage of the

lifecycle of a typical Hamas activist, the social wing of

Hamas is around there giving the services.

        And then we go to some possibilities, like recruitment to

the military wing and supporting special segments of the

population which are very important to Hamas, like prisoners,

like families of martyrs, and you get to the end of the cycle.

Q.    When you say lifecycle are you referring to a sort of

cradle to grave type analysis?

A.    That is exactly what I meant, the idea here.

Q.    So do these stages represent different stages of life?

A.    Different stages of life, yes, from youngsters to -- from

little age and until universities and so on.

Q.    Let's start in the beginning with the youngsters in the

kindergartens. Have you -- Based on your research, do you know what goes on in a Hamas-run kindergarten?

A. Yes. I have seen examples of ceremonies that take place in kindergartens of the Hamas, of the social wing of Hamas. They run a lot of kindergartens, but I reviewed examples of the kind of ideology and the philosophy of Hamas that you can see from little age. This is the first time -- I would say little age is the first time that the child can absorb the ideas, in general the ideas of Hamas. And this is the crucial age for Hamas to influence little kids. And the different societies, the different social societies of Hamas runs a lot of kindergartens.

Q. Are there also -- After kindergarten are there also grade schools so the child can continue?

A. Yes.

Q. I am sorry. Your last answer was after kindergarten there are grade schools?

A. Schools and high schools, and university. I just wanted to demonstrate the whole education stages, the different education stages.

Q. And you said that you have seen videos of ceremonies in some of these schools. Is that right?

A. That is right.

Q. And are these videos the kinds of things that you would rely on in forming your opinion about the Hamas social wing

and its institutions?

A. Among other things, yes.

Q. And I want to draw your attention to what has been marked as Demonstrative No. 10. Before we look at it, can you -- Do you know what Demonstrative No. 10 is?

A. A video.

Q. And do you know where the video was from?

A. I have a paper written that it is a video.

Q. I can pull out the original, but is this -- If I can refresh your recollection, is this a video from al-Aqsa Television?

A. From al-Aqsa Television. Okay.

Q. And do you know -- You recall this video now?

A. Yes.

Q. Okay. And did you download it?

A. Recorded.

Q. Recorded. Sorry.

A. It was also downloaded from another source, yes.

Q. But it was originally on TV?

A. On TV, yes.

Q. And what TV station?

A. Al-Aqsa.

Q. And al-Aqsa is what kind of TV station?

A. It is the Hamas television.

Q. And can you record Hamas television from your home in Tel

Aviv?

A. Yes.

Q. And what year does this ceremony take place that is depicted on the video?

A. I think it was May 31, 2007.

Q. Okay. And will this video assist the jury in understanding the social wing of Hamas, even though it is in 2007?

A. Yes.

Q. Is it the ceremony typical of what you have seen even in earlier years?

A. I saw similar ceremonies in earlier years, yes.

Q. Okay.

MS. SHAPIRO: Your Honor, I move to admit and to publish Demonstrative No. 10.

THE COURT: Previous objection?

MS. DUNCAN: Yes, Your Honor.

THE COURT: That is overruled. Demonstrative No. 10 is admitted. .

Q. (BY MS. SHAPIRO) Did you tell us what specific institution or place this ceremony takes place?

A. The society is called the Mujama'a al-Islami which also in English it is the Islamic Center or the Islamic Complex.

Q. Okay. Can you spell al-Mujama'a so we have it for the court reporter?

A. A-L M-U-J-A-M-A-A.

Q. Is that Arabic for the Islamic Center?

A. Yes.

Q. Or complex?

A. Mujama'a, yes.

Q. All right. Can we play Demonstrative No. 10, please?

(Whereupon, Demonstrative No. 10 was played in open court.)

Q. (BY MS. SHAPIRO) You said that was the Islamic Center, I believe. Correct?

A. Yes.

Q. Okay.

MS. SHAPIRO: Could we bring up InfoCom Search No. 28, please, page 98?

Q. (BY MS. SHAPIRO) Do you see where this talks about the Islamic Complex?

A. Yes.

Q. Is this the same institution where we just saw this ceremony take place?

A. Yes.

Q. Okay.

MS. SHAPIRO: Your Honor, because it is difficult for the witness to read in English, would it be all right if I read from the document?

THE COURT: Yes.

MS. SHAPIRO: Thank you.

Q. (BY MS. SHAPIRO) Reading the first paragraph of this document, "The Islamic Complex was founded in 1973 by a group of Muslims led by mujaheed Sheikh Yassin, may God release him from his jail and reward him for his sincerity and guard him as a role model for Islamic activism. These people have vowed to serve Islam and Islamic activism and to provide care to the Muslim individual since the cradle."

If I can just stop there. When it says "care since the cradle," is that similar to the concept you have been describing about a lifecycle?

A. This is a part of the concept, yes. This is the first part of the concept.

Q. Okay. "As well as providing treatment to the ill and assistance to the poor and the needy as much as possible. The Islamic Complex also paid special attention to the Muslim women, and provided many venues for the mothers of Muslims to learn her religion and to improve herself through knitting and similar projects."

And do you see the first name listed here under members of the administrative financial board?

A. Yes.

Q. And who is that?

A. Ibrahim Farcs al-Yazouri is the chairman of the Islamic Society one of the founders of Hamas, a very known and senior

member of Hamas.

Q. We will talk about him later. Right?

A. Yes.

Q. Okay. If we turn the page, do you see where it says, No. 2, "Children kindergarten centers." Is that consistent with what you have seen that the Islamic Center has kindergartens? Is that right?

A. Yes.

Q. And if we could go to page 103. And for the Islamic Center it says future aspiration, No. 3, "To have children's kindergartens everywhere;" No. 4, "To have an elementary school affiliated with the Complex;" and No. 7, "Our biggest aspirations is the liberation of the land of Palestine and to establish an Islamic state on its land. It is not too much for God the Almighty."

The idea of kindergartens in terms of the importance to Hamas, I mean, what does it mean to you when you look at these institutions and their educational services?

A. Ahmed Yassin, who actually founded the Islamic Complex many years since the beginning of the Islamic Complex emphasized the issue of education and education from small age. Because this is the age where the children start to absorb the ideas that are important to Hamas that those kids, those children will receive. And this is the Hamas philosophy, this is the Hamas ideology, this is the creation

of a new Muslim in the eyes of the Muslim Brotherhood. And the first step that you can do it is through the kindergartens, and that is why the Islamic Complex the Mujama'a Islami created a network of educational institutions, including kindergarten schools, and they tried to collect enough money to create some big projects of educational center called Dar al-Arqam.

Q. Let me direct your attention -- Do you have a binder in front of you of exhibits that we are going to use today?

A. Yes.

Q. I direct your attention to what is marked as German Document No. 2. And without reading from it or telling me the contents of it, can you describe generally what this is?

A. This is a letter.

Q. Who is the letter from?

A. A letter from -- There is a seal of Sheikh Ahmed Yassin.

Q. And who is the letter to?

A. The letter is for the brothers in al-Aqsa in Germany.

Q. And are you familiar with the al-Aqsa Foundation in Germany?

A. Yes.

Q. And is that something that we are going to be talking about a little bit later?

A. Yes.

Q. And in your opinion, based on your research and what we

will talk about, is al-Aqsa a Hamas institution?

A. Yes.

MS. SHAPIRO: Your Honor, I move the admission of German Document No. 2 at this time.

THE COURT: Previous objections?

MS. DUNCAN: Previous objections, Your Honor.

THE COURT: That is overruled and German Document No. 2 is admitted. .

Q. (BY MS. SHAPIRO) You mentioned a seal.

MS. SHAPIRO: Could we enlarge the seal at the bottom, please?

Q. (BY MS. SHAPIRO) Is that the seal you are referring to?

A. Yes.

Q. Okay. And whose name is on that seal?

A. Sheikh Ahmed Yassin.

Q. Ahmed Yassin was a paraplegic. Is that right?

A. That is right.

Q. So was he able to sign his name?

A. No.

Q. So was this seal essentially his signature?

A. This is his signature since he couldn't sign his own.

Q. Okay.

MS. SHAPIRO: Let's look at page 2 of that document, please. If we can blow up the second paragraph.

Q. (BY MS. SHAPIRO) I am going to read this second

paragraph on page 2. It says, "Honorable brothers. The mujaheed Sheikh Ahmed Ismail Yassin has considered establishing an exemplary school to be an extension to his pioneering role in education and building, a school that offers an integrated curriculum that combines religious and worldly studies, especially that the beloved homeland is still suffering from my of the effects of the detestable occupation, particularly in the educational arena, which came close to destruction during the occupation period. Consequently, the mujaheed Sheikh Ahmed Yassin started to rebuild the Palestinian human being who believes in his God, who belongs to his homeland, and who rejects the plans and conspiracies of the enemies through this large educational project, the project of building the school of the exemplary Dar al-Arqam. There is no way to correct the Society's course except by correcting the educational course through the restoration of correct values and notions so they can direct the philosophy of education. And education at this school will be free for children of martyrs and children of detainees, orphans, the poor, and the needy, God almighty is willing."

Do you see in there a discussion of remaking the Palestinian human being? Is that consistent with the philosophy that you have seen of Hamas toward education?

A. Yes, the same philosophy of the Muslim Brotherhood, and this is an example for this.

Q. Okay. If we go back to the lifecycle for a moment, this lifecycle also has a stage for summer camps. Is that -- In your research, is that another important step along this path that the Hamas social wing supports?

A. Yes. The social wing and the social institution usually conduct summer camps after school in the summer vacation; the summer camps for girls, and boys, children of course.

Q. Okay.

MS. SHAPIRO: Can we pull up al-Isla No. 1, please?

Q. (BY MS. SHAPIRO) Do you recognize this document?

A. Yes.

MS. SHAPIRO: If you can go to the English and blow up the numbered paragraphs in the middle.

Q. (BY MS. SHAPIRO) Do you see the goals for the summer camp? Do you see No. 10, "Planting the spirit of jihad for the sake of God in their souls and the sacrifice for this homeland"? Have you seen summer camps consistent with the idea of planting the see seed of jihad?

A. Yes.

Q. Are we going to see some of that a little later?

A. Yes.

Q. Do committees, zakat committees, do they sponsor summer camps based on your research?

A. Yes.

Q. Did they also sponsor schools?

A. Yes.
Q. Does Hamas have --
MS. SHAPIRO: If we can go back to the lifecycle again.
Q. (BY MS. SHAPIRO) You said you talked about the universities. Does Hamas have a presence in universities?
A. Yes. Hamas has a big presence in universities like the Islamic University Birziet with a party called the Kutle el-Islamia.
Q. Can you spell that, please?
A. Kutle, K-U-T-L-E, Kutle al-Islamiya, which is a student party of Hamas and combined what is called the Islamic block in the university, it is part of the -- Actually it is -- the majority of the Islamic block is known as the same in the university. They ran students for the election in the universities. They have a big presence in the universities. Social institutes support students of the Kutle al-Islamiya.
Q. And you have written on the slide it says "a pool for recruiting military activists." Have you seen in your research where military activists to Hamas are recruited from the Kutle Islamiya in the university?
A. Yes.
Q. And continuing along the circle, if there is a recruitment to the military wing, does the Hamas social wing also, then, provide if that person is arrested, provide for

the prisoner and the prisoner's family?

A. Yes. That is the next stage if a person is arrested or on trial, so his family will be supported by a social institute.

Q. And what objective does that satisfy? How does that serve Hamas' goals?

A. First of all, this issue of supporting families of prisoners and also martyrs was mentioned by the Hamas leadership, by Khalid Mishal and by other leaders many times.

Q. Khalid Mishal, if you can tell us who he is again. We have heard his name before, but just in case?

A. He is the leader of the bureau of Hamas. Today he is considered to be the leader of Hamas. He mentioned this. Not only Khalid Mishal, but many leaders of Hamas emphasize this segment. It is very important, very important for the Hamas organization to support, first of all, to show the fact that they didn't just leave them away without any support.

Q. Them meaning the prisoners?

A. The prisoners, the families, and the prisoners, of course. It is very important for them morally that a person who goes to a mission by Hamas and if he is seized or arrested that he will be supported. Hamas would not leave him alone, and would support him.

Second, it is important for Hamas for glorifying this to show the importance of this segment for the organization. It

serves several goals of Hamas in that point, in that specific point.

Q. Does support for the families, does that serve any other objective of Hamas with respect to future recruits?

A. This is a message, to deliver a message. The Hamas understands that if it doesn't support these special segments, it means that in the future it will have difficulties to recruit new members. It is very logical. If those families will not be supported, how are they going to recruit another member. Because the families are important factor here. The Hamas understands it is very good.

And even in times that the Hamas was in the financial crisis, like the starting of the '90s, the first money that they sent to collect went to the families. This was the primary goal for the Hamas leadership to raise money for the families, for the families of the martyrs and the prisoners.

MS. SHAPIRO: Let's look at ICS Hebron No. 5, please.

Q. (BY MS. SHAPIRO) Okay. Are you familiar with this document? Do you have it in your binder, ICS Hebron No. 5?

A. I can't find it, but I am familiar with this document.

Q. Where does it come from?

A. This comes from the Young Muslim Society which is one of the societies that is controlled by the Islamic Charitable Society in Hebron. It is a letter written by prisoners to the

Society asking them to keep supporting them because the support is very important.

Q. Let's look at the translation.

A. I just don't have the translation here.

Q. The next page is the translation. Let's just read a little bit of it. It says, "Honorable brothers at the Young Men Muslim Society, peace be upon you, God's mercy and blessings.

"We extend to you our sincere greetings and thanks for your sincere efforts in serving the dawa and consistently highlighting the bright visage of the city of martyrs. We also submit to you our heart felt greetings for your stand by us, the prisoners in the prisons of the grudging occupation and your stand by our families and care for our children."

And can you see who signed this letter and the date?

A. The date is December 12th, 1999 signed by the prisoners of Hamas Nafha prison in Israel. Hamas operatives were arrested and were tried.

Q. Okay. And is this document an example of support for prisoners for Hamas prisoners?

A. Yes.

Q. That you have spoken about?

A. Yes.

Q. Based on your research, are you familiar with any particular individuals who have traveled the entire course of

this lifecycle that we talked about on your PowerPoint slide? And we will talk about them later. I am just wondering if you have encountered those kinds of people.

A. I reviewed several Hamas operatives. I mean, a member of the Izz el-Din al-Qassams, the military arm of Hamas, and even suicide bombers who went through this cycle.

Q. We will talk about them a little later in more detail.

MR. DRATEL: We want to renew our objections on those previous grounds, Your Honor.

THE COURT: Okay. Overruled.

Q. (BY MS. SHAPIRO) We have talked about the kinds of activities that the Hamas social wing engages in. Does this social infrastructure that we have talked about, the schools, the support for prisoners, the summer camp, does it require money to operate?

A. It requires a lot of money. I would say that it requires more than the military activity or the terrorist activity itself. The supporting and building schools and building institutes, it costs a lot of money, and the price of one terrorist attack is very cheap. The material or the explosives are very, very low price, and this is --

Q. When you say the social wing requires the majority of the money --

A. I would say so, yes.

Q. And where does the social wing of Hamas get its money

from?

A. The social wing of Hamas in the territories receives its money from a global network of Hamas foundations located all over the world.

Q. Why does Hamas need to go out into the world to collect its money? Why can't it just get money from inside the West Bank and Gaza?

A. Well, Hamas, and it was part of what I call a plan, and it goes to something that is called the Palestine Committee.

Q. We will get into that in a minute.

A. For Hamas the plan was actually to raise money from places that it will be more convenient where there are Muslim communities that they can send money to the territories without being targeted, without being -- It was very convenient in Western countries, in democratic countries, and was created in the times when Hamas was not banned yet. That is why they used many, many places where they are supportive in Muslim communities.

Q. Okay. Now, you mentioned the Palestine Committee so let's talk about the Palestine Committee you familiar with the idea of a Palestine Committee?

A. Yes.

Q. Okay. And what is it?

A. This is a basic idea that actually started to being raised in the '80s as a plan that the Muslim Brotherhood will

create and with regard to -- Even before Hamas was founded and
when the Muslim Brotherhood talked about the struggle in
Palestine, the idea was to establish and to found several
committees that will operate in different places all over the
world.  And when I say operate, it is including raising money,
it is including information centers, even propaganda, issuing
newspapers.  This is the Palestine Committee.  So it is
combined with several departments and also raising money.

Q.   Have you seen documents in this case that refer to the
Palestine Committee?

A.   Yes.

          MS. SHAPIRO:  Can we put up Elbarasse Search No. 5,
please?  Can we go to the first page of the translation?

Q.   (BY MS. SHAPIRO)  This is a document called the Islamic
Action for Palestine internal memo October 1992.

          MS. SHAPIRO:  If we can look at page 11, please, the
bottom half of the page.

Q.   (BY MS. SHAPIRO)  It is going to read -- where it says
Palestine Committee the countries, do you see where that is?

A.   Yes, Section D.

Q.   Paragraph D.  "With the growth of the blessed Intifada
and the spread of the spirit of jihad amidst the children of
Palestine and the nation, it became incumbent upon the
remainder of the Ikhwan branches to play a role in attributing
this Intifada and the Islamic Action for Palestine.

Therefore, a resolution was issued by the guidance office and the shura council of the international movement to form 'Palestine Committee the Arab, the Islamic, and the Western nations, whose job it is to make the Palestine cause victorious and what to support it with what it needs of media, money, men, and all of that."

And then No. 3, The Islamic Resistance Movement. "With the increase of the Intifada and the advance of the Islamic action inside and outside Palestine, the Islamic Resistance Movement, Hamas, provided through its activities in resisting the Zionist occupation a lot of sacrifices from martyrs, detainees, wounded, injured, fugitives, and deportees, and it was able to prove that it is an original and an effective movement in leading the Palestinian people. This movement, which was bred in the bosom on the mother movement, the Muslim Brotherhood, restored hope and life to the Muslim nation and the notion that the flare of jihad has not died out and that the banner of Islamic Jihad is still raised."

Is this document that talks about the Palestine Committee, is that consistent with your understanding historically of what happened around the world?

A. Yes.

MR. DRATEL: Object to the form of the question, Your Honor.

THE COURT: Do you want to rephrase?

MS. SHAPIRO: Sure.

Q. (BY MS. SHAPIRO) Is this consistent with what you have learned about your growth of the Palestine committees?

A. Yes. And just one or two -- It started before the Hamas -- The idea was started before Hamas was founded, but with increase of -- When the Hamas was founded, an increase of the struggle, when the struggle became very -- In the beginning from the '90s the need was more and more crucial for Hamas, for the Palestine committees so actually they started to form in the beginning of the '90s. So the idea was there before.

MS. SHAPIRO: Can we look at Elbarasse Search No. 15, please? And if we can go to page 2, the translation.

Q. (BY MS. SHAPIRO) This is a document dated -- Do you have it in your binder? Do you see it?

A. Yes.

Q. Okay. Dated February 22nd, 1991 called resolutions relating to the Occupied Land Fund. And I am reading No. 3. "The relationship" -- I will start earlier. "The following issues have been agreed on during your presence and the brothers, members of the board of directors, in the city of Los Angeles on February 17th, 1991.

"No. 3, the relationship between the Fund and the bodies similar to it outside of America will be settled at a later time."

Is this document also consistent with your research with respect to the creation of various Palestine committees around the world?

A. Yes. Various Palestine committees is the global network that I am talking about. This is the same. The world financial network is the Palestine Committee. This is the idea.

Q. Okay.

MS. SHAPIRO: Could we go back to the Demonstrative No. 30, the second slide, please?

Q. (BY MS. SHAPIRO) Okay. I want to talk for a moment about how the money gets from this global network that you have talked about and how it gets inside Palestine. Let's talk about what the slide is. What have you called it?

A. This is the Hamas charity wing in the early '90s, and the focus here on the global network, how it operated in the early '90s.

Q. Okay. So what is depicted, the organizations in red that are in Europe and the United States, what are those -- what do they represent?

A. Interpal in England, CBSP in France, al-Aqsa in Europe, and the Other Gulf Funds, they were all Hamas foundations that supported the Hamas in the territory.

Q. Okay. Let me back up one step. Do all of these organizations out here, did they form from Palestine

committees?

A. Yes.

Q. And in the United States we have HLF, Holy Land Foundation. Right? And in Europe you read Interpal. What is in the parentheses underneath it?

A. Palestine Lebanon Relief Foundation.

Q. That is the PLRF?

A. This is the PLRF.

Q. And what it that?

A. It is former name of Interpal before it changed its name in 1994.

Q. And CBSP, that is a similar committee, and where is that based?

A. Yes.

Q. Where? I am sorry.

A. In France.

Q. In France. And al-Aqsa?

A. Al-Aqsa, it is similar Palestine Committee that had branches in several countries in Europe including Germany, Belgium, Netherlands.

Q. Now, do you remember we looked at German Document No. 2 a few moments ago?

A. Yes.

Q. That document you mentioned was written to al-Aqsa. Is this the same al-Aqsa that we see on your map?

A. It is the same al-Aqsa written on the map.
Q. And there are arrows going from these organizations into a green box that says Islamic Relief Committee. What is the Islamic Relief Committee?
A. The Islamic Relief Committee is one of the Islamic Movement We talked about the Islamic Movement in Israel in the beginning. This is the case that was started by Raed Salah. The Islamic Relief Committee was one of the early committees that operated in the Islamic Movement in Israel, and its main goal was to receive money from the Palestine committees in Europe and the places you see on the map, and to deliver it or transfer it to the Hamas social network in the territories. The Islamic Relief Committee is, as I said, is one of the committees of the -- is an institution that belonged to the Islamic Movement And the picture is Raed Salah which is the leader of the Islamic Movement in Israel.
Q. Did the Islamic Relief Committee support Hamas institutions?
A. Yes.
Q. Okay. So when the money for these red lines comes into the Islamic Relief Committee then there is a green line going out, where is that going?
A. The red lines demonstrate the flow of money. That was the idea of this demonstration. Now, the green arrow goes to the territories to the little map. This is the flow of money

from the Islamic Relief Committee inside the territories to

Hamas social institutions called Hamas zakat or Hamas

societies, that conducted several activities, like we saw in

the chart, for example, in the demonstrative chart of the

lifecycle.

Q.    And the smaller map, the insert map, does that depict the

West Bank and then the smaller area on the left is that Gaza

Strip?

A.    Yes, the West Bank and the Gaza Strip.

Q.    Okay.  And then you have these pink boxes on the left.

What do those depict?

A.    It reflects the idea of the social institution of Hamas.

Control or part of the leaders are Hamas activists that

operate and conduct the Dawa or the civilian activity of Hamas

in the West Bank and Gaza Strip.  And that kind of activity is

like supporting -- it was very prominent at that time to see

the support of families of prisoners, families of martyrs, and

deportees, and other Hamas activities like we saw in the

demonstrative slide, including education projects, but most of

the money went to the special segment.

Q.    Okay.  And you have these arrows going into the Islamic

Relief Committee.  Could you have also drawn arrows that went

straight from these international organizations into the West

Bank and Gaza?

A.    Yes.  Yes.  The Islamic Relief Committee was kind of a

pipeline, an intermediate. It doesn't necessarily say that all the money went to the Islamic Relief Committee. It was a convenient intermediate because it was located in an area which was very close to the West Bank, and the money -- And it was more convenient to the Hamas foundation to deliver the money to an institute that operated at that time in Israel.

Q. And that is in Nazareth?

A. Nazareth in the north, yes.

MS. SHAPIRO: Can we pull up InfoCom Search No. 28, please, page 91?

Q. (BY MS. SHAPIRO) Is this the same committee, the same organization? It says Islamic Relief Agency Nazareth. Is the Islamic Relief Committee sometimes called the Islamic Relief Agency?

A. Yes.

Q. And do you know -- It has the name of a person on the top here for the phone number. Says Dr. Soliman Ghabariyah. How do you say that?

A. Ghabariyah.

Q. And who is that?

A. He was the chairman of the Islamic Relief Committee and he was also the deputy or the vice chairman of Raed Salah and the Islamic movement. Raed Salah that we saw in the previous slide in the small picture, he is the deputy and the chairman of the Islamic Relief Committee.

Q. Okay. When it talks about scope of work under No. 2 it says, "Supporting orphans and needy families, sciences, and technology committee Jerusalem, Young Men Muslim Association Hebron," are those two organizations that we have seen and will be talking about?

A. Yes.

Q. All right.

THE COURT: Let's take an afternoon break. Let's take a 20-minute break.

(Whereupon, the jury left the courtroom.)

THE COURT: We will be in recess. Be back at 20 till.

(Brief recess.)

THE COURT: Ms. Shapiro?

MS. SHAPIRO: Thank you.

Q. (BY MS. SHAPIRO) Before the break we were talking about the Islamic Relief Committee. Do you remember that?

A. Yes.

Q. Okay.

MS. SHAPIRO: If I can just have the map back for a moment, the PowerPoint slide.

Q. (BY MS. SHAPIRO) The Islamic Relief Committee in the box, you said that the Islamic Relief Committee sends money inside the territories. Correct? And it says here Hamas zakat committees Gaza and West Bank. Right? Now, does the

Islamic Relief Committee only support Hamas or did it support other people amongst the Palestinian population?

A. I checked 36 [sic] institutions in the West Bank and the Gaza Strip, and my conclusion was that 23 out of 26 were Hamas.

Q. Okay. I am sorry. I don't think you understood my question. Let me ask it a different way. My question was that the money that comes in through the Islamic Relief Committee is to support I think you said martyrs, prisoners, a special segment of the population. Is that right?

A. That is right.

MR. WESTFALL: Object to leading, Your Honor.

THE COURT: Do you want to rephrase?

Q. (BY MS. SHAPIRO) Is it the Islamic Relief Committee -- Who does it send its money to inside the territories?

A. Inside the territories?

Q. Right.

A. Yes, it can.

Q. But who? Who are the recipients of the money? Who is receiving it?

A. Charity institutions.

Q. Okay. Do the charity institutions provide only for Hamas members or also for other people?

MR. WESTFALL: Object to leading, Your Honor.

THE COURT: Overruled. You may answer that.

THE WITNESS: Not only for Hamas members. They also support non-Hamas members.

Q. (BY MS. SHAPIRO) Can you speak up just a little bit because I am having trouble hearing you. Thanks.

And why is that? Why would they support -- If they are a Hamas institution, why would they support more than Hamas members?

A. This is the basic idea of gaining the people's support. If you want to support -- If you want to gain the support of the people, if you focus on only one segment of the population you are not growing yourself. You are staying very small, very -- If you want to increase the support among the people, you give to a lot more -- to more population. This is the idea gaining the support and winning the hearts and minds, not focusing only on a small group, otherwise you will have the support of only a small group.

Q. Okay.

MS. SHAPIRO: Can we play HLF Search No. 75, just clip G, please?

(Whereupon, HLF Search No. 75, clip G was played in open court, while questions were propounded.)

Q. (BY MS. SHAPIRO) Who is in the picture?

A. This is Jamal Mansour.

Q. You saw reference to the Islamic Relief Committee?

A. Yes.

Q. Is this the same organization we are talking about?

A. Yes.

Q. Continue.

And could we -- You said that the Islamic Relief Committee was located in Nazareth.

A. Yes.

Q. Could you point out -- I am just going to show you a map to orient where it is. This is map No. 5.

MS. SHAPIRO: May I approach, Your Honor?

THE COURT: Yes.

Q. (BY MS. SHAPIRO) Where is Nazareth?

A. Here.

Q. In the north?

A. Yes.

MS. SHAPIRO: Could you pull up, please, Payments to Islamic RA?

Q. (BY MS. SHAPIRO) This is an exhibit that was prepared for this trial called Payments to Islamic Relief Agency. Is that the same organization that we are talking about now?

A. Yes.

Q. Okay. And you can see payments start April 1991. Could you go to the end of this document, please? The last payment is February 15th, 1996.

Is the Islamic Relief Committee still operating.

A. No.
Q. What happened to it?
A. It was shut down by the Israeli authority.
Q. In what year?
A. In 1996.
Q. Okay. Now, you testified earlier that based on your research these organizations that were in Europe and the United States, that international network, was sending money to charity committees inside the West Bank and Gaza. Have you seen -- From your work on the Islamic Movement case, have you seen evidence of money coming in from all those organizations?
A. Yes.
Q. Into the Islamic Relief Committee?
A. The Islamic -- Through the Islamic Relief Committee.
Q. Okay. All right. Now, I want to focus your attention now on some of the organizations that received the money, the zakat committees and the charitable societies, moving inside the West Bank and Gaza.

Are there specific committees in the West Bank and Gaza that are controlled by or operate on behalf of Hamas?
A. Yes.
Q. Okay. And are those the committees that the Islamic Relief Committee is sending money to?
A. Among others.
Q. And you said money went directly to those committees. Is

that right?
A. That is right.
Q. Does Hamas acknowledge that it runs charity committees? Generally does it acknowledge it has a social wing?
A. Yes, generally it does acknowledge that it has a social wing.
Q. And does it identify by name which institutions are Hamas institutions?
A. I want to divide my answer to two parts. About the societies in the Gaza Strip, it is -- There are more publications that identify the societies in the Gaza Strip as Hamas. The reason is because it was founded by Sheikh Ahmed Yassin. I am talking about the Islamic Society the Islamic Center they were founded by Ahmed Yassin and the Muslim Brotherhood. And after they were founded, they continued to be Hamas, so that is why we have more publications that identify them as Hamas.

The West Bank this is a different story. And the Hamas don't -- They don't acknowledge the names of the charities, even although they say they have a charity network, they don't reveal the names, the Hamas leaders or the Hamas itself, the organization, don't give the names, the specific names.
Q. And why don't they?
A. The main reason is because Hamas is afraid that the money flow will stop. It is afraid that in places where the Hamas

is banned it will cut its flow of money, and this is the main issue. For example, I heard Mahmoud Rumhi saying the same thing, Jamil Hamami in 1994, he said in an interview that this is a security issue we don't want to -- I am saying now. They don't want to reveal the names because they don't want to be targeted by Israel or by other countries.

Q. And you mentioned a lot in that response. Mahmoud Rumhi is that someone we will talk about later?

A. Yes.

Q. Who is he, just generally?

A. Mahmoud Rumhi was a member of the Ramallah charity committee, the Ramallah zakat committee, and also a senior Hamas member in the West Bank.

Q. Okay. And you mentioned Jamil Hamami.

A. One of the founders of Hamas in the West Bank.

Q. Okay. Now, if Hamas doesn't acknowledge to the world which committees are Hamas committees, what about in the local communities where they are providing services?

A. In the local communities, of course, it is important for the Hamas to acknowledge to their population that it operates social wings, and if outside they don't want to reveal the name or to expose the names of the committees. Inside the population are aware of this social, of this network, the leaders that runs those societies and activities, and other parameters that they use, I use as a professional, they all

 assist -- They are helping the Hamas to acknowledge the population who really runs the committees.  There are other indications that I can --

Q.   Is it fair generally to say that the local communities --

MR. DRATEL:  Objection; leading.

THE COURT:  Sustained.  Rephrase.

Q.   (BY MS. SHAPIRO)  Do the local communities understand which committees are Hamas, the population, the local population?

A.   Yes.

Q.   And to the world at large, does Hamas acknowledge that same information?

A.   No.

Q.   Okay.  Let me just ask you one other question.  Does Hamas run every committee in the West Bank and Gaza?

A.   No.

Q.   Okay.  So if one wanted to provide charity to needy Palestinian the West Bank and Gaza, could it do that?  Can people do that without giving to a Hamas institution?

A.   Yes.

Q.   Okay.

MS. SHAPIRO:  Can we play Elbarasse No. 33, please?

(Whereupon, Elbarasse Search No. 33 was played, while questions were propounded.)

Q.   (MS. SHAPIRO)  Do you recognize one of the people in the

picture here?
A. On the left is Khalid Mishal.
Q. Okay. And who did you say he was?
A. He is the leader of the Political Bureau of Hamas, leader of Hamas.
Q. Okay. Go ahead.
There was Abu Walid. What is Abu Walid?
A. This is the nickname of Khalid Mishal.
Q. Is what Khalid Mishal is saying here consistent with what we have been talking about in terms of providing for the martyrs and the detainees?
A. Very important for Hamas. Yes, it is consistent. The special segment is mentioned in this interview. And I think I reviewed this video and it mentions several times, at least another time, that he specifically is saying the martyrs is important for the Hamas organization.
Q. Let's continue.
Okay. So here Khalid Mishal is saying "American ears are listening, and we don't get money that way. Give it to someone you trust?" Do you see that? What does that mean in your analysis?
A. Consistent with what I say, the names, the I.D. is here, the idea of supporting families and all the segments and all the charity work and doing jihad with money I think he mentioned here in this interview, but it is not revealing the

specific names where a person who wants to donate or support. He doesn't give a single, of course, a single detail about where this man can give his money. Why? Because of security reasons. The American ears are listening.

Q. Okay. Now, I want to talk a little bit about the societies and the zakat committees in the West Bank and Gaza, the specific committees. Are there different kinds of charitable committees in the West Bank and Gaza?

A. Yes.

Q. Okay. And can you group them into two categories?

A. I can group them into two categories. The first category would be societies, these are societies that were established by the Muslim Brotherhood and controlled by the Muslim Brotherhood, like the Jamaiya Islamiya, which the Islamic Society in Gaza.

The other part, the other kind of charities are zakat committees, zakat committees that were under the supervision of the waqh. The waqh is the --

Q. I was going to interject a question so we don't pack too much information into an answer. You talked about societies and zakat committees. Right?

A. Right.

Q. You told us the societies are Muslim Brotherhood. And what about the zakat committees?

A. The zakat committee were formed during the '70s and the

'80s as a part of the Jordanian waqh the Jordanian --

Q. Define what that is for us. Could you spell it first, please?

A. W-A-Q-F.

Q. And what is the waqh?

A. The waqh is actually the ministry that deals with the religious affairs and endowments of the population. One of the offices that lasted from the Jordanian regime until '96 to '97.

Q. And the word zakat, do you know what that means?

A. Yes, zakat in free translation it is charity, charitable. But it has a meaning as one of the pillars of Islam a religious obligation of giving, a specific part of your money to charity. It is a very important part of Islam.

Q. Let's talk first about the societies and then we will get to the zakat committees in a bit.

The societies, you said that many were started by the Muslim Brotherhood?

A. Yes, many started.

Q. Were all of them Muslim Brotherhood?

A. No.

Q. Okay. And what it was goal of the Muslim Brotherhood?

A. The Muslim Brotherhood we are talking -- We are going a little bit back into history.

Q. A little historical background?

A. It is a little bit of historical background that started actually in Egypt in the '20s.

MS. HOLLANDER: Your Honor, I am going to object. I don't believe this witness is an expert on the Muslim Brotherhood.

THE COURT: Overruled. Go ahead.

THE WITNESS: And the idea was to fix or to create a new society, a new Muslim, to bring the Muslim back to their religion, and the goal was to create one state that is ruled by the sharia, by the Islamic law. That is the idea. And you do it by giving -- building a new society that is based on -- it is a charity, it is services. This was the idea, very generally.

Q. Is it sort of a long-term vision?

A. It is a very long -- Yes, it is a very long vision. The first Muslim Brotherhood --

Q. Go ahead.

A. The first activity of the Muslim Brotherhood in the Gaza and Judea and Samaria was in the '40s, since 1940 and so on. And then after the Six Day War in the Gaza Strip and the West Bank there was a presence, increasing presence of the Muslim Brotherhood under the influence of the Muslim Brotherhood in Egypt.

Q. Okay. Let's slow down a little bit. Now, you talked about creating a new society. Did part of creating a new

society, were services provided as part of that return of Muslims to their religion?

A. Yes.

Q. Okay. And were those the kinds of services that we saw on your lifecycle slide?

A. Yes.

Q. And you started to mention that the Muslim Brotherhood was active in the Palestinian territories. Is that right?

A. That is right.

Q. Okay. And before the Six Day War which you mentioned, was the Gaza Strip part of Egypt?

A. Yes.

Q. And the Muslim Brotherhood was born in what country?

A. Egypt, the region.

Q. And who was the head of the Muslim Brotherhood in the Gaza Strip?

A. Since the '70s Ahmed Sheikh Ahmed Yassin was the leader of the Muslim Brotherhood in the Gaza trip.

Q. And did Sheikh Ahmed Yassin and the Muslim Brotherhood create institutions in the Gaza Strip for the purpose of providing these services that you have discussed?

A. Yes.

Q. And about what time frame are we talking about when the Muslim Brotherhood and Sheikh Yassin created these institutions?

A. Since the beginning or the mid '70s, the Islamic Center since '1973, and this is the kind of -- This is the period of time where it started to operate.
Q. And was the Muslim Brotherhood legal in the Gaza Strip? Could it operate openly?
A. They operated at the time openly, yes.
Q. And which government controlled the Gaza Strip during this time period the '70s and '80s?
A. The Israeli government.
Q. And did Israel have a civil administration of some kind that ran the civil affairs of the Gaza Strip?
A. Yes.
Q. And did the Muslim Brotherhood during that time need the permission of the Israeli government to operate its institutions?
A. In Gaza, yes.
Q. And did Israel give them permission?
A. Yes.
Q. Why would Israel give these societies these Muslim Brotherhood societies, permission to operate?
A. At that time they didn't perceive it a real threat, and Israel at that time was dealing, I would say, with the left wing faction that operated in Gaza and in territories like the Fatah, like other left wing that committed terrorist attacks. And in that time the Muslim Brotherhood were concentrated and

focusing on the social work inside and they didn't perceive at that time that it is a growing threat, so that is why they gave permission to the Muslim Brotherhood institution to operate freely.

Q. You mentioned that there were actually other violent attacks going on during that time period?

A. Yes.

Q. Is that right? And that was -- you mentioned Fatah. Was that the Palestine Liberation Organization?

A. This is the main organization of the PLO, yes.

Q. Okay. And what kinds of activities was it conducting during that time period of the '70s and '80s?

A. Explosive, bombs, plane kidnapping, the Olympics in 1972 in Munich one of the operations of the PLO.

Q. What happened at the Olympics in Munich?

MR. DRATEL: Object to relevance, Your Honor, as well as 403.

THE COURT: Overruled. Go ahead.

Q. (BY MS. SHAPIRO) Go ahead.

A. Was attacked when the Israeli sport mission to the Olympics in Munich in 1972, and 11 sport --

Q. When you say sport?

A. Athletes, 11 athletes were killed in that attack.

Q. Okay. And compared to those kinds of attacks that were going on during that period, what were the Muslim Brotherhood

or the Islamist organizations engaged in?

A. They were engaged mainly on social services, maybe -- They were not engaging in terrorist acts at that time.

Q. And in fact did the Israeli government even give support to those organizations?

A. In a way it gave support in the beginning, yes. I think so. It gave support. It gave permission. It let it operate because it was a counterweight to the Fatah. That was the thinking then. Israel didn't perceive, as I said, the Muslim Brotherhood as an immediate threat. And comparing to the Fatah, for the Israeli government it was a way to give the support of the Muslim Brotherhood a counterweight to the Fatah terrorist attack.

Q. And did there come a time when the Muslim Brotherhood figures began to engage in violent activities?

A. Yes.

Q. And when was that, about?

A. In the '80s.

Q. About what year?

A. About around -- There were early cells that operated in the '80s, but in 1985 Ahmed Yassin was arrested with others, other Muslim Brotherhood members.

Q. Why was Ahmed Yassin arrested?

A. There were charges of planning attacks and holding

possession of weapons. That was the main charge.

Q. Okay. Now, around 1985 at this time what major social welfare associations did the Muslim Brotherhood have up and running then?

A. In 1985?

Q. Yes.

A. Three organizations, three central organizations called the Islamic Society in Gaza, the Islamic Center, the Mujama'a Islami in Gaza, and the al-Salah Society.

Q. And what happened to those institutions when Hamas formally came into existence in 1987?

A. As the Hamas was founded, the Muslim Brotherhood institution became -- with the formation of Hamas it naturally became Hamas.

Q. And Sheikh Ahmed Yassin, he was Muslim Brotherhood. Did he also become Hamas?

A. He was the Hamas founder and he also was the founder of the Mujama'a Islami. So what happened to this society is that they were part of Hamas. Actually the Hamas was created based on the society.

Q. And when you say Mujama'a that is the Arabic word for the Islamic Center?

A. Yes.

Q. And that is where the ceremony in Demonstrative No. 10 took place in 2007?

A. Yes.

Q. Now, that is the Gaza Strip. Now, moving to the West Bank, were there Muslim Brotherhood institutions in the West Bank?

A. There were Muslim Brotherhood institutions in the West Bank. There were less institutions or there were few institutions including the Islamic Charitable Society in Hebron, there was al-Tadamoun the society in Nablus.

Q. About when were those organizations established, those Muslim Brotherhood organizations? About what time were they established? What year, approximately?

A. Al-Tadamoun was established in 1956, though it doesn't say it was admittedly a Muslim Brotherhood organization. I am just saying it became a Muslim Brotherhood before the Hamas was founded. I am talking about al-Tadamoun. The Islamic Charitable Society was founded as the Muslim Brotherhood.

Q. And do you know about what year?

A. If I recall correct, it was 1984, I think.

Q. And when the Muslim Brotherhood organizations in the West Bank, when Hamas was formally established in 1987, what happened to those organizations?

A. They became Hamas also.

Q. Okay. Now, turning away from the societies for a moment and talking about the zakat committees, did they develop in a different way?

A.   They developed in a different way.  As I said before,

they were not part of Hamas at the time of the formation.

Most of the -- I say most of the central committees that

operated in the big cities of the West Bank were established

in the '70s and in the '80s.  Now, in the first place they

were operating under the Jordanian waqh, the Jordanian

religious ministry.

Q.   Okay.  Are you familiar with the committees at issue in

this case?

A.   Yes.

Q.   And what time frame were those committees established?

A.   In the '70s and the '80s.  For example, Jenin is 1984,

and Tulkarem is 1981.  That period --

Q.   About that time, '70s and '80s?

A.   '70s and '80s.

Q.   But before Hamas became a formal organization.  Is that

fair?

A.   Before, yes.

Q.   Okay.  And you said that they were under the Jordanian

waqh.  So let me just understand, because again which

government is in control of the West Bank during this time?

A.   Israeli government.

Q.   So why would the zakat committees be operating under a

Jordanian body?

A.   The policy of Israel was not to interfere or not to

let -- In the religious issues not to interfere with the waqh, the Jordanian waqh. That was the policy at that time. And again, the perception was that it is no threat or no immediate threat under this circumstance.

Q. So did the Jordanians essentially have control of these committees, even though Israel had control of the West Bank? Is that right?

A. I would say that the Jordanian had control, and according to the Jordanian law from 1966, if I remember, so they were operating under the Jordanian law. The workers were Palestinian.

Q. Were they registered with the waqh?

A. They were registered with the waqh.

Q. And so they would have certificates of that nature?

A. They would have certificates, yes.

Q. Now, when Hamas came into existence formally in 1987, what happened to the zakat committees? And I am talking about the collection of zakat committees that are at issue in this case.

A. They were not automatically became Hamas. Hamas take them over after it was founded. Hamas realized after it was formed, Hamas realized very soon that they are missing, I would say, those kind of organizations that they have in the Gaza Strip, the big organizations, the Islamic Society and that is why the Hamas started to invest efforts to take over

those zakat committee. And since 1988 in the gradual process the Hamas succeeded to take the central zakat committees in the West Bank.

Q. Okay. Let me just show you a document from 1991.

MS. SHAPIRO: If we can put up Elbarasse Search No. 22. Can you go to the English translation?

Q. (BY MS. SHAPIRO) Have you seen this document before?

A. Yes, I have.

Q. Does this illustrate in any way the idea of a gradual takeover of the zakat committees?

A. Yes. This is kind of a status of "which committees is ours, and what is the situation regarding to the zakat committee, how we can" -- This is the Hamas control over the committees. And there is a specific mention in the document, each committee what is the status, and I can review it and just say -- just read it.

Q. And some of the people that are listed in here, we will talk about them later, but are they familiar to you?

A. Yes.

Q. Now, during this process of taking over, when would you say that these committees were fully controlled by Hamas?

A. I would divide it to three stages. The first stage was just after the Hamas was formed. In 1988 I think that the Hamas started to take -- They had a presence in some of the committees. In 1991, according to my research, most of the

committees were in the point of no return when they had heavyweight in these committees. The process didn't end at this time, and it lasted until 1994. So it was not a race that we have a specific time that you can say, okay, from this and this it is finished. It was a gradual process where member after member, Hamas members one by one just entered into the committees, elected --

Q. How would they get these people into the committees? How did Hamas get its people in?

A. Some of the persons were already there as Muslim Brotherhood, identified as Muslim Brotherhood. The others just were -- Some of them were appointed by the waqh. Some of them were elected, an election that they had in the committees. So it was -- There was a variety of ways how Hamas activists got into -- entered these committees.

Q. And by 1994, I think you said this process was essentially complete. What happened in 1994?

A. In 1994 the Palestinian Authority came into the territories and formed its regime as a part of the Oslo Accords.

Q. Okay. And when the Palestinian Authority was created and took over administration of these areas, were the zakat committees--again, I am talking about the ones at issue in this case--were they already fully under the control of Hamas?

A. Yes.

Q. And what happened to the Jordanian waqh once the Palestinian Authority was created?

A. The Jordanian waqh at this time, actually it turned to the Palestinian I mean, the Palestinian regime also they had the ministry of endowments, the Palestinian waqh, and at that time this is --

Q. Did the PA create such an entity, a ministry of -- What did you call it? Endowments or religious affairs?

A. Yes, they have a minister of endowment.

Q. And were committees required to register with the new waqh with the Palestinian Authority offices?

A. Yes, but those were registered as before, actually just they didn't need to do any special things. They just -- The registration went to the Palestinian ministry.

Q. So was it sort of automatic?

A. Almost automatic, yes. I don't know in my research of a committee that was turned down in the registration in the Palestinian ministry.

Q. Okay.

A. Certainly these committees that we are talking here, they just continued to operate in the way they were registered.

Q. So they would all have sort of the registration certificates or licenses to operate?

A. Yes.

Q. And did at some point the Palestinian Authority come to

understand that the Hamas control over these zakat committees was a problem?

A. I think from the beginning. Not I think. There is strong indication that the Hamas -- That the PA, the Palestinian Authority thought those committees are controlled by Hamas and they are a threat in the early stages after the forming of the Palestinian Authority.

Q. So why didn't the PA do something about it?

A. At that time the Hamas, first before Hamas was extremely -- They had fully control of these committees. They had a firm stronghold in the population. This was a delicate political balance. The Palestinian Authority, that was just formed. They didn't want to fight, to go into a struggle with Hamas that has a presence and that support in the population at that time. So that is why all the time we are talking about very delicate balance between those two entities. The Palestinian Authority from one side and the Hamas, I would say they were opponent. They were rivals. There was a rivalry between those. But the PA didn't want to go to civil war just after it was formed.

MS. SHAPIRO: Can we pull up HLF Search No. 107, please?

Q. (BY MS. SHAPIRO) This is a book called Middle East Affairs.

MS. SHAPIRO: We have to go to the translation. I

think it is page 11 maybe of the translation.

Q. (BY MS. SHAPIRO) In the bottom paragraph, "Hamas' social and educational activities in the occupied territories have become" -- Before I start reading this, let's look at who authored this article.

MS. SHAPIRO: Do we have the table of contents? The first page of the translation? There is no translation? It is in English. Of course.

Q. (BY MS. SHAPIRO) Okay. What we are looking at is The "Legitimacy of Palestinian Resistance and the Islamist Perspective" from Azzam Tamimi. Do you know who Azzam Tamimi is?

A. Yes.

Q. Who is Azzam Tamimi?

A. Azzam Tamimi is a scholar that defined himself a Hamas supporter, Hamas and Hezbollah supporter.

Q. Has he written books?

A. He has written books, and lately he wrote a book about the Hamas History From Within. So it is a very close to the Hamas organization.

Q. Okay. Let's look at what he wrote back to where we were. "Hamas' social and educational activities in the occupied territories have become so entrenched within the Palestinian community that neither the Israelis nor their peace partners in the Palestinian Authority have been able to eliminate them.

The fact of the matter is that Hamas, contrary to Israeli assessment, acts as an infrastructure to the numerous cultural, educational, and social institutions in Gaza and the West Bank that render invaluable and irreplaceable services to the public. In other words, it is Hamas that gives life to these institutions and not the reverse. The Israelis have repeatedly told the PA to close them down. The PA has tried but failed."

Is that consistent with your research with respect to the difficulties of the relationship between the PA and Hamas?

A. The difficulty as it is expressed in this paragraph that, first of all, the PA tried but failed, and at that time these zakat committees are controlled by Hamas. It is something that is expressed very well in the article. And the Hamas gives those institutions the power, and that is what it said in the article. They are not existed without Hamas.

Q. And did in fact there come a time when the Palestinian Authority from time to time would attempt to close these committees?

A. Yes.

Q. And based on your research, when did they start trying to attempt to take some control over them?

A. There were several times that the PA took some actions against the zakat committees in the West Bank and the Gaza Strip, started in 1996, for example, after under the pressure

from outside, from the U.S. and Israel, because of serious attacks by Hamas, the PA took some actions against several social institutions of Hamas, including the Islamic Society and the Mujama'a Islami and leaders of Hamas, including social leaders of Hamas.

It happened in 1997. But each time it happened, the Hamas actually responded very, very aggressively, and even threatened the PA if it will not reopen those societies that were closed, so the Hamas will react. And so that is why shortly after the PA, the Palestinian Authority, shut down the social institution of Hamas, the PA reopened these institutions.

Q. Did they also close some of -- the PA, did it close from time to time some of the zakat committees in the West Bank?

A. Yes.

Q. Which ones come to mind that you remember?

A. 1996, the Jenin zakat committee, in 2001 several zakat committees, in December 2001 several zakat committees in the West Bank, also al-Tadamoun in 2001.

Q. Is the Ramallah zakat committee shut down ever by the PA?

A. No, not the Ramallah zakat committee, but related other Hamas zakat committees were shut down by the PA, institutions that relates to the zakat committee in Ramallah.

Q. Okay.

A. Also in 2003 there were -- Again the PA froze bank

accounts of some of the Hamas social institutions in the Gaza Strip.

Q. Okay. Now, in the period you said 1994 and onward, if I understand you correct, that the Hamas had control of these institutions. Is that right?

A. Yes.

Q. Okay. Now, if you were a researcher, let's say an American researcher, and you went and knocked on the door of one of those committees, would --

MR. DRATEL: Objection, Your Honor.

MS. SHAPIRO: Should I finish the question so I understand the objection.

MR. DRATEL: What is the basis of this? It is complete speculation by an American researcher in 1994 when he wasn't doing this work.

THE COURT: Overruled. Go ahead and ask your question.

Q. (BY MS. SHAPIRO) If a researcher from the United States, based on your research and your opinion, what you know, went and knocked on the door of one of these zakat committees and asked, "Are you a Hamas committee," would the committee -- what would the committee do?

MR. DRATEL: Objection, Your Honor.

Q. (BY MS. SHAPIRO) In your opinion what would happen?

THE COURT: He may state an opinion. Overruled. Go

ahead.

THE WITNESS: I expect -- I don't expect a zakat committee to expose its affiliation to Hamas.

Q. (BY MS. SHAPIRO) And if someone called up from the United States, for example, and made an appointment with somebody at the committee for an interview, say even a journalist, would you expect the zakat committee to acknowledge its Hamas affiliation?

MR. WESTFALL: Object to leading, Your Honor.

THE COURT: Overruled. Go ahead.

THE WITNESS: I don't expect a zakat committee to expose itself to outside from the territories to be targeted by either its Israeli, by a European country, by other states. I think this is something that they will not do. They will not expose themselves, because they know that they will be targeted because the Hamas is banned in many places and they will not do it. That is my opinion.

Q. (BY MS. SHAPIRO) Okay. Now, we are talking about sort of the relationship between the Palestinian Authority and Hamas. Did there come a time when Hamas actually participated in the general elections of the Palestinian Authority?

A. Yes.

Q. When was that?

A. 2006 in the general election. There were also local elections before in 2005 and also the Hamas participated in

some of the elections in many places.

Q. And when you say general election, do you mean a parliamentary election?

A. Parliamentary.

Q. Who is the president of the PA?

A. The president of the PA today is Mahmoud Abbas from the Fatah faction.

Q. In 2006 he was president?

A. Yes.

Q. Okay. And when he had these parliamentary elections did Hamas run on a ticket with a political party, or did it have another name?

A. Yes.

Q. What was the name of that?

A. It is run the al-Isla -- I need to translate it to English. I forgot the translation.

Q. Change and reform. Does that refresh your memory?

A. Yes.

Q. And was that the change and reform ticket?

A. Yes. This is the Hamas party that they ran in 2006.

Q. All right. And what were the results of that election?

MS. MORENO: Your Honor, may we have a standing objection as to the relevance of this. Five years after the Holy Land closed down, the witness is talking about an election. There would be a relevance objection.

THE COURT: As to the relevance, you may have a standing objection. Go ahead.

Q. (BY MS. SHAPIRO) What were the results of that election?

A. Hamas had a big victory in the parliamentary election.

Q. Did Hamas attribute its success in those elections to anything in particular?

A. There were several expressions by Hamas leaders like Mahmoud Rumhi said that the charity, social work brought this victory. He was not the only one who said that, but he was interviewed in the BBC and said it loud and clear.

Q. And after those elections where you said Hamas got a majority, was the parliament then controlled by Hamas at that point?

A. Yes.

Q. And who had the presidency?

A. Abu Mazin from the Fatah. They had the coalition, but the Hamas had the majority in the parliament and the government.

Q. So you had both the Fatah and Hamas together in the government?

A. Yes.

Q. Okay. And how did that arrangement work out?

A. Well, it didn't work out very well.

Q. Did there come a time when Hamas took up arms against the PA, against Fatah?

A. Yes.
Q. When was that?
A. In summer 2007.
Q. And what happened?
A. The Hamas just attacked Abu Mazin and there was -- I would say there was a civil war, short civil war. Fatah was beaten by Hamas and Hamas took control of the Gaza Strip, full control of the Gaza Strip.
Q. While the civil war was going on in Gaza, what was happening in the West Bank?
A. In the West Bank there are many events of retaliation I would say by people in the West Bank against Hamas institutions, and some of the zakat committees were also attacked because they were identified as a Hamas Institution by those who attacked them.

In the same days that the Hamas took over in the Gaza Strip, Fatah activists and other activists attacked Hamas institutions all over, and the Hamas complained about these attacks.
Q. Okay. So you had this violence occurring both in Gaza and the West Bank. What was the result of the civil war? How did we end up, with Gaza and the West Bank?
A. The West Bank -- The Gaza Strip is fully controlled by Hamas and the West Bank is controlled by the Fatah, Abu Mazin as the president and the government that he established after

that.

Q. Okay. And after Hamas took over the Gaza Strip, did the Palestinian Authority's attitude toward Hamas' social institutions, the zakat committees, did that attitude change?

A. Dramatically, I would say.

Q. What happened?

A. Bawatneh which is the minister of endowments, the waqh --

Q. What was his name?

A. Jamal Bawatneh.

Q. How would you spell that?

A. B-A-W-A-T-N-E [sic].

Q. Okay.

A. He announced that he is -- a resolution of the Palestinian Authority to dissolve 92 zakat committees all over the West Bank; all the zakat committees actually.

Q. Did he replace them? What did he do with them?

A. He reorganized everything, all the committees into 11 district committees and they also dismissed all the activists that worked in the old 92 zakat committees.

Q. And was this action that the PA took to close the zakat committees and reorganize them?

MR. DRATEL: Leading.

MS. SHAPIRO: I am summarizing, Your Honor.

THE COURT: I think you are leading.

MS. SHAPIRO: I am sorry. I apologize. The

language barrier makes it a little harder to ask an open-ended question.

Q. (BY MS. SHAPIRO) Was there publicity surrounding the action of the PA with respect to this reorganization?

A. Yes. The Hamas leaders denounced had -- They accused the Fatah and the PA that they are taking action against the Hamas because of political affiliation. The Hamas denounced -- really they were really angry at this move after they dissolved, after the dissolution Of all the committees reacted very, very, very strong against this. And it implies against Hamas' attitude towards this committee.

Q. Okay. So now we have heard just some background, the history from the '70s through the present of these committees. Now I want to focus on our committees during time period of 1995 to 2001.

THE COURT: Let's go ahead and recess here for the day. Let's go ahead and break.

Be back at 9:00 in the morning. Please recall the instructions about not discussing the case with anyone. See you back at 9:00 in the morning.

(Whereupon, the jury left the courtroom.)

THE COURT: You can have a seat. We will wait for the jury to leave.

Any matters we need to bring up before we recess?

MR. DRATEL: Yes, Your Honor. The last bit of

testimony I think in the context of 403 and *al-Moayad* and what the real issues are in this case, I think was so far beyond the bounds in terms of introducing things that are so prejudicial that they cannot be overcome, and particularly -- In essence what the Government has done is said that Holy Land's aid to Palestinian people in the zakat committees is responsible for the election of Hamas and a civil war, so I would move for a mistrial on those grounds. It is so long after, it is so attenuated that it cannot -- Even if it is relevant it cannot overcome the prejudicial impact, the unfair prejudicial impact.

MS. MORENO: Join on behalf of Mr. Elashi.

MS. CADEDDU: Join on behalf of Mr. Abdulqader.

MS. HOLLANDER: And Mr. Baker.

MR. WESTFALL: And Mr. Odeh as well.

MS. SHAPIRO: This is background histories of these committees which the Defense will rely heavily on, and asked many witnesses about these committees predated the time of Hamas. It is important for the jury to understand the history. The implication was not at all that the committees caused civil war or caused the elections, but it is part of the history and part of how we know that certain people are Hamas because they ran on a Hamas ticket, for example, is one way to know they were Hamas.

THE COURT: That is one thing. But I didn't see any

of that. Except maybe an individual name or so, you went well beyond that in terms of somebody running on a Hamas ticket to identify them as Hamas. That is one thing. You did go well beyond that. I was having trouble understanding the relevance of what is happening in --

MS. SHAPIRO: It is also important to understand that the PA recognizes these committees as Hamas, so they went so far as to reorganize them. And what caused that reorganization was the violent confrontation. Before there was this delicate balance, there was this political working it out which caused them to coexist. But after there was actual violent clashes a whole different attitude prevailed, and that history is very important to understand how these committees operate and why they were allowed to operate.

And I think I am safe in assuming that the Defense will argue to the jury that the fact that the PA could have taken action against them, that that undermines the Government's argument that these committees were controlled by Hamas. We think it is fair and appropriate to give the jury an understanding of the background and history.

MS. MORENO: Excuse me, Your Honor. If I may, to 2001, not six years later, which is what the Government now has brought in before the jury the history after the Holy Land is closed down, no more operation, no more money to these zakat committees, and they have now brought before the jury

the civil war and the conflict.

MR. DRATEL: And, Your Honor, it is not history. Many of these events we are talking about happened while we were on trial last year and afterwards. This is not history.

MS. HOLLANDER: My concern, Your Honor, is that we are now going to have to deal with all of this period of time in 2001 until 2006 to this election, and talk about it, because, frankly, I believe that our experts will not agree with what happened, with why the PA took over, but it is really completely irrelevant to our case, and yet we can't just let it go unanswered and that is the problem with this.

THE COURT: All right. Any other issues we need to address?

MS. MORENO: Your Honor, there will be a 106 issue with respect to I believe a tape that the Government is going to introduce. We can discuss it very briefly in the morning, if the Court wishes.

THE COURT: Through this witness?

MS. MORENO: I think so.

THE COURT: Do you know the exhibit number?

MS. SHAPIRO: I think it is Jenin Zakat No. 6.

THE COURT: Is that in that latest disk.

MS. SHAPIRO: That is in the very initial set of exhibits.

MS. MORENO: No one has testified to it. It is in

evidence, but there is a 106 issue. It is a video, Your Honor.

THE COURT: Do you have a transcript of what you are wanting to ad?

MS. MORENO: Yes, we do. It was in last year.

THE COURT: I mean do you have it like now so I can take a look at it.

MS. MORENO: I will get it as soon as I can get my hands on it.

THE COURT: Why don't you email that so we can take a look in the morning before we get here.

MS. HOLLANDER: Your Honor, I still have this Hamami issue, Your Honor, that this witness also has talked about, Jamil Hamami, and I don't know -- It will take me about 30 seconds to explain why I believe we are entitled to his 302s, but I am concerned about this because it is going to come up again with this witness.

THE COURT: Okay. Go ahead. Make your --

MS. HOLLANDER: I haven't seen them, of course, and Your Honor has. If these are 302s that were written by Agent Burns or Agent Miranda, both of whom talked about Jamil Hamami, then if they relate to their testimony, that is the test under Rule 26.2 and the *Jencks* Act. And Agent Burns has testified that Hamami told her he was -- She learned -- She didn't say what he told her. She said she learned he was

excommunicated from Hamas in 1995. If Jamil Hamami when she met with him told her something different, then that would certainly relate to her testimony. If he said anything about whether -- about Holy Land and its relationship to his committee and Hamas, that would reasonably relate to her testimony. And Agent Miranda testified that the meeting with Hamami was in 2004, and all we ever received from the Government was a letter in 2006, which I believe Your Honor has because they attached it to their response to the 302s, which simply said they met with him in 2002 and he said that his organization, although he was a member of Hamas, his organization was not.

And if those 302s go beyond that and talk about Holy Land or contradict their testimony, or in any way relate to their testimony and they wrote them, then I believe we are entitled to them, and that is my concern about them.

THE COURT: Mr. Jonas?

MR. JONAS: You ruled on this the other day, Your Honor, and you denied them.

THE COURT: She had wanted to I think make, I guess, you said something for the record, I guess just your argument.

MS. HOLLANDER: Yes, sir. I would like them to be made as part of the record.

THE COURT: They are going to be made a part of the record.

MS. HOLLANDER: As a Court exhibit. But I just wanted to explain why I was concerned about them.

THE COURT: All right.

MS. SHAPIRO: Your Honor, can I say one last thing on the issue of the history, that last year the events of the election and the parliamentary election and the change in reform ticket into 2006 was discussed freely and often at last year's trial, so it had not occurred to me it would even elicit an objection.

MR. DRATEL: Your Honor, last year we objected to anything after December 4th, 2007. This year we did also, both trials. Obviously both courts allowed the Government to put in that evidence, and we were simply meeting it. We always wanted the end date to be December 4th, 2001.

THE COURT: All right. We are in recess. Be back at 8:45, then.

(End of day.)

I HEREBY CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER. I FURTHER CERTIFY THAT THE TRANSCRIPT FEES FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL CONFERENCE OF THE UNITED STATES.

S/Shawn McRoberts 06/06/2009

__________________________DATE____________

SHAWN McROBERTS, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER