1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
2                    DALLAS DIVISION

3    UNITED STATES OF AMERICA      )  CAUSE NO. 3:04-CR-240-P
                                   (
4    vs.                           )
                                   (  OCTOBER 28, 2008
5                                  )  DALLAS, TEXAS
     HOLY LAND FOUNDATION, ET AL   (  9:00 A.M.
6
     _____
7

8                        VOLUME 26 OF 37

9    _____

10                     STATEMENT OF FACTS

11
              BEFORE THE HONORABLE JORGE A. SOLIS
12               UNITED STATES DISTRICT JUDGE
                        and a jury
13   _____

14

15              A P P E A R A N C E S

16

17

18      FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                              1100 COMMERCE, 3RD FLOOR
19                            DALLAS, TEXAS  75242
                              BY:  MR. JIM JACKS
20                                 MR. BARRY JONAS
                                   MS. ELIZABETH SHAPIRO
21
        FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
22      (SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
                              20 FIRST PLAZA, SUITE 700
23                            ALBUQUERQUE, NEW MEXICO 87102
                              BY:  MS. NANCY HOLLANDER
24                                 MS. TERESA DUNCAN

25

```
1         FOR THE DEFENDANT:    LAW OFFICE OF JOSHUA L. DRATEL
          (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
2                               NEW YORK, NEW YORK  10005
                                BY:  MR. JOSHUA DRATEL
3                                    MR. AARON J. MYSLIWIEC

4         FOR THE DEFENDANT:    LAW OFFICE OF MARLO P. CADEDDU
          (MUFID ABDULQADER)    3232 McKINNEY AVENUE, SUITE 700
5                               DALLAS, TEXAS  75204
                                BY:  MS. MARLO P. CADEDDU
6
          FOR THE DEFENDANT:    LAW OFFICE OF LINDA MORENO
7         (GHASSAN ELASHI)      P.O. BOX 10985
                                TAMPA, FLORIDA  33679
8                               BY:  MS. LINDA MORENO

9                               JONES DAY
                                555 CALIFORNIA ST., 26TH FLOOR
10                              SAN FRANCISCO, CA  94104
                                BY:  MR. JOHN D. CLINE
11
          FOR THE DEFENDANT:    WESTFALL, PLATT & CUTRER
12        (ABDULRAHAM ODEH)     ONE SUMMIT AVENUE, SUITE 910
                                FORT WORTH, TEXAS  76102
13                              BY:  MR. GREG WESTFALL

14        COURT'S LAW CLERK:    MS. JENNIFER HELMS
                                1100 COMMERCE, RM. 1654
15                              DALLAS, TEXAS  75242

16        COURT COORDINATOR:    MS. BRENDA WEBB
                                1100 COMMERCE, RM. 1654
17                              DALLAS, TEXAS  75242

18   OFFICIAL COURT REPORTER:   SHAWN M. McROBERTS, RMR, CRR
                                1100 COMMERCE STREET, RM. 1654
19                              DALLAS, TEXAS  75242
                                (214) 753-2349
20

21

22

23

24

25
```

# <u>INDEX</u>

**Motions Hearing**

**Motions Hearing**                                                                                 **Page**
                                                                                                        4

1          THE COURT:  Good morning.

2      All right.  We will start with the -- I know Ms. Moreno

3   is not here.  We will let the record reflect that she is ill.

4          MS. DUNCAN:  I spoke to her this morning and she

5   expressed her regrets, but she is extremely ill.

6          THE COURT:  She left a voicemail and I heard her

7   voice.  She is pretty bad.  I hope she is well by tomorrow.

8      One of the things to be thinking about as well, too, is I

9   was thinking about maybe working Friday since we are out

10  today.  Now, we called off some of the jurors this morning.

11  As soon as we found out, we started calling them, Brenda did,

12  and some of them had plans on Friday.  They were going to look

13  to see what they could do.  So it is iffy.  And of course the

14  Marshal needs to know.  So we will let everybody know tomorrow

15  about your plans for Friday.

16          MS. CADEDDU:  I am not sure because the Court I

17  don't think has little children, but Friday is actually

18  Halloween.

19          THE COURT:  I was aware, yes.

20          MS. CADEDDU:  It is a big deal around the Cadeddu

21  house.  Maybe we can work in the morning and take the

22  afternoon off as sort of a compromise, if the jurors are even

23  available to do that.  That way we can do the Halloween

24  festivities.

25          THE COURT:  Mr. Dratel?

1          MR. DRATEL:  Can we go off the record?

2          THE COURT:  Sure.

3          (Discussion held of the record.)

4          MS. SHAPIRO:  Just a scheduling issue.  The strong

5     preference of I think the witness is to not have to stay

6     through a weekend, but to finish this week, and I think today

7     sort of throws that into doubt.

8          And the other problem is that Friday, because we are off

9     and we expected him to be finished as well, he has something

10    else scheduled in another part of the country on Friday.  He

11    is willing -- they can rearrange that if we can be in court

12    Friday and he can finish.  If we are not going to be in Court

13    Friday and he has to be back on Monday, then he would like to

14    be able to keep that meeting on Friday, which means that he

15    would have to -- We would have to finish court Thursday by

16    3:00 so he could get out.

17         So I know it is all very complicated, but I guess -- If

18    we are not having court on Friday, then our requests would be

19    that we end at 3:00 so that he could get to his commitment.

20         THE COURT:  He needs to finish by 3:00 Thursday, and

21    if we don't do that then he would rather not work Friday and

22    be back Monday.  Is that what I am hearing?

23         MS. SHAPIRO:  Right.  Preferably if we could finish

24    this week, he is willing to cancel everything to have it all

25    done by Friday.  But if we know for sure that it is not going

1    to happen and he is going to have to be here Monday anyway --

2              THE COURT:  Then he wants to leave at 3:00.

3              MS. HOLLANDER:  Just to add to the complications.

4              THE COURT:  We needed some more complication.

5              MS. HOLLANDER:  One of our experts is only available

6    Monday.  He was available this Wednesday.  Is that today or

7    tomorrow?  Tomorrow.  But we found out the Government wasn't

8    going to be finished, so we gave him that day back, and the

9    only other day we have him is Monday.

10             THE COURT:  Which expert is that?

11             MS. HOLLANDER:  Doctor Esposito.

12             THE COURT:  And we will get to those motions in

13   limine.

14        How much longer do you have on direct?

15             MS. SHAPIRO:  Well, I was hoping to be done by the

16   end of today with direct.  Basically I need to cover each

17   committee and that is what we are starting to get to now.

18        Gauging by last year, it was I think a day and a little

19   bit, so since we already sort of covered a little bit, it

20   could be by the end of the day on direct, so I would hope by

21   the end of the day tomorrow.  If I were really optimistic, I

22   would say by the last break, but to be safe I would say I need

23   a whole day.

24             THE COURT:  How long did cross take the last time?

25   Do you all remember?

1          MR. DRATEL:  This is obviously all dependent on how

2   different tomorrow is than it was the last time.  I don't

3   know.  But I am thinking that if we start cross tomorrow, we

4   could finish by 3:00 on Thursday.  It is conceivable.  I am

5   not saying that it is absolute.  But the cross last year -- my

6   recollection is that it was -- and it went over a period of

7   two days because it started in the afternoon, but I think it

8   went at least the balance of one afternoon, and it was about a

9   day I think.  Is that right?  I am including recross.  I am

10  saying from the moment we started cross to the moment he got

11  off, about a day.

12          MS. HOLLANDER:  It wasn't even a whole day, because

13  that second day something else happened.

14          THE COURT:  It sound likes we could finish him

15  Friday.

16          MS. SHAPIRO:  We could if we worked Friday,

17  absolutely.  The issue is if we don't work Friday or we work

18  half a day Friday.

19          THE COURT:  But if they can finish by Thursday

20  afternoon, your redirect shouldn't be too much longer.  We may

21  not need but half a day to wrap it up by the time Friday, if

22  we could finish the cross by Thursday.

23          MR. DRATEL:  It is conceivable.

24          THE COURT:  And then we will just have to go from

25  there.  You will have to be a little late to your Halloween

1  festivities.

2       MS. CADEDDU:  They have a parade at my child's

3  school at 2:00.  That will be the goal.

4       MR. DRATEL:  And maybe we will get together in terms

5  of counsel may come up with a proposal, perhaps, if tomorrow

6  we work a little later, I don't know about -- how given

7  everybody's different schedules, but perhaps if we put in a

8  half hour additional or perhaps more, we would know more about

9  our ability to finish Thursday.

10       I mean, obviously if the Government doesn't get to finish

11  tomorrow, for whatever reason, then it is going to be hard to

12  finish Thursday.  But if we do start cross tomorrow, perhaps

13  if we get into it --

14       THE COURT:  We could spend an extra hour tomorrow

15  and Thursday.  That may help us as far as Friday.  We will see

16  where we are, then, how soon you are able to finish up your

17  direct.  So we will get started, and then we can just decide

18  as we get on into Thursday afternoon, or maybe even by

19  Thursday morning we may know depending on where everything is.

20       All right.  And at this point is the Government

21  anticipating additional witnesses after Avi?

22       MR. JONAS:  Your Honor, we received notice from

23  Ms. Hollander that she anticipates trying to move into

24  evidence certain exhibits relating to USAID through Avi.  We

25  are going to object to that and file objections.  We don't

1    think he is a proper witness for that.

2        If Your Honor admits those exhibits, then we will be

3    calling a witness from USAID.  He will not be a very lengthy

4    witness at all.  I just need to know and figure out--he is in

5    Washington is where USAID is based--whether or not I should

6    have him here Friday, or whether I should tell him to be here

7    Monday.

8              THE COURT:  When are you getting the objections to

9    these exhibits?

10             MR. JONAS:  I just received the email.  I don't know

11   when Ms. Hollander sent it --

12             MS. HOLLANDER:  I sent it last night.

13             THE COURT:  It was late last night.

14             MS. HOLLANDER:  It was fairly late last night, yes

15   it was.

16             THE COURT:  Maybe 10:00 or so.  Maybe 8:00.

17             MR. JONAS:  We will have our objections to you by

18   the end of the day today.  And they all seem to be one

19   category, so it should be fairly simple to object.

20             MS. HOLLANDER:  They were the same ones that were

21   introduced last year.

22             THE COURT:  We will take those objections an rule on

23   those in the morning and you will know by then.  So be there

24   at 8:30 in the morning and I will give you a ruing on those.

25   And if we get your objections in early enough this afternoon,

1    I may be able to give you a ruling this afternoon.  It just

2    depends on when you are able to get your objections in.

3         The 106 issue, is that your issue, Ms. Duncan.

4              MS. DUNCAN:  It is actually Ms. Moreno's issue.

5              THE COURT:  We will take that one up in the morning.

6         Have you looked at that?  Are you going to object to

7    that?

8              MS. SHAPIRO:  Yes.  I mean, what we got was the

9    excerpts.  We didn't get an explanation of how it explains or

10   relates --

11             THE COURT:  We will address that in the morning.  I

12   don't want to do it now.  I just wanted to know whether you

13   were going to object or not, and you are, so we will take that

14   up at 8:30 in the morning as well.

15        Let's get to the motions in limine, then.  Beginning with

16   Doctor McDonald, do you want to address that.

17             MS. CADEDDU:  Yes, I can.  I will try to address --

18   I was hoping to be able to get the Court a written response,

19   but I haven't had a chance.

20        I guess there are three issues.  One is the notice that

21   he would be called.  Another is the sufficiency of the notice

22   about what he would be testifying to.  And another is

23   relevance.  If I have mischaracterized it, I am sure the

24   Government will correct me.

25        As far as notice about whether he would be called, we

1    complied with the Court's deadline and gave notice on July 8th

2    or 9th, whenever it was, that we intended to call him,

3    although we let the Government know we were having funding

4    issues, as the Court will recall.  So we said, you know, we

5    haven't been able to give him any materials to review because

6    we haven't been able to officially retain him, but I

7    anticipate that he will cover these areas based upon his

8    education and training and his review of the exhibits.

9        Subsequent to that, as the Court will recall, the Fifth

10   Circuit approved funding him so we were able to retain him,

11   and in August I provided a supplemental notice and I think

12   those are both attached to the Government's motion.  And I

13   have given the Government his CV as well.

14       And the supplemental notice expanded on the general areas

15   he was going to testify about that I put in the final

16   paragraph of the July 9th notice, and expanded on that.  Of

17   course, even though he had been retained, he had not -- we

18   didn't have all the Government's exhibits yet, and what he was

19   reviewing was five videotapes that the Government provided

20   notice of long ago that those were the ones that had Mr.

21   Abdulqader's performances and that the Government would be

22   using those.  So he was doing a preliminary analysis based on

23   those five videotapes, even though we didn't have the exhibits

24   that were going to be in evidence.  So I provided the

25   Government with that notice.

1    And around that time I had a conversation with Mr. Jacks

2    about that witness, and Mr. Jacks said, "Well, I understood

3    you weren't going to call him because he didn't think he would

4    be ready."  And I said, "We would do the best we could to have

5    him ready to testify."  And it has been a struggle because he

6    has started a new position and he is trying to start this with

7    not a lot of lead time.

8        Actually the Friday before trial Mr. Jacks, I don't know

9    if it was Mr. Jacks from the Government, we received one copy

10   of all -- the Defense received one copy of all the videotapes

11   that the Government intended to introduce, the video clips,

12   the ones we have been seeing.  We have a package of 30 or 40

13   of those.  And the first week of trial I actually asked Mr.

14   Jacks for another copy to send to my expert because, because

15   we received them right before trial, and I am not faulting

16   them, we all were exchanging exhibits, that I couldn't send

17   them out somewhere to have copies made because I wouldn't have

18   access to them while we were in trial preparing.

19       So Mr. Jacks provided those to me I think the second and

20   third week of trial.  That extra copy was provided on a

21   rolling basis and I received those.  And I did in fact send

22   them to Doctor McDonald.  So Mr. Jacks has a known from at

23   least the first week of trial -- I mean, even if there was

24   perhaps some confusion about the initial notices, although, I

25   mean, I provided notice twice that he would be testifying, he

1    has known since at least the first week of trial that I

2    intended to call him because I requested the video clips so I

3    could send them to him.

4         So the idea that the Government only recently learned

5    that he was going to be testifying is something that I just --

6    I mean, I don't --

7              THE COURT:  Have you submitted an expert report in

8    compliance with Rule 16 yet?

9              MS. CADEDDU:  I have provided those two letters.

10             THE COURT:  And you think those are sufficient?

11   They don't state his opinions.  You give the area that he is

12   covering, but there is no opinions in there.

13             MS. CADEDDU:  I understand.  And certainly if the

14   Government, the Government has provided us with similar -- I

15   mean, those -- The witness notice I provided for Doctor

16   McDonald is no less detailed than any of the expert notices we

17   have been provided by the Government.  It gives areas of

18   testimony and contextualizing the history of the conflict.

19             THE COURT:  I know what it says.  I have read the

20   letters.  So you are not going to give an expert report that

21   complies with Rule 16?

22             MS. CADEDDU:  If the Government feels it doesn't

23   comply with Rule 16, I can provide a supplement.  That is the

24   first I have heard that the Government doesn't think it

25   complies.

1          THE COURT:  Mr. Jacks, what about that issue?

2          MR. JACKS:  Well, Your Honor, part of the issue is

3    the number of expert witnesses that were noticed by the

4    Defense, and which ones were going to be actually called and

5    which ones were not going to be called.

6          But regardless of the circumstances surrounding this

7    Doctor McDonald, it is not just for the Government's benefit

8    that an opinion is required.  It is also for the benefit of

9    the Court so that the Court can have some kind of a notice

10   that this is the bottom line as far as what this witness

11   intends to opine about, and then the Government and the Court

12   can make a decision about the relevancy of that witness'

13   testimony.

14         And it is our position that at this stage there has still

15   not been any kind of notice provided as to what this witness

16   intends -- what his opinion will be and how it relates to the

17   issues in this case, how it is relevant, how it will help the

18   jury.  And to us that is the first step that is lacking.  And

19   you know, we simply need that so that -- And admittedly it is

20   late in the game, but I think a lot of these motions in limine

21   are of a nature that if they are filed several weeks prior to

22   trial, the Court is really in a position of having to wait and

23   see what evidence comes in and what issues develop before it

24   can make a ruling on these motions in limine.

25         But right now it is simply our position that given the

1    lack of any kind of report or any kind of opinion, that we

2    really are handicapped in terms of being able to respond to

3    the witness' --

4          THE COURT:  And I agree that if the motion is filed

5    in advance, we may not be able to rule on it, but at least

6    everybody is on notice that you are objecting and what it is

7    that you need rather than waiting until the end.  And it looks

8    like, I mean, they should have had a better expert report.

9          Those letters do not comply with Rule 16, in my view.

10   They do not state any opinions.  You cover areas that they are

11   going to talk about, but they don't state any opinions.  It

12   makes it hard for me to determine whether it is relevant.  And

13   I may not have been able to do that if we had gotten a more

14   timely motion in limine.  But, of course, they couldn't file

15   one because they didn't have the expert report.  It is hard to

16   challenge relevance when you have something that broad and

17   that big.  I can't tell, Frankly, whether that is relevant or

18   not.

19         So both of these experts, McDonald and Esposito, you need

20   to provide more specific -- There need to be some opinions,

21   the areas where those opinions are.  Of course the rule states

22   what basis -- the basis for those opinions and whatever else

23   it states, or the qualifications.  But primarily -- You have

24   attached the CVs, so that is taken care of.  The witnesses

25   certainly appear to be qualified in their areas, but we don't

have opinions.  We don't have bases.  That is what puts the

other side on notice whether to challenge relevance, whether

to try to get somebody to try to meet those.  They can't do

that with what you have.  I can't rule on relevance without

doing that.

MS. HOLLANDER:  Can I respond as to Doctor Esposito?

This was actually Ms. Moreno's expert, but she has been ill

and I have taken over this.  She filed that letter.

You know, we didn't -- This was not part of the funding

problem.  This was filed on July 9th.

THE COURT:  Right.

MS. HOLLANDER:  And Your Honor had an order that

came out, and the order which was filed on the 11th of June

said that the Government was to respond by July 30th and the

Court was not inclined to grant extensions of time to file

responses.  The Government didn't respond at all to us.  They

didn't say that the Government thought the report didn't

comply with Rule 16.  And frankly, we did follow the report

form that the Government used in this case for its experts,

this being -- I mean, I assumed that the Government knew what

the Court wanted.  This is the form actually that the experts

followed in the first trial, and we didn't have these kinds of

objections from the Government.

I think we actually ultimately did object to some of

theirs as not following the Rule 16, and the Court admitted

1    those experts.

2        But we certainly would be happy to supplement.  The

3    problem is that we assumed, I know Ms. Moreno assumed and I

4    assumed, that the Government was not going to contest Doctor

5    Esposito's qualifications or relevance because we never heard

6    anything back about him or the Doctor Haykel.  And up until

7    literally last week we weren't sure which one we would call,

8    because pinning these guys down on a date, as you know, is

9    very difficult.  We have pinned Doctor Esposito down.

10       If the Government, you know, would like more information,

11   if Your Honor would like more information, I would be happy to

12   provide it.  It is just difficult to do at the last minute is

13   all.  But we can certainly do that.

14       But I just wanted to explain that the form was followed

15   that Ms. Moreno followed was the same as the ones the

16   Government used that seemed to be --

17           THE COURT:  I don't know that.  I know you are

18   saying that.  I have not gone back and looked at what was

19   there.  That is not a good enough reason.  I guess that is

20   some basis for thinking that, but Rule 16 is Rule 16.

21           MS. HOLLANDER:  I understand.

22           THE COURT:  And it requires -- I assume all counsel

23   know what it takes.  And it does state you have to give the

24   opinions and the basis for the opinions.  That is the whole

25   purpose of having an expert testify.  And the report and

1    notice is so the other side can know and you can attempt to

2    meet what it is that the expert is going to be expressing an

3    opinion on.

4        Mr. Jacks, let me hear from you.  Are you wanting those

5    expert reports that comply with Rule 16, some specific --

6            MR. JACKS:  Yes, Your Honor.

7            THE COURT:  Okay.  And I think that would be helpful

8    for me as well.  So go ahead and get those in on both experts.

9    And when do you think you can get yours in?  I know you are

10   going to need to talk to him.

11           MS. CADEDDU:  I will need to talk to him.  I am not

12   sure what his teaching schedule is today.  Maybe by the end of

13   the day tomorrow.

14           MS. HOLLANDER:  Yes.

15           MS. CADEDDU:  Mr. Esposito is little more difficult.

16           MS. HOLLANDER:  I think I can do it by the end of

17   the day today.  I have talked to him extensively.  And I think

18   that I can prepare a report that -- I mean, there is certainly

19   no question about his qualifications, so I assume -- Can I

20   leave that part --

21           THE COURT:  Well, Mr. Jacks, are you satisfied with

22   the qualifications?  Are you willing to rest on relevance, or

23   do you want more on that as well?  And I didn't have the CVs

24   attached to the letters I have.  The letters that you all are

25   sending says the CVs are attached, but they weren't attached

1   to the Government's motion so I don't have those in front of

2   me.  From what is stated in there, they certainly appear to be

3   qualified individuals.

4            MR. JACKS:  Your Honor, I think it just depends on

5   what they are testifying about.  I mean, one kind of follows

6   the other.

7            MS. HOLLANDER:  I mean, I will be happy to attach a

8   CV.  I don't think that is even an issue at all.

9            THE COURT:  All right.  Okay.

10           MR. JACKS:  Judge, let me just make one point for

11  the record.

12       The Government did file a motion in limine as to Doctor

13  Esposito and Tripp Mackintosh on August 29th, the day the

14  pretrial materials were due.  We specifically filed motions in

15  limine regarding their expert testimony.

16           THE COURT:  Challenging --

17           MR. JACKS:  Yes, sir.  And admissibility thereof.

18  So with regard to Doctor Esposito, we did file that for the

19  record.

20       One thing, Your Honor, is that if we could have some

21  better information about which experts the Defense intends to

22  call so that we can be preparing.  Obviously there are several

23  of them that are on their witness list, but now that we are

24  close to the end of the Government's case, it would certainly

25  be important to us to know which ones we are talking about

1    now.

2          MS. CADEDDU:  I intend to call Doctor McDonald.

3          MS. HOLLANDER:  We do intend to call Doctor

4    Esposito.  As I said, we intend to call him next Monday.  We

5    intend to call Jonathan Benthall.  And at this point we also

6    intend to call Tripp Mackintosh.  Are those our only experts?

7    I am trying to remember.

8          MR. JONAS:  If I may inquire some names whether or

9    not they are not forgetting anybody.  Bernard Haykel.

10         MR. DRATEL:  No.  Doctor Esposito is going to cover

11   that.

12         MR. JONAS:  Nathan Brown.

13         MR. DRATEL:  No.

14         MR. JONAS:  Leah Tsemel.

15         MS. HOLLANDER:  We haven't made a final decision on

16   her.

17         MR. JONAS:  Your Honor, If they intend to call Leah

18   Tsemel that is an issue that we need to take up with when they

19   make a decision.  I believe we have raised an issue about Leah

20   Tsemel both in the last trial and prior to this trial.

21         THE COURT:  Are you planning on calling her?

22         MS. HOLLANDER:  She is an Israeli lawyer, Your

23   Honor, and we haven't made the final decision on her, but we

24   will tell the Government if we do plan to call her so that

25   they can object, because we know they do have objections.

1    MR. JONAS:  And those objections were filed prior to

2    the last trial.  We renewed them prior to this trial.

3    Mr. Cline said there is no need -- prior to this trial

4    starting, I recall Mr. Cline saying there is no need to

5    address this issue regarding her at that time because they

6    weren't sure if they were going to call her.

7         So if they do make that decision, we want to be clear for

8    the record that there is no late notice from the Defense that

9    we are objecting to her.

10        MR. DRATEL:  No, we are not subjecting that.  And

11   she wouldn't be one of the first witnesses anyway, even if we

12   called her.

13        MS. HOLLANDER:  If we called her -- She was also a

14   fact witness.  But if we are going to call her at all, we will

15   notify the Government, and she would be toward the end.

16        Our other witnesses are fact witnesses.

17        THE COURT:  Okay.

18        MS. HOLLANDER:  And I think the Government has

19   notice of all of them.

20        THE COURT:  All right.  Any other issues, then, as

21   far as experts or scheduling that we need to address?

22        MR. JONAS:  Your Honor, we did file a motion in

23   limine regarding, or a *Daubert* motion, I can't recall exactly

24   how we styled it, regarding Tripp Mackintosh.  It is our

25   position, based upon what they state he is going to testify

1    about, that he is not qualified to testify in this trial.  He

2    is an export violation expert, not a terrorism expert.

3              THE COURT:  We will take a look at that.  I assume

4    you have responded to that motion.

5              MS. HOLLANDER:  I would have to check, because he

6    was Mr. Cline's expert, but I am going to have to check on

7    that.

8              THE COURT:  We will take a look at that.  And if you

9    change your mind, let us know.  We don't want to be doing a

10   lot of reading and making decisions if you are not going to

11   call these witnesses.  We have enough else going on.

12             MS. HOLLANDER:  Absolutely.

13        Now, Ms. Duncan has reminded me of another issue.  Do you

14   want to raise that?

15             MS. DUNCAN:  Your Honor, we had one translation so

16   far, and I am not sure if we have some others.  We talked

17   about having witnesses sponsor those.  I am not sure whether

18   the Court or the Government wants us to bring someone in, or

19   if it is sufficient --

20             THE COURT:  Why don't you get with the Government,

21   let them take a look at it, and if you work that out that is

22   fine with me, obviously.  If you don't, then probably you will

23   need somebody.  See if you can work that out.

24             MS. HOLLANDER:  The only other issue, Your Honor, if

25   I could go back to one for a minute, which the Government's

objections to the USAID documents, if the Government does

object to those I would like an opportunity to respond.  Judge

Fish, there were two prior --

THE COURT:  They are going to object.  You don't

need to respond in writing.  We are going to gather in the

morning.  I said I might look at them this afternoon and give

you a ruling, but if I need you to respond I will

certainly --

MS. HOLLANDER:  I just wanted to alert the Court

that Judge Fish wrote two opinions on those.

THE COURT:  If you can find the numbers and provide

that to us, I will go back read them while I am reviewing the

objections.

MS. HOLLANDER:  There was also lengthy discussion

during the examination where he admitted them.

THE COURT:  If you can give us the ECF numbers for

those orders, we can take a look at those.

MS. HOLLANDER:  I think I have those with me.

THE COURT:  Any other issues on this?

MS. SHAPIRO:  I wanted to tender to the Court, not

that you need more paper, in fact I only tabbed specific

pages, this was the transcript from Defendants' expert Nathan

Brown from last year.  I just wanted the Court to be able to

see that on direct examination Defense counsel elicited all

kinds of information about recent events with the Palestinian

1    Authority.  And, in fact, he based part of his expertise on

2    the fact that he was monitor of those elections in 2006.

3    There is quite a bit of discussion about it.

4        And I am also happy to provided additional points of

5    relevance about that matter.  But I at least wanted the Court

6    to understand how it came into the trial.

7            MR. DRATEL:  Your Honor, the Government had put in

8    stuff after December 1 over our objection, and that testimony,

9    which was obviously on the Defense case, was to meet what had

10   occurred.

11           THE COURT:  Was he an expert witness?

12           MR. DRATEL:  He was an expert, yes.

13           THE COURT:  Do you want to bring that up to

14   Jennifer?  We will take a look at that.

15           MS. CADEDDU:  Your Honor, I am not sure -- I know

16   Mr. Dratel moved for a mistrial, as he was wanting to do, but

17   I don't know if we had asked for a motion to strike and then

18   an instruction to the jury.  And I think for the record we

19   have to make that request as well.  So I just wanted to make

20   sure that that was --

21           MR. DRATEL:  And Your Honor, may I just cite to the

22   record from last year as well, August 15th, 2007, during Avi's

23   testimony.  And at page 21 and 22 of that testimony that in

24   response to a question, "Who is Mahmoud Rumhi?" the answer

25   was, "One of the founders of Hamas in the West Bank and

1    Ramallah.  And I remember him in general saying that Hamas won

2    the election because of its charity branch, social branch.  He

3    was not the only one who said that."

4        So obviously that came in well before Nathan Brown.  And

5    we objected -- part of our motion in limine prior to the case,

6    was to keep out everything after December 4th, 2001.

7        Thank you.

8            MS. SHAPIRO:  I will just say two things.  One that

9    points out the relevance of the information is that part of

10   knowing the people on these committees and their affiliation

11   with Hamas comes from a variety of sources of information, and

12   one is that Hamas sometimes comes out itself and identifies

13   people as being one of their own.  And one of the ways they

14   did that is when people ran on the Hamas ticket in the

15   elections.

16       So it is relevant for an expert looking at an individual

17   to know, okay, in 2006 this person is running on the Hamas

18   ticket.  They probably didn't become Hamas the week before.

19   And you look at the totality of the evidence.

20       In addition, the civil conflict that broke out in Gaza at

21   the same time in the West Bank, there were charity committees

22   at issue in this case.  The Nablus zakat committee was

23   actually attacked, physically attacked by Fatah supporters.

24   Obviously it was attacked because they viewed it, the public

25   viewed it as a Hamas institution.

1    And again, it is relevant to an expert to see that when

2    you have the Fatah faction attacking what they believe is a

3    Hamas institution, that is relevant to the communities'

4    understanding that that is a Hamas institution.

5    Probably, again, logically it didn't become a Hamas

6    institution the day before.  This is a time progression, and

7    he will testify that these committees were Hamas beginning

8    around in 1994 solidly, and then all the way up to the action

9    that the PA took recently.

10    Doctor Brown didn't respond to that so much.  He went and

11    talked about events that went two weeks prior to his

12    testimony.  He specifically said that the PA had taken an

13    action, it might have been days before, that had closed down a

14    number of committees in the West Bank, and then he

15    specifically said, and none of the zakat committees were on

16    that list, and, therefore, in his opinion that means that the

17    PA doesn't view them as Hamas committees.  In fact, now they

18    have been closed down and reorganized, so all of that backdrop

19    is very relevant to understanding the nature of these

20    committees and the understanding of the people in those

21    communities as to whether they are Hamas.

22    MR. DRATEL:  The only thing I would say, Your Honor,

23    is Your Honor identified yesterday what the problem was, and I

24    think that problem is still there in terms of your colloquy

25    with the Government about how far it went and how far afield

1    it went.  We are not talking about something that happened

2    yesterday.  We are talking about a six-year hiatus.

3              THE COURT:  Is it Doctor Brown that testified the

4    last time?

5              MR. DRATEL:  Yes.

6              THE COURT:  Are you are intending on bringing him

7    again this time?

8              MR. DRATEL:  No.  We have a different witness.

9              THE COURT:  To testify on the same area?

10             MR. DRATEL:  About zakat committees.  He is going to

11   talk about zakat committees.

12             THE COURT:  Is he going to take it to the present.

13             MR. DRATEL:  If this is in here.

14             THE COURT:  What if it isn't in there?

15             MR. DRATEL:  I have to go look at what is already in

16   the record in the sense that it -- He wasn't planning on

17   talking about civil war, and he wasn't planning on talking

18   about the reasons why Hamas won the election.  But they have

19   put in as part -- And I think Agent Burns testified about

20   people running on a Hamas ticket as well.  So in terms of what

21   that --

22             THE COURT:  But the elections and running on a Hamas

23   ticket and who controls, that doesn't go to the issue of

24   necessarily who controls the zakat committees.

25             MR. DRATEL:  But the Government put that in for that

1    reason.

2          THE COURT:  I understand.  But I am saying I don't

3    know why we need to get into too far into that.

4          MR. DRATEL:  It is not going to be too far into it,

5    but just the identity of certain people and people who may

6    have run on the ticket and whether or not they are identified

7    with Hamas or; not about the election.

8          THE COURT:  Whether certain individuals are Hamas or

9    not?

10          MR. DRATEL:  That is correct.

11          THE COURT:  Individuals named in the trial.

12          MR. DRATEL:  Right.  Right.  That are associated

13    with the zakat committees and what that means if they ran on a

14    ticket.  And it wasn't called a Hamas ticket.  It was called

15    Change and Reform.  It included a variety of different people,

16    including Christians, on the ticket.  So it is a lot more --

17          THE COURT:  He is going to address those issues.

18          MR. DRATEL:  In the context of those specific

19    people, yes.  And, you know, I mean, they have opened up this

20    whole issue --

21          THE COURT:  It sounds like you were planning on

22    going into it in any event.  You have got an expert lined up

23    to talk about this.  It just sounds like you were planning on

24    going into this as part of showing that these people are not

25    Hamas; that the Government has been trying to show they were

Hamas, with or without this discussion we had yesterday.  I am just still --

MS. HOLLANDER:  I think we are talking about different people.  I mean, I am listening to you, Your Honor, and I am listening to Mr. Dratel, and I think -- Maybe I am wrong, but you are talking I believe about people who Avi is identifying as being Hamas, and Mr. Dratel --

MR. DRATEL:  I will be talking about a variety of people; people on these zakat committees and people --

THE COURT:  That have been identified throughout the case.

MR. DRATEL:  That is right.  They were identified by Agent Burns in her charts.  He is probably going to talk about them tomorrow.  You know, and they are fair game in that regard both ways.  I mean, if they are going to put in saying he is a Hamas person, there are indications that he is not or that it doesn't matter in the context of the committee, that is what our expert will be talking about.

MS. HOLLANDER:  Your Honor, also Mr. Abington, if the Government had not put this information in, then his testimony would just cover the period of time that Holy Land was open, actually '93 to '97 or '99 when he was there.  But the fact that the Government has put this in and he has -- Mr. Avi has stated his opinion about why Hamas won, I mean, there is a big difference of opinion there.  And that is --

1          THE COURT:  I am just wondering why any of that is

2     relevant to this case.  I am hearing all this, but the issues

3     that the jury is going to have to decide -- Did these

4     Defendants give money to the zakat committees knowing that

5     they were controlled and run by Hamas, that is the issue.

6          MS. CADEDDU:  And we don't think it is relevant.  I

7     just want to make --

8          MR. DRATEL:  But it is out there now.

9          THE COURT:  But you are still having an expert lined

10    up to come in and talk about things that have happened after

11    the fact -- Hold on.  Because they are saying they were Hamas

12    back when the money was being given.  And even before that the

13    Government has evidence that these individuals were connected

14    with Hamas, and then you are wanting to get into that they ran

15    in 2006 and they weren't on the Hamas ticket, or whatever it

16    is you are wanting to do, you are going along the same --

17         MR. DRATEL:  Agent Burns has already testified to

18    the election and people running on the Hamas ticket, and that

19    is what it was designed to -- What I was objecting to

20    yesterday was the context that Avi put it in, which is

21    essentially to try to telegraph to the jury that the Holy Land

22    Foundation is responsible for Hamas winning the election and

23    for a civil war that followed, and that to me is beyond 403.

24    And I don't think an instruction or a striking can do it.  I

25    think it is grounds for a mistrial.

1        THE COURT:  I think it probably can.  And I don't

2   think that is where that testimony was going.  This is in '06

3   and '07, and so Holy Land had been closed down a while back.

4   He was talking more about the conflict between Hamas and

5   Fatah.  I didn't understand that as somehow Holy Land is

6   responsible for any of that, the way you are making it out.

7        And, of course, I have still been having some concerns

8   with the relevance.  Do you want to address that?

9        MR. JACKS:  Your Honor, yes.

10        The object of this conspiracy was to support Hamas, and

11   when the Holy Land Foundation was shut down December 4th of

12   2001, the conspiracy did not end.  The object or the desire or

13   the goal to support Hamas --

14        THE COURT:  But the conspiracy that you have alleged

15   in the indictment involves the funding of the zakat committees

16   through Holy Land.

17        MR. JACKS:  That is one aspect of it, yes, Your

18   Honor.  And that may be a conspiracy within a conspiracy.

19        THE COURT:  Is that not the conspiracy you have

20   alleged?

21        MR. JACKS:  It is, Your Honor.  But it is also --

22   There is also evidence of the overarching conspiracy, if you

23   will, to support Hamas.  And I guess this case is different,

24   say, from a drug case in the sense that once the drug

25   defendants were arrested, that that was the end of the

conspiracy.  It was not, because there is other people, other

conspirators out there still working toward this goal.  And --

        THE COURT:  But doesn't that start getting reduced

in relevance as it is other conspirators and not the

Defendants, and Holy Land has been closed down?  Aren't we

just getting further and further away?

    I mean, even if that is 100 percent true, how is that

really going to show -- The charges against these Defendants

are that they funded Hamas through these -- by giving money to

these zakat committees.  That is how they were supporting

Hamas.  How does that go to show whether that happened or not?

        MR. JACKS:  And part of our burden is to show that

those zakat committees were controlled by Hamas.

        THE COURT:  Right.  During the relevant time frames.

        MR. JACKS:  I understand.  But just as the evidence

prior to the Hamas being designated is probative of who

controlled those committees, likewise time evidence later can

be probative --

        THE COURT:  And I agree to an extent.  That is the

problem that I am having is we start getting into '06

elections and '07.  But go ahead.  I keep interrupting.  Let

me hear your theory.

        MR. JACKS:  Well, as I said and as Ms. Shapiro

pointed out, these things don't just happen overnight, so the

argument is if they were Hamas in 1999 and 2001, they didn't

1    stop being Hamas.  There is evidence that they were continuing

2    to be controlled by Hamas, and there is evidence that other

3    people took action because they were controlled by Hamas, and

4    that is the evidence that we seek to introduce.

5              THE COURT:  And the action is what was -- the action

6    taken by the Palestinian Authority?

7              MR. JACKS:  Yes, sir.  And that is the PA, or

8    actually Fatah I guess you could say, the other dominant

9    party, took action to --

10             THE COURT:  And that is closing these committees

11   down?

12             MR. JACKS:  Closing these committees and removing

13   people that were in there.

14             THE COURT:  Okay.  And when are you saying that this

15   happened?

16             MR. JACKS:  It has happened in 2007, Your Honor.

17             THE COURT:  Okay.

18             MR. JACKS:  And part of the relevance of it is to

19   also rebut the Defense argument that they have made a point of

20   saying that Fatah, or the PA at the time which was controlled

21   by Fatah, was the bitter enemy of Hamas.  These documents from

22   several of these zakat committees bear the PA logo, so the

23   argument or the implication is that if the PA has licensed

24   these organizations they must not be Hamas, and that is not

25   the whole story.  So it is to rebut that --

1          THE COURT:  This closing them down in '07 and '08,

2     then, goes to rebut that?

3          MR. JACKS:  Yes.  And that is -- And we intend to

4     present evidence to better explain the relationship between

5     the PA, Fatah, and Hamas.

6          THE COURT:  And this is through Avi?

7          MR. JACKS:  Yes.  And he has already testified about

8     -- They raised the point, or they did last year, that the

9     Israeli authorities licensed these zakat committees and

10    permitted them to operate, and he has already testified about

11    why the Israeli authorities did that to explain that part of

12    their argument.

13         So this later evidence is still probative of this

14    relationship and to show the evidence that supports the

15    Government's argument that these committees were Hamas and

16    they continue to be Hamas up until the time that in I belief

17    it was December of 2007 the PA basically reorganized all of

18    it.  They took away all of these zakat committees and said

19    there is going to be one for each district, and it will be

20    non-political, and they removed people from them.  And that is

21    probative of the fact that the PA regarded these committees as

22    Hamas.

23         And then he further testified that Hamas objected loudly

24    and violently and claimed, "This is an attack on us."  So it

25    is evidence from Hamas itself corroborating that these were

1    their committees because of the way they reacted to their

2    closure.  And that is what this evidence is intended to show.

3         I yield to my colleague from Washington.

4         MR. JONAS:  Your Honor, this fits in also with what

5    Avi was saying about the delicate balance between the PA and

6    Hamas.  And he referenced the Middle East Affairs Journal.

7    Once there was that civil war between Hamas and the PA, that

8    delicate balance no longer applies, and the PA basically took

9    the position of, "We are now going to go after Hamas."  And

10   that is when they shut down these organizations in 2007.  So

11   it all feeds into that, and it all stems from the Defense that

12   Mr. Jacks said, saying, "The PA is licensing these committees.

13   They must be okay."

14        MS. SHAPIRO:  And just finally, Your Honor, the

15   Defense experts, and I am sure you will hear this argument in

16   their case that these are just charity committees.  They are

17   non-political.  They are just giving out aid to the poor and

18   the needy.  So evidence that there are Hamas people who are in

19   these committees, evidence that the PA viewed them as Hamas,

20   that the Palestinian population viewed them as Hamas, even if

21   it is after the date that Holy Land closed, those committees

22   are still up and operating.  And it is probative of the

23   character of those committees, and we believe they are very

24   relevant to meet their arguments.

25        MR. DRATEL:  I don't need to repeat myself, Your

1  Honor.

2          MR. WESTFALL:  It sounded to me like, Your Honor,

3  and I might be wrong, that you and Mr. Dratel were kind of

4  talking past each other a little bit.  We don't have an expert

5  that is just brought in to talk about these --

6          THE COURT:  I didn't say just, but you were planning

7  on addressing that issue, it sounds like.

8          MR. WESTFALL:  Well, we had to address it last year

9  certainly, yeah.

10          THE COURT:  But you had an expert already lined up.

11          MR. WESTFALL:  We did, who was capable of doing

12  that.  But the 2007 events, Your Honor, those zakats were

13  closed down while we were in trial, and so, you know, they are

14  trying to use that to prove their case.  We are doing what we

15  need to do to defend ourselves.

16      And I can't imagine how we opened the door to that.  I

17  mean, there is always some argument that we opened the door to

18  this or that.  That is just kind of the nature of the case,

19  Your Honor.  I guess we all just have to try our case.  It

20  doesn't make sense.

21          THE COURT:  I understand what you are saying.  I

22  mean, I understand.  And normally I like to let the parties

23  try their case, but I also like to keep it within the bounds

24  of relevance.  I think we are pushing the bounds of relevance.

25          I understand your relevance arguments.  I haven't made

1    any decisions, but I just wanted to understand, you know,

2    because we didn't get into that much depth, detail yesterday

3    in terms of your arguments as to why this was relevant and why

4    you thought you needed to get into it.

5              MR. DRATEL:  Just to clarify based on what Mr.

6    Westfall said, the expert we have, Mr. Benthall is going to

7    talk about the entire range of this.  He has studied the

8    history of them.  He was there on the ground in the '90s in

9    the West Bank, so that other part is just a small tiny piece

10   really.

11             THE COURT:  All right.

12             MS. SHAPIRO:  Your Honor, I just wanted to let you

13   know, just so you know what is coming with Avi's testimony,

14   essentially that discussion of sort of the history of the

15   committees was background, and now we are going to get into

16   the specific committees and I am going to focus his attention

17   and his opinion will be on the period of 1995 to 2001.

18       But as an expert he evaluates lots of different kinds of

19   evidence.  One piece of information and one criteria that he

20   applies is how the PA has treated these committees over the

21   years.  So he will talk about the different people in the

22   committee, and he will bring multiple sources of information

23   to bear, including what they were doing in the early '90s,

24   including the mid '90s, and also if, for example, they

25   identified themselves as Hamas by running on the Hamas ticket,

1    that will be relevant to his overall opinion.

2          THE COURT:  And then he is going to discuss the

3    reorganizations, then, of those particular --

4          MS. SHAPIRO:  He is not.

5          THE COURT:  That is done?

6          MS. SHAPIRO:  Yes.  That was background to

7    understand and to meet the argument that the fact that the PA

8    did nothing --

9          THE COURT:  Right.  What testimony, then, respecting

10   these 2006 elections and then the aftermath, what else is left

11   rather than self-identification by running on the Hamas

12   ticket?

13         MS. SHAPIRO:  Nothing.  I mean, that was really

14   intended to be simply a background to understand the history

15   of the context so that when the argument comes back that the

16   Israelis licensed them and the PA didn't do anything about

17   them, and they have never been closed even today--I guess they

18   can't say that now, but last year--so that there is some

19   context to understand these committees.

20       Now what he is going to do is he is going to apply a

21   number of criteria that he looks at when looking at the

22   composition of these committee, he is going to discuss the

23   individuals in the committee, and he is going to refer to

24   different pieces of evidence that identify those individuals

25   and talk about these individuals as Hamas when they came into

1    the committee, and that the committee, based on the

2    individuals, items that were seized from the committee, public

3    sources, media reports, and things like that, that all of that

4    information together tells him, in his opinion, that during

5    the time period of the indictment, '95 to '01, that those

6    committees were controlled by Hamas.

7        He is not going to get into anymore discussion -- And the

8    conflict was only, again, I think -- In the context of the

9    Nablus zakat committee it was relevant to him again that Fatah

10   went out and actually physically attacked this committee,

11   thereby identifying -- the community identified that committee

12   as Hamas.  That was relevant to him.

13       Other than that, and other than the fact that some of

14   these people self-identified by running on a Hamas ticket,

15   that is all we have.

16            THE COURT:  Okay.

17            MR. WESTFALL:  Can I just say one thing, Your Honor?

18            THE COURT:  Yes.

19            MR. WESTFALL:  Along with so many other kind of

20   unique issues in this case, this whole phrase Hamas ticket is

21   even an issue, whether or not it was the, quote unquote, Hamas

22   ticket.  I mean, it was not called the Hamas ticket.  And

23   there are strong differences of opinion as to whether or not

24   it was a Hamas ticket.  So that is just -- You know, these

25   issues like, that that -- This isn't a drug case, clearly.  I

1   mean, so there is a lot more at dispute here than kind of

2   meets the eye at first.

3           MS. SHAPIRO:  Your Honor, whether or not -- The

4   ticket was called the Change and Reform Party, and there were

5   people who ran on that.  And not every person was Hamas, but

6   people identified their party.  So when somebody ran on the

7   Change and Reform ticket and ran from Hamas, then they were

8   Hamas, so it is not a big secret.  And it was widely viewed as

9   the Hamas ticket, and Hamas took control of parliament as a

10  result of the victory in that election.

11          THE COURT:  That was in Gaza?

12          MS. SHAPIRO:  Well, this was the PA parliamentary

13  elections.  It didn't evolve into sort of split Government's

14  until this civil conflict in 2007.

15          THE COURT:  Okay.

16          MR. DRATEL:  That is just an evidentiary issue.

17  They can say it, but it may not be the truth.

18          THE COURT:  I understand it is disputed.  You are

19  entitled to put in your opinions on that.

20          MR. JACKS:  And it was an evidentiary issue in the

21  last trial, and I venture to say it didn't add 20 minutes to

22  the trial.

23          THE COURT:  Okay.  Anything else we need to address

24  along those lines.

25      We have a couple of other issues I guess we can get off

1    the record here for a minute.

2         (Discussion held of the record.)

3         THE COURT:  All right.  With respect to the

4    discovery issue, and the Court had an ex parte conference with

5    Defense counsel last Thursday, which would have been October

6    the 23rd, I believe, after court recessed at the end of the

7    day, specifically to get their understanding and idea from

8    them as to what it was they were looking for before I looked

9    at some classified material.

10        I looked through that material and have determined that

11   there is not anything in there that should be disclosed to

12   Defense counsel, to the Defendants.

13        Anything else that anybody wanted to add to that?

14        MS. HOLLANDER:  I can't think of anything else.

15        MR. DRATEL:  No, Your Honor.

16        THE COURT:  All right.

17        MS. HOLLANDER:  What time tomorrow?

18        THE COURT:  Be here at 8:30.  We will address your

19   objections and the 106 issue that Ms. Moreno raised, and if

20   there is anything else I need to add on this relevance issue

21   that we have been discussing with the elections and the

22   aftermath, we will discuss that at 8:30 in the morning.

23        Are you anticipating having a lot of objections to these

24   exhibits identified?

25        MR. JONAS:  No, sir.  There is only roughly ten or

1    so.  I didn't count.  There are not that many.

2              MS. HOLLANDER:  They are all the same kind of

3    objection.

4              MR. JONAS:  If I can ask a question of Defense

5    counsel, is that all of the exhibits that collectively you all

6    plan on showing through Avi?

7              MS. HOLLANDER:  Those were just mine.

8              MR. JONAS:  So that is the only ones that we have

9    noticed, Your Honor.

10             THE COURT:  Anybody else intending to offer any?

11             MR. DRATEL:  There might be one.

12             THE COURT:  If you will get that to the Government.

13             MR. DRATEL:  We will get that to them today.

14             THE COURT:  In fact, why don't you try to get them

15   to them in the afternoon.

16        Ms. Cadeddu, do you expect any?

17             MS. CADEDDU:  Your Honor, I don't believe I have

18   any.

19             THE COURT:  Mr. Westfall?

20             MR. WESTFALL:  No.

21             THE COURT:  That way I can get the objections this

22   afternoon, and I can have a chance to look at them for in the

23   morning.

24             MS. HOLLANDER:  Actually I am reviewing one more,

25   but I was in the middle of reviewing it, so if I am going to

1   add one more I will give it to you.

2           THE COURT:  Let's here at 8:45 in the morning.

3           THE COURT:  You made your additional motions, so I

4   will give you a ruling.  Just remind me in the morning and I

5   will give you a ruling on that.

6                       (End of day.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts            06/07/2009

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25