1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
2                  DALLAS DIVISION

3   UNITED STATES OF AMERICA     )  CAUSE NO. 3:04-CR-240-P
                                 (
4   vs.                          )
                                 (  OCTOBER 30, 2008
5                                )  DALLAS, TEXAS
    HOLY LAND FOUNDATION, ET AL  (  9:00 A.M.
6
    _____
7

8                     VOLUME 28 OF 37

9   _____

10                    STATEMENT OF FACTS

11
             BEFORE THE HONORABLE JORGE A. SOLIS
12               UNITED STATES DISTRICT JUDGE
                        and a jury
13  _____

14


15              A P P E A R A N C E S

16


17

18      FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                              1100 COMMERCE, 3RD FLOOR
19                            DALLAS, TEXAS  75242
                              BY:  MR. JIM JACKS
20                                 MR. BARRY JONAS
                                   MS. ELIZABETH SHAPIRO
21
        FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
22      (SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
                              20 FIRST PLAZA, SUITE 700
23                            ALBUQUERQUE, NEW MEXICO 87102
                              BY:  MS. NANCY HOLLANDER
24                                 MS. TERESA DUNCAN

25

```
1        FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
         (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
2                             NEW YORK, NEW YORK  10005
                             BY:  MR. JOSHUA DRATEL
3                                  MR. AARON J. MYSLIWIEC

4        FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
         (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
5                             DALLAS, TEXAS  75204
                             BY:  MS. MARLO P. CADEDDU
6
         FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
7        (GHASSAN ELASHI)     P.O. BOX 10985
                             TAMPA, FLORIDA  33679
8                             BY:  MS. LINDA MORENO

9                             JONES DAY
                             555 CALIFORNIA ST., 26TH FLOOR
10                            SAN FRANCISCO, CA  94104
                             BY:  MR. JOHN D. CLINE
11
         FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12       (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                             FORT WORTH, TEXAS  76102
13                            BY:  MR. GREG WESTFALL

14       COURT'S LAW CLERK:   MS. JENNIFER HELMS
                             1100 COMMERCE, RM. 1654
15                            DALLAS, TEXAS  75242

16       COURT COORDINATOR:   MS. BRENDA WEBB
                             1100 COMMERCE, RM. 1654
17                            DALLAS, TEXAS  75242

18   OFFICIAL COURT REPORTER: SHAWN M. McROBERTS, RMR, CRR
                             1100 COMMERCE STREET, RM. 1654
19                            DALLAS, TEXAS  75242
                             (214) 753-2349
20

21

22

23

24

25
```

# <u>INDEX</u>

**EXAMINATION**

| **Witness Name** | **Page** |
|---|---|
| AVI | |
| Direct By MS. SHAPIRO | 26 |
| Cross By MR. DRATEL | 84 |
| Cross By MR. WESTFALL | 181 |
| Cross By MS. HOLLANDER | 194 |
| Cross By MS. CADEDDU | 222 |
| Cross By MS. MORENO | 225 |

## Government's Exhibits

| **Government's Exhibits** | **Page** |
|---|---|
| Demonstrative No. 29 | 26 |
| Demonstrative No. 31 | 64 |
| Demonstrative No. 35 | 84 |

## Defendant Exhibits

| **Defendant Exhibits** | **Page** |
|---|---|
| No. 102 | 5 |

          THE COURT:  As far as tomorrow, we will work
tomorrow.  We are going to go ahead and plan on working
tomorrow.  So we will discuss the scheduling a little later
today in terms of where we are going to be.

     One of the things I didn't ask you yesterday, how much
longer do you anticipate on your direct?

          MS. SHAPIRO:  Probably the first break, or if we go
beyond that not very much.  I will be done before lunch.

          THE COURT:  And then so we may not finish him today,
then, it sounds like.

          MS. SHAPIRO:  That is entirely dependent upon them.

          THE COURT:  Okay.  We will see how that goes, but we
will plan on working tomorrow either way.

          MR. JONAS:  Do we plan on working a full day or half
day.

          THE COURT:  Well, depending on what we are and what
we have going.  I sure want to finish this witness, and so
that will probably determine that as much as anything.

     And then with respect to the exhibits that we were
discussing yesterday, the Defense exhibits that they want to
use through this witness --

          MS. CADEDDU:  Your Honor, may I interrupt for one
moment?  As far as the schedule for today, are we going to
work late today.

          THE COURT:  Yes.

1          MS. CADEDDU:  What do you anticipate?

2          THE COURT:  Probably like we did yesterday--6:00 to

3     6:30.

4     Any other interruptions before I go on?

5     And with respect to the exhibits that we were discussing

6     yesterday, I think Exhibit No. 102, Mr. Jonas, you pretty much

7     had withdrawn your objection, so that is admitted.

8     I have a concern with the exhibits that state results,

9     you know, what you are wanting to use as investigations by the

10    USAID, because of what is stated in the documents and, of

11    course the evidence we have here, 803(8) discusses factual

12    findings can be admitted by a government agency, unless there

13    are circumstances indicating a lack of trustworthiness.

14    And without knowing what the USAID did, as we were

15    discussing yesterday, I think that those documents have more

16    of a potential for confusion than they do anything else,

17    without knowing what criteria USAID was using, what evidence

18    they had, what information they had, what the basis was for

19    their determination.

20    So my inclination -- I am going to sustain the objection

21    to those Exhibits No. 1010, 1075, 1077, and 1078.

22    No. 1014, as I understand it, you were going to make a

23    decision depending on how much was stated about the University

24    of Gaza, so I am withholding a ruling until you decide whether

25    you want to offer that or not.

1    We have No. 1071, 1074, and 1076 that indicate some kind

2    of disbursement to one of these various zakat committees,

3    which I take it that is the reason that you are wanting that

4    in.

5         MS. HOLLANDER:  Correct.

6         THE COURT:  Mr. Jonas, what is your objection to

7    those?  Those appear to just set out the activities of the

8    agency, which would appear to qualify under 803(8)(A)--that

9    they are disbursing money without any regards to any

10   investigation, purported investigation; just they are giving

11   money.  Why would that be --

12        MR. JONAS:  Because, Your Honor, first of all, and I

13   am not taking them in numerical order.  No.  1074 is not a

14   USAID document.  It is a document created by CAIR.  CAIR is

15   not a United States organization, so I don't think it is

16   proper for that document to come in.

17        THE COURT:  There are some documents, the annexes --

18   It does have, what is it?  A seal of USAID on the front cover?

19   I couldn't quite tell from the copy.

20        USAID It was submitted to USAID.  It is not created by

21   USAID.

22        THE COURT:  Now, the annex at the end, that is where

23   the reference to the Qalqilya zakat committee is.  I think you

24   stated that in your response to the Government's objections

25   that there is a reference to the Qalqilya zakat committee in

1    one of the annexes at the back, and you stated in your

2    response that is what you wanted in.  That would appear on its

3    face, from the documents that we have it looks like CAIR works

4    with USAID, and this would appear to be indication that they

5    were one of the recipients of USAID money.  And that is what

6    they want it for.  And then the other Exhibits, No. 1071 and

7    1078, are similar.

8              MR. JACKS:  No. 1078 or 1076?

9              THE COURT:  No. 1076.  Excuse me.  Yes.  I sustained

10   the objection as to No. 1078.

11             MR. JONAS:  Your Honor, I think something you just

12   said makes our point, it would appear.  I am starting for a

13   moment with No. 1074, the CAIR document.  There is nothing to

14   indicate that this is USAID money that is going through CAIR

15   to these organizations, first of all.

16       Second of all, there is nothing to indicate that USAID

17   approved this or was aware of it at the time this was

18   happening.  This could be an after-action type of report that

19   they blessed it.

20       And this is sort of the that point I think the Defense

21   was trying to make is the U.S. Government is giving money to

22   the same organizations, but that is not necessarily the case.

23   And more importantly, this witness can't address that.

24             THE COURT:  Well, set this exhibit aside, because I

25   understand it is a CAIR document.  But you have No. 1071 and

1    then No. 1076 that also have listings of some of the zakat

2    committees that are in issue here that appear to indicate that

3    money is going there.  I think one of them is just a chart.

4    No. 1076, isn't that just a list of charts?

5            MS. HOLLANDER:  Yes, sir.

6            MR. JONAS:  And No. 1071 is a chart with an email

7    attached.

8            THE COURT:  Right.

9            MS. HOLLANDER:  And 1074, I mean --

10           THE COURT:  I will let you have a chance in a little

11   bit.  I just want to get his position on this.

12           MR. JONAS:  Basically, Your Honor, the document

13   raises questions.  What it may appear to be that we can sit

14   here and assume what it is and what actually it is I think

15   there is a difference to that.  And it comes back to what I

16   said a moment ago.  This witness knows nothing about these

17   documents, doesn't work for the USAID --

18           THE COURT:  I understand that part of it, but I am

19   just talking from the documents themselves.

20           MR. JONAS:  From the documents themselves, I think

21   it raises a lot of questions as to what actually was going on

22   here.  And whether or not USAID gave money directly to the

23   organizations, through sub-grantees, which often does happen

24   -- you know, what really was going on behind these documents I

25   think raises a lot of questions, and I think that is why they

1    need to bring in a witness to sponsor them.

2              THE COURT:  So you do have No. 1071 with you?

3              MR. JONAS:  Yes, sir.

4              THE COURT:  And then the charts --

5              MR. JONAS:  The email itself from No. 1071, which of

6    course is hearsay as well and it raises a separate hearsay

7    issue, it doesn't say anything about these are groups USAID is

8    paying.  All it says is, "This is the information you

9    requested."  That is it.  So there is no indication that these

10   were payments made by USAID through a sub-grantee or anything.

11   We don't know if the money went out.  We don't know if this is

12   how much was requested.

13             THE COURT:  The chart on the next page, like the

14   fourth from the bottom, says zakat committee Nablus.

15             MR. JONAS:  Yes, sir.

16             THE COURT:  And it says grant, grantee, purpose.

17             MR. JONAS:  Yes, sir.

18             THE COURT:  Doesn't that appear to be a grant from

19   USAID?  Why would they be having this information if they

20   weren't involved in awarding this money?

21             MR. JONAS:  Because it could be going through a

22   sub-grantee.  In other words, it is not uncommon for there to

23   be an intermediary --

24             THE COURT:  That USAID makes a lump sum to a grantee

25   and they sub it out?

1          MR. JONAS:  Right.  They sub it out.  And I think

2     that is important to know, because then it goes to whether

3     USAID intended to give to this group, the final recipient, or

4     whether they just intended to give to the sub-grantee and the

5     sub-grantee did what it did with the money.  Those are

6     questions that need to be asked and answered of a witness.

7          THE COURT:  Okay.  And so would that be true, then,

8     with respect -- no. 1076 is the charts.  Was there anything

9     else with the charts other than the charts on No. 1076?  I

10    don't have that.

11         MR. JONAS:  All I have are charts, Your Honor.

12         THE COURT:  Do you remember, counsel?  Was there

13    anything else with No. 1076 other than this list of charts?

14         MS. HOLLANDER:  That is what we received from the

15    Government from USAID, Your Honor.

16         THE COURT:  All right.

17         MS. HOLLANDER:  I don't know if you are ready to

18    hear from me.

19         THE COURT:  Yeah, go ahead.  Let me hear from you.

20         MS. HOLLANDER:  Your Honor, in the first place, the

21    Government does know that that is what happened in these cases

22    and that the money did go to these places.  The fact that it

23    may have gone through some sub-grantee, that is how USAID

24    works.  That goes to weight.  But the point of this is clearly

25    that this is money that came from USAID.  These were documents

1    in USAID files that were turned over to us that show what they

2    did, and the Government's arguments go to weight.

3         No. 1071, the ones Your Honor talked about, No. 1076 and

4    1074, the other one is 1077, which is an interoffice

5    memorandum clearly involving -- In fact, it actually goes with

6    the CAIR document because it responds to it and says, "Per

7    your request we have vetted these people."  I mean, that is

8    what the agency does.

9         THE COURT:  But the problem is, like I was speaking

10   with respect to the other ones, we don't know what that

11   vetting entails.

12        MS. HOLLANDER:  That goes to weight, Your Honor.

13        THE COURT:  But under 803(8)(C), if there is

14   circumstances indicating lack of trustworthiness then that is

15   one of the things that I have to consider.  There is certainly

16   a lot of evidence in here that indicates to the contrary, so I

17   think absent a witness from the agency that can explain what

18   they did and what information they used and explain what that

19   investigation was it does leave it open and vague, and I think

20   it is just more confusing than anything.  It just leaves it

21   open for speculation.

22        MS. HOLLANDER:  You are talking about the vetting.

23        THE COURT:  The vetting ones -- That one has

24   vetting.  And then those that have a result of a trace report

25   or whatever, trace records, all of those.  So this would be

1    the same with respect to the email, that particular phrase.  I

2    am not getting there yet.  We are talking about these charts

3    that appear to set out the activities of the agency.  And Mr.

4    Jonas is raising the issue that we don't really know what is

5    going on in terms of how that is handled and what is being

6    done without somebody here to testify to that.

7              MS. DUNCAN:  Your Honor, the only other point I

8    would make is the vetting results, regardless of the

9    admissibility of those pieces of evidence in this trial, I

10   mean, they contradict Mr. Jonas' argument that somehow we

11   don't know if USAID knew that money was going to these

12   particular organizations because they are vetting them for

13   that particular purpose.  So those documents support the

14   admissibility of the grants list; that clearly USAID did know

15   who they were giving money to or they wouldn't vet them.

16             MR. JONAS:  Your Honor, one point in response to Ms.

17   Hollander about the CAIR document No. 1077 is in response to

18   the CAIR document No. 1074.  They are dated two years apart,

19   so I don't see how an email in 2002 can be in response to

20   documents in USAID in 2004.

21             THE COURT:  The email is 2002, and then what is

22   2004?

23             MR. JONAS:  The CAIR document that Ms. Hollander

24   said is related to the email.

25             MS. HOLLANDER:  My point is simply that they work in

1    connection.  CAIR was one of those organizations that USAID

2    worked through, Your Honor, and there is a presumption of

3    admissibility.  The Government's arguments go to weight.  This

4    is really the only way we can introduce these documents that

5    the Government knows are accurate.

6            THE COURT:  It is not the only way.  I disagree with

7    that.  There are ways to sponsor these documents in.  You just

8    are not wanting to do it at this point, but that is not true

9    that that is the only way that you have.

10           MS. HOLLANDER:  I think the real problem I have with

11   the Government's argument, frankly, is the Government knows

12   these documents are accurate and that this is what happened.

13           THE COURT:  I don't think they are saying that they

14   are necessarily not accurate.  They are just saying "We don't

15   know the decision-making, the vetting, and who made the

16   decision to get them there."

17       It appears, because of some of these vetting documents,

18   that USAID was making some of these decisions, but without

19   more, without more it is just difficult to tell what is going

20   on.  And so I think there is an issue as to the

21   trustworthiness of those decisions, and it can cause confusion

22   more than anything.

23       Yes.

24           MS. DUNCAN:  I just wanted to make sure that the

25   three documents we are talking about, No. 1071, 1074, and

1    1076, we are talking about admissibility under provision (A),

2    and so I think that the vetting documents --

3            THE COURT:  I know you are saying that, and you said

4    that yesterday, but you are offering those, and you stated

5    that in your response and you stated that here yesterday, that

6    after an investigation USAID determined that these zakat

7    committees were eligible to received these.  You stated that

8    in your argument yesterday and in your response.  That is

9    clearly why you want them.  That is why they are valuable.

10   And they would be relevant if, in fact, you had the evidence

11   to support what kind of an investigation and satisfy -- so you

12   are offering them under (C).  I think (A) may be those charts.

13   That is where I am going with that.

14           MS. DUNCAN:  That is what I was talking about, Your

15   Honor.  I was talking about the charts.  Because I think the

16   documents that you have excluded, the vetting, just goes to

17   show -- I mean, the charts show that USAID gave money to these

18   certain organizations, and the Government said, "Well, we

19   don't know if they knew if they did that."  And the vetting

20   documents go to that argument.

21       So I wasn't rearguing the ones you have excluded.  I was

22   arguing those charts that simply show that money went from

23   USAID to those organizations.

24           MS. HOLLANDER:  Those come under (A).

25           THE COURT:  I think that is right.  That is why I

was asking Mr. Jonas about those and specifically with (A),

and you have raised the issue that you still can't tell what

happened.

MR. JONAS:  I think our bottom line position on this

is if this is an issue that he want to bring before the jury,

let them do so by calling a witness from USAID.  I think it is

as simple as that.

THE COURT:  Well, but they are entitled -- If the

exhibits, you know, on their face are admissible because they

satisfy -- you have already stipulated to authenticity, so the

only issue left is hearsay, and if on their face they satisfy

any of the 803(8) requirements, then they are admissible and

they get to come in.  They don't need to bring somebody else

to explain it.

With the investigation I agree because I don't think they

get there.  But with these that appear to just be setting out

the agency activities that come under that 803(A) that we

discussed, that is the one that I think is a more difficult

issue for you.

MR. JONAS:  Yes, sir.  But, I mean, I guess that is

our problem is we don't think it satisfies the rule because on

its face it is not clear enough whether it does or not, and

that is why I was saying they need a sponsoring witness.

THE COURT:  I understand the issues.  I will get to

those, then, certainly by the time you start your cross

1   examination on those three exhibits.

2        Mr. Dratel, you brought up No. 1069.  I just looked at

3   that for the first time this morning, and I haven't heard on

4   it a lot because I hadn't looked at it yesterday.

5        What are your -- What is your position on No. 1069?  That

6   is that Interpal, English commission investigation into

7   Interpal.

8             MR. JONAS:  It is a foreign government document,

9   Your Honor, and there are certain rules both in the Federal

10  Rules of Evidence and the statutes that require that certain

11  steps be taken in order to make those authentic.

12            THE COURT:  You had stipulated to the other exhibits

13  as authentic.  Is there a stipulation with respect to this

14  exhibit?

15            MR. JONAS:  No, sir.

16            THE COURT:  Okay.  And then what about the hearsay

17  issue?

18            MR. JONAS:  Well, it is hearsay as well.  I mean,

19  there has been no foundation laid whatsoever that it is not

20  hearsay.  You know, I think they first have to -- Very often

21  when it comes to a foreign record, foreign government record,

22  the certifications usually cover authenticity and hearsay.  So

23  I guess the argument that I made sort of goes to both issues.

24  And until Mr. Dratel is able to satisfy that, we stand by our

25  position that this is an inadmissible document.

1          THE COURT:  Mr. Dratel?

2          MR. DRATEL:  The foreign documents is not

3 exclusively the way they come in, because there are obviously

4 other rules that apply.  902(5) which I cited yesterday, it is

5 a publication from a government and that satisfies that.  So

6 as far as authentication goes, that is not a problem.

7          As far as hearsay, it is a report -- it qualifies under

8 803(8).  It is a report of a government.  The Government has

9 put in foreign government documents, the PA documents, through

10 another -- without authenticating them by certification.

11 There are other ways to do it.  There are alternative means.

12 These are the alternative means that we have--902(5) for the

13 self-authentication and then 803(8) for the hearsay.

14          And I think it satisfies them -- as I said, it came in

15 last year.  He was cross examined about it.  He is very

16 familiar with Interpal and he knows the decision, so that is

17 our argument.

18          MR. JONAS:  Your Honor, we admitted foreign public

19 records through a witness, and Mr. Dratel is aware --

20 Obviously he is aware of this document because as he just said

21 they used it last year.  There is no reason why he could not

22 have taken the proper steps according to the rules to get it

23 authenticated to make it an admissible document.  I am not

24 quite sure why they are trying to circumvent the rules of

25 evidence.

1       MR. DRATEL:  We don't have the person who actually

2   seized the PA documents, so we don't have a person that

3   actually can speak to them.  As has been clear, there are

4   alternative means.  We have cited the two that apply here I

5   think on their face without question.

6       THE COURT:  All right.  I will get back to you as

7   well on that one, then.

8       Ready for the jury?

9       MR. DRATEL:  Your Honor, may we have just two

10  minutes to talk among counsel?

11      THE COURT:  Yes.  Come on up.  In fact I needed to

12  visit with you as well.

13      MR. DRATEL:  I was hoping we could talk among

14  counsel.

15      THE COURT:  I will give you a minute here.

16      (The following was had at the bench.)

17      THE COURT:  The CIPA issue that you raised, we are

18  going to have that hearing, and I was thinking Monday.  Would

19  that work.  We can just break at 5:00.  And you say you want

20  to have somebody here.

21      MR. JONAS:  Yes.

22      THE COURT:  So I was thinking of Monday.

23      MS. CADEDDU:  We need to check with Mr. Cline.

24      MS. DUNCAN:  Your Honor, the only other issue is

25  that we have that one witness that we need to call Monday and

1    he needs to be done Monday.

2           THE COURT:  How long would you expect on his direct?

3           MS. HOLLANDER:  I don't expect his direct to be more

4    than a couple of hours.  There is only one of us directing

5    him, but I can't guarantee what the Government is going to do.

6           THE COURT:  If direct is a couple of hours, I

7    wouldn't think cross would be --

8           MR. JACKS:  No.  I am going to try to prepare some

9    issues.  I have some relevancy objections to what he intends

10   to testify to, and I will try --

11          THE COURT:  Who is this witness that is testifying?

12          MS. HOLLANDER:  Doctor Esposito.  I don't think it

13   will be a problem.  It is just that we only have him for that

14   one day.

15          THE COURT:  That is fine.  It sounds like if you can

16   limit your direct to two hours, it should not be a problem.

17          MS. HOLLANDER:  I think I will.  I am pretty quick.

18          THE COURT:  Two, two and a half hours, we should be

19   able to finish it if you keep it to that.

20          MR. JACKS:  You know how accurate I am.

21          THE COURT:  Right.  But this is cross, so I am not

22   going to let you go longer than they go.  So if you keep yours

23   two, two and a half, you will be at two, two and a half.

24          MR. JACKS:  I can do that.

25          MS. HOLLANDER:  I am not the best judge either.

1    That is my best guess.

2          THE COURT:  We need to get this done before

3    Mr. Abington testifies, and I don't know when that is going to

4    be.  So if Mr. Cline doesn't have a problem with it, whoever

5    is going to check with him, we are going to plan on Monday at

6    5:00.

7          MS. HOLLANDER:  My only concern about Mr. Cline, he

8    is in a trial and he is two hours earlier than we are.  I

9    wonder if you would be willing to say 6:00.

10          THE COURT:  I don't have a problem with that.  That

11    would be 8:00 his time.

12          MS. HOLLANDER:  It is 4:00.

13          THE COURT:  I was thinking New York.

14          MS. HOLLANDER:  I think that would be safer in terms

15    of this witness, and since Mr. Jacks is cross examining him.

16          THE COURT:  Your legacy lives.

17          MS. HOLLANDER:  And we have to check with Mr. Cline,

18    but I think that is safer.  We will check with him today.

19          MR. JONAS:  I am going to step out and call to make

20    the arrangements to see if they can be here Monday.

21          MS. HOLLANDER:  We don't need the jury anyway.

22          THE COURT:  Right.  And they can be checking with

23    Cline, and then we can work a little later.

24          MS. CADEDDU:  He is in trial, so it may take a while

25    to reach him.

1          THE COURT:  How long is he going to be in trial?  Do

2     you know.

3          MS. CADEDDU;  A week or more, I think.

4          THE COURT:  He is not here anymore, then, likely.

5          MS. HOLLANDER:  Unless they start reading long

6     depositions.  It is a civil case.

7          MR. JONAS:  Are you planning on having him here via

8     telephone?

9          MS. HOLLANDER:  I don't know, because we don't have

10    a secure phone.

11         MR. JONAS:  That raises an issue.

12         MR. MYSLIWIEC:  If possible, we would like to

13    support that option.

14         THE COURT:  Do you have a secure phone?

15         MR. JACKS:  Yes.

16         THE COURT:  So it would have to be there.

17         MR. JONAS:  I don't know if your room with the

18    secure phone will hold everybody.

19         MR. JACKS:  There is another one in Richard's

20    office.

21         MS. HOLLANDER:  And since John is in a courthouse in

22    San Francisco, I know they have one somewhere.

23         MS. CADEDDU:  Ms. Duncan was suggesting that maybe

24    we can take a few minutes and we can try to call him now, and

25    it is 7:00 in the morning California time.

1          THE COURT:  That is fine, but I want to get started

2    in just a few minutes with the jury, and the witness is here

3    so let's get started.

4          MR. DRATEL:  Can we just take a few minutes for some

5    scheduling issues because of tomorrow now?

6          THE COURT:  Do you need to do that right now?

7          MR. DRATEL:  We would prefer to alert the Court

8    sooner rather than later.

9          THE COURT:  Go ahead and Take a few minutes.  We

10   will wait here.

11               (Pause in proceedings.)

12         MS. DUNCAN:  We are ready.  Ms. Cadeddu has a status

13   report.

14         MS. CADEDDU:  I managed to reach Mr. Cline.  He said

15   he should be out of court at 4:00, 6:00 our time, so Monday

16   should work, assuming the phone is set up.

17         MR. JACKS:  And Betsy mentioned, I am not sure --

18   Most of those phones don't have a speakerphone on them.  I

19   will have to make sure ours do.

20         THE COURT:  All right.  We will check on that maybe

21   at the break and you can let us know.

22         MS. DUNCAN:  And I just wanted to raise a scheduling

23   issue at the start of the Defense case.  We are not sure when

24   we will end with Mr. Avi.

25         THE COURT:  Let's discuss that towards the end of

1  the day as we see where we are with Mr. Avi.  Have you decided

2  yet whether he is your last witness or not?  It is up in the

3  air?

4          MR. JACKS:  It depends on the USAID documents.  It

5  is one of those things that we will see how it comes out and

6  then make a decision --

7          THE COURT:  And you wouldn't expect that to be too

8  long, that witness?

9          MR. JACKS:  No.

10         THE COURT:  Let's just see where we are, then.

11         MS. DUNCAN:  And our preference would be to start

12 our case first thing Monday morning just because of some of

13 the scheduling issues and --

14         THE COURT:  I am fine with that, but I don't want to

15 waste tomorrow.  We are going to take the time to work.

16         MS. DUNCAN:  There may be some motions we can do

17 tomorrow.

18         THE COURT:  It won't to take all day to do motions,

19 so you need to be ready, have somebody ready to go tomorrow.

20         MS. DUNCAN:  We may have one witness that is ready

21 to go.  We just may not be able to fill the day.

22         THE COURT:  I wouldn't want to come in here and then

23 work an hour and go for that just to wait until Monday.  The

24 jury wants to work tomorrow, and I think we need to work

25 tomorrow since we took the other day off.  I would like to use

1   as much as we can.

2       I don't mind taking off early like we were discussing,

3   but I want to put in a good half a day or more.

4               MR. MYSLIWIEC:  So if we are trying to schedule

5   flights and that kind of thing, it is safe to do it later

6   afternoon?

7               THE COURT:  Right, in the later afternoon.  I don't

8   want to come in for an hour, unless that is what it takes to

9   finish Avi, and at that point we will just go.

10              MR. WESTFALL:  If we want to put on one witness

11  tomorrow, we will be okay?

12              THE COURT:  I think so.

13              MS. MORENO:  So the Court is telling us we should

14  have one witness?

15              THE COURT:  Like I am saying, until we see how this

16  witness goes, it is just hard to say.

17              MS. HOLLANDER:  We can get to the first one, but we

18  won't get past one.  I guess that is what we need to know.

19              THE COURT:  It is going to depend on how soon we

20  finish him.  I don't know.

21              MS. CADEDDU:  Our concern is we have a lot of out of

22  town witnesses, and we have some that -- We thought we were

23  going to go through the end of the week, Thursday, and have

24  Friday off, and we had scheduled to prepare them, and now we

25  have them all coming and preparing them.

1    MR. DRATEL:  So in terms of if we finish Avi at a

2  reasonable time today and they don't call the USAID, we don't

3  have somebody to fill out the rest of today.

4    THE COURT:  I understand that.  I wouldn't expect

5  you, because nobody knows where we are with this witness.  It

6  is tomorrow that I am concerned about.

7    MR. DRATEL:  If they call USAID, we certainly want

8  to get through them tomorrow and see where we are.

9    MS. HOLLANDER:  But we don't need to have your

10  witness ready to today?

11    THE COURT:  Tomorrow will be fine.

12    MS. CADEDDU:  Tomorrow we will get through one at

13  most?

14    THE COURT:  That is what I am not sure, because it

15  depends on how soon we finish this.  I don't know -- How long

16  do you anticipate with that particular witness?

17    MS. MORENO:  He didn't go that long last time.  Less

18  than two hours total.

19    THE COURT:  We will have a better feel -- Once we

20  get to our afternoon break, we will know where we are.

21    MS. CADEDDU:  So we will regroup at the afternoon

22  break.

23    (The following was had in the presence and hearing

24    of the jury.)

25    THE COURT:  Bring the jury in.

```
 1                    (Whereupon, the jury entered the courtroom.)

 2                    THE COURT:  Ladies and gentlemen of the jury, good

 3         morning.  We are ready to proceed.

 4              Ms. Shapiro?

 5                    MS. SHAPIRO:  Thank you.

 6         Q.  (BY MS. SHAPIRO)  Good morning.

 7         A.   Good morning.

 8         Q.   Where we ended off yesterday, we just talked about

 9         several individuals at the Islamic Charitable Society of

10         Hebron.

11         A.   Correct.

12         Q.   I just want to ask you about one more person or a couple

13         of more people.

14              Are you familiar with somebody named Izz al-Din Farah.

15         A.   Yes, I do.

16         Q.   Who is he?

17         A.   He was a member in the Society for a short time,

18         according to what I reviewed, as a Hamas member, but he was

19         only on the board in '96 and '97.

20         Q.   Okay.  And did you assist in preparing a demonstrative

21         exhibit collecting the people of the Islamic Charitable

22         Society of Hebron that we discussed yesterday?

23         A.   Yes.

24                    MS. SHAPIRO:  Your Honor, I move the admission of

25         Demonstrative No. 29.
```

1                    THE COURT:  Same as the previous objection.

2                    MS. DUNCAN:  Your Honor I think there is one

3     photograph that they couldn't identify.

4                    MS. SHAPIRO:  That photograph has been covered up,

5     Your Honor.

6                    MS. DUNCAN:  If we could just see the modified

7     exhibit.

8          Just the previous objections, Your Honor.

9                    THE COURT:  Okay.  And those have been overruled.

10    Government Demonstrative No. 29 is admitted.

11                   MS. SHAPIRO:  Thank you, Your Honor.

12    Q.   (BY MS. SHAPIRO)  I am showing you Demonstrative No. 29,

13    and I have covered up the picture you couldn't remember

14    yesterday, Mr. Farah, and I want to talk about this collection

15    of people and how they were known in the community.

16         First let me ask you, were any of these people here on

17    the Islamic Charitable Society of Hebron connected to the

18    military wing of Hamas?

19    A.   Abd al-Khaliq Natshe, head of the charitable society of

20    Hebron was also the head of Hamas in Hebron and was also

21    involved in military activity of the Izz el-Din al-Qassam.

22                   MS. SHAPIRO:  May I approach the demonstrative, Your

23    Honor?

24                   THE COURT:  Yes.

25    Q.   (BY MS. SHAPIRO)  Can I put a red sticker next to him?

And was Abd al-Kaliq al-Natshe also identified by Hamas?

A.    Yes.

Q.    Who else in the Islamic Charitable Society of Hebron has
been identified by Hamas as being one of its own members?

A.    Hashem Natshe also identified by Hamas.

Q.    Go ahead.

A.    The green one.

Q.    Okay.  And who else?

A.    Mohammed Eid Misk also.

Q.    Okay.

A.    Adel Jneidi, Hazim Salhab, Moustafa Shawer.  Adel Jneidi
was also involved in the military activity.  He was the head,
of course, for commander for Izz el-Din al-Qassam during the
'90s.

Q.    Can you speak up just a little bit?  Pull the microphone
closer to you.

A.    Okay.

Q.    It is Okay.

A.    Okay.

Q.    Thanks.  Okay.  Now, when you talk about people as being
part of Hamas, what kinds of things are you relying on to come
to that conclusion?

A.    I am relying on a variety of sources, and in the case of
Hebron there were plenty of sources in the Palestine Info,
which is a Hamas internet site, which actually gives the CV of

1    these people.  Also Khalid Mishal mentioned many of them as

2    senior Hamas activists.

3    Q.    And Khalid Mishal is who?

4    A.    Khalid Mishal is the head of the Hamas, the head of the

5    political bureau of Hamas.

6    Q.    Has he given interviews?

7    A.    Al-Hayat in December 5th, 2003, and he gave the names,

8    many names of charity leaders, including many of the persons

9    mentioned in this demonstrative.

10   Q.    Okay.  And do you rely on more than one source to

11   determine whether people are connected to Hamas?

12   A.    Yes.

13   Q.    And is that true for all the committees that we have been

14   discussing yesterday and a couple of days ago?

15   A.    Yes.

16          MR. DRATEL:  Your Honor, just *Crawford* objection

17   that we discussed yesterday.

18          THE COURT:  Overrule that objection.  Go ahead.

19   Q.    (BY MS. SHAPIRO)  Do you know who Kamal al-Tamimi is?

20   A.    Kamal Tamimi was a member, an employee of the Islamic

21   Charitable Society.  He was the head of the foreign

22   affairs -- foreign relations for the society, and he also was

23   representative of the Holy Land Foundation.

24   Q.    A representative?

25   A.    A representative of the Holy Land Foundation in the

1    Islamic Charitable Society in Hebron, and he is also a Hamas

2    member.

3    Q.    Okay.

4              MS. SHAPIRO:  Can we pull up HLF Hebron No. 1,

5    please?

6    Q.    (BY MS. SHAPIRO)  This is a letter from the Holy Land

7    Foundation.

8              MS. SHAPIRO:  If we can go to the English, please.

9    Q.    (BY MS. SHAPIRO)  Okay.  I will just read a portion of

10   this letter dated July 17th, 2001.

11        "Dear brother Kamal al-Tamimi, may God protect him.

12   Subject, disbursing a grant to the Young Muslim Youth

13   Association Hebron."

14        Yesterday I think you mentioned the Young Muslim

15   Association or Young Muslim Youth Association.  Is there a

16   connection between that organization and the Islamic

17   Charitable Society of Hebron?

18   A.    This is more than a connection.  I would say that the

19   Islamic Charitable Society is the mother society.

20   Q.    Parent organization?

21   A.    Parent society.  Sorry.  Parent society for the Young

22   Muslim Society.  This is not the only indication, and I

23   reviewed more indications that there is a strong connection

24   between those societies.

25   Q.    Do they share some of the same leadership?

1    A.    Yes.  Hatem Qafisheh, for example, was a member in the

2    membership, both members of the societies.  Also some of the

3    members of the Islamic Charitable Society used to attend

4    events of the Young Muslim Society.  So they were very, very

5    close relations between the two societies.  Some of the money

6    that the Young Muslim Society received came through the

7    Islamic Charitable Society in Hebron.

8    Q.    Okay.  And this letter says, "A kind greetings to

9    proceed.  Please take the necessary action to disburse the sum

10   of $5,000 to the account of the Young Muslim Youth Association

11   Hebron as a grant from the Holy Land Foundation for the

12   purpose of organizing a summer camp according to a proposal

13   that was submitted by the Association."  And it is signed by

14   the Director of Programs and Grants.

15        Have you seen any videotapes of school or summer camps or

16   ceremonies involving young people at the Young Muslim

17   Association.

18   A.    Yes.

19              MS. SHAPIRO:  Could we play, please, ICS Hebron

20   No. 12?

21              (Whereupon, ICS Hebron No. 12 was played in open

22              court, while questions were propounded.)

23   Q.    (BY MS. SHAPIRO)  If you see something in this video that

24   you want to tell us about, please just stop me and I will stop

25   the tape.  Thanks.

```
 1        Who is the gentleman with the full white beard and the
 2   headdress?
 3   A.    This is Adel Jneidi.  He is the chairman -- at that time
 4   a chairman of the Islamic Charitable Society in Hebron.
 5   Q.    Does he appear on your demonstrative?
 6   A.    He is the second from the right in the upper row.
 7   Q.    Here?
 8   A.    Yes.  This is Adel Jneidi and he is participating in the
 9   ceremony.
10   Q.    I am sorry.  Who do you see here?
11   A.    Again, this is Adel Jneidi, but previously I also
12   identified Azzam Hasuni which is a chairman of the Young
13   Muslim Society in Hebron and also Hamas member.
14   Q.    Is okay.  You mentioned Adel Jneidi was involved in
15   military activity.  Can you be more specific?
16   A.    He was instructor in summer camps of the Young Muslim
17   Society during 1995 until 1999, and he was instructor for
18   small military cells of students that participated in these
19   summer camps.
20   Q.    Okay.  Thank you.
21   A.    It is a commander, like commander of the platoon, a
22   platoon commander.  It is a course that was the course itself.
23   Q.    Are you saying course?
24   A.    It is a course, yes.  You have to be qualified.  And the
25   course itself to place in the facilities of the Islamic
```

1    Charitable Society in Hebron.

2    Q.    Okay.  Thank you.  Let's continue with the video.

3          Are you pointing to this guy?

4    A.    The left member.

5    Q.    The baldish man?

6    A.    Yes.

7    Q.    And remind us who he is?

8    A.    This is as Azzam Hasuni.

9    Q.    He was?

10   A.    Chairman for the Young Muslim Society in Hebron.

11   Q.    That is where the ceremony is taking place?

12   A.    That is where the ceremony is taking place.

13   Q.    Did you see where it says "kindergartens are the

14   children's garden"?  Is that consistent with how Hamas views

15   education?

16   A.    Exactly.

17            MS. HOLLANDER:  Objection, Your Honor, to leading.

18            THE COURT:  Do you want to rephrase the question?

19   Q.    (BY MS. SHAPIRO)  When it says their kindergartens are

20   the children's garden, what does that mean to you?

21   A.    As I said a few days ago, the kindergartens are the first

22   stage shown in this lifecycle that I draw in the

23   demonstrative, and this is the first stage where the kids, the

24   children, and like this example, absorb the ideas of the Hamas

25   philosophy, ideology, and the violence that are

```
 1    shown--obviously what you see here, the RPG and weapons.  And

 2    this is in small age, and they are in a small age and they can

 3    absorb very easily the ideas of Hamas.  So this is the idea

 4    why the kindergartens are so important for Hamas.

 5    Q.   Thank you.  Okay.  Let's continue?

 6         Yehia Ayyash.  Who is he?

 7    A.   Yehia Ayyash, I talked about him yesterday.  His nickname

 8    is the engineer.  He graduated in Birzeit University, and the

 9    one who created or invented the mechanism for explosive --

10    human explosive belt.  And he prepared many explosives like

11    this that were used for suicide attacks.

12    Q.   Is this Yehia Ayyash?  This is Tulkarem Zakat No. 3.

13    A.   This is Yehia Ayyash.

14    Q.   Okay.  Continue, please.

15         When it says Izz el-Din what are they referring to?

16    A.   Izz el-Din al-Qassam Brigades the military arm of Hamas.

17    Q.   Okay.  Continue, please.

18         Do you know who this person is Ammar Amarna.

19    A.   Ammar Amarna is the suicide bomber in a bus in Hadera.

20    Q.   What is Hadera?

21    A.   Hadera is a city in Israel.

22    Q.   This is Map No. 5.  This is Hadera?  Okay.  Pointing to a

23    town on the Mediterranean sea.  In Israel.  Right?

24    A.   In Israel.

25    Q.   Continue, please.
```

1      Do you know who is Saleh Abel Rahim Suey is?

2  A.    He is suicide bomber from Dizengoff in October 1994.

3  Q.    What is Dizengoff?

4  A.    It is a street in Tel Aviv city.

5  Q.    Is it a main street?

6  A.    It is a main street.

7  Q.    Okay.  Go ahead.

8        Do you know who Majdi Wardah is?

9  A.    Majdi Abu Wardah is a suicide bomber.  I don't remember

10 where exactly, but he is a suicide bomber that -- I remember

11 his name.  For sure he was also appearing in publications that

12 was seized by the Israeli army in the Islamic Charitable

13 Society in Hebron.

14 Q.    Go ahead.

15       Do you know who he is?

16 A.    Diyai Tawil was the head of the Kutle el-Islamia which is

17 the student party of Hamas in Birzeit University in Ramallah.

18 He was the nephew of Jamal Tawil.  We just spoke about him as

19 a member of at least three committees that we spoke about

20 yesterday.  Diyai Tawil is a suicide bomber from the French

21 Hill in Jerusalem in a bus.

22 Q.    And just for a moment -- Let me ask you this.  This

23 particular person, did he travel any of the stages of the

24 lifecycle that we spoke about?

25 A.    Yes.  He learned in school in high school that was

1    supported by the Ramallah zakat committee, and then he was the

2    head of the Kutle el-Islamia.

3    Q.    What is that again?

4    A.    The student party of Hamas in the University.  It was in

5    Birzeit University.

6    Q.    And after he studied at the university, what happened

7    then?

8    A.    He committed a suicide attack in March 2001 in the place

9    called the French Hill in Jerusalem in a bus.

10   Q.    Did his family receive support afterwards?

11   A.    Yes, from the Ramallah zakat committee.

12   Q.    Okay.  And I am going to show you some pictures from HLF

13   Search No. 51 from the Holy Land Foundation offices in

14   Chicago.

15         MS. SHAPIRO:  If I could have the overhead for a

16   moment, please.  This has Q-40 on the back.

17   Q.    (BY MS. SHAPIRO)  Who is this?

18   A.    This is Diyai Tawil.

19   Q.    This is the same person being spoken about in the video

20   that you just described his education?

21   A.    Yes.

22   Q.    Okay.  And how about this?  Let me just give the number

23   out for the record.  No. 92?

24   A.    Diyai Tawil.

25   Q.    Also Diyai Tawil?

1    A.    Yes.

2    Q.    And how about this?

3    A.    Diyai Tawil.

4    Q.    The same person?

5    A.    The same person.

6    Q.    Okay.

7              MS. SHAPIRO:  That was No. 153.

8         If we can go back to the tape, please.

9         (Whereupon, ICS Hebron No. 12 continued to be played.)

10        (BY MS. SHAPIRO)  Who are these individuals on the

11   screen?

12   A.    On the right this is Adel Jneidi.

13   Q.    Is that the person you pointed out earlier?

14   A.    Yes.  The second -- Yes, this is the Adel Jneidi, the

15   chairman of the Islamic Charitable Society at the time.

16   Q.    Who is next to him?

17   A.    And next to him is Abd al-Khaliq Natshe.

18   Q.    Is he the individual in the brown jacket and polka dot

19   tie?

20   A.    Yes.  And he is the member on the upper row on the left.

21   Q.    Here?

22   A.    Correct.

23   Q.    Continue.

24        Do you know who this person is, Hamid Abu Hijlah?

25   A.    He is also a suicide bomber that committed a suicide

1    attack.  I remember that we saw his postcard in the Nablus

2    zakat committee, the same postcard that described his suicide

3    attack and his background.

4    Q.   Was that the postcard that had two individuals on it next

5    to each other?

6    A.   Yes.

7    Q.   In the Nablus zakat committee?

8    A.   Nablus zakat committee.

9    Q.   Continue, please.

10        And who is that individual.

11   A.   Abd al-Khaliq Natshe.

12   Q.   How did the woman identify Abd al-Khaliq Natshe on the

13   videotape?

14   A.   Basically the head of the Hamas in Hebron.

15   Q.   Okay.

16        MS. SHAPIRO:  Can we bring up Elbarasse No. 22,

17   please?

18   Q.   (BY MS. SHAPIRO)  Do you see a reference to the Islamic

19   Charitable Society in Hebron?

20   A.   Yes.

21   Q.   And do you see the person mentioned in there, two people

22   mentioned in there specifically?

23   A.   Yes I see.

24   Q.   Who are they?  Why don't you read what it says here?

25   A.   Actually three.  "All of it is ours.  It has Adnan

1   Masouda that was the manager of the office, administrative

2   manager.

3   Q.   Adnan Masouda?

4   A.   Adnan Masouda.

5   Q.   Okay.

6   A.   Abd al-Khaliq Natshe and Hashem el-Natshe is written.

7   Q.   That was 1991.  When was the tape -- can you tell from

8   the contents of the tape about when that was filmed?

9   A.   2001.

10  Q.   2001?

11  A.   Yes.

12  Q.   This tape that we just saw?

13  A.   Yes.  It is from the summer 2001, July, because there was

14  in this tape they were referring to the death of Fizel

15  Husseini and the tape -- Fizel Husseini died in July 2001, and

16  they referred to his death a few weeks ago.  So that is the

17  time frame.

18  Q.   And from 1991 through 2001, do you have an opinion with

19  respect to this committee the Islamic Charitable Society of

20  Hebron?  And we will talk more about it, but I just want to

21  understand the time frame for your opinion.

22  A.   Yes.  The Islamic Charitable Society in Hebron was

23  definitely part of the Hamas social network, and actually it

24  was the biggest Hamas society in the West Bank.

25          MS. SHAPIRO:  Can we look at InfoCom No. 28, please,

1    page 86.  Again this is the same document we have looked at

2    from time to time that has various committees listed out in it

3    from the InfoCom corporation.  The Islamic Charitable Society

4    of Hebron.

5              MS. SHAPIRO:  Can we go to the next page, please.

6    Q.   (BY MS. SHAPIRO)  Do you see any familiar names here?

7    A.   Yes.  Hajj Hashem is a deck Abdel Nabi al-Natsheh.

8    Q.   Who was that?

9    A.   The vice president.  He is on the poster as the second

10   from the left.

11   Q.   Here?

12   A.   Yes.

13   Q.   And anybody else?

14   A.   Hajj Saleh Salem Abdel Nabi Natshe was the treasurer,

15   also Hamas member.  He is not on the chart.

16   Q.   Okay.

17   A.   Adnan Abdel Hafiz Masouda, house director.  Actually it

18   is administrative.

19   Q.   Is that the person you referred to on Elbarasse No. 22

20   that had Adnan and illegible on the last name?

21   A.   Correct.  Mohamed Eid Misk, secretary.

22   Q.   Is he on the poster?

23   A.   Yes, he is on the poster.

24   Q.   Here?

25   A.   Yes, in the middle.  And also Taher Dandis, a Member.

```
 1    Q.    Okay.

 2            MS. SHAPIRO:  Can we go to Philadelphia Meeting No.

 3    13-E, please.

 4    Q.    (BY MS. SHAPIRO)  "At the same time we have the Islamic

 5    Charitable Society which has a school a kindergarten and a

 6    deaf and dumb institution."

 7            "In Hebron, Hebron as a city is a place where we consider

 8    that we have a good presence and weight as Islamic

 9    organizations such as the Islamic Charitable Society, which

10    was founded in 1962 and which has over 1,000 employees."

11            MS. SHAPIRO:  Can we pull up the ICS Hebron Summary,

12    please?

13    Q.    (BY MS. SHAPIRO)  This is another one of these summaries

14    of the committees that connects the Holy Land Foundation

15    evidence to these particular individuals.  Do you recognize

16    these names?

17    A.    Yes.  Abdel Khaleq Natshe.

18    Q.    And just point out where he is again.  Left?

19    A.    Correct.

20    Q.    And the next one, Hashem Natshe next to him?

21    A.    Yes.

22    Q.    Who is the next name?

23    A.    Mohammed Eid Misk.

24    Q.    He appears in your poster?

25    A.    Yes, next to Hashem Natshe.
```

```
1   Q.   And Kamal al-Tamimi.  You spoke about him?

2   A.   Yes, I spoke about him.

3   Q.   Remind us who he was.

4   A.   He was the foreign relations, public relations for the

5   Islamic Charitable Society and also the representative of the

6   Holy Land Foundation in the Islamic Charitable Society of

7   Hebron.

8   Q.   Okay.

9   A.   And Adnan Masouwda.

10  Q.   You identified him earlier in Elbarasse No. 22?

11  A.   Yes.

12  Q.   Adel Juneidi?

13  A.   Adel Juneidi, next to him.

14  Q.   He is the individual with the white beard?

15  A.   Correct.

16  Q.   Okay.  Saleh Natshe?

17  A.   I just mentioned him.  He is in the previous document.

18  Azzam Salhab.

19  Q.   Is he on your poster?

20  A.   Yes Azzam Salhab.

21  Q.   Bottom row?

22  A.   Yes.  Next to him is Moustafa Shawer.

23  Q.   Okay?

24  A.   And Talal Sadr, he is both the Young Muslim and the

25  Islamic Charitable Society, but he left in the early stages of
```

the '90s.

Q.   Okay.  Going back to the criteria that you identified
yesterday when you look at these different committees, were
there other criteria other than the leadership of the
committee that were significant to you in evaluating this
committee?

A.   Yes.

Q.   First can you tell us whether this committee had any
relationships with the external worldwide network that we
discussed?

A.   Yes.  The same network that we spoke about yesterday, the
same network that was shown on the demonstrative map,
including the Interpal in Britain, CBSP in France, al-Aqsa
branches in Europe, and other Hamas foundations in the Persian
Gulf countries.

Q.   And did the Islamic Charitable Society of Hebron have
relationships with the other zakat committees and societies
that we have spoken about over the course of your testimony?

A.   Almost -- It had relation with almost all -- I would say
not all, but many of the zakat and societies in several
rounds.  The first rounds was subcommittees, branches of the
Islamic Charitable Society like in Dura, like in Bethlehem.
These are villages that are very close to Hebron, suburbs of
Hebron.  These are part of the Islamic Charitable Society, so
this is the first round.

1    The second round is other committees that were subjected

2    to the Islamic Charitable Society in Hebron like in Qalul,

3    like in Daharia.

4    And other places and the third round they had relations

5    with the committees in the West Bank like Jenin, like Nablus,

6    like Tulkarem, like Ramallah.  Like the Orphan Care Society in

7    Hebron.  This is a major and the biggest society of Hamas in

8    the West bank.

9    Q.   And in your opinion based on what you have looked at, was

10   the community aware that this was the biggest Hamas society in

11   the West Bank?

12   A.   You know, when you are asking me this and I am just -- it

13   reminds me of the video.  In the video we saw many kids

14   participated in this event.  Just a demonstration.  And these

15   kids have parents, and many of the leaders of Hamas are

16   participating in this event, a lot of people in one event.

17   And this is -- It is spread out.  I mean, it is not something

18   that is secret in the community.  It may be secret to someone

19   who sits out of the Palestinian territories, but this is the

20   kind of ceremonies also in Gaza it is the same idea.  And many

21   people are exposed to this kind of ceremonies and ideas.

22   So when you are talking about known in a community, I

23   think that there are a lot of indications that you can say

24   they are known.  For example, one of the summer camps of the

25   Islamic Charitable Society from July, in July 1998, was shut

1    down by the PA.  Another example.

2         So known in the community?  I think the answer is yes.

3    It was known.  And the Islamic Charitable Society in Hebron

4    was known because of its leaders.  It has the leaders from the

5    first row of Hamas.  I am talking about Abd al-Khaliq Natshe,

6    Azzam Salhab, Abdel Jneidi, very known leaders of Hamas that

7    take key positions in the Society.  So there are many, many

8    indications that I can learn from them about the fact that the

9    Islamic Charitable Society of Hebron was known in the

10   community as Hamas.

11   Q.    Okay.  And you mentioned the Palestinian Authority.  Were

12   there any other indications about how the Palestinian

13   Authority viewed this committee?

14   A.    Yes.  The Palestinian Authority view, and even view

15   specific persons like Azzam Salhab, like Adel Jneidi with

16   Hamas.  The relation with the Orphan Care Society was the

17   focus of the Palestinian Authority, too, of the Hamas

18   societies in the south of the West Bank.  They were both in

19   the focus of the Palestinian Authority.

20        MS. HOLLANDER:  Your Honor, I am going to object to

21   a line on the Palestinian Authority documents.

22        THE COURT:  Overrule that objection.

23   Q.    (BY MS. SHAPIRO)  And have you seen any items that were

24   taken from the Islamic Charitable Society of Hebron that

25   contribute to your understanding of the nature of this

1    committee?

2    A.    Yes.

3            MS. SHAPIRO:    Let's look at ICS Hebron No. 6,

4    please.

5    Q.    (BY MS. SHAPIRO)    I will show you the original as well.

6    Okay.    Do you know who this person is?

7    A.    Abdl Ju'aba.

8    Q.    Can you say that again?

9    A.    Abdel Ju'aba.

10   Q.    And who is he?

11   A.    He is a Izz el-Din al-Qassam member.

12   Q.    Okay.    And can you tell from this poster that this person

13   is connected with the Izz el-Din al Qassam Brigades?

14   A.    Yes.    The emblem of the Izz el-Din al-Qassam on the right

15   upper right.    This is the Izz el-Din al-Qassam emblem, and in

16   the left the Hamas emblem.

17   Q.    Okay.

18           MS. SHAPIRO:    Can we look at ICS Hebron No. 7,

19   please?

20   Q.    (BY MS. SHAPIRO)    Who is this person?

21   A.    Yacoub Idkek.

22   Q.    And who is he?

23   A.    He is also Izz el-Din al-Qassam member.

24   Q.    Can you tell from this poster that he is connected to

25   Hamas?

1    A.    Yes.   The Hamas emblem is on the right.

2    Q.    Okay.   And with respect to these two individuals that you

3    just identified, ICS Hebron No. 6 and 7, did they travel any

4    of the steps of the lifecycle that we have talked about that

5    the Hamas social wing provides?

6    A.    Partially.   Both of them learned in schools of the

7    Islamic Charitable Society, the sharia schools for boys.   And

8    I don't know about kindergarten, I didn't see any indication

9    about this, but they learned in the schools and high schools

10   of the Islamic Charitable Society.   And then they were a

11   member of the Kutle al-Islamiya, which is the student party

12   for Hamas in the Polytechnic in Hebron.   It is a university

13   that is controlled by the Kutle al-Islamiya.

14   Q.    And the Kutle al-Islamiya, again, just because these are

15   unfamiliar to us --

16   A.    The Kutle al-Islamiya it is the student party of Hamas in

17   the universities.

18   Q.    Okay.

19           MS. SHAPIRO:   And can we look at ICS Hebron No. 8,

20   please?

21   Q.    (BY MS. SHAPIRO)   I am holding up the original of ICS

22   Hebron No. 8.   Can you see the original is still framed in

23   glass?

24   A.    Yes.

25   Q.    Okay.   Framed poster with -- it has a place to hang it

1  up?

2  A.    It has, yes.

3  Q.    All right.  And is there any indication from this poster

4  that it is connected to Hamas?

5  A.    The emblem of Hamas is on the top and the left, and also

6  in the middle on the bottom.

7  Q.    Okay.  And any idea who these individuals are?

8  A.    These are four members of the Izz el-Din al-Qassam

9  Brigades from the Halaiqah family, and this is an announcement

10  of the Harakat al-Muqawaman al-Islamiya al-Shiyoukh.  This is

11  a branch of Hamas in a village near Hebron called al-Shiyoukh,

12  and it was seized in Bani Na'em.

13  Q.    Which is what?

14  A.    Which is a branch of the Islamic Charitable Society of

15  Hebron.

16  Q.    Okay.

17        MS. SHAPIRO:  Can we look at ICS Hebron No. 9,

18  please?

19  Q.    (BY MS. SHAPIRO)  Okay.  And is there any indication in

20  this poster that it has a connection to Hamas?  It should be

21  in your binder also.

22  A.    I just want to focus on -- Okay.  This is a picture of

23  Salah Shehadeh.

24  Q.    Who is he?

25  A.    The chief commander of the Izz el-Din al-Qassam Brigades

1    from Gaza.  There is the Hamas emblem on the top on the left.

2    Q.    Okay.

3    A.    And the map of Palestine and also Chechnya and

4    Afghanistan.  It is written in Arabic below.  It is something

5    that expresses the idea of the global idea of the jihad.  I

6    mean the Hamas and other movements.

7              MS. SHAPIRO:  Can we go to ICS Hebron No. 10,

8    please?

9    Q.    (BY MS. SHAPIRO)  Okay.  Now, do you know where -- ICS

10   Hebron No. 10 was a computer disk.  Are you familiar with that

11   computer disk?

12   A.    Yes.

13   Q.    And what was on it?

14   A.    Many pictures of members of Hamas, the Izz el-Din al

15   Qassam Brigades.  I am just looking at one of them.

16   Q.    Did it have more than one or two posters on it from this

17   computer?

18   A.    Yes, there was more.

19   Q.    All right.  I am just going to -- We just pulled out some

20   examples, and am just going to scroll through them seriatim.

21   Let me stop on this poster for a moment.  Do you recognize the

22   people around this poster, or some of them?  Let's go to the

23   bottom row.  Who is the person in the bottom row left far

24   left?

25   A.    Khalid Mishal.

```
 1    Q.    And who is he?

 2    A.    The leader of Hamas.

 3    Q.    And the person next to him?

 4    A.    Abdel Aziz Rantisi.

 5    Q.    Who is he?

 6    A.    One of the founders of Hamas.

 7    Q.    And who is next to him?

 8    A.    Yehia Ayyash, the engineer.

 9    Q.    Okay.  Are there other people?  Do you seek Sheikh

10    Yassin?

11    A.    Ahmed Akl next to Ayyash.  Mahmoud Hanoud next to Akl,

12    Salah Shehadeh --

13    Q.    Identify where you are talking about.  You are going

14    across the row?

15    A.    Across the row from left to right.

16    Q.    Okay.

17    A.    Salah Shehadeh, Jamal Mansour.

18    Q.    Okay.  So now you are moving up?

19    A.    Yes, now we are moving up.  Salah Shehadeh.  I am not

20    sure.  I think this is Mahmoud Zahar, but I am not sure.

21    Mahmoud Zahar, Mousa Abu Marzook.  Now I am on the upper row.

22    Q.    Where is Marzook?

23    A.    On the upper row, the second to the right.

24    Q.    Next to him?

25    A.    Ahmed Yassin.
```

```
 1   Q.    Okay.

 2   A.    Izz el-Din al-Qassam.

 3   Q.    Next to him?

 4   A.    The next one I don't recognize.

 5   Q.    Who is in the corner?

 6   A.    In the corner, Ibrahim Ghousheh.

 7   Q.    Who is he?

 8   A.    Spokesman of Hamas in Jordan.

 9   Q.    And below him?

10   A.    Jamal Abu Hija.

11   Q.    Where did we see Jamal Abu Hija?

12   A.    From the zakat committee of Jenin.

13   Q.    Okay.  Was he one of the individuals who was in the zakat

14   committee also involved in military activities?

15   A.    Correct, yes.

16   Q.    Okay.  Do you recognize the person under him?

17   A.    Imad al-Alami.

18   Q.    Is that the person we saw in the Palestinian Authority

19   document who is financing Hamas PA --

20   A.    It is the same Imad al-Alami.

21   Q.    Okay.  And any doubt that this is a Hamas poster?

22   A.    No, no.  There is no doubt that this is a Hamas --

23   Q.    Okay.  Remind us again where this computer was seized

24   from?

25   A.    The Islamic Charitable Society of Hebron.
```

1   Q.   Okay.

2           MS. SHAPIRO:  Let's scroll to another one.

3   Q.   (BY MS. SHAPIRO)  And is this the symbol -- The seal that

4   is on there, which symbol is that again?

5   A.   Yes.  This is a symbol of the Izz el-Din al-Qassam.

6   Q.   The military wing?

7   A.   The military wing, correct.

8   Q.   Okay.

9           MS. SHAPIRO:  Keep going.  And now let me just stop

10  you for a moment.

11  Q.   (BY MS. SHAPIRO)  Do you see the gentlemen in this poster

12  have green headbands on their heads?

13  A.   Yes, I see.

14  Q.   Did we see anything like that in the video that we saw?

15  A.   Yes.  Both of them we see the same on the video.  The

16  upper guy is the Izz el-Din al-Qassam which committed the

17  suicide attack in the Sbarro.  The lower one is Abdul Basat

18  Odeh that we saw his poster in the Tulkarem zakat committee.

19  Q.   Okay.  All right.

20          MS. SHAPIRO:  Keep going.

21  Q.   (BY MS. SHAPIRO)  Again, the same seal?

22  A.   Same seal, yes.

23          MS. SHAPIRO:  Keep going.

24  Q.   (BY MS. SHAPIRO)  You see the same green headband around

25  this person's head?

1   A.    Same green, the same emblem, Hamas emblem, the Izz el-Din

2   al-Qassam emblem.

3   Q.    Okay.

4         MS. SHAPIRO:  Continue.

5   Q.    (BY MS. SHAPIRO)  Again?

6   A.    The Izz el-Din al-Qassam emblem.

7   Q.    Okay.

8         MS. SHAPIRO:  Next.

9         THE WITNESS:  Izz el-Din al-Qassam.

10        MS. SHAPIRO:  Next?

11        THE WITNESS:  Izz el-Din al-Qassam and Hamas emblem.

12        MS. SHAPIRO:  Okay.

13  Q.    (BY MS. SHAPIRO)  Who is on the bottom left hand corner

14  of this poster?

15  A.    Yehia Ayyash, the engineer.

16  Q.    Okay.  Do we see the Hamas symbol on this one also?

17  A.    Sorry?

18  Q.    Do you see the Hamas symbol on this poster also?

19  A.    Yes, I can see that.

20        MS. SHAPIRO:  Okay.

21  Q.    (BY MS. SHAPIRO)  Do you see indications of Hamas on this

22  poster?

23  A.    Yes, Yehia Ayyash, Ahmed Yassin.  There is also a picture

24  of Hassan al-Banna from the Muslim Brotherhood, Izz el-Din

25  al-Qassam on his behalf, the brigades, the military wing of

1    Hamas is calling his name, Muhammad Silih, Mahmoud Abu Hanoud.

2    Q.    Who are those people?

3    A.    They are all Izz el-Din al-Qassam members.

4           MS. SHAPIRO:  Okay.

5    Q.    (BY MS. SHAPIRO)  The next poster, signs of Hamas on this

6    poster?

7    A.    The sign of Izz el-Din al-Qassam.  This is Abdel Basat

8    Odeh, the suicide bomber in the Park Hotel.

9    Q.    Did we see his picture in another zakat committee, too?

10   A.    In Tulkarem zakat committee.

11          MS. SHAPIRO:  Okay.

12   Q.    (BY MS. SHAPIRO)  Any sign of Hamas in this poster?

13   Let's look at the translation.  Because it is Hamas, the

14   Islamic Resistance Movement, al-Qasammi martyr Ahmad Muhammad

15   Aslim.

16   A.    Yes, it said so, I just don't know the person.

17          MS. SHAPIRO:  Next poster.

18   Q.    (BY MS. SHAPIRO)  Any sign that this poster is connected

19   to Hamas?

20   A.    Just looking at the faces, we have here Diyai Tawil that

21   we just spoke about, Hashim Najal.

22   Q.    Which one is Diyai Tawil.  Can you tell me which number?

23   A.    The third row.  Sorry.  The second row, the second from

24   the right.

25   Q.    Right there.  And that is the person whose pictures we

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

1  saw on the Holy Land computers?

2  A.    Correct.  And on the upper row the two from the left is

3  Hashim Najal and Hamid Abu Hajlah.  Amad Zabuydi below Hamid

4  Abu Hajlah.  We saw his shahid file, martyr file in the

5  Society of al-Tadamoun.

6  Q.    Al-Tadmoun is connected --

7  A.    A subcommittee of the Nablus zakat committee.  Also the

8  suicide bomber of the Dolphinarium, the suicide bomber of the

9  Dolphinarium.

10  Q.    Will you stop for a moment?  What do you mean for the

11  suicide bomber of the Dolphinarium?  What is the Dolphinarium?

12  A.    Said Hotari is shown in the picture --

13            MR. DRATEL:  Object on 403 and *al-Moayad*.

14            THE COURT:  Overruled.

15            THE WITNESS:  Dolphinarium is a place, a discotheque

16  for youth.

17  Q.    (BY MS. SHAPIRO)  Discotheque?

18  A.    Discotheque for youth on the Tel Aviv shore.  And on the

19  night of June 1st, 2001 Said Hotari, a member of the Izz

20  el-Din al-Qassam he approached the entrance of this

21  discotheque and blow himself with 22 youths, youngsters that

22  were killed.  So this is his picture.

23  Q.    Okay.

24            MS. SHAPIRO:  If I can have the overhead for a

25  moment.

1   Q.   (BY MS. SHAPIRO)  I am just going to show you a few

2   pictures of HLF Search No. 51.  Picture No. 51, is this him?

3   A.   This is Said Hotari.

4   Q.   From the Holy Land Foundation office in Chicago.  Is this

5   also him?

6   A.   This is -- He is a younger age, but this is Said Hotari.

7   Q.   Is this yet another picture of him?

8   A.   Said Hotari, same.

9   Q.   And that picture is No. 79.  The previous picture was No.

10  43.

11          MS. SHAPIRO:  Were there anymore of those posters?

12  Q.   (BY MS. SHAPIRO)  Any indication this one is Hamas?

13  A.   Both Hamas and Izz el-Din al-Qassam emblems on the upper

14  of the picture.

15          MS. SHAPIRO:  Okay.  Anymore?

16  Q.   (BY MS. SHAPIRO)  And this one, does it also have a

17  symbol or sign of Hamas?

18  A.   Yes.  I am just trying to remember if I remember the

19  person.  But yes, the emblem is here.

20          MS. SHAPIRO:  Okay.  Anymore?

21  Q.   (BY MS. SHAPIRO)  And this one?

22  A.   Izz el-Din al-Qassam emblem in the right upper right.

23  Q.   Thank you.

24          MS. SHAPIRO:  Can I have a overhead, please?

25  Q.   (BY MS. SHAPIRO)  Those pictures we just looked at were

1    from a computer, and I wanted to show you some of the pictures

2    taken from the Holy Land computer.  And you can just see -- We

3    are not going to talk about them all, or even close to them

4    all, but I want to see if these are some familiar faces in

5    here.  Who is this?

6    A.    Sheikh Ahmed Yassin, founder of Hamas.

7    Q.    This is HLF Search No. 47, Dallas.  And this person?

8    A.    Abdel Aziz al-Rantisi, one of the founders of Hamas.

9    Q.    Okay.  And we see a poster here.  Can you see who the

10   person in the background is on the left?

11   A.    This is Mahmoud Hanoud, and behind him it is Yehia

12   Ayyash.

13   Q.    Okay.  And do you see the same symbol on this poster that

14   we just saw in all of the posters we saw from the Islamic

15   Charitable Society of Hebron?

16   A.    Correct.  This is the Izz el-Din al-Qassam emblem.

17   Q.    All right.  Do you recognize this?

18   A.    Simi Awad, a member of the Izz el-Din al Qassam Brigades.

19   Q.    Okay.  These sort of look like RPGs like we saw in the

20   video?

21            MR. DRATEL:  Object; leading, Your Honor.

22            MS. SHAPIRO:  I am sorry.  Withdrawn.

23   Q.    (BY MS. SHAPIRO)  Who is this person?

24   A.    Ahmed Yassin, the founder of Hamas.

25   Q.    What is this generally?

```
1    A.    Well, it looks like -- It is a scene of an attack, but I

2    don't recognize the place.

3    Q.    And this?

4    A.    Again it is the scene of a suicide attack in a bus, but I

5    don't recognize the specific attack.

6    Q.    Okay.  And this person I think we saw?

7    A.    Yehia Ayyash.

8    Q.    Yehia Ayyash.  Is that familiar to you, that symbol?

9    A.    Yes.  The symbol is -- I recognize the Hamas symbol.

10   Q.    Okay.  Is this person familiar?

11   A.    Yousef Akil.

12   Q.    Who is that?

13   A.    A member of the Izz el-Din al-Qassam Brigades.

14   Q.    And here is another picture of him?

15   A.    Yes, with the emblem.

16   Q.    Okay.  And right here is the emblem of what?

17   A.    Of the Izz el-Din al Qassam Brigades.

18   Q.    This person at the bottom, is he familiar to you?  It is

19   sort of hard to see.  Here is another picture.

20   A.    I don't remember this person.

21   Q.    Okay.

22   A.    I don't remember.

23   Q.    Okay.  I am not going to take you through all the photos,

24   but were there many similar photos in the various computer

25   pictures that you have seen in the Holy Land Foundation
```

1    computers?

2    A.    Yes.

3    Q.    Have you seen any Hamas political material that was

4    seized from this particular committee from the Islamic

5    Charitable Society of Hebron?

6    A.    Yes.

7         MS. SHAPIRO:    Can we pull up ICS Hebron No. 3,

8    please?  Can we go to the next page?

9    Q.    (BY MS. SHAPIRO)  And this is entitled "The political

10   statement."

11        "Fight them, God will torment them at your hand, he will

12   humiliate them and make you victorious over them."

13        "A call for unity and resistance."

14        What is this document?

15   A.    If you can just go to the bottom.

16        MS. SHAPIRO:    Can you enlarge the bottom?

17        THE WITNESS:    This is the memoranda of the Islamic

18   block that was seized in the Islamic Charitable Society.  It

19   is the Islamic block in the Polytechnic University.  I just

20   mentioned the Polytechnic University a few minutes ago to Izz

21   el-Din al-Qassam.

22        MS. SHAPIRO:    Can you enlarge the bottom part so we

23   can get the whole bottom paragraph?  Thank you.

24        THE WITNESS:    This memorandum actually suggests that

25   the way, the path of Hamas is the right path and expect

1    everybody to join the Hamas path.

2    Q.    (BY MS. SHAPIRO)  Let me just read this paragraph that we

3    have here on the screen.  It says, "O beloved brothers, O,

4    glorious sisters.  This popular conviction of the Palestinian

5    people for choosing the resistance path proves anew the

6    correct direction of the jihadist course which is chosen by

7    the Islamic Resistance Movement, Hamas, relying on the solid

8    foundation in depth understanding political Islam, its

9    thorough knowledge of the Zionist enemy, and its infliction

10   upon the enemy heavy casualties.  This movement is motivated

11   by its firm belief in the power of this jihadist Muslim

12   Palestinian people.  It believes in its strength and

13   capability in renewing its contributions, developing its jihad

14   and struggle, which is continuous for approximately one

15   century, and which no force on earth was able to terminate its

16   existence.  In the same fashion the American Indians have been

17   terminated in America, or like the termination of in

18   Australia.  The Palestinian people will, God's willing,

19   continue the path of resistance, confrontation, defiance, and

20   sacrifice of all jihadist reserves until God allows victory

21   and achieve liberation.  So we want more endurance, more

22   popular bonding around the banner of jihad, resistance,

23   liberation, more of draining and bleeding of the enemy's

24   energies, more in rebuffing the Americans Zionist initiatives,

25   as well as rejecting this staged solutions.  We want more

1    unity.  It is jihad for victory or martyrdom.  God is great

2    and victory for Islam.  The Islamic block."  It is dated April

3    1st, 2001.

4         And what does it mean for you to find a document like

5    this in a charitable committee?

6    A.    A charitable committee, if we are talking only a

7    charitable committee office that deals only with the pure

8    humanitarian affairs, you don't expect to find this kind of

9    document, a political -- But it is not just political, it is

10   not something that -- It is very extremist, radical.  Many

11   ideas are combined in this memorandum.  And it means that the

12   charity offices, the Hamas charity offices are also used for

13   other activities.

14        We saw the document in Jenin, we reviewed it, and it was

15   sent to Jenin that the Jenin will send their opinion back to

16   the headquarters in Gaza.  So it is not only for social

17   activities.  Although there is social activities, the social

18   activity as Hamas sees it, but they are doing other things.

19        And at this date it is significant because there was

20   initiation, it comes as a reaction to a initiation of United

21   States to bridge or to reconciliate between the Palestinians

22   and Israel.  So this is a reaction to the initiation.  So

23   there is a political very, very strict and prominent political

24   path expressed in this document.

25   Q.    Okay.

1      MS. SHAPIRO:  Can we look at ICS Hebron No. 2,

2  please?  Can we go to the first English page?

3  Q.   (BY MS. SHAPIRO)  Okay.  This is entitled "A political

4  memorandum concerning (illegible), the Western and U.S.

5  efforts to abort the Intifada of our people and its

6  resistance.

7      "To our steadfast Palestinian nation, to our Arab and

8  Islamic nation witnessing the occupier's savagery, to the

9  international community raising the banners of justice,

10  freedom, and human rights."

11      MS. SHAPIRO:  And can we go to the end of the

12  document, please?

13  Q.   (BY MS. SHAPIRO)  And who is this document signed by?

14  A.   The Islamic resistance movement, Hamas.  Again, the date

15  June 16, 2001.  And that month -- It was the first month after

16  the second Intifada started, and there was efforts made by the

17  U.S. to negotiate, reconcile or negotiate.

18      MR. DRATEL:  Object, Your Honor; hearsay,

19  foundation.

20      THE COURT:  Overruled.

21      THE WITNESS:  And there were efforts made by the

22  U.S. to reconciliate or negotiate between the Palestinian and

23  the Israeli government.  Again, this memorandum explains that

24  this initiation is trying to damage the Intifada, the second

25  Intifada, to damage.  The initiation is a damage to the

1  Intifada, and this is the bottom line.

2  Q.   (BY MS. SHAPIRO)   Okay.  I am not quite sure.  Can you

3  just repeat the last thing you said?  I was a little confused.

4  A.   Okay.  This document is going against the efforts of the

5  U.S. to negotiate between the Israelis and the Palestinians.

6  Q.   I understand.  And it is signed by Hamas?

7  A.   And it is signed by Hamas.

8  Q.   And where was this document found?

9  A.   It was found in the Islamic Charitable Society in Hebron.

10  Q.   Okay.

11       MS. SHAPIRO:   Could we pull up ICS Hebron No. 1,

12  please?  Can you go to the Arabic for a moment, please?

13  Q.   (BY MS. SHAPIRO)   Generally what is this document and can

14  you -- Do you derive any meaning from its appearance?  And we

15  will talk about it a little more, but if you can generally

16  describe what it is.

17  A.   This is a memorandum, it is a note, it is a small note,

18  it is a small message written in very, very tight -- tight

19  written.  It is two pages that were wrapped.  It looks -- It

20  looks like a secret message that was sent because of its form,

21  very tight and in paper and wrapped.  That is how it was

22  found.

23  Q.   You mean wrapped up like in a --

24  A.   Wrapped up.

25  Q.   Okay.

1        MS. SHAPIRO:  Let's go to the English for a moment.

2      Do you want me to continue, Your Honor, or do you want to

3   take --

4            THE COURT:  Let's go about another five minutes.

5            MS. SHAPIRO:  Great.

6   Q.   (BY MS. SHAPIRO)  Did you create a demonstrative exhibit

7   that blows up this document into a larger poster?

8   A.   Yes, I did.

9   Q.   Okay.

10           MS. SHAPIRO:  Your Honor, I move the

11  admission -- Just a moment.  I will give you the number.

12  Demonstrative No. 31.

13           THE COURT:  Counsel?

14           MS. DUNCAN:  Same objections that we had to the

15  underlying document, Your Honor.

16           THE COURT:  Those have been overruled.

17  Demonstrative No. 31 is admitted.  Since you are getting ready

18  to go over that, let's take the morning break.  Let's take a

19  20-minute break.

20           (Whereupon, the jury left the courtroom.)

21           THE COURT:  We will be in recess.  Be back at five

22  after.

23                     (Brief recess.)

24           THE COURT:  Ms. Shapiro?

25           MS. SHAPIRO:  Thank you.

1    Q.   (BY MS. SHAPIRO)  Before we get to this demonstrative

2    that we just put up, I want to ask you a couple of quick

3    questions that I forgot to ask before.

4         MS. SHAPIRO:  If we can pull up InfoCom No. 13,

5    please, page 70.

6    Q.   (BY MS. SHAPIRO)  This is a letter from the Holy Land

7    Foundation dated July 5th, 1994.  "Subject:  Assistance to

8    families of the Ibrahimi sanctuary massacre.  Party:  The

9    Islamic Charitable Society Hebron/for committee of the

10   martyrs' families."

11        I want to go down to the last sentence before the

12   remarks.  It says, "Please notify brother Abdel Khaliq

13   al-Natsheh of the arrival of the amount and deliver it to

14   their committee."  Who is he again?

15   A.   Abd al-Khaliq Natshe is the head of the Hamas in Hebron,

16   and I would say the highest in the Islamic Charitable Society.

17   Q.   He is on your poster?

18   A.   He was on the poster, yes.

19   Q.   And was he the person -- did you see him in the videotape

20   at the school ceremony that we saw?

21   A.   Yes.  This is Abd al-Khaliq Natshe.  He was shown with

22   Abdel Jneidi, the chairman of the Islamic Charitable Society,

23   and was also announced as the head of the Hamas in Hebron.

24   Q.   Okay.

25        MS. SHAPIRO:  Could we go back momentarily to ICS

1     Hebron No. 10, page 3?

2     Q.   (BY MS. SHAPIRO)   Remember we talked about this poster

3     and you identified some of the people's pictures?

4     A.   Yes.

5     Q.   I want to just show you Demonstrative No. 17 and see if

6     you see any of those people on the demonstrative.   Are there

7     any people on this demonstrative exhibit that also appear on

8     this poster from the Islamic Charitable Society of Hebron?

9     A.   Yes.

10     Q.   Like who?

11     A.   Sheikh Ahmed Yassin.

12     Q.   Okay.   Where is he?

13     A.   In the middle on the top.

14     Q.   Okay.

15     A.   Mousa Abu Marzook on the right.   Yes.   Khalid Mishal on

16     the left.   Mahmoud Zahar on the right.   Yes.   Rantisi.

17     Q.   Here?

18     A.   Yes.   Ibrahim Ghousheh.   Imad al-Alami.

19     Q.   Here?

20     A.   Correct.

21     Q.   Okay.   Thank you.

22        MS. SHAPIRO:   Let's go back to our demonstrative

23     exhibit, which is an enlarged version of Islamic Charitable

24     Society ICS Hebron No. 1.

25        MS. SHAPIRO:   May I approach the demonstrative?

                THE COURT:  Yes.

Q.  (BY MS. SHAPIRO)  Is there any indication in this

document that it is connected to Hamas?

A.   In the beginning of the letter there is a description.

Q.   If you can speak up a little louder.  It is just hard to

hear.

A.   In the beginning of the letter there is a short message

of the results for the election or the re-election of Aboul

Walid, which is the nickname of Khalid Mishal.

Q.   And who is Khalid Mishal?

A.   The leader of Hamas.

Q.   Khalid Mishal?

A.   Khalid Mishal.

Q.   Okay.

A.   And he was re-elected to be the head of the political

bureau of Hamas.

Q.   I am going to just read the first block of the

demonstrative, which is the translation from page 1.  It says,

"The beloved brothers with God's guidance and thanks, the

Shura Council held its session with about 80 of its members in

attendance.  Five representatives from the sector attended as,

well as two from the brothers in Ramallah, two from the

brothers in Hebron, while none attended from Nablus and

brother Aboul Walid was re-elected."

        Okay.  And Aboul Walid you said is who?

1    A.    It is the nickname of Khalid Mishal, the leader of Hamas.

2    And it is a description of the shura council meeting.

3    Q.    What is a shura council meeting?

4    A.    It is like the highest council.  I just can't find the

5    right word in English, but this is the highest council in the

6    hierarchy, and they re-elected Aboul Walid.

7    Q.    In the hierarchy of what?

8    A.    Of Hamas.  This committee is combined with a

9    representative from all kinds of areas.

10   Q.    Where does this committee sit?

11   A.    I don't know what to tell you where this committee sits

12   and where they did this meeting.

13   Q.    Is it inside the territories?

14   A.    No, it is not inside the territory.

15   Q.    Where would it be?

16   A.    I don't know.  I don't know --

17   Q.    But outside the West Bank?

18   A.    Outside the West Bank and Gaza Strip.  I don't know

19   exactly where this meeting takes place.

20   Q.    Where is Hamas, the political body of Hamas,

21   headquartered?

22   A.    It used to be in Jordan and then -- in the '90s, and then

23   it moved to Syria.

24   Q.    Where is it today?

25   A.    Syria.

1    Q.    Okay.

2    A.    It doesn't mean that the meeting was held in Syria.

3    Q.    Understood.  So does this -- What we just read, does that

4    indicate to you that -- What does it indicate to you about the

5    nature of this document?

6    A.    This is a Hamas inside memorandum.

7    Q.    Okay.

8    A.    Also in the document it speaks about the Movement, and

9    other words that I can identify very easily as a Hamas

10   document.

11   Q.    We are not going to read the whole document, but can you

12   -- Before we get to other quotations here, can you describe

13   what is going on in this document generally?

14   A.    In general the document discusses the Intifada, the

15   second Intifada.  This document was written a few months after

16   the second Intifada started.  And this is kind of a

17   reorganization, or reorganizing or planning the next step of

18   the Movement, how to prepare itself to the continuation of the

19   second Intifada.

20   Q.    Let's look at this quotation that we have blown up.  This

21   is towards the end of the document.  And it says from the

22   writer, "Please comfort us regarding your financial situation

23   as we try hard to make more transfers to your end, whether

24   through charity work or through emergency budgets with which

25   we still operate."

1      Remind us again, where was this document found?

2      A.    This document was found in the Islamic Charitable

3      Society.  Actually there were three copies, and one of them

4      was seized in Abd al-Khaliq Natshe's office in the Islamic

5      Charitable Society of Hebron.

6      Q.    And Abd al-Khaliq Natshe again is who?

7      A.    The head of the Hamas in Hebron and --

8      Q.    Did he have an office at the Islamic Charitable Society?

9      A.    Yes, he had.

10     Q.    Okay.  Now, the next block quote we have here says, "On

11     that regards, we confirm our need for new account numbers for

12     the transfer from...and stress the fact that work is underway

13     to provide money to aspects relating to the martyrs and the

14     detainees and other issues through what is being transferred

15     through the charity organizations, as this is a main goal for

16     the increase in transfers to these organizations so that

17     budgets are dispensed according to the most ideal needs which

18     elevate the performance of the movement."

19         What does this say to you?

20     A.    Two major points.  One is, again --

21     Q.    Just keep your voice up.  I am sorry to keep saying that.

22     It is a big room.  Thank you.

23     A.    Two major points.  One is the significance of this

24     special segment for Hamas, the martyrs and the prisoners, and

25     the second one is the significance of the social institute to

1  Hamas.  These two points are also linked.  They relate to each

2  other.  How do you support this special segment that is so

3  important for Hamas?  Through the charities, through the

4  social institute of Hamas.

5      And they are talking about budget.  And again, it is to

6  show the significance of the social wing for Hamas.

7  Q.  Now, the end of the document is signed, "Your brothers,"

8  and it is dated January 18th, 2001.  Then it has in

9  parentheses, "P.S., please call us at the following phone

10 number for emergency matters from public phones.  The caller

11 is to inquire about the Dar al-Taqwa campaign for Pilgrimage

12 and Minor Pilgrimage and then identifies himself and his

13 region.  The number is 0041793689694."

14 A.  Correct.

15 Q.  First of all, do you have any indication who is writing

16 this document; not the name of the person, but generally?

17 A.  Obviously there are security measures that must be taken

18 before contacting this number.

19 Q.  Before we get to that, do you know who is writing this

20 document, what organization is authoring it?

21 A.  Again, this is a Hamas document.  Who wrote it, I don't

22 know.  I don't know.  But --

23 Q.  You started to explain, but what is the meaning of having

24 these procedures for contacting whoever is the author of this

25 document?

A.    It is not simply procedures.  It is -- Obviously this is

security measures how to identify yourself, how to contact,

who to ask.  This is something very common in this kind of

behavior.  Security behavior is something very common for the

Hamas or for what name to use.  And also there is the number

in Switzerland.

Q.    How do you know it is in Switzerland?

A.    This is the prefix.

Q.    The prefix?

A.    Yes.

Q.    And the 00?

A.    It is international.  Obviously no one wanted to give the

direct number of the headquarters of Khalid Mishal himself, so

they used the numbers international exchange for creating

contact.  This number appeared in other places.  They are not

using this number today.

Q.    Okay.  Again, can you just explain the significance of

finding this kind of an internal Hamas document within the

offices of the Islamic Charitable Society of Hebron?

A.    It shows -- First of all, I just mention the fact that

the social institute of Hamas is focusing not only on social

affairs and humanitarian aspects.  These are Hamas offices.

And as Hamas offices they are part of the organization and

they handled internal affairs of the Hamas movement.

       Now, the fact that you -- And this is -- It shows that

1    this report from the outcome, from the result of the shura

2    council, this is the counsel, and re-election of Khalid

3    Mishal, and they are sending it to a charity society, it shows

4    the significance of the charity society in the structure of

5    Hamas, and the fact that it was found at Abd al-Khaliq

6    Natshe's office shows the significance of Abd el-Khaliq

7    Natshe's office.  So there are many indications that show

8    significance.

9         Also they are talking about actually supporting the

10   Intifada, supporting through the charity committees.  This is

11   the message that comes from this letter from this memorandum.

12   There are many, many points that shows the significance of the

13   social wing again to Hamas.

14   Q.   Okay.  Have you formed an opinion with respect to the

15   Islamic Charitable Society of Hebron and its connection to

16   Hamas?

17   A.   Yes.

18   Q.   And what is that opinion?

19   A.   The Islamic Charitable Society of Hebron is a Hamas

20   society, and an essential part of the Hamas organization.

21   Q.   Okay.  And if I could focus you specifically on the

22   period of 1995 to 2001, would you characterize it the same way

23   for that period?

24   A.   Yes.

25         MS. SHAPIRO:  Can we pull up HLF Search No. 109,

1  please?  Let's look at page 139 first.

2  Q.  (BY MS. SHAPIRO)  This is a book that was seized from the

3  Holy Land Foundation offices in New Jersey published by the

4  United Association for Studies and Research.  And I want to

5  point you toward page 143.  1991, this is dated.  On page 143,

6  and I want you to look at the paragraph that starts "The

7  occupation authorities."  Okay?  I am just GOING to read that

8  paragraph to you and ask you a question about it.

9      "The occupation authorities' political, administrative,

10  and security apparatuses intensified their scrutiny of Hamas.

11  They worked through their agents and eyes to collect as much

12  information as possible through which they could reach the

13  suitable way to deal with this movement.  This does not mean

14  that the enemy during this stage has been lax in dealing with

15  Hamas and ignored its moving and effectiveness, but it worked

16  while monitoring it to deal preventive blows to it.  It

17  started those by deporting one of the most renowned preachers

18  in the Gaza sector Sheikh Khalil Al-Koka, and followed that a

19  few months later by deporting 21 members of the teaching staff

20  of the Islamic University in Gaza, on top of which was

21  Dr. Mohamed El Sheik Mahmoud Siam, deputy president of the

22  university.  The justification for the deportation was that

23  the university had turned into a fortress of resistance for

24  the occupation through the collaboration of the university's

25  administration and its teaching staff which it accused of

1    belonging or cooperating with the Hamas movement.

2         "The occupation authorities also arrested many ranking

3    personalities and figures and sentenced them to various

4    administrative sentences.  The most ranking of those are Sheik

5    Mohamed Fouad Abu Zeid, Sheik Bassam Jarar, Sheik Jamil

6    Hamami, Sheik Ahmad El Hajj Ali, Sheik Fadel Saleh, Sheik

7    Hasan Yousif, Sheik Ibrahim Abou Salem, lecturer Ghassan

8    Hermas, Sheik Ahmad Nimr, Dr. Abdel Azizz Al Rantisi,

9    Dr. Mahmoud Al Zahar.  The arrest also included most of the

10   imams, the scholars, and most of the activists of the Islamic

11   Student Movement."

12        Okay.  Now, all of those names that I just read off from

13   this document, is there anything that strikes you about the

14   collection of those names.

15   A.   When I review the names that are mentioned here in this

16   document, and I just want to relate again there are -- Looking

17   at the names and see what team did Hamas put in the charity

18   wing of Hamas, the social wing of Hamas, this is the best team

19   they had.

20   Q.   Well, are these people from the social wing of Hamas that

21   are listed here?

22   A.   Some of them.  Khalil Kuka was mentioned Mohammad Fouad

23   Abu Zeid, Basam Jarar that was linked to Ramallah committee.

24   Q.   Where was Mohamed Fouad Abou Abu Zeid?

25   A.   From the Jenin zakat committee.

```
 1   Q.   Okay.

 2   A.   Sheik Jamil Hamami.

 3   Q.   Which committee was he from?

 4   A.   From the Islamic Science and Culture.  Sheik Fadel

 5   Hamdan.

 6   Q.   Where was he --

 7   A.   Sheik Hamdan from Ramallah zakat committee.

 8   Q.   Okay.

 9   A.   Sheik Ibrahim Abu Salem from the Islamic Culture and

10   Science.  Ghassan Hermas from the Bethlehem Orphan Care

11   Society.

12   Q.   Okay.

13   A.   You see here the best team of Hamas, because the social

14   wing, the social work was so important for Hamas that they put

15   there their best team.  There are also names not mentioned

16   here, but no doubt that Hamas I would say --

17             MR. DRATEL:  Object; non-responsive, your Honor, not

18   mentioned in the paragraph.

19             THE COURT:  Overrule the objection.  He is

20   explaining his answer.  Go ahead.

21             THE WITNESS:  There are other leaders that are also

22   not mentioned in this paragraph, like Hamed Bitawi and others.

23   It seems that the leadership of Hamas is actually in the

24   social wing.

25   Q.   (BY MS. SHAPIRO)  All right.  Now, this portion that I
```

1    just read mentions deportation, and we have talked in this

2    case about Marj al-Zahour.  Can you remind us where this is?

3    A.    This is the place where 400 members of the Hamas and

4    Islamic Jihad were deported.

5    Q.    Where is that geographically?

6    A.    It is in the south of Lebanon.

7    Q.    Okay.

8          MS. SHAPIRO:  Could we play HLF Search No. 70, Clip

9    A, please?

10         (Whereupon, HLF Search No. 70, Clip A was played,

11         while questions were propounded.)

12   Q.   (BY MS. SHAPIRO)  If you recognize people, you can point

13   them out.

14   A.    Yes.  Sheikh Abu Salem from the Islamic Culture and

15   Science.

16   Q.   Islamic Science and Culture Committee?

17   A.    Islamic Science and Culture.

18         Abdel Aziz Rantisi.

19   A.    Abdel Aziz Rantisi.

20   Q.   Who is he?

21   A.    The founder, leader of Hamas.

22   Q.   Okay.  Go ahead.

23   A.    Abdel Fattah al-Dukan, one of the Hamas founders.

24   Q.   Was he connected to any of the committees?

25   A.    Not that I remember.

```
 1   Q.   Okay.

 2   A.    No.  Hamed Al-Bitawi.

 3   Q.    And he is from which committee?

 4   A.    He is the vice chairman of the Nablus zakat committee.

 5   And the chairman of the al-Tadamoun society which is a

 6   subcommittee of the Nablus zakat committee.

 7   Q.    Okay.  Continue, please.

 8         Okay.  Who is pictured on the screen.

 9   A.    Hamed Hassanat.

10   Q.    Where did we see him?

11   A.    Two societies in Gaza, the Islamic Society and also the

12   Islamic Center.

13   Q.    Okay.  Who is this?

14   A.    Jamal Mansour.

15   Q.    Which committee was he connected to?

16   A.    We have seen his poster.  The Tulkarem committee and

17   Nablus committee, and also his picture was in the computers of

18   the Islamic Charitable Society of Hebron, and what you showed

19   me from the Holy Land Foundation computer and also used to be

20   a member of the al-Tadmoun Society.

21   Q.    And that society was connected to?

22   A.    To the Nablus zakat committee.

23   Q.    Nablus?

24   A.    Yes, it is a sub-society.

25   Q.    Okay.  Continue.
```

```
1    A.    Muhammad Fouad Abu Zeid.

2    Q.    Who is this?

3    A.    Muhammad Fouad Abu Zeid.

4    Q.    Is that Muhammad Fuad Abu Zeid?

5    A.    Yes.

6    Q.    Which committee is he connected to?

7    A.    The Jenin zakat committee and senior Hamas activist.

8    Q.    Did we see other videos of him speaking?

9    A.    Yes.

10   Q.    Go ahead.

11         When it says director of Jenin endowment what does that

12   mean?

13   A.    That is what I said before.  He was the head of the waqh,

14   the endowment ministry in Jenin.

15   Q.    Okay.  So the Jenin endowment is that equivalent to the

16   waqh?

17   A.    Yes.

18   Q.    Okay.  And that is the waqh of the Palestinian Authority

19   or the Jordanian waqh?

20   A.    He was in the time of Jordanian committee and then it was

21   shifted to the PA, to the Palestinian Authority.

22   Q.    Okay.

23   A.    Now, he was not the only one that was also the head of

24   the waqh.  Also Bilal Hanoun and from Tulkarem Bilal Khamis.

25   And the Hamas had a firm control of the waqh offices at that
```

1   point of time.

2   Q.   Okay.  Go ahead.

3        That is Hamed Al-Bitawi.

4   A.   That is Hamed Bitawi.  We just spoke about him.

5   Q.   Which committee again?

6   A.   The Nablus zakat committee as a vice chairman and the

7   chairman of the al-Tadmoun el-Islami, which the Tadmoun

8   society.

9   Q.   We saw him on your demonstrative poster.  Is that right?

10  A.   Yes.

11  Q.   Go ahead.

12  A.   Azzam Salhab.

13  Q.   And where is he connected to?

14  A.   The Islamic Charitable Society of Hebron.

15  Q.   The last committee we talked about?

16  A.   Yes.

17  Q.   Okay.

18        MS. SHAPIRO:  Can I bring up Demonstrative No. 30,

19  the last slide, page 4.

20  Q.   (BY MS. SHAPIRO)  Okay.  This is entitled "Hamas founders

21  and leaders in the West Bank."  What were you trying to say

22  with this slide here?

23  A.   The common characteristic of all the pictures that I

24  decided to put in this demonstrative is to show that the Hamas

25  leadership in the West Bank, the Hamas founders and leadership

1   in the West Bank, also had fully control of the zakat

2   committees that we spoke about.  And the Hamas invests a lot

3   of efforts to take control of these committees.

4       And these are prominent known leaders of Hamas, each one

5   of them.  They were known in the community as Hamas.  And if I

6   could say, it is like -- for Hamas, it is like a dream team,

7   that they have a very -- They are known.  This is not a clerk

8   that worked in some committee.  We are talking here on the

9   heavy leaders; I mean, really the important founders of Hamas,

10  each one of them.  And they are all members of the different

11  communities that we discussed until now.

12  Q.   The different committees?

13  A.   The different committees and societies in the West Bank.

14  Q.   And all of these photographs we have seen at various --

15  on various of your demonstrative posters describing the

16  committees?

17  A.   Correct.  Mahmoud Rumhi, Omar Hamdan, Fadel Hamdan,

18  Mahmud Musleh, Ghassan Harmas, Ibrahim Dawud, Riad Walwil,

19  Bilal Khamis, Amar Badawi, Muhamad Eid Misk, Hamed Bitawi,

20  Abdelrahim Al-Hanbali, Mohammed Fuad Abu Zeid, Jamal Abu Al

21  Hija, Ibrahim Abu Salem, Jamil Hammami, Jamal Tawil, Azzam

22  Salhab, Abd al-Khaliq al-Natshe, some of them also were

23  involved in military activities of the Izz el-Din al-Qassam,

24  and that was the point here.

25  Q.   Okay.

1    MS. SHAPIRO:  Can I have one moment please, Your

2  Honor?

3    THE COURT:  Yes.

4    MS. SHAPIRO:  I am putting up what has been marked

5  as Defendants No. 1334.

6    May I have the overhead projector?

7  Q.   (BY MS. SHAPIRO)  All right.  This is a copy of what you

8  see on this demonstrative poster.  This is sort of a timeline

9  that has -- Everything before 1995 is dark, everything after

10  late 2001 almost 2002 is dark, and then there is a white

11  section between 1995 and the end of 2001.  What I would like

12  you to do for me is I want to review just the names of each

13  committee that we have spoken about, and I want you to tell me

14  whether that committee was part of the Hamas social wing just

15  during the white period of time here.  Okay?  And I will write

16  each one as you tell me.

17    How about the Jenin zakat committee.

18  A.   Jenin zakat committee is part of the Hamas social network

19  between '95 and 2002, 2001.

20  Q.   Okay.  And what about the Nablus zakat committee?

21  A.   Nablus zakat committee is part of the Hamas social wing

22  in this timeline, time frame.  Tulkarem zakat committee is

23  part of Hamas' social wing in this time frame.  Qalqilya zakat

24  committee.  Ramallah zakat committee, Culture and Science

25  Society, it is only until it stopped operating in the

1    beginning of '96, so it is not all there.

2    Q.   Okay.  I will put it, Islamic Science and Culture until

3    -- What time did it close?

4    A.   Early stages.  I don't remember the exact date, but it

5    was in early 1996.

6    Q.   1996?

7    A.   1996, correct.

8    Q.   I am going to put 1996 here.  Okay.

9    A.   When it stopped operating, because the office was shut

10   down early in 1995, but then it continued to operate with bank

11   accounts in Ramallah, but then stopped operating.

12       Now, the Orphan Care Society is only from 1997.

13   Q.   Bethlehem Orphan Care.  I will put from 1997.

14   A.   Yes.

15   Q.   Okay.

16   A.   The Islamic Charitable Society of Hebron.

17   Q.   Is that for the whole time period?

18   A.   For the whole time period.

19       In Gaza --

20   Q.   We will just focus on the West Bank.  We are just

21   focusing on the committees in the indictment.  But the Gaza

22   committees, if we wanted to include Gaza, would they have

23   been -- Would they fall within the white space on this chart?

24   A.   Yes.

25   Q.   Okay.  All three of the Gaza committees we spoke about?

1    A.    All three of the committees.

2    Q.    Okay.  And did we miss any?  That covers it.

3          Now, you said all these committees during this time were

4    controlled by Hamas.

5    A.    Yes.

6    Q.    Okay.  Would it be fair to circle Hamas up here in the

7    title?  Is that a fair characterization?

8    A.    Yes.

9          MS. SHAPIRO:  I would like to mark this as

10   Demonstrative No. 35 and move its admission as a Government

11   exhibit.

12         MS. MORENO:  Your Honor, may I voir dire the

13   witness?

14         THE COURT:  No, you can cross examine him.  Any

15   objections to the exhibit?

16         MS. MORENO:  Yes.

17         THE COURT:  The Demonstrative No. 35 is admitted.

18         MS. SHAPIRO:  I pass the witness, Your Honor.

19         THE COURT:  Mr. Dratel?

20                    CROSS EXAMINATION

21   By Mr. Dratel:

22   Q.    Good morning.

23   A.    Good morning.

24   Q.    Now, you are testifying under an assumed name here.

25   Right?

1   A.   Correct.

2   Q.   And not even the Prosecutors know your real name.  Right?

3   A.   They know my real name.

4   Q.   They know your real name.  We don't know your real name,

5   the Defense.

6   A.   Correct.

7   Q.   The Court doesn't know your real name.

8   A.   That I don't know.

9   Q.   And there is no way that we could do any research on you

10  or your writings or your work or who you are or your

11  credentials.  Right?  Because we don't know your real name.

12  A.   Only what you heard here, yes.  You cannot research me.

13  That is correct.

14  Q.   So we have to take your word for everything about

15  yourself.

16  A.   What I presented here is the result--

17  Q.   We have to take your word for it.  We can't look beyond

18  your word for it because we don't know your name.  Right?

19  A.   You can check the details that I gave in the testimony

20  and see if they are correct.

21  Q.   As to what?  As to Avi?  We won't find anything, will we?

22  A.   That is correct.

23  Q.   So we can't learn anything about you.  Right?

24  A.   Outside the resources, you are correct.

25  Q.   But that is not about you.

1    A.    I am saying in outside sources, outside this court you

2    cannot learn about me.  That is correct.

3    Q.    Inside the court all we know is an alias.  Right?  An

4    assumed name.

5    A.    Assumed name, correct.

6    Q.    In fact, if you weren't even a lawyer, how would we go

7    about proving that, not knowing your real name?

8    A.    I don't know how to answer this question.

9    Q.    Because there is no way.  Right?

10   A.    I just don't know.

11   Q.    You could be an Israeli Intelligence officer trained to

12   do this testimony.  We wouldn't be able to find that out,

13   would we?

14   A.    Well, I testified here that I am a legal advisor for the

15   Israeli Security Agency.

16   Q.    Right.  And we don't have a name that we can go check who

17   the legal advisor is for the Israeli Security Agency.  Right?

18   We don't have your real name.  Right?

19   A.    You don't have my real name.  That is right.

20   Q.    Now, you are testifying here as part of your job for the

21   Israeli Security Agency.  Right?

22   A.    Yes.

23   Q.    You are here under orders, in fact.

24   A.    It is part of my job.

25   Q.    Yes.  And you are here under orders.  Right?

```
1    A.    What do you mean orders?

2    Q.    You were directed to appear here by your superiors.

3    A.    I think order is not the proper word, because no one can

4    make me, force me to testify here.

5    Q.    Did you testify differently in another proceeding here

6    last year?  Did you give these questions and these answers

7    under oath in a proceeding, a different proceeding in this

8    case?

9          Question, "Could you refuse to come?"

10         Answer, "I didn't refuse.  I wasn't asked.  We obey

11   orders.  I am working in an organization, and they told me to

12   go, and so that is what I did."

13         Were you asked that question and did you give that

14   answer?

15   A.    I give that answer.

16   Q.    The question is was that your testimony under oath.

17   A.    This was my testimony under oath, but I think you are not

18   explaining it correct because --

19   Q.    But the question is did you give that testimony under

20   oath?

21   A.    Can I see it?

22   Q.    Certainly.

23   A.    And I will explain.

24   Q.    And if you need the interpreter to translate it for you,

25   I would ask that she be permitted to do it.
```

1    A.    Okay.  "Did you refuse to come?"  I didn't refuse.  That

2    is correct.

3    Q.    Did you give that answer, "We obey orders."

4    A.    In general we obey orders --

5    Q.    Did you say, "We obey orders" --

6    A.    And I met --

7    Q.    Did you say, "We obey orders" in your testimony or not?

8              MS. SHAPIRO:  Argumentative, Your Honor.

9              THE WITNESS:  That is what I said, but in general

10   that we have orders, we are an organization that has

11   hierarchy, but no one forced me to come.  I didn't refuse and

12   no one forced me.

13   Q.    (BY MR. DRATEL)  So I am going to ask the question again.

14   Did you say in your testimony, "we obey orders"?

15   A.    I did say that.

16             MS. SHAPIRO:  I object.

17             THE WITNESS:  I did say that, correct.

18   Q.    (BY MR. DRATEL)  You also have a lawyer here.  Right?  To

19   consult.

20   A.    I have a lawyer, yes.

21   Q.    Now, you have never published anything on this subject in

22   the public.  Correct?  On the subject about which you

23   testified.  Right?

24   A.    There was --

25   Q.    Have you ever published an article in a journal, in a

1    magazine, or anything like that in public?

2    A.    Not in public.

3    Q.    And you have never taken any counterterrorism courses

4    outside of the government, outside of ISA.  Right?

5    A.    Correct.

6    Q.    Now, you said on direct you can't publish, but even under

7    an assumed name you are not able to publish, like under Avi.

8    You couldn't publish under Avi.

9    A.    Rules the regulations of the ISA say I cannot publish.

10   As an employee I cannot publish.

11   Q.    Have you written any books on the subject of zakat

12   committees?

13   A.    No.

14   Q.    Now, you have never been involved in a public panel or a

15   debate with anyone on any of the opinions that you have

16   rendered here.  Correct?

17   A.    That is not correct.  A panel in Israel I did.

18   Q.    In public?

19   A.    In public.

20   Q.    With people outside the ISA?

21   A.    For the government.

22   Q.    I am talking about outside the government.

23   A.    No, not outside the government.

24   Q.    With an academic, a professor, or somebody like that.

25   A.    In panel with, no.

Q.   Okay.  Do you know what the term peer review means?  Peer

review.  If you want to translate that.

A.   You mean colleagues?

Q.   Peer review, as in like to have a professional who is an

expert in a subject to review your work; someone outside the

government review your work.

A.   If someone outside the government --

Q.   Yes.

A.   Yes.

Q.   And the government in Israel?

A.   No.

Q.   But they reviewed -- Did they review your work and

critique it?

A.   They reviewed the work.

Q.   I don't mean they read it.  I mean, did they analyze it

and correct things in it before you sent it somewhere else.

A.   No.

Q.   Okay.  Now, you testified -- I think you were asked the

question on direct way back I think probably Monday, I guess

it was Monday, you were asked a question, are your opinions

based on practical experience or are they based on books, and

you said practical experience.  Right?

     Okay.  So you have never been to a zakat committee.

Right?

A.   Correct.

```
1    Q.    You have never spoken to anyone who has received money

2    from a zakat committee about that.  Correct?

3    A.    Can you just elaborate the question?

4    Q.    Sure.  Someone who has received -- Like an orphan or a

5    family that has received money from a zakat committee, you

6    have not spoken to them about receiving money from a zakat

7    committee.

8    A.    That is correct.

9    Q.    You have never done that.

10   A.    No.

11   Q.    You have never been in a classroom of any of these

12   schools when it is in session that you are talking about.

13   A.    Correct.

14   Q.    You have never reviewed the curriculum.  Do you know what

15   I mean by curriculum?

16   A.    That is not correct.

17   Q.    What they are taught on a day-to-day basis, you have seen

18   --

19   A.    I have seen, yes, I have seen.

20   Q.    Okay.  Lesson plans?  Lesson plans?

21   A.    I see lesson plans, yes.  That is what I saw.  I review

22   some.

23   Q.    Some?

24   A.    Some, yes, relating to the zakat committee.

25   Q.    The stuff that we have seen?
```

```
1    A.    No.

2    Q.    Now, basically -- Withdrawn.  But what you do is you go

3    on the internet.  Right?  That is one of your research

4    mechanisms.  Right?

5    A.    One of them, yes.

6    Q.    You read newspapers?

7    A.    Correct.

8    Q.    Right?  And some you can't even read.  They are in Arabic

9    and you have to have them translated.  Right?

10   A.    I testified that I move it to a professional translation.

11   That is correct.

12   Q.    If you think it is necessary.  Some things you look at

13   and you decide not to.

14   A.    Correct.

15   Q.    You are the first line of sorting in that regard, Arabic

16   newspapers.

17   A.    What do you mean first line?

18   Q.    In other words, you said that you look at them first

19   before you put them -- You wouldn't just send them to a

20   translator.  You look at them first and make decisions as to

21   what to send to a translator.

22   A.    This is -- I have to explain.  The amount of information

23   that you have in the internet is huge, so there is no way that

24   I can pass to a professional translation each page in the

25   internet that I review, so that is why I have to make the
```

1    priorities for what I am sending to translation.

2    Q.    Right.  And that applies to newspapers as well.  Right?

3    A.    And then I collaborate with other material.  That is what

4    I am doing.

5    Q.    Now, and then you review the documents or the materials

6    that were seized during Operation Defensive Shield.  Right?

7    A.    Also in Defensive Shield, yes.

8    Q.    And that is starting from 2002 forward, those seizures.

9    A.    Not exactly.

10   Q.    Operation Defensive Shield didn't start in April of 2002?

11   A.    No.  I review documents from earlier stages.

12   Q.    But I am asking about Operation Defensive Shield.  2002

13   forward.  Right?

14   A.    Correct.

15   Q.    You weren't involved in the seizure of any of those

16   documents.

17   A.    Correct.

18   Q.    You were given those documents.

19   A.    Correct.

20   Q.    By the Israeli Defense Force.

21   A.    Correct.

22   Q.    As far as the previous documents, you weren't involved in

23   seizing them either.  Right?  The previous documents you have

24   looked at, you were not involved in actual seizures.

25   A.    The previous documents that were seized by the police.

1    Q.    But I am saying you weren't involved in those seizures.

2    They were all given to you.

3    A.    They were given to me.  Correct.

4    Q.    And that is your practical experience.  Withdrawn.

5          Now, you are not an expert on the Muslim Brotherhood.

6    Right?

7    A.    I don't focus on the Muslim Brotherhood.

8    Q.    Are you an expert on the Muslim Brotherhood?

9    A.    Not as a subject, but there are --

10   Q.    Are you on expert --

11         THE COURT:  Counsel, he is trying to answer.  You

12   are cutting him off.

13         THE WITNESS:  There are aspects in the Muslim

14   Brotherhood that I have to understand and research in order to

15   understand the social work.

16   Q.    (BY MR. DRATEL)  Okay.

17   A.    So there is a specific area that I am interested in the

18   Muslim Brotherhood and also history, but I am not an expert

19   for the whole Muslim Brotherhood because it is a huge subject.

20   Q.    So let's try my question again.  You are not an expert on

21   the Muslim Brotherhood?

22         MS. SHAPIRO:  Objection; asked and answered.

23         THE COURT:  Sustained.  He has explained.

24   Q.    (BY MR. DRATEL)  And you are not an expert on zakat law

25   either, under the Jordanian zakat law.  Correct?

```
 1    A.    I am not an expert for the Jordanian law.  I am --

 2    Q.    Thank you.  That is an answer actually.

 3    A.    Not correct.  I read articles about the Jordanian and

 4    Palestinian zakat law, and the method and how committees are

 5    registered and how it is liberal.  So I read some articles

 6    about this.  I am not an expert for the Jordanian or

 7    Palestinian law.  That is correct.

 8    Q.    And in fact, when you testified in a prior proceeding in

 9    this case, you weren't familiar at all with the Jordanian law,

10    were you?

11    A.    I did some research, because in 2000 and after that there

12    were drafts of new law that the Palestinian Authority wanted

13    to issue, and this was the end of last year.

14    Q.    And also to prepare for this case.  Right?

15    A.    No.  This is for part of my work.

16    Q.    You don't speak Arabic.  Right?

17    A.    I don't speak Arabic.

18    Q.    Have you ever been to a mosque in any of the cities that

19    you have talked about that talk about zakat committees with

20    any of the people there?

21    A.    A mosque of the zakat committee?

22    Q.    No.

23    A.    In the mosque in the area you are asking?  In the West

24    Bank, that is what you are asking?

25    Q.    Yeah.
```

A.    The answer is yes.

Q.    And you have spoken about zakat committees with those

people?

A.    No.

Q.    All right.  Okay.  Have you ever conducted a poll among

Palestinians about their feelings about zakat committees in

any of these locales?

A.    No.

Q.    Ever sit in a cafe in any of these cities and talk to

Palestinians about zakat committees?

A.    No.

Q.    Now, you were asked if you -- What would happen in 1994

or later, or some point that if someone went and knocked on

the door of a zakat committee and asked if they were related

to Hamas, what would the answer be, would they get the truth.

In fact, in 1994 you were in law school?

A.    Yes.

Q.    You didn't start any of this until 2000.  Right?  Looking

at any of this material.

A.    You are asking if this is my opinion?  This is my

opinion.

Q.    No.  What I am asking you is, you did not start to look

at zakat committees or Hamas financing until 2000.

A.    That is correct.

Q.    Yeah.  By the way, you have never tried to go knock on

1    the door of a zakat committee and ask them anything.  Right?

2    A.    I didn't knock on the door of a zakat committee.

3    Correct.

4    Q.    Now, you remember Demonstrative No. 10, a video which she

5    said was the Islamic Center of Gaza 2007 ceremony.

6    A.    Correct.

7    Q.    Right?  Now, you have never actually been to a class in

8    that school.  Right?  When it is in session.

9    A.    I have never been in a class.  That is correct.

10   Q.    You base your opinion on that video.  Right?  I mean,

11   about what that is all about.

12   A.    No, I based my opinion not only on this video.  I also

13   review another videos that are published by the way of the

14   internet, for example, from the BBC video that describes class

15   in the Jam'iyah Islamiya, the Islamic Society.  There are many

16   resources that I review on what is happening in classes.  For

17   example, the BBC Panorama from July 30, 2006 --

18   Q.    2006.

19   A.    -- from Dura.  Yes.

20   Q.    But nothing from '95 to 2001.

21   A.    This is also not correct.  The exhibit that is here is

22   not necessarily what I reviewed in my research.

23   Q.    You think 2007 is more relevant than 1995 to 2001?

24   A.    No.  2007 is demonstrating the idea of what is happening

25   for many years in those schools.  I just think they are

1    demonstrative.

2    Q.    That 2007 video, the Islamic Center of Gaza, still

3    operating, still operating in 2007.  Right?

4    A.    Correct.

5    Q.    Even though everybody knows it is founded by Sheikh

6    Yassin.

7    A.    Correct.

8    Q.    Now, the documents that you brought, the materials from

9    Operation Defensive Shield, for this case, is the only time

10   they have left Israel, or the West Bank, or wherever they are

11   held.  Right?  They don't get sent all over the world.  You

12   brought them here.  Right?

13   A.    The material, the exhibits.  Yes, correct.

14   Q.    And essentially, you don't know where these were found

15   within the locations that they were found.  Right?  You don't

16   know whether they are found in a closet or on a desk or on a

17   wall or in a drawer.

18   A.    That would not be accurate.  Sometimes where specific

19   documents were, for example, was for me was substantial, like

20   the Hebron document I tried to find out where it was found,

21   whether what office and what room, how it was found, in what

22   box, or sometimes I do this.  Of course, when you are dealing

23   with a lot of materials, and there were a lot of material that

24   were seized, when it was in a folder I can only assume that

25   they were taken from a closet.  But you are correct in a sense

1    that I cannot point out every and each document when it was

2    seized.

3    Q.    And who gave you that specific information?

4    A.    This is -- I consulted with the officers that were in

5    these committees and that conducted --

6    Q.    You say officers.  You mean IDF officers.

7    A.    Correct.

8    Q.    Israeli Defense Force officers.

9    A.    Correct.

10   Q.    Now, I want to talk about some of the documents that you

11   discussed in your direct testimony, and some of the seizure

12   dates.  Do you have that material there or do I need to come

13   up?

14   A.    I don't think I -- I have only the last book.  There are

15   four.  So if you can show me, I will of course answer.

16   Q.    Okay.  ICS Hebron No. 6.

17        MR. DRATEL:  May I approach, Your Honor?

18        THE COURT:  Yes.

19   Q.    (BY MR. DRATEL)  That would be -- actually you can hold

20   onto this one for a minute.  ICS Hebron No. 6 would be June

21   25th, 2002.  Is that right?

22   A.    Yes.  June 25, yes.

23   Q.    And ICS Hebron No. 7.  Same day?

24   A.    Same day.  Correct.

25   Q.    If you could look to Jenin Zakat No. 1.  Let me just show

1   you.  Jenin Zakat No. 1, you testified -- I am sorry.  Jenin

2   Zakat No. 1 is down here.

3   A.   Yes.  July 8th, 2004.

4   Q.   Okay.  You testified about No. 3 and 4.  Those are the

5   postcards of Yassin and Rantisi.  That would be also April of

6   2002.

7   A.   Correct.

8   Q.   Jenin Zakat No. 5, also April of 2002?

9   A.   Correct, yes.

10  Q.   Jenin Zakat No. 7, October of 2003?

11  A.   Correct.

12          MS. DUNCAN:  Excuse me, Your Honor.  Can we take

13  down that demonstrative?  It is blocking our view of the

14  witness.  Thank you.

15          MR. DRATEL:  Now, if we could bring up Jenin No. 3,

16  please, Jenin Zakat No. 3.  If we can go to the English,

17  please.  Let's stay here for a second.

18  Q.   (BY MR. DRATEL)  That is Sheikh Yassin.  Correct?

19  A.   Correct.

20          MR. DRATEL:  If we could go to the English, please.

21  Q.   (BY MR. DRATEL)  And if you could read that second

22  paragraph, please.

23  A.   The second --

24  Q.   Yes.

25  A.   "The Islamic Resistance Movement, Hamas, announces the

1    good news to the Arab and Muslim nation and to our Palestinian

2    people to the death of the founder of Mujahid Sheikh of

3    Palestine, Sheikh Ahmed Yassin."

4    Q.    Now, he was killed in 2004.  Correct?

5    A.    Correct.

6    Q.    So it couldn't have been seized in 2002 like you

7    testified.  Right?

8    A.    Correct.

9    Q.    Okay.

10              MR. DRATEL:  Can we go to Jenin Zakat No. 4, please?

11   Q.    (BY MR. DRATEL)  And this is Doctor Rantisi.  Correct?

12   A.    Correct.

13              MR. DRATEL:  If we could go to the English, please.

14   Q.    (BY MR. DRATEL)  Can you read that second paragraph?

15   A.    "The Islamic Resistance Movement, Hamas, announces the

16   good news of the death of its leader and one of its founders,

17   the Mujahid martyr Dr. Abdel Aziz al-Rantisi."

18   Q.    He was killed after Sheikh Yassin.  Correct?

19   A.    Correct.

20   Q.    And he was also killed in 2004.  Couldn't have been

21   seized in 2002, could it?

22   A.    Correct.

23   Q.    In fact, both Sheikh Yassin and Abdel Rantisi were the

24   leaders of Hamas at the time they were killed.  Correct?

25   A.    Correct.

1    Q.   And they were killed by the Israeli military.  Correct?

2    A.   Correct.

3    Q.   And obviously not part of a trial.  They were killed in

4    the street.  Right?

5    A.   They were killed in Gaza in the street.  Correct.

6    Q.   In a military operation.  Right?

7    A.   In a military operation.  Correct.

8            MR. DRATEL:  Can we look at Jenin Zakat No. 5,

9    please?  If we can hold off for one second, please.

10   Q.   (BY MR. DRATEL)  Operation Defensive Shield in April of

11   2002, that was a military operation.  Correct?

12   A.   Correct.

13   Q.   And it met with resistance from Palestinians.  Correct?

14   A.   Correct.

15   Q.   And there were some significant battles.  Right?

16   A.   Correct.

17   Q.   Including one in Jenin.

18   A.   Correct.

19           MR. DRATEL:  If you could bring up Jenin No. 5,

20   please.  And if you go to the English, please.

21   Q.   (BY MR. DRATEL)  If you can read that last sentence,

22   please.

23   A.   "Who was martyred in the battle defending the Jenin camp

24   on 10 April, 2002."

25   Q.   And that would be most, likely part, of that conflict

1   that we just discussed.

2   A.    This was probably, yes, although it was identified as Izz

3   el-Din al-Qassam, regardless this --

4   Q.    But I am just saying, most likely when they say defending

5   the Jenin camp, that is when the Israeli military operation

6   moved into the Jenin camp was in April of 2002.

7   A.    I just wanted to be accurate.  The Hamas didn't issue a

8   postcard for each Palestinian that was killed; only for its

9   members.

10  Q.    I am not interested in that.  I am interested in the

11  context of his death.

12  A.    Okay.  It could be -- Yes, it could be clashes between

13  the IDF and the Hamas operative.

14  Q.    It would be likely, wouldn't it, given the time frame and

15  the place?  When they say Jenin camp and that date, it is more

16  than likely that is what it is.

17  A.    Yes.

18        MR. DRATEL:  Now, if we could bring up ICS Hebron

19  No. 6, please.  If we can go to the English, please.

20  Q.    (BY MR. DRATEL)  And if you look at the bottom right,

21  that is April 11th, 2002.  Right?  The following day.

22  A.    Correct.

23  Q.    Now I just wanted --

24        MR. DRATEL:  ICS Hebron No. 9, just to get the

25  seizure date.

```
1    Q.   (BY MR. DRATEL)  And that would be August 12th of '04?

2    A.   No.

3    Q.   December 8th of '04?

4    A.   2004.

5    Q.   Correct?

6    A.   Correct.

7    Q.   Okay.

8              MR. DRATEL:  And ICS Hebron No. 10, too.

9              THE WITNESS:  12th of August, 2004.

10   Q.   (BY MR. DRATEL)  Thank you.  Now, you remember ICS Hebron

11   No. 3.

12             MR. DRATEL:  If we could bring that up, please.

13   Q.   (BY MR. DRATEL)  Do you remember that document?

14   A.   Correct.  Yes, I remember.

15   Q.   And you gave a very long answer when you were asked --

16   After reviewing that document, you gave a very long answer

17   about what that means to find that at a charitable committee.

18   Do you remember?

19   A.   I remember talking about the document, yes.

20   Q.   And you talked about how all the significance that you

21   put in it.  Right?  That was seized from the Anwar Library,

22   wasn't it, that document?

23             MR. DRATEL:  May I approach?

24             THE COURT:  Yes.

25             THE WITNESS:  There is something I have to check.  I
```

1    cannot confirm it.

2    Q.    (BY MR. DRATEL)  Could you check it over lunch, please?

3    A.    I can check it now.

4    Q.    You can check it now?  Go ahead.

5    A.    I don't have any indication about that in Anwar.  Sorry.

6             MR. DRATEL:  Can we go to ICS Hebron No. 2, please?

7    Go to page 7, please.  If we can start with "With regard."

8    Q.    (BY MR. DRATEL)  If you could read that, please?  This

9    document is already in evidence.

10   A.    From the beginning?

11   Q.    Yes.

12   A.    All of that?

13   Q.    From "With regard" from the top.

14   A.    "With regard to these frantic efforts, the Islamic

15   Resistance Movement, Hamas, would like to clarify its position

16   concerning the following.

17       "First, despite the lapse of more than eight months on

18   the occupier's assault against our" --

19   Q.    I will read it, to make it easier for all of us.  I will

20   read it.

21   A.    I am willing to read it.

22   Q.    I just think -- It will probably just be easier.

23       "With regard to these frantic efforts, the Islamic

24   resistance movement, Hamas, would like to clarify its position

25   concerning the following.

1    "First, despite the elapse of more than eight month on

2    the occupier's assault against our defenseless Palestine

3    people under the leadership of the Sharon government, and

4    Barak before it, and despite the martyrdom of more than five

5    hundred and more than twenty five thousand wounded from our

6    sons and defenseless unarmed people, and despite the

7    destruction and killing caused by the internationally banned

8    weaponry, such assaults were never intensified to this level

9    until our people's Intifada began.  Only when our glorious

10   resistance started to exhaust the enemy and embed horror among

11   its lines, it became evidence that Sharon aggressive offense

12   plan neither succeeded in subjugating our people and aborting

13   their Intifada nor re-establishing security for the Zionists.

14   "This timing and this intensification of pressure on the

15   Palestinian Authority can only suggest victory for the Zionist

16   aggressor and support the occupation with all its ferocity,

17   barbaric inhumane actions.  It is such pressure that our

18   people with all their factions and forces reject and refuse to

19   yield to.  It will even make our people more persistent to

20   continue the Intifada and expand resistance against the

21   occupation."

22   "Second:  These frantic efforts with all its various

23   forms under the banner of cease fire ignore the truth,

24   justice, and logic; they ignore our people real cause and

25   blatantly side with the demands of oppressor occupier.  In

1   this context we would like to clarify to everybody the

2   following issues:

3       "The cease fire banner is false and misleading; the

4   crisis is not between two fighting parties that they must be

5   separated by a cease fire.  In reality, it is an aggression by

6   an oppressor occupier on a defenseless unarmed nation that has

7   been subjected to the most severe barbaric assault and has

8   been inflicted with tremendous fatal casualties in human lives

9   and material.  The occupation is the highest forms of

10  terrorism, violence, and aggression.  What is needed here is

11  to stop this aggression and the remove this occupation.  Any

12  attempt contrary to that is an attempt to hide the truth, and

13  will not solve the crisis or lead to peace and stability.  The

14  talk about a cease fire is a crisis in itself because it would

15  mean putting an end to the Intifada and resistance while

16  maintaining the reality of the occupation and grant it

17  security.  It would also mean wasting all the great sacrifices

18  of our people and aborting all the achievements and great

19  impact of the Intifada."

20      That also was in ICS Hebron No. 2.  Correct?

21  A.   Correct.

22  Q.   Which you just read, like the last sentence or two of

23  that document.  Right?  On direct when Ms. Shapiro had your

24  examination.

25      And this is basically the onset of the second Intifada.

Right.

A.    This is the what?

Q.    This is at the beginning of the second Intifada.

A.    The beginning of the second Intifada, yes.

Q.    Within a couple of months.  Right?  This is January 2001.

Right?  Do you want to --

A.    June 2001.

Q.    June 2001, is it?  But it is within the time frame of the

second Intifada.

A.    Correct.

Q.    So six months after it started.  It started --

A.    Eight.

Q.    It started late September '99 -- 2000, rather.  Late

December 2000.  Right?

A.    It started actually in October, the October event, so

October, November, December, it is almost eight, nine months.

Q.    And one of those events that started it was prime

minister of Israel Ariel Sharon visiting the temple mount.

Right?

A.    He was not prime minister at that time.

Q.    But he was running for prime minister.  Right?

A.    Not yet.

Q.    He was going to.

A.    Something else.

Q.    But Sharon's visit to the temple mount was one of the

1   events that started it.

2   A.    Yes.   This was the event that --

3   Q.    And the second Intifada increased the amount of violence

4   in the West Bank and Gaza considerably, didn't it, between

5   Arabs and Israelis between Palestinians and Israelis?

6   A.    It increased, yes.

7   Q.    Increased, yes?

8   A.    Yes.

9   Q.    Yes, right?

10  A.    Correct.

11  Q.    And over time, that was over a period, obviously,

12  starting in late 2000, but then getting more and more violence

13  throughout 2001.

14  A.    I am not sure what you are saying now is correct.  What I

15  can say, not until 2001.  From 2002 there was -- You are right

16  in 2002 in two or three months there were a series of events

17  or events that caused the escalation.  Correct.

18  Q.    And there was an escalation in 2001, wouldn't you say?

19  We have seen some of the documents with those dates.

20  A.    There was a second Intifada.  Like you said, there was

21  violence.

22  Q.    Now, with respect to Nablus No. 2, that was the two

23  people who you said had gone to the Nablus high school that

24  was part of the zakat committee, the Nablus zakat committee.

25  Right?

```
1    A.   Correct.

2    Q.   And do you know how many high school student are in that

3    high school every year?  Do you know how many graduate from

4    that high school every year?

5    A.   Hundreds.

6    Q.   But you don't know for sure.

7    A.   I don't know the exact number.

8    Q.   Right.  And do you know how many graduates there have

9    been since that zakat committee began at the high school?

10   A.   I don't have the exact number.

11   Q.   Do you know how many have become members of Hamas?

12   A.   I don't know -- This is something that I have to

13   elaborate a little bit, if I may.  I don't know what exact

14   number of high schoolers that graduated became Hamas.

15   Q.   That was my question.

16   A.   But -- Okay.

17   Q.   Now, with respect to --

18        MR. DRATEL:  Your Honor, we are going to get into

19   another issue.

20        THE COURT:  All right.  Let's go ahead and take our

21   lunch break.  Let's be back at 2:00.

22        (Whereupon, the jury left the courtroom.)

23        MR. DRATEL:  Your Honor, just two things.  One is,

24   the instruction please to not consult with the Government

25   while he is on cross examination.
```

1          And I was about to get to No. 1069.

2               THE COURT:  Okay.  I will let you know after lunch.

3               MS. DUNCAN:  Your Honor, this is another brief

4    issue.  When Ms. Shapiro was showing different pictures whose

5    images were shown on the Holy Land computers, twice she showed

6    an image of the burning American flag, and because we have a

7    403 objection to those photographs we would like to get the

8    exhibit number and the page of that photograph.

9               MS. SHAPIRO:  I don't think I did display any of

10   those.  I scrolled through them I am happy to find --

11              THE COURT:  While you were scrolling through I think

12   is what -- I don't remember -- I remember an American flag.  I

13   don't remember that it was burning.  But look through what you

14   scrolled through and see if there is anything in there like

15   that.

16        All right.  Be back at 2:00.

17                    (Lunch recess.)

18              THE COURT:  Let me ask counsel to approach the

19   bench.

20        (The following was had at the bench.)

21              THE COURT:  I am sustaining the objection for now to

22   your Exhibit No. 1069.  I still have some concerns on this

23   reliability, trustworthiness issue that we discussed, whether

24   there was an investigation.  And I am not quite sure how I am

25   going to handle that.  We may come back and revisit it for

1    your case, but I am sustaining that for now.

2         MR. DRATEL:  Can I ask him whether he has seen this

3    or not, whether he is familiar with the decision, and see if

4    he can authenticate it?  I know he knows about the results and

5    stuff like that.

6         THE COURT:  Well, it is getting into the results

7    that I am having concern with, with the reliability and

8    trustworthiness.

9         MR. DRATEL:  He knows that it is a British --

10        THE COURT:  I know he knows it, but him knowing it

11   is not the same as getting into to --

12        MR. DRATEL:  Not getting into the document, but at

13   least the subject matter.  He knows there has been a

14   determination in Great Britain that Interpal is not part of

15   this network.  He knows it.  He is an expert.  Last year I

16   went --

17        THE COURT:  I understand all this was in last year.

18        MR. JACKS:  That was -- That Interpal is not a part

19   of this network is not what that report says.  I mean, that is

20   his argument, but that is not what the -- The charity

21   commission didn't make a finding like that.

22        THE COURT:  What do you see as a specific finding

23   made by them?

24        MR. JACKS:  The issue was Interpal was providing --

25        MR. DRATEL:  "Interpal had been subject to a charity

commission in 1996"--this is 2003--"that some of its funds had

been misappropriated from the political or violent militant

activities of Hamas in Palestine.  This inquiry found no

evidence--this is paragraph three--"of inappropriate activity,

and the information available indicated Interpal was a

well-run organization."

"In April 2003"--this is paragraph four--"similar

allegations" -- "Detailed, found it improved its procedures,

recordkeeping since the commission's previous inquiry."  And

then it goes on.  I am looking for actions.

THE COURT:  Findings and outcomes, paragraphs eight

and nine.

MS. SHAPIRO:  This investigation is actually

ongoing, Your Honor.

MR. DRATEL:  But at this time this one was closed.

And it was opened in '06, which I will be happy to ask him,

too.  I was going to ask him that, too.

THE COURT:  No.  I think I am going to stay away

from any report, any finding or conclusions of this

investigation for now.  I think there is still some issues I

need to resolve as far as the reliability issues under 803(8).

MR. DRATEL:  That is for the document.  With respect

to -- He knows about the findings.  He is aware that Interpal

has been --

THE COURT:  He knows it through --

1           MR. DRATEL:  He knows it through other research.

2           THE COURT:  What is the distinction you want to

3    make?  That you want to question him --

4           MR. DRATEL:  The document itself may not be -- But

5    he is an expert.

6           THE COURT:  It is not the document.  It is the

7    conclusions and the findings that were reached by this agency

8    that I think is in question in terms of the reliability and

9    the trustworthiness of it, and I think that is an issue we

10   need to explore some more.

11          MR. DRATEL:  Your Honor, he is an expert.

12          THE COURT:  Yes.

13          MR. DRATEL:  He is relying on all sorts of things.

14   This is contrary to his opinion.  The jury should be allowed

15   to factor in --

16          THE COURT:  That is the issue.

17          MR. DRATEL:  This is -- No one has contested that

18   this is not the findings of the British government.

19          THE COURT:  I understand that.

20          MR. DRATEL:  I object, obviously.

21          THE COURT:  Of course.  I understand that.  But I

22   think the same ruling is with those that we discussed this

23   morning, whether investigations are final.

24          MS. HOLLANDER:  But the other ones I can --

25          THE COURT:  Let me get back to those as well.  It

took me longer than I thought, frankly.  I was looking at this

over the lunch hour.  I just saw this exhibit for the first

time this morning.

MS. HOLLANDER:  After Mr. Dratel is Mr. Westfall and

then me.

THE COURT:  Okay.

MS. HOLLANDER:  But those other --

THE COURT:  I may have to do the same thing there.

If you are there, I will just not let you get into them until

I am able to fully resolve it, so maybe get into them in your

case.

MS. HOLLANDER:  I need to get into mine with this

witness.

THE COURT:  I don't know about that.

MS. HOLLANDER:  It is minor impeachment of him.

MS. CADEDDU:  Can I just ask, Your Honor, because I

am reading the rule here, and it says, "Unless the source of

information or other circumstances indicate lack of

trustworthiness," is Your Honor concerned about the

trustworthiness of the document or the trustworthiness of the

commission?

THE COURT:  Just of the report, the findings, the

conclusions.  That is what we are dealing with here.  And I

have some concern, and I was reading some Fifth Circuit case

law, and it says if there is questions as to the

1    trustworthiness or the reliability of the findings of the

2    report, then it is not admissible.  And --

3            MS. CADEDDU:  So the Court's position would be that

4    the commission's findings are not reliable?

5            THE COURT:  Correct, this report.  It is not my

6    position yet.  I have been saying what I have been saying this

7    morning.  I think there are some issues there, and I frankly

8    haven't had the time to work my way through it.

9            MS. CADEDDU:  I just wanted to clarify so I could

10   look and see if maybe I could something that would help.

11           MR. DRATEL:  Your Honor, just so we are clear, I

12   object, obviously, to the document not coming in, but also to

13   putting off limits for cross examination for witnesses an

14   expert who knows about also this, and it does have to be the

15   document itself that gets into evidence, but there is nothing

16   about 803(8) that says you can't cross examine someone about

17   things like this.  So that is my objection as well.

18           THE COURT:  Do you have a position on that as far as

19   cross examination of this witness?

20           MR. JONAS:  I couldn't hear anything.

21           MR. JACKS:  The issue was if he doesn't use the

22   document but just ask him about, you know, "Are you aware of

23   the findings of the commission" --

24           MR. JONAS:  Can I confer real quick?

25           THE COURT:  Sure.

1          MR. JONAS:  Your Honor, we think it is proper for

2    him to question the witness' knowledge of the investigation to

3    Interpal.  Our objection goes to the document itself.

4          THE COURT:  Okay.  You have no objection to that?

5    Then you are good to go.

6        What about on her situation?

7          MR. JONAS:  About USAID?

8          THE COURT:  Yes.

9          MR. JONAS:  I think she can question him about his

10   knowledge of the USAID.  I think can question him on what he

11   knows about it, If USAID gave money to organizations and probe

12   that.

13         MS. HOLLANDER:  I would just like that --

14         THE COURT:  And probe the findings, that there were

15   these findings?

16         MR. JONAS:  No.  I think it depends upon where it

17   leads.  In other words, she can ask --

18         MS. HOLLANDER:  I make this simple.  I will withdraw

19   the ones -- the vetting ones.  The ones that I want to

20   introduce are the ones that you said this morning.

21         THE COURT:  Where they don't have any findings; just

22   showing that money went --

23         MS. HOLLANDER:  Yes.  And just those.  The one you

24   have already admitted, No. 102, and three others, just limit

25   it to those.  And that is what I --

         1          THE COURT:  One of those.  And I think it is maybe
         2     No. 1010, the one with the email, it does have some language
         3     in there about vetting.
         4          MS. HOLLANDER:  No. 1010 was not one of the ones I
         5     am considering.
         6          THE COURT:  Well, it was one of those.  You are
         7     right.  I sustained the objection.  Maybe No. 1071.
         8          MS. HOLLANDER:  I won't ask about vetting, and I
         9     will redact that.  I want to ask about the money.
        10          THE COURT:  Just the money going there.
        11          MR. JONAS:  A couple of issues here.
        12          First of all, with regard to this witness I think there
        13     is a distinction between what he knows and what is in those
        14     documents, because again those aren't his documents.  And so I
        15     think -- I don't have a problem with Ms. Hollander questioning
        16     what he knows about USAID, and if they gave money to
        17     committees.  By I still have an objection to her admitting the
        18     documents through him and questioning him about the documents
        19     he has never dealt with before.
        20          MS. HOLLANDER:  Well, he has dealt with them before.
        21          MR. JONAS:  Only because you showed it to him last
        22     trial.  He hasn't dealt with them in terms of his research as
        23     an expert.  You showing them to him in the last trial doesn't
        24     all of a sudden make him familiar with them that he can
        25     discuss them in testimony.

1        THE COURT:  I assume you are going to question him

2   on that issue about the USAID, and then we will approach the

3   bench and I will give you a ruling at that time.

4        MS. HOLLANDER:  Okay.

5        MR. JONAS:  If I can make one other point.  On those

6   three documents there is still that CARE document, which I

7   think is distinctive from the other two graphs or charts.

8        THE COURT:  And I think -- As I understand, the main

9   thing you wanted from that, one of those charts attached had

10  some money going to Qalqilya, one of those committees.

11       MS. HOLLANDER:  Right.  That is through CARE.  And

12  that is how USAID works.  He knows that.

13       MR. JONAS:  When you say he, or are you talking

14  about me or the witness?

15       MS. HOLLANDER:  You also know that these are

16  accurate.

17       MR. JONAS:  Your Honor, I am tired of the you know.

18  That is not in the rules of evidence.  We don't know what

19  this -- I think the question should be proffered on what he

20  knows and see what happens.

21       THE COURT:  All right.

22       MR. DRATEL:  May I have a minute with Ms. Shapiro?

23       THE COURT:  Go ahead.

24       (The following was had in open court.)

25       THE COURT:  Go ahead and bring the jury in.

1           (Whereupon, the jury entered the courtroom.)

2               THE COURT:  Mr. Dratel?

3               MR. DRATEL:  Thank you, Your Honor.

4    Q.  (BY MR. DRATEL)  I want to go back before lunch.  We were

5    talking about Jenin Zakat No. 3 and Jenin Zakat No. 4, which

6    were the postcards of Sheikh Yassin and Abdel Rantisi

7    announcing -- postcards sort of announcing they had been

8    killed.  Right?

9    A.  Correct.

10   Q.  And they weren't killed in combat, were they?  They

11   weren't involved in combat with Israeli forces at the time.

12   Right?

13   A.  You mean, they are not fight --

14   Q.  Right.  In fighting with forces at the time.  Right?

15   They were killed -- Did you have --

16   A.  If you can --

17   Q.  Okay.  They were killed by rocket fire from either a

18   helicopter or a plane.  I think Sheikh Yassin in a car or

19   right after he left a mosque.  Right?

20   A.  That is what I know.  Correct.

21   Q.  And Abdel Rantisi, the same kind of situation; not

22   involved in firing weapons or anything like that at the time.

23   A.  Correct.

24   Q.  Okay.  And if you remember, and we can pull it up if you

25   don't, but if you remember the little announcement that said,

1    "We bring you the good news."  Right?  "Of the death of."

2    A.    Right.

3    Q.    And they don't really mean good news in that context like

4    they were happy about it.  Right?

5    A.    I don't know how to answer this question.

6    Q.    Do you think that the people who put out the postcard

7    were happy that Sheikh Yassin had been killed or that Rantisi

8    had been killed?

9    A.    You just can read what is written there.

10    Q.    Okay.

11    A.    It is written, "We are glad to announce," or something

12    like this.  That is what they write.

13    Q.    So if it were good news, then it wouldn't be Hamas that

14    was putting out those postcards.  Right?  If they were

15    announcing the good news that Sheikh Yassin was dead.

16    A.    Well, I have to elaborate a little bit.  In many

17    announcements of the death of Izz el-Din al-Qassam members, it

18    is happy.  It is for happiness.  There is a reason why.  And

19    also in postcards that -- I just want to demonstrate what I am

20    trying to say here.  For example, the postcard that was seized

21    in the Islamic Charitable Society in Hebron, this is a

22    postcard which written, "You have to be happy, the mother of

23    shahid, because your son is now going to happiness."  So it is

24    typical to what I have seen in posters and postcards.  It is

25    not something unusual.

```
1   Q.   What I am saying is do you think they would

2   rather -- that they are happy the person is dead?  Or that is

3   a religious expression, do you think?

4   A.   This is -- I think that the fact that it is written in

5   numerous posters, this is some kind of idea that the jihad is

6   some kind of fulfillment.  But that is what is written and it

7   is not exceptional.

8   Q.   Okay.  You talked about Interpal.  Right?  Interpal is a

9   British organization.

10  A.   Correct.

11  Q.   And it has twice been subjected to an inquiry by the

12  British government.  Right?

13  A.   Three times.

14  Q.   Three times.  One is pending right now.

15  A.   Correct.

16  Q.   They did one in '96, 1996.  Right?

17  A.   Correct.

18  Q.   And another one in 2003.  Right?

19  A.   Correct.

20  Q.   And both times inquiries were closed and Interpal was

21  continued to operate.  Correct?

22  A.   They were closed because of insufficient evidence and, as

23  you said, they were allowed to continue working.

24  Q.   Right.  Okay.  And it was about Hamas, basically,

25  relationship to Hamas.
```

1    A.    Correct.

2    Q.    Now, about the Palestinian Authority, the Palestinian

3    Authority has control, political control and other types of

4    control over parts of the West Bank and Gaza.  Right?

5    A.    Correct.

6    Q.    And those are what you describe as the territories.

7    Right?  When you say the territories you are talking about

8    West Bank and Gaza.

9    A.    Correct.

10   Q.    That is short for occupied territories.  Right?

11   A.    When I say territories I say territories.

12   Q.    But isn't that short for occupied territories?  Isn't

13   that what it was called for years and years and years?

14   A.    I don't agree with you.  What I was saying was

15   geographical areas, territories, it means the West Bank and

16   Gaza Strip.  Part of this territories were controlled by the

17   Palestinian Authority.

18   Q.    And before that, by Israel.

19   A.    Before the Palestinian Authority.  Correct.

20   Q.    After the 1967 War, Israel took control of those.

21   A.    Correct.

22   Q.    And weren't they called the occupied territories by many?

23   A.    Yes, it was called the occupied territories.  That is

24   correct.

25   Q.    You also mentioned yesterday once Judea and Samaria when

1   you were describing the West Bank.  And that is an Israeli

2   description of parts of the West Bank, breaking it up into

3   north and south.  Right?  Judea in the south and Samaria in

4   the north.

5   A.    Correct.

6   Q.    And it has a Biblical meaning, doesn't it?

7   A.    Correct.

8   Q.    And that is sort of a Biblical meaning when Israel

9   controlled all of that territory in the time of the Bible.

10  Right?

11  A.    It is a geographical area that were mentioned in the

12  Bible.  That is correct.

13  Q.    And that is a subject of dispute in terms of that kind of

14  use, of that kind of name for it with Palestinians.  Right?

15  In terms of calling it Judea and Samaria.

16  A.    The Palestinian has their own definition for -- How do

17  you call it?  They have their own words.  I call it many

18  times, and I called here in this court the West Bank and Gaza

19  Strip.  I used this many times.  And it is correct that once I

20  mentioned the word Judea and Samaria.  For me this is a way to

21  define between the southern of the West Bank and the northern

22  of the West Bank.  Usually I do --

23  Q.    Isn't that what the regions were called when Israeli

24  Civil Administration ran that territory before the PA?  Wasn't

25  it called Judea and Samaria?

1   A.   Yes.

2   Q.   So it is not just your division.  It was official

3   division by the Israeli government.

4   A.   Yes.

5   Q.   And you know those names have never been recognized by

6   the United Nations as being valid.  Right?

7   A.   I don't know how to answer this question.

8   Q.   Now, Hamas -- Let's go back to the period between '95 and

9   2001, really from the start of the PA to 2001.  And Hamas was

10   viewed as a threat to the Palestinian Authority because the

11   Palestinian Authority was essentially run by Fatah.

12   A.   By the PLO.  Correct.

13   Q.   Yes.  And Fatah is the main party of the PLO.  Correct?

14   A.   Fatah is the main party of the PLO.

15   Q.   And the Palestinian Authority viewed it as a threat,

16   Hamas, to its control.

17   A.   The Palestinian Authority, which was the government that

18   ruled, they saw Hamas as a threat.  That is correct.

19   Q.   Okay.  And occasionally they took actions against -- the

20   Palestinian Authority took action against the zakat

21   committees, and you mentioned that, back in 1996 in fact.

22   Right?  And even before there were some attempts?

23   A.   There were attempts, and 1996 was the first, I would say,

24   wide range action that were taken by the Palestinian

25   Authority.

1    Q.   And you have relied on some of the literature at that

2    point, newspaper articles, things like that, in your work, the

3    thing you have in front of you, and other places.  Right?  On

4    some of what was going on at that time.  Right?

5    A.   Correct.

6    Q.   And one of the things that you relied on was an April

7    10th, 1995 article from al-Wasat newspaper?

8    A.   Al-Wasat.

9    Q.   And you relied on that?

10   A.   I mentioned it, yes.

11   Q.   In fact, you quote from it in your work.  Right?

12   A.   Do you want to refresh?

13   Q.   Yes.  Let me bring to you the Hebrew.  Okay?  So that you

14   can -- Just wait for me to ask you to look for a specific

15   part.  Okay?  It should be the first paragraph.  Right?  It

16   talks about April 10th, 1995 article.

17   A.   I am just looking at the English article.  I am not

18   having the Hebrew.  Do you have the English?

19   Q.   Yes, I do, actually.

20   A.   That will be better.  Okay.

21   Q.   And it was reported in that article that in accordance --

22   quote, "In accordance with the new plan, the Palestinian

23   Authority must renew its control of these committees."  And it

24   is talking about zakat committees.  Right?

25   A.   You are now reading from English?

```
1    Q.   Yes.  You know --

2    A.   I just cannot follow you.

3    Q.   Let me stay here and you look at this, and I have what I

4    need over there.  So you can look -- And this is where I am.

5            MS. SHAPIRO:  Your Honor, he is reading from a

6    document that is not in evidence.

7            THE COURT:  Is it a document he said he relied on?

8            MR. DRATEL:  Yes.

9            THE COURT:  He can read it to himself right now.

10           MS. SHAPIRO:  Mr. Dratel started reading it out loud

11   just now.

12           THE COURT:  Well, were you going to read from that

13   document that is not in evidence?

14           MR. DRATEL:  Yes, because he relied on it and it

15   is --

16           THE COURT:  You want to ask him about it?

17           MR. DRATEL:  Yes.

18           THE COURT:  Okay.

19           THE WITNESS:  I want to say something.  The English

20   translation comparing to the Hebrew is not correct.  It is not

21   the same.  There is differences.  And sometimes, for example

22   -- I will give you, if you let me, I will give you examples.

23           MR. DRATEL:  Can we approach, Your Honor?

24           THE COURT:  Yes.

25           (The following was had outside the hearing of the
```

1        jury.)

2              MR. DRATEL:  This is from his 3500 material.  What

3    we were told is that this corresponds to page 1804.  This is

4    the original.  This is both from the Government.  This is page

5    1804.  Now he is saying they don't match.

6              MS. SHAPIRO:  I don't know what he is reading from.

7    Can I look at what you are reading?

8              THE COURT:  What is it.

9              MR. DRATEL:  It is something that he prepared.

10             MS. SHAPIRO:  This is not something he prepared.

11             MR. DRATEL:  He said last year he did.  He testified

12   last year --

13             MS. SHAPIRO:  That he prepared this?

14             MR. DRATEL:  Yeah.  I showed it to him last year.

15   It is part of his --

16             MS. SHAPIRO:  I actually don't know if this is stuff

17   he collected or prepared.  I don't know.

18             MR. DRATEL:  The point is, I am giving him a

19   document that says it corresponds to a certain page, and it

20   doesn't.  I didn't do the translation.  We were given these

21   translations.

22             MS. SHAPIRO:  We didn't do the translations either.

23             MR. DRATEL:  Well, I think when they give them to us

24   they are supposed to be accurate.

25             THE COURT:  What is your point?

1   MR. DRATEL:  I want to just be able to go through

2   the English because that is the only one I can understand.

3   And he can read the English, so I would like to be able to do

4   that.

5        MS. SHAPIRO:  Well, he should be entitled to correct

6   it if it doesn't correspond.

7        MR. DRATEL:  I don't even know if it is the same

8   thing.  I will ask him if it is the same thing.  I don't know

9   what he is saying is different anyway.

10        THE COURT:  Okay.  All right.  I don't have either

11   one in front of me so.

12        (The following was had in the presence and hearing

13        of the jury.)

14        MR. DRATEL:  May I have just a moment, Your Honor --

15        THE COURT:  Yes.

16        MR. DRATEL:  -- just to get this together?

17   Q.  (BY MR. DRATEL)  Just so I am clear, this is the Hebrew.

18   It is the same subject matter, but what you are saying is the

19   translation is not --

20   A.  If you will let me explain, I will tell you why I think

21   it is not an accurate translation.

22   Q.  Okay.

23   A.  Because in the article it says that the opinion of the

24   Palestinian Authority is that Hamas took over in the past

25   three years the zakat committee.  Here it says Hamas assumed

1  control over, and it is not what it says in Hebrew and in the

2  Arabic.

3  Q.    But that is not what I am asking you about.

4  A.    But what I am trying --

5         MR. DRATEL:  But, Your Honor, now he is reading from

6  a document.  I am not asking him that he relied on that.  He

7  can be asked that on redirect.  I want him to go to the

8  specific part I would like to use and not the rest of it.

9         THE COURT:  Do you want to direct his attention to

10 the specific part?

11        MR. DRATEL:  Yes.

12        THE COURT:  Try to answer his question.

13 Q.    (BY MR. DRATEL)  If you could look at the part where it

14 says -- And it should be in the second or third paragraph,

15 because I don't know how it corresponds in Hebrew.  "In

16 accordance with the new plan"--do you see it--"the Palestinian

17 Authority"?

18 A.    Yes, I can see that.

19 Q.    Can you read that from the Hebrew so we don't get it

20 wrong in English?

21 A.    Okay.  I will read it.  "According to the new plan, the

22 PA" -- I am reading from my translation because I translate it

23 as I understand it.  Is it okay?  Maybe it will satisfy you

24 and then --

25 Q.    Okay.  Can I see it, Your Honor?

```
1              THE COURT:  Yes.

2              MR. DRATEL:  Okay.

3              THE WITNESS:  If you agree for the translation.  So

4   maybe not a problem.

5   Q.   (BY MR. DRATEL)  Yes.  Do you want to read that, just

6   that sentence, "According to the new plan"?

7   A.   "According to the new plan, the PA must regain its

8   control of these committees directly by appointing workers and

9   strictly supervising their ledgers or by proceeding with the

10  present system and infiltrating PA supporters into the

11  committees."

12  Q.   Now, that was 1995.  Right?

13  A.   That is correct.

14  Q.   And these committees continued to operate during that

15  period.  Right?

16  A.   Correct.

17  Q.   Okay.  We are going to try another one.  I hope this one

18  we do better.  Do you still have the -- I have the English and

19  I will give you the Hebrew.

20  A.   It is the same article?

21  Q.   No, I don't know if it is.

22  A.   It is the same article.

23  Q.   There may be a different part.  Just give me one second.

24  For some reason the numbers don't match.  It is the same

25  article, so let me see what you have got there and maybe that
```

1   will -- Thank you.

2   A.   Yes.

3   Q.   Let me just compare it.  Okay.  This should work.  That

4   page is Hebrew.  I didn't see it in here, but it should be

5   this first sentence.  I can highlight it for you.  Is that

6   from the same article?

7   A.   No, it is not from the same article.  This is a different

8   paragraph.  The article I gave here in Hebrew, it says see an

9   article in al-Wasat.  This is a new paragraph that gives more

10  examples.

11  Q.   Okay.  But it is your words.  Right?  Is this --

12  A.   This is a translation, so --

13  Q.   But here is the Hebrew.  Do you want to read what it says

14  under there example?

15  A.   Do you want me to translate it?

16  Q.   Yes.

17  A.   I will try.  "In the years" --

18          THE COURT:  Before you go there, I am not clear.

19  Whose article is this that you are reading from?

20          THE WITNESS:  I assume that it was taken from some

21  binders that were delivered to the Prosecution.

22          THE COURT:  But is this your work product?  Are you

23  reading from something that you wrote?

24          THE WITNESS:  Yes, it is something that I gave a

25  long time ago to the Prosecution.

1           THE COURT:  This is your work?  This is your

2    product?

3           THE WITNESS:  Yes.  It looks like, yes.

4           THE COURT:  Okay.

5           THE WITNESS:  Yes.

6           THE COURT:  Go ahead.

7    Q.  (BY MR. DRATEL)  Can you read that part that says, "In

8    the years '95, '96"?

9    A.  "Between the year '95 and '96 where the taking over

10   process was complete, the Palestinian police started to take

11   actions against offices of the charity committees."

12   Q.  Okay.  Thank you.

13          MS. SHAPIRO:  Your Honor, I am sorry.  I am still

14   not clear if he is reading from a translation of a newspaper

15   article or what he is reading from is his own work product.

16          THE COURT:  Are you reading from something that you

17   yourself wrote, that part you just read?

18          THE WITNESS:  Yes.  It is not an article.  It is

19   something that I wrote.

20          THE COURT:  Okay.  Does that clear it up?  Okay.

21   Q.  (BY MR. DRATEL)  And so since that time, from the time

22   that the Palestinian Authority assumed control over the zakat

23   committees in 1994.  Right?  '94, '95, would you say, when the

24   Palestinian authority was up and running?

25   A.   In 1995 this program, this plan of the Palestinian

Authority was a reaction after Hamas taking over --

Q.   I am asking when did the Palestinian Authority take over control of the zakat committees as a legal matter?  When the Oslo Accords created the Palestinian Authority, the Palestinian Authority became the Government in parts of the West Bank and Gaza.  Right?

A.   Yes.

Q.   When was that?

A.   According to the Oslo Accords, the specific paragraph there that says that what was before is adopted into the Palestinian Authority.  I mean, the Jordanian law from 1966 is automatically embraced by the Palestinian Authority.  So actually --

Q.   That is not my question.  My question is when did the Palestinian Authority start to exist as a government?

A.   After -- There were two stages.  First of all, the recognition as authority, and this is the Oslo Accords, and then when it started to come into the cities of the Palestinian territories, and that was in 1994.

Q.   Okay.  That was the question.

A.   So it was formally created by the Oslo Accords, and the fact they went into the territories in 1994.  Okay?

Q.   Okay.  That was just my question.  So that is when they began to have civil control over that area.  Right?

A.   Correct.  In 1994, and 1995 also.

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

1    Q.   And since that time period, in that time period between

2    '95 and '01, the Palestinian Authority would occasionally

3    close some of these zakat committees.

4    A.   Shut down their offices.

5    Q.   Yes.  And freeze bank accounts.

6    A.   No.  Freeze bank accounts is not accurate.  They shut

7    down offices.

8    Q.   Did you not testify --

9    A.   Yes, in 2003 they froze bank accounts.  That is correct.

10   In 2003.  There were several steps that were taken against --

11   First of all, they tried to shut down the offices themselves

12   and the activists in these offices.  That was in 1996 and

13   1997.  And then in 2003 it froze the bank accounts.  It was

14   Salem Fiad that acted as the prime minister at the time of the

15   Palestinian Authority that decided to freeze the bank accounts

16   of the societies in Gaza.

17   Q.   And they were reopened ultimately after that.  Right?

18   A.   They -- The freeze was lifted few months after in 2005 I

19   think it was -- I think it was April 2004 or something like

20   that, May 2004.  I am not sure.

21   Q.   And the Palestinian Minister of Labor had said initially

22   that was a temporary freeze to review administration of the

23   committees.  Right?  Ghassan al-Katib?

24   A.   Can I refresh my memory?

25   Q.   Sure.  Read here to yourself.

```
 1    A.    So the time period is 2003 --

 2    Q.    I am just asking you --

 3    A.    You are asking about 2003.

 4    Q.    What you just described, you answered -- I asked you --

 5          THE COURT:  Counsel, you keep cutting him off.  And

 6    you have changed your question and dates as he is answering,

 7    so let him answer.

 8          THE WITNESS:  What time period are we talking about?

 9    Q.    (BY MR. DRATEL)  The 2003 time period you just discussed.

10    A.    Okay.  2003.  Yes, on August 28th, 2003 there was a

11    decision of the PA to freeze the bank account.  And I don't

12    remember the labor Ghassan Khatib in that connection, but --

13    Q.    Do you want to see this again?

14    A.    Ghassan Khatib -- What are you showing me exactly?

15    Q.    I will just show you.

16    A.    I just don't remember this document so -- Can I read it?

17    Q.    Sure.  Start at line 15 and go over to line 20 on the

18    other page.

19    A.    Again, Ghassan Khatib was not in this period of 2003, so

20    you are asking me about 2003, and Ghassan Khatib -- There is a

21    mixture between two periods, so I don't -- Ghassan Khatib is

22    not from 2003.  That is what I am trying to say.

23    Q.    Okay.  So what time period is Ghassan al-Khatib from?

24    A.    I need to refresh my memory.

25    Q.    We will move on.  You talked about one of the closures in
```

1    1996 was after some suicide bombings.  Right?

2    A.    Correct.

3    Q.    And that was based on the pressure from the Government of

4    Israel?

5    A.    Also from the government of Israel there was a summit in

6    Sinai, and a decision to taking with the participation on

7    Jordan, Egypt, and the Palestinian Authority, Israel, and the

8    U.S., and there was a decision, a pressure that was --

9    Q.    On the Palestinian Authority.

10   A.    On the Palestinian Authority.  That is correct.

11   Q.    And then it closed them and then they reopened.  Right?

12   A.    Correct.

13   Q.    And you said during your direct testimony at some point

14   that Hamas -- Withdrawn.  Fuad Abu Zeid.  Right?  From Jenin?

15   A.    Fuad Abu Zeid.  Okay.

16   Q.    And from the Jenin zakat committee.  Right?

17   A.    Correct.

18   Q.    And you said that in the '90s he was in charge of the

19   waqh for Jenin.

20   A.    Correct.

21   Q.    And that would be under the Palestinian Authority.

22   Right?

23   A.    No, it was before the Palestinian Authority.

24   Q.    So it was under the Israelis, when the Israelis had

25   control.

```
 1   A.   Correct.

 2   Q.   And so the Jenin zakat committee was, you said, point of

 3   no return by 1991 with respect to control by Hamas.  Right?

 4   A.   Point of no return.  That is what I said, yes.

 5   Q.   And he was the head of that committee, or one of the

 6   heads of that committee.  Right?

 7   A.   He was a member of that committee.  Correct.

 8   Q.   And you said he was one of the founders of the Hamas on

 9   the West Bank.

10   A.   Correct.

11   Q.   And he was in charge of the waqh when the Israelis

12   controlled that territory.

13   A.   He was the head of that waqh.  Correct.

14   Q.   Okay.  Now, with respect to Ghassan Harmas of Bethlehem

15   Orphan Care Society.  Right?  Are you aware that he was not

16   the director as of 1999?

17   A.   Not the director of what?

18   Q.   Of the Orphan Care Society.

19   A.   No, I am not aware of this.

20   Q.   Okay.  Weren't you shown documents by the Government to

21   that effect?  By the Prosecutors?

22   A.   No.

23   Q.   Were you shown documents, letters from the Palestinian

24   Authority to zakat committees with respect to certain projects

25   that were ongoing?  Did you see anything like that?
```

1    Withdrawn.

2         Did you see letters from the Palestinian Authority to the

3    Holy Land Foundation with respect to work done by the Holy

4    Land Foundation in the West Bank?

5    A.    I don't remember that I see something like this.

6    Q.    Okay.  Now, one of the sources that you quote from the

7    PA -- And you -- In one of your documents is Khalid al-Qidra?

8    A.    Yes, just a minute.  The General Prosecution.

9    Q.    Right.

10   A.    Prosecutor.

11   Q.    And ultimately he was removed because of corruption.

12   Right?

13   A.    I don't know.

14   Q.    You don't know?

15   A.    No.

16   Q.    Do you know whether he was also accused of political

17   prosecutions?

18   A.    I don't know what has happened with the General

19   Prosecutor after -- I don't know.

20   Q.    Now, the Palestine Authority documents that you have

21   talked about, PA 2, 8, 9, they were taken by force.  Right?

22   From the Palestinian Authority.

23   A.    What do you mean by force?

24   Q.    Part of Operation Defensive Shield.  A military

25   operation.

1   A.   It was part of a military operation.

2   Q.   Right.  And when I say by force, I mean without their

3   consent--the Palestinian Authority.

4   A.   I just want to elaborate something.  The Operation

5   Defensive Shield was focused on those offices and places where

6   terror was -- centers of terrorism.  Now, this was a military

7   operation that the Israeli army raided on places where, in the

8   Israeli army eyes, there were some terrorists, arms, et

9   cetera, et cetera.  So actually in the frame of a military

10  operation, no consent was asked, I assume, by them.

11  Q.   That included the headquarters of the Palestinian

12  Authority.

13  A.   Correct.

14  Q.   And the headquarters of the Palestinian Security Service.

15  A.   Correct.

16  Q.   So these documents were not the result of the government

17  of Israel asking the Palestinian Authority, "Give us whatever

18  reliable information you have on the zakat committees."  You

19  just took what was there.  Right?

20  A.   Well, it is -- Okay.  I will try to explain myself.  The

21  reason why the Israeli army raided on these offices is that

22  the same Palestinian Preventive Security Forces were alleged

23  to be engaged in terrorism against Israel.  And that is why

24  they didn't ask for consent.  And when the Israeli army raided

25  these offices in the military operation, they took documents

1   from there.

2   Q.   Right.  But my question was, so this was not the Israeli

3   government asking the Palestinian Authority Security Service,

4   "Give us whatever reliable information you have on the zakat

5   committee."  It wasn't a result of a request like that.

6   A.   It wasn't the result of a request.  I agree with you.

7   Q.   Now, you -- On direct you talked about a time when the

8   Palestinian Authority was responsible for policing zakat

9   committees, and that the government of Israel didn't have

10  jurisdiction.  Right?

11  A.   What time period.  Sorry?  In what time period?

12  Q.   After '95.

13  A.   After '95.  Okay.

14  Q.   Right?  But in 2002 this Operation Defensive Shield,

15  there was no jurisdiction to go to Jenin.  Right?  Jenin?  You

16  didn't have jurisdiction of Jenin.  Right.

17  A.   In 2002, just to be accurate, this was a military

18  operation after terrorist organizations like Hamas and Islamic

19  Jihad, and it is not a question -- I assume it is not a

20  question of jurisdiction, but that is what the army was

21  ordered to do by the government of Israel.

22  Q.   So the point being, is it true, that the Israeli

23  government is not limited by things like jurisdiction; that

24  they basically -- the government of Israel, when it decides it

25  is necessary for its security, can go into the West Bank and

1    Gaza, places like Jenin and the other places that were raided,

2    all of these committees where you put in all this material,

3    they can go there when they want to.  And, in fact, they have

4    been there over and over again since 2002.  Right?

5    A.   They way you put it is something that has to be

6    explained, because the decision of the government of Israel

7    was, and they ordered the army to prevent and to go to all of

8    the places that are controlled by terrorist organizations.  So

9    that is why in this case, and the decision of the government

10   of Israel was taken at that time, to protect the citizens of

11   Israel, to go to the places where terrorist offices -- I will

12   tell you alleged if you --

13            THE COURT:  Hold on a second.  We need to take a

14   little break.  We have some malfunctioning equipment.

15                    (Brief recess)

16            THE COURT:  Mr. Dratel?

17            MR. DRATEL:  Thank you, Your Honor.

18   Q.   (BY MR. DRATEL)  Now, in Operation Defensive Shield,

19   going back to that 2002-2004 time period, I guess it is

20   continued also to the present in terms of Israeli army

21   searches of institutions, things like that, in the West Bank.

22   A.   The searches continue after 2002.  That is correct.

23   Q.   Beyond 2002, I am saying.  Beyond 2004.

24   A.   Beyond 2002.

25   Q.   And after 2004.

1   A.   But this is not part of Defensive Shield.

2   Q.   But I am saying searches generally.

3   A.   Okay.  It is a different kind of searches, but --

4   Q.   But back to Operation Defensive Shield in 2002, in the

5   spring of 2002, wasn't one of the places that the Israeli army

6   went into in the military operation was the Palestine Central

7   Bureau of Statistics, the Palestinian Authority Central Bureau

8   of Statistics?

9   A.   I don't know about this.

10  Q.   You don't know?  Okay.  They went into various

11  Palestinian Authority government buildings.  Right?

12  A.   You mean the mukata?

13  Q.   I mean buildings.  Just, I mean -- The Security Service.

14  Right?

15  A.   No.  It is not a yes or no.  There are some parts that --

16  some parts of the Palestinian Authority, some places that the

17  IDF did went inside because I believe that the Israeli army

18  believed that there was a terrorist attack going from there.

19  I just -- If you want to ask me about specific buildings, I

20  don't know if I can tell you.

21      I can tell you that, for example, the mukata, part of the

22  mukata, which is the headquarters of actually the presidential

23  residence part of it, the IDF raided and took some documents

24  from there.  That is correct.  But the word jurisdiction, I

25  think it is not appropriate to this issue.  That is what I was

1    trying to say.

2    Q.    Okay.  You talked about the Hamas ticket in the 2006

3    elections.  Right?  During your direct examination?

4    A.    Hamas?

5    Q.    Have you said the Hamas ticket for the elections.

6    A.    Under the Hamas name.

7    Q.    It was called the Hamas --

8    A.    No.

9    Q.    It was called change and reform.  Right?

10   A.    Correct.

11   Q.    And in fact, Christians were on that ticket.  Right?

12   A.    I don't know if Christians were.

13   Q.    You don't know?

14   A.    Could be.  I don't know.

15   Q.    Okay.

16   A.    If you want to show me some person --

17   Q.    I just want to know if you were aware of it.

18   A.    This is a Hamas party, so --

19   Q.    Now, Hamas has been illegal in Israel since 1989.  Right?

20   A.    Illegal in Israel since 1989.  That is correct.

21   Q.    So Hamas members can be arrested and prosecuted and

22   charged.  Right?

23   A.    Correct.

24   Q.    And the Muslim Brotherhood, though, has not, between 1995

25   and 2001, not outlawed.  Right?

A.   The Muslim Brotherhood was not outlawed.  That is correct.

Q.   And the Muslim Brotherhood -- Rather, Hamas is a branch of the Muslim Brotherhood.  Right?  In Palestine.

A.   A branch in Palestine.  Correct.

Q.   And in 1992, in December of 1992, Israel deported the 400 people, and they knew who they were.  They knew the names of the people they were deporting.  Right?

A.   Correct.

Q.   And they didn't charge them with any crime, though, at that time.

A.   No legal -- You mean no --

Q.   Prosecution.

A.   Prosecution.  Correct.

Q.   Now, Israel also, as we talked about before, has also at times killed Hamas leaders.  Right?  Like Yassin, Rantisi?

A.   Yassin and Rantisi were killed by Israel.

Q.   Is ISA in that process about targeting people or finding information involved in that?

        MS. SHAPIRO:  Objection, Your Honor.

        MR. DRATEL:  Are you looking at your lawyer for an answer?

        THE COURT:  There is an objection, counsel.

        MS. SHAPIRO:  Objection; relevance.

        THE COURT:  I will sustain the objection.

1    Q.    (BY MR. DRATEL)  But a number of Hamas leaders have been

2    killed by Israel.  Correct?

3    A.    Correct.

4            MS. SHAPIRO:  Asked and answered, Your Honor.

5    Q.    (BY MR. DRATEL)  And Israel also has available

6    administrative detention.  Right?  Do you know what I mean by

7    that?

8    A.    Yes.

9    Q.    And -- Right?

10   A.    Correct.

11   Q.    And that can be without charges?

12   A.    No, it is not --

13           THE COURT:  Counsel, I don't see the relevance of

14   getting into those kind of issues.  That is not going to help

15   the jury decide the issues before them.

16           MR. DRATEL:  I would be happy to proffer.  I don't

17   know if you want me to do it here.

18           THE COURT:  Approach the bench.

19           (The following was had outside the hearing of the

20           Jury.)

21           MR. DRATEL:  I was going to get into some specific

22   examples which have been brought out by the Government, and it

23   has to do with the options available to Israel to clamp down

24   on these committees, and part of the circumstantial evidence

25   is they don't.

1          THE COURT:  They don't what?

2          MR. DRATEL:  Use all of their -- They don't

3    close --

4          THE COURT:  Why is that relevant?

5          MR. DRATEL:  Because someone looking at this

6    situation is capable of saying, "Well, then they are okay."

7    Someone who is thinking about where to give money, these are

8    committees that are not shut down, they operate, they are

9    licensed.  This is part of the circumstantial evidence on both

10   sides.

11         MS. SHAPIRO:  I never raised administrative

12   detention once in my direct.  I don't know what possible

13   relevance it has.

14         THE COURT:  You are getting into administrative and

15   there are no charges required.

16         MR. DRATEL:  That means they can go out and arrest

17   anyone they believe -- They can do it, and it doesn't require

18   charges and all the other things, and so it goes both ways.

19   One is that they have options available to shut down zakat

20   committees and take out the leadership who they say are all

21   these Hamas people running around.  The other thing is people

22   who have been detained -- They put in a video that Fuad Abu

23   Zeid said, "I have been detained 14 times without charges" --

24         THE COURT:  Yes.  But I don't know that we need to

25   explore that any further.

1          MR. DRATEL:  I was narrowing it.

2          THE COURT:  You are making these issues out of a lot

3    of things that are ultimately irrelevant to what the jury is

4    deciding.

5          MR. DRATEL:  I will say we disagree.

6          MS. SHAPIRO:  Your Honor, I just want to object to

7    comments that Mr. Dratel just made about "Are you looking to

8    your lawyer for an answer?"  That is clearly meant to suggest

9    something that is inappropriate and not true.  And plus, he

10   has the right if he needs to consult on a question.

11         THE COURT:  You might want to clarify what it is

12   that he has his lawyer here for.  I don't know that the jury

13   understands that.

14         MR. JACKS:  I don't know that that is an issue for

15   the jury.  That is more for procedurally the protective order.

16   It is not something that is really an issue.

17         THE COURT:  Is it on -- Why is the lawyer here for?

18   Classified?

19         MS. SHAPIRO:  Yes, unless there is a question about

20   eliciting classified information.

21         MR. DRATEL:  I am not saying I am not going to get

22   into it.

23         THE COURT:  That is what you asked him, "You are

24   looking to your lawyer for an answer," when you know what the

25   issue is.  So that is creating a misimpression with the jury,

1    so don't do that anymore.

2            MR. DRATEL:  Okay.

3            THE COURT:  I have heard enough.

4            (The following was had in the presence and hearing

5            of the jury.)

6            THE COURT:  I sustain that objection.

7    Q.    (BY MR. DRATEL)  You saw on the video Abu Zeid, the video

8    of the deportees, and you saw him say, "I have been detained

9    14 times without charges.  I have been arrested 14 times

10   without charges"?

11           THE COURT:  Counsel, did you just not say me hear me

12   say I sustained the objection?

13           MR. DRATEL:  I am sorry.  I thought I could go into

14   the specifics.

15           THE COURT:  No, that is what we were talking about.

16           MR. DRATEL:  I misunderstood, Your Honor.

17           THE COURT:  I am sure you did.

18   Q.    (BY MR. DRATEL)  Now, you testified in your direct back

19   on Monday that the Islamic Relief Committee, the Islamic

20   Relief Agency was in Nazareth.  Right?

21   A.    The center was in Nazareth and Um al-Fatem.  There was

22   two offices that they operated.

23   Q.    But you testified that it was in Nazareth so it could get

24   money to the West Bank.  So it was close to the West Bank.

25   Right?

1    A.   That is also correct, like Um el-Fatem.  It is two

2    cities.

3    Q.   Is that what you testified to on Monday?  Do you need to

4    see it?

5    A.   No, no, I don't need to see it.  I know where it

6    operated.  It operated in two places.

7    Q.   But you said Nazareth so it would be close to get money

8    to --

9    A.   It is correct.  I agree with you.

10   Q.   That is what you said.

11   A.   I agree.  I agree.

12   Q.   That is all my question was.  Is that what you said?

13   A.   Yes, I did.

14   Q.   Okay.  Now, have you seen documents about Holy Land

15   projects through the Islamic Relief Committee?  Have you seen

16   documents to that effect?

17   A.   I have seen documents that were seized in the IRC

18   relating to projects.

19   Q.   Have you seen Holy Land -- documents seized from Holy

20   Land?

21   A.   No, no, no.  I saw --

22   Q.   That is what I am asking you about.  Have you seen Holy

23   Land documents seized?

24   A.   No, I saw the IRC documents.

25            MR. DRATEL:  Can we pull up InfoCom No. 3, please,

page 94?

Q.   (BY MR. DRATEL)   Now, do you see where it says Occupied

Land Fund?   And you know that was the Holy Land Foundation at

one point and it changed its name.

A.   Yes.

Q.   And this is a project -- do you see there the Islamic

relief organization?   Right?   Three lines from the bottom.   Do

you see it?

A.   I see it, but I don't know if this is the IRC that I am

talking about.   Do you have the whole document?

Q.   Yes.

         MR. DRATEL:   Can we show the page before, perhaps?

         THE WITNESS:   Because there is another organization

called IRO, so it is not the IRC.

Q.   It is Um el-Fatem you are talking about, the IR --

A.   IRO is a different -- there is a different organization

that is not out of Palestine, not in Israel, not in Palestine,

called IRO.

         MR. DRATEL:   If we can could go --

         THE WITNESS:   If you have an address and phone and

everything I will recognize it.

         MR. DRATEL:   Go either back or forward a couple of

pages.   One forward.   Another.

     Well, let's go to page 97, then.   Another one.

Q.   (BY MR. DRATEL)   Islamic Relief Organization.   But I want

1    to point you to the address.  It is Gaza.  Right?  Of this

2    family?

3    A.    Just the question --

4    Q.    I understand.  I am not asking you to say that this is

5    the Islamic Relief Committee.  There are other documents in

6    this exhibit that talk about Islamic Relief Committee Um

7    el-Fatem?

8    A.    So we don't talk about the Islamic Relief Committee.

9    Right?  Or we do?

10   Q.    I am just talking about where these people are from.

11   A.    I am trying to answer something.

12            MR. DRATEL:  Can we go to page 1 of the document,

13   please?

14   Q.    (BY MR. DRATEL)  Do you see where it says organization,

15   Islamic Relief Agency?

16   A.    Yes.

17   Q.    Um el-Fatem?

18   A.    This is what we are talking about.

19   Q.    Thank you.

20            MR. DRATEL:  If we can go back to page 94 then.

21            THE WITNESS:  This is not the same organization.  Do

22   you have Arabic?

23   Q.    The page before is Arabic, I believe.

24   A.    Is this a translation?

25   Q.    Yes, it is a translation.

```
 1   A.    I just cannot confirm this is from the IRC.  I don't

 2   know.  Maybe -- It doesn't look to me the same IRC, because

 3   there is another organization called International Relief

 4   Organization.

 5   Q.    I understand what you are saying.  You weren't shown

 6   these documents by the Government.

 7   A.    No.

 8   Q.    Just to clarify, Nazareth is up here near the north, just

 9   to south of Haifa.  Right?

10   A.    Correct.

11   Q.    And Gaza is pretty far away.  Right?  Relatively?

12   A.    Correct.

13   Q.    Okay.  Now, in 1993 Israel controlled the West Bank.

14   Correct?

15   A.    Most -- Yes.

16   Q.    And that included Jenin.  Right?

17   A.    Correct.

18   Q.    And I am going to put on the elmo, what is in evidence --

19              MS. SHAPIRO:  What exhibit number is this.

20              MR. DRATEL:  No. 1070.

21              MS. SHAPIRO:  Defense 1070?

22              MR. DRATEL:  Yes, 1070.

23   Q.    (BY MR. DRATEL)  Do you see that is a fax from al-Razi

24   Hospital in Jenin?  Do you see the top line?

25   A.    Yes, I can see what is written.
```

1    Q.    And the fax date is August 16th, 1998.  Do you see on the

2    far right?

3    A.    That is what is written.

4    Q.    Yes.  And I will show you the original Hebrew.  That is

5    the Hebrew document.  Right?  Is that in Hebrew?

6    A.    That is Hebrew.

7    Q.    And it says, "The Civil Administration of Judea and

8    Samaria and Medical Services, the Department of the Medical

9    Services Officer."  Right?

10   A.    That is what it says in the document.

11   Q.    And if we go to the bottom, it is signed by Dr. Yitzhak

12   Sefer.  Right?

13   A.    Yes, I can see it.

14   Q.    And by the way, Yitzhak, if you look at the English

15   translation it is spelled with an I-T-Z.  Do you see that?  Do

16   you see it is spelled I-T-Z-H-A-K?

17   A.    Yitzhak?

18   Q.    Yes, Yitzhak.

19   A.    Okay.

20   Q.    But that can also be spelled in English with a Y.  Right?

21   Like Y-I.  You have seen it that way.

22   A.    You see, I don't know who wrote the document, and I don't

23   know how to relate to it.

24   Q.    I am not asking about this -- I am asking about the name

25   Yitzhak.  Have you seen it in English?

1    A.    I don't know.  It can be many names in Hebrew.  I just

2    don't know the person, so I am not sure I can answer this.

3    Q.    But this is a time -- This is November 24th, 1993 is this

4    letter.  Right?  Do you see that?

5    A.    The date, yes, I can see the date.  The date, that is

6    what it said in the document.

7    Q.    Right.  And the document says it is a preliminary license

8    to the zakat society of Jenin for the construction of a

9    general hospital.  Right?

10   A.    If you ask me if I can confirm what is written in the

11   document, it is not in my knowledge.  I just cannot answer

12   you.  If you want me to translate --

13   Q.    Not confirm.  Just read the document.

14   A.    I can read the document.

15   Q.    Yes.

16   A.    And what you are saying is correct.  But I don't know --

17   Q.    I am not asking if you know.  It is already in evidence.

18   A.    I can --

19   Q.    I am just asking you to confirm what is in the document,

20   and then I will ask you a question.

21   A.    I cannot confirm the content of the document because I

22   don't know it and I just can --

23   Q.    But it says what it says.  It says what I read.  Right?

24   A.    Yes, but I am not Doctor --

25   Q.    I am not saying you are.  I am saying this document was

1  written November 24th, 1993, and that is two years after you

2  say the Jenin committee passed the point of no return.  Right?

3  1991 is when you say it passed the point of no return.

4  A.   I want to tell you something.

5  Q.   No, let me ask you the question.

6        THE WITNESS:  I cannot answer yes or no, Your Honor.

7  I just have --

8        MR. DRATEL:  I ask it be a yes or no question, Your

9  Honor.

10  Q.   (BY MR. DRATEL)  Is this two years after you said that

11  the Jenin zakat committee passed the point of no return that

12  it was controlled by Hamas--1993?

13  A.   A yes or no question will maybe -- I am going to confirm

14  part of what he suggested now.  I did say that in 1991 this

15  was the point of no return.  But I am asked here to confirm

16  some document that I really don't know, and I am not --

17  Q.   I will just ask you the question.  I am not asking you to

18  confirm anything about the document.

19  A.   But you asked me about if there were a license --

20  Q.   I just asked you to read the document.  I am not asking

21  you to say that you have knowledge of what is in it.  The

22  document is in evidence.

23  A.   That is what I am trying to do.

24  Q.   I am asking you, 1993 is two years after you say the

25  Jenin zakat committee passed the point of no return.

1   A.   That fact we can agree for sure.

2   Q.   Okay.  And this letter is addressed to Ziad Mahmoud

3   Zakarneh, head of the zakat committee in Jenin.

4   A.   That is what it reads.

5   Q.   And he was the head of the zakat committee at that time,

6   wasn't he?

7   A.   At that time he was the head of the zakat.

8   Q.   And you said that he was a member of Hamas.

9   A.   That is what I said.

10   Q.   A known member of Hamas.

11   A.   I said it, yes.

12   Q.   By that time.

13   A.   By that time.  Correct.

14   Q.   Now, we talked a little bit about searches of zakat

15   committees, but I want to talk to you not about Operation

16   Defensive Shield.  I want to go back in time between 1993 and

17   1995.  And you are familiar with some searches that occurred

18   in those times.  Right?

19   A.   Only in the beginning of 1993.

20   Q.   Right.  Now, in February of '93 there was an audit of the

21   Mujama'a in Gaza.  Right?  The Islamic Center?

22   A.   I think in that time I am not sure if it was 1993, but

23   there was a raid on the -- Yes, there was a raid.  I am not

24   sure about the date.  If you would like me to check it I will.

25   Q.   I will refresh your recollection.

```
 1    A.    Okay.  May I see the Hebrew?  I will show you --
 2    Q.    This is the Hebrew, and I will tell you what page.  It
 3    says page 1.  It is this page.
 4    A.    Yes.  The date is January 8th, and not what is written
 5    there.
 6    Q.    Okay.  January 8th, 1993?
 7    A.    Correct.
 8    Q.    Okay.  So January 8th, 1993 there was an audit of the
 9    Islamic Center of Gaza.
10    A.    There was an inspection.
11    Q.    And it remained open afterwards.
12    A.    Correct.
13    Q.    Okay.  There was also a search --
14    A.    The search was not in the Mujama'a.  It was in the
15    mosque.  It was not closed.  That is correct.  But it is a
16    mosque of the Mujama'a.  It is not the Mujama'a itself.  I
17    just want to make sure --
18    Q.    Well, let me show you again and ask you -- I am sorry.
19    Don't look at page 1.  My confusion there.  Look at page 18.
20    I am sorry.
21    A.    Can I see the --
22    Q.    I forgot to bring it back.  Page 18 is the Hebrew.
23    A.    Yes, it is a mosque of the Mujama'a.
24    Q.    Look at page 18.  That is what I am asking about.
25    February 17th, 1993, of the Mujama'a Islamic Association.
```

1   A.   Are we looking on the same thing?

2   Q.   This is what it says.

3   A.   I want the tell you something there is no raid on the

4   Mujama'a.

5   Q.   I didn't say raid.

6   A.   There was no search on the Mujama'a --

7   Q.   I said audit?

8   A.   Just a second.  I know this document.  There were

9   searches -- Not even searches.  It was inspection of the Civil

10  Administration in several institutes of the Mujama'a Islami,

11  not the Mujama'a Islami itself, just to make clear for the

12  fact.

13  Q.   Can you read the first paragraph where it says,

14  "General"?

15  A.   Yes.

16  Q.   What does that say?

17  A.   The date, first of all --

18  Q.   Not page 1.  Page 18.

19       MS. SHAPIRO:  Your Honor, can we just clarify from

20  what he is reading and whether it is something he wrote?

21       THE COURT:  Is this an exhibit that is in evidence?

22       MR. DRATEL:  No, it is his 3500 material.

23       THE COURT:  Is it something he wrote?

24       MR. DRATEL:  I don't know.  I just said 3500

25  material.

1    THE COURT:  I am not playing games.  I am asking is

2    that something he wrote, and I know you know that.

3    MR. DRATEL:  I don't know.  I was given --

4    THE COURT:  Ask him.

5    Q.   (BY MR. DRATEL)  You are familiar with these documents.

6    Did you write them?

7    A.   I didn't write.  I am familiar.

8    Q.   You reviewed them?

9    A.   I reviewed these documents.  Correct.

10   Q.   In preparation for your testimony?

11   A.   Yes.

12   Q.   Okay.  So I am just asking to read to yourself, not out

13   loud, that first paragraph on page 18 of the Hebrew.  And I

14   ask you whether it says "a government audit was conducted on

15   February 17th, 1993" --

16   MS. SHAPIRO:  Your Honor, I am sorry.

17   THE COURT:  Sustained.  You are reading from a

18   document that is not in evidence.

19   MR. DRATEL:  I am just asking him.

20   THE COURT:  But you are reading.  It is not in

21   evidence.

22   THE WITNESS:  I will try to find it.

23   Q.   (BY MR. DRATEL)  It is not on page 18?

24   A.   No.

25   MR. DRATEL:  This is what I got from the Government.

```
 1              THE COURT:  Do you want to help him find it?

 2              MR. DRATEL:  This is what I got from the Government.

 3    If it says page 18 and it is not page 18, I don't --

 4              THE COURT:  He has what you have there, counsel.  If

 5    you want to help him --

 6              MR. DRATEL:  I gave him the Hebrew I got from the

 7    Government, so it is supposed to correspond.

 8    Q.   (BY MR. DRATEL)  Have you read page 18?

 9    A.   I will tell you what is written on page 18.

10    Q.   No, don't tell me what is written.  I just want to know

11    if you have read page 18.

12    A.   Yes.

13    Q.   Was there a search -- Not a search.  Was there an audit,

14    or an inspection is the word you used, of the Mujama'a, the

15    Islamic Center, in February of '93?

16    A.   I will confirm to you, just I want to see the

17    correct -- I will confirm if it was -- I will confirm to you.

18    It is not a problem.  I mean, if it was it was.  We cannot

19    argue.  I just can't see it in the document itself, so I need

20    to review all the document.  Because in page 18 what I have is

21    findings from a mosque.

22    Q.   That is not what it says in English.  I don't know what

23    to tell you.

24    A.   This is a mosque --

25    Q.   Can you confirm that if you look at the English?
```

1    A.    I need to review it.  I will review it and I will compare

2    it and I will confirm it, of course.

3    Q.    I will move on for now.  You know also that there were

4    searches in January 1993 of the Tulkarem zakat committee.

5    A.    Yes.

6    Q.    And there was an inventory of documents.  Right?  Of

7    things that were seized.

8    A.    Yes.  There is a report of --

9    Q.    Right.  And there is nothing about anything related to

10   Hamas in that report so far as what was seized.  Right?

11   A.    I am not sure.

12   Q.    Well --

13   A.    If you want to show me that I will --

14   Q.    Sure.  Let me ask you a couple of questions and we can

15   hopefully get this all done at once rather than you having to

16   read and read again.  There was also a January 1993 search of

17   the Jenin zakat committee.  Right?

18   A.    Of?

19   Q.    Jenin zakat.

20   A.    Just a second.  I see -- I found the inspection in

21   Tulkarem, so may I review it?  You asked me if there were

22   Hamas items, and I just want to --

23   Q.    Go ahead.

24   A.    In another page of the Tulkarem search it says there was

25   a search in the Zeid mosque in Tulkarem.

Q.   I am not talking about the mosque.  I am talking about
the Tulkarem zakat committee.

A.   The office itself?

Q.   Yes.

A.   There are several searches in Tulkarem and mosques that
belong to the zakat.  You mean in the office itself.  Correct?

Q.   Yes.

A.   Okay.  I found it.

Q.   No Hamas documents in the office.

A.   No.

Q.   Okay.  Jenin, January '93.  It is in the same batch.  Do
you need to look at it to refresh your recollection?

A.   Well, it is not accurate about Jenin, because there were
a document about the financial resources and some financial --

Q.   Of what?

A.   Of some of the Hamas funds.

Q.   That is because you say they are Hamas funds, but not
Hamas itself.  It is like the Holy Land Foundation and
Interpal and those places.  Right?  And in fact, if you look
at Tulkarem, if you look at Tulkarem again, it also talks
about some of their sources of funding.  Right?

A.   Correct.  But --

Q.   It talks about the Red Crescent Society?

A.   The Red Crescent Society in Kuwait.

Q.   And also Abu Dhabi too, I think.

1  A.   That is correct.  But also in the same search they found

2  other items in mosque of Tulkarem zakat committee.

3  Q.   I am talking about the zakat committee office.

4  A.   But --

5  Q.   I am talking about the zakat committee.  Have you

6  finished looking at Jenin, the Jenin appendix?

7  A.   Correct.

8  Q.   Now, if you go back to Tulkarem -- Are you reading the

9  Hebrew right now are you looking at the Hebrew?

10 A.   I am with the Hebrew, yes.

11 Q.   I will try to tell you what page it is on, according to

12 this that I have here.

13          MS. HOLLANDER:  Your Honor, may we approach?

14          THE COURT:  All right.  Come on up.

15          (The following was had outside the hearing of the

16          jury.)

17          MS. HOLLANDER:  I think there may be something wrong

18 with a juror.  That is why --

19          THE COURT:  Which juror?

20          MS. DUNCAN:  The second from the end.

21          THE COURT:  On the front row or back row.

22          MS. DUNCAN:  Front row, second from the right.

23          THE COURT:  From the right?  I will keep an eye on

24 her.

25          (The following was had in the presence and hearing

1          of the jury.)

2   Q.   (BY MR. DRATEL)  If you look at Appendix No. 6 -- Can you

3   find Appendix No. 6 there?  It should be page 47 of the

4   Hebrew.

5              THE COURT:  Ms. Fabela, do you need a break?

6              JUROR FABELA:  Yes, I would like a break, please.

7              THE COURT:  Let's take a break.

8              (Whereupon, the jury left the courtroom.)

9              THE COURT:  Let's take an afternoon recess.

10             MR. DRATEL:  Your Honor, may the witness look at the

11  stuff so we can get rolling, because if the pages don't match

12  up it will be hard.

13             THE COURT:  Sure.  That will be helpful.

14      Let's take a break.  We will be in recess until 4:00.

15                       (Brief recess.)

16             THE COURT:  Mr. Dratel?

17             MR. DRATEL:  Thank you, Your Honor.

18  Q.   (BY MR. DRATEL)  Have you had a chance to review those

19  documents?  Right?

20  A.   Yes.

21  Q.   And those are documents you provided to the Government?

22  A.   Yes.

23  Q.   And so there was an inspection or search of Jenin zakat

24  committee in January of '93.  Right?

25  A.   Correct.

1    Q.    No Hamas documents noted in that.

2    A.    No Hamas documents in this.

3    Q.    Right.  And there was some -- They found some funding

4    sources, including the Red Crescent Society.  Right?

5    A.    Many.

6    Q.    Okay.  Including the Red Crescent Society.

7    A.    Correct.

8    Q.    And the Holy Land Foundation.

9    A.    Correct.

10   Q.    And with respect to Tulkarem, did you have a chance to

11   check out the appendix with respect to Tulkarem?

12   A.    Yes, but it was one inspection that was made -- conducted

13   in the Tulkarem office and in the Tulkarem, the mosques of the

14   zakat committee there are findings.

15   Q.    I am just talking about the offices of the zakat

16   committee.

17   A.    If you are speaking only on the offices, you are correct.

18   Q.    I am going to ask you another question, though.  Was

19   there a finding or was it a result that they looked at the

20   members of the committee?  Right?

21   A.    Correct.

22   Q.    And they said that five of the 16 committee members were

23   Hamas activists.  Right?  Look at page 50, I think.

24   A.    You are talking about Tulkarem now.  Right?

25   Q.    Yes.  Do you want me to show you?

1    A.    It says at least five members.

2    Q.    Right.

3    A.    Okay.

4    Q.    Are identified as Hamas activists.  Right?  Five of 16?

5    A.    At least five, it is written here.

6    Q.    And a couple of the people had been detained on the eve

7    of the deportation, but in fact were released.  Right?  If you

8    don't know you don't know.

9    A.    I am not saying I don't know, because you are presenting

10   something that is written in this document, which is the Civil

11   Administrative report.  They say at least five out of 16 are

12   Hamas, and in my testimony here I also identify more than

13   that.  So I just want to make it clear.

14   Q.    Now, did you also get a chance to look at the Dura

15   committee?

16   A.    Correct.

17   Q.    Inspection.  Right?  That was July of '95.

18   A.    Yes.

19   Q.    And Dura is part of Hebron?  It is affiliated with

20   Hebron?

21   A.    This report is of the Zlashnah Zaka (phonetic) of Dura

22   and I was referring to the Jam'iyah al-Khalil of Dura.  It is

23   not the same.

24   Q.    But Holy Land was a contributor to this zakat committee.

25   A.    According to the --

1    Q.    Records that were found there.

2    A.    To the records, yes, but it is not the committee that I

3    was testifying on.

4    Q.    But Holy Land was a contributor to that committee.

5    A.    Yes.

6    Q.    And there were no Hamas documents found there?

7    A.    No.

8    Q.    Now, you testified about the Nablus zakat committee.

9          MS. SHAPIRO:  Your Honor, I don't think the witness

10   answered.  He was about to answer the question.

11         MR. DRATEL:  There wasn't actually --

12         THE WITNESS:  He asked me to read Dura in the

13   recess, and I didn't have time to read it.

14         THE COURT:  Just go ahead and answer his question.

15         MR. DRATEL:  Your Honor --

16   Q.    (BY MR. DRATEL)  It is not the one you are talking about.

17   I am going to ask that Holy Land was a contributor.

18   A.    As I saw in the document, that is correct.

19   Q.    Okay.  Nablus, Nablus zakat.  Now the Nablus zakat, as

20   you described it, is an institution that has a lot of separate

21   parts.  Right?

22   A.    Subcommittees.

23   Q.    Right.  But it had a lot of separate projects, the

24   al-Tadmoun high school.

25   A.    Correct.  Mosques.

1   Q.   Are you familiar with a dairy?

2   A.   With?

3   Q.   A dairy?

4   A.   You mean Saffa?

5   Q.   Yes.  But you are familiar with it?

6   A.   I am familiar -- I don't know if at that time it was

7   already established.  Are you talking about the Saffa?

8   Q.   I am not limiting it to '95 to 2001.  I am talking about

9   the time period you testified about --

10  A.   No, because it is important, because if you are talking

11  about the Saffa, dairy, I don't know if it was in 2001.

12  Q.   Okay.  But I am --

13  A.   I am familiar with the name.

14  Q.   Right.  Of the parts of the organization is what I am

15  talking about.  So it has all these different projects.

16  Right?  And ICS Hebron is similar.  Right?  It has a lot of

17  different things--Young Men's Muslim Association?

18  A.   Correct.

19  Q.   The Dura committee that you talked about, not the one --

20  A.   The Jam'iyah.

21  Q.   And Jenin also has different projects, like a hospital.

22  The al-Razi Hospital?

23  A.   Correct.

24  Q.   And Ramallah as well, you said.  Right?

25  A.   Correct.

Q.   Has different sort of satellite organizations.  Do you

know what I mean by that?

A.   It is central committees that were located in central

cities in the Palestinian territories, so they had a lot of

institutes around -- like satellite, exactly like you said.

Q.   And you say you don't know whether Saffa was in existence

before 2001.

A.   Correct.

Q.   You don't know?

A.   I don't know about this.  Correct.

Q.   Okay.  And just tell me if you are aware of these things

I am going to ask you.  Do you know whether the government of

Israel, the Civil Administration of Israel, approved an

ophthalmic hospital by the al-Tadamoun Society in the early

'90s?

A.   Which one?

Q.   Ophthalmic.  Eye.  An eye care hospital by al-Tadamoun.

Are you aware of that?  Do you know whether that is a fact or

not?

A.   I know that they have a clinic, but from the '80s.  I

don't know whether it was approved.  Maybe.  I don't know how

to answer this question.

Q.   If you don't know, you don't know.

A.   Okay.

Q.   Do you know whether a variety of Christian organizations,

1    including Caritas and St. Mary's Maternity Hospital, have

2    business dealings with the Nablus zakat committee?

3    A.    What name?

4    Q.    Sure.  Caritas, C-A-R-I-T-A-S.  You don't know?

5    A.    Don't know.

6    Q.    Okay.  St. Mary's Maternity Hospital, do you know?

7    A.    You just pronounce it so fast.

8    Q.    I apologize.  St. Mary's Maternity Hospital.

9    A.    I don't know about this.

10   Q.    Okay.  St. Nicholas Home Charitable Society for the

11   Elderly.

12   A.    I Don't know about this.

13   Q.    Do you know of any work that Nablus zakat committee does

14   with the United Nations Development Program?

15   A.    Not that I know.  It doesn't say that there is not, but

16   not that I know.  But the document that I reviewed from Nablus

17   I didn't see the names that you just mentioned.

18   Q.    The World Food Program?

19   A.    I don't remember about this.

20   Q.    Land O' Lakes, incorporated?  It is a dairy company.

21   Land O' Lakes.  Does that sound familiar?  If you have ever

22   seen documents related to Nablus or the dairy or the

23   al-Al-Saffa Dairy?

24   A.    Al-Sal-Saffa?  Again you are talking about al-Saffa?

25   Q.    That is part of the Nablus zakat committee.  Right?

1    A.    There was a project of an organization called ANERA that

2    I saw, but this was in the late 2004, 2005 something like

3    this.

4    Q.    ANERA --

5    A.    ANERA, this is something else.

6    Q.    This is something else I am talking about.  Okay.  But

7    you don't know about that.  But ANERA is the American Near

8    East Relief Agency.  Right?

9    A.    Right.

10   Q.    Not part of the closed network of Hamas financing.

11   A.    They were not.  They are not part of this.

12   Q.    You hesitated there.  Are you not sure?

13   A.    No, because one of their -- I am sorry.  I just want to

14   clarify.  The ANERA is not designated.  It is not Hamas.  One

15   of the workers called Robert Museri was dealing with the

16   Nablus zakat committee.  And he was arrested and he was warned

17   not to deal with the zakat committee of Nablus, and just --

18   Q.    Okay.

19   A.    And they don't work anymore with the zakat committee of

20   Nablus.

21   Q.    Now, were you shown any documents or have you reviewed

22   any documents -- were you shown any documents by the

23   Government with respect to other organizations, aid

24   organizations that Holy Land had projects with?  I will give

25   you some examples.  The International Committee of the Red

1    Cross, have you seen any documents with respect to that?

2    A.    International --

3    Q.    The Red Cross, the International Red Cross.

4    A.    I didn't see documents like that.

5    Q.    And just go back for a second.  The Red Crescent is the

6    Muslim equivalent of the Red Cross.  Right?

7    A.    Correct.

8    Q.    How about the American Red Cross?  Did you see any

9    documents with respect to Holy Land in the American Red Cross?

10   A.    I would say that my specialty is on the zakat committees

11   in the West Bank and Gaza, and not what projects were

12   conducted in other parts of the world by different--

13   Q.    So you wouldn't know of any other -- Kosovo or Turkey, or

14   anything, you wouldn't have any knowledge of?

15   A.    No, it is not correct.  There are international

16   organizations that I am familiar with projects that they

17   conduct in this area, including the Red Crescent.  That is

18   correct.  But even in the Red Crescent, there is

19   differentiation between the branches, because only lately one

20   of the branches of the Red Crescent was designated as Hamas,

21   and it depends.  It doesn't say that the whole Red Cross is

22   forbidden.  That is correct.

23   Q.    And are you familiar with any work that Holy Land did

24   with, and I will give you -- UNWRA.  Do you know what I mean

25   by UNWRA?

1    A.    I am familiar with.

2    Q.    United Nations Relief Works Agency?

3    A.    Yes.

4    Q.    Are you familiar with any work Holy Land has done with

5    them?

6    A.    No.

7    Q.    How about the World Wheelchair Association?  Been shown

8    any documents in that regard?

9    A.    Are you asking me specifically of connection between Holy

10   Land, or are you asking me about projects between Hamas

11   committees and the international organization?  It is

12   different.

13   Q.    I am talking about Holy Land.  Do you ever see anything

14   having to do with the Holy Land projects with the World

15   Wheelchair Association?

16   A.    I didn't see.

17   Q.    Okay.  Now, you have talked about this point of no return

18   for these committees, and that your claim that it is common

19   knowledge, you said.  Right?  That these committees are

20   controlled by Hamas.

21   A.    It became common knowledge.

22   Q.    And you have called it Hamas' overt secret.  Is that

23   right?

24   A.    Correct.

25   Q.    Two words that are contradictions.  Right?

```
1    A.    Correct.  That expression was taken from an article of

2    one of the Palestinian --

3    Q.    And you have said that this connection between Hamas and

4    the zakat committees is readily apparent and all but official.

5    Correct?

6    A.    Again?

7    Q.    I will slow down.  Readily apparent and all but official.

8    Do you need to have it --

9    A.    If you can, I will appreciate it.  Yes.  Correct.

10   Q.    Thank you.  And you say that -- You also write, don't

11   you, "that Hamas gets money from overseas"--and I am quoting

12   now--"while concealing the actual link to Hamas"?  I will show

13   you.

14   A.    "While concealing the actual link to the organization."

15   Q.    And the organization, you mean Hamas.  Right?  By the

16   organization you mean Hamas.

17   A.    Yes.

18   Q.    Now, in terms of the financing, you have -- Isn't it true

19   that by the late '90s, let's say 1998, that Hamas was moving

20   money not through regular banks?  That Hamas -- Withdrawn.

21   That by the late 1990s, by 1998, that Hamas was not using

22   banks to make transfers.

23   A.    That is not true.

24   Q.    Well, didn't you write and don't you rely on an interview

25   with Moustafa Lidawi?
```

1   A.   That is -- Moustafa Lidawi, that interview said many

2   things.  It doesn't say that everything I quote from this

3   interview is something that I apply.

4   Q.   Let me ask you --

5   A.   If you want to show me.

6   Q.   I will.  I will.  Did you not write --

7   A.   I wrote a quote.

8   Q.   I am going to quote your work, and when I get to his

9   quote I will tell you.  I ask you if you wrote this.

10  A.   I am willing to read it, if you want.

11  Q.   "The method for concealing the genuine nature of the

12  organizations was also described in the statement of a senior

13  member of Hamas, Moustafa Lidawi, who was interviewed on radio

14  of Tehran, 11 June, '98.  Quote -- And here you are quoting

15  Mr. Lidawi.  Right?  "If we are to look closely at details, I

16  do not think there are unconcealed funds in the U.S. for Hamas

17  movement.  The donaters know how to transfer the funds and

18  they are very much aware of the fact that all the banks and

19  the financial funds are monitored by U.S. security agencies.

20  And this is why they abstain from transferring funds through

21  these banks.  These funds are transferred through other

22  channels and are eventually invested in support of people and

23  insurgents to the occupied lands."

24       Do you want to see if that is what you wrote?

25  A.   Well, before I quoted him I just wrote that the method

1    for concealing, hiding the genuine nature of the organization

2    was also described in a statement of senior member of Hamas.

3    What I wanted to say, it is the opposite.

4    Q.    It doesn't say that there, though, does it?

5    A.    That is what I said.  It says the opposite.  I wanted to

6    say that he is referring like we are not using channels,

7    because he is trying to hide the fact that in that time the

8    Hamas organization, the network are a global network did use

9    bank transfers, but he wanted to cover it.  Since I know, and

10   I have reviewed a lot of material that proves that Hamas uses

11   bank channels.  And Lidawi said, "We are not."  Why did Lidawi

12   say, "we are not"?  Because there are several investigations

13   at that time in several countries and he wants to avoid and he

14   wants to say, "We are not using banks."

15   Q.    That is your interpretation of what you wrote there, what

16   I quoted.

17   A.    I just wanted to demonstrate --

18   Q.    That is your interpretation.  Right?  Okay.

19         Now, there are a lot more people in Palestine among the

20   Palestinians who are considered martyrs than just Hamas.

21   Right?

22   A.    Right.

23   Q.    And there are more prisoners in Palestine in terms of

24   prisoners of Israel or the Palestinian Authority than Hamas.

25   Correct?

1    A.    If you mean that Hamas are not the only prisoners, that

2    is correct.

3    Q.    And in fact, the PA, the Palestinian Authority, has a

4    martyrs and prisoners ministry.  Right?

5    A.    Correct.

6    Q.    Now, you talked about the money that goes to the zakat

7    committees, the money that goes to Hamas.  In fact, no one

8    knows Hamas' budget.  Right?

9    A.    No one knows Hamas --

10   Q.    Hamas' budget.  The amount of money it spends a year.

11   Its balance sheet in effect.

12   A.    Hamas, I would say -- I would phrase it that Hamas

13   doesn't publish any of its budgets.

14   Q.    Right.  So no one really knows what it is.

15   A.    It doesn't necessarily say that no one knows what it is.

16   Q.    Do you know what it is?

17   A.    I can assess -- According to what I review, I can assess

18   what is the Hamas budget.

19   Q.    And it is also true, isn't it, that in 1995 the Authority

20   received $1.4 billion in aid from international sources?  Are

21   you familiar with that?

22   A.    It sounds -- I don't know, because the annual budget of

23   the Palestinian Authority at that time, I am not sure that it

24   was $1.4 billion.  I am not sure that this is -- at that time

25   this was the budget.  So it is like doubling the budget of the

1    Palestinian Authority.  So it is --

2    Q.    You don't know.

3    A.    I don't know -- I am not familiar with this fact what you

4    said now.

5    Q.    You talked about special segments.  Right?  Now, do you

6    know the percentage of people aided by the zakat committees,

7    whether orphans or needy families, or what have you?  Do you

8    know the percentage of people aided by all these zakat

9    committees I have been talking about that constitute what you

10   call special segments?

11   A.    They support whoever they can.

12   Q.    So you don't know the answer.  You don't know the

13   percentage.  Is that what you are saying?

14   A.    No, I am not saying this.

15   Q.    Do you know the percentage?

16   A.    I don't -- You are taking something I wrote, and you are

17   mixing --

18   Q.    I am asking the question.  Do you know the percentage?

19   Have you ever evaluated or studied to see what percentage of

20   zakat committee recipients fall into the special segment

21   category?

22   A.    I can say that from the overall people who are supported.

23   Okay?  From each zakat, they are not the majority, but they

24   are -- It is not a high percentage.

25   Q.    But you haven't studied it specifically?

1    A.    I did.  And they will get always, even if others will

2    not.  This small percentage will always get the money.  That

3    was my point there when I say focusing on special segments.  I

4    said that if they cannot support, and they want to support

5    everybody, but the special segment will always get the

6    support.  They are focusing on this.  And it is not high

7    percentage.  Okay?

8    Q.    Now, you talked about hearts and minds.  Right?  Hearts

9    and minds?

10   A.    Hearts and minds, yes.

11   Q.    And are you familiar with a public opinion polls by the

12   Palestinian Center for Policy and Survey Research in the West

13   Bank and Gaza that showed that Hamas was much less popular

14   among Palestinians during periods of calm, ranging from 9 to

15   13 percent, but that in periods of conflict--in other words,

16   when there was violence--it went as high as 25 percent?  Are

17   you familiar with that?

18              MS. SHAPIRO:  Object to the form of the question.

19              THE COURT:  He may ask.  Go ahead.  You may answer

20   that.

21              THE WITNESS:  I am not familiar with this kind of

22   poll.  If you want to refer --

23   Q.    (BY MR. DRATEL)  I just want to know if you were familiar

24   with it.

25              MR. DRATEL:  Pass the witness, Your Honor.

1    THE COURT:  Mr. Westfall?

2    MR. WESTFALL:  Thank you, Your Honor.

3    CROSS EXAMINATION

4    By Mr. Westfall:

5    Q.   I am showing you what is already in evidence as German

6    Document No. 2.  Okay?  Can you read that?  I don't mean read

7    out loud.  I am asking if you can see it okay.

8    A.   I can see it okay.

9    Q.   It says, "Education at this school will be free for

10   children of martyrs and children of detainees, orphans, the

11   poor, and the needy."  Do you see that?

12   A.   I can see that.

13   Q.   Now, you don't consider the needy to be a special

14   segment, do you?

15   A.   That is not what I meant when I said special segment.

16   Q.   Right.  And that is what I am -- So you would agree that

17   you don't consider the needy to be a special segment, part of

18   the special segment.

19   A.   When I meant -- I would just explain.  When I meant by

20   special segment, I meant martyrs and prisoners.  They support

21   needy, that is correct.  It is true.  They support as much as

22   they can.  But special segment, they emphasize the special

23   segment.  That is the special segment.  And if you are saying

24   the they are the needy, they are not considered special

25   segment for me.  I am talking about an idea here.  It is not

1    categorized for some more -- I mean, more human or less human.

2    It is not -- Okay.

3    Q.    And I think you have answered my question.  My question

4    was, you don't consider the needy to be a special segment.

5    But I think what you have told me is that the special segments

6    here are the children of the detainees and the children of

7    martyrs.

8    A.    The special segments are the families of martyrs and

9    families of prisoners.  Correct.

10   Q.    Okay.

11   A.    That is what I said.

12   Q.    And Hamas gives preference to these special segments.

13   A.    Correct.

14   Q.    I want to show you what has been admitted into evidence

15   as Qalqilya Zakat No. 1.  Okay?  And you may recall it is

16   three different orphan applications that were seized in the

17   Qalqilya zakat committee.  One of them is it looks like a

18   Sanabil Dawud, who he appears to have been -- a girl appears

19   to have been about seven when her father was killed, and said

20   that he was cause of death martyrdom.  Do you know how he was

21   killed?

22   A.    Yes.  He was killed during clashes with the IDF.

23   Q.    Here is two different applications, the remaining two.

24   A.    All three of them died in the same circumstances.

25   Q.    Okay.  These are two more girls.  One of them appears to

1    be about I guess nine when her father was killed, and the

2    other one is five when her father was killed.  And these were

3    clashes with the IDF as well?

4    A.    The cause of death, correct.  They were armed.  I checked

5    the martyrs here.  I checked them.  They were armed, and it

6    was not -- It was during clashes; I mean, shooting each other.

7    Q.    Right.  I understood that is what you meant by clash.

8          Is that microphone as close to you as it can get, because

9    I am having a hard time hearing you.  Maybe you just scooted

10   closer to it.  That is good.

11   A.    Okay.

12   Q.    Now, these three were seized at the same time from the

13   Qalqilya zakat committee.  True?

14   A.    Correct.

15   Q.    And this was during the 2002 operation?

16   A.    Correct.

17   Q.    Now, when these were seized, they were -- In the Qalqilya

18   zakat committee there were hundreds of orphan applications

19   seized.  True?

20   A.    I wouldn't say hundreds, but there were more.  That is

21   correct.

22   Q.    Certainly there were many others than these three?

23   A.    Yes, correct.

24   Q.    And orphan applications were seized from all of the zakat

25   committees that were raided during that operation.  Isn't that

1    true?

2    A.    In other zakat committees?

3    Q.    Yes.

4    A.    Correct.

5    Q.    And if we were to add them all together, there would be

6    thousands of orphan applications that were seized during the

7    Operation Defensive Shield.   True?

8    A.    It could be that number.   Correct.

9              MR. WESTFALL:   Your Honor, may I approach?

10              THE COURT:   Yes.

11   Q.    (BY MR. WESTFALL)   I have handed you some lists, some

12   orphan lists from the Holy Land Foundation.   Okay?   And these

13   are already in evidence.   I will tell you that.   And I will

14   read off the exhibit numbers as we go through them.   Okay?

15        For the record, we will start with Defendants No. 1364,

16   and this is at page 34, 35 through 38.   Now, please turn to

17   page 36.   Actually page 38 you can see there, there are 72

18   orphans.   That money was transferred to the Qalqilya zakat

19   committee in April, April 10th of 2000 to these 72 orphans.

20        Will you please look through there and tell me the ones

21   you find that you recognize that belong to special segments.

22   A.    I will it will you this.   When I say special segments, it

23   means that the zakat committee gave priority to those who died

24   with a conflict in Israel, with Israel; because it was a

25   conflict with Israel.   The support in the other population --

1  And there were priorities, like suicide bombers, they were the

2  first, also the operatives of the Izz el-Din al-Quassam

3  Brigades, there were others that received money.

4      But the priority was like this.  The operatives, suicide

5  bombers, the shahids, what they call the regular shahid that

6  died during the confrontation with Israel, and if something is

7  left, to the rest of the population.

8      When I say special segments, it was very important for

9  Hamas to encourage the fact that it was against Israel.  So

10  this is the perception.

11      Now, of course you are giving me now 70 names to check.

12  I can check them, and it will take some time, and I don't know

13  if I can do it now because this is a research.  But if you

14  want, this is something that will take time.

15  Q.  Well, we went through several postcards today and you

16  recognized all those names.  Right?

17  A.  Correct.

18  Q.  And certainly in your research the names of at least the

19  major operatives in Hamas who have been killed, you know those

20  names.  Right?

21  A.  Correct.

22  Q.  So this is a list, and the evidence has already shown

23  this is a list that was prepared by the Holy Land Foundation

24  and money was sent to these 72 orphans at the time when I told

25  you.  And what I want to know is in this list of 72 orphans,

1   do you see any that belong to special segments?

2   A.    The one that I recognize -- I am working with names, and

3   the one who I recognize was after research.  It will be very

4   not professional for me to review the names that I didn't do

5   any research.  I didn't see what circumstances their father

6   died, and it is something that can be done, but not in the

7   court and not when you are not prepared for this.

8   Q.    Okay.  So as we sit here right now you cannot tell me if

9   any of these 72 names are in special segments?  And it is fine

10  if you can't.

11  A.    Actually I cannot -- In fact, beside the fact that the

12  money, $7,470 went to the budget of the Qalqilya zakat

13  committee and goes to the bank, I cannot tell you what they

14  did with the money.

15      You show me a document of the Holy Land Foundation.  Now,

16  the Holy Land Foundation sent money, assume, unless you tell

17  me now, that it is directly sent money to other bank accounts

18  of the needy without the zakat committee.  This is something

19  else.

20  Q.    So signature sheets showing that these needy children

21  actually received this money would be quite compelling,

22  wouldn't they?

23  A.    That is not what I said.  What I said is it depends.

24  There are sponsorships in Israel.  For example, there are

25  Israelis who support orphans.  They do it by sending checks

1    directly to the family, their money, and to many orphans.  The

2    money doesn't go to the bank account of a Hamas committee.

3    That is what I am trying to say.  There are ways to support

4    orphans.

5    Q.    That is Defendants' No. 1364 you have, and there are 72

6    orphans in that.  The next one is Defendants No. 1360, Nablus

7    zakat committee.  There are 94 orphans listed on that sheet.

8    The next one is Defendants No. 1356.  There are 69 orphans

9    listed.  Defendants No. 1357.

10   A.    You are running very fast and I cannot catch you.

11   Q.    Well, I want to go ahead and kind of tell you what I have

12   here.  Okay?  Because I want to ask your opinion.  All right?

13   A.    Okay.

14   Q.    No. 1357 is the Jenin zakat committee from April of 2000,

15   73 orphans.  Defendants No. 1359 is to the Islamic Charity of

16   Hebron.  That is March 2nd of 1999, 126 orphans.  Ramallah

17   zakat committee, Defendants No. 1362, is from April of 2000.

18   It is 105 orphans.  Tulkarem zakat committee, December of

19   1999, 49 orphans.  And the Holy Land Foundation Gaza, this is

20   from November of '98, 132 orphans.

21        And these are all lists prepared by the Holy Land

22   Foundation and lists sent to the zakat committees and lists of

23   who received what money.  Okay?  And what I want to know is,

24   can you look in these lists and tell us if you see any special

25   segments?

1    A.    Looking at these lists, and I am reviewing the list, if I

2    analyze what happens here if I calculate all the dollars that

3    were sent to the social branch of Hamas, then actually this

4    money supported Hamas in general if Hamas committees received

5    money and the public recognized them as Hamas.  The special

6    segment here is not an issue.  It is an issue not in these

7    lists.  What I am saying is that the special segment is not

8    the only way that you can support Hamas.  When the zakat

9    committee of Nablus and the zakat committee of Ramallah

10   supports orphans, not shahids and whatever, they do it in the

11   name of Hamas, and that is what I was talking in all my

12   testimony.  This is how Hamas gets its power.

13   Q.    Okay.  Let me ask you this, then, because these were

14   lists that were prepared in Dallas.  Okay?  Just pick the very

15   top one.  What is the number at the top?

16   A.    No. 1393.

17   Q.    No. 1393.  That is the Holy Land Foundation Gaza office.

18   Please look in there and tell me if you see Hamas see, the

19   words Hamas in there anywhere.  These were lists prepared in

20   Dallas.

21   A.    And where was it sent for?

22   Q.    It was sent to the Holy Land Foundation for 132 orphans.

23   A.    Where the money was sent, that is what I am asking, the

24   money.  What bank account finally it arrived in.  That is the

25   only question -- That is the test here.  If the Holy Land

1    Foundation sent money directly to bank accounts of orphans, so

2    actually you are telling me that the Holy Land Foundation

3    didn't support zakat committee.  Okay?  This is one story.

4    But if you tell me that this list were sent to a branch of the

5    Holy Land Foundation who then delivered the money to one of

6    the committees or for the request of one of the committees, in

7    the name of one of the committees, this is a different story.

8    The question is whether the money finally went through the

9    Hamas social channels.  That is what I am saying.

10   Q.   Do you doubt that the money actually went to the orphans?

11   Do you agree that the money went to the orphans?  Is that just

12   not the issue?

13   A.   I am not saying that.  I am not saying that.  I am saying

14   that by supporting the orphans through Hamas social

15   committees, you are supporting Hamas.  That is what I am

16   saying.

17   Q.   And what I am saying is where are the special segments in

18   these lists.  That is my question to you.  Is that a question

19   that you are prepared to answer?

20   A.   It is a question that I cannot here answer.

21   Q.   Then hold on.  I am going to spot you one.  Okay?  Nablus

22   zakat committee, April 2000.  Do you recognize this name?

23   A.   No.

24   Q.   Yehia Yehia Ayyash.

25   A.   It doesn't say that it is Yehia Ayyash.  You have to

1    check it.

2    Q.   I will represent to you that it is.  That is the infant

3    son of the man that you have been talking about, Yehia Ayyash.

4    Okay?

5    A.   If I see the full name of Yehia Ayyash, I can recognize

6    that.  I am not sure that this is the name of Yehia Ayyash.

7    Q.   Okay.  Do you think it is not the name of Yehia Ayyash?

8    A.   I have to check it.  When I check names in Arabic, I

9    don't check by one name or two names.  Usually, unless I have

10   other indication, I check the full name--private, Father,

11   grandfather, and family.  This is the fourth name, and here I

12   have only three names.  I don't have any other indication that

13   it will tell me it is Yehia Ayyash.  So I cannot tell you that

14   you supported Yehia Ayyash.

15   Q.   Well, let's then hypothetically suppose that we did.

16   Okay?  Will you go with me?

17   A.   Okay.

18   Q.   See what the payment was to Yehia Ayyash here?  Can you

19   see that?  You got the actual document in your hand.  It is

20   page 64 of No. 1360.  Okay?  You see his payment here is

21   $85.50?

22   A.   I think that the hypothetical question can be so now.

23   Yehia Abdel Atif Ayyash, it is not hypothetical.  This is not

24   Yehia Ayyash.

25   Q.   It is not?  Okay.  And you are definitive on that, that

1  is definitely not Yehia Ayyash?

2  A.    Okay.  So it is not Yehia Ayyash.  This is not the

3  engineer that we were talking about.

4  Q.    Okay.  So this is not one of his kids either?

5  A.    It doesn't look like one of his, and I don't think that

6  he have had a son named Yehia.  I don't think this is the

7  Yehia Ayyash that we were referring to before.

8  Q.    Okay.  So then -- We are done with special segments.  It

9  seems like you have been given access to the Elbarasse

10 documents in your preparation for testimony here.

11 A.    Access?

12 Q.    Yeah.  The Elbarasse documents?

13 A.    The Elbarasse documents -- I know what you are talking

14 about, but when you say access.

15 Q.    Access, you were given the Elbarasse documents, you were

16 allowed to read the Elbarasse documents.

17 A.    Yes, I read what the Prosecution --

18 Q.    What they gave you.

19 A.    Yes.

20 Q.    Okay.  And they also gave you some of the Ashqar

21 documents.  Right?  Al-Ashqar?

22 A.    The Ashqar documents, I review some of the Ashqar

23 documents.

24 Q.    You have also been given certain things that were seized

25 from the Holy Land Foundation.  Right?

1    A.    What was shown here.  I mean, the exhibits that the

2    Prosecution just showed me here, yes, I review.

3    Q.    You were given some documents that were seized from the

4    Holy Land Foundation--documents, papers.

5    A.    Documents that the Prosecution let me see for this

6    testimony, yes.

7    Q.    You have seen some videos that were seized from the Holy

8    Land Foundation.

9    A.    Yes, I have seen some videos that were seized.

10   Q.    You have seen some pictures that have been seized from

11   the Holy Land.

12   A.    Yes.

13   Q.    And for instance, those pictures today from the

14   computers.  Remember those?

15   A.    You are just speaking very fast.  The pictures that

16   were --

17   Q.    Pictures when Ms. Shapiro pulled them out of these little

18   books.

19   A.    Yes.  From the computer, yes.

20   Q.    Okay.  Were you told that those came out of temporary

21   internet files?  Do you know what temporary internet files

22   are?

23   A.    Yes, I was told.

24   Q.    Okay.  What were you told?

25   A.    That this was in the cache memory.

1    Q.    Okay.  And in dealing with special segments and making an

2    assessment as to whether or not Holy Land actually gave

3    support to special segments, and when I talk about support to

4    special segments I am talking about making a true distinction.

5    Okay?  Were you ever given a list of the beneficiaries of the

6    Holy Land Foundation and asked to do this research that you

7    say would make you comfortable to answer the question?

8    A.    I was not given lists to analyze.  I was analyzing lists

9    that were seized in the zakat committees, in those social

10   committees of Hamas.  That is what I was analyzing.

11   Q.    Were you ever given signature sheets that showed the

12   signatures of the orphan's mother or father or -- I mean

13   mother, or the fingerprint of the orphan's mother, and

14   actually has the names on there?  Were you actually given

15   those and asked to analyze those?

16   A.    From the HLF?

17   Q.    From the Holy Land Foundation.

18   A.    No.  But I saw -- By the way, I saw in the zakat

19   committee there are signatures of recipients.

20   Q.    Okay.

21   A.    But again, they now -- of course they created Hamas for

22   this.  That is the point; not only the special segment, but

23   the credit is given to Hamas that supports.

24   Q.    It is starting to sound like the special segments thing

25   doesn't matter much.  Is that true?

1   A.   I didn't say that.  I say it is only one of many criteria

2   that I used.  And by the way, it is one -- It is not the only

3   one.  There are an accumulation of criteria.

4   Q.   The Holy Land Foundation also had at least five bankers

5   boxes full of orphan applications.

6   A.   Five?

7   Q.   Five boxes full of orphan applications of the type we

8   have seen with the pictures and all the other documents that

9   go with them.

10  A.   Okay.

11  Q.   All right.  Thousands of orphan applications.  Were you

12  given those and asked to look through them and find special

13  segments?

14  A.   No.

15          MR. WESTFALL:  Pass the witness, Your Honor.

16          THE COURT:  Ms. Hollander?

17          MS. HOLLANDER:  Yes, sir.

18                     CROSS EXAMINATION

19  By Ms. Hollander:

20  Q.   Good afternoon.

21  A.   Good afternoon.

22  Q.   I want to ask you about something slightly different.

23  You have talked about a man named Jamil Hamami as a senior

24  Hamas activist.  Correct?

25  A.   Correct.

1    Q.    And, in fact, you said he was one of the founders of the

2    Hamas in the West Bank.  Correct?

3    A.    Correct.

4    Q.    And you said that Jamil Hamami and Hamas had a rift

5    sometime in the mid '90s.  Correct?

6    A.    That is what I know.  Correct.

7    Q.    All right.  But your opinion, it is your opinion that he

8    is a Hamas activist today, isn't it?

9    A.    My opinion is that he never left Hamas.  There was a

10   rift, but he never abandoned the idea of Hamas.  He just in

11   certain time thought that he had within Hamas a different

12   view.  That is why in Hamas they didn't -- it didn't work for

13   a period of time.

14   Q.    But he never left Hamas.  That is your view.  Correct?

15   That is what you have testified to.

16   A.    I am not saying he never left Hamas.  I am saying that

17   today --

18   Q.    Today he is a Hamas activist?

19   A.    That is what I am saying.

20          THE COURT:  Let him finish answering the question,

21   counsel.

22          MS. HOLLANDER:  I am sorry, Your Honor.  You are

23   correct.

24   Q.    (BY MS. HOLLANDER)  Now, you know that Jamil Hamami came

25   to the United States in 1990, don't you?

1    A.    I heard about this, yes.

2    Q.    And you know that when he returned to Israel from the

3    United States, that he was detained for about 20 months.

4    Correct?  You know he was arrested.  I am not sure what the

5    exact legal term is, but he went to prison for 20 months after

6    he returned from the U.S. in 1990.  You know that.  Correct?

7    A.    This I need to check what you said right now.

8    Q.    Okay.  You know he came to the United States again in

9    1994.  Correct?  You know that, don't you?

10    A.    I don't know this, that in 1994 in the United States.  I

11    don't know this.

12    Q.    You know he came to the United States in 1999, don't you?

13    A.    I heard about this, yes.  This I heard.

14    Q.    And he came as a guest of the United States government.

15    Correct?

16    A.    That is what I heard.

17    Q.    You don't doubt that, do you?

18    A.    I don't have any reason to doubt it now when you are

19    telling me.

20    Q.    I don't think I asked you this.  Do you know he was

21    arrested in Israel again in 1995?  Did you know that?

22    A.    He was arrested -- Yes, he was arrested.  I am not sure

23    that he was trialed.

24    Q.    He was arrested and then released?

25    A.    He was investigated and then released.

```
 1   Q.   That is what you mean by administrative detention.   Is
 2   that what you mean?
 3   A.   I don't think it was administrative.
 4   Q.   So it is something even different from that.   He was
 5   arrested and then released at some point?
 6   A.   Maybe he has -- there was an investigation, because there
 7   was a search in the office, maybe he was arrested, but I don't
 8   think he was -- I don't know.   I didn't hear that he was
 9   administrative --
10   Q.   I may have the terms wrong.   All I am trying to get at is
11   that he was in jail for a period of time in 1995.   Correct?
12   A.   Arrested for investigation.
13   Q.   Right.   And then he came to the United States after that
14   in 1999.
15   A.   Yes.
16   Q.   And in your opinion he is still Hamas now.
17   A.   That is my opinion.
18   Q.   Now, these various postcards and posters and things that
19   you have shown us, in fact those are available in shops all
20   over the West Bank, aren't they?
21   A.   I think it is a little exaggerated to say it was
22   available all --
23   Q.   In fact, you haven't been to the West Bank to see, have
24   you?
25   A.   I haven't been in the West Bank, but I think to say that
```

```
1   this is something to sell, it is not that I don't know what is

2   happening in the West Bank.  They are our neighbors after all.

3   Q.   You haven't been to the markets in the West Bank, have

4   you.  In the last ten years --

5   A.   In the last ten years --

6   Q.   Have you been to the West Bank in the last ten years?

7   A.   I have been in the West Bank.

8   Q.   In the markets?

9   A.   Not in the markets.

10  Q.   In the shops?

11  A.   Not in the shops.

12  Q.   Now, some of the zakat committees--I think you have

13  testified to this; I am not going to spend much time on it,

14  but just to lead into something--some of them actually own

15  clinics.  Correct?

16  A.   Own clinics?

17  Q.   They own clinics medical clinics.

18  A.   Correct.

19  Q.   Right?

20  A.   Correct.

21  Q.   And dental clinics.

22  A.   And dental?

23  Q.   Dental for teeth.

24  A.   I know about clinics I don't know about dental clinics.

25  Q.   But you know they own clinics.
```

1    A.    Yes, correct.

2    Q.    And hospitals.

3    A.    Correct.

4    Q.    So as part of their activities they have to buy medical

5    supplies.  Correct?

6    A.    Correct.

7    Q.    And they have to pay for doctors and nurses.  Correct?

8    A.    Correct.

9    Q.    Now, for example, the Jenin zakat committee has the

10   hospital called al-Razi Hospital.  Correct?

11   A.    Correct.

12   Q.    And by the way, the United States and Israel do share

13   intelligence information.  Isn't that correct?

14   A.    Correct.

15   Q.    I want to talk to you a little bit about the al-Razi

16   Hospital.  You have mentioned that Operation Defensive Shield

17   took place, it was about a month period in March to April, end

18   of March to the end of April 2002.  Correct?

19   A.    I didn't define it in a time period, but it was around

20   between two weeks and three weeks.

21   Q.    Starting at the end of March.

22   A.    Correct.

23   Q.    And that involved -- You said it was a military operation

24   and it included the city of Jenin.  Correct?

25   A.    It included the city of Jenin.

1    Q.   And the refugee camp in Jenin.

2    A.   Correct.

3    Q.   And those are separate, aren't they?  There is a city of

4    Jenin and there is the refugee camp.

5    A.   Correct.

6    Q.   Okay.  Just because people aren't necessarily familiar.

7         Now, I want to show you what has previously been

8    introduced when the jury wasn't here as Defendants' Exhibit

9    No. 102.

10             MS. HOLLANDER:  Correct, Your Honor?

11             THE COURT:  Yes, that is in evidence.

12             MS. HOLLANDER:  Thank you, Your Honor.

13   Q.   (BY MS. HOLLANDER)  And then I am going to ask you about

14   it.  Let me get another copy so I can read it so you don't

15   have to read it.  Now, let's start -- I will make it bigger in

16   a minute, but this says USAID West Bank and Gaza.  Correct?

17   A.   Correct.

18   Q.   And you are familiar with USAID.  Correct?

19   A.   I know about this organization.  Correct.

20   Q.   United States -- I can never remember what it is.  Agency

21   for International Development.  That is what it is.  United

22   States Agency for International Development.  Correct?

23   A.   Correct.

24   Q.   And that is a United States organization that is run by

25   the government of the United States to distribute charity.

1    Correct?  You know that.

2    A.    I don't know the exact definition, but -- Okay.  I know

3    that this is a U.S. or supported U.S. organization or

4    something like that.

5    Q.    It is an official U.S. organization.

6    A.    Official.  Okay.

7    Q.    We can agree on that part.  Okay?

8    A.    Okay.

9    Q.    And you see -- Let me just show this.  What I am showing

10   you comes from actually the internet.  Do you see that?

11   A.    Yes.

12   Q.    Okay.  And it says www.usaid.gov, and goes on to talk

13   about press.  This is the kind of thing you look for.  Right?

14   On the internet.

15   A.    Correct.

16   Q.    You didn't find this on the internet, though, did you?

17   You didn't look for USAID on the internet.  That is not one of

18   the places you look, is it?

19   A.    No, I was looking at the dates.

20   Q.    Right.

21   A.    Because the dates are meaningful for me.

22   Q.    But this isn't a website that you normally go to, is it,

23   for your research?

24   A.    I do not exclude any website from my research.

25   Q.    This isn't something you talked about on your direct

1  examination, is it?  You didn't talk about the website for

2  USAID, did you?

3  A.   I didn't talk about this.  Correct.

4  Q.   No.  Now, you see the date is April 26, 2002?  And that

5  would have been about three weeks or a little more after the

6  beginning of Operation Defensive Shield.  Correct?

7  A.   Correct.

8  Q.   And during Operation Defensive Shield, there were curfews

9  in the cities.  Correct?

10  A.   Curfews?

11  Q.   Curfew.  Do you know the word curfew?

12  A.   I would say that there was a situation of fighting.  That

13  would be more correct to say.  There were shooting, there were

14  fire exchange, there were curfew.

15  Q.   And people were told to stay in their homes.  Correct?

16  A.   People were told to stay in their homes, I assume for not

17  getting hit.

18  Q.   I didn't ask why.  I just asked if there was a curfew.

19  People were told they had to stay in their homes.

20  A.   I am answering.  This is something that --

21  Q.   And that included in Jenin.  Correct?

22  A.   Correct.

23  Q.   And there were a lot of people wounded in Jenin during

24  that time.  Correct?  Palestinians.

25  A.   Correct.

```
 1   Q.   And killed.  Correct?

 2   A.   Correct.

 3   Q.   This is very small.  I am not sure anyone can read it,

 4   but I will --

 5        MS. HOLLANDER:  If it is all right with Your Honor,

 6   I will read it rather than have the witness read it.

 7        THE COURT:  That is fine.

 8        MS. HOLLANDER:  Thank you.

 9   Q.   (BY MS. HOLLANDER)  It says, "USAID delivers humanitarian

10   relief to Jenin.  USAID team visits Jenin refugee camp.  On

11   April 24th, 2002, a team from the USAID West Bank and Gaza

12   Mission visited Jenin to assess increased humanitarian needs

13   in the areas of housing, nutrition, and municipal

14   infrastructure following the recent violence.  The visiting,

15   USAID group included deputy mission director Mr. Bill

16   Hammink."  Have you ever met him?

17   A.   No.

18   Q.   "And representative from the health and water resources

19   offices."  Now the health and water resource offices would

20   have been the Palestinian Authority.  Correct?  It says there

21   were representatives from the health and water resources

22   offices.  That would have been the Palestinian Authority at

23   that time.  Correct?

24   A.   Zurman Nasra was the governor at that time.

25   Q.   Right.  And that would have been the Palestinian
```

1   Authority?

2   A.   Correct.

3   Q.   "They met with the Jenin governor Zehir Mansara, and with

4   hospital directors, municipal engineers, and staff from United

5   Nations Refugee Works Administration, UNWRA, and United

6   Nations Development Program, UNDP."

7        Now, in 2002 it is your opinion that the hospital

8   directors were Hamas.  Correct?

9   A.   Correct.

10  Q.   Okay.  And you are familiar with the United Nations

11  Refugee Works Administration.  Correct?  What is known as

12  UNWRA?

13  A.   Correct.

14  Q.   That is the organization that assists people in the

15  refugee camps in the West Bank and Gaza.  Correct?

16  A.   Correct.

17  Q.   And you are familiar with the United Nations Development

18  Program.  Correct?

19  A.   Correct.

20  Q.   And they have programs also in the West Bank and Gaza.

21  Correct?

22  A.   Correct.

23  Q.   And by the way, UNWRA gets its funding from the wealthier

24  nations in the world.  Isn't that right?  From Europe and the

25  United States?

1    A.    I assume so.  I don't exactly know where UNWRA gets its

2    money, but it is reasonable to believe that.

3    Q.    And you do know that the U.S. is the largest single

4    contributor to UNWRA.  You know that.

5    A.    I know that.

6    Q.    Now, the second paragraph says, "Additionally USAID,

7    along with other international funders, supported the delivery

8    of two humanitarian aid convoys to Jenin and Nablus, another

9    West Bank city, on April 19th.  The conveys delivered food,

10   water, and urgently needed medical supplied to al-Razi

11   Hospital, the Patients Friends Society Hospital, and the Jenin

12   Government Hospital adjacent to Jenin camp.  Specific items

13   delivered included baby formula and food; kidney dialysis

14   medication and supplies; pharmaceuticals such as IV fluids and

15   wound care kits; and canned and package food basics."

16        And the al-Razi Hospital is the one that is owned by the

17   Jenin zakat committee.  Correct?

18   A.    Correct.

19   Q.    And that is the one that the USAID was giving assistance

20   to in 2002.  Correct?

21   A.    By the permission of the government of Israel.  It must

22   be explained what you are reading now.

23   Q.    Because the government of Israel has control over Jenin,

24   even though -- It had military control, even though it was not

25   an area that it normally controlled.  Correct?

1    A.    I just want to clarify something, because you are reading

2    an article, and this is not the full picture.

3    Q.    I am sure you will get the opportunity to explain the

4    full picture.  Are you familiar with the charity CARE,

5    C-A-R-E, international organization CARE.  You have heard of

6    that.

7    A.    Yes, I have heard about this.

8    Q.    And that is a humanitarian organization that is

9    worldwide.  Correct?

10   A.    Correct.

11   Q.    You know that.  Okay.

12            MS. HOLLANDER:  Your Honor, I would like to get into

13   the other three documents at this time as we discussed.

14            THE COURT:  Not the documents.  I think we discussed

15   you could question about it, but not the documents.

16            MS. HOLLANDER:  I didn't realize you had made a

17   final decision.

18            THE COURT:  I haven't, but we discussed we weren't

19   going to get into the documents just yet.

20            MS. HOLLANDER:  Okay.  I just wanted to make sure I

21   did it right.

22            THE COURT:  All right.

23   Q.    (BY MS. HOLLANDER)  You know USAID has provided money for

24   other zakat committees in 2002, don't you?

25   A.    That I don't know.  I don't know in 2002.  I know this

1   specific operation because it was a request of the USAID with

2   other organizations to the government of Israel to support

3   because of the situation there, and the government of Israel

4   -- although the government of Israel, because of what happened

5   in Jenin, because of the casualties, agreed in spite of -- the

6   government knew that this is a Hamas committee, and --

7   Q.   Let me stop you, because that is non-responsive to my

8   question.

9   A.   Okay.

10  Q.   You are aware that USAID also sent a $7,000 check to the

11  Nablus zakat committee for CARE in 2002, aren't you?

12  A.   No, I am not.  Actually I know they stopped working with

13  Nablus zakat committee.

14          MS. HOLLANDER:  Your Honor, may we approach?

15          THE COURT:  Yes.

16          (The following was had outside the hearing of the

17          jury.)

18          MS. HOLLANDER:  It is really now a matter of

19  impeachment, because I did show him these documents last year,

20  and in fact the only way I can confront this witness is to

21  show him the document and ask him if he is familiar with it.

22          THE COURT:  But he says he is not familiar with the

23  '02.  You asked him and he said he wasn't.

24          MS. SHAPIRO:  He wasn't familiar last year either.

25          MS. HOLLANDER:  I just think it is almost impossible

1    to cross examine this witness --

2              THE COURT:  It is going to be because he says he

3    doesn't know.  That is not going to help you.  He is not

4    familiar with that.  That is why you want them in is to show

5    that it is true, but he doesn't know about that.

6              MS. HOLLANDER:  The problem I am having --

7              THE COURT:  You can cross examine what he knows, but

8    that is as far as you were going to be able to go.

9              MS. HOLLANDER:  I guess the only thing I can do,

10   then, is go back to his testimony last year where I showed him

11   these documents.

12             THE COURT:  No.  Then you are doing the same thing I

13   told you not to do, counsel.

14             MS. HOLLANDER:  I am not going to do it.  I am just

15   saying that is the only thing I can do.

16             THE COURT:  I said we aren't going to documents

17   right now.  You have to fiend another way.

18             MS. HOLLANDER:  I didn't mean -- I am sorry.  I

19   didn't mean I was going to do that.  I am saying that is the

20   only way I could do it since you are saying I can't.

21             THE COURT:  Right.  We are not getting into the

22   documents just yet.

23             (The following was had in the presence and hearing

24             of the jury.)

25   Q.   (BY MS. HOLLANDER)  Now, you do know that there was a

1    period of time when USAID was giving money to -- providing

2    money to the Nablus zakat committee.  Correct?

3    A.   I don't know this.  I know of other facts, if you want,

4    that relates --

5    Q.   You don't know that the USAID was ever giving money to

6    the Nablus zakat committee?  Is that what you are saying?

7    A.   No.  It is just not accurate, and I just want to explain.

8    Q.   It is a simple question.

9    A.   No, it is not.

10   Q.   Do you know whether the United States USAID ever gave

11   money to the Nablus zakat committee?  The answer is either yes

12   you know or no you don't know.

13   A.   I cannot answer here yes or no, because what I know is

14   not -- is more complicated.  What I do know --

15   Q.   But my question is a very simple one, sir.  Do you have

16   any information that the United States USAID, through any of

17   its organizations, ever gave money--I will limit it--gave

18   money to the zakat committee, the Nablus zakat committee,

19   after 1995?  Do you know whether they did or didn't?  It is

20   either yes or no, and that is my question.

21   A.   They gave money to ANERA, and ANERA gave money to Nablus

22   zakat committee.  Whether they knew --

23   Q.   That is all -- Then that is the answer to my question.

24   They gave money to ANERA.

25   A.   I didn't -- Okay.

1    Q.    What was the date when the USAID gave money to ANERA for

2    Nablus?  Do you know?

3    A.    2005.

4    Q.    Thank you.  And ANERA is an American non-profit

5    organization.  Correct?

6    A.    Correct.

7    Q.    That provides charity.

8    A.    Provides charity and support, yes.

9    Q.    Support.  Okay.

10        Now, Operation Defensive Shield, it may have ended, but

11   there were other incursions and seizures later.  Correct?  In

12   2003 and 2004.

13   A.    Searches of material.

14   Q.    And seizures of material from the zakat committees.

15   A.    Correct.

16        MS. HOLLANDER:  Would you pull up ICS Hebron No. 12,

17   page 18?  I can do without it.  It is a video?  I am sorry.

18   It is the wrong number.  How about No. 10.  Maybe I have the

19   wrong one.  You know what?  I am going to do without it since

20   obviously my notes are wrong.

21   Q.    (BY MS. HOLLANDER)  Let me just ask you a question.  You

22   showed a disk that you found in Hebron that had a number of

23   different people on it, and it showed the dates they had died

24   and what their names were.  Do you recall this?  It had a

25   picture of a lot of people and then it had several pages.

1    A.   You mean what was seized in the computer of the ICS?

2    Q.   Yes.

3    A.   Yes.

4    Q.   You know what I am talking about?

5    A.   Yes.

6    Q.   There was -- On page 18 of that there was a reference to

7    the date that someone had died, and it was April 5th of 2003.

8    It is ICS Hebron No. 10.  Do you follow me?

9             MS. HOLLANDER:  ICS Hebron No. 10.  I was right the

10   second time.  It is page 18.

11   Q.   (BY MS. HOLLANDER)  I am sorry.  I didn't mean to confuse

12   you.  Okay.  You see the date here?  It says 4/5/2003?

13   A.   Right.

14   Q.   Now, that means that this had to have been made sometime

15   after April 5th of 2003.  Correct?  Because that is the date

16   this particular person died.  Correct?

17   A.   Correct.

18   Q.   Okay.  So that means that the seizure of this particular

19   item was sometime after April 5th of 2003.  Correct?

20   A.   I remember it was in 2004.

21   Q.   2004.  Okay.  So there was a seizure of documents from

22   ICS Hebron in 2002.  Correct?

23   A.   Also in 2002.

24   Q.   Right.  But then ICS Hebron, the organization, continued

25   functioning for another two years.  Correct?  It wasn't

1    closed, was it?

2    A.    No, it is not correct.

3    Q.    It was closed?

4    A.    It was shut down and it reopened.

5    Q.    And it reopened.  That is my -- That is the answer to my

6    question.

7    A.    What I said was --

8            THE COURT:  Let him finish, counsel.

9            THE WITNESS:  That is not what I said.  The offices

10   were shut down and they themselves reopened it.  That is what

11   I said.

12   Q.    (BY MS. HOLLANDER)  Thank you.  You also showed us a

13   demonstrative of ICS Hebron No. 1, and you said it was a

14   demonstrative and it was also a document and you said this was

15   found in Mr. Natshe's office.

16   A.    Correct.

17   Q.    Do you have some document that tells you where that this

18   was found specifically in his office?

19   A.    The day -- I was informed of this document the day of the

20   seizure, and I called to the officer at that time, one of

21   the -- from the unit of Lior, and asked him where exactly he

22   found this document, and that is how I got the details.

23   Q.    So someone called you the day they actually found the

24   document?

25   A.    The day after.

```
 1    Q.    The day after?

 2    A.    Correct.

 3    Q.    And what date was that?

 4    A.    If I remember correct, it was -- I received the call on

 5    the 26th of June, 2002, if I remember correct.

 6    Q.    Did you ask them to keep track of where other documents

 7    were found?

 8    A.    When it happens, when I do inform that a kind of document

 9    that seems to have importance, like this one, because it came

10    from the headquarters, so I do try to find out where exactly

11    it was found.  But here I am talking -- My research is

12    thousands of items, so not all the time I can just find out

13    where exactly each item was in place.

14    Q.    Did you ask some of the other soldiers where they found

15    other documents?

16    A.    It happened, not necessarily with this item in the trial,

17    but it happened, yes.

18    Q.    And do you have a list of this somewhere?

19    A.    When I have something, I write it down, like this

20    summary.

21    Q.    Did you bring it with you?  So your summary is what you

22    are relying on?

23    A.    I am relying on what I did and put on the summary.

24    Q.    Now, the index you referred to on direct, that is not in

25    your summary, is it?
```

1    A.    The index?

2    Q.    The index you referred to.  You said you looked at an

3    index, and that is how you knew where the posters were, what

4    kind of posters.  That is not in your summary, is it?

5    A.    I looked at the posters themselves, not the index.  And

6    if I was misunderstood, I was looking at the posters in the

7    boxes.

8    Q.    So you looked through all the boxes of everything that

9    was seized?

10   A.    Of the posters.

11   Q.    And those are kept somewhere in Israel.  Correct?  I am

12   not asking you where.

13   A.    Correct.  It is in the possession of the army.

14   Q.    They are in the possession of the army.

15   A.    Correct.

16   Q.    So you have to have official authority to get to see

17   them.  Is that correct?

18   A.    You can request.  I am not the one who is authorizing

19   this.  I am a guest there also.  I am not part of this place.

20   They are the same government, of course, but I am not working

21   there.

22   Q.    The United States Prosecutors were allowed to look at

23   them.  Is that correct?

24   A.    That is correct.

25   Q.    Do you know Doctor Levitt?

1   A.   I know him.  I don't have any relation, working relation

2   with him.

3   Q.   Did you work with him and show him these documents?

4   A.   No.

5   Q.   I want to move to another subject.  I want to ask you, we

6   talked a little bit about UNWRA, the U.N. Works and Relief

7   Agency.  And UNWRA actually provides the schools in the

8   refugee camps.  Isn't that correct?

9   A.   Some of the schools.

10  Q.   Right.  And in addition to other relief that it does.

11  But it is still running the schools in the West Bank and Gaza.

12  Correct?

13  A.   Not all of them.  They run schools.  That is correct.

14  Q.   There run schools, but they are still today running

15  schools in the West Bank and in Gaza, and actually in Lebanon,

16  too, and other places?

17  A.   I don't know about Lebanon.

18  Q.   But you know they are running schools in the West Bank.

19  A.   I know in Gaza Strip.

20  Q.   And Gaza?

21  A.   And also institutes in the West Bank.  But mainly in

22  Gaza.

23  Q.   Most of them are in Gaza.  Isn't that correct?

24  A.   Correct.

25  Q.   And any child in the refugee camps can go to these

1    schools.  Is that correct?

2    A.   I don't know from my knowledge if UNWRA receives anybody.

3    I just don't know how the application -- I don't know.

4    Q.   You don't know whether it is limited to just needy

5    families or not, do you?

6    A.   I don't know how they -- I am not specializing in UNWRA.

7              MS. HOLLANDER:  Can you play for me, this one I do

8    have right, HLF Search No. 75, Clip F?

9              (Whereupon, HLF Search No. 75, clip F, was played,

10             while questions were propounded.)

11   Q.   (BY MS. HOLLANDER)  Let me ask you a question which may

12   make this easier.  Did you see where Hamed --

13   A.   Al-Hassanet.

14   Q.   You have it?  I was going to try to do without it.  You

15   see that he says he said he lives in the refugee camp.

16   Correct?

17   A.   Correct.

18   Q.   And he is a teacher with the Refugee Relief Agency.  And

19   that is UNWRA that he is talking about, isn't it?

20   A.   Correct.

21   Q.   Thank you.  Now, he was publicly identified, you said, as

22   a Hamas person.  Correct?

23   A.   Correct.

24   Q.   But he was also teaching at UNWRA.  And as far as you

25   know, went back to teaching at UNWRA after he was released.

```
1    Correct?

2    A.    No.

3    Q.    And his house was demolished in 1994 also.  Correct?

4    A.    You are asking me facts I do not know.

5    Q.    You don't know?

6    A.    He was working before the deportation.  That is correct.

7    I can --

8    Q.    You know that?

9    A.    I can confirm this, yes.

10   Q.    And he had publicly acknowledged he was a member of

11   Hamas.  Correct?

12   A.    Correct.

13   Q.    Okay.  Now, at UNWRA, UNWRA doesn't tell children if

14   their fathers are in prison that they can't go to school

15   there, do they?

16   A.    I don't know how UNWRA works, but I don't assume that

17   they ask any question about -- I don't know.

18   Q.    There certainly are men from the refugee camps who are

19   in -- who are prisoners, aren't there?  Let me ask the

20   question a different way.  That is not a very good question.

21   Some of the prisoners in the Israeli prisons are from the

22   refugee camps.  Isn't that correct?

23   A.    That is correct.

24   Q.    And as far as you know, their children still get to

25   attend the U.N. school.  Correct?
```

```
 1    A.    Correct.

 2    Q.    And that is true even if they are in prison because the

 3    parents are Hamas activists.  Correct?

 4    A.    Could you repeat the question again?

 5    Q.    The children still get to go to school even if their

 6    fathers are accused of being Hamas activists.  Correct?

 7    A.    Correct.

 8    Q.    So you didn't ever examine how much money UNWRA spends on

 9    the special segment of families of martyrs and prisoners, did

10    you?

11    A.    I didn't find out that UNWRA has a lifecycle --

12          MS. HOLLANDER:  Strike that as non-responsive, Your

13    Honor.

14          THE COURT:  Overruled.

15    Q.    (BY MS. HOLLANDER)  You didn't investigate how much money

16    UNWRA spends on providing for the families of martyrs and

17    prisoners, did you?

18    A.    Just -- I am not researching non-Hamas foundations.

19    Q.    I am asking you a simple question.

20    A.    And I am answering no.  There is a reason why I am not

21    doing this.

22    Q.    But the answer is that you didn't check.

23    A.    I didn't check.

24    Q.    Now, when you say prisoners, and you will have to correct

25    me if I get the terminology wrong, are you including people
```

1    who are in prison who have been convicted and also people who

2    are in prison because they are being investigated and people

3    who are in administrative detention.

4    A.    When I say prisoner, I am talking of those who are

5    convicted.

6    Q.    You are only talking about those who are convicted?

7    A.    Correct.

8    Q.    You are not including people in administrative detention?

9    A.    No.

10   Q.    So you don't consider the families of people in

11   administrative detention to be a special segment?

12   A.    I didn't say that.  That is not what I say.  When I say

13   special segment I am talking about -- I meant that special

14   segment that were convicted in serious crimes like sending

15   suicide bombers and et cetera.  That is what -- When I say --

16   and those who serve prison for many years.  That is what I

17   meant, special segment.  Because administrative detention, it

18   is not the same procedure.

19   Q.    It is not the same procedure, but it can be for a long

20   period of time, can't it?

21          MS. SHAPIRO:  Objection, Your Honor.

22          MS. HOLLANDER:  Well, I will strike that, Your

23   Honor.

24   Q.    (BY MS. HOLLANDER)  Let me ask a different question.

25   When you talk about prisoners and special segments, are you

1    only including prisoners who you identify as being in jail for

2    what you consider terrorist acts against Israel?  And what I

3    mean, so that you understand, are you including people who are

4    in prison for murder or burglary or robbery or child abuse?

5    A.    No.  I am talking about terrorists.

6    Q.    That is all you are talking about?

7    A.    Yes, correct.

8    Q.    So the children of the people you identify as terrorists

9    are the ones you consider the special segments.  Correct?

10   A.    I didn't say that.  I didn't refer to children.  I

11   referred to special segments, the families of those who

12   committed suicide attacks or are prisoners because of serious

13   terrorist crime.

14   Q.    Now, you also said martyrs.

15   A.    I also say martyrs.

16   Q.    Right.  And when you are talking about the special

17   segment of martyrs, families of martyrs, because the martyrs

18   are dead.  Right?  We mean the families.  Correct?

19   A.    I mean the families.  Correct.

20   Q.    Do you include in your list of martyrs pregnant women who

21   die at Israeli checkpoints because they can't get to

22   hospitals?  Are you including those?

23          MS. SHAPIRO:  Objection, Your Honor.

24          THE COURT:  Sustained.

25   Q.    (BY MS. HOLLANDER)  Are you including people who are

Shawn M. McRoberts, RMR, CRR

1    killed when Israeli Defense Forces target people such as

2    Rantisi and Yassin and kill them and other people are killed

3    with them?  Are those included as the martyrs?

4    A.    I include as a martyr each one who was a member of a

5    terrorist organization, and can be one who committed suicide

6    attacks or committed -- or was a senior member of a terrorist

7    organization.  That is the special segment that I meant.

8    Q.    Do you include the Hebron martyrs who were killed by the

9    Jewish settler?  Do you include those in your special segment,

10   those families?

11   A.    What do you mean special segment?

12   Q.    Do you consider those, the families of those people, as

13   special segments?

14   A.    I am not sure I am following this question.

15   Q.    Well, I am trying to understand.  You know, we see the

16   word martyr, and it sounds like your definition of martyr may

17   be different from the definitions of martyrs on some of the

18   orphan lists, for example.

19   A.    I don't think so.  I think we say the same.  I didn't say

20   that each martyr is a person who committed suicide attack.  I

21   didn't say that.  I said that they are priorities, and those

22   who were -- that Hamas wants to glorify, like suicide bombers

23   and et cetera, have a special treatment.  But I didn't say

24   that other martyrs that died in the confrontation with Israel

25   are not supported.  And more than that, I didn't say that only

1   special segments are supported.  It is not the Hamas

2   philosophy.

3   Q.   But you can't determine from the word martyr how that

4   person died, can you?

5   A.   I totally agree with you.

6           MS. HOLLANDER:  I pass the witness, Your Honor.

7           THE COURT:  Ms. Cadeddu, are you up?

8           MS. CADEDDU:  Yes, Your Honor, very briefly.

9                      CROSS EXAMINATION

10  By Ms. Cadeddu:

11  Q.   Sir, you are familiar with the Intelligence and Terrorism

12  Information Center in Israel, are you not?

13  A.   Correct.

14  Q.   And that is an Israeli organization.

15  A.   That is Israeli -- Yes.  Not I don't know if it is a

16  government organization.  I know it is in Israel.

17  Q.   So you don't know if it is a government organization?

18  A.   I don't know if it is a government organization.

19  Q.   And that Intelligence and Terrorism Information Center,

20  it used to be called the Center for Special Studies.  Isn't

21  that right?

22  A.   I think so.

23  Q.   And that Intelligence and Terrorism Information Center or

24  Center for Special Studies is actually located at something

25  called the Israeli Intelligence Heritage and Commemoration

1    Center.  Do I have that right?

2    A.    I think so.  That is what is written on the website.

3    Correct.

4    Q.    I am sorry.  Are you done?

5    A.    Yes that is what was written on the website.  Correct.

6    Q.    And the head of that organization is a man by the name of

7    Reuven Erlich.  Is that right?

8    A.    Correct.

9    Q.    And he is, as I understand it, a retired ISA agent.

10   A.    No.  He is retired from the Israeli army.

11   Q.    Retired from the Israeli army.  Okay.  So he is not a

12   retired ISA agent, like I guess you are an ISA agent?

13   A.    I am not an agent.  I am a legal advisor.

14   Q.    With the Israeli Security Agency.  He was not retired

15   from the Israeli Security Agency.  He was retired from the

16   army.

17   A.    Correct.

18   Q.    And that organization, you know that that organization

19   maintains a collection of some of the documents and materials

20   that were seized in Operation Defensive Shield.  Right?

21   A.    Correct.  I know this.  Correct.

22   Q.    And in fact, those documents and materials are on display

23   at the center somewhere outside of Tel Aviv.  Am I right?

24   A.    I think -- Yes, outside of Tel Aviv.  Yes.

25   Q.    And that organization, either the Center for Special

1    Studies or by its other name, the Intelligence and Terrorism

2    Information Center, puts out bulletins or analyses.  Is that

3    right?

4    A.    Correct.

5    Q.    And those are called either intelligence bulletins or --

6    I am sorry.  Information bulletins.  Is that right?

7    A.    Correct.

8    Q.    Or special information bulletins.

9    A.    Correct.

10   Q.    And those are analyses of the documents that it maintains

11   from Operation Defensive Shield.

12   A.    Correct.

13   Q.    And those documents that it maintains from Operation

14   Defensive Shield were obviously received from the Israeli

15   army.  Is that right?

16   A.    It is not in -- I assume so.  It is not in my personal

17   knowledge, but I assume so.  It must have been -- I don't know

18   for sure.  I am not in the -- whether they have relation with

19   the IDF.  I just don't know.

20   Q.    But they must have gotten those documents from the IDF.

21   Right?  The ones that they display?

22   A.    I assume so.

23   Q.    Since the IDF is the one that seized them.

24   A.    The IDF is the one who seized them.  I assume, yes, that

25   if they have -- Maybe they have copies.  I am not familiar

1    with the relation between those two organizations.

2    Q.    Okay.  And in fact, you have on occasion been consulted

3    by the Center for Special Studies, also known as the

4    Intelligence and Terrorism Information Center.  Isn't that

5    right?

6    A.    Once, correct.

7              MS. CADEDDU:  Thank you.  Pass the witness.

8              THE COURT:  Ms. Moreno?

9                     CROSS EXAMINATION

10   By Ms. Moreno:

11   Q.    Hello.

12   A.    Hello.

13   Q.    You talked about -- You testified about videos that were

14   seized from different committees in the last couple of days.

15   Do you recall that?

16   A.    Yes.

17   Q.    Okay.  And in fact, these videos are videos that you have

18   seen a few times.  Correct?

19   A.    Not all of them.

20   Q.    All right.  Let's talk about Jenin Zakat No. 6.  That is

21   a video of a school ceremony.  Do you remember that?  We are

22   going to play a portion of it, but do you recall that

23   particular video?

24   A.    I think so.

25   Q.    Okay.  And that was a video that was made in 2004.

1   A.   Correct.

2   Q.   Correct?  And that would have been three years after the

3   closure of Holy Land.  Correct?

4   A.   Correct.

5   Q.   Okay.  And in fact, after Jenin Zakat No. 6 was played,

6   if you remember, Ms. Shapiro actually brought up on the screen

7   Jenin Zakat No. 7.

8           MS. MORENO:  Can I have Jenin Zakat No. 7?  Not the

9   video.  Thank you so much.  And if we could go to the

10  translation, please.  And if you could enlarge it a bit.

11  Q.   (BY MS. MORENO)  And up above it I believe the date is

12  May 2003.  Do you see that?

13  A.   Yes.

14  Q.   And you remember talking about this letter?

15  A.   Yes.

16  Q.   Okay.  And this letter was shown to you after the video.

17  Do you recall that?

18  A.   I think so.

19  Q.   Okay.  And this letter is dated 2003, but the video was

20  made in 2004.  Correct?

21  A.   Correct.

22  Q.   Now, the whole video was not played for the jury.

23  Correct?

24  A.   Correct.

25  Q.   Because you have seen that whole video.  And just a

1    portion of it was played for the jury.  Would you agree?

2    A.    Yes.

3    Q.    Okay.  We are going to play a portion, and there is not

4    going to be any sound.  And then we are going to

5    read -- Before you begin, we are going to read the approved

6    translation.  I would like you to pay particular attention,

7    sir, to the sashes that the girls are wearing, and also to the

8    banners, the colors and what is written on them.  Would you do

9    that for me?  All right.

10             MS. MORENO:  If you could please play that portion.

11             (Whereupon, a portion of Jenin Zakat No. 6 was

12             played, while questions were propounded.)

13             MS. MORENO:  If you could freeze it there.  Thank

14   you so much.

15   Q.    (BY MS. MORENO)  Now, that is not a Hamas flag.  Correct?

16   A.    It is a Islamic Jihad.

17   Q.    That is Islamic Jihad.  So this is a ceremony that has

18   nothing to do with Hamas.  Correct?

19   A.    Not accurate.

20   Q.    Okay.  From what we have seen, we have seen no Hamas

21   flags on this portion.  Correct?

22   A.    In that, no.

23   Q.    That is right.  And in fact, you know, because you have

24   seen this video, that this is not even the Jenin zakat

25   committee ceremony.  Right?  You know that.

A.    And I testified that it was taken from the el-Qassan

Society in Hebron that at this time was supported by the Jenin

zakat committee.

Q.    So this does not have anything to do with Hamas.  It has

to do with Islamic Jihad.  Correct?

A.    This video is Islamic Jihad and supported also by the

Jenin zakat committee.

Q.    So the Jenin zakat committee supports Islamic Jihad and

Hamas?

A.    No, this is not the case.  What has happened is because

the Qassan in Jenin didn't have independent financial sources,

they asked for the help of the Jenin zakat committee in summer

camp.  The Jenin zakat committee agreed and they received back

the video to show what they did in the summer camp.  That is

what I said.

Q.    That is what you said then?

A.    That is what I meant.

Q.    That is what you just said now.

A.    That is what I meant.

Q.    That is what you are saying today.  Right?

A.    Correct.

        MS. MORENO:  If I can have the elmo, please.  Thank

you so much.

Q.    (BY MS. MORENO)  And I will just read for the jury what

the girls were saying.

1    The first girl said, "Is it true that Israel is a

2    neighbor and that it has a right or a sanctity, and does

3    Sharon the slaughterer of orphans has any business other than

4    crime, and does an America, did it incline our way becoming a

5    consultant for the rabism and the blood of the martyrs, did it

6    goes to waste, and does the honorable free forget a revenge,

7    and does the honorable free forget a revenge, and does the

8    honorable free forget a revenge."  And then it is "Say God is

9    great.  God is great.  Say God is great.  God is great."

10    And then the last girl said, "you do not know me, oh

11    soldier.  You are afraid of my childhood, afraid of my small

12    fingers and of my dreams.  You can grasp the collar of my

13    shirt, but you will not be able to grasp my heart.  You are

14    afraid of my notebook and my toy and my books.  You are, you

15    are, you are afraid of my notebook and my toy and my books.

16    You scream in fear of my innocence and hide in the rusty

17    helmet and ask for help while in hiding.  I am looking you in

18    the eyes.  What right do you have for me to give you my

19    homeland?  What right do you have for me to give you my

20    homeland?  What right do you have for me to give you my

21    homeland?"

22    Now, I think I heard you say when you were talking about

23    the Nablus zakat committee -- Remember Elbarasse Search No.

24    22, the document that Ms. Shapiro kept referring to?  This

25    document?  Remember this document, sir?

```
 1    A.    Correct.

 2    Q.    Yes.  And this is a document that you have looked at and

 3    used in your analysis.  Is that fair?

 4    A.    Correct.

 5    Q.    To arrive at your conclusions?  Yes?

 6    A.    Correct.

 7    Q.    And this document says that for the Nablus zakat

 8    committee, "We have nobody in it.  His wife is one of us.  We

 9    have a relationship with Haj Yaish."  That is what it says

10    there.  That is what it says there.  Right?

11    A.    That is what it says there.

12    Q.    Now, in Philly No. 13, that is also something that I

13    would assume you have looked at in arriving at your opinion.

14    Correct?

15    A.    Correct.

16    Q.    And that is the transcript of the Philadelphia meeting.

17    Right, sir?

18    A.    Correct.

19    Q.    And in Philly No. 13-E, in talking about the Nablus zakat

20    committee, the person said, "In reality we as Islamists have a

21    weak presence in it."  Do you remember that?

22    A.    If you want to show me.

23    Q.    My question is do you remember that.

24    A.    If I can see exactly --

25    Q.    So you don't remember that?
```

1    A.    I don't know the document by heart.

2    Q.    Do you recall -- Here is my question.  Do you recall in

3    the transcript when they are discussing -- when that person is

4    discussing all of the committees, and he discusses the Nablus

5    zakat committee, that he says, "In reality we as Islamists

6    have a weak presence in it."

7    A.    To give you an answer, an accurate one, I need to refresh

8    my memory.  I need to see it.

9    Q.    Of course.

10              MS. MORENO:  How long does the Court wish me to go?

11              THE COURT:  How much time do --

12              MS. MORENO:  I have a while.

13              THE COURT:  We will go a little while longer.

14              MS. MORENO:  The next page, please.

15    Q.    (BY MS. MORENO)  Right in the middle of page 2 where it

16    has "women's association," now, do you see where it talks

17    about "1,000 orphans, over 2,200 families which are sponsored

18    monthly, they have investment activities and other

19    activities"?  Do you see that, sir?

20    A.    I see that.

21    Q.    It is kind of in the middle.

22    A.    Okay.  I see that.

23    Q.    Do you see that, sir?

24    A.    I see that.

25    Q.    "But when we speak about it as a zakat committee we tie

1    it to us."  Do you see that?

2    A.    Yes.

3    Q.    And then the next sentence is, "In reality we as

4    Islamists have a weak presence in it."  Do you see that?

5    A.    I can see that.

6    Q.    And above it they are talking about the Nablus zakat

7    committee.

8    A.    Correct.

9    Q.    So does that refresh your recollection that the person

10   who was talking about the Nablus zakat committee said "In

11   reality we as Islamists have a weak presence in it"?

12   A.    Of course I am not taking for granted every document

13   unless I check other sources.

14   Q.    Right.  So this doesn't fit into your opinion.

15   A.    I didn't say that.  It is quite accurate, but still every

16   detail should be checked.

17   Q.    So this is accurate?

18   A.    I didn't say --

19   Q.    You didn't say that either.

20   A.    I said when a document has many details and when you

21   research and research each detail, sometimes, for example,

22   perhaps that the person who gave the detail didn't know

23   exactly what happened in Nablus.  It could be.  I am checking

24   it.  And I must say that many of the things that were written

25   here are collaborated with what I saw in my separate work.  It

1    do collaborate with what I think.  There are special details

2    that still I think my opinion is that in this time the Nablus

3    zakat committee was already Hamas.

4    Q.    Because, in fact, you have testified that Nablus was so

5    inundated with Hamas that the color of Hamas, the smell of

6    Hamas, was everywhere in that committee.  That is what you

7    said about Nablus.  Right?

8    A.    That is what was written and not understood, because it

9    is a Hebrew expression.

10   Q.    Uh-huh.  I am not talking about written.  I am talking

11   about what you said about Nablus.  Okay?

12   A.    You just --

13   Q.    So I will ask you the question again, so please listen to

14   my question.  Okay?

15   A.    I am listening.

16   Q.    You testified before that Nablus, the color of Hamas, the

17   smell of Hamas, it is everywhere in the Nablus charity

18   committee.  That is what you said.  Right?

19   A.    I said it and it was an expression that was not

20   understood.  That is what I said.

21   Q.    Not understood by who?

22   A.    The translation of the expression by me was not --

23   Q.    This is in English.  This is your English testimony.

24   Right?

25   A.    If my English, if the English was my native speaking

1    probably I would not say this expression, because it is a free

2    translation from Hebrew.  And in Hebrew there is -- it has a

3    different meaning from what you are trying to refer to me now.

4    Q.    I am going to ask you, do you recall being asked this

5    question --

6    A.    I confirm the fact that I did say that.

7              THE COURT:  He has answered.

8              MS. MORENO:  He has answered it.

9              THE WITNESS:  I did answer this.

10             THE COURT:  He has answered.  He has acknowledged

11   saying this.  He is trying to explain what he meant.

12   Q.    (BY MS. MORENO)  When you said it you said it in English,

13   not in Hebrew.  Correct?

14   A.    Correct.

15   Q.    Okay.  But that doesn't comport with these two other

16   documents, does it, that says the Nablus committee did not

17   have a presence?

18   A.    When you conduct a research it doesn't mean that every

19   document is necessarily collaborative of what you think.  I do

20   my own independent research.  I don't rely only on this --

21   Q.    Let's talk about that research.  Now, you have said that

22   your expertise derives from practical experience more than

23   books.  Right?  You said that.  Because you really haven't

24   read any books on zakat committees.  Correct?

25   A.    Books as a subject?

1    Q.   Right.

2    A.   There are books about Hamas that there are chapters or a

3    paragraph about charity, but not as the subject of zakat.  I

4    didn't read it --

5    Q.   Right.

6    A.   -- such a book.  I just want to be accurate to be

7    understood.

8    Q.   Right.  And your expertise, your study, your research,

9    you have gained mostly after hours and on the weekends.

10   Correct?

11   A.   A lot of time I do conduct my research after, because the

12   time that I can concentrate, because reading internet sites

13   and searching is not something that you can always do in the

14   middle of the day.  It is not a hobby.

15   Q.   Most of your research you have done after working hours

16   during your vacations and on weekends.  Is that right?

17   A.   I don't remember saying this.

18   Q.   You don't remember --

19        MS. SHAPIRO:  Objection; asked and answered.  He

20   just answered that very same question.

21        MS. MORENO:  He said he doesn't remember saying

22   this.

23        THE COURT:  Go ahead.  You can ask your question.

24   Q.   (BY MS. MORENO)  Do you recall being asked this question,

25   "And in your current position as a legal advisor, about how

1    much of your time is devoted to the social infrastructure of

2    the Hamas wing?"  And your answer was, "well, a lot of time,

3    but most of my research I am doing after the working hours,

4    during my vacations and on weekends."  Did you give that

5    answer?

6    A.    I just maybe -- I just want to see.  I will --

7              MS. MORENO:  May I approach, Your Honor?

8              THE COURT:  Yes.

9              THE WITNESS:  I will confirm.

10        That is what is written here.  If I said it, I said it.

11   Q.    (BY MS. MORENO)  Did you say it or didn't you say it,

12   sir?

13   A.    I don't remember saying this, but if it is written I must

14   have said it.  I am not arguing or denying.

15   Q.    Okay.  The Islamic Relief Committee, you gave some

16   testimony about the Islamic Relief Committee.  And, in fact,

17   we just saw some -- a film clip of the deportees and a

18   gentleman that was involved with the Islamic Relief Committee.

19   Correct?

20   A.    Correct.

21   Q.    Now, you are familiar with the indictment in this case.

22   Correct?

23   A.    When you say Islamic Relief Committee --

24   Q.    Islamic relief Agency, Islamic Relief Committee.

25   A.    Well, wait.  What Hassanat said, I don't know if he

1   referred to the IRC that I was speaking about in Nazareth and

2   Um el-Fatem.  I do not know what he referred.

3   Q.   You have given testimony in the last couple of days and

4   you have referred, in fact, to summary charts dealing with the

5   Islamic Relief Committee.  Is that correct?

6   A.   That is correct.

7   Q.   And you are familiar with the indictment in this case.

8   Correct, sir?

9   A.   In general.

10  Q.   You know what the charges are in this case.

11  A.   In general I know.  I didn't read it.  I know what

12  committees we are talking about and what in general what are

13  its charges.

14  Q.   And the Islamic Relief Committee appears nowhere in this

15  indictment.  Right?

16  A.   I don't -- I need to see the document.

17              MS. MORENO:  May I approach, Your Honor?

18              THE COURT:  Yes.

19              THE COURT:  Why don't we break for the day, and give

20  you a chance to read the indictment.

21      Please recall the instructions we have been over, and be

22  back at 9:00 in the morning.

23              (Whereupon, the jury left the courtroom.)

24              THE COURT:  All right.  Be back at 9:00 in the

25  morning.

1          MR. DRATEL:  Your Honor, I have just one issue which

2     is, I asked the witness -- Maybe I should wait for him to go.

3     Actually it doesn't matter.  I asked the witness about a

4     specific document, where it was found, and he said he didn't

5     know.  I was working off two lists given by the Government,

6     one last year and one this year; the same exhibit taken from

7     the zakat committees prepared by the Government, based on

8     Major Lior's -- whatever he told them.  And it says al-Anwar

9     Library.  And I asked the Government to stipulate.  The

10    Government doesn't want to stipulate, so I would seek to move

11    that one line in evidence as admission for where it comes

12    from.  And I can provide these to the Court in the morning.

13         THE COURT:  Why don't you do that and then --

14         MS. SHAPIRO:  Your Honor, those were not prepared by

15    the Government.  They were turned over -- They were not

16    prepared by the Government.  They were turned over as 3500

17    material for Major Lior.  So I don't know the basis -- When

18    Major Lior was on the stand, he could have asked him.  He

19    asked this witness and he didn't know, so I don't know what

20    the basis of that is.

21         MR. DRATEL:  I can't recall him is the real problem.

22    I could recall him I ask him that question, but he is back in

23    Israel.

24         THE COURT:  I will take a look at those, and we will

25    discuss that then.

```
 1              MR. WESTFALL:  Your Honor, just one thing, charity

 2    is reigning down on us.  Tomorrow could we, if we put on one

 3    witness, could that be enough?

 4              THE COURT:  I think so.  How much time --

 5              MS. MORENO:  We have --

 6              THE COURT:  How long do you anticipate your cross?

 7    And I think if the jury is gone you may be excused.

 8              MS. MORENO:  Fifteen.

 9              THE COURT:  You are almost through, then.

10              MS. MORENO:  And for the witness, our first

11    witness --

12              THE COURT:  Are you doing the direct?

13              MS. MORENO:  I am doing the direct.  Forty-five

14    minutes.

15              THE COURT:  How long do you anticipate on your

16    redirect of Mr. Avi?

17              MS. SHAPIRO:  I don't know that I can tell until I

18    have heard all the cross.

19              THE COURT:  She said she is pretty close to

20    finishing.

21              MS. SHAPIRO:  I am sorry.  I didn't hear it.

22              THE COURT:  Just an estimate.  I know you probably

23    haven't thought about it.

24              MS. SHAPIRO:  Less than an hour.

25              THE COURT:  Okay.  And then recross, and then the
```

1    one witness.  That probably will get us to where we were

2    talking about.  I am not committing to anything, but I think

3    that will work.

4            MR. MYSLIWIEC:  Do you have a specific time in mind

5    tomorrow?

6            THE COURT:  I think we were talking -- For sure we

7    wanted to finish him.  If that happens, we can break at 12:00

8    or 1:00, after we finish that witness.

9            MS. MORENO:  That is what we are trying to discern

10   from the Court.

11           THE COURT:  And start with the expert witness on

12   Monday?

13           MS. MORENO:  Yes, Your Honor.

14           MR. JONAS:  Your Honor, one thing we did mention.

15   There is a chance we may consider calling a witness from

16   USAID.  We need to discuss that among yourselves.  If we do,

17   he will be less than 30 minutes or maybe 30 minutes on direct.

18       The other question I have, if I can ask defense counsel

19   who will be that witness tomorrow.

20           MR. DRATEL:  John Bryant.

21           MS. MORENO:  So what time should we have our witness

22   here, then, Your Honor?

23           THE COURT:  I think, based on what we talked about,

24   why don't you figure it out and have him here sometime in the

25   morning.

1          MS. MORENO:  10:00?

2          THE COURT:  I would say 9:00 or 10:00.  Make sure we

3    have him, and then they might have theirs.

4       All right.  See you in the morning.

5                    (End of day.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts              06/07/2009

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25