IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA      )  CAUSE NO. 3:04-CR-240-P
                              (
vs.                           )
                              (  OCTOBER 31, 2008
                              )  DALLAS, TEXAS
HOLY LAND FOUNDATION, ET AL   (  9:00 A.M.

_____

VOLUME 29 OF 37

_____

STATEMENT OF FACTS

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

_____

A P P E A R A N C E S

FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                      1100 COMMERCE, 3RD FLOOR
                      DALLAS, TEXAS  75242
                      BY:  MR. JIM JACKS
                           MR. BARRY JONAS
                           MS. ELIZABETH SHAPIRO

FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
(SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
                      20 FIRST PLAZA, SUITE 700
                      ALBUQUERQUE, NEW MEXICO 87102
                      BY:  MS. NANCY HOLLANDER
                           MS. TERESA DUNCAN

```
1          FOR THE DEFENDANT:  LAW OFFICE OF JOSHUA L. DRATEL
           (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
2                              NEW YORK, NEW YORK  10005
                               BY:  MR. JOSHUA DRATEL
3                                   MR. AARON J. MYSLIWIEC

4          FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
           (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
5                               DALLAS, TEXAS  75204
                                BY:  MS. MARLO P. CADEDDU
6
           FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
7          (GHASSAN ELASHI)     P.O. BOX 10985
                                TAMPA, FLORIDA  33679
8                               BY:  MS. LINDA MORENO

9                               JONES DAY
                                555 CALIFORNIA ST., 26TH FLOOR
10                              SAN FRANCISCO, CA  94104
                                BY:  MR. JOHN D. CLINE.
11

12         FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
           (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
13                              FORT WORTH, TEXAS  76102
                                BY:  MR. GREG WESTFALL
14
           COURT'S LAW CLERK:   MS. JENNIFER HELMS
15                              1100 COMMERCE, RM. 1654
                                DALLAS, TEXAS  75242.
16
           COURT COORDINATOR:   MS. BRENDA WEBB
17                              1100 COMMERCE, RM. 1654
                                DALLAS, TEXAS  75242
18
     OFFICIAL COURT REPORTER:   SHAWN M. McROBERTS, RMR, CRR
19                              1100 COMMERCE STREET, RM. 1654
                                DALLAS, TEXAS  75242
20                              (214) 753-2349

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| AVI | |
| Cross By MS. MORENO | 6 |
| Redirect By MS. SHAPIRO | 30 |
| Recross By MR. DRATEL | 48 |
| Recross By MS. HOLLANDER | 54 |
| JOHN BRYANT | |
| Direct By MS. MORENO | 66 |
| Cross By MS. SHAPIRO | 77 |
| AVI | |
| Direct By MS. HOLLANDER | 89 |
| Cross By MR. DRATEL | 97 |
| Direct By MS. SHAPIRO | 103 |
| Recross By MR. DRATEL | 109 |
| Cross By MR. WESTFALL | 111 |
| Recross By MS. HOLLANDER | 119 |

## Defendants' Exhibits

| Defendants' Exhibits | Page |
|---|---|
| No. 1425 | 24 |

## Government Rests

| Government Rests | Page |
|---|---|
| | 65 |

## Rule 29 Motions

| Rule 29 Motions | Page |
|---|---|
| | 61 |

1          THE COURT:  Good morning.

2      Mr. Jonas, has the Government decided about your witness?

3          MR. JONAS:  Yes, sir.  We are not going to call the

4   witness.  We are going to rest after Avi's testimony.

5          THE COURT:  Okay.  That was the only issue we had

6   outstanding as far as you are concerned?

7          MR. JONAS:  As far as I am concerned, yes.

8          MR. DRATEL:  I just want to hand up to the Court

9   what I was talking about yesterday with respect to the

10  document.  One is from this year and the one from last year.

11         THE COURT:  Tell me what this is.

12         MR. DRATEL:  This was prepared by Major Lior and

13  provided by the Government as an inventory and index of where

14  these documents came from.

15         THE COURT:  What is the issue?

16         MR. DRATEL:  That it came from the Anwar library.

17         THE COURT:  That is what you questioned the witness

18  about.

19      And have you had a chance to see this?

20         MR. JONAS:  We are familiar with the document, Your

21  Honor.  We are not prepared to stipulate to this.  Major Lior

22  was on the stand and Mr. Dratel could have cross examined him

23  about the issue.

24      When he asked Avi about it, he said he wasn't sure why it

25  says on that document what it says, so I think he just has to

live with that answer.  The U.S. government didn't prepare the
document.

        MR. DRATEL:  That is what they testified off of.
They were reading from his testimony last year and this year,
and I would recall him for that purpose, but I can't,
obviously, at this point.

        THE COURT:  I don't understand.  What it is you are
asking me to do?

        MR. DRATEL:  Just to either admit that one line.
That is really it.  Because they won't stipulate.  Just admit
that one line.

        THE COURT:  And your position on that?

        MR. JONAS:  We object to that, Your Honor, because
there is no foundation for that line.

        THE COURT:  So who prepared these documents?

        MR. JONAS:  It came from Major Lior and his unit.

        THE COURT:  All right.  I will take a look at this.
   Any other issues we need to address, then, before we
begin?
   You are up?

        MS. MORENO:  I am up still, Judge.

        THE COURT:  Let's see if we have everybody arriving.
We will be in recess.  It looks like we have we are a few
jurors short.

                  (Brief recess.)

1          THE COURT:  Ladies and gentlemen of the jury, good

2     morning.  We are ready to proceed.

3          Ms. Moreno?

4          MS. MORENO:  May it please the Court, Your Honor.

5     Thank you.

6     Q.   (BY MS. MORENO)  Good morning, sir.

7     A.   Good morning.

8     Q.   I think when we left off yesterday you were looking at

9     the indictment, and you were trying to find if you could see

10    anywhere in the indictment any mention of the Islamic Relief

11    Committee.  Do you remember that?

12    A.   I remember that.

13    Q.   Okay.  And would you like to continue looking through the

14    indictment to see if the Islamic Relief Committee appears

15    anywhere in there?

16    A.   I didn't finish to review it, but if you want to show me

17    I will.

18          MS. MORENO:  May I approach?

19          THE COURT:  Yes.

20    Q.   (BY MS. MORENO)  And while you are looking there, if you

21    could also see if the Bethlehem Orphans Care Society appears

22    anywhere in there as well.  And what I have done for you, the

23    little yellow stickies, that is where all the counts of the

24    indictment and the different committees are, so you can look

25    to those pages where the committees are listed.

1    A.    Okay.  Thank you.

2            MS. SHAPIRO:  Your Honor, to save time, we are

3    perfectly happy to stipulate to Ms. Moreno's question.

4            MS. MORENO:  And the stipulation would be the

5    Islamic Relief Committee and the Bethlehem Orphans Care

6    Society appear nowhere in the indictment.

7            THE COURT:  Are you prepared to agree to that.

8            MS. SHAPIRO:  Yes.

9            THE COURT:  Members of the jury, I explained to you

10   before, you can accept that as a fact, then, without any

11   further evidence.

12        Ms. Moreno?

13   Q.    (BY MS. MORENO)  Now, when you were testifying about the

14   secretive nature of Hamas within the zakat committees over the

15   last day or so, do you remember that?  In general, when you

16   were talking about the zakat committees and how only the local

17   community knew that they were Hamas.

18   A.    Right.  I am not sure it is accurate.  I said that the

19   secrecy goes as far as for those who they don't want to be

20   targeted by; countries like Israel, like the United States or

21   European countries that consider Hamas as a terror

22   organization.  I didn't talk about the Palestinian community

23   or Muslim community around the world.  So I just want to

24   differentiate when I say secrecy.

25   Q.    Okay.  I understood your testimony, and correct me if I

1    am wrong, I understood your testimony to be that in the

2    Palestinian community, in the community in the West Bank, that

3    those people know, they know who the zakat committee charities

4    are controlled by Hamas.  Didn't you say that?

5    A.    I said that the fact that these committees were

6    controlled by Hamas is a common knowledge.  That is what I

7    said.

8    Q.    Common knowledge in the Palestinian community in the West

9    Bank?

10   A.    Yes, that is what --

11   Q.    Right?

12   A.    Yes.

13   Q.    And this is the Palestinian community you admitted to Mr.

14   Dratel you never conducted a poll on.  Correct?  You have

15   never polled the Palestinian community in the West Bank, sir,

16   have you in your research?

17   A.    I never polled.  That is correct.

18   Q.    You understand what I mean by polling?

19   A.    By polling you are talking about one of the methods that

20   you can measure whether the community knows or doesn't know

21   about this.

22   Q.    Right.

23   A.    Correct.

24   Q.    You have never done that?

25   A.    Polling, I didn't do.

1  Q.   Okay.  And I think you also said when you were testifying

2  about the West Bank and the charities, I think you said that

3  they don't acknowledge the names of the charities; although

4  they say they have a charity network, they don't reveal the

5  names, the Hamas leaders, or Hamas itself, the organization,

6  they don't give names.  Do you remember testifying to that

7  about a day or two ago?

8  A.   They are not acknowledging in public.  That is what I

9  said.

10  Q.   Okay.  But all of these zakat committees and charities,

11  they actually operate out in the open.  Right?

12  A.   They act in the open.

13  Q.   They have addresses that are out in the open.  Correct?

14  A.   They have addresses.  Correct.

15  Q.   Okay.  In fact --

16       MS. MORENO:  If I could have the elmo, sir.

17  Q.   (BY MS. MORENO)  And I am showing you what has been

18  marked as InfoCom Search No. 59.  And I think Ms. Shapiro

19  showed you this.  This is one of the letters that was written

20  to CBS.  And this was written from the Islamic Science and

21  Culture Committee of Jerusalem.  Do you remember talking about

22  that?

23  A.   Correct.

24  Q.   And if you look at the bottom here, it has got Jerusalem

25  and it has got phone numbers and fax numbers.  Correct?

```
1    A.    Correct.

2    Q.    Okay.  And then she showed you InfoCom Search No. 64,

3    which I will show you No. 64, which is the letter from the

4    Nablus zakat committee.  Correct?

5    A.    Correct.

6    Q.    And she didn't -- I think she referred to the first page.

7    Do you remember that in the testimony?

8    A.    I think I saw this page.

9    Q.    You saw that page.  Right?

10   A.    Correct.

11   Q.    But she didn't talk about the second page.  Let's talk

12   about the second page.  And I will read it.  It is from the

13   Nablus zakat committee to CBS.  And it says, "We have learned

14   that your report on October 3rd has accused the Holy Land

15   Foundation of diverting money to terrorists.  If you think

16   that providing medicine, education, food and clothes to the

17   needy people of the Holy Land is wrong, please tell us what is

18   the right thing to do."  That is what it says.  Right?

19   A.    That is what it said.  Right.

20   Q.    Nablus zakat committee is asking CBS --

21   A.    Correct.

22   Q.    -- what is the right thing to do.

23   A.    That is what is written on the letter.  Correct.

24   Q.    And then it says, "We trust the Holy Land Foundation and

25   we know where the money goes.  It goes to keep the Palestinian
```

1   people alive."  Right?

2   A.   Correct.

3   Q.   "Please stop your propaganda and correct your

4   mistake."  Correct?

5   A.   That is what is written.

6   Q.   That is what is written.  Now, on the next page it has

7   what I believe is a copy of the envelope.  And in case someone

8   did not know where to go to the Nablus zakat committee, let's

9   take a look at the address.  It says al-Shantir Building,

10  Sifyan Street.  Do you see that at the bottom?

11  A.   I can see that.

12  Q.   And it actually gives you directions so if you are on

13  Sifyan Street and want to go to the Nablus committee, it says

14  "behind the green market."  It even tells you directions.

15  "Behind the green market."  That is what it says.  Right?

16  A.   Correct.

17  Q.   But you didn't go to any of the zakat committees in your

18  research, I recall.  Is that right?  You have never been to a

19  zakat committee, sir?

20  A.   You asked me if during the time period when the

21  Palestinian Authority controlled the city whether I got into

22  there and visited.  The answer is no.

23  Q.   Let's talk about -- I think you said -- I want to talk to

24  you a little bit about control of the zakat committees.  Okay?

25  And I think you said it is in three stages, and the first

1   stage was just after Hamas was formed.  That is what you said.

2   Right?

3   A.   Correct.

4   Q.   I think you said they had a presence in 1988, according

5   to you, and then you said in 1991, according to your

6   research --

7   A.   Correct.

8   Q.   -- most of the committees were in the point, your words,

9   of no return.

10  A.   Correct.

11  Q.   Right?  And then you said -- You asked how did these

12  people get into the committees, and you said in a variety of

13  ways.  And you said, sometimes the people were already there

14  from the Muslim Brotherhood.  You remember that?

15  A.   They were.

16  Q.   Already there?

17  A.   Already there.  Correct.

18  Q.   Right?  And this -- When you mean already there, you are

19  talking about zakat committees that were formed in the '70s

20  and the '80s and before Hamas was formed.  Correct, sir?

21  A.   Correct.

22  Q.   Okay.  And then you said that sometimes they were

23  elected.

24  A.   Correct.

25  Q.   Okay.  Let's talk a little bit about that.  I also -- You

1    have also said that -- I think you testified that you do not

2    know who all of the members of the zakat committees were at

3    any one period of time.  Correct?

4    A.    I am not sure that that is accurate.

5    Q.    Okay.  I am going to be very specific in my question.

6    A.    Okay.

7    Q.    Do you know who all of the members of the zakat

8    committees were for any committee during the relevant time

9    period between 1995 and 2001, all of the members of the

10   committee?  Can you recite them now?

11   A.    Actually I do have the documents.  I reviewed the

12   documents of the zakat committees with all the members.  This

13   is from documents that were seized by the Israeli army, and I

14   didn't put every one there in my review, my summary.  There

15   was a reason.  Sometimes I didn't put even Hamas activists,

16   but I knew how many members.  I reviewed and I decided to put

17   specific members that were, according to my opinion, were

18   dominant leaders.

19   Q.    Okay.  Are you finished?

20         Now, this document that you say that you reviewed that

21   was seized by the Israeli Defense Forces, what document is

22   that?

23   A.    For example, I am talking about documents that announce

24   the results of the elections that were made for the Islamic

25   Charitable Society in Hebron.  For example, I am talking about

1    inspections that were made in 1992 by the Civil Administration

2    that gave all the names of the zakat committee members.

3    Q.    Are you finished?

4    A.    There are more documents that I reviewed that I knew who

5    were the members in Qalqilya.  I knew who were the members.

6    And by the way, between 1995 and 2001, there were respectively

7    minor changes comparing to what happened before that.  Between

8    1990 and 1995 there were more changes.  Between 1995 there

9    were more minor changes.

10   Q.    Okay.

11   A.    Okay.  So I knew -- I had a very good picture, quite

12   accurate, because I reviewed -- Okay.

13   Q.    Okay.  So you have said that there were some minor

14   changes, and that you have reviewed these documents that told

15   you about election results.  That is one thing you just

16   mentioned.  Correct?

17   A.    There were not actually elections in every committee.

18   Q.    Okay.

19   A.    Some committees there were elections.

20   Q.    Are those documents in evidence in this case that the

21   jury can look at?

22   A.    These documents I think part --

23        MS. SHAPIRO:  Objection, Your Honor.  I object to

24   the question because it is going to discovery issues.

25        THE COURT:  She may ask if they are in evidence.  Go

1  ahead.

2  Q.   (BY MS. MORENO)  Are the documents you say you have

3  reviewed that informed of you of election results, are they in

4  evidence in this case?

5  A.   I will lead you to the paper that I gave the Government

6  and they gave to you, I assume, because you presented it to

7  me, and this is the inspection that was done in 1992 by the

8  Civil Administration with all the names of the people that

9  were there.  Also in the binders that I gave to the -- The

10  binders that I gave to the Prosecution, there were several

11  documents that expose the election of all the board members.

12  You have this in your possession.  Whether it is evidence or

13  not --

14  Q.   So you say I have it in my possession?

15  A.   No, I am relying on these documents.

16  Q.   Okay.  All right.  You are relying on those documents

17  that you say is in this summary?

18  A.   There are more documents.  I am just giving you little

19  examples.  There are more than that.  They are, for example,

20  prosecution cases that I reviewed, and then I saw who were the

21  members in several points of time, several -- I had a quite

22  accurate picture of what was going on and who was the members

23  in each specific time, in the time frame that you are pointing

24  out, and before that and after that.

25  Q.   So you say, sir.

1          Let's talk about elections in zakat committees.  Okay?

2     Let's talk about the majority vote.  Now, these elections in

3     the zakat committees, how were they conducted?

4     A.   They were conducted -- It depends on what committee we

5     are talking about.

6     Q.   Let's say Nablus.

7     A.   Nablus, there were some kind of a council that elected

8     the members.

9     Q.   And what would have been the council during the relevant

10    period of time?

11    A.   You are asking me the affiliation of the council?

12    Q.   I am sorry?

13    A.   What would be the council?

14    Q.   Yeah.  When you say council, what do you mean by council?

15    A.   A gathering of members.  Not all the cities.  It is not

16    election for the mayor.

17    Q.   I am talking about the zakat committees.

18    A.   I know.

19    Q.   I am not talking about public elections.

20    A.   In each committee there was a different way, and --

21    Q.   So tell me the different way between the Jenin zakat

22    committee and the Nablus zakat committee.

23    A.   Actually in Jenin zakat committee in the time frame that

24    you are talking, there was not election.

25    Q.   There was no election?

1    A.   There was no election.

2    Q.   Because you didn't find any information about an

3    election, so you have concluded there was no election?

4    A.   There was no election in this period of time.  They were

5    approved, the members that were in 1988, 1989, 1990, and 1991,

6    after the same board was approved when the Palestinian

7    Authority went in the territory.

8    Q.   Let me ask you this.

9    A.   In Tulkarem, for example, there were elections.

10    Q.   Okay.  Let's take Tulkarem.

11    A.   Let's take Tulkarem.

12    Q.   All right.  In the Tulkarem zakat committee election,

13    does the president of the zakat committee, does his vote count

14    more than the others?

15    A.   Does his vote --

16    Q.   Does his vote count more than the others?

17    A.   You are asking me questions how they count the position,

18    the key position in the members.  This is something different.

19    If you are talking to me about the election to the board

20    members, this is one thing.  If you are talking to me about

21    appointing persons to specific positions, this is something

22    else.  If you want to focus me, talk to me about --

23    Q.   I am going to focus you right now.  Okay?

24    A.   All right.

25    Q.   In the committee when they are voting, when the committee

1    is voting on let's say a grants project.  All right?  Does the

2    president --

3    A.    On project.

4    Q.    On a project, where to send money.  Does the president's

5    vote count more than the other members of the board?

6    A.    Actually in that case I cannot give you an accurate

7    answer and why, because there was -- The chairman, for

8    example, and the treasurer and those who were signatory, had a

9    lot of power that was given by the council by the members.

10   Q.    I understand what you are saying.

11   A.    Just a second.  And sometimes they can conduct projects

12   without the authorization of the board member.  Sometimes the

13   board members was actually not even meeting.  They were not

14   meeting at all.

15   Q.    Sometimes they didn't meet at all?

16   A.    At all.

17   Q.    Uh-huh.  And the evidence that you rely on to testify to

18   this jury about that is what?  Where do you see that evidence?

19   A.    I see this evidence for inspections that were conducted

20   by the administration.  I see --

21   Q.    When you say the civil administration --

22   A.    I didn't finish.  You asked me something.

23   Q.    I want to be clear.  When you say civil administration --

24            THE COURT:  Counsel, you cut him off in the middle.

25   You can ask him when he finishes.  Don't interrupt.  Go ahead.

1    Q.    (BY MS. MORENO)    You may complete your answer.

2    A.    Also a document of the PA, the Palestinian Authority,

3    talking about how things are going on in these committees,

4    criticism of how the things are running, inspections that were

5    made by the waqh, for example, in Jenin, how they take the

6    decisions, and also in the investigations, in prosecution

7    files actually, I was going to prosecution files, and board

8    members for example that say no one consulted them.    They were

9    not part of making the decision, because the chairman, for

10   example, had a powerful -- he was very significant.

11           If you want to take examples, in Nablus, for example,

12   Adly Ayyash, Hamed Bitawi, and Abdel Halim Hanabili were

13   making decisions.    Actually Hanabili sometimes took decision

14   by himself.    In Tulkarem, for example, Khamis took the

15   decision by himself.

16           By the way, some of the members complained and even left

17   the committee because they felt that they didn't participate.

18           So what I am saying is that what is written in the bylaws

19   not necessarily happened in the committee itself.    It is all a

20   matter of practicing and the reading material from within the

21   committees.    That is what I am saying.

22   Q.    So my question about how the decision-making process is

23   in the zakat committee, whether the president's vote counts

24   more, you can't tell me.

25   A.    No, I can.

1    Q.    I thought you said you could not tell me.

2    A.    No, I can.  What I said and just demonstrate now is that

3    the chairman's decision and opinion, no matter -- It is not an

4    issue of democracy and counting the votes.  His fellows, board

5    member was counting more than others, meaning that, for

6    example, the treasurer, the chairman, the vice chairman, and

7    the secretary had a lot of power in their hands.

8    Q.    And would that be true for you, say, for all the zakat

9    committees?

10   A.    I said that it is different from committee to committee.

11   But in general it is correct that the chairman and the

12   treasurer had a lot of power in each committee, no matter what

13   was the base of law that they conducted.

14   Q.    So let me ask you this.

15   A.    The regulation.  I think the word is regulation.  No

16   matter the fact that they didn't go strictly by the regulation

17   that they created by the waqh, it speaks for itself.

18   Q.    It speaks for itself?

19   A.    Yes.  They had regulations --

20   Q.    Let me ask you this.  In the Tulkarem zakat committee

21   board, how many votes were necessary to vote somebody in?

22   A.    Somebody to the board?

23   Q.    Yeah.  How many votes were necessary?

24   A.    In Tulkarem committee I had the fact who was elected.  It

25   is not -- For me it is not important to know who vote him and

1   why.  I just saw the results and the results are important.

2   Q.   You saw the results and you then derived at your opinion

3   from the results.  Is that fair?

4   A.   Yeah, it is fair to say that I saw the results and I saw

5   who was elected, who is running the committee.  That is the

6   important issue.

7   Q.   All right.  Let me move on.

8       Now, you are familiar with the list, what we call the

9   list put out by the Treasury Department that talks about

10  specially designated foreign terrorist organizations, and, in

11  fact, this is what Hamas falls under in American law?  You are

12  familiar with that?  Yes?

13  A.   I reviewed this list.  I reviewed some of the lists, yes.

14           MS. MORENO:  May I approach, Your Honor?

15           THE COURT:  Yes.

16  Q.   (BY MS. MORENO)  Showing you what is in evidence in this

17  case, Defense Exhibit No. 963, that is a copy of the list that

18  is in evidence.  Okay?  You have seen that list before, sir.

19  Correct?

20  A.   I have seen some of it.  Not all of it, but of course if

21  you want me to find something --

22  Q.   We are going to go through that in a minute.

23  A.   If it is there, of course.

24  Q.   Of course.  And that list ends, and you can see it on the

25  front page, it ends on June 29th, 2001.  It is on the very top

1    of the front page.  Do you see that?  It ends June 29th, it is

2    dated, 2001.

3    A.    Okay.  I can see that, yes.

4    Q.    Okay.  And the last financial transaction in the

5    indictment in this case, sir, is June 14th, 2001.  Take my

6    word for it.  Okay?

7    A.    Okay.

8    Q.    Now, this is the Demonstrative No. 35 that Ms. Shapiro

9    showed you.  Remember that?

10   A.    Correct.

11   Q.    And she wrote the zakat committees with your help in this

12   particular area.  Do you recall that?

13   A.    Correct, yes.

14   Q.    And she circled Hamas designated.  Right?

15   A.    Correct.

16   Q.    Because Hamas is specially designated under the law.

17   Correct?

18   A.    Correct.

19   Q.    Now, I want you to go to the list and see if you can find

20   if the Jenin zakat committee is specially designated in that

21   list.

22   A.    I will save the time of the jury and the Court.  I know

23   that they are not appeared --

24   Q.    Let me take you through it.  Let's not rush.

25   A.    I know that they are not there.

1    Q.    So Jenin is not.  Correct?

2    A.    Correct.

3    Q.    We can go through this.

4          And Nablus is not.  Correct?

5    A.    Correct.

6    Q.    Specially designated.

7          Nor is Tulkarem.  Correct?

8    A.    Correct.

9    Q.    Nor Qalqilya?

10   A.    Correct.

11   Q.    Ramallah?

12   A.    Correct.

13   Q.    Islamic Science and Culture?

14   A.    Correct.

15   Q.    Now the Bethlehem Orphan Care, we now know it is not even

16   in the indictment.  Correct?  It is not even mentioned in the

17   indictment?

18   A.    According to what was --

19   Q.    The stipulation, you were listening.  Right?

20   A.    Okay.

21   Q.    Okay.  But that is not specially designated either, is

22   it, sir?

23   A.    What do you mean?

24   Q.    The Bethlehem Orphan Care Society is not specially

25   designated.

1   A.   I agree.  Correct.

2   Q.   And neither is -- The Islamic Charitable Society of

3   Hebron is not specially designated under the law.  Correct?

4   A.   Correct.

5           MS. MORENO:  Your Honor, I move this exhibit as next

6   in line.  It would be Defense exhibit -- and because Ms.

7   Hardman is not here, I am going to safely say Defense Exhibit

8   No. 1425.

9           THE COURT:  Counsel, any objection?

10          MS. SHAPIRO:  No objection, Your Honor.

11          THE COURT:  Admitted.

12          MS. SHAPIRO:  As a demonstrative, of course.

13          THE COURT:  No. 1425, are you offering that as a

14  demonstrative.

15          MS. MORENO:  Yes, Your Honor.

16          THE COURT:  That is admitted as a demonstrative

17  exhibit.

18  Q.   (BY MS. MORENO)  Finally, sir, just to orient the jury

19  again, the Defense does not know your real name.  Correct?

20          THE COURT:  Counsel, we have been through that

21  yesterday.  We don't need to go over that again.

22          MS. MORENO:  All right.  That is fine.  Thank you,

23  Your Honor.

24      Pass the witness.

25          THE COURT:  Ms. Shapiro?

1          MS. SHAPIRO:  May we approach just briefly, Your

2     Honor?

3          THE COURT:  Yes.

4          (The following was had outside the hearing of the

5          jury.)

6          MS. SHAPIRO:  There are two issues I wanted to bring

7     out on redirect that I just wanted to run by the Court first.

8          One is that Defense counsel brought out that Avi is

9     testifying under an assumed name, and there has been a

10    stipulation in the case that we had agreed that the Court

11    would tell the jury that he was testifying under an assumed

12    name because Israeli law requires it.  Because of the emphasis

13    that the Defense put on that, I feel compelled to ask why is

14    that, and bring out that it is for security reasons.  That is

15    issue No. 1.

16         Issue No. 2 is Mr. Dratel asked a lot about the kinds of

17    materials and was trying to make the point that they don't

18    have access to anything because they can't research him, and I

19    want to bring out the volume of material that was provided to

20    the Defense in this case.  So those two issues I wanted to

21    front before I actually asked them.

22         THE COURT:  How are you going to bring out the

23    volume of material through this witness?

24         MS. SHAPIRO:  Just ask him if he provided to the

25    Government to turn over to the Defense material that pertained

1    to the pieces of his opinion.

2          MS. HOLLANDER:  If we can take the second one first,

3    the volume of material, I can do it now--I was going to do it

4    before my redirect--move the Court again for letters rogatory

5    to review the documents, and also remind the Court--I have to

6    do this somewhat vaguely--about a funding request and the

7    Fifth Circuit's response to that funding request that if

8    something came up in trial that made it necessary for us to

9    have an expert, that would be reconsidered.  I can remind you

10   in detail of that later.

11         But that issue has come up now, and we have been severely

12   prejudiced by our inability to go and research these issues.

13   Finally, while -- just after he said that he turned over --

14   They did.  They turned over 21 volumes of information.

15   However, we translated them all, at tremendous cost, and I

16   have just searched them for the word election, and it appears

17   nowhere.  And it is 21 volumes, but the Adobe search is pretty

18   good because it found other places, it just didn't find

19   elections of the zakat committee.  I have read them all.  I

20   don't remember reading anything.

21         So I don't believe that he ever turned over to -- the

22   Prosecution ever turned over to us any of these documents that

23   he is talking about, about elections or numbers of people in

24   the zakat committees, because that was something I was

25   particularly looking at.

1          MS. SHAPIRO:  That is in his 3500 material.

2          MS. HOLLANDER:  Mr. Dratel has read his 3500

3    material.

4          MR. DRATEL:  The inspections that he is talking

5    about, you should read them, because there is nothing in there

6    about what he is talking, nothing.  As a matter of fact, there

7    are only two committees in the indictment that are in that

8    material.

9          THE COURT:  In the 3500 material?

10          MR. DRATEL:  Inspections by the Israelis that he

11    talking about.  I went through with him yesterday the

12    committees that are in the indictment that are in the

13    documents are Jenin, Tulkarem, I went through with him --

14    There is a list of -- There is no list of the Jenin committee.

15          MS. SHAPIRO:  Did you read his book?

16          MR. DRATEL:  This is not the inspection documents

17    and it is not primary documents.  He is talking about

18    documents he was supposed to get, not a summary of.  I can't

19    cross examine his summary.

20          MS. HOLLANDER:  We just don't have the documents

21    that he is referring to.

22          THE COURT:  I am not sure that you don't.  We will

23    have to resolve that issue.  You think they do or do not?

24          MS. SHAPIRO:  I would say a couple of things.  The

25    3500 material with respect to the reports, that is somewhat of

1    a misnomer.  He didn't write them.  They were official

2    reports.  We have been turning over far, and we did turn over

3    far in excess of what is required to be turned over.  We

4    turned over I guess it is 21 binders, because there was a

5    19-A, B, and C of material that we received pursuant to MLAT

6    requests.  We turned it over wholesale to the Defense years

7    ago, and that is what Ms. Hollander is referring to.  We also

8    turned over these reports that we just got, even though they

9    are not 3500 material.

10        So because of the conditions under which he is

11   testifying, we have been extremely forthcoming about what has

12   been turned over.  This witness has written basically a sort

13   of book, not a book that can be published in the marketplace

14   because he is not allowed to publish, but it is probably 300

15   pages, a bound book that is essentially the pieces of his

16   opinion.  And obviously everything that he has reviewed in his

17   entire career on the subject--this is what he does every

18   day--can't be turned over, and that is not required to be

19   turned over.  What is in this book is in essence like an

20   expert report.  And there is plenty in there on which they can

21   cross examine.  And I don't think any expert, and I don't

22   think that Mr. Benthall will be turning over everything he has

23   ever relied on ever in forming his opinion.  That is just not

24   something that experts do.

25             MS. HOLLANDER:  Your Honor, I think we are talking

across purposes here.  The Government did turn over 21 binders

of material, and I have read it, every bit of it at one time

or another.  But the quantity doesn't change what is missing.

What is missing is what he just said.

THE COURT:  Maybe; maybe not.  I don't know that is

missing.  You don't have it.  You can bring that out.

MS. SHAPIRO:  It can be in his book.  Evening though

it is a summary, it is there.

THE COURT:  I don't want to spend anymore time on it

because I don't want to keep this jury waiting.  You can go

into the security in terms of why, because you all have

brought that out.  They have opened the door.

And as far as the documents, don't go into that just yet.

I think we need to maybe resolve this other issue.  I know

they have been making some other issues, and this isn't the

first time.  They have been doing it throughout the trial,

what they have access to and not have access to.  So we will

just have to resolve that at some point.  And you can go back

into it if you need to, but for now we will stay away.

MS. HOLLANDER:  At the appropriate time ex parte I

can explain the other thing about the funding, if Your Honor

doesn't remember.

THE COURT:  You can do that.

(The following was had in the presence and hearing

of the jury.)

## REDIRECT EXAMINATION

By Ms. Shapiro:

Q.   Good morning.

A.   Good morning.

Q.   I wanted to ask you a few questions to follow up on some of the things that Defense counsel asked you.

Now, Mr. Dratel pointed out yesterday that you are not testifying under your real name.  Do you recall that?

A.   Correct.

Q.   Okay.  Why is that?

A.   It is a law the ISA law in Israel forbids for exposing name of Israeli Security Agency employees because of security reasons, and after a few cases where ISA or Israeli Security Agency were killed during -- or were threatened because of their duty.

Q.   Do you remember we saw yesterday--and I am not going to play it again--or it may have been a couple of days ago we saw it of a videotape it that was exhibited as Nablus No. 6, and it was a videotape from the Nablus zakat committee, and it showed somebody with a gun just sort of reciting a speech about a kidnapping.  Do you recall that?

A.   I remember, yes.

Q.   Do you remember what the subject matter pertained to in that video, what the man with the gun was talking about?

A.   The plan was to kidnap or kill Israeli Security Agency

1    officer.

2    Q.    And the Israeli Security --

3            MR. DRATEL:    Your Honor, I object; 403 and

4    *al-Moayad*.

5            THE COURT:    Overruled.

6    Q.    (BY MS. SHAPIRO)    Is the Israeli Security Agency the

7    agency you work for?

8    A.    Correct.

9    Q.    Now, Mr. Dratel also asked you about your practical

10   experience and your practical experience versus your sort of

11   research.    In other words, he asked you about books that you

12   have read and internet sites that you looked at, and he asked

13   you specifically about whether internet sites are the kinds of

14   things that you rely on in your research.    Do you remember

15   that?

16   A.    I remember.

17   Q.    Do you rely on just internet sites?

18   A.    Of course not.

19   Q.    What other kinds of THINGS do you rely on?

20   A.    As I said in the direct examination, I rely on a variety

21   of sources, and this includes books, articles, court cases,

22   prosecution cases.

23           MR. DRATEL:    Objection, Your Honor; *Crawford*,

24   confrontation.

25           THE COURT:    Overruled.

1          THE WITNESS:  Television sites, speaking with

2    people, consulting with other academic or experts in a variety

3    of fields.

4    Q.   (BY MS. SHAPIRO)  And in terms of your practical

5    experience, do you study the Hamas social wing as a living

6    every day?

7    A.   It is a daily work.  It is a daily work.  Of course there

8    can be one day that I cannot approach it, but it must be a

9    daily work to be updated all the time, because there is a lot

10   going on in this field.

11   Q.   And is it important to the mission of your agency for

12   your work to be accurate?

13   A.   This is important, and it is part of preventing

14   terrorism.  This is the ISA definition to prevent terrorism.

15   Q.   And Mr. Dratel also pointed you to a number of documents

16   yesterday, and he pointed out that some of these documents

17   postdated 2001.  Do you recall that?

18   A.   What exactly document?

19   Q.   I think he pointed you to some of the posters from the

20   Islamic Charitable Society of Hebron of suicide bombers and

21   other martyrs who had died in 2002, 2003.

22   A.   Okay, yes.

23   Q.   2004?

24   A.   Yes, I remember, yes.

25   Q.   Is information that postdates 2001 relevant to your

1   analysis about these committees?

2   A.   Yes, but I have to elaborate.

3   Q.   Please.

4   A.   I was also asked yesterday about inspections that were

5   made back in the '90s.

6            MR. DRATEL:  Your Honor, non-responsive.

7            THE COURT:  Overruled.  Go ahead.

8            THE WITNESS:  At that time, and I was not allowed to

9   say it yesterday, but in the same inspection of the zakat

10  committee in Tulkarem, Nablus, and other places, the Islamic

11  Sciences, in institutions like in mosques, there were seized a

12  lot of material like posters of Hamas, Izz el-Din al-Qassam,

13  leaflets of Hamas, books of Hamas, and when I took it back to

14  the early '90s, 1993, for example, and findings or items that

15  were found even in 2004 and 2005, and I am looking on the time

16  period, this is very significant.  It is very indicative.

17       I am not saying this is the only criteria, but if

18  speaking on the specific criteria, I think that if you find

19  for a long period of time similar items, it says something.

20  And it said that in this period of time these committees were

21  controlled by Hamas.  Items that were found in mosques in

22  Tulkarem, in mosques of the Mujama'a al-Islami, which is the

23  Islamic Center, even ammunition that was found there in one of

24  the mosques of the Mujama'a al-Islami, this is the kind of

25  material that helped me, of course, not solely, but helped me

1    to make my opinion.

2    Q.   Okay.  You are jumping a little ahead, but I want to go

3    back to that answer which is important.  But let me ask you,

4    in addition, those documents that come after 2001, how are

5    they relevant to your analysis?

6    A.   They are very relevant.  Again, it is not that one day

7    these offices started to have Hamas material.  It wasn't

8    created in one day.  And when I see posters or videos that

9    were seized before 2001 even, or were there, a video described

10   before 2001 and after, I see the continuous -- For me it is

11   one line, it is a timeline, a time frame.  And it doesn't stop

12   where the indictment or when the specific foundation was--I

13   don't know if I am allowed to say this--was designated.  In

14   2001 there was a designation.  I don't know --

15              MS. HOLLANDER:  Objection, Your Honor.

16              MS. MORENO:  May we approach?

17              THE COURT:  No.  Go ahead.

18   Q.   (BY MS. SHAPIRO)  Don't tell me what designation you are

19   talking about.  Okay?  Because it is not important here.  What

20   we are talking about --

21   A.   I am asked about 2001.  2001, for me what happened before

22   2001 and after 2001, it doesn't -- Nothing happened in that

23   sense.

24   Q.   Okay.  There was no change?

25   A.   There is no change.  What was before 2001 was after 2001.

1    Q.   Okay.  Now, going back to the issue of the mosques.  Mr.

2    Dratel asked you about whether there were Hamas items found in

3    the offices of certain committees like Tulkarem, and you

4    started to say there were things found in the mosques, and

5    then he cut you off because he wanted to know only what was

6    found in the office.  Do you remember that?

7    A.   Yes.

8    Q.   Okay.  And you just testified now that there were in fact

9    Hamas materials that were found in the mosques.

10   A.   Correct.

11   Q.   Why is it that things were found in the mosques but not

12   in the office, in your opinion?

13          MR. DRATEL:  Objection, Your Honor.  He wasn't a

14   part of that inspection.

15          THE COURT:  Overruled.  He may state an opinion.  Go

16   ahead.

17          THE WITNESS:  I want to go back to this report of

18   Tulkarem.

19   Q.   (BY MS. SHAPIRO)  I only ask that you not read from it.

20   A.   I am not reading.

21   Q.   Okay.

22   A.   I am not reading --

23   Q.   You can refresh your memory.  That is fine.  It is just

24   the rules of evidence.

25   A.   I understand.  Okay.  Zeid mosque was one of the mosques

1   of -- is one and still one of the mosques of Tulkarem.  In an

2   inspection that were carried out in 1993, there were Hamas

3   items that were found.  Nine years after that, the same mosque

4   also Hamas items were found.

5       If you remember, you presented me yesterday a leaflet of

6   Hamas taking responsibility for the suicide attack in

7   Passover, the Park Hotel.  It is the same mosque.  I am

8   talking about 1993 and 2002.  This is -- For me it is

9   part -- It is also important if I make my opinion to see that

10  a mosque institute that supported or is a part of the zakat

11  committee, and the same emam at that time is also in the waqh,

12  everything is linked here.  And the time frame -- during all

13  this time frame that I am talking about.

14      Now, it wasn't only on Tulkarem, it was also on Nablus,

15  it was also in the Islamic Sciences and Culture, it was also

16  in the Mujama'a Islami, the Islamic Center and Islamic

17  Society.

18  Q.   So these materials you said were found in 1993.  Is that

19  right?

20  A.   The material that were found in 1993 and the material

21  were brought to court.  I reviewed prosecution cases.

22           MR. DRATEL:  Objection again, Your Honor.

23           THE COURT:  Overruled.

24  Q.   (BY MS. SHAPIRO)  Who was in control of the West Bank in

25  1993?

A.    Israel.

Q.    Okay.  So when Israel found these materials, why didn't
Israel close down these mosques and these committees?

A.    It is complicated, and I will try to answer as simple as
I can.  First of all, as I said, I don't think at that time
even that Israel perceived the real danger, even though in
1993 it started to perceive what is the big threat, how big is
the threat, and that is why these actions were taken against
institutes of the zakat.  It started action in 1992 and 1993.

Q.    What was happening --

A.    Israel government, Civil Administration, according to the
documents I review, and part of them are here, decided not to
shut down mosques.  But if there was someone who brought
material, to take action against a specific person.  The emam,
if it was an emam, that took Hamas items into the mosques, not
to shut down the mosque because the mosque is serving people.
That was the first attitude.  And I am not judging it if it is
good or bad.  This is the fact.

Q.    What was the policy of Israel toward religious
institutions of the Palestinians at that time?

A.    Israel's attitude, the Israeli government attitude was to
leave the religious affairs in the hands of the Jordanian
waqh.  And after that it was, of course, handed to the
Palestinian Authority, and in many areas not to interfere with
the religious affairs of the Palestinians.

1    Q.    Okay.  Now, Mr. Dratel also pointed you to a couple of

2    documents, and he pointed out that you spoke about Operation

3    Defensive Shield, but yet there were documents seized from the

4    committees at a time period later than Operation Defensive

5    Shield.  Do you remember that?

6    A.    I remember.

7    Q.    Okay.  Were there operations after Defensive Shield that

8    collected -- where the Israeli army collected items from these

9    committees?

10   A.    Yes.

11   Q.    And the documents that were presented to you during your

12   direct examination, did it come from a variety of these

13   operations?

14   A.    Correct.

15   Q.    Okay.  Now, Mr. Dratel asked you about Interpal.  Do you

16   recall that?  One of the organizations that was on your

17   PowerPoint map as being an external funding source for the

18   committees.

19   A.    I remember.  Correct.

20   Q.    Okay.  And he talked to you about the British Charity

21   Commission.  Do you remember that?

22   A.    I remember.  Correct.

23         MS. SHAPIRO:  Okay.  And I want to pull up

24   designation No. 1, please.  Could we go to the next page?

25   Q.    (BY MS. SHAPIRO)  What you are seeing is a certified

1    document from the Department of Treasury.

2              MS. SHAPIRO:  If we could go to page 3, please.

3    Q.   (BY MS. SHAPIRO)  What does No. 3 say on this list?  Can

4    you read that?

5    A.   No. 3, palestinian Relief and Development Fund, a.k.a.

6    Interpal.

7    Q.   Okay.  Is this the same Interpal we were talking about?

8    A.   Yes.

9    Q.   And are you aware that Interpal in the United States,

10   under United States law, is a designated organization?

11   A.   Yes.

12   Q.   Now, Mr. Dratel also questioned you about a 1995

13   newspaper article in an Arabic publication called al-Wasat.

14   Do you remember that?

15   A.   Yes.

16   Q.   And in that article it described that the Palestinian

17   Authority needed to gain control over the zakat committees.

18   Do you remember that?

19   A.   Correct.

20   Q.   Okay.  Was the Palestinian Authority successful in

21   gaining control over the committees?

22   A.   No, even though there were efforts in a certain period of

23   time to do this, but in the overall they were not successful.

24   Q.   Did Hamas retain their control of these committees for

25   the entire period between 1995 and 2001?

1    A.    In the same article--you are referring to an article, and

2    I couldn't say that--that Hamas in the same article was -- In

3    a different article that relates to this article, when Yasser

4    Arafat in a newspaper called al-Sabil August 23rd, 1994 said

5    that the Palestinian Authority should embrace or take over

6    those committees.

7    Q.    And were they successful?

8    A.    The answer was no.  And Hamas in the same article

9    al-Sabil, which is a Jordanian newspaper, said it threatened

10   Yasser Arafat not to touch those committees.

11   Q.    And how does that play into your analysis of the

12   committees?

13   A.    The fact that the Palestinian Authority had an interest

14   but couldn't -- they couldn't execute or they couldn't

15   translate this interest into action, I would say there they

16   were stopped, blocked by Hamas each time they wanted to do

17   something against these committees.

18        And we have to remember at that time, 1995, the Hamas is

19   a very substantial presence in the Palestinian population, and

20   that is what this threat of Hamas over the PA only increased

21   until 2007.

22   Q.    So just going back to my earlier question, did Hamas

23   retain control over these committees between 1995 and 2001?

24   A.    Yes.

25   Q.    Now, Ms. Hollander asked you about Jamil Hamami.  Do you

1  remember that?

2  A.    Yes.

3  Q.    And you had said that Jamil Hamami had a rift with Hamas,

4  but that in your opinion today he is Hamas.  Do you remember

5  that?

6  A.    This is my opinion.

7  Q.    Okay.  Do you know whether that rift between Jamil Hamami

8  and Hamas was still going on in 1999?

9  A.    I think -- No, I don't think.  Yes, the change came in

10  the second Intifada.  The second Intifada started in 2000 and

11  2001.  This is where the change where actually Jamil Hamami

12  just went -- The rift was, how you say -- I don't know what

13  the word is.  Finished.

14  Q.    So the rift ended at the -- it ended in the second

15  Intifada, and when was the second --

16  A.    During the period of the time of the second Intifada.  At

17  that time Hamas was -- I can't say that Jamil Hamami held the

18  same view that he expressed in 1996, let's say towards the

19  negotiation or the recognizing Israel.  I cannot say that the

20  same views of Hamami held during the second Intifada.

21  Q.    Okay.  Now, Ms. Hollander also asked you about Operation

22  Defensive Shield, and she pointed out that there were

23  confrontations in Jenin and that there were casualties.  Do

24  you remember that?

25  A.    Correct.

1  Q.  What event prompted the Israeli army to start Operation

2  Defensive Shield?  Did you understand my question?

3  A.  No.  I just thought there was objection.

4         THE COURT:  No.  I didn't hear one.

5         MS. HOLLANDER:  I was waiting for him to start.  I

6  stood up for another reason.  But there is an objection to

7  this under 403.

8         THE COURT:  Okay.  Overrule the objection.

9  Q.  (BY MS. SHAPIRO)  What event prompted Operation Defensive

10  Shield?

11  A.  27 March, 2002, the evening Passover, a suicide bomber

12  entered the Park Hotel, killing 32 Israeli citizens.  That day

13  the Israeli government took a decision.  This was the last

14  suicide attack, serious suicide attack going on between

15  January, February, and March 2002.  And the Israeli government

16  ordered the Israeli army to go and to go after the terrorist

17  cells, the terrorist activists, the terrorist headquarter.

18  Q.  Was there something in particular about the Park Hotel

19  suicide bombing that was the straw that broke the camel's

20  back, so-to-speak?

21         MR. DRATEL:  Leading.

22         THE COURT:  Overruled.

23         THE WITNESS:  I think at that time the Israeli

24  society was shocked from this event.  This was many, many

25  Israeli citizens that were killed at that time at that special

1    event, and it was a holiday, it was a holiday --

2              MR. DRATEL:  Object under 403, Your Honor.

3              THE COURT:  Overruled.

4    Q.    (BY MS. SHAPIRO)  What holiday was it?

5    A.    Passover.

6    Q.    Is that a Jewish holiday?

7    A.    Yes.

8    Q.    Okay.

9    A.    And I think it shocked a lot of Israeli citizens.  The

10   scope of the event, the number of the casualties actually.

11   And that is why the Israeli government actually decided to put

12   an end to the fact that on a daily basis suicide bombers just

13   entered Israel and explode and killed Israeli citizens.  So I

14   think this is what led to the Operation Defensive Shield.

15   Q.    Ms. Hollander also talked to you a little bit about the

16   United Nations, United Nations Relief Agency.  And she

17   mentioned that the United Nations runs schools in Gaza and the

18   West Bank.  Is the United Nations a designated terrorist

19   organization?

20   A.    No.

21   Q.    Okay.  Now, Ms. Moreno asked you about an exhibit called

22   Jenin Zakat No. 6, and it was a videotape from Jenin, taken

23   from the Jenin zakat committee.  And then she showed you Jenin

24   Zakat No. 7, which was a letter addressing the issue of summer

25   camps, and that letter was dated in 2003 and the video was

1    from 2004.  Do you remember that?

2    A.    Yes.

3    Q.    Okay.  That letter that was in 2003, what was that meant

4    to illustrate?

5    A.    This letter actually was an instruction from the global

6    network of Hamas to the committee of Jenin, the zakat

7    committee of Jenin to handle differently their summer camps.

8    The reason to handle differently, it is changing the name,

9    changing the manner and the kind of activities.  But they say

10   there that the reason why it was sent is because of the

11   problems of the brothers in Europe.  At that time, as I

12   explained in my testimony, there were legal actions taken

13   against some of the global network foundations by several

14   countries, like in Germany, like in Netherlands.

15   Q.    Now, Ms. Moreno also asked you about polling.  Do you

16   remember that?

17   A.    Yes.

18   Q.    About taking polls.  If somebody from the West -- When I

19   mean the West, I mean the United States or Europe.  Somebody

20   from the West went into the West Bank and took a poll, would

21   that be determinative for you?  When I mean take a poll, take

22   a poll about whether or not a committee is controlled by

23   Hamas.

24   A.    I understand the question.  I wouldn't rely on a poll as

25   long as we are talking about -- I wouldn't rely on polls that

1    are conducted in the Palestinian Authority as well as other

2    places, by the way, but also in the Palestinian Authority.

3    The indication -- There is a big end occasion, for example,

4    many polls before the election, the last election in the

5    Palestinian Authority in 2006, predicted winning for the

6    Fatah.  That didn't happen.

7    Q.    Okay.  What about if a Westerner came--I am talking about

8    specifically somebody from Europe or somebody from the United

9    States--came to the West Bank and asked a lot of people what

10   they thought about this committee.  Would that be reliable?

11         MR. DRATEL:  We object, Your Honor.  He is not a

12   pollster and beyond the scope, and speculative.

13         THE COURT:  You asked about polling.  He may give an

14   opinion.  Go ahead.

15         THE WITNESS:  I would say that when a foreigner

16   comes to a community or society like the Palestinian society,

17   I wouldn't say that everything that the Palestinian has in his

18   mind he would tell to others, and I would say that he would

19   be -- First of all, ask if his name is going to -- if they are

20   going to expose his name.  So I cannot -- You know, I cannot

21   even estimate what the weight that this poll will have even by

22   Palestinians themselves.  And say I if the Palestinian

23   themselves, the polls of the Palestinians are not accurate,

24   why should we rely on other external polls.

25   Q.    (BY MS. SHAPIRO)  Okay.  Now, Ms. Moreno also talked to

1    you about some documents that had the location of these zakat

2    committees right on the stationery.  Do you remember that?

3    A.    Yes.

4    Q.    Now, when you talked about the committees and their

5    character being secret to the local community, were you

6    referring to the location of the committee itself, or were you

7    referring to its control by Hamas?

8    A.    No, no, no.  It was very clear I was talking about the

9    affiliation to Hamas.

10   Q.    Okay.  Not just the location was secret?

11   A.    No, I was not talking about the location.  The location,

12   by the way, is something that is known to the Israeli

13   government.  It is known to -- Sometimes they give it in an

14   internet site.  I am not talking at all about locations.  This

15   is not what we are talking about.

16   Q.    Okay.  Now, Ms. Moreno also put up this Demonstrative

17   No. 35, and she asked you whether each of these committees was

18   designated, and then she crossed off each one.  Do you

19   remember that?

20   A.    Yes.

21   Q.    Okay.  Now, on this demonstrative, were the committees

22   that are listed here -- And I am not talking about

23   designation.  I am talking about because -- Let me ask you.

24   Are you aware of whether Hamas was designated in the United

25   States between 1995 and 2001?

1  A.    Yes.

2  Q.    Okay.  And was it?

3  A.    Yes.

4  Q.    Okay.  So not referring to designation now, but let's

5  talk about whether these committees listed here were

6  controlled by Hamas or part of the Hamas social wing.  Okay?

7  A.    Just, about the designation --

8  Q.    I am not asking you about the designation.  I am just

9  asking you about whether each of these was controlled by Hamas

10  or part of the Hamas social wing.  Okay?  The Jenin zakat

11  committee?

12  A.    Yes.

13  Q.    Okay.  Nablus zakat committee?

14  A.    Yes.

15  Q.    Tulkarem zakat committee?

16  A.    Yes.

17  Q.    Qalqilya zakat committee?

18  A.    Yes.

19  Q.    Ramallah zakat committee?

20  A.    Yes.

21  Q.    Islamic Science and Culture Committee?

22  A.    Yes.

23  Q.    Bethlehem Orphan Care, Orphan Society, though we have

24  stipulated it is not in the indictment?

25  A.    Correct.

1    Q.    Islamic Charitable Society in Hebron?

2    A.    Correct.

3    Q.    And they are controlled by Hamas, as circled in this

4    demonstrative.  Is that right?

5    A.    I would think the word controlled is not only controlled

6    part of Hamas --

7    Q.    Okay.  Part of the Hamas social wing?

8    A.    Controlled and part of Hamas.  I think this is the

9    definition as an expert I --

10   Q.    Okay.  With that, is this Demonstrative No. 35 an

11   accurate representation of your opinion?

12   A.    Yes.

13            MS. SHAPIRO:  Can I have a moment, please, Your

14   Honor?

15            THE COURT:  Yes.

16            MS. SHAPIRO:  Pass the witness, Your Honor.

17            THE COURT:  Mr. Dratel?

18                    RECROSS EXAMINATION

19   By Mr. Dratel:

20   Q.    Good morning.

21   A.    Good morning.

22   Q.    In 1993 Israel had civil control over the West Bank and

23   Gaza.  Right?

24   A.    Correct.

25   Q.    And military control.

```
1   A.   Correct.

2   Q.   And police control.

3   A.   That is not correct, not accurate.

4   Q.   There wasn't a Palestinian Authority.  Correct?

5   A.   There was not until it was formally -- from the Oslo

6   Accord in September that is formally announced.

7   Q.   Right.  But there was no Palestinian Authority --

8   A.   Police inside.

9   Q.   Right.

10  A.   Okay.  Yes.

11  Q.   So it was Israel that controlled that area?

12  A.   Israel controlled the area.  Correct.

13  Q.   Hamas was declared illegal by Israel in 1989.

14  A.   Correct.

15  Q.   It was perceived as a threat to Israel in 1989.

16  A.   No.  That is not accurate.

17  Q.   It was declared illegal.  But Hamas was not considered a

18  threat?

19  A.   This is something I have to clarify.  When you designate,

20  you refer to information that comes from before, from the

21  past.  You are not designated to predict the future.  When you

22  are saying that it was designated in 1989, in 1987 in Israel

23  it was already a threat.

24  Q.   I am sorry.  But by -- It was perceived a threat in 1987?

25  A.   It was perceived.  And designated is a summary of a
```

1   threat, and usually it comes a few years after --

2   Q.   You misunderstand my question.  My question was certainly

3   by 1989 and as early as 1987 Hamas was perceived as a threat

4   to Israel.

5   A.   Perceived earlier.  And then it was designated legally.

6   Q.   In 1989?

7   A.   That is correct.

8   Q.   Okay.  And 1991 is the date for you of the point of no

9   return of the committees, the zakat committees that we are

10  talking about.

11  A.   Correct.

12  Q.   In terms of Hamas control.

13  A.   Correct.

14          MR. DRATEL:  Now can we pull up designation No. 1,

15  please, the last page?

16  Q.   (BY MR. DRATEL)  This is the designation of Interpal by

17  the United States as a specially designated terrorist, on the

18  last page.  And that date is August 21st, 2003.  Correct?

19  A.   Correct.

20  Q.   Okay.  And by the way, I just want to clarify.  1989,

21  when you said Hamas was designated, that was Israel.  Not in

22  the United States.  Correct?

23  A.   Correct.

24  Q.   Now, you talked about Hamas and its position on the zakat

25  committees.  Right?  On redirect with Ms. Shapiro?

1    A.    What do you mean position.

2    Q.    In other words, Hamas' public position and -- In other

3    words, the Hamas indications of its control of these

4    committees over time.

5    A.    I don't think this is -- We were talking about Hamas

6    control.

7    Q.    Yeah.  Okay.

8    A.    Of the time.

9    Q.    And isn't it a fact that Hamas in 1994 publicly stated

10   that the committees were independent religious institutions?

11   A.    That is not what I wrote from the -- That is not what I

12   cited from the al-Sabil.

13   Q.    Hamas didn't say that?

14   A.    Hamas called Yasser Arafat not to touch them and to keep

15   them independent.

16   Q.    Right.  And so let's look at page 43, if you want to.  I

17   will give it to you.

18   A.    I have it.  It is okay.

19   Q.    I want to show you the highlighted part so we can save

20   some time.

21   A.    I can read it.  "Hamas called upon Arafat and the PA not

22   to harm the position of these institutions and stop" --

23   Q.    Can you read the whole thing?  Can you read the whole

24   thing from --

25          MS. SHAPIRO:  I am sorry.  Objection, Your Honor.

```
1   Q.   (BY MR. DRATEL)  This is something you wrote, yourself.

2   Right?

3              THE WITNESS:  Yes.

4              MS. SHAPIRO:  He is reading from something --

5              THE COURT:  You are saying he is reading from

6   something he wrote?

7              MR. DRATEL:  Yes.

8              THE COURT:  Okay.

9              MS. SHAPIRO:  Thank you.

10  Q.   (BY MR. DRATEL)  Start reading -- read the whole

11  paragraph.

12  A.   I will.  But if you don't mind, I WILL read from here.

13  Q.   That is fine.

14  A.   Okay.  I will read.  "Another article emphasizing the

15  centrality of the charitable layout in funding Hamas was

16  published on August 23rd, 1994, al-Sabil Jordan.  According to

17  the article, Hamas published a statement which criticized the

18  Palestinian Authority because of the decision of the Chairman

19  Arafat to intervene in the practice of the Islamic and

20  independent charitable institution, and to subordinate the

21  institution to the direct inspection of the Palestinian

22  Authority.  It was also written in the announcement that Hamas

23  stresses the independence of the institution which are not

24  subject to negotiate"--"which are not subject to negotiate,

25  that is what I wrote--"and not to impose on them any
```

1  sovereignty.  Since they are popular independent institutions.

2  Hamas call upon Arafat and the PA not to harm the position of

3  these institutions and stop tightening their steps."

4       So I said -- you said half of what is written here.

5  Q.   You read the whole thing just now.  Right?

6  A.   Yes.

7  Q.   Okay.  You wanted to read the second half.

8       Okay.  Now, as of 2001, December of 2001, Ramallah zakat

9  committee, open and operating.  Correct.

10 A.   December 2001?

11 Q.   Yes.

12 A.   Ramallah zakat was operating.

13 Q.   Jenin.  Operating?

14 A.   No.  In Jenin there was a short closure and then it was

15 reopened.

16 Q.   It was reopened.  Tulkarem.  Operating?

17 A.   In 2001?

18 Q.   Yes.

19 A.   Correct.

20 Q.   Hebron ICS.

21 A.   Short closure, but it was reopened.

22 Q.   Qalqilya.

23 A.   Was operating.

24 Q.   And the other committees that were on the list that Ms.

25 Shapiro told you, all open and operating in 2001.  Do you need

1    the list?

2    A.    If you just ask me specific I will answer.

3    Q.    Nablus zakat.  Right?  Still open and operating?

4    A.    It was shut down for a short time.

5    Q.    2001?

6    A.    Also al-Tadamoun.  But it was reopened.

7    Q.    But reopen.  Right?

8    A.    Correct.

9    Q.    Okay.

10              MR. DRATEL:  Pass the witness, Your Honor.

11              THE COURT:  Mr. Westfall?

12              MR. WESTFALL:  Your Honor, I have no further

13   questions.

14              THE COURT:  Ms. Hollander?

15              MS. HOLLANDER:  Yes, sir.

16                      RECROSS EXAMINATION

17   By Ms. Hollander:

18   Q.    A mosque is a public place, isn't it?  The public can go

19   into a mosque, can't they?

20   A.    Correct.

21   Q.    So the mosques in the various cities in the West Bank are

22   open to the public, to pray or whatever they want to do in the

23   mosque.  Correct?

24   A.    Correct.  Of course, in general, you meant unless you

25   find weapons in a specific mosque.

1    MS. HOLLANDER:  Move to strike as non-responsive.  I

2    didn't have a question, Your Honor.

3    THE COURT:  Sustained.  Just try to answer her

4    question, if you would.

5    Q.  (BY MS. HOLLANDER)  I get to ask the questions and you

6    answer them.

7    THE COURT:  Counsel, he understands.  Just ask your

8    questions.

9    Q.  (BY MS. HOLLANDER)  Now, you have talked about Jamil

10   Hamami.  Correct?

11   A.  Correct.

12   Q.  And you just said, when Ms. Shapiro asked you, that he

13   had this rift in the '90s, and you think he went back to Hamas

14   in 2001.  Correct?

15   A.  I said the second Intifada.

16   Q.  Right.

17   A.  That period of time.

18   Q.  2000.  Right?  It started in 2000, 2001?

19   A.  Well, it is a process.  It is not a day that I can say in

20   November 2001, the first of November he came back to Hamas.

21   It was a gradual process.  But he came back to Hamas.

22   Q.  But you have testified previously about Jamil Hamami, and

23   on August 16th, 2007 you said, "I would say there was a

24   dispute inside the family."  And you were asked by -- You were

25   asked about when was that approximately, and you answered, "I

1  think it was around the mid '90s and a little bit further it

2  was a kind of dispute, but I think after, that like every good

3  family they reconcile.  And Jamil Hamami is definitely Hamas

4  activist today."  You also said the next sentence, "Even

5  though there was a dispute, he never left the Hamas

6  organization."  That was your testimony.  Correct?

7  A.    And that is exactly what I am saying.  Correct.

8  Q.    Okay.  Now, you also talked about the suicide bombings

9  that in your opinion were the precipitating factors in

10  Operation Defensive Shield.

11  A.    The word precipitate --

12  Q.    You talked about suicide bombings in Israel and then

13  Operation Defensive Shield followed that.  Correct?

14  A.    Okay.

15  Q.    That is what you said.  Okay.  And during Operation

16  Defensive Shield, and we have talked about it before, the

17  basic time period was about three weeks.  Correct?  Three,

18  three and a half weeks?

19  A.    I didn't say three and three and a half, but it is --

20  Q.    Is that close enough?

21  A.    That is during April.

22  Q.    During April.  Okay.  Maybe it was four weeks.  During

23  that time you are aware of the fact that there were 500

24  Palestinians killed.  Correct?

25  A.    I don't have the exact number, but I can confirm that

1    there were --

2    Q.    And about 1500 were wounded.  Correct?

3    A.    I don't think that I have these numbers.

4    Q.    Okay.  It was a lot, wasn't it?  It was a large number.

5    Correct?

6    A.    I think 500, this is more than the number that I review

7    once, but if I don't remember so it will not support your

8    opinion.

9    Q.    Is the -- That is fine.  But you know it was a large

10   number.  Correct?  You don't disagree with that?

11   A.    I don't disagree that there were persons killed.

12   Q.    Now, you talked about polls and how difficult they are,

13   you said, in your opinion, to run.  But in your research polls

14   could be valuable, couldn't they?  If you considered them

15   useful they would be a useful thing for someone to look at if

16   you could rely on them.

17   A.    Polls can help.  It depends on the place, time, and

18   society, and it should be fit to what you are wanting to

19   achieve.

20   Q.    During the 1990s, the Internal Republican Institute,

21   funded by the United States government, provided $400,000 for

22   polls in the West Bank.  Did you ever review any of those

23   polls?

24   A.    No.

25   Q.    Now, I would like to -- You also mentioned that it was

1    the policy of Israel in 1992 and 1993 not to interfere with

2    religion of the Palestinians.  The policy of Israel.  Correct?

3    A.    Correct.

4            MS. HOLLANDER:  Would you pull up InfoCom clip No.

5    26-A?  InfoCom Search No. 26-A.

6            (Whereupon, InfoCom Search 26, Clip A was played.)

7    Q.    (BY MS. HOLLANDER)  Did you see at the end -- Now, this

8    is a document, a video that is in evidence in this case, and

9    this was from the time when Israel deported approximately 412

10   or 415 men in 1992.  Correct?

11   A.    Correct.

12   Q.    Same period of time you were talking about?

13   A.    Correct.

14   Q.    And this is what the Government played.  And I want you

15   to see what is also in evidence as Defendants' Exhibit No.

16   1417, which is how this sentence continues.  The sentence

17   continues, that the Government did not play, "And some

18   brothers did not belong to any group, but they got used to

19   praying at the mosque, and they grow their beards, so they

20   arrested them."  The they would be Israel.  Correct?

21   A.    Correct.

22   Q.    "We consider this probably an assault, not just on the

23   land of Palestine but on all Muslims worldwide."  This was

24   part of that video from 1992.  Do you understand that?

25   A.    This is part of the video.

1    Q.   Right.  And that was during a time when you said Israel

2    did not interfere with religious institutions.  Correct?  That

3    is what you said.  Is that what you said?

4    A.   I still say that.

5              MS. HOLLANDER:  I will pass the witness, Your Honor.

6              THE COURT:  Ms. Cadeddu?

7              MS. CADEDDU:  I have no further questions, Your

8    Honor.

9              THE COURT:  And Ms. Moreno?

10             MS. MORENO:  No further questions, Your Honor.

11             MS. SHAPIRO:  Nothing further, Your Honor.

12             THE COURT:  Members of the jury, let's go ahead and

13   take the morning recess at this time.

14        Let me ask you to step back into the jury room.

15             (Whereupon, the jury left the courtroom.)

16             THE COURT:  All right.  Are you prepared to rest?

17        Why don't we take a short break, about 15 minutes, and we

18   will come back in.  I assume you are going to have some

19   motions.  I will hear briefly, I don't want to hear a lot, but

20   I will certainly hear your motions so you can get it on the

21   record.

22             MS. HOLLANDER:  Your Honor, if you have a minute, I

23   have the funding issue if you want to do that now.

24             THE COURT:  We can.

25        And we will be in recess.  Be back in 15 minutes,

1    counsel, and I will hear your motions.

2         And then you will be prepared to proceed then?

3              MS. MORENO:  Yes, Your Honor.  He is outside.

4              THE COURT:  All right.

5                        (Brief recess.)

6              THE COURT:  Let me ask counsel to come up here a

7    minute.

8              (The following was had at the bench.)

9              THE COURT:  It is just a scheduling thing.  Does Avi

10   have like a flight scheduled that he is trying to meet?

11             MR. JACKS:  I am not sure.

12             THE COURT:  We may need to have him testify outside

13   the presence of the jury to make a record.

14        But what I want to do is take your motions and rule on

15   those and then bring the jury in and start the witness, and

16   once we excuse the jury we can do that.

17             MR. JONAS:  We will send an agent down.

18             THE COURT:  Find out and make sure that is not a

19   problem, and we can do that.

20        I would rather do it after the jury leaves, but I don't

21   want to miss something if he has something.  So we will see

22   what they say.

23             (The following was had in open court.)

24             THE COURT:  Who is ready to go on the motions?

25        Mr. Westfall?  We will hear from you.

1          MR. WESTFALL:  Very well.

2      Your Honor, on behalf of Abdulrahman Odeh, we move for an

3  instructed verdict of acquittal of not guilty as to all issues

4  in the indictment as they appear to Abdul Odeh.  In

5  particular, there is legally insufficient evidence and

6  factually insufficient evidence to show that he was a part of

7  either any of the three conspiracies that he is charged with.

8          THE COURT:  Okay.  Thank you.

9      Who wants to go next?

10          MS. HOLLANDER:  On behalf of Shukri Abu Baker we

11  move for a judgment of acquittal on all counts.

12          THE COURT:  Thank you.

13      Mr. Dratel?

14          MR. DRATEL:  Your Honor, on behalf of Mohammad

15  El-Mezain I move for a judgment of acquittal on the one count

16  charged against Mr. El-Mezain as to all elements.

17      And I will just add briefly that the Government has not

18  presented any evidence with respect to the applicable time

19  frame for Mr. El-Mezain, certainly not sufficient evidence

20  with respect to any of the elements between October 8th, 1997

21  and December 4th, 2001 or thereafter, and that they are

22  estopped from relying on the prior evidence by collateral

23  estoppel because the jury previously has already found he was

24  not a co-conspirator from the 1995 period through the 1997

25  period by acquitting him of the other conspiracy and all of

1    the substantive counts.

2              THE COURT:  Okay.  Thank you.

3         Ms. Moreno?

4              MS. MORENO:  On behalf of Ghassan Elashi, I move for

5    a judgment of acquittal as to all counts and as to all

6    elements.

7              MR. DRATEL:  And also double jeopardy.

8              THE COURT:  Yes.

9         Ms. Cadeddu?

10             MS. CADEDDU:  On behalf of Mr. Abdulqader, I move

11   for judgment of acquittal pursuant to Rule 29, as well as

12   double jeopardy for dismissal on that motion.

13        And with regard specifically to the issue of whether Mr.

14   Abdulqader was a member of the conspiracy, the Government has

15   adduced no evidence of any participation in any of the

16   conspiracies charged.  He was a singer is the evidence and he

17   was a volunteer fundraiser, and that is insufficient to carry

18   the Government's burden.

19             MS. MORENO:  Your Honor, I need to supplement my

20   motion for dismissal with respect -- I would also assert the

21   grounds of double jeopardy on behalf of Mr. Elashi.

22             MR. WESTFALL:  Your Honor, I think I said all

23   issues.  I meant to say all elements, all counts, all elements

24   that Abdul Odeh is charged with, there is legally insufficient

25   evidence.

1          MS. HOLLANDER:  I suppose I should add that we make

2     our motion on the basis of denial of the protections against

3     double jeopardy.

4          THE COURT:  And those motions will be denied.  I

5     believe there is sufficient evidence as to each of the

6     Defendants to submit the case to the jury.

7          We will let you rest, then, in the presence of the jury.

8          Did you fiend out about scheduling?

9          MR. JONAS:  My understanding is he is not going

10    anywhere.

11         THE COURT:  Okay.

12         MS. DUNCAN:  Your Honor, we actually had two other

13    motions to make at the close of the Government's case.

14         We just filed on ECF a motion to strike all the purported

15    co-conspirator statements in this case thus far.  I am not

16    going to repeat it.  It is in our motion, and we direct the

17    Court to that.  But basically it is that the Government has

18    failed to meet its burden of proving each statement the

19    Government provisionally introduced under the co-conspirator

20    exception that, A, a conspiracy existed; b, that the declarant

21    and the person, these Defendants here, were members of that

22    conspiracy during the relevant time period; and third, that

23    the statements were made in furtherance of that conspiracy.

24         MR. DRATEL:  And Your Honor, what is not in the

25    written is with respect to Mr. El-Mezain specifically that the

1    Government is precluded by collateral estoppel from using

2    those, because the jury has -- a jury has already found that

3    he was not a conspirator, part of any conspiracy between 1995

4    and 1997.  And that would also preclude the joint venture

5    issue pre-'95, because essentially the jury found that as well

6    in acquitting him of the other counts.

7              THE COURT:  All right.  And did you say there was

8    another motion?

9              MS. DUNCAN:  Just the last motion, Your Honor, was a

10   motion for mistrial based on the accumulation of the

11   prejudicial evidence or the evidence that we have objected to

12   and sought a mistrial before in this case.

13             THE COURT:  And just generally, and we will address

14   it more specifically, the issue with the co-conspirator

15   statements, that is denied.  I think the Government has

16   established a conspiracy, and they have established some

17   evidence that each of these Defendants was a member of that

18   conspiracy.  And we will address that more specifically at

19   some point between now and the jury charge in terms of what is

20   going to the jury.  But generally the Government has

21   established some evidence, presented some evidence to

22   establish a conspiracy.

23        And then the second motion?

24             MS. DUNCAN:  A motion for mistrial based on the

25   effect of all the issues we have asked for a mistrial before.

1              THE COURT:  That is denied as well.

2        Mr. Westfall?

3              MR. WESTFALL:  Your Honor, I need to join in the

4    motions for dismissal on double jeopardy and collateral

5    estoppel grounds on behalf of Abdul Odeh.

6              THE COURT:  You have that, and that is denied on the

7    same basis as others.

8        Ms. Moreno, is this your witness coming up?

9              MS. MORENO:  Yes, Your Honor.  He is here waiting

10   outside.

11             MS. HOLLANDER:  Your Honor, can the Marshals somehow

12   tell people they can come back?

13             THE COURT:  They can, and then they will have to

14   leave when we get Mr. Avi again.

15             MS. HOLLANDER:  Right.

16             THE COURT:  Or if somebody is down there that can

17   tell them that.  I am not going to stop proceedings for that.

18        Bring the jury in and bring your witness in.

19             (Whereupon, the jury entered the courtroom.)

20             THE COURT:  Mr. Jacks or Mr. Jonas?

21             MR. JACKS:  Your Honor, at this time, ladies and

22   gentlemen of the jury, the Government would rest its case in

23   chief.

24             THE COURT:  Okay.  And Ms. Moreno, you are ready to

25   call your witness?

1          MS. MORENO:  Yes, Your Honor.  Thank you.

2          THE COURT:  Members of the jury, the Government has

3     finished its case, so now you will be hearing evidence from

4     the Defense, and they are able to present their case.

5          MS. MORENO:  Your Honor, the Defense calls Mr. John

6     Bryant to the stand.

7          (Whereupon, the oath was administered by the Clerk.)

8                         JOHN BRYANT,

9     Testified on direct examination by Ms. Morano as follows:

10    Q.    Good morning, sir.

11    A.    Good morning.

12    Q.    Could you state your name for the record, please?

13    A.    John W. Bryant.

14    Q.    Mr. Bryant, where do you live?

15    A.    Dallas.

16    Q.    And how long have you lived in Dallas?

17    A.    Since 1965.

18    Q.    And Mr. Bryant, what do you do for a living?

19    A.    I am a lawyer.

20    Q.    And how long have you been a lawyer, sir?

21    A.    Since 1972.

22    Q.    Where did you go to law school?

23    A.    Southern Methodist University.

24    Q.    And is that Southern Methodist University here in Dallas?

25    A.    Yes.

1   Q.   Okay.  Now, in addition to being a lawyer, during your

2   life you have been in government service.  Is that correct?

3   A.   That is correct.

4   Q.   Okay.  And have you held elected office?

5   A.   Yes, I have.

6   Q.   Mr. Bryant, what was the first elected office you held?

7   A.   I was a member of the Texas House of Representatives for

8   five terms.

9   Q.   And five terms, how many years would that be, sir?

10   A.   In my case it was nine years.  My first term was a

11   partial term.

12   Q.   Other than the Texas legislature, have you held office?

13   A.   Yes.  I was a member of the U.S. Congress representing

14   Dallas.

15   Q.   And can you tell the jury what period of time you

16   represented Dallas in the United States Congress?

17   A.   From January of 1983 until January of 1997.

18   Q.   And have you held any presidential appointments, sir?

19   A.   Yes.  I was in charge of our government's

20   telecommunications treaty negotiations at the International

21   Telecommunications Union in Geneva in 1997.

22   Q.   Now, I know you don't go by ambassador, but did you

23   actually hold that rank at one period?

24   A.   Yes.

25   Q.   And did you have a security clearance in connection with

1    that?

2    A.    Yes, I did.

3    Q.    And what kind of a clearance was that, sir?

4    A.    Top secret.

5    Q.    And you are not going to be talking about any classified

6    information today here.  Is that correct?

7    A.    No, I am not.

8    Q.    Now, what did you do after you left Congress?

9    A.    Well, I did the job assigned to me in Geneva, and then

10   after that I returned to Dallas.

11   Q.    And what year was that?

12   A.    I returned to Dallas in 1998.

13   Q.    And did you pick up your law practice then?

14   A.    Yes, I did.  If I might clarify, I actually returned to

15   Dallas in late 1997.

16   Q.    Okay.  All right.  And so from 1997 currently you are

17   maintaining a law practice.  Is that correct?

18   A.    That is correct.

19   Q.    Now, at some point in time did the Holy Land Foundation

20   retain you?

21   A.    Yes, they did.

22   Q.    And do you recall when that was?

23   A.    Late 1997.

24   Q.    After Holy Land came to employ you, did you set up any

25   meetings with government officials?

1    A.    Yes, I did.

2    Q.    Now, let me ask you before we discuss those meetings, was

3    there anything going on publicly in the public realm that made

4    you think it was a good idea to set up those meetings?

5    A.    Yes.

6    Q.    And what was that?

7    A.    Well, for several years prior to the time that I was

8    retained, there had been periodic news reports that included

9    assertions that somehow the Holy Land Foundation was involved

10   in providing assistance to organizations overseas to whom it

11   would be illegal to provide assistance, and assertions that

12   they were under some kind of an investigation.  These were

13   unattributed reports, and so I began to set up meetings in

14   order to find the source of these reports and see if we could

15   address the concerns, if there were really any concerns.  And

16   if there were not any concerns, we could dispel of those

17   rumors and hopefully put an end to these reports.

18   Q.    Let's talk a little bit about those meetings that you had

19   with government entities.  First of all, did you meet with any

20   foreign governments?

21   A.    Yes, I did.

22   Q.    Who was that?

23   A.    I met with the Charge (French, phonetically Sharje),

24   which is a fancy word for the number two man in charge of the

25   Israeli embassy.

```
 1    Q.    And do you remember what year that would have been, sir?

 2    A.    That would have been in 1998.

 3    Q.    Okay.  And where was that meeting held?

 4    A.    At the Israeli embassy in Washington.

 5    Q.    Washington, D.C.?

 6    A.    Yes.

 7    Q.    And how is it that you set up that particular meeting?

 8    A.    I called and requested the meeting.

 9    Q.    All right.  So you requested it on behalf of the Holy

10    Land Foundation?

11    A.    Yes.

12    Q.    So do you remember the gentleman's name who you met with?

13    A.    Yes.  It was Mr. Ben-David.

14    Q.    Okay.

15    A.    Ben-David is his last name.

16    Q.    Okay.  Now, you met with him at the Israeli embassy in

17    Washington, D.C.  Correct?

18    A.    Yes.

19    Q.    And was there anyone else with you at this meeting with

20    Mr. Ben-David?

21    A.    No.

22    Q.    Now, when you met with Mr. Ben-David at the Israeli

23    embassy, did you ask him for any guidance?

24    A.    Yes.  I observed to him that these reports had repeatedly

25    surfaced in the newspaper, and that the Holy Land Foundation
```

1   was providing significant financial relief to Palestinian

2   refugees and other Palestinian people who were in need of

3   relief, and if indeed the government of Israel had concerns

4   about the way in which they were providing that relief, if he

5   would simply give me guidelines I would convey those to the

6   Foundation and they would operate within those guidelines so

7   that the government of Israel would not have any concern about

8   the way this was being carried out.

9   Q.   Now, how did Mr. Ben-David respond to this request for

10  guidance?

11  A.   Positively.  He viewed it as a helpful suggestion and

12  said that he would get back to me.

13  Q.   Did Mr. Ben-David ever get back to you?

14  A.   No, he did not.

15  Q.   Did you get back to him?

16  A.   Yes.  I contacted him and I was informed that he had been

17  told by his own government that he was not to talk to the Holy

18  Land Foundation anymore.

19  Q.   What was the next governmental meeting that you had that

20  year, if you recall?

21  A.   Well, I don't recall the exact order in which these

22  meetings took place, but we also met with the Federal Bureau

23  of Investigation on three occasions.

24  Q.   Okay.  Let's take those in order.  Where were the

25  meetings with the Federal Bureau of Investigation held, sir?

1    A.    Two of the meetings were held here in Dallas at the

2    offices of the FBI.

3    Q.    And where was the third meeting held?

4    A.    The third meeting was held in Washington, D.C.  It was a

5    meeting with Stephen Jennings who was at that time the number

6    two man in the Counterterrorism Division of the FBI.

7    Q.    Now, the meeting in Washington, D.C., who -- Besides

8    Mr. Jennings, who else was at that meeting?

9    A.    Only me and him.

10   Q.    All right.  And now these meetings with the FBI, what

11   years did they take place, if you recall?

12   A.    I believe all these meetings took place in 1998 and 1999.

13   Q.    Okay.  Now, you said you had two meetings in Dallas.

14   Correct?

15   A.    Yes.

16   Q.    And who did you meet in Dallas at the FBI headquarters?

17   A.    The first meeting was with the agent in charge of the

18   Dallas office Mr. Danny Defenbaugh and other agents and

19   members of his staff whose names I can't recall.  That was the

20   first meeting.

21   Q.    And do you remember what year that might have been?

22   A.    I believe that was in 1998.

23   Q.    Now, were you alone in that meeting or were you

24   accompanied by anyone?

25   A.    No, Shukri Abu Baker and Ghassan Elashi accompanied me.

1  Q.  To the meeting with Mr. Defenbaugh?

2  A.  Defenbaugh and his staff, yeah.

3  Q.  And what was the position of Mr. Defenbaugh with the FBI,

4  if you recall?

5  A.  He was the head of the Dallas office.

6  Q.  Now, the second meeting with the FBI was also in Dallas.

7  Correct?

8  A.  That is correct, yes.

9  Q.  And do you recall who was present at that particular

10  meeting?

11  A.  I believe at that meeting first Shukri Abu Baker and

12  Ghassan Elashi accompanied me to that meeting, and I believe

13  that the agent we met with was named Steven Garrett.  I

14  believe that is correct.  And I don't recall if -- He have

15  been accompanied by someone else.

16  Q.  But it was not with Mr. Defenbaugh?

17  A.  No, he wasn't present.

18  Q.  And what was your understanding of Mr. Garrett's position

19  with the FBI, if you know?

20  A.  I don't know.

21  Q.  Now, at each of those three meetings with the FBI, the

22  two in Dallas and the one in Washington, D.C., did you ask for

23  guidance on what the Holy Land Foundation should be doing

24  differently, if anything?

25  A.  Yes, I did.

1    Q.   And were you given any guidance?

2    A.   No, I was not.

3    Q.   At any of these meetings did anyone from the FBI tell you

4    that the Holy Land Foundation should not be doing business

5    with these zakat committees and charitable societies in the

6    West Bank and Gaza?

7    A.   They did not.

8    Q.   Now, after your meetings with the FBI, did you meet with

9    the State Department?

10   A.   Yes, I did.

11   Q.   And who did you meet with at the State Department?

12   A.   I met with Michael Sheehan who was the head of the

13   Counterterrorism Division of the State Department, and there

14   was someone else present that worked for him.

15   Q.   Do you recall what year that might have been, sir?

16   A.   I am not certain.  I assume that was probably in 1999,

17   possibly 2000.

18   Q.   And where would that meeting have taken place?

19   A.   In the State Department headquarters in Washington, D.C.

20   Q.   And was anyone from the Holy Land Foundation with you at

21   that particular meeting?

22   A.   No.

23   Q.   Was anyone from the State Department there other than the

24   head of the Counterterrorism Department?

25   A.   There was someone else in the meeting who I took to be

1    his assistant, but I don't know the name of the person.

2    Q.    Now, did you ask for guidance from the State Department?

3    A.    Yes, I did.

4    Q.    And did anyone from the State Department at that meeting

5    tell you that the Holy Land Foundation should not be doing

6    business with the zakat committees?

7    A.    No.

8    Q.    Did anyone from the State Department give you any sort of

9    guidance as to what the Holy Land Foundation should do

10   differently?

11   A.    No, they did not.

12   Q.    At any time during any meeting that you had with a

13   government official as counsel for the Holy Land Foundation,

14   Mr. Bryant, did anyone tell you that the Holy Land Foundation

15   should not be doing business with the zakat committees and the

16   charitable societies in Gaza and the West Bank?

17   A.    No.

18   Q.    And did anybody from the government at any time in any of

19   these meetings give you any sort of guidance as to what the

20   Holy Land Foundation should do differently?

21   A.    No, they didn't.

22   Q.    When did you stop representing the Holy Land Foundation?

23   A.    In March of 2001.

24   Q.    Let me ask you something, a couple of last questions.

25   Was there anyone in the United States government that you

1    sought a meeting with on behalf of the Holy Land Foundation

2    but you weren't able to get a meeting with?

3    A.    Yes.  I sought a meeting with Jim Reynolds who was the

4    head of the Criminal Division of the Justice Department,

5    unsuccessfully.  I didn't get that meeting.  And I asked for a

6    meeting with Secretary of State Madeleine Albright and

7    Attorney General Janet Reno, and I didn't get those meetings

8    either.

9    Q.    And you asked for these meetings all on behalf of the

10   Holy Land Foundation.  Is that correct?

11   A.    That is correct.

12   Q.    And finally Mr. Bryant, what is it you expected from the

13   United States government when you sought this guidance on

14   behalf of the Holy Land Foundation?

15   A.    I expected that they would explain what concerns, if any,

16   they had; and if they had concerns, give the Foundation

17   guidance about how it could continue to provide the financial

18   relief and assistance in the West Bank and Gaza to the

19   Palestinian refugees and the Palestinian population in such a

20   way that it did not cause any concern on the part of our

21   government, if indeed they had any concerns.

22   Q.    All right.  Thank you.

23          MS. MORENO:  Pass the witness, Your Honor.

24          THE COURT:  Any other questions from Defense

25   counsel?

1             MR. DRATEL:  No, Your Honor.

2             MS. HOLLANDER:  No, Your Honor.

3             MR. WESTFALL:  No, Your Honor.

4             MS. CADEDDU:  No, Your Honor.

5             THE COURT:  Mr. Jacks or Ms. Shapiro?

6             MS. SHAPIRO:  Thank you.

7                     CROSS EXAMINATION

8    By Ms. Shapiro:

9    Q.    Good morning, Mr. Bryant.

10   A.    Good morning.

11   Q.    My name is Elizabeth Shapiro.

12         Now, you mentioned in your direct there were news reports

13   that you had heard that had certain allegations about the Holy

14   Land Foundation sending money overseas.  Correct?

15   A.    Yes.

16   Q.    Okay.  And the organization that Holy Land was alleged to

17   be SENDING MONEY to was Hamas.  Isn't that right?

18   A.    In some reports, yes.

19   Q.    Okay.

20   A.    These were newspaper reports.

21   Q.    That is right.  And that is what prompted you to seek

22   these meetings.  Right?

23   A.    Correct.

24   Q.    Okay.

25   A.    Plus the assertion that they were under investigation,

1    which was something we had not seen any evidence of.

2    Q.   Okay.  And you are a lawyer.  Correct?

3    A.   Yes.

4    Q.   Okay.  And, in fact, as a lawyer you have done

5    investigations yourself.  Right?

6    A.   Well, of cases that I was handling, yes.

7    Q.   Sure.  And you understand, of course, that it is

8    important not to reveal the subjects of ongoing

9    investigations.  Right?

10   A.   Yes.

11   Q.   Okay.  And as a lawyer and as a lawyer for the Holy Land

12   Foundation, you have an ethical obligation to zealously

13   represent your client.  Isn't that right?

14   A.   Yes.  Ethically represent them, yes.

15   Q.   I am sorry?

16   A.   Ethically represent them.

17   Q.   Of course.  And we all have an obligation under the

18   ethical rules of being lawyers to zealously and ethically

19   represent your client.  Correct?

20   A.   Yes.

21   Q.   And as part of your representation of your client, you

22   would want to investigate some of the facts before you went to

23   these meetings, wouldn't you?

24   A.   Yes.

25   Q.   Okay.  And as part of your investigation, you probably

1    consulted with your client.  Correct?

2    A.    Well, I consulted with my client in the normal course of

3    being retained to represent my client.

4    Q.    Of course.  And --

5    A.    I didn't carry out an investigation of my own client.

6    Q.    I understand.  But you would have consulted with your

7    client.  It is natural to do that.  Correct?

8    A.    Yes.

9    Q.    And one of the people you would have consulted with is

10   Ghassan Elashi.  Isn't that right?

11   A.    Yes.

12   Q.    And another person you would have consulted with is

13   Shukri Abu Baker.

14   A.    That is correct.

15   Q.    Okay.  And when you went and met with the FBI, for

16   example, you would have tried to make a case for the Holy Land

17   Foundation, wouldn't you have?

18   A.    I explained to the FBI what the Holy Land Foundation

19   does, how it raises its money, and to whom it gives its money.

20   Q.    Right.  And did you tell the FBI when you met with them

21   that the Holy Land Foundation was part of the Palestine

22   Committee?

23   A.    That wasn't the truth, as far as I know.  I simply told

24   them this was a very large Muslim foundation, the largest in

25   the country, that is run by American citizens, and that

1   provides assistance overseas to the Palestinians and to other

2   Muslim groups that are in need of help in other parts of the

3   world.

4   Q.   Okay.  And when you talked to the FBI, you would have

5   told them that the Holy Land worked closely with an individual

6   named Ismail Elbarasse.  Is that right?

7   A.   I told the FBI just -- What I just told you I told them.

8            MS. MORENO:  Your Honor, may we approach?

9            THE COURT:  Yes.

10           (The following was had outside the hearing of the

11           jury.)

12           MS. MORENO:  Your Honor, Mr. Bryant's testimony as

13  counsel for the Holy Land Foundation was litigated in the

14  first trial before Judge Fish with respect to the

15  attorney/client privilege, and I am concerned that Ms. Shapiro

16  is getting into any sort of privileged communications.  This

17  was fully litigated before Judge Fish, and Judge Fish found

18  that Mr. Bryant has a privilege with the Holy Land Foundation

19  and he is only their counsel, and as such his communications

20  with the Foundation through principals, Mr. Elashi and Mr. Abu

21  Baker, are privileged, and I am concerned Ms. Shapiro is

22  getting into that.

23           MS. SHAPIRO:  Your Honor, one, I am not getting into

24  privilege.  What was discussed with Judge Fish in the last

25  trial was whether we could ask what Mr. Bryant discussed with

1    his clients, and I am not asking that.  I am purposefully

2    staying away.  I am asking whether he conveyed certain

3    information to the FBI.

4              MS. MORENO:  Which is based on --

5              MR. JONAS:  Your Honor, if I can interject, I

6    remember this very clearly because Mr. Bryant was my witness

7    in the last trial, and I remember specifically having a

8    conversation with Mr. Cline about the exact nature of the

9    questions Ms. Shapiro is asking this witness, because Mr.

10   Cline and I discussed this attorney/client issue extensively.

11   And Mr. Cline felt in his opinion that asking what this

12   witness told the FBI was completely proper and not

13   attorney/client privilege.

14             MS. MORENO:  That is not part of any --

15             THE COURT:  What he told the FBI is not privileged.

16   Obviously he is sharing that with somebody else, so what he

17   told them is not privileged.

18             MR. DRATEL:  She is asking other questions about --

19   She is asking what he told them, and that is not privileged,

20   but when she starts going into other things that gets into

21   privilege, she starts putting into her questions things about

22   whether he told --

23             THE COURT:  Not necessarily.  Are you saying that by

24   asking the question, that that is implying.

25             MR. DRATEL:  When you say in a predicate question

1    "Did you consult with your client, and did you then tell the

2    government X, Y, Z," that is coming from the client.

3              THE COURT:  Maybe not.  I don't know who all he

4    talked to in terms of before he went to talk to the FBI.

5              MR. JONAS:  Your Honor, even if the information that

6    is imparting to the FBI came from the client --

7              MS. SHAPIRO:  I understand what he tells the FBI.

8    That is not what they are complaining about.  That is not what

9    they are complaining about.  They understand that is not

10   privileged.  What they are saying is the way you are framing

11   your question is that the implication is that had to come from

12   the clients.  And when he says, "I didn't tell the FBI," you

13   are still eliciting information that had to come from the

14   clients that he didn't tell the FBI.  Do I have it right?

15             MS. MORENO:  That is exactly the point.

16             MR. JACKS:  I am still not understanding the

17   distinction.  If all she is asking is what he told the FBI --

18             THE COURT:  That is not what she is asking.  She is

19   framing it a little different.  She is not saying, "What did

20   you tell the FBI," and then getting that back.  You are asking

21   about, "Did you tell him about so and so and such and such."

22             MS. SHAPIRO:  All the things in evidence.

23             MS. DUNCAN:  But Your Honor, for example, with the

24   Elbarasse, the evidence is that this stuff was seized from

25   2004, and so we are talking about a time period that it

1    implies that the only source of information would be the

2    Defendants in this case, and that again is privileged.

3              MS. MORENO:  She said you consulted with Mr. Elashi,

4    you consulted with Mr. Abu Baker, now let's talk about what

5    you told the FBI.  The implication is clear.  It is privileged

6    communications, and it is not permissible, Your Honor.

7              THE COURT:  Everybody understands that.  The issue

8    is whether this is client information, whether this is going

9    there or not.

10             MR. JACKS:  What he told them --

11             THE COURT:  What he told them, That is also not --

12             MR. JACKS:  They waived the privilege.

13             THE COURT:  I understand that.

14             MS. MORENO:  He hasn't waived the privilege to the

15   charity.

16             THE COURT:  No.  He waived the privilege to what he

17   told the FBI.

18             MS. MORENO:  There is no privilege.

19             THE COURT:  That is what he is saying.

20             MR. JONAS:  The implication here is that he was

21   fully honest with the FBI.  Maybe in his mind he was, but I

22   think the evidence shows there is a lot more to this picture

23   that wasn't told to the FBI, so I think Ms. Shapiro is

24   entitled to point out that there is more going on and he

25   didn't know it.

1          MR. DRATEL:  That is the privilege.

2          MR. JONAS:  That is why she is not asking --

3          THE COURT:  One at a time.  We are on the record,

4    counsel.

5          MR. JONAS:  That is why she is saying, "Did you tell

6    the FBI this?"  "Did you tell the FBI that?"  And leaving it

7    alone.

8          MS. SHAPIRO:  There is also a sword and a shield

9    issue.  I mean, they are using it as a sword to try to make a

10   certain implication, and we have to be permitted to have the

11   opposite implication.

12         MR. DRATEL:  Your Honor, I think what is proper is

13   for the Government to elicit what Mr. Bryant told the FBI, and

14   then they are free to argue --

15         THE COURT:  You can just establish that was

16   everything he told the FBI, and then he tells you, and then

17   that included everything else.

18         MS. SHAPIRO:  Can I ask him what he based that on?

19         MS. MORENO:  No.

20         MS. SHAPIRO:  Because I thought he said he did his

21   own inquiry.

22         THE COURT:  You can ask him that.  But they are

23   correct.  The way you are framing it leading up to this, you

24   asked if he talked to the two Defendants and then he goes and

25   talks to the FBI.  So the way you left it, it certainly is a

1    clear implication this is where this information came from.

2            MS. SHAPIRO:  Okay.

3            MR. JACKS:  I am not sure how if they didn't --

4            THE COURT:  If they didn't tell him.

5            MR. JACKS:  How it can be privileged.

6            THE COURT:  What they didn't tell him.

7            MR. DRATEL:  The full range of what -- I mean, that

8    is still privileged.  What somebody didn't tell you, it is all

9    within the confines of the privileged communication.

10           THE COURT:  But that is not communications if they

11   didn't tell him.  That is their point.

12           MR. DRATEL:  It gets into the communications if they

13   are asking about communications.

14           THE COURT:  If he didn't make any communications --

15   communications is what is communicated.  Right?  Back and

16   forth.  Back and forth between the lawyer or what the client

17   told the lawyer, that is communication.  But if they didn't

18   tell him anything, why is that --

19           MR. DRATEL:  His answer is privileged as to what is

20   said or not.  That is what is privileged.

21           MS. HOLLANDER:  The problem is they can ask him,

22   "What did he tell the FBI?"

23           THE COURT:  Do you have any case law on this.  I am

24   not sure that what he didn't tell him --

25           MR. DRATEL:  His answer is privileged.  "What did

1  your client tell you?"

2          THE COURT:  No, it is not.  If they didn't tell you

3  then it isn't communication.

4          MS. HOLLANDER:  It is if you follow it to its

5  logical conclusion.

6      "Your client didn't tell you this, did he?"

7      "No, he didn't."

8      That gets into what their privileged conversations were.

9          MS. SHAPIRO:  I mean, personally I think I made the

10  point.  I don't need to go on.

11          THE COURT:  I think that is the safe thing to do,

12  because I don't know the answer, frankly.

13          MS. SHAPIRO:  He said what he told the FBI.

14          THE COURT:  If you established that, that is the

15  safe thing to do.  All right.

16          (The following was had in the presence and hearing

17          of the jury.)

18  Q.  (BY MS. SHAPIRO)  Okay.  Back again.  Before we broke for

19  that conference, I was asking you about the kinds of things

20  that you conveyed to the FBI.  Earlier you told me what it was

21  that you said to the FBI.  Is that everything that you said to

22  the FBI that you can remember?

23  A.  Well, I told them that the Holy Land Foundation raised

24  money from a large number of contributors, and sent that money

25  to assist -- provide financial relief for Palestinians, among

1    other groups.  They also gave relief around the world to many

2    other places as well.  And I also observed that if indeed they

3    were under investigation, that they already knew where the

4    money came from and where the money went because bank

5    transactions are widely -- are transparent to investigating

6    agencies, so they knew that.

7    Q.    Okay.  And that is what you told the FBI, what you just

8    described.  That is everything you told the FBI.  Right?

9    There was no more specific information that you conveyed to

10   the FBI during that meeting.  Is that your memory?

11   A.    Except that we were anxious to be given guidance.

12   Remember, we had only seen news reports.  We wanted to know if

13   there was an investigation.  And if they couldn't confirm

14   that, could they simply provide guidance, because the Holy

15   Land Foundation was giving its relief funds to charitable

16   organizations that had existed for a very long time.  That was

17   all they were doing.  And if there is anything wrong with

18   that, we would certainly like to know about it.

19   Q.    I understand that, and I am focusing specifically on the

20   factual information that you conveyed to the FBI.  I just want

21   to be clear that what you are telling us now, that that is the

22   factual information that you conveyed to the FBI.

23   A.    Yes.

24   Q.    And that is your understanding of the situation.

25   Correct?

```
1    A.    Yes.

2    Q.    Thank you.

3              MS. SHAPIRO:  I have no further questions.

4              THE COURT:  Ms. Moreno?

5              MS. MORENO:  May I have just a moment?

6              THE COURT:  Sure.

7              MS. MORENO:  Thank you so much, Mr. Bryant.

8         We pass the witness, Your Honor.

9              THE COURT:  Mr. Bryant, you are free to go.  Thank

10   you.

11        Members of the jury, we are going to go ahead and recess

12   here.  This is the last witness the Defense has for today.

13   They have an expert coming on Monday from out of state, so we

14   will recess for the day.

15        Please recall the instructions we have been over about

16   not discussing the case with anyone, and we will start back

17   Monday at 9:00.

18              (Whereupon, the jury left the courtroom.)

19              THE COURT:  Ms. Hollander, are you ready to go into

20   the meeting?

21              MS. HOLLANDER:  I will be ready.

22              MS. SHAPIRO:  Is it okay for me to talk to him at

23   this juncture?  I assume it is.  I just want him to understand

24   why he is coming back.

25              THE COURT:  Just tell him he is going to be asked a
```

1    few questions outside the presence of the jury about records

2    that he relied on for his testimony.

3         And we are going to need to clear the courtroom again.

4              MS. CADEDDU:  Your Honor, I just want to make sure

5    the record is clear.  We have made our motions before the

6    Government rested.  They were outside the presence of the

7    jury.  And I have waived too much error in the Fifth Circuit

8    not to raise that again on behalf of all Defendants to all

9    counts, all the motions we made just before the Government

10   rested just to --

11             THE COURT:  You are renewing them?

12             MS. CADEDDU:  Just in case it matters.

13             THE COURT:  And those are denied.  Same ruling.

14        Mr. Avi, have a seat there.  Sorry to bring you back.  We

15   just have a few questions on an issue that we need to take up.

16        You are still under that seam oath you took when you

17   first started testifying.

18        Ms. Hollander?

19             MS. HOLLANDER:  Thank you, Your Honor.

20   Q.   (BY MS. HOLLANDER)  These are some questions that have to

21   do with some discovery in this case, which is why the jury is

22   not here.  And I need to make sure I understand what you were

23   saying.  Okay?

24        You said -- You were talking about documents involving

25   elections of the committees.  Okay?  And what you said earlier

1    was, and I am just going to quote this just so we have it in

2    the record what you said that the court reporter has just

3    copied for us.  "I will lead you to the paper that I gave the

4    Government and they gave to you, I assume, because you

5    presented it to me.  This is the inspection that was done in

6    1992 by the Civil Administration with all the names of the

7    people that were there.  Also in the binders that I gave to

8    the Prosecution, there were several documents that exposed the

9    election of all board members.  You have this in your

10   possession."

11        He took that down correctly, did he not?

12   A.   Correct.

13   Q.   And then I believe it was -- Ms. Moreno asked you, "So

14   you have it in my possession?"

15        And your answer was, "No, I am relying on these

16   documents.  So what I want to be --"

17        And then she said, "All right.  You are relying on those

18   documents that you say is in this summary, and you said there

19   are more documents."

20        "I am just giving you little examples.  This are more

21   than that."

22        And so that is what you said.  Correct?

23             MS. SHAPIRO:  Can you make sure we have a yes or no

24   for to record?

25   Q.   (BY MS. HOLLANDER)  I am going to ask you some questions,

1    and I just want to make sure Mr. McRoberts got that correct.

2    A.   As far as I remember, that is what I said.

3    Q.   Okay.  Now, here are my questions.  The documents that

4    you relied on were documents that were seized during Operation

5    Defensive Shield and subsequent seizures.  Is that correct?

6    A.   Correct.

7    Q.   That is what you are talking about?

8    A.   No, not only.

9    Q.   Right.  But for the documents.  You are also talking

10   about additional documents, like prosecution documents.

11   Correct?

12   A.   Also.

13   Q.   Okay.  And it is your understanding that those were

14   turned over to the Defense, too?

15        You don't know what was turned over to the Defense.  Let

16   me ask you this.  Those were turned over to the Prosecution?

17   A.   No, no, it is not the answer to the question.  Just a

18   second.  I just want to explain.  I mentioned, for example,

19   documents related to an election held in the Islamic Society

20   in Hebron, election from April 2000.  These were, for example,

21   were documents that was in binders that I gave to the

22   Government a few years ago.  Okay?  This is one example.

23   Q.   Okay.  Now, let me ask you --

24   A.   Another example.

25   Q.   Let me ask you about that for a minute.

1    A.    Okay.

2    Q.    This was one document or a series of documents?

3    A.    This was a series of documents.  You are talking about

4    the specific documents?

5    Q.    That election in 2000.

6    A.    This was a series of documents that -- actually letters

7    that were sent to several foundations overseas informing what

8    were the results, what are the new board, what is the new

9    board of the Islamic Charitable Society.

10   Q.    Now, were those documents that were seized from the

11   Islamic Charitable Society during one of the seizures?

12   A.    Correct.

13   Q.    And were -- You said they were sent to foundations

14   overseas.  Were these the organizations that you have

15   mentioned here today?

16   A.    No.  I said that the letters were sent because there --

17   Q.    You don't know for sure?

18   A.    No, of course.  The recipient was one of the foundations.

19   I don't know for sure if it was sent.

20   Q.    This is not a trick.  We are just trying to get

21   information here.  Okay?

22   A.    Okay.

23   Q.    The foundations they were sent to, were those the places

24   you mentioned, like al-Aqsa and Interpal, or were they other

25   places?

```
1    A.    They were other places.  I mean, if I remember correct,
2    this was al-Aqsa in Netherlands, al-Aqsa in Belgium, al-Aqsa
3    in Germany, Interpal, maybe, and I am not sure, a foundation
4    in Austria.
5    Q.    Okay.
6    A.    Okay.
7    Q.    And these letters stated who all the committee members
8    were or all the board members as a result of an election?  Do
9    you remember that?
10   A.    I don't remember what was said there.  And if you want
11   me, I can bring my book and maybe I have it there.  I am not
12   sure.
13   Q.    You may have summarized it in your report.  Is that what
14   you are talking about?
15   A.    I summarized -- I don't think I summarized this
16   special -- I used them, of course.  I was relying on them.
17   But it is not brought as a list.  Okay?  So it was in the
18   binders.  And if I can ask to show me the binder, I will show
19   you, Al-Janadi Chairman, Sam Salab, vice chairman.  And the
20   same letters, by the, way was published also in the
21   newspapers.
22   Q.    Okay.  Now, you had that for the Islamic Charitable
23   Society for Hebron in 2000.  But am I correct that you don't
24   have this information for all of the zakat committees and all
25   of their elections?  Is that correct?
```

1    A.    It is correct that not all the zakat committees, but I

2    mentioned where I have it.  And I mentioned also Tulkarem, for

3    example, and for Jenin, that I have the results of the new

4    board.  Why?  Because there were inspections there in these

5    places.

6         Now, during this inspection, the Civil Administration

7    interviewed the chairman of these committees and also the head

8    of the waqh was accompanied to this inspection, and they said

9    who are the board members.

10        Now, in Tulkarem for example it was just after the

11   election, and it was not -- It was I think maybe Al-Jallal

12   Jatawi or Al-Bilal Khamis who gave the names.  It is written

13   in a document that is not in front of me.

14        Now, you are correct, I don't have all of the results of

15   the election; for example, Bethlehem I don't have.

16   Q.    Okay.  When you went through the documents to provide

17   them to the Prosecution, you chose which documents -- Did you

18   personally choose which documents to give to the Prosecution?

19   A.    No.  I took all the inspections that were carried out,

20   that were conducted at this time, I took all the documents of

21   the Civil Administration conducted between -- before the

22   Palestinian Authority took control and just handed them to the

23   Prosecution.  This is the binder written in Hebrew with a

24   sign --

25   Q.    Right.  We have that document.  And I think Mr. Dratel

1    will ask you some questions about it because he has reviewed

2    that document.  My question goes to the other documents you

3    have reviewed and that you have relied on.

4         Am I correct that there are documents that were seized?

5    There were thousands and thousands of pages seized.  Correct?

6    A.    From?

7    Q.    From these zakat committees during the Operation

8    Defensive Shield and then in 2003 and 2004.

9    A.    Overall there were thousands of documents, but not

10   necessarily from thousands of documents from also other

11   committees that are not part of this indictment.

12   Q.    Right.

13   A.    Okay.

14   Q.    Limiting it to the committees that are part of this

15   indictment --

16   A.    Okay.

17   Q.    -- do the 21 binders include every piece of paper having

18   to do with the--and this is a series of questions--with the

19   committee members, board members, functions, and where they

20   get their money from, all of the committees in this

21   indictment.  Do you understand?

22   A.    I understand.  The answer is I picked -- I was picking

23   those folders who included the projects, board members, and

24   support from the outside.  For example, students, low grade

25   students I didn't take, because there were several folders of

1    grades in school, I mean, that I didn't take.  Also there were

2    receipts from all kinds of like Pal Tel, the Palestinian

3    communication, paying bills.  I didn't take them.  It was not

4    of my interest.  So I cannot say that I took everything.  I

5    took what I thought is connecting to, first of all, projects,

6    who are the members, who are -- what is the network that they

7    are talking about and the outside network.  But I didn't take

8    every document.

9    Q.   And you made choices along the way of the documents you

10   thought were important.  Correct?  You made the choices of

11   which ones to give the Prosecution and which ones not to give?

12   A.   Not exactly.  These folders that I just mentioned that I

13   did take that dealt with the network, I gave it in the

14   binders.

15   Q.   Right.  All I am asking -- This is not a trick.  Are you

16   the person who went through all the documents and decided what

17   to give to the Prosecutors?  Was that you or someone else?

18   A.   No, it was me.  But it is not kind of a decision that I

19   have -- For example, I have many boxes of documents, let's

20   say, and what I did with the Prosecution, in 2005 they came

21   and just copied everything, just gave it as it is, what I had,

22   what I choose.

23   Q.   What you had chosen.  That is all I am asking.

24   A.   Okay.

25   Q.   That is all.

1   A.   The subjects that I choose, not the specific documents.

2   For example, I didn't take -- I think it is important to

3   explain it.  If there was -- They had, for example, they, I

4   mean the committees, had folders dealing with foreign

5   relations.  Okay?  Correspondence with other -- This was the

6   subject.  I didn't pick documents from these folders.  I just

7   took the folder as it is and copied it, and that is what I

8   gave to the Prosecution.

9   Q.   Okay.  I think you have answered my question.

10  A.   Okay.

11  Q.   You were the one who made the decisions about what to

12  give them.  That is all I was asking.  Correct?  Is that

13  correct?

14  A.   The answer I gave, this is what is correct, yes.

15        MS. HOLLANDER:  Do you have some more questions?

16  Can he ask some more, because he has read some different

17  documents, Your Honor?

18        THE COURT:  Yes.

19  Q.   (BY MR. DRATEL)  It is still good morning.  Just to

20  clarify the documents that we are talking about --

21        MR. DRATEL:  May I approach, Your Honor?

22        THE COURT:  Yes.

23  Q.   (BY MR. DRATEL)  And I think you might have kept the

24  Hebrew from yesterday.  I don't know that I took back the

25  Hebrew from you of these documents.  Right?  Just take a

1    look --  Assuming that this is correct --

2    A.   Okay.

3    Q.   I just want -- That is the inspections you are talking

4    about.  Right?  From '92 to '93.  Right?

5    A.   Okay.  I didn't review the translation, but obviously --

6    Q.   I think it is an FBI translation, I was told yesterday by

7    Ms. Shapiro.  It is what we are stuck with.  But we have the

8    Hebrew, and we can print it out and make it part of the

9    record.

10            MR. DRATEL:  What I want to do is perhaps designate

11   this as Court Exhibit Avi No. 1, and the Hebrew will be Avi

12   1-H?

13            THE COURT:  Okay.

14   Q.   (BY MR. DRATEL)  Those are the inspections.  We got it on

15   a disk from the Government.  The Government can make sure it

16   is complete and it is what they gave us.  But those are the

17   documents.  I am not going to take the time to do it.  This is

18   really a legal matter as to what is in there or not in there.

19   I just want to make sure that we know what documents we are

20   talking about.

21   A.   I am relying on the Hebrew version.

22   Q.   I understand.

23   A.   This is the original.

24   Q.   Okay.  And this is what you call your summary.  Right?

25   A.   Correct.

1    Q.    And this is dated October 13th, 2008?

2    A.    Correct.

3    Q.    If you want to look.  Right?

4    A.    Correct.

5    Q.    And this is the summary.  But this doesn't have any

6    primary documents in it.  It is just your work quoting and

7    citing and charts at the end of people.  Right?

8    A.    I am not sure.

9    Q.    It doesn't have an appendix of actual documents.  This is

10   all something that you have prepared.  You quote from

11   documents, you cite documents, but it doesn't have any stuff

12   from the zakat committees themselves in terms of --

13   A.    Not true.

14   Q.    You have little pictures.  Right?  But you don't have the

15   documents.

16   A.    No, I have.  And if talking about the proceeding that was

17   taken last year, I gave the documents.

18   Q.    What I am saying is you have -- For example, we are going

19   to look at page 240.  You have like a little photostat of the

20   document in there?

21   A.    Correct.  This document was attached last year in the

22   same book.

23   Q.    Again, this is not a trick.

24   A.    I know.

25   Q.    It is just to determine what is in here.

1    A.    I think we both know that -- Just a second.

2    Q.    No, no, no.  I understand where you are going, and I will

3    be happy to assist.

4            THE COURT:  Let him finish.  I think he is still

5    trying to finish.  Was there something you wanted to say?

6            THE WITNESS:  Before the trial the Prosecution asked

7    me -- Before this trial and the last trial, I think I can

8    mention it now.

9            THE COURT:  Yes.

10           THE WITNESS:  The Prosecution asked me every

11   document that I am relying on.  Okay?  So they say this is

12   called *Jencks*, a word that I think we have a similar -- And I

13   gave these binders and additional material to the Prosecution

14   already last year.  And he showed me a document, for example,

15   that I handed over.  I just gave it to the Prosecution as

16   *Jencks*.  But many of them were also already included in the

17   binders, in the 19 binders.  Okay?

18   Q.    (BY MR. DRATEL)  I am not talking about the binders now.

19   A.    But if you look in the binders so I can find you the

20   document.  It may be there two or three or four times.  You

21   just have to compare it.

22   Q.    I just am asking you about this document.  I am not

23   saying that they are not somewhere else.  I am just asking you

24   about this document.

25   A.    Okay.

1          MR. DRATEL:  And I would like to designate this as

2    Avi No. 2, which is called "The charity branch of Hamas

3    organization structure.  Function and significance for Hamas."

4    And it said "reviewed by Avi, legal advisor.  ISACT Division."

5    Q.   (BY MR. DRATEL)  That is you.  Right?

6    A.   Correct.

7    Q.   And it is dated October 13th, 2008?

8          THE COURT:  This is what you were referring to as

9    the summary earlier?

10         MR. DRATEL:  Yes, the summary.

11         THE COURT:  All right.

12   Q.   (BY MR. DRATEL)  So just so we are clear, what we are

13   talking about, that is the summary, and the inspections are

14   the other document we talked about a few minutes ago.  Right?

15   A.   Correct.

16         MR. DRATEL:  That is all I have, Your Honor.  Thank

17   you.

18        And I will provide a copy to the Court of these so that

19   the record is complete.

20         THE COURT:  You want those to be made a part of the

21   record?

22         MR. DRATEL:  Yes, I do.

23         THE COURT:  Any other counsel?

24         MS. MORENO:  No questions, Your Honor.

25         MR. WESTFALL:  Your Honor, I may have one.

1          THE COURT:  Go ahead.

2          MR. WESTFALL:  Never mind.  I don't, Your Honor.

3          THE COURT:  Ms. Cadeddu?

4          MS. CADEDDU:  No, Your Honor.

5          THE COURT:  Any questions you want to ask?

6          MS. SHAPIRO:  I am trying to understand what the

7     issue is.  I am not sure.

8          THE COURT:  I think the issue is -- Do you want to

9     explain what the issue is?  You can probably do it better than

10    I can, since it is your issue.

11         MS. HOLLANDER:  The issue is very simply that there

12    are documents, a vast trove of documents --

13         THE COURT:  Let's leave out the editorials.  Let's

14    just get to the issues.

15         MS. HOLLANDER:  And this witness made the choices

16    about which ones to bring and which ones not to.  All I was

17    saying was there were a lot of them and we have some.

18         MR. DRATEL:  And Your Honor --

19         THE COURT:  Do you want to question about that?

20         MR. DRATEL:  Your Honor, just so we don't have

21    to -- My point in putting those documents in, when he refers

22    to the inspections that were done, there is nothing in there

23    -- there is one list of Tulkarem, there is no list of any

24    other --

25         THE COURT:  Well, we can get to that later.  I am

1    still --

2         MR. DRATEL:  I didn't want to waste time.

3         THE COURT:  For the issue we don't need to go there.

4    But I think you can tell from the cross obviously there is

5    some issue as to whether they have been provided everything,

6    and then another issue as to -- for some of the testimony that

7    he gave about the elections, that that is nowhere in the

8    documents, at least that they have been provided.

9         MS. SHAPIRO:  Okay.  Let me try.  I think about what

10   the Prosecution provided, that is something I think that

11   counsel -- that I am happy to make representations to.  I am

12   not sure --

13        THE COURT:  Right.  You can state what you provided,

14   but in terms of what was provided to you.

15        MS. SHAPIRO:  Let me take a crack at it.

16   Q.   (BY MS. SHAPIRO)  I think you mentioned that the

17   Prosecution asked you -- Let me start backward.  In 2005 did

18   you meet with the Prosecution team that is here today?

19   A.   Correct.

20   Q.   And did you provide us with approximately 8,000 pages of

21   material collected, between 19 and 21 binders depending on how

22   you count them?

23   A.   Correct.

24   Q.   They were in black loose-leaf binders?

25   A.   Correct.

1  Q.   Okay.  And it was represented to you by the Prosecution

2  team that we intended to turn all of that material over to the

3  Defense.  Correct?

4  A.   Correct.

5  Q.   In fact, we asked permission about whether the government

6  of Israel objected to the production of any of that material.

7  A.   Correct.

8  Q.   And that was material that was culled from Operation

9  Defensive Shield and subsequent operations.  Right?

10  A.   Correct.

11  Q.   And you didn't yourself make any determinations about

12  what was relevant to this case.  You simply provided

13  everything on subject matters that were found in the

14  committees that we were interested in.  Is that right?

15  A.   During my work, I concentrated on the charities, the

16  social branch of Hamas, and there are obviously subjects like

17  the administrative folders that are not part of my interest.

18  It doesn't matter to me who pays the electricity bills, the

19  phone bills, whatever.  I don't take them.  And it is true

20  that I didn't take those kinds of documents.

21      But when for my work it was important, and this criteria

22  that I was speaking, so when I was speaking of supporting

23  orphans or special segments -- By the way, not only special

24  segments.  There were in many these binders, there are many

25  documents that --

1    Q.   Here is the point I am getting at.

2    A.   And what I had, what I took is what I --

3    Q.   I understand.

4    A.   -- I handed over.

5    Q.   I understand.  Let me see if I can make you understand

6    this distinction.  When you collected the documents from

7    Operation Defensive Shield, you weren't selecting them for the

8    Prosecution.  In fact, you had them collected before you ever

9    met the Prosecution team here.  Is that right?

10   A.   Definitely.  You are definitely correct.

11   Q.   Okay.  So what you had is what you took out from all of

12   these documents for your own work in your own research.  Is

13   that right?

14   A.   That is absolutely right.

15   Q.   Okay.  And then when you were introduced to the

16   Prosecution team, you simply turned it all over to the

17   Prosecution.

18   A.   All I had I turned it over without any distinction

19   whether a specific document is helping to the Prosecution or

20   not helping to the Prosecution.  I just gave it everything I

21   had.  This consideration was not mine.  I just took it as it

22   is and say, "You look at this.  You choose what" -- I mean,

23   this is your decision what to use and what you want to.  It

24   was not my decision.  And when you decided to use a document

25   as evidence --

1    Q.   I understand.  And the Government didn't task you on its

2    behalf to go back to the original collection and search for

3    something specific.  Right?

4    A.   Absolutely not.  What I had is what I gave you.  And

5    after that when there was -- there were new binders that I got

6    filled with letters of the Holy Land Foundation, I gave it

7    over.  That is exactly without any --

8    Q.   Right.  I understand.

9    A.   No, but it should be written.

10   Q.   I think it is clear.

11          MS. SHAPIRO:  Just a moment, Your Honor.

12   Q.   (BY MS. SHAPIRO)  I am going to clear up one more issue

13   because my colleague is confused, which means everybody is

14   probably confused.

15          The binders came from Operation Defensive Shield and the

16   later operations.  Correct?

17   A.   Correct.

18   Q.   Now, the material that Mr. Dratel marked as Avi No. 1, I

19   believe, those did not come from Operation Defensive Shield?

20   A.   The summaries?

21   Q.   No, the reports from --

22   A.   No, it is not from Defensive Shield.

23   Q.   Inspections.

24          THE COURT:  That is what we have been referring to

25   as inspections.

1   Q.   (BY MS. SHAPIRO)   I will refer to the reports they had a

2   seal on them.  Right?  Those were not from Operation Defensive

3   Shield?

4   A.   No.

5   Q.   What kind of documents were those?  Where did they come

6   from?

7   A.   These documents are documents that were received by the

8   Civil Administration.  These are reports that the Civil

9   Administration sent to several, I assume several security

10  agencies including the ISA.

11  Q.   So those documents were maintained at the ISA?

12  A.   Yes.

13  Q.   What we are calling the inspections?

14  A.   Yes.

15  Q.   Okay.  And you provided them to the Government prior to

16  your testimony this year because you relied on them.  You

17  looked at them.

18  A.   I relied, and as soon as I -- After last year when I was

19  asked some questions, I wanted to make it more clear what I am

20  saying, so I was reviewing this kind of material inspections

21  that were conducted in these years.  And when I find it as it

22  is, I just handed it over.

23  Q.   You gave it to the Prosecution for us to provide to --

24  A.   And I didn't --

25  Q.   I understand.  Nobody is accuses you of anything.

```
1    A.   I just --
2              THE COURT:  He wants it on the record.  Let him
3    state his position.
4              THE WITNESS:  I didn't focus in something like
5    finding only ammunition and not phone numbers or phone
6    records.  I just gave it as it is.
7         I must say something.  As a legal advisor also, not as an
8    expert, I am aware of the fact that material that is related
9    to a trial must be handed to the Prosecution.  This is
10   something that I am -- This is my daily practice.  And we are
11   not -- There is no gaming here, no fooling around.  What I am
12   relying on is going to the Prosecution without any -- How do
13   you say?  Sorting.  Without sorting and deciding.  That is it.
14   Q.   (BY MS. SHAPIRO)  Okay.  So what you relied on with
15   respect to those inspections you gave to the Government and
16   the Government gave it to the Defense?
17   A.   This is not my --
18             THE COURT:  Did you turn over all of the inspection
19   records that you have?
20             THE WITNESS:  Yes.
21             THE COURT:  That is what I understood you to say.
22   So all of the inspection records that you had, you turned over
23   to the Government?
24             THE WITNESS:  Absolutely.
25             THE COURT:  All right.  And then you turned that
```

1    over to the Defense?

2              MS. SHAPIRO:  Yes.

3              THE COURT:  Any other questions?

4              MR. DRATEL:  I have just a couple, Your Honor.

5              MS. SHAPIRO:  Just a moment, Your Honor, just to

6    check with my colleagues.

7         Nothing.

8              THE COURT:  Okay.

9         Mr. Dratel?

10   Q.   (BY MR. DRATEL)  You testified when the jury was here

11   that there was a photo of Yasser Arafat found among the

12   documents at the zakat committees.  Did you turn that over to

13   the Government?  Did you give that to the Prosecution?

14   A.   I testified that --

15   Q.   Did you give that photograph to the -- Was that among the

16   things that you gave to the Government?  Was it in the

17   binders?  I am just asking a simple yes or no question.

18             THE COURT:  Counsel, stop arguing.  This is a

19   hearing outside the presence of the jury.  Stop arguing, let

20   him testify, and we can go from here.  Make it easier.

21             THE WITNESS:  I will make it clear.  I review 200

22   posters in boxes that not necessarily relate to committees

23   that are part of this trial, and the reason I review, I wanted

24   to see some -- I wanted to look in my eyes and to be impressed

25   of what was found not only on specific zakat committees, but I

1    reviewed those 200 posters and including this poster of Yasser

2    Arafat, and it is not one of the committees here, and I didn't

3    take it from the Army.  I left them there.  I am not using

4    them.

5         And I didn't hand it over to the Defense because I didn't

6    have possession.  For me it was just an impression.  I wanted

7    to look and to see whether there is something that I can

8    conclude.  It was a method, let's say something that I wanted

9    to be impressed.  That is the whole idea.

10   Q.   (BY MR. DRATEL)  Now, the inspections that you provided,

11   though, that is beyond what is in this indictment.  Right?

12   There are mosques in Shechem and --

13   A.    Exactly.  These mosques that belong to the zakat

14   committees that controlled and the emams are appointed by

15   specific persons in the zakat committees.

16   Q.   But the other materials --

17          MS. SHAPIRO:  Your Honor, Mr. Dratel, I just want to

18   understand if the purpose here is a search for facts right

19   now.  This isn't argument, and what I am hearing is argument,

20   and I don't think there is any point to it in this setting.

21   We are here to understand what he has and what he didn't have.

22          MR. DRATEL:  I am asking him -- he testified about

23   the Yasser Arafat poster, and I am --

24          THE COURT:  And he explained it.

25   Q.   (BY MR. DRATEL)  And your role in the beginning of this

1    process in 2000 was to prepare for prosecutions.  Right?

2    A.    2000?

3    Q.    Yes.  The Raed Saleh --

4    A.    Right, yes.

5    Q.    Right?  And that is what you do at ISA is you also

6    prepare for prosecutions in that regard.

7    A.    From the end of 2000?

8    Q.    Yes.

9    A.    As I said we started to -- The investigation formally

10   started --

11   Q.    I don't mean Raed Saleh.

12   A.    I don't understand the question.

13   Q.    Let me rephrase it.  In your job when you were working on

14   this material, not the legal advisor part but this particular

15   part of what you do, you assist in the preparation of

16   prosecutions.

17   A.    Correct.

18            MR. DRATEL:  Nothing further, Your Honor.

19            THE COURT:  Ms. Hollander any questions?

20            MS. HOLLANDER:  No, I think those are my questions.

21            MR. WESTFALL:  May I briefly?

22            THE COURT:  Mr. Westfall?

23   Q.   (BY MR. WESTFALL)  Yesterday when you and I were

24   speaking, you talked about orphan applications, like thousands

25   of orphan applications that had been seized during Operation

1  Defensive Shield.

2  A.   I didn't say thousands.

3          MS. SHAPIRO:  I just object to him going now into

4  Holy Land documents.

5          THE COURT:  Let's see where he is going.  I am not

6  sure where he is going.

7  Q.   (BY MR. WESTFALL)  Seized from the zakat committees, the

8  orphan applications seized from the zakat committees.  And all

9  of the zakat committees I think you agreed that it would add

10  up to thousands of orphan applications.  Do you remember that?

11  A.   I am not sure that the IDF took all the material from the

12  zakat committee.  If you imply that I had thousands of orphan

13  applications, that is not true.  I don't.  What I had are

14  lists.  The lists are part of the binders.

15  Q.   Who made the lists?

16  A.   The zakat committees.

17  Q.   Who brought the orphan applications that we saw?

18  A.   These orphan applications were part of the IDF searches.

19  What they had, that is what I got.

20  Q.   But there was more than three orphan applications at the

21  Qalqilya zakat committee.  Where are the other ones?  Did you

22  include those in the 19 to 21 binders?

23  A.   What I had is included in the 19 binders.  It doesn't

24  necessarily that I -- For example, I don't remember

25  specifically.  What I had in Qalqilya is in Qalqilya.

1    But from the al-Tadamoun, for example, the Prosecution

2    showed three files.  There are more, I think 40.  They didn't

3    show all the 40, even though there are many cases there that

4    can be discussed.  What I have I handed over.  That is it.

5    And it doesn't necessarily -- If you think that there

6    were dozens of orphan applications, by the way, you can see

7    the list, and maybe you will find the list, and if you review

8    the list you will find those thousands that you claim, but I

9    don't know whether the IDF in this operation took all the

10   applications.  But what I had in my possession was handed to

11   the Prosecution.

12   Q.   The IDF didn't destroy the records.  They put them in the

13   warehouse.  Right?

14   A.   I am not sure that the question is for me.  You asked me

15   what the IDF did during the searches?

16   Q.   What they did with the records, I thought they were in a

17   big warehouse at Dar El or something like that?

18        MS. SHAPIRO:  Your Honor, he is right.  This is the

19   wrong witness to ask.  He is not with the IDF.

20   Q.   (BY MR. WESTFALL)  You mentioned there were grade reports

21   that you looked at but didn't include in the materials?

22   A.   What reports?

23   Q.   You said something about student grade reports.

24   A.   I said there were also -- Yes, I said that there were

25   also folders of grades, students doing fine, this student is

1    doing not fine.  I don't think that this -- My opinion was

2    that this binder, this specific folder is not of my interest

3    because it is a fact that they have schools and they have

4    grades.

5    Q.    Right.

6    A.    And the specific grade of each student is not part

7    of -- I think is not something that I can build my opinion and

8    my expertise.

9    Q.    And these specific grades of these specific students were

10   in the kindergartens in the zakat committees.  Right?

11   A.    What do you mean kindergartens?

12   Q.    These grade reports were taken from the zakat committees.

13   A.    I saw folders that were taken from several zakat

14   committees.  I am not sure that all the students were there.

15   I am not sure -- I don't know to tell you whether all the

16   folders were taken from there.  I saw several of these.  Some

17   of them even relate to the committees that we are talking

18   about.  That is true.  But I didn't take them into my

19   possession because this was not my interest.  The specific

20   interest of grades, electricity bills, and phone bills was of

21   not my interest.  It couldn't promote me to anywhere because

22   there was no argument that these kids are having education.

23   Q.    So can we say that that right there what you just said is

24   kind of the guide that you used in what you included and what

25   you didn't, because you didn't include the grade?  And I am

1  wondering about your decision.  And what I am hearing from you

2  is that it wasn't relevant really to why you were putting the

3  materials together.  Is that fair?

4  A.    This is a very long sentence that I would simplify.  I

5  took what is relevant to the subject that I wrote.  Okay?

6  Q.    And the stuff that wasn't relevant you left out.

7  A.    By the way, if you find -- maybe you will find

8  other -- if you look at the binders you will find grades.

9  Q.    And the stuff that wasn't relevant you left out?

10  A.    I thought, and my opinion is still, that the subject of

11  the grades is not of interest to my subject of searching and

12  researching.  Of course, you can disagree with me, but this is

13  my opinion and it is still my opinion.

14         THE COURT:  I don't think he is trying to argue with

15  you.  He is just trying to determine what you left behind and

16  what you took.

17         THE WITNESS:  Okay.  This is -- I think, Your Honor,

18  that I have said it in the first sentence.  I left it behind.

19         THE COURT:  All right.

20  Q.    (BY MR. WESTFALL)  Okay.  Then in the category of left it

21  behind, that is where I want to be.  Okay?  The other orphan

22  applications from all of the other committees, those were left

23  behind.  Right?

24  A.    I didn't say that.

25  Q.    Okay.  What did you do with those?

1    A.    I didn't say that.

2    Q.    Then tell us what you did with those.

3    A.    The application that I had, you have it in the 19, 20

4    binders --

5              THE COURT:  Counsel, he has said that repeatedly;

6    that you have what he said.  He said IDF might have had some

7    and he doesn't know what the IDF might have done with those.

8    He has answered that.  You have been hung on these orphan

9    applications and he has already answered that.

10   Q.    (BY MR. WESTFALL)  Then what other things did you look at

11   and make the decision should not be included in your binders?

12   A.    That is, so far as I remember, I don't -- Let me think if

13   any other subject -- You are saying subjects that are

14   excluded?

15   Q.    From your binders.  Right.  What things did you not

16   include in there?

17   A.    As I said, grades, bills, correspondence with the

18   suppliers, suppliers like gas, receipts that they paid to

19   suppliers like paper, these kind of things, paper for office,

20   chairs, that was not of my interest so I kept it behind.

21   Q.    I guess there would have been photographs and such.  We

22   already know about Arafat.  Right?  Arafat wasn't included in

23   there, that picture of Arafat wasn't included in there.

24             THE COURT:  That picture from Arafat, you said that

25   was a committee that wasn't related --

1            THE WITNESS:  That was not related to this case.

2    Q.   (BY MR. WESTFALL)  And so it is not a committee that the

3    Holy Land Foundation ever did business with?

4    A.   I don't know.  The committee was Beit Zahul.  I don't

5    know whether this was part of the indictment or not.

6    Q.   Okay.

7            MS. SHAPIRO:  I don't want to make argument, but I

8    mean, I feel like we are spinning our wheels.

9            THE COURT:  We are, to a certain extent.  I am going

10   to give a little bit of latitude, but we are on a fishing

11   expedition.

12   Q.   (BY MR. WESTFALL)  There was 200 boxes you said of stuff

13   that didn't necessarily pertain to the trial that is not in

14   the binders?

15   A.   200 posters.

16   Q.   Posters.

17   A.   Yes.

18   Q.   Okay.  I misunderstood that.  The original reason you put

19   these binders together, what was that?

20   A.   What do you mean binder?

21   Q.   The binders, the 19 to 21 binders, why did you originally

22   put those together?

23   A.   We spoke just a few minutes ago about a meeting I had in

24   2005.  The Prosecution asked me for all the material that I

25   have and that is what I did.

1   Q.   It sounded like they were already put together by 2005.

2   I am wondering why you originally put them together.

3   A.   What do you mean together?

4        MS. SHAPIRO:  Your Honor, one, it is asked and

5   answered.  He explained how and why he selected these

6   documents.  We are just encountering language and semantic

7   issues.

8        MR. WESTFALL:  And Josh just advised me of that, too

9   so I am going to leave that alone.

10  Q.   (BY MR. WESTFALL)  Once you were told your materials were

11  going to be turned over to the Defense, did you pull anything

12  out of them?

13  A.   Did I pull --

14  Q.   Did you remove any documents from them once you were told

15  they were going to be turned over to the Defense?

16  A.   I think this question is -- The Prosecution team took the

17  material in the last day of their visit.  At that time they

18  didn't even tell me that they were going to use it for the

19  trial.  So if I wanted to take out some document, I should

20  have -- There were a lot --

21  Q.   So no?

22  A.   That, of course, is no.

23  Q.   Very well.

24        MR. WESTFALL:  Thank you, Your Honor.

25        THE COURT:  Ms. Shapiro, anything else?

1          MS. SHAPIRO:  I don't have any questions of the

2     witness, but I am happy to argue.

3          THE COURT:  We will get to that.

4          MS. HOLLANDER:  Can I ask one question?

5          THE COURT:  Yes, one question.

6          MS. HOLLANDER:  I hope it is one.

7          THE COURT:  It will be one question.  I am not going

8     to let this keep going on.

9     Q.   (BY MS. HOLLANDER)  It is my understanding that the zakat

10    committees write receipts for the money that they pay orphans

11    and families, and I am assuming that you did not consider

12    those receipts necessary to turn over to the Prosecution.  Is

13    that correct?

14    A.   Absolutely not correct, and that is not what I said.  If

15    you look in the binders you will find receipts, lists,

16    signatures, and if you want to bring me the binders here I

17    will look for you.

18    Q.   All I am trying to find out is -- I thought you said that

19    you didn't include the administration receipts.

20    A.   I didn't say that.  I said what I had, including lists,

21    receipts.  Whatever I had that is what I give.  And I didn't

22    say it is not of my interest.

23    Q.   You are answering questions that I am not asking.  All I

24    am asking you is a simple question.  The zakat committees

25    write a receipt every time they give money, for example, $85 a

1    month to an orphan.  Did you include all of those receipts

2    that you found in the documents that were seized?  Did you

3    turn over all of those receipts to the Prosecution?

4    A.    In one of the inspections of the Jenin zakat committee

5    they were told that not all the receipts are there and they

6    are missing some receipts.  It was inspection of the PA.

7         Now, you are asking me something that I cannot even prove

8    to you because they didn't write any -- I am not sure that

9    they wrote receipts to every orphan.  So what I had I have

10   given.  That is what I am saying.

11   Q.    Okay.  So you gave them every receipt that was seized

12   from every --

13   A.    No, I didn't say that.

14        THE COURT:  That is not what he said, counsel.  You

15   have twisted this thing around ever since you started.  That

16   is the reason I had a problem with you getting up here.

17        MS. HOLLANDER:  I don't understand what he is

18   saying.

19        THE COURT:  Of course not, because you keep twisting

20   it around.  You have misconstrued what he said.  You have

21   assumed -- You want him to assume that there were these

22   receipts.  He has never said that there were receipts for

23   orphans.  But you are starting off with that assumption.  He

24   has never said that.  He was talking about receipts for bills

25   and suppliers.  Did I understand you?  That is the receipt he

1    is was talking about.

2              THE WITNESS:  That is correct.

3              THE COURT:  He didn't say there were receipts for

4    orphans.  You assumed that, and then asked if he turned that

5    over.  How about asking him if he ever saw any of those?  You

6    are assuming it and you have twisted what he said all around,

7    and that is why he doesn't want to answer what you are asking.

8              MS. HOLLANDER:  I am sorry.  I was trying to make it

9    easier.

10             THE COURT:  You are not making it easier.  That is

11   the problem.  You are assuming that certain things are

12   happening, and that is where you are going instead of trying

13   to find out what really happened.

14        Go ahead.

15   Q.   (BY MS. HOLLANDER)  Did you see in the documents that

16   were seized receipts from -- any receipts from the zakat

17   committee that they wrote that showed the money they gave to

18   orphans and families?

19   A.   Actually I have to review the binders, because all the

20   material is there, but I am sure that one receipt, if I

21   remember correct, and this is a receipt from the Jenin zakat

22   committee supporting one of -- a person named Raed Kilani, and

23   that is one of the operatives the Izz el-Din al-Qassam and

24   there was a receipt.  But I am not saying that -- This

25   happened to be something that I remember, but I think there

1    are more receipts.  What I took from the Army, from the

2    possession of the Army included lists of orphans and not all

3    of them --

4              THE COURT:  Mr. Avi, what she is asking, though, do

5    you remember leaving behind -- that you didn't get from the

6    Army any receipts that had to do with orphans?

7              THE WITNESS:  No.  That is what I am saying.

8              THE COURT:  I don't know what her question is, but I

9    think that is where you were trying to get.

10             THE WITNESS:  I will make it more clear.  I took

11   what they called orphan folders.  Orphan folders, I took them.

12   Q.  (BY MS. HOLLANDER)  Okay.  You took all the orphan

13   folders you found from the zakat committees in this

14   indictment, or that have been mentioned here?

15   A.   I didn't say that.  I say when there was orphan folders I

16   took it.  That is what I am saying.  Maybe the --

17   Q.   No.  It --

18   A.   I will tell you where you are wrong.  Because when you

19   are assuming that in the Nablus zakat committee there was

20   orphan folders --

21   Q.   All I am asking you --

22   A.   Maybe there was not even -- it was not taken.  I am --

23   just for the argument, maybe there was not orphan folders, so

24   I didn't take it if there were not.  But if there was, like in

25   Jenin, for example, I remember correct there were many lists,

1    I took it because it was one of my interests.

2    Q.   So to make this really clear, we don't know what the

3    zakat committees -- everything that they had, and we don't

4    know what --

5    A.   If they had.

6    Q.   If they had.  And we don't know --

7              MS. SHAPIRO:  Your Honor, I object.

8              THE COURT:  Sustained.  We have been over and over

9    this, counsel.  Sustained.

10             MS. HOLLANDER:  I don't have anything else.

11             THE COURT:  Any other questions you wanted to ask?

12             MS. SHAPIRO:  No.

13             THE COURT:  All right.

14        Mr. Avi, you may step down.  You are free to go.  Thank

15   you.

16        Did you want to argue on any of the issues, or is this

17   something we need to take up?

18             MS. HOLLANDER:  It is something we actually need to

19   take up ex parte.

20             MR. DRATEL:  Your Honor, all I would ask, and I am

21   making part of the record and the Court is going to look at

22   them, because with respect to the inspections, what he claimed

23   in his testimony in the inspections just isn't there.

24        Thank you.

25             MS. SHAPIRO:  Your Honor, I just -- I found all of

1    this colloquy very frustrating.  We turned over everything

2    that we received to the Defense.  We turned over more than we

3    are legally required to turn over.  He does not need to turn

4    over, and no expert needs to turn over under Rule 16

5    everything that expert has ever seen in his entire career and

6    research.  We had him turn over what he relied on to form his

7    opinion.  I tried to make this clear with him, with these

8    Defensive Shield materials, he gathered materials prior to

9    there ever being this prosecution.  He went and gathered these

10   materials for his own research, and then everything that he

11   gathered that was relevant to him for his own research well

12   before this prosecution, he turned it all over and we turned

13   it all over to them.  And I just don't understand, you know,

14   what the issue is here.  We turned over --

15          THE COURT:  Well, there is two issues.  One is what

16   Mr. Dratel is bringing up, that as part of those documents

17   that you turned over, what he said came from there he says

18   isn't there.  Of course I don't have the documents.  You do.

19   But that is one of the issues.

20          MS. SHAPIRO:  But even if he relied on other

21   materials that were outside of those documents, I guess my

22   point is that he doesn't have to bring or give to the

23   Prosecution every single thing he has ever looked at.  They

24   asked him questions -- He might have drawn on information that

25   he knows from his research in the many years that he spent

1    investigating these committees.  But that doesn't mean that it

2    all had to have been turned over to the Prosecution.

3            THE COURT:  You are telling me that you turned over

4    what you had.

5            MS. SHAPIRO:  Right.  Exactly.  For his direct we

6    asked "Everything that you relied on, give it to us and we are

7    going to turn it over."

8            THE COURT:  And then the other issue they are

9    interested in, of course, is what wasn't turned over.

10           MS. SHAPIRO:  That issue I do want to say something

11   about, Your Honor.  That issue really goes to whether they

12   have a right to go to look at the Defensive Shield material.

13   That is separate and apart from this witness.  And I just want

14   to point out that very, very early on in this case, and we

15   have a letter to show it, I believe Mr. Jonas sent a letter to

16   the Defense and said that if they want to go there, I think

17   the request was for us to do an MLAT or assist them in getting

18   to look at those materials.  And we responded with a letter

19   saying that under the treaty we can't use the MLAT process,

20   and they would need to do a letter rogatory, and they never

21   did that.  The first time they did that was after the first

22   trial and I don't remember how long before the second trial,

23   but it was a request to Your Honor, not even a request to

24   Judge Fish.

25           So for them to come in now at this juncture and say, "We

1    have to go see those materials," when they just didn't go

2    through the right process all the way around I think it is

3    just too late.

4         MR. DRATEL:  Your Honor, with respect to the expert

5    part of it, it is more complicated than that.  What we have is

6    items coming in as substantive evidence from another witness

7    and this witness together from seizures.  If this case was a

8    domestic case and the Government went to a house and received

9    100 items, we would get those hundred items.  Out of the

10   hundred items, they want to put 20 in evidence.

11        THE COURT:  That is not true, because they have

12   given you everything, not just what they put in evidence.

13        MR. DRATEL:  But they haven't given us everything

14   that is seized.

15        THE COURT:  No, but that is not what you are saying,

16   counsel.  You are saying that if they introduce 20 items of

17   evidence, that is all you get to see is 20 items of evidence.

18   It is in between that.

19        MR. DRATEL:  I agree, yes.

20        THE COURT:  I understand that, but that is the

21   issue.  I know that is the issue.

22        MR. DRATEL:  Yes.  Okay.  Thank you, Your Honor.

23        MS. SHAPIRO:  If I may just make a final point.  It

24   wasn't the U.S. government that seized these documents.

25        THE COURT:  Right.  And that has been the whole

1    problem over this case to begin with.  It wasn't the U.S.

2    government who seized it, otherwise you would have access and

3    we wouldn't be going through this.  We have been having to

4    deal with this.

5        The issue of the letters rogatory was brought up, but it

6    was late in the process.  And I explained already I thought it

7    was tied in with the request for funding, and so I was waiting

8    for that.  And of course that didn't happen until August, and

9    then it wasn't brought up again until sometime after we

10   started the trial that it was brought to my attention, or

11   somewhere in there, that that was still a pending motion.  I

12   thought that was a moot issue because of the funding request

13   that it was tied in with.

14       I still have a concern -- I am not convinced that it is

15   not anything other than a fishing expedition.  I know you

16   think there is something there, but based on what has been

17   stated here, I don't know that there is anything there that

18   would warrant authorizing a fishing expedition.  We will have

19   to discuss these other issues, the funding issues.  But that

20   is what it looks like to me.  I know you don't know what is

21   there and you don't want to believe that, but from where I sit

22   and trying to look at it objectively, I don't see anything

23   there that strikes me as something that you just -- it would

24   be important to your case.

25            MS. HOLLANDER:  I think part of the problem is we

1    don't know.  He is developing --

2         THE COURT:  We do know to a certain extent, and that

3    is why you were asking him that.  And I was going to ask him

4    that, but Mr. Westfall got there.  That is why I let him go on

5    with that, because I know that is important.  I know you are

6    interested in what he didn't turn over and what he didn't get,

7    and Mr. Westfall asked him that.  You know, you heard what he

8    said on that.

9         If you can make something out of that that would be

10   material, I would be glad to hear it and we can talk about it,

11   you know, as far as the CJA issue, but from what I heard --

12        MS. HOLLANDER:  Well, it is hard to -- It is

13   difficult to know, frankly, I think from his answers because

14   -- and that is why when I said I was assuming something, it is

15   because based on something that I knew.

16        THE COURT:  Well, based on something that maybe you

17   have been told.  I don't know how you know what is over there

18   or not over there.

19        MS. HOLLANDER:  I can explain that at another time.

20   But the point is that we don't have access to -- We have not

21   been --

22        THE COURT:  I understand all that, counsel.  And the

23   issue is whether we should authorize you to go over there.  I

24   understand that.

25        MS. HOLLANDER:  Or had we had access to -- we even

1    now know there was an index that was provided to Doctor

2    Levitt, and we didn't have access.

3              THE COURT:  But he also testified that that index

4    was just -- it didn't play a role in anything.

5              MS. HOLLANDER:  It is important to us to what is

6    there and what isn't there.

7              THE COURT:  Maybe; maybe not.  I know you think it

8    is, but maybe; maybe not.  We don't know that.

9              MS. HOLLANDER:  You are right.  But I think the most

10   telling --

11             THE COURT:  He said he didn't rely on it; that it

12   just played zero or no part in his opinions and his testimony,

13   so I didn't see any basis for making that available.

14             MS. HOLLANDER:  Well, but I think the most telling

15   thing this witness said, in my view, was that he picked what

16   he thought was relevant.

17             THE COURT:  That is not what he said.  That is just

18   not what he said.  And that is why -- And that is why you have

19   to look at the rest of it.  There was some selection, but it

20   was broader than that.  You are acting like he was just

21   picking and choosing and he is leaving behind all this

22   valuable information.  He described how that selection process

23   worked and how he went by subject, and once there was a

24   subject that it related to the subject he was interested in,

25   he took it all.  There was no picking and choosing within

1    that.

2        And then Mr. Westfall asked him what he left behind, and

3    he described that, and it didn't seem to be a lot of picking

4    and choosing within the things that are relevant in this

5    particular case, that I heard in terms of all of that.  So I

6    heard that and I knew where you were going, but I also heard

7    Mr. Westfall's cross plus what he was already saying.

8        I don't think it is the kind of selecting that you want

9    to make it out to be, counsel.  That is where I disagree with

10   you.  You have your arguments on the record, but I disagree

11   with you that it is that kind of selectiveness involved.  He

12   explained it, the record is clear, and so that is where I am

13   on that.

14       We will be in recess.  Anything we need to take up Monday

15   morning before we start with this -- Who is the witness?

16            MR. DRATEL:  Esposito.

17            THE COURT:  That is right.  And I do have your

18   motion.

19            MR. JACKS:  And if there are going to be any

20   exhibits introduced through him.

21            THE COURT:  Do you anticipate any?

22            MS. HOLLANDER:  It is my witness, Your Honor.  At

23   this point the only exhibits I have are Government exhibits,

24   and that are in evidence.  And if that changes -- I am going

25   to be working on this tomorrow, and I will send you anything

1    else, but I don't anticipate anything else.

2           MR. JACKS:  And then, Your Honor, there may be some

3    areas of his testimony that I am going to object to on grounds

4    of relevancy, and I will be preparing that and I will email it

5    to the parties and the Court.

6           THE COURT:  Okay.  Then why don't -- Let's plan on

7    being here at 8:45, and we will address that.  You are not

8    challenging his credentials?  Are you challenging his

9    credentials?

10          MR. JACKS:  I don't think so, Your Honor, in terms

11   of -- Again, it relates to the relevancy of what he is

12   testifying to.  But as far as, you know --

13          THE COURT:  I think you stated yesterday there may

14   be some relevance to some of his testimony, but not all of it.

15          MR. JACKS:  Yes, sir.

16          THE COURT:  Okay.  Then just let us know and then we

17   will be here at 8:45 and resolve it.

18          MS. SHAPIRO:  Your Honor, could we just inquire as

19   to who is going to be after Mr. Esposito?

20          THE COURT:  Do you have an idea?

21          MR. DRATEL:  We haven't yet decided, but we will let

22   them know before.

23          THE COURT:  And also let them know, of course, any

24   exhibits, if it is different than what is in evidence.

25          MS. MORENO:  Of course.

1          THE COURT:  And let them know so that he can do the

2   objections.

3        Have a good weekend.  See you Monday.

4                     (End of day.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               I HEREBY CERTIFY THAT THE FOREGOING IS A

2               CORRECT TRANSCRIPT FROM THE RECORD OF

3               PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4               I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5               FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6               COURT AND THE JUDICIAL CONFERENCE OF THE

7               UNITED STATES.

8

9               S/Shawn McRoberts        06/24/2009

10             _____DATE_____

                    SHAWN McROBERTS, RMR, CRR

11             FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25