IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CAUSE NO. 3:04-CR-240-P |
| | ( | |
| vs. | ) | |
| | ( | NOVEMBER 5, 2008 |
| | ) | DALLAS, TEXAS |
| HOLY LAND FOUNDATION, ET AL | ( | 9:00 A.M. |

_____

VOLUME 32 OF 37

_____

STATEMENT OF FACTS

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

_____

A P P E A R A N C E S

FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                      1100 COMMERCE, 3RD FLOOR
                      DALLAS, TEXAS  75242
                      BY:  MR. JIM JACKS
                           MR. BARRY JONAS
                           MS. ELIZABETH SHAPIRO

FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
(SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
                      20 FIRST PLAZA, SUITE 700
                      ALBUQUERQUE, NEW MEXICO 87102
                      BY:  MS. NANCY HOLLANDER
                           MS. TERESA DUNCAN

```
 1              FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
                (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
 2                                   NEW YORK, NEW YORK  10005
                                     BY:  MR. JOSHUA DRATEL
 3                                        MR. AARON J. MYSLIWIEC

 4              FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
                (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
 5                                   DALLAS, TEXAS  75204
                                     BY:  MS. MARLO P. CADEDDU
 6
                FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
 7              (GHASSAN ELASHI)     P.O. BOX 10985
                                     TAMPA, FLORIDA  33679
 8                                   BY:  MS. LINDA MORENO

 9                                   JONES DAY
                                     555 CALIFORNIA ST., 26TH FLOOR
10                                   SAN FRANCISCO, CA  94104
                                     BY:  MR. JOHN D. CLINE
11
                FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12              (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                     FORT WORTH, TEXAS  76102
13                                   BY:  MR. GREG WESTFALL

14              COURT'S LAW CLERK:   MS. JENNIFER HELMS
                                     1100 COMMERCE, RM. 1654
15                                   DALLAS, TEXAS  75242

16              COURT COORDINATOR:   MS. BRENDA WEBB
                                     1100 COMMERCE, RM. 1654
17                                   DALLAS, TEXAS  75242

18      OFFICIAL COURT REPORTER:   SHAWN M. McROBERTS, RMR, CRR
                                     1100 COMMERCE STREET, RM. 1654
19                                   DALLAS, TEXAS  75242
                                     (214) 753-2349
20

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| Redirect By MR. WESTFALL | 95 |
| Redirect By MS. DUNCAN | 124 |
| Recross By MR. JONAS | 136 |
| EDWARD ABINGTON | |
| Direct By MS. HOLLANDER | 140 |

## Government Exhibits

| Government Exhibits | Page |
|---|---|
| Baker Wiretap 40-43, 40A-43A Admitted into Evidence | 7 |

## Defendant Exhibits

| Defendant Exhibits | Page |
|---|---|
| No. 1217, 1221, 1436 Admitted into Evidence | 107 |
| HLF Foreign Acct. No. 7 Admitted into Evidence | 113 |
| No. 858, 1418-1422 Admitted into Evidence | 124 |

1        THE COURT:  Mr. Jonas, good morning.

2        Do we need to take up some matters before the jury comes

3   in?

4        MS. DUNCAN:  Yes, Your Honor.  The Government is

5   going to attempt to introduce the original wiretaps during the

6   cross examination of Mr. Yaish.  Of course I can't find them.

7   Here they are.  And we wanted to register an objection to

8   these on a couple of grounds.

9        One is, as Your Honor is aware, most of these telephone

10  calls have been classified, and the Defense sought to have

11  them declassified so the clients would have access to them and

12  be able to help us to get them translated.  Just because of

13  resource constraints, that hasn't happened, and now the

14  Government has been able to declassify two of these calls just

15  within I think the last week to be using during this cross

16  examination, to the prejudice of the Defense, which doesn't

17  have the same sort of access or ability --

18        THE COURT:  The lawyers have had access to this,

19  haven't you?

20        MS. DUNCAN:  Except that they are in Arabic, and

21  none of the lawyers speak Arabic, so we don't have --

22        THE COURT:  I understand.  But you have had them for

23  years.  This didn't start yesterday or last week.  These

24  conversations have been made available, I take it, from the

25  beginning.

1          MR. JONAS:  Years.  And if I can interject, there

2     are English summaries of these calls that were declassified,

3     and the Defendants did have access of these particular calls.

4     So it is not as if --

5          THE COURT:  Were these exhibits listed on your --

6          MR. JONAS:  No, sir.  And it is all a matter of

7     cross and impeaching the witness.  And they were just

8     declassified.

9          THE COURT:  Go ahead.  I cut you off, Ms. Duncan.

10          MS. DUNCAN:  We have had these thousands and

11     thousands, tens of thousands of telephone calls on disks for

12     years, Your Honor --

13          THE COURT:  Apparently you had the summaries of this

14     as well.

15          MS. DUNCAN:  Not all of them.  I think it was less

16     than -- I don't know about these particular ones.  I didn't

17     search through the summaries.  We do have some summaries, Your

18     Honor, that were in English.  We did not have the verbatims of

19     these before yesterday.

20          THE COURT:  So what is your objection, then?

21          MS. DUNCAN:  So that is basically our objection.  We

22     are objecting to them also on hearsay grounds, Your Honor, and

23     403, but we also wanted to raise that issue.

24          THE COURT:  How many conversations are there?

25          MR. JONAS:  There are three in total, two of which I

1   gave them yesterday.

2           THE COURT:  And then the third one?

3           MR. JONAS:  The third one I think I had given to

4   them --

5           THE COURT:  This morning?

6           MR. JONAS:  No, several days ago.

7           MS. DUNCAN:  I think the other one you gave --

8           MR. JONAS:  It was all within the past few days.

9   And as far as the summaries go, it is my understanding that

10  they have the vast majority of summaries.  So I don't want the

11  Court to have the impression that there was a small amount of

12  summaries that was turned over and declassified.

13          MR. DRATEL:  Your Honor, just to be clear, we are

14  really talking about specific things.  We have summaries.  The

15  summaries represent a fraction of the total number of calls

16  over a ten-year period.  That is the impossibility.  Even

17  having them for years, we couldn't go through all those calls

18  even with an Arabic translator in the time we have had them.

19          MR. JONAS:  Your Honor, these particular calls, and

20  I know I can speak for at least one of them if not all three

21  of them, are summarized.  So anyway, that is enough said.

22          THE COURT:  Okay.  And are there other exhibits that

23  you are planning on using that you have objections to,

24  counsel?

25          MS. DUNCAN:  My understanding is these are the only

1    three exhibits that the Government intends to use.

2              MR. JONAS:  That have not been admitted.

3              THE COURT:  All right.  I will overrule those

4    objections, then.  Give me those exhibit numbers.

5              MR. JONAS:  It will be Baker Wiretap No. 40, and of

6    course 40-A for the audio, Baker Wiretap No. 41 and 41-A, and

7    Baker Wiretap No. 42 and 42-A.  I believe at least No. 41 and

8    No. 42 I emailed -- when I emailed the Defense the transcripts

9    of those last night I emailed Jennifer as well.  They should

10   be on -- we filed another exhibit list I believe late

11   yesterday, and they should be on there.  If not, we will file

12   yet another exhibit list.

13             THE COURT:  And those exhibits are admitted.

14        Any other issues with respect to this witness' testimony?

15             MS. DUNCAN:  I don't think so, Your Honor.  We renew

16   or objection to the evidence we discussed yesterday, and I

17   think that is the only other exhibit coming in.

18             MR. JONAS:  Yes.

19             MS. DUNCAN:  The certification.

20             THE COURT:  And do you still expect Mr. Abington to

21   be your next witness.

22             MS. HOLLANDER:  Yes, sir.

23             THE COURT:  And then the Government, I received your

24   email.  You are wanting --

25             MR. JONAS:  We would like to discuss an issue the

1  Court.

2          THE COURT:  Let's have a bench conference on this.

3          (Bench conference that was sealed by order of the

4          Court.)

5          (The following was had in open court.)

6          THE COURT:  Bring in the jury.

7          (Whereupon, the jury entered the courtroom.)

8          THE COURT:  Ladies and gentlemen of the jury, good

9  morning.  We are ready to proceed.

10      Mr. Jonas?

11          MR. JONAS:  Thank you, sir.

12  Q.  (BY MR. JONAS)  Good morning.  When we broke yesterday I

13  was asking about something called the FBAR form and about the

14  foreign bank accounts of the HLF in the Gaza and West Bank.

15          MR. JONAS:  Before I get back to the form, if we can

16  pull up the exhibit marked Bank Accounts.

17      Your Honor, I have an enlargement of the exhibit we used

18  earlier.  I will put it on the easel.

19          THE COURT:  All right.

20  Q.  (BY MR. JONAS)  You should be able to see this on your

21  screen as well.

22      Sir, I want to ask you about the foreign bank accounts of

23  the Holy Land Foundation.  Can you see the top?  Can you see

24  those account listings?

25  A.  Yes, sir.

1   Q.   Okay.  Now, just to let you know, this document contains

2   a listing of all the bank accounts discussed in this case, not

3   just the HLF accounts, but do you see starting on the right

4   hand side where it says "exhibit series"?

5   A.   Yes, sir.

6   Q.   It says HLF Foreign Account No. 2, which is the fifth one

7   down from the top?

8   A.   Yes, sir.

9   Q.   Okay.  I just want to get an understanding of what your

10  knowledge is of these foreign bank accounts.  The first one

11  says Holy Land Foundation Gaza Arab Land Bank.  Are you

12  familiar with that account?

13  A.   Not the account itself, but I know there is an account in

14  Gaza.

15  Q.   Okay.  How about the next one, which is HLF Foreign

16  Account No. 1, Bank of Palestine also in Gaza?

17  A.   I am not familiar with that account, but again, I know

18  there is a bank account in Gaza.

19  Q.   Okay.  Do you know how many bank accounts there were in

20  Gaza?

21  A.   I am not sure.

22  Q.   Okay.  Then there is two at the Bank of Palestine, and

23  then are you aware if the Holy Land Foundation had an account

24  in Jerusalem?

25  A.   Yes, sir.

1   Q.   Does an account at Barclays & Mercantile Discount Bank

2   sound familiar?

3   A.   I am not sure.

4   Q.   That would be HLF Foreign Account No. 3.  And then there

5   are three accounts at the Cairo Amman Bank.  Are you familiar

6   with those accounts?

7   A.   I know we had one in Hebron, but I am not sure which bank

8   account it was with.

9   Q.   Sir, wasn't it part of your responsibility to deal with

10   these foreign bank accounts?

11   A.   No, sir.

12   Q.   Were you involved in the wire transfers to those

13   accounts?

14   A.   Just verifying.

15   Q.   I am sorry?

16   A.   Verifying the wire.

17   Q.   How would you verify them?

18   A.   I would verify, you know, the account number and the

19   beneficiaries.

20   Q.   Which account number did you verify--the sending account

21   or the receiving account?

22   A.   The one who is going to receive the account.

23   Q.   So you verified the account numbers of the Holy Land

24   accounts over in Gaza and the West Bank?

25   A.   Whatever the beneficiary is, yes.

1    Q.    At the time you were doing this you must have been aware

2    that there were more than one account that the Holy Land

3    Foundation had.

4    A.    Yes, sir.

5    Q.    That they had multiple accounts over there.

6    A.    Well, as I said, I mean, you know, I would know the

7    recipients, the account number, and the amounts, you know.  I

8    don't pay attention to the bank itself.

9    Q.    Okay.  Now, I asked you yesterday about something called

10   an FBAR form.  I believe you said you weren't familiar with

11   that.

12   A.    No, sir.

13   Q.    Let me ask it this way and maybe some accounting ease.

14   Are you familiar with an IRS form or a Department of Treasury

15   form No. TD S90-22.1?

16   A.    No, sir.

17   Q.    How about it is called report of foreign bank and

18   financial accounts?

19   A.    No, sir.

20   Q.    Are you aware that a U.S. person or entity is required to

21   file a form with the Treasury Department if they have control

22   over a foreign bank account?

23   A.    I am not sure.

24   Q.    How long have you been a CPA?

25   A.    Twelve years.

```
1    Q.    Do you fill out personal income tax returns?

2    A.    Yes, sir.

3    Q.    1040 forms?

4    A.    Yes, sir.

5    Q.    In fact, you said you filled out 1040 forms for the

6    Defendant Mufid Abdulqader.

7    A.    Yes, sir.

8    Q.    And how many years have you been filling out, preparing

9    1040 forms?

10   A.    Since 1996.

11   Q.    And just so we are clear, what is a 1040 form?

12   A.    It is individual tax return.

13   Q.    Are you comfortable filling out those forms?

14   A.    Yes, sir.

15   Q.    In other words -- Go ahead.

16   A.    Yes, sir.

17   Q.    I don't mean to speak over you.

18         Do you feel like you know those forms fairly well?

19   A.    A 1040, yes.

20   Q.    Do you know what a Schedule B is?

21   A.    Yes, sir.

22   Q.    What is a Schedule B?

23   A.    It is reporting the interest.

24   Q.    Okay.  Do you know that there is something on Schedule B

25   called Part III, foreign accounts and trusts?
```

1    A.    Again --

2    Q.    Do you recall off the top of your head what a Schedule B

3    looks like?

4    A.    You report the interest income from, you know, dividends

5    or just interest income from, you know, the bank accounts.

6    Q.    Are you familiar with the bottom portion of Schedule B

7    that talks about foreign bank accounts?

8    A.    Never dealt with it.

9    Q.    You never dealt with it?

10   A.    No, sir.

11   Q.    But are you familiar with it?

12   A.    I am, just the top part which is the interest income and

13   dividends.

14   Q.    So you haven't studied the whole portion of Schedule B?

15   A.    No, sir.

16   Q.    So if a client comes in and tells you, "I have a bank

17   account in London," you wouldn't know what to do?

18   A.    No, I would research it.

19   Q.    And how would you research it?

20   A.    I will go on the internet and see what exact needs to be

21   reported, and I will report it.

22   Q.    Well, would you think about looking on the form itself on

23   the tax form?

24   A.    Yeah.  I mean, if I look at the form, yes, I can do that.

25            MR. JONAS:  Your Honor, may I approach?

```
 1            THE COURT:  Yes.
 2   Q.   (BY MR. JONAS)  I want to make sure you have a Schedule B
 3   in front of you and not just go off of memory.  I want to
 4   question you about the Schedule B.
 5        Are you familiar with the Schedule B now that you have
 6   one in front of you?  I want to make sure we are clear on
 7   that.
 8   A.   Yes, sir.
 9   Q.   And have you ever reviewed and researched the bottom
10   portion of a Schedule B that talks about foreign bank
11   accounts?
12   A.   Are you talking about Part III?
13   Q.   Yes.
14   A.   No, sir.
15   Q.   You never looked into it.
16   A.   No, sir, because I never had any person come to me with a
17   foreign bank account.
18   Q.   Except the HLF had multiple foreign bank accounts.
19   A.   Yes, sir.
20   Q.   Okay.  So you never thought to research it to see what
21   you are supposed to do with regard to the tax forms for the
22   HLF?
23   A.   I wasn't preparing a 1040 for, you know, as an
24   individual.
25   Q.   But you are familiar with the 1040s.
```

1    A.    Yes, sir.

2    Q.    In fact, on the 1040s, doesn't it refer to that foreign

3    bank account form that I asked you about?

4    A.    Yes, sir.

5    Q.    Okay.  So it never struck you that as a CPA that you

6    should look into foreign bank accounts and how they should be

7    reported to the U.S. government?

8    A.    If it has an interest, but if there is no interest

9    bearing, I mean, how are you going to report it?

10    Q.    Is that your position that it has to have an interest

11    bearing account?

12    A.    I mean, I know the interest is the income that is to be

13    reported in the tax return.  But if you don't have any

14    interest, you know, it has not going to be reported.

15    Q.    Is that what that Part III says--you have to have

16    interest income from the bank account to report a foreign

17    account?

18    A.    It says, "At any time did you have any interest or

19    signature authority over financial accounts in a foreign

20    country."  No, sir.

21    Q.    It doesn't say you have to actually earn money from a

22    foreign account.

23    A.    No, sir.

24    Q.    You just have to have interest in a foreign account.

25    A.    Yes, sir.

```
 1   Q.   And is this the first time that you are being aware of
 2   this?
 3   A.   Yes, sir.
 4   Q.   And when you became a CPA, did you have to take a test?
 5   A.   Yes, sir.
 6   Q.   How long was that test?
 7   A.   Three days.
 8   Q.   Three days?
 9   A.   Uh-huh.
10   Q.   You must have studied hard for it.
11   A.   Yes, sir.
12   Q.   And wouldn't studying hard include being familiar with
13   the 1040 forms?
14   A.   Yes, sir.
15   Q.   And all the requirements that go with being a CPA and
16   filling out tax returns?
17   A.   Yes, sir.
18   Q.   As well as forms with the Department of Treasury on other
19   matters?
20   A.   Not everything.
21   Q.   Not everything, but a lot of matters related to tax
22   returns?
23   A.   Yes, sir.
24   Q.   Such as knowing what to do when someone has a foreign
25   bank account?
```

```
 1    A.    Supposedly, yes.

 2    Q.    So you just didn't research it on behalf of the HLF?

 3    A.    No, sir.

 4    Q.    Well, did you file a foreign bank account form, this TD

 5    form we are referring to, with the Government?

 6    A.    No, sir.

 7    Q.    You testified yesterday about financial forms that were

 8    created that you put together, and it was Defense Exhibit

 9    No. 1410, a journal or ledger?

10    A.    The journal.

11    Q.    That is an annual report that you put together?

12    A.    I am not exactly following you on that.

13    Q.    Did you put together an annual financial report for the

14    HLF?

15    A.    Yes, sir.  Not annual.  It is on a monthly basis.

16    Q.    It was yesterday that Mr. Westfall showed you, if you

17    recall.  It was Defendants' --

18    A.    July 1999 monthly financials.

19    Q.    It was just for one month?

20    A.    Yes, sir.

21    Q.    And you list out the bank accounts on that form?

22    A.    Yes, sir.

23    Q.    To be clear, the HLF bank accounts.

24    A.    Yes, sir.

25    Q.    Did you list out the foreign bank accounts?
```

A.   No, sir.

Q.   Why not?

A.   Because I don't have any control over it.  Plus, I mean,
all the income is coming through our local banks.  I mean, the
other banks are just receiving the donation from us to them.
It is not -- You know, we have no source of income to those
banks separate from the Holy Land's wires.

Q.   So you are saying HLF had no control over those foreign
bank accounts?

A.   I am saying I didn't have control, not HLF.

Q.   Okay.  Now you are confusing me, because these aren't
your financial forms or financial products.  These are the
HLFs.  Right?

A.   What I mean, I mean, those banks, you know, receive money
from HLF accounts here.  It is not like, you know, they have
their own separate accounts that receive it from somewhere
else.

Q.   You are talking about the HLF accounts in Gaza and West
Bank that receive funding exclusively from HLF in Dallas?

A.   That is correct.

Q.   And I showed you some accounts yesterday from those
foreign bank accounts that are letters from HLF principles,
including Shukri Baker, showing that they are exercising
control over the account by opening the account or changing
the signature on the accounts.  Do you recall those?

```
1    A.    Yes, sir.

2    Q.    So those are HLF accounts in West Bank and Gaza.

3    A.    Yes, sir.

4    Q.    Shouldn't they be listed on the financial reports of the

5    HLF?

6    A.    Well, maybe yes, maybe no.

7    Q.    Maybe yes, maybe no.

8    A.    Yes, sir.

9    Q.    Well, you said that you hired an independent auditor to

10   come in and audit the HLF every year.

11   A.    Correct.

12   Q.    Did you tell the independent auditor about these foreign

13   bank accounts?

14   A.    Well, I open all the books for him.  I mean, any question

15   he has, I mean, you know, I will give him the documents.

16   Q.    You opened all the books.  Did those books include the

17   foreign bank accounts?

18   A.    Everything I have available, I give it to him.

19   Q.    Did you give him any information on the HLF foreign bank

20   accounts?

21   A.    I don't recall that, sir.

22   Q.    Would you like to see the audit report or all of the

23   papers pertaining to one particular year's audit that were

24   taken from the HLF?  Would that help you?

25   A.    Maybe, yes.
```

1           MR. JONAS:  Your Honor, if I may approach?

2           THE COURT:  Yes.

3           MS. DUNCAN:  Do you have an exhibit number?

4           MR. JONAS:  This is not in evidence, Your Honor.  I

5      am offering this to refresh his recollection.  He is saying

6      maybe yes, maybe no, and I am trying to get a definitive

7      answer as to whether or not he told or gave information to --

8           MS. DUNCAN:  We would like to see it, Your Honor.

9           THE COURT:  Do you have a copy of it there?

10          MR. JONAS:  I don't have a copy.  I will have to

11     give them a copy.

12          THE COURT:  Let them take a look at it.

13          MR. JONAS:  And if I can approach the witness one

14     more time?

15          MR. WESTFALL:  Your Honor, I don't want to take up

16     anymore of the Court's time reviewing.  I would ask, before

17     Mr. Yaish goes back on redirect, may we have a few moments to

18     look through this maybe a little more closely?

19          THE COURT:  Sure.

20          MR. WESTFALL:  Thank you, Your Honor.

21     Q.   (BY MR. JONAS)  Mr. Yaish, I don't want to waste a lot of

22     time.  I am going to hand you this back.  And it is a fairly

23     thick volume of material.  Is there a particular document you

24     can go to in this file to see whether or not the auditors were

25     made aware of these foreign bank accounts?

1    A.    Well, I can see -- I mean, the confirmation letters to

2    several banks, you know, within the United States.

3    Q.    Any information like that pertaining to banks overseas?

4    A.    No, sir.

5    Q.    So would it be fair to say that the auditors were not

6    made aware of these foreign bank accounts of the HLF?

7    A.    I would say yes.

8    Q.    Yes they were not made aware of it?

9    A.    Maybe yes, yeah.

10   Q.    Shouldn't they have been made aware of it?

11   A.    Well, if they ask, I would provide the information.

12   Q.    If they ask?

13   A.    Yes, sir.

14   Q.    Shouldn't you be providing them the information without

15   them having to ask?

16   A.    Well, I mean, in the initial interview they will write a

17   questionnaire asking all the questions they need to ask before

18   they conduct an audit, and based on the information if they

19   ask those questions we will answer them.

20   Q.    Well, you testified that all your books were open to

21   them.

22   A.    Yes, sir.  I mean, our books are open, but, you know, in

23   the audit -- When they conduct an audit, they have a

24   questionnaire to ask the clients, and we will answer them, you

25   know, freely and, you know, to the best of our knowledge.

1    If they include in their questionnaires if you have

2  foreign accounts, we will say yes.  If they did not include it

3  in there, I would not -- what do you call it?  Cross my mind,

4  you know, just to say, "Yeah, I forgot to mention those to

5  you."

6  Q.   Okay.  So if they don't specifically say, "Do you have

7  foreign bank accounts," then you are not going to tell them?

8  A.   Oh, no, no, no.  It is not that.  I mean, I would answer

9  the questionnaires.  Based on their questions I will answer.

10 Q.   And if the questionnaire doesn't say, "Do you have

11 foreign bank accounts," then you are not going to tell them?

12 A.   You know, I might forget to tell them, you know.

13 Q.   You may forget?

14 A.   Yes.

15 Q.   How much money did you approve and verify in wire

16 transfers to the HLF foreign bank accounts?

17 A.   Whatever wires I have in front of me, I will verify it.

18 In amounts during my four years could be, you know, in the

19 millions.

20 Q.   Millions.  So it didn't cross your mind to tell the

21 auditors about foreign bank accounts controlled by the HLF who

22 the HLF sent over a million dollars to, you just forgot about

23 them?

24 A.   Yes, sir.

25 Q.   Did the auditors ask for a listing of bank accounts,

1    whether they said domestic or foreign?

2    A.    Whatever they asked we gave them.

3    Q.    Whatever they asked.

4    A.    Uh-huh.

5    Q.    And again, if they didn't ask, you didn't give it?

6    A.    I mean, it just, you know, did not cross my mind.

7    Q.    Don't you think the public would want to know about

8    foreign bank accounts controlled by the HLF?

9           MR. DRATEL:  Objection.

10          THE COURT:  Overruled.  You may ask.  He is a CPA

11   for the HLF.

12          THE WITNESS:  The public, they need to know their

13   money is at work and being received by, you know, the needy

14   families, needy children.

15   Q.    (BY MR. JONAS)  You testified your books are open to the

16   public.

17   A.    Yes, sir.

18   Q.    Don't you think the public would want to know?

19   A.    If they asked, we would provide them.

20   Q.    If they ask.

21   A.    Yes, sir.

22   Q.    But you are not telling the auditors.

23   A.    No.  I mean, if he asked I would provide them, but I

24   don't have copies of the foreign bank accounts, you know, in

25   my department.

1    Q.   Are there copies of the foreign bank accounts anywhere in

2    the Holy Land Foundation in Dallas?

3    A.   In my department I don't have it, no.

4    Q.   In your department.  Well, you have records of wire

5    transfers going to these foreign bank accounts, don't you?

6    A.   Yes, sir.

7    Q.   Isn't that evidence of these foreign bank accounts?

8    A.   Yes, sir.

9    Q.   So you have some information on them.

10    A.   Yes, sir.

11    Q.   But you didn't provide it to the auditors.

12    A.   I mean, if he asked, I would provide him.

13    Q.   Okay.

14         MR. JONAS:  Can we pull up the schedule Payments to

15    Jenin Zakat Committee?  Go to the last page.  If we can

16    enlarge the last two transactions, please.

17    Q.   (BY MR. JONAS)  Do you see these two transactions that

18    are on your screen?  One is for July 8th of 2001 and one is

19    for October 11th, 2001?

20    A.   Yes, sir.

21    Q.   And do you see how the payment came from the Holy Land

22    Foundation Cairo Amman account, two different account numbers,

23    one for each transaction?

24    A.   Yes, sir.

25    Q.   Okay.  And let me just represent -- Well, withdrawn.

1    Have you seen these schedules before?

2              MR. JONAS:  If we can enlarge the page, please.

3    Q.   (BY MR. JONAS)  Has any of the Defense counsel showed you

4    these schedules?

5    A.   No, sir.

6    Q.   So you are not familiar with them?

7    A.   No.

8    Q.   All right.  Then let me just represent to you that the

9    last column on the far right where it says "exhibit number"

10   are all the supporting documentation for transaction that the

11   Government can find in the Holy Land Foundation records.

12   Okay?  And if you look at the second transaction from the top,

13   the June 4th transaction, you will see the supporting

14   documentation includes HLF search warrant material, HLF

15   domestic bank account information, and HLF foreign account

16   information.  Do you see that?

17   A.   Yes, sir.

18   Q.   And will you accept my representation on this, because if

19   you want I can pull up the supporting documentation if you

20   want to see it?

21   A.   No, sir.  I accept.

22   Q.   The last two transactions, and I am going to use these as

23   a sample, the only information the Government could find in

24   the Holy Land records -- Strike that.  The only information

25   that the Government can find regarding these transactions came

1    strictly from those foreign bank accounts.  Do you see that it

2    says HLF Foreign Account No. 4, pages 713 to 714 on the July

3    8th, 2001 transaction?

4    A.    Yes, sir.

5    Q.    Okay.  My question to you is this.  Shouldn't there be

6    records in the Holy Land Foundation in Dallas that support

7    that transaction?

8    A.    The wire transfers that we received from the bank here,

9    you know, to that bank account.

10   Q.    There should be wire transfers in Dallas?

11   A.    Yes, sir.

12   Q.    What about documentation showing what the money was for?

13   A.    Yes, sir.

14   Q.    There should be?

15   A.    There should be.

16   Q.    But with regard to these two transactions, in fact, three

17   out of the four on this particular page alone there wasn't

18   any.

19   A.    Well, could be lost or could be --

20        MS. DUNCAN:  I would object to the form of the

21   question.  Because the Government didn't find them doesn't

22   mean they didn't exist.

23        THE COURT:  All right.  Overrule that objection.  Go

24   ahead.

25   Q.    (BY MR. JONAS)  You are saying they could have been lost?

1    A.    Yes.

2            MR. JONAS:  Let's go to the Nablus zakat committee,

3    Payments to Nablus zakat committee.  Go to the last page.

4    Q.    (BY MR. JONAS)  The last two transactions on this

5    schedule to the Nablus zakat committee?

6    A.    Yes, sir.

7    Q.    Same thing.  Are you saying that there should have been

8    records at the HLF Dallas office to explain the purpose of

9    these wire transfers?

10   A.    Yes, sir.

11   Q.    But the FBI and the IRS couldn't find any, and you are

12   saying they could have been lost.

13   A.    Yeah.  We are talking about thousands of transactions.

14   If a few of them are not found, that does not mean they don't

15   exist.

16           MR. JONAS:  Payments to the Qalqilya Zakat

17   Committee.  Last page, please.

18   Q.    (BY MR. JONAS)  Same thing, these last two transactions,

19   The FBI and the IRS cannot find any supporting documentation

20   for.

21   A.    Again, out of thousands of transactions if we find a few

22   ones they the didn't exist, that does not mean we don't have

23   them at that moment.  I mean, they could be lost.

24   Q.    Do you find it coincidental that these transactions I

25   have been showing you all occurred in the later years of the

1  Holy Land Foundation's existence?

2  A.   Well, I mean, we could find some similar wire transfers

3  to the same zakat committees and we have the supporting

4  documentation.

5  Q.   I am not saying there isn't.  I am just talking about

6  particular time periods.

7  A.   No, sir.

8  Q.   You don't find that coincidental?

9  A.   No, sir.

10  Q.   Okay.  Staying with the zakat committees.

11  A.   Sure.

12  Q.   I asked you yesterday to name some of the zakat

13  committees that the HLF dealt with, and you named some?

14  A.   Yes, sir.

15  Q.   And I specifically also asked you about payments to

16  Islamic Charitable Society of Hebron, and you said it did not

17  sound familiar.

18  A.   Well, I mean, I don't remember all of them.  I mean, but,

19  you know, it is not familiar to me.

20        MR. JONAS:  Can we pull up Payments to the Islamic

21  Charitable Society of Hebron, please?  Go to the last page.

22  Q.   (BY MR. JONAS)  Do you see how much money the Holy Land

23  Foundation has given in total to the Islamic Charitable

24  Society of Hebron?  Over $1.6 million?

25  A.   Yes, sir.

1    Q.   A lot of money.

2    A.   Uh-huh.

3    Q.   Would you agree it is one of the larger zakat committees

4    or one of the zakat committees that received the most money

5    from the HLF?

6    A.   I cannot know exactly.

7    Q.   But it is a lot of money.

8    A.   Yes, sir.

9    Q.   Does seeing -- If you want to see any wire transfers to

10   ICS Hebron, would seeing that refresh your recollection as to

11   the dealings between the HLF and this organization?

12   A.   Well, I mean, it is all right.

13   Q.   All right.  I want to show you --

14        MR. JONAS:  If I may approach, Your Honor?

15        THE COURT:  Yes.

16   Q.   (BY MR. JONAS)  Defense Exhibit No. 734.  I am going to

17   put it on the screen because the Defense was kind enough to

18   lend me their copy.

19        You identified this picture yesterday.  You testified

20   about the backpacks and the Holy Land Foundation logo.  Do you

21   recall that?

22   A.   Yes, sir.

23   Q.   I know you were shown a lot of pictures yesterday, but do

24   you recall this being one of them?

25   A.   Yes, sir.

```
1   Q.   Do you see who the Holy Land Foundation was dealing with

2   with regard to these backpacks?

3   A.   The Islamic Charitable Society of Hebron.

4   Q.   Does that refresh your recollection that that is one of

5   the organizations the Holy Land Foundation had business with?

6   A.   Yes, sir.

7   Q.   Okay.

8           MR. JONAS:  If we can pull up HLF Hebron No. 1.

9   Q.   (BY MR. JONAS)  Do you recognize the letterhead?

10  A.   This looks like the project manager in Gaza.

11  Q.   Okay.  That is a Holy Land Foundation --

12  A.   Yes, sir.

13  Q.   Okay.

14          MR. JONAS:  Second page, please.

15  Q.   (BY MR. JONAS)  This is a translation of that letter.  Is

16  that correct?

17  A.   Yes, sir.

18  Q.   Do you know who Atia Abu Moor is?

19  A.   The Holy Land Foundation hired him to be like a project

20  manager.

21  Q.   Where?

22  A.   In the West Bank or in Gaza somewhere.

23  Q.   Okay.  The letter addressed to Kamal al-Tamimi.  Do you

24  know who he is?

25  A.   I think he is in one of the Islamic charities I think in
```

1   Hebron.

2   Q.   Do you know anything about him?

3   A.   No, sir.

4   Q.   Are you familiar with a Young Muslim Youth Association?

5   A.   No, sir.

6   Q.   Are you surprised that the HLF gave them $5,000?

7   A.   I mean, we gave money to a lot of organizations.

8   Q.   Would this transaction be found in the books and records

9   of the Holy Land Foundation in Dallas?  Should it be?

10  A.   If it came from us to them, yes.

11  Q.   Us to them?

12  A.   I mean from here.  If the wire came from here to the

13  Muslim Youth, yes, it would be included.

14  Q.   If it came directly from HLF in Dallas to directly the

15  Young Muslim Youth Association, there would be a record for it

16  here in Dallas?

17  A.   Yes, sir.

18  Q.   What if it wasn't from the HLF office in Gaza or in West

19  Bank to the Young Muslim Youth Association?  Would there be a

20  record of that transaction in Dallas?

21  A.   As a specific, what I will do, I mean, if the money goes

22  from here to there based on certain grants or certain

23  programs, I would include it.  But if it went from there to

24  different, I wouldn't know.

25  Q.   So when the HLF offices in Gaza and the West Bank

1  distribute funds, you don't know where it goes?

2  A.   Based on our instructions, like we send them the money to

3  distribute it, let's say $5,000 to the Jenin zakat, I would

4  know that this $5,000 goes as social services or education

5  services.

6  Q.   Let me interrupt you for a moment.  Are you talking about

7  a direct payment from HLF Dallas to the Jenin zakat committee

8  now?

9  A.   Or a direct payment from us to our offices overseas and

10  we have an instruction to them what to do with this money,

11  yes, I would know how to record it and allocate it.

12  Q.   And what if there is no instruction?

13  A.   Usually there is an instruction that goes with it.

14  Q.   So then would this payment of $5,000 to the Young Muslim

15  Youth Association be found in any of the books and records of

16  the HLF in Dallas?  Should it be is my question.

17  A.   It should be, if it comes from us to the Gaza office or

18  to the West Bank office instructing them to give this money to

19  Muslim Youth, yes.

20  Q.   Were there times when the HLF Gaza or the West Bank

21  office spent money without instructions from the Dallas

22  office?

23  A.   I have no idea.

24  Q.   You have no idea.  How much -- Did you ever conduct an

25  audit of the books of the Gaza or the West Bank office?

```
 1   A.   We used to hire some international auditor to audit their
 2   books.
 3   Q.   And did you review those audit reports?
 4   A.   Sometimes, yes.
 5   Q.   Sometimes?  Now, that picture I showed you a moment ago,
 6   Defense Exhibit No. 734, which was with the backpacks with the
 7   ICS Hebron.
 8   A.   Yes, sir.
 9   Q.   Are you familiar with what goes on in these schools?
10   A.   What goes on in the schools?
11   Q.   Yeah.
12   A.   Like what?
13   Q.   Well, let me -- You give backpacks to kids?
14   A.   Yes, sir.
15   Q.   What do you expect those kids to do with the backpacks?
16   A.   I mean, they use it to carry their books and go to
17   school.
18   Q.   Go to school.  And you know what schools they go to?
19   A.   No, sir.
20   Q.   You talked about the HLF supporting education.
21   A.   Correct.
22   Q.   When you talk about education, do you mean the backpacks
23   or do you mean actually supporting schools?
24   A.   Yes, sir.
25   Q.   Which one.  I asked you an either or question.
```

1    A.    The school.  I mean, everybody goes to their schools to

2    study, whether it is elementary or high school to get some

3    education.

4    Q.    Does the HLF, the Holy Land Foundation, did it support

5    schools over in the West Bank and Gaza?

6    A.    Support schools?

7    Q.    Provide money for schools, either directly or through

8    zakat committees or through its offices in Gaza and the West

9    Bank?

10   A.    I have no idea, but I think yes.

11   Q.    You think they did.  Okay.  And my question to you is do

12   you know what went on in those schools?

13   A.    No, sir.

14          MR. JONAS:  Your Honor, I would like to play a

15   segment from a videotape of a school.  This is ICS Hebron

16   No. 12.  It is already in evidence.

17          If we can play segment A, please.

18   Q.    (BY MR. JONAS)  This is from the Young Muslim Association

19   of which the HLF send that $5,000 to, and it is connected to

20   the Islamic Charitable Society for Hebron.

21          MR. DRATEL:  May we have just one moment?

22          THE COURT:  Sure.

23          MR. JONAS:  The video is dated 2001, which is the

24   same year as the letter I showed you when the HLF gave $5,000

25   to this school.

1                    (Whereupon, ICS Hebron No. 12, Clip A was played,

2               while questions were propounded.)

3   Q.   (BY MR. JONAS)  Do you know what an RPG is?

4   A.   Yes, sir.

5   Q.   What is it?

6   A.   It is a rocket.

7   Q.   Sir, do you know that what was going on at the schools in

8   the associations that the HLF was giving money to?

9   A.   No, sir.

10  Q.   Were you aware there were ceremonies with kids holding

11  mock RPG, rocket propelled grenade launchers?

12  A.   No, sir.

13  Q.   Do you know who Abd al-Khaliq Natshe is?

14  A.   No, sir.

15  Q.   Hashem Natshe?

16  A.   No, sir.

17  Q.   Do you recall yesterday you identified pictures from a

18  summer camp?

19  A.   Yes, sir.

20  Q.   Ms. Duncan showed you a series of pictures from a summer

21  camp?

22  A.   Yes, sir.

23  Q.   Did you ever see a video of what goes on at a summer

24  camp?

25  A.   I saw the pictures.

1    Q.    You saw the pictures, but I am asking if you have ever

2    seen a video owe of what went on.

3    A.    No, sir.

4              MR. JONAS:  If we can play InfoCom Search No. 57,

5    and segments A through C.

6    Q.    (BY MR. JONAS)  Before we start that, do you know what

7    InfoCom is?

8    A.    Yes.  It was run by the Elashi brothers.

9    Q.    Can you say that again?

10   A.    It is a company across from the Holy Land that is run by

11   the Elashi brothers.

12   Q.    Elashi brothers?

13   A.    Yes, sir.

14   Q.    That would include the Defendant Ghassan Elashi?

15   A.    Yes, sir.

16   Q.    What was the relationship between the HLF and InfoCom?

17   A.    Mr. Ghassan Elashi was the chairman of the board of HLF.

18   Q.    Was that it?  Was Ghassan Elashi the only relationship

19   between the HLF and InfoCom?

20   A.    We used to have also one brother I think worked for us

21   for some period of time, yes, and we do some business

22   relationship with them.

23   Q.    Were you aware that the HLF stored material over at

24   InfoCom?

25   A.    I have been told this lately, but I know we have a space

1  to shoot some infomercials there.

2  Q.   Are you aware or records and videotapes being kept over

3  there?

4  A.   No, sir.

5  Q.   Documents being kept over there?

6  A.   No, sir.

7  Q.   All right.  This videotape we are about to play, it was

8  taken from InfoCom and it pertains to a summer camp supported

9  by the HLF.

10         MR. JONAS:  If we can play clip A, B, and C, please.

11         MR. WESTFALL:  What year is this?

12         MR. JONAS:  I am not sure what year it is, but it is

13  certainly prior to 2001 and earlier.

14         MS. CADEDDU:  What is the exhibit number?

15         MR. JONAS:   InfoCom Search No. 57.

16         MS. CADEDDU:  Agent Burns' cheat sheet says it is

17  August of '03.

18         MR. JONAS:  That has got to be a typo.  The InfoCom

19  search was in August of 2001, so it is a typo.

20     If we can play the clip, please.

21         (Whereupon, InfoCom Search No. 57, Clips A, B, and

22         C, was played, while questions were propounded.)

23  Q.   (BY MR. JONAS)  Is that statement accurate where it says

24  Holy Land Foundation contributed to the funding of summer

25  camps?

```
 1    A.    Yes, sir.

 2    Q.    Are you familiar with the Islamic Society of Gaza?

 3    A.    I heard of it but I am not familiar with it.

 4    Q.    Are you aware if the HLF gave it money?

 5    A.    Yes, sir.

 6    Q.    The HLF did give it money?

 7    A.    The Islamic Society of Gaza, yes.

 8    Q.    Are you aware that these summer camps supported by the

 9    HLF there are individuals holding machine guns?

10    A.    No, sir.

11    Q.    Or some sort of weaponry, if you can see over their is

12    shoulders.

13          Do you see the signs, there is a caption first one said

14    "Quran is our charter," and then it says, "Jihad is our path"?

15    A.    Yes, sir.

16    Q.    Are you familiar with that saying?

17    A.    Yes, sir.

18    Q.    How are you familiar with it?

19    A.    Well, I mean, Quran is our holy book, and, you know,

20    jihad, you know, is a struggle to defeat, you know, the

21    occupiers.

22    Q.    Are you familiar -- I didn't mean to cut you off.

23    A.    That is what is meant.  I mean, you know.

24    Q.    Are you familiar with the Hamas charter?

25    A.    No, sir.
```

```
1   Q.   You don't know the Hamas motto?

2   A.   No, sir.

3   Q.   You testified yesterday that the summer camps were fun.

4   A.   Yes, sir.

5   Q.   Is your definition of fun including mobilizing soldiers

6   and making itself ready for the decisive stance?

7   A.   No, sir.

8   Q.   Have you ever seen this video before?

9   A.   No, sir.

10  Q.   I want to move on to another area.  You were shown, we

11  talked about a moment ago, a whole series of pictures

12  yesterday.

13  A.   Yes, sir.

14  Q.   And some of those pictures showed people carrying like

15  large boxes.  Do you recall what was in those, from the

16  pictures?

17  A.   The large boxes?

18  Q.   Boxes or crates.  Let me ask it this way.  Are you aware

19  if the HLF -- You said the HLF gave food packages?

20  A.   Correct.

21  Q.   Did the HLF give people appliances?

22  A.   Correct.

23  Q.   What sort of appliances did they give?

24  A.   They gave them gas cooktops, refrigerators, you know.

25  Q.   How about washing machines?
```

1    A.   Well, I mean, washing machine would also be part of

2    that--appliances.

3    Q.   If you give them a washing machine, does a person have

4    electricity and running water in order to run a washing

5    machine?

6    A.   Well, you know, electricity, yes, they do have, you know.

7    Q.   And running water?

8    A.   Of course.

9    Q.   Okay.  And if you are giving them gas stoves, is that

10   what you are saying?

11   A.   Yes, sir.

12   Q.   Then they have gas?

13   A.   Yeah.  I mean, the small gas, you know, tanks they were

14   carrying.

15   Q.   And when you give money for children, is it needy

16   children?

17   A.   Yes, sir.

18   Q.   Families that have economic need for this money?

19   A.   Correct.

20   Q.   And do you ever give money to families that don't need

21   it?

22   A.   No, sir.

23         MR. JONAS:  If we can pull up HLF Search No. 160,

24   specifically page 36.

25   Q.   (BY MR. JONAS)  This is an English translation.  Would

1  you like to see the Arabic page so you can be familiar with

2  it?

3  A.   No problem.

4  Q.   Do you recognize this document?  And let me

5  represent -- Let's go back to the prior page.  Do you

6  recognize it now as an HLF record?

7  A.   Yes, sir.

8  Q.   Okay.  And I can represent to you this was taken from the

9  Holy Land Foundation.

10       MR. JONAS:  If we can go to the translation on the

11  next page.

12  Q.   (BY MR. JONAS)  The title says, "List of orphans of the

13  Holy Land Foundation for Relief and Development, supervising

14  party Jenin zakat committee."

15  A.   Yes, sir.

16  Q.   The Jenin zakat committee, as we talked about, that is

17  one of the committees the HLF sent money to?

18  A.   Yes, sir.

19  Q.   In this document, in this HLF document, you see the left

20  side has the names.  Would that be the name of the orphan?

21  A.   Yes, sir.

22  Q.   On the right side, on the far right side it has notes.

23  A.   Yes, sir.

24  Q.   The First one says, "financial situation is excellent."

25  Do you see that?

A.    Yes, sir.

Q.    Third one says, "financial situation good."

      And if you scroll down--I am not going to read every one--but you see where it says "financial situation good," "financial situation good," multiple times.

      If the financial situation is good, or even in the case of the first one is excellent, why would the HLF be giving these people money?

A.    They should not.

Q.    They should not.  But this record indicates that they did.

A.    Yes, sir.

      MR. JONAS:  If we can pull up Demonstrative Exhibit No. 30, page 1, please.

Q.    (BY MR. JONAS)  Sir, do you see this diagram on your screen?

A.    Yes, sir.

Q.    This is a document that was created by the Government as an aid for the jury, so I am not asking if you are familiar with it, but there is a couple of things on here I want to ask you about.

      Do you see the top where it says "kindergartens," the first purple circle on the top above the red arrow?

A.    Yes, sir.

Q.    HLF supported kindergartens.  When I say support, gave

1    money for kindergartens?

2    A.    Yes, sir.

3    Q.    And it says next to that "summer camps"?

4    A.    Yes, sir.

5    Q.    HLF gave money for summer camps?

6              MS. DUNCAN:  Your Honor, that is not what this

7    demonstrative says.  It says Hamas.

8              THE COURT:  Overruled.

9    Q.    (BY MR. JONAS)  The title of it is "The lifecycle of A

10   typical Hamas activist through the Dawa infrastructure," as it

11   says in the middle of the circle.

12         The third purple circle says healthcare.  Did HLF have

13   healthcare support?

14   A.    Yeah, but we give to the needy, you know.

15   Q.    You testified hospitals.

16   A.    Yes, sir.

17   Q.    HLF supported hospitals?

18   A.    Yes, sir.

19   Q.    Okay.  The next one says "assisting the needy," so you

20   just mentioned that a moment ago.  Then it says "mosques."

21   Did the HLF give money for mosques?

22   A.    Yes, sir.

23   Q.    Universities, the next circle?

24   A.    Yes, sir.

25   Q.    Did the HLF support people going to universities?

1  A.    Yes, sir.

2  Q.    So basically the six purple circles on this diagram HLF

3  gave money to support?

4  A.    That is correct.  But I mean, if we look at -- The Red

5  Cross would give to kindergartens, summer camps, healthcare.

6  That make it Hamas?

7  Q.    I understand.  And then there is three red circles on the

8  left.  And it says "Reimbursing prisoners and families."  Are

9  you aware if the HLF had projects where they support families

10  of prisoners?

11  A.    Maybe, but I am not aware.  But we will give to the

12  needy, whether their father is in prison or dead or in need.

13  Q.    And then the top red circle on the left says "Monthly

14  payments to the families of activists who were killed."  Did

15  the HLF support people whose father -- You talked about

16  supporting orphans.

17  A.    Yes, sir.

18  Q.    So in case this it would be martyrs who were killed?

19  A.    If they are in need of assistance, yes.

20  Q.    Would it be reflected on the application forms for

21  support--martyr, or how the person was killed?

22  A.    Yes, sir.

23  Q.    Why?

24  A.    I mean, it is an application.  They have to fill out all

25  of the information, I mean, truly.

```
1    Q.    What difference does it make how the father was killed?

2    A.    It doesn't make any difference.

3    Q.    Then why does the HLF ask for that information?

4    A.    No idea.

5    Q.    Did you create the application forms?

6    A.    No, sir.

7    Q.    Did anyone ever consult with you as to what to put on the

8    application form?

9    A.    No, sir.

10   Q.    But you are saying you shouldn't need that information?

11   A.    What I said, I mean, you know, I don't know why they

12   asked for that information, but, you know.

13   Q.    Are you aware that they do that; that the HLF application

14   forms do ask for the cause of death?

15   A.    Yes, sir.

16   Q.    Are you aware that some of them say "martyr"?

17   A.    Yes, sir.

18   Q.    I want to move to a new area.  Is the HLF part of a

19   larger organization?

20   A.    Not to my knowledge, no.

21   Q.    Wouldn't you know if they were?

22   A.    No.

23   Q.    You wouldn't know?

24   A.    No.

25   Q.    You wouldn't know if HLF was a subsidiary of another
```

1    organization?

2    A.    No.

3    Q.    Shouldn't you know as their accountant?  Wouldn't that

4    affect their books and records?

5    A.    Yes.

6    Q.    But you are not aware of it?

7    A.    No, sir.

8    Q.    But I want to be clear.  You should be aware of it.

9    A.    Yes, sir.

10   Q.    Okay.  Does the HLF answer to anyone else, as far as you

11   are aware?  In other words, answer to any other organization

12   above itself.

13   A.    No, sir.

14   Q.    Did you ever hear of the Palestine Committee?

15   A.    No, sir.

16        MR. JONAS:  If we can pull up Elbarasse Search

17   No. 7, page 7, please.

18   Q.    (BY MR. JONAS)  Have you ever seen this document before?

19   A.    No, sir.

20   Q.    This talks about on the first page something called the

21   Central Committee, and it talks about the Muslim Brotherhood

22   movement.  Do you know what the Muslim Brotherhood is?

23   A.    I heard of it, yes.

24   Q.    Are you a member of the Muslim Brotherhood?

25   A.    No, sir.

1          MR. JONAS:  If we can go to the next page, page 8.

2     Q.   (BY MR. JONAS)  And just to orientate ourselves,

3     Article 1 --

4          MR. DRATEL:  I am going to object, Your Honor.  He

5     says he doesn't know this document, and he is going to read

6     from this document that he doesn't know anything about.

7          THE COURT:  He may ask him questions.  Go ahead.

8     Q.   (BY MR. JONAS)  Just so we can orientate ourselves,

9     Article 1 says, "The Palestine Committee will be called the

10    Central Committee."  So on the first page of this document

11    that we just looked at, when it says Central Committee it is

12    synonymous with the Palestine Committee.

13    A.   Okay.

14         MR. JONAS:  If we can go to the next page, page 9 at

15    the top.

16    Q.   (BY MR. JONAS)  "Issues relating to the Occupied Land

17    Fund."  Do you know what the Occupied Land Fund is or was?

18    A.   Yes, sir.

19    Q.   And what was it?

20    A.   It was the first name of the Holy Land Foundation.

21    Q.   Okay.  This says, "Issues relating to the Occupied Land

22    Fund.

23         "It is the official organization which represents the

24    financial and charitable aspect to support the homeland people

25    in the occupied territories."

1       Occupied territories, sir, are the West Bank and Gaza.

2   Would you agree with that?

3   A.    Yes, sir.

4   Q.    Okay.  It talks about, "The duty of the Central Committee

5   in regards to the fund is as follows:

6       "Drawing the general strategy," and I am shortcutting

7   some of this, "approving the plan, work programs, approving

8   the budget, employees, appointing the Fund's board of

9   directors."

10      Sir, were you aware that the HLF's strategy, plan,

11  budget, employees, and board of directors had to be approved

12  by the Palestinian Committee?

13          MR. DRATEL:  I am going to object to the form of the

14  question, Your Honor.  It assumes a fact not in evidence.

15          THE COURT:  Overrule the objection.

16  Q.    (BY MR. JONAS)  Were you aware of it?

17  A.    No, sir.

18          MR. JONAS:  If we can turn to page 12 of this

19  document.  Enlarge that part, please, "remarks."

20  Q.    (BY MR. JONAS)  Under remarks, No. 3 talks about

21  collecting of donations for the Islamic Resistance Movement.

22  Do you know what the Islamic Resistance Movement is?

23  A.    It is Hamas.

24  Q.    It is Hamas.  And from the Ikhwan and others.  Do you

25  know what Ikhwan is?

```
 1    A.    Brothers.

 2    Q.    Do you know Ikhwan being used to refer to Muslim

 3    Brotherhood members?

 4    A.    Yes, sir.

 5    Q.    Okay.  Were you aware of the HLF collecting donations for

 6    Hamas?

 7    A.    No, sir.

 8              MR. JONAS:  If we can put up Elbarasse Search

 9    No. 10, please.

10    Q.    (BY MR. JONAS)  Now, this also -- Are you familiar with

11    this document?

12    A.    No, sir.

13    Q.    This is an organizational chart --

14              MR. DRATEL:  I object, Your Honor.  May we approach,

15    Your Honor?

16              THE COURT:  No.  We don't need to approach.

17    Overrule the objection.  He may ask.

18              MR. JONAS:  Thank you, sir.

19    Q.    (BY MR. JONAS)  This particular page was not in Arabic.

20    This is the way it was found.  And it says the Central

21    Committee, which we saw in the prior document is Palestine

22    Committee.  Do you see the organizations listed under the line

23    "Central Committee"?

24    A.    Yes, sir.

25    Q.    It says "IAP."  Are you familiar with the IAP?
```

1   A.    Islamic Association of Palestine.

2   Q.    Did the HLF have a relationship with the IAP?

3   A.    Yes, sir.

4   Q.    What was that relationship?

5   A.    Well, they coordinate to raise some funds, you know, and

6   sometimes IAP with the HLF will have some fundraising events.

7   Q.    Are you aware of the HLF and the IAP both being under

8   this Central Committee or Palestine Committee?

9   A.    No, sir.

10  Q.    Under the IAP, if you look down there is a listing of

11  titles--"Shura Council, executive committee," and so forth.

12  Do you see that?

13  A.    Yes, sir.

14  Q.    The third one from the bottom says "Sakhra Group."  What

15  was the name of Mufid Abdulqader's band, the initial name?

16  A.    Well, I know it is Al-Nujoom.

17  Q.    Do you know what the name was prior to Al-Nujoom?

18  A.    No, sir.

19  Q.    Are you familiar with the "Al Sakhra Group"?

20  A.    No, sir.

21  Q.    It doesn't ring a bell?

22  A.    No.

23  Q.    Okay.  I may have asked you this, but while we are on

24  this chart I want to be clear.  Were you aware of the HLF, as

25  set forth in this chart, being part of the Central Committee

```
 1   of Palestine?

 2   A.   No, sir.

 3           MR. JONAS:  I want to stay with this.  Go to page 3,

 4   please.

 5   Q.   (BY MR. JONAS)  This page of this document was found in

 6   Arabic.  You can see it, and there is handwriting.  And you

 7   read Arabic.  Correct?

 8   A.   Yes, sir.

 9   Q.   Okay.  I am assuming the jury doesn't, so we will go to

10   the translation, which is the next page.

11   A.   No problem.

12   Q.   "Chart outline for the Palestinian action aspects."  I am

13   not going to go through this whole thing for you, but I want

14   you to focus on No. 7, "Artistic aspect."  Do you see that on

15   the bottom of the screen?

16   A.   Yes, sir.

17   Q.   It says, "Artistic foundation, Munzer."  You have

18   identified several individuals that are part of the Al-Nujoom

19   Band.

20   A.   Yes, sir.

21   Q.   I think you said you even did the tax returns for some of

22   them.

23   A.   Yes, sir.

24   Q.   Do you know someone named Munzer?

25   A.   Munzer Taleb.
```

1   Q.   Okay.  Do you see to the right there is a list of names

2   and do you see No. 25?

3   A.   Yes, sir.

4   Q.   What does that name say?

5   A.   Munzer Taleb.

6   Q.   Did you know Munzer Taleb was part of the Palestine

7   Committee?

8   A.   No, sir.

9   Q.   Right above Munzer Taleb is the name Fawaz Mushtaha.  Do

10  you know who he is?

11  A.   No, sir.

12  Q.   You were shown yesterday Defense Exhibit No. 67, which is

13  an annual report that you testified about.  I am holding it up

14  to see.  I can hand it to you, if you would like.

15  A.   That is fine.

16  Q.   Did you help compile this?

17  A.   The financial only.  I will give them, you know, a copy

18  of the financials for the annual report.

19  Q.   Are you familiar with the document, though?

20  A.   I have seen it.

21  Q.   You have read it?

22  A.   Yes.

23  Q.   Does it reflect anywhere in the financial report or the

24  annual report the HLF being part of the Palestine Committee?

25  A.   No, sir.

1    Q.   Did you tell the auditors about the HLF being part of the

2    Palestine Committee?

3    A.   I didn't know myself.  How am I going to tell them?

4    Q.   Okay.  I want to play a phone call for you.

5    A.   Okay.

6    Q.   This is in evidence.  This is Baker Wiretap No. 5.

7         (Whereupon, Baker Wiretap No. 5 was played, while

8         questions were propounded.)

9    Q.   (BY MR. JONAS)  You recognize Shukri Baker's voice.

10   Correct?

11   A.   Yes, sir.

12   Q.   You are familiar with it.

13        This call involves a call named Shukri Baker and Omar

14   Ahmad.  Do you know who Omar Ahmad is?

15   A.   Yes, sir.

16   Q.   Or also goes by the name Omar Yehia.  I may be

17   mispronouncing it.

18             MR. MYSLIWIEC:  Your Honor, I am going to object to

19   this as beyond the scope.  It pertains to Mohammad El-Mezain

20   and I didn't ask any questions nor was he mentioned at any

21   point during direct examination, so it is really beyond the

22   scope of direct.

23             THE COURT:  Okay.  I will overrule that objection.

24   You may question him on it.

25   Q.   (BY MR. JONAS)  Do you know who -- Was there an Akram

1    that worked at the HLF?

2    A.    Yes, sir.

3    Q.    What was the name of that person, the full name?

4    A.    I know Akram Ahmed Mishal.

5    Q.    That is one person Akram Ahmed Mishal?

6    A.    Yes, sir.

7    Q.    What was his role at the HLF?

8    A.    Towards the end he was in charge of projects after Bassam

9    Faris.

10   Q.    Okay.  Do you know who Abdel Jabbar is?

11   A.    Yes, sir.

12   Q.    Who is that?

13   A.    He is a Holy Land Foundation fundraiser in Los Angeles.

14   Q.    The next name is Sheikh Muharam.  Do you know who that

15   is?

16   A.    I believe he is a Lebanese scholar.  They used to bring

17   him over here during Ramadan for fundraising.

18   Q.    And then it says Abu Ibrahim.  Do you know who Abu

19   Ibrahim is?

20   A.    Usually Mohammad El-Mezain goes by Abu Ibrahim.

21   Q.    The Defendant Mohammad El-Mezain?

22   A.    Yes.

23   Q.    This call was in 1999.  What was his position with the

24   HLF up to that point?

25   A.    He was a board member and a fundraiser for the Holy Land.

1  Q.   And did his position change in 1999?

2  A.   After he moved to San Diego, yes, we hired him as an

3  employee, you know, the endowment project manager.

4  Q.   Endowment project manager?

5  A.   Yes, sir.

6  Q.   Prior to becoming endowment project manager you said he

7  was a board member.

8  A.   Yes, sir.

9  Q.   Was he in fact one of the founding members of HLF?

10  A.   Yes, sir.

11  Q.   From the context of the call, are you able to tell who

12  the Ghassan is that Shukri Baker is referring to?

13  A.   Mr. Ghassan Elashi.

14  Q.   (BY MR. JONAS)  Sir, this is all part of the same

15  conversation.  It is just a separate clip.  Do you see where

16  it says -- Shukri says, "Let me sit down in the morning with

17  Wafa"?

18  A.   Yes, sir.

19  Q.   Is that you?

20  A.   That is me.

21  Q.   Did Ghassan Elashi become chairman of the board at that

22  point?

23  A.   I believe so.

24  Q.   Did Shukri Baker come to you in 1999 and ask you to write

25  a $20,000 check to the Defendant Mohammad El-Mezain?

1    A.    Yes, sir.

2    Q.    Why?

3    A.    It is like a compensation for all his trips in the past

4    and also to help him move to San Diego.

5    Q.    Is that something that the Holy Land Foundation normally

6    did for fundraisers?

7    A.    No, sir.

8    Q.    Did Shukri Baker tell you where he came up with the

9    $20,000 figure from?

10   A.    No, sir.

11   Q.    Did he tell you he spoke to Omar Ahmad or Omar Yehia

12   about this?

13   A.    No, sir.

14   Q.    What is Omar Ahmad's position with the HLF?

15   A.    I have no idea.

16   Q.    You don't know if he is part of the board of directors?

17   A.    No, sir.

18   Q.    Did you ask Shukri Baker for any supporting paperwork for

19   this $20,000 check?

20   A.    I just asked him for the letter, you know, to have signed

21   so I can issue a check.

22   Q.    What letter?

23   A.    I mean, usually before I issue any check he will give me

24   like a note from his desk, you know, please issue the amount,

25   and his signature is on it.

Q.    Did you give a 1099 to the Defendant Mohammad El-Mezain?

A.    No, sir.

Q.    Why not?

A.    Well, because most of our 1099s are within the payroll --
outside payroll company, and you know, this is being issued
directly from our checks, you know, accounts payable, you
know, checks.  But we discussed it with him and we told him to
include it.

Q.    When you say you discussed it with him, you mean --

A.    With Mohammad El-Mezain, yes.

Q.    Okay.  Omar Ahmad said in the second clip that "we
reviewed the records for the past three years."  Are you aware
of Omar Ahmad reviewing HLF records for three years?

A.    No, sir.

Q.    For a three-year time period?

A.    No, sir.

Q.    Any idea why Omar Ahmed is determining how much the
Defendant Mohammad El-Mezain is going to be getting?

A.    No, sir.

            THE COURT:  Let's take the morning break.  Let's
take a 20-minute break.

            (Whereupon, the jury left the courtroom.)

            THE COURT:  We will be in recess for 20 minutes.  Be
back at five after.

                    (Brief recess.)

1        THE COURT:  Mr. Jonas?

2        MR. JONAS:  Thank you, sir.

3   Q.   (BY MR. JONAS)  When we broke for the break I said I

4   wanted to move on to another subject matter, but I actually

5   don't yet.  I have one more question to ask you on what we

6   were talking about with the Palestine Committee and Omar

7   Yehia.

8        MR. JONAS:  If we can pull up Elbarasse Search

9   No. 10 and go back to that, please, page 4.

10  Q.   (BY MR. JONAS)  This is the same document I questioned

11  you about before.  The right hand side, do you see there is a

12  list of names?  Again, I asked you earlier about Munzer Taleb

13  and Fawaz Mushtaha.  And if you go to No. 4, do you see

14  El-Mezain?

15  A.   Yes, sir.

16  Q.   No. 11 is Shukri.  No. 13 Omar Yehia.  Again, were you

17  aware Omar Yehia, who was on that phone call, being part of

18  the Palestine Committee?

19  A.   No, sir.

20  Q.   Now I want to move onto another subject.

21       You testified yesterday about the atmosphere at the HLF.

22  Do you recall Ms. Duncan asked you questions about that?

23  A.   Yes, sir.

24  Q.   And you said it is a nice atmosphere, the doors are

25  unlocked.

1   A.   Yes, sir.

2   Q.   A happy place to work?

3   A.   Yes, sir.

4   Q.   Generally?

5   A.   Uh-huh.

6   Q.   Were there any rules and regulations or policies

7   regarding the conduct of people while they were at work?

8   A.   Yes, sir.

9   Q.   And I am going to be specific.  Was there anything

10  regarding employees' ability to surf the internet for

11  political or other affiliated websites?

12  A.   There was a verbal instruction by Mr. Shukri Baker that

13  nobody goes to any suspicious websites or political websites

14  or terrorist websites.

15  Q.   Okay.  Who did he give that instruction to?

16  A.   He instructed all employees.  I mean, verbally.

17  Q.   And When you say terrorist websites, as far as you know

18  did people follow that instruction?

19  A.   I have no idea.

20  Q.   You testified that HLF had multiple offices in the United

21  States.

22  A.   Yes, sir.

23  Q.   Dallas was the headquarters or Richardson was the

24  headquarters.  Correct?

25  A.   Correct.

1    Q.    Was there an office in Chicago?

2    A.    Yes, sir.

3    Q.    Who ran the Chicago office?

4    A.    Kifah Mustapha.

5    Q.    Were you aware if Shukri Baker gave the same instructions

6    about not surfing for political or terrorist websites?

7    A.    I have no idea.

8              MR. JONAS:  Can I have the elmo, please?

9    Q.    (BY MR. JONAS)  Do you know who this individual is?

10   A.    Sheikh Yassin.

11   Q.    Okay.  Do you know what he did when he was alive?

12   A.    He was founder of Hamas.

13   Q.    Do you know that this -- Were there any Other employees

14   in the Chicago office?  Was it just a one-man operation?

15   A.    Yes, sir.

16   Q.    Did you know Kifah was surfing the web and was hitting

17   websites that had multiple pictures of Sheikh Yassin?

18   A.    No, sir.

19   Q.    Would this be in violation of policy?

20   A.    Yes, sir.

21   Q.    Do you know what that is?

22   A.    That is -- I don't know him, but it is a picture of like

23   al-Aqsa Brigade.  I am not sure.

24   Q.    It looks like he is wearing a suicide belt?

25   A.    Yes, sir.

1  Q.   This also came from Kifah Mustapha's computer in Chicago,

2  the HLF computers.

3        Let me show you one more.  Do you see what the child is

4  holding?

5  A.   Yes, sir.

6  Q.   What is that?

7  A.   It is a grenade.

8  Q.   Also came from the same computer.

9        Did HLF have an office in New Jersey?

10 A.   Yes, sir.

11 Q.   Who ran that office?

12 A.   Abdulrahman Odeh.

13 Q.   That is the Defendant?

14 A.   Yes, sir.

15 Q.   Anyone else work in that office?

16 A.   No, sir.

17 Q.   Was he allowed to surf websites for terrorist websites?

18 A.   No, sir.

19 Q.   Are you aware this picture came from a website that he

20 surfed?

21 A.   No, sir.

22 Q.   By the way, I know this is a little difficult to see, do

23 you recognize the headband?

24 A.   It is the Hamas --

25 Q.   Okay.  You said that Shukri told people in the office

1   they can't surf.  Was that just in the Dallas office?

2   A.   I heard him in Dallas.

3   Q.   Okay.  Did he just tell this to you personally or tell it

4   to other people?

5   A.   No, other people.

6   Q.   Do you know if other people were surfing terrorist

7   websites?

8   A.   No, sir.

9   Q.   No, you don't know, or no, they weren't?

10  A.   No, I don't know.

11  Q.   This is from HLF Search No. 47.  This came from the

12  Dallas computers, the HLF office Dallas computers.  These are

13  from websites people were surfing in Dallas.  Do you see what

14  is around this person's head who is bending over?  Do you

15  recognize it?

16  A.   It is the Hamas headband.

17  Q.   Do you recognize what is on the right side of the

18  picture?

19  A.   The front, I mean, the rockets?

20  Q.   Rockets, yes.  And I don't know if you can see.  I am

21  turning multiple pages in this exhibit of many pictures taken

22  off the computer.

23       Let me show you another one.  This one has the website on

24  the picture itself palestineinfo.net.  Do you know what

25  palestineinfo.net is?

```
1    A.    No, sir.

2    Q.    Are you aware of Hamas itself having a website?

3    A.    No, sir.

4    Q.    I will show you one picture from the HLF computers.  Do

5    you recognize what is around their head?

6    A.    Yes, sir.

7    Q.    What is that?

8    A.    It is the Hamas headband.

9    Q.    Recognize what is around their waist?

10   A.    It is like TNT.

11   Q.    Explosives.

12   A.    Yeah.

13   Q.    Sir, do you find it a coincidence that in the Dallas

14   office, the New Jersey office, and in the Chicago office

15   people were surfing the web on these terrorist websites?

16              MS. DUNCAN:  Your Honor, I object.  That

17   mischaracterizes the evidence in this case.

18              THE COURT:  Overrule the objection.

19   Q.    (BY MR. JONAS)  Do you find it a coincidence?

20   A.    Well, I mean, nobody -- I mean, neither Shukri nor

21   anybody had control on anybody to surf the websites.

22   Q.    Apparently people were doing it.

23   A.    Yes, sir.

24   Q.    This is what was going on in the HLF.

25   A.    Well, I mean, some individuals, yes.
```

```
 1    Q.    I want to move on.  You mentioned when Ms. Cadeddu
 2    questioned you that during certain times of the year HLF
 3    needed more volunteers.
 4    A.    Correct.
 5    Q.    Fundraising volunteers.
 6    A.    Yes.
 7    Q.    And tell us again, what were those times of the year?
 8    A.    During Ramadan and during the Eid.
 9    Q.    Did Mufid Abdulqader only fundraise during those time
10    periods, or was he a year-round fundraiser?
11    A.    Whenever they need him.
12    Q.    Whenever they need him.
13    A.    Yeah.  If they need him they will call him.
14    Q.    So did they need him more than just Ramadan and Eid?
15    A.    Probably, yes.
16    Q.    Do you know how long he was fundraising for the HLF?
17    A.    No, sir, but I know when I joined in 1997 he was a
18    volunteer fundraiser.
19    Q.    And was he a volunteer fundraiser up until the time HLF
20    closed in 2001?
21    A.    Yes, sir.
22    Q.    All right.  Did the HLF have an office in Detroit?
23    A.    Used to have one.
24    Q.    Used to.  And who ran that office?
25    A.    Some guy.  I cannot recall his name.
```

```
 1    Q.    Does the name Musphaka sound familiar?

 2    A.    What is his name?

 3    Q.    Musphaka.  I am assuming I am pronouncing it correctly.

 4    I may not be.

 5    A.    I cannot recall that.

 6    Q.    Okay.  Did the HLF collect funds in Michigan?

 7    A.    Yes, sir.

 8    Q.    Did they have coin boxes in Michigan?

 9    A.    Yes, sir.

10    Q.    Are you aware that in order to collect -- to solicit

11    charitable contributions in Michigan, that you need to

12    register with the Michigan Secretary of State?

13    A.    When we start doing, all that was administration, but I

14    am not sure if we registered with Michigan or not.

15    Q.    Were you collecting funds in Michigan prior to being

16    registered?

17    A.    I have no idea.

18              MR. JONAS:  Your Honor, I would like to -- We don't

19    have this captioned so I can't play this.  We need to read

20    this call.  This is Baker Wiretap No. 41 that Your Honor has

21    admitted into evidence.

22              MR. DRATEL:  Your Honor, may we approach?

23              THE COURT:  All right.

24              (The following was had outside the hearing of the

25              jury.)
```

1          MR. DRATEL:  This sounds like 404(b).

2          THE COURT:  Which one?

3          MR. DRATEL:  This registration issue.  And I don't

4    know if this tape is going to get into that, or these tapes.

5    We just got them last night.  I haven't read them because we

6    didn't examine this witness.

7          MR. JONAS:  It is impeachment.

8          THE COURT:  On what?

9          MR. JONAS:  On him, because he talked on this call

10   that they are breaking the law in Detroit because they are

11   raising funds prior to being registered, and he is telling the

12   Detroit rep, "We need to register, but don't tell them we have

13   been raising funds yet."  This all goes to his credibility.

14         MR. DRATEL:  But it is still other bad acts by other

15   Defendants.  It is really about the Defendants' conduct.  He

16   never testified on direct about that.

17         THE COURT:  But he is on cross.  You have been doing

18   it all trial.

19         MR. DRATEL:  I am not suggesting that if it didn't

20   affect the Defendants that it wouldn't be appropriate, but I

21   think the problem is it is 404(b) and there was no notice.  We

22   just got these things last night.

23         THE COURT:  I don't think it is 404(b), I just don't

24   know why it is relevant.  Why is that relevant?

25         MR. JONAS:  Because he just said that, you know,

"You have to register, and I don't know if we are raising funds or not," and on the call he says, "We are breaking the law," and it goes to his credibility as a witness. He says, you know, "We are raising funds" --

THE COURT: "We have to register, but don't tell them we have been raising funds"?

MR. JONAS: "We have these coin boxes in Michigan." I am paraphrasing. "We are not allowed to have them."

"We are breaking the law." And that is a quote.

THE COURT: What kind of offense is it?

MS. SHAPIRO: I was just going to say that he testified that he always complied with all the rules of accounting principles, and clearly he knows he is not reporting money, and it goes to his credibility.

THE COURT: Reporting money is different than registration.

MR. JONAS: It is not reporting money. It is properly registering with the State of Michigan to solicit charitable contributions. He knows they are supposed to do that. They didn't do it. They didn't do it when they were collecting it, and he has a call with the Detroit representative and he says, "We are breaking the law."

THE COURT: And that is what this tape is about, No. 41?

MR. JONAS: Yes.

1          THE COURT:  Okay.

2          MR. DRATEL:  When he says "We are breaking the law,"

3    he is talking about everybody.  And it goes to the Defendants.

4    They don't have to call it 404(b) but it is.  Just because

5    they don't call it that, but it is other crimes.  That is what

6    he is saying.

7          MR. JONAS:  It is all tied into the fundraising.

8          THE COURT:  Then we start getting further and

9    further out.

10         MS. HOLLANDER:  Your Honor, there is an additional

11   problem, which is that for the first time in the history of

12   this country our clients can't look at their statements, so we

13   don't know what other conversations are around there.  And

14   when they give it at the last minute like this, we have no

15   opportunity to see what other calls there are what our clients

16   said about this.

17         THE COURT:  I am going to sustain the objection.  I

18   think this is not that pertinent to the issue, and you have

19   other areas you can cross examine him on.

20         MR. JONAS:  Let me raise the next area to save us

21   having to come back up.

22         MS. DUNCAN:  There are actually three calls that are

23   similar.

24         THE COURT:  All three of these?

25         MR. JONAS:  Not all like.  The next one is a donor

calls him and says, "I want a backdated receipt."  And he

agrees, and it goes to his credibility.  He is the accountant

and he is willing to backdate receipts.  I think it goes --

THE COURT:  That goes to his, without implicating

anybody else.

MS. DUNCAN:  Your Honor, I would like you to look at

that call, because that is not what the call says.  The donor

says, "I want to make a donation for $30,000.  I want to give

me a receipt for $100,000."

And Wafa says, "Absolutely not."

The donor says, "Well, can you at least backdate it?"

And  Wafa never agrees to it.  And the donor says he is

going to talk to his accountant and get back to Wafa, and that

is the end of the call.  I would like you to look at it

because I don't think -- it doesn't say.

THE COURT:  Do you have it?

MS. DUNCAN:  Yes.

THE COURT:  What is your position?

MR. JONAS:  I don't agree that that is what it says.

THE COURT:  What is the third one?

MR. JONAS:  The third one is he has testified how

all their books are open and available to the public.  He has

a call where he is chastising, for lack of a better term,

somebody regarding receipts for reimbursement.  And he talks

about in the call, you know, "We have got to do things right

1   because the FBI is listening to us."  And I think that goes to

2   his motivation.

3           MS. HOLLANDER:  I think Ms. Duncan has reviewed that

4   call, too, Your Honor, and I think there is much more to it.

5           THE COURT:  Ask her to bring that transcript up here

6   as well.

7           MR. JONAS:  That call they asked us to add

8   additional portion, which we did.

9           THE COURT:  You did.

10          MR. JONAS:  Yes.

11          THE COURT:  Are you going to the funeral this

12  afternoon, you and Jim?

13          MR. JONAS:  He hasn't said whether or not he is, and

14  Mr. Abington is his witness.

15          MS. MORENO:  Is Your Honor going?

16          THE COURT:  I am thinking about it.  It is at 4:00,

17  so we can work until 3:00.

18          MS. DUNCAN:  Up to this point he is basically

19  saying, "I am not going to do it."  And then he says -- they

20  start talking about the churches do it all the time, and Wafa

21  says, "We are not a church.  We have to be careful what we

22  do."  And then you go to here and it is the end of the call

23  and he never agrees to do it.

24          MR. JONAS:  And he says, "Yeah, as long as you write

25  the check on the date."

1          MS. DUNCAN:  The thing is -- I think he is trying to

2    understand what the guy is asking.  If you get to the next

3    page, it becomes clear.

4          THE COURT:  You can argue certainly both ways, but I

5    think they are entitled to play this.  It goes to his

6    mentality.

7          MS. DUNCAN:  The only other problem --

8          THE COURT:  And state of mind and credibility.

9          MS. DUNCAN:  Just because of the late disclosure, we

10   have no opportunity to find out if there is another phone call

11   that says never mind.

12         THE COURT:  This is impeachment.  And, you know, I

13   think they are entitled to cross examine him on this without

14   giving notice of everything they are going to cross examine

15   him on.  They can cross examine him on this.  And I don't

16   think it is unfairly prejudicial.

17         MS. HOLLANDER:  The only issue -- I understand what

18   Your Honor is saying, but the issue for us, which is that we

19   have thousands of tapes that our clients can't look to say is

20   there anything around here.  We have no way to do that.

21         THE COURT:  But you had a summary of this.  She

22   stated that, and nobody said otherwise.

23         MS. DUNCAN:  Your Honor, again, I don't know.

24         MS. HOLLANDER:  But there are 1,000 --

25         THE COURT:  I understand.  You keep saying that.

1     But unless this is one of those, if you can tell me that this

2     is one of those, I might have a different -- but he told me

3     they provided you --

4                MS. DUNCAN:  Do you know if this is one of the ones?

5                MR. JONAS:  I can tell you this.  The agents brought

6     me this call.  The agents were going through the summaries.

7     So my assumption is they got this call from the summaries.

8                THE COURT:  And they were turned over?

9                MR. JONAS:  All the summaries were turned over, as

10    far as I know.

11               MR. DRATEL:  There are 9600 pages of summaries.

12               THE COURT:  I know, but I can't help that.  As long

13    as they gave them to you.

14               MR. DRATEL:  I just wanted to --

15               MR. JONAS:  The summaries are organized.

16               THE COURT:  I understand.  But it is still

17    impeachment, and they are entitled --

18               MS. DUNCAN:  I wanted to clarify.  You are planning

19    to read the whole call?

20               MR. JONAS:  I don't have much of a choice, because I

21    got this so late I didn't have a chance to redact it.  But I

22    think most of the call does talk about this one subject

23    matter.  It is a nine-page call.

24               THE COURT:  Is there something in particular that

25    you are concerned about?

1    MS. DUNCAN:  When the person starts speaking "I want

2    this $100,000 receipt," and Wafa says, "no," and I think that

3    early part --

4    THE COURT:  You want don't want that in.

5    MS. DUNCAN:  I do, because he is saying, "I am not

6    breaking the law for you."

7    THE COURT:  What about the last one?

8    MS. HOLLANDER:  I am assuming that they just did

9    this now, because there was an order that we were supposed to

10   get all the verbatim translations.

11   MR. JONAS:  This was done in the last couple of

12   days.

13   MS. DUNCAN:  This is the last one.  I think it is

14   different than the other two.  This one is basically, and tell

15   me if I characterize it wrong, it is a phone call about --

16   there was apparently a double billing, a room that was

17   reserved on the Holy Land credit card and somebody else paid

18   for the room and the credit card company billed both.  And as

19   a matter of Holy Land policy, apparently there was a letter

20   sent to the fundraiser who used the credit card saying, "We

21   are deducting this out of your paycheck."

22   So this person is calling Wafa to say, "Let me explain to

23   you, it is a double billing problem; you shouldn't punish him

24   for it."  And Wafa talks a lot about how it is really

25   important that the Holy Land Foundation follow the law.  And

1    ultimately he says, "I am going to call the credit card

2    company and see what is going on."  So the Government wants to

3    bring it in just this part.

4              THE COURT:  And you want to use some of the other?

5              MS. DUNCAN:  I rather the whole thing not come in,

6    Your Honor, personally.

7              THE COURT:  It is awful long.

8              MS. DUNCAN:  I am not asking for the whole thing.

9    They wanted to put this part in, and then when I talked to Mr.

10   Jonas earlier I asked him to put in from over here, and I

11   think he had no objection to that.

12             THE COURT:  That is fine.  It is just a couple of

13   pages, then.  That is 18, and you started over at 17.

14             MS. DUNCAN:  And our objection -- I think the 106

15   issue, we resolved that without you.  It is a miracle.

16             THE COURT:  We are seven weeks into the trial.  It

17   is about time.

18             MS. DUNCAN:  We can finally get along.  If only that

19   could happen in the Middle East.

20        But for this one, I guess our objection to this is just

21   relevance.  I mean, Wafa --

22             THE COURT:  Well, I think it goes to his state of

23   mind, certainly, and I think they are entitled to use that.

24             MS. DUNCAN:  Those are the only three.

25             THE COURT:  Okay.

1          MS. HOLLANDER:  I was wanting to find the summary,

2     but I can't -- Without that I can't --

3          MR. JONAS:  I can look.  I mean --

4          MS. DUNCAN:  I may be able to answer that question.

5     Would it be on the exhibit list, the Government's exhibit

6     list?

7          MR. JONAS:  I am sorry, Your Honor.  This came to me

8     so late yesterday.  I have to check what I have.  It may be on

9     the disk itself.

10          THE COURT:  And you are looking to see the date?

11          MS. HOLLANDER:  To see if we have the summary or

12     not.

13          MR. JONAS:  If I can take a moment look at it?

14          THE COURT:  Sure.

15          MS. HOLLANDER:  They must have the summary because

16     they said they just brought it.

17          THE COURT:  He is going to go check.  We will

18     probably break about 12:15 and come back about 1:15, and then

19     break at 3:00.

20          MS. DUNCAN:  Okay.

21          THE COURT:  I am going to try to make that memorial

22     service.

23        After Mr. Abington, who else do you have?  Mr. Benthall?

24          THE COURT:  And who do you have besides him, just

25     numbers?

1          MS. HOLLANDER:  One or two more.

2          MS. SHAPIRO:  I think they have either Natalie

3     Suleiman and then there is Tripp Mackintosh.  And I understand

4     you haven't decided, but Tripp Mackintosh we filed a motion

5     last night.

6          THE COURT:  I haven't seen it yet, but I saw where

7     you filed a motion.  So those two, perhaps.  And how long

8     would you expect your direct?

9          MS. HOLLANDER:  Anyone else would be if the

10    Government put on rebuttal, we might have some surrebuttal.

11         MS. SHAPIRO:  I think we would object to

12    surrebuttal.  We had this discussion last year, but we aren't

13    there yet.

14         MS. HOLLANDER:  I hope we are never going to be

15    there.

16         THE COURT:  How long do you expect your direct on

17    these witnesses?

18         MS. MORENO:  Pretty short.

19         THE COURT:  Both of them?

20         MS. MORENO:  I think so.

21         MS. HOLLANDER:  I thought we were going to get to

22    Abington yesterday, and now it may not be until this

23    afternoon.

24         THE COURT:  Are you planning at this point to do any

25    rebuttal?

1                MS. SHAPIRO:  I think we are debating that right

2       now.  We are discussing it.

3                THE COURT:  We can discuss all that tomorrow, and

4       then we will make our decision by Friday.

5                MR. JONAS:  I can't find the date.  I apologize.

6                MS. MORENO:  If Your Honor is going to wait until

7       tomorrow to make the decision about Friday, and if we do work

8       Friday, if you will just call the Judge and let him know not

9       to hold me in contempt.

10               THE COURT:  If we don't work Friday?

11               MS. MORENO:  No, if we do work Friday so that I can

12      tell the Judge, because I think they don't quite believe me

13      that I can't give them an answer.  I do have co-counsel,

14      though.

15               THE COURT:  I thought that was resolved.

16               MS. MORENO:  Well, they think that I am the one that

17      should be there.

18               THE COURT:  Let's get on with it.  The jury is in

19      the box.

20               MR. JONAS:  I don't have the date.

21               THE COURT:  We will just have to deal with that.

22               (The following was had in the presence and hearing

23               of the jury.)

24               THE COURT:  I apologize for that delay, members of

25      the jury.  We are ready to go.

1          MR. JONAS:  I found the answer to the question we

2     were looking for.

3          THE COURT:  Okay.

4          MR. JONAS:  If I can just --

5          THE COURT:  Yes.

6          MR. JONAS:  No, Your Honor.  I apologize.  I don't

7     have the answer.

8          THE COURT:  Still don't have it.  Okay.

9     Q.   (BY MR. JONAS)  Sir, I want to ask you about donations

10    received by the HLF.  When someone makes a donation, does the

11    HLF give a receipt for the donation?

12    A.   Yes, sir.

13    Q.   Okay.  Is the receipt contemporaneous with the receipt of

14    the donation?  In other words, when you get the donation how

15    soon after do you issue a receipt?

16    A.   Well, we have monthly, you know, receipts that are to be

17    mailed out, and there is one annually.

18    Q.   Monthly an annually.  Can you explain that?

19    A.   Yeah.  I mean, if somebody gives a donation to the Holy

20    Land Foundation, at the end of the month we send a receipt for

21    everybody donating during that month, and at the year end we

22    will send the annual donation.

23    Q.   What do you put on the receipt?  What information?

24    A.   If I remember, I mean the donor's name, address, the

25    amount he donated, and the purpose for his donation.

```
 1   Q.   How about the date of the donation?

 2   A.   Yes.

 3   Q.   Does the receipt get signed?

 4   A.   Yes.

 5   Q.   Does that matter?

 6   A.   I mean, just as a signature on the donation, this is an

 7   official receipt.

 8   Q.   Do you know what backdating a receipt is?

 9   A.   Backdating receipts?

10   Q.   Did you ever give a receipt for a donation that you

11   received let's say on day one but the receipt reflected a

12   donation in a prior year?

13   A.   No, sir.

14   Q.   Had anyone ever asked you to do that?

15   A.   Well, no, sir, I don't issue the receipts.  But we made

16   it clear, I mean, the donations, the receipts will be dated

17   for the dates of the donation.

18   Q.   Okay.

19          MR. JONAS:  One moment.  Let me just provide that

20   information.

21   Q.   (BY MR. JONAS)  Did you ever consider backdating a

22   receipt?

23   A.   No.

24          MR. JONAS:  At this time I would like to read Baker

25   Wiretap No. 42.
```

1          THE COURT:  All right.

2     Q.  (BY MR. JONAS)  This is from January of 1999.  I am going

3     to pull up on the screen a transcript of a telephone call

4     involving yourself.

5          MR. DRATEL:  Your Honor, it is not in evidence.

6          MR. JONAS:  Your Honor --

7          THE COURT:  I did admit it this morning.

8          MR. DRATEL:  Okay.

9          MR. JONAS:  If we can go to the second page.

10    Q.  (BY MR. JONAS)  And I can't play this call, but I am

11    going to ask you if you can help me and roll play with me.

12    A.  Okay.

13    Q.  The participants are Bassam Faris.  I believe you

14    testified about him already?

15    A.  Yes, sir.

16    Q.  And yourself.  So the initials are going to be BA for

17    Bassam Faris and WA for yourself, and an individual named

18    Kosai K-O-S-A-I, and his initials are KO on this transcript.

19    Okay?

20    A.  Okay.

21    Q.  Do you know who Kosai is?

22    A.  No, sir.

23    Q.  We can skip the first part.  And what we will do is I

24    will read just the first few lines until we get to yourself

25    when you were on the call, and then you can read your lines

1    and I will read the others.

2        The call starts with Bassam answering, "Holy Land

3    Foundation."

4        And then the other person, Kosai, says, "Hello."

5        Bassam says, "Yes."

6        Kosai says, "Peace be upon you."

7        And Bassam says, "And peace and God's mercy be upon you."

8        And Kosai says, "May I speak with Wafa Yaish?"

9        That is you.  Correct?

10   A.    Yes.

11   Q.    And Bassam says, "Just a second, please."

12       And then if you can start reading your line and I will

13   read the other line.

14   A.    "Holy Land Foundation."

15   Q.    "Peace be upon you."

16   A.    "And peace and God's mercy be upon you."

17   Q.    "Brother Wafa?"

18   A.    "Yes."

19   Q.    "How are you?"

20   A.    "May God greet you."

21   Q.    "How is the health?"

22   A.    "Thanks to God."

23   Q.    "I apologize.  I am late calling you."

24   A.    "Not, not to worry."

25   Q.    "Kosai is with you."

```
1    A.    "May God greet you and you are welcome, brother Kosai."

2    Q.    Does this refresh your recollection as to who this

3    individual is?

4    A.    No, sir.

5    Q.    Okay.  "Welcome to you.  Welcome."

6    A.    "How is your health?"

7    Q.    Perfect.  Perfect?

8    A.    "Sir, frankly the question was, what I understand is that

9    your good self wanted to donate approximately $30,000,

10   provided that we issue a check for that with backdated -- I

11   mean backdated receipt."

12   Q.    "What happened this year is that I did not have a monitor

13   for the -- for the -- for the incoming profits."

14   A.    "Uh-huh."

15   Q.    "So I have profits which -- I mean, I have lots of

16   profit."

17   A.    "Uh-huh."

18   Q.    "So at the same time I have a considerable amount of tax

19   to pay for this year, so I spoke to brother Omar."

20   A.    "Uh-huh."

21   Q.    "As to paying you part and donating part.  You would give

22   us the -- for instance we want to donate 30,000 to you."

23   A.    "Uh-huh."

24   Q.    "And you give us that we donated $100,000 to you."

25   A.    "No, no, no."
```

1    Q.    "Backdated."

2    A.    "That we -- I mean, give you a receipt for an amount that

3    is different than what -- "

4    Q.    "Yes."

5    A.    "No, no, we cannot."

6    Q.    "You can't?"

7    A.    "No, no, we don't -- we cannot."

8    Q.    "Okay.  What is the -- "

9    A.    "No.  I mean, we issue a receipt for the amount that you

10   pay.  But we issue a receipt for amounts other than the

11   amounts that you -- this is -- I mean, you put yourself and

12   you put us into -- "

13   Q.    "I don't want to -- I mean -- "

14   A.    "Legal problem that has no -- "

15   Q.    "We don't want to -- "

16   A.    "Would you hold for me brother Kosai, just because, one

17   moment?"

18   Q.    "Yeah, go ahead."

19   A.    "One moment."

20   Q.    We can skip down to where you pick up again, "Hello.

21   Peace be upon you."

22         "And piece be upon you."

23         Go ahead?

24   A.    "Yes, my brother."

25   Q.    "Wafa?"

A. "Yes. Pardon me. I apologize."
Q. "No, not to worry."
A. "So this is the problem, I mean, that we can't issue a receipt for an amount other than we received."
Q. "Yes. If you backdate it."
A. "And?"
Q. "And to make it backdated."
A. "We cannot -- cannot. I mean, that brother Omar Al Kurdi did not -- did not make it clear to me."
Q. Who is Omar Al Kurdi?
A. He used to a Houston fundraiser.
Q. For the HLF?
A. Yes, sir.
Q. Okay. Does so far what we have read and then the mention of Omar Al Kurdi, does that refresh your recollection as to this call?
A. No, sir.
Q. Let's go on. "No, it is all right. Just so that one knows."
A. "Uh-huh. I mean, that even -- I told him, I mean, does he know for instance that if he wants to donate this amount if it is the company, he will only be liable for 10 percent of the taxable income."
Q. "I know."
A. "Yes."

1   Q.   "I understand what you are saying."

2   A.   "Yes."

3   Q.   "I am going to take these gain from the profit."

4   A.   "Yes.  Okay."

5   Q.   "Do you understand me?"

6   A.   "Uh-huh."

7   Q.   "They will be deducted from the profit and this will

8   remain."

9   A.   "I mean, we -- It is possible that with the same amount

10  backdated we will see -- We will try.  But that, for instance,

11  the 30,000 and issue you a check for 100,000, I mean, they

12  themselves will tell you prove it."

13  Q.   "Of course.  Of course.  Prove it.  I -- I need

14  everything as -- as your good self said, everything correct

15  and everything right."

16  A.   "Uh-huh."

17  Q.   "If anything happened."

18  A.   "Uh-huh."

19  Q.   "Do you understand me?"

20  A.   "Yes, my brother.  I am not -- "

21  Q.   "Well, just another small question.  How do the -- the --

22  the -- the entities like -- pardon me.  I mean, churches and

23  things, do they do that?"

24  A.   "Churches?"

25  Q.   "There are entities.  They do it."

```
1    A.    "They claim that they get 30,000 and they give them -- "

2    Q.    "It does.  They take -- they take certain amounts and

3    they give you amounts."

4    A.    "Do you mean a receipt in larger amount?"

5    Q.    "Yeah."

6    A.    "By God, I mean, I am not, I mean, I don't have any idea

7    about the -- some churches do they do it or not, but the issue

8    remains to where?  The churches, for instance, if we assume

9    that the churches do that, they remain protected in their

10   country.  We -- You know, all eyes are on us."

11   Q.    What did you mean by that?

12   A.    On Muslims.

13   Q.    All eyes on us being the Muslims are on us?

14   A.    Yes.

15   Q.    "Hmm."

16   A.    "I mean, as a Palestinian organization and they consider

17   us Islamic organization in this country.  You know how the

18   Jews looks at us with eye and their fire filled eyes."

19   Q.    What did you mean by that?

20   A.    You know, because, you know, there is a lot of Zionist,

21   Jewish organizations in this country.  Whenever, you know, we

22   give to a Palestinians, I mean, they don't like it.

23   Q.    They don't like it, but are they watching the HLF

24   carefully?

25   A.    Well, you know, as we see and read in the newspapers,
```

1   yes.

2   Q.   The newspapers say that the Jews are watching the HLF

3   carefully?

4   A.   Well, I mean, what they write about the HLF, you know,

5   and, you know, terrorists, front for Hamas or financial front

6   for Hamas, that is, you know, what is being written in the

7   newspapers.

8   Q.   Let's go can on.

9        "Yes."

10  A.   "I mean, that we make a mistake like this one."

11  Q.   "Yeah.  We don't want to."

12  A.   "I mean, or -- I mean, not you."

13  Q.   "It is just that one says that he benefits kids benefits

14  us, because all what they do is wrongdoing, wrongdoing."

15  A.   "Yes, yes."

16  Q.   "So when I lose this huge amount, I mean -- "

17  A.   "Uh-huh."

18  Q.   "For me it is a big amount.  It is the first year that I

19  pay it.  Do you understand me?"

20  A.   "How much do you owe IRS?"

21  Q.   "I, by God, owe approximately 100,000 or even 100,000."

22  A.   "Praise God.  Praise God.  This means that you -- you can

23  instead of what's called, you can donate a big amount."

24  Q.   "Yeah.  I can now donate.  Currently there is -- "

25  A.   "Uh-huh."

Q.    "But, I mean, also our lawyer is a Lebanese Christian."

A.    "Uh-huh."

Q.    "Also the other one, I mean, all -- each one of course
tries to steer -- "

A.    "Uh-huh."

Q.    "-- towards him."

A.    "Uh-huh.  I understand you."

Q.    "I have to make the decision."

A.    "Uh-huh.  I understand you.  It means that he tells you
to donate to churches."

Q.    "Yeah.  It doesn't -- We don't want to speak over the
phone, but I am just giving you head notes."

A.    "Yes, I understand you."

Q.    Do you know -- When you said you understand him, when he
says, "We don't want to speak over the phone," what did you
understand him to mean?

A.    It has been a long time.

Q.    You don't recall?

A.    I don't recall.

Q.    Okay.  "Do you understand me?"

A.    "Uh-huh."

Q.    "So I said, why should I give the benefit?  I will try to
see."

A.    "Uh-huh."

Q.    "Something, someone to give him the benefit, better

1    than -- "

2    A.    "By God, I wish we could -- he would have -- have -- have

3    told you yes, but it is that -- this lawyer, if they want to

4    do it, you know how?  It would be in an illegal method a

5    hundred percent."

6    Q.    "We know and understand."

7    A.    "I mean, and we cannot do it in any way, methods.

8    Firstly, we try to protect the Foundation.  Do you know what I

9    am saying here?  Secondly, it will draw attention to us."

10   Q.    "We don't want -- you and I myself do not want to be, I

11   mean, to draw anything.  I told you, everything, it has to be

12   legal."

13   A.    "Yes.  May God bless you, oh Lord."

14   Q.    "So since this is the case, brother Fiez, God willing,

15   you will hear from me."

16   A.    Who is Fiez.

17   Q.    That is what it says in the transcript.  Is that a name

18   that you have gone by?

19   A.    No.

20   Q.    Okay.  "God willing, you will hear from me.  Anyway, let

21   me see what -- how -- but you told me that we can backdate

22   even if I donated the amount."

23   A.    "Yes, as long as you, for instance, if you write the

24   check on the date or, I mean -- "

25   Q.    "Yes.  I have the check ready.  I may write it to you

1   with last year's date."

2   A.   "Uh-huh."

3   Q.   "In December, this is the most important."

4   A.   "Uh-huh."

5   Q.   "Okay?"

6   A.   "And that we received it late."

7   Q.   "Yes.  You received it late and such, and you did not

8   cash it until blah, blah, blah.  This year.  It doesn't

9   matter."

10  A.   "It doesn't matter how."

11  Q.   "What is important is that the receipt be backdated."

12  A.   "Hmm."

13  Q.   Do you understand me?

14  A.   "Uh-huh."

15  Q.   And I will call -- I will talk to the accountant today,

16  God willing.  They are coming here today.  I have a meeting?

17  A.   "Uh-huh."

18  Q.   "And we will see how.  You will hear from me tomorrow,

19  God willing."

20  A.   "May God bless you.  May God bless you."

21  Q.   "God willing, even the worst, we will see how -- what we

22  will do."

23  A.   "God willing.  May God greet you."

24  Q.   And there is just closing greetings or closing.

25       So this donor was asking to donate $30,000 and you give

1    him a receipt for $100,000, which you said you wouldn't do.

2    A.    No.

3    Q.    But he was also asking you to backdate the receipt to the

4    prior year, which you were willing to do?

5    A.    No.

6    Q.    No, you weren't willing to do it?

7    A.    No, I mean, if the check dates on that one, you know, for

8    the same year, I will give the check for the same year.

9    Q.    But this call is in January of 1999 and he is asking you

10   to backdate it to December of the prior year.

11   A.    It could be possible.

12   Q.    So you were willing to backdate a receipt.

13   A.    In this situation it looks like it.

14   Q.    To help him out on his tax situation.

15   A.    Well, I was -- As they say, I mean, I am trying any way

16   possible just to block him out, but it looks like, you know,

17   the guy, he just kept insisting.

18   Q.    He kept insisting and you agreed at least for part of his

19   request?

20   A.    Yes.

21   Q.    Okay.  Now, in that call you said several times about "We

22   are being watched," or "eyes are upon us."

23   A.    Yes.

24   Q.    I want to show you HLF Search No. 91.

25            MR. JONAS:  If we can pull that on the screen,

1  please.

2  Q.  (BY MR. JONAS)  Sir, this is a letter, or I guess this is

3  the cover page from a company called Executive Protection

4  Group, and it is dated in July of 2000.  You were working at

5  the HLF in July of 2000.  Correct?

6  A.  Yes.

7  Q.  Are you familiar with the Executive Protection Group?

8  A.  No, sir.

9  Q.  The letter states -- It is addressed to Shukri Abu Baker,

10 and it is addressed -- It states, "This letter is to thank you

11 and your organization for allowing EPG"--which is the

12 Executive Protection Group--"to provide a basic RF

13 countersurveillance sweep for your facilities on Wednesday

14 August 23rd, 2000."

15     Now, were you aware that the HLF hired a company to sweep

16 the Holy Land Foundation for bugs, electronic listening

17 devices?

18 A.  Yes.

19 Q.  You were aware of that?

20 A.  Yes.

21 Q.  Okay.  Why?

22 A.  They were doing a construction, you know, inside the Holy

23 Land Foundation, and the contractor, when he was trying to do

24 the wiring, I think in the attic he find, you know, like the

25 whole rewiring are not in its place.  So he advised.  So

1    Shukri said -- He said, "It looks like somebody is tapping

2    your phones and your lines, so you better check it."

3    Q.   And that is in 2000, this letter.  You can see the date

4    in the top left corner.

5    A.   July 29, 2000, yes.

6    Q.   Prior to this, the Holy Land Foundation bringing a

7    company to come in to sweep for bugs, were you aware of the

8    FBI actually tapping the phones?

9    A.   I have suspects, yes.

10   Q.   And did you tell people that?

11   A.   Well, I mean, probably, yes.

12              MR. JONAS:  If we can play Baker Wiretap No. 40.

13              (Whereupon, Baker Wiretap No. 40 was played, while

14              questions were propounded.)

15   Q.   (BY MR. JONAS)  If we can pause it for a moment, this is

16   a call that took place in February of 1999.

17   A.   Uh-huh.

18   Q.   So it is shortly after that last call THAT you and I just

19   read.  And you are on the phone, and it says Wafa, with Amar

20   Al-Jilani.  Does that name sound familiar?

21   A.   No, sir.

22   Q.   I may be mispronouncing it, but it is spelled  A-L hyphen

23   J-I-L-A-N-I.  Does it not sound familiar?

24   A.   No, sir.

25   Q.   He goes by the initials AJ.

1          Was it common knowledge at the HLF or common suspicion

2     that the FBI was eavesdropping on the calls?

3     A.    Yes.

4     Q.    And did you watch what you say or be careful what you say

5     in the phone because of that?

6     A.    Well, what I was saying is just, you know, insisting in

7     getting all the receipts, you know, from Abdul Jabbar from the

8     fundraiser so I can record it in the books so I wouldn't be

9     sitting in this chair as I am sitting right now.

10    Q.    But the prior call we read you talked about, "Eyes are

11    upon us," so --

12    A.    Yes.

13    Q.    So weren't you careful in what you had to say?  In fact,

14    didn't that person you were speaking to, the one regarding the

15    backdated receipt say, "We don't want to talk on the phone.

16    We shouldn't talk on the phone"?  You don't recall that?

17    A.    No.

18    Q.    Okay.  Did you ever report to the police that your phones

19    were being bugged--HLF?

20    A.    I have no idea.

21    Q.    Okay.

22              MR. JONAS:  Your Honor, I will pass the witness.

23              THE COURT:  Mr. Westfall?

24              MR. WESTFALL:  Your Honor, if I may, could I go on

25    for about as long as I can and then maybe we will break for

1    lunch so I can review these materials?

2              THE COURT:  We are going to break at about 12:15.

3              MR. WESTFALL:  Thank you, Your Honor.

4         Could I have the elmo?

5                    REDIRECT EXAMINATION

6    By Mr. Westfall:

7    Q.   Mr. Yaish, this is an exhibit we spoke about yesterday.

8    It is Defendants No. 1410.

9    A.   Yes.

10   Q.   And I want to show you something here.  Do you see this

11   little number right here, HLDL11 1501?

12   A.   Yes.

13   Q.   I will tell you that the evidence in this case is that

14   the FBI put those numbers on this document, and this means

15   they have had the documents since 2002.  Okay?

16   A.   Yes.

17   Q.   This is Defendants No. 1413, which is the journal

18   vouchers.

19   A.   Yes, sir.

20   Q.   Does it also.  There is No. 1413.  Does it also bear one

21   of those numbers?

22   A.   No.

23   Q.   Right there, the HLDL5 3114.  Do you see that?

24   A.   Yes, sir.

25   Q.   Okay.  Now, I want to talk to you just a bit about the

1  foreign accounts.  Okay?

2  A.    Okay.

3  Q.    And I want to kind of take them in turn.  Can you see

4  right here where the foreign accounts are?

5  A.    Yes, sir.

6  Q.    Can you see that?

7  A.    Yes, sir.

8  Q.    Can you see there is 2, 1, 8, 3, 4, 5, 6?  Do you see

9  those numbers?

10  A.    HLF Foreign Account 2, 1, 8, 3, 4, 5, 6, yes.

11  Q.    I want to speak to you about each one of those foreign

12  accounts.

13  A.    Okay.

14  Q.    Let's start with Foreign Account No. 2.  This is the

15  first page of HLF Foreign Account No. 2.  It is a Government

16  exhibit.  Can you see that okay?

17  A.    Yes, sir.

18  Q.    And what does the bank say?

19  A.    Ban Leumi.  It is an Israeli bank, Tel Aviv.

20  Q.    And then down here does that say "beneficiary customer"?

21  A.    Holy Land Foundation.

22  Q.    And then there is a number above it.  What is that

23  number?

24  A.    5401358.

25  Q.    Does that match?  Here is Foreign Account No. 2.

```
 1    A.    5401358, yes, sir.

 2    Q.    Okay.  Now, I want to show you what is already in

 3    evidence as Defendants' Exhibit No. 1393.  Okay?

 4    A.    Uh-huh.

 5    Q.    And this is a 10/20/98 transaction.

 6    A.    Yes, sir.

 7    Q.    I want to go to the request for wire transfers.  Is that

 8    what this is?

 9    A.    Yes, sir.

10    Q.    What is the date on this?

11    A.    11/24/98.

12    Q.    And where -- What account does it show that it is going

13    to?

14    A.    5401358.

15    Q.    Is that the same as HLF Foreign Account No. 2?

16    A.    Yes, sir.

17    Q.    And is there one of those little HLDL numbers on the

18    bottom of this?  Can you see that?

19    A.    001.

20    Q.    HLDL 001?

21    A.    Yes.

22    Q.    That was page 3.  This is the same exhibit page 5.  Does

23    that show the same account number?

24    A.    5401358.  Yes, sir.

25    Q.    The same exhibit, page 8.
```

1    A.    Yes, sir.

2    Q.    This is page 15 of the same exhibit.

3    A.    Yes, sir.

4    Q.    Does it have one of those numbers down at the bottom?

5    A.    001, yeah.

6    Q.    Same exhibit, page 20.  Is that that number again?

7    A.    Yes, sir.

8    Q.    And page 22.  Same number?

9    A.    Yes, sir.

10   Q.    I am going to show you now what is already in evidence as

11   HLF Foreign Account No. 4.  Okay?  Do you see this number

12   here?

13   A.    4883.

14   Q.    And here is Foreign Account No. 4, 4883J.

15   A.    Without the J, 4883 Cairo Amman.

16   Q.    See the highlighted part?

17   A.    Yes.

18   Q.    Does it say 4883?

19   A.    Yes, sir.

20   Q.    Now, we are still in Defense Exhibit 1393.  Okay?  Here

21   is page 33.  What number appears there?

22   A.    4883.

23   Q.    And what is the date, please?

24   A.    December 21st, 1999.

25   Q.    Okay.  And what is the bank?

```
 1   A.   Cairo Amman Bank.
 2   Q.   Here is page 34 of the same transaction.  Is that the
 3   same?
 4   A.   Yes, sir.
 5   Q.   And does it have one of those bates numbers at the
 6   bottom?
 7   A.   Yes, sir.
 8   Q.   Page 35.
 9   A.   Same account number.
10   Q.   Page 36?
11   A.   Account number 4883.
12   Q.   This is page 44.
13   A.   Account number 4883.
14   Q.   And is this a Social Services transaction?  We got the
15   orphan list with it.  Is that what this is?
16   A.   Yes, sir.
17   Q.   And where was this money being sent?
18   A.   It is being sent to Holy Land Foundation account in Cairo
19   Amman Bank for the benefit of the orphans.
20   Q.   Let me ask you this.  When you send a wire transfer, does
21   it take two banks?
22   A.   The sender and the receiver.
23   Q.   Right.  And when you sent the wire transfers here, did
24   you direct them on how to spend the money that is being spent?
25   A.   Based on the -- I don't see it here, unless there is the
```

1   breakdown of the others.

2   Q.   Right.  How much is that there?  $5,010?

3   A.   Yes.

4   Q.   This is the second page of the orphan list.

5   A.   Yes, sir.

6   Q.   Is this the same number?

7   A.   Yes, sir.

8   Q.   Same number?

9   A.   Yes, sir.

10  Q.   And in fact, here is page 53.  Here is page 55.  Here is

11  page 57, page 60, page 63, 65, 67, 69, 71, and 74.  And every

12  one of those we just went by, does it have that exact same

13  bank account number?

14  A.   Yes, sir.

15  Q.   I am going to skip down to HLF Foreign Account No. 6.

16  Can you read that account number there?

17  A.   0010005957032111814.

18  Q.   And how is it listed here on Foreign Account No. 6?

19  A.   5957.

20  Q.   Returning back to the same transaction, Defendants'

21  Exhibit No. 1393, this is page 93 of that exhibit.  Can you

22  see that?

23  A.   Yes, sir.

24  Q.   Is this an example of one of the transactions you were

25  talking about that would go into the Holy Land Foundation and

1   then be distributed from there into the zakat committees?

2   A.   Yes, sir.

3   Q.   This is page 94 of that transaction.  What date is that?

4   A.   June 14, 2001.

5   Q.   Okay.  And what account does it show it is going to?

6   A.   5957.

7   Q.   And then does that also have the HLDL 70 number?

8   A.   Yes, sir.

9           MR. WESTFALL:  Your Honor, may I approach for a

10  moment?

11          THE COURT:  Let's break here for lunch.

12      Members of the jury, for your planning today I have

13  another funeral that I am going to have to go to this

14  afternoon, so we will work until 3:00.  We will take a little

15  shorter lunch break.  We will break now and come back at 1:15

16  and work until 3:00 and break there for the day.

17          (Whereupon, the jury left the courtroom.)

18          THE COURT:  We will be in recess until 1:15.

19                  (Lunch recess.)

20          THE COURT:  Was there a matter we need to take up?

21          MR. JONAS:  May we approach?

22          THE COURT:  Yes.

23          (The following was had at the bench.)

24          MR. JONAS:  I am just making a verbal motion to seal

25  the transcript of the sidebar this morning regarding the issue

1    of the next witness.

2              THE COURT:  That is Probably a good idea.

3              MR. DRATEL:  And we should also redact one part of

4    the transcript.

5              THE COURT:  Redact?

6              MR. JONAS:  I consulted with the attorney from that

7    particular area, and he had reviewed the transcript on the

8    computer.  He said as long as it is sealed then we are okay.

9    So I am making that verbal motion to seal that transcript from

10   this morning.

11             MS. HOLLANDER:  No objection.

12             THE COURT:  All right.  We will order that that be

13   sealed.

14             MR. JACKS:  Judge, with regard of how to proceed, I

15   would at this time just agree to let's just see how it goes on

16   direct examination and see if there is an issue.

17             THE COURT:  So you are not asking for the hearing

18   prior to?

19             MR. JACKS:  No.

20             MS. HOLLANDER:  And I did give Mr. Jacks a copy, at

21   his request, which is fine with me, a copy of the specific

22   questions.

23             THE COURT:  Okay.  That makes it easier.

24             (The following was had in open court.)

25             THE COURT:  Bring the jury in.

1          (Whereupon, the jury entered the courtroom.)

2          THE COURT:  Mr. Westfall?

3          MR. WESTFALL:  Thank you, Your Honor.

4    Q.   (BY MR. WESTFALL)  Mr. Yaish, I would like to back up

5    just a little bit.  Tell us about what one of these audits was

6    like, one of these audits you were discussing with Ms. Duncan

7    and with the Prosecutor this morning.

8    A.   Well, the audit has a certain procedure.  You know, first

9    of all, it has to be an independent auditor.  I mean, it has

10   nothing to do any relationship with any of the employees or

11   any of the board members.  So we selected an independent

12   auditor requesting that they conduct a complete audit on the

13   company's financials.

14         So out of that they have to ask us questions, and we

15   answer the questions at the same time.  You know, they have a

16   certain audit procedures they follow step by step, and, you

17   know, based on each step, we have to collect the data and the

18   documents.

19         And after he finishes his audit, I mean, either they will

20   give us what they call a clean report, which is he didn't have

21   any major findings in the books, or he can give us what they

22   call some observation about the audit itself, and we have to

23   adjust those.  And after he finishes the complete audit, he

24   will issue his audited financial reports.

25   Q.   Okay.  Do you need some water?  Have you got water in

1   there?

2   A.    Yes.

3   Q.    Now, is this -- What you just outlined, is this the audit

4   that the Holy Land Foundation would have done each year on the

5   books?

6   A.    Yes, sir.

7   Q.    And about how long would one of these audits last?

8   A.    Well, it depends.  Mostly around three to four weeks.

9   Q.    And would the auditors actually come to the office or did

10  you send records to them?

11  A.    No, he comes to the office.

12  Q.    All right.  And what sorts of records would the auditor

13  have access to there?

14  A.    All of the records.

15  Q.    And were you available to answer questions of the

16  auditor?

17  A.    Yes, sir.

18  Q.    And did the auditor actually ask you questions from time

19  to time?

20  A.    Yes, sir.

21  Q.    We looked through Defendants' No. 1413 yesterday, which

22  is the journal vouchers.

23  A.    Yes, sir.

24  Q.    Now, these journal vouchers and the financial statements,

25  would those be made available to the auditor?

1    A.    Yes, sir.

2    Q.    There would be 12 months of those and then the journal

3    vouchers underlying them?

4    A.    Those are the basics.  If any auditor wants to check he

5    would check those also.

6    Q.    Okay.  And I saw in the materials the Prosecutor handed

7    you to refresh your memory with this file here.

8    A.    Yes, sir.

9    Q.    I saw some journal vouchers in there.  Would the

10    accountant actually want to make copies of some of them?

11    A.    Yes.  That is like back-up documentation for the audit.

12              MR. WESTFALL:  Your Honor, may I approach?

13              THE COURT:  Yes.

14    Q.    (BY MR. WESTFALL)  Now, I have given you Defendants'

15    No. 1413, which is those July of '99 journal vouchers, and

16    there is a part there that is clipped.  Would you do me a

17    favor and look through those and satisfy yourself that the

18    HLDL number is on every page?

19    A.    Yes, sir.

20              MR. WESTFALL:  May I approach, Your Honor?

21              THE COURT:  Yes.

22    Q.    (BY MR. WESTFALL)  Now, is this the same journal voucher

23    that we were talking about yesterday with the Tulkarem zakat

24    committee?  Is this the journal voucher that appears to have

25    covered all of the social dues for the month of July?  Do you

1    want me to hand it to you again?

2              MR. WESTFALL:  May I approach, Your Honor?

3              THE COURT:  Yes.

4    Q.  (BY MR. WESTFALL)  It is so hard on that elmo.  Just have

5    a look.

6    A.  Yes, sir.

7    Q.  This is HLDL5 3202.  What is this again?

8    A.  This is a wire transfer advice.

9    Q.  Okay.  And how did you get these?

10   A.  From the bank when we make the wires.

11   Q.  And as a routine, did you attach these to the journal

12   vouchers?

13   A.  Yes, sir.

14   Q.  Can you see the account there?

15   A.  5401358.

16   Q.  Is that the same as the HLF Foreign Account No. 2?

17   A.  Yes, sir.

18             MR. WESTFALL:  May I approach again, Your Honor?

19             THE COURT:  Yes.

20   Q.  (BY MR. WESTFALL)  I have set before you now Defendants'

21   No. 1217, Defendants' No. 1221, and Defendants No. 1436.

22   Would you please look at those, and I am going to ask you some

23   questions about them.  Okay?

24        Number one, are these business records from the Holy Land

25   Foundation?

A.   Yes, sir.

Q.   And are these records that the Holy Land Foundation kept in the ordinary course of its business?

A.   Yes, sir.

Q.   And was it the ordinary course of the Holy Land's business, in fact your department, to keep these records?

A.   Yes, sir.

Q.   And all of the entries in these records, were these made at or near the time of the events by a person with knowledge?

A.   Yes, sir.

     MR. WESTFALL:  Your Honor, I move for admission of Defendants' No. 1217, 1221, and 1436.

     THE COURT:  Counsel?

     MR. JONAS:  No objection.

     THE COURT:  Admitted.

Q.   (BY MR. WESTFALL)  I am going to back up a little bit.  I talked to you a little bit about HLF Foreign Account No. 1. Okay?  This is an exhibit that is already in evidence as HLF Foreign Account No. 1.  Is this number --

A.   10137717.

Q.   Now, this is what has just been put into evidence as Defendants' No. 1436.  And tell us, what is this thing right there?

A.   It is a bank wire advice.

Q.   Okay.  And what is the date on that?

1  A.    January 10, 1995.

2  Q.    That would have been before you even got there?

3  A.    Yes, sir.

4  Q.    Look at this number right there.  Do you see that?

5  A.    Yes there is numbers and 101377.

6  Q.    Okay.  So does that match foreign Bank Account

7  No. 1--101377?

8  A.    Yes, sir.

9  Q.    And 1013777.  And there is another 7 there actually.

10 Look there.  Is this one of those HLDL numbers?

11 A.    Yes, sir.

12 Q.    And you remember what that means?

13 A.    This is FBI records.

14 Q.    They have had since 2002?

15 A.    Yes, sir.

16 Q.    Okay.  What is this?  This is actually page 2 of this

17 same exhibit.

18 A.    This is a request of transfer of funds.

19 Q.    And is it to the same number?

20 A.    Yes, sir.

21 Q.    And does it also have one of these on it?

22 A.    Yes, sir.

23 Q.    Now, we already covered this one, which is 5401358, which

24 matches up with HLF Foreign Account No. 2.

25 A.    Yes, sir.

1    Q.    Is that one of them that we covered this morning?

2    A.    Uh-huh.

3    Q.    And this is Defendants' No. 1393 that we talked about.

4    A.    Yes, sir.

5    Q.    We won't go back through all of these, but I am trying to

6    recap a little bit.  Is this the bank account number of the

7    HLF Foreign Account No. 2?

8    A.    Yes, sir.

9    Q.    And is this again one of those HLDL numbers?

10    A.    Yes, sir.

11    Q.    This is HLF Foreign Account No. 3.  Do you see this

12    number here?

13    A.    465054.

14    Q.    And does that match up with this number?

15    A.    Yes, sir.

16    Q.    So HLF Foreign Account No. 3.  This is Defendants'

17    Exhibit No. 1221, pages 837 to 842.  Okay.  And what is this?

18    A.    This is an electronic payment advice.

19    Q.    And this is another one that predates you.  Right?

20    A.    Yes, sir.

21    Q.    Is this the account number over here?

22    A.    465054, yes, sir.

23    Q.    And who is the bank?

24    A.    Mercantile Discount Bank, branch Salaheldin Street,

25    Jerusalem, Israel.

1    Q.   And one of those HLDL numbers?

2    A.   Yes, sir.

3    Q.   The next page, is this the same transaction with the same

4    account number?

5    A.   465054, yes, sir.

6    Q.   This is from HLDL55 1064.  What is this?

7    A.   This is the same wire transfer advice.

8    Q.   Now, it is not the same one, but is it going to the same

9    account?

10   A.   465054, yes, sir.

11   Q.   Here is also HLDL55.  What is the reference here?

12   A.   Sixty-seven orphans.  That means there is a list of 67

13   orphans supporting that.

14   Q.   This is orphan dues?

15   A.   Yes, sir.

16   Q.   And what is the bank account this is going to?

17   A.   465054.

18   Q.   What is this?

19   A.   This is Eid gift.

20   Q.   Is that going also to the same 465054 foreign bank

21   account?

22   A.   Yes, sir.

23   Q.   And does this HLDL 1087, what is this going to?

24   A.   This is 12 needy families.  That is Social Services also.

25   Q.   And is that going to the same foreign bank account?

```
1    A.   Yes, sir.

2    Q.   Now, Foreign Account No. 4 is the one we covered earlier,

3    the 4883.

4    A.   Yes, sir.

5    Q.   And there are many pages represented in that in

6    Defendants No. 1393.  We went through those earlier?

7    A.   Yes, sir.

8    Q.   HLDL5.  Do you see HLDL5 up there?

9    A.   I don't see it.

10   Q.   Do you see this 149760?

11   A.   Yes, sir.

12   Q.   This is small, but can you make this out?  Does it say

13   9/5 --

14   A.   '01.

15   Q.   '01?

16   A.   Yes, sir.

17   Q.   $219,121?

18   A.   Yes, sir.

19   Q.   This is Defendants' No. 1217, page 55.  This 8/31/01,

20   does that appear to be the wire transfer?

21   A.   Yes, sir.

22   Q.   To the Holy Land Foundation?

23   A.   Yes, sir.

24   Q.   Do you see how this says 149760?

25   A.   Yes, sir.
```

1    Q.    This says 179760.

2    A.    Yes, sir.

3    Q.    Now, do these come to you after the wire has been

4    successfully done?

5    A.    The electronic wires, yes.

6    Q.    The advice?  Here it shows $219,121.  Right?

7    A.    There is the bank charges, probably $5.

8    Q.    Right.  It would be $5 exactly.  So whatever the mix-up

9    is on the number, it appears that the wire went to this very

10   account.  Would you agree?

11   A.    Yes, sir.

12   Q.    And that is HLF Bank Account No. 5?

13   A.    Yes, sir.

14   Q.    HLF Foreign Bank Account.  And does this document here

15   have one of those HLDL numbers on it as well?

16   A.    Yes, sir.

17   Q.    This is HLF Foreign Account No. 6.  Do you see the number

18   there?

19   A.    5957?

20   Q.    Exactly.  And you see how it is listed here--5957?

21   A.    Yes, sir.

22   Q.    Going back to Defendants' No. 1393.  Does that say 5957

23   on it?

24   A.    Yes, sir.

25   Q.    And what is the name of the bank?

1    A.    Cairo Amman Bank.

2    Q.    Okay.  And does that have one of those numbers at the

3    bottom, too?

4    A.    Yes, sir.

5           MR. WESTFALL:  May I approach?

6           THE COURT:  Yes.

7    Q.    (BY MR. WESTFALL)  I am handing you pages 94 to 144.

8    Will you do me a favor and just look through this and tell me

9    if they are all from the same account?

10   A.    They all are going to the same account.

11   Q.    And that is 5957, which is Foreign bank Account No. 6 on

12   the Government's chart?

13   A.    Yes, sir.

14          MR. WESTFALL:  And that is in Defendants' No. 1393,

15   for the record.

16   Q.    (BY MR. WESTFALL)  Finally, Foreign bank Account No. 7 is

17   already in evidence.  Here it says Foreign bank Account No. 8.

18   Well, there may actually be a Foreign Bank Account No. 7

19   because the number is different, but let me show it to you.

20   Is this in evidence, Foreign Bank Account No. 7?  You don't

21   think so?  No?

22          MR. WESTFALL:  Well, then, I will move in Foreign

23   Bank Account No. 7 as a demonstrative, Your Honor.

24          MR. JONAS:  No objection.

25          THE COURT:  Admitted.

Q.   (BY MR. WESTFALL)  And what is the account number on

this?

A.   352680.

Q.   Okay.

          THE COURT:  Is that what you had on your list as HLF

Foreign Account No. 7.

          MR. WESTFALL:  HLF Foreign Account No. 7.  Or

Foreign Bank Account.

          MR. WESTFALL:  This is Defendants' 1216, pages 16 to

17, for the record.

Q.   (BY MR. WESTFALL)  Can you see the account number on this

right there?

A.   Yes, sir.

Q.   Is that the same as Foreign Bank Account No. 7?

A.   Yes, sir.

Q.   And does that also have the HLDL number on it?

A.   Yes, sir.

Q.   Pages 49 to 52 of Defendants No. 1217.  Does that also

have the 352680?

A.   Correct.

Q.   And the HLDL number?

A.   Yes, sir.

Q.   Defendants No. 1221, pages 819 to 820.  Is this another

advice, another thing that the bank would actually mail to you

after the successful completion of a wire?

1   A.   Yes, sir.

2   Q.   And does that have the same foreign bank account number

3   on it?

4   A.   Yes, sir.

5   Q.   Does it also have an HLDL number?

6   A.   Yes, sir.

7   Q.   You actually visited with the Government on at least four

8   different occasions between 2002 and 2004.  Did the Government

9   or some agents from the Government visit with you four times?

10  A.   Actually six times.

11  Q.   Okay.  And in any of those six visits, did they ever ask

12  you to explain how the finances of the Holy Land Foundation

13  worked?

14  A.   They just want to know about, you know, the funding to

15  the orphans.

16  Q.   Did they ever, you know, ask you how the -- Like for

17  instance, the finance statements and the journal vouchers, how

18  the cash flows went through the organization; how you all kept

19  records?

20  A.   No, not in that detail.

21  Q.   Now, what is the ADL?

22  A.   I think it is Anti-Defamation League.  It is a Jewish

23  organization.

24  Q.   And during the time of, you know, the whole '99 period,

25  2000, 2001 period, in addition to the press saying things,

1   wasn't the ADL also saying things about the Holy Land

2   Foundation?

3   A.   Yes, sir.

4           MR. WESTFALL:  Would you do me a favor and pull up

5   Payments to Nablus Zakat Committee, the very last page?

6   Q.   (BY MR. WESTFALL)  Okay.  Do you see these two

7   transactions, the two transactions with the HLF foreign

8   account and no other information there?

9   A.   Yes, sir.

10  Q.   Okay.  Now, were you aware that the Government when they

11  actually seized all of these records, when the FBI came into

12  possession of these records in 2002, that there was some 500

13  bankers boxes, all told?

14  A.   I am not sure.

15  Q.   Okay.

16  A.   How many boxes -- I mean, I know they took all the

17  documents, but how many boxes, I have no idea.

18  Q.   Okay.  What are the dates of these last two transactions?

19  A.   July 8, 2001 and October 11, 2001.

20  Q.   And these are Nablus?

21  A.   Nablus zakat committee and Nablus zakat committee.

22          MR. WESTFALL:  Would you please pull up Payments to

23  Qalqilya, the last page?

24  Q.   (BY MR. WESTFALL)  Do you see the last two with just the

25  foreign account?

1    A.    Yes, sir.

2    Q.    What were the dates on those?

3    A.    July 8, 2001, and October 11, 2001.

4    Q.    So is that the same as the dates on the Nablus ones we

5    just saw?

6    A.    Yes, sir.

7              MR. WESTFALL:  Would you please pull up Ramallah?

8    Q.    (BY MR. WESTFALL)  There is not but one there.  What is

9    the date of that?

10   A.    October 11, 2001.

11   Q.    Okay.  And is that the same as the second date on both of

12   those previous ones?

13   A.    Yes, sir.

14             MR. WESTFALL:  Would you please go to Tulkarem and

15   pull up the last page?

16   Q.    (BY MR. WESTFALL)  What are those last two?  What are the

17   dates on those?

18   A.    July 8, 2001; October 25, 2001.

19   Q.    Okay.  The July 8th is that the same as the previous July

20   date?

21   A.    Yes, sir.

22   Q.    And then the October 25th would be two weeks

23   after -- Okay.  Did the Holy Land Foundation make a -- start

24   towards the end to move away from sending money directly to

25   zakat committees?

1   A.   Toward the end, yes, sir.

2   Q.   And is that when we start seeing the larger transactions

3   in '99, 2000, sometimes 2001 going to these Holy Land offices

4   and going from there out to the zakat committees?

5   A.   Yes, sir.

6        MR. WESTFALL:  May I have the elmo again?

7   Q.   (BY MR. WESTFALL)  And if someone just brought you for

8   your purposes of verifying the wire transfers -- Did you say

9   yesterday that if someone just brought you the request for

10  wires without the orphans lists, you would not verify that?

11  A.   I won't.

12  Q.   Now, here is a June 5, and this is page 91 of Defendants'

13  No. 1393.  And let me just skip ahead here.  This is page 93.

14  Can you see this okay with that bad copy like that?

15  A.   I can see what is in the middle.

16  Q.   This is $165,333?

17  A.   Yes, sir.

18  Q.   And is this number down here the same number as that?

19  A.   Correct.

20  Q.   Does this appear to be divided up between a number of

21  zakat committees?

22  A.   Jenin zakat and Holy Land Foundation--Jenin, Tulkarem

23  zakat, Qalqilya, Nablus, yes.

24  Q.   And these down here are zakat committees and

25  subcommittees, or whatever, that we have seen generally come

1    under the heading of the ICS Hebron?

2    A.    Yes, sir.

3    Q.    All of these wire transfers, now, do these all go to that

4    same foreign bank account 5957?

5    A.    Yes, sir.

6    Q.    Which is what?

7    A.    Cairo Amman Bank, Holy Land Foundation account.

8    Q.    Now, these last ones we just talked about, July 8th, '01

9    to Nablus, the July 8th, '01 to Qalqilya, and July 8th, '01 to

10   Tulkarem, and then the October 11 of '01 to Nablus, October

11   11, '01 to Qalqilya, October 11, '01 to Ramallah.  Okay?  In

12   what increments did the orphans dues, the family dues,

13   ordinarily go out?

14   A.    Sometimes every two months.

15   Q.    Sometimes two months?  Sometimes three months?

16   A.    Yes, sir.

17   Q.    So would it be consistent with two subsequent payments to

18   be in July and October?

19   A.    It could be.

20   Q.    And the fact that these all occurred on the same day, is

21   that consistent with two sets of payments for the family dues?

22   A.    Yes, sir.

23   Q.    And the orphans dues?

24   A.    Yes, sir.

25   Q.    So would you expect to see somewhere in all of the Holy

1    Land Foundation files the wire transfers and the requests for

2    wire transfers and the such that would back these transactions

3    up?

4    A.    Yes, sir.

5              MR. JONAS:  Objection; leading.

6              THE COURT:  He is asking about documents.  Go ahead.

7    Q.    (BY MR. WESTFALL)  This is HLF Search No. 50.  I guess

8    the Prosecutor mentioned that these came from looking at

9    websites.  Do you know how that works?

10   A.    No, sir.

11   Q.    I think -- Did you know that if you go to a website,

12   pictures automatically download into your computer?

13   A.    I have no idea.

14   Q.    Let me ask you this.  Do you know what that is?  How well

15   are you tuned into I guess the political organizations over in

16   Palestine?  What that is?

17   A.    No.  Somebody is carrying a machine gun and --

18   Q.    Do you see this PFLP?

19   A.    Yes, sir.

20   Q.    Have you ever heard of the --

21   A.    No, sir.

22   Q.    Popular Front for the Liberation of Palestine?

23   A.    Yes, I have heard of it, but I don't know that that is --

24   that PFLP stands for that.

25   Q.    Did the Prosecutor mention to you that in addition to

1   these pictures there were like icons for BBC News Agency?

2   A.   No, sir.

3   Q.   Al Jazeera?

4   A.   No, sir.

5   Q.   CNN?

6   A.   No, sir.

7   Q.   Did the Prosecutor mention to you that --

8            THE COURT:  Counsel, leave off the editorial

9   comment.  Just ask your question.

10  Q.   (BY MR. WESTFALL)  Did you know that there were thousands

11  of other images in the computers, these computers that were

12  recovered?

13  A.   No.

14  Q.   Images and things like -- There is one other one I wanted

15  to show you.  I guess it was in one of the other books.

16           MR. WESTFALL:  Now, Your Honor, I would like to move

17  in for admission again the video from yesterday, the Egypt

18  trip.  And what I have done is gone back and looked at the

19  record and I have found a basis for moving it into evidence.

20  Would the Court allow me to do that?

21           THE COURT:  If you want to try to lay your

22  foundation.

23  Q.   (BY MR. WESTFALL)  Now, I have now placed before you

24  again Defendants' No. 858.  We spoke about this yesterday, the

25  one relief mission that Abdul Odeh went on there to Egypt.

```
 1    A.   Yes, sir.

 2    Q.   Now, having reviewed the videotape, which you did before

 3    yesterday even, do you see in there an image of Abdul Odeh?

 4    A.   Yes, sir.

 5    Q.   And is there also a truck with relief supplies in it?

 6    A.   Yes, sir.

 7    Q.   And is there a banner on the side of the truck?

 8    A.   Yes, sir.

 9    Q.   Does the banner identify the date and the location?

10    A.   Yes, sir.

11    Q.   And does it also carry the Holy Land Foundation symbol?

12    A.   Yes, sir.

13    Q.   Is the video itself even dated?

14    A.   Yes, sir.

15    Q.   And is that consistent with the date that is on the side

16    of the truck on the banner?

17    A.   Yes, sir.

18    Q.   Is there a sign that says "Canada Camp"?

19    A.   Yes, sir.

20    Q.   And is that an UNWRA sign, United Nations Relief Works

21    Agency?

22    A.   Yes, sir.

23    Q.   In there also do you see people signing signature sheets?

24    A.   On the video, yes.

25    Q.   Yes.  And is it obvious that it is the distribution of
```

1    aid?

2             MR. JONAS:  I will object.  It is leading, and he is

3    getting into details in the video that is not in evidence.

4             THE COURT:  Sustained on leading.

5             MR. WESTFALL:  I am sorry, Your Honor.

6    Q.  (BY MR. WESTFALL)  Now, look at those pictures there in

7    front of you, the No. 1418, 1419, 1420, 1421, and 1422.  Do

8    those also have images of Abdul Odeh in all of them?

9    A.  Yes, sir.

10   Q.  And in those are the same images in those the ones that

11   you see on the videotape as well?

12   A.  Yes, sir.

13            MR. WESTFALL:  Your Honor, I had one other thing

14   just to present to the Court.  Agent Burns during her

15   testimony, the question was asked, "Now, Odeh went to Egypt

16   and took a relief mission to a U.N. camp there, didn't he?"

17        Answer:  "He did."

18        Question:  "And that was called the Canada Camp?"

19        Answer:  "I believe that is correct."

20        Now I think that between --

21            THE COURT:  I don't need to hear any argument.  Are

22   you moving those into evidence?

23            MR. WESTFALL:  Yes, I am.

24            THE COURT:  Mr. Jonas?

25            MR. JONAS:  We object to the same foundation as

1    yesterday.

2              THE COURT:  I think he has laid a foundation.

3    Defense Exhibit No. 858 and then 1418 through 1422 are

4    admitted.

5              MR. WESTFALL:  Thank you, Your Honor.  May I

6    approach?

7              THE COURT:  Yes.

8              MR. WESTFALL:  May I have just a moment, Your Honor?

9              THE COURT:  Sure.

10             MR. WESTFALL:  Your Honor, permission to publish

11   Defendants' Exhibit No. 858?

12             THE COURT:  Yes, sir.

13             (Whereupon, Defendants' Exhibit No. 858 was played

14             in open court.)

15   Q.   (BY MR. WESTFALL)  I am going to show you now, this is

16   No. 1422.  Is that just another scene from the same video?

17             MR. WESTFALL:  Well, Your Honor, I will pass the

18   witness.

19             THE COURT:  Ms. Duncan?

20             MS. DUNCAN:  Thank you, Your Honor.

21        Sorry.  I am a little less organized this time.

22                    REDIRECT EXAMINATION

23   By Ms. Duncan:

24   Q.   Good afternoon, Mr. Yaish.

25   A.   Good afternoon, Terry.

1    Q.    During cross examination the Prosecutor asked you about

2    reporting foreign bank accounts to the IRS.  Do you remember

3    that?

4    A.    Yes, ma'am.

5    Q.    And he asked you a series of questions about Schedule B

6    of Form 1040.  Do you recall that?

7    A.    Yes, ma'am.

8    Q.    Can you remind us what the Form 1040 is?

9    A.    It is individual tax return.

10   Q.    And was the Holy Land Foundation required to file the

11   Form 1040?

12   A.    No, ma'am.

13   Q.    Now, do you know if during the relevant time period the

14   Form 990 had a similar question about foreign bank accounts?

15   A.    No, ma'am.

16   Q.    I would like to show you what has been admitted into

17   evidence as HLF Tax No. 9, which is the Holy Land Foundation

18   Form 990 for the year 2000.  And am I correct that this is the

19   last Form 990 that was filed by the Holy Land Foundation?

20   A.    Correct.

21           MS. DUNCAN:  May I approach, Your Honor?

22           THE COURT:  Yes.

23   Q.    (BY MS. DUNCAN)  Mr. Yaish, would you please look through

24   that and let me know if you is see a question similar to that

25   found in the Form 1040 asking for foreign bank account

1    information.

2         You know, I may have a quicker way to do this, Mr. Yaish.

3    Let me ask you another question.  Do you know, does the IRS

4    change its forms, the forms you are required to fill out each

5    year, from year to year?

6    A.    Yes, ma'am.

7    Q.    And when they update the form, do they send out a new

8    form for each year?

9    A.    Yes, ma'am.

10   Q.    Do they -- In addition to the form, do they send out

11   publications to explain how you fill out the forms?

12   A.    Yes, ma'am.

13   Q.    And do they have a means for alerting the taxpayer of

14   changes, new things, new additions to the form from year to

15   year?

16   A.    Yes, ma'am.

17   Q.    And how does the IRS alert us to those changes?

18   A.    They send publications and they post it on the website

19   for any new forms or any new things to be added to the tax

20   return.

21   Q.    Okay.

22            MS. DUNCAN:  Your Honor, may I approach?

23            THE COURT:  Yes.

24   Q.    (BY MS. DUNCAN)  Will you look at this and tell us if you

25   recognize it?

```
1    A.    Yes, ma'am.

2    Q.    Does that appear to be a publication from the IRS?

3    A.    Yes, ma'am.

4    Q.    Does it appear to be an instruction for a Form 990?

5    A.    Correct.

6    Q.    And can you tell us what year?

7    A.    2005.

8    Q.    Thank you.

9          MS. DUNCAN:  Your Honor, I would like to mark this

10   as a Defense exhibit and offer it into evidence.  It would be

11   Defense Exhibit No. 1437.

12         MR. JONAS:  We object.  2005?  It is a little bit

13   late, Your Honor.  It is years after the Holy Land Foundation

14   filed their last tax return.

15         THE COURT:  What is the relevance of the 2005 --

16         MS. DUNCAN:  In the "what's new" section on the 2005

17   Form 990, it introduces for the first time a requirement that

18   an organization indicate whether it had an interest in a

19   foreign bank record, so it is offered to show that during the

20   entire time that the Holy Land Foundation was filing these

21   forms that that was not a requirement.

22         MR. JONAS:  Can we have a sidebar on this?

23         THE COURT:  Yes.

24         (The following was had outside the hearing of the

25         jury.)
```

1          MS. DUNCAN:  This is it.  I can do it the other way

2     and just show him.  This is just the quicker way.

3          MR. JONAS:  This is improper, Your Honor.  First of

4     all, she just testified.

5          THE COURT:  True.  But go ahead.  What was your

6     objection?

7          MR. JONAS:  My objection -- Can I see it, Your

8     Honor?  This is wrong.  This does not say that this is the

9     first time a charity is required to fill out the FBAR form.

10          MS. DUNCAN:  That is not what I said; that that

11     question was on the Form 990.

12          THE COURT:  The first time that that question was in

13     the Form 990?

14          MS. DUNCAN:  That was not my point, not the FBAR.

15          MR. JONAS:  Which was not the subject of my

16     questioning.  The subject of my questions was whether or not

17     he knew about the FBAR form and filled it out, which was

18     required by a charity.  So this is misleading, Your Honor.  It

19     is 2005.  I never asked him about the Form 990 and whether

20     that line was on the Form 990.  I asked about the 1040,

21     because it was on the 1040, and as a result he should have

22     been aware of it as a CPA.  That was the purpose of asking

23     about the 1040--his knowledge of this form.  Okay?

24          The charities were required to file this FBAR form going

25     back to the time period that he was working for Holy Land

1    Foundation.  I think this is misleading and it is improper.

2             THE COURT:  Okay.

3             MS. DUNCAN:  Your Honor, I mean, whether they were

4    required to file this form, we don't have that into evidence

5    either way.  It wasn't my intention -- That wasn't the point I

6    was making.

7        Mr. Jonas asked a long series of questions about 1040s

8    and having this question, and I want to clarify to the jury

9    that the form at issue here is Form 990, and it didn't have

10   that check a box here, so that the Holy Land Foundation wasn't

11   required to report on the Form 990 that it had these foreign

12   bank accounts.  That was my only point.

13            MR. JONAS:  And that wasn't my point.  My point was

14   the foreign bank reporting form, which is a completely

15   different form.  I never asked about the 990s.

16            MS. DUNCAN:  But he was asking about his knowledge

17   through these returns that he was filing.

18       I can move on, Your Honor.  I just wanted -- That was --

19   My whole point was that that question was not on the form, on

20   the returns he was required to file.

21            THE COURT:  Right.  But he wasn't challenging him on

22   filing those forms without that information.  It is not filing

23   this other form.

24            MR. JONAS:  Yes, sir.

25            MS. DUNCAN:  I think my concern was so much time was

1    spent on that form that it potentially misleads the jury into

2    thinking that he was required to report that on this form, and

3    he wasn't --

4         THE COURT:  He didn't mention this form in

5    connection with that.

6         MS. DUNCAN:  This is what my concern was about going

7    into this whole area, first of all, without the prior notice,

8    because it is complicated.  I mean, from my research it

9    appears that this requirement was part of the financial -- the

10   branch of the Department of Treasury that regulates banks, and

11   in 2003 it was moved into the IRS in order to ensure

12   compliance, particularly among individual filers.

13        So the suggestion was that somehow through preparing

14   returns he would know this information, but the fact that he

15   would know it from a 1040 wouldn't moon he would necessarily

16   know it --

17        THE COURT:  But he wasn't asked about the 1040 in

18   connection with that.

19        MS. DUNCAN:  I understand that, Your Honor.  I think

20   what I am just trying to clarify is that there was nothing in

21   the return, this return that the Holy Land Foundation had to

22   file, that asked that question.  So even if he saw it on the

23   1040 for an individual, it wouldn't mean that he would need to

24   know he needed to file it here on the 990.

25        MR. JONAS:  I think she can question him on that.

1    My objection is this document coming into evidence.  You

2    questioned him about the 990 and whether there is anything on

3    the relevant 990s, regarding filing that form -- Not filing

4    the form, but checking the box.  My objection is to this

5    document you are now seeking to introduce.

6            MS. DUNCAN:  My point was simply that it was on the

7    form 990, and that is what this was, which was the form for

8    the instruction 990.

9            MR. JONAS:  But it is a 2005 year.

10            MS. DUNCAN:  That was just to show that that is the

11    first year that this line was on that form.

12            THE COURT:  We are going around circles.  We have

13    already argued it.

14        So what are you proposing to do, then.

15            MS. DUNCAN:  I can move on or just ask him -- I was

16    trying to make it clearly.  I can ask him if he sees a line in

17    the 2000.

18            THE COURT:  All right.  That is not in evidence.

19            (The following was had in the presence and hearing

20            of the jury.)

21            MS. DUNCAN:  Your honor, may I approach?

22            THE COURT:  Yes.

23    Q.   (BY MS. DUNCAN)  Mr. Yaish, we are going to go back to

24    the 2000 Form 990.  If you could finish your review of that

25    form and see if there is any requirement on that form to

1    notify of foreign bank accounts.

2         THE COURT:  How much longer?  I haven't seen the

3    form.  How long is it?

4         MS. DUNCAN:  I think he is moving fairly quickly

5    through it, Your Honor.

6         THE WITNESS:  One thing I am sure of.  Whatever is

7    required on this form, we complied with it.

8    Q.   (BY MS. DUNCAN)  Okay.  Thank you, Mr. Yaish.

9         The Prosecutor also asked you about whether you were

10   aware if the Holy Land Foundation was part of a larger

11   organization, and you said you were not aware of that.  Do you

12   remember that?

13   A.   Yes, ma'am.

14   Q.   What did you mean when you said that you were not aware?

15   A.   I don't know.

16   Q.   When you were working for the Holy Land Foundation -- So

17   other than the representations of counsel, are you aware of

18   any evidence from your work at the Holy Land Foundation,

19   whether with the financial records or just working at the

20   Foundation, of the Holy Land Foundation being part of a larger

21   organization?

22   A.   Never crossed my mind that they are part of another

23   organization.

24   Q.   Did you see anything that would suggest that to you while

25   you were working at the Holy Land Foundation?

1   A.   No, ma'am.

2   Q.   Now, the Prosecutor showed you some documents to follow

3   up his questions about whether or not the Holy Land Foundation

4   was part of a larger organization.  Do you remember that?

5   A.   Yes.

6   Q.   Do you remember the dates of those documents?

7   A.   I think it is 1991.

8   Q.   And did you see an author on either of those documents,

9   who wrote them?

10  A.   No, ma'am.

11  Q.   And also the Prosecutor asked you about a telephone call

12  between a man named Omar Yehia and Shukri Abu Baker.  Do you

13  recall that?

14  A.   Yes, ma'am.

15  Q.   And I believe the Prosecutor asked you why Mr. Yehia

16  would be telling Shukri Abu Baker to pay Mr. El-Mezain money.

17  Do you recall that?

18  A.   Yes, ma'am.

19  Q.   Do you remember in this conversation Mr. Yehia

20  identifying himself as a go-between?

21  A.   Yes, ma'am.

22  Q.   In your experience, is it unusual for a person to act as

23  an intermediary during negotiations?

24  A.   Yes, ma'am.

25  Q.   It is unusual?

1    A.    No, it is not unusual.

2    Q.    It is not unusual.  And why would a third party be called

3    into a negotiation?

4              MR. JONAS:  Your Honor, I am going to object.  This

5    is completely speculation on his part.  He doesn't know.  He

6    said that he doesn't know why this person --

7              THE COURT:  I don't think she is asking about this

8    person.  She is asking generally based on his knowledge why a

9    third party may become involved.  She may ask.  Go ahead.

10             THE WITNESS:  Well, sometimes if somebody would feel

11   embarrassed to go directly to the other party, so he would

12   have somebody in between just, you know, to talk to them about

13   it.

14   Q.    (BY MS. DUNCAN)  Let's look at the transcript itself.

15             MS. DUNCAN:  If we can pull up Baker Wiretap No. 5,

16   please, and page 7.

17   Q.    (BY MS. DUNCAN)  And I will go ahead and read this.  Do

18   you see, Mr. Yaish, in the middle of the page Omar says, "I

19   don't -- to me I am a go-between."

20             Shukri says, "a-ha."

21   A.    Yes, ma'am.

22   Q.    And Omar says, "I am a go between you and nothing more."

23             And Shukri says, "You're a go-between."

24             And Omar says, "Yes."

25             And Shukri says, "You became a go between, Abu Mohammed.

1    I am doing this in your honor."

2        Do you see that there?

3    A.    Yes, ma'am.

4    Q.    Now, the Prosecutor also asked you specifically why Omar

5    Yehia would be telling Shukri to give El-Mezain $20,000.  Do

6    you remember that?

7    A.    Yes, ma'am.

8            MS. DUNCAN:  If we could go to page -- First of all,

9    if we could go to page 5 of the transcript, please.

10   Q.    (BY MS. DUNCAN)  And can you see here that Shukri and

11   Omar are sort of trading numbers.

12       Omar says, "We consider that he made ten trips, and we

13   pay him for the next ten trips."

14       And then we go down and Omar says, "One and a half trips

15   per day, which makes it 40,000."

16       Shukri sighs and says, "I don't know what to do."

17       And then we go down the page and Shukri says that he

18   would like to call Ghassan and see if he might be able to.

19       And then we go to the next page, and Omar suggests, "We

20   can say let's give him 25 now."

21       And Shukri says, "Hmm."

22       And then Omar says, "Well, how about 20?"

23       And then we go down and Shukri sighs, "I mean -- I mean

24   20 max."

25       Do you see that there?

1    A.    Yes, ma'am.

2    Q.    So this looks a little bit like a negotiation, does it

3    not?

4    A.    Yes, ma'am.

5              MS. DUNCAN:  Your Honor, can I just have a moment?

6              THE COURT:  Yes.

7              MS. DUNCAN:  I pass the witness, Your Honor.

8              THE COURT:  Ms. Cadeddu?

9              MS. CADEDDU:  No, Your Honor.

10             THE COURT:  Mr. Dratel?

11             MR. DRATEL:  No questions, Your Honor.

12             MS. MORENO:  No questions, Your Honor.

13             THE COURT:  Mr. Jonas?

14             MR. JONAS:  Yes, sir.

15                         RECROSS EXAMINATION

16   By Mr. Jonas:

17   Q.    Sir, let's start with a phone call.

18             MR. JONAS:  And if we can pull Baker Wiretap No. 5

19   on the screen first, page 1, the transcript.  Can you enlarge

20   the top half?

21   Q.    (BY MR. JONAS)  Ms. Duncan asked you about the date of

22   those documents I showed you before that you said were 1991.

23   What is the date of this phone call?

24   A.    1999.

25   Q.    Okay.  And Ms. Duncan asked you about -- she asked you to

1    speculate about why a third party would be brought into

2    negotiations.  In this phone call do you know why Shukri Baker

3    was talking to Omar Yehia about payments to El-Mezain?

4    A.    No.

5    Q.    Based upon your experience working at the Holy Land

6    Foundation, was the Defendant Mohammad El-Mezain embarrassed

7    to talk to Shukri Baker about money?

8    A.    I don't know.

9    Q.    Do you know what sarcasm is, sir?

10   A.    Yes.

11   Q.    When the phone call was played -- And I don't want to

12   have to play the whole thing again.  I want to see if you

13   remember this portion.  If not I will try to play this one

14   particular section.  Ms. Duncan asked you about the

15   discussion between Shukri Baker and Omar Ahmad where Omar

16   Ahmad says, "I am a go-between."

17   A.    Yes, sir.

18   Q.    Do you remember that portion when it was played?

19            MR. JONAS:  Your Honor, I apologize.  I need to get

20   to that section on the audio.  And I am going to ask Mr.

21   Lewis, I think it is clip A, if you can fast forward.  It is

22   going to take a moment.

23            THE COURT:  Yes, that is fine.

24            MS. HOLLANDER:  What is this?

25            MR. JONAS:  This is Baker Wiretap No. 5.

Q.   (BY MR. JONAS)  Sir, I asked you if you know what sarcasm

is.  Can't you tell when someone is talking in a manner of

speaking whether they are being sarcastic?

A.   Yes, sir.

          (Whereupon, a portion of Clip A was played in open

          court.)

Q.   (BY MR. JONAS)  Do you hear the way they were laughing

when Omar Ahmad said he was a go-between?

A.   Yes, sir.

Q.   It sounds a little sarcastic.

          MS. DUNCAN:  Your Honor, I object.  That is just

commentary.

          THE COURT:  Go ahead.

Q.   (BY MR. JONAS)  You don't know.  You are hesitating.

A.   It looks like, I mean, he just got surprised by somebody

intervening on behalf of El-Mezain.

Q.   Surprised somebody is intervening or saying he is a

go-between?

A.   When he said in Arabic -- He is trying to talk on behalf

of El-Mezain.  That is as if El-Mezain sent him to talk to

Shukri.

Q.   But Shukri's reaction was he was laughing at that?

A.   Yeah, it looks like he was surprised.

Q.   Surprised?

A.   Yes.

1    Q.    That is what you think?

2    A.    Well, I mean, the way he laughed, you know.

3    Q.    Now, Mr. Westfall asked you about those pictures.

4    Remember he showed you some pictures that came off the

5    computer?

6    A.    Yes, sir.

7    Q.    And Mr. Westfall showed you one and asked you whether or

8    not I had asked you about other images taken off of the

9    computer of Odeh.

10   A.    Yes, sir.

11   Q.    Did you meet with Mr. Westfall prior to testifying?

12   A.    No, sir.

13   Q.    Did you meet with any Defense counsel prior to

14   testifying?

15   A.    Just with Terry.

16   Q.    Did she show you pictures of the BBC or CNN taken off of

17   Odeh's computer?

18   A.    No, sir.

19   Q.    Mr. Westfall asked you about thousands of images or a

20   large number of images taken off of Odeh's computer.  Did they

21   show you any of them?

22   A.    No, sir.

23   Q.    Any idea what those images were?

24   A.    No, sir.

25   Q.    Other than the ones we showed you during your testimony

1    today?

2    A.   No, sir.

3         MR. JONAS:  Your Honor, no more questions.

4         THE COURT:  Mr. Yaish, you may step down.  You are

5    free to go.

6         Who is your next witness?

7         MS. HOLLANDER:  Mr. Abington.

8         THE COURT:  Do you want to put him on for 20

9    minutes?

10        MS. HOLLANDER:  It is up to you, Your Honor.

11        THE COURT:  Let's go 20 minutes, then, if he is

12   ready to go --

13        MS. HOLLANDER:  He is here.  He is just outside.

14        (Whereupon, the oath was administered by the Clerk.)

15                   EDWARD ABINGTON,

16   Testified on direct examination by Ms. Hollander as follows:

17   Q.   Good afternoon.

18   A.   Good afternoon.

19   Q.   Could you tell the jury your name, please?

20   A.   It is Edward Gordon Abington.

21   Q.   And Mr. Abington, in what city do you currently live?

22   A.   I live in The Hague in the Netherlands.

23   Q.   And in Europe?

24   A.   In Europe, yes.  That is correct.

25   Q.   Are you actually -- I guess we could tell this from your

1   voice, but are you actually an American citizen?

2   A.    I am.  I was born in Lubbock, Texas.

3   Q.    Actually a Texan.

4       Could you tell the jury a little bit about your

5   educational background -- Let me back up just so we have a

6   framework.  Did you -- And I am going to go into more detail,

7   but did you work for the United States government?

8   A.    I did.

9   Q.    Okay.  And what was your position with the United States

10  government between 1993 and 1997?

11  A.    I was the American Consul General in Jerusalem

12  representing the United States government in its dealings with

13  the Palestinian Authority.

14  Q.    Now, if you could tell the jury a little bit about your

15  educational background, starting with college.

16  A.    I went to Texas Tech for a couple of years and found West

17  Texas not so much to my liking, so I transferred to the

18  University of Florida where I had gone to high school in

19  Florida.  I got a Bachelor's Degree at the University of

20  Florida in political science, and then a Master's Degree in

21  history and international relations.

22  Q.    Was that also in Florida?

23  A.    At Florida.  At the University of Florida.

24  Q.    Now, you said that you worked for the United States

25  government in the '90s.  In what field have you worked most of

1   your life, the general field?

2   A.   I spent 30 years in the State Department as a diplomat

3   abroad.  And working in the State Department in Washington,

4   D.C. In the State Department if you are a foreign service

5   officer, as I was, you are periodically sent overseas.  And

6   then I transferred back to Washington.  So over a 30-year

7   period, I spent approximately 15 years overseas and 15 years

8   in Washington.

9   Q.   Before you worked in Washington, was there a time when

10  you worked in any other part of the United States government?

11  A.   I worked briefly -- After graduating from receiving my

12  Master's Degree, I worked briefly as an analyst for the

13  Central Intelligence Agency and then I was drafted into the

14  U.S. Army for two years in 1968.  And upon completion of my

15  service, I joined the State Department.

16  Q.   And when you were in the Army, what area did you work in?

17  A.   I worked in the Pentagon for the Assistant Chief of Staff

18  for Intelligence, and after that I was transferred to the

19  National Security Agency.

20  Q.   And where is that?  In Maryland?

21  A.   In Maryland, yes.

22  Q.   Is that -- And then so you went to work for the State

23  Department.  Would that have been what year?

24  A.   1970, April of 1970.

25  Q.   And that was after your discharge from the Army?

```
1    A.    That is correct.

2    Q.    Now, can you tell the jury what role in our government

3    the State Department plays?

4    A.    They represent the policies of the United States of the

5    administration in its dealings with foreign governments.  And

6    it reports to the State Department and other elements of the

7    national security apparatus--the White House, the Defense

8    Department, other U.S. government agencies--the discussions

9    analyses, et cetera of the policies of that particular

10   government.

11   Q.    And we have ambassadors in various countries.  Correct?

12   A.    Yes.

13   Q.    Are those people within the State Department?

14   A.    Yes, they are.

15   Q.    Is that someone, the ambassador, this person who is

16   called the Head of Mission?

17   A.    Chief of Mission.

18   Q.    Chief of Mission?

19   A.    Yes.

20   Q.    And does the ambassador also work with foreign

21   governments in the area wherever he is stationed, he or she?

22   A.    The ambassador is considered the President's personal

23   representative to deal with foreign governments.

24   Q.    Would it be fair to say that the ambassadors are the eyes

25   and ears of the United States in a foreign country?
```

1    A.    The ambassador and his staff or her staff.

2    Q.    Now, in what countries have you worked?

3    A.    I have worked in Israel from 1972 to 1975, I was then in

4    Tunisia in the '70s, and from there went to Damascus, Syria

5    and spent three and a half years in Syria.  I served twice in

6    Islamabad, Pakistan in the late '80s and the early '90s, and

7    from 1993 until 1997 I served in Jerusalem.

8    Q.    Do you read and speak Arabic?

9    A.    It is rusty.  I haven't used it since I left the State

10    Department very much, so it is really quite rusty.

11    Q.    Did you at the time you worked there?

12    A.    I used it as a working language.

13    Q.    Now, what exactly was your assignment in Jerusalem from

14    1993 to 1997?  You said you were the American Consul General

15    Can you just explain what that is, as I take it that you were

16    not the ambassador.

17    A.    Because the Palestinians did not have a state, the United

18    States government has never sent an ambassador to represent

19    the United States government, but since the 1830s there has

20    been an American consulate in Jerusalem.  It started off to

21    take care of pilgrims, American pilgrims who came to the Holy

22    Land, and it continued as an independent consulate, of which

23    it is currently the only one that the United States government

24    maintains.

25    Q.    Do you mean anywhere in the world?

1    A.    Anywhere in the world.  The Consul General is considered

2    to be the de facto ambassador to the Palestinian Authority.

3    Q.    Are there any other countries that also have Consul

4    General in Jerusalem?

5    A.    There are approximately nine to ten consulates there, and

6    those consulates -- the establishment of those consulates

7    predate the establishment of the state of Israel in 1948, and

8    they have been there ever since as independent consulates.

9    Q.    Did that make you the Chief of Mission for that area?

10   A.    I was -- At the time I was picked for assignment, I was

11   vetted by the White House, and my assignment to Jerusalem as a

12   Chief of Mission it is a Chief of Mission position, was

13   approved by the White House.

14   Q.    Now then, since you were in Jerusalem, did you also deal

15   with -- I guess you got there in 1993, but in The Palestinian

16   Authority was created in '93 or '94.  Correct?

17   A.    1994.

18   Q.    Okay.  And did you have dealings with the Palestinian

19   government?

20   A.    I did.  The Palestinian Authority was established after

21   an agreement negotiated in Cairo in May of 1994.  Following

22   the negotiation of that agreement, the Palestinian Authority

23   under the leadership of Yasser Arafat was established in Gaza,

24   the Gaza Strip and the Jericho area in the West Bank in the

25   summer of 1994.  And it was my responsibility to be a primary

1   American official charged with dealing with Mr. Arafat and

2   members of his government on a daily basis.

3   Q.   Now, just by way of background, you don't have to go into

4   a lot of detail, but did you -- We have heard about the Oslo

5   agreement, and I may ask you some more about that.  Were there

6   other agreements after that between the Palestinians and the

7   Israelis during the time you were there?

8   A.   Yes.

9   Q.   Did you negotiate any of those?

10   A.   I helped negotiate the 1995 follow-on agreement, which

11   was involved -- which involved the Israeli withdrawal from

12   certain cities of the West Bank, and the extension of the

13   authority of the Palestinian Authority into those cities.  And

14   then in 1996, 1997, we negotiated or I was part of the

15   negotiating team on an agreement involving the city of Hebron

16   involving Israeli evacuation from parts of the city and the

17   Palestinian Authority taking over control of those areas.

18   Q.   And after 1997 when you left that post, did you continue

19   to work for the United States government in any capacity?

20   A.   I did.  I was transferred back to Washington.  I was the

21   senior deputy in the Bureau of Intelligence and Research at

22   the State Department.

23   Q.   And did you ultimately retire from the foreign service?

24   A.   I left the foreign service in December of 1999.

25   Q.   And did you continue working?

```
1   A.    I worked until the end of 2006.  I was a consultant to

2   the Palestinian Authority advising them on their relationships

3   with the Administration in Washington, with Congress,

4   preparing reports on attitudes in Washington, interacting with

5   U.S. officials as well as with Palestinian officials.

6   Q.    And why do you currently live in the Netherlands?

7   A.    I met and married a very beautiful Dutch woman who was

8   transferred back to the Hague from Washington almost two years

9   ago, and I decided to join her.

10  Q.    We have heard a great deal in this case about the

11  Palestinian Authority and about Hamas, and you mention that

12  you were working for the Palestinian Authority up until

13  sometime in 2006.  And we know there was an election.  Were

14  you ever working for Hamas?

15  A.    Never.

16  Q.    Did you have contact -- We will get back to that.

17        Now, were you actually in Israel or the West Bank during

18  the election in 2006?

19  A.    I was.  I was there -- It was in January of 2006, and I

20  was there as an election observer.

21  Q.    And what cities were you in?

22  A.    I visited polls in the city of Ramallah, which is more or

23  less the capital of the Palestinian Authority on the West

24  Bank, and also in Nablus, a Palestinian city about 25 or 30

25  miles north of Ramallah.
```

1    Q.    And you said you were accredited as an election observer.

2    Who accredited you?

3    A.    The Palestinian Election Commission which organized and

4    put on the elections in 2006 and in 2005 when a new president

5    was elected.

6    Q.    Were there other Americans who were also accredited as

7    election observers, to your knowledge?

8    A.    Yes.    The National Democratic Institute, which is

9    headquartered in Washington, as well as the International

10   Republican Institute, also headquartered in Washington,

11   organized and sent to the West Bank and to Gaza and election

12   observer mission, which included, Americans, republicans and

13   democrats, and people from other countries as well, and it was

14   headed up by former president Jimmy Carter.

15   Q.    And just final background questions.    Have you ever given

16   any speeches on issues involving Israel and Palestine?

17   A.    Over the course of my career both in the foreign service

18   and after I left the foreign service, I gave numerous speeches

19   around the United States.    I gave one here in Dallas several

20   years ago, as well as numerous press and television

21   interviews.

22            MS. HOLLANDER:    Your Honor, I am going to move into

23   another area.    Do you want me to start another area?

24            THE COURT:    Why don't we just break.

25            MS. HOLLANDER:    Because that was the end of the

1    background.

2              THE COURT:  Let's go ahead and break for the day.

3    Be back at 9:00 in the morning.

4              (Whereupon, the jury left the courtroom.)

5              THE COURT:  We have some objections to some exhibits

6    that you are planning on introducing.

7              MS. HOLLANDER:  Yes, sir.

8              THE COURT:  Be back at 8:45, and we will take those

9    up.

10             MR. JONAS:  Your Honor, there was some complaints by

11   the Defense to summaries provided by the Government that are

12   called Baker Wiretap No. 40 and 42 that I played for Mr. Yaish

13   I gave Ms. Hollander a copy of the summaries we had provided

14   to them several years ago, so they had summaries of those

15   calls, and I wanted the record to reflect that.

16             MS. HOLLANDER:  Your Honor, I mean, there is a

17   little more to that.  I don't know if you want to go into it

18   now.

19             THE COURT:  Not right now.  I guess also for the

20   record I had admitted this morning when we discussed those No.

21   40, 41, and 42 and their A counterparts.  I guess 41 is the

22   one I sustained.

23             MR. JONAS:  Right.  And we will pull that out.

24             MS. HOLLANDER:  And we will take the rest of it up

25   in the morning?

1          THE COURT:   Yes.   We will take up the objections at

2     8:45.

3                              (End of day.)

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2          CORRECT TRANSCRIPT FROM THE RECORD OF

3          PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4          I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5          FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6          COURT AND THE JUDICIAL CONFERENCE OF THE

7          UNITED STATES.

8

9          S/Shawn McRoberts         06/09/2009

10        _____DATE_____
           SHAWN McROBERTS, RMR, CRR

11        FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25