IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA　　　) CAUSE NO. 3:04-CR-240-P
　　　　　　　　　　　　　　　(
vs.　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　( NOVEMBER 6, 2008
　　　　　　　　　　　　　　　) DALLAS, TEXAS
HOLY LAND FOUNDATION, ET AL　( 9:00 A.M.

_____


VOLUME 33 OF 37

_____


STATEMENT OF FACTS


BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE
and a jury

_____




A P P E A R A N C E S



FOR THE GOVERNMENT:　UNITED STATES ATTORNEY'S OFFICE
　　　　　　　　　　　1100 COMMERCE, 3RD FLOOR
　　　　　　　　　　　DALLAS, TEXAS 75242
　　　　　　　　　　　BY: MR. JIM JACKS
　　　　　　　　　　　　　MR. BARRY JONAS
　　　　　　　　　　　　　MS. ELIZABETH SHAPIRO

FOR THE DEFENDANT:　FREEDMAN, BOYD, HOLLANDER,
(SHUKRI ABU BAKER)　GOLDBERG & IVES, P.A.
　　　　　　　　　　　20 FIRST PLAZA, SUITE 700
　　　　　　　　　　　ALBUQUERQUE, NEW MEXICO 87102
　　　　　　　　　　　BY: MS. NANCY HOLLANDER
　　　　　　　　　　　　　MS. TERESA DUNCAN

```
 1              FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
                (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
 2                                   NEW YORK, NEW YORK  10005
                                     BY:  MR. JOSHUA DRATEL
 3                                        MR. AARON J. MYSLIWIEC

 4              FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
                (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
 5                                   DALLAS, TEXAS  75204
                                     BY:  MS. MARLO P. CADEDDU
 6
                FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
 7              (GHASSAN ELASHI)     P.O. BOX 10985
                                     TAMPA, FLORIDA  33679
 8                                   BY:  MS. LINDA MORENO

 9                                   JONES DAY
                                     555 CALIFORNIA ST., 26TH FLOOR
10                                   SAN FRANCISCO, CA  94104
                                     BY:  MR. JOHN D. CLINE
11
                FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12              (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                     FORT WORTH, TEXAS  76102
13                                   BY:  MR. GREG WESTFALL

14              COURT'S LAW CLERK:   MS. JENNIFER HELMS
                                     1100 COMMERCE, RM. 1654
15                                   DALLAS, TEXAS  75242

16              COURT COORDINATOR:   MS. BRENDA WEBB
                                     1100 COMMERCE, RM. 1654
17                                   DALLAS, TEXAS  75242

18      OFFICIAL COURT REPORTER:   SHAWN M. McROBERTS, RMR, CRR
                                     1100 COMMERCE STREET, RM. 1654
19                                   DALLAS, TEXAS  75242
                                     (214) 753-2349
20

21

22

23

24

25
```

# INDEX

**EXAMINATION**

| Witness Name | Page |
|---|---|
| EDWARD ABINGTON | |
| Direct By MS. HOLLANDER | 22 |
| Direct By MR. DRATEL | 100 |
| Cross By MR. JACKS | 101 |
| Redirect By MS. HOLLANDER | 169 |

## Defendants' Exhibits

| Defendants' Exhibits | Page |
|---|---|
| No. 1074, 1076 Admited into Evidence | 45 |
| No. 532 Admited into Evidence | 57 |
| No. 426 Admited into Evidence | 74 |
| No. 364 Admited into Evidence | 83 |

## Defendants Rest

| Defendants Rest | Page |
|---|---|
| | 170 |

1          THE COURT:  Good morning.

2      Let's go ahead and take up these Government's objections

3  to the exhibits.

4      Are you addressing these, Ms. Duncan?

5          MS. DUNCAN:  I am, Your Honor.

6          THE COURT:  Okay.  The first two, 364 and 532, are

7  photos.

8          MS. DUNCAN:  I think that is right, Your Honor.  Let

9  me look in my little stack.

10          THE COURT:  Same objection on foundation?

11          MR. JACKS:  The photos, yes, Your Honor.  And then

12  also in addition there is these two, No. 1198 and 1199, this

13  graffiti.

14          THE COURT:  Yes.  And we will get to those.  I was

15  just taking them in the order you have them listed.

16          MS. DUNCAN:  Yes, I see them, Your Honor.

17      As to both Defense Exhibits No. 364 and 532, we expect

18  the Defense witness has personal knowledge of the scenes that

19  are depicted therein.  For example, with No. 532 in his work

20  as Consul General he frequently visited the UNWRA camps and

21  can identify the UNWRA sign.

22          THE COURT:  Okay.  Of course, that will just depend

23  on you laying the foundation, so we can carry that one along.

24      That No. 966, that United Nations resolution?

25          MS. DUNCAN:  Yes, Your Honor.

1    THE COURT:  Resolution of 12/18/92, that was in

2  reference to the deportation?

3    MS. DUNCAN:  That is correct, Your Honor.  And we

4  are offering that as a public record.  He knows the

5  circumstances of this and will be testifying about it, so it

6  is admissible as a public record.  And the case law the

7  government cited to this Court to offer --

8    THE COURT:  I don't have a problem as far as -- The

9  trouble I am having is just the relevance of the U.N.

10  resolution.

11    MS. DUNCAN:  The relevance of it, the Government has

12  attempted to portray the Holy Land Foundation's support for

13  the people who were deported as support for Hamas, and the

14  fact is that the international community, including the U.N.,

15  found this to be a grave human rights violation, and this

16  resolution gives context to that support, and that the support

17  was intended to just remedy that grave human rights crisis,

18  not to support any terrorist group.  It simply was to provide

19  humanitarian aid to those who needed it.  And this resolution

20  gives context to that aid that the Holy Land provided and

21  gives a fuller picture than what has been offered through the

22  Government's witnesses.

23    THE COURT:  Mr. Jacks?

24    MR. JACKS:  Your Honor, first of all, it is not

25  certified as a public record.  It doesn't even show that it is

1    printed off the internet.  So again we are just -- The Defense

2    is circumventing the Rules of Evidence in terms of complying

3    with what is required to authenticate a public record.  And

4    the Government has endeavored not to do that, and there is no

5    reason that the Defense could not have written a letter to the

6    U.N., asked for a certification from the U.N., and asked for a

7    copy of this resolution.

8         Notwithstanding that, whatever the U.N.'s position was on

9    this particular event is not really relevant.  And there has

10   been testimony already that there was criticism of the

11   government of Israel and this item of evidence.  And I assume

12   he is going to testify to that effect.

13        This item of evidence is not necessary and it is, you

14   know -- it is not relevant to that particular issue.  It is

15   just another -- It is an attempt to inflame the jury and

16   arouse the emotions of the jury.

17        And the point really, the Government is not putting in

18   evidence that so much that the Holy Land -- They are putting

19   in evidence that the Holy Land Foundation supporting these

20   individuals, but the most probative part of that fact is the

21   fact that these individuals identified themselves as members

22   of Hamas, to show not so much the rightness or the

23   inappropriateness of them being deported, but the fact that it

24   identifies that the Holy Land Foundation is aware of the fact

25   that these are Hamas individuals.  So the issue about what the

1    U.N., how it regarded this event is not really relevant to

2    this discussion.

3        And as I said, this document has not been authenticated.

4    Again, it doesn't even rise to the level of showing something

5    that was downloaded off the internet.

6            MR. JONAS:  Your Honor, with regard to the

7    individuals, we highlighted specific individuals because those

8    are the same individuals who are later connected to the zakat

9    committees that Holy Land dealt with, so we pinpointed our

10   evidence to those individuals to show that those individuals

11   are Hamas, not the support overall.

12           THE COURT:  All right.

13       Ms. Duncan?

14           MS. DUNCAN:  With respect to the Government's

15   argument on relevance, they had an opportunity to describe

16   their meaning to that event, and now we are asking for our

17   opportunity to describe our meaning to that event, and this

18   particular document is relevant to that meaning.

19       With respect to the authenticity, it is not required that

20   this be certified.  It is required that looking at this, it

21   appears to be what it appears to be.  I mean, we could

22   probably get a copy that has a tag-line off of the internet,

23   but it will look just like this.  I mean, this is an exhibit I

24   believe that came in during the last trial.

25           MS. HOLLANDER:  It did come in during the last

1  trial, Your Honor, and Mr. Abington is familiar with this.  I

2  mean, he personally knows about it.

3          THE COURT:  I assumed he would.  That is why --

4          MS. HOLLANDER:  He could probably recite it without

5  looking at it.

6          MS. DUNCAN:  In terms of the relevance, also it is

7  important to remember that the United States is a member of

8  the Security Council at the time that this resolution was

9  issued, and that they were part of this resolution.

10          THE COURT:  But the concern that I have is what the

11  United Nations did -- Evidence has come out that the

12  international community criticized this.  It goes to the

13  Israeli action with the deportation.  That is really not an

14  issue that is here in this case.

15      You have evidence that that has been criticized, and of

16  course, you have evidence as to why Holy Land did what they

17  did to help, and that has been throughout the case, so I think

18  this is irrelevant to the issue.  I will sustain the objection

19  to No. 966.

20      No. 1071, then, is a letter from USAID to Larry Brady

21  regarding grant information.

22          MS. HOLLANDER:  May I ask a question about if the

23  document doesn't come in, I assume I can ask my witness about

24  the deportations.

25          THE COURT:  The deportation and the international

1    community criticism.  I don't want to get into did the U.N.

2    pass a resolution criticizing it in specifics, but then that

3    -- you can get into certainly that it was criticized.

4              MS. HOLLANDER:  I will just need to tell him,

5    because otherwise it will come out in his answer.

6              THE COURT:  All right.

7              MS. HOLLANDER:  Thank you.

8              THE COURT:  And No. 1071, do you have that before

9    you, Ms. Duncan?  That is that letter of May 16th, 2002 from

10   USAID to Larry *Brady* regarding a grant?

11             MS. DUNCAN:  Yes, Your Honor.  And before the letter

12   is a table of grants that were made by USAID and identifying a

13   grant that was made to the Nablus zakat committee.  Mr.

14   Abington is familiar with this particular project.  He has

15   personal knowledge of that project, and that is why we are

16   seeking to introduce this.

17             THE COURT:  Mr. Jacks?

18             MR. JACKS:  Judge, him saying that he has personal

19   knowledge of this project, I think that that needs to be

20   explored.  He may have been told about this project, but that

21   is not personal knowledge.  And this document is dated May

22   16th of 2002.  Mr. Abington, according to his earlier

23   statements, was completely out of the government by then.  He

24   left the Government in 1999.  So I do not see how he can

25   sponsor in or authenticate something that he had --

1          THE COURT:  That postdated his service there?

2      Ms. Duncan, any --

3          MS. DUNCAN:  He was working with the PA government

4  in 2002 is my understanding.

5          THE COURT:  Let me do this.  Why don't you just try

6  to lay your foundation through him and then offer it.  I have

7  heard the arguments, so I don't need to hear them again, and I

8  will just make a ruling at that time.

9      No. 1074.  That is that CAIR International final report.

10          MS. DUNCAN:  It is the same thing.  Mr. Abington is

11  familiar with this project.

12          THE COURT:  From what year is that?

13          MS. DUNCAN:  2005, Your Honor.

14          THE COURT:  Okay.  Same thing with that one, then.

15  Just lay your foundation through him, and then I will make the

16  decision at that time.

17      And then No. 1076.

18          MS. DUNCAN:  Same thing, Your Honor.

19          THE COURT:  Okay.  That is a USAID procurement

20  distribution list.  We will handle those three the same way,

21  then.

22      The next one, No. 1102, pictures of Laura Bush at the

23  Dome of the Rock on May 22nd of 2005.

24          MS. DUNCAN:  This picture, Your Honor, we expect

25  Mr. Abington to identify the individual on the right side of

1    the photograph as someone he recognizes as an Islamist, and of

2    course recognizes First Lady Bush in this photograph as well.

3    So he has personal knowledge of the event and the individuals

4    pictured.

5              THE COURT:  And the relevance of it is what?

6              MS. DUNCAN:  That the Government has attempted to

7    portray Islamists as terrorists, as people to be suspicious

8    of, and this shows that the Islamists aren't -- I mean, they

9    are not all terrorists.  Some of them are world leaders and

10   people with whom our government deals.  So it is offered as

11   sort of a counterweight to that portrayal that the Government

12   has given of what an Islamist is.

13             THE COURT:  Mr. Jacks?

14             MR. JACKS:  Well, again, Your Honor, the Rules of

15   Evidence seem to have just not been utilized here.  This is

16   something apparently downloaded off the internet, and I don't

17   believe that the creation of the internet supplemented the

18   Rules of Evidence in terms of what you have to do to

19   authenticate an exhibit.

20       Also my copy has a bunch of other photographs down the

21   side of the page, which are certainly not relevant.  And, you

22   know, we just think that there is no way that, first of all,

23   that he can lay the foundation for this exhibit; and

24   otherwise, it is hearsay to him.  He doesn't know about this

25   presumably, unless somebody told him.

1          THE COURT:  He stated he was familiar with this

2     particular occurrence?  He can identify the individuals?

3          MS. DUNCAN:  He can identify the individual and the

4     place where this meeting is taking place.

5        And with respect to the photographs at the right side

6     that Mr. Jacks mentioned, I believe these are just photographs

7     of First Lady Bush's visit to Jerusalem, and we can --

8          THE COURT:  Excise those?

9          MS. DUNCAN:  Yes, Your Honor.

10         MR. JACKS:  Your Honor, assuming the basis of his

11    knowledge is this, that he saw this picture, that is hearsay.

12    He doesn't have independent knowledge of it.

13         THE COURT:  We will let you ask him what he knows

14    and I will make a ruling at that time.

15       Then No. 1198 and 1199, those are pictures of graffiti,

16    some walls with graffiti.

17         MS. DUNCAN:  Yes, Your Honor.  And again

18    Mr. Abington is familiar with this sort of graffiti from

19    Hebron.  It appears in Hebron, which has been an area we have

20    discussed in this case.

21         THE COURT:  What is that relevant to as far as any

22    issue in this case?

23         MS. DUNCAN:  It is actually two points to it.  It

24    gives context to some of the speech we have heard in this case

25    that, you know, the jury and people here are not familiar with

1    the way that people in Israel and the West Bank and Gaza talk

2    to each other.  And this is illustrative of the way that some

3    Israelis talk to the Palestinians, which is using this

4    graffiti of "Death to Arabs.  Kill the Arabs."  And these are

5    things that Mr. Abington personally witnessed both with his

6    work for the U.S. government and for -- And also with his work

7    with the PA.

8                   THE COURT:  Okay.  Mr. Jacks?

9                   MR. JACKS:  There is nothing in this exhibit that

10   says where this picture was taken.  She says Hebron, but there

11   is nothing in here that indicates that.  There is nothing in

12   here that indicates that an Israeli did this.  The only

13   purpose of this exhibit is to inflame the jury.  For all we

14   know, this could be in London.  It could be anywhere.  And the

15   photographer could have done this, stepped back, and took a

16   picture of it.  There is no relevance to this.

17                  THE COURT:  I think that is my concern, regardless

18   of whether it is even, if it is as you stated in Hebron, that

19   is not relevant to any issues in the case.  I will sustain the

20   objection as to No. 1198 and 1199.

21                  MS. HOLLANDER:  Can I ask the witness whether he has

22   seen graffiti of anti-Arab and anti-Jewish, because he is

23   going to talk about both sides.

24                  THE COURT:  I think phrased like that that is okay,

25   and I think that has been discussed some.  I just don't want

1    to get into a lot of detail about that, because that is what

2    we have been trying to avoid.  The jury understands there is a

3    conflict there and there is two sides to it, but that is not

4    what this case is about ultimately.

5            MS. HOLLANDER:  Right.  And I understand.  That is

6    why -- There has been a lot of videos, et cetera, very

7    vitrupative talk.  He knows where these are --

8            THE COURT:  But that is focusing on Hamas, which is

9    the issue here, not the greater conflict the

10   Israeli-Palestinian conflict.  That is not an issue here other

11   than as a backdrop.  But we keep wanting to get into more and

12   more detail of it.

13       So I will let you do that some.  The way you phrased it

14   is fine.  But I don't want to spend a lot of time on it

15   because it is not relevant.

16           MS. HOLLANDER:  Can we just introduce the photos as

17   demonstratives?

18           THE COURT:  No.  I don't think those are relevant to

19   anything.

20       No. 1335, that is it looks like maps and then some photos

21   about the different closures.

22           MS. DUNCAN:  Yes, Your Honor.  It is actually a

23   PowerPoint, so those are printouts of the slides of the

24   PowerPoint -- this is a PowerPoint from the United Nations

25   office.

1          THE COURT:  Of course I have the same relevance

2    concerns with this.  It has been talked about that there are

3    closures and these issues, but I don't know why we need to get

4    into this.

5          MS. DUNCAN:  It illustrates his familiarity with the

6    effect of the closures on the economy of the Palestinians and

7    how it creates a tremendous amount of need.  And there has

8    been some testimony here about roads, through Doctor Levitt,

9    for example, attempting to minimize that impact on the

10   Palestinians and their economy.  And Mr. Abington has personal

11   knowledge of that impact, and these slides will help to

12   illustrate that point that the checkpoints and the road

13   closures do in fact create tremendous need both in the West

14   Bank and Gaza.

15          MR. JACKS:  Judge, this is exactly what we have been

16   talking about in terms of the Defense's effort to make this

17   case about the Palestinian-Israeli conflict.  This issue is a

18   political issue.  It has nothing to do with this case.  The

19   Defendants in this case have indicated that they are a

20   legitimate charity, that their purpose is to take care of the

21   needy, and neither the Government -- The Government has not

22   disputed that there are needy people and that there is need in

23   the occupied territories.  And the effort to go into this is

24   nothing more than an attempt to shift the blame, if you will,

25   or to attempt to have the jury focus on this greater conflict.

1    When they supply relief to earthquake victims, then don't

2    sit there and talk about that the earthquake was caused by

3    these tectonic plates that shifted and this is what happened

4    and this is why these people need it.

5    Their whole defense has been, "We are not political.  We

6    are apolitical.  We are only here to provide to the needy."

7    And the effort to shift the focus and to bring in what they

8    contend is the justification or reason for the need is really

9    an effort just to bring in the conflict.

10    I am sure the Court knows that there is another side to

11    this story, and the Government has not attempted to bring in

12    that side of the story because that is what we are seeking to

13    avoid--to make this case about the conflict.  And we object

14    not just to this exhibit, but we object to the effort to have

15    him testify about these events.  That is not relevant.  Their

16    position is that "We are an apolitical organization, just like

17    the Red Cross or any other organization, and it is not an

18    issue with us as far as -- we help Christians.  We help

19    non-observant Muslims.  We are apolitical."  And this is an

20    effort to politicize their case and to in essence have the

21    jury think that, "Well, regardless of what the law may say,

22    both sides have done wrong over there and so we are just not

23    going to find these men guilty."

24    That is not the purpose of this trial.  That is not the

25    issue in this trial.  And these exhibits and any of that

testimony that they would seek to elicit from him is not

relevant and is an effort to shift the focus of this case to

who is right in this argument who has done what to who.

THE COURT:  Ms. Duncan?

MS. DUNCAN:  We are not trying to shift the focus of

this case.  We are trying to provide a full and accurate

picture of the need in both the West Bank and Gaza, and the

Government -- Not all of their evidence has been about Hamas.

It also has been speech of other Palestinians and other

Palestinian groups, and what we are intending to do is just

provide a full picture of the speech and the events that took

place in this case.

It is not to say it is Israel's fault or not the

Palestinians' fault.  It is just to give that fuller picture,

and that is what this exhibit is intended to do.

THE COURT:  Again I am going to have to disagree.  I

don't think this is relevant.  There is evidence about the

closures.  That has already come out.  There is some evidence

about why the Israelis did what they did, but I don't think we

need anymore than that because, again, it gets into the

broader conflict.

So certainly you are entitled to talk about the need.  He

can talk about the need and why aid was necessary.  That is

not a problem.  That goes to the defense.  But I don't want to

get into the broader political situation, so I will sustain.

1          MS. HOLLANDER:  Your Honor, I have a question about

2     that one, too.  I have to have some guidance here.

3          THE COURT:  Go ahead.

4          MS. HOLLANDER:  I would like -- Doctor Levitt

5     testified that there were 200,000 people in settlements, and

6     we believe that that is wrong.  He also testified, much more

7     importantly, that Palestinians can drive on the bypass roads

8     except during times of high security and, therefore, there is

9     not this problem of people being separated from their own

10    lands, and this is -- I mean, Mr. Abington will impeach that,

11    and I do want to ask him that.

12         And my request would be -- The other thing was that

13    Doctor Levitt complained about one of my exhibits, which was

14    No. 1110, because it shows all of the settlements as though

15    they are the same size, the little triangles.  I would ask the

16    Court to let us introduce just one page from that, and I can

17    show you which one it is.  It is the page that simply shows

18    the three areas and it actually shows the populations.

19         THE COURT:  Turn it around so I can see.  I may be

20    able to see it.  No, I can't see it.  I think I see it.  Come

21    up a little closer so I can take a look.  Let me see that.

22    Actually that is the one I have.

23         MS. HOLLANDER:  Just that one I would like to

24    introduce, because that is a more accurate one than the one

25    actually that I have.

1          THE COURT:  Show that to Mr. Jacks.

2          MR. JACKS:  Is it among the ones you submitted?

3          THE COURT:  It is.

4          MS. HOLLANDER:  It is part of that.

5          THE COURT:  There is a map already in showing

6     settlements?

7          MS. HOLLANDER:  Yes.  It is 110, and I just think

8     this one is more accurate.

9          THE COURT:  Okay.

10         MR. JACKS:  Your Honor, they are the ones that

11    brought it up with Doctor Levitt, so it is bootstrapping.

12    They bring it up with him and then they are using that to

13    justify bringing in this other evidence.  So they shouldn't

14    have brought it up in the first place because it is not a

15    relevant issue.

16        But once they brought it up--the Government didn't bring

17    it out, they did--so now they are using their own -- the fact

18    that they brought it up themselves during cross examination to

19    justify bringing it in during Mr. Abington, and it is not

20    proper.  Just the fact that they were successful or they asked

21    Doctor Levitt about it and he gave them an answer doesn't mean

22    they now get to contradict him or attempt to contradict him.

23    They shouldn't have asked him that question in the first

24    place.

25         THE COURT:  I don't know if there was an objection,

1    counsel, at the time, but it is in so I am going to let them

2    put this map in.  It is related to that other one.  I think

3    you can get that one in, assuming Mr. Abington can recognize

4    it.

5             MR. JACKS:  Your Honor, for the record we objected

6    before trial, so, I mean, we had objected to them going into

7    that.

8             THE COURT:  You objected generally, and then I asked

9    you for some specifics and you couldn't give me any specifics

10   at that time, so we went along trying the case.  And sometimes

11   you objected and sometimes you didn't.  You got some things in

12   and they put some things in.  So there is some evidence in.  I

13   don't know whether you objected to this in particular or not.

14        And I know you didn't object to a lot of issues because

15   you were also discussing them.  Maybe this one you did.  I

16   don't remember.  But the map is in, so I think they can put

17   this other one in if they want to draw a contrast.

18            MR. JACKS:  I have a question about how much he will

19   be able to talk about it, then, because it would seem that

20   there is no value in this evidence if he doesn't explain --

21            THE COURT:  She says she wants to use it to impeach

22   Doctor Levitt's testimony, so we will let them go there.  And

23   if you have objections to anything beyond that, why don't you

24   object at the time.

25        I don't want to get into everything she is going to ask

1   because we just don't need to do that.  You just object if you

2   have an issue that you think there is an issue that goes

3   beyond the scope of what we are dealing with here.

4         MS. HOLLANDER:  Your Honor, it is Defendants

5   No. 1423.  I renamed just the individual one as No. 1423.

6         THE COURT:  Okay.

7     Any other matters before the jury comes in?

8         MS. DUNCAN:  Your Honor, did we talk about Defense

9   Exhibit No. 364?

10        THE COURT:  I believe we did.  Yes.  That is that

11  photo, and all the photos No. 364, 532, and then the letters,

12  and then 1102, you are going to lay a foundation and I will

13  make a ruling at that time.

14        MS. DUNCAN:  Thank you, Your Honor.

15        MS. HOLLANDER:  There is one more.  I don't know if

16  the Government maybe doesn't have an objection to.  It wasn't

17  on that list.  I sent it to Mr. Jacks later, but in the email

18  he may have missed it.

19        MS. SHAPIRO:  We also filed objections to the

20  exhibits that John Benthall intends to sponsor, and you may

21  not have seen those yet.

22        THE COURT:  I haven't.

23        MS. SHAPIRO:  Later in the day before he gets on,

24  just so you know, they are out there.

25        THE COURT:  I will take a look at them.

1       Are we ready for the jury, then.

2           MS. HOLLANDER:  I need just a minute.  I can do it

3   while the jury comes in to explain some of these things to --

4           THE COURT:  Why don't you go ahead and take that

5   minute to make sure everybody is on the same page.

6           MS. HOLLANDER:  Thank you, Your Honor.

7           THE COURT:  Go ahead and bring the jury in.

8           (Whereupon, the jury entered the courtroom.)

9           THE COURT:  Ladies and gentlemen of the jury, good

10  morning.  We are ready to proceed.

11      Ms. Hollander?

12          MS. HOLLANDER:  Thank you, Your Honor.

13  Q.   (BY MS. HOLLANDER)  Good morning.

14  A.   Good morning.

15  Q.   We have just about finished the background.  I just

16  wanted to finish one other question that I didn't get to

17  yesterday.

18      Are you being paid for your testimony today?

19  A.   No, I am not.

20  Q.   Now, I want to draw your attention primarily to the time

21  first when you were working as Consul General representing the

22  United States.  And to some extent after that, based on your

23  personal knowledge, what you know during those years -- And I

24  want to start by way of background with the years '93 to '97

25  when you represented the United States government.  During

1    that time did you have an office in Jerusalem?

2    A.   I did, the American consulate was located with offices in

3    both East Jerusalem and West Jerusalem.

4    Q.   And can you explain why we had two offices in Jerusalem?

5    A.   It really goes back to pre 1967 War, because the

6    Jordanians were in control of East Jerusalem and the West

7    Bank, and the Israelis of course were in control of West

8    Jerusalem.  So up until that point we maintained offices, the

9    United States government, in both East and West Jerusalem.

10        After the '67 War, Israel declared the unilateral

11   unification of the city and annexed a large amount of land in

12   East Jerusalem.  The United States never recognized that

13   annexation, but kept its offices in both East and West

14   Jerusalem.

15   Q.   And did you work in both or in just one of them?

16   A.   Essentially I worked in West Jerusalem, because that is

17   where the political offices were, that is where our

18   communications were, and the office in East Jerusalem was a

19   consular office for the issuance of visas and passports, and

20   also the United States Information Agency head offices there.

21   When Secretaries of State, like Warren Christopher or

22   Madeleine Albright would come to Jerusalem and meet with

23   Palestinians, frequently we would meet in the offices of East

24   Jerusalem.

25   Q.   Now, during the time you represented the United States

1   government in Jerusalem, did you receive regular briefings

2   from the United States government?

3   A.    I did.

4   Q.    Were they on -- How often?

5   A.    On a daily basis.

6   Q.    And as part of those briefings, did you receive any

7   guidance from the United States government regarding Hamas?

8   A.    Yes, on occasion.

9   Q.    Were you told to interact with Hamas or not interact with

10  Hamas?

11  A.    There were very strict instructions issued by the

12  Department of State that U.S. government officials, no matter

13  what agency, whether it was the Commerce Department or the

14  State Department, or whoever, were not to have any dealings

15  with Hamas officials.  And those were standing instructions,

16  which are valid until today.

17  Q.    Did the United States government have any information

18  sharing relationships with foreign governments?

19  A.    Yes.

20  Q.    And did the United States government have any information

21  sharing relationships with Israel?

22  A.    It does.

23  Q.    And one more on that subject.  Does the United States

24  government have information sharing relationships with the

25  Palestinian government in the West Bank, I guess the PA before

1    2006?

2    A.    That is correct.  Yes, it does.

3    Q.    And now, as a United States representative, did you

4    personally consider all the information from the Israeli

5    government to be reliable?

6    A.    No.  I think some was, but others was of questionable

7    reliability.

8    Q.    Let me turn to a different subject.  Do you know what a

9    zakat committee is?

10   A.    I do.

11   Q.    Is zakat an Arabic word?

12   A.    Yes, it is.

13   Q.    And do you know what it means?

14   A.    It is the giving of alms.  It is one of the five pillars

15   of Islam.

16   Q.    Do you -- what is your understanding of the role of a

17   zakat committee in general in the Muslim countries?

18   A.    Once a year during the holy month of Ramadan when people

19   fast, again one of the five pillars of Islam, people give a

20   percentage of their earnings as charity, and that charity is

21   to be shared with the less fortunate.  Sometimes it goes to a

22   zakat committee.  Sometimes it can be done on an individual

23   basis.  If your next door neighbor has a difficult time, you

24   may go give him some food or clothing or so forth.  But quite

25   often people will contribute cash, in kind, food, clothing, et

1    cetera, to a zakat committee to distribute to the less

2    fortunate.

3    Q.    And I know you have worked in the Middle East.  Have you

4    encountered zakat committees in other Muslim countries?

5    A.    I have.  I have in Pakistan where I served for four

6    years, I encountered them in Syria, as well as Tunisia.

7    Q.    And are you aware of any of the zakat committees, that

8    there are zakat committees in the West Bank and Gaza also?

9    A.    Yes, I am.

10   Q.    Okay.  Have you ever met with any members of the zakat

11   committees in the course of your duties?

12   A.    I did.

13   Q.    Now, do you know from your experience working there,

14   particularly let's focus on the West Bank and Gaza, how the

15   zakat committees function?

16   A.    Generally people volunteer to become a member of the

17   zakat committee.  It is a very informal arrangement.  They may

18   say, "I volunteer to be on this committee."  It is considered

19   to be an apolitical form of service.  And they are sort of an

20   informal consensus that is reached within the area where the

21   zakat committees are put together as to whether this is a good

22   person or not.  Generally they are considered, the people who

23   serve, to be pius, religious people, interested in doing good

24   works.

25   Q.    And I am going to get into some specifics here in a

1   minute, but in the course of your duties representing the

2   United States government, and later when you were working for

3   the Palestinian government, was one of your duties meeting

4   with people in Palestine?

5   A.    Yes.

6   Q.    And when you were working for the United States

7   government as Consul General, why was that considered one of

8   your duties?

9   A.    The State Department, the White House, other branches of

10  the U.S. government, considered it crucial to understand the

11  dynamics of the society, what people were concerned about.  In

12  our case, we were trying to promote a process that we hope

13  would lead to peace between Israelis and Palestinians, and so

14  both I, as well as the officers who worked for me in the

15  consulate, we were constantly out meeting with Palestinians,

16  meeting with members of NGOs, including zakat committees.

17  Q.    Tell us again what an NGO is.

18  A.    I am sorry.  A non-governmental organization.

19  Q.    Do you mean like charities?

20  A.    Charities.  But they can also be politicized as well, and

21  to try to understand what the attitudes of the population was.

22  And we would go back and we would write analyses and telegrams

23  reporting to Washington of our impressions.  And that was a

24  very important part of the policy-making process in

25  Washington.

1        People would read these telegrams and they would say,

2   "Well, this is working.  This approach of the U.S. government

3   doesn't seem to be working.  Maybe we should adjust it."  So

4   the reports that -- It wasn't just the consulate.  This is the

5   duty of any American diplomatic establishment abroad is to

6   talk to the people, talk to government officials, et cetera,

7   and try to assess the thinking of people on crucial issues how

8   they react to U.S. policy, et cetera.

9   Q.    And so -- I believe I understand you correctly.  Your

10  role in Jerusalem was not really different than the role of

11  the Chief of Mission in any other country in that sense.

12  A.    No, absolutely not.

13  Q.    Okay.  Now, did you ever -- When you talked to people,

14  you personally, did you just--not asking you now what they

15  said--but just did you talk to just government officials or

16  people in cafes or, you know --

17  A.    I would talk to a wide range of people, as would the

18  officers working for me.  We would talk to Palestinian

19  officials.  We had business to do with them, directions from

20  Washington requiring us to go in and try to persuade them of a

21  certain course of action, to agree to something.  In the

22  process of negotiations, I dealt with Palestinian officials to

23  try to move them forward in the negotiating process.

24        I would meet with businessmen, you know, "How is this

25  process working for you?"  Because the Israelis and the

1   Palestinians had negotiated economic protocols which were

2   supposed to improve the business environment in which

3   Palestinians operated.  So I would talk to them.

4       I would talk to religious figures, both Christian and

5   Muslim, to see how they looked upon this process;

6   intellectuals at universities, because they were important

7   leaders of public opinion; and sometimes just sitting in a

8   cafe drinking a cup of coffee and talking with the guy next to

9   me that has a small shop or something like that--"is your life

10  getting any better?  Do you think this process is going to

11  work?  Do you support it?"

12      So we talked to a very, very wide range of Palestinians,

13  from the very highest down to maybe a guy driving a taxi cab.

14  Q.   Were these conversations in English or Arabic?

15  A.   They would be in both.

16  Q.   Okay.  And did you travel around the area?

17  A.   Yes.  I traveled all over the West Bank.  I traveled to

18  Gaza.  When Yasser Arafat was headquartered in Gaza, I would

19  go there sometimes five or six times a week to meet with him.

20  Q.   Now, you mentioned Yasser Arafat was in Gaza.  During

21  what -- Remind us again who Yasser Arafat is.  We have had a

22  lot of names in this case.

23  A.   Yasser Arafat was the chairman of the Palestine

24  Liberation Organization, which is an umbrella group of various

25  Palestinian organizations.  He was also the chairman of the

1    Fatah, which is the primary secular Palestinian political

2    organization.  And as such, as chairman of the Palestine

3    Liberation Organization, he is the person that signed the Oslo

4    Agreement on September 13, 1993 on the White House lawn with

5    Prime Minister Yitzhak Rabin of Israel with President Clinton

6    overseeing that process.  And this is a process of mutual

7    recognition between the government of Israel and the Palestine

8    Liberation Organization.

9    Q.   Let me stop you there.  Now, his office was for a time in

10   Gaza.  Is that correct?

11   A.   As I said yesterday, there were two agreements that were

12   negotiated.  One was in 1994 which was the Gaza Jericho

13   agreement, and that essentially meant that the only areas that

14   Arafat could operate in were Gaza and Jericho, which is a very

15   small relatively isolated town in the West Bank on the Jordan

16   River.

17   Q.   Let me stop you a minute and let's find Jericho.  Can you

18   just point out to the jury just where Jericho is?

19   A.   I suppose all of you know Joshua and the battle of

20   Jericho.  That is where it is.  And the walls are still there,

21   believe it or not.

22   Q.   Okay.  Thank you.

23        So I interrupted you.  You said that Yasser Arafat had

24   authority over Gaza and the city of Jericho.

25   A.   Until the agreement that was negotiated in September of

1   1995, which was a follow-on agreement between Israel and the

2   Palestine Liberation Organization.  At that point the Israelis

3   withdrew from about 18 or 19 percent of the West Bank and it

4   was under the authority of the Palestinian Authority.  Arafat

5   moved his office to the city of Ramallah, which is just a

6   little bit north of Jerusalem, and he would divide his time

7   between Gaza and Ramallah, and travel around -- He would

8   travel around the West Bank as well.

9   Q.   So you would do that also during that time?

10  A.   Yes.  I would follow him around.

11  Q.   And -- Okay.  Let me go back a little bit to the zakat

12  committees.  I believe I asked you whether you visited any of

13  them.  Do you remember any of them in particular that you

14  visited?

15  A.   I visited zakat committees in Hebron, I think in

16  Bethlehem, in Ramallah, Jenin, Tulkarem, Qalqilya, and in Gaza

17  City.

18  Q.   Did the United States government, when you were

19  representing our government, have any policy regarding the

20  zakat committees that you were required to follow?

21  A.   Zakat committees were considered by the -- particularly

22  by the Agency for International Development, which was charged

23  with doing economic assistance programs for the

24  Palestinians --

25       MR. JACKS:  Your Honor, I am going to object.  It

1    seems to be non-responsive and a narrative.

2            MS. HOLLANDER:  That is fine, Your Honor.  We will

3    get into that.

4    Q.  (BY MS. HOLLANDER)  My question is just a simple one,

5    which was, was there any particular kind of policy regarding

6    the zakat committees.  If there wasn't --

7    A.  No, there wasn't.

8    Q.  Were you ever told -- And we are going to get into some

9    more detail, but first, were you ever told in any United

10   States government briefing that any of the zakat committees at

11   issue in this case were actually controlled by Hamas?

12   A.  I was not.

13   Q.  Okay.  Now, -- And because I am going to ask you about a

14   broad range of time, after 1999 when you left your work with

15   the foreign service State Department and you were working for

16   the Palestinian Authority, did you still have communications

17   with the United States government?

18   A.  I did.

19   Q.  Okay.  And did you then deal with any of the Palestinian

20   policy makers, the president or the prime minister?

21   A.  I dealt with them on almost a daily basis.

22   Q.  And who was the president of the Palestinian Authority

23   who you dealt with?

24   A.  Well, it was Yasser Arafat until his death in 2004, and

25   then it was Mahmoud Abbas, who was elected in January of 2005.

1    Q.    And is he still the president?

2    A.    He is still the president of the Palestinian Authority.

3    Q.    And he is not Hamas?

4    A.    No.

5    Q.    Okay.  Now, what about the prime minister?  Are there two

6    prime ministers?

7    A.    Well, as a result of the elections in 2006, Hamas formed

8    a government and the United States government, the U.S.

9    officials refused to deal with that government.  There was a

10   break between Fatah, the PLO, and Hamas a little over a year

11   ago, with Hamas in essence taking over Gaza but the Palestine

12   Liberation Organization being in charge of the West Bank.  And

13   they formed a government with -- and named a prime minister, a

14   man named Salam Fayyad.

15   Q.    And are you familiar with Salam Fayyad?

16   A.    I have known him for many years.

17   Q.    Let me stop you.  Is he -- He is not Hamas?

18   A.    He is not.  He is in essence I would say he is an

19   independent.  He is not a member of Fatah or Yasser Arafat's

20   wing or Mahmoud Abbas' wing, and he is certainly not a member

21   of Hamas.

22   Q.    Does he have any connection to the United States or to

23   Texas?

24   A.    He received his Ph.D. from the University of Texas.  A

25   couple of weeks ago the Alumni Association at U.T., The Texas

1    Exes named him one of U.T.'s distinguished alumni, and he was

2    in Austin to receive that award.

3    Q.    Now, you have mentioned Fatah, and I don't know whether

4    you know this or not, but if you do, do you know what -- We

5    have heard what Hamas stands for in Arabic.  Do you know what

6    Fatah stands for the Arabic?

7    A.    It is Harakat Tahrir Filastini, the Palestinian

8    Liberation Movement.

9    Q.    And the word Harakat, I believe is also --

10   A.    Harakat means movement.  Fatah is referred by

11   Palestinians, by many Palestinians as Harakat, the movement.

12   And people also refer to Hamas as the movement.  So you have

13   to know the context where it is used.

14   Q.    Because the word is in both?

15   A.    Yes, it is.

16   Q.    Harakat.  Now, you mentioned United States Agency for

17   International Development, USAID.  Is that a United States

18   government organization?

19   A.    Yes, it is.

20   Q.    Okay.  And because I am going to ask you some questions

21   about that, can you tell us what that organization does?

22   A.    It is charged by the Executive Branch with developing

23   economic assistance programs in countries where we want to try

24   to influence the policies of that country.  It has a mandate

25   to operate all over the world, but particularly in less

1    developed parts of the world.

2    Q.    Is this taxpayer money?

3    A.    It is.  It is money that is appropriated by Congress.

4    Q.    And when you worked in the United States government as

5    Consul General between '93 and '97, did you work with USAID?

6    A.    On a daily basis.  They had staff members at the

7    consulate.

8    Q.    And then afterwards were you also familiar with USAID

9    projects?

10   A.    Yes.  I would go and meet with USAID officials and take

11   Palestinians to meet with them.

12   Q.    Up until?

13   A.    The end of 2006.

14   Q.    Do you know -- And I am going to ask you some specifics,

15   but just in general first, do you know whether USAID provided

16   funds directly or indirectly to any of the zakat committees in

17   the West Bank?

18   A.    They did.

19        MR. JACKS:  Your Honor, I am going to object, unless

20   there is personal knowledge and not that somebody told him or

21   he read it somewhere.

22        THE COURT:  I think the question calls for yes or

23   no.  "Did you know" and the answer was yes.  You can follow up

24   from there how he knew.

25        MS. HOLLANDER:  I am sorry.  I didn't hear you.

```
 1              THE COURT:  The basis of his knowledge.

 2    Q.   (BY MS. HOLLANDER)  Did you work with the USAID?

 3    A.   I did.

 4    Q.   Did you ever go to zakat committees with representatives

 5    of the USAID?

 6    A.   I went to signing ceremonies where we would sign a

 7    project, in this case in Nablus with the zakat with USAID.

 8    Q.   So was this something that in your job you were involved

 9    with them?

10    A.   Yes.

11    Q.   Now, we have seen -- Let me just show you, I am going to

12    be asking you some questions about a document that is in

13    evidence as Defendants' Exhibit No. 102, and this involves a

14    place called the al-Razi Hospital.  Do you know from personal

15    experience, the work you did, whether the USAID provided

16    medical supplies to the al-Razi Hospital in 2002?

17    A.   Yes, I know they did.

18    Q.   Would that have been consistent with United States policy

19    as you understood it?

20    A.   Yes.

21    Q.   Now, would it have been consistent with U.S. policy for

22    USAID to provide funds to any Hamas organization?

23    A.   No, that would be against U.S. policy.

24    Q.   Okay.  Now, are you personally familiar with the al-Razi

25    Hospital?
```

1    A.    I visited it in the past.

2    Q.    Okay.  And is that run by the Jenin zakat committee?

3    A.    Yes.

4    Q.    Okay.  How are you personally familiar with that

5    hospital?

6    A.    During one of the trips I took to Jenin when I was the

7    Consul General, I went around to various -- I met with

8    officials, Palestinian officials, I visited hospitals and so

9    forth, I visited sort of the general hospital which was under

10   the auspices of the Israeli military, and I also visited

11   al-Razi Hospital, which was a relatively new hospital that had

12   been built and staffed I think within a short period, within a

13   year or so before I went there.

14        I might say I was interested in medical care, because

15   when I was in college --

16              MR. JACKS:  I object, Your Honor; non-responsive.

17              MS. HOLLANDER:  I will ask the question.

18   Q.    (BY MS. HOLLANDER)  Did you have some particular interest

19   in medical care?

20   A.    I did.  I wanted -- I mean, it was something that was

21   very important to Palestinians to have adequate medical care,

22   and they did not have adequate medical care in many cases.

23   Q.    Did you have any particular expertise or knowledge that

24   would make it for you to tour a hospital?

25   A.    I worked five years as a surgical technician in college,

1    and so I have been in many operating rooms worked with many,

2    many doctors over the years, and so I had some familiarity

3    with medical facilities.

4    Q.    And what was your impression of this hospital?

5    A.    It was very clean, it had new and modern equipment, it

6    was a very good hospital, and it was one that Palestinians

7    were using on a regular basis, in contrast to the hospital

8    that the Israeli military ran.

9    Q.    And why were they not using -- Palestinians not going to

10   the Israeli military hospital?

11   A.    They were dirty, they were unsanitary, the medical

12   equipment was antiquated, and the care was very poor.

13   Q.    Now, why is there an Israeli military hospital in Jenin?

14   You call it a military hospital.

15   A.    It was administered by the military.

16   Q.    By the Israeli military?

17   A.    An civilian Palestinian hospital administered by the

18   Israeli military, because at that point it was still under

19   Israeli occupation, and the Israeli military government for

20   the West Bank was responsible for overseeing medical care for

21   Palestinians.

22   Q.    If you know, do you know whether Israel ever interfered

23   with functions of the al-Razi Hospital during the time you

24   were there?

25                MR. JACKS:  Your Honor, I am going to object to this

1  as irrelevant.  Again, it goes to the issue that we spoke

2  about earlier.  It is not --

3           THE COURT:  I understand.  What is the relevance of

4  that?

5           MS. HOLLANDER:  I am just trying to ascertain the

6  control of this hospital, Your Honor.  I can approach and

7  explain it.

8           THE COURT:  Go ahead and ask your question.  Go

9  ahead.

10  Q.  (BY MS. HOLLANDER)  Do you know whether Israel ever

11  interfered with the functioning of the al-Razi Hospital during

12  the time you were there?

13  A.   Not when I was the Consul General, but on later

14  occasions.

15  Q.  Did you ever learn from the United States government in

16  the course of your work as a U.S. official in Jenin -- I am

17  sorry.  Let me rephrase that.  Did you ever learn from the

18  U.S. government that you were not to deal with the al-Razi

19  Hospital?

20           MR. JACKS:  Your Honor, could we have a time frame

21  as far as when she is referring to?

22           MS. HOLLANDER:  Sure.

23  Q.  (BY MS. HOLLANDER)  Did you ever learn from the U.S.

24  government at any time during the time you were in Jerusalem,

25  either working for the U.S. government or working for the PA,

1  that you were not to deal with this hospital because it was

2  controlled by Hamas?

3  A.    No, never.

4  Q.    Now, are you aware -- And I will ask you some specifics,

5  but in general first, are you aware of any specific projects

6  of the USAID in the West Bank?

7  A.    Yes, I am.

8  Q.    Okay.  Are you familiar with an organization called CARE,

9  C-A-R-E?

10 A.    I am.

11 Q.    What is that organization?

12 A.    CARE is an American contractor that does projects for

13 AID.  AID does not implement projects on the ground

14 themselves, but they use various contractors to do this.  CARE

15 has had a presence on the West Bank for maybe the last 30 or

16 40 years, and continues to do projects there.

17 Q.    And are you aware of any particular projects that CARE

18 did with USAID?

19 A.    There is a multi-year project called the Emergency

20 Medical Assistance Program, which I think --

21         MR. JACKS:  Your Honor, excuse me.  I request again

22 a clarification as to time and basis of knowledge.

23         THE COURT:  I think he has established a basis of

24 knowledge.  Do you want to clarify the time?

25 Q.    (BY MS. HOLLANDER)  Okay.  Do you recall the years, or is

1    there anything --

2    A.    It is from 2002 to 2008.

3    Q.    Thank you.  Okay.  Go ahead and answer the question.

4    A.    It is a multi-year program aimed at improving medical

5    services in the West Bank by providing medical supplies and

6    equipment to various clinics run by Palestinians in the West

7    Bank.  It is about a $30 million project.

8    Q.    And does USAID actually have people who work for the

9    United States that are on the ground in the West Bank?

10   A.    Yes, they do.

11   Q.    Do they have any Arabic speakers?  Do you know?

12   A.    Yes, they do.  They have -- There are people assigned to

13   the embassy in Tel Aviv, there are people assigned to the

14   consulate in Jerusalem, and many of these aid contractors,

15   such as CARE, are in Ramallah and elsewhere around the West

16   Bank as they implement the programs that are funded by the

17   Agency for International Development.

18   Q.    Have you actually seen documents that USAID and CARE have

19   created to discuss the Emergency Medical Assistance Program?

20   A.    Yes, I have.

21          MS. HOLLANDER:  May I approach, Your Honor?

22          THE COURT:  Yes.

23   Q.    (BY MS. HOLLANDER)  I have shown you what has been marked

24   I believe as Defendants' No. 1074 and 1076.  And without

25   describing those to us yet because they have not been admitted

1    into evidence, have you seen -- Are you familiar -- Is that

2    the project you were talking about?

3    A.    Yes, it is.

4    Q.    And have you seen documents like this?

5    A.    I have.

6    Q.    Do these documents -- Can you identify where they come

7    from?

8    A.    They are prepared by the staff in this case of CARE to

9    the Agency for International Development describing the

10   implementation of the programs which AID funded, where they

11   went and so forth.

12            MS. HOLLANDER:  At this time I move the admission of

13   Defendants' No. 1074 and 1076.

14            THE COURT:  Mr. Jacks?

15            MR. JACKS:  May I take the witness on voir dire,

16   Your Honor?

17            THE COURT:  Sure.  Go ahead.

18   Q.    (BY MR. JACKS)  Sir, you said you have seen these

19   exhibits before?

20   A.    I said I have seen documents like this before.

21   Q.    But not these specific exhibits?  Not these specific

22   ones?

23   A.    No.

24   Q.    So until now or you were being prepared as a witness in

25   this case, that is when you first saw these exact documents?

```
1    A.    I am sorry?  Would you --

2    Q.    The documents that are in front of you, when is the first

3    time you laid eyes on them?

4    A.    I saw them in my meeting with Ms. Hollander.

5    Q.    That would have been a few days ago or --

6    A.    Yes.

7    Q.    -- weeks?  Okay.  So other than the fact that they are in

8    front of you and what they may say, that is the extent of what

9    you know about those documents?

10   A.    These specific ones.  I said I have seen similar

11   documents by CARE in the past.

12          MR. JACKS:  Your Honor, we object.

13          THE COURT:  Do you want to ask some further

14   questions?

15          MS. HOLLANDER:  Yes.

16   Q.    (BY MS. HOLLANDER)  Do you know whether USAID generally

17   is required to set forth the activities of that office?  In

18   other words, do these documents show the activities of USAID?

19   A.    They show the activities of the contractor that USAID has

20   worked with to implement a project on the ground.

21   Q.    Do they also have, one of them have the USAID logo on it?

22   A.    That is correct.

23   Q.    And does the other one have a marking on it, which you

24   may or may not be able to see that it comes from--it will be I

25   think a very small little number--that it comes from the
```

1  USAID --

2  A.    Well, I think the second document is a USAID document.

3          THE COURT:  Which number is that?

4          THE WITNESS:  That is No. 1076, Your Honor.

5          THE COURT:  All right.

6  Q.   (BY MS. HOLLANDER)  The first document, is that a

7  document that is your understanding that USAID would --

8          MR. JACKS:  Object to leading, Your Honor.

9          THE COURT:  Rephrase.

10 Q.   (BY MS. HOLLANDER)  Do you know whether USAID would have

11 documents and put together documents with the charities that

12 it works with?

13 A.    Yes.  I mean, this is not so much a charity.  This is an

14 aid contractor, and this is an implementation report from CARE

15 to AID.

16         MR. JACKS:  Your Honor, objection; non-responsive.

17         THE COURT:  Overruled.  Go ahead.

18         MR. JACKS:  She asked "Do you know."

19         THE COURT:  I made my ruling, counsel.

20 Q.   (BY MS. HOLLANDER)  Do you know whether these

21 documents -- Do you know that these projects actually were

22 carried out?

23 A.    Yes, I do.

24         MS. HOLLANDER:  Your Honor, I think we have met the

25 qualifications under 803(8)(a).  These are documents that show

1    the activities of the office of agency.

2            THE COURT:  I don't need to hear argument.  Same

3    objections, Mr. Jacks?

4            MR. JACKS:  Yes, Your Honor.

5            THE COURT:  I will overrule those objections and No.

6    1074 and 1076 are admitted.

7            MS. HOLLANDER:  Thank you, Your Honor.

8    Q.   (BY MS. HOLLANDER)  Let me ask you first about No. 1074.

9    Can you see the date on this?  I don't know if it is as fuzzy

10   there as it is here.

11   A.   It is a little fuzzy.  It says December something 2004, I

12   believe.

13   Q.   December 22nd, 2004?

14   A.   Yeah.

15   Q.   Now, this logo where my finger is, what is that?

16   A.   That is the symbol of the Agency for International

17   Development.

18   Q.   And the title of this document?

19   A.   "Final implementation report, Emergency Medical

20   Assistance Program," and then the contract number with AID.

21   Q.   Now, what it says here, it may be difficult for you to

22   read, is the project had six specific objectives.

23   A.   Yes.

24   Q.   Can you see that?

25   A.   Yes, I do.

Q.   Can you just read what the six objectives were?  Can you

read that there, or do you need to see a copy?

A.   I can read it.  The first objective, "Develop a sentinel

surveillance system capable of detecting early changes in the

health status of vulnerable Palestinian Committees.

     "Provide emergency medical equipment and supplies to

local and regional health facilities to meet increased demands

for emergency services.

     "Provide technical assistance for the development of

sustainable educational programs and trauma management and

emergency medical, and to develop the capacity of referral

centers in the West Bank and Gaza.

     "Provide temporary financial assistance to Palestinian

NGOs currently offering emergency care rehabilitation

services" --

          THE COURT:  Slow up a little bit when you are

reading so the court reporter can keep up with you.

          THE WITNESS:  I am sorry, Your Honor.

     "...to physically impaired Palestinians.

     "Conduct a rapid nutritional assessment.

     "Conduct a food security assessment and nutritional

surveillance."

Q.   (BY MS. HOLLANDER)  And was it important to the United

States that the Palestinians see that this aid came from the

United States?

A.   Yes, very much so.

Q.   So this is a picture here that says "contents of medical kits for NGO clinics."  Have you seen equipment in NGOs and in clinics that have logos like that?

A.   Yes, I have.

Q.   I am not going to go through this whole document.  The jury will have it.  But I want to point out one specific thing.  On this page there is a reference to -- it says Johns Hopkins University was subcontracted by CARE for emergency training and trauma.  Are you familiar with the fact that something starts out with USAID money and then gets subcontracted like that?  Is that unusual or usual?

A.   It is a normal practice.

Q.   There is a final budget here for that part of it in 2004. Can you read that number, the final number?

A.   The number on the left?

Q.   Yes.

A.   Yes.  It is $12,454,847.

Q.   And then it also has something called the CA budget.  I am not sure what that is.  But then it has a total right here.

A.   Yeah.

Q.   $582,627.

A.   I see that, yes.

Q.   And finally one other page from that document.  There actually are several pages of where the money went, but I just

1    want to show you one.

2              MR. JACKS:  Your Honor, I would ask to eliminate the

3    narrative by counsel and just have her ask a question rather

4    than making this narrative.

5              THE COURT:  Okay.  Counsel, if you would just ask a

6    question.

7              MS. HOLLANDER:  Yes, Your Honor.

8    Q.   (BY MS. HOLLANDER)  I am going to make this bigger, but

9    can you tell what this is, just what it is?

10   A.   It appears to be a spreadsheet on where the money under

11   this grant was disbursed.

12   Q.   Do you see the one that is the fourth from the bottom?

13   A.   I do.

14   Q.   And what is that?

15   A.   It is the Qalqilya zakat committee.

16   Q.   And what is the amount that the zakat committee received

17   from this program?

18   A.   It looks like it is $47,719.

19   Q.   Now, I would also like to show you Defendants' Exhibit

20   No. 1076, which you also said was part of this.  Can you see

21   the date of this?

22   A.   March 24, 2005.

23   Q.   And what were the dates that the USAID has this emergency

24   program?

25   A.   It is a three-phase program which covers the years from

1    2002 until 2008.

2    Q.   And what does it say in this part?

3    A.   It says "medical disposables," and that is medical

4    equipment that has been delivered, and it lists the places

5    where that equipment was delivered.

6    Q.   And what is the first one?

7    A.   It is the zakat committee in Nablus.

8    Q.   And in 2005 how much did this zakat in Nablus receive for

9    this portion of the program?

10   A.   $6,678 in equipment.

11   Q.   Was that what we refer to as in kind?

12   A.   Yes.

13   Q.   Now, do you know whether USAID ever provided any

14   emergency relief to the Nablus zakat committee earlier than

15   that in 2002?

16   A.   You mean before 2002 or in 2002?

17   Q.   In 2002.

18   A.   In 2002 they provided assistance after Defensive Shield,

19   I believe.

20          MS. HOLLANDER:  May I approach, Your Honor?

21          THE COURT:  Yes.

22   Q.   (BY MS. HOLLANDER)  I am showing you what has been marked

23   as Defendants' Exhibit No. 1071 which is not in evidence yet,

24   so looking at the date of that, is that after Defensive

25   Shield?

1    A.    Yes.

2    Q.    And are you familiar with that particular service

3    that -- Do you know whether that is USAID?

4    A.    Yes, this is a USAID email.

5    Q.    And are you familiar with that provision of service that

6    is -- I believe it is highlighted there?

7    A.    Not that specific one, but in general during that period

8    assistance was provided.

9    Q.    Is that the same time period as the aid to Jenin at the

10   al-Razi Hospital?

11   A.    That was April 2002.  This is May 2002.

12   Q.    Was there a reason in particular that USAID had to

13   provide emergency relief at that time?

14         MR. JACKS:  Objection, Your Honor; calls for

15   hearsay.

16         THE COURT:  He may answer that if he knows.

17         THE WITNESS:  There was a tremendous amount of

18   disruption of medical services, of ability of Palestinians to

19   get food.  After Operation Defensive Shield it was basically

20   chaos in the West Bank for Palestinians.  It was in essence

21   under military occupation.  And AID provided emergency medical

22   assistance to Palestinian health facilities, and it provided

23   emergency food packets to feed Palestinians.

24   Q.    (BY MS. HOLLANDER)  And are you aware of whether that

25   included the Nablus zakat committee?

A.    Yes.

         MS. HOLLANDER:  Your Honor, I move the admission of
No. 1071.

         THE COURT:  Objection?

         MR. JACKS:  Hearsay, Your Honor.

         THE COURT:  I don't think he has established he has
a specific knowledge of this one.  I will sustain this one,
counsel.

         MS. HOLLANDER:  Okay, Your Honor.

Q.    (BY MS. HOLLANDER)  Now, you said you went to signing
ceremonies.  What are those?

A.    The United States government wanted Palestinians to see
that programs were being implemented to help them.  Sometimes
it would be at a hospital.  Sometimes it would be for water
projects.  Sometimes it would be equipment.

         And what it would involve would be American officials
would be there with Palestinian officials, and generally you
would sign an agreement with the Palestinians for that
specific project.  And we would invite media to it and various
other people so that it would be publicized in the local press
and the local television.

Q.    And did you do this with USAID during the years that you
were Consul General, kind of going back down to '93 to '97?

A.    Yes, I did.

Q.    And did you do it at any of these zakat committees?

1    A.    I did one in Nablus.

2    Q.    At the Nablus zakat committee?

3    A.    Yes.

4    Q.    Do you know what year that was, approximately?

5    A.    I believe it was 1995.

6    Q.    Now, slightly changing the subject, in the Palestinian

7    government, are there specific religious authorities who are

8    in the government?

9    A.    Yes.

10   Q.    Okay.  This is somewhat different than the United States.

11   Can you explain why there are religious authorities in the

12   government?

13   A.    It is really common throughout the Muslim world.  In the

14   case of the Palestinian Authority, there is something called

15   the Ministry of Waqf, W-A-Q-F, and in essence that means

16   religious endowments.  And there may be secular people in it,

17   but also religious people.  And they are charged with

18   overseeing and auditing zakat committees.  They are charged

19   with appointing the religious figures in the mosque, and they

20   are charged with overseeing religious properties that people

21   who have died, have willed, that these properties be

22   maintained by the Ministry of Waqf for the benefit of the

23   Palestinian people.

24   Q.    Now, we have also heard this word as awqaf?

25   A.    Awqaf is the plural of waqf.  Arabic is a very, very

1    complicated language, but waqf is the singular; awqaf is the

2    plural.

3    Q.   So if we have heard them, they are basically the same

4    thing?

5    A.   They are essentially the same thing.

6    Q.   Now, before I forget, on this subject while you were

7    working as a representative of the United States government in

8    '93 to '97, did you ever hear anything about the Holy Land

9    Foundation?

10   A.   Yes, I did.

11   Q.   And what did you know about its reputation?

12   A.   I knew that it was a very large Palestinian-American

13   charitable organization, and it had a good reputation for

14   implementation of projects, for delivering the most bang for

15   the buck--in other words, low overhead costs, and projects of

16   assistance that went to needy Palestinians.

17   Q.   Was it just one of many organizations like that that you

18   heard about?

19   A.   Yes.

20   Q.   Did you also interact as part of your job with the United

21   Nations?

22   A.   I did.

23   Q.   And why would it be part of your job to interact with the

24   United Nations?

25   A.   Well, there are a variety of reasons.  The Palestinian

1    refugees in Gaza and the West Bank are assisted by a U.N.

2    agency that the U.S. contributes a lot of money to, the United

3    Nations Relief and Works Agency, which has been in existence

4    since about 1949.  There are also various U.N. organizations

5    that provide assistance.  For example, the World Food Program

6    provides food packets to Palestinians in Gaza and in the West

7    Bank, and the United States contributes money to that.

8        And from a political point of view, the United Nations

9    has an office in Jerusalem, a representative appointed by the

10   Secretary General of the United Nations, which is the U.N.

11   special coordinator for the occupied territories, who is

12   essentially one of my counterparts as we tried to negotiate

13   and push along this peace process.  So I dealt with a variety

14   of U.N. organizations when I was in Jerusalem.

15   Q.   Let's talk about the refugees.  You said the -- and we

16   have heard about it.  That is UNWRA.  Correct?

17   A.   Yes, that is correct.

18   Q.   Okay.  Does it -- Is its mandate just the Palestinian

19   refugees from Israel in 1948?

20   A.   For Palestinian refugees from 1948, and then also

21   Palestinian refugees who fled again in the 1967 War.

22   Q.   So does it just operate in the West Bank and Gaza?

23   A.   It operates in the West Bank, Gaza, Jordan, Syria, and

24   Lebanon.

25   Q.   Because that is where the refugee camps are?

1    A.    That is correct.

2    Q.    Now, was it part of your mandate as Chief of Mission

3    Consul General to work with UNWRA?

4    A.    Yes.

5    Q.    Is that because there is U.S. money involved?

6    A.    I think the U.S. contributes annually about 55 percent of

7    the budget of UNWRA.

8    Q.    Do you know how many people live in refugee camps in the

9    West Bank and Gaza?

10   A.    In the West Bank or in Gaza the population is

11   approximately 1.1 million Palestinians.  Eighty percent of

12   those Palestinians live in refugee camps.  In the West Bank I

13   think that the number of refugees is smaller actually living

14   in the camps, and about -- But about 40 percent of the total

15   refugee population in the West Bank lives outside the camps,

16   60 percent live inside the camps.

17   Q.    During the time -- any of the times that you worked,

18   because I believe you worked in Israel at an earlier time.

19   A.    Yes, that is correct.

20   Q.    During any of those times, as part of your duties with

21   the government or later when you worked for the Palestinian

22   Authority, did you ever go to refugee camps?

23   A.    Many times.

24   Q.    And are the refugee camps just the people who fled in

25   1948, or are there now extended families?

A.   It is the people and their descendants and, you know,

this goes back almost 60 years, plus refugees from 1967 as

well.

Q.   You know, I think we think of refugee camps as tents.  Is

that what these are?

A.   Originally they were tents, but over time they became

built up areas.  They are extraordinarily crowded.  I think

the most densely populated in the world is the Gaza Strip.

And these people live in relatively primitive conditions.

Q.   But do they have shops and schools --

A.   They have shops.  UNWRA is mandated to provide schools

for the refugees.  It provides medical care, although it is

not of a particular high quality.  And UNWRA also provides

monthly food rations for the refugees.

Q.   Can you -- Does UNWRA put up any kind of a sign so people

know --

A.   Yes.

Q.   -- that it is U.N.?

          MS. HOLLANDER:  May I approach, Your Honor?

          THE COURT:  Yes.

Q.   (BY MS. HOLLANDER)  Without describing that yet--I

believe that is Defense Exhibit No. 532--let me just ask you,

if asked, if you could identify the sign in that photograph?

A.   Yes.

Q.   And is that representative of a scene that you have seen

1   in either the West Bank or Gaza or in an UNWRA refugee camp?

2   A.   Yes, it is.

3   Q.   Is that picture a fair and accurate photo of a U.N. sign

4   and a refugee camp?

5   A.   Yes, I have seen many such signs in the past.

6           MS. HOLLANDER:  Your Honor, I move the admission of

7   Defense Exhibit No. 532.

8           THE COURT:  Counsel?

9           MR. JACKS:  Same objection as originally stated.

10          THE COURT:  That is overruled, and Defense Exhibit

11  No. 532 is admitted.

12  Q.   (BY MS. HOLLANDER)  And what is that sign in No. 532?

13  A.   It is not -- You know, it is a little fuzzy, but on the

14  left hand side it is in English, and I can see the UNWRA logo

15  as well as the words UNWRA.  And on the right hand side it is

16  in Arabic.  It appears to be in front of a school and it

17  appears to be a group of young school children, seven or eight

18  years old.

19          MS. HOLLANDER:  May I approach, Your Honor?

20          THE COURT:  Yes.

21  Q.   (BY MS. HOLLANDER)  Since the Arabic is kind of fuzzy, is

22  it possible to determine whether this is Lebanon or the West

23  Bank or Gaza?

24  A.   I can't tell from the photograph.

25  Q.   But this is the sign that UNWRA would put up?

1  A.    Yes.

2  Q.    I believe you mentioned the population.  Do you know what

3  the approximate size of families is in the West Bank and Gaza?

4  A.    There is a very high birthrate among Palestinians, and I

5  think the average size according to the U.N. in the immediate

6  family is seven to eight people.

7  Q.    Okay.  Do you know, if you know, the approximate

8  percentage of the Palestinian population that receives and

9  requires charities to provide food?

10 A.    I would say approximately 40 percent.  It has increased

11 dramatically over the past several years.

12 Q.    Now, you said that UNWRA provides schools.  Does UNWRA

13 provide other things besides schools?

14 A.    It provides -- In addition to schools, it has medical

15 clinics that people can go to, and it also provides monthly

16 food rations.

17 Q.    But this is just to the refugees.  Is that correct?

18 A.    Yes.

19 Q.    Do you know whether UNWRA is still providing assistance

20 to the people in Gaza, even though Hamas is now in control of

21 Gaza?

22 A.    It is.

23 Q.    It appears that part of your job you spent a great deal

24 of time dealing with the provision of aid.  Is that correct?

25 A.    Yes, I did.

1    Q.    And why was that so much a part of your job?

2    A.    Because the United States government felt that if this

3    peace process that was launched in 1993 was to succeed,

4    Palestinians had to feel that their lives were improving, and

5    that that meant economically their lives were improving as

6    well.

7         There was large scale unemployment among Palestinians, so

8    another objective was to try to generate employment, and that

9    in turn improved the general standard of living.  So the

10   provision of assistance, the coordination of efforts among

11   different donors, was a major part of my responsibility when I

12   served in Jerusalem.

13   Q.    Now, you mentioned that UNWRA ran schools in the refugee

14   camps, and we have seen some backpack programs that Holy Land

15   provided.  Are there public schools in Palestine?

16   A.    Yes, there are.

17   Q.    And who runs those?

18   A.    The Palestinian Authority runs those.

19   Q.    Okay.  Was there ever a period of time when the public

20   schools had been closed in Palestine?

21   A.    Yes.

22   Q.    What periods of time?

23   A.    Particularly during the first Intifada, which was from

24   1988 to 1991.

25   Q.    And why were the schools closed?

1  A.    Israeli military authorities closed down schools as well

2  as universities as a punitive measure against the

3  Palestinians.

4  Q.    And how were the children educated during that time?

5  A.    Basically home schooling.

6  Q.    Home schooling?

7  A.    Home schooling, yes; to the extent that people were able

8  to do that.

9  Q.    Now, you have -- I believe you said that when you worked

10  as a representative of the United States government you worked

11  with the PLO and Fatah.  Is that correct?

12  A.    Yes, I did.

13  Q.    Was that government at that time in alliance with Hamas

14  or in conflict with Hamas?

15  A.    It was not in alliance with Hamas, and at various times

16  there was actual armed conflict between Hamas and the

17  Palestinian Authority.

18  Q.    Now, I want to go back a little bit to one thing I didn't

19  ask you about zakat committees.  You said it was part of your

20  job to meet with Palestinian people.  Is that correct?

21  A.    Yes.

22  Q.    During the course of your work in Palestine, did you ever

23  learn from anyone that Hamas got credit for the services

24  received from the zakat committees?

25  A.    No.

1    Q.   I want to turn to a different subject.  We have heard in

2    this case about the deportees in 1992.  Are you familiar with

3    that?

4    A.   I am.

5    Q.   And very briefly, can you tell us from your perspective

6    what that was?

7              MR. JACKS:  Judge, I am going to object.  This

8    predates the time that he was there, and it is something that

9    has got to be based on hearsay, and we would object to that.

10   He testified that he arrived there in 1993, and this is after

11   he arrived.

12             THE COURT:  Do you want to ask some questions to lay

13   a foundation as far as basis of knowledge?

14   Q.   (BY MS. HOLLANDER)  What is your basis of knowledge for

15   knowing about the deportee situation?  Is this part of what

16   you had to know to work in Palestine?

17   A.   Not exactly.  It was something that I dealt with when I

18   was the Deputy Chief of Mission in Pakistan, because it was an

19   issue that had a lot of resonance in the Islamic world, and I

20   received instructions and other guidance from the Department

21   of State on this specific issue.

22   Q.   So you are familiar with this as part of your background

23   and personal experience?

24   A.   Yes, I am.

25             MS. HOLLANDER:  I would like to ask the question

1    again, Your Honor.

2            THE COURT:  Go ahead.

3    Q.   (BY MS. HOLLANDER)  What is your understanding broadly of

4    this event?

5    A.   There had been some attacks against Israeli soldiers and

6    an Israeli policeman in December of 1992 that culminated in

7    the kidnapping and murder of an Israeli policeman Nissim

8    Toledano in early December 1992.  Yitzhak Rabin was the prime

9    minister of Israel at the time, and he ordered that people be

10   rounded up and in essence expelled, exiled from the West Bank

11   and Gaza.

12        The Israeli Defense Forces arrested approximately 1600

13   people, and they attempted to expel them without any judicial

14   review.  Ultimately approximately 415 Palestinians were exiled

15   into southern Lebanon in December, I think December 16th,

16   1992, and they basically remained there, because the Lebanese

17   government would not allow them to disburse and go into

18   Lebanon.

19   Q.   Do you know just in general what the United States'

20   position was at that time?

21   A.   The United States government was very strongly opposed to

22   this action, which violated the Geneva Convention.

23   Q.   And do you know what finally happened to the 400 odd men?

24   A.   Ultimately Israel allowed them to return to their homes

25   and they just went back to their normal community life.

1    Q.    Do you know whether Israel claimed that the people who

2    were deported were the ones who actually kidnapped and killed

3    the Israeli?

4    A.    Israel never claimed that.

5    Q.    And do you know whether the people who were deported were

6    Hamas?

7    A.    I think it was a mixture of people.  There were some

8    Hamas, there were probably some Islamic Jihad people, but

9    there were also religious people who just got caught up in a

10   big dragnet by the Israeli Defense Forces.

11   Q.    Now, we heard a great deal about this particular

12   deportation.  Is this the only deportation like this, or just

13   the one that is best known?

14   A.    Israel since 1967 has exiled Palestinians from their

15   homeland.  This was the largest single deportation since 1967.

16   Q.    Have they ever -- Has Israel ever deported secular

17   non-religious people?

18   A.    Yes, a number of them.

19   Q.    I want to ask you a slightly different subject.  We have

20   heard a lot of discussion in this case about the Oslo Accords.

21   Do you have information, based on your personal and

22   professional background, about the Oslo Accords?

23   A.    I do.

24   Q.    And preliminarily, was the United States government

25   involved in the development of what we call the Oslo Accords,

1    the development of it?

2    A.    No.   It was negotiated secretly by the Palestinians and

3    the Israelis in Oslo under the auspices of the government of

4    Norway.

5    Q.    And how was that?

6    A.    There were public negotiations going on in Washington,

7    D.C. which started after the first Iraq war, and there was a

8    peace conference in Madrid, and then the negotiations started

9    and they were hosted in Washington, D.C. at the State

10   Department.

11        Parallel to that there were these secret talks that

12   started off and developed, and ultimately it reached its

13   conclusion in the Oslo Agreement, which was signed at the

14   White House on September 13, 1993.

15   Q.    How did the United States learn about the Oslo -- what

16   was going on in Oslo?

17   A.    There was a Norwegian academician named Terje Larsen who

18   basically worked this out along with the Norwegian foreign

19   minister.   His name was Holst.   They had a private jet or

20   Norwegian jet that he flew to Alameda Air Station in

21   California and briefed Secretary of State Warren Christopher

22   and Dennis Ross, who was the special Middle East negotiator,

23   about the Oslo Agreement, and basically they were asking for

24   American blessing of this.

25   Q.    And did they receive the American blessing?

A.    They did.  The United States government strongly
supported it.

Q.    And that is what ended up in the signing the agreement at
the White House?

A.    Yes, that is correct.

Q.    And who represented the Palestinian people?

A.    There were several negotiators.  One was named Ahmed
Qurei, who later became the prime minister of the Palestinian
Authority, and he was the leader of the Palestinian
delegation.

Q.    Was Yasser Arafat there?

A.    No, he was not.  He was in Tunis at the time.

Q.    So he was not in the White House at Oslo?

A.    No, I am talking about the negotiations in Oslo.

Q.    I am sorry.

A.    When the agreement was signed at the White House lawn, it
was Yasser Arafat and the Israeli prime minister Yitzhak
Rabin.

Q.    In the United States?

A.    That is correct, yes.

Q.    Now, do you know whether Hamas supported the Oslo
Accords?

A.    They did not.

Q.    Okay.  And do you know whether there were any other
organizations or segments of--let's start first with the

1   Palestinian side--who opposed to Oslo Accords?

2   A.    There were a number of Palestinians who were against the

3   Accords.

4   Q.    And I am going to ask you about both.  Do you know

5   whether there were any Israelis who opposed Oslo?

6   A.    Very many Israelis opposed it.

7   Q.    Okay.  Let's talk first about the Israelis.  What segment

8   of the Israeli population opposed Oslo?

9   A.    The Likud Party in Israel, which was the second largest

10  party after the Labor Party, was strongly opposed to Oslo.

11  They believed that Israel should not give up any of the

12  territory of the West Bank or Gaza to the Palestinians,

13  because God had promised that land to the Jews.  There were

14  other parties, religious parties, Israeli religious parties

15  that were opposed to it.  And when it was ultimately approved

16  in the Knesset, the vote was 61 to 59, and the 59 included

17  Likud and various Israeli religious parties that were strongly

18  opposed to the Oslo Accords.

19            THE COURT:  We are getting into a lot of detail

20  about the Israeli-Palestinian conflict.

21            MS. HOLLANDER:  That was my last question about

22  that.

23            THE COURT:  We discussed that this morning.  We

24  discussed that this morning.

25  Q.    (BY MS. HOLLANDER)  I was going to ask about on the other

1    side, the Palestinian side, whether there were others besides

2    Hamas who opposed Oslo?

3    A.    There were.

4    Q.    In particular anyone?

5    A.    Well, for example, one of the lead negotiators in

6    Washington, a woman named Hanan Ashrawi, who I think is very

7    well-known, was against the Oslo Accords.

8               MR. JACKS:  Objection.  Again, this is outside the

9    scope of this trial and --

10              THE COURT:  And I agree about that.  She asked about

11   the Israeli, so I will let you finish up about the

12   Palestinians.  She asked about Israelis without objection.

13              MR. JACKS:  Well, he is testifying about somebody

14   else's statements or opinion.

15              THE COURT:  That is what she is asking about, and

16   you didn't object at that time.

17   Q.    (BY MS. HOLLANDER)  And this is my last question, if he

18   can finish this question -- who if you could go back to this.

19   A.    There were Palestinians both within the West Bank and

20   Gaza, as well as in the Palestinian diaspora, who opposed to

21   Oslo Accords because they felt that it was not precise about

22   the creation of a Palestinian state, and because there was

23   nothing to stop the confiscation of Palestinian land by the

24   Israelis and the building of settlements On Palestinian land

25   by the Israelis.  And these were both secular and religious.

1          MR. JACKS:  We have gone from --

2          THE COURT:  I had overruled the objection.  He is

3    finished now.  Let's move on.

4    Q.   (BY MS. HOLLANDER)  I just want to show you a map that

5    has been introduced as No. 1013.  And this map is dated -- It

6    is called Oslo II 1995.  And I want to ask you if, in your

7    opinion, this accurately portrays Area A, which we have heard

8    about, which is the kind of red areas; Area B, the Palestinian

9    villages; and Area C, the Israeli settlement military areas

10   and state lands.  Does that look accurate to you?

11   A.   Yes, it does.

12   Q.   Now, I want to ask you about another area, and that is

13   Hebron.  I am just looking to see --

14         MS. HOLLANDER:  May I approach and let him point it

15   out on the map, Your Honor?

16         THE COURT:  Yes.

17   Q.   (BY MS. HOLLANDER)  Can you just show us where Hebron is?

18   A.   Yes, the city down here.

19   Q.   And you are pointing to the south part of the West Bank?

20   A.   Yes, that is correct.

21   Q.   Have you ever been to Hebron?

22   A.   I have.

23   Q.   And what is the population mix of the city of Hebron?

24   A.   There are a few thousand Israeli settlers there and maybe

25   a couple of hundred thousand Palestinians.

1    Q.    Now, we have discussed in this case a particular incident

2    involving Baruch Goldstein and the Hebron massacre.  And I

3    don't want to ask you -- We have been through that.  I don't

4    want to ask about that.  What I want to ask you is whether

5    there is anything in your view particularly about Hebron that

6    caused this to happen there?

7    A.    I think it is considered --

8          MR. JACKS:  Your Honor, I am going to object to the

9    question, the scope of the question, and the relevance of the

10   question.

11         THE COURT:  Well, I am not sure where you are going.

12   That has been talked about, but I think it seems you are going

13   beyond where we need to go.

14         MS. HOLLANDER:  I will narrow it, Your Honor.  I was

15   trying to lead into something.

16   Q.    (BY MS. HOLLANDER)  Have you been to Hebron?

17   A.    I have.

18   Q.    Have you ever seen graffiti in Hebron?

19   A.    Yes.

20   Q.    And have you seen graffiti that is anti-Jewish or

21   anti-Israeli?

22         MR. JACKS:  Objection, Your Honor; relevance.

23         THE COURT:  You may ask these questions.  Overruled.

24   Go ahead.

25         THE WITNESS:  Yes, I have.

1  Q.   (BY MS. HOLLANDER)  Have you seen any graffiti that is

2  anti-Arab?

3  A.   I have.

4  Q.   Is it just in Hebron, or have you seen both in other

5  places?

6  A.   You see it at different -- I have seen it in East

7  Jerusalem, for example, where Israeli Jews and Palestinians

8  come into contact.  There is frequent friction, and you will

9  see that kind of graffiti around the West Bank.

10  Q.   But do you see both is what I am asking.

11  A.   Yes, you see both anti-Israeli and anti-Muslim.

12  Q.   Now, after the Hebron massacre, was there anything as a

13  result of that that resulted in a particular need for the

14  people -- I mean economic need for the Palestinians in Hebron?

15  A.   After the massacre, the government of Israel imposed a

16  24-hour, seven day a week curfew for approximately two months,

17  and it would allow Palestinians to leave their house maybe

18  every couple of days to go out and get food, but otherwise

19  they were confined to their houses on a 24-hour curfew for two

20  months.

21  Q.   And did anything happen to the settlement where Doctor

22  Goldstein lived?

23  A.   No, nothing.

24  Q.   Now, you have talked about Yasser Arafat and his position

25  while you were representing the United States government.  Was

1    it also part of your job description to have contact with him?

2    A.    Yes, it was.

3    Q.    And what kind of contact did you have?

4    A.    I would meet with him four or five times a week on

5    instructions from the State Department to talk about the

6    negotiations, to discuss institution-building.  It was

7    just -- It was -- The primary focus of what I was doing was to

8    try to promote this peace process, and Yasser Arafat was

9    obviously the key person on the Palestinian side, so I dealt

10   with him, on instructions from Washington, on almost a daily

11   basis.

12   Q.    Did you get to know him personally?

13   A.    I did over the course of the years.

14   Q.    Did you ever have any personal encounters with him or

15   social meetings?

16   A.    Yes.

17   Q.    Now, were you also in Jerusalem when Prime Minister

18   Yitzhak Rabin was assassinated?

19   A.    I was.

20   Q.    And when did that happen?

21   A.    I think it was November 4, 1995.

22   Q.    And as U.S. Consul General what did you do in response?

23   A.    Called Yasser Arafat and informed him of it, and I was

24   the first one to let him know that Rabin had been

25   assassinated.

1    Q.    And what happened after that?

2    A.    He was really shocked because he was afraid, first of

3    all, that a Palestinian had killed him.

4            MR. JACKS:  Objection, Your Honor.

5            THE COURT:  Sustained.

6    Q.    (BY MS. HOLLANDER)  Did Yasser Arafat attend Rabin's

7    funeral?

8            MR. JACKS:  Your Honor, this is beyond issues of

9    this trial.

10           THE COURT:  And I agree, counsel.  Sustained.  That

11   entire issue wasn't gone into, and I don't know what it is

12   relevant to.

13           MS. HOLLANDER:  I will move on, Your Honor.

14           THE COURT:  All right.

15           MS. HOLLANDER:  May I approach with a photograph?

16           THE COURT:  Yes.

17   Q.    (BY MS. HOLLANDER)  I have shown you what has been marked

18   for identification as Defendants' Exhibit No. 426, and the man

19   on I guess the left has already been identified in this case

20   as a Holy Land Gaza employee Mohammad Abu Muharam.  Don't tell

21   us who he is, but can you recognize the other gentleman?

22   A.    Yes, I do.

23   Q.    And do you know what his position was in the Palestinian

24   government?

25   A.    Yes, I do.

1          MS. HOLLANDER:  Your Honor, I would move the

2    admission of Exhibit No. 426.  I don't know that there is any

3    objection.

4          MR. JACKS:  I object, Your Honor; no foundation in

5    terms of time, place.

6          THE COURT:  Do you want to lay a foundation?  I

7    don't remember what was stated about it, if anything,

8    previously.  You said somebody had previously been identified,

9    but I don't recall any of the specifics about this.

10          MS. HOLLANDER:  Well, laying the foundation is going

11    to require asking him some questions about the photograph and

12    who the person is?

13          THE COURT:  No.  He stated he can recognize the

14    individual.

15    Q.   (BY MS. HOLLANDER)  Do you know whether this individual

16    was involved in the Palestinian government during the '90s?

17    A.   Yes, he was.

18    Q.   Okay.  Was he involved in providing of social services

19    and charity?

20    A.   Yes, he was.

21          MR. JACKS:  Your Honor, I am still going to object.

22          THE COURT:  Come up here.  Let me take a look at it.

23    I don't have it before me.

24          (The following was had outside the hearing of the

25          jury.)

1          MS. DUNCAN:  Your Honor, you might recall, yesterday

2     Mr. Yaish identified this person as with Holy Land.

3          MR. JACKS:  Not in that photograph.

4          MS. DUNCAN:  Yes, in that exact photograph.

5          THE COURT:  But what is the setting here?

6          MS. HOLLANDER:  The setting is -- I mean, he was the

7     Minister of Social Affairs, and the purpose of --

8          THE COURT:  Social affairs for.

9          MS. HOLLANDER:  For the Palestinian Authority, and

10    he knows him.  And the purpose of asking him about this is

11    simply that the Holy Land was obviously talking to a member of

12    the Palestinian Authority, and he is going to say he is not

13    Hamas, and that is all.

14         THE COURT:  Okay.

15         MR. JACKS:  We don't know when, where, he didn't

16    know what they are talking about.

17         THE COURT:  I think that just goes to argument.  I

18    don't think it goes to admissibility.  If he identifies it, it

19    is admitted.

20         (The following was had in the presence and hearing

21         of the jury.)

22         THE COURT:  What exhibit number was that, counsel?

23         MS. HOLLANDER:  It is No. 426, Your Honor.

24         THE COURT:  And that is admitted.

25    Q.   (BY MS. HOLLANDER)  As to that photograph, as I have

said, the gentleman -- one gentleman has already been
identified as the Holy Land representative in Gaza Mr. Abu
Muharam.  Can you identify the other man?  I will just take it
back from you after you identify him.

A.   His name is Dr. Riyad Zanoun.  He is a physician, and at
the time he was the Palestinian Minister of Health.

          MS. HOLLANDER:  May I retrieve it, Your Honor?

          THE COURT:  Yes.

Q.   (BY MS. HOLLANDER)  And the one you have identified is
this balding gentleman?

A.   That is correct.

Q.   And who did you say he was?

A.   Dr. Riyad Zanoun, a physician who was the Palestinian
Minister of Health.

Q.   And is this someone who you interacted with?

A.   Yes, I did.

Q.   And what was his job?

A.   He was responsible for overseeing the hospitals, the
public hospitals, clinics and so forth, and we dealt with him
in terms of providing assistance to the medical sector.

Q.   So would you expect, or do you know whether it was part
of his job to deal with the organizations that were providing
charity within the West Bank and Gaza?

A.   He would meet with them in order to coordinate
activities.  If they were assisting the ministry of health, it

1  would be part of his duties to meet with these people.

2  Q.   I don't know if you can, but can you identify the flags

3  in that?

4  A.   The one in the background is the Palestinian flag, the

5  one that goes up right to the right of Doctor Zanoun.  The one

6  in front I really can't tell, but the one in the back is the

7  Palestinian flag.

8  Q.   And I just want to ask you, do you see a small number

9  here that says HLDL216 and a longer number?

10  A.   Yes, I see that.

11  Q.   And I forgot to ask you when we were looking at

12  Defendants' No. 532, the UNWRA picture, do you also see an

13  HLDL216 and a longer number there?

14  A.   I do.

15  Q.   Now, was Doctor Zanoun someone who was in Chairman

16  Arafat's cabinet?

17  A.   He was.  He was the Minister of Health.

18  Q.   And was he a Hamas member?

19  A.   No, he was Fatah.

20  Q.   I am going to move to --

21          THE COURT:  Let's take a 20-minute recess.

22          (Whereupon, the jury left the courtroom.)

23          THE COURT:  Be in recess 20 minutes.

24                  (Brief recess.)

25          THE COURT:  Ms. Hollander?

1          MS. HOLLANDER:  Thank you, Your Honor.

2     Q.   (BY MS. HOLLANDER)  Before I move onto another subject, I

3     forgot to ask you another question about UNWRA.  Does UNWRA

4     provide some kind of rations?

5     A.   It does.  It provides monthly rations to refugees in the

6     camps in Gaza and also the West Bank.

7     Q.   And do you know what those rations consist of?

8     A.   For a family of five it is 110 pounds of flour a month,

9     10 pounds of sugar, 10 pounds of rice, 10 pounds of lentils,

10    two quartz of cooking oil, and two pounds of dried powdered

11    milk.

12    Q.   And do you know whether UNWRA is still providing these

13    rations in Gaza?

14    A.   I am sorry?

15    Q.   Do you know whether UNWRA is still providing these

16    rations?

17    A.   Yes, they are.

18    Q.   Now, I want to show you what has been admitted I guess

19    outside the presence of the jury as Defendants No. 1423.  It

20    is a map.  And because it is a little hard to show the whole

21    thing at once, let me first ask you if you have ever seen this

22    map before.

23    A.   I have.

24    Q.   And what is the little logo up here?

25    A.   That is the symbol of the United Nations.

1    Q.    And this particular United Nations agency, United Nations

2    Office for the Coordination of Humanitarian Affairs, are you

3    familiar with that agency?

4    A.    Yes, I am.

5    Q.    And what is that?

6    A.    It is an agency -- a branch of the U.N. presence in

7    Jerusalem.  It has its offices in East Jerusalem, and it

8    monitors the placement of Israeli road blocks and barriers in

9    the West Bank that impede Palestinian movement.  It monitors

10   violence between Israelis and Palestinians, and it monitors

11   the construction of the security barrier that the Israelis

12   have built, as well as settlements and the roads leading to

13   the settlements and, it issues periodic reports on those.

14   Q.    Now, I am going to have to go up and down with this.  Is

15   this essentially a map of the West Bank?

16   A.    Yes, it is.

17   Q.    And there are some areas in red.  Do you know -- By red,

18   I mean these areas like I am pointing to.

19   A.    Yes.  Those are Israeli settlements.

20   Q.    Okay.  And then there are some areas in yellow.  What are

21   those?

22   A.    Those are built-up Palestinian areas.

23   Q.    And there is an area in gray, and what is that?

24   A.    Those are closed military areas by the Israeli army.

25   Q.    Okay.  And just so we have a reference, what is this

```
1    river?

2    A.    That is the Jordan River.

3    Q.    So that is Jordan on the east?

4    A.    The east, yes.  The country, the Hashemite Kingdom of

5    Jordan.

6    Q.    Let me ask you, or let's start at the top.  What is

7    the -- Now, this map is dated -- I am not sure you can read

8    it, but the date is 5 October, 2006.

9    A.    Yes, I see that.

10   Q.    Let me ask you, first of all, where it says Palestinian

11   built-up areas in the West Bank, what is the population?

12   A.    According to this map 244,500.

13   Q.    No, 2 million?

14   A.    Excuse me 2,444,500.

15   Q.    And do you know whether that is accurate?

16   A.    I think -- Well, this is two years old, so the population

17   has increased somewhat since then.

18   Q.    And the red areas, you said those were Israeli

19   settlements?

20   A.    That is correct.

21   Q.    And it says 96 outposts.  What are those?

22   A.    Those are illegal settlements that the government of

23   Israel has not sanctioned but settlers have set up.

24           MR. JACKS:  Your Honor, objection.

25           THE COURT:  Sustained.
```

1   Q.   (BY MS. HOLLANDER)  What is the population of the

2   settlements?

3   A.   Again, it says 450,000 here.  It is now approximately

4   490,000.

5   Q.   Okay.  Now, we have heard some evidence in this case

6   about bypass roads, and they aren't on this map but can --

7   Using this map, can you just say where the bypass roads go and

8   what they are?

9   A.   If you look at the settlements, the red areas, the

10  Israelis from 1996 on --

11          MR. JACKS:  Your Honor, again I think you told me to

12  object if I have an objection.  I do object to this.  I think

13  it is irrelevant and outside the scope of this trial.

14          THE COURT:  I will sustain the objection, counsel.

15          MS. HOLLANDER:  Can I just ask the impeachment

16  question, Your Honor, about who can use the bypass roads?

17          THE COURT:  You may do that.

18  Q.   (BY MS. HOLLANDER)  We have heard about the bypass roads.

19  Can you just tell us who can use the bypass roads that go to

20  the settlements?

21  A.   The Israeli military only allows Israeli yellow-plated

22  cars to use the bypass roads, and the roads are predominantly

23  for the settlers to travel in and out of the West Bank.  There

24  are a limited number of Palestinian officials, approximately

25  250 or so, with VIP passes that are allowed to use the bypass

1    roads.  The ordinary Palestinian is subject to arrest if he or

2    she drives on the bypass roads.

3    Q.   Is that true all the time or just during sometimes?

4    A.   It is true all the time.

5    Q.   Now, are there any Arabs who are actually Israeli

6    citizens and who have the Israeli license plates?

7    A.   There are -- Approximately 15 percent of the Israeli

8    population of 7 million are Israeli Arabs, plus there are a

9    another 200,000 Palestinians in East Jerusalem who have a

10   license plate that allows them to use the bypass roads.

11   Q.   Okay.  I want to ask you another question about something

12   we have seen in this case.  We saw a lot of posters that were

13   seized from the zakat committees.

14        MS. HOLLANDER:  May I retrieve one of the

15   Government's --

16        THE COURT:  Yes.

17        MS. HOLLANDER:  May I approach, Your Honor?

18        THE COURT:  Yes.

19   Q.   (BY MS. HOLLANDER)  I am showing you what has been marked

20   as Tulkarem exhibit Zakat No. 1 just as a representative

21   sample.  Have you seen posters like this?

22   A.   Yes, I have.

23   Q.   Okay.  And where have you seen posters of people who in

24   the general parlance are terrorists or suicide bombers?

25   A.   They are plastered all over Palestinian cities.  You see

```
 1   them on walls, on light posts, in offices.  It is a very
 2   common -- Like I say, you see them all over the place.
 3   Q.   Are they just -- When you were in the zakat committees,
 4   did you ever see posters like this one?
 5   A.   On occasion.
 6   Q.   Did you see other kinds of posters?
 7   A.   Well, there is always a photograph of Yasser Arafat
 8   there, as well as, you know, a poster of Jerusalem.  That is
 9   also very common to see there.  And you would see Fatah
10   figures as well, Fatah figures that have been killed by the
11   Israelis.
12         MS. HOLLANDER:  May I approach?
13         THE COURT:  Yes.
14   Q.   (BY MS. HOLLANDER)  Showing you what has been marked as
15   Defendants' Exhibit No. 364, without telling us what that is,
16   do you recognize that?
17   A.   Yes.
18   Q.   And does that photograph represent the area that -- an
19   area that you are familiar with?
20   A.   It appears to be in the Gaza Strip.
21   Q.   Okay.  Don't say what it is yet.
22   A.   All right.
23   Q.   And does it include some things on a wall that you have
24   seen before?
25   A.   Yes.
```

1  Q.   Does that -- Would you have seen that picture, that scene

2  during the time you were stationed in Jerusalem?

3  A.   Yes, it was very common.

4          MS. HOLLANDER:  Your Honor, I move Defendants'

5  Exhibit No. 364.

6          THE COURT:  Mr. Jacks?

7          MR. JACKS:  May I take the witness on voir dire?

8          THE COURT:  Yes.

9  Q.   (BY MR. JACKS)  Sir, the exhibit, do you know where that

10  picture was taken?

11  A.   Not precisely I do not.

12  Q.   Do you know when it was taken?

13  A.   No, I don't know.

14  Q.   Okay.

15          MR. JACKS:  I don't believe there is any foundation,

16  Your Honor.

17          THE COURT:  Well, she has laid a foundation.

18  Defendants' No. 364 is admitted.

19          MS. HOLLANDER:  May I retrieve it, Your Honor?

20          THE COURT:  Yes.

21          MR. JACKS:  Your Honor, is it a demonstrative?

22          THE COURT:  Are you using that as substantive

23  evidence.

24          MS. HOLLANDER:  It is substantive evidence, Your

25  Honor.

1          THE COURT:  I think that is what she offered it for.

2          MR. JACKS:  We object to it in the sense that he

3     doesn't know where it is.  If it is a demonstrative and

4     similar to places he has seen and places he has been, then we

5     believe at most it should be a demonstrative.

6          MS. HOLLANDER:  He does know where it is.

7          THE COURT:  I think he identified the place.  Let

8     her examine the witness, but it has been admitted.

9     Q.   (BY MS. HOLLANDER)  Looking at No. 364, where is that?

10    A.   The Gaza Strip.

11    Q.   And how do you identify the Gaza Strip?

12    A.   You can tell by the kind of buildings and then the road

13    which is frequently sandy and so forth; very flat coastal

14    area.

15    Q.   And are there any trees there?

16    A.   No.

17    Q.   Are there trees in Gaza?

18    A.   There are.  There are olive groves, a lot of orange

19    groves.

20    Q.   But do you see them in the cities?

21    A.   No, you do not.

22    Q.   Now, there are some posters on the side there.  Do you

23    see those?

24    A.   I do.

25    Q.   What kinds of posters are those?

1    A.   Those are when someone has been killed by the Israelis,

2    for whatever reason, the family or political organization will

3    put up posters that will print up posters, and they are sort

4    of plastered around the city.

5    Q.   Does it also -- Do you also see posters of people who

6    kill Israelis, like suicide bombers?

7    A.   Yes, you do, yes.

8    Q.   Okay.  And so when you say that these are plastered

9    around the city, do you see these on the West Bank, too?

10    A.   You do.

11    Q.   Can you buy them in the markets?

12    A.   You can buy some posters in the markets, but generally

13    the practice is they just print them up and put them on walls

14    and light posts and things like that.  But you can purchase

15    posters that, you know, may glorify some particular

16    individual.

17    Q.   I would like you to look at -- If we can switch for a

18    minute, I would like you to look at something that has been

19    introduced in this case.  It is Nablus Zakat No. 5.  This has

20    been introduced.  Can you see this?  Do you know generally

21    what that is?

22    A.   It looks like a day calendar.

23    Q.   And I would like to ask you to describe the individual

24    pictures if you know what they mean.  What is that a picture

25    of?

1    A.    It appears to be an Israeli soldier with Palestinian

2    school children.

3    Q.    And does the soldier have a weapon?

4    A.    He does.  He has an M-16, I believe.

5    Q.    And the next one?

6    A.    That appears to be a Palestinian demonstration.

7    Q.    Have you ever seen demonstrations like this?

8    A.    I have.

9    Q.    And the next one?

10   A.    It appears to with a destroyed Palestinian house.

11   Q.    Have you ever seen destroyed Palestinian houses?

12   A.    Many times.

13   Q.    The next one, what is that?

14   A.    It is a Palestinian, I guess, young man with a sling

15   probably throwing a stone.

16   Q.    Did you ever see children throwing stones?

17   A.    I have.  My car has been hit by them.

18   Q.    The next one, what is that?

19   A.    I think that this is the al-Aqsa mosque in Jerusalem with

20   an Israeli soldier and with Palestinians throwing rocks.

21   Q.    We have heard about the Dome of the Rock.  Is that what

22   that is?

23   A.    The Dome of the Rock is another structure on the holy

24   platform.  This is the al-Aqsa mosque which is part of that

25   general complex, but the Dome of the Rock is something

1    different.

2    Q.    Do you know whether this symbol is important to Muslims

3    in general?

4    A.    Al-Aqsa mosque is one of the most holy mosques in Islam

5    and it is considered, you know, a very sacred site by Muslims.

6    Q.    And the Dome of the Rock, do you know if it is considered

7    sacred?

8    A.    Very much so.  It is when the Prophet Muhammad sprang

9    into heaven and received the word from God that Muslims should

10   pray five times a day.

11   Q.    And the next one, please.  What does this appear to be?

12   A.    It appears to be Palestinian school girls running for

13   some reason.

14   Q.    And the next one, please.  Can you tell what this is?

15   A.    It is an Israeli policeman, but I can't quite make out

16   what he is doing.

17   Q.    Okay.  The next one, please.

18   A.    I think that is an Israeli soldier in front of a burning

19   building.

20   Q.    And the next one?

21   A.    It appears to be an Israeli bus or vehicle that has maybe

22   been blown up.

23   Q.    And the next one, what is that?

24   A.    It appears to be a car with an individual in it that has

25   had numerous shots fired at it.

1   Q.   And is there another one?  One more?

2   A.   This appears to be the transfer of either a Palestinian

3   who is on a stretcher.  Whether the person is dead or alive,

4   you really can't tell.

5   Q.   Okay.  Now, if you go back just to the one that is the

6   demonstration up in the top middle, can you tell what those

7   flags are?

8   A.   I think the red flag is of the Palestinian communist

9   party, and I am not sure what the black flags are.

10  Q.   Do you know what the Hamas flag looks like?

11  A.   The Hamas flag is green, and it may be a green flag

12  behind the red one but it is too blurry for me to say with any

13  certainty.

14  Q.   Do you have any -- Do you know what this calendar

15  represents overall?

16  A.   I think for Palestinians it represents a kind of

17  extraordinarily difficult life they lead.

18          MR. JACKS:  Your Honor, I object.  Expressing an

19  opinion of what this calendar means, his opinion, he is not an

20  expert.

21          THE COURT:  You can offer a lay opinion, of course,

22  if he has a basis.  You may ask.  Go ahead.

23  Q.   (BY MS. HOLLANDER)  You may continue.

24  A.   The Israelis exercise a very, very hard-handed,

25  hard-fisted occupation of the Palestinian areas.  They destroy

1  Palestinian houses, they arbitrarily arrest people --

2        THE COURT:  That is going beyond the opinion of the

3  calendar, without describing all the political --

4        THE WITNESS:  All right.  These are scenes that I

5  believe Palestinians would say are representative of daily

6  Palestinian life under occupation.

7  Q.  (BY MS. HOLLANDER)  Thank you.

8        MS. HOLLANDER:  You can take it down.  Thank you

9  very much, Mr. Lewis.

10  Q.  (BY MS. HOLLANDER)  Do you know whether the -- during

11  Operation Defensive Shield whether the Israeli army took land

12  records?

13  A.  Yes, they did, in Ramallah.

14  Q.  And did that have any economic impact on the

15  Palestinians?

16        MR. JACKS:  Objection; irrelevant.  It is not

17  relevant to any issue in this case.

18        THE COURT:  What is that relevant to, counsel?

19        MS. HOLLANDER:  Your Honor, the Government has

20  brought up Operation Defensive Shield.

21        THE COURT:  I understand that, but this particular

22  question --

23        MS. HOLLANDER:  It has an economic effect on

24  individuals.  That is all I am going to ask him.

25        MR. JACKS:  Your Honor, that is not relevant to this

1    issue.

2              THE COURT:  Economic effects, I will let you ask

3    that.

4              MS. HOLLANDER:  Thank you, Your Honor.

5    Q.   (BY MS. HOLLANDER)  What was the economic effect of the

6    Israelis taking the land records?

7    A.   The Israeli army seized the land records of the

8    Palestinian Authority in Ramallah, and what it meant was that

9    without those records you can't prove ownership of the land.

10   Q.   For individuals?

11   A.   For individuals.  That is correct.

12   Q.   I mean, how does that have an economic effect on people?

13   A.   If you can't prove the ownership of the land, then

14   Palestinians fear that the Israelis would seize it for

15   settlement purposes.

16   Q.   Now, we have heard the word Islamist in this trial a

17   number of times.  From your years of working in the Middle

18   East, do you have an opinion as to what that word means, what

19   an Islamist is?

20   A.   It is kind of a complicated issue to explain, but it is

21   between political Islam -- Islam has always been a very

22   politicized religion and Palestinian secular nationalism,

23   which from 1945 to say 1990 or so was fighting with political

24   Islam.  To say that -- I mean, it just means that Islam as a

25   focus of the life of a Muslim covers all aspects of that life;

1    his personal life as well as political.

2    Q.    Do you -- In your mind is Islamist the same as Hamas?

3    A.    No.

4    Q.    And would -- For, example do you know whether --

5    would -- You said it considers it a pius Muslim.  Is that what

6    you said?

7    A.    Yes.

8    Q.    Do you know whether Yasser Arafat who ran the secular

9    party Fatah was a pius Muslim?

10   A.    Yes, he was.

11   Q.    Do you know whether he prayed on a regular basis?

12              THE COURT:  Why is that relevant?

13              MS. HOLLANDER:  I am trying to define what this term

14   means.

15              THE COURT:  I think you are getting too far afield

16   again.

17   Q.    (BY MS. HOLLANDER)  Are you familiar with a man named

18   Adnan Husseini?

19   A.    I am.

20   Q.    And who is he?

21   A.    He is the director of awqaf at the Haram al-Sharif in

22   East Jerusalem.

23   Q.    What is the Haram al-Sharif?

24   A.    For Muslims, it is the holy complex where the al-Aqsa

25   mosque is and the Temple mount is.  For Jews, it is called the

1   Temple mount and it was the site of the Jewish Temple that was

2   destroyed by the Romans in the first century A.D.  It is the

3   holy site to both.

4   Q.   This is the place where the wailing wall comes together

5   with the Muslim holy site.  Is that correct?

6   A.   That is correct.

7   Q.   And the awqaf is the Islamic Trust?

8   A.   That is correct.

9   Q.   Okay.  In your opinion, is this somebody you know, Adnan

10  Husseini?

11  A.   Yes.  I dealt with him when I was a Consul General.

12  Q.   Would you consider him an Islamist?

13  A.   Yes.

14  Q.   Do you know whether he had any contact with other members

15  of the United States government in addition to you?

16  A.   Yes, he did.

17          MS. HOLLANDER:  May I approach, Your Honor?

18          THE COURT:  Yes.

19  Q.   (BY MS. HOLLANDER)  I am showing you what has been marked

20  as Defendants' Exhibit No. 1102, and without describing it,

21  are you familiar with that website?

22  A.   Yes, I am.

23  Q.   And can you identify the woman in the black scarf?

24  A.   Yes, I can.

25  Q.   Can you identify the gentleman she is talking to?

1    A.    Yes, I can.

2    Q.    Can you identify the location?

3    A.    I can.

4    Q.    And are you familiar -- You said that Americans would

5    from time to time meet Adnan --

6              MR. JACKS:  Object to the narrative of the question.

7              THE COURT:  Do you want to ask a question?

8              MS. HOLLANDER:  I am trying to lay this predicate,

9    Your Honor.

10   Q.   (BY MS. HOLLANDER)  Is this a fair and accurate

11   representation of a United States -- someone representing the

12   United States meeting with Adnan Husseini?

13   A.    Yes, it is.

14             MS. HOLLANDER:  Your Honor, I move the admission of

15   No. 1102.

16             THE COURT:  Mr. Jacks?

17             MR. JACKS:  Same objection, Your Honor.  There is no

18   foundation, it is not relevant, and no proper predicate has

19   been laid.

20             THE COURT:  Approach the bench on this one a minute.

21             (The following was had outside the hearing of the

22             jury.)

23             THE COURT:  This is the First Lady picture.  Right?

24             MS. DUNCAN:  Yes.

25             THE COURT:  Why is it relevant?  Who is that

1  individual?

2          MS. HOLLANDER:  Adnan Husseini is the leading

3  Islamic figure, and this is a member of the -- Bush's wife --

4          THE COURT:  Has he been mentioned in this case?

5          MS. HOLLANDER:  He has not been mentioned.  Well,

6  yes.  He is the Minister of Awqaf, which is the Islamic Trust

7  which administers the zakat committees, and she is meeting

8  with him.

9          THE COURT:  Okay.  I am going to sustain on

10 relevance.  Sustained.

11         (The following was had in the presence and hearing

12         of the jury.)

13         THE COURT:  Sustain the objection to Defendants'

14 Exhibit No. 1102.

15 Q.  (BY MS. HOLLANDER)  Do you know whether Yasser Arafat was

16 a member of the Muslim Brotherhood?

17 A.  Yes, he was.

18 Q.  Another area that we have discussed in this case is the

19 issue of martyrs.  Do you know whether the Palestinian

20 Authority had a cabinet post that was focused on martyrs?

21 A.  Yes, I do.

22 Q.  And what is it called?

23 A.  It was the Ministry of Martyrs.

24 Q.  And what did that ministry do?

25 A.  It provided allowances, financial allowances to people

1   who had been killed by the Israeli military.

2   Q.   Now, was this under Fatah or Hamas?

3   A.   It was under Fatah.

4   Q.   And do you know, if you know, whether this ministry is

5   provided across the board for families of -- I think it is

6   called the Ministry of Prisoners and Martyrs.  Is that

7   correct?

8   A.   Yes.

9   Q.   Do you know whether it made any distinctions between who

10  it assisted and who it didn't, if you know?

11  A.   I don't know.

12  Q.   Okay.  Do you know whether Chairman Arafat took any

13  particular interest in orphans or martyrs?

14  A.   Yes, he did.

15  Q.   And do you know that from personal experience?

16  A.   I do.

17  Q.   How do you know that?

18  A.   He took me to an orphanage once that he had sponsored

19  where there were children from -- very young children to 16,

20  17, 18 years old.

21  Q.   And were those -- Were any of those children the children

22  of parents who had been imprisoned, or do you know?

23  A.   As he stated to me, their parents had been killed during

24  the course of Israeli military operations.

25  Q.   On behalf of the United States when you were there

1   representing the United States, did you ever attend the

2   funeral or visit the family of a martyr?

3   A.   I did.

4   Q.   On one occasion, more than one occasion?

5          MR. JACKS:  Objection, Your Honor; relevance.

6          THE COURT:  Sustained.

7   Q.   (BY MS. HOLLANDER)  Let me ask you a different question.

8   Some of the gentlemen on trial here have family members that

9   have been identified as members of Hamas.

10         MR. JACKS:  Your Honor, I object again to the

11  unnecessary narrative.

12         THE COURT:  Sustained.  You are --

13         MS. HOLLANDER:  I am just trying -- I can ask it

14  without that, Your Honor.  I am just trying to make this clear

15  where we are going.  I am sorry.

16         THE COURT:  Okay.

17  Q.   (BY MS. HOLLANDER)  Are you aware of Palestinians who

18  have family members who are on both sides of the Palestinian

19  issue, like one family member is one organization and another

20  one is another organization?

21  A.   Yes, I am.

22  Q.   Do you know whether that is common or uncommon?

23  A.   It is fairly common.

24  Q.   Are there any particular individuals who are well known

25  in the United States with family members who are members of

1    Hamas or other organizations like Hamas?

2    A.    Well, for example, Mousa Abu Marzook is part of the Hamas

3    Polit Bureau, and he has a cousin who was General Abu Marzook,

4    who was on the staff of President Arafat.

5    Q.    Did you ever meet General Marzook?

6    A.    I did.

7    Q.    Okay.  Are you familiar with an individual named Khalil

8    Shikaki?

9    A.    I am.

10   Q.    And who is he?

11   A.    He is an American educated Ph.D. who does public opinion

12   surveys in the West Bank and Gaza.

13   Q.    To your knowledge--this is kind of a yes or no

14   question--has he ever met with members of the U.S. government?

15   A.    He has.

16   Q.    And do you know if he has a relative or had a relative

17   who was a member of a terrorist organization?

18   A.    His brother Fathi Shikaki had been head of the

19   Palestinian Islamic Jihad, and was assassinated by the Mossad

20   in 1990 for --

21            MR. JACKS:  Your Honor --

22            MS. HOLLANDER:  That is the end of that, Your Honor.

23            MR. JACKS:  I object.  She asked about if he had a

24   brother, and he volunteered --

25            THE COURT:  The part about the assassination, that

1    was not necessary.  That was not part of it.

2    Q.   (BY MS. HOLLANDER)  Now, I just want to go through the

3    zakat committees in this case, specific zakat committees, and

4    ask you some questions.

5         MS. HOLLANDER:  Your Honor, I am going to ask these

6    one at a time so it is not a compound question.

7    Q.   (BY MS. HOLLANDER)  Were you ever told in any U.S.

8    government briefing that the Qalqilya zakat committee was

9    operated on behalf or under the control of Hamas?

10   A.   No.

11   Q.   Were you ever told in any U.S. government briefing that

12   the Islamic Charitable Society of Hebron was operated on

13   behalf or under the control of Hamas?

14   A.   No.

15   Q.   Were you ever told in any U.S. government briefing that

16   the Tulkarem zakat committee was operating on behalf of or

17   under the control of Hamas.

18   A.   No.

19   Q.   Were you ever told in any United States government

20   briefing that the Nablus zakat committee was operated on

21   behalf of or under the control of Hamas?

22   A.   No.

23   Q.   Were you ever told in any United States government

24   briefing that the Ramallah zakat committee was operated on

25   behalf of or under the control of Hamas?

```
1    A.    No.

2    Q.    Were you ever told in any United States government

3    briefing that the Jenin zakat committee was operated on behalf

4    of or under the control of Hamas?

5    A.    No.

6    Q.    And were you ever told in any United States government

7    briefing that the Islamic Science and Culture Committee was

8    operated on behalf of or under the control of Hamas?  Were you

9    ever told in any briefing that that organization was operated

10   under the control of Hamas?

11   A.    I think that was the one in Gaza?

12   Q.    No, it is in Jerusalem.

13   A.    Jerusalem?

14   Q.    Were you ever specifically told --

15   A.    No, not that I recall, no.

16   Q.    Do you know whether zakat committees are effective in

17   what they do for people?

18   A.    Yes.

19   Q.    And is there any question in your mind, based on your

20   experience, of the tremendous need of the Palestinian people

21   for charity?

22   A.    No, there is not.

23   Q.    Do you know whether Israel provides the necessary food,

24   medical care, and schooling for the Palestinian people?

25   A.    It does not.
```

1    Q.   Do you know whether the Palestinian Authority is capable

2    of providing the necessary food, medical care, and schooling

3    for the Palestinian people?

4    A.   In limited amounts, but not fully.

5    Q.   And just to be clear, this program we talked to,

6    Defendants' Exhibit No. 1074, am I correct that the United

7    States government through the USAID continued to provide

8    charity?

9              MR. JACKS:  Objection; leading.

10             THE COURT:  Do you want to rephrase?

11             MS. HOLLANDER:  I will rephrase.

12   Q.   (BY MS. HOLLANDER)  Did the USAID continue to provide

13   charity, either -- I mean services, directly or indirectly, to

14   the zakat committees after 2001?

15   A.   Yes, until 2006.

16   Q.   In your opinion, are charities necessary for the

17   Palestinian people to survive?

18   A.   Very much so.

19             MS. HOLLANDER:  Your Honor, I will pass the witness.

20             THE COURT:  Any other Defense counsel?

21        Mr. Dratel?

22                     DIRECT EXAMINATION

23   By Mr. Dratel:

24   Q.   Good morning.

25   A.   Good morning.

1    Q.    There has been testimony about people who experts have

2    relied on.  One is someone named Khalid al-Qidra.  Is that

3    name familiar to you?

4    A.    Yes, it is.

5    Q.    And who is or was Khalid al-Qidra?

6    A.    He was the Palestinian Attorney General in the Ministry

7    of Justice in Gaza when I was the American Consul General.

8    Q.    And was he Fatah or Hamas?

9    A.    He was Fatah.

10   Q.    And do you know what happened to him professionally?

11   A.    He was fired by the Palestinian Authority for corruption.

12   Q.    Thank you.

13            MR. DRATEL:  Pass the witness, Your Honor.

14            THE COURT:  Any other counsel have any --

15            MS. MORENO:  No, Your Honor.

16            MR. WESTFALL:  No, Your Honor.

17            MS. CADEDDU:  No, Your Honor.

18            THE COURT:  Mr. Jacks?

19                    CROSS EXAMINATION

20   By Mr. Jacks:

21   Q.    Sir, your career with the State Department began when?

22   A.    In April 1970.

23   Q.    And your postings have been where?

24   A.    Do you want me to include the postings in Washington,

25   D.C.?

```
 1    Q.    No.

 2    A.    I have been posted in Tel Aviv.

 3    Q.    When was that?

 4    A.    That was 1972 to 1975.

 5    Q.    And did you work in the embassy in Tel Aviv?

 6    A.    I did.

 7    Q.    What was your department?

 8    A.    I was in the Political Section.

 9    Q.    And after -- What other overseas postings?

10    A.    I was in Tunisia in 1978, '79.

11    Q.    Tunisia is in North Africa.  Correct?

12    A.    That is correct.

13    Q.    And what was your portfolio or responsibility?

14    A.    I was studying Arabic at the U.S. embassy there.

15    Q.    So you just took language lessons?

16    A.    That is correct.

17    Q.    Had no other real duties?

18    A.    It was a language program administered by the Department

19    of State.

20    Q.    All right.  And your next overseas posting?

21    A.    It was Damascus, Syria.

22    Q.    The time period?

23    A.    From 1979 to 1982.

24    Q.    And after that?

25    A.    I was in Islamabad, Pakistan from 1987 to 1990.
```

1   Q.   And after that?

2   A.   I returned to Islamabad, Pakistan and was the Deputy

3   Chief of Mission from 1992 to 1993.

4   Q.   The gaps or the periods that are unaccounted for, for

5   example from 1982 to 1987, would you have been stationed in

6   Washington, D.C.?

7   A.   Yes, that is correct.

8   Q.   Did your assignment have anything to do with the Middle

9   East during that time?

10  A.   Yes, it did.

11  Q.   What was your post or area of responsibility?

12  A.   From 1982 to 1985 I was the acting Director of the

13  Israeli-Palestine Desk, and then Deputy Director of the

14  Israeli-Palestine Desk.

15  Q.   And from '90 to '92, were you in Washington?

16  A.   Yes, I was.

17  Q.   What was your responsibility?

18  A.   I was Director of the Desk for Afghanistan, Bangladesh,

19  and Pakistan.

20  Q.   Tunisia, is that a Muslim country?

21  A.   It is.

22  Q.   And Syria, is that a Muslim country?

23  A.   Yes, it is.

24  Q.   And Pakistan, is that a Muslim country?

25  A.   It is.

```
 1   Q.   You were the Consul General in Jerusalem from 1993 to

 2   1997?

 3   A.   Yes, that is correct.

 4   Q.   And when in 1993 did you arrive there?

 5   A.   October 1.

 6   Q.   So after the Oslo Accords had been signed?

 7   A.   That is correct.

 8   Q.   And when did you leave?  What month did you leave?

 9   A.   I think it was in August of 1997.  Either late July or

10   early August.

11   Q.   Who was your predecessor as Consul General?

12   A.   A woman named Molly Williamson.

13   Q.   Who was your successor?

14   A.   A man named John Herbst.

15   Q.   Would you spell his last name?

16   A.   H E-R-B-S-T.

17   Q.   Your tenure there as the Consul General was during the

18   Clinton administration.  Correct?

19   A.   That is correct.

20   Q.   And who did you report to as Consul General?

21   A.   I reported to the Department of State.

22   Q.   And was there a particular position that you reported to,

23   a department, sub-department?

24   A.   There was -- Administratively my post, and others in the

25   region, were under the authority of the Assistant Secretary
```

1    for Near Eastern Affairs.

2    Q.   You say others in the region.  That would include where?

3    A.   Egypt, Jordan, Syria, Lebanon, North Africa, Saudi

4    Arabia, Iran.

5    Q.   All right.  And then that position was what?  Assistant

6    Secretary for Near East Affairs?

7    A.   That is correct.

8    Q.   Was it further defined as Near East Affairs for any type

9    of activity or area of responsibility?

10   A.   The specific title, Mr. Jacks, was the Bureau of Near

11   East Affairs, and then the Assistant Secretary of Near Eastern

12   Affairs.

13   Q.   And the Secretary of State, the person that was the head

14   of the State Department, was whom during your tenure as Consul

15   General?

16   A.   When I first arrived in Jerusalem it was Warren

17   Christopher, and then it became Madeleine Albright.

18   Q.   And you have told us the distinction between the Consul

19   General and the ambassador.  The United States had an

20   ambassador to Israel.  Is that correct?

21   A.   That is correct.

22   Q.   And that -- The United States embassy in fact is located

23   in Tel Aviv.  Correct?

24   A.   Yes.

25   Q.   And that is where the ambassador officed or sat.

1  A.   That is correct.

2  Q.   Who was the ambassador while you were Consul General?

3  A.   A man named Martin Indyk.

4  Q.   During the entire time that you were there?

5  A.   Yes.  No, when I first arrived the ambassador was a guy

6  named Ed Djerejian, and then he was replaced by Martin Indyk.

7  Q.   Now, the ambassador to a country has to be confirmed by

8  the Senate.  Correct?

9  A.   Correct.

10  Q.   He is appointed by the President and then there is a

11  Senate confirmation process.

12  A.   Yes, that is correct.

13  Q.   Is that -- That is not true for the Consul General,

14  though, is it?

15  A.   No.  The Consul General was vetted by the White House but

16  not subject to confirmation by the Senate.

17  Q.   After you left in August of '97, where did you go?

18  A.   I was posted back to the Department of State in

19  Washington.

20  Q.   And how long did you work for the State Department after

21  that?

22  A.   Until December 1999.

23  Q.   And did you resign or retire?

24  A.   I retired.

25  Q.   What did you do after that?

1    A.    After I retired?

2    Q.    Yes.

3    A.    I was a consultant to the Palestinian Authority from late

4    December 1999 until late December 2006.

5    Q.    And did you -- What was the time span between the time

6    you retired until you became a consultant for the Palestinian

7    Authority?

8    A.    Same day.

9    Q.    Okay.  And as a consultant, were you -- Did you at times

10   in that job act as a lobbyist?

11   A.    I did.

12   Q.    Did you have to register as a lobbyist?

13   A.    I did.

14   Q.    Did you also have to register as an agent for a foreign

15   power or government or entity?

16   A.    To tell you the truth, I am not -- I don't recall the

17   distinction between the registration requirements, but the

18   firm I worked in, we were -- we followed the legal

19   requirements in terms of representing a foreign entity.

20   Q.    Okay.  And then there was -- Was other requirements you

21   had to fill out to register as a lobbyist to contact the U.S.

22   government on behalf of other entities?

23   A.    Yes, that is correct.

24   Q.    Is it a fair assumption that your discussions -- Let me

25   strike that, please, and let me back up.  Who hired you to be

1    a consultant for the -- Was it -- Who was your client?  The

2    Palestinian Authority, the Palestinian government?

3    A.    It was the Palestinian Authority.

4    Q.    Who --

5    A.    Administered on behalf of the Palestinian Authority.

6    Q.    Who hired you for that job?

7    A.    It was with the agreement of Yasser Arafat.  I mean, I

8    think he basically approved the arrangement.

9    Q.    And did you negotiate for that position while you were

10   still working for the State Department?

11   A.    I did.

12   Q.    And you said you worked as the consultant for basically

13   seven years for the Palestinian Authority.  Is that correct?

14   A.    Yes.

15   Q.    And what was your compensation for that during that time?

16   A.    The contract -- The first year was for $750,000, which

17   went to the firm, not me personally, went to the firm of

18   approximately 12 people, and then thereafter the compensation

19   under the contract was $600,000 per year.  And again, it went

20   to the firm, not to me personally.

21   Q.    You said this firm -- What was the name of the firm?

22   A.    Bannerman & Associates.

23   Q.    You said it had 12 people.  Does that include secretaries

24   and everything or --

25   A.    Yes.

1   Q.   Okay.  And this firm Bannerman & Associates, did it exist

2   before you went to work for them?

3   A.   Yes, it did.

4   Q.   And did they have the Palestinian Authority as a client

5   before you went to work for them?

6   A.   They did not.

7   Q.   So you brought them there as a client?

8   A.   Yes.

9   Q.   And you said it was $750,000 for the first year and then

10  $600,000 for each year after that?

11  A.   That is correct.

12  Q.   And so three or four million over the span of the

13  contract was what the compensation was for that service?

14  A.   Approximately, yes.

15  Q.   Were you criticized for that -- for the fact that you had

16  left the government one day and then went to work for the

17  Palestinian Authority the next day?

18          MS. HOLLANDER:  Objection, Your Honor; irrelevant.

19          THE COURT:  Overruled.  You may answer that.

20          THE WITNESS:  I cleared the arrangement with the

21  State Department before I left, and with the Office of Ethics

22  and the Bureau of Legal Affairs.  And they, as is the case,

23  they said there is a cooling off period of one year in which

24  you are not allowed to have contact with your former employer,

25  the Department of State.  But in terms of the arrangement,

1    there was no impediment to signing the contract.

2         The Palestinians in Washington are not a particularly

3    highly thought after client, and so yes, there was criticism,

4    there was some Congressional criticism, but not from the State

5    Department.

6    Q.   (BY MR. JACKS)  But -- All right.  It was not so much who

7    you were representing that the criticism was about, but just

8    the way that it came about?

9    A.   No, it was criticizing -- The criticism was I think

10   specifically an arrangement as a former Consul General who was

11   working with the Palestinians.

12   Q.   That you may have been too close to them?  Was that the

13   nature of the criticism?

14   A.   I think there was some criticism along those lines.

15   Q.   But was there also criticism that you went from being a

16   representative of the government to the next day representing

17   an entity that you had worked with while you were a

18   representative of the government?  Was there criticism in that

19   area?

20   A.   I don't recall.  There may have been.

21   Q.   And you did that work, you said, until December of 2006.

22   Is that correct?

23   A.   Yes, that is correct.

24   Q.   And I don't know that it has been established now, but

25   what are you doing now?

1   A.    I am retired.

2   Q.    And so you don't do anything right now in terms of

3   earning or generating income.  You live off your retirement?

4   A.    I do some periodic consulting for different people.

5   Q.    And you said that you live in The Hague in the

6   Netherlands?

7   A.    That is correct.

8   Q.    You testified about your closeness -- the fact that you

9   had worked closely with Yasser Arafat, and that your family

10  had visited his family.  Is that correct?

11  A.    Yes.

12  Q.    When you were the Consul General, did your family live

13  there with you in Jerusalem?

14  A.    They did.

15  Q.    And what did your family consist of at that time?

16  A.    It was my wife and my daughter.

17  Q.    How old was she, your daughter, at that time?

18  A.    When I arrived in Jerusalem she was three years old, and

19  when I left Jerusalem she was seven.

20  Q.    And I think you testified that you took your family to

21  socialize with Yasser Arafat and his family?

22  A.    No, I wouldn't put it that way.

23  Q.    When did your family visit with his family?

24  A.    On December 22nd or 23rd, 1995, my wife and my daughter

25  and I went to Bethlehem where the Israelis had just evacuated

1    the Israeli military and handed it over to the Palestinian

2    Authority.  We went to call on the wife of Yasser Arafat, who

3    had just had a baby, and to pay a call on her and congratulate

4    her on the birth of her daughter.  And I had I think Arafat,

5    who was in another compound, had heard that I was there, and

6    so he asked us to come say hello to him.  So I mean, that was

7    basically the socialization or the socializing.

8    Q.    Arafat's wife, what is her first name?

9    A.    Her first name is Suha.

10   Q.    And did she live in the territories or did she live

11   somewhere else?

12   A.    She came to Palestine and lived in Gaza and on occasion

13   the West Bank the years I was there, and then after that I

14   believe she moved to Paris after I left.

15   Q.    So she lived in Paris from about what time?

16   A.    You know, I am not really sure.  I think it is maybe

17   around 2000, 2001, somewhere around there.  I don't know.

18   Q.    And you said -- Do your wife and daughter live with you

19   in The Hague now?

20   A.    I was divorced several years ago.

21   Q.    All right.  So the woman you are married to now is not

22   the woman that went with you to these functions or this

23   function?

24   A.    That is correct.

25   Q.    I want to cover some of the -- Let me just specifically

address a question that was asked of you by Mr. Dratel.  He

asked you about an individual who was the Palestinian Attorney

General, or the equivalent of the Palestinian Attorney

General.  Do you recall that?

A.    I do.

Q.    Okay.  And you said that he was fired from the PA for

corruption?

A.    He was.

Q.    And was that financial corruption, stealing money?

A.    Financial corruption.

Q.    Do you -- Were there in fact -- Was it a known fact or

would you consider it a known fact that Fatah and the PA was

corrupt?

A.    I think there certainly was corruption there, and the PA

was widely criticized for the corruption.

Q.    Was there -- Was Yasser Arafat perceived to be corrupt?

A.    I don't think so, no.

Q.    Was there -- Do you recall -- Was there a report in

Fortune magazine during the time that you were in the Consul

General's position that put his net worth at $300 million?

A.    I have heard that that was the case.  I didn't see -- I

haven't seen the report myself.

Q.    If that were the case, do you have any information about

how he would have acquired that kind of fortune?

              MS. HOLLANDER:  Objection, Your Honor.  I don't

1    think it is relevant.

2          THE COURT:  Mr. Jacks, why is this relevant?

3          MR. JACKS:  I will connect it in a moment, Your

4    Honor, in regards to the reasons for the difficulty in the

5    Palestinian territories in terms of where the money --

6          THE COURT:  I will let you.  Go ahead and ask him,

7    if you are going to connect it.

8    Q.   (BY MR. JACKS)  Let me just ask you, Mr. Abington, do you

9    have an estimate of how much money -- Let's just start after

10   the Oslo Accords in 1993, do you have any estimate of how much

11   money was poured into the Palestinian Authority from Europe,

12   Japan, the United States, Saudi Arabia, the Gulf countries,

13   how much money was given to the Palestinian Authority to get

14   its government started?

15   A.   The United States government under Congressional mandate

16   was not authorized to give money to the Palestinian Authority.

17   The money that the United States had set aside for economic

18   assistance went for specific projects which were implemented

19   by American and sometimes Palestinian contractors, but not --

20   the money did not go directly to the Palestinian Authority.

21        And most of the other donors did the same thing.  The

22   money that was raised in various international conferences

23   went for specific projects, often in coordination with the

24   Palestinian Authority but not necessarily directly to the

25   Palestinian Authority.

1       The Saudi government I think, frankly, was concerned

2   about where the money would go, and it, therefore, channeled a

3   lot of its money specifically to different projects.

4       As the financial difficulties of the Palestinian

5   Authority grew, because of the Israeli closure policy, the

6   United States urged other governments, the Saudis,

7   particularly countries in the Gulf, the Saudis, the United

8   Arab Emirates, and others, to give direct budgetary support to

9   the Palestinian Authority.  But that was primarily in the

10  years, say, 2002 on.

11  Q.   I thought my question was how much money -- Can you give

12  us an estimate about how much money from these sources was put

13  into the Palestinian territories, whether it was through

14  private entities or the Palestinian Authority itself?

15  A.   I would say -- I think in the beginning, say 1994 and so,

16  it was in the neighborhood of maybe a billion dollars a year.

17  Q.   Billion dollars a year with a B?

18  A.   That is correct.

19  Q.   Okay.  And were there reports or were you aware of

20  reports or complaints by the Palestinian population about

21  Palestinian officials building extravagant homes and buying

22  Mercedes, and doing all these things with money that was

23  coming from these various sources?

24  A.   No.

25  Q.   You weren't aware of that?

1   A.   The complaints was not about money coming from the donor

2   community.  They were complaints about monopoly arrangements

3   that had been set up between some of the associates of Yasser

4   Arafat with the government of Israel.

5   Q.   Well, and with regard to that, then, so this money that

6   came in, this billion dollars a year, where was it -- where

7   did it go?

8   A.   Well, for example, the United States built -- the United

9   States government built an apartment building in Gaza, and it

10  was inaugurated in 1994.

11  Q.   What was the budget for that project?

12  A.   It was approximately $30 million, but it was implemented

13  by AID.  None of the money went through the Palestinian

14  Authority.

15  Q.   I understand.  But there were private Palestinian

16  businessmen that would get the contracts to do that.  Correct?

17  A.   I think in that specific instance there was -- they used

18  Palestinian contractors, but they were regularly audited by

19  the Agency for International Development.

20  Q.   Was it -- Let me just lay the groundwork.  You have

21  previously given testimony about this matter in other

22  proceedings.  Is that correct?

23  A.   Yes.

24  Q.   Okay.  You -- I believe, and it may have been yesterday,

25  but was it your testimony that part of the attractiveness, if

1    you will, of Hamas to certain people was the fact that they

2    were not stealing money; that the money that they took in they

3    didn't spend it on themselves?

4            MS. HOLLANDER:  Objection, Your Honor.  I don't

5    believe there has been any testimony in that regard.

6    Q.   (BY MR. JACKS)  I will just ask you, then.  Do you agree

7    with what I just said?

8    A.   I think that is one factor that led to support for Hamas.

9    Q.   With regard to -- You were asked about the term Islamist.

10   A.   Yes, sir.

11   Q.   Okay.  And just so that we are clear, the word is

12   I-S-L-A-M-I-S-T?

13   A.   Yes.

14   Q.   Okay.  And your definition of that word is what?

15   A.   I have said that that is someone who is a pius Muslim or

16   someone who has Islam as a central part of their life.

17   Q.   Is that -- Could it also be a broader term than that?

18   A.   As I said, you know, there has been this dichotomy by

19   people, particularly in the United States over the question of

20   Islam, Islamist, and so forth.

21       Islam has always been a political religion since its

22   inception, and the term Islamist I think is something that

23   arose specifically after the Shaw of Iran was overthrown in

24   1979, and Islam was considered to be or came to be seen by

25   some in the U.S. as a revolutionary threatening religion to

1    U.S. national interests.

2    Q.    And the revolutions that you just spoke of, that was the

3    one in which the Ayatollah Khomeini came to power in Iran?

4    A.    That is correct.

5    Q.    And is Iran an Islamist state now?

6    A.    As are others.

7    Q.    For example, the Sudan?

8    A.    Pakistan.

9    Q.    Pakistan?

10   A.    Yes, is an Islamic state.

11   Q.    Now, an Islamist state in Iran, though, the rulers of the

12   country, the ultimate rulers of the country are the mullahs.

13   Right?  The religious figures.

14   A.    The Ayatollahs.

15   Q.    Yes.  And they outrank, if you will, the elected

16   officials?

17   A.    Well, the political -- It is a different political theory

18   or system of government.  It is fairly unique in Iran.  It is

19   not replicated elsewhere in the Islamic world.

20   Q.    Are you familiar with a group called the International

21   Crisis Group?

22   A.    I am.

23   Q.    In Belgium, Brussels?

24   A.    And Washington, D.C.

25   Q.    Let me just ask you if you agree with these definitions.

1   Islamic, just I-S-L-A-M-I-C, would be entities that are

2   nominally or generically Muslim.

3   A.    I would probably make it a little stronger than that.  It

4   says nominally or generically.  I mean, I think of Islamic as

5   being something that is, you know, a very central part of -- I

6   don't know how to explain it.  But Islamic is central.

7   Q.    A person can be a Muslim but not be a very observant

8   Muslim.  Correct?

9   A.    Sure, just like Christians.

10  Q.    Right.  I mean, they can drink alcohol or they cannot

11  pray or not fast, but they are still Muslims; just maybe

12  perceived by some as not good Muslims.

13  A.    It is a degree of how observant you are.

14  Q.    Okay.  And Islamist, is it your opinion that Islamists

15  are those people that are very adherent to the strictures of

16  the religion?

17  A.    The five pillars of Islam.

18  Q.    Yes.  And let me just ask you if you agree with this

19  definition.  Islamist, with the I-S-T, denotes entities or

20  individuals which are self-consciously Islamic and formulate

21  explicit political or ideological objectives on this basis?

22  A.    That is what I said--that Islam has been a political

23  religion ever since its inception, so an Islamist is someone

24  where, as I see it, not only are they pius, but their religion

25  is part of their politics.

1    Q.   Okay.  And let me see if you agree with this phrase.

2    Islamists movements are those that pursue political power in

3    order to promote Islam as the dominant force in government and

4    society?

5    A.   Yes.

6    Q.   And although they may differ in their interpretation, as

7    a common denominator they share the belief that there should

8    be an application of sharia law?

9    A.   I think -- Yes, I agree with that.

10   Q.   Okay.  And Hamas is an Islamist organization.  Is there

11   any question about that?

12   A.   No, I don't think so.

13   Q.   And I believe you have previously stated that it is a

14   radical fundamentalist organization.

15   A.   Yes.

16   Q.   What do you mean by that term?

17   A.   Well, you know, you talk about Islamist --

18   Q.   I am asking, what do you mean by radical fundamentalist

19   organization?

20   A.   Organizations that use violence to achieve their

21   objectives.

22   Q.   And fundamentalist in regard to what?  What is their

23   fundamentalist nature?  Fundamental about what?

24   A.   Well, I would say fundamentalist in terms of a very

25   strict application of the precepts of Islam.

1    Q.   I believe you have also testified -- You are familiar

2    with the Hamas charter?

3    A.   Yes, I have read it.

4    Q.   And are you familiar with the provisions of the charter

5    that call for the destruction of the state of Israel and its

6    replacement with a Palestinian Islamic state?

7    A.   Yes.

8    Q.   Are you familiar with the provisions that call for this

9    to be done through jihad?

10   A.   Yes.

11          MS. HOLLANDER:  Your Honor, I am just going to

12   object that this is beyond the scope of the direct

13   examination.  There was no discussion about the Hamas charter.

14          THE COURT:  Overrule that objection.

15   Q.   (BY MR. JACKS)  And are you familiar with the provisions

16   of the charter that say that any negotiations, any peace

17   conferences, peace negotiations, are a waste of time and are

18   contrary to--and I am paraphrasing--but contrary to the goals

19   of Hamas?

20   A.   Yes, I am.

21   Q.   You talked about on direct examination the fact that the

22   relationship between Fatah or the PLO and Hamas, and you

23   talked about the fact that there are examples where one member

24   of a family will be in one camp and another member of a family

25   will be in another camp.  Is that correct?

```
1    A.   Yes, it is.

2    Q.   And I believe that you have previously stated that the

3    relationship between Hamas and Fatah would kind of ebb and

4    flow.  Is that correct?

5    A.   Yes.

6    Q.   And that on occasion there would be times that they would

7    have battles, actual military or armed battles with each

8    other.  Is that correct?

9    A.   Yes, it is.

10   Q.   And then there would be times that they would actually

11   attend meetings or ceremonies together?

12   A.   Or negotiate with each other.

13   Q.   Okay.  So it is -- Would you agree that it is a situation

14   in which you cannot always determine -- Let me just ask this.

15   Does the phrase "politics makes strange bedfellows" apply to

16   those two organizations?

17   A.   Well, that is your phrase.  I would sort of explain it a

18   little differently.

19   Q.   Well, let me just ask you a little bit about the

20   background.  Now, as I understand your explanation, Fatah is a

21   party, a political party.  Correct?

22   A.   That's -- Yes.

23   Q.   And it is the dominant party in the Palestine Liberation

24   Organization.  Correct?

25   A.   Yes, it is.
```

```
1   Q.   And that organization has been around since what?  The
2   '60s?
3   A.   Yes, that is right.
4   Q.   Okay.  And that was Yasser Arafat's organization?
5   A.   Yes.
6   Q.   And it was considered by many people, including the
7   United States, a terrorist organization?
8   A.   That is right.
9   Q.   And certainly by the Israelis.  Correct?
10  A.   Yes.
11  Q.   And were they the organization responsible for the
12  massacre at Munich of the Israeli athletes?
13  A.   Yes, they were.
14  Q.   Okay.  But they were -- You described them as a secular
15  organization.  Correct?
16  A.   Yes, I did.
17  Q.   And by that you mean they don't -- Separation of church
18  and state?  Is that fair?
19  A.   No, that is not fair in this context.
20  Q.   Okay.
21  A.   I would say it is an Arab nationalist movement where
22  religion is not the predominant at the core of what they do.
23  Q.   All right.  And during its heyday, if you will, the PLO
24  and Yasser Arafat, were they considered kind of a Marxist
25  socialist group?
```

1    A.    Arafat?

2              THE COURT:  Mr. Jacks, why is this kind of detail

3    relevant?

4              MR. JACKS:  Your Honor, I expect --

5              THE COURT:  Approach the bench.

6              (The following was had outside the hearing of the

7              jury.)

8              THE COURT:  You have been going 30 minutes on this

9    stuff, and I fail to see where there is any connection.  Go

10   ahead.

11             MR. JACKS:  Your Honor, the Defense I believe, based

12   on what they did the last time, is going to seek to try to get

13   the jury to infer that because the PA did or didn't do

14   something, that therefore they can infer that this

15   organization was not Hamas and the relationship is not one of

16   strictly, you know -- It is not a situation of black and white

17   where you have Hamas and the PA.

18        Now, this other background information, I am finished

19   with that, but the purpose of this was to help the jury to

20   understand that these groups worked together at times, but

21   that just because the PA would not shut down a committee

22   doesn't mean that it wasn't Hamas, because they would shut

23   them down for a week or two and then reopen.

24             THE COURT:  That is where you are going to get

25   there?

```
 1              MR. JACKS:  Yes, sir.

 2              THE COURT:  Let's just see if we can get there a

 3   little quicker.  We spent a lot of time on that.

 4              (The following was had in the presence and hearing

 5              of the jury.)

 6              MR. JACKS:  Your Honor, how long did you want to go?

 7              THE COURT:  Let's go until about a quarter till.

 8              MR. JACKS:  Okay.

 9   Q.   (BY MR. JACKS)  You spoke about the concept of zakat.

10   A.   Yes, sir.

11   Q.   And that that is one of the pillars of Islam?

12   A.   Yes.

13   Q.   And it is, as you described it, a percentage of earnings.

14   And do you know what percent of earnings is prescribed?

15   A.   I believe it is 2.5 percent.

16   Q.   And I think you said that -- Well, strike that.  I

17   believe you said that Muslims are expected to give that amount

18   at least once a year to less fortunate people.  Correct?

19   A.   Yes.

20   Q.   But it doesn't necessarily mean a zakat committee.  Is

21   that correct?

22   A.   I think it is up to the individual how he makes the

23   donation, he or she.

24   Q.   Okay.  So, I mean, it is conceivable that a Muslim in the

25   United States could give to the Salvation Army or to Goodwill
```

1  or a charity hospital, or he could -- or his next door

2  neighbor as you said.  Is that a fair statement?

3  A.   I don't know.  I mean, you know, I don't know the answer

4  to that.  Do Muslims give to the Salvation Army in the U.S.?

5  I don't know.

6  Q.   You were explaining to us --

7  A.   What I was saying is you can give it to a zakat committee

8  because they have a good feeling for who needs the money on

9  the ground or who needs the assistance, or -- It depends on

10 the individual.  You may -- Your next door neighbor may have

11 suffered a great difficulty and needs food or clothing and you

12 may just give that to them.  So it can be distributed in

13 different ways.  It is not a firm and fast rule how you do it.

14 Q.   Okay.  That is my point.

15 A.   Okay.

16 Q.   So the individual, as long as it is to a needy person or

17 organization, that is permissible, as far as you understand?

18 A.   Yes.

19 Q.   Okay.  One of the things that I believe you touched upon

20 was you were being asked about population and that type of

21 thing, and you made -- You testified that there are in

22 fact -- there is a portion of the Israeli population that is

23 Arabs.  Correct?

24 A.   Yes.

25 Q.   And in fact, there are Arab members of the Israeli

1  parliament.  Correct?

2  A.    There are.

3  Q.    You testified about your visits to a hospital, and I

4  believe was it the al-Razi Hospital that you said you went to?

5  A.    Among others, yes.

6  Q.    Okay.  And that hospital is run by the Jenin zakat

7  committee.  Correct?

8  A.    Yes, my understanding.

9  Q.    And when did you go there?

10  A.    I believe it was in 1994.

11  Q.    And was that an Islamist hospital?

12  A.    Well, if it was run by the zakat committee, I guess you

13  could say it was Islamist, but it was open to all Palestinians

14  whether they were Christian or Muslim.

15  Q.    Did the Palestinian Authority have hospitals that it

16  operated?

17  A.    That was -- The Palestinian Authority on the West Bank

18  did not have the responsibility for operating hospitals until

19  it was established on the West Bank in 1996.

20  Q.    Well now, the Oslo Accords were in September of 1993.

21  A.    Yes, that is correct.

22  Q.    And when did the Palestinian Authority -- When did it

23  come into existence?

24  A.    It came into existence after the negotiation in the

25  spring of 1994 of the Gaza Jericho Agreement.  And when Yasser

1　Arafat came from Cairo to Gaza in I believe July 1994, that

2　was seen as the establishment of the Palestinian Authority.

3　But its mandate only included the non-Israeli-held portions of

4　the Gaza Strip, plus the city of Jericho.  So it had no -- It

5　had no authority over almost all of the West Bank.  That did

6　not take place until it started the fall of 1995.

7　Q.   Is it fair to say that the Oslo Accords was a staged

8　agreement?

9　A.   Yes.

10　Q.   I mean, it was to be --

11　A.    Implemented in phases.

12　Q.   Correct.  In other words, you just don't flip a switch

13　and one day you have got one country and the next day you have

14　two.

15　A.   Yes, that is correct.

16　Q.   All right.  So there was this period when it was going to

17　be done in stages, and gradually the plan was that more

18　control would be assumed and taken over by the Palestinian

19　Authority.

20　A.   Yes.

21　Q.   Okay.  And of course one -- Would you agree that one of

22　the principal issues in that agreement was the issue of

23　security?

24　A.   Yes, from the Israeli perspective.

25　Q.   What about from the Palestinian perspective?

A.   From the Palestinian perspective it was that the Israelis

would stop confiscating land for settlements.

Q.   I am talking about security.

A.   Well, you know, it is not all -- It is not one or the

other.  It was a mutual obligation on the side of each party.

The basis -- Excuse me.

Q.   The agreement called for the Palestinian Authority to

create its police departments and to start exercising security

over those parts of the area that they were responsible for.

Is that correct?

A.   Yes.

Q.   And they were to assume responsibility to make sure that

there were no attacks or any other actions taken against

Israel.  Is that correct?

A.   Yes.

Q.   You were shown an exhibit, it was a press release, I

believe, about aid going to the al-Razi Hospital.  Do you

recall that one page --

A.   Yes, I do.

Q.   -- thing off the internet?  And do you know when that

happened?

A.   April 2002.

Q.   And at that time you were out of the government and were

working as a lobbyist or consultant for the Palestinian

Authority.  Is that correct?

1  A.    Yes.

2  Q.    And where did you live when you held that position?  Were

3  you living in Washington?

4  A.    I was.

5  Q.    Okay.  And you said that you knew the story of that aid.

6  Is that correct?

7  A.    Yes.

8  Q.    Were you aware that that -- And that aid was actually

9  medical supplies as opposed to cash.  I mean, it was medical

10  supplies.  Correct?

11  A.    Yes.

12  Q.    And were you aware that that was actually surplus

13  supplies that were supposed to go somewhere else but then they

14  were not needed there and then were diverted to the al-Razi

15  Hospital?

16  A.    That happens all the time.

17  Q.    I know.  But I am asking you as far as this instance --

18         MS. HOLLANDER:  Your Honor, he is trying to answer

19  the question and he keeps cutting him off.

20         MR. JACKS:  He says it happens all the time.

21  Q.    (BY MR. JACKS)  My question was, were you aware with that

22  with regard to this incident.

23         THE COURT:  Okay.  Can you answer that question?

24         THE WITNESS:  I was not aware it was diverted from

25  other programs.

1    Q.   (BY MR. JACKS)  You were asked again to go back to some

2    of the questions you were asked about the demographics, if you

3    will, of the territories, and you said that the population of

4    Gaza, for example, is a little over 1 million?

5    A.   Yes.

6    Q.   And you said that the average size of the family there is

7    seven to eight people?

8    A.   Yes.

9    Q.   Okay.  And are most families there fairly large by

10   Western standards?

11   A.   Yes.

12   Q.   Okay.  Does that contribute to the degree of need

13   there--the fact that they are large families?

14   A.   Well, I mean, it is an economically very depressed area.

15   Q.   I understand.

16   A.   And so obviously if you have more mouths to feed, it is

17   much more difficult if you don't have a job and if you are not

18   able to earn a living.

19   Q.   Do some men have more than one wife?

20   A.   I think that is pretty rare in Palestinian society.  I

21   don't know of any Palestinian who has more than one wife.

22   Q.   But obviously, would you agree, it is easier to feed four

23   kids than it is eight kids?

24   A.   Sure, yes.

25   Q.   But that is a factor that contributes to the situation

1  there.  Is that correct?

2  A.    To the difficulty of feeding a family?

3  Q.    To the degree of whatever the conditions are there in

4  terms of the poverty or the need.

5  A.    Well, the poverty is caused by people unable to work.

6  And whether you have a family or four or a family of eight, if

7  you are not able to work you are in a very difficult position.

8  Q.    You were asked about the deportation in 1992.  Correct?

9  A.    Yes, sir.

10  Q.    That was before you got there to -- You were in Pakistan

11  at that time.  Is that correct?

12  A.    Yes, sir, I was.

13  Q.    And I believe you testified that there were--I think I

14  wrote this down correctly--some attacks by Hamas that

15  precipitated that action by the Israeli government.  Is that

16  correct?

17  A.    There were attacks which I think resulted in the deaths

18  of six Israeli soldiers and policemen, which preceded the

19  deportation of these individuals.

20  Q.    And then you specifically mentioned that there was an

21  Israeli policeman or soldier that was kidnapped and held -- Do

22  you know what the demands of the kidnappers were?

23  A.    His name was Nissim Toledano.  He was an Israeli

24  policeman.  And the kidnappers were trying to get the Israeli

25  government to release prisoners, Palestinian prisoners.

```
 1   Q.   Which one?

 2   A.   Which prisoner?

 3   Q.   Yes.  Was there one in particular?

 4   A.   Not that I am aware of.

 5   Q.   You are not aware that they demanded the release of

 6   Sheikh Yassin?

 7   A.   In that specific one?

 8   Q.   Yes.

 9   A.   No, if I -- I am not aware.  I don't recall that.

10   Q.   Well, are you aware that Hamas claimed responsibility for

11   this kidnapping?

12   A.   Yes.  That is what I said.  They did.

13   Q.   All right.  And again, it was not just that event, but I

14   believe you testified that there were, plural, attacks that

15   precipitated this deportation.

16   A.   Yes.

17   Q.   Is that correct?

18   A.   Yes.  That is right.

19   Q.   You testified that these individuals were taken and

20   dropped off across the Lebanese border, and you testified that

21   the Lebanese government would not let them go anywhere.  Is

22   that what your testimony was?

23   A.   Yes, it was.

24   Q.   And then you said there was this international outrage

25   about what the Israelis had done.  Is that correct?
```

1    A.    Yes.  It was taken to the United Nations and --

2    Q.    Okay.  Was there any outrage at the Lebanese for not

3    letting them leave or go somewhere else?

4    A.    The Lebanese were already hosting hundreds of thousands

5    of Palestinian refugees.  They are a sovereign country.

6    Q.    Isn't it true these individuals refused to go anywhere

7    else?

8    A.    The Lebanese government refused to let them leave that

9    area because they felt that Israel had illegally, and contrary

10   to international law and the Geneva convention, had illegally

11   deported them.

12   Q.    Isn't it true, though, that those deportees purposely --

13   They chose to stay there.  Their choice was either, "We go

14   back to Israel or we stay here"?  Wasn't that the position

15   they took?

16   A.    I don't know.

17          THE COURT:  Let's go ahead and take the lunch break.

18   Be back at 2:00.

19          (Whereupon, the jury left the courtroom.)

20          THE COURT:  We will be in recess until 2:00.

21                    (Lunch recess.)

22          THE COURT:  Mr. Jacks?

23          MR. JACKS:  Thank you.  May I proceed?

24          THE COURT:  Yes, sir.

25   Q.    (BY MR. JACKS)  Mr. Abington, you testified about what

1    has been referred to as the Hebron massacre, and that was the

2    event that happened in February of 1994.  Is that correct?

3    A.    Yes, it is.

4    Q.    When this Israeli-American walked into this mosque and

5    started killing men.

6    A.    Yes.  That is correct.

7    Q.    Correct?

8    A.    Yes.

9    Q.    And you were asked what did the Israeli government do

10   after that, and you said they imposed a curfew on the town.

11   A.    Yes.

12   Q.    Is that correct?

13   A.    Yes.

14   Q.    You were not asked what happened between the massacre and

15   the curfew, but in fact there were riots.  Is that correct?

16   A.    No, I don't believe that there were riots.

17   Q.    There was no reaction by the community to this massacre

18   or killing?

19   A.    I think obviously Palestinians were incredibly upset

20   about it, but I don't recall that there were riots.

21   Q.    Were there violent confrontations that took place between

22   individuals?

23   A.    You know, I honestly can't remember.

24   Q.    This man that committed this massacre, what happened to

25   him?

1   A.   He was killed.  He was bludgeoned to death with a fire

2   extinguisher in the mosque.

3   Q.   By the other bystanders?

4   A.   By the worshippers, yes.

5   Q.   And were you privy to or were you aware that Yitzhak

6   Rabin, the Prime Minister of Israel, called Yasser Arafat and

7   condemned this act as a crazy criminal act?

8   A.   Yes, I was aware of that.

9   Q.   I want to talk to you a little bit about your testimony

10  regarding zakat committees.  As I understand your testimony,

11  you did not receive any information from the U.S. government

12  regarding these zakat committees as to whether they were or

13  whether they were not controlled by Hamas.  Is that correct?

14  A.   I asked before making these visits, "Am I going to run

15  into Hamas people there," and, you know, "We need to check

16  this out."  And the response I got was, "No, they are okay."

17  Q.   All right.  And this is from your security people?

18  A.   It is from the staff of the consulate.

19          MS. HOLLANDER:  Your Honor, may we approach?

20          THE COURT:  Yes.

21          (The following was had outside the hearing of the

22          jury.)

23          MS. HOLLANDER:  I did not want my witness walking

24  into something that he is not allowed to say, and this is

25  where we are going with this question.

1        MR. JACKS:  Your Honor, he knows where he can and

2   can't know.  I am just trying to find out -- I didn't --

3        MS. HOLLANDER:  He is asking --

4        MR. JACKS:  First of all, his question was

5   non-responsive, and then he goes into this, "I asked am I

6   going to run into any," which sounds like a conversation he is

7   having.  And I was asking him, "Are you talking about with

8   your security people?"  This doesn't sound like he is getting

9   a briefing or reading a report.  It sounds like, "Am I going

10  to be running into any Hamas people here?"  And it is a little

11  -- In fact, it is a little different from saying, "Are these

12  committees controlled by Hamas?"  He is asking, "Am I going to

13  be running into any Hamas" --

14       MS. HOLLANDER:  Before he answers, I would like

15  guidance by Mr. Broxmeyer.

16       THE COURT:  If he can come up.

17       MR. DRATEL:  Monday we were told the specific

18  protocol with specific --

19       THE COURT:  I understand that, but we discussed it

20  yesterday -- He asked for a hearing, and we discussed about

21  having a cross examination, so that is what this is about.  Go

22  ahead.

23       MR. JACKS:  You know, my question was basically

24  patterned after Ms. Hollander's -- In fact, I asked her before

25  he even started this morning, "Is his answer going to be that

1    basically he didn't receive any information one way or the

2    other," and that was the answer I was expecting him to say is

3    no.  So now he goes off into this thing about, "Well, I asked

4    before" --

5                THE COURT:  I understand that.  But we obviously

6    can't go into an area just because he opened it up.

7                MR. JACKS:  I know.  He has given an answer contrary

8    to what she told me he was going to say.

9                MS. SHAPIRO:  It doesn't sound like an oral

10   conversation with just casual people that he has asked -- It

11   does not sound like it would implicate our issue, but --

12               THE COURT:  He asked was it your security people,

13   that that wouldn't implicate anything, would it?

14               MS. HOLLANDER:  That is my question.

15               THE COURT:  The question that Mr. Jacks asked about

16   "Were you hearing this from your security people?"  Does he

17   know what -- I don't know what that is.  I am assuming he

18   knows.

19               MR. JACKS:  It is my understanding they traveled

20   with regional security officers.

21               THE COURT:  The State Department?

22               MR. JACKS:  The State Department.

23               MR. BROXMEYER:  So am I understanding it is

24   something like bodyguards or something like that?

25               THE COURT:  I don't know.

1          MR. JACKS:  I don't know what he --

2          THE COURT:  Is that what you are talking about

3    security people?

4          MR. JACKS:  That is what I was asking him about,

5    because the way he framed the answer was, "I asked my people

6    am I going to be running into any Hamas people?"  And you

7    know, that is the way I took it.  But again --

8          MS. SHAPIRO:  He should be educated enough for Ms.

9    Hollander to know not to say --

10          THE COURT:  Well, it is from his job, too.

11          MR. DRATEL:  But the problem is is that now we have

12    opened it up, we, the government, and they opened it up to

13    something more than the Government to answer the question.

14    Now he thinks he should be asked specifically.  If he is going

15    to ask about specific things and leave one out, that impairs

16    us.  We were willing to live with this notion that both sides

17    were limited to the government at large and not specific

18    elements of the government.  Now they want to do it their way

19    and we can't.

20          THE COURT:  Counsel, you are getting off on areas we

21    aren't even there yet.  We discussed specifically that he was

22    going to ask some specific questions to see where he got his

23    information, because we didn't have that hearing, and that is

24    what I wanted to do yesterday.  Where this goes, other than we

25    don't want to go where we can't go, but other than that he is

1   entitled to ask.  If it opens up some areas, we will deal with

2   that later.  Nobody is saying you are not going to get to go

3   into that.

4           MS. HOLLANDER:  My concern, which I wanted to ask

5   Mr. Broxmeyer, is the question was, "Did you learn this from

6   your security people?"

7           THE COURT:  I think that is what he asked.

8           MS. HOLLANDER:  That is right.  And I don't know

9   whether -- what Mr. Abington thinks.  I mean, when I heard

10  that, I don't know -- Maybe if you could -- And let me ask for

11  some guidance from you, too.  If you could focus it like, "Did

12  you learn this from your bodyguards in the State Department,"

13  or something really specific.

14          MR. JACKS:  I am also concerned that he is giving an

15  answer contrary to what she told me he would say.

16          THE COURT:  All you can do is ask, but just make

17  sure you try to make it as narrow to where we don't go where

18  we don't need to go.  But everybody knows, including I think

19  the witness.  I think that is all we can do is just frame your

20  questions.

21          MR. BROXMEYER:  This doesn't relate to the

22  documents.  Right?  This goes along with "When you were told

23  by your people"?

24          MS. HOLLANDER:  Right.

25          MR. BROXMEYER:  So it is not really our issue.

1          THE COURT:  Not anything you were concerned about?

2          MR. BROXMEYER:  No, as long as we were talking about

3    the briefings.  I think at the beginning, "You were told not

4    to deal with Hamas," that is where I thought this --

5          MS. HOLLANDER:  I am just concerned now going into

6    specific agencies.  That is what concerns me.

7          THE COURT:  Well, I think you are entitled to ask

8    your question and we will go from there.

9          (The following was had in the presence and hearing

10         of the jury.)

11   Q.   (BY MR. JACKS)  Just to try to clarify what your answer

12   was, you said that before you would go to these meetings, you

13   would ask your, I don't remember if you said your security

14   people or your people "Am I going to meet any Hamas

15   individuals at this meeting."

16   A.   I asked my staff, yes.

17   Q.   And when you talk about your staff, are you talking about

18   the security officers or bodyguards that travel with you?

19   A.   No.  They wouldn't have that knowledge.

20   Q.   And let me again go back to me question that you did not

21   receive any information that affirmatively told you that these

22   zakat committees were not controlled by Hamas.  Is that

23   correct?

24   A.   Affirmative information that the zakat committees were

25   not controlled by Hamas?

1    Q.    Correct.  You were never told that.

2    A.    I was never told that they were controlled by Hamas.

3    Q.    And conversely, you were never told that they are not

4    controlled by Hamas.

5    A.    I guess that would be correct.

6    Q.    And in fact, you have stated previously that you -- I

7    think you may have used the term "we," that we didn't

8    understand how Hamas operated, we didn't understand how their

9    decisions were made, that we just -- You didn't know anything

10   about that aspect of how they operated.  Do you recall giving

11   that testimony?

12   A.    What I would say is we didn't have a clear understanding.

13   We had some understanding of what they did and how they

14   operated; but to have absolute clear understanding of what

15   they did, we did not because we weren't allowed to deal with

16   them.

17   Q.    Let me see if I can specifically focus --

18            MS. HOLLANDER:  Tell me the page.

19            MR. JACKS:  Just a second.  It would be page 158 and

20   159.

21   Q.    (BY MR. JACKS)  Do you recall being asked the question

22   previously, "Can you explain your understanding of how Hamas

23   is structured?"  And giving the answer, "There were charities,

24   non-governmental organizations that were widely believed to be

25   Hamas organizations, and I think Hamas would create some of

1   them.  They were responsible for distributing assistance for

2   poor people, for running schools, things like that.  There was

3   a military wing and a political leadership wing that we had

4   very, very little knowledge of.  We did not understand how it

5   operated.  We did not understand how decisions were made.  We

6   did not understand how Hamas leaders on the West Bank and Gaza

7   interacted with each other."  Do you recall making that

8   statement?

9   A.    Yes, I do.

10  Q.    In addition, have you also stated that you were not made

11  aware -- when you were working there as the Consul General,

12  that in that position you were not in the loop or made aware

13  of what may have been learned in ongoing investigations?  That

14  was something that was not -- you were not privy to, you and

15  your staff.  Is that correct?

16  A.    You mean by the Justice Department?

17  Q.    Whoever--the FBI, the Justice Department, other agencies.

18  You were not privy to those ongoing investigations.

19  A.    That is correct.

20  Q.    And is it a fair statement that the materials that had

21  been presented in this case, the search warrant materials, the

22  videotapes, the intercepted calls, all of the matters that

23  have been presented in this case, you did not have that at

24  your disposal and you were not privy to that at the time that

25  you were there?

1  A.    That is correct.

2  Q.    You did testify, and I believe during direct examination

3  yesterday or today actually, that you do know and did know

4  that Hamas did operate charities and non-governmental

5  organizations as you called them, and was running schools and

6  had medical clinics and that type of thing?

7  A.    Yes.

8  Q.    Okay.  Can you name -- Let me back up for a second.  What

9  is the difference between a zakat committee and a charitable

10  organization?

11  A.    A zakat committee is religious in the sense that, as I

12  stated earlier, zakat is one of the five pillars of Islam.  It

13  is a relatively informal organization.  It is audited and has

14  oversight from the Palestinian Ministry of Awqaf or waqf, as

15  well as the Palestinian Ministry of Social Welfare.

16       A charitable society could be secular, Christian,

17  Islamic.  It has to be licensed by the Ministry of Interior.

18  It is audited and overseen by the Palestinian Ministry of

19  Social Welfare.  And depending on the type of work done by the

20  charity, other ministries might be involved in its oversight

21  as well.

22  Q.    What -- Are you able to name the zakat committees or

23  charitable organizations that Hamas controlled?

24  A.    Well, I believe al-Salah in Gaza was pretty well-known as

25  a Hamas organization.

1  Q.  Any others?

2  A.  Well, I can't remember.  There was another one in Gaza,

3  but I don't remember the name of it.

4  Q.  How about in the West Bank?

5  A.  In the West Bank -- The situation was different in the

6  West Bank in the sense that because the Israelis had a

7  presence there --

8  Q.  I am sorry.  If I could interrupt you.  I just would like

9  you to name the ones that you know or remember.

10  A.  In the West Bank?

11  Q.  Yes.

12  A.  I am sorry.  I can't give you a name there.

13  Q.  How about -- What about zakat committees?  Do you know of

14  any zakat committees -- can you name any zakat committees that

15  Hamas controlled?

16  A.  I stated previously that I didn't have any information

17  when I was a Consul General that Hamas controlled any zakat

18  committees in the West Bank.

19  Q.  Okay.  You said that you had -- I am sorry.  It wasn't

20  clear to me.  Have you been to zakat committees or simply met

21  with people who were from zakat committees?

22  A.  Both.

23  Q.  And can you tell us which ones you have been to?

24  A.  I have been to zakat committees in Ramallah, in Nablus,

25  in Jenin, in Hebron, and I believe in Gaza City.

1    Q.   I am sorry.  I was not writing that fast.  Ramallah,

2    Nablus, Jenin?

3    A.   Hebron.

4    Q.   Hebron.

5    A.   Gaza City.

6    Q.   Okay.  Any others that you can recall?

7    A.   Not specifically.

8    Q.   All right.  Now, the Hebron zakat committee, that is not

9    the same as the Islamic Charitable Society of Hebron, is it?

10   A.   No.

11   Q.   Okay.  And from -- For example, that USAID document that

12   you saw this morning, and it had a long -- several pages of an

13   organization.  There are hundreds of zakat committees and

14   charitable organizations in the West Bank.  Correct?

15   A.   Yes.

16   Q.   And in fact, there are, if not dozens, but hundreds of

17   zakat committees in the West Bank.  Is that correct?

18   A.   No, I wouldn't say so.

19   Q.   There is certainly more than one in different areas.

20   Correct?

21   A.   There are zakat committees organized according to the

22   districts in the West Bank, which is set up by the

23   Palestinians.  Well, actually it comes from Ottoman times.

24   There are approximately eight or nine different districts.

25   Each district will have sort of a zakat committee.  There

1    might be smaller zakat committees that form clusters in the

2    West Bank to become a larger zakat committee.

3    Q.    So you are saying that there is one main zakat committee

4    in each district?

5    A.    Yes.

6    Q.    And in other villages or branches or whatever, that those

7    are not separate from that zakat committee?

8    A.    As I understand it, in a small village it will report to

9    the zakat committee in that particular district, which is

10   overseen, as I said, by the Palestinian Ministry of Social

11   Welfare and the Ministry of Awqaf.

12   Q.    What was the occasion of -- I will just take them in the

13   order you gave them.  What was the occasion of you going to

14   the Ramallah zakat committee?

15   A.    When I would go on these trips, and I would go frequently

16   out around the West Bank and Gaza, I would meet with a variety

17   of Palestinian organizations, both secular and religious, and

18   I would talk to them about the work that they did and, you

19   know, what kind of problems they were encountering, what kind

20   of successes they had, et cetera.  And normally on my trips

21   around the West Bank if I hadn't met with a local zakat

22   committee, I would stop by and have a chat with them.

23   Q.    Let's take the Ramallah zakat committee next.  Who did

24   you meet with?

25   A.    I don't recall the names of the people, but I met with

1    the head of the committee as well as members of his staff.

2    Q.    When you say the head of the committee, what title would

3    that be?  Who was the head, as far as you believed?

4    A.    You know, 15 years ago I can't remember the names of the

5    people that I met with.

6    Q.    And you said -- You had only been there one time to the

7    Ramallah zakat committee?

8    A.    I think it was only once.

9    Q.    And Nablus, how many times did you go there?

10   A.    I think twice.

11   Q.    And Jenin?

12   A.    I only recall having been there once.

13   Q.    Hebron zakat committee, how many times did you go there?

14   A.    Once or twice.

15   Q.    And with these -- As far as Nablus, do you know who you

16   met with there?

17   A.    I met with Dr. Muayawa al-Masri.

18   Q.    Can you spell that?

19   A.    M-u-a-y-a-w-a  A-L-M-A-S-R-I.  And I met with several

20   other individuals.  I think I met with a Mr. Kanan.  I can't

21   recall the names.

22   Q.    Do you know what position they held?

23   A.    They don't -- I mean, when I met with them they didn't

24   say, "This is the accountant.  This is the vice president.

25   This is the president of the zakat committee."  It is just

1    these were members of the committee.

2    Q.    And Jenin, who did you meet with?

3    A.    Again, I do not recall the names.

4    Q.    When you would -- I believe you testified this morning

5    that when you would finish that you would go back and make a

6    report and send the report in or a cable or whatever back to

7    Washington.  Did you do that after these meetings?

8    A.    I don't recall.  I mean, you know, sometimes -- I didn't

9    do a cable on every single visit I made, because what I heard,

10   what was told to me may or may not have been relevant or

11   significant.  So it would only be -- It is not like I would go

12   to a zakat committee and send a telegram back to the State

13   Department saying, "I visited this zakat committee and this is

14   what they said."  It is just not the way we operate.

15   Q.    Okay.  I am just trying to be clear in terms of you -- I

16   was left with the impression you would go out in the community

17   and talk to these people, and then kind of take the results of

18   that and at some point send it back to Washington.

19   A.    Sometimes I would.  Sometimes I wouldn't.  For example,

20   going to Jenin, I would say, you know, "These are the

21   impressions we have.  People are skeptical about the Oslo

22   process.  There are things that the economic situation is bad,

23   the infrastructure is bad, and so forth."  I mean, those were

24   the kind of cables that we would do.  It would not be focused

25   specifically on something as finite as a zakat committee.

1   Q.   Going back to your testimony about charities that you

2   were aware of that Hamas controlled, and I may have asked you

3   this but I didn't write it down as far as what charities do

4   you recall that Hamas controlled?

5   A.   I mentioned al-Salah in the Gaza Strip, and there is -- I

6   can't remember the exact name.  There is another one, the

7   Islamic something.  I just can't remember.

8   Q.   The Islamic Relief Committee?

9   A.   I think so.  I am not sure.

10  Q.   Do you recall previously making a statement that the

11  Islamic Relief Committee was one of the organizations that was

12  controlled by Hamas?

13  A.   I just don't remember.

14  Q.   Do you know what the Islamic -- Do you know where the

15  Islamic Relief Committee was located?

16  A.   I think in Gaza, but I am not sure.

17  Q.   Were you aware that the Islamic Relief Committee had been

18  closed down by the Israeli government for being Hamas?

19  A.   I don't recall that.

20  Q.   Do you recall being asked this question?  And maybe this

21  will refresh your memory.  You were being shown a document,

22  and in that document it says, "Sir, if we can go to the top of

23  the document, you see on the top left it says the Islamic

24  Relief Committee."

25       And you said, "Yes."

         1          And do you recall being asked, "And do you know what that

         2     was?"

         3          And your answer was, "I think it is a group controlled by

         4     Hamas.  I am not sure."

         5          Do you recall giving that testimony?

         6     A.   If you say if that is from the transcript.

         7     Q.   Would you like me to show it to you?

         8     A.   No, I will take your word for it.

         9     Q.   And you said that you knew the al-Salah organization in

        10     Gaza was controlled by Hamas, and that organization has been

        11     closed.  Are you aware of that?

        12     A.   I don't know if it has been closed.

        13     Q.   I am sorry?

        14     A.   I think that it was designated by the Justice Department

        15     or by the Treasury Department, but I don't know that it is

        16     closed.

        17     Q.   And are you familiar with the Islamic Society of Gaza?

        18     A.   I just can't recall.

        19     Q.   How about the Islamic Complex of Gaza?

        20     A.   I know the name.  I think that Sheikh Yassin was one of

        21     the founders of it.

        22     Q.   And would you agree or do you accept that those are

        23     organizations that are Hamas organizations?

        24     A.   Yes, I would.

        25     Q.   You talked about I guess the governmental organizations

1    or bodies that are over zakat committees, and I want to ask

2    you specifically about the Jenin zakat committee and -- Let me

3    back up, first of all.  Again, if you would, just to make sure

4    we are on the same page, what governmental branch or body

5    under the Palestinian Authority would have supervised the

6    Jenin zakat committee?

7    A.    The Ministry of Awqaf and the Ministry of Social Welfare.

8    Q.    And did those -- Do you know, in the structure of the

9    Palestinian Authority were there like regional individuals

10   that were responsible for that branch of the government?

11   A.    Yes, there would be regional, and they in turn were

12   supervised by the ministries in Ramallah.

13   Q.    Okay.  And specifically, with regard to the Jenin zakat

14   committee, do you know who was in charge of that committee?

15   A.    No.

16   Q.    At any time you don't know who was in charge of that?

17   A.    Of the zakat committee?

18   Q.    Right.

19   A.    I may have known when I was in Jerusalem, but as of now I

20   don't recall that detail.

21   Q.    And are you familiar with a man by the name of Mohammed

22   Fuad Abu Zeid?

23   A.    It doesn't ring a bell.

24   Q.    Would you have been aware of the fact that he was a part

25   of the waqf, at least the Jenin district he was a part of the

1    governmental organization that supervised zakat committees in

2    that region?

3    A.    I probably wouldn't have gotten into that level of

4    detail, so no, I don't think I would have known that.

5    Q.    Okay.  And are you aware of the fact that he has been

6    identified as a Hamas leader by Khalid Mishal?

7    A.    No.

8    Q.    Okay.  Have you looked into or done anything to

9    investigate who runs these committees, who the individuals are

10   that control these committees, and what their background might

11   be?

12   A.    You mean in terms of when I was a Consul General?

13   Q.    Well, in terms of before you come in here and render an

14   opinion, have you done anything to look and see if there is

15   anything that might affect your opinion?

16   A.    Based on the information I received when I was a Consul

17   General from various offices within the consulate, the

18   information I received was that these were not controlled by

19   Hamas and, therefore, there was no prohibition against me

20   meeting with them.

21   Q.    I am sorry.  You are stating that you received

22   affirmative information that these were not controlled by

23   Hamas, and it was my understanding you said --

24   A.    No, I would rephrase it.  That there was no -- Well, the

25   way I would ask the question, "Are there going to be problems?

1    If I go and meet with any of these various committees, am I

2    going to run into Hamas people?"  And the information I

3    received was no.

4    Q.   You know who Khalid Mishal is.

5    A.   I do.

6    Q.   Okay.  And would you consider him an authoritative source

7    if he is naming off people who are members of Hamas and

8    leaders of Hamas?  That is my question.  Would you consider

9    him an authoritative source?

10   A.   I suppose, if he so identified people.

11   Q.   Okay.  So if he identifies individuals that are leaders

12   of these zakat committees as Hamas, would that affect your

13   opinion about whether or not these zakat committees are

14   controlled by Hamas?

15   A.   I would say that there is a difference between having a

16   Hamas member on a zakat committee and being controlled by

17   Hamas, and I believe that the zakat committees are not

18   controlled by Hamas.

19   Q.   You worked closely with the Palestinian Authority,

20   obviously.  In fact, that was really your primary

21   responsibility was to be the U.S. representative to the

22   Palestinian Authority.  Is that correct?

23   A.   Yes, it is.

24   Q.   I want to direct your attention --

25              MR. JACKS:  Mr. Lewis, could you bring up

1    Palestinian Authority No. 2?  And just leave it there for a

2    second.

3    Q.   (BY MR. JACKS)  Have you seen this document before, Mr.

4    Abington?

5              MS. HOLLANDER:  Your Honor, may we approach?

6              THE COURT:  No, not yet, counsel.

7              THE WITNESS:  I don't know if I have or not.

8    Q.   (BY MR. JACKS)  And are you able to read the writing at

9    the very top?

10   A.   The handwriting?

11   Q.   Yes.

12   A.   I am not sure, but it may be Yasser Arafat's signature.

13   Q.   And how about just the other writing there?  Can you read

14   the title in the block there where the cursor is?

15   A.   It says, I don't know, "From the desk," or "From the work

16   of" -- I am not -- I have a hard time reading cursive Arabic

17   like this.

18             MR. JACKS:  Let's just go to the English

19   translation, then.  It will be page 4 of the exhibit, Mr.

20   Lewis.

21   Q.   (BY MR. JACKS)  And do you see the title now in the

22   block?

23   A.   Yes.  "Who is financing Hamas."

24   Q.   And does this document appear to have come from the

25   Palestinian Authority going back to what you saw on the first

1   page?  You said it appeared to be Yasser Arafat's signature.

2   A.   I don't know if it was or not.  I have a couple of pieces

3   of paper with his signature.  Maybe it was him; maybe not.  I

4   am not quite sure.

5   Q.   And let me ask -- It talks there -- Do you see where it

6   talks about Hamas' foreign finance sources?

7   A.   Yes.

8   Q.   And the three sources for Hamas funds that are listed

9   there?

10  A.   I see, yes.

11  Q.   Okay.  And you see --

12         MR. JACKS:  Mr. Lewis, let me ask you to go to where

13  it says "the Movement" there in the middle of that large

14  paragraph.

15         THE WITNESS:  Yes, I see that.

16  Q.   (BY MR. JACKS)  Do you see that "The Movement controls

17  daycare centers, schools, sport rinks, medical clinics, and

18  mosque committees through three institutions, thus interlacing

19  religious political and social affairs," and it goes on to

20  talk about, "It is not a coincidence that Hamas officials tend

21  to search for suicide operatives among their schools,

22  students, or their sports groups and teams."  And it talks

23  about "Hamas paying monthly stipends to families of martyrs

24  and the wounded."  And talks about "Hamas is trying to pull

25  the rug from under the Palestinian Authority of Yasser Arafat

1    who aspires to establish his state."

2    A.    Yes, I see that.

3    Q.    All right.

4          MR. JACKS:  If we can go to the next page, please.

5    Q.    (BY MR. JACKS)  And do you see the references to "Hamas

6    financial resources worldwide:"  And then, "No. 1, United

7    States of America:"  Below that "Texas:  The Islamic

8    Association for Palestine and the Holy Land Fund"?  Do you see

9    that?

10   A.    I do.

11   Q.    And below also it has "Virginia:  United Association for

12   Studies and Research."  Do you see that?

13   A.    Yes.

14   Q.    In terms of the institutions at the bottom --

15         MR. JACKS:  Would you go to the third page, Mr.

16   Lewis?

17   Q.    (BY MR. JACKS)  And it talks about where the Hamas money

18   is spent, it says, "There are three major Islamic institutions

19   concerned with all aspects of social affairs."  And talks

20   about, "Services, healthcare centers, and clinics, education

21   and sport."  Do you see that?

22   A.    Yes.

23         MR. JACKS:  Mr. Lewis, if you could, post Government

24   Exhibit Palestinian Authority No. 9.

25   Q.    (BY MR. JACKS)  And Mr. Abington, can you identify or do

1    you recognize the letterhead for this particular page?

2    A.    It is the General Intelligence Organization of the

3    Palestinian Authority.

4             MR. JACKS:  And if you could go to the next page,

5    please.

6             MS. HOLLANDER:  Your Honor, may we approach?

7             THE COURT:  No.

8    Q.    (BY MR. JACKS)  Do you see the English translation, Mr.

9    Abington?

10   A.    Yes, I see that.

11   Q.    All right.  And do you see it is addressed to the

12   Director of Intelligence Service of the Ramallah and Al-Bireh

13   Governorate, and "Subject:  "The zakat committee," and gives

14   an address.  And does that appear to be talking about the

15   Ramallah zakat committee?

16   A.    Yes.

17   Q.    And it talks about financing.  Its says foreign support

18   from several countries, and then it talks about, "This

19   committee supports families of detainees and families of

20   deportees.  It financially supports needy students and

21   distributes money and clothes to the orphans and the poor."

22   And then it goes on to say, "Officials and members of this

23   community are associated with Hamas movement and some of them

24   are activists in the movement."  And then it has a signature

25   from a Major Khalid Abu-Yaman, Director of Operations.  Do you

1    see that?

2    A.    I do.

3    Q.    I take it you were not privy to this document?

4    A.    No.

5    Q.    Were you ever advised of these facts or facts such as

6    this by the Palestinian Authority?

7    A.    No.

8    Q.    Now, the Palestinian Authority would on occasion close

9    certain zakat committees and charitable organizations.  Is

10   that correct?

11   A.    Yes.

12   Q.    And that would be in response to suicide bombings or

13   terrorist attacks.

14   A.    Yes.

15   Q.    And the suicide bombings and terrorist attacks for the

16   most part would have been terrorist attacks committed by

17   Hamas.  Is that correct?

18   A.    During the period I was Consul General, Hamas or Islamic

19   Jihad.

20   Q.    And would you agree that under the terms that the

21   Palestinian Authority would close those committees, because

22   they were pressured or urged to do so by the United States and

23   the Israelis?

24   A.    Yes.

25   Q.    And the committees that would be closed would be the

1   committees that are supposed to be connected to Hamas.  Is

2   that correct?

3   A.    Maybe.  Maybe not.

4   Q.    Well, so are you saying, then, that Chairman Arafat would

5   close some unrelated committees as opposed to the committee

6   that were controlled by Hamas?

7   A.    I will give you an example.  During the suicide bombings

8   in Jerusalem and Tel Aviv in the spring of 1996, I went down

9   on instructions from the State Department to really press

10  Arafat that he had to take action against people carrying out

11  these suicide bombings, and that he had to deal with mosques

12  and other places where Hamas might be operating or planning or

13  congregating.  We never gave any specific names to Arafat of

14  things that he should close down.  I don't know if the

15  Israelis did or not.  But to the best of my knowledge the U.S.

16  government did not.

17  Q.    Okay.  So the U.S. government left it to him to close

18  down the proper committees, whether they are zakat committees

19  or charitable organizations.

20  A.    Yes, I would say that is correct.

21  Q.    So he would know which ones were Hamas or which ones were

22  not?

23  A.    That is assuming he closed them on that basis.

24  Q.    And his closure would not last.  Is that correct?

25  A.    Often he would close something down or he would arrest

1  someone, and after a period of time he might release that

2  person or allow the office to reopen.

3  Q.   You stated that you are retired, but do you still keep up

4  with events in the Middle East?

5  A.   Yes, I do.

6  Q.   And are you aware of the fact that the Palestinian

7  Authority in December of 2007 closed all of these zakat

8  committees and removed their leaders?

9  A.   Yes.

10  Q.   And replaced them?

11  A.   Prime Minister Fayyad told me that.

12  Q.   So -- And are you aware that the principal reason for

13  that was because of the fact that they were controlled by

14  Hamas?

15  A.   That is not what he told me.

16  Q.   All right.  And do you know what Hamas' reaction was when

17  these committees were closed down and their membership

18  removed?

19  A.   I think they saw it as a challenge, part of the ongoing

20  battle between Hamas and Fatah.

21  Q.   And in fact they -- did they threaten the Palestinian

22  Authority or Fatah that they shouldn't do that?

23  A.   There has been an ongoing struggle which occasionally

24  breaks into absolute armed conflict between the Palestinian

25  Authority and Hamas more or less since Hamas won the elections

1  in 2006.

2  Q.   I just want to go back to something that you testified

3  about on direct examination.

4       MR. JACKS:  Mr. Lewis, could you post or show Nablus

5  Zakat No. 5, I believe?

6  Q.   (BY MR. JACKS)  I believe you testified that this was

7  what -- you described it as a day planner or a type of a

8  calendar.  And I believe Ms. Hollander told you this is

9  something that was taken from the Nablus zakat committee.  Do

10 you recall that?

11 A.   Yes.

12 Q.   And are you -- Is your Arabic good enough to read who put

13 out this day planner?  Do you see anywhere?

14 A.   In the bottom it looks like it is done by Hamas, Harakat

15 al-Muqawaman al Islamiyya, Nablus, the Governorate of Nablus.

16 Q.   And are you familiar with an organization called the

17 Islamic Bloc?

18 A.   No.

19 Q.   Are you aware of Hamas organizations within colleges and

20 universities, what name it goes by?

21 A.   Well, I know that Hamas has student organizations, and

22 these universities every year carry out student elections and

23 they are hotly contested between Hamas, Islamic Jihad, and

24 Fatah.

25 Q.   Do you know the name of the Hamas party in these student

1    elections?

2    A.    No.

3    Q.    And just --

4         MR. JACKS:  Mr. Lewis, can you go to the picture in

5    the bottom right corner?

6    Q.    (BY MR. JACKS)  And I think you testified that you

7    thought that was a Palestinian ambulance?

8    A.    Yes, it appeared to me to be so.

9    Q.    And you are sure that is not an Israeli ambulance?

10   A.    Well, I can't tell.  Now that you mention it, when you

11   look at the right hand side there appears to be English

12   writing, so it could be.  I don't know.  You see English

13   writing on Palestinian ambulances as well as Israeli

14   ambulances.

15   Q.    I think one of the --

16        MR. JACKS:  May I have just a moment, Your Honor?

17        THE COURT:  Yes.

18   Q.    (BY MR. JACKS)  Mr. Abington, it is -- You are not

19   purporting or attempting to portray yourself as a Hamas

20   expert, are you?

21   A.    No, I am not.

22   Q.    Okay.  And as I understand your testimony, your testimony

23   is based on the available information that you had during the

24   time that you were the Consul General in Jerusalem from 1993

25   to 1997.  Correct?

1   A.    Yes.

2   Q.    And you do not know and did not know who were the heads

3   or who were the members of the zakat committees that you have

4   been asked about.  That was not something you were aware of.

5   A.    It is something I would ask my staff to look at.

6   Q.    But you do not have any information -- you are not able

7   at this time to talk about who the individuals were, what

8   their background was, what their affiliation was, any of that.

9   You don't have any recollection of that?

10  A.    I don't.

11  Q.    Okay.  And that would be true about all of these zakat

12  committees and charitable societies that we have asked you

13  about.  Is that correct?

14  A.    Well, in the course of our duties at the consulate, we

15  were obviously trying to learn more about Hamas and how it

16  operated, and we would do reporting on that, which I think I

17  am not at liberty to go into.

18        But if you ask me specifically do I recall specific

19  names, other than the leaders and founders of Hamas, like

20  Khalid Mishal and Sheikh Yassin and others, you know, it was

21  15 years ago and I do not recall the specific names.

22  Q.    And I am not even talking about necessarily the leaders

23  and founders of Hamas, but I am talking about you haven't

24  studied these zakat committees and you haven't studied to see

25  who is in there, how long they have been in there, what

1  newspaper articles there are out there about them.  You don't

2  have access or you haven't had access to police interviews.

3  You haven't looked at court records.

4          MR. DRATEL:  Objection, Your Honor.

5          THE COURT:  Overruled.  Go ahead.

6  Q.  (BY MR. JACKS)  You haven't had access to police

7  interviews.

8          MS. HOLLANDER:  Objection.

9          THE COURT:  That is the same objection, and I

10  overruled it, counsel.

11  Q.  (BY MR. JACKS)  You haven't had access or looked at court

12  records, prosecution records.  You haven't done that kind of a

13  study, have you?

14  A.  Court records of whom?

15  Q.  Individuals.

16  A.  Court records, Israeli court records, U.S. court records?

17  What?

18  Q.  Have you looked at any court records?

19  A.  No.

20  Q.  Okay.  All right.

21  A.  I have read books about Hamas, but I haven't --

22  Q.  Okay.  I think your previous statement was you read part

23  of Matt Levitt's book.  Is that correct?

24  A.  I have read the entire book.

25  Q.  And you have testified or you have stated that, you know,

1    you know that Hamas uses its social wing in order to gain

2    support for its political movement.

3    A.    Yes.

4    Q.    Okay.  Do you know an individual named Azzam Tamimi?

5    A.    What is the first name.

6    Q.    A-Z-A-M or A-Z-Z-A-M.  He is an author?

7    A.    He what?

8    Q.    An author?

9    A.    I think he wrote a book on Hamas.

10   Q.    Okay.  But I take it you haven't read it.

11   A.    No.

12   Q.    Okay.  You have testified about Mousa Abu Marzook.  You

13   know who he is?

14   A.    I do, yes.

15   Q.    You know he lived in the United States.

16   A.    Yes.

17   Q.    And did you have any knowledge before becoming involved

18   in this case about the Palestine Committee?

19   A.    No.

20   Q.    Okay.  And his relationship to that committee?

21   A.    No.

22   Q.    Okay.  And the people that were a part of that committee

23   under him?

24   A.    No, I did not.

25   Q.    You didn't have access or you weren't even aware of that

1    until this case.  Is that correct?

2    A.    That is correct, yes.

3    Q.    But again, just to go back to my last question, I mean,

4    it is your testimony that Hamas does use its social wing to

5    gather and garner favor among the Palestinian public.  Is that

6    correct?

7    A.    Yes.

8    Q.    Do you know what Hamas' budget is, how much money they

9    bring in or spend in a year?

10   A.    I don't think anyone has an accurate number for that

11   budget.

12   Q.    What are some of the figures that you have heard?

13   A.    I have heard anywhere from ten to hundreds of millions of

14   dollars, and there is such a wide range that I don't think

15   there is an accurate figure.

16   Q.    Just take say $100 million or $150 million, if we could

17   just take that, where does that money go?

18   A.    Well, I guess it goes to pay salaries, it goes to rent

19   places, it goes to buy supplies, medical supplies, school

20   supplies, I suppose.  I don't know where it goes.

21   Q.    So is it your testimony that they have a social wing,

22   they operate charities, they operate NGOs, but you don't know

23   which ones they are by name?

24   A.    I know that they do that.  Specific NGOs by name I can't

25   give you.

```
 1              MR. JACKS:  Just one moment.
 2        I pass the witness, Your Honor.
 3              THE COURT:  Ms. Hollander?
 4              MR. DRATEL:  May we approach for a second, Your
 5   Honor?
 6              THE COURT:  Yes.  Come up.
 7              (The following was had outside the hearing of the
 8              jury.)
 9              MR. DRATEL:  May I have five minutes with counsel?
10              THE COURT:  Sure.
11              MS. HOLLANDER:  Before?
12              MR. DRATEL:  Redirect, yes.
13              MS. HOLLANDER:  I want to explain, Your Honor, my
14   concern about this was going into areas that I didn't think we
15   were supposed to go into.
16              THE COURT:  But it didn't.  I am not going to
17   approach the bench every time there is a concern unless I have
18   a concern.  I just didn't have it, and it didn't go there.
19              MS. HOLLANDER:  But I was just worried.
20              THE COURT:  I thought that is what you were, but I
21   didn't, so that is why --
22              MR. DRATEL:  I have a couple of applications, but we
23   can do it later.  I have a couple of applications, but we will
24   do it later.
25              THE COURT:  Do you want me to excuse the jury?
```

1          MR. DRATEL:  Yes.

2          (The following was had in the presence and hearing

3          of the jury.)

4          THE COURT:  Members of the jury, let's take a

5     ten-minute recess at this time.

6          (Whereupon, the jury left the courtroom.)

7          THE COURT:  We will be in recess, ten minutes.

8                    (Brief recess.)

9          THE COURT:  Ms. Hollander?

10          MS. HOLLANDER:  Thank you, Your Honor.

11                 <u>REDIRECT EXAMINATION</u>

12     <u>By Ms. Hollander:</u>

13     Q.   I just have a few questions.  Did you receive daily

14     briefings from the United States government during the time

15     you were Consul General?

16     A.   I did.

17     Q.   And did the government of Israel share information with

18     the United States government?

19     A.   It did.

20     Q.   Did the Palestinian Authority share information with the

21     United States government?

22     A.   Yes, it did.

23     Q.   Were you instructed to have nothing to do with Hamas?

24     A.   Yes, I was.

25     Q.   In all of the years that you worked in Israel and Tel

1    Aviv and Jerusalem for the United States government, for the

2    Palestinian Authority as a consultant for them, did you ever

3    learn that the zakat committees were controlled by Hamas?

4    A.    No.

5    Q.    Were you ever told in any U.S. government briefing that

6    any zakat committee was controlled by or operated on behalf of

7    Hamas?

8    A.    No.

9              MS. HOLLANDER:  Pass the witness, Your Honor.

10             THE COURT:  Mr. Dratel?

11             MR. DRATEL:  No, thank you.

12             MS. MORENO:  No, Your Honor.  Thank you.

13             MS. CADEDDU:  No, Your Honor.

14             MR. WESTFALL:  No, Your Honor.

15             THE COURT:  Mr. Jacks?

16             MR. JACKS:  No, sir.

17             THE COURT:  Mr. Abington, you may step down.  You

18   are free to go.

19             THE WITNESS:  Thank you, Your Honor.

20             THE COURT:  Next witness?

21             MS. HOLLANDER:  Your Honor, at this time the Defense

22   rests.

23             THE COURT:  Okay.

24             MS. HOLLANDER:  For Mr. Abu Baker, we rest.

25             THE COURT:  Mr. Westfall?

1          MR. WESTFALL:  Yes, Your Honor.

2      Ladies and gentlemen of the jury, on behalf of Abdul

3  Odeh, we rest.

4          THE COURT:  Mr. Dratel?

5          MR. DRATEL:  Your Honor, ladies and gentlemen of the

6  jury, on behalf of Mohammad El-Mezain, we rest.

7          THE COURT:  Ms. Moreno?

8          MS. MORENO:  Thank you, Your Honor.

9      Ladies and gentlemen of the jury, on behalf of Ghassan

10 Elashi, we rest.

11         THE COURT:  And Ms. Cadeddu?

12         MS. CADEDDU:  Yes.

13     Ladies and gentlemen of the jury, on behalf of Mufid

14 Abdulqader, the Defense rests.

15         THE COURT:  Thank you.

16     If counsel will approach the bench.

17         (The following was had outside the hearing of the

18         JURY.)

19         MR. JONAS:  I have piles of stuff to cross examine

20 Benthall on.

21         THE COURT:  They just wanted to keep you occupied

22 last night.

23         MR. JONAS:  When Ms. Shapiro finds this out, just

24 look at her face.  It is going to be great.

25         THE COURT:  Where are you?

1           MR. JONAS:  We may have one rebuttal witness.  We

2    told him to come here Monday morning.  He is in Washington.  I

3    can get on the phone and see if he can get here tomorrow.  And

4    we also need to confer to make sure we absolutely want to call

5    him.  He is the USAID witness.  So I don't know how Your Honor

6    wants to proceed, if we will let the jury go for the day.

7           THE COURT:  That is what we will do.  Why don't we

8    let them go and just get together and see where we go from

9    here.

10          MS. HOLLANDER:  Let them go and stay here?

11          THE COURT:  Yes.

12          MS. HOLLANDER:  Will Mr. Dratel have time to inform

13   the witness?

14          THE COURT:  Yes.

15       The jury will be happy.  We will just send them home for

16   the day.

17               (The following was had in the presence and hearing

18               of the jury.)

19          THE COURT:  Members of the jury, the Defense has

20   rested, and a little ahead of schedule, so we are not quite

21   prepared so we are going to let you go for the day.  This is

22   all the testimony you will hear today.  You may hear some

23   tomorrow.  We are not sure.  We will discuss that with the

24   lawyers this afternoon.  But we are near the end of the case,

25   so at some point here in the next few days we will get the

1    case to you.

2         It is important for you to continue to observe and abide

3    by all the instructions about not discussing the case with

4    anybody.  Don't watch or read anything about it until you

5    finish your deliberations in this case.

6         Have a good evening and see you back at 9:00 in the

7    morning.

8              (Whereupon, the jury left the courtroom.)

9              THE COURT:  Court will be in recess.  If you will go

10   back into Judge Buchmeyer's chambers in the next 5 minutes or

11   so.

12             MR. JONAS:  Your Honor, can we have 30 minutes?

13             THE COURT:  In fact, why don't we do this.  Go back

14   up to 16, and if you need some time.  Just go back to 16 and

15   we will meet in the conference room and go from there.

16             MS. CADEDDU:  Your Honor, on behalf of Mr.

17   Abdulqader, I renew at this time my Rule 29 motion for

18   judgment of acquittal on all counts, all elements of every

19   count.

20             MS. MORENO:  On behalf of Mr. Elashi, I renew my

21   motion to dismiss on all counts and all elements of all

22   counts, and on double jeopardy grounds as well.

23             MS. CADEDDU:  Ditto.

24             THE COURT:  Yes.

25         Mr. Dratel?

1          MR. DRATEL:  On behalf of Mr. El-Mezain, I renew my

2     Rule 29 motion with respect to sufficiency as to the single

3     count against Mr. El-Mezain on all elements, and collateral

4     estoppel, and double jeopardy.

5          THE COURT:  Mr. Westfall?

6          MR. WESTFALL:  Yes, Your Honor.  On behalf of

7     Abdulrahman Odeh, I renew my request for a judgment of

8     acquittal on all counts, insufficient evidence on all elements

9     of all counts, and also double jeopardy.

10          THE COURT:  Thank you.

11      And Ms. Hollander?

12          MS. HOLLANDER:  On behalf of Mr. Abu Baker, we renew

13     our motion for judgment of acquittal pursuant to Rule 29, and

14     on the basis of double jeopardy, Your Honor.

15          THE COURT:  And those motions are denied, the same

16     as the previous rulings.  And we will see you in chambers at

17     4:00.

18          MR. DRATEL:  And, Your Honor, I just have one short

19     application, which is I move for a mistrial based on the cross

20     examination of Mr. Abington in which Mr. Jacks explicitly and

21     repeatedly referred to matters for which we do not have

22     confrontation right--police statements, prosecution reports,

23     court records, all of which is covered by *Crawford* and the

24     Sixth Amendment.

25          THE COURT:  And everybody can join in that.  I will

1  deny those.  He did not get into what any of those statements

2  were.  He was asking him simply whether he looked at them.

3  That is permissible.

4       All right.  I will see you in chambers at 4:00.

5                      (End of day.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            I HEREBY CERTIFY THAT THE FOREGOING IS A

2       CORRECT TRANSCRIPT FROM THE RECORD OF

3       PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4       I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5       FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6       COURT AND THE JUDICIAL CONFERENCE OF THE

7       UNITED STATES.

8

9       S/Shawn McRoberts       06/09/2009

10      _____DATE_____
           SHAWN McROBERTS, RMR, CRR

11      FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25