1           IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
2                   DALLAS DIVISION

3   UNITED STATES OF AMERICA    )  CAUSE NO. 3:04-CR-240-P
                                (
4   vs.                         )
                                (  NOVEMBER 7, 2008
5                               )  DALLAS, TEXAS
    HOLY LAND FOUNDATION, ET AL  (  9:00 A.M.
6
    _____
7


8                      VOLUME 34 OF 37

9   _____


10                   STATEMENT OF FACTS

11

12         BEFORE THE HONORABLE JORGE A. SOLIS
             UNITED STATES DISTRICT JUDGE
                     and a jury
13  _____

14


15                  A P P E A R A N C E S

16


17


18   FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                           1100 COMMERCE, 3RD FLOOR
19                         DALLAS, TEXAS  75242
                           BY:  MR. JIM JACKS
20                              MR. BARRY JONAS
                                MS. ELIZABETH SHAPIRO
21
     FOR THE DEFENDANT:   FREEDMAN, BOYD, HOLLANDER,
22   (SHUKRI ABU BAKER)   GOLDBERG & IVES, P.A.
                          20 FIRST PLAZA, SUITE 700
23                        ALBUQUERQUE, NEW MEXICO 87102
                          BY:  MS. NANCY HOLLANDER
24                             MS. TERESA DUNCAN

25

```
1            FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
             (MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
2                                 NEW YORK, NEW YORK  10005
                                  BY:  MR. JOSHUA DRATEL
3                                      MR. AARON J. MYSLIWIEC

4            FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
             (MUFID ABDULQADER)   3232 McKINNEY AVENUE, SUITE 700
5                                 DALLAS, TEXAS  75204
                                  BY:  MS. MARLO P. CADEDDU
6
             FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
7            (GHASSAN ELASHI)     P.O. BOX 10985
                                  TAMPA, FLORIDA  33679
8                                 BY:  MS. LINDA MORENO

9                                 JONES DAY
                                  555 CALIFORNIA ST., 26TH FLOOR
10                                SAN FRANCISCO, CA  94104
                                  BY:  MR. JOHN D. CLINE
11
             FOR THE DEFENDANT:   WESTFALL, PLATT & CUTRER
12           (ABDULRAHAM ODEH)    ONE SUMMIT AVENUE, SUITE 910
                                  FORT WORTH, TEXAS  76102
13                                BY:  MR. GREG WESTFALL

14           COURT'S LAW CLERK:   MS. JENNIFER HELMS
                                  1100 COMMERCE, RM. 1654
15                                DALLAS, TEXAS  75242

16           COURT COORDINATOR:   MS. BRENDA WEBB
                                  1100 COMMERCE, RM. 1654
17                                DALLAS, TEXAS  75242

18    OFFICIAL COURT REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                  1100 COMMERCE STREET, RM. 1654
19                                DALLAS, TEXAS  75242
                                  (214) 753-2349
20

21

22

23

24

25
```

## <u>INDEX</u>

**Charge Conference**

**Charge Conference**                                                          **Page**
                                                                                  4

1          THE COURT:  All right.

2          MS. SHAPIRO:  Your Honor, we would like to be able

3    to consider the possibility of a very short rebuttal witness

4    Monday morning.  It will be about 30 minutes, very brief, to

5    rebut Mr. Abington.

6          THE COURT:  Which witness would this be?

7          MS. SHAPIRO:  It would be a representative from the

8    State Department.

9          THE COURT:  Anybody THAT agrees to that?

10         MS. MORENO:  No.

11         THE COURT:  It seems to be unanimous.  Well, I am

12   not inclined to do that.  Let me give that some thought.

13       To rebut on the specific issues that he discussed?

14         MS. SHAPIRO:  Yes.  And I can sort of give you A

15   very brief description of what this person would say.

16       Essentially Mr. Abington left a false impression that the

17   State Department's position is that these committees aren't

18   controlled by Hamas, and the fact is that is not the State

19   Department's position, and that position is known in public

20   because the State Department is required to consult on

21   designations, and they did consult and concur in designations

22   of entities as SDTs based on their support of Hamas through

23   these committees.  So essentially the State Department would

24   say that it is their position and they have concurred that the

25   support of Hamas through these committees, that these

committees are part of Hamas and controlled by Hamas during
the relevant time period.

THE COURT:  The basis for that opinion is going to
be what?  That these zakat committees were controlled by Hamas
during the relevant time period?

MS. SHAPIRO:  The basis would be public
designations.

THE COURT:  But this person, I take it, doesn't
have, or does he, have any personal knowledge of what was
going on in Jerusalem at the time, what kind of briefings were
taking place, anything like that?  Or is it just strictly from
the designation.

MS. SHAPIRO:  It would be strictly that the State
Department's position is that they agree and concur that these
committees were controlled by Hamas between 1995 and 2001.

THE COURT:  But what is the basis for that
conclusion?  Just the designation in '95?

MR. JACKS:  No, sir.  It was the information that
was used to --

MS. SHAPIRO:  In other words, what happens in a
designation is that there is three agencies required through
an interagency process to consult and concur on a designation,
and that consultation process is set out actually in the
executive order itself.  And so these designations are made on
evidentiary memoranda and evidence that is considered by the

1  agencies, and then there is a decision as to whether that

2  supports designation.  And there have been designations based

3  on the consideration of information --

4          THE COURT:  So based on information that the State

5  Department obtained that they had before them, and that

6  information was from what period of time?

7          MS. SHAPIRO:  That information was from a variety of

8  period of time.  The designations have been mostly 2001 and

9  forward, but they are backward looking.

10          THE COURT:  Okay.  So talking about the designations

11  of what?

12          MS. SHAPIRO:  Well, the designation of the Holy Land

13  Foundation, which we wouldn't mention the Holy Land

14  Foundation.  It would just be an entity.  There is also the

15  designation of Beit Amal as being Hamas, of Interpal, al-Aqsa,

16  CBSP --

17          THE COURT:  Some of that is already in.

18          MS. SHAPIRO:  Right.  But not that they are

19  designated for being Hamas and their support of these

20  committees.  That is the issue.

21          MR. JONAS:  And that is the State Department's

22  position --

23          MS. SHAPIRO:  And the State Department position is

24  not part of the record, and that directly rebuts Mr. Abington.

25          MR. WESTFALL:  It really doesn't.  He is talking

1    about briefings that he got in '93, '94, '95, and '96. She is

2    talking about the information that went into the designation

3    starting in 2001.

4         MS. SHAPIRO: But the information is all the way

5    back. And it also underscores that he didn't have access to a

6    whole lot of information.

7         MS. HOLLANDER: That came out. I mean, he was cross

8    examined on that.

9         MS. SHAPIRO: The State Department's position,

10   though, is not in the record.

11        MR. DRATEL: There is also an issue as to the types

12   of information. They are going to be relying on things that

13   we won't have an ability to confront. It is some documents

14   which I don't know if anybody has ever seen.

15        MS. SHAPIRO: That is not true.

16        MR. DRATEL: In terms of unless someone brings a

17   lawsuit to overturn a designation, you never see what is in

18   that record.

19        MS. SHAPIRO: Can I say, A, that is not true; that

20   the particular designation of the Holy Land Foundation, the

21   entire basis for the designation was put on the public record.

22   Okay? So that has been public since 2001, and these lawyers

23   have it. And then there have also been FOIA requests

24   subsequent for the designation packages, and they are in the

25   public domain.

1      So it is not true that they are not public, but certainly

2      the ones that discuss the committee and the information

3      underlying that has been public for a long time.

4           MR. JONAS:  Ms. Hollander was the one who brought a

5      lawsuit challenging the HLF designation, so what the State

6      Department relied upon has been available to her since 2001.

7           THE COURT:  Does that discuss the zakat committees?

8           MS. SHAPIRO:  Yes.

9           THE COURT:  And information that goes back to '93?

10          MS. HOLLANDER:  I don't think it does.

11          MR. DRATEL:  It doesn't.  And that is a way of

12     shoehorning the HLF designation --

13          MS. SHAPIRO:  It would never be mentioned.

14          MR. DRATEL:  But it is the same thing.

15          THE COURT:  Remember we are on the record, guys.

16          MR. DRATEL:  It is newspaper articles, it is

17     detention investigations, it is all this stuff that comes

18     under -- It is either hearsay or confrontation issue problems.

19     It is a whole can of worms, and, you know --

20          MS. MORENO:  And it doesn't really rebut

21     Mr. Abington.

22          MS. HOLLANDER:  There is not a single statement in

23     that administrative record from the government that is not a

24     hearsay statement, not a single one.

25          MR. JACKS:  Mr. Abington was all hearsay in terms of

1  what he said.  He was repeating hearsay.

2         THE COURT:  He wasn't repeating it, but he was

3  certainly relying on what he said he was told.

4         MR. JONAS:  And we are not seeking to admit the

5  underlying record.  It is the position of the State Department

6  that is the issue here.

7         THE COURT:  So how you would frame it would be the

8  position of the State Department is that they were controlled

9  by Hamas?

10         MS. SHAPIRO:  Yes.  Right.  The position would be

11  that the State Department is required to concur in these

12  designations.  They have made designations of entities --

13         THE COURT:  You would outline the process.

14         MS. SHAPIRO:  Right.  Not at length.  They have

15  heard that process.  They have made designations of entities

16  as specially designated terrorists for their support of Hamas,

17  supporting Hamas through these committees, and it is their

18  position that between 1995 and 2001 these committees were

19  controlled by Hamas.  Now, Mr. Abington may not have had that

20  information, but that is the State Department's position.  And

21  he left a misimpression that the State Department's position

22  is to the contrary.

23         THE COURT:  I don't know that he left the impression

24  that it was the State Department.  They didn't ask it that

25  way.  They asked, "Did you receive any information," and he

1    said no.  I don't know --

2         MS. SHAPIRO:  Right.  And it was even broader

3    because he said U.S. government.

4         THE COURT:  Nobody knows from where.  But I don't

5    think he was implying that this was some kind official --

6    Well, I guess just because he was a State Department official,

7    it might have that implication.

8         MS. SHAPIRO:  And he was the consular general, and

9    he made a point of how it was his job to know all this

10   information and how he received briefings on a daily basis.

11   And he also did talk about how his people gave him

12   information.

13        THE COURT:  Okay.  Mr. Westfall?

14        MR. WESTFALL:  I mean, it sounds like what they are

15   wanting to do is basically repeat McBrien's testimony, and it

16   has been -- The fact that Hamas is designated, the fact that

17   these other things got designated after Holy Land was closed

18   has been proven about three teams so far in this trial.  And

19   it really does not -- What she is talking about does not rebut

20   what Abington said, which is from the briefings he was getting

21   there on the ground nobody ever told him that these committees

22   were Hamas.

23        So now they want to come back and basically repeat the

24   same thing McBrien said was that there is this -- Except now

25   it will be from the State Department's perspective.  Yep

1   everyone is designated.

2          THE COURT:  McBrien's testimony went to Hamas,

3   whereas here now we are dealing with the zakat committees.

4   That is what Abington dealt with, and that is what you are

5   trying to address is the zakat committees.

6          MS. SHAPIRO:  And we would not be repeating --

7          MR. DRATEL:  What McBrien testified to was there was

8   no need to designate zakat committees, and that is exactly

9   what they are going to say.

10          MS. SHAPIRO:  We wouldn't be saying that.

11          THE COURT:  But generally testifying there was no

12   need to, did he ever opine that they were controlled by Hamas?

13   I don't know that he got there.

14          MS. CADEDDU:  He did opine that Interpal, al-Aqsa,

15   that all of those were designated because they supported the

16   same zakat committees he testified to that.

17          MS. HOLLANDER:  And they were umbrella

18   organizations.

19          MR. JACKS:  And he is Treasury.

20          THE COURT:  Did he say because they supported the

21   zakat committees or because they supported Hamas.

22          MS. CADEDDU:  No, he talked about that they were

23   part of the global network.

24          THE COURT:  Yes.  Of the Hamas global network.

25          MS. CADEDDU:  He linked them to the zakat

1    committees.

2         MS. HOLLANDER:  He said that they didn't -- My

3    memory of what he said was they didn't need to designate the

4    specific zakat committees because these were the umbrella

5    organizations.

6         THE COURT:  He did say that they didn't need to, but

7    I don't know that he ever gave an opinion that the zakat

8    committees were in fact controlled by Hamas.  I think the

9    question, the way the Government was saying, if they were

10   controlled by Hamas would there be a need to, and he said no.

11   But I don't think he ever gave an opinion that he thought,

12   based on whatever, that the zakat committees were controlled

13   by Hamas.

14        MS. CADEDDU:  I believe he said that the reason that

15   Interpal and al-Aqsa and all of those were designated was

16   because they were part -- they had contributed money to the

17   same zakat committees.

18        MS. SHAPIRO:  You are both right actually, and Marlo

19   is right, but it is also true they didn't give an opinion

20   about them.  And he is also a Treasury Department official.

21   The point of having State Department is to highlight the

22   contradiction of Mr. Abington.  It will strictly go to Mr.

23   Abington.

24        MS. HOLLANDER:  Your Honor, part of the problem -- and we

25   have got the Administrative Record, if you want to look at it.

1    I mean, there is not anything that we can confront there.

2    That was the problem with that record.  I mean, it is an

3    Administrative Record.

4            MS. CADEDDU:  The standard of proof is much lower.

5            MS. HOLLANDER:  I mean, much lower.  And it is pages

6    and pages and pages of police interrogations and newspaper

7    reports and secret informants, and that is all it is.  I mean,

8    there is not one page, not one page, because we litigated

9    this, that is not hearsay.

10           MS. MORENO:  That is not going to be a 30-minute

11   witness, Your Honor, given the scope now what we are hearing.

12           MS. SHAPIRO:  It would be a very narrow scope.

13           MS. MORENO:  Yeah, but I am talking about cross.

14           MS. HOLLANDER:  I mean, I would certainly like all

15   the 3500 material from the State Department that they are

16   relying on for this.  I think we are entitled to know what

17   that is.

18           MR. WESTFALL:  Yesterday we had no rebuttal witness,

19   and now all of a sudden a rebuttal witness on Monday.  Anyway.

20           THE COURT:  What were you going to say?

21           MR. JACKS:  Well, the fact that it is hearsay and

22   they can't confront it, that is the same position we were in

23   with Abington.  He was talking about these things that, you

24   know, we don't know what he is talking about in terms -- It is

25   unclear to us what documents he is talking about.

1       And again, I would have to go back and look because I

2   wasn't taking copious notes during his testimony, I was

3   listening to him, but it certainly was the impression that he

4   was representing that the State Department's position was that

5   these committees were not.  And we believe that is false.  You

6   know, whether he was mistaken or exaggerating or just not in

7   the loop, which seems unlikely, but there is a witness that

8   can testify as to what the State Department's position was and

9   is.  And I don't believe it opens up the entire realm of all

10  of that information, and it is strictly focused on what he

11  testified about and the impression that it was sought to be

12  left through him.

13      And as I said, I believe that it can be a very pointed

14  examination, and I disagree that it is going to open up a much

15  broader cross examination.

16          THE COURT:  Abington testified that from '93 through

17  '97 he was getting briefings, and based on that nothing about

18  Hamas controlled zakat committees.  This designation happened

19  in '01, so that is when the State Department formed its

20  opinion and reached the conclusion that Hamas --

21          MS. SHAPIRO:  That is not necessarily true.

22          THE COURT:  That is what I was getting ready to ask.

23  Let me finish and then I will give you a chance.  So in '01

24  after going through the designation process they conclude that

25  these Hamas committees were controlled by Hamas, but were they

1    -- did they have that same opinion and conclusion?  Is there

2    anything that indicates what their opinion was back in '93

3    through '97?  Because that is what Abington testified to

4    during that time period.

5         I don't know that that is strictly you know the same

6    thing when you can come back in '01, then, after they get a

7    lot of information and say, "Okay.  Now going back they were

8    controlled by Hamas with all this information that we have."

9         See what I am saying?  It is a little different.  But

10   what was their position in '93 through '97?  Do you have

11   anybody that can address that?

12             MS. SHAPIRO:  Right.  I mean, the problem is we

13   wouldn't be able to come up with, you know, this quickly

14   somebody on the ground there who can speak to that.  What we

15   do know is that in '01 it was publicly known based on lots of

16   information that covered that time period.

17             THE COURT:  But that is the problem--in '01, and he

18   testified '93 to '97.  Well, that is one of the problems.

19             MS. SHAPIRO:  But the information has been collected

20   has been information that has been collected over the years,

21   and you know, then it is compiled into this record.  And, you

22   know --

23             MS. MORENO:  Your Honor, if I may, I think the Court

24   is correct in the questions that you are asking.  A proper

25   rebuttal witness would be a witness who could address

1    specifically that time period, perhaps a briefer, perhaps

2    someone on the ground there, who could specifically rebut

3    exactly what Mr. Abington said.

4         This is a different kind of evidence that they now want

5    to bring back before the jury.  It is not proper rebuttal.

6    They could have put such a witness on in their case.  They

7    chose not to.

8         THE COURT:  Well, you wouldn't do it until -- I

9    guess they could have, but obviously it opened up after

10   Abington, but now we have rested and getting ready to get it

11   to the jury.  But go ahead.

12        MR. JONAS:  Two points, Your Honor.

13        One is, Abington didn't say "My opinion was limited to

14   the time period '93 to '97.  He gave his opinion is from '93

15   until 2008, in effect saying it is the same from '93 until

16   today.

17        Two is, part -- the converse is going to come out as

18   well, that in 2001, you know, it is the State Department's

19   position, but also it was not the State Department's position

20   in '93 through 97 that they were not Hamas.  And I think that

21   is an important point as well, because of the impression

22   Abington left.

23        THE COURT:  But can you have somebody that can

24   testify to what was the State Department's position in '93,

25   '94, '95, '96, '97 prior to the '01 designation?  Can this

1    person testify to that--that in '93 to '97 the official

2    position was that these committees were --

3                MS. SHAPIRO:  I would have to probe that and see if

4    that person could opine to that.

5                THE COURT:  That would be the relevant issue.  I

6    understand the first point you made about, well, he says it

7    went all the through until '06 --

8                MS. SHAPIRO:  He did it say it was his opinion.

9                THE COURT:  However the wording was, whatever it

10   was, it was that they were not controlled by Hamas, whatever

11   we want to call it.  But that is his testimony--that they were

12   not controlled by Hamas.  But I am not sure --

13               Well, I have to think about this, obviously.  I am

14   not prepared to make a ruling.

15               MS. HOLLANDER:  Your Honor, if I could add two

16   things.

17        One is, equating the Government's right to respond to

18   hearsay and the Defendants of course is different because we

19   have a confrontation right that the Government does not have

20   under the Sixth Amendment.

21        But more importantly, this is not something the

22   Government didn't know was coming out.  I mean, they knew what

23   Mr. Abington's opinion was.  They knew what it was last year,

24   and they -- You know, and last year also Mr. Jonas asked to

25   speak with him before he testified, and we sat down in the

1    lobby of the Adolphus.  He could have done that again this

2    year.

3         To say that all of a sudden they have a new rebuttal

4    witness is just really not proper, in addition to all the

5    things Your Honor has said.

6              THE COURT:  Any last words?

7              MS. SHAPIRO:  No.  Only that I think we are

8    additionally confined this year because of the CIPA issue.  So

9    his testimony came out as more sweeping and broader this year,

10   and we were not able to pick away at it because of the CIPA

11   issue.

12             THE COURT:  All right.  Well, I will take that into

13   account, and we will try to make a decision later this

14   afternoon so that way you will know and you will know, and we

15   will let you know.

16             MR. JACKS:  And if we can gather anymore

17   information, we will let you know in terms of what this

18   witness can testify to.

19             THE COURT:  All right.  Okay.

20        Okay.  Any other things before we start on the charge?

21        Who is speaking on behalf of the Government?

22             MR. JONAS:  I guess it will be me.

23             THE COURT:  And is everybody speaking on behalf of

24   your clients, or is there somebody that is designated?

25             MS. MORENO:  I think just a couple of us.

1      MS. HOLLANDER:  I think it is mostly these two.

2      THE COURT:  And remind me, I want to talk about

3 those protesters across the street before we leave.  I forgot

4 to talk about it yesterday, but I want to talk to you about

5 that.

6      I don't want them out there while the jury is

7 deliberating, and so I wanted to talk to you all about that

8 and see if we can work something out without me having to

9 issue an order.

10      MS. HOLLANDER:  I have never even seen them.

11      THE COURT:  They are out there pretty much every

12 day.  There is not a lot of them, but they are out there and

13 they are holding science "HLF not guilty," and clearly

14 attempts at influencing the jury, and that is improper.  I let

15 it go on because I just didn't want to create a stir, but now

16 that the jury is deliberating --

17      MS. CADEDDU:  Can we do that, Judge?

18      THE COURT:  I think I can do it.

19      MS. CADEDDU:  Really.

20      THE COURT:  They don't have a right to interfere

21 with the jury deliberation process, anymore than these people

22 in the hallway or in the courtroom.

23      MS. CADEDDU:  I just --

24      MS. MORENO:  We can tell the community, Your Honor.

25      THE COURT:  And I thought you could.  That is why I

1    wanted to bring it up.  We see where these folks are leaving

2    the courtroom right before lunch and going out.

3              MS. MORENO:  We will do that.

4              THE COURT:  What I was going to do is if they still

5    want to do, it if they move west of Griffin and east of Field.

6    I want this block cleared.  That is the way the jurors are

7    coming in and out, because that is where the restaurants are.

8              MS. HOLLANDER:  West of Griffin.

9              THE COURT:  And east of Field.  If they just feel

10   like they have to have more days of having those banners up

11   there, then they can do it in those places.

12             MS. HOLLANDER:  I have never gone out at lunch.

13             MR. WESTFALL:  I have never seen it.

14             THE COURT:  They are out there pretty much every

15   day, and then some days -- They are the small banners, not as

16   big as last year, frankly, but some days they stretch from the

17   door where we go out all the way to the corner, big banners.

18   And most of it is feeding children that kind of stuff, but

19   they do have some, that they are not guilty, and to me it is a

20   clear attempt, which is what I would have to find because they

21   don't have the right to do that, to try to influence the jury.

22   Once they start deliberating, we just don't need to do with

23   that.

24        So if you all would work with them, and that is all I was

25   going to ask you.  And let me know Monday what they are going

1    to do, because if they are here Wednesday I am going to issue

2    an order and I will have the marshal move them.

3              MS. HOLLANDER:  We will tell them the message.  Hope

4    it works.

5              THE COURT:  Hopefully it will, and we won't have to

6    get into that.

7         All right.  Let's get to the jury charge.  Both parties

8    have rested and closed, and we have now prepared a jury charge

9    and counsel have been given a copy of this and have had time

10   to look at it.

11        And Mr. Jonas, any objections or corrections?

12             MS. MORENO:  Are we going to go page by page?

13             THE COURT:  Well, let him do his, and I will let you

14   respond, and then you do yours.

15             MR. JONAS:  Okay.  The first one is the Court's

16   charge page 21 is the First Amendment instruction.  Our

17   position is it shouldn't be in there, but if it is going to be

18   in there, we would request some additional language that says

19   something to the effect of, "However, you may consider a

20   person's speech in determining their intent--that is, if they

21   acted knowingly or willfully."  I believe we had something

22   about that in last year's charge.

23             THE COURT:  We normally give something like that,

24   not in the First Amendment, but just for intent or knowingly

25   sometimes, there is an instruction along those lines for

1    determining intent.

2              MS. CADEDDU:  I believe we already have that.

3              THE COURT:  That is what I was going to look.  I

4    don't know that it has this language.

5              MR. JONAS:  I think it is important that the

6    language be there with the First Amendment instruction.

7              THE COURT:  Read that again.

8              MR. JONAS:  At the end of the instruction, "However,

9    you may consider a person's speech in determining their

10   intent--that is, if they acted knowingly or willfully."

11             THE COURT:  Okay.  All right.  Any thoughts?

12             MS. CADEDDU:  I would object to that.  I think the

13   instruction that was given last year was --

14             MS. MORENO:  I have the instruction of last year.

15             THE COURT:  I have it, too.  And I didn't think it

16   was complete enough, frankly.  I thought just leaving it out

17   there with what the First Amendment is without a little more

18   instruction was a little too vague, so we added that last

19   sentence.

20             MS. CADEDDU:  I am fine with the new version.  I

21   think adding this section on intent here gives that too much

22   weight.  There is an entire section on intent, willfully and

23   knowingly, what is required in order to determine whether they

24   acted with intent.  So I would ask that the Court give the

25   instruction that is proposed as you have modified it.

1          THE COURT:  And I will take a look at that and we

2    will get back with you.

3          MR. JACKS:  I think the only thing about the intent

4    is knowingly and willfully are defined.  I don't think it

5    talks about --

6          THE COURT:  It doesn't have the extra language?

7          MR. JACKS:  Right.  The fact that speech can be used

8    as evidence of intent or motive.

9          THE COURT:  Okay.  I will take a look at that.

10          MR. DRATEL:  I think if there were any modification

11    to the charge as it is right now, I think that it should also

12    incorporate the statutory language of 2339(B)(i) that says,

13    "Nothing in the statute is intended to infringe a person's

14    right to speak, and that the statute does not cover such

15    conduct."  But I think it is fine as it is.  I agree with Ms.

16    Cadeddu.  I would rather it be complicated --

17          THE COURT:  You would want to add that?

18          MR. DRATEL:  Yes.

19          MS. MORENO:  Specific First Amendment language in

20    the statute.

21          THE COURT:  All right.  I will get back with you on

22    that again by this afternoon, any changes that we make, and we

23    will give you a chance on Monday morning to get on the record

24    and make your final objections to it.

25          Next one?

1          MR. JONAS:  In Counts 2 through 10, something that

2     is not in Your Honor's instruction we had proposed --

3          THE COURT:  What page are you on?

4          MR. JONAS:  It will be page 30.  I think this is

5     where the place where we are about to propose.  It will be

6     going in page 30 right before Count 11.  And that is we had

7     submitted a *Pinkerton* instruction, a *Pinkerton* paragraph.  And

8     what our thinking is that in the substantive counts of both

9     the Ghassan Elashi and Shukri Baker charge, not each of those

10    defendants committed a wire.  In other words, on our financial

11    schedules you will see Shukri Baker on one count as submitting

12    a wire, but Ghassan Elashi is charged in that count for that

13    wire as well.  So we would submit the *Pinkerton* paragraph, if

14    you want to call it, that we had submitted specifically with

15    regard to that situation.

16        We are not looking to add any additional Defendants to

17    charges that they are not currently involved in, but we want

18    to make sure the jury can understand that you may see Shukri

19    Baker do the wire, but Ghassan Elashi can be guilty of that

20    wire as well.

21          THE COURT:  Okay.  So you want to add the *Pinkerton*

22    instruction to both those substantive counts?

23          MR. JONAS:  Yes, sir.

24          THE COURT:  Because you had it in all of them.

25          MS. MORENO:  We would object.  And when you say

1    *Pinkerton* and instruction, I am assuming you mean the

2    paragraph on page 18 that starts, "A conspirator is

3    responsible."  Is that what you are talking about.

4            MR. JONAS:  Correct.  When you say page 18, I am not

5    sure what you are referring to, but that is the paragraph.

6            MS. MORENO:  Let me read it.  "A conspirator is

7    responsible for a crime committed by other conspirators if the

8    conspirator was a member of the conspiracy when the crime was

9    committed, and if the crime was committed in furtherance of or

10   as a foreseeable consequence of the conspiracy."  It seems to

11   me that is you --

12           MR. JONAS:  That is the beginning of the paragraph I

13   am referring to.

14           THE COURT:  This is part of the general conspiracy

15   instruction.  There is a separate *Pinkerton* that they had.

16   Apparently it was given the last time.

17           MR. JONAS:  Yes, sir.

18           THE COURT:  That was in the instructions from last

19   year.  And that was after the substantive counts.  It is a

20   longer instruction, and it includes more language than this,

21   and that is what they are wanting with respect to I guess the

22   substantive counts following each of the conspiracies,

23   including the money laundering?

24           MR. JONAS:  I think within the substantive counts.

25           THE COURT:  But in each of the conspiracies, because

1    in each conspiracy you have substantive counts following, and

2    you want that with each one of those?

3            MR. JONAS:  Yes, sir.

4            MS. MORENO:  Our position, certainly on behalf of

5    Mr. Elashi, would be we would object to the *Pinkerton*

6    instruction entirely, which includes the page 18 paragraph,

7    Your Honor, and the modifications that the Government wishes

8    to include.

9        And I would also ask where do you want to include that

10   language specifically?

11           MR. JONAS:  Within the instructions regarding the

12   substantive counts that follow.  It can even go at the end of

13   the instructions --

14           THE COURT:  I think that is what he has it right

15   now.  On page 30, that is the end of the instructions for the

16   substantive Counts 2 through 10.  So he wants it at the end,

17   and then we would do that with each other set of substantive

18   counts.

19           MS. HOLLANDER:  We object to that on behalf of

20   Mr. Abu Baker also.

21           MS. CADEDDU:  And on behalf of Mr. Abdulqader.

22           THE COURT:  It doesn't affect you or you either on

23   those, now that they have dropped your client.  If you want to

24   go ahead and have an extra objection, then, go ahead.  We

25   didn't have enough in this trial.

1          THE COURT:  All right.

2      Next one?

3          MR. JONAS:  In count 11, which starts again page 30,

4  we submitted language from the executive order, as well from

5  the CFRs, regarding generally speaking that prohibition of

6  making -- That making humanitarian donations such as food,

7  clothing, and medicine can be in violation of the executive

8  order.  And I am summarizing it very briefly, but we have a

9  few paragraphs of that from the executive order and the CFR

10  that talk about that.

11      There is a line in the foreign terrorist organization

12  counts, Counts 1 through 10 I think it is, that say, you know,

13  provisions for humanitarian assistance is not a defense.  This

14  sort of goes along with the same -- This matches that.  The

15  language here is a lot more verbose, because we are taking  it

16  directly from the CFR and the executive order.  The point is

17  the same--money for humanitarian purposes is not a defense.

18  And you have that in FTO violations.  We think it should be

19  matched in the SDT violations.

20          THE COURT:  And is there similar language in the

21  regs?

22          MR. JONAS:  Yeah.  In the CFRs we submitted that as

23  well.  I can give that to Your Honor if you wish.

24          THE COURT:  We took some of that out.  You had a lot

25  -- I think what you are talking about, the humanitarian aid,

1    that is okay.  I don't have a problem giving that.  But we

2    took out more.  If you will --

3              MR. JONAS:  These are the pages.

4              THE COURT:  Do you want all of that?

5              MR. JONAS:  I mean, this is the verbatim from the

6    executive order, and the next page is the verbatim from the

7    CFR.  It doesn't have to be all that.  It is the point that we

8    want to get out there that, again, like with the other

9    violations, humanitarian assistance is not a defense with

10   regard to these particular charges.

11             MS. DUNCAN:  Which CFR are you talking about, the

12   number?

13             MR. JACKS:  595.408 of Title 31.  Did you have it

14   reversed?  You were talking about SDTs versus FTOs.

15             MR. JONAS:  The language is in the FTO charges right

16   now with the one line.

17             MR. DRATEL:  Which parts of the CFR?

18             MR. JACKS:  Title 31, Section 595.408 (a) and (b).

19             MR. DRATEL:  There is a problem with (b).  There is

20   a specific problem with (b).

21             THE COURT:  You raised that, and I thought there

22   might be a problem with (b).  You say there is already one, a

23   similar one with respect to count?

24             MR. JONAS:  There is one line that covers this on

25   Count 1.

1          THE COURT:  Yes, Page 25, next to the last

2    paragraph.

3          MR. JONAS:  Your Honor, with regard to the CFR we

4    don't need (b).  (a) is what we want.

5          THE COURT:  Let me take a look at that.  What would

6    be wrong with just a similar paragraph like we have on page 25

7    with respect to --

8          MR. JONAS:  With regard to humanitarian assistance

9    not being a defense?

10          THE COURT:  Right.

11          MR. JONAS:  Probably nothing.  But I think -- The

12    reason we cited CFR because it is there --

13          MR. JACKS:  It is specific.

14          MR. JONAS:  As Mr. Dratel cited on the First

15    Amendment one that he wanted language from the statute I guess

16    for the same reason.  You can't go wrong when you cite the

17    statute.

18          THE COURT:  Does this apply to -- What is this?

19          MR. JONAS:  That specifically applies to the SDT,

20    which is Count 1 and the substantive counts that follow.

21          THE COURT:  That is why that is not in there like

22    that for Count 1?

23          MR. JONAS:  Right.  Because Count 1 does not have

24    that.

25          THE COURT:  So you want Count 1, which is page 25,

1    that is fine, and then you want to add this to Count 11.

2              MR. JONAS:  Yes.  And then I guess it would also

3    have to go into 12 through --

4              THE COURT:  The substantive counts.

5              MR. JONAS:  Yes.

6              MS. HOLLANDER:  So you want the paragraph from page

7    25 plus?

8              THE COURT:  No.  We will just give that one.  If we

9    are going to give that one, we don't need the other paragraph.

10             MR. JONAS:  The paragraph from page 25 will be the

11   same, because that goes to the FTO violations.  This is for

12   SDT violations, which is a separate set of counts.

13             MR. DRATEL:  So is Your Honor's intention to put in

14   the (a) paragraph?

15        We objected to any of this obviously coming in at trial,

16   so we are repeating that objection with respect to the

17   instructions, but also I think that the way the Court defined

18   it in Count 1 with respect to humanitarian assistance is also

19   sufficient given the need to avoid complexity and try and make

20   this less dense for the jury.

21             THE COURT:  Okay.

22             MS. SHAPIRO:  Your Honor, I just think the reg is

23   better because it is a little more complex than that.  The reg

24   is specific.

25             THE COURT:  And I will include (a) but not (b) with

1 respect to Count 11.  Did you have a particular place where

2 you wanted that?

3 　　　　　　MR. JONAS:  I guess just on the heels of the other

4 CFR citations would make sense, because the CFR sort of

5 followed numerically.

6 　　　　　　THE COURT:  What was that number?

7 　　　　　　MR. JONAS:  595.401.  It 595.408.  I am sorry.

8 　　　　　　MS. MORENO:  You mean on page 33 where you are going

9 to cite them numerically?

10 　　　　　　THE COURT:  I show page 32.

11 　　　　　　MS. MORENO:  I guess I am a page off with everybody.

12 　　　　　　MR. DRATEL:  Because it is WordPerfect.  It depends

13 on the printer you use.

14 　　　　　　MS. MORENO:  So your intention is to put it

15 numerically after that Section 595.205 of Title 31.

16 　　　　　　THE COURT:  And before the 701, yes.

17 　　　And you object to that?

18 　　　　　　MR. DRATEL:  Yes.  I am objecting for everyone,

19 because I am not even in that count.

20 　　　　　　THE COURT:  You are covering all the bases.

21 　　　　　　MR. DRATEL:  I am speaking for everyone on that.

22 　　　　　　THE COURT:  I understand.

23 　　　　　　MR. DRATEL:  I am the designated objector.

24 　　　　　　MS. CADEDDU:  He is going to object to things that

25 don't matter for him.

1    MR. DRATEL:  I just want to make sure that was an

2  objection for everybody else, because it really does not apply

3  to Mr. El-Mezain.

4    MS. MORENO:  We don't need to hear that over and

5  over again, Mr. Dratel.

6    THE COURT:  This might be fun to follow once

7  somebody starts reading that later on.

8    MS. HOLLANDER:  In case it becomes an issue because

9  it doesn't apply to him, I will object on behalf of everybody.

10    THE COURT:  Designated Objector No. 2, then.  We

11  have got the plan.  Let's get back on to your --

12    MR. JONAS:  The same would apply to the substantive

13  counts I guess going on page 35.  It is the substantive counts

14  following the same language.

15    THE COURT:  *Pinkerton*.

16    MR. JONAS:  We are talking about the CFR.

17    MR. DRATEL:  So the same place before 701?

18    MR. JONAS:  Yes.

19    THE COURT:  Right.

20    MR. DRATEL:  We obviously have the same objection,

21  Your Honor.

22    THE COURT:  Okay.

23    MR. JONAS:  Should I continue?

24    THE COURT:  Yes.

25    MR. JONAS:  Staying with Counts 12 through 21 on my

1    page 34, it is the portion of the count that restates the

2    indictment.  You have additional Defendants in there.

3         MR. DRATEL:  That actually happens for 2 to 11, but

4    we will get back --

5         THE COURT:  Which counts were these again?

6         MR. DRATEL:  When Your Honor has the block quote

7    from the indictment, it actually includes Mr. El-Mezain, Mr.

8    Abdulqader, and Mr. Odeh, so they should be removed.  If you

9    go back to page, I think it is 23.  No, I am sorry.

10        MR. JONAS:  Page 27.

11        MR. DRATEL:  Right.  Page 27 is the same problem.

12   It also includes Maghawri and Mishal, so they should also be

13   taken out.

14        MR. WESTFALL:  By the way, I don't think there is an

15   amended indictment on file yet.

16        MR. JONAS:  We have got to get filed.  Jim just has

17   to get that done.

18        MR. WESTFALL:  So you could have given us a directed

19   verdict on some stuff, Judge.

20        THE COURT:  I guess that is right.  I didn't think

21   about it.

22        Go ahead.

23        MR. JONAS:  Let me just find my place.  And I am not

24   going to repeat -- We talked about the *Pinkerton* paragraphs so

25   I am not going to repeat that.  The typos we just discussed, I

1    am not going to discuss those because they are repeated

2    several times throughout.

3         I think that pretty much is it, except just a suggestion

4    in the very, very end, your final instruction to them, the

5    duty to deliberate, I would just suggest that if you want to

6    tell them if they wish to view a video or listen to an

7    audiotape, just send out a note and we will make arrangements,

8    because I don't think they will have a DVD player in there or

9    a TV.

10        MS. SHAPIRO:  Unless you want to put one into the

11   jury room.

12        MR. JONAS:  I think it is better that they come back

13   in the courtroom, and we can just play the clips and all that.

14        THE COURT:  We can talk to the jury and see how -- I

15   mean, they are entitled to look at whatever evidence they want

16   to look at, but -- Thoughts on that--bringing them into the

17   courtroom versus just--and I don't know what we are going to

18   have, frankly--versus just letting them see if we can set them

19   up with some equipment.

20        And we were going to talk to the Systems folks, we

21   haven't done it, but we were going to talk about them to see

22   if they could set something up because everything is on disk,

23   and so they could have available if they wanted it.

24        MR. JONAS:  Part of the issue the way it is

25   identified on the disk.  I don't know if you saw when Agent

1  Lewis would pull up the menu and hit on the clip, it wasn't --

2  The exhibit number wasn't identified on the menu of the

3  exhibit number.  So they may just need some assistance to find

4  the clip they are looking for.

5          MS. CADEDDU:  I don't think it is a problem to put

6  in here if you want to see anything, let us know.

7          MR. JONAS:  Or hear any part of the transcript, let

8  us know.

9          MS. HOLLANDER:  We do want them to have the actual

10  documents.

11          MR. JONAS:  They will have the actual documents and

12  the disks.

13          MS. HOLLANDER:  I thought the Judge was saying about

14  having the disks.

15          THE COURT:  No.  They will have the actual

16  documents, sure.  Any document that is in evidence, they will

17  have that.

18          MR. JONAS:  I am just talking about mechanically

19  being able to play it.

20          THE COURT:  For the videos, that is what we are

21  talking about.

22          MR. JONAS:  So they will know.

23          MS. CADEDDU:  And it is not the easiest thing in the

24  world to pull the clips up off the disk.

25          MR. WESTFALL:  The things I put in are actually

1    QuickTime videos, which I could convert somehow to DVDs that

2    will self-play like every other DVD, but it is up to you how

3    you want to handle with that.  I will have to do that this

4    weekend.

5          THE COURT:  I think you all are right.  I think for

6    the videos, if they want to see that we can bring them into

7    the courtroom and the others they will have the paper

8    documents and they can see that.

9          MR. JONAS:  I assume if they want to listen to the

10   audios of the calls, I mean, they will have the transcripts,

11   but they may want to hear it.  So the same would hold true.

12         THE COURT:  Okay.  You all in agreement with that?

13         MR. DRATEL:  Yes.  Sure.

14         MS. HOLLANDER:  That is fine.

15         MR. JONAS:  There is one other issue that the

16   Government has, and I will let Mr. Jacks address that one.

17         MR. JACKS:  Judge, we would request I think it is

18   called a consciousness of guilt instruction.  And I had a

19   copy, I printed it out, and now I may have stapled it

20   somewhere in these others I printed out.  But essentially it

21   says that the jury can consider false statements as evidence

22   of state of mind.  And I believe there is a standard

23   instruction that goes to that.

24         THE COURT:  In the pattern you believe?

25         MR. JACKS:  I believe so.  I don't know if it is in

1    the Fifth Circuit pattern or Devitt & Blackmar.  But I don't

2    know why I didn't --

3              MS. MORENO:  Was that given last year?

4              MR. JACKS:  No.

5              THE COURT:  But the gist of it is what?

6              MR. JACKS:  That the jury can consider false

7    statements as evidence of consciousness of guilt on the part

8    of the--and I am paraphrasing it--on the part of the person

9    that made the statement.  And we believe that that has been

10   raised by the numerous false statements that, according to the

11   Government, that have been attributed to various individuals,

12   Shukri Baker and Mohammad El-Mezain in their depositions for

13   example, in I believe it was Mr. Baker's declaration, in their

14   interviews.  The Government submits that there were false

15   statements made by Mufid Abdulqader when he talked about he

16   didn't know anybody at the HLF, and we believe that that issue

17   or that evidence has been raised and that that instruction is

18   appropriate.  And I apologize for not --

19             THE COURT:  When you get your hands on it, just go

20   ahead and send it to everybody.

21             MR. DRATEL:  There are two aspects that I think

22   would have to be added to any such instruction.  One is that

23   it is only considered -- you can only consider it against the

24   Defendant who made the statement.  And the second part is

25   which --

1          THE COURT:  I think that one is in.

2          MR. DRATEL:  And the other one is that -- I mean

3    even in that particular charge, because they talk about

4    consciousness of guilt, it only goes to that particular

5    person.

6          THE COURT:  Well, but I think we would probably just

7    put it together, if we have the other if we do that.  I

8    haven't seen that.

9          MR. DRATEL:  And the other is that -- I am not sure

10   if it is in the pattern instruction because I haven't looked,

11   but I know it is a correct statement of the law in terms of

12   the case law, which is even if the jury were to find that

13   there were false statements by a particular defendant, that

14   would not be sufficient to establish that person's

15   participation in a conspiracy.  That I think is the law that

16   there has to be additional evidence.  Even if it is

17   considered, it is not sufficient.

18          THE COURT:  By itself, that is not sufficient --

19          MR. DRATEL:  Right.

20          THE COURT:  -- to establish a conspiracy or

21   participation?

22          MR. DRATEL:  Right, exactly.

23          MS. MORENO:  Is the Court referring to the section,

24   I think it is on my page 8, evidence admitted for a limited

25   purpose or certain statements of Defendants may be considered

1   only in connection with the charges against the Defendant who

2   made the statement, Your Honor?

3           THE COURT:  Yes.  That is on page 8.  Because this

4   is what you were wanting that instruction in connection with,

5   isn't it?

6           MR. JACKS:  Yes.  That would be the location where

7   it could go.

8           MR. JONAS:  Yes, sir.  Because these statements here

9   we are not contesting as false that are currently in there, so

10  we are talking about the ones -- I think we are in agreement

11  on that.

12          THE COURT:  Okay.  These are the ones that you are

13  not disagreeing with, so it is other statements that we

14  haven't set out?

15          MS. MORENO:  We haven't seen it yet.

16          THE COURT:  Once you find it, of course, we want

17  some case law with it and then some case law with your

18  particular ones, and we will take a look at that.  And we will

19  see -- I was assuming it would come in here, but where would

20  it go if we did that?

21          MR. JACKS:  After that part there.  I think that

22  would be the logical place to put it, after you after you talk

23  about statements that are singled out as to only applying to

24  the Defendants that they are attributed to.

25          THE COURT:  Okay.

1      MR. JONAS:  Finally, Your Honor, just as a reminder

2  to the Court not so much for these instructions but there is

3  obviously a forfeiture count that if there are convictions we

4  will just need to address.  I don't want to let that slip by.

5      And I think that is it on behalf of the Government.

6      THE COURT:  Okay.  So if you could get that to us as

7  soon as you can so we can take a look at it.

8      MR. JACKS:  I had it printed out from an earlier

9  instruction and don't know what I did with it.

10     THE COURT:  And then we will get back with you this

11  afternoon with a final.

12     They are finished.  Do you want to go?

13     MR. DRATEL:  Thank you, Your Honor.

14     Page 5, the last paragraph, this is the credibility of

15  witnesses instruction.  It says in that second sentence, "Do

16  not reach a conclusion on a particular point just because

17  there were more witnesses testifying for one side on that

18  point," and I just think because of the nature of the

19  documentary evidence, "...or introduced more exhibits or

20  testified longer," or something that incorporated that as

21  well.

22     THE COURT:  Or testified longer, huh?  I haven't

23  heard that one.

24     MR. DRATEL:  We had people going for four days.

25     THE COURT:  All right.  What about --

1           MR. JACKS:  Judge, we object because this is about

2     witnesses and not about documents, so it is not relevant to

3     mention, you know, documents.

4           THE COURT:  About how long a witness testified.

5           MR. JACKS:  And I don't think that, you know, needs

6     to be in there.  There are too many factors that cause a

7     witness to testify longer.

8           THE COURT:  I don't think documents would go in

9     there because this is credibility of witnesses, and I will

10    consider your request for the length of the time that a

11    witness has testified.

12          MR. DRATEL:  Also in credibility we have a proposed

13    -- I think it is the pattern instruction for the Fifth

14    Circuit.  Is that correct?

15          MS. DUNCAN:  It is.

16          MR. DRATEL:  Which is accomplice, informer, immunity

17    type instruction.  And I can hand up a copy to the Court.

18          THE COURT:  If you will just give me -- Okay.  That

19    is good.

20          MR. DRATEL:  That should go right after that

21    credibility.

22       In addition, we have -- when you are ready, Your Honor,

23    we have one more on credibility, which Ms. Moreno has the

24    language.

25          MS. DUNCAN:  Your Honor, that is pattern instruction

1.14.

THE COURT:  That you submitted?

MS. DUNCAN:  Yes.  Fifth Circuit pattern.

THE COURT:  Okay.  Good.  That is what I was hoping
I would get.  And this is for Shorbagi?

MR. DRATEL:  Yes.

THE COURT:  We will give --

MS. HOLLANDER:  This is straight from the pattern
instruction.

MS. DUNCAN:  I pulled it right off the website.

MR. JONAS:  Your Honor, I think our concern or my
concern is just there is some benefits in here that are listed
out that are not applicable.  In other words, Mr. Shorbagi has
not been immunized from prosecution or received any benefits
financially either, and that is some of what is set forth
here.  Not so much in the first paragraph or the first
sentence, informer for pay or immunity from punishment.  I
understand the personal advantage in the form of a 5K, but
then later on it specifically talks about or --

MS. HOLLANDER:  I think he has received financial.

MR. JONAS:  There are a lot of ors in there that
just aren't applicable.

MR. DRATEL:  As a technical matter he didn't get
immunity, but he certainly did get a lesser punishment, and I
think that needs to be incorporated in there somewhere.

1          MS. CADEDDU:  He wasn't prosecuted for the other

2     offense.

3          MR. DRATEL:  He wasn't technically immunized, but he

4     certainly did not get punished for a whole separate crime and

5     received a 5K on his sentencing, so I think it is a lesser

6     punishment.

7          MS. HOLLANDER:  He also didn't pay the whole amount.

8          MR. DRATEL:  He hasn't paid any.

9          MR. JONAS:  He hasn't been absolved from that

10    either.

11         MS. MORENO:  I think you can strike "...or

12    vindication."

13         MR. DRATEL:  He is not an informer for pay, but he

14    is a Defendant for lesser punishment or personal advantage.

15         MS. CADEDDU:  Would that also include -- I am sorry.

16         MR. JONAS:  I was just going to say, we don't want

17    to leave with the jury with the impression he received

18    additional benefits because of the instructions that weren't

19    elicited during his testimony.

20         MS. CADEDDU:  There was a benefit, an immigration

21    benefit for his family.

22         MR. WESTFALL:  This is the Fifth Circuit pattern

23    instruction.  Presumptively it is definitely acceptable, and

24    it is the same one that gets used all the time when there is

25    drug cases whether or not they were getting paid for testimony

1  but they got a 5K.

2          MR. JACKS:  Well, the fact that it is a pattern

3  instruction doesn't mean that it goes in in toto.  It just

4  means it is a starting point and you tailor it to the facts of

5  the case.

6          MR. DRATEL:  I think tailoring would be as follows.

7          THE COURT:  I think we need to do that.

8          MR. DRATEL:  Where it says, "Evidence against a

9  defendant," I would take out "...as an informer for pay."  I

10  would take out that whole phrase.  I would take out the "or."

11  I would say "for" but not immunity.  I would say, "...for a

12  reduced punishment or for personal advantage."  And I would

13  take out "...or vindication."  I think that tailors it to that

14  situation.

15          THE COURT:  What is the vindication?

16          MR. DRATEL:  No, I said I would take out the

17  vindication, take out, "...or vindication" and put the comma

18  after "advantage."

19          MS. HOLLANDER:  So it reads, "The testimony of an

20  alleged accomplice and the testimony of one who provides

21  evidence against a defendant for a reduced punishment or for

22  personal advantage, must always be examined."

23          MS. SHAPIRO:  And the bottom half would also be

24  tailored to match the top.

25          MR. DRATEL:  Right.  Benefits the witness has

1    received -- We could just put received, period.  Otherwise it

2    gets complicated.

3                   MR. JONAS:  I think we are okay with that.

4                   MR. DRATEL:  So after "received" would be another

5    period, Your Honor.

6                   THE COURT:  I think I have got it marked the way --

7    I was marking them as you stated that.

8                   MR. DRATEL:  Okay.  Great.  Thank you.

9                   THE COURT:  All right.  Next one?

10                  MR. DRATEL:  Page 6, your Honor, the last sentence.

11                  MS. MORENO:  We are still on --

12                  MR. DRATEL:  That is right.  Ms. Moreno has one on

13   page 5.

14                  THE COURT:  So on the title it says "Accomplice,

15   informer, immunity."

16                  MR. JONAS:  I think just "accomplice."

17                  MR. DRATEL:  Accomplice.  He is not an informer

18   technically.

19                  MS. SHAPIRO:  And not immunity.

20                  THE COURT:  He is technically not an accomplice.

21   Not in this charge he is not accomplice.

22                  MS. MORENO:  Rat.

23                  MS. CADEDDU:  The snitch charge.

24                  MR. JONAS:  How about person who decided to come

25   forward and do the right thing.

1          MS. CADEDDU:  Cooperating witness.

2          MS. DUNCAN:  Mr. Westfall has another suggested

3    change.

4          MR. WESTFALL:  Going along those same lines, perhaps

5    we need to get rid of, "The testimony of an alleged accomplice

6    and," then just capitalize the T.  "The testimony of one who

7    provides evidence against a defendant for a reduced

8    punishment.

9          MR. JACKS:  I believe he is an accomplice.  He is a

10   participant in the scheme, and that is the only reason it is

11   in there.

12         THE COURT:  In a broader --

13         MR. JACKS:  Yes.

14         THE COURT:  Otherwise it wouldn't -- he would just

15   be another witness.

16         THE COURT:  No, because you can have is someone that

17   is charged with a separate crime that they are not accomplice

18   to this crime, but yet they are testifying in this crime

19   because of benefits that you are hoping to get.  You do this

20   all the time.

21         MR. JONAS:  Except in the crime he pled guilty to

22   was --

23         MR. DRATEL:  It did not mention Holy Land.

24         THE COURT:  It is the same charge, but it is still

25   different than these particular allegations in this

1    indictment.  You didn't charge him with these transactions.

2            MR. JONAS:  Not with these transactions.

3            THE COURT:  Just because it is similar I don't think

4    that makes him an accomplice.

5            MR. DRATEL:  There is no mention of Holy Land in his

6    information.

7            THE COURT:  Well, we may be getting bogged down in

8    something that we don't need to.

9            MR. JACKS:  Well, I believe that is what he is.  I

10   mean, he is an accomplice within the scheme to carry out the

11   support for Hamas.

12           MS. MORENO:  Why don't we just put it at the end of

13   credibility of witnesses, and we don't have to call it

14   anything with a title, Your Honor, and just add it to --

15           THE COURT:  So you don't want to leave out "The

16   testimony of an alleged accomplice."  The way we have it now

17   would be, "...the testimony of a person who provides

18   evidence," or "...of one."

19           MR. WESTFALL:  Or "...the testimony of one who

20   provides evidence."

21           MS. SHAPIRO:  Except a lot of people who provided

22   evidence.

23           THE COURT:  But not for a reduced sentence.

24           MR. WESTFALL:  That would have been nice to know

25   that.

1                MR. JONAS:  I defer to Mr. Jacks.

2                MR. JACKS:  I believe it should be "...an

3    accomplice."

4                THE COURT:  What is your basis for thinking he is an

5    accomplice?

6                MR. JACKS:  He was in the conspiracy with them to

7    support Hamas, by his own testimony.

8                THE COURT:  With these Defendants?

9                MR. JACKS:  Yes.

10               MR. WESTFALL:  But what he pled guilty to was

11   supporting Hamas through his dad.  He wasn't charged with Holy

12   Land.  He didn't plead guilty to Holy Land.

13               MR. JACKS:  I was just told that, you know, what if

14   somebody is getting a benefit for another case, but he is, you

15   know, and by his testimony he is involved in this conspiracy.

16               THE COURT:  The fact he was charged or convicted of

17   something else, you are saying based on the evidence he is an

18   accomplice.

19               MR. MYSLIWIEC:  Where has the Government alleged he

20   is an accomplice?

21               MR. JACKS:  Through his testimony.  I mean, it is --

22   Whether we allege it or not, I think it is apparent that that

23   is --

24               MR. JONAS:  Where would we allege it?  In the

25   indictment?

1          MR. MYSLIWIEC:  Anywhere.

2          MR. JONAS:  It is his testimony.

3          MR. JACKS:  I think he is listed in the unindicted

4   co-conspirator's list.

5          THE COURT:  All right.  We will make a decision on

6   that one.

7          MR. DRATEL:  Ms. Moreno has also a credibility --

8          MS. MORENO:  Again in the credibility of witnesses,

9   Your Honor, with respect to Avi and Major Lior, we would

10  propose an instruction that reads, "There are two witnesses

11  who testified under assumed names--Avi and Major Lior.  You

12  can consider that fact in your evaluation of their

13  credibility."

14         MR. JONAS:  We would object to that, because the

15  assumed names has to do with security issues, and I think that

16  is not their credibility.  It is security.

17         MS. SHAPIRO:  They had an opportunity to cross

18  examination --

19         MS. MORENO:  That is your argument.  That is not our

20  argument.

21         MR. JONAS:  You are testifying that they testified

22  under assumed names, that it goes to their credibility; that

23  the reason they are testifying under assumed names and not

24  because it is a law in Israel?  I mean, it is an improper --

25         MS. SHAPIRO:  It is a stipulation.

1           MR. JONAS:  It is an improper charge.  It sends the

2    wrong message.

3           MS. MORENO:  Well, we could say, "There are two

4    witnesses who testified under assumed names--Avi and Major

5    Lior.  You may consider the fact that their anonymity, the

6    Defense does not know their real names and, thus, cannot

7    independently investigate their backgrounds, and in your

8    evaluation you can consider that in their credibility," or

9    something like that.

10          I believe it is proper, Your Honor.  I believe it is

11   proper for the Defense to argue to the jury the fact that

12   these witnesses were anonymous.  We don't have to subscribe to

13   their position that it is a security issue for Israel.  That

14   is what they say.  We understand that.  But the fact that we

15   could not corroborate what they said about their backgrounds

16   is an issue for us.  We are entitled to argue that to the

17   jury.

18          MS. CADEDDU:  Can I make one additional point?

19   Whether they are testifying anonymously pursuant to Israeli

20   law also is not -- The fact of the matter is their anonymity

21   shields them.  They can say whatever they want.  We have no

22   way to verify it.

23          So even if the reason is security, it still impedes our

24   ability to verify and test their credibility through cross

25   examination, and so the fact that they are shielded from

1    testing by their anonymity is something that is important to

2    us.

3            MR. JONAS:  There is a difference between arguing to

4    the jury and what the court instructs the jury, and that is

5    the problem here.

6            MS. SHAPIRO:  I would also add that we had a CIPA

7    conference about this, and as a result of that conference the

8    Defense provided us with a list of questions that they wanted

9    to cross examine these witnesses about and asked whether they

10   would be a problem, whether it would elicit classified

11   information.

12       We provided full responses to that and were informed that

13   there were no issues.  They did not cross examine on that list

14   of questions, a great number of them.  So what they did is put

15   us through this exercise and then they didn't cross examine,

16   and now they want to come out and put an instruction in that

17   somehow that makes them less credible.

18           MS. MORENO:  In fact, Your Honor, if you recall in

19   my recross of Avi I started to go back into the fact that he

20   was testifying anonymously, and Your Honor said, "Ms. Moreno,

21   we have already done that."  It is an issue for us, and I

22   believe we are entitled.

23       And Ms. Cadeddu is absolutely right.  It is not -- We are

24   not contesting that Israel has this security law that is

25   mandating that they testify anonymously.  What we are saying

1    is because we can't find out who they are and we can't

2    challenge what they tell the jury on the stand, that is a

3    factor --

4              THE COURT:  I understand that.  But what about their

5    position that you can argue that to the jury but it shouldn't

6    be in the instructions.

7              MS. MORENO:  I think the evidence supports it.

8              MR. DRATEL:  Also I think Ms. Shapiro's last

9    comments actually proves the point, which is that if I have a

10   list of questions that I may ask a witness on cross

11   examination, I am not going to give him a free ride if I can't

12   investigate whether it is true or not.  I am not going to let

13   him just say what it is and just ask an open-ended question

14   "Have you done this?  Have you done that?"  When I haven't had

15   a chance to investigate.  And that is what we have been

16   deprived of the opportunity to determine whether those -- So I

17   have to forego a lot of those questions that I might otherwise

18   be able to ask if I can in fact investigate the background of

19   a witness.

20             MS. SHAPIRO:  Your Honor, they had a list of

21   questions about where did he go to school and all kinds of

22   things that that they never asked him.

23             MR. DRATEL:  That is my point.  He got a free ride.

24   He can say anything, and I can't do anything about that, so I

25   am not going to ask a question like that.

1          THE COURT:  So what was the purpose of setting out

2     those questions?

3          MS. SHAPIRO:  The purpose was whether they wanted to

4     question him about all of these subjects and they wanted to

5     know whether it would elicit classified information.  We told

6     them no, you can ask all these questions.

7          THE COURT:  I don't know that that answers the

8     question, because even if had he said whatever he said, the

9     point is they couldn't really challenge it.

10          MR. JONAS:  Your Honor, these witnesses were under

11     oath, and there is a presumption that they are telling the

12     truth, and it is for the jury to decide, it is not for the

13     Defense counsel to decide --

14          THE COURT:  It is not a matter of them deciding.  It

15     is a matter of arguing it and throwing it out there for the

16     jury.  The jury is the one that will decide credibility

17     ultimately.

18          MR. JONAS:  We are not saying they can't argue, but

19     there is difference when Your Honor makes it a part of the

20     charge.

21          MR. DRATEL:  I don't believe there is a presumption

22     that any witness is telling the truth.

23          THE COURT:  I think certainly that is correct.

24          MS. MORENO:  I have a compromise.  We could begin

25     this particular paragraph by saying, "Two witnesses, Avi and

1    Major Lior, in this case testified pursuant to" -- and the

2    Government can put some language about this Israeli law

3    regarding security.  Then we want our sentence that says, "You

4    can consider the fact that they testified under assumed names

5    in your evaluation of their credibility."  Because we are

6    going to argue that, and we have a right to argue that.

7              THE COURT:  They are not saying you don't have the

8    right to argue it --

9              MS. MORENO:  And we also believe because Mr. Dratel

10   did cross Avi about his credibility.  That was a big part I

11   think of the whole Defense team's cross examination.  And

12   because of the answers that were elicited we believe that

13   gives rise to a jury instruction.

14             MR. DRATEL:  And also, Your Honor, I think with

15   respect to the propriety of an instruction and the need for an

16   instruction in this case is the extraordinary nature of it,

17   because I don't think we have ever had in a United States

18   court an expert testify anonymously, and so I think that it

19   does merit an instruction.

20             MS. SHAPIRO:  Major Lior was not an instruction.

21   Avi was.

22             MR. JACKS:  I have an issue with them even arguing

23   about the their inability to find documents or whatever.  That

24   is a discovery issue.  And in essence it is them testifying in

25   terms of they are bringing in issues in which they, the

1    lawyers, are witnesses, and that they are talking about what

2    they were able to do, not able to do.  And so they are putting

3    themselves in the position of being a witness to this

4    difficulty.  And I have an issue and I don't believe it is

5    proper to talk about that in terms of, you know, what is

6    essentially a discovery issue, because they have injected

7    themselves into the case as witnesses now as opposed to just

8    lawyers for a party.

9         So to sit there and argue to the jury that we couldn't go

10   look for documents that he --

11              THE COURT:  Actually he was cross examined on some

12   of that, wasn't he?

13              MR. JACKS:  That still doesn't make it right.  I

14   mean, I still think that that was something that, you know,

15   that that was something that he was arguing about a discovery

16   issue.  And I am not sure -- I would have to go back and look

17   and see what Avi's answer was.  I want to separate what his

18   question was versus what Avi's answer was.  And, you know, I

19   am not sure if his answer was, "Well, I am not aware," or "I

20   don't know," or if it was equivocal.

21              THE COURT:  I think with respect to some of it we

22   have to take your word for it, we asked you this and take your

23   word for it, I think he acknowledged that that was true.

24   There was no way that they could go back and check that out.

25              MS. SHAPIRO:  I don't know if they intend to, but

1   with respect to whether they had access to the full volume of

2   Defensive Shield materials, that would be clearly improper, we

3   think, because they could have had access if they had years

4   ago done a letters rogatory and had enough time to do that

5   process.

6           THE COURT:  We aren't going to get into that because

7   that is a discovery issue and it is a different issue.  That

8   is separate.  But this is a different issue.  We may need to

9   look, but I think some of that was brought out.  In fact, he

10  cross examined him at length.  That is why I didn't let you go

11  into it anymore, because you spent your first 30 or 45 minutes

12  on that, and I said that was enough.  We have already gone

13  through that.

14      But he did elicit some information on that.  And I

15  struggled with it at the time.  I don't think you objected.  I

16  struggled with whether that was proper, but it is a valid area

17  of concern, I mean, because of case law that is out there.

18  That is why we don't normally let people testify anonymously.

19  There is a reason for that, and so it is open and everybody

20  gets a chance to do their investigations, you of their

21  witnesses and they of your witnesses.

22      There was a reason here why we let him do it, but I don't

23  know how that plays overall, then, into whether that

24  forecloses their ability to at least question that.  Because

25  part of the deal here is Lior is a little different because he

1    was a custodial witness in essence.  He just brought in the

2    documents.  I don't know that there is anything really in

3    issue there.  But you chose to bring in this expert witness.

4    That was your choice.

5              MR. JACKS:  I understand.

6              THE COURT:  And so you chose to bring in an expert

7    witness that couldn't use his name, and so once you make that

8    decision I don't know that you can then hide behind that or

9    shield that Israeli law as a shield and say, "Well, they don't

10   let us use his real name, so tough luck."

11             MR. JACKS:  I understand that.  I just think that

12   there needs to be -- My concern was when it started getting

13   into discovery matters, you know -- I am not saying that they

14   can't comment on the fact that, you know, he testified under a

15   different name.  I think where you go past that and where you

16   talk about -- you start getting into matters that are really

17   kind of personal matters, personal in the sense that the

18   lawyers themselves are actually injecting themselves as far as

19   what they did or couldn't do, and the discovery efforts and

20   that kind of thing.

21             THE COURT:  The discovery I agree with you.

22   Discovery is never for the jury.  Those issues are resolved

23   before and outside the presence of the jury, and the jury

24   deals with what is before them; not with what I should have

25   had, the Judge didn't let me, that is all improper for the

1    jury.  We never get into that.  But this is a little

2    different.

3            MR. JACKS:  I understand.  And I am not sure if I

4    heard correctly what Ms. Moreno said about that they testified

5    under whatever it is, an assumed name or whatever, and you can

6    consider that in evaluating their credibility.

7            MS. MORENO:  Right.

8            MR. JACKS:  Just that statement alone, you know,

9    that is probably proper.  But then the argument part I have

10   is, you know, what do you do with that when you get up there

11   and how do you flesh that out in terms of "And this is why you

12   should give them less credibility, because yada, yada, yada."

13           MR. JONAS:  Your Honor, the first thing is we don't

14   think there should be an instruction.  The second thing is if

15   there is an instruction, the instruction should say why they

16   were testifying --

17           THE COURT:  That is in evidence as well, so we can

18   do that.  I think she agreed to that.

19           MS. MORENO:  I proposed that.  So this would be my

20   suggestion, and I will give this Your Honor, that it should

21   read something like this:  "There were two witnesses in this

22   case who testified under assumed names--Avi and Major Lior."

23   If you could give us a sentence about what you would like.

24           MS. SHAPIRO:  But I would also object to putting

25   Major Lior in there because he is a fact witness.  It is not

1    unprecedented to have a fact witness testify under an assumed

2    name.  And he was a custodial witness which we didn't really

3    need to bring once the Judge made the ruling that he was

4    adopting the prior ruling.  So I think that is highlighting

5    something that is improper.

6          MS. MORENO:  Okay.  So we would ask to have both Avi

7    and Major Lior in there, and then whatever they would like to

8    put about the Israeli law regarding security, a sentence

9    there, and then the next sentence would be, "You can consider

10    the fact that they testified under assumed names in your

11    evaluation of their credibility."  And that is all.

12      And we are entitled to argue credibility to the jury, and

13    we believe the evidence before the jury is sufficient to

14    warrant this particular instruction.

15          THE COURT:  Any other thoughts on that, then?

16          MR. JONAS:  No, just what we have said.

17          THE COURT:  I think you have said it.  Let me give

18    that some thought, again, and we will get back with you this

19    afternoon.

20      I think there is a concern about putting Major Lior in

21    there, but both of them testified that way.  It might be a

22    little more odd if you just leave one out when the jury is

23    going to know that two of them testified to that.

24          MS. SHAPIRO:  We can put "...testified as an expert

25    witness."

1          THE COURT:  That is a thought.  Because Lior, I

2    mean, he was a custodial witness.  The only issues there I

3    know for counsel was what did he take, what did he leave, but

4    I don't know that any of that is before the jury.

5          MS. MORENO:  I may have to talk with everybody else,

6    but I think I would be fine --

7          THE COURT:  With just identifying Avi as an expert

8    witness?  Just think about that and then let Jennifer know.

9    We will give this some thought in terms of whether it gets in

10   or not.

11         MS. MORENO:  We can do that as soon as we leave

12   here.

13         MR. DRATEL:  Page six, Your Honor, the last

14   sentence, "I remind you that a Defendant has the right not to

15   testify."  Now, I know that subsequently you have the fuller

16   explanation of drawing no inference.  I just think that is

17   such an important issue that that language should also be

18   incorporated here about that you are to draw no inference from

19   that fact.

20         THE COURT:  This is our standard instruction.  They

21   get that later on.  I don't know that we need to do that.

22   Actually this is a little different, because we are reminding

23   them before we are giving them the instruction.  You would

24   think it would go the other way.  Maybe we will flip them

25   around or something.  That way they are just reminded.  They

1    have been given the instruction.  That is the intent is to

2    remind them.

3                MR. DRATEL:  Page 8, "Evidence admitted for a

4    limited purpose," I think I also speak for Mr. Abu Baker as

5    well in the sense that we don't think the Court should marshal

6    -- I guess Mr. Abdulqader as well.  We don't think you should

7    not marshal the specific statements in the sense of that part,

8    but just say --

9                THE COURT:  Just give a general instruction?

10               MR. DRATEL:  Yes.  Because it also includes

11   depositions and other things with respect to Mr. El-Mezain.

12               THE COURT:  What about that?  I understand your

13   argument.  What about that?

14               MR. JONAS:  I guess I am confused as to what the

15   language, what the objection would be.

16               MR. DRATEL:  It would be, "Certain statements of the

17   Defendants in this case may be considered only in connection

18   with the charges against the Defendant who made the statement.

19   Those statements include Mr. El-Mezain's interview by Federal

20   Bureau of Investigation, his deposition, Mr. Baker's

21   declaration, his deposition, Mr. Abdulqader's statements and

22   interviews with the FBI."

23               MR. JACKS:  The problem is that then they could be

24   left with the impression that the false statements he made

25   could only be used against him when you don't break it out.

1          MR. DRATEL:  That is true.  His false statements can

2   only be used against him.

3          MR. JACKS:  No, they can't.  They can also be used

4   as co-conspirator statements.

5          MR. DRATEL:  Not a custodial statement.  Not his

6   deposition or his statement to the FBI.

7          MR. JACKS:  In furtherance of the conspiracy, if he

8   lied --

9          MR. DRATEL:  It is a custodial statement that we

10  don't have a chance to cross examine.  Not custodial.

11  Testimonial statement.

12          THE COURT:  Rather than custodial.

13          MR. DRATEL:  I am sorry.  I used the wrong word.

14  Testimonial, which gets us into *Crawford*.  That is exactly why

15  it is only admissible against that defendant.

16          MR. JACKS:  And it is a co-conspirator statement,

17  which is not --

18          THE COURT:  That is an exception.

19          MS. HOLLANDER:  How can they be co-conspirator?

20          MR. JACKS:  Lied to conceal the conspiracy.

21          MS. CADEDDU:  I propose this maybe as an

22  alternative.  We could do, "Certain statements of the

23  Defendants may be considered only in connection with the

24  charges who made the statement," and then get rid of all the

25  specific statements.

1        MR. JONAS:  The question becomes the jury has no

2   direction as to which statements they can consider against

3   only the Defendant and which ones aren't.  Part of the problem

4   is there has been a lot of the statements of the Defendants

5   made during the course of the time frame in issue here, not

6   just these depositions or post-2001 statements.  You know,

7   there is phone calls and --

8        THE COURT:  That is why --

9        MR. DRATEL:  That is why I identified the

10  statements.

11       THE COURT:  One as a time.

12       MR. JONAS:  I think I have an issue with you just

13  cutting it off --

14       MR. DRATEL:  But I think just generically --

15       THE COURT:  More general.  And that still raises

16  this problem that Jim is talking about.

17       MR. DRATEL:  That is for argument.  It is not for

18  the Court in its instructions to delineate for the jury which

19  statements the Government --

20       THE COURT:  It could be misleading is the problem.

21  That is the concern he is having.  If you just leave it to

22  everything in the deposition -- And frankly, I don't know that

23  everything in the deposition -- is there anything in there in

24  the declaration that you were wanting to use as evidence

25  against all of them?

1          MR. JACKS:  Yes.  The false statements, what we

2     submit are the false statements.

3          THE COURT:  And you think those are in furtherance

4     of the conspiracy because they were trying to conceal.

5          MR. JACKS:  Yes.

6          THE COURT:  Of course, if that is true that would be

7     an exception.

8          MS. CADEDDU:  I am fine with Mr. Abdulqader's

9     statements.  If we are not going to cut it off right here, you

10    can leave it like this.

11         THE COURT:  For you --

12         MS. CADEDDU:  That is fine.

13         MR. DRATEL:  I just want to look at one thing, Your

14    Honor.

15         MS. SHAPIRO:  Your Honor, do you mind if I leave?

16         THE COURT:  Not at all.

17         MS. SHAPIRO:  I have some things I have to do, and

18    can leave it to these guys to hammer out.

19         THE COURT:  In fact if we could have about nine or

20    ten lawyers leaving, we could get through this quicker.

21         MS. HOLLANDER:  Some of us have been pretty quiet.

22         MR. DRATEL:  Obviously I would prefer, you know,

23    what we said.  Also just one thing, just a typo in (B) of

24    El-Mezain that "...one of his cousins" in the second line.

25         THE COURT:  Yes.  We appreciate all those.  Point

1    all those out.

2         MR. DRATEL:  That is our objection.

3      We also have with respect to other evidence limit for a

4    limited purpose, I think Ms. Duncan has an instruction on

5    demonstratives that we adopted from last year.  It is a little

6    different than last year simply because some of the

7    demonstrative evidence was different from last year.

8         MS. CADEDDU:  And also because Judge Fish gave it

9    pretty much every time there was a demonstrative, but you had

10    said you wanted to do it at the end.  This was -- Remember,

11    Jennifer, I gave you a copy of one that had been given early

12    in the trial?  This is basically the same thing.

13         THE COURT:  Okay.  That is I think a standard

14    instruction.  Any objection to giving this one?

15         MR. JONAS:  I don't think so.

16         THE COURT:  I think it is pretty standard.

17         MR. DRATEL:  Do we have any others on limited

18    evidence?

19         MS. DUNCAN:  Are we correct that nothing came in

20    under Rule 703; that it was -- You used demonstratives during

21    some of your experts, but I don't think anything came in --

22         MR. JONAS:  No, that is not true.  Government of

23    Israel No. 1, which is the kindergarten videotape admitted

24    through Doctor Levitt I think is 703.

25         MS. MORENO:  That was a demonstrative.

1          MR. JONAS:  It is not a demonstrative.

2          MR. DRATEL:  We will go back and look and see,

3    because 703, it would be limited to the types -- something

4    that the expert relied on as opposed to substantive evidence.

5    So we will fashion an instruction on that that we will get to

6    the Court this afternoon.

7          MR. JACKS:  On this one, Your Honor, I would ask

8    that it be stopped at the phrase, "...but not for any other

9    purpose," because I think that is confusing.  It reads, "These

10   exhibits were admitted for the sole purpose of assisting you,

11   if they did, to understand and evaluate the testimony of

12   various witnesses."

13         MS. MORENO:  No, we object to that.

14         MR. DRATEL:  We object to that because that

15   essentially just eviscerates it, because it is not for any

16   other purpose.  That is why it is a limited purpose.

17         THE COURT:  Okay.  All right.  And I think this is

18   the standard pattern that we give, so I think that is the way

19   to go with this one.  There is no reason to change it here.

20       Going back to these statements, so that is the reason you

21   broke them out --

22         MR. JACKS:  Yes, sir.

23         THE COURT:  Because you are saying these are the

24   statements that are limited, then, to being considered only as

25   to this Defendant?

1          MR. JACKS:  Yes, sir.

2          THE COURT:  That may be the way to go.

3          MS. DUNCAN:  Maybe, Your Honor, have the Government

4    provide us with a consciousness of guilt instruction, because

5    I think that is what you were talking about with the

6    statements you allege are untrue, to revisit this issue with

7    this instruction.

8          MR. JACKS:  If you want me to -- Are you talking

9    about --

10         MR. DRATEL:  Just delineating the statements.  I

11   would object to delineating the statements.

12         MS. DUNCAN:  Not delineating, but just looking at

13   the language --

14         MR. DRATEL:  In conjunction.  In other words, when

15   we get to consciousness of guilt instruction, we see a way to

16   do what we suggested with respect to sort of the

17   non-marshaling while still preserving what the Government

18   needs, if there is a way to harmonize them, we will propose

19   them.  That is what we are talking about.  And obviously the

20   Government can say yes or no or make other modifications, if

21   we can manage that.  I am not saying that we will be able to.

22         MS. DUNCAN:  I am not either.  I think they are sort

23   of related.

24         MR. JACKS:  I want to make sure I understand what

25   you are asking that you want from us.

1        MS. DUNCAN:  Whether -- With this instruction you

2   were saying you were concerned about just listing the

3   statements because you also have this issue about what you

4   considered to be false statements and that you were going to

5   have a separate instruction about consciousness of guilt that

6   certain defendants, that they lied, and that showed evidence

7   of consciousness of guilt.

8        So I think -- What I was just saying is perhaps we should

9   revisit the issue once we have gotten your consciousness of

10   guilt instruction.

11        MR. JACKS:  Okay.

12        THE COURT:  Of some way to not put these specific

13   statements, but yet preserve your concern about some

14   statements can be used for any purpose as co-conspirators.

15        Next?

16        MR. DRATEL:  On page 14 under the aiding and

17   abetting, I would just ask that it just be -- a sentence that

18   aiding and abetting does not apply to conspiracy, because it

19   doesn't necessarily say that here.  It doesn't necessarily

20   distinguish between substantive and conspiracy crimes, and

21   since Mr. El-Mezain is only charged with a conspiracy crime.

22   I think the others are, too--Mr. Odeh and Mr. Abdulqader.

23        MS. CADEDDU:  That is correct.

24        MR. JACKS:  We object.  This is standard.  I think

25   the pattern should be the one that applies.

1          THE COURT:  That is my inclination, because this is

2     the pattern, the one we usually give.  But I will give that

3     some thought.  I will get back to you.

4          MR. DRATEL:  Page 17 on my version, which begins,

5     "The Government need not prove that the alleged conspirators."

6     In that paragraph --

7          MS. HOLLANDER:  It may be on page 16 in some others.

8          MR. DRATEL  But the paragraph reads, "The Government

9     need not prove that the alleged conspirators entered into any

10     formal agreement."  That is the first clause in that

11     paragraph.

12        The third sentence of that paragraph reads, "It is not

13     necessary that any overt act proven by the Government be an

14     overt act alleged in the indictment."  We would ask that that

15     be stricken based on the fact that we think that the Supreme

16     Court has never endorsed that position, and I think there is a

17     split have in the Circuits on that, so we say that that is not

18     a correct statement of the law.

19          THE COURT:  It is a correct statement under Fifth

20     Circuit law.

21          MR. JONAS:  We would object.  We think it is proper.

22          THE COURT:  That is Fifth Circuit law.

23          MR. DRATEL:  Just as long --

24          THE COURT:  You have your objection on the record.

25          MS. CADEDDU:  On behalf of all of us.

1          THE COURT:  Yes, I understand.

2          MR. WESTFALL:  And specifically it lowers the

3     Government's burden of proof dramatically and also, you know,

4     doesn't give fair notice of what is charged.

5          MR. DRATEL:  With respect to Count 1, and this is

6     the end of the discussion of Count 1 at page 18 with the

7     *Pinkerton* instruction, I am not sure where to put it in Count

8     1, but I would leave that up to the Court --

9          THE COURT:  The *Pinkerton*?

10         MR. DRATEL*:  Pinkerton* ends the discussion of Count

11    1.  I am not talking about *Pinkerton.*  We object to the

12    *Pinkerton*, and Ms. Moreno has done that.  But somewhere in

13    Count 1, and like I say, I have ideas where it could go but I

14    would leave it to the Court, I have a proposed collateral

15    estoppel instruction with respect to Mr. El-Mezain.  And I

16    have three proposed versions, any of which I would accept.  I

17    think they all effectively state the law properly, but I have

18    styled them differently because just to give the Court

19    options.  I will read them into the record.

20         MS. MORENO:  I failed to make my complete request on the

21    *Pinkerton* paragraph, Your Honor, on page 18.  If the Court was

22    going to overrule my objection, which Your Honor did, I would

23    then object only to --

24         THE COURT:  We haven't gotten to *Pinkerton* yet?

25    That is with the substantive counts.  That will be next.

1    MR. DRATEL:  It is actually in the conspiracy, at

2  the end --

3    THE COURT:  That is really a separate conspiracy.

4  That is a general conspiracy.  That is a little different than

5  the *Pinkerton*.  That is a general conspiracy charge that you

6  are talking about on page 18.  That is the end of the general

7  conspiracy charge.

8    MR. DRATEL:  There is one thing we object to in that

9  sentence.

10    MS. MORENO:  That is what I am trying to say.

11    MR. DRATEL:  Go ahead.

12    MS. MORENO:  All I am asking, Your Honor, is on the

13  last line where it says "...committed in furtherance of or as

14  a foreseeable consequence of the conspiracy," we would object

15  to the word "or" and it should be an "and", "...and as a

16  foreseeable consequence of the conspiracy."

17    THE COURT:  I think that is probably right.  I think

18  you have to show both.

19    MR. DRATEL:  Your Honor, just for --

20    THE COURT:  That "or" becomes an "and", "...was

21  committed in furtherance of and as a foreseeable consequence

22  of the conspiracy."

23    MR. DRATEL:  If I may just read into the record as

24  slowly and as quickly as possible the collateral estoppel just

25  so we get them in the record.

1        THE COURT:  Go ahead.

2        MR. DRATEL:  First option would read, "With regard

3    to Mr. El-Mezain, you may not consider any conduct by,

4    statements by, or evidence against Mr. El-Mezain from before

5    October 8th, 1997 as proof of his membership in the conspiracy

6    charged in count 1."

7        Option No. 2, "With regard to Mr. El-Mezain, in order to

8    find him guilty on Count 1, you must find beyond a reasonable

9    doubt that he joined the conspiracy charged in that count on

10   or after October 8th, 1997.  If you do not find beyond a

11   reasonable doubt that Mr. El-Mezain joined the conspiracy

12   charged in Count 1 after October 8th, 1997, you must find him

13   not guilty."

14       Option No. 3, "With regard to Mr. El-Mezain, in order to

15   find him guilty on Count 1, you must find sufficient evidence

16   beyond a reasonable doubt that he joined the conspiracy

17   charged in that count on or after October 8th, 1997.  If you

18   do not find beyond a reasonable doubt that there is evidence

19   Mr. El-Mezain joined the conspiracy charged in Count 1 on or

20   after October 8th, 1997, you must find him not guilty."

21       MR. JONAS:  We object, but I will let Mr. Jacks --

22       MR. JACKS:  As to the first --

23       THE COURT:  No. 1 is out.  I have let those

24   statements in, and I think they are in as to everybody,

25   because it goes, of course, to state of mind and intent.  So

1    No. 1 is out.

2        What about No. 2 and 3?

3            MR. JACKS:  It overlooks the fact that it could be a

4    straddle conspiracy; that he is in the conspiracy and then

5    October 8th, 1997 comes and now it is a crime.  So it

6    eliminates that.  He doesn't have to have joined it after

7    October 8.  He could have been in it before and he could have

8    continued in it, so in essence as soon as October 8th, 1997

9    gets here then he is guilty of a crime.  So it misstates the

10   law in terms of when a person has to have joined a conspiracy.

11           MR. DRATEL:  Your Honor, there are two things about

12   that.  One is that there is no conspiracy before October 8th,

13   1997 on Count 1.  It is not a crime at all.  The point being

14   that there is another conspiracy that exists between '95 and

15   '97 that he has been acquitted of.  The jury has already --

16   the previous jury already found, and this is what collateral

17   estoppel, what the principle means in this sense, is that the

18   jury has already found that he was not a co-conspirator during

19   that period from '95 to '97.

20           THE COURT:  I disagree that the jury found that.  I

21   know that is your argument, but I disagree that they found

22   that.  They didn't necessarily have to find that.

23           MR. DRATEL:  But in the only conspiracy charged they

24   found him not guilty.

25           THE COURT:  But that doesn't mean that they didn't

1    find there was a conspiracy.  They could have found, as we

2    explained, that he didn't willfully join.  They didn't have to

3    find that there was no conspiracy.

4              MR. DRATEL:  That is what I am saying.  The language

5    says "...join the conspiracy."  There is no conspiracy on

6    Count 1 before October 8th, 1997 as a matter of law.

7              THE COURT:  Except for what he is talking about,

8    that they could have been in agreement and then they continued

9    it after this particular agreement to fund Hamas as charged in

10   Count 1.  That agreement could have been in place before, and

11   then once the law was passed they continued it.  That is the?

12   Point you are making.

13             MR. JACKS:  Yes.

14             MR. DRATEL:  But they have already acquitted him of

15   an agreement to fund Hamas.

16             THE COURT:  A different conspiracy that had

17   different elements and different facts that go into that.  I

18   disagree.  You have been stating all trial that they acquitted

19   found he was not a member of a conspiracy.  That is not true.

20   They didn't necessarily have to find that.  That is the test

21   for both double jeopardy and collateral estoppel.  They had to

22   necessarily find that, and you can't get there.  I know that

23   is your argument, but I don't think you can get there.

24             MR. DRATEL:  I also think that there has to be some

25   way to incorporate --

1          THE COURT:  I will give it some thought.  I know

2     what you are getting at, and certainly I understand the issues

3     there, and I will get back with you on that.

4          MR. JONAS:  Your Honor, just generally I think your

5     charge on conspiracy pretty much covers it.

6          THE COURT:  It does.  I think it does, but I am

7     going to go back and look at this.  I think generally it does

8     cover it, because that would apply to everybody that is

9     charged with that conspiracy; that they have to have joined

10    the conspiracy or been in it as of the date that it became a

11    crime.  That is to every Defendant charged.  I know you have

12    special issues, in your view, but I will look at that.

13         MR. DRATEL:  Thank you, Your Honor.

14         THE COURT:  The next one?

15         MR. DRATEL:  Also with respect to -- I guess this

16    includes Count 1, but also includes Counts 2 through 10,

17    Ms. Moreno has part of the intent instruction, or do I have

18    that?  I have that, I think.  I am sorry.  We would ask with

19    respect to and this is -- It is in the -- I just want to make

20    sure I am putting it in the right place, because it does get

21    confusing between the substantive counts.  This is for

22    counts -- This is the substantive 2339(B) counts, the 2

23    through 10, for the fifth element, which is on page -- I have

24    it on page --

25         MS. HOLLANDER:  Page 26 is where mine starts.

1    MR. DRATEL:  I guess you only have three elements

2    here.  But we would ask as part of the second element, and

3    this is based on -- I will give you the citation.  It is based

4    on the Court's charge and decision in *United States v.*

5    *Al-Arian*, A-L  A-R-I-A-N, 308 F.Supp.2d, 1322, Middle District

6    of Florida, 2004.  And the sentence that we would like added

7    to I guess the second element would be -- it can go either in

8    the first or second element, I guess.  This is the part I will

9    quote now:  "That the Defendant you are considering with

10   respect to a particular count had the specific intent that the

11   material support he was conspiring to provide would be used to

12   further the illegal activities of Hamas."  And that is our

13   request.

14           MR. JONAS:  Your Honor, this issue was briefed last

15   year and Judge Fish declined to give this.  Congress changed

16   the law to be clear in response to the *Al-Arian* instruction.

17           THE COURT:  Okay.

18           MR. JACKS:  I am not aware of any other Court that

19   has proposed that requirement either.

20           MR. JONAS:  We litigated this in the *InfoCom* case

21   which was before Judge Lindsay and he wouldn't give it, Judge

22   Fish wouldn't give it.  Congress responded by changing the law

23   to be clear on it.  This is not an element that has to be

24   proven by the Government, and we strongly, strongly urge the

25   Court to not give this.

1          THE COURT:  We will take a look at that.

2          MR. JONAS:  You know how those Middle District of

3    Florida people are?

4          THE COURT:  That wasn't your case, was it?

5          MS. MORENO:  It certainly was, Your Honor.  It is my

6    instruction.

7          MR. JONAS:  I want to congratulate you.  Because of

8    you Congress as a body got together.

9          MS. MORENO:  It won't be the last time.

10         MR. DRATEL:  Page 27, we have already covered the

11   additional names that were in that block.  It was the

12   inclusion of the additional names and the quote from the

13   indictment.

14         MS. MORENO:  We discussed the CFR issues.

15         MR. DRATEL:  Right.

16      Page 31 of my version, which is the beginning of Count

17   11, there is another reference to the indictment that includes

18   Mr. El-Mezain in that block paragraph, so we need to --

19         THE COURT:  He is only in Count 1.  Right?

20         MS. CADEDDU:  Would you take out Mr. Abdulqader?

21         MR. WESTFALL:  If you wouldn't mind taking Odeh out,

22   too.

23         MS. HOLLANDER:  My client, take him out, too.

24         MR. DRATEL:  Let me just move on.  Let me see where

25   my next -- We did that to 12 through 21.

1          MR. DRATEL:  Now we have page 36, it is -- when you

2     are defining the elements of Counts 12 through 21, you have a

3     first and a second, and on the second you have an "or", which

4     has "that the Defendant in question was an officer, director,

5     or agent of the Holy Land Foundation, and knowingly

6     participated and that corporation's willful contribution or

7     attempted contribution of the support listed in the count

8     under consideration to the entity identified in that count."

9          We believe that that is not a correct statement because

10    it really undercuts the whole knowingly.  It makes them liable

11    for corporate conduct without their knowing.  It takes out the

12    knowingly and sort of makes it almost a corporate liability in

13    almost a civil sense, and we don't think that that is

14    appropriate.

15         MS. MORENO:  It reduces the mens rea element, Your

16    Honor.

17         MR. JACKS:  It says willfully.

18         MR. DRATEL:  It says knowingly participated, and the

19    corporation's willful contribution.  So we think that that

20    undermines the mens rea.

21         THE COURT:  You have got willfully in the first part

22    of that, but then when it drops to the "or", you are talking

23    about the Holy Land it only says knowingly.

24         MR. JACKS:  It says, "...knowingly participated in

25    the corporation's," so the willful part is picked up there.

1    So I think it is covered.

2              MS. MORENO:  We object to the "or" there, Your

3    Honor.

4              THE COURT:  I think the "or" is proper.  And I think

5    you are right, Jim.  I think once that corporation's willful

6    contribution, that is what it is talking about in that first

7    clause of that sentence.

8              MR. DRATEL:  But it should be the individual's

9    knowing and willful.  The individual has to be knowingly and

10   willful, not the corporation's willfulness.  I mean, if an

11   individual knows that the corporation he is in is breaking the

12   law, he is still not liable unless he is an actor, unless he

13   is willful.

14             THE COURT:  Any thoughts on that?

15             MR. JACKS:  I disagree.  It says, "The Defendant

16   under consideration willfully contributed," and then "...or

17   that the Defendant" --

18             THE COURT:  Well, but if you look at that first

19   phrase, the Defendant had to willfully be involved.  How are

20   you going to drop that to knowingly?  That is the Defendants'

21   involvement.  In here you are saying, well, that is the

22   corporation is willful, but the Defendant now has dropped from

23   willfully to knowingly.  I think that is the concern.

24             MR. JONAS:  So if it said --

25             THE COURT:  "...willfully participated in the

1    corporation's willful contribution.  Or "...knowingly and

2    willfully" or "knowingly"?

3              MR. DRATEL:  "Knowingly and willfully."

4              THE COURT:  You have to put "willfully" in there.

5              MR. JONAS:  That is fine; "knowingly and willfully."

6              MS. HOLLANDER:  How does it read now?

7              MR. DRATEL:  "...or that the Defendant in question

8    was an officer, director, or agent of the Holy Land

9    Foundation, and knowingly and willfully participated."

10             THE COURT:  I think that is right.  Because you are

11   talking about knowing participation.  I will look at that some

12   more.

13             MR. DRATEL:  And I think the last one I have got is

14   just to make sure that on page 39 when we talk about Counts 22

15   through 32 we also eliminated the additional Defendants who

16   were mentioned in that block quote from the indictment.  I

17   don't know if we went through them all before, but that is

18   another one.  It is Mr. El-Mezain, Mr. Abdulqader, and

19   Mr. Odeh.

20             THE COURT:  Correct.  All right.  Those changes are

21   made.

22             MS. MORENO:  That is it for us, Your Honor, I

23   believe.

24             THE COURT:  That is it.  Okay.

25         Where did we have that corporate?  Page 20.  Because that

1    is -- No, this is a different --

2            MR. DRATEL:  The corporation is separately charged

3    as a Defendant.

4            THE COURT:  I am still going back to that issue.

5            MR. DRATEL:  I think it is another reason to put the

6    knowingly in there, because if they find the corporation

7    guilty, and the Defendant knew about it, then the Defendant

8    would be guilty without a proper mens rea standard.

9            MR. WESTFALL:  Did you mean put the willfully --

10           MR. DRATEL:  I apologize.  Put the willfully in

11   there.  You guys agreed to that?

12           THE COURT:  That is the way I have it.  I will take

13   another look, but I think you are right.  I will take another

14   look.  It is a little different, but I don't know that you can

15   get away from that willfully there.  And of course we have to

16   get the mens rea right.

17      Anything else?

18           MS. MORENO:  Not from us.

19           MR. JONAS:  I just have one question, if Your Honor

20   has considered the time amounts for the closing.

21           THE COURT:  Yes.  I am glad you brought that up.  I

22   think six hours is too long.  You were asking for six.  Right?

23           MR. JONAS:  Collectively, and six for them.

24           THE COURT:  I will go five hours.  I think four

25   hours is sufficient, frankly.

1          MR. JONAS:  There is a lot to say.

2          THE COURT:  I know there is a lot to say, but the

3   jury has heard it repeatedly for seven or eight weeks.  But I

4   will give you five hours.  And so you are going to divvy up

5   your five hours.

6       Now, do you know the order that you are going?

7          MS. HOLLANDER:  We know --

8          THE COURT:  You can let me know Monday.  Just let me

9   know so I know who to call next.  And then you will divvy up

10  your time.  And do you want to keep your time or do you want

11  us to warn you at a certain point?

12          MS. CADEDDU:  What is the division going to be?

13          MR. JONAS:  As to how much time?

14          MR. JACKS:  We are going to fight about that.

15          MR. DRATEL:  It shouldn't be like one and four.

16          THE COURT:  Yesterday they had it four and two.

17  They know you have to make a full opening.

18       We can get off the record now.  We don't need this.

19          (Discussion held of the record.)

20       Anything else?

21       Thank you.  We will get this back to you this afternoon.

22                  (End of day.)

23

24

25

1        I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25