```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
 2                         DALLAS DIVISION

 3   UNITED STATES OF AMERICA      )  CAUSE NO. 3:04-CR-240-P
                                   (
 4   vs.                           )
                                   (  MAY 27, 2009
 5                                 )  DALLAS, TEXAS
     SHUKRI ABU BAKER              (  9:00 A.M.
 6
     _____
 7

 8

 9   _____

10                           SENTENCING

11

12            BEFORE THE HONORABLE JORGE A. SOLIS
                  UNITED STATES DISTRICT JUDGE

13   _____

14


15              A P P E A R A N C E S

16

17

18        FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                                1100 COMMERCE, 3RD FLOOR
19                              DALLAS, TEXAS  75242
                                BY:  MR. JIM JACKS
20                                   MR. BARRY JONAS
                                     MS. ELIZABETH SHAPIRO
21                                   MR. WALT JUNKER

22        FOR THE DEFENDANT:    FREEDMAN, BOYD, HOLLANDER,
          (SHUKRI ABU BAKER)    GOLDBERG & IVES, P.A.
23                              20 FIRST PLAZA, SUITE 700
                                ALBUQUERQUE, NEW MEXICO 87102
24                              BY:  MS. NANCY HOLLANDER
                                     MS. TERESA DUNCAN
25
```

1           THE COURT:  Good morning, counsel.  We are ready to

2   proceed.

3       I am going to call these cases, and we will start with

4   the individual defendants first, so we will start with  Mr.

5   Baker.

6       So Mr. Jacks, is the Government ready to proceed on this

7   case?

8           MR. JACKS:  Yes, Your Honor.

9           THE COURT:  And Ms. Hollander, are you ready to

10  proceed?

11          MS. HOLLANDER:  Yes, Your Honor.

12          THE COURT:  Ms. Hollander, if you and Ms. Duncan and

13  Mr. Baker would come on up to the podium, I will address him

14  from there.

15          MS. HOLLANDER:  Yes, sir.

16          THE COURT:  Any matters that we need to address,

17  Ms. Hollander, before we proceed with the sentencing hearing?

18          MS. HOLLANDER:  We just need to get our paper up

19  here.

20          THE COURT:  Sure.  Take your time.

21          MS. HOLLANDER:  I don't think that there are any

22  matters, Your Honor.  Ms. Duncan is going to address the

23  Guidelines and the objections.  I am going to address the

24  sentencing issues.

25          THE COURT:  Ms. Hollander, Ms. Duncan, have you

1  heard from the Probation Office this morning?  They were

2  preparing a new Guideline calculation.  Has anybody heard from

3  them this morning?

4          MS. DUNCAN:  We haven't, Your Honor.

5          THE COURT:  All right.  I think they are supposed to

6  be on the way up here.

7      Let's go ahead and proceed with the hearing.

8      You are Shukri Abu Baker?

9          THE DEFENDANT:  Yes, sir.

10         THE COURT:  Mr. Baker, you were here in Court last

11 fall, we had a trial by a jury and you were convicted by a

12 jury on November the 24th, 2008 on multiple counts--Count 1,

13 conspiring to provide material support to a foreign terrorist

14 organization; and then Counts 9 through 10, providing material

15 support to a foreign terrorist organization; Count 11,

16 conspiring to provide funds, goods, and services to a

17 specially designated terrorist; Counts 12 through 21,

18 providing funds, goods, and services to a specially designated

19 terrorist; Count 22, conspiracy to commit money laundering;

20 Counts 23 through 32, money laundering counts; Count 34, the

21 filing false returns of an exempt organization.

22     We are now here on a sentencing hearing based on the

23 jury's conviction on those counts.  And the Probation Office

24 has prepared a presentence report and then an addendum to the

25 presentence report, and they have now prepared second addendum

1    to the presentence report.  If you will hand those out.

2        Counsel, I will give you a chance to look at those.  I

3    have not had a chance to look at them either.

4            MS. DUNCAN:  Your Honor, may I take a minute?

5            THE COURT:  Sure.  Take your time.

6                    (Pause in proceedings.)

7            THE COURT:  Mr. Baker, if you would come back up to

8    the podium.  I think we left off -- The Probation Office has

9    prepared a presentence report and then an addendum to that

10   presentence report based on some objections that were filed by

11   your attorneys, and they have now prepared a second addendum

12   that was just given to counsel this morning in response to

13   some of the objections filed by your attorneys.

14       Have you had the opportunity to review these presentence

15   reports with your attorneys?

16           THE DEFENDANT:  Yes, Your Honor.

17           THE COURT:  And do you understand the information

18   that is contained in these presentence reports?

19           THE DEFENDANT:  Yes, Your Honor.

20           THE COURT:  Ms. Duncan, you and Ms. Hollander have

21   had the opportunity to review these presentence reports with

22   Mr. Baker, go over them with him and explain them to him?

23           MS. DUNCAN:  We have, Your Honor.

24           THE COURT:  And you are satisfied that he

25   understands the information in the presentence reports.

1    MS. DUNCAN:  Yes, Your Honor.

2    THE COURT:  And you filed a number of objections.

3  We will get to those momentarily.

4    And Mr. Jacks or Mr. Jonas, who is speaking on behalf of

5  the Government?

6    MR. JONAS:  Your Honor, depending upon the issue, we

7  divided them up.

8    THE COURT:  And the Government filed no objections.

9  I have received your sentencing memorandum, but you have no

10  objections to that report.  Is that correct?

11    MR. JONAS:  Yes, sir.

12    THE COURT:  Then why don't we start with your

13  objections, Ms. Duncan.

14    MS. DUNCAN:  Your Honor, we trust that you have read

15  our objections to the presentence report and the amended

16  presentence report, and we are not going to repeat what we

17  have written.

18    I did want to address the question of whether the 2001 or

19  2002 Guidelines apply.

20    THE COURT:  We can start off with that one, and then

21  address first those that impact the Guidelines, and then if

22  you want to address any of the others.  You had a number of

23  challenges and objections to factual statements in the PSR

24  that don't affect the Guidelines one way or the other.  But

25  let's start off with that issue first, and then all the

1    objections that impact the calculation of the Guidelines.

2              MS. DUNCAN:  Sure, Your Honor.

3         Obviously since we were just handed this supplement to

4    the presentence report, I am not prepared to fully respond to

5    the allegations here by the Probation Office.  We maintain our

6    objections, though, Your Honor, that the 2001 Guidelines

7    apply, and under those 2001 Guidelines the terrorism

8    enhancement does not apply to the offense --

9              THE COURT:  What is your basis for that argument?

10             MS. DUNCAN:  It being the 2001, your Honor?

11             THE COURT:  I understand your argument why it should

12   be the 2001.  That has to do with when the offense was

13   concluded.  But why the terrorism enhancement doesn't apply,

14   the 3A1.4 enhancement.

15             MS. DUNCAN:  Your Honor, as we said in our

16   objections to the presentence report, in 2001 there were no

17   Guidelines for the material support offense and so the

18   Guidelines would be calculated under the money laundering,

19   1956.  1956 is not a federal crime of terrorism under 18

20   U.S.C. 2332, and, therefore, the enhancement wouldn't apply.

21             THE COURT:  But 3A1.4 was a part of the 2001 manual,

22   so why wouldn't it apply?

23             MS. DUNCAN:  Because it wouldn't apply to the

24   offense of conviction for which the Guidelines were being

25   calculated, Your Honor.  There was no --

1      THE COURT:  What offense of conviction does 3A1.4

2  apply to on its face?

3      MS. DUNCAN:  It applies to the material support,

4  Your Honor, but there were no Guidelines under -- the

5  Guideline that applied to material support was not in the

6  2001, so --

7      THE COURT:  But what about 3A1.4 states that you

8  have to have a conviction, that you have to have a Guideline,

9  that 2M5.3?  What about that states that you had to have that

10  Guideline in place?

11      MS. DUNCAN:  Well, the 2332 says that it has to be a

12  federal crime of terrorism, and the money laundering is not a

13  federal crime of terrorism.  Material support is, Your Honor.

14  But what you look at is because there was no -- And I am

15  trying to get to my notes here, Your Honor.  Just a moment,

16  Your Honor.  Let me find that portion in my notes.

17      THE COURT:  Do you happen to have that Guideline

18  manual with you?

19      MS. DUNCAN:  I do.

20      THE COURT:  I am just wondering what about that

21  Guideline, 3A1.4 Guideline language leads you to believe that

22  it doesn't apply to a money laundering conviction.  Because it

23  says, "If the offense is a felony that involved intending to

24  promote."  So it doesn't refer to any particular conviction.

25  It is just the offense of conviction was intended to promote a

1    federal crime of terrorism.  That is what it applies to.

2            MS. DUNCAN:  And our position would be, Your Honor,

3    that it would only apply to an offense that is listed in 18

4    U.S.C. 2332.

5            THE COURT:  But do you have to have a conviction for

6    that?

7            MS. DUNCAN:  Yes.

8            THE COURT:  And we there was a conviction for under

9    2339B.

10           MS. DUNCAN:  Correct, Your Honor.  Our position

11   I -- I am sorry, Your Honor.  I just found it.  Thank you,

12   Your Honor.  As we pointed out, and it is in pages 7 through 8

13   of our objections to the first presentence report, Your Honor,

14   the Guidelines manual does not provide a Chapter 2 Guideline

15   for 2339B.  Therefore you would look to 2X for an analogous

16   Guideline, and there is no analogous Guideline under the

17   rules.

18       So then we look to 18 U.S.C., 3553(b), which controls,

19   which says that you can look to the Guidelines and policy

20   statements that can be applied meaningfully in the absence of

21   a Chapter 2 offense Guideline.  Application note to that, to

22   2X5.1 lists the Guidelines and policy statements that can be

23   applied meaningfully in the absence of a Chapter 2 offense

24   Guideline.  And in 2001 there is no Chapter 2 offense

25   Guideline.

1          THE COURT:  But doesn't that go to the calculation

2     of the base offense level?  I am just speaking here about

3     application of the terrorism Guideline 3A1.4, base offense

4     level.

5          MS. DUNCAN:  Sure.  I understand.  Our position

6     would be that that enhancement would apply to the offense for

7     which Mr. Abu Baker was being sentenced, and under the 2001

8     Guidelines that would be the money laundering which is not an

9     offense under --

10          THE COURT:  Okay.  That is the basis for your

11     argument.

12        Mr. Jonas, or Mr. Jacks, any response to that?

13          MR. JONAS:  Your Honor, I am hoping that this issue

14     is moot and the Court agrees with the Government and uses the

15     later Guideline book with there is a section for material

16     support.

17        Putting that aside, I don't think that you have to

18     sentence someone under the material support base offense level

19     to apply 3A1.4.  He was convicted of providing material

20     support.  If the Court uses the 2001 book and uses the money

21     laundering section as the base offense level, there is

22     absolutely no reason why 3A1.4 can't apply to that, because

23     especially in this case the money laundering offense level

24     directly relates to the underlying conduct, providing material

25     support.

1          Understanding that the IEEPA violation was the SUA --

2               THE COURT:  The specific crime?

3               MR. JONAS:  But the actual acts were very similar to

4     the material support section.  So I think the conviction of

5     material support gives us a 3A1.4, and Your Honor can apply it

6     to whatever base offense level Your Honor finds, whether it is

7     money laundering or material support under 2M5.3.

8               THE COURT:  Thank you.

9          Any response to that?

10              MS. DUNCAN:  Nothing further, Your Honor.  We stand

11    on our objections.

12              THE COURT:  And I agree with Probation in the second

13    addendum.  In looking at the Guideline, there is nothing on

14    the face of 3A1.4 that states -- it was in place in the 2001

15    manual, and there is nothing on the face of that Guideline

16    that indicates it couldn't be applied in a money laundering

17    conviction, just on its face.

18         It states that if the offense is a felony that involved

19    or was intended to promote a federal crime of terrorism, then

20    the Guideline applies, and I think that applies here in this

21    case, so I think Probation is correct in the way that they

22    have calculated their Guidelines.

23         And that section applies under either the 2001 or the

24    2002 manual, and so either way that application is going to be

25    there.

1        And it ends up, then, not making a difference in terms of

2   application of the Guidelines which manual you end up

3   applying, because that was the primary difference in the

4   arguments that counsel was making that the 3A1.4 didn't apply.

5   I think it does apply.  And so it ends up not making a

6   difference in terms of the application of the Guidelines.

7        Okay.  I will hear your next argument.

8        MS. DUNCAN:  Your Honor, before we go any further,

9   we wanted to incorporate the other Defendants' objections and

10  their sentencing memorandum to the extent that they benefit

11  Mr. Abu Baker, and that would include the arguments that Your

12  Honor hears today on those objections.

13       THE COURT:  And you may have that.

14       MS. DUNCAN:  Your Honor, I would like to focus on

15  the level -- the enhancements that the PSR recommends be

16  applied in this case.

17       The first is the two-level enhancement under 2M5.3(b).

18  The Government and the Probation officer are arguing that the

19  base level should be increased by two points because of the

20  Government's allegation that in 1992 money from the Holy Land

21  Foundation was sent to be used to buy pieces of steel.  And I

22  trust that Your Honor remembers the evidence that the

23  Government proffered in support of that allegation at trial.

24       THE COURT:  And I am not going to use that evidence

25  in applying that enhancement.  I think you are correct on

1    that.  That was a pre-designation act, so I don't think you

2    would use that to apply an enhancement.

3              MS. DUNCAN:  Thank you, Your Honor.

4         Secondly, under the terrorism enhancement that we have

5    been discussing this morning, as we noted in our objections,

6    in order for the terrorism enhancement to apply in this case

7    the Government had to prove that by providing charity through

8    zakat committees and other charitable organizations, Mr. Abu

9    Baker intended to influence or affect the conduct of

10   Government by intimidation or coercion.  Your Honor, there was

11   no evidence that Mr. Abu Baker intended any such thing.

12        Although this the presentence report is full of

13   accusations that Mr. Abu Baker and other Defendants provided

14   charity in order to, and I quote, "Rid Palestine of the Jewish

15   people through violent jihad," the Government offered not a

16   shred of evidence to support that allegation.  The Government

17   did not point to a single conversation, a piece of writing,

18   anything from Mr. Abu Baker where he advocated violence

19   against the State of Israel, against Jewish people, against

20   anyone.  So the suggestion that somehow by the very fact that

21   Hamas is a designated terrorist organization Mr. Abu Baker

22   should be held liable for the terrorism enhancement, it is

23   just an unfounded allegation.

24        The only thing the Government or the presentence report

25   points to to support this allegation that Mr. Abu Baker had

1   such intent was the Philadelphia meeting and its discussion of

2   opposition to the Oslo Accords.  And as Your Honor heard

3   throughout the trial there were many people who were opposed

4   to the Oslo Accords; not because they supported Hamas, but

5   because they felt that the Oslo Accords were unfair to the

6   Palestinian people.  And Your Honor heard of Edward Said, who

7   was a Christian Palestinian, who was opposed to the Oslo

8   Accords for that very purpose.

9        So to say that opposition to an agreement that was

10  perceived by many to be unfair to a nation means that you had

11  the intent to coerce, intimidate, or destroy another people,

12  it is simply a baseless argument and it is not a basis for

13  application of the terrorism enhancement in this case.

14       The evidence shows that Mr. Abu Baker, through the Holy

15  Land Foundation, provided charity to people in need in

16  Palestine.  And the jury found that some of those charities

17  were affiliated with Hamas.  The Government proved no more

18  than that at trial, and the enhancement does not apply.

19            THE COURT:  Thank you.

20       Mr. Jonas?

21            MR. JONAS:  I think Your Honor, this is a

22  no-brainer, frankly.  The Government proved that the Defendant

23  knowingly and willfully provided material support to Hamas.

24       As Your Honor knows, the requirement under 3A1.4 is not

25  that he himself committed an act of violence, or even

1    supported the specific acts of violence, but that he intended

2    to influence or affect the conduct of a government by

3    intimidation or coercion.

4         They provided millions of dollars to a terrorist

5    organization whose purpose was to intimidate and coerce the

6    government of Israel, the Palestinian Authority, and

7    indirectly the government of the United States, as the

8    Government's evidence proved during the two-month trial.

9         The Defendants knew that.  There was abundant evidence

10   that Defendants knew about Hamas and what they intended to do,

11   and that they intentionally, knowingly, willfully supported

12   Hamas.  So that alone gets us to the terrorism enhancement.

13        But then to show their specific intent on their own

14   intention to intimidate and coerce the government of Israel,

15   the Palestinian Authority, and the United States, is clearly

16   evident in this Philadelphia meeting in what was said.  And

17   the Government cited several specific examples of quotes just

18   as a sample.  The record is full of quotes from the

19   Philadelphia meeting where these Defendants and the

20   co-conspirators intended to derail the agreement.

21        And I understand Ms. Duncan's argument, it was made

22   during the course of trial, that other people did not like

23   Oslo, but those other people have not been convicted of

24   providing material support to Hamas.  These Defendants were.

25        So not only did they not like Oslo; they took steps to

derail the peace agreement by providing millions of dollars to

Hamas.  In other words, they specifically and intentionally

attempted and intended to intimidate and affect the conduct of

a government by intimidation and coercion.

I think this enhancement -- I think we are bullseye for

this enhancement.  We are right on point.

THE COURT:  Thank you.

Ms. Duncan, anything else?

MS. DUNCAN:  Your Honor, I mean, it is a two-prong

test.  The first is are you convicted of a federal offense of

terrorism, which is the material support offense, if you are

applying the 2002 Guidelines.  So what Hamas is, Hamas' status

as a terrorist organization goes to that first prong.

The second prong asks what was Mr. Abu Baker's intent.

And the Government throughout trial is just blurring the

intent of people, speakers.  And what is at issue here at

sentencing is Mr. Abu Baker.

Mr. Abu Baker -- the jury did not find and was not asked

to find that he gave money to Hamas.  It was asked to find

that he gave money to organizations affiliated with Hamas.  So

for the Government to say that they proved at trial that Mr.

Abu Baker gave money for the terrorist aims of Hamas is simply

not true, and it is not supported by the evidence.  He gave

charity to organizations that the jury found were affiliated

with that organization.

1    I mean, other than that we stand on the record.  There is

2    nothing -- The Philadelphia meeting, as we said, it was a

3    political debate about the Oslo Accords, and to say that

4    opposition to those accords equals a desire to see people

5    killed is ludicrous.  And to say that there are certain people

6    at the Philadelphia meeting that what they said should be

7    attributed to Mr. Abu Baker for his intent is also not

8    warranted.

9        So for those reasons, Your Honor, we believe that the

10   terrorism enhancement does not apply to Mr. Abu Baker.

11               THE COURT:  And you are still speaking of the 3A1.4?

12               MS. DUNCAN:  Yes, Your Honor.

13               THE COURT:  Or are you speaking of purchasing?

14               MS. DUNCAN:  No, Your Honor.  I was talking to the

15   terrorism enhancement under -- Yes, this is 3A1.4.

16               MR. JONAS:  Your Honor, I was speaking of 3A1.4.

17               MS. DUNCAN:  Not the weapons; the actual

18   enhancement, the 12-point enhancement.

19               THE COURT:  Okay.  And I think it does apply in this

20   case.  I think the evidence does establish -- I am finding

21   that the evidence does establish that that enhancement does

22   apply.

23       The evidence in this case established that the purpose of

24   creating the Holy Land Foundation was to support Hamas.  It

25   was a fundraising arm of the Palestine Committee to support

Hamas and its functions, and I don't think we have to rely on statements made by any of the other individuals, statements made by Mr. Baker and those with whom he was working at the HLF. Through the videos at various fundraising functions that occurred, the wiretapped conversations, the documents that were seized all show this interlinked connection between the Holy Land Foundation, Mr. Baker, and Hamas and their support of Hamas in supporting Hamas and what Hamas' mission was and is.

And so I think the evidence amply establishes, and the jury's verdict also supports that, that Mr. Baker was in fact supporting personally through his work with HLF supporting Hamas, supporting Hamas' mission and function, which included the terrorism acts that Hamas was engaging in.

So I will overrule that objection. That enhancement properly applies.

MS. DUNCAN: And Your Honor, in our sentencing memorandum we asked the Court to depart from that enhancement because this case is not within the heartland of cases to which the enhancement applies, and also because the criminal offense history --

THE COURT: Why don't we save the departure for later. I know that is going to be part of an oral argument. There are some other objections you have that go to the --

MS. DUNCAN: I actually wasn't going to go into it,

1    Your Honor.  I was just going to say that because it all

2    applies the factors the Court must consider in the sentencing

3    statute, Ms. Hollander will be discussing that in more detail

4    later.

5              THE COURT:  All right.

6              MS. DUNCAN:  The final upward adjustment argued for

7    in the PSR is the obstruction adjustment.  And Section 3C1.1

8    applies only when the Government proves that the Defendant

9    willfully obstructed or impeded, or attempted to obstruct or

10   impede the administration of justice during the course of the

11   investigation, prosecution, or sentencing of the instant

12   offense of conviction.

13        Both the Government and the presentence report are

14   relying on a deposition that Mr. Abu Baker gave in 2003 in the

15   course of the Boim litigation, which we heard about at trial.

16        First of all, the language the Government is relying upon

17   to argue that this enhancement applies comes from the 2008

18   Guidelines.  It is not found in either the 2001 or the 2002

19   Guidelines.  So we would argue, first, that that is an ex post

20   facto violation.

21        Secondly, even if this enhancement in 2001 or 2002 was to

22   apply to a civil proceeding, a lawsuit between private parties

23   is not the kind of civil proceeding that the enhancement --

24   that the Commission was considering.  This sort of enhancement

25   would apply to a civil proceeding that is ancillary to a

1    criminal proceeding; so, for example, an investigation by the

2    SEC, which is civil in nature.  And I believe there is a Fifth

3    Circuit case in which a Defendant gave a statement to the SEC

4    during a civil proceeding, and the Court in 2009, Your Honor,

5    found that false statements made during that civil proceeding

6    would qualify under 3C1.1 as an obstruction of justice,

7    because it is a corollary between the two.

8        In this case we are talking about a statement that Mr.

9    Abu Baker made as a 30(b)(6) witness in a civil proceeding

10   between a private party and private parties, and so it would

11   not apply, even assuming that civil proceedings are

12   incorporated in the rule in 2001, 2002.

13       Moreover, Your Honor, the Government has failed to prove

14   that Mr. Abu Baker made any false statements during that

15   deposition.  At most what the Government has shown is that

16   Mr. Abu Baker did not provide as complete answers as they

17   would have liked.

18       For example, the Government offers the Court that when

19   Mr. Abu Baker was asked about the relationship between the HLF

20   and the IAP, Mr. Abu Baker correctly said, "It is a business

21   relationship.  We advertise in their newsletters.  We

22   participated in some of their conventions."  That is

23   absolutely true.

24       What the Government wants this Court to hold against

25   Mr. Abu Baker for purposes of this enhancement is that Mr. Abu

1    Baker didn't say, "And by the way, ten years ago we were all

2    part of this loose association called the Palestine

3    Committee."  That is an incomplete answer according to the

4    Government's standards.  It is not a lie and it is not an

5    effort to obstruct justice.  It was a correct answer when

6    made, and it is just not a basis for application of this

7    enhancement.

8         And the same is true of the other quotes that the

9    Government relies on to argue that this enhancement should

10   apply.  They are nothing more than at best an incomplete

11   answer.

12        And I would note that at the time he gave this deposition

13   in 2003 he did not have access to the Holy Land Foundation

14   records, he did not have access to the evidence that the

15   Government had.  And Your Honor saw during this very trial

16   that Agent Burns couldn't remember something because she

17   didn't have access to documents she had access to the day

18   before.  It happens to all of us.  And so to hold that his

19   failure to remember certain things in 2003 was, first of all,

20   false, and second, a willful attempt to obstruct justice in a

21   civil proceeding, is simply unwarranted.

22             THE COURT:  Thank you.

23        Ms. Shapiro?

24             MS. SHAPIRO:  Yes.  Your Honor, we believe that the

25   obstruction enhancement applies fully based on both the

1    deposition and the declaration.

2         The deposition, firstly, it wasn't just an omission of

3    information.  There were direct lies.  For example, when Mr.

4    Abu Baker was asked, "Are you aware of any relationship or

5    involvement that Mr. Abu Marzook had with the Holy Land

6    Foundation?"

7         Answer:  "No."

8         We presented abundant evidence of phone calls, of money

9    transfers, of a close relationship with Mr. Marzook and the

10   Holy Land Foundation and Mr. Abu Baker.  It was clearly a

11   false statement and intentional false statement.

12        Not only that, but Mr. Abu Baker was plainly aware that

13   the Holy Land Foundation was being investigated.  There were

14   phone calls that were introduced at trial where participants

15   joked about the telephone having a cold.  They hired someone

16   to sweep for bugs in the office.  It was clear that they knew

17   they were under investigation.  It was plainly foreseeable

18   that the FBI would be reviewing that deposition and those

19   statements by Mr. Abu Baker, and it was plainly a false

20   statement designed to obstruct.

21        Similarly, the declaration that was submitted in 2002, it

22   was submitted to a federal judge in Washington, D.C. in

23   essentially the civil equivalent to this criminal trial.  And

24   in that case it wasn't Mr. Abu Baker appearing pursuant to a

25   subpoena.  He voluntarily submitted a sworn under penalty of

1    perjury declaration to the Court where he made such statements

2    as "I reject and abhor Hamas," which the evidence abundantly

3    showed was not true.  We showed evidence where Mr. Abu Baker

4    authored a poem where he praised Hamas.  We saw videotapes of

5    Mr. Abu Baker singing praise of Hamas and dancing.  There was

6    abundant evidence, as the Court has already found, of Mr. Abu

7    Baker's support for Hamas that those statements in the sworn

8    declaration were plainly false.

9         In that declaration were also statements about the use of

10   the word Samah during the Philadelphia conference, which even

11   in closing Mr. Abu Baker's counsel admitted that those were

12   not true statements, but he made those false statements

13   because he was afraid that he would end up in trial like this

14   one.

15        So I think there is no question that the obstruction

16   enhancement applies in this case.  There is no need for

17   records to know about support of Hamas or anything like that.

18   And we would argue for the application of those additional two

19   levels.

20             THE COURT:  Thank you.

21        Ms. Duncan?

22             MS. DUNCAN:  First of all, Your Honor, the

23   declaration is not included in the presentence report, but I

24   will nonetheless address it.

25        When Mr. Abu Baker said in 2003 that he rejected and

abhorred Hamas, what he said was absolutely true.  And the

only evidence that the Government is offering to say that it

was false was an article written I believe in the early 1990s

about the situation in Palestine.  And it was the byline, not

the body of the argument, that mentioned the word Hamas.

So to say that that in 2003 "I reject and abhor Hamas" is

a lie because of a byline in a newsletter in 1990 is simply

not warranted.

Secondly, there were no videos of Mr. Abu Baker singing

praise for Hamas.  That is simply absolutely not true.

And in my closing, Your Honor, I did not say that Mr. Abu

Baker lied.  I said exactly what I am saying here today--that

his answers were at best incomplete, and that he may not have

disclosed in those answers that he was at a festival where

someone who was affiliated with Hamas was at in the early

1990s.

With respect to the use of the word Samah, that is just

not a material falsehood.  I mean, it was a whimsical play on

words that under no definition of obstruction of justice would

that qualify, Your Honor.

THE COURT:  The Government is relying and Probation

Office on the statements made in the deposition given in a

civil lawsuit.  That civil lawsuit was, of course, directly

related.  It is a civil lawsuit, as you pointed out, but it

involved suing HLF for Hamas' actions, much as was involved

here in this case.  Mr. Baker was on trial and was convicted

because of the support he provided to Hamas.  So the lawsuits

were related.

He had all the incentives to answer the way he did, and

so I think he did give materially false information.  And the

evidence that was introduced at trial showed, in fact, that

Mr. Baker is an ardent supporter of Hamas.  I think the

evidence shows that.

The multiple videotapes and whether he is singing the

praises of Hamas, it is HLF raising money at these functions

where Hamas clearly is present, Hamas clearly is the focus and

the focal point of these fundraisers, and he is there and

other HLF persons are there and they are raising money, HLF is

raising money for purposes of this, both for purposes of

supporting Hamas -- And this is both pre-designation, a lot of

them were pre-designation but there is also plenty of evidence

post-designation.

I think the evidence leaves no question that Mr. Baker

was in fact a supporter of Hamas and was raising money for

Hamas at these functions, and that is what he was doing.

He did give materially false information, and I think he

did so with the intent to obstruct and impede the criminal

investigation, which by that point they knew was ongoing.  The

Holy Land Foundation was shut down in December of 2001.  The

assets were frozen.  So by 2003 they were well aware.  I think

1   by then he had been interviewed, several of the other

2   Defendants had been interviewed by the FBI.  They were aware

3   of the ongoing criminal investigation.  And I believe that

4   that enhancement is properly applied.  I overrule that

5   objection.

6       Going to your next one, you filed two objections that go

7   to the money laundering if we did a 2S1.1, the amount of the

8   laundered funds and then also the sophisticated means

9   enhancement which would apply if the 2001 manual is used.  Do

10  you want to go ahead and address those?

11          MS. DUNCAN:  Sure.  Let me pull up that part, Your

12  Honor.

13      With respect to the amount of the money laundering, Your

14  Honor, I will stand on our objections.

15          THE COURT:  The written objections.  Okay.

16          MS. DUNCAN:  With respect to the sophisticated money

17  laundering, we would note that it is pure speculation that the

18  Holy Land Foundation structured these transactions in order to

19  evade detection.

20      I mean, they were operating in Palestine.  There was

21  evidence that the banking system and doing business in

22  Palestine is a complicated endeavor.  Holy Land Foundation

23  opened its offices in Palestine in order to facilitate the

24  work on the ground, and sent money to those offices.  There

25  was no effort to deceive.  And the fact that the Government

1    took a long time to get certain bank records means nothing.

2         The Holy Land Foundation was open throughout its entire

3    operation about where its money was going, how much money was

4    going over there.  So they structured their transactions in

5    order to facilitate the transfer of money to people who needed

6    it in the most effective way possible, and not to thwart any

7    sort of Government investigation.  The Government knew

8    throughout the entire time that the Holy Land Foundation was

9    operating where the money was going.

10              THE COURT:  Thank you.

11         Mr. Jonas?

12              MR. JONAS:  Your Honor, I think as we stated in our

13   response to Defendants' objections, I will basically in a

14   nutshell restate that.  There was a layering effect going on

15   here by sending money to their own accounts, which they

16   established in the later years or existence in the West Bank

17   and Gaza, impeded the Government's ability to then trace where

18   the money went from that point further, up until the Patriot

19   Act when the law gave us the right to get those records.  At

20   the time they were conducting these acts, we wouldn't be able

21   to get them.  And that layering effect that I think the

22   Guidelines call for is a basis for a sophisticated money

23   laundering and gives it two levels additional to the base

24   offense level.

25              THE COURT:  Thank you.

1          Ms. Duncan?

2              MS. DUNCAN:  Your Honor, every transaction that the

3    Holy Land Foundation sent over to its office in Gaza or in the

4    West Bank was accompanied by a fund transfer notification that

5    listed every single organization to whom that money was to be

6    given.  The Government was wiretapping the Holy Land

7    Foundation that whole time.  They just argued that this Court

8    should find Mr. Abu Baker liable for the obstruction of

9    justice enhancement because he knew that they were under

10   investigation.  So they can't have it both ways.

11             THE COURT:  Except that that enhancement, though, is

12   in 2003.  They have seized the records.  This enhancement for

13   obstruction of justice happened in 2003.

14             MS. DUNCAN:  They are arguing -- what Ms. Shapiro

15   argued --

16             THE COURT:  They were saying that he knew of the

17   investigation certainly since 2001.

18             MS. DUNCAN:  Right.  But she was arguing that there

19   was evidence at trial during the relevant period up to 2001,

20   there were phone calls that indicated they knew they were

21   under scrutiny, and you heard a lot of evidence about that.

22       You saw every single transfer to Palestine was documented

23   where it was going to go.  The fund transfer notifications

24   would say this amount of money is going to our office in West

25   Bank, and then it should be distributed to these certain

1    people, so there was no effort to hide.  The Government knew

2    where that money went.  For them to say now, "We didn't know,"

3    that is not true.  They have those records from the second

4    that they were sent from the Holy Land office in Richardson,

5    Texas to the Holy Land offices in Palestine.

6              THE COURT:  I agree with Probation as they

7    calculated this enhancement.  There was layering, as the

8    Government has pointed out, I think even going through these

9    zakat committees, that there were clearly efforts to try to

10   hide the trail of money.  They weren't sending checks directly

11   to Hamas, even though the evidence shows that that is what the

12   money was for was to support Hamas.  So I think the structure

13   of the entire operation that HLF was involved in was designed,

14   in part, to obstruct or to keep agents from discovering what

15   was going on there with HLF.

16        I will overrule that objection and find that that

17   enhancement is properly given.

18        And also the amount of the money laundering, I think that

19   is properly given.  That is properly calculated.  You are

20   arguing that it should be strictly the amounts that were

21   alleged in the indictment.  Of course the Government is not

22   limited to that.  The evidence presented -- And I think

23   Probation is actually right in terms of $16 million versus the

24   $12 million, because even the funds that were used based on

25   the evidence that was presented at trial, even the funds,

1    there is some $4 million there that apparently can't be

2    accounted for, and so that is where the difference between the

3    $12 million and $16 million is.

4         But as Probation points out in its addendum, that money,

5    even assuming that it went to some legitimate purpose, all of

6    that, the intent of all the entire operation of the Holy Land

7    Foundation was to support Hamas.  And so all of it I think is

8    properly used in the calculation of the laundered funds,

9    because the sole purpose of the Holy Land Foundation was to

10   provide financial support for Hamas.  That is what the

11   evidence establishes in this case.

12        So I will overrule the objection with respect to the

13   amount of the money laundering as well.  I think Probation

14   accurately calculated that.

15        Are there any other objections that affect the

16   calculations of the Guidelines that you want to address?

17             MS. DUNCAN:  I don't believe so, Your Honor.

18             THE COURT:  Okay.

19             MS. DUNCAN:  I think the remainder of our objections

20   were to the factual allegations.

21             THE COURT:  And I think a lot of those, of course,

22   they overlap with what we have stated here, and I think my

23   statements have covered those as well.  I think Probation, to

24   a large extent, there is some small, perhaps, statements that

25   are not completely accurate, but in terms of capturing the

1    gist of what the evidence shows was occurring here with the

2    Holy Land Foundation, I think the Probation Office correctly

3    captured that in its reports.

4        So those objections have been overruled, and I will

5    accept, then, the findings of the Probation Office as

6    contained in their presentence report, and also the addendum

7    and the second addendum to the report.

8        And with respect to Mr. Baker, we have a Guideline

9    offense level, in effect, of 43 because of the calculations,

10   and then a Criminal History Category of VI, a Guideline range

11   of up to life in prison.

12       And I will hear from -- Are you finished with your

13   objections?

14           MS. DUNCAN:  Yes, Your Honor.  I mean, I do have a

15   short thing to say about the downward departure request.

16           THE COURT:  I will give you an opportunity about

17   that, to address the sentencing issue in its entirety.

18       Ms. Hollander?

19           MS. HOLLANDER:  Thank you, Your Honor.  Your Honor,

20   what I would like to address is the sentencing statute, 18

21   U.S.C., 3553.

22       As the Court of course is well aware, the Guideline range

23   is not necessarily reasonable.  This Court cannot presume that

24   it is reasonable.  It is only one factor to be considered post

25   *Booker* and the other Supreme Court cases.

1    And what I would like to talk about is the other factors

2    that are in 3553(a).  And let me start with the fact that the

3    statute says, and I quote, "There is the need to avoid

4    unwarranted sentence disparities among defendants with similar

5    records who have been found guilty of similar conduct."

6    Now, in fact, there aren't any that are really similar to

7    this.  We gave the Court some cases in our brief of people who

8    have received much lower sentences than these Guidelines who

9    have committed violent acts or have attempted to commit

10   violent acts under the same statute.

11   And I would like to just point out two examples; one that

12   is not a U.S. case, but I think is significant, and that is

13   the case of Mr. Raed Salah who was tried in Israel.  Your

14   Honor may remember that the Government witness who went by the

15   name Avi said that he learned, got his experience by working

16   on a case of Mr. Raed Salah, who was convicted of providing

17   material support to the Islamic Relief Service in Israel.  And

18   that was a case that went on for many years.  Avi talked about

19   it, and talked about what he learned from that case.

20   Mr. Salah received a sentence from the government of

21   Israel of slightly under five years for that, a case that is

22   significant because it is so much lower than what the

23   Government is asking for and Probation Office is asking for in

24   this case.

25   The other example which is closer to home and involves

1    this Government is a very recent example of Ali Al-Marri.  Ali

2    Al-Marri came to the United States on September 10th, 2001,

3    one day before September 11th, and has now admitted that he

4    came as an Al-Qaeda sleeper agent, that he came for the

5    purpose of committing more terrorist acts, that he was working

6    with a man named Khalid Sheikh Mohammed who the Government

7    claims and I believe has admitted that he was the architect of

8    9/11.

9        Mr. Al-Marri has admitted these facts and additional

10   facts in his plea agreement.  I believe that plea agreement is

11   actually attached to one of the other sentencing memoranda.

12       But the Government of the United States has agreed that

13   Mr. Al-Marri can plead guilty to a maximum of 15 years.  This

14   is a man who this Government alleges and has now admitted that

15   he came to this country as a sleeper agent to commit violent

16   acts against this country of the very worst kind, and the

17   Government of the United States believes that 15 years is a

18   sufficient sentence for that person.

19       So that alone makes this proposed sentence, if you look

20   just at the Guidelines, to just be preposterous for these

21   Defendants who are not accused -- My client is not accused of

22   any violent act, of committing any violent act, nor is there

23   any evidence that he ever espoused any violent act.

24       He is convicted of providing charity to organizations

25   that the Government alleges were and the jury found were

1    associated with Hamas.  And that is what he -- That is what he

2    was convicted of.  And Your Honor is required under the

3    sentencing statute to take into account whether his sentence

4    is disparate to others.  And there were others listed in our

5    brief.

6        I would also like to point out one of the other factors

7    that the Court must consider under 3553, and that is the

8    nature and circumstances of this offense.  And I understand

9    Your Honor's position that you stated and the Government's

10   position, but there is no denying that the bottom line here is

11   that they provided -- Shukri Abu Baker through Holy Land

12   provided charity to zakat committees, which the jury found

13   were associated with Hamas.  The Government has consistently

14   blurred this, and throughout their pleadings blur this and say

15   that they gave their money to Hamas, they gave their money for

16   the purposes of Hamas' military wing.

17       That is not what was found in this case, nor even what

18   was alleged in this case.  It was that they gave funding to

19   these zakat committees, which were found to be associated with

20   Hamas, and that is a significant distinction.

21       Whatever Hamas' intent is and Hamas' violent agenda, that

22   is essentially the Government's rhetoric here, but it is not

23   the evidence in this case, and there is no evidence whatsoever

24   that by giving that money to those charities, that that is

25   what Mr. Abu Baker intended.

1    In fact, the Government goes so far as to say in their

2  brief that because Holy Land gave money to these zakat

3  committees, that that led to Hamas winning election five years

4  later in 2006, even though Holy Land closed down in 2001.  And

5  if in fact that is their position, and if in fact it is the

6  position, as Ms. Shapiro stated here today, that the

7  Government knew about Hamas and its intent in 2001 when it

8  froze Holy Land's funds, and that the case where the funds

9  were frozen was a civil equivalent of this criminal case, that

10  the Government knew at that point and stated at that point

11  that these zakat committees were associated with Hamas, then

12  the Government of the United States is responsible for Hamas

13  winning that election, because the Government of the United

14  States continued to fund those same zakat committees all the

15  way up to at least 2004, December, which was almost a year and

16  slightly more than just before the time Hamas won that

17  election.

18    And we introduced the evidence, and I will just give one

19  example, which was Defendants' Exhibit No. 1074, a CAIR

20  implementation report which showed that the United States

21  Agency for International Development gave $47,000 to the

22  Qalqilya zakat committee in 2004.  And that, Your Honor, means

23  that the United States government either didn't believe that

24  these zakat committees were associated with Hamas, or is

25  responsible for supporting Hamas in all the ways and with all

1    the same intent that the Government attributes falsely to

2    Mr. Abu Baker.

3        There is no doubt that the Palestinian people were in

4    desperate need.  The Government's experts admitted that.  The

5    Government's experts admitted that the Palestinian people

6    needed the charity that was provided to them.  So there is no

7    doubt that what Mr. Abu Baker was doing was providing charity

8    that was necessary, and the Government's evidence supports

9    that.

10       I want to talk about, and that leads me to one of the

11   next factors that Your Honor must consider, and that is the

12   history and characteristics of the Defendant.  And that is a

13   quote again from -- I am quoting from 3553(a).

14       Mr. Abu Baker, and there is no doubt of this either, has

15   devoted his life to helping others in his community and in the

16   world community.  And there is no doubt that he has raised his

17   daughters to be productive citizens and to support their

18   community and to work in their community.

19       We have provided the Court with many, many letters, and I

20   have to assume that Your Honor has seen those letters.  We

21   provided a chart -- Because we knew there were so many letters

22   of support, we provided them in a chart with kind of what we

23   consider the most important quote from each one to make it a

24   little easier for you to remember who said what.  And I am not

25   going to repeat those here, because I believe Your Honor has

1    seen those.

2        But those were people who were touched by Mr. Abu Baker

3    in one way or another; school children, people in the

4    community, old people, people who benefited from his

5    counseling and benefited from the work he did and benefited

6    from the work he did with his hands to plant trees and build

7    buildings.

8        And this is what he has done with his whole life.  This

9    is what he has done, and that is why so many people in this

10   community were willing to write letters in support of him and

11   to stand up and say publicly in front of this Court that this

12   is the person Mr. Abu Baker is.

13       He is also very much a hands-on father, very involved

14   with his daughters with their school, gave them advice, helped

15   them.  His eldest daughter is getting a Master's degree in

16   counseling.  He has worked hard to make sure his children were

17   well-educated.  He spent lots and lots of time at their

18   school.  He helped develop their school and make sure that it

19   was a good school and spent time in the classroom with them.

20       And he also has a very special relationship with his one

21   daughter who suffers from two devastating illnesses.  And as

22   he will tell you, his daughter's illness and the wonderful

23   care that she received because they lived in the United States

24   is what really prompted him to want to see that other children

25   could get some of the benefits of this, even though they

1    didn't have the benefits of our medical system, which has

2    saved his daughter's life; a child who no one thought would

3    live past a year or two, is still alive, still here, still in

4    this courtroom going to college because of the care she

5    received and because the care she received from her father,

6    who has spent untold hours in the hospital where she has to go

7    almost once a month throughout her I believe 19 or 20 years.

8        The Government wiretapped his home, his office,

9    everywhere he was for eight years, and they produced not one

10   sentence that says anything against the Jewish people or any

11   other people, not one word of violence, not one word in all

12   those years of wiretapping phones and offices and emails and

13   reading everything.  And if there had been one word, we would

14   have seen it.

15       He worked to support the Palestinian people.  There is no

16   denying that.  There is no denying that need.  And yet, Your

17   Honor, the Government's brief makes no mention of 3553(a).  It

18   is based strictly on the Guidelines.  And although the Court

19   is to start with the Guidelines, and the Guideline range is

20   one of the factors, it is only one factor, and the Court is

21   required to consider all of these other factors, none of which

22   the Government even mentions.

23       The Government -- If you read the Government's brief, you

24   would think that *Booker* and all the cases that came after it

25   never even happened, and yet that has been the law of this

1    country for the last few years.

2         The job of an Assistant United States Attorney is not to

3    convict people.  The job of the Assistant U.S. Attorney and

4    the Justice Department is not to win cases.  The job of the

5    U.S. Attorney and his assistants is to do justice and to do

6    the right thing.  Those are not my words, Your Honor.  Those

7    are the words of Eric Holder, the Attorney General of the

8    United States, in speaking to his Assistant U.S. Attorneys,

9    and that is what he has told them to do.

10        If the Government won't do the right thing here, Your

11   Honor, if the Government will not depart way below these

12   Guidelines and consider the other factors in 3553 that must be

13   considered under the Supreme Court law in this country, then

14   this Court must do it.  And this Court is obligated, as I am

15   sure Your Honor knows, to sentence Shukri Abu Baker according

16   to that statute as upheld by the United States Supreme Court

17   and as required by the Justice Department to a sentence that

18   is, and I quote, sufficient but not any greater than

19   necessary.  That is the Court's obligation and that is what we

20   ask the Court to do.

21             THE COURT:  Thank you.

22        Mr. Baker, you are entitled to speak if your behalf.  Is

23   there anything you wish to state?

24             THE DEFENDANT:  Yes, Your Honor.

25             THE COURT:  You may do so.

1    THE DEFENDANT:  I wish, Your Honor, that you bear

2  with me.  This is a last-minute decision to speak.  I didn't

3  have much time to rehearse, but I know you are going to bestow

4  upon me your kindness and the opportunity to express my

5  feelings and my beliefs in this occasion.

6    In the name of Allah, the compassionate and merciful.

7  Good morning, Your Honor.

8    This day the 27th is indeed a special day for me and my

9  family and my friends.  This week is also special because it

10  marks my 27th week in prison.  And this month, Your Honor, is

11  extra special because it marked the 27th anniversary of my

12  blessed marriage to my great wife Wejdan, so it is something

13  with the number 27.

14    But it was February 3rd, 1959 when I was born to a mixed

15  couple in Catanduva, Brazil, South America.  My mother Zaira,

16  who is 71 years old, was a first generation Brazilian child of

17  a Catholic Italian immigrant couple, Mr. and Mrs. Guerzoni,

18  Maria and Senor Ugu Guerzoni.

19    My father, Mr. Ahmad Abu Baker, who is 79 years old, was

20  born to a Palestinian people in the West Bank Palestine.  He

21  immigrated to Brazil in 1952 in pursuit of a better life.

22    From the beginning I was a product of a love story

23  between a dark-skinned, brown-eyed Muslim/Palestinian

24  immigrant and a white, green-eyed, blond Catholic/Brazilian

25  citizen.  That is a blessing to start with.  I am so blessed.

1    Two different worlds fusing into one, and I was a product of

2    that, that is a blessing.

3        And I was second in order to three other brothers.

4        In 1965 my father decided to return back to his homeland

5    and the trip took us one whole month by sea.

6        In 1967 the Six Day War broke and I got to witness

7    firsthand the ugliness and the horror of war as we hid for

8    several nights in a cave in the heart of a mountain.  Soon

9    thereafter, I saw total strangers marching the narrow streets

10   of our village with strange and scary looking military gear.

11       Later we settled in Kuwait, and I graduated from high

12   school in 1977, only to start my forever departure from the

13   Arab and the Muslim world into the lands of liberty, the lands

14   of freedom, the United Kingdom and then later on the United

15   States of America.

16       I attended college in the United Kingdom.  Then in

17   January 1980, Your Honor, I set foot in this blessed land when

18   I transferred to a college near Sanford, Florida, where most

19   of my paternal relatives had been living since early '50s.

20       I got married to Wejdan on May 2nd, 1980, while I was

21   still in college.

22       On November 3rd, 1983, my first child Zaira was born, and

23   I named her after my mother.

24       On the day of my closing statement, November 10th back in

25   1984, my son Mohammad was born.  Apparently he had arrived

1    this world with a return ticket that had to be used within

2    five months, and he did.  Watching my child die in a hospital

3    crib proved to be the most painful and everlasting experience

4    for me and beloved Wejdan.

5         After burying a piece of our flesh in the soils of

6    Chicago, we moved to Indianapolis, Indiana.  It wasn't until

7    the birth of our third child, now it is two years later, that

8    I had started to realize where my new destiny was taking me.

9    On March 25th, 1987, Sanabel was born.  "Wow, she is such a

10   big girl," said the nurse.  "She weighs 9 pounds and 7 ounces,

11   and she is adorable.  Proud, dad?" added the nurse.  And she

12   was absolutely right.  And we named her Sanabel, which means

13   weed spikes, a Quranic indicative of goodness, wholesomeness

14   and abundance.

15        But as bad news tends to be enveloped in the state of the

16   unexpected, Your Honor, a routine blood test in November

17   revealed a horrible message in the most abrasive and blunt

18   way.  We were told that our pretty and chubby girl had arrived

19   this world with two chronic and incurable diseases, two

20   elements of death entrenched in her body from day one of her

21   birth--Cystic Fibrosis and Thalassemia Major.

22        In a nutshell, most of her body functions were afflicted

23   severely afflicted, respiratory, digestive, reproductive, and

24   even her own ability to produce her own blood.  Thus, we were

25   advised by the doctors that her life expectancy was only 12

1    years.  That is if she got lucky.  And she did.

2         Realizing the gravity of her medical situation, Sanabel

3    was admitted to Children's Medical almost immediately.  And

4    being the only child in the state of Indiana in her condition,

5    she received superb and unparalleled medical attention.

6         And while our attention was glued on Sanabel, there the

7    world's attention was being drawn to another travesty, but one

8    that involved the lives of millions of people that was taking

9    place thousands of miles away--the Palestinian uprising, the

10   Intifada of 1987, December 8, 1987.  People took off to the

11   streets throwing stones at Israeli soldiers protesting 20

12   years of Israeli occupation.

13        Like most Americans, I learned about the uprising through

14   the eyes of the media.  I remember sitting next to Sanabel in

15   her hospital room watching the news.  I still can remember

16   some of the disturbing images of children being beaten by

17   soldiers, crushing their bones by a big piece of stone, and

18   under the heavy blows of military batons.  That was on CNN.

19   It is not my own imagination.  Demonstrators received live and

20   rubber bullets; ambulances and their personnel chaotically

21   trying to pick up the wounded amidst the heavy and blinding

22   smoke of tear gas canisters.

23        I was shocked and sickened.  I have seen demonstrations

24   in this country, but I have never seen the police shoot to

25   kill in response.  However, that was not the dominant thought

1    that was preoccupying my mind in relationship to the uprising.

2    The profound one was the comparison that I started to make

3    between the care my own child was receiving in her own country

4    and that was afforded to her counterparts in their home

5    country.   For some reason I started to feel more guilty than

6    relieved.

7         My conscious became restless.  I felt as if humanity had

8    two opposite faces--the face of mercy that manifested in the

9    care my daughter was receiving in the U.S., and the face of

10   cruelty that manifested itself in the way Palestinian children

11   were being treated in their homeland.

12        Now, I had two realities to ponder upon--a reality that

13   was evolving in front of my own eyes, my own lap, my own

14   shoulder, that is Sanabel, and reality that presented itself

15   in my father's homeland thousands of miles away.  I started to

16   dwell on the question why do people have to suffer

17   unnecessarily.  Why couldn't the care of my child was

18   receiving in this country be extended to children who were

19   disadvantaged by political and economic realities?  Why not?

20   My moral values etched in my heart a very strong belief that

21   the great care Sanabel and her American children were

22   receiving in this great country should be afforded to children

23   of the less fortunate world by virtue of them, too, being

24   children of God, worthy of living and thriving.

25        But how?  That is when God's loving hands pointed my

attention to the amazing observation.  I was utterly surprised

to discover the non-profit network that was there all the

time, providing moral, educational, financial, and even

medical assistance for support and us as her family.  I have

never been in a position before to be exposed to the immensity

of the non-profit and charitable structure in this country.

It was mind-opening for me to find that the very

hospital, Children's Hospital in Indianapolis, now they

changed it to Riley hospital, was a non-profit organization

indeed, a charitable organization.  What a discovery.  So I

thought, just like America has been exporting technology and

commodities to the world, it is time, it was time to start

exporting expertise on non-profits and charitable Ventures.

This explains, Your Honor, for example, why I made sure that

the HLF kept emphasis on hospitals, clinics, and health

services at large, including the Al-Salam Hospital in Khan

Yunis, Gaza.

By this point in time I was occasionally participating in

the collection of donations in response to some needs here and

there through some ad hoc committees, but that was more of an

impulsive and reaction than a well-thought out action.

Sanabel's situation allowed me to think of charity in a whole

new dimension.  I started to believe that God had a message

for me in the seemingly unfortunate events in my life from the

death of my own child Mohammad to the ailment of my daughter

Sanabel.

God wanted me to find a silver lining to discover the bigger world in me and to assume a bigger life, and I call this, Your Honor, the Sanabel awakening. This is all I needed to start shifting my life into higher plane. I did not need any other argument or purposes to put me in that direction. It was already happening in my heart and mind. As the Bible says, "As a man thinks in his heart, so he becomes." And when the intention is clear the methods show up.

Early in 1990 I started the first HLF office, being the only full time employee. I remained in my job until closure on December 4th, 2001.

Regardless of what my opponents may claim, the facts speak for themselves. We are multidimensional beings, and personal experiences in life have profound impact on our decisions. As holocaust survivor Dr. Viktor Frankl said in his book Man's Search For Meaning, "No man and no destiny can be compared with any other man or destiny. No situation repeats itself, and each situation calls for a different response."

My commitment to charity was a product of my own suffering as a father. I played no role in timing my daughter's birth and her diagnosis to coincide with a historic event in the Palestinian-Israeli conflict. I did not. Sanabel was real and her situation is real, and my wife and I

1    were swallowing our own tears as we strapped her to her

2    cushion board every night to painfully change her central line

3    dressing.  I was there.  My accusers were not there, Your

4    Honor.  I was there inserting the empty tubing all the way

5    down from her nose to her stomach twice a day to force some

6    liquid food into her frail body.  My accusers were not there.

7         Neither were they there when Wejdan and I slipped in fear

8    dreading the thought that the next morning could spill another

9    encounter with death in our family.  They were not there.

10        So it is easy, it is the easy, Your Honor, to demonize

11   your opponent if you lack the knowledge about the real human

12   inside of them and the real human suffering around their life.

13   Because of Sanabel my life changed, and, I am proud to say, so

14   did the lives of countless people.

15        It was not rage against Israel or passion for Hamas that

16   had placed me in the realm of charity.  Rather, it was the

17   father's heart reaching a melting point, a melting point as

18   his own child suffered in front of his own eyes.  As she sat

19   on my lap coughing and wheezing feverishly, when she was in

20   pain or fear, especially during endless needle poking to get

21   an IV or draw blood, she screamed, desperately screamed and

22   cried for help while squeezing my supportive fingers; these

23   very fingers that signed the checks to relieve and alleviate

24   the suffering for children all around the world.  Witness

25   these fingers, and God is my witness.

Her screams were louder, and I swear were much louder in my conscience then the roaring of Israeli jet fighters, and much, much louder than the fiery rhetoric of Palestinian leaders.

Her fever kept Wejdan and I up all night, but my mind often tried to compensate for the suffering by thinking about ways to alleviate the suffering of less fortunate children; children who had no fingers to squeeze on and no shoulders to cry on, forgotten and abandoned amidst the darkness of their own helplessness.

It was not hate for Israel or passion for politics that drove my destiny. Sanabel's entire life had been a symphony of suffering and pain, and God helped me to remix that symphony into a mix of relief and hope for so many people around the globe. This is how HLF transcended, raised politics and religion. And the more Sanabel triumphed and showed resilience to her killer diseases, the more energetic I became and the more resolve I became. The more she fought back and clung to life, the more I fought the impossible to help others cling to their life.

I had traveled the corners of the world to do God's work, and I met face to face with the subjects of my work. I cried with them, and for them I listened passionately to their stories, and I held the babies on these arms against this very chest. I toured their makeshift homes and open sewage streets

1    with these feet.  I did it because I cared, because I am a

2    human being, too; not in the behest of Hamas and not to

3    promote a Palestinian group over another, or either not to

4    instigate the afflicted against the Israelis, not in

5    Palestinian or Lebanon or Bosnia or Oklahoma City, or even in

6    downtown Dallas or in Turkey or Kosovo or Chechnya or Jordan.

7              THE COURT:  Mr. Baker, you have now used almost 15

8    minutes and you have made your point, and you need to finish

9    up here in the next minute or two.

10             MS. HOLLANDER:  Your Honor, with all due respect, I

11   believe that Mr. Abu Baker would like to finish what he has to

12   say.

13             THE COURT:  I don't mind him finishing, but I don't

14   know how long he is going to go, and I don't want to go all

15   morning, counsel.  He is not entitled to do that.

16             MS. HOLLANDER:  He is not going to go all morning.

17             THE COURT:  How long is he going to go?

18             MS. HOLLANDER:  I believe he has maybe ten more

19   minutes and he will be finished.

20             THE COURT:  I will give you five more minutes.  You

21   can finish in five minutes; five minutes, counsel.

22             THE DEFENDANT:  Thank you, Your Honor.

23             MS. HOLLANDER:  Your Honor, just for the record, we

24   do object to the Court interrupting Mr. Abu Baker.  He has a

25   right to make his statement.  He is being sentenced to a very

1    long time, and we object to the Court's interrupting him.

2            THE COURT:  That objection is overruled.  Any other

3    statements, Ms. Hollander, from you or Ms. Duncan?

4            MS. DUNCAN:  No, Your Honor.

5            THE COURT:  Mr. Jonas, or who is speaking?  Ms.

6    Shapiro?

7            MS. SHAPIRO:  Your Honor, I just want to return for

8    a moment to the evidence that was presented at trial, because

9    Mr. Abu Baker and counsel ignore the evidence that was

10   introduced at trial showing that this was not a legitimate

11   charity that accidentally sent a few wire transfers to the

12   wrong committees.

13       The evidence showed, contrary to Mr. Abu Baker's

14   statement, that this was a deliberate design, plan, and scheme

15   to support Hamas from the United States.  The Elbarasse

16   documents show us that the Holy Land Foundation was set up as

17   part of a larger organization to the Palestine Committee.  It

18   was designed to be the money operation for Hamas in the United

19   States for the Palestine Committee, whose larger mission was

20   to support Hamas.

21       That plan was to exploit the American public's generosity

22   and empathy, to collect donations, and to put that money into

23   the hands of Hamas and specifically into the hands of Hamas'

24   social wing, the base on which the entire Hamas organization

25   was built.  All of this was done to promote Hamas and its

1  objectives, objectives which the Defendants, including Mr. Abu

2  Baker, were well aware.

3      They were well aware of the violence that Mr. Hamas

4  employed, and the evidence of this was breathtaking and

5  presented at trial.  There were the Elbarasse documents

6  showing the organizational structure and design of the

7  Palestine Committee.  There were videotapes showing the

8  Defendants' support for Hamas, including Mr. Abu Baker,

9  showing him dancing with children on the stage as songs

10  praising Hamas were being sung.  There were tapes showing the

11  brainwashing of children.  We saw evidence that children were

12  being indoctrinated to support hatred.

13      We saw the Philadelphia conference where they spoke about

14  undermining the Oslo Accords and the need to conceal their

15  activities.  They spoke about deceiving the American public,

16  about the need to talk to the American public about things

17  they understand like civil rights because Americans could

18  relate to that.  They talked about how war is deception--fake

19  left look right.

20      There were phone calls, contacts, conferences with major

21  Hamas leaders.  There is Mohammed Siam, Abdullah Azzam,

22  Mahmoud Zahar, and Jamil Hamami just to name a few, the upper

23  echelon of the terrorist organization.  There was evidence of

24  the spiritual leader Sheikh Ahmed Yassin covering up for the

25  Holy Land Foundation when a reporter from the Dallas Morning

1    News interviewed him.

2         We heard Mohamed Shorbagi who is a supporter of Hamas, an

3    insider, talk about how the Holy Land Foundation was Hamas,

4    how the money that went to the Holy Land Foundation, that he

5    knew that that money would go into the hands of Hamas.

6         There were wire transfers showing the clear pattern of

7    money going to Hamas' social wing through the zakat

8    committees.  There was evidence showing the concealment by

9    routing it through the zakat committees and routing it through

10   their own accounts overseas so it couldn't be traced.

11        If Mr. Abu Baker wanted to commit himself to a life of

12   charity, he should have done it without providing that charity

13   to a terrorist organization.

14        We all feel for the family and the dependents of Mr. Abu

15   Baker.  Nobody wants the family and dependents to suffer.  But

16   for a long period of time this Defendant and others engaged in

17   conduct that put their dependents at risk.  Mr. Abu Baker is

18   responsible.  He engaged in this conduct over the course of a

19   decade.

20        We understand of course, Your Honor, that the Guidelines

21   are advisory, and with respect to other cases that Ms. Duncan

22   cited, with respect to Mr. Raed Salah, of course, he was

23   sentenced in another country, completely different punishment

24   structure.  He also pled guilty to a lesser charge.  The case

25   of *el-Masri* presented unique circumstances with respect to

1    Guantanamo.  And in addition, he also pled guilty to a charge

2    that capped at 15 years.

3         Mr. Abu Baker has not pled guilty, has not taken

4    responsibility, and we think that the evidence at trial, Your

5    Honor, speaks for itself.

6              THE COURT:  Thank you.

7         Ms. Duncan or Ms. Hollander, any further statements?

8              MS. HOLLANDER:  Your Honor, once again, if the

9    problem here is that Mr. Abu Baker gave charities to the

10   wrong -- gave money to the wrong charities, then I submit that

11   the United States government continued to do that for years

12   afterwards through USAID to the same charities.  The

13   Government refuses to acknowledge that this was evidence in

14   this case, and refuses to acknowledge that this same

15   government didn't have to agree to let Mr. Al-Marri, a sleeper

16   agent for Al-Qaeda, plead to 15 years.  The Government didn't

17   have to agree that that individual should get out of jail even

18   though he admitted to planning terrorist acts.

19        And the Government has said that they understand that the

20   Guidelines are only one factor, but if you read everything

21   that they have said, all they have focused on are the

22   Guidelines, as though the United States Supreme Court did not

23   speak to them.

24        I repeat, Mr. Eric Holder, who is their boss, has said it

25   is not their obligation to convict.  It is their obligation to

1     do what is right.

2          In 30 years of practicing law, Your Honor, in 30 years of

3     standing before courts and in sentencings, I have never heard

4     the Government allocute with such vitriol as I have heard in

5     this case.  I have never heard the Government repeat

6     testimony, as they did in this case, and I think that the

7     Government -- It is up to this Court now to do what is right

8     and to sentence my client to a sentence that is well below the

9     Guidelines in this case.

10              THE COURT:  Okay.  Thank you.

11          Well, I have accepted the findings of the Probation

12     Office as contained in the presentence reports and the

13     addendums.

14          It will be the judgment of the Court -- We have these

15     multiple counts.  It will be the judgment of the Court, Mr.

16     Baker, that you be sentenced to 15 years in the custody of the

17     U.S. Bureau of Prisons on Count 1; 15 years on each of the

18     next 9 counts, 2 through 10, and those will run concurrent

19     with each other and concurrent with Count 1.  And then you

20     will be sentenced to 10 years on Count 11.  That will run

21     consecutive to Counts 1 through 10.

22          You are sentenced to 10 years on Counts 12 through 21.

23     Those will run concurrent with all the other counts.  You are

24     sentenced to 20 years on Count 22.  Those will run consecutive

25     to Counts 1 and 11.  You are sentenced to 20 years on Count

1    23.  That will run consecutive to Counts 1, 11, and 22.  You

2    are sentenced to 20 years on Counts 24 through 32.  Those will

3    run concurrent with all of the other counts; five years on

4    Count 33 to run concurrent with all of the counts; three years

5    on Count 34 to run concurrent with all of the counts.

6         Your total sentence is 65 years when you add the

7    consecutive counts.

8         A further judgment of the Court that that will be

9    followed by a three-year term of supervised release on the

10   various counts, they carry three years; one year on count 34.

11   Those will all run concurrently.  You will have certain

12   conditions that the Probation officer will explain to you.

13        I will not order a fine in this case in light of your

14   financial circumstances and the length of the sentence.

15        Restitution does not apply.

16        There is a $100 per count mandatory special assessment

17   that has to be imposed in each case.  That will be imposed in

18   your case for a total of $3,400.

19        I need to make a statement in terms of the reasoning for

20   the sentence, Mr. Baker, you and your attorneys of course

21   presented the defense that your life's work was helping

22   others, the charity that you were involved in, but the problem

23   with that is it doesn't tell the whole story; that the

24   evidence presented that was played out here over the two

25   months we were here in trial, as shown by the evidence -- And

of course there is no dispute that the Palestinian people are
in need.  There is a lot of desperate situations over there,
but that doesn't justify violating the law and it doesn't
justify supporting terrorist groups, and that is what you
keeping out and that is what your lawyers keep leaving out.
The jury didn't leave it out, and that is why you were
convicted.

     Ms. Hollander, you keep pointing out that the allegations
are simply that he provided aid to these zakat committees that
were controlled by Hamas, and that that is all that the
allegations are.  And that is what the allegations were, and
that is what the convictions were, but the evidence shows much
more than that.  It shows the other half of the story.

     And you stated that there were no evidence of anti-Jewish
statements from Mr. Baker.  I don't know how many videos we
saw where there were vehement and violent anti-Jewish skits
presented, dances, songs, Mr. Baker was there, Hamas speakers
were there are both pre- and post-designation; lots of
evidence that indicated that that is what is going on.

     The money that -- It was advertised that HLF was raising
money to go to the benefit of Hamas; skits about killing Jews,
praising killing Jews, just a lot of the documents,
conversations that were intercepted between some of the
Defendants where they are praising the suicide bombings where
individuals are killed, civilians that are not soldiers that

1    are not involved in the war over there but they are being

2    killed by Hamas, and these Defendants were praising that

3    conduct.  So there is plenty of evidence that you haven't

4    touched on that shows the other side of what is going on here.

5         Part of the problem that we have here, this is one of the

6    first financing cases that we have, and so there aren't a lot

7    of other comparators.  But you have to consider that the fact

8    that someone who commits one or two acts of terrorism and

9    violence, are they in the same category as someone who is

10   raising millions of dollars over years to fund a terrorist

11   group who repeatedly commits acts of violence, and this is

12   what we have here these Defendants have done.  This is what

13   the evidence shows over the years since HLF was created until

14   it was shut down in 2001, for over ten years they raised

15   millions of dollars that went to support a terrorist

16   organization and to support terrorists.  And so that is a

17   different situation than someone who simply commits an act of

18   terrorism, as bad as that is.  They are funding and helping to

19   cause the commission, then, of ongoing repeated acts of

20   violence over the years, multiple acts.

21        And in short, Mr. Baker, you weren't here and weren't

22   convicted because you were helping people.  There is nothing

23   wrong with helping people.  A lot of people help people and

24   they don't get brought into court.  You were here and you were

25   convicted because you were supporting terrorists.  And the

1    evidence shows that probably most of your adult life you have

2    been a supporter of Hamas.  That is one of the reasons that

3    that pre-designation evidence came in.  It shows your entirety

4    of the conduct, how long you were engaged in this conduct of

5    supporting Hamas.  It wasn't illegal at the time, but it

6    became illegal and you continued doing it because you are a

7    supporter of Hamas.  This was your function.  This was the

8    function of the HLF, and so you continued to do it after it

9    was illegal.

10        And it is not that you were helping people.  You were

11   helping people.  But you were supporting Hamas, and you were

12   supporting Hamas through the guise of helping people.  So

13   there is no question you were helping people, but that is not

14   why you were charged and that is not why you were convicted by

15   the jury.  You were convicted because you were found to be a

16   strong and ongoing, active, and long continuing supporter of

17   Hamas and you violated the law in doing that.

18        I also need to state that the sentence of the Court has

19   been imposed considering the factors, the 3553(e) factors,

20   which you pointed out, Ms. Hollander, as well as the evidence

21   that I heard over the weeks of trial, the evidence contained

22   in the presentence reports.

23        And it is also based, regardless of manual that is used,

24   whether we use the 2001 or 2002, I think the calculations

25   would be roughly the same.  The sentence that the Court would

1    impose would be the same under either manual.  It would be the

2    same if we were simply just going under 3553(e), which I think

3    at some point is your argument in there under the 2001 manual.

4    I disagree that that is the way those calculations would work.

5    I think the 2S1.1 calculations would be the one in effect.  I

6    think the 3A1.4 Guideline still would apply, so we would

7    roughly have the same Guideline calculation.

8        In any event, the Court's sentence would be the same

9    regardless of which manual we are using or just proceeding

10   under 3553.

11       I need to advise you, Mr. Baker, that you have the right

12   of course to appeal in this case.  If you don't have the funds

13   to hire an attorney, we will appoint an attorney to represent

14   you at no cost to you.  You will be entitled to a copy of the

15   transcript of the trial, all the proceedings before trial, as

16   well as the proceedings here today.  Those will be provided at

17   no cost to you.  You can speak with your attorneys about

18   exercising your right of appeal, if you wish to do so.

19       Ms. Hollander, Ms. Duncan, anything else we need to

20   address here?

21            MS. HOLLANDER:  Yes, Your Honor.  We have two

22   requests.

23       One is pursuant to Rule 38, Your Honor can recommend that

24   Mr. Abu Baker remain close by until the appeal, and in this

25   case we particularly ask for that because, as you know,

1    some -- We are going to have to come to Dallas to work in our

2    secure room for -- part of the appeal will involve classified

3    evidence.  And it would actually, since he is indigent, will

4    save the government considerable money, too, if he can be in

5    the same place so that we don't have to travel to two

6    different places when we are working on the appeal.  Since we

7    are going to have to come to Dallas to do part of it, Rule 38

8    does provide that Your Honor can recommend to the Attorney

9    General that he stay where he is, or if there is another

10   facility close to Dallas during the pendency of the appeal.

11        Our second request is that Your Honor recommend to--this

12   is a separate request--to the Bureau of Prisons that his

13   designation be as close to Dallas as possible.  And we make

14   that request specifically because his daughter Sanabel cannot

15   travel very far.  And if he is in a remote prison where

16   normally a family, even a large family can get there, she is

17   not going to be able to see him.

18        So we would ask Your Honor -- I realize the Bureau of

19   Prisons makes the final decision, but the Bureau of Prisons

20   does consider a judge's recommendation, and in this case we

21   have a specific request based on the illness of the child that

22   you recommend that he remain --

23        THE COURT:  I will grant those requests.  I think

24   the appeal certainly is more practical if he is here so you

25   can work on it, and because of his daughter's situation.

1    I am sure you understand, Mr. Baker, your lawyers have

2  explained to you that that is not binding on the Bureau of

3  Prisons, they will make the final designation, but I will be

4  glad to make the recommendation.

5    Anything else that we need to address, then, counsel?

6        MS. DUNCAN:  No, Your Honor.

7        THE COURT:  From the Government?

8        MS. SHAPIRO:  Your Honor, just two small points.

9  This is just to make sure the record is clean.  I believe in

10  the Guidelines for the obstruction enhancement, you may have

11  done this, but there needs to be a specific finding made by

12  Your Honor that there was a material falsehood.

13        THE COURT:  I think I stated that he made some

14  material false statements, and that it was made with the

15  intent to impede and obstruct the criminal investigation.

16        MS. SHAPIRO:  Thank you.

17    The other thing is I am told that as part of the sentence

18  there should be a pronouncement of forfeiture.

19        THE COURT:  Correct.  We have entered a preliminary

20  order of forfeiture, and the Court win incorporate that into

21  the judgment based on the's verdict.

22        MR. JUNKER:  Your Honor, Walter Junker appearing for

23  the Government.  The case law actually requires that the Court

24  orally pronounce the forfeiture as part of the sentence of the

25  Defendant, not just merely just incorporate it.

1            THE COURT:  That incorporating it is not sufficient?

2            MR. JUNKER:  That the Defendant has to be informed

3   on record, for example, that for this particular Defendant it

4   would be a money judgment has been found against him by

5   special verdict of the jury in the amount of $12.4 million

6   that he is jointly and severally liable with the other

7   Defendants for.

8            THE COURT:  All right.  Did you understand that, Mr.

9   Baker, that the jury answered yes on the forfeiture, that

10  $12.4 million.  So the judgment will include this judgment

11  against you for the $12.4 million, and you are jointly and

12  severally liable with your co-Defendants.

13       Anything else from the Government?

14            MS. SHAPIRO:  No, Your Honor.

15            THE COURT:  Mr. Baker, you are remanded to the

16  custody of the Marshal to serve your sentence.  Good luck to

17  you.

18                     (End of hearing.)

19

20

21

22

23

24

25

1       I HEREBY CERTIFY THAT THE FOREGOING IS A

2       CORRECT TRANSCRIPT FROM THE RECORD OF

3       PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4       I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5       FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6       COURT AND THE JUDICIAL CONFERENCE OF THE

7       UNITED STATES.

8

9       S/Shawn McRoberts            06/17/2009

10      _____DATE_____
        SHAWN McROBERTS, RMR, CRR
11      FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25