IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

UNITED STATES OF AMERICA      )   CAUSE NO. 3:04-CR-240-P
                               (
vs.                             )
                               (   MAY 27, 2009
                               )   DALLAS, TEXAS
MOHAMMAD EL-MEZAIN         (   9:00 A.M.

_____

_____

SENTENCING

BEFORE THE HONORABLE JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE

_____

A P P E A R A N C E S

FOR THE GOVERNMENT:   UNITED STATES ATTORNEY'S OFFICE
                         1100 COMMERCE, 3RD FLOOR
                         DALLAS, TEXAS   75242
                         BY:   MR. JIM JACKS
                               MR. BARRY JONAS
                               MS. ELIZABETH SHAPIRO
                               MR. WALT JUNKER

FOR THE DEFENDANT:   LAW OFFICE OF JOSHUA L. DRATEL
(MOHAMMAD EL-MEZAIN) 14 WALL STREET, 28TH FLOOR
                         NEW YORK, NEW YORK   10005
                         BY:   MR. JOSHUA DRATEL
                               MR. AARON J. MYSLIWIEC

1    THE COURT:  Call the case against Mohammad

2  El-Mezain.

3       Mr. Dratel and Mr. Mysliwiec, you are ready to proceed?

4            MR. DRATEL:  Yes, Your Honor.

5            THE COURT:  And Mr. Jonas, you are ready to proceed

6  on this case?

7            MR. JONAS:  Yes, sir.

8            THE COURT:  If you will come up with your client.

9            MR. DRATEL:  Your Honor, due to Mr. El-Mezain's

10 position, he can't stand for any period of time.  If he can

11 sit -- I am happy when I am speaking to be at the podium, but

12 in terms of the initial allocution I will stand next to him.

13           THE COURT:  That is fine.  Let's take a short

14 recess.  Let's take about a five-minute break, and we will

15 continue.

16                     (Brief recess.)

17           THE COURT:  Mr. Dratel, are you ready to proceed?

18           MR. DRATEL:  Yes, Your Honor.

19           THE COURT:  And Mr. El-Mezain, you were convicted by

20 a jury back on November the 4th, 2008 on Count 1, conspiracy

21 to provide material support to a foreign terrorist

22 organization.

23      We are now here on a sentencing hearing.  The Probation

24 Office has prepared a presentence report, then an addendum to

25 that presentence report, and then this morning provided your

1    counsel with a second addendum to the presentence report.  The

2    addendums were prepared in response to objections filed by

3    your attorney.

4        And have you had the opportunity to review the

5    presentence report with your attorneys, Mr. El-Mezain?

6            THE DEFENDANT:  Yes, sir.

7            THE COURT:  All right.  And do you understand all of

8    the information that is contained in these presentence

9    reports?

10           THE DEFENDANT:  Yes, sir.

11           THE COURT:  And Mr. Dratel, you have gone over these

12   presentence reports and the addenda with your client?

13           MR. DRATEL:  Yes.  Although obviously to the second

14   addendum we have not had an opportunity in that regard.

15           THE COURT:  And you satisfied, at least with respect

16   to the first addendum and the presentence report, Mr.

17   El-Mezain understands all of the information in there?

18           MR. DRATEL:  Yes, Your Honor.

19           THE COURT:  And then Mr. Jonas, the Government had

20   no objections to the presentence report in this case as well?

21           MR. JONAS:  That is correct, sir.

22           THE COURT:  And Mr. Dratel, you filed a number of

23   objections.  Do you wish to address those beyond what you have

24   in writing?

25           MR. DRATEL:  No, Your Honor.  Just the three that

1    affect the Guidelines.  And I know that obviously the Court

2    has reached certain conclusions with respect to them, and I

3    just want to sort of put them in the context of Mr. El-Mezain

4    and not revisit the argument that occurred before.

5        I would, of course, adopt all co-Defendants' arguments,

6    both before and afterwards, to the extent that they benefit

7    Mr. El-Mezain.

8        The terrorism enhancement, I just want to point out also

9    in the context of Mr. El-Mezain, obviously, that the

10   Government's sentencing memorandum focuses -- when it talks

11   about the coercion and intimidation element of the terrorism

12   enhancement, it is the Defendant's conduct that must do that,

13   not the FTO, the foreign terrorist organization that does

14   that, but it is really the Defendants' conduct.  And I don't

15   believe there has been any evidence with respect Mr.

16   El-Mezain, particularly within the confines of the statutory

17   period that is relevant to him, which is after October 8,

18   1997, which is the statute --

19            THE COURT:  And you are speaking of the 3A1.4

20   enhancement?

21            MR. DRATEL:  Yes.  And so I think with respect to

22   Mr. El-Mezain there has not been that proof, and as a result

23   the terrorism enhancement should not apply to him.

24       If you want I can go over the other two --

25            THE COURT:  Sure.  Why don't you go ahead and go

1    over all --

2          MR. DRATEL:  On the obstruction, there are two parts

3    of the obstruction that have been raised in the presentence

4    report.  The first is with respect to the 302s, you know, the

5    interview with the FBI, which I think doesn't qualify under

6    the application notes, and certainly I think the addendum is

7    completely off base or there is no basis for the claim in the

8    addendum that somehow that Abu Marzook relates to an element

9    in Count 1.  I don't think that is the case.

10         With respect to the deposition, we have obviously set it

11   out in paper, and also with respect to the interviews, and I

12   am just sort of putting those in more specific context.  With

13   respect to the depositions, we have set it in writing, but I

14   just want to point out again that the 2003 deposition does not

15   state a time frame for the answers that the presentence report

16   relies on with respect to Mr. Abu Marzook in terms of when

17   these contacts and what the frequency of contacts was over the

18   time.  We are talking eight years since Mr. Abu Marzook was in

19   the United States, or at least he was in custody for two

20   years, but since he was available in the United States to

21   speak to, and that it is also I think telling that in the

22   entirety of the wiretap from '93 to 2003 of Mr. El-Mezain's

23   lines there are no conversations between he and Mr. Marzook.

24         So I don't think there can be a finding that -- I don't

25   think there can be the necessary finding of intentionality as

opposed to mistake, failure of memory, and other things that
are factors in the obstruction because it is a very different
guideline than many others because it really does put the
burden on the Government to demonstrate to the Court that in
fact it was willing and -- knowing and willful as opposed to
the product of either mistake or the failure of the questioner
to be precise.  So I think that also would negate that
guideline for Mr. El-Mezain.

       With respect to leadership role, again, the leadership
role is about offense conduct of the Defendant, not the
Defendant's position in an organization.  So the fact that Mr.
El-Mezain was a founder of Holy Land when it was perfectly
legal in terms of whatever its activities were, that would not
be a leadership role in the context of the offense conduct.
And again, if you look at the evidence there is no evidence
about Mr. El-Mezain's activity or involvement in any of the
decision-making about where specific money went to specific
zakat committees.

       Essentially he is a fundraiser and a founder, so he is
not part of that decision-making process, and I think that it
would be inappropriate to assess a leadership role in the
offense conduct because his role in the organization had
nothing to do with the offense conduct.

       In addition, the only project that Mr. El-Mezain is
actually personally connected to in the evidence is the Dar

Salam project, the hospital, which is not part of the

Government's proof and not part of the conspiracy.  So in that

context I think the leadership role enhancement would be

inappropriate, whether it be 4, 3, 2, or 1.  Obviously we

would be arguing against the 4, but I don't think it applies

at all.

So those are the three that affect the Guidelines.

Obviously we made the others in writing, and we stand by

those.

THE COURT:  Thank you.

Mr. Jonas.

MR. JONAS:  Your Honor, if Your Honor is going to

apply the same rulings you made with the Defendant Abu Baker

to Defendant El-Mezain, as the Government thinks you should

because they are the same course of conduct, then there is

really no need to make more arguments.  I will just rely upon

the arguments we made this morning.

THE COURT:  He has made some specific arguments here

that just apply to Mr. El-Mezain, specifically the obstruction

and then the leadership role.  I think the 3A1.4, he made some

slightly different arguments, but I think the application of

that is going to work the same in all Defendants.  But he has

made some specific arguments as far as the application of

those enhancements for the obstruction of justice and the

leadership role for Mr. El-Mezain.  If you want to address

1  those.

2       MR. JONAS:  I will briefly address those, and we

3  addressed these in our papers so I won't belabor the point.

4       With regard to the leadership role, Mr. Dratel is arguing

5  that his role with the HLF, the Holy Land Foundation, was not

6  the same as a leadership role for the offense conduct.  They

7  are one and the same.  The HLF was created, as Your Honor has

8  acknowledged, for the purpose of supporting Hamas.  The

9  Defendant El-Mezain is one of the three founders of the Holy

10  Land Foundation.  He was an officer or director.  He held a

11  high position in that organization.

12       THE COURT:  What about post-conduct?  I think

13  Mr. Dratel's argument is a lot of that is pre-designation, and

14  so his offense conduct didn't begin until 1997 with that

15  designation in 1997.  And so he is saying you have to focus on

16  his role at that time.

17       MR. JONAS:  He was chairman of the board until 1999

18  when he became I believe it was director of endowments, and I

19  think Defendant Ghassan Elashi became chairman of the board at

20  that point.  Once he became director of endowments, then he

21  started receiving a salary.  If Your Honor recalls, we played

22  a phone call between Defendant Shukri Baker and Omar Ahmed

23  where they talked about how much money the Defendant El-Mezain

24  should receive for his past fundraising activity in 1999,

25  because at that point he was going to receive a salary from

that point forward. So he always maintained a high position
within the organization post-1997.

From 1997 through 1999 when he lived in New Jersey, he
was directly controlling the activity of Abdulrahman Odeh, as
was brought out in trial. We noted the transcript page in our
sentencing memorandum. So he controlled the activity of
another individual involved in the conspiracy. So I think he
clearly played a role from 1997 forward that started prior to
that time period and just continued on up until the time that
the Holy Land Foundation was shut down.

As the Government showed during the trial, his rank in
the Palestine Committee, as established by the Elbarasse
documents show that he is was fairly high up there as a member
of that committee. Again, that committee continued on
throughout the years in the course of the conspiracy.

So even though Mr. Dratel is focusing on the time period
in 1997 forward, his activities prior to 1997 continued and
his role in this case, his role in the Holy Land Foundation,
continued on and forward through 1997 up through 2001.

With regard to the obstruction of justice, and I will
focus for a moment on the deposition, the deposition that took
place in 2003, we highlighted certain statements in that
deposition, which was Government's Exhibit El-Mezain
Deposition, in our sentencing memo we highlighted certain
statements that were patently false, along the same lines as

1    the Defendant Abu Baker's statements.  They were in effect one

2    and the same.  The two of them were both lying about Palestine

3    Committee, the relationship between the HLF and other

4    organizations that were part of the committee, including

5    individuals, the relationship with Abu Marzook, the

6    Defendant's own relationship with Abu Marzook, which the

7    Government showed was extensive.

8         So I think the Defendant's false statements in that

9    deposition mirror the false statements of Defendant Abu Baker

10   and both the leadership role, four levels for leadership role

11   and two levels for obstruction should apply.

12             THE COURT:  Thank you.

13        Mr. Dratel?

14             MR. DRATEL:  I just want to point out, with respect

15   to leadership, Mr. Odeh ran the New Jersey office.  Mr.

16   El-Mezain was not a part of the New Jersey office.  He

17   happened to live in New Jersey.  But even that would still

18   only be one person for purposes of management and supervision,

19   which wouldn't qualify for leadership enhancement.

20        When you talk about the Palestine Committee, there is no

21   evidence after 1997 of Palestine Committee activity that Mr.

22   El-Mezain is involved in one way or the other.  I don't think

23   there evidence of Palestine Committee activity after the early

24   '90s from the Elbarasse documents.  So in that context I don't

25   think that proves it.  I think that we are still stuck in the

1    same place.

2           THE COURT:  Okay.  Thank you.

3       And I am going to overrule those objections.  I believe

4    Probation correctly calculated and correctly applied those

5    enhancements.

6       With respect to the deposition testimony I am going to

7    find that Mr. El-Mezain did give materially false -- made

8    materially false statements that were made and given with the

9    intent to obstruct the investigation that he knew -- the

10   criminal investigation that he knew was already underway and

11   ongoing at that time.

12      The leadership, Mr. El-Mezain was one of the founders,

13   was one of the creators that helped create the Holy Land

14   Foundation for the purpose of supporting Hamas.  And while the

15   roles changed among Mr. Baker, El-Mezain, and Mr. Elashi over

16   time, it always appeared from the evidence consistently

17   throughout the entire time of the conspiracy through the time

18   that it was shut down Mr. El-Mezain was one of the leaders of

19   the Holy Land Foundation, was one of the leaders in the bigger

20   Palestine Committee enterprise that was ongoing at that time.

21   So I think the enhancements are properly given.  Those

22   objections are overruled.

23      And the 12-level enhancement for 3A1.4, I think that is

24   also properly given.  And as I stated previously in regards to

25   the previous sentencing, that section applies whether we are

using the 2001 or the 2002 manual.  The Guidelines section
states that if the offense is a felony that involved or was
intended to promote a federal crime of terrorism, and so this
underlying -- Well, the money laundering offense was clearly,
the evidence showed, was intended to promote a federal crime
of terrorism, the 2339B of which some of the other Defendants
were convicted.  And I think the prerequisites and the
requirements of that section are met by the evidence in the
case.  So that application is also properly given.  I will
overrule the objections that affect the calculation of the
Guidelines.

Any other objections that you wish to address?

MR. DRATEL:  No, Your Honor, other than what we have
already submitted in writing.

THE COURT:  And you are resting on those.

MR. DRATEL:  Yes.

THE COURT:  And with that, then, I will accept the
findings of the Probation Office as contained in the
presentence report, also in the addendum to the presentence
report.  I will adopt those as the findings of the Court in
this case.

We do have an offense level of 43, Criminal History
Category of VI because of the terrorism enhancement with a
range of life, but we have a maximum sentence here, statutory
maximum of 15 years, 180 months.  So that will be the maximum

1    that the Court will consider in this case.

2        Mr. Dratel, I will hear from you.

3            MR. DRATEL:  I think the place to start is the

4    language of the statute 3553(a), which Ms. Hollander mentioned

5    so I won't go into it in significant detail, but just

6    sufficient but not greater than necessary is the important

7    language that the Supreme Court has focused on, which is what

8    the sentence should be; sufficient but not greater than

9    necessary to achieve the purposes of sentencing set forth in

10   3553(a)(2).

11       And I think in this case with respect to Mr. El-Mezain,

12   aside from what we have submitted to the Court, I know we

13   submitted voluminous materials to the Court and I am not going

14   to go through them in great detail, but I just want to

15   summarize them and essentially distill it to two elements that

16   make this case different with respect to Mr. El-Mezain and

17   compel a sentence that is substantially below the statutory

18   maximum, and in fact should be time served, but at least

19   substantially below the statutory maximum.

20       The first element is the unique conduct that is at issue

21   in this case, and the second is the extraordinary Defendant

22   who stands before the Court for sentencing.

23       And with respect to the conduct, the statute, 2339B that

24   he is convicted of, the only statute that he is convicted of,

25   the structure of the statute and the construction of the

 1   statute I think are important because the intent element is so

 2   important, because -- We lost this legal issue in litigating

 3   before the Court, so I am not trying to relitigate the

 4   question of liability.  I just want to point out that with

 5   respect to liability, the Defendant is guilty if the Defendant

 6   knowingly provides material support to a designated entity.

 7   Now, it doesn't matter what the Defendants' motivation is.  So

 8   his motivation or his intent in terms of what he is trying to

 9   do can be bad, it could be benign, or it could even be

10   benevolent.  That doesn't matter for purposes of liability.

11   If he knowingly provides it to a terrorist organization, it is

12   a crime.  But it does matter with respect to sentencing as to

13   what that underlying motivation is.

14       That is what 3553(a) and the factors that the Court must

15   consider, that is what they are all about is looking at the

16   conduct beyond just the offense of conviction, which is all

17   just about the Guidelines.  And that is what *Booker* is all

18   about, an advisory Guideline system as opposed to a mandatory

19   Guideline system.

20       Otherwise, really, if you are just looking at the offense

21   of conviction, and it is really just a mandatory Guideline

22   system recast in another form and which would violate the

23   Sixth Amendment.

24       This case is completely unlike other material support

25   cases in two ways at least.  The first is that this is a case

1    of money provided for charity that went to charity.  So we

2    have money that was given for the purpose of providing

3    essential goods and services for needy persons, and it went to

4    those needy persons.  This distinguishes this case from other

5    material support cases which involve the provision -- the

6    material support in those cases, the provision of services

7    such as someone going to a training camp, someone offering

8    their services to Al-Qaeda.

9         There is a case that we mentioned, the *Tarik Shah* case,

10   who offered to provide martial arts training to Al-Qaeda.  He

11   received a sentence of 15 years.  That is a knowing provision

12   of material support for the purpose of supporting violent

13   conduct.

14        There are other cases, weapons, the *Arif* case, missiles,

15   15 year sentence.  Equipment, expertise, those are the types

16   of things that are the hallmark of every material support case

17   except this one.

18        The other way that this case is so different than other

19   cases is the material support is indirect.  It doesn't go

20   directly to Hamas.  It goes to organizations that the

21   Government says are operated for the benefit of Hamas; not

22   necessarily part of Hamas proper, but operated in an affiliate

23   form for Hamas.  And that is important also, because the

24   attenuation from the terrorist organization is another unique

25   aspect of this case.

1    There are some other factors that make this case unique,

2    and I will summarize them.  Ms. Hollander went into some

3    detail, and of course I adopt those arguments.  Some of the

4    organizations that received money in the indictment are the

5    same as the U.S. government provided money to.

6    Dar Salam, that is one aspect of this case that we know

7    Mr. El-Mezain was closely involved in.  That is not in the

8    indictment.

9    Mr. El-Mezain's acquittals I think should be factored

10   into the equation, because if you look at the nature of the

11   conduct and the nature -- it is really just extraordinarily

12   narrow at this point, and the jury has found him not guilty of

13   all the other conduct.

14   The hearts and minds theory of the Government also

15   attenuates this case from the ordinary case.  This is not

16   about a case where things went directly to a terrorist

17   organization.  The Government's theory, which is unique among

18   material support cases as well, is that Mr. El-Mezain did what

19   he did so that Hamas could win the hearts and minds.  It is

20   not even a direct benefit to Hamas.  It is an indirect benefit

21   to Hamas, because Hamas gets this sort of secondary benefit.

22   It is not a direct primary benefit.  It is a secondary benefit

23   down the road that Hamas wins the hearts and minds.

24   And they placed a lot of evidence, the Government in its

25   sentencing memorandum places a lot of evidence on the Bruce

1    Hoffman's testimony, and they point out there was no cross

2    examination.  There is just a fundamental fallacy in Mr.

3    Hoffman's thesis and his testimony, and I will explain why he

4    wasn't cross examined as well.  But he says, "Successful

5    terrorism groups have social service networks, and it is

6    essential."

7        Well, the most successful terrorist organization in the

8    world today, Al-Qaeda, does not have any social service

9    network.  It is a fallacy that that is required, that they are

10   somehow connected.  And obviously we weren't going to cross

11   examine on the issue of Al-Qaeda when the Court had already

12   said that is not part of the case, and we are not going to be

13   baited into making that distinction to open that door.

14       All of these factors make this case and the conduct in it

15   completely outside the heartland.  And whether it is a formal

16   departure or whether it is under 3553(a), I think this case

17   stands unique and Mr. El-Mezain's position in it stands

18   unique, because if you look at the amount of conduct with

19   respect to Mr. El-Mezain, what came into evidence and what

20   came in post 1997, the actual time period of the statute and

21   what came in pre-'97 I think that is also a factor.

22       So I think all of those things really take the Guidelines

23   and put them in a special place for this case where they have

24   almost no meaning.  And there are a couple of reasons why as

25   well, because -- I am going to address something that I think

1    is lurking out there in sentencing in the context of Mr.

2    El-Mezain's position compared to the other Defendants, which

3    is he has this high Guidelines computation, assuming --

4    understanding that the Court has already ruled on those

5    issues, and that he is subject to a 15-year maximum despite

6    the fact that he has got a life Guidelines range, and there

7    might be a sense that there is already a significant discount

8    in that context.

9        But to do that and to give credence to that argument I

10   think would be the same as presuming the Guidelines level to

11   be reasonable, which it is not, and the Court is not permitted

12   to do, as the Supreme Court has explicitly said.  I think you

13   have to start with the offense conduct by the Defendant and

14   who the Defendant is, and that is where I am going to get to

15   now, which is the extraordinary Defendant in the case.

16       3553(a) has elements that the Government simply just

17   refused to address.  And it is not surprising, because the

18   Government and the Assistants in this case, they are hamstrung

19   by their own policy which is the Ashcroft memo which dates

20   back to 2002 or 2003 which says that the Government has to ask

21   for a Guidelines sentence, at least if not above, in every

22   case.  So it is not surprising that the Government can't

23   address that in a principled way because it is not permitted

24   to consider those when it talks about sentencing.

25       The Government memo is all about conduct.  It is all

about one factor.  It is all about the Guidelines really.  It
is not about all the other factors of 3553(a).  In fact, at
the end they say there are no grounds for departure.
Departure is a Guidelines concept.  It is not a 3553(a)
concept.  3553(a), the other elements of it, the other factors
operate independent from the Guidelines.

And if I may, Your Honor?

THE COURT:  Certainly.

MR. DRATEL:  As the Court is aware, in fact Mr.
El-Mezain's background is crucial in sentencing.  It is not
just the offense, it is the offender, when you are talking
about sufficient but not greater than necessary.  And 3553(a)
makes that clear.

There are 275 letters that we have submitted on behalf of
Mr. El-Mezain, Mr. El-Mezain specifically.  There is more than
275.  I received another six last night.  And I don't think it
matters whether it is 275 or 280 or 286 or 300, the volume is
there for the Court to see and to consider.

There are another 280 that came from the Dallas community
just in support of Holy Land and Mr. El-Mezain generally.  We
didn't need to submit them because the nearly 300 we have
submitted are about Mr. El-Mezain in particular.

All of these letters demonstrate the personal support,
the support Mr. El-Mezain has in the community personally and
also at large in the context that the work that Holy Land did

1   and the work that Mr. El-Mezain has done outside of Holy Land.

2       I just -- Just to give an example of the letters, among

3   the letters that we did not quote from in the sentencing

4   letter, we only quoted from I think from 31 of the nearly 300

5   that we had on his behalf, but there is one from someone in

6   San Diego who is working as an engineer in the U.S., and he is

7   a recent immigrant in the last decade to the United States.

8   He knows Mr. El-Mezain as an emam and leader of the community.

9   And he says, "Even though he had pain in his leg Sheikh Abu

10  Ibrahim"--that is Mr. El-Mezain--"had always a smile on his

11  face.  I have never seen him getting angry.  He was very

12  affectionate to all of us, including the kids.  My

13  six-year-old son is very fond of him.

14      "Sheikh Abu Ibrahim used to give us short talk after the

15  early morning and night prayers.  In his talk he used to

16  encourage us to be obedient to God.  He always used to

17  encourage us to do good deeds, obey and respect the parents,

18  help the poor and needy.

19      "Sheikh Abu Ibrahim was always present for raising funds

20  for the poor Muslims all over the world and for the local

21  school, masjid, and other Islamic instructions.  On Sunday

22  mornings he always brought traditional Palestine food and we

23  would have a potluck breakfast.

24      "We all miss him and hope and pray he will be with us

25  soon."

1     That is indicative of the types of letters, whether

2  quoted or not.

3     Mr. El-Mezain is someone obviously without a criminal

4  record prior to this case.  Thirty years of service in his

5  community, and if you look at the letters and the people, not

6  only the depth of the people who have written and their

7  comments about Mr. El-Mezain, but also the breadth and scope

8  of it, people who talk about his work in interfaith

9  activities, his work in the community, his work -- and his

10  work is micro and macro.  It is micro on a fundamental level

11  as an emam with families and individuals, helping them solve

12  their problems, as he has done in all the communities that he

13  has been in, but also in the macro in the sense of making his

14  community part of the larger community and a productive part

15  of it and a patriotic part of the community, as the letters

16  demonstrate as well.

17     In the context of all of this information, it is clear

18  that what we heard here in Court is really the isolated part

19  of Mr. El-Mezain's character and history; that this is really

20  what Mr. El-Mezain is all about.  This is the part that is not

21  isolated.  This is his entire life.  And what we hear in the

22  courtroom in the context of a criminal case is a small slice

23  of what a person is in totality.  And the Court has to

24  sentence the totality and not just that small slice that the

25  Court sees.  And that is really what *Booker* is all

1    about--returning to the Court that obligation.

2         Mr. El-Mezain's medical conditions, which again I won't

3    go into detail, we have done that in writing, but I have seen

4    them deteriorate over time as I have been visiting him in

5    prison these last six months, particularly his arthritis and

6    the sciatica.

7         I think alone those are sufficient to compel a sufficient

8    below the statutory maximum, particularly because we don't

9    know the nature of what kind of designation will occur.  There

10   is essentially a Muslim ghetto at Terre Haute, Indiana where

11   many terrorism defendants are sent, regardless of the fact of

12   the nature of their convictions and the nature of their

13   sentences.

14        I fear that in that kind of restricted atmosphere,

15   because there are special restrictions that apply to those

16   inmates in terms of exercise and access to the outside world,

17   that his conditions will deteriorate further and that each day

18   of prison for him will be far more onerous than it will be for

19   an ordinary defendant in an ordinary situation in an ordinary

20   facility.

21        In comparing this case with other cases, looking at the

22   sentence, and I won't go into detail about *Ali Al-Marri*

23   because Ms. Hollander did, but I think the notion that there

24   is an equivalency there, it just doesn't -- I just don't think

25   it is equivalent to say that a 15-year sentence for someone

1  who is bent on committing acts of violence can be equated with

2  the conduct here.

3       There are other cases, too.  The Government is also

4  incorrect.  Mr. Al-Marri was not at Guantanamo.  He was an

5  enemy combatant held in the United States, and apparently he

6  may well get credit for those six years as part of his

7  sentence as part of his plea agreement, that that is available

8  to the judge to do that.

9       But look at even the people in Guantanamo, Hamdan and

10  Hicks who have been sentenced to five years essentially and

11  are already home and free for conduct, conduct on behalf of

12  Al-Qaeda directly--carrying weapons, driving Osama bin

13  Laden--five years for each of them.

14       So when it comes back to sufficient but greater than

15  necessary, these are the factors that need consideration.

16  And when you think of the message that the Government has sent

17  with this conviction, it does not require additional prison

18  time for Mr. El-Mezain.  The message is out there, and the

19  question is for Mr. El-Mezain, given who he is, who he has

20  been, what his conduct was in this case, distinct from other

21  material support cases, his medical conditions, all of that I

22  think compels a sentence of time served or at the very least

23  something very substantially below the statutory maximum that

24  he faces.

25       Thank you, Your Honor.

1              THE COURT:  Thank you.  Mr. El-Mezain, you are

2     entitled to speak in your behalf.  Anything that you wish to

3     state?

4              MR. DRATEL:  Your Honor, if I may say in advance of

5     that, after watching Mr. Abu Baker, we have sort of rehearsed

6     this.  I think it is going to be between 15 and 20 minutes.  I

7     ask the Court give him the opportunity -- We have obviously

8     spent less time --

9              THE COURT:  I gave Mr. Baker in essence 20 minutes.

10    He didn't take it, but he used 15 and I gave him an extra

11    five, so 20 minutes we can live with.

12             MR. DRATEL:  If he goes 30 seconds over, I hope the

13    Court will accommodate him in that regard.

14             THE COURT:  Certainly.

15        Mr. El-Mezain?

16             THE DEFENDANT:  In the name of Allah, the most

17    gracious, the most merciful, good morning, Your Honor.

18        I start my speech with what Prophet Moses, peace be upon

19    him, said in the holy Quran, Chapter 20 Ta Ha, verses 25 to

20    28:  "Oh, my Lord, I ask you to fill my heart with peace and

21    wisdom.  It is my task for me, and remove the impediment from

22    my speech so they may understand what I say clearly."

23        Your Honor, this is a difficult day for me, my family.  I

24    sat through two trials listening to videotapes, tape

25    recordings, reading evidence, watching videos.  It is not easy

1    to be a spectator when your life is at stake.

2         Nevertheless, today is a remarkable day for me, for my

3    life, for my family, the eight million American Muslims, and

4    the history of American justice.

5         I Mohammad El-Mezain, a Muslim born in Palestine and

6    raised in a modest family.  My 105-year-old father, my

7    105-year-old father and my 95-year-old mother have raised me

8    throughout my childhood as a righteous person who devoted

9    himself to serving his family and community.

10         I lived 19 years in Palestine, went to university for

11   five years in Cairo, Egypt, worked another five years in the

12   United Arab Emirates, and for the last 20 years I lived in the

13   United States, where I earned my Master's degree and very

14   close to completing my Ph.D.

15         Your Honor, I would like to thank Almighty God that

16   throughout my life I gained no enemies and I have never been

17   in violation of the law.  I certainly kept away from crime and

18   related activities.

19         I believe Your Honor has received and perhaps had an

20   opportunity to read hundreds of letters addressed to you by

21   members of the community nationwide, narrating their

22   experience with me and citing some of my qualities.

23         I acknowledge the Jewish delegate, even though, of

24   course, I disagree with it.  But that is not what today's

25   proceeding is about.  It is about a just and appropriate

punishment for the conduct that I have been convicted of.

No one disagrees that I was a founder of the Holy Land Foundation, and that I fully supported its mission for providing aid to the needy, not only in the West Bank and Gaza but also the many the United States, and everywhere our charity was needed and could reach.  We never wavered that from that mission, and it is more important to me than any political -- It was more important to me than any political agenda or goals.

I am a religious person, and as an emam for over 30 years what motivates and guides me are religious principles, family principles, and social principles regarding what is acceptable conduct, and on all three levels I believe the work of the Holy Land Foundation was right and successful.

Your Honor, my awareness and interest in the charitable work picked up at such a young age when I was about 10 years old.  Like all other Palestinian refugees, my family lived in a refugee camp in Khan Yunis in Gaza Strip after we were driven out from our homeland in Palestine in 1948.  Like everyone else, we suffered from severe shock, depression, on top of poverty and humiliation.  We waited desperately for the United Nations to hand us our monthly food parcel, some marked as gift from the people of the United States to the Palestinian refugees, not for sale or exchange.

However, we remained malnourished as the food was still

1    not enough.  Some unfortunate families were served meat only

2    once or twice a year.  Families were banded together in one or

3    two small rooms that were forced to accommodate five to eight

4    people, regardless of their basic human and private needs.

5         We endured a life without electricity, running water,

6    proper sewage system.  Many of the people ran in the streets

7    barefooted with worn out clothes.  We have had the firsthand

8    experience with poverty, alongside the orphan, the poor, and

9    the needy, and the elderly.

10        For the United Nations and the world, those humanitarian

11   aids were meant to ease the suffering of the Palestinian

12   people who lost their homeland to Israel in 1948.  The

13   Palestinians expressed appreciation to the United Nations and

14   to the United States, and I grew up to share their gratitude

15   to the helping hand.

16        The love of charitable work for the poor and needy and

17   the orphan was seeded in my heart as a part of my upbringing,

18   my religious teaching, and my observations as how charity

19   affects the life of the needy.

20        I have become proud of my role with the Holy Land

21   Foundation as our work expanded and started to reach the needy

22   all over the world.  We have saved human life in Lebanon,

23   Jordan, Egypt, Turkey, Bosnia, Albania, Mozambique, and in the

24   other parts of the world.  We have responded to the tragic

25   bombing of Oklahoma City in 1995.

1    We have always acted as a proud American charity, with

2    full respect and adherence to the law.  We have not engaged in

3    promoting violence, much less advocated terrorism.  This is

4    why when the laws were changing in 1995, we were careful not

5    to break the law.  That is why so much of the Government case

6    was before Hamas was designated as a foreign terrorist

7    organization.

8        Unfortunately, the Holy Land Foundation and my role in it

9    was not fully shown.  The Court needed to know about lives we

10   saved and enhanced throughout our humanitarian work--the

11   hundreds of thousands that received our food packages and

12   financial aids, the countless men and women and the children

13   that benefited from our social services, our health services,

14   and community improvement.  We did it all in the name of

15   America, under the American law.

16       We gave the same people, Your Honor, we gave the same

17   people and the same -- unto the same organization that the

18   United Nations and the world community gave to.

19       Your Honor, the Holy Land Foundation was no different

20   than any other religious charity, whether it is Catholic or

21   Methodist or Jewish or Baptist charity.  They all give and

22   continue to give to the needy and the orphans, regardless of

23   who they father or mother were.

24       But our situation at the Holy Land Foundation, as the

25   largest Muslim charity in the United States, is unique

1    because, to my knowledge, never before have officers of a

2    charity been prosecuted for giving aid to the poor and needy.

3         Your Honor, we believe in America as the land of

4    abundance, the land of the free, and the land of the

5    Constitution.  I think Israel's invasion into the Gaza Strip

6    earlier this year shows that we were doing the right thing at

7    the Holy Land Foundation.

8         For many, Gaza Strip may be thousands of miles away, just

9    some brief glimpse on the TV news or a footnote in the

10   newspaper, but it is very close and personal, personal for me.

11   My family still lives there.  My aged parents, my brother and

12   my sisters, as well as hundreds of other relatives, they were

13   trapped there during the invasion.  I have not seen them, Your

14   Honor, for 24 years.

15        Your Honor, the victims that were shown on the news and

16   in the newspapers are the same people we at the Holy Land

17   Foundation were dedicated to help.  So many of the people

18   affected were civilians, yet they suffered so greatly.  It is

19   those people who the Holy Land helped through its existence.

20        Just because the cameras and the reporters were not there

21   does not mean they were not in need.  I think that was clear

22   from the evidence of the trial, and that is why we helped

23   them.

24        I am particularly proud of the Dar Salam Hospital, which

25   was an actual project Khan Yunis, south of Gaza, where I grew

1    up and my family lives there.  I am sure during the invasion

2    it was vital to treating the sick and wounded.  That makes me

3    proud.  But it also makes me sad, because since 2001 we were

4    unable to provide for the needy like we were before.

5         Your Honor, regardless of the verdict and the upcoming

6    sentence, I hold strong my belief in the Constitution and the

7    ultimate justice.  I hope and pray to receive the ultimate

8    justice today.

9         Your Honor, while exercising your duty to sentence me

10   today, it is important to remember that all of us, along with

11   all the entire universe, shall gather again on the day of

12   judgment, the day when Almighty God will bring us all before

13   him and hold us all accountable to our deeds, right and wrong.

14        I believe I am innocent and I have not committed any

15   crime.

16        To the audience, thank you for believing -- To the

17   audience, thank you for coming today to the court, and thank

18   you for believing in the judicial system of this blessed

19   country.

20        To those who believed in my innocence from the Muslim and

21   non-Muslim community, thank you for your moral support.

22   Please do not be discouraged.  Continue your work for justice

23   and charity.  Love this country even more and cherish its

24   Constitution.

25        To the American-Muslim community here and in San Diego,

1   California, the Dallas metropolitan area, New Jersey,

2   Illinois, and nationwide, thank you for standing beside us and

3   asking about us.  Thank you for sending your letters to our

4   Honorable Judge.  Thank you for asking about our family.

5   Thank you for praying to us in the day and in the night.  We

6   feel your prayer.  And your prayer, that Allah will accept

7   your prayer.

8       You face a huge challenge today.  Do not be discouraged.

9   Do not give up your Constitutional rights, including the

10  giving of charity; charity which is also a part of our

11  religion, especially the giving of the zakat.  You are a

12  beautiful part of this American culture.  You are a great

13  addition, not a burden.  You are not alone.  Righteous

14  Americans of all religion and groups stand with you.

15      To my dear parents, thank you for raising me as a

16  righteous man; a man that gave and received love; a man to the

17  best of his ability knows right and does it, and knows wrong

18  and avoids it.  Thank you for keeping up and putting up with

19  me, despite the 24 years of separation due to the illegal

20  occupation of Palestine by Israel.

21      Please, my parents, forgive me, please forgive me for

22  your emotional stress, and to pray for me, my wife, my

23  children, and my grandchildren.  We need your prayers.  It is

24  so powerful.  I am sure your prayers will not go unanswered.

25      To my dear wife Fatima El-Mezain Um Ibrahim, thank you

1    for unconditional support of me and the family in Gaza and in

2    the States.  My love and respect for you only increased during

3    our 30 years from a blessed marriage.

4         Today is a difficult day for you.  It is a difficult day

5    for all, especially you.  Please do not be shaken by the pain

6    of the moment.  Do not allow your big heart to be broken on

7    this day or any other day.  Allah will ease our difficulty.

8    Allah Almighty said in Chapter 94 Al-Inshirah, verses 5 and 6,

9    "So, verily, verily, with every difficulty there is a relief.

10   Verily, with every difficulty there is a relief."

11        And I hope that soon I will be home next to you and to

12   the children.  Thank you for being a great wife.  And as the

13   mother of eight children and three grandchildren, please keep

14   up your great work you are doing.

15        To my dear children Ibrahim, Abu Bakr, Omar, Othman, Ali,

16   Emam, Salsubil, Tasnim, my son-in-law Petri, my

17   daughters-in-law Wileh, Browa, and Bushera, and my grandsons

18   Erdam and Jashnim (all phonetic), thank you for all your

19   unwavering support and love to me and to the family in

20   Palestine and in the States.

21        It is your destiny to be separated from your father.

22   Please have strong faith, endure patience and perseverance.

23   I am proud of all of you.  Today more than any other day you

24   should feel proud of me and my Eid and my achievements.  We

25   have been through as much as we could to lead a happy and

righteous life.  Please stay the course.  Keep your head up
and your spirits high.  Love and support each other and your
mother, your family, your blessed country the United States
and Palestine.

To my attorney Joshua Dratel and all his team, thank you
so much for all your efforts and support to me, and I would
like to thank all of our Defense team.

Finally, Your Honor, I believe my mission is still not
finished.  My natural place is among my family and my
community.  I need them as much as they need me.  I want to be
able to continue my role in advancing moral values to the new
generation, and to teach the young and old about the goodness
and success in the life and in the hereafter.

I had heard that President Obama wants to spend $900
million in aid to rebuild Gaza.  I would like nothing more
than the opportunity to participate in the relief that will
provide aid and hope of the future to many needy people.

Your Honor, as God saved Moses and his followers and made
them across the sea to the safety with a strike of Moses'
cane, I hope the Almighty God will open the road for me and my
honorable brothers to the safety and freedom.  Because to
Almighty, feeding the children, orphans, and needy families is
never a crime.  Allah said in Chapter 76 Al-Insan, verses 8
and 9, "They give food for the love of Allah to the needy, to
the orphan, to the prisoners, saying, 'We feed you for the

1    sake of Allah.  We do not want any award from you nor any

2    thanking.'"

3         I would like to end by recalling the advice of my father

4    that Your Honor had heard in the court and that still rings in

5    my ears, deep in my heart, when he quotes from verses from the

6    holy Quran Chapter 21 verses 111 and 112 after he said to me,

7    "Mohammed, do not worry, nor be afraid."  And he reminded me

8    and described how everyone would be held accountable to the

9    result of his deed in the day of judgment, and he recites,

10   "All faces shall be humbled before the Living One, the All

11   Sustainer.  He will fail who bears the burden of wrongdoing,

12   but whoever works of righteousness and has faith will have no

13   fear of harm and will be rewarded to the full."

14        Thank you, Your Honor.  God bless you.  God bless

15   America.  And God bless and bring peace and safety to the Holy

16   Land.  Thank you.

17             THE COURT:  Thank you.

18        Mr. Jonas?

19             MR. JONAS:  Yes, sir.  Thank you.

20        Your Honor, not surprisingly, comments of Mr. Dratel and

21   Mr. El-Mezain try to portray the Defendant El-Mezain in a

22   beneficial light, benevolent light.  And Mr. Dratel said that

23   the evidence in this court showed isolated behavior sort, of

24   just sort an isolated portion of who this person is.

25        I would take issue with that.  I think what we saw is

evidence of the Defendant's true nature and his lifeblood in supporting Hamas starting from the late 1980s up until the time the Holy Land Foundation was shut down.

I think the Defendant El-Mezain is a passionate man, as evidenced by this speech and as evidenced by the videotapes we showed that show him fundraising on behalf of the HLF, raising funds that he knew were going to be used for Hamas.

I wanted to point out briefly just a couple of pieces of evidence that underscore my point about this Defendant.

First of all, there was one videotape we saw where the Defendant is accepting donations from the crowd, and he accepts and announces proudly a donation that he received from Hamas. Or for Hamas. Sorry, for Hamas.

There was another speech, and I believe this was Government's Mushtaha Search No. 1, where he is on stage and he invokes the spirit and the statements of Abdullah Azzam, where he talks about being and working with Abdullah Azzam before he was killed and cites a speech that Abdullah Azzam gave.

Well, if Your Honor remembers, we played about three videotapes from Abdullah Azzam that were seized from the Holy Land Foundation. This is the individual who was very fiery and had a lot of violent rhetoric in his speeches. And during that violent rhetoric, he talks about providing money to support the fighters of Palestine, and at that time on the

screen came "Send your donations to the Occupied Land Fund," the predecessor name for the Holy Land Association.

So the HLF and this Defendant El-Mezain were invoking the spirit of this individual, who was very violent, whose life was to support violence, in their fundraising activities. So when they say they are not engaged in promoting violence, that is not exactly true.

The third point I want to make, the Defendant talked about they weren't breaking the law and they tried to follow the law. Well, let me remind the Court of a phone call that we played where the Defendant El-Mezain was talking to the Defendant Odeh. This was right after Hamas was first designated. I can't remember with it was the '95 or '97 designation. It was the '95 designation. And they were talking about money, cash that Odeh had that was raised in New Jersey and what he should do with it. And El-Mezain instructed him to structure that cash, deposit it in the bank accounts in denominations less than $10,000 to conceal its existence.

So this benevolent, law-abiding individual that they are trying to paint and portray before Your Honor is not true, and it goes contrary to the evidence that this Court and this jury heard.

Mr. Dratel and Defendant El-Mezain talk about charity and how other charities gave to the same organizations and how the

HLF is no different than any other charity.  That is not true
either.  Other charities don't intentionally and willfully
support Hamas.  The HLF did.  As Your Honor already
acknowledged, they were created for and by Hamas.

As they said in Philadelphia, they must show one face to
America which is different--of course I am paraphrasing--which
is different from the true nature.  As Ms. Shapiro said,
quoting Shukri Baker, "War is deception."  And what they did
is they concealed their true aim and their true nature to
America.  They concealed their support for terrorism because
they knew if they revealed who they really were, even before
Hamas was designated, that people would not give to them.  No
one wants to support a terrorist organization or an
organization supporting a terrorist organization.

What they did instead to the American people was they
encouraged donations under the guise of charity.  They
basically highjacked the generous laws of the United States
and encouraged people to make donations by making those
donations tax deductible.  And the Defendant El-Mezain, as we
have shown in several videotapes, said to the audience, "These
donations are tax deductible."

So what they did was they hid behind charity, they took
advantage of charity, and they took advantage of this
country's good nature and support of individuals who need
money.  And in doing so, they hoodwinked this country, led by

1    this Defendant and the others.

2         And the fact that this Defendant is capped at 15 years,

3    it is a benefit for him.  He got lucky, Your Honor.  Let's

4    face it.  His conduct warranted conviction of every single

5    count that he was originally charged in, but he got lucky by

6    being acquitted on the other counts and only being convicted

7    of one.

8         And we ask that Your Honor sentence him to the statutory

9    maximum of 15 years.

10             THE COURT:  Thank you.

11        Mr. Dratel?

12             MR. DRATEL:  Thank you, Your Honor.

13        As expected, the Government does not address any 3553(a)

14   factors.  They don't address Mr. El-Mezain's background, they

15   don't address the medical, because they can't.  They are bound

16   by policy.  They only want to talk about the offense, the

17   offense, the offense, the Guidelines, the Guidelines, the

18   Guidelines.  It is a one-dimensional approach to a

19   multi-faceted process.  It is an attempt to reduce the

20   Defendant to only the offense of conviction.  That is

21   precisely what 3553(a) and *Booker* have relegated to the

22   dustbin of history.  That is not sentencing.  It is about the

23   whole person.

24        That last remark by the Government I think is astonishing

25   that Mr. El-Mezain got lucky.  We sit here acknowledging the

1    jury's verdict.  We will be appealing.  But for the Government

2    of the United States, particularly in light of the statement

3    by Attorney General Holder that Ms. Hollander repeated twice,

4    to take a jury's verdict on 31 of 32 counts and say he got

5    lucky, it is the Government that got lucky that one count

6    remained to be tried.  And that is the count that the Court

7    has to sentence on, and I have said what I need to say, Your

8    Honor.  Thank you.

9           THE COURT:  Thank you.

10    Well, considering all of the factors, the 3553(e)

11    factors, and understanding your request for downward departure

12    based on the Defendant's health and, Mr. Dratel, as well as

13    what you claim is an offense that is outside the heartland of

14    ordinary material support case, I disagree with that.  I don't

15    think the evidence shows that.  I think the evidence shows, as

16    I stated previously, that Mr. El-Mezain, you were involved at

17    the very beginning with the creation of the Hamas Palestine

18    Committee here in the United States, and you were involved

19    with the creation of the setting in motion the apparatus to

20    support Hamas.  The financial arm of that was Holy Land.  You

21    were a part of that from the very beginning.  The evidence

22    shows that you continued that even after it became illegal.

23    I have already stated, and then Mr. Jonas has also

24    reiterated some of the evidence, the videos, the phone

25    conversations that were played that indicated the violence

1    against the Israelis, the Jews, killing Jews, and your

2    support, your ardent and really not hidden support of Hamas.

3    That is what you were about.  So your function I think in life

4    was raising money to support Hamas.

5         You know, you stated in here that in fact it was to help

6    people, but I think the motive was to support Hamas, and part

7    of doing that was raising this money for charity and helping

8    people.

9         You state that you are innocent, not guilty of any crime.

10   I think the evidence shows the opposite.  I think it shows to

11   the contrary--that you are in fact guilty, as the jury found

12   you were guilty.  You are guilty of this offense that is

13   alleged in Count 1, and you were a part of this, and were a

14   part of it from the beginning until the Government closed it

15   in 2001.

16        And so I don't find that there is -- Considering the

17   3553(e) factors, and also considering that the Guidelines are

18   advisory I could depart -- not depart, but sentence anywhere

19   below 15 years that I thought was appropriate, but I don't

20   think it is appropriate in this case on the facts of this

21   case.

22        It will be the judgment of the Court, Mr. El-Mezain, that

23   you be sentenced to the custody of the U.S. Bureau of Prisons

24   for a term of 180 months.

25        That will be followed by a three-year term of supervised

1  release.

2      I will not order a fine in light of your financial

3  circumstances.

4      Restitution doesn't apply.

5      There is a $100 mandatory special assessment that has to

6  be imposed in each case, and that will be imposed in your

7  case.

8      Following your release from custody, you will be on this

9  supervised release for three years.  You have certain

10  conditions -- If you are not deported from the United States,

11  you have certain conditions that you have to follow.  Your

12  Probation officer will go and explain them to you, but among

13  the conditions are that you not commit any other violations of

14  law, whether it be federal, state, or local law; that upon

15  completion of your term in custody, that you be surrendered to

16  an Immigration official for deportation in accordance with the

17  Immigration and Nationality Act.

18      If you are ordered deported from the United States, then

19  another condition will be that you not reenter the United

20  States without legal permission.

21      If you are not deported, then you will have certain other

22  conditions that you have to follow, including not illegally

23  possessing or using any type of a controlled substance;

24  cooperate in the collection of DNA as directed by your

25  Probation officer.

1    Do not possess a firearm, ammunition, destructive device,

2    or any other dangerous weapon.

3    Provide to your Probation officer any requested financial

4    information.

5    And then do not enter into any self-employment while you

6    are under supervision without the prior approval of your

7    Probation officer.

8    And then lastly, if you are not deported from the United

9    States, then following your release from custody you will need

10   to report to the Probation Office in the district where you

11   are released.  Report within 72 hours of your release.  They

12   will get you started on this supervised release and explain

13   these conditions of supervised release to you.

14   I need to advise you that you have the right to appeal

15   both the conviction, the jury verdict, as well as the sentence

16   I have imposed here today, the rulings that I have made here

17   today.

18   If you don't have the means to hire an attorney to

19   represent you on appeal, we will appoint an attorney to

20   represent you at no cost to you.  You will be provided a copy

21   of the transcript of the trial as well as today's hearing, and

22   any other documents that you need rulings that the Court has

23   made during the course of the case for your use in appeal.

24   You can speak with your attorneys about exercising your right

25   of appeal, if you wish to do so.

1    I also need to state that the Court's sentence in this

2    case would be the same whether we were using the 2001 or 2002

3    manual with your sentence capped at 15 years.  Under either

4    manual, that is well within the Guideline range that would

5    result, and so the Court's sentence would be the same

6    regardless of the manual used.

7        I also need to incorporate the forfeiture language.  The

8    jury found in accordance with the jury verdict --

9            MR. DRATEL:  Your Honor, there is no forfeiture

10   count.

11           THE COURT:  You were not convicted of the money

12   laundering.  Excuse me.  So that is not part of this sentence.

13       Mr. Dratel, anything else we need to address?

14           MR. DRATEL:  Yes, Your Honor.  Just two requests

15   that mirror those made by Ms. Hollander.

16       One is the Rule 38 request that Mr. El-Mezain be

17   permitted to and that the Court recommend that he stay in

18   Dallas pending the preparation of the appeal.

19       And with respect to ultimate designation after that time,

20   that it be as close as possible to his home in San Diego to

21   his family.

22           THE COURT:  I will grant the first request and ask

23   that he be allowed to stay here pending the appeal, just for

24   purposes as you explained.

25       The second request I don't generally make unless there

1   are compelling circumstances.  I don't see them here, and so I

2   will just leave that decision up to the Bureau of Prisons as

3   to where they will designate his facility.

4        Anything else from the Defense?

5             MR. DRATEL:  No, Your Honor.

6        Anything from the Government?

7             MR. JONAS:  No, sir.

8             THE COURT:  Mr. El-Mezain, you are remanded to the

9   custody of the Marshal to serve your sentence.  Good luck to

10  you.

11                       (End of hearing.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts              06/18/2009

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25