```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 2                     DALLAS DIVISION

 3   UNITED STATES OF AMERICA      )  CAUSE NO. 3:04-CR-240-P
                                   (
 4   vs.                           )
                                   (  MAY 27, 2009
 5                                 )  DALLAS, TEXAS
     GHASSAN ELASHI                (  9:00 A.M.
 6
     _____
 7

 8

 9   _____

10                       SENTENCING

11

12        BEFORE THE HONORABLE JORGE A. SOLIS
                UNITED STATES DISTRICT JUDGE

13   _____

14

15                 A P P E A R A N C E S

16

17
          FOR THE GOVERNMENT:  UNITED STATES ATTORNEY'S OFFICE
18                             1100 COMMERCE, 3RD FLOOR
                               DALLAS, TEXAS  75242
19                             BY:  MR. JIM JACKS
                                    MR. BARRY JONAS
20                                  MS. ELIZABETH SHAPIRO
                                    MR. WALT JUNKER
21
          FOR THE DEFENDANT:   LAW OFFICE OF LINDA MORENO
22        (GHASSAN ELASHI)     P.O. BOX 10985
                               TAMPA, FLORIDA  33679
23                             BY:  MS. LINDA MORENO

24                             JONES DAY
                               555 CALIFORNIA ST., 26TH FLOOR
25                             SAN FRANCISCO, CA  94104
                               BY:  MR. JOHN D. CLINE
```

1          THE COURT:  Call this case against the Defendant

2    Ghassan Elashi.

3        And Mr. Jonas, you are ready to proceed?

4          MR. JONAS:  Yes, sir.

5          THE COURT:  And Mr. Cline and Ms. Moreno, you are

6    ready to proceed?

7          MR. CLINE:  Yes, Your Honor.

8          THE COURT:  Who is all going to be -- Are you going

9    to be splitting?

10          MR. CLINE:  To some extent, yes.

11          THE COURT:  Just do it as you need to.

12        If you will come up to the podium, then.

13        And you are Ghassan Elashi?

14          THE DEFENDANT:  Yes.

15          THE COURT:  And Mr. Elashi, you were convicted by a

16    jury back on November the 24th, 2008 of multiple counts, one

17    count of conspiring to provide material support to a foreign

18    terrorist organization; nine counts of providing support to a

19    foreign terrorist organization; one count of conspiring to

20    provide funds, goods, and services to a specially designated

21    terrorist; ten counts of providing funds to a specially

22    designated terrorist; one count of conspiring to commit money

23    laundering; ten counts of money laundering; one count of

24    conspiring to impede and impair the IRS and to file false

25    returns of an exempt organization; and then two counts of

1     filing false returns of an exempt organization.

2          We are now here on a sentencing hearing.  The Probation

3     Office has prepared a presentence report, an addendum to the

4     presentence report in response to some objections by your

5     attorneys, and then they have also prepared a second addendum

6     to the presentence report.

7          Have you had the opportunity to review these reports with

8     your attorneys?

9                    THE DEFENDANT:  Yes.

10                   THE COURT:  And do you understand all of the

11    information that is contained in these reports?

12                   THE DEFENDANT:  Yes.

13                   THE COURT:  And Mr. Cline, you have explained these

14    reports to your client?

15                   MR. CLINE:  Ms. Moreno did, but yes.

16                   THE COURT:  And you are satisfied that he

17    understands the information in these reports?

18                   MS. MORENO:  Yes, sir.

19                   THE COURT:  And you had a number of objections.  We

20    will come to those momentarily.

21         Mr. Jonas, the Government filed no objections with

22    respect to the presentence reports in this case.  Is that

23    correct?

24                   MR. JONAS:  That is correct, Your Honor.

25                   THE COURT:  And is that still your position?

1            MR. JONAS:  Yes, sir.

2            THE COURT:  Who is addressing the objections?

3            MR. CLINE:  I will.

4       Your Honor, we have been here through the morning

5  proceedings, and I think all we really care to do is

6  incorporate the objections and arguments of our co-counsel,

7  both those that came before and those that come after, and

8  submit our written objections.  Given the colloquy that has

9  occurred this morning, there is no need to go through them

10  again.

11            THE COURT:  I appreciate that, and I think that is

12  right.  The ruling is going to be the same.  I think those

13  enhancements apply to all of the Defendants based on the

14  reasons that I have stated previously.

15       You do have your objections that you filed submitted in

16  writing, and we will let you incorporate the arguments that

17  were made here by your co-counsel in the previous sentencings.

18       And on that basis, then, I have overruled those

19  objections.  And just for the record, just so we will

20  understand what we are talking about, you are objecting to the

21  amount of the money laundering, the tax loss amount, using

22  this pre-designation act, this 1992 act, of course my ruling

23  was I accepted that objection, and then the 2M5.3(b)

24  enhancement, the purchasing of the weapons, the sophisticated

25  means under the money laundering enhancement, and then, of

1   course, the 3A1.4 terrorism, promoting a crime of terrorism

2   enhancement.  Those are, as I understand, were your objections

3   that impact the calculation of the Guidelines.

4          MR. CLINE:  Yes.  That is a summary of them.

5   Obviously we detailed them more --

6          THE COURT:  Right, in your argument.  But in a

7   nutshell that is the objections.

8       Those are overruled.  I will accept the findings of the

9   Probation Office as contained in the presentence report.  I

10   will adopt those as the findings of the Court in this case.

11       And on that basis we have an offense level of 43,

12   criminal History Category of VI, with a Guideline range of

13   life.

14       And then Mr. Cline or Ms. Moreno, I will hear from you.

15          MS. MORENO:  Thank you, Your Honor.

16       As Mr. Cline said, we don't wish to repeat the eloquent

17   remarks made by Ms. Hollander and Mr. Dratel, and to the

18   extent that they are relevant to Mr. Elashi, we would ask you

19   to consider them.

20       Of course I am here and I stand here to address the 3553

21   factors that we are asking the Court to consider.  The only

22   thing I want to say about the Guideline calculations, Your

23   Honor, as we argued in our brief that they are untenable and

24   that the Guideline range of 491 years for Mr. Elashi is

25   clearly violative of the Eighth Amendment prescription against

1  cruel and unusual punishment.  I wanted to put that on the

2  record.

3      And I would also -- I won't belabor, but Mr. Dratel did

4  speak to the one-sided arguments that we have heard by the

5  Government with respect on the sentencing issues, that they do

6  not address the 3553 characteristics, and I suspect they won't

7  now as well, but I am going to do that, Your Honor.

8      Sufficient but not greater than necessary, that is the

9  primary directive of this sentencing statute, as this Court

10  well knows.  And we understand that in determining the

11  sentence that is minimally sufficient to comply with the

12  purposes of sentencing, we look to these particular factors.

13      In acknowledging the verdicts that the Court recited at

14  the beginning of this sentencing, we ask the Court to look at

15  the underlying conduct of the verdict and what is the

16  underlying conduct of Mr. Elashi specifically and uniquely

17  before Your Honor at this time.

18      The Government's theory, and I understand the Court's

19  ruling, but if I may just put our position on the record with

20  respect to this, and this goes to the underlying conduct, the

21  Government's theory from the beginning of this case we assert,

22  and it was made abundantly clear in the jury selection at the

23  very beginning, that indeed it seems that they conceded that

24  all of the money that was raised by the Holy Land Foundation

25  went to the needy, and that the issue was how it went to the

needy. So these arguments that Your Honor has heard about the
uniqueness of this material support of terrorism case goes
there.

There is no question that the Holy Land Foundation and
Mr. Elashi signed checks that raised money and bought food
packets and medicine, wheelchairs, ambulances, the Court saw
those photographs, mobile bakery units, the building of
libraries. You saw videos, photographs, you heard testimony
about that.

And if the Court recalls in Mr. Jacks' very carefully
worded voir dire, he wanted to know if this were jurors who
could still find someone guilty of material support of
terrorism, if indeed the evidence showed that they provided
humanitarian relief. And I understand the Court's thinking on
this, but our position is that is what Mr. Elashi did, and
that is all that he did was provide humanitarian relief. So
our position is that the underlying conduct that Your Honor
can look at with respect to Mr. Elashi was humanitarian.

And again, the arguments that Mr. Dratel made with
respect to the heartland issues we would also incorporate in
terms of the sentencing. We are not talking about liability.
We are talking about the intent here for sentencing.

With respect to the specific evidence against Mr. Elashi,
in other words, when you heard Mr. Elashi's voice or when you
saw anything with respect to Mr. Elashi directly and

1    specifically, there was very, very little.  And this was

2    against the backdrop of tens of thousands of wiretaps and

3    anonymous documents recovered around the world.

4         Putting aside the co-conspirator theories of the

5    Prosecution, Your Honor, what you heard specifically from

6    Mr. Elashi in the few transcripts that were brought before the

7    Court was his passion about the humanitarian relief for the

8    needy in Palestine.  And some of what you also heard was his

9    reaction to the occupation, the catastrophic event in the life

10   of all Palestinians.  And I think you will hear just a bit

11   more about that, Your Honor.

12        But even still, in the face of those sorts of passionate

13   remarks about the occupation, you did not hear Mr. Elashi

14   support violence or say that he supported Hamas.  That was not

15   evidence that this Court or this jury heard.

16        With respect to the unwarranted sentence disparity

17   among -- in these kinds of cases, the Court has already heard

18   Ms. Hollander refer to the case of Raed Salah, which the

19   Government's anonymous expert said began his career, whatever

20   that career is.

21        And I would just add to that, Your Honor, this was in an

22   Israeli Court with Israeli prosecutors meting out Israeli

23   justice against a threat, Hamas, directly against the country

24   of Israel.  And even there in light of this case, which was a

25   materially support case of Hamas, Mr. Salah received 39 months

and he was released after serving two-thirds of that.

There are other cases can look at, and I am mindful of the Court's sentence of Mr. Abu Baker, so I speak to that particular sentence when I bring to the Court's attention cases like what was called the American Taliban, John Walker Lynd, who was caught on the battlefield. He received 20 years. Salim Hamdan, which Mr. Dratel mentioned, there he was sentenced to five and a half years; the driver of Osama bin Laden himself, and he was returned home to Yemen.

The Lackawanna Six was a case that no one mentioned. There those defendants were convicted of providing material support to terrorists. There those defendants were found to actually attend the Al Farouq, which is a terrorist training camp in Afghanistan, and the range of sentences, Your Honor, ranged from eight to ten years. So we say that a sentence of 65 years would belie the disparity, and the Court should impose what we asked for in our brief.

I want to speak to the letters in support of Mr. Elashi. I counted 343 letters we submitted, and I just received another 20, like Mr. Dratel, which I will be forwarding to the Court, and-we are asking the Court to make them a part of the record.

And many voices, Your Honor, have come forward to support Ghassan Elashi, as the Court knows in reading those letters--teachers and doctors, lawyers, engineers, veterans,

1    neighbors, hundreds of members of the community.  And they

2    have called him many things--a good American, he has been

3    described as considerate and patient.  You have heard how he

4    inspired his children and he was a mentor to his family and to

5    his nieces and nephews.  You have read letters from people who

6    have prayed alongside Mr. Elashi and who have written to you

7    about his kindness.

8         There should be little doubt, Your Honor, after the

9    evidence in this case, that Ghassan Elashi through his work

10   saved lives, saved lives, and helped turn the tragic victims

11   of the devastation in Palestine away from violence and toward

12   a hopeful future.

13        A sentence that is sufficient but not greater than, Your

14   Honor, we believe in these circumstances is one that allows

15   Mr. Elashi to be released from prison upon completion of his

16   current sentence after we -- as we asked for in our brief.

17        Thank you.

18            THE COURT:  Thank you.

19        Mr. Elashi, you are entitled to speak in your behalf.

20   Anything you wish to state?

21            THE DEFENDANT:  Salamu-alaykum.

22        First of all, I would like to declare that I am innocent

23   of all the charges against me.  When the Holy Land Foundation

24   was incorporated in 1989, I had no intention in my mind and my

25   heart but to help the Palestinian indigenous people who are

1    and have been and still facing unusual economical distress.

2         What motivated me to this charitable work was seeing on

3    TV station and the press video images and pictures of

4    Palestinians' homes being demolished, seeing the

5    indiscriminate arrests of Palestinians' breadwinners, and

6    seeing Palestinian farms, hundreds and thousands of farms and

7    acres, I mean acres of farms, being raided by settlers coming

8    from Europe, from all over the world, to the West Bank,

9    getting rid of the indigenous population, riding Caterpillar

10   earth removal tractors and uprooting thousands of trees in

11   front of their owners, and they can do nothing because it is

12   an occupational rule.

13        Volunteering with the Holy Land Foundation as a board

14   member, I was all the time a volunteer, and later as a

15   chairman was the most enjoyable time of my life, despite what

16   I am going through now.  It is an honor for me.  Nothing in my

17   life was as satisfactory and sense-fulfilling and rewarding as

18   knowing that I could sign a check, the evidence that is used

19   against me.  It is the only evidence you have against me,

20   signing the check.  But that was the most enjoyable part of my

21   life and rewarding, knowing that I could sign a check or a

22   wire transfer advice to assist hundreds of Palestinian

23   families who got displaced after their homes were demolished,

24   knowing that the Holy Land Foundation was able to cut through

25   all bureaucracies and assistance that would reach the

Palestinians in matter of days.  And I can see it, and I see

the money and the picture comes back and we have on ground

people to tell us this.

Nothing was more satisfactory to me than awarding, than

granting scholarships to hundreds of Palestinian students who

had high average grades despite the circumstances, but needed

financial assistance to attend universities in Gaza and the

West Bank.

Nothing was more rewarding to me than being a catalyst

and turning the zakat, the zakat I am sure everybody knows

about it now, turning the zakat and the subeta, and those who

don't know what it means, it means alms and charity, turning

it to a donation, turning towards charitable donation of

American Muslims into a real life assistance to the orphans

and the needy families where Prophet Muhammad, salamu-alaykum

said, this is a quote, he said it, the Prophet said, "Me and

the sponsor of an orphan will be as close to each other in the

paradise as two fingers of one hand," two fingers of one hand.

And that is what motivated me, nothing else.

The Holy Land Foundation was an ambassador of a generous

charitable face of America, and that was not faked.  That was

not two faces.  There was only one face.  The Holy Land

Foundation was an ambassador of the general charitable face of

America, and I will tell you why it was not fake.  Whenever

the Holy Land Foundation staff volunteers and aid went either

in Palestine, Jordan, Lebanon, Egypt, Turkey, Bosnia, or Albania, we posted large and highly visible signs stating the word U.S.A. or America next to the Holy Land Foundation name, and the evidence showed it. Everybody knows it.

The Holy Land Foundation was a goodwill ambassador of America to the Muslim world. When the HLF volunteered, donated the blood and money to the victims of the Oklahoma City bombing, the Ft. Worth tornado victims, and fed the homeless, the Holy Land Foundation was projecting the goodwill of the largest Muslim charity to the U.S. to the American community at large.

Throughout my life -- Throughout the life of the Foundation, and since its incorporation in Los Angeles, California in 1989, we did our best to make sure that funds collected are disbursed according to the purpose it was collected for, which is aiding the needy in Palestine and other parts of the world.

We helped Palestinian orphans and needy families giving them hope and life. Hope and life. We gave them hope and life.

We provide scholarships to students, built and equipped clinics and hospitals, provided ambulances, and school backpacks with school supplies, school supplies for thousands of children, thousands, including shoes and uniforms, built schools, orphanages, children libraries, and we gave out food

1    packages in Ramadan.

2        While we at the Holy Land Foundation, providing all the

3    above services, the occupation forces were uprooting thousands

4    of trees, olive trees, fruit trees, demolishing thousands of

5    homes--this is not an exaggeration when I say thousands of

6    homes--restricting the movement till today of the

7    Palestinians, no matter who they are, students going to

8    college, going to hospital, or business owners wanting to do

9    their business, they are all restricted.

10       We at the Holy Land Foundation were giving hope and

11   providing the basic essentials of life to the Palestinians,

12   basic essentials--oil, rice, flour, not hamburgers or others.

13   And what was the occupation giving them?  The occupation was

14   providing them with death and destruction.  And then we are

15   turned criminals.  That is irony.

16       The Foundation's goal was to assist the Palestinians in

17   their steadfastness against a brutal apartheid, and as the

18   picture is going to show and you all are going to remember

19   that.

20           THE COURT:  Mr. Elashi, direct your remarks to the

21   Court.

22           THE DEFENDANT:  The apartheid face of Israel will

23   come out.  Some might say, that is your political, but that

24   is -- That is just the charity work anyway.

25       The Foundation's goal was to assist the Palestinians and

1    steadfast against the brutal apartheid regime by giving

2    charity, not bullets, the bullets that Shukri talked about

3    shooting demonstrators.  By providing books, not tanks, we

4    provided books not tanks.  We provided hope, not fear.

5         Finally, and my talk is short, I would like to take this

6    opportunity to extend my great, great, great appreciation for

7    my mother.  She is there, Fadwa, my wife Majida, my daughters

8    Noor, Huda, and Asma, and my sons Mohammad, Osama, and Omar, I

9    guess he cannot be here, my brothers, nephews, nieces,

10   friends, and all the brothers and sisters and the community

11   members for their support and courageous standing in the midst

12   of this unjust and selective political prosecution.

13        My thanks goes to my attorneys Linda Moreno and John

14   Cline, who will be filing an appeal on my behalf to a higher

15   court regarding all the legal challenges we face in the trial.

16        Again, I would like to declare my innocence of all the

17   charges.  I am really honored and privileged to have the

18   chance to serve the people of the Holy Land and the world and

19   provide them with hope.

20             THE COURT:  Thank you.

21        Mr. Jonas?

22             MR. JONAS:  Your Honor, Mr. Jacks, will be speaking

23   on this issue.

24             THE COURT:  Mr. Jacks?

25             MR. JACKS:  May it please the Court.

1    Your Honor, I want to address the comments that the

2    Government has done nothing in its pleadings except to refer

3    to the Guidelines, and I want to take exception with that,

4    because the Government has talked about factors that are a

5    part of Section 3553.  We have talked about the nature and

6    circumstances of the crimes, and we referred to the evidence,

7    not to opinions or the character of opposing lawyers.  We

8    are -- Our arguments are based upon the evidence that was

9    presented in this case.

10    And to this point none of the Defense counsel and none of

11    the Defendants have really addressed the volume of evidence

12    that shows, as the Court has found--that this organization was

13    established in order to be the fundraising mechanism for the

14    Islamic Resistance Movement in the United States, and that

15    evidence has not been refuted or even mentioned by these

16    Defendants.

17    There is no question that there was a great deal of

18    charity work done by these Defendants, but to state that

19    without putting it in context and without putting it next to

20    all of the evidence that shows when this organization was

21    created, what other organizations it aligned with, the cross

22    membership between individuals and these other organizations,

23    is simply misleading and doesn't accurately state all the

24    evidence.

25    As the Court has already recognized and stated in these

hearings today, the evidence does show that the Holy Land

Foundation, the Islamic Association for Palestine, the United

Association for Studies and Research, this Palestine Committee

of which Mr. Elashi and Mr. El-Mezain and Mr. Abu Baker are

all shown and listed as members of that organization and its

sub-components, the evidence shows that this was done in order

to raise money for Hamas.

Now, it seems that every person you talk to acknowledges

that Hamas has a social side, and the Government presented

evidence that, you know, the social side of Hamas is where it

gets its strength.  The Government also presented evidence

that Hamas has never changed its stated purpose, which is the

destruction of the State of Israel and its replacement with an

Islamic state.  That has never changed throughout -- since the

creation of its charter.

And so to simply come in here and to talk about all of

the charitable works that these individuals and this

organization did, again as I said, is to state only a partial

truth.  There is no question that it is extremely important to

Hamas that it garner the support of the Palestinian people.

There are many organizations that seek to provide aid to

the Palestinian people.  These Defendants, however, chose only

those organizations that were a part of Hamas.  They

particularly selected and stayed with those organizations that

were a part of Hamas, and there is a reason for that, and that

1    is to make sure that those people that are the recipients of

2    this aid understand and recognize from whom they are getting

3    this aid.  And the Government presented experts that this is

4    how a terrorist organization thrives and continues to exist.

5         This case is admittedly different from other cases, but I

6    think in terms of Section 3553, as far as the factors that the

7    Court needs to look at, I think the Court has to look at the

8    fact of how long this conduct went on and the fact that, I

9    would submit, that these individuals were not just Palestinian

10   Americans who decided, "We want to help the people in

11   Palestine and we just got our wires crossed and ended up

12   giving money to organizations that somebody else says are

13   associated with Hamas."  The evidence shows that that is not

14   the case; that from its inception this organization was set up

15   to help and to support and raise money for the Islamic

16   Resistance Movement, an organization which at the time

17   couldn't raise taxes, couldn't -- That was their life blood is

18   whatever they could collect either from foreign governments,

19   like Iran, or from Palestinian expatriates, wherever they may

20   be in the world, or other Muslims in the world, or other

21   well-meaning people of whatever faith that they could convince

22   to help the Palestinian people, not knowing that the

23   organization that they are providing money through was set up

24   by Hamas to further its goals and objectives.

25        And we talk about Section 3553, and you talk about one of

1    the factors is to deter, you know, future criminal conduct.

2    Well, there has been no acknowledgment by any of these

3    Defendants of the evidence and what the evidence shows

4    regarding their connection to Hamas.  So apparently they

5    haven't been deterred.

6         Their entire sentencing presentation is that they are

7    being punished for providing charity.  Well, anyone who wants

8    to provide charity in Palestine or the occupied territories,

9    or anywhere else in the Middle East, and are concerned about

10   it, they need only look at the record in this case and they

11   will be able to tell the difference between a true charity and

12   a charity such as the Holy Land Foundation which was set up

13   for a specific purpose.

14        So I think it is important for the Court to impose a

15   sentence that will tell those other people this case is

16   different, this case is not about punishing someone for doing

17   nice things for people who need it.  This case is about a

18   group of individuals who banded together with an organization

19   that uses terror as one of its tools and has never backed off

20   from that, has never apologized for that, and they have stayed

21   loyal to that organization.  It is indicative of the meeting

22   in Philadelphia, which was largely paid for by the Holy Land

23   Foundation in terms of travel and the hotel rooms and that

24   kind of thing.

25        So it is not a true charity in the sense that it is a

charity that "We don't care how you got where you are to the persons who need it, we don't care what the cause is, whether it is an earthquake or tsunami or whatever. We are just here to help you." That is not what this organization is about.

If you look through their materials, so many of their materials, rather than say "The Palestinian people need this," so many of their materials contain some kind of reference to something that the Israelis have done, something to blame the Israelis for the plight of the Palestinian people.

And I will be the first to say there are two sides to every story. There is no question about that. And that is not the purpose of this trial. It was never the purpose of this trial to say who was right or wrong in that conflict. But these Defendants knew the laws, they kept up with the laws, and it was clear that they were maneuvering and lying to conceal who they worked for and who they supported.

I think the last tape that was played during the Government's closing argument probably illustrated as well as anything we could the charity that this organization provided. And it was a videotape I believe at the Jenin zakat committee. There was a Holy Land Foundation banner hanging on the wall. This is a tape that was found in the Holy Land Foundation, one that they either filmed or had filmed and sent back to them. And the individual in charge of this ceremony was talking to the little boy and saying, "Who killed your father?" And he

1    didn't answer.  And then the questioner said, "You know the

2    Jews killed your father.  Remember that."

3        That is so much a part of what this organization's

4    charity carried with it, this notion of to continue the hate

5    and to continue the animosity and to continue this fight,

6    rather than just helping these people.  It was to help them,

7    but it was also to also help them remember and to carry on

8    this conflict.  And so we are addressing the specific topics

9    and factors in 3553.

10       And, you know, I think it continues today in the

11   sentencing hearing when it talks about the occupation and the

12   fact that this is the fault of Israelis.  Well, there are any

13   number of ways to help people with charity, but this was a

14   charity with a political bent and a political statement, and

15   that statement was the statement and the message of Hamas, and

16   that is why these Defendants are here today, Your Honor.

17            THE COURT:  Thank you.

18       Ms. Moreno?  Any additional?

19            MS. MORENO:  No, Your Honor.

20            THE COURT:  If you will come back up to the podium,

21   again.

22       Well, I made my statements previously in terms of my

23   findings here.  I agree with the Government's position in

24   essence that HLF was created to support and fund Hamas.

25       Mr. Elashi, you have stated that you are innocent of all

1    charges.  Of course the jury disagreed with you on that after

2    reviewing the evidence and receiving the instructions on the

3    law.  The evidence supports the verdict of the jury in this

4    case that in fact you did support Hamas in violation of the

5    law.  You were one of the creators at the very beginning, the

6    creation and establishment of HLF for funding Hamas.

7         You state that Hamas doesn't have two faces, that it is

8    one face.  If it has one face, that face is Hamas.  That is

9    what the evidence establishes.  And you were using charity as

10   a guise to support Hamas.  That is what the evidence

11   establishes.  And that is why the jury found you guilty and

12   that is why you are here today; not because you were providing

13   the school books to the school children.  You can provide

14   school books to school children without doing the support of

15   Hamas.

16             THE DEFENDANT:  I said I have --

17             THE COURT:  I don't need to hear any more from you.

18   I don't need to hear anymore from you.  I have heard from you.

19             THE DEFENDANT:  I just want to clarify that I said I

20   have one face.  I was not referring to Hamas.

21             THE COURT:  I don't want to argue with you.

22             THE DEFENDANT:  That is not argument.

23             THE COURT:  You are arguing, Mr. Elashi, and I have

24   heard from you so I don't need to hear anymore from you.

25             THE DEFENDANT:  Okay.

1           THE COURT:  And so the basis and the reason for HLF

2   was to support Hamas.

3        So considering that, the other statements that I have

4   made, the evidence that was presented at the trial that is

5   contained in the PSR, and considering the 3553(e) factors, I

6   find that a sentence of 65 years --

7        First, I am going to find that the range established by

8   the Guidelines in this case is reasonable.  I understand they

9   are not binding on the Court, but that is a reasonable range

10  in light of the enhancements that are properly applied in this

11  case.

12       It will be the judgment of the Court that you be

13  sentenced to the custody of the U.S. Bureau of Prisons for a

14  term of 65 years.  That will be 15 years on Count 1, 10 years

15  on Count 11, 20 years on Count 22, and 20 years on Count 23 to

16  run consecutive to each other, for a total sentence of 65

17  years.  The sentences on the other counts will run concurrent

18  to each other and to those counts.

19       In addition, you will have a three-year term of

20  supervised release to run concurrently, so a total term of

21  supervised release of three years.

22       I will not order a fine in this case, in light of the

23  sentence that you have received and in light of your financial

24  circumstances.

25       Restitution doesn't apply.

1      There is a $100 per count mandatory special assessment

2  that has to be imposed in each case.  That will be imposed in

3  your case for a total of $3,500.

4      I need to advise you, of course, that you have the right,

5  as you are aware, you have the right appeal both the jury

6  verdict in this case as well as the sentence that I have

7  imposed, the decisions that I have made here today.

8      If you don't have the means to hire an attorney to

9  represent you on appeal, we will appoint an attorney to

10 represent you at no cost to you.

11     You will be entitled to a copy of the transcripts of all

12 the hearings, the trial and all the hearings that we have held

13 in this case for your use in your appeal.  Those will be

14 provided at no cost to you.  If you wish to exercise your

15 right of appeal, you can speak with your attorneys about doing

16 that.

17     Mr. Cline, Ms. Moreno, anything else we need to address

18 here?

19          MR. CLINE:  Yes, Your Honor.  As you did for the

20 other Defendants, could Mr. Elashi be kept in Dallas?

21          THE COURT:  And I will make that recommendation that

22 he be here during the term of the appeal.

23     Anything else?

24          MR. CLINE:  No, Your Honor.

25          THE COURT:  Anything from the Government?

1          MS. SHAPIRO:  Just the forfeiture.

2          THE COURT:  And I need to include the forfeiture

3     language.

4          In accordance with the jury's verdict, Mr. Elashi, any

5     interest that you have in the $12.4 million that the jury

6     found was subject to forfeiture, that is ordered forfeited to

7     the Government.  That will be part of the judgment in this

8     case.

9          Anything else?

10          MR. JUNKER:  That will be in the form of money

11     judgment, too, and he will be jointly and severally liable

12     with the other Defendants that were part of the special

13     verdict.

14          THE COURT:  Thank you for pointing that out.  There

15     will be a money judgment that will be part of the judgment of

16     this case, and that you are jointly and severally liable with

17     your co-Defendants.

18          You are remanded to the custody of the Marshal to serve

19     your sentence.  Good luck to you.

20                    (End of hearing.)

21

22

23

24

25

1    I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts                06/18/2009

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25