1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS

2                  DALLAS DIVISION

3  UNITED STATES OF AMERICA    )  CAUSE NO. 3:04-CR-240-P
                      (

4  vs.                )
                      (  MAY 27, 2009

5                      )  DALLAS, TEXAS
  MUFID ABDULQADER          (  2:00 P.M.

6

  _____

7

8

9  _____

10                   SENTENCING

11

12        BEFORE THE HONORABLE JORGE A. SOLIS
            UNITED STATES DISTRICT JUDGE

13  _____

14

15             A P P E A R A N C E S

16

17

18       FOR THE GOVERNMENT:  UNITED STATES ATTORNEY'S OFFICE
                   1100 COMMERCE, 3RD FLOOR

19                   DALLAS, TEXAS  75242
                   BY:  MR. JIM JACKS

20                      MR. BARRY JONAS
                      MS. ELIZABETH SHAPIRO

21                      MR. WALT JUNKER

22       FOR THE DEFENDANT:   LAW OFFICE OF MARLO P. CADEDDU
      (MUFID ABDULQADER)  3232 McKINNEY AVENUE, SUITE 700

23                   DALLAS, TEXAS  75204
                   BY:  MS. MARLO P. CADEDDU

24

25

1          THE COURT:  Call this case against the Defendant

2   Mufid Abdulqader.

3       And Mr. Jonas, you are ready to proceed?

4          MR. JONAS:  Yes, sir.

5          THE COURT:  And Ms. Cadeddu, you are ready to

6   proceed?

7          MS. CADEDDU:  Yes, Your Honor.

8          THE COURT:  If you and your client would come up to

9   the podium, please, ma'am.

10          MS. CADEDDU:  Good afternoon, Your Honor.

11          THE COURT:  Good afternoon.

12       You are Mufid Abdulqader?

13          THE DEFENDANT:  Yes, sir.

14          THE COURT:  And Mr. Abdulqader, you were convicted

15   by a jury on November the 24th, 2008 on three counts--one

16   count of conspiring to provide material support to a foreign

17   terrorist organization, one count of conspiracy to provide

18   funds, goods, and services to a specially designated

19   terrorist, and one count of conspiracy to commit money

20   laundering.

21       We are now here on a sentencing hearing.  The Probation

22   Office has prepared a presentence report and an addendum to

23   the presentence report and a second addendum to the

24   presentence report in response to some objections by your

25   attorney.

1          Have you had the opportunity to review these presentence

2     reports with your attorney Ms. Cadeddu?

3     THE DEFENDANT:  Yes, I have.

4          THE COURT:  And do you understand the information in

5     these reports?

6          THE DEFENDANT:  Yes, I do.

7          THE COURT:  And Ms. Cadeddu, you have explained the

8     reports to Mr. Abdulqader?

9          MS. CADEDDU:  I have, Your Honor, although I had to

10    speak with him in the holdover about the third addendum that

11    we received this morning.

12         THE COURT:  Correct.  And you are satisfied that he

13    understands the information in these reports?

14         MS. CADEDDU:  Yes, Your Honor.

15         THE COURT:  You have some objections, and we will

16    get to those momentarily.

17       Mr. Jonas, the Government filed no objections to the

18    report.  Is that still your position?

19         MR. JONAS:  Yes, sir.

20         THE COURT:  Ms. Cadeddu, let's take up your

21    objections.

22         MS. CADEDDU:  Thank you, Your Honor.

23       I would stand on the written objections and adopt the

24    arguments of all counsel as they benefit Mr. Abdulqader that

25    have been made up till this point and the one argument that

will follow mine, and I would like to have those made part of
the record for Mr. Abdulqader.

I would stand on the written objections that have been
filed, with the exception of one that I think perhaps needs a
little further elucidation.  So with your permission, I will
address that one.

THE COURT:  Yes.

MS. CADEDDU:  And any others that you would like me
to address.

I would like to talk for a brief moment about the role
adjustment objection.

THE COURT:  For not receiving a mitigating role?

MS. CADEDDU:  That is correct, Your Honor.

THE COURT:  Okay.  Go ahead.

MS. CADEDDU:  And I would argue that Mr. Abdulqader
is in fact a minimal participant in this offense.

As the Court will recall from the trial evidence, he was
not a Holy Land employee or a board member.  He was an
occasional volunteer.  He lacked signing authority, had no
role in deciding where any of Holy Land's monies went.

In addition, as far as the band, he was a band member --
And by the way, there were hundreds of volunteers for Holy
Land over the years.

With regard to the band, Mr. Abdulqader was one of the
perhaps 20 band members who were involved with the band over

the years from its inception. He served the band leadership

-- The person who would book the engagements rotated every few

years, as the Court will recall from the evidence, and Mr.

Abdulqader, kind of late in the band's history, served that

role for I think a year or so.

The Government alleged initially that Mr. Abdulqader was

a top fundraiser, and in their most recent filings the

Government has backed off from that and said, I think, he was

a substantial fundraiser, or something like that.

I think that the evidence, as the Court will recall, was

that Mr. Abdulqader over the period of his volunteer work with

the Holy Land raised I think about $114,000 is my recollection

from the two exhibits. The ones I am talking about are the

thick listings of the amounts of monies that were raised by

various persons for the Holy Land Fund. That amount was

significantly less than the top fundraisers and was really

average. Indeed, the accountant for the Holy Land Foundation

testified that Mr. Abdulqader's fundraising activities, his

fundraising and the amounts he raised, that he was an average

fundraiser for the Holy Land Foundation.

In fact, I wanted to point out and I will talk about this

later when we talk about sentencing factors, he had a full

time job with the City of Dallas, and his volunteer work and

his performance with the band were part time endeavors for

him.

1    And so for all of those reasons, and I think by any

2    measure, he warrants a minimal participant adjustment from the

3    offense level that is otherwise applicable.

4              THE COURT:  All right.  Any other objections that

5    you wish to address beyond what you have in writing?

6              MS. CADEDDU:  I don't believe so, Your Honor.  I

7    would reurge all of my written objections, as I said, and

8    adopt the arguments of other Defense counsel.  And I would be

9    happy to address any of those the Court wishes.

10             THE COURT:  I think your writings are certainly

11   sufficient, and I have heard from the other lawyers, and you

12   may adopt those arguments.

13        Mr. Jonas, do you want to address that no adjustment for

14   mitigating role in the offense?

15             MR. JONAS:  Yes, sir.

16        While we acknowledge certainly that this Defendant, his

17   conduct does not rise to the level of the three Defendants

18   that Your Honor sentenced this morning, when you look at the

19   broader conspiracy, he certainly played a larger role than

20   many of the co-conspirators.

21        He was at the Philadelphia conference, which we know was

22   a seminal event involving the Palestine Committee.  The Al

23   Sakhra Band that he was a major part of was on the Palestine

24   Committee list, the Palestine Committee chart.  That was one

25   of the Elbarasse documents.

1    The amounts of money he raised, I would submit to the

2    Court, are larger than the amounts Ms. Cadeddu said.  That

3    list of donors or amounts of money raised by fundraisers was

4    not the exhaustive list, which was testimony elicited at

5    trial.  I don't think she can quantify and I don't think that

6    we know how much he actually raised.

7         And he certainly was well aware of what was going on, as

8    the songs he was singing in the band, as the skits he was

9    portraying as the Hamas member killing an Israeli and leading

10   the crowd in chants supporting Hamas shows he wasn't a minor

11   role in the larger breadth of the conspiracy, and does not

12   warrant any levels off for mitigating role.

13              THE COURT:  Thank you.

14        Ms. Cadeddu?

15              MS. CADEDDU:  I would like to respond to that very

16   briefly, Your Honor.

17        The Government states that Mr. Abdulqader was at the

18   Philadelphia conference as if that is fact, and in fact we

19   have contested that vigorously.  There was a Government

20   witness, in fact the Government's lead translator in this

21   case, who testified that he was 80 percent sure that he heard

22   Mr. Abdulqader's voice.  That was the first time that that

23   information had ever been disclosed to the Defense.

24        I would point out that that translator is the lead

25   translator in a case where there have been serious, serious

1   problems with translations, including mistranslations that

2   several of the Defendants made incredibly ugly statements

3   about Jews that turned out not to even be in the document

4   itself.  And those documents are attached, actually, I believe

5   to a motion that the Defense filed to unseal the Defendants'

6   or declassify the Defendants' statements.  So I would

7   incorporate that by reference here.  And that is -- Actually

8   that is the last I have to say about that.

9           THE COURT:  Okay.  And I think Probation correctly

10  did not include that adjustment.  He clearly wasn't as

11  involved as the three that were sentenced this morning, as

12  Mr. Jonas pointed out, but that fact is taken into account by

13  the fact that those individuals received a four-level

14  enhancement for role in the offense.

15      I think Mr. Abdulqader's involvement in the offense is

16  sufficient, it goes back to the earliest days and he is in

17  those earliest videotapes and goes all the way to the end, and

18  that is sufficient that it doesn't merit any adjustment for

19  mitigating role in the offense.  That objection is overruled.

20      The remaining objections as far as the amount of money

21  laundered, the enhancement for obstruction of justice, those

22  are overruled as well.

23      The application of the terrorist enhancement, those are

24  overruled based on the reasons I stated earlier today.

25      And are there any other objections you wish to address,

1    Ms. Cadeddu?

2            MS. CADEDDU:  No objections, Your Honor.

3            THE COURT:  I will get back -- let you address the

4    sentencing in a minute.

5        I will accept the findings of the Probation Office as

6    contained in the presentence report and in the addendum to the

7    presentence report and the second addendum to the report.  I

8    will adopt those as the findings of the Court in this case.

9        Probation has calculated an offense level of 40, a

10   Criminal History Category of VI, and a Guideline range of 360

11   months to life, with a statutory maximum here on the three

12   counts of 45 years.  Of course I understand that the Guideline

13   range is advisory.

14       Ms. Cadeddu, I will hear from you.

15           MS. CADEDDU:  Thank you, Your Honor.

16       As the Court knows, I filed a lengthy sentencing

17   memorandum with a number of attachments to it, and I will

18   refer to those.  But just so that I don't forget, I believe I

19   attached some 80 character letters on behalf of the Defendant.

20   Since that time actually I have received this whole red rope

21   two-inch-thick file of additional letters that I have not

22   submitted to the Court, and I wanted the record to reflect

23   that.

24       In the sentencing memorandum that we filed, we have made

25   arguments for a traditional departure on a number of grounds,

 1    and also a number of mitigation arguments under 3553(a), so I

 2    will address those in the order that they are set out in the

 3    sentencing memorandum.

 4        The first downward departure ground, and I think this is

 5    one that has been raised by the Probation officer herself, is

 6    that the criminal history score in this case overrepresents

 7    Mr. Abdulqader's risk of recidivism and his dangerousness.

 8    And it is a rare case where a Defendant appears before this

 9    Court without ever even having been arrested for any offense

10    for any criminal behavior whatsoever, particularly a Defendant

11    who is Mr. Abdulqader's age.

12        As the Court knows, the application of the terrorism

13    enhancement increases the criminal history score,

14    notwithstanding the lack of even an arrest, from a Criminal

15    History Category of I to VI in this case.  And I cited a case

16    *Benkahla* in the sentencing memorandum in which a court has

17    found that it is appropriate and permissible to depart

18    downward on the basis of overrepresentation of criminal

19    history, even in a case where a terrorism enhancement is

20    applied.

21        In that case the defendant received a downward departure

22    because the court said that he lacked the characteristics of a

23    terrorist.  And as the Court may recall, or may not because

24    you have read a whole lot of these, Mr. Benkahla had had

25    terrorism training in jihadist camps overseas and had lied

about his connections to persons who were conspiring to levy war against the United States.  The court found that that defendant lacked the characteristics of a terrorist and that a downward departure because of overrepresentation of criminal history was warranted.

And I would contend to the Court, contend that Mr. Abdulqader is even less deserving of a terrorism enhancement, or that he is even more deserving of a downward departure from that increased criminal history score than was Mr. Benkahla.

His offense conduct, as the Court knows, is volunteering for the Holy Land Foundation beginning in about 1996, and singing with a Palestinian band really for most of his life. Those acts, even more than the acts of Mr. Benkahla, are not the classic acts that we would associate with a terrorist, and so I would argue that is a basis for a downward departure in the case.

The second ground for a downward departure is the nature of the punishment in this case.  And as we have discussed in the sentencing memorandum, Mr. Abdulqader, particularly in this case, and his family have been vilified and abused and talked about in an incredibly disparaging way in the media.  I think that is largely -- Well, it is for two reasons.  It is because Mr. Abdulqader has the misfortune of being related to someone who is a terrorist, the leader of a terrorist organization, Mr. Khalid Mishal, and also because Mr.

Abdulqader was working at the City at the time that he was
arrested. And so I believe that the media grasped those two
things and turned that into some sort of -- something much
more than it was. There was in fact a D Magazine article with
a reverse exposed photograph of Mr. Abdulqader that said "The
terrorist at City Hall."

As a result of that large amount of media exposure, Mr.
Abdulqader's family was subjected to death threats, as we have
set out in the sentencing memorandum and significant trauma as
a result of that.

In addition to all the things that have happened to
Mr. Abdulqader and his family as a result of being under
indictment for a terrorism offense, being fired, being
vilified, having death threats made against his family, we
also, as I think Mr. Dratel said, we are not sure where
Mr. Abdulqader will be sent when he is ultimately designated
by the Bureau of Prisons, and the conditions of confinement in
this case could put Mr. Abdulqader in a place with people who
are extremely violent and who have committed extremely violent
acts. And the nature -- his complete lack of criminal history
and complete lack of any background that would warrant that
would make his incarceration more difficult I think than it
should be, than it would for the average defendant who goes to
the federal Bureau of Prisons.

The third basis for a downward departure -- And I should

1    also point out that the Government is claiming that Mr.

2    Abdulqader may be eligible to be civilly denaturalized as a

3    result of this case.  He has been here for decades, is married

4    to an American who can trace her heritage back to the American

5    Revolution, and is by all accounts, by every person who knows

6    him, one of the most patriotic people around, and the fact

7    that he could be denaturalized is a punishment that goes

8    really above and beyond even the incarceration that is

9    contemplated here.  So I wanted to point that out as another

10   basis.

11       I discussed in the sentencing memorandum Mr. Abdulqader's

12   background and history as a Palestinian war refugee, and the

13   scarring experiences.  I think some of the other Defendants

14   have talked about those, and he shares those.  And it is not

15   every defendant who appears before this Court who has seen and

16   suffered the things that Mr. Abdulqader has.  That in itself

17   has been recognized by the courts as a basis for a downward

18   departure from the Guidelines.

19       Lastly, in terms of classic Guideline departures, and

20   these are all recognized bases for downward departure from the

21   Guidelines even pre-*booker*, Mr. Abdulqader's exceptional

22   charitable community activities and good works warrant a

23   downward departure in this case.

24       Mr. Abdulqader gave motivational speeches to area high

25   school students about hard work and the value of the

opportunities in this country.  We have submitted to you a
note from a North Dallas High School administrator thanking
him for one such speech.  He gave motivational speeches to
young people in area mosques, and I think some of the letters
the Court has received reflect that.

He was a member of Toastmasters, a public speaking
organization, for a number of years, and was involved in I
believe six Toastmaster clubs during the period of time that
he was involved.

His volunteer work for the Holy Land Foundation was not
the only volunteer work that he did for Islamic organizations
in Dallas and beyond.  There are letters that reflect that he
helped raise money for the East Plano Pakistani community to
build a mosque.  He also helped the Islamic Association, I
believe it is in Irving or Arlington, I am not sure, raised
money to build a mosque in Watauga.

Mr. Abdulqader has engaged in numerous interfaith
dialogues, and the letters discuss that.  One of those
letter-writers, Mr. Charles Redd, is actually here today, and
I will ask him to be able to address the Court briefly in a
moment.

Mr. Abdulqader, in addition to doing volunteer work for
various organizations, also touched individual people's lives
deeply and personally, and some of those people have written
to the Court to talk about how he took care of their children

during a spouse's surgery, or that he spoke to them kindly and

gave them inspiration when they were going through difficult

times, and a family he counseled through a divorce and helped

and the family credits him with that.

So I would raise for the Court those four downward

departure grounds as traditional downward departure bases from

the Guidelines that are appropriate in this case, either

singly or in combination with each other.

I would next like to turn for a moment to the 3553(a)

factors, and I would incorporate everything that I have just

said regarding the Guideline departures into my 3553(a)

discussion as well.

The first characteristic that is important to consider,

and I suppose probably the most important in this case, is the

nature and circumstances of the offense and the history and

characteristics of the Defendant.

In no case I have ever seen in my life, and in no case

that any lawyer I have talked to has ever seen in his or her

life, has a Defendant been acquitted of all counts of an

indictment only to have that acquittal voided after four days

by a single juror.  That is extraordinary, unprecedented, and,

quite frankly, horrifying.

In no case that I am aware of has a juror backed out whom

we know to have been influenced by demonstrative and

non-admitted evidence that was improperly sent back to the

1  jury by the Government.  And I know the Court has ruled on

2  motions that relate to that, but that is a mitigating factor

3  that the Court may consider.

4      Mr. Abdulqader has a stellar work history.  I have talked

5  a little about his charitable endeavors, but he is a lifetime

6  public servant who worked for the Oklahoma Department of

7  Transportation.  He authored manuals that are still in use

8  today, including this manual, the cover of which I have

9  included in the Court's materials in connection with

10 sentencing, The Inroads Training Manual that was written in

11 September 1995.

12     Mr. Abdulqader received numerous awards and accolades

13 while working at the Oklahoma Department of Transportation.  I

14 have included some of those.

15     He won numerous awards when he was working with the City

16 of Dallas, one of which was the 2001 Preservation Achievement

17 Award.  And in the materials that I submitted to the Court,

18 the Court will recall that there is a photograph of

19 Mr. Abdulqader receiving that award standing next to his boss

20 at the City of Dallas and also then mayor Laura Miller.

21     Mr. Abdulqader's work with the Bishop Arts District

22 project, his significant work that has improved the lives of

23 people in Dallas is discussed by several of the folks who

24 wrote letters and is something that is a real tangible

25 contribution that he made during his life, and something that

1    ought to matter in this case.

2        I have already discussed his charitable work, his refugee

3    status, the lack of criminal history, and the nature of the

4    punishment he has already sustained as a result of being under

5    indictment of this case for five years.

6        I would also now like to move to another 3553(a) factor,

7    which is that the sentence must reflect the seriousness of the

8    offense, promote respect for law, provide just punishment,

9    afford deterrence, and protect the public from the defendant.

10       Your Honor, in this case the actual conduct that we are

11   talking about here is performing with a band, along with a

12   number of other people over a period of years, and volunteer

13   fundraising for the Holy Land Foundation on an ad hoc, as

14   needed basis beginning in 1996.

15       This case, as I think I set forth in the sentencing

16   memorandum, will have I think a counterintuitive effect.  I

17   think it will deter volunteers.  I think it will deter

18   performers from expressing themselves, and I don't believe a

19   lengthy sentence will serve any deterrent functions that would

20   be a deterrent function we will be looking for.

21       As far as vocational and educational opportunities,

22   Mr. Abdulqader does not need those, although of course if he

23   spends the rest of his life in prison he will certainly need

24   healthcare as he grows older.

25       The unwarranted disparities, the other Defendants have

talked, or the other lawyers for the Defendants have talked a

little bit about the disparities, and I attached to the

sentencing memorandum several press releases from the

Department of Justice for cases that involve charges of

material support of terrorism.  Some of those were pleas to

which the Government agreed to the sentence and some were

trials.

There were two defendants who were convicted of

conspiracy to provide material support in connection with an

attack on New York with a weapon of mass destruction, and

those Defendants received 15 year sentences.  The press

releases are attached.

There was another defendant who went to jihadist camps

and plotted to blow up the mall, blow up a mall and certain

Washington, D.C. Monuments.  The Government agreed that a

ten-year sentence for material support in that case was

appropriate.

And then lastly, the other example I included was two

defendants who were involved in attempting to buy weapons to

send to the Tamil Tigers, the Sri Lankan designated terrorist

group, and they each received 37 month sentences.

So with regard to the sentencing memorandum, I think that

that concludes my argument for a downward departure for a

below Guidelines sentence.  I would like to -- That concludes

the bulk of it.

1    I would like to actually ask -- there are two people I

2    would like to address the Court very briefly, then  I will

3    summarize the argument that I have made, and then

4    Mr. Abdulqader would like to make a statement to the Court.

5         THE COURT:  You may do so.  Go ahead.

6         MS. CADEDDU:  Thank you, Your Honor.

7    I would like Zainab Abdulqader to come forward, please.

8         THE WITNESS:  Thank you, Your Honor.

9    I just want to say that my father, like a lot of parents,

10   always tells me that all he wants is for me to be happy and to

11   be successful, and it was the reason that he came to this

12   country because he was seeking a better life, not only for

13   himself but for his future wife and children.

14   And, you know, nothing was handed to him and he worked

15   very hard for everything that he earned, and in the end he

16   managed to give me a much better childhood and quality of life

17   than he ever had when he was growing up.

18   He always taught me to be really grateful for, you know,

19   all the opportunities that I had available to me and the good

20   fortune that I had to be a citizen of this country.  And he

21   and my family wholeheartedly embrace the rich values and

22   principles of this country.

23   And so while he was a very proud Palestinian-American and

24   he never forgot the unfortunate people he left behind, he

25   always made sure that I embraced the other side of my heritage

1    as well, which was on my mother's side.  And she is, I think

2    as my dad's lawyer said, she is of Irish and English and

3    Scottish descent, which incidentally I started researching on

4    our family's genealogy, after my father encouraged me to, and

5    later on when I found out that we had several ancestors who

6    had fought in the revolutionary war, he encouraged my desire

7    to join the Daughters of the American Revolution, because I

8    was very proud of that fact.

9        And he also reminded me that I needed to honor the legacy

10   of my ancestors who helped establish this country and that I

11   needed to take advantage of all of the freedoms that I had

12   available to me, including civic participation and political

13   participation, and great educational opportunities.

14       And so when I wanted to study politics and international

15   affairs for my undergraduate degree, at first he was a little

16   concerned because I was choosing a less traditional path than,

17   say, a doctor or something of that sort.  But after I

18   explained to him that I really wanted to get involved in my

19   country and to really, you know, support for it, he really

20   encouraged me after that and he has encouraged me to get my

21   Master's degree, which I will start on this fall, and to get

22   my Ph.D.

23       And so he really encouraged me, you know, in my work in

24   the future to get to know all kinds of people, and he always

25   told me that I need to be very tolerant and very compassionate

1  for all kinds of people no matter who they are, whether they

2  be Jewish or Buddhist or Baha'i, or anyone that is different

3  than me, and that I need to get to know them and I need to get

4  to know their story, and that is the only way that I will

5  truly be able to be a good public servant to my country.

6         And he always told me to remember above all else that I

7  need to complete service above self.  I can't just remember

8  about myself and my own needs and wants.  I need to think

9  about what I can do for other people and what I can do for my

10  country, and that is something that he always stressed to me,

11  and that is why I am studying what I am studying.  And that

12  was the way he conducted his own life, too, was service above

13  self.

14         So Your Honor, I just want to say that the absence of my

15  father has left a really large hole in my own life, and I know

16  in the life of many others who always looked up to him for

17  strength and for knowledge and compassion, and so I ask you

18  humbly and from the bottom of my heart to please really look

19  at my father's record and look at what he has done and to hear

20  the pleas of everyone who loves him and who really knows him

21  to be a kind and entirely honorable man.

22         So I ask you to please grant him leniency in your

23  sentencing so that he can be at home with us again.

24              THE COURT:  Thank you.

25              MS. CADEDDU:  And I would like Mr. Charles Redd to

1    come forward, please.

2            THE WITNESS:  Good afternoon, Your Honor.

3            THE COURT:  Good afternoon.

4            THE WITNESS:  I am Charles Redd.  I am retired from

5    the City of Dallas and from -- a consultant with DART.

6        I have known Mufid ever since he started working for the

7    City of Dallas in 1996.

8        One of the things that first impressed me and my other

9    associates was how hard Mufid worked at his job.  He was very

10   good.  I mean, just the few weeks after he was there he

11   impressed management with his leadership ability, with his

12   generosity of knowledge, how he would share with some of the

13   junior engineers some of his experience that he had.

14       Before I met him, one of my associates jokingly said that

15   his name was Muffin, and that I should call him Muffin.  I

16   didn't fall for that.  I asked him, "How do you pronounce your

17   name?"  And he said, "When you think of my name, think of a

18   cow."  And I was a little puzzled.  He said, "It is Moo-fid."

19   And so that is really how I remembered Mufid starting out.

20       He and I got to be good friends.  We went to lunch.  He

21   would -- He told me about working at Wendy's while he was

22   putting his way through college, and that they offered him a

23   managerial position, which at that time seemed like a lot of

24   money to him and he was tempted by that.  And he called and

25   talked to his dad, and his dad told him to go ahead and get

1    his education.  There is probably not as much future as a

2    manager at Wendy's.

3         I just remember these little anecdotes.  Mufid is a

4    religious man.  He practices prayers at work, but he was

5    always respectful.  He was respectful of other religions.

6    He was respectful of my religion.

7         About this time in our relationship 9/11 happened, and I

8    talked to Mufid about 9/11, and he was as horrified at it as I

9    was, and at first he didn't believe that there could have even

10   been Muslims involved in that.  And he told me later that not

11   to judge the entire Muslim faith on what happened at 9/11,

12   just as anybody else would judge Jim Jones as a Christian.

13   And I thought that was a pretty good point.

14        One of Mufid's job at the City was negotiating with

15   engineers and engineering contracts and negotiating with

16   contractors.  He was always good at that, and was respectful

17   at that job, and I think earned the respect of the other

18   engineers and the contractors.

19        And I think we have already touched on his awards with

20   Bishop, the Bishop project.  That was one of his.  He was very

21   proud of that.

22        One of the things after 9/11 at my church, the associate

23   pastor asked if there was anybody -- in a Sunday school class

24   if there was anybody that knew somebody in the Muslim

25   community, and his concern was that there might be some

backlash or some discrimination or problems after 9/11, and he
wanted to -- And I was the only one volunteered that knew
anybody.  I was amazed.  It was a fairly large Sunday school
class.  So I asked Mufid to come, and he without hesitation
said that he would.

He came to my house and talked to my wife.  My wife was
very impressed with Mufid and his gentleness and his
commitment to family.  And he talked to my daughters and said,
"Be sure and respect your parents, especially your mother, and
do what they say," and they still remember him very vividly.

After Mufid was arrested, Mufid told me a little bit
about the arrest, which must have been very traumatic for his
family--how they rushed in the house and the daughters hid
under the bed, and the parents weren't allowed to go comfort
their children.  But he didn't talk about it with anger.  He
just talked about it with sorrow and disappointment and how
the children were affected by that.

I continued to have -- He was fired from the City.  He
again, without anger, told me that he was disappointed that
his supervisor, and every level of appeal that he had over his
firing, that they wouldn't discuss anything with him other
than the firing has been upheld.  They wouldn't -- They didn't
discuss why it was upheld, even after he was told at first
that he could continue to work there until he was sentenced.

But we talked about his loss of his job, about

how -- Mufid had gone through four years of undergraduate

school, he also got a Master's degree, which was another two

years, six years, served as an engineering in training which

was probably another two years, so he worked long and hard to

get to the position that he got to.  And he was a senior

engineer at the City of Dallas, so the loss of the job was a

big deal to him.

I guess in closing I would like to tell one other story.

One day at lunch I kind of leaned over to Mufid and I said,

"How do you stay so optimistic?  How are you able to do this?"

And he said, "I owe it to my family.  I have got to.  It

is my job to be optimistic."

And what I would like to ask is that the Court take into

account Mufid's accomplishments, his -- He always expressed

patriotism to the U.S.  Any time I talked to him it was about

his great opportunity he had here, and his faithfulness to the

American system of justice.

Thank you.

THE COURT:  Thank you.

MS. CADEDDU:  Your Honor, this is the point where I

would summarize my argument for the Court.

This has been a really hard part of the argument.  I can

make Guidelines objections, I can do sentencing memoranda, I

can do everything that needs to be done, but this case -- I

can't even pretend that this case makes any sense to me or

1      that it doesn't really trouble me deeply.

2          The Government in this case wants to send Mufid to prison

3      for 45 years for being an occasional volunteer for a

4      registered charity--and I understand the position about that,

5      but it was at the time a registered charity--and for singing

6      songs and performing with a band.  I can't pretend that I

7      think that is a rational or a normal thing or an appropriate

8      sentence for that conduct.

9          What makes this case even worse is that Mufid was

10     acquitted of every count, and I have and have attached, as the

11     Court knows, and I will put it in the record, I have put it in

12     the record probably five times and I just can't -- I am kind

13     of obsessed with it, the verdict sheet in the first sheet

14     signed, seven pages long, every single count "not guilty," and

15     signed and dated October 1st, 2007, 21 days before the

16     verdicts were taken for the other Defendants.

17         But for one juror backing out after the four-day delay in

18     taking the verdict, and but for the fact that that juror

19     relied on documents that were sent back that should not have

20     been in evidence, and but for I don't even know what, Mr.

21     Abdulqader would not even be standing before the Court.

22         I have done everything in my power to explain to the

23     Court Mr. Abdulqader's life and who he really is and what he

24     has done as a person, as a human being, and his role in this

25     case, and I don't know what else to say.

1    I ask the Court for mercy and for leniency.  And I know

2 that Mr. Abdulqader has something to say, but that is all I

3 have.

4         THE COURT:  Thank you.

5    Mr. Abdulqader?

6         THE DEFENDANT:  Good afternoon, Your Honor.

7    As customary of people of faith, I will start with a

8 blessing.  In the name of Allah, God, the most merciful, the

9 most compassionate.

10    Before I begin, I want to thank my family, especially my

11 wife Diane of over 24 years of blessed marriage.  Thank you

12 for your love, dedication, courage, and unwavering support.

13 Diane, you and my kids, my daughters, are my life.

14    To my oldest daughter Zainab, my middle daughter Sarah,

15 and my youngest daughter Nadia I want to thank you for your

16 unconditional love and for your support, unwavering support.

17    I would like also to thank my father, my mother, and all

18 my family overseas for their continuous support and love.

19    To my father-in-law Gerald who lives in Broken Arrow,

20 Oklahoma, to my Grandma White, 97 years old, my sisters-in-law

21 Donna and Chris and their families, thank you all for your

22 unwavering support and love.

23    I would like to pay tribute to my mother-in-law Janice

24 who passed away in December of 2008, just a few days after I

25 started my incarceration.

1    I would like also to thank all my relatives, friends, the

2    eight million American Muslims in the United States, and

3    especially my beloved community in the Dallas/Fort Worth area.

4    Guys, you are just great.  Thank you.

5        Finally I would like to thank my fellow Americans, my

6    neighbors, co-workers, friends, and all fellow citizens for

7    their support throughout this difficult time.  Thank you all.

8    I am eternally grateful to all of you.  You are in my heart

9    and prayers, and we will be united soon again.

10       Your Honor, I have lived in this country some 30 years as

11   a young man hoping to fulfill my American dream.  I have the

12   sign in my home in Kuwait that says "America or bust," for I

13   was determined to make it.

14       I came to the United States to escape the turmoil,

15   political dictatorships, and uncertainties that ravage the

16   Middle East, as well as the lack of human and civil rights

17   which was prevalent in that part of the world.  I was hoping

18   for a fresh start.

19       Even though I could speak barely English, I could speak

20   English barely, I knew very little about culture and custom

21   except what Hollywood portrays in movies.  Though I knew very

22   little, I had a great interest in this country.  I was

23   accepted and received with open hearts and minds of my fellow

24   American citizens.  They gave me a chance to succeed, and

25   indeed I took advantage of the opportunities afforded to me.

1    Back in 1980 I arrived here to start my dream with $1600

2    in my pocket.  I worked at several fast food places, one of

3    them is Wendy's, earning a minimum wage.  In the summer I

4    would work an average of 90 hours a week, seven days a week,

5    in order to secure my tuition for the fall and the spring

6    semester while attending Oklahoma State University.  I am the

7    classic example of an American dream.

8    I worked very hard.  I paid for every penny, every penny

9    of my education, my Bachelor's and my Master's.  I paid for it

10   myself through working full time and attending school full

11   time.

12   In December of 1984 I received my Bachelor's degree from

13   Oklahoma State University, and later on in 1994 -- I went back

14   to school, driving 70 miles one way, to get my Master's

15   degree, which I got back in 1994.

16   At the same time I was still working as a professional

17   engineer at the Oklahoma Department of Transportation.  I

18   worked there for eight years, and I advanced the civil life

19   through the design and construction of highways and streets as

20   part of the infrastructure of my beloved country America.  I

21   was realizing my own dream.

22   I wrote also and authored several manuals.  As of today

23   one of these manuals is still in use at the Oklahoma

24   Department of Transportation.  These manuals cover the wide

25   range of practical aspects of engineering design.

1    In 1996 I moved to Texas looking for a better

2    opportunity, and I took a position as a senior project manager

3    with the City of Dallas.  I continued my role as a devout

4    public servant for eight and a half years, and I faithfully

5    served the citizens of Dallas.

6    My work on the Bishop Arts District in Oak Cliff, which

7    has won many awards, this is just an example of these awards

8    that I have received.

9    That helped me display, this project and others, helped

10   me display my engineering talent and total dedication to my

11   engineering profession.

12   I was also fully engaged in the development and

13   implementation of several City of Dallas engineering bond

14   programs that enhanced the quality of lives of the citizens of

15   Dallas.

16   Also I authored several more engineering training manuals

17   to help new engineers join in the Public Works and

18   Transportation Department at the City.

19   Continuing with the spirit of my American dream, I

20   eventually established my own engineering company called D&Z

21   Consulting Engineers.  The initials have a special meaning.

22   The D is for my wife Diane and the Z is for my daughter

23   Zainab.

24   I always wanted to volunteer.  It is in my heart.  It is

25   in my nature.  When I joined the Boy Scouts of America in

1    1980, only two weeks after arriving here, I was an assistant

2    scout master in Troop 96 in the Indian Nation Council in

3    Tulsa, Oklahoma.

4         President Bush has called for all citizens to volunteer

5    in many civic and charitable organizations, organizations such

6    as the United Way, The Salvation Army, The Goodwill

7    Industries, and The Habitat For Humanity, and many others,

8    serving our own citizens who are less fortunate and provide

9    help to them to overcome difficulties in their lives.

10        I am a lifelong volunteer, as is evident of my

11   volunteering in so many Muslims and non-Muslim organizations.

12   I volunteered in the relief effort in 1995 in the aftermath of

13   Oklahoma City bombing.  I volunteered in the Oklahoma tornado

14   clean-up.  I volunteered with The Habitat For Humanity

15   building homes.  I was also an active participant and frequent

16   speaker post-9/11 commemorative renunciation of terrorism

17   ceremonies expressing support for my own country, just like

18   when I went to SMU and delivered a speech on that.

19        I was invited to local high schools.  I was invited to

20   Samuel High School, North Dallas High School, 1997, 1998.  I

21   encouraged the entire graduating class, I encouraged each and

22   every one of them to take full advantage of the opportunities

23   that this great country afforded everyone.  I spoke and told

24   them, "Pursue your dreams.  Go to college."

25        I also volunteered at the University of Texas at

1    Arlington youth program to encourage students to enroll at the

2    university.  I was also involved in Toastmasters, as Ms. Marlo

3    has just mentioned.

4         I volunteered also my services as a counselor for youth

5    and for families in the community for families that are facing

6    stressful and emotional difficulties.

7         As part of my volunteerism, I was also involved in the

8    interfaith dialogue between Muslims, Christians, and Jews.  I

9    have always been a proponent of peace, tolerance, and

10   understanding so that we all live in harmony and peace

11   together.

12        I also volunteered and presented several seminars about

13   motivation, human resource issues to the City of Dallas

14   employees at their annual conference held at the Dallas

15   National Convention Center.  I also volunteered and presented

16   several training seminars for department employees encouraging

17   them and showing them ways to improve productivity while

18   instilling pride in their work.  All this volunteerism was not

19   part of my official responsibility.

20        My volunteerism continued as of today, for once I get

21   back I am going to have to get back to work.  I am a tutor.  I

22   am tutoring several inmates in math in order to help them pass

23   the GED.  We spend one to two to three hours every day

24   tutoring them helping them so they can pass their GED.

25        America, Your Honor, is built on volunteerism.  It is the

engine that runs the majority of the charitable organizations in this country. Therefore, it becomes a citizen's obligation to engage fully in preserving the spirit of our country which entails extending a hand, giving time or money if one can.

What I did, Your Honor, was not a deviation but rather an affirmation of my civic duties. That why I felt proud and accomplished while volunteering for all these organizations.

I volunteered for the Holy Land Foundation, just like hundreds did. Back then it was a registered 501(c)(3) tax exempt non-profit organization. It offered help to a people around the globe, and it offered them the opportunity to rebuild their lives through its humanitarian programs.

I have been living in this country, Your Honor, for some 30 years, with the exception of a few visits three to four weeks each, mainly to see my ailing mother and father. Over 21 years ago I became a U.S. citizen by choice. I have my family here, and we are all rooted here. We are an integral part of the fabric of the American society.

My wonderful wife Diane was born in Arkansas. Her ancestors, just like my daughter told you, actually goes back -- they carry the blood of Martha Washington, the wife of the first president of the United States of America.

Zainab at the age of 21 has graduated with her Bachelor degree in arts in December 2008. I was looking forward to celebrating this great accomplishment, but I couldn't because

I was incarcerated right after the trial ended in 2008.
Zainab will start her Master's degree program this fall at the
University of Texas at Austin.  Zainab, way to go, girl.

Middle daughter Sarah, 17 years old, is also in line to
graduate from high school next year and enroll in college.  By
the time she finish her high school next year, she will have
completed a year and a half of college courses.

My youngest daughter Nadia, she is not here, she couldn't
make it.  She is also just as bright and doing great in
school.  My wife Diane and I pride ourselves in raising our
children to be loving, caring, responsible, and roll-model
citizens.

I was never involved in any crime or violence ever.  I
have a spotless, clean record with civic duties like no other.

I am also proud of my culture and heritage, of my
birthplace Palestine.  In 1967 we lost our home and land and
became refugees.  I recall as an eight-year-old boy when my
family and I were escaping on the back of a truck.  As we made
our way out of Palestine running for our lives, I remember
seeing the burned and bombed bodies of innocent Palestinian
men, women, children on the sides of the road.  That image is
engrained in my mind.  Now the Palestinian people are the
largest ethnic refugee group in the world.

I was told by my new country that it is natural and right
to express my feelings and experiences through art and songs.

1    Throughout my wife singing has been a part of me from early

2    childhood.  So far me and the Al-Nujoom Band, we have sang in

3    over 500 wedding celebrations here in the U.S. and Canada.  My

4    singing has brought happiness and joy to over 500 married

5    couples and their families and loved once.

6        I have also performed at hundreds of social, religious

7    cultural, community, public gatherings.  We have also

8    professionally recorded six albums with a variety of songs

9    ranging from children's songs that celebrate childhood to

10   spiritually uplifting songs along with the traditional

11   cultural songs that depicted the reality of living on the

12   ground of occupied Palestine.  Our songs express the desire of

13   the Palestinian aspiration of freedom and justice, of people's

14   daily suffering of over 61 years of brutal occupation.  Our

15   songs express the desire of Palestinian people to have a state

16   of their own, just like President Bush and Clinton and Obama

17   has called for.

18       These songs are traditional songs.  They were sung by

19   generations of Palestinians from the early British occupation

20   of Palestine until now.

21       The United States has told me that the First Amendment of

22   our Constitution protects my right to express my thoughts

23   through art and song, whether these thoughts are popular or

24   not.  I was also told that freedom of expression is not

25   exclusive to ideas, authors, language of country of origin.  I

1    pray that my lifelong civic contribution, some 30 years still

2    matters.

3         America is my home, the birthplace of my wife and three

4    children, and in this country, in this courtroom, a historical

5    moment may take place in my life.  I am worried that my family

6    will not escape the scars that the legal calamity have endured

7    throughout the two trials and beyond.  I am worried of them

8    being ostracized, labeled, harassed, and scarred for life,

9    just what happened when I was arrested.

10         It is a fact, just like with my attorney has mentioned,

11   that I was acquitted of all charges, and she has gone through

12   all the details.  But I wanted to say, it breaks my heart and

13   my family's heart to have heard the Court pronounce my verdict

14   of innocent, total acquittal in open court in all counts of

15   the indictment against me, and now I am facing a long, long

16   prison sentence.

17        I do acknowledge the verdict reached by the jury reached

18   in this trial, and obviously disagree with it.  I believe in

19   the justice system.  I say it now, I say it tomorrow, and I

20   will always say it.  My faith has not been shaken despite what

21   has transpired in this case.

22        And finally, Your Honor, a few words for my loved ones

23   who endured so much throughout the past few years.

24        My loved ones, supporters, and defenders, I want you to

25   be proud of me and all of my civic charitable work.  It was my

greatest honor to volunteer to feed children.  It is

un-American to ignore starving women and children.  It is

un-American not to help desperate fellow humans suffering from

oppression and occupation.

Keep the faith.  Be proud.  Stay strong.  I will always

be a proud American volunteer.

To my beloved wife Diane, you have been a great partner

and a loving mother.  Your unconditional love has taught me so

much about life and the facts of life.  I am sorry that you

have to endure so much anguish what you are enduring in this

ordeal, but I know that Allah will make it up for us.  He is

the most compassionate and most merciful.

To my oldest daughter Zainab, I am so proud of you and

your accomplishment.  At this age which holds the promise of

greater things to be achieved in life, I wish I was next to

you and the family as you were celebrating graduation.

Unfortunately I could not be in two places at the same time.

To my beloved daughter Sarah, I am so proud of your early

maturity and positive outlook on life, despite our ordeal.

Keep your beautiful smile on your face and keep hope in your

heart.

To my beloved daughter Nadia, I know your childhood has

been disrupted early on with legal issues.  I am sorry that I

am unable to take you to buy your favorite ice cream as I used

to do so often.  I have to believe that the day will come when

1    we will all be -- when I will be able to make up for the lost

2    time.  Meanwhile, hang in there, my girl.  Be strong.  Keep

3    your old Baba in your prayers.  I will always love you.  You

4    will always be daddy's princess.

5        To my beloved father, thank you for instilling in me high

6    ethics and moral values at a young age, and for guiding me

7    through a turbulent time.  I look forward to celebrating your

8    94th birthday despite the numerous health ailments and

9    difficulties you are struggling with.  Even though I have not

10   seen you in 11 years, hang in there, wise old man.  As you

11   always told me, "Rainy days do not last for long.  The sun

12   will shine again."

13       To my mother, thank you for bringing me to life and

14   putting up with me with years of anxiety and worries which has

15   complicated the numerous health ailments and difficulties you

16   are suffering.  I am so sad and disheartened that you can no

17   longer walk since you broke your hip five days ago.  I am

18   sorry, Mama.  I am sorry that I cannot be beside you to give

19   you the love and care you deserve.  I know things are harder

20   because we have not seen each other for 11 years.  Thank you

21   for inspiring me to withstand and overcome adversities and

22   difficulties.  Thank you for feeding me the love of my

23   birthplace Palestine.

24       Finally, to my attorney Marlo, and entire Defense team,

25   Thank you, Marlo, for your dedication, hard work, and honesty.

1    You have done a great job, and I will express my deepest

2    appreciation to you and your family for the late night working

3    hours and the disruption of your life throughout the trial.

4         To the rest of the Defense team, thank you all for your

5    hard work.

6         And finally, Your Honor, I never in my wildest

7    imaginations ever imagined that my life would be destroyed and

8    devastated as a result of volunteering to rebuild people's

9    destroyed and devastated lives.  Your Honor, I have never

10   imagined that I would be put in jail as a result of

11   volunteering to take people out of their jail of poverty and

12   starvation.

13        Your Honor, I never ever Imagined that my three daughters

14   would be orphaned as a result of volunteering to help orphans

15   who are over crying for help.  It would be indeed a sad tragic

16   day in the history of our giving and generous nation when

17   charity organizations are forced to shut down due to lack of

18   volunteers who fear persecution and prosecution if they get

19   involved.

20        Your Honor, my youngest daughter asked me a question.

21   "If I help other people, will they put me in jail like they

22   did to you?"

23        I told her, "I do not know the answer to this question,

24   and I do not know who knows the answer."

25        Thank you, Your Honor.

1          THE COURT:  Thank you.

2     Mr. Jonas?

3          MR. JONAS:  Yes, sir.  Before I respond to comments

4    by Ms. Cadeddu and the Defendant, just for the record, Your

5    Honor has found that two points for obstruction of justice

6    apply.  I think Your Honor needs to make a specific factual

7    finding of that, if you can put that in the record.

8          And Your Honor, as the Government set forth in its

9    sentencing memo, the Defendant was interviewed by the FBI

10   during the course of this investigation during the course of

11   the interview he made several false statements regarding his

12   involvement with the Holy Land Foundation, including the time

13   he first became involved in it he stated it was 1995, 1996

14   when he moved to Dallas.  In fact we showed a videotape and it

15   shows it was the early 1990s that he was fundraising for them.

16         THE COURT:  Let me interrupt you there.  In the

17   addendum to the presentence report, I think Probation did not

18   give that enhancement.  That is why we don't have an objection

19   to that.

20         MR. JONAS:  I am sorry, Your Honor.  I thought you

21   said you had found for it.

22         THE COURT:  Actually you are correct.  Because in

23   the first report you had an enhancement.  That is where the

24   objection was.  But in the second report they agreed and left

25   that out.

1      MR. JONAS:  Then I won't go any further.  I just

2  wanted to make sure the record is clear.

3      THE COURT:  You are looking puzzled, Ms. Cadeddu,

4  but it is not part of the findings.

5      MS. CADEDDU:  May I just correct one thing?  In the

6  presentence report it doesn't actually allocate two points for

7  that either.

8      THE COURT:  In the original one it didn't?

9      MS. CADEDDU:  No, Your Honor, in neither.

10      MR. JONAS:  I thought it had.  Just so we are clear,

11  then, the Guideline is money laundering plus the 3.A1.4 for

12  enhancement.

13      Addressing the comments made by counsel and the

14  Defendant, just to start briefly with the downward departure

15  grounds that Ms. Cadeddu raised stating that the Defendant

16  lacked the characteristics of a terrorist, that he received

17  death threats, that he had been vilified and fired from his

18  job, that the conditions that he finds himself in put him in

19  physical risk, and that there is potential to

20  denaturalization.  I don't think any of these are grounds for

21  downward departure.  I don't think any of these grounds are

22  aggravating mitigating factors not taken into consideration by

23  the Sentencing Commission.

24      Denaturalization, I don't think Your Honor should take

25  that into consideration.  We don't know.

1       The Defendant and Ms. Cadeddu said he is being convicted

2   just for singing in a band and being an occasional fundraiser.

3   This seems to be a theme of the day to distance themselves

4   from the facts of the trial.  But they are ignoring the point.

5   He sang in a band and he raised funds to support a terrorist

6   organization.

7       This Defendant himself, we have seen him on videotapes

8   portraying a Hamas member killing an Israeli and then leading

9   the crowd in chants supporting Hamas.  This is supposed to be

10  a charity fundraiser.  It just boggles the mind how what we

11  would consider normally to be a charity event, they would put

12  on such skits, unless in fact they were supporting Hamas as

13  the evidence showed.  He claims to be a proponent of peace,

14  but I think these videos show otherwise.

15      He talks about having a classic record of civic duties,

16  yet he made false statements to the FBI in his interview about

17  the Holy Land Foundation.  There is a theme running through

18  all this that we have seen today.  The Defendants have been

19  distancing themselves from what happened, who they are really

20  are, what they are really about.  I think Your Honor has

21  recognized that.  And I don't think that we should be fooled

22  as to who this person is, and I would ask the Court to set him

23  at a sentence that reflects his conduct.

24          THE COURT:  Thank you.

25      Ms. Cadeddu?

1        MS. CADEDDU:  Your Honor, I would just reiterate

2   what we talked about before and remind the Court about

3   particularly Mr. Redd's statement.

4        THE COURT:  Okay.  Thank you.

5        We have a Guideline range of 360 months to life in this

6   case, with a statutory maximum total of 45 years.

7        And although I agree that, again, as Mr. Jonas stated,

8   Mr. Abdulqader, you weren't convicted for singing.  You

9   weren't convicted for freedom of expression.  You were

10  convicted because the jury found that you were supporting

11  Hamas.  The evidence supports that finding by the jury.  There

12  is lots of evidence that was introduced that indicated you and

13  the Holy Land Foundation and your co-Defendants were involved

14  in supporting Hamas, and you were doing this through the form

15  and through the guise of this charitable work that the HLF was

16  supposedly involved in, it was involved in.  But it was doing

17  that ultimately to support Hamas.

18        That being said, certainly the evidence supports the

19  jury's verdict of guilty against you in this case on all three

20  counts, but with that being said, you are clearly not in the

21  same category as the three Defendants that were sentenced this

22  morning.  All of them were leaders.  They received

23  enhancements for their role in the offense.  They helped

24  create HLF.  They were the leaders that were disbursing the

25  money, dealt with all of the money.  You were a fundraiser,

1    part time fundraiser.

2         You held a full time job outside of HLF and outside your

3    Hamas activities, which those Defendants didn't.  You weren't

4    involved of course in as much fundraising as they were in

5    dealing with as much money as they did, so I think a sentence

6    well below theirs is appropriate in this case.

7         Not a departure, but I am going to find that a variance

8    is appropriate in this case.  But considering the 3553(e)

9    factors and then the factors that I have just stated in terms

10   of your ultimate role in the offense, even though I didn't

11   give you an adjustment for mitigating role, clearly your

12   involvement is quite a bit less than the other Defendants.

13        It will be the judgment of the Court that you be

14   sentenced to custody of the U.S. Bureau of Prisons for a term

15   of 20 years.  So that will be 20 years on Count 22, 10 years

16   on Count 11, and 15 years on Count 1.  That will all run

17   concurrently, so you will have a total sentence of 20 years.

18        There will be a three-year term of supervised release

19   following your release from custody.

20        I will not order a fine in light of the length of the

21   sentence and your financial circumstances.

22        Restitution doesn't apply.

23        And there is a $100 per count mandatory special

24   assessment that has to be imposed in each case.  That will be

25   imposed in your case.

1    Following your release from custody, you will be on this

2  supervised release for a period of three years.  You have

3  certain conditions that you have to follow.  Your Probation

4  officer will explain these to you, but among the conditions

5  are that you not commit any other violations of law, whether

6  it be federal, state, or local law; that you not illegally

7  possess or use any type of a controlled substance.

8    Cooperate in the collection of DNA, as directed by your

9  Probation officer.

10   Do not possess a firearm, ammunition, destructive device,

11  or any other dangerous weapon.

12   Provide to your Probation officer any requested financial

13  information that they require from you.

14   I think I already mentioned the $300 special assessment.

15   And lastly following your release from custody, report in

16  person to the Probation Office in the district where you are

17  released.  Report within 72 hours of your release to the

18  Probation Office there.  They will get you started on this

19  supervised release and go over these conditions of supervised

20  release with you.

21   I will accept the findings of the Probation Office as

22  contained in the presentence report.  I may have already done

23  that, but if I haven't.  I adopt those as findings of the

24  Court in this case.

25   And I need to advise you, Mr. Abdulqader, that you have

1    the right to appeal both the jury verdict finding you guilty,

2    as well as the decisions and the sentence I have imposed here

3    today.

4        If you don't have the means to hire an attorney to

5    represent you an appeal, we will appoint an attorney to

6    represent you at no cost to you.  And you can speak with

7    Ms. Cadeddu about exercising your right of appeal.

8        You will be entitled to a free copy of the transcript of

9    the trial, as well of this hearing and any other hearings that

10   we have held, for your use in appeal.

11       Ms. Cadeddu, anything else that we need to address?

12           MS. CADEDDU:  No, Your Honor.

13           THE COURT:  Did you want the same request as far as

14   that he stay here during --

15           MS. CADEDDU:  Actually I do.  I would I apologize

16   for that, Your Honor.  I would like to request that he stay

17   here pending appeal so that I can work with him on the appeal.

18           THE COURT:  And we will make that recommendation to

19   the Bureau of Prisons.

20       And I saw Mr. Jonas stand up, and I forgot to state

21   forfeiture language.

22       Mr. Abdulqader, in accordance with the jury's verdict,

23   there is also a forfeiture finding against you.  So part of

24   the judgment will be a judgment against you in the amount of

25   $12,400,000 that the jury found, and I am ordering your

1    interest forfeited in any of that money that was seized.  And

2    we will issue a separate judgment as well as make it a part of

3    the judgment in this case.  You will be jointly and severally

4    liable with the other co-Defendants that were found guilty on

5    the money laundering count.

6            MR. JUNKER:  Judge, I am sorry to interrupt.  Again,

7    this was a money judgment, not for the assets actually seized,

8    and he would be jointly and severally liable --

9            THE COURT:  I think I stated jointly and severally,

10   and it is a money judgment.

11        Ms. Cadeddu, anything else we need to address?

12           MS. CADEDDU:  Just briefly, Your Honor.  I know the

13   Court already said that you don't make recommendations for

14   final placement.  I just would request it anyway.  I feel like

15   I need to.  The Bureau of Prisons says in its policy

16   statements that it takes that into account, and the Defendant

17   who doesn't receive that recommendation is disadvantaged.  So

18   I ask for placement or assignment to a facility in the

19   Dallas/Fort Worth area so Mr. Abdulqader can be near his

20   family.

21           THE COURT:  And again, my policy is I don't make

22   that recommendation in the absence of a compelling

23   circumstances.  I don't find those here.  And so I will just

24   leave that decision to the Bureau of Prisons.

25           MS. CADEDDU:  I understand.

1          THE COURT:  Anything else?

2          MS. CADEDDU:  No, Your Honor.

3          THE COURT:  Anything else from the Government?

4          MR. JONAS:  No, sir.

5          THE COURT:  Mr. Abdulqader, you are remanded to the

6   custody of the Bureau of Prisons to serve your sentence.  Good

7   luck to you.

8                     (End of hearing.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts          06/20/2009

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25